**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOYCE BEATTY,

                    *Plaintiff*,

          v.                                              No. 25 Civ. 4480 (CRC)

DONALD J. TRUMP *et al.*,

                    *Defendants*.

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR TEMPORARY RESTRAINING ORDER**
**AND FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND .......................................................... 4

LEGAL STANDARD ............................................................................................. 10

ARGUMENT .......................................................................................................... 10

I.     Plaintiff Is Likely to Succeed on the Merits of Her Claims Underlying Her Motion for TRO: Her Exclusion from Board Full Participation in Board Decision-making Is Unlawful. ............................................................................................................. 12

     A.     Plaintiff Has the Right and Obligation by Statute to Vote on Board Decisions. .................................................................................................. 12

     B.     Plaintiff Has the Right to Be Heard at Board Meetings ............................... 17

     C.     Plaintiff Has a Right to Information Necessary to Discharge Her Duties as a Trustee .......................................................................................................... 18

II.     Plaintiff Is Likely to Succeed on Her Claims Underlying Her Motion for Preliminary Injunction: The Closure, Demolition, and "Rebuilding" of the Kennedy Center Are Unlawful ............................................................................................................. 20

III.     Emergency Relief Is Necessary to Prevent Irreparable Harm. ................................... 27

     A.     The Urgent Need for a Limited TRO Prior to March 16, 2026. .................... 27

     B.     The Urgent Need for Preliminary Injunctive Relief to Prevent Irreparable Harm from Steps to Close the Center or Demolition in Advance of Rebuilding. ................................................................................................... 29

IV.     The Balance of Equities and Public Interest Favor a Limited TRO and Subsequent Preliminary Injunction. ............................................................................................. 35

CONCLUSION ...................................................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Airgas, Inc. v. Air Prods. & Chemicals, Inc.*, 8 A.3d 1182 (Del. 2010) ...................................... 16

*Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018) ................................... 32

*Benedict v. Amaducci*, No. 92 Civ. 5239 (KMW),
    1993 WL 87937 (S.D.N.Y. Mar. 22, 1993) ....................................................................... 18, 20

*Birnbaum v. Birnbaum*, 73 N.Y.2d 461 (N.Y. 1989)..................................................................... 26

*Brennan Ctr. v. Dep't of Com.*, 498 F. Supp. 3d 87 (D.D.C. 2020) ............................................ 29

*Church v. Biden*, 573 F. Supp. 3d 118 (D.D.C. 2021) ................................................................. 10

*Cummock v. Gore,* 180 F.3d 282 (D.C. Cir. 1999) ...................................................................... 17

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
    286 F. Supp. 3d 96 (D.D.C. 2017) .................................................................................... 29

*Equitable Tr. Co. v. Schwebel*, 32 F. Supp. 241 (E.D. Pa. 1940),
    *aff'd*, 117 F.2d 738 (3d Cir. 1941) ................................................................................ 19, 20

*Holt v. Coll. of Osteopathic Physicians & Surgeons*, 394 P.2d 932 (Cal. 1964)......................... 21

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .............................. 28

*Nat'l Shooting Sports Found., Inc. v. Jones*, 840 F. Supp. 2d 310 (D.D.C. 2012),
    *aff'd*, 716 F.3d 200 (D.C. Cir. 2013)............................................................................... 16

*Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1 (D.D.C. 2025) ................................... 31

*National Trust for Historic Preservation in the United States v. National Park Service*, No. CV
    25-4316 (RJL), 2026 WL 533420 (D.D.C. Feb. 26, 2026)...................................................... 27

*NLRB v. Amax Coal Co.*, 453 U.S. 322 (1981)....................................................................... 5, 26

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)............................................................ 28

*Pac. Realty Tr. v. APC Invs., Inc.*, 651 P.2d 163 (Or. App. 1982) ............................................. 16

*Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1 (D.D.C. 1997) ...................... 32

*Protect Democracy Project, Inc. v. DOJ*, 498 F. Supp. 3d 132 (D.D.C. 2020)............................ 28

*Rawat v. Comm'r of Internal Revenue*, 108 F.4th 891 (D.C. Cir. 2024) .................................... 16

*Rhode Island v. Trump*, 155 F.4th 35 (1st Cir. 2025) ................................................................ 31

*Richardson v. Clarke*, 364 N.E.2d 804 (Mass. 1977).................................................................. 17

*Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676 (7th Cir. 2012) ............................... 32

*United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693 (7th Cir. 1982)................. 34

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ............................. 26

*Wilson v. Bd. of Directors of City Trusts*, 188 A. 588 (Pa. 1936) .......................................... 19, 20

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 10

*Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287 (11th Cir. 2024) .......................... 32

**Statutes**

2 U.S.C. § 1901a(a)(2) ........................................................................................................... 14

2 U.S.C. § 4711(c)(3) ............................................................................................................. 14

2 U.S.C. § 803(a)(1)(E) .......................................................................................................... 13

2 U.S.C. § 806(i)(2)(A) ........................................................................................................... 13

7 U.S.C. § 1505(a)(2)(A) ........................................................................................................ 14

7 U.S.C. § 1627b(f)(3) ............................................................................................................ 13

10 U.S.C. § 2113a(b) .............................................................................................................. 15

10 U.S.C. § 2113a(b)(5) ......................................................................................................... 15

10 U.S.C. § 2902(b)(9) ........................................................................................................... 13

12 U.S.C. § 2160(d)(1) ........................................................................................................... 13

12 U.S.C. § 5321(b) ................................................................................................................ 13

15 U.S.C. § 78qq(b)(1)(C) ...................................................................................................... 13

15 U.S.C. § 657u(b)(2) ........................................................................................................... 13

15 U.S.C. § 4102(b) ................................................................................................................ 15

16 U.S.C. § 460aaa-7(b)(1)(A) ............................................................................................... 14

16 U.S.C. § 583j-1(a) ............................................................................................................. 15

16 U.S.C. § 1262(c) ................................................................................................................ 14

20 U.S.C § 42(b) ..................................................................................................................... 17

20 U.S.C.§ 42(b)(2) ................................................................................................................ 17

20 U.S.C. § 76h ................................................................................................................... 2, 23

20 U.S.C. §§ 76h(a)-(b) ...................................................................................................... 6, 12

20 U.S.C. § 76h(a)(1) ............................................................................................................. 21

20 U.S.C. § 76i(a) ................................................................................................................... 24

20 U.S.C. § 76i(b) ............................................................................................................... 6, 24

20 U.S.C. § 76i(c) ..................................................................................................................... 6

20 U.S.C. § 76i(c)(4) .............................................................................................................. 24

20 U.S.C § 76j ......................................................................................................................... 22

20 U.S.C § 76j(a)(1)(H) .......................................................................................................... 23

20 U.S.C. §§ 76j-k .................................................................................................................... 5

20 U.S.C. § 76*l* .................................................................................................................... 16

20 U.S.C. 76*l*(b) .................................................................................................... 21

20 U.S.C. § 76m ..................................................................................................... 24

20 U.S.C. § 76q ....................................................................................................... 4

20 U.S.C.§ 76h(a)(1) ............................................................................................... 5

20 U.S.C.§ 76i(c)(3) ............................................................................................... 4

20 U.S.C.§ 76j ........................................................................................................ 2

20 U.S.C.§ 76j(a)(1)(A) .......................................................................................... 5

20 U.S.C.§ 76j(a)(1)(G) ..................................................................................... 5, 23

20 U.S.C.§ 76j(a)(2)(F) ........................................................................................... 5

20 U.S.C.§ 76j(b)(1) ............................................................................................... 4

20 U.S.C.§ 76l(b) .................................................................................................... 5

20 U.S.C.§§ 76h(a)-(b) ........................................................................................... 5

22 U.S.C. § 2511(c)(3) ........................................................................................... 15

22 U.S.C. § 2511(e) ............................................................................................... 14

22 U.S.C. § 7302(b)(2)(B) ..................................................................................... 14

22 U.S.C. § 7652(c)(2) ........................................................................................... 14

28 U.S.C. § 991(a) ................................................................................................. 15

40 U.S.C. § 8722 ................................................................................................... 24

40 U.S.C. §§ 9101 et seq. ...................................................................................... 24

42 U.S.C. § 12651a(a)(3) ....................................................................................... 15

42 U.S.C. § 17352(c)(4) ......................................................................................... 15

42 U.S.C. § 283r(d) ............................................................................................... 15

42 U.S.C. § 2996d(a) ............................................................................................. 15

46 U.S.C. § 51312(b)(1)(F) .................................................................................... 15

47 U.S.C. § 1423(b)(1)(B) ...................................................................................... 14

49 U.S.C. § 117(b)(4) ............................................................................................. 14

49 U.S.C. § 24302(a)(1)(B) .................................................................................... 14

49 U.S.C. § 24712(a)(2)(B) .................................................................................... 14

49 U.S.C. § 24905(a)(1)(D) .................................................................................... 14

54 U.S.C. § 101112(a) ............................................................................................ 15

54 U.S.C. § 306108 ................................................................................................ 24

John F. Kennedy Center Parking Improvement Act of 1997,

    Pub. L. No. 105–95, 111 Stat. 2148 (1997) ....................................................... 6

