# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOYCE BEATTY,

                    *Plaintiff*,

     v.

DONALD J. TRUMP *et al.*,

                    *Defendants*.

No. 25-CV-4480 (CRC)

## DECLARATION OF DEBORAH BORDA

I, Deborah Borda, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.　　I submit this declaration in support of Plaintiff's request for emergency relief. I have personal knowledge of the facts stated herein, except where stated otherwise.

2.　　I am President Emerita of the New York Philharmonic. I retired from active leadership last year after a career spanning nearly five decades at the highest levels of performing arts management. I graduated from Bennington College in 1971 and pursued graduate studies at the Royal College of Music in London. I hold honorary doctorates from Julliard, the Curtis Institute, the New England Conservatory, and the Manhattan School of Music. I began my career as a musician before transitioning to arts administration.

3.　　In 1979, I became Director of Artistic Planning for the San Francisco Symphony. In 1986, I became President and CEO of the St. Paul Chamber Orchestra, and then President and CEO of the Detroit Symphony Orchestra. In 1991, I became President of the New York Philharmonic, serving in that role until 2000, when I left to become President and CEO of the Los Angeles Philharmonic and the Hollywood Bowl. In 2017, I returned to the New York Philharmonic

as President and CEO, serving until my retirement last year. I currently work as a consultant advising major arts institutions throughout the world.

4.    Over the course of my career, I have led or overseen major construction and renovation projects at several of the most prominent concert halls in the United States, including a renovation of Orchestra Hall in Detroit, the construction of Walt Disney Concert Hall in Los Angeles, and the renovation of David Geffen Hall in New York. I was also involved with the building of Davies Symphony Hall in San Francisco. These experiences give me direct, firsthand knowledge of what planning for a major performing arts venue renovation requires, how long it takes, and what it costs.

5.    I make the statements below based on my experience managing, leading, and consulting for performing arts institutions.

6.    I have decades of experience with how performing arts seasons are planned and how artists are contracted. A concert season is typically planned and finalized at least two years in advance. Planning for the 2028-2029 season is already underway. Top-tier guest artists — the soloists and conductors who anchor a season and drive ticket sales — are contracted two to three years in advance. Touring engagements by major international ensembles, such as orchestras like the Vienna Philharmonic, are booked even further in advance. Three to four years is common.

7.    A closure announcement of the kind issued for the Kennedy Center does not simply defer future bookings — it may prevent the Kennedy Center from returning to the touring schedules of the world's leading performers. If a major touring ensemble were scheduled to appear at the Kennedy Center and that engagement were canceled, it would not be possible to simply reinstate the booking three or six months later. The ensemble would immediately find an alternative because it cannot keep a touring show on the road without performances. Once the

Kennedy Center is removed from a touring schedule, it is my judgment that it would take a number of years before the Kennedy Center could be restored to that ensemble's touring calendar. In short, even if the Court ordered Defendants to immediately resume normal operations, it will be impossible to do so, once the Center shuts down.

8.     This dynamic applies across every category of programming. Broadway touring productions are particularly important to a venue like the Kennedy Center because they are highly popular, generate long runs, are financially self-sustaining, and substantially enlarge a venue's community and subscriber base. Such performances are also booked well in advance, and once the Kennedy Center cancels existing performances, it will quickly become impossible to rebook those performances, even if the Court orders Defendants to do so.

9.     Prior to the events of the past year, the Kennedy Center had a stellar reputation in the United States and around the world as a presenting venue. When a touring production was planning its national schedule, booking the Kennedy Center was something companies actively sought. That reputation, and the trust underlying it, has arguably already been damaged. A closure will further undermine the Kennedy Center's reputation, which will take years to rebuild.

10.    Even if a court were subsequently to order the Kennedy Center to reopen—for example sixth months after the closure—the reputational harm would not be remedied. Performers and their representatives who have experienced or observed the Kennedy Center canceling their engagements will be worried about committing to future appearances at the Center, and many will choose to book other venues instead. When artists and their management weigh whether to book a tour stop or an engagement, institutional reliability is paramount. An institution that has demonstrated it may cancel contracts will be viewed as a risk.

