UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOYCE BEATTY,

        *Plaintiff*,

v.

DONALD J. TRUMP *et al.*,

        *Defendants*.

No. 25-CV-4480 (CRC)

## DECLARATION OF EDWIN ANDREW TAYLOR

I, Edwin Andrew Taylor, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I submit this declaration in support of Plaintiff's request for emergency relief. I have personal knowledge of the facts stated herein, except where stated otherwise. I submit this declaration in my personal capacity; my institutional affiliations are noted solely to establish my professional credentials.

2. In 1986 I earned a Bachelor of Arts in English from the University of Colorado, Boulder, and in 1994 I earned a Master of Arts in Business in Arts Administration from the University of Wisconsin-Madison.

3. I am currently serving as an Associate Professor of Arts Management and the Director of the Arts Management program at American University. Prior to joining the American University faculty, I served as Director of the Bolz Center for Arts Administration at the Wisconsin School of Business, University of Wisconsin-Madison, from 2000 to 2012, and as Assistant Director of that program from 1994 to 2000.

4. I am the founder and president of Arts Axis LLC, a consulting practice through which I have provided management, strategy, governance, and communications consulting to arts

and cultural organizations nationwide. I formed Arts Axis LLC in 2014, and prior to that operated as a sole proprietorship since 1996. My consulting clients have included American Ballet Theatre, the Overture Center for the Arts, the Andrew W. Mellon Foundation, the International Society for the Performing Arts, Americans for the Arts, AMS Planning & Research Corp., and numerous other performing arts centers, cultural institutions, and government agencies. I have also worked on consulting projects involving the construction and operational planning of large-scale performing arts centers, including work with the Overture Center for the Arts in Madison, Wisconsin, on an approximately $200-million multi-venue renovation and construction project, where I assisted with budgets, strategic planning, and the organization's conversion from a city-owned agency to an independent nonprofit.

5. Based on my three decades of teaching, research, and consulting practice in the nonprofit arts, a closure of the Kennedy Center—even for a few months—would have devastating and durable impact on the Center's viability, given the disruption to its skilled and professional labor, its earned and contributed revenue, its reputation and relationships with a global network of touring artists and artistic productions, and its national commitments to arts education.

6. The Kennedy Center's ability to operate as a world-class performing arts center depends on a large group of skilled professional staff—salaried administrators, contracted union employees, and independent contractors—who have developed deep institutional knowledge and working relationships over time. A building of the Kennedy Center's complexity cannot be operated without seasoned, professional, qualified staff. If there were significant layoffs or suspensions of staff, the institution would lose that population of people, and it will be very hard to rehire those staff, even if the Court orders the Kennedy Center to reopen. Staff will find new positions, many in entirely different cities.

7. Beyond the salaried workforce, the Kennedy Center relies on layers of contract labor, including those represented by collective bargaining agreements. These workers are highly skilled, and there is no comparable alternative employer in the Washington, D.C. area capable of absorbing them at this level of capacity. If the Kennedy Center closes while this litigation is proceeding, many of those workers would be likely to move to other markets. In short, the entire city would lose a powerfully important and well-skilled pool of laborers, both contracted and salaried.

8. A closure of even a short duration will also be particularly damaging because it will lead to the loss of the durable, continuing relationships with (1) production companies and artists, (2) audience members, and (3) donors, on which the Kennedy Center's institutional life depends.

9. The Kennedy Center's programming involves multiple distinct categories of activity: The Kennedy Center creates some productions in-house, it presents touring productions created by other companies, it rents its venues to producing companies and promoters, and it also offers free public programming through both self-production and community partnerships. Rebuilding these categories after a shutdown faces different barriers, but they share a common feature: all of them are built on trust and relationships that take years to develop and cannot be quickly rebuilt after a break.

10. In-house produced programming takes years to build. Productions that an audience might see on any given night may have required one to three years of continual effort by an internal team to develop. A closure that disperses that team means not only that the team must be reconstituted, but also that the institution must then wait another cycle of years before that reconstituted team is able to create a production. As a result, even if the Court orders the Kennedy

Center to resume operations after it conducts layoffs and closes, it will not be able to do so immediately.

11. The Kennedy Center will also not be able to secure touring productions immediately, if ordered to reopen after a closure. The presenting model under which the Kennedy Center primarily operates is built on consistency and trust between the Kennedy Center, producing companies, and artist management professionals. These relationships cannot be broken and immediately restarted. Broadway touring productions in particular are notoriously complicated to schedule and present: they involve buses, trucks, and sets, and major tours typically begin to be sketched out a year or two in advance.

