Docusign Envelope ID: 5345E512-7BDE-4790-AC39-9BFB55FA9B4B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOYCE BEATTY,

      *Plaintiff*,

 v.

DONALD J. TRUMP *et al.*,

      *Defendants*.

No. 25-CV-4480 (CRC)

## DECLARATION OF JOSHUA BORENSTEIN

I, Joshua Borenstein, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I submit this declaration in support of Plaintiff's request for emergency relief. I have personal knowledge of the facts stated herein, except where stated otherwise.

2. I graduated from Wesleyan University in 1997 with a degree in Classical Civilization. I obtained a Master of Fine Arts in Theater Management at the Yale School of Drama in 2002.

3. Following my MFA, I received a fellowship from Theatre Communications Group—a national service organization for nonprofit theater—which placed me in a mentorship at the Huntington Theatre Company in Boston. In 2003, I became General Manager of Long Wharf Theatre in New Haven, Connecticut, where I was responsible for finances, budgets, human resources, and union agreements, and served on the senior leadership team.

4. From 2008 to 2011, I worked at AMS Planning and Research, one of the leading consulting practices in the United States devoted exclusively to arts and cultural organizations. I worked on approximately 50 projects during that period, including projects involving performing arts centers planning new construction and modeling their future operations.

5. I returned to Long Wharf Theatre in 2011 as Managing Director, a position I held until 2019. I left Long Wharf in July 2019 and founded Odyssey Associates, through which I advise performing arts organizations and government agencies on operational planning and management. I have completed approximately 50 consulting engagements to date, working with performing arts centers, classical music organizations, producing theaters, museums, and local and state government agencies.

6. I am also an Assistant Professor Adjunct and Program Chair in the Theater Management program at the Yale School of Drama, Yale University. Beginning in 2017, I served as a part-time lecturer at Yale. Since July 2025, I have served full time as an Assistant Professor and Program Chair in the Theater Management program. I continue my consulting practice through Odyssey Associates.

7. I am submitting this declaration in my personal capacity, and I provide my institutional affiliations only to the extent they are relevant to evaluating my expertise.

8. The Kennedy Center operates at a different scale and under a presenting model distinct from the producing theaters with which I have worked most directly. That said, the fundamental operational dynamics I describe in this declaration—staffing, institutional relationships, programming timelines, audience development, and fundraising—apply across the performing arts sector, including to institutions like the Kennedy Center.

9. Based on my experience and expertise, the process of shutting down the Kennedy Center and its ultimate closure will cause severe harm to the institution that cannot be undone even if the Court orders its reopening.

10. Based on public reporting, the leadership at the Kennedy Center has stated that it plans to reduce its staff to a "skeleton crew." When a performing arts organization loses most or

2

all of its staff, it loses two assets that cannot be quickly or easily replaced: institutional knowledge and organizational culture.

11. Experienced performing arts staff develop institutional knowledge over time: familiarity with their organization's systems, processes, and history that allows them to operate efficiently and anticipate problems before they arise. That accumulated knowledge and those working relationships cannot be transferred to a new team by instruction alone. They must be rebuilt through time and shared experience.

12. The Kennedy Center operates under the "presenting model," that is, it sources and presents performances from other producers from around the world rather than produce its own performances. In the presenting model in particular, a critical component of institutional capacity is the relationships that programming staff maintain with talent agencies, artist managers, and producing organizations who are the source of potential productions. When an organization's artistic and programming staff depart, those relationships depart with them. A new team must rebuild those relationships from scratch.

13. If the Kennedy Center closes for any significant period, its current staff will not wait for it to reopen. Experienced arts administrators and production professionals will seek employment at other performing arts organizations, and many will find it. A significant portion of the Kennedy Center's existing staff will likely relocate to other cities and will not be available to be rehired when the Center seeks to reopen.

14. Rebuilding a staff after a closure is a substantial undertaking. For senior leadership positions — Vice Presidents of programming, production, development, and similar roles — a national search is typically required, because candidates with the requisite experience may not be located in the greater Washington, D.C. area. A national search for senior leadership, often

conducted with the assistance of an executive search firm at a cost of $40,000 to $50,000 per search, can take six to nine months simply to identify and hire a candidate. Once senior leadership is in place, those individuals must then recruit and hire the staff below them. The total time required to rebuild a functioning senior leadership team and the staff supporting it could easily be a year to a year and a half — meaning once the Kennedy Center closes, it will take at least a year simply to be operationally staffed before it could resume full programming. During that ramp-up period, the organization would be incurring salary expenses without generating the income such as ticket sales, venue rentals, and related revenue that those salaries would ordinarily support.

15. In addition to losing staff, the Kennedy Center will be unable to resume programming, even if ordered by the Court. Instead, it could take at least a year—and potentially several years—to assemble a full season's programming after a closure.

16. The programming the Kennedy Center offers at any given time is constrained by what touring programming is available, when that programming is available, and whether the touring schedule aligns with the Kennedy Center's calendar. Presenting organizations like the Kennedy Center cannot simply decide to present a production that is not on tour, and as a result those organizations cannot compress the planning timeline that touring productions require.

