**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

JOYCE BEATTY,

                    *Plaintiff*,

      v.

DONALD J. TRUMP *et al.*,

                    *Defendants*.

---

No. 25 Civ. 4480 (CRC)

<u>**REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER**</u>

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

ARGUMENT ............................................................................................................. 5

    I.    The Court Should Enjoin Defendants from Withholding Documents in Advance of the March 16, 2026, Board Meeting. .......................................................... 5

    II.   The Court Should Enjoin Defendants from Preventing Plaintiff from Voting........... 13

        A.  Plaintiff Is Likely to Succeed On Her Claim to Vote at Board Meetings............. 13

        B.  Plaintiff Will Suffer Irreparable Harm Absent Relief.......................................... 17

    III.  The Court Should Enjoin Defendants from Precluding Plaintiff's Participation in the Upcoming March 16 Meeting. ..................................................................... 19

    IV.  The Balance of Equities and Public Interest Favor a TRO Confirming Plaintiff's Rights to Receive Information, Participate, and Vote at the March 16 Meeting........ 21

CONCLUSION....................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Arc of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014)........................................................ 18

*Bd. of Directors, Washington City Orphan Asylum v. Bd. of Trs., Washington City Orphan Asylum*, 798 A.2d 1068 (D.C. 2002) ..................................................................................... 9

*\*Benedict v. Amaducci*, No. 92 CIV. 5239 (KMW),

1993 WL 87937 (S.D.N.Y. Mar. 22, 1993)........................................................... 2, 5, 11

*Cabaniss v. Cabaniss*, 464 A.2d 87 (D.C. 1983) ...................................................................... 9

*Clinton v. Jones*, 520 U.S. 681 (1997)..................................................................................... 21

*Equitable Tr. Co. v. Schwebel*, 32 F. Supp. 241 (E.D. Pa. 1940) ............................................ 5

*\*Fam. Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234 (D.C. 2015) ....................... 8, 10

*Farina v. Janet Keenan Hous. Corp.*, 335 A.3d 537 (D.C. 2025)............................................. 9

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................................ 15

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025).............................................. 18

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2011) ................................................................. 18

*He Depu v. Yahoo! Inc.*, 950 F.3d 897 (D.C. Cir. 2020) ........................................................... 9

*Hooker v. Edes Home*, 579 A.2d 608 (D.C. 1990) .................................................................. 10

*Kline v. Reed*, 479 N.E.2d 714 (Mass. 1985).......................................................................... 20

*MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994)...................................................... 15

*NLRB v. Amax Coal Co.*, 453 U.S. 322 (1981)........................................................................ 14

*Richardson v. Clarke*, 364 N.E.2d 804 (Mass. 1977)............................................................. 11

*Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912 (D.C. Cir. 2009) ............................................... 16

*Wilson v. Bd. of Directors of City Trusts*, 188 A. 588 (Pa. 1936) ...................................... 6, 11

**Statutes**

20 U.S.C. § 42(b) .................................................................................................................... 16

20 U.S.C. § 76h....................................................................................................................... 14

20 U.S.C. § 76*l*(a) .............................................................................................................. 11, 15

*\*20 U.S.C. § 76l(b) .......................................................................................................... 8, 11, 14

Uniform Trust Code § 703(g) ................................................................................................. 20

Uniform Trust Code § 703(h) (2000)...................................................................................... 20

**Other Authorities**

American Bar Association, *Model Nonprofit Corporation Act: Official Text with Official*

*Comments and Statutory Cross-references* § 8.04 cmt. 3 (4th ed. 2022) ................................. 14

G. Bogert et al., *The Law of Trusts and Trustees* 584 (Supp. rev. 2d ed. 1992)............................ 9

**Rules**

Fed. R. Evid. 602, 801, 1002 ........................................................................................ 17

**Restatements**

*Restatement (Second) of Trusts § 391 ........................................................................ 9

Restatement (Third) of Trusts § 39................................................................................ 20

Restatement (Third) of Trusts § 81................................................................................ 19

Restatement (Third) of Trusts § 81(1) ........................................................................... 14

Restatement (Third) of Trusts § 94................................................................................ 9

iv

## INTRODUCTION

On February 1, 2026—without any advance notice to the Board—President Trump announced that he will shutter the Kennedy Center in July and intimated he will demolish the building. The Board is slated to vote on these drastic measures on Monday, March 16, 2026. Defendants are already undertaking steps to effectuate the closure. *See* Declaration of Joseph LaFauci ("LaFauci Decl.") ¶ 5 (stating that "preliminary work has been started").

But Defendants flatly refuse to provide Plaintiff—and nearly every other Board member— *any* documents in advance of that meeting that will shed light on the nature of Defendants' plans, such as a description of the anticipated construction, blueprints, timelines, budgets, or analysis regarding the need to completely shutter the Kennedy Center during construction. Instead, Defendants state they will provide a "construction update" at the Monday meeting—after which, according to the agenda, the Board will immediately vote on enormously consequential changes to the Kennedy Center. Meanwhile, Defendants have made clear that they will not allow Plaintiff to cast a vote on that momentous decision, even though she is a trustee. And they have stated that even her right to participate and speak at the meeting will be "subject to . . . the discretion of the Chair"— which, if past is prologue, means that Plaintiff is again likely to find herself completely silenced.

