**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOYCE BEATTY,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>DONALD J. TRUMP *et al.*,<br><br>　　　　　*Defendants*. | No. 25 Civ. 4480 (CRC) |

**<u>SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................... iii

INTRODUCTION.............................................................................................................. 1

ARGUMENT .................................................................................................................... 3

      I.      The Documents Underscore That Defendants' Actions Are Imprudent........... 3

      II.     There Is No Need to Close the Kennedy Center in July................................. 10

      III.    President Trump Treated the Board as a Rubberstamp. ................................ 12

CONCLUSION................................................................................................................. 14

## TABLE OF AUTHORITIES

**Cases**

*Stern v. Lucy Webb Hayes Nat. Training Sch. for Deaconesses & Missionaries*, 381 F. Supp. 1003 (D.D.C. 1974)............................................................................................................... 13

*United States v. Mount Vernon Mortg. Corp.*, 128 F. Supp. 629 (D.D.C 1954) ...................... 6, 13

**Statutes**

20 U.S.C. § 76*l*(b) .................................................................................................................. 2, 3, 13

**Restatements**

Restatement (Third) of Trusts § 39, cmt. a .................................................................................. 12

Restatement (Third) of Trusts § 77 cmt. b.................................................................................... 4

Restatement (Third) of Trusts § 81 .............................................................................................. 12

**Other Authorities**

Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 1, 2026 at 6:21 PM)......................... 4

G. Bogert et al., *The Law of Trusts and Trustees* 584 (Supp. rev. 2d ed. 1992)........................... 13

President Trump Participates in a Lunch with the Trump Kennedy Center Board Members, at 32:39 (YouTube, Mar. 16, 2026) ......................................................................................... 13

Remarks: Donald Trump Speaks to Reporters at a Kennedy Center Board Lunch - March 16, 2026 ("March 16 Meeting Tr.") ............................................................................................. 4

**INTRODUCTION**

On March 16, 2026, over Plaintiff's objections, the Board of the Kennedy Center voted to approve the shutdown of the Center for two years, beginning in July.  As Plaintiff's memorandum in support of a preliminary injunction explained, shuttering the Kennedy Center for this prolonged period—without the approval of Congress—would violate the Board's statutory "duty . . . to maintain and administer the John F. Kennedy Center for the Performing Arts and site thereof as . . . *a living memorial to John Fitzgerald Kennedy*" and as "the National Center for the Performing Arts . . . present[ing] classical and contemporary music, opera, drama, dance, and other performing arts from the United States and other countries."  Turning the Kennedy Center into a lifeless husk for two years would also constitute a fundamental breach of Defendants' most basic fiduciary obligations as trustees.  On these grounds alone, the Court should hold that Plaintiff is likely to succeed on the merits.  And the irreparable injury—to Plaintiff as a Trustee with fiduciary duties and to the public at large—could not be more obvious.

Plaintiff submits this supplemental brief to inform the Court about recent developments that further underscore the improper nature of the shutdown decision, confirm that Defendants are proceeding in a manner that violates their basic fiduciary duties, and make clearer still that the Court should grant the preliminary injunction.  In particular, the documents that Defendants finally produced to Plaintiff pursuant to the Court's March 14, 2026, temporary restraining order ("TRO Op.," ECF No. 24) and statements that President Trump made during the March 16, 2026, meeting reflect a haphazard and irrational process that portends irreparable damage to a national treasure.

*First*, the documents prove that Defendants rushed to close the Kennedy Center without conducting *any* independent analysis—let alone the detailed planning that is necessary for a decision of this magnitude.  When President Trump (without Board approval) announced the

1

closure on February 1, 2026, he claimed that it was based on an extensive "one-year review."  The Defendants have confirmed that this claim was false.  They acknowledged that there was *not a single analytical report* created during the prior year and that Defendants did not consult *a single outside expert or consultant* in that period.  To borrow the Court's words from its TRO decision, as an exercise of fiduciary stewardship, this so-called review "borders on preposterous," and falls well "below even a forgiving standard of prudence."  TRO Op. at 21.

