**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOYCE BEATTY, <br><br> *Plaintiff*, <br><br> v. <br><br> DONALD J. TRUMP *et al.*, <br><br> *Defendants*. | No. 25-CV-4480 (CRC) |

**DECLARATION OF CRAIG WILLIAMS**

I, Craig Williams, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. From 1985 until my retirement in 2018, I was a licensed architect, registered in the District of Columbia. Over more than four decades of professional practice, I have developed extensive expertise in the design, renovation, and programming of performing arts facilities, including concert halls, opera houses, and multi-venue performing arts centers. My performing arts project experience includes, among others, Severance Hall in Cleveland, OH, Schermerhorn Symphony Center in Nashville, TN, and Gaillard Center in Charleston, SC. I submit this declaration in my personal capacity.

2. I have reviewed the engineering and planning documents produced by defendants, including the 2021 and 2022 Comprehensive Building Plans and the May 2024 Leak Investigation Report prepared by Walter P. Moore and Page/Stantec. I have also reviewed the draft Capital Improvement Plan and related budget documents.

3. These documents are assessment-phase materials. They identify conditions requiring repair and provide cost estimates at a conceptual level. They are not contract documents. They contain no construction drawings, no technical specifications, no bid packages, and nothing

in the format from which a contractor could form a binding bid or perform work. The assessments represent what I would characterize as the discovery or pre-design phase of a project—the stage at which you learn what needs to be done, before you have detailed and documented how to do it.

4.      In my professional opinion, all the work identified in the 2021, 2022, and 2024 assessment documents can be performed while maintaining operations in the Kennedy Center, through phased sequencing of the work. A complete two-year closure of the entire main building is not required to accomplish the deferred maintenance described in those reports.

5.      The work described falls into several broad categories: building envelope and waterproofing; mechanical, electrical, and plumbing ("MEP") systems; structural and concrete remediation; and performance venue refurbishment. Each of these categories can be approached in a phased manner.

6.      With respect to building envelope work—roof replacement, plaza waterproofing, garage repairs, exterior glass—this type of work is routinely performed on occupied buildings. Contractors frequently replace roofs, repair facades, and address waterproofing while buildings continue to function. It is actually easier to conduct construction and keep the Kennedy Center operational, because the Center's large terrace level above the main halls physically separates the roof work from hall operations.

7.      With respect to MEP systems: a major performing arts building typically has separate air-handling units serving different sections of the building. Those units can be replaced sequentially, one section at a time, without requiring simultaneous shutdown of the entire facility. Central plant equipment — boilers, chillers, cooling towers — can similarly be replaced with minimal downtime.  Cooling towers, for example, typically take days to a week to replace. I am

2

not aware of any MEP condition described in the Kennedy Center's documents that would categorically require a two-year full shutdown.

8.     The multi-venue nature of the Kennedy Center makes phased renovation particularly feasible. The Concert Hall, Opera House, Eisenhower Theater, and other spaces are functionally distinct. Work can be sequenced so that while one hall is undergoing renovation, others remain operational. This is not an unusual approach. The Kennedy Center, with multiple halls of different sizes, has even great flexibility to sustain programming continuity during phased work.

9.     The renovation of Severance Hall in Cleveland, which I led, illustrates one approach. We developed a construction phasing plan keyed to the orchestra's schedule. Work on the project proceeded during the orchestra's regular season, and the extent of work—full construction, limited work, no work—was done based on whether the orchestra was absent, present but not performing, or present and actively rehearsing or performing.

10.     The Kennedy Center itself has employed phased renovation in the past. The Concert Hall underwent acoustic improvements in the mid-to-late 1990s while other venues in the building continued to operate. The Eisenhower Theater and the Terrace Theater have been renovated while the rest of the building remained open. The approach is not novel; it is standard practice for this type of institution.

11.     I have reviewed the document titled "Closure Background and Talking Points" prepared by Matt Floca. The conclusions reached by Mr. Floca in this document are not supported by the four underlying reports. The reports themselves contemplate a phased approach that does not require a full closure of the Kennedy Center.

