**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOYCE BEATTY,<br><br>　　　　　　*Plaintiff,*<br><br>　v.<br><br>DONALD J. TRUMP, *et al.,*<br><br>　　　　　　*Defendants*. | Civil Action No. 25-4480 (CRC) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTIONS FOR A PRELIMINARY INJUNCTION AND FOR PARTIAL
SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    A.    Legal Background ............................................................................... 2

    B.    Factual Background ............................................................................ 4

LEGAL STANDARDS ................................................................................................ 8

    A.    Preliminary and Permanent Injunction ............................................ 8

    B.    Motion for Summary Judgment ........................................................ 9

ARGUMENT ............................................................................................................... 9

I.    Plaintiff Lacks Article III Standing to Challenge the Naming and Renovation. ............... 9

    A.    Plaintiff's challenges to the Board's naming and closure votes present only generalized grievances. ..................................... 11

    B.    Plaintiff's status as a trustee does not establish that she suffered or will suffer an Article III injury. ........................................... 12

II.    Plaintiff's Claims Fail on the Merits. .............................................. 17

    A.    The Board's decision to close the Center for renovation is lawful. .................... 18

        i.    The Board's closure of the Center for renovation fully complies with—and, indeed, affirmatively fulfills—the Board's statutory duties. .................... 18

        ii.    The Board's expenditure of funds for capital repair and restoration is not subject to approval by other regulatory agencies. ........................... 24

    B.    The Board's adoption of a secondary name complies with the law. ................... 31

        i.    The Board's "renaming" vote adopted a secondary name, an action that does conflict with the Center's governing statutes. ........................... 31

        ii.    Lettering on the building's facade is neither a "memorial" nor a "plaque in the nature of a memorial" within the statutory prohibition on additional memorials. ........................... 32

    C.    Plaintiff's breach-of-trust claims fail on state law grounds. ............... 33

    D.    *Ex officio* trustees have no categorical right to vote on Board matters. ............... 35

i

E.      The Court's temporary restraining order granted Plaintiff the informational relief she sought, mooting that request for relief. .................................................. 36

F.      Plaintiff's remaining claims fail procedurally, on the merits, and as duplicative of her primary claims. ......................................................... 37

III.    Preliminary and Permanent Injunctive Relief Are Not Warranted. .................................. 39

A.      Plaintiff will not be irreparably harmed from the Center's closure for renovation and has not been harmed by the adoption of a secondary name. ........ 39

B.      The balance of the equities and public interest favor Defendants. ....................... 43

CONCLUSION ............................................................................................................. 45

ii

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Adirondack Med. Ctr. v. Sebelius*,
  740 F.3d 692 (D.C. Cir. 2014) ................................................................................. 22

*Air Line Pilots Ass'n v. Civ. Aeronautics Bd.*,
  750 F.2d 81 (D.C. Cir. 1984) ..................................................................................... 5

*Alcresta Therapeutics, Inc. v. Azar*,
  318 F. Supp. 3d 321 (D.D.C. 2018) ........................................................................ 40

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) ................................................................................. 37

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ................................................................................. 38

*Bartlett v. Hatch*,
  17 Abb. Pr. 461, 1864 WL 3792 (N.Y. Sup. Ct. 1864) ........................................... 16

*\*Bd. of Dirs. of the Wash. City Orphan Asylum v. Bd. of Trs. of the Wash. City Orphan Asylum*,
  798 A.2d 1068 (D.C. 2002) ..................................................................................... 34

*Calderon v. Moore*,
  518 U.S. 149 (1996) ................................................................................................. 37

*Carney v. Adams*,
  592 U.S. 53 (2020) ................................................................................................ 9, 10

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367 (2004) ................................................................................................. 38

*\*Dellinger v. Bessent*,
  766 F. Supp. 3d 57 (D.D.C. 2025) ............................................................... 40, 41, 44

*Depu v. Oath Holdings, Inc.*,
  715 F. Supp. 3d 1 (D.D.C. 2022) ............................................................................. 44

*\*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ..................................................................... 26, 29, 38

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
  944 F.3d 945 (D.C. Cir. 2019) ................................................................................. 38

*Fam. Fed'n for World Peace & Unification Int'l v. Moon*,
  338 A.3d 10 (D.C. 2025) .......................................................................................... 34

iii

*Fam. Fed'n for World Peace & Unification Int'l v. Moon*,
  No. 2011 CA 003721 B, slip op. (D.C. Super. Ct. Aug. 28, 2023), *aff'd*, 338 A.3d 10 (D.C.
  2025), *cert. denied*, ---S. Ct.--- , No. 25-634, 2026 WL 642851 (Mar. 9, 2026) (mem.)......... 34

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)................................................................................................... 10, 14

*Fisheries Survival Fund v. Jewell*,
  236 F. Supp. 3d 332 (D.D.C. 2017) .............................................................. 39, 40, 42

*Fitts v. Fed. Nat'l Mortg. Ass'n*,
  44 F. Supp. 2d 317 (D.D.C. 1999) ............................................................................. 37

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) ..................................................................................... 38

*Gill v. Whitford*,
  585 U.S. 48 (2018)...................................................................................................... 25

*Greene v. Art Inst. of Chi.*,
  147 N.E.2d 415 (Ill. App. Ct. 1957) .......................................................................... 15

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013).................................................................................................... 12

*Hooker v. Edes Home*,
  579 A.2d 608 (D.C. 1990) .......................................................................................... 44

*Hunter v. Fed. Energy Regul. Comm'n*,
  711 F.3d 155 (D.C. Cir. 2013).................................................................................... 29

*In re Am. Fed'n of Gov't Emps., AFL-CIO*,
  837 F.2d 503 (D.C. Cir. 1988).................................................................................... 45

*In re United States ex rel. Smithsonian Inst.*,
  485 F. Supp. 1222 (D.D.C. 1980) ............................................................................... 16

*In re United States ex rel. Smithsonian Inst.*,
  No. 13-mc-1454 (KBJ), 2019 WL 3451394 (D.D.C. July 31, 2019) ....................... 16

*Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)...................................................................................................... 9

*Jackson v. Phillip*,
  96 Mass. (14 Allen) 539 (1867).................................................................................. 15

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  634 F.2d 1197 (9th Cir. 1980) .................................................................................... 40

iv

*Lance v. Coffman*,
  549 U.S. 437 (2007)..............................................................................................................12

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  808 F. Supp. 3d 29 (D.D.C. 2025) ......................................................................................25

*Leedom v. Kyne*,
  358 U.S. 184 (1958)..............................................................................................................38

*\*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................ 10, 11, 12, 15

*Maryland v. King*,
  567 U.S. 1301 (2012)............................................................................................................44

*MobilizeGreen, Inc. v. Cmty. Found. for the Cap. Region*,
  267 A.3d 1019 (D.C. 2022) ..................................................................................................15

*Morgan v. Robertson*,
  609 S.W.2d 662 (Ark. Ct. App. 1980) ..................................................................................34

*Mount Vernon Mortg. Corp. v. United States ex rel. Att'y Gen.*,
  236 F.2d 724 (D.C. Cir. 1956)..............................................................................................34

*Munaf v. Geren*,
  553 U.S. 674 (2008)................................................................................................................8

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................................................................9

*Nyunt v. Charman, Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009)..............................................................................................38

*\*Olds v. Rollins Coll.*,
  173 F.2d 639 (D.C. Cir. 1949).................................................................................. 23, 24, 44

*Pileggi v. Wash. Newspaper Publ'g Co.*,
  146 F.4th 1219 (D.C. Cir. 2025), *petition for cert. docketed*, No. 25-1040 (U.S. Mar. 4,
  2026) ......................................................................................................................................10

*Royal Canin U.S.A., Inc. v. Wellschleger*,
  604 U.S. 22 (2025)................................................................................................................17

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020)..............................................................................................................16

*\*Shelton v. King*,
  229 U.S. 90 (1913).................................................................................................. 23, 24, 36, 44

v

*Skelly Oil Co. v. Phillips Petroleum Co.*,
339 U.S. 667 (1950) .......................................................................................................... 37

*Sofi Classic S.A. de C.V. v. Hurowitz*,
444 F. Supp. 2d 231 (S.D.N.Y. 2006) ................................................................................ 37

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......................................................................................................... 10

*\*Storch v. Hegseth*,
804 F. Supp. 3d 216 (D.D.C. 2025) ............................................................................. 42, 43

*Swanson Grp. Mfg. LLC v. Jewell*,
790 F.3d 235 (D.C. Cir. 2015) ............................................................................................ 9

*Talavera v. Shah*,
638 F.3d 303 (D.C. Cir. 2011) ............................................................................................ 9

*\*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020) ..................................................................................................... 13, 14

*\*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................................................................................................. *passim*

*Trs. of Phila. Baptist Ass'n v. Hart's Ex'rs*,
17 U.S. (4 Wheat.) 1 (1819), *abrogated on other grounds by Vidal v. Girard's Ex'rs*, 43 U.S.
(2 How.) 127 (1844) ......................................................................................................... 16

*U.S. Ctrs. for Disease Control & Prevention*,
786 F. Supp. 3d 83 (D.D.C. 2025) ..................................................................................... 40

*United Church of the Med. Ctr. v. Med. Ctr. Comm'n*,
689 F.2d 693 (7th Cir. 1982) ............................................................................................. 42

*United States ex rel. Att'y Gen. v. Mount Vernon Mortg. Corp.*,
128 F. Supp. 629 (D.D.C. 1954) ........................................................................................ 24

*Universal Interpretive Shuttle Corp. v. Wash. Metro. Area Transit Comm'n*,
393 U.S. 186 (1968) .......................................................................................................... 29

*Usher v. U.S. Dep't of Just.*,
698 F. Supp. 3d 174 (D.D.C. 2023) ................................................................................... 37

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
259 F.2d 921 (D.C. Cir. 1958) .......................................................................................... 43

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) .......................................................................................................... 17

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) .................................................................................................... 37

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................... 9, 43

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
   758 F.2d 669 (D.C. Cir. 1985) ................................................................................... 40

## Constitution

U.S. Const. art. II, § 1, cl. 1 ........................................................................................ 16

## Statutes

5 U.S.C. § 551(1) ......................................................................................................... 26

5 U.S.C. § 552(f)(1) ..................................................................................................... 26

5 U.S.C. § 1212 ............................................................................................................ 41

7 U.S.C. § 1627b(f)(3)(A) ............................................................................................ 35

12 U.S.C. § 1716b ........................................................................................................ 32

12 U.S.C. § 2160(d)(1) ................................................................................................. 35

12 U.S.C. § 5321(b) ..................................................................................................... 35

12 U.S.C. § 5491(a) ..................................................................................................... 31

15 U.S.C. § 657u(b)(1) ................................................................................................. 35

20 U.S.C. §§ 41-70 ...................................................................................................... 28

20 U.S.C. § 42(b)(2) ............................................................................................... 27, 28

20 U.S.C. § 75b note (2003) ........................................................................................ 28

*20 U.S.C. § 76h(a) ...................................................................................... 2, 26, 27, 32

*20 U.S.C. § 76i(a) .......................................................................................... 29, 31, 32

*20 U.S.C. § 76j.................................................................................................... *passim*

*20 U.S.C. § 76k.................................................................................................... *passim*

*20 U.S.C. § 76l........................................................................................................ 2, 3, 41

20 U.S.C. § 76q ........................................................................................................ 31

20 U.S.C. § 76r(a), (b) ............................................................................................. 4

22 U.S.C. § 2511(c)(2)(A) ...................................................................................... 35

22 U.S.C. § 7302(b)(2)(A) ...................................................................................... 35

28 U.S.C. § 991(a) .................................................................................................. 35

28 U.S.C. §§ 516–19 ............................................................................................... 16

40 U.S.C. § 8702 ..................................................................................................... 26

40 U.S.C. § 8711(a) ................................................................................................ 30

40 U.S.C. § 8722(a) ................................................................................................ 26

40 U.S.C. § 9101 ..................................................................................................... 30

40 U.S.C. § 9102(a) ........................................................................................... 29, 30

42 U.S.C. § 283r(d)(2) ............................................................................................ 36

42 U.S.C. § 2996c(a) ............................................................................................... 36

46 U.S.C. § 51312(b)(1)(F)(vi) .............................................................................. 36

47 U.S.C § 1423(b)(1)(A) ....................................................................................... 35

49 U.S.C. § 24712(a)(3)(A) .................................................................................... 35

54 U.S.C. § 304101(a) ............................................................................................ 30

54 U.S.C. § 306108 ................................................................................................. 28

D.C. Code § 19-1307.03(f) ................................................................................. 14, 17

