# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOYCE BEATTY,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP *et al.*,<br><br>*Defendants*. | No. 25-cv-4480 (CRC) |

## DECLARATION OF CHARLES MATTHEW ("MATT") FLOCA

In accordance with the provisions of 28 U.S.C. § 1746, I, Charles Matthew Floca, state as follows, under penalty of perjury, pertinent to the above-styled and numbered case:

1. I currently serve as the Executive Director and Chief Operating Officer of the Trump Kennedy Center ("the Center"). In this capacity, I exercise operational authority over all institutional departments, managing a complex integration of both trust and federal functions. My mandate includes the strategic direction of the 1.7 million square foot Center campus and the direct oversight of federally appropriated operating and capital budgets exceeding $300 million.

2. As the primary lead for the Center's operational backbone, I am responsible for the stewardship of our federal functions, encompassing enterprise-wide maintenance, capital improvements, and the hardening of our physical and digital security, while simultaneously directing the trust functions that support our production management and core performing arts business operations. Serving as the Staff Chair of the Building and Grounds Committee, I ensure institutional alignment to fulfill our national mandate while maintaining the fiscal, technical, and structural integrity of this multi-billion dollar federal asset.

3. My professional background includes over 15 years of experience managing complex programs, facilities, and large-scale budgets. Prior to my appointment as Executive Director, I served as the Vice President of Operations at the Center, a position I held from January 2024 to March 2026.

4. The statements set forth in this Declaration are based on my personal knowledge and review of documents and information provided to me in my official duties. I make this

declaration in support of the Defendants' opposition to Plaintiffs' motion for a preliminary injunction. I developed the recommendation to close the Center for capital repair and restoration that the Center's Board of Trustees ("Board") adopted at its March 16 meeting. I will specifically address and respond to the assertions in the Declaration of Craig Williams, which Plaintiffs submitted.

5. Mr. Williams's views are at odds with the physical and legal realities of managing the Center. As set forth in his Declaration, Mr. Williams' opinion is informed by a career focused on neoclassical design and acoustical enhancements. His background does not include the requisite experience in building security, large-scale facility operations, or the management of a complex and independent trust instrumentality of the federal government.

6. My determination that a full closure of the Center is necessary is informed by my responsibility over the 'total equation of care' for the Center. This encompasses the digital stability of our networks, the hardening of our physical security, and the integrity of our theatrical systems, factors that Mr. Williams, as a consultant, is not tasked with managing. Specialized departments like Programming and Education must stay closely aligned with artistic vision while adhering to strict institutional requirements. These include mandatory life-safety compliance, continuity of operations, and the stringent environmental controls required to protect our archives and instrument collections.

7. Furthermore, as the Center's main steward, I am responsible for maintaining a high standard of patron experience and artistic excellence. The "Artistic Envelope" of our venues, specifically, the precision-tuned acoustics of the Concert Hall and Opera House, cannot be maintained while demolition and structural steel reconfiguration occur elsewhere in the Center. To present a performance in a facility undergoing building-wide mechanical overhauls would not only degrade the patron experience to a sub-standard level but would also violate our obligations to artists and resident ensembles who require pristine, interference-free environments. Unlike a commercial theater, the Center's mandate is to provide a premier national stage; providing a "compromised" experience amidst dust, structure-borne noise, and erratic climate control is inconsistent with my executive duty and would injure the institution's global reputation.

8. Lastly, my decision is grounded in our statutory duty under 20 U.S.C. § 76h to "maintain and administer" the Center. The Center is federal land, and our Board members include the Chairman of the Commission of Fine Arts (CFA) and the Director of the National Park Service. The planned closure and renovations will maintain the memorial by addressing critical failures across a multitude of systems, including exterior envelope and subsurface infrastructure which requires targeted, temporary site disturbance to access

and replace failing waterproofing membranes, expansion joints, and structural facade elements that have reached a point of systemic decay. We have begun to engage the National Capital Planning Commission and CFA as collaborators in this stewardship (including holding an initial, staff-level meeting on March 30, 2026), and we are planning for further consultation with historic preservation groups to ensure our modernization respects Edward Durell Stone's architectural heritage while securing the building's structural integrity for the next fifty years.

9.  Mr. Williams' declaration incorrectly assumes that the Center's project scopes are in unformed discovery phases. In reality, thorough project outlines and justifications served as the foundational documents provided to secure the federal funding necessary for this restoration. This project is a mission-critical mandate to address facility-wide obsolescence, including a total overhaul of central mechanical and life-safety systems and the hardening of the security perimeter. These systems have building-wide impacts and cannot be phased venue-by-venue without leaving significant portions of the facility unprotected and out of compliance.

10. The complexity of this project is heightened by the obsolescence of the Center's production and stage technology. As documented in the 2019 Discovery Design Package, the Concert Hall requires the total replacement of stage lifts and rigging systems. This work involves the demolition of stage floors and the reconfiguration of overhead structural steel, creating massive vibrations and structure-borne noise that render the building unusable for rehearsals or performances. Furthermore, the replacement of high-voltage electrical switchgear and primary chillers and boilers necessitate building-wide cooling power and climate-control shutdowns. Mr. Williams dismisses these as "minimal downtime," but my operational experience confirms these shutdowns would leave the facility uninhabitable and put assets at risk of damage for extended durations.

11. The technical need for these improvements is already established via established points of reference, such as the 2019 Concert Hall Design Package, the 2024 Leak Report, and the project outlines used to secure federal funding. We do not need to wait for the 12-month design-bid-build lag for which Mr. Williams advocates. These materials represent the conclusion of the "pre-design phase," which serves as the trigger to transition from consultant-led design to contractor-led execution via strategic procurement like Job Order Contracting. This allows us to mobilize immediately, bypassing the administrative delays of traditional models.

12. I disagree with Mr. Williams' assertion that a July 2026 start is "not achievable." Design discovery has been underway for years. By moving directly into execution via collaborative project delivery, the renovation can proceed more quickly than Mr.

Williams suggests. To delay critical construction further for "design development" that was largely completed and funded years ago would be a failure of my mandate to protect the Center.

13. The invasive nature of the theatrical work, the total obsolescence of security and mechanical systems, and documented structural failures prove that "phasing" these plans is an operational impossibility. The responsibility for the safe and timely renewal of the Center lies with the operators who manage the total risk of the facility. A full two-year closure is the only responsible path forward.

_____

Charles Matthew Floca

.