**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOYCE BEATTY,<br><br>    *Plaintiff,*<br><br>  v.<br><br>DONALD J. TRUMP *et al.*,<br><br>    *Defendants*. | No. 25 Civ. 4480 (CRC) |

**MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND PARTIAL MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 3

    I.      PLAINTIFF HAS ARTICLE III STANDING ................................................. 3

    II.     PLAINTIFF HAS A CAUSE OF ACTION ..................................................... 11

    III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO
            PLAINTIFF AS TO RENAMING ..................................................................... 14

    IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO
            PLAINTIFF ON VOTING RIGHTS ................................................................. 19

    V.     THE COURT SHOULD GRANT PLAINTIFF'S MOTION FOR A
            PRELIMINARY INJUNCTION AND DENY DEFENDANTS' MOTION
            FOR SUMMARY JUDGMENT AS TO CLOSURE AND REBUILDING.. 23

         A.     The Court Should Grant Plaintiff's Motion for
                a Preliminary Injunction ..................................................................... 23
                1.   Plaintiff is likely to prevail on the merits..................................... 23
                2.   The preliminary injunction is needed to
                     prevent irreparable harm. ............................................................... 32
                3.   The balance of equities and public interest favor a preliminary
                     injunction. ...................................................................................... 34

         B.     Summary Judgment for Defendants on the
                Closure Is Not Warranted. ................................................................... 36

CONCLUSION.................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*Airgas, Inc. v. Air Prods. & Chemicals, Inc.*, 8 A.3d 1182 (Del. 2010) ....................................... 22

*Bartlett v. Hatch*, 17 Abb. Pr. 461, 1864 WL 3792 (N.Y. Sup. Ct. 1864) ................................... 10

*Bd. of Dirs. of the Wash. City Orphan Asylum v. Bd. of Trs. of the Wash. City Orphan Asylum*, 798 A.2d 1068 (D.C. 2002) .................................................................................................. 13

*Bost v. Illinois State Bd. of Elections*, 146 S. Ct. 513 (2026) ..................................................... 3, 11

*Brown v. Brown-Thill*, 762 F.3d 814 (8th Cir. 2014) ..................................................................... 4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 20

*Cook v. Marshall*, 126 F.4th 1031 (5th Cir. 2025) ......................................................................... 4

*Dong v. Smithsonian Inst.*, 125 F.3d 877 (D.C. Cir. 1997) .......................................................... 11

*Family Fed'n for World Peace v. Moon*, 129 A.3d 234 (D.C. 2015) ..................................... 12, 13

*Family Fed'n for World Peace v. Moon*, 338 A.3d 10 (D.C. 2025) ....................................... 12, 13

*Family Fed'n for World Peace v. Moon*, No. 2011 CA 003721 B, 2019 WL 13403236 (D.C. Super. Ct. Apr. 19, 2019) ................................................................................................. 13

*Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332 (D.D.C. 2017) ..................................... 33

*Gantler v. Stephens*, 965 A.2d 695 (Del. 2009) ........................................................................... 18

*Kain v. Gibboney*, 101 U.S. 362 (1879) ....................................................................................... 11

*Marshall as co-trustee of 4-M River Farm Tr. v. Munder*, No. 23 C 1958, 2023 WL 7325935 (N.D. Ill. Nov. 7, 2023) ......................................................................................................... 4

*Monahan v. Holmes*, 139 F. Supp. 2d 253 (D. Conn. 2001) .......................................................... 4

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...... 27

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) ................................................. 22

*Pac. Realty Tr. v. APC Invs., Inc.*, 651 P.2d 163 (Or. App. 1982) .............................................. 22

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. 639 (2012) ................................ 31

*Shapiro v. Tarnay*, No. 86 C 8247, 1987 WL 19140 (N.D. Ill. Oct. 22, 1987) ............................. 4

*Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985)..........................................................................18

\* *Sprint Commc'ns Co., L.P. v. APCC Servs.*, Inc., 554 U.S. 269 (2008)............................ passim

\* *Thole v. U. S. Bank N.A*, 590 U.S. 538 (2020)......................................................................8, 9

*Trs. of Phila. Baptist Ass'n v. Hart's Ex'rs*, 17 U.S. 1 (1819).......................................................10

*Vidal v. Girard Ex'rs*, 43 U.S. 127 (1844).....................................................................................10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .............................29

**Statutes**

20 U.S.C. § 75h(a)(2)......................................................................................................................21

20 U.S.C. § 76h................................................................................................................................32

20 U.S.C. § 76h(a)(1).............................................................................................................. passim

20 U.S.C. § 76h(a)(3)......................................................................................................................14

20 U.S.C. § 76h(a)-(b) ....................................................................................................................20

20 U.S.C. § 76i(a) ...........................................................................................................................15

20 U.S.C. § 76i(a); (2) .....................................................................................................................14

20 U.S.C. § 76i(c)(3)........................................................................................................................14

20 U.S.C. § 76j(a)(1)(G)..................................................................................................................31

20 U.S.C. § 76j(a)(1)(G)..................................................................................................................28

20 U.S.C. § 76j(b)............................................................................................................................16

20 U.S.C. § 76j(b)(1) .................................................................................................................. 1, 14

20 U.S.C. § 76k(e) ...........................................................................................................................31

20 U.S.C. § 76l.................................................................................................................................32

20 U.S.C. § 76l(a) ...........................................................................................................................20

20 U.S.C. § 76l(b)................................................................................................. 3, 6, 8, 11, 12, 21

20 U.S.C. § 76q...............................................................................................................................15

46 U.S.C. § 51312(b)(1) ..................................................................................................................21

iii

D.C. Code § 19-1307.03 ................................................................................................................ 7

D.C. Code § 19-1307.03(f) ........................................................................................................... 6

D.C. Code § 19-1307.03(g)........................................................................................................... 6

D.C. Code § 6-641.15 ................................................................................................................. 30

Pub. L. 88-260, 78 Stat. 4 (Jan. 23, 1964) ................................................................................. 16

Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3(c)(2), 117 Stat. 888 (Aug. 15, 2003)........................................................................................................................................ 30

**Rules**

Fed. R. Civ. P. 56(f)(1) ............................................................................................................... 20

**Restatements**

Restatement (First) of Trusts § 391 cmt. b ................................................................................. 11

Restatement (Second) of Trusts § 187 cmt. e ............................................................................. 18

Restatement (Second) of Trusts § 200 cmt. d............................................................................... 7

Restatement (Second) of Trusts § 224......................................................................................... 7

Restatement (Second) of Trusts § 383 ................................................................................... 21, 22

Restatement (Third) of Trusts § 76............................................................................................. 15

Restatement (Third) of Trusts § 77............................................................................................. 33

Restatement (Third) of Trusts § 77(2) .................................................................................... 18, 24

Restatement (Third) of Trusts § 78............................................................................................. 33

Restatement (Third) of Trusts § 81.......................................................................................... 3, 7

Restatement (Third) of Trusts § 81 cmt. d................................................................................... 6

Restatement (Third) of Trusts § 81 cmt. e ................................................................................... 7

Restatement (Third) of Trusts § 94...................................................................................... 11, 33

Restatement (Third) of Trusts § 94 cmt. c ................................................................................... 6

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024)...................................................................................... 20

G. Bogert et al., *The Law of Trusts and Trustees* (Supp. rev. 2d ed. 1992)........... 7, 13, 21, 22, 27

James Hill, *A Practical Treatise on the Law Relating to Trustees, Their Powers, Duties, Privileges and Liabilities* 305 (1845).......................................................................................... 9

Nat'l Capital Planning Comm'n, Mem. of Agreement Between the National Capital Planning Commission and the Smithsonian Institution 3 (2018)............................................................. 30

*Special Envoy Ric Grenell Speaks at CPAC in Grapevine, Texas*, at 2:09, C-SPAN (Mar. 27, 2026)....................................................................................................................................... 37

**INTRODUCTION**

In December 2025, Defendants ignored plain statutory text, formally renamed the Kennedy Center after President Trump, and placed the current President's name above John F. Kennedy's on the building's façade.  When artists and patrons fled, Defendants chose to shutter the Center for two years—a decision of extraordinary significance—based on no independent analysis whatsoever.  This is the exact opposite of how a prudent fiduciary acts.  Plaintiff is not asking the Court to micromanage the Kennedy Center's operations or substitute the Court's judgment for the Board's.  She is seeking to enforce the bare minimum the law requires of her co-trustees.  Congress charged Defendants with protecting this sacred national memorial to a fallen leader.  But Defendants have failed their most minimal legal obligations.  As a trustee, Plaintiff has the right— indeed, the duty—to halt their actions.

In the face of that egregious illegality, Defendants' arguments fail. First, Defendants have no meaningful answer to the fact that they have renamed the Kennedy Center in open defiance of the organic statute.   Instead, Defendants now make the bizarre claim that they adopted a "secondary name" (whatever that means), and that, because President Trump is alive today, Defendants did not violate the prohibition on erecting "additional memorials or plaques in the nature of memorials." 20 U.S.C. § 76j(b)(1).  This is chicanery.  Congress formally designated the Center and took steps to prevent precisely this kind of promotion—here, self-promotion. Defendants are willfully flouting the statute Congress passed and advancing a "secondary" legal regime that flouts the *actual* rule of law.  The Court should reject Defendants' mishmash of theories regarding the renaming and enforce the statute that Congress enacted.

Second, Defendants did not conduct any independent analysis of the need for a two-year closure.   The documents disclosed pursuant to this Court's temporary restraining order

demonstrate that the supposed one-year review that was President Trump's basis for closing the Kennedy Center *never happened*. Defendants' rush to shutter the Center—without the most basic analysis—falls below "even a forgiving standard of prudence." *See* March 14, 2026, Mem. Op. and Order ("TRO Op.") at 21, ECF No. 24. Indeed, at the TRO stage, the Court explained it would "border[] on preposterous" if copious expert analysis, plans, and other information did not exist to support the decision to close the Center. *Id*. Yet as it turns out, there was *nothing*. Before the Court, Defendants try to obfuscate their failures with post-hoc rationalizations from the Center's new executive director, Matt Floca. But this is all too little, too late. The reality is that Defendants did not do what any prudent trustee would do in these circumstances. The record also shows that Defendants' reckless actions threaten the future health of the Center and interests of the public. The Court should hold Defendants to the basic standard of prudence that would apply to any trustee in similar circumstances.

