**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOYCE BEATTY,

               *Plaintiff*,

    v.

DONALD J. TRUMP, *et al.*,

               *Defendants*.

Civil Action No. 25-4480 (CRC)

**DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT .................................................................................................................... 1

I.    Plaintiff Fails to Carry Her Burden to Show She Has Article III Standing to
      Challenge the Center's Renovation and Secondary Naming. ............................................. 1

II.   The Law Permits the Center's Actions. .......................................................................... 6

      A.    The Board is permitted to proceed with its renovation and need not obtain
            formal outside approval to engage in the project. ..................................................... 6

      B.    No provision prevents the Board from adopting a secondary name. ..................... 17

      C.    Plaintiff's voting-rights claim fails. ....................................................................... 20

      D.    Plaintiff does not satisfy state-law requirements for her breach-of-
            fiduciary-duty claims. ............................................................................................ 21

      E.    Plaintiff has no other path to success on the merits. ............................................. 23

III.  The Remaining Injunctive-Relief Factors Strongly Favor Defendants. ......................... 23

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Christie's Inc.*,
880 A.2d 774 (R.I. 2005) ................................................................................................. 21

*Ali v. Rumsfeld*,
649 F.3d 762 (D.C. Cir. 2011) ........................................................................................ 23

*Am. Hosp. Ass'n v. Azar*,
468 F. Supp. 3d 372 (D.D.C. 2020) ................................................................................ 18

*\*Bd. of Dirs., Wash. City Orphan Asylum v. Bd. of Trs., Wash. City Orphan Asylum*,
798 A.2d 1068 (D.C. 2002) ........................................................................................ 2, 21

*Bethesda Health, Inc. v. Azar*,
980 F.3d 121 (D.C. Cir. 2020) ........................................................................................ 18

*Branch Ministries, Inc. v. Richardson*,
970 F. Supp. 11 (D.D.C. 1997) ....................................................................................... 18

*Carney v. Adams*,
592 U.S. 53 (2020) ............................................................................................................ 2

*Chemung Canal Tr. Co. v. Sovran Bank/Md.*,
939 F.2d 12 (2d Cir. 1991) ...................................................................................... 3, 4, 6

*Citizens for Resp. & Ethics in Wash. v. U.S. Ctrs. for Disease Control & Prevention*,
786 F. Supp. 3d 83 (D.D.C. 2025) .................................................................................. 23

*Cunningham v. Cornell Univ.*,
604 U.S. 693 (2025) .......................................................................................................... 3

*\*Dong v. Smithsonian Inst.*,
125 F.3d 877 (D.C. Cir. 1997) ................................................................................... 11, 23

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
944 F.3d 945 (D.C. Cir. 2019) ........................................................................................ 23

*Erickson v. AmeriCold Logistics, LLC*,
311 F. Supp. 3d 1073 (D. Minn. 2018) ............................................................................. 3

*Fam. Fed'n for World Peace & Unification Int'l v. Moon*,
338 A.3d 10 (D.C. 2025) ................................................................................................. 22

*Free v. Briody*,
732 F.2d 1331 (7th Cir. 1984) ..................................................................................... 4, 6

*Groce v. Rodriguez,*
  743 F. Supp. 3d 244 (D.D.C. 2024) ........................................................................... 13

*Hollingsworth v. Perry,*
  570 U.S. 693 (2013) ........................................................................................... 2, 4

*\*Hooker v. Edes Home,*
  579 A.2d 608 (D.C. 1990) ............................................................................ 2, 22, 24

*Kingman Park Civic Ass'n v. Gray,*
  956 F. Supp. 2d 230 (D.D.C. 2013) ......................................................................... 24

*Mount Vernon Mortg. Corp. v. United States ex rel. Att'y Gen.,*
  236 F.2d 724 (D.C. Cir. 1956) .......................................................................... 21, 22

*Nyunt v. Chairman, Broad. Bd of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ............................................................................... 23

*\*Olds v. Rollins Coll.,*
  173 F.2d 639 (D.C. Cir. 1949) ......................................................................... *passim*

*Shelton v. King,*
  229 U.S. 90 (1913) ........................................................................................... 8, 11

*\*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ............................................................................................... 3

*Sprint Commc'ns Co., L.P. v. APCC Services,*
  554 U.S. 269 (2008) ............................................................................................... 4

*Steeneck v. Univ. of Bridgeport,*
  668 A.2d 688 (Conn. 1995) .................................................................................... 21

*Texas v. United States,*
  523 U.S. 296 (1998) ............................................................................................. 15

*\*Thole v. U.S. Bank N.A.,*
  590 U.S. 538 (2020) ......................................................................................... 3, 4, 6

*\*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ........................................................................................... 2, 3

*Wilton v. Seven Falls Co.,*
  515 U.S. 277 (1995) ............................................................................................. 23

**Statutes**

20 U.S.C. § 42(b) ..................................................................................................... 13

*20 U.S.C. § 76h ............................................................................................................. *passim*

20 U.S.C. § 76i(a) ...................................................................................................................... 17

*20 U.S.C. § 76j ............................................................................................................... *passim*

*20 U.S.C. § 76k(e) ............................................................................................................... 6, 13

20 U.S.C. § 76*l*(a) ................................................................................................................. 20, 21

40 U.S.C. § 8722(d) ................................................................................................................... 13

D.C. Code § 19-1307.03 ........................................................................................................... 5, 6

D.C. Code § 29-401.02(8) ........................................................................................................... 21

Act of Jan. 23, 1964,
    Pub. L. No. 88-260, 78 Stat. 4 (1964) ................................................................................ 18

Smithsonian Facilities Authorization Act,
    Pub. L. No. 108-72, 117 Stat. 888 (2003) .......................................................................... 13

An Act to Provide for Reconciliation,
    Pub. L. No. 119-21, 139 Stat. 72 (2025) ........................................................................... 7, 9

## Regulations

1 C.F.R. § 601.3 ......................................................................................................................... 14

1 C.F.R. § 601.5 ......................................................................................................................... 14

## Other Authorities

Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's the Law of Trusts
    and Trustees* § 585 (May 2025 update) ................................................................................. 5

Restatement of Charitable Nonprofit Organizations § 6.05(c) ............................................ 22, 24

Restatement of Charitable Nonprofit Organizations § 6.02(b)(2) ............................................. 22

Restatement (Third) of Trusts § 50 ...................................................................................... 16, 17

*A Living Memorial* (2026),
    https://www.kennedy-center.org/memorial/ ........................................................................ 17

*Special Envoy Ric Grenell Speaks at CPAC in Grapevine, Texas*, at 2:09, C-SPAN (Mar. 27.
    2026), https://www.c-span.org/program/public-affairs-event/special-envoy-ric-grenell-speaks-
    at-cpac-in-grapevine-texas/676522 ...................................................................................... 16

Noah Webster, Webster's New Universal Unabridged Dictionary 1123 (2d ed. 1983)............... 19

**INTRODUCTION**

Plaintiff concedes that the Board has a weighty interest in conducting renovations to ensure that the Center remains a safe and modern performing-arts venue, to serve as the nation's cultural center for generations to come. Plaintiff takes issue with *how* the Board has decided to go about vindicating that interest. But the Board's decision falls well within its statutory authority, and the Court should not second-guess the Board's exercise of discretion.

