IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
JOYCE BEATTY,

Plaintiff,

v.

DONALD J. TRUMP, et al.,

Defendants.
- - - - - - - - - - - - - - - - x

CA No: 1:25-cv-04480-CRC

Washington, D.C.
Tuesday, April 28, 2026
10:09 a.m.

---

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff:

**NATHANIEL AVI GIDEON ZELINSKY, ESQ.**
**ALEXANDER KRISTOFCAK, ESQ.**
**KYLE RENEE FREENY, ESQ.**
**WASHINGTON LITIGATION GROUP**
1717 K Street NW
Washington, DC 20006
(202) 521-8750

**NORMAN LARRY EISEN, ESQ.**
**DAVID WILLIAM OGDEN, ESQ.**
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Ave SE, Unit 15180
Washington, DC 20003
(202) 594-9958

For the Defendants:

**BRANTLEY MAYERS, ESQ.**
**DOJ-CIV**
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 890-9874
brantley.t.mayers@usdoj.gov

(CONTINUED ON NEXT PAGE)

APPEARANCES (CONTINUED):

For the Defendants:

**WILLIAM S. JANKOWSKI, ESQ.**
**PIERCE ANON, ESQ.**
**STEPHEN McCOY ELLIOTT, ESQ.**
**U.S. DEPARTMENT OF JUSTICE**
Federal Programs Branch
1100 L St NW
Washington, DC 20530
(202) 353-7578

Court Reporter:

Lisa A. Moreira, RDR, CRR
Official Court Reporter
U.S. Courthouse, Room 6718
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3187

P R O C E E D I N G S

THE COURTROOM DEPUTY: Good morning, Your Honor. We're on the record for Civil Case 25-4480, *Joyce Beatty v. Donald J. Trump, et al.*

Starting with the plaintiff, please approach and identify yourself for the record.

MR. EISEN: Good morning, Your Honor; Norman Eisen for plaintiff. Congresswoman Joyce Beatty is with us at counsel table. And we have Nathaniel Zelinksy, Kyle Freeny, and Alexander Kristofcak from the Washington Litigation Group, and my Democracy Defenders founding colleague David Ogden is with us as well.

THE COURT: Okay. Good morning, everybody.

Congresswoman Beatty, good to see you.

CONGRESSWOMAN BEATTY: Good morning.

MR. MAYERS: Good morning, Your Honor; Brantley Mayers, of counsel to the Assistant Attorney General, for the defendants. At counsel's table are Principal Deputy Assistant Attorney General Yaakov Roth; and Will Jankowski, Pierce Anon, and Steven Elliott from the Federal Programs Branch.

THE COURT: Both of you all have switched players on me here.

MR. EISEN: Not entirely, Your Honor. With the Court's --

THE COURT: There's a curve ball coming.

MR. EISEN: It's more like a split-finger fastball.

Your Honor, with the Court's leave, Mr. Zelinksy will argue the issues on the preliminary injunction as to the closure, and then I'll pop back up to talk about the renaming summary judgment.

THE COURT: Okay. Very well.

MR. EISEN: Thank you.

THE COURT: Just to set the stage, particularly for the lesser initiated, the present briefing before the Court covers three issues: the renaming of the center, the board's decision to amend the bylaws to indicate that ex officio members do not have voting rights, and finally, the closure of the Center.

In the Court's prior ruling, the Court denied the plaintiff's temporary restraining order application with respect to the voting rights issue based on a lack of irreparable harm. Here the plaintiffs have moved or the plaintiff has moved for summary judgment on the renaming issue and a preliminary injunction -- and for a preliminary injunction on the closure.

The defendants oppose the plaintiff's preliminary injunction request and have moved for summary judgment on all three issues, I believe.

Plaintiff has not cross-moved on the voting issue but has requested summary judgment in her favor on that issue if the Court agrees with the plaintiff that, as a matter of law, ex officio members may not be stripped of their voting rights.

So we have a number of issues to discuss, some of which overlap with issues raised in a companion case filed by a series of historic preservation organizations on which the Court will hear argument tomorrow.

All right. So with that, Mr. Eisen or Mr. Zelinksy -- so I -- just to show my cards a little bit. I have sort of organized the issues. Obviously, you know, standing, as always, comes first with respect to the three issues, and then the merits of renaming, voting, and closure. If you're going to be arguing closing, you're screwing up with my order.

MR. ZELINKSY: I apologize, Your Honor.

THE COURT: I can roll with the punches.

MR. ZELINKSY: I'm also the person doing voting and Article III standing, so it really might throw a curve ball for you, and I apologize for that.

So maybe, taking my cue from the Court, I think the best place to start might be, with the Court's indulgence, Article III standing.

THE COURT: Okay.

MR. ZELINKSY: And the government's standing theory boils down to the I think remarkable proposition that Congresswoman Beatty is similarly situated to a member of the public asserting a generalized grievance. Nothing could be further from the truth.

The congresswoman is a trustee charged by law with overseeing the center. She's one of a handful of similarly situated individuals with that unique legal obligation, and she -- hers is a quintessential particularized interest in the law. And I think there are three separate ways of looking or four separate ways of looking at the Article III standing issue, and we win on any of those four ways, and the government would have to run the table on all of them.

The first is to look at what the Supreme Court said in the majority opinion in the *Sprint* case and well as in *Thole*, which is that a trustee has standing to sue to protect the trust. And the majority directly addresses in that case the argument --

THE COURT: And is that under federal law, or was that under state law?

MR. ZELINKSY: Well, this is a question of Article III standing, and so what -- in *Sprint* they're addressing the question of does a trustee, if they have a cause of action, whether the cause of action is under state law and you're hearing it in a diversity jurisdiction, whether the

cause of action, as here, arises as a matter of federal law because of 20 USC 76*l*, which gives Congresswoman Beatty the rights and obligations of a trustee.

There's still a question, if you have that cause of action, of whether the case is one that is cognizable in an Article III court.

And so what the Court says in *Sprint*, they directly address -- Justice Breyer directly addresses the argument made in the context of an assignee or an assignor that my friends on the other side make, which is that there is no benefit that flowed in that case to the assignee. All the benefit flowed to the assignor; and, therefore, the assignee didn't have Article III standing. And the Court says, "No, that's wrong. There are circumstances in the law where the benefit will flow to the vehicle of the assignor." And the example the Court gives --

THE COURT: Counsel, I'm going to ask you just to slow down a little bit for the court reporter.

MR. ZELINKSY: You know, it's funny, Your Honor. I actually promised the court reporter that I wouldn't do that earlier, so I'm going to get in a little bit of trouble later. So I apologize.

What Justice Breyer says in his majority opinion is that argument's wrong. It's the very argument that my friends are making in this case, and the example he gives is

a trustee suing to protect a trust. And it will be a remarkable proposition if federal courts couldn't hear that type of case.

But that's only one way of skinning the standing cat, and there are at least three others.

One other way is to view the problem the way that Chief Justice Roberts did in dissent in *Sprint*. Both the majority and the dissent in *Sprint* agreed that trustees had standing to sue. What Chief Justice Roberts said in Footnote 2 of his *Sprint* dissent is the trustee has standing to sue because the trustee discharges a legal obligation and, by the way, happens to be the legal owner of the trust; and in discharging that obligation, a trustee receives a personal benefit that flows directly to the trustee. So that's yet another way --

THE COURT: Okay.

MR. ZELINKSY: -- of addressing this problem.

THE COURT: The government tells me that Ms. Beatty has discharged her obligation by voicing her dissent at least to the closure and to the voting rights issue.

MR. ZELINKSY: So, Your Honor, I think the --

THE COURT: Why, then, is she personally injured if presumably she will have no liability for violating her trust obligations because she has fulfilled them?

MR. ZELINKSY: Well, so there are a couple of

answers to that. I don't think it just turns on liability. I think the specter of potential liability is of course a potential reason for standing, but there is an obligation -- and actually my friends on the other side recognize this in the companion case you referenced, which you're hearing tomorrow, when they cite the *Dellinger* decision, and they say if the Court issues a preliminary injunction in that case, it will prevent the board from carrying out their duties.

One of the duties that Congressman Beatty is prevented from carrying out here is the duty to protect the trust. She has a duty, independent of coming into court, to make sure that this entity is a sole memorial to John F. Kennedy, and to nobody else, and that her trustees don't commit a serious breach of trust.

But the other thing is, all of the sources that they cite, they selectively quote, all of them confirm that a trustee has an obligation not merely to dissent but also to sue in court. And let me just give you one, which I think is sort of the clearest example of this.

If you look at *Bogert*, Section 584 of *Bogert* -- and we address this in our reply -- it says, "Even co-trustees who dissent have a duty to prevent their co-trustees from committing serious breaches of trust and to require a co-trustee who does commit a serious breach of

trust to redress the breach."

THE COURT: It seems a little concerning to me to imply that a trustee, in order to fulfill their duties, has to file a suit and can be subject to a lawsuit themselves if they don't go to court. Is it not enough just to voice your dissent?

MR. ZELINKSY: So, Your Honor, I'm not making it up. It's unfortunately trust law.

I mean, if you look at the Uniform Trust Code, they cite the D.C. Code's incorporation of the Uniform Trust Code Section 19-1307.03. They happen to cite (f).

If you look at (g)(2), which you cited in your TRO opinion, it says that a trustee shall, quote, compel a co-trustee to redress a serious breach of trust. And that's precisely what this lawsuit is.

And if you don't permit Congressman Beatty to sue here, the ramifications are extraordinary. It would prevent a co-trustee -- imagine the worst possible breach of fiduciary duty. Put the facts --

THE COURT: So one trustee embezzles from the trust, and the other trustee objects, but the embezzlement continues. And what else is there for the trustee to do besides file suit?

MR. ZELINKSY: Precisely. And we could probably spend all day coming up with equally concerning fact

patterns. And I will add this gets to the final point on why there's standing here, which is the point that you and I had a bit of a colloquy on on the TRO hearing, which is these suits have historically been heard by American courts, and what *Sprint* makes clear, what *TransUnion* makes clear, is that where there is a long history and tradition of these suits, we expect them to fall within the core heartland of cases or controversies for purposes of Article III.

And my friends on the other side don't really dispute that. I mean, we have marshalled everything from historic treatises to Justice Story to historic case law. And what that shows is that there is a long history and tradition of co-trustees entering into federal court -- or, I'm sorry, entering into court.

THE COURT: Okay. Any recent cases?

MR. ZELINKSY: Yes. We cited several recent cases, Your Honor. And I'll just give you one. There's a District Court case from 2023 that we cited out of Illinois. This is the *Marshall as Co-Trustee of 4-M River Farm v. Blunder*.

THE COURT: This is a trustee suing a co-trustee for breach of fiduciary duty?

MR. ZELINKSY: Yes.

THE COURT: What's the case?

MR. ZELINKSY: It's cited in our briefing, in our

opening brief, and I believe in our reply as well. It's *Marshall as Co-Trustee of 4-M River Farm v. Blunder*. It's 2023 Westlaw, and then there's a long cite, 7325935.

THE COURT: And so nothing in circuit. All out of circuit.

MR. ZELINKSY: I don't know if there's anything in circuit. Part of that may be, candidly, the circuit tends not to have a ton of commercial or sort of private cases, and it's a small circuit geographically. So to the extent there are charitable trusts, it's not a huge -- you know, I wouldn't take -- I don't take it as terribly surprising that there's not much in circuit case law there.

What I do think is highly instructive dicta is *Sprint* and *Thole*. I think *Sprint* and *Thole* put a heavy thumb on the scale of assuming that a trustee can come into federal court and sue to protect the trust. And it could potentially do all kinds of havoc to areas of federal law where there is a trust relationship. I'm just thinking of bankruptcy. Right?

One could imagine that if there's no standing, you could have all kinds of problems in those type of trust scenarios if you can't enter into federal court.

THE COURT: So just doctrinally, the organic statute vests the trustees with all of the standard obligations and duties of trustees, right? But it doesn't

say, like some trust statutes do, that the trustees can sue or be sued, right?

Are you asking me to infer or imply a cause of action, or is it your position that the cause of action is explicit because the standard duties of trustees under state law include the ability to sue co-trustees?

MR. ZELINKSY: I wouldn't put it potentially that way, but yes. And let me unpack it.

THE COURT: Yes to -- okay.

MR. ZELINKSY: So there is that phrase "all the usual obligations of a trustee," and it's got "all" and "usual." So Congress is calling out the whole body of trust law. And what the old soil canon says is where Congress has used a common law phrase like that, it sucks up into that phrase all of the meaning that's associated with it.

So this is not an implicit cause of action, it's an explicit one. Congress said, "All of the usual rights and obligations of a trustee," and so it is bringing in there this body of law.

And this is not some peripheral body of law. It's core. It's central. Because, as you pointed out, if you're a trustee, you have to protect the corpus of the trust. And if your co-trustee is embezzling, you've got to have the ability to go into court. That's sort of quintessential core, heartland stuff of what a trustee does.

So we view it as an old soil, and I will resist the suggestion it's an implied cause of action. It's express. It's express in that language.

And I would note where maybe I think there's just a touch of daylight with my friends. I don't think it ultimately makes a difference. But we view the task in front of the Court as interpreting that phrase, and so the question is: What does that phrase mean?

We're not here suing under a state law cause of action. We're suing under the federal statute, under that cause of action.

To interpret it, you can look to a variety of sources, because Congress, in incorporating that phrase, brings with it the body of law that Congress is calling out.

So I don't think you're just confined to looking to D.C. law. For what it's worth, I don't think it makes a difference because we think D.C. law tracks the restatement. And we went through this I think in the TRO decision -- in the TRO hearing. So we don't think there's much daylight, but just as a pure doctrinal matter, I think that's what's happening here.

THE COURT: On another point, your colleagues suggest that you are required under *TransUnion* not simply to identify an historically analogous cause of action but a historically analogous harm. Respond to that argument.

MR. ZELINKSY: So I think what -- I think the easiest response is to look at *Sprint* and the way the Court looks to the history of assigning/assignor actions in *Sprint*. What it says is there's a history of these types of disputes.

And our argument is, yes, there's a history here of these types of disputes. And it parses it a little finely to say that you have to show a harm to a renaming, like some comparable renaming case.

What we've shown is there's a bunch of cases where there has been harms to the corpus of a trust, and one trustee sues to protect the trust for the malfeasance of the other trustee. That's precisely what's happening here.

I think it slices the salami a little thin to start saying, Well, you've identified this body of case law within the heartland of Article III, but it's not close enough. That's not how the court treated it in *Sprint*, which I think is the closest analogous case.

THE COURT: Okay. Perhaps I should have started here, but as a procedural matter, it seems as if -- and correct me if I'm wrong -- most of your arguments about what injuries she suffered are in your briefs as opposed to a declaration or an affidavit. Is that an issue or not?

MR. ZELINKSY: I actually would disagree that they're not in the declarations and only --

THE COURT: They're in her declaration?

MR. ZELINKSY: Well, so as to voting for sure. Right? I mean, it's very clear we've presented evidence that she can't vote.

The complaint itself is verified so -- and there's a lot in the complaint where we allege the harms to her and then all of the harms we've identified that will occur to the trust, which we think are harms that she can stand in the shoes of the trust to assert.

THE COURT: Okay. The complaint is verified. I had forgotten that. Okay.

MR. ZELINKSY: Yes.

THE COURT: All right. What about closure?

MR. ZELINKSY: So, Your Honor, I think on closure, what this Court said in its TRO opinion is that it would sort of be preposterous if there was a one-year review and there was nothing to show for it. And the reality is that as a result of the TRO decision, which required the disclosure, it turned out that there was nothing that was done in that one-year period.

If you look at what the President said on February 1st, the President said, "A one-year review occurred with contractors, musical experts, art institutions, advisors, and consultants deciding between construction, closure, and partial reopening." None of that occurred.

Now, we think that's the easiest way for you to rule on the preliminary injunction.

THE COURT: Well, let's stick with standing --

MR. ZELINKSY: Uh-huh.

THE COURT: -- on the closure, and your briefing is a little confusing on this point.

Is the injury you are asserting the closure itself, or is it the purportedly deficient process surrounding the board vote on closure?

MR. ZELINKSY: So --

THE COURT: And if it is the former, how is that injury particular to Ms. Beatty as opposed to the general public?

And if it's the latter, in other words, the process of the board vote, then how is the remedy that you are seeking, which is an injunction against the closure, I think, not a mismatch with that injury?

MR. ZELINKSY: So I want to put aside -- those voting issues to one side because that's actually not the harm that we're asserting and linking when it comes to closure.

When we are talking about proceed --

THE COURT: I mean, not the voting rights issue --

MR. ZELINKSY: Yes.

THE COURT: -- but the vote to close.

MR. ZELINKSY: The vote to close.

I think that the argument is that the trustees are violating their duties of prudence, their basic fiduciary obligations to consider whether the closure is warranted. They're doing this in a rushed, hurried manner with no analysis.

THE COURT: And so if I agree with you --

MR. ZELINKSY: Uh-huh.

THE COURT: -- just assuming for the sake of argument, isn't the remedy for that a revoked or a new process?

MR. ZELINKSY: Well, so the problem is the process. The preliminary injunction is just to preserve the status quo and to prevent further harms. The harm here is closing the center without even considering what will occur. Right? No prudent board in this similar circumstance would do it this way.

THE COURT: Well, let me say it differently. Wouldn't the remedy be a preliminary injunction against closure absent a vote at which the board members were provided sufficient information and analysis to discharge their fiduciary duty?

MR. ZELINKSY: Yes, I think -- but I think what is important to note is that that's not something they can just manufacture in the way they've attempted to do here, sort of

post hoc with a one-page declaration from Mr. Floca.

As we've provided to the Court an extraordinary amount -- and I know I'm slipping to the merits here, but with your indulgence, because I think it answers the question about the precise nature of the remedy.

We have provided the declaration of Deborah Borda, who is the former President of the New York Philharmonic. We've provided Andrew Borenstein, who is -- Andrew Taylor, who is a professor at American University; Josh Borenstein, who is a professor at Yale. They talk at length about the extraordinary amount of care and attention and analysis that would go into this. This is not something where they can snap their fingers tomorrow and manufacture it.

So I think that -- I don't disagree with you that that is purely as to the lack of analysis.

There are, by the way, three other reasons why there is -- we think you should provide the preliminary injunction. I think the easiest route is to rule for us in the preliminary injunction and just halt the closure and prevent those harms from occurring.

And, again, we're just here on the preliminary injunction to try to stop the bleeding. It's not the permanent injunction. It's not saying everything they can do. It's simply we just have to show a likely success on the merits to say there's a lot of harm occurring right now,

stanch the bleeding.

But we think there are three other reasons that we think ultimately we should prevail in this case and that I don't think you need to address if you narrowly decide this on the PI just on the deficient failure to do any analysis. Right? But there are three other reasons why I think we should prevail.

The first is, this is plainly pretextual. So one of the things that a trustee cannot do, right, is they can't prioritize their own self-interest over the trust. Hiding embarrassment, for example. Shutting the center down because after the renaming patrons have fled, and things like that, is a quintessential breach of fiduciary duty. We think that's something you don't need to get into as much if you agree with us on that first reason to grant the preliminary injunction.

But I think that is yet another reason, and I'm not sure that is necessarily so easily cured. I don't think the first issue is so easily cured either, because to do that analysis is a lengthy, multiyear-long process.

And then you have two other arguments that I think you would have to run through as well if you don't rule on that first ground or the second ground.

The first is that you have the NCPC and other environmental reviews, the Commission on Fine Arts, the 106

reviews, all of which I think you may be talking about at greater length tomorrow. All of that is also a reason that we are likely to succeed on the merits.

And then on top of that you have our statutory argument. And our statutory argument is where it is possible -- and this is the bare minimum of the statutory argument. Where it is possible to do the renovation, which has been the plan for years, and to keep the center open, you have these two mandatory statutory duties. You cannot say I'm going to prioritize one statutory duty that's mandatory, which is to do renovations, at the entire expense of the other mandatory statutory duty. And by the way -- and this gets to our first reason for ruling for us -- they didn't even consider that mandatory statutory duty.

So to your point as to what I think the order says, I think the order's just to stop the bleeding right now. I think you don't have to get into what a permanent injunction looks like, but I think we are likely to succeed on any of those four bases. I do think the easiest route might be to rule on the first one, but I think that for the government to prevail at the PI stage, they would have to run the table on all four of those where we only have to show a likelihood of success on the merits.

THE COURT: Okay. All right. You've previewed your merits arguments. Do you want to now make them, or are

we going to switch now to Mr. Eisen or --

MR. ZELINKSY: Well, Your Honor, I'm at the Court's disposure [sic]. I think that we view this as a pretty shocking but -- record. You know, we have experts from academia, from, you know, practitioners, and I would add also the declaration from Mr. Williams, all of which say that this is not how a prudent board operates.

A prudent board would do an extraordinary amount of analysis. You would have things like independent cost analysis. You would have consulted. And I think the President's own Tweet is sort of an admission of this, that they should have done all of those things. That's why they said it on February 1st.

THE COURT: Well, I mean, it seems to me that to a large degree the merits turn on the factual question of what the scope of work is. Right?

You have continued to say that the plan is very likely demolition, you know, like the East Wing. But this is a very different set of facts based on the evidence that the government has submitted.

MR. ZELINKSY: So I actually --

THE COURT: Let me finish. Right?

You know, we have a specific congressional authorization of $257 million for specific purposes. We have a board-approved capital improvement plan, which is

thin on details, I will submit or agree, but is roughly consistent with the scope of the congressional appropriation in terms of dollars and in terms of the scope of work and the specifics of the work. And on top of that, we have sworn declarations from a person in a position to know saying that there will be no rebuilding, there will be no stripping down to the steel, you know, there will be no construction of new structures, et cetera, et cetera.

On the other side of the coin, we have, you know, the Truth Social posts. We have the -- you know, an ABC News article where the President says he's going to -- you know, some of the steel will be exposed. You know, you, you know, accuse or suggest that, you know, other statements made by him are -- that he has dissembled in other areas, but you want me to believe that.

And so, you know, the question is: What is the plaintiff's current position as to what the scope of the project is?

MR. ZELINKSY: So, Your Honor, I hate to fight the hypo --

THE COURT: Okay.

MR. ZELINKSY: -- but I want to answer your question. But I actually think that if this is just the planned renovation of what has been planned for years, and in that plan for years the plan was always to keep the

center open, and they have never considered even the extraordinary harms that flow from shuttering the center, those are harms to the, you know, good will to the center, breaking the relationship with donors, violating those mandatory statutory duties, we prevail.

So I actually don't think for us to prevail you have to agree that the scope of work here might be demolition. I will add, part of the reason it's still ambiguous what the scope of the work here is because they haven't done that process.

But I want to just be very clear. I think that you may -- it may be that the case tomorrow is more about that sort of scope-of-work question. Today I think we are 100 percent on -- right on the merits if all they're planning to do is renovation.

And Congress didn't authorize that they would shut down. In fact, if you look -- and this is in the Taylor declaration, which is in 13-20. In the Taylor declaration he explains that they submitted to Congress a budget proposal; and in that budget proposal, it says the center is going to remain open.

So Congress didn't authorize that this center would close. For years the plan had been -- up until February 1st the plan had been to do phased renovations, and then all of a sudden you get an about-face with absolutely

no analysis.

And what every expert in front of you is saying, and this is totally uncontrovertible -- uncontroverted in the record, what Deborah Borda says, what Andrew Taylor says, this is the exact opposite. A board does everything it can -- a performing arts institution, a board of performing arts institution does everything it can not to close. It does the exact type of phased renovation that had been planned for years.

So you don't have to find -- to rule on the preliminary injunction, you don't have to find that they're going to knock the thing down. All you have to find is they didn't even consider the extraordinary harms that will occur here, and there aren't the basic things you would expect.

Andrew Taylor's declaration, Deborah Borda's declaration go into this in extraordinary detail. Things like independent cost analyses. You would have much more detailed plans. You would have the things that President Trump articulated in his Truth Social post, none of which occurred. I think it's shocking that they came forward with not a single shred of evidence. Instead they have four stale reports that actually contemplate doing this in a phased approach and keeping the center open.

So the lack of any meaningful analysis is breathtaking, and it suggests that this is a monumental

breach of fiduciary duty.

THE COURT: Okay.

MR. ZELINKSY: That's part of why I think there's a very strong argument here for pretext, because this is a strong deviation from normal process, which is indicative of an ulterior motive.

But you again don't need to go that far. All you need to find is this is a situation where they haven't done the bare minimum expected of a trustee in comparable circumstances.

THE COURT: So obviously the organic statute contains twin obligations. Right? You have emphasized the obligation to present performances and to maintain the center as a living memorial to the President.

The government has emphasized the opposing or the second obligation, which is to maintain the center and repair it up to an acceptable standard as laid out in the statute.

I mean, it seems to me that it can't be that the center could never close under any obligation -- under any circumstances in order to fulfill the first, and it closed during COVID. You know, if there were an earthquake or a disaster or if the need for renovations were so great that it was impossible to remain open, then one of those obligations would have to give way to the other. Okay?

And so if you accept that premise, then it becomes, you know, an exercise in line drawing. You know, can it close for two weeks? Can it close for a season? Can it close for the summer while the air conditioner is being repaired?

And once we get into that area, you're asking the Court, arguably, to, you know, micromanage the Kennedy Center's, you know, construction projects, which obviously I'm not in a position to do, and it's not my role to do.

So, you know, obviously the board is under some obligation to balance those. But that's a different question as to whether the obligation that you've emphasized always has to trump the other.

MR. ZELINKSY: So, Your Honor, let me answer that. And I want to be very clear. We're not asking you to micromanage the center. We're not asking for the kind of quotidian grievance, to quote your TRO opinion, that a Court shouldn't be in the position of adjudicating.

We think the facts of this case show an extraordinary breach of trust that is, again, breathtaking. The board didn't do the bare minimum. It didn't even consider here can we do these competing obligations, which had been the plan up until February 1st.

And so to your point --

THE COURT: And I would add to what I said even

though it's not in the statute, but it seems to me that any board of trustees has to manage or has to consider the financial implications of both, and so -- you know, even if your pretextual hypothesis is correct. I mean, if, in fact, you know, over the next two years the Kennedy Center would not be taking in any revenues because of the losses of sponsorships and donations and performance artists, you know, why wouldn't the center be able to take that into effect and say, you know, "Why don't we retool? Why don't we restructure the way we do things, and in the meantime get all these necessary repairs done?" Why wouldn't that be -- you might disagree about that. I might disagree about that. But why wouldn't that be a prudent way for a board to proceed?

MR. ZELINKSY: So I want to answer the statutory question, which I think is at the heart of this, but I want to add the first reason we gave for the preliminary injunction is none of that analysis occurred here. Not a single lick of that analysis.

