**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOYCE BEATTY,

        *Plaintiff*,

  v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 25-4480 (CRC)

### DEFENDANTS' POST-HEARING SUPPLEMENTAL BRIEF

In a preliminary injunction hearing in a related case, Plaintiff's counsel sought and received an opportunity to examine Matthew Floca, the Executive Director of the Center, on matters relevant to this case. That testimony—which is therefore now part of the record in this case too—further demonstrates that the Court should grant summary judgment to Defendants and deny Plaintiff's motions for a preliminary injunction and partial summary judgment.[1] Indeed, that testimony exposed a fatal defect in Plaintiff's theory of standing to challenge both the renovation and the addition of a secondary name. It also belied Plaintiff's claim that the Center's decision to close for renovations was rushed or inadequately considered. And, as to the balance of harms, the testimony underscored that enjoining the closure at this juncture would jeopardize the responsible execution of a project that is critical for the Center's future viability. That would impair the public interest without remedying any harm to Plaintiff.

## I.    The Testimony Exposed a Critical Limit on Plaintiff's Standing Theory.

As the Court is aware, Plaintiff's theory of standing in this case rests on the provision of the Center's organic act that confers on the Center's trustees "all the usual powers and obligations of a trustee." 20 U.S.C. § 76*l*(b); *see* ECF No. 30-1 at 21; ECF No. 37 at 3. Indeed, at the hearing in this case, Plaintiff's counsel emphasized that provision as the source of both her standing and her cause of action. *See* ECF No. 44 ("Apr. 28 Hr'g Tr.") at 6:25–7:15, 13:10–25.

During Mr. Floca's testimony, however, Plaintiff's counsel elicited testimony that calls her theory of standing into serious question. Importantly, § 76*l*(b) includes a final clause that has thus far escaped attention: "The Board shall have all the usual powers and obligations of a trustee *in respect of all trust funds administered by it*." 20 U.S.C. § 76*l*(b) (emphasis added). What are the

---

[1] A transcript of the relevant April 29, 2026 hearing in *D.C. Preservation League, et al. v. Board of Trustees of the John F. Kennedy Center for the Performing Arts, et al.*, No. 26-cv-981 (CRC) (D.D.C.), is attached as Exhibit A to this supplemental brief.

"trust funds" to which the statute refers? Mr. Floca was asked, and explained in his testimony that the trust funds are distinct from the federal funds that are appropriated annually for the Center's capital improvements and that were appropriated to the tune of approximately $257 million in the 2025 reconciliation law. The "trust funds" are private donations and revenues from performances, and those funds are used solely for programming purposes—not for capital improvements. *See* Ex. A ("Apr. 29 Hr'g Tr.") at 84:15–85:5, 93:18–24.

To be sure, Plaintiff's counsel elicited this testimony to argue that a different provision, 20 U.S.C. § 76k(e), does not shield the Center's renovations from external regulatory review, because that review immunity extends only to "payments made . . . by the Board from any trust funds." But the testimony also bears on Plaintiff's theory of standing. If Plaintiff holds the usual powers and obligations of a trustee only "in respect of all trust funds administered by" the Center, that means that she holds no such powers or obligations in respect of the Center's *appropriated* funds. Those appropriated funds, however, are the funds being used for the planned renovations. *See* Apr. 29 Hr'g Tr. at 39:24–40:20. And there is no reason to believe the new exterior signage to which Plaintiff objects was paid for using trust funds, which Mr. Floca testified are designated for programming uses. *See* Apr. 29 Hr'g Tr. at 84:15–85:3.

