A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE                          Civil Action
                                                No. 1:26-0981

        Plaintiffs,

      vs.                                       Washington, DC
                                                April 29, 2026
BOARD OF TRUSTEES OF THE
JOHN F. KENNEDY CENTER FOR
THE PERFORMING ARTS, et al,

          Defendants.                        10:08 a.m.
_____/


TRANSCRIPT OF EVIDENTIARY AND MOTION HEARING PROCEEDINGS
**BEFORE THE HONORABLE CHRISTOPHER R. COOPER**
UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the Plaintiffs:**   **Gregory Bestor Craig**
                    FOLEY HOAG LLP
                    1717 K Street, NW, Suite 1200
                    Washington, DC 20006
                    Email: gcraig@foleyhoag.com

                    **Thaddeus A. Heuer**
                    **Matthew Casassa**
                    FOLEY HOAG, LLP
                    155 Seaport Boulevard
                    Boston, MA 02210
                    Email: theuer@foleyhoag.com

                    **Abbe David Lowell**
                    **Caleb Hayes-Deats**
                    **Angela Reilly**
                    LOWELL & ASSOCIATES, PLLC
                    1250 H St NW, Suite 250
                    Washington, DC 20005
Email: alowellpublicoutreach@lowellandassociates.com
Email: chayes-deats@lowellandassociates.com
Email: areilly@lowellandassociates.com

APPEARANCES CONT'D.:

For the Plaintiffs:        **Gregory Alan Werkheiser**
                           CULTURAL HERITAGE PARTNERS, PLLC
                           1811 E. Grace Street
                           Richmond, VA 23223
                  Email: greg@culturalheritagepartners.com


                           **Marion Forsyth Werkheiser**
                           CULTURAL HERITAGE PARTNERS PLLC
                           1811 East Grace Street, Suite A
                           Richmond, VA 23223
                  Email: marion@culturalheritagepartners.com


For the Defendants:        **Yaakov M. Roth**
                           **Brantley Mayers**
                           DOJ-Civ
                           950 Pennsylvania Avenue NW
                           Washington, DC 20530
                           Email: yaakov.m.roth@usdoj.gov
                           Email: brantley.t.mayers@usdoj.gov

                           **Pierce Anon**
                           **William S. Jankowski**
                           **Stephen McCoy Elliott**
                           DOJ-CIV
                           1100 L Street
                           Washington, DC 20005
                           Email: pierce.anon@usdoj.gov
                           Email: william.s.jankowski@usdoj.gov
                           Email: stephen.m.elliott@usdoj.gov

                           **Elliot Berke**
                           BERKE FARAH LLP
                           701 8th Street, NW, Suite 620
                           Washington, DC 20001
                           Email: eberke@berkefarah.com


Reported By:               **LORRAINE T. HERMAN, RPR, CRC**
                           Official Court Reporter
                           U.S. District & Bankruptcy Courts
                           333 Constitution Avenue NW
                           Washington, DC 20001
                           lorraine_herman@dcd.uscourts.gov

**\*\*\***   Proceedings recorded by stenotype shorthand;
      transcript produced by computer-aided transcription.

\*\*\* I N D E X \*\*\*


<u>THE WITNESS:</u>


EXAMINATION OF MATTHEW FLOCA

By Mr. Lowell on Pages:        7, 26, 39 & 78

By The Court on Pages:        26, 37, 84 & 101

By Mr. Anon on Pages:        52 & 98

By Ms. Freeny on Page:        87

**P R O C E E D I N G S**

DEPUTY CLERK:  Your Honor, we are on the record this morning in civil matter 26-981, DC Preservation League, et al. vs. Board of Trustees of the John F. Kennedy Center for the Performing Arts, et al.

Counsel for the parties, beginning with the plaintiffs, please approach and note your appearances for the record.

MR. CRAIG:  Good morning, Your Honor.  My name is Gregory Craig.  I am senior legal counsel for the law firm FOLEY HOAG, in Washington, D.C.

I'd like to introduce my team to you.  Thad Heuer, will be arguing for the plaintiffs in the case and Matt Casassa.

Also, counsel for the plaintiffs are Greg Werkheiser and Marion Werkheiser of the Cultural Heritage Partners.  Abbe Lowell, will be handling the witness.  And I will let Abbe introduce his team to you.

THE COURT:  Nice to see everybody.

MR. CRAIG:  Thank you, Your Honor.

MR. LOWELL:  Good morning, Your Honor.

Abbe Lowell, at LOWELL AND ASSOCIATES, on behalf of the plaintiffs.  With me is Caleb Hayes-Deats and with him is also Angela Reilly.  And we also have our paralegal,

who will help me with exhibits, if it pleases the Court.

THE COURT:  Welcome, everyone.

Mr. Lowell, I didn't know you were a historic preservation lawyer.

MR. LOWELL:  You know, every day there is a new practice area that emerges in this administration.

THE COURT:  And you are now.

MR. LOWELL:  You'll decide that after I'm done.

THE COURT:  There we go.

MR. ROTH:  Good morning, Your Honor.

Yaakov Roth, on behalf of defendants from the civil division.  Joined by Brantley Mayers from my office, Stephen Elliot, Pierce Anon and Will Jenkowski from the federal programs branch.  And from the center, the executive director, Mr. Floca and general counsel, Mr. Berke.

THE COURT:  Mr. Roth, I've seen your name on pleadings but this is the first time I've had the pleasure of seeing you here, so welcome.

MR. ROTH:  I will be handling the argument and Mr. Anon will be handling the witness.

THE COURT:  All right.  Very well.

What I'd like to do is take the testimony first and then take a break so you-all can assess the fact of the testimony on the subsequent argument, and then come back and go into the argument section.

All right?

MR. LOWELL:  Your Honor, may I get an organizational 10 seconds?  We've prepared for whatever exhibit may come up, a series of loose leaves that will have them for Your Honor the witness, counsel.  We'll also be projecting them on the screen.  It's the easiest way to do it; is that all right?

THE COURT:  Sure.  You can hand it up.

MR. LOWELL:  Your Honor, we would like Mr. Floca to take the witness stand.

THE COURT:  Mr. Floca, step up and remain standing and raise your right hand to be sworn in.

THE WITNESS:  Right here?

DEPUTY CLERK:  Please raise your right hand.

Sir, do you solemnly swear or affirm the testimony you are about to give in this proceeding will be the truth, the whole truth and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Thank you, sir.  Please be seated and state your name for the record.

MR. LOWELL:  Good morning, Mr. Floca.

THE COURT:  Mr. Floca, do you have a glass of water?

THE WITNESS:  I do have one.

THE COURT:  Please proceed.

EXAMINATION OF MATTHEW FLOCA

BY MR. LOWELL:

Q.    As I introduced myself, my name is Abbe Lowell.  I am one of the attorneys that represent the plaintiffs in this case.

Just to set the table, briefly, as I understand it, your involvement in the Kennedy Center started in 2024.

A.    Yes, sir.

Q.    And then you were vice president for facilities.

A.    Yes, that's right.

Q.    And then about a year and a half later you became the vice president for operations; is that correct?

COURT REPORTER:  Judge, his microphone is not on.

THE COURT:  Ladies and gentlemen in the audience in the back row, raise your hand if you can hear the witness.

THE WITNESS:  Good morning, everyone.

THE COURT:  All right.  Let's precede.

Madam Court Reporter, if you can't make out what he's saying, we will take a break and get back to you.

COURT REPORTER:  Thank you.

BY MR. LOWELL:

Q.    As a general matter, is it a fair characterization of your present role that you direct the operations, manage the Kennedy Center?

A.    Yes.

Q.    Before I ask you about some statements that you've made in the declarations in this and a companion case that was argued yesterday and in other circumstances about what is planned for the Kennedy Center, I want to ask you whether The plaintiffs, the Court and the public will be able to rely on those statements, given that the chairman of the board's role and the power that he asserts and his ability to overrule anything you say in his position, as the record indicates he may have already done.

So the question to start off with is, when you speak, are you speaking for yourself?  Are you speaking for the board?  Are you speaking for the chairperson?

A.    I am speaking for myself.

Q.    As chair -- sorry.  The position you hold, as the chair -- the chairman of the board has the ability and the power to remove and replace you with someone else he prefers correct?

A.    The board has that ability, yes.

Q.    And would that be how it turned out that you became the position you're in, when the board with the chair replaced Ric Grenell with you?

A.    I'm in this position because I have the support of the board.

Q.    Okay.  And I take it also the chair?

A.    Yes.

Q.    Are you aware that the chairman, when he's wearing a different hat than his chair position at the Kennedy Center, as this administration is now 15-, 16-months old, has removed various officials in his administration or with whom he has the ability to do it when he believes they are not carrying out his directions?

A.    I am not close enough to any of those conversations to say I understand them to that degree.

Q.    You have seen people in positions be fired by him?

A.    Yes.

Q.    Would it be fair to say in the role that you've played since you have gotten there, that your job is basically to carry out the directions that you get from the chairman?

A.    No.  That is not my job.

Q.    Let's see.  I'd like to play our first exhibit, Exhibit 1.  This is from a March 16th meeting of the board.

(Audio played.)

Q.    You were there when this was said?

A.    Yes, sir.

Q.    Pretty direct comment from the chairperson that if you don't do a good job, in his opinion, he's going to fire you?

A.    That is what he said.

Q.   Let's explore some of the things you said in your declaration to test whether or not what you said is bearing itself out.  In February of 2025, had the chairman appointed Ric Grenell the interim Executive Director?

THE COURT:  Sorry, Counsel, is this the declaration you submitted in this case?

MR. LOWELL:  It is the declaration I submitted in this case.  It's not on the screen yet.  I will get to that in another minute.

BY MR. LOWELL:

Q.   In February of '25, there became a new chairman who replaced Ric Grenell in March of '26.

My first question is, in that period of time, did you have any conversations with the chairman about Ric Grenell's performance, about what he was doing and about whether he should or should not be replaced?

A.   I had conversations with the chairman about my interactions with Ric Grenell, yes.

Q.   So describe those.  First of all, how many were there?

A.   I don't know.  Numerous conversations.

Q.   Numerous is a word.  Let's figure out how many times that would be.  Would you say numerous is more than 10?

A.   Conversations about -- specifically about Ric

Grenell with the president?

Q.   Well, the question started with conversations in which the president and you were discussing whether he should replace Ric Grenell, and then whether he should replace Ric Grenell with you.  Anything in that neighborhood.  How many of those?

A.   I would say less than five conversations with me and the chairman that involved Ric Grenell.

Q.   Okay.  How about those that involved whether you should take his place?

A.   Again, less than five for anything about Ric Grenell and myself.

Q.   When you had those conversations, where were they?

A.   All phone conversations.

Q.   Never in person?

A.   Never in person.

Q.   And then when you had them, were they during a business day in which you operate or was it something that happened after the business day, for example, in the evenings?

A.   I'm sorry.  I don't know exactly when all of the phone conversations happened.  We talked multiple times a day at different hours.

Q.   So if you're talking to the chairman multiple times a day, you explain how many fit into my question about

Mr. Grenell and you.  Those multiple times a day are talking about Kennedy Center business, beyond the issue of who's leading it; is that a fair conclusion from what you said?

You just said multiple times a day.  So I'm trying to figure out if only five of them were about Mr. Grenell, that would mean in a five-day week, multiple times a day, that could be 25 or 30 conversations.

So I'm just asking, what are the subject matters?

A.    You are asking me -- sorry.  Ask me again what you're asking me.  I'm sorry.

Q.    Sure.  I think I heard you say that you speak to the chairman multiple times a day.

A.    We have in the past, yes, sir.  Yes.

Q.    And you identified the number that would have included the issue of Mr. Grenell and your ascendancy. Right?  You gave me a number.

A.    Where that was part of a wider conversation, yes.

Q.    So what I was asking is, what are the topics that you discussed with him beyond those five, if you are talking to him multiple times a day?

A.    Oh, mainly the conversations we have had are about the state of the building and the needs of the building and the needs of the campus; that's mainly what we've discussed.

Q.    Starting with this piece of litigation today and the one argued here yesterday, when the cases were filed to

challenge the operations that you were overseeing and what was going on at the center, did you have any conversations with the chairman about the lawsuits when they were filed?

A.   No.

Q.   You have submitted sworn declarations, I think three, perhaps, in the other case and one in this case. When you were thinking or planning to do that, did you discuss those declarations with the chairman?

A.   No.

Q.   Is it a fact, therefore, that from the time the declarations you submitted were conceived of, to the time that they were submitted in Court, that you had no conversation with the chairman about that?

A.   I've never discussed this declaration or any of these declarations with the chairman.

Q.   When was the last time you spoke to the chairman before taking the stand today?

A.   A couple weeks ago, I think.

Q.   So nothing in the last few days?

A.   No.

Q.   A few weeks ago, where was that?

A.   A phone conversation.

Q.   Where were you?

A.   At my house, home.

Q.   What was the topic?

A.    Mainly around the seats that we're contemplating to replace in the concert hall and opera house.

Q.    What was the issue about the seats?

A.    We were just -- I don't know how to put it -- deciding on the best time frame, the best course of action, some of the color schemes and what truly, you know, the seats needed to be.

Q.    Speaking -- sorry, I cut you off.  Say that last sentence again.

A.    The fixed seats in the concert hall in the opera house.

Q.    On that topic, had there been a time where seats had been ordered?

COURT REPORTER:  Excuse me.  I don't think the witness's microphone is on.

(Brief pause in the proceedings.)

THE WITNESS:  How's that?

THE COURT:  There we go.

THE WITNESS:  Good morning, everyone.

THE COURT:  Can you repeat everything you just said?

[Laughter]

BY MR. LOWELL:

Q.    Speaking of the seats, was there a time prior to the conversation you just told us about in which there was

an issue of seats in the Kennedy Center having already been ordered and the chairman directed you to change the order to a different kind of chair?

A.   No.

Q.   I'd like to put up your exhibit called Floca Exhibit No. 2.  In this exhibit, Mr. Floca, this is a statement that has quoted you in an article, and this is what it says.  "It's a public building, and I completely acknowledge that, but the President is really great at this, and I think his input is invaluable.  He is in the details."

Do you recall saying that?

A.   Yes, sir.

Q.   I would like to explore with you some of those details.  On December the 18th, I think, of '25, the board voted at a meeting at Steve Wynn's Florida home to rename the Kennedy Center the Trump-Kennedy Center.  Am I right about that?

A.   Yes.

Q.   You were the vice president of operations at the time.  Right?

A.   Yes.

Q.   As I understand it, you weren't there but you participated in the meeting remotely.

A.   No.  I was there.

Q.   Okay.  So you heard what was going on?

A.   Yes.

Q.   What notice did you have in advance of that meeting on December the 18th that the topic of changing the name of the Kennedy Center was going to be coming up?

A.   I was asked by Ric Grenell to --

MR. ANON:   Objection, Your Honor.   This is outside the scope of this case.   This is the Beatty case, I believe.

THE COURT:   Mr. Lowell?

MR. LOWELL:   Your Honor, the relevance of every question I'm going to ask the witness today, based on even a remark you made yesterday, was that Mr. Floca makes statements about his authority and about who's calling the shots and it is, in part, our point that we can't rely on his statements --

THE COURT:   Let's stick to the issues in your lawsuit.   If there is a statement that he has made that is contradicted by something outside of your lawsuit, you're free to impeach him on that contradiction.   But otherwise, let's just stick to issues in the Preservation League suit.

MR. LOWELL:   I have a breach question, Your Honor.

THE COURT:   Very well, very well.

MR. LOWELL:   I'll try to make it make sense to you, so that it will obviate the objection.

THE COURT:   Very well.

BY MR. LOWELL:

Q.    Putting aside what happened at that meeting, were you the one to then oversee putting up the name of Donald Trump above John Kennedy's on the same day as the vote was taken by the board?

A.    Yes.

Q.    What was the name of the company that did that?

A.    Cyprus, like the tree.

Q.    Cyprus will be involved in other things that are going on at the Kennedy Center; is that correct?

A.    Potentially, yes.

Q.    And we'll maybe come back next to the issue of columns, particularly, on the exterior, which is something that you said about whether the exterior of this building will be changed.  Okay?

Last question on that subject, then:  Can you explain how it was possible for the board in Florida to vote to change the name, and within hours Cyprus was able, with your supervision, to put his name above that of John Kennedy in the same letters and in the same fashion, if this hasn't been something that had been planned way before then?

MR. ANON:  Objection, Your Honor.  Same.  This is outside of the scope of this case.

THE COURT:  Sustained.

MR. LOWELL:  Let me turn, then, to the columns,

which is something on the exterior.  Right?

BY MR. LOWELL:

Q.   You understand -- by the way, as a fundamental premise of this case, I'd like to make sure that you and I are on the same page about something.

You understand the plaintiffs in this case are not objecting to the possibility or to the likelihood or to the reality that there are things at the Kennedy Center that require maintenance and repair; that is not the subject.  We are not denying or arguing that there are things that need to be done.  Do you understand that that is part of this case?

A.   That sounds good.

Q.   So let's get to one of the things you said about the exterior.  In September of 2025, about 200 -- 124 exterior and 76 interior -- gold columns that were outside were painted white.  Correct?

A.   Yes.

Q.   Did you discuss that with the chairman before it was done?

A.   Yes.  He was part of many conversations involving that piece of work and other pieces of work, yes.

Q.   And the painting of those columns from gold to white was a priority of this chairman.  Correct?

A.   I wouldn't say it was a priority, no.

Q.   You would not?

A.   No.

MR. LOWELL:  Would you please put up Floca Exhibit No. 4.

BY MR. LOWELL:

Q.   In this, in the transcript announcing the honors, way back even in '25, this is what the chairman said:  These columns, when you see them the next time, they'll be magnificent.  I mean, we have some great plans for this."

That was a great deal before they actually were painted.  Right?

A.   Yes.

Q.   And then in terms of your answer to me about his priority, let me show you what he said about the mix.

MR. LOWELL:  Would you please play Floca Exhibit 1 and part B.

(Video played.)

BY MR. LOWELL:

Q.   This statement speaks for itself.  You would not characterize his -- as making this painting and the columns changing color a priority?

A.   I think it's on his mind, moving back in time, because this is not just a random action.  It was something that we had been planning for before this leadership was in place.

So this is not only something he's talking about here, but this is something we've talked about for a long time, the need to address the rust and the structural degradation at the base of the columns, mismatched paint jobs that were previously done to the columns, damage to the columns. I mean, it was a routine action.

Q. Changing the color was a routine action. In other words, if you were fixing rust, if you were making sure that the job was done, you are suggesting that changing the color of columns that been that color as part of the original design of the Kennedy Center for 50 years was, how you described it, a maintenance issue?

A. Well, the original design was not a painted column. The original design was a brass or a polished brass or bronze wrap that Edward Durell Stone never was able to do, not the paint that you see there now. Originally, it was a wrap around the columns that was polished.

So my opinion is that changing from the mismatched bronze and gold paint that was installed over decades to what is there now is not a material change.

Q. Of all the things you have been doing or planning to do at the Kennedy Center, what made doing the column change happening as fast as it did, which I had called a priority? It wasn't a structural problem at that point, was it? It was a color issue.

A.   No.  I don't think it was exclusively a color issue.  There were a number of columns where we had structural engineers actually doing analysis of section loss, and a handful of columns were problematic.

All of the columns, though, had rust at the bases of the columns.  Now, that's, you know, an example of water intrusion issues that are systemic around the building.  So we, you know, holistically addressed that issue.

Q.   And why that one first?  I mean, there is a problem with the marble.  There are problems with other parts of the building.  Why were the columns done so quickly?

A.   It's easy; painting is easy.

Q.   Speaking of painting being easy, the contract for this paint was done with an entity called Washington Office Interiors, LLC; is that right?

A.   Yes.

Q.   But that's not the entity that did the work, is it?

A.   Washington Office Interiors is the AASPA contractor that held the contract.

Q.   Okay.  But that didn't really answer my question, which was, they are not the entity that actually did the work.  You've mentioned a company to me and to the Court before, earlier in your testimony, called Cyprus, and that's

the entity that did the work.

MR. ANON:  Objection, Your Honor.  Misstating witness's prior testimony.

MR. LOWELL:  I'll withdraw the question.

BY MR. LOWELL:

Q.   Who did the actual work?  Was it WOI or was it Cyprus?

A.   I'm sorry.  I spoke over you.

Q.   Did Cyprus, notwithstanding that it was Washington Office Interiors who signed the contract, do the actual work?

A.   Cyprus is -- they are the painting contractor that was a sub to Washington Office Interiors, yes.

Q.   I guess -- is that a way to say that I'm right and they're the ones who did the work?

A.   Well, both entities did work on the project.  It's not as simple as what you're...

Q.   So there was Washington Office Interiors personnel that were on site doing the actual painting, et cetera; is that your testimony?

A.   No.  It's not out of the ordinary construction or maintenance to have prime contractors and subcontractors, and that's what we were doing with the columns.

Q.   I understand -- sorry to interrupt.  Go ahead.

A.   It's pretty normal.

Q.   I understand contracting and subcontracting but it wasn't my question.  My question was, the contract says WOI, and I wanted to find out who was actually doing the work.  I think you're agreeing with me but maybe you're not.  Did Cyprus do the actual painting job or did WOI?

A.   Yes, Cyprus painted the columns.

Q.   The contract for this with WOI is dated a full month after the columns were beginning, if not many of them already painted; isn't that true?

A.   I don't know exactly when the contract is dated.

MR. LOWELL:  Can you please pull up Exhibit No. 6.

BY MR. LOWELL:

Q.   Do you see that?  Do you recognize it?

A.   Yes.

MR. ANON:  I'm sorry, Your Honor.  Our screen is not working.  Can we get a description of --

THE COURT:  I think it's in the binder.

MR. LOWELL:  That is in the binder in front of you.  That would be Floca Exhibit 6 attached to that.

THE COURT:  Just for the record, the Court will pre-admit any exhibits that are shown to the witness.

MR. LOWELL:  Thank you, Your Honor.

THE COURT:  Not necessarily all of them in the binder, but anything shown to the witness will be admitted as part of the hearing record.

BY MR. LOWELL:

Q.   Do you see that?

A.   Yes, sir.

Q.   And you see the date.  Would you tell us the date of this contract?

A.   The award date is October 10th, 2025.

Q.   And the fact of the matter is that the painting occurred a whole month before this.  Correct?

A.   I don't recall exactly when the first columns started to be painted.

MR. LOWELL:  Would you please put up Floca Exhibit No. 5.

BY MR. LOWELL:

Q.   Let me read this to you.  Do you see the date at the bottom?

A.   Yes.

Q.   Do you see that it's coming from the Trump-Kennedy Center?

A.   Yes.  Yes, I see that.

Q.   It says, "Today we start refurbishing and re-painting the 200 iconic columns around the Kennedy Center with a new color - Site White."

Do you see that?

A.   Yes.

Q.   So the work on this facility, based on I don't

know what plan or criteria, began, as I asked you, 30 days before a contract was ever signed; is that right?

A.   Yes.

Q.   On what basis?

A.   There are a number of levers that contracting officials can use to give contractors authorization to do work.  Again, this is basic -- a basic way that, in my experience, you can move projects forward.  I don't --

Q.   Did the board approve the contract?

A.   No.

Q.   Did the board know that the work was going to be done before a contract was ever signed?

A.   No.  The board is not involved in every contracting and every, you know, bit of work that we do there.  It's not that detailed.

Q.   Did the chairman know?

A.   Did the chairman know what?

Q.   That the work was going to start on September 9th, 30 days before the contract was signed.

A.   I never had any conversations with the chairman about contracts for this project.

Q.   But you did about what was going to happen in the change of color?

A.   Yes.

Q.   In addition, another factor, another change,

another event that occurred was having to do with the outside trees on the exterior, which is part of the original design.  Do you know what I am talking about?

A.    Yes.

Q.    The original design of the Kennedy Center had a very specific reference to a very specific kind of tree. They were willow trees.  Do you remember why?

A.    To honor President Kennedy.

THE COURT:  I'm sorry, if we're moving away from the columns, can I just interject a couple of questions?

**EXAMINATION OF MATTHEW FLOCA**

BY THE COURT:

Q.    Was the work on the columns included in the Big Beautiful Bill appropriation that covered the rest of the project that we've been talking about in these two cases?

A.    No.

Q.    So that was not funded from a congressional appropriation?

A.    It was funded from our annual capital appropriation, which is separate from the Big Beautiful Bill.

Q.    Thank you.

EXAMINATION OF MATTHEW FLOCA

BY MR. LOWELL:

Q.    You were saying that it was part of the

commemoration.  Specifically, it was placed as part of the original design because willows are weeping, and it was supposed to represent the grief of the nation for a fallen president.  Do you understand and agree with that?

A.    Yes.

Q.    And you understand the Kennedy Center has submitted to the National Register a proposal for it to be eligible to be designated as such.  You know that.  Right?

MR. ANON:  Objection, Your Honor.  That calls for a legal conclusion.

THE COURT:  Overruled.  That the center has submitted an application.

THE WITNESS:  I believe you're talking about the determination of eligibility.

BY MR. LOWELL:

Q.    Yes.

A.    Eligibility.  Determination of eligibility, yes.

Q.    Do you know what happened?  Isn't it true that the willow trees that were part of the original design for the purpose you and I have discussed, and with which you have agreed, were taken out, and to be, if they haven't already been, replaced by a different kind of tree?

A.    The trees were taken out because they were falling down.

Q.    Every single one that was taken out you are saying

were taken out because they were, quote, falling out [sic].

A.    Ninety percent of the trees were decaying and every time there was a heavy wind or rain a tree would fall down.  If you walk around the center at that time, you would see limbs falling and trees falling down.

Q.    Consistent with -- sorry.

A.    So we took them out because of a maintenance need. We are contemplating the appropriate tree to put back in place, and I completely acknowledge the weeping aspect of the memorial to President Kennedy.

Q.    So when you are replacing a willow tree that you claim to all of which being fallen down, will they be replaced with other willows?  Because it has been said that the chairman would prefer them to be either cherry trees or maple trees or some other kind of tree.  Have you had that conversation with him?

A.    We haven't specifically talked about the weeping willows or the replacement.  I think that a weeping cherry tree would be perfect.  But we are going to come up with a complete landscape -- a comprehensive landscape plan that doesn't only talk to the planters and the willow trees, and that will be part of the plan, the replacement.

Q.    And either way, what you're saying is that whatever you are just describing, you would agree with me is going to be a change to the exterior of the Kennedy Center.

Correct?

A.    I don't think going from a weeping willow to a weeping cherry is a material change to the exterior.

Q.    Okay.  You used the word "material."  I'll come back to that.

One more topic to see about your conversations with the chairman.  You were there in 2024; part of the Kennedy Center.  Correct?

A.    I started in January 2024.

Q.    In April '24, the carpets at the center were changed out, weren't they?

A.    It was -- that was a year-long project.  It wasn't just in April.

Q.    Okay.  It started in April and they were taken out.

A.    I don't think they started.

Q.    So tell me the sequence.  The carpets were replaced starting in 2024.  Correct?

A.    The carpets in the Hall of States, Hall of Nations and Grand Foyer were replaced.  I don't know the exact time frame.  I do remember that project being underway when I started.

Q.    And then when you started, I think people who have ever been to the Kennedy Center recognized the carpets that were there.  Again, part of the original design were red.

Correct?

A.    Ask me that again.    Sorry.

Q.    The color of the carpets that were there and replaced were red?

A.    Yes.    Yes.

Q.    And now those red carpets have been removed for another kind of carpet.    Correct?

A.    No.    The carpets are still in place.

Q.    The plan is to replace them, isn't it?

A.    We are working on multiple interior finishes, and those carpets are part of a larger vision, yes.

MR. LOWELL:    Would you put up Floca Exhibit 9.

BY MR. LOWELL:

Q.    In this report about your plans in February, you see the carpeting is being talked about, and it says, "From the current red carpeting and seating to 'black with a gold pattern.'"

Do you see that?

A.    Yes.

Q.    Was that an instruction that you got from the chairman, to change this 50-year red carpet scheme to now being black and gold?

A.    No.    He never instructed us to do that.    Again, decisions like this are part of a comprehensive interior design package, not just, I want black and gold carpets.    Go

do it.

Q.   Based on what I introduced is why I'm asking you these questions.  I would like to turn to statements you've made and then have you see statements that the chairman has made on the very same subject.  Okay?

MR. LOWELL:  Would you put up Exhibit 10.

BY MR. LOWELL:

Q.   Which is your declaration in this case.  And you have stated, "I can confirm that the planned construction, renovation and renewal efforts are only limited to the current structures, buildings and grounds.  No new structure or building will be erected on the campus."

That's what you stated in your declaration. Correct?

A.   Yes.

MR. LOWELL:  Would you please put up Floca Exhibit No. 11.

BY MR. LOWELL:

Q.   On the other hand, the chairman has stated in one of his communications that there will be a closing for a "construction, revitalization" and what he calls "complete rebuilding" and says it will be a "new and beautiful landmark."

You see that that was his statement?

A.   I see that statement, yes.

Q.    Okay.

MR. LOWELL:  Would you please put up Floca Exhibit 4.

BY MR. LOWELL:

Q.    You will see that, again, not in a tweet but in a transcript of his duties as the chair, he also said this: "In the coming months, we'll fully renovate in the dated and the, really, entire infrastructure of the building and make the Kennedy Center a crown jewel of American arts and culture."

Do you see that?

A.    [No audible response]

Q.    So my question is, is it going to be a "no structure or building" the way you said or is it going to be "a complete rebuilding and an entire infrastructure change of the building" the way the chairman said?  Which will it be?

A.    I can't speak to what the chairman is intending in these comments, but I know what the campus needs.  I know what the building needs.  And those are decisions that are informed by reports that pre-date this administration and are consistent with what we're planning.  But I can't speak to what he's intending with these messages that he's just brought up.

MR. LOWELL:  Floca Exhibit 10, please.

BY MR. LOWELL:

Q.    Again, this is something you said.    "The exterior of the center's main building will not be materially effected."

Do you see that?

A.    [No audible response]

Q.    I asked you one question about that and you were helpful.    You reminded me that there's a word "material."    So let me ask you:    Would changing nearly 200 columns that had been gold for 50 years -- to ask that -- from one color to another, if it was part of the same, you don't deem that to be a material change?

A.    I think the historical significance is not the color of the columns.    It's the low overhang.    It's the slender nature of the columns.    It's the fin.    That's what's historically significant about the material with the exterior of the building.    We are not changing any of them.

Q.    And then you already told us that the change from one kind of historic tree to some other tree that has not yet been decided, that may not be, in your view, a material change to the exterior either.

A.    It's less the species of tree that is honoring President Kennedy and more the weeping nature; that's what's important in the type of tree that goes back on the River Plaza.

But there are other places across the building where the trees are not original and have no historical significance.

Q.   Judge Cooper asked you, for example, about where the funds for the columns came from.  You said it wasn't part of the appropriation.

Are things like changing the willow trees or the columns or other things that you have stated in your declaration part of a plan as to what's going to happen tomorrow, the next month, after that, in how you understand the changes of the center are going to be?  Is there a plan that says all of that?

A.   The action that we are taking right now is using all of the past reports, our comprehensive building plan, everything that is a part of that tool, and translating them into an integrated master schedule that outlines how we're accomplishing what we need to accomplish over a two-year period of time.

So that's -- we have the comprehensive building plan and that tells us the needs, and we are translating that into a schedule, which tells us when.

Q.   Let me unpack what you just said, if I can.

MR. LOWELL:  Will you pull up Floca Exhibit No. 12, please.

BY MR. LOWELL:

Q.   Do you see this exhibit?

A.   Yes.

Q.   This was in the record as Exhibit E in one of the proceedings in this case, ours or the one yesterday.  Is this the plan, when you talk about there being a plan, that you are saying is going to dictate the work going forward?

A.   These are budget categories for financially showing how we are going to control each one of these actions.

Q.   To use a phrase I heard yesterday, these are kind of "light on details," aren't they?

A.   Yes.  But each one of these line items is informed by the comprehensive building plan.

Q.   Informed by what?

A.   The comprehensive building plan.

Q.   Where is that comprehensive building plan?

A.   It's a document.

Q.   Where?  Where is it a document?  On your desk?  In a file cabinet?  Submitted in this litigation?  Provided to agencies?  Sent to Congress?  Where is it?

A.   So it's a statutorily-required action that we need to take every year to update.  Unfortunately, the last time we've comprehensively updated the comprehensive building plan was 2021.  So that is really -- that document, the 2021

comprehensive building plan, is what informed this $250 million number.

Q. Wow. If I understand what you just said, this Exhibit E, which is made in the current tense, is informed by something you are saying is comprehensive from 2021; is that what you just said?

A. Yes.

Q. So is the 2021 comprehensive plan now to change date, and all of a sudden become the 2026/2027 comprehensive plan? How is that going to work?

A. No. There's two things that are happening at the same time. We have this opportunity with this Big Beautiful Bill funding to complete work that is much need and we brought on a team to focus on that work.

The other team at the center is going to focus on updating the comprehensive building plan and making that public document a lot more -- well, updating it but making it readily available to the public so they can see what is in the comprehensive building plan and what our $250 million is going to, all at the same time. So we are updating the comprehensive building plan now.

Q. So you are taking what existed five years ago and saying you are going to change it into the comprehensive plan; is that the right way to say it? That's a yes-or-no question, if you can.

A.   Ask it again for me, please.

Q.   Are you taking the 2021 plan that you just described and now changing it to become a new plan or are you just, basically, taking the date and changing it into 2026?

A.   No.  We are not simply changing the date.  We are updating it.

Q.   Okay.  But then how do you justify the fact that you're saying that, and yet the statements by the chair call it a new building and new project, if what you're relying on is something that was five years planned before?

A.   I can't speak to why or what is in the chairman's mind when he is making those comments.  I know what the building needs; that's what I'm focused on.

THE COURT:  Can I just clarify a nomenclature?

**EXAMINATION OF MATTHEW FLOCA**

BY THE COURT:

Q.   As I understand it, the budget figures in front of you correspond to the capital improvement plan that was summarized at the March 2nd Building and Grounds Committee meeting; is that correct?

A.   Yes.

Q.   Okay.  And those numbers all add up to the $257 million appropriation?

A.   Yes.

Q.   And that the capital -- the comprehensive building plan was one of the four documents that you say that you consulted in deciding whether the building should be closed or not?

A.   Yes.

Q.   Okay.

So you were updating those prior comprehensive building plans to include work that is consistent with the capital improvement plan or beyond or that goes beyond work that is in the capital improvement plan?

A.   Both.

Q.   So the comprehensive building plan will include words that are not included in what we have all been discussing as the project funded by the appropriation?

A.   Yes.  The comprehensive building plan should have a 10-year capital outlay that goes into the future.

Q.   And is that funded or not yet funded?

A.   It's funded with our annual capital appropriation.

Q.   Totally funded?

A.   Well, the action of updating the comprehensive building plan is funded with the annual capital, totally funded.  It's roughly a million-dollar cost.

Q.   A million dollars?

A.   Yes.

Q.   So the comprehensive building plan will be a

million dollars annually more than the $257 million appropriation?  How do those two things relate?

A.    Sure.  The center has three main funding streams, federal funding streams.  O&M, which is the security officers, housekeeping; that's annual operating costs.  We have an annual capital budget as well, and then we have this $250 million.

Q.    Okay.

A.    The purpose of the annual capital budget is to cyclically replace things that are capital eligible.  But a piece of that is also updating why and the "why" is the comprehensive building plan.

Q.    Okay.

A.    And to bring in a team of outside consultants, to bring in that full team, it's roughly a million-dollar cost.

Q.    Okay.

And is that fund or are those monies supplemented by private contributions and donations as well or no?

A.    No, sir.

THE COURT:  You'll have more time.

MR. LOWELL:  You lived in Washington too long.

EXAMINATION OF MATTHEW FLOCA

BY MR. LOWELL:

Q.    Let's put a final point on the questions that Judge Cooper just asked you about finding.  Appropriations

$257 million.  Correct?

A.    Yes.

Q.    It's now on the columns and on what the judge asked, you said there's a source of funds that are not going to be from the 257.  Correct?

A.    Yes.  We have multiple sources of funds, yes.

Q.    So I have a question.  I think you just recently did a tour with journalists and with members of Congress and their staffs to see the building.  Correct?

A.    Yes.

Q.    And on one of those tours did you tell the members of Congress that there would not be a need for any outside funds to accomplish what you're now saying will become the comprehensive building plan, and that it will all be able to be done either from that appropriation or now you're saying there is a general capital fund, but you don't need any private funds; is that right?

A.    We don't need private funds to take care of the structure, the structure at large.  It's a publicly-funded responsibility.

Q.    So you are aware, are you not, of statements by the chair that says, "We've already purchased" -- sorry.  Which says, "We are making tremendous amounts of money coming in from people who have made very generous contributions and have never done it before."

You've heard him say that.  Right?

A.   No, actually.  Sorry.

MR. LOWELL:  Okay.  Would you please put up Exhibit 1D.

BY MR. LOWELL:

Q.   Can you look at that.  This was, again, at that March 16th meeting in which you say you were there; is that right?

A.   Yes, I see it.

Q.   And you see that's what he said.  So if the funding for what you just described is going to come from the sources that you just described, then the money that is the tremendous amount being raised, why is that not going to be used in this project?  And if not, are there other parts of this project that he has in mind that are to be funded with these private donations?

A.   Well, the board is responsible for privately raising money for the center to meet its artistic mission. The funding for the building is a congressional, is a public responsibility.

Q.   So it's going to be clear as we go forward that not one dollar of the amount that the chairman is raising and talking about is going to be used for these improvements for the exterior for the other issues we've been talking about in court; is that right?

A.    Yes.  But I'll make one exception.  There's a handful of lounges, if you will, membership spaces, that we would not -- it would not be appropriate to use federal funding to update.  So there is always an opportunity to use outside privately-raised dollars to update members' lounges.

Q.    One of the things you said in your declaration was something called the hardening of the exterior of the Kennedy Center.  You used the exact phrase that the exterior is going to have hardened security perimeters.  Do you recall that?

A.    Yes.

Q.    Wouldn't a hardened security perimeter, different than what exists now, end up being a material change to the exterior of the Kennedy Center?

A.    When I'm saying the "hardened perimeter," I'm talking about bollards at the service tunnel that work.  Vehicle force protection.  I'm talking about doors that lock on the perimeter of the building.  I'm talking about we need to harden, from a physical security standpoint, the perimeter of the building because we are a very soft target.

Q.    And then the question I asked you is still something I would still like you to respond to, if you can.  So bollards or other things that you're doing on the exterior, doors, bollards, other things that harden the security, it's on the exterior, isn't it?

A.   Yes.

Q.   And I'm asking you, aren't those material changes to the exterior?

A.   No, because they don't have any historical significance.

Q.   They certainly change the way the building looks.

A.   I honestly don't think you would even notice when we replace a bollard.

Q.   Let me close one topic and try to expedite my examination, if the judge will let me have it.  The issue of what is going to be done has been coming up a couple of times, and I want to talk specifically about what is happening, and you've already mentioned the word "steel." So let me get right as to steel.

You said in your declaration, in Exhibit 10, "And the planned construction renovation renewal efforts will not tear down the center to its structural steel and rebuild a new structure from those foundations."

That's what you said.  Right?

A.   Yes, sir.

MR. LOWELL:  Would you put up Exhibit 13, please.

BY MR. LOWELL:

Q.   And the chairman said something different.  He said, "The steel will all be checked out because it'll be fully exposed."

You saw where he said that.  Correct?

A.   I see that, yes.

Q.   Is he right or are you?

A.   Again, I don't know what he is intending with that comment, but I can tell you where there will be exposed structural steel.  There are a number of systems where we do need to excavate to expose structure, where you will see exposed structural steel.  But I, again, know all of the locations and it's not across the board.

Q.   So putting it to rest, will the steel of the exterior of the Kennedy Center be exposed in any way or will it not be, according to what you understand the plan to be developed in the future will be?

A.   You will see exposed steel on the exterior of the center when we do some of the work we need to do, yes.

Q.   And that's different than, therefore, what the president said, the steel will be all checked out because it will be fully exposed.

How are you going to select what steel is going to be, quote, fully exposed without exposing all of the steel for its structural analysis?

A.   The comprehensive building plan tells us what steel we need to expose.

Q.   And when can we expect to see this comprehensive building plan?

MR. ANON:  Your Honor, we're on 50 minutes right now.

MR. LOWELL:  Can I have a little indulgence, Judge?

THE COURT:  I'll give you a little leeway.

MR. LOWELL:  Thank you, sir.

THE WITNESS:  So, just as an example, the soffit panels.  What you see around the whole perimeter of the building at the plaza level -- sorry, terrace level, if you're standing on the plaza level and you look up at the soffit panels, those are large 2200-pound concrete soffits. We need to expose the degrading and rusting and failing structural steel that is supporting those soffit panels. So, yes, you will see that steel when we do that improvement, when we make those changes.

BY MR. LOWELL:

Q.  Okay.  In the opposition brief that's been filed in this court, the counsel representing the defendant stated, The president never stated that the center would be demolished or destroyed.  Did you see that pleading?

A.  No.

Q.  You don't contest that that's what is in the file, I take it?

A.  I don't contest that.

Q.  With what was said in that pleading, have you ever

seen what was said before President Trump talked about what he wanted to do at the East Wing of the White House?

A.   No.

Q.   So, as I asked you in the beginning of my asking you questions, given what you said and what I pointed out he has said, how can anyone be sure that the events of the East Wing will not occur here?

A.   Because we have no plans to demolish the center.

Q.   And that's what the president, you say, is also saying.  Correct?

A.   I have no plans to demolish the center.

Q.   Ah.

MR. LOWELL:  So let me put up Floca Exhibit 14, please.

BY MR. LOWELL:

Q.   This is what the chairman, in his different capacity, said about what I just asked you; that the ballroom would not interfere with the current building.  It would be near but not touching the existing East Wing building and pay total respect to the existing building.

Do you see he said that was the plan that he had and what he said to the world?

A.   I see that.

Q.   What happened three months later?

A.   [No audible response]

Q.    The East Wing was knocked down to the ground.

So how can we rely on what you're telling us the plan is when we now know that the chairman has the authority to change it however he wants?

A.    The gravity of this situation is not lost on me. I can tell you that there are no active plans within anyone at the center or that could do something like this to demolish the building.

Q.    With the exception that he can change that decision, as he has done with others.

A.    I am not in control of his personal decision-making.

Q.    In terms of the Court and others looking at what's being planned and whether it fits into the requirements, have you ever heard the expression "fool me once, shame on you; fool me twice, shame on me?"

A.    [No audible response]

Q.    I take it you have.  Let me get to one last topic, if I can.

MR. LOWELL:  And I promise I'll move through it quicker, Your Honor and Counsel.

BY MR. LOWELL:

Q.    In the original statute that renamed the National Culture Center for the John F. Kennedy Center for the Performing Arts, this is what Congress said.  "Whereas the

living memorial to be named in his honor by the joint resolution shall be the sole national moment to his memory within the city of Washington and its environs."  That's been well talked about and reported.

But, similarly, there is part of the law that exists in terms of the board's responsibility, of which you are involved with.  It says, "No change in the management and operation of the grounds may be made without the express approval of Congress and/or the Secretary of the Interior."

And I guess one question to start is, as you are figuring out when this comprehensive building plan is going to rise and be understood, is it your view that that doesn't have to go to Congress for its approval, to determine whether it is not going to interfere with the operation and management?

MR. ANON:  Objection, Your Honor.  That calls for a legal conclusion.

MR. LOWELL:  Let me rephrase the question.

BY MR. LOWELL:

Q.    Putting aside whether the law or a statute, is it your intention, for any reason, to ensure that whatever you develop as the CBP is going to be submitted to Congress?

A.    Yes.

Q.    Last series of questions, then.

In terms of statements in litigation as to whether

or not Congress needs to be in the process, you won't disagree with me, will you, that in all of the projects that have occurred at the Kennedy Center over the last, I could say, 10 or 15 years, whether they were somewhat larger or somewhat smaller, those in charge like you did submit them to Congress.  Correct?

MR. ANON:  Your Honor, that question is beyond the scope of this case.

MR. LOWELL:  Well, this will have a lot to do with exterior that he says is not material.

THE COURT:  Overruled.

BY MR. LOWELL:

Q.   Yes?

A.   Ask me one more time, please.

Q.   Let me be specific and save time.  In terms of the parking garage, which sits outside and also inside, when those changes were made, the Kennedy Center submitted that for approval by Congress.  Correct?

A.   I'm not -- that was in the '90s.  But I have seen the statute that talks about that, yes.

Q.   Okay.  I just want to -- maybe this will be a shorter series of questions then.

Sitting here as the ED and the COO, you are putting together a plan, don't know which pieces that are similar have been submitted to Congress in the past like,

for example, the REACH, which certainly affects the exterior of what the place looks like.  So if I ask you questions, you don't know which were submitted to Congress?

A.    I can tell you that we need to keep Congress updated on what we're doing, and I respect that process.  We have both a mechanism in our budget, congressional justifications, and I want Congress to come and see what we're doing.  I want to meet with the appropriators.  I want to tell them this is what we're investing in and this is what we're doing.

So, yes.  Congress needs to be aware and they will be aware of what we're doing.

Q.    Sorry.  Sometimes I don't know that you're finished and then I get yelled at.  It's my fault.

A.    Sorry.

Q.    There is a gulf of difference between telling me that Congress is going to be aware because you take somebody on a walking tour versus Congress getting a plan and do their function to approve it.  You agree with that.  Correct?

A.    Yes, those are two different things.

Q.    Which one did you mean?

A.    Both.

Q.    Um, a couple last things to conclude, then.

THE COURT:  Wrap it up.

MR. LOWELL:  I am.  I'm sorry, Judge.

BY MR. LOWELL:

Q.   As to the purpose to honor John Kennedy, I have a few last questions.

Does the comprehensive building plan envision that you, the board or the chairman are going to take down the bust of John F. Kennedy in the lobby?

A.   No.

Q.   And you can commit that for yourself.  Can you commit that to the chair -- for the chair?

A.   Are you asking me if I can commit to the chair that I'm not taking the bust down?

Q.   Can you commit that there's no plan that you know of or conversation with the chair to take the bust of John Kennedy out of the lobby?

A.   I have never talked to the chairman about removing or changing the bust that's in the Grand Foyer.

Q.   And as I've asked other questions, you don't know what his intention is then?

A.   I have no idea what his intentions are, no.

Q.   Have you discussed with him or is there a part of the plan to put a bust or statute or other part of some commemoration of him in the lobby of the Kennedy Center?  Is that in the plan?

A.   That has never come up.

Q.   Do you know whether that's his intention?

A.   I don't know his intentions.

Q.   And what about whether or not the plan calls for the maintenance of the seventh floor exhibit -- some people call it museum -- that is part of honoring John Kennedy; is that going to remain in place?

A.   Yes.

MR. LOWELL:  Your Honor, I am going to wait to see if -- I would ask your indulgence for a few minutes on recross but I am done with this.

THE COURT:  You are pushing it.

Counsel.

MR. ANON:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. ANON:  I think this should be a little quicker, hopefully.

**EXAMINATION OF MATTHEW FLOCA**

BY MR. ANON:

Q.   Good morning, Mr. Floca.

A.   Good morning.

Q.   So I'd like to start with your background and experience.  Could you just tell us a little bit about your credentials, your jobs you've had in the past?

A.   So I have a construction management degree from Louisiana State University.  I graduated in 2009.  At that

time, I moved here to work for a general contractor that was building the District of Columbia's Consolidated Forensic Lab. I spent three years working on that project at L'Enfant Plaza, pretty major $300-million investment for the City. After that project, I had an opportunity to move from that general contractor and apply for a job within D.C. government in their Department of General Services.

I spent about 11 years in D.C. government, working on capital improvement projects for police stations, fire stations, public schools. I also was responsible for facilities maintenance of the public schools, and most recently, before joining the center, sustainability efforts and energy, you know, improvements across publicly-owned buildings in the District. I've been here since January of '24.

Q. Okay. And with all of that, would it be fair to say you have significant experience in facilities management?

A. I have significant experience in what it takes to -- uh, to -- ground-up construction, routine maintenance of buildings across the board, yes.

Q. And as I heard my colleague said, you joined the Kennedy Center in 2024; is that correct?

A. Yes.

Q. What was your role when you joined?

A.    At that time, I was the vice president of facilities.

Q.    Okay.  And your role now is what?

A.    Executive director and chief operating officer.

Q.    Okay.  And what roles have you had in between those two positions?

A.    The vice president of operations, which, really, that change in title and increased duties was reflecting the other things that I was taking on, like food and beverage across the center, production, stagecraft, managing all of the unionized stagehands, more non-routine facility maintenance work.

Q.    Would it be fair to say you are intimately familiar with the center and its needs?

A.    Yes.  I'm familiar with, really, all aspects of the center, from a development perspective, programming perspective, because the building has to support what everything -- everything else that the other folks are responsible for.

Q.    Okay.  What are the scope of responsibilities of your current role as executive director and COO?

A.    I am in charge of the institution, day-to-day operations.

Q.    Okay.  And what would be your involvement in the recommendations of submitting plans to the board?

A.    I am the author of those recommendations.

Q.    Okay.  And would it be fair to say that you were the principal person to execute any recommendations of renovation plans that the board tenders to you?

A.    Yes.  I am responsible for executing what's in our capital improvement plans, yes.

Q.    And also for submitting recommendations to the board?

A.    Yes.

Q.    Okay.

I want to turn now to the scope of the renovations and what is planned.  And maybe you could just tell me, you know, in phases or in buckets or whatever works best for your mind, what is the work that needs to be done, just very quickly so we get an idea.

A.    So there are mainly three buckets, if you will, that correspond to the two years of the schedule.  And the first bucket has to do with the structure, the soffits I mentioned earlier, the failing steel, really all driven by water intrusion, not being able to keep the water away from the structure and route it to where it should go, which is decades in the making.  Those structural and waterproofing repairs is the first bucket that happens in year one.

In year two, the next bucket, are the public patron-facing improvements that you will see in the

theaters, that you will see in bathroom improvements.

And then spanning years one and two, we have substantial failures in mechanical, electrical and plumbing systems. So you have the third bucket, which spans the two years, and that -- you know, that's the big project.

Q. Okay. I want to go through these one by one and I want to have you talk us through it as if we were next to you in the building. Okay?

So bucket one, this is water damage, water incursion, the soffits, a couple other things. I want to start with the soffits. We say this word "soffits" all the time. I went to law school. I don't have the practical benefits of being an engineer. Can you just tell us what a soffit is?

A. The soffit is the underside of the overhang, the lower roof of the center. So it's what you see -- just like you see the ceiling here, the soffit is what you see when you look up when you're standing around the building.

Between the soffit and the terrace where you walk on the top of the building, there is an interstitial base where drainage takes water out of the building. Those drain systems have failed. The roof on that overhang has failed and water is getting into the steel and the concrete that is supporting the soffits. And that has happened for years and years and years because the roof is well-past its end of

life.

So when -- actually, shortly after I started two years ago, one of the soffit panels failed because the only thing that's supporting them are hundreds, if not a thousand of tie wires, little cables, that are supporting or connecting the soffits to that steel.  All of those cables are rusting.

There are six or seven really dangerous locations that we're tracking, and we are working on destructive testing to identify exactly what needs to happen.  But that's the soffit and, again, that is -- making the changes to the soffit is going to be a very visible improvement but we are rebuilding them the way they look now.  There will be no changes.

Q.    Okay.

A.    I can move down the building and talk about some of the other water-intrusion issues --

Q.    I'd like to stay on the soffits, just really quickly, if we could.

How big are these soffits, so we have an idea?  I think you mentioned earlier it was some pounds.

A.    Yeah, they're roughly 2200 pounds a piece.

Q.    So I understand, they are the underneath of the roof.  Right?

A.    Yes.

Q.   On the terrace levels?

A.   Yes.

Q.   How high up are they, approximately?

A.   Five or six stories high.

Q.   So maybe 50 or 60 feet high?

A.   If not higher.

Q.   Okay.  You said one of these have fallen before, is that correct, or they failed?

A.   It failed and kind of wedged itself against the building.

Q.   Okay.  Did they fall down from the 50 --

A.   Didn't fall to the ground but the systems that connected the soffit to the steel failed, yes.

Q.   And there's structural degradation in these soffits.  Correct?

A.   Both to the soffits and the support systems, yes.

Q.   Do patrons traverse underneath the soffits?  Is that something that happens?

A.   Every day, hundreds of thousands of people, yes.

Q.   What is going on with the roof that is connected to the soffits?  Is there structural degradation there?  Is it rusting?  Any water incursion?

A.   Yes.  The water -- the roof has failed and the drains have failed and that has caused water to get into the 50-year-old concrete and make the concrete extremely

brittle.  And the metal deck that's supporting the roof, there is pitting and spalling in both the steel and the concrete that supports that roof.

Q.    What is spalling?  Can you break that down for us?  I'm not familiar with that term.

A.    It's an outside bit of the building.  So water, if it's not controlled, gets into the concrete.  When it freezes, it expands and it breaks the concrete.

Q.    Okay.  Is there any other water intrusion at the center that is of concern?

A.    There is significant water intrusion across the entire campus but some of the most significant water intrusion is into the electrical vaults, where we have three main electrical vaults and they all are situated just under the reflecting pool in front of the building under the service road, is what we call it, the main entrance to the building.

And there is significant water intrusion.  The water is not being diverted away from those structures.  So it's sitting on top of the structures and sitting behind the structures.  It's coming into the electrical vaults and damaging, you know, the main electrical equipment, main points of incoming service to the building.

Q.    That sounds serious, water in the electrical vaults.

A.    It is a very significant safety concern, yes.

Q.    When you enter these electrical vaults, what do you see?  Is there anything that jumps out at you that is abnormal?

A.    Well, there are stalactites.

Q.    There are stalactites?

A.    Yes, hanging from the ceiling.  There is significant rust and failure on the electrical equipment itself and, you know, what that -- the water is so perverse because of these stalactites and the amount of water, that the equipment is failing.  And, yes, you could have a failure with the electrical equipment and that could short the electrical equipment and that could lead to a fire and, the worst case, you know, an explosion.

Q.    I mean, that sounds like a safety hazard.  Right?

A.    If we don't address it, yes.

Q.    Okay.

A.    It's a safety concern now but if we continue to let it degrade, it's only exponentially worse.

Q.    And how old is the equipment in the electrical vaults?  Do you know?

A.    The equipment -- all of the electrical equipment was manufactured in the late '60s, '67, I believe.

Q.    So almost 50 years old?

A.    Yes.

Q.   Is there water incursion anywhere else?   The tunnels?   Any subterranean areas?

A.   There are two other areas where water intrusion is really bad.   Around expansion joints on the River Plaza, so the structure that supports the River Plaza and the overhang over Rock Creek Parkway, some of those steel girders are actually delaminating and the fireproofing is rusting.

Then, in the service tunnel, which runs, again, the full length of the building, there are expansion joints that are failing, and the worst is actually just directly below the entrance to the Hall of States and Hall of Nations, where we have two main loading docks.

Loading dock one, underneath the Hall of States, we've actually had to install a big bandaid to hold the entrance to Hall of States up because that -- you know, that deck that you walk on when you come into the building is failing.

Q.   You said you installed a bandaid underneath the Hall of States; is that correct?

A.   Yes.   It's a metal deck system that's keeping the concrete from falling onto the delivery trucks and also supporting that section of the building.

Q.   Okay.   And what would happen if there was no bandaid and there was structural degradation underneath the Hall of States, as you just said?

A.   I mean, the beams that are holding up the walkway into the Hall of States entrance could fail.

Q.   Just ballpark, how many people traverse through the Hall of States?

A.   It could be a million people in a year.

Q.   Okay.  Let's go back to the tunnels for a second. I hear that there's a nickname floating around for the tunnels within the staff; is that true?

A.   For as long as anyone can remember, the stagehands, where they do all of their painting and their stagecraft, have called their offices and their work area the swamp because of the water intrusion into the service tunnel.

Q.   Okay.  What's a natural segue to the plumbing issues, could you just describe those briefly?

A.   Similarly to the electrical equipment, all of the plumbing infrastructure is the age of the building.  Cast iron rusted pipe that has not been -- you know, that has not been dealt with in the last 50 years.

So there are, I think, between 12 and 13 actual risers throughout the building that support bathrooms in different areas and all of that plumbing infrastructure -- there's a bathroom in the Concert Hall that was out of service for three months because we had to replace cracked, failing plumbing infrastructure.

Q.    Tell me about the central plant.  What is the central plant?  What is it comprised of?

A.    The central plant is just off of the service tunnel, underneath the middle of the building.  And that is the room where all of the chillers and boilers and hot water heating equipment lives.

All of that infrastructure is well past its end-of-useful life.  I believe the chillers were installed in the late '90s and the boilers were installed in the early 2000s.

So these pieces of equipment, again, they are central to how we move water around the building to all of the 70-some-odd air handlers that are throughout the building and it's the central point of cooling and heating. We've been lucky there hasn't been a failure with that equipment, mainly due to the age.

Q.    Were they properly maintained?

A.    No.  The biggest concern with the chillers and the boilers is that we're bringing water directly into this equipment from the Potomac River that is unfiltered, because the main filtration system, the traveling screens, that's actually in a different part of the building, in the river pump room, have not worked since 1996-ish.  So we are bringing dirty, unfiltered Potomac River water into our central plant.

Q.    Let's go to the staging and rigging.  So it actually is used in the concert halls.  Can you just tell me about the condition of that equipment?

A.    There's different types of equipment in the different halls.  Some production and rigging equipment is a little more automated than others.  But in the Opera House, for example, all of the line sets, you know, what the stagehands actually use to control set moving around on the stage, all of those line sets are, as an example, the age of the building.

So this effort, this investment opportunity is not only back-of-the-house infrastructure, it's back-of-the-house theatrical spaces as well.  We're going to have the opportunity to replace hundreds of actual ropes that are the age of the building, as well as some of the lacking safety mechanisms.

When these spaces were constructed, there was no fall protection.  If you go there now, there's no fall protection.  So we are doing a lot of investment for the production infrastructure, as well as bringing things up to current safety standards.

Q.    There was no fall protection when this equipment was installed 50 years ago; is that correct?

A.    Construction was a very different time back then.

Q.    Okay.

A.    And operating these theatrical spaces was very different as well.

Q.    Would you say the safety concerns 50 years ago were perhaps the same as today?

A.    No, not at all.  Not at all.

Q.    Okay.  And who was working the staging equipment? Is it stagehands?

A.    Yes.

Q.    Okay.  Does it pose a safety risk?

A.    I think it poses a safety risk to them, yes.  Yes.

Q.    Okay.

And just very quickly.  I want to back up.  We were talking about the structure underneath the building. When you go underneath the building and you look at the concrete that's upholding, you know, the main hall, the foyer, do you see any degradation with the concrete?

A.    Yes.  Yes.

There is -- essentially, on the plaza level of the center, there is a complete failure in redirecting storm water away from the building, and that's impacting the deck and just -- it's numerous locations throughout the parking garage, throughout the service tunnel and, again, the main entrances, Hall of States, Hall of Nations.

Q.    If you wanted to fix some of this, couldn't you just do it from the tunnel?  Do you have to go from the top?

How do you fix that?

A.    No.   You can't just fix it from the blind side. You have to fix it from within the space.   You have to fix it from the top and bottom, from the inside and the outside if you want to do it right.   You can inject things into walls and try to do it from inside the building only, but that's not the appropriate way.

So for the electrical vaults that I was discussing earlier, really fixing that water intrusion into the electrical equipment, that means we have to excavate along the entire length of the service road down to install new waterproofing.   And, again, that's an incredibly intrusive project but the safety risks of not accomplishing that are just profound.

Q.    All right.

And just square that for us.   What is directly above those service tunnels that need to be repaired?

A.    Well, the main entrance, that turn into cross one, the first turn into the Hall of Nations, right when you make that turn is a really bad failure in the service tunnel.

So, again, in order to complete that project, we have to shut down the main entrance to the road -- to the building for, you know, a three-month period of time, and we have to do that similar thing for the electrical vaults and we have to do similar shutdowns in the Hall of States, Hall

of Nations.  We have to do similar on the B/C North parking garage entrance, on the River Plaza.  I haven't even talked about the soffits.

Q.   All right.  I think we have a good picture.

I want to talk now about the plans.  I think we previewed some of that in my friend's discussion.  You know, you talk about the comprehensive building plan.  Can you give us an idea how complex this thing is, how many pages there are?

A.   The comprehensive building plan, the 2021 version, is a roughly 300-page document that includes a lot of the things I've been talking about here but it also includes routine maintenance efforts as well.  It does include schedule information and it does include cost estimates.

Q.   It would be fair to say this plan is pretty detailed.  Right?

A.   It is very detailed, yes.

Q.   A little more detailed than the budget document my friend was showing you?

A.   Yes.  The comprehensive building plan is what informed the original ask, the original request of Congress.

Q.   Okay.

I'm familiar with something called a "master schedule."  Do you know what that is?  Can you tell us about that?

A.    Yes.  We brought on board an entity to help manage and implement and plan all of these needs.  One of their first deliverables is taking everything and putting it into an integrated master schedule that shows when and how we are going to do this work over two years.

Q.    Okay.

A.    The first deliverable is later -- the end of this month, the end of April, a draft of that.

Q.    So maybe just a couple days?

A.    Yes.

Q.    And when would it be finalized?  Do we have a date there?

A.    A month after.

Q.    Okay.  All right.

A.    A month after.

Q.    Could you just tell us a little bit about the current progress of the renovations?  Has any work occurred?  Is it all planning?  Could you tell us about that?

A.    Seventy-five percent of what we're doing now is planning.  Again, making sure we have an achievable schedule.  Making sure we have independently-verified cost estimates for the work that's in the comprehensive building plan and that's in our budget documents.

We are making a handful of just routine improvements in the REACH, to get that space ready for what

the closure means.  But it's mostly planning and contracting.

Q.   All right.  I'm glad you brought up the REACH. One of Judge Cooper's questions yesterday was, what would remain open if the plan renovations went forward.  Could you just tell us a little bit?  Maybe we can go through one by one and leave the end for some miscellaneous things, but what would remain open?  Would the grounds of the center remain open during renovations?

A.   The majority of the grounds directly around the building will be behind a construction fence, but the REACH will remain open.  A lot of the functions that happen inside the REACH now will continue on.  There are education functions.  There's a -- Moonshot Studio is in the REACH. Those pieces will continue to live on.

Some of the improvements I mentioned -- the floor, for example, in Skylight Pavilion was not the right material selected during the construction of the REACH for that space.  So we replaced it with a better floor, harder wood. And that space, for example, is going to be the temporary home of the memorial to JFK.  So we will take content from the JFK memorial, move it into the REACH; that will remain publicly accessible.

Q.   Sorry to cut you off but just to be clear, that will remain open throughout the renovations.  Correct?

A.    Yes.

THE COURT:  And does that include the bust that Mr. Lowell was referring to?

THE WITNESS:  Well, the bust weighs, like, 3,000 pounds.  So we're not going to move the bust into the REACH.  It would be impossible to do that.  But the bust will stay in the Grand Foyer.

We are taking this opportunity to maintain some of the artwork that the center owns.  There has never been a comprehensive conservation effort across the board.  So we will use this time to address the bust, but it's staying in the Grand Foyer.

BY MR. ANON:

Q.    Judge Cooper was talking about the bust.  I think maybe he was getting at, would there be displays regarding the memorial to the fallen president at the REACH?

A.    Yes.  We will move content from the memorial that's on the terrace level, and there are some other things, interactive displays that people really like.  So we will move that into the REACH and maintain public access.

Q.    And just to back up a second.  You and myself know what the REACH is, but can you just tell us and those in the courtroom what is the REACH?  Is it a big part of the center?

A.    The REACH is a roughly 70,000-square-foot

expansion that is the newer section of the campus.  It's mostly underground but there are a handful of above-ground structures.  It's on the south side of the campus.

Q.   Got it.

THE COURT:  Just to be clear, no artistic performances but perhaps rehearsals or no rehearsals either?

THE WITNESS:  So the other -- we are exploring now moving certain artistic efforts into the REACH.  We have the Millennial Stage program, which is a smaller artistic program, that we do want to move into the REACH.  The River Pavilion seems like a good spot to do that, which is still publicly accessible.  So we are looking at how we maintain some of our duty to present in the REACH.

The NSO will use a handful of rooms as rehearsal space, equipment storage in the lower level of the main REACH facility.

THE COURT:  Thank you.

BY MR. ANON:

Q.   All right.  Just to be clear, there are going to be rehearsals.  Correct?

A.   There will be rehearsals in Studio K.

Q.   And perhaps performances?

A.   And there will be, yes, yes.  Not in Studio K, potentially, but in other locations.  But we are working on plans for all of that now.

Q.    All right.  Will some offices move to the REACH?

A.    We want to move select NSO offices to the REACH, and we also want to figure out how we can stand up flexible space for staff that need to be on site.

Q.    Okay.  Any educational or outreach materials being moved to the REACH?

A.    We will continue to use the REACH to accomplish some of the education department's mission during the closure, yes.

Q.    All right.

I want to talk now about the decision to close the center.  So what recommendation was made and who made the recommendation?

A.    I recommended to the board that the most efficient and effective way to complete the magnitude of projects that we need to complete is to temporarily close the center.

Q.    Okay.  And tell us about why you recommended to make that decision.

A.    Well, the first thing that comes to mind is, again, the magnitude of some of these projects and the safety concerns.  I think the -- it is very -- I don't want to make light of the situation but it is pretty basic to understand that it's easier to do the things I've been talking about, in addition to, you know, moving certain functions around the building and doing office -- tens of

thousands of square feet of office renovations in a closed facility.

So there are very clear efficiencies, both from a cost standpoint and a schedule standpoint, to not have to work around thousands of patrons moving throughout the campus.

Q. Okay.

And I understand your capacity as executive director you would be the person in charge to make that recommendation, as we just said. Correct?

A. Yes.

Q. Okay.

And was there any cost-benefit analysis done? Were there reports you analyzed? Were there recommendations or any other sort of analysis you --

THE COURT: All right, Counsel. So why isn't sauce for the goose, sauce for the gander? Aren't we getting into the issues that we were discussing yesterday? I know Mr. Zelinsky is in the audience. We could prolong this all day.

MR. ANON: I'll skip this answer, Your Honor.

THE COURT: Thank you.

MR. ANON: Yep.

BY MR. ANON:

Q. So you're just talking about efficiencies in

closing the center versus perhaps a phased plan; is that correct?

A.    Yes.

Q.    And could you just tell us, would there be benefits to cost by closing it fully versus phasing it?

A.    Yeah.  There are clear efficiencies, cost efficiencies in doing the work in an unoccupied building. Just looking at the labor itself, working second shifts overnight, that's a 20- to 25-percent increase in just the labor costs.  So there's clear efficiencies.

Q.    Okay.  How about to the timeline of the construction?

A.    If we are required to phase all of the things that I have been discussing today, there's definitely a concern that we're not going to complete the work before the funding authorization expires in 2029.

Q.    To parse that out, there is this funding authorization that expires in 2029.  Correct?

A.    We have through fiscal year '29 to obligate funds that were in the Big Beautiful Bill, yes.

Q.    If there was a phased construction, it would make it difficult to hit the 2029 target, if you will?

A.    Yes.

Q.    How difficult?

A.    It's impossible to do some of the things I have

been talking about. The biggest concern I would have is actually getting into the plumbing risers that I mentioned. There would clearly be plumbing and sanitary projects that we could not complete because they are so intrusive and impact such a large portion of the building.

Q. Okay.

Is this an opportune time to close the center fully to do these recommendations? Are there any programmatic concerns that made this especially opportune?

A. I think this is an incredibly unique time, and it's probably the only time in the center's history where an opportunity like this has ever been possible. We have the -- you know, we have the time in our programming schedule to do this now and we have the funding available that's never been available, and we have a leadership team that will prioritize these improvements. So it's incredibly -- it's the perfect time to do this work.

Q. Okay.

And just to jump off that, has delay in performing these renovations, has that been part of the calculus to do this full closure and just get everything done all at once?

A. Not prioritizing this work and prioritizing the programming has put us in this situation. Not fully understanding the extent of what is happening in the building and then requesting funding to address those

issues, yes, those are the reasons why we are here.

Q.   Okay.

A.   Now we have an opportunity to prioritize these improvements.

MR. ANON:  I'll wrap up soon, Your Honor.

BY MR. ANON:

Q.   So just to put a finer point on it, what are the safety issues that could occur if we have a phased renovation versus a fully-closed renovation?

A.    I think it's irresponsible to think we can address these water-intrusion issues and these concrete issues and these electrical issues and try to funnel patrons through the building and not do the work correctly.

So just the basic, you know, safety issues of having patrons try to get to the Concert Hall when we are fixing the soffits and we have electrical outages and we have bathrooms being renovated and we're trying to pour concrete in the front of the building.  It's just irresponsible.

Q.   It's not conducive to a good patron experience?

A.   No, not at all.

Q.   Would there be dust in the building while the patrons traverse?

A.   Yes.

Q.   Could there be asbestos?

A.   There could be any number of indoor air quality issues when we are trying to do work directly above or directly below or within the same space as patrons, yes.

Q.   All right.

MR. ANON:   I want to close now with a few final questions.   I don't think I should take too much of this Court's time.

BY MR. ANON:

Q.   What does being the steward of the center mean to you?

A.   It's my job to protect the National Cultural Center.   And, you know, I completely understand the position that I'm in, but I think I'm really well-suited to do just that.   I understand the responsibilities, and I have an appreciation for the mission and Congress and leadership.   I am responsible for this and I respect the opportunity.

Q.   Do you care about the center?

A.   Deeply.

Q.   Do you care about the building of the center?

A.   Yes.

Q.   Do you care about its future?

A.   Yes.

Q.   Okay.

In your capacity as executive director and chief operating officer, if renovation plans were to change, would

you be aware?

A. Yes, definitely.

Q. Are you aware of the current extent of the plans?

A. One hundred percent aware, yes.

Q. Okay.

Will the center's exterior be materially altered from today's appearance?

A. No.

Q. Will any new structures or buildings be erected?

A. No.

Q. Will the center be rebuilt from the bare structural steel, as my friend had intimated?

A. No.

Q. Last question:  Will the center be demolished?

A. No.

MR. ANON:  No further questions.

THE COURT:  Very briefly, Mr. Lowell.

MR. LOWELL:  I appreciate the time restraints but there's -- I had very few but then we got into the whole issue of this closure.

THE COURT:  Go ahead.

MR. LOWELL:  Thank you.

### EXAMINATION OF MATTHEW FLOCA

BY MR. LOWELL:

Q. It won't take long, Mr. Floca, but I need to

understand.

You have explained your view that the best way to handle -- that nobody contesting that there are serious things that need to be attended to supports the decision to close the center. And I think it's for two years. That's what you have explained in the last few minutes. Right?

A.    Yes, sir.

Q.    But it's true that before February 1st of 2026, that was not what your view was. And before 2026, that which you have done indicated that these repairs could be done without closing it in its entirety and to do it in phases.

A.    Previous leadership would have never taken this as an opportunity. So I don't think it's as much my opinion as it is the situations that we are in.

Q.    But there were safety concerns before February 1st. There were rusting issues before February 1st. There were issues about the chillers before February 1st. And in the lead-up before something happened on February 1st, closure was not something you had recommended in all the time that you had been vice president for operations or facilities. That's just a plain fact, isn't it?

A.    Well, I'd like to answer that in a way that I hope makes sense. When I came in and I saw the condition of the

campus, I was dumbfounded.  And we are getting 10- to $11 million a year in capital improvement numbers.  Why are we not telling people the true needs?  Leadership, at that time, knew that we were not telling people the true needs of the campus.

So my priority at the time was not just saying, oh, my gosh, we need to close.  My priority was communicating to leadership how much it really costs to address the issues that are pretty evident and, you know, I started that work immediately when I started in '24.

Q.   How much before February 1st, '26, did you to articulate what became your view, as you are testifying about it now, that this place needed to be closed for two years?  Because I didn't see it in anything that you had written or anything that you say you reviewed prior to that.  So I'm just asking you to place a date before February 1st.

A.   Probably four months before that.  I mean, I was actively working on the plans to do all of these things in an occupied building.

Q.   Last question on this point.  Was it you, the board or the chairman that, on February 1st, announced something that had not been publicly announced from the time that he had been involved in the second administration as chair, that the closure was the way to go?  Was it your decision, was it the board's decision or was it solely his?

A.    I did not have any -- I did not direct him to announce anything on it, if that's what you're asking.  I didn't inform, you know, directly his effort to make that announcement.

Q.    In light of your question, I want to show you something about February 1st and be done with this subject, and then I only have three other questions, I think.

MR. LOWELL:  So would you please put up...

(Video played.)

BY MR. LOWELL:

Q.    Mr. Floca, I just heard the chairman, notwithstanding your answer, saying how it got to be that this decision was made, he said, after blah, blah, blah, year review, et cetera, "subject to the board approval today, it's a little late for the board because we've already announced it."  Maybe he speaks of himself in the third person.  And he said those are minor details, that he decided it versus the board.

That's what he said on that date, isn't it?

A.    I heard him say there were minor details, yes.

Q.    Notwithstanding all that had happened before where that wasn't the plan until that date.  Correct?

A.    [No response]

Q.    I'm going to move on.  In the questions that were asked to you about the closure, I just have a question.  Did

you have any opportunity to review the National Park Service regulations or the statute about what closure does or does not require?  I'm not asking you to opine on whether what you are doing violates or doesn't violate.  I just want to know if it was something that was on your radar screen.  Was it?

A.   My understanding is those don't apply to us.

Q.   And your understanding is it doesn't apply because why?

A.   Because we are an independent trust instrumentality.

Q.   Got it.  And then, kind of last, back to the plan -- well, one more thing before.  I heard you ask questions about --

MR. ANON:  Your Honor, can we wrap this up?  We are going --

MR. LOWELL:  I have really two questions.  You can indulge me.

THE COURT:  Wrap it up, Mr. Lowell.

BY MR. LOWELL:

Q.   The plan that you talked about with counsel that opened this issue about what you have to do on the service road, et cetera, will you need to have access to the River Plaza in order to do what you said underneath.

A.   Yes.

Q.    And is the plan, as you are calling it a plan, does that envision that the entrance, the ability of people to enter the Kennedy Center from the riverside is going to be stopped?  Is going to end?  It's going to be blocked?  It's not going to be possible in the future?  Yes or no, do you know?

A.    During construction we're going to block --

Q.    When it's opened, is it going to be permanently closed?

A.    No.

Q.    And the last question is:  As I understand it, there is not one single document that exists in the record that this Court can look at and determine the issues in the case where an actual plan as to the proposed work will be done has been stated in the detail in which a court, the public, the plaintiffs could review it.  There's not one document right now, is there?

A.    There's not one deliverable that outlines everything we've discussed today, no.

Q.    So all that's happened has been based on a plan to come sometime in the future.

I asked you one quote, let me end with another quote.  Have you ever heard the expression, "Trust but verify"?

A.    Yes, sir, of course.

84

THE COURT:  All right.  Just a couple very targeted questions, Mr. Floca.

**EXAMINATION OF MATTHEW FLOCA**

BY THE COURT:

Q.    Mr. Lowell mentioned National Park Service regulations and agreements concerning operation and management of the grounds, as opposed to the buildings.  Are you aware of any such agreements?  Have you seen them?

A.    We have no agreements with NPS to maintain the grounds of the center, no.

Q.    As a practical matter, how does the center interact, if at all, with the National Park Service?

A.    Mainly on a law enforcement basis; that's it.

Q.    Okay.

Does the center make a distinction between, quote/unquote, trust funds and appropriated funds or any other funds?  Are those maintained in separate accounts?

A.    Yes.  We have a very significant accounting structure that delineates between public and trust dollars.

Q.    So trust funds, in your view, include what?

A.    Trust funds are anything we need to programmatically meet the mission.  So that's paying for production costs for an outside entity if they want to come rent the space, the fees for artists.  Those artistic operations are trust-funded.

I like to think of it as whatever happens within the four walls, trust; and the four walls themselves, that's appropriated public dollars.

Q.   Okay.

To what extent will the construction implicate statues, monuments or fountains?

A.   The fountains will be improved.

Q.   How many fountains?

A.   We have four main fountains and we have three reflective pools.  We will replace the guts of those fountains, but the footprint of those fountains will not change.  So there aren't any plans to expand the fountains or make them smaller, make them bigger or different sizes, but we will replace what is inside the fountains.

Q.   Mr. Lowell touched on this, I believe, with his penultimate question.  How can the center accomplish the repairs on the pump room and any water intrusions from the Potomac without implicating the Rock Creek Parkway or National Park Service land near the parkway, or can it?

A.   The extent of --

Q.   Or what effects will those repairs and improvements have on the operation of the parkway and adjacent National Park Service land?

A.   Mainly, just traffic control.  We will need to coordinate with NPS on traffic control of Rock Creek

Parkway, but structurally we are not making any changes to the parkway.

Q.   Do you anticipate that traffic will be rerouted at times to accommodate the construction on those systems?

A.   Very minimally for the systems.

Q.   Okay.

A.   There is failure on the landscaping towards the end of the REACH, where that's the biggest impact of traffic control, is the landscaping improvements.

Q.   But traffic control on the parkway you think may be affected by those landscaping works?

A.   No, sir.

THE COURT:  Okay.  That's all I have.

MS. FREENY:  Your Honor, may we address the --

THE COURT:  Come to the podium.

MR. ANON:  Your Honor, very quickly.  I have two questions.  It's no more than 20 seconds, if that's all right?

THE COURT:  Go for it.

MR. ANON:  All right.  The first re-redirect.

BY MR. ANON:

Q.   Mr. Floca, just to be clear, did you advise the chairman of the board on the decision to close the center?

A.   Yes.

Q.   Did you advise the building and grounds committee

on the decision to close the center?

A.   Yes.

MR. ANON:  Okay.  No further questions.

Thank you, Your Honor.

MS. FREENY:  Good morning, Your Honor.

THE COURT:  Please identify yourself for the record.

MS. FREENY:  My name is Kyle Freeny.  I am counsel for Congresswoman Beatty in the related case.

Your Honor, we would request the opportunity for a limited cross on topics related to closure that overlap with our case but implicate the issues uniquely presented in our case.

THE COURT:  I think your colleague crossed on -- or recrossed on some of these issues.

MS. FREENY:  He did, Your Honor.  And it would be limited to the issues that he did not cross on that we believe are before this Court.  And one of them, actually, relates to one of your questions, Your Honor.

THE COURT:  All right.  Very briefly.

EXAMINATION OF MATTHEW FLOCA

BY MS. FREENY:

Q.   Good morning, Mr. Floca.  How are you?

A.   It's Floca, Floca.  Everyone says Floca.  It's fine.

Q.   My apologies.

A.   That's fine.

Q.   You testified about a number of issues on direct that you said informed your decision to close the center. Right?

A.   Yes.

Q.   Things like water intrusion, needing to replace systems.  Do I have that right?

A.   Yes.

Q.   Those were longstanding issues, though.  Correct?

A.   Yes.

Q.   And so those were issues that were addressed in the existing, not the new comprehensive building plans. Correct?

A.   Yes.  The 2021 comprehensive building plan touches on the majority of the things I have been talking about, yes.

Q.   And so does the 2022 comprehensive building plan.

A.   There -- yes, there are previous -- yes, yes.

Q.   And that 2022 comprehensive business plan actually contemplated that the Kennedy Center would remain open during renovations to address those issues.  Correct?

A.   I don't know the origin of the comprehensive building plan but, again, this closure, the idea of doing this holistically, you know, was never an option during

previous administrations.

Q.   Understood.

But you don't disagree that the comprehensive building plan from 2022 did contemplate that the renovations to address these issues, like water intrusion, would be done in a phased manner, so that the building would remain open as much as possible?

A.   Yes.  The schedules in the comprehensive building plans have always been phased.

Q.   And did I hear you say today -- and this was, frankly, Your Honor, new, I think, to us -- that the center is undertaking currently the creation of a new comprehensive building plan?

A.   Well, I want to holistically update the comprehensive building plan.  We have not holistically done that since '21.

Q.   Since '21.  Okay.

And so that includes things like cost schedules? Updated cost schedules?

A.   Yes.

Q.   All right.

But you didn't wait to make the recommendation to close the center until that was completed.

A.   There's no need to.

Q.   Okay.

But that also means that you did not commission any study or cost estimates to compare the cost of construction on a phased level versus full closure. Correct?

A.    There is no need to.

Q.    Well, you are aware that President Trump, when he announced the closure, talked about a one-year review. Right?

A.    Yes.

Q.    All right.

And when he did, he talked about the review being for the purpose of deciding between construction with closure and partial construction, leaving it open.  Right?

A.    I don't know the intent of the President's tweet.

Q.    Understood.

I'm not asking his intent.  I'm just confirming that your understanding, what he said, we are deciding whether to close fully or partially close, and the purpose of the one-year review was to make that assessment, which one was better.

A.    I don't know what he was intending with his tweet.

Q.    Okay.

You did not, though, undertake to assess the costs of closure.  Correct?

A.    I mean, that's my job.  That's what I do

constantly every day with the information that I have.

Q.   Okay.

But you don't have a background in performing arts management.  Right?

A.   That has nothing to do with closing the center for the needs of the building.

Q.   Understood.

But you agree there is an option to adopt some mitigation measures that would allow you to keep the center open while doing renovation.  They may be more costly, but they are available.  Right?

A.   I think it's irresponsible.

Q.   Okay.

But you agree that there are measures that are available.  Right?

A.   We could -- yes.  We could do construction in a number of different ways.  But, again, it's irresponsible.

Q.   Okay.

Do you disagree, though -- you said, you know, that you're looking at the building.  But let's talk about the performing.  You did say, I think, that performances would potentially go on at the REACH.  Right?

A.   Yes.

Q.   I heard you say that you were exploring that.  So there's no definite plans for performance at the REACH.

Right?

A.   We've asked the programming team to look at how that's possible.

Q.   Isn't it right, though, that you or the center laid off all but three of the center's programming staff within the last two months?

A.   There are more than three programming staff still on board.

Q.   How many?

A.   Including the Millennium Stage and including the NSO and including --

Q.   Not including NSO, but --

MR. ANON:   Your Honor, I'm sorry, could the witness finish his answer?

MS. FREENY:   Sorry.

MR. ANON:   Also, could leading questions be limited?

MS. FREENY:   This is an adverse witness.

THE COURT:   You can lead him but wait until he finishes --

MS. FREENY:   I'm sorry, yes.

MR. CRAIG:   -- before you form your next question.

THE WITNESS:   I don't know exactly how many programmers we have but there are ten people focused on programming.

BY MS. FREENY:

Q.   Understood.

For some reason I thought you were going to give me the number of the Kennedy Center performers.  So that was why I jumped in.  My apologies.

So ten.  But you laid off dozens of programming staff.  Right?

A.   Not me.

Q.   Not you, the center?

A.   Yes.

Q.   Okay.

And you agree, also, that by closing the center for two years, you are -- it is going to have an effect on revenue.  Right?

A.   Yes.  Definitely.

Q.   Ticket sales?

A.   Contributed and earned revenue, yes.

Q.   And that is something that when we're talking about the rubric of appropriated funds and trust fund, that falls within the trust fund category.  Right?

A.   Yes.  Show-related costs, trust funds.

Q.   So the closure will have -- will reduce the revenue to the center.  Right?

A.   Correct.

Q.   But you didn't -- you didn't perform any analysis

or try to quantify what that cost was.  Correct?

A.   Ask me that one more time.

Q.   You didn't make an effort to quantify, What is that cost?  What is it going to cost the center in lost revenue, in lost goodwill, lost performances, if we do close for two years?

A.   I did not directly make that -- you know, do that review, no.  My decision was focused on the needs of the building.

Q.   Okay.

And you didn't -- it's not just that you didn't do the review, also, you didn't have any such review before you when you made your recommendation.  Right?

MR. ANON:  Your Honor, that's misstating witness's prior testimony.

THE COURT:  Sustained.

BY MS. FREENY:

Q.   All right.

Did you have in front of you an analysis of the costs to, sort of, the trust side of things, loss of ticket sales, when you made your recommendation to close the center?

A.   No.  I didn't have that information in front of me, no.

Q.   So you recommended to close the center based on

what you saw as the efficiencies on the construction side. Correct?

A.    Yes.  But I would like to make it clear, I'm not oblivious to what's happening on the programming side and, you know, the hurdles we have across the board.  So I'm -- I didn't make the decision in a vacuum, if that's what you're asking.

I think I understand -- I do understand the world that we are operating in and the impacts of this closure on the institution.  I understand where we are.

Q.    Understood.

And I'm not trying to question that.  I'm just trying to understand what you made your decision on.

In terms of the costs and the efficiencies, when you're looking at, "what is this going to cost," without having numbers, you couldn't have quantified, "how do I compare the cost of closure" to "this is what it's going to cost, this is our cost-savings."  Right?

A.    I mean, it's two separate -- it's two separate funding streams and two separate actions.  And, you know, the center can support itself in a -- you know, in an empty -- I don't know.  I'm struggling to understand what -- I get what you're saying but that's not a factor in deciding to do what we need to do.

Q.    I got it.  Okay.  Because you consider them kind

of separate buckets.

A.   Yes.   The risk to programming and the risk to the public benefit of the center is far greater if we don't act now.

Q.   And your assessment of that, that it's, you know, the cost and benefit of the construction, that was not based on any recent schedules, such as the kind that were set forth in 2021?

A.   You mean programming schedules?

Q.   Yeah, programming.   Or --

THE COURT:   Counsel, I get the idea.

MS. FREENY:   Okay.   I got it.   Okay.   Let me just make sure -- one more thing, Your Honor.

BY MS. FREENY:

Q.   You talked about keeping Congress abreast.   Right?  And you talked about having funding to address these issues.  Right?

A.   Yes.

Q.   But it's the case that when the Kennedy Center, while you were there, submitted a budget justification, which I think you mentioned previously, to Congress in connection with fiscal year 2026, that budget justification actually contemplated taking steps in construction to avoid affecting programming.   Meaning, it did not contemplate closure, did it?

A.   Well, the 2026 submission was a far-greater reduced submission due to the money that we have in the Big Beautiful Bill.  I think what you're looking at is a -- you know, a copy and paste from previous congressional justifications and budget submissions to OMB.  We're on this pathway that is separate from what we're requesting in the annual updates to Congress.

Q.   Understood.  My only question is to confirm that when the center, while you were the facilities manager, went to Congress and submitted the justification that you say is how you -- you know, how you keep Congress abreast, the submission contemplated that the center would remain open while renovations were undertaken.

A.   That has been the historical stance, yes.

Q.   And that is what was submitted to Congress in the most recent justification.

A.   I think you're just pointing out a clerical error in the submission.

Q.   Okay.

So your position is that the most recent justification had a clerical error when it contemplated that the center would remain open during renovations?

A.   That justification has nothing to do with the Big Beautiful Bill or the $250 million; that's an annual congressional justification.  But I understand what you're

trying --

Q.   That's all I need.

MS. FREENY:  No further questions.

THE COURT:  Thank you.

MR. ANON:  Your Honor, if I could have two minutes for what is surely the first triple redirect.

THE COURT:  It is the search for truth, after all. So let's get to the bottom of it.

MR. ANON:  Of course.

EXAMINATION OF MATTHEW FLOCA

BY MR. ANON:

Q.   So we were just talking about a cost-benefit analysis.  I think my colleague was talking about it.  I just wanted to explain that further.  Did you contemplate or did you think about any recommendations submitted to you? Was this something on the fly?  Did you really think about it at all or was this something that required, you know, the analysis of reports?

A.   So the decision in the analysis is really -- again, it's founded in what's outlined in the comprehensive building plan and it's founded in the risks that are identified in the evaluation that the structural engineers did, when the soffit failed, when we did a comprehensive leak investigation study.

When you start to reference all of these very

campus-wide issues that are safety concerns and you -- I did try for a long time to phase this -- to phase these efforts, to look at exactly how, you know, we can work in the Concert Hall but keep the Opera House open and the Eisenhower open and how we can limit parking in the parking garage when we are addressing structure failures in the River Pavilion.  It is just impossible and irresponsible.

Yes, we did analyze all of these different options and it was -- you know, there's a team on board at the center who I worked with constantly in trying to figure out contracting mechanisms and solutions to partially operating the building.  But, again, the depth of work is across the entire foundation of the campus, and it's irresponsible to do anything other than holistic fixes.

Q.   Okay.

I think you just put it, a minute ago, that there were long-term concerns about keeping the center open that could affect programmatic changes or the programs that are put into place at the Kennedy Center.

Could you just talk about that a little bit further?  I mean, did you think that there could be long-term concerns if you kept delaying construction?

A.   Yes.  There's clear concerns in not wanting to -- you know, not wanting to shut down the main entrance to the building because we are excavating to do water

intrusion.

You know, there are continuous efforts to program out years in advance. And those have always been at odds in creating or completing the amount of improvements that we need to do, that we know we need to do. There's always been one team trying to shut the building down and one team trying to keep it open; and that's been at odds for decades.

MR. ANON:  Just two more questions.

BY MR. ANON:

Q.    Would it be fair to say that previous approaches to considering a renovation plan versus full-closure renovation plan, it was sort of like kicking the can down the road?  Would you say that's fair?

A.    I would say there is lack of appreciation for the needs and there was definitely, you know, defer this, defer this and we were not prioritizing, under previous administrations, the right types of projects.

But, you know, the other issue here is that the true needs of the campus was never presented.  Before I got here, we were not presenting to leadership the true needs of the building, the true infrastructure issues.  So they were not making very well-informed decisions either, because they didn't understand the gravity of what's happening across the building.

Q.    Okay.

Would you say the deferred maintenance accumulated so much that it has now reached an inflection point and that you feel an obligation to renovate it?

A.   Yes.

Q.   Okay.  Last question.

Since those initial reports talking about phase construction were put into effect, has there been further decay to the center?

A.   Yes.  Every day.

MR. ANON:  All right.  No further questions.  Thank you.

EXAMINATION OF MATTHEW FLOCA

BY THE COURT:

Q.   We've talked about a lot, Mr. Floca.  One thing we haven't touched on is in your declaration you described having engaged with and consulted with the National Capital Planning Commission and the Commission on Fine Arts.  Can you just give us an update to what that has entailed a little more specifically.

A.   Yes.  We've had a couple of staff-level meetings with NCPC and CFA.  And, again, I've -- the center is incredibly unique, and I have a deep appreciation for the spirit of what NCPC and CFA want to do.

But at the same time, you know, the needs of the center are great and we have to -- we have to maintain this

momentum.  Otherwise, we're putting the institution at great risk.  But we have had staff-level NCPC and CFA meetings.

Q.   Have you received any feedback from those institutions?

A.   I think the feedback was positive.  I mean, they were good conversations.  There was, you know, some constructive criticism, maybe.  But, yes, I think they were good meetings.

Q.   Okay.

And have you submitted any plans, schematics, construction plans, even conceptual plans for approval as opposed to consultation or simply consultation?

A.   No, we have not submitted anything officially. We've just had staff-level consultation.

Q.   Okay.

And when do you expect, sitting here today, those consultations will conclude?

A.   Oh, I don't think they should conclude.

THE COURT:  All right.

With that, Counsel, we've been at it for a little over two hours.  For the benefit of these folks, we'll take our lunch break.  Why don't we reconvene at about 1:30 and you can tell me what all of this means.

All right.

(Lunch recess from 12:16 p.m. to 1:32 p.m.)

THE COURT: All right. We are back on the record.

Mr. Craig.

MR. CRAIG: Yes, sir.

THE COURT: It's your motion. Who's arguing?

MR. CRAIG: Mr. Heuer is going to argue.

THE COURT: Come on up. You've got a lot of lawyers to choose from.

MR. HEUER: Indeed.

Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. HEUER: It's obviously a preliminary injunction motion. I will speak about the factors that we want to go through.

I want to start by pointing out that this case is about a fundamental principle that the government, and even the government, must follow the rules.

Now, no one is contesting, as you heard this morning, that the Kennedy Center requires repairs. But before any repairs or major work begin at the Kennedy Center, the law requires compliance with a number of legal obligations, congressional authorization, historic preservation review, NCPC, CFA, NEPA.

The center has always complied in the past, and the defendants' newfound desire to move fast and break things, what Mr. Floca described earlier as, quote, keeping

up momentum, doesn't excuse non-compliance.

Equally important, however, the government is saying two fundamentally incompatible things about a project that is set to start in two months, without having yet produced any actual plans to review, as we heard this morning. Yet, simultaneously, they declare that they know for certain that no permits or approvals are needed.

Now, the chairman, President Trump, has publicly announced the, quote, complete rebuilding of a, quote, new and spectacular entertainment complex. He stated, as we saw this morning, that the building steel will be, quote, fully exposed, and that a brand-new building will replace it.

THE COURT: Right. We've now had sworn testimony --

MR. HEUER: We have.

THE COURT: -- in at least two places that delineates what the project is.

You're here on a PI motion. You have the burden to show that you're likely to succeed on the merits. Many of your arguments are premised on a scope of a project that is much broader than what Mr. Floca has testified to and more in line with what the president has said in various statements.

MR. HEUER: Correct.

THE COURT: So why, at the very least, isn't there

a factual dispute that would prevent a finding that you are likely to prevail?

MR. HEUER:  Because in either of these scenarios, whether it's Mr. Floca's scenario of only maintenance, no new structure, the exterior won't be materially affected -- although, I think we would say, though we heard this morning that painting the columns, plus changing the doors, plus changing the bollards, plus cutting the trees, plus adding a name, apparently none of that adds up to anything that's materially affecting the exterior.

Under either of these two scenarios, we still have a situation where it's appropriate to grant a preliminary injunction, which the Court doesn't have to decide between the two.  In either of those two scenarios, either Mr. Floca's scenario or President Trump's scenario, inchoate as they may be -- and we discussed this morning that we don't have a plan yet.  We don't know what the plan is.

THE COURT:  Let's start there.

Help me understand what it is you are challenging. What plan are you contesting needs approval by all of these various agencies before it can be implemented?

I mean, we have the capital improvement plan. What purpose is the $257 million appropriation that's being put to, but yet we also have the columns, which we learned today is not a part of the appropriation that was planned

prior, that is funded from different sources.

The trees seem to fall in the same category, not a part of the appropriation, not in the capital improvement plan, but some, essentially, routine work on the center.  So what's my target, I guess is the question.

MR. HEUER:  It's not about the plan and the $257 million per se, Your Honor.  Because any of these things would require going through the review processes that we've said.  Take, for instance, the columns.  Right.

The fact that they are being funded through an annual appropriation or through a special Big Beautiful Bill appropriation doesn't change the fact that they are still undertakings by a federal entity that has to undergo 106 review, that has to go to NCPC, that has to, when it's at NCPC, undergo NEPA.  Those things would be true regardless of who is paying for it.  They are things that need to be done because changes are being made.

Now, we've seen the proposal here, that's Exhibit E from Mr. Floca's declaration, that short -- you know, I think we discussed it yesterday as being light on detail.  That provides --

THE COURT:  The budget that corresponds to the capital improvement plan.

MR. HEUER:  Correct.

So that lists out, you know, a couple, maybe a

dozen or so, different projects in the tens of millions of each. Those are all things that we too agree would have to go through all these review processes, and also to the extent that they go beyond what we've talked about in terms of the statutory obligations of the center board in the Kennedy Center's Organic Act, would require congressional authorization. But all of those would require this type of review that we've been discussing here.

So I just want to be clear that the funding mechanism doesn't matter; it's what's being done to the building that matters and is what triggers all of these things. If you do it without any money, it would trigger it. If you do it with a billion dollars, it would trigger it. It's the action, not the funding.

I think on the point of what's the plan, we heard this morning that they have the 2021 plan, which is obviously now five years old. At this late date, we're two months out from when they want to start substantial construction; that's their words. We have someone with extensive construction experience who is saying that they are still translating the concepts into a master schedule and they don't have an actual plan. Usually, if you say what are you going to do --

THE COURT: Tell me this: What does your Complaint challenge? We're here on your Complaint.

MR. HEUER:  Correct.

THE COURT:  And some future plans -- why is that even ripe without me knowing -- why is any of your challenges ripe without me knowing exactly what a future plan might entail?  You've filed a complaint.  You've made allegations in the Complaint.

MR. HEUER:  Correct.

THE COURT:  What plan in the Complaint or what actions in the Complaint are you here on a PI on?

MR. HEUER:  We're here on the fact that we don't know what they're plan is but they've said, we're planning on doing many things.  If that is true, and we have to take them at their word that they are, would trigger all of these federal statutes.

You can't evade federal review by saying I have no plan and, therefore, when I do it it will be too late.  Right?  Because things like Section 106 are required to occur before.  If you look at NCPC, it says:  You must come to them before you start your plan.  CFA is:  You have to come to us before you even demolish something, if you're going to demolish it, and tell us what you're planning to do.  We know that they're not planning on doing nothing.  They're planning on doing something, but they won't tell anyone what it is.

Sometimes it's:  We're going to do a significant

amount of things, like President Trump.  Sometimes it's: We're just going to do maintenance.  Our point is that any of these things would require you at the start, not checking the box ex-post, to go through these processes.

THE COURT:  Correct me if I'm wrong, but a full board has approved the capital improvement plan, which is supported by those rough budget documents, those summary budget documents that we've mentioned, on the recommendation of the building and grounds commission, on Mr. Floca's recommendation.  Isn't that the target that we're here for in this case?

MR. HEUER:  It could be but we don't know what it is.

THE COURT:  Aren't we trying to flesh out, through Mr. Floca's declaration, and the questions we've all been talking about the last two days, exactly what that entails?

MR. HEUER:  Correct.

We've heard from him that he said:  Here are the things that I think it is going to be.  We also heard him say:  I can't control the President.  We've heard him say that he speaks only for himself.  He said:  I can't speak to what the chair is intending.  He said:  I am not in control of the chair's decision-making.  He admitted he can be fired at any time.

If it is indeed true that what Mr. Floca said is

110

true, then we think an injunction is required because the things that you need to go through, 106 review, NEPA, CFA, NCPC, all have to occur before you can do that.  You can't do those in two months.  You can't do them by July 6th.

If you look at any other project of any size, much less of this size, in the District, those processes take months to go through.  The reason they take months to go through is because they are deliberative for a reason.

Otherwise, we have a situation like we had this morning, where we have people coming into this court, spending time of numerous attorneys, trying to go through exactly what is going on with someone who is giving, appropriately, I suppose, a self-serving statement of what he believes is happening.

That's why we have these agencies.  That's why Congress set up these processes, so we don't have an ad hoc system where there is opacity rather than transparency.  We set them up so that everyone submits a plan, everyone can see them, everyone can comment on them, and then we go forward with what that plan is.

THE COURT:  Why don't we move to the various sources of authority that you believe require some pre-approval or consultation.

MR. HEUER:  So there are two main sets.  There are the constitutional-approval requirements and then there are

the procedural requirements, and I will discuss both.

Starting with the -- we think of the three constitutional-approval statutes.  The first is 40 U.S.C. 8106; that's the provision that says a building or structure shall not be erected on any federal or public grounds in the District without the express authority of Congress.

As we've heard this morning, the defendants say this won't be demolished, so there is going to be no structure erected.  I would say that Mr. Floca's declaration itself, apart from what we heard this morning, is internally contradictory.  Paragraph 19, he refers to critical failures of the exterior envelope and systemic decay of structural facade elements, which are hardly the stuff of an exterior that is not being materially affected.

THE COURT:  Wait.  Wait.

The standard under 8106 is whether a building or structure will be erected.

MR. HEUER:  Correct.

THE COURT:  What building or structure have we heard is going to be or is planned to be erected on the site?

MR. HEUER:  We've heard from the chairman of the board that that's what he intends to do.

THE COURT:  So there's a factual dispute as to

that.  Correct?

MR. HEUER:  I would suppose so.

THE COURT:  So you want me to hold that you are likely to succeed on that claim, because I believe the president's statement over the sworn statements of Mr. Floca here in court.

MR. HEUER:  Mr. Floca has testified that he can be fired at any time by that person, who then, as we have seen, engages in precisely this type of activity when it is to his advantage.

THE COURT:  Other than the president's statement that it's a complete rebuild, demolition or whatever, to support a conclusion that a new structure or building will be erected.

MR. HEUER:  Correct.

We saw this in the White House.  Right?  The President said in July that he wants to build a ballroom that won't interfere --

THE COURT:  My question was:  Is there anything other than his statements, that's in my record, that show that a new structure or building is going to be erected on the Kennedy Center grounds?

MR. HEUER:  Other than those statements and Mr. Trump's press statements about the White House, which you can take judicial notice of, I believe --

THE COURT:  Okay.

MR. HEUER:  -- I would say no.  That being said, those are fairly major things to think about in an administration where the president is able to fire at will everyone who he thinks is not doing the job he wants them to do.

As we saw with the White House, where he says one thing and then does another, we don't want to be in a situation where the Kennedy Center is the next East Wing.  Right?  Where we say:  We didn't really know because they said nothing was going to happen, and then they tore it down.  And as the government says repeatedly in their ballroom briefing, there's no PI that can issue because the demolition has already --

THE COURT:  I was planning on getting to this later, but let's assume for the sake of argument that I deny your PI, that the case goes on, is there anything that the Court could do, or the Court could order, to ensure that, if things change beyond what Mr. Floca has testified will happen, the plaintiffs or the Court would be advised of that?

MR. HEUER:  I think the Court can certainly enter a preliminary injunction that says that demolition is not allowed because it is beyond the scope of what Mr. Floca has testified.

If they are saying:  Well, we're not planning on demolishing, then they certainly aren't harmed by that injunction.  But since the government has, in our view, forfeited the presumption of regularity, given it's conduct in previous matters, literally down the street, by the same individuals, we would say that that injunction is highly valuable because, to the extent that they are planning on doing that and circumventing what they said this morning, perhaps by firing Mr. Floca and just doing what they wish and doing it before this Court can act upon it, then that is an entirely appropriate injunction.

THE COURT:  Okay.

MR. HEUER:  If they are not planning on doing it, there is no harm to them if it enters.

THE COURT:  All right.  What's next after 8106?

MR. HEUER:  The second is the statute about the board's capital authority.  Right?  And that's 76j(a)(1)(G).  And the board's authority is combined to repair, replacement, improvement, rehabilitation, alteration or modification projects that are necessary to maintain the functionality of the building and site at the current standards.

Again, no one is disputing that this site needs work; that's not at issue here.

THE COURT:  So what, in your view, is

beyond -- what are the aspects of the project that are beyond the scope necessary to maintain...

MR. HEUER:  Sure.

So work that is optional or aesthetic is almost, by definition, outside the bounds of what is necessary to maintain functionality.

THE COURT:  Okay.

MR. HEUER:  We've heard about things like, you know, the marble armrests.  I think even swapping out the weeping willows, which were an intentional element of this structure and this site, for things like maple trees because you like them better.  Those are not necessary to maintain functionality.  They are aesthetic optional choices that go beyond the board's authority from Congress.

THE COURT:  Okay.

MR. HEUER:  If they are going to do those types of things --

THE COURT:  The authority from Congress in the Big Beautiful Bill, also included funds for, quote/unquote, restoration.

MR. HEUER:  Correct.

THE COURT:  I suspect I'm going to hear from the government that, you know, changing the seats and rebuilding the stages fall under the category of restoration.  Why is that not the case?

MR. HEUER:  It depends on what you're talking about but a restoration is traditionally under the Secretary of Interior's standards, something where you have an existing thing and it goes back to being that same thing.

If you are changing it to something else, you are not restoring it; you are replacing it.  Those are different words.  So to the extent you are saying, my seat is worn out, I would restore it by bringing it back to what it looked like before.  If you are saying, my carpet is worn out, you can say I will return it to what it looked like before.

THE COURT:  You can replace the carpet but it has to be red still.

MR. HEUER:  Correct.  Otherwise, you are making a replacement.

THE COURT:  Okay.

MR. HEUER:  And we point out that those are some interior type things.  If you're talking about something in the exterior --

THE COURT:  When it comes to a stage or seating, the kinds of things that Mr. Floca has said they're examining and in some cases have already ordered, how much of a change is required for it not to be a restoration as opposed to a replacement?  You have to replace a seat. Right?

MR. HEUER:  Correct.

THE COURT:  If the seats are broken, if the seats are uncomfortable, you've got to replace them.  So are you asking me to say that this velvet is not close enough to that velvet in order to meet what Congress said?

MR. HEUER:  No.  But that's also what we have.  These other review processes for.  This shouldn't all be funneled into this courtroom.  Right?  There is no desire for anyone that this Court has to micromanage; that's why Congress created all of these other procedures, so other people do the micromanaging.

THE COURT:  But you're asking me to enjoin, you know, the ripping out of seats and ripping out of a stage.

MR. HEUER:  No.  What we're talking about are things that may be beyond the board's capital authority.  To the extent that they are beyond what the words are here and if they are necessary to maintain functionality --

THE COURT:  Okay.

MR. HEUER:  -- then that's fine.  But we think maintaining functionality is giving you the same thing you had before within the context of repair, replacement, improvement, rehabilitation, alteration or modification.

THE COURT:  So why isn't the experience of sitting in a seat in the Eisenhower Theater part of the function or functionality of the Kennedy Center?

MR. HEUER:  It certainly is but you also have the other elements.  It's separate from this statute.  You also have the other elements of 106 and other types of things that may be relevant.

THE COURT:  Okay.  Let's move to the next one.

MR. HEUER:  We want to talk about the third one, which is the grounds statute.  So this is 76j(a)(2)(F).

THE COURT:  Yes.

MR. HEUER:  That's the one that we discussed yesterday, it was discussed in the Beatty case.  It says: The board shall manage and operate the grounds in a manner consistent with the National Park Service regulations and agreements in effect on July 21st, 1994.  And then, continue on:  No change in the management and operation of the grounds may be made without the express approval of Congress and the Secretary of the Interior.

So the Court asked about these regulations yesterday.  Those regulations do exist.  I can provide a copy to you, so we can follow along here.

THE COURT:  Great.

MR. HEUER:  These are the Park Service's regulations.  You can see at the top, this is titled 36 of the C.F.R.  You see midway down the page the source is June 30th, 1983.  These were current on ECFR as of yesterday morning.  So they were in effect as of July 21st, 1994.

I would direct the Court to Section 1.5 after the numerous definitions.  You'll see that 1.5B, these are the regulations about closures.  It says closures of the nature, magnitude and duration that, quote, result in a significant alteration in the public-use pattern or adversely affect the park's natural aesthetic, scenic or cultural values --

THE COURT:  Slow down.

MR. HEUER:  Of course.

The regulations talk about those that result in a significant alteration in the public-use pattern or, quote, adversely affect the park's natural, aesthetic, scenic or cultural values.  It provides that such a closure must be published as a rulemaking in the federal register.

If you look at C, it also must include, quote, an explanation of why less restrictive measures will not suffice, end quote.

The Beatty documents in our companion case show that, for years, the government anticipated completing these repairs without closing the facility, much less the grounds. The engineering reports recommended face work.  We've talked about that repeatedly this morning.

That shows that less-restrictive measures could suffice.  The government has provided no such explanation and they have certainly not published the grounds closure as a rulemaking.  Indeed, this morning, Mr. Floca said that

there was no such regulation that applied to him because he was not the Parks Service.  He appears entirely unaware of these regulations or of his own statute.  It suggests that that is also a running theme, that the government is either intentionally or obliviously not aware of some of the statutes that apply to it.

I would also note the second sentence, which is the one in the statute which requires congressional approval for any change in management in operation.  We would point out that that needs to have some independent meaning.  By all rules of statutory construction, it can't just be surplusage, saying do the thing in the first sentence.

So, while a closure of the grounds certainly requires a rulemaking and an explanation to comply with the first sentence; i.e., complying with the regulations in effect as of 1994, the second sentence adds an additional requirement and it's specific to the center, unlike any other entity that may be covered by those regulations.  It says that Congress must authorize that closure as well.

So here we have both a requirement for the entity to do what the regulations say and we have a statutory requirement that Congress also doubly authorize it.  And that makes entire sense because Congress has repeatedly indicated that when it has something of significant magnitude at the center, whether that's adding a parking

garage, adding the REACH, adding the floatable tanks on the roof, it then says:  We need to be involved.

And that's yet another example here of where they are saying:  We set forth the procedure, but we also need to be involved as well.

I would like to speak before I switch to the --

THE COURT:  Okay.

This is the first time I'm seeing this.  This is somewhat on the fly but the closure needs to result in a, quote, significant alteration in the public use pattern.

What's the factual record on that?

MR. HEUER:  Mr. Floca spoke this morning and said --

THE COURT:  Hold on.  Hold on.  Hold on.

He said that, except for the area outside the construction fence, is the way that he put it.  And correct me if I'm wrong, that the public would still have access and it would have access to the REACH center, I believe.  Is that the extent of the facts at this point?

MR. HEUER:  I believe so.

If we think about what the site looks like, it's a multi-acre site.  The REACH -- if you look at the Kennedy Center, the Kennedy Center I believe is between 1 and a half and 1.7 million square feet.  He said the REACH is 70,000 square feet.  It is a much smaller component.

People -- I think, if you say, go to the Kennedy Center, for better or for worse, they are thinking of the building that we are all talking about, not I'm going to the REACH.

THE COURT:  I understand.

But we're not talking about the building.  We are talking about the grounds.

MR. HEUER:  Correct.

THE COURT:  So the question then becomes, I take it, how far into the grounds will the construction fence intrude?

MR. HEUER:  It's possible but I think we had discussed that the -- Mr. Floca testified that the public repeatedly walks around that building.  You can go to the grounds.  But if you look at the river terrace, on the west side, that's a rather small area and there are rather narrow areas to get to it.

Now, to the extent you're putting up a construction fence, I am highly doubtful that you will be able to access the river terrace, for instance.  I don't think you will be allowed near the front of the building, where the soffits that we discussed are.

I think there are major changes that would be fenced off for the plaza, if only because a project of this size, the notion that you wouldn't need anywhere to stage

the any of the materials that Mr. Floca discussed this morning is not plausible.  And I think that's noticeable, as a matter of common sense.

THE COURT:  In your view, would that mean that any closure of the grounds would require congressional approval, except in emergency situations?

MR. HEUER:  As long as it fits within 1.5B of a nature and magnitude or duration that will result in a significant alteration to the public-use pattern or adversely effect the park's natural, aesthetic, scenic or cultural values, then, yes.  That's why Congress included that element in its own statute.  We presume that they actually meant what they said and they want to be consulted when they say they want to be consulted.

THE COURT:  All right.  Next one.

MR. HEUER:  So before I switch over into the limitations for -- or the requirements for the procedural elements, I do want to touch briefly on the 76k argument, which is where the government argues that the center has this unique and expansive independence from federal review.

THE COURT:  Yep.

MR. HEUER:  So as you discussed earlier in your colloquy with Mr. Floca, 76k(e) governs trust funds.  You

124

said that's different from the congressional appropriation.

I think the broader point is that if you look at the statute, its scope is limited to actions relating to the performing arts.  In our view, that is a limitation intended to insulate artistic decisions from interfering.  It's not intended to eliminate review of compliance with any of the procedural requirements like NHPA or NEPA.

THE COURT:  Hold on.  Hold on.

MR. HEUER:  Sure.

THE COURT:  The provision reads:  The actions of the board related to the performing arts and to payments made or directed to be made from any trust funds shall not be subject to review by any officer or agency other than a court of law.

MR. HEUER:  Correct.

As you heard Mr. Floca this morning, his testimony was that the trust funds are used for performing arts.

THE COURT:  Right.

MR. HEUER:  He had the discussion of if it's trust funds, it's the activities; if it's structural, then it's appropriations.

THE COURT:  So any activities related to the performing arts or the trust funds that are used to support those activities, those are not subject to review because Congress wanted to observe the artistic independence of the

center; that has nothing to do with building something new on the grounds.

MR. HEUER:  I think that's a fair reading.

THE COURT:  Okay.

MR. HEUER:  Otherwise, I think we would point out you would have a bit of an absurdity because the statute that we just discussed, the provision about the grounds, you would say, well, the Secretary of Interior, who also has to provide approval, would automatically be nullified from doing anything.  Instead, Congress doesn't pass null statutes.

THE COURT:  Understood.

MR. HEUER:  So the four procedural statutes are the Historic Preservation Act, NCPC, NEPA and CFA.  Starting with Section 106 of the Historic Preservation Act, there's this threshold question where the government argues that the center isn't a federal agency, and, therefore, 106 doesn't apply to it.  Our position, as you see in our briefing, is that that fails on the text.

The center is designated by statute as a bureau of the Smithsonian.  The Smithsonian's Facilities Authorization Act expressly deems the Smithsonian an agency for purposes of compliance with Section 106, projects in the District that are subject to NCPC review and approval.  So the center, in our view, is therefore plainly within the scope

of 106.

I would also note, if you look at the Enabling Act, Section 76i(a), so the very first provision that talks substantively about the center, it says, quote, the board shall construct for the Smithsonian Institution a building to be designated as the John F. Kennedy Center for the Performing Arts.  So the Organic Act itself plainly establishes the building as a Smithsonian building.

And the government does compare the center to the National Gallery of Art.  That's the *Grosz* case.  If you look at *Grosz*, *Grosz* is a case about whether the gallery is an agency for sovereign immunity purposes under the APA.  We agree that's a *Dongan* functional analysis that is appropriate.

Here, we have an expressed statute.  We have the Smithsonian Facilities Act that, for all intents and purposes, overrides *Dongan* for 106 purposes.  Right?  It designates the Smithsonian as an agency, regardless of whether it's exercising governmental authority or not.

We also say that 106 shouldn't come as a surprise to the center as being relevant because the Kennedy Center was, as we discussed earlier, deemed eligible for the National Register in 2012.  It complied with Section 106 for the REACH.  There's nothing novel about 106.  It's been in place for many decades.  The only thing that's novel is the

government says it doesn't have to comply with it.

On the merits, the project in either of these forms, either Trump-chairman form or Floca-modified form, implicates a number of federal undertakings that trigger 106 and NCPC.

Look at Exhibit E, just the titles of those projects, all right, building envelope and structural rehabilitation, perimeter and physical security improvements, that includes glass door and -- exterior glass and door replacement.  River plaza perimeter.  These are all activities that constitute undertakings.

It includes funds for Rock Creek Parkway stabilization.  The Rock Creek Parkway is an NPS unit.  It's on the National Register.  It runs beside the center.  It runs under the center's west patio.  And we heard this morning that Mr. Floca said that the underside access to the west patio, the river terrace, would be required.

I don't know of any way that you can access that, other than by standing on and closing the Rock Creek Parkway, which, my understanding is, require the approval of the Park Service.  Once the Park Service must issue a permit for a project, you are very much in the land of Section 106; that's how 106 operates.

THE COURT:  Okay.  Let's go to the statutory language of the Smithsonian Facilities Authorization Act.

MR. HEUER:  Uh-huh.

THE COURT:  It says:  In carrying out other projects in the District that are subject to the review and approval of the NCPC, in accordance with Section 6.641.15 of the D.C. Code, the Smithsonian shall be deemed an agency for purposes of 106.

MR. HEUER:  Correct.

THE COURT:  That D.C. Code section, in turn, says that, quote, The location, height, bulk, number of stories, sides and open space shall be subject to NCPC approval.

So the question, I suppose, is if the project affects none of those vectors, then how would Section 106 approval be required?  Which one of those vectors does the project effect?

MR. HEUER:  Open space, certainly, because you are talking about perimeter and physical security improvements, and we heard this morning that that involved bollards. Bollards are the open space on the grounds.  I don't mean to be flippant, but if you put up a bollard, you can't walk in that open space.  Not only you can't drive on it, you can't access it.  There's a bollard there.

So if you're talking about physical security changes that are in the open space that currently exists, you are affecting the open space of the facility.

If you are talking about physical and perimeter

security improvements, if you look at Exhibit E, they are talking about hardscaping and landscaping.  All of those are, I think, paradigmatically, open space.

If you are talking about building envelope and structural rehabilitation, we think that that reasonably, and NCPC has for decades in the past, viewed those as relating to size, bulk, mass.  If you are changing things on the exterior, you are talking about the building.

THE COURT:  Okay.  But you're not talking about the location of the building.  You're not talking about the height of the building.  You may or may not be talking about the bulk of the building, depending on what -- you know, if there's new cladding that affects the bulk of the building, I suppose that might qualify.  They are not changing the number of stories and they are not changing the size.

MR. HEUER:  Correct.  They are not --

THE COURT:  You are relying on open space, really.

MR. HEUER:  Open space, primarily.

But I would point out they are not conjunctive. Any of those things that affect it put you into that box.

THE COURT:  Fair enough.

MR. HEUER:  So I think the other thing that we want to point out -- we also had testimony this morning from Mr. Floca about taking water from the Potomac and putting water back into the Potomac through some water interchanger

that failed in the 1990s and needs to be upgraded and modified.

My understanding is that any time you're taking water from the Potomac, which is a waterway, you are involving the Army Corps of Engineers; that's yet another permit that is involved that would be subject to a Section 106 review.  And those are Section 106 reviews that are conducted by those agencies.  Right?  By Army Corps.  By National Park Service.

Certainly would think that, because of the Smithsonian Facilities Act, you go through NCPC for the center itself, but that's not the only entity here.  Those entities, if they know they have permits to issue -- and that's part of the reason why they are named as defendants, because they need to be enjoined for not just what they have done but what they have failed to do under the APA.  And if you failed to perform a Section 106 or a NEPA, when you have an otherwise obligation to do so as part of a permit that you must issue to a project, those agencies have an obligation that is enjoinable under the APA.

I think the last thing I would say on 106 is that we know the defendants have already taken actions, like painting the columns and adding the name to the facade, that violate Section 110k of the National Historic Preservation Act, and that prevents an entity of undertaking projects

that were otherwise subject to 106 if they intentionally and significantly adversely affect the National Register-eligible property, which the center is.

Now, their claim that they didn't know 106 applied here rings a bit hollow because they did 106 just a few years ago with the REACH. So the notion that they're saying we acted in good faith here doesn't really square with the very recent past.

And under 110k, every federal official, including the agency defendants, that have authority to issue a permit for a project have a non-discretionary duty to deny those permits until they go to the advisory council and historic preservation and go through a separate process. That would be the permit-issuing agency, whether it's NCPC, whether it's the Park Service, whether it's Army Corps, whether it's some other entity, and get ACHP's approval, the advisory council's approval, to proceed. Those processes haven't happened yet either.

THE COURT: Tell me this -- let's go back to 106.

MR. HEUER: Uh-huh.

THE COURT: Assume I agree with you that installation of bollards or, you know, some restrictions of access to open space, as a result of the construction of the building, triggers 106 review. This is assuming that the Kennedy Center is treated as an agency. Would the scope of

that review be simply the effect of the bollard on the open space or does that get you into the building to, you know, require review of what the seats look like or the stage looks like or the carpets look like?

MR. HEUER:  I think it would probably get you to the exterior.  I'm not sure it would get you to the interior.  But we have a very clear policy of not segmenting activities.

We don't want to give entities an opportunity to say:  Well, I will submit just part of my project, just my bollards to you.  Thank you very much.  Just look at my bollards.  Don't look at anything else that I'm doing.  I'm going to do my landscaping, changes to my exterior doors, all of these other things.

We say that the project is a project; that's what you see with 8722(b).  That's the NCPC statute I will talk about in a moment.  That's where you go in and say, come to us with your project.  Tell us what you are doing.  And then we will evaluate, you know, what kinds of review/approval we need to give you.

You've got to go in with the whole thing.  You don't go in with just a little piece here, a little piece there.

Same as with NEPA.  We have strong anti-segmentation with NEPA, precisely so agencies don't

have a perverse incentive to chop up their projects into little pieces and avoid review.  We want them to go in with everything they are going to do, and then the process works and says, here is what the result is.

THE COURT:  And so tell me this:  Based on everything you know about the work to the exterior, what triggers historic preservation concerns?

You've heard Mr. Floca say, you know, that if they take down parts of the concrete soffits in order to inspect the steel, when they're done they're going to replace those soffits as-is.  What else about the exterior work, based on the information that we have, raises historic preservation concerns?

MR. HEUER:  So, Mr. Floca, I think, is under a misapprehension, although I have no reason to think it's an intentional one, that a like-for-like exchange doesn't require review.

Again, we don't know whether it's a like-for-like exchange because, once again, we don't have a plan.  Right? We just have, you know, the concepts of a plan.

So if you have a plan you would say, here's what I'm going to -- we talked about the marble, for instance. The marble is a good example.  The marble, if you look at some documents that are in our exhibits, was donated by the government of Italy.  The ambassador at the time wrote to

the Italian government and said, Thank you very much for this wonderful donation.  It will be a permanent addition to this living memorial that we are creating for the president. Right?  It's a very specific marble with a very specific cultural exchange reason.

If we go ahead and say, well, it's white marble versus white marble, it's the same.  You'd see it from 50 feet and it all looks like it's the same building.

That's not what 106 says is okay.  106 says:  Are you exchanging it with exactly the same marble?  Can you actually see the difference?  Is there some cultural imperative that permeates why that specific marble is important?  If so, we want to talk about it, have a discussion with you and say, is it five bucks more to get the marble that would literally match what we have before from the same quarry?  If so, we would suggest that you do that, rather than going out and getting something else that looks right from 50 feet away.  That's what that process is for.

Mr. Floca seem to be suggesting that if it all looks the same at the end of the day, it's no harm, no foul; that's not what 106 does.

THE COURT:  Okay.

MR. HEUER:  Turning to NCPC review, if I might, the government's suggestion seem to be that voluntary

consultation with NCPC staff suffices and that's wrong. Regardless of whether the project requires review under 8722(b) -- that's the provision that everyone has to go through -- or formal approval under 8722(d) -- that's what we were just discussing a moment ago, the provision of the D.C. Code -- neither of them is satisfied by a phone call to NCPC staff.  Both of those pathways require a full formal action before the commission.

And the Sullivan declaration --

THE COURT:  Well, let's stop there.

MR. HEUER:  Yeah.

THE COURT:  Is it not within the discretion of the agency or, in this case, the Kennedy Center to decide in the first instance whether to submit a plan to the NCPC?

MR. HEUER:  I don't believe so.  Otherwise, every entity would make a decision that their plan doesn't require NCPC and would force people to come to you and say that it does.

THE COURT:  Okay.  So what's the enforcement mechanism?

MR. HEUER:  Apart from bringing a lawsuit and saying you have got to go to NCPC to do it, I'm not sure there is one, but we're here.

THE COURT:  Okay.

MR. HEUER:  So if you look the statute, the

statute says that you need to have --

THE COURT:  It says:  Agencies of the federal government responsible for public developments and projects shall cooperate and correlate their efforts with the NCPC.

So it's up to the agency or the entity sponsoring the project to determine whether it's an undertaking and whether it requires consultation.

MR. HEUER:  Where are you?  Are you in (b)(1)?

THE COURT:  I'm in 40 U.S.C. 8722.

MR. HEUER:  But which --

THE COURT:  I don't have the statute numbers.

MR. HEUER:  So if you look at (b)(1) --

THE COURT:  Yeah.

MR. HEUER:  -- of that same statute, it says, Before preparing construction plans the agency originates for proposed developments and projects, before making a commitment to acquire land --

THE COURT:  Yeah.

MR. HEUER:  -- they shall advise and consult with the commission.

THE COURT:  Okay.  I see.

MR. HEUER:  So we have an entity that is making construction plans.  We just heard they have, apparently, a construction plan or at least a concept of it.  They then shall, which is a word of mandatory import, advise and

consult with the commission. I'm not sure it gets any clearer than that. They've got to show up.

And then the commission shall promptly make a report. It doesn't say the commission staff shall. It says the commission. The commission is a thing. It has a number of members. They are appointed. They hold meetings. They are subject to the Records Act.

So the commission shall make a preliminary report and recommendations to the agency.; i.e., the submitting entity that was mandatorily required, once it had a construction plan to go and talk to NCPC. The commission shall then -- shall submit a final report.

THE COURT: Okay. But you've named NCPC as a defendant here.

MR. HEUER: Correct.

THE COURT: So what is it that NCPC has failed to do if they don't get a submission from the Kennedy Center?

MR. HEUER: Correct. That goes to the anticipatory demolition element.

THE COURT: Okay.

MR. HEUER: So they have, as we see here, an obligation to review and, we believe, approve this plan. An approval would be something that they would be required to withhold if the center has engaged in 110k anticipatory demolition; i.e., the work that would be subject to 106, but

138

they did not previously obtain 106 approval for before engaging in it.

THE COURT:  And just so I'm clear, approval is only required if the project affects the bulk, size, location or provision of open space or number of stories?

MR. HEUER:  Correct.  That is 8722(d).

THE COURT:  Okay.

MR. HEUER:  I'll speak briefly about NEPA, only because NEPA is integrated in NCPC.  NCPC does the NEPA because NCPC is an agency -- no one disputes that -- that is subject to NEPA for any project it reviews.

Usually, for a standard agency project, the agency has conducted the NEPA and they give it to NCPC.

THE COURT:  Before we go onto NEPA, can I just ask, is it your position that the Kennedy Center is an agency for purposes of 40 U.S.C. 8722(b)?

MR. HEUER:  Yes.

THE COURT:  Even --

MR. HEUER:  It is an entity of the Smithsonian because it is a bureau of the Smithsonian.  It's subject to that.  Otherwise, you would end up in a situation where, if you look at the Smithsonian Facilities Act, that statute too would be a nullity because the Smithsonian would say, I never have to submit to NCPC, therefore, I never have to do 106.  That can't possibly be what Congress meant when they

said you are subject to 106.

THE COURT:  So your 106 arguments apply to NCPC review with respect to whether the Kennedy Center is an agency?

MR. HEUER:  Correct.  They must at least go through there because they are a bureau thereof.

THE COURT:  Okay.

MR. HEUER:  NEPA has to be integrated with NCPC action and completed prior to federal permitting.

Here we have the 2018 MOA between NCPC and the Smithsonian.  NCPC serves as the lead agency on Smithsonian projects within the District.  There's been no formal notification of NCPC.  We heard this morning there have only been informal discussions.  There's been no plan submitted. There's no environmental assessment.  There's no EIS. There's been no public comment.  Yet the defendants say they are planning on starting in two months.

Our position, again, is that all of these processes take some time, as we know, and saying that you are going to start construction means that you are planning on starting before doing things.  We've seen this movie play out before.  This is what happened with the ballroom. Right?  Demolition occurred, construction started, then they went to NCPC.  Then it was a fait accompli.

THE COURT:  Maybe I am missing something here too,

but is your claim that NCPC, which would be the NEPA-sponsoring agency, has failed to conduct any -- or began a NEPA analysis?  But they haven't received anything from the Kennedy Center yet.

MR. HEUER:  Correct.

THE COURT:  So how can they be responsible or how can it be responsible for failing to conduct an EA on a plan that it has not received?  Or is it your claim that the Kennedy Center has somehow violated NEPA responsibilities by not submitting that claim or that plan?

MR. HEUER:  I think it's the latter, that the Kennedy Center has an obligation, because of the various statutes, to submit to NCPC, which then has an obligation to conduct NEPA.

I think you're correct.  There is no claim against NCPC at the moment.  They have nothing to review.  Right?  So it is not their fault.  The fault lies with the Kennedy Center for not giving it to them to do the review they are otherwise required to do.

But I think, again, this goes to the question of they are named as an agency defendant because they do have an obligation to withhold the approval of a NEPA or of an approval under 8722, because of the actions that the Kennedy Center has already taken in violation of 106.

If they nonetheless went to do that without going

to ACHP and getting ACHP's blessing, they would be in violation and they should be enjoined for issuing those approvals, notwithstanding their obligations to withhold them.

THE COURT:  Okay.

Whoever the sponsoring agency is, what has triggered the obligation for a NEPA review here in your view, based on the facts as we know them?

MR. HEUER:  The fact that it's a major federal undertaking that involves a cultural resource.

Again, NEPA is not merely environmental, as in trees and flowers and oceans.  It involves historical resources and cultural resources.  And any federal undertaking that impacts a cultural or historical resource -- and being a National Register eligible-listed entity certainly makes you a historical resource.  I think there is no doubt here that this is the premiere performing arts center perhaps in the country.  It is definitely a cultural resource; and that both of those elements put you squarely within NEPA.

THE COURT:  Okay.

MR. HEUER:  The last of the statutes is CFA.  So the Commission on Fine Arts statute requires federal officers to request CFA's advice regarding public buildings, as well as we discussed fountains and other projects that

affect the city's appearance, and its regulations require submission of those plans before the action.

And when a project proceeds in stages, information about eventual plans must accompany that initial submission. Again, you can't just play it by ear. You are supposed to have thought it all out beforehand and then go to the agency. Whether it's CFA or 106 or NCPC, you're supposed to have your plan. You're not supposed to be doing it ad hoc at the moment.

And the Kennedy's organic statute talks about the CFA. Right? They know the CFA is there. So this notion that we don't have to go to CFA because we are not an agency, Congress expressly said go to CFA and talk to them about this building at the outset.

We know from the CFA statute that when they want to exclude buildings, they know very well how to do so. They excluded the Capitol. They excluded the Library of Congress.

Here, it did the opposite. Right? It says, affirmatively go to and talk to them. As you discussed with Mr. Floca, we have fountains that are being affected. Again, we don't know the plan. He says, I am planning on just replacing the guts.

Sitting here, I don't know what that means, but it's not really incumbent on us. They've said we're

supposed to do something with fountains.  That seems to suggest you should be going to CFA.  If you're doing something other than that, that's for CFA to decide, not for you to unilaterally decide you don't have to go there.

Now, these statutes are not for entities to say, I get to decide whether or not I have to go through your process.  Because almost every agency or entity would find it inconvenient.  Everyone wants to do things fast and without oversight.  So do my kids but that's not the way it works.

Those are statutory in other bases.  I can speak to irreparable harm and balance, if that would be valuable to the Court.

THE COURT:  Sure, while you're there.

MR. HEUER:  Okay.

So the defendants' position is that the center isn't going to be materially affected, that the loss of use is going to be temporary and that the procedural harms are not irreparable, and we would say that those contentions drastically understate the impact of the conduct.

First, the destruction or even a major transformation of a historic landmark is a paradigmatic irreparable harm.  The Kennedy Center has its original marble facade, its finishes, its design.  They all are parts of an irreplaceable architectural legacy, which many of the

declarations of plaintiffs and the affiants speak to, particularly as a living monument to the president.

We would say that the relief is warranted now because the defendants want to start construction on July 6th, but there is no realistic prospect of completing all of these reviews by that point.  We are approximately 60 days away.

And, similarly, the defendants show no intention of pausing in order to do so.  That deadline is, I think in every sense, arbitrary.  It appears to have been set by the president because July 4th is the 250th anniversary. July 6th doesn't have any special or magical meaning.  But we are being forced into this funnel where it all has to happen by then, even though we have processes that may take longer to do so.

I think we would also note that litigation takes a long time and a project in its infancy can very quickly out-pace the speed at which the court moves.  We are seeing this in the White House right now.

So the notion that, you know, we may get an injunction, only to find out that everything's already been done, is what we're trying to avoid here.

We've cited the *Semonite* case in our brief.  It was a case that National Trust was a participant in.  They were denied a preliminary injunction for some power towers

that were going to be in the James River.  The Court said there was going to be plenty of time later.  The towers were then built.  They went back after they won the case on the merits.

The Court said:  Well, they're already built.  I can't hardly take them down now.  We don't want to be in that position here.  And the changes that have already been completed here, so the changes to the columns, the addition of the name to the facade, these all, in our view, directly contravene the claim of no material exterior effect.  They are significant exterior effects.  They are referenced in the National Register-eligibility determination in terms of signage and the columns.

So to say, as Mr. Floca did, that he views them in his perspective as not material is not the standard.  It's whether they are material in general and whether they are material to the entities and the agencies and the processes that review those types of things and make their own determinations.

Second, I would say the plaintiffs' members will be irreparably harmed by losing a number of years' worth of these experiences.  They talk about this in detail in their affidavits.

The defendants compare this to the partial closure of a highway lane.  I think that is far from where we are

here.   Completely shuttering a center that has 2 million visitors annually for two years is just not remotely comparable.

And those experiences can't be gotten back.   We already know that if this occurs on July 6th, the entire rest of the year's schedule, which is booked, it's on the website, will not occur.   So there are numerous performances that just won't happen, that people won't be able to go see, and they won't be able to get them back two years from now.

Third, I think we would re-emphasize that when you have procedural violations like the ones that we have alleged and you combine them with environmental or anesthetic injury, that joins together to find irreparable harm.   This Court and the Circuit have found that that is the case.

And we think that combination is present here.   You have defendants that have bypassed each of these mandatory review processes and they're threatening the permanent alteration of a National Register-listed property, eliminating multiple years of access.   That combines into a notion of cognizable harm for the purposes of an injunction.

Lastly, I would talk about the balance of equities.   I think our main point is the government does not have any legitimate interest in perpetuating an unlawful act.

THE COURT: Okay. Before I hear from Mr. Roth, I'm sure that he's going to bring it up, but in anticipation, let's go back to the merits for a minute. Because the Kennedy Center is not an agency for APA purposes, you're here on *ultra vires* review, for the most part --

MR. HEUER: Correct.

THE COURT: -- which is obviously a very high standard of review, which of those statutory violations are so clear and mandatory that the government, in your view, has violated them on the record, given the number of sort of factual issues that have been discussed yesterday and today?

MR. HEUER: Of course.

So this is Changji Esquel. Right? So the standard is *ultra vires* is that the defendant has to have patently misconstrued the statute or disregarded a specific and unambiguous statutory directive or violated some specific statutory command. Right?

So if you look at the four statutes that we've talked about, not setting aside the APA statutes, 8106 bans erecting buildings on federal public grounds without express congressional authority.

Judge Leon found in the ballroom case that that was a plain *ultra vires* violation. If there is to be a demolition, and we are certainly not -- I understand the

Court's scepticism --

THE COURT:  Describing what the record is.

MR. HEUER:  To the extent that we see what has occurred before, we want to avoid a demolition.  We want to avoid one that can occur before -- you know, we're not able to get here as the wrecking ball goes in the back swing but before it hits the building.

THE COURT:  Right.

MR. HEUER:  Again, we think that that's a clear violation.  If they were to do that, they could not.  And start erecting a new building.  We want to prevent that with an injunction.  We think that that is an *ultra vires* claim.

On the capital authority, we would say that it's limited to maintaining the existing functionality.  It says necessary to maintain functionality.  And closing the center for two years eliminates all of its functionality.

I know there was discussion yesterday about balancing which one is appropriate or not, but we would say that when you say you have dual obligations, you don't ignore one of those obligations in favor of the other.

That sounds like what Mr. Floca was saying.  That he was saying, I've looked at the structural issues and I only look at the structural issues, and that's just what we had to do.

That's not what the statute says he has to do.

That may be his job, in his narrow position, but the statute is broader.  It says:  Have a building and use it as a living memorial for the president.

So if you're going to shut it for two years, I think that is ultra vires of the notion of maintaining its functionality and only necessary actions.

On the grounds, I think that's a fairly straightforward one.  The statute says you've got to do certain things, file with the -- file it as a rulemaking and then go to Congress.  If you don't do those things, you are clearly ultra vires of that statute; that's a command.

As to the Smithsonian Act, it requires the Smithsonian to comply with Section 106 for projects within the District, subject to NCPC.  If it does not, it's very plain.  They have an obligation to do it.  They have been designated as an agency for this purpose.  If they do not, they are in violation of that statute.

I would say that these are all, essentially, classic ultra vires standards.  Is it a high bar?  It is. But it is not a bar that the government is able to say it's so high that it can never be surpassed.  We saw this in the ballroom case.  We think it's equally applicable here.

Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Roth.

MR ROTH:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR ROTH:  Thank you.

So this case involves a lot of defendants, a lot of statutes and a lot of claims.

THE COURT:  Yes, it does.

MR ROTH:  I don't think any of them goes anywhere but I'm going to try to walk through it very methodically to try to show why that is.

I would actually like to start with the defendants who shouldn't be here, in our view, at all:  Interior, National Park Service, Army Corps of Engineers and NCPC.

Now, those are all agencies, so they are subject to the APA.  So far, so good.  But the plaintiffs have not identified any final agency action that any of those entities has taken or any action that they must take that they have failed to take.

So I just don't understand what relief they are asking for against those entities on this injunction motion or what exactly they want those entities to do.

For Interior and National Park Service and the Army Corps, I think their theory is that at some point the center might need to ask them for permits to do certain work.  That's possible.  I can't say that that won't happen.

But it hasn't happened yet and so there's no

permit in front of those agencies that we could say they need to act on.  And it's not like they've acted on one that they are trying to vacate.  Again, I don't really understand what they are trying to do there.

It sounds to me like what they are saying is, Well, the center needs -- you know, they're going to need to go and get a permit from one of these agencies and they haven't done it yet.  That would be a claim against the center, not against these other entities.

By the way, that's not even a claim they brought. Despite all the claims they brought, there is no claim against the center for failing to get a permit that is necessary.

I will say that on the Army Corps point, we don't think there is going to be any permit necessary.  The water system has been permitted for decades.  What needs to be updated is the filter.  When the water comes into the building, it should be filtered before it's used.  But the process of taking the water out has already been properly permitted for a long time.

With respect to the NCPC, I think I heard counsel say they don't have a claim against them right now, which is fine.  I can treat that as conceded.

I understand that they think the center should be submitting plans to NCPC, and that would then trigger

certain obligations for NCPC.  But, again, that hasn't happened yet and that's a claim against the center.  It's not a claim against NCPC now.  So put that aside.

And then I should also briefly touch on Smithsonian, because Smithsonian is a defendant here too. Unlike the others that I've just talked about, the Smithsonian is not an agency under the APA, but like the agencies I just talked about, it has nothing to do with this case.

THE COURT:  It is the parent organization of the center.  The center is a bureau of the Smithsonian.

MR ROTH:  Right.

THE COURT:  What legal import does that have here?

MR ROTH:  I assume that's why they named them, sort of the way that if you were -- you know, sometimes plaintiffs will sue ICE and then also sue DHS as the parent entity or the parent agency.  But that's because, in those situations, there's a control relationship and hierarchy; they report up.

That's not the case for the center and the Smithsonian.  The center has its own board.  It doesn't report to the Smithsonian board of regents.  It's independent.  It is designated as a bureau.  I'm honestly not sure what effect that has, other than to say that we know it's not an agency because --

THE COURT:  Why is it designated as a bureau? When did that happen?

MR ROTH:  I believe that was original to the Organic Act, but I don't know why and so I can't really offer any insight on to why it was structured that way.

We do know that there is no control relationship between them.  And so there's no relief that can be entered against the Smithsonian that would have any impact here. It's just sort of another bystander from the perspective of this case.  None of those entities are really the proper defendants for what plaintiffs are arguing here.

The only real defendant is the center itself.  To go to what Your Honor was raising at the end there, that's important because the center is not an agency for APA purposes and plaintiffs don't contest that.

So what that means is the causes of action they are bringing against the center are limited to ultra vires and *mandamus*.  And I don't need to tell the Court about the very demanding standards that apply to those causes of action.  But we basically need to see some sort of unambiguous, you know, statutory duty that isn't being done or that is sort of being patently violated.

When we look at that through the additional lens of preliminary injunction and the need to show likelihood of success on the merits, we need to approach each of these

claims through that prism.  I think that makes it impossible for the plaintiffs to carry the burden for any of their claims.  Just something to keep in mind as we start to walk through them one by one.

So I'll start with 8106, and I think our main point has already been foreshadowed here.  No building or structure is being erected.  The building is already there.  Work is being done on it.  It is not a new building.  It is not a new structure.

THE COURT:  Let's say that all of the marble were stripped off and all the steel was exposed and the marble was replaced by a different kind of marble that was not the gift of the Italian government.  Would that be a new building?

MR ROTH:  Not for 8106 purposes, Your Honor.

THE COURT:  Why not?  If you take a -- you know, take off the siding of a house and replace it with brick and you make a brick house out of a wooden house, isn't that a new structure?

MR ROTH:  I don't think it is, Your Honor.  I think the purpose of 8106 is for Congress to be able to decide what's going where.  Right?  We don't want -- it actually traces back -- we haven't gotten into this in the briefs, but it traces back over 100 years to a time when people were just building things on federal land without any

authorization. And Congress was trying to reign that in and say: No, we want to know, is there going to be a school over here? Is there going to be a museum over there? We want a say in that.

It's not about the landscaping. It's not about the materials. It's about is a structure going to be here or not? And there's no new building or structure.

Now, I will say the evidence in the record I don't think support the hypothetical question either. I think what we've heard is that there are repairs that need to happen. They are going to impact the exterior and the interior but they are not changing the nature of the structure and it's not actually going to look that different at all. Hopefully, it will look better and cleaner and shinier, but it's not fundamentally changing any of those aspects.

On 8106, I heard opposing counsel's theory to be, well, Mr. Floca's testified that there is no new building or structure but, you know, who knows what the president may decide in the future.

I don't think that's a basis for an injunction right now. I'll just add that, in this instance, we do have a board that needs to approve things. So it's not like the chair can order something without any process. The board has to sign off. The board includes trustees who are

sceptics, I will say, and as we heard yesterday.

So there will be -- there is no risk that there will be a unilateral change. Nobody will know. The next day we will wake up and the building will be gone. It's got to go through the board. And I'm sure the Court will be the first to hear if there were some new proposal that involves demolishing the building, but the testimony has been clear that that's not something that anyone has contemplated here.

THE COURT:  Okay.

MR ROTH:  I'll turn to the Organic Act.

THE COURT:  That may not be the case for the columns.  Right?  We haven't heard that the columns were approved by the board.

MR ROTH:  That's right.  And they weren't.  But a demolition would have to be in a way that painting columns is not.

With respect to the Organic Act, I think their main argument is this exceeds the scope of authority that the board has.  And I think one important point is that they've only focused on one of the statutory provisions that authorizes work.

So they're talking about (g), which talks about capital repair, replacement, improvement, rehabilitation, alteration or modification necessary to maintain the functionality of the building and site, current standards of

life, safety, security and accessibility.

I think what we heard this morning is that many of the aspects of this project fit squarely within that authorization.  They do relate to the functionality of the building and the safety standards of the building.

THE COURT:  Well, would purely aesthetic changes fall into that category?

MR ROTH:  That's why I was going to take you to the next subsection.

THE COURT:  Okay.

MR ROTH:  So (h)(2) provides that, with respect to the building and site, the board can also do all necessary maintenance, repair and alteration in a manner consistent with requirements for high-quality operations.  So there is sort of a high-quality operations standard that also applies to authorized work.

If you go further down, we have maintenance of the halls.  The board shall maintain the Hall of Nations, the Hall of States and the Grand Foyer in a manner that is suitable to a national performing arts center that is operated as a presidential memorial, and in a manner consistent with other national presidential memorials.

So the statutory authorization for the board at least has those three components to it, that are pretty wide-ranging.  I think across the three of those, we are

covering all of the work that Mr. Floca has testified is part of this plan.

I also heard a little bit more in argument than in the brief this argument that we talked a little bit about yesterday, that, well, even if you can do all of this work, the temporary closure to allow for the work is a problem because then you're not fulfilling the other mandate, which is to have performances and programming and so on.

You know, I see it sort of the way the Court described it yesterday, which is there are two distinct missions that the board has to fulfill. They have to -- they need programming and they need to maintain the site.

And this project is not about subjugating one to the other. The project is about ensuring that the facility is in a position to provide the programming into the future. If we don't have a site that is safe and secure and up to date and appropriate for performances, then we can't do that second part of the mission.

And I think what Mr. Floca was talking about this morning was that, for many years, the programming was sort of treated as the priority and the maintenance was sort of fit in here and there as possible around the programming.

And the new leadership at this point in the center's history is sort of flipping that and saying, we

need to get this work done and we'll do as much programming as we can, consistent with that, but if we don't do this now, with the money that Congress provided on the timeline Congress provided, then we are not going to be able to do programming.

THE COURT:  And you don't dispute, then, that until February/March of this year, no one contemplated a full closure, including the leadership in place since January of 2025.

MR ROTH:  What I -- sorry.

THE COURT:  And that Congress did not contemplate a full closure when it appropriated the $257 million?

MR ROTH:  I don't think that Congress was necessarily thinking about it one way or the other.  What I heard Mr. Floca testify was that it was about four months before January/February that he -- as he was working through this, you know, they get the money.  All right.

Now we have the money.  We have to go to this 300-page comprehensive building plan and we need to turn that into an action plan to get this work done.  And by the way, Congress has put a time limit.  So if we don't use the money by 2029 it's gone.

So he's working through this and comes to the recognition that if we don't have the building unoccupied, the ability to get all of this work done on that time frame

with that budget is not going to work.

THE COURT:   Okay.

MR ROTH:   And then he advises the Chair and the buildings committee and the board consistent with that recommendation, consistent with his professional expertise in the area.

One more thing on the scope of the work, Your Honor.   I just wanted to say, if it would be helpful to have a judicial inspection, we are happy to provide for a judicial inspection of the site.

I'll turn to their next statutory argument, which is the maintenance of the grounds.   Now, the way I read the statute is that you can't -- the grounds are supposed to be operated consistent with these 1994 regs and agreements, and changes to that would have to be approved.

Now, until counsel stood up today, I was not aware of any regulations or agreements that they claimed we were going to be violating, and so I'm not really in a position to respond to this new argument.

I think it's been forfeited, but just sort of from looking at it, it's not evident to me that this is a park for purposes of these regulations.   I don't know that it's been designated as a park.

The reference to rulemaking also doesn't fit.   I don't think the Kennedy Center has rulemaking authority.   So

there's a whole bunch of issues that I think would need to be fully reviewed and addressed and briefed before the Court could grant any kind of relief premised on this regulation that we are seeing for the first time today.

THE COURT:  Well, that makes two of us having seen it for the first time, but I will say it says that the regs cover proper use, management, government and protection of persons, property and natural and cultural resources within areas under the jurisdiction of the National Park Service. It's not limited to national parks.  It's parks, forests and public property.

MR ROTH:  That's right, Your Honor.

THE COURT:  These are the general provisions.

PUTATIVE JUROR:  They were pointing to 1.5B.

THE COURT:  Right.

MR ROTH:  Which applies if a closure designation, use or activity restriction or condition is going to result in significant alteration in the public use pattern of the park area.

THE COURT:  Park area.

MR ROTH:  Yeah.  Again, I'm looking at this for the first time.  It's on the fly.  Looking at this, it's not obvious to me that this is applicable or governing or exactly how it maps on or factually how it maps on to what the plans are.  Again, we didn't put any evidence in on this

point because they didn't identify any of this until today.

I also think to the extent that we're sort of talking about congressional approval, it's clear that the scope of the work Congress approved is going to prevent -- it's going to require fencing off certain areas at certain times, at minimum.  Right?

Whether it's fully closed for two years or not, you know, if you're tearing up the front road, you know, that's going to impact public access for a period of time.  So I think Congress did implicitly authorize at least that type of restriction.  So that's another, sort of, hurdle that they would have to clear on this particular claim.

Okay.  I will turn to CFA.  So the CFA, our main point here is not anything to do with agency.  The statute doesn't talk about agency.  But the statute does say that the role of the CFA is to advise on the location of statutes, fountains and monuments and then the selection of models for those statues, fountains and monuments and the selection of artists to carry out clause 2.

I think they would need to identify the statue, fountain or monument, and it would have to affect either the location or if there's a new artist being, you know, retained to redo it.  That's not what Mr. Floca said.  He said that the fountains need work, not saying they're moving them, changing them, changing the design.

So I don't think there is any obligation under the CFA statute to consult, but they are consulting.  So this is one area where there's no harm to doing it.  So the staff has reached out to CFA, so that they are aware, they could provide any feedback.  I think, as Mr. Floca said, he doesn't intend for that to end.  That's an ongoing iterative process as we move through the next two years.  That that's a resource available to advise on design questions.

THE COURT:  I asked this question yesterday but what is the legal effect of the center's voluntary decision to engage in the consultation but not the approval process, if I am understanding correctly?  Is it that the consultation claim is moot?  And if that is the claim, how is it moot if the center can at any time withdraw from the consultation process if it doesn't like the results?

MR ROTH:  With respect to the NCPC, we have the review and approval under two separate standards.  CFA is only consultation.

THE COURT:  Okay.

MR ROTH:  I think that it's both inapplicable and we have discharged it.  If it does apply, it's been discharged by talking to them.  There's no requirement for the CFA to sign off on anything.  It's just, you know, the officers shall request the commission to provide the advice --

THE COURT:  So it's not moot.  It's failure to state a claim, in a sense.

MR ROTH:  I think that's probably right.  It happened after -- I believe it happened after the complaint was filed.  So maybe that's why we used the term mootness, but -- regardless, it can't support preliminary injunctions.

THE COURT:  Okay.

MR ROTH:  We've done what we have to do.  More than we had to do, actually, but at least what we had to do.

All right.  Let's talk about NCPC, because NCPC is this one that has the two separate requirements.  We have different points on each.  So 8722(b) is the consultation.  That provision applies to a federal or D.C. agency.  So on 8722(b), I don't think that applies to the center at all because the center is not an agency.

Now, I heard counsel say they are contending otherwise for purposes of this statute.  That's not in their briefs.  So I don't know what their argument is but they have not made that argument.

Now, he pointed to the Smithsonian Facilities Improvement Act and said, well, that statute, you know, sort of contemplates that the Smithsonian will have to go through NCPC review.  So how could that be if it doesn't apply to agencies?

I think the answer to that is the 2003 statute

talks about projects that are subject to the review and approval after the NCPC.  And 8722(d), which is the requirement for approval, is not limited to agencies.

So there are projects that have to go through 8722(d) approval.  For example, the REACH.  When they built the REACH, it's a new building.  So if you were putting up a new building, you have to go through 8722(d), and that's why they did.

THE COURT:  Because location, height, bulk, number of stories, size, et cetera.

MR ROTH:  Right.  If it's a new building, it's --

THE COURT:  Subject to approval the process.

MR ROTH:  Correct.  So if it's implicating those features, which a new building does, you're stuck with 8722(d) approval, and that's why even the Smithsonian would be subject to NCPC and the center as well.

But here, we're not implementing the location, height, bulk, number of stories or size of the building.  I think Mr. Floca's testimony on that was clear.

So then we're left with, well, what about the provision for open space?  I think what that means is, like, if you're going to close an area that was open or open an area that was closed, like you're changing the way the space is used, then that may trigger 8722(d).

THE COURT:  But certainly closure of significant

amounts of open space to allow for the construction for two years would -- that generally falls under the provision for open space, doesn't it?

MR ROTH:  I don't think that could possibly be the way you read it because then it would cover every construction project, because any time you do work you're going to temporarily block some space for the work, and then that would sweep everything into that language.

I think that this has to be talking about permanent -- you know, the changes are intended to be permanent, not a construction fence that goes up so that people aren't hurt, you know, by falling rocks.

Counsel said, well, there's going to be new bollards.  Actually, what Mr. Floca said is that they're replacing the bollards because they don't work.  So even if putting up a bollard itself somehow implicated the provisions for open space, I don't think that's what we have here.

They are certainly doing work on the exterior, like, you know, replacing the pavers on the plaza.  I don't think that qualifies as provision for open space and I certainly don't think it rises to the level of ultra vires or *mandamus* review, given how debatable, at minimum, that question is.

So if 8722(d) doesn't kick in, then we never get

to NEPA or Section 106.  If NCPC goes through the approval process and votes, then NCPC, at minimum, is subject to NEPA and Section 106.

And by the way, they accept that.  We put in a declaration from NCPC.  They know that if they approve a project, they need to do NEPA.  They need to do Section 106, if applicable, because they are an agency subject to those statutory requirements.

But if we don't have the approval requirement, then the center itself is not subject to NEPA.  I think they concede that.  And the center itself is not subject to 106 because only -- and this takes us back to the Smithsonian Act from 2003.

Number one, it only applies to the Smithsonian. So we have this question of does that cover the bureaus that are independent; and then, number two, even if it does, that's only for projects subject to the review and approval of the NCPC.

THE COURT:  Okay.

MR ROTH:  So it all kind of comes back to that.

THE COURT:  Let's go to the threshold question. Right?  On whether the Kennedy Center is covered by 106 at all.  The Kennedy Center is treated the same as the Smithsonian in terms of whether it's an agency under the APA, under the Federal Tort Claims Act, under the Privacy

Act.

What shows that it should be treated differently for purposes of the 2003 act?

MR ROTH:  So I think when we are defining "agency" for purposes of those statutes, the D.C. Circuit has -- you know, they articulated a test for whether it counts as an agency or not.  And nobody has argued that the center qualifies as an agency under that test.

When we're reading a statute, I think we're figuring out what is Congress intending with these words, and they said the Smithsonian Institution.  They did not say and its bureaus.  And again, the Smithsonian is independent of the center.  The center is independent of the Smithsonian.

Now, look, you could read it.  I understand.  It's designated to the bureau.  You could read Smithsonian in the statute as including the bureaus.  It's not a crazy reading.  But for ultra vires review, I don't think it qualifies.

THE COURT:  But to accept your position would be -- would mean that, you know, maybe putting aside the White House and the Capitol, that the Kennedy Center would be treated differently than virtually every other federal public building in Washington, D.C. every museum, every presidential memorial, all of them are subject to 106 review, but not the Kennedy Center.  What makes you think

Congress contemplated that?

MR ROTH:  Well, I think before this statute, I don't think there was any doubt about that.  So before this 2003 amendment, the Smithsonian and its bureaus and the center were not subject to 106.

THE COURT:  Right.  Congress swept in all of the museums, all of the memorials maintained by the Smithsonian, but not the Kennedy Center, under your reading?

MR ROTH:  I'm not sure about that.  Like the National Gallery of Art is also designated as a bureau with independence.  So it also would be not within the scope of the 2003 act.

I think the question is really, what was Congress trying to do here?  If you look at the statute, it's in the context of a particular project that the Smithsonian was doing with the Patent Office.

So they're dealing at this time with, okay, the Smithsonian is doing this project.  We want to have more process around it or we want to have more input into it.  So we're going to amend the law.  And then we should also get future things that the Smithsonian may do.

But I don't know that they were thinking one way or the other about the center, and the statute doesn't suggest that they were.

And, again, you have to get past that and then you

reach the question of, is it subject to approval of the NCPC? Because, even for the Smithsonian, you are only subject to Section 106 if the project is otherwise subject to the approval of the NCPC.

So it's a lot of hoops for them to jump through, especially when we're talking about a *mandamus* framework or an ultra vires framework where they have to show unambiguous, nondiscretionary patent violations.

If Your Honor has other questions on the merits.

THE COURT: Why don't you go to the equities.

MR ROTH: Talk about the equities. And it depends a little bit --

THE COURT: I think we've covered every --

MR ROTH: We've covered all of the different theories. I think the discussion of the equities is a little bit tied to the nature of the remedy that we're talking about, which depends on the claim that we're talking about. So it's a little bit hard to do in the abstract. Right?

Like if the injunction were you have to talk to the CFA, you know, maybe the balance of equities would be not as slanted one way or the other. It's not a big deal.

But if the injunction is something like you can't close, that is a big deal because this Executive Director and this board has determined that if they have to leave

this building open while doing this work, it is going to imperil their ability to get the work done on the time frame that Congress assigned and for the price that Congress gave them.  And that's a big problem when you understand the scope of the work that's needed and the importance of the work that's needed.

And I don't think it helps the plaintiffs or the public interest to put that in jeopardy.  Because, again, the long-term implications of not getting this work done are going to -- they are going to be bad for them too.  Right?

I understand that they want to see shows this year and they are not going to be able to.  Just to be very practical, they are not going to be anyway because there is nothing scheduled.

Even if the building were open, these shows are scheduled, like, years in advance.  Like there's not suddenly going to be an opera in two months even if there's an injunction saying the building can't close.

The building would have to be open but that's not magically going to bring back a whole bunch of programming that doesn't exist over that period of time.  It's just going to make it harder to get done the work that has to get done, increase the cost and increase the time that it's going to take.  And that doesn't benefit the public; it doesn't benefit the plaintiffs.  And I think that's the most

important -- most important point here.

If there is a process issue, you know, that can be remedied by, for example, further board action, you know, then -- again, this is not an APA case but in an APA case I would be arguing, remand without vacatur. If this is something that can be fixed, let the agency fix it.

It's not an agency but I think the same thing is true. If the real concern is, well, did the board realize that it would be foregoing $20 million in ticket revenue, we can take that to the board and say, just to be clear, we're going to be foregoing $20 million, whatever it is, in ticket revenue by closing.

I suspect they all understood that but we can make that clearer if that's the issue, but that should not be a basis to throw a wrench into the plans that are being developed right now and, you know, put this project behind schedule before it even gets off the ground.

THE COURT:  Okay.  Thank you.

MR ROTH:  Thank you, Your Honor.

Oh, one last request.

I do think that in light of the testimony, it would be appropriate for all the parties to have an opportunity to submit some sort of post-hearing submission, including in the Beatty case, by the way, given that their counsel participated.

THE COURT:  How long do you think you need?

MR ROTH:  We need the transcript first.  So it depends a little bit on when the transcript will be available.  But one or two weeks is what I'm thinking.

THE COURT:  Very well.

MR ROTH:  Thank you, Your Honor.

THE COURT:  Mr. Heuer.

MR. HEUER:  Thank you, Your Honor.  I will attempt to be succinct and go roughly in the order of my brother.

On the point of final agency action, final agency action under the APA is both action taken and action withheld.  I think that's axiomatic.  So I'm not sure that point goes very far.

Again, as we discussed, the real issue --

THE COURT:  What, if any, agencies have withheld an action that they, sitting here today, are obligated to take, if there's been no submission of permit application or a plan for approval or anything concrete to the agency?

MR. HEUER:  Correct.  That goes to the 110k point.

THE COURT:  Okay.

MR. HEUER:  That's the obligation under the National Historic Preservation Act to withhold permits from entities and to affirmatively go to ACHP --

THE COURT:  Got it.

MR. HEUER:  -- to get the approval before you're

allowed to issue.

THE COURT:  Okay.

MR. HEUER:  That's why those entities are here, because that connects to our *mandamus* claim.  So we think they do have an obligation to send it to NCPC and to CFA, and once they do, those agencies have an obligation to hold rather than approve until they have gone to NCPC.  If they don't, then they are enjoinable.

I heard my brother say that we won't wake up the next day and the building will be demolished.  I've heard that one before in another case that I've argued.

On the point of balance and efficiency, we talked about the four-year funding deadline argument.  The government's claim is that this needs to be used by 2029 and that creates this sense of urgency.

A funding deadline by Congress doesn't authorize bypassing the procedural obligations that Congress also established.  Congress is well aware that when it appropriates funds for construction projects, they will have to go through things like NEPA and 106 and other things.

So the notion that there is some urgency and they can't go through these things doesn't make a lot of sense because Congress knows they exist.

Similarly, Mr. Floca was focused very much on calling the closure efficient.

THE COURT:  Calling it?

MR. HEUER:  Efficient.

Our point is that the statute doesn't speak to efficiency.  That may be his preference but he's conceded that he reviews only the structural issues.  He doesn't talk to the people on the performing arts side of the house about these types of issues.

And I point out that, quite frankly, it is possible to stage construction and continue operating.  I understand that there is a hole next to the White House and that there was a state dinner in the East Room last night.

It is very possible to do large construction projects, apparently, and continue to operate other parts of the facility, particularly a facility of this size, which has three theaters.  And the Grand Foyer, and my understanding, was at one point the longest room in the world, longer than the Washington Monument is tall.

This is a massive facility that can eminently sustain and allow for the use of multiple theaters' closures and still maintain its operation as a living memorial.

On the grounds point, I presume that my brother misspoke when he said that this is forfeited.  It's Count 11 in our Complaint.  So Page 71.  We reference it in our PI motion.

THE COURT:  I believe he was referring to your

reliance on the regs that we just saw today to bolster your point about the grounds.

MR. HEUER:  That may be so but it's not as though it was forfeited or waived.  It's a central part of our Complaint.

Again, I would point out that if anyone should know what those regulations are, I would suspect it is the government, who is subject to them.

I would also note that it certainly doesn't refer to permanence because if you look at 1.5C in those regs, there is a provision for lifting a closure.  So it certainly isn't meant for a permanent closure.  It's meant for a closure that could be temporary because, otherwise, you wouldn't need a provision for how you would lift that closure.

I would also note that it does refer to the national parks but I can certainly imagine there is a difference between closing the Kennedy Center, which is an 18-acre site, and closing all of Yellowstone.  The denominator issue matters here.  You're closing a large percentage of a small site; that will be much different than closing the same amount of acreage on a site that is several hundred thousands square miles, for instance.

THE COURT:  I guess the question is the specific provision at issue, which you cite as 105(b), which speaks

in terms of use of the park area --

MR. HEUER:  Correct.

THE COURT:  -- adversely affecting the park's natural aesthetic values, et cetera.

MR. HEUER:  Uh-huh.

THE COURT:  So the question is, does this apply simply to national parks or does it apply to the Kennedy Center, which is land owned by the trust that is administered or managed pursuant to agreements and regulations of the Park Service?

MR. HEUER:  Correct.  And if you look at the definition section in 1 --

THE COURT:  That was a question.

MR. HEUER:  I think it answers it.  The definition in 1 is that park area, see definition of National Park System.

THE COURT:  Yep.

MR. HEUER:  National Park System means any area of land or water now or hereinafter administered by the secretary through the National Park Service for park, monument, historic parkway, recreational or other purposes.

This is certainly that thing.

THE COURT:  Okay.

MR. HEUER:  And again, Congress decided to codify this in statute.  It doesn't matter whether it is or is not

a park.  It says you have to follow these regulations.

So it didn't certainly mean follow them other than the ones that say "Kennedy Center," because "Kennedy Center" is never mentioned, I will hazard to guess, in any regulation of the National Park Service.  So that would too be a nullity if they said follow these regulations that don't actually ever apply to you.

As to the CFA, my brother is correct that they are a consultation-only entity.  They are not an approval entity.  I would say incorrect that, again, a phone call to them is sufficient.  They have an entire process.  They have a commission.  You need to submit to them.  They usually vote twice, once on your preliminary plan and once on your final plan.

So the notion that you can avoid that simply by having a phone call with them, and that's sufficient under the statute, is incorrect.

As to the question of whether the Smithsonian Facilities Act applies only to new buildings, the Smithsonian doesn't think that.  You can look at Page 30 of our PI brief, 24-1, Note 14.  The Smithsonian has recently and without controversy gone to the NCPC for modifications to the Castle and to modifications to the Air and Space Museum.  So Smithsonian certainly believes it is.

THE COURT:  Is that an estoppel argument?  Because

they've done it in the past, they must always do it in the future, even if the statute doesn't apply?

MR. HEUER:  I think they believe the statue does apply and they've --

THE COURT:  It's evidence that the statute applies, that's your argument?

MR. HEUER:  Yes.

THE COURT:  Okay.

MR. HEUER:  In terms of -- the last thing that I heard was that because the shows have already been canceled, there's no point in going to the center and, therefore, we must let the work continue.  That sounds strongly like a self-imposed harm.  We canceled the shows; now what else would you do but continue the work.

That's not the way the statutes are supposed to work.  If you are going to do something that requires doing the work, you should probably have a plan for that before you start canceling the shows, rather than throw yourself on the mercy of the Court and say, what else would I do now?  That is self-imposed, not imposed externally.

Lastly, I would say our injunction is about following the law for construction.  I would go back to my initial point.  There are statutes that apply.  We're not saying you can't do repairs.  We're not saying you can't do major repairs.

We are saying that if you want to do these major repairs, there are statutes that apply that you need to follow. If you follow them, you can do those things. This is not an attempt to prohibit them from doing what they would like to do. It's just that they have to follow the rules.

As to the point about the relief, again, I would emphasize that one of the concerns we really do have here remains demolition. If an injunction is entered that says you may continue to do things that are authorized to be done, but you can't demolish, we think that is important.

We also think it's important that we know what the plan is and for the government to say this is not just a set of bullet points, things that we've cobbled together, things that we're putting into a rough-scheduling timetable.

Show us the plan. Once you've show us the plan, we will then be able to tell you do we think you have to go to NCPC, do we think you have to go to 106.

Right now they're saying we've got a bunch of different things, so you can't tell us to go anywhere, but they still want to keep pushing forward. What we're saying is show us what you want to do before you push forward. Then we decide whether the process is required and then you can proceed. We're not trying to stop them. We are saying go in an orderly, appropriate manner, the same way every

other federal project must do.

THE COURT:  Okay.  Thank you.

MR. HEUER:  Thank you, Your Honor.

THE COURT:  On the issue of supplemental briefing, I think it probably does make sense to give you folks an opportunity to assess and think about the implications of the testimony that we've heard today.

I don't want to wait a whole lot of time.  So what I'd like for you-all to do is to talk to each other, along with the Beatty plaintiffs, and come up with some, you know, fairly prompt briefs.  I don't know if we need a full opposition and replies.  Maybe two simultaneous briefs might do the trick.

I will leave you-all with some work as well.  So that is, you know, sort of limit it to a reasonable number of pages.  So why don't you-all get together and propose a scheduling order that will accomplish that, and we will wait until we receive those briefs before we issue anything.

All right?  All right.

Thank you very much.

(Proceedings concluded at 3:17 p.m.)

182

**C E R T I F I C A T E**

I, **Lorraine T. Herman, Official Court Reporter,** certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

_____May 2, 2026_____                    /s/ Lorraine T. Herman____
         **DATE**                              **REPORTED BY**

**BY MR. ANON: [9]**
52/18 70/13 71/18
73/24 76/6 77/8 86/21
98/11 100/9
**BY MR. LOWELL: [32]**
7/2 7/22 10/10 14/23
16/25 18/2 19/5 19/18
22/5 23/12 24/1 24/13
26/24 27/15 30/13 31/7
31/18 32/4 33/1 34/25
39/23 41/5 43/22 45/16
46/15 47/22 48/19
49/12 51/2 78/24 81/10
82/20
**BY MS. FREENY: [4]**
87/22 93/1 94/17 96/14
**BY THE COURT: [4]**
26/12 37/17 84/4
101/13
**COURT REPORTER:**
**[3]** 7/13 7/21 14/14
**DEPUTY CLERK: [2]**
4/3 6/14
**MR ROTH: [34]** 150/1
150/3 150/7 152/12
152/14 153/3 154/15
154/20 156/10 156/14
157/8 157/11 159/10
159/13 160/3 161/12
161/16 161/21 163/16
163/20 164/3 164/8
165/11 165/13 166/4
167/20 168/4 169/2
169/9 170/11 170/14
172/19 173/2 173/6
**MR. ANON: [26]** 16/6
17/22 22/2 23/15 27/9
45/1 48/16 49/7 52/13
52/15 73/21 73/23 76/5
77/5 78/16 82/15 86/16
86/20 87/3 92/13 92/16
94/14 98/5 98/9 100/8
101/10
**MR. CRAIG: [5]** 4/10
4/21 92/22 103/3 103/5
**MR. HEUER: [107]**
103/8 103/11 104/15
104/24 105/3 106/6
106/24 108/1 108/7
108/10 109/12 109/17
110/24 111/19 111/23
112/2 112/7 112/15

112/23 113/2 113/22
114/13 114/16 115/3
115/8 115/16 115/21
116/1 116/14 116/17
117/1 117/6 117/14
117/19 118/1 118/6
118/9 118/21 119/8
121/12 121/20 122/8
122/12 123/9 123/18
123/24 124/9 124/15
124/19 125/3 125/5
125/13 128/1 128/7
128/15 129/16 129/18
129/22 131/20 132/5
133/14 134/24 135/11
135/15 135/21 135/25
136/8 136/10 136/12
136/14 136/19 136/22
137/15 137/18 137/21
138/6 138/8 138/17
138/19 139/5 139/8
140/5 140/11 141/9
141/22 143/15 147/7
147/13 148/3 148/9
173/8 173/19 173/21
173/25 174/3 175/2
176/3 177/2 177/5
177/11 177/14 177/18
177/24 179/3 179/7
179/9 181/3
**MR. LOWELL: [39]**
4/22 5/5 5/8 6/2 6/9
6/21 10/7 16/9 16/20
16/22 17/25 19/3 19/15
22/4 23/11 23/18 23/22
24/11 30/12 31/6 31/16
32/2 32/25 34/23 39/21
41/3 43/21 45/3 45/6
46/13 47/20 48/18 49/9
51/1 52/8 78/18 78/22
81/8 82/17
**MR. ROTH: [2]** 5/10
5/19
**MS. FREENY: [9]**
86/14 87/5 87/8 87/16
92/15 92/18 92/21
96/12 98/3
**PUTATIVE JUROR:**
**[1]** 161/14
**THE COURT: [199]**
**THE WITNESS: [11]**
6/13 6/18 6/24 7/17
14/17 14/19 27/13 45/7
70/4 71/7 92/23

**$**
**$11 [1]** 80/2
**$11 million [1]** 80/2
**$20 [2]** 172/9 172/11
**$20 million [2]** 172/9
172/11
**$250 [4]** 36/2 36/19
39/7 97/24
**$250 million [4]** 36/2
36/19 39/7 97/24
**$257 [6]** 37/24 39/1
40/1 105/23 106/7
159/12
**$257 million [6]** 37/24
39/1 40/1 105/23 106/7
159/12
**$300 [1]** 53/4
**$300-million [1]** 53/4

**'**
**'21 [2]** 89/16 89/17
**'24 [3]** 29/10 53/15
80/10
**'25 [3]** 10/11 15/14
19/7
**'26 [2]** 10/12 80/11
**'29 [1]** 74/19
**'60s [1]** 60/23
**'67 [1]** 60/23
**'90s [2]** 49/19 63/9
**'black [1]** 30/16

**-**
**-- adversely [1]** 177/3
**-- before [1]** 92/22
**-- sorry [1]** 40/22
**-- to [1]** 173/25
**-- which [1]** 147/8

**/**
**/s [1]** 182/12

**0**
**02210 [1]** 1/18
**0981 [1]** 1/3

**1**
**1.5 [1]** 119/1
**1.5B [3]** 119/2 123/9
161/14
**1.5C [1]** 176/10
**1.7 million [1]** 121/24
**10 [7]** 6/3 10/24 31/6
32/25 43/15 49/4 80/1

**10-year [1]** 38/16
**100 [1]** 154/24
**101 [1]** 3/7
**105 [1]** 176/25
**106 [47]** 106/13 108/17
110/2 118/3 125/15
125/17 125/23 126/1
126/17 126/20 126/23
126/24 127/4 127/22
127/23 128/6 128/12
130/7 130/7 130/17
130/21 131/1 131/4
131/5 131/19 131/24
134/9 134/9 134/22
137/25 138/1 138/25
139/1 139/2 140/24
142/7 149/13 167/1
167/3 167/6 167/11
167/22 168/24 169/5
170/3 174/20 180/18
**10:08 [1]** 1/7
**10th [1]** 24/6
**11 [2]** 31/17 175/22
**11 years [1]** 53/8
**1100 [1]** 2/14
**110k [4]** 130/24 131/9
137/24 173/19
**12 [2]** 34/24 62/20
**1200 [1]** 1/14
**124 [1]** 18/15
**1250 [1]** 1/21
**12:16 p.m [1]** 102/25
**13 [2]** 43/21 62/20
**14 [2]** 46/13 178/21
**15 [1]** 9/4
**15 years [1]** 49/4
**155 [1]** 1/17
**16-months [1]** 9/4
**16th [2]** 9/18 41/7
**1717 [1]** 1/14
**18-acre [1]** 176/19
**1811 [2]** 2/3 2/6
**18th [2]** 15/14 16/3
**19 [1]** 111/12
**1983 [1]** 118/24
**1990s [1]** 130/1
**1994 [4]** 118/13 118/25
120/16 160/14
**1996-ish [1]** 63/23
**1:26-0981 [1]** 1/3
**1:30 [1]** 102/22
**1:32 [1]** 102/25
**1D [1]** 41/4
**1st [9]** 79/8 79/17

**1**

**1st... [7]** 79/18 79/19 79/20 80/11 80/16 80/21 81/6

**2**

**2 million [1]** 146/1
**20 [1]** 74/9
**20 seconds [1]** 86/17
**200 [3]** 18/15 24/21 33/9
**20001 [2]** 2/19 2/23
**20005 [2]** 1/22 2/15
**20006 [1]** 1/14
**2000s [1]** 63/10
**2003 [5]** 164/25 167/13 168/3 169/4 169/12
**2009 [1]** 52/25
**2012 [1]** 126/23
**2018 [1]** 139/10
**2021 [9]** 35/25 35/25 36/5 36/8 37/2 67/10 88/15 96/8 107/16
**2022 [3]** 88/18 88/20 89/4
**2024 [5]** 7/7 29/7 29/9 29/18 53/23
**2025 [4]** 10/3 18/15 24/6 159/9
**2026 [7]** 1/5 37/5 79/8 79/9 96/22 97/1 182/12
**2026/2027 [1]** 36/9
**2027 [1]** 36/9
**2029 [5]** 74/16 74/18 74/22 159/22 174/14
**20530 [1]** 2/10
**21st [2]** 118/13 118/25
**2200 [1]** 57/22
**2200-pound [1]** 45/11
**23223 [2]** 2/3 2/6
**24-1 [1]** 178/21
**25 [1]** 12/7
**25-percent [1]** 74/9
**250 [1]** 1/21
**250th [1]** 144/11
**257 [1]** 40/5
**26 [2]** 3/6 3/7
**26-981 [1]** 4/4
**29 [1]** 1/5
**2nd [1]** 37/20

**3**

**3,000 pounds [1]** 70/5
**30 [2]** 12/7 178/20

**30 days [2]** 25/1 25/19
**300-page [2]** 67/11 159/19
**30th [1]** 118/24
**333 [1]** 2/23
**36 [1]** 118/22
**37 [1]** 3/7
**39 [1]** 3/6
**3:17 [1]** 181/21

**4**

**40 [2]** 136/9 138/16
**40 U.S.C. 8106 [1]** 111/4
**4th [1]** 144/11

**5**

**50 [2]** 58/5 58/11
**50 feet [2]** 134/8 134/18
**50 minutes [1]** 45/1
**50 years [6]** 20/11 33/10 60/24 62/19 64/23 65/3
**50-year [1]** 30/21
**50-year-old [1]** 58/25
**52 [1]** 3/8

**6**

**6.641.15 [1]** 128/4
**60 [1]** 58/5
**60 days [1]** 144/7
**620 [1]** 2/18
**6th [4]** 110/4 144/5 144/12 146/5

**7**

**70,000 square [1]** 121/25
**70,000-square-foot [1]** 70/25
**70-some-odd [1]** 63/13
**701 [1]** 2/18
**71 [1]** 175/23
**76 [1]** 18/16
**76i [1]** 126/3
**76j [2]** 114/17 118/7
**76k [2]** 123/20 123/25
**78 [1]** 3/6

**8**

**8106 [8]** 111/4 111/17 114/15 147/20 154/5 154/15 154/21 155/17

**84 [1]** 3/7
**87 [1]** 3/9
**8722 [15]** 132/16 135/3 135/4 136/9 138/6 138/16 140/23 164/12 164/14 165/2 165/5 165/7 165/15 165/24 166/25
**8th [1]** 2/18

**9**

**950 [1]** 2/10
**98 [1]** 3/8
**981 [1]** 4/4
**9th [1]** 25/18

**A**

**a.m [1]** 1/7
**AASPA [1]** 21/20
**Abbe [5]** 1/19 4/18 4/19 4/23 7/3
**ability [7]** 8/8 8/16 8/19 9/6 83/2 159/25 171/2
**able [15]** 8/6 17/18 20/15 40/14 55/20 113/4 122/20 146/8 146/9 148/5 149/20 154/21 159/4 171/12 180/17
**abnormal [1]** 60/4
**about [187]**
**about -- specifically [1]** 10/25
**above [6]** 17/4 17/19 66/17 71/2 77/2 182/6
**above-entitled [1]** 182/6
**above-ground [1]** 71/2
**abreast [2]** 96/15 97/11
**abstract [1]** 170/18
**absurdity [1]** 125/6
**accept [2]** 167/4 168/19
**access [11]** 70/20 82/23 121/17 121/18 122/20 127/16 127/18 128/21 131/23 146/20 162/9
**accessibility [1]** 157/1
**accessible [2]** 69/23 71/12
**accommodate [1]** 86/4

**accompany [1]** 142/4
**accompli [1]** 139/24
**accomplish [5]** 34/17 40/13 72/7 85/16 181/17
**accomplishing [2]** 34/17 66/13
**accordance [1]** 128/4
**according [1]** 44/12
**accounting [1]** 84/18
**accounts [1]** 84/17
**accumulated [1]** 101/1
**achievable [1]** 68/20
**ACHP [2]** 141/1 173/23
**ACHP's [2]** 131/16 141/1
**acknowledge [2]** 15/9 28/9
**acquire [1]** 136/17
**acre [2]** 121/22 176/19
**acreage [1]** 176/22
**across [11]** 34/1 44/9 53/13 53/21 54/10 59/11 70/10 95/5 99/12 100/23 157/25
**act [28]** 96/3 107/6 114/10 125/14 125/15 125/22 126/3 126/7 126/16 127/25 130/11 130/25 137/7 138/22 146/25 149/12 151/2 153/4 156/10 156/17 164/21 167/13 167/25 168/1 168/3 169/12 173/22 178/19
**acted [2]** 131/7 151/2
**action [23]** 1/2 14/6 19/23 20/6 20/7 34/13 35/22 38/20 107/14 135/8 139/9 142/2 150/15 150/16 153/16 153/20 159/20 172/3 173/10 173/11 173/11 173/11 173/16
**actions [8]** 35/10 95/20 108/9 124/3 124/10 130/22 140/23 149/6
**active [1]** 47/6
**actively [1]** 80/18
**activities [5]** 124/20 124/22 124/24 127/11 132/8
**activity [2]** 112/9

**A**

**activity... [1]** 161/17
**actual [9]** 22/6 22/10
22/19 23/5 62/20 64/14
83/14 104/5 107/22
**actually [24]** 19/10
21/3 21/23 23/3 41/2
57/2 61/7 61/10 61/14
63/22 64/2 64/8 75/2
87/18 88/20 96/23
123/15 134/11 150/10
154/23 155/13 164/9
166/14 178/7
**ad [2]** 110/16 142/8
**add [2]** 37/23 155/22
**adding [5]** 105/9
120/25 121/1 121/1
130/23
**addition [4]** 25/25
72/24 134/2 145/8
**additional [2]** 120/16
153/23
**address [10]** 20/3
60/16 70/11 75/25
76/10 80/9 86/14 88/22
89/5 96/16
**addressed [3]** 21/8
88/12 161/2
**addressing [1]** 99/6
**adds [2]** 105/9 120/16
**adjacent [1]** 85/23
**administered [2]**
177/9 177/19
**administration [6]** 5/6
9/4 9/5 32/21 80/23
113/4
**administrations [2]**
89/1 100/17
**admit [1]** 23/21
**admitted [2]** 23/24
109/23
**adopt [1]** 91/8
**advance [3]** 16/2
100/3 171/16
**advantage [1]** 112/10
**adverse [1]** 92/18
**adversely [5]** 119/5
119/11 123/12 131/2
177/3
**advice [2]** 141/24
163/25
**advise [6]** 86/22 86/25
136/19 136/25 162/16

163/8
**advised [1]** 113/20
**advises [1]** 160/3
**advisory [2]** 131/12
131/16
**aesthetic [7]** 115/4
115/13 119/6 119/11
123/12 157/6 177/4
**affect [7]** 99/18 119/5
119/11 129/20 131/2
142/1 162/21
**affected [5]** 86/11
105/6 111/15 142/21
143/17
**affected -- although
[1]** 105/6
**affecting [4]** 96/24
105/10 128/24 177/3
**affects [4]** 50/1 128/12
129/13 138/4
**affiants [1]** 144/1
**affidavits [1]** 145/23
**affirm [1]** 6/15
**affirmatively [2]**
142/20 173/23
**after [16]** 5/8 11/19
23/8 34/10 53/5 57/2
68/13 68/15 81/13 98/7
114/15 119/1 145/3
164/4 164/4 165/2
**after -- I [1]** 164/4
**afternoon [4]** 103/9
103/10 150/1 150/2
**again [48]** 11/11 12/9
14/9 25/7 29/25 30/2
30/23 32/5 33/2 37/1
41/6 44/4 44/8 57/11
61/8 63/11 65/22 66/12
66/21 68/20 72/20
88/24 91/17 98/20
99/12 101/21 114/23
133/18 133/19 139/18
140/20 141/11 142/5
142/22 148/9 151/3
152/1 161/21 161/25
168/12 169/25 171/8
172/4 173/14 176/6
177/24 178/10 180/7
**against [11]** 58/9
140/15 150/19 151/8
151/9 151/12 151/22
152/2 152/3 153/8
153/17
**age [4]** 62/17 63/16

64/9 64/15
**agencies [16]** 35/21
105/21 110/15 130/8
130/19 132/25 136/2
145/17 150/13 151/1
151/7 152/8 164/24
165/3 173/15 174/6
**agency [46]** 124/13
125/17 125/22 126/12
126/18 128/5 131/10
131/14 131/25 135/13
136/5 136/15 137/9
138/10 138/12 138/12
138/16 139/4 139/11
140/2 140/21 141/6
142/7 142/13 143/7
147/4 149/16 150/15
152/7 152/17 152/25
153/14 162/14 162/15
164/13 164/15 167/7
167/24 168/4 168/7
168/8 172/6 172/7
173/10 173/10 173/18
**ago [9]** 13/18 13/21
36/22 57/3 64/23 65/3
99/16 131/6 135/5
**agree [9]** 27/4 28/24
50/19 91/8 91/14 93/12
107/2 126/13 131/21
**agreed [1]** 27/21
**agreeing [1]** 23/4
**agreements [7]** 84/6
84/8 84/9 118/13
160/14 160/17 177/9
**Ah [1]** 46/12
**ahead [3]** 22/24 78/21
134/6
**aided [1]** 2/25
**air [3]** 63/13 77/1
178/23
**al [3]** 1/6 4/5 4/6
**Alan [1]** 2/2
**all [138]** 5/21 5/23 6/1
6/7 7/18 10/19 11/14
11/21 20/21 21/5 23/23
28/12 34/12 34/14 36/9
36/20 37/23 38/13
40/14 43/24 44/8 44/17
44/20 49/2 53/16 54/10
54/15 55/19 56/11 57/6
59/14 60/22 62/10
62/16 62/22 63/5 63/7
63/12 64/7 64/9 65/5
65/5 66/15 67/4 68/2

68/14 68/18 69/3 71/19
71/25 72/1 72/10 73/16
73/20 74/13 75/21
76/21 77/4 79/21 80/18
81/21 83/20 84/1 84/12
86/13 86/17 86/20
87/20 89/21 90/10 92/5
94/18 98/2 98/7 98/17
98/25 99/8 101/10
102/19 102/23 102/24
103/1 105/20 107/2
107/3 107/7 107/11
108/13 109/15 110/3
114/15 117/7 117/10
120/11 122/3 123/17
126/16 127/7 127/10
129/2 132/14 134/8
134/20 139/18 142/6
143/24 144/6 144/13
145/9 148/16 149/18
150/11 150/13 151/11
154/10 154/11 155/14
157/12 158/1 158/5
159/17 159/25 164/10
164/14 167/20 167/23
168/24 169/6 169/7
170/14 172/13 172/22
176/19 181/9 181/14
181/16 181/19 181/19
**allegations [1]** 108/6
**alleged [1]** 146/12
**allow [4]** 91/9 158/6
166/1 175/19
**allowed [3]** 113/24
122/21 174/1
**almost [3]** 60/24 115/4
143/7
**along [3]** 66/10 118/19
181/9
**alowellpublicoutreach
[1]** 1/22
**already [20]** 8/10 15/1
23/9 27/21 33/18 40/22
43/13 81/16 113/14
116/22 130/22 140/24
144/21 145/5 145/7
146/5 151/19 154/6
154/7 179/10
**also [49]** 4/16 4/25
4/25 6/5 8/25 32/6
39/11 46/9 49/16 53/10
55/7 61/21 67/12 72/3
90/1 92/16 93/12 94/12
105/24 107/3 109/19

**A**

**also... [28]** 115/19 117/6 118/1 118/2 119/14 120/4 120/7 120/22 121/4 125/8 126/2 126/20 129/23 144/16 152/4 152/16 157/12 157/15 158/3 160/24 162/2 169/10 169/11 169/20 174/17 176/9 176/16 180/12

**alteration [10]** 114/19 117/22 119/5 119/10 121/10 123/11 146/19 156/24 157/13 161/18

**altered [1]** 78/6

**although [2]** 105/6 133/15

**always [6]** 42/4 89/9 100/3 100/5 103/23 179/1

**am [20]** 4/11 7/4 8/14 9/8 15/16 26/3 47/11 51/1 52/8 52/10 54/22 55/1 55/5 77/16 87/8 109/22 122/19 139/25 142/22 163/12

**ambassador [1]** 133/25

**amend [1]** 169/20

**amendment [1]** 169/4

**American [1]** 32/9

**amount [6]** 41/13 41/22 60/10 100/4 109/1 176/22

**amounts [2]** 40/23 166/1

**analysis [11]** 21/3 44/21 73/13 73/15 93/25 94/19 98/13 98/18 98/19 126/13 140/3

**analyze [1]** 99/8

**analyzed [1]** 73/14

**anesthetic [1]** 146/13

**Angela [2]** 1/20 4/25

**anniversary [1]** 144/11

**announce [1]** 81/2

**announced [5]** 80/21 80/22 81/16 90/7 104/9

**announcement [1]** 81/4

**announcing [1]** 19/6

**annual [9]** 26/19 38/18 38/21 39/5 39/6 39/9 97/7 97/24 106/11

**annually [2]** 39/1 146/2

**Anon [4]** 2/12 3/8 5/13 5/20

**another [13]** 10/9 25/25 25/25 26/1 30/7 33/11 83/22 113/8 121/3 130/5 153/9 162/11 174/11

**answer [7]** 19/13 21/22 73/21 79/24 81/12 92/14 164/25

**answers [1]** 177/14

**anti [1]** 132/25

**anti-segmentation [1]** 132/25

**anticipate [1]** 86/3

**anticipated [1]** 119/18

**anticipation [1]** 147/3

**anticipatory [2]** 137/19 137/24

**any [89]** 9/8 10/14 13/2 13/14 23/21 25/20 33/17 40/12 40/16 43/4 44/11 48/21 55/3 58/22 59/9 61/2 65/16 68/17 72/5 73/13 73/15 75/8 77/1 78/9 81/1 82/1 84/8 84/16 85/12 85/17 86/1 90/2 93/25 94/12 96/7 98/15 102/3 102/10 103/19 104/5 106/7 107/12 108/3 109/2 109/24 110/5 110/5 111/5 112/8 120/9 120/17 123/1 123/6 124/6 124/12 124/13 124/22 127/18 129/20 130/3 137/1 138/11 140/2 141/13 144/12 146/24 150/7 150/15 150/15 150/16 151/15 153/5 153/8 154/2 154/25 155/15 155/24 160/17 161/3 161/25 162/1 163/1 163/5 163/14 166/6 169/3 173/15 177/18 178/4

**any -- I [1]** 81/1

**any -- or [1]** 140/2

**anyone [7]** 46/6 47/6 62/9 108/24 117/9 156/8 176/6

**anything [21]** 8/9 11/5 11/11 23/24 60/3 80/14 80/15 81/2 84/21 99/14 102/13 105/10 112/19 113/17 125/10 132/12 140/3 162/14 163/23 173/18 181/18

**anyway [1]** 171/13

**anywhere [4]** 61/1 122/25 150/7 180/20

**APA [12]** 126/12 130/16 130/20 147/4 147/20 150/14 152/7 153/14 167/25 172/4 172/4 173/11

**apart [2]** 111/11 135/21

**apologies [2]** 88/1 93/5

**apparently [3]** 105/9 136/23 175/13

**appearance [2]** 78/7 142/1

**appearances [3]** 1/12 2/1 4/8

**appears [2]** 120/2 144/10

**applicable [3]** 149/22 161/23 167/7

**application [2]** 27/12 173/17

**applied [2]** 120/1 131/4

**applies [7]** 157/15 161/16 164/13 164/14 167/14 178/19 179/6

**apply [16]** 53/6 82/7 82/8 120/6 125/18 139/2 153/19 163/21 164/23 177/6 177/7 178/7 179/2 179/4 179/23 180/2

**appointed [2]** 10/3 137/6

**appreciate [1]** 78/18

**appreciation [3]** 77/15 100/14 101/22

**approach [2]** 4/8 153/25

**approaches [1]** 100/10

**appropriate [10]** 28/8

**42/3 66/7 105/12** 114/11 126/14 148/18 158/18 172/22 180/25

**appropriated [4]** 84/16 85/3 93/19 159/12

**appropriately [1]** 110/13

**appropriates [1]** 174/19

**appropriation [15]** 26/14 26/18 26/20 34/6 37/24 38/14 38/18 39/2 40/15 105/23 105/25 106/3 106/11 106/12 124/1

**appropriations [2]** 39/25 124/21

**appropriators [1]** 50/8

**approval [43]** 48/9 48/13 49/18 81/14 102/11 105/20 110/23 110/25 111/3 118/15 120/8 123/7 125/9 125/24 127/20 128/4 128/10 128/13 131/16 131/17 132/19 135/4 137/23 138/1 138/3 140/22 140/23 162/3 163/11 163/17 165/2 165/3 165/5 165/12 165/15 167/1 167/9 167/17 170/1 170/4 173/18 173/25 178/9

**approvals [2]** 104/7 141/3

**approve [6]** 25/9 50/19 137/22 155/23 167/5 174/7

**approved [4]** 109/6 156/13 160/15 162/4

**approximately [2]** 58/3 144/6

**April [5]** 1/5 29/10 29/13 29/14 68/8

**arbitrary [1]** 144/10

**architectural [1]** 143/25

**are [349]**

**are -- it [1]** 93/13

**area [13]** 5/6 62/11 121/15 122/16 160/6 161/19 161/20 163/3 165/22 165/23 177/1 177/15 177/18

## A

**areas [6]** 61/2 61/3 62/22 122/17 161/9 162/5
**areilly [1]** 1/23
**aren't [7]** 35/12 43/2 73/17 85/12 109/14 114/2 166/12
**argue [1]** 103/5
**argued [4]** 8/4 12/25 168/7 174/11
**argues [2]** 123/21 125/16
**arguing [5]** 4/14 18/10 103/4 153/11 172/5
**argument [15]** 5/19 5/24 5/25 113/16 123/20 156/18 158/3 158/4 160/11 160/19 164/18 164/19 174/13 178/25 179/6
**arguments [2]** 104/20 139/2
**armrests [1]** 115/9
**Army [6]** 130/5 130/8 131/15 150/12 150/22 151/14
**around [17]** 14/1 20/17 21/7 24/21 28/4 45/8 56/18 61/4 62/7 63/12 64/8 69/10 72/25 73/5 122/14 158/23 169/19
**Art [2]** 126/10 169/10
**article [1]** 15/7
**articulate [1]** 80/12
**articulated [1]** 168/6
**artist [1]** 162/22
**artistic [7]** 41/18 71/5 71/8 71/9 84/24 124/5 124/25
**artists [2]** 84/24 162/19
**arts [15]** 1/6 4/6 32/9 47/25 91/3 101/17 124/4 124/11 124/17 124/23 126/7 141/18 141/23 157/20 175/6
**artwork [1]** 70/9
**as [163]** 7/3 7/6 7/23 8/9 8/15 8/15 9/4 15/22 17/4 18/3 19/20 20/10 20/23 20/23 22/17 22/17 23/25 25/1 27/1 27/8 32/6 34/9 35/4 37/18 38/14 39/6 39/18 41/21 43/14 45/7 46/4 47/10 48/10 48/22 48/25 49/23 51/3 51/18 53/22 54/21 56/7 61/25 62/9 62/9 64/9 64/13 64/15 64/15 64/20 64/20 65/2 65/4 67/13 71/14 73/8 73/10 77/3 77/24 78/12 79/13 79/14 79/14 80/12 80/23 83/1 83/11 83/14 84/7 84/11 85/1 89/7 89/7 95/1 96/7 102/11 103/17 103/25 104/5 104/10 105/16 106/20 111/8 111/25 112/8 113/7 113/12 116/23 118/24 118/25 119/13 119/24 120/16 120/19 121/5 123/2 123/9 123/9 123/24 124/16 125/18 125/20 126/6 126/8 126/18 126/20 126/21 126/22 129/6 130/14 130/18 131/23 131/25 132/24 133/11 137/13 137/21 139/11 139/19 140/21 141/8 141/11 141/25 141/25 142/20 144/2 145/14 145/15 148/6 149/2 149/9 149/12 149/16 151/23 152/16 152/23 153/1 154/3 156/1 157/21 158/22 158/23 159/1 159/2 159/16 160/23 163/5 163/7 165/16 166/21 167/23 168/6 168/8 168/17 169/10 170/22 173/14 175/20 176/3 176/25 178/8 178/18 180/7 181/14
**as-is [1]** 133/11
**asbestos [1]** 76/25
**ascendancy [1]** 12/15
**aside [5]** 17/2 48/20 147/20 152/3 168/20
**ask [16]** 8/2 8/5 12/9 16/10 30/2 33/9 33/10 37/1 49/14 50/2 52/9 67/21 82/13 94/2

**138/15 150/23**
**asked [15]** 16/5 25/1 33/7 34/4 39/25 40/4 42/21 46/4 46/17 51/18 81/25 83/22 92/2 118/17 163/9
**asking [16]** 12/8 12/9 12/10 12/18 31/2 43/2 46/4 51/11 80/16 81/2 82/3 90/16 95/7 117/4 117/12 150/19
**aspect [1]** 28/9
**aspects [4]** 54/15 115/1 155/16 157/3
**asserts [1]** 8/8
**assess [3]** 5/23 90/23 181/6
**assessment [3]** 90/19 96/5 139/15
**assigned [1]** 171/3
**ASSOCIATES [2]** 1/21 4/23
**assume [3]** 113/16 131/21 152/14
**assuming [1]** 131/24
**attached [1]** 23/19
**attempt [2]** 173/8 180/4
**attended [1]** 79/4
**attorneys [2]** 7/4 110/11
**audible [4]** 32/12 33/6 46/25 47/17
**audience [2]** 7/14 73/19
**Audio [1]** 9/19
**author [1]** 55/1
**authority [15]** 16/12 47/3 110/22 111/6 114/17 114/18 115/14 115/18 117/15 126/19 131/10 147/22 148/13 156/18 160/25
**authorization [10]** 25/6 74/16 74/18 103/21 107/7 125/21 127/25 155/1 157/4 157/23
**authorize [4]** 120/19 120/22 162/10 174/16
**authorized [2]** 157/16 180/10
**authorizes [1]** 156/21
**automated [1]** 64/6

**automatically [1]** 125/9
**available [7]** 36/18 75/14 75/15 91/11 91/15 163/8 173/4
**Avenue [2]** 2/10 2/23
**avoid [6]** 96/23 133/2 144/22 148/4 148/5 178/15
**award [1]** 24/6
**aware [14]** 9/2 40/21 50/11 50/12 50/17 78/1 78/3 78/4 84/8 90/6 120/5 160/16 163/4 174/18
**away [6]** 26/9 55/20 59/19 65/20 134/18 144/7
**axiomatic [1]** 173/12

## B

**B/C [1]** 67/1
**back [32]** 5/24 7/15 7/20 17/12 19/7 19/22 28/8 29/5 33/24 62/6 64/12 64/13 64/24 65/12 70/21 82/12 103/1 116/4 116/8 129/25 131/19 145/3 146/4 146/9 147/3 148/6 154/23 154/24 167/12 167/20 171/20 179/22
**background [2]** 52/21 91/3
**bad [3]** 61/4 66/20 171/10
**balance [4]** 143/12 146/22 170/21 174/12
**balancing [1]** 148/18
**ball [1]** 148/6
**ballpark [1]** 62/3
**ballroom [6]** 46/18 112/17 113/13 139/22 147/23 149/22
**bandaid [3]** 61/14 61/18 61/24
**Bankruptcy [1]** 2/22
**bans [1]** 147/20
**bar [2]** 149/19 149/20
**bare [1]** 78/11
**base [2]** 20/4 56/20
**based [9]** 16/10 24/25 31/2 83/20 94/25 96/6

**B**

**based... [3]** 133/5 133/11 141/8

**bases [2]** 21/5 143/11

**basic [4]** 25/7 25/7 72/22 76/14

**basic -- a [1]** 25/7

**basically [3]** 9/14 37/4 153/20

**basis [4]** 25/4 84/13 155/21 172/15

**bathroom [2]** 56/1 62/23

**bathrooms [2]** 62/21 76/17

**be [276]**

**be -- there [1]** 156/2

**beams [1]** 62/1

**bearing [1]** 10/2

**Beatty [6]** 16/7 87/9 118/10 119/17 172/24 181/10

**beautiful [9]** 26/14 26/20 31/22 36/12 74/20 97/3 97/24 106/11 115/19

**became [4]** 7/11 8/21 10/11 80/12

**because [90]** 8/23 19/23 27/2 27/23 28/1 28/7 28/13 42/20 43/4 43/24 44/17 46/8 50/17 54/17 56/25 57/3 60/10 61/15 62/12 62/24 63/20 75/4 80/14 81/15 82/8 82/10 95/25 99/25 100/22 105/3 106/7 106/17 108/17 110/1 110/8 112/4 113/10 113/13 113/24 114/7 115/11 120/1 120/23 122/24 124/24 125/6 126/21 128/15 130/10 130/15 131/5 133/19 138/9 138/10 138/20 138/23 139/6 140/12 140/21 140/23 142/12 143/7 144/4 144/11 147/4 152/5 152/17 152/25 153/14 158/7 162/1 164/10 164/15 165/9 166/5 166/6 166/15 167/7 167/12

170/2 170/24 171/8 171/13 174/4 174/23 176/10 176/13 178/3 178/25 179/10

**become [3]** 36/9 37/3 40/13

**becomes [1]** 122/9

**been [68]** 14/12 14/13 15/1 17/21 17/21 19/24 20/10 20/21 26/15 27/22 28/13 29/24 30/6 33/10 33/20 38/13 41/24 43/11 45/17 48/4 49/25 53/14 62/18 62/19 63/15 63/15 67/12 70/9 72/23 74/14 75/1 75/12 75/15 75/20 79/21 80/22 80/23 83/15 83/20 88/16 89/9 97/14 100/3 100/5 100/7 101/7 102/20 107/8 109/15 126/24 139/12 139/14 139/14 139/16 144/10 144/21 145/7 147/12 149/15 151/16 151/19 154/6 156/7 160/20 160/23 163/21 173/17 179/10

**been -- you [1]** 62/18

**before [69]** 1/10 8/2 13/17 17/21 18/19 19/10 19/24 21/25 24/8 25/2 25/12 25/19 37/11 40/25 46/1 53/12 58/7 74/15 79/8 79/9 79/16 79/17 79/18 79/19 80/11 80/16 80/17 81/21 82/13 87/18 92/22 94/12 100/19 103/19 105/21 108/18 108/19 108/20 110/3 114/10 116/9 116/11 117/21 121/6 123/18 134/15 135/8 136/15 136/16 138/1 138/14 139/21 139/22 142/2 147/1 148/4 148/5 148/7 151/18 159/16 161/2 169/2 169/3 172/17 173/25 174/11 179/17 180/22 181/18

**beforehand [1]** 142/6

**began [2]** 25/1 140/3

**begin [1]** 103/19

**beginning [3]** 4/7 23/8 46/4

**behalf [2]** 4/23 5/11

**behind [3]** 59/20 69/11 172/16

**being [34]** 21/14 28/12 29/21 30/15 30/22 35/6 41/13 42/13 47/14 55/20 56/13 59/19 72/5 76/17 77/9 90/11 105/23 106/10 106/17 106/20 107/10 111/15 113/2 116/4 126/21 141/15 142/21 144/13 153/21 153/22 154/7 154/8 162/22 172/15

**believe [18]** 16/7 27/13 60/23 63/8 85/15 87/18 110/22 112/4 112/25 121/18 121/20 121/23 135/15 137/22 153/3 164/4 175/25 179/3

**believes [3]** 9/6 110/14 178/24

**below [2]** 61/11 77/3

**benefit [7]** 73/13 96/3 96/6 98/12 102/21 171/24 171/25

**benefits [2]** 56/13 74/5

**Berke [3]** 2/17 2/18 5/15

**berkefarah.com [1]** 2/19

**beside [1]** 127/14

**best [4]** 14/5 14/5 55/13 79/2

**Bestor [1]** 1/13

**better [5]** 69/19 90/20 115/12 122/2 155/14

**between [12]** 50/16 54/5 56/19 62/20 84/15 84/19 90/12 105/13 121/23 139/10 153/7 176/18

**beverage [1]** 54/9

**beyond [13]** 12/2 12/19 38/9 38/9 49/7 107/4 113/19 113/24 115/1 115/2 115/14 117/15 117/16

**beyond -- what [1]** 115/1

**big [15]** 26/13 26/20 36/12 56/5 57/20 61/14

70/23 74/20 97/2 97/23 106/11 115/18 170/22 170/24 171/4

**bigger [1]** 85/13

**biggest [3]** 63/18 75/1 86/8

**Bill [8]** 26/14 26/21 36/13 74/20 97/3 97/24 106/11 115/19

**billion [1]** 107/13

**binder [3]** 23/17 23/18 23/24

**bit [14]** 25/14 52/22 59/6 68/16 69/6 99/20 125/6 131/5 158/3 158/4 170/12 170/16 170/18 173/3

**black [2]** 30/22 30/25

**blah [3]** 81/13 81/13 81/13

**blessing [1]** 141/1

**blind [1]** 66/2

**block [2]** 83/7 166/7

**blocked [1]** 83/4

**board [55]** 1/5 4/5 8/13 8/16 8/19 8/21 8/24 9/18 15/14 17/5 17/17 25/9 25/11 25/13 41/17 44/9 51/6 53/21 54/25 55/4 55/8 68/1 70/10 72/14 80/21 81/14 81/15 81/18 86/23 92/8 95/5 99/9 107/5 109/6 111/24 118/11 124/11 126/4 152/21 152/22 155/23 155/24 155/25 156/5 156/13 156/19 157/12 157/18 157/23 158/11 160/4 170/25 172/3 172/8 172/10

**board's [7]** 8/8 48/6 80/25 114/17 114/18 115/14 117/15

**boilers [3]** 63/5 63/9 63/19

**bollard [5]** 43/8 128/19 128/21 132/1 166/16

**bollards [11]** 42/16 42/23 42/24 105/8 128/17 128/18 131/22 132/11 132/12 166/14 166/15

**bolster [1]** 176/1

**booked [1]** 146/6

**B**

**Boston [1]** 1/18
**both [13]** 22/16 38/11 50/6 50/23 58/16 59/2 73/3 111/1 120/20 135/7 141/19 163/20 173/11
**bottom [3]** 24/15 66/4 98/8
**Boulevard [1]** 1/17
**bounds [1]** 115/5
**box [2]** 109/4 129/20
**branch [1]** 5/14
**brand [1]** 104/12
**brand-new [1]** 104/12
**Brantley [2]** 2/9 5/12
**Brantley Mayers [1]** 5/12
**brantley.t.mayers [1]** 2/11
**brass [2]** 20/14 20/14
**breach [1]** 16/20
**break [5]** 5/23 7/20 59/4 102/22 103/24
**breaks [1]** 59/8
**brick [2]** 154/17 154/18
**brief [5]** 14/16 45/17 144/23 158/4 178/21
**briefed [1]** 161/2
**briefing [3]** 113/13 125/18 181/4
**briefly [7]** 7/6 62/15 78/17 87/20 123/20 138/8 152/4
**briefs [5]** 154/24 164/18 181/11 181/12 181/18
**bring [4]** 39/14 39/15 147/2 171/20
**bringing [6]** 63/19 63/24 64/20 116/8 135/21 153/17
**brittle [1]** 59/1
**broader [3]** 104/21 124/2 149/2
**broken [1]** 117/2
**bronze [2]** 20/15 20/19
**brother [4]** 173/9 174/9 175/21 178/8
**brought [6]** 32/24 36/14 68/1 69/3 151/10 151/11

**bucket [5]** 55/18 55/23 55/24 56/4 56/9
**buckets [3]** 55/13 55/16 96/1
**bucks [1]** 134/14
**budget [14]** 35/8 37/18 39/6 39/9 50/6 67/18 68/23 96/20 96/22 97/5 106/22 109/7 109/8 160/1
**build [1]** 112/17
**building [170]** 12/22 12/22 15/8 17/14 21/7 21/11 31/12 32/8 32/14 32/16 32/20 33/3 33/17 34/1 34/14 34/19 35/14 35/16 35/17 35/24 36/1 36/16 36/19 36/21 37/10 37/14 37/20 38/1 38/3 38/8 38/12 38/15 38/21 38/25 39/12 40/9 40/14 41/19 42/18 42/20 43/6 44/22 44/25 45/9 46/18 46/20 46/20 47/8 48/11 51/5 53/2 54/17 56/8 56/18 56/20 56/21 57/16 58/10 59/6 59/15 59/17 59/23 61/9 61/16 61/22 62/17 62/21 63/4 63/12 63/14 63/22 64/10 64/15 65/13 65/14 65/20 66/6 66/23 67/7 67/10 67/20 68/22 69/11 72/25 74/7 75/5 75/25 76/13 76/18 76/22 77/19 80/19 86/25 88/13 88/15 88/18 88/24 89/4 89/6 89/8 89/13 89/15 91/6 91/20 94/9 98/21 99/12 99/25 100/6 100/21 100/24 104/11 104/12 107/11 109/9 111/4 111/17 111/20 112/13 112/21 114/21 122/3 122/6 122/14 122/21 125/1 126/5 126/8 126/8 127/7 129/4 129/8 129/10 129/11 129/12 129/13 131/24 132/2 134/8 142/14 148/7 148/11 149/2 151/18 154/6 154/7 154/8 154/14 154/25

155/7 155/18 156/4 156/7 156/25 157/5 157/5 157/12 159/19 159/24 165/6 165/7 165/11 165/14 165/18 168/23 171/1 171/15 171/18 171/19 174/10
**buildings [10]** 31/11 53/14 53/21 78/9 84/7 141/24 142/16 147/21 160/4 178/19
**built [3]** 145/3 145/5 165/5
**bulk [7]** 128/9 129/7 129/12 129/13 138/4 165/9 165/18
**bullet [1]** 180/14
**bunch [3]** 161/1 171/20 180/19
**burden [2]** 104/18 154/2
**bureau [8]** 125/20 138/20 139/6 152/11 152/23 153/1 168/16 169/10
**bureaus [4]** 167/15 168/12 168/17 169/4
**business [4]** 11/18 11/19 12/2 88/20
**bust [11]** 51/7 51/12 51/14 51/17 51/22 70/2 70/4 70/5 70/6 70/11 70/14
**bypassed [1]** 146/17
**bypassing [1]** 174/17
**bystander [1]** 153/9

**C**

**C.F.R [1]** 118/23
**cabinet [1]** 35/20
**cables [2]** 57/5 57/6
**calculus [1]** 75/20
**Caleb [2]** 1/20 4/24
**call [6]** 37/9 52/5 59/16 135/6 178/10 178/16
**called [7]** 15/5 20/23 21/15 21/25 42/7 62/11 67/23
**calling [4]** 16/12 83/1 174/25 175/1
**calls [4]** 27/9 31/21 48/16 52/3
**came [2]** 34/5 79/25
**campus [12]** 12/23

31/12 32/19 59/12 71/1 71/3 73/6 80/1 80/5 99/1 99/13 100/19
**campus-wide [1]** 99/1
**can [96]** 5/23 6/8 7/15 14/20 17/16 23/11 23/16 25/6 25/8 26/10 31/9 34/22 36/18 36/25 37/15 41/6 42/22 44/5 44/24 45/3 46/6 47/2 47/6 47/9 47/19 50/4 51/9 51/9 51/11 51/13 56/13 57/16 59/4 62/9 64/2 66/5 67/7 67/24 69/6 70/22 72/3 76/10 82/15 82/17 83/13 85/16 85/19 92/19 95/21 99/3 99/5 100/12 101/17 102/23 105/21 109/23 110/3 110/18 110/19 112/7 112/25 113/13 113/22 114/10 116/10 116/12 118/18 118/19 118/22 122/14 127/18 134/10 138/14 140/6 140/7 143/11 144/17 148/5 149/21 151/23 153/7 155/24 157/12 158/5 159/2 163/14 172/2 172/6 172/10 172/13 175/18 176/17 178/15 178/20 180/3 180/24
**can't [31]** 7/19 16/13 32/18 32/22 37/12 66/2 108/15 109/20 109/21 110/3 110/4 120/11 128/19 128/20 128/20 138/25 142/5 145/6 146/4 150/24 153/4 158/18 160/13 164/6 170/23 171/18 174/22 179/24 179/24 180/11 180/20
**can't -- the [1]** 160/13
**canceled [2]** 179/10 179/13
**canceling [1]** 179/18
**capacity [3]** 46/17 73/8 77/24
**capital [24]** 26/19 37/19 38/1 38/9 38/10 38/16 38/18 38/21 39/6 39/9 39/10 40/16 53/9

**C**

**capital... [11]** 55/6 80/2 101/16 105/22 106/3 106/23 109/6 114/17 117/15 148/13 156/23
**Capitol [2]** 142/17 168/21
**care [4]** 40/18 77/17 77/19 77/21
**carpet [4]** 30/7 30/21 116/9 116/12
**carpeting [2]** 30/15 30/16
**carpets [10]** 29/10 29/17 29/19 29/24 30/3 30/6 30/8 30/11 30/25 132/4
**carry [3]** 9/14 154/2 162/19
**carrying [2]** 9/7 128/2
**Casassa [2]** 1/16 4/15
**case [46]** 4/14 7/5 8/3 10/6 10/8 13/6 13/6 16/7 16/7 17/23 18/4 18/6 18/12 31/8 35/5 49/8 60/14 83/14 87/9 87/12 87/13 96/19 103/14 109/11 113/17 115/25 118/10 119/17 126/10 126/11 135/13 144/23 144/24 145/3 146/15 147/23 149/22 150/4 152/9 152/20 153/10 156/11 172/4 172/4 172/24 174/11
**cases [3]** 12/25 26/15 116/22
**Cast [1]** 62/17
**Castle [1]** 178/23
**categories [1]** 35/8
**category [4]** 93/20 106/2 115/24 157/7
**caused [1]** 58/24
**causes [2]** 153/16 153/19
**CBP [1]** 48/22
**ceiling [2]** 56/17 60/7
**center [181]** 1/6 4/5 5/14 7/7 7/25 8/5 9/4 12/2 13/2 15/1 15/16 15/16 16/4 17/10 18/8 20/11 20/22 24/18

24/21 26/5 27/6 27/11 28/4 28/25 29/8 29/10 29/24 32/9 34/11 36/15 39/3 41/18 42/8 42/14 43/17 44/11 44/15 45/19 46/8 46/11 47/7 47/24 47/24 49/3 49/17 51/23 53/12 53/23 54/10 54/14 54/16 56/16 59/10 65/19 69/8 70/9 70/24 72/12 72/16 74/1 75/7 77/9 77/12 77/17 77/19 78/11 78/14 79/5 83/3 84/10 84/11 84/15 85/16 86/23 87/1 88/4 88/21 89/11 89/23 91/5 91/9 92/4 93/4 93/9 93/12 93/23 94/4 94/22 94/25 95/21 96/3 96/19 97/9 97/12 97/22 99/10 99/17 99/19 101/8 101/21 101/25 103/18 103/20 103/23 106/4 107/5 112/22 113/9 117/25 120/17 120/25 121/18 121/23 121/23 122/2 123/21 125/1 125/17 125/20 125/25 126/4 126/6 126/9 126/21 126/21 127/14 130/12 131/3 131/25 135/13 137/17 137/24 138/15 139/3 140/4 140/9 140/12 140/18 140/24 141/18 143/16 143/23 146/1 147/4 148/15 150/23 151/6 151/9 151/12 151/24 152/2 152/11 152/11 152/20 152/21 153/12 153/14 153/17 157/20 160/25 163/14 164/14 164/15 165/16 167/10 167/11 167/22 167/23 168/7 168/13 168/13 168/21 168/25 169/5 169/8 169/23 176/18 177/8 178/3 178/3 179/11
**center's [8]** 33/3 75/11 78/6 92/5 107/6 127/15 158/25 163/10
**central [7]** 63/1 63/2

63/3 63/12 63/14 63/25 176/4
**certain [8]** 71/8 72/24 104/7 149/9 150/23 152/1 162/5 162/6
**certainly [21]** 43/6 50/1 113/22 114/2 118/1 119/24 120/13 123/4 128/15 130/10 141/16 147/25 165/25 166/19 166/22 176/9 176/11 176/17 177/22 178/2 178/24
**certify [1]** 182/5
**cetera [5]** 22/19 81/14 82/23 165/10 177/4
**CFA [26]** 101/21 101/23 102/2 103/22 108/19 110/2 125/14 141/22 142/7 142/11 142/11 142/12 142/13 142/15 143/2 143/3 162/13 162/13 162/16 163/2 163/4 163/17 163/23 170/21 174/5 178/8
**CFA's [1]** 141/24
**chair [17]** 8/15 8/16 8/21 8/25 9/3 15/3 32/6 37/9 40/22 51/10 51/10 51/11 51/14 80/24 109/22 155/24 160/3
**chair -- sorry [1]** 8/15
**chair's [1]** 109/23
**chairman [42]** 8/7 8/16 9/2 9/15 10/3 10/11 10/14 10/17 11/8 11/24 12/12 13/3 13/8 13/13 13/15 13/16 15/2 18/19 18/24 19/7 25/16 25/17 25/20 28/14 29/7 30/21 31/4 31/19 32/16 32/18 41/22 43/23 46/16 47/3 51/6 51/16 80/21 81/11 86/23 104/8 111/23 127/3
**chairman's [1]** 37/12
**chairperson [2]** 8/13 9/22
**challenge [2]** 13/1 107/25
**challenges [1]** 108/4
**challenging [1]** 105/19
**change [29]** 15/2

17/18 20/20 20/23 25/23 25/25 28/25 29/3 30/21 32/15 33/12 33/18 33/21 36/8 36/23 42/13 43/6 47/4 47/9 48/7 54/8 77/25 85/12 106/12 113/19 116/23 118/14 120/9 156/3
**changed [2]** 17/15 29/11
**changes [17]** 34/11 43/2 45/15 49/17 57/11 57/14 86/1 99/18 106/17 122/23 128/23 132/13 145/7 145/8 157/6 160/15 166/10
**changing [24]** 16/3 19/21 20/7 20/9 20/18 33/9 33/17 34/7 37/3 37/4 37/6 51/17 105/7 105/8 115/23 116/5 129/7 129/14 129/15 155/12 155/15 162/25 162/25 165/23
**Changji [1]** 147/14
**characterization [1]** 7/23
**characterize [1]** 19/20
**charge [3]** 49/5 54/22 73/9
**chayes [1]** 1/23
**chayes-deats [1]** 1/23
**checked [2]** 43/24 44/17
**checking [1]** 109/3
**cherry [3]** 28/14 28/18 29/3
**chief [2]** 54/4 77/24
**chillers [4]** 63/5 63/8 63/18 79/18
**choices [1]** 115/13
**choose [1]** 103/7
**chop [1]** 133/1
**CHRISTOPHER [1]** 1/10
**Circuit [2]** 146/14 168/5
**circumstances [1]** 8/4
**circumventing [1]** 114/8
**cite [1]** 176/25
**cited [1]** 144/23
**city [2]** 48/3 53/5
**city's [1]** 142/1

**C**

**Civ [2]** 2/9 2/14
**civil [3]** 1/2 4/4 5/12
**cladding [1]** 129/13
**claim [22]** 28/12 112/4 131/4 140/1 140/8 140/10 140/15 145/10 148/12 151/8 151/10 151/11 151/22 152/2 152/3 162/12 163/13 163/13 164/2 170/17 174/4 174/14
**claimed [1]** 160/17
**claims [5]** 150/5 151/11 154/1 154/3 167/25
**clarify [1]** 37/15
**classic [1]** 149/19
**clause [1]** 162/19
**cleaner [1]** 155/14
**clear [20]** 41/21 69/24 71/5 71/19 73/3 74/6 74/10 86/22 95/3 99/23 107/9 132/7 138/3 147/10 148/9 156/7 162/3 162/12 165/19 172/10
**clearer [2]** 137/2 172/14
**clearly [2]** 75/3 149/11
**clerical [2]** 97/17 97/21
**close [21]** 9/8 43/9 72/11 72/16 75/7 77/5 79/5 80/7 86/23 87/1 88/4 89/23 90/18 90/18 94/5 94/21 94/25 117/4 165/22 170/24 171/18
**closed [7]** 38/3 73/1 76/9 80/13 83/9 162/7 165/23
**closing [14]** 31/20 74/1 74/5 79/11 91/5 93/12 119/19 127/19 148/15 172/12 176/18 176/19 176/20 176/22
**closure [36]** 69/1 72/9 75/21 78/20 79/20 80/24 81/25 82/2 87/11 88/24 90/3 90/7 90/13 90/24 93/22 95/9 95/17 96/25 100/11 119/12 119/24 120/13 120/19

121/9 123/7 145/24 158/6 159/8 159/12 161/16 165/25 174/25 176/11 176/12 176/13 176/15
**closures [3]** 119/3 119/3 175/19
**cobbled [1]** 180/14
**Code [3]** 128/5 128/8 135/6
**codify [1]** 177/24
**cognizable [1]** 146/21
**colleague [3]** 53/22 87/14 98/13
**colloquy [1]** 123/25
**color [12]** 14/6 19/21 20/7 20/9 20/10 20/25 21/1 24/22 25/23 30/3 33/10 33/14
**COLUMBIA [1]** 1/1
**Columbia's [1]** 53/2
**column [2]** 20/14 20/22
**columns [38]** 17/13 17/25 18/16 18/23 19/8 19/20 20/4 20/5 20/6 20/10 20/17 21/2 21/4 21/5 21/6 21/11 22/23 23/6 23/8 24/9 24/21 26/10 26/13 33/9 33/14 33/15 34/5 34/8 40/3 105/7 105/24 106/9 130/23 145/8 145/13 156/12 156/12 156/15
**combination [1]** 146/16
**combine [1]** 146/12
**combined [1]** 114/18
**combines [1]** 146/20
**come [19]** 5/24 6/4 17/12 28/19 29/4 41/11 50/7 51/25 61/16 83/21 84/23 86/15 103/6 108/18 108/20 126/20 132/17 135/17 181/10
**comes [5]** 72/19 116/20 151/17 159/23 167/20
**coming [7]** 16/4 24/17 32/7 40/24 43/11 59/21 110/10
**command [2]** 147/18 149/11
**commemoration [2]**

27/1 51/23
**comment [4]** 9/22 44/5 110/19 139/16
**comments [2]** 32/19 37/13
**commission [16]** 90/1 101/17 101/17 109/9 135/8 136/20 137/1 137/3 137/4 137/5 137/5 137/8 137/11 141/23 163/24 178/12
**commit [4]** 51/9 51/10 51/11 51/13
**commitment [1]** 136/17
**committee [3]** 37/20 86/25 160/4
**common [1]** 123/3
**communicating [1]** 80/8
**communications [1]** 31/20
**companion [2]** 8/3 119/17
**company [2]** 17/7 21/24
**comparable [1]** 146/3
**compare [4]** 90/2 95/17 126/9 145/24
**complaint [9]** 107/25 107/25 108/5 108/6 108/8 108/9 164/4 175/23 176/5
**complete [12]** 28/20 31/21 32/15 36/13 65/19 66/21 72/15 72/16 74/15 75/4 104/9 112/12
**completed [3]** 89/23 139/9 145/8
**completely [4]** 15/8 28/9 77/12 146/1
**completing [3]** 100/4 119/18 144/5
**complex [2]** 67/8 104/10
**compliance [4]** 103/20 104/1 124/6 125/23
**complied [2]** 103/23 126/23
**comply [3]** 120/14 127/1 149/13
**complying [1]** 120/15
**component [1]** 121/25

**components [1]** 157/24
**comprehensive [45]** 28/20 30/24 34/14 34/19 35/14 35/16 35/17 35/24 36/1 36/5 36/8 36/9 36/16 36/19 36/21 36/23 38/1 38/7 38/12 38/15 38/20 38/25 39/12 40/14 44/22 44/24 48/11 51/5 67/7 67/10 67/20 68/22 70/10 88/13 88/15 88/18 88/20 88/23 89/3 89/8 89/12 89/15 98/21 98/24 159/19
**comprehensively [1]** 35/24
**comprised [1]** 63/2
**computer [1]** 2/25
**computer-aided [1]** 2/25
**concede [1]** 167/11
**conceded [2]** 151/23 175/4
**conceived [1]** 13/11
**concept [1]** 136/24
**concepts [2]** 107/21 133/20
**conceptual [1]** 102/11
**concern [7]** 59/10 60/1 60/18 63/18 74/14 75/1 172/8
**concerning [1]** 84/6
**concerns [11]** 65/3 72/21 75/9 79/16 99/1 99/17 99/22 99/23 133/7 133/13 180/8
**concert [6]** 14/2 14/10 62/23 64/2 76/15 99/3
**conclude [3]** 50/24 102/17 102/18
**concluded [1]** 181/21
**conclusion [4]** 12/3 27/10 48/17 112/13
**concrete [14]** 45/11 56/23 58/25 58/25 59/3 59/7 59/8 61/21 65/15 65/16 76/11 76/18 133/9 173/18
**condition [3]** 64/3 79/25 161/17
**conducive [1]** 76/20
**conduct [5]** 114/4

**C**

**conduct... [4]** 140/2 140/7 140/14 143/20
**conducted [2]** 130/8 138/13
**confirm [2]** 31/9 97/8
**confirming [1]** 90/16
**Congress [62]** 35/21 40/8 40/12 47/25 48/9 48/13 48/22 49/1 49/6 49/18 49/25 50/3 50/4 50/7 50/11 50/17 50/18 67/21 77/15 96/15 96/21 97/7 97/10 97/11 97/15 110/16 111/7 115/14 115/18 117/5 117/10 118/15 120/19 120/22 120/23 123/13 124/25 125/10 138/25 142/13 142/18 149/10 154/21 155/1 159/3 159/4 159/11 159/13 159/21 162/4 162/10 168/10 169/1 169/6 169/13 171/3 171/3 174/16 174/17 174/18 174/23 177/24
**congressional [12]** 26/17 41/19 50/6 97/4 97/25 103/21 107/6 120/8 123/7 124/1 147/22 162/3
**Congresswoman [1]** 87/9
**conjunctive [1]** 129/19
**connected [2]** 58/13 58/20
**connecting [1]** 57/6
**connection [1]** 96/22
**connects [1]** 174/4
**conservation [1]** 70/10
**consider [1]** 95/25
**considering [1]** 100/11
**consistent [10]** 28/6 32/22 38/8 118/12 157/13 157/22 159/2 160/4 160/5 160/14
**Consolidated [1]** 53/2
**constantly [2]** 91/1 99/10
**constitute [1]** 127/11

**Constitution [1]** 2/23
**constitutional [2]** 110/25 111/3
**constitutional-approval [2]** 110/25 111/3
**construct [1]** 126/5
**constructed [1]** 64/17
**construction [45]** 22/21 31/9 31/21 43/16 52/24 53/20 64/24 69/11 69/18 74/12 74/21 83/7 85/5 86/4 90/3 90/12 90/13 91/16 95/1 96/6 96/23 99/22 101/7 102/11 107/19 107/20 120/11 121/16 122/10 122/19 131/23 136/15 136/23 136/24 137/11 139/20 139/23 144/4 166/1 166/6 166/11 174/19 175/9 175/12 179/22
**constructive [1]** 102/7
**consult [3]** 136/19 137/1 163/2
**consultants [1]** 39/14
**consultation [12]** 102/12 102/12 102/14 110/23 135/1 136/7 163/11 163/13 163/15 163/18 164/12 178/9
**consultation-only [1]** 178/9
**consultations [1]** 102/17
**consulted [4]** 38/3 101/16 123/15 123/16
**consulting [1]** 163/2
**CONT'D [1]** 2/1
**contemplate [4]** 89/4 96/24 98/14 159/11
**contemplated [7]** 88/21 96/23 97/12 97/21 156/8 159/7 169/1
**contemplates [1]** 164/22
**contemplating [2]** 14/1 28/8
**contending [1]** 164/16
**content [2]** 69/21 70/17
**contentions [1]** 143/19

**contest [3]** 45/22 45/24 153/15
**contesting [3]** 79/3 103/17 105/20
**context [2]** 117/21 169/15
**continue [10]** 60/18 69/13 69/15 72/7 118/13 175/9 175/13 179/12 179/14 180/10
**continuous [1]** 100/2
**contract [11]** 21/14 21/21 22/10 23/2 23/7 23/10 24/5 25/2 25/9 25/12 25/19
**contracting [5]** 23/1 25/5 25/14 69/2 99/11
**contractor [4]** 21/21 22/12 53/1 53/6
**contractors [2]** 22/22 25/6
**contracts [1]** 25/21
**contradicted [1]** 16/17
**contradiction [1]** 16/18
**contradictory [1]** 111/12
**contravene [1]** 145/10
**Contributed [1]** 93/17
**contributions [2]** 39/18 40/25
**control [11]** 35/9 47/11 64/8 85/24 85/25 86/9 86/10 109/20 109/22 152/18 153/6
**controlled [1]** 59/7
**controversy [1]** 178/22
**conversation [6]** 12/17 13/13 13/22 14/25 28/16 51/14
**conversations [17]** 9/9 10/14 10/17 10/21 10/25 11/2 11/7 11/13 11/14 11/22 12/7 12/21 13/2 18/21 25/20 29/6 102/6
**COO [2]** 49/23 54/21
**cooling [1]** 63/14
**COOPER [4]** 1/10 34/4 39/25 70/14
**Cooper's [1]** 69/4
**cooperate [1]** 136/4
**coordinate [1]** 85/25

**copy [2]** 97/4 118/19
**Corps [6]** 130/5 130/8 131/15 150/12 150/22 151/14
**correct [70]** 7/12 8/18 17/10 18/17 18/24 24/8 29/1 29/8 29/18 30/1 30/7 31/14 37/21 40/1 40/5 40/9 44/1 46/10 49/6 49/18 50/20 53/23 58/8 58/15 61/19 64/23 69/25 71/20 73/10 74/2 74/18 81/22 88/10 88/14 88/22 90/4 90/24 93/24 94/1 95/2 104/24 106/24 108/1 108/7 109/5 109/17 111/19 112/1 112/15 115/21 116/14 117/1 121/16 122/8 124/15 128/7 129/16 137/15 137/18 138/6 139/5 140/5 140/15 147/7 165/13 173/19 177/2 177/11 178/8 182/5
**correctly [2]** 76/13 163/12
**correlate [1]** 136/4
**correspond [2]** 37/19 55/17
**corresponds [1]** 106/22
**cost [22]** 38/22 39/15 67/14 68/21 73/4 73/13 74/5 74/6 89/18 89/19 90/2 90/2 94/1 94/4 94/4 95/15 95/17 95/18 95/18 96/6 98/12 171/23
**cost-benefit [2]** 73/13 98/12
**cost-savings [1]** 95/18
**costly [1]** 91/10
**costs [8]** 39/5 74/10 80/8 84/23 90/23 93/21 94/20 95/14
**could [44]** 12/7 47/7 49/3 52/22 55/12 57/19 60/11 60/12 60/13 62/2 62/5 62/15 68/16 68/18 69/5 73/19 74/4 75/4 76/8 76/25 77/1 79/10 83/16 91/16 91/16 92/13 92/16 98/5 99/18

**C**

**could... [15]** 99/20 99/21 109/12 113/18 113/18 119/22 148/10 151/1 161/3 163/4 164/23 166/4 168/15 168/16 176/13
**could -- yes [1]** 91/16
**couldn't [2]** 65/24 95/16
**council [1]** 131/12
**council's [1]** 131/17
**counsel [19]** 4/7 4/11 4/16 5/15 6/5 10/5 45/18 47/21 52/12 73/16 82/21 87/8 96/11 102/20 151/21 160/16 164/16 166/13 172/25
**counsel's [1]** 155/17
**Count [1]** 175/22
**Count 11 [1]** 175/22
**country [1]** 141/18
**counts [1]** 168/6
**couple [9]** 13/18 26/10 43/11 50/24 56/10 68/9 84/1 101/20 106/25
**course [5]** 14/5 83/25 98/9 119/8 147/13
**court [38]** 1/1 2/22 3/7 5/1 7/19 8/6 13/12 21/24 23/20 41/25 45/18 47/13 83/13 83/15 87/18 105/13 110/10 112/6 113/18 113/18 113/20 113/22 114/10 117/9 118/17 119/1 124/14 143/13 144/18 145/1 145/5 146/14 153/18 156/5 158/9 161/2 179/19 182/4
**Court's [2]** 77/7 148/1
**courtroom [2]** 70/23 117/8
**Courts [1]** 2/22
**cover [3]** 161/7 166/5 167/15
**covered [5]** 26/14 120/18 167/22 170/13 170/14
**covering [1]** 158/1
**cracked [1]** 62/25
**Craig [3]** 1/13 4/11

103/2
**crazy [1]** 168/17
**CRC [1]** 2/21
**created [1]** 117/10
**creates [1]** 174/15
**creating [2]** 100/4 134/3
**creation [1]** 89/12
**credentials [1]** 52/23
**Creek [6]** 61/6 85/18 85/25 127/12 127/13 127/19
**criteria [1]** 25/1
**critical [1]** 111/12
**criticism [1]** 102/7
**cross [3]** 66/18 87/11 87/17
**crossed [1]** 87/14
**crown [1]** 32/9
**cultural [14]** 2/2 2/5 4/17 77/11 119/6 119/12 123/13 134/5 134/11 141/10 141/13 141/14 141/19 161/8
**culturalheritagepartne rs.com [2]** 2/4 2/7
**culture [2]** 32/10 47/24
**current [11]** 30/16 31/11 36/4 46/18 54/21 64/21 68/17 78/3 114/21 118/24 156/25
**currently [2]** 89/12 128/23
**cut [2]** 14/8 69/24
**cutting [1]** 105/8
**cyclically [1]** 39/10
**Cyprus [9]** 17/8 17/9 17/18 21/25 22/7 22/9 22/12 23/5 23/6

**D**

**D.C [8]** 4/12 53/6 53/8 128/5 128/8 135/6 164/13 168/23
**D.C. [1]** 168/5
**D.C. Circuit [1]** 168/5
**damage [2]** 20/5 56/9
**damaging [1]** 59/22
**dangerous [1]** 57/8
**date [15]** 24/4 24/4 24/6 24/14 32/21 36/9 37/4 37/6 68/11 80/16 81/19 81/22 107/17 158/18 182/12

**dated [3]** 23/7 23/10 32/7
**David [1]** 1/19
**day [21]** 5/5 11/18 11/19 11/23 11/25 12/1 12/4 12/6 12/6 12/12 12/20 17/4 54/22 54/22 58/19 73/20 91/1 101/9 134/21 156/4 174/10
**days [6]** 13/19 25/1 25/19 68/9 109/16 144/7
**DC [9]** 1/2 1/4 1/14 1/22 2/10 2/15 2/19 2/23 4/4
**dcd.uscourts.gov [1]** 2/24
**deadline [3]** 144/9 174/13 174/16
**deal [3]** 19/10 170/22 170/24
**dealing [1]** 169/17
**dealt [1]** 62/19
**deats [3]** 1/20 1/23 4/24
**debatable [1]** 166/23
**decades [6]** 20/19 55/22 100/7 126/25 129/6 151/16
**decay [2]** 101/8 111/13
**decaying [1]** 28/2
**December [2]** 15/14 16/3
**decide [9]** 5/8 105/13 135/13 143/3 143/4 143/6 154/22 155/20 180/23
**decided [3]** 33/20 81/18 177/24
**deciding [5]** 14/5 38/3 90/12 90/17 95/24
**decision [18]** 47/10 47/12 72/11 72/18 79/4 80/25 80/25 81/13 86/23 87/1 88/4 94/8 95/6 95/13 98/19 109/23 135/16 163/10
**decision-making [2]** 47/12 109/23
**decisions [4]** 30/24 32/20 100/22 124/5
**deck [4]** 59/1 61/16 61/20 65/20
**declaration [15]** 10/2

10/6 10/7 13/14 31/8 31/13 34/9 42/6 43/15 101/15 106/19 109/15 111/10 135/9 167/5
**declarations [6]** 8/3 13/5 13/8 13/11 13/15 144/1
**declare [1]** 104/6
**deem [1]** 33/11
**deemed [2]** 126/22 128/5
**deems [1]** 125/22
**deep [1]** 101/22
**Deeply [1]** 77/18
**defendant [6]** 45/18 137/14 140/21 147/15 152/5 153/12
**defendants [15]** 1/7 2/8 5/11 111/8 130/14 130/22 131/10 139/16 144/4 144/8 145/24 146/17 150/4 150/10 153/11
**defendants' [2]** 103/24 143/16
**defer [2]** 100/15 100/15
**deferred [1]** 101/1
**defining [1]** 168/4
**definite [1]** 91/25
**definitely [5]** 74/14 78/2 93/15 100/15 141/18
**definition [4]** 115/5 177/12 177/14 177/15
**definitions [1]** 119/2
**degradation [5]** 20/4 58/14 58/21 61/24 65/16
**degrade [1]** 60/19
**degrading [1]** 45/12
**degree [2]** 9/9 52/24
**delaminating [1]** 61/7
**delay [1]** 75/19
**delaying [1]** 99/22
**deliberative [1]** 110/8
**delineates [2]** 84/19 104/17
**deliverable [2]** 68/7 83/18
**deliverables [1]** 68/3
**delivery [1]** 61/21
**demanding [1]** 153/19
**demolish [6]** 46/8

**D**

demolish... [5] 46/11 47/8 108/20 108/21 180/11
demolished [4] 45/20 78/14 111/9 174/10
demolishing [2] 114/2 156/7
demolition [10] 112/12 113/14 113/23 137/19 137/25 139/23 147/25 148/4 156/15 180/9
denied [1] 144/25
denominator [1] 176/20
deny [2] 113/16 131/11
denying [1] 18/10
Department [1] 53/7
department's [1] 72/8
depending [1] 129/12
depends [4] 116/1 170/11 170/17 173/3
depth [1] 99/12
describe [2] 10/19 62/15
described [7] 20/12 37/3 41/11 41/12 101/15 103/25 158/10
describing [2] 28/24 148/2
description [1] 23/16
design [12] 20/11 20/13 20/14 26/3 26/5 27/2 27/19 29/25 30/25 143/24 162/25 163/8
designated [9] 27/8 125/20 126/6 149/16 152/23 153/1 160/23 168/16 169/10
designates [1] 126/18
designation [1] 161/16
desire [2] 103/24 117/8
desk [1] 35/19
Despite [1] 151/11
destroyed [1] 45/20
destruction [1] 143/21
destructive [1] 57/9
detail [3] 83/15 106/21 145/22

detailed [4] 25/15 67/16 67/17 67/18
details [5] 15/10 15/14 35/12 81/17 81/20
determination [3] 27/14 27/17 145/12
determinations [1] 145/19
determine [3] 48/13 83/13 136/6
determined [1] 170/25
develop [1] 48/22
developed [2] 44/13 172/16
development [1] 54/16
developments [2] 136/3 136/16
DHS [1] 152/16
dictate [1] 35/7
did [63] 10/13 13/2 13/7 16/2 17/7 18/19 20/23 21/18 21/23 22/1 22/6 22/9 22/15 22/16 23/4 23/5 25/9 25/11 25/16 25/17 25/22 40/8 40/11 45/20 49/5 50/22 58/11 80/11 81/1 81/1 81/25 86/22 86/25 87/16 87/17 89/4 89/10 90/1 90/11 90/23 91/21 94/7 94/19 96/24 96/25 98/14 98/15 98/16 98/23 98/23 99/1 99/8 99/21 131/5 138/1 142/19 145/14 153/2 159/11 162/10 165/8 168/11 172/8
didn't [20] 5/3 21/22 58/12 80/14 81/3 89/22 93/25 93/25 94/3 94/11 94/11 94/12 94/23 95/6 100/23 113/10 131/4 161/25 162/1 178/2
didn't -- it's [1] 94/11
didn't -- you [1] 93/25
difference [3] 50/16 134/11 176/18
different [28] 9/3 11/23 15/3 27/22 42/12 43/23 44/16 46/16 50/21 62/22 63/22 64/4 64/5 64/24 65/2 85/13 91/17 99/8 106/1 107/1 116/6 124/1 154/12

155/13 164/12 170/14 176/21 180/20
differently [2] 168/2 168/22
difficult [2] 74/22 74/24
dinner [1] 175/11
direct [5] 7/24 9/22 81/1 88/3 119/1
directed [2] 15/2 124/12
directions [2] 9/7 9/14
directive [1] 147/17
directly [9] 61/10 63/19 66/16 69/10 77/2 77/3 81/3 94/7 145/9
director [7] 5/15 10/4 54/4 54/21 73/9 77/24 170/24
dirty [1] 63/24
disagree [3] 49/2 89/3 91/19
discharged [2] 163/21 163/22
discretion [1] 135/12
discretionary [1] 131/11
discuss [3] 13/8 18/19 111/1
discussed [20] 12/19 12/23 13/14 27/20 51/21 83/19 105/16 106/20 118/9 118/10 122/13 122/22 123/1 123/24 125/7 126/22 141/25 142/20 147/12 173/14
discussing [7] 11/3 38/14 66/8 73/18 74/14 107/8 135/5
discussion [5] 67/6 124/19 134/14 148/17 170/15
discussions [1] 139/14
displays [2] 70/15 70/19
dispute [3] 105/1 111/25 159/6
disputes [1] 138/10
disputing [1] 114/23
disregarded [1] 147/16
distinct [1] 158/10

distinction [1] 84/15
DISTRICT [12] 1/1 1/1 1/10 2/22 53/2 53/14 110/6 111/6 125/23 128/3 139/12 149/14
diverted [1] 59/19
division [1] 5/12
do [195]
dock [1] 61/13
docks [1] 61/12
document [8] 35/18 35/19 35/25 36/17 67/11 67/18 83/12 83/17
documents [6] 38/2 68/23 109/7 109/8 119/17 133/24
does [34] 51/5 65/9 67/13 67/14 70/2 77/9 82/2 82/2 83/2 84/11 84/15 88/18 107/24 113/8 126/9 128/13 132/2 134/22 135/18 138/9 146/23 149/14 150/6 152/13 162/15 163/21 165/14 167/15 167/16 176/16 177/6 177/7 179/3 181/5
doesn't [36] 28/21 48/12 82/4 82/8 104/1 105/13 106/12 107/10 125/10 125/17 127/1 131/7 133/16 135/16 137/4 144/12 152/21 160/24 162/15 163/6 163/15 164/23 166/3 166/25 169/23 171/21 171/24 171/25 174/16 174/22 175/3 175/5 176/9 177/25 178/20 179/2
doing [40] 10/15 20/21 20/22 21/3 22/19 22/23 23/3 42/23 50/5 50/8 50/10 50/12 64/19 68/19 72/25 74/7 82/4 88/24 91/10 108/12 108/22 108/23 113/5 114/8 114/9 114/10 114/13 125/10 132/12 132/18 139/21 142/8 143/2 163/3 166/19 169/16 169/18 171/1 179/16 180/4

**D**

**DOJ [2]**  2/9 2/14
**DOJ-Civ [2]**  2/9 2/14
**dollar [3]**  38/22 39/15 41/22
**dollars [6]**  38/23 39/1 42/5 84/19 85/3 107/13
**don't [109]**  9/23 10/21 11/21 14/4 14/14 21/1 23/10 24/9 24/25 25/8 29/2 29/16 29/20 33/11 40/16 40/18 43/4 43/7 44/4 45/22 45/24 49/24 50/3 50/13 51/18 52/2 56/12 60/16 72/21 77/6 79/14 82/7 88/23 89/3 90/14 90/21 91/3 92/23 95/22 96/3 102/18 102/22 105/17 105/17 107/22 108/10 109/12 110/16 110/21 113/8 122/20 123/4 127/18 128/18 132/9 132/12 132/22 132/25 133/18 133/19 135/15 136/11 137/17 142/12 142/22 142/24 143/4 145/6 148/19 149/10 150/7 150/18 151/3 151/14 151/22 153/4 153/15 153/18 154/20 154/22 155/8 155/21 158/17 159/2 159/6 159/13 159/21 159/24 160/22 160/25 163/1 164/14 164/18 166/4 166/15 166/17 166/20 166/22 167/9 168/18 169/3 169/22 170/10 171/7 174/8 178/7 181/8 181/11 181/16
**Donald [1]**  17/3
**donated [1]**  133/24
**donation [1]**  134/2
**donations [2]**  39/18 41/16
**done [41]**  5/8 8/10 18/11 18/20 20/5 20/9 21/11 21/15 25/12 40/15 40/25 43/11 47/10 52/10 55/14 73/13 75/21 79/10 79/11 81/6 83/15 89/5

89/15 106/17 107/10 130/16 133/10 144/22 151/8 153/21 154/8 159/1 159/20 159/25 164/8 171/2 171/9 171/22 171/23 179/1 180/11
**Dongan [2]**  126/13 126/17
**door [2]**  127/9 127/10
**doors [4]**  42/17 42/24 105/8 132/13
**doubly [1]**  120/22
**doubt [2]**  141/17 169/3
**doubtful [1]**  122/19
**down [23]**  27/24 28/4 28/5 28/12 43/17 47/1 51/6 51/12 57/16 58/11 59/4 66/11 66/22 99/24 100/6 100/12 113/12 114/5 118/23 119/7 133/9 145/6 157/17
**dozen [1]**  107/1
**dozens [1]**  93/6
**draft [1]**  68/8
**drain [1]**  56/21
**drainage [1]**  56/21
**drains [1]**  58/24
**drastically [1]**  143/20
**drive [1]**  128/20
**driven [1]**  55/19
**dual [1]**  148/19
**due [2]**  63/16 97/2
**dumbfounded [1]**  80/1
**duration [2]**  119/4 123/10
**Durell [1]**  20/15
**during [8]**  11/17 69/9 69/18 72/8 83/7 88/22 88/25 97/22
**dust [1]**  76/22
**duties [2]**  32/6 54/8
**duty [3]**  71/13 131/11 153/21

**E**

**EA [1]**  140/7
**each [7]**  35/9 35/13 107/2 146/17 153/25 164/12 181/9
**ear [1]**  142/5
**earlier [7]**  21/25 55/19 57/21 66/9 103/25 123/24 126/22

**early [1]**  63/9
**earned [1]**  93/17
**easier [1]**  72/23
**easiest [1]**  6/6
**East [7]**  2/6 46/2 46/7 46/19 47/1 113/9 175/11
**East Wing [1]**  46/7
**easy [3]**  21/13 21/13 21/14
**eberke [1]**  2/19
**ECFR [1]**  118/24
**ED [1]**  49/23
**education [2]**  69/13 72/8
**educational [1]**  72/5
**Edward [1]**  20/15
**effect [11]**  93/13 101/7 118/13 118/25 120/16 123/12 128/14 132/1 145/10 152/24 163/10
**effected [1]**  33/4
**effective [1]**  72/15
**effects [2]**  85/21 145/11
**efficiencies [7]**  73/3 73/25 74/6 74/7 74/10 95/1 95/14
**efficiency [2]**  174/12 175/4
**efficient [3]**  72/14 174/25 175/2
**effort [4]**  64/11 70/10 81/3 94/3
**efforts [8]**  31/10 43/16 53/12 67/13 71/8 99/2 100/2 136/4
**EIS [1]**  139/15
**Eisenhower [2]**  99/4 117/24
**either [16]**  28/14 28/23 33/21 40/15 71/6 100/22 105/3 105/11 105/14 105/14 120/4 127/2 127/3 131/18 155/9 162/21
**electrical [18]**  56/3 59/13 59/14 59/21 59/22 59/24 60/2 60/8 60/12 60/13 60/20 60/22 62/16 66/8 66/10 66/24 76/12 76/16
**element [3]**  115/10 123/14 137/19

**elements [5]**  111/14 118/2 118/3 123/20 141/19
**eligibility [4]**  27/14 27/17 27/17 145/12
**eligible [5]**  27/8 39/10 126/22 131/3 141/15
**eligible-listed [1]**  141/15
**eliminate [1]**  124/6
**eliminates [1]**  148/16
**eliminating [1]**  146/20
**Elliot [2]**  2/17 5/13
**Elliott [1]**  2/13
**else [9]**  8/17 54/18 61/1 116/5 132/12 133/11 134/17 179/13 179/19
**Email [13]**  1/15 1/18 1/22 1/23 1/23 2/4 2/7 2/11 2/11 2/15 2/16 2/16 2/19
**emergency [1]**  123/8
**emerges [1]**  5/6
**eminently [1]**  175/18
**emphasize [2]**  146/10 180/8
**empty [1]**  95/22
**empty -- I [1]**  95/22
**Enabling [1]**  126/2
**end [14]**  42/13 56/25 63/8 68/7 68/8 69/7 83/4 83/22 86/8 119/16 134/21 138/21 153/13 163/6
**energy [1]**  53/13
**enforcement [2]**  84/13 135/19
**engage [1]**  163/11
**engaged [2]**  101/16 137/24
**engages [1]**  112/9
**engaging [1]**  138/2
**engineer [1]**  56/13
**engineering [1]**  119/20
**engineers [4]**  21/3 98/23 130/5 150/12
**enjoin [1]**  117/12
**enjoinable [2]**  130/20 174/8
**enjoined [2]**  130/15 141/2
**enough [3]**  9/8 117/4

# E

**enough... [1]** 129/21
**ensure [2]** 48/21 113/18
**ensuring [1]** 158/15
**entail [1]** 108/5
**entailed [1]** 101/18
**entails [1]** 109/16
**enter [3]** 60/2 83/3 113/22
**entered [2]** 153/7 180/9
**enters [1]** 114/14
**entertainment [1]** 104/10
**entire [8]** 32/8 32/15 59/12 66/11 99/13 120/23 146/5 178/11
**entirely [2]** 114/11 120/2
**entirety [1]** 79/11
**entities [12]** 22/16 130/13 132/9 143/5 145/17 150/16 150/19 150/20 151/9 153/10 173/23 174/3
**entitled [1]** 182/6
**entity [22]** 21/15 21/18 21/23 22/1 68/1 84/23 106/13 120/18 120/20 130/12 130/25 131/16 135/16 136/5 136/22 137/10 138/19 141/16 143/7 152/17 178/9 178/10
**entrance [9]** 59/16 61/11 61/15 62/2 66/18 66/22 67/2 83/2 99/24
**entrances [1]** 65/23
**envelope [3]** 111/13 127/7 129/4
**environmental [3]** 139/15 141/11 146/12
**environs [1]** 48/3
**envision [2]** 51/5 83/2
**equally [2]** 104/2 149/22
**equipment [20]** 59/22 60/8 60/11 60/12 60/13 60/20 60/22 60/22 62/16 63/6 63/11 63/16 63/20 64/3 64/4 64/5 64/22 65/6 66/10 71/15

**equipment -- all [1]** 60/22
**equities [5]** 146/23 170/10 170/11 170/15 170/21
**erected [9]** 31/12 78/9 111/5 111/10 111/18 111/21 112/14 112/21 154/7
**erecting [2]** 147/21 148/11
**error [2]** 97/17 97/21
**especially [2]** 75/9 170/6
**Esquel [1]** 147/14
**essentially [3]** 65/18 106/4 149/18
**established [1]** 174/18
**establishes [1]** 126/8
**estimates [3]** 67/14 68/22 90/2
**estoppel [1]** 178/25
**et [8]** 1/6 4/5 4/6 22/19 81/14 82/23 165/10 177/4
**et al [1]** 4/6
**et cetera [5]** 22/19 81/14 82/23 165/10 177/4
**evade [1]** 108/15
**evaluate [1]** 132/19
**evaluation [1]** 98/22
**even [23]** 16/10 19/7 43/7 67/2 102/11 103/15 108/3 108/20 115/9 123/4 138/18 143/21 144/14 151/10 158/5 165/15 166/15 167/16 170/2 171/15 171/17 172/17 179/2
**evenings [1]** 11/20
**event [1]** 26/1
**events [1]** 46/6
**eventual [1]** 142/4
**ever [8]** 25/2 25/12 29/24 45/25 47/15 75/12 83/23 178/7
**every [20]** 5/5 16/9 25/13 25/14 27/25 28/3 35/23 58/19 91/1 101/9 131/9 135/15 143/7 144/10 166/5 168/22 168/23 168/23 170/13 180/25

**everybody [1]** 4/20
**everyone [10]** 5/2 7/17 14/19 87/24 110/18 110/18 110/19 113/5 135/3 143/8
**everything [10]** 14/20 34/15 54/18 54/18 68/3 75/21 83/19 133/3 133/6 166/8
**everything -- everything [1]** 54/18
**everything's [1]** 144/21
**evidence [3]** 155/8 161/25 179/5
**evident [2]** 80/9 160/21
**EVIDENTIARY [1]** 1/9
**ex [1]** 109/4
**ex-post [1]** 109/4
**exact [2]** 29/20 42/8
**exactly [12]** 11/21 23/10 24/9 57/10 92/23 99/3 108/4 109/16 110/12 134/10 150/20 161/24
**examination [13]** 3/5 7/1 26/11 26/23 37/16 39/22 43/10 52/17 78/23 84/3 87/21 98/10 101/12
**examining [1]** 116/22
**example [13]** 11/19 21/6 34/4 45/7 50/1 64/7 64/9 69/17 69/20 121/3 133/23 165/5 172/3
**excavate [2]** 44/7 66/10
**excavating [1]** 99/25
**exceeds [1]** 156/18
**except [2]** 121/15 123/8
**exception [2]** 42/1 47/9
**exchange [3]** 133/16 133/19 134/5
**exchanging [1]** 134/10
**exclude [1]** 142/16
**excluded [2]** 142/17 142/17
**exclusively [1]** 21/1
**excuse [2]** 14/14 104/1
**execute [1]** 55/3

**executing [1]** 55/5
**executive [7]** 5/14 10/4 54/4 54/21 73/8 77/24 170/24
**exercising [1]** 126/19
**exhibit [28]** 6/4 9/17 9/18 15/5 15/6 15/6 19/3 19/15 23/11 23/19 24/11 30/12 31/6 31/16 32/3 32/25 34/23 35/2 35/4 36/4 41/4 43/15 43/21 46/13 52/4 106/19 127/6 129/1
**Exhibit 1 [2]** 9/18 19/15
**Exhibit 10 [3]** 31/6 32/25 43/15
**Exhibit 13 [1]** 43/21
**Exhibit 14 [1]** 46/13
**Exhibit 1D [1]** 41/4
**Exhibit 4 [1]** 32/3
**Exhibit 6 [1]** 23/19
**Exhibit 9 [1]** 30/12
**Exhibit E [5]** 35/4 36/4 106/19 127/6 129/1
**exhibits [3]** 5/1 23/21 133/24
**exist [3]** 118/18 171/21 174/23
**existed [1]** 36/22
**existing [5]** 46/19 46/20 88/13 116/4 148/14
**exists [4]** 42/13 48/6 83/12 128/23
**expand [1]** 85/12
**expands [1]** 59/8
**expansion [3]** 61/4 61/9 71/1
**expansive [1]** 123/22
**expect [2]** 44/24 102/16
**expedite [1]** 43/9
**experience [7]** 25/8 52/22 53/17 53/19 76/20 107/20 117/23
**experiences [2]** 145/22 146/4
**expertise [1]** 160/5
**expires [2]** 74/16 74/18
**explain [3]** 11/25 17/17 98/14
**explained [2]** 79/2

**E**

**explained... [1]** 79/6
**explanation [3]** 119/15 119/23 120/14
**explore [2]** 10/1 15/13
**exploring [2]** 71/7 91/24
**explosion [1]** 60/14
**exponentially [1]** 60/19
**expose [3]** 44/7 44/23 45/12
**exposed [9]** 43/25 44/5 44/8 44/11 44/14 44/18 44/20 104/12 154/11
**exposing [1]** 44/20
**express [4]** 48/8 111/6 118/15 147/21
**expressed [1]** 126/15
**expression [2]** 47/15 83/23
**expressly [2]** 125/22 142/13
**extensive [1]** 107/20
**extent [12]** 75/24 78/3 85/5 85/20 107/4 114/7 116/7 117/16 121/19 122/18 148/3 162/2
**exterior [38]** 17/13 17/14 18/1 18/15 18/16 26/2 28/25 29/3 33/2 33/17 33/21 41/24 42/7 42/8 42/14 42/24 42/25 43/3 44/11 44/14 49/10 50/1 78/6 105/5 105/10 111/13 111/14 116/19 127/9 129/8 132/6 132/13 133/6 133/11 145/10 145/11 155/11 166/19
**externally [1]** 179/20
**extremely [1]** 58/25

**F**

**facade [4]** 111/14 130/23 143/24 145/9
**face [1]** 119/20
**facilities [13]** 7/9 53/11 53/17 54/2 79/22 97/9 125/21 126/16 127/25 130/11 138/22 164/20 178/19
**facility [10]** 24/25

54/11 71/16 73/2 119/19 128/24 158/15 175/14 175/14 175/18
**facing [1]** 55/25
**fact [9]** 5/23 13/10 24/7 37/8 79/22 106/10 106/12 108/10 141/9
**factor [2]** 25/25 95/23
**factors [1]** 103/12
**facts [2]** 121/19 141/8
**factual [4]** 105/1 111/25 121/11 147/12
**factually [1]** 161/24
**fail [1]** 62/2
**failed [15]** 56/22 56/22 57/3 58/8 58/9 58/13 58/23 58/24 98/23 130/1 130/16 130/17 137/16 140/2 150/17
**failing [8]** 45/12 55/19 60/11 61/10 61/17 62/25 140/7 151/12
**fails [1]** 125/19
**failure [7]** 60/8 60/12 63/15 65/19 66/20 86/7 164/1
**failures [3]** 56/3 99/6 111/12
**fair [11]** 7/23 9/12 12/3 53/16 54/13 55/2 67/15 100/10 100/13 125/3 129/21
**fairly [3]** 113/3 149/7 181/11
**fait [1]** 139/24
**faith [1]** 131/7
**fall [9]** 28/3 58/11 58/12 64/18 64/18 64/22 106/2 115/24 157/7
**fallen [4]** 27/3 28/12 58/7 70/16
**falling [6]** 27/23 28/1 28/5 28/5 61/21 166/12
**falls [2]** 93/20 166/2
**familiar [4]** 54/14 54/15 59/5 67/23
**far [6]** 96/3 97/1 122/10 145/25 150/14 173/13
**far-greater [1]** 97/1
**FARAH [1]** 2/18
**fashion [1]** 17/20
**fast [3]** 20/23 103/24

143/8
**fault [3]** 50/14 140/17 140/17
**favor [1]** 148/20
**features [1]** 165/14
**February [14]** 10/3 10/11 30/14 79/8 79/17 79/18 79/19 79/20 80/11 80/16 80/21 81/6 159/7 159/16
**February 1st [9]** 79/8 79/17 79/18 79/19 79/20 80/11 80/16 80/21 81/6
**February/March [1]** 159/7
**federal [23]** 5/14 39/4 42/3 106/13 108/14 108/15 111/5 119/13 123/22 125/17 127/4 131/9 136/2 139/9 141/9 141/13 141/23 147/21 154/25 164/13 167/25 168/22 181/1
**feedback [3]** 102/3 102/5 163/5
**feel [1]** 101/3
**fees [1]** 84/24
**feet [6]** 58/5 73/1 121/24 121/25 134/8 134/18
**fence [5]** 69/11 121/16 122/10 122/19 166/11
**fenced [1]** 122/24
**fencing [1]** 162/5
**few [8]** 13/19 13/21 51/4 52/9 77/5 78/19 79/6 131/5
**figure [4]** 10/22 12/5 72/3 99/10
**figures [1]** 37/18
**figuring [2]** 48/11 168/10
**file [4]** 35/20 45/22 149/9 149/9
**filed [5]** 12/25 13/3 45/17 108/5 164/5
**filter [1]** 151/17
**filtered [1]** 151/18
**filtration [1]** 63/21
**fin [1]** 33/15
**final [7]** 39/24 77/5 137/12 150/15 173/10 173/10 178/14

**finalized [1]** 68/11
**financially [1]** 35/8
**find [4]** 23/3 143/7 144/21 146/13
**finding [2]** 39/25 105/1
**fine [6]** 87/25 88/2 101/17 117/19 141/23 151/23
**finer [1]** 76/7
**finish [1]** 92/14
**finished [1]** 50/14
**finishes [3]** 30/10 92/20 143/24
**fire [4]** 9/23 53/9 60/13 113/4
**fired [3]** 9/10 109/23 112/8
**fireproofing [1]** 61/7
**firing [1]** 114/9
**firm [1]** 4/11
**first [27]** 5/17 5/22 9/17 10/13 10/19 21/9 24/9 55/18 55/23 66/19 68/3 68/7 72/19 86/20 98/6 111/3 120/12 120/15 121/8 126/3 135/14 143/21 156/6 161/4 161/6 161/22 173/2
**fiscal [2]** 74/19 96/22
**fit [4]** 11/25 157/3 158/23 160/24
**fits [2]** 47/14 123/9
**five [11]** 11/7 11/11 12/5 12/6 12/19 36/22 37/11 58/4 68/19 107/17 134/14
**five years [3]** 36/22 37/11 107/17
**five-day [1]** 12/6
**fix [6]** 65/24 66/1 66/2 66/3 66/3 172/6
**fixed [2]** 14/10 172/6
**fixes [1]** 99/14
**fixing [3]** 20/8 66/9 76/16
**flesh [1]** 109/14
**flexible [1]** 72/3
**flippant [1]** 128/19
**flipping [1]** 158/25
**floatable [1]** 121/1
**floating [1]** 62/7
**FLOCA [71]** 3/5 5/15 6/9 6/11 6/21 6/22 7/1

**F**

**FLOCA... [64]** 15/5
15/6 16/11 19/3 19/15
23/19 24/11 26/11
26/23 30/12 31/16 32/2
32/25 34/23 37/16
39/22 46/13 52/17
52/19 78/23 78/25
81/11 84/2 84/3 86/22
87/21 87/23 87/24
87/24 87/24 98/10
101/12 101/14 103/25
104/21 109/25 112/5
112/7 113/19 113/24
114/9 116/21 119/25
121/12 122/13 123/1
123/25 124/16 127/3
127/16 129/24 133/8
133/14 134/20 142/21
145/14 148/21 158/1
158/20 159/15 162/23
163/5 166/14 174/24
**Floca's [8]** 105/4
105/15 106/19 109/9
109/15 111/10 155/18
165/19
**Floca-modified [1]**
127/3
**floor [3]** 52/4 69/16
69/19
**Florida [2]** 15/15 17/17
**flowers [1]** 141/12
**fly [3]** 98/16 121/9
161/22
**focus [2]** 36/14 36/15
**focused [5]** 37/14
92/24 94/8 156/20
174/24
**FOLEY [3]** 1/13 1/17
4/12
**foleyhoag.com [2]**
1/15 1/18
**folks [3]** 54/18 102/21
181/5
**follow [8]** 103/16
118/19 178/1 178/2
178/6 180/3 180/3
180/5
**following [1]** 179/22
**food [1]** 54/9
**fool [2]** 47/15 47/16
**foot [1]** 70/25
**footprint [1]** 85/11

**force [2]** 42/17 135/17
**forced [1]** 144/13
**foregoing [3]** 172/9
172/11 182/5
**Forensic [1]** 53/2
**foreshadowed [1]**
154/6
**forests [1]** 161/10
**forfeited [4]** 114/4
160/20 175/22 176/4
**form [3]** 92/22 127/3
127/3
**formal [3]** 135/4 135/7
139/12
**forms [1]** 127/3
**Forsyth [1]** 2/5
**forth [2]** 96/8 121/4
**forward [7]** 25/8 35/7
41/21 69/5 110/20
180/21 180/22
**foul [1]** 134/21
**found [2]** 146/14
147/23
**foundation [1]** 99/13
**foundations [1]** 43/18
**founded [2]** 98/20
98/21
**fountain [1]** 162/21
**fountains [14]** 85/6
85/7 85/8 85/9 85/11
85/11 85/12 85/14
141/25 142/21 143/1
162/17 162/18 162/24
**four [9]** 38/2 80/17
85/2 85/2 85/9 125/13
147/19 159/15 174/13
**four months [2]** 80/17
159/15
**four-year [1]** 174/13
**foyer [7]** 29/20 51/17
65/16 70/7 70/12
157/19 175/15
**frame [4]** 14/5 29/21
159/25 171/2
**framework [2]** 170/6
170/7
**frankly [2]** 89/11 175/8
**free [1]** 16/18
**Freeny [2]** 3/9 87/8
**freezes [1]** 59/8
**friend [2]** 67/19 78/12
**friend's [1]** 67/6
**front [9]** 23/18 37/18
59/15 76/18 94/19

94/23 122/21 151/1
162/8
**fulfill [1]** 158/11
**fulfilling [1]** 158/7
**full [11]** 23/7 39/15
61/9 75/21 90/3 100/11
109/5 135/7 159/8
159/12 181/11
**full-closure [1]** 100/11
**fully [12]** 32/7 43/25
44/18 44/20 74/5 75/8
75/23 76/9 90/18
104/11 161/2 162/7
**fully-closed [1]** 76/9
**function [2]** 50/19
117/24
**functional [1]** 126/13
**functionality [12]**
114/21 115/6 115/13
117/17 117/20 117/25
148/14 148/15 148/16
149/6 156/25 157/4
**functions [3]** 69/12
69/14 72/25
**fund [4]** 39/17 40/16
93/19 93/20
**fundamental [2]** 18/3
103/15
**fundamentally [2]**
104/3 155/15
**funded [14]** 26/17
26/19 38/14 38/17
38/17 38/18 38/19
38/21 38/22 40/19
41/15 84/25 106/1
106/10
**funding [16]** 36/13
39/3 39/4 41/11 41/19
42/4 74/15 74/17 75/14
75/25 95/20 96/16
107/9 107/14 174/13
174/16
**funds [22]** 34/5 40/4
40/6 40/13 40/17 40/18
74/19 84/16 84/16
84/17 84/20 84/21
93/19 93/21 115/19
123/25 124/12 124/17
124/20 124/23 127/12
174/19
**funnel [2]** 76/12
144/13
**funneled [1]** 117/8
**further [9]** 78/16 87/3

98/3 98/14 99/21 101/7
101/10 157/17 172/3
**future [11]** 38/16 44/13
77/21 83/5 83/21 108/2
108/4 155/20 158/16
169/21 179/2

**G**

**gallery [3]** 126/10
126/11 169/10
**gander [1]** 73/17
**garage [5]** 49/16 65/22
67/2 99/5 121/1
**gave [2]** 12/16 171/3
**gcraig [1]** 1/15
**general [8]** 5/15 7/23
40/16 53/1 53/6 53/7
145/16 161/13
**generally [1]** 166/2
**generous [1]** 40/24
**gentlemen [1]** 7/14
**get [42]** 6/2 7/20 9/14
10/8 18/14 23/16 43/14
47/18 50/14 55/15
58/24 68/25 75/21
76/15 95/23 96/11 98/8
122/17 131/16 132/2
132/5 132/6 134/14
137/17 143/6 144/20
146/9 148/6 151/7
151/12 159/1 159/17
159/20 159/25 166/25
169/20 169/25 171/2
171/22 171/22 173/25
181/16
**gets [3]** 59/7 137/1
172/17
**getting [10]** 50/18
56/23 70/15 73/18 75/2
80/1 113/15 134/17
141/1 171/9
**gift [1]** 154/13
**girders [1]** 61/6
**give [10]** 6/16 25/6
45/5 67/8 93/3 101/18
132/9 132/20 138/13
181/5
**given [6]** 8/7 46/5
114/4 147/11 166/23
172/24
**giving [3]** 110/12
117/20 140/18
**glad [1]** 69/3
**glass [3]** 6/22 127/9

**G**

**glass... [1]** 127/9
**go [75]** 5/9 5/25 14/18
22/24 30/25 41/21
48/13 55/21 56/6 62/6
64/1 64/18 65/14 65/25
69/6 78/21 80/24 86/19
91/22 103/13 106/14
107/3 107/4 109/4
110/2 110/7 110/7
110/11 110/19 115/13
122/1 122/14 127/24
130/11 131/12 131/13
131/19 132/17 132/21
132/22 133/2 134/6
135/3 135/22 137/11
138/14 139/5 142/6
142/12 142/13 142/20
143/4 143/6 146/8
147/3 149/10 151/7
153/13 156/5 157/17
159/18 164/22 165/4
165/7 167/21 170/10
173/9 173/23 174/20
174/22 179/22 180/17
180/18 180/20 180/25
**goes [13]** 33/24 38/9
38/16 113/17 116/4
137/18 140/20 148/6
150/7 166/11 167/1
173/13 173/19
**going [122]** 9/23 13/2
15/25 16/4 16/10 17/10
25/11 25/18 25/22
28/19 28/25 29/2 32/13
32/14 34/9 34/11 35/7
35/7 35/9 36/10 36/15
36/20 36/23 40/4 41/11
41/13 41/21 41/23 42/9
43/11 44/19 44/19
48/11 48/14 48/22
50/17 51/6 52/6 52/8
57/12 58/20 64/13 68/5
69/20 70/5 71/19 74/15
81/24 82/16 83/3 83/4
83/4 83/5 83/7 83/8
93/3 93/13 94/4 95/15
95/17 103/5 106/8
107/23 108/21 108/25
109/2 109/19 110/12
111/9 111/21 112/21
113/11 115/16 115/22
122/3 132/13 133/3

133/10 133/22 134/17
139/20 140/25 143/2
143/17 143/18 145/1
145/2 147/2 149/4
150/8 151/6 151/15
154/22 155/2 155/3
155/6 155/11 155/13
157/8 159/4 160/1
160/18 161/17 162/4
162/5 162/9 165/22
166/7 166/13 169/20
171/1 171/10 171/10
171/12 171/13 171/17
171/20 171/22 171/24
172/11 179/11 179/16
**gold [7]** 18/16 18/23
20/19 30/16 30/22
30/25 33/10
**gone [4]** 156/4 159/22
174/7 178/22
**good [26]** 4/10 4/22
5/10 6/21 7/17 9/23
14/19 18/13 52/13
52/14 52/19 52/20 67/4
71/11 76/20 87/5 87/23
102/6 102/8 103/9
103/10 131/7 133/23
150/1 150/2 150/14
**goodwill [1]** 94/5
**goose [1]** 73/17
**gosh [1]** 80/7
**got [17]** 30/20 71/4
78/19 81/12 82/12
95/25 96/12 100/19
103/6 117/3 132/21
135/22 137/2 149/8
156/4 173/24 180/19
**gotten [3]** 9/13 146/4
154/23
**governing [1]** 161/23
**government [26]** 53/7
53/8 103/15 103/16
104/2 113/12 114/3
115/23 119/18 119/23
120/4 123/5 123/21
125/16 126/9 127/1
133/25 134/1 136/3
146/23 147/10 149/20
154/13 161/7 176/8
180/13
**government's [2]**
134/25 174/14
**governmental [1]**
126/19

**governs [1]** 123/25
**Grace [2]** 2/3 2/6
**graduated [1]** 52/25
**Grand [6]** 29/20 51/17
70/7 70/12 157/19
175/15
**grant [2]** 105/12 161/3
**gravity [2]** 47/5 100/23
**great [6]** 15/9 19/9
19/10 101/25 102/1
118/20
**greater [2]** 96/3 97/1
**greg [2]** 2/4 4/16
**Gregory [3]** 1/13 2/2
4/11
**Gregory Craig [1]** 4/11
**Grenell [13]** 8/22 10/4
10/12 10/18 11/1 11/4
11/5 11/8 11/12 12/1
12/5 12/15 16/5
**Grenell's [1]** 10/15
**grief [1]** 27/3
**Grosz [3]** 126/10
126/11 126/11
**ground [5]** 47/1 53/20
58/12 71/2 172/17
**ground-up [1]** 53/20
**grounds [30]** 31/11
37/20 48/8 69/8 69/10
84/7 84/10 86/25 109/9
111/6 112/22 118/7
118/11 118/15 119/19
119/24 120/13 122/7
122/10 122/15 123/7
125/2 125/7 128/18
147/21 149/7 160/12
160/13 175/21 176/2
**guess [5]** 22/14 48/10
106/5 176/24 178/4
**gulf [1]** 50/16
**guts [2]** 85/10 142/23

**H**

**had [46]** 5/17 10/3
10/17 11/13 11/17
12/21 13/12 14/12
14/13 17/21 19/24
20/23 21/2 21/5 25/20
26/5 28/15 33/10 46/21
52/23 53/5 54/5 61/14
62/24 78/12 78/19
79/20 79/21 80/14
80/22 80/23 81/21
97/21 101/20 102/2

102/14 104/13 110/9
117/21 122/12 124/19
129/23 137/10 148/24
164/9 164/9
**half [2]** 7/11 121/23
**hall [23]** 14/2 14/10
29/19 29/19 61/11
61/11 61/13 61/15
61/19 61/25 62/2 62/4
62/23 65/15 65/23
65/23 66/19 66/25
66/25 76/15 99/4
157/18 157/19
**halls [3]** 64/2 64/5
157/18
**hand [5]** 6/8 6/12 6/14
7/15 31/19
**handful [5]** 21/4 42/2
68/24 71/2 71/14
**handle [1]** 79/3
**handlers [1]** 63/13
**handling [3]** 4/18 5/19
5/20
**hanging [1]** 60/7
**happen [12]** 25/22
34/9 57/10 61/23 69/12
113/11 113/20 144/14
146/8 150/24 153/2
155/11
**happened [15]** 11/19
11/22 17/2 27/18 46/24
56/24 79/19 81/21
83/20 131/18 139/22
150/25 152/2 164/4
164/4
**happening [7]** 20/23
36/11 43/13 75/24 95/4
100/23 110/14
**happens [3]** 55/23
58/18 85/1
**happy [1]** 160/9
**hard [1]** 170/18
**harden [2]** 42/19 42/24
**hardened [3]** 42/9
42/12 42/15
**hardening [1]** 42/7
**harder [2]** 69/19
171/22
**hardly [2]** 111/14
145/6
**hardscaping [1]** 129/2
**harm [8]** 114/14
134/21 143/12 143/23
146/14 146/21 163/3

**H**

**harm... [1]** 179/13
**harmed [2]** 114/2 145/21
**harms [1]** 143/18
**has [111]** 8/16 8/19 9/5 9/6 15/7 16/16 27/6 27/11 28/13 31/4 31/19 33/19 39/3 41/15 43/11 46/6 47/3 47/10 51/25 54/17 55/18 56/22 56/24 58/23 58/24 62/18 62/18 68/17 70/9 75/12 75/19 75/20 75/23 83/15 83/20 91/5 97/14 97/23 101/2 101/7 101/18 103/23 104/8 104/21 104/22 106/13 106/14 106/14 109/6 112/7 113/14 113/19 113/24 114/3 116/12 116/21 117/9 119/23 120/23 120/24 123/5 123/21 125/1 125/8 129/6 135/3 137/5 137/16 137/24 138/13 139/8 140/2 140/8 140/9 140/12 140/13 140/24 141/6 143/23 144/13 146/1 147/11 147/15 148/3 148/25 150/16 151/16 151/19 152/8 152/21 152/24 154/6 155/25 156/7 156/8 156/19 157/24 158/1 158/11 159/21 160/25 163/4 164/11 166/9 168/5 168/7 170/9 170/25 171/22 175/15 178/21
**hasn't [4]** 17/20 63/15 150/25 152/1
**hat [1]** 9/3
**have [287]**
**have -- will [1]** 93/22
**haven't [9]** 27/21 28/17 67/2 101/15 131/17 140/3 151/8 154/23 156/12
**having [9]** 15/1 26/1 76/15 95/16 96/16 101/16 104/4 161/5 178/16

**Hayes [2]** 1/20 4/24
**Hayes-Deats [2]** 1/20 4/24
**hazard [2]** 60/15 178/4
**he [83]** 8/8 8/10 8/17 9/6 9/6 9/25 10/15 10/16 11/3 11/4 15/10 16/16 18/21 19/14 30/23 31/21 32/6 37/13 41/10 41/15 43/23 44/1 44/3 44/4 46/2 46/5 46/21 46/21 46/22 47/4 47/9 47/10 49/10 70/15 80/23 81/13 81/16 81/17 81/17 81/19 87/16 87/17 90/6 90/11 90/11 90/17 90/21 92/19 104/10 109/18 109/21 109/21 109/22 109/23 109/23 110/14 111/12 111/24 112/7 112/17 113/5 113/5 113/7 120/1 120/2 121/15 121/16 121/24 124/19 142/22 145/14 148/22 148/25 159/16 159/16 160/3 162/23 163/5 164/20 175/5 175/5 175/22 175/25
**he -- as [1]** 159/16
**he's [9]** 7/20 9/2 9/23 20/1 32/23 32/23 147/2 159/23 175/4
**hear [6]** 7/15 62/7 89/10 115/22 147/1 156/6
**heard [42]** 12/11 15/25 35/11 41/1 47/15 53/22 81/11 81/20 82/13 83/23 91/24 103/17 104/5 105/6 107/15 109/18 109/19 109/20 111/8 111/11 111/21 111/23 115/8 124/16 127/15 128/17 133/8 136/23 139/13 151/21 155/10 155/17 156/1 156/12 157/2 158/3 159/15 164/16 174/9 174/10 179/10 181/7
**hearing [3]** 1/9 23/25 172/23
**heating [2]** 63/6 63/14
**heavy [1]** 28/3

**height [4]** 128/9 129/11 165/9 165/18
**held [1]** 21/21
**help [3]** 5/1 68/1 105/19
**helpful [2]** 33/8 160/8
**helps [1]** 171/7
**here [70]** 5/18 6/13 12/25 20/2 46/7 49/23 53/1 53/14 56/17 67/12 76/1 100/18 100/20 102/16 104/18 106/18 107/8 107/25 108/9 108/10 109/10 109/18 112/6 114/24 117/16 118/19 120/20 121/3 126/15 130/12 131/5 131/7 132/22 133/4 135/23 137/14 137/21 139/10 139/25 141/7 141/17 142/19 142/24 144/22 145/7 145/8 146/1 146/16 147/5 148/6 149/22 150/11 152/5 152/13 153/8 153/11 154/6 155/3 155/6 156/8 158/23 162/14 165/17 166/18 169/14 172/1 173/16 174/3 176/20 180/8
**here's [1]** 133/21
**hereinafter [1]** 177/19
**HERITAGE [3]** 2/2 2/5 4/17
**herman [4]** 2/21 2/24 182/4 182/12
**Heuer [4]** 1/16 4/13 103/5 173/7
**hierarchy [1]** 152/18
**high [8]** 58/3 58/4 58/5 147/8 149/19 149/21 157/14 157/15
**high-quality [2]** 157/14 157/15
**higher [1]** 58/6
**highly [2]** 114/6 122/19
**highway [1]** 145/25
**him [16]** 4/25 9/10 12/19 12/20 16/18 28/16 41/1 51/21 51/23 81/1 81/20 92/19 109/18 109/19 109/20 120/1

**himself [2]** 81/16 109/21
**his [42]** 4/19 7/13 8/8 8/9 9/3 9/5 9/7 9/23 11/10 15/10 16/12 16/14 17/19 19/13 19/20 19/22 31/20 31/24 32/6 46/16 47/11 48/1 48/2 51/19 51/20 52/1 52/2 80/25 81/3 85/15 90/16 90/21 92/14 112/9 112/20 120/3 124/16 145/15 149/1 149/1 160/5 175/4
**historic [12]** 5/3 33/19 103/21 125/14 125/15 130/24 131/12 133/7 133/12 143/22 173/22 177/21
**historical [7]** 33/13 34/2 43/4 97/14 141/12 141/14 141/16
**historically [1]** 33/16
**history [2]** 75/11 158/25
**hit [1]** 74/22
**hits [1]** 148/7
**HOAG [3]** 1/13 1/17 4/12
**hoc [2]** 110/16 142/8
**hold [10]** 8/15 61/14 112/3 121/14 121/14 121/14 124/8 124/8 137/6 174/6
**holding [1]** 62/1
**hole [1]** 175/10
**holistic [1]** 99/14
**holistically [4]** 21/8 88/25 89/14 89/15
**hollow [1]** 131/5
**home [3]** 13/24 15/15 69/21
**honestly [2]** 43/7 152/23
**honor [54]** 4/3 4/10 4/21 4/22 5/10 6/2 6/5 6/9 16/6 16/9 16/20 17/22 22/2 23/15 23/22 26/8 27/9 45/1 47/21 48/1 48/16 49/7 51/3 52/8 52/13 73/21 76/5 82/15 86/14 86/16 87/4 87/5 87/10 87/16 87/19

**H**

honor... [19] 89/11 92/13 94/14 96/13 98/5 103/9 106/7 149/23 150/1 153/13 154/15 154/20 160/8 161/12 170/9 172/19 173/6 173/8 181/3
HONORABLE [1] 1/10
honoring [2] 33/22 52/5
honors [1] 19/6
hoops [1] 170/5
hope [1] 79/24
hopefully [2] 52/16 155/14
hot [1] 63/5
hours [3] 11/23 17/18 102/21
house [18] 13/24 14/2 14/11 46/2 64/6 64/12 64/13 99/4 112/16 112/24 113/7 144/19 154/17 154/18 154/18 168/21 175/6 175/10
housekeeping [1] 39/5
how [60] 8/20 10/19 10/22 11/6 11/9 11/25 14/4 17/17 20/11 34/10 34/16 35/9 36/10 37/8 39/2 44/19 46/6 47/2 57/20 58/3 60/20 62/3 63/12 66/1 67/8 67/8 68/4 71/12 72/3 74/11 74/24 80/8 80/11 81/12 84/11 85/8 85/16 87/23 92/2 92/9 92/23 95/16 97/11 97/11 99/3 99/5 116/22 122/10 127/23 128/12 140/6 140/6 142/16 161/24 161/24 163/13 164/23 166/23 173/1 176/14
How's [1] 14/17
however [2] 47/4 104/2
huh [3] 128/1 131/20 177/5
hundred [2] 78/4 176/23
hundred percent [1] 78/4

hundreds [3] 57/4 58/19 64/14
hurdle [1] 162/11
hurdles [1] 95/5
hurt [1] 166/12
hypothetical [1] 155/9

**I**

I -- sorry [1] 159/10
I'd [9] 4/13 5/22 9/17 15/5 18/4 52/21 57/18 79/24 181/9
I'll [13] 16/22 22/4 29/4 42/1 45/5 47/20 73/21 76/5 138/8 154/5 155/22 156/10 160/11
I'm [61] 5/8 8/23 11/21 12/4 12/8 12/10 16/10 22/8 22/14 23/15 26/9 31/2 37/14 42/15 42/15 42/17 42/18 43/2 49/19 51/1 51/12 54/15 59/5 67/23 69/3 77/13 77/13 80/16 81/24 82/3 90/16 90/16 92/13 92/21 95/3 95/5 95/12 95/12 95/22 109/5 115/22 121/8 121/17 122/3 132/6 132/12 132/12 133/22 135/22 136/9 137/1 138/3 147/2 150/8 152/23 156/5 160/18 161/21 169/9 173/4 173/12
I'm -- I [1] 95/5
I've [12] 5/16 5/17 13/14 51/18 53/14 67/12 72/23 101/21 148/22 152/6 174/10 174/11
I've -- the [1] 101/21
i.e [3] 120/15 137/9 137/25
ICE [1] 152/16
iconic [1] 24/21
idea [6] 51/20 55/15 57/20 67/8 88/24 96/11
identified [3] 12/14 98/22 150/15
identify [4] 57/10 87/6 162/1 162/20
ignore [1] 148/20
imagine [1] 176/17
immediately [1] 80/10

immunity [1] 126/12
impact [6] 75/5 86/8 143/20 153/8 155/11 162/9
impacting [1] 65/20
impacts [2] 95/9 141/14
impeach [1] 16/18
imperative [1] 134/12
imperil [1] 171/2
implement [1] 68/2
implemented [1] 105/21
implementing [1] 165/17
implicate [2] 85/5 87/12
implicated [1] 166/16
implicates [1] 127/4
implicating [2] 85/18 165/13
implications [2] 171/9 181/6
implicitly [1] 162/10
import [2] 136/25 152/13
importance [1] 171/5
important [9] 33/24 104/2 134/13 153/14 156/19 172/1 172/1 180/11 180/12
important -- most [1] 172/1
imposed [3] 179/13 179/20 179/20
impossible [4] 70/6 74/25 99/7 154/1
improved [1] 85/7
improvement [16] 37/19 38/9 38/10 45/15 53/9 55/6 57/12 80/2 105/22 106/3 106/23 109/6 114/19 117/22 156/23 164/21
improvements [14] 41/23 53/13 55/25 56/1 68/25 69/16 75/16 76/4 85/22 86/9 100/4 127/9 128/16 129/1
inapplicable [1] 163/20
incentive [1] 133/1
inchoate [1] 105/15
include [7] 38/8 38/12

67/13 67/14 70/2 84/20 119/14
included [5] 12/15 26/13 38/13 115/19 123/13
includes [6] 67/11 67/12 89/18 127/9 127/12 155/25
including [8] 92/10 92/10 92/11 92/12 131/9 159/8 168/17 172/24
incoming [1] 59/23
incompatible [1] 104/3
inconvenient [1] 143/8
incorrect [2] 178/10 178/17
increase [3] 74/9 171/23 171/23
increased [1] 54/8
incredibly [4] 66/12 75/10 75/17 101/22
incredibly -- it's [1] 75/17
incumbent [1] 142/25
incursion [3] 56/10 58/22 61/1
indeed [3] 103/8 109/25 119/25
independence [3] 123/22 124/25 169/11
independent [6] 82/10 120/10 152/23 167/16 168/12 168/13
independently [1] 68/21
independently-verified [1] 68/21
indicated [2] 79/10 120/24
indicates [1] 8/10
individuals [1] 114/6
indoor [1] 77/1
indulge [1] 82/18
indulgence [2] 45/3 52/9
infancy [1] 144/17
inflection [1] 101/2
inform [1] 81/3
informal [1] 139/14
information [5] 67/14 91/1 94/23 133/12 142/3

**I**

**informed [8]** 32/21 35/13 35/15 36/1 36/4 67/21 88/4 100/22

**infrastructure [9]** 32/8 32/15 62/17 62/23 62/25 63/7 64/12 64/20 100/21

**infrastructure -- there's [1]** 62/23

**initial [3]** 101/6 142/4 179/23

**inject [1]** 66/5

**injunction [19]** 103/12 105/13 110/1 113/23 114/3 114/6 114/11 144/21 144/25 146/21 148/12 150/19 153/24 155/21 170/20 170/23 171/18 179/21 180/9

**injunctions [1]** 164/6

**injury [1]** 146/13

**input [2]** 15/10 169/19

**inside [5]** 49/16 66/4 66/6 69/12 85/14

**insight [1]** 153/5

**inspect [1]** 133/9

**inspection [2]** 160/9 160/10

**install [2]** 61/14 66/11

**installation [1]** 131/22

**installed [5]** 20/19 61/18 63/8 63/9 64/23

**instance [6]** 106/9 122/20 133/22 135/14 155/22 176/23

**Instead [1]** 125/10

**institution [5]** 54/22 95/10 102/1 126/5 168/11

**institutions [1]** 102/4

**instructed [1]** 30/23

**instruction [1]** 30/20

**instrumentality [1]** 82/11

**insulate [1]** 124/5

**integrated [4]** 34/16 68/4 138/9 139/8

**intend [1]** 163/6

**intended [3]** 124/4 124/6 166/10

**intending [6]** 32/18 32/23 44/4 90/21

109/22 168/10

**intends [1]** 111/24

**intent [2]** 90/14 90/16

**intention [4]** 48/21 51/19 52/1 144/8

**intentional [2]** 115/10 133/16

**intentionally [2]** 120/5 131/1

**intentions [2]** 51/20 52/2

**intents [1]** 126/16

**interact [1]** 84/12

**interactions [1]** 10/18

**interactive [1]** 70/19

**interchanger [1]** 129/25

**interest [2]** 146/24 171/8

**interfere [3]** 46/18 48/14 112/18

**interfering [1]** 124/5

**interim [1]** 10/4

**interior [11]** 18/16 30/10 30/24 48/9 116/18 118/16 125/8 132/7 150/11 150/21 155/12

**Interior's [1]** 116/3

**Interiors [5]** 21/16 21/20 22/10 22/13 22/18

**interject [1]** 26/10

**internally [1]** 111/11

**interrupt [1]** 22/24

**interstitial [1]** 56/20

**intimated [1]** 78/12

**intimately [1]** 54/13

**introduce [2]** 4/13 4/19

**introduced [2]** 7/3 31/2

**intrude [1]** 122/11

**intrusion [14]** 21/7 55/20 57/17 59/9 59/11 59/13 59/18 61/3 62/12 66/9 76/11 88/7 89/5 100/1

**intrusions [1]** 85/17

**intrusive [2]** 66/12 75/4

**invaluable [1]** 15/10

**investigation [1]** 98/24

**investing [1]** 50/9

**investment [3]** 53/4 64/11 64/19

**involved [10]** 11/8 11/9 17/9 25/13 48/7 80/23 121/2 121/5 128/17 130/6

**involvement [2]** 7/7 54/24

**involves [4]** 141/10 141/12 150/4 156/6

**involving [2]** 18/21 130/5

**iron [1]** 62/18

**irreparable [4]** 143/12 143/19 143/23 146/13

**irreparably [1]** 145/21

**irreplaceable [1]** 143/25

**irresponsible [6]** 76/10 76/19 91/12 91/17 99/7 99/13

**is [621]**

**is -- essentially [1]** 65/18

**is -- making [1]** 57/11

**is -- they [1]** 22/12

**ish [1]** 63/23

**isn't [16]** 23/9 27/18 30/9 42/25 73/16 79/23 81/19 92/4 104/25 109/10 117/23 125/17 143/17 153/21 154/18 176/12

**issue [27]** 12/2 12/15 14/3 15/1 17/12 20/12 20/25 21/2 21/8 43/10 78/20 82/22 100/18 113/13 114/24 127/21 130/13 130/19 131/10 172/2 172/14 173/14 174/1 176/20 176/25 181/4 181/18

**issues [35]** 16/15 16/19 21/7 41/24 57/17 62/15 73/18 76/1 76/8 76/11 76/11 76/12 76/14 77/2 79/17 79/18 80/9 83/13 87/12 87/15 87/17 88/3 88/10 88/12 88/22 89/5 96/16 99/1 100/21 147/12 148/22 148/23 161/1 175/5 175/7

**issuing [2]** 131/14

141/2

**it [422]**

**it -- deciding [1]** 14/5

**it'll [1]** 43/24

**it's [169]** 6/6 10/8 15/8 19/22 21/13 22/16 22/21 22/25 23/17 24/17 25/15 33/14 33/14 33/15 33/22 35/18 35/22 38/18 38/22 39/15 40/3 40/19 41/21 42/25 44/9 50/14 56/16 59/6 59/7 59/20 59/21 60/18 60/19 61/20 63/14 64/12 65/21 69/1 70/11 71/1 71/3 72/23 74/25 75/11 75/16 75/17 76/10 76/18 76/20 77/11 79/5 79/8 79/14 81/15 83/4 83/5 83/8 86/17 87/24 87/24 91/12 91/17 94/11 95/17 95/19 95/19 96/5 96/19 98/20 98/21 99/13 103/4 103/11 105/4 105/12 106/6 106/14 107/10 107/14 108/25 109/1 112/12 114/4 118/2 120/17 121/21 122/12 124/5 124/19 124/20 124/20 124/20 126/19 126/24 127/13 131/14 131/15 131/15 131/15 133/15 133/18 134/4 134/6 134/7 134/8 134/21 136/5 136/6 138/20 140/11 141/9 142/7 142/25 145/15 146/6 148/13 149/14 149/20 149/22 151/2 151/18 152/2 152/22 152/25 153/9 155/5 155/5 155/6 155/13 155/15 155/23 156/4 159/22 160/20 160/21 160/22 161/10 161/10 161/22 161/22 162/3 162/5 162/7 163/20 163/21 163/23 164/1 164/1 165/6 165/11 165/11 165/13 167/24 168/15 168/17 169/14 170/5 170/18 170/22

**I**

**it's... [10]** 171/21 171/23 172/7 175/22 176/3 176/4 176/12 179/5 180/5 180/12
**Italian [2]** 134/1 154/13
**Italy [1]** 133/25
**items [1]** 35/13
**iterative [1]** 163/6
**its [23]** 41/18 43/17 44/21 48/3 48/13 54/14 56/25 63/7 77/21 79/11 123/14 124/3 142/1 143/23 143/24 143/24 144/17 148/16 149/5 152/21 168/12 169/4 175/20
**itself [13]** 10/3 19/19 58/9 60/9 74/8 95/21 111/11 126/7 130/12 153/12 166/16 167/10 167/11

**J**

**James [1]** 145/1
**Jankowski [1]** 2/13
**January [4]** 29/9 53/14 159/9 159/16
**January 2024 [1]** 29/9
**January of [1]** 159/9
**January/February [1]** 159/16
**Jenkowski [1]** 5/13
**jeopardy [1]** 171/8
**jewel [1]** 32/9
**JFK [2]** 69/21 69/22
**job [10]** 9/13 9/16 9/23 20/9 23/5 53/6 77/11 90/25 113/5 149/1
**jobs [2]** 20/5 52/23
**JOHN [10]** 1/6 4/5 17/4 17/19 47/24 51/3 51/7 51/14 52/5 126/6
**joined [3]** 5/12 53/22 53/25
**joining [1]** 53/12
**joins [1]** 146/13
**joint [1]** 48/1
**joints [2]** 61/4 61/9
**journalists [1]** 40/8
**judge [11]** 1/10 7/13 34/4 39/25 40/3 43/10 45/4 51/1 69/4 70/14

147/23
**judicial [3]** 112/25 160/9 160/10
**July [8]** 110/4 112/17 118/13 118/25 144/5 144/11 144/12 146/5
**July 21st [2]** 118/13 118/25
**July 4th [1]** 144/11
**July 6th [4]** 110/4 144/5 144/12 146/5
**jump [2]** 75/19 170/5
**jumped [1]** 93/5
**jumps [1]** 60/3
**June [1]** 118/24
**June 30th [1]** 118/24
**jurisdiction [1]** 161/9
**just [126]** 7/6 12/4 12/8 14/4 14/20 14/25 16/19 19/23 23/20 26/10 28/24 29/13 30/25 32/23 34/22 36/3 36/6 37/2 37/4 37/15 39/25 40/7 41/11 41/12 45/7 46/17 49/21 52/22 55/12 55/14 56/13 56/16 57/18 59/14 61/10 61/25 62/3 62/15 63/3 64/2 65/12 65/21 65/25 66/2 66/14 66/16 68/9 68/16 68/24 69/6 69/24 70/21 70/22 71/5 71/19 73/10 73/25 74/4 74/8 74/9 75/19 75/21 76/7 76/14 76/18 77/13 79/22 80/6 80/16 81/11 81/25 82/4 84/1 85/24 86/22 90/16 94/11 95/12 96/12 97/17 98/12 98/14 99/7 99/16 99/20 100/8 101/18 102/14 107/9 109/2 114/9 120/11 125/7 127/6 130/15 131/5 132/10 132/10 132/11 132/22 133/20 135/5 136/23 138/3 138/14 142/5 142/23 146/2 146/8 148/23 150/18 152/6 152/8 153/9 154/3 154/25 155/22 160/8 160/20 163/23 171/12 171/21 172/10 176/1 180/5 180/13

**just -- I [1]** 14/4
**just -- it's [1]** 65/21
**justification [7]** 96/20 96/22 97/10 97/16 97/21 97/23 97/25
**justifications [2]** 50/7 97/5
**justify [1]** 37/8

**K**

**keep [8]** 50/4 55/20 91/9 97/11 99/4 100/7 154/3 180/21
**keeping [4]** 61/20 96/15 99/17 103/25
**KENNEDY [77]** 1/6 4/5 7/7 7/25 8/5 9/3 12/2 15/1 15/16 15/16 16/4 17/10 17/19 18/8 20/11 20/22 24/17 24/21 26/5 26/8 27/6 28/10 28/25 29/8 29/24 32/9 33/23 42/8 42/14 44/11 47/24 49/3 49/17 51/3 51/7 51/15 51/23 52/5 53/23 83/3 88/21 93/4 96/19 99/19 103/18 103/19 107/6 112/22 113/9 117/25 121/22 121/23 122/1 126/6 126/21 131/25 135/13 137/17 138/15 139/3 140/4 140/9 140/12 140/17 140/23 143/23 147/4 160/25 167/22 167/23 168/21 168/25 169/8 176/18 177/7 178/3 178/3
**Kennedy's [2]** 17/4 142/10
**kept [1]** 99/22
**kick [1]** 166/25
**kicking [1]** 100/12
**kids [1]** 143/9
**kind [14]** 15/3 26/6 27/22 28/15 30/7 33/19 35/11 58/9 82/12 95/25 96/7 154/12 161/3 167/20
**kinds [2]** 116/21 132/19
**knew [1]** 80/4
**knocked [1]** 47/1
**know [148]** 5/3 5/5

10/21 11/21 14/4 14/6 21/6 21/8 23/10 25/1 25/11 25/14 25/16 25/17 26/3 27/8 27/18 29/20 32/19 32/19 37/13 44/4 44/8 47/3 49/24 50/3 50/13 51/13 51/18 52/1 52/2 53/13 55/13 56/5 59/22 60/9 60/14 60/21 61/15 62/18 64/7 65/15 66/23 67/6 67/24 70/21 72/24 73/19 75/13 76/14 77/12 80/9 81/3 82/5 83/6 88/23 88/25 90/14 90/21 91/19 92/23 94/7 95/5 95/20 95/21 95/22 96/5 97/4 97/11 98/17 99/3 99/9 99/24 100/2 100/5 100/15 100/18 101/24 102/6 104/6 105/17 106/20 106/25 108/11 108/22 109/12 113/10 115/9 115/23 117/13 127/18 129/12 130/13 130/22 131/4 131/22 132/2 132/19 133/6 133/8 133/18 133/20 139/19 141/8 142/11 142/15 142/16 142/22 142/24 144/20 146/5 148/5 148/17 151/6 152/15 152/25 153/4 153/6 153/21 154/16 155/2 155/19 156/3 158/9 159/17 160/22 162/8 162/8 162/22 163/23 164/18 164/21 166/10 166/12 166/20 167/5 168/6 168/20 169/22 170/21 172/2 172/3 172/16 176/7 180/12 181/10 181/11 181/15
**knowing [2]** 108/3 108/4
**knowing -- why [1]** 108/3
**knows [2]** 155/19 174/23
**Kyle [1]** 87/8

**L**

**L'Enfant [1]** 53/4

**L**

**Lab [1]** 53/3
**labor [2]** 74/8 74/10
**lack [1]** 100/14
**lacking [1]** 64/16
**Ladies [1]** 7/14
**laid [2]** 92/5 93/6
**land [7]** 85/19 85/23 127/22 136/17 154/25 177/8 177/19
**landmark [2]** 31/23 143/22
**landscape [2]** 28/20 28/20
**landscaping [6]** 86/7 86/9 86/11 129/2 132/13 155/5
**lane [1]** 145/25
**language [2]** 127/25 166/8
**large [5]** 40/19 45/11 75/5 175/12 176/20
**larger [2]** 30/11 49/4
**last [24]** 13/16 13/19 14/8 17/16 35/23 47/18 48/24 49/3 50/24 51/4 62/19 78/14 79/6 80/20 82/12 83/11 92/6 101/5 109/16 130/21 141/22 172/20 175/11 179/9
**Lastly [2]** 146/22 179/21
**late [5]** 60/23 63/9 81/15 107/17 108/16
**later [5]** 7/11 46/24 68/7 113/16 145/2
**later -- the [1]** 68/7
**latter [1]** 140/11
**Laughter [1]** 14/22
**law [9]** 4/11 48/5 48/20 56/12 84/13 103/20 124/14 169/20 179/22
**lawsuit [3]** 16/16 16/17 135/21
**lawsuits [1]** 13/3
**lawyer [1]** 5/4
**lawyers [1]** 103/7
**lead [4]** 60/13 79/19 92/19 139/11
**lead-up [1]** 79/19
**leadership [9]** 19/24 75/15 77/15 79/13 80/3 80/8 100/20 158/24

159/8
**leading [2]** 12/3 92/16
**LEAGUE [3]** 1/2 4/4 16/19
**leak [1]** 98/24
**learned [1]** 105/24
**least [7]** 104/16 104/25 136/24 139/5 157/24 162/10 164/9
**leave [3]** 69/7 170/25 181/14
**leaves [1]** 6/4
**leaving [1]** 90/13
**leeway [1]** 45/5
**left [1]** 165/20
**legacy [1]** 143/25
**legal [6]** 4/11 27/10 48/17 103/20 152/13 163/10
**legitimate [1]** 146/24
**length [2]** 61/9 66/11
**lens [1]** 153/23
**Leon [1]** 147/23
**less [7]** 11/7 11/11 33/22 110/6 119/15 119/19 119/22
**less-restrictive [1]** 119/22
**let [18]** 4/19 17/25 19/14 24/14 33/9 34/22 43/9 43/10 43/14 46/13 47/18 48/18 49/15 60/19 83/22 96/12 172/6 179/12
**let's [22]** 7/18 9/17 10/1 10/22 16/15 16/19 18/14 39/24 62/6 64/1 91/20 98/8 105/18 113/16 118/5 127/24 131/19 135/10 147/3 154/10 164/10 167/21
**letters [1]** 17/20
**level [11]** 45/9 45/9 45/10 65/18 70/18 71/15 90/3 101/20 102/2 102/14 166/22
**level -- sorry [1]** 45/9
**levels [1]** 58/1
**levers [1]** 25/5
**Library [1]** 142/17
**lies [1]** 140/17
**life [3]** 57/1 63/8 157/1
**lift [1]** 176/14
**lifting [1]** 176/11

**light [5]** 35/12 72/22 81/5 106/20 172/21
**like [72]** 4/13 5/22 6/9 9/17 15/5 15/13 17/8 18/4 30/24 31/3 34/7 42/22 47/7 49/5 49/25 50/2 52/21 54/9 56/16 57/18 60/15 70/4 70/19 71/11 75/12 79/24 85/1 88/7 89/5 89/18 95/3 100/12 108/17 109/1 110/9 115/8 115/11 115/12 116/9 116/10 121/6 121/21 124/7 130/22 132/3 132/4 132/4 133/16 133/16 133/18 133/18 134/8 146/11 148/21 150/10 151/2 151/5 152/7 155/23 163/15 165/21 165/23 166/20 169/9 170/20 170/23 171/16 171/16 174/20 179/12 180/5 181/9
**likelihood [2]** 18/7 153/24
**likely [3]** 104/19 105/2 112/4
**limbs [1]** 28/5
**limit [3]** 99/5 159/21 181/15
**limitation [1]** 124/4
**limitations [1]** 123/19
**limited [9]** 31/10 87/11 87/17 92/17 124/3 148/14 153/17 161/10 165/3
**line [4]** 35/13 64/7 64/9 104/22
**listed [2]** 141/15 146/19
**lists [1]** 106/25
**literally [2]** 114/5 134/15
**litigation [4]** 12/24 35/20 48/25 144/16
**little [22]** 45/3 45/5 52/15 52/22 57/5 64/6 67/18 68/16 69/6 81/15 99/20 101/19 102/20 132/22 132/22 133/2 158/3 158/4 170/12 170/16 170/18 173/3
**live [1]** 69/15

**lived [1]** 39/21
**lives [1]** 63/6
**living [5]** 48/1 134/3 144/2 149/3 175/20
**LLC [1]** 21/16
**LLP [3]** 1/13 1/17 2/18
**loading [2]** 61/12 61/13
**lobby [3]** 51/7 51/15 51/23
**location [7]** 128/9 129/10 138/5 162/16 162/22 165/9 165/17
**locations [4]** 44/9 57/8 65/21 71/24
**lock [1]** 42/17
**long [13]** 20/2 29/12 39/21 62/9 78/25 99/2 99/17 99/22 123/9 144/17 151/20 171/9 173/1
**long-term [3]** 99/17 99/22 171/9
**longer [2]** 144/15 175/17
**longest [1]** 175/16
**longstanding [1]** 88/10
**look [36]** 41/6 45/10 56/18 57/13 65/14 83/13 92/2 99/3 108/18 110/5 119/14 121/22 122/15 124/2 126/2 126/11 127/6 129/1 132/3 132/4 132/11 132/12 133/23 135/25 136/12 138/22 147/19 148/23 153/23 155/13 155/14 168/15 169/14 176/10 177/11 178/20
**looked [3]** 116/9 116/10 148/22
**looking [9]** 47/13 71/12 74/8 91/20 95/15 97/3 160/21 161/21 161/22
**looks [7]** 43/6 50/2 121/21 132/4 134/8 134/18 134/21
**loose [1]** 6/4
**lorraine [4]** 2/21 2/24 182/4 182/12
**losing [1]** 145/21
**loss [3]** 21/4 94/20

**L**

**loss... [1]** 143/17
**lost [4]** 47/5 94/4 94/5 94/5
**lot [13]** 36/17 49/9 64/19 67/11 69/12 101/14 103/6 150/4 150/4 150/5 170/5 174/22 181/8
**Louisiana [1]** 52/25
**lounges [2]** 42/2 42/5
**low [1]** 33/14
**Lowell [14]** 1/19 1/21 3/6 4/18 4/23 4/23 5/3 7/3 16/8 70/3 78/17 82/19 84/5 85/15
**lowellandassociates.com [3]** 1/22 1/23 1/23
**lower [2]** 56/16 71/15
**lucky [1]** 63/15
**lunch [2]** 102/22 102/25

**M**

**MA [1]** 1/18
**Madam [1]** 7/19
**made [23]** 8/3 16/11 16/16 20/22 31/4 31/5 36/4 40/24 48/8 49/17 72/12 72/12 75/9 81/13 94/13 94/21 95/13 106/17 108/5 118/15 124/12 124/12 164/19
**magical [1]** 144/12
**magically [1]** 171/20
**magnificent [1]** 19/9
**magnitude [5]** 72/15 72/20 119/4 120/25 123/10
**main [20]** 33/3 39/3 59/14 59/16 59/22 59/22 61/12 63/21 65/15 65/22 66/18 66/22 71/15 85/9 99/24 110/24 146/23 154/5 156/18 162/13
**mainly [7]** 12/21 12/23 14/1 55/16 63/16 84/13 85/24
**maintain [15]** 70/8 70/20 71/12 84/9 101/25 114/20 115/2 115/6 115/12 117/17 148/15 156/24 157/18

158/12 175/20
**maintained [3]** 63/17 84/17 169/7
**maintaining [3]** 117/20 148/14 149/5
**maintenance [16]** 18/9 20/12 22/22 28/7 52/4 53/11 53/20 54/12 67/13 101/1 105/4 109/2 157/13 157/17 158/22 160/12
**major [8]** 53/4 103/19 113/3 122/23 141/9 143/21 179/25 180/1
**majority [2]** 69/10 88/16
**make [33]** 7/19 16/22 16/22 18/4 32/8 42/1 45/15 58/25 66/19 72/18 72/22 73/9 74/21 81/3 84/15 85/13 85/13 89/22 90/19 94/3 94/7 95/3 95/6 96/13 135/16 137/3 137/8 145/18 154/18 171/22 172/13 174/22 181/5
**makes [7]** 16/11 79/25 120/23 141/16 154/1 161/5 168/25
**making [18]** 19/20 20/8 36/16 36/17 37/13 40/23 47/12 55/22 57/11 68/20 68/21 68/24 86/1 100/22 109/23 116/14 136/16 136/22
**manage [3]** 7/24 68/1 118/11
**managed [1]** 177/9
**management [9]** 48/7 48/15 52/24 53/18 84/7 91/4 118/14 120/9 161/7
**manager [1]** 97/9
**managing [1]** 54/10
**mandamus [4]** 153/18 166/23 170/6 174/4
**mandate [1]** 158/7
**mandatorily [1]** 137/10
**mandatory [3]** 136/25 146/18 147/10
**manner [6]** 89/6 118/11 157/13 157/19

157/21 180/25
**manufactured [1]** 60/23
**many [17]** 10/19 10/22 11/6 11/25 18/21 23/8 62/3 67/8 85/8 92/9 92/23 104/19 108/12 126/25 143/25 157/2 158/21
**maple [2]** 28/15 115/11
**maps [2]** 161/24 161/24
**marble [15]** 21/10 115/9 133/22 133/23 133/23 134/4 134/6 134/7 134/10 134/12 134/15 143/24 154/10 154/11 154/12
**March [5]** 9/18 10/12 37/20 41/7 159/7
**March 16th [2]** 9/18 41/7
**March 2nd [1]** 37/20
**marion [3]** 2/5 2/7 4/17
**mass [1]** 129/7
**massive [1]** 175/18
**master [4]** 34/16 67/23 68/4 107/21
**match [1]** 134/15
**material [15]** 20/20 29/3 29/4 33/8 33/12 33/16 33/20 42/13 43/2 49/10 69/17 145/10 145/15 145/16 145/17
**materially [6]** 33/3 78/6 105/5 105/10 111/15 143/17
**materials [3]** 72/5 123/1 155/6
**Matt [1]** 4/14
**matter [8]** 4/4 7/23 24/7 84/11 107/10 123/3 177/25 182/6
**matters [4]** 12/8 107/11 114/5 176/20
**Matthew [13]** 1/16 3/5 7/1 26/11 26/23 37/16 39/22 52/17 78/23 84/3 87/21 98/10 101/12
**may [26]** 6/2 6/4 8/10 33/20 48/8 86/10 86/14 91/10 105/16 117/15 118/4 118/15 120/18

129/11 129/11 144/14 144/20 149/1 155/19 156/11 165/24 169/21 175/4 176/3 180/10 182/12
**maybe [16]** 17/12 23/4 49/21 55/12 58/5 68/9 69/6 70/15 81/16 102/7 106/25 139/25 164/5 168/20 170/21 181/12
**Mayers [2]** 2/9 5/12
**McCoy [1]** 2/13
**me [61]** 4/24 5/1 11/7 12/9 12/9 12/10 12/16 14/14 17/25 19/13 19/14 21/24 23/4 24/14 28/24 29/17 30/2 33/8 33/9 34/22 37/1 43/9 43/10 43/14 46/13 47/5 47/15 47/16 47/16 47/18 48/18 49/2 49/14 49/15 50/16 51/11 55/12 63/1 64/2 82/18 83/22 93/4 93/8 94/2 94/24 96/12 102/23 105/19 107/24 108/3 108/4 109/5 112/3 117/4 117/12 121/17 131/19 133/5 151/5 160/21 161/23
**me -- sorry [1]** 12/9
**mean [19]** 12/6 19/9 20/6 21/9 50/22 60/15 62/1 77/9 80/17 90/25 95/19 96/9 99/21 102/5 105/22 123/6 128/18 168/20 178/2
**meaning [3]** 96/24 120/10 144/12
**means [9]** 66/10 69/1 90/1 102/23 139/20 142/24 153/16 165/21 177/18
**meant [4]** 123/15 138/25 176/12 176/12
**measures [4]** 91/9 91/14 119/15 119/22
**mechanical [1]** 56/3
**mechanism [3]** 50/6 107/10 135/20
**mechanisms [2]** 64/16 99/11
**meet [4]** 41/18 50/8 84/22 117/5

**M**

**meeting [7]** 9/18 15/15 15/23 16/3 17/2 37/21 41/7
**meetings [4]** 101/20 102/2 102/8 137/6
**members [4]** 40/8 40/11 137/6 145/20
**members' [1]** 42/5
**membership [1]** 42/2
**memorial [11]** 28/10 48/1 69/21 69/22 70/16 70/17 134/3 149/3 157/21 168/24 175/20
**memorials [2]** 157/22 169/7
**memory [1]** 48/2
**mentioned [10]** 21/24 43/13 55/19 57/21 69/16 75/2 84/5 96/21 109/8 178/4
**mercy [1]** 179/19
**merely [1]** 141/11
**merits [6]** 104/19 127/2 145/4 147/3 153/25 170/9
**messages [1]** 32/23
**metal [2]** 59/1 61/20
**methodically [1]** 150/8
**micromanage [1]** 117/9
**micromanaging [1]** 117/11
**microphone [2]** 7/13 14/15
**middle [1]** 63/4
**midway [1]** 118/23
**might [5]** 108/5 129/14 134/24 150/23 181/12
**miles [1]** 176/23
**Millennial [1]** 71/9
**Millennium [1]** 92/10
**million [21]** 36/2 36/19 37/24 38/22 38/23 39/1 39/1 39/7 39/15 40/1 53/4 62/5 80/2 97/24 105/23 106/7 121/24 146/1 159/12 172/9 172/11
**million-dollar [2]** 38/22 39/15
**millions [1]** 107/1
**mind [6]** 19/22 37/13

41/15 55/14 72/19 154/3
**minimally [1]** 86/5
**minimum [3]** 162/6 166/23 167/2
**minor [2]** 81/17 81/20
**minute [3]** 10/9 99/16 147/3
**minutes [4]** 45/1 52/9 79/6 98/5
**misapprehension [1]** 133/15
**miscellaneous [1]** 69/7
**misconstrued [1]** 147/16
**mismatched [2]** 20/4 20/18
**missing [1]** 139/25
**mission [5]** 41/18 72/8 77/15 84/22 158/19
**missions [1]** 158/11
**misspoke [1]** 175/22
**misstating [2]** 22/2 94/14
**mitigation [1]** 91/9
**mix [1]** 19/14
**MOA [1]** 139/10
**models [1]** 162/18
**modification [3]** 114/20 117/22 156/24
**modifications [2]** 178/22 178/23
**modified [2]** 127/3 130/2
**moment [5]** 48/2 132/17 135/5 140/16 142/9
**momentum [2]** 102/1 104/1
**money [9]** 40/23 41/12 41/18 97/2 107/12 159/3 159/17 159/18 159/22
**monies [1]** 39/17
**month [7]** 23/8 24/8 34/10 66/23 68/8 68/13 68/15
**months [14]** 9/4 32/7 46/24 62/24 80/17 92/6 104/4 107/18 110/4 110/7 110/7 139/17 159/15 171/17
**monument [4]** 144/2

162/21 175/17 177/21
**monuments [3]** 85/6 162/17 162/18
**Moonshot [1]** 69/14
**moot [3]** 163/13 163/14 164/1
**mootness [1]** 164/5
**more [25]** 10/23 29/6 33/23 36/17 39/1 39/20 49/14 54/11 64/6 67/18 82/13 86/17 91/10 92/7 94/2 96/13 100/8 101/19 104/22 134/14 158/3 160/7 164/8 169/18 169/19
**more -- well [1]** 36/17
**morning [35]** 4/4 4/10 4/22 5/10 6/21 7/17 14/19 52/13 52/14 52/19 52/20 87/5 87/23 103/18 104/6 104/11 105/7 105/16 107/16 110/10 111/8 111/11 114/8 118/25 119/21 119/25 121/12 123/2 124/16 127/16 128/17 129/23 139/13 157/2 158/21
**most [8]** 53/11 59/12 72/14 97/16 97/20 147/5 171/25 172/1
**mostly [2]** 69/1 71/2
**motion [6]** 1/9 103/4 103/12 104/18 150/19 175/24
**move [17]** 25/8 47/20 53/5 57/16 63/12 69/22 70/5 70/17 70/20 71/10 72/1 72/2 81/24 103/24 110/21 118/5 163/7
**moved [2]** 53/1 72/6
**moves [1]** 144/18
**movie [1]** 139/21
**moving [7]** 19/22 26/9 64/8 71/8 72/24 73/5 162/24
**Mr [6]** 3/6 3/8 5/15 5/16 6/21 6/22
**Mr. [68]** 5/3 5/15 5/20 6/9 6/11 12/1 12/5 12/15 15/6 16/8 16/11 52/19 70/3 73/19 78/17 78/25 81/11 82/19 84/2 84/5 85/15 86/22 87/23

101/14 103/2 103/5 103/25 104/21 105/4 105/15 106/19 109/9 109/15 109/25 111/10 112/5 112/7 112/24 113/19 113/24 114/9 116/21 119/25 121/12 122/13 123/1 123/25 124/16 127/16 129/24 133/8 133/14 134/20 142/21 145/14 147/1 148/21 149/25 155/18 158/1 158/20 159/15 162/23 163/5 165/19 166/14 173/7 174/24
**Mr. Anon [1]** 5/20
**Mr. Craig [1]** 103/2
**Mr. Floca [41]** 5/15 6/9 6/11 15/6 16/11 52/19 78/25 81/11 84/2 86/22 87/23 101/14 103/25 104/21 109/25 112/5 112/7 113/19 113/24 114/9 116/21 119/25 121/12 123/1 123/25 124/16 127/16 129/24 133/8 133/14 134/20 142/21 145/14 148/21 158/1 158/20 159/15 162/23 163/5 166/14 174/24
**Mr. Floca's [8]** 105/4 105/15 106/19 109/9 109/15 111/10 155/18 165/19
**Mr. Grenell [3]** 12/1 12/5 12/15
**Mr. Heuer [2]** 103/5 173/7
**Mr. Lowell [7]** 5/3 16/8 70/3 78/17 82/19 84/5 85/15
**Mr. Roth [2]** 147/1 149/25
**Mr. Trump's [1]** 112/24
**Mr. Zelinsky [1]** 73/19
**Ms [1]** 3/9
**much [19]** 36/13 77/6 79/14 80/8 80/11 89/7 101/2 104/21 110/5 116/22 119/19 121/25 127/22 132/11 134/1 159/1 174/24 176/21

# M

**much... [1]** 181/20
**multi [1]** 121/22
**multi-acre [1]** 121/22
**multiple [11]** 11/22
11/24 12/1 12/4 12/6
12/12 12/20 30/10 40/6
146/20 175/19
**museum [4]** 52/5
155/3 168/23 178/24
**museums [1]** 169/7
**must [13]** 103/16
108/18 119/12 119/14
120/19 127/21 130/19
139/5 142/4 150/16
179/1 179/12 181/1
**my [54]** 4/10 4/13 5/12
7/3 9/16 10/13 10/17
11/25 13/24 20/18
21/22 23/2 23/2 25/7
32/13 43/9 46/4 50/14
53/22 67/6 67/18 77/11
78/12 79/14 80/6 80/7
80/7 82/7 87/8 88/1
90/25 93/5 94/8 97/8
98/13 106/5 112/19
112/20 116/7 116/9
127/20 130/3 132/10
132/10 132/11 132/13
132/13 143/9 173/9
174/9 175/15 175/21
178/8 179/22
**myself [4]** 7/3 8/14
11/12 70/21

# N

**name [13]** 4/10 5/16
6/20 7/3 16/4 17/3 17/7
17/18 17/19 87/8 105/9
130/23 145/9
**named [5]** 48/1 130/14
137/13 140/21 152/14
**narrow [2]** 122/16
149/1
**nation [1]** 27/3
**national [35]** 27/7
47/23 48/2 77/11 82/1
84/5 84/12 85/19 85/23
101/16 118/12 126/10
126/23 127/14 130/9
130/24 131/2 141/15
144/24 145/12 146/19
150/12 150/21 157/20
157/22 161/9 161/10

169/10 173/22 176/17
177/7 177/15 177/18
177/20 178/5
**Nations [6]** 29/19
61/12 65/23 66/19 67/1
157/18
**natural [6]** 62/14 119/6
119/11 123/12 161/8
177/4
**nature [6]** 33/15 33/23
119/3 123/10 155/12
170/16
**NCPC [64]** 101/21
101/23 102/2 103/22
106/14 106/15 108/18
110/3 125/14 125/24
127/5 128/4 128/10
129/6 130/11 131/14
132/16 134/24 135/1
135/7 135/14 135/17
135/22 136/4 137/11
137/13 137/16 138/9
138/9 138/10 138/13
138/24 139/2 139/8
139/10 139/11 139/13
139/24 140/1 140/13
140/16 142/7 149/14
150/12 151/21 151/25
152/1 152/3 163/16
164/10 164/10 164/23
165/2 165/16 167/1
167/2 167/5 167/18
170/2 170/4 174/5
174/7 178/22 180/18
**near [3]** 46/19 85/19
122/21
**nearly [1]** 33/9
**necessarily [2]** 23/23
159/14
**necessary [11]** 114/20
115/2 115/5 115/12
117/17 148/15 149/6
151/13 151/15 156/24
157/12
**need [61]** 18/10 20/3
28/7 34/17 35/22 36/13
40/12 40/16 40/18
42/18 44/7 44/15 44/23
45/12 50/4 66/17 72/4
72/16 78/25 79/4 80/7
82/23 84/21 85/24
89/24 90/5 95/24 98/2
100/5 100/5 106/16
110/2 121/2 121/4

122/25 130/15 132/20
136/1 150/23 151/2
151/6 153/18 153/20
153/24 153/25 155/10
158/12 158/12 159/1
159/19 161/1 162/20
162/24 167/6 167/6
173/1 173/2 176/14
178/12 180/2 181/11
**needed [5]** 14/7 80/13
104/7 171/5 171/6
**needing [1]** 88/7
**needs [29]** 12/22
12/23 32/19 32/20
34/20 37/14 49/1 50/11
54/14 55/14 57/10 68/2
80/3 80/4 91/6 94/8
100/15 100/19 100/20
101/24 105/20 114/23
120/10 121/9 130/1
151/6 151/16 155/23
174/14
**needs -- you [1]** 151/6
**neighborhood [1]**
11/6
**neither [1]** 135/6
**NEPA [28]** 103/22
106/15 110/2 124/7
125/14 130/17 132/24
132/25 138/8 138/9
138/9 138/11 138/13
138/14 139/8 140/2
140/3 140/9 140/14
140/22 141/7 141/11
141/20 167/1 167/2
167/6 167/10 174/20
**NEPA-sponsoring [1]**
140/2
**never [20]** 11/15 11/16
13/14 20/15 25/20
30/23 40/25 45/19
51/16 51/25 70/9 75/15
79/13 88/25 100/19
138/24 138/24 149/21
166/25 178/4
**new [38]** 5/5 10/11
24/22 31/11 31/22 37/3
37/10 37/10 43/18
66/11 78/9 88/13 89/11
89/12 104/9 104/12
105/5 112/13 112/21
125/1 129/13 148/11
154/8 154/9 154/13
154/19 155/7 155/18

156/6 158/24 160/19
162/22 165/6 165/7
165/11 165/14 166/13
178/19
**newer [1]** 71/1
**newfound [1]** 103/24
**next [16]** 17/12 19/8
34/10 55/24 56/7 92/22
113/9 114/15 118/5
123/17 156/3 157/9
160/11 163/7 174/10
175/10
**NHPA [1]** 124/7
**Nice [1]** 4/20
**nickname [1]** 62/7
**night [1]** 175/11
**Ninety [1]** 28/2
**Ninety percent [1]**
28/2
**no [118]** 1/3 9/16 13/4
13/9 13/12 13/20 15/4
15/24 18/25 19/2 21/1
22/21 25/10 25/13
26/16 30/8 30/23 31/11
32/12 32/13 33/6 34/2
36/11 36/24 37/6 39/18
39/19 41/2 43/4 45/21
46/3 46/8 46/11 46/25
47/6 47/17 48/7 51/8
51/13 51/20 51/20
57/14 61/23 63/18
64/17 64/18 64/22 65/5
66/2 71/5 71/6 76/21
78/8 78/10 78/13 78/15
78/16 81/23 83/5 83/10
83/19 84/9 84/10 86/12
86/17 87/3 89/24 90/5
91/25 94/8 94/23 94/24
98/3 101/10 102/13
103/17 104/7 105/4
108/15 111/9 113/2
113/13 114/14 114/23
117/6 117/8 117/14
118/14 119/23 120/1
133/15 134/21 134/21
138/10 139/12 139/14
139/15 139/15 139/16
140/15 141/17 144/5
144/8 145/10 150/25
151/11 153/6 153/7
154/6 155/2 155/7
155/18 156/2 159/7
163/3 163/22 173/17
179/11

**N**

No. [6]  15/6 19/4 23/11 24/12 31/17 34/24
No. 11 [1]  31/17
No. 12 [1]  34/24
No. 2 [1]  15/6
No. 4 [1]  19/4
No. 5 [1]  24/12
No. 6 [1]  23/11
nobody [3]  79/3 156/3 168/7
nomenclature [1] 37/15
non [3]  54/11 104/1 131/11
non-compliance [1] 104/1
non-discretionary [1] 131/11
non-routine [1]  54/11
nondiscretionary [1] 170/8
none [3]  105/9 128/12 153/10
nonetheless [1] 140/25
normal [1]  22/25
North [1]  67/1
not [280]
not -- I [1]  147/25
not -- it [1]  42/3
not -- that [1]  49/19
note [7]  4/8 120/7 126/2 144/16 176/9 176/16 178/21
Note 14 [1]  178/21
nothing [11]  6/17 13/19 91/5 97/23 108/22 113/11 125/1 126/24 140/16 152/8 171/14
notice [3]  16/2 43/7 112/25
noticeable [1]  123/2
notification [1]  139/13
notion [8]  122/25 131/6 142/11 144/20 146/21 149/5 174/21 178/15
notwithstanding [4] 22/9 81/12 81/21 141/3
novel [2]  126/24 126/25

now [64]  5/7 9/4 20/16 20/20 21/6 30/6 30/21 34/13 36/8 36/21 37/3 40/3 40/13 40/15 42/13 45/2 47/3 54/3 55/11 57/13 60/18 64/18 67/5 68/19 69/13 71/7 71/25 72/11 75/14 76/3 77/5 80/13 83/17 96/4 101/2 103/17 104/8 104/13 106/18 107/17 122/18 131/4 143/5 144/3 144/19 145/6 146/9 150/13 151/22 152/3 155/8 155/22 159/3 159/18 160/12 160/16 164/16 164/20 168/15 172/16 177/19 179/13 179/19 180/19
NPS [3]  84/9 85/25 127/13
NSO [4]  71/14 72/2 92/11 92/12
null [1]  125/10
nullified [1]  125/9
nullity [2]  138/23 178/6
number [23]  12/14 12/16 21/2 25/5 36/2 44/6 77/1 88/3 91/17 93/4 103/20 127/4 128/9 129/15 137/5 138/5 145/21 147/11 165/9 165/18 167/14 167/16 181/15
numbers [4]  37/23 80/2 95/16 136/11
numerous [7]  10/21 10/22 10/23 65/21 110/11 119/2 146/7
NW [5]  1/14 1/21 2/10 2/18 2/23

**O**

objecting [1]  18/7
objection [6]  16/6 16/23 17/22 22/2 27/9 48/16
obligate [1]  74/19
obligated [1]  173/16
obligation [13]  101/3 130/18 130/20 137/22 140/12 140/13 140/22 141/7 149/15 163/1

173/21 174/5 174/6
obligations [7]  103/21 107/5 141/3 148/19 148/20 152/1 174/17
oblivious [1]  95/4
obliviously [1]  120/5
observe [1]  124/25
obtain [1]  138/1
obviate [1]  16/23
obvious [1]  161/23
obviously [3]  103/11 107/17 147/8
occupied [1]  80/19
occur [6]  46/7 76/8 108/18 110/3 146/7 148/5
occurred [6]  24/8 26/1 49/3 68/17 139/23 148/4
occurs [1]  146/5
oceans [1]  141/12
October [1]  24/6
October 10th [1]  24/6
odd [1]  63/13
odds [2]  100/3 100/7
off [14]  8/11 14/8 63/3 69/24 75/19 92/5 93/6 122/24 154/11 154/17 155/25 162/5 163/23 172/17
offer [1]  153/5
office [9]  5/12 21/15 21/20 22/10 22/13 22/18 72/25 73/1 169/16
office -- tens [1]  72/25
officer [3]  54/4 77/25 124/13
officers [3]  39/5 141/24 163/24
offices [3]  62/11 72/1 72/2
official [3]  2/22 131/9 182/4
officially [1]  102/13
officials [2]  9/5 25/6
oh [4]  12/21 80/7 102/18 172/20
okay [112]  8/25 11/9 15/25 17/15 21/22 29/4 29/14 31/5 32/1 37/8 37/23 38/6 39/8 39/13 39/16 41/3 45/17 49/21 53/16 54/3 54/5 54/20

54/24 55/2 55/10 56/6 56/8 57/15 58/7 58/11 59/9 60/17 61/23 62/6 62/14 64/25 65/6 65/9 65/11 67/22 68/6 68/14 72/5 72/17 73/7 73/12 74/11 75/6 75/18 76/2 77/23 78/5 84/14 85/4 86/6 86/13 87/3 89/17 89/25 90/22 91/2 91/13 91/18 93/11 94/10 95/25 96/12 96/12 97/19 99/15 100/25 101/5 102/9 102/15 113/1 114/12 115/7 115/15 116/16 117/18 118/5 121/7 125/4 127/24 129/9 134/9 134/23 135/19 135/24 136/21 137/13 137/20 138/7 139/7 141/5 141/21 143/15 147/1 156/9 157/10 160/2 162/13 163/19 164/7 167/19 169/17 172/18 173/20 174/2 177/23 179/8 181/2
old [5]  9/4 58/25 60/20 60/24 107/17
OMB [1]  97/5
once [9]  47/15 75/21 127/21 133/19 137/10 174/6 178/13 178/13 180/16
one [92]  6/24 7/4 12/25 13/6 17/3 18/14 21/9 27/25 29/6 31/19 33/7 33/10 33/19 35/4 35/5 35/9 35/13 38/2 40/11 41/22 42/1 42/6 43/9 47/18 48/10 49/14 50/22 55/23 56/2 56/6 56/6 56/9 57/3 58/7 61/13 66/18 68/2 69/4 69/6 69/7 78/4 82/13 83/12 83/16 83/18 83/22 87/18 87/19 90/7 90/19 90/20 94/2 96/13 100/6 100/6 101/14 103/17 113/7 114/23 118/5 118/6 118/9 120/8 123/17 128/13 133/16 135/23 138/10 148/5 148/18 148/20

**O**

**one... [21]** 149/8 151/2 151/7 154/4 154/4 156/19 156/20 158/14 159/7 159/14 160/7 163/3 164/11 167/14 169/22 170/22 172/20 173/4 174/11 175/16 180/8

**one-year [2]** 90/7 90/19

**ones [3]** 22/15 146/11 178/3

**ongoing [1]** 163/6

**only [33]** 12/5 20/1 28/21 31/10 57/4 60/19 64/12 66/6 75/11 81/7 97/8 105/4 109/21 122/24 126/25 128/20 130/12 138/4 138/8 139/13 144/21 148/23 149/6 153/12 156/20 163/18 167/12 167/14 167/17 170/2 175/5 178/9 178/19

**only -- and [1]** 167/12

**opacity [1]** 110/17

**open [37]** 69/5 69/8 69/9 69/12 69/25 88/21 89/6 90/13 91/10 97/12 97/22 99/4 99/4 99/17 100/7 128/10 128/15 128/18 128/20 128/23 128/24 129/3 129/17 129/18 131/23 132/1 138/5 165/21 165/22 165/22 166/1 166/3 166/17 166/21 171/1 171/15 171/19

**opened [2]** 82/22 83/8

**opera [5]** 14/2 14/10 64/6 99/4 171/17

**operate [3]** 11/18 118/11 175/13

**operated [2]** 157/21 160/14

**operates [1]** 127/23

**operating [7]** 39/5 54/4 65/1 77/25 95/9 99/11 175/9

**operation [7]** 48/8 48/14 84/6 85/22 118/14 120/9 175/20

**operations [10]** 7/12 7/24 13/1 15/19 54/7 54/23 79/22 84/25 157/14 157/15

**opine [1]** 82/3

**opinion [3]** 9/23 20/18 79/14

**opportune [2]** 75/7 75/9

**opportunity [15]** 36/12 42/4 53/5 64/11 64/14 70/8 75/12 76/3 77/16 79/14 82/1 87/10 132/9 172/23 181/6

**opposed [3]** 84/7 102/12 116/24

**opposing [1]** 155/17

**opposite [1]** 142/19

**opposition [2]** 45/17 181/12

**option [2]** 88/25 91/8

**optional [2]** 115/4 115/13

**options [1]** 99/8

**order [10]** 15/2 66/21 82/24 113/18 117/5 133/9 144/9 155/24 173/9 181/17

**ordered [3]** 14/13 15/2 116/22

**orderly [1]** 180/25

**ordinary [1]** 22/21

**organic [6]** 107/6 126/7 142/10 153/4 156/10 156/17

**organization [1]** 152/10

**organizational [1]** 6/3

**origin [1]** 88/23

**original [14]** 20/10 20/13 20/14 26/2 26/5 27/2 27/19 29/25 34/2 47/23 67/21 67/21 143/23 153/3

**Originally [1]** 20/16

**originates [1]** 136/15

**other [70]** 8/4 13/6 17/9 18/22 20/7 21/10 28/13 28/15 31/19 33/19 34/1 34/8 36/15 41/14 41/24 42/23 42/24 51/18 51/22 54/9 54/18 56/10 57/17 59/9 61/3 70/18 71/7 71/24

73/15 81/7 84/17 99/14 100/18 110/5 112/11 112/20 112/23 117/7 117/10 117/10 118/2 118/3 118/3 120/18 124/13 127/19 128/2 129/22 131/16 132/14 141/25 143/3 143/11 148/20 151/9 152/24 157/22 158/7 158/15 159/14 168/22 169/23 170/9 170/22 174/20 175/13 177/21 178/2 181/1 181/9

**others [4]** 47/10 47/13 64/6 152/6

**otherwise [13]** 16/18 102/1 110/9 116/14 125/5 130/18 131/1 135/15 138/21 140/19 164/17 170/3 176/13

**our [40]** 4/25 9/17 16/13 23/15 26/19 34/14 36/19 38/18 50/6 55/5 63/24 68/23 71/13 75/13 87/12 87/12 95/18 102/22 109/2 114/3 119/17 124/4 125/18 125/18 125/25 133/24 139/18 144/23 145/9 146/23 150/11 154/5 162/13 174/4 175/3 175/23 175/23 176/4 178/21 179/21

**ours [1]** 35/5

**out [57]** 7/19 8/20 9/7 9/14 10/3 10/22 12/5 22/21 23/3 27/21 27/23 27/25 28/1 28/1 28/7 29/11 29/15 43/24 44/17 46/5 48/11 51/15 56/21 60/3 62/24 72/3 74/17 97/17 99/10 100/3 103/14 106/25 107/18 109/14 115/9 116/8 116/10 116/17 117/13 117/13 120/10 125/5 128/2 129/19 129/23 134/17 139/22 142/6 144/18 144/21 151/19 154/18 162/19 163/4 168/10 175/8 176/6

**out -- we [1]** 129/23

**out-pace [1]** 144/18

**outages [1]** 76/16

**outlay [1]** 38/16

**outlined [1]** 98/20

**outlines [2]** 34/16 83/18

**outreach [1]** 72/5

**outset [1]** 142/14

**outside [14]** 16/6 16/17 17/23 18/16 26/2 39/14 40/12 42/5 49/16 59/6 66/4 84/23 115/5 121/15

**over [13]** 20/19 22/8 34/17 49/3 61/6 68/5 102/21 112/5 123/18 154/24 155/3 155/3 171/21

**overhang [4]** 33/14 56/15 56/22 61/5

**overlap [1]** 87/11

**overnight [1]** 74/9

**overrides [1]** 126/17

**overrule [1]** 8/9

**Overruled [2]** 27/11 49/11

**oversee [1]** 17/3

**overseeing [1]** 13/1

**oversight [1]** 143/9

**own [4]** 120/3 123/14 145/18 152/21

**owned [2]** 53/13 177/8

**owns [1]** 70/9

**P**

**p.m [3]** 102/25 102/25 181/21

**pace [1]** 144/18

**package [1]** 30/25

**page [7]** 3/9 18/5 67/11 118/23 159/19 175/23 178/20

**Page 30 [1]** 178/20

**Page 71 [1]** 175/23

**pages [5]** 3/6 3/7 3/8 67/8 181/16

**paint [4]** 20/4 20/16 20/19 21/15

**painted [6]** 18/17 19/11 20/13 23/6 23/9 24/10

**painting [13]** 18/23 19/20 21/13 21/14 22/12 22/19 23/5 24/7

**P**

**painting... [5]** 24/21 62/10 105/7 130/23 156/15
**panels [4]** 45/8 45/11 45/13 57/3
**paradigmatic [1]** 143/22
**paradigmatically [1]** 129/3
**Paragraph [1]** 111/12
**Paragraph 19 [1]** 111/12
**paralegal [1]** 4/25
**parent [3]** 152/10 152/16 152/17
**park [27]** 82/1 84/5 84/12 85/19 85/23 118/12 118/21 127/21 127/21 130/9 131/15 150/12 150/21 160/21 160/23 161/9 161/19 161/20 177/1 177/10 177/15 177/15 177/18 177/20 177/20 178/1 178/5
**park's [4]** 119/6 119/11 123/12 177/3
**parking [6]** 49/16 65/21 67/1 99/5 99/5 120/25
**parks [5]** 120/2 161/10 161/10 176/17 177/7
**parkway [11]** 61/6 85/18 85/19 85/22 86/1 86/2 86/10 127/12 127/13 127/20 177/21
**parse [1]** 74/17
**part [37]** 12/17 16/13 18/11 18/21 19/16 20/10 23/25 26/2 26/25 27/1 27/19 28/22 29/7 29/25 30/11 30/24 33/11 34/6 34/9 34/15 48/5 51/21 51/22 52/5 63/22 70/23 75/20 105/25 106/3 117/24 130/14 130/18 132/10 147/6 158/2 158/19 176/4
**partial [2]** 90/13 145/24
**partially [2]** 90/18

99/11
**participant [1]** 144/24
**participated [2]** 15/23 172/25
**particular [2]** 162/12 169/15
**particularly [3]** 17/13 144/2 175/14
**parties [2]** 4/7 172/22
**PARTNERS [3]** 2/2 2/5 4/18
**parts [5]** 21/11 41/14 133/9 143/24 175/13
**pass [1]** 125/10
**past [11]** 12/13 34/14 49/25 52/23 56/25 63/7 103/23 129/6 131/8 169/25 179/1
**paste [1]** 97/4
**patent [2]** 169/16 170/8
**patently [2]** 147/16 153/22
**pathway [1]** 97/6
**pathways [1]** 135/7
**patio [2]** 127/15 127/17
**patron [2]** 55/25 76/20
**patron-facing [1]** 55/25
**patrons [6]** 58/17 73/5 76/12 76/15 76/23 77/3
**pattern [5]** 119/5 119/10 121/10 123/11 161/18
**pattern.' [1]** 30/17
**pause [1]** 14/16
**pausing [1]** 144/9
**pavers [1]** 166/20
**Pavilion [3]** 69/17 71/11 99/6
**pay [1]** 46/20
**paying [2]** 84/22 106/16
**payments [1]** 124/11
**Pennsylvania [1]** 2/10
**penultimate [1]** 85/16
**people [20]** 9/10 29/23 40/24 52/4 58/19 62/3 62/5 70/19 80/3 80/4 83/2 92/24 110/10 117/11 122/1 135/17 146/8 154/25 166/12 175/6

**per [1]** 106/7
**percent [4]** 28/2 68/19 74/9 78/4
**percentage [1]** 176/21
**perfect [2]** 28/19 75/17
**perform [2]** 93/25 130/17
**performance [2]** 10/15 91/25
**performances [7]** 71/6 71/22 91/21 94/5 146/7 158/8 158/18
**performers [1]** 93/4
**performing [14]** 1/6 4/6 47/25 75/19 91/3 91/21 124/4 124/11 124/17 124/23 126/7 141/17 157/20 175/6
**perhaps [7]** 13/6 65/4 71/6 71/22 74/1 114/9 141/18
**perimeter [9]** 42/12 42/15 42/18 42/20 45/8 127/8 127/10 128/16 128/25
**perimeters [1]** 42/9
**period [5]** 10/13 34/18 66/23 162/9 171/21
**permanence [1]** 176/10
**permanent [5]** 134/2 146/19 166/10 166/11 176/12
**permanently [1]** 83/8
**permeates [1]** 134/12
**permit [10]** 127/21 130/6 130/18 131/10 131/14 151/1 151/7 151/12 151/15 173/17
**permit-issuing [1]** 131/14
**permits [5]** 104/7 130/13 131/12 150/23 173/22
**permitted [2]** 151/16 151/20
**permitting [1]** 139/9
**perpetuating [1]** 146/24
**person [6]** 11/15 11/16 55/3 73/9 81/17 112/8
**personal [1]** 47/11
**personnel [1]** 22/18
**persons [1]** 161/8

**perspective [4]** 54/16 54/17 145/15 153/9
**perverse [2]** 60/9 133/1
**phase [4]** 74/13 99/2 99/2 101/6
**phased [6]** 74/1 74/21 76/8 89/6 89/9 90/3
**phases [2]** 55/13 79/12
**phasing [1]** 74/5
**phone [6]** 11/14 11/22 13/22 135/6 178/10 178/16
**phrase [2]** 35/11 42/8
**physical [5]** 42/19 127/8 128/16 128/22 128/25
**PI [6]** 104/18 108/9 113/13 113/17 175/23 178/21
**picture [1]** 67/4
**piece [6]** 12/24 18/22 39/11 57/22 132/22 132/22
**pieces [5]** 18/22 49/24 63/11 69/15 133/2
**Pierce [2]** 2/12 5/13
**Pierce Anon [1]** 5/13
**pierce.anon [1]** 2/15
**pipe [1]** 62/18
**pitting [1]** 59/2
**place [11]** 11/10 19/25 28/9 30/8 50/2 52/6 80/13 80/16 99/19 126/25 159/8
**placed [1]** 27/1
**places [2]** 34/1 104/16
**plain [3]** 79/22 147/24 149/15
**plainly [2]** 125/25 126/7
**plaintiffs [21]** 1/3 1/13 2/2 4/8 4/14 4/16 4/24 7/4 8/6 18/6 83/16 113/20 144/1 150/14 152/16 153/11 153/15 154/2 171/7 171/25 181/10
**plaintiffs' [1]** 145/20
**plan [112]** 25/1 28/20 28/22 30/9 34/9 34/11 34/14 34/20 35/6 35/6 35/14 35/16 35/17

**P**

**plan... [99]** 35/25 36/1 36/8 36/10 36/16 36/19 36/21 36/24 37/2 37/3 37/19 38/2 38/9 38/10 38/12 38/15 38/21 38/25 39/12 40/14 44/12 44/22 44/25 46/21 47/3 48/11 49/24 50/18 51/5 51/13 51/22 51/24 52/3 67/7 67/10 67/15 67/20 68/2 68/23 69/5 74/1 81/22 82/13 82/21 83/1 83/1 83/14 83/20 88/15 88/18 88/20 88/24 89/4 89/13 89/15 98/21 100/11 100/12 105/17 105/17 105/20 105/22 106/4 106/6 106/23 107/15 107/16 107/22 108/5 108/8 108/11 108/16 108/19 109/6 110/18 110/20 133/19 133/20 133/21 135/14 135/16 136/24 137/11 137/22 139/14 140/7 140/10 142/8 142/22 158/2 159/19 159/20 173/18 178/13 178/14 179/17 180/13 180/16 180/16

**plan -- well [1]** 82/13
**planned [9]** 8/5 17/21 31/9 37/11 43/16 47/14 55/12 105/25 111/21
**planning [19]** 13/7 19/24 20/21 32/22 68/18 68/20 69/1 101/17 108/11 108/21 108/22 108/23 113/15 114/1 114/7 114/13 139/17 139/20 142/22
**plans [30]** 19/9 30/14 38/8 46/8 46/11 47/6 54/25 55/4 55/6 67/5 71/25 77/25 78/3 80/18 85/12 88/13 89/9 91/25 102/10 102/11 102/11 104/5 108/2 136/15 136/23 142/2 142/4 151/25 161/25 172/15
**plans -- why [1]** 108/2
**plant [4]** 63/1 63/2

63/3 63/25
**planters [1]** 28/21
**plausible [1]** 123/2
**play [4]** 9/17 19/15 139/21 142/5
**played [4]** 9/13 9/19 19/17 81/9
**plaza [12]** 33/25 45/9 45/10 53/4 61/4 61/5 65/18 67/2 82/24 122/24 127/10 166/20
**pleading [2]** 45/20 45/25
**pleadings [1]** 5/17
**please [19]** 4/8 6/14 6/19 6/25 19/3 19/15 23/11 24/11 31/16 32/2 32/25 34/24 37/1 41/3 43/21 46/14 49/14 81/8 87/6
**pleases [1]** 5/1
**pleasure [1]** 5/17
**plenty [1]** 145/2
**PLLC [3]** 1/21 2/2 2/5
**plumbing [7]** 56/3 62/14 62/17 62/22 62/25 75/2 75/3
**plus [4]** 105/7 105/8 105/8 105/9
**podium [1]** 86/15
**point [39]** 16/13 20/24 39/24 63/14 76/7 80/20 101/2 107/15 109/2 116/17 120/9 121/19 124/2 125/5 129/19 129/23 144/6 146/23 150/22 151/14 154/6 156/19 158/24 162/1 162/14 172/1 173/10 173/13 173/19 174/12 175/3 175/8 175/16 175/21 176/2 176/6 179/11 179/23 180/7
**pointed [2]** 46/5 164/20
**pointing [3]** 97/17 103/14 161/14
**points [3]** 59/23 164/12 180/14
**police [1]** 53/9
**policy [1]** 132/7
**polished [2]** 20/14 20/17
**pool [1]** 59/15

**pools [1]** 85/10
**portion [1]** 75/5
**pose [1]** 65/9
**poses [1]** 65/10
**position [16]** 8/9 8/15 8/21 8/23 9/3 77/12 97/20 125/18 138/15 139/18 143/16 145/7 149/1 158/16 160/18 168/19
**positions [2]** 9/10 54/6
**positive [1]** 102/5
**possibility [1]** 18/7
**possible [10]** 17/17 75/12 83/5 89/7 92/3 122/12 150/24 158/23 175/9 175/12
**possibly [2]** 138/25 166/4
**post [2]** 109/4 172/23
**post-hearing [1]** 172/23
**potentially [3]** 17/11 71/24 91/22
**Potomac [6]** 63/20 63/24 85/18 129/24 129/25 130/4
**pound [1]** 45/11
**pounds [3]** 57/21 57/22 70/5
**pour [1]** 76/17
**power [3]** 8/8 8/17 144/25
**practical [3]** 56/12 84/11 171/13
**practice [1]** 5/6
**pre [3]** 23/21 32/21 110/23
**pre-admit [1]** 23/21
**pre-approval [1]** 110/23
**pre-date [1]** 32/21
**precede [1]** 7/18
**precisely [2]** 112/9 132/25
**prefer [1]** 28/14
**preference [1]** 175/4
**prefers [1]** 8/17
**preliminary [8]** 103/11 105/12 113/23 137/8 144/25 153/24 164/6 178/13
**premiere [1]** 141/17
**premise [1]** 18/4

**premised [2]** 104/20 161/3
**prepared [1]** 6/3
**preparing [1]** 136/15
**present [3]** 7/24 71/13 146/16
**presented [2]** 87/12 100/19
**presenting [1]** 100/20
**preservation [12]** 1/2 4/4 5/4 16/19 103/22 125/14 125/15 130/24 131/13 133/7 133/12 173/22
**president [31]** 7/9 7/12 11/1 11/3 15/9 15/19 26/8 27/4 28/10 33/23 44/17 45/19 46/1 46/9 54/1 54/7 70/16 79/21 90/6 104/8 104/22 105/15 109/1 109/20 112/17 113/4 134/3 144/2 144/11 149/3 155/19
**president's [3]** 90/14 112/5 112/11
**presidential [3]** 157/21 157/22 168/24
**press [1]** 112/24
**presume [2]** 123/14 175/21
**presumption [1]** 114/4
**pretty [7]** 9/22 22/25 53/4 67/15 72/22 80/9 157/24
**prevail [1]** 105/2
**prevent [3]** 105/1 148/11 162/5
**prevent -- it's [1]** 162/5
**prevents [1]** 130/25
**previewed [1]** 67/6
**previous [7]** 79/13 88/19 89/1 97/4 100/10 100/16 114/5
**previous -- yes [1]** 88/19
**previously [3]** 20/5 96/21 138/1
**price [1]** 171/3
**primarily [1]** 129/18
**prime [1]** 22/22
**principal [1]** 55/3
**principle [1]** 103/15

**P**

**prior [7]** 14/24 22/3 38/7 80/15 94/15 106/1 139/9

**prioritize [2]** 75/16 76/3

**prioritizing [3]** 75/22 75/22 100/16

**priority [8]** 18/24 18/25 19/14 19/21 20/24 80/6 80/7 158/22

**prism [1]** 154/1

**Privacy [1]** 167/25

**private [4]** 39/18 40/17 40/18 41/16

**privately [2]** 41/17 42/5

**privately-raised [1]** 42/5

**probably [6]** 75/11 80/17 132/5 164/3 179/17 181/5

**problem [4]** 20/24 21/10 158/6 171/4

**problematic [1]** 21/4

**problems [1]** 21/10

**procedural [7]** 111/1 123/19 124/7 125/13 143/18 146/11 174/17

**procedure [1]** 121/4

**procedures [1]** 117/10

**proceed [3]** 6/25 131/17 180/24

**proceeding [1]** 6/16

**proceedings [6]** 1/9 2/25 14/16 35/5 181/21 182/6

**proceeds [1]** 142/3

**process [17]** 49/1 50/5 131/13 133/3 134/18 143/7 151/19 155/24 163/7 163/11 163/15 165/12 167/2 169/19 172/2 178/11 180/23

**processes [11]** 106/8 107/3 109/4 110/6 110/16 117/7 131/17 139/19 144/14 145/17 146/18

**produced [2]** 2/25 104/5

**production [4]** 54/10 64/5 64/20 84/23

**professional [1]** 160/5

**profound [1]** 66/14

**program [3]** 71/9 71/10 100/2

**programmatic [2]** 75/9 99/18

**programmatically [1]** 84/22

**programmers [1]** 92/24

**programming [21]** 54/16 75/13 75/23 92/2 92/5 92/7 92/25 93/6 95/4 96/2 96/9 96/10 96/24 158/8 158/12 158/16 158/21 158/23 159/1 159/5 171/20

**programs [2]** 5/14 99/18

**progress [1]** 68/17

**prohibit [1]** 180/4

**project [47]** 22/16 25/21 26/15 29/12 29/21 37/10 38/14 41/14 41/15 53/3 53/5 56/5 66/13 66/21 104/3 104/17 104/20 110/5 115/1 122/24 127/2 127/22 128/11 128/14 130/19 131/11 132/10 132/15 132/15 132/18 135/2 136/6 138/4 138/11 138/12 142/3 144/17 157/3 158/14 158/15 166/6 167/6 169/15 169/18 170/3 172/16 181/1

**projecting [1]** 6/6

**projects [24]** 25/8 49/2 53/9 72/15 72/20 75/3 100/17 107/1 114/20 125/23 127/7 128/3 130/25 133/1 136/3 136/16 139/12 141/25 149/13 165/1 165/4 167/17 174/19 175/13

**prolong [1]** 73/19

**promise [1]** 47/20

**prompt [1]** 181/11

**promptly [1]** 137/3

**proper [2]** 153/10 161/7

**properly [2]** 63/17 151/19

**property [4]** 131/3 146/19 161/8 161/11

**proposal [3]** 27/7 106/18 156/6

**propose [1]** 181/16

**proposed [2]** 83/14 136/16

**prospect [1]** 144/5

**protect [1]** 77/11

**protection [5]** 42/17 64/18 64/19 64/22 161/7

**provide [6]** 118/18 125/9 158/16 160/9 163/5 163/24

**provided [4]** 35/20 119/23 159/3 159/4

**provides [3]** 106/21 119/12 157/11

**provision [14]** 111/4 124/10 125/7 126/3 135/3 135/5 138/5 164/13 165/21 166/2 166/21 176/11 176/14 176/25

**provisions [3]** 156/20 161/13 166/17

**public [30]** 8/6 15/8 36/17 36/18 41/19 53/10 53/11 55/24 70/20 83/16 84/19 85/3 96/3 111/5 119/5 119/10 121/10 121/17 122/13 123/11 136/3 139/16 141/24 147/21 161/11 161/18 162/9 168/23 171/8 171/24

**public-use [3]** 119/5 119/10 123/11

**publicly [6]** 40/19 53/13 69/23 71/12 80/22 104/8

**publicly-funded [1]** 40/19

**publicly-owned [1]** 53/13

**published [2]** 119/13 119/24

**pull [2]** 23/11 34/23

**pump [2]** 63/23 85/17

**purchased [1]** 40/22

**purely [1]** 157/6

**purpose [8]** 27/20 39/9 51/3 90/12 90/18

105/23 149/16 154/21

**purposes [15]** 125/22 126/12 126/17 126/17 128/6 138/16 146/21 147/5 153/15 154/15 160/22 164/17 168/3 168/5 177/21

**pursuant [1]** 177/9

**push [1]** 180/22

**pushing [2]** 52/11 180/21

**put [32]** 14/4 15/5 17/19 19/3 24/11 28/8 30/12 31/6 31/16 32/2 39/24 41/3 43/21 46/13 51/22 75/23 76/7 81/8 99/16 99/19 101/7 105/24 121/16 128/19 129/20 141/19 152/3 159/21 161/25 167/4 171/8 172/16

**putting [13]** 17/2 17/3 44/10 48/20 49/24 68/3 102/1 122/18 129/24 165/6 166/16 168/20 180/15

**Q**

**qualifies [3]** 166/21 168/8 168/18

**qualify [1]** 129/14

**quality [3]** 77/1 157/14 157/15

**quantified [1]** 95/16

**quantify [2]** 94/1 94/3

**quarry [1]** 134/16

**question [46]** 8/11 10/13 11/2 11/25 16/10 16/20 17/16 21/22 22/4 23/2 23/2 32/13 33/7 36/25 40/7 42/21 48/10 48/18 49/7 78/14 80/20 81/5 81/25 83/11 85/16 92/22 95/12 97/8 101/5 106/5 112/19 122/9 125/16 128/11 140/20 155/9 163/9 166/24 167/15 167/21 169/13 170/1 176/24 177/6 177/13 178/18

**questions [27]** 26/10 31/3 39/24 46/5 48/24 49/22 50/2 51/4 51/18 69/4 77/6 78/16 81/7

## Q

**questions... [14]** 81/24 82/14 82/17 84/2 86/17 87/3 87/19 92/16 98/3 100/8 101/10 109/15 163/8 170/9
**quicker [2]** 47/21 52/16
**quickly [6]** 21/12 55/15 57/19 65/12 86/16 144/17
**quite [1]** 175/8
**quote [17]** 28/1 44/20 83/22 83/23 84/16 103/25 104/9 104/9 104/11 115/19 119/4 119/10 119/14 119/16 121/10 126/4 128/9
**quote/unquote [2]** 84/16 115/19
**quoted [1]** 15/7

## R

**radar [1]** 82/5
**rain [1]** 28/3
**raise [3]** 6/12 6/14 7/15
**raised [2]** 41/13 42/5
**raises [1]** 133/12
**raising [3]** 41/18 41/22 153/13
**random [1]** 19/23
**ranging [1]** 157/25
**rather [6]** 110/17 122/16 122/16 134/17 174/7 179/18
**re [3]** 24/21 86/20 146/10
**re-emphasize [1]** 146/10
**re-painting [1]** 24/21
**re-redirect [1]** 86/20
**reach [35]** 50/1 68/25 69/3 69/11 69/13 69/14 69/18 69/22 70/6 70/16 70/20 70/22 70/23 70/25 71/8 71/10 71/13 71/16 72/1 72/2 72/6 72/7 86/8 91/22 91/25 121/1 121/18 121/22 121/24 122/4 126/24 131/6 165/5 165/6 170/1
**reached [2]** 101/2

163/4
**read [5]** 24/14 160/12 166/5 168/15 168/16
**readily [1]** 36/18
**reading [4]** 125/3 168/9 168/17 169/8
**reads [1]** 124/10
**ready [1]** 68/25
**real [3]** 153/12 172/8 173/14
**realistic [1]** 144/5
**reality [1]** 18/8
**realize [1]** 172/8
**really [28]** 15/9 21/22 32/8 35/25 54/7 54/15 55/19 57/8 57/18 61/4 66/9 66/20 70/19 77/13 80/8 82/17 98/16 98/20 113/10 129/17 131/7 142/25 151/3 153/4 153/10 160/18 169/13 180/8
**really -- again [1]** 98/20
**really -- that [1]** 35/25
**reason [7]** 48/21 93/3 110/7 110/8 130/14 133/15 134/5
**reasonable [1]** 181/15
**reasonably [1]** 129/5
**reasons [1]** 76/1
**rebuild [2]** 43/17 112/12
**rebuilding [5]** 31/22 32/15 57/13 104/9 115/23
**rebuilt [1]** 78/11
**recall [3]** 15/11 24/9 42/10
**receive [1]** 181/18
**received [3]** 102/3 140/3 140/8
**recent [4]** 96/7 97/16 97/20 131/8
**recently [3]** 40/7 53/12 178/21
**recess [1]** 102/25
**recognition [1]** 159/24
**recognize [1]** 23/13
**recognized [1]** 29/24
**recommendation [9]** 72/12 72/13 73/10 89/22 94/13 94/21 109/8 109/10 160/5

**recommendations [8]** 54/25 55/1 55/3 55/7 73/14 75/8 98/15 137/9
**recommended [5]** 72/14 72/17 79/21 94/25 119/20
**reconvene [1]** 102/22
**record [16]** 4/3 4/9 6/20 8/9 23/20 23/25 35/4 83/12 87/7 103/1 112/20 121/11 147/11 148/2 155/8 182/6
**recorded [1]** 2/25
**Records [1]** 137/7
**recreational [1]** 177/21
**recross [1]** 52/10
**recrossed [1]** 87/15
**red [6]** 29/25 30/4 30/6 30/16 30/21 116/13
**redirect [2]** 86/20 98/6
**redirecting [1]** 65/19
**redo [1]** 162/23
**reduce [1]** 93/22
**reduced [1]** 97/2
**refer [2]** 176/9 176/16
**reference [4]** 26/6 98/25 160/24 175/23
**referenced [1]** 145/11
**referring [2]** 70/3 175/25
**refers [1]** 111/12
**reflecting [2]** 54/8 59/15
**reflective [1]** 85/10
**refurbishing [1]** 24/20
**regarding [2]** 70/15 141/24
**regardless [4]** 106/15 126/18 135/2 164/6
**regents [1]** 152/22
**register [8]** 27/7 119/13 126/23 127/14 131/3 141/15 145/12 146/19
**Register-eligibility [1]** 145/12
**Register-eligible [1]** 131/3
**Register-listed [1]** 146/19
**regs [4]** 160/14 161/6 176/1 176/10
**regularity [1]** 114/4

**regulation [3]** 120/1 161/3 178/5
**regulations [19]** 82/2 84/6 118/12 118/17 118/18 118/22 119/3 119/9 120/3 120/15 120/18 120/21 142/1 160/17 160/22 176/7 177/10 178/1 178/6
**rehabilitation [5]** 114/19 117/22 127/8 129/5 156/23
**rehearsal [1]** 71/14
**rehearsals [4]** 71/6 71/6 71/20 71/21
**reign [1]** 155/1
**Reilly [2]** 1/20 4/25
**relate [2]** 39/2 157/4
**related [5]** 87/9 87/11 93/21 124/11 124/22
**relates [1]** 87/19
**relating [2]** 124/3 129/7
**relationship [2]** 152/18 153/6
**relevance [1]** 16/9
**relevant [2]** 118/4 126/21
**reliance [1]** 176/1
**relief [5]** 144/3 150/18 153/7 161/3 180/7
**rely [3]** 8/7 16/13 47/2
**relying [2]** 37/10 129/17
**remain [12]** 6/11 52/6 69/5 69/8 69/9 69/12 69/22 69/25 88/21 89/6 97/12 97/22
**remains [1]** 180/9
**remand [1]** 172/5
**remark [1]** 16/11
**remedied [1]** 172/3
**remedy [1]** 170/16
**remember [3]** 26/7 29/21 62/9
**reminded [1]** 33/8
**remotely [2]** 15/23 146/2
**remove [1]** 8/17
**removed [2]** 9/5 30/6
**removing [1]** 51/16
**rename [1]** 15/15
**renamed [1]** 47/23
**renewal [2]** 31/10

Case 1:25-cv-04480-CRC    Document 45-1    Filed 05/11/26    Page 215 of 227

**R**

**renewal... [1]** 43/16
**renovate [2]** 32/7 101/3
**renovated [1]** 76/17
**renovation [9]** 31/10 43/16 55/4 76/9 76/9 77/25 91/10 100/11 100/12
**renovations [11]** 55/11 68/17 69/5 69/9 69/25 73/1 75/20 88/22 89/4 97/13 97/22
**rent [1]** 84/24
**repair [5]** 18/9 114/18 117/21 156/23 157/13
**repaired [1]** 66/17
**repairs [11]** 55/23 79/10 85/17 85/21 103/18 103/19 119/19 155/10 179/24 179/25 180/2
**repeat [1]** 14/20
**repeatedly [4]** 113/12 119/21 120/23 122/14
**rephrase [1]** 48/18
**replace [18]** 8/17 11/4 11/5 14/2 30/9 39/10 43/8 62/25 64/14 85/10 85/14 88/7 104/12 116/12 116/24 117/3 133/10 154/17
**replaced [10]** 8/22 10/12 10/16 27/22 28/13 29/18 29/20 30/4 69/19 154/12
**replacement [8]** 28/18 28/22 114/19 116/15 116/24 117/21 127/10 156/23
**replacing [5]** 28/11 116/6 142/23 166/15 166/20
**replies [1]** 181/12
**report [6]** 30/14 137/4 137/8 137/12 152/19 152/22
**reported [3]** 2/21 48/4 182/12
**Reporter [3]** 2/22 7/19 182/4
**reports [6]** 32/21 34/14 73/14 98/18

101/6 119/20
**represent [2]** 7/4 27/3
**representing [1]** 45/18
**request [5]** 67/21 87/10 141/24 163/24 172/20
**requesting [2]** 75/25 97/6
**require [15]** 18/9 82/3 106/8 107/6 107/7 109/3 110/22 123/7 127/20 132/3 133/17 135/7 135/16 142/1 162/5
**required [13]** 35/22 74/13 98/17 108/17 110/1 116/23 127/17 128/13 137/10 137/23 138/4 140/19 180/23
**requirement [6]** 120/17 120/20 120/22 163/22 165/3 167/9
**requirements [8]** 47/14 110/25 111/1 123/19 124/7 157/14 164/11 167/8
**requires [9]** 103/18 103/20 120/8 120/14 135/2 136/7 141/23 149/12 179/16
**rerouted [1]** 86/3
**resolution [1]** 48/2
**resource [5]** 141/10 141/15 141/16 141/19 163/8
**resources [3]** 141/13 141/13 161/8
**respect [8]** 46/20 50/5 77/16 139/3 151/21 156/17 157/11 163/16
**respond [2]** 42/22 160/19
**response [5]** 32/12 33/6 46/25 47/17 81/23
**responsibilities [3]** 54/20 77/14 140/9
**responsibility [3]** 40/20 41/20 48/6
**responsible [8]** 41/17 53/10 54/19 55/5 77/16 136/3 140/6 140/7
**rest [3]** 26/14 44/10 146/6
**restoration [4]** 115/20

115/24 116/2 116/23
**restore [1]** 116/8
**restoring [1]** 116/6
**restraints [1]** 78/18
**restriction [2]** 161/17 162/11
**restrictions [1]** 131/22
**restrictive [2]** 119/15 119/22
**result [7]** 119/4 119/9 121/9 123/10 131/23 133/4 161/17
**results [1]** 163/15
**retained [1]** 162/23
**return [1]** 116/10
**revenue [6]** 93/14 93/17 93/23 94/5 172/9 172/12
**review [49]** 81/14 82/1 83/16 90/7 90/11 90/19 94/8 94/12 94/12 103/22 104/5 106/8 106/14 107/3 107/8 108/15 110/2 117/7 123/22 124/6 124/13 124/24 125/24 128/3 130/7 131/24 132/1 132/3 132/19 133/2 133/17 134/24 135/2 137/22 139/3 140/16 140/18 141/7 145/18 146/18 147/5 147/9 163/17 164/23 165/1 166/23 167/17 168/18 168/25
**review/approval [1]** 132/19
**reviewed [2]** 80/15 161/2
**reviews [4]** 130/7 138/11 144/6 175/5
**revitalization [1]** 31/21
**Ric [11]** 8/22 10/4 10/12 10/14 10/18 10/25 11/4 11/5 11/8 11/11 16/5
**Richmond [2]** 2/3 2/6
**rigging [2]** 64/1 64/5
**right [120]** 5/21 6/1 6/7 6/12 6/13 6/14 7/10 7/18 12/16 15/16 15/20 18/1 19/11 21/16 22/14 25/2 27/8 34/13 36/24 40/17 41/1 41/8 41/25

43/14 43/19 44/3 45/1 57/24 60/15 66/5 66/15 66/19 67/4 67/16 68/14 69/3 69/17 71/19 72/1 72/10 73/16 77/4 79/6 83/17 84/1 86/18 86/20 87/20 88/5 88/8 89/21 90/8 90/10 90/13 91/4 91/11 91/15 91/22 92/1 92/4 93/7 93/14 93/20 93/23 94/13 94/18 95/18 96/15 96/17 100/17 101/10 102/19 102/24 103/1 104/13 106/9 108/17 112/16 113/10 114/15 114/17 116/25 117/8 123/17 124/18 126/17 127/7 130/8 133/19 134/4 134/18 139/23 140/16 142/11 142/19 144/19 147/14 147/18 148/8 151/22 152/12 154/22 155/22 156/12 156/14 159/17 161/12 161/15 162/6 164/3 164/10 165/11 167/22 169/6 170/19 171/10 172/16 180/19 181/19 181/19
**rings [1]** 131/5
**ripe [2]** 108/3 108/4
**ripping [2]** 117/13 117/13
**rise [1]** 48/12
**risers [2]** 62/21 75/2
**rises [1]** 166/22
**risk [6]** 65/9 65/10 96/2 96/2 102/2 156/2
**risks [2]** 66/13 98/21
**river [15]** 33/24 61/4 61/5 63/20 63/22 63/24 67/2 71/10 82/23 99/6 122/15 122/20 127/10 127/17 145/1
**riverside [1]** 83/3
**road [6]** 59/16 66/11 66/22 82/23 100/13 162/8
**road -- to [1]** 66/22
**Rock [6]** 61/6 85/18 85/25 127/12 127/13 127/19
**rocks [1]** 166/12
**role [7]** 7/24 8/8 9/12

# R

**role... [4]**  53/25 54/3 54/21 162/16
**roles [1]**  54/5
**roof [9]**  56/16 56/22 56/25 57/24 58/20 58/23 59/1 59/3 121/2
**room [5]**  63/5 63/23 85/17 175/11 175/16
**rooms [1]**  71/14
**ropes [1]**  64/14
**Roth [5]**  2/8 5/11 5/16 147/1 149/25
**rough [2]**  109/7 180/15
**rough-scheduling [1]**  180/15
**roughly [6]**  38/22 39/15 57/22 67/11 70/25 173/9
**route [1]**  55/21
**routine [7]**  20/6 20/7 53/20 54/11 67/13 68/24 106/4
**row [1]**  7/15
**RPR [1]**  2/21
**rubric [1]**  93/19
**rulemaking [6]**  119/13 119/25 120/14 149/9 160/24 160/25
**rules [3]**  103/16 120/11 180/6
**running [1]**  120/4
**runs [3]**  61/8 127/14 127/15
**rust [4]**  20/3 20/8 21/5 60/8
**rusted [1]**  62/18
**rusting [5]**  45/12 57/7 58/22 61/7 79/17

# S

**safe [1]**  158/17
**safety [16]**  60/1 60/15 60/18 64/16 64/21 65/3 65/9 65/10 66/13 72/21 76/8 76/14 79/16 99/1 157/1 157/5
**said [84]**  9/20 9/25 10/1 10/2 12/3 12/4 14/21 17/14 18/14 19/7 19/14 28/13 32/6 32/14 32/16 33/2 34/5 34/22 36/3 36/6 40/4 41/10 42/6 43/15 43/19 43/23

43/24 44/1 44/17 45/25 46/1 46/5 46/6 46/17 46/21 46/22 47/25 53/22 58/7 61/18 61/25 73/10 81/13 81/17 81/19 82/24 88/4 90/17 91/19 104/22 106/9 108/11 109/18 109/21 109/22 109/25 112/17 113/2 113/11 114/8 116/21 117/5 119/25 121/13 121/15 121/24 123/15 124/1 127/16 134/1 139/1 142/13 142/25 145/1 145/5 162/23 162/24 163/5 164/21 166/13 166/14 168/11 175/22 178/6
**sake [1]**  113/16
**sales [2]**  93/16 94/21
**same [27]**  17/4 17/20 17/20 17/22 18/5 31/5 33/11 36/12 36/20 65/4 77/3 101/24 106/2 114/5 116/4 117/20 132/24 134/7 134/8 134/10 134/16 134/21 136/14 167/23 172/7 176/22 180/25
**sanitary [1]**  75/3
**satisfied [1]**  135/6
**sauce [2]**  73/17 73/17
**save [1]**  49/15
**savings [1]**  95/18
**saw [8]**  44/1 79/25 95/1 104/10 112/16 113/7 149/21 176/1
**say [91]**  8/9 9/9 9/12 10/23 11/7 12/11 14/8 18/25 22/14 36/24 38/2 41/1 41/7 46/9 49/4 53/17 54/13 55/2 56/11 65/3 67/15 80/15 81/20 89/10 91/21 91/24 97/10 100/10 100/13 100/14 101/1 105/6 107/22 109/20 109/20 111/8 111/10 113/2 113/10 114/6 116/10 117/4 120/21 122/1 123/16 125/8 126/20 130/21 132/10 132/15 132/17 133/8 133/21 134/6 134/14 135/17

137/4 138/23 139/16 143/5 143/19 144/3 145/14 145/20 148/13 148/18 148/19 149/18 149/20 150/24 151/1 151/14 151/22 152/24 154/10 155/2 155/4 155/8 156/1 160/8 161/6 162/15 164/16 168/11 172/10 174/9 178/3 178/10 179/19 179/21 180/13
**saying [39]**  7/20 15/11 26/25 27/25 28/23 35/7 36/5 36/23 37/9 40/13 40/15 42/15 46/10 80/6 81/12 95/23 104/3 107/20 108/15 114/1 116/7 116/9 120/12 121/4 131/6 135/22 139/19 148/21 148/22 151/5 158/25 162/24 171/18 179/24 179/24 180/1 180/19 180/21 180/24
**says [40]**  15/8 23/2 24/20 30/15 31/22 34/12 40/22 40/23 48/7 49/10 87/24 108/18 111/4 113/7 113/12 113/23 118/10 119/3 120/19 121/2 126/4 127/1 128/2 128/8 133/4 134/9 134/9 136/1 136/2 136/14 137/4 142/19 142/22 148/14 148/25 149/2 149/8 161/6 178/1 180/9
**scenario [3]**  105/4 105/15 105/15
**scenarios [3]**  105/3 105/11 105/14
**scenic [3]**  119/6 119/11 123/12
**scepticism [1]**  148/1
**sceptics [1]**  156/1
**schedule [12]**  34/16 34/21 55/17 67/14 67/24 68/4 68/21 73/4 75/14 107/21 146/6 172/17
**scheduled [2]**  171/14 171/16

**schedules [5]**  89/8 89/18 89/19 96/7 96/9
**scheduling [2]**  180/15 181/17
**schematics [1]**  102/10
**scheme [1]**  30/21
**schemes [1]**  14/6
**school [2]**  56/12 155/2
**schools [2]**  53/10 53/11
**scope [16]**  16/7 17/23 49/8 54/20 55/11 104/20 113/24 115/2 124/3 125/25 131/25 156/18 160/7 162/4 169/11 171/5
**screen [4]**  6/6 10/8 23/15 82/5
**screens [1]**  63/21
**se [1]**  106/7
**Seaport [1]**  1/17
**search [1]**  98/7
**seat [3]**  116/7 116/24 117/24
**seated [1]**  6/19
**seating [2]**  30/16 116/20
**seats [12]**  14/1 14/3 14/7 14/10 14/12 14/24 15/1 115/23 117/2 117/2 117/13 132/3
**second [9]**  62/6 70/21 74/8 80/23 114/16 120/7 120/16 145/20 158/19
**seconds [2]**  6/3 86/17
**secretary [5]**  48/9 116/2 118/16 125/8 177/20
**section [24]**  5/25 21/3 61/22 71/1 108/17 119/1 125/15 125/23 126/3 126/23 127/22 128/4 128/8 128/12 130/7 130/7 130/17 130/24 149/13 167/1 167/3 167/6 170/3 177/12
**Section 1.5 [1]**  119/1
**Section 106 [14]**  108/17 125/15 125/23 126/23 127/22 128/12 130/7 130/7 130/17 149/13 167/1 167/3

**S**

**Section 106... [2]** 167/6 170/3
**Section 110k [1]** 130/24
**Section 6.641.15 [1]** 128/4
**Section 76i [1]** 126/3
**secure [1]** 158/17
**security [10]** 39/4 42/9 42/12 42/19 42/25 127/8 128/16 128/22 129/1 157/1
**see [61]** 4/20 9/17 19/8 20/16 23/13 24/2 24/4 24/14 24/17 24/19 24/23 28/5 29/6 30/15 30/18 31/4 31/24 31/25 32/5 32/11 33/5 35/2 36/18 40/9 41/9 41/10 44/2 44/7 44/14 44/24 45/8 45/14 45/20 46/21 46/23 50/7 52/8 55/25 56/1 56/16 56/17 56/17 60/3 65/16 80/14 110/19 118/22 118/23 119/2 125/18 132/16 134/7 134/11 136/21 137/21 146/8 148/3 153/20 158/9 171/11 177/15
**seeing [4]** 5/18 121/8 144/18 161/4
**seem [3]** 106/2 134/20 134/25
**seems [2]** 71/11 143/1
**seen [9]** 5/16 9/10 46/1 49/19 84/8 106/18 112/8 139/21 161/5
**segmentation [1]** 132/25
**segmenting [1]** 132/7
**segue [1]** 62/14
**select [2]** 44/19 72/2
**selected [1]** 69/18
**selection [2]** 162/17 162/19
**self [3]** 110/13 179/13 179/20
**self-imposed [2]** 179/13 179/20
**self-serving [1]** 110/13
**Semonite [1]** 144/23

**send [1]** 174/5
**senior [1]** 4/11
**sense [9]** 16/22 79/25 120/23 123/3 144/10 164/2 174/15 174/22 181/5
**Sent [1]** 35/21
**sentence [5]** 14/9 120/7 120/12 120/15 120/16
**separate [11]** 26/20 84/17 95/19 95/19 95/20 96/1 97/6 118/2 131/13 163/17 164/11
**separate -- it's [1]** 95/19
**September [2]** 18/15 25/18
**September 9th [1]** 25/18
**sequence [1]** 29/17
**series [3]** 6/4 48/24 49/22
**serious [2]** 59/24 79/3
**serves [1]** 139/11
**service [29]** 42/16 59/16 59/23 61/8 62/12 62/24 63/3 65/22 66/11 66/17 66/20 82/1 82/22 84/5 84/12 85/19 85/23 118/12 120/2 127/21 127/21 130/9 131/15 150/12 150/21 161/9 177/10 177/20 178/5
**Service's [1]** 118/21
**Services [1]** 53/7
**serving [1]** 110/13
**set [9]** 7/6 64/8 96/7 104/4 110/16 110/18 121/4 144/10 180/13
**sets [3]** 64/7 64/9 110/24
**setting [1]** 147/20
**seven [1]** 57/8
**seventh [1]** 52/4
**Seventy [1]** 68/19
**Seventy-five [1]** 68/19
**several [1]** 176/22
**shall [17]** 48/2 111/5 118/11 124/12 126/5 128/5 128/10 136/4 136/19 136/25 137/3 137/4 137/8 137/12 137/12 157/18 163/24

**shame [2]** 47/15 47/16
**shifts [1]** 74/8
**shinier [1]** 155/15
**short [2]** 60/12 106/19
**shorter [1]** 49/22
**shorthand [1]** 2/25
**shortly [1]** 57/2
**shots [1]** 16/13
**should [21]** 10/16 10/16 11/4 11/4 11/10 38/3 38/15 52/15 55/21 77/6 102/18 141/2 143/2 151/18 151/24 152/4 168/2 169/20 172/14 176/6 179/17
**shouldn't [3]** 117/7 126/20 150/11
**show [14]** 19/14 81/5 93/21 104/19 112/20 119/17 137/2 144/8 150/9 153/24 170/7 180/16 180/16 180/22
**Show-related [1]** 93/21
**showing [2]** 35/9 67/19
**shown [2]** 23/21 23/24
**shows [8]** 68/4 119/22 168/2 171/11 171/15 179/10 179/13 179/18
**shut [4]** 66/22 99/24 100/6 149/4
**shutdowns [1]** 66/25
**shuttering [1]** 146/1
**sic [1]** 28/1
**side [7]** 66/2 71/3 94/20 95/1 95/4 122/16 175/6
**sides [1]** 128/10
**siding [1]** 154/17
**sign [2]** 155/25 163/23
**signage [1]** 145/13
**signed [4]** 22/10 25/2 25/12 25/19
**significance [3]** 33/13 34/3 43/5
**significant [18]** 33/16 53/17 53/19 59/11 59/12 59/18 60/1 60/8 84/18 108/25 119/4 119/10 120/24 121/10 123/11 145/11 161/18 165/25
**significantly [1]** 131/2

**similar [4]** 49/25 66/24 66/25 67/1
**similarly [4]** 48/5 62/16 144/8 174/24
**simple [1]** 22/17
**simply [5]** 37/6 102/12 132/1 177/7 178/15
**simultaneous [1]** 181/12
**simultaneously [1]** 104/6
**since [8]** 9/13 53/14 63/23 89/16 89/17 101/6 114/3 159/8
**single [2]** 27/25 83/12
**sir [14]** 6/15 6/19 7/8 9/21 12/13 15/12 24/3 39/19 43/20 45/6 79/7 83/25 86/12 103/3
**site [17]** 22/19 24/22 72/4 111/22 114/21 114/23 115/11 121/21 121/22 156/25 157/12 158/13 158/17 160/10 176/19 176/21 176/22
**sits [1]** 49/16
**sitting [7]** 49/23 59/20 59/20 102/16 117/23 142/24 173/16
**situated [1]** 59/14
**situation [7]** 47/5 72/22 75/23 105/12 110/9 113/9 138/21
**situations [3]** 79/15 123/8 152/18
**six [2]** 57/8 58/4
**size [9]** 110/5 110/6 122/25 129/7 129/15 138/4 165/10 165/18 175/14
**sizes [1]** 85/13
**skip [1]** 73/21
**Skylight [1]** 69/17
**slanted [1]** 170/22
**slender [1]** 33/15
**Slow [1]** 119/7
**small [2]** 122/16 176/21
**smaller [4]** 49/5 71/9 85/13 121/25
**Smithsonian [44]** 125/21 125/22 126/5 126/8 126/16 126/18 127/25 128/5 130/11

**S**

**Smithsonian... [35]**
138/19 138/20 138/22
138/23 139/11 139/11
149/12 149/13 152/5
152/5 152/7 152/11
152/21 152/22 153/8
164/20 164/22 165/15
167/12 167/14 167/24
168/11 168/12 168/14
168/16 169/4 169/7
169/15 169/18 169/21
170/2 178/18 178/20
178/21 178/24
**Smithsonian's [1]**
125/21
**so [255]**
**soffit [12]** 45/7 45/11
45/13 56/14 56/15
56/17 56/19 57/3 57/11
57/12 58/13 98/23
**soffits [18]** 45/11
55/18 56/10 56/11
56/11 56/24 57/6 57/18
57/20 58/15 58/16
58/17 58/21 67/3 76/16
122/22 133/9 133/11
**soft [1]** 42/20
**sole [1]** 48/2
**solely [1]** 80/25
**solemnly [1]** 6/15
**solutions [1]** 99/11
**some [55]** 8/2 10/1
14/6 15/13 19/9 28/15
33/19 44/15 51/22 52/4
57/16 57/21 59/12 61/6
63/13 64/5 64/15 65/24
67/6 69/7 69/16 70/8
70/18 71/13 72/1 72/8
72/20 74/25 87/15 91/8
93/3 102/6 106/4 108/2
110/22 116/17 116/22
120/5 120/10 129/25
131/16 131/22 133/24
134/11 139/19 144/25
147/17 150/22 153/20
156/6 166/7 172/23
174/21 181/10 181/14
**somebody [1]** 50/17
**somehow [2]** 140/9
166/16
**someone [3]** 8/17
107/19 110/12

**something [44]** 11/18
16/17 17/13 17/21 18/1
18/5 19/23 20/1 20/2
33/2 36/5 37/11 42/7
42/22 43/23 47/7 58/18
67/23 79/19 79/20
80/22 81/6 82/5 93/18
98/16 98/17 108/20
108/23 116/3 116/5
116/18 120/24 125/1
134/17 137/23 139/25
143/1 143/3 154/3
155/24 156/8 170/23
172/6 179/16
**sometime [1]** 83/21
**sometimes [4]** 50/13
108/25 109/1 152/15
**somewhat [3]** 49/4
49/5 121/9
**soon [1]** 76/5
**sorry [23]** 8/15 10/5
11/21 12/9 12/10 14/8
22/8 22/24 23/15 26/9
28/6 30/2 40/22 41/2
45/9 50/13 50/15 51/1
69/24 92/13 92/15
92/21 159/10
**sort [19]** 73/15 94/20
100/12 147/11 152/15
153/9 153/20 153/22
157/15 158/9 158/21
158/22 158/25 160/20
162/2 162/11 164/21
172/23 181/15
**sounds [6]** 18/13
59/24 60/15 148/21
151/5 179/12
**source [2]** 40/4 118/23
**sources [4]** 40/6 41/12
106/1 110/22
**south [1]** 71/3
**sovereign [1]** 126/12
**space [28]** 66/3 68/25
69/19 69/20 71/15 72/4
77/3 84/24 128/10
128/15 128/18 128/20
128/23 128/24 129/3
129/17 129/18 131/23
132/2 138/5 165/21
165/23 166/1 166/3
166/7 166/17 166/21
178/23
**spaces [4]** 42/2 64/13
64/17 65/1

**spailing [2]** 59/2 59/4
**spanning [1]** 56/2
**spans [1]** 56/4
**speak [12]** 8/12 12/11
32/18 32/22 37/12
103/12 109/21 121/6
138/8 143/11 144/1
175/3
**speaking [7]** 8/12 8/12
8/13 8/14 14/8 14/24
21/14
**speaks [4]** 19/19 81/16
109/21 176/25
**special [2]** 106/11
144/12
**species [1]** 33/22
**specific [10]** 26/6 26/6
49/15 120/17 134/4
134/4 134/12 147/16
147/18 176/24
**specifically [5]** 10/25
27/1 28/17 43/12
101/19
**spectacular [1]** 104/10
**speed [1]** 144/18
**spending [1]** 110/11
**spent [2]** 53/3 53/8
**spirit [1]** 101/23
**spoke [3]** 13/16 22/8
121/12
**sponsoring [3]** 136/5
140/2 141/6
**spot [1]** 71/11
**square [7]** 66/16 70/25
73/1 121/24 121/25
131/7 176/23
**squarely [2]** 141/20
157/3
**St [1]** 1/21
**stabilization [1]**
127/13
**staff [12]** 62/8 72/4
92/5 92/7 93/7 101/20
102/2 102/14 135/1
135/7 137/4 163/3
**staff-level [3]** 101/20
102/2 102/14
**staffs [1]** 40/9
**stage [8]** 64/9 71/9
92/10 116/20 117/13
122/25 132/3 175/9
**stagecraft [2]** 54/10
62/11
**stagehands [4]** 54/11

62/10 64/8 65/7
**stages [2]** 115/24
142/3
**staging [2]** 64/1 65/6
**stalactites [3]** 60/5
60/6 60/10
**stance [1]** 97/14
**stand [3]** 6/10 13/17
72/3
**standard [6]** 111/17
138/12 145/15 147/9
147/15 157/15
**standards [8]** 64/21
114/22 116/3 149/19
153/19 156/25 157/5
163/17
**standing [4]** 6/11
45/10 56/18 127/19
**standpoint [3]** 42/19
73/4 73/4
**start [20]** 8/11 24/20
25/18 48/10 52/21
56/11 98/25 103/14
104/4 105/18 107/18
108/19 109/3 139/20
144/4 148/11 150/10
154/3 154/5 179/18
**started [12]** 7/7 11/2
24/10 29/9 29/14 29/16
29/22 29/23 57/2 80/10
80/10 139/23
**starting [6]** 12/24
29/18 111/2 125/14
139/17 139/21
**state [5]** 6/20 12/22
52/25 164/2 175/11
**stated [8]** 31/9 31/13
31/19 34/8 45/19 45/19
83/15 104/10
**statement [8]** 15/7
16/16 19/19 31/24
31/25 110/13 112/5
112/11
**statements [14]** 8/2
8/7 16/12 16/14 31/3
31/4 37/9 40/21 48/25
104/23 112/5 112/20
112/23 112/24
**STATES [13]** 1/1 1/10
29/19 61/11 61/13
61/15 61/19 61/25 62/2
62/4 65/23 66/25
157/19
**stations [2]** 53/9 53/10

**S**

statue [2]  162/20 179/3
statues [2]  85/6 162/18
statute [47]  47/23 48/20 49/20 51/22 82/2 114/16 118/2 118/7 120/3 120/8 123/14 124/3 125/6 125/20 126/15 132/16 135/25 136/1 136/11 136/14 138/22 141/23 142/10 142/15 147/16 148/25 149/1 149/8 149/11 149/17 160/13 162/14 162/15 163/2 164/17 164/21 164/25 168/9 168/17 169/2 169/14 169/23 175/3 177/25 178/17 179/2 179/5
statutes [16]  108/14 111/3 120/6 125/11 125/13 140/13 141/22 143/5 147/19 147/20 150/5 162/17 168/5 179/15 179/23 180/2
statutorily [1]  35/22
statutorily-required [1]  35/22
statutory [13]  107/5 120/11 120/21 127/24 143/11 147/9 147/17 147/18 153/21 156/20 157/23 160/11 167/8
stay [2]  57/18 70/7
staying [1]  70/11
steel [24]  43/13 43/14 43/17 43/24 44/6 44/8 44/10 44/14 44/17 44/19 44/20 44/23 45/13 45/14 55/19 56/23 57/6 58/13 59/2 61/6 78/12 104/11 133/10 154/11
stenotype [1]  2/25
step [1]  6/11
Stephen [2]  2/13 5/13
stephen.m.elliott [1]  2/16
steps [1]  96/23
Steve [1]  15/15
steward [1]  77/9

stick [2]  16/15 16/19
still [12]  30/8 42/21 42/22 71/11 92/7 105/11 106/12 107/21 116/13 121/17 175/20 180/21
Stone [1]  20/15
stood [1]  160/16
stop [2]  135/10 180/24
stopped [1]  83/4
storage [1]  71/15
stories [6]  58/4 128/9 129/15 138/5 165/10 165/18
storm [1]  65/19
straightforward [1]  149/8
streams [3]  39/3 39/4 95/20
street [6]  1/14 2/3 2/6 2/14 2/18 114/5
stripped [1]  154/11
strong [1]  132/24
strongly [1]  179/12
structural [21]  20/3 20/24 21/3 43/17 44/6 44/8 44/21 45/13 55/22 58/14 58/21 61/24 78/12 98/22 111/13 124/20 127/7 129/5 148/22 148/23 175/5
structurally [1]  86/1
structure [27]  31/11 32/14 40/19 40/19 43/18 44/7 55/18 55/21 61/5 65/13 84/19 99/6 105/5 111/5 111/10 111/18 111/20 112/13 112/21 115/11 154/7 154/9 154/19 155/6 155/7 155/13 155/19
structured [1]  153/5
structures [6]  31/11 59/19 59/20 59/21 71/3 78/9
struggling [1]  95/22
stuck [1]  165/14
Studio [3]  69/14 71/21 71/23
study [2]  90/2 98/24
stuff [1]  111/14
sub [1]  22/13
subcontracting [1]  23/1

subcontractors [1]  22/22
subject [34]  12/8 17/16 18/9 31/5 81/6 81/14 124/13 124/24 125/24 128/3 128/10 130/6 131/1 137/7 137/25 138/11 138/20 139/1 149/14 150/13 165/1 165/12 165/16 167/2 167/7 167/10 167/11 167/17 168/24 169/5 170/1 170/3 170/3 176/8
subjugating [1]  158/14
submission [9]  97/1 97/2 97/12 97/18 137/17 142/2 142/4 172/23 173/17
submissions [1]  97/5
submit [8]  49/5 132/10 135/14 137/12 138/24 140/13 172/23 178/12
submits [1]  110/18
submitted [19]  10/6 10/7 13/5 13/11 13/12 27/7 27/12 35/20 48/22 49/17 49/25 50/3 96/20 97/10 97/15 98/15 102/10 102/13 139/14
submitting [5]  54/25 55/7 137/9 140/10 151/25
subsection [1]  157/9
subsequent [1]  5/24
substantial [2]  56/3 107/18
substantively [1]  126/4
subterranean [1]  61/2
succeed [2]  104/19 112/4
success [1]  153/25
succinct [1]  173/9
such [8]  27/8 75/5 84/8 94/12 96/7 119/12 119/23 120/1
sudden [1]  36/9
suddenly [1]  171/17
sue [2]  152/16 152/16
suffice [2]  119/16 119/23
suffices [1]  135/1

sufficient [2]  178/11 178/16
suggest [3]  134/16 143/2 169/24
suggesting [2]  20/9 134/20
suggestion [1]  134/25
suggests [1]  120/3
suit [1]  16/19
suitable [1]  157/20
Suite [4]  1/14 1/21 2/6 2/18
suited [1]  77/13
Sullivan [1]  135/9
summarized [1]  37/20
summary [1]  109/7
supervision [1]  17/19
supplemental [1]  181/4
supplemented [1]  39/17
support [9]  8/23 54/17 58/16 62/21 95/21 112/13 124/23 155/9 164/6
supported [1]  109/7
supporting [6]  45/13 56/24 57/4 57/5 59/1 61/22
supports [3]  59/3 61/5 79/4
suppose [4]  110/13 112/2 128/11 129/14
supposed [7]  27/3 142/5 142/7 142/8 143/1 160/13 179/15
sure [20]  6/8 12/11 18/4 20/8 39/3 46/6 68/20 68/21 96/13 115/3 124/9 132/6 135/22 137/1 143/14 147/2 152/24 156/5 169/9 173/12
surely [1]  98/6
surpassed [1]  149/21
surplusage [1]  120/12
surprise [1]  126/20
suspect [3]  115/22 172/13 176/7
sustain [1]  175/19
sustainability [1]  53/12
Sustained [2]  17/24 94/16

## S

**swamp [1]** 62/12
**swapping [1]** 115/9
**swear [1]** 6/15
**sweep [1]** 166/8
**swept [1]** 169/6
**swing [1]** 148/6
**switch [2]** 121/6
123/18
**sworn [4]** 6/12 13/5
104/13 112/5
**system [6]** 61/20
63/21 110/17 151/16
177/16 177/18
**systemic [2]** 21/7
111/13
**systems [8]** 44/6 56/4
56/22 58/12 58/16 86/4
86/5 88/8

## T

**table [1]** 7/6
**take [35]** 5/22 5/23
6/10 7/20 8/25 11/10
35/23 40/18 45/23
47/18 50/17 51/6 51/14
69/21 77/6 78/25
102/21 106/9 108/12
110/6 110/7 112/25
122/9 133/9 139/19
144/14 145/6 150/16
150/17 154/16 154/17
157/8 171/24 172/10
173/17
**taken [11]** 17/5 27/21
27/23 27/25 28/1 29/14
79/13 130/22 140/24
150/16 173/11
**takes [4]** 53/19 56/21
144/16 167/12
**taking [13]** 13/17
34/13 36/22 37/2 37/4
51/12 54/9 68/3 70/8
96/23 129/24 130/3
151/19
**talk [25]** 28/21 35/6
43/12 56/7 57/16 67/5
67/7 72/11 91/20 99/20
118/6 119/9 132/16
134/13 137/11 142/13
142/20 145/22 146/22
162/15 164/10 170/11
170/20 175/5 181/9
**talked [22]** 11/22 20/2

28/17 30/15 46/1 48/4
51/16 67/2 82/21 90/7
90/11 96/15 96/16
101/14 107/4 119/20
133/22 147/20 152/6
152/8 158/4 174/12
**talking [47]** 11/24 12/1
12/19 20/1 26/3 26/15
27/13 41/23 41/24
42/16 42/17 42/18
65/13 67/12 70/14
72/24 73/25 75/1 88/16
93/18 98/12 98/13
101/6 109/16 116/1
116/18 117/14 122/3
122/6 122/7 128/16
128/22 128/25 129/2
129/4 129/8 129/9
129/10 129/11 156/22
158/20 162/3 163/22
166/9 170/6 170/17
170/17
**talks [5]** 49/20 126/3
142/10 156/22 165/1
**tall [1]** 175/17
**tanks [1]** 121/1
**target [4]** 42/20 74/22
106/5 109/10
**targeted [1]** 84/2
**team [11]** 4/13 4/19
36/14 36/15 39/14
39/15 75/15 92/2 99/9
100/6 100/6
**tear [1]** 43/17
**tearing [1]** 162/8
**tell [29]** 24/4 29/17
40/11 44/5 47/6 50/4
50/9 52/22 55/12 56/13
63/1 64/2 67/24 68/16
68/18 69/6 70/22 72/17
74/4 102/23 107/24
108/21 108/23 131/19
132/18 133/5 153/18
180/17 180/20
**telling [4]** 47/2 50/16
80/3 80/4
**tells [3]** 34/20 34/21
44/22
**temporarily [2]** 72/16
166/7
**temporary [4]** 69/20
143/18 158/6 176/13
**ten [2]** 92/24 93/6
**tenders [1]** 55/4

**tens [2]** 72/25 107/1
**tense [1]** 36/4
**term [5]** 59/5 99/17
99/22 164/5 171/9
**terms [11]** 19/13 47/13
48/6 48/25 49/15 95/14
107/4 145/12 167/24
177/1 179/9
**terrace [7]** 45/9 56/19
58/1 70/18 122/15
122/20 127/17
**test [3]** 10/2 168/6
168/8
**testified [8]** 88/3
104/21 112/7 113/19
113/25 122/13 155/18
158/1
**testify [1]** 159/15
**testifying [1]** 80/12
**testimony [14]** 5/22
5/24 6/15 21/25 22/3
22/20 94/15 104/14
124/16 129/23 156/7
165/19 172/21 181/7
**testing [1]** 57/10
**text [1]** 125/19
**Thad [1]** 4/13
**Thaddeus [1]** 1/16
**than [31]** 9/3 10/23
11/7 11/11 39/1 42/13
44/16 64/6 67/18 86/17
92/7 99/14 104/21
110/17 112/11 112/20
112/23 124/13 127/19
134/17 137/2 143/3
152/24 158/3 164/9
168/22 174/7 175/17
176/21 178/2 179/18
**Thank [24]** 4/21 6/19
7/21 23/22 26/22 45/6
71/17 73/22 78/22 87/4
98/4 101/11 132/11
134/1 149/23 149/24
150/3 172/18 172/19
173/6 173/8 181/2
181/3 181/20
**that [1102]**
**that -- the [1]** 60/9
**that's [140]** 7/10 12/23
21/6 21/18 21/25 22/23
31/13 33/15 33/23
34/19 36/24 37/14 39/5
41/10 43/19 44/16
45/17 45/22 46/9 48/3

51/17 52/1 56/5 57/4
57/11 59/1 61/20 63/21
65/15 65/20 66/7 66/12
68/22 68/23 70/18 74/9
75/15 79/5 79/22 81/2
81/19 83/20 84/13
84/22 85/2 86/8 86/13
86/17 88/2 90/25 90/25
92/3 94/14 95/6 95/23
97/24 98/2 100/7
100/13 105/10 105/23
106/18 107/19 110/15
110/15 111/4 111/24
112/20 114/17 114/24
117/6 117/9 117/19
118/9 120/25 121/3
122/16 123/2 123/13
124/1 125/3 126/10
126/13 126/25 127/23
130/5 130/12 130/14
132/15 132/16 132/17
134/9 134/18 134/22
135/1 135/3 135/4
143/3 143/9 148/9
148/23 148/25 149/7
149/11 150/24 151/10
152/2 152/14 152/17
152/20 153/13 155/21
156/8 156/14 157/8
161/12 162/9 162/11
162/23 163/6 163/7
164/3 164/5 164/17
165/7 165/15 166/17
167/17 171/4 171/5
171/6 171/19 171/25
172/14 173/12 173/21
174/3 178/16 179/6
179/15
**that's -- we [1]** 34/19
**Theater [1]** 117/24
**theaters [2]** 56/1
175/15
**theaters' [1]** 175/19
**theatrical [2]** 64/13
65/1
**their [27]** 40/9 50/19
53/7 62/10 62/10 62/11
62/11 68/2 107/19
108/13 113/12 131/4
133/1 135/16 136/4
140/17 141/3 145/18
145/22 150/22 154/2
156/17 160/11 164/17
164/18 171/2 172/24

**T**

**them [66]**  6/5 6/6 9/9 11/17 12/5 19/8 23/8 23/23 28/7 28/14 30/9 33/17 34/15 49/5 50/9 57/4 57/13 65/10 84/8 85/13 85/13 87/18 95/25 108/13 108/19 110/4 110/18 110/19 110/19 113/5 114/14 115/12 117/3 133/2 135/6 140/18 141/4 141/8 142/13 142/20 145/6 145/14 146/9 146/12 147/11 150/7 150/23 151/22 152/14 153/7 154/4 162/25 162/25 163/22 168/24 170/5 171/4 171/10 176/8 178/2 178/11 178/12 178/16 180/3 180/4 180/24

**theme [1]**  120/4

**themselves [1]**  85/2

**then [81]**  5/23 5/24 7/9 7/11 11/4 11/17 17/3 17/16 17/21 17/25 19/13 29/23 31/4 33/18 37/8 39/6 41/12 42/21 48/24 49/22 50/14 50/24 51/19 56/2 61/8 64/24 75/25 78/19 81/7 82/12 110/1 110/19 110/25 112/8 113/8 113/11 114/2 114/10 117/19 118/13 121/2 122/9 123/13 124/20 128/12 132/18 133/3 136/24 137/3 137/12 139/23 139/24 140/13 142/6 144/14 145/3 149/10 151/25 152/4 152/16 158/7 158/18 159/4 159/6 160/3 162/17 165/20 165/24 166/5 166/7 166/25 167/2 167/10 167/16 169/20 169/25 172/4 174/8 180/17 180/23 180/23

**then -- shall [1]**  137/12

**theories [1]**  170/15

**theory [2]**  150/22 155/17

**there [176]**  5/5 5/9 9/13 9/20 10/11 10/20 14/12 14/18 14/24 14/25 15/22 15/24 16/16 18/8 18/10 20/16 20/20 21/2 21/9 21/10 22/18 25/5 25/15 28/3 29/7 29/25 30/3 31/20 34/1 34/11 35/6 40/12 40/16 41/7 41/14 42/4 44/5 44/6 47/6 48/5 50/16 51/21 55/16 56/20 57/8 57/13 58/21 58/21 59/2 59/9 59/11 59/18 60/3 60/5 60/6 60/7 61/1 61/3 61/9 61/23 61/24 62/20 63/15 64/17 64/18 64/22 65/18 65/19 67/9 68/12 69/13 70/9 70/15 70/18 71/2 71/19 71/21 71/23 73/3 73/13 73/14 73/14 74/4 74/6 74/17 74/21 75/3 75/8 76/22 76/25 77/1 79/3 79/16 79/17 79/18 81/20 83/12 83/17 85/12 86/7 88/19 88/19 90/5 91/8 91/14 92/7 92/24 96/20 99/16 99/21 100/2 100/14 100/15 101/7 102/6 104/25 105/18 110/17 110/24 110/24 110/25 111/9 112/19 113/17 114/14 117/8 120/1 122/16 122/23 128/21 132/23 134/11 135/10 135/23 139/6 139/13 140/15 141/17 142/11 143/4 143/14 144/5 145/2 146/7 147/24 148/17 151/4 151/11 151/15 153/6 153/13 154/7 155/2 155/3 155/3 155/10 155/18 156/2 156/2 156/2 156/6 157/14 158/10 158/23 163/1 165/4 169/3 171/13 172/2 174/21 175/10 175/11 176/11 176/17 179/23 180/2

**There -- yes [1]**  88/19

**there's [45]**  33/8 36/11 40/4 42/1 51/13 58/14 62/7 62/23 64/4 64/18 69/14 74/10 74/14 78/19 83/16 83/18 89/24 91/25 99/9 99/23 100/5 111/25 113/13 125/15 126/24 128/21 129/13 139/12 139/14 139/15 139/15 139/16 150/25 152/18 153/7 155/7 161/1 162/22 163/3 163/22 166/13 171/16 171/17 173/17 179/11

**therefore [7]**  13/10 44/16 108/16 125/17 125/25 138/24 179/11

**thereof [1]**  139/6

**these [81]**  13/15 19/7 26/15 31/3 32/19 32/23 35/8 35/9 35/11 35/13 41/16 41/23 56/6 57/20 58/7 58/14 60/2 60/10 63/11 64/17 65/1 68/2 72/20 75/8 75/16 75/20 76/3 76/11 76/11 76/12 79/10 80/18 87/15 89/5 96/16 98/25 99/2 99/8 102/21 105/3 105/11 105/20 106/7 107/3 107/11 108/13 109/3 109/4 110/15 110/16 117/7 117/10 118/17 118/21 118/24 119/2 119/18 120/3 127/2 127/10 132/14 139/18 143/5 144/6 145/9 145/22 146/17 149/18 151/7 151/9 153/25 160/14 160/22 161/13 168/10 171/15 174/22 175/7 178/1 178/6 180/1

**theuer [1]**  1/18

**they [217]**

**they'll [1]**  19/8

**they're [17]**  22/15 57/22 108/11 108/22 108/23 116/21 131/6 133/10 133/10 145/5 146/18 151/6 156/22 162/24 166/14 169/17

**180/19**

**they've [7]**  108/11 137/2 142/25 151/2 156/20 179/1 179/4

**thing [21]**  57/4 66/24 67/8 72/19 82/13 96/13 101/14 113/8 116/4 116/4 117/20 120/12 126/25 129/22 130/21 132/21 137/5 160/7 172/7 177/22 179/9

**things [73]**  10/1 17/9 18/8 18/10 18/14 20/21 34/7 34/8 36/11 39/2 39/10 42/6 42/23 42/24 50/21 50/24 54/9 56/10 64/20 66/5 67/12 69/7 70/19 72/23 74/13 74/25 79/4 80/18 88/7 88/16 89/18 94/20 103/25 104/3 106/8 106/15 106/16 107/2 107/12 108/12 108/17 109/1 109/3 109/19 110/2 113/3 113/19 115/8 115/11 115/17 116/18 116/21 117/15 118/3 129/7 129/20 132/14 139/21 143/8 145/18 149/9 149/10 154/25 155/23 169/21 174/20 174/20 174/22 180/3 180/10 180/14 180/14 180/20

**think [157]**  12/11 13/5 13/18 14/14 15/10 15/14 19/22 21/1 23/4 23/17 28/18 29/2 29/16 29/23 33/13 40/7 43/7 52/15 57/21 62/20 65/10 67/4 67/5 70/14 72/21 75/10 76/10 76/10 77/6 77/13 79/5 79/14 81/7 85/1 86/10 87/14 89/11 91/12 91/21 95/8 96/21 97/3 97/17 98/13 98/15 98/16 99/16 99/21 102/5 102/7 102/18 105/6 106/20 107/15 109/19 110/1 111/2 113/3 113/22 115/9 117/19 121/21 122/1 122/12 122/21 122/23

**T**

**think... [91]** 123/2
123/4 124/2 125/3
125/5 129/3 129/5
129/22 130/10 130/21
132/5 133/14 133/15
140/11 140/15 140/20
141/16 144/9 144/16
145/25 146/10 146/16
146/23 148/9 148/12
149/5 149/7 149/22
150/7 150/22 151/15
151/21 151/24 154/1
154/5 154/20 154/21
155/9 155/9 155/21
156/17 156/19 157/2
157/25 158/20 159/13
160/20 160/25 161/1
162/2 162/10 162/20
163/1 163/5 163/20
164/3 164/14 164/25
165/19 165/21 166/4
166/9 166/17 166/21
166/22 167/10 168/4
168/9 168/18 168/25
169/2 169/3 169/13
170/13 170/15 171/7
171/25 172/7 172/21
173/1 173/12 174/4
177/14 178/20 179/3
180/11 180/12 180/17
180/18 181/5 181/6

**thinking [5]** 13/7 122/2
159/14 169/22 173/4

**thinks [1]** 113/5

**third [4]** 56/4 81/17
118/6 146/10

**this [269]**

**this -- let's [1]** 131/19

**those [122]** 8/7 9/8
10/19 11/6 11/9 11/13
12/1 12/19 13/8 15/13
18/23 30/6 30/11 32/20
37/13 37/23 38/7 39/2
39/17 40/11 43/2 43/18
45/11 45/13 45/15 49/5
49/17 50/21 54/6 55/1
55/22 56/21 57/6 59/19
61/6 62/15 64/9 66/17
69/15 70/22 75/25 76/1
81/17 82/7 84/17 84/24
85/10 85/11 85/21 86/4
86/11 88/10 88/12

88/22 100/3 101/6
102/3 102/16 105/14
106/15 107/2 107/7
109/7 109/7 110/4
110/6 112/23 113/3
115/12 115/16 116/6
116/17 118/18 119/9
120/18 124/24 124/24
127/6 128/12 128/13
129/2 129/6 129/20
130/7 130/8 130/12
130/19 131/11 131/17
133/10 135/7 141/2
141/19 142/2 143/11
143/19 145/18 146/4
147/9 148/20 149/10
150/13 150/15 150/19
150/20 151/1 152/17
153/10 153/19 155/15
157/24 157/25 162/18
165/13 167/7 168/5
174/3 174/6 176/7
176/10 180/3 181/18

**though [9]** 21/5 88/10
90/23 91/19 92/4 105/6
123/4 144/14 176/3

**though -- you [1]**
91/19

**thought [2]** 93/3 142/6

**thousand [1]** 57/5

**thousands [4]** 58/19
73/1 73/5 176/23

**threatening [1]** 146/18

**three [16]** 13/6 39/3
46/24 53/3 55/16 59/13
62/24 66/23 81/7 85/9
92/5 92/7 111/2 157/24
157/25 175/15

**three months [2]**
46/24 62/24

**three years [1]** 53/3

**three-month [1]** 66/23

**threshold [2]** 125/16
167/21

**through [40]** 47/20
56/6 56/7 62/3 69/6
74/19 76/12 103/13
106/8 106/10 106/11
107/3 109/4 109/14
110/2 110/7 110/8
110/11 129/25 130/11
131/13 135/4 139/6
143/6 150/8 153/23
154/1 154/4 156/5

159/16 159/23 163/7
164/22 165/4 165/7
167/1 170/5 174/20
174/22 177/20

**throughout [6]** 62/21
63/13 65/21 65/22
69/25 73/5

**throw [2]** 172/15
179/18

**ticket [4]** 93/16 94/20
172/9 172/11

**tie [1]** 57/5

**tied [1]** 170/16

**time [66]** 5/17 10/13
13/10 13/11 13/16 14/5
14/12 14/24 15/20 19/8
19/22 20/3 28/3 28/4
29/20 34/18 35/23
36/12 36/20 39/20
49/14 49/15 53/1 54/1
56/12 64/24 66/23
70/11 75/7 75/10 75/11
75/13 75/17 77/7 78/18
79/21 80/4 80/6 80/22
94/2 99/2 101/24
109/24 110/11 112/8
121/8 130/3 133/25
139/19 144/17 145/2
151/20 154/24 159/21
159/25 161/4 161/6
161/22 162/9 163/14
166/6 169/17 171/2
171/21 171/23 181/8

**timeline [2]** 74/11
159/3

**times [11]** 10/23 11/22
11/25 12/1 12/4 12/6
12/12 12/20 43/12 86/4
162/6

**timetable [1]** 180/15

**title [1]** 54/8

**titled [1]** 118/22

**titles [1]** 127/6

**today [18]** 12/24 13/17
16/10 24/20 65/4 74/14
81/15 83/19 89/10
102/16 105/25 147/12
160/16 161/4 162/1
173/16 176/1 181/7

**today's [1]** 78/7

**together [4]** 49/24
146/13 180/14 181/16

**told [2]** 14/25 33/18

**tomorrow [1]** 34/10

**too [9]** 39/21 77/6
107/2 108/16 138/22
139/25 152/5 171/10
178/5

**took [1]** 28/7

**tool [1]** 34/15

**top [5]** 56/20 59/20
65/25 66/4 118/22

**topic [6]** 13/25 14/12
16/3 29/6 43/9 47/18

**topics [2]** 12/18 87/11

**tore [1]** 113/11

**Tort [1]** 167/25

**total [1]** 46/20

**totally [2]** 38/19 38/21

**touch [2]** 123/20 152/4

**touched [2]** 85/15
101/15

**touches [1]** 88/15

**touching [1]** 46/19

**tour [2]** 40/8 50/18

**tours [1]** 40/11

**towards [1]** 86/7

**towers [2]** 144/25
145/2

**traces [2]** 154/23
154/24

**tracking [1]** 57/9

**traditionally [1]** 116/2

**traffic [5]** 85/24 85/25
86/3 86/8 86/10

**transcript [7]** 1/9 2/25
19/6 32/6 173/2 173/3
182/5

**transcription [1]** 2/25

**transformation [1]**
143/22

**translating [3]** 34/15
34/20 107/21

**transparency [1]**
110/17

**traveling [1]** 63/21

**traverse [3]** 58/17 62/3
76/23

**treat [1]** 151/23

**treated [5]** 131/25
158/22 167/23 168/2
168/22

**tree [12]** 17/8 26/6
27/22 28/3 28/8 28/11
28/15 28/19 33/19
33/19 33/22 33/24

**trees [15]** 26/2 26/7
27/19 27/23 28/2 28/5

**T**

**trees... [9]** 28/14 28/15 28/21 34/2 34/7 105/8 106/2 115/11 141/12
**tremendous [2]** 40/23 41/13
**trick [1]** 181/13
**trigger [6]** 107/12 107/13 108/13 127/4 151/25 165/24
**triggered [1]** 141/7
**triggers [3]** 107/11 131/24 133/7
**triple [1]** 98/6
**trucks [1]** 61/21
**true [15]** 23/9 27/18 62/8 79/8 80/3 80/4 100/19 100/20 100/21 106/15 108/12 109/25 110/1 172/8 182/5
**truly [1]** 14/6
**Trump [8]** 15/16 17/4 24/17 46/1 90/6 104/8 109/1 127/3
**Trump's [2]** 105/15 112/24
**Trump-chairman [1]** 127/3
**Trump-Kennedy [2]** 15/16 24/17
**trust [19]** 82/10 83/23 84/16 84/19 84/20 84/21 84/25 85/2 93/19 93/20 93/21 94/20 123/25 124/12 124/17 124/19 124/23 144/24 177/8
**trust-funded [1]** 84/25
**trustees [3]** 1/5 4/5 155/25
**truth [4]** 6/16 6/17 6/17 98/7
**try [9]** 16/22 43/9 66/6 76/12 76/15 94/1 99/2 150/8 150/9
**trying [17]** 12/4 76/17 77/2 95/12 95/13 98/1 99/10 100/6 100/7 109/14 110/11 144/22 151/3 151/4 155/1 169/14 180/24
**tunnel [7]** 42/16 61/8 62/13 63/4 65/22 65/25

66/20
**tunnels [4]** 61/2 62/6 62/8 66/17
**turn [11]** 17/25 31/3 55/11 66/18 66/19 66/20 128/8 156/10 159/19 160/11 162/13
**turned [1]** 8/20
**Turning [1]** 134/24
**tweet [3]** 32/5 90/14 90/21
**twice [2]** 47/16 178/13
**two [53]** 26/15 34/17 36/11 39/2 50/21 54/6 55/17 55/24 56/2 56/4 57/3 61/3 61/12 68/5 79/5 80/14 82/17 86/16 92/6 93/13 94/6 95/19 95/19 95/20 98/5 100/8 102/21 104/3 104/4 104/16 105/11 105/14 105/14 107/18 109/16 110/4 110/24 139/17 146/2 146/9 148/16 149/4 158/10 161/5 162/7 163/7 163/17 164/11 166/2 167/16 171/17 173/4 181/12
**two days [1]** 109/16
**two hours [1]** 102/21
**two minutes [1]** 98/5
**two months [6]** 92/6 104/4 107/18 110/4 139/17 171/17
**two weeks [1]** 173/4
**two years [14]** 55/17 57/3 68/5 79/5 80/14 93/13 94/6 146/2 146/9 148/16 149/4 162/7 163/7 166/2
**two-year [1]** 34/17
**type [5]** 33/24 107/7 112/9 116/18 162/11
**types [6]** 64/4 100/17 115/16 118/3 145/18 175/7

**U**

**U.S [1]** 2/22
**U.S.C [1]** 136/9
**U.S.C. [2]** 111/4 138/16
**U.S.C. 8722 [1]** 138/16
**uh [4]** 53/20 128/1

131/20 177/5
**Uh-huh [3]** 128/1 131/20 177/5
**ultra [11]** 147/5 147/15 147/24 148/12 149/5 149/11 149/19 153/17 166/22 168/18 170/7
**Um [1]** 50/24
**unambiguous [3]** 147/17 153/21 170/8
**unaware [1]** 120/2
**uncomfortable [1]** 117/3
**under [29]** 59/14 59/15 100/16 105/11 111/17 115/24 116/2 126/12 127/15 130/16 130/20 131/9 133/14 135/2 135/4 140/23 152/7 161/9 163/1 163/17 166/2 167/24 167/25 167/25 168/8 169/8 173/11 173/21 178/16
**undergo [2]** 106/13 106/15
**underground [1]** 71/2
**underneath [9]** 57/23 58/17 61/13 61/18 61/24 63/4 65/13 65/14 82/24
**underside [2]** 56/15 127/16
**understand [38]** 7/6 9/9 15/22 18/3 18/6 18/11 22/24 23/1 27/4 27/6 34/10 36/3 37/18 44/12 57/23 72/23 73/8 77/12 77/14 79/1 83/11 95/8 95/8 95/10 95/13 95/22 97/25 100/23 105/19 122/5 147/25 150/18 151/3 151/24 168/15 171/4 171/11 175/10
**understand -- I [1]** 95/8
**understand -- sorry [1]** 22/24
**understanding [8]** 75/24 82/7 82/8 90/17 127/20 130/3 163/12 175/16
**understate [1]** 143/20
**understood [9]** 48/12

89/2 90/15 91/7 93/2 95/11 97/8 125/12 172/13
**undertake [1]** 90/23
**undertaken [1]** 97/13
**undertaking [5]** 89/12 130/25 136/6 141/10 141/14
**undertakings [3]** 106/13 127/4 127/11
**underway [1]** 29/21
**unfiltered [2]** 63/20 63/24
**Unfortunately [1]** 35/23
**unilateral [1]** 156/3
**unilaterally [1]** 143/4
**unionized [1]** 54/11
**unique [3]** 75/10 101/22 123/22
**uniquely [1]** 87/12
**unit [1]** 127/13
**UNITED [2]** 1/1 1/10
**University [1]** 52/25
**unlawful [1]** 146/24
**unlike [2]** 120/17 152/6
**unoccupied [2]** 74/7 159/24
**unpack [1]** 34/22
**unquote [2]** 84/16 115/19
**until [9]** 81/22 89/23 92/19 131/12 159/7 160/16 162/1 174/7 181/18
**up [62]** 6/4 6/8 6/11 15/5 16/4 17/3 19/3 23/11 24/11 28/19 30/12 31/6 31/16 32/2 32/24 34/23 37/23 41/3 42/13 43/11 43/21 45/10 46/13 50/25 51/25 53/20 56/18 58/3 61/15 62/1 64/20 65/12 69/3 70/21 72/3 76/5 79/19 81/8 82/15 82/19 103/6 104/1 105/9 110/16 110/18 122/18 128/19 133/1 136/5 137/2 138/21 147/2 152/19 156/4 158/17 160/16 162/8 165/6 166/11 166/16 174/9

## U

**up... [1]** 181/10
**update [5]** 35/23 42/4 42/5 89/14 101/18
**updated [4]** 35/24 50/5 89/19 151/17
**updates [1]** 97/7
**updating [7]** 36/16 36/17 36/20 37/7 38/7 38/20 39/11
**upgraded [1]** 130/1
**upholding [1]** 65/15
**upon [1]** 114/10
**urgency [2]** 174/15 174/21
**us [36]** 14/25 24/4 30/23 33/18 34/20 34/21 44/22 47/2 52/22 56/7 56/13 59/4 66/16 67/8 67/24 68/16 68/18 69/6 70/22 72/17 74/4 75/23 82/7 89/11 101/18 108/20 108/21 132/18 132/18 142/25 161/5 167/12 180/16 180/16 180/20 180/22
**usdoj.gov [5]** 2/11 2/11 2/15 2/16 2/16
**use [20]** 25/6 35/11 42/3 42/4 64/8 70/11 71/14 72/7 119/5 119/10 121/10 123/11 143/17 149/2 159/21 161/7 161/17 161/18 175/19 177/1
**used [11]** 29/4 41/14 41/23 42/8 64/2 124/17 124/23 151/18 164/5 165/24 174/14
**useful [1]** 63/8
**using [1]** 34/13
**usually [3]** 107/22 138/12 178/12

## V

**VA [2]** 2/3 2/6
**vacate [1]** 151/3
**vacatur [1]** 172/5
**vacuum [1]** 95/6
**valuable [2]** 114/7 143/12
**values [4]** 119/6 119/12 123/13 177/4
**various [5]** 9/5 104/22

105/21 110/21 140/12
**vaults [8]** 59/13 59/14 59/21 59/25 60/2 60/21 66/8 66/24
**vectors [2]** 128/12 128/13
**Vehicle [1]** 42/17
**velvet [2]** 117/4 117/5
**verified [1]** 68/21
**verify [1]** 83/24
**version [1]** 67/10
**versus [8]** 50/18 74/1 74/5 76/9 81/18 90/3 100/11 134/7
**very [48]** 5/21 16/21 16/21 16/24 26/6 26/6 31/5 40/24 42/20 55/14 57/12 60/1 64/24 65/1 65/12 67/17 72/21 73/3 78/17 78/19 84/1 84/18 86/5 86/16 87/20 98/25 100/22 104/25 126/3 127/22 131/8 132/7 132/11 134/1 134/4 134/4 142/16 144/17 147/8 149/14 150/8 153/19 171/12 173/5 173/13 174/24 175/12 181/20
**very -- I [1]** 72/21
**vice [6]** 7/9 7/12 15/19 54/1 54/7 79/21
**Video [2]** 19/17 81/9
**view [15]** 33/20 48/12 79/2 79/9 80/12 84/20 114/3 114/25 123/6 124/4 125/25 141/8 145/9 147/10 150/11
**viewed [1]** 129/6
**views [1]** 145/14
**violate [2]** 82/4 130/24
**violated [4]** 140/9 147/11 147/17 153/22
**violates [1]** 82/4
**violating [1]** 160/18
**violation [5]** 140/24 141/2 147/24 148/10 149/17
**violations [3]** 146/11 147/9 170/8
**vires [11]** 147/5 147/15 147/24 148/12 149/5 149/11 149/19 153/17 166/22 168/18

170/7
**virtually [1]** 168/22
**visible [1]** 57/12
**vision [1]** 30/11
**visitors [1]** 146/2
**voluntary [2]** 134/25 163/10
**vote [3]** 17/4 17/17 178/13
**voted [1]** 15/15
**votes [1]** 167/2
**vs [2]** 1/4 4/5

## W

**wait [7]** 52/8 89/22 92/19 111/16 111/16 181/8 181/17
**waived [1]** 176/4
**wake [2]** 156/4 174/9
**walk [6]** 28/4 56/19 61/16 128/19 150/8 154/3
**walking [1]** 50/18
**walks [1]** 122/14
**walkway [1]** 62/1
**walls [3]** 66/6 85/2 85/2
**want [56]** 8/5 30/25 43/12 49/21 50/7 50/8 50/8 55/11 56/6 56/7 56/10 65/12 66/5 67/5 71/10 72/2 72/3 72/11 72/21 77/5 81/5 82/4 84/23 89/14 101/23 103/13 103/14 107/9 107/18 112/3 113/8 118/6 123/15 123/16 123/20 129/23 132/9 133/2 134/13 142/15 144/4 145/6 148/4 148/4 148/11 150/20 154/22 155/2 155/4 169/18 169/19 171/11 180/1 180/21 180/22 181/8
**want -- it [1]** 154/22
**wanted [6]** 23/3 46/2 65/24 98/14 124/25 160/8
**wanting [2]** 99/23 99/24
**wants [4]** 47/4 112/17 113/5 143/8
**warranted [1]** 144/3

**was [197]**
**was -- that [1]** 29/12
**Washington [17]** 1/4 1/14 1/22 2/10 2/15 2/19 2/23 4/12 21/15 21/20 22/9 22/13 22/18 39/21 48/3 168/23 175/17
**wasn't [5]** 20/24 23/2 29/12 34/5 81/22
**water [43]** 6/23 21/6 55/20 55/20 56/9 56/9 56/21 56/23 57/17 58/22 58/23 58/24 59/6 59/9 59/11 59/12 59/18 59/19 59/24 60/9 60/10 61/1 61/3 62/12 63/5 63/12 63/19 63/24 65/20 66/9 76/11 85/17 88/7 89/5 99/25 129/24 129/25 129/25 130/4 151/15 151/17 151/19 177/19
**water -- the [1]** 58/23
**water-intrusion [2]** 57/17 76/11
**waterproofing [2]** 55/22 66/12
**waterway [1]** 130/4
**way [37]** 6/6 17/21 18/3 19/7 22/14 25/7 28/23 32/14 32/16 36/24 43/6 44/11 57/13 66/7 72/15 79/2 79/24 80/24 121/16 127/18 143/9 151/10 152/15 153/5 156/15 158/9 159/14 159/21 160/12 165/23 166/5 167/4 169/22 170/22 172/24 179/15 180/25
**ways [1]** 91/17
**we [391]**
**we'll [5]** 6/5 17/12 32/7 102/21 159/1
**we're [51]** 14/1 26/9 32/22 34/16 45/1 50/5 50/8 50/9 50/10 50/12 57/9 63/19 64/13 68/19 70/5 74/15 76/17 83/7 93/18 97/5 97/6 102/1 107/17 107/25 108/10 108/11 108/25 109/2 109/10 114/1 117/14

**W**

**we're... [20]** 122/6 135/23 142/25 144/22 148/5 162/2 165/17 165/20 168/9 168/9 169/20 170/6 170/16 170/17 172/10 179/23 179/24 180/15 180/21 180/24

**we've [39]** 6/3 12/23 20/2 26/15 35/24 40/22 41/24 61/14 63/15 81/15 83/19 92/2 101/14 101/20 102/14 102/20 104/13 106/9 106/18 107/4 107/8 109/8 109/15 109/18 109/20 111/8 111/23 115/8 119/20 139/21 144/23 147/19 155/10 164/8 170/13 170/14 180/14 180/19 181/7

**wearing [1]** 9/2

**website [1]** 146/7

**wedged [1]** 58/9

**week [1]** 12/6

**weeks [3]** 13/18 13/21 173/4

**weeping [8]** 27/2 28/9 28/17 28/18 29/2 29/3 33/23 115/10

**weighs [1]** 70/4

**welcome [2]** 5/2 5/18

**well [56]** 5/21 11/2 16/21 16/21 16/24 20/13 22/16 36/17 38/20 39/6 39/18 41/17 48/4 49/9 56/25 60/5 63/7 64/13 64/15 64/20 65/2 66/18 67/13 70/4 72/19 77/13 79/24 82/13 89/14 90/6 97/1 100/22 114/1 120/19 121/5 125/8 132/10 134/6 135/10 141/25 142/16 145/5 151/6 155/18 157/6 158/5 161/5 164/21 165/16 165/20 166/13 169/2 172/8 173/5 174/18 181/14

**well-informed [1]** 100/22

**well-past [1]** 56/25

**well-suited [1]** 77/13

**went [6]** 56/12 69/5 97/9 139/24 140/25 145/3

**were [112]** 5/3 7/9 9/20 10/19 11/3 11/13 11/17 12/5 12/25 13/1 13/3 13/7 13/11 13/12 13/23 14/4 15/19 17/2 18/16 18/17 19/10 20/5 20/8 20/8 21/2 21/4 21/11 22/19 22/23 23/8 26/7 26/25 27/19 27/21 27/23 27/23 28/1 28/1 28/2 29/7 29/10 29/14 29/17 29/20 29/25 29/25 30/3 30/4 33/7 38/7 41/7 49/4 49/17 50/3 55/2 56/7 63/8 63/9 63/17 64/17 65/4 65/13 73/14 73/14 73/18 74/20 77/25 79/16 79/17 79/18 80/4 81/20 81/24 88/10 88/12 88/12 91/24 93/3 96/7 96/20 97/9 97/13 98/12 99/17 100/16 100/20 100/21 101/7 102/6 102/7 115/10 118/24 118/25 131/1 135/5 144/25 145/1 145/2 148/10 152/15 154/10 154/25 156/6 156/12 160/17 161/14 165/6 169/5 169/22 169/24 170/20 171/15

**were -- you [1]** 152/15

**weren't [3]** 15/22 29/11 156/14

**Werkheiser [4]** 2/2 2/5 4/17 4/17

**west [3]** 122/15 127/15 127/17

**what [274]**

**what -- I [1]** 95/23

**what's [16]** 33/15 33/23 34/9 47/13 55/5 62/14 95/4 98/20 100/23 106/5 107/10 107/15 114/15 121/11 135/19 154/22

**whatever [7]** 6/3 28/24 48/21 55/13 85/1

112/12 172/11

**when [89]** 8/11 8/21 9/2 9/6 9/20 11/13 11/17 11/21 12/25 13/3 13/7 13/16 19/8 23/10 24/9 28/11 29/21 29/23 34/21 35/6 37/13 42/15 43/7 44/15 44/24 45/14 45/15 47/3 48/11 49/16 53/25 56/17 56/18 57/2 59/7 60/2 61/16 64/17 64/22 65/14 66/19 68/4 68/11 76/15 77/2 79/25 80/10 83/8 90/6 90/11 93/18 94/13 94/21 95/14 96/19 97/9 97/21 98/23 98/23 98/25 99/5 102/16 106/14 107/18 108/16 112/9 116/20 120/24 123/16 130/17 133/10 138/25 142/3 142/15 146/10 148/19 151/17 153/2 153/23 154/24 159/12 165/5 168/4 168/9 170/6 171/4 173/3 174/18 175/22

**when -- actually [1]** 57/2

**where [49]** 11/13 12/17 13/21 13/23 14/12 21/2 34/2 34/4 35/17 35/19 35/19 35/21 44/1 44/5 44/6 44/7 55/21 56/19 56/21 59/13 61/3 61/12 62/10 63/5 75/11 81/21 83/14 86/8 95/10 105/12 110/10 110/17 113/4 113/7 113/9 113/10 116/3 121/3 122/22 123/21 125/16 132/17 136/8 138/21 144/13 145/25 154/22 163/3 170/7

**Whereas [1]** 47/25

**whether [43]** 8/5 10/2 10/16 11/3 11/4 11/9 17/14 38/3 47/14 48/14 48/20 48/25 49/4 52/1 52/3 82/3 90/18 105/4 111/17 120/25 126/11 126/19 131/14 131/14 131/15 131/15 133/18

135/2 135/14 136/6 136/7 139/3 142/7 143/6 145/16 145/16 162/7 167/22 167/24 168/6 177/25 178/18 180/23

**which [73]** 11/3 11/18 14/25 17/13 18/1 20/23 21/23 26/2 26/20 27/20 28/12 31/8 32/16 34/21 36/4 39/4 40/23 41/7 48/6 49/16 49/24 50/1 50/3 50/22 54/7 55/21 56/4 61/8 71/9 71/11 79/10 83/15 90/19 96/21 105/13 105/24 107/16 109/6 111/14 112/24 115/10 118/7 120/7 120/8 123/21 127/20 128/13 130/4 131/3 136/10 136/25 140/1 140/13 143/25 144/18 146/6 147/8 147/9 148/18 151/22 156/22 158/7 158/10 160/11 161/16 165/2 165/14 170/17 175/14 176/18 176/25 176/25 177/8

**while [8]** 76/22 91/10 96/20 97/9 97/13 120/13 143/14 171/1

**white [12]** 18/17 18/24 24/22 46/2 112/16 112/24 113/7 134/6 134/7 144/19 168/21 175/10

**who [21]** 5/1 10/12 22/6 22/10 22/15 23/3 29/23 40/24 65/6 72/12 99/10 106/16 107/20 110/12 112/8 113/5 125/8 150/11 155/19 155/25 176/8

**who's [3]** 12/2 16/12 103/4

**Whoever [1]** 141/6

**whole [8]** 6/17 24/8 45/8 78/19 132/21 161/1 171/20 181/8

**whom [1]** 9/6

**why [41]** 21/9 21/11 26/7 31/2 37/12 39/11 39/11 41/13 72/17

**W**

**why... [32]** 73/16 76/1 80/2 82/9 93/5 102/22 104/25 108/2 108/3 110/15 110/15 110/21 115/24 117/9 117/23 119/15 123/13 130/14 134/12 150/9 152/14 153/1 153/4 153/5 154/16 157/8 164/5 165/7 165/15 170/10 174/3 181/16
**wide [2]** 99/1 157/25
**wide-ranging [1]** 157/25
**wider [1]** 12/17
**will [132]** 4/14 4/18 4/19 5/1 5/13 5/19 5/20 6/4 6/16 7/20 8/6 10/8 16/23 17/9 17/15 23/20 23/24 28/12 28/22 31/12 31/20 31/22 32/5 32/16 33/3 34/23 38/12 38/25 40/13 40/14 42/2 43/10 43/16 43/24 44/5 44/7 44/10 44/11 44/13 44/14 44/17 44/18 45/14 46/7 49/2 49/9 49/21 50/11 55/16 55/25 56/1 57/13 69/11 69/12 69/13 69/15 69/21 69/22 69/25 70/7 70/11 70/17 70/20 71/14 71/21 71/23 72/1 72/7 74/22 75/16 78/6 78/9 78/11 78/14 82/23 83/14 85/5 85/7 85/10 85/11 85/14 85/21 85/24 86/3 93/22 93/22 102/17 103/12 104/11 104/12 108/16 111/1 111/18 112/13 113/4 113/19 116/10 119/15 122/10 122/19 122/21 123/10 132/10 132/16 132/19 134/2 145/20 146/7 151/14 152/16 155/8 155/14 156/1 156/2 156/3 156/3 156/4 156/4 156/5 161/6 162/13 164/22 173/3 173/8 174/10 174/19 176/21 178/4

180/17 181/14 181/17 181/17
**Will Jenkowski [1]** 5/13
**William [1]** 2/13
**william.s.jankowski [1]** 2/16
**willow [6]** 26/7 27/19 28/11 28/21 29/2 34/7
**willows [4]** 27/2 28/13 28/18 115/10
**wind [1]** 28/3
**Wing [5]** 46/2 46/7 46/19 47/1 113/9
**wires [1]** 57/5
**wish [1]** 114/9
**withdraw [2]** 22/4 163/14
**withheld [2]** 173/12 173/15
**withhold [4]** 137/24 140/22 141/3 173/22
**within [20]** 17/18 47/6 48/3 53/6 62/8 66/3 77/3 85/1 92/6 93/20 117/21 123/9 125/25 135/12 139/12 141/20 149/13 157/3 161/8 169/11
**without [19]** 44/20 48/8 79/11 85/18 95/15 104/4 107/12 108/3 108/4 111/6 118/15 119/19 140/25 143/9 147/21 154/25 155/24 172/5 178/22
**witness [11]** 3/3 4/18 5/20 6/5 6/10 7/16 16/10 23/21 23/24 92/14 92/18
**witness's [3]** 14/15 22/3 94/14
**WOI [4]** 22/6 23/2 23/5 23/7
**won [1]** 145/3
**won't [11]** 49/1 78/25 105/5 108/23 111/9 112/18 146/8 146/8 146/9 150/24 174/9
**wonderful [1]** 134/2
**wood [1]** 69/19
**wooden [1]** 154/18
**word [7]** 10/22 29/4 33/8 43/13 56/11

108/13 136/25
**words [6]** 20/8 38/13 107/19 116/7 117/16 168/10
**work [79]** 18/22 18/22 21/18 21/24 22/1 22/6 22/11 22/15 22/16 23/3 24/25 25/7 25/11 25/14 25/18 26/13 35/7 36/10 36/13 36/14 38/8 38/9 42/16 44/15 53/1 54/12 55/14 62/11 68/5 68/17 68/22 73/5 74/7 74/15 75/17 75/22 76/13 77/2 80/10 83/14 99/3 99/12 103/19 106/4 114/24 115/4 119/20 133/6 133/11 137/25 150/24 154/8 156/21 157/16 158/1 158/5 158/6 159/1 159/20 159/25 160/1 160/7 162/4 162/24 166/6 166/7 166/15 166/19 171/1 171/2 171/5 171/6 171/9 171/22 179/12 179/14 179/16 179/17 181/14
**worked [2]** 63/23 99/10
**working [11]** 23/16 30/10 53/3 53/8 57/9 65/6 71/24 74/8 80/18 159/16 159/23
**works [4]** 55/13 86/11 133/3 143/10
**world [3]** 46/22 95/8 175/17
**worn [2]** 116/7 116/9
**worse [2]** 60/19 122/2
**worst [2]** 60/14 61/10
**worth [1]** 145/21
**would [178]** 6/9 8/20 9/12 10/23 10/23 11/7 12/6 12/14 15/13 19/1 19/3 19/15 19/19 23/19 24/4 24/11 28/3 28/4 28/14 28/19 28/24 30/12 31/3 31/6 31/16 32/2 33/9 40/12 41/3 42/3 42/3 42/22 43/7 43/21 45/19 46/18 46/19 52/9 53/16 54/13 54/24 55/2 61/23 65/3

67/15 68/11 69/4 69/8 69/8 70/6 70/15 73/9 74/4 74/21 75/1 75/3 76/22 77/25 79/13 81/8 87/10 87/16 88/21 89/5 89/6 91/9 91/22 95/3 97/12 97/22 100/10 100/13 100/14 101/1 105/1 105/6 106/8 106/15 107/2 107/6 107/7 107/12 107/13 108/13 109/3 111/10 112/2 113/2 113/20 114/6 116/8 119/1 120/7 120/9 121/6 121/17 121/18 122/23 123/6 123/7 125/5 125/6 125/8 125/9 126/2 127/17 128/12 129/19 130/6 130/10 130/21 131/13 131/25 132/5 132/6 133/21 134/15 134/16 135/16 135/17 137/23 137/23 137/25 138/21 138/23 138/23 140/1 141/1 143/7 143/12 143/19 144/3 144/16 145/20 146/10 146/22 148/13 148/18 149/18 150/10 151/8 151/25 153/8 154/13 156/15 157/6 160/8 160/15 161/1 162/12 162/20 162/21 165/15 166/2 166/5 166/8 168/19 168/20 168/21 169/11 170/21 171/19 172/5 172/9 172/22 176/6 176/7 176/9 176/14 176/16 178/5 178/10 179/14 179/19 179/21 179/22 180/5 180/7
**would -- that [1]** 166/2
**wouldn't [4]** 18/25 42/12 122/25 176/14
**Wow [1]** 36/3
**wrap [6]** 20/15 20/17 50/25 76/5 82/15 82/19
**wrecking [1]** 148/6
**wrench [1]** 172/15
**written [1]** 80/15
**wrong [3]** 109/5 121/17 135/1

Case 1:25-cv-04480-CRC    Document 45-1    Filed 05/11/26    Page 227 of 227

**W**

**wrote [1]** 133/25
**Wynn's [1]** 15/15

**Y**

**Yaakov [2]** 2/8 5/11
**yaakov.m.roth [1]** 2/11
**Yeah [7]** 57/22 74/6 96/10 135/11 136/13 136/18 161/21
**year [19]** 7/11 29/12 30/21 34/17 35/23 38/16 55/23 55/24 58/25 62/5 74/19 80/2 81/14 90/7 90/19 96/22 159/7 171/11 174/13
**year's [1]** 146/6
**year-long [1]** 29/12
**years [38]** 20/11 33/10 36/22 37/11 49/4 53/3 53/8 55/17 56/2 56/5 56/24 56/25 56/25 57/3 60/24 62/19 64/23 65/3 68/5 79/5 80/14 93/13 94/6 100/3 107/17 119/18 131/6 146/2 146/9 146/20 148/16 149/4 154/24 158/21 162/7 163/7 166/2 171/16
**years' [1]** 145/21
**yelled [1]** 50/14
**Yellowstone [1]** 176/19
**Yep [3]** 73/23 123/23 177/17
**yes [154]** 7/8 7/10 8/1 8/19 9/1 9/11 9/21 10/18 12/13 12/13 12/17 15/12 15/18 15/21 16/1 17/6 17/11 18/18 18/21 18/22 19/12 21/17 22/13 23/6 23/14 24/3 24/16 24/19 24/19 24/24 25/3 25/24 26/4 27/5 27/16 27/17 30/5 30/5 30/11 30/19 31/15 31/25 35/3 35/13 36/7 36/24 37/22 37/25 38/5 38/15 38/24 40/2 40/6 40/6 40/10 41/9 42/1 42/11 43/1 43/20 44/2 44/15 45/14 48/23

49/13 49/20 50/11 50/21 52/7 53/21 53/24 54/15 55/5 55/6 55/9 57/25 58/2 58/13 58/16 58/19 58/23 60/1 60/7 60/11 60/16 60/25 61/20 65/8 65/10 65/10 65/17 65/17 67/17 67/20 68/1 68/10 70/1 70/17 71/23 71/23 72/9 73/11 74/3 74/20 74/23 76/1 76/24 77/3 77/20 77/22 78/2 78/4 79/7 81/20 82/25 83/5 83/25 84/18 86/24 87/2 88/6 88/9 88/11 88/15 88/17 88/19 88/19 88/19 89/8 89/20 90/9 91/16 91/23 92/21 93/10 93/15 93/17 93/21 95/3 96/2 96/18 97/14 99/8 99/23 101/4 101/9 101/20 102/7 103/3 118/8 123/13 138/17 150/6 179/7
**yesterday [17]** 8/4 12/25 16/11 35/5 35/11 69/4 73/18 106/20 118/10 118/18 118/24 147/12 148/17 156/1 158/5 158/10 163/9
**yet [16]** 10/8 33/20 37/9 38/17 104/4 104/6 105/17 105/24 121/3 130/5 131/18 139/16 140/4 150/25 151/8 152/2
**you [725]**
**you -- I [1]** 99/1
**you -- you [1]** 97/11
**You'd [1]** 134/7
**You'll [3]** 5/8 39/20 119/2
**you're [54]** 8/21 11/24 12/10 16/17 22/17 23/4 23/4 27/13 28/23 37/9 37/10 40/13 40/15 42/23 45/10 47/2 50/13 56/18 73/25 81/2 91/20 95/6 95/15 95/23 97/3 97/17 97/25 104/18 104/19 108/20 108/21 116/1 116/18 117/12 122/18 128/22 129/9

129/10 130/3 140/15 142/7 142/8 143/2 143/14 147/5 149/4 158/7 162/8 165/14 165/22 165/23 166/6 173/25 176/20
**you've [16]** 8/2 9/12 21/24 31/3 41/1 43/13 52/23 103/6 108/5 108/5 117/3 132/21 133/8 137/13 149/8 180/16
**you-all [4]** 5/23 181/9 181/14 181/16
**your [137]** 4/3 4/8 4/10 4/21 4/22 5/10 5/16 6/2 6/5 6/9 6/12 6/14 6/20 7/7 7/15 7/24 9/13 10/1 12/15 15/5 16/6 16/9 16/15 16/17 16/20 17/19 17/22 19/13 21/25 22/2 22/20 23/15 23/22 27/9 29/6 30/14 31/8 31/13 33/20 34/8 35/19 42/6 43/15 45/1 47/21 48/12 48/16 48/21 49/7 52/8 52/9 52/13 52/21 52/22 52/23 53/25 54/3 54/21 54/24 55/14 73/8 73/21 76/5 77/24 79/2 79/9 80/12 80/24 81/5 81/12 82/5 82/8 82/15 84/20 86/14 86/16 87/4 87/5 87/10 87/14 87/16 87/19 87/19 88/4 89/11 90/17 92/13 92/22 94/13 94/14 94/21 95/13 96/5 96/13 97/20 98/5 101/15 103/4 103/9 104/20 106/7 107/24 107/25 108/3 108/19 113/17 114/25 123/6 123/24 132/18 138/15 139/2 140/1 140/8 141/7 142/8 143/6 147/10 149/23 150/1 153/13 154/15 154/20 160/8 161/12 168/19 169/8 170/9 172/19 173/6 173/8 175/25 176/1 178/13 178/13 179/6 181/3
**Your Honor [44]** 4/3

4/10 4/22 5/10 6/2 6/5 6/9 16/6 16/20 17/22 22/2 23/15 23/22 27/9 45/1 48/16 49/7 52/8 52/13 73/21 76/5 82/15 86/14 86/16 87/4 87/10 87/16 87/19 89/11 92/13 94/14 96/13 98/5 103/9 106/7 150/1 153/13 154/15 154/20 160/8 161/12 170/9 172/19 173/8
**yourself [4]** 8/12 51/9 87/6 179/18

**Z**

**Zelinsky [1]** 73/19