**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOYCE BEATTY,<br><br>    *Plaintiff*,<br><br>  v.<br><br>DONALD J. TRUMP *et al.*,<br><br>    *Defendants*. | No. 25 Civ. 4480 (CRC) |

**PLAINTIFF'S POST-HEARING SUPPLEMENTAL MEMORANDUM**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

    I.      MR. FLOCA WILLFULLY IGNORED HARMS TO THE CENTER. .......... 3

    II.    CONGRESS FUNDED THE PLANNED RENOVATIONS BASED ON
          REPRESENTATIONS THAT THEY WOULD BE PHASED........................ 7

    III.   THE PROJECT'S NASCENT STATUS CONFIRMS THE
          ARBITRARINESS OF CLOSURE AND THE LACK OF ANY
          EQUITABLE HARM IN ENJOINING IT. ...................................................... 8

CONCLUSION................................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........ 7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ................................ 9

**Statutes**

20 U.S.C. § 76h(a)(1) ............................................................................................................. 1

20 U.S.C. § 76j ....................................................................................................................... 2

20 U.S.C. § 76j(a)(1)(A) ........................................................................................................ 6

20 U.S.C. § 76j(a)(1)(G) ........................................................................................................ 6

**Other Authorities**

* G. Bogert et al., *The Law of Trusts and Trustees* (Supp. Rev. 2d ed. 1992) ................................ 7

## **INTRODUCTION**

The decision to shutter the Kennedy Center for two years is "one of the more consequential decisions in the institution's lifespan."  TRO Opinion, ECF 24 at 22.  As Plaintiff's experts detailed, a full-scale closure, especially where prolonged, is uniquely damaging to a performing arts center, which is why responsible performing arts centers make every effort to remain open during renovations to the full extent possible.  To evaluate whether to instead close the Kennedy Center, any prudent trustee would have before them a significant body of materials and analysis, such as thorough architectural plans and independent cost estimates.  It would "border[] on preposterous" for a fiduciary of any performing arts institution—let alone a sacred, living memorial to a fallen President, which must by law conduct artistic performances—to shutter that institution without even an iota of analysis before them comparing the costs and benefits of closure versus phrased renovations.  *Id*. at 21.

But the documentary record in this case reveals that Defendants went forward without any analysis or consideration of the impact of a two-year closure on the Center's revenue, goodwill, and relationships with performers, laborers, donors, and patrons—and also without any consideration for the Kennedy Center's statutory mission.  Contrary to Defendants' assertions, there was no "one year review" comparing the benefits of closing the Kennedy Center for renovations versus phased construction.  Instead, Defendants admitted: They did not consult a single expert or commission any reports.  Nor did they even *consider* the costs of closure, which the record shows are extraordinary.  This is an astonishing breach of fiduciary duty—and abdication of the Board's duty to "maintain and administer" the Kennedy Center as "a living memorial" to its namesake, 20 U.S.C. § 76h(a)(1), that "present[s] classical and contemporary music, opera, drama, dance, and other performing arts from the United States and other countries."

1

*id.* § 76j.  It cries out for interim relief to prevent irreparable injury and preserve the ability of the Kennedy Center to serve as a living center for the performing arts.

Because the record in this case was so clear, the live testimony of the Kennedy Center's Director Matt Floca was not necessary to establish that Plaintiff is likely to prevail on the merits, and neither party sought to have Mr. Floca testify in this case.  But to the extent the Court considers it, Mr. Floca's testimony only crystallized what the record had already established.  On the stand, Mr. Floca confirmed that the Kennedy Center can conduct renovations in a phased manner, which would allow the Center to remain at least partially open.  That is unsurprising.  Until Defendants abruptly reversed course on February 1, 2026, the Kennedy Center's longstanding plan had been to perform maintenance and repairs in a manner that kept the Kennedy Center open.  A phased approach is what any other performing arts institution would do in a comparable circumstance, precisely because closing causes such severe harms.

