**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-4480 (CRC) |

**JOINT STATUS REPORT**

Pursuant to the Court's June 24 and July 28, 2026 Minute Orders, the parties provide their respective positions about the status of this litigation. As required by the Court's orders, Defendants here "apprise the Court of any pertinent factual developments as to plans for future construction and operations at the Kennedy Center." Min. Order (June 24, 2026). Defendants here also "indicate the purpose for and status of the tarp and scaffolding that Defendants have erected on the front portico of the Center." *Id.*

**A. Defendants' Statement:**

***i. Plans for construction and operations***

The Center's Board of Trustees met on August 13, 2026, to vote on course of action for the Center's forthcoming programming schedule, level of operations, and construction activities. *See* Exhibit A, Decl. of Charles Matthew Floca ¶ 3. Prior to the vote, an independent analyst from the Delta Consulting Group presented an overview of the Center's structural needs. *Id.* The Delta consultant developed two different proposals for the Center's forthcoming operational model and discussed the Center's programming outlook, operational needs, and construction prospects. *Id.* ¶¶ 3–4. During the presentation, the analyst provided his expert opinion that a partial closure

model—which would contemplate four years of revolving partial closures of the main building of the Center—would increase the length and cost of construction and lead to substantial safety concerns. *Id.* ¶ 4. He also noted his opinion that the Center would suffer a reduction in both revenue and fundraising ability over the entire four years of a partial closure, leading also to reputational damage that would result from the proximity of construction activities to performance venues. *Id.* He recommended that the Board proceed with a full closure for two years, which would minimize total cost, minimize the amount of time that programming would be subject to disruptions from construction, and best preserve the Center's reputation as world-class performing-arts venue. *Id.* After receiving this information and engaging in discussion about the proper course, the Board voted to adopt a closure proposal that contemplates a full closure of the main building of the Center; the maintenance of fine- and performing-arts programming activities at the REACH building on the Center's campus; support for offsite performances by the National Symphony Orchestra; the continuation of educational programming; the continuation of signature productions put on by the Center, like the Kennedy Center Honors and the Mark Twain Prize for American Humor, at offsite locations; and the relocation of the memorial experience for President Kennedy to the REACH building. *See id.* ¶ 5.

Defendants understand that Plaintiff opposes the Board's chosen course of action. In light of the Board's vote and the fact that Defendants understand the Court's preliminary injunction entered on May 29, 2026 (ECF No. 48) to restrain Defendants from immediately undertaking certain closure activities contemplated under the Board's approved plan, Defendants propose that the Court enter a scheduling order for briefing a consolidated motion for summary judgment and motion to dissolve the preliminary injunction. In Defendants' view, and as the Court acknowledged at the July 28, 2026 initial scheduling conference with the parties, consolidated briefing will

preserve the parties' and the Court's resources and allow for efficient resolution of the remaining issues in this litigation. Defendants propose that the Court enter the below schedule for further proceedings:

| | |
|---|---|
| Defendants' Consolidated Motion for Summary Judgment and Motion to Dissolve the Preliminary Injunction | **September 18, 2026** |
| Plaintiff's Opposition to Defendants' Consolidated Motion | **October 9, 2026** |
| Defendants' Reply in Support of their Consolidated Motion | **October 23, 2026** |

Defendants will respond to Plaintiff's legal arguments in the consolidated motion. *See* ECF No. 60 at 1 n.1 ("The Court should disregard Plaintiff's legal arguments, which are not within the scope of this Court's [June 24] order and not within the function of a status report."). For now, Defendants will note their disagreement, as the record will demonstrate the Board's prudence.

For the same reasons, Defendants will not now litigate the propriety of hypothetical discovery requests. A party can file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b); *see Parker v. Hoglander*, No. CV 15-926 (JDB), 2016 WL 3527014, at *3 (D.D.C. June 23, 2016) ("A motion for summary judgment can thus be too late, but not too early; 'at any time' does in fact mean 'at any time.'"). If, after reviewing Defendants' summary judgment motion, Plaintiff contends that she "cannot present facts essential to justify its opposition," she can seek relief under Federal Rule of Civil Procedure 56(d) by filing an affidavit or declaration that "(1) outline[s] the particular facts [she] intends to discover and describe why those facts are necessary to the litigation;" (2) "explain[s] why [she] could not produce [the facts] in opposition to the motion [for summary judgment];" and (3) "show[s] the information is in fact discoverable." *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 530 (D.C.

Cir. 2019). Then, this Court, with Defendants' summary judgment motion in hand, will be able to apply these three "criteria to the specific facts and circumstances presented in [Plaintiff's] request." *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 27 (D.C. Cir. 2014). And it is not an abuse of discretion for a Court to grant summary judgment when a nonmovant does not pass this three-element test. *See, e.g.*, *Haynes*, 924 F.3d at 530. Defendants are confident that will be the case here. Until Plaintiff pursues such a motion, though, any consideration of discovery is unwarranted.[1]

