**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-4480 (CRC) |

**DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


BACKGROUND ..... 2

A. Initial Development of the Recommendation to Close the Main Building for Construction ..... 3

B. This Litigation ..... 6

C. Subsequent Analysis of Renovation Options ..... 8

a. The JLL comprehensive project development plan ..... 9

b. The Delta Consulting Group project assessment and recommendation ..... 11

D. The Board's August 13, 2026 Decision ..... 16

E. Subsequent Events and the Board's September 15, 2026 Decision ..... 20

LEGAL STANDARDS ..... 22

A. Motion for Summary Judgment ..... 22

B. Dissolving a Preliminary Injunction ..... 22

ARGUMENT ..... 23

I. Summary Judgment Is Warranted on Plaintiff's Outstanding Claims. ..... 23

A. The Board's renewed closure vote comports fully with its statutory duties. ..... 24

B. The Board's renewed decision to close comports fully with its fiduciary duties. ..... 27

C. No genuine disputes of material fact preclude summary judgment ..... 33

II. The Preliminary Injunction Should Be Dissolved. ..... 38

A. Defendants have satisfied their burden to show that significantly changed factual conditions merit dissolution. ..... 38

B. Continued enforcement of the preliminary injunction would be detrimental to the public interest, and the equities support dissolution. ..... 40

CONCLUSION ..... 44

# TABLE OF AUTHORITIES

## Cases

*Am. Council of the Blind v. Mnuchin*,
878 F.3d 360 (D.C. Cir. 2017) ........ 22, 23

**Beatty v. Trump*,
834 F. Supp. 3d 41 (D.D.C. 2026) ........ *passim*

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ........ 27

*Day v. Apoliona*,
616 F.3d 918 (9th Cir. 2010) ........ 36

*Dellinger v. Bessent*,
766 F. Supp. 3d 57 (D.D.C. 2025) ........ 43

**Doe 2 v. Shanahan,*
755 F. App'x 19 (D.C. Cir. 2019) ........ 22, 38, 40

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
944 F.3d 945 (D.C. Cir. 2019) ........ 27

*Horne v. Flores*,
557 U.S. 433 (2009) ........ 38

*In re Am. Fed'n of Gov't Emps., AFL-CIO*,
837 F.2d 503 (D.C. Cir. 1988) ........ 43

*In re Curlew Valley Assocs.*,
14 B.R. 506 (Bankr. D. Utah 1981) ........ 37

*In re U.S. Bank Nat'l Ass'n*,
27 N.Y.S.3d 797 (Sup. Ct. 2015) ........ 35

*Leedom v. Kyne*,
358 U.S. 184 (1958) ........ 27

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 40

*Nuclear Regul. Comm'n v. Texas,*
605 U.S. 665 (2025) ........ 27

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ........ 27

**Olds v. Rollins Coll.*,
173 F.2d 639 (D.C. Cir. 1949) ........ 28

*Pepper v. United States*,
562 U.S. 476 (2011) ........ 24

*Petties ex rel. Martin v. District of Columbia*,
662 F.3d 564 (D.C. Cir. 2011) ........ 23

*Salazar v. Buono*,
559 U.S. 700 (2010) ........ 44

**Shelton v. King*,
229 U.S. 90 (1913) ........ 28, 35

*Talavera v. Shah*,
638 F.3d 303 (D.C. Cir. 2011) ........ 22

*Talbott v. United States*,
775 F. Supp. 3d 445 (D.D.C. 2025) ........ 22, 23, 40

*Texas v. United States*,
523 U.S. 296 (1998) ........ 34

**<u>Statutes</u>**

*20 U.S.C. § 76j(a)(1)(G) ........ 24, 36

*20 U.S.C. § 76l(b) ........ 27, 28

*20 U.S.C. § 76h(a)(1) ........ 24

An Act to Provide for Reconciliation,
Pub. L. No. 119-21, § 60025(a), 139 Stat. 72, 157 (2025) ........ 4, 44

**<u>Administrative & Executive Orders</u>**

Fed. R. Civ. P. 56(a) ........ 22

Fed. R. Civ. P. 56(b) ........ 22

Fed. R. Civ. P. 60(b)(5) ........ 22

**<u>Other Authorities</u>**

*Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, Bogert's The
Law of Trusts and Trustees (2025 ed.) ........ 28, 29

Restatement (First) of Trusts (1935) ........ 28

*Restatement (Third) of Trusts (2007) ........................................................................ *passim*

The Kennedy Center has become dangerously dilapidated and decrepit. Indeed, just two weeks ago, a large piece of the ceiling collapsed into the Center. Historic failures to invest appropriately in the Center's infrastructure have transformed the building into a structurally unsound, fundamentally unsafe facility in desperate need of intervention. Over the past year, the Center's management and its Board have developed a comprehensive restoration plan to return the Kennedy Center to greatness. This plan includes funds sought by the Trump Administration and appropriated by Congress. Yet Plaintiff sued and challenged the initial Board vote to renovate and restore the Center. And in May 2026, the Court preliminarily enjoined Defendants from effectuating the Board's March 2026 decision to temporarily close the Center's main building to allow for safe and effective renovations. Mem. Op. at 88, ECF No. 50.

Since that day, the Board has been given information necessary to make a sound decision on how to safely, efficiently, and most appropriately address the Center's dramatic structural decline. On August 13, after receiving and considering a detailed written project plan and the recommendation of two sets of consultants, the Board again voted to temporarily close the Center for two years to complete the needed repairs. As part of its resolution to do so, the Board memorialized its commitment to continue supporting artistic and educational programming, both on and off campus, and to maintaining public access to the memorial for President Kennedy during renovations. And on September 15, after receiving an additional comprehensive and detailed report recommending temporary closure and information concerning imminent collapse of the Center's roof, the Board voted once more to temporarily close the Center for two years to complete repairs.

Defendants have now twice "approve[d]" a "closure consistent with the Court's Memorandum Opinion," Order on Mot. for Prelim. Inj. at 1, ECF No. 48, and have thus satisfied

their fiduciary duties. Defendants therefore are entitled to summary judgment on Plaintiff's remaining claims (*i.e.*, those that are related to the closure) in this litigation.

The Court should likewise dissolve the preliminary injunction that it entered in May. The Board's renewed votes fundamentally change the calculus underlying the Court's May memorandum opinion. Indeed, Defendants undertook the renewed votes in accordance with that opinion and have satisfied their duties under the law. And recent events—the completion of a soffit-panel engineering study and the safety hazard created by the collapse of ceiling material following significant stormwater intrusion—underscore that further delay will only harm the Center and the public.

Continued enforcement of the preliminary injunction will also continue to harm the public interest by limiting the Center's ability to fulfill its statutory duties and to perpetuate the substantial uncertainty that has surrounded the Center's future since the onset of this litigation. Under the status quo established by the Court's preliminary injunction, it cannot adequately perform the necessary renovations, which will not be complete in time or within budget without a full closure of the Center. Further, any limitations on a full closure during renovation present significant safety concerns for the Center's employees, artists, and members of the public. The Center's Board has decided that the prudent path forward to address the Center's severe structural deficiencies and to give the institution the renovations it needs to thrive long into the future is to temporarily close its main building to conduct substantial renovations. This Court should lift the last impediment in place preventing that outcome.

## BACKGROUND

Much of the relevant factual background to this litigation appears in the Court's May 2026 Memorandum Opinion. *See* ECF No. 50 (also available at *Beatty v. Trump*, 834 F. Supp. 3d 41,

53–64 (D.D.C. 2026), *appeal filed*, No. 26-5224 (D.C. Cir. June 12, 2026)). The instant motion recounts only those background facts relevant to the claims remaining at issue in this litigation, related to the Board's decision to fully close the Center's main building for repairs for a two-year period. Specifically, Defendants first address the origins of their plan to close the building prior to this litigation, then address the relevant history of this litigation through the Court's issuance of its preliminary injunction in May 2026. Defendants conclude with the developments subsequent to the preliminary injunction, up through and including the Board's August 13, 2026 vote to close the building and ratification vote, on September 15, 2026, to the same effect.

### A. Initial Development of the Recommendation to Close the Main Building for Construction

The genesis for Defendants' plan to close the Center's main building to effectuate necessary renovation and repairs was in the fall of 2025. At that time, the Center had already determined that a variety of repairs to the building were necessary. For example, consultants concluded in 2021 that the Center's vertical plumbing risers reached a state of systemic failure and the Center's steel channels had corroded. *See* Second Decl. of Charles Matthew Floca ¶ 9, ECF No. 29-3. In 2022, consultants concluded that the Center's boilers and chillers had reached the end of their engineered service life. *Id.* And in 2024, consultants identified severe water intrusion at exterior column bases and main electrical vaults of the Center. *Id.* Further, consultants concluded in 2022 after a failure of certain soffit panels on the building's exterior that deterioration had resulted in the risk that the panels would become a falling hazard. Ex. Z to Kristofcak Decl. at 3, ECF No. 29-17. Faced with these reports when he joined the Center as Vice President of Facilities in early 2024, Matthew Floca, now the Center's Executive Director and Chief Operating Officer, began a comprehensive review of the Center's infrastructure needs. *See* ECF No. 29-3 ¶¶ 6–7.

Consistent with the needs identified by the Center's consultants, Congress, in July 2025, recognized the need for repairs and renovation to the Center and appropriated approximately $257 million to help the Center conduct necessary renovation and restoration work. *See* An Act to Provide for Reconciliation, Pub. L. No. 119-21, § 60025(a), 139 Stat. 72, 157 (2025); *see also* ECF No. 50 at 13. Following that appropriation, the Board received updates from management—including Mr. Floca—on what construction at the Center might look like as a result of that new funding. *See* ECF No. 50 at 13–15. As part of this process, Mr. Floca began to consider how best the Center might put the resources appropriated by Congress to use in an effective and efficient manner. *See* ECF No. 29-3 ¶ 6. To that end, during the fall and winter of 2025 and into 2026, Mr. Floca "realized that closure was necessary after 'an extensive analysis of expert evidence and internal operational data,'" including the Center's comprehensive building plans, external consultant reports, and information gathered from certain staff at the Center. ECF No. 50 at 15–16 (quoting ECF No. 29-3 ¶¶ 7, 9, 11). As Mr. Floca testified, he "'analyze[d] . . . different options' with a 'team,' 'constantly . . . trying to figure out contracting mechanisms and solutions to partially operat[e] the building,' but ultimately concluded that it would be 'irresponsible to do anything other than holistic fixes.'" *Id.* at 16 (alterations in original) (quoting *D.C. Pres. League* Hr'g Tr. at 99:8–14, ECF No. 45-1).

