**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br>*Plaintiff*,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>*Defendants*. | Civil Action No. 25-4480 (CRC) |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h), Defendants Donald J. Trump, *et al.*, respectfully submit the following Statement of Material Facts as to which there is no genuine dispute in support of their Motion for Partial Summary Judgment on the outstanding claims raised in Plaintiff's Amended Complaint, ECF No. 12.

1. Defendants first undertook activities that would lead to the development of the plan to temporarily close the main building of the John F. Kennedy Center for the Performing Arts ("the Center") in the fall of 2025. At that time, based on existing evidence showing that the Center required significant repairs, Matthew Floca, the then-Vice President of Facilities and now-Executive Director and Chief Operating Officer of the Center, began a comprehensive review of the Center's infrastructure needs. *See* Second Decl. of Charles Matthew Floca ¶¶ 6–7, 9, ECF N. 29-3.

2. In July 2025, Congress appropriated approximately $257 million to the Center to conduct necessary renovation and restoration work. *See* An Act to Provide for Reconciliation, Pub. L. No. 119-21, § 60025(a), 139 Stat. 72, 157 (2025); *see also* Mem. Op. at 13, ECF No. 50.

3. During the fall and winter of 2025 and into 2026, Mr. Floca "realized that closure was necessary after 'an extensive analysis of expert evidence and internal operational data,'" including the Center's comprehensive building plans, external consultant reports, and information gathered from certain staff at the Center. ECF No. 50 at 15–16 (quoting ECF No. 29-3 ¶¶ 7, 9, 11).

4. In January 2026, Mr. Floca spoke with President Trump several times and suggested over the course of those engagements that "a singular, concentrated 24-month closure [would be] the most cost-effective and efficient path for addressing the Center's acute infrastructure needs." *Id.* (alteration in original) (quoting ECF No. 29-3 ¶ 7).

5. In Mr. Floca's view, such a closure would help address "the facility's critical infrastructure failures while eliminating the hidden costs and safety risks inherent in a multi-year, phased renovation." *Id.* (quoting ECF No. 29-3 ¶ 7).

6. On March 16, 2026, the Board of Trustees of the Center first considered and adopted a proposal to effectuate Mr. Floca's recommendation to conduct a concentrated, 24-month closure to conduct renovations. *See id.* at 20–21.

7. On May 29, 2026, the Court preliminarily enjoined Defendants from effectuating the Board's March 16 closure vote, concluding that Defendants had failed to satisfy their fiduciary duties by failing to consider their statutory obligations and failing to gather and consider sufficient information about the proposed closure. *See id.* at 75–83.

8. During the pendency of this litigation, the Center's management engaged JLL, a construction management firm with large-scale construction experience, to develop a detailed and comprehensive project overview for the proposed renovations. *See* JLL Comprehensive Project Development Plan at 2, ECF No. 65-1.

9. The report sets out three distinct phases that would guide the firm's management of the renovation: (1) historic preservation and planning activities, (2) assessments and repairs of major systems and equipment at the Center, and (3) renovation of interior spaces at the Center. *See* ECF No. 65-1 at 4.

10. JLL's report includes detailed architectural diagrams of site logistics and the planned work. *See., e.g.*, *id.* at 22 (site logistics diagrams); *id* at 27 (proposed work on the Center's roof level), *id.* at 28 (proposed work at the Center's penthouse level); *id.* at 29–30 (work on the Center's terrace level); *id.* at 31 (work in the Center's main performance venues); *id.* at 32–33 (proposed scope of work on the Center's plaza); *id.* at 34–36 (planned work in the parking garages); *id.* at 37–40 (contemplated work on the Center's façade).

11. For each project line item contemplated under the renovation—including items as diverse as elevator modernization, *see id.* at 41–42; escalator capital repair, *see id.* at 42–44; fire protection system upgrades, *see id.* at 45–46; hazardous materials abatement, *see id.* at 46; employee office renovations, *see id.* at 67–71; and the Opera House restoration, *see id.* at 76–79—the report also details the scope of work to be performed, *see id.* at 41–87.

12. JLL's report includes assessments of the renovation's budget and delivery strategy, project risks, risk-mitigation strategy, quality assurance and control, worker safety, and communications strategy. *See id.* at 88–100.

