**APPENDIX L**

Memorandum Opinion

United States District Court for the District of Columbia

May 29, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOYCE BEATTY,**<br><br>Plaintiff,<br><br>v.<br><br>**DONALD J. TRUMP** *et al.*,<br><br>Defendants. | Case No. 25-cv-4480 (CRC) |

**TABLE OF CONTENTS**


I. Background ............ 4
- A. Institutional Background ............ 4
- B. Statutory Background ............ 6
- C. Factual Background ............ 8
  - 1. May 2025 Bylaw Amendment ............ 9
  - 2. Renaming ............ 9
  - 3. Closure ............ 11
- D. Procedural History ............ 22

II. Legal Standards ............ 23
- A. Summary Judgment ............ 23
- B. Preliminary Injunction ............ 24

III. Analysis ............ 25
- A. Renaming ............ 30
  - 1. Article III Standing ............ 30
  - 2. Section 76*l*(b) Renaming Claim ............ 44
  - 3. *Ultra Vires* Claim ............ 53
  - 4. Remedy ............ 55
- B. Voting ............ 57
  - 1. Article III Standing ............ 58
  - 2. Section 76*l*(b) Voting Claim ............ 58
  - 3. Remedy ............ 64
- C. Closure ............ 65
  - 1. Likelihood of Success on the Merits ............ 65
  - 2. Irreparable Harm ............ 83
  - 3. Balance of Equities/Public Interest ............ 86
  - 4. Preliminary Relief ............ 87

IV. Conclusion ............ 90

# MEMORANDUM OPINION

In November 1962, President John F. Kennedy and First Lady Jacqueline Kennedy presided over "An American Pageant of the Arts," a televised fundraiser for what was then known as the National Cultural Center. The event boasted an impressive slate of performers, including poet Robert Frost, singer Harry Belafonte, and a seven-year-old cellist by the name of Yo-Yo Ma, among other famed (or soon-to-be-famous) artists. Addressing the gathering, President Kennedy expounded:

> [A]rt knows no national boundaries. Genius can speak in any tongue, and the entire world will hear it and listen. Behind the storm of daily conflict and crisis, the dramatic confrontations, the tumult of political struggle, the poet, the artist, the musician continues the quiet work of centuries, building bridges and experience between peoples, reminding man of the universality of his feelings and desires and despairs, and reminding him that the forces that unite are deeper than those that divide . . . I am certain that after the dust of centuries has passed over our cities, we, too, will be remembered, not for victories or defeats in battle or in politics but for our contribution to the human spirit.[1]

Congress chose to honor President Kennedy's commitment to the arts—reflected in his lyrical remarks at the American Pageant—following his assassination a year later. It enacted legislation that formally designated the National Cultural Center as the "John F. Kennedy Center for the Performing Arts." Congress made clear that the Kennedy Center would serve as both the nation's premier performing arts center and a living memorial, the sole one dedicated to the late President in the Washington, D.C. area. The Center has played those roles for over five decades.

Early last year, however, rumblings of change reverberated through the Kennedy Center. In February 2025, President Donald Trump replaced several trustees on the Center's Board of

---

[1] See The Trump Kennedy Center, Creating the National Cultural Center, https://www.kennedy-center.org/memorial/jfk/highlights/national-cultural-center/ (last visited May 7, 2026); The Trump Kennedy Center, An American Pageant of the Arts, at 6:10–7:45 (YouTube, May 29, 2020), https://www.youtube.com/watch?v=pCIg6fTPA5U&t=51s [https://perma.cc/PHZ9-9LGE].

Trustees and appointed himself as a trustee, too. The newly-reconstituted Board then elected him chair and, under his direction, replaced the Center's president. In May, the Board amended the governing bylaws, stripping *ex officio* trustees of their right to vote on board matters. In December, the Board decided to rename the institution the "Trump Kennedy Center," and new lettering was affixed to the Center's front portico the next day. On February 1 of this year, with no advance warning, President Trump announced that the Kennedy Center would close for two years pending "Construction, Revitalization, and Complete Rebuilding." The Board voted to approve the closure six weeks later.

Ohio Congresswoman Joyce Beatty, an *ex officio* member of the Kennedy Center Board of Trustees, has sued to block several of these Board actions. Relevant here, she has moved for partial summary judgment on the name change and for a preliminary injunction ("PI") to halt the imminent closure. The Defendants—who include the Kennedy Center, the Board, President Trump in his capacity as a trustee, and scores of its general and *ex officio* trustees—oppose Beatty's motion for preliminary relief and have cross-moved for summary judgment on her claims for relief.

Having considered the parties' briefs and the factual record before it, the Court reaches several distinct conclusions.

First, Representative Beatty is entitled to summary judgment on the renaming issue. The Kennedy Center's organic statute makes crystal clear that the Center is to be named for President Kennedy, and it cannot bear any other formal name or public memorial based on the Board's unilateral say-so. Congress gave the Kennedy Center its name, and only Congress can change it.

Next, Beatty is entitled to summary judgment on the voting rights issue. The Center's organic statute makes no distinction between the powers of general and *ex officio* trustees.

Nothing in the statute permits the Board to discriminate categorically between the two as to fundamental trustee rights. And stripping *ex officio* trustees of their voting rights runs afoul of common-law trust principles incorporated into the statute, principles which presumptively place trustees on equal footing when it comes to participating in the trust's administration.

Finally, Beatty is likely to succeed on her claim that the Board violated its fiduciary duty in voting to close the Kennedy Center, "one of the more consequential decisions in the institution's lifespan." Beatty v. Trump, No. 25-cv-4480 (CRC), 2026 WL 712814, at *10 (D.D.C. Mar. 14, 2026). The Center's organic statute vests the Board with several overarching responsibilities. It must maintain the Center in good working order. It must also operate the Center as a performing arts venue and as a memorial to President Kennedy. As stewards of property held in trust for the American people, Board members must go about fulfilling these duties consistent with common-law standards of prudence. The preliminary factual record before the Court reveals that, in ratifying President Trump's closure announcement, the Board was derelict in discharging the full range of its responsibilities to the Center. More specifically, the Board based its decision on an insufficient, one-sided presentation of information and neglected to consider the full range of its statutory obligations and potential adverse consequences of closure on programming and memorial functions. The deficiencies in the Board's decision-making thus "fall[] below even a forgiving standard of prudence." Id. at *10.

Because Congresswoman Beatty has identified several irreparable harms that will flow from a two-year closure, and those harms outweigh any countervailing prejudice to the Defendants or the public, the Court will preliminarily enjoin the Defendants from effectuating the closure decision made at the March 16 Board meeting. However, the preliminary injunction will not prevent the Center from moving forward with the capital repair work it has planned,

which the record demonstrates is sorely needed. Nor will it categorically prohibit the Board from closing the Center should it come to this decision anew after independently balancing its multiple obligations to the Center in a prudent fashion.

## I. Background

### A. Institutional Background

The John F. Kennedy Center for the Performing Arts is a multifaceted institution. It is both the nation's preeminent performing arts venue and a memorial to President Kennedy. It is a trust instrumentality of the United States that not only plans artistic programming, but also formulates arts-related policy and engages in community outreach. Physically, the Center is more than just a grand marble building overlooking the Potomac River. In addition to its famed theaters, concert halls, and Grand Foyer, the Center occupies a campus of seventeen acres, replete with a presidential grove, several smaller theaters and performance spaces, plazas and pavilions, offices, commemorative exhibits, classrooms, restaurants, and shops. See generally The Trump Kennedy Center, Explore Our Spaces, https://www.kennedy-center.org/visit/exploring-our-spaces/ (last visited May 6, 2026).

As the Court explained in its earlier ruling on Congresswoman Beatty's request for a temporary restraining order ("TRO"), "[t]he notion of a national cultural center in Washington, D.C. dates back to the mid-1950s when President Eisenhower formed a commission to consider creating a public auditorium in the country's capital." Beatty, 2026 WL 712814, at *1. "Both the idea—and the necessary fundraising—stalled for a few years, until President Kennedy resuscitated the effort in the early 1960s." Id. Then, after Kennedy's assassination, "Congress enacted a statute authorizing the federal government to provide millions of dollars to match private donations to the new institution," which would be named for and in honor of the late

president. Id. Congress originally conceptualized the Center as a "bureau" in the Smithsonian Institution, see National Cultural Center Act, Pub. L. No. 85-874, § 2(a), 72 Stat. 1698, 1698 (1958), and it continues to operate as such today, see 20 U.S.C. § 76h(a)(1).

Designed by architect Edward Durell Stone, the Kennedy Center opened for its first performance in 1971. See PI Mot., ECF No. 13-4, Ex. B ("Board of Trustees Handbook") at 10. In its early years of life, the Center was jointly administered by its Board of Trustees, which was responsible for artistic activities, and the National Park Service ("NPS"), which kept up the facilities and grounds. See, e.g., U.S. Gov't Accountability Off., GAO-03-823, Kennedy Center: Improvements Needed to Strengthen the Management and Oversight of the Construction Process 4 (Sep. 2003), https://www.gao.gov/assets/gao-03-823.pdf [https://perma.cc/2W7S-Q7UF]. But over time, that bifurcated arrangement proved difficult. As a result, in 1994, Congress passed the John F. Kennedy Center Act Amendments, which consolidated arts programming, presidential memorial activities, and overall facilities management in the hands of the Kennedy Center Board. See id.; see also The Kennedy Center, Fiscal Year 2026 Congressional Budget Justification, at 6-3 https://www.kennedy-center.org/globalassets/our-story/mission/kennedy-center-fy26-budget-justification-to-congress.pdf [https://perma.cc/94QC-29JC].[2]

Today, the Center "is one of the few performing arts centers in the world to house every major artform under one roof." Board of Trustees Handbook at 14. Until recently, it had artistic affiliations with both the Washington National Opera and the National Symphony Orchestra, and it still oversees "[m]arquee" awards programming like the Kennedy Center Honors and the Mark Twain Prize for American Humor. Id. at 15–16. "Mandated by Congress to serve as a leader for

[2] The Court takes judicial notice of this official document, which is cited in one of Representative Beatty's supporting declarations. See PI Mot., ECF No. 13-20 ¶ 16.

arts education," the Center additionally offers arts programming for students and educators, school districts, online users, and young artists. Id. at 17–18.

B. Statutory Background

The Kennedy Center is, at base, a creature of statute. As noted, Congress organized the Center as a "bureau" within the Smithsonian Institution, directed by a Board of Trustees "whose duty it shall be to maintain and administer" the Center and "site thereof as . . . a living memorial to John Fitzgerald Kennedy, and to execute such other functions as are vested" in it. 20 U.S.C. § 76h(a)(1). The Board is composed of *ex officio* members who occupy positions in federal and D.C. government, as well as general trustees who are appointed by the President to serve six-year terms. Id. § 76h(a)(2), (b). Aside from their mode of appointment and term lengths, the statute does not distinguish between these two types of Board members in any way.

Congress has assigned the Board several duties. One set might be termed its programming obligations. The Board "shall . . . present" a variety of performing arts from the United States and other countries; serve as a leader in developing national performing arts education, policy, and programming; and offer "facilities for other civic activities[.]" Id. § 76j(a)(1)(A)–(D). Another set might be regarded as the Board's memorial obligations. The Board "shall . . . provide within the [Kennedy Center] a suitable memorial in honor of the late President," id. § 76j(a)(1)(E), and must also maintain the Hall of Nations, Hall of States, and Grand Foyer "in a manner that is suitable to a national performing arts center that is operated as a Presidential memorial and in a manner consistent with other national Presidential memorials," id. § 76j(a)(2)(E). Finally, the Board has general maintenance obligations. "[W]ith respect to the building and site" of the Center, the Board "shall . . . plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary to

maintain the functionality of the building and site at current standards of life, safety, security and accessibility." Id. § 76j(a)(1)(G). And it must provide "all necessary maintenance, repair, and alteration of, and all janitorial, security, and other services and equipment necessary for the operations of, the building and site, in a manner consistent with requirements for high quality operations." Id. § 76j(a)(1)(H)(ii).

To satisfy these tripartite statutory obligations, Congress has empowered the Board to do the kinds of things boards typically do: negotiate contracts, prepare budgets, employ personnel, solicit and accept gifts, transfer property, bargain with employees, procure insurance, and issue annual reports. Id. §§ 76j(a)(2)(A)–(D); 76k(a)–(d), (f); 76*l*(c), (e). The statute further provides that the Board "shall have all the usual powers and obligations of a trustee in respect of all trust funds administered by it." Id. § 76*l*(b). Moreover, the Board is "authorized . . . to make such bylaws, rules, and regulations, as it deems necessary for the administration of its functions . . . including, among other matters, bylaws, rules, and regulations relating to the administration of its trust funds and [its own] organization and procedure[.]" Id. § 76*l*(a).

Congress has also imposed some guardrails on the Board's conduct. In a nod to the Center's prior institutional arrangement with NPS, "[n]o change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior." Id. § 76j(a)(2)(F). In addition, "actions of the Board relating to performing arts and to payments made or directed to be made by the Board from any trust funds shall not be subject to review by any officer or agency other than a court of law." Id. § 76k(e). Furthermore, although the Board may "function notwithstanding vacancies," "twelve members of the Board shall constitute a quorum for the transaction of business." Id. § 76*l*(a). In other words, the Board needs at least a quorum to conduct its core "business."

A few final points underscore the Center's role not just as a national institution for the performing arts, but as a presidential memorial. Both the building and the institution are "designated" as the "John F. Kennedy Center for the Performing Arts." See id. §§ 76h(a)(1), 76i(a). Congress commanded that the Center be "the sole national memorial" to President Kennedy "within the city of Washington and its environs," id. § 76q, and that it be a "living" memorial, id. § 76h(a)(1). With a handful of exceptions not relevant here, see id. § 76j(b)(2), "no additional memorials or plaques in the nature of memorials shall be designated or installed in the public areas" of the Center. Id. § 76j(b)(1).

C. Factual Background

Joyce Beatty is a member of the House of Representatives from Ohio's third congressional district, encompassing part of Columbus and its northeastern suburbs. First Am. Complaint, ECF No. 12 ("FAC") ¶ 13. By virtue of that position, Representative Beatty serves as an *ex officio* trustee on the Kennedy Center Board. Id. According to Beatty, prior to 2025, "the Board of Trustees conducted its affairs in a manner consistent with the Kennedy Center's statutory mission: to maintain and administer the Center as a living memorial to President John F. Kennedy and as a premier performing arts institution for all Americans." See PI Mot., ECF No. 13-2 ("Beatty Decl.") ¶ 3.

In Beatty's telling, things changed in 2025. In February of that year, President Trump fired the Board's longtime chair and replaced several of its general trustees. Id. ¶ 4. He also appointed himself as a general trustee, and the Board promptly elected him as its new chair. Id. ¶ 5. Under President Trump's direction, the Board sacked the Center's president and replaced her with Richard Grenell. Id. Matthew Floca, who joined the Kennedy Center in 2024 as a facilities-focused vice president, recently replaced Mr. Grenell as Executive Director and Chief

Operating Officer of the Center, making him the institution's seniormost employee. See Pl.'s Resp. to Defs.' Stmt. of Facts ("Pl.'s Resp. to SMF"), ECF No. 38-1 ¶¶ 18–19.

*1. May 2025 Bylaw Amendment*

Following this initial upheaval, the reconstituted Board convened in May 2025. It voted to amend the Center's bylaws, rendering *ex officio* trustees "non-voting members" of the body and general trustees "voting members." Beatty Decl. ¶ 8. The parties disagree whether this bylaw amendment reaffirmed or departed from the Board's prior practice. Compare Beatty Decl. ¶ 6 and Pl.'s Reply in Supp. of TRO Mot., ECF No. 20-3 ¶¶ 4–6 (declaration averring that *ex officio* and general trustees have shared the same voting rights in the past), with Opp. to TRO Mot., ECF No. 19-2 ¶ 2 (declaration averring that *ex officio* members have not counted toward a voting quorum in the past). In recently-filed tax forms, the Center indicated that it has 59 "voting" members and noted no "material differences in voting rights" between board members. See Not. of Suppl. Auth., ECF No. 22-1, at 6, 47–48.

*2. Renaming*

Whatever the Board's past practice, Congresswoman Beatty was not permitted to vote after the bylaw amendment was adopted. On December 18, 2025, she logged on to a remote Board meeting convened at the residence of Defendant and general trustee Andrea Wynn. Beatty Decl. ¶¶ 9–10; Defs.' Resp. to Pl.'s Stmt. of Mat. Facts, ECF No. 33-1 ("Defs.' Resp. to SMF") ¶ 10. To Beatty's purported surprise, it was announced at the end of the meeting that the Board would vote on whether to add Trump's name to the Kennedy Center title. Beatty Decl. ¶ 11. Renaming was not on the agenda for that meeting. Defs.' Resp. to SMF ¶ 11. Beatty tried to voice her opposition to the proposal, but found herself involuntarily muted. Beatty Decl. ¶ 12. It is undisputed that "[n]o discussion" took place "about the potential risks or consequences of

the renaming." Defs.' Resp. to SMF ¶ 16. Nor is there any indication in the available record that the Center's counsel advised the Board on the statutory implications of the renaming. The Board voted and declared the result "unanimous." Beatty Decl. ¶ 13. The Center would be renamed.

The next day, President Trump's name was affixed on the Center's front portico above President Kennedy's. Defs.' Resp. to SMF ¶ 19. The parties agree that "[g]iven the speed with which the signage was installed," it was "prepared and/or purchased prior to the Board's vote the day before." Id. ¶ 20. They also agree that the website was promptly updated to refer to the institution as the "Trump Kennedy Center," and that promotional materials and subscriber communications were sent out under that tag, as well. Id. ¶¶ 22, 23. On March 3 of this year, the Kennedy Center filed for a trademark with the U.S. Patent and Trademark Office, which shows the name "The Trump Kennedy Center" under a rendering of the main building. Id. ¶ 25.

Ticket sales at the Center had already slowed over the course of 2025, according to media reports. See, e.g., PI Mot., ECF No. 13-9, Ex. B (Washington Post report on declining ticket sales). But in the immediate wake of the renaming, numerous additional artists canceled performances. Defs.' Resp. to SMF ¶ 34; see also Am. Amicus Br., ECF No. 35-1, at 15–16. At the beginning of this year, the Washington National Opera, "the Kennedy Center's resident company since 1971," announced that it would part ways with the Center and find a new home. Defs.' Resp. to SMF ¶ 35. And "[a]n analysis of ticket sales reported by the Wall Street Journal showed a 70% drop in a week's worth of 2026 sales compared to the three prior years." Id. ¶ 36.

On December 22, 2025, Beatty filed this lawsuit, challenging the name change as unlawful under 28 U.S.C. § 76*l* and the common law of trusts and as *ultra vires*.

*3. Closure*

Fast forward to the more recent present. On February 1, 2026, President Trump took to Truth Social to announce that the Kennedy Center would close for two years, starting in July:

> After a one year review of The Trump Kennedy Center, that has taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants, deciding between either Construction with Closure and Re-Opening or, Partial Construction while continuing Entertainment Operations through a much longer period of time . . . I have determined that The Trump Kennedy Center, if temporarily closed for Construction, Revitalization, and Complete Rebuilding, can be, without question, the finest Performing Arts Facility of its kind, anywhere in the World. . . .
>
> Based on these findings, and totally subject to Board approval, I have determined that the fastest way to bring The Trump Kennedy Center to the highest level of Success, Beauty, and Grandeur, is to cease Entertainment Operations for an approximately two year period of time . . .
>
> Therefore, The Trump Kennedy Center will close on July 4th, 2026, in honor of the 250th Anniversary of our Country, whereupon we will simultaneously begin Construction of the new and spectacular Entertainment Complex. Financing is completed, and fully in place! This important decision, based on input from many Highly Respected Experts, will take a tired, broken, and dilapidated Center . . . and turn it into a World Class Bastion of Arts, Music, and Entertainment, far better than it has ever been before. America will be very proud of its new and beautiful Landmark for many generations to come. Thank you for your attention to this matter!

PI Mot., ECF No. 13-12, Ex. E ("Truth Social Post") at 2–3.

Beatty again reports being taken aback. She was "aware that the Board had previously discussed plans for various capital improvements to the Center—including improvements funded by Congress's recent $257 million appropriation, which the Board was informed were already underway—but to [her] knowledge the Board had never discussed" an extended closure. Beatty Decl. ¶ 18. With the benefit of additional record evidence submitted by both sides, the story of the Kennedy Center's abrupt closure comes into slightly clearer focus.

a. <u>The Need for Capital Repairs at the Kennedy Center</u>

For years, the Kennedy Center Board has understood that the facilities are in need of some major capital repairs. In 2021 and 2022, the Board issued successive Comprehensive Building Plans ("CBPs"), which followed "a complete survey of the facility and its systems" by "outside consultants." <u>See</u> Pl.'s Suppl. Br. in Support of PI Mot. ("Pl.'s First Suppl. Br."), ECF No. 29-15, Ex. X ("2022 CBP") at 8.[3] The CBPs outlined the need for fire alarm system replacement, overhang roof work, and waterproofing, and also indicated that certain piping, chillers, and boilers were approaching or had reached the end of their engineered service lives. <u>See, e.g.</u>, 2022 CBP at 39, 79, 88–90, 94; <u>see also</u> Pl.'s First Suppl. Br., ECF No. 29-3, Ex. L ("Second Floca Decl.") ¶ 9. External consultant reports from 2022 (concerning a displaced soffit panel) and 2024 (concerning water intrusion at exterior column bases and main electrical vaults) further substantiated the need for repair work. Second Floca Decl. ¶ 9; <u>see also</u> Pl.'s First Suppl. Br., ECF No. 29-17, Ex. Z ("2022 Soffit Report"); ECF No. 29-18, Ex. AA ("2024 Leak Investigation Report Part 1"); ECF No. 29-19, Ex. BB ("2024 Leak Investigation Report Part 2"); ECF No. 29-20, Ex. CC ("2024 Leak Investigation Report Part 3").

The Center has not developed a new CBP since 2021. <u>See</u> <u>DC Preservation League v. Board of Trustees of the John F. Kennedy Center for the Performing Arts</u>, No. 26-cv-981 (CRC), Prelim. Inj. Hr'g Tr., ECF No. 39, at 35:23–36:7 ("<u>DCPL</u> Hr'g Tr.").[4] And it is not clear from

[3] The survey was part of an ongoing program since the early 1990s to "safeguard against a recurrence of the severe deterioration" that occurred in the campus's "first 24 years," during which time building conditions were apparently "not evaluated" and "deficiencies were not addressed in a coordinated manner." 2022 CBP at 8. Congress formalized the Board's duty to regularly update the CBP in 1994. <u>See</u> 20 U.S.C. § 76j(a)(1)(F).

[4] The Court may take judicial notice of evidence adduced in <u>DCPL</u> that is "not subject to reasonable dispute," as the two cases are closely related, and the parties have cross-cited liberally due to the overlap between them. <u>See</u> <u>Fain v. Islamic Republic of Iran</u>, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (citing Fed. R. Evid. 201(b)). In addition, the Defendants made the <u>DCPL</u> PI

the record how many of the recommended projects from 2021 to 2024, if any, have been started or completed, given the years that have elapsed since the reports were generated.

Although the CBPs and external reports recommended an assortment of renovation projects, none called for the complete closure of the Center in order to accomplish the repairs. See, e.g., 2022 CBP at 130 ("In formulating this plan, projects were prioritized in terms of need. Projects have been scheduled in such a way as to keep the facility operating to the maximum extent, with efforts phased over the multi-year period."); 2024 Leak Investigation Report Part 1 at 82 (explaining that the next steps in addressing waterproofing and leak issues would be to consider "phasing, impacts to Kennedy Center operations, costs, and relative urgency classifications"). Indeed, according to Mr. Floca's recent testimony, the CBPs contemplated that any necessary renovations would be done while the building remained open. In his words, "[t]he schedules in the [CBPs] ha[d] always been phased." DCPL Hr'g Tr. at 89:8–9.

b. The Big Beautiful Bill Appropriation

In July 2025, Congress passed the One Big Beautiful Bill Act ("OBBBA"). The statute appropriated, through September 30, 2029, roughly $257 million "for necessary expenses for capital repair, restoration, maintenance backlog, and security structures of the building and site of the John F. Kennedy Center for the Performing Arts." See OBBBA, Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025). Though Congress's cash infusion would accelerate repairs, there was still no suggestion that the Center might need to shut down fully during renovations.

To the contrary, the Kennedy Center's annual budget justification submission for fiscal year 2026 represented that "as major capital projects necessitate disruptions in date availability

---

hearing transcript a formal part of the record in this case by filing it with their post-hearing supplemental brief. See generally Defs.' Suppl. Br., ECF No. 45-1, Ex. A (DCPL Hr'g Tr.).

Case 1:25-cv-04480-CRC Document 89-6 Filed 05/19/26 Page 16 of 224

in certain theaters, these disruptions need to be carefully planned and coordinated to not materially affect important programming initiatives." The Kennedy Center, Fiscal Year 2026 Congressional Budget Justification, at 6-3. And in then-President Grenell's opening remarks at a September 2025 Board meeting, he looked forward to future performances and other events, describing his "excitement about ticket sales and noting that the Center ha[d] raised the ticket prices for Honors, because the demand was so high," and "[t]ickets [were] selling out." Pl.'s First Suppl. Br., ECF No. 29-22, Ex. DD ("September 2025 Board Meeting Minutes") at 4. Grenell added that "America 250 [was] coming up" and promised that "the Center [would] be one of the premiere spots" for celebrating the occasion. Id.

Serving in his facilities role, Mr. Floca also took the floor at the September Board meeting. He "presented a slide show" that addressed how the OBBBA appropriation would be allotted. Id. Floca would aim to "reduc[e] maintenance backlog (electrical system and plumbing systems)," "improv[e] security systems," and engage in some "marble and granite restoration and structural repair." Id. More specifically, he explained that the "building has had some problems for some time," citing the water intrusion; the need to restore seats, paint, and carpeting in various theater spaces; and the required infrastructure projects, which included HVAC, central plant, and plumbing upgrades. Id. at 4–5. Floca closed by "stat[ing] that they are moving quickly on everything." Id. at 5.

At the September 2025 Board meeting, then, there was no hint that the Center might close pending OBBBA-funded renovations. Floca admits that he "tr[ied] for a long time to phase th[e]" work and to "look at exactly how" various spaces on the campus could remain open while addressing necessary repairs. DCPL Hr'g Tr. at 99:1–6. And there is likewise no suggestion that the December 2025 Board meeting involved any discussion of a wholesale shuttering,

despite the fact that some capital repair work had already begun. See Pl.'s First Suppl. Br., ECF No. 29-23, Ex. EE (December 2025 Board meeting agenda) at 2 (noting that Floca would provide a report on the "Kennedy Center Renovation"); see also Beatty Decl. ¶ 18 ("I am aware that the Board had previously discussed plans for various capital improvements to the Center . . . but to my knowledge the Board had never discussed, deliberated upon, or voted to approve a closure of the Center for an extended period[.]").

c. The Closure Recommendation

The record indicates that the Board learned of the plan to close the Kennedy Center at the same time the public did: on February 1, when President Trump announced it on Truth Social. Beatty Decl. ¶ 20. Though the President trumpeted a "one year review . . . that ha[d] taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants, deciding between either Construction with Closure and Re-Opening or, Partial Construction while continuing Entertainment Operations through a much longer period of time," Truth Social Post at 2, the evidence of any such review is nil.

Instead, the idea of full closure apparently came from Mr. Floca, who at some point changed his mind about the propriety and feasibility of carrying out the Center's needed repairs while it remained open to the public. Floca testified that he came to that conclusion "[p]robably four months" before the Truth Social post, DCPL Hr'g Tr. at 80:17, after having "engaged" in a "review of the Center's infrastructure needs" since his arrival at the Center in 2024, Second Floca Decl. ¶ 6. No evidence in the record substantiates that timing.

In Floca's words, he realized that closure was necessary after "an extensive analysis of expert evidence and internal operational data," including the 2021 and 2022 CBPs, the external consultant reports from 2022 and 2024, and consultation with certain members of the Center's

operations, facilities, and contracting staff. Id. ¶¶ 7, 9, 11.[5] He acknowledges that there were "no other reports sourced from experts or advisors during the period from February 1, 2025 to February 1, 2026," coinciding with President Trump's purported "one year review," and "to the best of [his] knowledge, no other experts or advisors who provided input on [his] review of the Center's infrastructure needs" during the same period. Id. ¶¶ 6, 10, 12. Floca says he "analyze[d] . . . different options" with a "team," "constantly . . . trying to figure out contracting mechanisms and solutions to partially operat[e] the building," but ultimately concluded that it would be "irresponsible to do anything other than holistic fixes." DCPL Hr'g Tr. at 99:8–14. There are no reports or other evidence in the record apart from Floca's own testimony to confirm the details of his "extensive analysis."

In late January, Mr. Floca recounts speaking with President Trump several times and suggesting to the Chairman that "a singular, concentrated 24-month closure [would be] the most cost-effective and efficient path for addressing the Center's acute infrastructure needs," tackling "the facility's critical infrastructure failures while eliminating the hidden costs and safety risks inherent in a multi-year, phased renovation." Second Floca Decl. ¶ 7. In Floca's view, "there [were] very clear efficiencies, both from a cost standpoint and a schedule standpoint, to not have to work around thousands of patrons moving throughout the campus." DCPL Hr'g Tr. at 73:3–6; see also id. at 74:6–10 ("There are clear efficiencies, cost efficiencies in doing the work in an unoccupied building. Just looking at the labor itself, working second shifts overnight, that's a 20- to 25-percent increase in just the labor costs. So there's clear efficiencies."). Floca admits that his analysis was based on cost schedules from a years-old set of CBPs; in his estimation,

---

[5] Floca attests that he consulted "Stagehand Daniel Yannantuono." Second Floca Decl. ¶ 11. Mr. Yannantuono appears to be the only arts-oriented Kennedy Center staff member consulted about the closure. Id.

there was "no need to" commission studies to compare the cost of phased versus full-closure construction. DCPL Hr'g Tr. at 89:14–90:5.

Ultimately, Floca's analysis was focused on closure "for the needs of the building." Id. at 91:5–6. He conceded—when pressed—that doing the renovations with the Center open was possible, though, in his view, "irresponsible." Id. at 91:8–17.[6] He also acknowledged that he made no effort to quantify the costs of closure in terms of lost revenue or goodwill, see id. at 93:25–94:9, nor did he have any "information" related to those costs "in front of" him while developing his recommendation, id. at 94:23–24. Though Floca insisted that he was "not oblivious to what's happening on the programming side" and did not "make the [closure] decision in a vacuum," he conceptualized the Center's programming and facilities needs as entirely separate, with the former "not a factor in deciding . . . what we need to do" on the latter. Id. at 95:3–4, 5–7, 19–20, 23–24. He added that "[t]here's always been one team trying to shut the building down and one team trying to keep it open[.]" Id. at 100:5–7. The two had been at "odds" for decades. Id. Presented with a "unique" opportunity given the lapse in programming, the OBBBA appropriation, and "a leadership team that [would] prioritize" the renovation, Floca considered the next two years a "perfect time to do this work." Id. at 75:10–17.

d. Operationalizing the Closure Decision

Once President Trump took to Truth Social on February 1 to announce the Kennedy Center's closure, plans for the shutdown began to take shape.

[6] Beatty has submitted a declaration by a licensed architect confirming that "the work identified in the 2021, 2022, and 2024 assessment documents can be performed while maintaining operations in the [] Center through phased sequencing of the work," and that a "complete two-year closure . . . is not required to accomplish the deferred maintenance[.]" Pl.'s First Suppl. Br., ECF No. 29-24 ¶ 4.

Roughly two weeks after the social media post, Mr. Floca developed a set of talking points to support the closure proposal. See Second Floca Decl. ¶ 8; Pl.'s First Suppl. Br., ECF No. 29-4, Ex. M ("Floca Talking Points"). "The Trump Kennedy Center should implement a full facility closure to execute the required mechanical overhauls and the invasive nature of the needed structural repairs," his notes read. Floca Talking Points at 2. "Framing the project as a singular, concentrated event, rather than a multi-year series of patchwork repairs, is the most efficient and cost-effective path forward." Id. The talking points elaborated that, "[w]hile a phased approach may be considered," several "critical issues suggest[ed] that an occupied renovation would be unsafe and logistically impractical": work on the structural steel and concrete deck defects would render the "primary public access points unusable"; performing the electrical vault waterproofing and parking garage fireproofing would create "significant liability and safety concerns"; operating the building during the requisite mechanical and electrical shutdowns would not be "feasible"; and "[b]y opting for a full closure, teams avoid the hidden costs of phased construction, such as temporary life-safety systems, after-hours labor premiums, and the constant disruption of the patron experience." Id.

By mid-February, a high-level budget had been prepared, outlining several generic categories of work slated for the two-year closure (*i.e.*, "Shell & Site Infrastructure," "Public & Support Spaces," "Performance Venue Revitalization," and "Safety & Building Systems"). Pl.'s First Suppl. Br., ECF No. 29-11, Ex. T (project budget document) at 2. The budget alludes to various discrete projects within those categories, such as "Rock Creek Parkway Stabilization," "Front of House Renewal," "Sanitary & Domestic Piping" improvements, and "Electrical System Upgrades." Id. at 3, 6, 10. But it includes no additional information about these sub-

projects, and Mr. Floca has since testified that there is no "one deliverable" that outlines the entirety of the work planned for the Kennedy Center. DCPL Hr'g Tr. at 83:18–19.

Nevertheless, by March 2, Floca was ready to present his recommendation to the Board's Building and Grounds Committee. See Pl.'s First Suppl. Br., ECF No. 29-7, Ex. P ("Building and Grounds Committee Meeting Minutes"). Four committee members were present, along with Floca and two staff members. Id. at 2. The meeting minutes reflect that "[m]anagement presented the rationale for a full main-building closure rather than a phased approach," the latter of which "would take longer, cost more, and create operational inefficiencies." Id. at 3. The minutes continue, "Major infrastructure needs include HVAC and chilled water systems, electrical infrastructure, structural and concrete deficiencies, service tunnel conditions, waterproofing, roof and steel degradation, and life-safety systems." Id. Under the topic "continuity of mission during closure," Floca advised the Committee that "portions of" the Center's expansion campus, known as the REACH, "*may* remain active," "the Skylight Pavilion *may* be used to maintain the memorial experience, and campus grounds *may* remain accessible when construction permits." Id. (cleaned up) (emphasis added). Some rehearsal studios might remain open. And "[e]xternal venue options, including Strathmore and Wolf Trap, remain under review." Id. Floca said that 75 to 175 of roughly 300 employees at the Center would be affected by the closure. Id. Regarding "next steps," proposals for the project apparently had already "been received," with "mobilization by July 6 . . . essential." Id. (cleaned up). The motivation to shutter the Center by that particular date is not clear, aside from the fact that President Trump had already announced that closure would take place around Independence Day. There was no discussion of how the closure might implicate the Board's other trust obligations.

On March 16, 2026, the Board met to vote on the closure proposal. See Defs.' Cross-Mot. for Summ. J. ("Defs.' Cross-Mot."), ECF No. 34-5 ("Mar. 16 Board Meeting Minutes"), at 3–11. Based on the record before the Court, the trustees not on the Building and Grounds Committee had received no plans or details about the closure—at least until, two days before the meeting, this Court granted Congresswoman Beatty's TRO seeking further information about the planned work. See generally Beatty, 2026 WL 712814, at *9–10. President Trump confirmed that the Board meeting was somewhat of a formality. In a wide-ranging press conference immediately preceding the Board vote, he remarked:

> As I announced in February after a one year review based on input from highly-respected experts and subject to board approval today, we determined—*it's a little late for the board because we've already announced it, but these are . . . minor details* . . . I think everybody agrees, but subject to board approval, we determined that the fastest way to bring the Trump Kennedy Center to the highest level of success, beauty, and grandeur is to cease the entertainment operations for a two-year period of time as we complete high-quality, really high-quality construction. And we've already purchased seating . . . We've already purchased a lot of the marbles and some of the things that are hard to get . . . [T]his temporary closure will enable us to complete the work much faster and . . . of a much higher quality.

Pl.'s Reply in Supp. of PI Mot. ("PI Mot. Reply"), ECF No. 37-3 ("Mar. 16 Press Conf. Tr."), at 15–16 (emphasis added) (cleaned up).

After President Trump addressed the press, Mr. Floca presented a slide deck on the need for capital improvements at the Center and explained why a full shutdown would facilitate the "big undertaking." Mar. 16 Board Meeting Minutes at 6–7. Although the Center's General and Associate General Counsel were in attendance, they do not appear to have offered legal guidance on the closure, at the meeting or otherwise. Id. at 1, 3. Representative Beatty then spoke, relaying her opposition to the closure vote while maintaining that "she had no opposition [to] the need for repair." Id. at 7. Other trustees raised issues about the state of the premises, including asbestos remediation and potential liability from allowing public access during renovations, and

expressed their support for the closure. Id. at 7–8. After some discussion, the Board ratified President Trump's motion "to conduct an orderly wind-down of programming activities through the Spring of 2026, and close [the Center's] doors entirely effective July 6, 2026, for such a time as is required to complete the repair and restoration funded" by the OBBBA. Id. at 8–9. The meeting was brought to a close, having lasted 34 minutes in total. Id. at 5, 9.

e. Latest Developments

Though the Kennedy Center's full closure is not scheduled to take effect until July, the "wind-down" has begun. The closure will affect several existing performance contracts. See Pl.'s First Suppl. Br., ECF No. 29-5, Ex. N (list of performance contracts impacted by closure). The Center has laid off at least two tranches of staff members, including various programming personnel. See generally PI Mot. Reply, ECF No. 37-5, Ex. PP (Washington Post reporting); ECF No. 37-6, Ex. QQ (additional Washington Post reporting). Mr. Floca reports that just ten members of the programming staff remain. DCPL Hr'g Tr. at 92:24–25, 93:6–10.

At the same time, the details of the planned work and scope of the shutdown remain murky—perhaps because there is no up-to-date document that outlines construction plans with any specificity. Mr. Floca has attested that "[n]o new structure or building will be erected on the campus"; the "exterior of the Center's main building will not be materially affected"; and "the planned construction, renovation, and renewal efforts will not tear down the Center to its structural steel and rebuild a new structure from those foundations." DCPL, Defs.' Opp. to PI Mot., ECF No. 27-2, Ex. A ("Fourth Floca Decl.") ¶ 6. Yet structures inside the building—for instance, various stages and seats—will be demolished and rebuilt; structural steel will be "reconfigur[ed]"; and historic marble will be replaced, among other changes. See Defs.' Cross-

Mot., ECF No. 34-4 ("Third Floca Decl.") ¶¶ 7, 10; see also Mar. 16 Press Conf. Tr. at 16 ("[W]e've already purchased the seating . . . We've already purchased a lot of the marble . . .").

As for scope, Mr. Floca has confirmed that "[t]he majority of the grounds directly around the building will be behind a construction fence[.]" DCPL Hr'g Tr. at 69:10–12. Material from President Kennedy's memorial exhibit will be moved to REACH, and the Skylight Pavilion will serve as the "temporary home of the memorial[.]" Id. at 69:16–23. "[S]ome" of the Center's "education functions" will "continue" at the REACH. Id. at 69:13–14; 72:5–9. Plans for continued artistic programming are more tentative. See, e.g., id. at 71:7–13 ("[W]e are . . . looking at how we maintain some of our duty to present in the REACH.").

D. Procedural History

Representative Beatty originally filed this lawsuit in December 2025, following the Kennedy Center's renaming, and amended her complaint to include claims challenging the Center's imminent closure in early March 2026. She promptly moved for a TRO, asking the Court to direct the Defendants to provide her with information about the planned renovation and to allow her to participate in and vote during the March 16, 2026 Board meeting. The Court granted the TRO in part and denied it in part, concluding that she was entitled to certain information and owed the right to participate in Board meetings as a trustee of the Kennedy Center, but that she was not entitled to vote at the upcoming meeting because the TRO factors did not weigh decisively in her favor. See Mar. 14, 2026 Mem. Op. and Order.

Beatty also moved for a PI barring the Kennedy Center's imminent closure. After the March 16 Board vote, she supplemented her PI motion with an additional brief supported by hundreds of pages of documents she was given in response to the Court's TRO order, which shed some light on the planned work. She has also since filed a motion for partial summary judgment

on the issue of the Center's renaming. The Defendants have responded by not only opposing Beatty's PI and summary judgment motions, but also cross-moving for summary judgment on the claims in Beatty's FAC. Beatty has opposed the Defendants' cross-motion and requested summary judgment on the voting issue, though she did not formally so move. Individual former members of the Kennedy Center Board, the President's Advisory Committee on the Arts, and the President's Committee on the Arts and the Humanities, along with the Committee for the First Amendment, have filed an amicus brief in support of Beatty's request for injunctive relief.

The Court held a hearing on all the pending motions in this case on April 28. It also held a hearing the following day on a PI motion in the related DCPL case, during which Mr. Floca testified. Although only the plaintiffs in the DCPL case requested Floca's testimony, the Court allowed Beatty's counsel to briefly cross-examine him at the hearing. The Court also permitted the parties in both cases to submit simultaneous post-hearing supplemental briefs addressing the impact of Mr. Floca's testimony. The pending motions in this case are now ripe for adjudication.

## II. Legal Standards

### A. Summary Judgment

A court "shall grant summary judgment" to a particular party on a particular claim "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if "a dispute over it might affect the outcome of a suit under governing law." Mayorga v. Merdon, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006)). And a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Holcomb, 433 F.3d at 895).

"In considering a motion for summary judgment, judges must ask themselves not whether they think the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Stoe v. Barr, 960 F.3d 627, 638 (D.C. Cir. 2020) (cleaned up). "And in viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in [its] favor, the court's role is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. (cleaned up). "In short, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are not the functions of the court. These are matters for a jury if the court determines that there is a genuine issue for trial." Id. (cleaned up). Furthermore, "[a]lthough a moving party may not be required to support its motion with affidavits, it is still clear that summary judgment should only be granted in cases when whatever [evidence] is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." AFL-CIO v. Chavez-DeRemer, 789 F. Supp. 3d 66, 80 (D.D.C. 2025) (cleaned up).

B. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To secure a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. "The movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." Abdullah v. Obama, 753 F.3d 193, 197 (D.C. Cir. 2014) (cleaned up). And if the movant carries her burden, "[c]rafting a preliminary injunction" remains "an exercise of discretion and judgment, often dependent as

much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Proj., 582 U.S. 571, 579 (2017).

## III. Analysis

Representative Beatty challenges three actions by her fellow trustees on the Kennedy Center Board: (1) their renaming the institution after President Trump; (2) their stripping *ex officio* Board members of the right to vote; and (3) their decision to close the Center for at least two years pending what all agree to be at least a substantial renovation of the premises. The Court tackles each of the three issues—renaming, voting, and closure—in turn.

Before diving into the fray, however, some verbiage from the Kennedy Center's organic statute requires upfront attention because its interpretation will lay the groundwork for the Article III standing and cause-of-action analyses to come. Section 76*l*(b) of the statute affords the Board "all the usual powers and obligations of a trustee in respect of all trust funds administered by it." 20 U.S.C. § 76*l*(b). The Board, in turn, is "composed of" *ex officio* and general trustees. Id. § 76h(a)(2). The Court thus reads the statute to confer "all the usual" trustee "powers and obligations" on the Board's members. Beatty, 2026 WL 712814, at *6.

As at the TRO stage, the parties appear to agree that this choice of statutory language indicates that "Congress intended to legislate against the backdrop of common-law trust principles." Id. After all, it referred to "*all the usual* powers and obligations" that a trustee has. Id. (emphasis added). Moreover, "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." NLRB v. Amax Coal Co., 453 U.S. 322, 329 (1981); see also Jazz Pharms., Inc. v. Kennedy, 141 F.4th 254, 261 (D.C. Cir. 2025) (explaining that the "words of a statute must be read in their context

and with a view to their place in the overall statutory scheme," and with an eye toward "statutory history," and, in appropriate circumstances, "considerations of incorporation and the old-soil canon") (cleaned up)); cf. Cent. States, Se. and Sw. Areas Pension Fund, Inc. v. Cent. Transp., Inc., 472 U.S. 559, 570 (1985) (explaining that in the ERISA context, "rather than explicitly enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility").

What to make of the last clause in the sub-section, which vests trustees with the usual powers and obligations "in respect of all the trust funds" they "administer[]"? In a late-breaking development, the Defendants suggest that, in light of testimony from Mr. Floca at the motions hearing, the statute's reference to "trust funds" means that trustees only have the "usual" common-law powers and obligations with respect to "private donations and revenues from performances." Defs.' Suppl. Br., ECF No. 45, at 2.[7] But the statute does not expressly define the term "trust funds." To the extent the Kennedy Center's officers interpret the phrase in a specific way in their day-to-day management of the institution, see id., the Court owes that interpretation no deference when it comes to parsing statutory meaning. Cf. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 400–01 (2024).

The Court looks elsewhere for guidance. One pertinent source of authority is the common law, given the backdrop against which the organic statute must be read. Cf. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 320–21 (2012) ("A statute that uses a common-law term, without defining it, adopts its common-law meaning."). In common-law parlance, "trust funds" is not so much a special term of art as it is a straightforward

[7] The Court might not have bothered to address this eleventh-hour argument, which was raised in a post-hearing supplemental brief to which Beatty had no meaningful opportunity to respond, except that the Defendants have styled it as a potential jurisdictional issue.

way of referring to the "funds" that belong to the "trust." See, e.g., Restatement (First) of Trusts § 179 cmt. b (A.L.I. 1935) ("It is the duty of the trustee not to mingle trust funds with his own funds."); Restatement (Second) of Trusts § 181 cmt. c. (A.L.I. 1959) ("The trustee is liable if he fails to invest trust funds which it is his duty to invest . . .").

Another pertinent source is the rest of the Kennedy Center's organic statute, which uses the term "trust funds" several other times. The statute does indicate that the term encompasses "gifts, bequests, or devises of money, securities, or other property of whatsoever character," which "the Board is authorized to sell or exchange and to invest or reinvest." 20 U.S.C. § 76k(a). But it would be unnatural to read "trust funds" to include only private gifts and donations. When the statute was first enacted in 1958, Congress contemplated that the Kennedy Center might receive funds from different places, requiring the Boad to submit to the Smithsonian "an annual report of its operations under this Act, including a detailed statement of all public and private moneys received and disbursed by it." National Cultural Center Act § 6(c). Following President Kennedy's assassination, Congress appropriated up to $15.5 million in federal funds matching private donations to encourage the Center's development. Pub. L. No. 88-260, § 8, 78 Stat. 4, 4 (1964). Starting in 1994, Congress began authorizing regular appropriations directly to the Kennedy Center for its maintenance, repair, and security needs, at the same time transferring relevant pieces of "property, liabilities, contracts, records, and unexpended balances of appropriations, authorizations, allocations, and other funds" from the Secretary of the Interior to the Kennedy Center. John F. Kennedy Center Act Amendments of 1994, Pub. L. No. 103-279, §§ 4, 7, 108 Stat. 1409, 1411, 1415–16 (1994).

If "trust funds" refers only to private gifts, as the Defendants now suggest, the Board's trustees would lack the "usual powers and obligations" to administer *any* of the other substantial

funds the Center has or may receive. There is nothing in the text or structure of the statute to require that odd result. The Defendants' proposed interpretation would also require an unduly cramped construction of the Board's power to make "bylaws, rules, and regulations relating to the administration of its trust funds." 20 U.S.C. § 76*l*(a). It cannot be that the Board may make bylaws relating to the administration of private funds, but is powerless to do so with respect to the Center's administration of public dollars. Such a reading also runs headlong into the Defendants' assertion that "Congress *affirmatively* conferred on the Board *broad* authority to manage its own affairs." See Defs.' Opp. to TRO Mot., ECF No. 19, at 9 (emphasis added) (citing 20 U.S.C. § 76*l*(a)). Finally, this interpretation of "trust funds" would seemingly leave any "actions of the Board relating to . . . payments made or directed to be made by the Board from any" *non*-private funds "subject to review" by any number of other "officer[s]" and "agenc[ies]." 20 U.S.C. § 76k(e). The Defendants have argued precisely the opposite elsewhere in their briefing in this case and DCPL. See Defs.' Cross-Mot. at 28–29 (asserting that § 76k(e) of the organic statute "grant[s] the Center its independence from" *any* "external review," not solely with respect to decisions about private funds); see also DCPL, Defs.' Opp. to PI Mot. at 19 ("The Board's actions 'relating to' its expenditure of funds appropriate by Congress for capital repair and restoration fall squarely within the plain text of the limitation in § 76k(e).").

In short, the Defendants' last-minute attempt to cabin the scope of Section 76*l*(b) to the administration of private funds is unavailing. Their construction would impose an illogical restriction on the Board's inherent powers, one unsupported by the common law and the structure of the statute, not to mention Defendants' *own* statutory constructions advanced elsewhere in this litigation and related litigation. The Court declines to adopt such a disruptive

read over the far more sensible understanding that "all the trust funds" encompasses "all" funds belonging to the Kennedy Center trust.[8]

In any event, even if the Court were to endorse the Defendants' awkward understanding of "trust funds" as denoting only private funds, it would not materially change the scope of Representative Beatty's powers and obligations as a trustee with respect to the claims in *this* case. The Center's renaming implicates private funding because Defendants' use of the "Trump Kennedy Center" name has evidently had an impact on private donations and revenue generation. See Am. Amicus Br. at 15–16; see also Defs.' Resp. to SMF ¶ 34. The categorical right of *ex officio* members to vote bears on the use of private funds insofar as the Board is often called to vote on matters involving their use. And according to the record, the Center's imminent closure is poised to affect the Center's privately-funded arts programming and reduce revenue generation for two years, if not far longer. See PI Mot., ECF No. 13-19 ("Borda Decl.") ¶¶ 7–15; ECF No. 13-20 ("Taylor Decl.") ¶¶ 6–13; ECF No. 13-21 ("Borenstein Decl.") ¶¶ 11–25; ECF No. 13-22 ("Miller Decl.") ¶¶ 11–17; see also Am. Amicus Br. at 8–13.

In assessing Representative Beatty's claims, then, the Court understands that the Center's trustees must discharge their relevant duties in a manner consistent with the common law of trusts. And having cleared that brush, it is time to embark on an admittedly lengthy trek through the many claims and issues raised by the competing motions before the Court. Let's begin with the Center's renaming.

---

[8] To be clear, this conclusion does not mean that the Center's private and public funds are somehow interchangeable. It is entirely appropriate that the privately-generated funds, which Mr. Floca refers to as "trust funds," see DCPL Hr'g Tr. at 84:21–25, are kept separately from appropriated funds because the statute prohibits appropriations from being "used for any direct expense incurred" on the programming side, 20 U.S.C. § 76r, and uniquely subjects appropriated funds to Inspector General oversight, id. § 76*l*(d).

A. Renaming

The parties have cross-moved for summary judgment on the lawfulness of the Kennedy Center's renaming. In resolving the cross-motions, the Court first considers Representative Beatty's Article III standing to challenge the renaming, then discusses her asserted causes of action and their merits, and finally addresses the appropriate remedy.

*1. Article III Standing*

Under Article III of the Constitution, federal courts have jurisdiction to adjudicate "Cases" and "Controversies." § 2, cl. 1. "For a lawsuit to constitute a case within the meaning of Article III, the plaintiff must have standing to sue," and "[t]o demonstrate standing, plaintiffs must answer a basic question—What's it to you?" Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 110 (2025) (cleaned up). "In other words, plaintiffs must show that they possess a personal stake in the dispute and are not mere bystanders." Id. at 110–11 (cleaned up). "When determining whether a plaintiff has Article III standing, the court must assume that [the plaintiff] will prevail on the merits." Comm. On Judiciary of U.S. House of Reps. v. McGahn, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc). At the summary judgment stage, plaintiffs must generally substantiate standing "by affidavit or other evidence." Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009) (cleaned up).

Standing has three elements: injury-in-fact, causation, and redressability. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). "The first requirement, injury in fact, requires the plaintiff to demonstrate an injury that is concrete, particularized, and actual or imminent, not speculative." Diamond Alt. Energy, 606 U.S. at 111 (cleaned up). "The second and third requirements, causation and redressability, are usually flip sides of the same coin." Id. (cleaned

up). Causation entails a showing that the plaintiff's injury was likely caused by the defendant, whereas redressability requires that the injury would be redressed by judicial relief. Id.

The parties' standing dispute here centers on whether the Congresswoman has experienced a concrete injury-in-fact. Beatty contends that she has suffered a concrete and particularized injury because "[s]he is a fiduciary charged with protecting the Center," and "as a direct result of her co-trustee[s'] unlawful actions, [she] cannot fulfill and is in breach" of her fiduciary duties. See Pl.'s Mot. for Part. Summ. J. ("Pl.'s PSJ Mot."), ECF No. 30-1, at 19–20. The Defendants disagree, arguing mainly that Beatty has already fulfilled any fiduciary duty she owes by registering her dissent to the renaming and filing this lawsuit. Defs.' Cross-Mot. at 17.

Representative Beatty has the better of the argument. In fact, her injury-in-fact is not nearly as "complicated" as the Defendants make it out "to be," Bost v. Ill. State Bd. of Elec., 607 U.S. 71, 73 (2026) (cleaned up), but given the considerable ink spilled on the subject in the parties' briefs, the Court will elaborate in perhaps greater-than-necessary detail.

a. Beatty's Legal Obligations as a Trustee

It is plain that, as a trustee, Beatty bears certain fiduciary duties to the Kennedy Center. One of her elemental duties is to "administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law." Restatement (Third) of Trusts § 76(1). That duty applies equally to private and charitable trustees. See G. Bogert *et al.*, Bogert's The Law of Trusts and Trustees § 394 (May 2025 Update) ("Bogert's Law of Trusts") ("[A] charitable trustee has the same duty as a private trustee to administer the trust according to its terms and applicable law."). And a subcomponent of that duty is to "protect[] trust property." Restatement (Third) of Trusts § 76(2)(b).

Beatty has another legal obligation, as well. She must "use reasonable care to prevent a co-trustee from committing a breach of trust and, if a breach of trust occurs, to obtain redress." Restatement (Third) of Trusts § 81(1)–(2); see also Restatement (Second) of Trusts § 224 (explaining that a trustee is liable to a beneficiary if he "neglects to take proper steps to compel his co-trustee to redress a breach of trust"). The Defendants insist that D.C. trust law governs here. See, e.g., Defs.' Cross-Mot. at 34. Assuming they are right, the District's Uniform Trust Code imposes a similar responsibility, unless the terms of the trust provide otherwise, see D.C. Code § 19-1307.03(g) ("[E]ach trustee shall exercise reasonable care to: (1) Prevent a cotrustee from committing a serious breach of trust; and (2) Compel a cotrustee to redress a serious breach of trust"). Notably, this duty of reasonable care attaches even where the trustee "does not join in" her co-trustee's conduct and thus is not otherwise "liable for the action." Id. § 19-1307.03(f). And it, too, applies with equal force in the charitable context. Id. § 19-1301.02 ("This chapter applies to express trusts, charitable or noncharitable, and trusts created pursuant to a statute, judgment, or decree that requires the trust to be administered in the manner of an express trust.").

If Beatty is right that changing the Center's name directly contravenes its organic statute, the renaming prevents her from fulfilling her fiduciary duty to administer the trust according to its terms and governing law, and more specifically to protect the trust *res*. See FAC ¶¶ 13–14, 74–76 (attesting that Beatty is harmed by the Defendants' actions because they "prevent her from fulfilling her statutory duties to maintain the Center as a living memorial to John F. Kennedy" and explaining, specifically, that the renaming violates the Kennedy Center's trust terms).[9] The renaming decision constitutes an alleged breach of trust that Beatty must take "reasonable

---

[9] Beatty's amended complaint is verified, see FAC at 37, which means that "it has the same evidentiary value as a plaintiff's affidavit or sworn declaration," Grimes v. District of Columbia, 794 F.3d 83, 94 n.5 (D.C. Cir. 2015).

care"—and is perhaps even obligated—to redress. In other words, as a trustee, Beatty has "standing to commence" legal proceedings to "secure compliance with [fiduciary] duties or otherwise to enforce the trust." Bogert's Law of Trusts § 394.

The Defendants insist that Beatty has "discharged" all pertinent fiduciary duties by "noting her dissent, seeking to convince her co-trustees not to proceed, and declining to join in the Center's renaming." Defs.' Cross-Mot. at 17. This assertion rests on shaky ground. For one thing, the parties agree that Beatty was not permitted to vote—or even speak—at the meeting where the Board voted to rename the Center. See Defs.' Resp. to SMF ¶ 15. So, she had no formal opportunity to dissent or persuade her colleagues to vote differently.

For another, even if Beatty *had* registered her dissent at the renaming meeting, she would not have fully discharged her legal duties. As previously noted, if Beatty is right on the merits, the renaming prevents her from administering the trust in accordance with its terms and governing statute. Common-law trust principles require a trustee to do more than merely oppose a breach of fiduciary duty by her colleagues; after the breach transpires, she must also "use reasonable care . . . to obtain redress," Restatement (Third) § 81(1)–(2). Framed another way, she must act to "[c]ompel a cotrustee to redress a serious breach." D.C. Code § 19-1307.03(g); see also Bogert's Law on Trusts § 584 ("[E]ven co-trustees who dissent have a duty to prevent their co-trustees from committing serious breaches of trust, and to require a co-trustee who does commit a serious breach to redress the breach." (citing Unif. Trust Code § 703(g))). Dissenting from a board decision may be enough to discharge a duty to take reasonable care to *prevent* a breach, but once the breach occurs, something more is required.

Beatty insists that "something more" necessarily entails an affirmative lawsuit. See PI Mot. Reply at 6. Common-law authority gestures in that direction—one wonders how else, aside

from a lawsuit, a trustee would be able to "compel" or "require" her co-trustees to redress a serious breach.[10] Yet the Court need not definitively resolve that question to find that Beatty has been injured. Even though she did not lead the charge to rename the Center or support the decision, she has suffered a harm because, due to her colleagues' alleged misfeasance, she cannot fulfill her duty to administer the trust in accordance with its terms and protect the trust *res* in the manner contemplated by the Kennedy Center's governing statute. And whether a lawsuit is the *only* way for a minority trustee to discharge her duty of reasonable care, assuming Beatty is right on the merits, she will satisfy her administrative duty if she prevails on her renaming claim. The satisfaction of that duty is a benefit that gives her a "personal stake" in this dispute. Bost, 607 U.S. at 76 (quoting FDA v. All. for Hipp. Med., 602 U.S. 367, 379 (2024)).[11]

[10] The Defendants suggested, at the motions hearing, that on Beatty's framing of her Article III injury, she entirely discharged her duty merely by *filing* the present lawsuit. As a result, they suggested the case may already be moot. See Mot. Hr'g Tr., ECF No. 44, at 51:10–18 ("[I]f the theory is she must sue to extinguish her liability, then we don't know why she would be entitled to anything more. Right? By . . . coming to federal court and opposing in that way, we think that's [in tension] with the idea that standing needs to remain throughout the case . . . Because if the idea is you have to file a lawsuit or else I'm going to potentially be sued, well the congresswoman filed a lawsuit."). This line of argument ignores Beatty's more fundamental obligation to administer the trust in accordance with its terms and protect the trust *res*. Playing courthouse "ding dong ditch" can hardly be said to satisfy these legal obligations.

[11] At the motions hearing, Defendants contended that if the crux of Beatty's theory of injury is a fear of future liability, that fear is too "speculative" to amount to an Article III injury. See Mot. Hr'g Tr. at 52:3–7; cf. Khalid v. TSA, 172 F.4th 866, 872 (D.C. Cir. 2026) (holding that speculative allegations of future possible injury do not satisfy Article III's requirements). But Beatty's theory of Article III harm does not strictly rely on some hypothetical lawsuit—though, as she points out, the possibility is far from fanciful, see PI Mot. Reply at 4 ("[A]t the last meeting of the Kennedy Center's Board, President Trump even raised the specter of suing past trustees for allegedly breaching their duties."); see also DCPL, No. 26-cv-981 (CRC) (in which the Board has been sued for allegedly violating its statutory obligations). Her principal theory of injury rests on the fact that she has been effectively induced to breach her duty to administer the trust and protect the *res*. Assuming she is right on the merits, that induced breach has already occurred, regardless of the likelihood of a suit against her in the future or the merits of her defense to any such suit.

b. Supreme Court Authority

Supreme Court precedent also lends clear support to the notion that trustees have Article III standing to enforce the terms of a trust and prevent or redress breach. Consider, first, Sprint Commc'ns Co., L.P. v. APCC Servs., which held that "an assignee of a legal claim for money owed has standing to pursue that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor." 554 U.S. 269, 271 (2008) ("Sprint"). It was of no moment that the sought-after relief would ultimately run to the assignor, as "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit." Id. at 287. After all, the majority reasoned, "*[t]rustees bring suits to benefit their trusts*; guardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth." Id. at 287–88 (emphasis added).

The dissent, for its part, agreed that these types of suits fell well within Article III's bounds, albeit for more specific reasons. "Trustees hold legal title to the assets in the trust estate and have an independent fiduciary obligation to sue to preserve those assets," Chief Justice Roberts, joined by Justices Scalia, Thomas, and Alito, explained. Id. at 305 n.2 (Roberts, C.J., dissenting). He elaborated that "[t]he trustee's discharge of its legal obligation is an independent, personal benefit that supports the trustee's standing to sue in federal court." Id. True, this observation is dicta in a dissent. But the majority likewise recognized that, "[t]o the extent that trustees, guardians ad litem, and the like have some sort of 'obligation' to the parties whose interest they vindicate through litigation, the same [was] true in respect to the [assignees]" in Sprint, who had a contractual obligation to litigate on behalf of the assignors and had standing by virtue of needing to fulfill that obligation. Id. at 288 (quoting the dissent at 305 n.2).

Both the majority and dissent in Sprint thus support Beatty's theory of Article III injury. As explored above, she owes fiduciary duties to the trust *res* and its beneficiaries, and she is required to fulfill them. Her discharge of those duties redounds to her advantage, representing an "independent personal benefit that supports [her] standing to sue in federal court." Id. at 305 n.2 (Roberts, C.J., dissenting). Even more fundamentally, as both the majority and dissent recognize, a trustee has a unique legal relationship with the trust *res*. She does not just represent the trust in court, as a lead plaintiff in a collective action might represent a broader class of individuals or an associational plaintiff might represent its members. She is not merely a "nominal party" standing in for some other "real party in interest." Id. at 305 n.2 (Roberts, C.J., dissenting). She is a steward of the *res*, holding a legal interest in it that is "subject to an equitable obligation to keep or use that interest for the" American public. Bogert's Law on Trusts § 1. And the legal rights she seeks to vindicate are "first-party, not third-party" ones. Sprint, 554 U.S. at 290.

Next, consider Thole v. U.S. Bank N.A., which concluded that beneficiaries of a defined-benefit retirement plan lacked Article III standing to sue under the Employee Retirement Income Security Act ("ERISA") because they would be entitled to the same monthly benefit payments whether they won or lost the lawsuit and thus had "no concrete stake" in the dispute. 590 U.S. 538, 541 (2020). The Defendants submit that Thole precludes Beatty's suit because she, too, has no stake in the dispute, as the harms stemming from renaming flow to the Kennedy Center and not to her personally.

Thole presents no such obstacle to Beatty's suit; like Sprint, it supports her theory of standing. The Thole plaintiffs were retirement plan beneficiaries who "possess[ed] no equitable or property interest in the plan." Id. at 538. Unlike the plaintiffs in Sprint, they had not been

"legally or contractually assigned" any other party's right to sue. Id. at 543. And unlike "guardians, receivers, and executors," the plaintiffs had not been "legally or contractually appointed to represent the plan." Id. at 544.

Trustees, by contrast, fall squarely into this latter bucket. Thole points out that, within the "regulatory phalanx" of actors who police trusts, "fiduciaries (including trustees who are fiduciaries) can sue other fiduciaries—and they would have good reason to sue if [as alleged in that case] one fiduciary were using the plan's assets as a 'personal piggybank.'" Id. at 545. Nowhere does Thole suggest, as the government insinuates in its papers, that "trustees may sue in federal court *only* to pursue financial claims for contribution or indemnity." Defs.' Cross-Mot. Reply, ECF No. 39, at 6 (emphasis added) (citing Thole). Case in point: one co-trustee suing another to prevent him from "using the plan's assets as a 'personal piggybank'" does not stand to gain financially from the suit. Instead, the first trustee does so to protect the trust property from being raided, to fulfill her legal responsibility as a fiduciary, and to protect herself from potential liability. She need not wait until a lawsuit is on the horizon to act.

Perhaps recognizing that Sprint and Thole are hard to reconcile with the notion that trustees lack standing to pursue claims for anything other than "contribution or indemnity," the Defendants retreated from this hardline position at the motions hearing. They acknowledged that a private trustee "has a legal interest, a property right" in the trust *res* and may sue to "vindicate" that interest and right when, for instance, the trust's assets have been depleted. Mot. Hr'g Tr., ECF No. 44, at 48:14–16. In the Defendants' view, such would be "an ordinary case" involving a "normal injury" that one would "see in federal court" "quite often." Id. at 48:17–20, 50:9–12. The case at bar is different, they maintained, because Beatty "is proceeding in a representational

capacity on behalf of the public," and enforcement of any such public interest is reserved for the "Executive Branch and not . . . any one individual." Id. at 48:21–49:3.

This distinction does not take the Defendants far, at least for Article III standing purposes. No one disputes that Congresswoman Beatty is the trustee of a charitable government trust, not a private trust. "The powers, duties, and liabilities of trustees of a charitable trust are, with only a few exceptions, the same as the powers, duties[,] and liabilities of private trusts." Bogert's Law of Trusts § 391. And a "charitable trustee has the same duty as a private trustee to administer the trust according to its terms and applicable law." Id. § 394. The charitable nature of the Kennedy Center trust does not magically relieve Beatty of the fiduciary duties that she would discharge by pursuing and prevailing in this lawsuit.

Nor does the Bogert treatise's description of the charitable trustee as proceeding in a "representational capacity" suggest that Beatty is somehow divested of the powers and duties of her private counterpart. See Mot. Hr'g Tr. at 48:21–49:3. As a prefatory matter, all trustees—whether private or charitable—are understood to "represent" the interests of the trust beneficiaries in some sense. Cf. Trustee, Black's Law Dictionary (12th ed. 2024) (defining "trustee" as "[s]omeone who *stands* in a fiduciary or confidential *relation to another*; esp., one who, having legal title to property, holds it in trust *for the benefit of another*" (emphasis added)).[12] More to the point, Beatty is justified in exercising her trustee powers precisely

[12] See also G.G. Bogert, Handbook of the Law of Trusts (1st ed. 1921) § 91 ("The trustee [generally] has implied authority to represent the cestui que trust in all actions respecting the trust estate . . ."); Corcoran v. Chesapeake & O. Canal Co., 94 U.S. 741, 745 (1876) (noting that a trustee has a "duty" to "represent and protect" the *cestui que trust*); Kerrison v. Stewart, 93 U.S. 155, 160 (1876) (explaining that under appropriate circumstances, a duly-appointed trustee "may represent his beneficiaries in all things relating to their common interest in the trust property" and "is in court for and on behalf of the beneficiaries").

*because* she "hold[s] a fiduciary interest that distinguishes" her from the public, Bogert's Law of Trusts § 413, so her grievances are anything but "generalized," Defs.' Cross-Mot. at 11–12.[13]

Relatedly, the Defendants seemed to imply at the hearing that Beatty's "property right" in the trust *res* is diminished because she is a charitable trustee. Mot. Hr'g Tr. at 50:11. If the Court correctly understands the Defendants' position, it would mean that Beatty could not sue to redress a co-trustee's hypothetical embezzlement from the trust's funds,[14] a rather surprising proposition. In any case, that position lacks a basis in trust law. The "hallmark of a charitable trust" is "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for a charitable purpose." He Depu v. Yahoo! Inc., 950 F.3d 897, 903 (D.C. Cir. 2020) (quoting Restatement (Second) of Trusts § 348). To suggest that a charitable trustee lacks a property interest in the trust *res* would be to hamstring the former in both day-to-day trust management and larger administrative decisions. One wonders, for instance, how a charitable board of trustees could vote to authorize renovations to a trust property without a legal right to administer the trust *res* how they see fit.

[13] To the extent the Defendants suggest that the Attorney General has an acknowledged role in enforcing charitable trusts too, that point goes to Beatty's cause of action and "is distinct from Article III standing." He Depu v. Yahoo! Inc., 950 F.3d 897, 905 & n.11 (D.C. Cir. 2020).

[14] See Mot. Hr'g Tr. at 49:22–50:12 ("THE COURT: So I was going to ask you to respond to the hypothetical of . . . a two-trustee trust. One is embezzling from the trust. The other objects to it. Can't do anything about it and so sues to enforce the trust. Your position would be that that . . . plaintiff may well have standing, but that is not this case because the interest would be on behalf of the American people, even if the American people are losing the money that is being embezzled? MR. MAYERS: Yes, Your Honor, we think there is a difference. So the Marshall case [the plaintiff] point[s] to from the Northern District of Illinois and also the Sprint and Thole cases we discussed are all in those . . . asset depletion cases where the trustee would have this . . . property interest, this legal right. That's a much more normal injury that Your Honor would see quite often.").

To sum up, Representative Beatty's Article III standing is entirely consistent with dicta in Sprint and Thole confirming the ability of trustees to sue on another for violations of their fiduciary duties. The fact that she is a charitable trustee, rather than a private trustee, does not diminish the relevance of these on-point Supreme Court authorities.

c. History and Tradition

If the foregoing analysis were not enough, "history and tradition" confirm that Beatty's is the "type[] of case that Article III empowers federal courts to consider." TransUnion LLC v. Ramirez, 594 U.S. 413, 424 (2021) (quoting Sprint, 554 U.S. at 274). It is "[un]dispute[d]" that "suits by trustees . . . make up a settled continuous practice 'of the sort traditionally amenable to, and resolved by, the judicial process.'" Sprint, 554 U.S. at 305 n.2 (Roberts, C.J., dissenting); see also Restatement (First) of Trusts § 200, cmt. d ("If there are several trustees, one or more of them can maintain a suit against another to . . . compel him to redress a breach of trust committed by him."). Charitable trusts, in particular, "have *long been* enforceable . . . by co-trustees[.]" Bogert's Law of Trusts § 967; see also Restatement (First) of Trusts § 391 cmt. b.

Prominent historical treatises underscore that courts regularly entertained suits between trustees. For instance, Justice Story's well-known 1844 treatise on equity jurisprudence described that "one trustee" may sue "another to compel to replace the trust stock," and in such an instance, "the *cestuis que trust* need not be made parties" for the action to be valid. Joseph Story, Commentaries on Equity Pleadings and the Incidents Thereof According to the Practice of the Courts of Equity, of England and America 245–47 (3rd ed. 1844); see also id. at 94–95 n.2 (explaining that "[i]n cases concerning trust property, . . . the *cestuis que trust* are always the persons interested in the subject of the suit, and yet they are very frequently not to be introduced

among the parties," "[w]here[as], for instance, there are trustees to sell an estate, receive the purchase money, and pay it to particular individuals . . .").[15]

The Defendants point out that it is not enough that "traditionally, trustees may bring actions to compel co-trustees in common-law courts"—it is the underlying *harm* that must be analogous, not the cause of action. Defs.' Cross-Mot. at 15–16. To be sure, cases like TransUnion and Spokeo hold that Congress cannot legislate an Article III injury into existence. But the history-and-tradition analysis asks whether the present injury is analogous to a harm "traditionally recognized as providing a basis for lawsuit in American courts." TransUnion, 594 U.S. at 427. Here, the answer to that question is undoubtedly yes. In the distant and more recent past, courts have routinely considered suits brought by trustees against current or former co-trustees accused of having engaged in improper conduct or breach of fiduciary duty. See, e.g., Elmendorf v. Lansing, 4 Johns. Ch. 562 (N.Y. Ch. Ct. 1820); Marshall v. Caldwell, 125 Mass. 435 (Mass. 1878); Laroe v. Douglass, 13 N.J. Eq. 308, 1861 WL 1979 (N.J. Ch. Ct. 1861); Crane

[15] Other treatises suggested that haling a scofflaw co-trustee into court was not just an option, but an obligation. "It is the *duty* of one trustee," an 1845 commentator on trusts wrote, "to protect the trust estate from any misfeasance by his co-trustee, upon being made aware of the intended act, by obtaining an injunction against him (*a*), and if, the wrongful act has been already committed, to take measures by suit or otherwise to compel the restitution of the property and its application in the manner required by the trust (*b*)." James Hill, A Practical Treatise on the Law Relating to Trustees, Their Powers, Duties, Privileges and Liabilities 314 (1st ed. 1845) (emphasis added); see also James Hill, A Practical Treatise on the Law Relating to Trustees 433 (2nd ed. 1854) ("When more than one trustee is appointed, and all have accepted the trust, it is the duty of each one to protect the trust property from the acts of his colleagues."); Jairus W. Perry, A Treatise on the Law of Trusts and Trustees 530–31 (4th ed. 1889) ("In all cases, if a trustee becomes aware of any fact tending to show that his cotrustee is committing a breach of trust, or if he learns any fact endangering the trust fund, he must communicate it to his cotrustees or make application to the court, and take active measures to protect the fund, or he will be personally liable for its loss."); Bogert, Handbook of the Law of Trusts § 120 at 490 (similar). Although trust law has understandably evolved to limit liability for trustees who refuse to participate in their co-trustees' misconduct, historical commentators recognized that "a trustee is not absolutely and under all circumstances free from liability with respect to his co-trustees." John Pomeroy, Treatise on Equity Jurisprudence 2488–89 (4th ed. 1918–1919).

v. Hearn, 26 N.J. Eq. 378 (N.J. Ch. Ct. 1875); Morville v. Fowle, 144 Mass. 109 (Mass. 1887); Eastman v. Allard, 149 Mass. 154 (Mass. 1889); Crawford v. Nies, 220 Mass. 61 (Mass. 1914); Skinnell v. Mahoney, 197 A.D. 808 (N.Y. Sup. Ct. App. Div. 1921); Tracy v. Cent. Tr. Co., 327 Pa. 77 (Pa. 1937); Equitable Tr. Co. v. Schwebel, 32 F. Supp. 241 (E.D. Pa. 1940); Gilbert v. McLeod Infirmary, 219 S.C. 174 (S.C. 1951); see also Richards v. Midkiff, 48 Haw. 32 (Haw. 1964); Holt v. Coll. of Osteopathic Physicians & Surgeons, 61 Cal. 2d 750 (Cal. 1964).

Implicitly or explicitly, the basis for such suits is the trustee's need to protect the trust *res* and discharge her legal duty as a fiduciary. See, e.g., Crane, 26 N.J. Eq. at 381–82 (explaining that it was trustee's "duty" to "file[] his bill in this cause to restrain" his co-trustee from "expending" trust assets); Richards, 48 Haw. at 42 (basis for trustee's suit against co-trustees was trustee's common-law duty to compel co-trustees to redress their alleged breach).[16]

Thus, co-trustee actions to redress misconduct or breaches of trust have not just been categorically available for centuries, but also regularly litigated, without concern that the injury in question was somehow insufficiently personal to the trustee plaintiff. The historical evidence quiets any doubt that Beatty has established an injury-in-fact. Trustees have been suing each other for at least two centuries to enforce trust terms and fulfill their own legal obligations.

* * *

[16] See also Smith v. Pettigrew, 34 N.J. Eq. 216, 218 (N.J. Prerog. Ct. 1881) ("It is the duty of one trustee to protect the trust estate from any misfeasance by his co-trustee . . . and if the wrongful act has been already committed, to take measures, by suit or otherwise, to compel the restitution of the property and its application in the manner required by the trust."); cf. Bartlett v. Hatch, 17 Abb. Pr. 461 (N.Y. Sup. Ct. 1864) ("I have . . . no doubt that a trustee may, in case of a threatened breach of trust by his colleague, institute an action for the purpose of restraining the threatened act, and it may be his duty to do this for his own protection and the protection of the property as it is the duty of every trustee to protect the trust property and faithfully execute the trust; and if he cannot do these without the aid of the court, I see no reason why he may not resort to the court for such purpose.").

With the injury-in-fact element of standing out of the way, the Court straightforwardly concludes that the causation and redressability requirements are satisfied. If Representative Beatty is right that the renaming violates the Kennedy Center's organic statute, and she has a cognizable personal injury stemming from the Board's failure to administer the trust in accordance with its governing terms, her injury is directly traceable to the renaming decision. And an order enjoining the renaming of the Kennedy Center without Congressional authorization would redress that injury.

Summing up, one of the questions posed by the Article III standing inquiry is whether the plaintiff has "anything to gain from this lawsuit." Fox v. McCormick, 20 F. Supp. 3d 133, 141 (D.D.C. 2013). The answer here is "a lot." The Congresswoman is one of a select group of individuals who possess a fiduciary duty to administer the Kennedy Center trust. If she is right on the merits and prevails on her renaming claim, she will have fulfilled her personal legal obligation to ensure that the Kennedy Center retains its original identity—meaning that she does not seek relief on some generalized ground or solely based on harm to a third-party. See Hollingsworth v. Perry, 570 U.S. 693, 708 (2013); see also Sprint, 554 U.S. at 290. The benefit of discharging that legal duty, coupled with guiding Supreme Court precedent and a strong historical foundation, is more than enough to satisfy the injury-in-fact element of the standing inquiry. The consequences of holding otherwise would ripple through the administration of all variety of trusts, potentially upending centuries of settled trust law in the process.[17]

[17] The Court also notes that the Defendants make no effort to distinguish contemporary case law confirming that trustee-against-trustee suits do not raise serious Article III hang-ups. See, e.g., Marshall as co-trustee of 4-M River Farm Tr. v. Munder, No. 23-cv-1985, 2023 WL 7325935, at *3 (N.D. Ill. Nov. 7, 2023); see also Cook v. Marshall, 126 F.4th 1031 (5th Cir. 2025); Brown v. Brown-Thill, 762 F.3d 814 (8th Cir. 2014); Grede v. Bank of N.Y. Mellon, 598 F.3d 899 (7th Cir. 2010); Monahan v. Holmes, 139 F. Supp. 2d 253 (D. Conn. 2001).

*2. Section 76l(b) Renaming Claim*

Reassured that Representative Beatty has Article III standing to challenge the renaming, the Court turns to the contents of her challenge.

a. Cause of Action

First, does Beatty have a cause of action? Section 76*l*(b) of the organic statute—coupled with Section 76k(e), which expressly contemplates judicial review of Board actions related to performing arts and the payment of trust funds—authorizes Beatty to sue her co-trustees to enforce the terms of the trust and to prevent or rectify a breach of trust. See Beatty, 2026 WL 712814, at *6–7. At the risk of repetition, the statute's language expressly bestows all the "usual powers and obligations" on trustees.[18] In so legislating, "Congress intended to impose on trustees traditional fiduciary duties," especially as the statute includes no "unequivocal[] express[ion]" of an "intent to the contrary." Cobell v. Norton, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (quoting NLRB v. Amax Coal Co., 453 U.S. at 330). "[M]uch as the Supreme Court has regularly turned to the Restatement and other authorities to construe trust responsibilities, it is appropriate for the district court to consult similar sources." Id. Such authorities confirm that the Kennedy Center trustees' "usual powers and obligations" include the ability to sue to enforce the terms of the trust.[19]

---

[18] Congress's unequivocal word choice distinguishes the Kennedy Center trust from other government trust relationships in which applicable treaties, statutes, or regulations have been held not to create judicially-enforceable fiduciary duties. See, e.g., Arizona v. Navajo Nation, 599 U.S. 555, 564 (2023); Power v. McDonough, 163 F.4th 1162, 1190–91 (9th Cir. 2025).

[19] See, e.g., Restatement (Second) of Trusts § 184 ("If there are several trustees, each trustee is under a duty to the beneficiary to participate in the administration of the trust and to use reasonable care to prevent a co-trustee from committing a breach of trust or to compel a co-trustee to redress a breach of trust."); id. § 391, cmt. b ("A suit for the enforcement of a charitable trust can be maintained by one or more of several trustees against the other trustees."); Restatement (Third) of Trusts § 81 ("Each trustee . . . has a duty to use reasonable care to prevent a co-trustee from committing a breach of trust and, if a breach of trust occurs, to obtain

The Defendants' principal rejoinder is that Beatty's asserted cause of action is foreclosed under D.C. law. See Defs.' Cross-Mot. at 33–34. In this jurisdiction, they point out, "the traditional rule has been that only a public officer, usually the state Attorney General" may "bring an action to enforce the terms of [a charitable] trust." Hooker v. Edes Home, 579 A.2d 608, 612 (D.C. 1990). "An exception to th[is] general rule . . . exists where an individual seeking enforcement of the trust has a 'special interest' in continued performance of the trust distinguishable from that of the public at large." Id. In order to proceed under the "special interest" exception, a plaintiff must demonstrate that she belongs to a "particular," "sharply defined," and "limited" class of potential beneficiaries and that she challenges more than "an ordinary exercise of discretion on a matter expressly committed to the trustees." Id. at 614–15. The Defendants contend that Beatty lacks a "special interest" and thus cannot maintain this suit.

Assuming the Defendants are correct that D.C. trust law governs here, which is not patently obvious, the Court stands by its rejection of the Defendants' argument in its TRO ruling: Hooker, its underlying rationale, and its progeny do not "restrict the availability" of a trustee's cause of action against her co-trustees. Beatty, 2026 WL 712814, at *8. For one thing, both statutory and common-law authorities that govern in the District acknowledge a co-trustee's ability to challenge a colleague's misconduct. Again, D.C.'s Uniform Trust Code provides both

redress."); id. § 94(2), cmt. c (authorizing "suit for the enforcement" of charitable trust by co-trustee); see also Bogert's Law of Trusts § 394 (explaining that a co-trustee may "commence" legal "proceedings to enforce charitable trust); id. § 413 ("In certain instances, standard trust doctrine allows trustees or successor trustees to sue cotrustees or trustees of the same trust."); id. § 871 ("The action to obtain relief for a breach of trust may be brought on behalf of the beneficiary . . . by a co-trustee[.]"); Scott and Ascher on Trusts § 37.3.10 (6th ed. 2023) ("Although it is frequently said that only the Attorney General has the power to enforce charitable trusts, this is not strictly true. When there are several trustees, any one or more of them may maintain an action against the others to enforce the trust or to compel redress of a breach of trust.").

that trustees "shall exercise reasonable care" to "[p]revent a cotrustee from committing a serious breach of trust" and "[c]ompel a cotrustee to redress a serious breach of trust." D.C. Code § 19-1307.03(g). It further provides that the settlor "of a charitable trust, *among others*, may maintain a proceeding to enforce the trust." Id. § 19-1304.05(c) (emphasis added).

For another, local case law bolsters Beatty's position. In 2002, the D.C. Court of Appeals considered whether the directors of a local charitable corporation known as the Washington City Orphan Asylum could sue to challenge the institution's board of trustees' breach of fiduciary duty, among other alleged torts. See Bd. of Dirs. Of the Wash. City Orphan Asylum v. Bd. of Trs. of the Wash. City Orphan Asylum, 798 A.2d 1068 (D.C. 2002). The directors sued in their capacity either as "co-trustees or sub-trustees, or as persons holding a special interest in a charitable trust under" the Restatement and Hooker. Id. at 1075. The Court of Appeals concluded that the directors had "made colorable arguments regarding their status as persons who have a special interest in the enforcement of a trust or as intermediate beneficiaries of a trust sufficient to give them standing," but did not address whether the directors could independently sue as trustees. Id.

A subsequent Court of Appeals decision—Family Fed'n for World Peace and Unification Int'l v. Hyun Jin Moon—clarified that even though charitable corporation directors enjoy special interest standing, they *also* "fall within the definition of 'among others' in D.C. Code § 19-304.05 . . . for enforcement of charitable trusts" and therefore may maintain a proceeding to enforce the trust, separate and apart from their special interest standing. 129 A.3d 234, 244 n.16 (D.C. 2015) ("Moon I"). Ten years later, the case made its way back to the Court of Appeals, which again applied the special interest standing test as a "prerequisite for certain private plaintiffs who wish to challenge the actions of a 'charitable trust[.]'" Family Fed'n for World

Peace and Unification Int'l v. Hyun Jin Moon, 338 A.3d 10, 27 (D.C. 2025) ("Moon II"). But the Court of Appeals was careful to note once more that "[s]ome private plaintiffs do not need to establish special interest standing where their standing is established by statute." Id. at 27 n.7.

The Court thus remains persuaded that Beatty's cause of action hews to D.C. trust law. To be sure, public officers have unique common-law standing to enforce the terms of a charitable trust. See, e.g., Mount Vernon Mortg. Corp. v. U.S. by Att'y. Gen., 236 F.2d 724, 725 (D.C. Cir. 1956) (recognizing the Attorney General's special capacity to "sue to prevent" a charitable trust's property "from being diverted to private profit"). And "the traditional rule" has been that others do not have that same standing. Hooker, 579 A.2d at 612. Otherwise, a risk exists that "any and all" *beneficiaries* of a charitable trust—who are a "large and constantly shifting" class—might engage in "vexatious litigation" and place "recurring burdens on the trust res." Id. at 611–12 (quoting, in part, G. G. Bogert, The Law of Trusts and Trustees § 411 (2d ed. 1977)).

Allowing trustees to sue pursuant to the D.C. Code's "reasonable care" provision does not upset this careful balance. D.C. Code § 19-1307.03(g). The statute carves out a sharply defined and limited group—trustees—who are specially positioned to challenge trust-related misconduct. And consistent with Moon I and II, trustees fall within the category of "others" who, alongside settlors and directors, may "maintain a proceeding to enforce a trust." Id. § 19-1304.05(c). Read in parallel with the Restatement and the Bogert treatise's embrace of trustee-against-trustee suits, cf. He Depu, 950 F.3d at 901 n.2 (recognizing these sources as "authoritative"), D.C. trust law does not foreclose Beatty's cause of action.[20]

[20] What's more, permitting trustees to sue to protect trust property strikes the Court as entirely sensible. The Attorney General "serves as a potential surrogate who is able to represent the public interest," and thus represents a "*supplement* to, rather than a *replacement* for, the trustees acting in the name of [a charitable trust] to vindicate [the trust's] rights." In re Bos. Reg'l Med. Ctr., Inc., 328 F. Supp. 2d 130, 147 (D.D.C. 2004) (emphasis added). It is crucial

b. Merits

With that threshold issue out of the way, it is time to get down to brass tacks. May the John F. Kennedy Center for the Performing Arts be renamed absent Congressional authorization? The answer, plain from the face of the statute, is no. Nor can any other individual be memorialized on the front portico of the building. There are no genuine disputes of material fact on this score, so Beatty is entitled to summary judgment on her renaming claim.

To start, the statute instructs the Board to "construct for the Smithsonian Institution . . . a building *to be designated as* the John F. Kennedy Center for the Performing Arts," built on a particular parcel of land in the District overlooking the Potomac River and nested between Rock Creek Parkway, the Potomac River Freeway, and the Roosevelt Bridge. 20 U.S.C. § 76i(a) (emphasis added). The verb "designate" possesses a particular meaning. Around the time of the Kennedy Center's naming, Black's Law Dictionary tells us it meant to "indicate or set apart for a purpose or duty," Designate, Black's Law Dictionary (4th rev. ed. 1968); today's edition defines it as "represent[ing] or referr[ing] to (something) using a particular symbol, sign, name, etc.," , Designate, Black's Law Dictionary (12th ed. 2024). Congress intended the Kennedy Center, so "*designated* by [the] subchapter," to be "the sole national memorial to the late John Fitzgerald Kennedy within the city of Washington and its environs." 20 U.S.C. § 76q (emphasis added).

The evolution of the organic statute over time is also telling. The Center was originally known as the "National Cultural Center." National Cultural Center Act § 2(a). In 1964, Congress amended the statute to "renam[e] the National Cultural Center as the John F. Kennedy

---

that a sovereign have the power to step in to enforce a charitable trust where the trustees have been derelict. But all else equal, a "charity's own representative has at least as much interest in preserving the charitable funds as does the Attorney General who represents the general public. The cotrustee is also in the best position to learn about breaches of trust and to bring the relevant facts to a court's attention." Holt, 61 Cal. 2d 750, 756 (citation omitted).

Center for the Performing Arts," which entailed "striking out" the former name "each place that it appear[ed]" in the original act and replacing it with the latter. Pub. L. No. 88-260, 78 Stat. at 4. It is hard to imagine a more intentional legislative effort to call the Center by its chosen name.

There is more. Congress honored the fallen president not just with a building, but an entire institution. According to the statute,

> [t]here is established in the Smithsonian a *bureau*, which shall be directed by a board to be known as the Trustees of the *John F. Kennedy Center for the Performing Arts* . . . whose duty it shall be to maintain and administer the *John F. Kennedy Center for the Performing Arts and site thereof* as the National Center for the Performing Arts, a *living memorial* to *John Fitzgerald Kennedy*[.]

20 U.S.C. § 76h(a)(1) (emphasis added). The law refers to the institution as the "John F. Kennedy Center for the Performing Arts" no fewer than two dozen times. There can be no confusion about the name Congress gave it.[21]

The organic statute also takes pains to ensure that the Kennedy Center's public spaces honor President Kennedy and President Kennedy alone. With a handful of enumerated exceptions that do not apply here,[22] "the Board shall assure that after December 2, 1983, no

[21] The Defendants contend that even if the "building" is to be named the Kennedy Center, the name of the complex more broadly—including the building and the "site thereof"—is in fact the "National Center for the Performing Arts." See Defs.' Cross-Mot. Reply at 17 n.6. That contention is beside the point—even if Congress gave the Center some *third* name, it certainly has not authorized the Board to rename the institution after President Trump. The Defendants' contention is wrong in any event. Properly read, the cited language reflects Congress's directive that the Board of Trustees should "maintain and administer" the Kennedy Center and site thereof "*as* the National Center for the Performing Arts," just as it should administer the institution *as* "a living memorial to John Fitzgerald Kennedy." 20 U.S.C. § 76h. Defendants are therefore hard-pressed to argue that the institution has been the "National Center for the Performing Arts" this whole time.

[22] The statute permits "any plaque acknowledging a gift from a foreign country"; "any plaque on a theater chair or a theater box acknowledging the gift of such chair or box"; and "any inscription on the marble walls in the north or south galleries, the Hall of States, or the Hall of Nations acknowledging a major contribution," "which plaque or inscription is permitted under policies of the Board in effect on December 2, 1983." 20 U.S.C. § 76j(b)(2).

additional memorials or plaques in the nature of memorials shall be designated or installed in the public areas of the John F. Kennedy Center for the Performing Arts." Id. § 76j(b)(1). The prohibition is unambiguous, and the narrow exceptions only serve to reinforce the breadth of the bar on public memorials and plaques. Indeed, Congress was so wary of diluting the power of the public dedication to the slain president that, when it authorized the REACH expansion in 2012, it noted that the Board could "acknowledge private contributions" that made the expansion possible, but only "in the interior of the project" and not "on the exterior[.]" Id. § 76i(c)(3).

Taken together, these citations establish that the Kennedy Center must be named for, and is meant to honor, President Kennedy alone. The Defendants have identified no statutory sources that empower the Board to change the name or designate new memorials in the public areas of the Center without Congressional approval. To the contrary, Congress has definitively established the Center's name and prohibited the installation of any "memorials or plaques in the nature of memorials," aside from a few minor carveouts not relevant here.

Accordingly, in voting to formally rename the Center after President Trump and allowing his name to be mounted alongside President Kennedy's on the front portico of the main building, the Board has violated the terms of the trust and governing statute. Cf. Restatement (Third) of Trusts §§ 70 (trustee's powers "limited by statute or terms of trust"); 76 (requiring trustees to administer the trust "in accordance with the terms of the trust and applicable law").

The Defendants do not contest that the Center must be named for President Kennedy. Nor do they deny that memorials in public spaces of the Center are generally verboten or suggest that the new lettering falls into one of § 76j(b)'s enumerated exceptions. They instead submit that everything is not what it seems. This decision was not a renaming, insist the Defendants, and President Trump's name on the front portico is not a "memorial." Not so fast.

On the first point, Defendants posit that the "Trump Kennedy Center" is merely a "secondary name." See Defs.' Cross-Mot. at 31–32. That convenient reframing is too cute by half—and belied by the record. According to White House Press Secretary Karoline Leavitt, the Board formally "voted" to "*rename* the Kennedy Center to the Trump-Kennedy Center" on December 18, 2025. Defs.' Resp. to SMF ¶ 18 (emphasis added). The next day, President Trump's name was affixed to the front portico of the main Kennedy Center building—*above* President Kennedy's, to boot. Id. ¶ 19. The joint name has since been featured on the Center's official website, email communications, letterhead, and logo. Id. ¶¶ 22–24, 26–28. The Center even filed a trademark application with the institution's new name and logo. Id. ¶ 25. These official changes reflect far more than an innocuous nicknaming.

The rechristening is not, as Defendants suggest, like calling the "Bureau of Consumer Financial Protection" the "Consumer Financial Protection Bureau," which is merely a clerical rearrangement. Nor is it akin to calling the Federal National Mortgage Association "Fannie Mae," which, as even the Defendants admit, is simply a "play on the pronunciation of its acronym." The administration's efforts to alter the names of other institutions—calling the Department of Defense the "Department of War," for example—are beside the point. Most fundamentally, none of these examples implicate a presidential memorial that was legislatively intended to honor a specific public figure. The "Trump Kennedy Center" label adds an entirely new name to the Center's formal title and relegates President Kennedy's name to second place. If that is not a renaming, what is?

On the second point, Defendants suggest that physical addition of President Trump's name to the face of the building is not a "memorial" or "plaque in the nature of" a memorial under § 76j(b). That suggestion is risible, both in light of the record evidence and as a matter of

common sense. The lettering literally reads: "The Donald J. Trump and John F. Kennedy *Memorial* Center for the Performing Arts." Defs.' Resp. to SMF ¶ 17 (emphasis added). When Press Secretary Leavitt announced the Board's vote to change the Kennedy Center's name, she explained that the decision was taken "because of the unbelievable work President Trump ha[d] done over the last year in saving the building," "[n]ot only from the standpoint of its reconstruction, but also financially, and its reputation." Pl.'s PSJ Mot., ECF No. 30-7, Ex. HH ("Leavitt X Post") at 1. "Congratulations to President Donald J. Trump," her social media post continued, "and likewise, congratulations to President Kennedy, because this will be a truly great team long into the future! The building will no doubt attain new levels of success and grandeur." Id. Similarly, the Center's vice president of public relations Roma Daravi told Fox News that the vote "recognizes that the current Chairman saved the institution from financial ruin and physical destruction." PI Mot. Reply, ECF No. 37-2, Ex. MM (Fox News reporting) at 2. Absent any contrary evidence from the Defendants, the Court cannot but conclude that the renaming was meant to honor President Trump's work on the Center. And no wonder—why add an individual's name to the very title of an institution if not to commemorate him?

The Defendants also quibble with the terms of Congress's clear proscription, arguing, for instance, that the lettering on the front portico is permissible because a "memorial" can only honor some "past impression" of a person or entity, and Mr. Trump is the sitting president. This is more than a stretch. Defs.' Cross-Mot. at 33–34. As a textual matter, Congress has not just banned public "memorials" at the site, but "plaques *in the nature of* memorials." 20 U.S.C. § 76j(b)(1). In any event, according to the Press Secretary, the "Trump Kennedy Center" name recognized the "unbelievable work President Trump" *had already done* to "salvag[e]" the

building during the first year of his second term. See Leavitt X Post at 1. The renaming was thus an effort to ensure that future visitors would be aware of the President's "past" work.

At the motions hearing, the Defendants pressed that the "best" way to read 20 U.S.C. § 76j(b) was as a prohibition on memorializing "deceased" individuals, based on a passing reference to a piece of legislative history that they did not cite in their briefs. See Mot. Hr'g Tr. at 63:4–64:21. But nothing in the plain text of the statute endorses such a constricted reading. And nothing in the ordinary meaning of "memorial" suggests that the word *necessarily* denotes posthumous commemoration, even by the Defendants' own cited dictionary definition. Cf. Scalia & Garner, Reading Law 69–72 (describing the ordinary-meaning canon).

In sum, the Board clearly violated the Kennedy Center's organic statute—and the terms of the trust—when it formally renamed the Center after President Trump and memorialized him on the face of the building. There is no genuine dispute of material fact on this point, just a lackluster attempt to recast the renaming as something it was not: a casual nicknaming. Beatty is therefore entitled to summary judgment on Count One of her FAC.

### 3. *Ultra Vires Claim*

In the event that Section 76*l*(b) does not establish a cause of action by which the Congresswoman may challenge the unlawful conduct of her colleagues, her fall-back *ultra vires* claim embedded in Count Four of the FAC would do the trick. Such a claim is available when a government entity or official acts "outside of the authority Congress granted." Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv., 26 F.4th 960, 970 (D.C. Cir. 2022). "To prevail on an ultra vires claim, the plaintiff must establish that (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim, and (3) the challenged action is plainly in excess of the agency's delegated powers and contrary to a specific prohibition

in the statute that is clear and mandatory." Glob. Health Council v. Trump, 153 F.4th 1, 20 (D.C. Cir. 2025) (cleaned up). The third requirement means that "[o]nly error that is patently a misconstruction of the [relevant statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." Fed. Express Corp. v. U.S. Dep't of Commerce, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up) ("FedEx"); see also Changji Esquel Textile Co. Ltd. v. Raimondo, 40 F.4th 716, 722 (D.C. Cir. 2022).

As *ultra vires* review "could become an easy end-run around the limitations" of judicial review statutes, the Supreme Court has "strictly limited" its scope. Nuclear Reg. Comm'n v. Texas, 605 U.S. 665, 681 (2025). The exception does not apply "simply because" an administrative action "does not comport with law." Id. (cleaned up). Rather, the challenged conduct must be patently "unauthorized by any law and in violation of the rights of the individual." Id. (cleaned up). Due to these stringent requirements, an *ultra vires* claim is often characterized as a "Hail Mary pass." Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009). Still, "it is not insurmountable." Nat'l Trust for Hist. Pres. v. Nat'l Park Serv., No. 25-cv-4316 (RJL), 2026 WL 877779, at *6 (D.D.C. Mar. 31, 2026) (referencing successful *ultra vires* claim in lower court decisions leading to Learning Res., Inc. v. Trump, 146 S. Ct. 628 (2026), as well as Nat'l Ass'n of Postal Supervisors, 26 F.4th at 972 and Chamber of Comm. of U.S. v. Reich, 74 F.3d 1322, 1324 (D.C. Cir. 1996)), op. clarified, 2026 WL 1027744 (D.D.C. Apr. 16, 2026).

If the Section 76*l*(b) claim is not available to Congresswoman Beatty, the three *ultra vires* criteria are satisfied here. *First*, judicial review is not expressly precluded by the Kennedy Center's organic statute. Again, review is specifically contemplated by 20 U.S.C. § 76k(e), which provides that the "actions of the Board relating to performing arts and to payments made

or directed to be made by the Board from any trust funds shall not be subject to review by any officer or agency *other than a court of law*" (emphasis added).

*Second*, if a cause of action under Section 76*l*(b) were unavailable, there would be no alternative procedure for review of Beatty's claim because the Kennedy Center does not qualify as an "agency" under the APA. Cf. Dong v. Smithsonian Inst., 125 F.3d 877, 882 (D.C. Cir. 1997) (holding that the Smithsonian does not qualify as an "agency" for APA purposes).

And *third*, as the Court has just concluded, the Kennedy Center statute makes abundantly clear that the Center is to be named after John F. Kennedy alone. As a result, the Center's renaming plainly "disregards a specific and unambiguous statutory directive" and "violates [a] specific command of a statute." FedEx, 39 F.4th at 764. Placing President Trump's name on the front portico of the building further contravenes the organic statute's unequivocal prohibition on additional memorials in the Center's public areas. The Defendants cite, and the Court can find, no authority allowing the Board to formally and unilaterally change the institutional name Congress has chosen. Moreover, the violation infringes on Beatty's individual right to "carry out the terms and purposes of the trust" consistent with her fiduciary duties. See Restatement (Third) of Trusts § 70; see also 20 U.S.C. § 76*l*(b).

The Court thus finds that, if the renaming claim is found not to be actionable under Section 76*l*(b), this case presents one of the rare situations in which the "Hail Mary" pass of an *ultra vires* claim finds the hands of a receiver in the end zone. Staubach to Pearson, indeed.

*4. Remedy*

Representative Beatty requests both declaratory and permanent injunctive relief. In light of the merits analysis above, the Court will enter summary judgment in Beatty's favor on Count One of the FAC, declaring that Congress has named the John F. Kennedy Center for the

Performing Arts in honor of President Kennedy and that the formal renaming of the Center as the "Trump Kennedy Center" (in that or any related permutation) without Congressional authorization is unlawful and unenforceable.

As for the requested injunctive relief, "[a] plaintiff seeking a permanent injunction 'must satisfy a four-factor test before a court may grant such relief.'" Anatol Zukerman & Charles Krause Reporting, LLC v. USPS, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006)). She must demonstrate that (1) she has "suffered an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "that the public interest would not be disserved by a permanent injunction." Id. (quoting eBay, 547 U.S. at 391).

The Defendants' arguments against a permanent injunction on renaming largely echo their challenges to Beatty's Article III standing, which the Court has already rejected. Beatty's inability to administer the trust in accordance with its governing statute is an irreparable injury that the Court cannot fix by awarding money damages or remedies available at law; only an injunction prohibiting the Board from continuing to effectuate its unlawful decision will place Beatty in good stead as to her statutory and fiduciary duties.[23]

---

[23] The Court also acknowledges the apparent damage that the renaming has caused to the trust *res* that Beatty is charged with protecting. The parties agree that "[f]ollowing the renaming," many artists canceled upcoming performances, alluding to their discomfort with the changes that the Kennedy Center's new leadership had wrought. See Defs.' Resp. to SMF ¶ 34; see also Am. Amicus Br. at 15–16. A few weeks after the renaming, the Washington National Opera, the Kennedy Center's resident company since 1971, announced it would part ways with the institution. Defs.' Resp. to SMF ¶ 35. Ticket sales in early 2026 experienced a precipitous drop as compared to prior years, as did viewership of the Kennedy Center Honors broadcast which took place a few days after the renaming. Id. ¶ 36; see also Am. Amicus Br. at 15.

The balance of hardships also strongly favors the Congresswoman. The cost of removing the "Trump Kennedy" name from the Center's façade, website, and official materials are *de minimis* and, of course, stem from the Board's own unlawful decision.[24] The Defendants have pointed to no "public interest" that would be "disserved" by permanently enjoining the renaming. And "[t]here is generally no public interest" in the "perpetuation" of "unlawful" governmental action. League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016).

In sum, the Court rules that Representative Beatty is entitled to a permanent injunction prohibiting the Defendants from effectuating the formal renaming of the Kennedy Center in honor of President Trump unless they receive Congress's approval to do so. And because the Defendants are currently in violation of Congress's express statutory direction, the Court will order that they remove President Trump's name from the institution's title, as represented on the façade of the Center, any other physical or digital signage, and official materials.

B. Voting

Moving along, the Defendants have cross-moved for summary judgment on Beatty's claim that she has a legal right to vote as an *ex officio* Board member. Although Beatty did not

[24] In another last-ditch effort, the Defendants have moved for leave to file a supplemental declaration by Mr. Floca, which posits that enjoining the Center's name change would cause irreparable harm to the Kennedy Center. According to Floca, removing President Trump's name would "sever[]" his connection to "vital fundraising" and thereby impair artistic programming and render the "continuation of . . . operations financially nonviable." See Defs.' Mot. for Leave to File Suppl. Decl., ECF No. 47.

The Court will deny the motion given the unexplained and unjustified delay in its filing. The declaration has zero evidentiary value in any case. First, it lacks a factual basis and is grounded on Floca's unsupported opinion alone. There is no proof that current or future donations hinge on President Trump's name being on the building. Second, the declaration is internally inconsistent in suggesting that the Center has already amassed millions in contributions yet would be in financial ruin if Trump's name were excised from the title. Third, it is contradicted by the record, including Mr. Grenell's rosy assessment of fundraising prior to the name change. In short, there is no competent evidence that removing the Trump name would prevent the Center from fulfilling its artistic mission, as it has done for the last sixty years.

move for partial summary judgment on this issue initially, she responded to the Defendants' cross-motion by requesting that the Court grant summary judgment in her favor on this issue, noting that "district courts possess the authority to enter summary judgment against a party *sua sponte*" as long as "the losing party was on notice that she had to come forward with all her evidence." Athridge v. Rivas, 141 F.3d 357, 361 (D.C. Cir. 1998) (cleaned up). Both parties have now had a full opportunity to argue and present evidence on the voting question, and neither opposes treating the issue as one on which each side has effectively cross-moved for summary judgment.

*1. Article III Standing*

Article III "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." TransUnion, 594 U.S. at 431. Here, as the government recognizes, see Defs.' Cross-Mot. at 11 n.2, Beatty has standing to challenge the Board's decision to strip her of her right to vote on trust matters—which, if she is correct on the merits, is a right that belongs to her personally. Being deprived of the right to vote is a concrete and particularized injury, which is causally related to the challenged bylaw amendments and would be redressed by an order enjoining the implementation of the amendments to the extent they prevent Beatty from voting.

*2. Section 76l(b) Voting Claim*

a. Cause of Action

For the reasons laid out above, Beatty has a valid cause of action under Section 76*l*(b), as she has challenged the Board's bylaw amendments as inconsistent with the organic statute and governing terms of the trust, see FAC ¶ 87. The Court approaches the availability of an alternative *ultra vires* cause of action with more skepticism. The organic statute does not

expressly state whether all trustees have the right to vote. And it expressly "authorize[s]" the Board "to make such bylaws, rules, and regulations, as it deems necessary for the administration of its functions . . . including, among other matters, bylaws, rules, and regulations relating to the administration of its trust funds and [its own] organization and procedure[.]" 20 U.S.C. § 76(a). Because the requisite statutory interpretation on this claim is more involved, the Court reviews Beatty's right to vote through her Section 76*l*(b) claim alone.

b. Merits

Turning to the merits of that claim, the Court observes that there remains a factual dispute as to whether the Board has historically let *ex officio* members vote. Were that dispute material, summary judgment for either party would be premature. But the parties have now apparently converged on the understanding that the voting rights of *ex officio* Board members is a question of statute, not historical practice. See Defs.' Cross-Mot. at 35–36; PI Mot. Reply at 19–23. The Court agrees and therefore will not defer a summary judgment ruling.

The Court starts by re-treading some old analytical ground. See Beatty, 2026 WL 712814, at *12. Once again, the Kennedy Center statute confers "the usual powers and obligations of a trustee" on the Board's individual members. 20 U.S.C. § 76*l*(b). Each trustee has a "duty and the right to participate in the administration of the trust," except "as otherwise provided by the terms of the trust." Restatement (Third) of Trusts § 81(1). Said another way, trustees have both an obligation and an opportunity to participate in trust decision-making, whether or not that takes the precise form of casting a vote. Cf. id. § 39, cmt. a ("[W]hen feasible all trustees must be consulted before decisions are made.").

This default rule is entirely sensible; after all, if an individual joins a deliberative body, but is then entirely "wall[ed] . . . off" from its operations, her membership is "render[ed] . . .

essentially meaningless." Cummock v. Gore, 180 F.3d 282, 291 (D.C. Cir. 1999). To render Representative Beatty's Kennedy Board membership "meaningless" would not only contravene common-law trust principles, but also by extension, Congress's chosen language. Still, it remains unclear whether a trustee must be able to *vote* in order to participate meaningfully in the trust's affairs. For guidance, the Court turns back to the organic statute.

Congress has delineated in granular detail whom the Board "shall be composed of." See 20 U.S.C. § 76h(a)(2). It has permitted the Board to "function notwithstanding vacancies and twelve members of the Board shall constitute a quorum for the transaction of business." See id. § 76*l*(a). Furthermore, the Board is "authorized . . . to make such bylaws, rules, and regulations, as it deems necessary for the administration of its functions under this subchapter, including, among other matters, bylaws, rules, and regulations relating to the administration of its trust funds" and, relevant here, "the organization and procedure of the Board." Id. (emphasis added).

But the statute says nothing explicit about which members may or may not vote. How are we to read that silence, in light of the other provisions just mentioned? Though somewhat of a close question, the Court remains persuaded that each Board member identified in § 76h(a)(2) is entitled to vote at Board meetings.

*First*, since the time of the organic statute's first enactment, the term *ex officio* has denoted a position, power, or privilege that is held by virtue of a particular office. See Ex officio, Webster's New Dictionary of the American Language (1957) (defining the term as "by virtue of one's office, or position"); see also Ex officio, Black's Law Dictionary (4th ed. rev. 1968) (defining the term as "[f]rom office; by virtue of the office; without any other warrant or appointment than that resulting from the holding of a particular office"). In the trust context, the phrase does not inherently connote that a trusteeship is merely honorary. In fact, though "[t]he

term is often misused as a synonym for 'nonvoting,'" "an ex officio member is a voting member unless the applicable governing document provides otherwise." Ex officio, Black's Law Dictionary (12th ed. 2024).

*Next*, the Center's organic statute does not distinguish between general trustees and *ex officio* members in any way, other than to identify who they are, spell out how they are appointed, and specify the term length for general trustees. See 20 U.S.C. § 76h(a)(2). Coupled with the fact that trustees possess "all the usual powers and obligations . . . in respect of all trust funds" they collectively administer, id. § 76*l*(b), the lack of any meaningful distinction between general and *ex officio* trustees reinforces a baseline presumption that they possess identical "powers and obligations" under trust law.[25] That presumption is further bolstered by the 1994 amendments to the Kennedy Center statute, which added several new *ex officio* members to the Board. In a corresponding House Report, legislators explained that "[a]lthough these trustees are ex officio, they are permitted to vote." H.R. Rep. No. 103-453, pt. 1, at 11 (1994). Though this language did not make it into the text of the statute, it offers at least some indication that Congress did not intend to preclude *ex officio* trustees from voting in Board proceedings.

If trustees presumptively possess the right to vote, what, if anything, authorizes the Board to unilaterally strip certain trustees of voting rights? The body may, of course, make "bylaws,

[25] Both sides have proffered a laundry list of U.S. Code provisions dealing with the voting status of other federal board or commission members. See PI Mot. at 13–16 (collecting citations); Defs.' Cross-Mot. at 35–36 (same). Congress has, in other contexts, specified that such are non-voting or voting. And it has sometimes specified that non-voting members are to participate in an "advisory capacity." See, e.g., 15 U.S.C. § 657u(b)(2); 12 U.S.C. § 5321(b)(2). But this variety of citations, none of which appear to deal with a trust instrumentality, is not especially helpful in elucidating what Congress meant when it conferred the "usual powers and obligations" on Kennedy Center trustees. The Court thus stands by its conclusion that the lack of distinction between general and *ex officio* board members, coupled with the "usual powers and obligations" language, places trustees on a default level playing field when it comes to voting.

rules, and regulations" as "it deems necessary for the administration of its functions," "including among other matters, bylaws, rules, and regulations relating to the administration of its trust funds and the organization and procedure of the Board." 20 U.S.C. § 76*l*(a). But this provision is not a catch-all allowing the Board to regulate any subject not expressly mentioned in the statute. Where possible, courts are to give "effect" to "every clause and part of a statute." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) (citation omitted). The phrase "necessary for the administration of [the Board's] functions" must be doing some work here, limiting the scope of the Board's otherwise broad power to make its own procedural rules.

Stripping trustees of their right to vote in *any* Board matter does not strike the Court as "necessary" for "administrati[ve]," "organization[al]," or "procedur[al]" purposes. The right to vote implicates and shapes a trustee's core fiduciary duties. It differentiates trustees with decision-making authority from those who merely advise. Of course, not all trustees vote on all trust business. In the normal course, the chairperson, secretary, and treasurer handle housekeeping matters. Some decision-making power is duly delegated to committees, sub-committees, and agents. Officers, executives, and staff handle quotidian management issues. Notwithstanding this ordinary dispersion of authority, however, a trustee's *categorial* right to vote is substantive—rather than organizational or procedural—in nature. And the Court discerns nothing in the statutory terms of the Kennedy Center trust that empowers the Board to deprive trustees of their right to vote altogether.

As a practical matter, adopting the Defendants' construction of the organic statute could lead to very strange outcomes. The most explicit textual guardrail on the Board's administrative function is that a quorum of twelve members is required to "transact[]" its "business." 20 U.S.C.

§ 76*l*(a). On the Defendants' reading of the statute, the Board could decide to strip all but twelve arbitrary members of the right to vote. Or it could decide to vest voting rights in *ex officio* members alone, leaving general trustees powerless. Such a result is hard to square with a statute that affords trustees the "usual" common-law "powers and obligations," without regard to their *ex officio* or general status.

The Defendants suggest in their final reply brief that the statute's generic distinction between *ex officio* and general trustees itself "provides a meaningful bulwark" against the absurd results noted above. Defs.' Cross-Mot. Reply at 20–21. But they backtracked on that stance at the motions hearing when confronted with the following hypothetical. Say that after some future presidential election but before inauguration, the Center's general trustees—who have been appointed by the now-lame-duck president—vote to strip the voting rights of all general trustees moving forward because they worry that future general trustees will lead the trust in a disagreeable direction. Such a move, the Defendants said, would *not* "violate [Section] 76*l*." Mot. Hr'g Tr. at 67:18–25. But "perhaps" it could present "a problem under general trust principles." Id. at 68:3–5.

That last caveat proves too much. In what has become a familiar refrain, the Kennedy Center statute confers the "usual powers and obligations" on trustees in their administration of the trust *res*. If voting rights gamesmanship is inconsistent with "general trust principles," then it is in direct tension with the statute, which again reflects no distinction between general and *ex officio* trustees aside from their mode and length of appointment.

To recap, the Kennedy Center's organic statute does not expressly prohibit *ex officio* members from voting, nor does it say that all trustees must be able to vote in quite so many words. In the face of some ambiguity, the Court has parsed the specific text of the statute and its

structure and is persuaded that Congress did not mean for general trustees and *ex officio* trustees to have fundamentally different voting powers. Accordingly, to the extent the May 2025 bylaw amendments categorically strip *ex officio* members of the right to vote, those amendments are inconsistent with the organic statute.

*3. Remedy*

As to remedy, the Court again finds that the permanent injunction factors weigh in the Congresswoman's favor. She is irreparably harmed by the offending portion of the bylaw amendments because she has been rendered an advisory Board member without a concrete say in its activity. The Defendants cannot remediate that harm with monetary damages. And Beatty's inability to exercise voting power outweighs any harm to the Defendants, who have not, in this latest round of briefing, identified any prejudice associated with allowing *ex officio* members to vote, either to the Center or the public at large. Though not dispositive of the balancing of the equities, it is worth noting that general trustees significantly outnumber *ex officio* trustees. To the extent that general trustees have acted "unanimously" in the recent past, see, e.g., Leavitt X Post at 1, voiding the unlawful provision of the bylaw amendments is unlikely to change the Board's current balance of power, cf. Defs.' Opp. to TRO Mot. at 17 ("Plaintiff has provided no evidence that her participation in the May 2025 amendment, December 2025 vote, or upcoming March 2026 vote would have changed or will change any of those votes' outcomes.").[26]

In sum, Representative Beatty is entitled to summary judgment on her voting rights claim in Count Three of the FAC. Absent Congressional authorization, the Board may not deprive a duly-appointed Kennedy Center trustee of her right to vote on Board matters on which all other

---

[26] The Court acknowledges that it balanced the equities differently at the TRO stage, when the emergency relief requested and the exigencies and compressed briefing schedule demanded a different calculus. The circumstances have changed since then.

trustees are entitled to vote. The May 2025 bylaw amendment stripping Beatty and other *ex officio* members of their voting rights is thus void and unenforceable. The Board is enjoined from enforcing the bylaw amendments to the extent that the Court has deemed them unlawful.

C. Closure

The last issue before the Court is the proposed closure of the Kennedy Center, which is slated to take effect this July. Representative Beatty initially sought a PI "preventing Defendants from undertaking further irreparable steps toward effectuating the Center's closure . . . or any steps toward tearing down or 'rebuilding' the structure, before this Court has the opportunity to reach a final resolution in this case." PI Mot. at 3. The Defendants have cross-moved for summary judgment, maintaining that the Center's closure is plainly lawful, and that no genuine dispute of material fact exists on the subject. Defs.' Cross-Mot. at 18.

The Court analyzes the closure in the preliminary injunction posture. As explained below, the Congresswoman is likely to succeed on her claim that the Board violated its fiduciary duty in approving the closure plan at the March 16 Board meeting, so summary judgment in the Defendants' favor is not warranted. Because the other preliminary injunction factors also counsel in Beatty's favor, the Court will grant her motion for preliminary relief in part.

*1. Likelihood of Success on the Merits*

a. Article III Standing

A plaintiff must "demonstrate [Article III] standing for each claim [s]he seeks to press and for each form of relief that is sought." Town of Chester, N.Y. v. Laroe Ests., Inc., 581 U.S. 433, 439 (2017) (cleaned up). The fact that Representative Beatty has standing to raise her renaming and voting claims does not automatically mean she has standing to challenge the Center's closure. However, the same theory of Article III injury-in-fact accepted above would

seem to apply here. Assuming Beatty is right on the merits, "[a]ny closure and 'rebuilding' of the Kennedy Center without proper and meaningful Board deliberation, without the required regulatory approvals, and in violation of applicable law . . . frustrate[s]" her "ability to fulfill [her] fiduciary duties." Beatty Decl. ¶ 26. These include her duty to administer the trust in accordance with its terms, her duty (and right) to participate in the administration of the trust, and her duty to "administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust." Beatty, 2026 WL 712814, at *7 (quoting Restatement (Third) of Trusts § 77(1)). This last duty of prudence, in turn, necessitates the "exercise of reasonable care, skill, and caution," which entails, among other things, using "reasonable effort and diligence" in planning and decision-making and "obtaining relevant information." See Restatement (Third) of Trusts § 77(2); id. cmt. b.

As the Defendants point out, Representative Beatty was permitted to register her dissent on the closure question at the March 16 Board meeting, pursuant to this Court's TRO Order. That lodged opposition greatly reduces the likelihood that she would be found personally liable for a breach of fiduciary duty in some future lawsuit. But as explored above, her dissent did not instantaneously satisfy all of her applicable trustee duties. If the Center may not close without Congressional approval, or instead may not close absent some modicum of prudent analysis, Beatty will satisfy her pertinent fiduciary duties by obtaining an injunction against an unlawful closure. Because the purportedly unlawful decision to close the Center for two years prevents Beatty from fulfilling her fiduciary duties, and an injunction prohibiting that unlawful closure would allow her to discharge those duties, the causation and redressability elements of Article III standing are satisfied.

b. Section 76*l*(b) Closure Claim

*i. Cause of Action*

The Court is once again reassured that Representative Beatty's Section 76*l*(b) claim is viable for the reasons set forth in Section III.A.2.a. However, it is unlikely that Beatty can pursue an *ultra vires* claim in the alternative. Again, in order to "prevail on an ultra vires claim, the plaintiff must establish that . . . the challenged action is plainly in excess of the agency's delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." Glob. Health Council, 153 F.4th at 20. At this stage, Beatty has neither established that the closure is *per se* or patently "unauthorized by any law," nor that it violates any specific statutory prohibition. Nuclear Reg. Comm'n, 605 U.S. at 681. Thus, even if the Board's closure vote "does not comport with law" for some other reason, that unlawfulness alone likely does not sustain an *ultra vires* action. Id. The Court will therefore consider the merits of Beatty's Section 76*l*(b) claim—*i.e.* Count Two of the FAC—only.

*ii. Merits*

Recall that Congress has appropriated $257 million for repairs to the Kennedy Center. In assessing whether Congresswoman Beatty is likely to succeed on her claim that the Board violated its governing statute by voting to close the Center for at least two years to accomplish the necessary construction work, the Court considers three "257 million dollar" questions.

**The Scope of Construction Work.** The threshold question: What exactly *is* the scope of the construction work planned for the Kennedy Center? The President's February 1 social media post suggested that the Center would be entirely remade, describing the project as "Construction, Revitalization, and Complete Rebuilding." Truth Social Post at 1. A February 24 email from the Center to potential donors described the project as a "massive, much-needed revitalization" that

would "revolutionize the building[.]" See PI Mot., ECF No. 13-14, Ex. G (Kennedy Center donation email) at 1. Especially after the demolition of the East Wing of the White House—which occurred out of the blue a few months after President Trump pledged that construction would not "interfere with" and would "pay[] total respect to the existing building"—there has been understandable concern that the Kennedy Center may be the next target of the wrecking ball. See, e.g., PI Mot. Reply, ECF No. 37-7, Ex. RR (New York Times reporting) at 2.

On February 2, President Trump clarified to news outlets that he was not "ripping [the Center] down," but would be "using the steel," the "structure," and "some of the marble," with "some of the marble com[ing] down." PI Mot., ECF No. 13-13, Ex. F (Politico reporting) at 2. "[W]hen it's open, it'll be brand new and really beautiful," he continued. Id. Another White House official informed the press that the project would entail a "pretty significant renovation," but not a "whole scale tear down." Id.

The evidence amassed since early February suggests a more modest, albeit still substantial, scope of work. According to Mr. Floca's testimony in DCPL and the documentary record in this case, the renovation project will generally entail mechanical overhauls and structural repairs. More specific plans include systematic waterproofing; fireproofing; the replacement of boilers, chillers, and pipes; restroom and elevator modernization; employee office renovation; various technical restorations of performance spaces; carpeting and seating replacement; and site and landscaping improvements.

The evidence before the Court does not demonstrate that the Center is poised for wholesale destruction and rebuilding, à la the East Wing. Mr. Floca, who is overseeing the project, has credibly testified to that effect, see Fourth Floca Decl. ¶ 6; DCPL Hr'g Tr. at 78:6–15—though indications are that he could be fired on a dime should his work prove

unsatisfactory, see Mar. 16 Press Conf. Tr. at 9 ("But if I don't think he will do a good job, I'll say, Matt, you're fired, I'm getting somebody else. So you're under no pressure, Matt. OK?).[27]

But by no means will the work be minor or unintrusive. For instance, Floca avers that the "precision-tuned acoustics of the Concert Hall and Opera House cannot be maintained while demolition and structural steel reconfiguration occur elsewhere in the Center." Third Floca Decl. ¶ 7. He relatedly notes that the "total replacement of stage lifts and rigging systems" in the Concert Hall "involves the demolition of stage floors and the reconfiguration of overhead structural steel." Id. ¶ 10. To address water intrusion in the main Kennedy Center building, its top will be "excavat[ed]," and the area "where the patrons enter" the Hall of States will be "t[orn] up." Mar. 16 Board Meeting Minutes at 6. Historic marble will be replaced, and so will the seating in one or more of the Center's performance spaces; in fact, the marble and seats have apparently already been purchased. See Mar. 16 Press Conf. Tr. at 16.

Based on the record before it, the Court concludes that the Kennedy Center is poised to undergo a set of serious renovations, which may involve demolition and reconfiguration of component parts of the building. It is not persuaded that the building will be razed to the ground or stripped to its studs and reconstructed, as initially feared by some, and it will proceed with the preliminary injunction analysis on that understanding.

**The Center's Statutory and Regulatory Obligations.** Against that factual backdrop, here's the second question: Is Representative Beatty likely to prevail on her contention that the Kennedy Center's closure for substantial renovation violates its organic statute or another

---

[27] President Trump likely lacks the power to fire Mr. Floca unilaterally. But given that the President seems to view the Board's approval as a "minor detail[]," Mar. 16 Press Conf. Tr. at 15–16, and a majority of Kennedy Center trustees have green-lit his recent decisions without question, his warning carries significant weight.

applicable statutory command? To answer that question, the Court marches through the roster of statutory provisions that Beatty claims have been violated.

First, Congress has mandated that the Board "maintain and administer" the Kennedy Center as a "living memorial" to its namesake, 20 U.S.C. § 76h(a)(1), which involves "present[ing] classical and contemporary music, opera, drama, dance, and other performing arts," spearheading performing arts "policy" and "programs," "provid[ing] facilities for other civic activities" at the Center, and "provid[ing] within" the Center "a suitable memorial in honor of the late President." 20 U.S.C. 76j(a)(1). In her opening brief, Beatty leaned heavily on this language to suggest that closure, which would "render the Kennedy Center a lifeless husk," necessarily "breaches the trust terms." PI Mot. at 22–23.

It would be a stretch to interpret either the amorphous "living memorial" language or the Center's "programming" and "memorial" obligations as requiring the Center building and site to remain open at all times. Even Beatty does not suggest that the Center must be open to the public for 24 hours a day, seven days a week, or that it could not close on an emergency basis. Cf. PI Mot. at 22 (implying that an "emergency" might "prevent Defendants from requesting the necessary congressional approval"). That, coupled with the textual reality that there is no express prohibition on a temporary closure of the Center, leaves Beatty hard-pressed to argue that the cited language strips the Board of *any* unilateral authority to close the Center for certain periods of time or for certain justified purposes. The extent of that authority presents a line-drawing problem with which Beatty's briefing does not grapple.

At the same time, Beatty is surely right that—notwithstanding the Board's clear duty to carry out "necessary" capital repairs and ensure that the Kennedy Center site is kept in "safe[]," "secur[e]," "accessib[le]," and "high quality" condition—the Board bears an affirmative duty to

carry out the Center's programming and maintain a memorial to President Kennedy. It may not simply stop putting on shows altogether or close the presidential memorial permanently—just as it is not at liberty to let the Center fall into complete disrepair, given its statutory responsibility for upkeep and maintenance. In other words, the Center may not sacrifice one statutory duty at the altar of another.

If it were clear that the Kennedy Center will cease all operations for two years, as the Board's March 16 meeting minutes suggest, Beatty might have a better claim that the Board has violated its legislative obligations. In the wake of Mr. Floca's live testimony, however, the factual record is now mixed. There are at least some plans to carry out Kennedy Center programming—including rehearsals, performances, and educational programming—at the REACH expansion and off-site, if needed. Floca also indicates that a temporary memorial to President Kennedy will be set up in the REACH, as well. These plans have not been set down in writing and strike the Court as somewhat of an afterthought, which only bolsters its forthcoming conclusion that the Board did not consider the full panoply of its statutory duties before ratifying the closure. Still, the Court struggles to conclude on this record that Center will eschew its programming and memorial duties altogether, come July. Beatty therefore has not established that a potential future failure to sponsor any programming or memorialize President Kennedy during the two-year closure yet constitutes a statutory violation.

Beatty also points to a few statutory commands elsewhere in the U.S. Code, contending that the Board's failure to obtain regulatory approvals from the National Capital Planning Commission ("NCPC"), the Commission of Fine Arts ("CFA"), and the Advisory Council on Historic Preservation ("ACHP") violates its statutory planning obligations. According to Mr. Floca's sworn declaration, the Center has been engaging with the NCPC and CFA on a voluntary

basis. See Third Floca Decl. ¶ 8. Defendants therefore argue that even if the Center was required to submit its plans to those entities for review, "any injunctive relief available to Plaintiff" would be "limited" to what the Center has already begun to do. Defs.' Cross-Mot. at 25. That argument misses the mark, as the NCPC and CFA planning processes require more rigorous engagement than voluntary, *ad hoc* staff meetings. But Beatty does not press the NCPC and CFA points in her reply. See PI Mot. Reply at 30 ("[A]lthough Defendants dispute that they are subject to the regulatory requirements of the NCPC and CFA, the Court need not even decide that issue for the purposes of Plaintiff's PI motion, because Defendants concede that they are engaging in these processes.").[28]

The Court instead focuses on the more active conflict over the Kennedy Center's obligation to consult with the ACHP under Section 106 of the National Historic Preservation Act ("NHPA"). The NHPA provides that the

> head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State . . . , prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property.

50 U.S.C. § 306108. This is known in historic-preservation circles as the "Section 106" process.

The work planned for the Kennedy Center would likely be subject to the Section 106 process if the Center were an agency, as the "undertaking" is funded by federal dollars and will materially affect structures within a historically salient building. But the NHPA defines "Federal

[28] The Court engages with these points more fully in its concurrent opinion in DCPL. That opinion also grapples with the organic statute's prohibition on a change in the "management and operations of the [Kennedy Center] grounds" without approval from Congress and the Secretary of the Interior. See 20 U.S.C. § 76j(a)(2)(F). Beatty's briefing does not digest this provision in any detail.

agency" the same way that term is defined under the APA, so per Dong v. Smithsonian Inst., the Smithsonian—and therefore the Kennedy Center—would seem not to be covered.

Apparently recognizing this oversight, Congress enacted the Smithsonian Facilities Authorization Act ("SFAA") in 2003, which provides that

> in carrying out other projects in the District of Columbia *which are subject to the review and approval of the National Capital Planning Commission in accordance with section 16 of the Act of June 20, 1938 (sec. 6–641.15, D.C. Official Code)*, the Smithsonian Institution shall be deemed to be an agency for purposes of compliance with regulations promulgated by the Advisory Council on Historic Preservation pursuant to section 106 of the National Historic Preservation Act (16 U.S.C. 470f).

Pub. L. No. 108-72, § 3(c)(2), 117 Stat. 888, 889 (2003) (emphasis added). D.C. Code § 6-641.15, in turn, provides that "in order to ensure the orderly development of the national capital, the location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around the same will be subject to the approval of the [NCPC]."

Quilting together this patchwork of planning statutes, the Court understands the SFAA to require the following: When the Smithsonian constructs or alters federal public buildings in a manner that will affect their location, height, bulk, number of stories, size, and surrounding open space, it must seek NCPC approval and is accordingly subject to compliance with Section 106. Even though the Kennedy Center is in some ways institutionally independent from the Smithsonian, see 20 U.S.C. §§ 42, 76k(e), the Court sees no reason why a newly built or significantly rebuilt structure on the Kennedy Center's campus would not trigger the historic preservation review process, as well. After all, the Kennedy Center has been a "bureau" of the Smithsonian since its creation. See id. § 76h(a)(1). The Defendants fail to explain why a

component part of a federal instrumentality is presumptively exempt from any regulatory regime that applies to its parent.[29]

The problem for Representative Beatty is that she has not established that the proposed renovations will change the Kennedy Center's ultimate location, height, bulk, number of stories, size, and surrounding open space, assuming the scope of the project will remain as Mr. Floca described it in his testimony. The Court appreciates that even interior upgrades and repairs to the Center's facilities may implicate certain of its historic features. As elaborated in the companion opinion in <u>DCPL</u>, the gaps in the Section 106 regulatory regime could lead to concerning consequences. But the Court struggles to discern how, as a textual matter, the SFAA obligates Section 106 review when it comes to the renovation plans that have crystallized here.

Representative Beatty insists that the Kennedy Center Board's decision to close its doors pending substantial renovations violates both the Center's organic statute and an array of D.C.

[29] Defendants also contend that the Kennedy Center is not subject to any of the relevant planning statutes because 20 U.S.C. § 76k(e), which provides that the "actions of the Board relating to performing arts and to payments made or directed to be made by the Board from any trust funds shall not be subject to review by any officer or agency other than a court of law." Whatever actions this provision insulates from external review—*i.e.*, whether it applies to any action relating to trust fund payments or only those actions related to performing arts *and* trust fund payments, given the conjunctive connector—the Court is not persuaded that § 76k(e) supersedes external planning requirements. There are, after all, several sections of the organic statute that impose external agency review on Board conduct. <u>See, e.g.</u>, 20 U.S.C. § 76i(a) (requiring that the Kennedy Center building be constructed "in accordance with plans and specifications approved by the Commission of Fine Arts"); <u>id.</u> § 76j(a)(2)(F) ("No change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior"); <u>id.</u> § 76k(g) (making "plans" and "projects to improve pedestrian and vehicular access" "[s]ubject to the approval of the Secretary of the Interior"); <u>id.</u> § 76*l*(d) (subjecting the "functions of the Board funded by [appropriated] funds" to the oversight of the Inspector General of the Smithsonian). Section 76k(e) is thus no answer to a later-enacted and more specific statute subjecting the Smithsonian—and by extension, the Kennedy Center—to historic preservation review.

planning laws. The Court is not convinced, and given that she must show a likelihood of success at this stage, she has not carried her burden on this theory of her closure claim.

**The Board's Alleged Breach of Fiduciary Duty.** The final big-money question raised by Representative Beatty's challenge to the closure is whether the decision to shutter the Center pending major renovation constitutes a violation of the Board members' fiduciary duties. Particularly relevant are the duties of participation and prudence, the latter of which requires a trustee to "administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust," Restatement (Third) of Trusts § 77(1), and with the requisite information to make decisions, see id. § 77, cmt. b; Bogert's The Law of Trusts § 584. Beatty insists the answer is yes; the gist of Defendants' response is that the Board's decision was a reasonable one, within the bounds of its discretion, that the Court should not second-guess.

The scope of a court's review of board of trustee decisions is limited. So long as "a trustee has discretion with respect to the exercise of a power, its exercise is subject to supervision by a court only to prevent abuse of discretion." Restatement (Third) of Trusts § 87. Framed differently, a court may not freely substitute its judgment for that of a fiduciary acting within the scope of her discretion. The court must instead assess whether the fiduciary was derelict in her duties, acted beyond the scope of her authority or in bad faith, or otherwise abused her discretion. See Shelton v. King, 229 U.S. 90, 94–95 (1913); see also Olds v. Rollins Coll., 173 F.2d 639, 641–42, 642 n.7 (D.C. Cir. 1949).

Even accepting, for the purpose of this final sub-inquiry, that the Board has the discretion to close the Kennedy Center for *some* period of time without Congressional or other regulatory approval, the evidence in the record strongly suggests that the Board's decision to do so here was an abuse of discretion. The Court reaches this conclusion for three interrelated reasons.

*First*, there is no evidence that the Board took account of its full range of statutory obligations in determining that a wholesale shuttering of the Kennedy Center was appropriate. As just explained, the organic statute does not give the Board the latitude to pick and choose which legal duties it will satisfy. So even if the Board has the discretion to close the Center for some period of time for renovations, it does *not* have leeway to disregard its obligations to present programming and maintain a presidential memorial site.

The Defendants resist this conclusion by suggesting that the Board did, in fact, consider its broader duties. It points to Mr. Floca's discussion of "continuity of mission" during his March 2 presentation to the Building and Grounds Committee. See, e.g., Defs.' Cross-Mot. at 23 n.6. Floca informed the committee that "portions of the REACH campus *may* remain active"; "[t]he Skylight Pavilion *may* be used to maintain the memorial experience"; and "campus grounds *may* remain accessible when construction permits." Building and Grounds Committee Meeting Minutes at 2 (emphasis added). But the mere mention of these possibilities does not reflect *bona fide* consideration of the Board's codified duties.

Moreover, there is no indication in the minutes that the Committee discussed, let alone weighed, the negative consequences of closure on the Board's programming or memorial-related responsibility—which should come as no surprise given the "Building and Grounds" Committee's presumed focus on the construction aspects of the project. That task falls to the full Board, not a subset of trustees, and the concept of "continuity of mission" was not raised at the March 16 Board meeting at which the vote to close the Center was taken. In short, there is *no* evidence before the Court that the Kennedy Center Board of Trustees considered how it would accomplish its full legislative mandate during the closure period.

As an important aside, the exercise of the Board's statutory duties involves *legal* questions, complex ones at that. Which naturally raises the question: Where were the lawyers? The answer appears to be "nowhere." The Center's General Counsel and Associate General Counsel were present at the March 16 Board Meeting but, according to the minutes, did not speak. There is, further, nothing in the record to indicate that the Board relied on any legal advice in reaching the closure decision. It goes without saying that, for all his background in project management and construction, Mr. Floca is no legal expert.

*Second*, the Board appears to have founded its March 16 closure vote on woefully insufficient information. There was no "one year review of the Trump Kennedy Center, that has taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants, deciding between" complete and partial closure, as President Trump claimed. Truth Social Post at 1. The Defendants insist that the Board acted based on Mr. Floca's recommendation. Though they are no doubt correct that the Board is not obligated to "create a detailed administrative record" of its decision, Defs.' Suppl. Br. at 7, the Court can only evaluate the Board's decision-making for abuse of discretion against the evidence the parties have provided to it.

What does that evidence reveal? A concededly one-sided justification for full closure. Consider, for instance, the basis on which Mr. Floca reached his closure recommendation. The materials he reviewed were years old and reflected "longstanding" problems with the building, but nevertheless contemplated that the Kennedy Center would remain open while those problems were remediated. See DCPL Hr'g Tr. at 88:10–11, 89:3–9. Floca's contrary recommendation in favor of closure focused on the time and cost "efficiencies" of performing the renovation work while the Center was closed, as well as concerns about patron safety and experience. His

assessment may ultimately prove sound. The needed renovations are extensive, and the Court accepts that there are potential safety and liability concerns associated with phased construction. But by his own admission, Floca was focused *solely* on the "needs of the building"; arts programming was simply "not a factor." He considered only the benefits of full closure and none of the costs. And mothballing the nation's preeminent performing arts center for several years surely comes with ascertainable downsides—including, according to sworn testimony in the record, lost ticket and tourist revenue; chronic challenges in audience retention; reputational damage that could far outlast the closure; potentially permanent loss of highly-specialized arts professionals; and long-term attrition of donors. See Borda Decl. ¶¶ 7–15; Taylor Decl. ¶¶ 5–13; Borenstein Decl. ¶¶ 9–25.

Consider, too, the information before the Board (or lack thereof) by the time March 16 rolled around. Until the Court ordered the disclosure of certain documents and information in response to Representative Beatty's TRO request, the record shows that most Board members had received *no* document, plan, or even the vaguest of explanations for the proposed closure. The documents disclosed to Beatty filled in some detail, but they focused largely on the renovation work that the Board was already aware would take place, not the need to shutter the Kennedy Center.[30]

[30] The Court here notes that, according to Beatty's declarants, "[a] governing board charged with stewardship of an institution like the Kennedy Center would expect to receive, before approving a closure of this kind, a comprehensive package of planning materials: an overall architectural concept, identification of the major professional consultants who will lead the project, timelines, budgets, and supporting analysis from each of the relevant specialists." Borda Decl. ¶ 18; see also Taylor Decl. ¶ 15 ("If a closure is truly necessary, by the time it is announced, the governing body should already have in hand extensive reports, cost analyses, construction plans, and third-party validated budgets[.]"); Am. Amicus Br. at 4–8. Here, Board members received, two days before the closure vote, a handful of vague documents penned by Mr. Floca, a light-on-details budget document, and a few years-old CBPs and consultant reports.

Just before the vote occurred, Mr. Floca briefly outlined the merits of a two-year closure, and there were a few minutes of group discussion. Again, Floca's high-level recommendation presented all the advantages and none of the drawbacks. Faced with such a stacked deck and having received no other information about the effects that closure might have on the institution as a whole, a prudent trustee would have at least tried to understand the full consequences of the proposal. Cf. Bogert's The Law of Trusts § 558 (noting that courts have held a trustee's conduct to be arbitrary where she has "gone through the formality of exercising . . . discretion without deliberately considering the circumstances"). The Defendants point to a few comments from trustees about asbestos remediation and air conditioning to suggest that the Board duly considered the pros and cons of the decision before voting. See Mar. 16 Board Meeting Minutes at 7–8. But these stray remarks do not reflect a meaningful effort to confirm the wisdom of a recommendation that could adversely affect the Center in numerous ways for years to come.[31]

[31] The Court does not pull this conclusion out of thin air. Both industry experts and alumni of the Kennedy Center Board of Trustees and the President's Advisory Committee on the Arts submit that the Board's "rushed decision . . . flies in the face of industry best practices." Am. Amicus Br. at 3. The Center's own history of renovation, as well as those of its peer institutions like Lincoln Center, demonstrate that "[c]losure of any one . . . performance space[], if determined to be necessary, would be done with precision to minimize impact on the institution overall," and "[t]he documents disclosed in this case make clear that no meaningful assessment or planning supports" the closure of the Kennedy Center in its entirety. Id. at 7–8. In view of the record, any remotely prudent trustee would have wanted to know whether the work could be phased. See DCPL Hr'g Tr. at 91:8–17 (Floca admitting phased construction would be possible). In amici's words, "complete venue closure" should be considered a "last resort." Am. Amicus Br. at 3 (cleaned up). The Defendants do not attempt to rebut Beatty's expert evidence or the amici's arguments.

The Court lays out this evidence not to prescribe precisely what information the Board should have considered. A board of trustees may act within the bounds of reasonable discretion without necessarily following the same approach taken by similar institutions. But a failure to consider *any* conceivable downside of such a weighty institutional decision reflects a dereliction of the trustees' duty of prudence.

Recall, finally, that Mr. Floca was not ideating on a blank slate. His (and President Trump's) views about the necessity of wholesale closure represented a 180-degree change in plans because, until February 1, the Board was made to think that the OBBBA-funded renovations would be phased. The Kennedy Center's annual budget justification document for fiscal year 2026 advised Congress that the "disruptions" stemming from "major capital projects" in "certain theaters" would need to be "carefully planned and coordinated to not materially affect important programming initiatives."[32] Congress's OBBBA appropriation does not authorize a two-year shutdown of the institution during construction. Floca testified that he worked "constantly," and well into autumn, to identify "solutions" that would allow him to "partially operat[e] the building." DCPL Hr'g Tr. at 80:17–19, 99:9–12. And his representations at the September and December 2025 Board meetings would have left trustees with the impression that the plans for renovation were proceeding in a phased manner. Cf. Mot. Hr'g at 71:13–25 ("THE COURT: Is there anything in the record that would suggest [that] before [February 1] anyone at the center or in Congress or anywhere else contemplated closure to pursue the renovations . . . ? MR. MAYERS: Not that I know of, Your Honor[.]").

Faced with evidence of these serious informational deficits, the Defendants retort that the Board was entitled to rely on Mr. Floca's analysis as an expert adviser. See Defs.' Suppl. Br. at 4–7. The Court does not doubt Floca's expertise in facilities and project management. And the Board is undoubtedly entitled to rely on that expertise without "flyspecking" his work. Id. at 5. But the one-sidedness of Floca's approach and resulting presentation to the Board are plain. Whatever "analysis" Floca undertook in advance of February—evidence of which is nonexistent

[32] Mr. Floca's attempt to explain this representation away by casting it as a "clerical error," DCPL Hr'g Tr. at 97:17–18, is unconvincing at best.

apart from his own description—entirely sidelined programming concerns. And critically, he is no expert in arts management. He had served in the role of Kennedy Center Executive Director for all of a few minutes before suggesting that the institution be shut down for years. "Reliance on relevant professional advice does not afford a complete defense to allegations of breach of trust, for that protection should not apply, for example, if the trustee acted unreasonably in following the advice or in procuring it[.]" Restatement (Third) of Trusts § 93, cmt. c. The evidence before the Court contradicts a conclusion that the Board's reliance on Floca's recommendation alone was reasonable under the circumstances.

The Board's decisional shortcomings are perhaps reflective of a *third* problem with the March 16 closure vote: that the record and timing of relevant events strongly suggest that the Board lacked *any* meaningful say in this matter because the closure decision was foreordained. Note, for example, some conspicuous oddities in Mr. Floca's story, notwithstanding his credible testimony on the need for repairs at the Kennedy Center. He says that he realized it would be "irresponsible" not to close the Center about four months before President Trump announced the closure on February 1. Timing-wise, that means Floca had already begun to plan for a complete closure by October of November of 2025. He had access to all the information that he says he needed to arrive at that conclusion well before the end of the year—yet, as noted above, did not even allude to the possibility of closure around the time of the OBBBA appropriation or at the September or December 2025 Board meetings. Former Kennedy Center President Grenell emphasized that the Center would be one of the "premiere spots" for America's 250th celebration—quite a concerning idea if the Center is as dangerous as the Defendants now represent. If Floca decided that closure was necessary sometime in the fall of 2025, it is curious that the Kennedy Center's leaders were mum on the matter until February 1.

Whatever happened during that purported four-month incubation period, Board input was, most evidently, an afterthought. Trustees learned about the plan to close the Center at the same time as the general public, by social media post. Deprived of time and information, they had no meaningful opportunity to consider perhaps the most momentous decision in the Center's lifetime since it opened in 1971.[33] Although boards may ratify past institutional actions after *bona fide* consideration, President Trump's assurance that closure would be "totally subject to Board approval" rings hollow, as he himself later admitted that it was "a little late for the board" to weigh in because the plan had already been "announced." To him, Board approval was just a "minor detail[]."[34] Mar. 16 Press Conf. Tr. at 15–16.

* * *

The Court appreciates that, in both the charitable and corporate spheres, board meetings are often scripted affairs. Staff, management, and board committees have ideally laid the groundwork for large-scale projects well before they are brought to a board vote. Objections and concerns have typically been aired and resolved by the time such proposals reach the full board. And board members naturally rely on findings, analysis, and recommendations developed by experts and other qualified personnel. The Court should not be heard to suggest that trustees

---

[33] According to experts in arts management, renovations of performing arts spaces are highly "complex[]" endeavors. See Borda Decl. ¶ 17. As the former director of the New York Philharmonic attests, when the Philharmonic and Lincoln Center "undertook the renovation of David Geffen Hall" a few years ago, "the joint boards of both institutions met for at least two to three years reviewing the renovation plans, and in fact made significant changes to those plans over the course of that review process. The boards met five times a year on a regular schedule; the executive committee engaged more frequently; and a dedicated building committee met as often as every week." Id.

[34] Congresswoman Beatty posits that the decision to close the Kennedy Center was a pretextual maneuver meant to "hide the . . . fact that the (unlawful) name-change has led patrons and artists to flee the Center." PI Mot. at 26. The Court need not consider this possibility to conclude that the Board's decision fell short of its trust duties.

must scrutinize every piece of prefatory work that has been done, or labor through the night debating the relative merits of their decisions in order to discharge their fiduciary duties—especially where, as here, a board is large and comprised of members who may not be well-schooled in the subject matter before them.

The problem with this particular board vote, judging from the available record, is that it consummated a process that seems to have fallen grossly short of prudent decision-making. The closure proposal reflected an under-informed reversal that would surely have come out of nowhere to the Board. Mr. Floca's recommendation was premised on a cursory, one-sided accounting of the benefits and drawbacks of full closure. No countervailing cost-benefit analysis of the closure was provided to the Board, or even prepared. And neither the Kennedy Center's leadership nor the trustees appear to have given *any* serious thought to how the closure would square with the Board's range of statutory obligations.

To be clear, assuming that long-term closure of the Kennedy Center is within the Board's discretion and does not require Congressional authorization, this Court is not to substitute its judgment for the Board's as to whether a temporary but long-term closure is, all things considered, a good idea. The Court takes no position on that question. Instead, it concludes that in ratifying the already-announced decision to close the Center, the Board appears to have been derelict in its duty to "administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust" and exercise adequate "care, skill, and caution" in decision-making. Restatement (Third) of Trusts § 77(1)–(2).

*2. Irreparable Harm*

Having concluded that Beatty is likely to succeed in establishing that the Board breached its trust obligations in voting on March 16 to close the Kennedy Center, the Court weighs the

remaining preliminary injunction factors. The D.C. Circuit "has set a high standard" for irreparable harm. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). The injury must "be both certain and great," and "actual and not theoretical." Id. (cleaned up). It must also be imminent and beyond remediation even if "adequate compensatory or other corrective relief" becomes "available at a later date." Id. (cleaned up).

The Board's likely imprudent decision to shutter the Kennedy Center has caused, and will continue to cause, ongoing irreparable harm to Beatty and the trust property she and her colleagues are charged with protecting. *None* of the Board members had sufficient information in advance of the March 16 meeting to make a well-considered decision to close the Center. Beatty could not meaningfully participate in the administration of the trust then, and her ability to do so will continue to be undermined each day that vote is implemented. As of this writing, she lacks any up-to-date construction plan, an accounting of the closure's short- and long-term costs to the institution, and concrete details about how the Center will continue to fulfill its statutory missions during the closure period. Remaining performances have been or will be cancelled, and staff are being laid off *en masse*, meaning that most of the Center's operations will come to a halt by July. Letting the defective March 16 Board vote take effect will thus hobble the Center as an arts institution, while trustees like Beatty are forced to stand idly by.

In essence, Representative Beatty cannot do her job as a *bona fide* trustee so long as the Center remains closed on the basis of the March 16 Board vote. And being "deprived of the ability to perform [her] statutory functions and fulfill [her] statutory obligations" to the trust *res* is neither a minor or theoretical injury, nor the kind that can be remediated with corrective relief down the line. Dellinger v. Bessent, 766 F. Supp. 3d 57, 72 (D.D.C. 2025). A judgment rendered in Beatty's favor at the end of this case, whenever that may be, will not make up for an

unlawful closure during which time she has been rendered a powerless token and the Kennedy Center has likely alienated performers, audiences, staff, and donors alike.[35] A preliminary injunction, by contrast, would place Beatty and her colleagues in the *status quo ante*, and if, with adequate information and planning, they decide that closure is still the optimal course, they may very well be able to contain its fallout.

The Court thus concludes Beatty has carried her burden of establishing that, absent preliminary relief, she will suffer irreparable harm as a result of the Board's March 16 vote to close the Center.

[35] Beatty's declarants and amici identify a number of lasting consequences stemming from the derelict manner in which the closure was carried out. *First*, the abrupt decision could "prevent the Kennedy Center from returning to the touring schedules of the world's leading performers" because it indicates the institution's willingness to cancel contracts on a whim. Borda Decl. ¶¶ 7, 10. "When artists and their management weigh whether to book a tour stop or an engagement, institutional reliability is paramount," id. ¶ 10, and performers will be wary of "commit[ting] to an institution that has treated their schedules so capriciously," Am. Amicus Br. at 9. *Second*, even if the Court were to order the Kennedy Center to reopen at some future point, many hyper-specialized staff will likely have "secured employment elsewhere" in the arts world "and will not return." Borda Decl. ¶ 11; Taylor Decl. ¶¶ 6–7. The speed and erratic character of this closure decision have undoubtedly accelerated this process. *Third*, the nature of the Board's decision will likely fray the Center's goodwill with specific donors, which may be impossible to recover. A rapid decision to close the institution's doors for two years does not inspire confidence, especially where the Center's fundraising "depends on deeply personal relationships that development staff have cultivated with individual donors over many years." Borda Decl. ¶ 12. "If that contact stops," especially with no substantial explanation or justification, "donors will not simply wait" but "will redirect their philanthropic support to other institutions." Id. More specifically, "[t]he manner in which this closure has been announced compounds the harm to the relationship with donors." Borenstein Decl. ¶ 20. "[A] closure of this significance" typically "requires extensive advance planning and communication," including an explanation to donors as to why complete closure rather than partial operation is necessary. Id. "Abruptly closing the Center," by contrast, "alienate[s] donors," id., and "donors who disengage will not re-engage," id. ¶ 25. The Defendants offer no countervailing evidence to this raft of well-informed opinions.

*3. Balance of Equities/Public Interest*

Lastly, the Court considers whether prejudice to the Defendants and the public interest outweigh the irreparable harms that Beatty has identified. The answer is no. At the outset, the Court stresses that it will not enjoin the Defendants from undertaking the capital repair and restoration activities that Congress has authorized through the OBBBA. Instead, the preliminary injunction will only temporarily prevent the Board from effectuating its March 16 vote. So a carefully tailored injunction would not "prevent the Board from" carrying out "capital repair and restoration activities that directly fulfill its statutory duties," which seems to be the Defendants' primary concern. Defs.' Cross-Mot. at 44.

The Defendants also press that a preliminary injunction would threaten the Center's ability to complete its planned work by September 2029, when the OBBBA funding expires, and "put the entire project in jeopardy." Defs.' Suppl. Br. at 8. That assertion falls flat. Mr. Floca has testified that renovations are still very much in planning mode—again, no official, up-to-date building plan or master construction schedule yet exists. And until a few months ago, the Board understood that it was moving full steam ahead on a phased renovation project, not a full closure. Any hypothetical delay in breaking ground would seem to be self-inflicted, stemming from the Defendants' own about-face.

As for the potential safety risks associated with doing renovation work while the Center is open, no one disputes that the construction must be undertaken safely. And the Court does not understand Beatty to be challenging limited closures of spaces in and around the remedial work, which would seem to be inherent in the construction plans laid out in the CBPs. See Pl.'s Second Suppl. Br., ECF No. 46, at 9 n.4 (Beatty "does not seek to enjoin 'routine maintenance, repairs, and operations that are contemplated by the Kennedy Center's existing Comprehensive

Building Plan.'"). But again, up until February 1, the Center was planning to proceed apace with some form of phased construction and cited no safety concerns about that plan. Returning to the *status quo* does not strike the Court as substantially prejudicial.

Finally, the Defendants argue that a preliminary injunction would interfere with its discretionary decision-making. Yet the Court's preliminary relief does not dictate any particular decision-making outcome. It simply enjoins the implementation of a single decision that was reached without the requisite fiduciary caution, without dictating how the Board might proceed from there. What's more, "[t]here is generally no public interest" in the "perpetuation" of "unlawful" governmental action. Newby, 838 F.3d at 12.

The Court is persuaded that the irreparable injury to Representative Beatty outweighs the comparatively lesser harms associated with returning the Board to its pre-February 1 position. It will therefore grant Beatty's request for a preliminary injunction in part, consistent with the parameters laid out below.

*4. Preliminary Relief*

Crafting preliminary relief is more of an art than a science, as it requires "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Int'l Refugee Assistance Proj., 582 U.S. at 579. And "because preliminary injunctions are a significant measure, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown by the facts." North. Am. Bldg. Trades Unions v. DOD, 783 F. Supp. 3d 290, 301 (D.D.C. 2025) (cleaned up).

In light of the preliminary injunction factors above, the Court is persuaded that Beatty is entitled to a preliminary injunction that prohibits the Board from implementing its March 16 decision to "conduct an orderly wind-down of programming activities through the Spring of

2026, and close [the Center's] doors entirely effective July 6, 2026." Mar. 16 Board Meeting Minutes at 8–9. On the record before the Court, that decision was taken in dereliction of the trustees' duty of prudence, as imposed on them by the Center's governing statute, and is thus unenforceable for the pendency of this action.

However, the Court carefully circumscribes its ruling in two ways. *First*, as just mentioned, this preliminary relief should not be understood to enjoin the necessary maintenance and repair work that Congress authorized last June through its OBBBA appropriation. That work may move forward, as Beatty has not demonstrated, at this juncture, that the renovations run afoul of any particular statutory command. *Second*, although the Board may not take steps to operationalize the March 16 decision, this ruling does not mean that it is necessarily barred from closing the Kennedy Center while renovations take place. Beatty has only shown a likelihood of success on her claim that the Board acted imprudently in reaching a closure decision based on the circumstances of *that* vote. The Court is not persuaded that the closure is categorically unwarranted or impermissible under the U.S. Code. The Court's preliminary injunction thus does not bar the Board from reconsidering the closure issue in a prudent manner.

Should it choose to chart that course, the Board will be expected to prepare itself with sufficient information to make a considered, independent decision, taking account of its obligation to both maintain *and operate* a premiere arts venue and its solemn duty to memorialize a fallen President. The Court declines to dictate what specific information and analysis is required, or what form they should take, echoing its colleague overseeing the East Wing litigation that it has "no desire or intention to be dragooned into the role of construction manager"—or, for that matter, board counsel. Nat'l Trust for His. Pres. v. Nat'l Park Serv., No. 25-cv-4316 (RJL), 2026 WL 1027744, at *5 (D.D.C. Apr. 16, 2026). But this opinion (and the

age-old trust principles on which it rests) should at least provide a helpful guide. The Court would expect an informed Board to insist on receiving input from the Center's programing and fundraising experts, in addition to Mr. Floca. The Center's lawyers, who appear to have exited stage left, would also have a role to play; the duties discussed throughout this opinion are legal ones, after all. The upshot is tailored preliminary relief that is responsive to the theory of liability on which Congresswoman Beatty is likely to prevail and respectful of the discretion vested in the Board to fulfill its important duties.

The Court further notes that the Defendants have not sought a bond in the event that the Congresswoman prevailed on her preliminary injunction. Federal Rule of Civil Procedure 65(c) requires that a PI movant "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Defendants may have forfeited the issue, but because of the mandatory language of the rule, the Court considers the question *sua sponte* out of an abundance of caution.

"Rule 65(c) gives this court broad discretion to determine the appropriate amount of an injunction bond," which may include imposing "no bond at all." North. Am. Bldg. Trades Unions, 783 F. Supp. 3d at 315 (cleaned up); see also P.J.E.S. by and through Escobar Francisco v. Wolf, 502 F. Supp. 3d 492, 520 (D.D.C. 2020); Simms v. Dist. of Columbia, 872 F. Supp. 2d 90, 107 (D.D.C. 2012). The Defendants have generally argued that enjoining the closure would be prejudicial, but they have not pinpointed "quantifiable costs" they would "incur as a result of being temporarily restrained from enforcing" the March 16 vote, especially given the careful contours of the injunction. North. Am. Bldg. Trades Unions, 783 F. Supp. 3d at 315. Moreover, the Court has not been provided with any evidence to confirm the extent to which some phased or shortened construction would be more expensive than the full shutdown, nor has it been

provided with any master construction plan with up-to-date cost schedules, which the Defendants are still preparing. On this basis, the Court has no way of knowing whether the costs of complying with its PI are more than hypothetical, and it will not speculate on a figure given a return to the *status quo* of just a few months ago. In light of all this, and the cautious scope of the PI itself, the Court finds that a nominal bond of $1.00 is appropriate. Cf. Endocrine Soc'y v. FTC, No. 26-cv-512 (JEB), 2026 WL 1257289, at *15 (D.D.C. May 7, 2026) (finding a nominal $1.00 bond sufficient).

## IV. Conclusion

In the words of President Kennedy, artists do the "quiet work of centuries" behind the "storm of daily conflict and crisis." They entertain, educate, and move us. They sustain us through oncoming tides of joy and despair. And so the institutions that nurture and empower artists are nothing short of integral to our social fabric. The Kennedy Center is one of the foremost of those institutions.

At some point, the lofty heights of artistic performance collide with the gritty realities of arts and facilities management. The Kennedy Center is, legally speaking, a trust instrumentality belonging to the American people, governed by a Board of Trustees. Congress has imbued Board members with all the "usual powers and obligations" of common-law trustees, as they work collectively to fulfill various statutory directives related to arts programming, education, policy, community outreach, and memorializing the slain president. The Board must also maintain the Kennedy Center in good repair.

The Kennedy Center Board has wide discretion to steward the institution in service of its various responsibilities. But that discretion is not boundless; it is circumscribed by legislatively imposed guardrails, which include core common-law trust principles that Congress imported into

the Center's organic statute. As a result, when the Board veers beyond what the governing statute and the common law of trusts permit, redress can be sought.

The Court has concluded that the Board overstepped its statutory bounds by unilaterally renaming the Kennedy Center after President Trump. In 1964, Congress deliberately rechristened the "National Cultural Center" the "John F. Kennedy Center for the Performing Arts." The text, structure, and evolution of the organic statute makes the institution's name abundantly clear. Congress likewise took pains to ensure that no other memorial-like dedication would grace the Center's public spaces. As a result, the Kennedy Center Board's decision to rename the Center, along with its decision to affix President Trump's name to the building's façade, violate Congress's unequivocal mandate. As stated at the outset, Congress gave the Kennedy Center its name, and only Congress can change it.

The Board also overstepped its statutory bounds by unilaterally stripping *ex officio* trustees of any right to vote on trust matters. The relevant provision of the May 2025 bylaw amendments finds no support in the statute, as Congress hinted at no qualitative difference between general and *ex officio* trustees, and the common law presumptively places them on equal footing. Moreover, a trustee's categorical right to vote is not a mere "organizational" or "procedural" housekeeping matter appropriately left to the Board's discretion.

Finally, the Court is preliminarily persuaded that the Board's March 16 vote to close the Kennedy Center pending a years-long renovation represents a dereliction of its common-law-derived duty of prudence. The current record reveals that the Board rendered this ill-informed and seemingly preordained decision without regard for how it would accomplish its full array of statutory responsibilities. The trustees might have assessed the propriety of closure in a number of prudent ways. This was not one.

In closing, the Court recognizes that there is a longstanding—and bipartisan—Washington, D.C. tradition of appointing political supporters and personal acquaintances to public boards and commissions. These appointees should ideally have some subject-matter expertise, but for better or worse, it is often neither required nor demanded. For that reason, and others rooted in the common law's general endorsement of judicial deference to reasonably wielded trustee discretion, board members are entitled to rely on committees, staff, legal counsel, and other experts to inform their decision-making. But, while public board service may be an honor, board members are not mere figureheads. They are still duty-bound to fulfill their roles with due care and some modicum of independence. That tenet holds especially true for board members tasked by Congress with managing property held in trust for the enjoyment of the American people.

By way of this opinion, the Court does not purport to dictate how the Center should be run, nor does it prescribe any particular plan for the institution—construction, closure, or otherwise—moving forward. It simply holds the Kennedy Center Board to certain minimum requirements imposed by law. Beyond that, the Court will let the parties play on.

For the foregoing reasons, the Court will **GRANT** Plaintiff's Motion for Partial Summary Judgment on Count One of her FAC (Section 76*l*(b) renaming claim). It will *sua sponte* **GRANT** partial summary judgment to Plaintiff on the voting rights prong of Count Three (Section 76*l*(b) trustee rights claim). As to these two claims, the Court will also **GRANT** Plaintiff the declaratory relief sought in Count Five. And consistent with the rationale laid out in this opinion, the Court will **GRANT in part** Plaintiff's Motion for Preliminary Injunction on Count Two (Section 76*l*(b) closure claim).

The Court will accordingly **DENY** Defendants' Cross-Motion for Summary Judgment as to Counts One, Two, Three, and Five. It will reserve judgment on Count Four, the Plaintiff's multi-part *ultra vires* claim, and Count Seven, the Plaintiff's mandamus claim, until any motions for reconsideration or interlocutory appeals have been resolved. However, the Court will **GRANT** Defendants' Cross-Motion for Summary Judgment as to Count Six of the FAC alleging an APA claim. As the Court has explained, neither the Kennedy Center nor its parent institution, the Smithsonian, is subject to the APA per Dong v. Smithsonian, 125 F.3d 877 (D.C. Cir. 1997).

A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: May 29, 2026

**APPENDIX M**

Field Observation Report - Kennedy Center Soffit Failure

Prepared by Walter P. Moore (WPM)

December 23, 2022

walter p moore

202.481.7685 main

# Field Observation Report

| | | | |
|---|---|---|---|
| FIELD OBSERVATION REPORT #: | 1 | | |
| OBSERVATION DATE/TIME: | December 20, 2022 | 8:30 AM | |
| REPORT DATE: | December 23, 2022 | | |
| PROJECT: | **Kennedy Center Soffit Failure** | | |
| WALTER P MOORE PROJECT NO. | D01.22010.00 | | |
| WEATHER: | Clear, 40°F (December 20, 2022), Raining, 40°F (December 22, 2022) | | |
| PRESENT AT SITE: | Christopher DeRosa<br>Amir Manafpour<br>Serena Siciliano<br>Carissa Faroughi | Walter P Moore (WPM)<br>Walter P Moore (WPM)<br>Walter P Moore (WPM)<br>The Kennedy Center | |
| DISTRIBUTION LIST: | Robert Perry<br>Marisa Aschettino | Page<br>Page | |

On the date indicated representatives of Walter P Moore visited the reference site to observe the general condition of the soffit.

## Overview

Walter P Moore (WPM) received an email from Page, dated Friday, December 16th regarding a displaced soffit panel on the northwest corner of the Kennedy Center. In a follow up call, WPM was requested by Page and the Kennedy Center to conduct a site visit and perform an initial assessment.

Based on discussion with Kennedy Center staff, it is understood that the failure was discovered on the 15th of December by building staff during or soon after a heavy rain event and water was observed flowing down the face of the marble clad exterior wall in the vicinity of the displaced soffit. As a part of this investigation, WPM reviewed applicable construction documents, spoke with building staff, and completed a preliminary on-site visual investigation.

During the initial site visit, WPM was provided access to observe the exterior of the failed soffit panel from an elevated man lift, and the interior of the soffit from a roof access point to the walkable soffit cavity above the failure. Exterior roof access was also provided to examine the existing TPO roof.

Close-up visual assessment of the panels was limited to the stucco panels at the northwest corner immediately adjacent to the displaced panel. In general, most of the stucco panel support system assembly was visually obstructed and Walter P Moore was only able to observe isolated locations.

## Observations/Comments

The assessment began with a visual inspection of the failed soffit panel from an elevated man lift, provided by the Kennedy Center. The assembly of the failed soffit panel and its connection to the structure is shown in Figure 1 and Appendix A. The naming convention shown in Figure 1 will be used consistently throughout this document. The following issues in this area were identified:

- Wire ties had failed in approximately half of the displaced panel, resulting in an approximately 8-inch vertical deflection at one corner of the panel. The area where the wire ties have failed are shaded in Figure 2. (Figure 2, Photos 1, 2, and 3). The remaining, intact wire ties appeared corroded.

- The adjacent panel also appeared to have deflected approximately 2” at the adjacent corner, indicating similar failure of its wire ties (Photo 4).
- Corrosion of the hat and steel channels was observed. (Photo 5)

During the investigation within the soffit cavity, the conditions supporting both the inner and outer soffit panels were observed, as illustrated in Appendix A. The configuration of the outer soffit panel support system uses the metal roof deck approximately 8” above for support rather than a concrete plank, as shown for the inner panel in Figure 3. The following issues were observed within the soffit cavity, and the approximate 8” space above the outer panel:

- Corrosion of the wire ties, hat channels, metal deck, and steel channels in the 8” space above the outer soffit support configuration. (Photo 6)
- Mineral deposits formed on the underside of the planter concrete slab indicating potential water intrusion in the past. (Photo 7)

It was reported that an active leak in the vicinity of the drain above the failed soffit panel has been observed for several years. The review of the TPO roof was limited to the NW corner of the building immediately adjacent to the falling panel. The following issues were observed:

- Ponding of water in multiple areas (Photo 8)
- Deteriorated flashing and TPO in the vicinity of the scupper drain at the NW corner (Photo 9)

On December 22nd WPM returned to the site to observe additional panel conditions (from grade) around the entire building, using binoculars. WPM observed the following:

- One additional location of water leaks on the south elevation, where water was observed dripping through the joint between two panels (adjacent to gridlines G and 21.5).
- One location of apparent patch repair (on gridline 21.5 and between gridlines L and M). Kennedy Center staff also mentioned that one of the panels on the south elevation may have been replaced in the past. Indicating potential prior issues with the panels on that end.
- One panel appeared to have cracks with dark stains spreading out to a panel joint (on gridline 21.5 and between gridlines N and M).
- No significant deflection of remaining panels was observed; however, it is very difficult to discern deflection at such heights with visual observations from grade.

Please do not hesitate to contact us if we can further clarify the conditions observed during this site visit and discussed in this report.

## Recommendations

The two deflected panels (potentially weighing over 2,500 lbs each) are at risk of separating further from the structure and becoming a falling hazard. We recommend the following to mitigate the falling risk:

- For immediate remedy, we recommend installing emergency shoring as soon as possible to support the two deflected panels. This can be performed with the use of temporary scaffolding (designed by a licensed engineer), erected to support the underside of the panel. The area, plus a buffer area, should continue to be blocked off from public access.
- During (or prior to) installation of scaffolding, it is recommended that the vertical legs of the hat channels are clamped and temporarily reattached to the concrete planks above, to a snug tension only (not causing movement). The temporary connections can be attached

to a channel secured to the top of the concrete planks. This should be performed carefully so as to avoid impacting or laterally moving the displaced panels until shoring is installed.

- In the northwest soffit cavity where cores were drilled into the concrete planks directly above the current failure, it is recommended that the concrete debris currently sitting on the panel be carefully removed from the damaged panel promptly, to reduce the additional burden on the panel.
- Any additional coring or demolition of the concrete planks that may be required, should be completed under the direction of a licensed engineer to avoid compromising the plank's structural integrity.
- Waterproofing repairs should be performed at the TPO roof drain and the planters.

There are a number of potential reasons for the failing of the wire ties including:

1. Corrosion (section loss), due to exposure to water infiltration or condensation,
2. Cyclic fatigue stresses in the bends of the wires over more than 50 years,
3. Abrasion of wires from the channel flange edges and from the concrete planks above,
4. Water accumulation and saturation of panels increasing the total load,

WPM recommends additional investigation to determine the cause(s) of failure and to understand if similar conditions have occurred at other locations. WPM also recommends additional investigations to determine the structural capacity of the backup framing supporting these panels.

At a minimum, any panels with similar conditions (leaking, deflected, or at failed drains) should be investigated. In addition, a representative number of panels (approximately 3-5), without the above issues, should also be investigated for fatigue or abrasion. Following an initial assessment, further monitoring/testing methods can be considered, including laser scanning to detect early deflections in the panels and/or testing the tensile strength of the wire ties.

## FIGURES




Figure 1: Inner Soffit Panel Assembly – below walkable enclosure area




Figure 2: Shaded Area – Inner Panel location of observed failed wire ties




Figure 3: Outer Soffit Panel Configuration - Under Steel Deck

## PHOTOS



1 Overall photo of displaced inner soffit panels



2 Failed wire ties at North side of panel



3 Gap at edge of panel at wall, approximately 8".



4 Adjacent panel displacement, approximately 2"



5 Corroded hat and steel channel



6 Corroded metal deck and support system for outer soffit panels



7 Mineral deposits on underside of planter slab



8 Ponding on TPO Roof



9 Water infiltration reported at scupper roof drain

# Appendix A

# SHEET 5-5-2A OF ORIG ARCH DWGS


NOTE:
Inner Soffit Panel
Outer Soffit Panel
NORTH ELEVATION
WEST ELEVATION
1/2" WALL SECTIONS - ELEV. 40'-0" TO 109'-0"
CANOPY SOFFIT & COFFER DETAILS
WOMEN'S TOILET
UNFINISHED AREA
STAGE DOOR LOBBY
TYPICAL CANOPY SCUPPER DET.
LONGITUDINAL SECTION THRU PLANTER & DRAIN TILE
TYPICAL TERRAZZO DRAIN DET.
TYPICAL DETAIL - TERRAZZO CONTROL JTS. @ ROOF TERRACE
COFFER DETAIL
DETAIL @ COLUMN
END DETAIL @ FASCIA
PARTIAL REFLECTED PLAN - CANOPY SOFFIT
JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS
EDWARD DURELL STONE ARCHITECT
5-5-84

**APPENDIX O**

JLL Kennedy Center Renewal Project

Monthly Progress Report

June 2026

# KENNEDY CENTER
# RENEWAL PROJECT

## Monthly Progress Report

June 2026 | Report No. 003

Issuance Date: July 6, 2026

*Note: Report Nos. 001 and 002 refer to the Draft and Final CPDP (Comprehensive Project Development Plan) submitted to the Kennedy Center. Report No. 003 represents the first issuance of the Monthly Progress Report in this format.*

| | |
|---|---|
| Client | John F. Kennedy Center for the Performing Arts |
| Location | 2700 F Street NW, Washington, DC 20566 |
| Owner's Rep | JLL Project & Development Services |
| Report Period | June 1 – June 30, 2026 |
| Distribution | Kolan Campbell, Project Management Office |
| Project Budget | $250,000,000 |
| Overall Status | • On Track |

## JLL PROJECT & DEVELOPMENT SERVICES

## EXECUTIVE SUMMARY

**Overall Project Status:** • On Track | Construction Start: July 6, 2026 | Reopening: Q3 2028

The Kennedy Center Renewal Project remains on track for its July 6, 2026, construction start and Q3 2028 reopening, pending direction from the Kennedy Center (KC). In June, JLL submitted the final Comprehensive Project Development Plan (CPDP) and Integrated Project Schedule (IPS) on June 8 and finalized the Budget Allocation Matrix with the Kennedy Center leadership. Design and engineering contracts advanced: ATSR brought Lee & Associates (landscape) and WB Engineering (MEP) under contract, with structural and preservation consultants nearing execution. WB Engineering formally started the MEP feasibility study on June 16th and is on track to complete the study by August 14th.

Several time-sensitive items need Kennedy Center action to hold the construction schedule. The temporary site fencing requisition, resubmitted June 26, requires approval to enable July 6 mobilization. HITT Contracting has finalized work and safety plans for the below soffit investigation, with boom lift delivered to the site on June 30 and interstitial make-safe work scheduled for July 13 commencement. The procurement process for a consultant to perform hazardous materials testing is on schedule, with committee review set for July 2. In July, the team will focus on contractor mobilization, weekly coordination meetings across workstreams, and finalizing the garage repair and sprinkler packages. With contracts advancing and the feasibility study underway, the project is positioned for a July 6 construction start, contingent on timely Kennedy Center approvals of the outstanding requisitions.

### Month at a Glance

| | | | |
|---|---|---|---|
| 4 | 5 | 4 | 6 |
| Active Projects | Open Decisions | Consultants Under Contract | Days to Construction Start |

## Key Accomplishments This Month

- ATSR (Architect of Record) contract executed May 29; design kick-off held June 11.
- CPDP (Comprehensive Project Development Plan) finalized by JLL and submitted to Kennedy Center on June 8.
- IPS (Integrated Project Schedule) finalized by JLL and submitted to Kennedy Center on June 8.
- HITT Contracting Soffit Investigation Scope of Work advanced: asbestos material testing of interstitial space pathways completed, contract signed June 15, boom lift delivered to site on 6/30/2026, work and safety plans submitted to the Center for below soffit investigation scope.
- MEP Feasibility Study began June 16th and is on track to be completed by Aug 14th.
- MEP feasibility study survey completed June 22 by WB Engineering; DC Water coordination meeting held, and weekly review meetings established. Hazardous materials testing procurement: proposals received June 22, evaluation committee kick-off held June 25, final review scheduled July 2.
- Budget Allocation matrix finalized following leadership meetings on June 22-23; final version shared with ATSR.
- ATSR key subconsultants contracts executed: Lee & Associates (landscape) and WB Engineering (MEP) fully under contract; WP Moore (structural) and KCCT (preservation) contracts in final review.
- MEP Feasibility Study began June 16th and is on track to be completed by Aug 14th.
- walk conducted material the Kennedy MarbleCrafters contract executed on June 26th under BPA for interior marble replacement and repair scope.
- JLL hosted meeting with all Venue & Interior staff to finalize and prioritize the scope of work for each area. The results are captures within the CPDP plan and Budget Allocation Matrix.

## SCHEDULE & MILESTONE TRACKER

| Milestone | Planned Date | Actual / Forecast | Status |
|---|---|---|---|
| Project Charter Approval | April 2026 | April 2026 | ✓ Complete |
| ATSR Contract Award | April 2026 | May 29, 2026 | ✓ Complete |
| MEP Consultant Award | May 8, 2026 | June 2026 | ✓ Complete |
| MEP Feasibility Study Begins | May 11, 2026 | June 16, 2026 | ✓ Complete |
| CPDP Final Submission | June 8, 2026 | June 8, 2026 | ✓ Complete |
| IPS Final Submission | June 8, 2026 | June 8, 2026 | ✓ Complete |
| ATSR Design Kick-off | June 2026 | June 11, 2026 | ✓ Complete |
| Hazardous Materials Consultant Proposals Due | June 15, 2026 | June 22, 2026 | ✓ Complete |
| CPDP Plan Approval by KC | June 23, 2026 | TBD | ○ Pending |
| Construction Start / Site Mobilization | July 6, 2026 | July 6, 2026 | ● On Track |
| MEP Feasibility Study Complete | Aug 14, 2026 | Aug 14, 2026 | ● On Track |
| Schematic Design Complete | Q3 2026 | TBD | ● On Track |
| Historic Commission Emergency Package | May 7, 2026 | TBD | ○ Pending |
| Historic Commission Exterior Package | June 2, 2026 | TBD | ○ Pending |
| Design Development Complete | Q4 2026 | TBD | ● On Track |
| Construction Documents Complete | Q1 2027 | TBD | ● On Track |
| Substantial Completion / Reopening | Q3 2028 | Q3 2028 | ● On Track |

The full integrated project schedule update for June has been provided and is included as Exhibit A to this monthly report.

## BUDGET & FINANCIAL STATUS

### Budget Summary

| Budget Category | Approved Budget | Committed / Expended |
|---|---|---|
| **Total Project Budget** | $248,900,000 | To be reported (TBR) |
| **Design & Engineering Fees** | $16,650,500 | Contracts executed; expenditures TBR |
| **Construction – Year 1 (Infrastructure)** | $157,031,800 | TBR |
| **Construction – Year 2 (Venues)** | $38,412,420 | TBR |
| **Owner's Project Management (JLL)** | $5,042,980 | Active; expenditures TBR |
| **Furniture, Fixtures & Equipment** | $28,812,300 | TBR |
| **Other / Allowances** | $2,950,000 | TBR |

The full budget allocation matrix as shared with the Center on June 22nd has been included as Exhibit B to this monthly report.

## PROJECT STATUS DETAIL

### Project 1 — Infrastructure • Active

*Soffit investigation and repair, garage structural/waterproofing, roof infill, loading dock, expansion joints, hazardous materials.*

**This Month**

- HITT contract for Soffit Investigation Scope of Work signed June 15; hazardous materials report received.
- Soffit investigation Scope of Work is underway; HITT/WPM completed below soffit and terrace level LiDAR scans. HITT finalizing work and safety plans for Terrace/Interstitial Space scopes of work. Work and Safety Plans for below soffit investigation submitted to the Center for review. Boom lift delivered to site on 6/30/2026. ; interstitial make-safe is scheduled to commence July 13 pending the submission and approval of safety/work plans.
- Garage repair SOW and updated IGCE finalized; requisition submitted to KC June 26 (comments received, JLL to resubmit with contract exhibit).
- Site fencing revised requisition package submitted to KC for review June 26.
- 3rd Party Inspection requisition submitted to KC for review June 29.
- Weekly Soffit Investigation coordination calls held Wednesdays at 1:30 PM.
- Initial review of debris removal scope with KC (utilizing stagehands).

**Next Month**

- Coordinate KC review of HITT's safety/work plans for below soffit investigation work
- Commence with below soffit investigation.
- HITT to submit safety/work plan for Terrace/Interstitial Space scopes of work; commence with interstitial make-safe scope July 13.
- Review HITT's Interstitial Space safety plan with the Center and stagehands (for debris removal scope).
- Resubmit garage repair requisition and statement of work incorporating KC comments and exhibits (including form contract).
- Initiate site control activities upon KC approval.
- Review debris/insulation removal scope and safety plan with KC.

### Decisions Required

- KC approval of temporary fencing requisitions (procurement and installation) – July 6 mobilization at risk.
- KC review and approval of below soffit investigation safety and work plans.
- KC review and approval of resubmitted garage repair scope requisition.
- KC direction on debris removal scope for the soffit interstitial space.

## Project 2 — MEP Systems • Active

*Central plant replacement, condenser water loop improvement/ replacement, electrical system upgrades, and domestic cold water and sanitary piping replacement. Comprehensive MEP feasibility study covering mechanical, electrical, and plumbing infrastructure replacement strategy and budget validation.*

### This Month

- Sprinkler repair RFP scoping meeting held with KC Facilities team June 30; JLL is developing scope and determining potential bidders .
- MEP Feasibility Study awarded to WB Engineering
- MEP Feasibility Study began on June 16th and the team completed an existing conditions survey.
- Mechanically:
  - Cooling Tower Option is under review by WB for potential options.
  - DC wastewater heat rejection option is under review by WB as team met with DC Water.
  - River water option is under review by WB for potential improvements/ EPA compliance.
  - Block load analysis for central plant sizing is underway by WB with trend data/ utility bills provided by KC.
- Electrically:
  - Alternative switchgear rooms are being considered by WB to minimize outage time.

### Next Month

- Receive design engineering input on sprinkler scope outstanding questions and move forward to finalizing RFP scope.
- Begin concept development for mechanical and electrical feasibility study.
- Receive civil engineering input on DC wastewater heat rejection option.
- Continue weekly MEP meetings with WB and ATSR
- Further define scope for domestic cold water and sanitary piping replacement.

### Decisions Required

- None outstanding

## Project 3 — Interiors & Performance Venues • Active

*Interior stone restoration (MarbleCrafters), seating replacement (Concert Hall and Opera House), performance venue design development.*

### This Month

- MarbleCrafters (KC's vendor) BPA funding package finalized; KC issued award (JLL received copy June 25).
- Irwin Seating provide market research and budget pricing for the full replacement of stationary seating within the Concert Hall and Opera House.
- Existing-conditions gathering for all performance venues is underway.

### Next Month

- JLL to coordinated and facilitate meeting between Marble Crafters and ATSR to discuss next steps and begin document sharing.
- Irwin to provide market research and budget pricing for the Eisenhower Theater
- ATSR/Irwin Seating to continue existing conditions gathering.
- Advance performance venue interior design development and onboard consultants as required.
- Coordinate historic preservation requirements for interior improvements.

### Decisions Required

- None outstanding

## Project Administration & Planning • Active

*CPDP, budget allocation framework, ATSR onboarding, consultant procurement, schedule development, regulatory strategy.*

### This Month

- Final CPDP submitted to KC June 8 with updated phased schedule and scope budgeting matrix; K.

### Next Month

- Obtain KC approval of final CPDP plan and confirm presentation date.

Campbell confirmed a review meeting will be scheduled (date pending from KC).

- Budget Allocation Matrix reviewed with KC; JLL moving forward with the allocation and sharing the final version with ATSR (resolved).
- ATSR contract executed May 29; kick-off June 2; design kick-off with JLL June 11; subconsultants engaged.
- Hazardous materials testing consultant RFP issued to 3 firms; proposals received; evaluation committee kick-off held June 25.
- Historic preservation: master CIP summary submitted to KC for approval; scope breakdown to be provided for historic review.
- Move management coordination remains on hold per KC direction; NSO Music Room move proposal/change order submitted to KC June 18 (no change since).

- Complete hazardous materials consultant proposal evaluation; JLL/KC committee review July 2.
- Finalize Design Development Package scope and corresponding ATSR Work Authorizations.
- Prepare early procurement package documentation.
- Await KC direction on the NSO Music Room move proposal; all other move activities remain pending KC approval.

**Decisions Required**

- KC availability/date for the CPDP presentation and plan approval.
- KC committee to complete hazardous materials consultant proposal evaluation (review July 2).
- KC direction on full move management scope and timeline, including the NSO Music Room move proposal.

## CONSULTANT & PROCUREMENT STATUS

| Firm / Scope | Contract Status | Start / Kick-off | Contract Vehicle | Status |
|---|---|---|---|---|
| ATSR (Architect of Record) | Executed | May 29, 2026 (design KO June 11) | Prime | • Active |
| WB Engineering (MEP Feasibility) | Executed | June 16, 2026 | ATSR Sub | • Active |
| Lee & Associates (Landscape) | Executed | TBD | ATSR Sub | • Active |
| Walter P. Moore (Structural) | In Progress | TBD | ATSR Sub | ○ Pending |
| KCCT (Historic Preservation) | In Progress | TBD | ATSR Sub | ○ Pending |
| IMEG (Civil / Survey) | In Progress | TBD | ATSR Sub | ○ Pending |
| HITT Contracting (Soffit Investigation) | Executed | June 15, 2026 | Direct | • Active |
| MarbleCrafters (Stone Restoration) | Awarded | June 25, 2026 | Direct (BPA) | • Active |
| Hazardous Materials Consultant | In Evaluation | Committee review 7/2 | Direct | ○ Pending |
| Jensen Hughes (Plan Review) | Not Started | TBD | Direct | ○ Pending |

## DECISIONS REQUIRED

The following items require Kennedy Center leadership action to maintain the project schedule:

| Priority | Decision Item | Owner | Required By | Impact if Delayed |
|---|---|---|---|---|
| CRITICAL | Approve temporary fencing requisition — package submitted to KC 6/25 | Kennedy Center | ASAP (before July 6) | July 6 construction start / mobilization at risk |

| Priority | Decision Item | Owner | Required By | Impact if Delayed |
|---|---|---|---|---|
| CRITICAL | CPDP Plan approval — final plan submitted 6/8; confirm presentation date (awaiting date from KC) | Kennedy Center | ASAP | Affects CPDP milestone and design schedule |
| HIGH | Garage repair requisition — KC comments received 6/30; review JLL's resubmitted package with contract exhibit | Kennedy Center | ASAP | Garage scope procurement delay |
| HIGH | Hazardous materials consultant selection — committee kick-off 6/25; evaluation underway | Kennedy Center | July 2, 2026 | Scope procurement delay |
| MEDIUM | Full move management scope direction — beyond the NSO Music Room move | Kennedy Center | July 2026 | Decommissioning schedule impact |

## SAFETY & COMPLIANCE

### Safety

- HITT finalizing work and safety plans for Terrace/Interstitial Space scope of work; Interstitial Space make-safe scheduled to commence July 13.
- Soffit safety notice (per W.P. Moore, June 17): due to concerns over structural integrity of the soffit panels, no personnel to access the interstitial space unless properly trained and tied off.
- Project planning incorporates safety performance requirements for future contractor selection (EMR limits, safety plans, reporting protocols per Charter Section 11).
- JLL safety oversight protocols established for construction phase per Owner's Representative role.

### Regulatory & Permitting

- KCCT (historic preservation) engaged as ATSR subconsultant. A three-phase submission strategy was the original plan which has been paused per direction from the Center. Discussions with historic preservation groups expected to commence in July pending direction from the Center. Tentative submission strategy includes:
  - Phase I — Emergency Repairs: notify commissions of immediate repair scope (target CFA meeting: TBD; submission deadline RBS)
  - Phase II — Exterior Improvements: Section 106 review submission (target CFA meeting: TBD; submission deadline TBD)
  - Phase III — Interior Improvements: interior documentation submission (target CFA meeting: TBD; submission deadline TBD)
- Master CIP summary submitted to KC for approval including scope breakdown to be provided for historic review.
- Building permit applications to be prepared and submitted to KC's Authority Having Jurisdiction.

## RISK MANAGEMENT

| Risk Category | Risk Description | Score | Owner |
|---|---|---|---|
| **Client & Stakeholder Complexity** | Scope change governance for budget/timeline impacts | HIGH | Client |
| **Client & Stakeholder Complexity** | Kennedy Center Board decision-making speed | HIGH | Client |
| **Operational & Coordination Risks** | Public access/tourism considerations during renovation | HIGH | Client |
| **Schedule & Delivery Risks** | Missing July 4, 2028 reopening deadline | HIGH | CM/JLL |
| **Schedule & Delivery Risks** | Change order impact management with fixed approval deadlines | HIGH | Client/JLL |

| Risk Category | Risk Description | Score | Owner |
|---|---|---|---|
| **Schedule & Delivery Risks** | Early warning indicators for critical schedule slippage | **HIGH** | JLL |
| **Schedule & Delivery Risks** | 28-month timeline realism vs. similar historic renovations | **HIGH** | Client/JLL |
| **Technical & Execution Risks** | Inadequate contingency reserves for 65 year old building unknowns | **HIGH** | Client/JLL |

The full risk register including recommend controls and monitoring activities has been included as Exhibit C to this monthly report.

## 30 / 60 / 90-DAY LOOK-AHEAD

| 30 Days (July 2026) | 60 Days (August 2026) | 90 Days (September 2026) |
|---|---|---|
| – Construction mobilization (July 6), pending direction from Kennedy Center<br>– HITT soffit investigation scope underway<br>– CPDP plan approval by KC<br>– Hazardous materials consultant contract awarded (committee review July 2)<br>– MEP feasibility study underway<br>– Sprinkler RFP coverage / market research | – MEP feasibility study complete (Aug 14)<br>– Schematic design development initiated<br>– Garage repair scope procurement complete<br>– Early procurement packages issued<br>– Budget validation complete | – Schematic design complete<br>– Design development begins<br>– CIP project budgets finalized<br>– Construction Document scope defined<br>– Historic commission Phase III (Interior) prep |

Report prepared by JLL Project & Development Services

## EXHIBITS

- **Exhibit A – Integrated Project Schedule – June 2026** *[attached]*
- **Exhibit B – Budget Allocation Matrix** *[attached]*
- **Exhibit C – Risk Register** *[attached]*

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| **Kennedy Center Renewal Project July 1, 2026** | | 09-Mar-26 A | 29-Dec-28 | 735 |
| **Milestones and Summary** | | 20-Mar-26 A | 29-Dec-28 | 702 |
| MS-1000 | Start Project / Start Sprints | 20-Mar-26 A | | 0 |
| MS-1010 | Approve Project Charter | | 22-Apr-26 A | 0 |
| MS-1020 | Submit CPDP Draft | | 30-Apr-26 A | 0 |
| MS-1040 | Submit IPS Draft | | 30-Apr-26 A | 0 |
| MS-1025 | Approve CPDP Draft (Verbal) | | 13-May-26 | 0 |
| MS-1140 | Day One Scopes of Work | | 01-Jun-26 A | 0 |
| MS-1130 | Confirm Readiness (by June 6) | | 05-Jun-26 A | 0 |
| MS-1030 | Submit CPDP Final | | 08-Jun-26 A | 0 |
| MS-1050 | Submit IPS Final | | 08-Jun-26 A | 0 |
| MS-1060 | Construction Start | 06-Jul-26* | | 0 |
| SUMMARY-1000 | Construction:Infrastruture Projects Summary | 06-Jul-26* | 30-Jul-27 | 280 |
| SUMMRY-1010 | Construction: MEP Projects Summary | 06-Jul-26* | 24-Mar-28 | 450 |
| MS-1070 | Preservation League Engagement | 13-Jul-26* | 10-Sep-26 | 44 |
| MS.SUMMRY-1020 | Construction: Interiors and Venue Renovations Summary | 01-Mar-27* | 31-Jul-28 | 371 |
| MS-1090 | Reopen Building | | 02-Oct-28* | 0 |
| SUMMARY-1100 | Construction: Final Completion & Closeout | 02-Oct-28 | 29-Dec-28 | 65 |
| **Phases** | | 09-Mar-26 A | 30-Nov-28 | 714 |
| Prework | | 09-Mar-26 A | 25-Sep-28 | 666 |
| Regulatory approvals (CFA/NCPC) | | 13-Jul-26 | 31-Aug-26 | 35 |
| REGLT.Ph1-1030 | Notify Preservation League | | 13-Jul-26* | 0 |
| REGLT-Ph3-1090 | Submit and review Exterior scope to Preservation League | | 30-Jul-26* | 0 |
| REGLT-Ph3-1080 | Regulatory:Submit and review Interiors scope to Preservation League | | 31-Aug-26* | 0 |
| A&E team onboarding | | 15-Apr-26 A | 24-Jun-26 A | 44 |
| Architect Onboarding | | 15-Apr-26 A | 24-Jun-26 A | 44 |
| ATSR.CNTRCT-1000 | Contract with ATSR | 15-Apr-26 A | 04-Jun-26 A | 20 |
| ATSR.ONBRD-1060 | Provide Preliminary Documentation | 19-May-26 A | 24-Jun-26 A | 20 |
| ATSR.ONBRD-1000 | Kickoff Mtg. and Scope Development -Assessments and Inspections | 11-Jun-26 A | 11-Jun-26 A | 1 |
| Digital design file consolidation | | 05-Jun-26 A | 17-Jul-26 | 21 |
| DIGTL-0010 | Start (based on Architect Award) | 05-Jun-26 A | 05-Jun-26 A | 5 |
| DIGTL-1060 | Consolidate Digital Design | 08-Jun-26 A | 17-Jul-26 | 20 |
| Consultant onboarding | | 09-Mar-26 A | 21-Aug-26 | 120 |
| Consultants | | 21-Apr-26 A | 16-Jul-26 | 63 |
| ONBRDC-2170 | Consultant Procurement - PreConstruction (HITT) | 21-Apr-26 A | 15-Jun-26 A | 30 |
| ONBRDC-2110 | KC Consultant Procurement - Hazardous Materials Consultant | 26-May-26 A | 10-Jul-26 | 20 |
| ONBRDC-2120 | ATSR Consultant Onboarding - Landscape Architect (LEE) | 19-Jun-26 A | 22-Jun-26 A | 9 |
| ONBRDC-2100 | ATSR Consultant Procurement - Historic Preservation Consultant (KCCT) | 06-Jul-26* | 10-Jul-26 | 5 |
| ONBRDC-2140 | ATSR Consultant Procurement - Civil Engineer (TBD) | 06-Jul-26 | 16-Jul-26 | 9 |
| Consultants onboarding (TKC) | | 09-Mar-26 A | 21-Aug-26 | 120 |
| ONBRDC-2180 | Consultant Procurement - JLL | 09-Mar-26 A | 09-Mar-26 , | 1 |
| ONBRDC-2130 | Consultant Procurement - Jensen Hughes: Plan review and inspections | 28-Apr-26 A | 17-Jul-26 | 20 |



Remaining Level of Effort — Actual Level of Effort — Primary Baseline — Actual Work — Remaining Work — Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| ONBRDC-2150 | Consultant Procurement – Geotechnical Engineer (TBD) | 06-Jul-26 | 21-Aug-26 | 35 |
| Mechanical (MEP) system feasibility study | | 21-May-26 A | 09-Feb-27 | 189 |
| FEASABILTY.MEP-0005 | Feasibility Procurement | 21-May-26 A | 27-May-26 | 45 |
| FEASABILTY.MEP-0006 | Feasibility Award to WB | 04-Jun-26 A | 04-Jun-26 A | 45 |
| FEASABILTY.MEP-0010 | Determine Feasibility and Present Findings (Hydronic and Elect. Distributi | 06-Jul-26* | 04-Sep-26 | 45 |
| FEASABILTY.MEP-0020 | Review Feasibility Options Decision: Proceed with Design / Hold / Do Not | 03-Aug-26 | 25-Sep-26 | 40 |
| FEASABILTY.MEP-0030 | Approve & Release Arch., MEP Consultants Work Authorization | 24-Aug-26 | 16-Oct-26 | 40 |
| Mechanical (MEP) system design – priorities | | 03-Sep-26 | 16-Dec-26 | 75 |
| FEASABILTY.MEP-0040 | Develop Long Lead Material Early Release Package (MEP) | 03-Sep-26 | 21-Oct-26 | 35 |
| FEASABILTY.MEP-0050 | Develop Mechanical Package | 03-Sep-26 | 16-Dec-26 | 75 |
| FEASABILTY.MEP-0060 | Develop Electrical Package | 03-Sep-26 | 16-Dec-26 | 75 |
| FEASABILTY.MEP-0070 | Develop Plumbing Package | 03-Sep-26 | 16-Dec-26 | 75 |
| Mechanical (MEP) system scope development – balance of scope | | 09-Sep-26 | 03-Nov-26 | 40 |
| FEASABILTY.MEP-0080 | Develop Balance of MEP Scope: Review Existing Conditions | 09-Sep-26 | 29-Sep-26 | 15 |
| FEASABILTY.MEP-0090 | Develop Balance of MEP Scope: Update Pricing Matrix | 16-Sep-26 | 20-Oct-26 | 25 |
| FEASABILTY.MEP-0100 | Develop Balance of MEP Scope: Prioritize List | 14-Oct-26 | 27-Oct-26 | 10 |
| FEASABILTY.MEP-0110 | Develop Balance of MEP Scope: Confirm List and Direction with KC | 28-Oct-26 | 03-Nov-26 | 5 |
| Mechanical (MEP) system design – balance of scope | | 04-Nov-26 | 09-Feb-27 | 70 |
| FEASABILTY.MEP-0120 | Develop Mechanical Package | 04-Nov-26 | 09-Feb-27 | 70 |
| FEASABILTY.MEP-0130 | Develop Electrical Package | 04-Nov-26 | 09-Feb-27 | 70 |
| FEASABILTY.MEP-0140 | Develop Plumbing Package | 04-Nov-26 | 09-Feb-27 | 70 |
| Destructive Testing | | 15-Jun-26 A | 21-Aug-26 | 50 |
| DSTRC.TEST-1000 | Soffit Investigation Award (HITT) | 15-Jun-26 A | 15-Jun-26 A | 36 |
| DSTRC.TEST-1010 | Mobilize (HITT) | 29-Jun-26 A | 29-Jun-26 A | 1 |
| DSTRC.TEST-1110 | Exterior Investigation (HITT) | 06-Jul-26* | 24-Jul-26 | 15 |
| DSTRC.TEST-1150 | Terrace Investigation (HITT) | 13-Jul-26 | 07-Aug-26 | 20 |
| DSTRC.TEST-1140 | Testing, Inspections and Reports | 27-Jul-26 | 21-Aug-26 | 20 |
| Hazardous Materials Assessment | | 21-Apr-26 A | 15-Sep-26 | 62 |
| HAZ.MAT.TEST-1000 | Scope Development, Walks and Reviews - Assessments and Inspections | 21-Apr-26 A | 05-May-26 | 10 |
| HAZ.MAT.TEST-1010 | Bids Received | | 22-Jun-26 A | 0 |
| HAZ.MAT.TEST-1020 | RFP Review | 13-Jul-26 | 22-Jul-26 | 8 |
| HAZ.MAT.TEST-1030 | Award | | 28-Jul-26 | 0 |
| HAZ.MAT.TEST-1040 | Destructive Testing | 05-Aug-26 | 01-Sep-26 | 20 |
| HAZ.MAT.TEST-1050 | Testing, Inspections and Reports | 02-Sep-26 | 15-Sep-26 | 10 |
| CM on boarding | | 21-Apr-26 A | 02-Dec-26 | 156 |
| MEP Construction Manager | | 06-Jul-26 | 04-Sep-26 | 45 |
| MEP.CM.ONBRD-0010 | MEP CM: Develop Procurement Strategy and Conduct Market Research | 06-Jul-26 | 24-Jul-26 | 15 |
| MEP.CM.ONBRD-0015 | MEP CM: Develop Conduct Market Research | 27-Jul-26 | 07-Aug-26 | 10 |
| MEP.CM.ONBRD-0020 | MEP CM: Develop Short List for Each Category | 10-Aug-26 | 14-Aug-26 | 5 |
| MEP.CM.ONBRD-0040 | MEP CM: Approve Short List and Scope (KC) | 17-Aug-26 | 20-Aug-26 | 4 |
| MEP.CM.ONBRD-0050 | MEP CM: Conduct RFP Process | 21-Aug-26 | 03-Sep-26 | 10 |
| MEP.CM.ONBRD-0060 | MEP CM: Review Recommendation (KC) | 04-Sep-26 | 04-Sep-26 | 1 |
| MEP.CM.ONBRD-0070 | MEP CM: Approve Award (KC) | 04-Sep-26 | 04-Sep-26 | 1 |




Remaining Level of Effort | Primary Baseline | Remaining Work
Actual Level of Effort | Actual Work | Critical Remaining Work

Page 2 of 12

TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| MEP Direct Subs | | 27-Jul-26 | 02-Dec-26 | 93 |
| MEP.DIRCT.ONBRD-2000 | MEP Direct Subs: Market Research | 27-Jul-26 | 14-Aug-26 | 15 |
| MEP.DIRCT.ONBRD-2020 | MEP Direct Subs: Develop Short List | 17-Aug-26 | 21-Aug-26 | 5 |
| MEP.DIRCT.ONBRD-2040 | MEP Direct Subs: Approve Short List (KC) | 24-Aug-26 | 24-Aug-26 | 1 |
| MEP.DIRCT.ONBRD-2050 | MEP Direct Subs: Confirm Scope of Work | 24-Aug-26 | 27-Aug-26 | 4 |
| MEP.DIRCT.ONBRD-2060 | MEP Direct Subs: RFP Process | 22-Oct-26 | 11-Nov-26 | 15 |
| MEP.DIRCT.ONBRD-2070 | MEP Direct Subs: KC Approval | 12-Nov-26 | 02-Dec-26 | 15 |
| MEP.DIRCT.ONBRD-2090 | MEP Direct Subs: Award MEP Subs | | 02-Dec-26 | 0 |
| Structural Repair Construction Manager | | 21-Apr-26 A | 17-Jul-26 | 58 |
| STRCT.CM.ONBRD1030 | Structural Repair CM: Review and Approve ROM and Scope | 21-Apr-26 A | 21-May-26 | 21 |
| STRCT.CM.ONBRD1020 | Structural Repair CM: Requisition submitted to KC | | 22-May-26 | 0 |
| STRCT.CM.ONBRD1050 | Structural Repair CM: Review Recommendation (KC) | 06-Jul-26 | 17-Jul-26 | 10 |
| STRCT.CM.ONBRD1060 | Structural Repair CM: Approve Award (KC) | 17-Jul-26 | 17-Jul-26 | 1 |
| Move management and collections relocation strategy (Sprint #8) | | 01-May-26 A | 25-Sep-28 | 627 |
| MOVEMG-1000 | KC Preliminary Review and Discussions | 01-May-26 A | 19-May-26 | 10 |
| MOVEMG-1060 | Approve Verbal (KC) | 22-May-26 A | 22-May-26 | 20 |
| MOVEMG-1070 | Approve Written (KC) - ON HOLD | 06-Jul-26 | 06-Jul-26 | 1 |
| MOVEMG-1090 | Issue Purchase Orders | 07-Jul-26 | 20-Jul-26 | 10 |
| MOVEMG-1080 | Issue NTP | | 20-Jul-26 | 0 |
| MOVEMG-1110 | Move Out and Archiving (Initial) | 21-Jul-26 | 14-Sep-26 | 40 |
| MOVEMG-1120 | Move In and Archiving (After Phase 4: Interiors and Venues) | 01-Aug-28 | 25-Sep-28 | 40 |
| Site Mobilization | | 20-Jul-26 | 03-Dec-26 | 98 |
| MOBILIZE-1110 | Mobilize Structural Repair CM | 20-Jul-26 | | 0 |
| MOBILIZE-1120 | Mobilize MEP Direct Subs | 03-Dec-26 | | 0 |
| Project 1: Historic Preservation & Prework & Architectural Infrastructure | | 21-Apr-26 A | 18-Feb-28 | 478 |
| PH2.SUMMARY-1000 | Start Phase 2: Architectural Infrastructure - Construction | 06-Jul-26* | | 0 |
| PH2.SUMMARY-1010 | Start Phase 2: Architectural Infrastructure - Construction | 06-Jul-26 | 30-Sep-26 | 63 |
| PH2.SUMMARY-1020 | Complete Phase 2: Architectural Infrastructure - Construction | | 30-Sep-26 | 0 |
| 1B10001 - Plaza Level Waterproofing & Hardscapes | | 21-Apr-26 A | 08-Jan-27 | 188 |
| RSTOR1000 | Scope Development - Assessments and Inspections (includes marble) | 21-Apr-26 A | 08-Jun-26 A | 15 |
| RSTOR1010 | Review and Approve Scope (KC) | 26-May-26 A | 23-Jun-26 A | 15 |
| RSTOR1020 | Design Kick Off Meeting | 06-Jul-26 | 07-Jul-26 | 2 |
| RSTOR1030 | Schematic Design (SD) | 08-Jul-26 | 08-Jul-26 | 1 |
| RSTOR1040 | Design Development (DD) | 09-Jul-26 | 09-Jul-26 | 1 |
| RSTOR1050 | Construction Documents (CD) | 10-Jul-26 | 10-Jul-26 | 1 |
| RSTOR1060 | Provide Final Documentation | 13-Jul-26 | 13-Jul-26 | 1 |
| RSTOR1070 | Review and Approve Final Design (KC) | 14-Jul-26 | 20-Jul-26 | 5 |
| RSTOR1080 | Issue NTP | 21-Jul-26 | 21-Jul-26 | 0 |
| RSTOR1100 | 3rd Party Plan Review | 21-Jul-26 | 21-Jul-26 | 1 |
| RSTOR1090 | Issue Purchase Orders and Procure Material ( Marble) | 21-Jul-26 | 12-Oct-26 | 60 |
| RSTOR1110 | Construction | 18-Aug-26 | 07-Dec-26 | 80 |
| RSTOR1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 08-Dec-26 | 28-Dec-26 | 15 |
| RSTOR1160 | Testing and Inspections | 29-Dec-26 | 29-Dec-26 | 1 |
| RSTOR1170 | Commissioning | 30-Dec-26 | 30-Dec-26 | 1 |




Remaining Level of Effort — Actual Level of Effort — Primary Baseline — Actual Work — Remaining Work — Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| RSTOR1130 | Substantial Completion | 31-Dec-26 | 31-Dec-26 | 0 |
| RSTOR1180 | Punch List and Final Inspections | 31-Dec-26 | 31-Dec-26 | 1 |
| RSTOR1140 | Review and Approve (KC) | 01-Jan-27 | 07-Jan-27 | 5 |
| RSTOR1150 | Turnover to Client | 08-Jan-27 | 08-Jan-27 | 0 |
| **1B10002 - Garage Repairs & Subgrade Waterproofing** | | 14-May-26 A | 14-Dec-26 | 152 |
| GARAGE-1000 | Draft Scope Development - Assessments and Inspections | 14-May-26 A | 25-May-26 | 10 |
| GARAGE-1010 | Requisition submitted to (KC) Correct this, then RFP - fcst Award - 8/1 | 25-Jun-26 A | 10-Jul-26 | 5 |
| GARAGE-1080 | Contract Award | 03-Aug-26* | 06-Aug-26 | 4 |
| GARAGE-1090 | Kick off Meeting | 07-Aug-26 | 07-Aug-26 | 1 |
| GARAGE-1100 | NTP Garage Contractor | 11-Aug-26 | 11-Aug-26 | 1 |
| GARAGE-1110 | Construction | 12-Aug-26 | 17-Nov-26 | 70 |
| GARAGE-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 18-Nov-26 | 01-Dec-26 | 10 |
| GARAGE-1160 | Testing and Inspections | 02-Dec-26 | 02-Dec-26 | 1 |
| GARAGE-1170 | Commissioning | 03-Dec-26 | 03-Dec-26 | 1 |
| GARAGE-1130 | Substantial Completion | 04-Dec-26 | 04-Dec-26 | 0 |
| GARAGE-1180 | Punch List and Final Inspections | 04-Dec-26 | 04-Dec-26 | 1 |
| GARAGE-1140 | Review and Approve (KC) | 07-Dec-26 | 11-Dec-26 | 5 |
| GARAGE-1150 | Turnover to Client | 14-Dec-26 | 14-Dec-26 | 0 |
| **1B10003 - Terrace Level Overhang & Roof** | | 09-Jun-26 A | 03-Feb-27 | 171 |
| INFR.BESR.SCTR-1010 | Review and Approve Scope (KC) | 09-Jun-26 A | 23-Jun-26 A | 11 |
| INFR.BESR.SCTR-1000 | Scope Development - Assessments (Early Destructive Testing) and Inspe | 06-Jul-26 | 12-Aug-26 | 28 |
| INFR.BESR.SCTR-1020 | Design Kick Off Meeting | 27-Jul-26 | 28-Jul-26 | 2 |
| INFR.BESR.SCTR-1030 | Schematic Design (SD) | 29-Jul-26 | 29-Jul-26 | 1 |
| INFR.BESR.SCTR-1040 | Design Development (DD) | 30-Jul-26 | 30-Jul-26 | 1 |
| INFR.BESR.SCTR-1050 | Construction Documents (CD) | 31-Jul-26 | 31-Jul-26 | 1 |
| INFR.BESR.SCTR-1060 | Provide Final Documentation | 03-Aug-26 | 14-Aug-26 | 10 |
| INFR.BESR.SCTR-1070 | Review and Approve Final Design (KC) | 17-Aug-26 | 21-Aug-26 | 5 |
| INFR.BESR.SCTR-1080 | Issue NTP | 24-Aug-26 | 24-Aug-26 | 0 |
| INFR.BESR.SCTR-1100 | 3rd Party Plan Review | 24-Aug-26 | 24-Aug-26 | 1 |
| INFR.BESR.SCTR-1090 | Issue Purchase Orders | 24-Aug-26 | 11-Dec-26 | 80 |
| INFR.BESR.SCTR-1110 | Construction | 25-Aug-26 | 14-Dec-26 | 80 |
| INFR.BESR.SCTR-1115 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 15-Dec-26 | 28-Dec-26 | 10 |
| INFR.BESR.SCTR-1120 | Testing and Inspections | 29-Dec-26 | 11-Jan-27 | 10 |
| INFR.BESR.SCTR-1130 | Commissioning | 12-Jan-27 | 12-Jan-27 | 1 |
| INFR.BESR.SCTR-1140 | Substantial Completion | 13-Jan-27 | 13-Jan-27 | 0 |
| INFR.BESR.SCTR-1150 | Punch List and Final Inspections | 13-Jan-27 | 26-Jan-27 | 10 |
| INFR.BESR.SCTR-1160 | Review and Approve (KC) | 27-Jan-27 | 02-Feb-27 | 5 |
| INFR.BESR.SCTR-1170 | Turnover to Client | 03-Feb-27 | 03-Feb-27 | 0 |
| **1B20001 - Landscaping Replacement** | | 06-Jul-26 | 26-Oct-26 | 80 |
| RSTOR1190 | Scope Development - Assessments and Inspections | 06-Jul-26 | 17-Jul-26 | 10 |
| RSTOR1200 | Review and Approve Scope (KC) | 20-Jul-26 | 24-Jul-26 | 5 |
| RSTOR1210 | Design Kick Off Meeting | 27-Jul-26 | 28-Jul-26 | 2 |
| RSTOR1220 | Schematic Design (SD) | 29-Jul-26 | 29-Jul-26 | 1 |
| RSTOR1230 | Design Development (DD) | 30-Jul-26 | 30-Jul-26 | 1 |




Remaining Level of Effort | Primary Baseline | Remaining Work
Actual Level of Effort | Actual Work | Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| RSTOR1240 | Construction Documents (CD) | 31-Jul-26 | 31-Jul-26 | 1 |
| RSTOR1250 | Provide Final Documentation | 03-Aug-26 | 03-Aug-26 | 1 |
| RSTOR1260 | Review and Approve Final Design (KC) | 04-Aug-26 | 10-Aug-26 | 5 |
| RSTOR1270 | Issue NTP | 11-Aug-26 | 11-Aug-26 | 0 |
| RSTOR1290 | 3rd Party Plan Review | 11-Aug-26 | 11-Aug-26 | 1 |
| RSTOR1280 | Issue Purchase Orders | 11-Aug-26 | 07-Sep-26 | 20 |
| RSTOR1300 | Construction | 12-Aug-26 | 06-Oct-26 | 40 |
| RSTOR1370 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 07-Oct-26 | 13-Oct-26 | 5 |
| RSTOR1310 | Testing and Inspections | 14-Oct-26 | 14-Oct-26 | 1 |
| RSTOR1320 | Commissioning | 15-Oct-26 | 15-Oct-26 | 1 |
| RSTOR1330 | Substantial Completion | 16-Oct-26 | 16-Oct-26 | 0 |
| RSTOR1340 | Punch List and Final Inspections | 16-Oct-26 | 16-Oct-26 | 1 |
| RSTOR1350 | Review and Approve (KC) | 19-Oct-26 | 23-Oct-26 | 5 |
| RSTOR1360 | Turnover to Client | 26-Oct-26 | 26-Oct-26 | 0 |
| **1B20002 - Fountain Restoration** | | 30-Apr-26 A | 28-Sep-26 | 107 |
| FOUNTAIN-1000 | Scope Development - Assessments and Inspections | 30-Apr-26 A | 08-Jun-26 A | 10 |
| FOUNTAIN-1010 | Review and Approve Scope (KC) | 06-Jul-26 | 10-Jul-26 | 5 |
| FOUNTAIN-1020 | Design Kick Off Meeting | 13-Jul-26 | 14-Jul-26 | 2 |
| FOUNTAIN-1030 | Schematic Design (SD) | 15-Jul-26 | 15-Jul-26 | 1 |
| FOUNTAIN-1040 | Design Development (DD) | 16-Jul-26 | 16-Jul-26 | 1 |
| FOUNTAIN-1050 | Construction Documents (CD) | 17-Jul-26 | 17-Jul-26 | 1 |
| FOUNTAIN-1060 | Provide Final Documentation | 20-Jul-26 | 20-Jul-26 | 1 |
| FOUNTAIN-1070 | Review and Approve Final Design (KC) | 21-Jul-26 | 27-Jul-26 | 5 |
| FOUNTAIN-1080 | Issue NTP | 28-Jul-26 | 28-Jul-26 | 0 |
| FOUNTAIN-1100 | 3rd Party Plan Review | 28-Jul-26 | 28-Jul-26 | 1 |
| FOUNTAIN-1090 | Issue Purchase Orders | 28-Jul-26 | 24-Aug-26 | 20 |
| FOUNTAIN-1110 | Construction | 29-Jul-26 | 08-Sep-26 | 30 |
| FOUNTAIN-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 09-Sep-26 | 15-Sep-26 | 5 |
| FOUNTAIN-1160 | Testing and Inspections | 16-Sep-26 | 16-Sep-26 | 1 |
| FOUNTAIN-1170 | Commissioning | 17-Sep-26 | 17-Sep-26 | 1 |
| FOUNTAIN-1130 | Substantial Completion | 18-Sep-26 | 18-Sep-26 | 0 |
| FOUNTAIN-1180 | Punch List and Final Inspections | 18-Sep-26 | 18-Sep-26 | 1 |
| FOUNTAIN-1140 | Review and Approve (KC) | 21-Sep-26 | 25-Sep-26 | 5 |
| FOUNTAIN-1150 | Turnover to Client | 28-Sep-26 | 28-Sep-26 | 0 |
| **1B20003 - Rock Creek Parkway Stabilization** | | 30-Apr-26 A | 07-Sep-26 | 92 |
| EXTERIOR-1000 | Scope Development - Assessments and Inspections | 30-Apr-26 A | 08-Jun-26 A | 28 |
| EXTERIOR-1010 | Review and Approve Scope (KC) | 09-Jun-26 A | 23-Jun-26 A | 11 |
| EXTERIOR-1020 | Design Kick Off Meeting | 06-Jul-26 | 07-Jul-26 | 2 |
| EXTERIOR-1030 | Schematic Design (SD) | 08-Jul-26 | 08-Jul-26 | 1 |
| EXTERIOR-1040 | Design Development (DD) | 09-Jul-26 | 09-Jul-26 | 1 |
| EXTERIOR-1050 | Construction Documents (CD) | 10-Jul-26 | 10-Jul-26 | 1 |
| EXTERIOR-1060 | Provide Final Documentation | 13-Jul-26 | 13-Jul-26 | 1 |
| EXTERIOR-1070 | Review and Approve Final Design (KC) | 14-Jul-26 | 20-Jul-26 | 5 |
| EXTERIOR-1080 | Issue NTP | 21-Jul-26 | 21-Jul-26 | 0 |

Remaining Level of Effort | Actual Level of Effort | Primary Baseline | Actual Work | Remaining Work | Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| EXTERIOR-1100 | 3rd Party Plan Review | 21-Jul-26 | 21-Jul-26 | 1 |
| EXTERIOR-1090 | Issue Purchase Orders | 21-Jul-26 | 17-Aug-26 | 20 |
| EXTERIOR-1110 | Construction | 22-Jul-26 | 18-Aug-26 | 20 |
| EXTERIOR-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 19-Aug-26 | 25-Aug-26 | 5 |
| EXTERIOR-1160 | Testing and Inspections | 26-Aug-26 | 26-Aug-26 | 1 |
| EXTERIOR-1170 | Commissioning | 27-Aug-26 | 27-Aug-26 | 1 |
| EXTERIOR-1130 | Substantial Completion | 28-Aug-26 | 28-Aug-26 | 0 |
| EXTERIOR-1180 | Punch List and Final Inspections | 28-Aug-26 | 28-Aug-26 | 1 |
| EXTERIOR-1140 | Review and Approve (KC) | 31-Aug-26 | 04-Sep-26 | 5 |
| EXTERIOR-1150 | Turnover to Client | 07-Sep-26 | 07-Sep-26 | 0 |
| **1B30001 - Vehicle Force Protection** | | 30-Apr-26 A | 21-Sep-26 | 102 |
| SECURITY-1000 | Scope Development - Assessments and Inspections | 30-Apr-26 A | 08-Jun-26 A | 10 |
| SECURITY-1010 | Review and Approve Scope (KC) | 09-Jun-26 A | 23-Jun-26 A | 11 |
| SECURITY-1020 | Design Kick Off Meeting | 06-Jul-26 | 07-Jul-26 | 2 |
| SECURITY-1030 | Schematic Design (SD) | 08-Jul-26 | 08-Jul-26 | 1 |
| SECURITY-1040 | Design Development (DD) | 09-Jul-26 | 09-Jul-26 | 1 |
| SECURITY-1050 | Construction Documents (CD) | 10-Jul-26 | 10-Jul-26 | 1 |
| SECURITY-1060 | Provide Final Documentation | 13-Jul-26 | 13-Jul-26 | 1 |
| SECURITY-1070 | Review and Approve Final Design (KC) | 14-Jul-26 | 20-Jul-26 | 5 |
| SECURITY-1080 | Issue NTP | 21-Jul-26 | 21-Jul-26 | 0 |
| SECURITY-1100 | 3rd Party Plan Review | 21-Jul-26 | 21-Jul-26 | 1 |
| SECURITY-1090 | Issue Purchase Orders | 21-Jul-26 | 17-Aug-26 | 20 |
| SECURITY-1110 | Construction | 22-Jul-26 | 01-Sep-26 | 30 |
| SECURITY-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 02-Sep-26 | 08-Sep-26 | 5 |
| SECURITY-1160 | Testing and Inspections | 09-Sep-26 | 09-Sep-26 | 1 |
| SECURITY-1170 | Commissioning | 10-Sep-26 | 10-Sep-26 | 1 |
| SECURITY-1130 | Substantial Completion | 11-Sep-26 | 11-Sep-26 | 0 |
| SECURITY-1180 | Punch List and Final Inspections | 11-Sep-26 | 11-Sep-26 | 1 |
| SECURITY-1140 | Review and Approve (KC) | 14-Sep-26 | 18-Sep-26 | 5 |
| SECURITY-1150 | Turnover to Client | 21-Sep-26 | 21-Sep-26 | 0 |
| **1B30003 - Exterior Glass & Doors Replacement** | | 30-Apr-26 A | 21-Sep-26 | 102 |
| DRWIND1000 | Scope Development - Assessments and Inspections | 30-Apr-26 A | 08-Jun-26 A | 28 |
| DRWIND1010 | Review and Approve Scope (KC) | 09-Jun-26 A | 23-Jun-26 A | 5 |
| DRWIND1020 | Design Kick Off Meeting | 06-Jul-26 | 07-Jul-26 | 2 |
| DRWIND1030 | Schematic Design (SD) | 08-Jul-26 | 08-Jul-26 | 1 |
| DRWIND1040 | Design Development (DD) | 09-Jul-26 | 09-Jul-26 | 1 |
| DRWIND1050 | Construction Documents (CD) | 10-Jul-26 | 10-Jul-26 | 1 |
| DRWIND1060 | Provide Final Documentation | 13-Jul-26 | 13-Jul-26 | 1 |
| DRWIND1070 | Review and Approve Final Design (KC) | 14-Jul-26 | 20-Jul-26 | 5 |
| DRWIND1080 | Issue NTP | 21-Jul-26 | 21-Jul-26 | 0 |
| DRWIND1100 | 3rd Party Plan Review | 21-Jul-26 | 21-Jul-26 | 1 |
| DRWIND1090 | Issue Purchase Orders | 21-Jul-26 | 17-Aug-26 | 20 |
| DRWIND1110 | Construction | 22-Jul-26 | 01-Sep-26 | 30 |
| DRWIND1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 02-Sep-26 | 08-Sep-26 | 5 |

Remaining Level of Effort | Primary Baseline | Remaining Work
Actual Level of Effort | Actual Work | Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| DRWIND1160 | Testing and Inspections | 09-Sep-26 | 09-Sep-26 | 1 |
| DRWIND1170 | Commissioning | 10-Sep-26 | 10-Sep-26 | 1 |
| DRWIND1130 | Substantial Completion | 11-Sep-26 | 11-Sep-26 | 0 |
| DRWIND1180 | Punch List and Final Inspections | 11-Sep-26 | 11-Sep-26 | 1 |
| DRWIND1140 | Review and Approve (KC) | 14-Sep-26 | 18-Sep-26 | 5 |
| DRWIND1150 | Turnover to Client | 21-Sep-26 | 21-Sep-26 | 0 |
| 2B30000 - Vertical Transportation Improvements | | 01-Apr-27 | 18-Feb-28 | 231 |
| 2B30001 - Elevator Modernization | | 01-Apr-27 | 18-Feb-28 | 231 |
| ELVTR.ESCLTR-1000 | Request Otis Condition Assessment and Inspections Report | 01-Apr-27* | 28-Apr-27 | 20 |
| ELVTR.ESCLTR-1010 | Finalize Delegated Design | 29-Apr-27 | 26-May-27 | 20 |
| ELVTR.ESCLTR-0010 | RFP Process: Otis Elevator NewAgreement | 29-Apr-27 | 23-Jun-27 | 40 |
| ELVTR.ESCLTR-1080 | Issue NTP | 24-Jun-27 | 24-Jun-27 | 0 |
| ELVTR.ESCLTR-1100 | 3rd Party Plan Review | 24-Jun-27 | 24-Jun-27 | 1 |
| ELVTR.ESCLTR-1090 | Issue Purchase Orders | 24-Jun-27 | 30-Jun-27 | 5 |
| ELVTR.ESCLTR-1110 | Construction | 01-Jul-27 | 15-Dec-27 | 120 |
| ELVTR.ESCLTR-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 16-Dec-27 | 12-Jan-28 | 20 |
| ELVTR.ESCLTR1160 | Testing and Inspections | 13-Jan-28 | 26-Jan-28 | 10 |
| ELVTR.ESCLTR1170 | Commissioning | 27-Jan-28 | 27-Jan-28 | 1 |
| ELVTR.ESCLTR-1130 | Substantial Completion | 28-Jan-28 | 28-Jan-28 | 0 |
| ELVTR.ESCLTR1180 | Punch List and Final Inspections | 28-Jan-28 | 10-Feb-28 | 10 |
| ELVTR.ESCLTR-1140 | Review and Approve (KC) | 11-Feb-28 | 17-Feb-28 | 5 |
| ELVTR.ESCLTR-1150 | Turnover to Client | 18-Feb-28 | 18-Feb-28 | 0 |
| 2B30002 - Escalator Capital Repair | | 01-Apr-27 | 15-Oct-27 | 141 |
| ELVTR.ESCLTR-1160 | Request Otis Condition Assessment and Inspections Report | 01-Apr-27* | 28-Apr-27 | 20 |
| ELVTR.ESCLTR-1170 | Finalize Delegated Design | 29-Apr-27 | 26-May-27 | 20 |
| ELVTR.ESCLTR-1320 | RFP Process: Otis Elevator NewAgreement | 29-Apr-27 | 23-Jun-27 | 40 |
| ELVTR.ESCLTR-1240 | Issue NTP | 24-Jun-27 | 24-Jun-27 | 0 |
| ELVTR.ESCLTR-1260 | 3rd Party Plan Review | 24-Jun-27 | 24-Jun-27 | 1 |
| ELVTR.ESCLTR-1250 | Issue Purchase Orders | 24-Jun-27 | 30-Jun-27 | 5 |
| ELVTR.ESCLTR-1270 | Construction | 01-Jul-27 | 25-Aug-27 | 40 |
| ELVTR.ESCLTR-1310 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 26-Aug-27 | 08-Sep-27 | 10 |
| ELVTR.ESCLTR1190 | Testing and Inspections | 09-Sep-27 | 22-Sep-27 | 10 |
| ELVTR.ESCLTR1200 | Commissioning | 23-Sep-27 | 23-Sep-27 | 1 |
| ELVTR.ESCLTR-1280 | Substantial Completion | 24-Sep-27 | 24-Sep-27 | 0 |
| ELVTR.ESCLTR1210 | Punch List and Final Inspections | 24-Sep-27 | 07-Oct-27 | 10 |
| ELVTR.ESCLTR-1290 | Review and Approve (KC) | 08-Oct-27 | 14-Oct-27 | 5 |
| ELVTR.ESCLTR-1300 | Turnover to Client | 15-Oct-27 | 15-Oct-27 | 0 |
| Project 2: Major Systems and Equipment | | 03-Aug-26 | 03-Mar-28 | 414 |
| PH3.SUMMARY-1000 | Start Phase 2: Major Systems Construction | 03-Aug-26* | | 0 |
| PH3.SUMMARY-1010 | Phase 2:Major Systems Construction | 03-Aug-26 | 17-Dec-27 | 360 |
| PH3.SUMMARY-1020 | Complete Phase 2: Major Systems Construction | | 17-Dec-27 | 0 |
| 4B30001 - Sanitary & Domestic Piping | | 03-Sep-26 | 01-Oct-27 | 281 |
| SANITRY.MAINS1000 | Scope Development and Design | 03-Sep-26 | 16-Dec-26 | 75 |
| SANITRY.MAINS1070 | Review and Approve Final Design (KC) | 17-Dec-26 | 23-Dec-26 | 5 |

Remaining Level of Effort — Actual Level of Effort — Primary Baseline — Actual Work — Remaining Work — Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| SANITRY.MAINS1080 | Issue NTP | 24-Dec-26 | 24-Dec-26 | 0 |
| SANITRY.MAINS1090 | Issue Purchase Orders | 24-Dec-26 | 20-Jan-27 | 20 |
| SANITRY.MAINS1100 | Preconstruction | 24-Dec-26 | 20-Jan-27 | 20 |
| SANITRY.MAINS1110 | Construction | 21-Jan-27 | 21-Jul-27 | 130 |
| SANITRY.MAINS1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 22-Jul-27 | 25-Aug-27 | 25 |
| SANITRY.MAINS1160 | Testing and Inspections | 26-Aug-27 | 08-Sep-27 | 10 |
| SANITRY.MAINS1170 | Commissioning | 09-Sep-27 | 09-Sep-27 | 1 |
| SANITRY.MAINS1130 | Substantial Completion | 10-Sep-27 | 10-Sep-27 | 0 |
| SANITRY.MAINS1180 | Punch List and Final Inspections | 10-Sep-27 | 23-Sep-27 | 10 |
| SANITRY.MAINS1140 | Review and Approve (KC) | 24-Sep-27 | 30-Sep-27 | 5 |
| SANITRY.MAINS1150 | Turnover to Client | 01-Oct-27 | 01-Oct-27 | 0 |
| **4B30002 - Central Plant Upgrades** | | 03-Sep-26 | 24-Dec-27 | 341 |
| MAIN.PWR-1000 | Scope Development and Design | 03-Sep-26 | 16-Dec-26 | 75 |
| MAIN.PWR-1070 | Review and Approve Final Design (KC) | 17-Dec-26 | 23-Dec-26 | 5 |
| MAIN.PWR-1080 | Issue NTP | 24-Dec-26 | 24-Dec-26 | 0 |
| MAIN.PWR-1090 | Issue Purchase Orders | 24-Dec-26 | 20-Jan-27 | 20 |
| MAIN.PWR-1100 | PreConstruction | 24-Dec-26 | 14-Apr-27 | 80 |
| MAIN.PWR-1110 | Construction | 15-Apr-27 | 13-Oct-27 | 130 |
| MAIN.PWR-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 14-Oct-27 | 17-Nov-27 | 25 |
| MAIN.PWR-1160 | Testing and Inspections | 18-Nov-27 | 01-Dec-27 | 10 |
| MAIN.PWR-1170 | Commissioning | 02-Dec-27 | 02-Dec-27 | 1 |
| MAIN.PWR-1130 | Substantial Completion | 03-Dec-27 | 03-Dec-27 | 0 |
| MAIN.PWR-1180 | Punch List and Final Inspections | 03-Dec-27 | 16-Dec-27 | 10 |
| MAIN.PWR-1140 | Review and Approve (KC) | 17-Dec-27 | 23-Dec-27 | 5 |
| MAIN.PWR-1150 | Turnover to Client | 24-Dec-27 | 24-Dec-27 | 0 |
| **4B30003 - Condenser Loop** | | 03-Sep-26 | 03-Sep-27 | 261 |
| MECH.REPLC-1000 | Scope Development and Design | 03-Sep-26 | 16-Dec-26 | 75 |
| MECH.REPLC-1070 | Review and Approve Final Design (KC) | 17-Dec-26 | 23-Dec-26 | 5 |
| MECH.REPLC-1080 | Issue NTP | 24-Dec-26 | 24-Dec-26 | 0 |
| MECH.REPLC-1090 | Issue Purchase Orders | 24-Dec-26 | 20-Jan-27 | 20 |
| MECH.REPLC-1100 | PreConstruction | 24-Dec-26 | 14-Apr-27 | 80 |
| MECH.REPLC-1110 | Construction | 15-Apr-27 | 23-Jun-27 | 50 |
| MECH.REPLC-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 24-Jun-27 | 28-Jul-27 | 25 |
| MECH.REPLC-1160 | Testing and Inspections | 29-Jul-27 | 11-Aug-27 | 10 |
| MECH.REPLC-1170 | Commissioning | 12-Aug-27 | 12-Aug-27 | 1 |
| MECH.REPLC-1130 | Substantial Completion | 13-Aug-27 | 13-Aug-27 | 0 |
| MECH.REPLC-1180 | Punch List and Final Inspections | 13-Aug-27 | 26-Aug-27 | 10 |
| MECH.REPLC-1140 | Review and Approve (KC) | 27-Aug-27 | 02-Sep-27 | 5 |
| MECH.REPLC-1150 | Turnover to Client | 03-Sep-27 | 03-Sep-27 | 0 |
| **4B30004 - Electrical Feeders** | | 03-Sep-26 | 03-Mar-28 | 391 |
| ELEC.UPG-1000 | Scope Development and Design | 03-Sep-26 | 16-Dec-26 | 75 |
| ELEC.UPG-1070 | Review and Approve Final Design (KC) | 17-Dec-26 | 23-Dec-26 | 5 |
| ELEC.UPG-1080 | Issue NTP | 24-Dec-26 | 24-Dec-26 | 0 |
| ELEC.UPG-1090 | Issue Purchase Orders | 24-Dec-26 | 20-Jan-27 | 20 |




Remaining Level of Effort | Primary Baseline | Remaining Work
Actual Level of Effort | Actual Work | Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| ELEC.UPG-1100 | PreConstruction | 24-Dec-26 | 23-Jun-27 | 130 |
| ELEC.UPG-1110 | Construction | 24-Jun-27 | 22-Dec-27 | 130 |
| ELEC.UPG-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 23-Dec-27 | 26-Jan-28 | 25 |
| ELEC.UPG-1160 | Testing and Inspections | 27-Jan-28 | 09-Feb-28 | 10 |
| ELEC.UPG-1170 | Commissioning | 10-Feb-28 | 10-Feb-28 | 1 |
| ELEC.UPG-1130 | Substantial Completion | 11-Feb-28 | 11-Feb-28 | 0 |
| ELEC.UPG-1180 | Punch List and Final Inspections | 11-Feb-28 | 24-Feb-28 | 10 |
| ELEC.UPG-1140 | Review and Approve (KC) | 25-Feb-28 | 02-Mar-28 | 5 |
| ELEC.UPG-1150 | Turnover to Client | 03-Mar-28 | 03-Mar-28 | 0 |
| **4B10001 - Extend Fire Protection A Level** | | 03-Sep-26 | 10-Dec-27 | 331 |
| FIRE.ALARM-1000 | Scope Development and Design | 03-Sep-26 | 16-Dec-26 | 75 |
| FIRE.ALARM-1070 | Review and Approve Final Design (KC) | 17-Dec-26 | 23-Dec-26 | 5 |
| FIRE.ALARM-1080 | Issue NTP | 24-Dec-26 | 24-Dec-26 | 0 |
| FIRE.ALARM-1100 | Permitting | 24-Dec-26 | 24-Dec-26 | 1 |
| FIRE.ALARM-1090 | Issue Purchase Orders | 24-Dec-26 | 20-Jan-27 | 20 |
| FIRE.ALARM-1105 | PreConstruction | 24-Dec-26 | 14-Apr-27 | 80 |
| FIRE.ALARM-1110 | Construction | 15-Apr-27 | 29-Sep-27 | 120 |
| FIRE.ALARM-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 30-Sep-27 | 03-Nov-27 | 25 |
| FIRE.ALARM-1160 | Testing and Inspections | 04-Nov-27 | 17-Nov-27 | 10 |
| FIRE.ALARM-1170 | Commissioning | 18-Nov-27 | 18-Nov-27 | 1 |
| FIRE.ALARM-1130 | Substantial Completion | 19-Nov-27 | 19-Nov-27 | 0 |
| FIRE.ALARM-1180 | Punch List and Final Inspections | 19-Nov-27 | 02-Dec-27 | 10 |
| FIRE.ALARM-1140 | Review and Approve (KC) | 03-Dec-27 | 09-Dec-27 | 5 |
| FIRE.ALARM-1150 | Turnover to Client | 10-Dec-27 | 10-Dec-27 | 0 |
| **Project 3: Interiors & Performance Venues** | | 06-Jul-26 | 05-Sep-28 | 566 |
| PH4.SUMMARY-0050 | Procurement Long Lead Items Project 3: Interiors and Venues | 06-Jul-26 | 28-Sep-26 | 61 |
| PH4.SUMMARY-1000 | Start Construction Project 3: Interiors and Venues | 01-Apr-27* | | 0 |
| PH4.SUMMARY-1010 | Construction Project 3: Interiors and Venues | 01-Apr-27 | 31-Jul-28 | 348 |
| PH4.SUMMARY-1020 | Complete Construction Project 3: Interiors and Venues | | 31-Jul-28 | 0 |
| **2B10000 -Front of House Renewal - exterior sculpture restoration** | | 18-Sep-26 | 05-Sep-28 | 511 |
| PUBLIC.SPC-1000 | Complete - Scope Development and Design | | 18-Sep-26* | 0 |
| PUBLIC.SPC-1070 | Review and Approve Final Design (KC) | 21-Sep-26 | 25-Sep-26 | 5 |
| PUBLIC.SPC-1080 | Issue NTP | 28-Sep-26 | 28-Sep-26 | 0 |
| PUBLIC.SPC-1100 | 3rd Party Plan Review | 28-Sep-26 | 28-Sep-26 | 1 |
| PUBLIC.SPC-1090 | Issue Purchase Orders | 28-Sep-26 | 23-Oct-26 | 20 |
| PUBLIC.SPC-1105 | Exploratory Investigation Work/Demo | 28-Sep-26 | 18-Dec-26 | 60 |
| PUBLIC.SPC-1110 | Construction | 21-Dec-26 | 28-Jul-28 | 420 |
| PUBLIC.SPC-1160 | Testing and Inspections | 31-Jul-28 | 11-Aug-28 | 10 |
| PUBLIC.SPC-1170 | Commissioning | 14-Aug-28 | 14-Aug-28 | 1 |
| PUBLIC.SPC-1130 | Substantial Completion | 15-Aug-28 | 15-Aug-28 | 0 |
| PUBLIC.SPC-1180 | Punch List and Final Inspections | 15-Aug-28 | 28-Aug-28 | 10 |
| PUBLIC.SPC-1140 | Review and Approve (KC) | 29-Aug-28 | 04-Sep-28 | 5 |
| PUBLIC.SPC-1150 | Turnover to Client | 05-Sep-28 | 05-Sep-28 | 0 |
| **2B20001 - Employee Office Renovation** | | 06-Jul-26 | 11-May-27 | 221 |




Remaining Level of Effort | Actual Level of Effort | Primary Baseline | Actual Work | Remaining Work | Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| EMPLYEE.OFFICE-1000 | Review and finalize design and contractor bids | 06-Jul-26 | 14-Aug-26 | 30 |
| EMPLYEE.OFFICE-1010 | Employee Move | 30-Sep-26* | 27-Oct-26 | 20 |
| EMPLYEE.OFFICE-1080 | Issue NTP | 28-Oct-26 | 28-Oct-26 | 0 |
| EMPLYEE.OFFICE-1100 | 3rd Party Plan Review | 28-Oct-26 | 28-Oct-26 | 1 |
| EMPLYEE.OFFICE-1090 | Issue Purchase Orders | 28-Oct-26 | 24-Nov-26 | 20 |
| EMPLYEE.OFFICE-1110 | Construction | 02-Nov-26 | 26-Feb-27 | 85 |
| EMPLYEE.OFFICE-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 01-Mar-27 | 02-Apr-27 | 25 |
| EMPLYEE.OFFICE-1160 | Testing and Inspections | 05-Apr-27 | 16-Apr-27 | 10 |
| EMPLYEE.OFFICE-1170 | Commissioning | 19-Apr-27 | 19-Apr-27 | 1 |
| EMPLYEE.OFFICE-1130 | Substantial Completion | 20-Apr-27 | 20-Apr-27 | 0 |
| EMPLYEE.OFFICE-1180 | Punch List and Final Inspections | 20-Apr-27 | 03-May-27 | 10 |
| EMPLYEE.OFFICE-1140 | Review and Approve (KC) | 04-May-27 | 10-May-27 | 5 |
| EMPLYEE.OFFICE-1150 | Turnover to Client | 11-May-27 | 11-May-27 | 0 |
| **2B20000 - Employee Office Renovations - OPH, Level A, COH, Terrace Office** | | 30-Oct-26 | 31-Aug-27 | 217 |
| AMENITIES-1000 | Complete - Scope Development and Design | | 30-Oct-26* | 0 |
| AMENITIES-1080 | Issue NTP | 08-Jan-27 | 08-Jan-27 | 0 |
| AMENITIES-1100 | 3rd Party Plan Review | 08-Jan-27 | 08-Jan-27 | 1 |
| AMENITIES-1090 | Issue Purchase Orders | 08-Jan-27 | 04-Feb-27 | 20 |
| AMENITIES-1110 | Construction | 11-Jan-27 | 25-Jun-27 | 120 |
| AMENITIES-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 28-Jun-27 | 23-Jul-27 | 20 |
| AMENITIES-1160 | Testing and Inspections | 26-Jul-27 | 06-Aug-27 | 10 |
| AMENITIES-1170 | Commissioning | 09-Aug-27 | 09-Aug-27 | 1 |
| AMENITIES-1130 | Substantial Completion | 10-Aug-27 | 10-Aug-27 | 0 |
| AMENITIES-1180 | Punch List and Final Inspections | 10-Aug-27 | 23-Aug-27 | 10 |
| AMENITIES-1140 | Review and Approve (KC) | 24-Aug-27 | 30-Aug-27 | 5 |
| AMENITIES-1150 | Turnover to Client | 31-Aug-27 | 31-Aug-27 | 0 |
| **4B20001 - Hazardous Materials abatement** | | 06-Jul-26 | 28-Sep-26 | 61 |
| ABATEM-1110 | Perform Hazardous Material Abatement | 06-Jul-26 | 31-Jul-26 | 20 |
| ABATEM-1120 | Construction Schedule Contingency (Discovery, Difficulty, Weather) | 03-Aug-26 | 25-Sep-26 | 40 |
| ABATEM-1130 | Substantial Completion | 28-Sep-26 | 28-Sep-26 | 1 |
| ABATEM-1180 | Turnover to GC | | 28-Sep-26 | 0 |
| **Peformance Venue Revitalization** | | 22-Jan-27 | 18-Jan-28 | 256 |
| **3B10000 - Concert Hall** | | 22-Jan-27 | 18-Jan-28 | 256 |
| CONCERT.HALL1000 | Complete - Scope Development and Design | | 22-Jan-27* | 0 |
| CONCERT.HALL1070 | Review and Approve Final Design (KC) | 25-Jan-27 | 29-Jan-27 | 5 |
| CONCERT.HALL1080 | Issue NTP | 01-Feb-27 | 01-Feb-27 | 0 |
| CONCERT.HALL1100 | 3rd Party Plan Review | 01-Feb-27 | 01-Feb-27 | 1 |
| CONCERT.HALL1090 | Issue Purchase Orders | 01-Feb-27 | 26-Feb-27 | 20 |
| CONCERT.HALL1105 | Exploratory Investigation Work/Demo | 01-Feb-27 | 02-Apr-27 | 45 |
| CONCERT.HALL1110 | Construction | 02-Feb-27 | 10-Dec-27 | 224 |
| CONCERT.HALL1160 | Testing and Inspections | 13-Dec-27 | 24-Dec-27 | 10 |
| CONCERT.HALL1170 | Commissioning | 27-Dec-27 | 27-Dec-27 | 1 |
| CONCERT.HALL1130 | Substantial Completion | 28-Dec-27 | 28-Dec-27 | 0 |
| CONCERT.HALL1180 | Punch List and Final Inspections | 28-Dec-27 | 10-Jan-28 | 10 |




Remaining Level of Effort | Primary Baseline | Remaining Work
Actual Level of Effort | Actual Work | Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| CONCERT.HALL1140 | Review and Approve (KC) | 11-Jan-28 | 17-Jan-28 | 5 |
| CONCERT.HALL1150 | Turnover to Client | 18-Jan-28 | 18-Jan-28 | 0 |
| 3B20000 - Opera House | | 01-Mar-27 | 18-Jan-28 | 231 |
| OPERA.HOUSE-1000 | Complete - Scope Development and Design | | 01-Mar-27* | 0 |
| OPERA.HOUSE-1070 | Review and Approve Final Design (KC) | 01-Mar-27 | 05-Mar-27 | 5 |
| OPERA.HOUSE-1080 | Issue NTP | 08-Mar-27 | 08-Mar-27 | 0 |
| OPERA.HOUSE-1100 | 3rd Party Plan Review | 08-Mar-27 | 08-Mar-27 | 1 |
| OPERA.HOUSE-1090 | Issue Purchase Orders | 08-Mar-27 | 02-Apr-27 | 20 |
| OPERA.HOUSE-1105 | Exploratory Investigation Work/Demo | 08-Mar-27 | 30-Apr-27 | 40 |
| OPERA.HOUSE-1110 | Construction | 03-May-27 | 10-Dec-27 | 160 |
| OPERA.HOUSE-1160 | Testing and Inspections | 13-Dec-27 | 24-Dec-27 | 10 |
| OPERA.HOUSE-1170 | Commissioning | 27-Dec-27 | 27-Dec-27 | 1 |
| OPERA.HOUSE-1130 | Substantial Completion | 28-Dec-27 | 28-Dec-27 | 0 |
| OPERA.HOUSE-1180 | Punch List and Final Inspections | 28-Dec-27 | 10-Jan-28 | 10 |
| OPERA.HOUSE-1140 | Review and Approve (KC) | 11-Jan-28 | 17-Jan-28 | 5 |
| OPERA.HOUSE-1150 | Turnover to Client | 18-Jan-28 | 18-Jan-28 | 0 |
| 3B30000 - Eisenhower Theater | | 03-May-27 | 18-Jan-28 | 185 |
| EISENHOWER-1000 | Complete - Scope Development and Design | | 03-May-27* | 0 |
| EISENHOWER-1070 | Review and Approve Final Design (KC) | 04-May-27 | 10-May-27 | 5 |
| EISENHOWER-1080 | Issue NTP | 11-May-27 | 11-May-27 | 0 |
| EISENHOWER-1100 | 3rd Party Plan Review | 11-May-27 | 11-May-27 | 1 |
| EISENHOWER-1090 | Issue Purchase Orders | 11-May-27 | 07-Jun-27 | 20 |
| EISENHOWER-1105 | Exploratory Investigation Work/Demo | 11-May-27 | 07-Jun-27 | 20 |
| EISENHOWER-1110 | Construction | 08-Jun-27 | 10-Dec-27 | 134 |
| EISENHOWER-1160 | Testing and Inspections | 13-Dec-27 | 24-Dec-27 | 10 |
| EISENHOWER-1170 | Commissioning | 27-Dec-27 | 27-Dec-27 | 1 |
| EISENHOWER-1130 | Substantial Completion | 28-Dec-27 | 28-Dec-27 | 0 |
| EISENHOWER-1180 | Punch List and Final Inspections | 28-Dec-27 | 10-Jan-28 | 10 |
| EISENHOWER-1140 | Review and Approve (KC) | 11-Jan-28 | 17-Jan-28 | 5 |
| EISENHOWER-1150 | Turnover to Client | 18-Jan-28 | 18-Jan-28 | 0 |
| 3B40000 - Family Theater | | 01-Jun-27 | 18-Jan-28 | 164 |
| FAMILY.THEATER-1000 | Complete - Scope Development and Design | | 01-Jun-27* | 0 |
| FAMILY.THEATER-1070 | Review and Approve Final Design (KC) | 02-Jun-27 | 08-Jun-27 | 5 |
| FAMILY.THEATER-1080 | Issue NTP | 09-Jun-27 | 09-Jun-27 | 0 |
| FAMILY.THEATER-1100 | 3rd Party Plan Review | 09-Jun-27 | 09-Jun-27 | 1 |
| FAMILY.THEATER-1090 | Issue Purchase Orders | 09-Jun-27 | 06-Jul-27 | 20 |
| FAMILY.THEATER-1105 | Exploratory Investigation Work/Demo | 09-Jun-27 | 06-Jul-27 | 20 |
| FAMILY.THEATER-1110 | Construction | 07-Jul-27 | 10-Dec-27 | 113 |
| FAMILY.THEATER-1160 | Testing and Inspections | 13-Dec-27 | 24-Dec-27 | 10 |
| FAMILY.THEATER-1170 | Commissioning | 27-Dec-27 | 27-Dec-27 | 1 |
| FAMILY.THEATER-1130 | Substantial Completion | 28-Dec-27 | 28-Dec-27 | 0 |
| FAMILY.THEATER-1180 | Punch List and Final Inspections | 28-Dec-27 | 10-Jan-28 | 10 |
| FAMILY.THEATER-1140 | Review and Approve (KC) | 11-Jan-28 | 17-Jan-28 | 5 |
| FAMILY.THEATER-1150 | Turnover to Client | 18-Jan-28 | 18-Jan-28 | 0 |




Remaining Level of Effort — Primary Baseline — Remaining Work
Actual Level of Effort — Actual Work — Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

**Appendix A**
**Kennedy Center Renewal Project IPS**
**Integrated Project Schedule**
**Progress through June 30, 2026**

| Activity ID | Activity Name | Start | Finish | Org Dur |
|---|---|---|---|---|
| 3B50000 - Terrace level dining | | 05-Jul-27 | 18-Jan-28 | 140 |
| TERRACE.DINE1000 | Complete - Scope Development and Design | | 05-Jul-27* | 0 |
| TERRACE.DINE1070 | Review and Approve Final Design (KC) | 06-Jul-27 | 12-Jul-27 | 5 |
| TERRACE.DINE1080 | Issue NTP | 13-Jul-27 | 13-Jul-27 | 0 |
| TERRACE.DINE1100 | 3rd Party Plan Review | 13-Jul-27 | 13-Jul-27 | 1 |
| TERRACE.DINE1090 | Issue Purchase Orders | 13-Jul-27 | 09-Aug-27 | 20 |
| TERRACE.DINE1105 | Exploratory Investigation Work/Demo | 13-Jul-27 | 09-Aug-27 | 20 |
| TERRACE.DINE1110 | Construction | 10-Aug-27 | 10-Dec-27 | 89 |
| TERRACE.DINE1160 | Testing and Inspections | 13-Dec-27 | 24-Dec-27 | 10 |
| TERRACE.DINE1170 | Commissioning | 27-Dec-27 | 27-Dec-27 | 1 |
| TERRACE.DINE1130 | Substantial Completion | 28-Dec-27 | 28-Dec-27 | 0 |
| TERRACE.DINE1180 | Punch List and Final Inspections | 28-Dec-27 | 10-Jan-28 | 10 |
| TERRACE.DINE1140 | Review and Approve (KC) | 11-Jan-28 | 17-Jan-28 | 5 |
| TERRACE.DINE1150 | Turnover to Client | 18-Jan-28 | 18-Jan-28 | 0 |
| 3B60000 - Theater Lab | | 02-Aug-27 | 18-Jan-28 | 120 |
| THEATER.LAB-1000 | Complete - Scope Development and Design | | 02-Aug-27* | 0 |
| THEATER.LAB-1070 | Review and Approve Final Design (KC) | 03-Aug-27 | 09-Aug-27 | 5 |
| THEATER.LAB-1080 | Issue NTP | 10-Aug-27 | 10-Aug-27 | 0 |
| THEATER.LAB-1100 | 3rd Party Plan Review | 10-Aug-27 | 10-Aug-27 | 1 |
| THEATER.LAB-1090 | Issue Purchase Orders | 10-Aug-27 | 06-Sep-27 | 20 |
| THEATER.LAB-1105 | Exploratory Investigation Work/Demo | 10-Aug-27 | 06-Sep-27 | 20 |
| THEATER.LAB-1110 | Construction | 07-Sep-27 | 10-Dec-27 | 69 |
| THEATER.LAB-1160 | Testing and Inspections | 13-Dec-27 | 24-Dec-27 | 10 |
| THEATER.LAB-1170 | Commissioning | 27-Dec-27 | 27-Dec-27 | 1 |
| THEATER.LAB-1130 | Substantial Completion | 28-Dec-27 | 28-Dec-27 | 0 |
| THEATER.LAB-1180 | Punch List and Final Inspections | 28-Dec-27 | 10-Jan-28 | 10 |
| THEATER.LAB-1140 | Review and Approve (KC) | 11-Jan-28 | 17-Jan-28 | 5 |
| THEATER.LAB-1150 | Turnover to Client | 18-Jan-28 | 18-Jan-28 | 0 |
| Phase 5 Commisioning and Close Out | | 01-Aug-28 | 30-Nov-28 | 88 |
| PH5.SUMMARY-1000 | Start Phase 5: Commissioning and Closeout | 01-Aug-28* | | 0 |
| PH5.SUMMARY-1010 | Phase 5: Commissioning and Closeout | 01-Aug-28 | 30-Nov-28 | 88 |
| PH5.SUMMARY-1020 | Complete Phase 5: Commissioning and Closeout | | 30-Nov-28 | 0 |
| O&M | | 01-Aug-28 | 30-Nov-28 | 88 |
| OPS.MAINT1000 | Closeout O&M | 01-Aug-28 | 30-Nov-28 | 88 |
| Training | | 01-Aug-28 | 30-Nov-28 | 88 |
| TRAINING-1000 | Closeout Training | 01-Aug-28 | 30-Nov-28 | 88 |
| Final Commissioning | | 01-Aug-28 | 30-Nov-28 | 88 |
| FINAL.COMMISH-1170 | Closeout Final Commissioning | 01-Aug-28 | 30-Nov-28 | 88 |
| Punchlist | | 01-Aug-28 | 30-Nov-28 | 88 |
| PH5.PUNCH-1180 | Closeout Punch List and Final Inspections | 01-Aug-28 | 30-Nov-28 | 88 |




Remaining Level of Effort | Actual Level of Effort | Primary Baseline | Actual Work | Remaining Work | Critical Remaining Work



TASK filter: JLL exclude template.

Data Date: 04-Jul-26

Exhibit B: Budget Allocation Matrix 06.22.26

| Parent Project # | Parent Project Description (Renewal Project) | Activity # (Renewal Sub-Project #) | Activity Description (Renewal Sub-Project) | Phase | Budget | Allocation Roll-up | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Design | Project Management | Construction | Equipment | Other | Allocation Totals |
| **Shell & Site Infrastructure** | | | | | | | | | | | |
| SI01-00-000 | Building Envelope & Structural Rehabilitation | SI01-99-001 | Plaza Level Waterproofing, Hardscapes and Garage | A | $ 24,000,000 | $ 1,970,000 | $ 537,600 | $ 21,492,400 | $ - | $ - | $ 24,000,000 |
| | | SI01-99-002 | Garage Repairs & Subgrade Waterproofing | A | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | SI01-99-003 | Terrace Level Overhang & Roof | A | $ 14,000,000 | $ 280,000 | $ 313,600 | $ 12,605,700 | $ 800,700 | $ - | $ 14,000,000 |
| | | | | | **$ 38,000,000** | | | | | | |
| SI02-00-000 | Site Restoration | SI02-99-001 | Site & Landscaping Upgrades | B | $ 3,500,000 | $ 245,000 | $ 78,400 | $ 3,176,600 | $ - | $ - | $ 3,500,000 |
| | | SI02-99-002 | Fountain Restoration | B | $ 1,000,000 | $ 90,000 | $ 11,200 | $ 898,800 | $ - | $ - | $ 1,000,000 |
| | | SI02-99-003 | Rock Creek Parkway Stabilization | A | $ 350,000 | $ 47,000 | $ 11,000 | $ 292,000 | $ - | $ - | $ 350,000 |
| | | | | | **$ 4,850,000** | | | | | | |
| SI03-00-000 | Perimeter & Physical Security Improvements | SI03-99-001 | Vehicle Force Protection | A | $ 2,500,000 | $ 225,000 | $ 56,000 | $ 2,000,000 | $ 219,000 | $ - | $ 2,500,000 |
| | | SI03-99-003 | Exterior Glass & Door Replacement | A | $ 2,000,000 | $ 180,000 | $ 44,800 | $ 1,775,200 | $ - | $ - | $ 2,000,000 |
| | | | | | **$ 4,500,000** | | | | | | |
| **Public & Support Spaces** | | | | | | | | | | | |
| BB00-00-001 | Public Space Improvements | BB01-99-001 | Front of House Renewal | B | $ 20,000,000 | $ 700,000 | $ 448,000 | $ 18,852,000 | $ - | $ - | $ 20,000,000 |
| | | BB01-99-002 | Restroom Renovations | B | $ 7,000,000 | $ 630,000 | $ 156,800 | $ 6,213,200 | $ - | $ - | $ 7,000,000 |
| | | BB01-99-003 | Wayfinding | B | $ 2,000,000 | $ 80,000 | $ 44,800 | $ 1,875,200 | $ - | $ - | $ 2,000,000 |
| | | BB01-99-004 | Box Office Relocation | B | $ 8,000,000 | $ 760,000 | $ 179,200 | $ 6,410,800 | $ 650,000 | $ - | $ 8,000,000 |
| | | | | | **$ 37,000,000** | | | | | | |
| BB02-00-000 | Employee Office Renovations | BB02-99-001 | OPH Block Office Renovation | B | $ 4,000,000 | $ 380,000 | $ 89,600 | $ 3,230,400 | $ 300,000 | $ - | $ 4,000,000 |
| | | BB02-99-002 | Level A Office Renovation | B | $ 10,000,000 | $ 850,000 | $ 224,000 | $ 8,166,000 | $ 760,000 | $ - | $ 10,000,000 |
| | | BB02-99-003 | COH Block Office Renovation | B | $ 2,000,000 | $ 170,000 | $ 44,800 | $ 1,700,200 | $ 85,000 | $ - | $ 2,000,000 |
| | | BB02-99-004 | Terrace Office Renovation | B | $ 3,000,000 | $ 255,000 | $ 67,200 | $ 2,487,800 | $ 190,000 | $ - | $ 3,000,000 |
| | | | | | **$ 19,000,000** | | | | | | |
| BB03-00-000 | Vertical Transportation Improvements | BB03-99-001 | Elevator Modernization | AB | $ 10,000,000 | $ 250,000 | $ 41,000 | $ 5,709,000 | $ 4,000,000 | $ - | $ 10,000,000 |
| | | BB03-99-002 | Escalator Capital Repair | B | $ 1,000,000 | $ 25,000 | $ 15,000 | $ 860,000 | $ 100,000 | $ - | $ 1,000,000 |
| | | | | | **$ 11,000,000** | | | | | | |
| **Safety & Building Systems** | | | | | | | | | | | |
| SB01-00-000 | Fire Alarm & Fire Protection | SB01-99-001 | Extend Fire Protection A Level | A | $ 250,000 | $ 12,500 | $ 8,500 | $ 229,000 | $ - | $ - | $ 250,000 |
| | | SB01-99-002 | Fire Alarm Phase 2 | | $- | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | **$ 250,000** | | | | | | |
| SB02-00-000 | Hazardous Material Abatement | SB02-99-001 | Asbestos Abatement | AB | $ 400,000 | $ 250,000 | $ 24,000 | $ 126,000 | $ - | $ - | $ 400,000 |
| | | | | | **$ 400,000** | | | | | | |
| SB03-00-000 | MEP Improvements | SB03-99-001 | Sanitary & Domestic Piping | AB | $ 30,000,000 | $ 1,950,000 | $ 672,000 | $ 26,128,000 | $ 1,250,000 | $ - | $ 30,000,000 |
| | | SB03-99-002 | Central Plant Upgrades | AB | $ 10,000,000 | $ 650,000 | $ 224,000 | $ 3,526,000 | $ 5,600,000 | $ - | $ 10,000,000 |
| | | SB03-99-003 | Condenser Loop | AB | $ 16,000,000 | $ 1,040,000 | $ 358,400 | $ 13,201,600 | $ 1,400,000 | $ - | $ 16,000,000 |
| | | SB03-99-004 | Electrical System Upgrades | AB | $ 20,000,000 | $ 1,300,000 | $ 448,000 | $ 9,752,000 | $ 8,500,000 | $ - | $ 20,000,000 |
| | | SB03-99-005 | River Pump Room | B | $ 1,500,000 | $ 142,500 | $ 33,600 | $ 1,323,900 | $ - | $ - | $ 1,500,000 |
| | | | | | **$ 77,500,000** | | | | | | |
| **Administrative** | | | | | | | | | | | |
| BA01-00-000 | Mobilization Costs | BA01-99-001 | Mobilization Costs | A | $ 5,000,000 | $ - | $ - | $ 5,000,000 | $ - | $ - | $ 5,000,000 |
| | | | | | **$ 5,000,000** | | | | | | |
| BA02-00-000 | Support Services | BA02-99-001 | Staffing, Architectural Services, misc. | AB | $ 2,000,000 | $ - | $ - | $ - | $ - | $ 2,000,000 | $ 2,000,000 |
| | | BA02-99-002 | Document Mgmt. & Life Safety | AB | $ 950,000 | $ - | $ - | $ - | $ - | $ 950,000 | $ 950,000 |
| | | | | | **$ 2,950,000** | | | | | | |

Exhibit B: Budget Allocation Matrix 06.22.26

**Performance Venue Revitalization**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PV01-00-000 | Concert Hall Restoration | PV01-99-001 | Front of House | B | $ 10,000,000 | $ 900,000 | $ 224,000 | $ 8,426,000 | $ 450,000 | $ - | $ 10,000,000 |
| | | PV01-99-002 | Back of House | B | $ 1,500,000 | $ 135,000 | $ 33,600 | $ 1,331,400 | $ - | $ - | $ 1,500,000 |
| | | PV01-99-003 | Production Infrastructure | AB | $ 1,200,000 | $ 96,000 | $ 26,880 | $ 1,077,120 | $ - | $ - | $ 1,200,000 |
| | | PV01-99-004 | Acoustics | AB | $ 12,000,000 | $ 960,000 | $ 89,600 | $ 10,200,400 | $ 750,000 | $ - | $ 12,000,000 |
| | | | | | **$ 24,700,000** | | | | | | |
| PV02-00-000 | Opera House Restoration | PV02-99-001 | Front of House | B | $ 6,000,000 | $ 480,000 | $ 134,400 | $ 4,785,600 | $ 600,000 | $ - | $ 6,000,000 |
| | | PV02-99-002 | Back of House | B | $ 2,000,000 | $ 220,000 | $ 44,800 | $ 1,735,200 | $ - | $ - | $ 2,000,000 |
| | | PV02-99-003 | Production Infrastructure | B | $ 2,000,000 | $ 220,000 | $ 44,800 | $ 135,200 | $ 1,600,000 | $ - | $ 2,000,000 |
| | | | | | **$ 10,000,000** | | | | | | |
| PV03-00-000 | Eisenhower Theater Restoration | PV03-99-001 | Front of House | B | $ 4,000,000 | $ 320,000 | $ 89,600 | $ 3,470,400 | $ 120,000 | $ - | $ 4,000,000 |
| | | PV03-99-002 | Back of House | B | $ 2,000,000 | $ 180,000 | $ 44,800 | $ 1,775,200 | $ - | $ - | $ 2,000,000 |
| | | PV03-99-003 | Production Infrastructure | B | $ 1,000,000 | $ 90,000 | $ 22,400 | $ 87,600 | $ 800,000 | $ - | $ 1,000,000 |
| | | | | | **$ 7,000,000** | | | | | | |
| PV04-00-000 | Family Theater Restoration | PV04-99-001 | Front of House | B | $ 2,000,000 | $ 160,000 | $ 44,800 | $ 1,795,200 | $ - | $ - | $ 2,000,000 |
| | | PV04-99-002 | Back of House | B | $ 500,000 | $ 45,000 | $ 11,200 | $ 443,800 | $ - | $ - | $ 500,000 |
| | | PV04-99-003 | Production Infrastructure | B | $ 500,000 | $ 45,000 | $ 11,200 | $ 143,000 | $ 300,800 | $ - | $ 500,000 |
| | | | | | **$ 3,000,000** | | | | | | |
| PV05-00-000 | Terrace Theater Restoration | PV05-99-001 | Front of House | B | $ 500,000 | $ 40,000 | $ 11,200 | $ 448,800 | $ - | $ - | $ 500,000 |
| | | PV05-99-002 | Back of House | B | $ 1,000,000 | $ 90,000 | $ 22,400 | $ 887,600 | $ - | $ - | $ 1,000,000 |
| | | PV05-99-003 | Production Infrastructure | B | $ 500,000 | $ 40,000 | $ 11,200 | $ 112,000 | $ 336,800 | $ - | $ 500,000 |
| | | | | | **$ 2,000,000** | | | | | | |
| PV06-00-000 | Theater Lab Restoration | PV06-99-001 | Front of House | B | $ 250,000 | $ 22,500 | $ 11,000 | $ 216,500 | $ - | $ - | $ 250,000 |
| | | PV06-99-002 | Back of House | B | $ 1,000,000 | $ 85,000 | $ 22,400 | $ 892,600 | $ - | $ - | $ 1,000,000 |
| | | PV06-99-003 | Production Infrastructure | B | $ 500,000 | $ 40,000 | $ 11,200 | $ 448,800 | $ - | $ - | $ 500,000 |
| | | | | | **$ 1,750,000** | | | | | | |
| | | | | **Totals** | **$ 248,900,000** | **$ 16,650,500** | **$ 5,042,980** | **$ 195,444,220** | **$ 28,812,300** | **$ 2,950,000** | **$ 248,900,000** |

## Renewal Subproject: SI01-99-001 — Plaza Level Waterproofing, Hardscapes and Garage Repairs

Roll Up

| | |
|---|---|
| **Parent Project #** | SI01-00-000 |
| **Renewable Sub-Project Name** | Plaza Level Waterproofing, Hardscapes & Garage Repairs |
| **Location** | Campus Wide |
| **Facility Name / Identifier** | NA |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $24,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project establishes site control, logistics, and urgent structural remediation. Initial mobilization includes safety fencing and gates, traffic control coordination, temporary bus stop relocation, and wayfinding signage for parking garage, President memorial, and REACH access. Early work encompasses hazardous material abatement and demolition of existing North and South plaza planters while maintaining pedestrian ramps.

Primary scope addresses comprehensive parking garage structural repairs and waterproofing across Levels A, B, and C, including concrete delamination, spalling, exposed reinforcing steel remediation, structural infill repairs at podium locations, and targeted exterior column investigation and repair. Critical waterproofing work includes expansion joint replacement across South and North stairs, River Terrace, and East Plaza, plus below-grade waterproofing along the service tunnel east wall and electrical vaults to halt ongoing water infiltration.

This project also delivers exterior envelope restoration, site utility upgrades, and waterproofing across plazas and perimeter walkways. Work includes selective demolition, hazardous material abatement, and complete replacement of plaza pavers, waterproofing membranes, and expansion joints. Hardscape improvements encompass North and South plaza step reconstruction, ADA-compliant ramp replacement, and localized asphalt repaving. Civil infrastructure upgrades include new curbs, storm drain bodies, and trench drains.

Programming infrastructure includes integrated electrical and data systems across plazas, exterior emergency lighting, and North Plaza roll-up generator access. Preservation scope features structural column repairs, marble restoration at Rock Creek Parkway overhang, stained marble base course replacement/restoration, and comprehensive façade cleaning and repointing with mock-up test areas. Planter remediation includes West Plaza waterproofing replacement, revised East Plaza planter beds, and new tree planters with trees along North and South plazas. REACH scope addresses waterproofing and roofing assessment, Skylight Pavilion data infrastructure resolution, and water leak and ceiling repairs at Welcome Center and Pavilion.

### Justification

Critical failure of existing planter waterproofing membranes and expansion joints has caused cascading structural and operational damage. Water intrusion through compromised membranes has created extensive deterioration in below-grade parking structures, loading docks, and service tunnels. The waterproofing failure contributed to the loss of three-quarters of perimeter trees, eliminating landscape elements that define the building's iconic setting. More critically, ongoing water infiltration is compromising structural integrity in subgrade areas and creating erosion risks along adjacent roadways, potentially affecting public safety beyond the Center's property boundaries. Immediate intervention is essential to arrest active structural degradation. Emergency work includes complete removal of compromised trees and saturated soil, full replacement of failed waterproofing systems, and embankment stabilization to prevent further erosion. Delaying these repairs would expand the scope of required structural remediation.

### Progress Assessment

The project is currently in the pre-planning phase.

### Related Projects

1B20001 - Landscaping; 1B10002 - Garage Repairs; 1B10003 - Terrace Overhang; 1B20002 - Fountains

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $1,970,000 | $0 | $0 | $0 | $1,970,000 |
| Project Management | $537,600 | $0 | $0 | $0 | $537,600 |
| Construction | $21,492,400 | $0 | $0 | $0 | $21,492,400 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$24,000,000** | **$0** | **$0** | **$0** | **$24,000,000** |

## Renewal Subproject: SI01-99-002 Garage Repairs & Subgrade Waterproofing

Roll Up

| | |
|---|---|
| **Parent Project #** | SI01-00-000 |
| **Renewable Sub-Project Name** | Building Envelope & Structural Rehabilitation |
| **Location** | Parking Garage |
| **Facility Name / Identifier** | NA |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $0 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project establishes core site control, logistics, and urgent structural remediation ahead of site excavation for subgrade waterproofing repairs. Initial mobilization focuses on site security and public safety, including the installation of safety fence and gates, traffic control coordination, a temporary bus stop relocation, and the placement of temporary project and wayfinding signage for the parking garage, Memorial, and REACH access. Early civil scope includes hazardous material abatement and the demolition of existing planters at the North and South plazas, while existing pedestrian ramps are sequenced to remain initially.

The primary technical focus centers on comprehensive parking garage structural repairs and waterproofing. Concrete remediation addresses pervasive deficiencies across Garage Levels A, B, and C, specifically targeting surface delamination, spalling concrete, exposed reinforcing steel, and structural infill repairs at various podium locations, alongside a targeted investigation and repair protocol for exterior columns. To halt ongoing water infiltration, expansive expansion joint waterproofing will be executed across the South and North stairs, River Terrace, and East Plaza. Additionally, critical below-grade waterproofing will be applied along the east wall of the service tunnel and vital electrical vaults.

### Justification

The parking garage is in immediate need of structural remediation and extensive waterproofing to correct vulnerabilities stemming from years of deferred maintenance. Delaying the execution of this contract would allow active water intrusion to continue unabated, driving further structural degradation across the building envelope and ultimately compromising safety parameters for both operating staff and the public.

### Progress Assessment

Design drawings for this sub-project are fully finalized, and the Request for Proposal (RFP) for construction is on schedule to be issued by early June 2026. In strict alignment with data-driven engineering recommendations from prior comprehensive building assessments, this specific scope has been prioritized for immediate procurement and execution to secure the facility's foundational integrity.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $0 | $0 | $0 | $0 | $0 |
| Project Management | $0 | $0 | $0 | $0 | $0 |
| Construction | $0 | $0 | $0 | $0 | $0 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $0 | $0 | $0 | $0 | $0 |

## Renewal Subproject: SI01-99-003 Terrace Level Overhang & Roof

Roll Up

| | |
|---|---|
| **Parent Project #** | SI01-00-000 |
| **Renewable Sub-Project Name** | Building Envelope & Structural Rehabilitation |
| **Location** | Roof Terrace - Level 109 |
| **Facility Name / Identifier** | NA |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $14,000,000.00 |
| **Start FY (for 5-year window)** | 2026 |

**Description**

This project addresses critical structural, life-safety, and building envelope deficiencies associated with the Level 135 Penthouse Roof and Level 109 Terrace Overhang structure. Work begins with a comprehensive condition assessment to evaluate the current state of the roof, soffit, and support assemblies, including an investigation to validate permanent means and methods for re-supporting existing lath-and-stucco soffit panels whose connections have deteriorated and are actively failing. Required hazardous materials abatement will be completed, followed by repairs to existing soffit panels and support systems to stabilize conditions and ensure public safety. Additional scope includes installation of a new panel hanger support system, replacement of exterior soffit lighting, and remediation of existing lighting and convenience power systems located within interstitial spaces.

The project also focuses on improving long-term durability, maintainability, and performance of the terrace overhang infrastructure. The terrace overhang membrane roof will be replaced, while existing roof drains, scuppers, waterproofing systems, irrigation infrastructure, and planter electrical components will be repaired or replaced to address water intrusion and deferred maintenance concerns. The necessity of an air barrier between the soffit interstitial space and the building plenum will be evaluated to improve building performance and mitigate condensation. To support future operations and maintenance, new access platforms and fall-protection tie-off systems will be installed. The project concludes with installation of new exterior RGBW architectural lighting and comprehensive site cleanup.

**Justification**

Immediate repairs to the terrace level overhang and roof are required due to deferred maintenance, as deterioration poses risks of falling debris, water intrusion, and structural hazards in high traffic areas.

**Progress Assessment**

Investigation scope is underway. Design Packages: WP Moore, and MEP will coordinate Addendum or CCD following investigation scope.
Construction packages: GC to price existing 100% WPM package and other scope identified in the investigation.
Work to be completed by GC under the Omnia contract.

**Related Projects**

1B10001 - Plaza Level Waterproofing & Hardscapes

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $280,000 | $0 | $0 | $0 | $280,000 |
| Project Management | $313,600 | $0 | $0 | $0 | $313,600 |
| Construction | $12,605,700 | $0 | $0 | $0 | $12,605,700 |
| Equipment | $800,700 | $0 | $0 | $0 | $800,700 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$14,000,000** | **$0** | **$0** | **$0** | **$14,000,000** |

## Renewal Subproject: SI02-99-001 - Sight & Landscaping Upgrades

Roll Up

| | |
|---|---|
| **Parent Project #** | SI02-00-000 |
| **Renewable Sub-Project Name** | Site Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $3,500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses landscape restoration, site infrastructure renewal, and deferred maintenance across the campus's exterior public spaces. Work focuses on repairing and refurbishing landscaping and irrigation systems in areas impacted by previous construction activities, aging infrastructure, or ongoing deterioration. The project will restore the visual quality, functionality, and long-term sustainability of key exterior environments while improving the overall patron experience.

The primary scope includes replacement landscaping within Plaza Level planters, installation of new trees to replace aging weeping willows at the West, South, and North Plazas, and targeted repairs to irrigation systems supporting these areas. Additional work includes landscape restoration throughout the REACH campus, as well as electrical and conduit repairs within Ginkgo Plaza to address deteriorated site utilities and support continued operations. Together, these improvements will enhance the appearance, resilience, and performance of the Center's exterior grounds and public gathering spaces.

### Justification

More than three-quarters of the trees along the building's immediate perimeter are dead or severely damaged due to failing planter waterproofing, which is also contributing to water intrusion in subgrade areas. The trees and soil must be removed, planters re-waterproofed, and adjacent embankments stabilized to address ongoing erosion along nearby roadways.

### Progress Assessment

Scope has been identified. Landscape work will follow the hardscape site restoration project

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $245,000 | $0 | $0 | $0 | $245,000 |
| Project Management | $78,400 | $0 | $0 | $0 | $78,400 |
| Construction | $3,176,600 | $0 | $0 | $0 | $3,176,600 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$3,500,000** | **$0** | **$0** | **$0** | **$3,500,000** |

## Renewal Subproject: SI02-99-002 - Fountain Restoration

Roll Up

| | |
|---|---|
| **Parent Project #** | SI02-00-000 |
| **Renewable Sub-Project Name** | Site Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical repairs and modernization of the Center's exterior water features and supporting infrastructure. Work focuses on restoring the functionality, reliability, and appearance of existing fountain systems through targeted repairs to waterproofing assemblies, drainage infrastructure, and associated lighting systems. All fountain improvements will be completed within the existing fountain footprints to minimize site impacts while preserving the established design intent of the surrounding plazas.

The primary scope includes construction of a new feature fountain at the East Plaza, along with upgrades to fountain lighting and control systems across the campus. New controls will provide programmable and centralized operation capabilities, allowing greater flexibility for event programming, seasonal displays, and operational efficiency. These improvements will enhance the visitor experience while reducing maintenance needs and improving long-term system performance.

### Justification

The Kennedy Center's fountain systems have deteriorated due to age and deferred maintenance, leading to operational failures and inefficiencies. Full restoration is needed to rehabilitate mechanical and structural components and return the fountains to reliable, intended use.

### Progress Assessment

Scope of work identified. Fountain design will begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $90,000 | $0 | $0 | $0 | $90,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $898,800 | $0 | $0 | $0 | $898,800 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,000,000** | **$0** | **$0** | **$0** | **$1,000,000** |

## Renewal Subproject: SI02-99-003 - Rock Creek Parkway Stabilization

Roll Up

| | |
|---|---|
| **Parent Project #** | SI02-00-000 |
| **Renewable Sub-Project Name** | Site Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $350,000 |
| **Start FY (for 5-year window)** | 2026 |

**Description**

This project addresses critical site infrastructure, safety, and accessibility improvements along the Rock Creek Parkway and REACH campus perimeter. Work includes construction of a new retaining wall to stabilize the landscape edge, protect adjacent infrastructure, and address long-term erosion and structural concerns. Additional scope includes repairs to existing site lighting systems to improve reliability, visibility, and public safety throughout the affected areas.

The project also includes the extension of the existing handrail at the REACH Overlook Patio to enhance pedestrian safety and accessibility while maintaining consistency with the existing architectural character and materials. Together, these improvements will strengthen site resiliency, improve visitor safety, and support the long-term functionality of the Kennedy Center's exterior public spaces.

**Justification**

The Kennedy Center requires immediate repairs to the Rock Creek Parkway overhang due to deferred maintenance, as deterioration poses risks of falling debris, water intrusion, and structural hazards over in high vehicle traffic areas.

**Progress Assessment**

Scope of work identified. Design will begin this quarter.

**Related Projects**

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $47,000 | $0 | $0 | $0 | $47,000 |
| Project Management | $11,000 | $0 | $0 | $0 | $11,000 |
| Construction | $292,000 | $0 | $0 | $0 | $292,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$350,000** | **$0** | **$0** | **$0** | **$350,000** |

## Renewal Subproject: SI03-99-001 - Vehicle Force Protection

Roll Up

| | |
|---|---|
| **Parent Project #** | SI03-00-000 |
| **Renewable Sub-Project Name** | Perimeter & Physical Security Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $2,500,000 |
| **Start FY (for 5-year window)** | 2026 |

**Description**

This project enhances campus security and vehicle mitigation measures in accordance with guidance from the federal law enforcements entities and security consultants. The work focuses on strengthening protection at key public access points through the installation of both permanent and temporary anti-ram barriers at plaza entrances, event access locations, and guard station approaches. These improvements are intended to reduce vulnerability to vehicle-borne threats while maintaining operational flexibility for public events, VIP arrivals, and day-to-day campus activities.

The primary scope includes the deployment of strategically located bollard systems and other protective measures designed to secure critical pedestrian and operational areas without significantly impacting visitor circulation. In addition, the project establishes a new guard station along 25th Street to improve access control, security operations, and monitoring capabilities at a key campus entry point. Together, these improvements will strengthen perimeter security, support evolving threat mitigation requirements, and enhance the overall safety of visitors, staff, and special event operations.

**Justification**

Vehicle Force Protection measures serve as the building's first line of defense against real-world threats, and years of underinvestment and deferred maintenance have increased risk to staff and the public. Increased vehicle deployment is required to strengthen perimeter security, deter potential threats, and enhance overall safety, constituting unusual and compelling urgency.

**Progress Assessment**

Scope of work identified. Design will begin this quarter.

**Related Projects**

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $225,000 | $0 | $0 | $0 | $225,000 |
| Project Management | $56,000 | $0 | $0 | $0 | $56,000 |
| Construction | $2,000,000 | $0 | $0 | $0 | $2,000,000 |
| Equipment | $219,000 | $0 | $0 | $0 | $219,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,500,000** | **$0** | **$0** | **$0** | **$2,500,000** |

## Renewal Subproject: SI03-99-003 - Exterior Glass & Door Replacement

Roll Up

| | |
|---|---|
| **Parent Project #** | SI03-00-000 |
| **Renewable Sub-Project Name** | Perimeter & Physical Security Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

**Description**

This project modernizes critical building entrances and exterior envelope components to improve accessibility, security, operational control, and long-term maintainability. The work includes replacement of existing motor lobby doors at the A, B, and C levels, all sliding automatic doors on the Plaza and Terrace Levels, as well as repair or replacement of historic bronze doors at the Plaza and Terrace Levels to meet current ADA and security requirements while preserving the architectural character of the facility. Consistent with operational preferences, existing sliding doors will be evaluated for replacement with ADA-accessible automatic swing doors utilizing touchless wave-to-open technology in lieu of traditional push-button activation.

The project also enhances campus-wide security integration by providing electronic locking capabilities that allow the Security Operations Center to simultaneously secure all designated doors during emergency or special event operations. Door position sensors will be installed throughout the system to improve monitoring and situational awareness. Additional scope includes repair of Plaza Level stage access doors and installation of position sensors, repair of damaged glass mirrors within the Grand Foyer, replacement of failed insulated curtain wall glass units to match existing conditions, and resolution of identified glazing issues at the River Pavilion. All entrance modifications will be coordinated with security infrastructure upgrades, including permanent and temporary magnetometer locations, to ensure a seamless integration of access control, screening, and visitor circulation requirements.

**Justification**

Exterior glass and door systems along the perimeter are outdated and vulnerable, with sliding doors frequently malfunctioning and failing, limiting their effectiveness for both security and controlled access. Replacing these elements with reinforced, security-rated materials will strengthen the building envelope, improve access control integration, and enhance overall perimeter security and deterrence.

**Progress Assessment**

Scope of work identified. Design will begin this quarter.

**Related Projects**

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $180,000 | $0 | $0 | $0 | $180,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,775,200 | $0 | $0 | $0 | $1,775,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $2,000,000 | $0 | $0 | $0 | $2,000,000 |

## Renewal Subproject: BB01-99-001 - Front of House Renewal

Roll Up

| | |
|---|---|
| **Parent Project #** | BB00-00-001 |
| **Renewable Sub-Project Name** | Public Space Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $20,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project delivers a comprehensive modernization of the Front-of-House public spaces, enhancing the visitor experience while preserving the Center's architectural character, cultural assets, and historic significance. Work includes the conservation, cataloging, and archival preservation of fine art, sculptures, gifts of state, banners, and flags, ensuring these collections are protected and appropriately displayed for future generations. The project also includes the relocation of the JFK Memorial to the REACH campus, creating new opportunities for visitor engagement and interpretation. Interior finishes throughout public areas will be renewed through replacement of carpeting, wallcoverings, draperies, wood flooring, and furnishings, while marble walls, flooring, bases, and elevator surrounds will be restored or upgraded to reinforce the iconic aesthetic of the facility.

The technical scope focuses on modernizing infrastructure and supporting evolving guest amenities. New utility infrastructure, including data, power, and conduit systems, will be installed to support production requirements and future technology needs. Infrastructure for expanded food and beverage operations will also be provided under this project. Additional improvements include repairs to Hall of Nations ceilings impacted by prior condensation and ductwork issues, construction of a new gift shop within the Hall of Nations, and replacement of Grand Foyer drapery motors and controls to improve operational flexibility and reliability. Together, these enhancements will preserve the Center's legacy while modernizing its public spaces to meet contemporary expectations for accessibility, hospitality, programming, and visitor experience.

### Justification

Decades of deferred maintenance and evolving operational requirements necessitate modernization of Front-of-House public spaces where current conditions compromise the visitor experience. Conservation work is essential to protect irreplaceable cultural assets from continued deterioration caused by inadequate environmental controls and outdated display methods that threaten long-term preservation of gifts of state and fine art collections. Interior finishes have reached the end of their serviceable life after years of intensive public use, with visible wear. Obsolete infrastructure cannot support contemporary programming demands, limiting the Center's ability to deliver hospitality standards expected by modern audiences and restricting technical capabilities required for evolving performance requirements.

### Progress Assessment

Scope of work identified. Design will begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $700,000 | $0 | $0 | $0 | $700,000 |
| Project Management | $448,000 | $0 | $0 | $0 | $448,000 |
| Construction | $18,852,000 | $0 | $0 | $0 | $18,852,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$20,000,000** | **$0** | **$0** | **$0** | **$20,000,000** |

## Renewal Subproject: BB01-99-002 - Restroom Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB00-00-001 |
| **Renewable Sub-Project Name** | Public Space Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $7,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical public amenities while addressing aging building infrastructure throughout the facility. The primary focus is the renovation of public restrooms on the Plaza Level and Motor Lobbies on Levels A, B and C to improve accessibility, functionality, and guest experience. Restroom upgrades will bring facilities into compliance with current ADA standards. Renovations will include updated finishes, fixtures, layouts, and building systems designed to better accommodate current visitor needs and operational requirements.

Supporting these improvements is a comprehensive infrastructure renewal effort focused on replacement of aging sanitary and domestic water piping systems. This work will address deferred maintenance concerns, improve system reliability, reduce the risk of service interruptions, and ensure the long-term performance of critical building utilities. Together, these improvements will enhance accessibility, modernize visitor amenities, and strengthen the resilience of essential building infrastructure.

### Justification

The Kennedy Center's public restrooms, which serve the majority of visitors, have not been upgraded in decades and no longer meet modern standards for functionality, hygiene, or accessibility. As a fundamental yet often overlooked component of a healthy and equitable visitor experience, these facilities require modernization to adequately support the public.

### Progress Assessment

Further scope development, piping condition assessment and code compliance analysis required

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $630,000 | $0 | $0 | $0 | $630,000 |
| Project Management | $156,800 | $0 | $0 | $0 | $156,800 |
| Construction | $6,213,200 | $0 | $0 | $0 | $6,213,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $7,000,000 | $0 | $0 | $0 | $7,000,000 |

## Renewal Subproject: BB01-99-003 - Wayfinding

Roll Up

| | |
|---|---|
| **Parent Project #** | BB00-00-001 |
| **Renewable Sub-Project Name** | Public Space Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes and unifies the Kennedy Center's wayfinding and guest information systems to improve visitor navigation, accessibility, and overall arrival experience. The scope includes the design and installation of a comprehensive wayfinding program consisting of both static and electronic signage throughout the campus. The new system will establish a clear and consistent visual identity while improving directional guidance for patrons, visitors, performers, and event attendees.

The wayfinding program will encompass the full visitor journey, beginning at Juárez Circle and extending through major arrival points, circulation paths, public spaces, and theater entrances. Signage improvements will enhance orientation, reduce visitor confusion, support special event operations, and provide greater flexibility for programming through the use of electronic displays. Together, these upgrades will create a more intuitive, welcoming, and efficient guest experience while supporting the long-term operational needs of the Kennedy Center.

### Justification

The Kennedy Center's size and complexity make navigation difficult for visitors and staff, yet its signage and wayfinding systems have not been significantly updated since the early 1990s. Upgrading these systems is urgently needed to provide clear, accessible, and universally understandable navigation, meeting the standard for unusual and compelling urgency.

### Progress Assessment

Design assessment complete by RSM. Architect to complete design for fabrication and installation.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $80,000 | $0 | $0 | $0 | $80,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,875,200 | $0 | $0 | $0 | $1,875,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: BB01-99-004 - Box Office Relocation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB00-00-001 |
| **Renewable Sub-Project Name** | Public Space Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $8,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project transforms the Level A Motor Lobby into modernized public-facing space while addressing deferred maintenance, accessibility improvements, and evolving visitor service needs. Additional architectural upgrades include restoration and enhancement of wall finishes, terrazzo floor repairs, and refurbishment of historic brass handrails at public stairways, preserving the character of the facility while improving appearance and durability.

The project also supports new visitor amenities and operational enhancements through the relocation of the Box Office to the A Level, including installation of supporting electronic ticketing kiosk infrastructure. New food and beverage amenities will be constructed at the A Level to expand offerings and elevate centralized patron services. To support future programming and activation of public spaces, the project includes installation of upgraded lighting, sound, information technology, and production infrastructure within new public venue areas. Together, these improvements will modernize the arrival experience, expand guest amenities, and provide flexible infrastructure to support a broader range of public programming and events.

### Justification

The current Box Office location no longer supports efficient operations or visitor flow, creating congestion and limiting accessibility. Relocating the Box Office will improve customer experience, streamline ticketing operations, and enhance overall circulation within the building.

### Progress Assessment

Further programming and development will begin this quarter, piping condition assessment and code compliance analysis required

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $760,000 | $0 | $0 | $0 | $760,000 |
| Project Management | $179,200 | $0 | $0 | $0 | $179,200 |
| Construction | $6,410,800 | $0 | $0 | $0 | $6,410,800 |
| Equipment | $650,000 | $0 | $0 | $0 | $650,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$8,000,000** | **$0** | **$0** | **$0** | **$8,000,000** |

## Renewal Subproject: BB02-99-001- OPH Block Office Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB02-00-000 |
| **Renewable Sub-Project Name** | Employee Office Renovations |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $4,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project provides a comprehensive refresh of existing office and support spaces to improve functionality, workplace quality, and code compliance while minimizing disruption to existing building infrastructure. Work includes new paint throughout, replacement of aging carpet and other flooring finishes, installation of energy-efficient lighting fixtures utilizing existing electrical infrastructure, and replacement of dated ceiling tiles and window treatments. Minor millwork and casework repairs will be completed as needed to restore the appearance and usability of workspaces while maintaining the existing architectural character of the facility.

The scope is intentionally focused on modernization within the existing footprint, preserving current demising walls, office layouts, and circulation patterns while incorporating targeted upgrades necessary to meet current ADA accessibility and life-safety egress requirements. Door hardware will be replaced where required to support accessibility or security objectives. Building systems improvements include repairs to sprinkler infrastructure, upgrades to HVAC distribution systems, and replacement of variable air volume (VAV) units where necessary to improve occupant comfort and system performance. Electrical panels and data cabling pathways will remain largely unchanged, with modifications limited to necessary repairs and enhancements required to support new operational or programming needs. Together, these improvements will extend the useful life of existing office environments while providing a more efficient, comfortable, and code-compliant workplace.

### Justification

The Opera House Block Offices have not undergone significant renovations in decades and no longer adequately support the operational needs of staff. Improvements to these workspaces are necessary to modernize aging infrastructure, address long-standing maintenance and functionality issues, and provide employees with professional, efficient, and collaborative environments that support daily operations.

### Progress Assessment

Programming and design to begin this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $380,000 | $0 | $0 | $0 | $380,000 |
| Project Management | $89,600 | $0 | $0 | $0 | $89,600 |
| Construction | $3,230,400 | $0 | $0 | $0 | $3,230,400 |
| Equipment | $300,000 | $0 | $0 | $0 | $300,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$4,000,000** | **$0** | **$0** | **$0** | **$4,000,000** |

## Renewal Subproject: BB02-99-002 - Level A Office Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB02-00-000 |
| **Renewable Sub-Project Name** | Employee Office Renovations |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $10,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes existing office and support spaces through targeted architectural, mechanical, and life-safety improvements while preserving the current layout and operational functionality of the facility. Work begins with required hazardous materials abatement and includes a comprehensive interior refresh consisting of new paint, replacement of aging carpet and other flooring finishes, installation of energy-efficient lighting fixtures utilizing existing electrical infrastructure, and replacement of dated ceiling tiles and window treatments. Minor millwork and casework repairs will also be completed to improve the appearance, durability, and functionality of workspaces.
The scope is focused on extending the useful life of existing facilities while maintaining current demising walls, office configurations, and circulation patterns. Improvements will incorporate updates necessary to meet current ADA accessibility and egress requirements, including replacement of door hardware where needed to support accessibility or security objectives. Building systems work includes repairs to sprinkler infrastructure, upgrades to HVAC distribution systems, and replacement of variable air volume (VAV) units where required to improve performance and occupant comfort. Electrical panels and data cabling pathways will remain largely intact, with modifications limited to necessary repairs and enhancements required to support operational needs and future programming requirements. Together, these improvements will provide a more efficient, comfortable, and code-compliant workplace while minimizing construction impacts and infrastructure replacement costs.

### Justification

The Level A Offices have not undergone significant renovations in decades and no longer adequately support the operational needs of staff. Improvements to these workspaces are necessary to modernize aging infrastructure, address long-standing maintenance and functionality issues, and provide employees with professional, efficient, and collaborative environments that support daily operations.

### Progress Assessment

Programming and design to begin this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $850,000 | $0 | $0 | $0 | $850,000 |
| Project Management | $224,000 | $0 | $0 | $0 | $224,000 |
| Construction | $8,166,000 | $0 | $0 | $0 | $8,166,000 |
| Equipment | $760,000 | $0 | $0 | $0 | $760,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$10,000,000** | **$0** | **$0** | **$0** | **$10,000,000** |

## Renewal Subproject: BB02-99-003 - COH Block Office Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB02-00-000 |
| **Renewable Sub-Project Name** | Employee Office Renovations |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes existing office and support spaces through targeted architectural, mechanical, electrical, and life-safety improvements while preserving the current layout and operational functionality of the facility. Work begins with required hazardous materials abatement and includes a comprehensive interior refresh consisting of new paint, replacement of aging carpet and other flooring finishes, installation of energy-efficient lighting fixtures utilizing existing electrical infrastructure, and replacement of dated ceiling tiles and window treatments. Minor millwork and casework repairs will also be completed to improve the appearance, durability, and functionality of workspaces.

The scope is focused on extending the useful life of existing facilities while maintaining current demising walls, office configurations, and circulation patterns. Improvements will incorporate updates necessary to meet current ADA accessibility and egress requirements, including replacement of door hardware where required to support accessibility or security objectives. Building systems work includes repairs to sprinkler infrastructure, upgrades to HVAC distribution systems, replacement of variable air volume (VAV) units where needed, and replacement of the ESB-5-S electrical switchboard to improve system reliability and support future operational needs. Electrical panels and data cabling pathways will otherwise remain largely intact, with modifications limited to necessary repairs and enhancements required to support evolving programming requirements. Together, these improvements will provide a more efficient, comfortable, resilient, and code-compliant workplace while minimizing disruption to existing operations.

### Justification

The Concert Hall Block Offices have not undergone significant renovations in decades and no longer adequately support the operational needs of staff. Improvements to these workspaces are necessary to modernize aging infrastructure, address long-standing maintenance and functionality issues, and provide employees with professional, efficient, and collaborative environments that support daily operations.

### Progress Assessment

Programming and design to begin this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $170,000 | $0 | $0 | $0 | $170,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,700,200 | $0 | $0 | $0 | $1,700,200 |
| Equipment | $85,000 | $0 | $0 | $0 | $85,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: BB02-99-004 - Terrace Office Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB02-00-000 |
| **Renewable Sub-Project Name** | Employee Office Renovations |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $3,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes existing office and support spaces through targeted architectural, mechanical, and life-safety improvements while preserving the current layout and operational functionality of the facility. Work begins with required hazardous materials abatement and includes a comprehensive interior refresh consisting of new paint, replacement of aging carpet and other flooring finishes, installation of energy-efficient lighting fixtures utilizing existing electrical infrastructure, and replacement of dated ceiling tiles and window treatments. Minor millwork and casework repairs will also be completed to improve the appearance, functionality, and longevity of the workspace environment.

The scope is focused on extending the useful life of existing facilities while maintaining current demising walls, office configurations, and circulation patterns. Improvements will incorporate updates necessary to meet current ADA accessibility and egress requirements, including replacement of door hardware where needed to support accessibility or security objectives. Building systems work includes repairs to sprinkler infrastructure, upgrades to HVAC distribution systems, and replacement of variable air volume (VAV) units where necessary to improve occupant comfort and operational efficiency. Electrical panels and data cabling pathways will remain largely unchanged, with modifications limited to necessary repairs and enhancements required to support evolving operational and programming needs. Together, these improvements will provide a more efficient, comfortable, and code-compliant workplace while minimizing construction impacts and preserving existing infrastructure investments.

### Justification

The Terrace Offices have not undergone significant renovations in decades and no longer adequately support the operational needs of staff. Improvements to these workspaces are necessary to modernize aging infrastructure, address long-standing maintenance and functionality issues, and provide employees with professional, efficient, and collaborative environments that support daily operations.

### Progress Assessment

Programming and design to begin this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $255,000 | $0 | $0 | $0 | $255,000 |
| Project Management | $67,200 | $0 | $0 | $0 | $67,200 |
| Construction | $2,487,800 | $0 | $0 | $0 | $2,487,800 |
| Equipment | $190,000 | $0 | $0 | $0 | $190,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$3,000,000** | **$0** | **$0** | **$0** | **$3,000,000** |

## Renewal Subproject: BB03-99-001 - Elevator Modernization

Roll Up

| | |
|---|---|
| **Parent Project #** | BB03-00-000 |
| **Renewable Sub-Project Name** | Vertical Transportation Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $10,000,000 |
| **Start FY (for 5-year window)** | 2026 |

**Description**

This project addresses critical vertical transportation and accessibility infrastructure throughout the Kennedy Center, with priority placed on back-of-house systems that support daily operations, production activities, staff circulation, and accessibility. The scope focuses on modernizing aging freight elevators, lifts, canteen service lifts, the Eisenhower-to-Terrace elevator connection, and wheelchair lift systems that have reached the end of their useful life or are experiencing reliability issues. These improvements are intended to reduce operational disruptions, improve safety, and ensure continued support for production, facilities, and visitor services.

The project also includes targeted upgrades to public-facing vertical transportation systems to enhance the patron experience and improve accessibility. New elevator call stations will be installed at primary patron elevators to modernize controls and improve reliability. Additionally, the Tier 2 lifts within the Concert Hall, which are outdated and prone to frequent malfunctions, will be repaired or replaced to ensure dependable operation and compliance with current accessibility standards. Together, these improvements will strengthen the reliability, efficiency, and long-term sustainability of critical transportation systems across both public and operational areas of the campus.

**Justification**

The Kennedy Center operates 32 elevators, many of which lack modern safety features and are critical to daily operations, safety, and patron experience. Systematic modernization is necessary to improve reliability, incorporate advanced diagnostics, and reduce downtime and costly emergency repairs.

**Progress Assessment**

Otis has proposed minimum repairs and provided budgets for modernizations. Scope to be further developed this quarter

**Related Projects**

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $250,000 | $0 | $0 | $0 | $250,000 |
| Project Management | $41,000 | $0 | $0 | $0 | $41,000 |
| Construction | $5,709,000 | $0 | $0 | $0 | $5,709,000 |
| Equipment | $4,000,000 | $0 | $0 | $0 | $4,000,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$10,000,000** | **$0** | **$0** | **$0** | **$10,000,000** |

## Renewal Subproject: BB03-99-002 - Escalator Capital Repair

Roll Up

| | |
|---|---|
| **Parent Project #** | BB03-00-000 |
| **Renewable Sub-Project Name** | Vertical Transportation Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical reliability, safety, and lifecycle improvements for the Kennedy Center's escalator systems. The work focuses on replacing aging and worn components that have experienced years of continuous operation, reducing the risk of service disruptions while extending the useful life of existing equipment. Targeted repairs and modernization efforts will improve passenger safety, operational performance, and long-term maintainability without requiring full escalator replacement.

The primary scope includes replacement of worn step roller wheels, deteriorated step chain links, damaged comb plates, and brake system components, including brake pads and associated safety mechanisms. Handrail drive systems, skirt brushes, and other critical safety devices will be inspected and replaced as necessary to ensure compliance with current operational and safety standards. In addition, outdated controllers, sensors, switches, and other control system components will be upgraded to improve reliability, diagnostics, and overall system performance. Together, these improvements will enhance escalator safety, reduce maintenance requirements, and support uninterrupted service for visitors and staff.

### Justification

The Kennedy Center's escalators are critical to vertical circulation but have deteriorated due to age and deferred maintenance, resulting in reliability and safety concerns. Capital repairs are necessary to restore safe operation, reduce downtime, and extend asset life.

### Progress Assessment

Otis has proposed capital repairs. Scope to be further developed this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $25,000 | $0 | $0 | $0 | $25,000 |
| Project Management | $15,000 | $0 | $0 | $0 | $15,000 |
| Construction | $860,000 | $0 | $0 | $0 | $860,000 |
| Equipment | $100,000 | $0 | $0 | $0 | $100,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,000,000** | **$0** | **$0** | **$0** | **$1,000,000** |

## Renewal Subproject: PV01-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV01-00-000 |
| **Renewable Sub-Project Name** | Concert Hall Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $10,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project delivers a comprehensive renovation of the Concert Hall focused on improving patron experience, accessibility, building systems performance, and long-term operational reliability while preserving the hall's architectural and acoustical integrity. Prior to construction, dust and vibration mitigation measures will be implemented to protect the organ and other sensitive assets throughout the renovation process. Major audience-facing improvements include complete replacement of audience seating, extensive floor preparation and carpet replacement throughout public areas and Tier 1 and Tier 2 boxes, hardwood floor repairs and replacement, and renovations to balcony restrooms. Additional accessibility and life-safety enhancements include repair or replacement of deteriorated doors, hardware, crash bars, hinges, and stoppers, handrail modifications to meet current safety and ADA standards, and repairs to uneven and unstable orchestra-level stairs.

The technical scope modernizes critical theatrical and building infrastructure to support future programming and improve facility performance. New conduit pathways will be installed to provide flexible control locations within the hall, allowing production operations to be positioned either centrally or toward the rear of the venue. Existing spotlight booth operations will be replaced with ceiling-mounted RoboSpot systems, eliminating seat loss and patron sightline issues while increasing production flexibility. House lighting systems, including chandeliers, overhead sconces, and wall sconces, will be upgraded and rewired to correct existing electrical deficiencies and improve reliability. Mechanical improvements include replacement and modernization of HVAC controls, air handling equipment, supply and return air systems, and replacement of A/C-2S and A/C-3S units. Additional work includes investigation and remediation of ongoing water intrusion and moisture-related issues within the Israeli Lounge. Together, these improvements will enhance comfort, accessibility, safety, production capabilities, and the overall visitor experience while extending the useful life of one of the Kennedy Center's premier performance venues.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related projects

| | | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $900,000 | $0 | $0 | $0 | $900,000 |
| Project Management | $224,000 | $0 | $0 | $0 | $224,000 |
| Construction | $8,426,000 | $0 | $0 | $0 | $8,426,000 |
| Equipment | $450,000 | $0 | $0 | $0 | $450,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$10,000,000** | **$0** | **$0** | **$0** | **$10,000,000** |

## Renewal Subproject: PV01-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV01-00-000 |
| **Renewable Sub-Project Name** | Concert Hall Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical backstage and performer support spaces to improve functionality, accessibility, and the overall experience for artists, production teams, and staff. The work includes comprehensive refreshes of existing green rooms and dressing rooms, providing updated finishes, furnishings, lighting, and infrastructure to better support the needs of performers and visiting productions. Improvements will also be made to the Visiting Production Office to create a more efficient and professional workspace for production management and touring personnel.

The project further enhances accessibility and operational flow within back-of-house areas through targeted facility upgrades and circulation improvements. Dressing Room C will be renovated to achieve full ADA compliance, ensuring accessible accommodations for performers and guests. In addition, back-of-house corridor redesigns will improve wayfinding, circulation, aesthetics, and functionality throughout performer and production support areas. Together, these improvements will create a more welcoming, accessible, and efficient backstage environment while supporting the Kennedy Center's ability to host world-class productions and artists.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $135,000 | $0 | $0 | $0 | $135,000 |
| Project Management | $33,600 | $0 | $0 | $0 | $33,600 |
| Construction | $1,331,400 | $0 | $0 | $0 | $1,331,400 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,500,000** | **$0** | **$0** | **$0** | **$1,500,000** |

## Renewal Subproject: PV01-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV01-00-000 |
| **Renewable Sub-Project Name** | Concert Hall Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,200,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical stage infrastructure to improve performance capabilities, operational efficiency, safety, and long-term reliability within the theater. The primary scope includes complete replacement of the stage floor, addressing wear, structural deterioration, and performance limitations associated with the existing surface. Additional improvements include modifications to stage lift systems to enhance functionality, reliability, and compatibility with modern production requirements. Together, these upgrades will strengthen the venue's ability to accommodate a diverse range of performances while supporting the needs of artists, stage crews, and technical staff.

The technical scope also includes targeted improvements to theatrical infrastructure and acoustical performance. Cable management systems will be redesigned through the installation of improved cable tray infrastructure at key locations, reducing operational conflicts and improving backstage efficiency. The proscenium will be relocated and reworked in accordance with recommendations from the acoustical study to improve sound performance and audience experience within the hall. In addition, the existing light wagon system will be redesigned to increase flexibility, maintainability, and production capabilities. Collectively, these improvements will enhance stage operations, support evolving production technologies, and extend the useful life of critical theatrical systems.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $96,000 | $0 | $0 | $0 | $96,000 |
| Project Management | $26,880 | $0 | $0 | $0 | $26,880 |
| Construction | $1,077,120 | $0 | $0 | $0 | $1,077,120 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,200,000** | **$0** | **$0** | **$0** | **$1,200,000** |

## Renewal Subproject: PV01-99-004 - Acoustics

Roll Up

| | |
|---|---|
| **Parent Project #** | PV01-00-000 |
| **Renewable Sub-Project Name** | Concert Hall Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $12,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project implements significant acoustical and stagehouse enhancements designed to improve performance flexibility, sound quality, and the overall audience experience. Central to the effort is the installation of a fully automated adjustable acoustic drapery system, allowing venue staff to tailor acoustical conditions to the specific needs of a wide range of performance types. The project also includes construction of a permanent stage extension to increase performance area and improve artist engagement with audiences. Implementation of the stage extension will require reconfiguration of seating layouts and may result in a reduction of overall seat count to optimize sightlines, acoustics, and stage functionality.

The primary technical scope focuses on major acoustical infrastructure improvements recommended through prior performance studies. The existing acoustic canopy system will be completely demolished and replaced with a new design featuring enhanced structural support, improved reliability, and greater acoustic tunability. In addition, the proscenium will be relocated and reconfigured in accordance with previous acoustical report recommendations to optimize sound projection, stage performance, and audience listening conditions. Together, these improvements will create a more versatile and acoustically refined venue capable of supporting a broader range of artistic programming while meeting contemporary performance standards.

### Justification

Immediate acoustical improvements to the main theater is essential to preserve performance integrity and ensure a world-class audience experience as the Kennedy Center approaches America250.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $960,000 | $0 | $0 | $0 | $960,000 |
| Project Management | $89,600 | $0 | $0 | $0 | $89,600 |
| Construction | $10,200,400 | $0 | $0 | $0 | $10,200,400 |
| Equipment | $750,000 | $0 | $0 | $0 | $750,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$12,000,000** | **$0** | **$0** | **$0** | **$12,000,000** |

## Renewal Subproject: PV02-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV02-00-000 |
| **Renewable Sub-Project Name** | Opera House Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $6,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project provides a comprehensive renewal of the Opera House, focused on preserving its iconic architectural character while modernizing audience amenities, accessibility features, and critical building systems. A key preservation component includes specialized cleaning, restoration, and repair of the Opera House's distinctive red silk wall and ceiling finishes to maintain their appearance and historic integrity. Public-facing improvements include extensive floor preparation and replacement of carpeting throughout all levels of the Opera House and its associated foyers, a major audience seating modernization program encompassing both movable and stationary seating systems, and a complete remodel of balcony-level restrooms to enhance functionality, accessibility, and visitor comfort.

The technical scope addresses significant life-safety, building systems, and operational deficiencies throughout the venue. Existing doors throughout the facility will be replaced to address code compliance, accessibility, and operational concerns associated with aging and deteriorated assemblies. HVAC system upgrades will improve occupant comfort, energy efficiency, and system reliability, while stair safety improvements—including new nosings and handrail modifications—will enhance accessibility and reduce safety risks throughout public circulation areas. Together, these improvements will preserve the Opera House's architectural legacy while creating a safer, more comfortable, and modern experience for audiences, performers, and staff.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $480,000 | $0 | $0 | $0 | $480,000 |
| Project Management | $134,400 | $0 | $0 | $0 | $134,400 |
| Construction | $4,785,600 | $0 | $0 | $0 | $4,785,600 |
| Equipment | $600,000 | $0 | $0 | $0 | $600,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$6,000,000** | **$0** | **$0** | **$0** | **$6,000,000** |

## Renewal Subproject: PV02-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV02-00-000 |
| **Renewable Sub-Project Name** | Opera House Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes and enhances critical backstage and production support spaces to improve functionality, operational efficiency, and the overall experience for performers, production crews, and visiting companies. The work includes resurfacing and resealing of the backstage production area, including repairs to the U-shaped concrete surround where deterioration and surface imperfections have developed over time. These improvements will restore durability, improve safety, and provide a more resilient working environment for production operations.

The primary scope focuses on the refurbishment of performer and production support facilities throughout the back-of-house areas. Improvements include upgrades to dressing rooms, visiting production offices, green rooms, wardrobe facilities, hair and makeup spaces, and other backstage support areas. Additional work will improve off-stage and A-Level production storage areas to better support staging, equipment management, and touring production needs. Together, these enhancements will create a more functional, professional, and welcoming backstage environment while supporting the Kennedy Center's ability to accommodate world-class productions and performers.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $220,000 | $0 | $0 | $0 | $220,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,735,200 | $0 | $0 | $0 | $1,735,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: PV02-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV02-00-000 |
| **Renewable Sub-Project Name** | Opera House Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project delivers a comprehensive modernization of the Opera House's stage and theatrical infrastructure, addressing systems that have reached the end of their useful life and are critical to supporting contemporary performance requirements. The centerpiece of the project is a major upgrade and replacement of the stage lift and rigging systems, including complete replacement of the existing fly system, fly rail, rigging components, controls, and associated infrastructure. As these systems remain substantially original to the building, modernization is essential to improve safety, reliability, operational efficiency, and compatibility with modern production technologies. Additional work includes replacement of the stage floor and improvements to the orchestra pit fascia to enhance both performance functionality and audience presentation.

The technical scope also includes upgrades to front-of-house theatrical systems that support lighting, staging, and production flexibility. New or upgraded light bridge infrastructure will be installed to improve access, maintenance, and lighting capabilities within the venue. The project will also modernize front-of-house theatrical rigging systems, including replacement and enhancement of box boom infrastructure and associated rigging components. Together, these improvements will significantly enhance production capabilities, improve operational safety, and ensure the Opera House remains capable of supporting world-class performances for decades to come.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $220,000 | $0 | $0 | $0 | $220,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $135,200 | $0 | $0 | $0 | $135,200 |
| Equipment | $1,600,000 | $0 | $0 | $0 | $1,600,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: PV03-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV03-00-000 |
| **Renewable Sub-Project Name** | Eisenhower Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $4,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project enhances the patron experience and modernizes key audience-facing and building systems within the theater. The primary scope includes full replacement of stationary audience seating to improve comfort, accessibility, durability, and overall venue appearance. Additional architectural improvements include repair or replacement of deteriorated door assemblies throughout the facility and renovation of balcony-level restrooms to improve functionality, accessibility, and guest amenities while addressing deferred maintenance needs.

The technical scope focuses on targeted acoustical and mechanical improvements to support both audience and production operations. Existing acoustic treatments will be modified and optimized to improve sound quality, performance flexibility, and overall listening conditions within the venue. In addition, a dedicated HVAC zone will be created for the spotlight booth to provide independent environmental control, improving occupant comfort, equipment performance, and operational reliability. Together, these improvements will modernize critical venue infrastructure while enhancing comfort, acoustics, and the overall experience for patrons and production staff.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified.  Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $320,000 | $0 | $0 | $0 | $320,000 |
| Project Management | $89,600 | $0 | $0 | $0 | $89,600 |
| Construction | $3,470,400 | $0 | $0 | $0 | $3,470,400 |
| Equipment | $120,000 | $0 | $0 | $0 | $120,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$4,000,000** | **$0** | **$0** | **$0** | **$4,000,000** |

## Renewal Subproject: PV03-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV03-00-000 |
| **Renewable Sub-Project Name** | Eisenhower Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes and refreshes critical back-of-house performer and production support spaces to improve functionality, comfort, accessibility, and operational efficiency. The scope includes renovations to hair and makeup facilities, wardrobe areas, dressing rooms, visiting production offices, and green room spaces, providing updated finishes, furnishings, and infrastructure that better support performers, touring productions, and staff. Additional improvements include a refresh of the props kitchen and replacement of carpeting throughout designated back-of-house areas to enhance durability, appearance, and overall workplace quality.

The project also addresses targeted operational and comfort upgrades throughout performer support areas. Ladies' restrooms will be reconfigured to increase fixture capacity and improve accommodation during peak performance periods. New heating systems will be installed in Stairwell 2–5 at Level 27 and within the Orchestra Level Family Bathroom to address persistent temperature deficiencies and improve comfort for performers, staff, and guests. Together, these improvements will create a more functional, welcoming, and efficient backstage environment while supporting the Kennedy Center's ability to host world-class productions and performers.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $180,000 | $0 | $0 | $0 | $180,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,775,200 | $0 | $0 | $0 | $1,775,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: PV03-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV03-00-000 |
| **Renewable Sub-Project Name** | Eisenhower Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical theatrical infrastructure to enhance acoustical performance, production capabilities, and operational efficiency within the venue. The scope includes modifications to existing acoustic treatments to improve sound quality, performance flexibility, and audience experience while supporting a broader range of programming. In addition, modern stage lighting systems will be integrated throughout the theater, providing improved performance capabilities, energy efficiency, control flexibility, and compatibility with contemporary production technologies.

The primary technical focus is the complete replacement of the theater's aging stage machinery and rigging infrastructure. Work includes replacement of the existing fly system, fly rail, rigging equipment, controls, and associated components to improve safety, reliability, and operational performance. The project also includes replacement of the primary stage floor to address wear, structural deterioration, and evolving production requirements. Supporting operational improvements include enhancements to stage-level and A-Level production storage areas, providing more efficient space for equipment, scenery, and production support functions. Together, these improvements will modernize the theater's core production systems and ensure its continued ability to support world-class performances for decades to come.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | 0 | Spent | Balance |
|---|---|---|---|---|---|
| Design | $90,000 | $0 | $0 | $0 | $90,000 |
| Project Management | $22,400 | $0 | $0 | $0 | $22,400 |
| Construction | $87,600 | $0 | $0 | $0 | $87,600 |
| Equipment | $800,000 | $0 | $0 | $0 | $800,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,000,000** | **$0** | **$0** | **$0** | **$1,000,000** |

## Renewal Subproject: PV04-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV04-00-000 |
| **Renewable Sub-Project Name** | Family Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project enhances the safety, functionality, and visitor experience of the theater through targeted architectural and operational improvements. A primary focus is the replacement of aging entry doors and associated hardware, which have become increasingly unreliable and have caused operational disruptions, including false alarm activations during performances. Additional life-safety and accessibility improvements include replacement of existing railings that no longer meet current safety and ADA expectations, as well as installation of permanent row identification signage to improve patron wayfinding and seating navigation within the theater.

The project also includes a comprehensive refresh of public-facing interior finishes and amenities. Scope includes replacement of worn carpeting, replacement of deteriorated wall sconces, and restoration or replacement of textured wall fabric that has become stained and damaged over time. Restroom improvements will better accommodate the theater's younger audiences through the installation of appropriately sized child-accessible fixtures within each restroom. Additional enhancements include replacement of mismatched furnishings to create a more cohesive appearance, reinstallation of existing artwork, and incorporation of additional art elements where appropriate. Together, these improvements will create a safer, more welcoming, and more functional environment while improving the overall guest experience for patrons and families.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

A meeting was held on April 24, 2026 at 3:00 PM with Timothy Guillot and Melissa Santiago. The meeting focused on reviewing the currently identified renovation scope and gathering operational input from the Family Theater staff. The team worked to identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration. Timothy Guillot and Melissa Santiago were established as the primary decision-makers for the Family Theater project moving forward. Key findings from the meeting were documented and will inform the next phase of scope development.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $160,000 | $0 | $0 | $0 | $160,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,795,200 | $0 | $0 | $0 | $1,795,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: PV04-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV04-00-000 |
| **Renewable Sub-Project Name** | Family Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes key back-of-house support spaces to improve functionality, organization, and the overall experience for performers, production crews, and visiting companies. The scope includes comprehensive refreshes of existing dressing rooms and wardrobe facilities, incorporating updated finishes, furnishings, lighting, and operational improvements to better support daily performance activities and touring productions.

In addition, the project includes upgrades to stage-level storage areas to improve organization, accessibility, and efficient use of space for costumes, props, equipment, and production materials. Together, these improvements will enhance backstage operations, support production workflows, and provide a more professional and functional environment for artists and staff.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

A meeting was held on April 24, 2026 at 3:00 PM with Timothy Guillot and Melissa Santiago.  The meeting focused on reviewing the currently identified renovation scope and gathering operational input from the Family Theater staff. The team worked to identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration. Timothy Guillot and Melissa Santiago were established as the primary decision-makers for the Family Theater project moving forward. Key findings from the meeting were documented and will inform the next phase of scope development.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $45,000 | $0 | $0 | $0 | $45,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $443,800 | $0 | $0 | $0 | $443,800 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$500,000** | **$0** | **$0** | **$0** | **$500,000** |

## Renewal Subproject: PV04-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV04-00-000 |
| **Renewable Sub-Project Name** | Family Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical theatrical infrastructure within the Family Theater to enhance production capabilities, operational reliability, and the overall performance experience. The scope includes installation of a new audiovisual system to support contemporary production requirements, improve presentation quality, and provide greater flexibility for a wide range of performances, educational programming, and special events. The project also includes replacement of the primary stage floor to address wear, improve performer safety, and support the technical demands of modern productions.

The primary technical focus is the replacement of the theater's aging rigging infrastructure, which has become outdated and no longer provides the functionality required for current production needs. New rigging systems will improve safety, reliability, operational efficiency, and production flexibility while supporting a broader range of staging and performance configurations. Together, these improvements will ensure the Family Theater remains a versatile, modern venue capable of supporting diverse artistic and educational programming for years to come.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

A meeting was held on April 24, 2026 at 3:00 PM with Timothy Guillot and Melissa Santiago. The meeting focused on reviewing the currently identified renovation scope and gathering operational input from the Family Theater staff. The team worked to identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration. Timothy Guillot and Melissa Santiago were established as the primary decision-makers for the Family Theater project moving forward. Key findings from the meeting were documented and will inform the next phase of scope development.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $45,000 | $0 | $0 | $0 | $45,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $143,000 | $0 | $0 | $0 | $143,000 |
| Equipment | $300,800 | $0 | $0 | $0 | $300,800 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$500,000** | **$0** | **$0** | **$0** | **$500,000** |

## Renewal Subproject: PV05-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV05-00-000 |
| **Renewable Sub-Project Name** | Terrace Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project enhances the safety, comfort, and overall patron experience through targeted modernization of audience-facing elements within the theater. The primary scope includes replacement of existing audience seating, installation of new flooring and base materials throughout public areas, and repair or replacement of aging door assemblies that no longer function properly. These improvements will address deferred maintenance concerns while creating a more comfortable, durable, and welcoming environment for visitors.

The project also includes targeted life-safety repairs to address existing hazards within the seating areas. Specifically, the railing located adjacent to Rows U and V will be repaired or replaced to correct stability issues and ensure compliance with current safety standards. Together, these improvements will modernize the theater environment, improve accessibility and reliability, and enhance the overall experience for patrons while extending the useful life of critical facility components.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings  identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $40,000 | $0 | $0 | $0 | $40,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $448,800 | $0 | $0 | $0 | $448,800 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$500,000** | **$0** | **$0** | **$0** | **$500,000** |

## Renewal Subproject: PV05-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV05-00-000 |
| **Renewable Sub-Project Name** | Terrace Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical back-of-house performer, production, and VIP support spaces to improve functionality, security, and operational efficiency. The scope includes comprehensive refreshes of dressing rooms, wardrobe facilities, visiting production offices, green rooms, and stage storage areas, providing updated finishes, furnishings, lighting, and infrastructure to better support artists, touring productions, and staff. These improvements will create a more professional, comfortable, and functional backstage environment while enhancing day-to-day operations.

The project also addresses targeted upgrades to VIP and security support spaces. The existing Reception Room, which serves VIP guests and security personnel, will be renovated to include a dedicated restroom, eliminating the need for occupants to utilize public facilities across the corridor. Lighting within the space will also be upgraded to improve functionality and presentation. In addition, the Stage Door Office will receive security enhancements, including installation of a panic button to improve emergency response capabilities and support staff safety. Together, these improvements will strengthen backstage operations, enhance VIP accommodations, and improve security and support functions throughout the facility.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $90,000 | $0 | $0 | $0 | $90,000 |
| Project Management | $22,400 | $0 | $0 | $0 | $22,400 |
| Construction | $887,600 | $0 | $0 | $0 | $887,600 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,000,000** | **$0** | **$0** | **$0** | **$1,000,000** |

## Renewal Subproject: PV05-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV05-00-000 |
| **Renewable Sub-Project Name** | Terrace Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical theatrical infrastructure to improve safety, reliability, and production capabilities within the venue. The primary scope includes full replacement of the existing stage floor, addressing wear, structural deterioration, and performance limitations resulting from decades of use. The new stage floor will provide a durable, high-performance surface capable of supporting a broad range of artistic, technical, and production requirements while improving safety for performers and stage crews.

The project also includes significant upgrades to rigging and theatrical lighting systems to support contemporary production standards and enhance operational flexibility. Improvements will address aging equipment, increase reliability, and provide greater capability for staging, lighting design, and performance execution. Together, these investments will strengthen the theater's core production infrastructure, reduce maintenance requirements, and ensure the venue remains capable of supporting world-class performances well into the future.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $40,000 | $0 | $0 | $0 | $40,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $112,000 | $0 | $0 | $0 | $112,000 |
| Equipment | $336,800 | $0 | $0 | $0 | $336,800 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$500,000** | **$0** | **$0** | **$0** | **$500,000** |

## Renewal Subproject: PV06-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV06-00-000 |
| **Renewable Sub-Project Name** | Theater Lab Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $250,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes audience-facing spaces and critical life-safety infrastructure to improve patron comfort, accessibility, and operational reliability. The scope includes replacement of existing house flooring, installation of new audience seating to replace deteriorated chairs for which no spare inventory remains available, and restoration of interior wall fabric that has detached and deteriorated over time. In addition, the theater's lighting systems will be upgraded through a comprehensive LED conversion, improving energy efficiency, reducing maintenance requirements, and enhancing overall lighting quality throughout the venue.

The project also addresses significant code, security, and life-safety deficiencies. Existing door assemblies throughout the theater will be replaced to meet current code requirements and improve functionality and accessibility. Emergency egress capacity will be enhanced through the addition of two required emergency exits, strengthening occupant safety and code compliance. To improve operational control and security, a new dedicated entrance will be established at the south end of the theater with controlled card-reader access, providing secure circulation for authorized personnel while supporting venue operations. Together, these improvements will create a safer, more functional, and modern theater environment while extending the useful life of critical facility components.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings  identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $22,500 | $0 | $0 | $0 | $22,500 |
| Project Management | $11,000 | $0 | $0 | $0 | $11,000 |
| Construction | $216,500 | $0 | $0 | $0 | $216,500 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$250,000** | **$0** | **$0** | **$0** | **$250,000** |

## Renewal Subproject: PV06-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV06-00-000 |
| **Renewable Sub-Project Name** | Theater Lab Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical building infrastructure, life-safety concerns, and performer support spaces to improve reliability, resilience, and operational functionality throughout the facility. The scope includes replacement of the existing hot water heater and associated monitoring systems, including installation of new sensors to improve performance, reliability, and preventative maintenance capabilities. Additional work will address identified fire- and water-related damage within the facility, ensuring affected areas are properly repaired and restored to safe operating conditions.

The project also includes targeted improvements to both technical and performer support environments. Humidity control issues within the rack room will be corrected to protect sensitive technology systems and improve long-term equipment reliability. Back-of-house spaces, including green rooms, rehearsal rooms, and dressing rooms, will receive comprehensive refreshes featuring updated finishes, furnishings, and infrastructure to better support performers and production staff. In addition, repairs to the stage floor will address wear and deterioration, improving safety and functionality for performances and rehearsals. Together, these improvements will strengthen facility resilience, enhance backstage operations, and improve the overall performance environment.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $85,000 | $0 | $0 | $0 | $85,000 |
| Project Management | $22,400 | $0 | $0 | $0 | $22,400 |
| Construction | $892,600 | $0 | $0 | $0 | $892,600 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,000,000** | **$0** | **$0** | **$0** | **$1,000,000** |

## Renewal Subproject: PV06-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV06-00-000 |
| **Renewable Sub-Project Name** | Theater Lab Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses significant deferred maintenance and damage to critical performance infrastructure, ensuring the venue remains safe, functional, and capable of supporting future productions. The primary scope includes replacement of flooring throughout both the audience chamber and stage areas, addressing wear, deterioration, and damage that have accumulated through years of use. These improvements will enhance patron comfort, performer safety, and the overall appearance and functionality of the venue.

The technical scope focuses on repairing and restoring stage systems impacted by fire- and water-related damage. Work includes rehabilitation or replacement of affected rigging components and associated theatrical infrastructure to restore operational reliability, safety, and production capabilities. Together, these improvements will protect the long-term viability of the venue, improve performance conditions, and ensure continued support for artistic programming and public events.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $40,000 | $0 | $0 | $0 | $40,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $448,800 | $0 | $0 | $0 | $448,800 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$500,000** | **$0** | **$0** | **$0** | **$500,000** |

## Renewal Subproject: SB01-99-001 - Extend Fire Protection A Level

Roll Up

| | |
|---|---|
| **Parent Project #** | SB01-00-000 |
| **Renewable Sub-Project Name** | Fire Alarm & Fire Protection |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $250,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project improves the Kennedy Center's fire protection and life-safety systems to achieve compliance with current codes, improve emergency response capabilities, and enhance overall building safety. The primary scope includes design and construction of fire sprinkler protection throughout the remaining unprotected portions of Level A, extending coverage to occupied spaces, storage areas, support spaces, and common areas. New sprinkler piping, heads, flow switches, and tamper monitoring devices will be integrated into the existing fire protection infrastructure to provide comprehensive system coverage and monitoring. Additional fire protection improvements include evaluation and replacement of aging dry-pipe sprinkler systems within the parking garages, installation of fire protection within garage fan rooms, and expansion of protection into electrical closets and electrical rooms throughout the facility.

The project also modernizes fire alarm and emergency notification systems to improve detection, communication, and life-safety performance. Work includes installation of additional fire alarm coverage where required, upgrades to fire alarm control panel graphics, and deployment of new manual pull stations, smoke detectors, heat detectors, and audible and visual notification devices throughout the campus. To improve system reliability and long-term resilience, the existing fire pump will be replaced with a new electric fire pump. All work will be designed and implemented in accordance with applicable NFPA standards and Kennedy Center building code requirements, resulting in a more robust, code-compliant, and integrated life-safety system capable of supporting the facility's long-term operational needs.

### Justification

Fire protection coverage at the A Level is currently limited and does not meet the needs of a high-traffic public area, increasing risk to life safety and property. Extending fire protection systems is necessary to ensure adequate coverage, improve code compliance, and enhance overall safety.

### Progress Assessment

Fire Sprinkler design build contract to be awarded by Q3 2026

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $12,500 | $0 | $0 | $0 | $12,500 |
| Project Management | $8,500 | $0 | $0 | $0 | $8,500 |
| Construction | $229,000 | $0 | $0 | $0 | $229,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$250,000** | **$0** | **$0** | **$0** | **$250,000** |

## Renewal Subproject: SB02-99-001 - Asbestos Abatement

Roll Up

| | |
|---|---|
| **Parent Project #** | SB02-00-000 |
| **Renewable Sub-Project Name** | Hazardous Material Abatement |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $400,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project provides a comprehensive hazardous materials assessment to support future renovation, modernization, and capital improvement efforts throughout the facility. The assessment is intended to identify, document, and evaluate the presence of regulated hazardous materials that may impact construction activities, occupant safety, project phasing, and regulatory compliance. The resulting findings will establish a clear basis for planning, budgeting, risk management, and environmental remediation activities associated with future projects.

The scope includes a comprehensive asbestos-containing materials (ACM) survey covering both friable and non-friable materials, lead-based paint (LBP) testing, and identification of PCB-containing materials within building components and systems. Laboratory analysis and reporting will be performed to document findings and provide regulatory documentation. The project will also include development of abatement specifications and remediation recommendations to support future design and construction efforts, ensuring hazardous materials can be safely managed or removed in accordance with applicable environmental regulations and industry standards.

### Justification

Asbestos-containing materials remain present in areas of the Kennedy Center due to the building's age, posing potential health risks during maintenance, renovation, or disturbance. Abatement is necessary to eliminate exposure hazards, ensure regulatory compliance, and support safe ongoing operations.

### Progress Assessment

The RFP for a comprehensive Hazmat survey in areas of construction has been issued.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $250,000 | $0 | $0 | $0 | $250,000 |
| Project Management | $24,000 | $0 | $0 | $0 | $24,000 |
| Construction | $126,000 | $0 | $0 | $0 | $126,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$400,000** | **$0** | **$0** | **$0** | **$400,000** |

## Renewal Subproject: SB03-99-001 - Sanitary & Domestic Piping

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $30,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical plumbing infrastructure that has reached the end of its useful life and poses increasing risks to facility operations, occupant comfort, and building reliability. Work begins with required hazardous materials abatement and focuses on the replacement of aging domestic water, sanitary waste, and stormwater systems that have experienced deterioration, recurring failures, and increased maintenance demands. The project is intended to improve system reliability, reduce the risk of leaks and service interruptions, and ensure continued operation of essential building services.

The primary scope includes replacement of deteriorated vertical riser piping serving domestic water and sanitary waste systems, removal and replacement of sanitary piping in areas affected by chronic leaks and blockages, and modernization of the domestic water distribution network to improve water quality and pressure consistency throughout the facility. Additional work includes replacement of failed or deteriorating stormwater sump pumps and sewage ejector pumps serving below-grade areas to restore reliable drainage and wastewater conveyance. Supporting construction activities include necessary demolition to access concealed infrastructure, installation of code-compliant supports and seismic bracing, pressure testing of new piping systems, disinfection of potable water lines, and restoration of all affected architectural finishes. All work will be carefully coordinated with ongoing building operations to minimize disruption while delivering a more resilient and reliable plumbing infrastructure.

### Justification

The Kennedy Center's sanitary and domestic piping systems, which have not been updated in 50 years, are aging and deteriorating, resulting in leaks, blockages, and reduced reliability that impact daily operations and sanitation. Replacement and rehabilitation are necessary to ensure consistent service, prevent failures, and maintain safe and hygienic conditions.

### Progress Assessment

The O&M team and building condition assessment reports completed in the past five years have identified areas of problems. Design work to begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $1,950,000 | $0 | $0 | $0 | $1,950,000 |
| Project Management | $672,000 | $0 | $0 | $0 | $672,000 |
| Construction | $26,128,000 | $0 | $0 | $0 | $26,128,000 |
| Equipment | $1,250,000 | $0 | $0 | $0 | $1,250,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$30,000,000** | **$0** | **$0** | **$0** | **$30,000,000** |

## Renewal Subproject: SB03-99-002 - Central Plant Upgrades

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $10,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up

### Justification

The Kennedy Center's central plant systems—including chillers, boilers, and distribution infrastructure—have aged beyond their intended service life due to years of deferred maintenance, reducing reliability and efficiency. Upgrades are necessary to modernize core HVAC systems, improve performance, and prevent system failures, constituting unusual and compelling urgency.

### Progress Assessment

Complete a 60-day feasibility study to provide detailed assessment of the current hydronic system conditions, develop replacement or refurbishment concepts

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $650,000 | $0 | $0 | $0 | $650,000 |
| Project Management | $224,000 | $0 | $0 | $0 | $224,000 |
| Construction | $3,526,000 | $0 | $0 | $0 | $3,526,000 |
| Equipment | $5,600,000 | $0 | $0 | $0 | $5,600,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$10,000,000** | **$0** | **$0** | **$0** | **$10,000,000** |

## Renewal Subproject: SB03-99-003 - Condenser Loop

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $16,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses the deteriorating performance and reliability of the Kennedy Center's condenser water loop, a critical component of the central plant hydronic system that supports building cooling operations. The effort begins with a comprehensive engineering evaluation of existing condenser water piping, pumps, heat rejection equipment, water treatment systems, and associated controls to determine the most effective repair or replacement strategy based on remaining useful life, operational requirements, and long-term facility needs. The assessment will develop rehabilitation and replacement concepts while accounting for site constraints, equipment access limitations, rigging requirements, utility connections, and the need to maintain uninterrupted operation of the central plant.

The project will establish a phased implementation strategy that minimizes disruption to building cooling operations while addressing critical infrastructure deficiencies. Scope includes replacement of failed condenser loop components, installation of new condenser water distribution piping with appropriate insulation and supports, upgrades to condenser water pumps and associated controls, modernization of water treatment and chemical feed systems, and integration with existing or replacement chillers and boilers. Long-lead equipment requirements, including large-diameter piping and pumping equipment, will be identified early to support project scheduling and procurement. Following installation, the system will undergo controls programming, flushing, balancing, testing, and commissioning to optimize performance and ensure reliable operation. Together, these improvements will enhance central plant efficiency, improve system resiliency, and support the long-term reliability of the facility's cooling infrastructure.

### Justification

The Kennedy Center's chillers and boilers—critical HVAC components—have exceeded their service life due to years of deferred maintenance, and the condenser water loop's traveling screen system has been nonfunctional for over eight years. These deficiencies have reduced system reliability and increased routine maintenance costs, necessitating upgrades to restore efficient and dependable operation.

### Progress Assessment

Complete a 60-day feasibility study to provide detailed assessment of the current hydronic system conditions, develop replacement or refurbishment concepts

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $1,040,000 | $0 | $0 | $0 | $1,040,000 |
| Project Management | $358,400 | $0 | $0 | $0 | $358,400 |
| Construction | $13,201,600 | $0 | $0 | $0 | $13,201,600 |
| Equipment | $1,400,000 | $0 | $0 | $0 | $1,400,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$16,000,000** | **$0** | **$0** | **$0** | **$16,000,000** |

## Renewal Subproject: SB03-99-004 - Electrical System Upgrades

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $20,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical electrical infrastructure that has reached the end of its service life and is experiencing increasing reliability concerns that threaten the continuity of essential building operations. Work begins with required hazardous materials abatement and focuses on replacing aging electrical distribution equipment, strengthening system resiliency, and improving emergency power capabilities throughout the campus. Engineering services will include comprehensive load calculations, system coordination studies, code compliance reviews, and phased implementation planning to ensure the upgrades can be completed while maintaining ongoing building operations.

The primary scope includes replacement of aging switchboards, deteriorated main electrical feeders—including existing aluminum conductors—and transformers that no longer meet long-term operational requirements. The project will also upgrade the building grounding system, replace automatic transfer switches, and modernize emergency power infrastructure through replacement of aging generator fuel storage tanks with systems incorporating proper containment and monitoring capabilities. Additional resiliency improvements include installation of a dedicated connection point and automatic transfer switch provisions for temporary roll-up generators to support emergency operations and planned outages. Exterior and garage lighting systems will be upgraded with energy-efficient fixtures and modern controls to improve visibility, safety, security, and operational efficiency. Further enhancements include separation of REACH electrical distribution systems to improve operational flexibility and installation of Lutron processors at each riser to support advanced lighting control and building management functions. All new systems will undergo comprehensive testing and commissioning to ensure reliable integration, optimized performance, and long-term operational sustainability.

### Justification

The Kennedy Center's electrical feeders are aging and have deteriorated due to years of deferred maintenance, increasing the risk of outages and reduced system reliability. Upgrades are necessary to ensure consistent power distribution, support critical operations, and prevent potential failures.

### Progress Assessment

Electrical design work will begin next month.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $1,300,000 | $0 | $0 | $0 | $1,300,000 |
| Project Management | $448,000 | $0 | $0 | $0 | $448,000 |
| Construction | $9,752,000 | $0 | $0 | $0 | $9,752,000 |
| Equipment | $8,500,000 | $0 | $0 | $0 | $8,500,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$20,000,000** | **$0** | **$0** | **$0** | **$20,000,000** |

## Renewal Subproject: SB03-99-005 - River Pump Room

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $1,500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project restores and modernizes the Kennedy Center's river water heat rejection system, a critical component of the central plant cooling infrastructure. The scope focuses on repairing or replacing aging open-loop condenser water systems that rely on river water for heat rejection and have experienced deterioration, reduced reliability, and increasing maintenance demands. These improvements are intended to enhance operational performance, improve system resiliency, and ensure the long-term viability of this unique cooling infrastructure.

The primary scope includes rehabilitation of the river water intake system, including replacement or repair of intake screens, strainers, and debris protection mechanisms designed to protect downstream equipment. Additional work includes replacement or refurbishment of condenser water pumps that convey river water through the plate-and-frame heat exchangers, as well as upgrades to associated piping, valves, and discharge infrastructure. The project will also address environmental compliance requirements by restoring and maintaining conformance with applicable EPA National Pollutant Discharge Elimination System (NPDES) permit requirements. Together, these improvements will improve reliability, reduce operational risk, support central plant efficiency, and ensure continued compliance with environmental regulations.

### Justification

The Center's Potomac River condenser water system has served as the primary heat rejection mechanism for the building's 3,200-ton central HVAC plant since original construction. The system has deteriorated and affects the facility's ability to maintain climate control during critical performance periods. This open-loop system draws raw water from the Potomac River through a specialized intake structure located approximately 40 feet from shore at 20 feet depth, passes it through four 800-ton chillers and plate-and-frame heat exchangers to absorb heat from the building's closed-loop chilled water system, and discharges the heated water back to the river. The intake system components including screens, pumps, piping, and heat exchangers have experienced significant wear from continuous exposure to river sediment, debris, biological growth, and corrosive conditions. Upgrades are necessary to restore system reliability, ensure compliance with environmental discharge regulations.

### Progress Assessment

Complete a 60-day feasibility study to provide detailed assessment of the current hydronic system conditions, develop replacement or refurbishment concepts

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $142,500 | $0 | $0 | $0 | $142,500 |
| Project Management | $33,600 | $0 | $0 | $0 | $33,600 |
| Construction | $1,323,900 | $0 | $0 | $0 | $1,323,900 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,500,000** | **$0** | **$0** | **$0** | **$1,500,000** |

## Renewal Subproject: BA01-99-001 Mobilization Costs

Roll Up

| | |
|---|---|
| **Parent Project #** | BA01-00-000 |
| **Renewable Sub-Project Name** | Mobilization Costs |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | |
| **Useful Life (Years)** | |
| **Estimated Full Funding Cost ($)** | $5,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project provides the enabling services and support infrastructure necessary to facilitate major capital improvements while maintaining safe and efficient building operations throughout construction. The scope includes interior move activities required to temporarily relocate personnel, equipment, furnishings, and operational functions to accommodate phased construction efforts and minimize disruption to ongoing programming and business operations.

Supporting construction activities include installation of site fencing and other temporary controls to secure work areas, protect occupants and visitors, and maintain safe separation between construction zones and public spaces. The project also includes third-party inspection services and independent life-safety plan reviews to verify compliance with applicable codes, standards, and project requirements. In addition, third-party materials testing will be performed throughout construction to validate the quality, performance, and installation of critical building materials and systems. Together, these services provide essential oversight, safety, and logistical support necessary for the successful execution of the broader modernization program.

### Justification

Site mobilization establishes security perimeters, and logistical infrastructure required before construction can commence. These upfront costs include interior and exterior including fencing, signage, traffic control, temporary wayfinding, and temporary facilities—are necessary to protect public safety, maintain operational access to active areas, and comply with security requirements.

### Progress Assessment

Scoping in progress

### Related Projects

Shared across projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $0 | $0 | $0 | $0 | $0 |
| Project Management | $0 | $0 | $0 | $0 | $0 |
| Construction | $5,000,000 | | $0 | $0 | $5,000,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$5,000,000** | **$0** | **$0** | **$0** | **$5,000,000** |

## Renewal Subproject: BA02-99-001— Staffing, Architectural Services and Other Consulting Services

Roll Up

| | |
|---|---|
| Parent Project # | BA02-00-000 |
| Renewable Sub-Project Name | Support Services |
| Location | |
| Facility Name / Identifier | |
| Status | |
| Useful Life (Years) | |
| Estimated Full Funding Cost ($) | $2,000,000 |
| Start FY (for 5-year window) | 2026 |

### Description

For architectural services, staffing and other consulting services.

### Justification

Centers requirements and external expertise.

### Progress Assessment

Scoping in progress

### Related Projects

Shared across projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $0 | $0 | $0 | $0 | $0 |
| Project Management | $0 | $0 | $0 | $0 | $0 |
| Construction | $0 | | $0 | $0 | $0 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $2,000,000 | $0 | $0 | $0 | $2,000,000 |
| TOTAL | $2,000,000 | $0 | $0 | $0 | $2,000,000 |

## Renewal Subproject: BA02-99-002— Document Mgmt. & Life Safety

Roll Up

| | |
|---|---|
| Parent Project # | BA02-00-000 |
| Renewable Sub-Project Name | Support Services |
| Location | |
| Facility Name / Identifier | |
| Status | |
| Useful Life (Years) | |
| Estimated Full Funding Cost ($) | $950,000 |
| Start FY (for 5-year window) | 2026 |

**Description**

For collecting and distributing of cad files for consultants use for duration of the project. Includes temporary programming, building alarm systems, and life safety and low voltage to facilitate construction phasing.

**Justification**

To facilitate life safety protocols.

**Progress Assessment**

Scoping in progress

**Related Projects**

Shared across projects.

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $0 | $0 | $0 | $0 | $0 |
| Project Management | $0 | $0 | $0 | $0 | $0 |
| Construction | $0 | $0 | $0 | $0 | $0 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $950,000 | $0 | $0 | $0 | $950,000 |
| TOTAL | $950,000 | $0 | $0 | $0 | $950,000 |

| Risk Category 1 | Risk Category 2 | Risk Description | Risk Score (H, M, L) | Recommended Controls | Contingency | Owner | Monitoring |
|---|---|---|---|---|---|---|---|
| CLIENT & STAKEHOLDER COMPLEXITY | Governance | Scope change governance for budget/timeline impacts | HIGH | Governance structure and timeline definition with clear change control procedures and approval thresholds | Emergency decision protocols; scope reduction options | Client | Change request tracking; budget variance monitoring |
| CLIENT & STAKEHOLDER COMPLEXITY | Historic Preservation | Misalignment between Client and historic preservation board slowing project advancement or resulting in reallocation of budget | MEDIUM | Client has ultimate decision-making authority but elects to coordinate with historic preservation for input and review. Establish communication at regular intervals. | | Client/JLL | Monthly reporting/Weekly reporting (as needed) |
| CLIENT & STAKEHOLDER COMPLEXITY | Schedule + Decision Speed | Kennedy Center Board decision-making speed | HIGH | Governance structure and timeline definition with clear pre-approved decision frameworks and delegated authority levels | | Client | Decision cycle time tracking; critical path impact assessment |
| CLIENT & STAKEHOLDER COMPLEXITY | Stakeholder | Performer/patron input conflicting with preservation or other requirements | MEDIUM | Center completed patron/performer studies; standard architectural programming process | | Client | Monthly reporting/Weekly reporting (as needed) |
| OPERATIONAL & COORDINATION RISKS | Access | Public access/tourism considerations during renovation | HIGH | Facility shutdown (partial or full) with fencing/access restrictions; Reach area coordination; Public communication; alternative access arrangements | Tourism impact mitigation; community relations management | Client | Public feedback monitoring; access issue tracking |
| SCHEDULE & DELIVERY RISKS | Construction Schedule | Missing July 4, 2028 reopening deadline | HIGH | CM at Risk contract structure to shift risk to contractor; detailed work stream scheduling; Early milestone tracking; float management; alternative completion strategies | Activate liquidated damage provisions against CM at Risk; communicate mitigation efforts publicly | CM/JLL | Weekly schedule reviews; monthly executive dashboards |
| SCHEDULE & DELIVERY RISKS | Authority | Real-time decision authority | MEDIUM | Approval within role boundaries; Delegated authority frameworks | Escalation procedures; post-decision ratification processes; emergency decision protocols | Client/JLL | Decision response time tracking; authority usage monitoring |
| SCHEDULE & DELIVERY RISKS | Changes | Change order impact management with fixed approval deadlines | HIGH | Honest schedule impact communication; option provision protocols; Change impact assessment procedures; scope trade-off matrices | Schedule recovery plans; scope reduction alternatives | Client/JLL | Change order cycle time; schedule impact documentation |
| SCHEDULE & DELIVERY RISKS | Monitoring | Early warning indicators for critical schedule slippage | HIGH | Critical path milestone adherence requirements; consider real-time scheduling systems | Immediate recovery protocols; resource reallocation procedures | JLL | Daily progress tracking; weekly critical path analysis |
| SCHEDULE & DELIVERY RISKS | Timeline | 28-month timeline realism vs. similar historic renovations | HIGH | Straightforward scope assessment; Work prioritization framework; concurrent work optimization; rapid decision-making protocols | Phased completion options | Client/JLL | Decision cycle time tracking; work prioritization progress |
| SCHEDULE & DELIVERY RISKS | Weather | Seasonal construction limitations impacting timeline | LOW | Year 1 exterior work completion strategy; schedule float provision; Weather contingency planning; covered work alternatives | Weather-independent sequencing | Contractor | Weather impact tracking; seasonal progress monitoring |
| TECHNICAL & EXECUTION RISKS | Assessment | Potential inaccuracies of prior assessments | MEDIUM | Facilities team validation; plan to repair/replace aging infrastructure; perform reinvestigations as possible | Enhanced investigation protocols; scope adjustment procedures | JLL | Assessment completion tracking; variance documentation |
| TECHNICAL & EXECUTION RISKS | Budget | Inadequate contingency reserves for 65 year old building unknowns | HIGH | Target 3-5% contingency through scope/schedule definition | Scope reduction protocols; additional funding requests | Client/JLL | Monthly contingency burn rate; scope refinement progress |
| TECHNICAL & EXECUTION RISKS | Building Systems | Critical systems shutdown restrictions | MEDIUM | Temperature/humidity control maintenance plans; utilize temporary HVAC systems and/or phased shutdowns as appropriate. | Emergency system restoration; alternative climate control | Contractor | Environmental monitoring; system performance tracking |
| TECHNICAL & EXECUTION RISKS | Hazmat | Undiscovered hazardous materials beyond existing reports | LOW | Existing HAZmat report available; plan comprehensive hazmat verification and abatement | Enhanced abatement protocols; schedule recovery plans | Contractor | Ongoing environmental monitoring; abatement progress tracking |
| TECHNICAL & EXECUTION RISKS | Security | Construction access restrictions affecting work sequencing | LOW | Security coordination meetings; access protocol development | Alternative access routes; modified work sequences | JLL/ Contractor | Security incident tracking; access efficiency monitoring |

**APPENDIX Q**

Master CIP Summary Sheets

June 22, 2026

Exhibit B: Budget Allocation Matrix 06.22.26

| Parent Project # | Parent Project Description (Renewal Project) | Activity # (Renewal Sub-Project #) | Activity Description (Renewal Sub-Project) | Phase | Budget | Allocation Roll-up: Design | Project Management | Construction | Equipment | Other | Allocation Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Shell & Site Infrastructure** | | | | | | | | | | | |
| SI01-00-000 | Building Envelope & Structural Rehabilitation | SI01-99-001 | Plaza Level Waterproofing, Hardscapes and Garage | A | 24,000,000 | 1,970,000 | 537,600 | 21,492,400 | - | - | 24,000,000 |
| | | SI01-99-002 | Garage Repairs & Subgrade Waterproofing | A | - | - | - | - | - | - | - |
| | | SI01-99-003 | Terrace Level Overhang & Roof | A | 14,000,000 | 280,000 | 313,600 | 12,605,700 | 800,700 | - | 14,000,000 |
| | | | | | 38,000,000 | | | | | | |
| SI02-00-000 | Site Restoration | SI02-99-001 | Site & Landscaping Upgrades | B | 3,500,000 | 245,000 | 78,400 | 3,176,600 | - | - | 3,500,000 |
| | | SI02-99-002 | Fountain Restoration | B | 1,000,000 | 90,000 | 11,200 | 898,800 | - | - | 1,000,000 |
| | | SI02-99-003 | Rock Creek Parkway Stabilization | A | 350,000 | 47,000 | 11,000 | 292,000 | - | - | 350,000 |
| | | | | | 4,850,000 | | | | | | |
| SI03-00-000 | Perimeter & Physical Security Improvements | SI03-99-001 | Vehicle Force Protection | A | 2,500,000 | 225,000 | 56,000 | 2,000,000 | 219,000 | - | 2,500,000 |
| | | SI03-99-003 | Exterior Glass & Door Replacement | A | 2,000,000 | 180,000 | 44,800 | 1,775,200 | - | - | 2,000,000 |
| | | | | | 4,500,000 | | | | | | |
| **Public & Support Spaces** | | | | | | | | | | | |
| BB00-00-001 | Public Space Improvements | BB01-99-001 | Front of House Renewal | B | 20,000,000 | 700,000 | 448,000 | 18,852,000 | - | - | 20,000,000 |
| | | BB01-99-002 | Restroom Renovations | B | 7,000,000 | 630,000 | 156,800 | 6,213,200 | - | - | 7,000,000 |
| | | BB01-99-003 | Wayfinding | B | 2,000,000 | 80,000 | 44,800 | 1,875,200 | - | - | 2,000,000 |
| | | BB01-99-004 | Box Office Relocation | B | 8,000,000 | 760,000 | 179,200 | 6,410,800 | 650,000 | - | 8,000,000 |
| | | | | | 37,000,000 | | | | | | |
| BB02-00-000 | Employee Office Renovations | BB02-99-001 | OPH Block Office Renovation | B | 4,000,000 | 380,000 | 89,600 | 3,230,400 | 300,000 | - | 4,000,000 |
| | | BB02-99-002 | Level A Office Renovation | B | 10,000,000 | 850,000 | 224,000 | 8,166,000 | 760,000 | - | 10,000,000 |
| | | BB02-99-003 | COH Block Office Renovation | B | 2,000,000 | 170,000 | 44,800 | 1,700,200 | 85,000 | - | 2,000,000 |
| | | BB02-99-004 | Terrace Office Renovation | B | 3,000,000 | 255,000 | 67,200 | 2,487,800 | 190,000 | - | 3,000,000 |
| | | | | | 19,000,000 | | | | | | |
| BB03-00-000 | Vertical Transportation Improvements | BB03-99-001 | Elevator Modernization | AB | 10,000,000 | 250,000 | 41,000 | 5,709,000 | 4,000,000 | - | 10,000,000 |
| | | BB03-99-002 | Escalator Capital Repair | B | 1,000,000 | 25,000 | 15,000 | 860,000 | 100,000 | - | 1,000,000 |
| | | | | | 11,000,000 | | | | | | |
| **Safety & Building Systems** | | | | | | | | | | | |
| SB01-00-000 | Fire Alarm & Fire Protection | SB01-99-001 | Extend Fire Protection A Level | A | 250,000 | 12,500 | 8,500 | 229,000 | - | - | 250,000 |
| | | SB01-99-002 | Fire Alarm Phase 2 | | - | - | - | - | - | - | - |
| | | | | | 250,000 | | | | | | |
| SB02-00-000 | Hazardous Material Abatement | SB02-99-001 | Asbestos Abatement | AB | 400,000 | 250,000 | 24,000 | 126,000 | - | - | 400,000 |
| | | | | | 400,000 | | | | | | |
| SB03-00-000 | MEP Improvements | SB03-99-001 | Sanitary & Domestic Piping | AB | 30,000,000 | 1,950,000 | 672,000 | 26,128,000 | 1,250,000 | - | 30,000,000 |
| | | SB03-99-002 | Central Plant Upgrades | AB | 10,000,000 | 650,000 | 224,000 | 3,526,000 | 5,600,000 | - | 10,000,000 |
| | | SB03-99-003 | Condenser Loop | AB | 16,000,000 | 1,040,000 | 358,400 | 13,201,600 | 1,400,000 | - | 16,000,000 |
| | | SB03-99-004 | Electrical System Upgrades | AB | 20,000,000 | 1,300,000 | 448,000 | 9,752,000 | 8,500,000 | - | 20,000,000 |
| | | SB03-99-005 | River Pump Room | B | 1,500,000 | 142,500 | 33,600 | 1,323,900 | - | - | 1,500,000 |
| | | | | | 77,500,000 | | | | | | |
| **Administrative** | | | | | | | | | | | |
| BA01-00-000 | Mobilization Costs | BA01-99-001 | Mobilization Costs | A | 5,000,000 | - | - | 5,000,000 | - | - | 5,000,000 |
| | | | | | 5,000,000 | | | | | | |
| BA02-00-000 | Support Services | BA02-99-001 | Staffing, Architectural Services, misc. | AB | 2,000,000 | - | - | - | - | 2,000,000 | 2,000,000 |
| | | BA02-99-002 | Document Mgmt. & Life Safety | AB | 950,000 | - | - | - | - | 950,000 | 950,000 |
| | | | | | 2,950,000 | | | | | | |
| **Performance Venue Revitalization** | | | | | | | | | | | |
| PV01-00-000 | Concert Hall Restoration | PV01-99-001 | Front of House | B | 10,000,000 | 900,000 | 224,000 | 8,426,000 | 450,000 | - | 10,000,000 |
| | | PV01-99-002 | Back of House | B | 1,500,000 | 135,000 | 33,600 | 1,331,400 | - | - | 1,500,000 |
| | | PV01-99-003 | Production Infrastructure | AB | 1,200,000 | 96,000 | 26,880 | 1,077,120 | - | - | 1,200,000 |
| | | PV01-99-004 | Acoustics | AB | 12,000,000 | 960,000 | 89,600 | 10,200,400 | 750,000 | - | 12,000,000 |
| | | | | | 24,700,000 | | | | | | |
| PV02-00-000 | Opera House Restoration | PV02-99-001 | Front of House | B | 6,000,000 | 480,000 | 134,400 | 4,785,600 | 600,000 | - | 6,000,000 |
| | | PV02-99-002 | Back of House | B | 2,000,000 | 220,000 | 44,800 | 1,735,200 | - | - | 2,000,000 |
| | | PV02-99-003 | Production Infrastructure | B | 2,000,000 | 220,000 | 44,800 | 135,200 | 1,600,000 | - | 2,000,000 |
| | | | | | 10,000,000 | | | | | | |
| PV03-00-000 | Eisenhower Theater Restoration | PV03-99-001 | Front of House | B | 4,000,000 | 320,000 | 89,600 | 3,470,400 | 120,000 | - | 4,000,000 |
| | | PV03-99-002 | Back of House | B | 2,000,000 | 180,000 | 44,800 | 1,775,200 | - | - | 2,000,000 |
| | | PV03-99-003 | Production Infrastructure | B | 1,000,000 | 90,000 | 22,400 | 87,600 | 800,000 | - | 1,000,000 |

Exhibit B: Budget Allocation Matrix 06.22.26

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | $ 7,000,000 | | | | | | |
| PV04-00-000 | Family Theater Restoration | PV04-99-001 | Front of House | B | $ 2,000,000 | $ 160,000 | $ 44,800 | $ 1,795,200 | $ - | $ - | $ 2,000,000 |
| | | PV04-99-002 | Back of House | B | $ 500,000 | $ 45,000 | $ 11,200 | $ 443,800 | $ - | $ - | $ 500,000 |
| | | PV04-99-003 | Production Infrastructure | B | $ 500,000 | $ 45,000 | $ 11,200 | $ 143,000 | $ 300,800 | $ - | $ 500,000 |
| | | | | | $ 3,000,000 | | | | | | |
| PV05-00-000 | Terrace Theater Restoration | PV05-99-001 | Front of House | B | $ 500,000 | $ 40,000 | $ 11,200 | $ 448,800 | $ - | $ - | $ 500,000 |
| | | PV05-99-002 | Back of House | B | $ 1,000,000 | $ 90,000 | $ 22,400 | $ 887,600 | $ - | $ - | $ 1,000,000 |
| | | PV05-99-003 | Production Infrastructure | B | $ 500,000 | $ 40,000 | $ 11,200 | $ 112,000 | $ 336,800 | $ - | $ 500,000 |
| | | | | | $ 2,000,000 | | | | | | |
| PV06-00-000 | Theater Lab Restoration | PV06-99-001 | Front of House | B | $ 250,000 | $ 22,500 | $ 11,000 | $ 216,500 | $ - | $ - | $ 250,000 |
| | | PV06-99-002 | Back of House | B | $ 1,000,000 | $ 85,000 | $ 22,400 | $ 892,600 | $ - | $ - | $ 1,000,000 |
| | | PV06-99-003 | Production Infrastructure | B | $ 500,000 | $ 40,000 | $ 11,200 | $ 448,800 | $ - | $ - | $ 500,000 |
| | | | | | $ 1,750,000 | | | | | | |
| | | | | Totals | $ 248,900,000 | $ 16,650,500 | $ 5,042,980 | $ 195,444,220 | $ 28,812,300 | $ 2,950,000 | $ 248,900,000 |

## Renewal Subproject: SI01-99-001 — Plaza Level Waterproofing, Hardscapes and Garage Repairs

Roll Up

| | |
|---|---|
| **Parent Project #** | SI01-00-000 |
| **Renewable Sub-Project Name** | Plaza Level Waterproofing, Hardscapes & Garage Repairs |
| **Location** | Campus Wide |
| **Facility Name / Identifier** | NA |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $24,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project establishes site control, logistics, and urgent structural remediation. Initial mobilization includes safety fencing and gates, traffic control coordination, temporary bus stop relocation, and wayfinding signage for parking garage, President memorial, and REACH access. Early work encompasses hazardous material abatement and demolition of existing North and South plaza planters while maintaining pedestrian ramps.

Primary scope addresses comprehensive parking garage structural repairs and waterproofing across Levels A, B, and C, including concrete delamination, spalling, exposed reinforcing steel remediation, structural infill repairs at podium locations, and targeted exterior column investigation and repair. Critical waterproofing work includes expansion joint replacement across South and North stairs, River Terrace, and East Plaza, plus below-grade waterproofing along the service tunnel east wall and electrical vaults to halt ongoing water infiltration.

This project also delivers exterior envelope restoration, site utility upgrades, and waterproofing across plazas and perimeter walkways. Work includes selective demolition, hazardous material abatement, and complete replacement of plaza pavers, waterproofing membranes, and expansion joints. Hardscape improvements encompass North and South plaza step reconstruction, ADA-compliant ramp replacement, and localized asphalt repaving. Civil infrastructure upgrades include new curbs, storm drain bodies, and trench drains.

Programming infrastructure includes integrated electrical and data systems across plazas, exterior emergency lighting, and North Plaza roll-up generator access. Preservation scope features structural column repairs, marble restoration at Rock Creek Parkway overhang, stained marble base course replacement/restoration, and comprehensive façade cleaning and repointing with mock-up test areas. Planter remediation includes West Plaza waterproofing replacement, revised East Plaza planter beds, and new tree planters with trees along North and South plazas. REACH scope addresses waterproofing and roofing assessment, Skylight Pavilion data infrastructure resolution, and water leak and ceiling repairs at Welcome Center and Pavilion.

### Justification

Critical failure of existing planter waterproofing membranes and expansion joints has caused cascading structural and operational damage. Water intrusion through compromised membranes has created extensive deterioration in below-grade parking structures, loading docks, and service tunnels. The waterproofing failure contributed to the loss of three-quarters of perimeter trees, eliminating landscape elements that define the building's iconic setting. More critically, ongoing water infiltration is compromising structural integrity in subgrade areas and creating erosion risks along adjacent roadways, potentially affecting public safety beyond the Center's property boundaries. Immediate intervention is essential to arrest active structural degradation. Emergency work includes complete removal of compromised trees and saturated soil, full replacement of failed waterproofing systems, and embankment stabilization to prevent further erosion. Delaying these repairs would expand the scope of required structural remediation.

### Progress Assessment

The project is currently in the pre-planning phase.

### Related Projects

1B20001 - Landscaping; 1B10002 - Garage Repairs; 1B10003 - Terrace Overhang; 1B20002 - Fountains

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $1,970,000 | $0 | $0 | $0 | $1,970,000 |
| Project Management | $537,600 | $0 | $0 | $0 | $537,600 |
| Construction | $21,492,400 | $0 | $0 | $0 | $21,492,400 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$24,000,000** | **$0** | **$0** | **$0** | **$24,000,000** |

## Renewal Subproject: SI01-99-002 Garage Repairs & Subgrade Waterproofing

Roll Up

| | |
|---|---|
| **Parent Project #** | SI01-00-000 |
| **Renewable Sub-Project Name** | Building Envelope & Structural Rehabilitation |
| **Location** | Parking Garage |
| **Facility Name / Identifier** | NA |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $0 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project establishes core site control, logistics, and urgent structural remediation ahead of site excavation for subgrade waterproofing repairs. Initial mobilization focuses on site security and public safety, including the installation of safety fence and gates, traffic control coordination, a temporary bus stop relocation, and the placement of temporary project and wayfinding signage for the parking garage, Memorial, and REACH access. Early civil scope includes hazardous material abatement and the demolition of existing planters at the North and South plazas, while existing pedestrian ramps are sequenced to remain initially.

The primary technical focus centers on comprehensive parking garage structural repairs and waterproofing. Concrete remediation addresses pervasive deficiencies across Garage Levels A, B, and C, specifically targeting surface delamination, spalling concrete, exposed reinforcing steel, and structural infill repairs at various podium locations, alongside a targeted investigation and repair protocol for exterior columns. To halt ongoing water infiltration, expansive expansion joint waterproofing will be executed across the South and North stairs, River Terrace, and East Plaza. Additionally, critical below-grade waterproofing will be applied along the east wall of the service tunnel and vital electrical vaults.

### Justification

The parking garage is in immediate need of structural remediation and extensive waterproofing to correct vulnerabilities stemming from years of deferred maintenance. Delaying the execution of this contract would allow active water intrusion to continue unabated, driving further structural degradation across the building envelope and ultimately compromising safety parameters for both operating staff and the public.

### Progress Assessment

Design drawings for this sub-project are fully finalized, and the Request for Proposal (RFP) for construction is on schedule to be issued by early June 2026. In strict alignment with data-driven engineering recommendations from prior comprehensive building assessments, this specific scope has been prioritized for immediate procurement and execution to secure the facility's foundational integrity.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $0 | $0 | $0 | $0 | $0 |
| Project Management | $0 | $0 | $0 | $0 | $0 |
| Construction | $0 | $0 | $0 | $0 | $0 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | $0 | $0 | $0 | $0 | $0 |

## Renewal Subproject: SI01-99-003 Terrace Level Overhang & Roof

Roll Up

| | |
|---|---|
| **Parent Project #** | SI01-00-000 |
| **Renewable Sub-Project Name** | Building Envelope & Structural Rehabilitation |
| **Location** | Roof Terrace - Level 109 |
| **Facility Name / Identifier** | NA |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $14,000,000.00 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical structural, life-safety, and building envelope deficiencies associated with the Level 135 Penthouse Roof and Level 109 Terrace Overhang structure. Work begins with a comprehensive condition assessment to evaluate the current state of the roof, soffit, and support assemblies, including an investigation to validate permanent means and methods for re-supporting existing lath-and-stucco soffit panels whose connections have deteriorated and are actively failing. Required hazardous materials abatement will be completed, followed by repairs to existing soffit panels and support systems to stabilize conditions and ensure public safety. Additional scope includes installation of a new panel hanger support system, replacement of exterior soffit lighting, and remediation of existing lighting and convenience power systems located within interstitial spaces.

The project also focuses on improving long-term durability, maintainability, and performance of the terrace overhang infrastructure. The terrace overhang membrane roof will be replaced, while existing roof drains, scuppers, waterproofing systems, irrigation infrastructure, and planter electrical components will be repaired or replaced to address water intrusion and deferred maintenance concerns. The necessity of an air barrier between the soffit interstitial space and the building plenum will be evaluated to improve building performance and mitigate condensation. To support future operations and maintenance, new access platforms and fall-protection tie-off systems will be installed. The project concludes with installation of new exterior RGBW architectural lighting and comprehensive site cleanup.

### Justification

Immediate repairs to the terrace level overhang and roof are required due to deferred maintenance, as deterioration poses risks of falling debris, water intrusion, and structural hazards in high traffic areas.

### Progress Assessment

Investigation scope is underway. Design Packages: WP Moore, and MEP will coordinate Addendum or CCD following investigation scope.
Construction packages: GC to price existing 100% WPM package and other scope identified in the investigation.
Work to be completed by GC under the Omnia contract.

### Related Projects

1B10001 - Plaza Level Waterproofing & Hardscapes

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $280,000 | $0 | $0 | $0 | $280,000 |
| Project Management | $313,600 | $0 | $0 | $0 | $313,600 |
| Construction | $12,605,700 | $0 | $0 | $0 | $12,605,700 |
| Equipment | $800,700 | $0 | $0 | $0 | $800,700 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$14,000,000** | **$0** | **$0** | **$0** | **$14,000,000** |

## Renewal Subproject: SI02-99-001 - Sight & Landscaping Upgrades

Roll Up

| | |
|---|---|
| **Parent Project #** | SI02-00-000 |
| **Renewable Sub-Project Name** | Site Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $3,500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses landscape restoration, site infrastructure renewal, and deferred maintenance across the campus's exterior public spaces. Work focuses on repairing and refurbishing landscaping and irrigation systems in areas impacted by previous construction activities, aging infrastructure, or ongoing deterioration. The project will restore the visual quality, functionality, and long-term sustainability of key exterior environments while improving the overall patron experience.

The primary scope includes replacement landscaping within Plaza Level planters, installation of new trees to replace aging weeping willows at the West, South, and North Plazas, and targeted repairs to irrigation systems supporting these areas. Additional work includes landscape restoration throughout the REACH campus, as well as electrical and conduit repairs within Ginkgo Plaza to address deteriorated site utilities and support continued operations. Together, these improvements will enhance the appearance, resilience, and performance of the Center's exterior grounds and public gathering spaces.

### Justification

More than three-quarters of the trees along the building's immediate perimeter are dead or severely damaged due to failing planter waterproofing, which is also contributing to water intrusion in subgrade areas. The trees and soil must be removed, planters re-waterproofed, and adjacent embankments stabilized to address ongoing erosion along nearby roadways.

### Progress Assessment

Scope has been identified. Landscape work will follow the hardscape site restoration project

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $245,000 | $0 | $0 | $0 | $245,000 |
| Project Management | $78,400 | $0 | $0 | $0 | $78,400 |
| Construction | $3,176,600 | $0 | $0 | $0 | $3,176,600 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $3,500,000 | $0 | $0 | $0 | $3,500,000 |

## Renewal Subproject: SI02-99-002 - Fountain Restoration

Roll Up

| | |
|---|---|
| **Parent Project #** | SI02-00-000 |
| **Renewable Sub-Project Name** | Site Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical repairs and modernization of the Center's exterior water features and supporting infrastructure. Work focuses on restoring the functionality, reliability, and appearance of existing fountain systems through targeted repairs to waterproofing assemblies, drainage infrastructure, and associated lighting systems. All fountain improvements will be completed within the existing fountain footprints to minimize site impacts while preserving the established design intent of the surrounding plazas.

The primary scope includes construction of a new feature fountain at the East Plaza, along with upgrades to fountain lighting and control systems across the campus. New controls will provide programmable and centralized operation capabilities, allowing greater flexibility for event programming, seasonal displays, and operational efficiency. These improvements will enhance the visitor experience while reducing maintenance needs and improving long-term system performance.

### Justification

The Kennedy Center's fountain systems have deteriorated due to age and deferred maintenance, leading to operational failures and inefficiencies. Full restoration is needed to rehabilitate mechanical and structural components and return the fountains to reliable, intended use.

### Progress Assessment

Scope of work identified. Fountain design will begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $90,000 | $0 | $0 | $0 | $90,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $898,800 | $0 | $0 | $0 | $898,800 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,000,000** | **$0** | **$0** | **$0** | **$1,000,000** |

## Renewal Subproject: SI02-99-003 - Rock Creek Parkway Stabilization

Roll Up

| | |
|---|---|
| **Parent Project #** | SI02-00-000 |
| **Renewable Sub-Project Name** | Site Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $350,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical site infrastructure, safety, and accessibility improvements along the Rock Creek Parkway and REACH campus perimeter. Work includes construction of a new retaining wall to stabilize the landscape edge, protect adjacent infrastructure, and address long-term erosion and structural concerns. Additional scope includes repairs to existing site lighting systems to improve reliability, visibility, and public safety throughout the affected areas.

The project also includes the extension of the existing handrail at the REACH Overlook Patio to enhance pedestrian safety and accessibility while maintaining consistency with the existing architectural character and materials. Together, these improvements will strengthen site resiliency, improve visitor safety, and support the long-term functionality of the Kennedy Center's exterior public spaces.

### Justification

The Kennedy Center requires immediate repairs to the Rock Creek Parkway overhang due to deferred maintenance, as deterioration poses risks of falling debris, water intrusion, and structural hazards over in high vehicle traffic areas.

### Progress Assessment

Scope of work identified. Design will begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $47,000 | $0 | $0 | $0 | $47,000 |
| Project Management | $11,000 | $0 | $0 | $0 | $11,000 |
| Construction | $292,000 | $0 | $0 | $0 | $292,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $350,000 | $0 | $0 | $0 | $350,000 |

## Renewal Subproject: SI03-99-001 - Vehicle Force Protection

Roll Up

| | |
|---|---|
| **Parent Project #** | SI03-00-000 |
| **Renewable Sub-Project Name** | Perimeter & Physical Security Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $2,500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project enhances campus security and vehicle mitigation measures in accordance with guidance from the federal law enforcements entities and security consultants. The work focuses on strengthening protection at key public access points through the installation of both permanent and temporary anti-ram barriers at plaza entrances, event access locations, and guard station approaches. These improvements are intended to reduce vulnerability to vehicle-borne threats while maintaining operational flexibility for public events, VIP arrivals, and day-to-day campus activities.

The primary scope includes the deployment of strategically located bollard systems and other protective measures designed to secure critical pedestrian and operational areas without significantly impacting visitor circulation. In addition, the project establishes a new guard station along 25th Street to improve access control, security operations, and monitoring capabilities at a key campus entry point. Together, these improvements will strengthen perimeter security, support evolving threat mitigation requirements, and enhance the overall safety of visitors, staff, and special event operations.

### Justification

Vehicle Force Protection measures serve as the building's first line of defense against real-world threats, and years of underinvestment and deferred maintenance have increased risk to staff and the public. Increased vehicle deployment is required to strengthen perimeter security, deter potential threats, and enhance overall safety, constituting unusual and compelling urgency.

### Progress Assessment

Scope of work identified. Design will begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $225,000 | $0 | $0 | $0 | $225,000 |
| Project Management | $56,000 | $0 | $0 | $0 | $56,000 |
| Construction | $2,000,000 | $0 | $0 | $0 | $2,000,000 |
| Equipment | $219,000 | $0 | $0 | $0 | $219,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $2,500,000 | $0 | $0 | $0 | $2,500,000 |

## Renewal Subproject: SI03-99-003 - Exterior Glass & Door Replacement

Roll Up

| | |
|---|---|
| **Parent Project #** | SI03-00-000 |
| **Renewable Sub-Project Name** | Perimeter & Physical Security Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical building entrances and exterior envelope components to improve accessibility, security, operational control, and long-term maintainability. The work includes replacement of existing motor lobby doors at the A, B, and C levels, all sliding automatic doors on the Plaza and Terrace Levels, as well as repair or replacement of historic bronze doors at the Plaza and Terrace Levels to meet current ADA and security requirements while preserving the architectural character of the facility. Consistent with operational preferences, existing sliding doors will be evaluated for replacement with ADA-accessible automatic swing doors utilizing touchless wave-to-open technology in lieu of traditional push-button activation.

The project also enhances campus-wide security integration by providing electronic locking capabilities that allow the Security Operations Center to simultaneously secure all designated doors during emergency or special event operations. Door position sensors will be installed throughout the system to improve monitoring and situational awareness. Additional scope includes repair of Plaza Level stage access doors and installation of position sensors, repair of damaged glass mirrors within the Grand Foyer, replacement of failed insulated curtain wall glass units to match existing conditions, and resolution of identified glazing issues at the River Pavilion. All entrance modifications will be coordinated with security infrastructure upgrades, including permanent and temporary magnetometer locations, to ensure a seamless integration of access control, screening, and visitor circulation requirements.

### Justification

Exterior glass and door systems along the perimeter are outdated and vulnerable, with sliding doors frequently malfunctioning and failing, limiting their effectiveness for both security and controlled access. Replacing these elements with reinforced, security-rated materials will strengthen the building envelope, improve access control integration, and enhance overall perimeter security and deterrence.

### Progress Assessment

Scope of work identified. Design will begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $180,000 | $0 | $0 | $0 | $180,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,775,200 | $0 | $0 | $0 | $1,775,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: BB01-99-001 - Front of House Renewal

Roll Up

| | |
|---|---|
| **Parent Project #** | BB00-00-001 |
| **Renewable Sub-Project Name** | Public Space Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $20,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project delivers a comprehensive modernization of the Front-of-House public spaces, enhancing the visitor experience while preserving the Center's architectural character, cultural assets, and historic significance. Work includes the conservation, cataloging, and archival preservation of fine art, sculptures, gifts of state, banners, and flags, ensuring these collections are protected and appropriately displayed for future generations. The project also includes the relocation of the JFK Memorial to the REACH campus, creating new opportunities for visitor engagement and interpretation. Interior finishes throughout public areas will be renewed through replacement of carpeting, wallcoverings, draperies, wood flooring, and furnishings, while marble walls, flooring, bases, and elevator surrounds will be restored or upgraded to reinforce the iconic aesthetic of the facility.

The technical scope focuses on modernizing infrastructure and supporting evolving guest amenities. New utility infrastructure, including data, power, and conduit systems, will be installed to support production requirements and future technology needs. Infrastructure for expanded food and beverage operations will also be provided under this project. Additional improvements include repairs to Hall of Nations ceilings impacted by prior condensation and ductwork issues, construction of a new gift shop within the Hall of Nations, and replacement of Grand Foyer drapery motors and controls to improve operational flexibility and reliability. Together, these enhancements will preserve the Center's legacy while modernizing its public spaces to meet contemporary expectations for accessibility, hospitality, programming, and visitor experience.

### Justification

Decades of deferred maintenance and evolving operational requirements necessitate modernization of Front-of-House public spaces where current conditions compromise the visitor experience. Conservation work is essential to protect irreplaceable cultural assets from continued deterioration caused by inadequate environmental controls and outdated display methods that threaten long-term preservation of gifts of state and fine art collections. Interior finishes have reached the end of their serviceable life after years of intensive public use, with visible wear. Obsolete infrastructure cannot support contemporary programming demands, limiting the Center's ability to deliver hospitality standards expected by modern audiences and restricting technical capabilities required for evolving performance requirements.

### Progress Assessment

Scope of work identified. Design will begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $700,000 | $0 | $0 | $0 | $700,000 |
| Project Management | $448,000 | $0 | $0 | $0 | $448,000 |
| Construction | $18,852,000 | $0 | $0 | $0 | $18,852,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $20,000,000 | $0 | $0 | $0 | $20,000,000 |

## Renewal Subproject: BB01-99-002 - Restroom Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB00-00-001 |
| **Renewable Sub-Project Name** | Public Space Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $7,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical public amenities while addressing aging building infrastructure throughout the facility. The primary focus is the renovation of public restrooms on the Plaza Level and Motor Lobbies on Levels A, B and C to improve accessibility, functionality, and guest experience. Restroom upgrades will bring facilities into compliance with current ADA standards. Renovations will include updated finishes, fixtures, layouts, and building systems designed to better accommodate current visitor needs and operational requirements.

Supporting these improvements is a comprehensive infrastructure renewal effort focused on replacement of aging sanitary and domestic water piping systems. This work will address deferred maintenance concerns, improve system reliability, reduce the risk of service interruptions, and ensure the long-term performance of critical building utilities. Together, these improvements will enhance accessibility, modernize visitor amenities, and strengthen the resilience of essential building infrastructure.

### Justification

The Kennedy Center's public restrooms, which serve the majority of visitors, have not been upgraded in decades and no longer meet modern standards for functionality, hygiene, or accessibility. As a fundamental yet often overlooked component of a healthy and equitable visitor experience, these facilities require modernization to adequately support the public.

### Progress Assessment

Further scope development, piping condition assessment and code compliance analysis required

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $630,000 | $0 | $0 | $0 | $630,000 |
| Project Management | $156,800 | $0 | $0 | $0 | $156,800 |
| Construction | $6,213,200 | $0 | $0 | $0 | $6,213,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | $7,000,000 | $0 | $0 | $0 | $7,000,000 |

## Renewal Subproject: BB01-99-003 - Wayfinding

Roll Up

| | |
|---|---|
| **Parent Project #** | BB00-00-001 |
| **Renewable Sub-Project Name** | Public Space Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes and unifies the Kennedy Center's wayfinding and guest information systems to improve visitor navigation, accessibility, and overall arrival experience. The scope includes the design and installation of a comprehensive wayfinding program consisting of both static and electronic signage throughout the campus. The new system will establish a clear and consistent visual identity while improving directional guidance for patrons, visitors, performers, and event attendees.

The wayfinding program will encompass the full visitor journey, beginning at Juárez Circle and extending through major arrival points, circulation paths, public spaces, and theater entrances. Signage improvements will enhance orientation, reduce visitor confusion, support special event operations, and provide greater flexibility for programming through the use of electronic displays. Together, these upgrades will create a more intuitive, welcoming, and efficient guest experience while supporting the long-term operational needs of the Kennedy Center.

### Justification

The Kennedy Center's size and complexity make navigation difficult for visitors and staff, yet its signage and wayfinding systems have not been significantly updated since the early 1990s. Upgrading these systems is urgently needed to provide clear, accessible, and universally understandable navigation, meeting the standard for unusual and compelling urgency.

### Progress Assessment

Design assessment complete by RSM. Architect to complete design for fabrication and installation.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $80,000 | $0 | $0 | $0 | $80,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,875,200 | $0 | $0 | $0 | $1,875,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: BB01-99-004 - Box Office Relocation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB00-00-001 |
| **Renewable Sub-Project Name** | Public Space Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $8,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project transforms the Level A Motor Lobby into modernized public-facing space while addressing deferred maintenance, accessibility improvements, and evolving visitor service needs. Additional architectural upgrades include restoration and enhancement of wall finishes, terrazzo floor repairs, and refurbishment of historic brass handrails at public stairways, preserving the character of the facility while improving appearance and durability.

The project also supports new visitor amenities and operational enhancements through the relocation of the Box Office to the A Level, including installation of supporting electronic ticketing kiosk infrastructure. New food and beverage amenities will be constructed at the A Level to expand offerings and elevate centralized patron services. To support future programming and activation of public spaces, the project includes installation of upgraded lighting, sound, information technology, and production infrastructure within new public venue areas. Together, these improvements will modernize the arrival experience, expand guest amenities, and provide flexible infrastructure to support a broader range of public programming and events.

### Justification

The current Box Office location no longer supports efficient operations or visitor flow, creating congestion and limiting accessibility. Relocating the Box Office will improve customer experience, streamline ticketing operations, and enhance overall circulation within the building.

### Progress Assessment

Further programming and development will begin this quarter, piping condition assessment and code compliance analysis required

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $760,000 | $0 | $0 | $0 | $760,000 |
| Project Management | $179,200 | $0 | $0 | $0 | $179,200 |
| Construction | $6,410,800 | $0 | $0 | $0 | $6,410,800 |
| Equipment | $650,000 | $0 | $0 | $0 | $650,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$8,000,000** | **$0** | **$0** | **$0** | **$8,000,000** |

## Renewal Subproject: BB02-99-001- OPH Block Office Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB02-00-000 |
| **Renewable Sub-Project Name** | Employee Office Renovations |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $4,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project provides a comprehensive refresh of existing office and support spaces to improve functionality, workplace quality, and code compliance while minimizing disruption to existing building infrastructure. Work includes new paint throughout, replacement of aging carpet and other flooring finishes, installation of energy-efficient lighting fixtures utilizing existing electrical infrastructure, and replacement of dated ceiling tiles and window treatments. Minor millwork and casework repairs will be completed as needed to restore the appearance and usability of workspaces while maintaining the existing architectural character of the facility.

The scope is intentionally focused on modernization within the existing footprint, preserving current demising walls, office layouts, and circulation patterns while incorporating targeted upgrades necessary to meet current ADA accessibility and life-safety egress requirements. Door hardware will be replaced where required to support accessibility or security objectives. Building systems improvements include repairs to sprinkler infrastructure, upgrades to HVAC distribution systems, and replacement of variable air volume (VAV) units where necessary to improve occupant comfort and system performance. Electrical panels and data cabling pathways will remain largely unchanged, with modifications limited to necessary repairs and enhancements required to support new operational or programming needs. Together, these improvements will extend the useful life of existing office environments while providing a more efficient, comfortable, and code-compliant workplace.

### Justification

The Opera House Block Offices have not undergone significant renovations in decades and no longer adequately support the operational needs of staff. Improvements to these workspaces are necessary to modernize aging infrastructure, address long-standing maintenance and functionality issues, and provide employees with professional, efficient, and collaborative environments that support daily operations.

### Progress Assessment

Programming and design to begin this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $380,000 | $0 | $0 | $0 | $380,000 |
| Project Management | $89,600 | $0 | $0 | $0 | $89,600 |
| Construction | $3,230,400 | $0 | $0 | $0 | $3,230,400 |
| Equipment | $300,000 | $0 | $0 | $0 | $300,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $4,000,000 | $0 | $0 | $0 | $4,000,000 |

## Renewal Subproject: BB02-99-002 - Level A Office Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB02-00-000 |
| **Renewable Sub-Project Name** | Employee Office Renovations |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $10,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes existing office and support spaces through targeted architectural, mechanical, and life-safety improvements while preserving the current layout and operational functionality of the facility. Work begins with required hazardous materials abatement and includes a comprehensive interior refresh consisting of new paint, replacement of aging carpet and other flooring finishes, installation of energy-efficient lighting fixtures utilizing existing electrical infrastructure, and replacement of dated ceiling tiles and window treatments. Minor millwork and casework repairs will also be completed to improve the appearance, durability, and functionality of workspaces.

The scope is focused on extending the useful life of existing facilities while maintaining current demising walls, office configurations, and circulation patterns. Improvements will incorporate updates necessary to meet current ADA accessibility and egress requirements, including replacement of door hardware where needed to support accessibility or security objectives. Building systems work includes repairs to sprinkler infrastructure, upgrades to HVAC distribution systems, and replacement of variable air volume (VAV) units where required to improve performance and occupant comfort. Electrical panels and data cabling pathways will remain largely intact, with modifications limited to necessary repairs and enhancements required to support operational needs and future programming requirements. Together, these improvements will provide a more efficient, comfortable, and code-compliant workplace while minimizing construction impacts and infrastructure replacement costs.

### Justification

The Level A Offices have not undergone significant renovations in decades and no longer adequately support the operational needs of staff. Improvements to these workspaces are necessary to modernize aging infrastructure, address long-standing maintenance and functionality issues, and provide employees with professional, efficient, and collaborative environments that support daily operations.

### Progress Assessment

Programming and design to begin this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $850,000 | $0 | $0 | $0 | $850,000 |
| Project Management | $224,000 | $0 | $0 | $0 | $224,000 |
| Construction | $8,166,000 | $0 | $0 | $0 | $8,166,000 |
| Equipment | $760,000 | $0 | $0 | $0 | $760,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $10,000,000 | $0 | $0 | $0 | $10,000,000 |

## Renewal Subproject: BB02-99-003 - COH Block Office Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB02-00-000 |
| **Renewable Sub-Project Name** | Employee Office Renovations |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes existing office and support spaces through targeted architectural, mechanical, electrical, and life-safety improvements while preserving the current layout and operational functionality of the facility. Work begins with required hazardous materials abatement and includes a comprehensive interior refresh consisting of new paint, replacement of aging carpet and other flooring finishes, installation of energy-efficient lighting fixtures utilizing existing electrical infrastructure, and replacement of dated ceiling tiles and window treatments. Minor millwork and casework repairs will also be completed to improve the appearance, durability, and functionality of workspaces.

The scope is focused on extending the useful life of existing facilities while maintaining current demising walls, office configurations, and circulation patterns. Improvements will incorporate updates necessary to meet current ADA accessibility and egress requirements, including replacement of door hardware where required to support accessibility or security objectives. Building systems work includes repairs to sprinkler infrastructure, upgrades to HVAC distribution systems, replacement of variable air volume (VAV) units where needed, and replacement of the ESB-5-S electrical switchboard to improve system reliability and support future operational needs. Electrical panels and data cabling pathways will otherwise remain largely intact, with modifications limited to necessary repairs and enhancements required to support evolving programming requirements. Together, these improvements will provide a more efficient, comfortable, resilient, and code-compliant workplace while minimizing disruption to existing operations.

### Justification

The Concert Hall Block Offices have not undergone significant renovations in decades and no longer adequately support the operational needs of staff. Improvements to these workspaces are necessary to modernize aging infrastructure, address long-standing maintenance and functionality issues, and provide employees with professional, efficient, and collaborative environments that support daily operations.

### Progress Assessment

Programming and design to begin this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $170,000 | $0 | $0 | $0 | $170,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,700,200 | $0 | $0 | $0 | $1,700,200 |
| Equipment | $85,000 | $0 | $0 | $0 | $85,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $2,000,000 | $0 | $0 | $0 | $2,000,000 |

## Renewal Subproject: BB02-99-004 - Terrace Office Renovation

Roll Up

| | |
|---|---|
| **Parent Project #** | BB02-00-000 |
| **Renewable Sub-Project Name** | Employee Office Renovations |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $3,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes existing office and support spaces through targeted architectural, mechanical, and life-safety improvements while preserving the current layout and operational functionality of the facility. Work begins with required hazardous materials abatement and includes a comprehensive interior refresh consisting of new paint, replacement of aging carpet and other flooring finishes, installation of energy-efficient lighting fixtures utilizing existing electrical infrastructure, and replacement of dated ceiling tiles and window treatments. Minor millwork and casework repairs will also be completed to improve the appearance, functionality, and longevity of the workspace environment.

The scope is focused on extending the useful life of existing facilities while maintaining current demising walls, office configurations, and circulation patterns. Improvements will incorporate updates necessary to meet current ADA accessibility and egress requirements, including replacement of door hardware where needed to support accessibility or security objectives. Building systems work includes repairs to sprinkler infrastructure, upgrades to HVAC distribution systems, and replacement of variable air volume (VAV) units where necessary to improve occupant comfort and operational efficiency. Electrical panels and data cabling pathways will remain largely unchanged, with modifications limited to necessary repairs and enhancements required to support evolving operational and programming needs. Together, these improvements will provide a more efficient, comfortable, and code-compliant workplace while minimizing construction impacts and preserving existing infrastructure investments.

### Justification

The Terrace Offices have not undergone significant renovations in decades and no longer adequately support the operational needs of staff. Improvements to these workspaces are necessary to modernize aging infrastructure, address long-standing maintenance and functionality issues, and provide employees with professional, efficient, and collaborative environments that support daily operations.

### Progress Assessment

Programming and design to begin this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $255,000 | $0 | $0 | $0 | $255,000 |
| Project Management | $67,200 | $0 | $0 | $0 | $67,200 |
| Construction | $2,487,800 | $0 | $0 | $0 | $2,487,800 |
| Equipment | $190,000 | $0 | $0 | $0 | $190,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$3,000,000** | **$0** | **$0** | **$0** | **$3,000,000** |

## Renewal Subproject: BB03-99-001 - Elevator Modernization

Roll Up

| | |
|---|---|
| **Parent Project #** | BB03-00-000 |
| **Renewable Sub-Project Name** | Vertical Transportation Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $10,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical vertical transportation and accessibility infrastructure throughout the Kennedy Center, with priority placed on back-of-house systems that support daily operations, production activities, staff circulation, and accessibility. The scope focuses on modernizing aging freight elevators, lifts, canteen service lifts, the Eisenhower-to-Terrace elevator connection, and wheelchair lift systems that have reached the end of their useful life or are experiencing reliability issues. These improvements are intended to reduce operational disruptions, improve safety, and ensure continued support for production, facilities, and visitor services.

The project also includes targeted upgrades to public-facing vertical transportation systems to enhance the patron experience and improve accessibility. New elevator call stations will be installed at primary patron elevators to modernize controls and improve reliability. Additionally, the Tier 2 lifts within the Concert Hall, which are outdated and prone to frequent malfunctions, will be repaired or replaced to ensure dependable operation and compliance with current accessibility standards. Together, these improvements will strengthen the reliability, efficiency, and long-term sustainability of critical transportation systems across both public and operational areas of the campus.

### Justification

The Kennedy Center operates 32 elevators, many of which lack modern safety features and are critical to daily operations, safety, and patron experience. Systematic modernization is necessary to improve reliability, incorporate advanced diagnostics, and reduce downtime and costly emergency repairs.

### Progress Assessment

Otis has proposed minimum repairs and provided budgets for modernizations. Scope to be further developed this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $250,000 | $0 | $0 | $0 | $250,000 |
| Project Management | $41,000 | $0 | $0 | $0 | $41,000 |
| Construction | $5,709,000 | $0 | $0 | $0 | $5,709,000 |
| Equipment | $4,000,000 | $0 | $0 | $0 | $4,000,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $10,000,000 | $0 | $0 | $0 | $10,000,000 |

## Renewal Subproject: BB03-99-002 - Escalator Capital Repair

Roll Up

| | |
|---|---|
| **Parent Project #** | BB03-00-000 |
| **Renewable Sub-Project Name** | Vertical Transportation Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical reliability, safety, and lifecycle improvements for the Kennedy Center's escalator systems. The work focuses on replacing aging and worn components that have experienced years of continuous operation, reducing the risk of service disruptions while extending the useful life of existing equipment. Targeted repairs and modernization efforts will improve passenger safety, operational performance, and long-term maintainability without requiring full escalator replacement.

The primary scope includes replacement of worn step roller wheels, deteriorated step chain links, damaged comb plates, and brake system components, including brake pads and associated safety mechanisms. Handrail drive systems, skirt brushes, and other critical safety devices will be inspected and replaced as necessary to ensure compliance with current operational and safety standards. In addition, outdated controllers, sensors, switches, and other control system components will be upgraded to improve reliability, diagnostics, and overall system performance. Together, these improvements will enhance escalator safety, reduce maintenance requirements, and support uninterrupted service for visitors and staff.

### Justification

The Kennedy Center's escalators are critical to vertical circulation but have deteriorated due to age and deferred maintenance, resulting in reliability and safety concerns. Capital repairs are necessary to restore safe operation, reduce downtime, and extend asset life.

### Progress Assessment

Otis has proposed capital repairs. Scope to be further developed this quarter

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $25,000 | $0 | $0 | $0 | $25,000 |
| Project Management | $15,000 | $0 | $0 | $0 | $15,000 |
| Construction | $860,000 | $0 | $0 | $0 | $860,000 |
| Equipment | $100,000 | $0 | $0 | $0 | $100,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $1,000,000 | $0 | $0 | $0 | $1,000,000 |

## Renewal Subproject: PV01-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV01-00-000 |
| **Renewable Sub-Project Name** | Concert Hall Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $10,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project delivers a comprehensive renovation of the Concert Hall focused on improving patron experience, accessibility, building systems performance, and long-term operational reliability while preserving the hall's architectural and acoustical integrity. Prior to construction, dust and vibration mitigation measures will be implemented to protect the organ and other sensitive assets throughout the renovation process. Major audience-facing improvements include complete replacement of audience seating, extensive floor preparation and carpet replacement throughout public areas and Tier 1 and Tier 2 boxes, hardwood floor repairs and replacement, and renovations to balcony restrooms. Additional accessibility and life-safety enhancements include repair or replacement of deteriorated doors, hardware, crash bars, hinges, and stoppers, handrail modifications to meet current safety and ADA standards, and repairs to uneven and unstable orchestra-level stairs.

The technical scope modernizes critical theatrical and building infrastructure to support future programming and improve facility performance. New conduit pathways will be installed to provide flexible control locations within the hall, allowing production operations to be positioned either centrally or toward the rear of the venue. Existing spotlight booth operations will be replaced with ceiling-mounted RoboSpot systems, eliminating seat loss and patron sightline issues while increasing production flexibility. House lighting systems, including chandeliers, overhead sconces, and wall sconces, will be upgraded and rewired to correct existing electrical deficiencies and improve reliability. Mechanical improvements include replacement and modernization of HVAC controls, air handling equipment, supply and return air systems, and replacement of A/C-2S and A/C-3S units. Additional work includes investigation and remediation of ongoing water intrusion and moisture-related issues within the Israeli Lounge. Together, these improvements will enhance comfort, accessibility, safety, production capabilities, and the overall visitor experience while extending the useful life of one of the Kennedy Center's premier performance venues.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related projects

| | | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $900,000 | $0 | $0 | $0 | $900,000 |
| Project Management | $224,000 | $0 | $0 | $0 | $224,000 |
| Construction | $8,426,000 | $0 | $0 | $0 | $8,426,000 |
| Equipment | $450,000 | $0 | $0 | $0 | $450,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$10,000,000** | **$0** | **$0** | **$0** | **$10,000,000** |

## Renewal Subproject: PV01-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV01-00-000 |
| **Renewable Sub-Project Name** | Concert Hall Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical backstage and performer support spaces to improve functionality, accessibility, and the overall experience for artists, production teams, and staff. The work includes comprehensive refreshes of existing green rooms and dressing rooms, providing updated finishes, furnishings, lighting, and infrastructure to better support the needs of performers and visiting productions. Improvements will also be made to the Visiting Production Office to create a more efficient and professional workspace for production management and touring personnel.

The project further enhances accessibility and operational flow within back-of-house areas through targeted facility upgrades and circulation improvements. Dressing Room C will be renovated to achieve full ADA compliance, ensuring accessible accommodations for performers and guests. In addition, back-of-house corridor redesigns will improve wayfinding, circulation, aesthetics, and functionality throughout performer and production support areas. Together, these improvements will create a more welcoming, accessible, and efficient backstage environment while supporting the Kennedy Center’s ability to host world-class productions and artists.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $135,000 | $0 | $0 | $0 | $135,000 |
| Project Management | $33,600 | $0 | $0 | $0 | $33,600 |
| Construction | $1,331,400 | $0 | $0 | $0 | $1,331,400 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,500,000** | **$0** | **$0** | **$0** | **$1,500,000** |

## Renewal Subproject: PV01-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV01-00-000 |
| **Renewable Sub-Project Name** | Concert Hall Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,200,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical stage infrastructure to improve performance capabilities, operational efficiency, safety, and long-term reliability within the theater. The primary scope includes complete replacement of the stage floor, addressing wear, structural deterioration, and performance limitations associated with the existing surface. Additional improvements include modifications to stage lift systems to enhance functionality, reliability, and compatibility with modern production requirements. Together, these upgrades will strengthen the venue's ability to accommodate a diverse range of performances while supporting the needs of artists, stage crews, and technical staff.

The technical scope also includes targeted improvements to theatrical infrastructure and acoustical performance. Cable management systems will be redesigned through the installation of improved cable tray infrastructure at key locations, reducing operational conflicts and improving backstage efficiency. The proscenium will be relocated and reworked in accordance with recommendations from the acoustical study to improve sound performance and audience experience within the hall. In addition, the existing light wagon system will be redesigned to increase flexibility, maintainability, and production capabilities. Collectively, these improvements will enhance stage operations, support evolving production technologies, and extend the useful life of critical theatrical systems.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $96,000 | $0 | $0 | $0 | $96,000 |
| Project Management | $26,880 | $0 | $0 | $0 | $26,880 |
| Construction | $1,077,120 | $0 | $0 | $0 | $1,077,120 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,200,000** | **$0** | **$0** | **$0** | **$1,200,000** |

## Renewal Subproject: PV01-99-004 - Acoustics

Roll Up

| | |
|---|---|
| Parent Project # | PV01-00-000 |
| Renewable Sub-Project Name | Concert Hall Restoration |
| Location | |
| Facility Name / Identifier | |
| Status | Planning |
| Useful Life (Years) | 35 year |
| Estimated Full Funding Cost ($) | $12,000,000 |
| Start FY (for 5-year window) | 2026 |

### Description

This project implements significant acoustical and stagehouse enhancements designed to improve performance flexibility, sound quality, and the overall audience experience. Central to the effort is the installation of a fully automated adjustable acoustic drapery system, allowing venue staff to tailor acoustical conditions to the specific needs of a wide range of performance types. The project also includes construction of a permanent stage extension to increase performance area and improve artist engagement with audiences. Implementation of the stage extension will require reconfiguration of seating layouts and may result in a reduction of overall seat count to optimize sightlines, acoustics, and stage functionality.

The primary technical scope focuses on major acoustical infrastructure improvements recommended through prior performance studies. The existing acoustic canopy system will be completely demolished and replaced with a new design featuring enhanced structural support, improved reliability, and greater acoustic tunability. In addition, the proscenium will be relocated and reconfigured in accordance with previous acoustical report recommendations to optimize sound projection, stage performance, and audience listening conditions. Together, these improvements will create a more versatile and acoustically refined venue capable of supporting a broader range of artistic programming while meeting contemporary performance standards.

### Justification

Immediate acoustical improvements to the main theater is essential to preserve performance integrity and ensure a world-class audience experience as the Kennedy Center approaches America250.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $960,000 | $0 | $0 | $0 | $960,000 |
| Project Management | $89,600 | $0 | $0 | $0 | $89,600 |
| Construction | $10,200,400 | $0 | $0 | $0 | $10,200,400 |
| Equipment | $750,000 | $0 | $0 | $0 | $750,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $12,000,000 | $0 | $0 | $0 | $12,000,000 |

## Renewal Subproject: PV02-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV02-00-000 |
| **Renewable Sub-Project Name** | Opera House Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $6,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project provides a comprehensive renewal of the Opera House, focused on preserving its iconic architectural character while modernizing audience amenities, accessibility features, and critical building systems. A key preservation component includes specialized cleaning, restoration, and repair of the Opera House's distinctive red silk wall and ceiling finishes to maintain their appearance and historic integrity. Public-facing improvements include extensive floor preparation and replacement of carpeting throughout all levels of the Opera House and its associated foyers, a major audience seating modernization program encompassing both movable and stationary seating systems, and a complete remodel of balcony-level restrooms to enhance functionality, accessibility, and visitor comfort.

The technical scope addresses significant life-safety, building systems, and operational deficiencies throughout the venue. Existing doors throughout the facility will be replaced to address code compliance, accessibility, and operational concerns associated with aging and deteriorated assemblies. HVAC system upgrades will improve occupant comfort, energy efficiency, and system reliability, while stair safety improvements—including new nosings and handrail modifications—will enhance accessibility and reduce safety risks throughout public circulation areas. Together, these improvements will preserve the Opera House's architectural legacy while creating a safer, more comfortable, and modern experience for audiences, performers, and staff.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $480,000 | $0 | $0 | $0 | $480,000 |
| Project Management | $134,400 | $0 | $0 | $0 | $134,400 |
| Construction | $4,785,600 | $0 | $0 | $0 | $4,785,600 |
| Equipment | $600,000 | $0 | $0 | $0 | $600,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $6,000,000 | $0 | $0 | $0 | $6,000,000 |

## Renewal Subproject: PV02-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV02-00-000 |
| **Renewable Sub-Project Name** | Opera House Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes and enhances critical backstage and production support spaces to improve functionality, operational efficiency, and the overall experience for performers, production crews, and visiting companies. The work includes resurfacing and resealing of the backstage production area, including repairs to the U-shaped concrete surround where deterioration and surface imperfections have developed over time. These improvements will restore durability, improve safety, and provide a more resilient working environment for production operations.

The primary scope focuses on the refurbishment of performer and production support facilities throughout the back-of-house areas. Improvements include upgrades to dressing rooms, visiting production offices, green rooms, wardrobe facilities, hair and makeup spaces, and other backstage support areas. Additional work will improve off-stage and A-Level production storage areas to better support staging, equipment management, and touring production needs. Together, these enhancements will create a more functional, professional, and welcoming backstage environment while supporting the Kennedy Center's ability to accommodate world-class productions and performers.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $220,000 | $0 | $0 | $0 | $220,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,735,200 | $0 | $0 | $0 | $1,735,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: PV02-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV02-00-000 |
| **Renewable Sub-Project Name** | Opera House Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project delivers a comprehensive modernization of the Opera House's stage and theatrical infrastructure, addressing systems that have reached the end of their useful life and are critical to supporting contemporary performance requirements. The centerpiece of the project is a major upgrade and replacement of the stage lift and rigging systems, including complete replacement of the existing fly system, fly rail, rigging components, controls, and associated infrastructure. As these systems remain substantially original to the building, modernization is essential to improve safety, reliability, operational efficiency, and compatibility with modern production technologies. Additional work includes replacement of the stage floor and improvements to the orchestra pit fascia to enhance both performance functionality and audience presentation.

The technical scope also includes upgrades to front-of-house theatrical systems that support lighting, staging, and production flexibility. New or upgraded light bridge infrastructure will be installed to improve access, maintenance, and lighting capabilities within the venue. The project will also modernize front-of-house theatrical rigging systems, including replacement and enhancement of box boom infrastructure and associated rigging components. Together, these improvements will significantly enhance production capabilities, improve operational safety, and ensure the Opera House remains capable of supporting world-class performances for decades to come.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $220,000 | $0 | $0 | $0 | $220,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $135,200 | $0 | $0 | $0 | $135,200 |
| Equipment | $1,600,000 | $0 | $0 | $0 | $1,600,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $2,000,000 | $0 | $0 | $0 | $2,000,000 |

## Renewal Subproject: PV03-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV03-00-000 |
| **Renewable Sub-Project Name** | Eisenhower Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $4,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project enhances the patron experience and modernizes key audience-facing and building systems within the theater. The primary scope includes full replacement of stationary audience seating to improve comfort, accessibility, durability, and overall venue appearance. Additional architectural improvements include repair or replacement of deteriorated door assemblies throughout the facility and renovation of balcony-level restrooms to improve functionality, accessibility, and guest amenities while addressing deferred maintenance needs.

The technical scope focuses on targeted acoustical and mechanical improvements to support both audience and production operations. Existing acoustic treatments will be modified and optimized to improve sound quality, performance flexibility, and overall listening conditions within the venue. In addition, a dedicated HVAC zone will be created for the spotlight booth to provide independent environmental control, improving occupant comfort, equipment performance, and operational reliability. Together, these improvements will modernize critical venue infrastructure while enhancing comfort, acoustics, and the overall experience for patrons and production staff.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified.  Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $320,000 | $0 | $0 | $0 | $320,000 |
| Project Management | $89,600 | $0 | $0 | $0 | $89,600 |
| Construction | $3,470,400 | $0 | $0 | $0 | $3,470,400 |
| Equipment | $120,000 | $0 | $0 | $0 | $120,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $4,000,000 | $0 | $0 | $0 | $4,000,000 |

## Renewal Subproject: PV03-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV03-00-000 |
| **Renewable Sub-Project Name** | Eisenhower Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes and refreshes critical back-of-house performer and production support spaces to improve functionality, comfort, accessibility, and operational efficiency. The scope includes renovations to hair and makeup facilities, wardrobe areas, dressing rooms, visiting production offices, and green room spaces, providing updated finishes, furnishings, and infrastructure that better support performers, touring productions, and staff. Additional improvements include a refresh of the props kitchen and replacement of carpeting throughout designated back-of-house areas to enhance durability, appearance, and overall workplace quality.

The project also addresses targeted operational and comfort upgrades throughout performer support areas. Ladies' restrooms will be reconfigured to increase fixture capacity and improve accommodation during peak performance periods. New heating systems will be installed in Stairwell 2–5 at Level 27 and within the Orchestra Level Family Bathroom to address persistent temperature deficiencies and improve comfort for performers, staff, and guests. Together, these improvements will create a more functional, welcoming, and efficient backstage environment while supporting the Kennedy Center's ability to host world-class productions and performers.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $180,000 | $0 | $0 | $0 | $180,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,775,200 | $0 | $0 | $0 | $1,775,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $2,000,000 | $0 | $0 | $0 | $2,000,000 |

## Renewal Subproject: PV03-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV03-00-000 |
| **Renewable Sub-Project Name** | Eisenhower Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical theatrical infrastructure to enhance acoustical performance, production capabilities, and operational efficiency within the venue. The scope includes modifications to existing acoustic treatments to improve sound quality, performance flexibility, and audience experience while supporting a broader range of programming. In addition, modern stage lighting systems will be integrated throughout the theater, providing improved performance capabilities, energy efficiency, control flexibility, and compatibility with contemporary production technologies.

The primary technical focus is the complete replacement of the theater's aging stage machinery and rigging infrastructure. Work includes replacement of the existing fly system, fly rail, rigging equipment, controls, and associated components to improve safety, reliability, and operational performance. The project also includes replacement of the primary stage floor to address wear, structural deterioration, and evolving production requirements. Supporting operational improvements include enhancements to stage-level and A-Level production storage areas, providing more efficient space for equipment, scenery, and production support functions. Together, these improvements will modernize the theater's core production systems and ensure its continued ability to support world-class performances for decades to come.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Scope identified. Next steps: programming and design

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | 0 | Spent | Balance |
|---|---|---|---|---|---|
| Design | $90,000 | $0 | $0 | $0 | $90,000 |
| Project Management | $22,400 | $0 | $0 | $0 | $22,400 |
| Construction | $87,600 | $0 | $0 | $0 | $87,600 |
| Equipment | $800,000 | $0 | $0 | $0 | $800,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,000,000** | **$0** | **$0** | **$0** | **$1,000,000** |

## Renewal Subproject: PV04-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV04-00-000 |
| **Renewable Sub-Project Name** | Family Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project enhances the safety, functionality, and visitor experience of the theater through targeted architectural and operational improvements. A primary focus is the replacement of aging entry doors and associated hardware, which have become increasingly unreliable and have caused operational disruptions, including false alarm activations during performances. Additional life-safety and accessibility improvements include replacement of existing railings that no longer meet current safety and ADA expectations, as well as installation of permanent row identification signage to improve patron wayfinding and seating navigation within the theater.

The project also includes a comprehensive refresh of public-facing interior finishes and amenities. Scope includes replacement of worn carpeting, replacement of deteriorated wall sconces, and restoration or replacement of textured wall fabric that has become stained and damaged over time. Restroom improvements will better accommodate the theater's younger audiences through the installation of appropriately sized child-accessible fixtures within each restroom. Additional enhancements include replacement of mismatched furnishings to create a more cohesive appearance, reinstallation of existing artwork, and incorporation of additional art elements where appropriate. Together, these improvements will create a safer, more welcoming, and more functional environment while improving the overall guest experience for patrons and families.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

A meeting was held on April 24, 2026 at 3:00 PM with Timothy Guillot and Melissa Santiago. The meeting focused on reviewing the currently identified renovation scope and gathering operational input from the Family Theater staff. The team worked to identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration. Timothy Guillot and Melissa Santiago were established as the primary decision-makers for the Family Theater project moving forward. Key findings from the meeting were documented and will inform the next phase of scope development.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $160,000 | $0 | $0 | $0 | $160,000 |
| Project Management | $44,800 | $0 | $0 | $0 | $44,800 |
| Construction | $1,795,200 | $0 | $0 | $0 | $1,795,200 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$2,000,000** | **$0** | **$0** | **$0** | **$2,000,000** |

## Renewal Subproject: PV04-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV04-00-000 |
| **Renewable Sub-Project Name** | Family Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes key back-of-house support spaces to improve functionality, organization, and the overall experience for performers, production crews, and visiting companies. The scope includes comprehensive refreshes of existing dressing rooms and wardrobe facilities, incorporating updated finishes, furnishings, lighting, and operational improvements to better support daily performance activities and touring productions.

In addition, the project includes upgrades to stage-level storage areas to improve organization, accessibility, and efficient use of space for costumes, props, equipment, and production materials. Together, these improvements will enhance backstage operations, support production workflows, and provide a more professional and functional environment for artists and staff.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

A meeting was held on April 24, 2026 at 3:00 PM with Timothy Guillot and Melissa Santiago. The meeting focused on reviewing the currently identified renovation scope and gathering operational input from the Family Theater staff. The team worked to identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration. Timothy Guillot and Melissa Santiago were established as the primary decision-makers for the Family Theater project moving forward. Key findings from the meeting were documented and will inform the next phase of scope development.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $45,000 | $0 | $0 | $0 | $45,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $443,800 | $0 | $0 | $0 | $443,800 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $500,000 | $0 | $0 | $0 | $500,000 |

## Renewal Subproject: PV04-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV04-00-000 |
| **Renewable Sub-Project Name** | Family Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical theatrical infrastructure within the Family Theater to enhance production capabilities, operational reliability, and the overall performance experience. The scope includes installation of a new audiovisual system to support contemporary production requirements, improve presentation quality, and provide greater flexibility for a wide range of performances, educational programming, and special events. The project also includes replacement of the primary stage floor to address wear, improve performer safety, and support the technical demands of modern productions.

The primary technical focus is the replacement of the theater's aging rigging infrastructure, which has become outdated and no longer provides the functionality required for current production needs. New rigging systems will improve safety, reliability, operational efficiency, and production flexibility while supporting a broader range of staging and performance configurations. Together, these improvements will ensure the Family Theater remains a versatile, modern venue capable of supporting diverse artistic and educational programming for years to come.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

A meeting was held on April 24, 2026 at 3:00 PM with Timothy Guillot and Melissa Santiago. The meeting focused on reviewing the currently identified renovation scope and gathering operational input from the Family Theater staff. The team worked to identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration. Timothy Guillot and Melissa Santiago were established as the primary decision-makers for the Family Theater project moving forward. Key findings from the meeting were documented and will inform the next phase of scope development.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $45,000 | $0 | $0 | $0 | $45,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $143,000 | $0 | $0 | $0 | $143,000 |
| Equipment | $300,800 | $0 | $0 | $0 | $300,800 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $500,000 | $0 | $0 | $0 | $500,000 |

## Renewal Subproject: PV05-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV05-00-000 |
| **Renewable Sub-Project Name** | Terrace Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project enhances the safety, comfort, and overall patron experience through targeted modernization of audience-facing elements within the theater. The primary scope includes replacement of existing audience seating, installation of new flooring and base materials throughout public areas, and repair or replacement of aging door assemblies that no longer function properly. These improvements will address deferred maintenance concerns while creating a more comfortable, durable, and welcoming environment for visitors.

The project also includes targeted life-safety repairs to address existing hazards within the seating areas. Specifically, the railing located adjacent to Rows U and V will be repaired or replaced to correct stability issues and ensure compliance with current safety standards. Together, these improvements will modernize the theater environment, improve accessibility and reliability, and enhance the overall experience for patrons while extending the useful life of critical facility components.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $40,000 | $0 | $0 | $0 | $40,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $448,800 | $0 | $0 | $0 | $448,800 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$500,000** | **$0** | **$0** | **$0** | **$500,000** |

## Renewal Subproject: PV05-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV05-00-000 |
| **Renewable Sub-Project Name** | Terrace Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical back-of-house performer, production, and VIP support spaces to improve functionality, security, and operational efficiency. The scope includes comprehensive refreshes of dressing rooms, wardrobe facilities, visiting production offices, green rooms, and stage storage areas, providing updated finishes, furnishings, lighting, and infrastructure to better support artists, touring productions, and staff. These improvements will create a more professional, comfortable, and functional backstage environment while enhancing day-to-day operations.

The project also addresses targeted upgrades to VIP and security support spaces. The existing Reception Room, which serves VIP guests and security personnel, will be renovated to include a dedicated restroom, eliminating the need for occupants to utilize public facilities across the corridor. Lighting within the space will also be upgraded to improve functionality and presentation. In addition, the Stage Door Office will receive security enhancements, including installation of a panic button to improve emergency response capabilities and support staff safety. Together, these improvements will strengthen backstage operations, enhance VIP accommodations, and improve security and support functions throughout the facility.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $90,000 | $0 | $0 | $0 | $90,000 |
| Project Management | $22,400 | $0 | $0 | $0 | $22,400 |
| Construction | $887,600 | $0 | $0 | $0 | $887,600 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $1,000,000 | $0 | $0 | $0 | $1,000,000 |

## Renewal Subproject: PV05-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV05-00-000 |
| **Renewable Sub-Project Name** | Terrace Theater Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical theatrical infrastructure to improve safety, reliability, and production capabilities within the venue. The primary scope includes full replacement of the existing stage floor, addressing wear, structural deterioration, and performance limitations resulting from decades of use. The new stage floor will provide a durable, high-performance surface capable of supporting a broad range of artistic, technical, and production requirements while improving safety for performers and stage crews.

The project also includes significant upgrades to rigging and theatrical lighting systems to support contemporary production standards and enhance operational flexibility. Improvements will address aging equipment, increase reliability, and provide greater capability for staging, lighting design, and performance execution. Together, these investments will strengthen the theater's core production infrastructure, reduce maintenance requirements, and ensure the venue remains capable of supporting world-class performances well into the future.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $40,000 | $0 | $0 | $0 | $40,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $112,000 | $0 | $0 | $0 | $112,000 |
| Equipment | $336,800 | $0 | $0 | $0 | $336,800 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $500,000 | $0 | $0 | $0 | $500,000 |

## Renewal Subproject: PV06-99-001 - Front of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV06-00-000 |
| **Renewable Sub-Project Name** | Theater Lab Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $250,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes audience-facing spaces and critical life-safety infrastructure to improve patron comfort, accessibility, and operational reliability. The scope includes replacement of existing house flooring, installation of new audience seating to replace deteriorated chairs for which no spare inventory remains available, and restoration of interior wall fabric that has detached and deteriorated over time. In addition, the theater's lighting systems will be upgraded through a comprehensive LED conversion, improving energy efficiency, reducing maintenance requirements, and enhancing overall lighting quality throughout the venue.

The project also addresses significant code, security, and life-safety deficiencies. Existing door assemblies throughout the theater will be replaced to meet current code requirements and improve functionality and accessibility. Emergency egress capacity will be enhanced through the addition of two required emergency exits, strengthening occupant safety and code compliance. To improve operational control and security, a new dedicated entrance will be established at the south end of the theater with controlled card-reader access, providing secure circulation for authorized personnel while supporting venue operations. Together, these improvements will create a safer, more functional, and modern theater environment while extending the useful life of critical facility components.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $22,500 | $0 | $0 | $0 | $22,500 |
| Project Management | $11,000 | $0 | $0 | $0 | $11,000 |
| Construction | $216,500 | $0 | $0 | $0 | $216,500 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $250,000 | $0 | $0 | $0 | $250,000 |

## Renewal Subproject: PV06-99-002 - Back of House

Roll Up

| | |
|---|---|
| **Parent Project #** | PV06-00-000 |
| **Renewable Sub-Project Name** | Theater Lab Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $1,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical building infrastructure, life-safety concerns, and performer support spaces to improve reliability, resilience, and operational functionality throughout the facility. The scope includes replacement of the existing hot water heater and associated monitoring systems, including installation of new sensors to improve performance, reliability, and preventative maintenance capabilities. Additional work will address identified fire- and water-related damage within the facility, ensuring affected areas are properly repaired and restored to safe operating conditions.

The project also includes targeted improvements to both technical and performer support environments. Humidity control issues within the rack room will be corrected to protect sensitive technology systems and improve long-term equipment reliability. Back-of-house spaces, including green rooms, rehearsal rooms, and dressing rooms, will receive comprehensive refreshes featuring updated finishes, furnishings, and infrastructure to better support performers and production staff. In addition, repairs to the stage floor will address wear and deterioration, improving safety and functionality for performances and rehearsals. Together, these improvements will strengthen facility resilience, enhance backstage operations, and improve the overall performance environment.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $85,000 | $0 | $0 | $0 | $85,000 |
| Project Management | $22,400 | $0 | $0 | $0 | $22,400 |
| Construction | $892,600 | $0 | $0 | $0 | $892,600 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$1,000,000** | **$0** | **$0** | **$0** | **$1,000,000** |

## Renewal Subproject: PV06-99-003 - Production Infrastructure

Roll Up

| | |
|---|---|
| **Parent Project #** | PV06-00-000 |
| **Renewable Sub-Project Name** | Theater Lab Restoration |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 years |
| **Estimated Full Funding Cost ($)** | $500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses significant deferred maintenance and damage to critical performance infrastructure, ensuring the venue remains safe, functional, and capable of supporting future productions. The primary scope includes replacement of flooring throughout both the audience chamber and stage areas, addressing wear, deterioration, and damage that have accumulated through years of use. These improvements will enhance patron comfort, performer safety, and the overall appearance and functionality of the venue.

The technical scope focuses on repairing and restoring stage systems impacted by fire- and water-related damage. Work includes rehabilitation or replacement of affected rigging components and associated theatrical infrastructure to restore operational reliability, safety, and production capabilities. Together, these improvements will protect the long-term viability of the venue, improve performance conditions, and ensure continued support for artistic programming and public events.

### Justification

Refurbishment of the main theater's seats, upgrades to the counterweight system used to fly (raise and lower) extremely heavy scenery, lighting, or equipment, maintain aging finishes and fixtures.

### Progress Assessment

Progress meetings identified renovation scope and gathering operational input from the Theater staff, identify staff requirements, concerns, and potential additional scope items while documenting any additional planned initiatives or budget allocations under consideration.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $40,000 | $0 | $0 | $0 | $40,000 |
| Project Management | $11,200 | $0 | $0 | $0 | $11,200 |
| Construction | $448,800 | $0 | $0 | $0 | $448,800 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $500,000 | $0 | $0 | $0 | $500,000 |

## Renewal Subproject: SB01-99-001 - Extend Fire Protection A Level

Roll Up

| | |
|---|---|
| **Parent Project #** | SB01-00-000 |
| **Renewable Sub-Project Name** | Fire Alarm & Fire Protection |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $250,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project improves the Kennedy Center's fire protection and life-safety systems to achieve compliance with current codes, improve emergency response capabilities, and enhance overall building safety. The primary scope includes design and construction of fire sprinkler protection throughout the remaining unprotected portions of Level A, extending coverage to occupied spaces, storage areas, support spaces, and common areas. New sprinkler piping, heads, flow switches, and tamper monitoring devices will be integrated into the existing fire protection infrastructure to provide comprehensive system coverage and monitoring. Additional fire protection improvements include evaluation and replacement of aging dry-pipe sprinkler systems within the parking garages, installation of fire protection within garage fan rooms, and expansion of protection into electrical closets and electrical rooms throughout the facility.

The project also modernizes fire alarm and emergency notification systems to improve detection, communication, and life-safety performance. Work includes installation of additional fire alarm coverage where required, upgrades to fire alarm control panel graphics, and deployment of new manual pull stations, smoke detectors, heat detectors, and audible and visual notification devices throughout the campus. To improve system reliability and long-term resilience, the existing fire pump will be replaced with a new electric fire pump. All work will be designed and implemented in accordance with applicable NFPA standards and Kennedy Center building code requirements, resulting in a more robust, code-compliant, and integrated life-safety system capable of supporting the facility's long-term operational needs.

### Justification

Fire protection coverage at the A Level is currently limited and does not meet the needs of a high-traffic public area, increasing risk to life safety and property. Extending fire protection systems is necessary to ensure adequate coverage, improve code compliance, and enhance overall safety.

### Progress Assessment

Fire Sprinkler design build contract to be awarded by Q3 2026

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $12,500 | $0 | $0 | $0 | $12,500 |
| Project Management | $8,500 | $0 | $0 | $0 | $8,500 |
| Construction | $229,000 | $0 | $0 | $0 | $229,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $250,000 | $0 | $0 | $0 | $250,000 |

## Renewal Subproject: SB02-99-001 - Asbestos Abatement

Roll Up

| | |
|---|---|
| **Parent Project #** | SB02-00-000 |
| **Renewable Sub-Project Name** | Hazardous Material Abatement |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $400,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project provides a comprehensive hazardous materials assessment to support future renovation, modernization, and capital improvement efforts throughout the facility. The assessment is intended to identify, document, and evaluate the presence of regulated hazardous materials that may impact construction activities, occupant safety, project phasing, and regulatory compliance. The resulting findings will establish a clear basis for planning, budgeting, risk management, and environmental remediation activities associated with future projects.

The scope includes a comprehensive asbestos-containing materials (ACM) survey covering both friable and non-friable materials, lead-based paint (LBP) testing, and identification of PCB-containing materials within building components and systems. Laboratory analysis and reporting will be performed to document findings and provide regulatory documentation. The project will also include development of abatement specifications and remediation recommendations to support future design and construction efforts, ensuring hazardous materials can be safely managed or removed in accordance with applicable environmental regulations and industry standards.

### Justification

Asbestos-containing materials remain present in areas of the Kennedy Center due to the building's age, posing potential health risks during maintenance, renovation, or disturbance. Abatement is necessary to eliminate exposure hazards, ensure regulatory compliance, and support safe ongoing operations.

### Progress Assessment

The RFP for a comprehensive Hazmat survey in areas of construction has been issued.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $250,000 | $0 | $0 | $0 | $250,000 |
| Project Management | $24,000 | $0 | $0 | $0 | $24,000 |
| Construction | $126,000 | $0 | $0 | $0 | $126,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $400,000 | $0 | $0 | $0 | $400,000 |

## Renewal Subproject: SB03-99-001 - Sanitary & Domestic Piping

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $30,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses critical plumbing infrastructure that has reached the end of its useful life and poses increasing risks to facility operations, occupant comfort, and building reliability. Work begins with required hazardous materials abatement and focuses on the replacement of aging domestic water, sanitary waste, and stormwater systems that have experienced deterioration, recurring failures, and increased maintenance demands. The project is intended to improve system reliability, reduce the risk of leaks and service interruptions, and ensure continued operation of essential building services.

The primary scope includes replacement of deteriorated vertical riser piping serving domestic water and sanitary waste systems, removal and replacement of sanitary piping in areas affected by chronic leaks and blockages, and modernization of the domestic water distribution network to improve water quality and pressure consistency throughout the facility. Additional work includes replacement of failed or deteriorating stormwater sump pumps and sewage ejector pumps serving below-grade areas to restore reliable drainage and wastewater conveyance. Supporting construction activities include necessary demolition to access concealed infrastructure, installation of code-compliant supports and seismic bracing, pressure testing of new piping systems, disinfection of potable water lines, and restoration of all affected architectural finishes. All work will be carefully coordinated with ongoing building operations to minimize disruption while delivering a more resilient and reliable plumbing infrastructure.

### Justification

The Kennedy Center's sanitary and domestic piping systems, which have not been updated in 50 years, are aging and deteriorating, resulting in leaks, blockages, and reduced reliability that impact daily operations and sanitation. Replacement and rehabilitation are necessary to ensure consistent service, prevent failures, and maintain safe and hygienic conditions.

### Progress Assessment

The O&M team and building condition assessment reports completed in the past five years have identified areas of problems. Design work to begin this quarter.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $1,950,000 | $0 | $0 | $0 | $1,950,000 |
| Project Management | $672,000 | $0 | $0 | $0 | $672,000 |
| Construction | $26,128,000 | $0 | $0 | $0 | $26,128,000 |
| Equipment | $1,250,000 | $0 | $0 | $0 | $1,250,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $30,000,000 | $0 | $0 | $0 | $30,000,000 |

## Renewal Subproject: SB03-99-002 - Central Plant Upgrades

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $10,000,000 |
| **Start FY (for 5-year window)** | 2026 |

**Description**

Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up Roll Up

**Justification**

The Kennedy Center's central plant systems—including chillers, boilers, and distribution infrastructure—have aged beyond their intended service life due to years of deferred maintenance, reducing reliability and efficiency. Upgrades are necessary to modernize core HVAC systems, improve performance, and prevent system failures, constituting unusual and compelling urgency.

**Progress Assessment**

Complete a 60-day feasibility study to provide detailed assessment of the current hydronic system conditions, develop replacement or refurbishment concepts

**Related Projects**

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $650,000 | $0 | $0 | $0 | $650,000 |
| Project Management | $224,000 | $0 | $0 | $0 | $224,000 |
| Construction | $3,526,000 | $0 | $0 | $0 | $3,526,000 |
| Equipment | $5,600,000 | $0 | $0 | $0 | $5,600,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$10,000,000** | **$0** | **$0** | **$0** | **$10,000,000** |

## Renewal Subproject: SB03-99-003 - Condenser Loop

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $16,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project addresses the deteriorating performance and reliability of the Kennedy Center's condenser water loop, a critical component of the central plant hydronic system that supports building cooling operations. The effort begins with a comprehensive engineering evaluation of existing condenser water piping, pumps, heat rejection equipment, water treatment systems, and associated controls to determine the most effective repair or replacement strategy based on remaining useful life, operational requirements, and long-term facility needs. The assessment will develop rehabilitation and replacement concepts while accounting for site constraints, equipment access limitations, rigging requirements, utility connections, and the need to maintain uninterrupted operation of the central plant.

The project will establish a phased implementation strategy that minimizes disruption to building cooling operations while addressing critical infrastructure deficiencies. Scope includes replacement of failed condenser loop components, installation of new condenser water distribution piping with appropriate insulation and supports, upgrades to condenser water pumps and associated controls, modernization of water treatment and chemical feed systems, and integration with existing or replacement chillers and boilers. Long-lead equipment requirements, including large-diameter piping and pumping equipment, will be identified early to support project scheduling and procurement. Following installation, the system will undergo controls programming, flushing, balancing, testing, and commissioning to optimize performance and ensure reliable operation. Together, these improvements will enhance central plant efficiency, improve system resiliency, and support the long-term reliability of the facility's cooling infrastructure.

### Justification

The Kennedy Center's chillers and boilers—critical HVAC components—have exceeded their service life due to years of deferred maintenance, and the condenser water loop's traveling screen system has been nonfunctional for over eight years. These deficiencies have reduced system reliability and increased routine maintenance costs, necessitating upgrades to restore efficient and dependable operation.

### Progress Assessment

Complete a 60-day feasibility study to provide detailed assessment of the current hydronic system conditions, develop replacement or refurbishment concepts

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $1,040,000 | $0 | $0 | $0 | $1,040,000 |
| Project Management | $358,400 | $0 | $0 | $0 | $358,400 |
| Construction | $13,201,600 | $0 | $0 | $0 | $13,201,600 |
| Equipment | $1,400,000 | $0 | $0 | $0 | $1,400,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $16,000,000 | $0 | $0 | $0 | $16,000,000 |

## Renewal Subproject: SB03-99-004 - Electrical System Upgrades

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $20,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project modernizes critical electrical infrastructure that has reached the end of its service life and is experiencing increasing reliability concerns that threaten the continuity of essential building operations. Work begins with required hazardous materials abatement and focuses on replacing aging electrical distribution equipment, strengthening system resiliency, and improving emergency power capabilities throughout the campus. Engineering services will include comprehensive load calculations, system coordination studies, code compliance reviews, and phased implementation planning to ensure the upgrades can be completed while maintaining ongoing building operations.

The primary scope includes replacement of aging switchboards, deteriorated main electrical feeders—including existing aluminum conductors—and transformers that no longer meet long-term operational requirements. The project will also upgrade the building grounding system, replace automatic transfer switches, and modernize emergency power infrastructure through replacement of aging generator fuel storage tanks with systems incorporating proper containment and monitoring capabilities. Additional resiliency improvements include installation of a dedicated connection point and automatic transfer switch provisions for temporary roll-up generators to support emergency operations and planned outages. Exterior and garage lighting systems will be upgraded with energy-efficient fixtures and modern controls to improve visibility, safety, security, and operational efficiency. Further enhancements include separation of REACH electrical distribution systems to improve operational flexibility and installation of Lutron processors at each riser to support advanced lighting control and building management functions. All new systems will undergo comprehensive testing and commissioning to ensure reliable integration, optimized performance, and long-term operational sustainability.

### Justification

The Kennedy Center's electrical feeders are aging and have deteriorated due to years of deferred maintenance, increasing the risk of outages and reduced system reliability. Upgrades are necessary to ensure consistent power distribution, support critical operations, and prevent potential failures.

### Progress Assessment

Electrical design work will begin next month.

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $1,300,000 | $0 | $0 | $0 | $1,300,000 |
| Project Management | $448,000 | $0 | $0 | $0 | $448,000 |
| Construction | $9,752,000 | $0 | $0 | $0 | $9,752,000 |
| Equipment | $8,500,000 | $0 | $0 | $0 | $8,500,000 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $20,000,000 | $0 | $0 | $0 | $20,000,000 |

## Renewal Subproject: SB03-99-005 - River Pump Room

Roll Up

| | |
|---|---|
| **Parent Project #** | SB03-00-000 |
| **Renewable Sub-Project Name** | MEP Improvements |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | Planning |
| **Useful Life (Years)** | 35 year |
| **Estimated Full Funding Cost ($)** | $1,500,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project restores and modernizes the Kennedy Center's river water heat rejection system, a critical component of the central plant cooling infrastructure. The scope focuses on repairing or replacing aging open-loop condenser water systems that rely on river water for heat rejection and have experienced deterioration, reduced reliability, and increasing maintenance demands. These improvements are intended to enhance operational performance, improve system resiliency, and ensure the long-term viability of this unique cooling infrastructure.

The primary scope includes rehabilitation of the river water intake system, including replacement or repair of intake screens, strainers, and debris protection mechanisms designed to protect downstream equipment. Additional work includes replacement or refurbishment of condenser water pumps that convey river water through the plate-and-frame heat exchangers, as well as upgrades to associated piping, valves, and discharge infrastructure. The project will also address environmental compliance requirements by restoring and maintaining conformance with applicable EPA National Pollutant Discharge Elimination System (NPDES) permit requirements. Together, these improvements will improve reliability, reduce operational risk, support central plant efficiency, and ensure continued compliance with environmental regulations.

### Justification

The Center's Potomac River condenser water system has served as the primary heat rejection mechanism for the building's 3,200-ton central HVAC plant since original construction. The system has deteriorated and affects the facility's ability to maintain climate control during critical performance periods. This open-loop system draws raw water from the Potomac River through a specialized intake structure located approximately 40 feet from shore at 20 feet depth, passes it through four 800-ton chillers and plate-and-frame heat exchangers to absorb heat from the building's closed-loop chilled water system, and discharges the heated water back to the river. The intake system components including screens, pumps, piping, and heat exchangers have experienced significant wear from continuous exposure to river sediment, debris, biological growth, and corrosive conditions. Upgrades are necessary to restore system reliability, ensure compliance with environmental discharge regulations.

### Progress Assessment

Complete a 60-day feasibility study to provide detailed assessment of the current hydronic system conditions, develop replacement or refurbishment concepts

### Related Projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Roll Up | Spent | Balance |
|---|---|---|---|---|---|
| Design | $142,500 | $0 | $0 | $0 | $142,500 |
| Project Management | $33,600 | $0 | $0 | $0 | $33,600 |
| Construction | $1,323,900 | $0 | $0 | $0 | $1,323,900 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $1,500,000 | $0 | $0 | $0 | $1,500,000 |

## Renewal Subproject: BA01-99-001 Mobilization Costs

Roll Up

| | |
|---|---|
| **Parent Project #** | BA01-00-000 |
| **Renewable Sub-Project Name** | Mobilization Costs |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | |
| **Useful Life (Years)** | |
| **Estimated Full Funding Cost ($)** | $5,000,000 |
| **Start FY (for 5-year window)** | 2026 |

### Description

This project provides the enabling services and support infrastructure necessary to facilitate major capital improvements while maintaining safe and efficient building operations throughout construction. The scope includes interior move activities required to temporarily relocate personnel, equipment, furnishings, and operational functions to accommodate phased construction efforts and minimize disruption to ongoing programming and business operations.

Supporting construction activities include installation of site fencing and other temporary controls to secure work areas, protect occupants and visitors, and maintain safe separation between construction zones and public spaces. The project also includes third-party inspection services and independent life-safety plan reviews to verify compliance with applicable codes, standards, and project requirements. In addition, third-party materials testing will be performed throughout construction to validate the quality, performance, and installation of critical building materials and systems. Together, these services provide essential oversight, safety, and logistical support necessary for the successful execution of the broader modernization program.

### Justification

Site mobilization establishes security perimeters, and logistical infrastructure required before construction can commence. These upfront costs include interior and exterior including fencing, signage, traffic control, temporary wayfinding, and temporary facilities—are necessary to protect public safety, maintain operational access to active areas, and comply with security requirements.

### Progress Assessment

Scoping in progress

### Related Projects

Shared across projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $0 | $0 | $0 | $0 | $0 |
| Project Management | $0 | $0 | $0 | $0 | $0 |
| Construction | $5,000,000 | | $0 | $0 | $5,000,000 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $5,000,000 | $0 | $0 | $0 | $5,000,000 |

## Renewal Subproject: BA02-99-001— Staffing, Architectural Services and Other Consulting Services

Roll Up

| | |
|---|---|
| **Parent Project #** | BA02-00-000 |
| **Renewable Sub-Project Name** | Support Services |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | |
| **Useful Life (Years)** | |
| **Estimated Full Funding Cost ($)** | $2,000,000 |
| **Start FY (for 5-year window)** | 2026 |

**Description**

For architectural services, staffing and other consulting services.

**Justification**

Centers requirements and external expertise.

**Progress Assessment**

Scoping in progress

**Related Projects**

Shared across projects

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $0 | $0 | $0 | $0 | $0 |
| Project Management | $0 | $0 | $0 | $0 | $0 |
| Construction | $0 | | $0 | $0 | $0 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $2,000,000 | $0 | $0 | $0 | $2,000,000 |
| TOTAL | $2,000,000 | $0 | $0 | $0 | $2,000,000 |

## Renewal Subproject: BA02-99-002— Document Mgmt. & Life Safety

Roll Up

| | |
|---|---|
| **Parent Project #** | BA02-00-000 |
| **Renewable Sub-Project Name** | Support Services |
| **Location** | |
| **Facility Name / Identifier** | |
| **Status** | |
| **Useful Life (Years)** | |
| **Estimated Full Funding Cost ($)** | $950,000 |
| **Start FY (for 5-year window)** | 2026 |

**Description**

For collecting and distributing of cad files for consultants use for duration of the project. Includes temporary programming, building alarm systems, and life safety and low voltage to facilitate construction phasing.

**Justification**

To facilitate life safety protocols.

**Progress Assessment**

Scoping in progress

**Related Projects**

Shared across projects.

## Funding by Phase (Prior + Proposed)

| Phase | Allotments | Commit. | Oblig. | Spent | Balance |
|---|---|---|---|---|---|
| Design | $0 | $0 | $0 | $0 | $0 |
| Project Management | $0 | $0 | $0 | $0 | $0 |
| Construction | $0 | $0 | $0 | $0 | $0 |
| Equipment | $0 | $0 | $0 | $0 | $0 |
| Other | $950,000 | $0 | $0 | $0 | $950,000 |
| **TOTAL** | **$950,000** | **$0** | **$0** | **$0** | **$950,000** |