# C

**THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**

# BOARD OF TRUSTEES — Special Meeting Minutes

Tuesday, September 15, 2026 | 12:30PM | Virtual Convening via Zoom

**EXECUTIVE BOARD MEMBERS PRESENT:**

Chairman, President Donald J. Trump
Vice Chair, Jennifer Fischer *(presiding)*
Secretary, Brian Ballard *(absent at roll call)*
Treasurer, John Falconetti
General Counsel, Elliot Berke *(present in the board room)*
Executive Director and Chief Operations Officer, Matt Floca *(present in the board room)*

**ATTENDED VIRTUALLY:**

Brian Ballard, Presidential Appointee *(absent at roll call)*
Maria Bartiromo, Presidential Appointee *(absent at roll call)*
Attorney General Pamela Bondi, Presidential Appointee
Mary Helen Bowers, Presidential Appointee
Hannah Buchan, Presidential Appointee
Bob Castellani, Presidential Appointee
Pamella DeVos, Presidential Appointee
Patricia Duggan, Presidential Appointee *(absent at roll call)*
John Falconetti, Presidential Appointee
Emilia May Fanjul, Presidential Appointee
Jennifer Fischer, Presidential Appointee
Lynn Friess, Presidential Appointee
Sergio Gor, Presidential Appointee
Pamela Gross, Presidential Appointee
Kate Haselwood, Presidential Appointee
Mindy Levine, Presidential Appointee
Lynda Lomangino, Presidential Appointee
Barbara Long, Presidential Appointee
Allison Lutnick, Presidential Appointee
Douglas Manchester, Presidential Appointee
Laura Perlmutter, Presidential Appointee
Denise Saul, Presidential Appointee
Dan Scavino, Presidential Appointee *(absent at roll call)*
Cheri Summerall, Presidential Appointee
Susie Wiles, Presidential Appointee
Paolo Zampolli, Presidential Appointee
President Donald J. Trump, Chairman

Representative Joyce Beatty, Ex-Officio Member
Representative Rick Larsen, Ex-Officio Member
Senator Sheldon Whitehouse, Ex-Officio Member *(absent at roll call)*
LaToya Foster — In Place of Mayor Muriel Bowser, Ex-Officio Member
Emily Berret — In Place of Leader Hakeem Jeffries, Ex-Officio Member
Elizabeth Falcone — In Place of Senator Mark Warner, Ex-Officio Member
Johanna Hardy — In Place of House Transportation and Infrastructure Chairman Sam Graves, Ex-Officio Member

Ann Jacobs — House Transportation and Infrastructure Committee, Ranking Member Rick Larsen
Jonathan Misk — Office of Senator Sheldon Whitehouse

**ABSENT:**
Secretary Elaine Chao, Presidential Appointee
Alma Gildenhorn, Presidential Appointee
Lee Greenwood, Presidential Appointee
Laura Ingraham, Presidential Appointee
Dana Kraft, Presidential Appointee
Catherine B. Reynolds, Presidential Appointee
Andrea Wynn, Presidential Appointee
Mayor Muriel Bowser, Ex-Officio Member *(represented by LaToya Foster)*
Secretary Lonnie Bunch, Ex-Officio Member
Senator Shelley Moore Capito, Ex-Officio Member
Senator Susan Collins, Ex-Officio Member
Chancellor Lewis Ferebee, Ex-Officio Member
Senator Deb Fischer, Ex-Officio Member
Congressman Sam Graves, Ex-Officio Member *(represented by Johanna Hardy)*
Leader Hakeem Jeffries, Ex-Officio Member *(represented by Emily Berret)*
Speaker Mike Johnson, Ex-Officio Member
Secretary Robert F. Kennedy, Jr., Ex-Officio Member
Representative Julia Letlow, Ex-Officio Member
Representative Michael McCaul, Ex-Officio Member
Robert Newlen, Ex-Officio Member
Secretary Marco Rubio, Ex-Officio Member
Leader Chuck Schumer, Ex-Officio Member
Leader John Thune, Ex-Officio Member
Billie Tsien, Ex-Officio Member
Senator Mark Warner, Ex-Officio Member *(represented by Elizabeth Falcone)*

