**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOYCE BEATTY,

*Plaintiff*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

Civil Action No. 25-4480 (CRC)

**DEFENDANTS' STATUS REPORT**

Pursuant to the Court's September 17, 2026 Minute Order, Defendants here provide a "detailed status report, supported by a sworn declaration from a knowledgeable representative of the Kennedy Center," on the "temporary closure" and "emergency repairs" described in Defendants' Response (ECF No. 86) to Plaintiff's Motion for Emergency Hearing (ECF No. 84).

Matt Floca, a knowledgeable representative of the Kennedy Center and signatory of the attached declaration, *see* Sep. 23 Floca Decl., ordered on September 16, 2026 that the John F. Kennedy Center for the Performing Arts ("the Center") close its main building "to protect employees, patrons, artists, contractors, and other members of the public while the Center evaluated documented falling-object hazards and other infrastructure conditions and determined what measures would be required for safe occupancy and emergency egress," *id.* ¶ 3. Mr. Floca "ordered the temporary closure based on the documented soffit hazards, the perimeter restrictions necessary to protect people from those hazards, and [his] conclusion that safe emergency egress could not be provided without protected pedestrian routes." *Id.*

On September 3, preliminary findings from a soffit-panel-assessment study conducted by the firm Walter P Moore were made available to Center management. *See id.* ¶ 8. Walter P Moore

"observed the structural components of approximately half of the Center's 278 soffit panels." *Id.* "Of the 278 panels, Walter P Moore classified 46 as having severe corrosion, 93 as having mild-to-moderate corrosion, four as having no observed issue, and 135 as having limited or no observation." *Id.* Walter P Moore determined, based on those findings, that "approximately one-third of all soffit panels were experiencing severe corrosion and required immediate replacement, and that nearly all remaining panels were experiencing some degree of corrosion." *Id.* "Walter P Moore recommended replacing the entire soffit-panel system and its supports, together with work addressing the related roofing, drainage, waterproofing, concrete-deck, and building-enclosure conditions." *Id.* Walter P Moore also "observed loose or disconnected support components" and "widespread" deterioration among the soffit panels. *Id.* ¶ 9.

"Because the soffits are located above areas regularly occupied by the public, Walter P Moore concluded that continued deterioration of the panels and support system presents a falling-object hazard and life-safety concern." *Id.* Mr. Floca thus imposed pedestrian restrictions beneath those active falling hazards (and around the immediate exterior of the Center). *See id.* ¶ 10. In discussions with Walter P Moore and JLL about the condition of the soffit panels, it became clear that "restricting pedestrian access beneath the soffits also affected the exterior routes needed to evacuate the building" in the event of an emergency. *Id.* ¶ 11. Without safe routes for emergency egress, Mr. Floca concluded that the Center "could not provide safe emergency egress for building occupants," meriting a temporary closure. *Id.*

On September 4, 2026, following severe regional storms, "a large section of ceiling plaster weighing approximately 150 pounds fell from approximately 60 feet to the floor in a public thoroughfare" of the Center. *Id.* ¶ 12. The Center "established a no-access exclusion zone in the Grand Foyer while ATSR, Walter P Moore, and internal facilities personnel investigated the failure

and surrounding conditions." *Id.* Preliminary investigations indicate that "water-related weakening of the plaster" is a "working hypothesis" for the ceiling collapse, though "additional testing is required to confirm the cause, identify the source or sources of moisture, and determine the extent of the condition." *Id.* ¶ 21. A September 17 visual review "identified ceiling irregularities at multiple Grand Foyer locations." *Id.* Review also "recorded reported falling objects in the Hall of States and ongoing water infiltration" in the Hall of Nations. *Id.* In reporting those observations on September 22, ATSR "recommended that interim safety procedures remain in place until further testing, diagnosis, and risk evaluation are completed." *Id.*

The Center is currently undergoing additional investigative and remediation activities related to other structural deficiencies identified throughout various public and performing spaces in the Center. On September 16 and 23, 2026, Mr. Floca held "building-safety meetings that included representatives from venue management, security, safety, facilities, programming, and project management." *Id.* ¶ 14. During the period between meetings, "internal staff prepared written narratives concerning water intrusion in the electrical vaults and deterioration of the plaster ceilings in the Grand Foyer, Hall of States, and Hall of Nations." *Id.* ¶ 15. "Internal production and stagehand reports also describe concerns involving Opera House lighting supports, auditorium lighting, pit-door interlocks, and the theaters' counterweight rigging systems." *Id.* Staff recommended that "affected portions" of spaces with water deterioration "remain closed to normal occupancy and public access pending investigation and a determination by appropriate qualified professionals that the affected ceiling areas can safely return to occupancy." *Id.* ¶ 16. Staff also recommended "prompt investigation of water-entry pathways and permanent waterproofing repairs" to address deterioration and corrosion on electrical equipment in "vaults serving the Eisenhower Theater, Opera House, and Concert Hall." *Id.* ¶ 17. Similar investigation indicates that

fixtures in the Opera House are not properly mounted and lighting in the Opera House is currently deteriorating. *See id.* ¶¶ 18–19.

Following investigation, WB Engineers+Consultants memorialized on September 22, 2026 further "electrical conditions that may present safety concerns." *Id.* ¶ 22. The firm "observed water apparently entering the transformer vault and contacting transformers, together with concrete fragments and other debris from the slab . . . on top of the equipment." *Id.* The firm "explained that prolonged moisture exposure can contribute to corrosion, insulation degradation, electrical faults, and equipment failure." *Id.* The firm recommended restricting access to the equipment rooms pending a more detailed assessment. *See id.*

Mr. Floca indicates that the temporary closure—which he set to last one week from September 16, 2026—will be reevaluated on a weekly basis. *See id.* ¶ 5. He intends to evaluate the necessity of any ongoing closure—and the extent to which portions of closed spaces might be safe to reopen—based on whether (1) "the required engineering assessments for the proposed occupied area and its access and egress routes have been completed;" (2) "the engineers have identified any necessary exclusion zones or interim controls;" (3) "adequate protected emergency-egress routes have been established beyond the applicable hazard zones;" (4) "identified electrical or structural hazards have been isolated, stabilized, or otherwise controlled," and (5) "security, safety, facilities, venue, programming, and project-management personnel can implement and maintain the required operating protocols." *Id.* ¶ 28. As of filing, Mr. Floca has determined that he "will be extending the temporary closure for an additional week, until September 30, 2026," because "the collection of information is ongoing and [he] remain[s] concerned about the documented hazards and inability to provide safe egress at this time in light of those hazards." *Id.* ¶ 27.

As Mr. Floca indicates, the "temporary closure is a management safety measure intended to permit investigation, risk evaluation, and the development and implementation of necessary interim protections while preserving programming and public engagement where those activities can continue safely." *Id.* ¶ 30. "It is separate from implementation of the Board's longer-term closure plan." *Id.* "Interim measures do not correct the underlying deterioration or predetermine the scope or duration of a longer-term capital program." *Id.*

Dated: September 23, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRANTLEY MAYERS
Counsel to the Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

CHRISTOPHER M. LYNCH
Chief Litigation Counsel

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
(202) 353-7578
william.s.jankowski@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, William S. Jankowski, hereby certify that on September 23, 2026, I electronically filed the foregoing, and all its attachments, using the Court's CM/ECF system, which automatically serves this document upon all counsel of record, in keeping with LCvR 5.4(d).

*/s/ William S. Jankowski*
William S. Jankowski

*Counsel for Defendants*