**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-4480 (CRC) |

**DECLARATION OF CHARLES MATTHEW ("MATT") FLOCA**

In accordance with the provisions of 28 U.S.C. § 1746, I, Charles Matthew Floca, state as follows, under penalty of perjury, pertinent to the above-styled and numbered case:

1. I currently serve as the Executive Director and Chief Operating Officer of the John F. Kennedy Center for the Performing Arts (the "Center"). In this capacity, I exercise operational authority over the Center's institutional departments, including its facilities and physical plant, and I represent executive management before the Center's Board of Trustees.

2. The matters set forth in this Declaration are true and correct based on my personal knowledge and on information made available to me in the course of my official duties. I make this Declaration in support of Defendants' Status Report concerning the temporary operational closure of the Center's main building and the safety assessments and related work currently underway.

3. Before September 16, the Board had received information concerning the condition of the Center's infrastructure, the scope of its capital needs, and potential approaches to completing the required work, including program, cost, and schedule analysis and condition information developed by the Center's consultants. The Board's longer-term closure plan remained subject to the Court's preliminary injunction and had not been implemented. My September 16 decision was separate from that longer-term plan. I ordered the temporary operational closure after consultations with outside consultants Walter P Moore and JLL based on the documented soffit hazards, the perimeter restrictions necessary to protect people from those hazards, and my conclusion that safe emergency egress could not be provided without protected pedestrian routes. A secondary basis for the closure was a life-safety incident involving the fall of a section of ceiling plaster in the Grand Foyer on September 4, 2026.

4. On September 16, 2026, I ordered a temporary operational closure of the Center's main building. I did so to protect employees, patrons, artists, contractors, and other members of the public while the Center evaluated documented falling-object hazards and other infrastructure conditions and determined what measures would be required for safe occupancy and emergency egress.

5. The initial closure was established for seven days. As I communicated to staff on September 16, the need for an extension would be evaluated on a weekly basis, informed by the progress and results of the ongoing engineering work.

6. The temporary operational closure does not extend to the entire Kennedy Center campus. Programming and other public engagement have continued at the REACH and at off-site partner venues. Designated essential personnel have entered or remained in the main building as necessary to support facility operations, security, investigation, and safety work.

7. A principal basis for my decision was the condition of the exterior soffit system and the resulting effect of necessary perimeter restrictions on emergency egress. The soffit panels are suspended approximately 60 feet above the plaza level and extend around the entire perimeter of the main building.

8. Walter P Moore's September 3, 2026 draft soffit assessment reported that it had observed the structural components of approximately half of the Center's 278 soffit panels, each of which weighs approximately 2,500 pounds. Of the 278 panels, Walter P Moore classified 46 as having severe corrosion, 93 as having mild-to-moderate corrosion, four as having no observed issue, and 135 as having limited or no observation. Walter P Moore extrapolated from the inspected panels that approximately one-third of all panels were experiencing severe corrosion and required immediate replacement, and that nearly all remaining panels were experiencing some degree of corrosion. Walter P Moore recommended replacing the entire soffit-panel system and its supports, together with work addressing the related roofing, drainage, waterproofing, concrete-deck, and building-enclosure conditions.

9. Walter P Moore further reported that deterioration was widespread rather than limited to discrete leakage locations. It observed loose or disconnected support components and stated that the remaining capacity of portions of the support system was difficult to establish. Because the soffits are located above areas regularly occupied by the public, Walter P Moore concluded that continued deterioration of the panels and support system presents a falling-object hazard and life-safety concern.

10. In reaching my September 16 decision, I considered multiple discussions with Walter P Moore and JLL regarding the soffit conditions, necessary perimeter restrictions, and their implications for building access and emergency egress. Those discussions occurred before or on September 16. In the course of those discussions, it was evident that protected pedestrian routes were necessary to provide safe egress through the affected perimeter areas. Based on the documented conditions and those discussions, I concluded that people could not be permitted to move freely beneath the soffits.

11. Because the soffit system extends around the entire main-building perimeter at plaza level, restricting pedestrian access beneath the soffits also affected the exterior routes needed to evacuate the building. Without pedestrian protection at the Hall of States and Hall of Nations entrances, or another professionally evaluated means of providing protected egress through the affected perimeter, I concluded that I could not provide safe emergency egress for building occupants. Restricting individual interior spaces would not resolve that problem. This relationship between the documented overhead hazard and the absence of protected pedestrian egress paths was the principal operational reason I ordered the temporary closure.

