**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br>*Plaintiff*,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>*Defendants*. | Civil Action No. 25-4480 (CRC) |

**DECLARATION OF CHARLES MATTHEW ("MATT") FLOCA**

In accordance with the provisions of 28 U.S.C. § 1746, I, Charles Matthew Floca, state as follows, under penalty of perjury, pertinent to the above-styled and numbered case:

1. I currently serve as the Executive Director and Chief Operating Officer of the John F. Kennedy Center for the Performing Arts ("the Center"). In this capacity, I exercise operational authority over all institutional departments, managing a complex integration of both trust and federal functions, including all elements of the Center's physical footprint. I represent the executive management of the Center before its Board of Trustees. In my employment, I report to the Board of Trustees ("Board").

2. The matters set forth in this Declaration are true and correct from my own personal knowledge and from information made available to me in the course of my official duties. I am a "knowledgeable representative of the Kennedy Center" competent to provide the detail required under the Court's September 17 Minute Order to describe the temporary closure and emergency repairs at the Center. I make this Declaration in support of Defendants' "further" Status Report, as required by the Court's September 25, 2026 Minute Order, on the temporary closure and emergency repairs currently ongoing at the Center.

3. As I explained in my prior declaration, I ordered a temporary operational closure of the main building on September 16, 2026. My principal operational reason was the relationship between the exterior soffit hazards and safe emergency egress. The soffit system extends around the entire perimeter of the main building at plaza level. Protecting people from the documented falling-object hazards requires restricting pedestrian access beneath the soffits, and those restrictions affect the exterior routes needed to egress and evacuate the building. Without protected pedestrian routes through the affected areas, I concluded that I could not provide safe emergency egress for building occupants. Nothing in this Declaration changes that account of my September 16 decision.

4. On September 23, 2026, I extended the temporary closure while the safety assessments continued. The closure remains in effect as of the date of this Declaration and continues to be reviewed on a weekly basis.

5. The closure does not extend to the entire Center campus. The REACH remains open to the public, and free programming continues there. Non-essential staff continue to work remotely. Essential on-site staff enter the main building only through designated access routes through The REACH or approved entrances on parking garage Levels A, B, and C, following the instructions of the Center's Office of Safety and Security. The Hall of States, Hall of Nations, and Grand Foyer remain restricted; entry requires express authorization and compliance with all prescribed safety controls, including hard hats and any other required personal protective equipment.

6. My Prior Declaration, ECF No. 91-1, described Walter P Moore's September 3, 2026 draft soffit assessment and noted that a further report was expected. Walter P Moore has since issued its final, signed soffit-panel assessment, dated September 25, 2026, and updated September 28, 2026, which supersedes the September 3 draft. A true and correct copy of that final report is attached to this declaration as Exhibit A.

7. Walter P Moore's assessment was not a single event. Its investigation was ongoing throughout the period from September 3, 2026, when it issued its draft assessment, through September 16, 2026, when I ordered the temporary closure, and it continued until Walter P Moore provided its final report. That work included the test openings described below, which were made between September 3 and September 11, 2026. During that period, I received information about the developing findings through the discussions with Walter P Moore and JLL described in my prior Declaration.

8. The final assessment is a visual condition assessment. Walter P Moore reported that it observed the top side of 143 of the 278 soffit panels and used LiDAR scanning to document the underside of all panels. Of the panels whose top side was observed, Walter P Moore classified 46 as having severe corrosion, 93 as having mild-to-moderate corrosion, and four as having no observed issues; 135 panels could not be observed, principally because of debris and insulation. In test openings made between September 3 and September 11, 2026, Walter P Moore reported that some framing members had corroded completely through. Because the causes of deterioration are widespread, Walter P Moore expects the unobserved panels to be in similar condition.

9. Walter P Moore identified the condition of the soffit system as a falling-object hazard and life-safety concern above areas used by the public. In the analysis section of its report, Walter P Moore recommended that the areas under and adjacent to the soffit panels remain closed to the public until repairs are made or further evaluation is carried out. Its recommended interim measures also include keeping maintenance personnel from walking on the panels and removing loose concrete. Its permanent recommendation is replacement of the soffit panels and supports, coordinated with roofing, drainage, waterproofing, building-enclosure, and associated concrete and steel repairs. The report did not evaluate the load capacity of the structure, and its repair recommendations are conceptual.

10. I received the final assessment after my September 16 decision, and I do not rely on it as information that was available to me at that time. It is, however, central to my continuing assessment. Its recommendation to keep the public out of the areas under and adjacent to

the soffits confirms that the perimeter restrictions affecting the building's exterior exit routes will remain necessary until repairs are made or further evaluation is performed. For that reason, whether and how the main building can be safely occupied now depends principally on whether safe egress can be provided while those restrictions remain in place.

11. On September 30, 2026, I sent an email to all Center staff updating them on the temporary closure. A true and correct copy of that email is attached to this declaration as Exhibit B. In it, I explained that the Center had temporarily closed the main building on September 16 because of safety concerns, including the effect of perimeter restrictions on safe emergency exit routes; that the closure had been extended on September 23; and that the final soffit assessment recommended keeping the public out of areas beneath and adjacent to the overhangs pending repairs or further evaluation.

