**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | No. 25 Civ. 4480 (CRC) |

**MOTION TO COMPEL**

In February 2025, Donald Trump appointed himself to the Kennedy Center's Board, and his handpicked trustees named him Chairman of the trust. By all accounts, Trump has personally dictated the goings on at the Kennedy Center in his capacity as Chairman. Indeed, this Court previously found that, from Donald Trump's perspective, the Board's "approval" for his decisions regarding the Kennedy Center is "just a minor detail." Mem. Op. 82, ECF No. 50 (citation modified). As Chairman, Trump is the one running the show. Trump unilaterally announced the plan to close the Kennedy Center on February 1, 2026, which this Court subsequently enjoined. Based on available evidence, Defendants' August 2026 vote to close the Center, like its prior vote, was designed to rubber stamp Trump's February ukase—regardless of the true best interests of the Kennedy Center or the factors that should bear on that analysis.

When Defendants filed their motion to vacate the preliminary injunction and for summary judgment, they initially relied on evidence of what Trump told Defendant Matthew Floca. *See, e.g.*, Defs.'s Mem. in Supp. of Mot. 4, ECF 88-1; Defs.'s Statement of Undisputed Material Facts ¶ 4, ECF No. 89-2; *see also* Suppl. Decl. Charles Matthew Floca ¶ 6, ECF No. 29-3. But after

Plaintiff served written discovery, the Department of Justice pivoted to a sweeping claim of presidential communications privilege to bar any inquiry into those communications, or indeed into any inputs and instructions the Kennedy Center's staff received from its board chair. The Department now refuses to provide *any* documents held by the Kennedy Center even touching on communications between the Chairman and management and intends to block all inquiry into those communications in depositions. Plaintiff does not bring this motion lightly. The Department's sweeping assertion of privilege, however, appears to be unprecedented. Donald Trump is the chair of a non-profit corporation's board, and his decisions and directions lie at the heart of that board's actions which, in turn, are the subject matter of this case. Allowing Defendants to hide behind this unwarranted assertion of privilege would obstruct the search for the truth, frustrate the Court's discovery order, and undermine public confidence in these important proceedings.

Presidential communications privilege is a species of executive privilege that "arises from the President's Article II powers," and "singularly protects the President's ability to perform his assigned constitutional functions." *United States v. Navarro*, 182 F.4th 1005, 1021 (D.C. Cir. 2026). As the D.C. Circuit recently underscored, the privilege applies "narrowly to records solicited and received by the President or the President's immediate White House advisers who have broad and significant responsibility for advising the President." *Id.* at 1011 (citation modified). The privilege does not shield any and all communications involving the President from scrutiny. This unique Article II privilege instead protects the sanctity of "sensitive Executive Branch deliberations." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 864 (2020). Meanwhile, because asserting executive privilege is so fraught, the privilege may only be invoked by "a president or his designee," with specificity, and even then, the privilege is not absolute but instead "may be overcome by a strong showing of need." *Navarro*, 182 F.4th at 1011, 1018 (citation

modified).

The issues in this case fall well outside the heartland of executive privilege. The Kennedy Center is not an Article II entity, is not "in the executive branch," and does not exercise executive power. *Dong v. Smithsonian Inst.*, 125 F.3d 877, 879 (D.C. Cir. 1997). Indeed, the Kennedy Center's staff are nothing like the close presidential advisors to whom the presidential communications privilege normally applies. After Trump voluntarily assumed the "usual powers and obligations of a trustee" with respect to this trust, 20 U.S.C. § 76*l*(b), Trump cannot simultaneously claim an Article II privilege meant to shield sensitive *executive branch* deliberations from scrutiny, and in doing so escape the legal requirements Congress imposed on the Kennedy Center's trustees. Meanwhile, the government ignores the procedural requirements requiring the President or his designee to personally invoke privilege, and the rule that the privilege cannot be invoked on a blanket basis.

Regardless, even if the privilege did apply to Trump's actions as Chairman of the Kennedy Center (it does not) and the proper procedures were met (they were not), if there were ever a circumstance in which the "qualified" privilege is overcome, it is here. *Navarro*, 182 F.4th at 1011. Defendants insist that the Board and management have now *independently* concluded that a two-year shutdown was warranted. But the limited evidence in the record indicates that Defendants are once again miming the motions to approve the Chairman's declaration in February 2026 that the Kennedy Center must close for two years. Meanwhile, the Board's chairman, Trump, is publicly and repeatedly threatening to demolish the Center and has stated he will not conduct renovations unless his name is affixed to the façade—including in new remarks made to *Time* magazine just a few days ago. Trump's conduct as chair of the Board and his directions to Board members and staff lie at the heart of this case. Placing them off limits will profoundly hinder this

Court's ability to get to the truth.

This is not a fight Plaintiff sought. To the contrary, Plaintiff has minimized imposition on the executive branch. For example, despite Donald Trump being the chair of the Board and the central actor in this case, Plaintiff agreed that Defendants need not search the Executive Office of the President for responsive documents. She likewise has not sought any evidence from Commerce Secretary Howard Lutnick, another major figure in this action whose participation bears no obvious relationship to his official duties as Secretary of Commerce (although his wife serves on the Board and is a Defendant in this case). Instead, Plaintiff has currently sought documents and testimony only from current and former Kennedy Center management, such as evidence bearing on the instructions and input Donald Trump has provided to management, which is plainly at the heart of this case. To date, Plaintiff has sought to accommodate any good faith concerns that the government may have.

