**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*<br><br>*Defendants.* | Civil Action No. 25-4480 (CRC) |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S DISCOVERY POSITION STATEMENT**

Plaintiff's overwrought position statement on discovery, ECF No. 95, only underscores what Defendants have argued to the Court throughout the course of the litigation on Plaintiff's remaining claims: No discovery is warranted or necessary because the existing record wholly supports the reasoned decision the Board of Trustees ("the Board") of the John F. Kennedy Center for the Performing Arts ("the Center") made in its August and September meetings to adopt a two-year closure plan to conduct renovation and remediation of the main building of the Center. Plaintiff's desperate efforts to seek additional discovery—because, to be clear, none of the voluminous evidence provided to her thus far supports her unfounded theories of impropriety—should be headed off at the pass. Enough is enough. The Court should not entertain Plaintiff's and counsel's efforts to mire this litigation in unnecessary and massively burdensome discovery simply because Plaintiff and her counsel believe something *must* be wrong with the Board's well-supported decision to take an action with which Plaintiff, for undefined reasons, evidently disagrees.

Defendants ask that the Court order discovery closed immediately or, if the original

deadline for the end of limited discovery—October 9, 2026, *see* ECF No. 82 at 1—passes while consideration of these statements is pending, decline to reopen discovery before resolving Defendants' pending motions to vacate the preliminary injunction and for partial summary judgment, *see* ECF Nos. 88, 89, or, indeed to reopen discovery at all. Moreover, given that Plaintiff's request to extend discovery, if granted, would directly prejudice Defendants' interest in lifting the injunction currently preventing Defendants from proceeding with full renovation activities under the two-year closure plan the Board adopted, Defendants ask that the Court exercise its discretion to grant Defendants' pending motion to vacate or dissolve the preliminary injunction, ECF No. 88, immediately.[1] *See, e.g.*, *Jones v. D.C. Redevelopment Land Agency*, 499 F.2d 502, 507 (D.C. Cir. 1974) (explaining that "the denial and dissolutions of preliminary injunctions" "call, ordinarily, for the exercise of judicial discretion"); *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 648 (1961) (affording courts "wide discretion" in balancing the equities while considering the modification of court orders); *Duma v. Unum Provident*, 191 F. Supp. 3d 1, 2–3 (D.D.C. 2012) (considering a party's Rule 60(b) motion for relief from final judgment "[a]lthough no opposition" to the "motion or writ has been filed," given that the Court "carefully . . . considered the motion and writ"); *see also* Fed. R. Civ. P. 60(b) (requiring only that relief may be granted "[o]n motion and just terms"); *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 351–52 (9th Cir. 1999) (concluding that a court can modify even a final judgment "on its own motion").

[1] If this Court is inclined to extend discovery, Defendants maintain their position that, given the equities, any extension of the briefing schedule for the dissolution motion would significantly prejudice Defendants. Defendants do not oppose bifurcation of the consideration of the motions so long as the extension of the summary judgment briefing schedule is "very brief," such as seven or fourteen days. ECF No. 95 at 7, and does not afford Plaintiff any opportunity to serve additional unnecessary discovery requests.

**Defendants' Document Productions**

Plaintiff's description of Defendants' production thus far, *see* ECF No. 95 at 2–4, wholly misstates the extent of Defendants' cooperation—under a severely expedited discovery timeline—with Plaintiff's requests for information. On top of the thousands of pages of record evidence already filed on the public docket in this litigation—which constitutes the entirety of the record put before the full Board during its August and September meetings, save for certain appendices to the Delta report containing sensitive architectural drawings that were provided to the Board but not filed publicly—Defendants have produced almost seven thousand pages of responsive evidence over the course of the last week and a half.

Despite the current record and Defendants' voluminous production, Plaintiff implies[2] that "financial information underlying the Kennedy Center's and Delta's analysis presented at the two Board meetings" has been withheld in some fashion. *Id.* at 2. That is flatly incorrect. The "agree[ment]" Plaintiff identifies, *id.*, covered financial data underlying Delta's analysis—which goes only to FY25. Delta did not consider FY26 financial data in developing its report—at the time it was conducting its analysis, FY26 had not ended (the Center's fiscal year extends from the end of September to the end of the next September). So the "agree[ment]" Plaintiff misrepresents in her position statement included that data underlying the Delta analysis, which went only through

[2] Plaintiff's position statement asserts that "Defendants did not provide those documents on September 30." ECF No. 95 at 3. For one, Defendants *did* provide financial information underlying the Center's and Delta's analysis on September 30—namely, FY25 unaudited financial statements, financial data provided to Delta to underpin its FY27 projections, and emails discussing financial estimates the Center would rely on to make those projections. But, more importantly, Defendants *also* provided *exactly the data Plaintiff requested* on October 1 and October 2. And, as Defendants' counsel communicated to Plaintiff and explained during the October 2 hearing, Defendants undertook those activities well *before* the "Court made unmistakably clear that financial materials must be produced." *Id.* at 4; *see also* Oct. 2 Hr'g Tr. at 27:4–12 (noting that the parties had been discussing production of financial information *before* involving the Court).

