# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

\- - - - -

| | |
|---|---|
| JOYCE BEATTY, Plaintiff, | ) |
| vs. | ) No. 25 Civ. 4480 (CRC) |
| DONALD J. TRUMP, et al., Defendant. | ) |

VIDEO RECORDED DEPOSITION OF MATTHEW FLOCA

Tuesday, October 6, 2026, 9:40 a.m.

Washington Litigation Group

1717 K Street, NW

Washington, DC

Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

Job Number: Lexitas 1039999

VIDEO RECORDED DEPOSITION OF MATTHEW FLOCA, a witness herein, called by the Plaintiff for examination, taken pursuant to the Federal Rule of Civil Procedure 45, and the Court's Scheduling Order of September 16, 2026 (ECF No. 82), by and before Marjorie Peters, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the District of Columbia, at Washington Litigation Group, 1717 K Street, NW, Washington, DC, on Tuesday, October 6, 2026, at 9:40 a.m.

P R O C E E D I N G S

MATTHEW FLOCA,

having been called as a witness, was legally placed under oath, testified as follows:

THE WITNESS: Yes.

EXAMINATION

BY MS. FREENY:

Q. Good morning, Mr. Floca. My name is Kyle Freeny; I represent Congresswoman Beatty in the lawsuit Beatty versus Trump.

Do you understand that?

A. Yes.

Q. Have you been deposed before?

A. No.

Q. So I understand that the court reporter gave you some pointers on how to make sure that she can transcribe, but I wanted to also go over some ground rules before we start. Is that okay?

A. Yes.

Q. So you understand that we're here today to take your deposition in the lawsuit Beatty versus Trump; right?

A. Yes.
Q. You understand that you are under oath?
A. Yes.
Q. You understand that that oath has the same effect as if you were testifying at trial; right?
A. Yes.
Q. Meaning that you have the obligation to tell the truth to the best of your ability; right?
A. Yes.
Q. Now, I mentioned this deposition is transcribed, and the reason it's important to note that is that -- well, at least two reasons:
One, if I ask you a question that is a yes or no question, I need you to answer verbally rather than just nodding your head. Okay?
A. Yes.
Q. If you don't, and if it sounds like I'm making a statement, I will say, "right," or something like that, and that's not meant to be, you know, offense. That's to prompt a verbal answer so that the court reporter can actually take down your

building, for two years of construction?

MR. JANKOWSKI: Objection. Vague on "definitively." And form.

A. The Board has voted on a resolution that -- yes, that includes that. Yes.

Q. Is it your expectation that if the Court lifts the injunction, that that decision would govern what next happens with respect to renovation?

A. Yes. Yes.

Q. Okay. I want to go back. You talked about -- I asked you about Secretary Lutnick. You said, I think, that he provided some high-level input on next steps.

What was Secretary Lutnick's role at this point in time, and "this point in time" meaning after the May decision, until today, with respect to the Kennedy Center?

MR. JANKOWSKI: Objection. Vague. Calls for speculation.

You can answer.

A. To help. That's all.

Q. To help what?

A. To help the Center in its decision-making processes. To help the Center from an executive level. Just to provide guidance. And he brings, you know, experience. So that was the intent, is to -- is just to bring more support to the process.

Q. What did you understand, sort of, your relationship to be with respect to Secretary Lutnick; that is to say, did you understand that you reported to him?

MR. JANKOWSKI: Objection. Vague on "reported."

You can answer.

A. I report to the Board of Trustees.

Q. Do you report to Secretary Lutnick?

A. No.

Q. Does Secretary Lutnick have any formal position with respect to the Kennedy Center?

MR. JANKOWSKI: Objection. Vague on "formal."

A. There's nothing in the bylaws about his position, or his involvement --

Q. Okay.
A. -- so as to that as formal or not.
Q. What would you call his -- like, how would you -- does he have a title? Does he have -- how would you describe what his role is? You said it's to provide, I guess, guidance, but does he have like a title or a description of that role?
MR. JANKOWSKI: Objection. Vague. Misstates as to the extent a role exists.
(Clarification requested by the Realtime Stenographer.)
A. I'm only aware of him being the Secretary of Commerce. So that's...
Q. So does he have a role with respect to the Kennedy Center?
MR. JANKOWSKI: Vague on "role."
But you can answer.
A. Yes.
Q. What is that role?
A. To help.
Q. Okay. So if you were called up on the Hill to testify, and you were asked what is the

Secretary's role, would you say, "To help"?

