**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-4480 (CRC) |

**DEFENDANTS' RESPONSE TO MOTION TO COMPEL**

## INTRODUCTION

Requests for discovery that pertain to the President of the United States are no ordinary matter. Instead, they raise distinct separation-of-powers concerns. Both the Supreme Court and the D.C. Circuit have recognized as much time and again. Thus, a plaintiff may not serve overbroad discovery requests on the President and expect a line-by-line response. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 388 (2004). Nor, without at a minimum showing that the sought-after evidence is "important evidence" that is "directly relevant to issues" pending before the Court and "not available with due diligence elsewhere," may a plaintiff acquire "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744, 754 (D.C. Cir. 1997).

Plaintiff's requests in this case fail on both points. Despite the expedited nature of discovery in this case, Plaintiff served on Defendants overbroad discovery requests that expressly implicated the President's involvement in the Kennedy Center's management and operations, and called for information, documents, and communications concerning that involvement. Plaintiff then asked similar questions during three depositions over the last two weeks.

Those requests are improper, and this Court should deny Plaintiff's motion to compel. Plaintiff's arguments to the contrary fail to convince. Plaintiff starts with procedure. But, as the declaration attached to this filing demonstrates, a Deputy Counsel to the President, at the direction of the President, has invoked the presidential communications privilege in response to Plaintiff's requests and questions and has done so with the level of specificity required by precedent.

Plaintiff next turns to substance, contending that the presidential communications privilege does not apply to the information, documents, and communications she seeks. But Congress tasked the President with appointing the Kennedy Center's general trustees and advisory

committee members, and inherent in that delegation of authority is the duty to ensure that the trustees are managing the Center ably and in accordance with their duties and statutory obligations, and that committee members the President designates are capable of advising and assisting the Board as needed. That these duties overlap with the President's duties as Chairman is no reason to sweep aside the obvious separation-of-powers concerns posed by Plaintiff's fishing expedition.

Plaintiff fails to overcome this privilege, for she cannot demonstrate that the information, documents, and communications she seeks are directly relevant to the Board's votes to temporarily close the Center, the sole remaining issue in front of the Court. Indeed, Plaintiff has already obtained extensive discovery—far more than needed—to address that narrow issue: Did the Board have sufficient basis, within its broad discretion, to support its votes to temporarily close the Center for necessary repair and renovation, given the documented plans and thorough expert analysis before it. And, on the record as it stands, this Court has enough evidence to answer that question with a resounding "yes" and grant summary judgment to Defendants. Plaintiff similarly fails to demonstrate that the President waived the privilege—a result that "should not be lightly inferred," *In re Sealed Case*, 121 F.3d at 741—with respect to any withheld information, document, or communication.

Given Plaintiff's failures, compulsion is unwarranted. Plaintiff references *Cheney*'s warning that the assertion of executive privilege sets coequal branches of government "on a collision course," but she misapprehends its significance. Mot. at 4 (quoting 542 U.S. at 389). That warning does not suggest the President should decline to assert appropriate privileges; it warns that plaintiffs should not be permitted to invoke the assertion of privilege through unnecessary and overbroad discovery requests. And Plaintiff has failed to heed it. That remains true even though she has not *even further* violated basic separation-of-powers principles.

Plaintiff's decision not to seek evidence from Secretary Lutnick does not provide cover to seek evidence concerning Secretary Lutnick's and President Trump's communications from others, especially when that evidence is not directly relevant to the limited issue that remains before the Court.

At bottom, Plaintiff presents an extraordinarily weak justification for an extraordinarily intrusive discovery campaign. This Court should deny Plaintiff's motion.

