**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOYCE BEATTY,

*Plaintiff*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

No. 25 Civ. 4480 (CRC)

**REPLY IN SUPPORT OF MOTION TO COMPEL**

In February 2025, Donald Trump appointed himself a trustee of the Kennedy Center, and his handpicked Board named him Chairman of this sacred memorial. Ever since, as Chairman, Trump has personally dictated the goings-on at the Kennedy Center—from choosing the color of seats to abruptly and unilaterally declaring that the Center would close for renovations. After the Court issued its decision in May, Trump began threatening to demolish the institution if he does not get his way. All the while, Trump has treated his fellow trustees as an afterthought and the Kennedy Center as his own fiefdom.

Because Defendants' latest vote to shutter the Kennedy Center simply rubberstamped Trump's longstanding ukase regarding closure, Plaintiff sought targeted discovery regarding the inputs and instructions that the Chairman had provided management. Plaintiff did everything she could to avoid a separation-of-powers fight. For example, despite Trump's centrality to this dispute, she sought document discovery, at this juncture, only from the Kennedy Center, and depositions only of current and former Kennedy Center staff and consultants. In response, rather than engage with Plaintiff, Defendants asserted a sweeping claim of executive privilege. Their

Response utterly fails to justify this audacious attempt to shield from the most minimal scrutiny all communications with the Kennedy Center's Chairman about management of the Kennedy Center. It would do a terrible disservice to the rule of law—to say nothing of disserving the search for truth in this important litigation about a national memorial to a slain President—to permit Defendants to hide the ball in this way.

For starters, Defendants still have not cured the glaring procedural defects in their invocation of the presidential communications privilege. With their Response, Defendants submitted only a vague declaration from a White House employee. That declaration neither clearly states that the President invoked privilege nor identifies specific communications as to which it is invoked. These errors on their own continue to be fatal. But the fundamental problem with Defendants' position runs deeper. The presidential communications privilege is meant to protect sensitive executive branch deliberations. Yet the Kennedy Center is *not an Article II entity.* This performing arts center *does not sit within the executive branch*. Defendants cannot assert a privilege meant to protect the President's communications with his closest advisers about management of the executive branch of government with respect to information regarding a board chairman's management of a performing arts venue.

The Department of Justice never grapples with this critical point. Instead, Defendants argue that, because Congress afforded the President a limited role in selecting Kennedy Center trustees, *everything* Trump does with respect to the Kennedy Center in his capacity as Chairman is somehow shielded by executive privilege. This is nonsense. When Trump directs the Center's renovation, Trump acts as the Chairman of the Board—not as the President selecting which trustees to appoint. When he interacts with other board members and the staff of the institution he acts as board chair, not President of the United States. No one seriously believes otherwise. And

under binding D.C. Circuit precedent, when the party invoking executive privilege wears "dual hat[s]," "the government bears the burden of proving that the communications occurred in conjunction with" the privileged role. *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). That is particularly so when Trump *voluntarily* assumed a role unprotected by executive privilege. Trump did not need to appoint himself to the Board (no prior President had ever done so), and Trump did not need to seek or accept the role as Chairman (again, no President had ever done so). Having done both, however, Trump cannot simultaneously claim that everything he does as Chairman is free from scrutiny because he is really acting as President.

In the end, Defendants have not even attempted to meet their burden in this case to prove Trump deserves the protections of the presidential communications privilege. Nor could they possibly do so, when Trump is so clearly acting in his capacity as Chairman. And even if the qualified privilege did apply (it does not), any privilege is also clearly overcome by Plaintiff's pressing need for information. Trump is at the heart of this case. For instance, in a recently produced document, JLL was told by the Center's management that "Q3 2028 reopening is absolute; driven by Presidential mandate." To get to the truth, it is imperative to inquire about this and other unreasoned dictates from the Chairman, which are plainly motivating the scheme to close the Kennedy Center.

One last point. In this filing and others, Defendants have sought to leave this Court with the mistaken impression that discovery has uncovered nothing to date. Defendants have even accused Plaintiff of undertaking a "fishing expedition." Resp. 2. That is wrong. To pick just one example, on Monday, October 19, 2026, Defendants disclosed *for the first time* a lengthy report produced by JLL on August 20, 2026. That report was, notably, never provided to the Board; confirms that a phased renovation was feasible; appears to contradict information provided to the

Board; and demonstrates how Defendants appear to have cherrypicked information from their own consultants to manufacture a case for shutdown and foreclose the Board's consideration of prudent alternatives.

