# Exhibit A

MR. JANKOWSKI: Asked and answered.
You can answer.
A. You're -- I'm sorry. You're framing it as a "We told you to do this."
Q. Mm-hmm.
A. "So go do it."
Q. Okay.
A. That's not just really how construction works. There's always a conversation about what's the best way, what's the most efficient way, what's going on in the building.
JLL did give us input on the efficiencies around closing the building versus doing the construction in an occupied manner.
Q. Okay. Tell me about that.
How did they convey that information?
A. Discussed in meetings. It was in a letter.
Q. A letter to the Center from JLL?
A. Yes.
MS. FREENY: I'm going to state for

the record that I don't think I have a copy of that letter, and to the extent that that letter exists, I would request a copy.

(Request.)

Q. When was that letter sent to the Center?

A. I don't recall. June. June, I think.

Q. It was after the May court decision?

A. Yes.

Q. Why was that letter not presented to the Board if it, as you state, contained JLL's discussion of the feasibility of phased versus full main building closure?

MR. JANKOWSKI: Objection. Lacks foundation. And -- yeah. As to whether it was presented to the Board.

A. I don't think I would ever just give -- I would never just give the Board a letter.

Q. Okay, but --

A. But it supports the underlying fact here of the efficiency and effectiveness that we have been discussing.

Q. That discussion of the efficiency and

effectiveness, as you describe it, of full closure versus phased renovation from JLL, that doesn't appear in JLL's report, does it?

A. Not in the -- not in the CPDP, Comprehensive Project Development Plan. There is not a -- that is a plan focused on a specific set of projects.

Q. So your testimony is that where we would find that is in a letter -- a separate letter from JLL?

MR. JANKOWSKI: Objection to the extent that misstates.

But you can answer.

A. You will find that this letter I'm referring to does include information on efficiency and effectiveness of completing the work in an occupied versus unoccupied building, yes.

Q. What was your understanding -- well, is that a letter that they voluntarily provided or that the Center requested?

A. They voluntarily provided.

Q. What was your understanding of why they

provided that letter to you if it was outside of the scope of work?

A. I think it's relevant to their relationship with the Center as a partner, and not just a contractor doing a job blindly.

Q. What is your recollection of the substance of what they said in that letter?

A. Again, I'd just -- the effectiveness of the work. Sorry, not the work. The effectiveness of, you know, occupied versus unoccupied.

Q. Occupied, that refers to phased construction?

A. To a degree, yeah.

Q. Did they state the basis for that perspective? In that letter.

A. I don't recall if it said exactly what their basis was.

Q. Well, do you have an understanding of what JLL did to, as you say, reach that perspective about effectiveness?

MR. JANKOWSKI: Objection to the extent it calls for speculation.

But you can answer.
A. Yes. At the same time as they're writing this letter, they're developing their understanding of the needs of the building, the project, the operations, so that's how they reached the conclusion that's in the letter.
Q. But as they're developing the projects, they're planning for a two-year closure; right?
MR. JANKOWSKI: Objection. Vague on "planning." And to the extent it misstates.
A. They're using that window, yes. Yes.
Q. Did JLL prepare a schedule for phased renovation?
A. I think we already talked about this, but they did not provide a schedule where Eisenhower is operational and Concert Hall is closed, and then Concert Hall is operational and Eisenhower is closed.
Q. So that means they did not prepare a schedule for phased renovation; correct?
MR. JANKOWSKI: Objection to the extent that misstates.

A. I would consider their schedule phased, as it is right now, but we're saying the same thing.
Q. Okay.
A. They did not -- they did not create a schedule where work within -- with the expectation that public access is maintained within the main building.
Q. Okay. Is another way to say that: JLL did not prepare a schedule that contemplated construction occurring while the main building was open at all?
A. Yes, but draw a delineation between the parking garage and the building above.
Q. Understood.
So separating out the parking garage, when I use the word "main building," I'm not talking about the parking garage. It would be fair to say that JLL did not prepare a schedule for renovations to occur while the main building was open.
A. Or sections of the main building was open, yes.

Q. Okay. Or any part of the main building was open; correct?

A. Correct.

Q. I want to get you to -- we're going to look at some documents now, and I want to just ask you a question about Tab 2 in your binder, which we are going to mark as Exhibit 1.

(Floca Exhibit 1, memorandum, 3.4.26, KC-BEATTY0827-829, was marked for identification.)

Q. Mr. Floca, you see in front of you Exhibit 1 is a memorandum from a source selection official to you with a Subject: Recommendation for Award.

Do you see that?

A. From me.

Q. Oh, I'm sorry.

I'm glad you corrected me, from you to the source selection official. Thank you.

Do you see that there are little numbers at the bottom that start "KC-BEATTY"; do you see that?

A. Yes.