**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOYCE BEATTY,

*Plaintiff*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

No. 25 Civ. 4480 (CRC)

# PLAINTIFF'S OPPOSITION TO MOTION TO DISSOLVE PRELIMINARY INJUNCTION

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

BACKGROUND .......... 4

I. Trump's Takeover And The Initial Closure Vote .......... 4

II. The Court's Preliminary Injunction .......... 6

III. Defendants Restack The Deck In Favor Of Closure .......... 8

IV. Management Again Curates The Record For The September 15 Meeting .......... 12

V. The September 15 Meeting .......... 13

LEGAL STANDARD .......... 15

ARGUMENT .......... 16

I. DEFENDANTS' CONDUCT AGAIN FELL BELOW "A FORGIVING STANDARD OF PRUDENCE." .......... 16

A. Defendants Did Not Receive Materials Until A Few Days Prior To Voting .......... 16

B. The "Stacked Deck" Lacked Critical Information .......... 18

1. *No performing-arts-management expertise* .......... 18

2. *No information on fundraising* .......... 19

3. *No information about the NSO remaining in the building* .......... 20

4. *No legal analysis of appropriations law* .......... 21

5. *No materials for a phased approach, including no updated JLL plan* .......... 22

C. The Rushed Process Was Designed To Reach A Predetermined Result .......... 23

1. *Trump's two-year timeframe* .......... 23

2. *Delta's bizarrely compressed timeline* .......... 24

3. *Delta's inputs came from management* .......... 26

D. The Circumstances Demonstrate Bad Faith .......... 26

1. *Defendants are closing the Kennedy Center to hide their mismanagement* .......... 27

2. *Trump is aggrandizing himself at the Kennedy Center's expense* .......... 29

3. *Defendants undermined plans to remain open* .......... 32

4. *Management withheld JLL's analyses of phased construction from the Board* .......... 33

5. *Delta was not independent* .......... 33

6. *The safety rationale is obviously pretextual* .......... 34

E. Defendants' Arguments Are Meritless .......... 35

II. THE EQUITIES SUPPORT THE EXISTING INJUNCTION ....................................40
A. The Court Should Not Reward Defendants' Conduct..............................................40
B. Defendants Have Not Come Clean About The Center's Finances ...........................43
III. THE COURT SHOULD ORDER FLOCA'S TESTIMONY .....................................45
IV. THE COURT SHOULD PROTECT THE CENTER FROM DEMOLITION ............45
CONCLUSION.........................................................................................................45

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Ali v. Carnegie Inst. of Wash.*,
309 F.R.D. 77 (D.D.C. 2015) ....16

*Cobell v. Jewell*,
802 F.3d 12 (D.C. Cir. 2015) ....15

*Cobell v. Norton*,
391 F.3d 251 (D.C. Cir. 2004) ....45

*Day v. Apoliona*,
616 F.3d 918 (9th Cir. 2010) ....39

* *Dep't of Comm. v. New York*,
588 U.S. 752 (2019) ....3, 25

*Glus v. Brooklyn E. Dist. Terminal*,
359 U.S. 231 (1959) ....41

*In Def. of Animals v. Nat'l Inst. of Health*,
543 F. Supp. 2d 70 (D.D.C. 2008) ....16

*In re Wash. Builders Benefit Tr.*,
293 P.3d 1206 (Wash. Ct. App. 2013) ....40

*Mills Acquisition Co. v. MacMillan, Inc.*,
559 A.2d 1261 (Del. 1989) ....36

*Riggs v. Palmer*,
22 N.E. 188 (N.Y. 1889) ....41

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ....42

*Shea v. Clinton*,
850 F. Supp. 2d 153 (D.D.C. 2012) ....15

*Singh v. George Washington Univ.*,
383 F. Supp. 2d 99 (D.D.C. 2005) ....16

*Stern v. Lucy Webb Hayes Nat. Training Sch. for Deaconesses and Missionaries*,
381 F. Supp. 1003 (D.D.C. 1974) ....36

* *Trump v. Cook*,
609 U.S. 528 (2026) ....3, 25

*United States v. Slough*,
61 F. Supp. 3d 103 (D.D.C. 2014) ....16

**STATUTES**

20 U.S.C. § 76j(a)(1)(A) ....20

31 U.S.C. § 1502(a) ....21

31 U.S.C. § 1552(a) ....................21
31 U.S.C. § 1553(a) ....................21
D.C. Code § 19-1308.02(a)....................29, 38
D.C. Code § 19-1310.09(b)(1)....................36
D.C. Code § 19-1310.09(b)(2)....................36
Pub. L. 119-21 § 60025, 139 Stat. 72 (2025)....................5, 21

**<u>RESTATEMENTS</u>**

Restatement (First) of Trusts § 194 ....................36
Restatement (Second) of Trusts § 174 ....................28
* Restatement (Second) of Trusts § 187 ....................16, 28, 38, 39
Restatement (Second) of Trusts § 392 ....................44
Restatement (Third) of Trusts § 39 ....................36
Restatement (Third) of Trusts § 77 ....................16, 22
Restatement (Third) of Trusts § 78 ....................29, 38
Restatement (Third) of Trusts § 80 ....................40
Restatement (Third) of Trusts § 87 ....................38
Restatement (Third) of Trusts § 95 ....................44
Restatement (Third) of Trusts § 97 ....................36

**<u>OTHER AUTHORITIES</u>**

* G. Bogert et al., *The Law of Trusts and Trustees* ....................16, 29, 30, 36
*Commerce Secretary Lutnick Speaks Outside of Kennedy Center Name Change Court Hearing* (C-SPAN Aug. 27, 2026) ....................30
Gov. Accountability Off., *Principles of Federal Appropriations Law* (January 2004)....................21, 22

## INTRODUCTION

For weeks, Defendants accused Plaintiff of a "fishing expedition," resisted even minimal inquiry into their actions, and have responded grudgingly—to put it generously—to discovery. ECF No. 97 at 9. But the limited materials Plaintiff has uncovered reveal that the Board's conduct has only grown worse since the Court entered its preliminary injunction in May. The Court should not allow Defendants to sweep their deeply concerning actions under the rug. The Court should hold them to account, deny their motion to lift the preliminary injunction, and continue to protect the Kennedy Center.

The Kennedy Center's trustees face "one of the more consequential decisions in the institution's lifespan"—whether to deviate from standard industry practice and shutter this performing arts center for two years, at Donald Trump's behest. Mem. Op. at 3, ECF No. 50 (citation omitted). On February 1, 2026, Trump declared that *he* had decided the Center would close for renovations, based on a fake one-year review by experts that never happened. In March, the Board voted to rubberstamp Trump's ukase. At the meeting, Trump bragged that "it was 'a little late for the board' " because he had already " 'announced' " the plan. *Id*. at 82. The trustees were nothing more than "an afterthought." *Id*.

This Court enjoined that "grossly" imprudent decision. *Id*. at 83. Defendants could have appealed. They did not. Defendants could have reversed course and honored their fiduciary duties. They did not. Instead, Defendants concocted a sham process to lend a false patina of legitimacy to their decision—ignoring their obligations to the Kennedy Center.

In July, Defendant Charles Matthew Floca searched for a consultant to bless Trump's closure decision. Only one firm—the Delta Consulting Group—applied. Floca initially told Delta it would have 60 days to produce a report. But after hiring Delta, Floca demanded that the firm

provide its recommendation within days. As the lightning-fast schedule indicates, Delta was never meant to provide a thorough or independent analysis. Delta's assignment was to validate Trump's foreordained outcome, regardless of the facts and what is best for the Kennedy Center.

On August 11, 2026—just two days before the Board meeting on August 13—Floca provided trustees with two documents to make the case for closure: (1) a PowerPoint produced by Delta, which contained two slides of conclusory analysis; and (2) a plan produced by Jones Lang LaSalle (JLL) dated June 8, 2026, which outlined the schedule for renovations if the Kennedy Center closed for two years. Delta's "vague" PowerPoint was entirely one-sided and lacked critical information the Court had previously faulted the Board for not considering, such as expert advice on "arts management" and fundraising. *Id.* at 78 n.30, 81. The Board nevertheless voted to close the Center on August 13. Astonishingly, Management did not provide Delta's written report to trustees until August 31—weeks *after* the Board had already approved the shutdown. This bizarre timeline says it all. Delta's recommendation never mattered. Once again, the "closure decision was foreordained." *Id.* at 81.

Defendants then orchestrated *another* vote on September 15. This second vote was itself a tacit admission that their earlier August 13 meeting was materially inadequate. This time, too, Floca did not provide the Board with the meeting packet until *three days before the meeting*. Floca again failed to provide critical information. Meanwhile, Delta's report contained obvious errors. In particular, Delta stated that the Kennedy Center needed to close, and complete renovations in two years, because congressionally appropriated funds must be spent by September 2029. That is wrong. Those funds can be spent through September 2034. It appears no one corrected this misunderstanding and, indeed, the Board never sought any legal analysis on a basic question of appropriations law.

But here's the kicker. In both the August and September meetings, Floca and others stressed to trustees that construction costs would double—increasing by more than $300 million—if the Center conducted renovations under a phased approach. The record now confirms that *they knew that estimate was wrong*. JLL updated its June 8 plan twice—once in a letter on June 16, and again in an entirely new plan on August 20. Those updated documents make clear that Delta's estimates were exaggerated. Floca provided Delta's analysis to trustees, but withheld JLL's contradictory analysis. Floca's cherry-picking was particularly egregious because JLL's outdated June 8 plan was one of the two documents on which the Board relied to vote for closure.

The evidence additionally confirms that Trump's two-year closure plan was designed, not in good faith for the best interests of the Center, but to cover up Defendants' own mismanagement and to please Trump. Floca and other Defendants admitted as much in their internal messages: "we need to get shut" because "we are burning money." Ex. F at 55.[1] Closure is a band-aid to hide the Center's failures and carry through the Chairman's wishes. The Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Trump v. Cook*, 609 U.S. 528, 535 (2026) (quoting *Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019)). It should decline Defendants' request to whitewash their conduct.

The limited record before the Court was developed on a highly expedited basis. There are numerous gaps involving everything from the Center's current finances (about which Defendants have been extremely evasive and regarding which Plaintiff cannot concretely discern, *see infra* pp. 43-44), to the Chairman's inputs and instructions mandating closure, ECF No. 96. The modest record assembled is already damning. Further discovery will almost certainly uncover additional

[1] Exhibits A-E contain excerpts of deposition transcripts and exhibits. Exhibit F contains other documents Defendants produced in discovery. Exhibits G and I contain other documents cited in this brief. Exhibit H contains JLL's August 20 plan, which Plaintiff is filing under seal.

evidence of misconduct, and the Court should hear live testimony to resolve important issues that are unclear. Right now, however, we know this much: Defendants have persisted in making a mockery of their fiduciary obligations. They fall well short of the tall burden required to take the extraordinary step of dissolving the preliminary injunction, which would reward egregious conduct and threaten the Kennedy Center's future.