John F. Kennedy Center Reauthorization Act of 2012,
Pub. L. No. 112-131, 126 Stat. 377 (2012) .............................................................. 6

**Regulations**

45 C.F.R. § 2101.1(a)(1) ............................................................................................ 24

**Restatements**

Restatement (Second) of Trust § 170(1) ................................................................... 26

Restatement (Third) of Trusts § 39 ........................................................................... 17

Restatement (Third) of Trusts § 76 ........................................................................... 16

Restatement (Third) of Trusts § 77 ........................................................................... 18

Restatement (Third) of Trusts § 81 ........................................................................... 18

Restatement (Third) of Trusts § 94 ........................................................................... 21

**Other Authorities**

American Bar Association, *Model Nonprofit Corporation Act: Official Text with Official Comments and Statutory Cross-references* § 8.04 cmt. 3 (4th ed. 2022) ................................. 13

*Black's Law Dictionary* (12th ed. 2024) .................................................................... 13

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 27, 2025, at 3:14 ET) .................... 25

G. Bogert, Trusts & Trustees § 584 (Supp. rev. 2d ed. 1992) ..................................... 19

H.R. Rep. No. 103-453, pt. 1, at 11 (1994) ............................................................... 13

*President Trump Signs an Executive Order*, July 31, 2025, YouTube (July 31, 2025) ............... 34

*President Trump Visits the Kennedy Center and Makes an Announcement*, YouTube (Aug. 13, 2025 at 13:54-14:10) ........................................................................................ 25

## INTRODUCTION

This is a case about the ongoing desecration and impending destruction of a cherished national monument—the John F. Kennedy Center for the Performing Arts—in violation of the governing federal statute.  Shortly after President Kennedy's death, Congress designated the performing arts center by law as a "living memorial" and the sole national monument dedicated to the late President.  For decades, a bipartisan Board of Trustees has governed the Kennedy Center, and this national treasure has served as a crown jewel of American culture in the nation's capital.

But all that changed after President Trump took office a year ago.  In February 2025, President Trump fired Board members and installed himself as Chairman, a role never held by a President.  In December 2025, President Trump's handpicked Board members purported to rename the Kennedy Center after Trump and placed Trump's name above President Kennedy's on the building's facade—a naked violation of the statutes that enshrined the center as a living memorial to John F. Kennedy.  As a result, ticket sales plummeted, and numerous artists canceled performances to protest the renaming.  On February 1, 2026, President Trump abruptly announced on social media that he will be shuttering the Kennedy Center for two years starting this July and tearing it down to replace it with something "brand new."

The announcement abruptly abandoned the Kennedy Center's operating plans, under which the Center would conduct routine repairs and capital maintenance *without* closing—let alone closing for an astonishing *two years*. The sudden closure appears designed to hide the embarrassing flight of patrons and performances precipitated by President Trump's turning the Kennedy Center into a personal vanity project.  Meanwhile, despite President Trump's claim that he will seek Board approval before effectuating the shutdown, the Kennedy Center is already plowing ahead with steps to bar its doors come this July, before the Board has had an opportunity

1

to weigh in.

Even if the Board ultimately approves the shutdown, a decision to turn the Kennedy Center into a lifeless husk for two years—without any congressional approval—will violate the Board's statutory mandate to "maintain and administer" the Kennedy Center as "a *living* memorial" to President Kennedy, 20 U.S.C. § 76h (emphasis added), and its mandatory statutory duties to host artistic functions, *id*. § 76j. Meanwhile, only Congress may authorize the kind of demolition and rebuilding of the Center that President Trump has unliterally announced.

Plaintiff Joyce Beatty represents Ohio's Third District in the House of Representatives. By virtue of her position in Congress, Plaintiff serves as an *ex officio* member of the Kennedy Center Board of Trustees. When the Board voted to unlawfully rename the Kennedy Center for President Trump, Plaintiff tried to oppose the change but was improperly prevented from speaking. She then filed this lawsuit, challenging the unlawful effort to change the Center's name and to prevent President Trump and his allies from unlawfully excluding Plaintiff for participating in future board meetings. The Board next meets on March 16, 2026, at the White House, where President Trump will seek ratification of his unlawful plans to shut down the Kennedy Center for two years and tear it down to build something "new." Plaintiff Beatty has not been invited to that Board meeting, nor provided any materials supporting the proposed closure and demolition, in clear violation of her rights as a member of the Board.

Plaintiff brings this combined motion for two discrete forms of emergency relief: (1) An immediate temporary restraining order (TRO) to permit Plaintiff to participate **in the upcoming Board meeting on March 16, 2026** and ensure Plaintiff's access to information regarding Defendants' plans; and (2) a preliminary injunction (PI) to halt the ongoing efforts to close and/or demolish the Kennedy Center.

*First*, **Defendants intend to hold the Board meeting at the White House on March 16**, 2026, where the Board will discuss and vote on the planned closure and demolition. Defendants muted and thereby prevented Plaintiff from participating in the December 2025 meeting. There is every reason to think they will do so again on March 16. Moreover, as of the date of this motion, while others have been invited to the meeting, Congresswoman Beatty has not. **Plaintiff requests the Court immediately issue a TRO to prevent Defendants from blocking her from participating in the meeting.** She further requests that the Court order Defendants to provide her documents regarding the Center's closure that are necessary for her to perform her duties as a trustee. Without a TRO, Plaintiff will suffer irreparable harm: She will be unable to participate in the meeting, with the information she needs, to act as a prudent fiduciary.

*Second*, in the interests of judicial economy and cognizant of the extraordinary nature of a TRO, Plaintiff has limited her request for a TRO to the relief necessary to address the imminent March 16, 2026, meeting. Plaintiff separately requests the Court issue a preliminary injunction preventing Defendants from undertaking further irreparable steps toward effectuating the Center's closure—such as firing employees and canceling contracts—or any steps toward tearing down or "rebuilding" the structure, before this Court has the opportunity to reach a final resolution in this case.

It bears emphasis: President Trump's imminent effort to close and tear down the Center are entirely unlawful. There is an urgent need for a preliminary injunction, although the irreparable harm does not hinge on the same March 16, 2026, drop-dead deadline that necessitates immediate relief through a TRO. As accompanying declarations demonstrate, once the Kennedy Center implements a winddown and closure, it will be extremely difficult to revive the institution, even if the Court orders Defendants to do so later. Performances will move elsewhere, staff will depart,

3

and the Center's reputation will be harmed.  Indeed, Defendants have already announced the closure to subscribers, and they will undertake other actions to prepare for the July 7, 2026, closure that will cause the Center irrevocable harm in the interim.  As the accompanying declarations demonstrate, these irreparable harms are expected to accelerate in April, when the Center will begin losing staff and access to programming as a result of its stated intent to close.  The Court should put a stop to those unlawful actions, which are ongoing and violate the Kennedy Center's statutory mandate.

The Court should also, at a minimum, enjoin Defendants from physically destroying the Center and require notice to the Court well before any construction begins.  The President's tactics with respect to the Kennedy Center are unfortunately reminiscent of his previous demolition of the East Wing of the White House.  There, President Trump misled Congress and the public regarding his construction plans and brazenly destroyed the People's house to build himself a gilded ballroom.  Based on his public comments about reusing "the steel" and "some of the marble" from the Kennedy Center, and that it would be "brand new," there is every reason to believe that past will be prologue.  The Court should not wait until the bulldozers are at the door.  It should issue an order that preserves the status quo until the rule of law—not unilateral executive action—determines the Kennedy Center's ultimate fate.

## LEGAL AND FACTUAL BACKGROUND

**1.**  According to statute, the John F. Kennedy Center for the Performing Arts "shall be the sole national memorial to the late John Fitzgerald Kennedy within" Washington D.C.  20 U.S.C. § 76q.  "No additional memorials or plaques in the nature of memorials shall be designated or installed . . . ."  *Id*. § 76j(b)(1). The statute prohibits displaying even acknowledgements of private contributions on the building's exterior.  *See id.* § 76i(c)(3).

Congress charged "the Trustees of the John F. Kennedy Center for the Performing Arts"—the Board—with "maintain[ing] and administer[ing]" the Center as "a living memorial to John Fitzgerald Kennedy." *Id.* § 76h(a)(1). The Board must assure that the Center presents "classical and contemporary music, opera, drama, dance, and other performing arts from the United States and other countries." *Id.* § 76j(a)(1)(A). The Board is "composed of" thirty-six general trustees appointed by the President for six-year terms, and twenty-three *ex officio* trustees, including cabinet secretaries and members of Congress. *Id.* §§ 76h(a)-(b). The statute makes no distinction between the rights and obligations of *ex officio* and appointed trustees. Instead, the statute always refers to "the Board" collectively and charges "the Board" with "all the usual powers and obligations of a trustee in respect of all trust funds administered by it." *Id.* § 76l(b); *see also NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."). Nowhere does the statute say or suggest that its *ex officio* members have any fewer rights — including the right to vote—than members appointed by the President.