11.     Closing will also cause severe harm to the Center's staffing, which will be difficult to undo. The Kennedy Center's staff represents an institutional asset of extraordinary and irreplaceable value. The Kennedy Center is the largest employer in the arts in the Washington, D.C. area. Its staff includes hyper-specialized professionals — not only artistic planners but also marketing directors, development directors, finance professionals with expertise in nonprofit accounting and union relations, and many others whose skills are highly specific to the performing arts context. These are people who can find employment elsewhere, and once the closure is finalized, they will begin looking. Indeed, it is likely that many are already looking. If the Court orders the Kennedy Center to reopen, critical staff will have already secured employment elsewhere and will not return.

12.     The loss of development and donor relations staff presents a particularly acute concern because it will also damage goodwill and reputation with donors. The Kennedy Center's fundraising depends on deeply personal relationships that development staff have cultivated with individual donors over many years. Those staff members know individual donors — their interests, their giving histories, their relationships to the institution — and they maintain contact with them on an ongoing basis. If that contact stops, donors will not simply wait. They will redirect their philanthropic support to other institutions. Once a donor has established a new philanthropic relationship elsewhere, recovering that donor relationship is difficult and time-consuming.

13.     It will also present serious challenges for the Kennedy Center to regain its audience once it shuts down, even if the Court orders it to reopen. There is intense competition for the leisure dollar, and when audiences stop attending one venue, they find other things to do with their time and money. To recover them, performing arts organizations must invest heavily in advertising, offer lower prices, and work to persuade lapsed patrons of the quality of what they will find when

they return. That process takes years and is expensive. Even a patron who attended only twice a year is, once out of the habit, difficult to re-engage.

14.    The disruption to ticket-buying audiences caused by the COVID-19 pandemic illustrates the problem. The pandemic forced performing arts venues to close for extended periods beginning in 2020. Earned revenue through ticket sales only recently recovered to 2019 level. Recovery was slow because audiences fell out of the habit of attending, and in many venues the recovery never occurred at all.

15.    In my professional judgment, the harms from a closure of the Kennedy Center at the scale and on the timeline announced are severe, immediate, and cannot be quickly reversed. The visiting performers who are removed from the schedule will find alternative venues and will not return quickly. The staff who depart will be difficult to replace. The donors who redirect their giving will develop new institutional loyalties. The audiences who fall out of the habit of attending will, as the COVID experience demonstrates, require years of effort and investment to recover. A Court order preventing the closure before it takes effect is the only means by which the most severe of these harms can be avoided.

16.    I have direct experience overseeing major performing arts venue renovations and can say with confidence that a responsible renovation of the scale apparently contemplated for the Kennedy Center cannot be planned and executed in the manner that has been announced. When orchestras move out of their halls for major renovations, for example, those projects are typically planned at least four to five years in advance. This is because the planning process is genuinely complex and requires considerable time to execute properly. A major renovation requires architects, acoustical specialists—of whom there are perhaps five or six in the world with the expertise required for concert hall acoustics—interior designers, accessibility specialists, lighting

designers, and other highly specialized professionals. Engaging these professionals, reviewing their proposals, and developing and refining detailed plans takes years.

17.    The governance process for a major renovation reflects this complexity. When the New York Philharmonic and Lincoln Center undertook the renovation of David Geffen Hall, the joint boards of both institutions met for at least two to three years reviewing the renovation plans, and in fact made significant changes to those plans over the course of that review process. The boards met five times a year on a regular schedule; the executive committee engaged more frequently; and a dedicated building committee met as often as every week. A separate full staff was brought in to manage the renovation project itself, because the work was simply too complex and specialized to be handled by the existing institutional staff alongside their ordinary responsibilities.

18.    A governing board charged with stewardship of an institution like the Kennedy Center would expect to receive, before approving a closure of this kind, a comprehensive package of planning materials: an overall architectural concept, identification of the major professional consultants who will lead the project, timelines, budgets, and supporting analysis from each of the relevant specialists. Those documents are developed and refined over years of work.

19.    The renovation of David Geffen Hall — a single 2,738-seat concert hall — cost approximately $550 million. The Kennedy Center contains multiple major performance spaces. A complete renovation of the Kennedy Center at the scale now being described would, in my professional judgment, cost something on the order of $2 billion. The approximately $250 million appropriated by Congress is clearly not sufficient for a complete rebuilding of the scope being claimed.

20.    I declare under penalty of perjury that the foregoing is true and correct.

Executed _3/4/2026_____

Signed by:

Deborah Borda
939A704989BD452
Deborah Borda