12. For smaller touring companies, the presenting and venue rental decisions for the fall season are typically being confirmed right now, in March and April. Those organizations are already sketching out where they will perform in the season that begins in the fall. Because smaller companies cannot count on the Kennedy Center being available in light of the announced closure, they will make commitments to other venues now, absent relief from the Court. By July, those alternate commitments have generally been confirmed, and the Kennedy Center would struggle to unwind them.

13. A closure, even one that is only a few months long, will also do severe and lasting harm to the Kennedy Center's relationship with audiences and donors, both essential to sustainable operations. The Center's 2023 annual report, as an example, showed an operating budget of approximately $286 million, supported by approximately $152 million in earned income (ticket sales, service fees, and the like) and approximately $85 million in contributions. Ticket-buying patronage is built through loyalty and trust that develops over long periods of time. The audience relationships that sustain ticket sales are relationship-based, not merely transactional, and if those

4

relationships are severed, they do not automatically return when the doors reopen. Active patrons who have a deep resonance with the Kennedy Center's mission become the institution's donors—and they will become alienated if they cease attending the institution and there is no reason to give to support ongoing programming.

14. A closure of the entire Kennedy Center is also not the only alternative available to allow for renovations, and the failure to consider alternatives reflects an absence of responsible governance analysis. The Kennedy Center is a sprawling campus with multiple performance and event spaces, only some of which require significant repair. The REACH campus, as one example, opened in 2019 and could continue to operate. The venues that do require significant repair, the Opera House and the Concert Hall, could be scheduled in ways that keep a continuing flow of programming and public activity through the institution, meaningfully reducing the severe financial, labor, community, and reputational damage of a complete shutdown. In this industry, it is well-accepted that one does not shut down an entire arts center of the size and complexity of the Kennedy Center for two years except for truly exigent circumstances, such as if the building is unsafe for public access. It is understood that responsible governance and executive leadership should consider every other possible alternative before opting for such a lengthy closure, given the widely understood devastating consequences of such a closure. None of those conditions appear to be present here, and in my review of press and public documents I have seen no evidence that the governing board has done substantial analysis to support the necessity of closure, let alone the kind of rigorous consideration of alternatives that I would expect to see based on decades of experience in the industry.

15. A responsible governing board considering a closure of this magnitude, undertaken for the purpose of renovations or "rebuilding," would have commissioned or completed a

5

comprehensive planning and analysis process before making that decision. If a closure is truly necessary, by the time it is announced, the governing body should already have in hand extensive reports, cost analyses, construction plans, and third-party validated budgets, including but not limited to architectural plans, blueprints, identification of primary engineers, general contractor(s), and acoustical specialists, specific site planning, and independent cost analysts. That preparation typically takes at least six to eighteen months. If the Kennedy Center is to close on July 7, 2026, that planning should be in place now. I have seen no public evidence that it is, other than the 2021 Comprehensive Building Plan, which is due for its five-year review and revision in 2026. That plan identified essential repair, replacement, and maintenance needs of $252 million, with approximately $257 million recently approved by Congress. That amount is well below what's necessary for the "complete rebuilding" that President Trump has announced as the justification for the closure.

16. The closure announcement has also failed to provide the kind of advance communication and stakeholder engagement that a responsible governing authority would undertake. Standard practice in major performing arts center renovations is to attempt to maintain at least partial operations throughout the construction period, precisely because the institutional costs of a complete closure are so severe. Even the Kennedy Center's fiscal year 2026 Congressional Budget Justification acknowledged the importance of continuing operations: "As major capital projects necessitate disruptions in date availability in certain theaters, these disruptions need to be carefully planned and coordinated to not materially affect important programming initiatives." Closing an entire institution without demonstrating that all alternatives have been exhausted, without a vetted plan, and without adequate notice is not consistent with responsible stewardship.

17. An injunction preventing the closure from occurring is the only mechanism by which the most severe and lasting of these harms—the dispersal of an irreplaceable workforce, the severing of programming relationships built over decades, the loss of donor and audience trust—can be avoided. Once those harms occur, no subsequent court order directing the Kennedy Center to reopen can undo them. The seasons will be lost. The staff will not all return. The audience and donors who disengage will not all come back. The trust of touring companies and their management representatives, once broken, takes years to rebuild. And art lovers, art makers, arts educators, and students in the region and across the country will lose the opportunity to enjoy a treasured institution for far longer than the nominal period of closure, because the programming, partnerships, and audience engagement that sustain the Center cannot simply resume where they left off.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 3/4/2026.

Edwin Andrew Taylor