17. Broadway series touring productions typically anchor the seasons of most major performing arts centers, including the Kennedy Center, because they generate the highest attendance, create a solid base of loyal patrons, and often account for the largest share of subscription holders. Securing a Broadway series show requires advance planning that typically begins more than a year beforehand. As with all other content, presenting institution seeking to book a production on tour cannot simply select a title; it must identify those that are touring,

4

confirm that the touring schedule and the center's availability are compatible, and negotiate terms. That process cannot be accelerated on demand.

18. A complete shutdown—even one that lasts for a brief period of time—will also severely harm the Kennedy Cetner's longstanding relationships. Once the Kennedy Center begins closing, companies and productions that have historically performed at the Kennedy Center on a regular basis will make commitments to other venues. When the Kennedy Center reopens, those companies will then already be contractually committed for one or more seasons and will be unable to return immediately. In addition, a company that has established a new presenting relationship with another venue during the Kennedy Center's closure may be reluctant to relinquish that relationship upon the Kennedy Center's reopening.

19. A shutdown will also severely harm the Kennedy Center's relationships with its existing donors for two related reasons. First, during a shutdown, no performances will exist for donors to sponsor. Performing arts philanthropy is substantially motivated by the donor's desire to underwrite specific programs and productions. When there are no programs or productions, the case for giving is substantially weakened. As the Kennedy Center's relationship with donors atrophies, those donors will cease feeling a connection to the Center. Second, many donors will adopt a wait-and-see posture, declining to make commitments until they can assess what the renovated facility looks like, how it will operate, and whether programming has returned to genres, artistic caliber, and levels they wish to support. Some donors will be alienated by aspects of the renovation itself particularly if the renovation alters the character of the living memorial of or diminishes its connection to President Kennedy's legacy and may not return as supporters at all.[1]

---

[1] According to the Kennedy Center's 2024 Form 990 filing, contributions excluding government sources were $127,227,485 or 41.4% of all revenues.

20.     The manner in which this closure has been announced compounds the harm to the relationship with donors. In my professional experience, a closure of this significance requires extensive advance planning and communication. Typically, that would begin at least a year before the closure date to communicate the organization's plans, explain the reasons for a complete closure rather than partial operation, and build donor support for sustaining the organization through the transition. Abruptly closing the Center, in contrast, will alienate donors.

21.     Furthermore, it is more common in major performing arts center renovations to attempt to keep at least a portion of the center operational throughout the construction period, precisely to maintain some level of audience engagement, earned income through reduced ticket sales and rentals, organizational continuity including maintain staff, and donor engagement. The Kennedy Center operates multiple performance spaces and galleries.[2]

22.     A closure will also severely harm the Kennedy Center's ability to retain and attract its existing audiences. If the Kennedy Center shuts down, even for only a few months, individuals who routinely patronize the Center will lose their relationship with the Center. It is extremely difficult to regain lost patrons once they depart an institution, even after it reopens. The performing arts sector's experience following the COVID-19 pandemic is instructive. Although there was initial enthusiasm when venues reopened after the pandemic-related closures, nationwide attendance at performing arts organizations subsequently settled at approximately fifty percent of pre-pandemic levels. Four years later, audiences are only now beginning to return to 2019 levels at many institutions. For example, in a recent study of 35 major organizations by JCA Performing

---

[2] In 2024, programming receipts, ticket handling fees, and theater license fees totaled $104,932,764 or 34.2% of all revenues, according to the Form 990 filing.

6

Arts, performing arts organizations did not see a return to pre-pandemic levels of audience attendance until the 2024 – 2025 season.

23. The harms which I have described are already beginning to materialize as the closure announcement creates uncertainty about the Kennedy Center's future. Artists, their representatives, and producing organizations making decisions about touring schedules and venue commitments for future seasons are doing so right now, without confidence about whether the Kennedy Center will be open to receive them.

24. Moreover, the on-again, off-again nature of a closure followed by a court-ordered reopening would itself cause reputational harm in the artist and presenting community. If the Kennedy Center closes, and a court subsequently orders it to reopen, artists and their representatives will be less willing to make commitments to the Kennedy Center in the future because of the demonstrated uncertainty about whether the Center is a reliable institutional partner. In addition, should a court re-open the Kennedy Center after its closure, the probability of any content being presented will be low, since scheduled artists will have made other arrangements and not be able to move back to the Kennedy Center on short notice. An injunction that prevents the closure from occurring in the first place avoids that uncertainty and preserves the institutional relationships and credibility that the Kennedy Center would otherwise lose.

25. In my professional judgment, the harms from closure—to staff, to programming, to relationships with donors, to audience relationships, and to the Kennedy Center's standing in the performing arts community—will not be fully remedied by a subsequent court order directing the Center to reopen. The shows that relocate cannot be rescheduled. The staff who depart will not all return. The donors who disengage will not re-engage. A court order preventing the closure before it is finalized is the only mechanism by which these harms can be avoided.

26. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 3/4/2026.

Signed by: Joshua Borenstein