This is extraordinary, and it warrants this Court's immediate intervention. Major renovations of public arts centers take *years* to assess and plan. Trustees evaluate substantial evidence as part of a lengthy and deliberate process. *See* Declaration of Deborah Borda ("Borda Decl.") ¶ 18; Declaration of Edwin Andrew Taylor ("Taylor Decl.") ¶ 15. Responsible fiduciaries do not make decisions of this magnitude based on brief oral presentations made *the same day* as the vote. This rush to rubber stamp President Trump's closure and demolition of a living memorial to a fallen President and one of our nation's most important arts venues is the height of imprudence. It is also

1

part of a concerted strategy: Defendants are hiding the details of their unlawful actions, silencing dissenters, and sprinting to irrevocably alter the Kennedy Center before anyone can object.

Exercising her rights as a trustee, Plaintiff requested that Defendants provide her specific information regarding the closure and construction in advance of the upcoming Board meeting, including: a detailed description of the construction; architectural plans and drawings; the identities of contractors; proposed contracts; timelines for securing necessary regulatory approvals; analyses regarding the need to close the center; and information about the Kennedy Center's existing contracts that will be canceled.  *See* Declaration of Joyce Beatty ("Pl.'s Decl."), Ex. D at 3-4.  These are all things that Defendants should already have assembled, notwithstanding their vague statement that certain materials have not been "finalized."  If they have not assembled these basic materials, the Board has a right to know that too in advance of the meeting, because it will confirm this shutdown is poorly planned and ill-conceived.

Defendants flatly refuse to provide Plaintiff *any* of that information.  Instead, Defendants assert that they have sole discretion to decide what information a trustee receives; argue that Plaintiff must be content with whatever curated presentation they provide on March 16; and claim they will be harmed if the Court orders them to provide her anything else.

Those assertions are wrong. "A trustee, 'particularly one empowered to exercise greater control, or having greater knowledge of trust affairs' is under a duty 'to inform each co-trustee of *all material facts* relative to the administration of the trust.'"  *Benedict v. Amaducci*, No. 92 CIV. 5239 (KMW), 1993 WL 87937, at *9 (S.D.N.Y. Mar. 22, 1993) (quoting  G. Bogert, Trusts & Trustees § 584, at 40 (Supp. rev. 2d ed. 1992)) (emphasis added).  "By refusing to provide a co-trustee with trust information, or a meaningful opportunity to review this information, a co-trustee commits a breach of trust."  *Id.* (quotation marks omitted).

Plaintiff is not asking the Defendants to compose a bespoke presentation for her. She is asking for the timelines, budgets, and plans Defendants *already have prepared*, or so they claim. In fact, President Trump stated that his decision to shutter the Center was based on a one-year comprehensive review. There is no reason Defendants cannot transmit documents from this one-year review to Plaintiff. She respectfully requests that the Court not permit Defendants to hide the details of their plans—or the fact that no plans exist. She asks that the Court require Defendants to provide the comprehensive review and the other materials Plaintiff requested, or confirm their non-existence, immediately, so that she has this information before the March 16, 2026, meeting.

The Court should similarly ensure that Plaintiff may deliberate and vote in the upcoming meeting, both functions being critical to her ability to fully participate in this significant decision. In December, Plaintiff was prevented from speaking in opposition to the Kennedy Center's unlawful name change. There is every reason to expect Defendants will try to silence her again. The Response confirms as much. According to Defendants, Plaintiff's ability to participate in the upcoming meeting is subject to "the discretion of the Chair." Defendants' Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order ("Resp.") at 5. The message is clear: President Trump (acting in his capacity as Chairman of the Board), and the loyalists he installed alongside him on the Board, will again prevent Plaintiff from speaking. This is unlawful. It is a breach of fiduciary duty for a co-trustee to silence and ignore dissenting voices, particularly in a meeting of this magnitude. The Court can and should issue an order that prevents Defendants from categorically barring Plaintiff from speaking. The Court should also ensure that Plaintiff can vote in the upcoming meeting. The statutory text, structure, and history all make clear that *ex officio* members have full voting rights. Defendants barely engage with that text, and nothing they say comes close to moving the needle. To the extent that the recent bylaws purport to strip *ex officio* members of their voting

rights, they are invalid.

Three overarching points bear emphasis. *First*, throughout their response, Defendants stress that they invited Plaintiff to the March 16, 2026 meeting by email, that she is "permitted to attend" and that this "obviates nearly all of the harm Plaintiff asserts." Resp. at 16. This misconstrues the gravamen of Plaintiff's Motion, which is about *full participation* and not just mere attendance. Plaintiff appreciates Defendants' confirmation that she can attend the meeting at the White House. Upon further investigation, it appears that the email regarding the Board meeting was routed to Plaintiff's spam folder. But it bears emphasis: When Plaintiff searched for and was unable to find the email last week, she contacted Defendant Richard Grenell and the Kennedy Center's General Counsel. They ignored her *for two days*. As a result, Plaintiff had reason to believe Defendants— who had already silenced her in the December meeting—had excluded her from the upcoming meeting. Regardless, in any event, her being "permitted to attend" does not come anywhere close to remediating her harms.