Instead, in response to the Court's order, Defendants produced four reports commissioned and delivered under prior Kennedy Center management in 2021, 2022, and 2024.  Those reports contemplated the Board conducting capital maintenance while the Kennedy Center remains open, consistent with the Board's statutory obligations.  Based on nothing more, and seemingly in response to the public and performers fleeing the Center after its unlawful renaming in honor of the sitting president and self-appointed chairman of the board, Defendants rushed to close the Kennedy Center.  To again borrow the Court's terminology, this is not a "quotidian grievance[] about board procedures."  *Id*. at 36.  This peremptory, ill-considered shutdown of a sacred living memorial—"one of the more consequential decisions in the institution's lifespan," *id*. at 22—is the very definition of imprudence and constitutes a violation of the "usual" "obligations of a trustee" with which Congress charged Defendants. 20 U.S.C. § 76*l*(b).

*Second*, at minimum, the scant documents Defendants produced provide no basis for a decision to close the Center *in July*.  As the accompanying declaration from an architect who practiced in the performing arts space explains, whatever maintenance projects Defendants intend to conduct are—at the very most—in the early design stages.  It will likely take twelve months of further design, permitting, and procurement work before Defendants could begin responsible construction work. There is no reason to close the Kennedy Center soon—and violate the Board's

obligations to maintain the Center as a living memorial—well before Defendants could even start responsible construction. The purpose of closure without that kind of preparation can only be an unlawful demolition-first-ask-questions-later approach that President Trump disastrously adopted with the East Wing of the White House—destroying protected buildings before anyone can stop him.

*Third*, at the Board meeting, President Trump said the quiet part out loud, admitting (as if it were humorous) that it was "a little late" for the Board to vote on the closure because he had already announced the decision weeks ago. That frank admission underscores Defendants' complete failure to perform their fiduciary duties.

Plaintiff is not asking the Court to micromanage the Board. She is asking the Court to ensure—before Defendants inflict irreparable damage to a cherished, living memorial to a fallen President and premier national performing arts center—that Defendants satisfy the most rudimentary "obligations of a trustee," 20 U.S.C. § 76*l*(b), giving due consideration to the commands of the federal statutes that establish their obligations and to a thorough expert analysis of how to conduct renovations in a manner best suited for the memorial. Serving as a trustee of this sacred national institution carries real legal responsibilities. The record before the Court shows that Defendants, led by their Chairman, have abdicated those obligations, causing imminent irreparable harm. Plaintiff respectfully requests that the Court grant the preliminary injunction.

## ARGUMENT

### I.    The Documents Underscore That Defendants' Actions Are Imprudent.

In his February 1, 2026 announcement that he would close the Kennedy Center, President Trump stated that his decision followed a "one year review" "that has taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants" and was "based on input

3

from many Highly Respected Experts." Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 1, 2026 at 6:21 PM), https://truthsocial.com/@realDonaldTrump/posts/115997939705121174 [https://perma.cc/8WRA-AQD5].  At the March 16, 2026, meeting, President Trump repeated that the closure was "based on input from highly respected experts."  Remarks: Donald Trump Speaks to Reporters at a Kennedy Center Board Lunch - March 16, 2026 ("March 16 Meeting Tr."), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-kennedy-center-board-lunch-march-16-2026/ [https://perma.cc/3J2E-LNZF].

    None of this was true.  In response to the Court's order, Defendants have now confirmed that not a *single responsive document* was created in the year preceding February 1, 2026. Defendants also confirmed they did not receive *any input from outside experts or consultants* during that period.  This is obviously the antithesis of how prudent trustees would approach a decision of this magnitude.  *See* Restatement (Third) of Trusts § 77 cmt. b (explaining that trustees must conduct "investigation appropriate to the particular action under consideration" and "obtain[] relevant information").  Indeed, as the Court noted, this was "one of the more consequential decisions in the institution's lifespan."  TRO Op. at 20.  It therefore stood to reason that "[i]f it is the case that many external advisors and Board members have been consulted, the financing is set, and already-made decisions are currently being implemented on-site, there *must* be some concrete information to share."  TRO Op. at 20.  Yet there is no relevant information from the year preceding President Trump's closure decision.  None.  The Board's ratification of that decision— "a little late," as President Trump joked—represents a monumental breach of Defendants' most basic fiduciary duties.