12.    Most significantly, nothing in the reports supports Mr. Floca's conclusion that the scope of the planned projects "require[s] sustained, facility-wide mechanical and electrical shutdowns" and that "[o]perating the building during these periods is not feasible, as it would leave the facility without life-safety systems, climate control, or power for extended durations." A credible determination that a building of the Kennedy Center's scale and complexity cannot safely undergo phased renovation requires analysis by qualified structural, MEP, and construction management professionals with relevant venue experience, working from complete design documents. That analysis was not performed here.

13.    Mr. Floca's assertion that a full closure "avoid[s] the hidden costs of phased construction such as temporary life-safety systems, after-hours labor premiums, and the constant disruption of the patron experience" is notable for a few reasons. First, it effectively concedes that phasing is possible. Second, Mr. Floca does not acknowledge that completing the project on a shorter timeline may itself require significant overtime or that a full shutdown eliminates the patron experience entirely—it is not a mitigation of disruption but its most extreme form. As a result, without a proper cost-benefit comparison, Mr. Floca's conclusion is nothing more than a preference for a shutdown.

14.    Even setting aside the question of whether a full closure is necessary, it is my professional opinion that a responsible construction start in July 2026 is not achievable for a project of this scope under any process that follows recognized professional standards.

15.    The standard sequence for a performing arts renovation of the complexity described in the Kennedy Center documents is as follows: (a) discovery/pre-design phase, which results in a defined and reconciled program, budget, and quality standard; (b) schematic design, in which the design team develops and prices an approach; (c) design development, in which the schematic

4

design is fleshed out with sufficient detail to confirm cost and constructability; (d) construction documents, which are the legally binding drawings and specifications from which contractors bid; and (e) bidding, contractor selection, and mobilization.

16.     The documents produced in this case are at or near the conclusion of the discovery phase, that is, the first phase of the project. Based on my review of those materials and the stage of planning they reflect, my professional estimate is that six to nine additional months of design and documentation work would be required before the project would be at a stage where construction could responsibly begin — and that estimate is assuming a complete and qualified design team is immediately assembled and working continuously. That six-to-nine-month estimate encompasses schematic design, qualified cost estimating, and sufficient design development to prepare biddable documents and initiate the permitting process.

17.     The competitive bidding process required for a federal project adds further time after design documents are complete. A standard bid period for a project of this magnitude is at minimum four weeks from the date bid documents are made available. Analysis of bids, selection of a contractor, and execution of a contract typically takes an additional one to two weeks. Contractor mobilization — assembling subcontractors, procuring materials, establishing site logistics — takes two weeks to a month thereafter. In total, the bidding and mobilization process alone adds two to three months after design is complete.

18.     Permitting presents an additional independent constraint. In the District of Columbia, obtaining a major building permit for a project of this scope can take up to one year from submission. Permit-ready documents cannot be submitted until drawings reach approximately eighty percent completion. Assuming a six to nine month design process, that submission point would occur roughly five to seven months into the design process. Even under

an expedited permitting scenario, the permit process consumes substantial time that cannot be compressed to weeks.

19.    Beyond permitting, any construction affecting the exterior of the Kennedy Center building is within the purview of the Shipstead-Luce Act and thus subject to review by the Commission of Fine Arts. These federal regulatory processes impose additional review requirements that take months to complete even under favorable circumstances.

20.    In summary: it is my professional opinion that the project, as reflected in the documents produced, is at least six months, and more likely closer to a year, away from being in a position where responsible construction could commence.

21.    Finally, in my professional experience, board approvals for major construction projects of this scope are not a single, one-time event. On projects of comparable scale and complexity, it is standard practice to return to the full board and relevant building committees at multiple stages—including schematic design, design development, and completion of construction documents—before any construction commences. Approval based on the preliminary, high-level materials provided here would be atypical and would not afford the board the information necessary to exercise meaningful oversight of a project of this magnitude.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of March, 2026.

DocuSigned by:

AEB012A5DD12454...

Craig Williams

6