Act of Jan. 23, 1964,
   Pub. L. No. 88-260, 78 Stat. 4 ............................................................................ 2

*An Act to Provide for Reconciliation,
   Pub. L. No. 119-21, 139 Stat. 72 (2025) ..................................................... *passim*

National Cultural Center Act,
   72 Stat. 1698 (1958) ........................................................................................... 2

Smithsonian Facilities Authorization Act,
   Pub. L. No. 108-72, 117 Stat 888 (2003) .......................................................... 28

**Rules**

Fed. R. Civ. P. 25(d) .................................................................................................... 5

Fed. R. Civ. P. 56 ......................................................................................................... 9

**Administrative & Executive Materials**

1 C.F.R. § 601.4(b) .................................................................................................... 26

1 C.F.R. § 601.5(b) .................................................................................................... 27

28 C.F.R. § 0.5 ........................................................................................................... 16

Exec. Order No. 14347,
    90 Fed. Reg. 43893 (Sep. 5, 2025). ..................................................................... 31

**Other Authorities**

Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's The Law of Trusts and Trustees* § 585 (May 2025 update) ................................................................ 14

Consumer Fin. Prot. Bureau, *Financial Report of the Consumer Financial Protection Bureau* at 1 (2011),
    https://files.consumerfinance.gov/f/reports/CFPB_Financial_Report_FY_2011.pdf
    [https://perma.cc/Q64L-QNCK] .............................................................................. 32

Fannie Mae, *Fannie Mae Announces Results of Tender Offer for Any and All of Certain CAS Notes* (Mar. 2, 2026),
    https://www.fanniemae.com/newsroom/fannie-mae-news/tender-offer-results-any-all-certain-cas-notes-feb-2026 [https://perma.cc/9A8G-LSG5] ............................................................ 32

Javier C. Hernández, *Trump's Kennedy Center Would Get $257 Million in House Republican Plan*, N.Y. Times (May 6, 2025),
    https://www.nytimes.com/2025/05/06/arts/music/kennedy-center-budget-congress-trump.html
    [https://perma.cc/QKB2-2YQ3] ................................................................................ 4

Noah Webster, *Webster's New Universal Unabridged Dictionary* 1123 (2d ed. 1983) ............... 33

*Rebuild*, *Merriam-Webster* (last updated Mar. 28, 2026),
    https://www.merriam-webster.com/dictionary/rebuild [https://perma.cc/Y8E3-LRCY] ......... 19

Restatement (Second) of Torts § 874 (A.L.I. Sep. 2025 update) .................................................. 14

Restatement (Second) of Trusts § 224 (A.L.I. Oct. 2024 update) ................................................ 14

Restatement (Third) of Trusts § 81 cmt. e (A.L.I. Oct. 2024 update) ......................................... 14

Restatement (Third) of Trusts § 94 cmt. f to Reporter's Notes ................................................... 34

Restatement (Third) of Trusts § 81 cmt. e (A.L.I. Oct. 2024 update) ......................................... 14

Ron Blunt, *The John F. Kennedy Center for the Performing Arts*, Google Arts & Culture, https://artsandculture.google.com/asset/the-john-f-kennedy-center-for-the-performing-arts/8gHub722aKNhhw [https://perma.cc/6H4X-3MX6] (last visited Mar. 24, 2026)............. 20–21

Ronald Chester, George Gleason Bogert & George Taylor Bogert, *Bogert's The Law of Trusts and Trustees* § 413 (May 2025 update) ................................................................................. 34

*The Federalist No. 70* (Alexander Hamilton) ............................................................................... 16

Travis M. Andrews & Janay Kingsberry, *Kennedy Center Begins Layoffs, Rocking Institution Ahead of Two-Year Closure*, Wash. Post (Mar. 26, 2026, at 14:16 ET), https://www.washingtonpost.com/style/2026/03/26/kennedy-center-layoff/ [https://perma.cc/2HQG-ZRQ3] ....................................................................................................... 42

Trump Kennedy Center, *A Living Memorial* (2026), https://www.kennedy-center.org/memorial/ [https://perma.cc/HK75-ZXC9].......................... 31

Trump Kennedy Center, Press Releases, *Trump Kennedy Center Board Unanimously Approves Landmark Renovation* (Mar. 16, 2026), https://www.kennedy-center.org/news-room/press-release-landing-page/tkc-board-unanimously-approves-landmark-renovation/ [https://perma.cc/89FZ-BRM9]....................... 44

Trump Kennedy Center, *The REACH at the Kennedy Center*, https://www.kennedy-center.org/reach/ [https://perma.cc/2LDB-JGWU] ............................... 32

x

**INTRODUCTION**

The Board of Trustees ("the Board") of the John F. Kennedy Center for the Performing Arts ("the Center"), secondarily named the "Donald J. Trump and the John F. Kennedy Center for the Performing Arts," decided that years of accumulating disrepair at the Center merit a concentrated renovation and restoration of the Center's building and site. Congress agreed. The $257 million appropriation that Congress made for capital repair and restoration will make the Center a safer and more modern performing arts complex. And the renewal will affirmatively fulfill the Board's responsibilities to repair and improve the Center in a manner consistent with "high quality operations" while minimizing costs to taxpayers and reducing safety risks that result from conducting renovations during public operations.

Representative Joyce Beatty, the plaintiff here, seeks to block this renovation and usurp the sound judgment of the Board in voting to close temporarily to conduct renovations and restorations. But Plaintiff lacks Article III standing to challenge that decision. And, on the merits, her argument that the law prohibits the Board from taking such an action rests on an untenably rigid interpretation of the Center's governing statutes. Further, Plaintiff's argument that the Board must gain various regulatory approvals before renovating fails because the Center's governing statutes and the legal schemes governing such approvals remove any requirement that the Center submit its plans for such review.

Plaintiff's challenge to the Board's adoption of a secondary name also fails. She lacks Article III standing here, too. And that decision does not conflict with the law. The Center is currently serving and will continue to serve as a living memorial to President John F. Kennedy. And the only relevant prohibition that appears in the Center's governing statutes—that the Board shall not place additional "memorials" or "plaques in the nature of memorials" in "public areas"

1

of the Center—does not apply, because display of the secondary name on the building's facade is not, nor was it intended to serve as, a "memorial" to anyone.

Plaintiff's request for preliminary- and permanent-injunctive relief fails because her claims are meritless. It also fails because Plaintiff improperly asserts the supposed irreparable harms of third parties. And the balance of the equities and public interest strongly favor Defendants, given their interest in maintaining and restoring the Center as a safe and modern public performing arts center. Indeed, a preliminary injunction is inappropriate on those grounds alone, regardless of Plaintiff's success on the merits of her claims.

The Court should deny Plaintiff's motion for a preliminary injunction, deny Plaintiff's motion for partial summary judgment, and grant Defendants' motion for summary judgment.

## BACKGROUND

### A. Legal Background

Congress first established the National Cultural Center in 1958. National Cultural Center Act, Pub. L. No. 85-874, 72 Stat. 1698 (1958). Shortly after President Kennedy's assassination, Congress and President Johnson renamed the new entity as the "John F. Kennedy Center for the Performing Arts." Act of Jan. 23, 1964, Pub. L. No. 88-260, 78 Stat. 4.

Congress provided that an array of individuals would, by virtue of their outside offices, sit as *ex officio* trustees on the Board, including the Secretary of State, the Mayor of the District of Columbia, the Speaker and Minority Leader of the House of Representatives, the Majority and Minority Leader of the Senate, and several other members of Congress. 20 U.S.C. § 76h(a)(2). Congress further provided that the Board would contain thirty-six "general" trustees, who "shall be appointed by the President" for terms of six years. *Id.* § 76h(a)(2)(L), (b).

Congress bestowed the Board with "all the usual powers and obligations of a trustee in respect of all trust funds administered by it." *Id.* § 76*l*(b). Per the governing statutes, the "Board is

2

authorized . . . to make such bylaws, rules, and regulations, as it deems necessary for the administration of its functions under this subchapter, including . . . bylaws, rules, and regulations relating to the administration of its trust funds and the organization and procedure of the Board." *Id.* § 76*l*(a). The Board is empowered to enter into contracts; prepare a budget; employ personnel; negotiate planning, design, engineering, and construction contracts; and manage the grounds of the Center in accordance with National Park Service regulations. *See id.* § 76j(a)(2).

Beyond establishing that the Board has the "usual powers" of a trustee, *id.* § 76*l*(b), and outlining the Board's specific duties, *see id.* § 76j, and powers, *see id.* § 76k, the statutes governing the Center provide no further detail regarding the individual rights and duties that either class of trustees possesses as members of the Board. Congress granted the Center's Board expansive independent authority to conduct its affairs without significant oversight from other federal entities: the "actions of the Board relating to performing arts and to payments made or directed to be made by the Board from any trust funds shall not be subject to review by any officer or agency other than a court of law." *Id.* § 76k(e).

The Board's specific duties include presenting "classical and contemporary music, opera, drama, dance, and other performing arts." *Id.* § 76j(a)(1)(A). It must also "promote and maintain" the Center by "developing and maintaining a leadership role in national performing arts education policy and programs" and by maintaining a "comprehensive and broad program for national and community outreach." *Id.* § 76j(a)(1)(B). It must "provide facilities for other civic activities" and "a suitable memorial in honor of the late President." *Id.* § 76j(a)(1)(D)–(E). It must develop and update a comprehensive building needs plan. *See id.* § 76j(a)(1)(F). It must provide "safe and convenient access" to the Center's site for pedestrians and vehicles. *Id.* § 76j(a)(1)(I). It must, "with respect to the building and site" of the Center, "plan, design, and construct each capital

3

repair, replacement, improvement, rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." *Id.* § 76j(a)(1)(G). And it must, "with respect to the building and site" of the Center, provide "all necessary maintenance, repair, and alteration of . . . the building and site, in a manner consistent with requirements for high quality operations." *Id.* § 76j(a)(1)(H)(ii).

In July 2025, Congress appropriated $256,657,000 to the Center for renovation. *See* An Act to Provide for Reconciliation, Pub. L. No. 119-21, § 60025(a), 139 Stat. 72, 157 (2025). Specifically, Congress allocated funding "for necessary expenses for capital repair, restoration, maintenance backlog, and security structures of the building and site of the John F. Kennedy Center for the Performing Arts." *Id.* The funding is available until September 30, 2029. *See id.* That amount represents "roughly six times the amount" the Center "usually receives from the government." Javier C. Hernández, *Trump's Kennedy Center Would Get $257 Million in House Republican Plan*, N.Y. Times (May 6, 2025), https://www.nytimes.com/2025/05/06/arts/music/kennedy-center-budget-congress-trump.html [https://perma.cc/QKB2-2YQ3]; *see also, e.g.*, 20 U.S.C. § 76r(a), (b) (authorizing a total of $51 million in similar funding for fiscal year 2024, $49 million for 2023, $47 million for 2022, $45 million for 2021, and about $43 million for 2020).

**B.    Factual Background**

Plaintiff Joyce Beatty, a member of the House of Representatives from Ohio, is an *ex officio* trustee on the Center's Board by virtue of her position in Congress. First Am. Compl. ¶ 13, ECF No. 12. In 2025, President Trump made several changes to the Board. After the President replaced the Board's general trustees, the Board elected President Trump as Chair and replaced the Center's president with Defendant Richard Grenell.[1] *Id.* ¶¶ 25–27. Plaintiff alleges that several artists cut

---

[1] As reflected in the draft March 16 Board meeting minutes, which have not yet been approved by the full Board, Mr. Grenell has left his position as President of the Center. *See* Ex. 1

ties with the Center and cancelled appearances because of those changes. *See id.* ¶ 42; *see also* Pl.'s Mem. in Supp. of Mot. for TRO & Prelim. Inj. at 8, ECF No. 13-1.

In May 2025, following the appointment of new general trustees, the Board voted to amend the Center's bylaws to affirm that the "Board shall be composed of ex officio non-voting members and general trustee voting members." ECF No. 12 ¶ 29. The proposed bylaw changes were provided to trustees and put to a vote at the May meeting. *See* Decl. of Joseph LaFauci ¶ 4, ECF No. 19-1. Plaintiff does not allege that she did vote or would have voted against this amendment; nor does she allege that her participation would have defeated this vote. *See* ECF No. 12 ¶ 29. Indeed, at that vote, the amendments to the bylaws passed unanimously; no *ex officio* trustee or general trustee raised any objection or sought discussion on the matter. *See* ECF No. 19-1 ¶ 4.