Third, Defendants seek to dodge accountability for their shocking actions by arguing Plaintiff lacks Article III standing to protect the trust. But that argument is meritless too. Defendants' theory boils down to the proposition that Plaintiff is similarly situated to a member of the public. Nothing could be further from the truth. Congresswoman Beatty is in no way a member of the public asserting a generalized grievance. She is one of a handful of trustees charged by law with maintaining and protecting the Kennedy Center. It is difficult to imagine someone with a more particularized interest in halting Defendants' damaging conduct. That is why the law has long recognized a trustee's rights to sue to protect their trust.

In short, Plaintiff is entitled to summary judgment on her challenge to the unlawful renaming of the Center, and she is entitled to preliminary injunctive relief to prevent the impending closure of the Center and the planned "rebuilding."

2

## ARGUMENT

### I.   PLAINTIFF HAS ARTICLE III STANDING

Article III's standing requirement ensures that "plaintiffs . . . have a personal stake in a case." *Bost v. Illinois State Bd. of Elections*, 146 S. Ct. 513, 519 (2026) (quotation marks omitted). "They must, in other words, be able to answer a basic question: What's it to you?" *Id.* (same).  In this case, Congresswoman Beatty "has an obvious answer." *Id.*  She is one of a limited number of trustees—a discrete set of identifiable individuals—with a "unique position and fiduciary interest in protecting the trust." TRO Op. at 19.  Congresswoman Beatty is hardly asserting "generalized grievances" common to any member of the public, and she is no "mere bystander." *Id.* at 520-21 (quotation marks omitted).  In sharp contrast to the public, Congresswoman Beatty is charged with "maintain[ing] and administer[ing]" the Kennedy Center as a "living memorial" to President Kennedy.  20 U.S.C. § 76h(a)(1).  Hers is a particularized injury, tied to her role as trustee: As a direct result of Defendant's unlawful actions, Congresswoman Beatty is frustrated from fulfilling her obligations in a prudent manner and consistent with the statute that Congress enacted.  This lawsuit will remedy that harm.

Plaintiff's Article III standing is particularly strong because of the unique obligations the law places on trustees like Congresswoman Beatty to protect their trusts.  The statute that Congress enacted imposes on Plaintiff "all the usual powers and obligations of a trustee." 20 U.S.C. § 76*l*(b).  As this Court has explained, that text imposes a trust-law obligation on Plaintiff to "[c]ompel" her "cotrustee[s] to redress a serious breach of trust." TRO Op. at 17 (quotation marks omitted); *see also* Restatement (Third) of Trusts § 81 ("Each trustee also has a duty to use reasonable care to prevent a co-trustee from committing a breach of trust and, if a breach of trust occurs, to obtain redress.").  In other words, Plaintiff *must* bring suit to combat Defendants' blatantly unlawful actions—or Plaintiff herself will court being in breach of her duty as a trustee.  *See* Pl.'s Part.

3

Summ. J. Mem. ("Pl.'s Mem.") at 20, ECF No. 30-1. And as Defendants recognize, a trustee's being in breach constitutes a real harm. Defs.' Mem. in Opp. to Pl.'s Mots for a Prelim. Injunction and for Partial Summ. J. and in Support of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 14, ECF Nos. 33 & 34. Indeed, at the last meeting of the Kennedy Center's Board, President Trump even raised the specter of suing past trustees for allegedly breaching their duties. *See* March 16, 2026, Board Meeting Minutes, ECF No. 34-5 at 10 ("The Chair stated that there are people who wanted to bring suit against the people who ran [the Kennedy Center] into the ground for 15 years.").

The commonsense conclusion that one trustee may sue a co-trustee to protect the trust and vindicate her legal obligations does not break new ground. As Plaintiff's opening memorandum explained, other federal courts have routinely heard actions between co-trustees. *See* Pl.'s Mem. at 20 (citing *Marshall as co-trustee of 4-M River Farm Tr. v. Munder*, No. 23 C 1958, 2023 WL 7325935, at *3 (N.D. Ill. Nov. 7, 2023); *Cook v. Marshall*, 126 F.4th 1031, 1035 (5th Cir. 2025); *Brown v. Brown-Thill*, 762 F.3d 814, 817 (8th Cir. 2014); *Monahan v. Holmes*, 139 F. Supp. 2d 253, 256 (D. Conn. 2001); *Shapiro v. Tarnay*, No. 86 C 8247, 1987 WL 19140, at *1 (N.D. Ill. Oct. 22, 1987)). Defendants offer no response.

Meanwhile, in *Sprint*, which Defendants also ignore altogether, the Supreme Court majority confirmed that "[t]rustees" may "bring suits to benefit their trusts." *Sprint Commc'ns Co., L.P. v. APCC Servs.*, Inc., 554 U.S. 269, 287 (2008). In addition, as Chief Justice Roberts explained in dissent, the trustee's "discharge" of her legal "obligation[s] is an independent, personal benefit that supports [her] standing to sue in federal court," *id.* at 304 n.2 (Roberts, C.J., dissenting). The conclusion that a trustee has Article III standing to sue to protect her trust is not controversial. Adopting Defendants' radical arguments—which would upset centuries of Anglo-American practice—could have sweeping ramifications and bar the door to federal court for

trustees in a host of circumstances.

What little Defendants offer falls apart under gentle scrutiny and further confirms that Plaintiff has Article III standing to sue to protect the Kennedy Center. Defendants' overarching narrative is that Plaintiff "has no concrete stake as an individual beyond the generalized interest she shares with every other citizen in compliance with the law." Defs.' Mem. at 17. But that is wrong, for all the reasons just discussed. Unlike a member of the general public, Plaintiff is a trustee charged by law with protecting the Kennedy Center and fulfilling its mission. Contrary to Defendants' assertions, it is difficult to imagine a plaintiff with a *more* "particularized" "concern" regarding whether "the Center might be able to fulfill its mission" than someone in Congresswoman Beatty's shoes. *Id.* at 12.

Defendants suggest Plaintiff has no "direct stake in the outcome" of this case because "the harms" that this action will remedy "belong to" "the Center itself." Defs.' Mem. at 12. This logic is wrong twice over. First, Plaintiff does receive a personal benefit from this litigation. By redressing harms to the Kennedy Center, Plaintiff will discharge her "legal obligation" to protect the Kennedy Center, which is a "an independent, personal benefit that supports [her] standing to sue in federal court." *Sprint*, 554 U.S. at 304 n.2 (Roberts, C.J., dissenting).

Second, in *Sprint*, the majority expressly rejected the same theory the government advances here. *Id.* at 287 (rejecting argument that "the entire relief requested will run to a party not before the court" (internal quotation marks omitted)). As the Supreme Court explained, in contexts like this one, "federal courts" may "entertain suits which will result in relief for parties that are not themselves directly bringing suit," such as when "[t]rustees bring suits *to benefit their trusts*." *Id.* (emphasis added). In short, Plaintiff can sue as a trustee to protect the Kennedy Center, whereas accepting Defendants' argument "would work a sea change in the law." *Id*. at 288.

Notably, Defendants effectively admit that a plaintiff has an interest in vindicating her fiduciary obligations to protect the trust and avoid being in breach of her duties. *See* Defs.' Mem. at 14. That alone explains why Plaintiff has Article III standing. Recognizing the flaw in their argument, Defendants downplay the benefit Plaintiff receives from this lawsuit by arguing that Plaintiff discharged all of her fiduciary duties by dissenting at the Board meeting and asserting that "[t]rust law releases any trustee 'who does not join in an action of another trustee'" *Id*. (quoting D.C. Code § 19-1307.03(f)). Defendants are wrong as a matter of hornbook law. Their own citations prove it. Each source confirms that Plaintiff must do more than merely dissent. To vindicate her obligations to the trust, Plaintiff is required to sue her co-trustees to halt and rectify their unlawful action.[1]

Consider each of Defendant's sources in turn. Defendants quote D.C. Code § 19-1307.03(f) for the proposition that "a trustee who does not join in an action of another trustee is not liable for the action." *Id.* But Defendants omit the first half of subsection f, which begins "[e]xcept as otherwise provided in subsection (g)." Subsection (g) states that "each trustee shall exercise reasonable care to: (1) Prevent a cotrustee from committing a serious breach of trust; and (2) compel a cotrustee to redress a serious breach of trust," D.C. Code § 19-1307.03(g), as the Court recognized in its TRO decision. *See* TRO Op. at 17. That describes exactly what Plaintiff is doing. She is suing to prevent further serious breach and compel her co-trustees to redress their

---

[1] Defendants briefly suggest Plaintiff did not make this argument. Defs.' Mem. at 14. To be clear, Plaintiff had no obligation to pre-rebut Defendants' arguments. Regardless, Plaintiff did make this argument. *See* Pl.'s Mem. at 14 ("Trust law—and by extension Section 76*l*(b)—imposes an affirmative 'duty' on trustees like Plaintiff 'to bring such a suit.' Restatement (Third) of Trusts § 94 cmt. c. '[I]t is a breach of trust for a trustee knowingly to allow a co-trustee to commit a breach of trust.' *Id*. § 81 cmt. d.); *id*. at 21-20 ("Congress imposed on Plaintiff an affirmative responsibility to prevent Defendants from breaching their duties. Restatement (Third) of Trusts § 94 cmt. c.").

breach through this action.  In short, D.C. Code § 19-1307.03 confirms that Plaintiff must do more than dissent. She must bring this lawsuit.