Further, the harm that Plaintiff asserts to her interest in enforcing the terms of the Center's governing statutes, as a trustee of the Board, is not the kind of harm that can provide a basis for a lawsuit in an Article III federal court. Plaintiff has no standing to challenge the Board's decisions to close for renovations and to adopt a secondary name. And Plaintiff fails to provide a legal basis to set aside the Board's decision to adopt such a name. Because the Center continues to serve as a living memorial to President John F. Kennedy, and because the Center's legal name continues to be the name Congress assigned it, there has been no breach of duty. Similarly, because Congress did not provide that *ex officio* trustees may vote on Board matters, Plaintiff cannot show that the Board's decision to distinguish the two classes of trustees—*ex officio* and general—in turn violates the Center's statutes. Summary judgment for Defendants is warranted.

**ARGUMENT**

**I.      Plaintiff Fails to Carry Her Burden to Show She Has Article III Standing to Challenge the Center's Renovation and Secondary Naming.**

Plaintiff does not satisfy her burden to show that she has suffered or will suffer a sufficiently concrete and particularized injury to maintain in federal court her challenges to the Center's renovation and secondary naming. Her opposition underscores that the only interest she has in the outcome of those challenges is a "generalized grievance" with the Board's actions, indistinguishable from the interest that any beneficiary of the Center's activities might have in

1

enforcing its compliance with the law. *Carney v. Adams*, 592 U.S. 53, 60 (2020); *see also Hollingsworth v. Perry*, 570 U.S. 693, 706–07 (2013) (holding that the petitioners, who had a "special" and "distinct" role in the initiation of a state ballot proposition, no longer had any role—"special or otherwise"—in the enforcement of the proposition, rendering their interest indistinguishable "from the general interest of every citizen" of the state (citation omitted)). Prior to the relevant votes, Plaintiff opposed the Board's decisions to adopt a secondary name and to close for a two-year renovation. Any "personal stake" she had in those decisions, now that they have been finalized, is indistinguishable from the interest any citizen has. *Hollingsworth*, 570 U.S. at 707. She thus lacks Article III standing.

The bulk of Plaintiff's response focuses on the special interest she claims her status as a trustee gives her. *See* Pl.'s Opp'n to Defs.' Cross-Mot. for Summ. J. & Reply in Supp. of Mot. for Prelim. Inj. & Partial Summ. J. at 3–6, ECF No. 38. At best, however, Plaintiff's authorities suggest that the common law permits a cause of action for trustees to sue co-trustees in state court to enforce the trust. Even assuming that were true,[1] her argument fails for the simple reason that federal standing law requires that she show a cognizable injury-in-fact that might have been the basis for a lawsuit at common law, not merely a cause of action. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (noting that the relevant inquiry "asks whether plaintiffs have identified a close historical or common-law analogue *for their asserted injury*" (emphasis added)). And Plaintiff has been in no way harmed.

---

[1] To be clear, as explained below, Defendants do not concede that point of state law—the common law of charitable trusts requires such a suit to implicate some "special interest" a private plaintiff has in the trust, which entails showing that the action challenged is "an extraordinary measure threatening the existence of the trust." *Hooker v. Edes Home*, 579 A.2d 608, 615 (D.C. 1990); *see also Bd. of Dirs. of the Wash. City Orphan Asylum v. Bd. of Trs. of the Wash. City Orphan Asylum*, 798 A.2d 1068, 1074–75 (D.C. 2002) [hereinafter *Wash. City Orphan Asylum*].

Plaintiff responds that the distinction between "*actions* heard at common law, and *harms* recognized as providing the basis" for a lawsuit "makes no sense." ECF No. 38 at 9. But that dichotomy reflects binding Supreme Court precedent on the nature of Article III. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (noting that "it is instructive to consider whether *an alleged intangible harm* has a close relationship *to a harm* that has traditionally been regarded as providing a basis for a lawsuit in English or American courts" (emphasis added)); *TransUnion*, 594 U.S. at 424 (noting that the inquiry "asks whether plaintiffs have identified a close historical or common-law analogue *for their asserted injury*" (emphasis added)). And it *does* make sense—federal courts, as courts of limited jurisdiction, do not hear every cause of action cognizable at common law (or even under statute), because the separation of powers reserves to the Executive Branch, as the branch most "accountable to the people," the "choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" where only the public at large has been harmed by the defendants' actions. *TransUnion*, 594 U.S. at 429.

The Supreme Court has confirmed that the existence of a "cause of action does not affect the Article III standing analysis." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 544 (2020); *see also Cunningham v. Cornell Univ.*, 604 U.S. 693, 708 (2025) (noting that district courts must, "consistent with Article III standing, dismiss suits" that allege violations of the Employment Retirement Income Security Act (ERISA) "but fail to identify an injury"). Under Article III, the "fact that plaintiffs are trustees does not excuse them from well established standing requirements." *Erickson v. AmeriCold Logistics, LLC*, 311 F. Supp. 3d 1073, 1077 (D. Minn. 2018). If a trustee were to suffer some kind of disproportionate financial harm from his trust's breach, such that he can invoke his "right of contribution among defaulting fiduciaries," that harm likely satisfies Article III's injury-in-fact requirement. *Chemung Canal Tr. Co. v. Sovran*

*Bank/Md.*, 939 F.2d 12, 16 (2d Cir. 1991); *see also Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984) (recognizing a limited right to indemnification between trustees). Indeed, the dicta in *Thole* to which Plaintiff points—that "fiduciaries (including trustees who are fiduciaries) can sue other fiduciaries," *Thole*, 590 U.S. at 545; *see also* ECF No. 38 at 8–9—contemplates exactly that kind of an action, where one trustee might cause another financial harm by "using the plan's assets as a personal piggybank," *Thole*, 590 U.S. at 545 (citation modified). The ERISA plan's liability would entitle one trustee to obtain indemnity or contribution from the liable co-trustee—but *only because* that liability would have resulted in financial harm to the non-breaching trustee, thus establishing Article III standing to proceed in federal court.[2]