And, in fact, I think Mr. Floca's talking points are incredibly indicative because he doesn't consider -- he says, "I'm worried about hidden costs." He never considers the extraordinary costs of closure. And, in fact, all of the evidence in front of you from people like Professor Borenstein at Yale, Professor Taylor at American, and

Deborah Borda, who is the former President of the New York Philharmonic, is that this will do incredible fiscal harm to the center.

Among other things, it breaks the link between the center's audiences and the center. It breaks the link between donors and the center, which are very difficult to -- that's the kind of good will that's incredibly hard to get back. Deborah Borda talks about the fights over the leisure dollar; and once you lose your audiences, it's very hard to bring them back. None of that was considered.

I don't think you need to get into any of the statutory questions about sort of the competing mandatory duties if you just rule on the procedural neutral issue at the beginning, which is: They didn't consider any of this. None of this was evaluated. And, again, if we're talking about a multispace performing venue, you would expect any board in any comparable circumstance to at least think: What are the real fiscal implications? That's why you would have things like independent cost analyses that Professor Taylor talks about. None of that was done here.

So I think the easiest route for you on a preliminary injunction is actually that answer right there.

But as to the statutory argument, which I think is sort of farther down the decision tree because we think there are those four reasons you should grant the

preliminary injunction, but farther down the decision tree is, okay, let's say the board actually does that analysis. Let's say they get the experts in the room. The Truth Social post was actually correct; there was a one-year review. There were serious outside consultants, and they all come together and say: Hey, the best way forward is to do this. Then I think that if there is no impossibility -- I think COVID -- an analogy might be contract law. Right? In contract law, we have doctrines like legal impossibility that give you an out, and you actually can't do something.

THE COURT: Force majeure.

MR. ZELINKSY: Yes. Where it's not impossible, where you can -- you have these two competing statutory duties, then you have to do everything you can to fulfill them. And my friends on the other side don't dispute that these two duties can be reconciled. Mr. Floca's talking points actually contemplate, he says, "Yeah, we can do a phased renovation. We just don't want to for these reasons."

And so our argument would be that that's a circumstance where you actually have to go and get congressional authorization. And there are members of Congress on this board, so it shouldn't be terribly difficult, if you really need to go to Congress. Because you say it might be prudent, but we don't have the statutory

authorization, there's an easy mechanism, which is you go to Congress, and you get that statutory authorization.

And Congress has been incredibly active when it comes to the Kennedy Center in terms of authorizing things the center needs. It's authorized not just the renovations here, which it did under the assumption that those renovations would be part of a phased approach, but Congress also authorized the REACH expansion. It authorizes something as small as a photovoltaic system on the roof. It authorizes the parking garage. And we went through all of these in our briefing.

So the solution, if you have these two competing duties, you can do them both and you want to be freed from one, the solution is to go to Congress.

THE COURT: Just to be clear, the standard that I would have to apply to the question of whether the board violated their fiduciary duties is one of abuse of discretion, correct?

And so your framing would be it was an abuse of discretion or a dereliction of duty to vote for the closure based on the information that was presented to it.

MR. ZELINKSY: Or it carried out the closure. I don't think it's just the voting. I think it's the actual efforts to carry it out. I mean, they're laying off staff as we speak. They're going to cancel performances.

THE COURT: Well, the trustees aren't doing that, but the trustees enabled it.

MR. ZELINKSY: They're directing -- they're directing their employees. And one of the defendants here is Mr. Floca in his official capacity, so they are directing that to occur.

And, again, our -- one analogy that might be helpful, Your Honor -- and I don't think we're trying to suggest this is an agency case at all, but one analogy that might just illustrate why we think we have a very strong argument on the likelihood of success on that first reason for winning, which is that they didn't even do the bare minimum analysis that you'd expect of a trustee, one way to think about this is as an analogy to an agency case.

If you had an agency in front of you that didn't consider anything -- it just promulgated a rule; it didn't consider any of the comments, any of the competing variables; it didn't do any analysis -- it would be clearly arbitrary. And you wouldn't have to get to the statutory questions about whether they have the power to do it or whether it was a prudent decision, a reasonable decision. You would just say they didn't consider anything.

And that's where we are. And so that's why we think we have that very strong reason for winning on that ground.

There then are those -- I don't want to be sort of overstaying my welcome at the podium, but there are those three other grounds that I think you have to run through if you disagree with us on that point, and those are the pretext points, the statutory structure point, and the environmental renewal arguments.

THE COURT: Okay. The statutory structure, you say, is that the provision that says there shall be no changes in the management or operation of the grounds?

MR. ZELINKSY: So I think that's a --

THE COURT: Is that the provision you're hanging your hat on?

MR. ZELINKSY: No. I'm hanging on -- I think that's a very helpful provision for us so I don't want to disclaim it, so we agree that that is a reason why there has to be expressed congressional authorization, because by shutting the center down and preventing people from accessing it, they're going to change the operation of the grounds.

But I think our argument that we were talking about earlier, what I referenced as statutory structure, are these multiple competing duties where you have two shalls, shall conduct renovations, shall do performances. How do you recognize those two when both are possible?

THE COURT: And so this will be under your *ultra*

*vires* cause of action?

MR. ZELINKSY: I disagree, Your Honor. I think this is under a -- I think all of this can fit under that breach cause of action under 20 USC 76*l*. The *ultra vires* cause of action is a belts-and-suspenders approach. That's the only reason we brought it. So I think you can do everything here under 20 USC 76*l*.

I think if you disagree with us on the cause of action point, that's when you get to *ultra vires*, but I don't think you have to get there if you agree with us on the cause of action.

THE COURT: Okay.

All right. I think the -- most of my remaining questions relate to the external regulatory approvals, which I think I will focus more on tomorrow.

MR. ZELINKSY: Okay. Your Honor, and do you have any questions on voting before I hand it over to my friend and colleague?

THE COURT: I guess the only question is to respond to the government's argument that, you know, we made the point in the TRO decision that there were examples of nonprofit federal boards where the ex officio members were not given the right to vote. The government has now pointed out examples where the statute explicitly gives the ex officio members the right to vote.

What am I to make of that?

MR. ZELINKSY: So I believe in those circumstances those are areas where the law is distinguishing between ex officios who cannot vote and those who can. And so there might be a board -- and I think we identified this in our reply -- where you have situations where the statute will say something like, here's Category A of ex officios, here's Category B. Category A is voting. Category B is not.

What that is is actually a pretty strong indication that when Congress wants to identify who can't vote and who can among the board, it says so.

And one thing --

THE COURT: But I think the point of our TRO ruling was that the fact that Congress has specified that ex officio members cannot vote in some circumstances is support for the proposition that there's a background presumption of voting. But if there's a counterexample, then that may not be the case.

MR. ZELINKSY: Well, I actually don't think so, Your Honor, for the following reason. I think I actually agree -- first off, I think my friends on the other side agree that there is this background principle of voting because when the center starts, when it's first created and it has ex officios, we just imagine a scenario where Congress creates a new board. I think everyone would say,

okay, the assumption is everyone can vote.

Their argument only works -- they only prevail if there's some kind of implied delegation in the words about organization and procedure to rewrite the statute, and we don't think there is.

So I don't actually take them to be disagreeing with the background principles which are rooted in trust law.

To your question specifically, I think in those scenarios where there is a statute, and Congress has called out some members for not voting, and there are other ex officios, Congress may want to, for the avoidance of any ambiguity, say, "And these too can vote." I don't think that that at all detracts from the general point that Congress put members of Congress onto the Kennedy Center's board to conduct oversight.

And it would be very surprising if there's an implied delegation to basically strip the board down, and you used this in the TRO opinion, under their theory, you could strip it down to nobody and rob it of a quorum. You could strip it down to 12. You could start divvying up the general trustees who are appointed by the President and saying there's a Class A and Class B. There's nothing in the statute that suggests Congress wanted to do that.

I would also note the narrative of my friends on

the other side started out as, "Well, we were just codifying past practice." And that's just totally wrong. We've given you two pieces of evidence of that.

The first piece of evidence is the declaration of the former president of the center from the '90s to the early 2000s who says ex officios vote. And then we also gave you the 990s in which the center itself, like, just a few years ago was saying we have trustees all of whom vote.

THE COURT: Okay. That raises a good question. If the government's moving for summary judgment on the voting, you have requested summary judgment if we agree with you as a matter of law. All that assumes that the factual dispute about historical practices is beside the point because there is a dispute. And so do you agree that the historical practice is beside the point for purposes of just interpreting the statute?

MR. ZELINKSY: I think that it goes a very long way toward dispelling the narrative of what was occurring there, and I don't think it should -- and I know I may be dodging the question. I don't want to dodge it. I want to answer it. But I want to just underscore, it shouldn't give the Court any heartburn to say that these ex officios have the right to vote because that's the way the center has operated recently and in the past.

THE COURT: But there's a dispute on that. I

mean, the question is, is there a, you know, material factual dispute on the voting question in light of the divergence of opinion on the historic practice?

MR. ZELINKSY: And to the extent that the Court deems that relevant, then I think that would prevent summary judgment. What I will --

THE COURT: I'm asking you, is it relevant?

MR. ZELINKSY: Well, I think --

THE COURT: You're now seeking summary judgment, so it's irrelevant?

MR. ZELINKSY: I think if you think that there is some ambiguity in the statute, then potentially that could be resolved, but I'm even hesitant to say that because, in a post-*Chevron* world, right, we just look at the law, and we decide what the best answer is.

There are situations where settled practice can liquidate meaning. I think in this area it's pretty clear, given the law and the structure, that we should prevail, but I don't want to disclaim that if you disagree, and you're looking at this, and you say, "No, I've got to know what the historical practice was," that there shouldn't be a little bit of discovery on the historical practice.

I would push back, if I could, with your indulgence, just a little bit on the notion that my friends have come forward with facts to rebut the facts that we've

brought forward. They actually haven't brought any facts forward. As you noted in the TRO opinion, if there were real records as to this practice, they're all in the control of the defendants. One would expect the defendants to come forward with them.

They haven't done that. Instead, they submitted two declarations in front of you, neither of which I think as a matter of law even rise to the level, right, that -- in summary judgment there is the old adage that you can't sort of stop summary judgment with a mere scintilla. They haven't even risen to the mere scintilla because they've got two declarations.

One declaration is from somebody who wasn't even at the center until after they changed the voting rules. And the other, which I think you explained in your TRO opinion, is by somebody who doesn't even say concretely ex officios couldn't vote. He just says, "I don't remember voting."

THE COURT: All right.

MR. ZELINKSY: So I don't think they've even brought forward -- if you think the facts matter --

THE COURT: Okay.

MR. ZELINKSY: -- I don't even think they've brought forward facts to defeat our assertion, which I think is very well documented, that ex officios always voted.

THE COURT: Okay. Thank you.

MR. ZELINKSY: Thank you, Your Honor.

THE COURT: All right. Mr. Eisen. I hope you don't plan on reading all those documents you brought with you.

MR. EISEN: No, Your Honor, it's this skinny document.

In terms of summary judgment on the naming, we think that that turns on the clear meaning of the governing act which you can find in Title 20, Chapter 3, Subchapter 520 USC 76*h*, et seq. And if you look at the statutory text, the statutory structure, and the statutory purpose, the Congress chose to name this the John F. Kennedy Center For The Performing Arts. And affixing the name of another president to the facade and otherwise renaming the center --

THE COURT: Okay. Let me stop you there. I don't know if you noticed it, but there was a reference in the footnote of the government's reply brief suggesting -- perhaps suggesting that the actual name is the National Center of Performing Arts, which is what it was named in the original statute in 1958.

What do you make of that?

MR. EISEN: Your Honor, 76*i*(a) very clearly states that this is a building to be designated as the John F. Kennedy Center For The Performing Arts. And if I may, I

actually -- I counted, and there are over 40 references in the organic statute to the John F. Kennedy Center For The Performing Arts.

I will not -- mindful of the Court's aversion to my pile of paper, I will not go through all of them. But with the Court's permission, I do have a summary sheet of those provisions. I'll give a copy to my friend and a copy to the Court.

Your Honor, I think looking at the express text, structure, and purpose answers the question raised in that footnote and the question that the Court has directed to me. It really starts and centers on the designation in 76*i*.

If you jump up above that to 76*b*(a)(1), you have the language about the living memorial to JFK. And this is one of those 40-plus places where they named the board "The Trustees of the John F. Kennedy Center For The Performing Arts."

If you look in the middle of the second column, it's the sole national memorial to the late John Fitzgerald Kennedy. The exclusion in 76*j*(b) provides that there shall be no additional memorials or plaques in the nature of memorials in the public areas of the John F. Kennedy Center For The Performing Arts.

In the expansion project, that's 76*i*(c)(3), and also in the building of the plaza, that's 76*q*-1(c)(4), no

private contributions are to be acknowledged on the exterior of those projects.

I'm almost done. I won't go through all of it, Your Honor.

The 76*a*-2(e) is important because the interior spaces are to be operated in a manner consistent with other national presidential memorials. If you look at the statute that was enacted in 1964, that's statutory in the "whereas" clauses, which are at the very bottom. The statute also makes clear it's dedicated to the memory of John F. Kennedy and is to be named in his honor. And I could keep going.

The bottom line is Congress named this center the John F. Kennedy Center For The Performing Arts to honor that slain president; and to change the name flouts the express memorial text, structure, and purpose that you see in these provisions and that are in the others.

THE COURT: Okay. Notwithstanding the footnote I mentioned, the government's position is that the new name is simply a secondary name or perhaps even a nickname akin to Fannie Mae or Ginny Mac, or some other agency like that.

Feel free to respond.

MR. EISEN: Your Honor, I will respond to that. I'll note that I have three other reasons besides the text, structure, and purpose, but I'll come back to those.

So I think the government's claim that the center

maintains its designation as the John F. Kennedy Center For The Performing Arts -- and this is simply a secondary claim -- is a brazen -- a secondary name is brazen and wrong. It's not a secondary name. It's a primary name. They've added the new name above "John F. Kennedy."

But more than that, if you look at their examples, I mean, they point out that the CFPB is called the BCFP in the statute. Your Honor, we wouldn't be here if this was an argument about whether or not you could call it the KCPA or some such thing. It's just the transposition of two letters.

Fannie Mae is nothing more than an acronym. You don't have that attack on the express text, purpose, and structure of the statute.

They point to the REACH at the Kennedy Center, but, Your Honor, I would -- that's simply a location at the Kennedy Center. I would not be objecting here if they had talked to the Court about the bathroom at the Kennedy Center or the gift shop at the Kennedy Center. Those are locations.

The only remotely relevant similar renaming anywhere that they point to in their papers is the Department of War. And whatever you may think of that controversial and contested and some say bizarre renaming, that is not this.

The Department of Defense is not a presidential memorial. It doesn't have any of that same express text, structure, and purpose to honor and remember a slain president.

Here what's happening is the combination of two different presidents, and remember that provision that I pointed you to, 76*j*(a)(2)(E), that the center is to be operated as a presidential memorial and in a manner consistent with other national presidential memorials.

We don't have the George Bush and George Washington Monument. We don't have the Andrew Johnson and Abraham Lincoln Memorial or Lee and Grant's Tomb.

So it's made worse because this is not only the national memorial, it's the sole national memorial, so that highlights it. So I think that those inapplicable examples only highlight the weakness of the government's position here.

THE COURT: Okay. In addition to contesting that this was a name change, the government's position is that this is also not a memorial to the current president. What is in the record that would indicate that the name is meant to memorialize or commemorate past actions by the current president as opposed to just his present service as President?

MR. EISEN: Your Honor, there's three examples in

the record that show that the defendants' claim that that language over in 76*j*(b) about memorials doesn't apply to living people. It only applies to -- it's an exclusion that only applies to dead people. That's exploded, by the way, in the record that the government has talked about this.

For example, the defendants' press secretary says that the name change was voted. They voted to rename, quote, because of the unbelievable work President Trump has done over the past year.

If you look in their briefs, they talk about -- they say the reason "memorial" has the meaning that they claim is because it's to remember a person or past impressions.

Well, over the past year, that's a past impression. That's in the complaint at Paragraph 32. Exhibit HH of ECF-30.7 also talks about the work President Trump has done over the past year. And then in that same footnote you have Exhibit MM, "The vote recognizes that the current chairman saved the institution." All of those are past impressions that explode this idea that they're advancing of the meaning of a memorial.

I think if you look at 76*j*(b) in context with the exclusions, the much more reasonable reading, particularly when you take into account "in the nature" -- right? They're not just saying "memorials" there. Congress has

instructed "in the nature." The much more reasonable reading is they're talking about naming to honor someone, something, some entity, and that's why you get those three exclusions; naming to honor a foreign country, a plaque on a chair or theater box acknowledging the gift. Typically patrons go to the center. They like to make those gifts. Inscriptions on the walls.

So it's an entirely implausible reading. It leads to the consequence. If it's truly limited, as they say, you could call it the Tesla John F. Kennedy Center For The Performing Arts. It makes no sense at all.

THE COURT: All right. Let's wrap it up.

MR. EISEN: Your Honor, we think that Congress has clearly instructed in the text, structure, and purpose that this center is named for John F. Kennedy, and that the deviation from that offends not only the statute but because it is the clear directive of Congress's Article 1. And for that reason we seek summary judgment and the denial of the defendants' summary judgment.

THE COURT: Thank you.

MR. EISEN: And, Your Honor, just with respect to the footnote question, if you look at Section 2 of Public Law 260, the text provides that any designation or reference to the national cultural center in any other law, et cetera, et cetera, shall be held to designate or refer to the center

as the John F. Kennedy Center For The Performing Arts. So that's on point.

THE COURT: Okay.

MR. EISEN: Thank you.

THE COURT: Thank you. Okay.

MR. MAYERS: Good morning, Your Honor.

THE COURT: Good morning. And it's Mayers or Meyers?

MR. MAYERS: Mayers.

THE COURT: Mayers, okay. Nice to meet you.

MR. MAYERS: I get a lot of Oscar-Meyer jokes.

THE COURT: It's all good.

MR. MAYERS: Do you have a preference as to how we go through the issues?

THE COURT: Let's start with standing.

MR. MAYERS: Okay.

THE COURT: And then we can address the merits issues in whichever order you'd like.

MR. MAYERS: So I think plaintiffs agree that there's no controlling case that speaks to the specifics. We have the dicta from *Thole* and *Sprint*, which speak to the private trust context, and then we have a score of, you know, the older common law cases that Your Honor discussed.

THE COURT: Right.

MR. MAYERS: So I think we need to look at this

through, you know, the *TransUnion* framework and the framework from the recent Supreme Court cases.

THE COURT: Okay. So no recent in-circuit cases that the Court can use to guide it?

MR. MAYERS: There's a case, *Mount Vernon*, a D.C. Circuit case -- I believe it's in our reply -- that speaks to the Attorney General having the ability to enforce a charitable trust, and so that is -- there are a few different theories of injury.

So the first is the inability to kind of fulfill this statutory obligation, and that, for example, is spoken to in Footnote 2 in Chief Justice Roberts's dissent. But if you look at the chief's dissent in that footnote, he's speaking in the private trust context where the trustee has a legal interest, a property right, and is suing to vindicate that, so you have the depletion of assets cases.

And that's more of, you know, an ordinary case that the Court -- you know, the Court would see in federal court, where there's some property interest and a private right at play, and the trustee is suing on that basis. Whereas here the Congresswoman is proceeding in a representational capacity on behalf of the public.

So *Bogert* speaks of that I think in Section 413 about how a trustee is appearing in a representational capacity. And so in suing to vindicate the public interest

in that way, it's our position that that is the job, as *TransUnion* says, of the Executive Branch and not of any one individual.

And on the other theory of harm --

THE COURT: Because the representational injury is not -- there's no historical analog to a harm like a denial of representational or a violation of a representational interest in a trust.

MR. MAYERS: Your Honor, we haven't seen one. They haven't put one forth.

THE COURT: I'm just trying to restate your argument slightly.

MR. MAYERS: So to put it maybe more, you know, cleaner is our position would be that when -- you know, in a charitable trustee -- in a trust like this -- there are charitable trustees with a more limited scope of beneficiaries. When it's one, you know, the beneficiary group is essentially the American public. We think, you know, the case like *TransUnion* and other recent cases talk about when -- suing to vindicate that, but a public's interest in something is reserved for Article II.

THE COURT: So I was going to ask you to respond to the hypothetical of, you know, a two-trustee trust. One is embezzling from the trust. The other objects to it. Can't do anything about it and so sues to enforce the trust.

Your position would be that that may -- that plaintiff may well have standing, but that is not this case because the interest would be on behalf of the American people, even if the American people are losing the money that is being embezzled?

MR. MAYERS: Yes, Your Honor, we think there is a difference. So the *Marshall* case they point to from the Northern District of Illinois and also the *Sprint* and *Thole* cases we discussed are all in those, you know, asset depletion cases where the trustee would have this, you know, property interest, this legal right. That's a much more normal injury that Your Honor would see quite often.

And I think the embezzlement example I think would also get to kind of the second theory of injury, which is this idea that if the congresswoman can't come into federal court, that she would be, you know, subject to a potential suit. A few responses to that, Your Honor.

First, it's speculative. They're seeking an injunction that this shows some sort of imminent injury that would befall the congresswoman unless she gets this injunction. So the theory of liability to us is speculative, one.

And also, as to how it is redressed. I think Your Honor asked, you know, why is it -- why is she still subject to that? And we, you know, agree with them that the

restatements and so forth mention, you know, a way potentially to, you know, extinguish liability is to, you know, file a lawsuit. Those don't point to satisfying -- we don't think those satisfy Article III on their own.

You know, as Your Honor discussed, there's the existence of the cause of action. Right? *TransUnion* says that's not enough. And so she needs that harm. She needs that piece of it to sue, and we just think that's speculative here.

We also think that if the theory is she must sue to extinguish her liability, then we don't know why she would be entitled to anything more. Right? By function of, you know, coming to federal court and opposing in that way, we think that's intention with the idea that standing needs to remain throughout the case or the case needs to remain justiciable all the way through. Because if the idea is you have to file a lawsuit or else I'm going to be potentially sued, well, the congresswoman filed a lawsuit.

So we don't think the theory of redressability, as Your Honor discussed, necessarily matches up with the theory of injury.

Unless Your Honor has any --

THE COURT: So she's able to sue under that theory, but not to recover?

MR. MAYERS: Well, we would still contest that she

is able to sue. We still think that the injury is speculative.

Your Honor asked about, you know, potential liability that she would face. I don't think there was any evidence in the record that such a suit is imminent, so we still think, on the imminence and concreteness aspects of the injury and fact analysis, that the case is lacking. But we would argue that even if that is her theory of injury, we don't think it would entitle her to the relief that she is seeking.

So, Your Honor, unless you have any further questions, I'll move to closure I think is the best place to -- temporary closure is the best place to start.

THE COURT: Okay.

MR. MAYERS: On the merits here, I'll address the trust law claims, I think, because those fail on the merits. So do the *ultra vires* and mandamus claims. And as plaintiff recognizes, given the existence of the *Dong v. Smithsonian* case, plaintiffs recognize that that would prevent, you know, absent D.C. Circuit reconsideration of that precedent, the APA action. We think that's so.

So on the temporary closure, the need for the renovations at the Kennedy Center are well documented. We think that Mr. Floca's declarations and the papers on that front, the comprehensibility plans, detail the, you know,

state of disrepair that the center is currently in.

And, you know, the congresswoman agrees with that. Read her statement at the March board meeting, and she says, "I don't contest that those repairs are needed and that the damage is significant."

Instead, the challenge is both on the law and on the process.

THE COURT: Let's talk briefly about the scope of work. And I guess the question -- and we may get into this tomorrow a little more, but why doesn't the President's statements, earlier statements about, you know, "the steel will be exposed" and "it will be a complete rebuilding" at least create a question of fact as to what the scope of the work is?

MR. MAYERS: Your Honor, I don't want to speculate as to what the President said. All I can say is as to what's in the record.

THE COURT: He said what he said. You can --

MR. MAYERS: Yes. I think what I can speak to is what Mr. Floca speaks to in his declaration, his three declarations. In all -- none of those contemplate the rebuilding that plaintiff thinks is, you know, contemplated or possible. I think Mr. Floca is quite clear. And Your Honor, again, as you referenced, will hear from him tomorrow as to the nature of the planned restoration and renovation

project.

THE COURT: Okay. But he does say that there will be a, quote, demolition and reconfiguration of structures inside the building, the concert hall stage, perhaps seats within a number of the halls and theaters; a, quote, excavation of the top of the center to address water intrusion; quote, tearing up the entrance to the hall of states.

So this is not just all internal renovation and repair. There is some structural demolition and reconstruction that will have to be done. Fair enough?

MR. MAYERS: Correct, Your Honor. There are significant structural issues that Mr. Floca speaks to.

THE COURT: Yes.

MR. MAYERS: For example, as I believe he explained in his declaration, there is the soffits, which overhang the walkways outside. Those are failing. And to remediate them, perhaps there will be some steel exposed or the entrance, as Mr. Floca talks about, to the Hall of States and the Hall of Nations, the service tunnel that runs underneath it is full of rotting concrete, rusting steel, and so those would need to be significant renovation and restoration projects. And I think that actually supports the board's decision here.

And the main entrances, as Mr. Floca says, to both

halls will need to be cordoned off because of the top down, you know, nature of the concrete project, the remediation projects that are necessary.

So yes, Your Honor, we agree that those structural repairs are needed and needed imminently.

So as to the two challenges, I heard from my friend on the other side, one is on the statutes, and one is on the process.

On the statutes, Your Honor hit the nail on the head. These are competing obligations, and we think it's the board's duty to look at them and balance them. We think they --

THE COURT: How do the financial considerations play into those two competing duties or interact with those two competing duties?

MR. MAYERS: I think the financial considerations as to the amount of money appropriated -- so Congress included a September of 2029, you know, potentially cutoff to the use of the appropriated funds for this project. And so one of the reasons that the temporary closure is needed, as Mr. Floca explains, is to be able to use those funds, you know, in their completion and to complete the project.

So the financial consideration, you know, the costs of the phased work, for example, Mr. Floca speaks to. So we think for cost reasons the temporary closure makes

perfect sense.

THE COURT: I meant it a little more broadly.

MR. MAYERS: Okay.

THE COURT: The statute does not say anything about financial stewardship of the center, unless I missed it, but as a general matter of sort of trustees' obligations. To what extent do the trustees have to and did they consider the financial implications, not just of the repairs on a closure basis or a phased stay-open basis, but also the sort of financial consequences from the closure, specifically those pointed out in the declarations from the amici?