In short, Plaintiff has premised her standing and her cause of action on a statutory provision that, as it turns out, has no application to the two concrete Board actions she challenges here. Even if the Court otherwise concludes that Plaintiff is entitled to sue her co-trustees in federal court to vindicate breaches of trust, that would hold true only when it comes to "trust funds administered by" the Center. Even assuming Plaintiff could be viewed as holding a property interest in those "trust funds" such that their waste or dissipation would constitute Article III injury, *cf. Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 304 n.2 (2008) (Robert, C.J., dissenting),

none of that matters here given that there is no evidence that either the renovation or the addition of the secondary name implicates the use of the trust funds that the Center administers. Accordingly, the Court should deny the preliminary injunction as to the renovations, and grant summary judgment to Defendants as to the naming issue.[2]

## II.    The Testimony Dispelled Plaintiff's Breach of Trust Claim as to the Closure.

At the hearing in this case, Plaintiff's counsel focused on a particular theory of breach of trust—that the Board violated its fiduciary duties by voting to close the Center for the renovations without adequately weighing the possibility of a phased renovation plan and the downsides of a closure. Plaintiff's suggestion was that the Board rushed to the closure conclusion without taking sufficient time to consider the relevant information bearing on that choice, and that this rises to the level of an "abuse of discretion" that warrants judicial intervention.

Mr. Floca's testimony demonstrated otherwise. As he explained, historically the Center's leadership had insisted on keeping the building open, even if that meant deferring maintenance or elongating capital-improvement projects. *See* Apr. 29 Hr'g Tr. at 75:19–76:1, 100:10–101:9. Mr. Floca did not believe that the Center's leadership was honestly confronting the scope and scale of the work needed to repair the building. *See id.* at 79:13–80:10, 100:10–24. After Congress in the summer of 2025 appropriated some $257 million for the Center to engage in long-overdue capital improvements and maintenance, Mr. Floca began to work on concrete plans to implement that comprehensive project. *See id.* at 80:11–19. Ultimately, he came the conclusion that it would be

---

[2] Because Plaintiff's claim about her right to vote at Board meetings implicates both trust funds and other funds, Defendants do not contend that she lacks standing to challenge the bylaw amendment restricting her right to vote. Defendants continue to maintain, however, that absent a specific statutory provision extending the right to vote to *ex officio* trustees, and given the fact that it is not unusual for *ex officio* trustees to serve in a non-voting capacity, the Board has discretion to specify the voting rights of its *ex officio* members through its bylaws. If the Court concludes otherwise, any injunctive relief should be limited to allowing Plaintiff to vote with respect to the administration of trust funds. *See* 20 U.S.C. § 76*l*(b).

"irresponsible" to attempt to complete this work while leaving the main building open. *Id.* at 91:12–17. The invasive nature of the work, combined with its holistic scope, and the aesthetic and safety concerns it would have on patrons, left him with no doubt that the only way to responsibly execute the project was to temporarily close to the public. *See id.* at 72:19–73:6, 76:7–77:3. Mr. Floca did not reach that conclusion in a "vacuum"; he has full awareness of the programming mission of the Center and is committed to it. *See id.* at 94:25–95:10, 98:12–99:14. But he understood that, at this time in the Center's history, completing this project within the timeframe and budget set by Congress is existential and must take priority. *See id.* at 96:2–4, 98:19–100:7. Relative to that need, the precise decline in ticket sales that may occur over the temporary closure period was immaterial—what mattered was that the "risk to programming and the risk to the public benefit" would be "far greater" if "we don't act now." *Id.* at 96:2–4.

By January 2026, Mr. Floca was ready to share his recommendation with the Chair of the Board, the Building and Grounds Committee, and the Board itself. But that hardly means that he developed that recommendation overnight, or that he was committed to a phased renovation until suddenly reversing course on February 1, 2026. To the contrary, as Mr. Floca testified, it was about four months earlier that he began to seriously consider a temporary closure, despite the Center's historic reluctance. *See id.* at 80:11–19. The fact that it took Mr. Floca several months to finalize that recommendation for the Center's Board shows care and diligence, not imprudence.