Meanwhile, Mr. Floca repeatedly testified that, in recommending that the Kennedy Center close, he did not even *consider* the grave harms a closure would produce.  Instead, Mr. Floca recommended a total shutdown of the Kennedy Center because he views closure as advantageous from an efficiency perspective.  Mr. Floca was frank: In making that drastic recommendation— the only thing Defendants purportedly did to evaluate whether to close the Kennedy Center—Mr. Floca completely ignored the extreme costs that would result, considering them irrelevant.  In other words, Mr. Floca put on blinders—flagrantly ignoring key considerations any prudent fiduciary would consider and the Kennedy Center's core statutory responsibilities to present artistic performances.  Thus, Mr. Floca's blinkered work cannot provide a basis for the Board's post-hoc ratification of its Chairman's ukase that the Kennedy Center be shuttered for two years.

It bears emphasis: Plaintiff is neither raising a "quotidian grievance[]," nor asking this

Court to micromanage the Board.  TRO Opinion, ECF 24 at 22 at 36.  She is asking for the bare minimum required of a trustee—an obligation which Congress required of Defendants by law—in any comparable circumstance. Plaintiff respectfully urges the Court to issue the preliminary injunction promptly and ensure that this critical decision about the future of this national treasure be made with due regard to the Board's fiduciary obligations.[1]

## ARGUMENT

### I.    MR. FLOCA WILLFULLY IGNORED HARMS TO THE CENTER.

A project of the "magnitude" contemplated by Defendants "does not happen overnight." TRO Opinion, ECF 24 at 22.  Instead, as Plaintiff's experts detailed—and as Defendants do not dispute—trustees acting consistently with their basic obligations would have before them "a comprehensive package of planning materials."  Borda Decl., ECF 13-19 at 6.  These would include, for example, "extensive reports, cost analyses, construction plans, and third-party validated budgets." Taylor Decl., ECF 13-20 at 6.  Indeed, "responsible governance and executive leadership should consider every other possible alternative before opting for such a lengthy closure, given the widely understood devastating consequences of such a closure."  *Id*. at 5; *see also* Williams Decl. ¶ 12 ("A credible determination that a building of the Kennedy Center's scale and complexity cannot safely undergo phased renovation requires analysis by qualified structural,

---

[1] For the first time, in the supplemental filing and without any notice to Plaintiff, Defendants argue that Section 76*l*(b) limits Plaintiff's cause of action to "trust funds."  Defendants waived this argument (which is wrong as a matter of statutory interpretation).  Plaintiff would normally not respond in a simultaneous filing.  But this sandbagging demands a response.  Even on its own terms, Defendants' argument is wrong:  The shutdown plainly implicates what Mr. Floca calls "trust funds" because closure directly effects performances, the funds used to conduct them, and the revenue received.  The renaming likewise plainly implicates what Mr. Floca calls "trust funds" because, at minimum, Defendants' use of the "Trump Kennedy Center" name implicates advertisements for performances, the website, emails, and other materials, as well attendance at performances and donations. *See, e.g.*, ECF 12 at 11; ECF 13-14; ECF 33-1 ¶¶ 34, 36 (SUMF).

MEP, and construction management professionals with relevant venue experience, working from complete design documents.").

Defendants apparently recognized as much, when President Trump falsely claimed to have conducted "a one year review" to allow the Board to "decid[e] between either Construction with Closure and Re-Opening or, Partial Construction while continuing Entertainment Operations." Ex. E to Freeny Decl. at 2, Doc. No. 13-12. Further recognizing that such a decision called for significant and sustained outside input, President Trump falsely claimed that the one-year review had included "Contractors, Musical Experts, Arts Institutions, and Other Advisors and Consultants." And yet, the documentary evidence in this case made clear: There never was "a one year review," no outside experts were consulted, and Defendants never considered the monumental harms of closing the Kennedy Center or the benefits of a phased approach.

The President's claims have been proven to be untrue. Mr. Floca's testimony confirmed what the record already revealed: Defendants did not conduct any meaningful analysis. Instead, Mr. Floca's recommendation to close the Kennedy Center reflected a unilateral preference for closure unsupported by any independent study, report, or cost-benefit assessment. Mr. Floca conceded that the Kennedy Center's capital maintenance needs—the purported basis for his closure recommendation—reflect "longstanding issues," not some unexpected intervening development. Tr. 88:10. He repeatedly cited prior Comprehensive Building Plans as the core support his preference for full closure. *See, e.g.*, Tr. 34:10-20, Tr: 67:4-21, 98:12-24. But at the same time, he conceded these Comprehensive Building Plans, from which he somehow divined a need to close the Center for two years, specifically "contemplate[d] that that the renovations to address these issues . . . would be done in a phased manner, so that the building would remain open as much as possible." Tr. 88:12-19; 89:3-9. Accordingly, Defendants' efforts to rehabilitate the

4

contemporaneous lack of analysis by eliciting testimony from Mr. Floca about how extensive those historical Comprehensive Building Plans were—over 300 pages, including cost schedules—only highlights the arbitrariness of their decision making.