***ii. Purpose for and status of the tarp and scaffolding on the front portico***

Water testing and structural repairs to the roof overhang of the Center's front portico require the use of a scaffolding system, including a protective covering—a tarp—around that scaffolding. *See* Floca Decl. ¶¶ 6–7. Center management has erected one portion of this necessary scaffolding, which it used to remove President Trump's name from the building's facade. *Id.* ¶ 6. The protective barrier around the scaffolding was and is a necessary element of the ongoing construction activities at the Center—during the removal of the name, it served as a safety barrier for ongoing construction activities and helped safeguard the marble facade of the building in light of reported panel damage. *Id.* And the Center will utilize the existing scaffolding to access,

[1] Plaintiff's counsel has requested that Defendants attach two documents shared with Board members during the August 13 Board meeting. One of the documents, a comprehensive building plan, contains highly sensitive information about the Center's physical building structures and safety elements. And the other, a consulting report, contains confidential information regarding the Center's financial projections. As the materials indicate, they were shared for the purpose of informing Board members about the Center's forthcoming proposed—and adopted—construction plans, and they were marked "confidential and privileged" for that purpose. With that in mind, Defendants have filed these attachments separately and under seal and ask that the Court accept those sealed filings. Defendants intend to rely on these materials in their forthcoming dispositive motion, but they must take steps to ensure that all sensitive information is properly redacted prior to those materials being made public. Plaintiff's counsel has informed Defendants that Plaintiff objects to maintaining the consulting report under seal, but does not object to maintaining the comprehensive building plan under seal.

investigate, and engineer structural repairs to the overhead soffit, which will enable further repairs to be made while minimizing delay, public disruption, and cost redundancies. *Id.* Final removal of the scaffolding and its barrier is contingent upon the scope of any repairs required at present to the marble facade, as well as any other necessary repairs. *Id.* ¶ 7.

In response, Plaintiff again improperly asks this Court for relief in a status report. *See* ECF No. 60 at 1 n.1.

***iii. Recognition resolution***

At the August 13 Board meeting, the Board passed a recognition resolution. *See* Ex. B. Defendants have committed to not effectuating this resolution until, at the earliest, September 8, 2026. Given Plaintiff's stated intent to seek relief regarding this resolution, the parties propose the following briefing schedule:

- Plaintiff files any motion no later than August 20, 2026.
- Defendants file a response no later than August 24, 2026.
- Plaintiff files reply no later than August 26, 2026.

If the Court desires to hold a hearing, counsel is available on August 27, August 28, and August 31. Counsel for Defendants is unavailable from September 1-2 and counsel for Plaintiff is unable from September 3-7. Defendants will respond on the merits in their response. *See* ECF No. 60 at 1 n.1.

**B. Plaintiff's Statement:**

***i. Summary***

Plaintiff raises three issues for the Court's attention. *First*, at the August 13 Board meeting, Defendants voted to add Donald Trump's name back onto the façade and grounds of the Kennedy Center. This latest move is deeply concerning. Defendants knowingly voted to violate their own organic statute and seem intent on defying the Court's decision. *Second*, in this status report, Defendants advance a pretextual justification for the tarp currently covering the façade. The

structure is an obvious effort to obstruct a return to the pre-litigation status quo. Congress established the Center as a tribute to President Kennedy. His name should once again be visible on the façade and Defendants' childish refusal to accept this Court's ruling to that effect should end now. *Third*, on August 13, Defendants voted to shut down the Center for two years based on a vague, two-page PowerPoint provided to the Board just two days before the meeting. This recent process mirrors Defendants' previous rush to rubberstamp President Trump's February 1 announcement that led this Court to enjoin the shutdown the first time.

Plaintiff respectfully requests that the Court: (i) immediately set the proposed briefing schedule with respect to the Board's efforts to defy this Court's decision and once again erect a memorial to President Trump, **so that the Court can rule before September 8, 2026**; (ii) order Defendants to show cause why the tarp should not be removed within 30 days; and (iii) order the parties to begin much needed discovery into the shutdown decision. The statement that follows discusses each of these matters in turn.[2]

***ii. Defendants are defying this Court's decision on renaming.***

At the conclusion of the meeting on August 13, Defendants voted to pass a resolution that was not on the agenda: adding Donald Trump's name back onto the façade and grounds of the Kennedy Center. Defendants prepared a draft resolution in advance. But they avoided including

[2] Given how much of Defendants' position statement relies on Mr. Floca's declaration, Plaintiff requested a copy of the declaration in advance. Defendants refused to provide one. To the extent the declaration contains information not in the statement, Plaintiff objects to sandbagging. Plaintiff also objects to Defendants' proposed sealing of the Delta Consulting Group PowerPoint. For the reasons described below, the PowerPoint is central to Plaintiff's arguments for why discovery is necessary, and Defendants cannot identify anything in the scant document that remotely deserves sealing. Defendants should not be allowed to manipulate the judicial process, and file documents unnecessarily under seal, to hide their embarrassment. Because Defendants have represented that the JLL document might provide details about the building's security, Plaintiff does not object to filing that document under seal for purposes of this status report.

the measure on the agenda or circulating the draft, likely to hinder any opposition from dissenting Board members. The resolution once again purports to "recognize and honor President Trump's existential and unprecedented contributions to the survival of the Center." To effectuate that purported "recognition," the resolution directs the Executive Director to do three things after 14 days.