In January 2026, Mr. Floca spoke with President Trump several times and suggested over the course of those engagements that "a singular, concentrated 24-month closure [would be] the most cost-effective and efficient path for addressing the Center's acute infrastructure needs." *Id.* (alteration in original) (quoting ECF No. 29-3 ¶ 7). In Mr. Floca's view, such a closure would help address "the facility's critical infrastructure failures while eliminating the hidden costs and safety risks inherent in a multi-year, phased renovation." *Id.* (quoting ECF No. 29-3 ¶ 7). On February 1,

2026, President Trump proposed publicly on social media that the Center close for two years to conduct renovation. *See id.* at 11 (citing ECF No. 13-12 at 2–3). Following that date, Mr. Floca developed a series of "talking points" to support the closure proposal. *Id.* at 18. He created a "high-level budget" for the project that outlined certain categories of work during the closure. *Id.* And he presented that budget—along with his recommendation—to the Center's Building and Grounds Committee on March 2, 2026. *See id.* at 19.

On March 16, 2026, the Board discussed Mr. Floca's recommendation to close the Center's main building and took a vote to effectuate that recommendation. *See id.* at 20–21. Mr. Floca presented proposed capital improvements. He started by reviewing the significant water intrusion at the Center, including a leak in an expansion joint to a service tunnel running the entire length of the Center, causing damage to loading docks located under the Center's Hall of States and intruding into the Center's electrical vaults. *See* ECF No. 34-5 at 8. Mr. Floca then presented information about the Center's River Plaza, showing the Board that steel on the top of girders supporting the Plaza had delaminated and caused "significant structural failures." *Id.* And Mr. Floca presented information about the Center's roof soffits, which have "buckled" and require testing and repair. *Id.* Mr. Floca further noted that there are "hundreds of points of failure across the parking garage," that concrete steel needs waterproofing, that stage rigging is at the end of its life, that elevators have reached the end of their service lives, and that water filtration from the Potomac River presents significant issues for the Center's systems. *See id.* at 9. Following a discussion among Board members, including participation from Plaintiff and questions from other Board members about whether other structural issues had been identified and what kinds of liability such issues might create, *see id.* at 9–10, the Board voted to "conduct an orderly wind-down of programming activities through the Spring of 2026 and close [the Center's] doors entirely

effective July 6, 2026, for such time as is required to complete the repair and restoration" funded by the congressional appropriation. *Id.* at 10.

**B. This Litigation**

Plaintiff Joyce Beatty, a member of the House of Representatives from Ohio, is an *ex officio* trustee on the Center's Board by virtue of her position in Congress. First Am. Compl. ¶ 13, ECF No. 12; *see also* ECF No. 50 at 8. In December 2025, Ms. Beatty filed this litigation, bringing claims unrelated to the issues in this motion. *See* Compl., ECF No. 1. On March 6, 2026, in advance of the Board meeting in which the Board first voted to close the Center's main building, Ms. Beatty amended her Complaint to challenge the (then) proposed closure. *See, e.g.*, First Am. Compl. ¶¶ 5–6. Ms. Beatty also moved for a preliminary injunction to, among other things, halt the proposed closure. *See* ECF No. 13 at 3. Defendants moved for summary judgment on Ms. Beatty's claims. *See* Defs.' Mot. for Summ. J., ECF No. 34.

In addition to extensive briefing and oral argument regarding these motions in the instant case, the Court heard oral testimony from Mr. Floca at a hearing in a related case in which Ms. Beatty's counsel participated. *See* ECF No. 50 at 23. At the hearing, Mr. Floca testified "credibly" about the scope of planned construction at the Center. *See* ECF No. 50 at 68; *see generally* ECF No. 45-1. And that testimony, along with documents prepared for the Board's consideration prior to its March vote, established a "more modest" yet "still substantial" scope of planned work than the "demolition" Plaintiff predicted in her pleadings. *Id.* at 68–69; *see also* ECF No. 12 ¶ 5.

On May 29, 2026, the Court granted Ms. Beatty's motion for preliminary injunction as to the closure of the Center. In reaching this conclusion, the Court found that years of comprehensive structural studies at the Center have pointed to one conclusion: that the Center needs "major capital

repairs."[1] ECF No. 50 at 12. Acute structural needs include "fire alarm system replacement, overhang roof work, [] waterproofing," the replacement of certain mechanical systems, and other significant repair work. *Id.* at 12 (collecting record sources).

As the Court found, "[a]ccording to Mr. Floca's testimony in [the related case] and the documentary record in this case, the renovation project will generally entail mechanical overhauls and structural repairs." *Id.* at 68. "More specific plans include systematic waterproofing; fireproofing; the replacement of boilers, chillers, and pipes; restroom and elevator modernization; employee office renovation; various technical restorations of performance spaces; carpeting and seating replacement; and site and landscaping improvements." *Id.* Work will address "demolition and structural steel reconfiguration" in certain spaces, while "stage lifts and rigging systems" will be replaced and "stage floors" will be demolished. *Id.* at 69 (quoting Third Decl. of Charles Matthew Floca ¶¶ 7, 10, ECF No. 34-4). To address water intrusion, certain spaces immediately outside the Center will be "excavat[ed]" and "t[orn] up." *Id.* (quoting ECF No. 34-5 at 8).

The Court concluded that the Center "is poised to undergo a set of serious renovations, which may involve demolition and reconfiguration of component parts of the building." ECF No. 50 at 69. But it was "not persuaded that the building will be razed to the ground or stripped to its studs and reconstructed." *Id.* And, although it preliminarily enjoined the Board against effectuating its planned full closure for renovation, the Court noted that, under the law, the Board might "reconsider[] the closure issue" upon a more complete record. *Id.* at 88.

[1] That need has only grown over time. For example, as explained below, since the Board's August 13 meeting, further soffit structural and waterproofing tests conducted by Walter P Moore have indicated that the extent of repair needed to the main building's roof and soffits is greater than previously known. *See* Sep. 16 Floca Decl. ¶¶ 4–6, ECF No. 86-1. And in the first week of September 2026 a section of the Grand Foyer ceiling of the main building collapsed after severe storms in Washington, D.C. *See id.* ¶ 4.

Under the preliminary-injunction standard, the Court concluded that it was "not persuaded that the closure is categorically unwarranted or impermissible under the U.S. Code" and noted that the Board "is not necessarily barred from closing the Kennedy Center while renovations take place." ECF No. 50 at 88. But the Court nonetheless issued a preliminary injunction against the March 16 closure decision, reasoning that the Board had failed to satisfy its fiduciary duties because it failed to consider its statutory obligations in making that decision, failed to gather and consider sufficient information about the impacts of closure on the Center's operations, and had no meaningful opportunity to consider closure before consummating its March 16 vote. *See id.* at 75–83. Under the preliminary injunction, Defendants "may not take steps to further effectuate the March 16 [closure] decision for the pendency of this action, or until the Board approves any closure consistent with the Court's Memorandum Opinion, and the Court issues a further Order dissolving or modifying [the] preliminary injunction." ECF No. 48 at 1.

**C. Subsequent Analysis of Renovation Options**

Following the Court's injunction, Defendants commissioned further analyses in order to determine the best manner to conduct the needed renovations and provide the Board with the tools to make a decision about how to proceed with the renovations that would satisfy its obligations, as set forth in the Court's opinion. Between the issuance of the injunction and the Board's August 13, 2026, vote to close the Center's main building for repair, the Center's management developed two sources of information, each of which was presented to the Board before its August 13 vote. First, the Center's management received from JLL, a construction management firm with significant and longstanding large-scale construction experience, a comprehensive project overview for the proposed renovation. Second, the Center's management retained Darin L. Buchalter of the Delta Consulting Group to provide expert consultation and analysis regarding

potential alternative approaches for conducting the renovation program contemplated for the Center.

a. <u>The JLL comprehensive project development plan</u>

During the pendency of this litigation, the Center's management hired JLL, a construction management firm with significant and longstanding large-scale construction experience, to develop a detailed and comprehensive project overview for the proposed renovations.[2] *See* JLL Comprehensive Project Development Plan at 2, ECF No. 65-1. This project overview was distributed to trustees prior to the August 13 meeting at which the Board again voted to undertake a full closure for construction. *See generally id.*; *see also* Sep. 18 Floca Decl. ¶ 4.

JLL's approximately 160-page report provides a comprehensive overview of the project, including a comparison of the construction costs of a two-year closure of the building and an alternative four-year project with phased, partial closures of the building, and a detailed scope of the work required. The report set forth costs, timing, and an assessment of the impacts that the construction will have on the Center's operations, including the budget for each project line item contemplated and an assessment of the feasibility of undertaking significant repair and restoration work within the nation's premier performing-arts venue. JLL concluded that the Center "requires a comprehensive renovation project to address critical structural deficiencies, replace aging building systems that have reached the end of their operational life, and restore interiors that should represent the venue's cultural significance." ECF No. 65-1 at 2. In JLL's judgment, the "scale of necessary work—including structural repairs, complete mechanical system replacement, life safety upgrades, and envelope and facade preservation—cannot be executed safely or cost-

[2] JLL identified a team of qualified firms and experts to undertake discrete portions of the project, including an architect of record, a preservation architect, a historic preservation consultant, a structural engineer, a civil engineer, a landscape architect, and an acoustical consultant. *See* ECF No. 65-1 at 17–19.

effectively while maintaining public operations." *Id.* And JLL found that "[a]ttempting phased construction would extend the timeline significantly, increase costs, and compromise both patron experience and contractor safety." *Id.*

In developing the comprehensive project plan, JLL set out three distinct phases that would guide its management of the renovation. First, JLL proposed to undertake historic preservation and planning activities, including by securing "preservation approvals," "validat[ing] mechanical and electrical system strategies," and undertaking prework aimed at ensuring that the Center is prepared for significant construction activities. *Id.* at 4. Second, it would then undertake assessments and repairs of major systems and equipment at the Center, including "mechanical systems, electrical distribution, emergency power, life safety systems, plumbing systems, vertical transportation, and building automation controls." *Id.* And, third, it would manage the renovation of "interior spaces," including "the three major performance venues and the four small venues, Hall of States, Hall of Nations, and Grand Foyer." *Id.*

JLL's report includes detailed architectural diagrams of site logistics and the planned work. *See., e.g.*, *id.* at 22 (site logistics diagrams); *id* at 27 (proposed work on the Center's roof level), *id.* at 28 (proposed work at the Center's penthouse level); *id.* at 29–30 (work on the Center's terrace level); *id.* at 31 (work in the Center's main performance venues); *id.* at 32–33 (proposed scope of work on the Center's plaza); *id.* at 34–36 (planned work in the parking garages); *id.* at 37–40 (contemplated work on the Center's façade).