13. JLL's report includes project timelines, *see id.* at 102–14, and a breakdown of budget allocations for each individual line item, *see id.* at 115–63.

14. JLL's topline recommendation was that the Center "requires a comprehensive renovation project to address critical structural deficiencies, replace aging building systems that have reached the end of their operational life, and restore interiors that should represent the venue's

cultural significance." ECF No. 65-1 at 2. It further concluded that the "scale of necessary work—including structural repairs, complete mechanical system replacement, life safety upgrades, and envelope and facade preservation—cannot be executed safely or cost-effectively while maintaining public operations." *Id.* And, it found, "[a]ttempting phased construction would extend the timeline significantly, increase costs, and compromise both patron experience and contractor safety." *Id.*

15. In response to the Court's preliminary-injunction order, the Center's management retained Darin L. Buchalter of the Delta Consulting Group to provide "expert consultation and analysis" in connection with "alternative approaches for conducting the repair and renovation program" contemplated for the Center. Construction Program Assessment Report ¶ 1, Ex. A.

16. Mr. Buchalter and Delta explain in their report that they prepared their report ("the Delta report") "independent[ly]," with "no prior involvement with the consideration of the Center's plans for repair," and "began with no preconceived notion of the necessity, proper approach for the repair and renovation of the Main Building, or the impact, if any, on mission-based programming." *Id.* ¶ 47.

17. Mr. Buchalter and other employees at his firm who contributed to the Delta report have experience in providing advisory services across multiple industries, including real estate, construction, financial services, and the nonprofit sector. *See* Ex. A ¶¶ 11–22, 29.

18. To develop their report, Mr. Buchalter and his team relied on a wide array of documents provided to Delta by the Center, including the 2021 Comprehensive Building Plan prepared by DLR Group and the 2026 Comprehensive Project Development Plan, discussed above, prepared by JLL. *See id.* ¶ 5.

19. Delta further relied upon other records, including assessments and capital plans for the Center's main building; audited financial statements; Finance Committee materials; financial information provided by the Center's management; programming, operations, facilities, engineering, construction, and institutional information provided by the Center's management; and this Court's preliminary injunction opinion, to develop its recommendation and report. *See id.* ¶ 27.

20. Delta consultants conducted research on pertinent construction matters; toured the Center with onsite operations and project-management personnel; and interviewed the Center's finance, programming, and operations personnel over a period of several weeks. *See id.* ¶ 5.

21. Delta identified two operational models it believes are feasible for the Center to adopt while undertaking the congressionally authorized renovation: either (1) to "Operate & Partially Renovate," which would entail maintaining public access to the main building of the Center, continuing arts programming throughout the Center, and conducting sequential closures of specific spaces in the main building to complete the proposed construction; or (2) to "Partially Close and Renovate," which would entail closing the main building to the public for the duration of the construction while maintaining programming, education, public engagement, and memorial functions at the REACH building and supporting National Symphony Orchestra and other performances at off-campus venues. *Id.* ¶ 3.

22. Based on his firm's analysis, Mr. Buchalter concluded that a closure of the main building of the Center over a two-year period would present significant advantages over the primary alternative. *See id.* ¶¶ 85–86.

23. He concluded that an extended renovation conducted in a partially open building would roughly double the current budget of $257 million and leave "most of the structural work" unfunded." *Id.* ¶¶ 89, 127–37, 142–43.

24. He also concluded that an extended renovation would expand the Center's operating losses by approximately $80 million per year. *See id.* ¶¶ 90, 202–13.

25. Mr. Buchalter concluded that a full closure of the Center would allow for concentrated construction activities, would reduce safety and logistical costs, and would enable the Center to shift programming to off-campus venues, thereby reducing operating costs. *See id.* ¶¶ 92–94.

26. Mr. Buchalter consolidated his conclusions into a slide deck, which he presented to the Board at its August 13 meeting. *See* Delta Construction Program Assessment, ECF No. 65-2; Ex. A ¶ 34; App. H to Ex. A; Sep. 18 Floca Decl. ¶ 4.

27. On August 11, 2026, the Board received a packet of information that included the slide deck presentation that Mr. Buchalter had developed and the entire JLL comprehensive development plan. *See* Sep. 18 Floca Decl. ¶ 4.

28. On August 13, the Board met to discuss those materials. *See id.* ¶¶ 3–4; *see also* Preliminary August 13 Board Minutes at 1, ECF No. 68-3.