**STAFF PRESENT:**
Bronagh Donlon, Vice President of Special Events
Ben Dransfield, Unified Communications Manager
Laura Hagan, Associate General Counsel
Joe LaFauci, Vice President of Board Relations and Protocol
Bob Sellappan, Chief Information Officer

**BOARD GUESTS AND GUEST SPEAKERS:**
Secretary Howard Lutnick
Darin Buchalter, Chief Executive Officer, Delta Consulting Group *(present in the board room)*
John Cracraft, Managing Director, JLL *(present in the board room)*

**MINUTES TAKEN BY:**
Bronagh Donlon, Vice President of Special Events
Joe LaFauci, Vice President of Board Relations

## I. Call to Order

Jennifer Fischer

The special meeting was called to order at 12:30 p.m. ET, convened virtually via Zoom. A quorum of the Board of Trustees was confirmed to be present.

At the time of the roll call, 24 members of the Board of Trustees were in attendance, together with 4 ex-officio members, 2 of whom attended through a representative.

## II. Approval of Prior Meeting Minutes

Jennifer Fischer

A motion was called to approve the minutes of the previous Board of Trustees meeting.

Representative Joyce Beatty stated that her remarks at the previous meeting had been mischaracterized, and requested that the minutes be corrected to reflect the recorded transcript accurately.

Vice Chair Fischer asked Rep. Beatty whether she would approve the minutes if they were changed to reflect exactly what the recorded transcript stated. Rep. Beatty asked whether she would be provided with the recording. Vice Chair Fischer undertook to ensure that the recording was made available, that the correction was reflected, and that the minutes were sent back out to her.

**ACTION:** Vice Chair Fischer agreed that the relevant language would be checked against the transcript, corrected, and recirculated.

**Motion:** Sergio Gor
**Second:** Hannah Buchan
**Vote:** Motion carried. Representative Beatty abstained. The previous minutes were approved subject to the requested correction.

## III. Litigation Update

Elliot Berke

Vice Chair Fischer stated that the first and only order of business was the state of the building, following the collapse of the Grand Foyer ceiling, and turned the meeting over to Mr. Floca. At Secretary Lutnick's request, it was confirmed that the video would be played so that the Board had seen it and its presentation was recorded. Before the building presentation, Mr. Floca advised that the recent occurrence in the court would be addressed briefly.

General Counsel Berke stated that he had not expected to give a litigation update, but that minutes before the Board meeting Judge Christopher Cooper had ruled on the Board's August 13 resolution recognizing the President. Mr. Berke reported that:

- The court ruled against the Center on all issues, including the language recognizing the President as having restored and renovated the building.
- The court left open the proposed endowment fund recognition on the ground that it was not yet ripe, although the judge stated that it was likely unlawful.

Mr. Floca advised that a number of options had been circulated and that management would continue to consider and address them at a later point.

Secretary Lutnick advised the Board that he had spoken with the President, and that from the Chair's perspective the Chair expects the Center to appeal the decision on the ground that the judge has significant conflicts, so that a less conflicted forum may opine on the matter. Secretary Lutnick stated that an appeal was the likely course going forward, and referred to the professional relationships of the judge's spouse.

Representative Beatty stated that she had been in court that day and had heard the judge's ruling, and that she had no objection to the Center appealing. She objected, however, to the introduction of politics and to the reference to the judge's spouse. Rep. Beatty cautioned that if the Board were to examine marital relationships, professional representations, clients, donations and political affiliations, the same standard would have to be applied to Board members voting on these matters, and she gave notice that she would look into the corporations, companies and businesses of those voting and their spouses' relationships, so that no member would be taken by surprise. She stated that the Kennedy Center is about the arts and is not political.

Secretary Lutnick responded that the judge had made his decision, that the comments regarding the judge's spouse had been made publicly some time ago and were not new, that whether they carried weight would be for the appeals court to determine, and that the Board needed to move forward.

Representative Beatty clarified that she was not referring to any prior public statement, nor to the identity of the spouse's clients, but to a statement made at a recent Board meeting that she considered distasteful — concerning the spouse not having taken the judge's name and an adjective applied to her. Rep. Beatty confirmed that Secretary Lutnick had not made that statement.