12. A secondary basis for the closure was a life-safety incident in the Grand Foyer on September 4, 2026. Following a rain event, a large section of ceiling plaster weighing approximately 150 pounds fell from approximately 60 feet to the floor in a public thoroughfare. The Center established a no-access exclusion zone in the Grand Foyer while ATSR, Walter P Moore, and internal facilities personnel investigated the failure and surrounding conditions.

13. Information resulting from investigations into the hazards posed by the soffits and the partial ceiling collapse—both of which indicated to me that concerns about the safety of occupancy of the building were greater than had previously been understood—led me to solicit additional information about potential hazards and conditions of the building in connection with my decision to temporarily close the building.

14. To that end, on September 16 and September 23, 2026, I held building-safety meetings that included representatives from venue management, security, safety, facilities, programming, and project management. The purpose of these meetings was to give the wider teams information about the engineering assessments and related work in progress, allow participants to ask questions, support staff engagement, and coordinate the operational response. These meetings were not a substitute for the professional judgments of the engineers or for my responsibility to make operational decisions.

15. As a result of the September 16 building-safety meeting, internal staff prepared written narratives concerning water intrusion in the electrical vaults and deterioration of the plaster ceilings in the Grand Foyer, Hall of States, and Hall of Nations. Those narratives document staff-reported conditions and recommendations for investigation, interim protections, and corrective work. Internal production and stagehand reports also describe concerns involving Opera House lighting supports, auditorium lighting, pit-door interlocks, and the theaters' counterweight rigging systems. In the following paragraphs, I distinguish these "internal" or "staff" accounts and recommendations from the findings of the outside engineering consultants.

16. The staff ceiling narrative reports water staining, discoloration, localized deterioration, and plaster damage in the Grand Foyer, Hall of States, and Hall of Nations, together with the September 4, 2026 plaster fall during a heavy rain event. The narrative recommends that affected portions of those spaces remain closed to normal occupancy and public access

pending investigation and a determination by appropriate qualified professionals that the affected ceiling areas can safely return to occupancy. It recommends examining suspect and surrounding areas, including concealed attachment and support conditions where accessible, investigating the water-entry pathways, and removing or stabilizing hazardous material under controlled conditions. These are staff observations and recommendations; the precise cause and extent of deterioration remain matters for the ongoing professional assessment described above.

17. The staff electrical-vault narrative reports persistent water intrusion in vaults serving the Eisenhower Theater, Opera House, and Concert Hall. It describes extensive staining, efflorescence, mineral deposits, stalactite-like formations, moisture-related deterioration, and visible corrosion on electrical equipment and associated metal components. The narrative identifies potential electrical, personnel-access, and operational risks and recommends prompt investigation of water-entry pathways and permanent waterproofing repairs, including excavation and exterior repairs where required. It also recommends interim inspections and monitoring, access restrictions where necessary, coordination with PEPCO, and immediate escalation if water is observed approaching or contacting energized equipment. These recommendations are not statements that those measures have been implemented, that the repair scope has been finalized or authorized, or that an electrical failure has occurred.

18. An internal production report reproduces a June 17, 2026 email from the Opera House Head Electrician describing movement in a box-tier lighting-support pipe while a 100-pound fixture was being hung. The email reports that some vertical pipes were not connected to building steel as the drawings indicated and that some locations had tack-welded connections. It records that the crew relocated the fixture and added safety cables around building steel for the run of Moulin Rouge. The production report expresses concern about hanging lighting over the audience from the affected position pending a qualified evaluation of its structural integrity. The reported precautions do not themselves establish the lighting supports' load capacity or constitute a professional clearance for continued use.

19. The internal Opera House auditorium-lighting report describes water exposure during the November 2024 fire-suppression event, visible damage to fixture insulation, and a December 2025 circuit problem attributed by the crew to water-damaged wiring that was subsequently replaced. The report also raises a concern about the compatibility of the existing dimmer-fed breaker-panel configuration and the performance of its overcurrent protection. That concern requires evaluation by qualified electrical professionals; I do not characterize the staff report as establishing that the protective devices will fail. The report recommends a longer-term LED conversion, which is distinct from determining what immediate repairs or restrictions are necessary for safe interim operation.

20. The internal Opera House pit-door report describes an interlock upgrade intended to prevent entry through a pit-access doorway when the lift is not present at that level, together with integration into the theatrical control system. The report identifies this work as a remaining aspect of the pit-improvement project, but does not establish the present condition or adequacy of the existing interlocks or other access controls.