12. I also informed staff that the Center's facilities, safety, and security teams were conducting a detailed emergency-egress assessment to determine whether, and under what conditions, the building can safely support occupants and be evacuated while these restrictions remain in place; that the main building would remain temporarily closed pending that determination; and that the assessment was then expected to be completed within one to two weeks. I stated that this was an assessment timeline, not a reopening date, and that the immediate safety determination is separate from the scope and schedule of the broader renovation program.

13. The purpose of the emergency-egress assessment is to determine whether everyone in the main building, including patrons, artists, staff, contractors, and people with disabilities, can be safely evacuated while the areas under and adjacent to the soffits remain closed, and, if not, what protective measures would be required. The assessment is evaluating, among other things, which exits discharge into or through the restricted perimeter areas, whether the remaining routes can safely serve the building's occupants, and what protected routes or other measures would be needed.

14. The assessment is being led by the Center's Office of Safety and Security, working with the Center's facilities, security, venue-management, accessibility, programming, and project-management personnel and with the Center's project-management consultant, JLL.

15. On October 1, 2026, the Center's Office of Safety and Security convened a meeting of Center personnel involved in the assessment to discuss draft evacuation routes. Participants shared a range of perspectives on the routes under consideration. Following that meeting, the Center's Office of Safety and Security circulated a draft evacuation-route document to the participants that sought to take those perspectives into account.

16. Safe egress must account for every occupant, including people with disabilities. Later on October 1, the Center's Director of Accessibility reviewed the draft evacuation routes, provided written accessibility recommendations/suggestions and proposed additional context and structure for finalizing an Interim Life Safety Plan. Those recommendations are being considered as part of the ongoing assessment.

17. The draft egress options are also undergoing independent technical evaluation by outside professionals. On October 1, 2026, JLL confirmed to the Center that they will oversee third-party life-safety reviews of the proposed egress routes and provide formal comments and recommendations. ATSR, the firm that investigated the September 4, 2026 Grand

Foyer ceiling plaster failure described in my prior declaration, continues to assist in evaluating overhead structural and life-safety impacts.

18. A true and correct copy of the current proposed emergency evacuation procedures under consideration by the Center, JLL, and ATSR—in draft form—is attached to this declaration as Exhibit C.

19. As of the date of this Declaration, the draft evacuation routes remain under review by Center personnel and by JLL and ATSR, and the assessment has not been finalized. Based on the information available to me, the Center cannot yet provide safe emergency egress for the main building while the soffit restrictions remain in place, and the main building will remain temporarily closed while the assessment is completed.

20. The Center is evaluating options for safely restoring access, which may include overhead scaffolding or other pedestrian protection along evacuation routes, including at the Hall of States and Hall of Nations entrances. Any such protection would require engineering design and any applicable reviews before installation. As of the date of this Declaration, no such protection has been designed.

21. In evaluating these options, the Center is applying a consistent process of identifying, evaluating, and mitigating risk. The first and controlling consideration is the risk to the safety of the public, artists, staff, and contractors. The Center is also evaluating the risk each option presents to the Center's budget and to its mission, including its ability to continue presenting programming and serving the public. Moving forward with any one of the options will include that evaluation. Budget and mission considerations inform how the Center chooses among options that provide safe egress; they do not determine whether safe egress is required.

22. The assessment also addresses the essential personnel who continue to enter the main building during the closure.

23. The other assessments described in my prior Declaration, including the Grand Foyer plaster investigation and the electrical-infrastructure review, remain ongoing. On October 1, 2026, testing confirmed that portions of the Grand Foyer ceiling contain material that requires specialized handling and containment procedures under applicable environmental and occupational-safety regulations. Any further investigation, removal, or repair of the affected ceiling areas must therefore be performed under those procedures, and the Grand Foyer remains restricted.

24. I will continue to review the closure weekly. In deciding whether any part of the main building may reopen, I will consider whether: (1) the emergency-egress assessment for the proposed occupied area has been completed, including the accessibility review and review by JLL and ATSR; (2) adequate protected emergency-egress routes have been established beyond the areas under and adjacent to the soffits; (3) any other engineering assessments required for the proposed occupied area have been completed and any identified hazards, including materials requiring specialized handling, have been isolated, stabilized, or otherwise controlled; (4) the risks of the selected option to public safety, the Center's budget, and its mission have been evaluated and mitigated; and (5) the Center's security, safety, facilities, venue, accessibility, programming, and project-management personnel can implement and maintain the required operating and evacuation procedures.

25. The temporary closure remains a management safety measure, separate from implementation of the Board's longer-term closure plan. Emergency physical remediation work to the overhead soffit panels has, as of the date of filing of this Declaration, commenced; that work falls within the scope of repairs and remediation authorized by the July 2025 congressional appropriation and contemplated within the scope of the current Comprehensive Project Development Plan. But such repairs are being conducted only to address emergency structural needs. Interim measures, including any protected egress routes, do not correct the underlying deterioration or predetermine the scope or duration of a longer-term capital program.[1]

Executed in Washington, DC, on Friday, October 2, 2026.

Charles Matthew Floca

[1] Other non-emergency work contemplated under the Comprehensive Project Development Plan—*e.g.*, design and planning work—is currently ongoing. But the Center's management views itself as bound by the Court's injunction in effectuating a full two-year closure pursuant to the Board's August and September votes, and, thus, any construction work for the renovation contemplated by the closure vote and the associated planning documents has not yet begun.