In response, the Department of Justice has presented a stone wall of executive privilege without engaging in any effort towards accommodation. The Supreme Court has warned that "[e]xecutive privilege is an extraordinary assertion of power 'not to be lightly invoked,' " precisely because it can set "coequal branches of the Government" "on a collision course." *Cheney v. United States Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004) (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953)). The Department of Justice has disregarded that warning and is improperly asserting a blanket privilege in an unprecedented fashion.

Having appointed himself to the Kennedy Center's board and having assumed the office of Chair, Donald Trump undertook the obligations placed on him by the Center's organic statute to safeguard and protect this sacred memorial to a fallen President. Trustee and board chair are not roles that must be performed by the President of the United States and, indeed, never have been

in the Center's history before now. Nor are the staff at the Kennedy Center anything like the close presidential advisers whose conversations executive privilege protects. The Court should not permit Defendants to evade accountability as trustees by abusing a privilege constructed for other purposes, not the chairmanship of this non-profit entity. Plaintiff therefore respectfully requests the Court compel the production of responsive documents and written production Defendants improperly withheld.

## BACKGROUND

**1.** "In February 2025, President Donald Trump replaced several trustees on the Center's Board of Trustees and appointed himself as a trustee, too. The newly reconstituted Board then elected him chair and, under his direction, replaced the Center's president." Mem. Op. 1-2. That "December, the Board decided to rename the institution the 'Trump Kennedy Center.'" *Id*. at 2. The next day, workers affixed signage with Trump's name above President Kennedy's on the main building's façade. *Id.* According to Trump's press secretary, the Kennedy Center's new name "recognized the unbelievable work President Trump had already done to salvage the building." *Id*. at 52-53 (citation modified).

On February 1, 2026, without any warning to the Board, Trump took to social media and announced that he had personally determined to close the Kennedy Center for two years. *Id*. at 11. In his words, "I have determined that The Trump Kennedy Center, if temporarily closed . . . can be, without question, the finest Performing Arts Facility of its kind, anywhere in the World," and "I have determined that the fastest way to bring The Trump Kennedy Center to the highest level of Success, Beauty, and Grandeur, is to cease Entertainment Operations for an approximately two year period of time." *Id.*

Trump's abrupt announcement of a two-year shutdown represented a remarkable "180-

degree change in plans" for the institution. *Id.* at 80. The Kennedy Center's longstanding plans called for phased renovations, which are the industry's gold-standard for performing arts centers. Under the prior plans, the Kennedy Center would have maintained a level of operations in its main building while simultaneously conducting needed repairs and maintenance. This would have ensured that the Kennedy Center maintained its link with donors, artists, staff, and patrons and continued to fulfill its statutory obligations.

By all accounts and by all appearances, Donald Trump is at the heart of the decision to shut down the Kennedy Center. When the Board met to approve the shutdown on March 16, 2026, the Chairman mocked the idea of the board's independence, joking that "it's a little late for the board" to approve his decision, but these "are minor details." *Id.* at 20 (emphasis omitted). When this Court held an evidentiary hearing several weeks later, Defendant Floca testified that the Chairman is intimately involved in the Kennedy Center's construction. Mr. Floca had "[n]umerous conversations" with the Chairman, "multiple times a day" including on "the state of the building and the needs of the building and the needs of the campus." Transcript of Evidentiary and Motion Hearing Proceedings at 10-12, *DC Pres. League v. Bd. of Trs. of the John F. Kennedy Ctr. for the Performing Arts*, No. 1:26-cv-00981 (D.D.C. Apr. 29, 2026), Dkt. No. 39.

The Chairman even routinely weighs in on matters ranging from the "color schemes" of seats to repainting the Kennedy Center's historic columns. *Id.* at 14, 18. Indeed, when Defendants filed for summary judgment several weeks ago, their statement of undisputed material facts stated that Mr. Floca developed a proposal to close the Kennedy Center only after speaking "with President Trump several times." ¶ 4, ECF No. 89-2; *see also* Defs.'s Mem. in Supp. of Mot. 4, ECF 88-1; Suppl. Decl. Charles Matthew Floca ¶ 6, ECF No. 29-3.

**2.** On May 29, 2026, this Court preliminarily enjoined the shutdown, finding that

Defendants likely violated their fiduciary duties when they rubber stamped Trump's planned closure based on incomplete information. In the Court's words, Defendants had presented the Board with "a stacked deck," replete with "serious informational deficits," designed to justify Trump's February 1 announcement. Mem. Op. at 79-80. The Court separately enjoined the unlawful renaming of this monument dedicated by Congress to President Kennedy. *Id.* at 57.

At that point, Defendants declined to resume meaningful programmatic operations in the Kennedy Center. Instead, Defendants doubled down on their strategy of rubber stamping the Chairman's preferred approach at all costs. They engaged no new programming for the main building of the Center. On August 13, 2026, the Board voted again to shut down the Kennedy Center for two years, based on a five-page PowerPoint presented by a consultant with no experience in performing arts. On September 15, 2026, the Board again voted to close the Kennedy Center for two years.