FY25 (for existing financial data) and projected forward through FY27 (for the Center's budget scenarios). And, pursuant to that agreement, Defendants provided the raw financial transaction data (in addition to unaudited FY25 financial statements) for *every single transaction* on the Center's financial ledger in FY25. That data presents the most holistic and complete picture of the Center's FY25 finances possible. And Defendants further produced an internal Center workbook containing detailed profit-and-loss data, and the accompanying analytical projections, underlying the FY27 budget projections that the Center communicated to Delta. In other words, Defendants produced *exactly* the "financial information underlying the Kennedy Center's and Delta's analysis presented at the two Board meetings." *Id.* at 3.

Notwithstanding the fact that the production of detailed FY26 financial data was outside the parties' agreement for proceeding on an expedited discovery timeline,[3] Defendants sought to determine whether its production might regardless be possible under the expedited discovery in this case. At this stage, though, such information is not reasonably available considering the significant burdens of expedited discovery and the needs of the case. As Defendants' counsel explained to Plaintiff's counsel, *see* ECF No. 95-2 at 2, Defendants' counsel understands from the Center that the institution updated the financial systems it uses to store financial data at the beginning of FY26. The data stored in the Center's systems is neither reasonably accessible from that system nor necessarily verified at this time, in large part because the fiscal year recently closed,

[3] Of course, on the merits, Defendants maintain their argument that FY26 financial data—like all of the data produced during this discovery process—is not material to the question of whether the Board satisfied its fiduciary duty in voting in August and September to close for two years to conduct renovations, given the extensive record developed by Center management, analyzed by Delta, and presented to the Board in connection with those meetings. And, further, such data is doubly immaterial under Plaintiff's theory of the case, given that any recent financial distress unique to FY26 would, if anything, provide *greater* support for a full closure now, as that distress only increases the benefit of full closure now, making any fully or partially open operating model in the near term, under Plaintiff's theory, *less* prudent.

and the data in the system would not reflect all transactions, reconciliations, year-end adjustments, management reviews, and other processes required to prepare the information for external use. Completing the required work would, at this point, be impossible for the Center to do on such an expedited discovery timeline and would be unduly burdensome in the context of the claims at issue.

Otherwise, Plaintiff provides only *one* example—in direct contravention of the Court's admonishment to give "examples" of discovery deficiencies, Oct. 2 Hr'g Tr. at 38:11—of what she alleges are "**very serious**" and "**systemic**" discovery deficiencies, ECF No. 95 at 2, 4 (emphasis in original). That example—a PowerPoint slide dated June 1, 2026, and provided to the Audit and Finance Committee—was made public on September 26, 2026, in a disclosure by Senator Whitehouse, an *ex officio* member of the Board. Plaintiff has therefore had access to the slide she alleges represents systemic discovery deficiencies since the week before Defendants' discovery responses were due. And, in any case, Defendants included in their production detailed minutes of the June 2026 meeting at which that presentation was given.

To be sure, if Plaintiff wishes to confer further on resolving one-off discovery concerns like the slide deck she identifies, Defendants stand ready to cooperate. But, at worst, one slide deck missing from an expedited discovery production—a production that included detailed minutes from the very meeting where that slide deck was presented—is just that: a one-off. In no way has Plaintiff shown that there are systemic discovery deficiencies requiring judicial intervention, especially given that Defendants had only one week to respond to Plaintiff's requests. The needs of this case simply do not call for more.

**The Scope of the Court's Discovery Order**

Plaintiff persists in minimizing Defendants' reasonable enforcement of the Court's limitations on discovery as mere "relevance" determinations. ECF No. 95 at 4–5. That characterization mischaracterizes both the import of this Court's explicit discovery limitation and Defendants' legal basis for invoking that limitation.[4] Defendants have objected to requests seeking information beyond the "substance, justification, mechanics, and process of the Board" at its "August 13, 2026" and September meetings, as well as "the surrounding equities" of the decisions, ECF No. 82 at 2, and the "subject" of Plaintiff's Notice of Supplemental Authority, ECF No. 85, "to the extent permitted by the Federal Rules and the Court's scheduling order," Min. Order (Sep. 17, 2026).