A. Yeah. There's nothing unique about that. I think he was brought in to help.

Q. Who brought him in?

A. He called me, and I answered.

Q. What did he say in that call?

MR. JANKOWSKI: Objection. Executive privilege on that. Don't answer that.

MS. FREENY: All right. So this is going to come up a couple times, so I'm going to make a record here.

What form of executive privilege are you asserting?

MR. JANKOWSKI: The presidential communications.

MS. FREENY: You are instructing the witness not to answer my question on the basis of presidential communications privilege?

MR. JANKOWSKI: Yes, without waiving any other objections that might apply, yes.

MS. FREENY: Are you invoking this privilege at the direction of the President?

MR. LYNCH: At this point, it's protective assertion --

MR. JANKOWSKI: Yeah.

MR. LYNCH: -- when there's a --

MR. JANKOWSKI: A formal indication, you know.

MS. FREENY: So, at this point, you are not asserting it at the direction of the President?

MR. JANKOWSKI: Correct. Protective restriction.

MS. FREENY: Since this is going to come up again, can I -- can we assume that you're not asserting privilege at the direction of the President anytime you assert the presidential communications privilege, or should I ask every time?

MR. JANKOWSKI: You know, we -- no. I think we should ask every time.

MS. FREENY: Okay.

BY MS. FREENY:

Q. Mr. Floca, are you going to decline to

answer my question at the instruction of your counsel?

A. Yes.

Q. Just to be -- just so -- that's not meant to be a trick question. That's so that we have a record, so that -- it's a lawyer thing.

So I just need a record that when you are instructed not to answer, that that is reason that I am not getting the answer is because of the instruction.

So you will hear me do that again. It's just a really lame lawyer thing. Okay?

A. Okay. Great. I think.

Q. How many conversations, roughly speaking, have you had with Secretary Lutnick about the, sort of, plans for presenting the closure issue to the Board?

A. I recall 10, 15.

Q. Next, I want you to walk me through how the Center decided what types of outside experts to retain.

Before I get you to answer, let me

award, and the, at that time, planned closure in July?

A. I don't remember why, explicitly, we used 26 months.

Q. Okay. Do you remember there ever being a discussion of the Renewal Project or the $257 million renovation needing to take 26 months instead of 24?

A. Sorry. Do I remember what?

Q. Do you remember there being a discussion ever -- and this is not -- I just want to make sure.

The 26 you don't remember, but do you remember there being a discussion that the project, the renovations, would take 26 instead of 24 months?

A. Not explicitly.

Q. Help me understand the reference to "compressed"; what did you mean by that?

A. There's a lot of work to be done in a definitive window.

Q. Mm-hmm.

A. So you have to compress that work.

Q. What do you mean by "a definitive window"?
A. The two years.
Q. Okay. Why was it -- I guess, why was it two years and not, for example, longer?
A. Balancing doing the work, the amount of work, with needing to open the building back up, and then...
Q. Okay. Who made that decision that it would be a two-year period?
A. That decision was part of the Truth Social message.
Q. What do you mean by that, "Truth Social message"?
A. That first announced -- the message that first announced the closure.
Q. Okay. Understood.
That was a Truth Social message by Chairman Trump?
A. Yes.
Q. So that was when the decision was made to adopt a two-year closure duration?

MR. JANKOWSKI: Objection to the extent that it misstates.

You can answer.

A. Yes.

Q. Did you understand that announcement to be sort of like a decision by the Chairman?

A. I took the announcement at face value.

Q. But did you think that you had the ability to override it?

MR. JANKOWSKI: Objection. Vague on "override."

A. I'm sorry. I'm just -- I don't know how I would over -- over-delete the post. I don't know.

Q. So no. Yeah, let me rephrase.

After you saw the Truth Social post by President Trump announcing this two-year closure, did you understand that you had to close the Center for two years, or that you had the option to disagree and not close the Center for two years, or close the Center for a different amount of time?

MR. JANKOWSKI: Objection. Compound.

You can answer.

A. When that message came out, I remember meeting as a team --

Q. Yep.

A. -- the leadership team that was in place at the time, to begin -- the direction then was to begin focusing on a structured implementation of this work.