## BACKGROUND

This case—or what remains of it—concerns the fiduciary duty that the Board of Trustees ("the Board") of the Center must satisfy in order to undertake a two-year closure of the Center's main building to conduct significant renovation and restoration of the building and surrounding infrastructure. *See* Mem. Op. at 87-89, Doc. 50. Following the Court's preliminary injunction of the Board's March 16 decision to close for two years, *see id.* at 91; Order at 1, Doc. 48, Defendants undertook a multi-month effort to comply with the Court's order and to "approve a[] closure consistent with the Court's Memorandum Opinion," Doc. 48 at 1. That effort involved the development of hundreds of pages of record evidence for the Board to consider on the state of the Center's structural integrity, on the Center's financial outlook, and on the impacts that different operating models might have on the Center's near- and medium-term ability to undertake necessary renovation, put on programming, maintain the Center as a memorial to President Kennedy, and fulfill its other missions. *See, e.g.*, Doc. 89-1 at 8-16 (discussing the development of a comprehensive construction project plan and of an independent report analyzing potential options available to the Center for conducting renovations and maintaining different operating models); *see also* Ex. A to Sep. 18 Decl. of Charles Matthew Floca, Docs. 89-4, 89-5, 89-6, 89-7, 89-8.

President Trump is the Chair of the Center's Board, *see* Pl.'s Am. Compl. ¶ 26, Doc. 12; Defs.' Answer ¶ 26, Doc. 61, and has at various times participated in renovation planning at the Center, *see* Defs.' Statement of Undisputed Material Facts ¶ 4, Doc. 89-2; *see also* Ex. A to Defs.' Suppl. Mem. at 14:1–15:10, Doc. 45-1. While that input has been "invaluable," Doc. 45-1 at 15:10, the Center has continued to operate pursuant to the authority vested by statute in the entire Board, *see* Ex. B to Pl.'s Mot. to Compel at 209:14–17, Doc. 102-2 (indicating that direction from the President alone would not be effective as to bind the Center's actions and would "need to come by way of resolution," especially if any direction is "counter" to "resolution[s] . . . passed" in "previous board meetings").

Although President Trump is not Chair of the Board of the Center by virtue of his position as the President of the United States, the President—in his capacity as President—has an official role in the Center's operations. Specifically, the "general trustees" of the Center "shall be appointed by the President of the United States."[1] 20 U.S.C. § 76h(b). The President also has a role in overseeing the Center's "Advisory Committee on the Arts," including by exercising removal authority over members of the advisory committee, by maintaining the ability to designate a Chairman of the committee, and by giving "consideration" to recommendations submitted to the President regarding appointments to the committee. *Id.* § 76h(c). The committee, by statute, "shall advise and consult with the Board and make recommendations to the Board regarding existing and prospective cultural activities to be carried out" by the Center. *Id.* The committee must also assist the Board in carrying out its duties under 20 U.S.C. § 76k(a), which concerns the solicitation and acceptance of gifts. *See id.* And the Board itself must, in operating the Center, present performing

[1] Those general trustees voted President Trump into his role as Chair. *See* Doc. 12 ¶¶ 25–26; Doc. 61 ¶¶ 25–26.

arts; develop performing-arts education policy and programming; enable civic activities; maintain a "suitable memorial" to President Kennedy; and plan, design, and construct capital repairs and other improvements necessary to maintain the Center's functionality and "high quality operations." *Id.* § 76j(a)(1).

Following the Board's reconsideration of renovation plans, the Court entered a scheduling order setting an expedited briefing and discovery schedule. *See* Scheduling Order, Doc. 82. Pursuant to that schedule, Defendants moved to vacate or dissolve the May 29, 2026, preliminary injunction that the Court entered against effectuating a two-year closure of the main building of the Center. *See* Defs.' Mot. to Dissolve Prelim. Inj., Doc. 88. Because the merits considerations on preliminary injunctive relief overlap significantly with those under a summary-judgment standard, Defendants also moved for partial summary judgment on Plaintiff's remaining claims. *See* Defs.' Renewed Mot. for Partial Summ. J., Doc. 89.

The parties served their discovery requests, pursuant to the Court's limited discovery order, on September 23, 2026, and served their written responses on September 30, 2026. *See* Doc. 82 at 1; *see also* Ex. A to Pl.'s Mot. to Compel, Doc. 96-1; *see also* Ex. B to Pl.'s Mot. to Compel, Doc. 96-2. In the midst of discovery—and before depositions had concluded—Plaintiff filed a motion to compel certain documents and written production Defendants withheld on executive-privilege grounds. *See* Pl.'s Mot. to Compel (Mot.), Doc. 96. And Plaintiff then filed a supplemental memorandum, following the close of depositions, describing privilege assertions that Defendants made during those depositions. *See* Pl.'s Suppl. Mem. Regarding Mot. to Compel, Doc. 102.[2]