Despite this latest JLL report being directly responsive to Plaintiff's discovery requests, Defendants did not disclose that document *until Monday of this week*, long after depositions had occurred.[1] Moreover, despite that document being responsive to questions in Mr. Floca's deposition, Mr. Floca did not disclose the document's existence in his testimony.[2] Today, Defendants additionally filed an erratum in which they stated that—despite withholding this JLL report from Plaintiff for weeks—Defendants apparently *referenced the document in their pending motion filed in September*. *See* ECF No. 109. It is therefore particularly inexplicable why Defendants did not produce the lengthy JLL report until now, at the tail end of the extended discovery period. This latest development only underscores why discovery is so important. The Court should reject Defendants' mistaken representations to the contrary and their concerted efforts to evade the truth, including their sweeping assertions of presidential communications privilege.

[1] For example, RFP 5 "sought any Documents or Communications concerning the alternatives or Scenarios that JLL was asked, instructed, or expected to evaluate," and RFP 8 sought "all communications with JLL relating to the duration, sequencing, phasing, or cost of the Renewal Project." ECF No. 96-1 at 10-11.

[2] Mr. Floca stated that JLL summarized their findings only in a letter, not in the Comprehensive Project Development Plan. *See* Ex. A. Defendants disclosed that letter—which was transmitted to management in June, but which was also withheld from the Board—only after Mr. Floca revealed its existence and Plaintiff raised Defendants' failure to produce it. Now, in their erratum, Defendants acknowledge that the August JLL report *was* an update to the Comprehensive Project Development Plan. ECF No. 109 at 2.

## I. Defendants Did Not Properly Invoke Presidential Communications Privilege.

Defendants have still not properly invoked the presidential communications privilege. As Plaintiff outlined in her motion, and as Defendants no longer contest, line attorneys lack authority to assert this sensitive privilege on their own. Rather, because of the unusual gravity associated with invoking the presidential communications privilege, the President or his assigned designee must do so formally. *See United States v. Navarro*, 182 F.4th 1005, 1019-1021 (D.C. Cir. 2026). But as Defendants now acknowledge, their initial and far-reaching assertions of privilege were made *prior* to any "final determination by the President or his designee." Resp. 7. Those invocations of privilege were, thus, dead on arrival.

For the first time—with their Response—Defendants submitted a vague declaration from a Deputy Assistant and Deputy Counsel to the President. *See* ECF No. 106-1. But that declaration is far too little, even if not also too late. Notably, the declaration is ambiguous on the key question of whether the President directed the declarant to invoke privilege. Instead, the document states only that the declarant "submits this declaration formally invoking the presidential communications privilege" at "the direction of the President." *Id*. at 1. Attesting that the President directed the submission *of the declaration*, however, is materially different from stating that the President directed *the invocation of privilege*, let alone that the President invoked privilege with respect to each communication at issue in this case. Moreover, the document states elsewhere that the declarant "hereby assert[s] presidential communications privilege" on "behalf of *the Office of the President*"—an entity that is distinct from the President *personally*. *Id*. at 1-2 (emphasis added).

These ambiguities are not minor defects. They are fatal errors. In *Navarro*, the D.C. Circuit explained that "executive privilege was never invoked by President Trump or a designee,"

even though an "attorney to President Trump" wrote a letter purporting to "confirm[] President Trump's position that, as one of his senior advisors, [Dr. Navarro] had an obligation to assert executive privilege on [President Trump's] behalf." *Navarro*, 182 F.4th at 1023 (alterations omitted). That "letter [did] not state that President Trump ever directed Dr. Navarro to assert executive privilege." *Id.*

The same is true here. The post-hoc declaration that accompanies Defendants' Response contains conspicuous and "critical omissions." *Id*. As in *Navarro*, Defendants have been afforded another "opportunity to clearly state" that the President had formally and properly "invoked or claimed executive privilege," but "that is not what" happened. *Id.* Just as in *Navarro*, the Court should deny the assertion of presidential communications privilege.