## BACKGROUND

### I. Trump's Takeover And The Initial Closure Vote.

In February 2025, Donald Trump fired the Kennedy Center's longtime Board chair "and replaced several of its general trustees." Mem. Op. at 8. Trump "appointed himself as a general trustee, and the Board promptly elected him as its new chair." *Id.* The "Board sacked the Center's president and replaced her with Richard Grenell," who had no prior professional experience in arts management. *Id.* In March 2026, Grenell was replaced with Floca, formerly responsible for facilities, who also lacks arts management expertise.[2] Ex. D at 85-86.

Trump's takeover caused a significant drop in attendance and donations at this premier performing arts institution. Ex. E at 121. In December 2025, the Board announced that the sacred memorial would be renamed after Trump. That development exacerbated the Center's struggles. "[A]rtists canceled performances," the Washington National Opera announced its departure, and an analysis reported by the *Wall Street Journal* "showed a 70% drop in a week's worth of 2026 sales compared to the three prior years." Mem. Op. at 10 (cleaned up).

According to internal documentation, key Defendants and management were acutely aware of and concerned by the problems plaguing the Kennedy Center. Ex. E at 35-36, 116. By

[2] Floca was automatically substituted for Grenell as a Defendant in this case by operation of Federal Rule of Civil Procedure 25(d).

September 2026, the Board's Vice Chair was saying that "we need to get shut" because "we are burning money." Ex. F at 55.

On February 1, 2026, approximately six weeks after the purported renaming, with attendance and contributions falling, Trump announced that "I have determined" the Kennedy Center will "close on July 4th, 2026," and "cease Entertainment Operations for an approximately two year period of time" to conduct renovations. Mem. Op. at 11 (quoting ECF No. 13-12 at 2-3). Trump claimed the Center had conducted a "one year review" with numerous experts who had recommended the closure. *Id.* No such review ever happened. *Id*. at 15.

The Center had long planned necessary renovations and capital maintenance. In July 2025, Congress appropriated approximately $257 million for upkeep of the main building, at the Center's request. Pub. L. 119-21 § 60025, 139 Stat. 72, 157 (2025). But consistent with best practices in the performing arts industry, all construction would occur in a phased approach, and the Center would remain open to patrons. Ex. B at 4-5, 8.

Trump was at the center of the abrupt decision to close the Kennedy Center. Floca initially stated he had recommended "a singular, concentrated 24-month closure" in January 2026. ECF No. 29-3 ¶ 7. Floca has since testified, however, that the two-year duration for the closure was set by Trump as "part of the Truth Social message." Ex. D at 17-18. Trump's dictate that construction must begin in July 2026 became a "non-negotiable" constraint, Ex. D at 108, and a "Q3 2028 reopening" reflected an "absolute" requirement "driven by Presidential mandate," Ex. F at 15.

Plaintiff Joyce Beatty is an ex officio member of the Kennedy Center's Board of Trustees. She initially brought this lawsuit to challenge Defendants' unlawful renaming. ECF No. 1. After Trump announced the two-year closure, Plaintiff amended her complaint to challenge the

shutdown as well. ECF No. 12. To assist in performing her fiduciary duties, Plaintiff requested that Defendants provide information necessary to evaluate the closure. ECF No. 12-1.

The Board vote was scheduled for March 16, 2026. Just a few days prior to the meeting, Defendants had still failed to provide materials. As a result, the Court issued an order requiring Defendants to provide Plaintiff with documents. The closure reflected "one of the more consequential decisions in the institution's lifespan." TRO Op. at 22, ECF No. 24. It "border[ed] on preposterous" to think the Chairman or management would not have finalized materials for the trustees "just *four days* before the Board" was "set to vote." *Id*. at 21.

It turned out, however, that there were no materials. In response to the Court's order, Defendants provided Plaintiff preexisting building plans and studies produced under the prior leadership. Those documents contemplated the Center would conduct all necessary renovations under a phased approach—the opposite of the total closure Trump dictated. Ex. B at 4-5, 8.

The Board met on March 16. In Trump's words, it was too "late for the board" to object "because we've already announced" the closure. Mem. Op. at 20 (cleaned up). To him, trustee input was a "minor detail[]." *Id*. (same). Following Trump's lead, the Board voted to close.

## II. The Court's Preliminary Injunction.

On May 29, 2026, this Court found Defendants violated their fiduciary duties when they rubberstamped Trump's two-year closure. The Court preliminarily enjoined the closure but made clear that all necessary renovations could proceed and the Center could, as needed, restrict public access to ensure safety. Mem. Op. at 87-88. Separately, the Court enjoined Defendants' effort to rename the institution for Trump. *Id*. at 92.

Under trust law, a court reviews a trustee's action "to prevent abuse of discretion." *Id*. at 75 (quoting Restatement (Third) of Trusts § 87). The court "must" "assess whether the fiduciary was derelict in her duties, acted beyond the scope of her authority or in bad faith, or otherwise

abused her discretion." *Id*. In this case, the answer was clear: Defendants were "derelict in discharging" their "responsibilities," and the "deficiencies" in their "decision-making" fell "below even a forgiving standard of prudence." *Id*. at 3 (cleaned up).

The Court highlighted glaring problems. The Board did not take "account of its full range of statutory obligations." *Id*. at 76. There was no indication, for example, that the trustees "discussed, let alone weighed, the negative consequences of closure on the Board's programming or memorial-related responsibility." *Id*.

The Board based its decision "on woefully insufficient information," what this Court described as a "stacked deck" consisting of "a handful of vague documents," provided "two days before the closure vote." *Id*. at 77, 78 n.30, 79. Despite what Trump proclaimed, there "was no one year review" by experts. *Id*. at 77 (quotation marks omitted). Instead, the Board received a "one-sided justification for full closure." *Id*. For instance, Floca "considered only the benefits of full closure and none of the costs," such as "lost ticket and tourist revenue; chronic challenges in audience retention; reputational damage that could far outlast the closure; potentially permanent loss of highly-specialized arts professionals; and long-term attrition of donors." *Id*. at 78.

The two-year closure flew "in the face of industry best practices." *Id*. at 78 n.31 (cleaned up). Normally, performing arts centers do everything possible to avoid a total shutdown, which is precisely why the Kennedy Center always planned to remain open during any renovations. *Id*. That Floca ignored the industry's best practice, however, was no surprise. Floca's background is in construction, and "he is no expert in arts management." *Id*. at 81.

The Court stressed that "the record and timing of relevant events strongly suggest that the Board lacked *any* meaningful say in this matter because the closure decision was foreordained."

*Id.* The Court additionally noted "conspicuous oddities in Mr. Floca's story," and emphasized that "Board input was, most evidently, an afterthought" in the decision to close. *Id.* at 81-82.

Because the Court ruled for Plaintiff on those grounds, the Court did not decide whether "the decision to close the Kennedy Center was" likely "a pretextual maneuver meant to hide the fact that the (unlawful) name-change has led patrons and artists to flee the Center." *Id.* at 82 n.34 (cleaned up).

**III. Defendants Restack The Deck In Favor Of Closure.**

After the Court halted the closure, Defendants did not take steps to resume normal operations. Instead, management wound down programming. Floca claims he did not order a "blanket hold on programming," but he took no efforts "to develop a '26-'27 season." Ex. E at 14-15, 18-19. Management canceled "the tail end" of the *Bluey* production. Ex. A at 40. That summer, Floca encouraged the National Symphony Orchestra to leave the campus, telling the Orchestra "the prudent thing is to move forward with plans" to perform "off-site." Ex. D at 33-37; Ex. E at 7-8 (*Shear Madness* was told availability of theaters at the Center would be impacted). The Center also continued to lay off staff, hamstringing any resumption of operations. Ex. A at 4, 41; Ex. E at 4-5 (20 to 30 programming employees were terminated or resigned after March vote).

Meanwhile, Floca began assembling a cherry-picked collection of materials to support a vote for closure. In March, the Center had hired JLL to develop a Comprehensive Project Development Plan that outlined the construction schedule during a two-year closure. Ex. D at 3-4, 108-110. By late May, JLL had not yet finished its plan, when the Court preliminarily enjoined the shutdown. On June 8, 2026, the Center received JLL's plan, dated the same day. ECF No. 88-5 at 107. In that plan, JLL continued to assume the Center would close and unequivocally stated that the project "requires a comprehensive two-year closure." ECF No. 65-1 at 3; Ex. D at 4, 11-

13 (statement of work for JLL assumed a two-year closure). Floca would ultimately provide this June 8 version of the plan to the Board in August. Ex. A at 7-8.

In the wake of the Court's decision, however, JLL reassessed the necessity and feasibility of closure. On June 16, JLL sent a letter to the Center regarding the feasibility of a phased renovation. Ex. E at 103-105, 107-108, 152. In the June 8 plan, JLL had emphatically concluded that the "scale of necessary work" "cannot be executed safely or cost-effectively while maintaining public operations." ECF No. 65-1 at 2. In the June 16 letter, JLL walked back that prior statement and explained that phased renovations were "feasible." Ex. E at 152. In its June 16 letter, JLL estimated that the Kennedy Center's "true needs approach $400-450 million," *id.*, far more than the $250 million budget allocated in the Comprehensive Project Development Plan, ECF No. 65-1 at 2. According to JLL, performing *all* of those $400-450 million in renovations, while keeping the Kennedy Center's main building operational, would incur an additional cost of $60-80 million. Ex. E at 152-153. Despite providing the June 8 plan to the Board, Defendants would withhold JLL's June 16 letter from the trustees. *Id.* at 104-105.

After receiving JLL's analysis supporting the feasibility of phased renovation, the Kennedy Center's management searched for a consultant to support a two-year shutdown. The sole firm to apply was Delta Consulting Group. Ex. F at 4. Delta lacked any expertise in performing arts management. Ex. C at 4. Over a handful of days in late July and early August, Delta would hurriedly go through the motions of analyzing whether to shut down and assemble a brief PowerPoint presentation for the Board.

From the beginning of Delta's analysis, management put a thumb on the scale in favor of Trump's preferred outcome. Delta was told to assume a two-year construction window beginning July 6, 2026, *i.e.*, the closure date under Trump's plan and the period Trump picked for closure.

Ex. F at 3 (specifying "the primary construction window spanning from July 6, 2026, through July 28, 2028" in the description of procurement). To craft its putatively independent assessment, Delta relied on information curated for it by the Center's management. Management told Delta what alternative scenarios to consider. Ex. C at 9-10. Management provided Delta with JLL's June 8 report, which Delta "did not independently validate." *Id.* at 11-12. Meanwhile, management apparently withheld JLL's June 16 letter from Delta.[3] Ex. E at 103-104. Management provided Delta with the Center's FY2023-2025 financial data, Ex. C at 41-42, but likewise withheld the most pertinent FY2026 data, Ex. E at 39-40; Ex. C at 89, even though the Center itself used FY2026 data internally, Ex. E at 39, and even though Delta had specifically requested FY2026 data, Ex. C at 34-35.