The Board's duties and powers are detailed in the statute. *Id.* §§ 76j-k. The Board may "plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility," *id.* § 76j(a)(1)(G), but "[n]o change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior," *id.* § 76j(a)(2)(F).

In the past, significant modifications to the Kennedy Center have occurred with Congressional approval. For example, in 1997, Congress amended the statute to authorize the

building of a parking garage and certain site improvements. *See* John F. Kennedy Center Parking Improvement Act of 1997, Pub. L. No. 105–95, 111 Stat. 2148 (1997) (codified at 20 U.S.C. § 76i(b)). Similarly, in 2012, Congress amended the statute to authorize an expansion project. *See* John F. Kennedy Center Reauthorization Act of 2012, Pub. L. No. 112-131, 126 Stat. 377 (2012) (codified at 20 U.S.C. § 76i(c)).

**2.** In February 2025, President Trump ousted members of the Kennedy Center's Board of Trustees; installed handpicked appointees in their place; named himself to the Board; had himself elected as Chairman; and replaced the Kennedy Center's existing President with Defendant Richard Grenell, who lacks any relevant experience, to lead the Kennedy Center. *See* Declaration of Congresswoman Joyce Beatty ("Pl.'s Decl.") ¶¶ 4-6.

In contrast to the statutes governing other federal boards, *see infra* pp. 12-15, the Kennedy Center's organic statute does not distinguish between the powers of a general trustee and an *ex officio* trustee. 20 U.S.C. §§ 76h(a)-(b); *see also* Pl.'s Decl., Ex. A at 5; Ex. B at 32-33 (2021 and January 2025 bylaws mirroring the statute). In recent memory, votes at the Kennedy Center have also largely been non-controversial and unanimous. *See* Pl.'s Decl. ¶ 6. But in May 2025, President Trump's handpicked Board purported to amend the bylaws to strip *ex officio* members of their ability to vote in meetings. *See id.* ¶ 8, *see also id.*, Ex. C at 5. ("Board shall be composed of ex officio non-voting members and general trustee voting members.").

On December 18, 2025, the Board held a meeting in Florida at the home of Andrea Wynn, the wife of a casino mogul and Republican donor, whom Defendant Trump installed on the Board. Pl.'s Decl. ¶¶ 9-10. Plaintiff attended the meeting virtually. *Id.* ¶ 11. At the end of the meeting, without any prior notice, Defendant Trump's loyalists abruptly announced that they had news they would like to share with the Board: the Kennedy Center would now be renamed after Donald

Trump. *Id.* ¶ 11. They then purported to solicit feedback, and some Board members voiced their support. *Id.* ¶ 13.

Plaintiff had previously been unmuted during the meeting, *id.* ¶ 11, but when she began speaking, identified herself, and indicated that she had a concern about the proposed renaming, she quickly found herself muted, *id.* ¶ 12. Plaintiff repeatedly attempted to unmute herself. She found that she was unable to do so. *Id.* Instead, Plaintiff received electronic messages that she would *not* be unmuted, and therefore she could not participate in the meeting. *Id.* At the end of the meeting, members of the Board falsely declared that the vote had been unanimous. *Id.* ¶ 13. The next day, workers installed pre-fabricated signage on the building's front portico. *Id.* ¶ 14; *see also* Declaration of Kyle Freeny ("Freeny Decl."), Ex. A at 2.



Plaintiff then filed this lawsuit challenging the unlawful renaming. *See* Compl., ECF No. 1. The complaint alleges that the purported renaming of the Kennedy Center for Donald Trump

violated the plain text of the Center's organic statute.

**3.**  The unlawful renaming engendered significant criticism and caused artists and patrons to flee.  As a result of President Trump's takeover of the Board, public reporting already indicated that nearly half of the tickets were going unsold—a stark decline for the once popular venue.  *See* Freeny Decl., Ex. B at 3.  After the name change, the Wall Street Journal reported that an analysis of a week's ticket sales from 2026 now showed an even starker 70% drop from the three prior years. *See* Freeny Decl., Ex. C at 4.  Meanwhile, following the name change, scores of artists canceled upcoming performances, such as: Seth Parker Woods and Hilary Hahn, Philip Glass, Renée Fleming, Vocal Arts DC, Brentano Quartet with Hsin-Yun Huang, Seattle Children's Theatre, The Martha Graham Dance Company, Sonia De Los Santos, Béla Fleck, Stephen Schwartz, Chuck Redd, The Cookers, Kristy Lee, Doug Varone and Dancers, Magpie, Low Cut Connie, Balún, and Rhiannon Giddens. *See* Freeny Decl., Ex. D.  And in early January 2026, the Washington National Opera announced that it would leave the Kennedy Center, which had been its home since 1971.  *Id.*  Many of these performers made clear that they canceled their performances due to Defendant's changes at the Kennedy Center, including the renaming.  *Id.*

On February 1, 2026, President Trump announced on social media that the Kennedy Center would close for approximately two years for "Construction, Revitalization, and Complete Rebuilding." Freeny Decl., Ex. E.  According to President Trump, his decision was based on "a one year review of the Trump Kennedy Center, that has taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants."  *Id.*  He subsequently said "I'm not ripping it down," but inconsistently stated that the project would involve using "the steel" and "some of the marble" from the current building, and that the building would be "brand new." Freeny Decl., Ex. F at 2-3.

President Trump's February 1, 2026, statement asserted that his plans are "totally subject to Board approval," but the announcement came without any prior notice to or deliberation by the Board, without any presentation of plans, analyses, or funding information to the trustees, and without seeking the approval of any necessary authorities, such as the National Capital Planning Commission. *See* Am. Compl. ¶¶ 54-66.

On February 20, 2026, Plaintiff sent a formal letter to President Trump and Defendant Grenell requesting information necessary for her to perform her fiduciary duties as a trustee, including: a description, plans, and documentation of the intended renovations, construction, and/or "rebuilding;" details regarding funding for the proposed project; a list of all performance contracts the Center has in place for the two-year period of closure and how they will be addressed; a list of all experts who were consulted and any reports they produced; and any analysis conducted on the purported need to close the Center during the period of renovation and documentation related to the costs of such closure. *See* Pl.'s Decl. ¶ 23 & Ex. D at 2-3. The letter further asked for a timeline of the Board's considerations of the plan announced by President Trump as well as a timeline for securing any required approvals. Ex. D at 2-3. Finally, the letter asked for assurances that Plaintiff and other *ex officio* members will be permitted to participate in the decision-making process and that no steps will be taken to effectuate the shutdown of the Kennedy Center without 60 days' notice, which time would allow Plaintiff to seek judicial review. *Id.*

The deadline Plaintiff specified—February 27, 2026—has passed and as of this filing, Defendants have provided no substantive response. Pl.'s Decl. ¶ 24. In the meantime, Defendants appear to be forging ahead with their plans regardless of what anyone has to say: on February 24, 2026, the Kennedy Center sent out an email communication to patrons with the subject "This is YOUR chance!" and stating that it "will be temporarily closing our doors after July 7th for a

massive, much-needed revitalization, which will . . . revolutionize the building." Freeny Decl., Ex. G at 2.

Plaintiff has recently learned that President Trump will hold a meeting on March 16, 2026 at the White House, in which the Board will vote on the Center's closure and renovation. Pl.'s Decl. ¶ 26. Other *ex officio* members have received an invitation to that meeting. Declaration of Todd Valentine ("Valentine Decl.") ¶ 3. Plaintiff has not received an invitation, and Defendants have not responded to her request regarding how she can RSVP to attend the meeting. *Id.* ¶¶ 2, 5-6.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief." *Church v. Biden*, 573 F. Supp. 3d 118, 132 (D.D.C. 2021).

## ARGUMENT

This case will ultimately call upon the Court to rule on the legality of (i) President Trump's unlawful effort to rename this the Kennedy Center after himself; (ii) his attempt to shutter and demolish the Kennedy Center, which is supposed to be a living memorial to its namesake; and (iii) his attempt to silence any dissent from *ex officio* Board trustees seeking to exercise their fiduciary duties. Plaintiff seeks two separate forms of emergency relief necessary to preserve the statute quo and prevent imminent, irreparable harm that will otherwise occur while this litigation proceeds.

***Motion for Temporary Restraining Order.*** Plaintiff seeks a temporary order, in advance of the Board meeting scheduled to be held on **March 16, 2026**, to prevent Defendants from excluding her from fully participating in the Board's discussion of President Trump's plan to close and demolish the Kennedy Center—as they excluded her from participating in, seeking to dissuade, and dissenting from, their decision to unlawfully rename the Kennedy Center after President Trump. As described below, Plaintiff is likely to succeed on the merits of her claim that she entitled to full participation—including the ability to voice her dissent, the right to vote, and the right to access basic documentation necessary to make the foregoing rights meaningful—pursuant to the Kennedy Center's organic statute and well-establish principles of trust law.

It bears emphasis: Defendants have needlessly brought this on themselves. President Trump announced the closure without consulting the Board. In response, Plaintiff requested information about the closure and advanced warning about the Board meeting, so that she could proceed to this Court to secure her rights in an ordinary fashion. But aside from acknowledging receipt, Defendants never responded to Plaintiff—and instead swiftly scheduled a special meeting of the Board for March 16, 2026 to which she has not been invited. Absent emergency intervention from this Court, Plaintiff will suffer irreparable harm to her ability to function as a trustee.