*Second*, Plaintiff has not slept on her rights regarding her ability to vote in Board meetings. She filed this case in December 2025, as soon as Defendants silenced her and prevented her from voting regarding the unlawful renaming of the Kennedy Center. Plaintiff then did everything possible to prevent this Court from having to address this upcoming meeting in an emergency posture—including by requesting information about the planned closure from Defendants and advance notification of the Board meeting. It is Defendants who (1) abruptly announced the dramatic decision to shutter the Kennedy Center only a few months in advance with zero discussion by the Board, (2) swiftly scheduled the March 16, 2026 meeting with little notice, (3) have continually refused to provide Plaintiff with critical information she requested, and (4) refuse to postpone the meeting for even a brief period of time to permit the Court to consider this matter under a less

compressed schedule.

*Third*, Defendants are barreling forward with plans to close and quite likely demolish the Kennedy Center—in direct violation of the law that Congress enacted. The preliminary injunction motion asks this Court to halt those unlawful actions. The TRO motion before the Court is similarly geared to stop the imminent destruction of this sacred national institution. President Trump's consistent tactic—with the East Wing of the White House, with the renaming of the Kennedy Center, and now with its closure—has been to shroud his actions in secrecy and move so fast that no one can intervene and probe the decision-making.

As part of that strategy, Defendants are obstructing Plaintiff from performing her fiduciary duties to investigate and oppose their illegal and imprudent efforts. This Court should not permit Defendants to hide their actions or to silence their critics. Irreparable harm will occur if Defendants are permitted to rush through a vote to shutter and "rebuild" the Kennedy Center on Monday, all without affording Plaintiff the necessary information about their plans and a full and fair opportunity to be heard in dissent. The balance of equities also favors relief. The Court should issue the requested TRO.

## ARGUMENT

## I.     The Court Should Enjoin Defendants from Withholding Documents in Advance of the March 16, 2026, Board Meeting.

Defendants' Opposition underscores that Defendants must provide Plaintiffs access to critical information in Defendants' possession regarding the proposed shutdown and demolition of the Kennedy Center. Defendants do not meaningfully dispute that a trustee has a legal right to require a co-trustee to provide "all material facts relative to the administration of the trust." *Benedict*, 1993 WL 87937, at *9; *see also, e.g.*, *Equitable Tr. Co. v. Schwebel*, 32 F. Supp. 241, 243 (E.D. Pa. 1940), *aff'd*, 117 F.2d 738 (3d Cir. 1941); *Wilson v. Bd. of Directors of City Trusts*,

188 A. 588, 594 (Pa. 1936).  This is common sense.  A trustee cannot conduct prudent decision-making and even rudimentary oversight without basic information about the actions proposed for the trust, the reasons for those actions, and their anticipated consequences.

 The information Plaintiff seeks is in no way unusual.  In the typical circumstance, when trustees are asked to decide whether to shutter a performing arts institution and engage in massive construction, they would have before them

> extensive reports, cost analyses, construction plans, and third-party validated budgets, including but not limited to architectural plans, blueprints, identification of primary engineers, general contractor(s), and acoustical specialists, specific site planning, and independent cost analysts.

Taylor Decl. ¶ 15.  Indeed, as the former President of the New York Philharmonic explains, projects of the magnitude announced by President Trump "are typically planned at least four to five years in advance," and boards meet for "years reviewing" the plans.  Borda Decl. ¶¶ 16-17.  That is why—after President Trump announced a closure, based on an alleged comprehensive one-year review by experts, but before filing this Motion—Plaintiff requested Defendants immediately provide her the information that would enable her to evaluate that decision.

The information Plaintiff requests is particularly crucial because of the Kennedy Center's unique status as an entity created by Congress and because Defendants' proposed actions go to heart of the operation of that entity.  The Kennedy Center may cease performing its statutory functions only with congressional approval, and the Kennedy Center may similarly only engage in major construction with congressional authorization.  President Trump and Defendant Grenell have nevertheless said they will close and intimated they will demolish the Kennedy Center, without any congressional authorization, while simultaneously attempting to remain ambiguous about the details of what will occur.  This strategy appears tailor-made to shroud Defendants' actions from scrutiny and prevent anyone from weighing in before it is too late to stop them.  It is

therefore critical for Plaintiff—who is charged in her role as trustee with overseeing the Kennedy Center—to ascertain precisely what is planned and why.  Plaintiff will suffer irreparable harm if she does not receive this information *before* the Board is asked to vote on and endorse President Trump's plans.

Nor is the information Plaintiff requested onerous for Defendants to provide.  It bears emphasis: President Trump touted the fact that his decision was based on a comprehensive one-year review of the costs and benefits of closure.  *See* Freeny Decl., Ex. E.  It should be straightforward for Defendants to provide Plaintiff the results of that review.  It should be similarly straightforward for Defendants—who are concededly already *in the process* of closing the Kennedy Center and have started "preliminary work," *see* LaFauci Decl. ¶ 5—to provide documents such as plans, blueprints, timelines, and financial analyses.  This material should be readily available unless Defendants commenced that preliminary shutdown work without the basic planning and analysis that even a minimum of fiduciary care would demand.  Moreover, Defendants admit that they *have* provided some information to a subset of trustees—and there is no reason they cannot provide that information to Plaintiff forthwith.  *See id*. ¶ 6 ("[I]nformation regarding construction planning has been presented to the members of the Building and Grounds Committee.").