    So what was this so-called "one-year review"?  In a declaration from Matt Floca, the Vice President of Operations of the Kennedy Center, Defendants now admit that it consisted only of:

4

(1) Mr. Floca reviewing four reports produced under prior management in 2021, 2022, and 2024; (2) Mr. Floca speaking with a handful of Kennedy Center employees; and (3) Mr. Floca making an oral recommendation to President Trump.  Declaration of Alexander Kristofcak ("Kristofcak Decl."), Ex. L ¶¶ 7, 9, 11.  Mr. Floca expressly confirmed there were "no other reports sourced from experts or advisors," and "no other experts or advisors" "provided input" "during the period from February 1, 2025 to February 1, 2026."  *Id.* ¶¶ 10, 12.  Moreover, Mr. Floca has no background in arts management.  Yet this momentous decision in the life of the Center was *entirely* based on his personal determination that shutting it down was "the most cost-effective and efficient path."  *Id*. ¶ 7.

This does not wash.  The central basis for President Trump's decision—the supposed "one-year review" with experts and consultants—never happened.  Nor did Defendants perform the thorough and reasoned analysis that is necessary before taking the drastic step of closing a performing arts center for two years.  As Deborah Borda, the President Emerita of the New York Philharmonic who led and oversaw major renovation projects of several prominent U.S. performance halls, explained:

> A major renovation requires architects, acoustical specialists—of whom there are perhaps five or six in the world with the expertise required for concert hall acoustics—interior designers, accessibility specialists, lighting designers, and other highly specialized professionals. Engaging these professionals, reviewing their proposals, and developing and refining detailed plans takes years.
>
> . . .
>
> A governing board charged with stewardship of an institution like the Kennedy Center would expect to receive, before approving a closure of this kind, a comprehensive package of planning materials: an overall architectural concept, identification of the major professional consultants who will lead the project, timelines, budgets, and supporting analysis from each of the relevant specialists."

Declaration of Deborah Borda ("Borda Decl.") ¶¶ 16, 18.  As Professor Andrew Taylor, the

Director of Arts Management at American University, explained:

> If a closure is truly necessary, by the time it is announced, the governing body should already have in hand extensive reports, cost analyses, construction plans, and third-party validated budgets, including but not limited to architectural plans, blueprints, identification of primary engineers, general contractor(s), and acoustical specialists, specific site planning, and independent cost analysts. That preparation typically takes at least six to eighteen months.

Declaration of Edwin Andrew Taylor ("Taylor Decl.") ¶ 15.

To top it off, Defendants also did not consult anyone with experience in major performing

arts venue renovations about closing the Center; speak with representatives from any of the

resident or presenting organizations whose relationships with the Center will be severed; or even

consider the serious harms that will occur if the Kennedy Center shuts down for two years—loss

of experienced staff, severed relationships with artists and performers, and alienation of donors

and audiences.  *See* Borda Decl. ¶¶ 7-15;  Taylor Decl. ¶¶ 6-14; Declaration of Joshua Borenstein

("Borenstein Decl.") ¶¶ 9-25; Declaration of Mallory Miller ("Miller Decl.") ¶¶ 10-19.  This failure

to seek any independent advice constitutes a clear breach of duty.  *See United States v. Mount*

*Vernon Mortg. Corp.*, 128 F. Supp. 629, 634, 636 (D.D.C. 1954), *aff'd sub nom.*, 236 F.2d 724

(D.C. Cir. 1956) (holding that trustees who "failed to inform themselves" about relevant

information and "sought no independent advice" committed a breach of trust).

It gets worse.  The documents that purportedly undergird Mr. Floca's "recommendation"

simply do not support the conclusion the Kennedy Center must shut down.  On the contrary, the

reports presuppose a phased approach, under which the Kennedy Center would remain open.  That

is why, until President Trump's abrupt announcement, the Kennedy Center had planned to keep

operating while performing capital maintenance.  *See* Declaration of Joyce Beatty ("Beatty Decl.")