On December 18, 2025, the Board voted to add Donald J. Trump's name to the Center. *See* ECF No. 12 ¶ 32. Plaintiff, who virtually attended the December Board meeting, alleges that she sought to speak in order to raise "a concern" but "found herself muted" and "unable" to speak. *Id.* ¶ 36. At the end of the meeting, the Board "declared that the vote had been unanimous." *Id.* Following the Board's vote, workers installed letters on the Center's front portico. *Id.* ¶ 33. When complete, the addition read—along with the existing lettering already on the facade—"The Donald J. Trump and the John F. Kennedy Memorial Center for the Performing Arts." *Id.* ¶ 33. The Center updated its website to read "The Trump Kennedy Center." *Id.* And the Center began to send emails that also referenced "The Trump Kennedy Center." *Id.*

---

to Second LaFauci Decl. at 4–5. Matthew Floca, formerly the Vice President of Operations for the Center, was voted in as the Executive Director and Chief Operating Officer of the Center at the Board's March 16 meeting. *See id.* at 5. Because Mr. Grenell no longer occupies his official role, and Mr. Floca now wields executive authority over the Center, Matthew Floca is automatically substituted under Federal Rule of Civil Procedure 25(d) as a Defendant. *See* Fed. R. Civ. P. 25(d); *Air Line Pilots Ass'n v. Civ. Aeronautics Bd.*, 750 F.2d 81, 87–88 (D.C. Cir. 1984) (substituting officials from a different agency who, by force of law, would assume previous officers' authority).

5

On February 1, 2026, President Trump announced that the Center would close for two years for construction, revitalization, and "[r]ebuilding," subject to Board approval. *Id.* ¶ 44. On February 20, Plaintiff sent the President and Mr. Grenell a letter expressing concerns about the construction and seeking eight categories of information about the closure. *See id.* ¶ 50.

On February 27, Plaintiff learned of the Board meeting on March 16 and further learned that the Board would receive a presentation on upcoming improvements, discuss the closure, and vote on the closure. *See id.* ¶ 53. Although she alleges that she was not invited to participate in the meeting, Plaintiff did receive an invitation to attend, sent to her personal email. *See* ECF No. 19-1 ¶ 2. Plaintiff later discovered that invitation in her email's spam folder. *See* Decl. of Todd Valentine ¶ 4, ECF No. 20-1. On March 6, 2026, unaware that she had been invited, Plaintiff amended her complaint and moved this Court for a temporary restraining order, challenging her purported exclusion from the meeting, her inability to vote at the meeting, and her lack of access to information about the Center's closure, which was to be a subject of discussion at the meeting. *See* ECF No. 12; Pl.'s Mot. for TRO & Prelim. Inj. at 2, ECF No. 13. Plaintiff also moved for a preliminary injunction enjoining Defendants "from taking any steps to implement the plan to close the Kennedy Center and 'rebuild' it, while this litigation is pending." ECF No. 13 at 3.

On March 14, the Court granted in part and denied in part Plaintiff's motion for temporary restraining order. *See* Mem. Op. & Order, ECF No. 24. The Court concluded that Plaintiff had shown a likelihood of success on her claims that the Board had violated her rights by declining to provide information about the discussion items for the March 16 Board meeting prior to the meeting, (potentially) barring her participation at the meeting, and preventing her from voting on Board matters. *See id.* at 2–3. Considering the parties' irreparable-harm arguments and the balance of the equities, the Court declined to order the Board to permit Plaintiff to vote, ordering only that

the Board distribute certain materials about the Board's vote to Plaintiff more than twenty-four hours before the meeting, *see id.* at 25, and that the Board afford Plaintiff a "meaningful opportunity" to "voice her dissent," *id.* at 36.

The Board, through counsel, distributed to Plaintiff a set of documents responsive to the Court's order. *See* Pl.'s Suppl. Br. in Supp. of Mot. for Prelim. Inj. at 2, ECF No. 29. The Board also distributed a declaration from Matthew Floca, the then–Vice President of Operations for the Center. *See* Decl. of Charles Matthew Floca, ECF No. 29-2. The declaration described Mr. Floca's development of his recommendation to close the Center for a 24-month period to permit renovation. *See id.* Mr. Floca also signed a supplemental declaration providing further detail on the basis for his conclusions. *See* Suppl. Decl. of Charles Matthew Floca, ECF No. 29-3.

In particular, Mr. Floca explained that he has been conducting a review of the Center's infrastructure needs for more than two years, starting in approximately February 2024. *See id.* ¶ 6. To undertake that review, he relied on several external reports obtained from architectural and engineering firms in the years prior to and during his tenure at the Center. *See id.* ¶ 9. He considered a May 2024 Leak Investigation report documenting severe water intrusion from the Potomac River. *See id.* He relied on a 2022 Comprehensive Building Plan for the Center that found that the building's central plant had reached the end of its engineered service life. *See id.* He considered a 2022 report showing that the Center's soffits—which overhang outdoor public spaces of the Center, *see* ECF No. 29-17 at 2–3; ECF No. 29-15 at 20–21—had failed, *see* ECF No. 29-3 ¶ 9. And he relied on a 2021 Comprehensive Building Plan, which showed that the Center's vertical plumbing risers had "reached a state of systemic failure" and its steel channels had corroded. *Id.* Considering those needs, Mr. Floca recommended to President Trump and, later, to the Board that

7

the Center be closed for a concentrated two-year closure to address significant infrastructure needs and renew the Center's public spaces. *See id.* ¶ 7; ECF No. 29-9 at 11–16.

On March 16, the Board held a meeting at the White House to discuss and vote on the Center's closure. *See* Ex. 1 to Second LaFauci Decl. at 1. Plaintiff attended. *See* at 2. Mr. Floca gave a presentation to the Board about the proposed construction plans. *See id.* at 6–7. Renovation at the Center is projected to require a budget of $248.9 million, about $7 million less than the amount Congress appropriated. *See* Capital Improvement Plan at 2, ECF No. 29-10; *see also* § 60025, 139 Stat. at 157. The plans budget $38 million for structural rehabilitation; $4.4 million for site restoration; $5 million for security improvements; $37 million for public space improvements; $19 million for office renovations; $11 million for elevator modernization and escalator capital repair; $48.5 million for revitalization of the Center's performance venues; $78.2 million for the renewal of safety and building systems, including piping, the central plant, the condenser loop, the electrical system, and the Center's river pump room; and $8 million in administrative costs. *See* ECF No. 29-10 at 3, 6, 8, 10, 13.

The meeting opened for discussion. *See* Ex. 1 to Second LaFauci Decl. at 7. Plaintiff spoke first, noting her objection to voting to close the Center but also indicating that she did not generally oppose renovation and repair of the building. *See id.* at 7–8. After further discussion, including about safety and liability issues that might result from extending the timeline for renovations and repairs, the Board voted to close the Center for two years for renovation. *See id.* at 8–9. The vote, conducted among the general trustees of the Board, was unanimous. *See id.* at 9.

## LEGAL STANDARDS

### A.    Preliminary and Permanent Injunction

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded" as a matter "of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations omitted).

8

A plaintiff must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Against the federal government, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). To receive permanent relief, a plaintiff must show she *has* suffered an irreparable injury and that remedies available at law, such as monetary damages, are inadequate. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### B.      Motion for Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). Summary judgment is appropriate "if the nonmoving party" fails to make a showing "sufficient to establish the existence of an element essential to that party's case," *id.* (citation omitted), including for an element of standing, *see Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). A party may "file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).

### ARGUMENT

### I.      Plaintiff Lacks Article III Standing to Challenge the Naming and Renovation.

Plaintiff's lawsuit is premised on a "generalized grievance" with the Board's votes to install the President's name on the Center's facade and website and to close for two years to conduct renovations. *Carney v. Adams*, 592 U.S. 53, 60 (2020). That grievance—which cannot establish a sufficiently "personal and individual" injury, "concrete" and "particularized" to Plaintiff—is

insufficient to invoke Article III jurisdiction over Plaintiff's challenges to the Board's decision to adopt a secondary name and to close for renovation. *Id.* (citation omitted).

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, to show a cognizable injury, a plaintiff must have suffered an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." *Id.* (citations omitted). Second, she must show a "causal connection between the injury and the conduct complained of." *Id.* And third, a plaintiff must show that a "favorable decision" would "likely" redress her injury. *Id.* at 561 (citation omitted).

"By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Citizens may not sue merely because, for example, they believe that the government is acting illegally or because "their legal objection is accompanied by" a strong personal objection to a government action. *Id.* "Vindicating 'the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive.'" *Id.* at 382 (quoting *Lujan*, 504 U.S. at 576).

In addition to classic physical or monetary harms, certain intangible injuries can be sufficiently "concrete" to qualify under Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Injuries "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts" can qualify for Article III purposes. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). An "exact duplicate in American history and tradition" is not required— instead, courts look for a "close relationship" between "the harm remedied by courts in the past and the harm that the plaintiff wants remedied by a court today." *Pileggi v. Wash. Newspaper*

10

*Publ'g Co.*, 146 F.4th 1219, 1226 (D.C. Cir. 2025) (quoting *TransUnion*, 594 U.S. at 424–25),

*petition for cert. docketed*, No. 25-1040 (U.S. Mar. 4, 2026).

      **A.**      **Plaintiff's challenges to the Board's naming and closure votes present only generalized grievances.**

Plaintiff's challenges to the naming and closure votes present a quintessential "generalized grievance" with an assertedly unlawful government action that fails to satisfy Article III.[2] *Lujan*, 504 U.S. at 575–77 (citation omitted); *see also TransUnion*, 594 U.S. at 424–29. To the point: Plaintiff has not alleged that she suffered *any* harm—whether "tangible," like a "physical" or "monetary" harm, or "intangible," like a reputational harm—stemming from the Board's decisions to adopt a secondary name and to close for renovation. *TransUnion*, 594 U.S. at 425.

Plaintiff's complaint is replete with the kinds of allegations that the Supreme Court has determined are insufficiently particularized to permit a plaintiff to proceed in federal court—*i.e.*, they do not affect her "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. She asserts that Defendants are "causing on-going severe harm *to the Kennedy Center*." ECF No. 12 ¶ 9 (emphasis added). She contends that the "effort to corrupt the Kennedy Center into a vanity project for President Trump will continue to harm *the institution*." *Id.* ¶ 70 (emphasis added). She asserts that the secondary naming has "undermined the institution's brand and mission" and inflicted "potential legal and financial harms" on the Center. *Id.* ¶ 75. She argues that the closure will turn the Center "into an empty husk" in "direct[] contradict[ion]" of its mission. *Id.* ¶ 69.

The thread running through these allegations is that they involve harms to *other* entities— like the Center—from the Board's actions. The allegations do not satisfy Plaintiff's burden to show

---

[2] The only instances in which Plaintiff invokes her own rights are her allegations that the Board violated her trustee rights by preventing her participation in the vote. *See* ECF No. 12 ¶¶ 84–91, 98–100, 103, 110–11, 114 (Count Three and portions of Counts Four, Five, Six, and Seven). Defendants do not contest Plaintiff's standing to pursue those claims.

11

that they constitute an "injury that affects [her] in a 'personal and individual way.' " *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (citation omitted). She has failed to establish that she has a "direct stake in the outcome" of her case, *id.* (citation omitted), because the harms she submits—financial, operational, and reputational harms—belong to someone else, *e.g.*, the Center itself, attendees of performances at the Center, and, at bottom, members of the public. The injuries are not sufficiently personal to her to qualify as *harms* to her. *See Lujan*, 504 U.S. at 560 n.1.

Plaintiff's allegations establish that the Center has been maintained for years as a "living memorial to the President for whom it is named and as a thriving cultural institution." ECF No. 12 ¶ 25. And, in Plaintiff's allegations, Defendants' impact on that status will "mar[] this important national institution." *Id.* ¶ 3. But that broad concern with how well the Center might be able to fulfill its mission is not particularized in any way to Plaintiff. Indeed, Plaintiff's allegations that many people disagree with the Board's decision to add the President's name to the Center's facade, *see, e.g.*, *id.* ¶¶ 30, 38–42, only confirm that Plaintiff's challenges rest solely on grievances asserting "only the right, possessed by every citizen, to require that the Government be administered according to law." *Lance v. Coffman*, 549 U.S. 437, 440 (2007) (citation omitted). The relief she seeks for most of her claims—an order directing the Center to remove signage, enjoining the Center from "renaming" itself, and enjoining the Center from "closing the Kennedy Center" or "taking steps to effectuate a closure," ECF No. 12 ¶¶ K, M, N (Prayer for Relief)—"no more directly and tangibly benefits [her] than it does the public at large." *Lujan*, 504 U.S. at 574.