Defendants likewise mischaracterize Section 81 of the Third Restatement.  That section actually confirms that Plaintiff has a duty to sue.  It states: "A trustee is not liable for a breach of trust committed by a co-trustee, unless the trustee enabled the co-trustee to commit the breach of trust by failing to exercise reasonable care, including by failing to make reasonable effort *to enjoin or otherwise prevent the breach of trust*."  Restatement (Third) of Trusts § 81 cmt. e (emphasis added).  This is of course an action "to enjoin or otherwise prevent the breach of trust." *Id*. (same).  Again, Plaintiff was obligated to bring this suit.  The benefit she receives from bringing this action provides her Article III standing.

Defendants also rely on Section 224 of the Second Restatement.  That section, too, confirms that Plaintiff had an obligation to sue.  It says: A trustee must "take proper steps *to compel* his co-trustee to redress a breach of trust."  Restatement (Second) of Trusts § 224 (emphasis added).  Indeed, there is a "duty" for "a co-trustee to bring such a suit."  *Id*. § 200 cmt. d.  The conclusion is again unmistakable: Plaintiff receives a benefit by bringing this lawsuit.  *See Sprint*, 554 U.S. at 304 n.2 (Roberts, C.J., dissenting).

Defendants also cite Bogert's treatise, which confirms that "a non-participating co-trustee [is] liable for loss occasioned by a serious breach of trust if the non-participating co-trustee failed to take action to prevent the other trustees from taking that action." Bogert et al., *The Law of Trusts and Trustees* ("*Bogert*") § 585.  Indeed, *Bogert* is crystal clear that Defendants are wrong.  "[E]ven co-trustees who dissent have a duty to prevent their co-trustees from committing serious breaches of trust, and to require a co-trustee who does commit a serious breach to redress the breach." *Id*. § 584.

In short, Plaintiff's personal interest in discharging her obligation is blackletter trust law, and the Court should conclusively reject Defendants' arguments. Plaintiff has Article III standing because—among other reasons—she must do more than dissent. She must sue to vindicate her own legal obligations as a trustee. *See Sprint*, 554 U.S. at 304 n.2 (Roberts, C.J., dissenting).

Defendants also misunderstand *Thole v. U. S. Bank N.A*, 590 U.S. 538 (2020), Defs.' Mem. at 12-13, which only confirms that Plaintiff has standing as a trustee to sue her co-trustees. In *Thole*, plaintiffs were the beneficiaries of an ERISA trust who had "not been legally or contractually appointed to represent the plan," *id*. at 544, and did not financially benefit from the lawsuit, *id*. at 547. The Court found that these unharmed beneficiaries lacked Article III standing to sue because "[w]inning or losing this suit would not change the plaintiffs' monthly pension benefits." *Id*. In its analysis, the Court addressed the concern that—if those beneficiaries could not sue—"no one will meaningfully regulate plan fiduciaries." *Id*. at 544. The Court rejected that concern because "fiduciaries (including trustees who are fiduciaries) can sue other fiduciaries" for the harms to the trust. *Id*. at 545. In short, the Supreme Court had no difficulty accepting the well-understood rule that a trustee can maintain an action against a co-trustee—in federal court—to protect the trust.

Defendants ignore the language in *Thole* that is most directly applicable to this case. Instead, Defendants home in on a snippet of the decision in which the Court explains that the fact Congress provided "a general cause of action" for beneficiaries "to sue for restoration of plan losses" did not provide all beneficiaries Article III standing to sue. *Id*. at 544. But Defendants misunderstand the way the Kennedy Center's organic statute operates. It does not simply provide Plaintiff with a generic cause of action. Instead, the statute imposes affirmative legal "rights and obligations" on Plaintiff, 20 U.S.C. § 76*l*(b), and requires her to maintain and administer the trust,

*id.* § 76h(a)(1).  In sharp contrast to the beneficiaries in *Thole*, Plaintiff thus has the "legal[]" authority "to represent" the Center's interests in this context.  *Thole*, 590 U.S. at 544.  Moreover, unlike the beneficiaries in *Thole*, Plaintiff benefits from discharging that obligation.  *See Sprint*, 554 U.S. at 304 n.2 (Roberts, C.J., dissenting).

Defendants also ask the Court to dismiss the well-documented common law history of trustees suing co-trustees to protect a trust.  But as Plaintiff's opening memorandum explained, that well-documented "history and precedent" is "well nigh conclusive in respect to the issue before" the Court.  *Sprint*, 554 U.S. at 285 (quotation marks omitted).  The historical sources are clear:

> It is the duty of one trustee to protect the trust estate from any misfeasance by his co-trustee, upon being made aware of the intended act, by obtaining an injunction against him, and if the wrongful act has been already committed, to take measures by suit or otherwise to compel the restitution of the property and its application in the manner required by the trust.

James Hill, *A Practical Treatise on the Law Relating to Trustees, Their Powers, Duties, Privileges and Liabilities* 305 (1845) (internal numbering omitted).  That passage fits this case hand-in-glove, and it would be astonishing to conclude that federal courts cannot ever hear this class of common law claims.

In response, Defendants attempt to distinguish between *actions* heard at common law, and *harms* recognized as providing the basis for suit.  Defs.' Mem. at 15.  This distinction makes no sense.  The Supreme Court explained in *Sprint* that "history and tradition" help determine "the types of cases that Article III empowers federal courts to consider."  *Id*. at 274.  *Sprint* directs the Court to examine "how courts have historically treated" similar "suits."  *Id*. at 275.  Where there is a "clear historical answer," courts presume the scope of Article III jurisdiction is consistent with that longstanding practice.

Here, the history about "how courts have historically treated" suits between co-trustees is clear: Courts have long permitted a co-trustee to enjoin a fellow trustee in these circumstances. *Id*. As a result, it would be wrong to conclude that federal courts cannot ever hear these actions.

Defendants briefly attempt to debate the history, but their heart is not in it. Thus, Defendants claim that *Bartlett v. Hatch*, 17 Abb. Pr. 461, 1864 WL 3792 (N.Y. Sup. Ct. 1864), demonstrates that "only the *cestuis que trust*—*i.e.*, the beneficiary—was the proper plaintiff, not a co-trustee, in an action recovering misappropriated rents from a co-trustee," Defs.' Mem. at 16. But Defendants misunderstand the case. The court did *not* hold the co-trustee could not ever sue. It held that the co-trustee could not sue, on the facts of that particular case, for damages that would flow *to the co-trustee*, not to the beneficiary. *Bartlett* is clear there was

> no doubt that a trustee may, in case of a threatened breach of trust by his colleague, *institute an action for the purpose of restraining the threatened act*, and it may be his duty to do this for his own protection and the protection of the property as it is the duty of every trustee to protect the trust property and faithfully execute the trust; and *if he cannot do these without the aid of the court, I see no reason why he may not resort to the court for such purpose*.

*Id*. (emphasis added). In short, history demonstrates that co-trustee v. co-trustee suits are not anomalies. This is the type of lawsuit that falls well within Article III's understanding of cases and controversies.

Defendants relatedly assert that *only* the U.S. Attorney General—and not the trustees—can sue to protect a charity. But that is wrong, both historically and today.[2] The First Restatement

---

[2] The government's reliance on *Trs. of Phila. Baptist Ass'n v. Hart's Ex'rs*, 17 U.S. 1 (1819), is misplaced. As an initial matter, *Baptist* concerned a unique scenario where there were no valid trustees, due to the defects in the specificity of the devise. See *Vidal v. Girard Ex'rs*, 43 U.S. 127, 192-93, 195-97 (1844) (distinguishing *Baptist* on the ground that the trustees there "had no legal capacity to take and hold the donation in succession for the purposes of the trust, and the beneficiaries also were uncertain and indefinite"). As Justice Story observed in his concurrence in *Baptist*, "where the charity is definite in its nature, and trustees are appointed to take or execute it, it is not perceived, why a suit at the instance of such trustees may not properly be maintained,

was published nearly a century ago.  It explained: "A suit for the enforcement of a charitable trust can be maintained by one or more of several trustees against the other trustees."  Restatement (First) of Trusts § 391 cmt. b.  The modern Third Restatement agrees.  *See* Restatement (Third) of Trusts § 94 .  Nor does Plaintiff's suit infringe on the executive's prerogative to enforce the law.  Again, Plaintiff is vindicating her particularized rights and obligations as a trustee—not "the public's interest in 'general compliance' with the law."[3]  Defs.' Mem. at 17.

* * *

At bottom, Defendants ask the Court to "make standing law more complicated than it needs to be."  *Bost*, 146 S. Ct. at 523.  Plaintiff is a trustee suing to protect the trust from her co-trustee's egregious abuses.  She cannot perform her duties because of her co-trustee's unlawful actions, and she has an affirmative duty to sue to protect the trust.  This is hardly a novel circumstance, and Plaintiff clearly has Article III standing to litigate this matter in federal court.

## II.    PLAINTIFF HAS A CAUSE OF ACTION

Plaintiff has a cause of action under Kennedy Center's organic statute—20 U.S.C. § 76*l*(b)—to enforce the terms of the trust, protect the institution, and prevent egregious abuses of fiduciary duty by her co-trustees.  As the Court explained, Congress incorporated "common-law trust principles" directly into the text of the statute, and under "those common-law principles" "Kennedy Center trustees may sue to rectify an infringement on their ability to carry out their

---

without the government being a party."  *Baptist*, 17 U.S. at 51. Furthermore, subsequent cases make clear that the core holding of *Baptist* was "erroneously stated" and that "courts of equity have an original and inherent jurisdiction over charities," *Kain v. Gibboney*, 101 U.S. 362, 366 (1879) (citing *Vidal*, 43 U.S. at 192) (omitting reference to any requirement for the attorney general to participate).