The nature of Plaintiff's asserted harm here is entirely different—she alleges the Board is violating the terms of the trust, as laid out in the Center's governing statutes, and as a result that she is prevented from fulfilling her fiduciary duties. *See* ECF No. 38 at 3–6. But that asserted harm is indistinguishable from the harm any *beneficiary* of the trust might assert from the Center's purported violation of the terms of its charter. And, because the beneficiaries of the Center's activities—as a charitable trust—are members of the public, that interest is indistinguishable from the general interest of any citizen. *See Hollingsworth*, 570 U.S. at 707. Unlike in the hypothetical

---

[2] Plaintiff insists that similar dicta in *Sprint Communications Co. v. APCC Services, Inc.* supports her position. *See* ECF No. 38 at 4–5 (citing 554 U.S. 269, 287 (2008)). To the contrary: nothing in *Sprint* suggests that a co-trustee has Article III standing to sue for every purported breach of the trust's terms. Instead, the case holds that a beneficiary's assignee "has standing to pursue the assignor's claims for money owed." *Sprint*, 554 U.S. at 274. That holding comports exactly with *TransUnion*'s requirement to show a harm cognizable at common law—in that case, a financial harm—and it underscores why Plaintiff, who has suffered no such harm, cannot proceed. And Chief Justice Roberts's comment in dissent that a "trustee's discharge of its legal obligation is an independent, personal benefit that supports the trustee's standing to sue in federal court" fails, as a dissent, to provide a binding rule for this Court to apply. *Sprint*, 554 U.S. at 304 n.2 (Roberts, C.J., dissenting). Further, that comment appears to contemplate the kind of contribution or indemnity claim typically maintained between co-fiduciaries to a financial trust. *See id.*

in *Thole*—or in prior cases recognizing that ERISA fiduciaries may sue under a contribution or indemnity theory—Plaintiff has suffered no individualized harm.

Plaintiff argues that common-law trust duties are not discharged until completion of the suit, such that she will suffer an injury (potential fiduciary liability) if she does not sue. *See* ECF No. 38 at 6–8. That is badly overstated. Plaintiff conflates the duty to "compel a cotrustee to redress a serious breach of trust," *id.* at 6 (quoting D.C. Code § 19-1307.03(g)), with an asserted requirement "to sue her co-trustees to halt and rectify their unlawful action," *id.* The latter is not required. A trustee is obligated only to use "reasonable care" to prevent a breach of trust. Restatement (Third) of Trusts § 81(2) (A.L.I. Oct. 2024 update). Exercising reasonable care does *not* require filing a lawsuit. *See id.* § 76 cmt. d ("Reasonable steps *may* include taking an appeal to a higher court, compromise or arbitration of claims by or against the trust, or even abandoning a valid claim or not resisting an unenforceable claim if the costs and risk of litigation make such a decision reasonable under all the circumstances." (emphasis added)). Here, Plaintiff fulfilled her fiduciary duty by opposing the Board's naming and closure decisions and seeking to convince her co-trustees not to proceed. *See* Defs.' Mem. in Supp. of Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Prelim. Inj. & Partial Summ. J. at 14, ECF No. 34-1; *see also* D.C. Code § 19-1307.03(f); Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's the Law of Trusts and Trustees* § 585 (May 2025 update) [hereinafter "Bogert's *Law of Trusts*"]. That means Plaintiff can suffer no individualized harm at all for the Board's actions, because her opposition means she is not liable for them. *See* D.C. Code § 19-1307.03(f); Bogert's *Law of Trusts* § 585. Indeed, Plaintiff's trustee-liability logic is circular: if Article III bars suits like hers, then bringing such a suit cannot be part of her fiduciary responsibility, and she would thus face no liability for declining to bring suit. Plaintiff cannot bootstrap standing in this fashion.

5

At bottom, Plaintiff attempts to import the full scope of trust law into federal Article III standing doctrine by claiming that, because the common law carries a duty to take reasonable care to prevent breaches of trust, she faces harm unless she can bring a lawsuit to prevent such a breach. *See* ECF No. 38 at 6–7. But a co-trustee may avoid liability by acting with "reasonable care," D.C. Code § 19-1307.03(g), and so Plaintiff's attempts to convince her co-trustees not to proceed are sufficient to avoid any risk of injury. Plaintiff therefore cannot show harm under Article III—she will face no individual consequences for the Board's actions. Instead, trustees may sue in federal court only to pursue financial claims for contribution or indemnity. *See Thole*, 590 U.S. at 545 (noting in dicta a potential co-fiduciary claim for financial mismanagement); *Chemung Canal*, 939 F.2d at 16; *Free*, 732 F.2d at 1337.

## II.     The Law Permits the Center's Actions.

Plaintiff has identified no statutory provision or common-law rule that prohibits the Board's decisions to proceed with a two-year closure for renovations, adopt a secondary name, or limit the voting rights of *ex officio* trustees on the Center's Board. All of her claims thus fail on the merits. The Center's governing statutes permit—and, indeed, affirmatively contemplate—significant renovation. They do not prohibit the use of secondary names. And they permit the Board to organize itself in a manner that will help it most effectively pursue its mandate—including by establishing different voting rights for its groups of trustees.

### A.     The Board is permitted to proceed with its renovation and need not obtain formal outside approval to engage in the project.

Congress plainly authorized the kind of renovation contemplated for the Center's upcoming closure. And it did so twice over. It first laid out the authority to plan and construct capital repairs and alterations, *see* 20 U.S.C. § 76j, without being subject to review "by any officer or agency other than a court of law," *id.* § 76k(e). And it appropriated to the Center $257 million

6

for "capital repair, restoration, maintenance backlog, and security structures," An Act to Provide for Reconciliation, Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025).

Plaintiff raises no serious challenge to the Board's authority to undertake capital repairs, improvements, and alterations. Congress clearly conferred on the Board the power to "maintain the functionality of the building and site at current standards of life, safety, security, and accessibility" and to ensure "high quality operations." 20 U.S.C. § 76j(a)(1)(G)–(H). The current plan adheres to the governing statutes and ensures that the Center will continue to serve as the nation's cultural center.

**1.** Plaintiff primarily challenges the *nature* of the upcoming renovation, arguing that the scope of the project exceeds that contemplated under the Center's governing statutes and under the 2025 congressional appropriation. *See* ECF No. 38 at 28–29. The record contradicts that assertion. Indeed, the terms of the trust expressly contemplate that the Board may plan and construct "capital repair[s], . . . rehabilitation[s], alteration[s], or modification[s]"—a broad grant of authority that itself is limited only by the qualification that such changes must be "necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G). As Matt Floca, the Executive Director and Chief Operating Officer of the Center, has explained, the majority of contemplated work fulfills exactly that purpose. Much of the renovation will "address facility-wide obsolescence, including a total overhaul of central mechanical and life-safety systems and the hardening of the security perimeter." Third Decl. of Charles Matthew Floca ¶ 9, ECF No. 34-4. Such repairs and improvements include "Building Envelope & Structural Rehabilitation," "Site Restoration," "Perimeter & Physical Security Improvements," "Fire Alarm & Fire Protection," "Hazardous

7

Material Abatement," and "MEP [mechanical/electrical/plumbing] Improvements." Capital Improvement Plan at 2, 3, 10, ECF No. 29-10.