MR. MAYERS: Yes, Your Honor. I think the -- so the -- you know, the President's involvement in the center has been well detailed. Plaintiffs discuss it at length in their briefs, and they -- you know, and Your Honor recognized -- they make the point they claim that the sales have decreased, et cetera. And we think that that actually, you know -- when is a better time, as Your Honor recognized, if they're right, to do these remediation and restoration projects?

And I think, of course, there are costs on both sides of it. Right? There are costs of staying open. There are phased construction costs. There are, you know, costs to the, you know, quality of the production, the

performance; and there are, you know, costs on their side, temporary closure.

THE COURT: Okay. And where -- to go to counsel's, you know, what I now view to be their sort of main argument, where in the record is there evidence that the board, either the buildings and grounds committee or the full board, was provided information sufficient for them to do that cost-benefit analysis along every aspect of the decision?

MR. MAYERS: So, Your Honor, I think Mr. Floca's conversation with the building and grounds committee --

THE COURT: Okay.

MR. MAYERS: -- goes through the costs on the -- you know, the one side. Right? The costs of the phased project versus the temporary closure. And I think the same is true with respect to these communications.

THE COURT: I didn't see any numbers associated with any of that discussion or the talking points that he prepared for that meeting.

MR. MAYERS: Yes, Your Honor. But the -- you know, the -- Mr. Floca is -- you know, has a well-documented history on projects of this nature. And I think he, along with the center's, you know, staff -- he discussed that he spoke with the center's well-tenured staff on this point. And, you know, given that the center's staff are, you know,

experts in a variety of different areas, I think of course they would have apprised him of the risks of the temporary closure; and I think he -- you know, and the board then in turn, I believe, is entitled to rely on his recommendation.

And, again, Your Honor, you know, a lot of --

THE COURT: And is there anything in the record that shows that either Mr. Floca in the first instance or the board considered the costs of closure, again, along the lines of the considerations that the amici point out, the loss of sponsorship, the loss of momentum, the loss of obviously revenue during that period?

MR. MAYERS: So, Your Honor, the -- there's no document -- that plaintiffs reference the Taylor declaration, I believe, and the Borda declaration, and they say the cost analysis and that sort of thing. And there are no documents of that nature we turned over to them.

Again, Your Honor, I think when a board is sitting there making a decision, whether, you know, they state it on the record, like, for example Ms. Ingraham talked about the liability risks of staying open; whether, you know, she expressly --

THE COURT: I think she mentioned asbestos specifically.

MR. MAYERS: Yes, there were some asbestos problems and other reasons that we think it's dangerous for

the public to, you know, be in the building during these remediation efforts.

Your Honor, I think there are always costs and benefits to a specific process. The fact that those were enumerated during the meeting minutes, I don't think it -- given the news coverage of the center and given, you know, the things that plaintiffs point out, I don't think it's -- I don't think it would be unknown to the board as to the costs of a temporary closure versus a phased process.

THE COURT: Is there anything in the record to suggest that any lawyer, either the general counsel or anyone else on the staff, advised the board about the name -- the legality of the renaming or the obligation to put on performances and maintain the memorial -- maintain the center as a living memorial? Was there any legal input into any of these decisions based on what we have before us?

MR. MAYERS: I believe the general counsel of the center was present at the board meetings.

THE COURT: I didn't see any indication that he spoke.

MR. MAYERS: And that's right, Your Honor. That's correct.

Well, but again, I think this is a classic case of, you know, there's costs on one side, there's costs on the other. There's benefits on both sides. And, Your

Honor, I appreciate and recognize that it's not the role of the Court to, you know, balance those necessarily or at all, and we appreciate that, and we think, again, this is a classic case of board discretion, to which judicial deference is entitled.

THE COURT: Okay.

All right. No one has discussed Section 76*k*(e), which says that the actions of the board relating to performing arts and to payments made or directed to be made by the board from any trust funds, quote, shall not be subject to review by any office or agency other than a court of law.

I think that provision cuts in favor and against both sides in this case in certain circumstances. But doesn't that -- or why doesn't that suggest that Congress contemplated that a Court would have jurisdiction over a claim like this?

MR. MAYERS: So given -- and I don't think there's a dispute here, given kind of the heritage of this deference principle. Right? It's Trust Law 101 that typically boards of trustees have this wide array of discretion. We don't think that provision speaks clearly to the idea that in this circumstance the board does not have that discretion. So we agree that, you know, there's a -- that that provision --

THE COURT: But a board can abuse discretion. No

one doubts that the board has discretion to, you know, weigh its various obligations and to weigh all of the interests and to come up with a prudent decision, agree or disagree. The question is whether, if there's a claim that suggests an abuse of discretion, why isn't that reviewable by a court of law as Congress said?

MR. MAYERS: Your Honor, I don't think it's our -- and it's not our position that abuse of discretion is -- you know, it's not -- or the use of discretion is not reviewable.

THE COURT: Okay.

MR. MAYERS: Our friend on the other side has said this is not an agency case. Right? So they're, you know, essentially in their argument trying, you know, to get around *Dong* in that sense by saying it's arbitrary and capricious in the APA sense. There were not these papers, there were not detailed analysis. They didn't talk about it. There's no lengthy administrative record.

I think, as Your Honor recognized in the TRO hearing and in your TRO order, this isn't normally how these processes work. Your Honor said there's a diffusion of information by the time it gets up to the board. There's consideration by the relevant committee, and then it gets to the board. And we think here the board was entitled to rely on the recommendation of Mr. Floca.

THE COURT: Okay.

All right. You can proceed.

MR. MAYERS: Does Your Honor have any other questions on the temporary closure matter?

THE COURT: I don't think so.

MR. MAYERS: We agree with Your Honor, of course, that the statute is not written sensibly to forbid, you know, closure in all circumstances. Your Honor mentioned COVID or a natural disaster.

THE COURT REPORTER: Please slow down.

MR. MAYERS: Yes.

Or a -- or some other instance that requires temporary closure. So I think the sensible reading of the statute is that's left to the Court's discretion as to how to balance those.

THE COURT: Okay.

MR. MAYERS: So, Your Honor, I'll turn now to the subject of the summary judgment motions, which is the addition of the name, the secondary name. So, Your Honor, I'll start with the prohibition in the statute, which is the prohibition on the placement of additional memorials or plaques in the nature of memorials.

As Your Honor discussed with the other side, it is our position that "memorial" is meant to commemorate the past, and we think that is -- a helpful piece on that is how

Subsection (b) or --

THE COURT: So the government agrees that one can memorialize a living person, or not?

MR. MAYERS: So, Your Honor, I think our position is that given how Subsection (b) came into the statute, it's best read to mean one deceased.

So Subsection (b) came in in 1983 as part of a -- most of the bill was meant to authorize the building of a memorial for the founder of the Girl Scouts who had, you know, been deceased I believe five decades.

THE COURT: The founder of the Girl Scouts?

MR. MAYERS: Yes.

THE COURT: All right.

MR. MAYERS: So the Subsection (b) --

THE COURT: Who was that, out of curiosity?

MR. MAYERS: Juliette Gordon Low I believe is her name.

THE COURT: So it could have been the Juliette Gordon Low Center For The Performing Arts?

MR. MAYERS: I don't think so, Your Honor.

So that is how this provision came into law. And so we think, read in context of that provision, "memorial" here is best read to mean commemorating someone who is deceased. And I think also --

THE COURT: And as a standard, you know, sort of

vernacular, one can memorialize a living person, but your argument is that in the context of this statute that is not what Congress intended.

MR. MAYERS: Yes, Your Honor.

THE COURT: Is that right?

MR. MAYERS: Yes, Your Honor, in the context of the statute and given the statutory history.

And I think another helpful textual point is the provision on acknowledgements that the plaintiffs rely on. So acknowledgements as to contributions are allowed inside the center as long as they meet Subsection (b). They're not allowed outside on the exterior of the center.

So we think an acknowledgement is broader than "memorial." We think "memorial" is kind of a subset of acknowledgements, as the statute indicates, where it says it can be an acknowledgement, but it can't be a memorial. So we think it's best read --

THE COURT: So what is the first line on the portico? Is that an acknowledgement?

MR. MAYERS: Yes, Your Honor, we think that is best considered an acknowledgement rather than a memorial.

THE COURT: Okay.

MR. MAYERS: So that's -- I think that's the best way to make sense of the text on that point.

And so that's the --

THE COURT: So -- and are you still standing by your argument that it is not the name, it is simply a secondary name?

MR. MAYERS: Yes, Your Honor.

So I think there's different components to their proposed injunction on this point. Right? So there is the signage. We think that's best addressed by the, you know, prohibition on memorials or other plaques in the nature of memorials.

THE COURT: Okay.

MR. MAYERS: And then there is the references and official communications contract, et cetera. And we think that that is best addressed, you know, or that's the most -- the statutory provision most relevant to that argument is the one that they point to about how the building used to be designated the John F. Kennedy Center for the memorial -- or center, yes.

Again, we don't find a prohibition in that statute. Right? That's the legal name. It says this is the -- you know, the statutory name.

But there's no prohibition on, you know, adding a secondary name. And we think the practice that we have demonstrated in our papers that the plaintiffs dismiss as, you know, anodyne monikers of the use of Fannie Mae and Freddie Mac and Department of War rather than Defense, we

think that practice shows that the statutes that designate a name have not been interpreted to be exclusive ones.

I think this is especially, you know -- we don't think Your Honor needs to get to the *ultra vires* claim, but especially in *ultra vires*, in other words, there's a specific prohibition in the statute. We don't think there's one in the statute here.

I'll turn briefly to the voting rights, voting argument.

THE COURT: Okay.

MR. MAYERS: It is our position, as Your Honor discussed with the other side, that the fact that there are statutes that, you know, enumerate when ex officio board members can vote and cannot disrupts the idea that, you know, Congress, by just putting nothing here, intended for the, you know, ex officio board members to have a statutory right to vote.

THE COURT: Okay.

MR. MAYERS: So we think that --

THE COURT: But does that -- does that still not maintain the background presumption that everyone votes?

MR. MAYERS: Your Honor --

THE COURT: Congress can designate one way or the other.

MR. MAYERS: Yes.

THE COURT: But, you know, as we discussed in the earlier decision, there's authority for at least a background presumption that trustees vote.

MR. MAYERS: So we think that the fact that Congress took care to enumerate in certain instances when they can vote and when they can't shows that background presumption --

THE COURT: Is the opposite?

MR. MAYERS: We wouldn't say necessarily it's an opposite. We would just say that the background presumption given those examples doesn't necessarily, you know, prove their case.

THE COURT: Okay. So there are no presumptions in your view?

MR. MAYERS: Your Honor, I think the -- again, the statutory examples show the presumption as to how the center will always operate.

THE COURT: So address your colleague's hypothetical or address this hypothetical: Between the election and the inauguration, if the sitting board members voted to take away the vote for new presidential appointees in anticipation of what they thought might happen, would that be legal?

MR. MAYERS: We don't think that would violate 76*l*.

THE COURT: You don't think it would violate?

MR. MAYERS: That's the first part.

The second part is, you know, it could, perhaps, be a problem under general trust principles that they referred to. Right? But we don't think that that would run afoul of, you know, the statute necessarily.

THE COURT: Okay.

MR. MAYERS: So there could be another way to get to that. But our position here is simply that the statute does not speak to ex officio board members one way or the other, and that the board's decision here comes within its discretion given the ex officio board members sometimes don't attend meetings or their other obligations, so we think that was a reasonable decision to make here.

I think finally, Your Honor, briefly on the remedy, if you will --

THE COURT: Before we get there, and we may get there tomorrow, but on sort of the center's voluntary consultations with the National Capital Planning Commission and the council or Commission on Fine Arts, I was a little confused as to what you think the legal effect of that is.

I mean, is that claim mooted in your view because they have voluntarily consulted in the way that the statute requires?

MR. MAYERS: So, Your Honor, we have --

THE COURT: Assuming the Kennedy Center is subject to those obligations.

MR. MAYERS: So yes. So, first, our argument would be that the center is not. And you're right that that's kind of the subject of tomorrow's suit.

THE COURT: Right.

MR. MAYERS: I don't think that the center is going through those processes in toto. There has been consultation communications, but the center does not plan to, you know, wait for, for example, NCPC approval or the like.

So there's been consultations, but I don't think there's currently --

THE COURT: So the center is voluntarily subjecting itself to the consultation requirements, but if NCPC determines that the project is such that it needs prior approval, the center has not agreed to subject itself to that process; is that fair?

MR. MAYERS: I think that's correct, Your Honor, yes.

THE COURT: Okay.

MR. MAYERS: So right now there's voluntary consultation. Of course, the center values any of those inputs. But as of now, there is no -- to my knowledge, no plan to fully, you know, submit to those processes.

THE COURT: Okay. Remedy.

MR. MAYERS: Yes. So on the remedy, Your Honor, I think the first point that I'd like to make is the one you made to the other side with respect to the process argument. You know, I think that is what they would be entitled to. If Your Honor approves the merits as to the process -- and we think that would be an inequitable remedy -- it would just simply delay the project.

THE COURT: Before we get to remedy. I mean, we're here on a PI on the closure.

MR. MAYERS: Yes.

THE COURT: Just again assuming for the sake of argument that I agree that I were to grant a PI on the closure in some fashion or the other -- or let me back up.

Why has the government been prejudiced or why would the government be prejudiced by an injunction against the closure when up until a month or so or a couple of months ago everyone envisioned that all of these renovations could be -- could take place in a phased manner that would not require closure?

MR. MAYERS: Well, Your Honor, I think there are a few different reasons. If the construction were to continue without closure, I think that there would be liability risks we discussed earlier. I think there would also be a delay in the project. Right? So Congress again gave this few-

year time window to do this.

THE COURT: All of that was the case up until February 1st?

MR. MAYERS: Which part is the case, Your Honor? So yes, there would be -- yes, there would be liability problems. Yes, those were -- those factors were present. However, you know, of course Mr. Floca --

THE COURT: Okay. But does the government agree that up until -- I believe February 1st was the date that the closure was first contemplated or that Mr. Floca indicates that he and the President talked about the closure and that he developed a recommendation for closure.

MR. MAYERS: So, Your Honor, yes, there was a recommendation made by Mr. Floca in late January. However, I think, as you'll hear tomorrow, Mr. Floca developed the preference for that before then, given his construction background and the needs for the center. So yes, that recommendation was made to the chairman in late January, and then discussed with the board thereafter.

THE COURT: Is there anything in the record that would suggest before that point anyone at the center or in Congress or anywhere else contemplated closure to pursue the renovations that everyone agrees are necessary?

MR. MAYERS: Not that I know of, Your Honor, in this instance.

THE COURT: And so --

MR. MAYERS: I think that --

THE COURT: So in light of that, what is the prejudice to the government of returning to the status quo that was in effect for, you know, five years?

MR. MAYERS: Your Honor, the government has -- or the center has made the decision to proceed with this temporary closure, and the injunction would prevent it from doing that.

THE COURT: Okay.

MR. MAYERS: And that, again, is a decision that the board, we think, is entitled to make. And we think that the -- you know, that the balance of the harm to the center versus the harm to the public is one that, you know, the board adjudged, and we think that adjudgment is entitled to deference.

And so I think on the -- that's the construction piece, the added costs, potential added liability, and there's delay.

And then on the naming piece, Your Honor, we don't think that there's much of a harm at all to the plaintiff, as we discussed, the congresswoman, and we think that to the government, take it down and put it back up later on, we think that that, you know, financial harm --

THE COURT: Renaming, we're on summary judgment,

so harms really don't matter.

MR. MAYERS: It goes to the permanent injunction piece, Your Honor. We think that the balancing there would still tilt to the government and the public's favor.

THE COURT: All right. Remedy, particularly on the closure. If I agree, again, for the sake of argument, that Congresswoman Beatty is correct that the board's process was flawed, what is the remedy for that finding?

MR. MAYERS: So then the remedy would be to, you know, I guess go back and maybe commission an expert report, which will cost a lot of money, and then look at it.

THE COURT: But what would my remedy look like?

MR. MAYERS: Yes, Your Honor. I think that --

THE COURT: I'm not going to order an expert report.

MR. MAYERS: That cuts in our favor. I think that is what her stated process claim would require ultimately.

If Your Honor agrees that closure isn't prohibited by the statute, and the board is not violating the statute by temporarily closing, I think that would -- the limited remedy would just be more process, more cost, more delay, et cetera. We don't think that is a, you know, good use of this Court's equitable discretion.

THE COURT: So enjoining closure unless and until the board satisfies a process that would enable the trustees

to fulfill their fiduciary duties?

MR. MAYERS: Your Honor, again, I think that would still be difficult. It would be caught up under 65(d). What does that necessarily mean? How much paper is needed? How much time is spent on it? How long do the meeting minutes need to be? We still don't think that ultimately would cut in their favor either.

And, Your Honor, I'll note, too, a lot of the claims are about, you know, what has and will happen because of the closure. Right? These plays have been cancelled. There's, you know, certain rearranging of schedules. And I want to note, too, the programming will -- there's a programming staff that will continue to work on the schedule very closely. Right? So it's not as if programming plans are at a halt.

But we don't think the Court can go beyond enjoining closure. So the claimed harm to the center as to the loss of business, et cetera, we don't think that the injunction as to closure would remediate that.

And I also want to note for Your Honor that there were certain elements of the center that will remain open during this process.

THE COURT: I was going to ask you about that.

MR. MAYERS: So the REACH --

THE COURT: Mr. Floca was somewhat ambiguous about

that.

MR. MAYERS: Yes, Your Honor.

THE COURT: "Programming may"?

MR. MAYERS: He said "may," yes.

THE COURT: Okay.

MR. MAYERS: So the REACH will remain open, and the memorial will be there and publically accessible as required by the statute. And there will be education programming. And I believe there will be certain musical practicing, you know, and other things at the REACH that will allow for the public to come and observe and enjoy.

THE COURT: Any office space?

MR. MAYERS: I don't know off the top of my head about that one. I believe --

THE COURT: Or administrative functions?

MR. MAYERS: I believe those will also be housed in the REACH facility. But I can double-check on that for Your Honor, but I believe. Yes, office space.

THE COURT: Be prepared tomorrow to let us know. And Mr. Floca obviously can testify to this, as to what precisely will remain open.

What about the grounds?

MR. MAYERS: The grounds as to the -- you know, to the extent it's safe and to the extent there needs to be a way to get to the open parts of the facility, but I'm not

sure that there is a specific plan yet as to where the public will be able to walk during which phase of the project.

THE COURT: Okay.

MR. MAYERS: And I just -- co-counsel --

THE COURT: That's another issue to come prepared for tomorrow, the extent to which the grounds will remain open for public access consistent with safety and construction practice. Right?

MR. MAYERS: Yes, I heard office space will remain open and available so...

THE COURT: Okay. But no performances of any kind other than some --

MR. MAYERS: The rehearsals I believe the public will be able to view from the REACH. I don't know what all those details as to, you know, the extent of that is, but there will be public access to certain rehearsals and other things of that nature.

THE COURT: Okay. Let me consult with my counsel for a minute.

(Pause)

THE COURT: Thank you.

MR. MAYERS: All right. Thank you, Your Honor.

THE COURT: See you tomorrow.

MR. ZELINKSY: Your Honor, just a brief -- I

promise to be brief. Look at all those papers they have. I know. I promise to be both brief and then --

THE COURT: Why don't you start with the remedy. How would the Court go about fashioning a remedy that would require the board to consider sufficient information to fulfill its statutory or its trust obligations while not putting the Court in a position of telling the board what, you know, expert reports it needs to consider and what financial projections it needs to commission, et cetera, et cetera?

MR. ZELINKSY: So, Your Honor, I would make just two very brief points on that, and then I want to make sure I get to the point about the testimony tomorrow as well and flag something for you there.

But my first -- I have a longer answer and a short answer. The short answer is this is a PI. And we're just asking you to stanch the bleeding. Right? There will obviously be subsequent litigation in this case if that is not converted into a permanent injunction under Rule 65 and, you know, the case has to move forward, and it's just a temporary measure to preserve the status quo.

I also don't think this has to -- it's terribly different from an agency case where an agency hasn't considered factors. The Court doesn't necessarily have to go and articulate every factor. We think we've given some

pretty good guidance to my friends on the other side.

In the record, Deborah Borda says you might have things like an architectural concept, timelines, budgets, supporting analysis, and that these documents are presented to the board.

Taylor talks about having things like extensive reports, cost analyses, construction plans, third-party validated budgets.

We don't think you have to list all of those, but we think you have to say it's enjoined temporarily, preliminarily, because they didn't do any analysis, and if they come back and do analysis, that will be a different scenario.

THE COURT: And so how would that work from a procedural perspective? You know, usually in a remand case the government -- you know, the agency does whatever it is it's told to do. It reconsiders the decision with new processes. It announces what that decision is, and then we come back on a -- on cross-motions for summary judgment a month later, two months later, three months later, whenever the decision is made.

Is that what you would envision here without the Court saying what it is you have to do in order to fulfill your trust obligations?

MR. ZELINKSY: I think that opinion provides a

little bit of guidance. So I think you don't just have an order, you also have an opinion that can say: Here are the types of things. I don't think you have to list out and say you have to tick every single box and micromanage. But I think you can say the undisputed record here shows that you would have these types of things. And if they want to come forward and request that the PI be dissolved, or we want to have a dispute later about a permanent injunction, you could then ask: Did they do any analysis?

And so I think that that is -- you know, if there's a different record in front of you at some future date, and they said, "Look, we actually looked at everything. We really crunched the numbers. We really asked, what's the financial harm of closure? What's the harm to good will? To reputation? To donors? To audiences?" I mean, I heard my friend say none of that was considered at all.

And so I don't think you have to micromanage and say these are every factor you must consider. I think you can gesture and say, "These are the types of things that it's undisputed on this record you would consider."

If they do consider them, and they want to come forward and then say, "Okay, now we've done it," it may be that Congressman Beatty may not object at that point. It may be a totally different circumstance.

But we're not there. And where we are instead is a situation where they did no analysis whatsoever.

And I would just point out, if I can -- I had it in front of me a moment ago, but --

THE COURT: So it would either be a motion to dissolve the preliminary injunction or a motion for summary judgment?

MR. ZELINKSY: That's precisely how it would occur, I think. I think it could be either one of those.

And I would just point out, to my friend on the other side's point that Mr. Floca consulted with people, it's actually notable -- this is at ECF-29-3, Page 4, Mr. Floca details all of the people he talked to. Not a single one of them does anything with donors or arts management. We have the director of operations and maintenance, mechanical engineering and plumbing supervisors, project managers -- I take it back. There is a single stage hand who was consulted, an accessibility expert, and someone from the contracting division.

So all of the things you were asking my friend about, about did they consider any of this, and his answer was, "Well, Floca talked to everybody," he didn't. I mean, this is extraordinary, Your Honor. This is -- if this were any other context with any other trustees, it would be a shocking breach of trust. And so I just -- I want to

underscore the paucity of the record here.

And if I could, with the Court's indulgence, I wanted to return to that point that I mentioned earlier, which the Court had suggested that Mr. Floca should come prepared to testify to some of these issues tomorrow. We think in our case and the record in front of you, the record in front of you is devoid of anything. I mean, they just said right now that the REACH will definitely remain open and that certain things will happen there. That's not in the record at all. And so I think that that is why we deserve a preliminary injunction.

But if I can, with your indulgence, we also provided notice in this case and the other one, we have some concerns now, having now heard this case on Tuesday, that on Wednesday they're going to come here and say a bunch of things that pertain solely to this case which has different causes of action, different standards, and we won't be able to cross-examine. And so, you know, with the Court's permission, we're prepared --

THE COURT: Let's see how it goes. To the extent that he says something that will, you know, affect your record, I will likely give you an opportunity to rehabilitate on that issue.

MR. ZELINKSY: Thank you, Your Honor.

And then I would make just -- I know that I'm sort

of overstaying my welcome at the podium, so I'll be as quick as possible.

On the Article III point, two quick things.

First, they just took the position in front of you, my friends took the position that if there's honest to goodness embezzlement occurring, but it's a federal trust, there's no way for Congress to ensure that that trustee has the same rights and responsibilities as every private trustee. That's extraordinary. Nothing in Article III requires that result.

And the converse is if they agree that an embezzlement scenario is a quintessential harm, well, that's this case, because what they're doing is they're embezzling the center's good will and its name.

One other just very brief point. I heard my friend on the other side suggest that you should look at the statutory context, and that's how you should interpret the statute with respect to the name. That cuts entirely in our direction. Every single ounce of this statute screams out it was named for John F. Kennedy, that the center was named for John F. Kennedy and John F. Kennedy alone.

The argument about the memorial, for what it's worth, it's like someone who says, "A sign that says 'no shirt, no shoes, no service' means I can show up with no pants on." It makes no sense. It makes a mockery of the

statute that Congress created.

And we'd ask that you grant us the preliminary injunction and summary judgment.

THE COURT: Great. Thank you.

MR. ZELINSKY: Thank you.

THE COURT: Hold on one second.

(Pause)

THE COURT: All right. Two brief questions.

One of your statutory arguments is that the board's decision to close the center violates the provision in the statute that the grounds be operated and maintained. Is that -- you're sort of -- you came off it a little bit. Is that still a live question for us?

MR. ZELINKSY: It's still a live question. I just want to also underscore that we have other statutory arguments, too. So I wasn't trying to suggest we're slumming away from it, wholly embracing it, but also it's there.

THE COURT: I spent about two hours this weekend reading the legislative history of that particular provision, so thank you for making it --

MR. ZELINKSY: Your Honor, I apologize that you had to read *Bogert* and a lot of other things, too. So I really -- I -- to the extent we are responsible, I'm sorry, and to your law clerk as well.

THE COURT: But if you read that provision and it's given more flavor in the legislative history, it was added after the '94 amendments where control over the center was consolidated in the board where it was shared previously with NPS. And in that provision, in the sentence above, I think the sentence that the plaintiff, emphasizes -- it talks about managing and operating the provisions consistent with existing NPS agreements and regulations.

MR. ZELINKSY: Uh-huh.

THE COURT: All right. And so it strikes me as not just a blanket prohibition, but it's a prohibition in light of what the agreements were at the time. No one has shown me what NPS agreements or regulations may exist that, you know, give any flavor or, you know, as to what any change -- whether any change or any closure might violate those provisions.

Can you shed any light on that?

MR. ZELINSKY: I'm going to look to my colleague who is going to either shake his head or -- no, he's going to shake his head.

So I think the answer, I think -- but I have an answer.

THE COURT: So do those regulations and agreements say, you know, you've got to cut the grass, you know, four times a year, you know -- or, you know, we have to use NPS

employees, or you have to do deferred maintenance once every -- according to an approved schedule? I mean, what is it that those agreements mean, because that will tell me whether a closure violates that "manage and operate."