The Board, in turn, was entitled to rely on Mr. Floca's professional recommendation, as the individual most familiar with the needs of the building and the work that would be necessary. Indeed, "a trustee's reliance on the advice of financial, legal, and other advisers is a significant factor in determining whether the trustee's conduct was prudent." Restatement (Third) of Trusts § 93, cmt. c (A.L.I. Oct. 2024 update). While reliance "on relevant professional advice does not

afford a complete defense," if a trustee "has selected an adviser prudently and in good faith, has provided the adviser with relevant information, and has relied on plausible advice on a matter within the adviser's competence, this conduct provides significant evidence of the prudence of the trustee's action or inaction in the matter at issue." *Id.* In accord with this rule, both state and federal courts have rejected challenges to trustee actions taken based on reasonable reliance on expert advice. *See, e.g.*, *Foltz v. U.S. News & World Rep., Inc.*, 663 F. Supp. 1494, 1536 (D.D.C. 1987) (recognizing that the law is "clear that fiduciaries may rely on expert and professional advice in administering a plan"); *In re Berget*, No. A13-2295, 2014 WL 6863043, at *6–7 (Minn. Ct. App. Dec. 8, 2014) (affirming district court's holding that the trustee did not breach her fiduciary duty and citing the fact that the trustee purchased the variable deferred annuities at issue "after receiving and relying on professional advice from a financial advisor who previously served as a financial advisor to the grantor of the trust"); *Fraternal Ord. of Police Lodge No. 2 v. City of St. Joseph*, 8 S.W.3d 257, 265 (Mo. Ct. App. 1999) ("[T]he trustees were entitled to rely upon their actuaries, even though an expert employed by [Appellants] reached different conclusions." (alteration in original) (citation omitted)). And when a trustee seeks and secures professional advice, the trustee need not conduct an independent analysis of every recommendation or assumption on which that advice is predicated. After all, if a trustee were obligated to flyspeck his advisor's work before relying on it, that would undercut the reason for employing the advisor in the first place. *Cf.* Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's The Law of Trusts and Trustees* § 555 (updated May 2025) ("[P]rudent persons often employ professionals to give them advice in the management of their affairs and rely on these professionals' advice precisely because they lack the knowledge or experience necessary to make certain decisions.").

5

Here, there can be no serious question about Mr. Floca's competence; he has significant and meaningful experience in large-scale construction projects in D.C., and has spent more than two years studying both the building and the Center's operations more broadly. *See* Apr. 29 Hr'g Tr. at 52:21–54:19, 79:24–80:10. The Board did not deprive him of any information, and his advice was more than merely "plausible." If a building suffers from comprehensive water damage and corrosion and requires new plumbing, a new central plant, new electrical equipment, and extensive work on both the foundation and the roof—among many other things—it is irresponsible to expect to continue to host operas and ballets while that work is done. At minimum, attempting to do so would introduce substantial new costs and delays into a project that is already congressionally bounded in both budget and time.

Plaintiff's counsel has nonetheless argued that the Board did not adequately consider the costs (*e.g.*, lost ticket revenue) and other intangible harms (*e.g.*, loss of goodwill or relationships) that would accompany a temporary closure. That argument fails for at least four reasons. *First*, just as Mr. Floca reasonably views responsible execution of the renovations as an imperative that vastly outweighs any transient costs of closure, the Board could reasonably have done the same, and for the same reasons. *Second*, the Board was entitled to assume that Mr. Floca, as Executive Director and Chief Operating Officer, had taken all of the relevant considerations into account. If a tax lawyer recommended a particular strategy for minimizing taxes on a corporate transaction, the trustees would not have breached their duties by failing to consider alternatives; they could have reasonably assumed that the expert had considered all relevant considerations. So too here. *Third*, it is far from clear that the Board is even supposed to consider factors such as ticket revenue; this is not a profitmaking enterprise, and the Center's statutory mandates say nothing on that subject. *See* Apr. 28 Hr'g Tr. at 56:4–5 ("The statute does not say anything about financial

stewardship of the center.") *Finally*, Plaintiff bears the burden of proof, and has not developed evidence of what the trustees did or did not consider. Whether or not the downsides of closing were written down or quantified, many of them are obvious or would be obvious from the trustees' experience, and Plaintiff herself raised them for consideration during the Board meeting. *See* ECF No. 34-5 (Mar. 16 Board Minutes) at 7. Again, the Center is not an APA agency and has no obligation to create a detailed administrative record.