Mr. Floca also confirmed that a phased approach is, in fact, possible.  Mr. Floca's talismanic invocation of the word "irresponsible" in characterizing phased repairs cannot substitute for the basic evaluative work Defendants failed to perform. Asked whether "there is an option to adopt some mitigation measures that would allow you to keep the center open while doing renovation," he conceded: "We could -- yes. We could do construction in a number of different ways."  Tr. 91:8-17; *cf.* Williams Decl. ¶ 13 (noting that Floca's declaration testimony "effectively concedes that phasing is possible" with proper mitigation methods).  Yet Mr. Floca did not analyze those alternatives, estimate their costs, weigh them against the harms of closure, or otherwise evaluate whether mitigation measures could permit continued operations—whether in whole or in part—during renovation.  Tr. 90:1-5 (Q: "[Y]ou did not commission any study or cost estimates to compare the cost of construction on a phased level versus full closure. Correct?" A. "There is no need to."). Nor, obviously, did the Board.

Most damningly, Mr. Floca conceded that he did not *consider*—let alone "make an effort to quantify"—the "lost revenue, [] lost goodwill, lost performances" and other non-construction-related costs of closure.[2]  Tr. 94:3-8, Tr. 19-23.  Instead, his "decision was focused on the needs of the building," Tr. 94:3-9, and he regarded any harms to the performing arts side of the equation

---

[2] Mr. Floca's claim that Defendants are "explor[ing]" the possibility of staging certain minor "artistic efforts" in the Reach, which they plan to keep open, does not absolve Defendants of their failure to consider their obligation to maintain the Center and its ability to stage performances. Not only is this claim a post-hoc rationale with no support in the materials presented to the Board, but Mr. Floca could only promise they were exploring the possibility (with limited staff) and had no actual plans.  Tr. 91:24-92:3.

as "not a factor in deciding to do what we need to do." Tr. 95:19-20. This myopic view may be unsurprising, given Mr. Floca's background in construction and lack of prior experience with performance arts venues. But it is not excusable. The record is undisputed that the costs that Defendants brushed aside are extraordinary, and they cannot readily be ameliorated when the Center reopens in two years' time. *See, e.g.*, Borda Decl. ¶¶ 7-15, ECF No. 13-19; Taylor Decl. ¶¶ 5-13, ECF No. 13-20; Borenstein Decl. ¶¶ 13-19, ECF No. 13-21; Miller Decl., ¶¶ 8-18, ECF No. 13-22. Meanwhile, neither Mr. Floca nor the other Defendants even considered how to balance the trustee's mandatory statutory obligation to conduct performances with their authority to conduct repairs. *Compare* 20 U.S.C. § 76j(a)(1)(A) (requiring Board to "present classical and contemporary music, opera, drama, dance, and other performing arts from the United States and other countries"), *with id*. § 76j(a)(1)(G) (providing authority to conduct repairs and rehabilitation).

Instead, Mr. Floca explained his one-sided rationale plainly: "it is pretty basic to understand that it's easier to do the things" in a closed building, and that "there are very clear efficiencies, both from a cost standpoint and a schedule standpoint." Tr. 72:22-25, 73:3-6. On cross-examination, Mr. Floca confirmed that his recommendation to close the Center was based entirely on what he "saw as the efficiencies on the construction side." Tr. 95:1-3. But this prediction of "efficiencies" rings particularly hollow when Mr. Floca never undertook any comparative analysis of phased versus full closure, never evaluated the costs of mitigation measures that could permit continued operations, and never weighed those asserted efficiencies against the substantial financial and reputational harms closure would inflict.