*First*, Defendants will add the following "inscribed recognition on the building, below the name of the Center, as follows:

**The John F. Kennedy Memorial Center for the Performing Arts**
**Restored and Renovated by President Donald J. Trump"**

*Second*, "upon the endowment of the Trump Kennedy Center Fund reaching $100M," Defendants will "further recognize the President's contribution" by adding to the inscription so that it reads:

**"The John F. Kennedy Memorial Center for the Performing Arts**
**Restored and Renovated by President Donald J. Trump**
**Endowed by the Trump Kennedy Center Fund"**

*Third*, Defendants will "name the physical site and grounds upon which the Center sits" the "President Donald J. Trump Plaza."

On August 13, Plaintiff's counsel contacted Defendants' counsel, who committed in writing not to "effectuate the façade/plaza resolution until, at the earliest, August 27th." This ensured Plaintiff could inform the Court of this astonishing development in this Joint Status Report, and obviated the need to seek emergency relief on the evening of August 13. In preparing this report, Plaintiff's counsel asked if Defendants would "commit to further holding off effectuating the resolution until after the Court rules on its legality." But Defendants refuse to unequivocally commit to forestall effectuation the resolution until the Court rules on the legality

of their actions. Instead, Defendants will commit *only* not to effectuate the resolution until September 8.

There is thus every reason to believe that Defendants will attempt to effectuate some or part of this latest unlawful resolution at the earliest opportunity after September 8. Moreover, Plaintiff is concerned that Defendants already may have damaged the historic marble that lines the façade with their original desecration of the Center's façade by attaching President Trump's name above President Kennedy's. In an earlier version of the joint status report, Defendants originally stated that they are conducting "evaluation to determine the extent of remediation required **following removal of President Trump's name**."[3] Adding another inscription or inscriptions, in naked defiance of this Court's ruling, obviously could do further damage.

To be clear: This fire drill is entirely of Defendants' making. Plaintiff repeatedly requested Defendants to forgo undertaking any action on resolution until after the Court had the opportunity to rule. But Defendants regrettably refuse commit to a simple measure to ensure the orderly course of this litigation. **As a result, the Court's intervention before September 8 is now imperative.** Plaintiff wishes Defendants had chosen a different course for everyone's sake. But Plaintiff stands ready to brief the matter on the expedited basis outlined above, and respectfully urges the Court to enter the briefing schedule and set an emergency hearing forthwith.[4]

[3] Upon receiving Plaintiff's response, Defendants changed their statement to say that "[f]inal removal of the scaffolding and its barrier is contingent upon the scope of any repairs required at present to the marble facade, as well as any other necessary repairs." The current statement also refers to vague "reported panel damage"—which apparently means damaged caused by the installation or removal of President Trump's name the first time around.

[4] Because the undersigned counsel for Plaintiff is traveling out of the country from September 3-7 for a close friend's wedding, the undersigned counsel respectfully requests the Court hold any hearing on the dates suggested by Defendants.

It bears emphasis: On the law, the latest renaming resolution is a breathtaking act of defiance. Adding the words "Restored and Renovated by," or "Endowed by," before President Trump's name, and renaming the ground on which the building sits, provides no lawful basis to ignore this Court's decision and impose Donald Trump's name on a memorial dedicated by the Congress exclusively to a different President.

As this Court previously explained, the Kennedy Center's statute states that "no additional memorials or plaques in the nature of memorials shall be designated or installed in the public areas of the John F. Kennedy Center for the Performing Arts," with three narrow exceptions none of which are applicable here. 20 U.S.C. § 76j(b)(1). Defendants are, once again, trying to memorialize Donald Trump—something the statute expressly prohibits.[5]

As the Court underscored:

- No "other individual [besides President Kennedy may] be memorialized on the front portico of the building." Mem. Op., ECF No. 50 at 48.
- "The organic statute . . . takes pains to ensure that the Kennedy Center's public spaces honor President Kennedy and President Kennedy alone." *Id*. at 49.
- The statutory prohibition on memorials "is unambiguous, and the narrow exceptions only serve to reinforce the breadth of the bar on public memorials and plaques." *Id*. at 50.
- "Congress was so wary of diluting the power of the public dedication to the slain president that, when it authorized the REACH expansion in 2012, it noted that the Board could 'acknowledge private contributions' that made the expansion possible, but only 'in the interior of the project" and not "on the exterior[.]' " *Id*. (quoting 20 U.S.C. § 76i(c)(3)).
- "The Defendants have identified no statutory sources that empower the Board to . . . designate new memorials in the public areas of the Center without Congressional approval." *Id*.
- "Defendants suggest that physical addition of President Trump's name to the face of the building is not a 'memorial' or 'plaque in the nature of' a memorial under § 76j(b). That

[5] To be clear, more statutory text and context makes it even clearer Defendants' actions are unquestionably unlawful. Plaintiff does not forfeit any arguments that she might advance in more fulsome briefing.

suggestion is risible . . . . [T]he renaming was meant to honor President Trump's work on the Center." *Id*. at 51-52.

- "The Defendants also quibble with the terms of Congress's clear proscription, arguing, for instance, that the lettering on the front portico is permissible because a 'memorial' can only honor some 'past impression' of a person or entity, and Mr. Trump is the sitting president. This is more than a stretch. . . . The renaming was . . . an effort to ensure that future visitors would be aware of the President's 'past' work." *Id*. at 52-53.