For each project line item contemplated under the renovation—including items as diverse as elevator modernization, *see id.* at 41–42; escalator capital repair, *see id.* at 42–44; fire protection system upgrades, *see id.* at 45–46; hazardous materials abatement, *see id.* at 46; employee office renovations, *see id.* at 67–71; and the Opera House restoration, *see id.* at 76–79—the report also

details the scope of work to be performed, *see id.* at 41–87. As an illustrative example, JLL broke out the $20 million set aside for electrical system upgrades into the constituent sub-projects to be completed over the course of the construction, including updates to the main electrical distribution; updates to the grounding system; updates to exterior and site lighting; updates to emergency power systems—and outlined the major components of each of these sub-projects. *See id.* at 54–56.

JLL laid out a budget and delivery strategy, breaking out the specific projects that depended on the Center's ability to close its main building to the public. *See id.* at 88–89. And it laid out certain risks to the project—including risks that might arise from the Center's project schedule, its budget, unforeseen conditions in the Center's main building, the need to expand the project's scope upon any determination that the extent of disrepair is greater than previously believed, and regulatory considerations—including from this Court's oversight. *See id.* at 90–91. JLL's report detailed risk-mitigation strategies, like undertaking consolidated materials and site assessments where possible, hiring specialized consultants, and developing a comprehensive logistics plan. *See id.* at 91–93. And it further outlined strategies for quality assurance and control, *see id.* at 93–97; properly managing worker safety, *see id.* at 98–99; and for communicating updates to the Board of Trustees and Center leadership, *see id.* at 100. JLL attached to its report as appendices a chart showing the projected integrated project timeline, *see id.* at 102–14, and a budget allocation matrix providing budget breakouts and project descriptions for each individual budget line item, *see id.* at 115–63.

b. <u>The Delta Consulting Group project assessment and recommendation</u>

While development of the JLL project overview was ongoing, and in response to the Court's May 29 preliminary-injunction order, the Center's management retained Darin L. Buchalter of the Delta Consulting Group to provide "expert consultation and analysis" in connection with "alternative approaches for conducting the repair and renovation program"

contemplated for the Center. Construction Program Assessment Report ¶ 1, Ex. A.[3] Mr. Buchalter and Delta prepared their report ("the Delta report") "independent[ly]," with "no prior involvement with the consideration of the Center's plans for repair," and "began with no preconceived notion of the necessity, proper approach for the repair and renovation of the Main Building, or the impact, if any, on mission-based programming." *Id.* ¶ 47.

While developing this report, Mr. Buchalter briefed two Board of Trustees subcommittees in early August on his initial findings. *See id.* ¶ 34. And he presented his "comparative assessment," which was based on the analysis later encapsulated within the final Delta Consulting Group report at Exhibit A to this motion, to the Board at its August 13 meeting to vote on closure. *See id.*; *see also* ECF No. 68-3 at 5–7.

Mr. Buchalter and other employees at his firm who contributed to the Delta report have significant experience in providing advisory services across multiple industries, including real estate, construction, and financial services. *See* Ex. A ¶¶ 11–21, 29. Mr. Buchalter also has experience in the nonprofit sector, having served on the board of directors of the Friends of the San Francisco Library while that entity was leading the "fundraising and execution of the renovation of the historically significant Andrew Carnegie library branches" while maintaining the library's "level of system-wide programming." *Id.* ¶ 22. And the personnel who helped conduct the analysis underpinning the Delta report have a wide array of experience, including in managing construction for complex capital programs, conducting project assessments for other federal entities, and undertaking a "time-critical" theater redevelopment in London. *Id.* ¶ 29.

---

[3] Exhibit A contains the full report developed by Delta Consulting and the report's appendices, save for appendices that already appear in the record or that contain sensitive architectural drawings. *See* Sep. 18 Floca Decl. ¶ 5. Citations to Exhibit A refer to the report itself; pincites are to the numbered paragraphs in the report. Citations to any appendix attached to the report appear as "App. X to Ex. A"; pincites refer to each appendix's numbered pages.

To develop his recommendation and resulting report, Mr. Buchalter and his team relied on a wide array of documents provided to Delta by the Center, including the 2021 Comprehensive Building Plan prepared by DLR Group and the 2026 Comprehensive Project Development Plan, discussed above, prepared by JLL. *See id.* ¶ 5. Delta further relied upon other relevant records, like assessments and capital plans for the Center's main building; audited financial statements; Finance Committee materials; financial information provided by the Center's management; programming, operations, facilities, engineering, construction, and institutional information provided by the Center's management; and this Court's preliminary injunction opinion, to develop its recommendation and report. *See id.* ¶ 27. And Delta consultants further conducted independent research on pertinent construction matters; toured the Center with onsite operations and project-management personnel; and interviewed the Center's finance, programming, and operations personnel over a period of several weeks. *See id.* ¶ 5.

In Delta's view, feasible operational models for the Center to adopt while undertaking the authorized renovation reduced down to two approaches: either (1) to "Operate & Partially Renovate," which would entail maintaining public access to the main building of the Center, continuing arts programming throughout the Center, and conducting sequential closures of specific spaces in the main building to complete the proposed construction; or (2) to "Partially Close and Renovate," which would entail closing the main building to the public for the duration of the construction while maintaining programming, education, public engagement, and memorial functions at the REACH building and supporting artistic performances at off-campus venues.[4] *Id.*

[4] Soon after the Court's preliminary-injunction order, Mr. Floca suggested that the Center might consider a "variation" on three potential options for the Center's operational model moving forward. *See* June 19 Decl. of Charles Matthew Floca ¶ 7, ECF No. 60-1. But Delta's independent review—which it conducted with "no prior involvement with the consideration of the Center's plans for repair" and "began with no preconceived notion" for what course of action might be

¶ 3. Mr. Buchalter and his firm conducted an in-depth and independent assessment of the merits of the proposed alternatives and recommended to the Board that it close the main building and "conduct repair and renovation" with the appropriated congressional funding "over a two-year period." *Id.* ¶ 85; *see also id.* ¶¶ 47–52.

Based on his firm's analysis, Mr. Buchalter concluded that a closure of the main building of the Center over a two-year period would present significant advantages over the primary alternative. *See id.* ¶¶ 85–86. Keeping the main building open while the Center conducted sequential closures for the contemplated renovation "would result in a dramatically underfunded Construction Program, a material operating deficit, and meaningful concerns for public safety." *Id.* ¶ 86. Under the extended partial-closure scenario, construction would—by necessity—take longer to complete than under a full main-building closure. *See id.* ¶ 88 (assuming a four-year period to conduct work in a partially operational main building). Over that extended period, Mr. Buchalter projected that costs for construction would roughly double the current budget of $257 million, due in part to increased complexity resulting from the need to protect patron safety and implement complex partial-closure logistics. *See id.* ¶ 89; *see also id.* ¶¶ 127–37 (noting that the required repairs are "invasive" and "cannot be performed without disturbing the spaces and systems necessary to operate" the main building, that phased renovation is "technically feasible" but will require significant logistical "controls" and would create a "substantial impact" on the project's cost and schedule). And, due to that budget shortfall, "most of the structural work" would be unfunded. *Id.* ¶ 89; *see also id.* ¶¶ 142–43. Moreover, extending renovation over four years would severely expand the Center's operating losses, to the tune of roughly $80 million per year

prudent, Ex. A ¶ 47—led the consultants to conclude that certain proposed models did not "differ meaningfully" and that only two were feasible, *id.* ¶ 3.

of the project, even assuming that arts programming would be conducted in the under-construction main building. *See id.* ¶ 90; *see also id.* ¶¶ 202–13 (outlining the Center's "existing operating deficit" and explaining that the Center's inability to reduce programming costs during a partial closure, paired with the extended duration of any impact on revenues resulting from impairments to the performing-arts experience, would lead to a $78 million annual deficit).[5]

Closing the main building, Mr. Buchalter found, would allow for the concentration of construction activities on a tighter timetable and reduce the safety and logistical costs associated with maintaining a partially open performing-arts space. *See id.* ¶¶ 92–93. And, moreover, temporary closure would enable the Center to shift programming to off-campus venues, allowing the Center to scale down its operating costs to the level required to conduct a focused set of on-campus programming at the REACH building and reducing the cumulative negative impact that the renovation will have on the Center's financial outlook. *See id.* ¶¶ 93–94; *see also id.* ¶¶ 214–25 (estimating under the main-building-closure scenario how much revenue the Center would be able to generate, how much the Center would be able to reduce operating costs, and how such savings compare to the scenario in which the main building remains partially open for performances).

Mr. Buchalter consolidated his conclusions into a slide deck, *see* Delta Construction Program Assessment, ECF No. 65-2, that he presented to the Board at its August 13 meeting, *see*

[5] Delta's financial analysis was supported by its comparative cost assessment, *see* Comparative Cost Assessment Workbook, App. T to Ex. A; a quarterly construction cost report, *see* 2026 Quarterly Construction Cost Report, App. U to Ex. A; the Center's 2023 and 2024 audited consolidated financial statements, *see* Consolidated Financial Statements, App. V to Ex. A; and an unaudited consolidated statement of activities for fiscal year 2025, *see* Unaudited Consolidated Statement of Activities for FY25, App. W to Ex. A. Delta factored each source of data into its construction and operations financial projections. *See* Ex. A ¶¶ 26–27, 43–44, 204–07, 209.

Ex. A ¶ 34; *see also* Presentation to the Board of Trustees, App. H to Ex. A. He finalized his report on August 20, 2026. *See* Ex. A at 68.

**D. The Board's August 13, 2026 Decision**

The Board met on August 13, 2026 to consider the potential paths forward for renovation of the Center. *See* Preliminary August 13 Board Minutes at 1, ECF No. 68-3. Two days prior to the meeting, trustees received a packet of information that included the slide deck presentation that Mr. Buchalter had developed for the Board's consideration and the entire JLL comprehensive development plan. *See* Sep. 18 Floca Decl. ¶ 4.