29. Mr. Buchalter presented a summary of the report's conclusions to trustees. *See* ECF No. 68-3 at 6–8.

30. The Board discussed the proposed operating models. *See id.* at 8–10.

31. Following discussion, the Board voted over three dissents to adopt Delta's and Mr. Buchalter's recommendation to close the main building of the Center to conduct renovations over a two year period. *See id.* at 10–13.

32. Specifically, the Board resolved that:

WHEREAS, the Board of Trustees has engaged the services of Delta Consulting Group, an internationally recognized leader in project advisory services, risk mitigation, and construction planning and management, to provide an independent and objective analysis of the Center's options to address decades of physical neglect and deferred maintenance;

WHEREAS, the two options for the renovation and restoration presented to the Buildings and Grounds Committee, and then to the full Board, included either a closure of the main building with continued programming in the REACH and offsite or a phased renovation while programming continues throughout the Center;

WHEREAS, Delta Consulting Group conducted a thorough review of the costs and benefits of each option, and reported its findings through an oral presentation[;]

WHEREAS, Delta Consulting Group's findings, reflected in its report and in the Minutes, demonstrate that the risks and costs of a phased renovation and restoration so greatly outweigh any potential benefit that the only viable safe and fiscally prudent course is to shut down the Center's main building entirely during construction;

WHEREAS, Delta Consulting Group's findings will be memorialized for the Board and will be submitted as part of any court record;

WHER[E]AS, the Board has also reviewed the Comprehensive Project Development Plan dated June 8, 2026 and anticipates further updates consistent with it.

WHEREAS, the Board is fully committed to its statutory and fiduciary obligations to maintain the Center as the Nation's Cultural Center, to maintain public access to the Memorial to John F. Kennedy, to maintain the historic and architecturally significant nature of the Center's main building, and to continue to present arts and educational programming during construction; and

WHEREAS, the Board believes that continuing its artistic and educational programming at the Center's performing arts facilities in the REACH, maintaining the memorial to President Kennedy for public access, and through its partnership with the National Symphony Orchestra, supporting those performances offsite, as well as other signature artistic productions offsite including but not limited to the Kennedy Center Honors and the Mark Twain Prize for American Humor, allows the Kennedy Center to perform its statutory mandate while the main building and theaters are closed for renovation;

IT IS HEREBY RESOLVED that the John F. Kennedy Center for the Performing Arts shall continue to present educational and artistic programming at the REACH;

> that the Center shall continue its partnership with and support of the National Symphony Orchestra in performances at off-site venues; that the Center shall continue signature artistic productions offsite including but not limited to the Kennedy Center Honors and the Mark Twain Prize for American Humor; that the Memorial to President John F. Kennedy be temporarily relocated to the REACH where it will remain open to the public; and that, based on technical assessments and expert opinions confirming the necessity of a closure, the main building be closed to the public for restoration and renovation in line with Delta Consulting Group expert opinion as well as the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto.
>
> IT IS FURTHER RESOLVED that the Executive Director and Chief Operating Officer shall undertake all legal means to effectuate the Board's direction in this matter, including by seeking to dissolve the preliminary injunction, entered in *Beatty v. Trump*, No. 25-cv-4480 (D.D.C.), currently preventing closure of the main building of the Kennedy Center for construction.

*Id.* at 10–13.

33. On August 31, the Center's management distributed the finalized Delta Consulting Group report, including its appendices, to trustees. *See* Sep. 18 Floca Decl. ¶ 5.

34. On September 3, an ongoing soffit-panel assessment conducted by Walter P Moore "identified widespread corrosion and deterioration affecting components that support exterior soffit panels around the building perimeter." Materials for Board of Trustees Special Meeting of September 15, 2026, Ex. B at 3; *see also id.* at 30–31.

35. Mr. Floca explained in materials he developed to distribute to the Board that the soffit-panel assessment showed that 46 of the 278 panels exhibited "severe corrosion" and that 93 additional panels "exhibited mild-to-moderate corrosion." *Id.* at 3. Mr. Floca described how Walter P Moore engineers concluded that "one-third of all panels" thus "require immediate replacement" and constitute an "active falling-object and life-safety hazard in areas regularly occupied by the public." *Id.* at 3, 30. Walter P Moore engineers concluded that, "[s]uspended 60 feet about primary public sidewalks and entrance plazas, the continuing degradation of these 2,500-pound assemblies constitutes an active, building-wide falling hazard." *Id.* at 30.