Trustee Mindy Levine addressed the Board, stating that she and other members have been subject to a considerable degree of scrutiny, including hate mail, false reporting in the domestic and international press concerning her husband and her relationship with the administration, and antisemitic statements, and that she and other members have retained personal security in response to threats. She stated that while she understood and respected the wish to vet members of the Board, the membership has in fact already been examined at length.

Representative Beatty responded that she had not been referring to personal scrutiny of that kind, that she also requires security in response to calls and threats, and that she sympathized; her point concerned business and political relationships.

Vice Chair Fischer closed the discussion, noting that all members of the Board are presidential appointees, and returned the meeting to Mr. Floca for the business at hand.

## IV. Facility Conditions and Capital Renovations — Matt Floca

Mr. Floca introduced Mr. Darin Buchalter, Chief Executive Officer of Delta Consulting Group, who had presented preliminary findings of the Delta report at the prior Board meeting, and noted that the full independent report had been provided to the Board on August 31. Mr. Floca also introduced Mr. John Cracraft, Managing Director at JLL, noting that Mr. Cracraft and JLL personnel were working on-site on project implementation and delivery for the Center.

A video presentation was played for the Board, showing structural risks, mechanical failures, electrical hazards and critical roof-system conditions across the campus. The video described the Center as a living memorial to President John F. Kennedy and America's home for the performing arts, and stated that critical systems are failing behind the marble facade. It characterized a planned temporary closure of the main facility as the only path to overhaul the compounding hazards, modernize critical plant and stage technology and safeguard the memorial, expressly noting that the matter is not one of demolition, and that a temporary closure does not mean silencing the Center's mission — the REACH would be activated and off-site artistic, educational and civic programming expanded, while preparing for a grand reopening.

Vice Chair Fischer remarked that the only word for the presentation was compelling, and opened the floor, asking that members raise a hand and speak one at a time.

Mr. Floca added a detailed explanation of facility conditions, noting that what was shown in the video was not a set of projections in an engineering binder, but the acute physical condition of the facility today, confirmed by licensed independent consulting firms that have tested and measured these conditions.

**Exterior Soffit Panels**

- The building has 278 exterior soffit panels located approximately 60 feet directly above public walkways.
- Each panel weighs up to approximately 2,500 pounds and is made of concrete on metal lath.
- The panels are approximately fifteen feet by fifteen feet.
- Walter P. Moore Engineers assessed all 278 panels. Approximately one-third, more than 93 panels, require immediate replacement without exception.
- The engineers' full assessment is that all of the panels and the substructure holding them up should be replaced, as they exhibit severe corrosion. The video reported that over 95 percent of the panels exhibit significant corrosion.
- The corrosion is driven by the roof drains above the system. Every roof drain was tested and every one leaks.

**Parking Garage, Plaza, Service Tunnel and Loading Areas**

- Decades of unmitigated water intrusion have compromised structural columns and reinforced concrete and corroded structural steel.
- Temporary shoring towers have been holding up deteriorating slabs in multiple locations for years, directly above active drive lanes.
- A steel girder supporting the River Plaza, directly beneath the expansion joint, has approximately 39 percent section loss — almost half gone. The video reported key steel beams exhibiting section loss of up to 40 percent.
- Thousands of square feet of failed fireproofing, rusting and failing expansion joints, fractured concrete, and deteriorated overhead slabs were identified.
- These conditions affect active vehicle lanes, backstage access routes, loading areas, and employee workspaces. The video described the service tunnel and loading docks as a primary

transit pipeline serving every backstage space, with chronic water intrusion having compromised joints and fractured overhead concrete slabs, creating immediate life-safety risks.

**Grand Foyer Ceiling Incident**

- On September 4, a section of plaster approximately four feet by five feet and one inch thick sheared off the Grand Foyer ceiling and fell roughly 60 feet.
- The section was estimated to weigh just over 150 pounds. Mr. Floca stated that had this occurred during a busy evening or an elementary school student matinee, someone would have been seriously hurt or killed.
- The video reported that the plaster broke free as a result of water damage, and that a security officer had cleared the area just minutes earlier. No one was injured.
- Other locations along the Grand Foyer ceiling show similar signs of trapped moisture and deterioration.
- This was not an isolated event; the building has many disparate systems that rely on one another and that are failing.