21. In a memorandum dated September 22, 2026, reviewing the Grand Foyer ceiling after the partial collapse on September 4, 2026, ATSR reported that its September 17 visual review identified ceiling irregularities at multiple Grand Foyer locations. ATSR also recorded reported falling objects in the Hall of States and ongoing water infiltration observed at the Hall of Nations. Based on its review of recovered plaster, ATSR observed what appeared to be separation between the base scratch coat and the intermediate brown coat and stated that the smooth cleavage plane was consistent with potential delamination and failure. ATSR identified water-related weakening of the plaster as a working hypothesis, but stated that additional testing is required to confirm the cause, identify the source or sources of moisture, and determine the extent of the condition. ATSR recommended that interim safety procedures remain in place until further testing, diagnosis, and risk evaluation are completed.

22. In a memorandum dated September 22, 2026, WB Engineers+Consultants reported several electrical conditions that may present safety concerns. WB reported that most PEPCO-owned dry-type transformers date to 1969 and exceed their stated 30-to-40-year useful-life expectancy. At Substation 5F, WB observed water apparently entering the transformer vault and contacting transformers, together with concrete fragments and other debris from the slab above on top of the equipment. WB explained that prolonged moisture exposure can contribute to corrosion, insulation degradation, electrical faults, and equipment failure. WB recommended prioritizing the affected section of the substation for replacement and, at minimum, restricting access to the equipment rooms until a qualified electrical contractor performs a more detailed assessment and determines appropriate interim safety measures.

23. WB also reported that most of the Center's switchboards date to 1968 or 1969 and are approximately 20 years beyond their expected useful life, increasing the risk of faults and fire and the potential duration of outages. WB identified a mixture of three-pole and four-pole automatic transfer switches and recommended proactively replacing the existing three-pole units with four-pole units. WB further reported that the Center's most recent arc-flash study was completed in 2009 and recommended that a new study be performed so that current hazards, protective measures, and equipment labeling can be evaluated.

24. The internal counterweight-rigging overview describes the Opera House, Eisenhower Theater, and Terrace Theater systems as largely original installations dating to 1971, 1971, and 1978, respectively. It reports that sealed components limit inspection and maintenance access, references a 2002 recommendation to replace the Opera House system, and states that a 2024 Sapsis inspection and subsequent Wenger/Clancy work identified deficiencies. These statements summarize the staff account; the overview does not itself identify the particular components restricted from use or establish that the systems are subject to an imminent failure.

25. Additional engineering assessments concerning the service tunnel, electrical vaults, and parking garage are ongoing.

26. I understand that Walter P Moore is preparing an additional written report expected on September 25, 2026. Based on information communicated to me to date, I expect that report to address a safety zone extending 30 feet outward from the edge of the lower roof overhang and to provide additional information concerning the service tunnel, electrical vaults, and parking garage.

27. Because the collection of information is ongoing and I remain concerned about the documented hazards and inability to provide safe egress at this time in light of those hazards, I will be extending the temporary closure for an additional week, until September 30, 2026, and will continue to reevaluate conditions and whether a closure remains necessary on a weekly basis.

28. In evaluating whether any part of the main building may reopen, I will consider whether: (1) the required engineering assessments for the proposed occupied area and its access and egress routes have been completed; (2) the engineers have identified any necessary exclusion zones or interim controls; (3) adequate protected emergency-egress routes have been established beyond the applicable hazard zones; (4) identified electrical or structural hazards have been isolated, stabilized, or otherwise controlled; and (5) security, safety, facilities, venue, programming, and project-management personnel can implement and maintain the required operating protocols.

29. My September 16 decision was based on the conditions and information available to me at that time, including the soffit findings and evaluations of safe egress. The September 22 ATSR and WB memoranda provide additional information for my ongoing assessment; I do not rely on those later memoranda or the anticipated September 25 report as information that was available to me when I made the original decision, although they support my decision to continue the temporary closure for an additional week. Likewise, the staff narratives prepared as a result of the September 16 meeting are distinguished from the information available when I initially ordered the closure. An earlier incident or observation date stated in a staff report does not, by itself, establish when that information was communicated to me.

30. The temporary closure is a management safety measure intended to permit investigation, risk evaluation, and the development and implementation of necessary interim protections while preserving programming and public engagement where those activities can continue safely. It is separate from implementation of the Board's longer-term closure plan. Interim measures do not correct the underlying deterioration or predetermine the scope or duration of a longer-term capital program.

Executed in Washington, DC, on Wednesday, September 23, 2026.

Charles Matthew Floca