In the meantime, Chairman Trump has continued to actively control the Kennedy Center's operations. Trump has also repeatedly threatened to demolish the Kennedy Center if prevented from adding his name back onto the institution. This demolition threat is particularly serious in light of Trump's pattern of acting before courts can intervene, including the sudden demolition of the East Wing of the White House without congressional authorization.

Thus, on September 15, 2026, the Court issued its decision enjoining the second attempt to unlawfully add Trump's name onto the façade. The same day, the Board voted (for the third time) to close the institution. In response, Trump posted on social media that "closing will take place immediately" but "renovation and Reconstruction" "cannot begin until such time as the D.C. Circuit rules on the Board's approved name. **If the ruling is a negative one, which it should not be, and is not overturned by the U.S. Supreme Court, the Reconstruction and the Renovation**

**of The Kennedy Center will not take place**." Pl.'s Notice of Board Vote and Chairman Statement 1, ECF No. 78 (emphasis added).

Similarly, on September 16, 2026, Trump told reporters that, "for the Trump administration, for me, to get involved, and to take on long term, and to carry it, or to raise money to carry it, I think that **the Trump administration should certainly have recognition**. Because frankly, **if we don't do that, it's going to close, it will end up being ripped down**." Pl.'s Notice of Suppl. Authority 1, ECF No. 85 (emphasis added). Separately, that evening, Trump was photographed reading a placard that appears to read "Kennedy Center DEMOLISHED." *Id*. at 1-2.

Just a few days ago, in an interview with *Time* magazine published October 1, 2026, Trump rhetorically asked, "why would I want to stick with something that's going to lose hundreds of millions of dollars, and I'm not even recognized?" When asked, directly, "**would you commit to not bringing in wrecking balls** to Washington to demolish the Kennedy Center without the consent of Congress?" Trump responded, "**I'm not committing to anything**. . . . It's a lot of money, and I said, **if I'm going to do this, then I think the Trump Administration should be recognized**." *Read the Full Transcript of Donald Trump's 2026 Interview With TIME*, TIME (Oct. 1, 2026), https://time.com/article/2026/10/01/donald-trump-2026-interview-transcript/ (emphasis added).

**3.** Because it appears that Defendants have once again produced a stacked deck to substantiate Trump's plan to close the Kennedy Center, it is critical for Plaintiff to probe the instructions and inputs management may have received from Trump. The Court also expressly authorized discovery, by its September 17 minute order, into Trump's September 16 statements and threat to demolish the Kennedy Center.

Plaintiff propounded document discovery to inquire into these matters.[1] Some of the requests sought the production of documents, for example, "concerning the decision to present Closure to the Board" and did not directly identify Trump. RFP 1. Other requests expressly sought records of communications, for example, "between the Chairman and any officer, employee, or trustee of the Kennedy Center." RFP 6.

Plaintiff was sensitive to concerns that might potentially arise from the Chairman's simultaneous status as President and the involvement of other high-level executive branch officials, such as Secretary Lutnick, in this matter. In meet-and-confers with opposing counsel, Plaintiff's counsel underscored that Plaintiff does not request that Defendants search the Executive Office of the President for responsive documents. Plaintiff likewise did not seek discovery from Secretary Lutnick nor the deposition of any Board member. Instead, at this juncture, Plaintiff seeks only information in the possession of the Kennedy Center that bears on the directions and inputs they received from any source, including their board chair.[2]

On September 30, 2026, Defendants transmitted their responses and objections. As relevant here, Defendants asserted that, "to the extent the discovery requests seek communications involving the President or White House personnel, they are inappropriate because they *may* have the effect of seeking information protected by the presidential communications privilege." Ex. B at 8-9 (emphasis added).

In other words, Defendants object to producing to any communications "involving the

[1] The discovery as served by Plaintiff appears as Exhibit A. The responses and objections as provided by Defendants appear as Exhibit B. This motion cites Plaintiff's requests for production (RFPs), requests for admissions (RFAs), and interrogatories (ROGs) by number.

[2] For their part, Defendants sought records of Plaintiff's interactions with the media and to depose Plaintiff, who is a sitting Congresswoman. By agreement of the parties, Plaintiff's deposition has been postponed, without prejudice to a motion to quash or a motion to compel. Pl.'s Position Statement 2 n.1, ECF No. 95.

President or White House personnel," regardless of whether such communications were confidential, and even if such information is in the possession of the Kennedy Center, which is not an Article II entity. Perhaps more notably, Defendants also claim that they are free to withhold such information even if the information is *not* protected by the presidential communications privilege. *Id.* (asserting that "[s]uch discovery violates the separation of powers" insofar as it seeks "responsive, non-privileged documents"). A list of RFPs, ROGs and RFAs to which Defendants asserted privilege appears in the footnote below.[3]

Defendants' assertion of privilege has completely squelched critical lines of inquiry. For example, Defendants refuse to provide any information in the Kennedy Center's possession responsive to RFP 6, seeking information about communications staff had with the Chairman regarding the pertinent issues in this case. Defendants likewise asserted presidential communications privilege with respect to, and refused to provide any documents responsive to, RFP 15, which seeks documents and communications "reflecting any analysis, performed in connection with either of the Board Decisions, of the effect of the Closure on programming, performers, staffing, audiences, donors, finances, the Kennedy Center's memorial function, or the Kennedy Center's reputation." *Id.* at 22. It bears repeating: At this juncture, Plaintiff is simply asking for information in the Kennedy Center's possession, not for anything in possession of the executive branch.