Information that does not fall within those subjects—like, for example, Plaintiff's repeated requests for information about the resolution that was withdrawn from consideration at the September 15 meeting, *see* Oct. Hr'g Tr. at 35:20–36:3—is out of scope of the Court's discovery order, and requests that are outside of those bounds themselves violate the Court's order. Enforcement of those limitations is not a mere "relevance" objection. The limitations derive from the limited discovery the Court ordered. The only remaining claims in this litigation are themselves necessarily limited, given the deferential standard that applies to decisions made by boards of trustees. These claims direct the expedited and focused discovery the Court has ordered; adhering to these boundaries is necessary to ensure that the litigation does not pose unreasonable burdens for Defendants. Plaintiff assumes that there are, for example, "plans showing a feasible path

[4] Plaintiff impugns Defendants' litigation conduct multiple times in her filing as "violat[ing]" this Court's orders and otherwise furthering unethical and inappropriate ends. ECF No. 95 at 6; *see also id.* at 4 (alleging non-compliance and "recalcitrant conduct"). Those aspersions are wholly unfounded, entirely inappropriate, and should merit rebuke from the Court.

forward for phased renovation" that were not "provided to Delta, JLL, or the Board for consideration." ECF No. 95 at 5. But Defendants have raised no such scope objection to such a request—instead, Defendants have instead explained that no such evidence exists. Indeed, the evidence provided makes clear that such a position is itself not a feasible one.

Documents regarding the Chairman's "February 1 Announcement" are, rightfully, out of scope, unless they fall within the "substance, justification, mechanics, and process" of the Board's August and September meetings or the "subject" of Plaintiff's Notice of Supplemental authority, "to the extent permitted" by the Court's scheduling order. The Court declined to order discovery on Board meetings—and the substance, justification, mechanics, and process of the Board—that occurred any earlier than August 13, 2026. And that limitation was rightful: the Board was permitted to consider anew its decision to close, on a new and independently developed record. The Court's order (and its May 29 memorandum opinion) were clear on that front. Expanding discovery to include the entire universe of information that might possibly be related to each trustee's actions in the years leading up to the August 2026 vote is massively overbroad and clearly out of proportion to the needs of the case and the remaining claims and defenses. Such requests fall squarely on the overbroad side of the interpretive line.[5] Other requests—like, for example, on the "subject" of the "demoli[tion]" noted in Plaintiff's Notice of Supplemental Authority, ECF No. 85, are within scope—and Defendants have responded accordingly.

Plaintiff takes a view of limited discovery here that would swallow the Court's reasonable

---

[5] Plaintiff notes a scope objection Defendants raised to the deposition of an employee who separated from the Center on May 1, 2026, weeks before this Court's memorandum opinion and months before the Board meetings at issue. *See* ECF No. 95 at 5–6. Although Defendants preserve that rightful objection, Plaintiff fails to note that the *deposition has already occurred*, without Defendants having raised that issue to the Court. That fact only underscores Defendants' good faith in undergoing this expedited discovery process.

limitation whole; indeed, it stretches the bounds of what would be proportional and justified under full merits discovery, given the limited scope of Plaintiff's claims and the deference that must be afforded to a Board's reasonable decisions under the law. Not all information, developed in any conceivably related scenario, is within the scope of the Court's order. Nor can it be, given the severely expedited timeline on which discovery is proceeding. The Court should decline to intervene on Plaintiff's behalf and instead should limit Plaintiff's frivolous and dilatory requests immediately.

**Executive Privilege**

Plaintiff erroneously represents that, with respect to her pursuit of discovery from the Chairman, "Defendants have improperly withheld swaths of material based on blanket claims of *potential* Executive Privilege." ECF No. 95 at 5. Instead, Defendants first objected that any such discovery is "unduly burdensome," "disproportionate to the needs of the case," and violative of the separation of powers. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) ("[S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated."). Defendants then explained that, because Plaintiff's requests could turn up privileged information to which she would not be entitled, requests seeking information involving the President or White House personnel would impose burdens on executive officials—including the identification and review of documents—that "are disproportionate to the benefit (if any) that Plaintiff might derive from the possibility of responsive, non-privileged documents." That undue burden is an independent reason for objecting to Plaintiff's requests. But to be clear, to the extent any request turns up communications that reflect presidential decision-making and deliberations (the type of material Plaintiff seems to be after), Defendants maintain that the presidential

communications privilege applies and supplies another reason to object to Plaintiff's fishing expedition. *See In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). Defendants will further address this issue in response to Plaintiff's motion to compel, ECF No. 96.

Dated: October 6, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRANTLEY MAYERS
Counsel to the Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

CHRISTOPHER M. LYNCH
Chief Litigation Counsel

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
(202) 353-7578
william.s.jankowski@usdoj.gov

*Counsel for Defendants*