Q. Okay. That was a structured implementation of the two-year period that Trump had announced; correct?

A. Yes.

Q. You said the leadership team that was in place at the time met. Who was that?

MR. JANKOWSKI: I'll just note that we'll -- we're probably going to start to raise a scope objection at a certain point. So --

MS. FREENY: Okay. I'm close to -- let me get this question.

MR. JANKOWSKI: Okay.

MS. FREENY: And then I will take a break.

Can I just get my question back.
(The record was read back by the Realtime Stenographer.)
THE WITNESS: Richard Grenell was the president of the Kennedy Center. I mean, there's a whole -- I could go through -- but the -- that leader -- that's the -- under ambassador, that's the leadership team.
BY MS. FREENY:
Q. Who do you remember being in that meeting specifically that talked about President Trump's announcement on February 1st, besides Mr. Grenell?
A. That wasn't one definitive meeting. There were multiple meetings about getting the work started.
Q. Okay.
A. You know, it wasn't one meeting where it was -- so...
Q. Then let me direct you, because I heard you say, I remember being -- after that Truth Social post, I remember being in a meeting with a

leadership team.

So just focus on that first meeting that you said you remembered. Who was there besides Mr. Grenell?

A. Nick Meade.

Q. Okay.

A. And Rick Loughery were the --

Q. I didn't hear the second.

A. Rick Loughery.

Q. Loughery.

You said the direction was to begin on -- begin focusing on implementation of the President's announcement. Direction by whom?

MR. JANKOWSKI: I think we'll make a scope objection here.

If you can explain to me how this relates to the process of --

(Clarification requested by the Realtime Stenographer.)

MR. JANKOWSKI: Substance, justification, mechanics of the later Board meetings, we can discuss maybe further going down

this road, but we'll -- for now, I'll instruct you not to answer as it's outside the scope.

MS. FREENY: Okay. So I'm going to say on the record, the witness already testified that the JLL report, which was put before the Board in support of the full closure, what I'm calling the full closure, was predicated on a projected duration, that was one of the assumptions of the JLL report of two years. Not more, not less.

I think he's also said that that was -- you know, that was arrived at after President Trump's Tweet.

I think we are entitled to understand if that was an input into what was put before the Board, we are entitled to that.

MR. JANKOWSKI: So I think that testimony has been given, though. So going beyond that is outside the scope.

MS. FREENY: I don't see how, if the direction is coming from President Trump, we are going to close for two years, and we are trying to probe whether the reason the Center is closing for

two years, as opposed to any other amount of time, whether that is because President Trump gave the direction, I want you to close for two years.

I think we are entitled to probe that because that was the only option that was put before the Board in terms of full closure.

MR. JANKOWSKI: Before the August and September meetings?

MS. FREENY: Yes.

MR. JANKOWSKI: So I think you can ask that. We can get into that with respect to the August and September meetings, as to the Center's understanding of whether that direction exists.

MS. FREENY: I want -- so I think that we are entitled to know whether there was direction from the President to -- who is also, in our view, acting as the chairman of the Center's Board, to close the Center for a period of two years.

I think we are entitled to know if that direction came from the President. I do not think it matters when it was, because regardless,

whether it was given in February, or whether it was given after the May decision, we regard that direction from the chairman as relevant to the decision before the Board, which included only one closure option, a period of two years.

MR. JANKOWSKI: The issue is that precedes the March meeting, which the Court -- at which the closure decision was taken, and the Board has already preliminarily enjoined. So, you know, I'll --

MS. FREENY: All right. So we will -- you know, we won't debate this.

I think this is something that we will end up litigating in front of the Court.

MR. JANKOWSKI: So I'll enforce the Court's Order discovery limitation there and say not to -- that's outside the scope, and instruct the witness not to answer.

MS. FREENY: We will just say, we do not think that is enforcing the scope.

BY MS. FREENY:

Q. But I will ask you, sir, are you going

to not answer that question at the direction of your counsel?

A. Yes.

MS. FREENY: I think this is now probably time for a break. Everyone good for a bathroom break?

MR. JANKOWSKI: Sure.

(RECESS, 11:15 a.m. - 11:23 a.m.)

MR. JANKOWSKI: I'm sorry. I'll just make a request to read and sign the transcript.

MS. FREENY: All right.

BY MS. FREENY:

Q. Mr. Floca, we're back from break. You understand you're still under oath?

A. Yes. Yes. Yes.

Q. All right. So we were talking about different scenarios, and I guess I just want to continue on talking about those scenarios.