---

[2] Plaintiff provides no authority—beyond her own assertion that she "would" do so if depositions raised executive-privilege issues—permitting her to lodge this supplemental

As relevant to Plaintiff's motion to compel, Defendants asserted a general objection to Plaintiff's discovery responses on the grounds that any requests propounded on the President raise separation-of-powers concerns under *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004). *See* Doc. 96-2 at 7. Defendants also raised a general objection to the extent that discovery requests "seek communications involving the President or White House personnel" in that such requests "may have the effect of seeking information protected" by the presidential-communications component of the executive privilege. *Id.* at 8 (first citing *United States v. Nixon*, 418 U.S. 683, 708 (1974); then citing *In re Sealed Case*, 121 F.3d 729, 743-44 (D.C. Cir. 1997)). Defendants also made specific privilege-based objections to written requests implicating the privilege. *See id.* at 12 (construing Plaintiff's request for production as excluding documents protected by the presidential-communications component of executive privilege); *id.* at 14 (same); *id.* at 15-16 (declining to produce documents in response to request for production number 6); *id.* at 19-20 (construing the request as excluding documents protected by the privilege and explaining that Defendants do not understand responsive materials to exist); *id.* at 20–21 (same); *id.* at 22 (same); *id.* at 38-39 (declining to produce documents responsive to a request for materials relating to presidential papers); *id.* at 39-40 (same for a request "relating to" a presidential statement); *id.* at 43-44 (construing the request as excluding presidential communications or documents); *id.* at 54-55 (same); *id.* at 58-59 (same); *id.* at 80-82 (declining to answer requests for admission seeking the content of discussions with or papers prepared for the President); *id.* at 83 (same); *id.* at 84-89 (same); *id.* at 90-91 (same).

---

memorandum with the Court. Doc. 102 at 1. Nor did she seek the Court's leave in filing the memorandum. *See generally id.*

Defendants subsequently raised objections based on executive privilege during depositions at which Plaintiff sought information about discussions involving the President and his advisors. As relevant to Plaintiff's motion, Defendants permitted questions concerning certain executive officials to proceed, *see, e.g.*, Floca Dep. Tr. at 31:10–34:5, Doc. 102-1, as well as questions regarding the Center's immediate renovation plans in light of the President's public statements about construction, *see* Ex. A (R. 30(b)(6) Dep. Tr.) at 209:2-215:4. But Defendants limited inquiry into the specific content of communications with the President (or his advisers, acting on his behalf) on the grounds that such communications are protected by executive privilege. *See* Doc. 102-1 at 34:6–36:12, 147:4–148:21, 162:13–164:13, 195:11–197:4, 273:6–277:7; Doc. 102-2 at 95:12–96:21, 206:16–209:1, 215:5–217:5, 235:6–20, 297:21–301:15.

**ARGUMENT**

Plaintiff identifies five reasons—two procedural and three substantive—as to why she thinks this Court should compel discovery responses. None of the reasons justify her requested relief.

## I. The President's Designee Has Invoked the Privilege.

Plaintiff first claims that the presidential communications privilege does not apply because "line attorneys," rather than the President or his designee, have invoked the privilege. Mot. at 13-17. Plaintiff relies on *United States v. Navarro*, in which the D.C. Circuit held "that only a President or his designee may invoke executive privilege." 182 F.4th 1005, 1021 (D.C. Cir. 2026). But Defendants' invocation of privilege satisfies the requirements set forth in *Navarro*. Defendants' reliance on executive privilege to date has been to protect the interests of the Executive Branch pending a final determination by the President or his designee whether to assert the privilege. Now, in the declaration attached to this response, Joshua T. Hoyt, a Deputy White House Counsel in the White House Counsel's Office, invokes, "[a]t the direction of the President,"

executive privilege as to Plaintiff's requests. *See* Declaration of Joshua T. Hoyt (Hoyt Decl.) ¶¶ 1-2. Therefore, Plaintiff's first argument does not provide a basis for relief.