## II. Defendants Continue To Assert Blanket Claims of Privilege.

In addition, Defendants' assertion of the presidential communications privilege has still not been made with the requisite particularity. This, too, is not a technical misstep. Without minimal information regarding what communication has been withheld, it is more difficult for courts to evaluate whether the qualified privilege applies and should be overcome. To be clear, in this case, for all the reasons described below, there is no possible scenario in which the presidential communications privilege could apply to the limited discovery Plaintiff seeks. But this procedural error is similarly fatal to Defendants' privilege claim and provides reason enough to rule for Plaintiff.

The law in this circuit is "abundantly clear": "[A]ny claim of privilege, whether of executive or Presidential privilege or of common-law evidentiary privilege" "must be made with particularity." *Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980). This rule comports with the Federal Rules of Civil Procedure. Whenever a "party withholds information otherwise

discoverable by claiming that the information is privileged," "the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A).

Yet even after Plaintiff underscored the defects in Defendants' blanket assertions of presidential communications privilege, Defendants declined to identify the particular communications to which they asserted privilege. Indeed, the declaration that accompanies the Response does not provide *any* specific information "describ[ing] the nature of the documents, communications, or tangible things not produced or disclosed," and still less does it "do so in a manner that . . . enable[s] other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). For example, the declaration does not identify the number or kinds of documents withheld (including whether they are memoranda, reports, emails, etc.); nor does it specify any of the information that would ordinarily be set out in a privilege log, such as "the subject matter, number of pages, author, date created, and the identity of all persons to whom the original or any copies of the document were shown or provided." *See Slaughter v. McDonough*, No. 18-1318, 2022 U.S. Dist. LEXIS 127292, at *9-10 (D.D.C. July 19, 2022) (internal quotation omitted); *Jones v. Carso*n, No. 15-310, 2018 U.S. Dist. LEXIS 67400, at *13 (D.D.C. Mar. 30, 2018) (internal quotation omitted); *Loftin v. Bande*, 258 F.R.D. 31, 33 (D.D.C. June 16, 2009) (internal quotation omitted). The declaration merely lists the questions to which Defendants assert the presidential communications privilege—and provides no further information. This is plainly deficient.

Defendants argue that the particularity requirement applies only to cases that "deal[] in criminal proceedings." Resp. 9. That is wrong as the plain text of Federal Rule of Civil Procedure 26 makes clear. There is also no special exception for executive privilege. Indeed, *Dellums* rose

out of a "class action suit" alleging that defendant officials "had engaged in a civil conspiracy to arrest and detain the class members with the purpose of frustrating their First Amendment right to protest against the war." 642 F.2d at 1353. Citing both civil and criminal cases, the D.C. Circuit made clear that the particularity requirement applies to claims of presidential communications privilege raised in civil litigation. *See id.* at 1363. Similarly, *Navarro*, though a criminal prosecution for contempt of Congress, concerned the failure to respond to a subpoena from a congressional committee on privilege grounds. *Navarro*, 182 F.4th at 1013-1014.

It also makes no sense to limit the particularity requirement to criminal cases. This requirement ensures the court and parties seeking discovery have sufficient information to assess a claim of privilege, including whether any such privilege should give way to competing interests that would be served by disclosure of otherwise discoverable information. *See, e.g.*, *Judicial Watch, Inc. v. Dep't of Def.*, 913 F.3d 1106, 1113 (D.C. Cir. 2019) (rejecting request for "more specific" information because such information was not "needed to determine the applicability of the" privilege to certain briefings). Those threshold determinations must be made in all cases, civil and criminal.

It is no answer to say that Defendants "believe" that the materials they seek to withhold are covered by the presidential communications privilege and that disclosure of such materials could have a chilling effect on future presidential communications. *See* ECF No. 106-1 at 5. Indeed, not long ago, Defendants were also of the view that line attorneys could unqualifiedly invoke the presidential communication privilege to flatly refuse to comply with discovery. As that error underscores, Plaintiff and the Court need not blindly accept Defendants' assertion that any particular documents or information Defendants seek to withhold are protected by executive privilege. Nor should Plaintiff and the Court be deprived of particularized information that will

demonstrate Plaintiff's need for the specific information outweighs any confidentiality interests that would be served by shielding that information from discovery.