The analysis Delta conducted was necessarily limited. Delta possessed no expertise in performing arts management and did not regard that subject as within its purview. *Id.* at 4, 77. Delta performed no analysis of the impact of closure on fundraising and was never asked to model the Center's cash or liquidity position. *Id.* at 52, 89. Instead, Delta at most had rough and vague estimates from the Center's management. *Id.* at 106.

Delta produced its purported analysis on a lightning-fast timeline. Initially, Delta was informed that it would have sixty days to produce its final report. Ex. C at 111; Ex. F at 4. Delta began work on July 27, fully expecting it would have the full sixty days. Ex. C at 15-16, 19, 25-26, 30. Within days, however, management informed Delta that the group needed to brief the Audit and Finance and Buildings and Grounds Committees on August 3 and 10, and that the Board

[3] Floca stated that he did not "know if [Delta] received this exact letter." Ex. E at 103-104. Delta did not include the letter in the list of records it reviewed. ECF No. 88-4 at 40-41. One text exchange between Floca and Delta's lead consultant references a "JLL letter." Ex. F at 27.

would vote again on closure on August 13. *Id.* at 19-21; Ex. E at 82-85, 144 (management only ever intended to provide consultants two weeks to produce materials).

On August 13, the Board met to consider Delta's recommendation and to vote on Trump's closure plan. The trustees received materials only two days beforehand. Those materials consisted of two documents: (i) JLL's June 8 plan; and (ii) a PowerPoint presentation thrown together by Delta. ECF Nos. 65-1, 65-2. The Delta presentation was five slides long. Only two slides contained substance, consisting of vague, high-level conclusions, which were transparently designed to favor closure. In testimony, Delta's lead consultant and Floca claimed Defendants did not edit the presentation. Ex. C at 62-63; Ex. E at 88-89. But subsequently produced documents, including texts between Floca and Delta, demonstrate that management and Howard Lutnick shaped the content of Delta's presentation. Ex. F at 23-24, 27-38.

In its presentation, Delta stated that undertaking phased renovations would cost an astronomical $560 million, far more than the $257 million Congress had appropriated. Ex. C at 120. At the August 13 Board meeting, the trustees were similarly told that "it will cost twice as much" to conduct a phased renovation. ECF No. 68-3 at 9. Management knew that was not accurate. JLL's June 16 letter made clear, *see supra* p. 9—and JLL subsequently confirmed a week later in an updated version of its plan, *see infra* pp. 12-13—that a phased renovation would be far cheaper. Despite Delta having no expertise in performing arts management, Delta additionally told the trustees that closure would comport with "industry practice," mitigate "market and consumer confusion," and preserve "the brand by delivering the highest caliber performances." Ex. C at 121.[4]

[4] Delta also told trustees that phased renovation would produce a $77.8 million annual operating deficit, whereas closure would produce a $3.4 million annual surplus. Delta reached this

The Board voted for closure. Plaintiff and two other ex officio members voted "no." Ex. A at 59-60.

## IV. Management Again Curates The Record For The September 15 Meeting.

Following the August 13 meeting, the Center's management solicited two additional documents, a formal report from Delta and an updated plan from JLL. Ex. D at 126 (Lutnick requesting Delta report); Ex. F at 20 (JLL transmitting "4 year occupied remodel CPDP [Floca] requested"). Management received both documents on August 20. Ex. D at 122-123; Ex. F at 19-20. Management only provided the trustees with Delta's report to bolster the case for closure. Management withheld JLL's updated plan, which contradicted Delta's hurried estimate and demonstrated that phased renovation would not be prohibitively expensive.

More specifically, in its report, Delta again asserted that a phased renovation would require $560 million, "more than double" the cost of construction under a phased approach. Delta Rep. ¶ 89, ECF No. 88-3. In contrast, JLL's updated Comprehensive Project Development Plan calculated an additional cost of $41 million for its plan for a phased renovation. Ex. H at 4. Meanwhile, in contrast to the June 8 JLL plan provided to the Board, but consistent with JLL's June 16 letter, JLL's updated plan concluded that phased renovations were "technically feasible" and even provided a detailed explanation of how phased renovation could occur. Ex. H at 6.[5]

---

conclusion by relying on management's projections regarding closure, while performing its own complicated estimates for phased renovations. Ex. C at 51-57, 83-84.

[5] The Board was misleadingly told the appropriations would fund nearly all of "the program" in the closure scenario. Ex. C at 121. That was inaccurate. Both JLL and Delta estimated that the full cost of all renovations would be much higher under either scenario. JLL estimated the Center's total "true needs approach $400-450 million." Ex. E at 152. Delta pegged the total figure at $503 million, with costs rising to $724 million if the Center remained open. Ex. C at 95-96, 126. Delta's report assumed that, in either scenario, the Center would not undertake approximately $100 million in projects, *id.* at 126, some of which appear to be included in JLL's plan for a two-year closure. Meanwhile, JLL's phasing plan included an adjusted scope of work, which may overlap with the projects likewise omitted from Delta's estimate. Ex. H at 4.

On August 31, 2026, the Kennedy Center's management transmitted Delta's report to the trustees. Ex. A at 46. Defendants scheduled another Board meeting on September 15, 2026, to allow the Board to discuss Delta's report with Delta's lead consultant. Ex. A at 14-15, 46. This was a transparent effort to backfill Delta's PowerPoint. In contrast, despite previously providing the Board with JLL's June 8 plan, management *never* provided JLL's updated August 20 plan to the trustees. ECF No. 109 at 2.

The updated JLL plan's existence was only belatedly revealed by Defendants after the completion of depositions, despite being directly responsive to multiple discovery requests. ECF No. 110 at 4. Indeed, Floca was directly asked about whether JLL had provided an updated plan regarding phased renovations. He denied that any such updated plan existed. Ex. D at 11-13.

**V. The September 15 Meeting.**

On September 4, 2026, after an unusually heavy rainstorm in Washington, a small section of ceiling plaster fell in the Grand Foyer of the main building. Defendants did not treat the event as an emergency. The Center advised personnel that the main building would be closed for that day, but that the building was "expected to reopen tomorrow for its normal operating hours," while the Grand Foyer would remain closed pending a determination that the area was "safe for occupancy." Ex. F at 10. Floca did not update the Board about the incident. Ex. A at 27-31.

The Board was originally told that the purpose of its September 15, 2026 meeting was to discuss Delta's report. But on the evening of September 12, 2026—just three days before the meeting—the Board received an entirely new packet of information. It contained a memorandum to the trustees from Floca regarding the September 4 incident, photographs of the damage, a link to a video portraying building conditions at the Center, and a written summary of building conditions. ECF No. 88-8.

The September 15 Board packet also contained two draft resolutions. One resolution proposed adding Trump's name back onto the building. In the recitals, the resolution stated that the Center was in a "dire financial position," "will not be able to support its payroll obligations, nor routine maintenance contracts within a matter of weeks," faced "certain fiscal collapse within weeks," and could not expect President Trump to "provide the fundamental oversight of the renovation" without "appropriate recognition" on the Center's façade. ECF No. 88-8 at 56. This was the first and only time that the full Board has been informed of the institution's "certain fiscal collapse." As described below, Defendants have been extremely evasive about the Kennedy Center's current cash position, and as a result Plaintiff is currently unable to determine an accurate state of the Center's finances. *See infra* pp. 43-44.

The second draft resolution proposed for the September meeting once again approved Trump's plan to close the building for two years. That resolution stated, for the first time, that Delta and Floca considered "the main building to be unsafe for continued occupancy." ECF No. 88-8 at 54. It stated that the Board reviewed "the full reports of both the Delta Consulting Group and JLL." *Id.* That was not accurate. Management had withheld both JLL's June 16 letter and JLL's August 20 updated plan, which undermined Delta's analysis.

Plaintiff contemporaneously informed the Court that Defendants intended to propose yet another resolution to rename the Kennedy Center after Trump. On September 14, at the General Counsel's direction, the Board was told that the meeting was "now exclusively focused on the necessary closure of the Center." Ex. A at 18, 23, 25. The recognition resolution was withdrawn without discussion. Ex. E at 48-51; Ex. A at 37.

The September 15 meeting lasted 68 minutes. ECF No. 88-9 at 4, 14. Floca once again told the trustees that phased work "would double the cost," *id.* at 8, which according to JLL was

incorrect. Ex. H at 4. The Board again voted for Trump's closure. Plaintiff and two other ex officio trustees voted "no." ECF No. 88-9 at 12. That same day, Trump posted on social media that "[t]he closing will take place immediately," but that the renovation "cannot begin until such time as the D.C. Circuit rules on the Board's approved name" and "will not take place" if that ruling is "negative." Ex. E at 77-79.

Immediately following Trump's post, on September 16, 2026, Floca announced that the main building needed to close immediately for safety reasons. ECF No. 86-2 at 2. According to Floca, his decision was made based on a consultant's assessment "completed in June and July of 2026" and the incident on September 4. ECF No. 86-1 at 2. Floca never informed the Board at the meeting that he intended to close the building imminently. Ex. E at 98-100.

That evening, Trump reiterated to reporters that, unless he was recognized on the Kennedy Center's façade, "it's going to close, it will end up being ripped down." ECF No. 85 at 1. This pronouncement followed Defendants' representations to this Court that, if Trump's name does not appear on the main building, the Kennedy Center would need "to be taken down" and replaced by "a large outdoor amphitheater." ECF No. 68 at 7. That same night, Trump was photographed reading a placard with the words "Kennedy Center DEMOLISHED." ECF No. 85 at 1.

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) governs motions to reconsider an interlocutory decision. *See Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015). Relief is available only "as justice requires." *Shea v. Clinton*, 850 F. Supp. 2d 153, 157 (D.D.C. 2012) (cleaned up). A "court should be loathe to revisit its own prior decisions in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.' " *Id*. at 157-158 (cleaned up).

The "Court considers whether it 'patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court.' " *United States v. Slough*, 61 F. Supp. 3d 103, 108 (D.D.C. 2014) (quoting *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)). The "party moving to reconsider carries the burden." *In Def. of Animals v. Nat'l Inst. of Health*, 543 F. Supp. 2d 70, 76 (D.D.C. 2008).[6]

## ARGUMENT

### I. DEFENDANTS' CONDUCT AGAIN FELL BELOW "A FORGIVING STANDARD OF PRUDENCE."

#### A. Defendants Did Not Receive Materials Until A Few Days Prior To Voting.

In August and September, the Board received the materials meant to inform their deliberations only two and three days before the meetings, respectively. TRO Op. at 21; Ex. A at 11, 33-34. This created unavoidable imprudence.