***Preliminary Injunction.*** Plaintiff has limited her emergency request for a TRO to the relief necessary to allow her participation at the upcoming March 16, 2026, meeting. But the reality is that Defendants' have *already* begun implementing President Trump's announcement about closing the Center for "rebuilding"—even though the Board has not yet even considered, let alone approved, the plan. And as described further below and in the attached declarations, these steps implementing the closure will become irrevocable *before* the announced closure date of July 7, 2026. Accordingly, Plaintiff simultaneously moves for preliminary injunctive relief related to the

planned closure and rebuilding—which are categorically unlawful in the absence of Congressional approval—to ensure that relief can be granted before any irrevocable actions are taken. To be blunt: The Court should not wait until the Kennedy's Center inability to operate has become a *fait acompli* and the bulldozers appear at the front door before issuing an order averting irreparable harm and preserving the status quo to allow Plaintiff's meritorious challenges to be fully heard.

**I.    Plaintiff Is Likely to Succeed on the Merits of Her Claims Underlying Her Motion for TRO: Her Exclusion from Board Full Participation in Board Decision-making Is Unlawful.**

Starting with the claim that underlies Plaintiff Beatty's request for an emergency TRO in advance of the March 16, 2026, meeting: Defendants may not lawfully preclude her from full participation in Board decision making. The Kennedy Center's organic statute makes Plaintiff an equal member of the Board and invests her with the ordinary rights and duties of a trustee. Participation in decisions—particularly decisions as momentous as a closure and "Complete Rebuilding" of the Kennedy Center—are core to her duties. As a necessary corollary, Plaintiff possesses a corresponding right, as a trustee, to access the materials necessary to meaningfully evaluate major decisions pending before the Board, including plans, analyses, and budgets underlying the extraordinary proposal to shutter and rebuild the Kennedy Center.

**A.    Plaintiff Has the Right and Obligation by Statute to Vote on Board Decisions.**

The statute provides that the Board shall be composed of both *ex officio* members such as Plaintiff and presidentially appointed trustees. 20 U.S.C. § 76h(a)-(b). It does not anywhere differentiate the rights and obligations of trustees based on how they were appointed. The entire "Board," instead, is charged with the "all the usual powers and obligations of a trustee." *Id.* § 76l(b).

This comports with the default legal rule, which is that *ex officio* members are full, voting

12

members of a board.  *See, e.g.*, *Ex officio*, *Black's Law Dictionary* (12th ed. 2024) ("[A]n ex officio member is a voting member unless the applicable governing document provides otherwise."); Restatement (Third) of Trusts § 81(1) ("If a trust has more than one trustee, except as otherwise provided by the terms of the trust, each trustee has a duty and the right to participate in the administration of the trust."); American Bar Association, *Model Nonprofit Corporation Act: Official Text with Official Comments and Statutory Cross-references* § 8.04 cmt. 3 (4th ed. 2022) ("The term 'ex officio' does not include the concept that the position is nonvoting.  If an ex officio director is to be nonvoting, that must be provided for expressly.").  And it comports with the Kennedy Center's legislative history:  In 1994, Congress added several new *ex officio* trustees to the Board.  In the process, Congress expressly stated that the "trustees who serve by virtue of their office . . . ex officio . . . are permitted to vote."  H.R. Rep. No. 103-453, pt. 1, at 11 (1994).

The Kennedy Center statute's vesting of all trustees—*ex officio* and presidentially-appointed—with the same powers and obligations, contrasts with circumstances throughout the United States Code in which Congress expressly differentiates between voting and non-voting members of other bodies. *See, e.g.*, 2 U.S.C. § 803(a)(1)(E) ("The Director of the Board, who shall serve as a nonvoting member."); 2 U.S.C. § 806(i)(2)(A) ("[T]he Director . . . shall serve as a nonvoting member [of the Board]."); 7 U.S.C. § 1627b(f)(3) ("The Board shall be composed of 7 voting members . . . and 2 nonvoting members . . . ."); 10 U.S.C. § 2902(b)(9) ("The Executive Director of the Council . . . shall be a nonvoting member."); 12 U.S.C. § 2160(d)(1) ("The board of directors shall be composed of nine voting members and one nonvoting member."); 12 U.S.C. § 5321(b) ("The Council shall consists of . . . [v]oting members [and] . . . [n]onvoting members . . . ."); 15 U.S.C. § 657u(b)(2) ("[T]he remaining members shall be nonvoting members who shall serve in an advisory capacity on the Committee."); 15 U.S.C. § 78qq(b)(1)(C) ("The members of

the Committee shall [include] three non-voting members."); 16 U.S.C. § 460aaa-7(b)(1)(A) (specifying that the Grand Island Advisory Commission would include "[t]hree non-voting members"); 16 U.S.C. § 1262(c) ("The Chair of the advisory committee shall . . . serve as a non-voting member."); 22 U.S.C. § 2511(e) ("A majority of the voting members of the Council shall constitute a quorum for the purposes of transacting any business."); 22 U.S.C. § 7302(b)(2)(B) ("The nonvoting members shall consist of the members appointed by departments and agencies designated under paragraph (1)(B) and shall act in an advisory capacity."); 22 U.S.C. § 7652(c)(2) ("The Panel shall be convened and chaired by the Global AIDS Coordinator, who shall serve as a nonvoting member."); 47 U.S.C. § 1423(b)(1)(B) ("The Assistant Secretary shall appoint 1 non-voting member to the Interoperability Board."); 49 U.S.C. § 117(b)(4) ("The Executive Director of the National Surface Transportation and Innovative Finance Bureau shall serve as a nonvoting member of the Council."); 49 U.S.C. § 24302(a)(1)(B) ("The Chief Executive Officer of Amtrak, who shall serve as a nonvoting member of the Board."); 49 U.S.C. § 24712(a)(2)(B) ("The Committee may invite and accept other non-voting members to participate in Committee activities, as appropriate."); 49 U.S.C. § 24905(a)(1)(D) ("The Commission shall be made up of non-voting representatives of freight and commuter railroad carriers authorities using the Northeast Corridor selected by the Secretary.").

The Kennedy Center's statute also contrasts sharply with sections of the United States Code in which Congress expressly specifies that *ex officio* members are non-voting. *See, e.g.*, 2 U.S.C. § 1901a(a)(2) ("The Chief of Capitol Police shall serve in an ex-officio capacity and be a non-voting member of the Board."); 2 U.S.C. § 4711(c)(3) ("[T]he chairman and ranking minority member of the full committee may only serve as non-voting, ex officio members on an investigative subcommittee."); 7 U.S.C. § 1505(a)(2)(A) ("The manager of the Corporation[] . . .

14

shall serve as a nonvoting ex officio member."); 10 U.S.C. § 2113a(b)(5) ("[T]he President of the University[] . . . shall be a nonvoting ex officio member."); 15 U.S.C. § 4102(b) ("The Commission shall be composed of seven members appointed by the President, with the Director of the National Science Foundation serving as a nonvoting, ex officio member."); 16 U.S.C. § 583j-1(a) ("The Chief of the Forest Service shall be an ex officio nonvoting member of the Board."); 22 U.S.C. § 2511(c)(3) ("In addition to the voting members of the Council, the Secretary of State and the Administrator of the Agency for International Development, or their designees, and the Director and Deputy Director of the Peace Corps, shall be non-voting members, ex officio, of the Council."); 28 U.S.C. § 991(a) ("The Attorney General, or the Attorney General's designee, shall be an ex officio, nonvoting member of the Commission."); 42 U.S.C. § 283r(d) ("The Board shall be composed of . . . [n]on-voting, ex officio members . . . [and] [i]ndividuals, appointed by the Secretary . . . who shall serve as voting members."); 42 U.S.C. § 2996d(a) ("The Board shall appoint the president of the Corporation, who shall be a member of the bar of the highest court of a State and shall be a non-voting ex officio member of the Board."); 42 U.S.C. § 12651a(a)(3) (listing several federal officers who "shall serve as ex officio nonvoting members of the Board"); 42 U.S.C. § 17352(c)(4) ("The Chief Executive Officer of the Foundation shall serve as a nonvoting, ex officio member of the Board."); 54 U.S.C. § 101112(a) ("The Secretary and the Director shall be non-voting members of the Board, ex officio.").

Indeed, there are situations in the United States Code where *within the same board* Congress designated some members of a board "*ex officio*" but designated only a subset of those member as "non-voting." *See* 10 U.S.C. § 2113a(b) (specifying that a board consists of (i) nine persons appointed by the Secretary of Defense, (ii) three ex officio members, and (iii) one non-voting ex officio member); 46 U.S.C. § 51312(b)(1)(F) (designating six ex officio members, only

one of which is designated as non-voting).  In short, Congress knows how to designate non-voting

ex officio members.  It did not do so here.  *See Rawat v. Comm'r of Internal Revenue*, 108 F.4th

891, 897 (D.C. Cir. 2024) (interpreting a provision "when construed in light of the Code as a

whole").