Alternatively, it may be the case that there never was a one year review; that Defendants do not have analysis, plans, blueprints, timelines, or budgets; and that Defendants are making it up as they go along.  That seems to be the import of Defendants' protestation that they should not have to provide information to Plaintiff "before it has been finalized," i.e., in advance of the meeting.  Resp. at 16.  If that is the case, Plaintiff has a right to know that Defendants do not have the requested information.  The *absence* of documentation is as material to the upcoming Board

decision as the documentation itself. A trustee cannot discharge her fiduciary obligation to deliberate and vote on a proposed course of action without knowing whether the proposal is supported by the kind of careful planning and analysis that would ordinarily be expected for an endeavor of this magnitude. If such documentation does not exist, it is imperative Plaintiff be able to relay that fact to her colleagues in Congress and the public as part of her fiduciary duty to oversee this treasured national institution.

Defendants offer precious little in response—and what they do say only confirms that the Court should enjoin them from withholding documents from Plaintiff, that Plaintiff will suffer irreparable harm absent relief, and that Defendants would suffer no harm whatsoever.

***Likelihood of Success.*** As a threshold matter, Defendants argue that D.C. trust law applies and suggest that, under D.C. law, Plaintiff cannot assert any claim against a co-trustee. But Congress imbued Kennedy Center trustees by statute with "all the usual powers and obligations of a trustee." 20 U.S.C. § 76l(b). There is every reason to think that Congress meant this to include, at a minimum, widely accepted principles of trust law as set forth in Restatements and as recognized by courts across jurisdictions. But because the result is the same if the Court looks to D.C. law, it does not make a difference to the outcome of this TRO. At a minimum, for the reasons explained below, Plaintiff has shown she is likely to prevail on her claims under D.C. law, which is all that is needed at the TRO stage.

As the D.C. Court of Appeals has explained—in a case involving "a charitable corporation akin to a charitable trust"—even an "*ousted director*" may "maintain a proceeding to enforce the trust." *Fam. Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234 (D.C. 2015) (emphasis added, quotation marks added). Under D.C. law, "when co-trustees are appointed to act as stewards of a trust, each trustee shall exercise reasonable care to prevent a co-trustee from

committing a serious breach of trust; and compel a co-trustee to redress a serious breach of trust." *Id.* (cleaned up); *cf. Bd. of Directors, Washington City Orphan Asylum v. Bd. of Trs., Washington City Orphan Asylum*, 798 A.2d 1068, 1077 (D.C. 2002).

In short, D.C. law permits co-trustees to sue to enforce the terms of a charitable trust—and, at minimum, there is no reason to think the D.C. Court of Appeals would deviate from the dominant view among common law courts. This is long settled blackletter law. As the Second Restatement of Trusts explains: "A suit can be maintained for the enforcement of a charitable trust by the Attorney General or other public officer, or *by a co-trustee*, or by a person who has a special interest in the enforcement of the charitable trust . . . ." Restatement (Second) of Trusts § 391. The Third Restatement—which Defendants cite, Resp. at 11—says the same thing: "A suit for the enforcement of a charitable trust may be maintained only by the Attorney General or other appropriate public officer *or by a co-trustee or successor trustee* . . . ." Restatement (Third) of Trusts § 94(2) (emphasis added). There is simply no reason to believe D.C. departs—in any way— from these hornbook principles. *See He Depu v. Yahoo! Inc.*, 950 F.3d 897 (D.C. Cir. 2020) ("Because the D.C. Court of Appeals cites *Bogert on Trusts* and the *Restatement (Second) of Trusts* as authoritative in applying the common law of the District, we do so as well."); *Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C. 1983) ("In the absence of any definitive case or other authority in this jurisdiction on the specific matter at issue, we have turned to, and conclude we agree, with the pertinent sections of the Restatement (Second) of Trusts (1959)."); *In re D.M.B.*, 979 A.2d 15, 24 n.8 (D.C. 2009) (similar); *Farina v. Janet Keenan Hous. Corp.*, 335 A.3d 537, 550 (D.C. 2025) (similar). Defendants themselves admit as much when they say that "District of Columbia law on trustees' rights to enforce the terms of charitable trusts accords with the common-law treatises Plaintiff cites," Resp. at 11 n.3, but fail to acknowledge that this common law also includes the

right of co-trustees to bring suit.[1]

The result is the same if the question is framed in terms of special interest standing under D.C. law. *See Fam. Fed'n for World*, 129 A.3d at 244-245 n.16 (finding that ousted directors had both co-trustee standing and special interest standing). To establish special interest standing, a plaintiff must show: (1) that the action challenges an "extraordinary measure threatening the existence of the trust," not just an "ordinary exercise of discretion" committed to the trustees; and (2) that the plaintiffs belong to a "sharply defined" class that is "limited in number." *He Depu*, 950 F.3d at 906.

Both requirements are readily satisfied in this case. The composition of the Kennedy Center's Board, and the trustee' voting and participation rights, are of foundational importance. Furthermore, the information that Plaintiff seeks in advance of the Monday meeting—documents, plans, and analysis relating to a full shutdown and "rebuilding" of the Kennedy Center—is not a mere administrative matter. Instead, the shutdown which Plaintiff seeks to understand directly threatens the "existence of the trust." *Hooker v. Edes Home*, 579 A.2d 608, 614-615 (D.C. 1990). Finally, Plaintiff is one of a handful of trustees—meaning she is part of a sharply defined class, distinct from the broader public at large.