¶ 18 (explaining that before President Trump's February 1 announcement, "the Board had never

6

discussed, deliberated upon, or voted to approve a closure of the Center"). Defendants thus face a heavy burden of explaining why these documents—which confirm that it is a perfectly viable approach for the Kennedy Center to remain operational during renovation—prove a drastic shutdown is warranted. Specifically:

- *The 2022 Comprehensive Building Plan ("CBP")* is a capital planning document that provides a framework for prioritizing repairs over a multi-year period. It states: "Projects have been scheduled in such a way as to keep the facility operating to the maximum extent, with efforts phased over the multi-year period." Kristofcak Decl., Ex. X at 13.

- *The 2021 CBP Presentation* identifies 323 capital projects totaling approximately $253 million, assigns them Priority 1, 2, and 3 designations, and identifies a budget gap of approximately $49 million at the time. Kristofcak Decl., Ex. Y at 7. It recommends two next steps: "Provide Implementation Plan," and "Final Presentation of the CBP," *id.* at 85, and does not recommend shuttering the Kennedy Center.

- *The 2024 Leak Investigation Report.* This May 2024 report identifies waterproofing and leak issues, assigning them high, medium, and low priority classifications. Kristofcak Decl., Exs. AA–CC. Appendix B to the report outlines a multi-phase repair plan that addresses the issues sequentially. Kristofcak Decl., Ex. AA at 30-37. In its "Next Steps," the report states "[t]he next phase will include the development of various repair options . . . . The process will include considerations for phasing, impacts to Kennedy Center operations, costs, and

relative urgency classifications, among others." *Id.* at 81. It does not recommend shuttering the Kennedy Center.

- *The 2022 Soffit Failure Field Report* documents specific soffit failures and recommends targeted repairs. Kristofcak Decl., Ex. Z. It does not recommend shuttering the Kennedy Center and does not address building-wide systems.

Defendants also produced a one-page document comprising talking points, prepared by Mr. Floca and presented at his March presentation to the Building and Grounds subcommittee. *See* Kristofcak Decl., Ex. M. Mr. Floca created these talking points on February 12, 2026, *after* President Trump announced the closure. Kristofcak Decl., Ex. L ¶ 7. Plainly, this document is a post-hoc justification for President Trump's earlier decision. Indeed, at the September 2025 Board meeting, Mr. Floca himself provided an overview of the repairs needed at the Kennedy Center and spoke about "[p]rioritized projects" with no mention of a need for a full shutdown. *See* Second Declaration of Todd Valentine, Ex. DD at 5. Fast forward five months, Mr. Floca's post-hoc talking points state that while "a phased approach may be considered," it offers five reasons for why "an occupied renovation would be unsafe and logistically impractical": the service tunnel requires concrete replacement; the electrical vaults have water intrusion; HVAC systems require replacement; mechanical and electrical shutdowns are required; and full closure avoids "hidden costs of phased construction." *Id*. Yet all of the earlier documents reflect that such work can be done without closing the Center and no other documents addressing these issues were produced in the five months since Mr. Floca's September 2025 update to the Board that would explain why the same projects now suddenly required a complete shutdown. Only one thing was new: President Trump's edict issued twelve days before, on February 1, 2026.

Setting aside the suspect timing, the talking points document is woefully inadequate. As Plaintiff's accompanying expert declaration explains, the "conclusions reached by Mr. Floca in this document are not supported by the four underlying reports" that Mr. Floca claims he relied on. Declaration of Craig Williams ("Williams Decl.") ¶ 11. Indeed, a "credible determination that a building of the Kennedy Center's scale and complexity cannot safely undergo phased renovation requires analysis by qualified structural, MEP, and construction management professionals with relevant venue experience, working from complete design documents." *Id.* ¶ 12. But "[t]hat analysis was not performed here." *Id.* Finally, to the extent Mr. Floca's recommendation is based on "hidden costs" of a phased construction, it fails to acknowledge the potential costs of a two-year shutdown and "without a proper cost-benefit comparison, Mr. Floca's conclusion is nothing more than a preference for a shutdown." *Id.* ¶ 13. In sum, the document production proves that Defendants did not meaningfully evaluate this "recommendation" at all—let alone consider the severe harm to a performance venue that accompany a closure of this magnitude.[1]