**B.      Plaintiff's status as a trustee does not establish that she suffered or will suffer an Article III injury.**

Plaintiff's own authority confirms that her status as an *ex officio* trustee on the Center's Board of Trustees gives her no more a concrete stake in the outcome of her construction and renaming claims than that enjoyed by any other member of the public. In *Thole v. U.S. Bank N.A.*,

12

one of the main cases on which Plaintiff relies, *see* Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at 20, ECF No. 30-1, the Supreme Court held that the existence of a "general" "cause of action" under the Employee Retirement Income Security Act (ERISA) for the "Secretary of Labor, *fiduciaries*, beneficiaries, and participants" does not "affect the Article III standing analysis." 590 U.S. 538, 541–42, 544 (2020) (emphasis added).

This holding came after the Supreme Court fleshed out the distinction between a common-law cause of action and the *harm* that a party must suffer to invoke Article III jurisdiction over her claim. The parties there were two participants in a defined-benefit retirement plan, which provides participants a fixed payment each month that does not change based on the value of the plan or the plan fiduciaries' investment decisions. *See id.* at 540. The plaintiffs sued under ERISA, arguing that the defendant violated ERISA's duty of loyalty and prudence by "poorly investing the assets of the plan." *Id.* at 541. In finding that the plaintiffs did not have Article III standing, the Supreme Court held that, in the private-trust context, beneficiaries might be harmed for Article III purposes only where their future benefit might be put at "risk." *Id.* at 542. And the Court went further: it confirmed that, although ERISA affords certain individuals—including plan fiduciaries, beneficiaries, and participants—a cause of action to sue for equitable relief, a suit merely to vindicate that statutory right does not alone suffice to establish a concrete injury. *See id.* at 544. The plaintiffs—who, recall, had failed to show any personalized concrete harm from the plan's actions because the value of the plaintiffs' benefit would never change, regardless of the plan's actions—failed to "plausibly and clearly allege a concrete injury." *Id.* "Winning or losing this suit would not change the plaintiffs' monthly pension benefits." *Id.* at 547. So they had no "concrete stake in [the] dispute." *Id.*

13

Plaintiff also could not (and does not attempt to) credibly allege that she might suffer individualized harm in the form of liability that the Board's actions might create for its trustees. Trust law releases any trustee "who does not join in an action of another trustee" from liability "for the action." D.C. Code § 19-1307.03(f); *see also* Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's The Law of Trusts and Trustees* § 585 (May 2025 update) [hereinafter "Bogert's *Law of Trusts*"] ("[A] co-trustee who does not join in taking an action concerning the trust ordinarily is not liable for any loss that occurs as a result of that action."); Restatement (Third) of Trusts § 81 cmt. e (A.L.I. Oct. 2024 update) ("A trustee is not liable for a breach of trust committed by a co-trustee," unless the trustee acquiesced in the breach, was involved in concealing it, improperly delegated the trust's administration to the co-trustee, or enabled the co-trustee to commit the breach by failing to exercise reasonable care to prevent the breach); Restatement (Second) of Trusts § 224 (A.L.I. Oct. 2024 update) (stating the general rule and limited exceptions). "Winning or losing this suit would not change" the legal liability Plaintiff might face from the Board's actions—which is none at all. *Thole*, 590 U.S. at 547. Without any harm from potential future legal liability, Plaintiff's only interest in her construction and renaming challenges is her general objection to the Board's actions. *See Hippocratic Med.*, 602 U.S. at 381.

Nor does any harm "traditionally recognized" at common law provide Plaintiff a proper comparator to her generalized harms in this lawsuit. *TransUnion*, 594 U.S. at 425. The closest common-law analogue to Plaintiff's theory for proceeding on her construction and renaming claims is that the Board has in some way breached a fiduciary duty. *See* ECF No. 30-1 at 22; Restatement (Second) of Torts § 874 (A.L.I. Sep. 2025 update). But that tort requires showing that the tortfeasor is "standing in a fiduciary relation" *with the plaintiff* and the harm results "from a breach of duty imposed *by the relation*." Restatement (Second) of Torts § 874 (emphasis added);

14

*see also MobilizeGreen, Inc. v. Cmty. Found. for the Cap. Region*, 267 A.3d 1019, 1026 (D.C. 2022) (holding that "summary judgment is appropriate on a breach of fiduciary duty claim where . . . the defendant did not undertake a duty to act *for the plaintiff's benefit*" (emphasis added)).

Here, under her construction and renaming claims, Plaintiff has suffered no harm to any interest she possesses by virtue of her position as a trustee. Any duties that Plaintiff alleges the Center possesses under her renaming and construction claims, it owes to its beneficiaries—the public. *See* 20 U.S.C. § 76j. And a generalized public interest cannot satisfy Article III. *Lujan*, 504 U.S. at 560 n.1. Indeed, the very fact that the *public* benefits from a charitable trust underscores why the traditional rule for enforcement of such trusts permits only the "public," as represented by the sovereign, to vindicate that harm. *See Jackson v. Phillip*, 96 Mass. (14 Allen) 539, 579 (1867) (holding that it is "the duty of the king, as *parens patriae*, to protect property devoted to charitable uses," noting that this duty is "executed by the officer who represents the crown for all forensic purposes," and clarifying that "[t]his duty of maintaining the rights of the public, and of a number of persons too indefinite to vindicate their own, has vested in the Commonwealth [of Massachusetts], and is exercised here, as in England, through the attorney general"); *Greene v. Art Inst. of Chi.*, 147 N.E.2d 415, 418 (Ill. App. Ct. 1957) (explaining that a plaintiff, as a member of the public, had no standing where his interests were represented by the state's attorney general).

Plaintiff asserts that certain common-law sources underscore that, traditionally, trustees may bring actions to compel co-trustees in common-law courts. *See* ECF No. 30-1 at 22. But Plaintiff fails to account for the independent Article III requirement that the lawsuit have a "close relationship to *harms* traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425 (emphasis added). Similarity to an *action*—without a specified harm—is not enough to proceed in federal court. *See id.* Further, at least one of the

15

authorities Plaintiff cites stands for the opposite proposition. *See Bartlett v. Hatch*, 17 Abb. Pr. 461, 1864 WL 3792, at *2–3 (N.Y. Sup. Ct. 1864) (holding that only the *cestuis que trust—i.e.*, the beneficiary—was the proper plaintiff, not a co-trustee, in an action recovering misappropriated rents from a co-trustee). And, for over two centuries, the Supreme Court has recognized the sovereign's exclusive "prerogative" to "superintend the care" of charities. *Trs. of Phila. Baptist Ass'n v. Hart's Ex'rs*, 17 U.S. (4 Wheat.) 1, 39 (1819), *abrogated on other grounds by Vidal v. Girard's Ex'rs*, 43 U.S. (2 How.) 127 (1844). Indeed, jurisdiction of United States courts over charitable-trust actions "can arise only where the attorney-general is made a party." *Id.* at 50.

Permitting Plaintiff to proceed here without having suffered a concrete and personalized harm would therefore "infringe on the Executive Branch's Article II authority." *TransUnion*, 594 U.S. at 429. The "choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)."[3] *Id.* By foreclosing Plaintiff's attempt to litigate a generalized grievance, Article III standing doctrine preserves an "essential" element of the

---

[3] Plaintiff's status as a member of Congress does not afford her the right to enforce the public interest in compliance with federal laws. *Contra* ECF No. 24 at 19 n.7; ECF No. 30 at 14 n.3. That power is vested solely in the President. *See* U.S. Const. art. II, § 1, cl. 1; *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213 (2020). Indeed, only the President (and the Vice President) are politically accountable to "the entire Nation." *Seila L.*, 591 U.S. at 224. And only the President can claim to represent the interests of the United States in "the steady administration of the laws." *Id.* at 223 (quoting *The Federalist No. 70*, at 471 (Alexander Hamilton)). The federal public-official enforcement power belongs to the U.S. Attorney General, who wields the executive power on the President's behalf. *See, e.g.*, *In re United States ex rel. Smithsonian Inst.*, No. 13-mc-1454 (KBJ), 2019 WL 3451394, at *1 (D.D.C. July 31, 2019) (Jackson, J.) (action to enforce trust); *In re United States ex rel. Smithsonian Inst.*, 485 F. Supp. 1222, 1224 (D.D.C. 1980) (action to enforce trust); 28 C.F.R. § 0.5 ("The Attorney General shall . . . [r]epresent the United States in legal matters generally."); 28 U.S.C. §§ 516–19.

"separation of powers": that only the Executive is empowered to vindicate the public's interest in "general compliance" with the law. *Id.*

*      *      *

Plaintiff has discharged her fiduciary duty by noting her dissent, seeking to convince her co-trustees not to proceed, and declining to join in the Center's renaming and closure. By doing so, she has discharged herself from any liability for those actions. *See* D.C. Code § 19-1307.03(f). She no longer possesses a concrete stake in this lawsuit as a trustee. And she has no concrete stake as an individual beyond the generalized interest she shares with every other citizen in compliance with the law. She will receive no benefit nor avoid any harm by obtaining a ruling in her favor on her construction and renaming claims. The judicial power—a power "limited" by Article III of the Constitution, *see Royal Canin U.S.A., Inc. v. Wellschleger*, 604 U.S. 22, 26 (2025)—does not extend to claims like the ones Plaintiff raises. Plaintiff argues that dismissal for lack of standing would "have sweeping unintended consequences." ECF No. 30-1 at 23. Not so—it would merely affirm that federal courts have limited jurisdiction. And the mere fact that most individuals might lack a concrete interest in the Board's actions "is not a reason to find standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982) (citation omitted). This Court should conclude that Plaintiff lacks standing to challenge the naming and renovation.

## II.    Plaintiff's Claims Fail on the Merits.

Defendants move for summary judgment on each of Plaintiff's claims in this lawsuit.[4] The proposed renovation of the Center fully complies with—and, in fact, affirmatively fulfills—the Board's statutory duties. Further, the renovation is not subject to review by outside agencies.

---

[4] Because Plaintiff's challenge to the renovation fails on the merits, her request for preliminary injunctive relief on those claims, *see* ECF No. 13-1 at 20–27; ECF No. 29, also fails.

17

Plaintiff's challenges to the Board's adoption of a secondary name for the Center also fails, as no statutory provision prohibits such an act. Nor does any provision prohibit affixing the secondary name to the Center's facade, as it is not a "memorial" or "in the nature of" one. And Plaintiff's remaining trusteeship claims also fail. The Court should grant summary judgment to Defendants, deny it to Plaintiff, and also deny Plaintiff's motion for a preliminary injunction.

**A.    The Board's decision to close the Center for renovation is lawful.**

Plaintiff's challenges to the Center's renovation fail because (1) the Center's renovation fulfills the Board's statutory duties and (2) the Board's expenditure of trust funds for capital repair and restoration is not subject to approval by entities like the National Capital Planning Commission ("Planning Commission") or the Commission on Fine Arts ("Fine Arts Commission"). The Court should thus grant summary judgment to Defendants on Count Two and partial summary judgment on Counts Four, Five, Six, and Seven of Plaintiff's amended complaint.

***i.    The Board's closure of the Center for renovation fully complies with—and, indeed, affirmatively fulfills—the Board's statutory duties.***

Plaintiff is incorrect on the merits of her argument that the Center's closure for renovation violates the Board's statutory duties. To the contrary: the renovation affirmatively *fulfills* the Board's statutory duty to "plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G). And it fulfills the Board's duty to conduct "maintenance, repair, and alteration" of the Center's "building and site" in "a manner consistent with requirements for high quality operations." *Id.* § 76j(a)(1)(H)(ii). Indeed, the $257 million July 2025 appropriation that Congress made to the Center—an amount five to six times what the Center typically receives on a yearly basis, available for use until September 2029—clearly contemplates and authorizes significant

"capital repair" and "restoration" of the Center, along with maintenance and improvement of "security structures" of the Center's building and site. § 60025(a), 139 Stat. at 157.