[3] Contrary to Defendants' assertion, Defs.' Mem at 16 n.3, recognizing Plaintiff's capacity to sue as a trustee—a position she holds by virtue of her role in Congress—does not raise any Article II concerns.  *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 879 (D.C. Cir. 1997).

fiduciary duties." TRO Op. at 13-14.

Defendants do not meaningfully dispute that Plaintiff possesses a statutory cause of action. Instead, Defendants "preserve" the arguments the Court previously rejected. Defs.' Mem. at 33. The Court can stop here. But three additional points bear emphasis.

*First*, Defendants continue to insist that the Court should exclusively apply D.C. law to identify the meaning of the phrase "all the usual powers and obligations of a trustee," 20 U.S.C. § 76*l*(b)—and imply D.C. law somehow deviates from the majority rule. That is wrong several times over. Congress did not incorporate D.C. law into Section 76*l*(b). Instead, Congress directed the Court to apply "all the usual powers and obligations of a trustee." To understand the meaning of that phrase, and the well-settled definitions it incorporated into the statute, the Court can look to treatises and other sources. Regardless, as the Court noted, D.C. courts also apply "the Restatement of Trusts and Bogert," and there is no daylight between D.C. law and those authorities on this point. TRO Op. at 18.

*Second*, the Court previously explained that the D.C. Court of Appeals decision in *Moon I* found that co-trustees have a cause of action in these circumstances. *Id*. (explaining that footnote 16 of *Family Fed'n for World Peace v. Moon*, 129 A.3d 234 (D.C. 2015) ("*Moon I*") confirms co-trustees may bring this action under D.C. law). Defendants now briefly assert that *Family Fed'n for World Peace v. Moon*, 338 A.3d 10 (D.C. 2025) ("*Moon II*") overruled *Moon I* and required all plaintiffs—including the two directors akin to trustees—to additionally demonstrate special interest standing.

Not true. By the time *Moon II* returned to the Court of Appeals in 2025, the two directors had been "dismissed as Plaintiffs" years before. *Family Fed'n for World Peace v. Moon*, No. 2011 CA 003721 B, 2019 WL 13403236 n.2 (D.C. Super. Ct. Apr. 19, 2019). As a result, the only

plaintiffs left in the case in *Moon II* were *not* akin to trustees—which is why the court required them to demonstrate special interest standing.  *See* TRO Hr'g Tr. at 67 (Plaintiff's counsel explaining that the two individual plaintiffs "had dropped out of the case by" *Moon II* and "that's why the second *Family Federation* case doesn't talk about that theory of standing").  Moreover, as the Court noted and *Moon I* explained, D.C. has adopted the "Uniform Trust Code" which "establishes that when cotrustees are appointed to act as stewards of a trust, each trustee shall exercise reasonable care to prevent a co-trustee from committing a serious breach of trust; and compel a co-trustee to redress a serious breach of trust."  TRO Op. at 19 (quoting *Moon I*, 129 A.3d at 244 n.16).  Regardless, for all the reasons explained in the TRO briefing—which Defendants do not meaningfully dispute—Plaintiff could readily meet the special interest-standing requirement too, if necessary.  ECF No. 20 at 10-11.[4]

*Third*, even if Plaintiff did not have a cause of action under the statute (and she does), she could *still* bring her claims under an *ultra vires* cause of action.  *See* Pl.'s Mem., ECF No. 30-1 at 15-16.

---

[4] Defendants suggest that "common-law sources cite to District of Columbia case law for the conclusion that co-trustees may sue to enforce a charitable trust," and assert that one D.C. case, *Bd. of Dirs. of the Wash. City Orphan Asylum v. Bd. of Trs. of the Wash. City Orphan Asylum*, 798 A.2d 1068 (D.C. 2002), implies trustees must demonstrate special interest standing.  But as Defendants note, *Orphan Asylum* did not decide whether co-trustees may sue in these circumstances.  The Court of Appeals answered that question in *Moon I* and confirmed that— under D.C. law—co-trustees can sue to protect a trust.  Regardless, both the Third Restatement and *Bogert* explain that a co-trustee's standing to sue is separate and distinct from the standing of someone with "a special interest in the enforcement of the charitable trust."  *Bogert* § 413; *see* Restatement (Third) of Trusts § 94 ("A suit for the enforcement of a charitable trust may be maintained only by the Attorney General or other appropriate public officer or by *a co-trustee or successor trustee*, by a settlor, or by another *person who has a special interest* in the enforcement of the trust." (emphasis added)).

### III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO PLAINTIFF AS TO RENAMING

The Court should grant summary judgment for Plaintiff on her challenge to the renaming of the Kennedy Center. The renaming plainly violates the statute and there are no disputed material facts. S*ee generally* Defs.' Resp. to Pl.'s Stmt. of Material Facts ("Defs.' Resp. to Stmt. of Facts"), ECF No. 33-1.

The Center's organic statute (which supplies the terms of the trust) restricts the name of and signage on the Kennedy Center in a litany of ways: (1) the building is "to be designated as the John F. Kennedy Center for the Performing Arts," 20 U.S.C. § 76i(a); (2) the Board has a "duty . . . to maintain and administer the John F. Kennedy Center for the Performing Arts" as a "a living memorial to John Fitzgerald Kennedy," *id.* § 76h(a)(1); and (3) the Board "shall assure that . . . no additional memorials or plaques in the nature of memorials shall be designated or installed in the public areas," *id.* § 76j(b)(1). The conclusion is clear and unmistakable: The Center is to be named for President Kennedy and no one else. The Board's formal renaming of the Kennedy Center as the "Trump Kennedy Center" and the subsequent installation of the words "THE DONALD J. TRUMP" on the building's façade and use of the redesignated name in formal communications, contravene this plain statutory language and the Board's mandatory duties.[5] The renaming is thus ultra vires and represents a breach of the trustees' duty "to administer the trust, diligently and in good faith, in accordance *with the terms of the trust and applicable law*," Restatement (Third) of

---

[5] And to the extent President Trump's name was added to the facade in recognition of the purported "work President Trump has done over the last year . . . from the standpoint of its reconstruction, but also financially, and its reputation," Ex. HH, ECF No. 30-7,  it also violates the prohibitions on "acknowledge[ing] . . . private contributions on the exterior of the project," 20 U.S.C. § 76i(c)(3). *See also* Third Kristofcak Declaration, Ex. MM (Kennedy Center spokesperson stating that "[t]he unanimous vote recognizes that the current Chairman saved the institution from financial ruin and physical destruction").

14

Trusts § 76.

Defendants attempt to evade accountability for their actions by claiming the "Trump Kennedy Center" is just a "secondary name"—whatever that means. Defs.' Mem. at 31. This post-hoc litigation gloss is untenable. The undisputed facts show that the Board renamed the Kennedy Center. Thus, President Trump's spokesperson, Karoline Leavitt, announced the renaming by explaining that the "Board of the Kennedy Center . . . ha[s] just voted unanimously to *rename* the Kennedy Center to the Trump-Kennedy Center." ECF No. 30-7 (emphasis added). Similarly, Roma Daravi, the spokesperson of the Kennedy Center, stated that "The Kennedy Center Board of Trustees voted unanimously today to *name* the institution The Donald J. Trump and The John F. Kennedy Memorial Center for the Performing Arts." *See* Third Kristofcak Decl. Ex. MM at 2 (emphasis added). Neither spokesperson characterized the new name as a "secondary name." Both simply described the Board as renaming the Kennedy Center to honor Donald Trump.

Regardless of what labels Defendants use to characterize their actions, those actions violate the statute all the same. Congress did not require that the Center bear a particular name somewhere in the background. The law mandates that the Center's building be "designated as the John F. Kennedy Center for the Performing Arts" and maintained as a "living memorial" and the "sole national memorial" to President Kennedy in the Nation's capital. 20 U.S.C. §§ 76i(a), 76q. To say (as Defendants do) that the Center still bears the "designation" of the John F. Kennedy Center—when it is identified and presented to the public under a materially different name, honoring President Trump—renders the statutory text utterly meaningless. In other words, by placing another individual's name in the Center's official usage, the Board has not merely supplemented the name Congress provided; it has displaced it altogether.

Defendants assert that "[t]he use of secondary names to refer to federal entities is not

uncommon." Defs.' Mem. at 31.  This is too clever by half.  With the exception of the newly rechristened "Department of War" (which is hardly settled precedent for their actions), the examples Defendants provide—such as the use of the name "Consumer Financial Protection Bureau" for the "Bureau of Consumer Financial Protection"—are largely anodyne shorthand monikers rather than substantive redesignations that alter the entity's foundational identity. Moreover, none of Defendants' examples involve an institution deliberately named for the purpose of honoring the memory of a particular person, let alone a former President credited with inspiring and championing the entity in question.[6]  *See* Pub. L. 88-260, 78 Stat. 4 (Jan. 23, 1964) ("Whereas it is the sense of the Congress that it is only fitting and proper that a suitable monument be dedicated to the memory of this great leader[.]").  Defendants' actions are as unprecedented as they are unlawful.

Defendants get no more purchase from their argument that Donald Trump's name on the façade is "neither a 'memorial' nor a 'plaque in the nature of a memorial,'" as prohibited by the statute, because Donald Trump is still alive.  Defs.' Mem. at 32 (quoting 20 U.S.C. § 76j(b)).  First, that argument addresses only one of several textual limits on the renaming of the Kennedy Center, which as discussed above provide that the Center is named for John F. Kennedy alone.  Moreover, the statutory structure forecloses Defendants' extremely narrow reading of Section 76j(b)'s prohibition on memorials and plaques to apply only to deceased individuals.  In particular, the statute specifically exempts from the prohibition on "additional memorials or plaques in the nature of memorials" to public areas of the Center, any "plaque acknowledging a gift from a foreign

---

[6] Defendants' final example—The REACH at the Kennedy Center—is not a secondary name for the institution but rather the description of a new space.  The acronym stands for "Renew, Experience, Activate, Create and Honor the legacy of Kennedy."  Third Kristofcak Decl. Ex OO at 2.