Moreover, the remaining improvements fall well within the Board's independent authority to conduct "maintenance, repair, and alteration of . . . the building and site" of the Center, "consistent with requirements for high quality operations." 20 U.S.C. § 76j(a)(1)(H). The Center's capital improvement plan contemplates "[r]enewal" of the Center's public spaces and "[r]estoration" of the Center's performance spaces, ECF No. 29-10 at 6, 8, enabling the Center to better support its performing-arts mission by modernizing public spaces and improving "acoustics, rigging, and audience-facing finishes" in the performance venues, Building & Grounds Committee Presentation (March 2, 2026) at 13, ECF No. 29-9. And other portions of the planned renovations address "obsolescence of the Center's production and stage technology," like the "total replacement of stage lifts and rigging systems" in the Center's concert hall. ECF No. 34-4 ¶ 10; *see also* ECF No. 29-10 at 8.

These statutory provisions confer significant discretion on the Board to undertake repairs and alterations. It is not the role of the Court to micromanage how the Board undertakes those duties or exercises that discretion. *See Olds v. Rollins Coll.*, 173 F.2d 639, 642 n.7 (D.C. Cir. 1949) ("It is [a] settled principle that trustees having the power to exercise discretion will not be interfered with so long as they are acting bona fide. To do so would be to substitute the discretion of the court for that of the trustee." (quoting *Shelton v. King*, 229 U.S. 90, 94–95 (1913)).

Were that not enough, Congress's 2025 appropriation to the Center decisively establishes that the proposed renovation is well within the scope of the Board's statutory authority. Congress did not simply appropriate "funds for deferred maintenance." ECF No. 38 at 29. Instead, it appropriated the largest amount of funding that the Center has received in recent history—$257

million—for "*capital repair*, *restoration*, maintenance backlog, and *security structures*." § 60025(a), 139 Stat. at 157 (emphasis added). Plaintiff provides no evidence that the Center's plans fall outside the scope of that expansive appropriation, other than one reference to a statement that then-President Grenell made suggesting that a "teardown was at least on the table." ECF No. 38 at 37. But that statement reflects neither the Board's intent nor its planned course of action. As discussed, the Board does *not* intend a full teardown of such a culturally significant establishment. Without any support, Plaintiff hypothesizes that "Defendants could just as easily escalate to wholesale structural changes, with minimal or no notice." *Id.* But no genuine dispute exists that the *actual* plans for renovation—which the Board viewed and adopted at its March 16 meeting— are consistent with the budget outlined in the Center's capital improvement plan. *See* ECF No. 29- 10 at 2.

The very fact that the current budget for the renovations falls within the congressional appropriation underscores that Congress contemplated exactly the kind of project that the Center is currently undertaking. *See* ECF No. 29-10 at 2. And each budget line item tracks to one of the four purposes outlined in the appropriations act.[3] *See* ECF No. 29-10 at 3, 6, 8, 10 (outlining rehabilitation and repair, restoration, security improvements, and other maintenance). Congress appropriated significant funding to conduct broad capital repair and restoration within a four-year time period (by September 2029). *See* § 60025, 139 Stat. at 157. The Center planned to use nearly all of that funding—$249 million of the $257 million total, *see* ECF No. 29-10 at 2—by the summer of 2028, two years after the Center would close for the project. The Board's actions here fall directly within its statutory duties, which Congress affirmed by appropriating $257 million in

---

[3] The act—like the capital improvement plan—also provides for administrative costs, which shall not be more than three percent of the total $257 million appropriation. *See* § 60025(b), 139 Stat. at 157; ECF No. 29-10 at 13.

2025 for capital repair and restoration. *See* Ex. 1 to Second Decl. of Joseph LaFauci at 8, ECF No. 34-5 (noting that the Speaker of the House of Representatives, in his capacity as an *ex officio* trustee, affirmed Congress's "intent" to get renovations "done as quickly as possible").

2.  Plaintiff also continues to contend that *closing* to conduct renovations is not necessary and thus violates the Board's duties to ensure that the Center is maintained as a "living memorial" to President Kennedy and to present classical and contemporary music as the National Center for the Performing Arts. ECF No. 38 at 27–29. Her reading of the Board's duties, though, would render several of them—including the Board's duties to ensure the existence of a safe and up-to-date set of public spaces and performance venues—entirely ineffectual. It cannot be the case that certain of the Board's duties must take precedence at all times over its complementary duties. 20 U.S.C. § 76j(a)(1). Requiring the Center to maintain public access all times to the "living memorial" would hamstring the Center's ability to, for example, conduct routine cleaning or maintenance of the space, let alone to conduct significant repairs.[4] Requiring that performance spaces be constantly open for public access would also constrain the Board's ability to provide for a high-quality and safe public experience—especially if, as is true here, obsolescence of certain performance-space elements necessitates substantial repair and renewal. The statutes cannot be read to impose such restrictions. And Congress's ratification of the Board's authority—through passage of the appropriation act—should decisively weigh in Defendants' favor. The mere fact that the Center "has historically undertaken renovations in phases while remaining open," ECF No. 38 at 27, does not mean that it *must* do so, especially where that very tactic resulted in "years"

---

[4] As previously explained, the Center plans to "maintain the memorial experience" during the closure. ECF No. 34-1 at 23 n.6 (quoting Building & Grounds Comm. Mar. 2 Minutes at 3, ECF No. 29-7).

of "[d]eferred maintenance," causing deterioration that could not be adequately addressed on the longer timeframe Plaintiff seeks to impose. ECF No. 34-5 Ex. 1 at 6.

Plaintiff further argues that the Board's decision to close for renovations was "imprudent," "arbitrary," and unconsidered. ECF No. 38 at 24–28. To start, the Center is not an agency under the Administrative Procedure Act (APA). *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 879 (D.C. Cir. 1997); Mem. Op. & Order, ECF No. 24 at 32 n.9. The APA's standards do not apply; indeed, the deference a board of trustees receives for its decisions is more flexible and deferential than any APA standard of review. *See Shelton*, 229 U.S. at 94 ("It is a settled principle that trustees having the power to exercise discretion will not be interfered with so long as they are acting bona fide."). Further, though, Plaintiff's apparent failure to assess evidence in existence and under consideration by the Center's executive staff and its Board well before the closure vote cannot and should not be the basis for any conclusion that the *Board* and its executive officers failed to do their due diligence. *See, e.g.*, Sep. 25, 2025 Board Meeting Minutes at 2, 4–5, ECF No. 29-22 (indicating Plaintiff's absence at the September 2025 meeting at which Mr. Floca provided a facilities update, including that the Center was contemplating "structural repair," "capital projects," "reducing maintenance backlog," the restoration of performance venues, and the replacement of significant Center infrastructure like "HVAC," the "central plant," and pipes).