MR. ZELINKSY: So the way I would square this particular circle, Your Honor, is that my friends on the other side have not come forward with any indication that a two-year closure of the grounds falls within those NPS regulations, so --

THE COURT: But it's your burden. And without the regulations and agreements, how can I know whether you've mounted that burden?

MR. ZELINKSY: Because I think it would be surprising, indeed, if any of those regulations would permit such an extraordinary total shuttering. Right? I mean, these are to keep the place -- I mean, it's to keep it operational. And I would be surprised, indeed, if there was a safety valve that said you can just ignore it all and close it all down.

But if it's helpful to the Court, with your indulgence, we'd be happy to take a look, see if we can find those --

THE COURT: That would be helpful.

MR. ZELINKSY: -- and submit them. Okay?

THE COURT: And finally, do I need to conclude

that she had an obligation to sue as a co-trustee in order to find that she was concretely injured here?

MR. ZELINKSY: No. I think you can skin this cat, like I said, any number of different ways. I think the easiest way to skin the cat is the majority opinion in *Sprint*, which says trustees are a quintessential example of someone who is suing to protect an institution, and the benefit may flow. In this case we think it flows to her, too, but it also will flow to the center, and so it directly refutes the argument my friends are making, which is you have to point -- you can't point to the center and have her standing as a representational capacity.

And if I can, *Thole* actually is quite helpful there, because in *Thole* what happens is the Court notes that the plaintiff in *Thole* was not given representational capacity. A trustee has representational capacity. And to the point my friends on the other side made that actually -- and this gets to the second point, which is the discharge of a legal obligation is itself a benefit. And so I don't think you have to find that she would be in breach, that the congresswoman would be in breach if she didn't sue to find that she still receives a legal benefit because she's discharging her obligation.

Now, I think --

THE COURT: Okay. So address your colleague's

argument that now that she has sued, there's no longer any obligation -- so while she might have the right to sue, her harm has already been remedied through the suit itself.

MR. ZELINKSY: Your Honor, the language that the things like the restatement use is "compel" and "enjoin" to prevent the redress of the breach. It cannot be that simply filing the complaint and then walking away is enough to discharge your obligation. You have to see it through.

THE COURT: Okay.

MR. ZELINKSY: And it may be, if you are successful, great. If you're not successful, then, you know, you -- the problem has been solved.

If I can, I know I've really overstayed my welcome, but I would just note that on *Sprint*, I think I heard my friend on the other side suggest that trustees don't in this context hold legal title to the trust. The whole point of a trust relationship as opposed to a corporation or some other relationship is that, as a matter of technicality, legal title but not equitable title is vested in the trustees. That's Chief Justice Roberts's whole point.

So I don't think that's right here. I think when Congress granted all the usual rights and obligations, it was granting that technical legal interest, but not the beneficial one.

THE COURT: Okay. Thank you.

MR. ZELINKSY: Thank you, Your Honor.

THE COURT: Well argued, both sides. We will take this under advisement and get an opinion out as soon as we can. And we'll see you tomorrow.

(Whereupon the hearing was adjourned at 12:03 p.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 30th day of April, 2026.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

## $

**$257** [1] - 22:24

## '

**'90s** [1] - 37:5
**'94** [1] - 84:3
**'no** [1] - 82:23

## /

**/s/Lisa** [1] - 88:18

## 1

**1** [1] - 46:17
**100** [1] - 24:14
**101** [1] - 60:20
**106** [1] - 20:25
**10:09** [1] - 1:5
**1100** [1] - 2:4
**12** [1] - 36:21
**12:03** [1] - 88:7
**13-20** [1] - 24:18
**15180** [1] - 1:18
**1717** [1] - 1:15
**19-1307.03** [1] - 10:11
**1958** [1] - 40:21
**1964** [1] - 42:8
**1983** [1] - 63:7
**1:25-cv-04480-CRC** [1] - 1:3
**1st** [6] - 16:22, 22:13, 24:24, 27:23, 71:3, 71:9

## 2

**2** [3] - 8:10, 46:22, 48:12
**20** [4] - 7:2, 34:4, 34:7, 40:10
**20001** [2] - 2:9, 88:21
**20003** [1] - 1:19
**20006** [1] - 1:15
**2000s** [1] - 37:6
**202** [5] - 1:16, 1:19, 1:23, 2:5, 2:9
**2023** [2] - 11:18, 12:3
**2026** [2] - 1:5, 88:16
**2029** [1] - 55:18
**20530** [2] - 1:22, 2:5
**25-4480** [1] - 3:3
**260** [1] - 46:23
**28** [1] - 1:5

## 3

**3** [1] - 40:10
**30th** [1] - 88:16
**32** [1] - 45:15
**333** [2] - 2:8, 88:20
**353-7578** [1] - 2:5
**354-3187** [1] - 2:9

## 4

**4** [1] - 80:12
**4-M** [2] - 11:19, 12:2
**40** [1] - 41:1
**40-plus** [1] - 41:15
**413** [1] - 48:23

## 5

**520** [1] - 40:11
**521-8750** [1] - 1:16
**584** [1] - 9:21
**594-9958** [1] - 1:19

## 6

**600** [1] - 1:18
**65** [1] - 77:19
**65(d)** [1] - 74:3
**6718** [2] - 2:8, 88:20

## 7

**7325935** [1] - 12:3
**76a-2(e** [1] - 42:5
**76b(a)(1** [1] - 41:13
**76h** [1] - 40:11
**76i** [1] - 41:12
**76i(a** [1] - 40:23
**76i(c)(3** [1] - 41:24
**76j(a)(2)(E** [1] - 44:7
**76j(b** [3] - 41:20, 45:2, 45:22
**76k(e** [1] - 60:7
**76l** [4] - 7:2, 34:4, 34:7, 67:25
**76q-1(c)(4** [1] - 41:25

## 8

**890-9874** [1] - 1:23

## 9

**950** [1] - 1:22
**990s** [1] - 37:7

## A

**a.m** [1] - 1:5
**ABC** [1] - 23:10
**ability** [4] - 13:6, 13:24, 48:7, 88:15
**able** [7] - 28:8, 51:23, 52:1, 55:21, 76:2, 76:15, 81:17
**about-face** [1] - 24:25
**Abraham** [1] - 44:12
**absent** [2] - 18:20, 52:20
**absolutely** [1] - 24:25
**abuse** [5] - 31:17, 31:19, 60:25, 61:5, 61:8
**academia** [1] - 22:5
**accept** [1] - 27:1
**acceptable** [1] - 26:17
**access** [2] - 76:8, 76:17
**accessibility** [1] - 80:18
**accessible** [1] - 75:7
**accessing** [1] - 33:18
**according** [1] - 85:2
**account** [1] - 45:24
**accurate** [1] - 88:13
**accuse** [1] - 23:13
**acknowledged** [1] - 42:1
**acknowledgement** [4] - 64:13, 64:16, 64:19, 64:21
**acknowledgements** [3] - 64:9, 64:10, 64:15
**acknowledging** [1] - 46:5
**acronym** [1] - 43:12
**act** [1] - 40:10
**action** [19] - 6:24, 7:1, 7:5, 13:4, 13:16, 14:2, 14:10, 14:11, 14:24, 34:1, 34:4, 34:5, 34:9, 34:11, 51:6, 52:21, 81:17
**actions** [3] - 15:3, 44:22, 60:8
**active** [1] - 31:3
**actual** [2] - 31:23, 40:19
**adage** [1] - 39:9
**add** [5] - 11:1, 22:6, 24:8, 27:25, 28:17
**added** [4] - 43:5, 72:18, 84:3
**adding** [1] - 65:21
**addition** [2] - 44:18, 62:19
**additional** [2] - 41:21, 62:21
**address** [9] - 7:8, 9:22, 20:4, 47:17, 52:15, 54:6, 67:18, 67:19, 86:25
**addressed** [2] - 65:7, 65:13
**addresses** [2] - 6:17, 7:8
**addressing** [2] - 6:22, 8:17
**adjourned** [1] - 88:7
**adjudged** [1] - 72:15
**adjudgment** [1] - 72:15
**adjudicating** [1] - 27:18
**administrative** [2] - 61:18, 75:15
**admission** [1] - 22:11
**advancing** [1] - 45:21
**advised** [1] - 59:12
**advisement** [1] - 88:4
**advisors** [1] - 16:23
**affect** [1] - 81:21
**affidavit** [1] - 15:23
**affixing** [1] - 40:14
**afoul** [1] - 68:6
**agency** [9] - 32:9, 32:14, 32:15, 42:20, 60:11, 61:13, 77:23, 78:16
**ago** [3] - 37:8, 70:18, 80:4
**agree** [20] - 18:7, 20:15, 23:1, 24:7, 33:15, 34:10, 35:21, 35:22, 37:11, 37:14, 47:19, 50:25, 55:4, 60:24, 61:3, 62:6, 70:13, 71:8, 73:6, 82:11
**agreed** [2] - 8:8, 69:17
**agreements** [6] - 84:8, 84:12, 84:13, 84:23, 85:3, 85:11
**agrees** [5] - 5:3, 53:2, 63:2, 71:23, 73:18
**air** [1] - 27:4
**akin** [1] - 42:19
**al** [2] - 1:6, 3:4
**Alexander** [1] - 3:10
**ALEXANDER** [1] - 1:13
**allege** [1] - 16:6
**allow** [1] - 75:11
**allowed** [2] - 64:10, 64:12
**almost** [1] - 42:3
**alone** [1] - 82:21
**ambiguity** [2] - 36:13, 38:12
**ambiguous** [2] - 24:9, 74:25
**amend** [1] - 4:13
**amendments** [1] - 84:3
**American** [6] - 11:4, 19:9, 28:25, 49:18, 50:3, 50:4
**amici** [2] - 56:12, 58:9
**amount** [4] - 19:3, 19:11, 22:8, 55:17
**analog** [1] - 49:6
**analogous** [3] - 14:24, 14:25, 15:18
**analogy** [4] - 30:8, 32:7, 32:9, 32:14
**analyses** [3] - 25:17, 29:19, 78:7
**analysis** [24] - 18:6, 18:21, 19:11, 19:15, 20:5, 20:20, 22:9, 22:10, 25:1, 25:24, 28:18, 28:19, 30:2, 32:13, 32:18, 52:7, 57:8, 58:15, 61:17, 78:4, 78:11, 78:12, 79:9, 80:2
**Andrew** [5] - 19:8, 25:4, 25:15, 44:11
**announces** [1] - 78:18
**anodyne** [1] - 65:24
**ANON** [1] - 2:2
**Anon** [1] - 3:20
**answer** [12] - 23:22, 27:14, 28:15, 29:22, 37:21, 38:15, 77:15, 77:16, 80:21, 84:21, 84:22
**answers** [3] - 9:1, 19:4, 41:10
**anticipation** [1] - 67:22
**APA** [2] - 52:21, 61:16
**apologize** [4] - 5:17, 5:21, 7:22, 83:22
**APPEARANCES** [2] - 1:12, 2:1
**appearing** [1] - 48:24
**application** [1] - 4:17
**applies** [2] - 45:3, 45:4
**apply** [2] - 31:16, 45:2
**appointed** [1] - 36:22
**appointees** [1] - 67:21
**appreciate** [2] - 60:1, 60:3
**apprised** [1] - 58:2
**approach** [4] - 3:5, 25:23, 31:7, 34:5
**appropriated** [2] - 55:17, 55:19
**appropriation** [1] - 23:2
**approval** [2] - 69:10, 69:17
**approvals** [1] - 34:14
**approved** [2] - 22:25,

85:2
**approves** [1] - 70:6
**April** [2] - 1:5, 88:16
**arbitrary** [2] - 32:19, 61:15
**architectural** [1] - 78:3
**area** [2] - 27:6, 38:17
**areas** [5] - 12:17, 23:14, 35:3, 41:22, 58:1
**arguably** [1] - 27:7
**argue** [2] - 4:5, 52:8
**argued** [1] - 88:3
**arguing** [1] - 5:15
**argument** [33] - 5:9, 6:18, 7:9, 7:24, 14:25, 15:6, 18:2, 18:10, 21:5, 21:7, 26:4, 29:23, 30:20, 32:11, 33:20, 34:20, 36:2, 43:9, 49:12, 57:5, 61:14, 64:2, 65:2, 65:14, 66:9, 69:3, 70:4, 70:13, 73:6, 82:22, 86:10, 87:1
**argument's** [1] - 7:24
**arguments** [6] - 15:21, 20:21, 21:25, 33:6, 83:9, 83:16
**arises** [1] - 7:1
**array** [1] - 60:21
**art** [1] - 16:23
**Article** [12] - 5:20, 5:24, 6:21, 7:6, 7:13, 11:8, 15:16, 46:17, 49:21, 51:4, 82:3, 82:9
**article** [2] - 6:11, 23:11
**articulate** [1] - 77:25
**articulated** [1] - 25:19
**artists** [1] - 28:7
**arts** [10] - 20:25, 25:6, 25:7, 40:14, 40:20, 42:13, 60:9, 63:19, 68:20, 80:14
**Arts** [7] - 40:25, 41:3, 41:17, 41:23, 43:2, 46:11, 47:1
**asbestos** [2] - 58:22, 58:24
**aside** [1] - 17:18
**aspect** [1] - 57:8
**aspects** [1] - 52:6
**assert** [1] - 16:9
**asserting** [3] - 6:4, 17:7, 17:20
**assertion** [1] - 39:24
**asset** [1] - 50:9
**assets** [1] - 48:16
**assignee** [3] - 7:9, 7:11, 7:13
**assigning/assignor** [1] - 15:3
**assignor** [3] - 7:9, 7:12, 7:15
**assistant** [2] - 3:17, 3:19
**associated** [2] - 13:15, 57:17
**assumes** [1] - 37:12
**assuming** [4] - 12:15, 18:9, 69:1, 70:12
**assumption** [2] - 31:6, 36:1
**attack** [1] - 43:13
**attempted** [1] - 18:25
**attend** [1] - 68:13
**attention** [1] - 19:11
**Attorney** [3] - 3:17, 3:19, 48:7
**audiences** [3] - 29:5, 29:9, 79:16
**authority** [1] - 67:2
**authorization** [5] - 22:24, 30:22, 31:1, 31:2, 33:16
**authorize** [3] - 24:16, 24:22, 63:8
**authorized** [2] - 31:5, 31:8
**authorizes** [2] - 31:8, 31:10
**authorizing** [1] - 31:4
**available** [1] - 76:11
**Ave** [1] - 1:18
**Avenue** [3] - 1:22, 2:8, 88:20
**aversion** [1] - 41:4
**AVI** [1] - 1:13
**avoidance** [1] - 36:12

## B

**b)** [1] - 64:11
**background** [8] - 35:16, 35:22, 36:7, 66:21, 67:3, 67:6, 67:10, 71:17
**balance** [5] - 27:11, 55:11, 60:2, 62:15, 72:13
**balancing** [1] - 73:3
**ball** [2] - 4:1, 5:21
**bankruptcy** [1] - 12:19
**bare** [4] - 21:6, 26:9, 27:21, 32:12
**based** [4] - 4:18, 22:19, 31:21, 59:16
**bases** [1] - 21:19
**basic** [2] - 18:3, 25:14
**basis** [3] - 48:20, 56:9
**bathroom** [1] - 43:18
**BCFP** [1] - 43:7
**BEATTY** [2] - 1:3, 3:15
**Beatty** [11] - 3:3, 3:8, 3:14, 6:3, 7:2, 8:19, 9:10, 10:16, 17:12, 73:7, 79:24
**becomes** [1] - 27:2
**befall** [1] - 50:20
**BEFORE** [1] - 1:10
**beginning** [1] - 29:14
**behalf** [2] - 48:22, 50:3
**belts** [1] - 34:5
**belts-and-suspenders** [1] - 34:5
**beneficial** [1] - 87:25
**beneficiaries** [1] - 49:17
**beneficiary** [1] - 49:17
**benefit** [8] - 7:11, 7:12, 7:15, 8:14, 57:8, 86:8, 86:19, 86:22
**benefits** [2] - 59:4, 59:25
**beside** [2] - 37:13, 37:15
**best** [13] - 5:23, 30:6, 38:15, 52:12, 52:13, 63:6, 63:23, 64:17, 64:21, 64:23, 65:7, 65:13, 88:14
**better** [1] - 56:19
**between** [5] - 16:24, 29:4, 29:6, 35:3, 67:19
**beyond** [1] - 74:16
**bill** [1] - 63:8
**bit** [8] - 5:11, 7:18, 7:21, 11:3, 38:22, 38:24, 79:1, 83:12
**bizarre** [1] - 43:24
**blanket** [1] - 84:11
**bleeding** [4] - 19:22, 20:1, 21:16, 77:17
**Blunder** [2] - 11:20, 12:2
**board** [56] - 9:8, 17:9, 17:15, 18:16, 18:20, 22:7, 22:8, 22:25, 25:5, 25:6, 27:10, 27:21, 28:2, 28:13, 29:17, 30:2, 30:23, 31:16, 35:5, 35:11, 35:25, 36:16, 36:18, 41:15, 53:3, 57:6, 57:7, 58:3, 58:8, 58:17, 59:8, 59:12, 59:18, 60:4, 60:8, 60:10, 60:23, 60:25, 61:1, 61:22, 61:24, 66:13, 66:16, 67:20, 68:10, 68:12, 71:19, 72:12, 72:15, 73:19, 73:25, 77:5, 77:7, 78:5, 84:4
**board's** [6] - 4:13, 54:24, 55:11, 68:11, 73:7, 83:10
**board-approved** [1] - 22:25
**boards** [2] - 34:22, 60:20
**body** [5] - 13:12, 13:19, 13:20, 14:14, 15:15
**Bogert** [4] - 9:21, 48:23, 83:23
**boils** [1] - 6:2
**Borda** [6] - 19:6, 25:4, 29:1, 29:8, 58:14, 78:2
**Borda's** [1] - 25:15
**Borenstein** [3] - 19:8, 19:9, 28:25
**bottom** [2] - 42:9, 42:12
**box** [2] - 46:5, 79:4
**branch** [1] - 3:21
**Branch** [2] - 2:4, 49:2
**Brantley** [1] - 3:16
**BRANTLEY** [1] - 1:21
**brantley.t.mayers@usdoj.gov** [1] - 1:23
**brazen** [2] - 43:3
**breach** [14] - 9:15, 9:25, 10:1, 10:14, 10:18, 11:22, 20:13, 26:1, 27:20, 34:4, 80:25, 86:20, 86:21, 87:6
**breaches** [1] - 9:24
**breaking** [1] - 24:4
**breaks** [2] - 29:4, 29:5
**breathtaking** [2] - 25:25, 27:20
**Breyer** [2] - 7:8, 7:23
**brief** [8] - 12:1, 40:18, 76:25, 77:1, 77:2, 77:12, 82:15, 83:8
**briefing** [4] - 4:11, 11:25, 17:5, 31:11
**briefly** [3] - 53:8, 66:8, 68:15
**briefs** [3] - 15:22, 45:10, 56:16
**bring** [1] - 29:10
**bringing** [1] - 13:18
**brings** [1] - 14:14
**broader** [1] - 64:13
**broadly** [1] - 56:2
**brought** [6] - 34:6, 39:1, 39:21, 39:24, 40:4
**budget** [2] - 24:19, 24:20
**budgets** [2] - 78:3, 78:8
**building** [7] - 40:24, 41:25, 54:4, 57:11, 59:1, 63:8, 65:15
**buildings** [1] - 57:6
**bunch** [2] - 15:10, 81:15
**burden** [2] - 85:10, 85:12
**Bush** [1] - 44:10
**business** [1] - 74:18
**bylaws** [1] - 4:13

## C

**CA** [1] - 1:3
**cancel** [1] - 31:25
**cancelled** [1] - 74:10
**candidly** [1] - 12:7
**cannot** [6] - 20:9, 21:9, 35:4, 35:15, 66:14, 87:6
**canon** [1] - 13:13
**capacity** [6] - 32:5, 48:22, 48:25, 86:12, 86:16
**Capital** [1] - 68:19
**capital** [1] - 22:25
**capricious** [1] - 61:16
**cards** [1] - 5:11
**care** [2] - 19:11, 67:5
**carried** [1] - 31:22
**carry** [1] - 31:24
**carrying** [2] - 9:8, 9:11
**Case** [1] - 3:3
**case** [50] - 5:7, 6:15, 6:18, 7:5, 7:11, 7:25, 8:3, 9:5, 9:8, 11:11, 11:18, 11:24, 12:12, 15:9, 15:15, 15:18, 20:3, 24:12, 27:19, 32:9, 32:14, 35:18, 47:20, 48:5, 48:6, 48:17, 49:19, 50:2, 50:7, 51:15, 52:7, 52:19, 59:23, 60:4, 60:14, 61:13, 67:12, 71:2, 71:4, 77:18, 77:20, 77:23, 78:15, 81:6, 81:13, 81:14, 81:16, 82:13, 86:8

**cases** [12] - 11:8, 11:15, 11:17, 12:8, 15:10, 47:23, 48:2, 48:3, 48:16, 49:19, 50:9, 50:10
**cat** [3] - 8:5, 86:3, 86:5
**Category** [2] - 35:7, 35:8
**category** [2] - 35:8
**caught** [1] - 74:3
**causes** [1] - 81:17
**center** [67] - 4:12, 4:15, 6:7, 18:15, 20:11, 21:8, 24:1, 24:2, 24:3, 24:20, 24:22, 25:23, 26:14, 26:16, 26:20, 27:16, 28:8, 29:3, 29:5, 29:6, 31:5, 33:17, 35:23, 37:5, 37:7, 37:23, 39:14, 40:13, 40:15, 40:20, 42:12, 42:25, 44:7, 46:6, 46:15, 46:24, 46:25, 53:1, 54:6, 56:5, 56:14, 59:6, 59:15, 59:18, 63:19, 64:11, 64:12, 65:16, 65:17, 67:16, 69:4, 69:7, 69:9, 69:14, 69:17, 69:23, 71:17, 71:21, 72:7, 72:13, 74:17, 74:21, 82:20, 83:10, 84:3, 86:9, 86:11
**Center** [16] - 28:5, 31:4, 40:25, 41:2, 41:16, 41:22, 42:13, 43:1, 43:15, 43:17, 43:18, 43:19, 46:10, 47:1, 52:23, 69:1
**Center's** [1] - 36:15
**center's** [7] - 27:8, 29:5, 57:23, 57:24, 57:25, 68:18, 82:14
**centers** [1] - 41:12
**central** [1] - 13:21
**certain** [7] - 60:14, 67:5, 74:11, 74:21, 75:9, 76:17, 81:9
**CERTIFICATE** [1] - 88:9
**certify** [1] - 88:12
**cetera** [10] - 23:8, 46:24, 46:25, 56:18, 65:12, 73:22, 74:18, 77:9, 77:10
**CFPB** [1] - 43:7
**chair** [1] - 46:5
**chairman** [2] - 45:19, 71:18
**challenge** [1] - 53:6
**challenges** [1] - 55:6
**change** [6] - 33:18, 42:14, 44:19, 45:7, 84:15
**changed** [1] - 39:14
**changes** [1] - 33:9
**chapter** [1] - 40:10
**charged** [1] - 6:6
**charitable** [4] - 12:10, 48:8, 49:15, 49:16
**check** [1] - 75:17
**Chevron** [1] - 38:14
**Chief** [4] - 8:7, 8:9, 48:12, 87:20
**chief's** [1] - 48:13
**chose** [1] - 40:13
**CHRISTOPHER** [1] - 1:10
**circle** [1] - 85:6
**circuit** [7] - 12:4, 12:5, 12:7, 12:9, 12:12, 48:3
**Circuit** [2] - 48:6, 52:20
**circumstance** [5] - 18:16, 29:17, 30:21, 60:23, 79:25
**circumstances** [7] - 7:14, 26:10, 26:21, 35:2, 35:15, 60:14, 62:8
**cite** [5] - 9:6, 9:17, 10:10, 10:11, 12:3
**cited** [4] - 10:12, 11:16, 11:18, 11:25
**CIV** [1] - 1:21
**Civil** [1] - 3:3
**claim** [10] - 42:25, 43:2, 45:1, 45:12, 56:17, 60:17, 61:4, 66:4, 68:22, 73:17
**claimed** [1] - 74:17
**claims** [3] - 52:16, 52:17, 74:9
**Class** [2] - 36:23
**classic** [2] - 59:23, 60:4
**clauses** [1] - 42:9
**cleaner** [1] - 49:14
**clear** [11] - 11:5, 16:3, 24:11, 27:15, 31:15, 38:17, 40:9, 42:10, 46:17, 53:23
**clearest** [1] - 9:20
**clearly** [4] - 32:18, 40:23, 46:14, 60:22
**clerk** [1] - 83:25
**close** [11] - 15:16, 17:25, 18:1, 24:23, 25:8, 26:20, 27:3, 27:4, 83:10, 85:19
**closed** [1] - 26:21
**closely** [1] - 74:14
**closest** [1] - 15:18
**closing** [3] - 5:15, 18:15, 73:20
**closure** [54] - 4:6, 4:15, 4:22, 5:15, 8:20, 16:13, 16:14, 16:24, 17:5, 17:7, 17:9, 17:16, 17:21, 18:4, 18:20, 19:19, 28:23, 31:20, 31:22, 52:12, 52:13, 52:22, 55:20, 55:25, 56:9, 56:10, 57:2, 57:15, 58:3, 58:8, 59:9, 62:4, 62:8, 62:13, 70:10, 70:14, 70:17, 70:20, 70:23, 71:10, 71:11, 71:12, 71:22, 72:8, 73:6, 73:18, 73:24, 74:10, 74:17, 74:19, 79:14, 84:15, 85:4, 85:8
**co** [12] - 9:22, 9:23, 9:25, 10:13, 10:18, 11:13, 11:21, 12:2, 13:6, 13:23, 76:5, 86:1
**Co** [1] - 11:19
**co-counsel** [1] - 76:5
**co-trustee** [6] - 9:25, 10:18, 11:21, 12:2, 13:23, 86:1
**Co-Trustee** [1] - 11:19
**co-trustees** [2] - 11:13, 13:6
**Code** [2] - 10:9, 10:11
**Code's** [1] - 10:10
**codifying** [1] - 37:1
**cognizable** [1] - 7:5
**coin** [1] - 23:9
**colleague** [3] - 3:11, 34:18, 84:18
**colleague's** [2] - 67:18, 86:25
**colleagues** [1] - 14:22
**colloquy** [1] - 11:3
**COLUMBIA** [1] - 1:1
**column** [1] - 41:18
**combination** [1] - 44:5
**coming** [4] - 4:1, 9:12, 10:25, 51:13
**commemorate** [2] - 44:22, 62:24
**commemorating** [1] - 63:23
**comments** [1] - 32:17
**commercial** [1] - 12:8
**commission** [4] - 20:25, 68:20, 73:10, 77:9
**Commission** [1] - 68:19
**commit** [2] - 9:15, 9:25
**committee** [3] - 57:6, 57:11, 61:23
**committing** [1] - 9:24
**common** [2] - 13:14, 47:23
**communications** [3] - 57:16, 65:12, 69:9
**companion** [2] - 5:7, 9:5
**comparable** [3] - 15:9, 26:9, 29:17
**compel** [2] - 10:13, 87:5
**competing** [9] - 27:22, 29:12, 30:13, 31:12, 32:17, 33:22, 55:10, 55:14, 55:15
**complaint** [5] - 16:5, 16:6, 16:10, 45:15, 87:7
**complete** [3] - 53:12, 55:22, 88:14
**completion** [1] - 55:22
**components** [1] - 65:5
**comprehensibility** [1] - 52:25
**concept** [1] - 78:3
**concerning** [2] - 10:2, 10:25
**concerns** [1] - 81:14
**concert** [1] - 54:4
**conclude** [1] - 85:25
**concrete** [2] - 54:21, 55:2
**concretely** [2] - 39:16, 86:2
**concreteness** [1] - 52:6
**conditioner** [1] - 27:4
**conduct** [2] - 33:23, 36:16
**confined** [1] - 14:15
**confirm** [1] - 9:17
**confused** [1] - 68:21
**confusing** [1] - 17:6
**Congress** [38] - 13:12, 13:13, 13:17, 14:13, 14:14, 24:16, 24:19, 24:22, 30:23, 30:24, 31:2, 31:3, 31:7, 31:14, 35:10, 35:14, 35:25, 36:10, 36:12, 36:15, 36:24, 40:13, 42:12, 45:25, 46:13, 55:17, 60:15, 61:6, 64:3, 66:15, 66:23, 67:5, 70:25, 71:22, 82:7, 83:1, 87:23
**Congress's** [1] - 46:17
**congressional** [4] - 22:23, 23:2, 30:22, 33:16
**Congressman** [3] - 9:10, 10:16, 79:24
**Congresswoman** [3] - 6:3, 7:2, 73:7
**congresswoman** [10] - 3:8, 3:14, 6:6, 48:21, 50:15, 50:20, 51:18, 53:2, 72:22, 86:21
**CONGRESSWOMAN** [1] - 3:15
**consequence** [1] - 46:9
**consequences** [1] - 56:10
**consider** [17] - 18:4, 21:14, 25:13, 27:22, 28:2, 28:21, 29:14, 32:16, 32:17, 32:22, 56:8, 77:5, 77:8, 79:19, 79:21, 79:22, 80:21
**consideration** [2] - 55:23, 61:23
**considerations** [3] - 55:13, 55:16, 58:9
**considered** [6] - 24:1, 29:10, 58:8, 64:21, 77:24, 79:17
**considering** [1] - 18:15
**considers** [1] - 28:22
**consistent** [5] - 23:2, 42:6, 44:9, 76:8, 84:7
**consolidated** [1] - 84:4
**constitutes** [1] - 88:12
**Constitution** [2] - 2:8, 88:20
**construction** [9] - 16:24, 23:8, 27:8, 56:24, 70:22, 71:16, 72:17, 76:9, 78:7
**consult** [1] - 76:19
**consultants** [2] - 16:24, 30:5
**consultation** [3] - 69:9, 69:15, 69:23
**consultations** [2] - 68:19, 69:12