"It is a settled principle that trustees having the power to exercise discretion will not be interfered with so long as they are acting bona fide." *Shelton v. King*, 229 U.S. 90, 94–95 (1913); *see also Olds v. Rollins Coll.*, 173 F.2d 639, 642 n.7 (D.C. Cir. 1949) (warning against action that would "substitute the discretion of the court for that of the trustee"). Plaintiff may disagree with Mr. Floca that undertaking to keep the Center open during this work would be irresponsible and endanger the entire project. But the Board considered her objections and chose to accept Mr. Floca's reasoned and reasonable recommendation. That does not rise to the level of an abuse of discretion, let alone sufficiently so to warrant the extraordinary remedy of preliminary relief.[3]

---

[3] At the conclusion of the hearing, in response to the Court's question about whether the Board's actions violate 20 U.S.C. § 76j(a)(2)(F), Plaintiff's counsel asserted that Plaintiff continues to rely on that provision, which requires the Board to "manage and operate" the grounds of the Center "consistent with National Park Service regulations and agreements in effect on July 21, 1994." 20 U.S.C. § 76j(a)(2)(F); *see also* Apr. 28 Hr'g Tr. 83:9–85:19. But Plaintiff in this case never made any developed argument that the Center's renovations would run afoul of any such National Park Service regulations or agreements. *See* ECF No. 13-1 at 5 (merely quoting 20 U.S.C. § 76j(a)(2)(F)). Plaintiff has therefore forfeited any argument that the Board's actions violated 1994 National Park Service regulations. *See Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 480 F. Supp. 3d 256, 274 (D.D.C. 2020). In all events, for reasons explained in detail in the companion brief Defendants file today in *D.C. Preservation League*, the 1994 regulations, codified at 36 C.F.R. § 1.5, do not provide any basis to enjoin the temporary closure of the Center. Those regulations do not apply and would not be violated by the Center's temporary closure, and there is certainly no basis to conclude otherwise at this point in time.

### III.    The Testimony Underscored the Irreparable Harm an Injunction Would Cause.

Finally, Mr. Floca's testimony showcased why the equitable factors cut so strongly against any injunctive relief. As he explained, the scope of the necessary work—most of which has been documented for years, dating back to the 2021 comprehensive building plan—reaches across the campus and implicates numerous building-wide systems (mechanical, electrical, plumbing, etc.). *See* Apr. 29 Hr'g Tr. at 55:16–63:25, 88:3–89:2. Repairing the erosion and corrosion caused by systemic water damage will require excavating the access roads that lead to the Center's main entrance, removing soffits from above the terrace, and reconstructing large parts of the parking garage, among other things. *See id.* at 45:7–15, 65:18–67:3. The stages and rigging equipment in the main theaters also need to be replaced due to age and inadequate safety-protection systems. *See id.* at 64:1–65:10. Conducting this work will involve considerable dust and potentially exposure to asbestos. *See id.* at 76:7–77:3. Under these circumstances, requiring the Center to remain open during the renovations would be "irresponsible," *id.* at 76:10, both because of the additional time and cost and because of the threats to patrons. Meanwhile, the Center has retained an advisory firm that is nearly done with preparing a master schedule—which is, of course, premised on the Center being unoccupied. *See id.* at 67:23–68:23. An injunction now would put the entire project in jeopardy, in addition to wasting limited time and money.

On the other side of the balance, the "irreparable harm" to Plaintiff appears to be the wholly speculative and unrealistic prospect that she will somehow be found liable for breach of fiduciary duty unless she sues and requests a preliminary injunction. *See* Apr. 28 Hr'g Tr. at 9:16–10:8. Even as a basis for Article III standing, that is dubious. *Supra* Part I. As a basis for an injunction, it is patently deficient, and it certainly cannot overcome the serious threat of harm posed by throwing wrench into the renovation plans just weeks before the work is set to kick off.

8

## CONCLUSION

The Court should deny Plaintiff's motions for a preliminary injunction and partial summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: May 11, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
PIERCE J. ANON
N.Y. Reg. No. 6184303
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
(202) 353-7578
william.s.jankowski@usdoj.gov

*Counsel for Defendants*

9