In short, Mr. Floca's twin admissions—that he focused exclusively on asserted construction efficiencies while entirely failing to consider the costs and feasibility of phased

6

construction or the impact of closure on the trustee's underlying mission to host performances—confirms that they rushed forward without even the bare minimum analysis. *See Bogert's The Law of Trusts and Trustees* § 558 ("Courts have held a trustee's conduct to be 'arbitrary and capricious' if he or she has gone through the formality of exercising the discretion without deliberately considering the circumstances."); *cf. Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that a decision is "arbitrary and capricious" when it "entirely failed to consider an important aspect of the problem").[3]  Mr. Floca's  testimony also puts the lie to the notion that Defendants were balancing between two competing statutory duties—repair and renovation, on the one hand, and maintaining the Center and its performance mission, on the other.  *See* Pl.'s Reply Br. at 27.  Whatever latitude Defendants may have in mediating between their statutory obligations, Defendants cannot discharge their statutory obligations by simply ignoring one congressional directive (artistic functions) in favor of another (repairs).

## II.  CONGRESS FUNDED THE PLANNED RENOVATIONS BASED ON REPRESENTATIONS THAT THEY WOULD BE PHASED.

Mr. Floca's testimony also confirmed that Congress was not informed about the closure when it approved the $257 million project.  Mr. Floca testified that he keeps Congress abreast of the Center's needs through budget justifications. Tr. 50:4-7, 96:15-18. But when pressed, he

---

[3] On redirect, Mr. Floca attempted to rewrite his testimony by claiming that he "did analyze all of these different options" and that "there's a team on board at the center who I worked with constantly in trying to figure out contracting mechanisms and solutions to partially operating the building," Tr. 99:8-12—despite previously stating that there was "no need to" study the cost-benefit of phasing versus a full shutdown, Tr. 90:1-5. However, if such analyses indeed exist, Defendants were required to produce them pursuant to the Court's TRO. *See* ECF No. 24 at 25 (ordering Defendants to produce "[a]ny reports provided by . . . experts and advisors . . . relating to . . . the planned closure of the Center"). Defendants cannot seriously contend that a reasoned "analy[sis] . . . of . . . different options" with respect to a quarter-billion project was conducted wholly verbally, or entirely in Mr. Floca's head.

confirmed that the fiscal year 2026 justification—submitted to Congress while he was facilities manager—"contemplated that the center would remain open while renovations were undertaken." Tr. 97:12-13; *see also* Taylor Decl. ¶ 16, ECF No. 13-20 (explaining that the 2026 justification stated: "As major capital projects necessitate disruptions in date availability in certain theaters, these disruptions need to be carefully planned and coordinated to not materially affect important programming initiatives."). Mr. Floca attempted to recharacterize this as "a clerical error in the submission." Tr. 97:17-18. Whatever the case, the fact remains that Congress was never informed of the closure plan through the very mechanism Mr. Floca identified as the primary channel of congressional communication.

Regardless, it bears emphasis: Congress could, in no way, be said to have authorized a closure when it appropriated funds in the summer of 2025. By Mr. Floca's own admission, the Kennedy Center's "historical stance" was that the "center would remain open," Tr. 97:14, and no one learned about the proposed closure until President Trump's abrupt announcement on February 1, 2026. Instead, Congress appropriated funds under the impression that the Kennedy Center *would remain open*.

### III. THE PROJECT'S NASCENT STATUS CONFIRMS THE ARBITRARINESS OF CLOSURE AND THE LACK OF ANY EQUITABLE HARM IN ENJOINING IT.

Mr. Floca's testimony also confirms Plaintiff's argument that the project is far from ready, highlighting the arbitrariness of the planned July closure. *See* ECF No. 29 at 10-12; *see also* Williams Decl. ¶ 16, 20, ECF No. 29-24 (it will take close to year before "responsible construction could commence," including "six to nine additional months of design and documentation work."). Mr. Floca brushed these concerns aside in his declaration, claiming that the Center can move "directly into execution," *see* Floca Decl. ¶ 12, ECF No. 34-4. But on the stand, he admitted that

8

"[s]eventy-five percent of what [they]'re doing now is planning," including "making sure [they] have an achievable schedule" and "cost estimates." Tr. 68:19-22.