Despite the Court's irrefutable explication of the law and Congress' crystal-clear intent, on August 13, Defendants voted to memorialize Donald Trump with new lettering, this time on the lines below President Kennedy's name. In defiance of the Court and their governing statute, they are once again attempting to "honor President Trump's work on the Center" by adding his name back onto "the front portico of the building"—and now the plaza, too—without identifying any "statutory sources that empower the Board to" "designate new memorials in the public areas of the Center without Congressional approval." Mem. Op. at 48, 50, 52. Moreover, the Board has determined to add the specific term "Trump Kennedy Center" back onto the building—a jaw-dropping flouting of this Court's prohibition on use of that specific term. Order, ECF No. 49 at 1, 2, 3. Indeed, the fact that these same Defendants purport to continue to maintain a foundation named "The Trump Kennedy Center Fund" is likewise impossible to reconcile with this Court's order.[6]

This Court should not permit Defendants to effectuate this latest gambit, in direct contravention of its earlier decision and in naked defiance of the law. Plaintiff respectfully requests

[6] It gets worse: in their earlier filings before the D.C. Circuit, Defendants also stated that the Fund's bylaws mandate that the Fund condition all "donations to the Center upon the name of the Center remaining unchanged as the 'Donald J. Trump and John F. Kennedy Memorial Center for the Performing Arts,' " and claw back all donations should the name be changed. Defendants' Stay Mot. 2, No. 26-5224 (D.C. Cir. June 12, 2026). This is nothing less than a contemptuous poison pill entirely apparently of Defendants' own making to undermine this Court's decision.

the Court promptly enter the proposed briefing schedule, set a hearing date, and issue a decision halting this blatant illegality before September 8, 2026.

***iii. Defendants are defying a return to the status quo.***

It has become clear that Defendants are maintaining scaffolding and a tarp to cover the Kennedy Center's façade to frustrate the intent of the Court's order that the Center be returned to a memorial exclusively honoring President Kennedy. Defendants have refused to provide Mr. Floca's declaration in advance of this filing. But the few sentences of explanation that Defendants provided in their position statement make no sense and suggest that their current explanations are pretextual. Plaintiff therefore respectfully requests the Court issue an order showing cause why the tarp should not be removed within 30 days.

Defendants' statement regarding the tarp falls apart under scrutiny. Defendants state they intend to use the scaffolding to examine the roof overhang. But the soffits are some twenty feet or more *above* the scaffolding. Defendants imply that they will erect more scaffolding around the rest of the Center, presumably to examine other portions of the roof. But Defendants tellingly *have not done so for months*, leaving *only* the Center's iconic name obscured—a strong indication that this structure has nothing to do with the roof and is, instead, meant to defy a return to the status quo. In a conclusory fashion, Defendants claim they need to use the tarp "for ongoing constructive activities" and to "help[] safeguard the marble façade." But Defendants provide *no details* on what construction remains necessary; when it will occur; and why it requires a tarp. Last, Defendants state that "[f]inal removal of the scaffolding and its barrier is contingent upon the scope of any repairs required at present to the marble facade, as well as any other necessary repairs." But that explanation for when the structure will come down is impossible to square with their assertions that they need the tarp and scaffolding *to examine the roof*.

Courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2nd Cir. 1977) (Friendly, J.)). Without a coherent justification, the tarp is simply defeating Congress' command that the Center serve as a memorial to John F. Kennedy, and the Court's decision reinforcing the same, by effectively redacting Kennedy's name from the façade. Plaintiff therefore respectfully requests that the Court order Defendants to show cause why they cannot remove the tarp within 30 days.

***iv. The second shutdown vote exhibits the same flaws as the first vote and confirms the propriety of discovery.***

After its May 29 decision, this Court provided Defendants two months to conduct a proper analysis and perform a second vote. But despite that considerable time and the benefit of this Court's guidance, Defendants have simply repeated the same errors that made their first decision so imprudent.

Defendants now ask this Court to sweep the case under the rug by forgoing *all* discovery and briefing a single, consolidated motion to lift the preliminary injunction and enter final judgment. This proposal flouts basic notions of fair play, makes a mockery of the normal process of litigation, and is an untenable way for this extremely important case to proceed. The Court should, instead, order the parties to begin discovery by entering a discovery order. Defendants' suggestion that all discovery be halted indefinitely, they move for summary judgment, and then Plaintiff be required to file a motion under Rule 56(d) is a delay tactic. For all the reasons described below, discovery is clearly imperative. Moreover, this bizarre sequence inverts the civil rules (including Rule 56(d)), which require discovery as a default. Indeed, there is no scenario, in this case, in which **no discovery** would be appropriate. The Court should not permit Defendants to stymie discovery—and forestall accountability—by playing a ridiculous game of keep-away.

We begin by outlining what happened immediately before and on August 13. Those facts underscore why Defendants are exceedingly unlikely to lift the preliminary injunction (let alone prevail at summary judgment) and highlight why discovery remains essential. We then further detail the three categories of discovery that remain imperative and explain why Defendants' effort to treat this case to an agency record dispute falls flat.