At the meeting, the Board's discussion of options for proceeding with the renovation authorized by congressional appropriation began with a trustee reporting that the Board's Buildings and Grounds Committee had held "several meetings reviewing the options to be presented" and had "spent considerable time reviewing the materials from JLL and having discussions with [Mr.] Buchalter." *Id.* at 5–6. Secretary Lutnick then introduced Mr. Buchalter, explaining that Mr. Buchalter would present an executive summary of his report's findings while the report was being finalized. *See id.* at 6. Secretary Lutnick further noted that, under both proposals, the Center "as a whole" would not close. *Id.* Programming would remain and support for artistic enterprises would continue off campus. *See id.*

Mr. Buchalter began his presentation by noting his and his firm's experience in providing advisory services to a wide array of clients, including to other federal entities conducting similar kinds of construction projects. *See id.* at 6. He explained that his firm had been engaged to "independently assess the construction program and identify the most effective path forward for the repair and renovation of the Center while balancing operations and mission." *Id.* And he presented the two options for renovation that his firm had developed and that he supported in his

final report: either to (1) operate and partially renovate or (2) close the main building and renovate comprehensively. *See id.* at 7.

Mr. Buchalter explained that under the first proposal, the planned construction would "[c]ost[] more and take[] longer." *Id.* Delta projected that cost increases would mean that the $257 million appropriation would cover only roughly half of the necessary work. *See id.* Delta pointed to recent revenue decline at the Center as evidence of "uncertainty and friction," a decline that Mr. Buchalter expected would continue over the course of the entire—longer—project timeframe. *See id.* And, because of an inability to reduce operating expenses, the Center would maintain a "meaningful" operating deficit over the four-year period of the construction. *Id.*

Under the proposal to close the Center's main building, the $257 million appropriation would cover "most of the program." *Id.* The remaining $30 million shortfall "could be addressed through value engineering, modest fundraising, or scope adjustment." *Id.* And, crucially, in Mr. Buchalter's view, completing the project over a two-year period would produce a "dramatically different exposure to cost escalation and a different level of safety" while enabling the Center to "curtail[]" operating costs and thus reduce its operating deficit. *Id.* Under this proposal, Mr. Buchalter explained, programming would be maintained at the REACH, thereby helping fulfill the Center's statutory and "cultural" mandate. *Id.* He concluded by recommending that the Center close the main building to renovate, a path that presented the "most efficient, economical, and safest way to maximize permanent capital improvements while maintaining mission continuity and the memorial experience." *Id.*

The Board began discussion. Secretary Lutnick first asked Mr. Buchalter about the cost comparison and to confirm that the four-year phased approach would result in a doubled cost figure. *See id.* at 8. Mr. Buchalter confirmed that fact. *See id.* Plaintiff then stated—incorrectly—

that she had received only two PowerPoint slides in her packet of materials and noted that she felt the volume of material was too great to digest within a one-hour meeting. *See id.* Center management confirmed that all trustees had received nearly two hundred pages of materials prior to the meeting; Secretary Lutnick confirmed that the packet included the full JLL report (described *supra* Section A.C.a) and a summary of the Delta report, which consisted of the slides that Mr. Buchalter had prepared and presented. *See id.* Plaintiff acknowledged that she had, in fact, received the JLL materials. *See id.* Secretary Lutnick confirmed that the REACH building on campus would remain open and that programming would continue. *See id.* He also confirmed that the memorial experience dedicated to President Kennedy would also relocate to the REACH building. *See id.*

Another *ex officio* member of the Board, *see id.* at 1, asked certain clarifying questions, including whether the projected $78 million operating deficit was tied only to the partial-closure proposal and if there was any projected deficit under the two-year proposal, *see id.* at 9. Mr. Buchalter responded that, per the slides included in the presentation, Delta did project a small operating deficit under the two-year scenario. *See id.*; *see also* App. H to Ex. A at 4. And the third *ex officio* member in attendance, *see* ECF No. 68-3 at 1, memorialized a request for financials during the two-year project, including forward-looking revenue and operating expense projections, a risk analysis of necessary capital expenses, and an assessment of restoring the Center's "performance capability." *Id.* at 9–10. The Board's Vice Chair responded that financials are "important and have been the subject of extensive internal discussion." *Id.* at 10. She further noted that "costs escalate" each day that closure is deferred. *Id.*

Upon the Treasurer's motion, the Board considered a resolution to adopt Delta's and Mr. Buchalter's recommendation to close the main building of the Center to conduct renovations over a two-year period. *See id.* at 10–13. The resolution read:

WHEREAS, the Board of Trustees has engaged the services of Delta Consulting Group, an internationally recognized leader in project advisory services, risk mitigation, and construction planning and management, to provide an independent and objective analysis of the Center's options to address decades of physical neglect and deferred maintenance;

WHEREAS, the two options for the renovation and restoration presented to the Buildings and Grounds Committee, and then to the full Board, included either a closure of the main building with continued programming in the REACH and offsite or a phased renovation while programming continues throughout the Center;

WHEREAS, Delta Consulting Group conducted a thorough review of the costs and benefits of each option, and reported its findings through an oral presentation[;]

WHEREAS, Delta Consulting Group's findings, reflected in its report and in the Minutes, demonstrate that the risks and costs of a phased renovation and restoration so greatly outweigh any potential benefit that the only viable safe and fiscally prudent course is to shut down the Center's main building entirely during construction;

. . .

WHER[E]AS, the Board has also reviewed the Comprehensive Project Development Plan dated June 8, 2026 and anticipates further updates consistent with it[;]

WHEREAS, the Board is fully committed to its statutory and fiduciary obligations to maintain the Center as the Nation's Cultural Center, to maintain public access to the Memorial to John F. Kennedy, to maintain the historic and architecturally significant nature of the Center's main building, and to continue to present arts and educational programming during construction; and

WHEREAS, the Board believes that continuing its artistic and educational programming at the Center's performing arts facilities in the REACH, maintaining the memorial to President Kennedy for public access, and through its partnership with the National Symphony Orchestra, supporting those performances offsite, as well as other signature artistic productions offsite including but not limited to the Kennedy Center Honors and the Mark Twain Prize for American Humor, allows the Kennedy Center to perform its statutory mandate while the main building and theaters are closed for renovation;

IT IS HEREBY RESOLVED that the John F. Kennedy Center for the Performing Arts shall continue to present educational and artistic programming at the REACH; that the Center shall continue its partnership with and support of the National Symphony Orchestra in performances at off site venues; that the Center shall continue signature artistic productions offsite including but not limited to the

> Kennedy Center Honors and the Mark Twain Prize for American Humor; that the Memorial to President John F. Kennedy be temporarily relocated to the REACH where it will remain open to the public; and that, based on technical assessments and expert opinions confirming the necessity of a closure, the main building be closed to the public for restoration and renovation in line with Delta Consulting Group expert opinion as well as the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto.
>
> IT IS FURTHER RESOLVED that the Executive Director and Chief Operating Officer shall undertake all legal means to effectuate the Board's direction in this matter, including by seeking to dissolve the preliminary injunction, entered in Beatty v. Trump, No. 25-cv-4480 (D.D.C.), currently preventing closure of the main building of the Kennedy Center for construction.

*Id.* at 10–12. Twenty-five trustees voted to adopt the resolution. *See id.* at 12–13. Plaintiff, Representative Larsen, and Senator Whitehouse voted against. *See id.* at 13.

**E. Subsequent Events and the Board's September 15, 2026 Decision**

On August 31, 2026, the Center's management distributed the finalized Delta Consulting Group report to trustees. *See* Sep. 18 Floca Decl. ¶ 5. On September 3, an ongoing soffit-panel assessment "identified widespread corrosion and deterioration affecting components that support exterior soffit panels around the building perimeter." Materials for Board of Trustees Special Meeting of September 15, 2026, Ex. B at 3; *see also id.* at 30–31. The assessment revealed that 46 of the 278 panels exhibited "severe corrosion" and that 93 additional panels "exhibited mild-to-moderate corrosion." *Id.* at 3. Walter P Moore engineers concluded that "one-third of all panels" thus "require immediate replacement." *Id.*; *see also id.* at 30. Indeed, the engineers concluded, the "continuing degradation of these 2,500-pound assemblies constitutes an active, building-wide falling hazard." *Id.* at 30. The Center "restricted public access" in areas "beneath or adjacent to exterior soffit assemblies" while "engineering assessment, monitoring, and stabilization activities proceed." *Id.* at 4.

On September 4, during a "severe regional storm," a "section of ceiling plaster detached and fell in the Grand Foyer near the Hall of Nations entrance." *Id.* at 3. The section "measured

approximately four feet by five feet and one inch thick and fell from an estimated height of 60 feet." *Id.* The Center closed the public space under the affected area and "began further condition assessment." *Id.* Preliminary conclusions point to "water infiltration." *Id.*; *see also id.* at 7–16 (showing existing damage and other areas of concern). The Center's management, having scheduled a trustee meeting for September 15, 2026 to discuss the completed Delta report, prepared materials documenting the above findings and distributed them to trustees in advance of that September 15 meeting. *See* Sep. 18 Floca Decl. ¶¶ 6–7.

At the September 15 meeting, the Board discussed management's findings and the full Delta report. *See* Prelim. Sep. 15 Board Minutes at 4–11, Ex. C. Representative Beatty participated actively in those discussions, including by remarking that the Delta report disavowed any claim to be a comprehensive evaluation of the safety of the building.[6] *See id.* at 10. When asked what more information Plaintiff believed the Board's deliberations lacked, she briefly discussed only the "absence of any record on employees, performers, and the associated cost" during a shutdown and pointed to no other relevant statutory or fiduciary obligations. *Id.* The Board's Vice Chair thereafter provided a brief response explaining likely actions the Center might take with respect to its employees. *See id.* at 11. After extended discussion, the Board ratified its August 13 vote to close the Center temporarily for a two-year renovation. *Id.* The Board adopted a resolution stating, in relevant part, that the Board "was able to meet with the principal of Delta Consulting Group" to

[6] On September 15, 2026, Mr. Buchalter signed an addendum to his report indicating his belief that Plaintiff's characterization "directly contradicts the views expressed in [his] Expert Report." Addendum to Expert Report ¶ 3, Ex. D. He pointed to numerous references in the Delta report outlining "meaningful concerns for public safety." *Id.* ¶ 4. And he noted that he personally observed the "ceiling debris field on the floor in the Grand Foyer" in the "area where a portion of the ceiling had fallen," which, he said, "provides additional evidence that the deterioration conditions identified in [his] report are continuing and may result in further failures that present hazards to occupants." *Id.* ¶ 5.