36. On September 4, during a "severe regional storm," a "section of ceiling plaster" measuring roughly four feet by five feet and one inch thick "detached and fell in the Grand Foyer near the Hall of Nations entrance." *Id.* at 3. Mr. Floca concluded that the detachment constituted a "life-safety incident" that required the Center to take "interim measures" to "protect occupants and preserve the facility." *Id.*

37. On September 13, 2026, the Board was provided with the packet of materials developed by Mr. Floca addressing the soffit-panel assessment conducted by Walter P Moore and the September 4 collapse of the portion of ceiling plaster. *See* Sep. 18 Floca Decl. ¶ 6.

38. On September 15, the Board met to discuss the full Delta report and to receive an update from the Center's management on the safety findings described above. *See* Sep. 18 Floca Decl. ¶ 7; *see also* Prelim. Sep. 15 Board Minutes at 4–11, Ex. C. At the meeting, Mr. Floca advised the Board that the plaster that fell on September 4 "was estimated to weigh just over 150 pounds" and that, had the floor below been occupied, "someone would have been seriously hurt or killed." Ex. C at 6. Mr. Floca noted that other locations show similar signs of deterioration and that the "building has many disparate systems" that are "failing." *Id.* Mr. Floca provided an overview of other acute renovation needs for other locations and systems within the Center. *See id.* at 5–7.

39. After discussion, the Board again voted over three dissents to ratify its earlier decision to close the Center temporarily for a two-year renovation. Ex. C at 11–12. Specifically, the Board resolved that:

> WHEREAS, the Board of Trustees has reviewed the full reports of both the Delta Consulting Group and JLL, as well as the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto;

WHEREAS, the Board was able to meet with the principal of the Delta Consulting Group on September 15, 2026, and fully explore the basis for its recommendation that the main building close for renovations;

WHEREAS, the Board has been advised of the Court's rulings in *Beatty v. Trump et al.* and has been guided by the Court's expressed thoughts about its statutory and fiduciary obligations;

WHEREAS, subsequent to the Board meeting on August 13 and the most recent hearing in *Beatty v. Trump et al.*, additional water intrusion and deterioration of the Center's physical plant caused a partial ceiling collapse in the Grand Foyer, releasing debris from a height of approximately 60 feet and endangering visitors and employees alike;

WHEREAS, both Delta Consulting Group and the Center's own Executive Director consider the main building to be unsafe for continued occupancy, and anticipate further risk to the public and employees if the building is not immediately closed and renovations begun;

WHEREAS, the Board, being duly advised, believes that the risk associated with exposing patrons and employees to a hazardous building greatly outweighs any reputational risk associated with closing the main building; and

WHEREAS, the Board, being duly advised, believes that maintaining continued programming in the REACH and offsite, maintaining educational outreach to the community, continuing the Center's support for the National Symphony Orchestra, and continuing the Center's long-standing tradition of presenting the Kennedy Center Honors and Mark Twain Prize, even though offsite, will ensure sufficient continuing engagement with the artistic community, the donor base, and patrons, that a two-year closure of the main building will not unduly affect its ability to ramp up programming in a revitalized main building in 2028;

IT IS HEREBY RESOLVED, in addition to the resolution passed by the Board on August 13, 2026, that the main building of the John F. Kennedy Center for the Performing Arts shall be closed to patrons forthwith; that the Center shall continue to present educational and artistic programming at the REACH; that the Center shall continue its partnership with and support of the National Symphony Orchestra in performances at off-site venues; that the Center shall continue signature artistic productions offsite including but not limited to the Kennedy Center Honors and the Mark Twain Prize for American Humor; that the Memorial to President John F. Kennedy be temporarily relocated to the REACH where it will remain open to the public; and that immediate repair and restoration work be commenced in accordance with the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto.

Dated: September 18, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRANTLEY MAYERS
Counsel to the Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

CHRISTOPHER M. LYNCH
Chief Litigation Counsel

*/s/ William S. Jankowski*

WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
(202) 353-7578
william.s.jankowski@usdoj.gov

*Counsel for Defendants*