**Electrical Systems**

- Water infiltration has saturated transformer vault walls and corroded concrete.
- The high-voltage electrical infrastructure for the main halls is rusting under constantly wet conditions.
- An electrical survey recently identified 26 switchboards across the building, all of the age of the facility, manufactured in the 1968 to 1969 period and well past their service life.
- Because the high-voltage equipment dating from the 1960s lacks modern downstream disconnects, major repairs or component failures require shutting down power to approximately two-thirds of the building. Replacing this end-of-life equipment and addressing the leaks in which it sits requires de-energizing large portions of the campus: because of how the system was designed, the Eisenhower Theater and the Opera House must be taken down at the same time, after which the work moves to the remaining third of the main building. That is not an operation that can reasonably be undertaken in an occupied facility.
- Active leaks beneath the front plaza threaten the Center's primary electrical infrastructure.

**Mechanical Systems**

- The central air conditioning plant is operating on borrowed time. The four main chillers were installed in 1995 and the boilers in 2003.
- The chillers and boilers are operating years past their engineered service life, leaving the facility vulnerable to catastrophic mechanical failure and rendering basic climate control increasingly unmanageable.
- The condenser water sent through the HVAC system has been drawn unfiltered from the Potomac River since 1996. For thirty years the condenser water entering the chillers has not been filtered, contributing to buildup, corrosion and additional strain on the aging cooling equipment.

**Theatrical and Backstage Systems**

- Ropes decades old are failing, and there is no fall protection for the stagehands who run the shows.
- Backstage in the Opera House, critical theatrical rigging and overhead production systems are decades beyond their intended service life. An independent engineering report recommended major replacement as far back as 2002, yet much of that equipment remains in use above performers and crews today.

**Conclusions**

Mr. Floca emphasized that what the Board had seen were not projections in an engineering binder but the physical conditions of the facility today; that the findings were confirmations by named licensed firms that had tested and measured those conditions; and that they were not staff opinions. He noted that taken individually these are major capital projects, but together they represent compounding systemic failures that temporary shoring and piecemeal repairs can no longer mitigate.

Recalling Mr. Buchalter's review of costs and schedule at the previous meeting, Mr. Floca stated that undertaking the necessary work in an occupied and phased environment would double the cost, producing a project of $500 to $600 million against an appropriation of approximately $250 million — funding less than half of the required scope.

Mr. Floca described the alternative as overnight work and early morning shifts, inviting the public into the building during electrical shutdowns and while 2,500-pound soffit panels are replaced overhead, and stated that this would be irresponsible. He reported that the entire leadership team, across the Center's consultants, is unified in the assessment that the main building must be closed in order to carry out the project safely and efficiently.

The assessment concluded that the failures were systemic and that it would be irresponsible not to close the building to the public in order to conduct the renovations. Mr. Floca stated that the resolution before the Board would provide management with the formal authorization to commence with the improvements, emergency and otherwise, and would also ensure that the Center meets its programmatic and educational mandates.

## V. Board Discussion and Questions — Jennifer Fischer

Vice Chair Fischer opened the floor, asking that members raise a hand and speak one at a time.

**Ms. Patricia Duggan** was recognized first. She noted the finding of corrosion on 95 percent of the soffit panels and stated that, among many concerning details, the wrong thing to do is nothing. Drawing on her experience in an investment business and a museum, and her earlier involvement with the symphony, Ms. Duggan described a building she had purchased in Florida for her investment team, in which a single storm brought down the entire ceiling over the regulatory office; the person seated at that desk would have been killed, and she subsequently had the building demolished. Ms. Duggan observed that a culture is defined by the art, knowledge and wisdom within it, urged that the Center be repaired, and acknowledged President Trump for his unwavering support of American culture, of the Kennedy Center and of the endowment fund.

**Ms. Mary Helen Bowers** spoke from the perspective of a performing artist, noting that she performs with New York City Ballet. She spoke in favor of the renovations, citing health and safety hazards for audience members and for employees of the Center, and stated that world-class talent requires a world-class facility. She noted that the risks shown in the video extend beyond the main hall to performers, stagehands and the entire crew. Ms. Bowers described the court's interference as a travesty and urged that the Center be closed, repaired and returned to business.