When Plaintiff served written discovery, Plaintiff's counsel noted "that the Court's schedule requires both sides to conduct substantial discovery on an unusually compressed

[3] Based on their written objections, Defendants have asserted presidential communications privilege or executive privilege with respect to: RFPs 1, 4, 6, 12, 13, 15, 38, 39, 45; ROGs 6, 13, 19; RFAs 42, 43, 44, 46, 48, 49, 50, 51, 53, 54, 55. Based on their generic assertion of privilege, Defendants also appear to have withheld documents or answers on the basis of the presidential communications privilege or executive privilege with respect to: RFPs 23, 46; ROGs 5, 21, 23.

timetable." Pl.'s Position Statement, Ex. A 8, ECF No. 95-1. Counsel emphasized that "Defendants' decision to seek summary judgment on the same timetable makes it particularly important that Plaintiff receive the discovery necessary to respond meaningfully to that motion." *Id*. at 9. But Plaintiff's counsel likewise sought "to discuss reasonable ways to prioritize production and narrow or sequence particular requests where doing so would facilitate production within the Court's schedule." *Id*. Plaintiff's counsel also sought to "discuss prioritization, custodians, search parameters, or other practical means of completing production without delaying the discovery that Plaintiff needs for the upcoming depositions and summary-judgment briefing." *Id*.

Rather than meaningfully produce documents, however, Defendants have broadly stonewalled discovery. Their primary production transmitted on September 30, 2026 consisted of only approximately 100 documents, including roughly 35 emails. Defendants have consistently refused to provide financial information, for example, even after the Court stressed the importance of doing so in the discovery conference. At the Court's instruction, Plaintiff filed a discovery statement requesting the Court compel production of responsive documents to which Defendants do not assert privilege. *See* Pl.'s Position Statement 1, ECF No. 95.

Plaintiff now brings this motion to compel with respect to written discovery for which the Defendants assert privilege. Defendants have also indicated that, in the upcoming deposition of Defendant Floca, Defendants will object to any questions regarding his interactions with the Chairman. Plaintiff reserves the right to file a supplemental request for the compulsion of Mr. Floca's testimony if and when his counsel directs him not to answer on the basis of presidential communications privilege or any other similar privilege.

## ARGUMENT

This is not a motion that Plaintiff makes lightly. But allowing the government to assert presidential communications privilege, in a sweeping manner and in a case that does not even involve an executive branch entity, is untenable. Defendants have simultaneously stonewalled the production of other documents for which they do not assert an Article II privilege—leaving Plaintiff in the dark regarding critical aspects of this case. Plaintiff is left with no choice but to raise this serious dispute for the Court's attention. To allow the matter to go unaddressed would greatly undermine public faith in the rule of law. Indeed, if the Court were to deny both this motion and the pending request for documents to which Defendants do not assert privilege, *see* ECF No. 95, it would amount to the effective denial of discovery in this important case. Plaintiff has sought to move as expeditiously as possible, mindful of the Court's order. To the extent that resolving these disputes delays the resolution of this case, the blame lies entirely with Defendants, who have adopted scorched-earth tactics toward discovery.

As a legal matter, Defendants' assertion of privilege fails for five independent reasons, two procedural and three substantive. *First*, Defendants have not established that the President or his designee has directed them to assert executive privilege as to any of the documents or information they seek to withhold. *Second*, Defendants' blanket and wholesale assertion of privilege fails to establish a valid claim of executive privilege. *Third*, Defendants have not met their burden of showing that any communications they seek to withhold pertain to direct decision-making by the President acting in his official capacity. Indeed, the requested records—which, again, are in the Kennedy Center's possession—plainly do not pertain to Trump's actions *as President*. Trump is acting *as a trustee and board chair of a trust instrumentality*, which is *not* an Article II entity. Indeed, it is impossible to reconcile Defendants' assertion of an Article II privilege meant to shield

sensitive *executive-branch* deliberations and Trump's status as a trustee of a non-Article II entity. Nor are the Kennedy Center staff close presidential advisors whose conversations the presidential communications privilege protects.

*Fourth*, Plaintiff's need for the materials at issue outweighs any legitimate confidentiality interests that would be protected by shielding those materials from disclosure. For starters, because the Kennedy Center is not an Article II entity, any constitutionally protected interest in non-disclosure is at its lowest ebb. Meanwhile, the President has repeatedly spoken about these issues in public, and Defendants themselves address these matters in their filings, a strong indication that these are not issues that must remain confidential. Nor does the President have any interest in shielding from scrutiny unlawful activity, including the brazen violation of Defendants' fiduciary duties or the potential demolition of the Kennedy Center. On the other side of the ledger, the inputs and instructions that Kennedy Center staff received are critical facts to uncover in this case. *Fifth*, Defendants appear to have waived executive privilege as to at least some responsive communications by publicizing and relying on those communications at an earlier stage of this litigation. That makes it even more puzzling that the Department of Justice is now staking out an extreme position to shield any evidence about the Chairman's communications with the institution's staff. Moreover, Defendants additionally waived all claims of privilege in the Kennedy Center's possession by disseminating purported executive branch information to a trust instrumentality that is not even within the executive branch.