We've talked about, I think, what I have been calling a phased construction scenario; right? It's one option?

A. Okay.

It sounds like, you know, at the time of the Board meeting, you were relying on your staff a little bit more for their knowledge about the Center's finances; is that fair to say?

A. That is fair.

Q. Is there anything else that prompted you to become more involved, other than just a general interest in being knowledgeable and able to answer questions?

A. No.

Q. So it didn't having anything to do with the Center's cash position?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer.

A. No.

Q. Did it have anything to do with representations that the Center made that it was within weeks of financial collapse?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer.

A. No.
Q. Do you recall the Center making representations that it was within weeks of financial collapse?
A. I do recall those representations.
Q. What can you tell me about those representations?
MR. JANKOWSKI: I'll just add -- not making a categorical objection, but just object to the extent that calls for attorney-client privilege, or executive privilege, as coming from, on behalf, or from the President, just instruct him not to answer.
But otherwise, you can answer.
A. Those comments are driven by the lack of following this process for FY26.
Q. What is "this process"?
A. The financial planning and analysis process.
Q. Okay. The Center's financial position, though, also was seriously affected by the decrease in revenue following the renaming of the Center;

may -- I'm probably going to return to this topic. But -- or, I at least reserve the right to.

But before we break for lunch, did you -- did you discuss the subject of the Center's -- I believe you called -- we agreed that it was dire fiscal position with Secretary Lutnick in September of this year?

MR. JANKOWSKI: Objection on executive privilege grounds.

Don't answer that.

MS. FREENY: Okay. So I just want to confirm that you are directing the witness not to answer on the grounds of what -- which form of privilege?

MR. JANKOWSKI: Executive privilege.

MS. FREENY: Is that the presidential communications privilege or another privilege?

MR. JANKOWSKI: It's the executive privilege, Kyle, but the presidential communications element of it, yes.

MS. FREENY: Are you invoking that

privilege at the direction of the President?

MR. JANKOWSKI: It's a protective assertion.

MS. FREENY: So you're not invoking it --

MR. JANKOWSKI: No. It's a protective assertion.

MS. FREENY: Sorry. Just -- let me make sure I finish.

You are not invoking that privilege at the direction of the President?

MR. JANKOWSKI: No. It's a protective assertion.

BY MS. FREENY:

Q. Sir, I'm just going to ask you to confirm that you are not going to answer my question about whether you had conversations with Secretary Lutnick about the Center's dire fiscal position in September of this year at the direction of your counsel; is that right?

A. Yes.

MS. FREENY: All right. With that,

I think we can go off the record and take a lunch break.

MR. JANKOWSKI: Fine by us.

(RECESS, 12:51 p.m. - 1:36 p.m.)

BY MS. FREENY:

Q. Good afternoon, Mr. Floca.

Just a reminder, you understand that you are still under oath in this deposition?

A. Yes.

Q. I want to -- we had been talking about the various scenarios that the Center considered in response to the Court's preliminary injunction in the Beatty versus Trump matter.

Do you recall that?

A. I recall the scenarios, yes.

Q. I have just I think one more subtopic on that that I want to close out before I move on.

The -- did management consider the scenario or the prospect of full closure of the main building for less than a year followed by partial reopening and phased construction?

A. Yes, we considered -- we considered a

that's identified, you know, it's about a year's worth of infrastructure and about a year's worth of interior work. Mechanical overlaps.

I think that's appropriate.

Q. You said you were not aware of the President's preferences.

Were you aware that Secretary Lutnick appeared at a -- gave -- I guess an interview or made some remarks in front of cameras outside of a hearing in this case over the summer?

A. I am aware of that. I did not watch the whole -- not an interview.

I did not watch the whole -- thing.

Q. Got it. I understand that you did not watch the whole thing, but were you aware that during those remarks Secretary Lutnick said the following: "Then why would the President agree to work on the restoration where he's going to be the President for the next 2.5 -- two-and-a-half years, and then he's leaving." (As read.)

Then he later said, "I mean, it's ridiculous. So he wouldn't be involved."