**II. Defendants Invoked Executive Privilege with Specificity.**

Plaintiff next argues that, in objecting, Defendants failed to provide the requisite specificity, contending Defendants made a "blanket" assertion of Executive Privilege. Mot. at 15; *see id.* at 15-17. The record reflects otherwise. Defendants' discovery responses made clear that Defendants invoked the presidential communications component of the executive privilege with respect to specific requests for production (RFPs), requests for admission (RFAs), and interrogatories (ROGs). *See* Mot. at 10 n.3. In the face of Plaintiff's broad requests that could encompass presidential communications, "[n]othing in the separation of powers requires" anything more. Mot. at 17; *see Cheney*, 542 U.S. at 388 (the Executive Branch does not "bear the onus of critiquing the unacceptable discovery requests line by line").[3]

To the extent there is doubt as to the corpus of communications where privilege is asserted, Mr. Hoyt's declaration clears it up. At the President's direction, he invokes privilege as to

[3] For three reasons, Plaintiff asserts that "[t]his Is Not A *Cheney* Case." Mot. at 23-24. All three are wrong. First, Plaintiff notes that she seeks discovery from the Kennedy Center, not, like in *Cheney*, from the Vice President and others. Mot. at 23. But the Supreme Court has made clear that seeking information from a third party does not exempt the seeker from separation-of-powers concerns. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020) ("[S]eparation of powers concerns are no less palpable here simply because the subpoenas were issued to third parties. Congressional demands for the President's information present an interbranch conflict no matter where the information is held—it is, after all, the President's information."). Second, Plaintiff claims that the discovery sought in *Cheney* was broader than the discovery sought here, which "is essential to the underlying claims in this lawsuit." Mot. at 24. But that is not right and also ignores the narrow context in which this Court has permitted discovery in the first place. *See infra* at 13-17 (explaining that Plaintiff's requests have minimal, if any, relevance). And third, Plaintiff accuses Defendants of "stonewalling." Mot. at 24. But that is not true either. Plaintiff, despite the expedited nature of discovery, has obtained "five depositions and 25 interrogatories, as well as approximately 6,800 pages [now more than 7500 pages] of documents and responses to 44 requests for admission." Doc. 101 at 3.

"information, documents, and communications shared between the President, his advisors (government and non-government), and Kennedy Center staff, pertaining to the management and operation of the John F. Kennedy Center for the Performing Arts." Hoyt Decl. ¶ 6. Mr. Hoyt then enumerates numerous examples of requests and questions that the invocation covers. *See id.* ¶¶ 7-12.

This case is nothing like *Navarro*. *Contra* Mot. 15-17. First, *Navarro* dealt in criminal proceedings. 182 F.4th at 1010; *accord Cheney,* 542 U.S. at 384 ("The need for information for use in civil cases ... does not share the urgency or significance of [] criminal subpoena requests[.]"). Second, the subpoena recipient in *Navarro* admitted "that some of the subpoenaed documents and testimony pertain to information not subject to executive privilege at all." 182 F.4th at 1024. Defendants have made no such admission. To the contrary, Defendants have made clear that, "to the extent any request turns up communications that reflect presidential decision-making and deliberations (the type of material Plaintiff seems to be after), Defendants maintain that the presidential communications privilege applies." Doc. 97 at 8-9; *see* Hoyt Decl. ¶¶ 6-12. In other words, Defendants are not claiming that the privilege applies to "information indisputably not protected by executive privilege." Mot. at 16. The language on which Plaintiff relies, *see* Mot. 15-16, is couched in the possible ("*may* have the effect") only because of Defendants' separate objection based on *Cheney* and its progeny, *see Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 532 F.3d 860, 867 (D.C. Cir. 2008) (recognizing the burdens imposed by "a massive, wide-ranging, overly broad discovery request" (citation modified)).

For those reasons, Plaintiff's second procedural argument also fails to justify relief.