Finally, Defendants continue to assert that following the shopworn procedures for invoking executive privilege would be too burdensome in this case. *See, e.g.*, Resp. 8. But Plaintiff *has* sought to alleviate "separation-of-powers concerns." *Id.* at 8 n.3. She did "not serve overbroad discovery requests on the President." *Id.* at 1. She instead sought information from *the Kennedy Center* regarding the instructions and input it received *from its Chairman*. Defendants' protests aside, that information is critical to this case for all the reasons described below. In contrast, Defendants have been less than forthcoming in discovery broadly, as the latest revelation regarding JLL confirms. *Id.* The Court should not permit Defendants to stonewall the truth in this manner by withholding critical discovery to which they do not assert a privilege and by also refusing to disclose anything about the Chairman's actions.

## III. Executive Privilege Does Not Apply To Trump's Actions As Chairman.

Even putting aside Defendants' procedural missteps, the presidential communications privilege simply does not apply in this case. When Donald Trump acts as the Chairman of the Kennedy Center, his communications do not merit the extraordinary protection meant to shield "sensitive *Executive Branch* deliberations," *Trump v. Mazars USA, LLP*, 591 U.S. 848, 864 (2020) (emphasis added), between the President and his "*immediate* advisers." *Navarro*, 182 F.4th at 1021 (emphasis added). Indeed, as Defendants do not dispute, the Kennedy Center is not an Article II entity. *See* Resp. 11. It is beyond cavil to suggest that the day-to-day operations of a performing arts center—which is not in the executive branch—amount to the kind of high-level "governmental operations" that by their nature require "direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752 ("The presidential communications privilege should never serve as a means

of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President.").

Defendants nevertheless argue that Donald Trump acts "in his official capacity" as President whenever he does *anything* associated with the Kennedy Center because, by statute, the President has an extremely limited role in appointing trustees to the Kennedy Center. Resp. 11. According to Defendants, Trump "must familiarize himself with the Kennedy Center's management, operations, and performance to ensure that the Board's general trustees" are "well-suited to meeting the challenges facing the Kennedy Center." *Id*. at 11-12.

This is risible. When Trump selects seat colors or devises a scheme to shutter the Kennedy Center, Trump is not weighing whether to exercise his limited statutory authority as President to appoint trustees. Trump is acting as Chairman. Indeed, Defendants themselves characterize Plaintiff's discovery as seeking information into Trump's "involvement in the Kennedy Center's *management and operations*." Resp. 1 (emphasis added). Nor does precedent permit Defendants to negate Trump's managerial actions as Chairman by claiming he's only performing the narrow function Congress assigned to the President in the statutory scheme. Much the opposite. Trump chose to appoint himself to the Board, and he chose to accept the Board's election as Chairman. He has since occupied those roles while micromanaging the institution. To the extent that Trump or anyone who engaged in purportedly privileged communications wears "dual hat[s]," "the government bears the burden of proving that the communications occurred in conjunction with the process of advising the President." *In re Sealed Case*, 121 F.3d at 752; *see also Judicial Watch*, 913 F.3d at 1111 (privilege must be "construed … narrowly"). Defendants have simply declined to engage in that inquiry and meet their burden. Nor could they. The record is plain: Donald

Trump is managing the Kennedy Center's operations and renovations as the Chairman of the Board, not as the President of the United States.

Simply put, Donald Trump cannot have it both ways. Trump may confine himself to his "official" duties as President—in this case, the narrow appointment of trustees—and shield, as appropriate, communications directly pertaining to those minimal duties. Or Trump may choose to take on extracurricular roles, like his role as Chairman of the Kennedy Center's Board, that extend far beyond his duties as President. Trump chose the latter path, and must therefore follow the rules that apply to those positions. The whole point of executive privilege is to protect decisionmaking *within* and concerning *the executive branch*. It has no place concealing the management deliberations of a board of directors about a performing arts center. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 745, 748 (explaining that the presidential communications privilege is "designed to protect executive branch decisionmaking," "is rooted in constitutional separation of powers principles and the President's unique constitutional role," and that precedent "identified the President's Article II powers and responsibilities as the constitutional basis of the presidential communications privilege"). It also bears repeating: Plaintiff crafted her discovery requests to avoid imposing on Trump (or any other Board member). She has only sought documents and depositions from the Kennedy Center—*i.e.*, from outside the executive branch. Plaintiff is not seeking a separation-of-powers fight. She endeavored to adopt a "balanced approach" precisely to avoid this dispute. *Mazars*, 591 U.S. at 869. The Court should not reward Defendants' tactics and permit them to stretch executive privilege beyond the breaking point.