Trustees must undertake "investigation appropriate to the particular action under consideration," Restatement (Third) of Trusts § 77, cmt. b, and act with "such care and skill as a man of ordinary prudence would exercise in dealing with his own property," Restatement (Second) of Trusts § 174. The deliberation must be meaningful. Trustees cannot go "through the formality of exercising" "discretion without deliberately considering the circumstances," G. Bogert et al., *The Law of Trusts and Trustees* ("*Bogert*") § 558, and courts intervene where trustees act "without knowledge of or inquiry into the relevant circumstances," Restatement (Second) of Trusts § 187.

---

[6] Contrary to Defendants' citation to Rule 60, Defs.' Mem. at 22, ECF No. 88-1, "Rule 54 governs reconsideration of interlocutory orders, [whereas] 60(b) dictate[s] when a party may obtain reconsideration of a final judgment." *Ali v. Carnegie Inst. of Wash.*, 309 F.R.D. 77, 80 (D.D.C. 2015).

The Board was on notice that it needed to make "a meaningful effort to confirm the wisdom of a recommendation that could adversely affect the Center in numerous ways for years to come." Mem. Op. at 79. Once again, in the time they were given, Defendants inevitably fell far short. An ordinary prudent person requires more than 48 or 72 hours to review materials regarding a decision of this magnitude. Prudent boards take *years* to make these kinds of monumental choices. Mem. Op. at 82 n.33; Borda Decl. at 5-6, ECF No. 13-19 (joint boards met for 2 to 3 years reviewing plans for David Geffen Hall); Taylor Decl. at 5-6, ECF No. 13-20 (a responsible performing arts governing body would consider closure plans for at least 6 to 18 months); Bornstein Decl. at 6, ECF No. 13-21 (planning for a closure of this significance would begin at least a year before closure).

But the sequence of events is even more concerning. Trustees did not receive Delta's full report *until August 31*, more than two weeks *after* the Board voted to close on August 13. At the August 13 meeting, trustees were incorrectly told Delta's report had been completed but had not been distributed. Ex. A at 56 (Lutnick claiming Delta's "full report" was not circulated "because it was repetitive" of the presentation). In fact, the report was not even written yet. Ex. D at 126 (requesting draft of Delta report by August 20, even if "preliminary"). It is grossly imprudent for the Board to vote for closure in this slapdash manner. Moreover, once the Board was belatedly provided with Delta's report, none of the trustees who voted again in favor of full closure asked *any* questions of the Delta representative present at the September meeting. Ex. C at 101.

Defendants' motion acknowledges that trustees must possess "sufficient time" to consider the materials they receive. Defs.' Mem. at 40, ECF No. 88-1. That obviously did not happen here. In their motion, Defendants assert that the Board "had months" to consider the shutdown. *Id.* That is factually wrong. Trustees had *just two and three days* respectively to evaluate key materials

before each vote. Defendants' statement also gives the game away: The Board only "had months" to consider their decision if the latest vote is simply a repeated attempt to rubberstamp Trump's earlier edict. Defendants' filing thus underscores that Trump's unreasoned mandate from February 1, 2026—including the fake one-year review that never happened—is still driving the Board's decision.

**B. The "Stacked Deck" Lacked Critical Information.**

In May, the Court faulted the Board for failing to consider critical information, such as the "costs" of closure and input from "programing and fundraising experts." Mem. Op. at 78, 89. But yet again, the Board *did not* consider that information. Even worse, Floca affirmatively withheld critical information produced by JLL that undermined the case for closure.

***1. No performing-arts-management expertise.***

In May, the Court faulted the Board for not considering obviously "ascertainable downsides," including "chronic challenges in audience retention; reputational damage that could far outlast the closure;" and "potentially permanent loss of highly-specialized arts professionals." Mem. Op. at 78. Once again, the Board did not receive any expert advice on those topics.

Delta did not have expertise in performing arts management, that was not a subject of Delta's report, and Delta provided no analysis of how closure would affect the Kennedy Center's programmatic mission. Ex. C at 4, 76, 86. To be sure, Delta's presentation stated that a shutdown would comport with "industry practice" and preserve "the brand by delivering the highest caliber performances." *Id.* at 121. But Delta was not qualified to provide that assessment. *Id.* at 76-77.

The belated report the trustees received two weeks after voting for closure underscores the gap in Delta's analysis. Delta acknowledged closure "has consequences for programming, performers, specialized staff, audiences, donors, revenue, and institutional reputation." Delta Rep. ¶ 145. Delta stated those "consequences, and the measures required to mitigate them, are

addressed in the supporting analyses that follow." *Id.* But no such analysis follows anywhere in Delta's report.

In response to interrogatories, Defendants identified four people with purported "professional expertise in performing-arts management" who they say were consulted regarding the Board's decision: Floca, Rick Canny, Jeffrey Finn, and Kevin Couch. Ex. D at 118-119. None fill the gap. Floca "is no expert in arts management." Mem. Op. at 81. Canny is a contractor whose background is in *commercial entertainment*, not non-profit performing arts centers. Ex. D at 73, 77-78, 86-87.[7] Couch's limited perspective was informed by an extremely short tenure at the Center. *Id.* at 93. Finn is an ex-employee who worked in the Center's programming department. *Id.* at 90. In short, this was no meaningful analysis of the programmatic issues the Court identified in May.

***2. No information on fundraising.***

The Board similarly did not receive the necessary information about how the closure would undermine fundraising, which is a critical lifeblood of a non-profit performing arts venue. ECF No. 88-7 at 7 (contributions, grants, and other support cover one-third of the Center's costs). Floca testified that "fundraising needs were analyzed" "as part of Delta's work" and that the Center analyzed fundraising "alongside Delta." Ex. D at 95-96. But Delta's lead consultant testified that Delta performed *no* analysis of how closure would affect fundraising, and Delta *was not asked to* perform any such analysis. Ex. C at 59.

In short, Defendants again received *no analysis* of the impact of closure on fundraising and donors. Defendants nevertheless voted to close the institution for two years. This is not a minor

[7] Asked whether Canny had experience with non-profit performing arts centers, Floca answered, "I think it's irrelevant." Ex. D at 80-81. Floca conceded that non-profit and for-profit performing arts centers face "definitely different considerations," including different missions. *Id.* at 81.

misstep. The Court underscored that the Board needed to consider the effect of closure on "the long-term attrition of donors." Mem. Op. at 78. Defendants did not do so.

***3. No information about the NSO remaining in the building.***

The Board likewise did not receive any analysis of a critical option for continuing programming during renovation, in which the National Symphony Orchestra performs in the main building during phased construction. According to the Center's internal analysis, keeping the National Symphony Orchestra in the building would have allowed the Center to fulfill all its statutory mandates with respect to programming. Ex. D at 114; *see generally* 20 U.S.C. § 76j(a)(1)(A).

At least some Defendants knew that a scenario in which the National Symphony Orchestra remained in the building was desirable. Defendant Floca presented the Audit and Finance Committee with three choices for programming. In one, the Orchestra remained in the main building. Ex. D at 22-23, 25-29, 114. This was the Orchestra's preferred approach, and this approach would have allowed the Center to continue to welcome "1,200, 2,000 patrons into the building." *Id.* at 32-33, 114. But the full Board was *never* presented with this option. Instead, Delta's presentation was another stacked deck that proposed two starkly different scenarios: four years of "revolving closures," or a two-year closure with the Orchestra "held offsite." Ex. C at 120-121.

The Court previously held that the Board "does *not* have leeway to disregard its obligations to present programming." Mem. Op. at 76. That is precisely what happened. Management initially designed an option to keep core programming in the main building during construction, and presented it to a subset of Defendants. But management withheld that highly preferable option from the full Board.

### *4. No legal analysis of appropriations law.*

The Board received no "legal advice" regarding appropriations law. Mem. Op. at 77. This was important. Delta's recommendation for a two-year closure rests on the legal conclusion that the $257 million Congress appropriated must be spent by September 30, 2029, and that a phased approach would require work "after the stated availability period." Delta Rep. ¶ 168. In their motion, Defendants similarly assert that Congress required "funding for the Center's renovation be used prior to September 30, 2029." Defs.' Mem. at 43. This is wrong. The funds must be *obligated* by September 2029, but the funds need not be *spent* until September 2034.

The legislation appropriating the $257 million states that the funds "remain available until September 30, 2029." Pub. L. 119-21 § 60025(a), 139 Stat. 72, 157 (July 4, 2025). That language has a technical meaning. The funds are "available" "for payment of expenses properly incurred during the period of availability or *to complete contracts properly made within that period of availability and obligated*." 31 U.S.C. § 1502(a) (emphasis added). After "the end of the period of availability for obligation," the funds "*remain available for recording, adjusting, and liquidating obligations*." *Id.* § 1553(a). The account closes, and the funds can no longer be spent, on "September 30th of the 5th fiscal year after the period of availability for obligation" "ends"—in this case, September 30, 2034. *Id.* § 1552(a).[8]

[8] As the Government Accountability Office explains: "During the 5-year period," following the period for which the funds are available "the expired account balance may be used to liquidate obligations properly chargeable to the account prior to its expiration. The expired account balance also remains available to make legitimate obligation adjustments." Gov't Accountability Off., 1 *Principles of Federal Appropriations Law* 5-72 (January 2004) (footnote omitted), https://www.gao.gov/assets/2019-11/202437.pdf. "At the end of the 5-year period, the account is closed. Any remaining unexpended balances, both obligated and unobligated, are canceled, returned to the general fund of the Treasury, and are thereafter no longer available for any purpose." *Id.* at 5-73 (footnote omitted).

In short, a major premise of the shutdown vote was wrong. The Center has until September 2034 to spend the funds. Defendants' failure to seek legal advice on this obvious issue, and the legal error itself, was a clear breach of fiduciary duty. *See* Mem. Op. at 77 ("Where were the lawyers?"); *see also, e.g.*, Restatement (Third) of Trusts § 77, cmt. c (explaining "trustee" must "acquire a reasonable understanding of" "the nature and circumstances of the trust property").

***5. No materials for a phased approach, including no updated JLL plan.***

Finally, despite the Board nominally evaluating between closure and a phased approach, the Board only received materials regarding the benefits of closure. For example, even glancing at Delta's presentation shows it is another "stacked deck" designed to place a heavy thumb on the scale for closure. Mem. Op. at 79. Meanwhile, the Board received JLL's June 8 plan which was sourced based on the express assumption that a two-year closure was necessary, and which asserts, in a conclusory fashion, that renovations "require[] a comprehensive two-year closure." ECF No. 65-1 at 3; Ex. F at 13, 15. Management deliberately withheld JLL's August 20 plan and the earlier June 16 letter from the Board. The trustees were repeatedly told that closure would be prohibitively expensive, costing upwards of $300 million in additional construction expenses. Ex. C at 120. The withheld JLL materials, however, concluded that a phased approach could cost far less. Ex. H at 4; Ex. E at 155. The importance of the withheld JLL materials cannot be overstated. Floca cherry-picked from amongst JLL's materials to exclude JLL's analysis that contradicted the case for closure.