To the extent Defendants argue the bylaws enacted in May 2025 stripped Plaintiff of any

right to vote, the bylaws are invalid.  The Board may enact only bylaws that comply with the statute

Congress enacted.  *See* 20 U.S.C. § 76*l* ("The Board is authorized to adopt an official seal which

shall be judicially noticed and to make such bylaws, rules, and regulations, as it deems necessary

*for the administration of its functions under this subchapter . . . .*") (emphasis added).  Indeed, it

is a basic tenet of trust law that a trustee cannot violate the governing terms of the trust—in this

case, the Center's organic statute that places all Board members on equal footing.  *See* Restatement

(Third) of Trusts §76 ("The trustee has a duty to administer the trust, diligently and in good faith,

in accordance with the terms of the trust and applicable law.").  Accordingly, bylaws that

contravene the statutory terms of the trust are void. *See Pac. Realty Tr. v. APC Invs., Inc.*, 651 P.2d

163, 167 (Or. App. 1982) (holding unlawful a bylaw that was not authorized and contravened the

declaration of trust); *cf. Airgas, Inc. v. Air Prods. & Chemicals, Inc.*, 8 A.3d 1182, 1195 (Del.

2010) (bylaw invalid where it conflicted with corporate charter).  Moreover, it is a fundamental

principle of our Constitution that an agency or federal corporation is bound, first and foremost, by

the statute that Congress enacts, and cannot contradict the guardrails Congress enacts.  *See Nat'l

Shooting Sports Found., Inc. v. Jones*, 840 F. Supp. 2d 310, 317 (D.D.C. 2012), *aff'd*, 716 F.3d

200 (D.C. Cir. 2013) ("A court must look to the agency's enabling statute and subsequent

legislation to determine whether it has acted within the bounds of its authority.").

The broader statutory structure confirms that a majority of the Board cannot neuter other

members by stripping them of voting authority.  Congress empowered the Board of Regents of the Smithsonian Institution to modify "the number of members, manner of appointment of members, or tenure of members, of the boards or commissions under" its "jurisdiction."  20 U.S.C § 42(b).  But Congress prohibited the regents from so modifying the Board of "the John F. Kennedy Center for the Performing Arts," and notably afforded the Board of the Kennedy Center no similar authority to alter its composition.  *Id*. § 42(b)(2).  Permitting a majority of the Board to strip members of voting rights—and effectively exclude them from important aspects of governance— would permit a majority of the Board of the Kennedy Center to assume a power that Congress expressly declined to provide.

### B.     Plaintiff Has the Right to Be Heard at Board Meetings.

Even if Defendants could lawfully strip Plaintiff of her voting rights as an *ex officio* member (to be clear: they cannot), Plaintiff will still prevail on her claim because she has a right— which nothing in the bylaws purports to revoke—to attend and actively participate in meetings.  This again flows from basic principles of trust law, which require trustees to engage in decision making regarding the trust administration.  Restatement (Third) of Trusts § 39, cmt. a ("[W]hen feasible all trustees must be consulted before decisions are made."); *see also Richardson v. Clarke*, 364 N.E.2d 804, 807 (Mass. 1977) ("[W]hile a majority vote of the trustees may bind the trust, all trustees must be adequately consulted and must participate in business transactions involved in the administration of the trust.")  Any other conclusion would render superfluous the portions of the statute designating *ex officio* members of the Board and investing them with rights and obligations.  In short, Defendants' actions to prevent Plaintiff from speaking, and their apparent attempt to exclude her from the March 16, 2026 meeting are unlawful. *See Cummock v. Gore,* 180 F.3d 282, 292 (D.C. Cir. 1999) ("[A]s a Commission member, [plaintiff] is entitled to fully participate in its

deliberations.").

### C.    Plaintiff Has a Right to Information Necessary to Discharge Her Duties as a Trustee.

Plaintiff is also entitled to the information she needs to conduct her duties as a trustee.  A trustee is charged with the core duty of prudence.  *See* Restatement (Third) of Trusts § 77.  This duty

> requires the trustee to exercise reasonable effort and diligence in planning the administration of the trust, in making and implementing administrative decisions, and *in monitoring the trust situation*, with due attention to the trust's objectives and the interests of the beneficiaries.  This will ordinarily involve *investigation appropriate to the particular action under consideration, and also obtaining relevant information* about such matters as the contents and resources of the trust estate and the circumstances and requirements of the trust and its beneficiaries.

*Id.* § 77, cmt. b (emphasis added).

This is not a peripheral or aspirational obligation.  It is foundational.  A trustee who lacks information about imminent developments affecting the trust—whether those developments are couched a proposal for the Board or a final decision of its Chairman—cannot exercise fiduciary judgment, cannot prevent breaches, and cannot fulfill the oversight function the law assigns her. *See id.* § 81, cmt. d ("[E]ach trustee ordinarily . . . has a duty to exercise reasonable care to prevent a co-trustee from committing a breach of trust.  And, if a breach occurs, the trustee must take reasonable steps seeking to compel the co-trustee to redress the breach of trust.").

*Benedict v. Amaducci*, No. 92 Civ. 5239 (KMW), 1993 WL 87937, at *9 (S.D.N.Y. Mar. 22, 1993), is illustrative.  In that case, plaintiffs sued their co-trustees for failing to provide them with the documentation required to fulfill their duty to see that the trust was properly executed, and to redress any breach of trust.  *Id*.  The court explained that a "trustee, 'particularly one empowered to exercise greater control, or having greater knowledge of trust affairs' is under a duty

'to inform each co-trustee of all material facts relative to the administration of the trust that have come to his attention.'" *Id.* (quoting G. Bogert, Trusts & Trustees § 584, at 40 (Supp. rev. 2d ed. 1992)).  The court further elaborated that "[e]ven though a majority of trustees are authorized to act for all trustees, each trustee is entitled to access to trust records and to information regarding the administration of the trust." *Id.*; *see also Equitable Tr. Co. v. Schwebel*, 32 F. Supp. 241, 243 (E.D. Pa. 1940), *aff'd*, 117 F.2d 738 (3d Cir. 1941) (holding that a co-trustee plaintiff "is entitled to complete and accurate information as to the nature and amount of the trust property and its administration, including a full, complete and detailed statement of account of the defendant's operations in connection with the trust"); *Wilson v. Bd. of Directors of City Trusts*, 188 A. 588, 594 (Pa. 1936) ("The law is clear that a trustee may compel his cotrustee to permit an examination, inspection, and audit of the records of the trust estate and all matters in connection therewith that he may perform the duties with which he is entrusted and for whose exercise he is responsible.").

So too here.  The specific information Plaintiff demanded goes to the core of her oversight duty.  *See* Declaration of Deborah Borda ("Borda Decl.") ¶ 18 (explaining that boards would normally review "comprehensive package of planning materials" "before approving a closure of this kind").  Indeed, in a normal circumstance,

> the governing body should already have in hand extensive reports, cost analyses, construction plans, and third-party validated budgets, including but not limited to architectural plans, blueprints, identification of primary engineers, general contractor(s), and acoustical specialists, specific site planning, and independent cost analysts.

Declaration of Edwin Andrew Taylor ("Taylor Decl.) ¶ 15.

Plaintiff's February 20, 2026, letter demanded eight categories of information: the plans and analyses underlying the closure decision; timelines for Board consideration; assurances of participation; timelines for required regulatory approvals; advance notice before any performance

19

contracts are cancelled; a list of existing performance contracts; the identity of consultants in the alleged "one year review"; and the consultants' reports and communications.  Pl.'s Decl. ¶ 23; Ex. D.

Each of these categories is directly relevant to Plaintiff's ability to evaluate a proposed action that would close a major national institution for two years, expend an unknown amount of public and trust funds, and potentially permanently alter or destroy the building itself.  Plaintiff is entitled to obtain this information.  *See Benedict*, 1993 WL 87937, at *9; *Schwebel*, 32 F. Supp. at 243; *Wilson*, 188 A. at 594.

Two final points bear emphasis:  *First*, President Trump touted the closure as based on "a one year review of the Trump Kennedy Center, that has taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants."  Freeny Decl., Ex. E.  At minimum, Defendants should provide materials related to that review to Plaintiff and other Board members in advance of the meeting.  Taking at face value President Trump's statement that the closure and demolition are "totally subject to Board approval," Plaintiff and other members of the Board cannot meaningfully review the project and exercise their duties without the information necessary to evaluate it.  *Two*, Congress included members of Congress on the Board is to facilitate oversight on behalf of the legislature and the American people.  The congressional members of the Board, including Plaintiff, can perform that critical function only if they have timely access to the relevant documents.