The decision in *Family Federation* is instructive. There, the D.C. Court of Appeals held that two "ousted directors" met the requirements for "special interest" standing—in addition to standing as co-trustees. 129 A.3d at 244. The ousted directors challenged an improper takeover of the board, the diversion of corporate expenditures, and self-dealing. *Id*. at 241-42. The court found

---

[1] Defendants are also wrong to argue that the principles of private trusts are not applicable to charitable trusts. Resp. at 10 n.2. As the restatement makes clear, "[t]he duties of the trustees with respect to the administration of charitable trusts are the same as the duties of the trustees of private trusts." Restatement (Second) of Trusts § 379.

that the plaintiffs had the requisite "special interest" to contest these actions. *Id.* at 244. By comparison, Plaintiff is in an even stronger position to claim "special interest" status as a *current* co-trustee than the "ousted directors" and "alleged successor trustees" in *Family Federation*. And the action she is challenging—the deprivation of her right to obtain information about the proposed shutdown of the Kennedy Center, fully participate in the March 16 meeting, and vote on the shutdown proposal—are at least as serious, if not more, than the actions challenged in *Family Federation*. In sum, under either theory of standing, the D.C. law is clear: Plaintiff can bring her claims to challenge Defendant's actions.

Defendants next claim that "Congress gave the Board discretion to determine the 'procedure[s]' it would undertake to administer its trust funds," including whatever information co-trustees provide to one another. Resp. at 9 (quoting 20 U.S.C. § 76*l*(a)). According to Defendants, they—or some subset of Defendants—and they alone may determine the information to which Plaintiff is entitled, when she receives it, and in what format.

Not so. Congress expressly charged the Board with "all the usual *powers and obligations* of a trustee." 20 U.S.C. § 76*l*(b) (emphasis added). A quintessential power of a trustee is the right to seek material information about the trust, and one of the obligations of a trustee is the duty to provide such information. *Benedict*, 1993 WL 87937, at *9; *Equitable Tr. Co.*, 32 F. Supp. at 243; *Wilson*, 188 A. at 594. It is likewise axiomatic that "while a majority vote of the trustees may bind the trust, all trustees must be adequately consulted and must participate in business transactions involved in the administration of the trust." *Richardson v. Clarke*, 364 N.E.2d 804, 807 (Mass. 1977). Nothing suggests that Congress intended to depart from that longstanding principle of trust law and allowed the Board, though its bylaws, to strip trustees of their right to access information, which is one of the "usual powers and obligations of a trustee." Regardless, Defendants point to

nothing in the bylaws that actually limits what information Plaintiff may request and receive. Moreover, it is perverse to suggest that Plaintiff—who has grave concerns that President Trump and Mr. Grenell are violating the Kennedy Center's organic statute—must rely exclusively on the curated information they choose to provide her.

*Irreparable harm.* Defendants suggest that Plaintiff suffers no irreparable harm because she will receive information at the Board meeting—immediately before the Board votes. This argument fails several times over.

For starters, having the information *in advance* is necessary for Plaintiff to prepare for the meeting and the ensuing discussion. Indeed, it is bizarre that Defendants intend to provide an "update on construction," Resp. at 5—the first time the issue has been presented to the Board— and ask Board members to vote on that proposed construction and closing *in the same meeting*. *See* Declaration of Todd Valentine ("Valentine Decl."), Ex. A. This is the opposite of responsible stewardship.

For another, Defendants have offered no details whatsoever about what the presentation on Monday will entail. In their response, Defendants notably do not commit to providing any of the specific information Plaintiff requested, such as timelines, copies of blueprints, analysis of the costs and benefits of closure, proposed contracts, and budgetary information. Instead, Defendants' position seems to be that—so long as they provide *some* information, regardless of what that information is—Plaintiff cannot complain. Not so. It is imperative that Plaintiff receive the information she requested—to the extent it exists—in order to allow her to evaluate any representations that are made to the Board. Allowing the Monday meeting to proceed, and the Board to vote on these momentous changes, without that relief would irreparably harm Plaintiff's ability to participate meaningfully in deliberations and cast an informed vote. It would be

unworkable for Plaintiff to have to rely solely on whatever curated presentation President Trump and Defendant Grenell choose to provide—without any underlying information necessary to evaluate it. Finally, it is critical that Plaintiff receive information in original documentary form which will enable her to carefully scrutinize precisely what Defendants intend and why.

      ***Balance of equities.*** Defendants suggest that providing Plaintiff with the information she requested—the bare minimum information trustees should receive—will "inflict significant harm on Defendants." Resp. at 15. Defendants provide not a shred of explanation for why that is so. Again, Plaintiff asked for the type of information that Defendants should already have at their fingertips—including President Trump's asserted one-year review. If Defendants cannot provide that information—because they do not actually have it—that is, itself, telling information material to the decision at issue and Plaintiff deserves to know that too.

      Because there is no conceivable harm to Defendants from either providing the requested information or acknowledging that it does not exist, the balance of equities sharply favors issuing the TRO. Providing Plaintiff the requested information would also benefit the public interest by enabling Plaintiff, other co-trustees, and ultimately the public at large to understand and evaluate the proposed closure and demolition of this treasured national institution.