In contrast to Mr. Floca's cursory, unsupported analysis, Craig Williams—an architect with decades of experience in major performing arts projects—explained that a "complete two-year closure of the entire main building is not required to accomplish the deferred maintenance" planned by the Kennedy Center. *Id.* ¶ 4. The building envelope work is "routinely performed on occupied buildings." *Id.* ¶ 6. Mechanical/electrical/plumbing can be replaced "with minimal downtime." *Id.* ¶ 7. "The multi-venue nature of the Kennedy Center makes phased renovation particularly feasible." *Id.* ¶ 8. The Kennedy Center has, in fact, successfully performed phased renovations in

---

[1] Defendants also produced a handful of scant documents—such as a slideshow presentation to the Buildings and Grounds Committee, a budget, meeting agendas, project photos, and contracts affected by closure—most of which post-date the President's February 1, 2026 announcement, and none of them provide any additional analysis. *See* Kristofcak Decl., Exs. N, O, P, Q, R, S, T, U.

9

the past. *Id.* ¶ 10.  Mr. Williams has personally worked on construction projects that permitted a venue to continue operating. *Id.* ¶ 9.

* * *

For all of these reasons, Defendants' decision to shutter the Kennedy Center is a gross dereliction of duty.  Plaintiff is not asking the Court to micromanage the Board.  Plaintiff is simply asking the Court to enjoin the closure of the Kennedy Center until and unless the Board has met minimal standards of prudence, consistent with the law that Congress enacted.  Indeed, if the "living memorial" can continue to "live" and meet its statutory obligation to present music, dance, drama and the fine arts—as the Kennedy Center's prior analysis demonstrated—then it should continue to do so.

## II.    There Is No Need to Close the Kennedy Center in July.

The documents separately make clear that there is no need to close the Kennedy Center in July for an additional and entirely distinct reason: It will take at least six months, and more likely a year, to conduct the steps necessary to begin construction.  As a result, Defendants either intend (1) to leave the Center fallow without performing any work, or (2) to plow ahead without securing regulatory approval or even all the necessary contractors—very likely as part of a concerted campaign to demolish first and ask questions later, much as occurred with the East Wing.  Neither approach is lawful or prudent.

Plaintiff's expert declaration confirms that Defendants cannot begin construction immediately.  According to Mr. Williams, the documents produced by Defendants show that the project is in the early stages.  Williams Decl. ¶ 16.  From this point it will take "at least six months, and more likely closer to a year" before "responsible construction could commence." *Id.* ¶ 20.

10

As Mr. Williams explains, "six to nine additional months of design and documentation work would be required before the project would be at a stage where construction could responsibly begin—and that estimate is assuming a complete and qualified design team is immediately assembled and working continuously." *Id.* ¶ 16. In addition, permitting and regulatory approval "presents an additional independent constraint." *Id*. ¶¶ 18-19. For example, "any construction affecting the exterior of the Kennedy Center building is within the purview of the Shipstead-Luce Act and thus subject to review by the Commission of Fine Arts. These federal regulatory processes impose additional review requirements that take months to complete even under favorable circumstances." *Id*. ¶ 19. The permitting process for the project can take up to a year from submission, and the submission cannot occur until design drawings are at 80% completion, about five to seven months into the design process. *Id.* ¶ 18. And the Kennedy Center's Interim Procurement Policies make it even more unlikely that responsible construction will commence in July. *See* Kristofcak Decl., Ex. V. A project of this scope requires, at minimum: an owner's representative, an architect of record, a construction manager, and major trade packages. Each is a separate procurement under the Policy and will take time to perform. *Id.* § 114.5.

The Kennedy Center's own recent experience underscores that these processes take considerable amounts of time. The Kennedy Center's REACH expansion project required engaging with the National Capital Planning Commission, the District of Columbia State Historic Preservation Office, and the Commission of Fine Arts. *See* Freeny Decl., Ex. J. These processes lasted approximately two years from first submission to final regulatory clearance. *Id.* These reviews are not formalities that can be compressed into weeks. They will require public notice,

comment periods, and agency-to-agency consultation.  As a result, Defendants cannot properly begin construction in July.

That Defendants are rushing to close the Kennedy Center—despite not being able to undertake responsible construction for months later—reinforces the troubling conclusion that they, in fact, do not plan to act responsibly.  Just a few months ago, President Trump demolished the East Wing of the White House—without securing the necessary regulatory approvals or plans—before anyone could stop him.  The fact that Defendants are barreling forward with a similar approach here suggests that the strategy is the same, and that this sacred institution will be irrevocably harmed absent this Court's protection.