The Center is closing for renovation because a concentrated two-year project—rather than a "multi-year series of patchwork repairs"—will enable the Board to fully execute required mechanical overhauls and to conduct invasive structural repairs in as short and cost-effective a timeframe as possible. ECF No. 29-4 at 2; *see also* ECF No. 29-3 ¶ 7. Structural steel and concrete deck defects will require concrete replacement directly in front of public access points to the Center. *See* ECF No. 29-4 at 2. Water intrusion and fireproofing repairs in and around the Center's parking garage would create liability and safety concerns should public access to that space be maintained. *See id.* Core life-safety and climate-control systems are operating well past their engineered end of life and, to be replaced, will require extended shutdowns. *See id.* A full closure would prevent cost overruns resulting from the use of temporary life-safety systems and after-hours labor premiums. *See id.* And avoiding a phased construction would avoid constant disruption of the patron experience during construction. *See id.*

The available evidence wholly defeats Plaintiff's wild assertions that the upcoming closure will result in the "wholesale closure, demolition," and "destruction" of the Center. ECF No. 13-1 at 21–23. Start with the main piece of evidence Plaintiff cites: the President's social media post announcing the closure. There, President Trump explained the proposal that the Center would close for "[c]onstruction, [r]evitalization, and [c]omplete [r]ebuilding." ECF No. 12 ¶ 44. Nowhere does he state that the Center would be "demolished" or "destroyed."[5]

---

[5] The specific term Plaintiff invokes—the Center's "rebuild," ECF No. 13-1 at 22—primarily means, at its most extreme, "to make extensive repairs to," or to "restore to a previous state." *Rebuild*, *Merriam-Webster* (last updated Mar. 28, 2026), https://www.merriam-webster.com/dictionary/rebuild [https://perma.cc/Y8E3-LRCY]. The word thus connotes *preservation*, not destruction.

Every other piece of evidence suggests that the proposed renovation falls well within the scope Congress envisioned in setting out the Board's duties and appropriating funding for capital repairs and restoration. *See* 20 U.S.C. § 76j(a)(1)(G)–(H); § 60025(a), 139 Stat. at 157. Plaintiff's own evidence reflects that the Board "*won't* tear down the Kennedy Center as part of [the] newly announced renovation of the cultural landmark." ECF No. 13-13 at 2 (emphasis added). The President expressly confirmed that he is "not ripping it down." *Id.* at 3. And a senior White House official confirmed that the project would not be a "whole scale tear down" and instead would result in a "pretty significant renovation." *Id.*

The specific evidence Plaintiff received in advance of the March 16 Board meeting further confirms that the Board will not "destroy the building on a whim." ECF No. 13-1 at 23. The capital improvement plan budgets for rehabilitation of the building by waterproofing specific levels of the building, conducting repairs, restoring the Center's fountain, and improving physical security on the Center's River Plaza and at the building's doors. *See* ECF No. 29-10 at 3. The plan contemplates "renewal" of the Center's public spaces by, for example, renovating restrooms and improving wayfinding. *Id.* at 6. It provides for "restoration" of the performance spaces. *Id.* at 8. And it contemplates—under the largest allocation of funding in the plan—the renewal of "Safety & Building Systems," by, primarily, making mechanical, electrical, and plumbing improvements to the Center's piping, central plant, condenser loop, electrical system, and river pump room. *Id.* at 10. Even cursory review of additional evidence Plaintiff cites—like renderings of the Center that the President posted on social media—plainly shows that any assertion that the Center will be destroyed has no basis in fact. *Compare* Notice of Suppl. Authority at 1, ECF No. 23 (showing renderings after renovation), *with* Ron Blunt, *The John F. Kennedy Center for the Performing Arts*, Google Arts & Culture, https://artsandculture.google.com/asset/the-john-f-kennedy-center-for-

20

the-performing-arts/8gHub722aKNhhw [https://perma.cc/6H4X-3MX6] (last visited Mar. 24, 2026) (current structure).

In her supplemental briefing, Plaintiff separately attacks the *process* the Board and Center used to determine it should proceed with the closure for renovation in July 2026. *See* ECF No. 29 at 10–12. Plaintiff suggests that closure on an expedited timeframe is not necessary and, further, is unlikely even to occur, given the proximity in time to early July and the current state of planning. *See id.* Plaintiff asserts, based on the declaration of an architect who has worked on performing-arts venues in Ohio, Tennessee, and South Carolina, *see* Decl. of Craig Williams ¶ 1, ECF No. 29-24, that it will "take at least six months, and more likely a year, to conduct the steps necessary to begin construction," ECF No. 29 at 10.

Plaintiff's attack is meritless. First: the Center's plan for renovation reached the stage depicted in the documents shared with Plaintiff by the end of January and beginning of February 2026. *See* ECF No. 29-3 ¶ 7–8. Even under Plaintiff's timeline, renovation would likely begin in earnest six months later than that—in July 2026. Second: Plaintiff assumes that "permitting and regulatory approval" would independently constrain the Center's timeline. *See* ECF No. 29 at 11. But, as explained below, the Center need not submit its renovation plans to the Planning Commission, the D.C. State Historic Preservation Office, or the Fine Arts Commission. *See infra* Section II.A.ii. Third: Plaintiff's expert apparently ignores that much of the early work—*e.g.*, the work proposed for Year 1 of the Project, *see* ECF No. 29-4 at 2 (outlining structural steel, concrete, waterproofing, hardscapes, envelope, and mechanical/electrical/plumbing improvements)—has already been the subject of significant planning. *See* Third Floca Decl. ¶¶ 9, 11–12, Ex. A. The Center's staff have been planning certain repairs for years, and the specific timeline for the

upcoming closure has been in the works for months. *See id.* And that planning will continue up until and past the July 2026 closing date. Plaintiff's evidence does not refute that fact.

Legally, Plaintiff's argument that the Board has violated or will violate its statutory duties by closing for renovation reduces to an argument that the Board must, apparently, at all times and in every action satisfy the statutory duties that Plaintiff has deemed most central to the Center's purpose. *See* ECF No. 13-1 at 21–22, 22 n.1 (citing the Board's duties to maintain the Center as a living memorial to President Kennedy, to present arts performances, and to provide civic facilities, though failing to explain how closure might affect the Center's ability to lead arts education policy and outreach, neither of which requires a dedicated physical space, and overlooking that public access to the memorial and performances must occur in a safe and functional physical complex).

That reading of the Center's organic statute is wholly untenable and absurd. The provisions Plaintiff cites cannot be read in isolation without considering the complementary—and, under Plaintiff's impossibly broad reading, contradictory—requirements expressed elsewhere in the very same provision. *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698–99 (D.C. Cir. 2014) ("[I]t is our duty to harmonize the [interrelated statutory] provisions and render each effective." (citation omitted)). But, taken to its conclusion, that reading would require the Center to remain open at all times for the constant presentation of performances and unrestricted public access to the Center's memorial to President Kennedy. Such a reading would render the provisions granting the Board authority to construct capital repairs and improvements entirely ineffective, at least with respect to the physical spaces in which performances occur or where the memorial is located.

That conflict cannot reflect Congress's intent. To the contrary: the provisions that the parties here cite are *not* "irreconcilably conflicting," *id.* at 698 (citation omitted), if interpreted to permit the Board flexibility in its choices for *how* to comply with each enumerated statutory duty.

22

Indeed, requiring that the Board "shall . . . present" performances, 20 U.S.C. § 76j(a)(1)(A), need not mean that the Board shall 'continuously' present performances. The Board might instead fulfill that obligation by 'regularly' presenting performances, or by 'sometimes' presenting performances. And, moreover, Plaintiff recognizes that the Board is currently presenting performances and, at the end of the two-year closure, will again do so. *See* ECF No. 13-1 at 8; *see also* ECF No. 12 ¶ 44 (citing the President's social media post announcing a "Closure and Re-Opening" of the Center). The same holds true for public access to the Center's memorial to President Kennedy.[6] The statutory scheme, interpreted as a whole, reveals Congress's intent that the Board should have flexibility to decide how to satisfy its obligations. Plaintiff can point to no provision that explicitly bars the Board's decision to close and renovate. And, further, Congress has *confirmed* its intent that the Center be able to undertake projects such as the upcoming renovation by appropriating $257 million—a significant increase over prior appropriations—for "capital repair, restoration, maintenance backlog, and security structures" of the Center. § 60025(a), 139 Stat. at 157.

Moreover, the common law expressly protects trustees' discretion to manage the charitable trust in good faith. "It is a settled principle that trustees having the power to exercise discretion will not be interfered with so long as they are acting bona fide. To do so would be to substitute the discretion of the court for that of the trustee." *Shelton v. King*, 229 U.S. 90, 94–95 (1913); *see also Olds v. Rollins Coll.*, 173 F.2d 639, 641–642, 642 n.7 (D.C. Cir. 1949) (applying the rule to a charitable trust). Plaintiff asserts that the closure appears to be "pretextual" and that the Board failed to consider viable alternatives to closing the Center for renovation. ECF No. 13-1 at 25–27.

---

[6] The construction plans further contemplate that the "Skylight Pavilion may be used to maintain the memorial experience" while construction is ongoing. ECF No. 29-7 at 3; *see also* ECF No. 29-9 at 17.

But the evidence contradicts any negative inference Plaintiff attempts to establish. Mr. Floca has been conducting a review of the Center's structural needs since approximately February 2024. *See* ECF No. 29-3 ¶ 6. Mr. Floca—an expert in construction and facilities management with more than a decade in relevant government experience—presented his conclusion that a two-year closure would be the most cost-effective, safe, and efficient path to the Chair in late January 2026 and to the Board's Building and Grounds Committee in March 2026. *See id.* ¶¶ 1, 7–8; Building & Grounds Comm. Mar. 2 Minutes at 2–3, ECF No. 29-7. The evidence rebuts any inference that the Board did not consider relevant options. Indeed, the Board *did* consider "independent advice" in its decision to close. *United States ex rel. Att'y Gen. v. Mount Vernon Mortg. Corp.*, 128 F. Supp. 629, 634 (D.D.C. 1954). It considered the very reports that formed the basis for Mr. Floca's recommendation. *See, e.g.*, ECF Nos. 29-16 (2021 Comprehensive Building Plan), 29-17 (2022 Soffit Failure Field Report), 29-18 to 29-20 (Leak Investigation). And it considered Mr. Floca's recommendation—itself an independent, expert one. *See* Ex. 1 to Second LaFauci Decl. at 6–9. The Board acted to address years of deferred maintenance that has, until now, gone unaddressed.[7] The Court should not disturb the Board's discretion. *See Shelton*, 229 U.S. at 94–95.

### ii. The Board's expenditure of funds for capital repair and restoration is not subject to approval by other regulatory agencies.

Plaintiff argues that the Board was required to follow a "complicated regulatory approval process" before renovating the Center. ECF No. 13-1 at 24. In particular, Plaintiff argues that the Board was required to submit development proposals and plans to the Planning Commission for

---

[7] Plaintiff's reliance on earlier reports' recommendations for phased closures, *see* ECF No. 29 at 6–8, fails to account for continued "budget gap[s]," *id.* at 7 (citing ECF No. 29-16 at 7) and for the passage of time since those reports were issued, *see* ECF No. 29-3 ¶ 7. And, more fundamentally, any argument that the Board is *required* under the law to adopt those recommendations improperly asks this Court to substitute its judgment for the Board's. *See Olds*, 173 F.2d at 642 n.7.

approval before proceeding with renovation. *See id.* She also argues that the Board was required to consult with the Advisory Council on Historic Preservation and the Fine Arts Commission before renovating. *See id.* But the terms of the schemes governing review by such commissions do not apply to the Center. And, further, Congress expressly granted the Center a statutory exception from any requirement to submit its spending plans for review by other regulatory agencies.

*First*, the Center has begun consulting with the Planning and Fine Arts Commissions on certain changes to the Center's building and site. *See* Third Floca Decl. ¶ 8. On March 30, 2026, staff from the Center and those two commissions met to discuss further cooperation during the Center's upcoming renovation. *See id.* Although the terms of that cooperation have not been finalized, the Center expects to engage with both commissions during the renovation to ensure that the Board continues to be a responsible steward of federal land. *See id.* Any basis for halting construction for lack of consultation thus fails—Defendants are engaging with relevant commissions where their expertise might be relevant. And moreover, should the Court conclude that the Board was required to submit plans for review by any of the above three agencies, any injunctive relief available to Plaintiff is limited to that required to remedy the asserted procedural injury. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 84 (D.D.C. 2025); *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (noting the rule that a "remedy must of course be limited to the inadequacy that produced the injury in fact" (citation omitted)). Here, that would only mean requiring that the Center engage in the relevant commissions' review processes before proceeding with renovation. It would not mean preliminarily or permanently halting renovation, even after that process has occurred, and where such renovation is needed.