16

country," any "plaque on a theater chair or a theater box acknowledging the gift of such chair or box," and any "inscription on the marble in the north or south galleries, the Hall of States, or the Hall of Nations acknowledging a major contribution."  If Defendants' cramped definition of "memorials or plaques in the nature of memorials" were correct—*i.e.*, it does not apply to anyone who is not deceased—these exclusions would be unnecessary.

Defendants' contrived reading also ignores the larger statutory context, which proves Congress went to great lengths, including in multiple independent provisions, to ensure that the Kennedy Center as an institution remained "a living memorial to John Fitzgerald Kennedy."  *Id.* § 76h(a)(1).  Indeed, taken to its logical conclusion, Defendants' position would produce an absurd result: the Board would be free to rebrand the Center with the name of any living individual or entity, no matter how unrelated to John F. Kennedy's legacy. That reading would gut the statute's core purpose and reduce Congress's carefully crafted statutory scheme to a nullity.  Because Defendants' position cannot be squared with the statute's text, structure, or purpose, the Board's renaming must be set aside.

The Court can stop here.  But Defendants' opposition also confirms that, in approving the renaming, the Board failed to consider the foregoing statutory objectives and constraints and, indeed, failed to engage in anything close to the requisite level of deliberation for a decision of this magnitude.  The proposed renaming did not appear on the agenda of the December 2025 meeting.  Defs.' Resp. to Stmt. of Facts ¶ 11.  "*No* discussion occurred . . . about the potential risks or consequences of the renaming" before a vote was taken.  *Id.* ¶ 16 (emphasis added).  The day after the meeting, workers installed signage on the Kennedy Center's façade which was prepared or purchased *prior* to the Board's vote.  *Id.* ¶¶ 19-20.

Even a minimum level of "reasonable care and diligence" would require a trustee to

17

undertake *some* consideration before renaming a beloved institution after a living, partisan politician. *See* Restatement (Third) of Trusts § 77(2) (noting that this diligence "will ordinarily involve investigation appropriate to the particular action under consideration"). This is doubly the case here, where it is undisputed that artists cancelled appearances at the Kennedy Center in response to President's takeover of the Center in early 2025, and that nearly half of the tickets were going unsold—the worst since 2018 (except for the COVID-related shutdown). Defs.' Resp. to Stmt. of Facts ¶¶ 32-33. In light of these facts, one would expect the Board to consider—at minimum—the potential impacts of *further* antagonizing performers and audiences by placing President Trump's above and before President Kennedy's in the Center's name. The Board's failure to engage in *any* discussion of the potential consequences was a complete dereliction of its duty of prudence. This is not a question of substituting the Board's judgment—there was no judgment exercised. *See* Restatement (Second) of Trusts § 187 cmt. e. (courts will interfere when trustee "fails to use his judgment"); *see also Smith v. Van Gorkom*, 488 A.2d 858, 874 (Del. 1985), *overruled on other grounds*, *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009) (holding, under the significantly more deferential corporate director standard, that directors were "grossly negligent in approving the 'sale' of the Company upon two hours' consideration, without prior notice, and without the exigency of a crisis or emergency").

As to remedy, the Court should grant Plaintiff declaratory and injunctive relief on the renaming. Pl.'s Mem. at 18-19, ECF No. 30-1. Defendants have no meaningful response to the fact that declaratory relief is warranted particularly where, as here, Defendants dispute the availability of injunctive relief.[7] In addition, injunctive relief is warranted because Defendants'

---

[7] Defendants' argument about Count Five of the Amended Complaint, Def.'s Mem. at 37, misses the point. Plaintiff is not asserting the Declaration Judgment Act as a substantive basis for relief.

ongoing actions are frustrating Plaintiff from fulfilling her most basic obligation: *i.e.*, to maintain the Kennedy Center as a memorial to John F. Kennedy—and to no one else.  This ongoing, willful violation of the terms of the trust can only be redressed through injunctive relief.  Indeed, as the common law sources discussed above confirm, Anglo-American courts have long permitted a trustee to seek to enjoin co-trustees' breaches.  *See supra* pp. 9-10.  The renaming has also harmed the Center, as evidenced by the artist cancellations directly in response to it.  *See* Defs.' Resp. to Stmt of Facts ¶ 34 (listing numerous artists who cancelled performances, including Chuck Redd who chose to cancel his appearance when he "saw the name change on the Kennedy Center website and then hours later on the building," and the Brentano Quartet who attributed its decision to "the recent changes at the John F. Kennedy Center").

Defendants' suggestion that the Kennedy Center remains a "memorial" of some sort, Defs.' Mem. at 42, ignores the fact that—as Congress determined and enshrined in the statutory text— the Center's unique role as the sole memorial to the late President is greatly diluted by its association with anyone other than John F. Kennedy.  Meanwhile, Defendants' assertion that Plaintiff has not quantified precisely "the magnitude" of artist cancellations as a result of the name change, Defs.' Mem. at 42, beggars belief.  Defendants do not dispute the many specific artists who canceled their performances as a direct consequence of Defendants' unlawful actions.  *See* Defs.' Resp. to Stmt. of Facts ¶ 34.  Unless and until the Court orders Defendants to halt, this ongoing harm to the Center's fundamental mission will persist.

IV.    **THE COURT SHOULD GRANT SUMMARY JUDGMENT TO PLAINTIFF ON VOTING RIGHTS**

The Court should also grant Plaintiff summary judgment to ensure she may vote.[8]  "[A]n

---

[8] The Court may grant summary judgment for Plaintiff on the voting rights claim even though Plaintiff did not independently move for summary judgment on that count. Rule 56(f)(1) expressly

19

ex officio member is a voting member unless the applicable governing document provides otherwise." *Ex officio*, *Black's Law Dictionary* (12th ed. 2024). Here, the governing document, *i.e.*, the statute, does not alter this default rule. *See* 20 U.S.C. § 76h(a)-(b) (not altering the voting default); 20 U.S.C. § 76*l*(a) (giving the entire Board "all the usual powers and obligations of a trustee"). In its TRO decision, the Court found that "the May 2025 bylaw amendments stripping *ex officio* members of their right to vote are likely contrary to the statute and void." TRO Op. at 30. As the Court explained, "the Center's organic statute does not distinguish between general trustees and *ex officio* members in any way." *Id*. at 28. In sharp contrast, "Congress regularly differentiates between voting and non-voting members of other bodies." *Id*.; *see* Pl.'s TRO/PI Mem. at 13-16, ECF No. 13-1. The government's argument—that Congress silently delegated to the Board the power to determine who votes—"proves too much." TRO Op. at 28. (quotation marks omitted). "For example, it would be both bizarre and potentially contrary to the statute for the Board, in its discretion, to strip voting rights from all the general trustees." *Id*. "Yet taken to its logical conclusion, the government's approach would seem to allow for an ever-changing set and number of voting members, constrained only by the quorum provision." *Id*. at 28-29. Meanwhile, the only relevant legislative history indicates that Congress intended ex officio members to vote. *Id*. at 30.

At summary judgment, Defendants rehash their old arguments that the Court already

---

authorizes the Court to "grant summary judgment for a nonmoving party" after "giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f)(1). As the Supreme Court has explained, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Any notice concern is absent here: Defendants themselves moved for summary judgment on this issue, both sides have briefed it, and the question is one of pure law requiring no further factual development. Defendants thus have had full notice and a complete opportunity to respond.

rejected.  The Court should put this matter to rest once and for all.  For example, Defendants argue that, "[w]ithout clear indication that Congress intended to foreclose any modification of trustees' ability to vote, statutory silence cannot be read" to preclude a majority of the Board from stripping ex officio members of the right to vote.  Defs.' Mem. at 36.  But the Kennedy Center's organic statute is not silent.  Congress granted to the Board—which is "composed" of each of the listed ex officio and general trustees, including Plaintiff—"all the usual powers and obligations of a trustee," without distinguishing between the "powers and obligations" of the appointed trustees and the ex-officio trustees.  20 U.S.C. §§ 76h(a)(2); 76*l*(b).

Moreover, at common law, all trustees presumptively vote on equal footing, unless the trust instrument—here, the statute—provides otherwise.  *See, e.g.*, Restatement (Second) of Trusts § 383 ("If there are several trustees of a charitable trust, the powers conferred upon them can properly be exercised by a majority of the trustees, unless it is otherwise provided by the terms of the trust."); *Bogert* § 391 ("[U]nless the instrument provides otherwise, charitable trustees act by majority vote.")

To the extent the statute was silent (and it is not), such silence would indicate that all of the trustees stand on equal footing and can vote.  As Plaintiff exhaustively detailed in her initial TRO/PI papers, when Congress intends to restrict voting of board members, it does so expressly.  *See* Pl.'s TRO/PI Mem. at 15-16; ECF No. 20 at 15.  Indeed, statutes Defendants now highlight make clear that Congress understands that voting rights run with the position created, *unless otherwise stated*.  *See, e.g.*, 46 U.S.C. § 51312(b)(1) (designating multiple categories of officials as board members, without specifying voting rights, and later cross-referencing two of those categories as being comprised of "voting members").  Meanwhile, Defendants fail to grapple with the absurd consequences of their interpretation of the statute.  As this Court underscored at the

21

TRO stage, it would be "bizarre," for example, to conclude the Board could strip general trustees of the right to vote or effectively alter the Board's composition.  TRO Op. at 28; *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) ("[A] statute should not be construed to produce an absurd result.").  But that is precisely what Defendants argue Congress intended, and they never reckon with that extreme result.