Plaintiff attempts to construct a timeline that, in her view, suggests some kind of malicious intent. She asserts that until February 2026 "the Kennedy Center's longstanding plan had been to conduct phased renovations while *remaining open*." ECF No. 38 at 29. But Mr. Floca's presentation to the Board on September 25, 2025, which described each element of the Center's upcoming renovation, disproves that assertion. Mr. Floca's September 2025 presentation—which noted there would be "structural repair," water intrusion repairs across "hundreds of locations" at

11

the Center, and restoration of "the theaters, infrastructure[,] and physical security," ECF No. 29-22 at 4—made clear the vast scope of the upcoming repairs. Such significant renovation would have been infeasible, especially within the four-year appropriation timeframe and while maintaining an adequate performance experience, without temporarily closing. *See* ECF No. 34-4 ¶¶ 7, 9–11, 13. The undisputed evidence clearly reflects that the Center's trustees and its leadership considered for many months exactly the kinds of repairs that the Center's executive leadership presented to the Board at its March 16 meeting. *Compare* ECF No. 29-22 at 4–6, *with* ECF No. 29-10 at 3, 6, 8, 10, *and* ECF No. 34-5 Ex. 1 at 6–7. That consideration alone defeats Plaintiff's assertions that the decision to close was imprudent.

Moreover, regardless of whether the Board *could* have conducted such renovations while open, the very fact that the tradeoffs involved—safety, the performing-arts experience, cost—might reasonably be balanced in different ways necessarily means that the Board's decision merits deference. And the discretion a board of trustees has to make exactly those decisions is "binding upon the court." *Olds*, 173 F.2d at 642. Closing the Center for a concentrated two-year period will enable it to safely and timely make significant structural repairs, restore the Center's performance spaces, and update the building's security and mechanical systems in as cost-effective a manner as possible. *See id.* That decision was sound; Plaintiff has provided no basis to disturb it.

**3.**  Plaintiff effectively concedes that the regulatory agencies she previously invoked, *see* Pl.'s Mem. in Supp. of Mot. for TRO & Prelim. Inj. at 24, ECF No. 13-1; Pl.'s Supp. Br. in Supp. of Mot. for Prelim. Inj. at 11–12, ECF No. 29, have no mandatory role in this renovation. *See* ECF No. 38 at 30. Instead, she argues, "[a]t minimum, Defendants must consult with the Advisory Council on Historic Preservation" because Congress provided that the Smithsonian "shall be deemed to be an agency for purposes of compliance with regulations" promulgated by that council.

12

*Id.* (quoting Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3(c)(2), 117 Stat. 888, 889 (2003)).

That is wrong twice over. *First*, the Center is not the Smithsonian. The Board acts wholly independently of the Smithsonian. The Smithsonian Board of Regents is barred from modifying the Center's Board, unlike for most other boards or commissions under the Smithsonian's "jurisdiction." 20 U.S.C. § 42(b). And the Board's actions are not subject to review by any officer or agency—which includes officers of the Smithsonian. *See id.* § 76k(e). The fact that the Board is independent necessarily establishes that Congress did not intend to sweep it into the Smithsonian's agency designation. "Technically, by statute," the Center "is a bureau of the Smithsonian Institution, but it is managed by an independent Board of Trustees," making it independent. *Groce v. Rodriguez*, 743 F. Supp. 3d 244, 251 n.6 (D.D.C. 2024) (considering the National Gallery of Art). And the context of the session law confirms that its terms apply only to the Smithsonian and its Board of Regents. The provision was included in an appropriation permitting the "Board of Regents of the Smithsonian Institution" to construct improvements to the "Patent Office Building." § 3(a), 117 Stat. at 888. The terms of the act thus apply only to the Smithsonian's Secretary and its Board of Regents—not the independent Board of the Center.

*Second*, even if the Center were conflated with the Smithsonian for purposes of this statute, this statutory requirement is triggered only for projects "subject to the *review and approval* of the National Capital Planning Commission." § 3(c)(2), 117 Stat. at 889 (emphasis added). But the Commission's approval is required only for projects implicating the "location, height, bulk, number of stories, and size" of federal public buildings, or "the provision of open space around them." 40 U.S.C. § 8722(d). It is far from clear that the Center's largely interior renovations are subject to that approval requirement, and the Commission has not yet made such a determination.

13

And if the Commission does make such a determination, it and the Center will undertake any necessary historic preservation review, consistent with the Commission's typical practice for non-agencies. *See* 1 C.F.R. § 601.5(a)–(b) (listing obligations, including compliance with Section 106 of the National Historic Preservation Act, and explaining that the Commission will serve as the lead agency for projects involving "Non-Federal Agenc[ies]"); *see also* 1 C.F.R. § 601.3 (including the Center as a "Non-Federal Agency" under Commission regulations).

**4.** Finally, Plaintiff attempts to construct a series of purported factual disputes that she believes prevent summary judgment on her renovation-related claims. *See* ECF No. 38 at 36–38. But none presents either a material or genuine dispute of fact.

*First*, the undisputed evidence rebuts any inference that Mr. Floca's recommendation to close the Center for renovation was "pretextual." ECF No. 38 at 36. Plaintiff provides no evidence to contradict Mr. Floca's assertion that he has been undergoing a review of the Center's infrastructure needs for years, nor does she explain why Mr. Floca—and the Board—would not be justified in relying on several years' worth of independent reports documenting continued structural degradation to come to the conclusion that a closure would be more effective and efficient than conducting repairs over an extended period of time. *See* Suppl. Decl. of Charles Matthew Floca ¶¶ 6–9, ECF No. 29-3; ECF No. 34-4 ¶ 11; *see also* ECF No. 29-22 at 4–5. Any dispute over alleged pretext is not genuine. Plaintiff does not dispute that Mr. Floca engaged in just such a review. And she provides no evidence to suggest that Mr. Floca did not actually communicate to the President in January 2026—before the public announcement and well before the Board's closure vote—that the best path would be to close the Center temporarily. *See* Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 10, ECF No. 38-1 (pointing only to a declaration that such a recommendation should have included more information to suggest it never

14

occurred at all). So any dispute over the *basis* for the recommendation is not genuine: the record clearly outlines severe structural deficiencies, supported by evidence from independent expert analysis, at the Center. The undisputed evidence reveals years of consideration about plans to conduct repairs at the Center, making Plaintiff's assertion of pretext untenable.