**consulted** [4] - 22:10, 68:23, 80:11, 80:18
**contains** [1] - 26:12
**contemplate** [3] - 25:22, 30:17, 53:21
**contemplated** [4] - 53:22, 60:16, 71:10, 71:22
**contest** [2] - 51:25, 53:4
**contested** [1] - 43:24
**contesting** [1] - 44:18
**context** [10] - 7:9, 45:22, 47:22, 48:14, 63:22, 64:2, 64:6, 80:24, 82:17, 87:16
**continue** [2] - 70:22, 74:13
**continued** [1] - 22:17
**CONTINUED** [2] - 1:24, 2:1
**continues** [1] - 10:22
**contract** [3] - 30:8, 30:9, 65:12
**contracting** [1] - 80:19
**contractors** [1] - 16:23
**contributions** [2] - 42:1, 64:10
**control** [2] - 39:3, 84:3
**controlling** [1] - 47:20
**controversial** [1] - 43:24
**controversies** [1] - 11:8
**conversation** [1] - 57:11
**converse** [1] - 82:11
**converted** [1] - 77:19
**COOPER** [1] - 1:10
**copy** [2] - 41:7
**cordoned** [1] - 55:1
**core** [3] - 11:7, 13:21, 13:25
**corporation** [1] - 87:18
**corpus** [2] - 13:22, 15:11
**correct** [8] - 15:21, 28:4, 30:4, 31:18, 54:12, 59:22, 69:19, 73:7
**cost** [9] - 22:9, 25:17, 29:19, 55:25, 57:8, 58:15, 73:11, 73:21, 78:7
**cost-benefit** [1] - 57:8
**costs** [16] - 28:22, 28:23, 55:24, 56:22, 56:23, 56:24, 56:25, 57:1, 57:13, 57:14, 58:8, 59:3, 59:9, 59:24, 72:18
**council** [1] - 68:20
**counsel** [7] - 3:9, 3:17, 7:17, 59:11, 59:17, 76:5, 76:19
**counsel's** [2] - 3:18, 57:4
**counted** [1] - 41:1
**counterexample** [1] - 35:17
**country** [1] - 46:4
**couple** [2] - 8:25, 70:17
**course** [6] - 9:2, 56:22, 58:1, 62:6, 69:23, 71:7
**COURT** [170] - 1:1, 3:13, 3:22, 4:1, 4:8, 4:10, 5:18, 5:25, 6:19, 7:17, 8:16, 8:18, 8:22, 10:2, 10:20, 11:15, 11:21, 11:24, 12:4, 12:23, 13:9, 14:22, 15:19, 16:1, 16:10, 16:13, 17:3, 17:5, 17:11, 17:23, 17:25, 18:7, 18:9, 18:18, 21:24, 22:14, 22:22, 23:21, 26:2, 26:11, 27:25, 30:11, 31:15, 32:1, 33:7, 33:11, 33:25, 34:12, 34:19, 35:13, 37:9, 37:25, 38:7, 38:9, 39:19, 39:22, 40:1, 40:3, 40:16, 42:17, 44:18, 46:12, 46:20, 47:3, 47:5, 47:7, 47:10, 47:12, 47:15, 47:17, 47:24, 48:3, 49:5, 49:11, 49:22, 51:23, 52:14, 53:8, 53:18, 54:2, 54:14, 55:13, 56:2, 56:4, 57:3, 57:12, 57:17, 58:6, 58:22, 59:10, 59:19, 60:6, 60:25, 61:11, 62:1, 62:5, 62:10, 62:16, 63:2, 63:11, 63:13, 63:15, 63:18, 63:25, 64:5, 64:18, 64:22, 65:1, 65:10, 66:10, 66:18, 66:20, 66:23, 67:1, 67:8, 67:13, 67:18, 68:1, 68:7, 68:17, 69:1, 69:6, 69:14, 69:21, 70:1, 70:9, 70:12, 71:2, 71:8, 71:20, 72:1, 72:3, 72:10, 72:25, 73:5, 73:12, 73:14, 73:24, 74:23, 74:25, 75:3, 75:5, 75:12, 75:15, 75:19, 76:4, 76:6, 76:12, 76:19, 76:22, 76:24, 77:3, 78:14, 80:5, 81:20, 83:4, 83:6, 83:8, 83:19, 84:1, 84:10, 84:23, 85:10, 85:23, 85:25, 86:25, 87:9, 88:1, 88:3, 88:9
**court** [21] - 6:14, 7:6, 7:13, 7:18, 7:20, 9:12, 9:19, 10:5, 11:13, 11:14, 11:18, 12:16, 12:22, 13:24, 15:17, 48:2, 48:19, 50:16, 51:13, 60:11, 61:5
**Court** [35] - 2:7, 2:7, 4:12, 4:16, 5:3, 5:9, 5:22, 7:7, 7:16, 9:7, 14:7, 15:2, 16:15, 19:2, 27:7, 27:17, 37:22, 38:4, 41:8, 41:11, 43:18, 48:4, 48:18, 60:2, 60:16, 74:16, 77:4, 77:7, 77:24, 78:23, 81:4, 85:20, 86:14, 88:19
**Court's** [11] - 3:25, 4:4, 4:16, 5:23, 22:3, 41:4, 41:6, 62:14, 73:23, 81:2, 81:18
**Courthouse** [2] - 2:8, 88:19
**COURTROOM** [1] - 3:2
**courts** [2] - 8:2, 11:4
**coverage** [1] - 59:6
**covers** [1] - 4:12
**COVID** [3] - 26:22, 30:8, 62:9
**create** [1] - 53:13
**created** [2] - 35:23, 83:1
**creates** [1] - 35:25
**cross** [3] - 5:1, 78:19, 81:18
**cross-examine** [1] - 81:18
**cross-motions** [1] - 78:19
**cross-moved** [1] - 5:1
**CRR** [3] - 2:7, 88:11, 88:18
**crunched** [1] - 79:13
**cue** [1] - 5:22
**cultural** [1] - 46:24
**cured** [2] - 20:18, 20:19
**curiosity** [1] - 63:15
**current** [4] - 23:17, 44:20, 44:22, 45:19
**curve** [2] - 4:1, 5:20
**cut** [2] - 74:7, 84:24
**cutoff** [1] - 55:18
**cuts** [3] - 60:13, 73:16, 82:18

## D

**D.C** [6] - 1:4, 10:10, 14:16, 14:17, 48:5, 52:20
**damage** [1] - 53:5
**dangerous** [1] - 58:25
**date** [2] - 71:9, 79:12
**Dated** [1] - 88:16
**David** [1] - 3:11
**DAVID** [1] - 1:17
**daylight** [2] - 14:5, 14:19
**DC** [6] - 1:15, 1:19, 1:22, 2:5, 2:9, 88:21
**dead** [1] - 45:4
**Deborah** [6] - 19:6, 25:4, 25:15, 29:1, 29:8, 78:2
**decades** [1] - 63:10
**deceased** [3] - 63:6, 63:10, 63:24
**decide** [2] - 20:4, 38:15
**deciding** [1] - 16:24
**decision** [22] - 4:13, 9:6, 14:18, 16:18, 29:24, 30:1, 32:21, 34:21, 54:24, 57:9, 58:18, 61:3, 67:2, 68:11, 68:14, 72:7, 72:11, 78:17, 78:18, 78:21, 83:10
**decisions** [1] - 59:16
**declaration** [15] - 15:23, 16:1, 19:1, 19:6, 22:6, 24:18, 25:15, 25:16, 37:4, 39:13, 53:20, 54:16, 58:14
**declarations** [7] - 15:25, 23:5, 39:7, 39:12, 52:24, 53:21, 56:11
**decreased** [1] - 56:18
**dedicated** [1] - 42:10
**deems** [1] - 38:5
**defeat** [1] - 39:24
**Defendants** [3] - 1:7, 1:21, 2:2
**defendants** [5] - 3:18, 4:23, 32:4, 39:4
**defendants'** [3] - 45:1, 45:6, 46:19
**DEFENDERS** [1] - 1:18
**defenders** [1] - 3:11
**Defense** [2] - 44:1, 65:25
**deference** [3] - 60:5, 60:19, 72:16
**deferred** [1] - 85:1
**deficient** [2] - 17:8, 20:5
**definitely** [1] - 81:8
**degree** [1] - 22:15
**delay** [4] - 70:8, 70:24, 72:19, 73:21
**delegation** [2] - 36:3, 36:18
**Dellinger** [1] - 9:6
**democracy** [1] - 3:11
**DEMOCRACY** [1] - 1:18
**demolition** [4] - 22:18, 24:8, 54:3, 54:10
**demonstrated** [1] - 65:23
**denial** [2] - 46:18, 49:6
**denied** [1] - 4:16
**DEPARTMENT** [1] - 2:3
**Department** [3] - 43:23, 44:1, 65:25
**depletion** [2] - 48:16, 50:10
**deputy** [1] - 3:18
**DEPUTY** [1] - 3:2
**dereliction** [1] - 31:20
**deserve** [1] - 81:11
**designate** [3] - 46:25, 66:1, 66:23
**designated** [2] - 40:24, 65:16
**designation** [3] - 41:12, 43:1, 46:23
**detail** [2] - 25:16, 52:25
**detailed** [3] - 25:18, 56:15, 61:17
**details** [3] - 23:1, 76:16, 80:13
**determines** [1] - 69:16
**detracts** [1] - 36:14
**developed** [2] - 71:12, 71:15
**deviation** [2] - 26:5,

46:16
**devoid** [1] - 81:7
**dicta** [2] - 12:13, 47:21
**difference** [3] - 14:6, 14:17, 50:7
**different** [14] - 22:19, 27:11, 44:6, 48:9, 58:1, 65:5, 70:22, 77:23, 78:12, 79:11, 79:25, 81:16, 81:17, 86:4
**differently** [1] - 18:18
**difficult** [3] - 29:6, 30:24, 74:3
**diffusion** [1] - 61:21
**directed** [2] - 41:11, 60:9
**directing** [3] - 32:3, 32:4, 32:5
**direction** [1] - 82:19
**directive** [1] - 46:17
**directly** [5] - 6:17, 7:8, 8:14, 86:9
**director** [1] - 80:15
**disagree** [9] - 15:24, 19:14, 28:12, 33:4, 34:2, 34:8, 38:19, 61:3
**disagreeing** [1] - 36:6
**disaster** [2] - 26:23, 62:9
**discharge** [3] - 18:21, 86:18, 87:8
**discharged** [1] - 8:19
**discharges** [1] - 8:11
**discharging** [2] - 8:13, 86:23
**disclaim** [2] - 33:15, 38:19
**disclosure** [1] - 16:19
**discovery** [1] - 38:22
**discretion** [13] - 31:18, 31:20, 60:4, 60:21, 60:23, 60:25, 61:1, 61:5, 61:8, 61:9, 62:14, 68:12, 73:23
**discuss** [2] - 5:6, 56:15
**discussed** [12] - 47:23, 50:9, 51:5, 51:20, 57:23, 60:7, 62:23, 66:12, 67:1, 70:24, 71:19, 72:22
**discussion** [1] - 57:18
**dismiss** [1] - 65:23
**dispelling** [1] - 37:18
**disposure** [1] - 22:3
**dispute** [8] - 11:10, 30:15, 37:13, 37:14, 37:25, 38:2, 60:19, 79:8
**disputes** [2] - 15:5, 15:7
**disrepair** [1] - 53:1
**disrupts** [1] - 66:14
**dissembled** [1] - 23:14
**dissent** [9] - 8:7, 8:8, 8:10, 8:19, 9:18, 9:23, 10:6, 48:12, 48:13
**dissolve** [1] - 80:6
**dissolved** [1] - 79:7
**distinguishing** [1] - 35:3
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [1] - 50:8
**district** [1] - 11:18
**divergence** [1] - 38:3
**diversity** [1] - 6:25
**division** [1] - 80:19
**divvying** [1] - 36:21
**doctrinal** [1] - 14:20
**doctrinally** [1] - 12:23
**doctrines** [1] - 30:9
**document** [2] - 40:7, 58:13
**documented** [3] - 39:25, 52:23, 57:21
**documents** [3] - 40:4, 58:16, 78:4
**dodge** [1] - 37:20
**dodging** [1] - 37:20
**DOJ** [1] - 1:21
**DOJ-CIV** [1] - 1:21
**dollar** [1] - 29:9
**dollars** [1] - 23:3
**DONALD** [1] - 1:6
**Donald** [1] - 3:4
**donations** [1] - 28:7
**done** [12] - 16:20, 22:12, 24:10, 26:8, 28:11, 29:20, 39:6, 42:3, 45:9, 45:17, 54:11, 79:23
**Dong** [2] - 52:18, 61:15
**donors** [4] - 24:4, 29:6, 79:15, 80:14
**double** [1] - 75:17
**double-check** [1] - 75:17
**doubts** [1] - 61:1
**down** [16] - 6:2, 7:18, 20:11, 23:7, 24:17, 25:12, 29:24, 30:1, 33:17, 36:18, 36:20, 36:21, 55:1, 62:10, 72:23, 85:19
**drawing** [1] - 27:2
**during** [6] - 26:22, 58:11, 59:1, 59:5, 74:22, 76:2
**duties** [17] - 9:9, 9:10, 10:3, 12:25, 13:5, 18:3, 21:9, 24:5, 29:13, 30:14, 30:16, 31:13, 31:17, 33:22, 55:14, 55:15, 74:1
**duty** [13] - 9:11, 9:12, 9:23, 10:19, 11:22, 18:22, 20:13, 21:10, 21:12, 21:14, 26:1, 31:20, 55:11

## E

**early** [1] - 37:6
**earthquake** [1] - 26:22
**easiest** [6] - 15:2, 17:1, 19:18, 21:19, 29:21, 86:5
**easily** [2] - 20:18, 20:19
**East** [1] - 22:18
**easy** [1] - 31:1
**ECF-29-3** [1] - 80:12
**ECF-30.7** [1] - 45:16
**education** [1] - 75:8
**effect** [3] - 28:9, 68:21, 72:5
**efforts** [2] - 31:24, 59:2
**Eisen** [4] - 3:7, 5:10, 22:1, 40:3
**EISEN** [12] - 1:17, 3:7, 3:24, 4:2, 4:9, 40:6, 40:23, 42:22, 44:25, 46:13, 46:21, 47:4
**either** [8] - 20:19, 57:6, 58:7, 59:11, 74:7, 80:5, 80:9, 84:19
**election** [1] - 67:20
**elements** [1] - 74:21
**ELLIOTT** [1] - 2:3
**Elliott** [1] - 3:20
**embarrassment** [1] - 20:11
**embezzled** [1] - 50:5
**embezzlement** [4] - 10:21, 50:13, 82:6, 82:12
**embezzles** [1] - 10:20
**embezzling** [3] - 13:23, 49:24, 82:13
**embracing** [1] - 83:17
**emphasized** [3] - 26:12, 26:15, 27:12
**emphasizes** [1] - 84:6
**employees** [2] - 32:4, 85:1
**enable** [1] - 73:25
**enabled** [1] - 32:2
**enacted** [1] - 42:8
**enforce** [2] - 48:7, 49:25
**engineering** [1] - 80:16
**enjoin** [1] - 87:5
**enjoined** [1] - 78:10
**enjoining** [2] - 73:24, 74:17
**enjoy** [1] - 75:11
**ensure** [1] - 82:7
**enter** [1] - 12:22
**entering** [2] - 11:13, 11:14
**entire** [1] - 21:11
**entirely** [3] - 3:24, 46:8, 82:18
**entitle** [1] - 52:9
**entitled** [7] - 51:12, 58:4, 60:5, 61:24, 70:5, 72:12, 72:15
**entity** [2] - 9:13, 46:3
**entrance** [2] - 54:7, 54:19
**entrances** [1] - 54:25
**enumerate** [2] - 66:13, 67:5
**enumerated** [1] - 59:5
**environmental** [2] - 20:25, 33:6
**envision** [1] - 78:22
**envisioned** [1] - 70:18
**equally** [1] - 10:25
**equitable** [2] - 73:23, 87:19
**especially** [2] - 66:3, 66:5
**ESQ** [9] - 1:13, 1:13, 1:14, 1:17, 1:17, 1:21, 2:2, 2:2, 2:3
**essentially** [2] - 49:18, 61:14
**et** [13] - 1:6, 3:4, 23:8, 40:11, 46:24, 46:25, 56:18, 65:12, 73:21, 74:18, 77:9
**evaluated** [1] - 29:15
**evidence** [8] - 16:3, 22:19, 25:21, 28:24, 37:3, 37:4, 52:5, 57:5
**ex** [17] - 4:13, 5:4, 34:22, 34:24, 35:3, 35:7, 35:14, 35:24, 36:11, 37:6, 37:22, 39:16, 39:25, 66:13, 66:16, 68:10, 68:12
**exact** [2] - 25:5, 25:8
**examine** [1] - 81:18
**example** [12] - 7:16, 7:25, 9:20, 20:11, 45:6, 48:11, 50:13, 54:15, 55:24, 58:19, 69:10, 86:6
**examples** [7] - 34:21, 34:24, 43:6, 44:15, 44:25, 67:11, 67:16
**excavation** [1] - 54:6
**exclusion** [2] - 41:20, 45:3
**exclusions** [2] - 45:23, 46:4
**exclusive** [1] - 66:2
**Executive** [1] - 49:2
**exercise** [1] - 27:2
**Exhibit** [2] - 45:16, 45:18
**exist** [1] - 84:13
**existence** [2] - 51:6, 52:18
**existing** [1] - 84:8
**expansion** [2] - 31:8, 41:24
**expect** [5] - 11:7, 25:14, 29:16, 32:13, 39:4
**expected** [1] - 26:9
**expense** [1] - 21:11
**expert** [5] - 25:2, 73:10, 73:14, 77:8, 80:19
**experts** [4] - 16:23, 22:4, 30:3, 58:1
**explained** [2] - 39:15, 54:16
**explains** [2] - 24:19, 55:21
**explicit** [2] - 13:5, 13:17
**explicitly** [1] - 34:24
**explode** [1] - 45:20
**exploded** [1] - 45:4
**exposed** [3] - 23:12, 53:12, 54:18
**express** [6] - 14:3, 41:9, 42:14, 43:13, 44:2
**expressed** [1] - 33:16
**expressly** [1] - 58:21
**extensive** [1] - 78:6
**extent** [9] - 12:9, 38:4, 56:7, 75:24, 76:7, 76:16, 81:20, 83:24
**exterior** [2] - 42:1, 64:12
**external** [1] - 34:14
**extinguish** [2] - 51:2,

51:11
**extraordinary** [12] - 10:17, 19:2, 19:11, 22:8, 24:2, 25:13, 25:16, 27:20, 28:23, 80:23, 82:9, 85:15

## F

**f)** [1] - 10:11
**facade** [1] - 40:15
**face** [2] - 24:25, 52:4
**facility** [2] - 75:17, 75:25
**fact** [11] - 10:25, 24:17, 28:4, 28:20, 28:23, 35:14, 52:7, 53:13, 59:4, 66:12, 67:4
**factor** [2] - 77:25, 79:19
**factors** [2] - 71:6, 77:24
**facts** [8] - 10:19, 22:19, 27:19, 38:25, 39:1, 39:21, 39:24
**factual** [3] - 22:15, 37:12, 38:2
**fail** [1] - 52:16
**failing** [1] - 54:17
**failure** [1] - 20:5
**fair** [2] - 54:11, 69:18
**fall** [1] - 11:7
**falls** [1] - 85:8
**Fannie** [3] - 42:20, 43:12, 65:24
**far** [1] - 26:7
**farm** [1] - 11:19
**Farm** [1] - 12:2
**fashion** [1] - 70:14
**fashioning** [1] - 77:4
**fastball** [1] - 4:3
**favor** [5] - 5:2, 60:13, 73:4, 73:16, 74:7
**February** [6] - 16:21, 22:13, 24:24, 27:23, 71:3, 71:9
**federal** [14] - 3:20, 6:19, 7:1, 8:2, 11:13, 12:16, 12:17, 12:22, 14:10, 34:22, 48:18, 50:15, 51:13, 82:6
**Federal** [1] - 2:4
**few** [5] - 37:8, 48:8, 50:17, 70:22, 70:25
**fiduciary** [8] - 10:19, 11:22, 18:3, 18:22, 20:13, 26:1, 31:17, 74:1
**fight** [1] - 23:19
**fights** [1] - 29:8
**file** [4] - 10:4, 10:23, 51:3, 51:17
**filed** [2] - 5:7, 51:18
**filing** [1] - 87:7
**final** [1] - 11:1
**finally** [3] - 4:14, 68:15, 85:25
**financial** [10] - 28:3, 55:13, 55:16, 55:23, 56:5, 56:8, 56:10, 72:24, 77:9, 79:14
**fine** [2] - 20:25, 68:20
**finely** [1] - 15:8
**finger** [1] - 4:3
**fingers** [1] - 19:13
**finish** [1] - 22:22
**first** [25] - 5:13, 6:14, 20:8, 20:15, 20:19, 20:23, 20:24, 21:13, 21:20, 26:21, 28:17, 32:11, 35:21, 35:23, 37:4, 48:10, 50:18, 58:7, 64:18, 68:2, 69:3, 70:3, 71:10, 77:15, 82:4
**fiscal** [2] - 29:2, 29:18
**fit** [1] - 34:3
**Fitzgerald** [1] - 41:19
**five** [2] - 63:10, 72:5
**flag** [1] - 77:14
**flavor** [2] - 84:2, 84:14
**flawed** [1] - 73:8
**fled** [1] - 20:12
**Floca** [22] - 19:1, 32:5, 53:20, 53:23, 54:13, 54:19, 54:25, 55:21, 55:24, 57:21, 58:7, 61:25, 71:7, 71:10, 71:14, 71:15, 74:25, 75:20, 80:11, 80:13, 80:22, 81:4
**Floca's** [4] - 28:20, 30:16, 52:24, 57:10
**flouts** [1] - 42:14
**flow** [4] - 7:15, 24:2, 86:8, 86:9
**flowed** [2] - 7:11, 7:12
**flows** [2] - 8:14, 86:8
**focus** [1] - 34:15
**following** [1] - 35:20
**footnote** [6] - 40:18, 41:11, 42:17, 45:18, 46:22, 48:13
**Footnote** [2] - 8:10, 48:12
**FOR** [1] - 1:1
**forbid** [1] - 62:7
**force** [1] - 30:11
**foregoing** [1] - 88:12
**foreign** [1] - 46:4
**forgotten** [1] - 16:11
**former** [4] - 17:11, 19:7, 29:1, 37:5
**forth** [2] - 49:10, 51:1
**forward** [12] - 25:20, 30:6, 38:25, 39:1, 39:2, 39:5, 39:21, 39:24, 77:20, 79:7, 79:23, 85:7
**founder** [2] - 63:9, 63:11
**founding** [1] - 3:11
**four** [7] - 6:11, 6:12, 21:19, 21:22, 25:21, 29:25, 84:24
**framework** [2] - 48:1, 48:2
**framing** [1] - 31:19
**Freddie** [1] - 65:25
**free** [1] - 42:21
**freed** [1] - 31:13
**FREENY** [1] - 1:14
**Freeny** [1] - 3:9
**friend** [9] - 34:17, 41:7, 55:7, 61:12, 79:16, 80:10, 80:20, 82:16, 87:15
**friends** [14] - 7:10, 7:25, 9:4, 11:9, 14:5, 30:15, 35:21, 36:25, 38:24, 78:1, 82:5, 85:6, 86:10, 86:17
**front** [11] - 14:7, 25:2, 28:24, 32:15, 39:7, 52:25, 79:11, 80:4, 81:6, 81:7, 82:4
**fulfill** [7] - 10:3, 26:21, 30:14, 48:10, 74:1, 77:6, 78:23
**fulfilled** [1] - 8:24
**full** [3] - 54:21, 57:7, 88:13
**fully** [1] - 69:25
**function** [1] - 51:12
**functions** [1] - 75:15
**FUND** [1] - 1:18
**funds** [3] - 55:19, 55:21, 60:10
**funny** [1] - 7:19
**future** [1] - 79:11