This is an extraordinary admission. With two months remaining before the Center is shut down, there *still* does not exist a comprehensive document that contains plans for the proposed project. Tr. 83:18-19 ("There's not one deliverable that outlines everything we've discussed today, no."). Mr. Floca also disclosed for the first time at the hearing that the Center is now creating a new, updated Comprehensive Building Plan that will include updated cost schedules. Tr. 89:11-16. But he admitted that *he did not wait for that new plan to be prepared before deciding that closure was the most "efficient and effective way" to complete the renovations*. Tr. 89:22-24. In sum, Mr. Floca insists the Kennedy Center *must* close in July for two years before having finalized anything. If nothing else, this testimony does not support Defendants' stated timeline and tips the equities strongly toward preventing closure, since Defendants are still in planning stages.[4]

Moreover, the clear disconnect between the stated urgency and the unfinished preparations underscores the shambolic arbitrariness of Defendants' decision-making. And, though not necessary for Plaintiff to prevail at this preliminary stage, Defendants' decide-first-analyze-later approach strongly suggests that their decision was designed to hide their embarrassment about declining ticket sales. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (deviation from normal process indicates "improper purposes").

\* \* \*

The Court should enjoin the closure. We are in a critical window in which the Center can

---

[4] It bears emphasis: Plaintiff seeks to enjoin the unlawful closure. She does not seek to enjoin "routine maintenance, repairs, and operations that are contemplated by the Kennedy Center's existing Comprehensive Building Plan." Proposed Prelim. Injunction Order, Doc. No. 13-24.

rebuild its calendar, Taylor Decl. ¶ 12, ECF 13-20, and key performances—such as the Nutcracker—will be lost if not booked soon, Miller Decl. ¶ 11, ECF No. 13-22.

During oral argument in the related case, after Mr. Floca's live testimony, the government suggested in passing that a preliminary injunction against closure would provide no practical relief because performances have already been canceled.  As an initial matter, Defendants never made this argument in *this* case, and it is therefore waived.  Indeed, they represented the opposite.  In arguing for a less abbreviated briefing schedule than Plaintiff sought, the government told the Court that the harms Plaintiff alleged—which included employee terminations and cancelled shows— "will not occur until July 2026." *See* ECF No. 26 at 5.  And there were performances already scheduled by the time the closure was announced, *see* ECF No. 13-16 (March 5, 2026, screenshot of the theater schedule showing July-September performances for *Shear Madness*, *Fraggle Rock*, *Back to the Future: The Musical*, *Mrs. Doubtfire*, and *The Outsiders*), and likely more in the late stage of contracting, Miller Decl. ¶ 7, ECF No. 13-22 (formal contract is last stage, but commitments are made before).  Defendants should not now be heard to invoke *their* cancelations of performances during the pendency of this motion (or other steps they have taken to try to make the closure a fait accompli) as a reason to deny *equitable* relief.  Defendants' post hoc efforts to entrench the closure only increases the urgency for the Court to promptly issue relief.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant her a preliminary injunction and partial summary judgment, and deny Defendants' motion for summary judgment.

Dated: May 11, 2026                       Respectfully submitted,

<table>
<tr><td>/s/ Norman Eisen</td><td>/s/ Nathaniel A.G. Zelinsky</td></tr>
<tr><td>NORMAN EISEN</td><td>NATHANIEL A.G. ZELINSKY</td></tr>
<tr><td>(D.C. Bar No. 435051)</td><td>(D.C. Bar No. 1724093)</td></tr>
<tr><td>STEPHEN JONAS</td><td>KYLE R. FREENY</td></tr>
<tr><td>(D.C. Bar No. 90037069)</td><td>(D.C. Bar No. 1684764)</td></tr>
<tr><td>DAVID W. OGDEN</td><td>ALEXANDER KRISTOFCAK*</td></tr>
<tr><td>(D.C. Bar No. 375951)</td><td>(D.D.C. No. NY0717)</td></tr>
<tr><td>DEMOCRACY DEFENDERS ACTION</td><td>WASHINGTON LITIGATION GROUP</td></tr>
<tr><td>600 Pennsylvania Avenue SE #15180</td><td>1717 K Street, NW, Suite 1120</td></tr>
<tr><td>Washington, D.C. 20003</td><td>Washington, D.C. 20006</td></tr>
<tr><td>202-594-9958</td><td>202-521-8750</td></tr>
<tr><td>norman@democracydefenders.org</td><td>nzelinsky @washingtonlitigationgroup.org</td></tr>
</table>

*Admitted only in California and New York; practicing under the supervision of D.C. Bar members*

*Attorneys for Plaintiff Joyce Beatty*