***In August, Defendants again kept the Board in the dark until two days before the meeting.*** Defendants had the chance to act in a prudent manner with the benefit of the Court's guidance. They did not. Instead, Defendants again provided all the preparatory documents just two days before a hugely consequential vote.

As this Court previously explained in its TRO decision, basic principles of trust law require Defendants to provide documents to Board members within "a timespan that" a "reasonable trustee" "would deem necessary to assess a proposal of such magnitude." TRO Op., ECF No. 24 at 21; *see also* Restatement (Third) of Trusts § 77 cmt. b (trustees must perform "investigation appropriate to the particular action under consideration, and also obtain[] relevant information about such matters as the contents and resources of the trust estate and the circumstances and requirements of the trust and its beneficiaries"). In its May 29 decision, this Court admonished Defendants for providing Board members materials "two days before the closure vote." Mem. Op. at 78.

But last week, the Board *again* were provided the preparatory materials only two days before the meeting—on August 11 for the August 13 vote. As in March, this rushed process has fallen "grossly short of prudent decision-making." *Id*. at 83. In this Court's language, it "borders on preposterous" to expect trustees to make monumental decisions about a performing arts center on a 48-hour timeline. TRO Op., ECF No. 24 at 21; *see also* Borda Decl., ECF No. 13-19 at 6

(explaining that when "the New York Philharmonic and Lincoln Center undertook the renovation of David Geffen Hall, the joint boards of both institutions met for at least two to three years reviewing the renovation plans"). This slapdash process strongly indicates that, as in March, "the Board lacked *any* meaningful say in this matter because the closure decision was foreordained." Mem. Op. at 81. It also suggests that Defendants understood a proper process, imbued with an appropriate fiduciary commitment, might well not result in the foreordained outcome or cherrypicked record they sought.

***Defendants again provided conclusory and vague reports, without supporting details.*** In March, Defendants provided the Board with "vague documents" that were "light-on-details," that did not provide a meaningful "cost-benefit analysis of the closure," and that appear to be a "stacked deck" meant to justify a preordained conclusion. *Id*. at 83, 79 & n.30. When they redid the process in August, Defendants had the opportunity to conduct a bona fide analysis, with the benefit of this Court's guidance. But here too, Defendants fell short by a country mile.

Defendants transmitted two preparatory documents to the Board on August 11.[7] The first document—and the vast majority of the packet by page count—is a "comprehensive project development plan" by a company called JLL. *See* Ex. 1. The JLL plan is not the meaningful "cost-benefit analysis of the closure" which this Court explained was critical for the Board to consider. Mem. Op. at 83. Instead, the JLL plan's executive summary states, in a conclusory fashion, that the work "cannot be executed safely or cost-effectively while maintaining public operations"—the exact opposite conclusion to the one the Kennedy Center had held until the President's bizarre February 1 announcement. Ex. 1 at 2. The JLL plan otherwise appears based on an assumption that the Kennedy Center will undergo a "two-year closure." *Id*. at 3. It is no surprise that this plan

[7] The Board packet also included a boilerplate agenda and the minutes of the prior board meeting.

assumes closure, does not grapple with the Kennedy Center's long-held plans to conduct a phased renovation, or perform a cost-benefit analysis. The plan appears to have been created *before* this Court issued its May 29 decision and repeatedly states the Center will cease operations on July 6.

The *only* materials that purport to examine the costs and benefits of the closure was a 5-slide PowerPoint presentation prepared by the Delta Consulting Group, which was subsequently displayed at the Board meeting. *See* Ex. 2. Excluding two cover slides and one slide describing the lead consultant's biography, **the substance of the presentation deck is *just two slides* long.**

There are apparent internal discrepancies in the two-page presentation that raise obvious concerns. For example, the slide outlining the costs of remaining open, Ex. 2 at 4, states that the National Symphony Orchestra (NSO) is expected to earn $6.6 million in that scenario. But the slide on shutdown states that—in that scenario—the NSO is expected to earn a whopping $28.3 million. Ex. 2 at 5. Meanwhile, the presentation provides sweeping assertions and vague budgetary numbers without any supporting information. Indeed, because the presentation is so vague, it is even unclear what task Delta Consulting Group was asked to perform, what documents the Group examined, and what other experts (if any) the Group consulted. That last omission is particularly worrisome because the Group does not appear to have arts management experience.

In the end, the conclusory two-slide presentation was another "stacked deck" in favor of closure. Mem. Op. at 79. For example, the slide outlining the option to conduct phased renovations **does not identify any benefits to remaining open.** Exhibit 1 at 4. This glaring omission is particularly noteworthy because the prevailing industry norm is to conduct phased renovations. As this Court underscored in May, the "Center's own history of renovation, as well as those of its peer institutions like Lincoln Center, demonstrate that closure of any one performance space if determined to be necessary, would be done with precision to minimize impact on the institution

overall." Mem. Op. at 79 n.31. "[M]othballing the nation's preeminent performing arts center for several years" will lead to "chronic challenges in audience retention; reputational damage that could far outlast the closure; potentially permanent loss of highly-specialized arts professionals; and long-term attrition of donors." *Id*. at 78. But once again, it appears Defendants did not consider *any* of these drawbacks in a serious manner. And they certainly did not explain their stark departure from the Kennedy Center's prior plans to conduct phased renovations.[8]

***Crucial materials were withheld from Board or were not considered.*** As notable as what the Board received on August 11 is what the Board did *not* receive.