"fully explore the basis for its recommendation that the main building close for renovations," that the Board "believes that the risk associated with exposing patrons and employees to a hazardous building greatly outweighs any reputational risk associated with closing the main building," and that "the main building" of the Center "shall be closed to patrons forthwith upon the dissolution of the preliminary injunction in *Beatty v. Trump, et al.*"[7] *Id.* at 11–12.

## LEGAL STANDARDS

### A. Motion for Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). A party may "file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).

### B. Dissolving a Preliminary Injunction

Federal Rule of Civil Procedure 60(b)(5) provides the basis for a party to seek dissolution of an injunction or order. *See Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017). To receive such relief, the movant must show "a significant change either in factual conditions or in law" that makes "continued enforcement" of the preliminary injunction "detrimental to the public interest." *Talbott v. United States*, 775 F. Supp. 3d 445, 448–49 (D.D.C. 2025) (quoting *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019) (per curiam)); *accord,*

[7] As of filing, as disclosed in Defendants' Response to Plaintiff's Motion for Emergency Hearing filed yesterday, the Center's main building is closed until September 23, 2026, at the earliest, to "address imminent life-safety risks" identified with the Center's soffit panels, electrical infrastructure, and other structural deterioration. *See* Ex. A to Sep. 16 Floca Decl. at 2, ECF No. 86-2. "The need to extend this temporary closure will be evaluated on a weekly basis." *Id.*

*e.g.*, *Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 569 (D.C. Cir. 2011). The party seeking dissolution "bears the burden of establishing that changed circumstances warrant relief." *Talbott*, 775 F. Supp. 3d at 449 (quoting *Am. Council of the Blind*, 878 F.3d at 366).

## ARGUMENT

### I. Summary Judgment Is Warranted on Plaintiff's Outstanding Claims.

The Court's May 29, 2026 memorandum opinion provides the governing framework for these combined motions and underscores why Defendants are now entitled to judgment as a matter of law. Following that opinion and the Court's contemporaneous Order, ECF No. 49, what remains are Count Two and those portions of Counts Four, Five, and Seven related to the Board's decision to adopt an operational model that calls for the full, but temporary, closure of the Center.[8] *See* ECF No. 49 at 3. The legal theories underpinning those remaining claims reduce to the dual theories that the Board has violated the Center's organic statutes and its fiduciary duties as a board of trustees. Following the Board's reconsideration (twice) of the question with new evidence before it and the adoption of a superseding closure resolution, neither theory has merit. And Plaintiff's apparent primary basis for opposing summary judgment now—the contention that the Board's closure vote was a pretext to hide the Center's "deteriorating" finances—fails both because it is

[8] In its May 29, 2026 memorandum opinion, the Court granted Plaintiff's motion as to her claims that the Center's adoption of a secondary name was unlawful: Counts One, portions of Count Four, portions of Count Five, and portions of Count Seven. *See* Pl.'s Mot. for Partial Summ. J. at 1, ECF No. 30; ECF No. 49 at 1. The Court granted Defendants' motion for summary judgment as to Count Six—Plaintiff's claim under the Administrative Procedure Act. *See* ECF No. 49 at 3; ECF No. 50 at 93. The Court also granted Plaintiff's request for summary judgment on her claim—Count Three—that the Board had violated her rights by limiting her voting rights, as an *ex officio* trustee, on the Board. *See* ECF No. 49 at 3; ECF No. 50 at 59. To the extent Plaintiff might argue that any portion of Count Three remains, such portions—related to the receipt of relevant information and the right to participate in Board meetings, *see* ECF No. 12 ¶¶ 84–91, are moot. As the evidence clearly demonstrates, since the Court's temporary restraining order, Plaintiff has been afforded exactly the same participatory rights as every other general trustee on the Board.

irrelevant as a matter of law and unfounded a matter of fact, as the Center's finances were expressly presented to and considered by the Board as part of the reason the closure was necessary. Defendants are entitled to summary judgment on the remaining claims.[9]

**A. The Board's renewed closure vote comports fully with its statutory duties.**

As the Court previously found, "Congress has mandated that the Board 'maintain and administer' the Kennedy Center as a 'living memorial' to its namesake," "which involves 'present[ing] classical and contemporary music' " and other performing arts, "spearheading performing arts 'policy' and 'programs,' " providing "facilities for other civic activities," and providing " 'within' the Center 'a suitable memorial in honor of the late President.' " ECF No. 50 at 70 (quoting 20 U.S.C. §§ 76h(a)(1), 76j(a)(1)). And, as the Court held, it would be a "stretch to interpret either the amorphous 'living memorial' language or the Center's 'programming' and 'memorial' obligations as requiring the Center building and site to remain open at all times." *Id.*

The closure plan adopted by the Board is consistent with these statutory requirements. Indeed, the resolution explicitly notes that the Board is "committed to its statutory and fiduciary obligations . . . to maintain public access to the Memorial to John F. Kennedy . . . and to continue to present arts and educational programming during construction." ECF No. 68-3 at 11. The resolution further establishes how the Board has committed itself to satisfy these obligations, namely by, for example, "continuing [the Center's] artistic and educational programming at the Center's performing arts facilities in the REACH, maintaining the memorial to President Kennedy

---

[9] Defendants preserve for further review their previous arguments that Plaintiff lacks Article III standing to assert these remaining claims against the Board's renewed closure vote, *see* Defs.' Mem. in Supp. of Cross-Mot. for Summ. J. at 9–17, ECF No. 34-1, and that Plaintiff's breach-of-trust claims fail as a matter of District of Columbia law, *see id.* at 33–34; *see also* Defs.' Mem. in Opp'n to Pl.'s Mot. for TRO at 10–13, ECF No. 19. Recognizing that the Court has already ruled on these issues, though, *see* ECF No. 50 at 45–47, 65–66, Defendants decline to press them further here. *See, e.g.*, *Pepper v. United States*, 562 U.S. 476, 506–08 (2011).

for public access," and supporting offsite artistic performances and productions. *Id.* And the "Memorial to President John F. Kennedy [will] be temporarily relocated to the REACH where it will remain open to the public." *Id.* The September 15 resolution reaffirms those commitments and makes clear that the Board "has been guided by the Court's expressed thoughts about its statutory and fiduciary obligations." Ex. C at 11.

Even during the preliminary injunction stage, the Court found the Center had "some plans to carry out Kennedy Center programming," and that Ms. Beatty "therefore ha[d] not established that a potential future failure to sponsor any programming or memorialize President Kennedy during the two-year closure yet constitutes a statutory violation." ECF No. 50 at 71. But the Court also noted at the time that such plans "have not been set down in writing" and "strike the Court as somewhat of an afterthought." *Id.* The record is now clear. Defendants have expressly adopted two written resolutions providing for both continued performing arts programming and the maintenance of a memorial to President Kennedy. There can be no dispute on the current record that Board firmly understands its statutory obligations and has acted in full accordance with them. Any claims thus founded on the theory that the Board is violating its statutory obligations by undertaking a two-year closure of the main building of the Center wholly fail.

As the Court previously found at the preliminary stage, the remaining statutory provisions Plaintiff invokes against the Board's closure vote fail to provide her relief, for the same reasons as above. Specifically, even on the record previously before the Court, Ms. Beatty failed to establish "that the proposed renovations will change the Kennedy Center's ultimate location, height, bulk, number of stories, size, and surrounding open space." ECF No. 50 at 74. Even if such actions might—which Defendants do not concede—create an obligation under the Smithsonian Facilities Authorization Act (SAFA), for the Center to consult with the National Capital Planning

Commission and to comply with Section 106 of the National Historic Preservation Act, that question is moot, because it is now clear that the project expressly authorized by the Board contemplates *none* of those changes. *See id.* at 72–73; *see also* ECF No. 68-3 at 10–12. Indeed, the record establishes that the Board will *not* change the Center's location, height, bulk, number of stories, size, or surrounding open space. The Board's August 13 resolution makes clear that it is fully committed to its "obligations to maintain the historic and architecturally significant nature of the Center's main building." ECF No. 68-3 at 11. To that end, the Board authorized the closure of the Center's main building "for restoration and renovation in line with . . . the Comprehensive Project Development Plan dated June 8, 2026." *Id.*; *see also* Ex. C at 11–12. This plan, which was provided to all Board members prior to the August 13, 2026 meeting, demonstrates in detail the precise scope of the project and the planned renovation work, with illustrations demonstrating that the Center will retain its overall envelope and footprint. *See See* ECF No. 65-1 at 22–40. So the statutory provisions Plaintiff cites have no bearing on the Board's actions in voting to undertake a closure and renovation.

For similar reasons, Plaintiff's *ultra vires* and mandamus claims—on the Board's violation of its statutory obligations—fail. As the Court already found, "there is no express prohibition on a temporary closure of the Center" in the applicable statutes. ECF No. 50 at 70. And, although the Board has an "affirmative duty" to "carry out the Center's programming and maintain a memorial to President Kennedy," *id.* at 70–71, it can fulfill that duty—in its discretion—by utilizing on-campus spaces like the REACH to maintain certain programming and the memorial experience. while continuing to provide support for off-campus performances and productions. *See* ECF No. 68-3 at 11; ECF No. 50 at 71 (noting at the preliminary stage that such activities are likely to satisfy the Board's statutory duties). Indeed, the Board has now done so. The failure to identify a

"specific," "clear and mandatory" statutory prohibition dooms Plaintiff's *ultra vires* claims against closure. *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). And the fact that the Board has *satisfied* its "clear" duties means Plaintiff fails to satisfy the jurisdictional prerequisites to receive mandamus relief. *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 949 (D.C. Cir. 2019) (citing *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004)).[10]

**B. The Board's renewed decision to close comports fully with its fiduciary duties.**

Plaintiff's final remaining theory—on which this Court granted her preliminary relief—rests on the contention that the Board violated its fiduciary duties by voting to close for two years without considering the full range of its legal duties, by making the decision based on insufficient information, and by voting without having "meaningful say." ECF No. 50 at 75–82. None of these conclusions can be drawn about the Board's August and September 2026 votes. The record now proves conclusively that, in independently considering newly defined operational proposals to undertake remediation and restoration work, the Board has fully satisfied its fiduciary duties.