**Ms. Hannah Buchan** stated that she has been involved with Buildings and Grounds for a number of years, and that the problem has existed throughout that period and has been patched rather than addressed. She thanked President Trump, Vice Chair Fischer, Mr. Floca, Delta Consulting Group and JLL for their persistence, stating that closure is the only solution.

**Ms. Denise Saul** stated that the Kennedy Center is the nation's cultural performing arts center and is in terrible condition. She applauded President Trump for making the video available and explaining the conditions so that they could be seen, and urged that the work be done quickly so that the Center can return to the business at hand — the performing arts in the nation's capital.

**Questions of Representative Larsen**

**Representative Rick Larsen** thanked Congress, and his committee in particular, for approving the $257 million, stating that credit should go where it is due. He noted that while some participants had raised objections to the judge's involvement, that was the situation before the Board, and that he did not intend to spend energy praising or complaining about it. Rep. Larsen asked:

1. Other than in its detail, how the operational result of this resolution differs from the resolution passed at the previous meeting;
2. How this resolution squares with the judge's decision to permit expedited discovery over the next two weeks before deciding;
3. Whether this forms part of the Board's effort to provide the judge with additional detail through that expedited discovery; and
4. Whether passage of the resolution would immediately change Judge Cooper's decision.

**Vice Chair Fischer** responded that the Delta report runs over 100 pages and is voluminous and difficult to absorb in full, and that the intention was to make the conditions unmistakable — nothing speaks like a moving picture. She noted that the footage was shot within the previous 48 hours and showed present conditions. She stated her hope that Representative Beatty would act to have the matter removed from the court, describing the situation as dangerous, and said that no amount of money changes the fact that with that many overhead panels requiring immediate attention there is no safe way to move the public or employees in and out of the building. Vice Chair Fischer stated that the Board's back is against the wall and that the key of all keys is to shut the building down completely and complete the work quickly, noting that the symphony is performing in other parts of the country, that the REACH will continue to operate and that the education departments are working nationally. She added that seven months had been lost during which the Center could have been under construction, deferring the reopening while time and costs increase.

Rep. Larsen expressed his appreciation for the Delta report, describing it as very complete.

**General Counsel Berke** responded that at the last hearing the judge had stated that he was not standing in the way of the renovations, and that the Center had countered that the renovations cannot be undertaken piecemeal for the reasons discussed. He stated that what had been missing was consideration of the full written Delta report. The Center's position has been that the Board's prior votes were sufficient to close the main building, and the judge has taken issue with that; the present resolution is intended to bridge the gap between what the judge asked and what more the Board could do. There has now been a completely independent review, and the Board has had two weeks to consider the full written report, placing the Center in the strongest position available to return to court.

Asked whether this changes the judge's announced timeline of two weeks of discovery, Mr. Berke stated that this is not yet known, that counsel are still digesting the opinion, and that the timeline was directed to the separate question of the recognition of the President, which should be clarified when the Center moves to vacate the preliminary injunction.

**Further Remarks of Board Members**

**Ms. Emilia May Fanjul** stated that she agreed with what other members had said, and that although she had not attended the previous meeting she had read the minutes and did not understand why the judge is standing in the way of a total closure of the building. She noted the record of the Congresswoman's statement that the matter had been predetermined, and stated that no one has told her how to vote, that nothing is predetermined for her, that she has reviewed all of the evidence, and that she is not anyone's puppet. Ms. Fanjul stated her support for full closure.

**Remarks of the Chairman**

Secretary Lutnick advised the Board that the President wished to address the meeting. Vice Chair Fischer invited him to do so.

President Trump addressed the Board. He stated that the project could have been half completed already, that the funding had been secured long ago and had been sitting unspent, and that in the meantime plaster has fallen from ceilings and steel is deteriorating — noting that once plaster fails, steel and concrete follow. He stated that he had inspected the building himself, including the parking garage, and considered the actual condition more severe than the presentation conveyed, describing the garage ceiling as ready to fall and the structure as in a state of collapse into which no one should be permitted until it is repaired.

The Chairman was critical of the court and of Representative Beatty, describing them as responsible for obstructing the closure and stating that he would hold them responsible for any injury resulting from delay. He described the presiding judge as politically conflicted by reason of his spouse's professional representations and stated that the judge should have recused himself.