## I. The President Or His Designee Must Invoke Executive Privilege.

"Executive privilege" should not "be lightly invoked" because it can set "coequal branches of the Government" "on a collision course." *Cheney*, 542 U.S. at 389 (citation modified). To avoid unnecessary stress on the separation of powers, courts may not apply executive privilege, which is an extremely serious matter, "based solely on a defendant's say-so." *Navarro*, 182 F.4th

at 1019. Instead, "only a President or his designee may invoke executive privilege," and courts require "proof of the privilege's proper assertion." *Id.* at 1019, 1021.

Defendants have not asserted, much less established, that the President or his designee has invoked executive privilege. *See, e.g.*, Ex. B at 7, 8-9, 12 (objecting to requests for information purportedly protected by executive privilege but providing no representation or evidence that the President has directed the assertion of executive privilege). Instead, line attorneys from the Department of Justice have made blanket assertions of privilege without any claim of proper authority.

Those line attorneys may not raise executive privilege on their own in this manner. *See Navarro*, 182 F.4th at 1023. In *Navarro*, for example, the district court properly found that "executive privilege was never invoked by President Trump or a designee," even though an "attorney to President Trump" wrote a letter to Navarro representing that "Dr. Navarro and President Trump had 'discussed matters of critical importance' regarding 'trade and manufacturing policy and a wide variety of other subjects' " and purporting to "*confirm[] President Trump's position that, as one of his senior advisors, [Dr. Navarro] had an obligation to assert executive privilege on [President Trump's] behalf*." *Id.* (emphasis added). That letter did not suffice, the D.C. Circuit explained, because it did "not state that President Trump ever directed Dr. Navarro to assert executive privilege with respect to the Select Committee's subpoena." *Id.*

The same is true here: Defendants have not said or shown that President Trump ever directed them "to assert executive privilege with respect to" any responsive documents or communications they are refusing to produce. Even if executive privilege were otherwise available here—and it is not—that consideration, standing alone, defeats Defendants' reliance on the presidential communications privilege. *See id.* at 1019 ("A court . . . cannot simply take a

defendant at his word that the President invoked privilege because doing so would impermissibly tangle separation-of-powers lines.”).

## II. Defendants Cannot Assert A Blanket Invocation Of Executive Privilege.

Executive privilege may also not be established via blanket or wholesale refusals to produce responsive records. *See Navarro*, 182 F.4th at 1023-1024 (holding that “no invocation of executive privilege could have excused Dr. Navarro’s wholesale default,” including his refusal to produce “information not subject to privilege at all,” and identifying that defect as an “independent reason” for concluding that defendant “failed to establish his executive-privilege claim”). Rather, “where the executive seeks to withhold from the court documents relevant to a civil or criminal lawsuit,” it is “essential” that the executive “*specify* the documents for which protection is sought” and “*explain why the specified documents* properly fall within the scope of the privilege.” *Black v. Sheraton Corp. of America*, 564 F.2d 531, 543 (D.C. Cir. 1977) (emphasis added); *see also, e.g.*, *Navarro*, 182 F.4th at 1010, 1016-17 (explaining that “a subpoena recipient may resist the disclosure of *specific* ‘governmental communications protected by executive privilege,’ ” accepting defendant’s concession that “executive privilege must be affirmatively invoked on a subpoena-by-subpoena basis,” and characterizing that concession as “well founded”) (citation modified) (emphasis added).

Those principles require rejecting Defendants’ blanket assertion of privilege. Here, as in *Navarro*, Defendants invoke “executive privilege” to justify their “wholesale” refusal to produce responsive documents and information, including—by their own admission—“information not subject to privilege at all.” *Navarro*, 182 F.4th at 1023-1024; Ex. B at 8-9 (objecting broadly to discovery requests that seek any “communications involving the President or White House personnel . . . because they *may* have the effect of seeking information protected by the presidential communications privilege,” even if the information at issue is *not* protected by that

privilege, and asserting that "[s]uch discovery violates the separation of powers" insofar as it seeks "responsive, *non-privileged* documents") (emphases added). For example, "executive privilege extends only to the provision of confidential advice by select presidential advisers; it does not apply to public statements or matters discussed in a personal capacity." *Navarro*, 182 F.4th at 1017 (citing *Mazars*, 591 U.S. at 864-65; *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). Defendants, however, are claiming the right to withhold *any* "communications involving the President or White House personnel." That capacious formulation, by its terms, would include nonconfidential statements made by Defendant Trump to persons who are not select presidential advisers—*i.e.*, information indisputably not protected by executive privilege.