Were you aware that Secretary Lutnick said that about the President?
A. I did hear him say that, yes.
Q. You heard that part of his interview?
A. Yes, yes.
Q. So when you said you didn't -- you weren't aware of the President's preferences, I take it you mean that's because you didn't speak directly with the President, but you are aware of what Secretary Lutnick represented about the President?
A. Yes. I saw that part of the -- of Secretary Lutnick's interview -- press release.
Q. Did you understand -- I guess, what do you understand Secretary Lutnick to be saying in terms of what the Center should be doing?
A. I take his comments there to say if the President is going to invest in this project, he will want to see it completed, and there's an end date, you know, to that.
Q. Then did that influence the way that you approached the timeline for construction?
A. I've always taken the end of -- you

know, September-October, Q3-Q4, of '28 to be our target for reopening, mainly based on that it makes sense for the Center.

Q. But at least in part also because it aligned with the President's preferences?

MR. JANKOWSKI: Objection. Form, and misstates.

A. I think it's that time frame aligns with the Center's operations.

Q. Mm-hmm.

A. Whether or not that aligns with the President's desires, I can't tell you.

Q. Does that mean that you have not had conversations with the President about the timeline for construction?

MR. JANKOWSKI: Objection on executive privilege grounds. I'll instruct you not to answer.

MS. FREENY: I'm again going to ask, which executive privilege?

MR. JANKOWSKI: The executive privilege, and the presidential communications

portion of it.

MS. FREENY: You are instructing the witness not to answer?

MR. JANKOWSKI: Yes.

MS. FREENY: Has the President or his representative directed you to assert that privilege?

MR. JANKOWSKI: No. It's protected because the White House will need to review the transcript of this deposition before it can make a specific invocation of the privilege.

BY MS. FREENY:

Q. Sir, are you going to decline to answer my question at the instruction of counsel?

A. Yes.

MS. FREENY: Also, let me just ask for the record: Has the White House instructed you to make that the -- I forget what you called it, but the prophylactic assertion so that they can have the opportunity to review the deposition?

MR. JANKOWSKI: I think there's -- I think even that could call for privileged

information. So it's a protective assertion.

MS. FREENY: So you're not going to tell me whether the approach of the Department of Justice, in invocation of the Presidential communications privilege, is at the direction of the White House?

MR. JANKOWSKI: I think the Department of Justice is following its standard procedure for asserting and invoking the executive privilege.

MS. FREENY: So you will not answer that question?

THE WITNESS: I will not.

BY MS. FREENY:

Q. I think maybe a little bit of a drier topic. I'm going to move on to talking about the Center's engagement with Delta Consulting. Okay?

A. Great.

Q. All right. I believe that you mentioned that it was a competitive bidding process; is that right?

A. Yes.

Q. When Secretary Lutnick offered guidance, you know, to you about the Center's -- about the -- you know, just about the Center and its operations, did you understand that he was offering guidance on behalf of himself, on behalf of the President, or both?

A. Both.

Q. Then in the meeting with Secretary Lutnick at which Mr. Buchalter was present, did Secretary Lutnick provide any input or guidance about the presentation to the Board?

MR. JANKOWSKI: I'll just raise the same objection to the extent anything is coming from the President or purporting to come from the President, executive privilege.

But other than that, feel free to answer.

A. We did not review the presentation with Darin and Secretary Lutnick. There wasn't a -- you know, a review of those slide decks.

Q. Understood.

Was there, like, more of just a more

informal oral discussion?
A. About the Center's operations in general, yes.
Q. I guess I would assume it would also be about Delta's analysis, since Delta had been invited as the outside consultant to meet with Secretary Lutnick; is that not the case?
A. Delta's -- it was a -- or a conversation around the work that the Center and Delta was doing together, yes.
Q. During that meeting, did Secretary Lutnick communicate any input from Chairman Trump?
MR. JANKOWSKI: Objection on executive privilege grounds. I'll instruct the witness not to answer.
MS. FREENY: I will confirm that when you say that, the privilege you are invoking is the presidential communications privilege?
MR. JANKOWSKI: The privilege we're invoking is the executive privilege, and specifically, the presidential communications component of it.

(Clarification requested by the Realtime Stenographer.)

MR. JANKOWSKI: Sorry.

The privilege we're invoking is the executive privilege, and specifically, the presidential communications component of it.

MS. FREENY: You are -- is that at the direction of the President or his representative?

MR. JANKOWSKI: I'll say it's pursuant to the government standard process for invoking the executive privilege at a deposition.

MS. FREENY: I just want to make sure I understand and the record reflects, you are asserting this privilege, and instructing the witness not to answer, notwithstanding the presence of an outside independent consultant in the room?

MR. JANKOWSKI: That's correct.