**III. Executive Privilege Applies to Communications Related to the President's Duties.**

Plaintiff next argues that executive privilege "protects the institution of the Presidency, not the individual who happens to occupy the White House." Mot. at 17. But, as the Supreme Court reinforced recently, the Framers vested "'the executive Power' in one person—'a President of the United States of America.'" *Trump v. Slaughter*, 609 U.S. 422, 428 (2026) (quoting U.S. Const. Art. II, § 1, cl. 1). Indeed, the President "occupies a unique position in the constitutional scheme as the only person who alone composes a branch of government." *Trump v. United States*, 603 U.S. 593, 610 (2024) (citation omitted). As a result, there are strong separation-of-powers concerns and "public interest[s]" in protecting and encouraging "candid, objective, and even blunt or harsh opinions in Presidential decisionmaking," including the need to protect communications between the President and those who advise and assist him "in the performance of [his] manifold duties." *Nixon*, 418 U.S. at 705, 708.

Those diverse and manifold duties comprise both constitutional and statutory dimensions, regardless of context. *See Trump*, 603 U.S. at 607 ("No matter the context, the President's authority to act necessarily "'stem[s] either from an act of Congress or from the Constitution itself.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952))). Plaintiff fixates on limiting the privilege to the President's express "constitutional" duties and contends that overseeing the Kennedy Center is not one of them. Mot. at 2, 13, 17-19. But that is not the law. Although the purpose of the privilege is to protect the President's confidentiality of office and autonomy and independence as the head of a co-equal branch under Article II, the privilege plainly applies to presidential decisions beyond those involving his express constitutional authorities. In *Nixon*, the President moved to quash a subpoena on the basis that it demanded "confidential conversations between a President and his close advisors that it would be inconsistent with the

public interest to produce," and the Supreme Court, without tracing each conversation to the exercise of a constitutional duty, stated that the communications were "presumptively privileged." 418 U.S. at 703, 708 (quotation omitted); *see Trump*, 603 U.S. at 612-13. Instead, it was sufficient that the tapes involved the President's White House activities. Moreover, the privilege has been asserted over the President's exercise of statutory functions on numerous occasions. *See Publ'n of A Rep. to the President on the Effect of Auto. & Auto.-Part Imports on the Nat'l Sec.*, 2020 WL 502937, at *6 (O.L.C. Jan. 17, 2020) (providing examples); *id.* ("The presidential communications component of executive privilege protects the President's power to faithfully execute all of the laws."). Added to that, some presidential conduct qualifies "as official even when not obviously connected to a particular constitutional or statutory provision," such as using "the office's 'bully pulpit.'" *Trump*, 603 U.S. at 618, 629.

Whatever branch the Kennedy Center may lie in, what matters for the purposes of executive privilege, as Plaintiff acknowledges, is whether the President takes the actions at issue in his "official capacity." Mot. at 12. Indeed, the Supreme Court has spoken of the privilege as applying to "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (cleaned up).

And here, the President's involvement with respect to the Kennedy Center is undoubtedly in his official capacity. The Kennedy Center statute mandates that "the general trustees *shall be appointed by the President of the United States.*" 20 U.S.C. § 76h(b) (emphasis added). To properly exercise that authority, the President must familiarize himself with the Kennedy Center's management, operations, and performance to ensure that the Board's general trustees and any trustees to be appointed in the future are well-suited to meeting the challenges facing the Kennedy

Center, are capable of managing the Center ably and in accordance with their duties and statutory obligations, and are in fact managing the Center ably and in accordance with their duties and statutory obligations. *See* Hoyt Decl. ¶ 13. The same is true when it comes to the President's authority to "designate" members of the Advisory Committee on the Arts. *See* 20 U.S.C. § 76h(c). To properly exercise his authority with respect to the Committee, which is tasked with "advis[ing] and consult[ing] with the Board and make recommendations to the Board regarding existing and prospective cultural activities to be carried out by" the Center, along with assisting the Board in the solicitation and acceptance of financial gifts, *id.*, the President must familiarize himself with existing cultural activities, those planned in the future, and the Board's fundraising efforts, *see* Hoyt Decl. ¶ 13.

That the President also serves as the Chairman of the Board is of no moment. In other words, even though the President's statutory duties and the Chairman's trust duties overlap, what matters for the purpose of executive privilege is that Plaintiff seeks information, documents, and communications concerning the President's actions in his official capacity. Given the President's "unique position in the constitutional scheme as the only person who alone composes a branch of government," *Trump*, 603 U.S. at 610, combined with his statutory mandate, the "[t]he interest[s] in preserving [the President's] confidentiality is weighty [] and entitled to great respect." *Nixon*, 418 U.S. at 712.