**IV. Plaintiff's Need for Evidence Overcomes Any Applicable Privilege.**

Even if the presidential communications privilege were properly invoked (it was not) and even if the privilege could apply to Trump's actions as Chairman (it does not), the nebulous

confidentiality interests Defendants assert are clearly outweighed by the compelling private and public interests that would be served by disclosure.

On one side of the ledger, the government's general confidentiality interests are weak. "[B]y definition," communications pertaining to the management of a performing arts center housed outside the executive branch do "not implicate sensitive Executive branch deliberations." *Mazars*, 591 U.S. at 864 ("declin[ing] to transplant" the protection of the presidential communications privilege "root and branch to … information[] which by definition does not implicate sensitive Executive branch deliberations"). Indeed, Defendants' confidentiality interests are substantially weaker than those asserted in other cases—a telling indication that this dispute lies far outside the heartland of executive privilege. *See In re Sealed Case*, 121 F.3d at 735-36, 752 (vacated and remanded for more careful consideration of whether the need for the documents at issue outweighed confidentiality interests with respect to communications with advisors in an internal White House investigation); *Judicial Watch*, 913 F.3d at 1111-1112 ("Declarations filed with the motion for summary judgment explained that the President and his immediate advisers solicited and received the advice of the top national security lawyers from the Department of Defense, CIA, and National Security Council relating to a potential military counterterrorism operation. The legal advice memorialized in each memorandum concerned that covert military operation and was shared only with the President and his closest advisers.") (citations omitted).

On the other side of the ledger, Plaintiff has a pressing need for the information she seeks. As the motion to compel explained, and as Defendants do not dispute, Donald Trump has been at the heart of the scheme to shutter the Kennedy Center. It was the Chairman who ordered a two-year closure, without warning, on February 1, 2026; who characterized the Board vote on his decision to close the Center as a "minor detail[]"; who threatened to demolish the Center in the

wake of Court's decision; and who similarly declared that no renovations will occur unless his name is added to the facade. Mot. 6 (quoting Mem. Op. 20). The Board, meanwhile, continues to remain a second fiddle to Trump's personal preferences. Indeed, rather than conduct a prudent analysis regarding how best to proceed—which would have led them to select the industry standard approach of a phased renovation—Defendants orchestrated a sham process to rubber-stamp the Chairman's earlier dictate.

The evidence uncovered in the limited discovery Defendants provided unsurprisingly confirms that the Chairman's whims—and not the best interests of the Kennedy Center—are motivating the decision to shutter the institution. For instance, the two-year period of the shutdown is an important factor in both Delta and JLL's analyses provided to the Board. But the two-year period appears to have been arbitrarily selected, not because that period served the Center's interests, *but because the Chairman chose that timeframe*. As Plaintiff detailed in her supplemental memorandum, Mr. Floca has now stated that the Chairman was the one who decided to close the Kennedy Center for two years. *See* ECF No. 102 at 4. Meanwhile, in a document disclosed during discovery, JLL was told by the Center's management that "Q3 2028 reopening is absolute; driven by Presidential mandate." Plaintiff has every right to inquire whether this mandate—and any others—reflected unreasoned edicts from the Chairman.

This example is necessarily illustrative. But it underscores that Defendants are blocking discovery into highly pertinent avenues of inquiry including: the instruction and input Trump provided to management and the ostensibly independent consultants regarding the decision to close; whether Trump is orchestrating the closure of the Center to hide embarrassment regarding ongoing mismanagement; and the risk that Trump will follow through on the repeated threats to

alter the scope of the renovations, including by demolishing the Center or conditioning renovations on the institution's renaming.