Defendants failed to disclose JLL's August 20 report to Plaintiff until the end of the discovery period. When pressed to explain their omission, Defendants suggested they "did not realize that there were any non-trivial differences between the June and August versions of" JLL's plan. Ex. G at 3. To the extent Defendants raise a similar argument in reply, it is implausible. The August 20 plan contains numerous pages outlining a phased approach, replete with technical

diagrams, that appear nowhere in the June 8 report. *See* Ex. H at 103-115, 180-183. Just glancing at the two plans demonstrates the differences.

Defendants also suggested that JLL's radically different cost-estimate figures "align with Delta's estimates." Ex. G at 3; *see also* Defs.' Mem. at 32 (accidentally citing JLL's August 20 report and suggesting "JLL's estimate" of "$41 million" additional cost for phased renovation "supports" Delta's analysis). This is risible. Delta's estimate was seven times higher than JLL's—$303 million versus $41 million. *See supra* p. 12, 22. The trustees should have received JLL's updated plan. The decision to withhold it was egregious.

**C. The Rushed Process Was Designed To Reach A Predetermined Result.**

The bizarre timeline under which the Board reviewed materials, *see supra* pp. 16-18, and the glaring omissions in the analysis before the trustees, *see supra* pp. 18-23, demonstrate that the Board again relied on a "one-sided justification for full closure." Mem. Op. at 77. But the entire process by which Defendants procured Delta's advice was designed to produce a predetermined result, painted with the patina of independence, to rubberstamp Trump's edict.

***1. Trump's two-year timeframe.***

In February 2026, Trump decided the Kennedy Center would close for two years. Ex. D at 17-19. To date, no one has seriously analyzed Trump's chosen timeframe. Ex. F at 15 (the two-year mandate came to JLL as a "Presidential mandate"); Ex. C at 11-12 (Delta "did not independently validate [the] two-year project"). For purposes of JLL's and Delta's analysis, the two-year period was a fixed variable, meaning the advice JLL and Delta provided simply parroted Trump's decision to shutter the Kennedy Center for that particular span of time. Meanwhile, the record casts serious doubt on the feasibility of a two-year timeline. JLL was the only vendor who submitted a proposal that met that "compressed" schedule, Ex. D at 108, and both Delta and JLL characterized the timeline as "aggressive," Delta Rep. ¶ 151; ECF No. 65-1 at 3.

After Trump's February 2026 announcement, Floca took Trump's timeline "at face value," and the "leadership team" implemented the two-year closure at Trump's "direction." Ex. D at 17-19. The two-year closure and a reopening in the third quarter of 2028 reflects an "absolute" and "non-negotiable constraint[]" "driven by Presidential mandate." Ex. F at 15. Floca never seriously considered whether to adopt, for example, a shorter one-year closure (followed by additional phased renovation), or otherwise deviate from Trump's announced plan that the Kennedy Center must reopen in 2028. Ex. D at 59-60. Meanwhile, despite the self-imposed delay in starting construction (which the Court made clear may proceed), Floca is still attempting to meet Trump's demand that the Center reopen before his presidential term ends. *Id.* at 61-70. *But see* Ex. F at 55 (Vice Chair represented to Lutnick "we are so far behind we will never reopen in two years").

The advice the Board received this summer was tailored to substantiate Trump's chosen timeline. JLL was told to assume a two-year closure and that the timeline was inflexible. Ex. F at 15. Indeed, JLL received its contract because "JLL's proposal was *the only submission*" that met the "compressed 26-month execution timeline." Ex. D at 108 (emphasis added). Delta was likewise told to assume a two-year construction window beginning July 6, 2026. Ex. F at 3.

***2. Delta's bizarrely compressed timeline.***

The bizarre timeline under which Delta was required to provide its recommendation confirms the process was never intended to produce meaningful analysis.

Delta was originally told it would have 60 days to perform its work. Ex. C at 15-16, 109-111. But even before Delta received the contract, Floca had decided the chosen consultant would provide a recommendation on a radically compressed timeline. *See* Ex. E at 144-145 (on July 14 noting firms would "compile documents and reports over the next two weeks" as the "Board Meeting [was] tentatively scheduled for 8/6"). The day after Delta began work on July 27, 2026, management told Delta to present initial findings to two Board committees on August 3, 2026.

Ex. C at 19-24. To any prudent trustee, it should have been a glaring red flag that Delta provided its recommendation in just a handful of days.

Delta's rush to judgment never let up. Following the August 3 committee meeting, Delta expected to have 45 days to conduct analysis. *Id.* at 25-26. Shortly thereafter, Delta was told to finalize an outline of its report for a second committee meeting on August 10. *Id.* at 19-20, 27-28. Unsurprisingly, Delta could not meet that arbitrary deadline. Instead, Delta created a PowerPoint with only two vague slides of high-level analysis transparently designed to paint closure in a positive light and to discourage phased renovations. *Id.* at 120-121. Delta's work was so hurried that the PowerPoint contained basic errors, which Delta's lead consultant attributed to his team drafting the "chart live," "dictating off of a spreadsheet." *Id.* at 71.[9] After the August 13 meeting, Lutnick demanded Delta produce a draft report by August 20, which management acknowledged was a "heavy lift." Ex. E at 150.

The Court need not embrace "naiveté from which ordinary citizens are free." *Cook*, 609 U.S. at 535 (quoting *Dep't of Comm.*, 588 U.S. at 785). The rush for Delta to produce a recommendation demonstrates that Delta's analysis was never the point. This was a process meant to manufacture a post-hoc justification for Trump's shutdown.

***3. Delta's inputs came from management.***

Finally, simply scratching the surface of Delta's analysis demonstrates that Delta did not provide independent analysis. Delta parroted information provided to it by the Center's management. When combined with text messages and documents demonstrating Floca and

[9] For example, the presentation misstated the Center's operating expenses under a phased renovation as $72.5 million, instead of $65.5 million. Ex. C at 70.

Lutnick edited Delta's initial presentation, *see infra* p. 33-34, it is clear that Delta was a conduit for management, accepting inputs and passing them off as thoroughly analyzed expert advice.

For example, Delta never considered a scenario in which the National Symphony Orchestra performed on-site during renovation. Delta understood that management had already decided that the Orchestra would perform off-site. Ex. C at 45-46; *see also* Ex. D at 33-37. Delta never received *any* FY2026 financial data from the Kennedy Center, despite Delta's lead consultant normally requiring the current year's finances from clients. Ex. C at 33-34. Delta likewise performed no analysis of the impact of closure on fundraising, and did not model the Center's cash or liquidity position. *Id.* at 59, 98.

Floca himself said the quiet part aloud: He knew the Board would vote for closure because "the information, to a degree, was already presented to them," "[s]o the underlying needs or analysis of the needs really had not changed." Ex. D at 37-38. In other words, Delta repackaged the same information which this Court found to be deficient.

**D. The Circumstances Demonstrate Bad Faith.**

The Court can again stop here. Mem. Op. at 82 n.34. But the concerning circumstances detailed above and the evidence described further below indicate that Defendants are shuttering the Kennedy Center to hide the ongoing mismanagement of this once vibrant institution and to placate its current Chairman.

***1. Defendants are closing the Kennedy Center to hide their mismanagement.***

For months, a subset of trustees and management have fretted that Trump's takeover of the Center and the unlawful renaming caused significant damage to the institution. To date, however, they have hidden this embarrassing information from the full Board, despite it animating the push to close the Center. This is a quintessential breach of fiduciary duty.

At a June 1, 2026 meeting, the Audit and Finance Committee was informed that Trump's purging of the Board triggered steep declines in attendance. Ex. E at 121 (ticket sales "decline accelerates in 2025 when the new board is announced"). By "2Q 2026, ticket sales further drop[ped] to pandemic levels – around $4m since Jan." *Id.*[10] The committee was similarly informed that fundraising in the months immediately following the renaming "starkly contrasts" with the prior months. *Id.* Pledges dropped more than "100% due to adjustments and write offs," *i.e.*, individuals withdrawing gifts after the renaming. *Id.*; *see also id.* at 116 ("ticket sales and fundraising came to a halt" following renaming). In other words, the committee and management were acutely aware that mismanagement was seriously harming the Kennedy Center.

In internal communications, various Defendants confirmed that they are closing the institution because it provides a band-aid solution for their mismanagement. On September 10, the Center's chief financial officer texted Floca, memorializing a conversation between Defendant Jennifer Fischer, the Board's Vice Chair, and Howard Lutnick. According to the text message, Defendant Fischer told Lutnick "we need to get shut" because "we are broke," "we are burning money," and "[o]pponents" will "say [prior Kennedy Center President] Grenell raised a ton of money and then we burned it to the ground." Ex. F at 55. In short, the closure was motivated, not by the need to conduct renovations, but by the desire of various Defendants, including the Board's Vice Chair, to hide the Kennedy Center's current struggles and their embarrassment.

After Plaintiff's filings in this Court stressed the obvious link between the Center's struggles and Defendants' insistence on closure, Defendants began obliquely acknowledging the relationship. Even then, however, Defendants have neither admitted the true purpose of the two-

[10] Defendants Jennifer Fischer, John Falconetti, Maria Bartiromo, Bob Castellani, Laura Ingraham, and Lee Greenwood attended the June 1 meeting. Ex. E at 115.

year closure nor accurately acknowledged how their mismanagement triggered the Center's current challenges. For example, prior to the September Board meeting, Floca provided the trustees a two-page memo on the "financial context" for the closure. Ex. E at 136. In that memo, Floca stated that the Center's "operating deficit" was "moving in an unfavorable direction." *Id.* Floca tried to pin the blame *on the pre-2025 management*. Floca stated that FY2024 saw a steep "drop in earned revenue" "wiping out post-pandemic attendance gains," and characterized FY2025 as showing "an upward rebound." *Id. This was an incomplete and inaccurate picture*. As the June 1, 2026 presentation made clear, the Kennedy Center's financial troubles began *after Trump's February 2025 takeover and the December 2025 renaming*. *Id.* at 121. By contrast, in FY2024, the Center was fiscally healthy. Ex. E at 127 (reporting a $68 million increase in net assets); Declaration of Nidhi Rao ("Rao Decl.") ¶ 12 (financial troubles began in 2025).[11]

In short, Defendants have claimed the shutdown is motivated by one thing (the need for renovations), when it is really driven in whole or in part by another (to hide mismanagement). A trustee of "ordinary prudence" does not obfuscate motivations and build a false record as a pretext for a particular outcome. Restatement (Second) of Trusts § 174. Moreover, the withholding of "material facts regarding the trust and its administration" is itself an extremely serious breach of fiduciary duty. *Bogert* § 584. But the problem runs deeper. Various Defendants have acted "dishonestly" or at minimum with an "improper even though not a dishonest motive." Restatement (Second) of Trusts § 187 cmt. e. The Court should not allow these egregious breaches to go unaddressed.