## II.    Plaintiff Is Likely to Succeed on Her Claims Underlying Her Motion for Preliminary Injunction: The Closure, Demolition, and "Rebuilding" of the Kennedy Center Are Unlawful

Although Defendants have publicly suggested that the proposed closure and "complete rebuilding" of the Kennedy Center remain subject to Board approval at the upcoming meeting

scheduled for March 16, 2026, Defendants' conduct tells a different story.  In practice, Defendants have already begun implementing President Trump's decision to shutter the Center, by notifying subscribers by email that the Center *will* close its doors on July 7 and by warning staff of impending major layoffs of staff.  *See* Freeny Decl., Exs. G at 2 & H at 2.  Plaintiff is concerned that these actions reflect not a proposal under consideration, but a decision that, for practical purposes, has already been made, with damaging consequences already in motion, making Plaintiff's motion for preliminary injunction ripe for consideration.  As explained below, Plaintiff is likely to succeed on her claim that the wholesale closure, demolition, and "rebuilding" of the Kennedy Center, without congressional authorization and without other approvals needed by statute, flatly contrary to the law.

As a threshold matter, it is a basic principle of trust law that Plaintiff may bring claims against her co-trustees to prevent a breach of fiduciary duties.  *See* Restatement (Third) of Trusts § 94 ("A suit against a trustee of a private trust to enjoin or redress a breach of trust or otherwise to enforce the trust may be maintained . . . by a co-trustee."); *see also Holt v. Coll. of Osteopathic Physicians & Surgeons*, 394 P.2d 932, 934 (Cal. 1964) (Traynor, J.) (agreeing with the prevailing view that trustees can sue to enforce a charitable trust); *see also* 20 U.S.C. 76*l*(b) ("The Board shall have all the usual powers and obligations of a trustee in respect of all trust funds administered by it.").

Plaintiff Beatty is likely to prevail on her claim to halt the two-year closure of the building.  Simply put: Congress has charged the Board with mandatory statutory duties among other things, to "maintain and administer" the Kennedy Center as "a living memorial" to its namesake,  20 U.S.C. § 76h(a)(1), and  to "present classical and contemporary music, opera, drama, dance, and

other performing arts from the United States and other countries," 20 U.S.C § 76j.[1]  Defendants cannot refuse to perform mandatory duties for two years without Congressional approval.  The closure will render the Kennedy Center a lifeless husk, violating the Board's fundamental statutory obligation to maintain the living memorial.  The lights will go out.  The art will stop.  That directly breaches the trust terms, established by Congress, and the Board cannot proceed in taking that drastic step without authorization from Congress.

There is no emergency that warrants a two-year closure or would prevent Defendants from requesting the necessary congressional approval.  Until President Trump's abrupt announcement on February 1, 2026, the Kennedy Center's had planned to perform routine maintenance and capital improvement projects without closing the center.  Pl.'s Decl. ¶ 18.  In December 2025, Defendant Richard Grenell told staff that employees might need to switch offices or buildings as a result of certain projects, but he never mentioned shutting down the Kennedy Center in violation of its mandatory statutory duties—let alone for multiple years.  Freeny Decl., Ex. C at 4.  The Board had previously discussed capital improvements using $257 million in congressional appropriation and had been informed at recent meetings that those improvements were underway—without any hint that the Kennedy Center would close.  Pl.'s Decl. ¶ 18.  Meanwhile, there is no indication that in requesting funding from Congress, Defendants disclosed to anyone that they planned to shut down the Kennedy Center *for multiple years*.

The apparently planned destruction of the physical memorial itself is also unlawful.  According to President Trump's own statements, he plans to rebuild the Kennedy Center, resulting

---

[1] By law, the Board "shall" also perform other duties, such as serving as a leader in "arts education policy and programs," conduct "national and community outreach," and providing facilities for "other civic activities."  20 U.S.C § 76j.  If Defendants close the Kennedy Center, those mandatory activities will grind to a halt for years, all without any congressional approval.

in a "brand new" building made (in part) from "steel" and "marble" of the current structure.  *See* Freeny Decl., Ex. F.  The Board does not have the power to unilaterally destroy the Kennedy Center, and even attempting this project would constitute a clear breach of the Kennedy Center's organic statute.  The statute charges the Board with the "duty" "to maintain and administer" the Kennedy Center as "a living memorial" to President Kennedy.  20 U.S.C. § 76h.  It goes without saying, but we say it anyway: Stripping the building to its studs, reusing the steel, and repurposing the marble is not maintaining and administering the existing structure.  Nor can the Kennedy Center serve as "a living memorial" if it does not exist.

Analyzing the express powers Congress conferred on the Board readily confirm that the trustees lack the authority to destroy the building on a whim.  For example, the Board is empowered to, "*with respect to the building* . . ., plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary *to maintain the functionality of the building* . . . at current standards of life, safety, security, and accessibility." *Id.* § 76j(a)(1)(G) (emphasis added).  Demolishing the building does not maintain its functionality, and Defendants decided to pursue this extreme step without presenting any evidence that it is necessary to preserve life, safety, security, and accessibility.  Similarly, the Board is charged with performing "all necessary maintenance, repair, and alteration of, and all janitorial, security, and other services and equipment necessary for the operations of, the building and site, in a manner consistent with requirements for high quality operations." *Id*. § 76j(a)(1)(H).  This limited grant of authority confirms that the Board can conduct maintenance, repairs, and ordinary alterations, but cannot demolish the structure.

That is why, in the past, the Board sought and Congress provided specific statutory authorization to undertake large construction projects.  In 1958, Congress provided an express

grant of authority to construct the "building" itself.  20 U.S.C. § 76i(a).  In 1997, Congress authorized the Board to "design and construct" a parking garage.  *Id*. § 76i(b).  In 2012, Congress authorized the Board to construct a maximum "100,000 square" foot "addition to the south end of the building."  *Id*. § 76i(c)(4); *see also, e.g.*, *id*. § 76m (providing that the "Board may study, plan, design, engineer, and construct a photovoltaic system for the main roof of the John F. Kennedy Center for the Performing Arts").  That the Board proceeded even on these far smaller projects only with Congressional approval indicates that the Board lacks the power to engage in the demolition and replacement of this historic building without express congressional approval.

Even if the Board had the unilateral authority for a sweeping rebuilding of this historic structure (it does not and has not yet purported to exercise that authority), the Board must also pursue a complicated regulatory approval process before it does so.  And nothing indicates that Defendants intend to do so before they begin construction in July 2026.  For example, the National Capital Planning Act, 40 U.S.C. § 8722, requires that development proposals and project plans for federally-owned land in Washington, D.C. be submitted to and approved by the National Capital Planning Commission before proceeding.  No such approval has been sought or obtained.  Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108, requires consultation with the Advisory Council on Historic Preservation before undertaking any action that may affect a historic property.  No such consultation has been initiated.  The Commission of Fine Arts Act, 40 U.S.C. §§ 9101 et seq., establishes the Commission of Fine Arts and requires its review of plans for the construction, alteration, or demolition of certain buildings and structures in the District of Columbia.  *See* 45 C.F.R. § 2101.1(a)(1) (stating that the commission "comments and advises on the plans and merits of the designs before final approval or action" with respect to buildings in Washington D.C. that "affect the appearance of the city").  These are not discretionary

24

requirements; they are mandatory conditions precedent to any lawful construction project. Proceeding without them is unlawful on its face.

Plaintiff is additionally likely to prevail on her claim because Defendants Grenell and President Trump bypassed the Board in effectuating the closure and, to the extent they have discussed their plans with Board members appointed by Trump, they have improperly sidelined *ex officio* members like Plaintiff.  Pl.'s Decl. ¶ 18.  President Trump nominally acknowledged the need to seek the Board's approval before closing the Kennedy Center.  *See*  Freeny Decl., Ex. E. But in official communication, the Center has already announced to patrons that it will close, starting July 7, 2026, and is presumably taking steps to effectuate that plan.  *See* Freeny Decl., Ex. G.  Defendant Grenell has warned the staff about "permanent or temporary adjustments" in staffing "for most everyone" that will reduce the Kennedy Center to "skeletal teams."  *See id.*, Ex. H.  This glaring failure to seek the Board's approval *before* effectively adopting a final plan of closure is reason enough for the Court to find the closure unlawful.  And so long as Defendants refuse to provide information about the closure and construction, the Board cannot consider that question in a prudent manner, consistent with its basic fiduciary obligations.

Finally, although the Court need not reach the issue to find Defendants' actions unlawful, there is every reason to believe that the stated reason for the closure is pretextual.  As recently as August 2025, President Trump referred to the Center as a "great gem," and claimed that "with a little fix up and a little work, we can make it unbelievable."  *President Trump Visits the Kennedy Center and Makes an Announcement*, YouTube (Aug. 13, 2025 at 13:54-14:10), https://www.youtube.com/watch?v=W2K2j_Wakgs.  In October 2025, President Trump expressly stated that the Kennedy Center would remain "fully open during construction, renovation, and beautification."  Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 27, 2025, at 3:14 ET),

https://truthsocial.com/@realDonaldTrump/posts/115444894900287475.    Then, a few months later—after a nosedive in ticket sales, and artists fleeing the so-called "Trump Kennedy Center" in droves—President Trump suddenly concluded (based on a heretofore unheard of "one year" review) that the building is in such dire shape is that it must undergo a "Complete Rebuilding" that will require it to shut down for two years.