## II.    The Court Should Enjoin Defendants from Preventing Plaintiff from Voting.

### A.    Plaintiff Is Likely to Succeed On Her Claim to Vote at Board Meetings.

      As a member of the Board of Trustees, Plaintiff is entitled to fully participate in the Board's decisionmaking, including by voting. Defendants' argument to the contrary rests on a faulty premise: that the Kennedy Center's bylaws are the operative "governing document" for determining trustees' voting rights. But for a congressionally created federal trust such as the Kennedy Center, the controlling governing instrument is the organic statute enacted by Congress—

not internal bylaws later adopted by the Board.  The statute establishes the trust, creates the Board, specifies its composition, and permits the Board to create bylaws.  *See* 20 U.S.C. § 76h.  The statute is inherently supreme to the bylaws the Board adopts.

Congress directed that the Board "be composed of" specified categories of trustees— including ex officio members—and vested the Board collectively with "all the usual powers and obligations of a trustee."  20 U.S.C. §§ 76h, 76l(b).  The statute does not distinguish between the powers or obligations of trustees based on how they joined the Board.   Congress's use of established legal terms carries settled meaning, *see NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981),  and under basic trust law, each trustee has both the duty and the right to participate in the administration of the trust, including in collective decisionmaking, *see* Restatement (Third) of Trusts § 81(1) ("If a trust has more than one trustee, except as otherwise provided by the terms of the trust, each trustee has a duty and the right to participate in the administration of the trust.")

Accordingly, Defendants are wrong when they suggest that the absence of any mention of voting in the statute means that *ex officio* members have no such rights.  Resp. at 8.  Voting is not an additional privilege that must be separately granted; it is a core component of trusteeship unless the governing instrument—here, the statute—expressly provides otherwise.    American Bar Association, *Model Nonprofit Corporation Act: Official Text with Official Comments and Statutory Cross-references* § 8.04 cmt. 3 (4th ed. 2022) ("The term 'ex officio' does not include the concept that the position is nonvoting. If an ex officio director is to be nonvoting, that must be provided for expressly.").  Defendants' argument also proves too much.  The statute does not mention the voting rights of general trustees either, but no one doubts that they may vote—and that this right cannot be stripped away by a bylaw adopted by other members of the Board.

Moreover, where Congress wishes to depart from the presumption that board membership

comes with voting rights, it does so expressly. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (looking to the "overall statutory scheme" and other Acts of Congress to determine that Congress precluded agency interpretation). As Plaintiff's opening brief explained, the United States Code contains numerous statutes that expressly designate particular members as "nonvoting," including multiple statutes that designate some members as "ex officio" and others as "nonvoting ex officio." *See* Pl.'s Mem. at 15-16. That drafting practice confirms the background presumption that voting authority accompanies membership—including *ex officio* membership—on a governing board *unless Congress provides otherwise*.

Defendants cannot override Congress's clear intent that ex officio members possess voting rights by invoking the Board's general authority to adopt "bylaws, rules, and regulations" relating to "the organization and procedure of the Board." 20 U.S.C. § 76l(a). That delegation covers internal mechanics—how meetings are conducted, how committees operate, and similar procedural matters. Voting rights are not merely procedural. They determine who exercises the governing authority Congress created.

Indeed, under the government's theory, the Board could use internal bylaws to strip voting rights from a group of disfavored trustees—or even from a handful of appointed trustees—all of whom Congress itself vested with all the ordinary rights and obligations of a trustee. Courts do not lightly presume that Congress has delegated authority to make fundamental changes to a statutory structure—particularly through broadly worded grants of internal administration or procedure. *See MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994) (refusing to read agency authorization to "modify" a requirement as permitting an agency to "fundamental[ly] change" it).

That principle is reinforced by Congress's treatment of board structure elsewhere. When

Congress intends to delegate authority to make structural changes to governing boards, it does so explicitly. For example, Congress has authorized the Board of Regents of the Smithsonian Institution to modify the composition of certain boards operating within the Smithsonian system. *See* 20 U.S.C. § 42(b). But Congress simultaneously barred the Regents from modifying both their own composition *and* the composition of the Kennedy Center Board. *Id.* That limitation reflects Congress's deliberate decision to fix the decision-making structure of the Kennedy Center Board by statute rather than allow it to evolve through internal bylaw amendments. Defendants' theory would invert that framework by allowing the Board to accomplish through bylaws what Congress chose to resolve in statute. And Defendants' theory of delegation ultimately collapses under its own logic: if the Board truly possessed authority to decide which trustees may vote, it could exercise that authority only through a vote of the trustees themselves—thereby presupposing that their voting rights were already established.

Finally, Defendants' assertion that *ex officio* trustees historically did not vote fails both legally and factually. As a legal matter, even a longstanding practice cannot override the proper construction of the statute, as set forth above. *See, e.g.*, *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009) ("[N]o amount of historical consistency can transmute an unreasoned statutory interpretation into a reasoned one."). In any event, Defendants' own submissions do not establish a historical practice of excluding ex officio trustees from voting. The declaration of former Board member William Shuster reflects only that he personally never voted or observed ex officio members voting (with no indication on how often he attended Board meetings by which that observation might be measured).[2] In contrast, Plaintiff, speaking with personal knowledge,

---

[2] The declaration of Joseph LaFauci fares even worse. Mr. LaFauci joined the Kennedy Center only in Spring 2025, when the bylaws were changed, undercutting any claim to personal knowledge on the matter of prior practice. He also provides no foundation for his review of

has confirmed that she "ha[s] voted on matters in the past," and even offered a possible reason Defendants' declarant did not notice ex officio voting—because votes were conducted by voice, and, until recently, were largely non-controversial and unanimous.  Beatty Decl. ¶ 5 (ECF No. 13-2).  Moreover, Plaintiff submits herewith a declaration from the President of the Kennedy Center from 1991 to 2001, who attended "numerous" meetings during his tenure and observed that *ex officio* members "voted on Board resolutions in the same manner as the trustees appointed by the President," and that no distinction in voting rights was ever asserted.  *See* Declaration of Lawrence Wilker ("Wilker Decl.").  Finally, there is no dispute that the bylaws first excluded *ex officio* members from voting only in 2025, further undermining Defendants' suggestion that non-voting reflected an established historical rule.