* * *

In short, if Defendants truly intend to engage in responsible construction, there is no need for Defendants to close the building on July 6—since the required regulatory approvals and procurement processes cannot be completed before then.  At minimum, the Court should issue an injunction requiring that the shutdown not commence until, at the least, regulatory approvals are obtained and a compliant procurement has been completed.

## III.    President Trump Treated the Board as a Rubberstamp.

Finally, President Trump's own remarks at the Board meeting reinforce the simple conclusion that, once he announced the Center's closure, the matter was a *fait accompli*—and the Board was simply a rubberstamp for his decision.  This is not how trusts operate under the law. Rather, "each trustee has a duty and the right to participate in the administration of the trust." Restatement (Third) of Trusts § 81.  "[W]hen feasible all trustees must be consulted before decisions are made." *Id.* § 39, cmt. a.

That was not what happened.  Instead, President Trump was frank when he addressed the

12

Board:

> As I announced in February, after a one-year review based on input from highly respected experts and subject to board approval today, we determined. *It's a little late for the board because we've already announced it*, but these are minor these are minor details, but I think everybody agrees. But subject to board approval, we determined that the fastest way to bring the Trump Kennedy Center to the highest level of success, beauty, and grandeur is to cease the entertainment operations for a two-year period of time.

March 16 Meeting Tr.[2]

These statements were not a gaffe. They were an accurate reflection of the decision-making process: President Trump decided to shut down the Kennedy Center and demanded that the Board rubberstamp that decision. The trustees then did so without *any* of the analysis that would normally go into a project of this magnitude or any meaningful deliberation. To say the least, this process was not normal—it was abdication of the trustees' duties. Defendants violated the "usual" "obligations of a trustee," 20 U.S.C. § 76*l*(b), even under "a forgiving standard of prudence." TRO Op., ECF 24, at 21. *See Mount Vernon*, 128 F. Supp. at 634, 636; *Stern v. Lucy Webb Hayes Nat. Training Sch. for Deaconesses & Missionaries*, 381 F. Supp. 1003, 1014 (D.D.C. 1974) (explaining that trustees' "[t]otal abdication of the supervisory role . . . is improper"); *see also* Bogert's *The Law of Trusts and Trustees* § 558 ("Courts characterize the cases in which they review and upset a trustee's use of discretionary powers as those involving 'abuse of discretion,' 'bad faith,' 'dishonesty,' or 'arbitrary' action," including "acting contrary to the purposes of the trust.").

---

[2] For video footage of the remarks, see President Trump Participates in a Lunch with the Trump Kennedy Center Board Members, at 32:39 (YouTube, Mar. 16, 2026), https://www.youtube.com/watch?v=LseQ1ecp-ZM [https://perma.cc/B7C8-8YS2].

13

**CONCLUSION**

Plaintiff respectfully requests that the Court grant the preliminary injunction.

Dated: March 25, 2026                          Respectfully submitted,


/s/ Norman Eisen                               /s/ Nathaniel A.G. Zelinsky
NORMAN EISEN                                   NATHANIEL A.G. ZELINSKY
  (D.C. Bar No. 435051)                          (D.C. Bar No. 1724093)
STEPHEN JONAS                                  /s/ Alexander Kristofcak
  (D.C. Bar No. 90037069)                      ALEXANDER KRISTOFCAK*
DAVID W. OGDEN                                 KYLE R. FREENY
  (D.C. Bar No. 375951)                          (D.C. Bar No. 247857)


DEMOCRACY DEFENDERS ACTION                     WASHINGTON LITIGATION GROUP
600 Pennsylvania Avenue SE #15180              1717 K Street, NW, Suite 1120
Washington, D.C. 20003                         Washington, D.C. 20006
202-594-9958                                   202-521-8750
norman@democracydefenders.org                  nzelinsky@washingtonlitigationgroup.org
                                               akristofcak@washingtonlitigationgroup.org

                                               *Admitted pro hac vice; admitted only in
                                               California and New York; practicing under
                                               the supervision of D.C. Bar members


*Attorneys for Plaintiff Joyce Beatty*

14