*Second*, although the Center is engaging with the Planning and Fine Arts Commissions to obtain the benefit of their expertise on certain renovation matters, Defendants do not concede that

the Center must submit any and all of its renovation plans for final approval by those commissions. The requirement to submit development plans to the Planning Commission for its review applies only to "[a]gencies of the Federal Government." 40 U.S.C. § 8722(a). The Center—like its parent institution, the Smithsonian—is not an agency. *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) (holding that the Smithsonian is not an "agency" under the definition applicable to the Privacy Act and APA). Although the National Capital Planning Act does not define the term "agency," *see* 40 U.S.C. § 8702, use of the term comports with the definition in the APA and the Privacy Act, *i.e.*, "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," 5 U.S.C. § 551(1), including "any executive department, military department, Government corporation, Government controlled corporation," any "other establishment in the executive branch," or "any independent regulatory agency," *id.* § 552(f)(1).

The Center does not "exercise some governmental authority," so it cannot "be an authority of the government." *Dong*, 125 F.3d at 881. It lacks the authority to "administer[] federal statutes, prosecute[] offenses," and "promulgate[] rules and regulations," other than for the Board's procedures and organization. *Dong*, 125 F.3d at 879. And it is "plain" that the Center "is not an establishment in the executive branch," *id.* at 879, given its composition of trustees—including members of Congress, the mayor of the District of Columbia, and the superintendent of D.C. schools, *see* 20 U.S.C. § 76h(a). Indeed, the D.C. Circuit concluded that the Smithsonian is not "an establishment in the executive branch" for the same reasons. *Dong*, 125 F.3d at 879.

Because the Center is not an "agency of the Federal Government," the plain text of the National Capital Planning Act does not apply to the Center.[8] And Plaintiff points to no provision

---

[8] Indeed, the Planning Commission's regulations confirm that any obligation imposed under the Act springs into existence only *after* a "Non-Federal Agency" voluntarily submits a plan for the Planning Commission's review. 1 C.F.R. § 601.4(b). Such obligations exist only because

requiring the Center—as an independent trust instrumentality, not an agency or authority of the United States—to submit proposed development plans to the Planning Commission for review. The one piece of factual evidence that Plaintiff provides (which she cites only once in her amended complaint, *see* ECF No. 12 ¶ 65, and does not cite at all in her preliminary injunction motion, *see generally* ECF No. 13-1) clarifies the relevant distinction and underscores why the Center's self-contained renovation here does not require approval. In 2015, the Center entered into a memorandum of agreement with the National Park Service, the Planning Commission, and the D.C. State Historic Preservation Office concerning an expansion project at the Center. *See* ECF No. 13-17. There, however, Planning Commission review occurred not due to the Center's involvement but because the National Park Service—a federal agency—possessed jurisdiction over portions of land to be used for the project, *see id.* at 3. Indeed, the Center participated as a "Consulting Party" because it was "invited" to the review, *id.* at 3–4, not because the Center was required to subject itself to the review independent of the National Park Service's involvement.

Plaintiff also finds no support in the fact that the Smithsonian Institution has entered into an agreement with the Planning Commission to submit *Smithsonian* projects for review. *See* Ex. A. There is no similar agreement between the *Center* and the Commission, and the Center is not a party to nor bound by the Smithsonian's agreement. Rather, the Center maintains its own authority to act pursuant to its Board's duly ratified decisions; it is not subject to the Smithsonian's control. *See* 20 U.S.C. §§ 76h(a), 76k(e); *see also id.* § 42(b)(2) (establishing that the Center's Board is

---

of the *Commission's* status as an "agency" under the Act, not the status of the "Non-Federal Agency." *Id.* § 601.5(b); *see also* Nat'l Capital Planning Comm'n, Memorandum of Agreement Between the National Capital Planning Commission and the Smithsonian Institution 2 (2018), Ex. A (noting that the Smithsonian is not subject to the National Environmental Policy Act but that, after the Institution submits a project for the Planning Commission's review, the statutory obligation for environmental review is triggered by the Commission's status as an agency).

independent of Smithsonian control). Without a similar agreement or statutory directive, the Center has no such independent obligation to submit all plans to Planning Commission review.

Further, the requirement to submit any federal "undertaking" for review by the Advisory Council on Historic Preservation similarly applies only to the "head" of any "Federal agency." 54 U.S.C. § 306108. Indeed, Congress expressly recognized that its development authorities did not apply to certain independent entities and decided to "rectify" that fact, with respect to the Smithsonian Institution, by passing the Smithsonian Facilities Authorization Act. Ex. A at 2; *see also* 20 U.S.C. § 75b note (2003) (Patent Office Building Improvements); Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, 117 Stat 888, 889 (2003). That Act, appended as a note to an appropriation for the Smithsonian Board of Regents to make improvements to the Patent Office Building, *see* § 3, 117 Stat. at 888, deemed the Smithsonian Institution to be "an agency for purposes of compliance with regulations promulgated by the Advisory Council on Historic Preservation" in "carrying out other projects in the District of Columbia which are subject to the review and approval of the National Capital Planning Commission," *id.* at 889, § 3(c).

That Act, which applies to the Smithsonian and its Board of Regents, makes no mention of the Center or its independent Board. *See id.* at 888–89. And the Center's statutory independence means that the Smithsonian's status cannot be imputed to the Center. Indeed, as noted above, the Center's actions relating to its expenditure of trust funds "shall not be subject to review by any officer or agency other than a court of law." 20 U.S.C. § 76k(e). And the Center's Board is not subject to control by the Smithsonian Board of Regents. *Id.* § 42(b)(2). Moreover, the Smithsonian Board of Regents itself possesses no similar immunity from review by other officers or agencies. *See id.* §§ 41–70. Although Congress decided to clarify that the Smithsonian Institution is subject to certain development regulations, it did not make any similar determination for the Center. That

28

silence cannot override the plain text of the provisions in which Congress granted the Center its independence from external review. *See Hunter v. Fed. Energy Regul. Comm'n*, 711 F.3d 155, 159 (D.C. Cir. 2013) (noting that "repeals by implication are not favored" (quoting *Universal Interpretive Shuttle Corp. v. Wash. Metro. Area Transit Comm'n*, 393 U.S. 186, 193 (1968)). In essence, Congress *confirmed* that the National Historic Preservation Act does not, by its text, apply to the Smithsonian and similar entities. And it has changed that determination only for the Smithsonian itself. The Center is thus not required to submit "undertakings" for review.

The Fine Arts Commission "advise[s]" on "the location of statues, fountains, and monuments in the public squares, streets, and parks in the District of Columbia" and on "the selection of models" and "artists" for "statues, fountains, and monuments erected under the authority of the Federal Government." 40 U.S.C. § 9102(a)(1)–(4). As above, the Center does not act "under the authority of the Federal Government" because it does not "exercise" governmental authority. *Dong*, 125 F.3d at 881. Moreover, the Fine Arts Commission's advisory authority extends only to proposals for *new* "statues, fountains, and monuments," given that the scheme contemplates advising on each fixture's location—which is fixed after the statue, fountain, or monument is installed—and on the selection of models and artists to "carry out" the "erect[ion]" of such fixtures. 40 U.S.C. § 9102(a). Plaintiff has not alleged that the Board plans to erect a new statute, fountain, or monument necessitating Fine Arts Commission review. *See* ECF No. 12 ¶ 63 (alleging only that alteration or demolition of an "iconic structure" is "precisely the type of project subject" to review). And the Fine Arts Commission fulfilled the only duty outlined for it under the Center's governing statutes by approving the original "plans and specifications" for the Center. 20 U.S.C. § 76i(a). No other provision contemplates the Commission's further involvement. *See id.*

The evidence indicates that nothing about the renovation to the Center will be sufficiently "material" to result in the kind of new structure—be it a statue, fountain, or monument—that might qualify under the Fine Arts Commission's provisions. The Center's building will not be torn down. *See* ECF No. 13-13 at 2–3; ECF No. 23 at 1; *see also* ECF No. 29-9 at 15–17; ECF No. 29-10. The building—to the extent it might even qualify as a "monument" under the law—will not be moved or require a new "model" for construction. 40 U.S.C. § 9102(a). The Fine Arts Commission's review thus does not apply to the Center's renovation.

*Third*, even assuming that non-agency might qualify under the above schemes, Congress expressly granted the Center itself expansive independence to operate without being constrained by the restraints that apply to federal agencies. Congress affirmed that the "actions of the Board relating to performing arts and to payments made or directed to be made by the Board from any trust funds shall not be subject to review *by any officer or agency other than a court of law*." 20 U.S.C. § 76k(e) (emphasis added). The Board's actions "relating to" its expenditure of funds appropriated by Congress for capital repair and restoration fall squarely within the plain text of the limitation in § 76k(e). The Board's decision to expend such funds to repair and improve the Center's building and site "shall not be subject to review," other than in court. *Id.* The regulatory bodies that Plaintiff identifies are not courts of law. *See* 40 U.S.C. § 8711(a) (establishing the Planning Commission as the "central federal planning agency for the Federal Government in the National Capital"); 54 U.S.C. § 304101(a) (establishing "as an independent agency of the United States Government an Advisory Council on Historic Preservation"); 40 U.S.C. § 9101 (establishing a "Commission of Fine Arts," composed of "seven well-qualified judges of the fine arts, appointed by the President"). The Board was thus not required to abide by the review process established by each entity to proceed with renovation.

30

B.    **The Board's adoption of a secondary name complies with the law.**

In addition to failing for lack of Article III standing, Plaintiff's challenge to the Board's decision to adopt a secondary name for the Center fails as a matter of law. The Court should grant summary judgment to Defendants on Count One and partial summary judgment on Counts Four, Five, Six, and Seven of Plaintiff's amended complaint.

i.    *The Board's "renaming" vote adopted a secondary name, an action that does conflict with the Center's governing statutes.*

Congress required that the Board construct "a building to be designated as the John F. Kennedy Center for the Performing Arts." 20 U.S.C. § 76i(a). The Board did so. And it maintains that designation today. *See, e.g.*, ECF No. 12 ¶ 33 (showing the retention of the statutorily mandated name on the building's facade); Trump Kennedy Center, *A Living Memorial* (2026), https://www.kennedy-center.org/memorial/ [https://perma.cc/HK75-ZXC9] (describing the living memorial to President Kennedy at the Center). Nowhere in the Center's governing statutes is there any limitation on the Board's ability to use a secondary name in reference to the Center. *See, e.g.*, 20 U.S.C. § 76i(a) (requiring that a building be "designated as the John F. Kennedy Center for the Performing Arts"). And the Center remains, as Congress required, "the sole national memorial to the late John Fitzgerald Kennedy within the city of Washington and its environs." 20 U.S.C. § 76q.

The use of secondary names to refer to federal entities is not uncommon. The Department of Defense is also known as the Department of War in "official correspondence, public communications, ceremonial contexts, and non-statutory documents within the executive branch." Exec. Order No. 14347, 90 Fed. Reg. 43893, § 2(a) (Sep. 5, 2025). The Consumer Financial Protection Bureau is statutorily designated as the "Bureau of Consumer Financial Protection." 12 U.S.C. § 5491(a). But, since its inception, the Bureau has been known as the "Consumer Financial Protection Bureau," and its logo has reflected that alternate name. *E.g.*, Consumer Fin. Prot.

31

Bureau, *Financial Report of the Consumer Financial Protection Bureau* at 1 (2011), https://files. consumerfinance.gov/f/reports/CFPB_Financial_Report_FY_2011.pdf [https://perma.cc/Q64L-QNCK]. The Federal National Mortgage Association, *see* 12 U.S.C. § 1716b, is commonly known—including on its website and in communications—as "Fannie Mae," a play on the pronunciation of its acronym. *See* Fannie Mae, *Fannie Mae Announces Results of Tender Offer for Any and All of Certain CAS Notes* (Mar. 2, 2026), https://www.fanniemae.com/newsroom/fannie-mae-news/tender-offer-results-any-all-certain-cas-notes-feb-2026 [https://perma.cc/9A8G-LSG5]. And even at the Center, the expansion project that Plaintiff identifies, *see* ECF No. 12 ¶ 65, is known as "The REACH at the Kennedy Center," Trump Kennedy Center, *The REACH at the Kennedy Center*, https://www.kennedy-center.org/reach/ [https://perma.cc/2LDB-JGWU]. As long as the Center continues to memorialize President Kennedy—which both Plaintiff's allegations, *see* ECF No. 12 ¶ 33, and available evidence establish it is doing—the Board is not violating its duty to maintain a "living memorial" to the late President, 20 U.S.C. § 76h(a)(1), or to designate the main building of the complex in President Kennedy's honor, *see id.* § 76i(a).