Because background trust law principles endow all trustees with voting rights and the trust instrument—the statute—does not alter and expressly affirms those principles, Defendants' invocation of the Board's authority to make "bylaws, rules, and regulations, as it deems necessary" for "administrati[ve]," "organization[al]," and "procedur[al]" is beside the point.  Defendants cannot use that narrow power to effectively rewrite the trust instrument.  *See Pac. Realty Tr. v. APC Invs., Inc.*, 651 P.2d 163, 167 (Or. App. 1982) (holding unlawful a bylaw that contravened the declaration of trust); *cf. Airgas, Inc. v. Air Prods. & Chemicals, Inc.*, 8 A.3d 1182, 1195 (Del. 2010) (bylaw invalid where it conflicted with corporate charter).  And this is what would be required to alter the allocation of voting rights.  As this Court correctly explained in its TRO opinion, "the opportunity to vote" "tilts toward the substantive side of the line of trustee rights" and is not a "procedural, administrative, or organizational" matter within "the province of the Board's discretion."  TRO Op. at 32.  Indeed, under trust law principles, the right of trustees to vote can only be changed by the trust "instrument" or "terms of the trust"—here, the statute, which only Congress may amend—not by other procedural or administrative devices.  *See* Restatement (Second) of Trusts § 383 (providing majority control of charitable trustees unless "otherwise provided *by the terms of the trust*" (emphasis added)); *Bogert* § 391 ("[U]nless the instrument provides otherwise, charitable trustees act by majority vote.").

In short: This Court was correct.  The Board's attempt to strip Plaintiff of her voting rights

22

in the May 2025 bylaws is unlawful and void, and the Court should issue declaratory and injunctive relief for Plaintiff.

## V.   THE COURT SHOULD GRANT PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CLOSURE AND REBUILDING

The Court should grant Plaintiff's motion for a preliminary injunction and deny Defendants' motion for summary judgment on her closure and rebuilding claims. Plaintiff is likely to succeed on the merits, faces irreparable harm absent relief, and the balance of equities and public interest favor preserving the status quo. The bottom line is this: There was no comprehensive one-year review supporting the closure. Defendants did not consult *any* independent experts or consider the harms of shuttering this storied institution for two years. They simply rushed to close the Center without any meaningful analysis. This Court should grant emergency relief before the harms get any worse and require Defendants to exercise the bare minimum of prudence before they irreparably alter the institution.

### A.   The Court Should Grant Plaintiff's Motion for a Preliminary Injunction

#### 1.   Plaintiff is likely to prevail on the merits

As detailed in Plaintiff's supplemental memorandum, the documents Defendants produced in response to the Court's TRO—which formed the basis for the Board's decision to shutter the Kennedy Center for two years—do not come close to justifying that decision. Pl.'s Supp. Mem. at 3-10, ECF No. 29. Instead, they expose Defendants' imprudent rush to justify a decision unilaterally announced by President Trump. As this Court noted, a project of this magnitude "does not happen overnight" and it would therefore "border[] on preposterous" to suppose that such a decision could be made without a substantial body of plans, analyses, and expert input. TRO Op. at 20-21. But Defendants have confirmed they did not do any meaningful analysis. Defendants have produced a thin collection of materials that neither support closure nor explain how that

23

decision—announced in advance and only later presented to the Board for approval—was reached. This is the exact opposite of how a prudent trustee operates. Ruling for Plaintiff on this basis does not require the Court to second guess the Board's decisioning making or substitute its judgment for the Board's. Plaintiff simply asks the Court to require the bare minimum of Defendants that would be expected of *any* board in comparable circumstances.

In this litigation, Defendants justify their decision to shutter the Kennedy Center by pointing to long delayed maintenance and Congress's appropriation of funds. But that argument only underscores the woefully imprudent nature of Defendants' actions. Until February 1, 2026, the Kennedy Center fully expected to remain open during renovations—and address those same repairs with the same $250 million appropriation. *See* Beatty Decl. ¶ 18, Doc. No. 13-2. Yet Defendants identify no intervening analysis, changed conditions, or new information to justify the abrupt shift to a full, two-year closure. That leaves only two possibilities: Either Defendants reversed course without any reasoned basis at all and without even considering the monumental nature of the decision. Or Defendants are hiding the details of a fundamentally different—and far more extensive—project from anything reflected in the scant materials provided to the Board. Neither possibility reflects the "investigation appropriate to the particular action under consideration" that the law demands of a prudent trustee. *See* Restatement (Third) of Trusts § 77(2).

Assume that Defendants simply intended to engage in the previously planned capital repairs (despite the obvious tension with the President's announcement of a "complete rebuilding"). Before reversing course and closing the Center, a prudent trustee would require considerable analysis justifying "one of the more consequential decisions in the institution's lifespan." TRO Op. at 22. Indeed, that is presumably why President Trump claimed Defendants

24

had conducted an extensive one-year review—none of which actually occurred. Instead, Defendants point to a one-page set of talking points prepared by Mr. Floca *after* the February 1, 2026 announcement, based on four old reports and conversations with a handful of employees. *See* ECF Nos. 29-2, 29-3, 29-4. But those talking points do not withstand even the gentlest scrutiny.

The first and most glaring gap is: What changed? Despite allegedly reviewing the conditions on the ground since February 2024, Mr. Floca did not mention the prospect of closing the Center anywhere in his updates to the Board until President Trump's announcement in February 2026. *See* September 2025 Board Minutes, ECF No. 29-22 at 5-6; *see also* Beatty Decl. ¶ 18, ECF No. 13-2 (Plaintiff explaining that there was no discussion of a closure until the February 1 announcement). To this day, Defendants have provided no coherent explanation for what new facts led to the sudden reversal in February 2026.

The next gap is the mismatch between Mr. Floca's recommendation and the materials on which it was purportedly based. The reports that Mr. Floca allegedly relied on do not support the need for a shutdown at all; on the contrary, they presume that the Center will stay open and updates will be done in stages. *See, e.g.*, ECF No. 29-15 at 130 ("Projects have been scheduled in such a way as to keep the facility operating to the maximum extent, with efforts phased over the multi-year period."); Williams Decl. ¶ 4 ("A complete two-year closure of the entire main building is not required to accomplish the deferred maintenance described in those reports."). Amazingly, Defendants now respond that these reports are outdated because of "the passage of time." *See* Defs.' Mem. at 24 n.7. But that misses the point. It is *Defendants* who suggested that the closure decision was justified by these four reports (and "no other reports"). ECF No. 29-3 ¶¶ 10, 12. Their attempt to disavow those same reports now—because of the passage of time—only

25

underscores the arbitrary and result-driven nature of the closure decision.

To be clear: Plaintiff is *not* arguing that "the Board is *required* under the law to adopt" the course of action outlined in the four reports. Defs.' Mem. at 24 n.7 (emphasis omitted). Plaintiff is making a more basic point: It is arbitrary to point to *those* reports, which did not contemplate closure at all, as analysis justifying closure. The fact that Defendants did not do *any* meaningful analysis—they did not consult a single independent expert in the performing arts, for example— is the height of imprudence. Indeed, it is borderline "preposterous." TRO Op. at 20.

Even setting aside those underlying reports, Mr. Floca's talking points underscore how little analysis was conducted. His oral recommendation is not a technical analysis, feasibility study, or expert report, as would ordinarily be expected in any comparable circumstance. *See* Taylor Decl., ECF No. 13-20 ¶ 15 (observing that a responsible governing board "would have commissioned or completed a comprehensive planning and analysis process before making [a closure] decision"). Rather, Mr. Floca provided a set of conclusory talking points, unsupported by any data, modeling, or comparison of alternatives. Moreover, Mr. Floca's conclusory statement that a full closure "avoid[s] the hidden costs of phased construction" is defective twice over: it concedes that phasing is possible, and it fails to consider the costs of a full shutdown. Williams Decl. ¶ 13.[9]

As Plaintiff's experts explain, a full closure severely harms the relationship with staff, performers, audiences, and donors, which is why comparable institutions instead pursue phased renovations whenever possible. *See* Pl.'s Mem. at 29-34; Borenstein Decl. ¶ 21, ECF No. 13-21.

---

[9] Mr. Floca's responses to Mr. Williams do not respond to these points with any specificity, and instead invoke vague, conclusory concepts like "total equation of care" and "high standard of patron experience." *See* ECF 34-4. Accordingly, they do not cure the defects in his original analysis.

Defendants did not consider these issues *at all.* Their focus was exclusively on purported efficiency and speed. *See* Defs.' Mem. at 19 (explaining that the "Center is closing for renovation . . . because a concentrated two-year project . . . will enable the Board to fully execute required mechanical overhauls and to conduct invasive structural repairs in as short and cost-effective a timeframe as possible"). This is textbook arbitrary decision-making, and it is exactly the opposite of how a prudent trustee would operate. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that a decision is "arbitrary and capricious" when it "entirely failed to consider an important aspect of the problem"); *see Bogert* § 558 ("Courts have held a trustee's conduct to be 'arbitrary and capricious' if he or she has gone through the formality of exercising the discretion without deliberately considering the circumstances.").

Defendants' failure to engage in the most basic reasoned decision-making is further underscored by the fact that the Kennedy Center's organic statute contains a clear directive that the Board "maintain and administer" the Kennedy Center as "a living memorial" to its namesake, 20 U.S.C. § 76h(a)(1), which "present[s] classical and contemporary music, opera, drama, dance, and other performing arts from the United States and other countries," *id.* § 76j. Defendants insist that Plaintiff's reading of these provisions is "absurd" because the Board must also undertake repairs and renovations. But there is no tension between those duties, and Defendants' assertion to the contrary finds no support anywhere in the record. Reflecting its mission as a living memorial, and consistent with best practices for performing arts spaces, the Kennedy Center has historically undertaken renovations in phases while remaining open, *see* Williams Decl. ¶¶ 8, 10 , ECF No. 29-24 (explaining that Kennedy Center's multi-venue nature makes phased renovation particularly feasible and discussing past examples), and its own planning documents for the current project assumed that same approach until President's abrupt announcement *see id.* ¶¶ 4-10, ECF

27

No. 29-24; Pl.'s Supp. Mem. at 7, ECF No. 29 (explaining the 2021, 2022, and 2024 documents relied on phased approaches). Indeed, it is what the Board and Mr. Floca were expecting to do with the current project all along—until the sudden and unexplained reversal of course. *See* ECF No. 13-2 ¶ 18 (Plaintiff explaining that until President Trump's February 1 announcement of the closure, the Board has never discussed a full closure); ECF No. 29-22 at 5-6 (Mr. Floca's September 2025 board meeting discussion of the project's "prioritized projects," that "they are moving quickly on everything" and not mentioning a closure). At a minimum, a decision to shut down a "living memorial" for two years—in contradiction of the statutory mandate—demands careful justification. The record contains none.[10]

Defendants' effort to recast the closure as pursuing their statutory duty to repair the Center misses the point. The Board unquestionably has authority to undertake capital repairs and improvements. *See* 20 U.S.C. § 76j(a)(1)(G). But that authority does not permit the Board to effectuate a complete multi-year closure without—at minimum—considering whether it can also perform its other mandatory artistic and memorial duties while conducting renovations. Indeed, it is manifestly imprudent not to evaluate the benefits of fulfilling both statutory missions.