Moreover, the basis for Mr. Floca's recommendation is not material to Plaintiff's renovation claims because the Board, in its discretion, is empowered to consider information presented to it and to act pursuant to its authority under the Center's governing statutes. *See Olds*, 173 F.2d at 642 n.7. Regardless of Mr. Floca's intent, the Board has received and considered numerous pieces of evidence indicating that severe structural deficiencies and outdated amenities at the Center warrant extensive renovation. *See, e.g.*, ECF No. 34-1 at 7–8 (outlining reports presented to the Center's Board); ECF No. 29-22 at 4–5 (outlining presentation of repairs to the Board at September 2025 meeting); ECF No. 34-5 Ex. 1 at 6–8 (outlining discussion and debate over upcoming repairs to the Center at Board's March 2026 meeting). The Board may have credited Mr. Floca's recommendation, or it may have come to its decision for independent reasons. What matters is that it has the authority and the discretion to fulfill its statutory duties in the manner it believes best. *See Olds*, 173 F.2d at 642 n.7; *see also* 20 U.S.C. § 76j(a)(1). The decision it did take was rational and well within that ample discretion.

*Second*, there is no genuine dispute about the proposed scope of the upcoming project.[5] Plaintiff cherry-picks two isolated statements that the President and Mr. Grenell, then-President of the Center, made about the project to suggest that it will depart from a mere "renovation." ECF

---

[5] Of course, claims about unknown future events that have yet to occur would not yet be ripe. *See Texas v. United States*, 523 U.S. 296, 300 (1998). Defendants are entitled to summary judgment exactly because the undisputed evidence supports that the *proposed* scope of construction—as adopted—is within the Board's statutory authority.

No. 38 at 36–37. Those statements prove the opposite: President Trump affirmed in his public announcement that renovation would be "subject to Board approval," Ex. E to Decl. of Kyle Freeny at 2, ECF No. 13-12, and Mr. Grenell, in the full context of his statement, said: "Some of our engineers were saying we should tear it down and start over, *but* President Trump said we're going to fix it, and we've tried to fix it as we've gone along, but the best thing to do is to shut it down . . . for two years," *Special Envoy Ric Grenell Speaks at CPAC in Grapevine, Texas*, at 2:09, C-SPAN (Mar. 27. 2026), https://www.c-span.org/program/public-affairs-event/special-envoy-ric-grenell-speaks-at-cpac-in-grapevine-texas/676522 (emphasis added). And the mountain of evidence to the contrary underscores why Plaintiff's purported dispute over scope is not genuine. *See, e.g.*, Ex. F to Freeny Decl., ECF No. 13-13; ECF No. 29-3; Closure Background & Talking Points, ECF No. 29-4; ECF No. 29-7; ECF No. 29-9; ECF No. 29-10; ECF No. 34-5 Ex. 1 (sources, including external news sources and internal planning materials, indicating that the Center will not be torn down and will instead go through repair and renewal). There is no "uncertainty," ECF No. 38 at 32, about the project underway. The renovations—as presented to and adopted by the Board—will be measured and reasonable repairs and restorations.

*Third*, any factual dispute over the standard of care applicable to renovation projects, *see* ECF No. 38 at 37–38, is immaterial to determining whether the Board's discretion, as a matter of law, includes the power to undertake capital repair, restoration, improvements, and alterations in accordance with its statutory duties and with the applicable congressional appropriation. *See* Restatement (Third) of Trusts § 50(a)(1) (explaining that a "discretionary power conferred upon the trustee to determine the benefit[] of a trust beneficiary is subject to judicial control only to prevent misinterpretation or abuse of the discretion by the trustee"); *see also id.* § 50 cmt. d (explaining that the "terms of trusts usually provide some standards or guidelines concerning the

purposes the settlor has in mind in creating a discretionary trust"); *Olds*, 173 F.2d at 642 n.7. The relevant standards appear in the Center's charter itself: that the Board "maintain the functionality of the building and site at current standards of life, safety, security, and accessibility" and that the Board maintain, repair, and alter the "building and site" in "a manner consistent with requirements for high quality operations." 20 U.S.C. § 76j(a)(1)(G)–(H). The evidence amply supports the Board's discretion to determine that the renovation does just that. And that determination may be made by looking at the standards in the governing statutes and deferring to the Board's reasonable exercise of its discretion—any general standard of care for conducting renovation is entirely immaterial.

### B.      No provision prevents the Board from adopting a secondary name.

The Board continues to designate the main building of the Center as the "John F. Kennedy Memorial Center for the Performing Arts," which is its legal, statutory name.[6] *See* Am. Compl. ¶ 33, ECF No. 12; *see also* 20 U.S.C. § 76i(a). And it continues to maintain the Center as a "living memorial" to President Kennedy. *See A Living Memorial* (2026), https://www.kennedy-center.org/memorial/ [https://perma.cc/HK75-ZXC9]. It thus satisfies its statutory duties.

Plaintiff contends that the designation including President Kennedy's name means that *only* that name can be used to refer to the Center. *See* ECF No. 38 at 14, 17. But that argument proves too much. Were that true, then using the Center's own shorthand—*i.e.*, being called the "Kennedy Center" or the "Center"—would be impermissible. Of course, Congress cannot have intended its statutory designation to create such inflexibility, given that certain settings might call for different

---

[6] The "building" constructed "on a site in the District of Columbia" is "designated as the John F. Kennedy Center for the Performing Arts." 20 U.S.C. § 76i(a). The entire complex is *not* named for President Kennedy, though. Instead, the building—*i.e.*, the "John F. Kennedy Center for the Performing Arts"—and "site thereof" are statutorily designated as the "National Center for the Performing Arts." *Id.* § 76h(a)(1).

naming conventions. *See, e.g.*, Ex. FF to Second Kristofcak Declaration at 2, ECF No. 30-5 (social media post from the President indicating the Center's shorthand name); ECF No. 12 ¶ 33 (indicating that the Center's website used the previous shorthand name). And, as Defendants previously showed, the use of such secondary names is not uncommon elsewhere in federal law. *See* ECF No. 34-1 at 31–32. The use of trade or doing-business-as names is exceedingly common for analogous organizations. *See, e.g.*, *Bethesda Health, Inc. v. Azar*, 980 F.3d 121 (D.C. Cir. 2020) (litigation involving hospital operating under different name); *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 379 (D.D.C. 2020) (same); *Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 13 (D.D.C. 1997) (example of a church). Indeed, Plaintiff provides no reasonable basis to determine how to distinguish "largely anodyne shorthand monikers" from "substantive redesignations that alter the entity's foundational identity." ECF No. 38 at 16.