## G

**g)(2** [1] - 10:12
**garage** [1] - 31:10
**general** [7] - 17:12, 36:14, 36:22, 56:6, 59:11, 59:17, 68:4
**General** [3] - 3:17, 3:19, 48:7
**generalized** [1] - 6:4
**geographically** [1] - 12:9
**George** [2] - 44:10
**gesture** [1] - 79:20
**GIDEON** [1] - 1:13
**gift** [2] - 43:19, 46:5
**gifts** [1] - 46:6
**Ginny** [1] - 42:20
**girl** [2] - 63:9, 63:11
**given** [17] - 34:23, 37:2, 38:18, 52:18, 57:25, 59:6, 60:18, 60:19, 63:5, 64:7, 67:11, 68:12, 71:16, 77:25, 84:2, 86:15
**goodness** [1] - 82:6
**Gordon** [2] - 63:16, 63:19
**governing** [1] - 40:9
**government** [16] - 6:13, 8:18, 21:21, 22:20, 26:15, 34:23, 45:5, 63:2, 70:15, 70:16, 71:8, 72:4, 72:6, 72:23, 73:4, 78:16
**government's** [8] - 6:1, 34:20, 37:10, 40:18, 42:18, 42:25, 44:16, 44:19
**grant** [4] - 20:15, 29:25, 70:13, 83:2
**Grant's** [1] - 44:12
**granted** [1] - 87:23
**granting** [1] - 87:24
**grass** [1] - 84:24
**great** [3] - 26:23, 83:4, 87:11
**greater** [1] - 21:2
**grievance** [2] - 6:4, 27:17
**ground** [3] - 20:23, 32:25
**grounds** [10] - 33:3, 33:9, 33:19, 57:6, 57:11, 75:22, 75:23, 76:7, 83:11, 85:8
**Group** [1] - 3:11
**group** [1] - 49:18
**GROUP** [1] - 1:14
**guess** [3] - 34:19, 53:9, 73:10
**guidance** [2] - 78:1, 79:1
**guide** [1] - 48:4

## H

**Hall** [2] - 54:19, 54:20
**hall** [2] - 54:4, 54:7
**halls** [2] - 54:5, 55:1
**halt** [2] - 19:19, 74:15
**hand** [2] - 34:17, 80:18
**handful** [1] - 6:7
**hanging** [2] - 33:11, 33:13
**happy** [1] - 85:21
**hard** [2] - 29:7, 29:10
**harm** [19] - 4:19, 14:25, 15:8, 17:20, 18:14, 19:25, 29:2, 49:4, 49:6, 51:7, 72:13, 72:14, 72:21, 72:24, 74:17, 79:14, 79:15, 82:12, 87:3
**harms** [10] - 15:11, 16:6, 16:7, 16:8, 18:14, 19:20, 24:2, 24:3, 25:13, 73:1
**hat** [1] - 33:12
**hate** [1] - 23:19
**havoc** [1] - 12:17
**head** [4] - 55:10, 75:13, 84:19, 84:20
**hear** [4] - 5:9, 8:2, 53:24, 71:15
**heard** [7] - 11:4, 55:6, 76:10, 79:16, 81:14, 82:15, 87:15
**HEARING** [1] - 1:9
**hearing** [6] - 6:25, 9:5, 11:3, 14:19, 61:20, 88:6
**heart** [1] - 28:16
**heartburn** [1] - 37:22
**heartland** [3] - 11:7, 13:25, 15:16
**heavy** [1] - 12:14
**held** [1] - 46:25
**HELD** [1] - 1:10
**helpful** [7] - 32:8, 33:14, 62:25, 64:8, 85:20, 85:23, 86:13
**hereby** [1] - 88:11
**heritage** [1] - 60:19
**hesitant** [1] - 38:13
**HH** [1] - 45:16
**hidden** [1] - 28:22
**hiding** [1] - 20:10
**highlight** [1] - 44:16
**highlights** [1] - 44:15
**highly** [1] - 12:13
**historic** [4] - 5:8, 11:11, 38:3
**historical** [5] - 37:13, 37:15, 38:21, 38:22, 49:6
**historically** [3] - 11:4, 14:24, 14:25

**history** [9] - 11:6, 11:12, 15:3, 15:4, 15:6, 57:22, 64:7, 83:20, 84:2
**hit** [1] - 55:9
**hoc** [1] - 19:1
**hold** [2] - 83:6, 87:16
**honest** [1] - 82:5
**honor** [5] - 42:11, 42:13, 44:3, 46:2, 46:4
**Honor** [104] - 3:2, 3:7, 3:16, 3:24, 4:4, 5:17, 7:19, 8:21, 10:7, 11:17, 16:14, 22:2, 23:19, 27:14, 32:8, 34:2, 34:16, 35:20, 40:2, 40:6, 40:23, 41:9, 42:4, 42:22, 43:8, 43:16, 44:25, 46:13, 46:21, 47:6, 47:23, 49:9, 50:6, 50:12, 50:17, 50:24, 51:5, 51:20, 51:22, 52:3, 52:11, 53:15, 53:24, 54:12, 55:4, 55:9, 56:13, 56:16, 56:19, 57:10, 57:20, 58:5, 58:12, 58:17, 59:3, 59:21, 60:1, 61:7, 61:19, 61:21, 62:3, 62:6, 62:8, 62:17, 62:19, 62:23, 63:4, 63:20, 64:4, 64:6, 64:20, 65:4, 66:4, 66:11, 66:22, 67:15, 68:15, 68:25, 69:19, 70:2, 70:6, 70:21, 71:4, 71:13, 71:24, 72:6, 72:20, 73:3, 73:13, 73:18, 74:2, 74:8, 74:20, 75:2, 75:18, 76:23, 76:25, 77:11, 80:23, 81:24, 83:22, 85:6, 87:4, 88:2
**HONORABLE** [1] - 1:10
**hope** [1] - 40:3
**hours** [1] - 83:19
**housed** [1] - 75:16
**huge** [1] - 12:10
**hurried** [1] - 18:5
**hypo** [1] - 23:20
**hypothesis** [1] - 28:4
**hypothetical** [3] - 49:23, 67:19

## I

**idea** [6] - 45:20, 50:15, 51:14, 51:16, 60:22, 66:14
**identified** [3] - 15:15, 16:7, 35:5
**identify** [3] - 3:6, 14:24, 35:10
**ignore** [1] - 85:18
**II** [1] - 49:21
**III** [11] - 5:20, 5:24, 6:11, 6:22, 7:6, 7:13, 11:8, 15:16, 51:4, 82:3, 82:9
**Illinois** [2] - 11:18, 50:8
**illustrate** [1] - 32:10
**imagine** [3] - 10:18, 12:20, 35:24
**imminence** [1] - 52:6
**imminent** [2] - 50:19, 52:5
**imminently** [1] - 55:5
**implausible** [1] - 46:8
**implications** [3] - 28:3, 29:18, 56:8
**implicit** [1] - 13:16
**implied** [3] - 14:2, 36:3, 36:18
**imply** [2] - 10:3, 13:3
**important** [2] - 18:24, 42:5
**impossibility** [2] - 30:7, 30:9
**impossible** [2] - 26:24, 30:12
**impression** [1] - 45:15
**impressions** [2] - 45:13, 45:20
**improvement** [1] - 22:25
**IN** [1] - 1:1
**in-circuit** [1] - 48:3
**inability** [1] - 48:10
**inapplicable** [1] - 44:15
**inauguration** [1] - 67:20
**include** [1] - 13:6
**included** [1] - 55:18
**incorporating** [1] - 14:13
**incorporation** [1] - 10:10
**incredible** [1] - 29:2
**incredibly** [3] - 28:21, 29:7, 31:3
**indeed** [2] - 85:14, 85:17
**independent** [4] - 9:12, 22:9, 25:17, 29:19
**indicate** [2] - 4:13, 44:21
**indicates** [2] - 64:15, 71:11
**indication** [3] - 35:10, 59:19, 85:7
**indicative** [2] - 26:5, 28:21
**individual** [1] - 49:3
**individuals** [1] - 6:8
**indulgence** [6] - 5:24, 19:4, 38:24, 81:2, 81:12, 85:21
**inequitable** [1] - 70:7
**infer** [1] - 13:3
**information** [5] - 18:21, 31:21, 57:7, 61:22, 77:5
**Ingraham** [1] - 58:19
**initiated** [1] - 4:11
**injunction** [31] - 4:5, 4:21, 4:22, 4:24, 9:7, 17:2, 17:16, 18:13, 18:19, 19:18, 19:19, 19:22, 19:23, 20:16, 21:18, 25:11, 28:18, 29:22, 30:1, 50:19, 50:21, 65:6, 70:16, 72:8, 73:2, 74:19, 77:19, 79:8, 80:6, 81:11, 83:3
**injured** [2] - 8:22, 86:2
**injuries** [1] - 15:22
**injury** [12] - 17:7, 17:12, 17:17, 48:9, 49:5, 50:12, 50:14, 50:19, 51:21, 52:1, 52:7, 52:8
**input** [1] - 59:15
**inputs** [1] - 69:24
**inscriptions** [1] - 46:7
**inside** [2] - 54:4, 64:10
**instance** [3] - 58:7, 62:12, 71:25
**instances** [1] - 67:5
**instead** [4] - 25:21, 39:6, 53:6, 80:1
**institution** [4] - 25:6, 25:7, 45:19, 86:7
**institutions** [1] - 16:23
**instructed** [2] - 46:1, 46:14
**instructive** [1] - 12:13
**intended** [2] - 64:3, 66:15
**intention** [1] - 51:14
**interact** [1] - 55:14
**interest** [10] - 6:9, 20:10, 48:15, 48:19, 48:25, 49:8, 49:21, 50:3, 50:11, 87:24
**interests** [1] - 61:2
**interior** [1] - 42:5
**internal** [1] - 54:9
**interpret** [2] - 14:12, 82:17
**interpreted** [1] - 66:2
**interpreting** [2] - 14:7, 37:16
**intrusion** [1] - 54:7
**involvement** [1] - 56:14
**irrelevant** [1] - 38:10
**irreparable** [1] - 4:19
**issue** [12] - 4:18, 4:21, 5:1, 5:3, 6:12, 8:20, 15:23, 17:23, 20:19, 29:13, 76:6, 81:23
**issues** [13] - 4:5, 4:12, 4:25, 5:6, 5:7, 5:12, 5:14, 9:7, 17:19, 47:14, 47:18, 54:13, 81:5
**itself** [7] - 16:5, 17:8, 37:7, 69:15, 69:17, 86:19, 87:3

## J

**JANKOWSKI** [1] - 2:2
**Jankowski** [1] - 3:19
**January** [2] - 71:14, 71:18
**JFK** [1] - 41:14
**job** [1] - 49:1
**John** [18] - 9:13, 40:13, 40:24, 41:2, 41:16, 41:19, 41:22, 42:10, 42:13, 43:1, 43:5, 46:10, 46:15, 47:1, 65:16, 82:20, 82:21
**Johnson** [1] - 44:11
**jokes** [1] - 47:11
**Josh** [1] - 19:9
**JOYCE** [1] - 1:3
**Joyce** [2] - 3:3, 3:8
**JUDGE** [1] - 1:10
**judgment** [18] - 4:7, 4:20, 4:24, 5:2, 37:10, 37:11, 38:6, 38:9, 39:9, 39:10, 40:8, 46:18, 46:19, 62:18, 72:25, 78:19, 80:7, 83:3
**judicial** [1] - 60:4
**Juliette** [2] - 63:16, 63:18
**jump** [1] - 41:13
**jurisdiction** [2] - 6:25, 60:16
**justice** [1] - 11:11
**Justice** [6] - 7:8, 7:23, 8:7, 8:9, 48:12, 87:20
**JUSTICE** [1] - 2:3
**justiciable** [1] - 51:16

## K

**KCPA** [1] - 43:9
**keep** [5] - 21:8, 23:25, 42:11, 85:16
**keeping** [1] - 25:23
**Kennedy** [28] - 9:14, 27:7, 28:5, 31:4, 36:15, 40:13, 40:25, 41:2, 41:16, 41:20, 41:22, 42:10, 42:13, 43:1, 43:5, 43:15, 43:17, 43:18, 43:19, 46:10, 46:15, 47:1, 52:23, 65:16, 69:1, 82:20, 82:21
**kind** [9] - 27:16, 29:7, 36:3, 48:10, 50:14, 60:19, 64:14, 69:5, 76:12
**kinds** [2] - 12:17, 12:21
**knock** [1] - 25:12
**knowledge** [1] - 69:24
**Kristofcak** [1] - 3:10
**KRISTOFCAK** [1] - 1:13
**Kyle** [1] - 3:9
**KYLE** [1] - 1:14

## L

**lack** [3] - 4:18, 19:15, 25:24
**lacking** [1] - 52:7
**laid** [1] - 26:17
**language** [4] - 14:3, 41:14, 45:2, 87:4
**large** [1] - 22:15
**LARRY** [1] - 1:17
**late** [3] - 41:19, 71:14, 71:18
**latter** [1] - 17:14
**law** [39] - 5:4, 6:6, 6:10, 6:19, 6:20, 6:24, 7:1, 7:14, 10:8, 11:11, 12:12, 12:17, 13:6, 13:13, 13:14, 13:19, 13:20, 14:9, 14:14, 14:16, 14:17, 15:15, 30:8, 30:9, 35:3, 36:8, 37:12, 38:14, 38:18, 39:8,

46:23, 46:24, 47:23, 52:16, 53:6, 60:12, 61:6, 63:21, 83:25
**Law** [1] - 60:20
**lawsuit** [5] - 10:4, 10:15, 51:3, 51:17, 51:18
**lawyer** [1] - 59:11
**laying** [1] - 31:24
**leads** [1] - 46:8
**least** [5] - 8:5, 8:20, 29:17, 53:13, 67:2
**leave** [1] - 4:4
**Lee** [1] - 44:12
**left** [1] - 62:14
**legal** [15] - 6:8, 8:11, 8:12, 30:9, 48:15, 50:11, 59:15, 65:19, 67:23, 68:21, 86:19, 86:22, 87:16, 87:19, 87:24
**legality** [1] - 59:13
**legislative** [2] - 83:20, 84:2
**leisure** [1] - 29:9
**length** [3] - 19:10, 21:2, 56:15
**lengthy** [2] - 20:20, 61:18
**lesser** [1] - 4:11
**letters** [1] - 43:11
**level** [1] - 39:8
**liability** [11] - 8:23, 9:1, 9:2, 50:21, 51:2, 51:11, 52:4, 58:20, 70:23, 71:5, 72:18
**lick** [1] - 28:19
**light** [4] - 38:2, 72:3, 84:12, 84:17
**likelihood** [2] - 21:23, 32:11
**likely** [5] - 19:24, 21:3, 21:18, 22:18, 81:22
**limited** [3] - 46:9, 49:16, 73:20
**Lincoln** [1] - 44:12
**line** [3] - 27:2, 42:12, 64:18
**lines** [1] - 58:9
**link** [2] - 29:4, 29:5
**linking** [1] - 17:20
**liquidate** [1] - 38:17
**LISA** [1] - 88:11
**Lisa** [1] - 2:7
**list** [2] - 78:9, 79:3
**Litigation** [1] - 3:10
**litigation** [1] - 77:18
**LITIGATION** [1] - 1:14
**live** [2] - 83:13, 83:14
**living** [6] - 26:14, 41:14, 45:3, 59:15, 63:3, 64:1
**location** [1] - 43:16
**locations** [1] - 43:20
**look** [25] - 6:14, 9:21, 10:9, 10:12, 14:12, 15:2, 16:21, 24:17, 38:14, 40:11, 41:18, 42:7, 43:6, 45:10, 45:22, 46:22, 47:25, 48:13, 55:11, 73:11, 73:12, 77:1, 82:16, 84:18, 85:21
**Look** [1] - 79:12
**looked** [1] - 79:12
**looking** [5] - 6:11, 14:15, 38:20, 41:9
**looks** [2] - 15:3, 21:18
**lose** [1] - 29:9
**losing** [1] - 50:4
**loss** [4] - 58:10, 74:18
**losses** [1] - 28:6
**low** [1] - 63:16
**Low** [1] - 63:19

## M

**Mac** [2] - 42:20, 65:25
**Mae** [3] - 42:20, 43:12, 65:24
**main** [2] - 54:25, 57:5
**maintain** [5] - 26:13, 26:16, 59:14, 66:21
**maintained** [1] - 83:11
**maintains** [1] - 43:1
**maintenance** [2] - 80:16, 85:1
**majeure** [1] - 30:11
**majority** [5] - 6:15, 6:17, 7:23, 8:8, 86:5
**malfeasance** [1] - 15:12
**manage** [2] - 28:2, 85:4
**management** [2] - 33:9, 80:15
**managers** [1] - 80:17
**managing** [1] - 84:7
**mandamus** [1] - 52:17
**mandatory** [6] - 21:9, 21:11, 21:12, 21:14, 24:5, 29:12
**manner** [4] - 18:5, 42:6, 44:8, 70:19
**manufacture** [2] - 18:25, 19:13
**March** [1] - 53:3
**marshall** [3] - 11:19, 12:2, 50:7
**marshalled** [1] - 11:10
**matches** [1] - 51:20
**material** [1] - 38:1
**matter** [11] - 5:4, 7:1, 14:20, 15:20, 37:12, 39:8, 39:21, 56:6, 62:4, 73:1, 87:18
**Mayers** [4] - 3:17, 47:7, 47:9, 47:10
**MAYERS** [87] - 1:21, 3:16, 47:6, 47:9, 47:11, 47:13, 47:16, 47:19, 47:25, 48:5, 49:9, 49:13, 50:6, 51:25, 52:15, 53:15, 53:19, 54:12, 54:15, 55:16, 56:3, 56:13, 57:10, 57:13, 57:20, 58:12, 58:24, 59:17, 59:21, 60:18, 61:7, 61:12, 62:3, 62:6, 62:11, 62:17, 63:4, 63:12, 63:14, 63:16, 63:20, 64:4, 64:6, 64:20, 64:23, 65:4, 65:11, 66:11, 66:19, 66:22, 66:25, 67:4, 67:9, 67:15, 67:24, 68:2, 68:8, 68:25, 69:3, 69:7, 69:19, 69:22, 70:2, 70:11, 70:21, 71:4, 71:13, 71:24, 72:2, 72:6, 72:11, 73:2, 73:9, 73:13, 73:16, 74:2, 74:24, 75:2, 75:4, 75:6, 75:13, 75:16, 75:23, 76:5, 76:10, 76:14, 76:23
**McCOY** [1] - 2:3
**mean** [23] - 10:9, 11:10, 14:8, 16:3, 17:23, 22:14, 26:19, 28:4, 31:24, 38:1, 43:7, 63:6, 63:23, 68:22, 70:9, 74:4, 79:16, 80:22, 81:7, 85:2, 85:3, 85:15, 85:16
**meaning** [5] - 13:15, 38:17, 40:9, 45:11, 45:21
**meaningful** [1] - 25:24
**means** [1] - 82:24
**meant** [4] - 44:21, 56:2, 62:24, 63:8
**meantime** [1] - 28:10
**measure** [1] - 77:21
**mechanical** [1] - 80:16
**mechanism** [1] - 31:1
**meet** [2] - 47:10, 64:11
**meeting** [4] - 53:3, 57:19, 59:5, 74:5
**meetings** [2] - 59:18, 68:13
**member** [1] - 6:3
**members** [14] - 4:14, 5:4, 18:20, 30:22, 34:22, 34:25, 35:15, 36:11, 36:15, 66:14, 66:16, 67:20, 68:10, 68:12
**memorial** [25] - 9:13, 26:14, 41:14, 41:19, 42:15, 44:2, 44:8, 44:12, 44:14, 44:20, 45:11, 45:21, 59:14, 59:15, 62:24, 63:9, 63:22, 64:14, 64:16, 64:21, 65:16, 75:7, 82:22
**memorialize** [3] - 44:22, 63:3, 64:1
**memorials** [10] - 41:21, 41:22, 42:7, 44:9, 45:2, 45:25, 62:21, 62:22, 65:8, 65:9
**memory** [1] - 42:10
**mention** [1] - 51:1
**mentioned** [4] - 42:18, 58:22, 62:8, 81:3
**mere** [2] - 39:10, 39:11
**merely** [1] - 9:18
**merits** [12] - 5:14, 19:3, 19:25, 21:3, 21:23, 21:25, 22:15, 24:14, 47:17, 52:15, 52:16, 70:6
**Meyer** [1] - 47:11
**Meyers** [1] - 47:8
**micromanage** [4] - 27:7, 27:16, 79:4, 79:18
**middle** [1] - 41:18
**might** [15] - 5:20, 5:23, 21:20, 24:7, 28:12, 30:8, 30:25, 32:7, 32:10, 35:5, 67:22, 78:2, 84:15, 87:2
**million** [1] - 22:24
**mindful** [1] - 41:4
**minimum** [4] - 21:6, 26:9, 27:21, 32:13
**minute** [1] - 76:20
**minutes** [2] - 59:5, 74:6
**mismatch** [1] - 17:17
**missed** [1] - 56:5
**MM** [1] - 45:18
**mockery** [1] - 82:25
**moment** [1] - 80:4
**momentum** [1] - 58:10
**money** [3] - 50:4, 55:17, 73:11
**monikers** [1] - 65:24
**month** [2] - 70:17, 78:20
**months** [3] - 70:18, 78:20
**Monument** [1] - 44:11
**monumental** [1] - 25:25
**mooted** [1] - 68:22
**MOREIRA** [1] - 88:11
**Moreira** [2] - 2:7, 88:18
**morning** [7] - 3:2, 3:7, 3:13, 3:15, 3:16, 47:6, 47:7
**most** [5] - 15:21, 34:13, 63:8, 65:13, 65:14
**MOTION** [1] - 1:9
**motion** [2] - 80:5, 80:6
**motions** [2] - 62:18, 78:19
**motive** [1] - 26:6
**Mount** [1] - 48:5
**mounted** [1] - 85:12
**move** [2] - 52:12, 77:20
**moved** [4] - 4:19, 4:20, 4:24, 5:1
**moving** [1] - 37:10
**MR** [166] - 3:7, 3:16, 3:24, 4:2, 4:9, 5:17, 5:19, 6:1, 6:21, 7:19, 8:17, 8:21, 8:25, 10:7, 10:24, 11:16, 11:23, 11:25, 12:6, 13:7, 13:10, 15:1, 15:24, 16:2, 16:12, 16:14, 17:4, 17:10, 17:18, 17:24, 18:1, 18:8, 18:12, 18:23, 22:2, 22:21, 23:19, 23:22, 26:3, 27:14, 28:15, 30:12, 31:22, 32:3, 33:10, 33:13, 34:2, 34:16, 35:2, 35:19, 37:17, 38:4, 38:8, 38:11, 39:20, 39:23, 40:2, 40:6, 40:23, 42:22, 44:25, 46:13, 46:21, 47:4, 47:6, 47:9, 47:11, 47:13, 47:16, 47:19, 47:25, 48:5, 49:9, 49:13, 50:6, 51:25, 52:15, 53:15, 53:19,

54:12, 54:15, 55:16, 56:3, 56:13, 57:10, 57:13, 57:20, 58:12, 58:24, 59:17, 59:21, 60:18, 61:7, 61:12, 62:3, 62:6, 62:11, 62:17, 63:4, 63:12, 63:14, 63:16, 63:20, 64:4, 64:6, 64:20, 64:23, 65:4, 65:11, 66:11, 66:19, 66:22, 66:25, 67:4, 67:9, 67:15, 67:24, 68:2, 68:8, 68:25, 69:3, 69:7, 69:19, 69:22, 70:2, 70:11, 70:21, 71:4, 71:13, 71:24, 72:2, 72:6, 72:11, 73:2, 73:9, 73:13, 73:16, 74:2, 74:24, 75:2, 75:4, 75:6, 75:13, 75:16, 75:23, 76:5, 76:10, 76:14, 76:23, 76:25, 77:11, 78:25, 80:8, 81:24, 83:5, 83:14, 83:22, 84:9, 84:18, 85:5, 85:13, 85:24, 86:3, 87:4, 87:10, 88:2
**multiple** [1] - 33:22
**multispace** [1] - 29:16
**multiyear** [1] - 20:20
**multiyear-long** [1] - 20:20
**musical** [2] - 16:23, 75:9
**must** [2] - 51:10, 79:19