At the meeting, another participant indicated that Delta Consulting Group had prepared a lengthy 100-plus page report, which was the basis for these recommendations. But that report was *never* provided to the Board and has not been provided to this date. Public reporting also indicates that at least one other document was provided to a subset of the Board. According to Axios, *another* plan was provided to the "Audit and Finance Committee, dated Aug. 3."[9] That plan contained *three proposed options for the Kennedy Center*, unlike the two presented to the full Board. Notably, the August 3 plan appears to contradict the Delta Consulting Group presentation. According to Axios, that plan included "financial projections for the two-year renovation, with both options to keep the NSO running costing $25 million annually. A third, slimmed-down option would cost $10 million but appears to pause NSO programs." The Delta Consulting Group's presentation, by contrast, appears to use different numbers with respect to the NSO.

[8] Instead, in an Orwellian fashion, the presentation suggests—in a conclusory sentence—that closure "mitigates market and consumer confusion," the exact opposite of the copious evidence already in the record in this case.

[9] Cuneyt Dil, *Scoop: Inside Kennedy Center's Renovation Scenarios*, Axios (Aug. 11, 2026), https://www.axios.com/local/washington-dc/2026/08/11/kennedy-center-national-symphony-orchestra.

Finally, prior to the August 13 meeting, the Defendants did not provide *any* meaningful analysis to the Board of the need to balance the Board's statutory obligations with renovations. As with the prior decision, there is "nothing in the record" provided prior to the August 13 meeting "to indicate that the Board relied on any legal advice in reaching the closure decision." *Id.*

***Discovery is essential.*** The Court should reject Defendants' proposal to forgo all factual discovery and proceed to expedited briefing on summary judgment. Critical evidence is in Defendants' exclusive possession. It is deeply unfair to force Plaintiff to litigate this extremely important case based solely on the curated (if extremely shabby) record assembled by Defendants—particularly after Plaintiff *prevailed* at the preliminary injunction stage. There are three categories of discovery which will be highly probative and are essential to a just resolution of this case.

*First*, at minimum, discovery is critical to evaluating the circumstances surrounding Defendants' most recent actions. Plaintiff is entitled to discovery regarding, for example, the instructions and information management gave to Delta Consulting Group; the nature of the work Delta Consulting group conducted; and the report they produced**,** which was inexplicably withheld from the Board. Plaintiff is also entitled to discovery regarding the competing plan reported about by Axios, and the budgetary or other supporting documents that provided the basis for either analysis—but which were withheld from the Board.

This information is all plainly relevant to evaluating whether the second vote was prudent. Consider the need to understand what instructions Delta Consulting Group received and what sources it examined. Under trust law, "[r]eliance on relevant professional advice does not afford a complete defense to allegations of breach of trust." Restatement (Third) of Trusts § 93 cmt. c. Instead, trustees" may "act[] unreasonably in following the advice or in procuring it, as might be

the case in shopping for advice to support a desired course of conduct." *Id*. Moreover, "[c]ourts have held a trustee's conduct to be 'arbitrary and capricious' if he or she has gone through the formality of exercising the discretion without deliberately considering the circumstances"—precisely, it seems, what Defendants did here. *Bogert's The Law of Trusts and Trustees* § 558.

Put bluntly: Knowing what management told Delta Consulting Group to do and what work the Group actually performed is essential to determining whether Defendants acted "unreasonably in following" Delta Consulting Group's professional "advice," Restatement (Third) of Trusts § 93 cmt. c, or whether Defendants simply went "through the formality of exercising the discretion without deliberately considering the circumstances." *Bogert's The Law of Trusts and Trustees* § 558. Forgoing discovery into these matters, by contrast, would give Defendants a free pass to violate the fiduciary duties which Congress imposed on them.

Similarly, it is critical to know what expertise, if any, Delta Consulting Group has in arts management, or what experts it consulted. This Court already held that it was unreasonable for the Board to rely on Mr. Floca because "he is no expert in arts management." Mem. Op. at 81. But it appears the lead consultant for Delta Consulting Group is also not an arts management expert. Instead, according to the biography the consultant provided in the PowerPoint presentation, he focuses on "professional services, real estate and construction industries." Ex. 2 at 3.

Defendants can hardly object to this kind of discovery into the recommendations and analysis that informed the Board's August 13 decision. After all, Defendants eagerly offered Mr. Floca to testify regarding the first shutdown decision.

*Second*, Plaintiff is likewise entitled to information regarding what actions Defendants undertook between May 29 and August 13. By their own admission, Defendants refused to book performances to maintain the Center's operations, **essentially effectuating a shutdown by**

**inertia**. Defendants may also have taken affirmative steps prior to August 13 to enable them to implement a full two-year shutdown, before the Board approved one. Discovery into Defendants' actions between May 29 and August 13 would be highly probative of whether this second shutdown decision was another "foreordained" conclusion, Mem. Op. at 81, and whether Defendants only went "through the formality of exercising the[ir] discretion without deliberately considering the circumstances." *Bogert's The Law of Trusts and Trustees* § 558.