Boards of trustees must operate under the "duties of participation and prudence, the latter of which requires a trustee to 'administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust.' " ECF No. 50 at 75 (quoting Restatement

[10] The Court recognized as much under the preliminary-injunction framework: "[I]t is unlikely that Beatty can pursue an *ultra vires* claim in the alternative" to her claim under 20 U.S.C. § 76*l*(b) (Count Two of her First Amended Complaint). ECF No. 50 at 67. Now, as then, "Beatty has neither established that the closure is *per se* or patently 'unauthorized by any law,' nor that it violates any specific statutory prohibition." *Id.* (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)). *Ultra vires* relief is thus unavailable for Plaintiff's closure claim. And, further, because review is available under section 76*l*(b), mandamus relief is likewise unavailable. *See Dunlap*, 944 F.3d at 949 (noting jurisdictional requirement that "no adequate alternative remedy" be available (citation omitted)).

(Third) of Trusts § 77(1)).[11] Trustees must also have sufficient information on which to base their decisions in order to exercise the requisite duty of care under the law. *See* Restatement (Third) of Trusts § 77 cmt. b; *see also* A. Hess, G. Bogert & G. Bogert, *Bogert's The Law of Trusts and Trustees* § 584 (2025 ed.) ("*Bogert's Law of Trusts*").

The "scope of a court's review of board of trustee decisions is limited." ECF No. 50 at 75. For discretionary decisions, the exercise of trustees' powers "is subject to supervision by a court only to prevent an abuse of discretion." Restatement (Third) of Trusts § 87. Indeed, even "in cases of what are often called 'mandatory' powers or provisions, for which trustee compliance is required . . ., the trustee often has some discretionary authority and responsibility in important matters of detail and implementation." *Id.* § 87 cmt. a. "[T]rustees having the power to exercise discretion will not be interfered with so long as they are acting *bona fide*." *Shelton v. King*, 229 U.S. 90, 94 (1913) (italicization added); *see also Olds v. Rollins Coll.*, 173 F.2d 639, 642 (D.C. Cir. 1949) (applying the *Shelton* rule in noting that trustees' factual findings "bind[]" courts "if made in good faith and if not clearly erroneous"). And, even assuming not all (or not a majority) of trustees consent to a given action, co-trustees can "ratify" the action "if such ratification is for the best interest of the trust." Restatement (First) of Trusts § 194 cmt. c; *see also* Restatement (Third) of Trusts § 39 cmt. b. Taken together, these rules mean—as the Court found—that boards of trustees may "ratify past institutional actions after *bona fide* consideration." ECF No. 50 at 82. And they may do so—and in fact may sometimes be *required* to do so—by "obtaining and considering the advice of others on a reasonable basis," Restatement (Third) of Trusts § 77 cmt.

[11] For the purposes of this motion, Defendants do not contest the Court's previous conclusion that, by enacting 20 U.S.C. § 76*l*(b), "Congress intended to impose on trustees traditional fiduciary duties." ECF No. 50 at 44 (citation omitted).

b, including by delegating certain tasks to agents, *see id.* § 80 cmts. f, g., and by "[t]aking the advice of legal counsel," *id.* §77 cmt. b(2).

Indeed, the "prudent person" standard applicable to assess trustee actions operates in many ways like the business-judgment rule limiting liability for corporate directors. *See Bogert's Law of Trusts* § 361 (explaining that it is "not clear" whether the "standards of care" for "trustees and directors of nonprofit corporations" are "in reality significantly different"). The standard underscores that, upon reaching the reasonableness threshold attendant to the prudent-person duty of care, a court's role in overseeing trustees' actions comes to an end.

Under the governing standards as previously set forth by the Court, the Board has more than satisfied its duties of participation and prudence.[12] Start with the Board's consideration of the "full range" of its "statutory obligations." ECF No. 50 at 76. The Board's August 13 meeting—and the direct text of the closure resolution that the Board adopted at that meeting—underscore the extent to which the Board was aware of its statutory duties and undertook to satisfy them (*i.e.*, to "present programming and maintain a presidential memorial site," *id.*). Secretary Lutnick emphasized that the plans proposed for consideration would *not* close the Center "as a whole," that "programming will continue," and that the "memorial will be moved to the REACH." ECF No. 68-3 at 6, 8. Mr. Buchalter emphasized that the Center could "leverag[e]" the REACH to ensure the Center "keeps the mandate during the shutdown." *Id.* at 7. And the Board discussed the benefits

[12] Although Plaintiff's pretext theory fails for the reasons set forth below, *see infra* Section I.C, the Board's *subsequent* consideration of Center management's proposed operational models evinces sufficient *bona fide* consideration to defeat any claim that the Board's renewed adoption of an operation model that contemplates the full closure of the main building of the Kennedy Center violated the Board's fiduciary duties. *See, e.g.*, ECF No. 50 at 82 n.34 (noting Plaintiff's contention that the Board failed to act in good faith throughout its earlier decision-making process).

and drawbacks of the potential operating models, including following extended discussion with Plaintiff and others on the information underlying the closure projections. *See id.* at 8–10.

Likewise, both the August 13 resolution and the September 15 resolution expressly acknowledged the Board's commitment "to its statutory and fiduciary obligations to maintain the Center as the Nation's Cultural Center, to maintain public access to the Memorial to John F. Kennedy, to maintain the historic and architecturally significant nature of the Center's main building, and to continue to present arts and educational programming during construction." *Id.* at 11; *see also* Ex. C at 11–12. The Board expressly resolved to "continue to present educational and artistic programming at the REACH," to continue "signature artistic productions" offsite, and to "temporarily relocate[]" the memorial to President Kennedy to the REACH building. ECF No. 68-3 at 11; *see* Ex. C at 12. The August and September Board meetings—and the resolutions passed at those meetings—thus demonstrate ample consideration of the Board's statutory obligations sufficient to satisfy its fiduciary duties. *Cf.* ECF No. 50 at 76.

Next, consider the wholly changed informational landscape. Since the Court's preliminary injunction, the Board received significantly more information about the planned construction, potential operational models for undertaking that construction, and the costs and benefits of those models. The information considered by the Board in taking its August 2026 vote is more than sufficient to satisfy its fiduciary duties. First, Center management—and the Board—received and considered the full comprehensive project development plan from JLL, a 180-page, thoroughly detailed report into the renovation activities to occur during the contemplated two-year closure. The report, a "comprehensive package of planning materials," ECF No. 50 at 78 n.30 (citation omitted), contains architectural concepts, *see* ECF No. 65-1 at 27–40, a breakdown of the firms hired to serve on the design team, *see id.* at 17–19, detailed timelines, *see id.* at 102–14, and

detailed budget line items, *see id.* at 115–63. The JLL Report provides a wealth of detail about the proposed two-year construction plan.

Delta's analysis further supports the sufficiency of the Board's decision. As Mr. Buchalter discussed during the August Board meeting, the Center could undertake one of two potential paths: (1) maintain operations in the main building of the Center while undertaking necessary (and congressionally authorized) renovations or (2) close the main building to conduct a more-concentrated set of construction over a shorter period of time. *See* ECF No. 68-3 at 6–7. As his supporting analysis confirms, the first option would "preserve[] more Main Building programming and generate[] more operating revenue during construction," but would require the Center "to maintain substantially more of its existing operating cost structure." Ex. A ¶ 220. The second model would "require[] the Center to accept a greater temporary reduction in Main Building programming and earned revenue," but would "allow[] operating expenses to be reduced substantially during the shorter construction period." *Id.* ¶ 221. Further weighing in favor of a more concentrated model is the fact that, due to the complexity of the required construction, renovation over a longer period of time would result in underfunding structural renovation and venue improvement, as compared to a shorter, two-year construction period. ECF No. 68-3 at 7. And, Mr. Buchalter explained, such complexity would result in significant safety concerns and associated costs by conducting construction in an operating building. *See id.*; *see also* Ex. A ¶¶ 131–37. In sum, the information in front of the Board is not "woefully insufficient." ECF No. 50 at 77. Trustees had—and continue to have—the benefit of a detailed package of construction planning materials (the JLL Report), a cost-benefit analysis (the Delta Report), and recent information regarding significant safety and structural concerns within the Center in voting to adopt an operational model that contemplates closure of the building during renovations.

Indeed, the information before the Board made emphatically clear that complete closure of the main building, rather than phased closure, was the only responsible option. Given the absence of any clear, overwhelming reason necessitating a phased closure, Mr. Buchalter's conclusion that a phased closure would result in a *$300 million* funding shortfall to conduct the necessary repairs, as opposed to a gap of less than $30 million if the building were completely closed, establishes that failing to pursue the closure model chosen by the Board would be *imprudent* under the circumstances.[13] *See* ECF 68-3 at 8; App. H to Ex. A at 3–4. JLL's estimate that a phased closure of parts of the building would cost $41 million more than a temporary closure of the building—in construction costs alone—further supports this conclusion. *See* ECF No. 65-1 at 4.

And if there were any doubt as to the sufficiency of the information in front of the Board in August, the Board reconvened on September 15, over two weeks after receiving the full Delta report and days after receiving information concerning the Center's ceiling collapse, again discussed the merits of closure, and again voted in favor of temporary closure to effectuate the necessary renovation and restoration. *See* Ex. C at 7–12. This is the work of a prudent Board making a prudent decision. Indeed, the significant structural and safety deficiencies—documented for the Board at its September 15 meeting—that have come to light in recent weeks underscore the urgency for undertaking the proposed two-year closure. As described above, preliminary engineering assessments indicate that the Center's soffit panels present a severe "falling-object

[13] At a certain point, it seems fair to question whether the continued delay to renovation resulting from the prosecution of this lawsuit, in light of the extensive structural and safety needs now thoroughly documented in this litigation and laid out in full for trustees' consideration, might itself constitute a breach of fiduciary duty. *See* Restatement (Third) of Trusts § 76 cmt. d (indicating that only "reasonable steps" to enforce a trust will satisfy a trustee's duty to protect the trust estate and that such "reasonable steps" might include abandoning even a "valid claim" if "the costs and risk of litigation make such a decision reasonable under all the circumstances").

and life-safety hazard in areas regularly occupied by the public." Ex. B at 3. And water intrusion resulted in the partial collapse of a significant portion of ceiling plaster in a public area of the Center, with "at least seven" other ceiling locations appearing to have similar deterioration. *Id.* Facts like these only underscore that the Board's decision to close for construction is, at bottom, eminently prudent.