On prior management, the Chairman stated that the Center had lost hundreds of millions of dollars before his involvement and that approximately $300 million appropriated by Congress had been spent constructing small underground theaters that have gone unused, while no funds were directed to the structure itself. He referred to the White House ballroom project as under budget and ahead of

schedule, thanked the Board, and stated that the Center would appeal the judge's decision immediately and proceed with closure.

**Representative Beatty**

**Representative Beatty** responded that she would not address the personal remarks directed at her, which she considered unprofessional, and stated that she is a member of the Board and an individual rather than a vote to be counted. She reiterated that she has never been opposed to the renovations and that this is on the record.

Rep. Beatty referred the Board to page 15 of the report provided to members, which she read as stating that it did not offer a building-wide opinion that the main building, considered as a whole, is presently unlawful or unsafe for occupancy, and that it instead identified documented conditions raising safety concerns and matters of safety management. She stated that this appeared inconsistent with other statements presented to the Board and required clarification, observing that the Board had one report indicating that the renovations are needed and another reaching a different conclusion, and that this matters where taxpayer funds are involved.

Rep. Beatty noted that the judge had separated the question of the naming from the question of the renovation and had ruled the naming unlawful on the statute rather than on any question concerning his spouse, adding that the Board includes attorneys who can read the statutes. She stated that she had no objection to the Center taking the matter to court, that she is not acting for publicity, and that she has served on this Board previously and on many other boards.

**Mr. Douglas Manchester** stated that it was time for the Board to move forward and to close the building for safety purposes, referring to his extensive experience in construction.

Vice Chair Fischer asked Representative Beatty to identify what caused her concern about closing the entire building immediately.

Rep. Beatty responded that she wished to know more specifically what happens to programming, to the performers and to the employees. She stated that she had received no financial assessment setting out the payroll for employees, and that she had heard for the first time that day that, in addition to the $257 million available, approximately $500 million would be required to complete all of the repairs. Her questions concerned whether employees would be terminated or furloughed, whether severance would be provided and at what cost, and whether employees of long service would be guaranteed a return to their positions in good standing after two years. She stated that she had no list of the affected performances; that while the Board had heard about the NSO agreement, the position of other performances was unclear; and that the judge had been explicit on the programmatic side and had raised mediation and the possibility of the parties coming together on programming. Rep. Beatty stated that the absence of any record on employees, performers and the associated cost was the source of her unease, and that she would not vote to close the building without it, noting that she had received the video and the accompanying materials two days earlier and had been working from a Delta report indicating that closure was not required.

An exchange followed between the Chairman and Representative Beatty. For formal meeting-note purposes, no separate motion or Board action resulted from this exchange.

**Ms. Maria Bartiromo** asked Representative Beatty what solution she would propose in light of the conditions described and the ceiling collapse that could have killed someone. Ms. Bartiromo stated that it was important to recognize that the Center has a Chairman with the background and skill set to identify the situation, urged that the temperature of the discussion be lowered, and said that the Board needed to arrive at a plan to return the facility to operation. Rep. Beatty stated she would not be answering any further questions. Ms. Mindy Levine called for the question to be answered due to its importance.

**Vice Chair Fischer** responded that management had considered every employee and had found a way to retain everyone it possibly could; that some employees would be placed on furlough and some would receive severance; and that the Center had kept the unions involved so far as possible and would seek to place their members in reconstruction work. She stated that shutting a building down necessarily requires minimizing expense, that the decision had not been easy or taken without a great deal of thought, and that the Center has an executive committee, an executive director and a president whom the Board has empowered to make these operational decisions. Vice Chair Fischer added that the Center is continuing to burn through funds that could otherwise support its educational mission, that the decision had to be made that day, and that absent anything further she would call the question.

## VI. Board Action — Closure Resolution

Douglas Manchester

Vice Chair Fischer called the question.

Representative Rick Larsen stated for the record that he would vote no, that he would not characterize his vote as being for or against any member of the Board, and that his concerns were operational, relating to employees.

Senator Sheldon Whitehouse then identified himself on the call and voted no. Vice Chair Fischer noted that the Board had been looking for his representative and had not seen anyone attending on his behalf.