Even putting aside their claim that executive privilege supports their refusal to produce non-privileged information, Defendants' blanket and wholesale assertion of privilege fails at the threshold. *See id.* at 1022-24. In email correspondence with counsel including the undersigned, for example, Defendants state they are "asserting the executive privilege for *any* discovery requests seeking communications (or the substance of those communications) to, from, or including the president." On its face, that generalized assertion fails to satisfy the "essential" requirements that the executive "specify the documents for which protection is sought" and "explain why the specified documents properly fall within the scope of the privilege." *Black*, 564 F.2d at 543.

That is no mere technical infirmity. A claim of executive privilege cannot be assessed by a court without any information about what privileged material is at issue and why it is being withheld. *See id.* Thus, Defendants' generalized assertion of privilege creates an unacceptable risk that Plaintiff will be denied her right to obtain responsive and unprivileged material. That risk is particularly acute here, since Defendants claim they need not find and produce any "responsive, non-privileged documents." Ex. B at 8-9.

Defendants cannot justify their categorical refusal to produce responsive information by suggesting that unspecified discovery requests "may" implicate privileged materials. *Id.* As in *Navarro*, Plaintiff "tried to accommodate" Defendants' generalized "assertion of privilege, seeking clarification on the nature and scope of [Defendants'] claims and offering to discuss ways to preserve [their] ability to assert any appropriate privilege in response to specific questions." *Navarro*, 182 F.4th at 1020. And here, as there, Defendants "flatly refused to engage." *Id.* "[N]othing in the separation of powers requires rewarding that behavior." *Id.*[4]

## III. Executive Privilege Does Not Apply To Communications Unrelated To Defendant Trump's Official Duties As President.

Executive privilege is a constitutionally based privilege that protects the institution of the Presidency, not the individual who happens to occupy the White House. *See Navarro*, 182 F.4th at 1020-1021. The privilege is "necessary to provide the confidentiality required for *the President's* conduct of office," *Nixon v. GSA*, 433 U.S. 425, 448 (1977) (citation modified) (emphasis added); it facilitates "the effective discharge of *a President's* powers," *United States v. Nixon*, 418 U.S. 683, 711 (1974) (emphasis added); and it arises by implication "from the nature of" *the President's* "enumerated powers" under Article II, *id.* at 705-06. Accordingly, "[t]he presidential communications privilege should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752. To the extent that the President and his advisers wear "dual hat[s]," "the government bears the burden of proving that" any communications

[4] To the extent the Court rules on procedural grounds only, and although Defendants' blanket assertion of executive privilege is contrary to longstanding law and should not be countenanced, the Court may wish to afford the President one additional "opportunity to present more particular claims of privilege, if accompanied by an analysis in manageable segments." *Nixon v. Sirica*, 487 F.2d 700, 721 (D.C. Cir. 1973). If the Court adopts this approach, it should also make clear that the Department's sweeping conception of the presidential communications privilege is wrong, for the reasons set forth in Parts III, IV, and V below.

purportedly protected by executive privilege "occurred in conjunction with the process of advising the President." *Id*.

The government has not even attempted to satisfy that burden here. As noted above, Defendants have not identified the particular communications they seek to withhold. Still less have Defendants asserted—much less established—that those communications involved the constitutional duties of the President and his close advisers acting in their official executive branch capacities. *See Navarro*, 182 F.4th at 1021 (explaining that "executive privilege may attach to" the documents and testimony of the President's "immediate advisers" "only when the President decides that doing so is necessary to avoid 'imped[ing] the President's ability' to obtain the information and advice *necessary 'to perform his constitutional duty*' ") (quoting *In re Sealed Case*, 121 F.3d at 751) (emphasis added).

Defendants err insofar as they assume that any communications "involving" Defendant Trump necessarily pertain to the President's constitutional duty. *See* Ex. B at 8-9. Article II of the Constitution does not call for "direct decisionmaking by the President" on whether and in what circumstances the Kennedy Center should be closed or demolished. *In re Sealed Case*, 121 F.3d at 752. Nor does any federal statute. Indeed, the Kennedy Center is not even part of the Executive Branch. *See* 20 U.S.C. § 76h(a)(1) (establishing the Kennedy Center as a bureau "in the Smithsonian Institution"); *Dong*, 125 F.3d at 879 ("It is plain that the Smithsonian is not an establishment in the executive branch."). Thus, communications related to the closure or demolition of the Kennedy Center need not—and at least presumptively do not—implicate the kind of "sensitive Executive Branch deliberations" protected by executive privilege. *Mazars*, 591 U.S. at 864 ("declin[ing] to transplant" the protection provided by executive privilege "root and branch to cases involving nonprivileged, private information").

It is no answer to say that Defendant Trump wears two hats—one as President and one (by virtue of his appointment to the Kennedy Center Board) as Chairman of the Board. All defendants here—including Chairman Trump—may invoke whatever evidentiary and procedural protections would ordinarily shield communications involving members of a non-profit board, such as attorney-client privilege. But Defendants may not collectively excuse themselves from the discovery obligations that would otherwise apply to *all* Board members just because *one* of them also happens to be President, or communications with that Board member acting in his Kennedy Center capacity. Similarly, Defendants cannot refuse to produce any and all "communications involving . . . White House personnel," regardless of whether those communications involved close presidential advisers acting in that capacity.