MS. FREENY: Okay.

BY MS. FREENY:

Q. Then, Mr. Floca, I'm just going to confirm that you are not going to answer my question

about what Secretary Lutnick may have told you in this meeting with Delta Consulting, at the instruction of your attorney?

A. Correct.

Q. When we talked to Delta Consulting, I will tell you that they mentioned having a conversation with someone that they represented to be a California consultant.

Does that ring a bell to you?

A. Not a California consultant.

Q. Okay. If I said that Mr. Buchalter mentioned talking about something like programming with a California consultant by phone, does that maybe jog a memory or suggest who he may have been talking about?

A. Yes.

Q. Who do you think that was?

A. Rick Canny.

Q. Who is Rick Canny?

A. Rick Canny.

Rick Canny is a California consultant.

might help to confer with you about how we're going to try to get some stuff on the record.

MR. JANKOWSKI: Okay. Sure.

(RECESS, 4:27 p.m. - 4:30 p.m.)

BY MS. FREENY:

Q. Mr. Floca, my next question for you: Did you talk to Chairman Trump about the Center's cash position at any point this year?

MR. JANKOWSKI: I'll object to that question on executive privilege grounds, and instruct the witness not to answer.

MS. FREENY: To confirm, that is the presidential communications privilege or aspect of executive privilege; right?

MR. JANKOWSKI: That's correct. The presidential communications component of the executive privilege, yes.

MS. FREENY: Was that at the direction of the White House?

MR. JANKOWSKI: It was pursuant to the standard procedures the Department of Justice uses to invoke and assert the executive privilege.

BY MS. FREENY:

Q. Mr. Floca, you're going to refuse to answer that question at your counsel's instruction?

A. Yes.

MS. FREENY: In the interest of time and just so that we make our record, I'm going to ask a series of other questions, and if you can agree that that same -- those same objections, and his -- you know, his -- that he will follow your instructions, is the case, unless you say otherwise.

Is that agreed?

MR. JANKOWSKI: Agreed. Blanket objection unless the Government notes otherwise.

MS. FREENY: Okay.

BY MS. FREENY:

Q. Mr. Floca, did you talk to Trump about a shutdown to avoid addressing the Center's financial -- nope. Let me just strike that one.

Did you talk to Trump about the fiscal harms caused by renaming?

MR. JANKOWSKI: Objection.

Q. Okay. Sorry. I forgot, I will just

keep reading with that understanding in mind.

Mr. Floca, did you talk to Chairman Trump about the decline in patrons, donations, and artists this year?

MR. JANKOWSKI: Objection.

Q. Did you talk to Chairman Trump about how to proceed following the Court's May 29th Order and preliminary injunction?

MR. JANKOWSKI: Objection.

Q. Did Chairman Trump instruct you or provide input to you on steps to take following the Court's May 29th Order and preliminary injunction?

MR. JANKOWSKI: Objection.

Q. Did Trump instruct you at all regarding the limitations on the funds from the Foundation?

MR. JANKOWSKI: Objection.

Q. Did anyone on Trump's behalf instruct you regarding the limitations on the funds from the Foundation?

MR. JANKOWSKI: Objection.

Q. Did Chairman Trump -- did you talk to Chairman Trump about his -- about whether he would

support renovation if he was not recognized in some way by the Kennedy Center?

MR. JANKOWSKI: Objection.

Q. Did you talk to President Trump about whether the Kennedy Center would potentially be demolished?

MR. JANKOWSKI: Objection.

Q. Did you talk to President Trump about the September 16th, rather than September 15th, decision to shut down the Kennedy Center main building on an emergency basis?

MR. JANKOWSKI: Apologies. I'm thinking on the fly.

Same objection, and also scope.

MS. FREENY: Okay. I think with that, I will just state for the record that the Plaintiff's position, I think as the Government knows, and as we discussed off the record, is that we would want to keep this deposition open for the possibility of recalling Mr. Floca to testify about matters that are the subject of pending discovery disputes.

MR. JANKOWSKI: To the extent that that outcome is dependent on the Court's ruling on the pending motion to compel, you know, I don't think the Government has an objection, but would otherwise not waive our right to declare the deposition closed assuming that the Court does not grant the Plaintiff's relief.

MS. FREENY: With that, I think we can go off the record, and thank you very much, Mr. Floca.

(RECESSED for the day at 4:34 p.m.)