Finally, Plaintiff errs in arguing that "[t]he staff at the Kennedy Center are not even the kind of close presidential advisors to whom the privilege has been understood t[o] apply." Mot. at 19-20. Courts routinely have recognized that the presidential communications privilege applies to communications between the President and governmental advisors outside the White House. *See, e.g.*, *Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1123-24 (D.C. Cir. 2004) (holding that

the presidential communications privilege did not apply to purely internal Justice Department documents that "never ma[d]e their way to the Office of the President" but did apply to Department documents solicited and received by the President or his White House advisers); *Loving v. Dep't of Def.*, 550 F.3d 32 (D.C. Cir. 2008) (holding that the privilege applied to a memorandum transmitted from an Army official to the Secretary of the Army, which the Secretary then forwarded to the President). Moreover, as explained further below, *see infra* at 18-19, the privilege can apply to communications between the President and nongovernmental advisors, so long as, like here, "the communications (1) relate to official presidential decisionmaking, (2) involve or reflect communications with the President or his direct advisers, and (3) are confidential." *Applicability of Executive Privilege to Presidential Communications with Private Advisers*, 50 Op. O.L.C. __, 2026 WL 245506 at *1 (Aug. 10, 2026); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 910 (D.C. Cir. 1993) ("A statute interfering with a President's ability to seek advice directly from private citizens as a group, intermixed, or not, with government officials, . . . raises Article II concerns").

In sum, Plaintiff seeks information, documents, and communications that pertain to the "performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *Adm'r of Gen Servs.*, 433 U.S. at 449. The presidential communications privilege therefore applies.

## IV. Plaintiff's Purported Need for the Evidence Does Not Overcome Executive Privilege.

Because the presidential communications privilege applies, Plaintiff must make "an adequate showing of need" to overcome it. *Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 886 (D.C. Cir. 2021). She fails to do so.

The rare instances in which the presidential privilege is overcome usually concern criminal prosecution—not civil litigation. *See Nixon*, 418 U.S. at 713 ("The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial."); *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (rejecting a presidential privilege objection to a grand jury subpoena "in the face of the uniquely powerful showing made by the Special Prosecutor in this case"). That distinction reflects, in part, the recognition that "the right to production of relevant evidence in civil proceedings does not have the same 'constitutional dimensions'" as it does in the criminal context. *Cheney*, 542 U.S. at 384 (quoting *Nixon*, 418 U.S. at 711). Indeed, *Nixon* made clear that it "address[ed] only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials." 418 U.S. at 712 n.19; s*ee id.* ("We are not here concerned with the balance between the President's generalized interest in confidentiality and the need for relevant evidence in civil litigation.").

No constitutional dimensions are present in this case, and Plaintiff fails to identify a similar civil case in which a court concluded that a plaintiff's needs overcame the presidential communications privilege. *Black v. Sheraton Corporation of America*, the case on which Plaintiff relies most, did not involve the presidential communications privilege at all but concerned the Attorney General's invocation of executive privilege in a case concerning electronic surveillance. 371 F. Supp. 97, 99-100 (D.D.C. 1974). As relevant to this issue, the district court concluded that public interest factors overcame a claim of executive privilege because the plaintiff's claim stemmed "from the admitted misconduct and perversion of power by governmental officials," which included an invasion of the plaintiff's "private quarters by lengthy secret electronic surveillance." *Id.* at 101. Despite Plaintiff's unfounded assertions otherwise, this case does not

include misconduct—and the dispute here, whether a board of trustees acted reasonably, certainly does not implicate the core individual constitutional rights of citizens at issue in *Black*.

And, in any case, the D.C. Circuit has held that, "even when there are allegations of misconduct by high-level officials," a "party seeking to overcome the presidential privilege seemingly must always provide a focused demonstration of need." *In re Sealed Case*, 121 F.3d at 746. In other words, Plaintiff's empty accusations do not exonerate her from showing, among other things, that the evidence she seeks is "directly relevant to issues" central to the motions pending before the Court. *Id.* at 754.