What little response Defendants offer does not move the needle. Defendants repeat their tired refrain that all that matters in this case is what Defendants "provided to the Board," a not-so-subtle attempt to relitigate whether discovery should occur at all. Resp. 15. But the Court already ordered discovery. Regardless, Defendants are wrong on the law. For example, if Defendants curated a record to produce a predetermined result, ignoring any evidence that contradicted the Chairman's whims, that would be a straightforward violation of their fiduciary duty. Indeed, the latest revelation that Defendants withheld JLL's August report from the Board indicates that is precisely what Defendants did.

Put differently, Defendants—who include Mr. Floca and the Chairman—cannot launder Trump's preferred outcome through outside consultants, handpick the information the Board receives, and thereby circumvent their fundamental obligations as trustees. It is thus imperative to know what instructions and input the Chairman provided Mr. Floca, the consultants, and others, and whether he is continuing to dictate the closure. Moreover, even if the trustees could disclaim responsibility for their initial votes because they relied on a laundered expert opinion, the trustees surely breach their fiduciary duties if they unreasonably maintain that decision *after* damning information comes to light. *See generally* Restatement (Third) of Trusts § 93 cmt. c. ("Reliance on relevant professional advice does not afford a complete defense to allegations of breach of trust, for that protection should not apply, for example, if the trustee acted unreasonably in following the advice or in procuring it, as might be the case in shopping for advice to support a desired course of conduct."); Bogert et al., *The Law of Trusts and Trustees* § 558 ("Courts have held a trustee's

conduct to be 'arbitrary and capricious' if he or she has gone through the formality of exercising the discretion without deliberately considering the circumstances.").

Defendants protest that inquiring into potential demolition is somehow "inapposite." Resp. 16. But the Court specifically authorized discovery into that precise issue in its September 17 minute order. The Court also recently reiterated "that the circumstances surrounding the [demolition] photograph, and what it may say about any intention to deviate from the renovation plans that have been presented to the Court, are within the scope of the Court's discovery order." ECF No. 103 at 5. Meanwhile, the Chairman has publicly stated that the Center will close immediately but renovations will not begin "until such time as the D.C. Circuit rules on the Board's approved name," and if the ruling "is a negative one" renovations "will not take place." ECF No. 78. If true, that assertion would similarly amount to a monumental breach of Defendants' (including the Chairman's) legal obligations.

Defendants' remaining arguments similarly miss the mark. Understanding what management told Trump regarding "the Center's financial state" is directly relevant to determining whether the closure he has relentlessly mandated was designed to hide the embarrassing drop in revenue and donations caused by the unlawful renaming. Resp. 17. Nor can Defendants escape their breach of duty on the theory that, if the Kennedy Center is in dire financial straits, a "temporary closure" might be necessary. *Id.* That the shutdown was designed to hide mismanagement, including financial decline, does not mean the Kennedy Center cannot operate. Instead, it can be true both that Trump sought to shutter the institution to hide ongoing failures (which would be a violation of his fiduciary duty) and also that the Center possesses sufficient capital to continue operations. Regardless, even assuming the Center is truly confronting "certain fiscal collapse within weeks," it would be imprudent for Trump to cover up that fact by concocting

a sham plan for renovations without addressing the underlying problem causing the putative fiscal collapse. ECF No. 75-2 at 2.

Defendants suggest that whether the Chairman instructed Delta to reach a predetermined conclusion is irrelevant. Resp. 17. But Defendants' motion relies on the assertion that Delta was independent. *See, e.g.*, ECF No. 89-1 at 33 ("[T]he Board received the recommendation of independent experts with no preconceived views."). It is thus extremely relevant if the Chairman (or a go-between) directed Delta to reach a particular outcome or otherwise placed a thumb on the scale of their analysis.

Similarly, Defendants nakedly assert that whether the closure is pretextual does not matter, and whatever inputs or instructions the Chairman provided are therefore immaterial. Resp. 17. That is wrong. This is not an agency case litigated on a curated record. Instead, under trust law, courts must scrutinize the facts to determine whether the trustees acted in "bad faith," Mem. Op. at 75, acted "from improper motive," Restatement (Third) of Trusts § 87 cmt. c, or only went "through the formality of exercising the[ir] discretion without deliberately considering the circumstances," *The Law of Trusts* § 558. This case reeks of that kind of bad faith, improper motive, and formalism without consideration by Defendants. It is impossible to perform the requisite factual analysis—which trust law demands—in a meaningful way without knowing what the Chairman told his subordinates.