[11] Floca disingenuously based his memo on a pre-Trump presentation, dated January 21, 2025, Ex. E at 136, even though management had more recent financial information, Rao Decl. ¶¶ 51-52, so as not to acknowledge the ongoing mismanagement.

### 2. *Trump is aggrandizing himself at the Kennedy Center's expense.*

On February 1, 2026, Donald Trump declared that he had decided to close the Kennedy Center, based on a supposed one-year review that never occurred. Mem. Op. at 11, 77. Trump has subsequently made clear that his decision is motivated by his personal interests, not his desire to protect the trust. Other Defendants are abetting Trump's serious violations, subordinating the Kennedy Center's interests to Trump's. These are quintessential breaches of fiduciary duty. At minimum, the facts strongly imply Defendants' decision to close the Kennedy Center for two years continues to be improperly motivated by nothing more than Trump's dictate. *See* Restatement (Third) of Trusts § 78 (duty of loyalty); *see also* D.C. Code § 19-1308.02(a).

Start with the facts demonstrating Trump—who is a Defendant in this case—is not acting with the kind of "complete loyalty" "without consideration of" his "personal interests" that trust law requires of a trustee. *Bogert* § 543. Trump has dictated that the Kennedy Center must reopen in the third quarter of 2028. This "absolute" "mandate" is plainly not driven by the needs of the Kennedy Center. Ex. F at 15. Instead, Trump is insisting on this timeline to ensure he personally presides over the Center's reopening. As Howard Lutnick mused outside the courthouse in the minutes leading up to one of this Court's hearings, "why would the President agree to work on the restoration where he's going to be the President for the next . . . two-and-a-half years, and then he's leaving?"[12]

But it gets far worse. Trump has declared that he will not conduct renovations *unless his name is placed on the building*, and Trump has *threatened to demolish the building if he does not get his way*. *See supra* p. 15. These are textbook examples of a trustee elevating "personal

---

[12] *Commerce Secretary Lutnick Speaks Outside of Kennedy Center Name Change Court Hearing*, at 5:02 (C-SPAN Aug. 27, 2026), https://www.c-span.org/program/news-conference/commerce-secretary-lutnick-speaks-outside-of-kennedy-center-name-change-court-hearing/684517.

interests" over the trust's interests. *Bogert* § 543. Trump is the animating force behind the closure. Trump decided to close. Trump selected the two-year timeframe. Trump treated the Board as an afterthought. That Trump has so nakedly violated his duty to the trust is reason enough to reject Defendants' request to lift the preliminary injunction.

The other Defendants willingly abet Trump's breach of fiduciary duty. For example, in a draft resolution provided to the Board for its consideration on September 15, management stated that "without" "appropriate recognition" on the main building's façade, "it is unlikely that President Trump will provide the fundamental oversight of the renovation of the main building and lead the fiscal rescue of the Center." Ex. E at 138. True, that resolution was withdrawn prior to the September 15 meeting—but not a single Defendant raised concern with the representation regarding Trump's need for recognition. In assessing whether Defendants are complying with their fiduciary duties, the Court should not ignore this highly probative evidence that Defendants will subordinate the trust's interests to Trump's whims.

That's not all. Defendants manipulated the Center's finances for Trump's improper ends. This is a grave breach of fiduciary duty. If concerns regarding the Center's finances motivate the shutdown, Defendants' manipulation of the finances taints their closure decision. At minimum, it provides circumstantial evidence that Defendants will elevate Trump's interests over the Center's.

Here is how the financial gambit works: Defendants funneled $17.5 million to a non-profit named the Trump Kennedy Center for the Performing Arts Foundation. Ex. E at 123. Defendants control the Foundation. Under the Foundation's founding bylaws, the "Kennedy Center" itself "is the sole voting member," and controls the Foundation.[13] ECF No. 88-7 at 10; Ex. I at 7-9. The Kennedy Center's general counsel must serve as the Foundation's general counsel, and he is today

[13] The Foundation was created under the prior management and was renamed in 2026. Ex. G at 8.

listed as the beneficial owner of the Foundation. Ex. G at 11; Ex. I at 11. Under the bylaws, the Kennedy Center's President must serve as the Foundation's President. Ex. I at 11. And as recently as this summer, the Kennedy Center's chief financial officer served as the Foundation's treasurer. Ex. F at 50 (chief financial officer reminding Floca "under the current Foundation bylaws, I am the Treasurer of the Foundation"). The Kennedy Center also currently pays for Trump loyalist Abby Mathis[14] to conduct "donor relations for the foundation account." Ex. F at 55.

Defendants assert they amended the Foundation's bylaws, such that all transfers from the Foundation to the Center are conditioned upon the Kennedy Center being named for Trump and Trump's name appearing on the façade. Ex. G at 19. If Trump's name is removed, the Foundation must claw all funds back from the Kennedy Center. *Id.*[15]

At some point in 2026, the Foundation transferred $17.5 million to the Center. Ex. D at 102-103. The Center is apparently relying on those funds to operate. *Id.* at 98-99, 128. But in the wake of this Court's rulings enjoining the unlawful renaming, it seems Trump or someone else sought to enforce the clawback provision. A few days after the Court's ruling, the Center's chief financial officer warned Floca that "we can't give" "back" funds from "the TKC Foundation." Ex. F at 47. On September 5, 2026, Floca and the chief financial officer faced a crisis, with Trump evidently mandating the Foundation funds be returned. The chief financial officer informed Floca that, if the Center was forced to return funds to the Foundation, "we need to inform Trust and NSO admin staff that they are immediately furloughed." Ex. F at 54. Five days later, Defendant Fischer

---

[14] Abby Mathis is a political fundraiser at MAGA Inc., a Trump-supporting PAC. Ex. G at 83.

[15] Defendants have the Foundation bylaws but refused to provide them to Plaintiff in discovery. Ex. G at 45.

asked Lutnick for the Center to keep "$10 m[illion]" from the Foundation, and asked if the Center can "avoid the naming." *Id.* at 55. Lutnick "said no." *Id.*[16]

It is difficult to imagine a clearer breach of fiduciary duty than a trustee, who is legally obligated to protect the Center, threatening to harm an institution unless he is personally feted and conditioning its funding on its unlawful renaming. This Court cannot ignore this evidence.

***3. Defendants undermined plans to remain open.***

After this Court's decision, Floca and others undertook steps to frustrate any scenario other than closure. This fact puts a lie to Defendants' claim that they sought to engage, in good faith, to seek independent advice and act in the Center's best interest.

After the Court enjoined the closure on May 29, the Center did not resume booking performances and other normal operations. Instead, Floca "deferred affirmative long-term programming" pending the Board's renewed vote. Ex. E at 112. When pressed to clarify what that meant, Floca was evasive. But Floca acknowledged the Center did not book any programming. Ex. E at 17-32. Floca encouraged the National Symphony Orchestra to perform off-site, sabotaging efforts to keep the premier Orchestra in the building this season. *See supra* p. 8. On July 16, the Center executed a contract to hold the annual Kennedy Center Honors, normally held inside the main building, at the Capital One Arena. Ex. G at 46; *see also* Ex. A at 40; Ex. E at 7-8. The Center likewise gutted its staff, a deliberate choice to shutter the institution in preparation for closure. *See* Ex. A at 4, 41-42 (discussing rounds of layoffs in June and September 2026).

[16] An internal document stated that the funds from the Foundation needed to be repaid "pending Board action," which appears to be a reference to the trustees' voting to rename the institution. Ex. D at 128. In testimony, Floca strenuously denied that the funds from the Foundation were restricted or subject to repayment. Ex. E at 42-44. The contemporaneous texts, and Defendants' statements in the Court of Appeals, suggest the contrary.

These are not the actions of trustees acting in good faith. Defendants sought to manipulate the facts on the ground to make their preferred choice a fait accompli.

***4. Management withheld JLL's analyses of phased construction from the Board.***

The management withheld multiple key documents from JLL that directly undermined the case for closure. *See supra* pp. 9, 12-14, 22-23. This fact cannot be overstated. It is strong evidence of bad faith. It is telling that Defendants initially failed to produce these documents in discovery. Plaintiff did not learn about the June 16 letter until the midst of Floca's deposition. Ex. D at 7-8. Defendants did not disclose the August 20 plan until the very end of the extended discovery period—even though whoever prepared Defendants' opening memorandum on the motion to lift the preliminary injunction was evidently aware of and relied on that document. *See* Notice of Errata, ECF No. 109; Defs.' Mem. at 32.

***5. Delta was not independent.***

Defendants claimed Delta was independent, but that was not true. In his deposition, Delta's lead consultant disclaimed that management was involved in the drafting of Delta's rushed and conclusory PowerPoint. Ex. C at 55-56. Floca testified that Lutnick did not provide anything beyond high-level guidance that the presentation needed to be detailed. Ex. E at 88-89.

The record suggests otherwise. On the last day of the extended discovery period, Defendants disclosed text messages between Floca and Delta consultants. Those messages demonstrate that Floca and Lutnick were heavily involved in shaping the presentation. Ex. F at 23-24, 26-38. At one point, Floca told Delta "I need to tweak a few things. Not there yet unfortunately." *Id.* at 23. Floca then asked to speak by phone to "make the tweaks live." *Id.* at 24. After discovery ended, *two days before this filing*, Defendants disclosed various draft versions

of Delta's presentation that appear to have been changed, likely based on management's input, to tilt the scales for closure.[17]

That Floca's testimony conflicts with the record is troubling. Plaintiff respectfully submits that it is imperative for the Court to hold live testimony to resolve these discrepancies. *See infra* p. 45. But the documentary record confirms that Defendants are not acting in good faith.

***6. The safety rationale is obviously pretextual.***

Finally, Defendants disingenuously seized on the September 4 incident as another pretext to justify their longstanding decision to close the Center for two years.

After the September 4 incident, Defendants did not treat the event as an emergency or deem the main building as unsafe. Instead, the building remained open for almost two weeks. Ex. E at 92. Floca declined to update the Board about the incident. Ex. A at 29-30. On September 12, Floca finally told the trustees that the incident was "consistent with broader facility-condition concerns." *Id.* at 70. At that time, Floca did not conclude the building needed to close immediately.