This pattern of abrupt decision making outside the normal governance framework, shifting explanations, and abnormally opaque processes strongly suggest that President Trump is attempting to hide the embarrassing fact that the (unlawful) name-change has led patrons and artists to flee the Center. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").  Such a self-interested gambit, sacrificing the Kennedy Center to save face, represents a quintessential breach of fiduciary duty. *See Amax Coal*, 453 U.S. at 329 ("Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties." (citing Restatement (Second) of Trust § 170(1) (1957))); *see also Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (N.Y. 1989) (explaining that duty of loyalty includes "not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty").

Indeed, as the accompanying declarations demonstrate, a prudent trustee would do everything possible to keep the Kennedy Center open.  *See* Taylor Decl. ¶¶ 14-15 ("A closure of the entire Kennedy Center is also not the only alternative available . . . . It is understood that responsible governance and executive leadership should consider every other possible alternative before opting for such a lengthy closure, given the widely understood devastating consequences

of such a closure."). The apparent failure to carefully consider the severe harms of closing the Center and the obvious alternatives is a breach of fiduciary and, at minimum, supports the inference of an improper motive.[2]

## III. Emergency Relief Is Necessary to Prevent Irreparable Harm.

Plaintiff's combined motion seeks to avert two distinct forms of irreparable harm. First, absent a TRO, Plaintiff will be unable to perform her fiduciary duties at the upcoming March 16, 2026 meeting the Board. Plaintiff respectfully requests that the Court issue this relief as quickly as possible, and no later than March 15. Second, absent a preliminary injunction, Defendants will continue to take irrevocable steps to close and demolish the Kennedy Center in July 2026, and the Court will be unable to provide effective relief even if it orders Defendants to reopen the Kennedy Center at final judgment.

### A.    The Urgent Need for a Limited TRO Prior to March 16, 2026.

If Plaintiff is not granted a TRO before the March 16, 2026 meeting at which the Board is scheduled to formally decide on the President's plan to close and rebuild the Center, she will irrevocably lose the ability to participate in that meeting and in that decision, as is her right and obligation by statute and under ordinary trust law. It bears emphasis: Right now, Defendants have invited other *ex officio* members to the March 16 meeting, but omitted Plaintiff from the invitation. Meanwhile, Defendants have not responded to her request about how Plaintiff should RSVP to attend. Even if Plaintiff can attend in person or virtually, there is every reason to believe she will

---

[2] This motion is readily distinguishable from Judge Leon's recent decision denying a preliminary injunction in *National Trust for Historic Preservation in the United States v. National Park Service*, No. CV 25-4316 (RJL), 2026 WL 533420 (D.D.C. Feb. 26, 2026). For example, Plaintiff's suit is grounded in the well-accepted trust principle that a trustee may sue to enforce the terms of the trust, and Plaintiff also brought ultra claims that are not included in the *National Trust* complaint.

be prevented from speaking and voting.

Courts routinely hold that the loss of opportunity to participate in a time-sensitive decision-making process constitutes irreparable harm because once the event occurs, the loss of the opportunity is "beyond remediation." *See, e.g.*, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Plaintiff took steps to prevent this exigency, requesting that the Defendants provide her with assurances that she would be permitted to participate in decision making on these momentous issues. *See* Pl.'s Decl., Ex. D.  It was Defendants who declined to provide her those assurances and instead refused to even invite her to the Board meeting. *See* Pl.'s Decl. ¶ 24.

Plaintiff also requested key documents and information that *all* Board members would need—well in advance of any final vote—in order to meaningfully consider such an extraordinary and irreversible change to the Center's functions and existence.  For work of this magnitude and complexity, one would ordinarily expect that the Board and/or executive leadership would already have in hand extensive reports, cost analyses, construction plans, and third-party validated budgets, including but not limited to architectural plans, blueprints, identification of primary engineers, general contractor(s), and acoustical specialists, specific site planning, and independent cost analysts. *See* Taylor Decl. ¶ 15.  To date, no such documentation has been provided—no plans, no budgets, no contacts, and no analysis that was supposedly already undertaken and informed President Trump's thinking.  Plaintiff must have access to these documents, which only Defendants control, in advance of the meeting to meaningfully exercise the fiduciary and oversight responsibilities that Congress has assigned her. *Cf. Protect Democracy Project, Inc. v. DOJ*, 498 F. Supp. 3d 132, 141 (D.D.C. 2020) ("[W]here an obligation to disclose exists, a plaintiff may suffer irreparable harm if denied access to information that is highly relevant . . . . (quotation marks

omitted)); *Brennan Ctr. v. Dep't of Com.*, 498 F. Supp. 3d 87, 101 (D.D.C. 2020); *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017).[3]

### B.    The Urgent Need for Preliminary Injunctive Relief to Prevent Irreparable Harm from Steps to Close the Center or Demolition in Advance of Rebuilding.

Notwithstanding the scheduling of a Board meeting for March 16, 2026, to consider President Trump's plan, the Kennedy Center is forging ahead with implementation of that plan without any approval.  On February 24, 2026, the Kennedy Center sent an email to subscribers confirming that it "will be temporarily closing [its] doors after July 7th."  Freeny Decl., Ex. G. Meanwhile, according to public reporting, Defendant Grenell stated he will impose widespread staffing cuts and reduce the center's personnel to "skeletal teams."  *Id.*, Ex. H.  Absent preliminary relief from this Court, Defendants will follow through on those cuts and undertake similar steps to cancel performance contracts with artists and companies, as a necessary precursor to the shutdown.[4]  As the accompanying declarations demonstrate, once that bell is rung, it will be incredibly difficult if not impossible for this Court to unwind the unlawful shutdown and order the resumption of the Kennedy Center's operations, which Plaintiff and her other Board members are charged with performing.

The declarants include a former President of the New York Philharmonic with decades of experience in the industry, two academic-practitioner experts in arts management, and a former employee of the Kennedy Center itself.  *See* Borda Decl.; Taylor Decl.; Declaration of Joshua

---

[3] To be very clear: Plaintiff's need for this information does not cease after the March 16, 2026, meeting.  She still needs the information to perform her core fiduciary duties in conducting prudent oversight.

[4] For example, according to its website, the Kennedy Center is currently slated to run *Mrs. Doubtfire* from July 14 to August 2, 2026, and the *Outsiders* from July 28 to August 16, 2026, both of which must be cancelled to effectuate the closure.  *See* Freeny Decl., Ex. I.

Borenstein ("Borenstein Decl."); Declaration of Mallory Miller ("Miller Decl.").  They describe in stark terms how—even if the Court orders the Kennedy Center to reopen—once Defendants cancel performances, they will be unable to restart programming.  For example, as one declarant explained,

> Broadway touring productions are particularly important to a venue like the Kennedy Center because they are highly popular, generate long runs, are financially self-sustaining, and substantially enlarge a venue's community and subscriber base.  Such performances are also booked well in advance, and once the Kennedy Center cancels existing performances, *it will quickly become impossible to rebook those performances, even if the Court orders Defendants to do so*.

Borda Decl. ¶ 8. (emphasis added); *see also, e.g.*, Taylor Decl. ¶ 11 ("The Kennedy Center will also not be able to secure touring productions immediately, if ordered to reopen after a closure."); Miller Decl. ¶ 10 ("They will make other plans and those plans cannot simply be undone."); Borenstein Decl. ¶ 15 ("[T]he Kennedy Center will be unable to resume programming, even if ordered by the Court. Instead, it could take at least a year—and potentially several years—to assemble a full season's programming after a closure.").

Indeed, a preliminary injunction is imperative because the next few weeks are particularly critical periods for the Kennedy Center to salvage whatever it can.

> For smaller touring companies, the presenting and venue rental decisions for the fall season are typically being confirmed right now, in March and April. Those organizations are already sketching out where they will perform in the season that begins in the fall. Because smaller companies cannot count on the Kennedy Center being available in light of the announced closure, they will make commitments to other venues now, absent relief from the Court. By July, those alternate commitments have generally been confirmed, and the Kennedy Center would struggle to unwind them.

Taylor Decl. ¶ 11; *see also* Miller Decl. ¶ 8 ("Decisions made, or not made, during this window determine what the next season looks like. If the window closes without those commitments being secured, the opportunity cannot be recovered.").  In short, absent preliminary relief, the Center for

which Plaintiff is fiduciarily responsible will not be able to perform its statutory mission. *Cf.*

*Rhode Island v. Trump*, 155 F.4th 35, 48 (1st Cir. 2025); *Nat'l Treasury Emps. Union v. Vought*,

774 F. Supp. 3d 1, 78 (D.D.C. 2025) ("Once the agency is gone, there will be no opportunity to

afford relief at a later point in the litigation.").

But the harm runs even deeper. A closure will do immeasurable damage to trust in the

Kennedy Center and its valuable goodwill. As the declarants collectively explain,

> Performers and their representatives who have experienced or
> observed the Kennedy Center canceling their engagements will be
> worried about committing to future appearances at the Center, and
> many will choose to book other venues instead. When artists and
> their management weigh whether to book a tour stop or an
> engagement, institutional reliability is paramount. An institution
> that has demonstrated it may cancel contracts will be viewed as a
> risk.

Borda Decl. ¶ 10.

> The presenting model under which the Kennedy Center primarily
> operates is built on consistency and trust between the Kennedy
> Center, producing companies, and artist management professionals.
> These relationships cannot be broken and immediately restarted.