### B.      Plaintiff Will Suffer Irreparable Harm Absent Relief.

Defendants do not dispute that—if Plaintiff has voting rights—she will suffer irreparable harm from being prevented from exercising her rights at the upcoming March 16, 2026 meeting. This makes sense: If that vote occurs—and Plaintiff is barred from participating—there is no way to unrung that bell. As the D.C. Circuit has stressed in a comparable contest, it is critical for a public official on a multimember body to be able to register dissent.   Congress included congressional ex officio members on the Board "to represent certain views."  *Cf. Cummock v. Gore*, 180 F.3d 282, 291 (D.C. Cir. 1999). It would "nullify Congress's express intent" if Plaintiff were prevented from voting.  *Id*.   Nor do Defendants point to any meaningful harm to them if Plaintiff is allowed to vote.

---

unspecified records.  If records of past voting practices existed to support Defendants' position, one would expect them to have been provided, or at least explained in some fashion. Accordingly, Mr. LaFauci's "belief" about voting is entitled to no weight.  *See* Fed. R. Evid. 602, 801, 1002.
.

Instead, Defendants solely accuse Plaintiff of sleeping on her rights. Resp. at 15-17. That argument fails as a matter of law. Under binding D.C. Circuit precedent, a "delay in filing" without more "is not a proper basis for denial of" emergency relief. *Gordon v. Holder*, 632 F.3d 722, 724-725 (D.C. Cir. 2011). Defendants are also factually wrong: Plaintiff sought to vindicate her voting rights *months ago*—as soon as her voting rights were denied on an issue of monumental importance in December 2025. She then promptly sought emergency relief in the form of her motion for a TRO when Defendants scheduled another Board meeting without giving her any warning, despite her request for advance notice to forestall precisely this circumstance. *See Arc of California v. Douglas*, 757 F.3d 975, 990-991 (9th Cir. 2014) ("[T]ardiness is not particularly probative in the context of ongoing, worsening injuries."). And it makes sense that Plaintiff waited until an actual controversy over a significant matter crystallized. As the Ninth Circuit has explained, "waiting to file for preliminary relief until a credible case for irreparable harm can be made is prudent rather than dilatory." *Id.*

Indeed, another Court in this district recently concluded that an alleged delay in challenging an Executive Order was "not a sufficient basis to deny" injunctive relief where "the effects of [the agency's] actions" were simply "more acutely felt" as the affected teachers "prepare for the school year." *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 100 (D.D.C. 2025). So too here. The harm to Plaintiff from denial of her voting rights was first made concrete and "acutely felt" when she was denied the ability to participate in the December 2025 meeting regarding the Kennedy Center's name change—whereupon Plaintiff promptly sued. The harm was heightened when Defendants scheduled the upcoming Monday, March 16, 2026 Board meeting without any prior notice and without providing critical information in advance—whereupon Plaintiff promptly sought a TRO. And the harm will become irreparable if the March 16 meeting proceeds without the requested

relief.

The blame for the urgent posture of this TRO motion lies with Defendants.  Following the December meeting, Plaintiff sought assurances that she would be allowed to vote in future Board meetings, and also requested advanced warning from Defendants about the next Board meeting to prevent the need to seek emergency relief.  Defendants refused to provide her that notice—and, indeed, insist on barreling forward with the March 16, 2026 meeting to facilitate their unlawful planned shutdown and construction—rather than press pause for this Court to consider the legal questions.

## III.    The Court Should Enjoin Defendants from Precluding Plaintiff's Participation in the Upcoming March 16 Meeting.

Finally, the Court should—at the very least—grant the TRO to ensure that Plaintiff may actively participate in the deliberations at the upcoming meeting.  This is no ordinary meeting. The Board will weigh whether to take a step—shuttering the Kennedy Center and potentially irrevocably altering its building—in ways that directly flout the law.  It is critical that trustees be able to participate fully in this extraordinary decision.  That is so even if they ultimately cast a vote only in dissent—and indeed, even if they do not vote at all.

Basic principles of trust law confirm that where a trust has multiple trustees, "each trustee has a duty *and the right* to participate in the administration of the trust."  Restatement (Third) of Trusts § 81 (emphasis added); *see also id.* cmt. c ("[E]ach co-trustee has a duty, and also the right, of active, prudent participation in the performance of all aspects of the trust's administration."). "Implicit in this requirement of prudent participation is a duty of reasonable cooperation among the trustees," *id.*, which includes sharing relevant information among co-trustees and allowing feedback from co-trustees about significant decisions affecting the trust.