### ii. Lettering on the building's facade is neither a "memorial" nor a "plaque in the nature of a memorial" within the statutory prohibition on additional memorials.

The only provision that imposes any restriction on the Board's decoration rights prohibits the Board from designating or installing "in the public areas" of the Center any "additional memorials or plaques in the nature of memorials." *Id.* § 76j(b)(1). The lettering on the building's facade—the only change the Board made that qualifies under the provision's regulation of "public areas"[9]—is not, and does not purport to be, a memorial to President Trump.

---

[9] Plaintiff's allegations do not establish—nor can the evidence prove—that the Center's "website" and "emails," ECF No. 12 ¶ 33, qualify as public areas under the statute.

Start with the text of the lettering itself. The word "memorial" appears once on the facade: immediately after President Kennedy's name. *See* ECF No. 12 ¶ 33. The text including President Trump's name does not indicate that the text is intended to memorialize him. *See id.* Moreover, the plain text of the statute underscores that the addition of the lettering to the building's facade is not barred. A "memorial" is "anything meant to help people remember some person or event, as a statue" or a "holiday." Noah Webster, *Webster's New Universal Unabridged Dictionary* 1123 (2d ed. 1983). A "memory" typically "denotes the power by which we reproduce past impressions," akin to a "distinct effort to collect again or call back what we know has been formerly in the mind," often as a "posthumous" "remembrance." *Id.* Congress's use of the term "memorial" confirms that it intended to sweep in only those adornments meant to "help remember" some "past impression." Any "impression" that President Trump makes, as the sitting president of the United States, is not "past." Including his name on the Center's facade—meant only to provide the secondary name to the public—does not qualify as, nor was it intended to be, a memorial.

Congress did not adopt the broadest possible prohibition to limit the Board's discretion in adding adornments to the Center's property. It limited only those adornments qualifying as "memorials or plaques in the nature of memorials." 20 U.S.C. § 76j(b)(1). It did not limit *all* additions of plaques or text in the public areas of the Center. *See id.* That choice matters. For text on the building's facade to fall within the statutory prohibition, it must be a memorial or "in the nature of" a memorial. Mere inclusion of President Trump's name does not qualify.

### C.  Plaintiff's breach-of-trust claims fail on state law grounds.

Although the Court previously found that Plaintiff had likely satisfied the state-law predicates for a breach-of-trust claim, *see* ECF No. 24 at 17–19, Defendants preserve here their argument that trust law does not permit a co-trustee to sue for every purported breach of fiduciary duty. Counts One, Two, and Three of Plaintiff's amended complaint fails as a matter of law.

33

Relevant common-law sources cite to District of Columbia case law for the conclusion that co-trustees may sue to enforce a charitable trust. *See* Restatement (Third) of Trusts § 94 cmt. f to Reporter's Notes (citing *Bd. of Dirs. of the Wash. City Orphan Asylum v. Bd. of Trs. of the Wash. City Orphan Asylum*, 798 A.2d 1068 (D.C. 2002) [hereinafter *Wash. City Orphan Asylum*]); Bogert's *Law of Trusts* § 413 n.6 (same). But that case law held that the plaintiff directors had standing only because they had "made colorable arguments regarding their status as persons who have a special interest in the enforcement of a trust or as intermediate beneficiaries of a trust sufficient to give them standing." *Wash. City Orphan Asylum*, 798 A.2d at 1075. The D.C. Court of Appeals *disclaimed* adopting the broadest reading, noting that it "need not decide whether we agree with the sweeping view" that a director may *always* challenge the conduct of other directors. *See id.* at 1075 n.4 (citing *Morgan v. Robertson*, 609 S.W.2d 662, 665 (Ark. Ct. App. 1980)).

*Family Federation for World Peace and Unification International v. Moon* confirms that the District of Columbia applies the special-interest test to directors and trustees. *See* 338 A.3d 10, 27–28 (D.C. 2025). There, the plaintiffs—who included two ousted directors—"lost special interest standing" because they no longer challenged "extraordinary measures." *Id.* at 27. The rule applies to all "private plaintiffs." *Id.* at 28. And there, the actions were not sufficiently extraordinary. *See id.* at 27–28; *see also Fam. Fed'n for World Peace & Unification Int'l v. Moon*, No. 2011 CA 003721 B, slip op. at 30–33, 30–31 n.10 (D.C. Super. Ct. Aug. 28, 2023), *aff'd*, 338 A.3d 10 (D.C. 2025), *cert. denied*, ---S. Ct.--- , No. 25-634, 2026 WL 642851 (Mar. 9, 2026) (mem.); *Mount Vernon Mortg. Corp. v. United States ex rel. Att'y Gen.*, 236 F.2d 724, 725 (D.C. Cir. 1956) (holding that because beneficiaries of a charitable trust are "practically unlimited," "unless the United States or the Attorney General can sue," "no one can sue").

34

**D.**    *Ex officio* **trustees have no categorical right to vote on Board matters.**

The Court previously concluded that, although a "trick[y] question," ECF No. 24 at 27, Plaintiff is likely to succeed on the merits of her claim that the Board is statutorily barred—due to Congress's importation of traditional common-law trust principles—from categorically limiting *ex officio* trustees' rights to vote on Board matters, *see id.* at 27–30. The Court noted that the term "*ex officio* does not inherently connote that a trusteeship is solely honorary in nature." *Id.* at 27. And it then primarily rested its preliminary conclusion on the fact that the Center's organic statute "does not distinguish between general trustees and *ex officio* members," a fact that—paired with Congress's choice to clarify that *ex officio* trustees on *other* boards are "non-voting"—means the Center's *ex officio* trustees have a statutory right to vote. *Id.* at 28.

But Congress has done more than clarify that *ex officio* members of other boards are nonvoting members. It has often specified—including in many of Plaintiff's own citations—that remaining members are *voting* members. *See* ECF No. 13-1 at 13–16 (collecting statutory citations); *see also* 7 U.S.C. § 1627b(f)(3)(A) (including on the board of the National Sheep Industry Improvement Center "7 voting members"); 12 U.S.C. § 2160(d)(1) (including on the board of the Federal Farm Credit Banks Funding Corporation "nine voting members"); 12 U.S.C. § 5321(b) (establishing the Financial Stability Oversight Council with "voting members"); 15 U.S.C. § 657u(b)(1) (establishing a Lender Oversight Committee with three "voting members"); 22 U.S.C. § 2511(c)(2)(A) (establishing a Peace Corps National Advisory Council with "fifteen voting members"); 22 U.S.C. § 7302(b)(2)(A) (establishing a Diplomatic Telecommunications Service Governance Board with five "voting members"); 47 U.S.C § 1423(b)(1)(A) (establishing a Public Safety Interoperability Board with fourteen "voting members"); 49 U.S.C. § 24712(a)(3)(A) (establishing an Amtrak State-Supported Route Committee with a "bloc voting system" including "3 separate voting blocs" to represent "voting members"); 28 U.S.C. § 991(a)

35

(establishing the Sentencing Commission, consisting of "seven voting members and one nonvoting member"); 42 U.S.C. § 283r(d)(2) (specifying that the National Science Advisory Board for Biosecurity include "voting members"); 42 U.S.C. § 2996c(a) (establishing the Board of Directors for the Legal Services Corporations with "eleven voting members"); 46 U.S.C. § 51312(b)(1)(F)(vi) (establishing that *ex officio* members of the Board of Visitors of the Merchant Marine Academy appointed under subparagraphs (B) or (D) are "voting member[s] of the Board").

Just as Congress's failure to specify that the Board's *ex officio* members are nonvoting might support Plaintiff's position, Congress's failure to specify that *ex officio* members have a clear right to vote—when it has done so elsewhere—confirms that Congress did not intend to establish such a right here. Without clear indication that Congress intended to foreclose any modification of trustees' ability to vote, statutory silence cannot be read to create the kind of right necessary to justify federal-court intervention in the trust's management. *Cf. Shelton*, 229 U.S. at 94–95. Defendants are entitled to partial summary judgment on Plaintiff's voting-right claims.

E.    **The Court's temporary restraining order granted Plaintiff the informational relief she sought, mooting that request for relief.**

Plaintiff's request for informational relief, which makes up portions of Counts Three, Four, Five, Six, and Seven in her amended complaint, is moot. The Court ordered Defendants to provide a set of documents drawn from the list in Plaintiff's February 20 letter, "less a few categories which appear to be moot given the unfolding of events." ECF No. 24 at 24. Those included: documents prepared for or presented to the Board's Building and Grounds Committee in connection with the closure and construction; the latest consolidated budget for the anticipated work; a list of artistic or performance contracts that will be affected by the closure; a list of experts or advisors who provided input, or documents indicating such experts, during the "one year review" of the Center; any reports provided by those experts or advisors relating to the "one year review" or planned

36

closure; and, to the extent any documents described do not exist, a notification in writing to that effect. *Id.* at 25. Plaintiff received documents responsive to each category, *see* ECF No. 29 at 1–2.

The Court has granted the relief Plaintiff sought. Accordingly, the informational claims "should be 'dismissed as moot' " because the Court "cannot grant any effectual relief" to Plaintiff. *Usher v. U.S. Dep't of Just.*, 698 F. Supp. 3d 174, 176 (D.D.C. 2023) (quoting *Calderon v. Moore*, 518 U.S. 149, 150 (1996)). Defendants have shown that Plaintiff's informational requests—portions of Counts Three, Four, Five, Six, and Seven—should be dismissed.

> **F.      Plaintiff's remaining claims fail procedurally, on the merits, and as duplicative of her primary claims.**

*First*, Plaintiff brings a freestanding declaratory-judgment cause of action "on the basis of all claims identified." ECF No. 12 ¶ 103 (Count Five). But the Act does not create a standalone cause of action. *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011). It is "procedural" in nature; it merely augments the remedial options available to district courts and does not expand courts' jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (citation omitted). Accordingly, Plaintiff cannot proceed independently here under the Declaratory Judgment Act.

Moreover, the Court can—and should—dismiss this claim as duplicative of the other claims. "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). Independently pleading such a claim merits dismissal as it seeks a "form of relief" for other causes of action already pleaded. *Fitts v. Fed. Nat'l Mortg. Ass'n*, 44 F. Supp. 2d 317, 330 (D.D.C. 1999); *see also Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249–50 (S.D.N.Y. 2006).

*Second*, Plaintiff's APA claim, ECF No. 12 ¶¶ 104–12 (Count Six), fails as a matter of law because the Center is not an "agency." Analogous precedent confirms that the Smithsonian

37

Institution is not an "agency" under the Privacy Act and, relatedly, the APA. *See Dong*, 125 F.3d at 879–81; *supra* Section II.A.ii. As noted above, *see supra* Section II.A.ii, the Center is not subject to the APA, so the Court should grant summary judgment to Defendants on Count Six.

*Third*, Plaintiff's mandamus claim (Count Seven) fails for lack of jurisdiction. "Mandamus is 'one of the most potent weapons in the judicial arsenal,' a 'drastic and extraordinary remedy reserved for really extraordinary causes.' " *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 949 (D.C. Cir. 2019) (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004)). A plaintiff must "demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Id.* (citation omitted). "These three threshold requirements are jurisdictional[.]" *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).

As shown above, Plaintiff has not shown a "clear and indisputable" right to relief and the violation of a "clear duty to act."[10] And she cannot show that no adequate alternative remedy exists. Plaintiff's lawsuit is premised on the availability of relief under the statutes that govern the Center, *see* 20 U.S.C. § 76k(e). *See* ECF No. 12 ¶¶ 71–112. Review under those provisions is adequate, even if the review "vindicates rights less efficiently" than Plaintiff's preferred method. *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005). Such review precludes mandamus relief. *See id.*

---

[10] Plaintiff's *ultra vires* claim, *see* ECF No. 12 ¶ 92–101 (Count Four), also fails because the Center has not acted " 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.' " *Nyunt v. Charman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). Plaintiff lacks Article III standing. *See supra* Section I. And she has failed to identify a "clear and mandatory" statutory prohibition for the Board's bylaw amendment, adoption of a secondary name, and closure. *See supra* Section II.A–II.C. The only provision applicable—20 U.S.C. § 76j(b)(1)—does not prohibit adornments that are not "memorials" or "in the nature of memorials." *Id.* The Court should grant summary judgment to Defendants on Count Four of Plaintiff's amended complaint.