Moreover, although the Court need not rule for Plaintiff on this basis to issue a preliminary injunction, where the Board can conduct renovations while also performing its mandatory artistic and memorial functions, the statute provides *no discretion* to ignore the latter. Instead, the statute uses mandatory language ("shall") that requires the trustees to perform all such functions. And it is bizarre to suggest (as the government does) that the Board could fulfill mandatory functions,

---

[10] Accordingly, although Defendants' closure of the Center without congressional authorization also contravenes the above-cited statutory provisions, Plaintiff's claim that the closure is a breach of fiduciary duties does not turn on the precise scope of these statutory provisions.

and comply with the law, simply by attesting that it will resume operations in the distant future.

Nor can Defendants credibly claim that Congress authorized this two-year closure because it appropriated funds for deferred maintenance.  *See* Defs.' Mem. 23.  At the time of the appropriation, the Kennedy Center's longstanding plan had been to conduct phased renovations while *remaining open*.  Thus, to the extent it is at all relevant, the $257 million appropriation supports the conclusion that Congress approved the Kennedy Center's preexisting plan—under which it would remain open and performing its statutory functions—not the new multi-year closure.

The lack of any meaningful basis for the decision is matched by the irregularity of the process.  President Trump announced the closure on February 1, 2026 with no notice; Mr. Floca put together his barebones talking points on February 12; and the Board ratified President Trump's decision on March 16—which, in President Trump's words, was "a little late . . . because we've already announced it."[11]  *See* Third Kristofcak Decl. Ex. NN.  Courts routinely treat such departures from ordinary process as evidence of pretext or an improper purpose.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

Separately, the closure is also premature.  Given the regulatory and procurement processes that have yet to occur, it will take "at least six months, and more likely closer to a year . . . [before] responsible construction could commence." Williams Decl. ¶ 20, ECF No. 29-24. Defendants

---

[11] Combined with the undisputed evidence of the artists and patrons leaving the Center since President Trump's takeover, Defs.' Resp. to Stmt. of Facts ¶¶ 32-36, the irregularity of the closure supports an inference that it was orchestrated to conceal the embarrassing the fact that the Center was failing under President Trump's leadership, an improper motive.  But the Court need not make this specific finding to hold that the closure was a breach of fiduciary duty.

claim that this timeline is consistent with a July closure, Defs.' Mem. at 21, but the record does not support that assertion. According to Mr. Floca, the Center held an "initial, staff-level meeting on March 30, 2026" with the National Capital Planning Commission ("NCPC") and the Commission of Fine Arts ("CFA"), ECF No. 34-4 ¶ 8, approximately *three months* before they claim construction will begin. And although Defendants dispute that they are subject to the regulatory requirements of the NCPC and CFA, the Court need not even decide that issue for purposes of Plaintiff's PI motion, because Defendants concede that they are engaging in these processes. Defs.' Mem. at 25 (stating that "the Center expects to engage with both commissions").

Regardless, Defendants are wrong on the law. At minimum, Defendants must consult with the Advisory Council on Historic Preservation and have not done so. As Defendants admit, Defs.' Mem. at 33, pursuant to a 2003 law:

> In carrying out this subsection, and in carrying out other projects in the District of Columbia which are subject to the review and approval of the National Capital Planning Commission in accordance with section 16 of the Act of June 20, 1938 (sec. 6–641.15, D.C. Official Code), the Smithsonian Institution shall be deemed to be an agency for purposes of compliance with regulations promulgated by the Advisory Council on Historic Preservation pursuant to section 106 of the National Historic Preservation Act (16 U.S.C. 470f).

Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3(c)(2), 117 Stat. 888, 889 (Aug. 15, 2003); *see also* D.C. Code § 6-641.15 (providing that "the location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around the same will be subject to the approval of the National Capital Planning Commission"). Indeed, Defendants' own sources state, once they trigger the NCPC process, Defendants must seek review with the Advisory Council on Historic Preservation. *See* Nat'l Capital Planning Comm'n, Mem. of Agreement Between the National Capital Planning Commission and the Smithsonian Institution 3 (2018), ECF No. 34-6 (explaining that the

30

"Smithsonian must comply with Section 106 of the NHPA for those projects it submits to NCPC for review and approval in the District").

Defendants attempt to distinguish the Smithsonian Facilities Authorization Act on the ground that it applies *only* to the "Smithsonian and its Board of Regent." Defs.' Mem. at 28. That is wrong. By its terms, the act applies to the entire "Smithsonian Institution," and the Kennedy Center is expressly denominated "a bureau" "in the Smithsonian Institution." 20 U.S.C. § 76h(a)(1). Defendants alternatively suggest that 20 U.S.C. § 76k(e) means the Kennedy Center is exempt from the requirements of the Smithsonian Facilities Authorization Act. Defs.' Mem. at 28. That portion of the Kennedy Center's organic statute provides that the Board's actions "shall not be subject to review by any officer or agency other than a court of law." 20 U.S.C. § 76k(e). But to the extent there is a conflict between these two statutes, the latter-in-time and more specific provision, in this case the Smithsonian Facilities Authorization Act, controls. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general.") (cleaned up).[12]

One final point bears emphasizing: If the renovation Defendants intend to undertake in fact resembles the "complete rebuilding" the President has repeatedly described, that only underscores the unlawfulness of their actions. The Board's statutory authority extends to repairs, alterations, and improvements necessary to maintain the existing facility—not to demolishing and replacing it. *See* 20 U.S.C. § 76j(a)(1)(G). As Plaintiff has previously explained, Congress has consistently required express authorization even for far more modest construction projects at the Kennedy

---

[12] As to Defendants' claim that the current project is beyond National Park Service's purview, Defs.' Mem. at 27, because the scope of the project is still unclear, and even air rights and right-of-way permits trigger NPS jurisdiction, *see* ECF No. 13-17 at 2, the precise scope of NCPC review remains unclear.

Center, including discrete expansions and site improvements. A wholesale teardown and reconstruction of the building—particularly one that would render it a "brand new" structure—would plainly exceed that authority and require congressional approval. *Id.* And yet Defendants have identified no such approval, nor any effort to obtain the multiple regulatory clearances that would be required before undertaking a project of that magnitude. Thus, if the closure is in service of a far more sweeping reconstruction, it is not merely imprudent—it is unlawful on its face.

In any event, the fact that there is still uncertainty about which of these two scenarios Defendants are actually pursuing only reinforces the conclusion that the decision to close the Kennedy Center was fundamentally imprudent and a clear violation of Defendants' fiduciary duties. No trustee can responsibly evaluate—or approve—a closure of this magnitude where the underlying project, and the justification for it, remain unclear.

### 2. The preliminary injunction is needed to prevent irreparable harm.

A closure will cause irreparable harm in at least five distinct respects, each supported by sworn declarations from experienced industry professionals: performers, staff, audiences, donors, and the Center's reputation. *See* Borda Decl. ¶¶ 7-15, ECF No. 13-19; Taylor Decl. ¶¶ 5-13, ECF No. 13-20; Borenstein Decl. ¶¶ 13-19, ECF No. 13-21; Miller Decl., ¶¶ 8-18, ECF No. 13-22.

Defendants' primary response is that Plaintiff has not alleged any harms that are personal to her. For the same reason that this argument was wrong with respect to Plaintiff's standing, it is wrong here. *See supra* pp. 3-8. The harms to the Kennedy Center are cognizable twice over—because Plaintiff is a trustee seeking to benefit the trust and because obtaining the injunction will discharge her duty as a trustee. *Sprint*, 554 U.S. at 287 & 304 n.2.

Trying to defeat this insurmountable obstacle, Defendants claim that the statute granted "all the usual powers and obligations of a trustee" to the Board itself, not the individual trustees.

Defs.' Mem. at 41. This argument is preposterous. The "Board" is defined as "the Trustees of the John F. Kennedy Center for the Performing Arts." 20 U.S.C. § 76h. The statute thus gives "the Trustees of the John F. Kennedy Center for the Performing Arts" "all the usual powers and obligations of a trustee in respect of all trust funds administered by it." 20 U.S.C. § 76*l*. There is no evidence that in giving "the Trustees" "all the usual powers and obligations of a trustee," Congress meant that these will be possessed and exercised collectively and not individually. If that were the case, it would render the grant of "*all* the usual powers and obligations" meaningless, since trust law is predicated on the concept of individual trustees. To wit, every section of the restatement is phrased around "the trustee" or "a trustee." *See, e.g.*, Restatement (Third) of Trusts § 77 ("The trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust."); *id.* § 78 ("Except as otherwise provided in the terms of the trust, a trustee has a duty to administer the trust solely in the interest of the beneficiaries, or solely in furtherance of its charitable purpose."). Furthermore, many trustee duties entail one trustee acting against his co-trustees. *See, e.g.*, *id.* § 94 ("A suit against a trustee of a private trust to enjoin or redress a breach of trust or otherwise to enforce the trust may be maintained only by a beneficiary or by a co-trustee, successor trustee, or other person acting on behalf of one or more beneficiaries."). All those provisions would be nullities under Defendants' peculiar reading. Such a meaningless grant of duties and powers is not what Congress could have intended.