To that point: in what context is the Board required to call the Center the "John F. Kennedy Center for the Performing Arts"? The statute also designates the entire complex as the "National Center for the Performing Arts," 20 U.S.C. § 76h(a)(1)—when is the Board allowed to use that "National Center" designation? The charter provides no guidance on the extent and nature of the names the Board must use. The best path is to defer to the Board's reasonable exercise of its trust powers. *See Olds*, 173 F.2d at 642 n.7. And, at any rate, the undisputed evidence makes clear that the Board's actions have *not* altered the Center's identity, at least to the extent that it continues to honor President Kennedy, as it has done since 1964. *See* Act of Jan. 23, 1964, Pub. L. No. 88-260, 78 Stat. 4; *see also* Pl.'s Resp. to Defs. Statement of Material Facts ¶ 20, ECF No. 38-1 (acknowledging that the main building "is designated by signage as 'The Donald [J.] Trump and The John F. Kennedy Memorial Center for the Performing Arts'" (quoting ECF No. 12 ¶ 33)).

Plaintiff's only recourse, then, is to argue that the statutory prohibition on "additional memorials" bars the Board from placing President Trump's name on the outer wall of the Center's main building. 20 U.S.C. § 76j(b). ECF No. 38 at 16–17. But Plaintiff provides no explanation for Congress's choice to specify that only "additional memorials or plaques in the nature of memorials" are prohibited. 20 U.S.C. § 76j(b)(1); *see* ECF No. 38 at 16–17. This signage is neither a memorial nor a plaque in the nature of one. She asserts that the exclusions in the statute—which specify that the prohibition shall not apply to plaques or inscriptions "acknowledging a gift from a foreign country," the "gift" of a chair or box, or a major contribution, *see* 20 U.S.C. § 76j(b)(2)(A)—would be rendered unnecessary by Defendants' reading, *see* ECF No. 38 at 17. Not at all. The exclusions clearly operate to *permit* a "memorial[] or plaque[] in the nature of [a] memorial[]" if it falls within one of the three enumerated categories. 20 U.S.C. § 76j(b)(1). That means, under those provisions, the Board could install plaques acknowledging gifts from foreign countries, gifts for chairs or boxes, or gifts acknowledging major contributions *even if* each gift serves as a memorial to the person or entity identified in the gift—*i.e.*, if it "help[s] . . . remember" some "past impression[]" of a person or entity. ECF No. 34-1 at 33 (quoting Noah Webster, *Webster's New Universal Unabridged Dictionary* 1123 (2d ed. 1983)); *see* 20 U.S.C. § 76j(b)(2). Such provisions simply carve out express exclusions to the ban on designating or installing memorials in the public spaces of the Center.

Plaintiff briefly asserts that the naming vote should be invalidated for lack of "reasonable care and diligence." ECF No. 38 at 17–18. Contrary to her assertions otherwise, *see id.* at 18, Plaintiff's own evidence establishes that the Board did consider the impact that President Trump's actions throughout 2025—including his determination to "turn[] fundraising around" and to enact "common sense programming change[s]"—had on the Center's financial performance. *See* Sep.

19

25, 2025 Minutes at 3–4, ECF No. 29-22. Plaintiff's allegations further establish that members of the Board "purported to solicit feedback" on the naming vote, and that other members "voiced their support." ECF No. 12 ¶ 35. Far from "further antagonizing performers and audiences," ECF No. 38 at 18 (emphasis omitted), through its conduct, the Board's discussions make clear that its actions throughout 2025 have been aimed to rework cultural programming for broader audiences, increase corporate fundraising, and avoid financial distress on display around the performing arts community. *See* ECF No. 29-22 at 3–4. Such changes provide more than an adequate basis for the Board to take its naming vote. In its judgment, such a vote would *bolster* the Center's standing. *See* Ex. MM to Third Kristofcak Decl. at 3, ECF No. 37-2 (noting the Board's belief that the President had pulled "the center out of financial straits while working to also update the building"). That decision was within the Board's wide discretion. *See Olds*, 173 F.2d at 642 n.7.

### C. Plaintiff's voting-rights claim fails.

Plaintiff fails to provide further statutory evidence that she has a categorical right to vote on Board matters—a right that, she alleges, Congress expressly embodied in the law. To the contrary: numerous examples elsewhere in federal law expressly provide that members of similar boards *do* have voting rights. *See* ECF No. 34-1 at 35–36 (collecting examples). But the Center's statutes confer no such express right. Indeed, the Board's statutory discretion to manage its "organization and procedure" suggests that Congress *did* intend for the Board to have flexibility in how its trustees are "organiz[ed]." 20 U.S.C. § 76*l*(a). And organizing the Board into two classes—*ex officio* and general trustees—is eminently reasonable, given that *ex officio* trustees, by the nature of their multiple roles, face significant burdens on their time and attention that might justify developing a different voting regime to govern their participation. *See* ECF No. 34-5 Ex. 1 at 2–3 (indicating, in March 16 Board minutes, that the vast majority of *ex officio* trustees were absent). That distinction, rooted in the statute's classification, *see* 20 U.S.C. § 76h(a)(2), provides

20

a meaningful bulwark against the Court's concern that the Board could "strip voting rights from all the general trustees" or from "all but a particular set of twelve members," ECF No. 24 at 28.

Plaintiff asserts that splitting trustees into classes (contemplated by the statutory scheme) would "effectively rewrite the trust instrument." ECF No. 38 at 22. The problem is that nowhere in the trust instrument does it provide that *ex officio* trustees must have the right to vote. *See generally* 20 U.S.C. §§ 76h, 76*l*. Plaintiff argues that Congress imported a background common-law presumption that all trustees of a Board may vote unless otherwise restricted. *See* ECF No. 38 at 22. But state and common law also generally carry a presumption that boards may alter the nature of their trustees' voting powers, as long as such an act does not *conflict* with the trust's terms and that such changes were properly adopted. *See, e.g.*, *Steeneck v. Univ. of Bridgeport*, 668 A.2d 688, 693–94 (Conn. 1995) (explaining that state law permitted a state-created educational trust to "deviate from the simple, traditional framework it recognizes for corporate management" and looking to the university's bylaws to assess the nature of that change (citation omitted)); D.C. Code § 29-401.02(8) (recognizing that the board of a nonprofit organization may vest "by" its "bylaws" a "[d]esignated body" with powers otherwise "exercised by the board or the members"); *cf. Adams v. Christie's Inc.*, 880 A.2d 774, 783–84 (R.I. 2005) (explaining that a nonprofit corporation's adoption of bylaws is presumed valid). The Board's voting decision does not conflict with the express terms of the statute, which are silent as to voting rights. That decision was valid.