## N

**nail** [1] - 55:9
**name** [25] - 40:13, 40:14, 40:19, 42:14, 42:18, 42:19, 43:3, 43:4, 43:5, 44:19, 44:21, 45:7, 59:12, 62:19, 63:17, 65:2, 65:3, 65:19, 65:20, 65:22, 66:2, 82:14, 82:18
**named** [7] - 40:20, 41:15, 42:11, 42:12, 46:15, 82:20
**naming** [4] - 40:8, 46:2, 46:4, 72:20
**narrative** [2] - 36:25, 37:18
**narrowly** [1] - 20:4
**NATHANIEL** [1] - 1:13
**Nathaniel** [1] - 3:9
**National** [1] - 68:19
**national** [7] - 40:19, 41:19, 42:7, 44:9, 44:14, 46:24
**Nations** [1] - 54:20
**natural** [1] - 62:9
**nature** [11] - 19:5, 41:21, 45:24, 46:1, 53:25, 55:2, 57:22, 58:16, 62:22, 65:8, 76:18
**NCPC** [3] - 20:24, 69:10, 69:16
**necessarily** [8] - 20:18, 51:20, 60:2, 67:9, 67:11, 68:6, 74:4, 77:24
**necessary** [3] - 28:11, 55:3, 71:23
**need** [13] - 20:4, 20:14, 26:7, 26:8, 26:23, 29:11, 30:24, 47:25, 52:22, 54:22, 55:1, 74:6, 85:25
**needed** [5] - 53:4, 55:5, 55:20, 74:4
**needs** [11] - 31:5, 51:7, 51:14, 51:15, 66:4, 69:16, 71:17, 75:24, 77:8, 77:9
**neutral** [1] - 29:13
**never** [3] - 24:1, 26:20, 28:22
**new** [7] - 18:10, 23:8, 35:25, 42:18, 43:5, 67:21, 78:17
**New** [2] - 19:7, 29:1
**news** [2] - 23:11, 59:6
**NEXT** [1] - 1:24
**next** [1] - 28:5
**nice** [1] - 47:10
**nickname** [1] - 42:19
**nobody** [2] - 9:14, 36:20
**none** [8] - 16:25, 25:19, 28:18, 29:10, 29:15, 29:20, 53:21, 79:16
**nonprofit** [1] - 34:22
**normal** [2] - 26:5, 50:12
**normally** [1] - 61:20
**Norman** [1] - 3:7
**NORMAN** [1] - 1:17
**Northern** [1] - 50:8
**notable** [1] - 80:12
**note** [8] - 14:4, 18:24, 36:25, 42:23, 74:8, 74:12, 74:20, 87:14
**noted** [1] - 39:2
**notes** [2] - 86:14, 88:13
**nothing** [8] - 6:4, 12:4, 16:17, 16:19, 36:23, 43:12, 66:15, 82:9
**notice** [1] - 81:13
**noticed** [1] - 40:17
**notion** [1] - 38:24
**notwithstanding** [1] - 42:17
**NPS** [5] - 84:5, 84:8, 84:13, 84:25, 85:8
**number** [3] - 5:6, 54:5, 86:4
**numbers** [2] - 57:17, 79:13
**NW** [5] - 1:15, 1:22, 2:4, 2:8, 88:20

## O

**object** [1] - 79:24
**objecting** [1] - 43:17
**objects** [2] - 10:21, 49:24
**obligation** [18] - 6:8, 8:11, 8:13, 8:19, 9:3, 9:18, 26:13, 26:16, 26:20, 27:11, 27:12, 48:11, 59:13, 86:1, 86:19, 86:23, 87:2, 87:8
**obligations** [17] - 7:3, 8:24, 12:25, 13:11, 13:18, 18:4, 26:12, 26:25, 27:22, 55:10, 56:7, 61:2, 68:13, 69:2, 77:6, 78:24, 87:23
**observe** [1] - 75:11
**obviously** [7] - 5:12, 26:11, 27:8, 27:10, 58:11, 75:20, 77:18
**occur** [5] - 16:7, 18:15, 25:13, 32:6, 80:9
**occurred** [4] - 16:22, 16:25, 25:20, 28:18
**occurring** [4] - 19:20, 19:25, 37:18, 82:6
**OF** [4] - 1:1, 1:9, 2:3, 88:9
**offends** [1] - 46:16
**office** [4] - 60:11, 75:12, 75:18, 76:10
**OFFICIAL** [1] - 88:9
**official** [3] - 32:5, 65:12, 88:19
**Official** [1] - 2:7
**officio** [9] - 4:14, 5:4, 34:22, 34:25, 35:15, 66:13, 66:16, 68:10, 68:12
**officios** [8] - 35:4, 35:7, 35:24, 36:12, 37:6, 37:22, 39:17, 39:25
**often** [1] - 50:12
**Ogden** [1] - 3:12
**OGDEN** [1] - 1:17
**old** [3] - 13:13, 14:1, 39:9
**older** [1] - 47:23
**ON** [1] - 1:24
**once** [3] - 27:6, 29:9, 85:1
**one** [62] - 6:7, 7:5, 8:4, 8:6, 9:10, 9:19, 10:20, 11:17, 12:20, 13:17, 15:11, 16:16, 16:20, 16:22, 17:19, 19:1, 20:8, 21:10, 21:20, 26:24, 30:4, 31:14, 31:17, 32:4, 32:7, 32:9, 32:13, 35:12, 39:4, 39:13, 41:15, 49:2, 49:9, 49:10, 49:17, 49:23, 50:22, 55:7, 55:20, 57:14, 59:24, 60:7, 61:1, 63:2, 63:6, 64:1, 65:15, 66:7, 66:23, 68:10, 70:3, 72:14, 75:14, 80:9, 80:14, 81:13, 82:15, 83:6, 83:9, 84:12, 87:25
**one-page** [1] - 19:1
**one-year** [4] - 16:16, 16:20, 16:22, 30:4
**ones** [1] - 66:2
**open** [15] - 21:8, 24:1, 24:21, 25:23, 26:24, 56:9, 56:23, 58:20, 74:21, 75:6, 75:21, 75:25, 76:8, 76:11, 81:8
**opening** [1] - 12:1
**operate** [2] - 67:17, 85:4
**operated** [4] - 37:24, 42:6, 44:8, 83:11
**operates** [1] - 22:7
**operating** [1] - 84:7
**operation** [2] - 33:9, 33:18
**operational** [1] - 85:17
**operations** [1] - 80:15
**opinion** [13] - 6:15, 7:23, 10:13, 16:15, 27:17, 36:19, 38:3, 39:2, 39:16, 78:25, 79:2, 86:5, 88:4
**opportunity** [1] - 81:22
**oppose** [1] - 4:23
**opposed** [4] - 15:22, 17:12, 44:23, 87:17
**opposing** [2] - 26:15, 51:13
**opposite** [3] - 25:5, 67:8, 67:10
**order** [11] - 4:17, 5:16, 10:3, 21:15, 26:21, 47:18, 61:20, 73:14, 78:23, 79:2, 86:1
**order's** [1] - 21:16
**ordinary** [1] - 48:17
**organic** [3] - 12:23, 26:11, 41:2
**organization** [1] - 36:4
**organizations** [1] - 5:8
**organized** [1] - 5:12
**original** [1] - 40:21
**Oscar** [1] - 47:11
**Oscar-Meyer** [1] - 47:11
**otherwise** [1] - 40:15
**ounce** [1] - 82:19
**outside** [3] - 30:5, 54:17, 64:12
**overhang** [1] - 54:17
**overlap** [1] - 5:7
**overseeing** [1] - 6:7
**oversight** [1] - 36:16
**overstayed** [1] - 87:13
**overstaying** [2] - 33:2, 82:1
**own** [3] - 20:10, 22:11, 51:4
**owner** [1] - 8:12

## P

**p.m** [1] - 88:7
**PAGE** [1] - 1:24
**Page** [1] - 80:12
**page** [1] - 19:1
**pants** [1] - 82:25
**paper** [2] - 41:5, 74:4
**papers** [5] - 43:22, 52:24, 61:16, 65:23, 77:1
**Paragraph** [1] - 45:15
**parking** [1] - 31:10
**parses** [1] - 15:7
**part** [8] - 12:7, 24:8, 26:3, 31:7, 63:7, 68:2, 68:3, 71:4
**partial** [1] - 16:25
**particular** [3] - 17:12, 83:20, 85:6

**particularized** [1] - 6:9
**particularly** [3] - 4:10, 45:23, 73:5
**parts** [1] - 75:25
**party** [1] - 78:7
**past** [10] - 37:2, 37:24, 44:22, 45:9, 45:12, 45:14, 45:17, 45:20, 62:25
**patrons** [2] - 20:12, 46:6
**patterns** [1] - 11:1
**paucity** [1] - 81:1
**Pause** [2] - 76:21, 83:7
**payments** [1] - 60:9
**Pennsylvania** [2] - 1:18, 1:22
**people** [8] - 28:24, 33:17, 45:3, 45:4, 50:4, 80:11, 80:13
**percent** [1] - 24:14
**perfect** [1] - 56:1
**performance** [2] - 28:7, 57:1
**performances** [5] - 26:13, 31:25, 33:23, 59:14, 76:12
**performing** [8] - 25:6, 25:7, 29:16, 40:14, 40:20, 42:13, 60:9, 63:19
**Performing** [7] - 40:25, 41:3, 41:16, 41:23, 43:2, 46:11, 47:1
**perhaps** [6] - 15:19, 40:19, 42:19, 54:4, 54:18, 68:3
**period** [2] - 16:20, 58:11
**peripheral** [1] - 13:20
**permanent** [5] - 19:23, 21:17, 73:2, 77:19, 79:8
**permission** [2] - 41:6, 81:19
**permit** [2] - 10:16, 85:14
**person** [5] - 5:19, 23:5, 45:12, 63:3, 64:1
**personal** [1] - 8:14
**personally** [1] - 8:22
**perspective** [1] - 78:15
**pertain** [1] - 81:16
**phase** [1] - 76:2
**phased** [11] - 24:24, 25:8, 25:23, 30:18, 31:7, 55:24, 56:9, 56:24, 57:14, 59:9, 70:19
**Philharmonic** [2] - 19:7, 29:2
**photovoltaic** [1] - 31:9
**phrase** [6] - 13:10, 13:14, 13:15, 14:7, 14:8, 14:13
**PI** [6] - 20:5, 21:21, 70:10, 70:13, 77:16, 79:7
**piece** [6] - 37:4, 51:8, 62:25, 72:18, 72:20, 73:3
**pieces** [1] - 37:3
**Pierce** [1] - 3:20
**PIERCE** [1] - 2:2
**pile** [1] - 41:5
**place** [5] - 5:23, 52:12, 52:13, 70:19, 85:16
**placement** [1] - 62:21
**places** [1] - 41:15
**plainly** [1] - 20:8
**Plaintiff** [2] - 1:4, 1:13
**plaintiff** [11] - 3:5, 3:8, 4:20, 5:1, 5:3, 50:2, 52:17, 53:22, 72:21, 84:6, 86:15
**plaintiff's** [3] - 4:17, 4:23, 23:17
**plaintiffs** [8] - 4:19, 47:19, 52:19, 56:15, 58:13, 59:7, 64:9, 65:23
**plan** [12] - 21:8, 22:17, 22:25, 23:25, 24:23, 24:24, 27:23, 40:4, 69:9, 69:25, 76:1
**planned** [4] - 23:24, 25:9, 53:25
**Planning** [1] - 68:19
**planning** [1] - 24:15
**plans** [4] - 25:18, 52:25, 74:14, 78:7
**plaque** [1] - 46:4
**plaques** [3] - 41:21, 62:22, 65:8
**play** [2] - 48:20, 55:14
**players** [1] - 3:22
**plays** [1] - 74:10
**plaza** [1] - 41:25
**plumbing** [1] - 80:16
**podium** [2] - 33:2, 82:1
**point** [44] - 11:1, 11:2, 14:22, 17:6, 21:15, 27:24, 33:4, 33:5, 34:9, 34:21, 35:13, 36:14, 37:13, 37:15, 43:7, 43:15, 43:22, 47:2, 50:7, 51:3, 56:17, 57:24, 58:9, 59:7, 64:8, 64:24, 65:6, 65:15, 70:3, 71:21, 77:13, 79:24, 80:3, 80:10, 80:11, 81:3, 82:3, 82:15, 86:11, 86:17, 86:18, 87:17, 87:21
**pointed** [4] - 13:21, 34:23, 44:7, 56:11
**points** [5] - 28:20, 30:17, 33:5, 57:18, 77:12
**pop** [1] - 4:6
**portico** [1] - 64:19
**position** [19] - 13:4, 23:5, 23:17, 27:9, 27:18, 42:18, 44:16, 44:19, 49:1, 49:14, 50:1, 61:8, 62:24, 63:4, 66:11, 68:9, 77:7, 82:4, 82:5
**possible** [6] - 10:18, 21:6, 21:7, 33:24, 53:23, 82:2
**post** [4] - 19:1, 25:19, 30:4, 38:14
**post-Chevron** [1] - 38:14
**posts** [1] - 23:10
**potential** [5] - 9:2, 9:3, 50:16, 52:3, 72:18
**potentially** [6] - 12:17, 13:7, 38:12, 51:2, 51:17, 55:18
**power** [1] - 32:20
**practice** [10] - 37:2, 37:15, 38:3, 38:16, 38:21, 38:22, 39:3, 65:22, 66:1, 76:9
**practices** [1] - 37:13
**practicing** [1] - 75:10
**practitioners** [1] - 22:5
**precedent** [1] - 52:20
**precise** [1] - 19:5
**precisely** [5] - 10:15, 10:24, 15:13, 75:21, 80:8
**preference** [2] - 47:13, 71:16
**prejudice** [1] - 72:4
**prejudiced** [2] - 70:15, 70:16
**preliminarily** [1] - 78:11
**preliminary** [19] - 4:5, 4:21, 4:23, 9:7, 17:2, 18:13, 18:19, 19:17, 19:19, 19:21, 20:16, 25:11, 28:17, 29:22, 30:1, 80:6, 81:11, 83:2
**premise** [1] - 27:1
**prepared** [5] - 57:19, 75:19, 76:6, 81:5, 81:19
**preposterous** [1] - 16:16
**present** [5] - 4:11, 26:13, 44:23, 59:18, 71:6
**presented** [3] - 16:3, 31:21, 78:4
**preservation** [1] - 5:8
**preserve** [2] - 18:13, 77:21
**president** [6] - 37:5, 40:15, 42:14, 44:4, 44:20, 44:23
**President** [13] - 16:21, 16:22, 19:7, 23:11, 25:18, 26:14, 29:1, 36:22, 44:24, 45:8, 45:16, 53:16, 71:11
**President's** [3] - 22:11, 53:10, 56:14
**presidential** [5] - 42:7, 44:1, 44:8, 44:9, 67:21
**presidents** [1] - 44:6
**press** [1] - 45:6
**presumably** [1] - 8:23
**presumption** [6] - 35:16, 66:21, 67:3, 67:7, 67:10, 67:16
**presumptions** [1] - 67:13
**pretext** [2] - 26:4, 33:5
**pretextual** [2] - 20:8, 28:4
**pretty** [4] - 22:4, 35:9, 38:17, 78:1
**prevail** [7] - 20:3, 20:7, 21:21, 24:5, 24:6, 36:2, 38:18
**prevent** [9] - 9:8, 9:23, 10:17, 18:14, 19:20, 38:5, 52:19, 72:8, 87:6
**prevented** [1] - 9:11
**preventing** [1] - 33:17
**previewed** [1] - 21:24
**previously** [1] - 84:4
**primary** [1] - 43:4
**principal** [1] - 3:18
**principle** [2] - 35:22, 60:20
**principles** [2] - 36:7, 68:4
**prioritize** [2] - 20:10, 21:10
**private** [6] - 12:8, 42:1, 47:22, 48:14, 48:19, 82:8
**problem** [5] - 8:6, 8:17, 18:12, 68:4, 87:12
**problems** [3] - 12:21, 58:25, 71:6
**procedural** [3] - 15:20, 29:13, 78:15
**procedure** [1] - 36:4
**proceed** [4] - 17:22, 28:14, 62:2, 72:7
**proceeding** [1] - 48:21
**proceedings** [1] - 88:14
**process** [19] - 17:8, 17:15, 18:11, 18:13, 20:20, 24:10, 26:5, 53:7, 55:8, 59:4, 59:9, 69:18, 70:4, 70:6, 73:8, 73:17, 73:21, 73:25, 74:22
**processes** [4] - 61:21, 69:8, 69:25, 78:18
**production** [1] - 56:25
**professor** [2] - 19:9, 19:10
**Professor** [3] - 28:24, 28:25, 29:19
**programming** [5] - 74:12, 74:13, 74:14, 75:3, 75:9
**Programs** [1] - 2:4
**programs** [1] - 3:20
**prohibited** [1] - 73:18
**prohibition** [8] - 62:20, 62:21, 65:8, 65:18, 65:21, 66:6, 84:11
**project** [12] - 23:18, 41:24, 54:1, 55:2, 55:19, 55:22, 57:15, 69:16, 70:8, 70:25, 76:3, 80:17
**projections** [1] - 77:9
**projects** [6] - 27:8, 42:2, 54:23, 55:3, 56:21, 57:22
**promise** [2] - 77:1, 77:2
**promised** [1] - 7:20
**promulgated** [1] - 32:16
**property** [3] - 48:15, 48:19, 50:11
**proposal** [2] - 24:20
**proposed** [1] - 65:6

**proposition** [3] - 6:2, 8:2, 35:16
**protect** [7] - 6:17, 8:1, 9:11, 12:16, 13:22, 15:12, 86:7
**prove** [1] - 67:11
**provide** [1] - 19:17
**provided** [6] - 18:21, 19:2, 19:6, 19:8, 57:7, 81:13
**provides** [3] - 41:20, 46:23, 78:25
**provision** [15] - 33:8, 33:11, 33:14, 44:6, 60:13, 60:22, 60:24, 63:21, 63:22, 64:9, 65:14, 83:10, 83:21, 84:1, 84:5
**provisions** [4] - 41:7, 42:16, 84:7, 84:16
**prudence** [1] - 18:3
**prudent** [7] - 18:16, 22:7, 22:8, 28:13, 30:25, 32:21, 61:3
**public** [14] - 6:4, 17:13, 41:22, 46:22, 48:22, 48:25, 49:18, 59:1, 72:14, 75:11, 76:2, 76:8, 76:14, 76:17
**public's** [2] - 49:20, 73:4
**publically** [1] - 75:7
**punches** [1] - 5:18
**pure** [1] - 14:20
**purely** [1] - 19:15
**purportedly** [1] - 17:8
**purpose** [7] - 40:12, 41:10, 42:15, 42:24, 43:13, 44:3, 46:14
**purposes** [3] - 11:8, 22:24, 37:15
**pursue** [1] - 71:22
**push** [1] - 38:23
**put** [9] - 10:19, 12:14, 13:7, 17:18, 36:15, 49:10, 49:13, 59:13, 72:23
**putting** [2] - 66:15, 77:7

## Q

**quality** [1] - 56:25
**questions** [7] - 29:12, 32:20, 34:14, 34:17, 52:12, 62:4, 83:8
**quick** [2] - 82:1, 82:3
**quintessential** [5] - 6:9, 13:24, 20:13, 82:12, 86:6
**quite** [3] - 50:12, 53:23, 86:13
**quo** [3] - 18:14, 72:4, 77:21
**quorum** [1] - 36:20
**quote** [8] - 9:17, 10:13, 27:17, 45:8, 54:3, 54:5, 54:7, 60:10
**quotidian** [1] - 27:17

## R

**raised** [2] - 5:7, 41:10
**raises** [1] - 37:9
**ramifications** [1] - 10:17
**rather** [2] - 64:21, 65:25
**RDR** [3] - 2:7, 88:11, 88:18
**REACH** [8] - 31:8, 43:15, 74:24, 75:6, 75:10, 75:17, 76:15, 81:8
**read** [7] - 53:3, 63:6, 63:22, 63:23, 64:17, 83:23, 84:1
**reading** [6] - 40:4, 45:23, 46:2, 46:8, 62:13, 83:20
**real** [2] - 29:18, 39:3
**reality** [1] - 16:17
**really** [9] - 5:20, 11:9, 30:24, 41:12, 73:1, 79:13, 83:24, 87:13
**rearranging** [1] - 74:11
**reason** [14] - 9:3, 20:15, 20:17, 21:2, 21:13, 24:8, 28:17, 32:11, 32:24, 33:15, 34:6, 35:20, 45:11, 46:18
**reasonable** [4] - 32:21, 45:23, 46:1, 68:14
**reasons** [10] - 19:16, 20:2, 20:6, 29:25, 30:19, 42:23, 55:20, 55:25, 58:25, 70:22
**rebuilding** [3] - 23:6, 53:12, 53:22
**rebut** [1] - 38:25
**receives** [2] - 8:13, 86:22
**recent** [5] - 11:15, 11:16, 48:2, 48:3, 49:19
**recently** [1] - 37:24
**recognize** [4] - 9:4, 33:24, 52:19, 60:1
**recognized** [3] - 56:17, 56:19, 61:19
**recognizes** [2] - 45:18, 52:18
**recommendation** [5] - 58:4, 61:25, 71:12, 71:14, 71:18
**reconciled** [1] - 30:16
**reconfiguration** [1] - 54:3
**reconsideration** [1] - 52:20
**reconsiders** [1] - 78:17
**reconstruction** [1] - 54:11
**record** [24] - 3:3, 3:6, 22:4, 25:4, 44:21, 45:1, 45:5, 52:5, 53:17, 57:5, 58:6, 58:19, 59:10, 61:18, 71:20, 78:2, 79:5, 79:11, 79:21, 81:1, 81:6, 81:10, 81:22
**records** [1] - 39:3
**recover** [1] - 51:24
**redress** [3] - 10:1, 10:14, 87:6
**redressability** [1] - 51:19
**redressed** [1] - 50:23
**refer** [1] - 46:25
**reference** [3] - 40:17, 46:23, 58:13
**referenced** [3] - 9:5, 33:21, 53:24
**references** [2] - 41:1, 65:11
**referred** [1] - 68:5
**refutes** [1] - 86:10
**regulations** [6] - 84:8, 84:13, 84:23, 85:9, 85:11, 85:14
**regulatory** [1] - 34:14
**rehabilitate** [1] - 81:23
**rehearsals** [2] - 76:14, 76:17
**relate** [1] - 34:14
**relating** [1] - 60:8
**relationship** [4] - 12:18, 24:4, 87:17, 87:18
**relevant** [5] - 38:5, 38:7, 43:21, 61:23, 65:14
**relief** [1] - 52:9
**rely** [3] - 58:4, 61:24, 64:9
**remain** [10] - 24:21, 26:24, 51:15, 74:21, 75:6, 75:21, 76:7, 76:10, 81:8
**remaining** [1] - 34:13
**remand** [1] - 78:15
**remarkable** [2] - 6:2, 8:2
**remediate** [2] - 54:18, 74:19
**remediation** [3] - 55:2, 56:20, 59:2
**remedied** [1] - 87:3
**remedy** [16] - 17:15, 18:10, 18:19, 19:5, 68:16, 70:1, 70:2, 70:7, 70:9, 73:5, 73:8, 73:9, 73:12, 73:21, 77:3, 77:4
**remember** [4] - 39:17, 44:3, 44:6, 45:12
**remotely** [1] - 43:21
**rename** [1] - 45:7
**renaming** [12] - 4:7, 4:12, 4:20, 5:14, 15:8, 15:9, 20:12, 40:15, 43:21, 43:24, 59:13, 72:25
**RENEE** [1] - 1:14
**renewal** [1] - 33:6
**renovation** [8] - 21:7, 23:24, 24:15, 25:8, 30:18, 53:25, 54:9, 54:22
**renovations** [9] - 21:11, 24:24, 26:23, 31:5, 31:7, 33:23, 52:23, 70:18, 71:23
**reopening** [1] - 16:25
**repair** [2] - 26:17, 54:10
**repaired** [1] - 27:5
**repairs** [4] - 28:11, 53:4, 55:5, 56:9
**reply** [5] - 9:22, 12:1, 35:6, 40:18, 48:6
**report** [2] - 73:10, 73:15
**REPORTER** [2] - 62:10, 88:9
**reporter** [2] - 7:18, 7:20
**Reporter** [3] - 2:7, 2:7, 88:19
**reports** [3] - 25:22, 77:8, 78:7
**representational** [8] - 48:22, 48:24, 49:5, 49:7, 86:12, 86:15, 86:16
**reputation** [1] - 79:15
**request** [2] - 4:24, 79:7
**requested** [2] - 5:2, 37:11
**require** [4] - 9:25, 70:20, 73:17, 77:5
**required** [3] - 14:23, 16:18, 75:8
**requirements** [1] - 69:15
**requires** [3] - 62:12, 68:24, 82:10
**reserved** [1] - 49:21
**resist** [1] - 14:1
**resolved** [1] - 38:13
**respect** [6] - 4:18, 5:13, 46:21, 57:16, 70:4, 82:18
**respond** [5] - 14:25, 34:20, 42:21, 42:22, 49:22
**response** [1] - 15:2
**responses** [1] - 50:17
**responsibilities** [1] - 82:8
**responsible** [1] - 83:24
**restate** [1] - 49:11
**restatement** [2] - 14:17, 87:5
**restatements** [1] - 51:1
**restoration** [3] - 53:25, 54:23, 56:20
**restraining** [1] - 4:17
**restructure** [1] - 28:10
**result** [2] - 16:18, 82:10
**retool** [1] - 28:9
**return** [1] - 81:3
**returning** [1] - 72:4
**revenue** [1] - 58:11
**revenues** [1] - 28:6
**review** [4] - 16:16, 16:22, 30:5, 60:11
**reviewable** [2] - 61:5, 61:10
**reviews** [2] - 20:25, 21:1
**revoked** [1] - 18:10
**rewrite** [1] - 36:4
**rights** [10] - 4:14, 4:18, 5:5, 7:3, 8:20, 13:17, 17:23, 66:8, 82:8, 87:23
**rise** [1] - 39:8
**risen** [1] - 39:11
**risks** [3] - 58:2, 58:20, 70:23

**river** [2] - 11:19, 12:2
**rob** [1] - 36:20
**Roberts** [2] - 8:7, 8:9
**Roberts's** [2] - 48:12, 87:20
**role** [2] - 27:9, 60:1
**roll** [1] - 5:18
**roof** [1] - 31:9
**Room** [2] - 2:8, 88:20
**room** [1] - 30:3
**rooted** [1] - 36:7
**Roth** [1] - 3:19
**rotting** [1] - 54:21
**roughly** [1] - 23:1
**route** [3] - 19:18, 21:19, 29:21
**rule** [7] - 17:2, 19:18, 20:22, 21:20, 25:10, 29:13, 32:16
**Rule** [1] - 77:19
**rules** [1] - 39:14
**ruling** [3] - 4:16, 21:13, 35:14
**run** [5] - 6:13, 20:22, 21:22, 33:3, 68:5
**runs** [1] - 54:20
**rushed** [1] - 18:5
**rusting** [1] - 54:21