*Third*, the August 13 vote was not made on a blank slate. Instead, this latest decision comes against the backdrop of President Trump's abrupt announcement on February 1, 2026, that he would close the Center for two years; Defendants' complete failure to do even the most basic due diligence in March; and their subsequent decision to abdicate responsibility and rubber stamp the shutdown.

Defendants cannot simply give the back of the hand to this important factual background. There is every reason to believe that the August 13 decision—like the March 16 decision before it—was not a genuine exercise of independent judgment and was instead meant to effectuate the President's February ukase. As a result, the circumstances surrounding the February shutdown announcement and the Board's earlier decision remain highly relevant.

Moreover, the facts in the public record strongly suggest Defendants have always been motivated by a desire to shut down the Kennedy Center to hide the loss in patrons, donations, and performers that is the direct result of their unlawful renaming and mismanagement. As this Court has detailed, "[t]icket sales at the Center had already slowed over the course of 2025," and "in the immediate wake of the renaming, numerous additional artists canceled performances." Mem. Op. at 10; *see also id*. 56 n.23 ("The Court also acknowledges the apparent damage that the renaming has caused to the trust *res* . . ."). Meanwhile, despite President Trump's emphatic

representations on February 1 that he consulted experts, there "was no 'one year review of the Trump Kennedy Center.' " *Id*. at 76. That blatant misrepresentation—which came out of the blue—is a strong indication that something other than a litigate arts management decision was motivating the February 1 shutdown.[10]

Put differently: In trust cases, courts must scrutinize the factual record to determine whether the trustees acted in "bad faith," Mem. Op. at 75, acted "from improper motive," Restatement (Third) of Trusts § 87 cmt. c, or only went "through the formality of exercising the[ir] discretion without deliberately considering the circumstances," *Bogert's The Law of Trusts and Trustees* § 558. This case reeks of that kind of bad faith, improper motive, and formalism without consideration. But it is impossible to perform that factual analysis—which trust law demands—in a meaningful way *without any discovery*.

***Proceeding without discovery would constitute reversible error.*** Contrary to Defendants' prior suggestions and the thrust of their current proposal, this is not an Administrative Procedure Act (APA) agency record case where their selective "administrative record" is limited to their cherry-picked two-page power point. Proceeding under Defendants' preferred manner, without any discovery, would constitute reversible error. *See Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012) ("While the district court enjoys broad discretion in structuring discovery, summary

[10] Other suspicious factors surrounding the first shutdown decision include, among other things, the following: Mr. Floca claimed to have decided on a "complete closure by October of November of 2025" for efficiency reasons, but Mr. Floca curiously did not "even allude to the possibility of closure around the time of the OBBBA appropriation or at the September or December 2025 Board meetings." Mem. Op. at 81. Mr. Floca apparently "decided that closure was necessary sometime in the fall of 2025," but the "Kennedy Center's leaders were mum on the matter until February 1." *Id*. And in this litigation, Mr. Floca provided a declaration claiming that the Center would face "financial ruin if Trump's name were excised from the title," but Mr. Grenell inexplicably offered a "rosy assessment of fundraising prior to the name change"—raising further questions about whether the shutdown was meant to hide Defendants' financial mismanagement. *Id*. at 57.

judgment is premature unless all parties have had a full opportunity to conduct discovery." (internal citations and quotation marks omitted)).

Defendants' "no-discovery" approach is plainly incompatible with the basic contours of trust law. Trust law *does not* limit the judicial inquiry to a circumscribed agency record before the Board. To be sure, trust law cares about what materials were transmitted to a Board before a meeting. But trust law also requires courts to examine, for example, whether trustees went "through the formality of exercising the[ir] discretion without deliberately considering the circumstances," *Bogert's The Law of Trusts and Trustees* § 558, whether trustees shopped "for advice to support a desired course of conduct," Restatement (Third) of Trusts § 93 cmt. c, whether trustees acted "from an improper even though not dishonest motive," *id*. § 87, or whether trustees acted in affirmative "bad faith." Mem. Op. at 75.

To answer those and similar factual questions in this case, Plaintiff must be able to pursue at least *some* discovery beyond the flimsy two-page power point provided prior to the August 13 board meeting. Otherwise, Defendants can hide *any* discovery into things like the reasonability of relying on Delta Consulting Group, or whether the Group received instructions or curated materials that put a thumb on the scale of their "analysis." **To be clear: Without any discovery, many of the important fiduciary duties Congress imposed by statute on the Board will become dead letter.**

Nor does Defendants' prior analogy to an APA case hold up. Defendants vigorously contested the idea that the Board is an agency under the APA, and fought tooth-and-nail to avoid agency status. In their prior briefing, Defendants insisted that the "Center is not an APA agency and has *no obligation to create a detailed administrative record*." Defs.' Suppl. Br., ECF No. 45 at 7 (emphasis). Defendants can hardly claim an analogy to an agency *now* when they so

vigorously rejected agency status before—and when they admitted that they were under no obligation to provide the equivalent of a fulsome administrative record. Moreover, last time around, Defendants offered up Mr. Floca to explain his thinking. That is a tacit admission that Defendants are not adverse to discovery, just discovery that harms their case. In sharp contrast to APA cases, Plaintiff is also a Board member who has a freestanding legal right to information necessary to perform her duties—not simply the information Defendants choose to provide. *See* TRO Op., ECF No. 24; *Benedict v. Amaducci*, No. 92 Civ. 5239 (KMW), 1993 WL 87937, at *9 (S.D.N.Y. Mar. 22, 1993).