Plaintiff has no credible argument that the Board lacked any meaningful say in a "foreordained" closure decision. ECF No. 50 at 81. The record underscores that the Board received the recommendation of independent experts with no preconceived views, Ex. A ¶ 47, meaningfully engaged with the proposed operational models, inquired about the analysis underpinning the independent assessments, and engaged in fruitful conversations aimed at addressing any concerns trustees might have about the Center's path forward. *See* ECF No. 68-3 at 8 (discussing—and addressing—Plaintiff's concerns about "how programming would continue"); *see also id.* at 9 (discussing questions about how the Delta analysis estimated each scenario's operating deficit); *see also id.* at 13–14 (discussing how trustees might reach common ground on the Center's path forward). The Board's vote reflected *bona fide*, legitimate discussion of—and, indeed, compromise over—the Board's proposed closure plans.[14]

**C. No genuine disputes of material fact preclude summary judgment.**

The facts material to the remaining claims in this litigation are not—and could not reasonably be—in dispute. Record evidence provides the Court ample basis to determine whether the Board satisfied its legal obligations in voting to adopt an operational model contemplating full

[14] Indeed, the specifics of the adopted plan reflect express acknowledgments that, for example, programming must be maintained, the memorial experience must continue to serve the public, and artistic productions must continue—all of which were developed in response to trustee and management input, including by Plaintiff herself.

closure of the Center during two years of renovation and restoration.[15] And as long as reasonable minds might dispute the prudent path for the Board to take, then the *judicial role* in cabining that discretion is at an end, and there can be no dispute of material fact.

Plaintiff's primary argument that summary judgment is unwarranted appears to relate to her belief that "the decision to close the Kennedy Center was a pretextual maneuver to hide the Kennedy Center's deteriorating financial performance." Joint Rule 26 Report at 3, ECF No. 63. Plaintiff's effort to undertake invasive and unnecessary discovery—a textbook fishing expedition—is incorrect for two primary reasons: (1) the question of pretext is, on this record, wholly immaterial; and (2) the record *undermines* any implication of pretext, as the basis for Plaintiff's allegation—"deteriorating financial performance"—was disclosed to the Board in its consideration of the August closure vote. Indeed, the Center's immediate financial outlook forms much of the basis for the Delta report's recommendation that a temporary closure represents the prudent path forward. *See* Ex. A ¶¶ 202–25. The disclosure of the very piece of information Plaintiff alleges is an unspoken basis for a pretextual vote entirely defeats any claim that bad faith infected the Board's decision-making process. The very basis that Plaintiff alleges was unstated—and resulted in a pretextual vote—was, in fact, provided to the Board in its discussion of the Center's financial outlook. An explicit basis cannot serve to show unlawful pretext.

[15] The specific action Plaintiff challenges is the Board's plan to close for renovation, which it effectuated through its closure vote on March 13, 2026 that it later superseded through its votes on August 13 and September 15, 2026. *See* ECF No. 34-5 at 10–11; ECF No. 68-3 at 12–13; Ex. C at 11–12. As Defendants earlier argued, "claims about unknown future events that have yet to occur"—like the *future* extent of construction, to the extent it differs from the plan the Board adopted—"would not yet be ripe." ECF No. 39 at 15 n.5 (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)). There is no dispute as to the scope of the renovation plans as they were developed by JLL and Delta and adopted by the Board of Trustees. *Contra* ECF No. 38 at 36–37 (arguing that the project's scope is uncertain). Defendants are entitled to summary judgment on the record as it currently exists, not as it could hypothetically exist at some point in the future.

*First*, as a matter of law, a court's review of trustee action ends upon the finding that the relevant board of trustees satisfied its duty to "administer the trust as a prudent person would" and to "exercise adequate 'care, skill, and caution' in decision-making." ECF No. 50 at 83 (quoting Restatement (Third) of Trusts § 77(1)–(2)). Upon making the showing that a board adequately and in good faith considered sufficient information and prudently undertook a decision made in light of the purposes of the trust, a court "will not . . . interfere[]."*Shelton*, 229 U.S. at 94. The finding that the trustees satisfied the "minimum requirements" of their duties with "due care and some modicum of independence," ECF No. 50 at 92, and did so while "acting bona fide," *Shelton*, 229 U.S. at 94, ends a court's inquiry into the lawfulness of the action at issue. As explained above, the Board here did just that. But, regardless, hypothetical allegations of pretext are not material to making that legal finding where, as here, the record provides ample evidence of the Board's independent, informed, and considered decision to renew its plans for a two-year closure.

When faced with evidence that the Board has met that minimum threshold, there is no further role for this Court to play. *See* ECF No. 50 at 75; *see also Shelton*, 229 U.S. at 94; Restatement (Third) of Trusts § 87. And if the evidence shows that a board has acted "within the bounds of a reasonable judgment," Restatement (Third) of Trusts § 87 reporter's notes cmts. b and c (citation omitted), judicial deference means that the Board's decision must stand. Determining whether the Board's decision here was within the bounds of a reasonable judgment does not depend on whether the Board may have had unstated reasons for taking the actions it did. All that matters is that the Board received, considered, and acted on sufficient evidence to support the decision it made. ECF No. 50 at 75; *see also In re U.S. Bank Nat'l Ass'n*, 27 N.Y.S.3d 797, 806–07 (Sup. Ct. 2015) (citing Restatement (Third) of Trusts §§ 80, cmt. b, 93, cmt. c, and concluding that, because the trustees "properly obtained and considered the opinions of several highly

respected outside experts," "no deficiencies in the experts' methodologies" appeared, and the "methodologies [did] not appear on their face to be implausible," no abuse of discretion existed); *cf. Day v. Apoliona*, 616 F.3d 918, 926–28 (9th Cir. 2010) (holding that where the terms of a trust confer discretion to follow trust purposes trustees may exercise that discretion to act in pursuit of one or more of those purposes even if those "benefits may extend beyond the trust's purposes").

Moreover, nowhere does the common law appear to contemplate that some unstated motive *alone* might be sufficient to invoke judicial oversight to invalidate the considered, otherwise permissible action. The Restatement notes only that "[a]n abuse of discretion may result from the exercise of discretionary authority *in bad faith* or *from improper motive*." Restatement (Third) of Trusts § 87 cmt. c (emphasis added). Such circumstances occur only where a trustee "acts dishonestly, such as when the trustee receives an improper inducement for exercising the power in question," or from when the trustee "acts from an improper even though not dishonest motive, such as when the act is undertaken in good faith but for a purpose other than to further the purposes of the trust or, more specifically, the purposes for which the power was granted." *Id.* And here, there is no dispute that the closure vote *does* fulfill certain trust purposes: the Board's duties to plan and construct capital repairs and improvements, *see* 20 U.S.C. § 76j(a)(1)(G), and to provide all necessary maintenance and alterations of the building and site in a manner consistent with "requirements for high quality operations," *id.* § 76j(a)(1)(H)(ii). Moreover, as discussed above and in the independent analysis that the Board received, the trustees might readily view the construction as *enabling* the long-term fulfillment of other trust purposes, like its duties to present performing arts and to provide facilities for civic activities, by ensuring that the Center will continue to survive as a safe and functional performing-arts venue long into the future. At bottom, ample evidence shows that the Board satisfied its fiduciary duties here. As a matter of law, that

suffices. Any allegation of pretext is irrelevant. *Cf. In re Curlew Valley Assocs.*, 14 B.R. 506, 513 n.11a (Bankr. D. Utah 1981) ("[S]o long as the trustee can articulate reasons for his conduct . . . the court will not inquire into the basis for those reasons.").

*Second*, Plaintiff's pretext argument appears to be that Defendants' closure vote was calculated "to hide the Kennedy Center's deteriorating financial performance." ECF No. 63 at 3. As discussed above, that fact is irrelevant to deciding whether the Board properly exercised its fiduciary duties in deciding to close for construction. But even taking Plaintiff's argument on its terms, it is meritless. First, it is based on an erroneous premise: The financial outlook at the Kennedy Center *supports* closure. Indeed, it is a key premise of Mr. Buchalter and Delta Consulting Group's recommendation that the main building be closed for the construction period instead of kept partially open. Mr. Buchalter's presentation to the Board noted that the Center's yearly revenue "would be expected to decline" under the partial-closure model, which was "already visible in year-over-year revenue decline because of uncertainty and friction" in the Center's operations. ECF No. 68-3 at 7. Delta conducted its analysis with the benefit of the Center's "audited FY23 and FY24 financial statements, unaudited draft FY25 financial statements, and FY27 budget scenarios prepared by the Center's finance team" and specifically noted in its recommendation that the Center already entered the construction program with an "existing deficit." Ex. A ¶¶ 204, 207; *see also* App. V to Ex. A; App. W to Ex. A; App. V to Ex. A.

This same evidence also establishes that there is nothing "hid[den]" about the Center's financial performance—another essential premise of Plaintiff's theory. There can be no dispute that the Board has been made fully aware of the Center's financial outlook. Indeed, the Board received a "report on the Center's financials" at the August 13 meeting. ECF No. 68-3 at 10. Whatever Plaintiff might say about Defendants' purported desire to hide some kind of smoking-

gun evidence about the Center's financial condition, she cannot credibly claim that Defendants have *actually* hidden any material information about the Center's finance from its trustees. There is no genuine dispute that accurate information *has* been provided to all trustees. Indeed, the Court has previously noted the lack of dispute in the *public record of this case* about declining ticket sales. *See* ECF No. 50 at 56 n.23 (citing Def's Resp. to Pl.'s Statement of Material Facts ¶¶ 34–36, ECF No. 33-1). There is thus no genuine dispute of any material fact related to alleged pretext that might preclude summary judgment on Plaintiff's remaining claims.

## II. The Preliminary Injunction Should Be Dissolved.

Even if the Court determines that outstanding material disputes of fact preclude summary judgment on Plaintiff's remaining claims, the preliminary injunction that the Court entered against the Center's closure for construction should be dissolved. The Board's August 13 and September 15 closure votes—made on a materially different record than its earlier vote—superseded the Board's March 16 closure vote. And the Court's May preliminary injunction continues to impose significant costs on the Center, and thus harms the public interest, with each day that passes. Given the significant change in the factual record underlying this litigation, renewed consideration of the equities supports dissolving the preliminary injunction.