**Motion:** Douglas Manchester
**Second:** Patricia Duggan
**Vote:** Motion carried by show of hands. A clear majority of raised hands voted in favor, with three members voting in opposition — Representative Joyce Beatty, Representative Rick Larsen and Senator Sheldon Whitehouse. No numerical count was taken. The two ex-officio representatives did not vote.

The resolution, which had been circulated to the Board in advance, provides as follows:

**RESOLUTION OF THE BOARD OF TRUSTEES OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**

WHEREAS, the Board of Trustees has reviewed the full reports of both the Delta Consulting Group and JLL, as well as the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto;

WHEREAS, the Board was able to meet with the principal of the Delta Consulting Group on September 15, 2026, and fully explore the basis for its recommendation that the main building close for renovations;

> WHEREAS, the Board has been advised of the Court's rulings in *Beatty v. Trump et al.* and has been guided by the Court's expressed thoughts about its statutory and fiduciary obligations;
>
> WHEREAS, subsequent to the Board meeting on August 13 and the most recent hearing in *Beatty v. Trump et al.*, additional water intrusion and deterioration of the Center's physical plant caused a partial ceiling collapse in the Grand Foyer, releasing debris from a height of approximately 60 feet and endangering visitors and employees alike;
>
> WHEREAS, both Delta Consulting Group and the Center's own Executive Director consider the main building to be unsafe for continued occupancy, and anticipate further risk to the public and employees if the building is not immediately closed and renovations begun;
>
> WHEREAS, the Board, being duly advised, believes that the risk associated with exposing patrons and employees to a hazardous building greatly outweighs any reputational risk associated with closing the main building; and
>
> WHEREAS, the Board, being duly advised, believes that maintaining continued programming in the REACH and offsite, maintaining educational outreach to the community, continuing the Center's support for the National Symphony Orchestra, and continuing the Center's long-standing tradition of presenting the Kennedy Center Honors and Mark Twain Prize, even though offsite, will ensure sufficient continuing engagement with the artistic community, the donor base, and patrons, that a two-year closure of the main building will not unduly affect its ability to ramp up programming in a revitalized main building in 2028;
>
> IT IS HEREBY RESOLVED, in addition to the resolution passed by the Board on August 13, 2026, that the main building of the John F. Kennedy Center for the Performing Arts shall be closed to patrons forthwith; that the Center shall continue to present educational and artistic programming at the REACH; that the Center shall continue its partnership with and support of the National Symphony Orchestra in performances at off-site venues; that the Center shall continue signature artistic productions offsite including but not limited to the Kennedy Center Honors and the Mark Twain Prize for American Humor; that the Memorial to President John F. Kennedy be temporarily relocated to the REACH where it will remain open to the public; and that immediate repair and restoration work be commenced in accordance with the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto.

The resolution was not read into the record in full and was not displayed to the Board during the meeting. Its substance was described and its intent was clear to the members, who had received the full Delta Consulting Group and JLL reports in advance and had undertaken their due diligence accordingly.

Vice Chair Fischer stated that the motion had passed and that the Center would move forward immediately, Mr. Floca and Mr. Berke being present and ready to proceed.

## VII. Authorized Follow-Up Actions — Elliot Berke

**Legal counsel** was directed to review Judge Cooper's ruling; to determine the appropriate motion to vacate or modify the preliminary injunction; and to pursue the anticipated appeal concerning recognition-related matters.

**Board administration** was directed to correct the previous meeting minutes to conform to the recorded transcript, and to recirculate the corrected minutes.

## VIII. Adjournment — Jennifer Fischer

Vice Chair Fischer called for a motion to adjourn. There being no further business:

**Motion:** Douglas Manchester
**Second:** Patricia Duggan
**Vote:** Motion carried. The meeting was adjourned at 1:38 p.m. ET.

In closing, Vice Chair Fischer thanked the trustees for their time, stated her conviction that the course adopted was the right one and that the Center would return bigger and better, and confirmed that work was proceeding on the reopening, which she said needed to be magnificent as the Center is the cultural center of the United States.

Mr. Paolo Zampolli addressed brief remarks to the Chairman, describing the White House ballroom project as impressive, noting that it had not been there sixty days earlier, and stating that he would not take his son into the Kennedy Center's main building in its present condition.

_______________________________
Brian Ballard, Secretary

_______________________________
Date