At a minimum, Defendants bear the burden of proving, as to communications to or from parties wearing "dual hat[s]," that the communications they seek to withhold "occurred in conjunction with the process of advising the President" in connection with his duties as President of the United States. *In re Sealed Case*, 121 F.3d at 752. Defendants here have not submitted any evidence or developed any argument purporting to show that any (much less all) of the communications they seek to withhold implicate the President's constitutional responsibilities; and there is no reason to assume that communications about the Kennedy Center with Kennedy Center personnel "involving" the Chairman of the Kennedy Center's Board, Ex. B at 8, implicate the constitutionally "enumerated powers" of the President under Article II, *Nixon*, 418 U.S. at 705-06.

It bears emphasis: This case lies far outside the heartland of executive privilege. The staff at the Kennedy Center are not even the kind of close presidential advisors to whom the privilege has been understood they apply. *See Mazars*, 591 U.S. at 863-64 (explaining that canonical examples of executive privilege from the Nixon administration concerned "conversations between

President Nixon and close advisers," and underscoring that the privilege ensures "candid, confidential deliberations within the Executive Branch"); *Navarro*, 182 F.4th at 1011 (explaining that the presidential communications privilege applies "narrowly to records solicited and received by the President or the President's immediate White House advisers who have broad and significant responsibility for advising the President." (citation modified)); *In re Sealed Case*, 121 F.3d at 752 (cautioning that "privilege should not extend to staff outside the White House in executive branch agencies," and instead protects White House staff who "have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate"). Thus, based on the record before the Court, Defendants have not met their burden of establishing a valid claim of executive privilege.

**IV. Plaintiff's Need For Evidence Overcomes Any Possible Privilege.**

Even if the presidential communications privilege did apply (it does not) and it was properly invoked (it was not), the privilege is qualified rather than absolute. *Nixon v. GSA*, 433 U.S. at 446. In particular, the privilege gives way when "the need for the evidence outweighs any arguable harm that could result from disclosure." *Black v. Sheraton Corp.*, 371 F. Supp. 97, 102 (D.D.C. 1974); *see also In re Lindsey*, 158 F.3d 1263, 1268 (D.C. Cir. 1998) ("[F]ederal courts do not recognize evidentiary privileges unless doing so promotes sufficiently important interests to outweigh the need for probative evidence." (citation modified)). That may be the case, for example, when a claim of executive privilege "seeks to shelter improper official acts" or otherwise illegal conduct. *Black*, 371 F. Supp. at 101-102 (distinguishing between "admitted misconduct and perversion of power by government officials" and evidence pertaining to "a legitimate determination of policy," and concluding that "[a]ny evidence which concerns the government's illegal acts are not privileged").

Here, Plaintiff's need for evidence is at an apex. Chairman Trump personally announced

the decision to shutter the Kennedy Center on February 1; the Board's initial vote to close was obviously a mere formality, as Trump himself made clear at the time. Thus, even by Defendants' account, Chairman Trump was intimately involved in making that decision. And he has continued to closely control the Kennedy Center since. It is extremely difficult to plumb the prudence of the Board's decision—and evaluate whether Defendants again improperly curated a stacked deck or acted in bad faith—without knowing what input and instructions management received from Donald Trump. Nor is it at all possible to determine whether Trump has conditioned certain renovations, for example, on his name being affixed to the building, or to determine accurately the risk of Trump following through on his threats to demolish the structure, without documents from the Kennedy Center and testimony from Kennedy Center employees that bear directly on that topic. *Cf. In re Sealed Case*, 121 F.3d at 761 ("Obviously, this evidence is not available elsewhere . . . .").

In contrast, to the extent the Chairman could invoke executive privilege, his concerns are at their nadir. For starters, because the Kennedy Center is outside of Article II and because its staff are not close presidential advisors, any concerns for the President's Article II prerogatives are at a minimum. The Court already underscored that Defendants, including the Chairman, likely violated their fiduciary duties; that the Chairman improperly treated the Board's authority as an afterthought; and the prior shutdown vote was a stacked deck in favor of a predetermined outcome. There is no possible interest in facilitating this kind of "perversion of power." *Black*, 371 F. Supp. at 101. Meanwhile, the Chairman has publicly and repeatedly threatened to demolish the Kennedy Center if he cannot get his way on the renaming, even in the face of Congressional and judicial authority making clear that he cannot lawfully do so. It would be deeply disturbing if the Department of Justice could sweep those potential illegalities under the rug simply by making a

conclusory assertion of executive privilege, without pointing to any specific and legitimate interests of the executive branch in blocking production of the information at issue.