Plaintiff does not meet that burden. At this stage of the litigation, the question in front of the Court is straightforward: whether the Board, in voting to temporarily close the Center for necessary renovations and restorations, complied with its fiduciary and statutory duties. *See* Doc. 89-1 at 23. The answer to that question is found in the materials that were provided to the Board before its relevant votes. *See id.* at 23-38. This Court's discovery order reflects as much. *See* Doc. 82 at 2 (limiting discovery to the "substance, justification, mechanics, and process of the Board of Trustees of the John F. Kennedy Center for the Performing Arts" at their August and September meetings regarding temporary closure and the "equities" surrounding the decisions); *see also* Doc. 103 at 6.

As a member of the Board, Plaintiff possesses that information. And with the voluminous discovery Defendants have produced, Plaintiff can vet the legitimacy of that information. Nothing more is warranted in this case, and nothing more is needed to "plumb the prudence" of the Board. Mot. at 21; *see* Doc. 89-1 at 34 (explaining that "as long as reasonable minds might dispute the prudent path for the Board to take, then the judicial role in cabining that discretion is at an end, and there can be no dispute of material fact").

To be sure, the information Plaintiff has received does not support her allegations of a grand conspiracy, so she wants to continue fishing for more. But the evidence Plaintiff seeks is, at best, "tangentially relevant or would relate to side issues," and thus does not overcome the privilege. *In re Sealed Case*, 121 F.3d at 754. For example, Plaintiff asks for documents and communications related to the "Naming Condition," *i.e.*, "any condition or understanding that renovation, restoration, construction, or funding of the Kennedy Center depends on placing any person's name on the Center" other than President Kennedy." Mot. at 21; *see, e.g.*, RFP No. 39; ROG No. 5; RFPs No. 52-53. Plaintiff also asked Mr. Floca about this during both his Rule 30(b)(6) deposition and his deposition in his individual capacity. *See* Doc. 102 at 3. But the Board decisions at issue do not hinge on the result of Defendants' appeal regarding the December 2025 and August 2026 recognition resolutions. In other words, the Board voted to temporarily close for the time needed to complete the necessary renovations and restorations regardless of whether recognition of the Trump Administration is allowed. And the only issue pending before the Court is whether the Board, in twice voting to temporarily close for the time needed to complete the necessary renovations and restorations, based on extensive reports and expert analysis, satisfied their duties.[4]

Plaintiff's requests related to "demolition" are similarly inapposite. Mot. at 21; *see, e.g.*, ROG No. 6; RFAs No. 47-51, 54-55; Doc. 102 at 3. The Board twice voted to temporarily close the Center to conduct necessary renovations and restorations, and Center staff are eager to begin.

---

[4] Plaintiff's requests are at best relevant only to a speculative hypothetical in which the Board changes its mind in some alternative new Board action. But whatever Plaintiff may imagine could happen in the future, these requests are not, in any way, directly relevant to the actions presently before the Court.

Plaintiff, a dissenting *ex officio* trustee, opposes temporary closure. That is the dispute in front of the Court, and these requests quite simply are not relevant to it.

Plaintiff's other requests similarly lack the direct relevance needed to overcome the privilege. Whether the President had communications concerning the Center's financial state (*see, e.g.*, RFAs No. 42-44, 46, Doc. 102 at 2-4) is irrelevant to whether temporary closure is justified based on that state. Questions or requests that run to communications with Delta, *see, e.g.*, RFP No. 6 and ROG No. 2, including discussions about the two-year timeline for closure, *see* Doc. 102 at 2-4, similarly lack direct relevance. Plaintiff has the Delta Report and the documents on which it relied, and she deposed Mr. Buchalter. To the extent anything in that Report, or in Delta's recommendation, is, in Plaintiff's opinion, unsupported, then Plaintiff can make her argument. Plaintiff also fails to demonstrate the direct relevance of her requests and questions concerning "input and instructions management received from" the President. Mot. at 21; *see, e.g.*, RFP No. 6; ROG No. 2; Doc. 102 at 2-4. These inquiries run to Plaintiff's unfounded accusations of pretext. But "hypothetical allegations of pretext are not material to" this Court's limited role in this case, where "the record provides ample evidence of the Board's independent, informed, and considered decision to renew its plans for a two-year closure." Doc. 89-1 at 35. Finally, as this Court recently made clear, questions or requests that do not pertain to the Board's August or September votes but instead run to "information bearing on the reasoning behind the Board's now-enjoined initial decision to close the Center, including President Trump's pre-announcement of the decision" are also irrelevant. Doc. 103 at 6.