**IV. Defendants Waived Executive Privilege.**

This Court can also independently resolve this dispute based on waiver. Defendants acknowledge that they have waived executive privilege as to information that they "specifically released" to others. Resp. 18; *see In re Sealed Case*, 121 F.3d at 741. Defendants therefore agree that they have waived executive privilege as to "the fact that Mr. Floca spoke with the President

several times in January 2026" and "recommended that a concentrated 24-month closure was the best path forward." Resp. 18.

Under Defendants' own understanding of waiver, Defendants likewise waived privilege as to any other document or information that they have specifically released to others, regardless of whether Plaintiff can "show that any information, document, or communication at issue here has been broadly or publicly distributed." Resp. 19 (incorrectly asserting that Plaintiff's purported "fail[ure]" to make that showing is "fatal"). After all, information may be "specifically released" (and thus waived under Defendants' test) without "broad[]" dissemination to a mass audience.

Defendants cannot withhold responsive discovery on the mistaken assumption that "Plaintiff seeks" only communications that "were intended to be confidential and have remained confidential." ECF No. 106-1 at 4-5. Plaintiff seeks any discoverable materials responsive to her requests. Regardless of whether the conclusion is framed in terms of waiver or whether privilege applies in the first place, Defendants may not invoke privilege as to information that has not been kept confidential. *Navarro*, 182 F.4th at 1017 (explaining that "the law is settled that executive privilege extends only to the provision of confidential advice by select presidential advisers").

Finally, Defendants should not be allowed to shield information that they themselves have chosen to release outside the executive branch by disseminating it to the Kennedy Center. The presidential communications privilege is "designed to protect executive branch decisionmaking," and so normally does "not extend to staff *outside the White House in executive branch agencies*." *In re Sealed Case*, 121 F.3d at 745, 752 (emphasis added). *A fortiori*, it should not extend to staff who are "outside" *both* the White House *and* the executive branch as a whole.

The cases Defendants cite are inapposite. *See* Resp. 18-19. Two involve intra-executive branch communications meant for the President. *See Judicial Watch*, 365 F.3d at 1123-1124;

*Loving v. Dep't of Def.*, 550 F.3d 32, 40 (D.C. Cir. 2008). The third—*AAPS v. Clinton*, 997 F.2d 898 (D.C. Cir. 1993)—does not help Defendants' cause. It is one thing to conclude, as the Court did in *AAPS*, that certain statutory transparency requirements applicable to "advisory groups" did not apply to "the President's Task Force on National Health Care Reform," a body "established" *by the President* for the express purpose of "directly advis[ing] and present[ing] recommendations *to the President*" in connection with his official presidential duties. *Id.* at 900-901 (emphasis added). It is another thing entirely to urge, as Defendants do here, that a constitutionally-based privilege intended to protect intra-executive branch decisionmaking shields information that has been released to a body created *by Congress* to serve *the public* (not to assist the President) and that operates wholly outside the executive branch. *See Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (explaining that ("[t]he executive privilege is just that—a privilege held by the Executive Branch, 'not for the benefit of the President as an individual, but for the benefit of the Republic,'" and explaining that "the privilege 'safeguards the public interest in candid, confidential deliberations *within the Executive Branch*'") (emphasis added).

## CONCLUSION

Plaintiff respectfully requests that the Court compel the production of documents, answers to requests for admission, responses to interrogatories, and responses to questions in depositions which were withheld based on the asserted claim of presidential communications privilege.

Dated: October 21, 2026

Respectfully submitted,

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
(D.C. Bar No. 1724093)
AMIT AGARWAL*
(D.C. Bar No. 90002013)
KYLE R. FREENY
(D.C. Bar No. 1684764)
ALEXANDER KRISTOFCAK
(D.C. Bar No. 90045623)

WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Application for admission forthcoming*

NORMAN EISEN
(D.C. Bar No. 435051)
STEPHEN JONAS
(D.C. Bar No. 90037069)
DAVID W. OGDEN
(D.C. Bar No. 375951)

DEMOCRACY DEFENDERS ACTION
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

*Counsel for Plaintiff Joyce Beatty*