But after Trump announced on September 15, 2026, that the Kennedy Center would immediately close, Ex. E at 142, Floca promptly barred the main building's doors. Floca has

[17] For example, likely sometime after Floca began editing the deck "live" on August 10, Ex. F at 24, the PowerPoint was altered to state, among other things, that the closure plan would comport "with industry practice," mitigate "market and consumer confusion," "best preserve[] the brand," and would serve as "a means of engagement with patrons and donors"—things about which Delta had no expertise. *Compare* Ex. F at 59-63, *with id.* at 66-71. More broadly, between August 7 and 10, Delta's conclusions changed considerably. For example, on August 7, Delta estimated that congressional appropriations would cover 67% of phased renovations. *Id.* at 74. By August 10, that figure dropped to 46%. *Id.* at 79. Meanwhile, Delta initially concluded that closing would enable the Center to perform 82% of critical work, *id.* at 74, but that number rose to 90% by August 10, *id.* at 79. Delta initially referred to the competing options as "Closure" and "Phased Renovation," *id.* at 74, then switched to "Close and Renovate" or "Operate and Renovate," *id.* at 86-87, and eventually, the presentation had been changed to not-so-subtly favor closure, using the loaded terms "Partially Close and Renovate" and "Operate and Partially Renovate," *id.* at 79-80.

claimed he independently decided to shut the Kennedy Center for safety reasons, citing both the September 4 incident and a recent study regarding the soffits. ECF No. 86-1 at 1. That is difficult to believe. Floca shut the building only after Trump announced the Center would close. Meanwhile the engineering report about the soffits was issued on September 3, almost two weeks *before* Floca closed the building. Ex. E at 94-95. At the September 15 Board meeting, Floca never gave the trustees any indication that he was planning on closing the Center that same day. *Id.* at 98. And to this day, the National Symphony Orchestra continues to rehearse in the Concert Hall, belying Floca's claims that the main building is unsafe. Ex. D at 32; Ex. G at 51-59. Defendants are exploiting the September 4 incident. Plain and simple.

**E. Defendants' Arguments Are Meritless.**

Defendants' motion argues they complied with their fiduciary duties in ratifying Trump's plan to shutter the Kennedy Center for two years and met their high burden to lift the preliminary injunction this Court imposed after it found Defendants had likely violated their fundamental obligations as trustees. For many of the reasons just described, that assertion does not survive first contact with law or fact.

**1.** Start with Defendants' efforts to water down their factual burden. Defendants suggest that their new votes wipe the slate clean and plead for deference. *See* Defs.' Mem. at 28. But the Court need not blind itself to reality. As a matter of logic, having already allowed the Board to be treated as an afterthought in March, Defendants bear a heavy burden in showing they genuinely reversed course and Trump's ukase no longer motivated their actions.

Trust law does not support the notion that a trustee who breaches a fiduciary duty can so easily re-ratify his prior conduct. Defendants rely on Restatement provisions involving circumstances in which one trustee acts "without the consent of the others" and the *other* trustees

subsequently "ratify his action if such ratification is for the best interest of the trust." Defs.' Mem. at 28 (quoting Restatement (First) of Trusts § 194 cmt. c & Restatement (Third) of Trusts § 39 cmt. b). Neither section involves trustees ratifying a *breach* of fiduciary duty, let alone a trustee who acted improperly rubberstamping *his own* decision. *See* Mem. Op. at 82 (explaining "boards may ratify past institutional actions," not their own).

To be sure, a *beneficiary* can ratify a trustee's breach. To do so, the beneficiary must be "aware of [their] rights and of all material facts and implications that the trustee knew or should have known relating to the matter," and the ratification is effective only if the beneficiary "was not induced by improper conduct of the trustee." Restatement (Third) of Trusts § 97(b)-(c). In that context, the trustee "normally has the burden of showing" that the ratifying party "was sufficiently informed to understand the character of the act or omission and was in a position to reach an informed opinion." *Id.* § 97 cmt. e; *see also, e.g.*, D.C. Code § 19-1310.09(b)(1)-(2).

In short, in light of their prior errors, Defendants bear a heavy factual burden to prove they acted appropriately in August and September. That burden is all the greater, moreover, because Defendants are seeking to modify an existing injunction.[18]

[18] In an aside, Defendants incorrectly assert that trustees are held to a standard similar to "the business-judgment rule limiting liability for corporate directors." Defs.' Mem. at 29. The "general view is that a trustee is held to a higher standard than a corporate director." *Bogert* § 394; *cf. Stern v. Lucy Webb Hayes Nat. Training School for Deaconesses and Missionaries*, 381 F. Supp. 1003, 1013 (D.D.C. 1974) ("A trustee is uniformly held to a high standard of care and will be held liable for simple negligence, while a director must often have committed 'gross negligence' or otherwise be guilty of more than mere mistakes of judgment."). Regardless, even if the business-judgment rule applied, that area of law imposes similar fiduciary duties and likewise contemplates exacting scrutiny in these circumstances. *See, e.g.*, *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989) (explaining that "judicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries").

**2.** Regardless of the precise burden Defendants bear, the factual record makes clear that Defendants once again breached their fiduciary duties.

Defendants suggest the JLL June 8 plan and Delta's presentation provided the "information" a prudent trustee would need to vote for closure. Defs.' Mem. at 30. That is manifestly incorrect. The trustees received no performing arts expert advice, *see supra* pp. 18-19; no expert advice on fundraising, *see supra* pp. 19-20; no information regarding the possibility of the National Symphony Orchestra remaining in the main building, *see supra* pp. 20; no information about appropriations law, *see supra* pp. 21-22; and no information about the technical feasibility of a phased approach, *see supra* pp. 22-23. The trustees likewise did not receive any analysis of whether two years was the proper timeframe for closure, *see supra* pp. 23-24, and Delta was largely a conduit for management, *see supra* p. 26. Meanwhile, Delta provided its recommendations for closure on a bizarrely rushed timeline, in which Delta's full report came only *after* the Board voted to close. *See supra* pp. 17, 24-25.

Defendants argue the Board's decision was prudent because Delta estimated "a phased closure would result in a *$300 million* funding shortfall to conduct the necessary repairs, as opposed to a gap of less than $30 million." Defs.' Mem. at 32. But JLL's updated plan was withheld from the Board. That updated plan indicated that a phased approach would cost far less. *See supra* pp. 12-13. Floca did not disseminate those JLL materials, most likely because they undermined the case for closure. This is inexcusable.

Defendants blithely assert that Delta had "no preconceived views." Defs.' Mem. at 33. But Delta produced its report so quickly it could not have conducted meaningfully independent analysis. In reality, Delta parroted management's inputs, *see supra* p. 26, and management helped craft Delta's nominally independent presentation, *see supra* pp. 11, 33.

Defendants suggest the Board could have prudently chosen to close based on Floca's assessment of the risks posed by falling soffits and water intrusion. Defs.' Mem. at 32-33. But as described more fully below, the Center has always planned to address those issues through phased renovations. *See infra* p. 42. They are, in no way, new developments, let alone urgent safety concerns. Instead, once again, Floca has pointed to the longstanding need for renovations as a need for closure—the very thing this Court found imprudent in May. Moreover, a prudent Board would have at least considered the possibility that Floca's latest justification was pretext.

**3.** Defendants argue that whether Defendants acted for pretextual reasons is immaterial "as a matter of law," so long as the record contains some minimal "evidence" to support that closure could have been reasonable. Defs.' Mem. at 35. That is wrong. Defendants selectively quote Section 87 of the Third Restatement and elide critical provisions. The full passage states a court will not interfere "so long as [the trustee] acts *not only in good faith and from proper motives, but also* within the bounds of a reasonable judgment." Restatement (Third) of Trusts § 87, reporter's notes on cmts. b & c (emphasis added); *see* Restatement (Second) of Trusts § 187 cmt. e. Defendants must act in good faith. They did not.

Defendants similarly suggest that their improper motives are irrelevant so long as the trustees' actions hypothetically could further some potentially valid trust purpose. Defs.' Mem. at 36. Not so. A charitable trustee must act "*solely* in furtherance of" the trust's "charitable purpose." Restatement (Third) of Trusts § 78(1) (emphasis added); *see also* D.C. Code § 19-1308.02(a) ("A trustee shall administer the trust solely in the interests of the beneficiaries."). Each trustee has "a duty . . . not to be influenced by the interest *of any third person or by motives other than the accomplishment of the purposes of the trust*." Restatement (Third) of Trusts § 78 cmt. f (emphasis added). Improper motives include acting "to further some interest of his own or of a person other

than the beneficiary." Restatement (Second) of Trusts § 187 cmt. g. Defendants' own authority confirms the point: Trustees "must reasonably act in pursuit of trust purposes *and no others*." *Day v. Apoliona*, 616 F.3d 918, 927 (9th Cir. 2010) (emphasis added).

In short, the law does not shield Defendants from scrutiny. Defendants subordinated the trust's interests to Trump's preferences—and voted to shutter the institution, contrary to its core mission and industry practice—to hide their mismanagement. That was a dereliction of their duty.

Defendants have the audacity to suggest "the Board has been made fully aware of the Center's financial outlook," and no one "*actually* hid[] any material information about the Center's finance [sic] from its trustees." Defs.' Mem. at 37-38. Not true. Only a select group of trustees—who are Defendants here—has been meaningfully briefed about the Center's ongoing financial struggles, and that information was deliberately withheld from Plaintiff. *See supra* pp. 27-28.

The fact that "the public record" contains evidence "about declining ticket sales" in no way excuses Defendants' effort to obfuscate those problems. Defs.' Mem. at 38 (emphasis omitted). Quite the opposite. A subset of Defendants and management manufactured a pretextual excuse to close and ignored the true challenges facing the Kennedy Center. As a result, Defendants utterly fail to grapple with the underlying sources of the Center's difficulties. Indeed, if an immediate shutdown is necessary because the Center truly cannot operate, responsible fiduciaries would determine how to remedy the underlying causes—not cover up the problem with a bait-and-switch shutdown, the length and nature of which bears no relationship to the Center's financial struggles.[19]

[19] The Board also could not rely on Delta's assessment that the Center's yearly revenue "would be expected to decline under the partial-closure model, which was already visible in year-over-year revenue decline because of uncertainty and friction in the Center's operations." Defs.' Mem. at 37 (cleaned up). The Center provided no FY2026 financials to Delta on which to make such assessments, Ex. C at 89, and the Center attributed the soft performance in 2026 not to "uncertainty" or "friction," but to Trump's takeover and unlawful renaming, Ex. E at 116.

Finally, Defendants cannot escape responsibility for their breach on the theory that not all trustees knew about management's various misdeeds. Even if the Court were to limit itself to examining only the scant record presented to the Board, there were obviously yawning gaps, such as the lack of expert advice on programming or fundraising. *See supra* pp. 18-20. Meanwhile, multiple Defendants knew critical information was withheld from the rest of the Board. For example, Vice Chair Fischer knew about the pretextual justification for closure, and the Audit and Finance Committee knew about the ongoing financial difficulties. At minimum, Defendants *now* know about the deeply concerning record—and Defendants therefore are in breach to the extent they persist in closing the Center, despite that knowledge.