Taylor Decl. ¶ 11.

> A complete shutdown—even one that lasts for a brief period of
> time—will also severely harm the Kennedy [Center's] longstanding
> relationships. Once the Kennedy Center begins closing, companies
> and productions that have historically performed at the Kennedy
> Center on a regular basis will make commitments to other venues.
> When the Kennedy Center reopens, those companies will then
> already be contractually committed for one or more seasons and will
> be unable to return immediately. In addition, a company that has
> established a new presenting relationship with another venue during
> the Kennedy Center's closure may be reluctant to relinquish that
> relationship upon the Kennedy Center's reopening.

Borenstein Decl. ¶ 18; *see also* Miller Decl. ¶ 16 (explaining that "closure will sever whatever

goodwill remains and will likely be understood by those companies as a definitive rupture, not a

temporary pause").

This kind of reputational injury and the loss of goodwill are irreparable.  *See, e.g.*, *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1297 (11th Cir. 2024) (finding that harm to reputation and ability to compete for contracts was irreparable and collecting cases); *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (finding "loss of goodwill and reputation" constituted irreparable harm); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) ("black mark" on "reputation" that will result in many lost contract opportunities" was "irreparable"); *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("[P]laintiffs have demonstrated irreparable harm in damage to their business reputation.").

The declarants additionally explain that closing "will also cause severe harm to the Center's staffing, which will be difficult to undo."  Borda Decl. ¶ 11.  The staff are "hyper-specialized professionals," "who can find employment elsewhere, and once the closure is finalized, they will begin looking."  *Id*.  "Indeed, it is likely that many are already looking.  *If the Court orders the Kennedy Center to reopen, critical staff will have already secured employment elsewhere and will not return*."  *Id*. (emphasis added); *see also* Miller Decl. ¶¶ 13, 15 (explaining that "stagehands, technical crew, and production professionals" "will not be easily replaced, and the damage to the Kennedy Center's production capacity will extend well beyond the formal period of closure.").

In fact, a "significant portion of the Kennedy Center's existing staff will likely relocate to other cities and will not be available to be rehired when the Center seeks to reopen."  Borenstein Decl. ¶ 13.  Meanwhile, as one declarant confirms based on her "conversations with employees," this process is already underway:  The Kennedy Center staff expects "layoffs to begin in April 2026," and "[e]mployees of the Center with institutional knowledge are likely to start departing in anticipation of layoffs."  Miller Decl. ¶18.

The declarants further confirm that the Kennedy Center will likewise lose goodwill with audience and donors. "If the Kennedy Center shuts down, even for only a few months, individuals who routinely patronize the Center will lose their relationship with the Center. It is extremely difficult to regain lost patrons once they depart an institution, even after it reopens." Borenstein Decl. ¶ 22.

> There is intense competition for the leisure dollar, and when audiences stop attending one venue, they find other things to do with their time and money. To recover them, performing arts organizations must invest heavily in advertising, offer lower prices, and work to persuade lapsed patrons of the quality of what they will find when they return.

Borda Decl. ¶ 13. "The audience relationships that sustain ticket sales are relationship-based, not merely transactional, and if those relationships are severed, they do not automatically return when the doors reopen." Taylor Decl. ¶ 13.

Similarly, donors "will redirect their philanthropic support to other institutions. Once a donor has established a new philanthropic relationship elsewhere, recovering that donor relationship is difficult and time-consuming." Borda Decl. ¶ 12. "When there are no programs or productions, the case for giving is substantially weakened. As the Kennedy Center's relationship with donors atrophies, those donors will cease feeling a connection to the Center." Borenstein Decl. ¶ 19. The loss of donor goodwill is bound up with the loss of staff:

> The Kennedy Center's fundraising depends on deeply personal relationships that development staff have cultivated with individual donors over many years. Those staff members know individual donors — their interests, their giving histories, their relationships to the institution — and they maintain contact with them on an ongoing basis. If that contact stops, donors will not simply wait. They will redirect their philanthropic support to other institutions. Once a donor has established a new philanthropic relationship elsewhere, recovering that donor relationship is difficult and time-consuming.

Borda Decl. ¶ 12.

Finally, once the Kennedy Center building is demolished or materially altered, it cannot be restored. This is quintessential irreparable harm. *See United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) ("It is settled beyond the need for citation . . . that a given piece of property is considered to be unique, and its loss is always an irreparable injury.").

The building is a unique federal structure designated by Congress as the sole national memorial to President Kennedy. It is a beloved feature of the D.C. skyline. No injunction issued after the fact can make the institution whole. The East Wing precedent confirms this threat is real. When President Trump announced plans for a White House ballroom in July 2025, he stated it "won't interfere with the current building." *President Trump Signs an Executive Order*, July 31, 2025, YouTube (July 31, 2025), https://www.youtube.com/live/NC09z2oqpDg?t=1354s. And yet, several months later, the East Wing was being demolished without warning and without required regulatory approvals. The same pattern is playing out here: public assurances that the current building will be preserved, followed by statements that are inconsistent with preservation, in the context of an established practice of proceeding without regulatory approval.

**IV.    The Balance of Equities and Public Interest Favor a Limited TRO and Subsequent Preliminary Injunction.**

The equities are striking in their asymmetry.  Starting with the TRO regarding the March 16, 2026, meeting, Defendants cannot claim any cognizable harm in providing Plaintiff the information to which she is entitled and allowing her to participate in Board meetings, as is her right as a trustee, *before* the Board takes final steps to effectuate the decision to close the Center. In sharp contrast, if this Court does not provide emergency relief, Plaintiff will forever lose her right to act as a trustee at this critical juncture, while Defendants rush to commit irreversible harm to the institution she is charged with protecting.  Meanwhile, the public interest is served by ensuring that there is appropriate and prudent oversight by the trustees Congress charged with shepherding this critical cultural institution.

The equities are similar with respect to Plaintiff's request for a preliminary injunction. Defendants cannot complain if this Court presses pause on the unlawful closure.  Until the President's bizarre announcement on February 1, 2025, the Kennedy Center had planned to conduct repairs and maintenance while fulfilling the Center's statutory mandate.  This Court's order would preserve the status quo that existed until just a few weeks ago.  There is no great urgency on Defendants' side that can justify the scramble to close the Center.  But if this Court does not act, Defendants may take irrevocable steps that effectively prevent Plaintiff from protecting the institution she is charged with overseeing.

The public interest weighs strongly in favor of a preliminary injunction.  The Kennedy Center is a national institution, funded by Congress, named by statute, and designated as a living memorial to President Kennedy. The American public has a direct interest in ensuring that decisions about whether to close, alter, or demolish it are lawful—made with proper legal authorization and with proper regulatory approval—rather than by a unilateral announcement on

social media.

Indeed, the mandatory approval requirements of the National Capital Planning Act, the National Historic Preservation Act, and the Commission on Fine Arts exist precisely to protect the public interest in the nation's capital and its historic resources.  Those statutory requirements reflect Congress's judgment that development affecting federally-owned land and historic properties should be subject to deliberate, transparent review before proceeding. A preliminary injunction that enforces those requirements serves the public interest the statutes were designed to protect.

Finally, a preliminary injunction will serve the interests of judicial economy.  This matter should not be litigated on an artificially compressed timeline.  The Court should not wait until the bulldozers are at the door to protect the Kennedy Center.  Neither the parties nor the Court are served by litigating under that kind of looming threat.  Indeed, if the Court does not enjoin Defendants from demolition altogether, the Court should at a minimum require Defendants to provide 60 days' notice before any destruction of the building begins to allow the Court to evaluate—in a reasonable timeframe—whether further emergency relief is warranted.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant the TRO and preliminary injunction as specified above. Plaintiff also respectfully requests that the Court hold a hearing on the Motion for TRO before March 16, 2026, and a hearing on the Motion for PI in accordance with LCvR 65.1(d).

Dated: March 6, 2026                     Respectfully submitted,


/s/ Norman Eisen                         /s/ Nathaniel A.G. Zelinsky
NORMAN EISEN                             NATHANIEL A.G. ZELINSKY
  (D.C. Bar No. 435051)                    (D.C. Bar No. 1724093)
STEPHEN JONAS                            /s/ Kyle R. Freeny
  (D.C. Bar No. 90037069)                KYLE R. FREENY
DAVID OGDEN                                (D.C. Bar No. 247857)
  (D.C. Bar No. 375951)                  ALEXANDER KRISTOFCAK*


DEMOCRACY DEFENDERS ACTION               WASHINGTON LITIGATION GROUP
600 Pennsylvania Avenue SE #15180        1717 K Street, NW, Suite 1120
Washington, D.C. 20003                   Washington, D.C. 20006
202-594-9958                             202-521-8750
norman@democracydefenders.org            kfreeny@washingtonlitigationgroup.org
                                         nzelinsky@washingtonlitigationgroup.org

                                         * *Application for admission forthcoming;
                                         admitted only in California and New York;
                                         practicing under the supervision of D.C. Bar
                                         members*


*Attorneys for Plaintiff Joyce Beatty*