As part of the exercise of their responsibilities, trustees have a right to be heard on decisions

affecting the trust, even when they hold a minority position or are ultimately out-voted by their other co-trustees.  *See* Restatement (Third) of Trusts § 39, cmt. a ("[W]hen feasible all trustees must be consulted before decisions are made.").  "[W]hile a majority vote of the trustees may bind the trust, all trustees must be adequately consulted and must participate in business transactions involved in the administration of the trust." *Richardson*, 364 N.E.2d at 807; *see also Benedict*, 1993 WL 87937, at *9 ("[E]ven though a majority of trustees are authorized to act for [the trust], each trustee is entitled to access to trust records and to information regarding the administration of the trust," in order to "fulfill their duties" as a trustee by participating in trust-related decision-making); *Kline v. Reed*, 479 N.E.2d 714, 717 (Mass. 1985) ("[I]t does not necessarily follow that because [one trustee] could outvote [another], she could validly disregard him altogether and act alone.").[3]

Accordingly, it does not matter whether Plaintiff's advocacy at the upcoming March 16, 2026 meeting would be outcome-determinative or not—although Plaintiff sincerely hopes that her fellow trustees will enter the room with an open mind.  As a trustee, Plaintiff has a right to participate fully in deliberations about that decision, and to make her voice heard, even if she ultimately dissents.  *See* Cummock, 180 F.3d at 284 (holding that "right to participate fully" in FACA commission included the right to dissent).  Any effort by the Chair, or any other trustee, to silence Plaintiff or to otherwise preclude her full participation during the March 16 meeting (as previously occurred during the December 18, 2025 meeting) would therefore itself be a breach of

---

[3] Under trust law, a trustee's full and informed participation in the deliberations is essential to ensuring that she cannot later be held responsible for any breach of trust committed by the majority of trustees.  *See* Uniform Trust Code § 703(h) (2000) (providing that a "dissenting trustee . . . who notified any cotrustee of the dissent at or before the time of the action" cannot be held liable for the decision from which they dissented, unless they later join in the action and "the action is a serious breach of trust"); *id.* at § 703(g) ("[A] trustee who does not join in an action of another trustee is not liable for the action.").

trust.  Plaintiff is entitled to an order from this Court clarifying that she will be permitted to fully participate on March 16 and make her position on the proposed closure and "rebuilding" known.

In their opposition, Defendants claim that Plaintiff will be permitted "to participate in the meeting, subject to orderly management at the discretion of the Chair."  Resp. at 5.  This carefully caveated statement provides little comfort given recent events.  At the recent December meeting, while participating remotely, Plaintiff was muted while attempting to voice her opposition to the renaming of the Center.  If past is prologue, there is every reason to expect that dissenting voices will again be silenced absent judicial intervention.  To be clear, Plaintiff is not asking the Court to supervise the minute-to-minute conduct of a Board meeting, nor does Plaintiff seek judicial oversight over ordinary parliamentary management.  Instead, she seeks only a narrow order that she may not be categorically prevented from exercising her basic right as a trustee to speak at the meeting and participate in the deliberations.[4]

Finally, Plaintiff will suffer irreparable harm if the Court does not provide relief.  As with Plaintiff's ability to vote, once Defendants prevent Plaintiff from participating in the meeting, it will be impossible to provide her effective relief.  Defendants—once again—do not contest this basic fact.

## IV.    The Balance of Equities and Public Interest Favor a TRO Confirming Plaintiff's Rights to Receive Information, Participate, and Vote at the March 16 Meeting.

The balance of equities and public interest both sharply favor a TRO.  For all the reasons explained above, Plaintiff faces serious irreparable harms absent a TRO.  Moreover, as already

---

[4] While the Chair is currently the President of the United States, he would be acting here in his capacity as Chair of the Kennedy Center Board—a role never before occupied by a President—rather than in his official presidential capacity.  Courts have long recognized that the President does not enjoy immunity when acting outside the core functions of the presidency.  *See Clinton v. Jones*, 520 U.S. 681, 694-695 (1997).

explained, Defendants will not suffer any meaningful harm from providing documents already in their possession—such as the one-year review President Trump commissioned.   Nor will Defendants suffer any harm from following the law, and permitting Plaintiff to vote and participate in the meeting in her role as a trustee.   The balance of equities thus tils strongly in favor of relief.

Finally, the public interest is served by ensuring that, before the Board enacts fundamental modifications to the Kennedy Center that violate the Center's organic statute and that cannot be undone, the Board does so with all the information and with the full participation of all the trustees.

## CONCLUSION

For the foregoing reasons and those in her motion, Plaintiff respectfully requests that this Court grant the TRO.

Respectfully submitted,

/s/ Norman Eisen
NORMAN EISEN
  (D.C. Bar No. 435051)
STEPHEN JONAS
  (D.C. Bar No. 90037069)
DAVID OGDEN
  (D.C. Bar No. 375951)

DEMOCRACY DEFENDERS ACTION
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
  (D.C. Bar No. 1724093)
/s/ Kyle R. Freeny
KYLE R. FREENY
  (D.C. Bar No. 1684764)
SAMANTHA P. BATEMAN
  (D.C. Bar No. 492919)
ELIZABETH D. COLLERY
  (D.C. Bar No. 4222246)
ALEXANDER KRISTOFCAK*

WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
kfreeny@washingtonlitigationgroup.org
nzelinsky@washingtonlitigationgroup.org

*Application for pro hac vice pending; admitted only in California and New York; practicing under the supervision of D.C. Bar members*

*Attorneys for Plaintiff Joyce Beatty*

23