III.    **Preliminary and Permanent Injunctive Relief Are Not Warranted.**

Plaintiff can show no irreparable harm to any personal interest that has resulted or would result from the Center's closure, renovation, and secondary naming. And even if she could assert harm on the *Center's* behalf, she fails her burden there, too. Furthermore, the balance of the equities and the public interest weigh decisively in Defendants' favor. Defendants are remedying severe structural and safety deficiencies at the Center that require immediate attention. And the Center's two-year closure will minimize the project's total timeline, enabling repairs and restoration to occur expeditiously and for the Center to reopen after two years. Moreover, injunctive relief will disrupt the Board's discretionary ability to manage its trust funds to serve the purposes of the trust and uphold the public interest. Each factor weighs strongly against Plaintiff.

A.    **Plaintiff will not be irreparably harmed from the Center's closure for renovation and has not been harmed by the adoption of a secondary name.**

Plaintiff will suffer no personal irreparable injury from the Board's decision to undergo renovation for two years, nor can she show any irreparable injury from the adoption of a secondary name. The only harms she asserts involve "damage to trust in the Kennedy Center and its valuable goodwill." ECF No. 13-1 at 31. Plaintiff provides no explanation for how she will suffer any injury at all from the Center's votes. And, to the extent Plaintiff can even assert harms on someone *else's* behalf—*i.e.*, the staff she alleges will be cut, the performers who might need to rebook shows, or the Center itself, *see id.* at 29–34—she fails to make the required showing.

"The standard for irreparable harm is particularly high in the D.C. Circuit. Plaintiffs have the 'considerable burden' of proving that their purported injuries are 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.' " *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (citation omitted). Importantly, the "moving party" must be the one "irreparably harmed." *Wis.*

39

*Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Citizens for Resp. & Ethics in Wash. v. U.S. Ctrs. for Disease Control & Prevention*, 786 F. Supp. 3d 83, 95 (D.D.C. 2025) (holding that a movant cannot rely on "injuries to third parties" to show irreparable harm (citation omitted)). And a failure to demonstrate concrete irreparable harm can alone serve as a basis to deny preliminary-injunctive relief. *See Fisheries*, 236 F. Supp. 3d at 337–38.

Plaintiff asserts no personal economic, physical, or intangible injury from the Center's closure, renovation and adoption of a secondary name. *See* ECF No. 13-1 at 29–34; ECF No. 30-1 at 17–18. Her request for injunctive relief thus fails to show that she has suffered or will suffer certain, great, and actual injury. *See Fisheries*, 236 F. Supp. 3d at 336; *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) ("[I]njuries to third parties are not a basis to find irreparable harm."). Moreover, the harm she purports she will suffer in her capacity as a trustee—the Board's "ongoing frustration of her obligations as a trustee," ECF No. 30-1 at 18, which obligations derive entirely from the Center's statutory charitable duties—is merely a 'harm' to the Center's ability to fulfill its mission. That 'harm,' as the Board's statutes make clear, is not to Plaintiff—it is to the *public*, as beneficiaries of the trust. Plaintiff's asserted harm is, at best, the harm any trustee—or, for that matter, any corporate director, legislator, or voter—faces when the democratic body in which she participates takes an action with which she disagrees. That harm is not cognizable in federal court. *Cf. L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1199, 1201–02 (9th Cir. 1980) (finding no irreparable injury where three-fourths quorum of owners needed to approve team transfers and plaintiff alleged it would lose such a vote).

The authority that Plaintiff cites, *see* ECF No. 30-1 at 18, confirms that any harm resulting from being unable to fulfill a "statutory mission" belongs to the person—or entity—directly charged with fulfilling that mission, *see Dellinger v. Bessent*, 766 F. Supp. 3d 57, 70 (D.D.C. 2025)

40

(citing 5 U.S.C. § 1212, establishing the Special Counsel role). Here, *the Board* is the "trustee in respect of all trust funds administered by it," 20 U.S.C. § 76*l*(b), responsible for fulfilling the duties established under the Center's governing statutes, *id.* § 76j(a)(1). Plaintiff is a member of the Board. But she is not *the* Board. Any harm from an inability to fulfill the statutory mission in the Center's charter belongs not to Plaintiff as an individual. It belongs to the Board itself. A trustee might well believe that *any* action taken against her wishes means that statutory obligations are being "frustrated." ECF No. 30-1 at 18. But only the body charged with undertaking those obligations has the right to assert that harm. *See Dellinger*, 766 F. Supp. 3d at 70.

To the extent Plaintiff may assert harms on other entities' behalf—she cannot—she still fails to satisfy her burden. Plaintiff does not provide specificity about the extent to which "programming" might be unable to "restart" upon reopening, just that it will be "impossible to rebook" performances that are cancelled. ECF No. 13-1 at 30 (quoting Decl. of Deborah Borda ¶ 8, ECF No. 13-19). Plaintiff does not contest that the Center *will* be able to book performances after renovations, having had two years to plan to do so. Instead, much of Plaintiff's asserted harm depends on actions that she requests the Court take—*i.e.*, entering an injunction and the effect such an order would have on performances scheduled during the closure. *See* ECF No. 13-1 at 30 (asserting that the Center will be unable to restart programming if ordered). If the injunction itself is what would cause harm—due to the effects of closure and Court-ordered reopening on the Center's commitments—then that harm cannot be a basis to *obtain* the injunction.

Plaintiff's allegations also lack specificity as to how staffing might be impacted. Plaintiff expects a "significant portion" of the staff to "likely relocate to other cities." *Id.* at 32 (quoting Decl. of Joshua Borenstein ¶ 13, ECF No. 13-21). And she claims that layoffs may "begin in April 2026," with some employees "likely to start departing in anticipation of layoffs." *Id.* (quoting Decl.

41

of Mallory Miller ¶ 18, ECF No. 13-22). But she provides no indication of how many staff may relocate or depart voluntarily.[11] She thus fails to satisfy her requirement to show that such harms are sufficiently "great" or "certain" to warrant emergency relief. *Fisheries*, 236 F. Supp. 3d at 336; *see also Storch v. Hegseth*, 804 F. Supp. 3d 216, 226 (D.D.C. 2025) (noting that the loss of a government job typically does not constitute irreparable injury).

Further, Plaintiff asserts that demolition or material alteration of the Center is "quintessential irreparable harm." ECF No. 13-1 at 34; *see also United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982). But Plaintiff has not shown that it is "certain" that the property will be lost or materially altered in a way that could constitute irreparable harm. *Fisheries*, 236 F. Supp. 3d at 336. The evidence shows only that the Center will be restored and repaired, consistent with a congressional appropriation and the Center's charter. *See* ECF No. 23 at 1; ECF No. 29-9 at 11–18; ECF No. 29-10 at 2–13.

Nor can Plaintiff show that any harm to the Center from the use of the secondary name is "certain" and "great." *Fisheries*, 236 F. Supp. 3d at 336. She asserts that "the renaming is directly linked to artists canceling performances," framing that harm as her inability "to maintain the Center as a performing arts space and living memorial to President Kennedy." ECF No. 30-1 at 18 (citing ECF No. 30-2 ¶ 34). But she provides no specificity about the magnitude or certainty of that purported harm. She certainly does not assert that the Center is *currently* unable to maintain itself as a performing arts space and living memorial to President Kennedy. *See id.* As she emphasizes elsewhere, the Center is hosting numerous performances (many of which, she notes,

---

[11] On March 26, 2026, the Center began layoffs in the "programming, development, advertising," and "marketing" departments, as well as the "office of the president." Travis M. Andrews & Janay Kingsberry, *Kennedy Center Begins Layoffs, Rocking Institution Ahead of Two-Year Closure*, Wash. Post (Mar. 26, 2026, at 14:16 ET), https://www.washingtonpost.com/style/2026/03/26/kennedy-center-layoff/ [https://perma.cc/2HQG-ZRQ3].

will need to be canceled or rescheduled during the closure). *See* ECF No. 13-1 at 9 (seeking a "list of all performance contracts" in place during the closure); *see also* ECF No. 29-5 (list of performance contracts affected); ECF No. 13-16 (showing upcoming shows at the Center). The Center continues to put on arts performances. Any alleged harm from adopting the secondary name is thus neither certain nor great. *See Storch*, 804 F. Supp. 3d at 226 (holding that "mere injuries, however substantial," are "not enough" to "prove irreparable harm" (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam)).

**B.    The balance of the equities and public interest favor Defendants.**

The balance of the equities and the public interest tilt even more strongly in Defendants' favor. The very purpose of the proposed closure for renovation is to limit the total amount of time and expense necessary to undertake renovation that will directly address critical infrastructure failures and limit safety risks to the public. *See* ECF No. 29-3 ¶ 7. The severity of the Center's existing infrastructure needs necessitates repair and renewal. And the complete closure will permit those needs to be addressed in as timely, cost-effective, and safe a manner as possible.

To assess the balance of the equities and public interest, courts "must balance the competing claims of injury", consider "the effect on each party of the granting or withholding of the requested relief," and "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted).

As explained above, Plaintiff will suffer no personal, imminent, great, and concrete harm from the Center's closure for renovation. And, indeed, the Center itself will suffer no irreparable harm, given that it will reopen after two years following improvements aimed at addressing serious structural deficiencies and providing updated facilities consistent with high quality performing-arts operations. Should an injunction issue, though, the Center will be hamstrung in its ability to address "critical infrastructure needs," like "severe water intrusion" from the Potomac River and

43

"systemic failure" of the Center's vertical plumbing risers. ECF No. 29-3 ¶¶ 7, 9. Indeed, routine maintenance has been "deferred" for "decades." Trump Kennedy Center, Press Releases, *Trump Kennedy Center Board Unanimously Approves Landmark Renovation* (Mar. 16, 2026), https://www.kennedy-center.org/news-room/press-release-landing-page/tkc-board-unanimously-approves-landmark-renovation/ [https://perma.cc/89FZ-BRM9]. Preventing the Board from addressing those issues will only magnify harms to the Center from ongoing structural degradation.

Moreover, an injunction against the Board will prevent the Board from undertaking capital repair and restoration activities that directly fulfill its statutory duties. *See Dellinger*, 766 F. Supp. 3d at 70–71; *see also* 20 U.S.C. § 76j(a)(1)(G)–(H); § 60025(a), 139 Stat. at 157. And this Court's intervention—on Plaintiff's renovation, naming, and voting-rights claims—would improperly intrude on the Board's statutory and common-law discretion to pursue the means it believes will best fulfill its duties. *See Olds*, 173 F.2d at 642 n.7 (citing *Shelton*, 229 U.S. at 94). That constitutes a harm in itself, both to the Board and to the public interest in the effective management of charitable trusts. *See Depu v. Oath Holdings, Inc.*, 715 F. Supp. 3d 1, 26–27 (D.D.C. 2022) (citing *Hooker v. Edes Home*, 579 A.2d 608, 610, 612 (D.C. 1990), for the proposition that trusts creating a "public benefit" and "social gains" should not be subject to the "recurring burdens" of "vexatious litigation"); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Finally, the public interest will be harmed should the Board be forced to undertake repairs while keeping the Center open, as the work will result in "safety risks" should construction occur while public access is maintained. ECF No. 29-3 ¶ 7; *see also* ECF No. 29-4 at 2 (noting that operation during construction is "not feasible" because it would "leave the facility without life-safety systems, climate control, or power for extended durations"). And, should an injunction result in work taking *longer* than two years to complete, it would threaten Congress's judgment that

44

funding for this renovation be used prior to September 30, 2029. *See* 139 Stat. at 157. The Court

is "not free to ignore [Congress's] judgment and rewrite the statute to include a [different]

timetable." *In re Am. Fed'n of Gov't Emps., AFL-CIO*, 837 F.2d 503, 506 (D.C. Cir. 1988).

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's motion for a preliminary

injunction and grant Defendants' cross-motion for summary judgment.

Dated: April 6, 2026                          Respectfully submitted,

                                              BRETT A. SHUMATE
                                              Assistant Attorney General, Civil Division

                                              YAAKOV M. ROTH
                                              Principal Deputy Assistant Attorney General

                                              ERIC J. HAMILTON
                                              Deputy Assistant Attorney General

                                              STEPHEN M. ELLIOTT
                                              Assistant Branch Director

                                              */s/ William S. Jankowski*
                                              WILLIAM S. JANKOWSKI
                                              D.C. Bar No. 90021524
                                              Trial Attorney
                                              U.S. Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street NW
                                              Washington, DC 20530
                                              (202) 353-7578
                                              william.s.jankowski@usdoj.gov

                                              *Counsel for Defendants*

45