Defendants next argue that Plaintiff has not asserted the harm with sufficient specificity.[13]

---

[13] Defendants' argument that "[i]f the injunction itself is what would cause harm—due to the effects of closure and Court-ordered reopening on the Center's commitments—then that harm cannot be a basis to *obtain* the injunction." Defs.' Mem. at 41, misunderstand's Plaintiff's argument. Plaintiff's point was simply that, absent relief now, these irreparable harms will occur even if Plaintiff ultimately prevails at a later date, and therefore can only be addressed through a

Defs.' Mem. at 41.  But the law does not require Plaintiff to have a crystal ball; it requires that the harms be "certain, great and actual—not theoretical—and imminent." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017).  The imminent and serious injuries described by Plaintiff's declarants—all industry professionals with experience either at the Kennedy Center or similar large performance venues—readily satisfy this standard.  *See, e.g.*, Bornstein Decl. ¶ 15 (explaining that "the Kennedy Center *will* be unable to resume programming, even if ordered by the Court" for as long as several years (emphasis added)); Miller Decl. ¶ 8 ("the opportunity [to secure performances] *cannot* be recovered" if the closure is not enjoined (emphasis added)); *id.* ¶ 16 (explaining that "closure will sever whatever goodwill remains").  Furthermore, the intervening events validate the imminence of these harms: on March 26, 2026, the Washington Post reported that the Kennedy Center initiated the "*first* wave of anticipated cuts tied to President Donald Trump's plan to shut down the institution for two years." Third Kristofcak Decl. Ex. PP (emphasis added). And on April 10, 2026, another round of layoffs was announced, to be followed by more layoffs as the closure nears.  *See id.* Ex. QQ.

### 3. The balance of equities and public interest favor a preliminary injunction.

The equities and public interest also tilt decisively toward Plaintiff: she is asserting profound injuries to the institution she is charged with protecting, backed up by sworn declarations from five industry professionals.  On the flip side, putting a pause on the closure which Defendants *themselves* did not think was necessary until February 1, 2026, causes them no meaningful harm. This is not a close call.

Defendants claim that the injunction will "prevent the Board from undertaking capital

---

preliminary injunction today.

repair and restoration activities." Defs.' Mem. at 44. That is a straw man. Plaintiff is not seeking to stop previously-planned renovations. And again, until about two months ago, everyone, including Mr. Floca, believed that these projects could be achieved without a full closure. *See* ECF No. 29-22 (September 2025 Board meeting minutes stating "Mr. Floca stated that they are moving quickly on everything"); Beatty Decl. ¶ 18 (explaining that prior to Trump's February 1 announcement, the Board has never discussed a full closure). Nothing in the record explains why it has now suddenly become necessary (or even reasonable) to perform the required projects through a full closure.

Defendants also attempt to manufacture urgency by invoking "safety risks." Defs.' Mem. at 44. Safety is, of course, a legitimate consideration, but here it is invoked as a generalized assertion, not a substantiated consideration underlying the closure decision. In his barebones "talking points," Mr. Floca asserts that continued operations during construction would be "not feasible," because it would "leave the facility without life-safety systems," but in the same document acknowledges that "phased construction" with "temporary life-safety systems" could be implemented—albeit at greater cost. ECF No. 29-4. At bottom, that is not a claim about protecting public safety; it is prioritization of up-front cost savings (which, as discussed above, is not grounded in any meaningful analysis). *See* Williams Decl. ¶ 13, ECF No. 29-24 (explaining that Floca's reasoning "effectively concedes that phasing is possible").

Finally, Defendants argue that enjoining the closure "would threaten Congress's judgment that funding for this renovation be used prior to September 30, 2029." Defs.' Mem. at 44-45. Not so. The Center has approximately 3.5 years until the funding expires, and Plaintiff is not seeking to prevent previously planned renovations. Defendants cannot show that deferring closure beyond the next few months would impair their ability to complete the project within Congress's multi-

35

year timeline.

### B. Summary Judgment for Defendants on the Closure Is Not Warranted.

For all the same reasons that Plaintiff is likely to prevail on her challenge to the Center's closure and rebuilding, Defendants are not entitled to summary judgment on those claims. Moreover, Defendants move for summary judgment on a record that, on their side of the ledger, consists almost entirely of self-serving declarations from a single interested witness—the current Kennedy Center Executive Director and Chief Operating Officer Matt Floca.  And those declarations are materially undermined by a trove of other record evidence, including five declarations from independent industry professionals.  That is not a plausible basis for summary judgment.  It is, at best, a demonstration for why discovery may be necessary on these claims (and, therefore, why preliminary injunctive relief is all the most critical to prevent irreparable harm in the interim).  *See generally* Pl.'s Resp. to Defs.' Stmt. of Material Facts (identifying disputed fact issues).

*First*, Defendants' assertion that the closure was undertaken *because of* Mr. Floca's recommendation is in dispute.  As Plaintiff has shown above, the conclusory and contradictory nature of his recommendation, together with the irregular sequence of events, sharply undermines that assertion.  At the end of the day, the Court could enter final judgment *for Plaintiff* without deciding whether Mr. Floca's recommendation was a pretext, because that recommendation was arbitrary in any event.  But that plainly pretextual recommendation cannot support summary judgment for Defendants.

*Second*, Defendants minimize the scope of the "rebuilding" project in an effort to portray it as an extension of the renovation plans submitted to Congress rather than a departure from them.  Setting aside that, if true, this would not justify closure for the reasons stated above, there is

36

evidence that contradicts this assertion.  For example, President Trump stated that he plans to "us[e] the steel" and "some of the marble," and that the building will be "brand new," ECF No. 13-13 at 2—not how one would normally describe anything short of "rebuilding."  Next, there is President Trump's conduct with respect to the East Wing of the White House—that is, his initial promise that the new ballroom "won't interfere with the current building," followed by his abrupt tearing down of the East Wing complex a few months later.  *See* Third Kristofcak Decl. Ex. RR.  In that vein, Richard Grenell, the former president of the Kennedy Center, disclosed that, at one point, "engineers were saying we should tear [the Kennedy Center] down and start over."  *Special Envoy Ric Grenell Speaks at CPAC in Grapevine, Texas*, at 2:09, C-SPAN (Mar. 27, 2026), https://www.c-span.org/program/public-affairs-event/special-envoy-ric-grenell-speaks-at-cpac-in-grapevine-texas/676522.  This statement shows that a teardown was at least on the table.  And given the history of the ballroom renovation, Defendants could just as easily escalate to wholesale structural changes, with minimal or no notice.  But most fundamentally, if the rebuilding is nothing other than the deferred maintenance that the Kennedy Center has been planning for years and *that it has all along planned to do without closing*, the sudden decision to close—with no explanation of what has changed—raises an inference that something other than the original renovation is being planned.  Accordingly, at minimum, a genuine dispute exists about the scope of the project that precludes summary judgment.

*Third*, there is a genuine dispute about the relevant standard of care in this context.  For their part, Defendants assert that the Board was entitled to rely on Mr. Floca's barebones conclusion that a full closure will allow the Kennedy Center to conduct repairs "in as short and cost-effective a timeframe as possible."  Defs.' Mem. at 19.  In sharp contrast, Plaintiff introduced declarations from numerous experts with experience in performing arts management and

37

architecture that demonstrate what a dramatic departure this decisionmaking process was from any recognizable standard of responsible institutional governance for a renovation of this scope. *See* Borda Decl. ¶¶ 16, 18, ECF No. 13-19; Taylor Decl. ¶¶ 15, 16, ECF No. 13-20; Williams Decl. ¶ 12, ECF No. 29-24. In sum, Plaintiff's expert declarations establish that no responsible institutional board would approve a two-year closure of a national performing arts center on the basis of a one-page "talking points" memo produced eleven days after the closure was publicly announced, without a comprehensive planning package, without independent professional assessments,[14] and without the governance process that the scale of the decision requires. This evidence shows that the Board committed a gross breach of its duties or, at minimum, that the appropriate standard of care is a factual dispute that cannot be resolved in Defendants' favor on the current record.

Accordingly, Plaintiff respectfully requests that the Court deny Defendants motion for summary judgment with respect to her closure and rebuilding claims.

---

[14] Defendants aver that they did consider independent expert opinion—that of Mr. Floca. Defs.' Mem. at 24. But Mr. Floca is neither an expert, nor independent. *See* Williams Decl. ¶ 12 ("A credible determination that a building of the Kennedy Center's scale and complexity cannot safely undergo phased renovation requires analysis by qualified structural, MEP, and construction management professionals with relevant venue experience, working from complete design documents. That analysis was not performed here.").

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant a preliminary injunction, deny Defendants' motion for summary judgment, and enter partial summary judgment for Plaintiff.

Dated: April 13, 2026

Respectfully submitted,

/s/ Norman Eisen
NORMAN EISEN
  (D.C. Bar No. 435051)
STEPHEN JONAS
  (D.C. Bar No. 90037069)
DAVID OGDEN
  (D.C. Bar No. 375951)

DEMOCRACY DEFENDERS ACTION
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
  (D.C. Bar No. 1724093)
/s/ Alexander Kristofcak
ALEXANDER KRISTOFCAK*
  (D.D.C. No. NY0717)
KYLE R. FREENY
  (D.C. Bar No. 1684764)

WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky @washingtonlitigationgroup.org
akristofcak@washingtonlitigationgroup.org
kfreeny@washingtonlitigationgroup.org

*Admitted only in California and New York; practicing under the supervision of D.C. Bar members*

*Attorneys for Plaintiff Joyce Beatty*

39