### D. Plaintiff does not satisfy state-law requirements for her breach-of-fiduciary-duty claims.

The enforcement of a charitable trust is a matter typically reserved to the sovereign, which informs much of the common law doctrine governing—and limiting—individuals' common-law standing to bring suits on that trust's behalf. *See, e.g.*, ECF No. 34-1 at 34; *Wash. City Orphan Asylum*, 798 A.2d at 1075; *Mount Vernon Mortg. Corp. v. United States ex rel. Att'y Gen.*, 236

21

F.2d 724, 725 (D.C. Cir. 1956) (noting that only "the United States or the Attorney General" could sue to enforce the terms of a charitable trust organized in the District of Columbia); *see also Jackson v. Phillip*, 96 Mass. (14 Allen) 539, 579 (1867) (describing the sovereign's *parens patriae* duty to "protect property devoted to charitable uses").

To limit the possibility of "vexatious litigation," suits to enforce charitable trusts by *other* parties require showing, among other things, that the action being challenged is an "extraordinary measure" that "threaten[s] the existence" of the charity. *Fam. Fed'n for World Peace & Unification Int'l v. Moon*, 338 A.3d 10, 28 (D.C. 2025) (quoting *Hooker v. Edes Home*, 579 A.2d 608, 612, 615 (D.C. 1990)); *see also* Restatement of Charitable Nonprofit Organizations §§ 6.02(b)(2), 6.05(c), (e) (explaining that actions by a current member of the board of a charity against one or more current or former fiduciaries require showing that "the alleged misconduct is egregious or the circumstances are serious and exigent"); *Fam. Fed'n*, 338 A.3d at 27 n.8 (explaining that "[s]pecial interest standing rules apply to both charitable trusts and charitable corporations"). As explained throughout this litigation, Plaintiff here challenges merely "ordinary" matters of discretion in the administration of the trust, *Fam. Fed'n*, 338 A.3d at 28 (citation omitted)—the Board's decisions to reorganize trustees' voting rights, to adopt a secondary name, and to conduct renovations in accordance with its statutory authority.[7] In no way do those actions threaten the existence of the Center—as the undisputed evidence shows, the Center's renovations will enable it to fulfill its statutory duties, and its other decisions fall within the Board's authority to administer the trust. Counts One through Three of Plaintiff's amended complaint thus fail.

---

[7] This is exactly the reason why Defendants argue now, as they did in earlier briefing, that Plaintiff is unable to satisfy the special-interest standing requirement. *See* Defs.' Mem. in Opp'n to Pl.'s Mot. for TRO at 12, ECF No. 19; ECF No. 34 at 33–34. *Contra* ECF No. 38 at 13 (asserting that Defendants have not "meaningfully dispute[d]" Plaintiff's special-interest standing).

### E.    Plaintiff has no other path to success on the merits.

Plaintiff's remaining claims fail on the merits. Plaintiff's *ultra vires* claim fails because the Board has not acted "contrary to a specific prohibition" that is "clear and mandatory." *Nyunt v. Chairman, Broad. Bd of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (citation omitted). No matter how the statutes governing the Board's activities *should* be read, Plaintiff cannot identify in them any "clear and mandatory" prohibition, violation of which is "so extreme that one may view it as jurisdictional or nearly so." *Id.* (citation omitted). Further, Plaintiff improperly brings a standalone claim under the Declaratory Judgment Act, which does not provide an independent cause of action. *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011). And, moreover, that claim is duplicative of Plaintiff's other claims. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). The Center is not an agency or authority of the United States, so it is not subject to the APA. *See Dong*, 125 F.3d at 878–80, 883; ECF No. 24 at 32 n.9. And Plaintiff's mandamus claim fails because she fails to satisfy jurisdictional requirements: she has identified in the law no "clear and indisputable right to relief," given the lack of any provision giving *ex officio* trustees any rights at all; she has not shown the existence of a "clear duty to act" that Defendants violated; and review of her claims is available under the Center's governing statutes. *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 949 (D.C. Cir. 2019) (citation omitted).

## III.    The Remaining Injunctive-Relief Factors Strongly Favor Defendants.

Plaintiff acknowledges that the only individual harms she could assert to support preliminary- or permanent-injunctive relief are those she can herself invoke—*i.e.*, harms to her interests in her capacity as a trustee on the Board. *See* ECF No. 38 at 32 (noting that her harm assertions track with her Article III standing assertions); *see also Citizens for Resp. & Ethics in Wash. v. U.S. Ctrs. for Disease Control & Prevention*, 786 F. Supp. 3d 83, 95 (D.D.C. 2025) (holding that a movant cannot rely on "injuries to third parties" to show irreparable harm (citation

23

omitted)). For the same reasons that Plaintiff lacks Article III standing, she cannot show her asserted harms are sufficiently personalized to merit injunctive relief. And, moreover, any harm to her interests in her capacity as a trustee of a charitable trust also fails, because she must show such harms are "egregious" or "serious and exigent," Restatement of Charitable Nonprofit Organizations § 6.05(c)—*i.e.*, that they, in accordance with the common law of charitable trusts, "threaten[] the existence of the trust," *Hooker*, 579 A.2d at 615. Plaintiff has failed to make both showings—her interests are indistinguishable from the interest any member of the public would have in enforcing the terms of the trust and she has not shown that any of the Board's decisions would threaten the Center's existence.

As importantly, Plaintiff fails to persuade that the balance of equities and public interest weigh in her favor. Perhaps most tellingly, Plaintiff concedes that the upcoming renovation *is* "required." ECF No. 38 at 35. Indeed, it will address significant safety concerns and remedy severe building obsolescence—exactly the kinds of weighty interests that justify undertaking the project. Plaintiff asserts instead that the *closure* is unwarranted, arguing that no reasoned analysis justifies the prioritization of "up-front cost savings." *Id.* First, Plaintiff fails to account for the Center's interest in preserving a high-quality performance environment, both for performers and members of the public—an interest that would suffer greatly should significant renovation work occur while performers and members of the public continue to use performance and public spaces in the Center. *See* ECF No. 34-4 ¶ 7. Second, Plaintiff provides no basis to conclude that "up-front cost savings" are not themselves a weighty interest in favor of conducting a concentrated closure of the Center. *See* ECF No. 38 at 35. To the contrary: such an interest readily supports Defendants' position. *See Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 258–59 (D.D.C. 2013). And third, Plaintiff's assertion that "deferring closure beyond the next few months" would not impair the

24

Center's ability to timely use the funds that Congress appropriated, ECF No. 38 at 35, is wholly meritless. The proposed two-year closure is already highly "concentrated." ECF No. 29-3 ¶ 7. Further delay, even by only several months, brings the end of that window all the closer to Congress's September 2029 deadline. And, should the Center be forced to remain *open* during renovation, phasing the projects will necessarily extend the project's timeline—taking it well past the congressional deadline. These cost, safety, and timing interests all heavily favor Defendants.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's motion for a preliminary injunction and grant Defendants' cross-motion for summary judgment.

Dated: April 17, 2026                    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
(202) 353-7578
william.s.jankowski@usdoj.gov

*Counsel for Defendants*

25