## S

**safe** [1] - 75:24
**safety** [2] - 76:8, 85:18
**sake** [3] - 18:9, 70:12, 73:6
**salami** [1] - 15:14
**sales** [1] - 56:17
**satisfies** [1] - 73:25
**satisfy** [1] - 51:4
**satisfying** [1] - 51:3
**saved** [1] - 45:19
**scale** [1] - 12:15
**scenario** [3] - 35:24, 78:13, 82:12
**scenarios** [2] - 12:22, 36:10
**schedule** [2] - 74:13, 85:2
**schedules** [1] - 74:11
**scintilla** [2] - 39:10, 39:11
**scope** [10] - 22:16, 23:2, 23:3, 23:17, 24:7, 24:9, 24:13, 49:16, 53:8, 53:13
**scope-of-work** [1] - 24:13
**score** [1] - 47:22
**scouts** [2] - 63:9, 63:11
**screams** [1] - 82:19
**screwing** [1] - 5:16
**SE** [1] - 1:18
**season** [1] - 27:3
**seats** [1] - 54:4
**second** [7] - 20:23, 26:16, 41:18, 50:14, 68:3, 83:6, 86:18
**secondary** [7] - 42:19, 43:2, 43:3, 43:4, 62:19, 65:3, 65:22
**secretary** [1] - 45:6
**Section** [5] - 9:21, 10:11, 46:22, 48:23, 60:7
**see** [11] - 3:14, 42:15, 48:18, 50:12, 57:17, 59:19, 76:24, 81:20, 85:21, 87:8, 88:5
**seek** [1] - 46:18
**seeking** [4] - 17:16, 38:9, 50:18, 52:10
**selectively** [1] - 9:17
**self** [1] - 20:10
**self-interest** [1] - 20:10
**sense** [6] - 46:11, 56:1, 61:15, 61:16, 64:24, 82:25
**sensible** [1] - 62:13
**sensibly** [1] - 62:7
**sentence** [2] - 84:5, 84:6
**separate** [2] - 6:10, 6:11
**September** [1] - 55:18
**seq** [1] - 40:11
**series** [1] - 5:8
**serious** [5] - 9:15, 9:24, 9:25, 10:14, 30:5
**service** [2] - 44:23, 54:20
**service'** [1] - 82:24
**set** [2] - 4:10, 22:19
**settled** [1] - 38:16
**several** [1] - 11:16
**shake** [2] - 84:19, 84:20
**shall** [7] - 10:13, 33:8, 33:23, 41:20, 46:25, 60:10
**shalls** [1] - 33:22
**shared** [1] - 84:4
**shed** [1] - 84:17
**sheet** [1] - 41:6
**shirt** [1] - 82:24
**shocking** [3] - 22:4, 25:20, 80:25
**shoes** [2] - 16:9, 82:24
**shop** [1] - 43:19
**short** [2] - 77:15, 77:16
**show** [9] - 5:11, 15:8, 16:17, 19:24, 21:23, 27:19, 45:1, 67:16, 82:24
**shown** [2] - 15:10, 84:13
**shows** [6] - 11:12, 50:19, 58:7, 66:1, 67:6, 79:5
**shred** [1] - 25:21
**shut** [1] - 24:16
**shuttering** [2] - 24:2, 85:15
**shutting** [2] - 20:11, 33:17
**sic]** [1] - 22:3
**side** [21] - 7:10, 9:4, 11:9, 17:19, 23:9, 30:15, 35:21, 37:1, 55:7, 57:1, 57:14, 59:24, 61:12, 62:23, 66:12, 70:4, 78:1, 82:16, 85:7, 86:17, 87:15
**side's** [1] - 80:11
**sides** [4] - 56:23, 59:25, 60:14, 88:3
**sign** [1] - 82:23
**signage** [1] - 65:7
**significant** [3] - 53:5, 54:13, 54:22
**similar** [2] - 18:16, 43:21
**similarly** [2] - 6:3, 6:7
**simply** [9] - 14:23, 19:24, 42:19, 43:2, 43:16, 65:2, 68:9, 70:8, 87:6
**single** [6] - 25:21, 28:19, 79:4, 80:14, 80:18, 82:19
**sitting** [2] - 58:17, 67:20
**situated** [2] - 6:3, 6:8
**situation** [2] - 26:8, 80:2
**situations** [2] - 35:6, 38:16
**skin** [2] - 86:3, 86:5
**skinning** [1] - 8:4
**skinny** [1] - 40:6
**slain** [2] - 42:14, 44:3
**slices** [1] - 15:14
**slightly** [1] - 49:12
**slipping** [1] - 19:3
**slow** [2] - 7:18, 62:10
**slumming** [1] - 83:17
**small** [2] - 12:9, 31:9
**Smithsonian** [1] - 52:18
**snap** [1] - 19:13
**so..** [1] - 76:11
**social** [1] - 23:10
**Social** [2] - 25:19, 30:4
**soffits** [1] - 54:16
**soil** [2] - 13:13, 14:1
**sole** [3] - 9:13, 41:19, 44:14
**solely** [1] - 81:16
**solution** [2] - 31:12, 31:14
**solved** [1] - 87:12
**someone** [5] - 46:2, 63:23, 80:19, 82:23, 86:7
**sometimes** [1] - 68:12
**somewhat** [1] - 74:25
**soon** [1] - 88:4
**sorry** [2] - 11:14, 83:24
**sort** [21] - 5:12, 9:20, 12:8, 13:24, 16:16, 18:25, 22:11, 24:13, 29:12, 29:24, 33:1, 39:9, 50:19, 56:6, 56:10, 57:4, 58:15, 63:25, 68:18, 81:25, 83:12
**sources** [2] - 9:16, 14:13
**space** [3] - 75:12, 75:18, 76:10
**spaces** [1] - 42:6
**speaking** [1] - 48:14
**speaks** [7] - 47:20, 48:6, 48:23, 53:20, 54:13, 55:24, 60:22
**specific** [5] - 22:23, 22:24, 59:4, 66:6, 76:1
**specifically** [3] - 36:9, 56:11, 58:23
**specifics** [2] - 23:4, 47:20
**specified** [1] - 35:14
**specter** [1] - 9:2
**speculate** [1] - 53:15
**speculative** [4] - 50:18, 50:22, 51:9, 52:2
**spend** [1] - 10:25
**spent** [2] - 74:5, 83:19
**split** [1] - 4:2
**spoken** [1] - 48:11
**sponsorship** [1] - 58:10
**sponsorships** [1] - 28:7
**sprint** [3] - 6:15, 6:22, 8:10
**Sprint** [13] - 7:7, 8:7, 8:8, 11:5, 12:14, 15:2, 15:4, 15:17, 47:21, 50:8, 86:6, 87:14
**square** [1] - 85:5
**St** [1] - 2:4
**staff** [6] - 31:24, 57:23, 57:24, 57:25, 59:12, 74:13
**stage** [4] - 4:10, 21:21, 54:4, 80:18
**stale** [1] - 25:22
**stanch** [2] - 20:1, 77:17
**stand** [1] - 16:8
**standard** [5] - 12:24, 13:5, 26:17, 31:15, 63:25
**standards** [1] - 81:17
**standing** [20] - 5:13, 5:20, 5:24, 6:1, 6:12, 6:16, 6:22, 7:13, 8:4, 8:9, 8:10, 9:3, 11:2, 12:20, 17:3, 47:15, 50:2, 51:14, 65:1, 86:12
**start** [7] - 5:23, 15:15, 36:21, 47:15, 52:13, 62:20, 77:3
**started** [2] - 15:19, 37:1
**starting** [1] - 3:5
**starts** [2] - 35:23, 41:12
**state** [6] - 6:20, 6:24, 13:5, 14:9, 53:1, 58:18
**statement** [1] - 53:3
**statements** [3] - 23:13, 53:11
**states** [2] - 40:23, 54:8
**STATES** [2] - 1:1, 1:10
**States** [2] - 54:20, 88:19
**status** [3] - 18:14, 72:4, 77:21
**statute** [40] - 12:24, 14:10, 26:11, 26:18, 28:1, 34:24, 35:6, 36:4, 36:10, 36:24, 37:16, 38:12, 40:21, 41:2, 42:7, 42:9, 43:8, 43:14, 46:16, 56:4, 62:7, 62:14, 62:20, 63:5, 64:2, 64:7, 64:15, 65:19, 66:6, 66:7, 68:6,

68:9, 68:23, 73:19, 75:8, 82:18, 82:19, 83:1, 83:11
**statutes** [5] - 13:1, 55:7, 55:9, 66:1, 66:13
**statutory** [32] - 21:4, 21:5, 21:6, 21:9, 21:10, 21:12, 21:14, 24:5, 28:15, 29:12, 29:23, 30:13, 30:25, 31:2, 32:19, 33:5, 33:7, 33:21, 40:11, 40:12, 42:8, 48:11, 64:7, 65:14, 65:20, 66:16, 67:16, 77:6, 82:17, 83:9, 83:15
**stay** [1] - 56:9
**stay-open** [1] - 56:9
**staying** [2] - 56:23, 58:20
**steel** [5] - 23:7, 23:12, 53:11, 54:18, 54:21
**stenographic** [1] - 88:13
**STEPHEN** [1] - 2:3
**Steven** [1] - 3:20
**stewardship** [1] - 56:5
**stick** [1] - 17:3
**still** [14] - 7:4, 24:8, 50:24, 51:25, 52:1, 52:6, 65:1, 66:20, 73:4, 74:3, 74:6, 83:13, 83:14, 86:22
**stop** [4] - 19:22, 21:16, 39:10, 40:16
**story** [1] - 11:11
**Street** [1] - 1:15
**strikes** [1] - 84:10
**strip** [3] - 36:18, 36:20, 36:21
**stripped** [1] - 5:4
**stripping** [1] - 23:7
**strong** [5] - 26:4, 26:5, 32:10, 32:24, 35:9
**structural** [3] - 54:10, 54:13, 55:4
**structure** [11] - 33:5, 33:7, 33:21, 38:18, 40:12, 41:10, 42:15, 42:24, 43:14, 44:3, 46:14
**structures** [2] - 23:8, 54:3
**stuff** [1] - 13:25
**Subchapter** [1] - 40:10
**subject** [8] - 10:4, 50:16, 50:24, 60:11, 62:18, 69:1, 69:5, 69:17
**subjecting** [1] - 69:15
**submit** [3] - 23:1, 69:25, 85:24
**submitted** [3] - 22:20, 24:19, 39:6
**Subsection** [5] - 63:1, 63:5, 63:7, 63:14, 64:11
**subsequent** [1] - 77:18
**subset** [1] - 64:14
**succeed** [2] - 21:3, 21:18
**success** [3] - 19:24, 21:23, 32:11
**successful** [2] - 87:11
**sucks** [1] - 13:14
**sudden** [1] - 24:25
**sue** [15] - 6:16, 8:9, 8:11, 9:19, 10:16, 12:16, 13:1, 13:6, 51:8, 51:10, 51:23, 52:1, 86:1, 86:21, 87:2
**sued** [3] - 13:2, 51:18, 87:1
**sues** [2] - 15:12, 49:25
**suffered** [1] - 15:22
**sufficient** [3] - 18:21, 57:7, 77:5
**suggest** [9] - 14:23, 23:13, 32:9, 59:11, 60:15, 71:21, 82:16, 83:16, 87:15
**suggested** [1] - 81:4
**suggesting** [2] - 40:18, 40:19
**suggestion** [1] - 14:2
**suggests** [3] - 25:25, 36:24, 61:4
**suing** [9] - 8:1, 11:21, 14:9, 14:10, 48:15, 48:20, 48:25, 49:20, 86:7
**suit** [6] - 10:4, 10:23, 50:17, 52:5, 69:5, 87:3
**suits** [2] - 11:4, 11:7
**summary** [19] - 4:7, 4:20, 4:24, 5:2, 37:10, 37:11, 38:5, 38:9, 39:9, 39:10, 40:8, 41:6, 46:18, 46:19, 62:18, 72:25, 78:19, 80:6, 83:3
**summer** [1] - 27:4
**supervisors** [1] - 80:17
**support** [1] - 35:15
**supporting** [1] - 78:4
**supports** [1] - 54:23
**Supreme** [2] - 6:14, 48:2
**surprised** [1] - 85:17
**surprising** [3] - 12:11, 36:17, 85:14
**surrounding** [1] - 17:9
**suspenders** [1] - 34:5
**switch** [1] - 22:1
**switched** [1] - 3:22
**sworn** [1] - 23:5
**system** [1] - 31:9

## T

**table** [4] - 3:9, 3:18, 6:13, 21:22
**talks** [6] - 29:8, 29:20, 45:16, 54:19, 78:6, 84:7
**task** [1] - 14:6
**Taylor** [8] - 19:8, 24:17, 24:18, 25:4, 28:25, 29:20, 58:13, 78:6
**Taylor's** [1] - 25:15
**tearing** [1] - 54:7
**technical** [1] - 87:24
**technicality** [1] - 87:19
**temporarily** [2] - 73:20, 78:10
**temporary** [13] - 4:17, 52:13, 52:22, 55:20, 55:25, 57:2, 57:15, 58:2, 59:9, 62:4, 62:13, 72:8, 77:21
**tends** [1] - 12:7
**tenured** [1] - 57:24
**terms** [4] - 23:3, 31:4, 40:8
**terribly** [3] - 12:11, 30:23, 77:22
**Tesla** [1] - 46:10
**testify** [2] - 75:20, 81:5
**testimony** [1] - 77:13
**text** [9] - 40:11, 41:9, 42:15, 42:23, 43:13, 44:2, 46:14, 46:23, 64:24
**textual** [1] - 64:8
**THE** [172] - 1:1, 1:1, 1:10, 3:2, 3:13, 3:22, 4:1, 4:8, 4:10, 5:18, 5:25, 6:19, 7:17, 8:16, 8:18, 8:22, 10:2, 10:20, 11:15, 11:21, 11:24, 12:4, 12:23, 13:9, 14:22, 15:19, 16:1, 16:10, 16:13, 17:3, 17:5, 17:11, 17:23, 17:25, 18:7, 18:9, 18:18, 21:24, 22:14, 22:22, 23:21, 26:2, 26:11, 27:25, 30:11, 31:15, 32:1, 33:7, 33:11, 33:25, 34:12, 34:19, 35:13, 37:9, 37:25, 38:7, 38:9, 39:19, 39:22, 40:1, 40:3, 40:16, 42:17, 44:18, 46:12, 46:20, 47:3, 47:5, 47:7, 47:10, 47:12, 47:15, 47:17, 47:24, 48:3, 49:5, 49:11, 49:22, 51:23, 52:14, 53:8, 53:18, 54:2, 54:14, 55:13, 56:2, 56:4, 57:3, 57:12, 57:17, 58:6, 58:22, 59:10, 59:19, 60:6, 60:25, 61:11, 62:1, 62:5, 62:10, 62:16, 63:2, 63:11, 63:13, 63:15, 63:18, 63:25, 64:5, 64:18, 64:22, 65:1, 65:10, 66:10, 66:18, 66:20, 66:23, 67:1, 67:8, 67:13, 67:18, 68:1, 68:7, 68:17, 69:1, 69:6, 69:14, 69:21, 70:1, 70:9, 70:12, 71:2, 71:8, 71:20, 72:1, 72:3, 72:10, 72:25, 73:5, 73:12, 73:14, 73:24, 74:23, 74:25, 75:3, 75:5, 75:12, 75:15, 75:19, 76:4, 76:6, 76:12, 76:19, 76:22, 76:24, 77:3, 78:14, 80:5, 81:20, 83:4, 83:6, 83:8, 83:19, 84:1, 84:10, 84:23, 85:10, 85:23, 85:25, 86:25, 87:9, 88:1, 88:3
**theater** [1] - 46:5
**theaters** [1] - 54:5
**themselves** [1] - 10:4
**theories** [1] - 48:9
**theory** [10] - 6:2, 36:19, 49:4, 50:14, 50:21, 51:10, 51:19, 51:20, 51:24, 52:8
**thereafter** [1] - 71:19
**therefore** [1] - 7:12
**they've** [5] - 18:25, 39:11, 39:20, 39:23, 43:4
**thin** [2] - 15:14, 23:1
**thinking** [1] - 12:18
**thinks** [1] - 53:22
**third** [1] - 78:7
**third-party** [1] - 78:7
**Thole** [7] - 6:16, 12:14, 47:21, 50:8, 86:13, 86:14
**thole** [1] - 86:15
**three** [14] - 4:12, 4:25, 5:13, 6:10, 8:5, 19:16, 20:2, 20:6, 33:3, 42:23, 44:25, 46:3, 53:20, 78:20
**throughout** [1] - 51:15
**throw** [1] - 5:20
**thumb** [1] - 12:15
**tick** [1] - 79:4
**tilt** [1] - 73:4
**timelines** [1] - 78:3
**title** [4] - 40:10, 87:16, 87:19
**today** [1] - 24:13
**together** [1] - 30:6
**Tomb** [1] - 44:12
**tomorrow** [16] - 5:9, 9:6, 19:13, 21:2, 24:12, 34:15, 53:10, 53:24, 68:18, 71:15, 75:19, 76:7, 76:24, 77:13, 81:5, 88:5
**tomorrow's** [1] - 69:5
**ton** [1] - 12:8
**took** [3] - 67:5, 82:4, 82:5
**top** [5] - 21:4, 23:4, 54:6, 55:1, 75:13
**total** [1] - 85:15
**totally** [3] - 25:3, 37:2, 79:25
**toto** [1] - 69:8
**touch** [1] - 14:5
**toward** [1] - 37:18
**tracks** [1] - 14:17
**tradition** [2] - 11:6, 11:13
**TRANSCRIPT** [1] - 1:9
**transcript** [2] - 88:13, 88:14
**transposition** [1] - 43:10
**TransUnion** [6] - 11:5, 14:23, 48:1, 49:2, 49:19, 51:6
**treated** [1] - 15:17
**treatises** [1] - 11:11
**tree** [2] - 29:24, 30:1
**TRO** [14] - 10:12, 11:3, 14:18, 14:19, 16:15, 16:18, 27:17, 34:21,

35:13, 36:19, 39:2, 39:15, 61:19, 61:20
**trouble** [1] - 7:21
**true** [3] - 57:16, 88:12, 88:14
**truly** [1] - 46:9
**trump** [1] - 27:13
**Trump** [4] - 3:4, 25:19, 45:8, 45:17
**TRUMP** [1] - 1:6
**Trust** [3] - 10:9, 10:10, 60:20
**trust** [41] - 6:17, 8:1, 8:12, 8:24, 9:12, 9:15, 9:24, 10:1, 10:8, 10:14, 10:21, 12:16, 12:18, 12:21, 13:1, 13:12, 13:22, 15:11, 15:12, 16:8, 16:9, 20:10, 27:20, 36:7, 47:22, 48:8, 48:14, 49:8, 49:15, 49:23, 49:24, 49:25, 52:16, 60:10, 68:4, 77:6, 78:24, 80:25, 82:6, 87:16, 87:17
**Trustee** [2] - 11:19, 12:2
**trustee** [41] - 6:6, 6:16, 6:23, 7:3, 8:1, 8:10, 8:11, 8:13, 8:14, 9:18, 9:25, 10:3, 10:13, 10:14, 10:18, 10:20, 10:21, 10:22, 11:21, 12:15, 13:11, 13:18, 13:22, 13:23, 13:25, 15:12, 15:13, 20:9, 26:9, 32:13, 48:14, 48:20, 48:24, 49:15, 49:23, 50:10, 82:7, 82:9, 86:1, 86:16
**trustees** [26] - 8:8, 9:14, 9:23, 9:24, 11:13, 12:24, 12:25, 13:1, 13:5, 13:6, 18:2, 28:2, 32:1, 32:2, 36:22, 37:8, 41:16, 49:16, 56:7, 60:21, 67:3, 73:25, 80:24, 86:6, 87:15, 87:20
**trustees'** [1] - 56:6
**trusts** [1] - 12:10
**truth** [2] - 6:5, 23:10
**Truth** [2] - 25:19, 30:3
**try** [1] - 19:22
**trying** [4] - 32:8, 49:11, 61:14, 83:16
**Tuesday** [2] - 1:5, 81:14
**tunnel** [1] - 54:20
**turn** [4] - 22:15, 58:4, 62:17, 66:8
**turned** [2] - 16:19, 58:16
**turns** [2] - 9:1, 40:9
**Tweet** [1] - 22:11
**twin** [1] - 26:12
**two** [24] - 20:21, 21:9, 27:3, 28:5, 30:13, 30:16, 31:12, 33:22, 33:24, 37:3, 39:7, 39:12, 43:10, 44:5, 49:23, 55:6, 55:14, 55:15, 77:12, 78:20, 82:3, 83:8, 83:19, 85:8
**two-trustee** [1] - 49:23
**two-year** [1] - 85:8
**type** [3] - 8:3, 12:21, 25:8
**types** [5] - 15:4, 15:7, 79:3, 79:6, 79:20
**typically** [2] - 46:5, 60:20

## U

**U.S** [2] - 2:3, 2:8
**ulterior** [1] - 26:6
**ultimately** [4] - 14:6, 20:3, 73:17, 74:6
**ultra** [6] - 33:25, 34:4, 34:9, 52:17, 66:4, 66:5
**unbelievable** [1] - 45:8
**uncontroverted** [1] - 25:3
**uncontrovertible** [1] - 25:3
**under** [23] - 6:19, 6:20, 6:24, 13:5, 14:9, 14:10, 14:23, 26:20, 27:10, 31:6, 33:25, 34:3, 34:4, 34:7, 36:19, 51:23, 68:4, 74:3, 77:19, 88:4
**underneath** [1] - 54:21
**underscore** [3] - 37:21, 81:1, 83:15
**undisputed** [2] - 79:5, 79:21
**unfortunately** [1] - 10:8
**Uniform** [2] - 10:9, 10:10
**unique** [1] - 6:8
**Unit** [1] - 1:18
**United** [1] - 88:19
**UNITED** [2] - 1:1, 1:10
**University** [1] - 19:9
**unknown** [1] - 59:8
**unless** [5] - 50:20, 51:22, 52:11, 56:5, 73:24
**unpack** [1] - 13:8
**up** [22] - 4:6, 5:16, 10:8, 10:25, 13:14, 24:23, 26:17, 27:23, 36:21, 41:13, 46:12, 51:20, 54:7, 61:3, 61:22, 70:14, 70:17, 71:2, 71:9, 72:23, 74:3, 82:24
**USC** [4] - 7:2, 34:4, 34:7, 40:11
**usual** [4] - 13:11, 13:12, 13:17, 87:23

## V

**validated** [1] - 78:8
**values** [1] - 69:23
**valve** [1] - 85:18
**variables** [1] - 32:18
**variety** [2] - 14:12, 58:1
**various** [1] - 61:2
**vehicle** [1] - 7:15
**venue** [1] - 29:16
**verified** [2] - 16:5, 16:10
**vernacular** [1] - 64:1
**Vernon** [1] - 48:5
**versus** [3] - 57:15, 59:9, 72:14
**vested** [1] - 87:20
**vests** [1] - 12:24
**view** [8] - 8:6, 14:1, 14:6, 22:3, 57:4, 67:14, 68:22, 76:15
**vindicate** [3] - 48:16, 48:25, 49:20
**violate** [3] - 67:24, 68:1, 84:15
**violated** [1] - 31:17
**violates** [2] - 83:10, 85:4
**violating** [4] - 8:23, 18:3, 24:4, 73:19
**violation** [1] - 49:7
**vires** [6] - 34:1, 34:4, 34:9, 52:17, 66:4, 66:5
**voice** [1] - 10:5
**voicing** [1] - 8:19
**voluntarily** [2] - 68:23, 69:14
**voluntary** [2] - 68:18, 69:22
**vote** [24] - 16:4, 17:9, 17:15, 17:25, 18:1, 18:20, 31:20, 34:23, 34:25, 35:4, 35:11, 35:15, 36:1, 36:13, 37:6, 37:8, 37:23, 39:17, 45:18, 66:14, 66:17, 67:3, 67:6, 67:21
**voted** [4] - 39:25, 45:7, 67:21
**votes** [1] - 66:21
**voting** [22] - 4:14, 4:18, 5:1, 5:5, 5:14, 5:19, 8:20, 16:2, 17:19, 17:23, 31:23, 34:17, 35:8, 35:17, 35:22, 36:11, 37:11, 38:2, 39:14, 39:18, 66:8

## W

**wait** [1] - 69:10
**walk** [1] - 76:2
**walking** [1] - 87:7
**walkways** [1] - 54:17
**walls** [1] - 46:7
**wants** [1] - 35:10
**War** [2] - 43:23, 65:25
**warranted** [1] - 18:4
**Washington** [9] - 1:4, 1:15, 1:19, 1:22, 2:5, 2:9, 3:10, 44:11, 88:21
**WASHINGTON** [1] - 1:14
**water** [1] - 54:6
**ways** [4] - 6:10, 6:11, 6:12, 86:4
**weakness** [1] - 44:16
**Wednesday** [1] - 81:15
**weekend** [1] - 83:19
**weeks** [1] - 27:3
**weigh** [2] - 61:1, 61:2
**welcome** [3] - 33:2, 82:1, 87:14
**well-documented** [1] - 57:21
**well-tenured** [1] - 57:24
**Westlaw** [1] - 12:3
**whatsoever** [1] - 80:2
**whereas** [2] - 42:8, 48:21
**whichever** [1] - 47:18
**whole** [3] - 13:12, 87:17, 87:21
**wholly** [1] - 83:17
**wide** [1] - 60:21
**WILLIAM** [2] - 1:17, 2:2
**Williams** [1] - 22:6
**win** [1] - 6:12
**window** [1] - 71:1
**Wing** [1] - 22:18
**winning** [2] - 32:12, 32:24
**words** [3] - 17:14, 36:3, 66:5
**works** [1] - 36:2
**world** [1] - 38:14
**worried** [1] - 28:22
**worse** [1] - 44:13
**worst** [1] - 10:18
**worth** [2] - 14:16, 82:23
**wrap** [1] - 46:12
**written** [1] - 62:7

## Y

**Yaakov** [1] - 3:19
**Yale** [2] - 19:10, 28:25
**year** [10] - 16:16, 16:20, 16:22, 30:4, 45:9, 45:14, 45:17, 71:1, 84:25, 85:8
**years** [8] - 21:8, 23:24, 23:25, 24:23, 25:9, 28:5, 37:8, 72:5
**York** [2] - 19:7, 29:1
**yourself** [1] - 3:6

## Z

**ZELINKSY** [67] - 5:17, 5:19, 6:1, 6:21, 7:19, 8:17, 8:21, 8:25, 10:7, 10:24, 11:16, 11:23, 11:25, 12:6, 13:7, 13:10, 15:1, 15:24, 16:2, 16:12, 16:14, 17:4, 17:10, 17:18, 17:24, 18:1, 18:8, 18:12, 18:23, 22:2, 22:21, 23:19, 23:22, 26:3, 27:14, 28:15, 30:12, 31:22, 32:3, 33:10, 33:13, 34:2, 34:16, 35:2, 35:19, 37:17, 38:4, 38:8, 38:11, 39:20, 39:23, 40:2, 76:25, 77:11, 78:25, 80:8, 81:24, 83:14, 83:22, 84:9, 85:5, 85:13, 85:24, 86:3, 87:4, 87:10, 88:2

**Zelinksy** [3] - 3:9, 4:4, 5:11
**ZELINSKY** [3] - 1:13, 83:5, 84:18