Even if this were an APA agency record case (to be clear: it just isn't), this matter would present the unusual circumstances in which the Court should order a supplemented record and discovery. The paltry Delta Consulting Group presentation is obviously incomplete, and there are strong indications that Defendants have acted in bad faith. For instance, there are materials—such as the Delta Consulting Group's full report—which are not even "in the record," but were before Mr. Floca and other decisionmakers. Thus, far, Plaintiff—and the Court—have been denied the actual "administrative record" on which Defendants have proceeded. Put differently: Even were this an APA case, it is hard to imagine that the Court would consider the scant PowerPoint a complete administrative record. Defendants are asking for an unprecedented approach in which a Plaintiff with extremely serious claims—which the Court found so likely to succeed they deserved a preliminary injunction—would effectively have access to no information whatsoever.

As the Supreme Court recently explained in an agency case, "[a]ccepting contrived reasons would defeat the purpose of th[is] enterprise." *Dep't of Com.*, 588 U.S. at 782. This Court should not allow Defendants to turn these important proceedings, and the duties of prudence to which Defendants are subject by law, into "an empty ritual." *Id.*

***Defendants proposed schedule is inappropriate.*** Because discovery is essential, Plaintiff strenuously objects to Defendants' proposed expedited schedule consolidating the motion to lift the preliminary injunction with summary judgment.

Implicit in Defendants' proposal for expedited briefing is the notion that Defendants corrected their errors and deserve quick relief because they acted appropriately. But Defendants did not even attempt to comply with the Court's decision, conduct a meaningful analysis, or act in a reasonable manner. Instead, Defendants again produced conclusory analysis and rushed to rubber stamp President Trump's ukase in an imprudent manner. Based on the numerous infirmities with the last Board decision, Defendants are extremely unlikely to prevail on a motion to lift the preliminary injunction. Regardless, Plaintiff would be entitled to discovery before the Court considered such a motion. And even if Defendants could mount a credible challenge to the preliminary injunction (they cannot, on this record), Plaintiff is at minimum entitled to discovery on all her underlying claims *before the entry of final judgment*.[11]

The Court should reject Defendants' bizarre suggestion that discovery should be prematurely stayed (which is the reverse of the normal civil process); that they should move for summary judgment (apparently based on two pages in a PowerPoint); and that Plaintiff should *then* move under Rule 56(d). This proposal is neither required by the civil rules (in fact, it sharply deviates from the normal course of litigation, in which discovery precedes summary judgment) nor is it a sensible way to handle the development of this case. To the extent the Rule 56(d) factors are even relevant, Plaintiff *has* outlined the particular facts she needs to discover and why they are

[11] Indeed, in its prior decision, the Court did not need to consider whether the closure was "pretextual" because the procedures were so woefully deficient. Mem. Op. at 82 n.34. Even if Defendants had cured every procedural defect (they did not), Plaintiff would still be entitled to *some* discovery on that theory of her case.

necessary; Plaintiff obviously cannot produce these facts because they are in Defendants' exclusive possession and she has had no opportunity at all to engage in *any* discovery; and these highly probative facts are readily discoverable because they are the kinds of records Defendants maintain. Indeed, even when there has been some discovery in a case, the D.C. Circuit has underscored that a "motion requesting time for additional discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *Convertino*, 684 F.3d at 99 (quotation marks omitted). It bears repeating: Forgoing discovery altogether would be reversible error.

Plaintiff therefore respectfully submits that the appropriate course of action is for the Court to enter a discovery order. In the parties' Rule 26(f) report, Plaintiff proposed a discovery plan that is reasonable under the circumstances, and Plaintiff is committed to conducting discovery as quickly and efficiently as possible. But Defendants' alternative would permit no discovery at all, *after* the Court found Plaintiff was likely to succeed on the merits and in light of a deeply disturbing record. That approach is truly unfair, is incompatible with trust law, and would make a mockery of the Board's fiduciary duties in this extremely important case.

Dated: August 18, 2026

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
(D.C. Bar No. 1724093)
KYLE R. FREENY
(D.C. Bar No. 1684764)
ALEXANDER KRISTOFCAK
(D.C. Bar No. 90045623)

WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

NORMAN EISEN
(D.C. Bar No. 435051)
STEPHEN JONAS
(D.C. Bar No. 90037069)
DAVID W. OGDEN
(D.C. Bar No. 375951)

DEMOCRACY DEFENDERS ACTION
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

*Attorneys for Plaintiff Joyce Beatty*

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

*/s/ Brantley Mayers*
BRANTLEY MAYERS
Counsel to the Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

CHRISTOPHER M. LYNCH
Chief Litigation Counsel

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
(202) 353-7578
william.s.jankowski@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I, Brantley Mayers, hereby certify that on August 18, 2026, I electronically filed the foregoing, and all its attachments, using the Court's CM/ECF system, which automatically serves this document upon all counsel of record, in keeping with LCvR 5.4(d).

*/s/ Brantley Mayers*
Brantley Mayers

*Counsel for Defendants*