### A. Defendants have satisfied their burden to show that significantly changed factual conditions merit dissolution.

By adopting a renewed closure vote based on factual evidence compiled and generated after the Court's entry of a preliminary injunction, Defendants can now point to "a significant change" in "factual conditions" sufficient to support dissolution of that preliminary injunction. *Doe 2*, 755 F. App'x at 22 (quoting *Horne v. Flores*, 557 U.S. 433, 447 (2009)).

First, the "government took substantial steps to cure the procedural deficiencies the [C]ourt identified" in its injunction of the March 13 closure vote. *Doe 2*, 755 F. App'x at 23. Such steps

include ensuring that trustees expressly consider the "full range" of the Board's "statutory obligations in determining that a wholesale shuttering of the Kennedy Center was appropriate." ECF No. 50 at 76. As discussed in detail above, the Center's management went to great lengths to ensure that the proposals laid before the Board reflected a holistic view of the Board's statutory obligations and how those obligations might be balanced against each other in considering viable paths forward. *See, e.g.*, ECF No. 68-3 at 6 (noting that Delta sought to identify the most effective path forward for repair and renovation "while balancing operations and mission" and considering "schedule impacts," "operating expenses," and "implications for the Center's long-term mission"); *id.* at 7 (noting that the REACH could be leveraged to fulfill the Center's "mandate" and to continue "the memorial experience"); *id.* at 8 (discussing how keeping the REACH open might allow programming to continue); *id.* at 11 (resolving that the Board is "fully committed to its statutory and fiduciary obligations" to present programming and maintain the memorial to President Kennedy); *see also* Ex. A ¶¶ 211, 215.

The Center also provided trustees substantially more information on which they could base their decision than during the March closure vote. *Cf.* ECF No. 50 at 77. Management hired both JLL and Delta to conduct intensive and independent analyses of the renovation needs facing the Center, how those needs intersect with the Center's statutory duties and operating models, and how the Center might ameliorate impacts from the necessary repair and restoration activities. Trustees received a detailed report from JLL that served as a "comprehensive package of planning materials" with "an overall architectural concept, identification of the major professional consultants who will lead the project, timelines, budgets, and supporting analysis." ECF No. 50 at 78 n.30. Trustees also received further analysis in the form of a presentation from Mr. Buchalter—

analysis that supported by an in-depth cost-benefit report. *See generally* Ex. A. The informational landscape has, thus, wholly changed since the Court entered its preliminary injunction.

And, finally, the Board's renewed discussion reflects that it has had sufficient time and motivation—given the Court's injunction—to provide a "meaningful say" in the closure vote. ECF No. 50 at 81. Trustees have now had months to "consider perhaps the most momentous decision in the Center's lifetime since it opened in 1971." *Id.* at 82. They have received significant amounts of expert-developed information aimed at ensuring trustees are informed about the Center's structural and operational needs. And the discussions at the Board's meetings also show that trustees engaged in a meaningful and informed discussion over the Center's future. Plaintiff herself raised several questions and engaged in back-and-forth discussion with others present, including Mr. Buchalter. *See* ECF No. 68-3 at 8–9. Others asked Mr. Buchalter for clarity on certain elements of Delta's financial analysis, asked for additional financial information, and received responses to their questions. *See id.* at 9–10. In short, the Board fulfilled its duty to consider the information presented to it and provided meaningful input on the proposed two-year closure before adopting the resolution effectuating the closure. Those changed factual conditions suffice to support dissolution of the Court's preliminary injunction.

**B. Continued enforcement of the preliminary injunction would be detrimental to the public interest, and the equities support dissolution.**

The changed factual conditions inherent in the Board's renewed closure vote "make[] continued enforcement" of the injunction "detrimental to the public interest." *Talbott*, 775 F. Supp. 3d at 448–49 (quoting *Doe 2*, 755 F. App'x at 22).[16] Because of this litigation, and because of Plaintiff, the Center is in limbo. The Court recognized in issuing its preliminary injunction—

[16] Because the government is the party opposing continued enforcement of the injunction, the "public interest" and "harm to" the government are one and the same. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

rightfully, in Defendants' view—that the Board "might have assessed the propriety of closure in a number of prudent ways." ECF No. 50 at 91. It has now done just that. And it is unable to effectuate that decision—which will require the implementation of a significant amount of planning work while necessarily foreclosing the use of the Center's main building as a performance venue—while the Court's preliminary injunction remains in place. The very fact that the two potential paths forward are mutually exclusive (the Center cannot close its main building while simultaneously planning for performances to occur in the main building during that closure) means that the Center's operational model is effectively frozen in place while this litigation continues. That uncertainty creates a significant harm to the Center and to the public interest.

First and foremost is the threat to public safety that the Center presents in its current state, made acute by investigations that have only yielded preliminary safety results in recent days and weeks. Walter P Moore, which has been conducting assessments of overhead soffit panels for several months, preliminarily determined in early September that roughly one-third of soffit panels currently in place at the Center "require immediate replacement." Ex. B at 29. "[C]ontinuing degradation of these 2,500-pound assemblies constitutes an active, building-wide falling hazard." *Id.* And similar risks were made more acute in the context of another problem that has been well documented in this litigation: water intrusion through the roof of the Center. Such intrusion caused a large section of ceiling plaster to fall into a public space within the Grand Foyer of the Center, near the main entrance of the Concert Hall; several other areas of concern currently exist in public spaces of the Center. *See id.* at 3; *see also id.* at 6–15. Center management considers this event a significant life-safety incident. *See id.* at 3. Further investigation and significant remediation activities are, at this stage, a necessity—and the Center should be permitted to close for an orderly renovation to address that necessity.

Even outside the context of these acute risks to public safety, there are also distinct risks to the Center's finances. As the Delta analysis confirms, operating expenses—which are currently largely frozen in place as the Center complies with the Court's order—"already exceed the combination of its earned operating revenues and annual contributions and other support." Ex. A ¶ 207. Closure of the main building would "allow[] the Center to reduce its operating cost structure during construction." *Id.* ¶ 214. Indeed, although "mission-based programming would continue primarily at the REACH" and in supporting other events, closure would allow the Center to "substantially reduce the costs associated with maintaining programming and public operations" throughout the main building. *Id.* ¶ 215. Expenses associated with maintaining the Center's current operational model have continued to accrue, with no revenue offset—given that the status quo prior to the preliminary injunction contemplated an empty programming schedule for the proposed two years of programming—to limit the operational impact of those expenses. Harms thus continue to accrue daily to the Center and, correspondingly, to the public interest.

Having taken two valid closure votes, the Board's interests—and the public interest—face additional harm from the Board's inability to conduct certain remediation and restoration activities with the Court's injunction in effect. At the preliminary-injunction stage, the Court declined to prevent Defendants from conducting "limited closures of spaces in and around the remedial work" contemplated by the congressional appropriation. ECF No. 50 at 86. But, as the record now clearly demonstrates, and as the Board affirmed in its August vote, it is almost impossible—at a minimum, highly impractical—to conduct required repairs without a sustained, two-year closure of the main building of the Center. *See* Ex. A ¶¶ 127–38; *see also* ECF No. 68-3 at 6 (discussing the difficulties inherent in undertaking all of the required work in a partially open building).

And it is certainly impossible to conduct the *full* scope of contemplated repairs and restorations under a partial-closure model, given the amount of funding Congress appropriated to the Center. *See* Ex. A ¶¶ 190–200 (explaining that, under a partial-closure model, existing funding could account for critical repairs to utilities but would leave much of the structural renovation unfunded and all of the venue-improvement construction unfunded); *see also id.* ¶ 200 (explaining that the phased alternative "does not eliminate the need for structural or venue work" and that "[t]emporary systems, repetitive mobilization and demobilization, restricted access, off-hours construction, public protection, utility cutovers," and other similar activities required in a partially open building would "consume funding that would otherwise be available for permanent improvements"); *see also* App. H to Ex. A at 3–4. The public interest supports reducing the amount of money that, as of now, is being put toward activities that confer minimal public benefit and, instead, redirecting the Center's resources toward activities that help the Board fulfill its duty to maintain a safe and high-quality performance venue and, in two years, to reopen for public access and programming in the Center's main building. *See Dellinger v. Bessent*, 766 F. Supp. 3d 57, 70–71 (D.D.C. 2025) (noting that the "loss" of a statutory "ability to do what Congress specifically directed" a statutory actor "to do" qualifies as a basis to receive relief).

Finally, the Court's conclusion that any timeliness assertion "falls flat," ECF No. 50 at 86, no longer holds true. Congress adjudged that funding for the Center's renovation be used prior to September 30, 2029. *See* 139 Stat. at 157. And well-settled law confirms that this Court is "not free to ignore [Congress's] judgment and rewrite the statute to include a [different] timetable." *In re Am. Fed'n of Gov't Emps., AFL-CIO*, 837 F.2d 503, 506 (D.C. Cir. 1988). At the preliminary-injunction stage, the Court declined to credit the government's argument here, noting that "renovations are still very much in planning mode" with "no official, up-to-date building plan or

master construction schedule" in place. ECF No. 50 at 86. That is no longer the case. There *is* an official, up-to-date building plan and master construction schedule: the JLL report. And although the report contemplates that the project will, as of today, be done in advance of the congressional deadline, every day that passes without substantial progress on construction threatens that timeline. The Delta report assumed that major construction would begin roughly "two months later than JLL's original July 6, 2026, planned start date," itself a date that has come and gone. Ex. A ¶ 168. And under the closure model, the estimated "25 to 28 months" of construction "would place Main Building reopening between October 2028 and January 2029." *Id.* Slipping any further threatens the Center's ability to meet the deadline set it by Congress.

The public interest strongly favors dissolving the Court's preliminary injunction. The Center's future hangs in the balance. The status quo—with the injunction in effect—has led only to increased safety risks, heightened uncertainty, resulted in undue expense, and led to an underused, unrepaired Center with no meaningful ability to move to the next stage in its storied history. That, paired with the significantly changed factual conditions following the Board's renewed closure votes, should lead this Court to dissolve its preliminary injunction.

## CONCLUSION

For the reasons stated above, the Court should grant Defendants' motion to dissolve the preliminary injunction. A "court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality op.). And the Court should grant Defendants' motion for summary judgment.

Dated: September 18, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRANTLEY MAYERS
Counsel to the Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

CHRISTOPHER M. LYNCH
Chief Litigation Counsel

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
(202) 353-7578
william.s.jankowski@usdoj.gov

*Counsel for Defendants*