**V. Defendants Have Waived Any Privilege.**

Finally, Defendants themselves have proffered—and asked the Court to rely on—facts involving certain kinds of communications with Donald Trump germane to the issues in this case. In particular, Defendants have relied on communications between Chairman Trump and Mr. Floca to support their motion to vacate and for summary judgment. *See* Defs. Mem. in Supp. of Mot. 4, ECF 88-1; Defs.'s Statement of Undisputed Material Facts ¶ 4, ECF No. 89-2; *see also* Suppl. Decl. Charles Matthew Floca ¶ 6, ECF No. 29-3. At a minimum, Defendants may not now assert executive privilege as to those facts and communications. *See Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 890 (D.C. Cir. 2021) (explaining that executive privilege may be waived, although such waivers "should not be lightly inferred" (citation modified)); *In re Sealed Case*, 121 F.3d at 741 (D.C. Cir. 1997) (citing cases for the proposition that "release of a document" may waive executive privilege, but only "for the document or information specifically released, and not for related materials," and explaining that "[t]his limited approach to waiver in the executive privilege context is designed to ensure that agencies do not forego voluntarily disclosing some privileged material out of the fear that by doing so they are exposing other, more sensitive documents"); *Cause of Action Inst. v. U.S. Dep't of Com.*, 513 F. Supp. 3d 116, 131 (D.D.C. 2021) (concluding that "[t]he government waived the presidential communications privilege as to those portions" of a report that were "directly quoted" in a public proclamation).

Moreover, Plaintiff currently only seeks documents in the possession of the Kennedy Center, meaning the information the Department of Justice intends to keep confidential has already been transmitted outside the executive branch. Because this information was not kept confidential from the start and has already been shared with or exposed to persons who are not among the

President's close advisers, they should be available for discovery.

### VI. This Is Not A *Cheney* Case.

It is unclear what arguments the Department of Justice will raise in response. But in their objections, Defendants implied that requiring them to assert the privilege would cause "an undue burden and distraction" on executive branch officials. Ex. B at 9. To the extent the Department raises that argument to the Court, it fails. It is extremely unlikely there *are* any responsive documents to which the privilege could possibly attach, for all the reasons discussed in this motion, meaning this claimed burden is substantially overstated. Regardless, it is plain that executive privilege cannot attach to material held by the Kennedy Center, which is not an executive branch agency, and even if it somehow did, that claim would be deeply attenuated and overcome by the need for the information in this case. Thus, even if the Court forgives the requirement that Defendants identify specific information, their claim of privilege should be denied. At a minimum, once the Court clarifies the permissible scope of the privilege, Defendants can easily identify whether any materials actually implicate Article II concerns.

The case to which Defendants have gestured, *Cheney*, is also plainly inapposite. In *Cheney*, a district court ordered "the Vice President and other senior officials in the Executive Branch to produce information about a task force established to give advice and make policy recommendations to the President." 542 U.S. at 372. In this case, by contrast, Plaintiff does not seek "to enforce" discovery "against the Executive Branch." *Id*. at 390. Instead, the evidence she seeks is in the possession of the Kennedy Center—which, again, is not an executive branch entity and which explains why the effort to assert the presidential communications privilege is unavailing.

*Cheney* also involved a unique situation in which plaintiffs sought to enforce a sunshine law against a federal task force. The Supreme Court emphasized the broad discovery plaintiffs

sought would have provided them with far more than the "disclosure to which they would be entitled in the event they prevail on the merits." *Id.* at 388; *see also id.* at 393 (Stevens, J., concurring) ("[R]espondents sought to obtain, through discovery, information . . . to establish their entitlement *to the same information*. . . . [Thus,] prejudge[ing] the merits of respondents' claim."). The Supreme Court also stressed that the government engaged in good faith efforts to respond to discovery, while moving to narrow it "in some way" to ameliorate its burden concerns. *Id.* at 388 (majority opinion).

By contrast, here, the information is essential to the underlying claims in this lawsuit. Moreover, in addition to asserting blanket claims of executive privilege, the Department of Justice has simultaneously refused to provide other non-privileged material. It cannot be that the government can *both* refuse to follow the procedures to assert executive privilege to avoid burdening the President while *also* stonewalling all other discovery that might shed light on key factual disputes. *See id.* at 390 ("[T]here is sound precedent in the District of Columbia itself for district courts to explore other avenues, short of forcing the Executive to invoke privilege . . . ."); *see also id.* at 393 n.* (Stevens, J., concurring) (emphasizing that a "few interrogatories or depositions might have" uncovered the same information).

* * *

Plaintiff is mindful of the Court's desire to avoid an unnecessary dispute over executive privilege. But the blame does not lie at her feet. Defendants are stonewalling discovery at every turn, and the Department of Justice is invoking executive privilege indiscriminately to block highly material inquiries. Absent the Court's intervention, Defendants will be allowed to curate the record and hide the truth from the Court.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court compel the production of documents, answers to requests for admission, and responses to interrogatories, which were withheld based on the asserted claim of presidential communications privilege.

Dated: October 5, 2026

Respectfully submitted,

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
(D.C. Bar No. 1724093)
AMIT AGARWAL*
(D.C. Bar No. 90002013)
KYLE R. FREENY
(D.C. Bar No. 1684764)
ALEXANDER KRISTOFCAK
(D.C. Bar No. 90045623)

WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

**Application for admission forthcoming*

NORMAN EISEN
(D.C. Bar No. 435051)
STEPHEN JONAS
(D.C. Bar No. 90037069)
DAVID W. OGDEN
(D.C. Bar No. 375951)

DEMOCRACY DEFENDERS ACTION
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

*Counsel for Plaintiff Joyce Beatty*