In sum, Plaintiff's pursuit of irrelevant evidence does not justify her extraordinary request. This Court should deny the motion.

## V. Defendants Have Not Waived Any Privilege

Plaintiff recognizes that a court should not "lightly infer[]" a waiver of executive privilege. *In re Sealed Case*, 121 F.3d at 741 (quotation omitted); *see* Mot. at 22. Even so, Plaintiff claims that Defendants have waived executive privilege with respect to communications between President Trump and Mr. Floca. *See* Mot. at 22-23. To support that assertion, Plaintiff relies on the Defendants' statement that "[i]n January 2026, Mr. Floca spoke with President Trump several times and suggested over the course of those engagements that a singular, concentrated 24-month closure would be the most cost-effective and efficient path for addressing the Center's acute infrastructure needs." Doc. 89-2 ¶ 4 (quotation omitted). *In re Sealed Case* makes clear, though, that this statement waives privilege only with respect to the "information specifically released." 121 F.3d at 741; *cf. Cause of Action Inst. v. U.S. Dep't of Com.*, 513 F. Supp. 3d 116, 131 (D.D.C. 2021) ("Previously generalized disclosures do not result in waiver, if they do not precisely track the records sought to be released." (quotation omitted)). Thus, the President has not waived his privilege with respect to any information beyond the fact that Mr. Floca spoke with the President several times in January 2026 (a time outside the scope of the ordered discovery) and recommended that a concentrated 24-month closure was the best path forward.

Plaintiff also argues that information transmitted to the Kennedy Center is no longer privileged because the Center is "outside the executive branch." Mot. at 22-23. But as discussed above, it is well established that the presidential communications privilege applies to communications between the President and his governmental advisors outside the White House. *See Jud. Watch.*, 365 F.3d at 1123-24; *Loving*, 550 F.3d at 40. Even for nongovernmental advisors, the D.C. Circuit has recognized "the President's capacity to solicit direct advice on *any* subject related to his duties from a group of private citizens, separate from or together with his closest governmental associate." *Ass'n of Am. Physicians & Surgeons, Inc.*, 997 F.2d at 908; *see also id.*

at 910 ("A statute interfering with a President's ability to seek advice directly from private citizens as a group, intermixed, or not, with government officials, . . . raises Article II concerns"); *In re Sealed Case*, 121 F.3d at 752 (stating "the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources"). The presidential communications privilege thus can attach to the President's communications with such private advisers "so long as the communications (1) relate to official presidential decisionmaking, (2) involve or reflect communications with the President or his direct advisers, and (3) are confidential." *Applicability of Executive Privilege to Presidential Communications with Private Advisers*, 2026 WL 2455067, at *1.

The President's conversations with Mr. Floca about the management and operation of the Center constitute communications with a governmental advisor protected by the presidential communications privilege. Even if Mr. Floca were considered a nongovernmental advisor, his communications with the President would be subject to privilege because they related to official presidential duties and have remained confidential. *See* Hoyt Decl. ¶ 13. The fact that any communications are in the Center's custody (Mot. at 22) provides no reason to think that the President spoke "without an expectation that the information will continue to be confidential," and they have continued to be treated as such. *Applicability of Executive Privilege to Presidential Communications with Private Advisers*, 2026 WL 2455067, at *13. Plaintiff fails to show that any information, document, or communication at issue here has been broadly or publicly distributed. And, because waiver in in this context "should not be lightly inferred," *In re Sealed Case*, 121 F.3d at 741, that failure is fatal. For those reasons, Plaintiff's waiver argument provides no basis for relief.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's motion to compel.

Dated: October 14, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

*/s/ Brantley T. Mayers*
BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 890-9874
brantley.t.mayers@usdoj.gov

TY TURLEY TREJO
Counsel to the Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

CHRISTOPHER M. LYNCH
Chief Litigation Counsel

WILLIAM S. JANKOWSKI
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch

*Counsel for Defendants*