More fundamentally, trust law doesn't permit trustees to willfully blind themselves to an agent's misdeeds. Trustees must "act with prudence in supervising or monitoring the agent's performance." Restatement (Third) of Trusts § 80, cmt. d(2). Once trustees learn about "a breach of duty by the agent," they must "take reasonable steps to remedy it." *Id.* And by acting as the trustees' agents, the Kennedy Center's management—including Defendant Floca—"assume[d] a fiduciary role with fiduciary responsibilities." *Id.* § 80 cmt. g; *see In re Wash. Builders Benefit Tr.*, 293 P.3d 1206, 1226 (Wash. Ct. App. 2013). In short, Defendants cannot escape their misdeeds by ignoring the disturbing facts of what occurred—and what continues to occur—here.

## II. THE EQUITIES SUPPORT THE EXISTING INJUNCTION.

### A. The Court Should Not Reward Defendants' Conduct.

**1.** Defendants additionally fall well short of their burden to show that changes to the equities warrant dissolving the injunction. It would be deeply harmful to Plaintiff, the Kennedy Center, and the public's faith in the rule of law to reward Defendants' conduct in this matter by lifting a preliminary injunction meant to ameliorate their violation of fiduciary duties in the face of their brazen and ongoing breach.

As the Court explained in May, Defendants' "decision to shutter the Kennedy Center has caused, and will continue to cause, ongoing irreparable harm to Beatty and the trust property she and her colleagues are charged with protecting." Mem. Op. at 84. The trustees continue to lack "sufficient information" "to make a well-considered decision to close the Center." *Id.* Meanwhile, Plaintiff still cannot "meaningfully participate in the administration of the trust [], and her ability to do so will continue to be undermined each day that vote is implemented." *Id.* at 84.

It gets worse. Since May, Defendants refused to book *any* performances, continued to lay staff "off *en masse*," and effectively halted "the Center's operations." *Id.* The Court can, and should, put a stop to that egregious behavior by swiftly denying Defendants' motion and making clear that Defendants must return to the pre-shutdown status quo. Defendants' continued intransigence and transparent lack of good faith are exacerbating the very harms this Court sought to prevent. *Id.* at 85 n.35. Defendants drove out the National Symphony Orchestra from the main building, caused other performers to leave as well, and refused to book programming. *See supra* pp. 8, 32-33. Defendants are intentionally "hobbl[ing] the Center as an arts institution." Mem. Op. at 84.

**2.** Defendants are not harmed by an injunction halting unlawful conduct. In addition, Defendants engaged in misconduct—from actively withholding critical materials from the Board, to sabotaging the Center's performing arts calendar, to slashing staff in a transparent effort to effectuate a closure by any means. Equity does not reward that bad faith. *See Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232 (1959); *Riggs v. Palmer*, 22 N.E. 188, 190 (N.Y. 1889).

Defendants argue that "the Center is in limbo" and "the Center's operational model is effectively frozen in place." Defs.' Mem. at 40-41. Any "limbo" is entirely of Defendants' making. This summer, Defendants—in defiance of the Court's order—*refused to return to the*

*status quo*. Defendants plowed ahead with a shutdown, pushed the Orchestra out of the Center, and adopted other deeply concerning tactics. Defendants cannot receive equitable relief based on hardships *they* created and which are entirely within *their* control.

Defendants' claim that the main building is unsafe is pretext. Full stop. The Court has repeatedly stressed that Defendants may undertake "capital repair and restoration" and can enact "limited closures of spaces" for "remedial work." Mem. Op. at 86. Nothing in the Court's order prevents the Center from fixing the roof, repairing the garage, or closing off an unsafe area.

Defendants make much ado about the soffits and the September 4 incident. Defs.' Mem. at 41. But issues with soffits are not new, and the record does not support that they require closing the building. The Center has known the soffits needed repairs since May 2024. Ex. B at 16. When a soffit partially failed in 2022, the Center limited access to an affected area and otherwise kept the building open. *Id.* at 11-14; *cf. Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 385 (1992) (courts should not grant modification based "upon events that actually were anticipated" when decree was entered). Earlier this year, Floca approved a contract to address the soffits. Yet Floca inexplicably canceled that contract in April 2026, apparently to funnel funds to Trump's pet projects. Ex. B at 19-21, 36-42. Nor did the Center treat the September 4 plaster incident as an emergency—until it became useful to Defendants. *See supra* pp. 34-35. The soffit, garage, tunnel, and systems work can all proceed with the building open. Ex. B at 24-33.

Defendants' suggestion that it is "almost impossible—at a minimum highly impractical—to conduct required repairs without a sustained, two-year closure of the main building," Defs.' Mem. at 42, is belied by (1) Delta's report, *see* Delta Rep. ¶ 135, (2) the evidence they failed to present to the Board, Ex. E at 152-158; Ex. H, (3) historical practice, Ex. B at 8, and (4) Center's own prior plans to phase the renovation, *id.* at 4-5.

**3.** Finally, the public interest is never served by unlawful action. Mem. Op. at 87. But it would be particularly damaging for public faith in these proceedings to reward Defendants' misconduct. Defendants made a mockery of their obligations to this sacred memorial. The Chairman—who is a Defendant—threatens to demolish the institution unless it bears his name. Defendants manipulated the record before the Board and repeatedly misstated the facts in testimony. To this day, Defendants hang a tarp over the Center's façade in a petulant defiance of the Court's renaming injunction.[20] It would do damage to the rule of law to reward this behavior.

**B. Defendants Have Not Come Clean About The Center's Finances.**

Defendants also suggest the Center must close due to "distinct risks to" its "finances." Defs.' Mem. at 42. It has proven difficult for Plaintiff to discern the truth about the finances. The record contains conflicting statements, and Defendants have withheld necessary documentation. It is undeniable Defendants' actions have caused significant harm. Their mismanagement should not go understated. But the Center's current position is unfortunately unclear.

Before the September meeting, Floca circulated a resolution declaring that the Center faced "certain fiscal collapse within weeks." Ex. E at 138. This was the only time that the Board has been told the fiscal situation is so dire. Internal documents, labeled a cash burn table, suggested that the Kennedy Center had millions of dollars representing months of operations, albeit from the Trump Kennedy Center Foundation and potentially subject to a clawback. Rao Decl. ¶¶ 17-27. As of FY2024, the Center also had $180.6 million in its endowment and investments. *Id.* ¶ 21.

Plaintiff asked Floca to explain, in his capacity as a Rule 30(b)(6) witness, the meaning of his representation to the Board that the Center faced "certain fiscal collapse within weeks." Ex. E

[20] Floca has told the Court the tarp serves a legitimate purpose. ECF No. 64-1 at 2. But public reporting indicates that Floca ordered workers to obscure the façade because he "was worried that the public spectacle" of removing Trump's name would "enrage" Trump. Ex. G at 77.

at 138. Floca was evasive and did not provide a coherent answer. *Id.* at 46-74. When testifying in his personal capacity, Floca represented that the Center's current cash position is "[g]ood." Ex. D at 51. Meanwhile, Delta was never asked to model the Center's cash or liquidity position, and management withheld FY2026 financial data from Delta. Ex. C at 89, 98.

Plaintiff hired a forensic accountant to better understand the Center's finances. As she details, however, the information Defendants provided *does not enable her to determine the Center's financial position*. Rao Decl. ¶¶ 11-16. The Center also appears to lack critical financial documents, *id.* ¶¶ 29-40, such as "periodic management financial statements and budget-to-actual comparisons for FY2026," *id.* ¶ 2, and the Board has not been provided materials that a Board would normally receive, *id.* ¶¶ 41, 45-59, such as "current financial statements, cash flow projections, complete information about outstanding and projected financial obligations, and management's plans to address such concerns," *id.* ¶ 2. This is all deeply concerning.

To the extent that the Center truly lacks funds to operate, Defendants must say so. In addition, if the Board votes to close based on that information, the length of the shutdown must be tailored to respond to the financial problems, and Defendants must articulate how they plan to reverse course. Finally, to the extent the Center faces imminent collapse, and Defendants have hidden the Center's financial difficulties, other equitable remedies would be appropriate to protect the trust, such as the appointment of an independent monitor or receiver. *See* Restatement (Third) of Trusts § 95 cmt. c; Restatement (Second) of Trusts § 392 cmt. a.

Plaintiff does not make this suggestion lightly. It would be astounding, however, if Defendants could evade accountability for their fiduciary breaches because they drove the Center into insolvency. Plaintiff stands ready to fully brief that remedial issue should it be necessary.[21]

## III. THE COURT SHOULD ORDER FLOCA'S TESTIMONY.

Plaintiff respectfully submits that it is imperative for the Court to hear live testimony from Floca. The Court should observe his demeanor, gauge his credibility, and require him to provide answers on issues to which he has been evasive or where testimony does not align with the documentary record (including documents produced after depositions). *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) ("If there are genuine issues of material fact[,] an evidentiary hearing is required."). Of note, Floca refused to provide a clear answer about finances, and Plaintiff was unable to inquire about Floca's decision to withhold JLL's August 20 report from the Board.

## IV. THE COURT SHOULD PROTECT THE CENTER FROM DEMOLITION.

No matter how it resolves the motion, the Court should make clear that Defendants must provide notice "30 days before" modifying "the project plans," including "any demolition." The unfortunate reality is that Trump has repeatedly threatened to demolish the Kennedy Center—including in filings in this Court. As the record makes clear, the Board unfortunately cannot check the Chairman's abuses. Trump tore down the East Wing and recently demolished part of the East Potomac golf course. It would be a travesty if the Kennedy Center became the next victim.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

---

[21] Delta states that closing would reduce operating expenses. Delta Rep. ¶¶ 214, 221. That is not a cure to financial problems, real or feigned; it is a decision to save the patient by killing him. Delta's methodology is also suspect. For example, to estimate the operating deficit under phased renovation, Delta performed adjustments to historic data. Ex. C at 51-57. But Delta relied on the Center management's rosier projections for calculating closure. *Id.* at 83-84. Floca "helped lead" preparing those projections, but is now "less comfortable" with them. Ex. D at 41-42.

Dated: October 30, 2026

Respectfully submitted,

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
(D.C. Bar No. 1724093)
/s/ Alexander Kristofcak
ALEXANDER KRISTOFCAK
(D.C. Bar No. 90045623)
KYLE R. FREENY
(D.C. Bar No. 1684764)
ROSA L. BAUM
(D.C. Bar No. 90032839)
WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org
akristofcak@washingtonlitigationgroup.org

NORMAN EISEN
(D.C. Bar No. 435051)
STEPHEN JONAS
(D.C. Bar No. 90037069)
DAVID W. OGDEN
(D.C. Bar No. 375951)
DEMOCRACY DEFENDERS ACTION
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

*Attorneys for Plaintiff Joyce Beatty*