# Exhibit A

09:13:25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - -

JOYCE BEATTY, )
)
Plaintiff, ) No. 25 Civ. 4480
) (CRC)
vs. )
)
DONALD J. TRUMP, et al., )
)
Defendants. )

REMOTE VIDEOCONFERENCE

DEPOSITION OF JOSEPH LAFAUCI

Thursday, October 1, 2026, 9:31 a.m.

All Parties Appearing Remotely

Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

Job Number: Lexitas 103996

09:42:50 Q. You can still answer.
09:42:51 MR. ANON: You can answer, Mr. LaFauci.
09:42:52 A. No, I don't remember.
09:42:56 Q. You don't recall what you were told a month ago?
09:43:00 A. Correct.
09:43:02 MR. ANON: Objection. Same.
09:43:03 Q. Have you collected any severance following your termination?
09:43:20 A. No.
09:43:21 Q. To be clear, did you start at the RNC before you were laid off?
09:43:40 A. Yes.
09:43:40 Q. On what day did you start at the RNC?
09:43:47 MR. ANON: Objection. Scope. This goes to outside of the Court's limitation. This is not relevant to the scope set forth by the Court.
09:43:59 I'm going to instruct the witness not to answer the question.
09:44:12 Q. Just to confirm, Mr. LaFauci, are you not going to answer the question?

09:44:16 MR. ANON: I'm going to instruct the witness not to answer the question.
09:44:23 Q. Just directing that question to Mr. LaFauci, are you not going to answer the question?
09:44:34 A. I'm not going to answer that question.
09:44:35 Q. Okay. Is that based on your attorney's instruction?
09:44:45 A. Yes.
09:44:45 Q. To your knowledge, did anyone -- was anyone else laid off from the Kennedy Center around the same time that you were?
09:44:59 A. Yes.
09:44:59 Q. Who was that?
09:45:08 A. Tammy Walsh, Taylor Strand, Casey Flores. I don't remember last names, but there was a few others that I know.
09:45:38 Q. Do you remember those peoples' first names?
09:45:42 A. Yes.
09:45:42 Q. Can you please provide them.
09:45:46 A. Deanna. That's all I can remember

for now.

Q. Do any of those individuals now work with you at the RNC?

A. No.

Q. Did any of those individuals start new jobs before they were laid off?

MR. ANON: I'm going to instruct the witness not to answer the question. That is outside the scope of the limitation set forth by the Court.

A. I'm not going to answer that question.

Q. Are you not going to answer the question based on the instruction from your attorney?

A. Yes.

Q. Do you know why any of those individuals were laid off?

A. I don't.

Q. Okay. Let's go back to when you were in the role of Vice President of Board Relations and Protocol.

Did you work with Donna Arduin Kauranen, the Kennedy Center's Chief Financial Officer?

A. Yes.

Q. Did you have a role during those meetings?

A. Can you say that again.

Q. Did you have a role during those meetings?

A. A roll call? Oh, a role for me?

Q. Yes.

A. To help take minutes. In the case of the last two meetings, to put things on the screen, take the roll call, record a roll call during a vote.

Q. I am now going to show you the next document that we'll mark as Exhibit 2.

(LaFauci Exhibit 2, Draft Board meeting agenda, 8.13.2026, [no Bates], was marked for identification.)

Q. Mr. LaFauci, do you recognize this document?

A. I do.

Q. So was this one of the meeting agendas to the Kennedy Center Board members that you were

responsible for circulating?

A. I was responsible for deploying this agenda, yes.

Q. Sorry, "for deploying this agenda," did you say?

A. I used the wrong word.

I was responsible for distributing the agenda.

Q. When did you put this agenda together, Mr. LaFauci?

A. Maybe the 9th or 10th of August.

Q. What was your process in putting together this agenda?

MR. ANON: Objection. Vague.

A. I think -- well, there's a standard structure to an agenda. Given that we needed to reelect our officers, we did so. And then I asked Elliot and Matt what they would like to add.

Once that was done, I would send them a draft. They would -- Matt would confirm it, and I would distribute it.

Q. If you will notice here, Mr. LaFauci,

10:46:43 there are 180 pages in this packet.
10:46:46 Do you see that?
10:46:46 A. I do.
10:46:46 Q. When did you compile the pages that
10:46:49 comprise this packet?
10:46:52 A. About everything except for the agenda
10:46:59 and the minutes, I received from Matt Floca, with
10:47:01 the instruction to send to the Board.
10:47:04 Q. When did you receive these materials
10:47:05 from Matt Floca?
10:47:11 A. It would either be the 10th or 11th.
10:47:13 Q. Do you know from whom Matt Floca
10:47:15 received these materials?
10:47:18 A. No.
10:47:18 Q. On how many other occasions did you send
10:47:24 a 180-page packet 24 to 48 hours in advance of a
10:47:30 meeting?
10:47:31 MR. ANON: Objection.
10:47:32 Argumentative.
10:47:34 A. I don't know.
10:47:37 Q. Is it your testimony that you don't
10:47:45 recall sending a packet of 180 pages to Board

10:47:49 members 24 to 48 hours before a meeting?
10:47:53 A. Well, I do remember for August 13th. I
10:48:09 don't remember sending anything -- oh. Yes, I have
10:48:11 for a meeting outside of August and September.
10:48:20 Q. How much time did you provide the Board
10:48:22 members before then?
10:48:25 A. It was typically 24 to 48 hours.
10:48:28 Q. For a packet with 180 pages?
10:48:36 A. I'm just referencing materials broadly.
10:48:43 The size of the packet always differed, varied.
10:48:49 Q. When did you send -- or when did you
10:48:53 previously send a packet with 180 pages to Board
10:48:58 members 24 to 48 hours in advance of a meeting?
10:49:06 A. I can't tell you exactly how big the
10:49:09 packets I was sending were.
10:49:11 Q. You can estimate, around 180 pages.
10:49:15 A. Yeah, I don't remember.
10:49:16 MR. ANON: Objection. Calls for
10:49:17 speculation.
10:49:17 Q. There was an instance that you referred
10:49:20 to, though. You said that there was an instance.
10:49:22 What was that instance?

10:49:24 A. I shared materials with the Board regarding a renovation -- actually, I don't know exactly what it was about. But I did share materials with Board prior to the March 16th Board meeting that was pretty hefty.

10:50:09 Q. When you say "pretty hefty," can you give me an estimate of what you mean by that.

10:50:13 A. I don't. It was probably 10 files.

10:50:16 Q. How big were those files?

10:50:20 A. I don't remember.

10:50:21 MR. ANON: Objection. Asked and answered.

10:50:22 A. I -- yeah.

10:50:27 Q. So there were 10 files, but you require them being -- sorry, you remember them being hefty?

10:50:35 A. The packet, yes.

10:50:36 Q. How long did it take you to put together this packet of 180 pages?

10:50:52 MR. ANON: Objection.

10:50:52 A. Five minutes.

10:50:52 MR. ANON: Asked and answered.

10:50:57 Q. You can answer, Mr. LaFauci.

A. No, I answered. Five minutes.
Q. Five minutes?
A. Yes. All I had to do was convert the PDF.
Q. What did you do after you converted the PDF with these materials?
A. I distributed them to the Board.
Q. Did anyone direct you on when to circulate this document to the Board members?
A. The one that I'm looking at now?
Q. Yes.
A. Matt Floca told me to send it ASAP.
Q. So was ASAP on August 11, 2026?
A. Yes.
Q. Is it the Kennedy Center's regular practice to circulate Board materials just two days before a meeting?
A. It's hard to say. I don't -- it varied.
Q. What was the variation?
A. Just the time it took to get everything together. I can't say for sure that there was a specific common practice getting materials to the

Board.

Q. In getting materials together, are you talking about the five minutes that you said it took you to compile this packet?

A. No. Waiting to receive any documents or confirmation.

Q. From whom would you be receiving the documents and confirmation?

A. Matt Floca.

Q. Who determines what materials were circulated to the Board members in preparation for the Board meetings?

A. Can you repeat that.

Q. Yes.

Who determines what materials are circulated to the Board members before Board meetings?

A. Matt Floca.

Q. Is anyone else involved in that decision?

A. I don't know.

Q. Did Matt Floca ever tell you that anyone

Q. Are these slides the only deliverables that Delta provided to the Kennedy Center on, as you frame it, the issues at the building?
A. Can you repeat the question.
Q. Did Delta send you any other materials that they prepared under their contract with the Kennedy Center?
A. Delta did not send me any materials.
Q. Did Delta provide the Kennedy Center any materials other than the slides that we have reviewed in this packet?
A. I don't know.
Q. What about the 1470-page report dated August 20, 2026?
A. It's dated August 20th?
Q. Yes.
A. I don't remember.
Q. Is it your testimony that Delta did not provide any other reports to the Kennedy Center Board?
A. No. That is not my testimony.
MR. ANON: Objection. Misstating

prior testimony.

Q. Did Delta provide any other reports to the Kennedy Center?

MR. ANON: Objection. Asked and answered.

A. Probably, but I don't remember.

Q. Mr. LaFauci, I'm going to show you another e-mail. It is up on your -- it should be up on your screen now.

(LaFauci Exhibit 3, e-mail chain, 8.31.26, [no Bates], was marked for identification.)

Q. As you can see, it's an e-mail from you dated August 31st. The opening line, you note, "Delta Consulting Group's Construction Program Assessment Report is now available on OnBoard for your review."

Does this jog your memory as to whether Delta provided further reports to the Kennedy Center?

A. It does.

Q. Was this longer report provided to the Board members before the August 13th meeting?

11:06:36 A. You're asking me if -- can you repeat the question.
11:06:39 Q. Of course.
11:06:41 Was this longer report provided to the Kennedy Center Board meetings before the August 13th Board meeting?
11:06:52 MR. ANON: Objection. Vague.
11:06:53 Can you restate that, Ms. Baum.
11:06:57 A. Yeah, can you please restate.
11:06:59 Q. So Delta also provided a report, right, that you advised the Board members was available on OnBoard for their review.
11:07:10 Was that report provided to the Board members before the August 13th Board meeting?
11:07:27 A. No.
11:07:28 Q. Why not?
11:07:37 A. I don't know the answer.
11:07:38 Q. You were involved -- you were responsible for sending materials to the Board members?
11:07:43 A. I was.
11:07:53 Q. Did the report exist on August 13, 2026?

A. I don't know the answer.

Q. We're going to turn back to the packet of materials for the August 13th Board meeting, so this is Exhibit 2 that we looked at. Now, I'm going to scroll down to page 18.

When did you receive this report?

A. August 11th. The same day I received the other materials.

Q. Are you aware of anyone at the Kennedy Center receiving this report before you?

A. Before me?

Q. Yes.

A. Matt Floca had it.

Q. Do you know when he received the report?

A. No.

Q. Who prepared this report for the Kennedy Center?

A. This one in particular --

Q. Yes.

A. -- or the entire attachment?

Q. Yes. This specific report in particular.

Board meeting. When was the decision made to convene a meeting on September 15th?

A. I don't exactly remember.

Q. I'm not asking exactly. If you can give me an approximate timing of when the decision was made to convene the September 15th Board meeting?

A. Between two and three weeks.

Q. Between two and three weeks what?

A. Prior.

Q. Who made the decision to convene this meeting?

A. I don't know who made the decision. I was told to notice.

Q. Who told you to send the notice to the Board meetings -- excuse me -- to the Board members that this meeting was occurring?

A. Matt Floca.

Q. What was the purpose of the September 15 Board meeting?

A. I believe I outlined that it was to discuss a building and grounds update.

Q. What sort of building and grounds

01:28:18 update?
01:28:20 A. To outline the needs of the building.
01:28:40 Q. What needs were those?
01:28:42 A. The building is in dire need of
01:28:52 infrastructure improvements.
01:28:55 Q. Going to show you a document that I'm
01:28:59 going to mark Exhibit 7.
01:28:59 (LaFauci Exhibit 7, e-mail, 9.14.26, [no Bates], was
01:29:03 marked for identification.)
01:29:03 Q. Okay. Mr. LaFauci, do you see a
01:29:13 document before you that is an e-mail from you dated
01:29:16 September 14, 2026?
01:29:18 A. Yes.
01:29:18 Q. Do you recognize this document?
01:29:22 A. Yes.
01:29:22 Q. In the first sentence of your e-mail,
01:29:27 you mention that there are structural emergencies.
01:29:32 What emergencies were those?
01:29:33 A. I don't know.
01:29:39 Q. Who directed you to send this e-mail?
01:29:48 A. Elliot Berke.
01:29:50 Q. Did Elliot Berke direct you on what to

say in the e-mail?

MR. ANON: Objection. That's privileged information. He's counsel for the Kennedy Center.

Q. What about the September 4th incident that Howard Lutnick posted about; would that be one of the emergencies?

A. To my knowledge, yes.

Q. What is your understanding of that emergency?

A. Part of the ceiling fell out, 60 feet, during a storm, to the ground while an employee was present.

Q. That occurred on September 4th?

A. I don't know what date. But it was an emergent issue.

Q. Do you recall around when that happened?

A. I don't. Within weeks of this Board meeting.

Q. What about the tarp and scaffolding that's currently covering the Kennedy Center's facade; is that related to one of the emergencies?

01:31:07 A. Not to my knowledge.
01:31:09 Q. So in your e-mail you mentioned multiple
01:31:12 emergencies -- emergencies, plural, I will say.
01:31:19 What other emergencies were you
01:31:21 referring to?
01:31:25 A. I don't know.
01:31:27 Q. Is the presence of the scaffolding
01:31:31 attached to the facade related to a structural
01:31:33 emergency?
01:31:34 A. I don't know.
01:31:34 Q. So you sent out this e-mail to the Board
01:31:39 without knowing to what you were referring?
01:31:42 MR. ANON: Objection. Asked and
01:31:43 answered. He's already answered the question.
01:31:48 A. I have already answered the question.
01:31:52 Q. You've not answered my question about
01:31:56 the fact that you sent out this e-mail without
01:31:58 knowing to what you were referring?
01:32:03 MR. ANON: Objection. Statement.
01:32:07 Q. Mr. LaFauci, did you send out this
01:32:08 e-mail to Board members of the Kennedy Center Board
01:32:15 without knowing to what you were referring?

MR. ANON: Objection. Asked and answered.

A. Um...

Q. Mr. LaFauci...

A. Among the dire need for renovation, that issue was emergent with the ceiling falling out, almost killing an employee. That was the pressing issue at the time, and that was a lot of what was in the Board packet.

So that is one example of many that I can't really detail here today.

Q. Why can't you detail them here today?

A. I have outlined earlier in this process a few of the things, and this is -- I've outlined that earlier.

Q. Help me understand what you've outlined earlier?

MR. ANON: Objection. Asked and answered.

A. Structural emergencies. Structural issues with the building.

Q. But at this point, we're just talking

about the structural emergencies that you're talking about here on August -- or, I'm sorry, on September 14th.

That's all I'm asking you about.

A. So what is your question?

Q. My question is whether you sent out this e-mail to the Board without knowing to what structural emergencies you were referring?

A. Using context in the Board packet, a lot of it was related to the issue in the ceiling, and previous discussions about the building's dire need for improvements. To address structural issues.

So broadly, yes, I did. But specifically --

Q. How did --

A. Go ahead. Please.

Q. Sorry. I thought you were done with your answer.

A. I am done with my answer.

Q. How did you come to learn that the plaster from the ceiling in the grand foyer had fallen on September 4th?

A. I think I -- I think I saw it online.
Q. Was it in a social media post?
A. Probably, yes.
Q. Did anyone from the Kennedy Center at work alert you to the fact that this had happened?
A. I don't remember.
Q. Okay. Turning back to this e-mail, you mentioned that first sentence that, "... this meeting is now exclusively focused on the necessary closure of the Center."
Did anyone advise you on this part of the e-mail?
A. Yes.
Q. Who?
A. Elliot Berke.
Q. Did Elliot Berke tell you what to write?
MR. ANON: Objection. Privileged information. Elliot Berke is counsel for the Kennedy Center.
MR. ZELINSKY: Can I clear a question, Mr. Anon, are you instructing your client not to answer?

MR. ANON: If it's about the contents of specific communications from counsel for the Kennedy Center, then yes, I am instructing my client not to answer.

MR. ZELINSKY: Mr. LaFauci, are you declining to answer on the instruction of your counsel?

THE WITNESS: Yes.

MR. TAGERT: Mr. Zelinsky, your co-counsel is the one taking the deposition, so if you want to have things like this, then delegate it to her.

MR. ZELINSKY: Okay. I think -- Mr. Tagert, I think your co-counsel is not properly instructing on attorney-client privilege, and I would request that he does.

MR. ANON: Mr. Zelinsky, just on the record, can you tell me why I am not properly instructing.

MR. ZELINSKY: Because it's unclear based on this record whether or whether not you are instructing your counsel not to answer. So if you

01:36:58 are going to instruct your counsel not to answer, I would ask that you simply say, I'm instructing -- I'm simply instructing my client not to answer.

MR. ANON: I will also provide a short and concise statement with my basis why.

So it's fair that I will include in the future more explicit reference for Mr. LaFauci not to answer, but it is a valid objection. Mr. Berke has been established to be counsel for the Kennedy Center. It's improper.

BY MS. BAUM:

Q. Mr. LaFauci, who made the decision to exclusively focus the meeting on this topic?

A. I don't know.

Q. How is the exclusive focus communicated to you?

A. Through the language for this e-mail.

Q. Did you type this e-mail?

A. Yes.

Q. So who -- how did you come to learn that the focus for the meeting was exclusively now on the necessary closure for the Center?

A. Through the e-mail language provided to me.

Q. So you did not come up with the language for the e-mail?

A. I've already stated that.

Q. Please answer the question.

A. I've already stated that.

Q. Mr. LaFauci, please answer my question.

A. That is correct.

MR. ANON: Objection. Asked and answered. Objection. It gets to privileged communications.

I'm going to instruct the client not to answer.

Q. Mr. LaFauci, in the second sentence of your e-mail there, it reads, "The Board stands by the recognition resolution proposed and passed by the Board on August 13, 2026."

Did I read that correctly?

A. Yes.

Q. What is your basis for this statement?

A. This language was handed to me for

distribution to the Board.
Q. But wasn't this an e-mail to the Board?
A. Yes.
MR. ANON: Objection. Misstating prior testimony.
A. Can we roll back on that because I might not have understood your question.
Q. Of course.
So in looking at that second sentence, that reads, "The Board stands by the recognition resolution proposed and passed by the Board on August 13, 2026," I'm asking what your basis for that is because wasn't this an e-mail to the Board?
A. Yes.
Q. So what is your basis for asserting that "the Board stands by the recognition resolution"?
A. This is the language that was handed to me for distribution to the Board.
Q. Do you have a basis for asserting that the Board was standing behind its proposed -- its resolution that was passed on August 13, 2026?

01:47:45 time of day.

01:47:47 MR. ZELINSKY: So to be clear, just
01:47:48 so that we're clear, we think these are related,
01:47:50 right. Putting even aside the relevancy objections
01:47:53 about renaming, they are so related they were the
01:47:57 only two sentences in this e-mail, but I think we
01:47:58 can agree to disagree on that, and we will bring
01:48:02 this matter to the Court.

01:48:03 MR. ANON: Perfectly fine. Thank
01:48:04 you.

01:48:04 Ms. Baum, all yours.

01:48:08 MS. BAUM: Okay.

01:48:08 BY MS. BAUM:

01:48:10 Q. So knowing that we will be returning to
01:48:15 that line of questioning at a different point,
01:48:26 Mr. LaFauci, you mentioned that the September 4th
01:48:29 incident of the plaster falling from the Kennedy
01:48:33 Center ceiling was one of these emergencies to which
01:48:35 you refer in this e-mail, but the date of your
01:48:39 e-mail here is September 14th.

01:48:40 If these were emergencies, as your
01:48:43 e-mail states, why was there a 10-day period between

01:48:46 the September 4 incident and the September 14
01:48:49 e-mail?
01:48:49 A. I don't know the reason.
01:48:53 Q. Were you a part of any discussions with
01:48:57 anyone in leadership positions at the Kennedy Center
01:49:01 between September 4th and 14th in which closure of
01:49:04 the Kennedy Center arose?
01:49:05 A. I don't remember.
01:49:20 Q. Were you in any discussions with anyone
01:49:30 in leadership positions at the Kennedy Center
01:49:33 following the September 4th incident regarding the
01:49:37 September 4th incident of plaster falling from the
01:49:41 ceiling?
01:49:41 A. Can you repeat that question.
01:49:42 Q. Of course.
01:49:43 Did you have any discussions with
01:49:47 individuals in positions of leadership at the
01:49:50 Kennedy Center regarding the September 4th incident
01:49:54 in which plaster fell from the ceiling at the
01:49:58 Kennedy Center?
01:50:15 A. Yes.
01:50:15 Q. Who was involved in those discussions?

01:50:20 A. I texted Matt Floca.
01:50:27 Q. What did you discuss?
01:50:35 A. Said that I was ready to share something
01:50:38 with the Board pertaining to that.
01:50:45 Q. On what platform did you text Matt
01:50:48 Floca?
01:50:52 A. iMessage.
01:50:53 Q. What were you ready to share with the
01:50:55 Board?
01:50:56 A. Simply that it happened, or any updates
01:50:59 to it.
01:51:04 Q. So is it your testimony that you did ask
01:51:07 Mr. Floca about communicating to the Board in this
01:51:09 instance?
01:51:10 A. Yes.
01:51:11 Q. What was Mr. Floca's response?
01:51:15 A. I did not get one.
01:51:18 Q. Did you follow up?
01:51:25 A. I don't remember.
01:51:26 Q. Did you have any conversations with
01:51:39 anyone else at the Kennedy Center regarding the
01:51:41 September 4th incident?

A. I think I spoke with Tammy Walsh to ask which security person was on-site when that happened.

Q. On your iMessage to Mr. Floca, would it refresh your memory if you looked back at this conversation?

A. Yeah, I'm pretty sure that I did not follow up.

Q. Would it refresh your memory as to what the contents of the message was?

A. Yes, I'm sure it would.

Q. Do you have that accessible?

A. Yes, I do.

MS. BAUM: Can we go off the record.

MR. ANON: We can go off the record for this.

MS. BAUM: Perfect. Thank you.

(RECESS, 1:53 p.m. - 1:53 p.m.)

MR. ANON: I think we need to go back on the record for that. This is time that's being used for the deposition.

MR. TAGERT: Yeah, if that's your

ensure accuracy of statements. That is what this exercise is for. It is for the truth. It is for accuracy.

He is taking normal pauses, and he is testifying truthfully. He is under oath. Penalty of perjury. He understands what those repercussions are. There's no more that should be read into that than what you hear today.

If he takes long pauses, by God, he should, because he wants to understand what the full truth is before he says it.

Ms. Baum, back to you, if you are ready.

MR. ZELINSKY: Mr. Pierce -- Mr. Anon, before we do, I want to make a couple of very brief observations in response.

First, your client has repeatedly contradicted himself in the course of his testimony.

Second, many of these questions are simple, basic questions about events that occurred relatively recently.

So I just dispute very -- what

01:57:41 you're implying, but we can leave it at that.
01:57:43 MR. ANON: Just the last thing, two
01:57:45 seconds, a simple explanation is he doesn't know, or
01:57:49 he doesn't remember. That's it.
01:57:50 Ms. Baum, back to you.
01:57:53 MS. BAUM: Thank you.
01:57:55 BY MS. BAUM:
01:57:55 Q. Let's continue on. So let's go to the
01:58:00 next exhibit, which I will be marking as Exhibit 8.
01:58:05 (LaFauci Exhibit 8, Board of Trustees, Special
01:58:05 Meeting Agenda, 9.15.26, [no Bates], was marked for
01:58:05 identification.)
01:58:05 Q. Mr. LaFauci, do you recognize the
01:58:18 document that I just pulled up?
01:58:20 A. Yes, I do. Sorry. I was muted.
01:58:27 Q. Not a problem.
01:58:28 This is the -- excuse me, the
01:58:35 meeting agenda for the Kennedy Center Board meeting
01:58:39 on September 15th; correct?
01:58:40 A. Yes.
01:58:41 Q. When was this document circulated to the
01:58:47 Board members?

A. It was either the Saturday or Sunday night before.
Q. Who decided when to circulate these materials to the Board members?
A. Matt Floca.
Q. Did Matt Floca direct you as to when to circulate these materials to the Board members?
A. Yes.
Q. When did you receive access to these materials?
A. I believe it was Saturday, early evening.
Q. How much time did it take you to then provide those materials to the Board?
A. It was within the hour.
Q. Who decided what materials to circulate to the Board ahead of the September 15th meeting?
A. Matt Floca.
Q. Just to confirm, at the point when you sent out these materials to the Board on that weekend prior to the September 15th Board meeting, the focus for that meeting, for the September 15

Board meeting, had not yet been changed to be, quote, exclusively on the necessary closure of the Kennedy Center; correct?

A. Yes.

Q. This was before your e-mail notifying the Board of the now-exclusive focus of the September 15 meeting?

A. Yes.

Q. The focus of the September meeting had not yet changed, even though the plaster from the ceiling in the main building at the Kennedy Center had fallen over a week beforehand?

A. That is correct.

Q. In the packet -- in this packet of materials that we have up, we're going to turn to page 5. So this is the -- Attachment 1 is titled Video Report of Current Building Conditions.

Have you viewed this video, Mr. LaFauci?

A. I believe so, if it's the one that's narrated by Matt Floca.

Q. Well, because who narrated this video is

02:38:51 been relayed to me. On this issue.
02:38:56 Q. So your testimony is that you have never spoken to anyone who relayed to you that Donald Trump would not oversee the renovations of the Kennedy Center unless his name appeared on the facade.
02:39:09 MR. ANON: Objection. Misstating prior testimony. That is not what he said.
02:39:17 Q. Mr. LaFauci, you can answer.
02:39:18 A. Yeah. I just -- I want to go back and cover -- figure out what's -- all right.
02:39:33 Can we start at the beginning of this. So you're asking if anybody has conveyed to me that President Trump --
02:39:40 Q. That Donald Trump --
02:39:41 A. -- threatened not to --
02:39:45 Q. Not to oversee the renovations of the Kennedy Center unless his name was placed on the facade of the building.
02:40:35 A. No.
02:40:36 Q. Sorry. Was your answer "no"?
02:40:48 A. It was no.

Q. Okay. I didn't hear.
Did the Board -- did the Board vote on this resolution at the September 15 Board meeting?
A. No.
Q. Why didn't they vote on it?
A. It's my understanding that the meeting was going to be solely focused on renovation and not recognition.
Q. So whose decision was it to pull this resolution from the Board's consideration?
A. I don't know the answer. I don't know.
Q. Who communicated to you that this resolution would not be considered at the September 15th Board meeting?
A. Either Matt Floca or Elliot Berke.
MR. ANON: Ms. Baum, can we take a three-minute break?
MS. BAUM: I have no objection to a three-minute break. Can we go off the record, Ms. Peters.
(RECESS, 2:42 p.m. - 2:48 p.m.)

02:48:12 BY MS. BAUM:
02:48:13 Q. Mr. LaFauci, you mentioned that -- previously in your testimony that you texted Mr. Floca about the September 4 incident with the plaster falling from the ceiling of the Kennedy Center.
02:48:26 Did you also text Mr. Floca about the decision to pull this resolution?
02:48:33 A. No. I believe we discussed it by phone, either after the e-mail was sent, or in the morning before the Board meeting.
02:49:05 Q. What e-mail was that, that you mentioned was sent?
02:49:11 A. I'm sorry. The e-mail regarding the scope of the meeting, of the September 15th meeting.
02:49:20 Q. Was that your September 14th e-mail regarding the change in topic to the exclusive focus of that meeting?
02:49:31 A. That's correct.
02:49:32 Q. Did you frequently text Mr. Floca?
02:49:43 A. Mostly handled by phone or e-mail.
02:49:48 If I needed him quickly, I would

communications between Chairman Trump and Ambassador Grenell on the Kennedy Center?

MR. ANON: Objection. Calls for speculation.

A. Yeah. I don't want to speculate. I will say probably at least equally as frequent.

Q. So I think earlier we had talked about the Court Order on May 29th stopping the closure of the Kennedy Center.

Do you remember that discussion with my colleague, Ms. Baum, earlier?

A. Yes.

Q. Do you have any personal knowledge of that May 29th Order to stop the closure of the Kennedy Center?

MR. ANON: Objection. Vague.

Q. Please answer.

A. I read about it online.

Q. Did you hear about it from Mr. Floca?

A. I don't remember.

Q. Did the Kennedy Center cancel any performances between May 29th and August 13th?

A. Did they engage in cancellations, or were there shows that were set for that period of time?

Q. Let's -- you know, two separate questions there. Good call. Let's do the first question first.

Did they engage in cancellations? Did the Kennedy Center actively engage in cancellations?

A. I don't know.

Q. What about other cancellations?

MR. ANON: Objection. Vague.

Q. I think it was the second category of the way that you had split my question.

Would have -- performers or for other reasons, were shows canceled between May 29th and August 13th that you're aware of?

A. I believe I noticed that the tail end of Bluey was canceled within that period, but that's all I know.

(Clarification requested by the Realtime Stenographer.)

04:00:14 Q. Are you aware that a number of staff left the Kennedy Center on June 10th of 2026?
04:00:30 A. Yes.
04:00:46 Q. Would it sound about right to you that something like 20-plus folks left around that time?
04:01:08 A. As in were laid off or...
04:01:23 Q. You said that you were aware of folks leaving on June 10th or around there.
04:01:27 The question is: Would it make sense there was about 20 of them, would that sound right to you, or more?
04:01:32 A. I do recall layoffs around that time.
04:01:36 Q. So you're getting to my next question a little bit, which is why did so many staff separate around then?
04:01:47 MR. ANON: Objection. Calls for speculation.
04:01:51 Q. Please answer.
04:01:52 A. I -- I'm not HR. I don't make those decisions.
04:01:57 Q. Well, so you had said that there were layoffs, right. So an answer might be, like, they

04:02:05 were laid off.
04:02:06 Do you know that there were layoffs, or are you speculating that there were layoffs?
04:02:10 A. Well, I'm not sure that we're talking about the same group, but...
04:02:14 Q. Well, tell me what you are talking about, because I don't understand your testimony right now.
04:02:21 So what are you referring to when you mention layoffs around June 10th of 2026?
04:02:28 A. Well, I don't know if that's the specific date, so -- but I understand that there were a couple of waves of layoffs, and that's about all I know.
04:02:38 Q. You believe that June 10th would be an approximate date that one of those waves that you're aware of took place?
04:02:46 A. Possibly.
04:02:51 Q. So we had talked about -- sorry, I'm trying to rearrange myself here -- Mr. Floca at that meeting in February in the Oval Office.
04:03:17 Was there a meeting in January in

the Oval Office with Mr. Floca?
A. I don't know.
Q. All right. Are you aware of any time that Chairman Trump and Mr. Floca discussed shutting down the Kennedy Center?
MR. ANON: Objection.
I'm going to instruct the witness not to answer the question. I'm going to assert the same privilege, presidential communications privilege.
A. I'm not going to answer.
MS. DOHRMANN: All right. Let's take a quick break, and then we'll wrap it up. Let's take -- what do you need, Ms. Peters? Sorry, can we go off the record.
(RECESS, 4:04 p.m. - 4:16 p.m.)
BY MS. DOHRMANN:
Q. All right, Mr. LaFauci. Just a few more questions.
I had asked you some questions earlier about the Trump Fund, and when it began.
Did you play a role at all in

CERTIFICATE OF COURT REPORTER

I, Marjorie Peters, Fellow of the Academy of Reporting, Registered Merit Reporter, Certified Realtime Reporter, Realtime Systems Administrator, and Notary Public in the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that the witness was placed under oath according to the law; that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction, and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

I further certify that signature was not waived by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand this day of , 2026.



Marjorie Peters, FAPR, RMR, CRR, RSA
My commission expires October 31, 2029.

# LaFauci Dep. Ex. 3

**From:** "LaFauci, Joseph" <JLaFauci@kennedy-center.org>
**Date:** August 31, 2026 at 6:15:09 PM EDT
**To:** "Floca, Matt" <MFloca@kennedy-center.org>
**Cc:** "Berke, Elliot" <EBerke@kennedy-center.org>, "Arduin, Donna" <DArduin@kennedy-center.org>
**Subject: Delta Consulting Group Program Assessment Report**

Good afternoon Trustees,

Delta Consulting Group's Construction Program Assessment Report is now available on OnBoard for your review. Due to the file size, the complete report is hosted directly on the platform in lieu of an email attachment.

This report follows the oral briefing delivered by Delta during the August 13, 2026 Board meeting. A formal meeting notice will be issued shortly for a session in approximately two weeks, where Delta representatives will be present to walk through their engagement scope, methodology, analysis, and conclusions, as well as answer any questions.

**To find the report:**
Log in to OnBoard – *If you have any issues, please respond to this email*.
Click "Resources" on the left side menu
Open the Folder Titled "2026 Improvements"
Open the Folder titled "Delta Program Assessment Report"

Thank you for your continued leadership and support.

Joe LaFauci
Vice President, Board Relations
The Kennedy Center
2700 F Street NW | Washington, DC 20566
(813) 210-5563
JLaFauci@Kennedy-Center.org | Kennedy-Center.org

The Kennedy Center

**EXHIBIT**
**LaFauci Exhibit 3**

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

# LaFauci Dep. Ex. 4

**THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**

# BOARD OF TRUSTEES — Meeting Minutes

Thursday, August 13, 2026 | 10:40AM | Held Virtually via Zoom

**EXECUTIVE BOARD MEMBERS PRESENT:**

Chairman, President Donald J. Trump *(addressed the meeting by phone; vote relayed)*
Vice Chair, Jennifer Fischer *(presiding)*
Secretary, Sergio Gor *(through Item III)*
Secretary, Brian Ballard *(elected at Item III)*
Treasurer, John Falconetti
General Counsel, Elliot Berke

**ATTENDED VIRTUALLY:**

Brian Ballard, Presidential Appointee
Maria Bartiromo, Presidential Appointee
Pamela Bondi, Presidential Appointee
Mary Helen Bowers, Presidential Appointee
Hannah F. Buchan, Presidential Appointee
Robert Castellani, Presidential Appointee
Pamella Roland DeVos, Presidential Appointee
Patricia Duggan, Presidential Appointee *(connection lost, recorded by email)*
John Falconetti, Presidential Appointee
Jennifer Fischer, Presidential Appointee
Lynette Friess, Presidential Appointee
Ambassador Sergio Gor, Presidential Appointee
Pamela Gross, Presidential Appointee
Kate Adamson Haselwood, Presidential Appointee
Laura Ingraham, Presidential Appointee
Dana Kraft, Presidential Appointee
Mindy Levine, Presidential Appointee
Lynda Lomangino, Presidential Appointee
Allison Lutnick, Presidential Appointee
Douglas Manchester, Presidential Appointee
Laurie Perlmutter, Presidential Appointee
Catherine B. Reynolds, Presidential Appointee
Denise Saul, Presidential Appointee
Andrea Wynn, Presidential Appointee
Paolo Zampolli, Presidential Appointee
Representative Joyce Beatty, Ex-Officio Member
Representative Rick Larsen, Ex-Officio Member
Senator Sheldon Whitehouse, Ex-Officio Member
Emily Berret — on behalf of Leader Hakeem Jeffries, Ex-Officio Member
Elizabeth Falcone — on behalf of Senator Mark Warner, Ex-Officio Member
Johanna Hardy — on behalf of House T&I Chairman Sam Graves, Ex-Officio Member
Ted Verrill — on behalf of Representative Julia Letlow, Ex-Officio Member
Jonathan Misk — Office of Senator Sheldon Whitehouse

EXHIBIT
LaFauci Exhibit 4

Ann Jacobs — Office of Representative Rick Larsen
Todd Valentine — Office of Representative Joyce Beatty
Adam Tomlinson – on behalf of Senator Shelley Moore Capito, Ex-Officio Member

**ABSENT:**

Secretary Elaine Chao, Presidential Appointee
Emilia Fanjul, Presidential Appointee
Alma Gildenhorn, Presidential Appointee
Lee Greenwood, Presidential Appointee
Barbara Long, Presidential Appointee
Dan Scavino, Presidential Appointee
Cheri Summerall, Presidential Appointee
Susie Wiles, Presidential Appointee *(vote relayed)*
Mayor Muriel Bowser, Ex-Officio Member
Secretary Lonnie Bunch, Ex-Officio Member
Senator Shelley Moore Capito, Ex-Officio Member
Senator Susan Collins, Ex-Officio Member
Senator Deb Fischer, Ex-Officio Member
Chancellor Lewis Ferebee, Ex-Officio Member
Speaker Mike Johnson, Ex-Officio Member
Secretary Robert F. Kennedy, Jr., Ex-Officio Member
Representative Michael McCaul, Ex-Officio Member
Robert Newlen, Ex-Officio Member
Secretary Marco Rubio, Ex-Officio Member
Leader Chuck Schumer, Ex-Officio Member
Leader John Thune, Ex-Officio Member
Billie Tsien, Ex-Officio Member

**STAFF PRESENT:**

Donna Arduin, Chief Financial Officer
Ary Boltansky, Education Grants Manager
Ben Dransfield, Unified Communications Manager
JoEllen Dinges, Associate General Counsel
Bronagh Donlon, Vice President of Special Events
Laura Hagan, Associate General Counsel
Laura Hanley, Director of Special Projects
Joe LaFauci, Vice President of Board Relations and Protocol
Lydia Makande, Associate General Counsel
Allie Marvin, Director of PR for institution
Bob Sellappan, Chief Information Officer
Taylor Strand, Director of Protocol
Sarah Weingast, Associate General Counsel

**ALSO PRESENT:**

Secretary Howard Lutnick, U.S. Secretary of Commerce
Ashley Davis, Vice Chair, National Symphony Orchestra
Darin Buchalter, Chief Executive Officer, Delta Consulting Group
John Cracraft, JLL Project Principal

## I. Call to Order

Jennifer Fischer

The annual meeting was called to order at 10:42 a.m. ET, held virtually via Zoom. A quorum of the Board of Trustees was confirmed to be present.

## II. Approval of Prior Meeting Minutes

Jennifer Fischer

A motion was called to approve the minutes of the June 11, 2026 Board of Trustees meeting.

Representative Rick Larsen noted several typographical errors for staff to correct, and further noted that the formal name of the subcommittee that dealt with the reconciliation bill (referenced on p. 8) was stated improperly. Rep. Larsen advised that the correct formal name is the Subcommittee on Economic Development, Public Buildings, and Emergency Management, and that he would provide the correction to Mr. LaFauci. Vice Chair Fischer accepted the corrections.

**Motion:** by John Falconetti
**Second: by Rick Larsen**
**Vote:** Motion carried by show of hands, 25 in favor, none opposed, one abstention (Ms. Gross). The minutes of the June 11, 2026 meeting were approved as amended.

The minutes were further amended later in the meeting on the motion of Senator Whitehouse. See Item IV.

## III. Election of Officers

Joe LaFauci

Mr. LaFauci advised the Board that, per the Bylaws, the annual meeting requires the election of officers, and that the Nominating and Governance Committee had met two days earlier, on Tuesday, August 11, 2026, to consider the slate.

General Counsel Elliot Berke observed that it would be recommended for the slate to be moved by a member of the Board who was not on the slate. Ms. Fischer confirmed that, as one of the officers, she could not bring the slate forward. Mr. Berke clarified that it is preferred to move the slate as a whole, rather than office by office.

At the request of Representative Larsen, the slate was read in full:

| Office | Nominee | |
|---|---|---|
| Chairman | President Donald J. Trump | Re-election |
| Vice Chair | Jennifer Fischer | Re-election |
| Treasurer | John Falconetti | Re-election |
| General Counsel | Elliot Berke | Re-election |
| Secretary | Brian Ballard | New — succeeding Sergio Gor |

Representative Joyce Beatty asked whether there would be time for nominations from the floor, and whether other nominations had been submitted. Pamella Roland DeVos, chair of the Nominating and Governance Committee, responded that the Committee had largely carried forward the prior term's

slate, that some new names had been put forward, and that the slate presented reflected the Committee's decision. Mr. LaFauci added that the Committee is appointed by the Chair not less than thirty days prior to the annual Board meeting. Representative Beatty indicated that she accepted that answer.

Secretary Lutnick stated that although it was not the ordinary process, the Board was open to nominations from the floor, and invited any member wishing to nominate an alternative candidate to do so. No nominations were made from the floor.

Ambassador Sergio Gor raised a point of clarification, asking whether the members of Congress serving on the Board are voting members. Representative Beatty noted that they had voted in the last meeting as well. Vice Chair Fischer confirmed that they are.

**Motion: by Mindy Levine**
**Second:** Made from the floor
**Vote:** Motion carried by voice vote, 23 in favor, 3 opposed. Representative Beatty, Representative Larsen and Senator Whitehouse were recorded in opposition. The slate was elected.

## IV. Amendment to the June 11, 2026 Minutes — Senator Sheldon Whitehouse

Senator Whitehouse, who had joined the meeting after the minutes were approved, asked to return to the earlier item in order to have his amendment considered.

Senator Whitehouse advised the Board that the minutes contain a reference to a comment he had made: that the measure voted upon at the previous meeting neither creates nor funds any entity — and that proposed amendatory text had been circulated to Senator Whitehouse's office in advance through staff. Mr. Berke confirmed, as counsel, that the Senator's statement of the matter was correct.

The amendment revises page 9 of the June 11, 2026 minutes to read as follows:

> "Senator Whitehouse noted that the actual operative language of the resolution neither creates nor approves a fund, which counsel confirmed. The resolution says we will abide by the law and by court orders."

**Motion: by** Senator Sheldon Whitehouse, Ex-Officio Member
**Second: by Hannah Buchan**
**Vote:** Motion carried by voice vote. None opposed. One abstention: Pamela Gross

## V. Litigation Update — Elliot Berke

Mr. Berke advised the Board at the outset that he would not address legal strategy, for reasons of privilege, and that nothing in his report constituted a waiver of privilege. He confirmed that no decisions regarding the litigation, and no actions taken at this meeting, are made without consultation with outside counsel. Mr. Berke noted that a litigant in one of the matters is a member of the Board.

Mr. Berke reported on three principal matters:

**1. Beatty v. Trump** The Center has appealed a ruling concerning the name and concerning the right of ex officio members to vote. Under the court's order, ex officio members may presently vote; that ruling

is now on appeal. The Center did not appeal the ruling concerning closure, and that litigation continues; the Board's vote on the renovation at this meeting will determine the next stage. A joint status report is due within five days of this meeting, and in any event by August 20, 2026. The Department of Justice takes the position that the preliminary injunction must be formally dissolved before any decision regarding the renovation can take effect, and that process will begin following the vote. This will not prevent the National Symphony Orchestra from announcing and proceeding with its plans for off-site performance.

**2. DC Preservation League v. Board of Trustees of the John F. Kennedy Center for the Performing Arts.** An answer has been filed and counsel are required to file a report every ninety days. There is no injunction in this matter; the process is going forward. Mr. Berke expressed confidence in the outcome.

**3. The Washington National Opera v. U.S.** An extension of time to answer has been granted and the answer is now due October 13, 2026. It is being drafted together with the Center's counterclaims. The case is filed in the Court of Federal Claims, which permits the Department of Justice to represent the Center.

Senator Whitehouse asked Mr. Berke to address a further matter concerning Mr. Chuck Redd, who had cancelled a Christmas Eve performance, and the attorney's fees judgment entered against the Center. Mr. Berke reported that the Center had brought litigation against Mr. Redd, that in his view the case was not well advised given that the performance was free and the compensation to the artist relatively small, and that the Center lost. Under applicable anti-SLAPP provisions. the Center has been ordered to pay Mr. Redd's attorney's fees in the amount of $250,000. That award will be appealed, as the amount is outrageous; Center's own costs in the matter were less than ten percent of that sum.

Mr. Berke estimated the cost of appeal to be approximately $10,000 to $15,000, which he considered a bargain measured against the fees charged by Mr. Redd's counsel.

Senator Whitehouse asked that the Center examine the performance of its outside counsel in that matter, stating that deadlines had been repeatedly missed and page limits ignored, characterizing the handling of the litigation as amateurish, and stating that the Kennedy Center deserves better. He asked whether the Center was reviewing whether that firm would be retained again, and further asked for an explanation of why the firm had been retained in the first instance and who had selected it. Mr. Berke confirmed that the selection is under review, and responded that the field had been canvassed to identify counsel thought to be well suited to bring the case.

Secretary Lutnick stated that the Board will clearly review that selection and its outcome, that he agreed with the concerns raised, and that the Center will be much more considered and precise in how it proceeds going forward.

## VI. Buildings and Grounds — Independent Assessment — Hannah Buchan / Darin Buchalter

Ms. Buchan reported that the Buildings and Grounds Committee had held several meetings reviewing the options to be presented — whether to leave the building partially open, or to close it and operate from the REACH with the National Symphony Orchestra performing off campus. Ms. Buchan advised

that the Committee had spent considerable time reviewing the materials from JLL and having discussions with Darin Buchalter. She believes there is a clear path forward with regard to efficiency and cost savings with the partial closure. Secretary Lutnick stated that the Center hired two experts to do a complete analysis – JLL and Delta Consulting. JLL's full Project Plan of approximately 130 pages had been sent to every Member; Delta's report is being finalized and the Center asked him to do an executive summary of his findings and recommendations..

Secretary Lutnick noted that the Center as a whole will not close. The REACH is new and will stay open and will continue to program. Secretary Lutnick met with the National Symphony Orchestra which remains fully committed to the Center and the Center remains fully committed to them. The NSO is a national treasure. Secretary Lutnick noted that we are only talking about the main building and how to renovate it. Secretary Lutnick pointed out that at the Mark Twain Awards, the air conditioning failed in the morning and the executive staff had to make it work. Secretary Lutnick closed his remarks by observing that the building needs massive renovations, and that JLL and Delta had no dog in the hunt and were hired to do a full, independent analysis with no preconceived notions.

The meeting was then turned over to Darin Buchalter, CEO of the Delta Consulting Group

**Qualifications and Scope of Engagement**

Mr. Buchalter described a thirty-six year career as a board advisor and expert witness in the real estate and construction industry, including testimony in federal courts and arbitral forums worldwide and before the Ninth Circuit. Delta Consulting Group has provided advisory services internationally for twenty-six years and employs 180 personnel, largely accounting, valuation and engineering professionals. He noted the firm's involvement with high-visibility sites in Washington, D.C., including Capitol Hill, the Senate and House office buildings and the Library of Congress, and a client relationship with the Architect of the Capitol spanning more than ten years.

Delta was engaged to independently assess the construction program and identify the most effective path forward for the repair and renovation of the Center while balancing operations and mission. The analysis relied on the JLL 2026 Comprehensive Project Development Plan and the 2021 DLR Comprehensive Building Plan, supplemented by Delta's own site tours alongside on-site project managers, interviews with finance, programming and operations staff, and briefings with Board committees. Mr. Buchalter emphasized that Delta had no prior involvement with the Center and no preconceived notion as to the proper path forward.

**The Two Scenarios**

Delta evaluated each scenario against the priority of work, schedule impacts, capital cost against the fixed appropriation, operating expense implications, and the implications for the Center's long-term mission. Delta thinks about the project as "What is priority of Work" It's a fixed appropriation, going to spend it on certain improvements. Question is What are operating Costs? Take into consideration long-term mission.

Operate and partially renovate means continuing to operate main building. The REACH continues to operate under either scenario.

Mr. Buchalter stated that the state of disrepair of the Center is significant and that the remedy will necessarily be invasive, and that the JLL report, the prior evidence, the site visits and the invasive testing currently underway all show rapidly accelerating deterioration. He further stated that these conditions "instantly challenging" to consider how the Center can continue to operate during the planned construction activities.

**Operate and partially renovate.** The complexity of construction would be severe, requiring that patrons, workmen and equipment be safely channeled so that they never meet, producing an invasive visitor experience. We would have to expect having equipment on various decks, temporary entrances; a very invasive, frankly unpleaseant experience for someone visiting the Center. Costs more and takes longer. The $257 million appropriation would cover only approximately half of the work. Delta prioritized utilities — the entirety of the mechanical, electrical and plumbing systems, which are antiquated and in disrepair. In thirty-six years, Mr. Buchalter has only seen one electrical room that looks like the electrical room at the Center. Once the utilities work is completed (cost $225M) , there would be insufficient funds (shortfall of $124M) to complete the structural renovation and no remaining funds at all for venue improvement. Revenues would be expected to decline, a compression Delta believes is already visible in year-over-year revenue decline because of uncertainty and friction; would expect that to continue. The main building does not segment well, gravitating around a core rather than separable wings; on a four-year assumption, approximately a third of the building would have to be closed at any given time, reducing programming space by a third (to allow for equipment etc). That's additional revenue degredation. The capital program would be underfunded by as much as half, while the Center runs a meaningful operating deficit, directing fundraising toward the deficit and capital gaps rather than toward an endowment.

**Close the main building.** The $257 million appropriation covers most of the program. Escalating the 2021 study to present-day dollars yields approximately $285 million; the resulting $30 million difference could be addressed through value engineering, modest fundraising, or scope adjustment. Executing over a certain two-year period rather than an uncertain four-year period produces a dramatically different exposure to cost escalation and a different level of safety. Delta believes operating costs can be curtailed. The Center can build excitement around the reopening. By leveraging the REACH and thinking about its mission, we can ensure it keeps the mandate during shutdown. Mr. Buchalter advised that he had been involved in renovation of Carnegie Libraries, so he understands the cultural mandate. The partial closure would be a much more virtuous use of fundraising dollars.

### Recommendation

Mr. Buchalter stated Delta's recommendation to close the main building and renovate, as the most efficient, economical and safest way to maximize permanent capital improvements while maintaining mission continuity and the memorial experience.

## VII. Board Discussion

Jennifer Fischer

### Cost Comparison

Secretary Lutnick asked Mr. Buchalter to confirm whether a four-year phased approach would cost approximately $500 million, with additional annual fundraising requirements, producing a comparison figure of $600 to $650 million. Mr. Buchalter confirmed the characterization, stating that the Board would either have to raise $300 million plus a $70 to $80 million annual deficit for four years, or raise the $80 million annual deficit while cutting the scope of work in half.

**Materials and Process**

Representative Beatty stated that her packet contained only two PowerPoint slides, received two days prior, and asked whether other trustees had received the detailed materials referenced in the presentation. She noted the difficulty of digesting the volume of material within a one-hour meeting and stated that if a vote were to be called, she would need more time.

Mr. LaFauci confirmed that a 180-page PDF had been distributed to all Board members on the Tuesday prior to the meeting. Secretary Lutnick clarified that two separate documents were involved: the JLL report, running approximately 130 pages, distributed to every Board member; and the Delta report, prepared at a summary level, Delta's full report of roughly 100 pages not having been distributed because it was repetitive of the same analysis. He emphasized that JLL and Delta worked independently, with no predetermined outcome.

Secretary Lutnick further stated that the REACH will remain open and programming will continue, that the memorial will be moved to the REACH, and that the only question before the Board is whether the renovation of the main building proceeds in stages or as a single concentrated effort. He cited the Chairman's record as a builder, referenced donated materials including steel for the ballroom and a donated air conditioning system, and stated that the Chairman is willing to complete the work for $257 million in two years and has agreed to seek to raise the endowment. He stated that the Center has lost approximately $100 million per year in operations for the last decade against approximately $85 million per year in fundraising, for a net loss of $15 million.

Representative Beatty responded that she had received the JLL materials but not the full Delta report, that she has never argued the need for renovations, and that she was seeking clarity on the meaning of "partial" and on how programming would continue, in order to be sure the Board was not putting the cart before the horse with respect to what the litigation required.

Secretary Lutnick responded that the litigation made clear that the Board should conduct a full and complete analysis, and reiterated that the Center will not close and will not stop programming. It will move the memorial to the REACH for the interim period. The question for the Board is it will cost twice as much and twice as long if you do it in parts: do we hit the whole building for $257 million or do we do it in phases which will cost $500 million? Secretary Lutnick noted President Trump has agreed to seek to raise the endowment ; he’s the best fundraiser in the world.

Representative Beatty stated that she never argued the need for renovation. She clarified that she had received the 100 page JLL report; she did not receive the Delta report other than the two PowerPoint slides.

At Rep. Beatty's request, Mr. Buchalter clarified the meaning of ‘partial’ - the most focused way to think of it is whether it is best to close the main building for a focused two year period for renovation or to rotate areas of the building over a four year period, sectioning off areas to do work. He reiterated the safety concerns of the public having access to the main building under construction. Trustee Andrea Wynn spoke in support of closing the main building while making use of the REACH.

**Report Reconciliation, Operating Deficit and the NSO**

Representative Larsen stated that he was not prepared to endorse characterizations of the Chairman as the greatest builder or fundraiser, citing cost overruns on the ballroom construction and delays to transit projects, but added that he did not consider the point relevant to the Board's discussion.

Rep. Larsen asked how the 2021 DLR report had been used relative to the 2026 JLL report. Mr. Buchalter responded that Delta aligned the two reports and found no notable change in scope; the real issues existed in 2021 and exist in 2026, with continuing deterioration. Delta treats the 2021 study as the cost baseline, escalated to present-day dollars, producing the $285 million figure. The JLL report's value lies in its detailed examination of individual building components, which allowed Delta to prioritize utilities over structure and over venue improvements.

Rep. Larsen asked whether the $78 million operating deficit was tied strictly to the four-year analysis and asked if there was an operating deficit associated with the two-year analysis. Mr. Buchalter responded that there is an operating deficit analysis associated with the two-year scenario, reflecting scaled programming and overhead including orchestra touring, and that over the two-year period Delta believes the deficit is relatively de minimis, as summarized on the sources-and-uses slide.

Rep. Larsen requested a document memorializing the NSO's commitment to the Center. Vice Chair Fischer responded that an affiliate agreement has been in effect since 1986 and remains fully in effect, and that amending it requires three-quarters of the Kennedy Center Board and three-quarters of the NSO Board.

Ashley Davis, Vice Chair of the National Symphony Orchestra, confirmed that the NSO is eager to continue as part of the Kennedy Center and is looking forward to announcing its season, and that the commitment is in writing through the affiliate agreement. Ms. Davis reported that no musicians have left over the past two years. Vice Chair Fischer noted the success of the NSO's summer season at Wolf Trap.

**Request for Pro Forma Financials**

Senator Whitehouse requested pro forma financials for the two-year period during which the JLL project would proceed, on a REACH-operating-only basis, summarizing his request in six points:

1. A REACH-operating-only scenario for the two-year period.
2. Forward-looking revenue and operating expense projections, noting that the falloff in revenues described by Mr. Buchalter is not reflected in figures reaching back into 2024.
3. A risk and range analysis of necessary capital expense under best-case and worst-case plausible scenarios.
4. An assessment of restoring the Center's performance capability, a number of acts having been unwilling to perform there.

5. The obligations reflected in the NSO agreement.
6. Any reportable prospect of an endowment.

Senator Whitehouse characterized these as baseline requirements for a decision of this kind, and noted that the authorizing committee would have to approve any shortfall.

Vice Chair Fischer responded that the pro formas are important and have been the subject of extensive internal discussion, but that costs escalate and money is lost each day a decision is deferred. She noted that programming at the REACH is limited by the size of those facilities, but that the REACH will produce savings with the symphony by accommodating rehearsals and equipment storage, and will house the John F. Kennedy memorial, relocated from the third floor, allowing public access at all hours. She also drew the Board's attention to the condition of the parking garage.

**Report of the Chief Financial Officer**

At Secretary Lutnick's request, Chief Financial Officer Donna Arduin gave a report on the Center's financials.

Vice Chair Fischer stated that a decision on when and how to renovate must precede the building of reopening programming.

## VIII. Board Action — Resolution Regarding Closure of the Main Building

John Falconetti

Treasurer Falconetti, stating that he did not wish to limit discussion, advised the Board that a resolution had been prepared for its consideration and asked that the General Counsel read it to the Board. General Counsel Berke read the resolution aloud while it was displayed to the Board. The resolution, as executed, provides as follows:

**RESOLUTION OF THE BOARD OF TRUSTEES**
**OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**

WHEREAS, the Board of Trustees has engaged the services of Delta Consulting Group, an internationally recognized leader in project advisory services, risk mitigation, and construction planning and management, to provide an independent and objective analysis of the Center's options to address decades of physical neglect and deferred maintenance;

WHEREAS, the two options for the renovation and restoration presented to the Buildings and Grounds Committee, and then to the full Board, included either a closure of the main building

with continued programming in the REACH and offsite or a phased renovation while programming continues throughout the Center;

WHEREAS, Delta Consulting Group conducted a thorough review of the costs and benefits of each option, and reported its findings through an oral presentation:

WHEREAS, Delta Consulting Group's findings, reflected in its report and in the Minutes, demonstrate that the risks and costs of a phased renovation and restoration so greatly outweigh any potential benefit that the only viable safe and fiscally prudent course is to shut down the Center's main building entirely during construction;

WHEREAS, Delta Consulting Group's findings will be memorialized for the Board and will be submitted as part of any court record;

WHERAS, the Board has also reviewed the Comprehensive Project Development Plan dated June 8, 2026 and anticipates further updates consistent with it.

WHEREAS, the Board is fully committed to its statutory and fiduciary obligations to maintain the Center as the Nation's Cultural Center, to maintain public access to the Memorial to John F. Kennedy, to maintain the historic and architecturally significant nature of the Center's main building, and to continue to present arts and educational programming during construction; and

WHEREAS, the Board believes that continuing its artistic and educational programming at the Center's performing arts facilities in the REACH, maintaining the memorial to President Kennedy for public access, and through its partnership with the National Symphony Orchestra, supporting those performances offsite, as well as other signature artistic productions offsite including but not limited to the Kennedy Center Honors and the Mark Twain Prize for American Humor, allows the Kennedy Center to perform its statutory mandate while the main building and theaters are closed for renovation;

IT IS HEREBY RESOLVED that the John F. Kennedy Center for the Performing Arts shall continue to present educational and artistic programming at the REACH; that the Center shall continue its partnership with and support of the National Symphony Orchestra in performances at off-site venues; that the Center shall continue signature artistic productions offsite including but not limited to the Kennedy Center Honors and the Mark Twain Prize for American Humor; that the Memorial to President John F. Kennedy be temporarily relocated to the REACH where it will remain open to the public; and that, based on technical assessments and expert opinions confirming the necessity of a closure, the main building be closed to the public for restoration

and renovation in line with Delta Consulting Group expert opinion as well as the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto.

IT IS FURTHER RESOLVED that the Executive Director and Chief Operating Officer shall undertake all legal means to effectuate the Board's direction in this matter, including by seeking to dissolve the preliminary injunction, entered in *Beatty v. Trump*, No. 25-cv-4480 (D.D.C.), currently preventing closure of the main building of the Kennedy Center for construction.

**Motion:** John Falconetti, Treasurer

**Second:** Not recorded

**Vote:** Motion carried by roll call, 23 in favor, 3 opposed. Representative Beatty, Representative Larsen and Senator Whitehouse were recorded in opposition.

**Roll call — appointed members**

| Trustee | Vote | Trustee | Vote |
|---|---|---|---|
| Brian Ballard | Yes | Mindy Levine | Yes |
| Maria Bartiromo | Yes | Lynda Lomangino | Yes |
| Pamela Bondi | Yes *(by email)* | Barbara Long | Absent |
| Mary Helen Bowers | Yes | Allison Lutnick | Yes |
| Hannah Buchan | Yes | Douglas Manchester | Yes *(by email)* |
| Bob Castellani | Yes | Laurie Perlmutter | Yes |
| Elaine Chao | Absent | Catherine B. Reynolds | Present, not voting |
| Pamella Roland DeVos | Yes | Denise Saul | Yes |
| Patricia Duggan | Yes *(by email)* | Dan Scavino | Absent |
| John Falconetti | Yes | Cheri Summerall | Absent |
| Emilia Fanjul | Absent | Susie Wiles | Yes *(relayed)* |
| Jennifer Fischer | Yes | Andrea Wynn | Yes |
| Lynn Friess | Yes | Paolo Zampolli | Yes |
| Alma Gildenhorn | Absent | President Donald J. Trump | Yes *(relayed)* |
| Sergio Gor | Yes | | |
| Lee Greenwood | Absent | | |
| Pamela Gross | Yes | | |
| Kate Haselwood | Yes | | |

| Trustee | Vote | Trustee | Vote |
|---|---|---|---|
| Laura Ingraham | Yes | | |
| Dana Kraft | Present, not voting | | |

**Roll call — ex-officio members**

| Member | Vote |
|---|---|
| Representative Joyce Beatty | No |
| Representative Rick Larsen | No |
| Senator Sheldon Whitehouse | No |

All remaining ex-officio members were called and were absent.

Trustees in attendance who experienced technical difficulties during the roll call subsequently recorded their votes by email, each in the affirmative: Pam Bondi, Mr. Manchester and Ms. Duggan, whose connection was lost while travelling. During the roll call, Secretary Lutnick advised the Board that both Ms. Wiles and the Chairman had contacted him directly and asked that their votes be recorded in the affirmative. Trustee Denise Saul noted that her name had not been called; Mr. LaFauci confirmed that her vote was recorded in the affirmative.

## IX. Discussion Following the Vote

Jennifer Fischer

Secretary Lutnick addressed the three members who had voted in the negative, asking whether their position was that the Center should remain open and renovate over four years, or whether they lacked sufficient information, stating that his objective was for the Board to reach agreement.

Representative Larsen responded that he had received and read everything sent to him, but that the materials addressed the two-year scenario and that the Board did not have the full four-year analysis. He noted that, as a member of Congress serving on the relevant committees, he and his colleagues would be accountable for any future appropriations. Rep. Larsen stated that the trustees had taken a vote, the majority had prevailed, and the discussion was concluded, and offered to speak with Secretary Lutnick separately.

Secretary Lutnick stated that he would like to speak separately with each member who voted in the negative. Senator Whitehouse agreed to speak separately and reiterated that the pro forma he had requested was elementary.

Representative Beatty stated that her position reflected a combination of the concerns raised by Rep. Larsen and Senator Whitehouse, that it was difficult for her — as a member of Congress, a board member, and a businessperson — to make a decision of this magnitude in this manner, and that the matter appeared to have been predetermined. She stated that she agreed the renovations are needed and that she was willing to have offline discussions; but this seems predetermined and exaggerated. The

Center held the Mark Twain Prize despite the conditions. She does not believe other members read it all or understood it and that it was predetermined.

Trustee Mindy Levine stated that obstacles have been put in place that preclude communication among trustees, and that the pending litigation has created hesitancy on both sides. She said that no one had contacted her to discuss concerns and that she had received only an email directing the preservation of documents, and urged that lines of communication be opened. She has respect for Representative Beatty and she knows they can find common ground.

Representative Beatty responded that she has undertaken such efforts, noting that she sat next to Ms. Levine at the in-person Board meeting and discussed these matters, that she has taken the tour, spoken with staff, and personally contacted the Center's prior administrative officer to arrange a tour. She observed that communication is a two-way street and acknowledged that Vice Chair Fischer had reached out to her. Vice Chair Fischer responded that everyone wants to say we've made good decisions.

Secretary Lutnick reflected on the due-diligence process and on his approximately twenty-two years of involvement with the Kennedy Center, and committed to reaching out to Rep. Beatty and others.

## X. Board Action — Resolution Recognizing the Chairman

Brian Ballard

Secretary Lutnick introduced a discussion regarding recognition of the Chairman, stating that if the Chairman is to complete the renovation in two years for $257 million, and has further committed to help raise money to endow the institution, it is appropriate that he be recognized. It is important to President Trump that if he's going to put his time and effort into the building and fundraising, that he be recognized. Secretary Lutnick stated that the name on the exterior of the building will remain the John F. Kennedy Memorial Center for the Performing Arts. Secretary Lutnick would like to talk about recognizing President Trump for renovating and restoring the building; also if he raises $100 million to endow, the Center would recognize the Trump Kennedy Center Fund.

Representative Larsen asked if the Board was going to be faced with a resolution to vote on immediately, stating that the renovation had not yet occurred and he had seen no endowment figure, and that if a resolution were brought forward at this meeting he would vote against it. Senator Whitehouse raised a procedural objection, noting that the item was not on the agenda and had not been raised by a member of the Board, and urged that it be handled through regular order. Vice Chair Fischer clarified that the item was framed as a discussion and not yet a vote.

Secretary Ballard asked whether the Board had voted unanimously at the previous meeting to establish an endowment fund. Senator Whitehouse and Vice Chair Fischer both responded that it had not; the earlier vote recognized the Chairman's contribution toward raising the $257 million and did not establish a fund.

Representative Beatty noted that Congress had appropriated the funds; and observed from long experience on the Board that the Center has always had to approach Congress and has never received the full amount needed. She stated that she had no objection to recognizing the Chairman inside the

building, but opposed any change to the exterior name, which she regarded as unlawful given the governing statute and the pending litigation. Ambassador Gor responded that he had been present when the Chairman personally lobbied senators to increase Kennedy Center funding, and argued that this merited recognition. Representative Beatty responded that she had no objection to recognizing the Chairman's role, but opposed doing so by changing the exterior name.

**Remarks of the Chairman**

Secretary Lutnick advised the Board that the Chairman wished to address the meeting, and the Board invited him to do so. President Trump addressed the Board at length, commenting on prior management and spending at the Center, the condition of the building including the parking structure, and the White House ballroom project, which he described as on time, under budget and privately funded. He responded to earlier comments by Rep. Larsen and Senator Whitehouse, described improvements in Washington, D.C., and stated his commitment to complete the renovation within two years with the building closed, and to reopen it in a substantially improved condition.

**Resolution**

Secretary Ballard brought forward a resolution that the Center recognize the Chairman for his contributions, and asked that it be displayed. General Counsel Berke read the resolution aloud. The resolution, as executed, provides as follows:

**RESOLUTION OF THE BOARD OF TRUSTEES**
**OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**

WHEREAS, the John F. Kennedy Center for the Performing Arts (“Center”) is currently experiencing decades of physical neglect and deferred maintenance that have resulted in significant degradation to the structure of the facility;

WHEREAS, the Center has been in dire need of funding for both the physical plant and the programming mission, historically losing $100M per year;

WHEREAS, President Donald J. Trump is successfully engaging in fundraising efforts, already raising hundreds of millions of dollars for the Center, both in appropriated funds and private funds, and bringing the Center back from the brink of disaster by overseeing an extensive restoration and renovation;

WHEREAS, the Center would be in financial ruin without President Trump’s unique stature as both an unparalleled fundraiser and world-class developer, and it is due to President Trump’s position as the head of the Center that both financial backers and Congress have been willing to, and remain willing to, support the Center to prevent financial ruin;

IT IS HEREBY RESOLVED that the Center desires to recognize and honor President Trump's current and future existential and unprecedented contributions to the survival of the Center by all legal means, in any or all of the following ways:

FIRST, the Center desires to honor the President's contributions, current and future, with an inscribed recognition on the building, below the name of the Center, as follows:

**The John F. Kennedy Memorial Center for the Performing Arts**
**renovated and restored by**
**President Donald J. Trump**

SECOND, the Center desires to further recognize the President's contributions, current and future, upon the endowment of the Trump Kennedy Center Fund reaching $100M, with an inscribed recognition on or in the building, below the name of the Center, once the $100M threshold is met, as follows:

**The John F. Kennedy Memorial Center for the Performing Arts**
**renovated and restored by**
**President Donald J. Trump**
**endowed by**
**The Trump Kennedy Center Fund**

THIRD, the Center desires to name the physical site and grounds upon which the Center sits, which are not named in the governing statutes, the "President Donald J. Trump Plaza."

IT IS FURTHER RESOLVED, that the Executive Director and Chief Operating Officer shall undertake all legal means to effectuate such recognition after fourteen (14) days from the date of the adoption of this resolution.

Secretary Ballard explained that the intent was to honor the Chairman for the $250 million raised and for the future fundraising needed to keep the Center open.

Representative Beatty asked whether the resolution complies with the statute governing the Center, which restricts inscriptions and plaques to specified exceptions, stating that she had no objection to recognition after an endowment is raised, nor to the naming of the plaza, but sought clarity. General Counsel Berke responded that he could not get into privileged conversations, but that we would not be moving forward with a resolution that DOJ did not think was legally defensible. In consultation with outside counsel at the Department of Justice and with the Office of Management and Budget, the position is that the proposed recognition does not constitute a memorial or a plaque in the nature of a memorial within the meaning of the statute.

Senator Whitehouse raised a further procedural objection, noting that the item was not on the agenda, had not been circulated in advance, and that the Board had received assurances rather than a formal

written legal opinion. Mr. Berke responded that, in consultation with the Department of Justice as outside counsel, the resolution is considered legally defensible. Mr. Berke reiterated that nothing should constitute a waiver of attorney/client privilege. Secretary Lutnick stated that if the court were to disagree, the Board would not execute it, confirming that the Center will not proceed unless it is within legal parameters and that this is the purpose of the fourteen-day period

Trustee Mindy Levine asked whether the Center had in fact obtained an advisory opinion from the Department of Justice. Representative Beatty stated that she would vote against the resolution, having been advised that it may not be in compliance, and that revisiting the matter after fourteen days does not resolve that concern. Mr. Berke reiterated that our position is that this resolution will not violate the injunction currently in place.

Vice Chair Fischer asked whether Secretary Lutnick's remarks were being added to Secretary Ballard's motion or whether the Board was voting on the original motion. Mr. Berke clarified that the fourteen-day provision is already contained in the resolution text. Mr. Ballard called for the vote.

**Motion:** Brian Ballard, Secretary
**Second: John Falconetti**
**Vote:** Motion carried by roll call, 20 in favor, 3 opposed. Representative Beatty, Representative Larsen and Senator Whitehouse were recorded in opposition.

**Roll call — appointed members**

| Trustee | Vote | Trustee | Vote |
|---|---|---|---|
| Brian Ballard | Yes | Mindy Levine | Yes |
| Maria Bartiromo | Present, not voting | Lynda Lomangino | Yes |
| Pamela Bondi | Yes *(by email)* | Barbara Long | Absent |
| Mary Helen Bowers | Yes | Allison Lutnick | Yes |
| Hannah Buchan | Yes | Douglas Manchester | Yes *(by email)* |
| Bob Castellani | Yes | Laurie Perlmutter | Yes |
| Elaine Chao | Absent | Catherine B. Reynolds | Present, not voting |
| Pamella Roland DeVos | Yes | Denise Saul | Yes |
| Patricia Duggan | Yes *(by email)* | Dan Scavino | Absent |
| John Falconetti | Yes | Cheri Summerall | Absent |
| Emilia Fanjul | Absent | Susie Wiles | Yes *(relayed)* |
| Jennifer Fischer | Yes | Andrea Wynn | Yes |
| Lynn Friess | Yes | Paolo Zampolli | Yes |
| Alma Gildenhorn | Absent | President Donald J. Trump | Yes *(relayed)* |
| Sergio Gor | Yes | | |
| Lee Greenwood | Absent | | |

| Trustee | Vote | Trustee | Vote |
|---|---|---|---|
| Pamela Gross | Yes | | |
| Kate Haselwood | Yes | | |
| Laura Ingraham | Present, not voting | | |
| Dana Kraft | Present, not voting | | |

**Roll call — ex-officio members**

| Member | Vote |
|---|---|
| Representative Joyce Beatty | No |
| Representative Rick Larsen | No |
| Senator Sheldon Whitehouse | No |

Trustees in attendance who experienced technical difficulties during the roll call subsequently recorded their votes by email, each in the affirmative: Ms. Bondi, Mr. Manchester and Ms. Duggan. The tally above is as announced at the meeting.

## XI. Other Business — Mindy Levine

Trustee Levine raised a matter for future meetings, asking for clarification between an "executive session" and an "executive committee" meeting. She stated that she had been excluded from the executive session at the previous meeting, that she still did not have access to what took place, and that under Robert's Rules the terminology should be used precisely so that members are not unnecessarily excluded.

General Counsel Berke clarified that an executive committee had been called at the previous meeting, and that Secretary Lutnick had referenced that executive sessions are normally warranted for every board meeting, but that the Board never in fact moved into an executive session and no executive committee meeting was held. Mr. Berke confirmed that the Center will be precise in its use of these terms going forward. Vice Chair Fischer thanked Ms. Levine for raising the matter.

Trustee Paolo Zampolli addressed the Board, observing that the building is fifty-five years old, is deteriorating and is not safe, that the Board has now voted, and that the Center should move forward.

## XII. Adjournment — Jennifer Fischer

Vice Chair Fischer thanked the trustees for their time, thanked Secretary Lutnick for his participation, and thanked the Chairman for making time to join the meeting. There being no further business, a motion to adjourn was made and seconded.

**Motion:** Jennifer Fischer, Vice Chair
**Second:** Ambassador Sergio Gor, and from the floor

**Vote:** Motion carried. The meeting was adjourned at 1:07 p.m. ET.

____________________________________

Brian Ballard, Secretary

____________________________________

Date

# LaFauci Dep. Ex. 8

# The Kennedy Center

**BOARD OF TRUSTEES | SPECIAL MEETING AGENDA**

Tuesday, September 15, 2026 | 12:30 P.M. Eastern Time

*Virtual Convening via Zoom (Access Link Provided to Members)*

**1. Call to Order**

**2. Approval of Minutes**

**3. Facility Conditions & Capital Renovations**

**4. Financial Position**

**5. Consideration of Formal Recognition Protocols**

**6. Adjournment**

**EXHIBIT**

**LaFauci Exhibit 8**

**MEMORANDUM**

**TO:** The Board of Trustees, The John F. Kennedy Center for the Performing Arts

**FROM:** Matt Floca, Executive Director and Chief Operating Officer

**DATE:** September 12, 2026

**SUBJECT:** Grand Foyer Incident and Supplemental Information Regarding Facility Conditions

Members of the Board of Trustees:

This memorandum is provided for the Board's information. It documents a recent life-safety incident in the Grand Foyer, summarizes preliminary observations and relevant findings from the independent assessment previously made available to the Board, and describes interim measures undertaken to protect occupants and preserve the facility.

On September 4, 2026, during a severe regional storm, a section of ceiling plaster detached and fell in the Grand Foyer near the Hall of Nations entrance. The fallen section measured approximately four feet by five feet and one inch thick and fell from an estimated height of 60 feet. The incident created a large debris field across the Grand Foyer, near the Concert Hall main entrance. No injuries were reported.

Management immediately secured the affected location, restricted access to the Grand Foyer, initiated safety surveys, and began further condition assessment. Preliminary field observations indicate that water infiltration associated with the Terrace Level low-roof overhang may have contributed to the failure. Final cause-and-origin findings remain subject to ongoing engineering and forensic review.

Initial surveys have identified at least seven additional Grand Foyer ceiling locations with visible water-related deterioration and conditions like those observed at the failure location. The Grand Foyer remains closed as necessary while assessment, monitoring, and stabilization measures continue.

A September 3, 2026, soffit-panel assessment identified widespread corrosion and deterioration affecting components that support exterior soffit panels around the building perimeter. Water testing revealed active leakage at all tested roof scupper drains, directly driving this deterioration. Of approximately half of the 278 panels observed, 46 exhibited severe corrosion and 93 exhibited mild-to-moderate corrosion, leading engineers to project that one-third of all panels require immediate replacement. Because these heavy assemblies are suspended approximately 60 feet above the plaza level, the engineering team concluded that continued deterioration presents an active falling-object and life-safety hazard in areas regularly occupied by the public.

Management has also restricted public access to the River Plaza and select perimeter areas beneath or adjacent to exterior soffit assemblies. These precautionary measures are intended to reduce exposure to potential falling-object hazards while engineering assessment, monitoring, and stabilization activities proceed.

The Grand Foyer incident and the perimeter soffit panel assessment are consistent with broader facility-condition concerns identified in the engineering materials previously made available to the Board. Management is coordinating with qualified engineers, specialty contractors, risk-management professionals, insurers, counsel, and other appropriate stakeholders. Immediate efforts are focused on life safety, area security, condition monitoring, incident documentation, and development of appropriate stabilization recommendations.

To facilitate decisive action, two draft resolutions have been prepared for Board review: one authorizing the necessary facility closure and capital renovation sequence, and the second establishing related institutional recognition protocols.

In total, the following materials are attached for the Board's information:

- **Attachment 1:** Video Report of Current Building Conditions
- **Attachment 2:** Grand Foyer Incident Photographic Log
- **Attachment 3:** Written Executive Summary of Building Conditions
- **Attachment 4:** Draft Board Resolutions for Consideration

I look forward to discussing these materials and answering your questions during our meeting on Tuesday, September 15, at 12:30 PM.

Sincerely,

Matt Floca
Executive Director and Chief Operating Officer
The John F. Kennedy Center for the Performing Arts

## TRANSMITTAL & REVIEW ROADMAP

This briefing packet compiles executive, forensic, photographic, and parliamentary documentation regarding building conditions and life-safety priorities across the campus. Trustees are encouraged to review these materials in the sequenced order below prior to our convening:

**Primary Action Document**

- **Executive Memorandum**
  - *Summary:* Formally notifies the Board of an acute life-safety incident in the Grand Foyer, summarizes preliminary findings from independent engineering reviews, outlines immediate precautionary closures, and frames the governance actions before the Board.

**Attachment 1: Executive Forensic Video Report**

- **Video Report of Current Building Conditions**
  - *Media Format:* High-Definition Digital Overview (Access Link & Password Provided)
  - *Summary:* A 4.5-minute forensic walkthrough inspecting eight critical hazard zones, including the exterior low-roof soffit deterioration, parking garage shoring, high-voltage vaults, central chiller plant, and backstage rigging systems.

**Attachment 2: Incident Field Survey**

- **Grand Foyer Incident Photographic Log (September 4, 2026)**
  - *Summary:* High-resolution forensic documentation of the ceiling failure outside the Hall of Nations entrance, illustrating the 4x5-foot ceiling void, 1-inch plaster thickness, 60-foot fall height, 25-foot measured debris field, and seven additional water-damaged ceiling locations.

**Attachment 3: Technical Briefing & Financial Analysis**

- **Written Executive Summary of Building Conditions**
  - *Summary:* A comprehensive synthesis of independent architectural and structural engineering evaluations to be reviewed alongside Delta's forensic and independent analysis.

**Attachment 4: Legislative Docket**

- **Draft Board Resolutions for Consideration**
  - *Summary:* Actionable governance instruments prepared for formal review and floor action during the September 15 meeting:
    - **Resolution 1 (Renovation):** Draft resolution authorizing comprehensive improvements.
    - **Resolution 2 (Recognition):** Resolution establishing formal and institutional recognition.

**Attachment 1: Video Report of Current Building Conditions**

Link:

https://jfkcpa-my.sharepoint.com/:f:/g/personal/multimediaonedrive_kennedy-center_org/IgAORRh3WMwzSoISetPg17A-AdRJsV8zCuwuCZKIPW9LGQw?e=WxoEmK

Password:

Potomac123

**Attachment 2: Grand Foyer Incident Photographic Log**




September 4th Damage
25 Feet


September 4th Damage
~4 Feet
~5 Feet


September 4th Damage
KLEIN TOOLS
25FT


September 4th Damage


Additional Grand Foyer Damage


Additional Grand Foyer Damage


Additional Grand Foyer Damage


Additional Grand Foyer Damage


Additional Grand Foyer Damage

**Attachment 3: Written Executive Summary of Building Conditions**

# The Kennedy Center




*Figure 1*

# Table of Contents


Executive Summary ..... 3

Purpose and Scope ..... 3

Bottom Line Up Front ..... 3

Key Physical Conditions by System ..... 4

Section 1 Summary – Exterior Soffit Panels and Structural Failures ..... 5

Section 2 Summary – Parking Garage Structural Deficiencies ..... 6

Section 3 Summary – Service Tunnel Water Intrusion ..... 7

Section 4 Summary – High Voltage Electrical Substations ..... 8

Section 5 Summary – Mechanical, Electrical and Plumbing Systems ..... 9

Section 6 Summary – Theatrical and Production Infrastructure ..... 10

Detailed Physical Conditions by System ..... 11

Section 1 Details – Exterior Soffit Panels and Structural Failures ..... 12

Section 2 Details – Parking Garage Structural Deficiencies ..... 16

Section 3 Details – Service Tunnel Water Intrusion ..... 19

Section 4 Details – High Voltage Electrical Substations ..... 23

Section 5 Details – Mechanical, Electrical and Plumbing Systems ..... 24

Section 6 Details – Theatrical and Production Infrastructure ..... 29

Financial Context ..... 32

Appendix A – Source Documents Reviewed ..... 34

Appendix B – Referenced Photographic Documentation ..... 36

# Executive Summary

## Purpose and Scope

This Executive Building Condition Report compiles findings from multiple independent architectural, structural, and engineering assessments conducted across the Kennedy Center campus between 2020 and 2026, including Delta's independent assessment previously made available to the Board on August 31, 2026. Its purpose is to provide executive leadership and project stakeholders with an objective overview of the facility's critical physical defects, life-safety compliance liabilities, and aging utility infrastructure.

## Bottom Line Up Front

The Kennedy Center is facing serious, worsening structural and safety problems that put visitors, performers, and staff in real danger. Outside engineering experts classify several of these issues as "High Priority," warning that they need immediate repair to keep the building safe. These are not minor maintenance chores or distant risks; they are long-standing, documented problems that have steadily worsened over years, and in some cases decades, creating dangerous conditions that can no longer be deferred.

Overhead, chronic roof leaks and failed drainage systems have caused widespread corrosion across the facility's 278 outer roof panels, with engineers projecting that one-third require immediate replacement to prevent 2,500-pound ceiling sections from collapsing 60 feet onto the walkways below. In the below-grade parking garage, unimpeded water leaks have rusted through key steel beams. Since 2021, temporary support systems have been installed as a band-aid just to keep concrete decks from collapsing onto driving lanes. Backstage, counterweight systems across major theaters depend on seizing pulley blocks and worn rope locks that may no longer safely hold out-of-balance loads. At the same time, missing technical infrastructure forces crews to tie off live overhead equipment to unrated pedestrian handrails directly over cast and crew. In the service tunnel, water constantly leaks into high-voltage electrical rooms, creating serious risks of fire, electrical explosion, and building-wide blackouts. Yet these critical failures illustrate only a fraction of the campus-wide risks the Kennedy Center faces under continued deferred maintenance. Crucially, none of these hazards exist in isolation.

Because key structural assemblies, primary evacuation routes, high-voltage electrical vaults, and central heating and cooling systems operate as interconnected networks, they cannot be isolated room by room for localized repairs. Required capital remediation demands large-scale utility blackouts, extensive structural demolition, and overhead construction directly above primary public entrance halls, carrying out these repairs directly impacts the ability to safely occupy the building. At the same time, ticket sales and earned revenue have fallen while operating deficits have grown, leaving the institution with no financial cushion to handle sudden emergency breakdowns.

A continued lack of prioritization and attention to the physical upkeep of the campus dramatically increases the chance of a disastrous failure, like the December 2022 soffit panel collapse, posing an unacceptable, life-threatening risk to the public and staff.

# Key Physical Conditions by System

## Section 1 Summary – Exterior Soffit Panels and Structural Failures

Engineers project that one-third of the facility's 278 outer roof panels suffer from severe corrosion and require immediate replacement, driven by roof scupper drains that completely failed water testing. Replacing these 2,500-pound ceiling assemblies, fixing cracked concrete decks, and replacing the roof cannot safely occur while visitors and staff walk 60 feet below.



Figure 2

Video Link: September 3, 2026 Water Test of Low Roof Scupper Drain

Password: Potomac123

## Section 2 Summary – Parking Garage Structural Deficiencies

Key steel girders in the garage have lost over a third of their strength to rust, while overhead concrete is crumbling onto driving aisles due to water intrusion. Crews cannot repair failing structural steel and concrete, reapply fireproofing, or install and remove temporary shoring braces while patrons and vehicles are actively using the garage.



*Figure 3*

## Section 3 Summary – Service Tunnel Water Intrusion

Stopping major water intrusion into the underground Service Tunnel will require lengthy closures to the main entrances directly above. Because most of the building's 44 emergency stairwells lead directly into these areas, closing them eliminates primary evacuation routes.



*Figure 4*



*Figure 5*

## Section 4 Summary – High Voltage Electrical Substations

Constant water leaks into high voltage electrical substations violate national safety codes, creating serious risks of electrical explosions, arc flash, and fire. Because workers cannot safely patch leaks or replace equipment around live high-voltage cables, fixing these rooms requires shutting down the power to more than half of the campus for extended periods of time.



*Figure 6*

## Section 5 Summary – Mechanical, Electrical and Plumbing Systems

Decades-old electrical switchboards and main power cables are failing safety tests, while central air conditioning and piping systems have exceeded their useful lifespans. Because these systems lack local isolation capabilities, replacing end-of-life infrastructure forces rolling and whole-building blackouts that make public occupancy unreasonable.



*Figure 7*



*Figure 8*

## Section 6 Summary – Theatrical and Production Infrastructure

Overhead stage rigging relies on unrated hardware, damaged batten trusses, and outdated safety gear that violate ANSI and OSHA standards. Replacing line sets and stage fire curtains require prolonged blackouts and heavy overhead work zones that cannot occur while the theaters remain active.



*Figure 9*



*Figure 10*

# Detailed Physical Conditions by System

## Section 1 Details – Exterior Soffit Panels and Structural Failures

**The December 2022 Failure**

The failure was discovered on December 15, 2022, by Kennedy Center staff during or soon after a heavy rain event, when water was seen flowing down the face of the marble-clad exterior wall in the vicinity of a displaced soffit at the northwest corner of the building, underside of the roof terrace canopy overhang. (2022 Field Report, p. 1–2)

Wire ties failed in approximately half of the displaced panel, resulting in an approximately 8-inch vertical deflection at one corner of the panel; the remaining, intact wire ties appeared corroded. The adjacent panel had deflected approximately 2 inches at its corner. (2022 Field Report, p. 1–2)

The contributing causes identified by Walter P Moore are (1) corrosion and section loss from water infiltration or condensation; (2) cyclic fatigue in the wire bends over more than 50 years; (3) abrasion from channel flange edges and concrete planks above; and (4) added load from water accumulation and saturation of the panels. (2022 Field Report, p. 3)

The two deflected panels, potentially weighing over 2,500 lbs each, were at risk of separating further from the structure and becoming a falling hazard. Therefore, immediate emergency shoring and public-access barricades were recommended and subsequently installed. (2022 Field Report, p. 2–3)

**Root Cause – Leaking Scupper and Roof Drains**

Every investigation phase, from the initial 2022 field report through the 2024 leak investigation, ties the soffit's wire-tie corrosion back to water entering through the roof-level scupper and corner drains above the panels (2024 Leak Investigation Report High-Priority finding GG-H3).

An active leak in the vicinity of the drain above the failed soffit panel had been observed for several years. Walter P Moore's roof review found ponding of water in multiple areas and deteriorated flashing and TPO membrane in the vicinity of the scupper drain at the northwest corner. (2022 Field Report, p. 2, 6)

A 2024 borescope-level inspection at Panel 114 found a scupper drain on the north elevation, with staining present on the steel structure below the drain, direct visual evidence linking a specific scupper to corrosion of the steel that supports the soffit panels. (Borescope Report, p. 2)

The 2024 Leak Investigation Report concluded that standing water at the TPO roof surface is believed to be connected to the leaks observed from the soffit panel seams below, and that moisture intrusion reported in the interstitial space below may also be connected to corrosion of the soffit panel steel support wires at the northwest corner. Walter P Moore recommended investigating the TPO roof corner drains from the drain undersides to locate potential leaks. (2024 Leak Investigation Report, p. 41–42)

The leak log recorded 8 separate leaks at the roof terrace overhang between 2019 and 2023 — a multi-year, recurring drainage failure at the same location, not a single isolated incident. (2024 Leak Investigation Report, p. 8, 41)

**2026 Confirmation: The Same Failure Mechanism Elsewhere in the Building**
A June 2026 LiDAR scan and a follow-up borescope investigation, both conducted for the ongoing Renewal Project, found that the corrosion and displacement pattern responsible for the 2022 collapse is present at numerous additional locations around the building's full perimeter of 136 outboard soffit panels. Note there are 278 total plaster soffit panels around the perimeter of the building, consisting of 136 outboard panels and 142 inboard panels across the four elevations: West Elevation: 90 panels (45 outboard, 45 inboard); North Elevation: 46 panels (23 outboard, 23 inboard); East Elevation: 96 panels (45 outboard, 51 inboard); South Elevation: 46 panels (23 outboard, 23 inboard).

LiDAR analysis identified five distinct perimeter areas (southwest corner, west elevation, northwest corner, north elevation, east elevation) with 2–4 inches of panel-joint displacement, characterized as consistent with the early stages of the wire-tie distress mechanism previously observed in the 2022 failure. (LiDAR Analysis, p. 4–5)

Borescope probing documented active corrosion at ten or more numbered panels (including Panels 83, 93, 109, 127, 129, 153, 159, 160, 167, and 172), plus a fractured/displaced marble fascia stone and multiple cracked panels. (Borescope Report, p. 2)

One area (gridlines 21–23/D–E) remains barricaded by facilities staff to prevent public access due to concerns of panel displacements. (LiDAR Analysis, p. 4)

As of June 2026, the Center's structural engineer issued a standing safety notice restricting all access to the soffit interstitial space to trained, tied-off personnel due to ongoing structural integrity concerns. (Kennedy Center Renewal Project Monthly Report, June 2026, p. 6)

**July 2026 Update: Load-Bearing Analysis and Confined-Space Classification**
HITT Contracting completed the below-soffit exploratory investigation on July 20, 2026. Following this field review, Walter P Moore analyzed the load capacity of the concrete planks in the west area and, on July 24, 2026, determined the load capacity is acceptable to support limited personnel, though the interstitial space itself has now been formally classified as a confined space and will require a minimum of three personnel (SPRAT-trained) working with continuous tie-offs every 6 feet. This confirms that any personnel access requires a trained multi-person crew and fall protection, consistent with an active life-safety hazard rather than routine maintenance conditions.

Sources: 2022-12-23 WPM Field Report on Kennedy Center Soffit Failure; Walter P Moore Soffit Borescope Investigation Field Observation Report; Walter P Moore Soffit Panel LiDAR Analysis; Walter P Moore Roof Terrace Canopy Field Investigation Work Plan; 2024 Leak

Investigation Report; Master CIP Summary Sheets; Kennedy Center Renewal Project Monthly Report, June 2026 and July 2026.

### September 2026 Comprehensive Engineering Assessment (Walter P Moore Draft Findings)

On September 3, 2026, Walter P Moore issued a draft Soffit Panel Assessment. While maintained as an engineering draft pending final photo log and field-note compilation, the report presents conclusive, campus-wide findings that substantiate the severity and systemic nature of the soffit failure mechanism across the entire facility perimeter.

The assessment evaluated the structural supports across approximately half of the Kennedy Center's 278 total plaster soffit panels using LiDAR scanning, elevated-lift borescope probes, interior drone flights, physical test cuts through the panel undersides, and ASTM D5957 flood testing of all overhead drains. Key findings include:

> Of the panels where structural components could be observed, 46 panels exhibited severe structural corrosion and 93 exhibited mild-to-moderate corrosion. Only four observed panels showed no signs of corrosion. Extrapolating these surveyed conditions across the entire 278-panel perimeter, Walter P Moore projects that one-third of all soffit panels campus-wide are experiencing severe corrosion and require immediate replacement, with nearly all remaining panels actively degrading.
>
> ASTM water testing revealed that 100% of the scupper drains on the low TPO roof leaked immediately during testing, saturating the interstitial space and causing active ponding on top of the soffit panels. Multiple terrace and planter drains also failed flood testing, actively leaking through concrete cracks into the ceiling cavities below.
>
> The engineering analysis determined that corrosion is not limited to discrete roof leaks. It is accelerated by a broken thermal enclosure: missing and deteriorated insulation allows humid interior air and outdoor air to freely enter the unconditioned interstitial space, continuously wetting the thin 20- and 24-gauge cold-formed steel channels, wire ties, and metal lath with condensation. This humidity is so severe that metal lath installed during the emergency repairs just three years ago (2023) already exhibits uniform surface corrosion.
>
> In addition to active wire-tie section loss, the structural report documented cracked plaster panels, displaced marble fascia stones, loose and disconnected hanger rods, and heavy debris loads (discarded equipment, makeshift sheet-metal drip pans, and sodden insulation) sitting directly on the unreinforced panel tops. Suspended 60 feet above primary public sidewalks and entrance plazas, the continuing degradation of these 2,500-pound assemblies constitutes an active, building-wide falling hazard.

Based on the systemic distribution of the distress, Walter P Moore concluded that localized patching is non-viable and recommended a complete, four-part capital renewal:

Completely replace all 278 plaster soffit panels and their underlying cold-formed steel framing and wire-tie suspension assemblies with hot-dip galvanized or stainless-steel systems.

Completely reconstruct the vertical interstitial enclosure and thermal barrier to eliminate vapor drive and prevent interior condensation.

Replace all TPO roof membranes, scupper drains, terrace waterproofing, and planter membranes, incorporating engineered expansion details across structural double-beam joints.

Sound, test, and execute concrete spall and crack repairs across the underside of the overhead terrace and planter decks.

Walter P Moore emphasized that because the new soffits cannot survive in a wet or humid environment, all overhead roofing, drainage, and enclosure repairs must precede or occur concurrently with panel replacement, work that requires extensive high-reach staging and overhead demolition over the building's primary pedestrian plazas.

## Section 2 Details – Parking Garage Structural Deficiencies

The parking garage occupies multiple below- and at-grade levels beneath the building and plaza. Structural assessments conducted for the Renewal Project identify active corrosion of structural steel and reinforcing, spalled concrete, and failed protective systems at several locations, two of which are rated High Priority (Delta Report Part 2, pp. 7–9; Master CIP Summary Sheets).

**Independently Documented Deficiencies**
Corroded structural steel girders and beams at garage expansion joints, with section loss visible on exposed steel; concrete encasement around steel members is cracked and, in places, has spalled away entirely. (Delta Report Part 2, p. 7–9)

Failed fireproofing on structural steel in multiple garage bays, removing a required layer of life-safety protection in the event of a vehicle or equipment fire. (Delta Report Part 2, p. 8)

Failed gutters and downspouts at expansion joints are allowing water to continue draining directly onto structural steel and reinforced concrete rather than being carried away, perpetuating the corrosion cycle. (Delta Report Part 2, p. 9)

Two garage-related conditions, GG-H1 (expansion joint steel corrosion) and GG-H2 (fireproofing and gutter failure), are both classified High Priority in the Center's facility condition tracking system. (Delta Report Part 2, p. 7, 9)

**September 2022 Field Investigation – Full Three-Level Assessment**
A September 23, 2022, Walter P Moore field investigation report, broader in scope than the expansion-joint findings above, surveyed all three garage levels (A, B, and C), the loading docks, service drive, and entry tunnel, and included non-destructive steel testing and concrete material testing. This report predates the Delta Report findings by roughly two years and shows that garage deterioration was already present, and independently measured, at that time.

Ultrasonic thickness testing at eight structural steel locations found measured section loss ranging from 0% to as much as 39% at one location (an unidentified I-shape seat at Level A plaza soffit, gridline C.5/15.9), compared against original 1966 design drawings or AISC reference thicknesses. (2022 WPM Parking Garage Field Investigation Report, p. 16)

Large areas of delaminated spray-applied fireproofing and isolated steel corrosion were observed at the structural steel plate girders supporting the cantilevered portion of the garage/plaza deck over Rock Creek Parkway, along the east elevation. (2022 WPM Parking Garage Field Investigation Report, p. 5)

Vertical hanger rods connecting steel spandrel beams, which support the cantilevered plaza and Level A slab edges, to the exterior precast wall were observed bent or deflected at most locations, indicating they may not be engaged or under tension as originally designed. (2022 WPM Parking Garage Field Investigation Report, p. 6)

At Loading Docks 1 and 2, service drive, and entry tunnel, the report documents significant ongoing water infiltration from the plaza/street level above, including standing water in the service tunnel and between Loading Docks 1 and 2, and overhead concrete spalling assessed to correspond to plaza fountains and planter boxes above. (2022 WPM Parking Garage Field Investigation Report, p. 10)

A July 21, 2022 Walter P Moore memorandum, referenced in this report, found overhead slab soffit delamination and spalling at Loading Dock 1 to be a potential overhead falling hazard and recommended shutting down the drive lanes above until temporary reinforcing of the plaza level was installed. (2022 WPM Parking Garage Field Investigation Report, p. 10)

Concrete material testing (compressive strength, chloride content, and petrographic analysis) of extracted floor slab cores at Levels A and B found the concrete itself in generally good condition, compressive strengths of 4,610–7,480 psi, with no petrographic evidence of freeze-thaw damage and no chloride levels indicating active corrosion of embedded reinforcing steel at the time of testing. The steel section loss and other distress documented above relate to protective-coating failure and expansion-joint water intrusion rather than to a deficiency in the concrete material itself. (2022 WPM Parking Garage Field Investigation Report, p. 18–22)

The report's scope was limited to vehicle-accessible areas and excluded the REACH building, finished interior areas, stair towers, and mechanical rooms entirely. By its own terms it was a field-investigation phase only, with a pending comprehensive report anticipated in the coming months after September 2022 — an early data point in what is now a multi-year documented deterioration history for the garage structure. (2022 WPM Parking Garage Field Investigation Report, p. 1, 3)

Sources: Delta Report Part 2 (Structural Findings); Delta Report Part 3 (FY2026 Capital Project Justifications); Master CIP Summary Sheets; Walter P Moore Parking Garage Structure Field Investigation Report, September 23, 2022.

**River Plaza Steel**

The River Plaza (also referred to in program documents as the "West Plaza") is supported by a structural steel frame that also carries the garage and building envelope described above. The same expansion-joint corrosion previously documented extends into the plaza-level steel.

Structural steel girders and beams beneath the River Plaza are actively corroding at expansion joints GG-H1 and GG-H2, the same High Priority findings referenced above, with cracked concrete encasement and failed fireproofing exposing bare steel to continued water contact. (Delta Report Part 2, p. 7–9)

The plaza's columns, visually prominent architectural features at the river-facing façade, have been confirmed to be structural steel columns, not purely decorative elements. (Delta Report Part 2, p. 22)

Walter P Moore's guidance is that structural repair will likely be required if corrosion has caused more than ten percent of section loss. Section-loss measurement at each column was recommended as part of the closure-phase investigative scope. (Delta Report Part 2, p. 22)

As of July 2026, three perimeter/interior columns were added to the investigation scope; a Walter P Moore borescope review found that the primary steel appears in good condition with no significant corrosion observed, though uncertainty remains around concealed sill plates that require more extensive demolition to access. (Kennedy Center Renewal Project Monthly Report, July 2026)

Sources: Delta Report Part 2 (Structural Findings, expansion joints and gold column assessment); Kennedy Center Renewal Project Monthly Report, July 2026 (column borescope update).

## Section 3 Details – Service Tunnel Water Intrusion

The Service Tunnel runs the entire length of the East/Welcome Plaza and serves as the primary thoroughfare for all facility operations, logistics, and back-of-house activity. Situated directly within the below-grade garage structure, this critical corridor connects Loading Dock 1, located beneath the Hall of States, and Loading Dock 2, located beneath the Hall of Nations. Directly above this operational artery sit two grand entrance halls, which serve as the Kennedy Center's primary public access points and principal means of egress. In an evacuation, the entrance halls receive discharge from the vast majority of the building's 21 primary and 23 secondary emergency stairwells rather than routing patrons directly to the exterior.

**What the Records Show**

The entrance halls sit directly above critical below-grade mechanical, electrical, and structural spaces that are suffering from active, severe water intrusion (addressed in Section 2 for garage and plaza steel, and Section 4 for high-voltage vaults). Remediating these foundational leaks is impossible without deep, intrusive surface excavation at the building's primary pedestrian level (Delta Report Part 1, p. 258).

Internal planning records explicitly recognize the physical impossibility of keeping the facility open during this work. Board discussion materials detailing the closure plan confirm that the Hall of States entrance plaza, the primary threshold "where the patrons enter", must be completely torn up down to the structural slab to execute necessary waterproofing and structural repairs (Board Meeting Minutes, March 16, 2026, as reproduced in Delta Report Part 1, p. 258). Because this work demolishes the facility's main public gateway and severs the primary discharge routes for dozens of required emergency stairwells, operating the building while these repairs occur is both a logistical and life-safety non-starter.

**Garage Structural Findings – Loading Dock 1 (Hall of States) and Loading Dock 2 (Hall of Nations)**

Walter P Moore's parking garage structural program, the September 2022 field investigation cited in Section 2, a follow-on Concept Solutions and Assessment Report dated October 25, 2022, and a Limited Plaza Slab Investigations addendum dated August 7, 2023, documents the plaza-level slab structure directly above both loading docks.

**Loading Dock 1 (Below the Hall of States)**

The October 2022 assessment identified a significant area of plaza slab soffit deterioration directly above Loading Dock 1, with more than 50% of the soffit area in the affected zone delaminated and some concrete debris already fallen; heavy corrosion of the bottom reinforcing bars was also observed. Because the top surface of the slab was covered by plaza overburden, its condition could not be determined visually at that time. (2022 WPM Garage Concept Solutions and Assessment Report, pp. 4, 8; 2023 WPM Addendum 1, p. 2)

Walter P Moore recommended temporary shoring and closing the area above to vehicular traffic until repairs were completed; reinforcing work began in November 2022. Per WPM's

structural drawing notes, that temporary reinforcing is valid for only one year from installation, after which the area either needs to be closed again or requires periodic monitoring by a licensed structural engineer. (2022 WPM Garage Concept Solutions and Assessment Report, pp. 8, 15)

Follow-on testing in 2023 (two test pits; concrete cores C1 and C2) found little to no delamination at the top surface of the structural slab, and a compressive strength of about 7,500 psi, above the 3,000 psi original design strength. However, carbonation at core C1 reached as deep as 1 inch from the slab's bottom surface, beyond the ¾-inch concrete cover specified in the original design drawings, which may accelerate corrosion of the primary reinforcement. Chloride content at both test locations remained below the threshold associated with accelerated reinforcement corrosion. (2023 WPM Addendum 1, pp. 3–4)

Both test pits, one over each loading dock, showed a steady flow of water ponding almost immediately after being pumped dry, indicating the structural slab is not sloped sufficiently for drainage at either location. The plaza waterproofing membrane was rated Fair to Good and generally well-adhered at both locations, but with localized adhesive failure at lap joints identified as a possible path for water intrusion at both. (2023 WPM Addendum 1, pp. 2–3, Photos 1–2)

Based on this testing, Walter P Moore's 2023 conceptual repair recommendation narrowed the scope from the 2022 report's preliminary assumption of full-depth slab and overburden replacement to a partial-depth repair: removing and replacing the bottom 2 to 3 inches of soffit concrete in the affected area, with the remainder of the slab assessed as likely in good condition. (2023 WPM Addendum 1, pp. 3–4)

**Loading Dock 2 (Below the Hall of Nations)**

The October 2022 assessment documented four slab dropdown locations, marked as "tree pits" on the original 1966 structural drawings, directly above Loading Dock 2, with portions of the concrete demolished, cut and exposed reinforcement, and exposed bituminous waterproofing on the vertical faces. The record does not establish whether these earlier modifications were reviewed by a licensed structural engineer. (2022 WPM Garage Concept Solutions and Assessment Report, p. 10)

2023 testing at Loading Dock 2 (concrete core C3) found chloride content below the accelerated-corrosion threshold and no gross deterioration mechanisms, generally consistent with Loading Dock 1, though carbonation and delamination were both comparatively lower. The test pit above Loading Dock 2 also showed standing water ponding and the same localized waterproofing lap-joint adhesive failure observed at Loading Dock 1. Loading Dock 2 did not receive the same tree-pit-specific destructive testing or repair scoping that Loading Dock 1 received. (2023 WPM Addendum 1, pp. 2–4)

**Plaza-Level Expansion Joints – Active Temporary Shoring**

Separately from the Loading Dock findings above, the 2024 Walter P Moore leak investigation documents active, unresolved water intrusion at expansion joints located at the intersections of the north and south plazas, directly tied to the same below-grade water-intrusion pattern affecting the halls and service tunnel. Facilities staff report that this deterioration has already required temporary structural intervention.

A High-Priority finding (GG-H4) traces water leaking from a south plaza planter, through the expansion joint, down through the A-Level parking garage, into the B-level south switchgear room, the same electrical room referenced in Section 4 (see also Section 2). (2024 Leak Investigation Report, p. 6, 173, 322–330)

A related Medium Priority finding (GG-M1) at the Welcome Pavilion stair/south plaza planter documents water reaching the A-Level MEP room and B-level parking garage from one of several unresolved candidate sources, including the same planter expansion joint. (2024 Leak Investigation Report, p. 542–556)

A system of braces and scaffolding is currently installed at the south plaza expansion joint, located beneath many of the north plaza planter boxes, to hold up the concrete deck above an active vehicle-traffic area of the parking garage, pending permanent repair (December 6, 2021 Walter P Moore field observation report).

**Assessment**

The documented conditions beneath both entrance halls reveal compromised structural elements directly supporting primary public egress zones:

Loading Dock 1 (Beneath Hall of States): Following an initial 2022 assessment that identified severe concrete soffit deterioration and active rebar corrosion, temporary shoring was installed under an explicit, non-permanent structural limitation note restricting its service life to just one year. Although subsequent 2023 destructive testing narrowed the scope to a partial-depth concrete repair, this shoring remains in place as an active, overdue structural liability beneath the facility's busiest patron entrance.

Loading Dock 2 (Beneath Hall of Nations): Conditions here present an unverified structural life-safety risk: four tree-pit slab dropdowns exhibit cut reinforcing steel and compromised waterproofing membranes, with no engineering records to confirm that these modifications were ever evaluated or approved by a licensed structural engineer. Furthermore, Loading Dock 2 has never undergone the destructive structural testing performed at Dock 1, leaving its true structural load-bearing capacity unknown.

Unresolved Water Ponding & Lap-Joint Failures: Both loading docks suffer from chronic, standing water ponding and failed waterproofing lap joints. These active leaks

bypass the proposed partial-depth repairs for Loading Dock 1 and operate independently of the separate expansion-joint shoring described in Section 3.

Taken together, these loading dock defects and the plaza-level expansion joint failures demonstrate that water intrusion beneath the halls is not a localized nuisance, but a systemic, interconnected structural breakdown spanning the Center's primary delivery artery, high-voltage electrical vaults, and main public evacuation paths (see also Sections 2 and 4). Executing the structural concrete repairs, slab waterproofing, and tree-pit reconstruction required to correct these hazards cannot be achieved while simultaneously routing patron traffic, logistics deliveries, and emergency egress through the spaces immediately above and below.

Sources: Delta Report Part 1 (Life Safety / Egress Review); Board Meeting Minutes, March 16, 2026; Walter P Moore Kennedy Center Parking Garage Concept Solutions and Assessment Report, October 25, 2022; Walter P Moore Addendum 1 to Concept Solutions and Assessment Report (Limited Plaza Slab Investigations), August 7, 2023; 2024 Leak Investigation Report (GG-H4, GG-M1); 2021-12-06 Walter P Moore Field Observation Report, JFKC Level A Floor Slab Shoring Installation; Facilities staff observation, August 2026.

## Section 4 Details – High Voltage Electrical Substations

The building's below-grade transformer vaults, switchgear rooms, and generator vault provide primary electrical service to the entire facility. These spaces have a documented, multi-decade history of water intrusion that is directly affecting live electrical equipment.

**Documented Conditions**

Many of the walls and slabs in the transformer vaults are saturated, with visible efflorescence, cracking, and corroding reinforcing steel, a condition surveyors trace back through building records for decades. (2020 Comprehensive Building Plan, p. 49)

The Renewal Project's Comprehensive Project Delivery Plan states current vault conditions are inconsistent with the National Electrical Code and OSHA's electrical safety standards, citing NFPA 70 §110.11 (deteriorating equipment) and 29 CFR §1910.303(b)(6) (electrical equipment guarding). (Delta Report Part 1, p. 33)

A switchgear room is actively leaking (GG-H4) and the transformer vault/generator room shows cracking and spalling (GG-H5); both findings are classified High Priority. (Delta Report Part 2, p. 11–12)

At one vault, standard interior crack-injection repair is not considered a safe option: high voltage cables that cannot be moved or turned off prevent crack injection at the negative side of the wall, meaning repair crews cannot access the leak from the interior without a live-electrical-contact hazard. (Delta Report Part 2, p. 12)

**Why This Matters**

Water intrusion into energized electrical vaults is not a passive maintenance issue, it is an acute life-safety hazard. Active moisture in these spaces carries an immediate risk of catastrophic arc flash, equipment explosion, and emergency building-wide blackouts. The code-compliance language in the Comprehensive Project Delivery Plan demonstrates that the Center's own capital program team recognizes this condition as far more than physical deterioration: it is an ongoing regulatory violation under NFPA and OSHA standards that creates unacceptable operational and legal liabilities for the Kennedy Center.

Sources: 2020 Comprehensive Building Plan; Delta Report Part 1 (Code Compliance Review); Delta Report Part 2 (Structural Findings).

## Section 5 Details – Mechanical, Electrical and Plumbing Systems

Mechanical, electrical, and plumbing (MEP) infrastructure, including the River Pump Room condenser water system and, separately, the electrical vault conditions documented in Section 4, are under active third-party review as part of the Renewal Project. WB Engineers+Consultants presented a facility-wide MEP feasibility study to Kennedy Center, JLL, and ATSR staff on August 27, 2026, and subsequently issued a full MEP Feasibility Study report (Revision 1, dated August 28, 2026). This section reflects findings from the presentation, meeting minutes and report.

**River Pump Room – Condenser Water Intake and Pumping System**

The River Pump Room houses the intake screens, pumps, and control valves for the Potomac River-based condenser water system that has cooled the building's central HVAC plant, approximately 3,200 tons of chiller capacity, since original construction in the 1970s. This equipment is the same condenser water system addressed in the WB Engineers+Consultants feasibility study referenced throughout this section.

The system suffered a complete operational failure in the summer of 2018 when accumulated river sediment fouled the intake and pumping equipment, interrupting cooling capacity during the performance season. (2020 Comprehensive Building Plan, p. 55)

Current isolation and bypass valves have surpassed their life expectancy and do not fully close, meaning the system cannot be reliably isolated for maintenance or emergency repair without a larger shutdown. (Plumbing System Report, p. 18)

The Renewal Project team states continued deterioration affects the facility's ability to maintain climate control during critical performance periods, i.e., a repeat failure risks an HVAC outage during a live performance. (Delta Report Part 3, p. 66)

Sources: 2020 Comprehensive Building Plan; Plumbing System Condition Report; Delta Report Part 3 (FY2026 Capital Project Justifications); Master CIP Summary Sheets.

**Feasibility Study Findings (Revision 1, Aug. 28, 2026)**

On August 28, 2026, WB Engineers+Consultants issued a comprehensive MEP Feasibility Study evaluating the facility's central plant, electrical distribution, and life-safety systems. The study identified extensive code non-compliance, failing distribution components, and unverified structural elements that severely compromise emergency operations and reliable power delivery:

> Calculated voltage drop to Reach electrical panels exceeds the 5% code limit (NEC 215.2(A)(1)(b) / 210.19(A)) on two of four feeder paths – measured at 7.4% and 5.1%, against a 3.9%–3.4% range on the two compliant paths. (WB Feasibility Study, p. 24)
>
> Original aluminum feeder conductors between network buses and switchboards are reportedly failing Megger insulation-resistance testing, indicating active insulation breakdown. (WB Feasibility Study, p. 24)

The existing emergency-generator feed arrangement is not a code-compliant installation under NEC 700.10(B)(5), which requires emergency loads to be isolated from legally required and optional standby loads; two life-safety panels may also be serving non-life-safety loads. (WB Feasibility Study, p. 25)

An August 6, 2026 generator load test recorded a 41.6% instantaneous demand on the existing unit. WB's load calculation – incorporating code-compliant emergency lighting, base elevator demand, and UPS/CRAC loads – determined that a replacement generator sized near 1,000 kW (1 MW) is required simply to support current baseline emergency loads. Sizing the unit up to 1,250 kW is necessary to accommodate the additional six elevators requested to be added to emergency power. (WB Feasibility Study, p. 26)

The most recent Short-Circuit/Coordination/Arc-Flash (SCCAF) study is 17 years old (2009); WB recommends renewal every 5 years, and it has not been confirmed whether panelboards that study identified as overdutied, or a coordination gap on the generator output breaker, have since been remediated. (WB Feasibility Study, p. 24, 26)

Of the building's 14 Automatic Transfer Switches, 6 are rated Good, 6 Fair, and 2 Poor; only one unit combines good condition with the correct 4-pole neutral configuration. WB recommends replacing 9 of the 14 as part of the generator project. (WB Feasibility Study, p. 18, 52)

The structural condition of the river water intake basin (walls, slabs, embedded components) has never been assessed; WB formally recommends engaging a structural engineer to evaluate it. (WB Feasibility Study, p. 22–23, 61)

**Existing Electrical System Risk**

The facility's primary electrical distribution network lacks modern isolation and safety redundancy, meaning that maintenance on any single component cascades into widespread utility outages:

There are no disconnects between substations and switchboards, meaning building shutdowns are required to isolate downstream equipment; there is currently no space to add downstream disconnects. (WB Engineers+Consultants MEP Feasibility Presentation, Aug. 27, 2026, p. 21)

Emergency loads may need separate handling under the current electrical configuration. (WB Engineers+Consultants MEP Feasibility Presentation, p. 21)

Automatic transfer switches (ATS) have documented condition-related and grounding-related deficiencies. (WB Engineers+Consultants MEP Feasibility Presentation, p. 29)

Generator load testing found that of the building's four elevator banks (32 elevators total), only three banks can run simultaneously on emergency power under the existing generator. (WB MEP Feasibility Presentation – Meeting Minutes, Aug. 27, 2026, p. 2)

**Equipment Age and Service-Life Summary**
The feasibility study documents the age and condition of major MEP equipment, much of which is at or beyond typical industry service-life benchmarks.

| Equipment | Age / Install Date | Status |
|---|---|---|
| Centrifugal chillers (4 units) | Installed 1995, ~31 years old | Exceeded ASHRAE-recommended useful life; effective lifespan significantly reduced because the condenser filtration system has been non-operational since 1996 |
| River water traveling screen | Original, ~60 years in place | Non-operational since 1996; full replacement recommended |
| Service entrance switchboards (majority of 26 total) | Manufactured 1968/1969 | Almost 20 years past expected useful life |
| Switchboard "TT" | Manufactured 1978 | ~10 years past expected useful life |
| Switchboard SH-LC-3B (NEW) | Manufactured 2002 | Only switchboard not recommended for replacement |
| Diesel fire pump | Installed 1989; rebuilt 2017 | Fair operating condition |
| Emergency diesel generator | Manufactured 2001 (~25 years old) | Nearing end of expected useful life; undersized for current/requested loads |
| Automatic Transfer Switches (14 units) | Mixed ages/manufacturers | 6 Good, 6 Fair, 2 Poor; 9 of 14 recommended for replacement |

Sources: WB Feasibility Study, pp. 10, 17–19, 22–24, 26, 52.

**MEP Recommendations and Open Items**

**Recommendations**
Condenser Water System: Retain and overhaul the river-water heat-rejection infrastructure by replacing and upgrading the existing traveling screen, bar grids, sluice gates, and

automated controls, rather than converting to cooling towers or an alternate wastewater/SHARC system.

Central Chiller Plant: Execute a comprehensive replacement of all four existing centrifugal chillers, chilled-water distribution pumps, and associated mechanical piping and controls within the existing refrigeration room footprint.

Service Switchboards and Power Distribution: Replace all service-entrance switchboards – excluding SH-LC-3B (NEW) – and install a new dedicated switchboard for the REACH, new medium-voltage chiller starters, and a consolidated building-wide grounding system. Execute this replacement sequentially across one building third at a time to manage the unavoidable network-bus outages caused by the lack of intermediary disconnects.

Fire Pump Infrastructure: Maintain, service, and retain the existing diesel-driven fire pump rather than converting the facility to an electric fire pump system.

Emergency Power Generation: Procure and install a 1,250 kW diesel emergency generator (in lieu of natural gas) to cover all code-mandated base emergency loads (1,000 kW base) plus the six additional elevators requested on emergency power; relocate the new generator assembly and associated switchboards to the adjacent gift shop storage room.

Automatic Transfer Switches (ATS): Replace 9 of the 14 existing automatic transfer switches in conjunction with the emergency generator replacement project to ensure reliable life-safety power transfer.

**Open / Pending**

River Intake Structural Basin: The structural condition of the river water intake basin (walls, slabs, and embedded structural components) has never been engineered or tested; an assessment is recommended but not yet performed.

Historical SCCAF Remediation Status: Confirmation remains pending as to whether overdutied panelboards and generator-breaker coordination gaps identified in the 2009 SCCAF study were ever remediated.

Updated Arc-Flash / Coordination Study: A complete Short-Circuit/Coordination/Arc-Flash (SCCAF) study is overdue (last completed 17 years ago in 2009) and recommended prior to equipment procurement.

Domestic Plumbing Infrastructure: The feasibility study identifies no plumbing capacity deficits related to cooling-tower make-up water; no separate capital scope for domestic water or sanitary piping is currently defined.

Cost Modeling & Phasing Alignment: Finalization of JLL complete-scope versus deferment modeling, along with switchboard replacement phasing and REACH voltage-drop mitigation strategies, remains ongoing.

Sources: WB Engineers+Consultants MEP Feasibility Presentation – Meeting Minutes, Aug. 27, 2026, pp. 1–2; WB Feasibility Study (Revision 1, Aug. 28, 2026), pp. 3–6, 20–23, 40–62.

**Service-Life Benchmark References**

The equipment-age findings and obsolescence ratings above are evaluated against recognized industry-standard service-life benchmarks and preventive maintenance guidelines:

APPA: Operational Guidelines for Educational Facilities: Maintenance and Capital Renewal and Deferred Maintenance Planning.

ASHRAE Handbook: HVAC Applications, Owning and Operating Costs chapter ("Comparison of Service Life Estimates" table).

ASHRAE Research: Equipment Life Expectancy / Service Life and Maintenance Cost Database (RP-1237).

BOMA International: Preventive Maintenance and Building Operation Guidelines.

CIBSE Guide M: Operational Engineering, Chapter 13 (Economic Life Cycle Tool / Asset Life Expectancy).

Federal Energy Management Program (FEMP): O&M Best Practices Guide, Central Plant and Capital Equipment Replacement chapter.

Unified Facilities Criteria (UFC): UFC 3-410-01, HVAC Systems (Lifecycle Criteria Appendix).

## Section 6 Details – Theatrical and Production Infrastructure

Backstage production infrastructure, including overhead counterweight fly systems and stage suspensions, presents severe life-safety and operational liabilities separate from the campus structural and utility networks. This section incorporates the September 4, 2026, field engineering evaluation by Wenger Corporation and J.R. Clancy, which established definitive replacement scopes and safety violations across the Eisenhower Theatre, Opera House, and Terrace Theater. Rigging data for the Concert Hall has not yet been surveyed and remains an open item but will be coordinated with required acoustical improvements.

**Rigging Inspection Findings**

On September 4, 2026, Wenger Corporation and J.R. Clancy issued a comprehensive on-site engineering assessment (Requisition #626011, led by Peter V. Svitavsky, P.E.) evaluating the stage rigging in the Eisenhower Theatre, Opera House, and Terrace Theater. The survey confirmed that after nearly 60 years of heavy commercial-scale duty cycles, the vast majority of original backstage rigging has reached the end of its useful service life and poses critical ANSI E-series and OSHA safety violations:

> Rope lock cams across all three halls are worn to the point that they can no longer be relied upon to hold out-of-balance loads. In addition, existing locking rails are two-piece constructions that do not meet the modern industry standard rating of 500 lb/ft. (Wenger Assessment, Sept. 4, 2026, pp. 2, 4, 10, 11, 15, 17)
>
> Head blocks, multi-line loft blocks, and double-purchase arbors are constructed with welded plates rather than serviceable housings. Pulley bearings cannot be lubricated or maintained, causing excessive internal friction and making linesets binding and difficult to operate. Floor blocks continue to run on well-worn friction bushings rather than modern roller bearings. (Wenger Assessment, pp. 1, 4, 5, 6, 12, 13, 17, 18, 19)
>
> The Opera House guide tee wall still exhibits unrepaired misalignment resulting from the 2011 earthquake, alongside an irregular 5-foot downstage tee wall section that must be demolished and re-engineered. (Wenger Assessment, pp. 15, 17)
>
> Due to missing infrastructure, crews in the Eisenhower and Opera House are actively tying off rigging loads to pedestrian handrailings that are not engineered to support rigging loads. In the Eisenhower, spot-line loads are suspended from unengineered bridles tied to handrails, grid hanger beams, and repurposed ceiling channels. (Wenger Assessment, pp. 7, 19)
>
> Batten cable terminations throughout the spaces are wrapped in vinyl covers that prevent routine visual inspection, and extra non-standard hardware is present. Operating handlines have worn down from their original 3/4" diameter to 5/8", and existing Galvanized Aircraft Cable (GAC) lift lines are worn to the point that they cannot be reused. (Wenger Assessment, pp. 4, 5, 12, 18)

Upper and lower loading galleries across all three theaters feature missing mid-rails and stanchions, leaving unguarded edges. In the Eisenhower, open floor hatches used to hoist equipment from the loading gallery to the grid rely on an improvised, unrated trolley beam with zero fall protection. (Wenger Assessment, pp. 8, 9, 14, 19, 20)

Carrying out the required complete replacement, encompassing 116 line sets in the Opera House, 78 in the Eisenhower Theatre, and 42 in the Terrace Theatre – involves extensive overhead torch-cutting, grinding, field welding, and fire-watch operations that strictly require dark, decommissioned stages. (Wenger Assessment, pp. 4, 12, 14, 18, 20)

**2024 Safety Inspection Report – Corroborating Primary-Source Detail**

A July 17–18, 2024 safety and rigging inspection conducted by Sapsis Rigging, Inc. covers the same three spaces, Eisenhower Theatre, Opera House, and Terrace Theatre, and was the underlying field inspection behind the Wenger Nov. 2025 summary above. Its findings corroborate the Wenger/Clancy Report in substantially greater technical detail and add findings not captured in that summary, including: (Sapsis Rigging Safety Inspection Report, July 2024, p. 1, 49, 110)

Fire safety curtains at the Eisenhower Theatre and Opera House both lack ANSI-compliant manual release boxes; the Eisenhower Theatre curtain is confirmed asbestos-containing; the Opera House curtain's stage-right dash pot is separately found leaking hydraulic fluid. (Sapsis Rigging Safety Inspection Report, p. 6, 54)

Additional structural and mechanical findings not captured in the Wenger summary: damaged diagonal members in truss batten sections at the Opera House; significant rust damage on several muleblocks at the Terrace Theatre; and a counterweight-assist winch control circuit at the Terrace Theatre with no acceleration/deceleration ramp, causing shock-load "bounce" on every run. (Sapsis Rigging Safety Inspection Report, p. 57, 116)

Ad-hoc, non-code access methods (wooden boards, plywood) are in use at fall-protection gaps in multiple spaces and are separately found not to meet OSHA requirements. (Sapsis Rigging Safety Inspection Report, p. 5, 53–54, 114–115)

Required ANSI E1.4/E1.6 maintenance and inspection logbooks for counterweight, motorized, and chain-hoist systems were not available at the time of inspection in any of the three spaces, consistent with the Wenger finding above. (Sapsis Rigging Safety Inspection Report, p. 6–8, 55, 57, 115–116)

Sources: Sapsis Rigging, Inc., Safety Inspection Report (Eisenhower Theatre, Opera House, and Terrace Theatre), inspected July 17–18, 2024.

**Scope of Replacement**

Wenger's Nov. 2025 proposal includes Range-of-Magnitude replacement scope for full counterweight-rigging system replacement at each of the three spaces inspected, sized by line-set count: Terrace Theatre (42 line sets), Opera House (106 line sets), and Eisenhower Theatre (75 line sets). This scope covers counterweight-rigging replacement only; it excludes the Concert Hall (not yet surveyed), motorized fire-curtain hoist systems in the Opera House and Eisenhower Theatre (excluded pending separate review), and a lower-cost repair-and-replace-parts alternative that Wenger states it cannot scope without a further, itemized site inspection.

Sources: Wenger Rigging Summary and Proposal, Nov. 25, 2025, pp. 7, 13, 18.

# Financial Context

The physical conditions documented in Sections 1–6 did not develop in isolation. Over the same period, the Center's own Finance Committee materials show its earned revenue, ticketing, rentals, concessions, and other self-generated income, as distinct from government and donor support, and its operating deficit both moving in an unfavorable direction. This section presents that financial context in qualitative terms, sourced entirely from the Center's internal Finance Committee reporting.

**Earned Revenue Trend**

FY2024 shows a steep, single-year decline in earned revenue compared to FY2023. This decline appears in the Finance Committee presentation dated January 21, 2025.

However earned revenue appears to be volatile rather than a clean, uninterrupted multi-year decline; FY2020–FY2021 are omitted from the Center's own reporting, consistent with pandemic-related closure. The FY2023-to-FY2024 decline is the most recent, and largest single-year, drop in the series, with a partial rebound projected for FY2025:

Baseline Pre-Pandemic Volatility (FY17–FY19): Performance revenue fluctuated normally before the pandemic, rising in FY18 and dipping slightly in FY19.

Post-Pandemic Rebound (FY22–FY23): After the FY20–FY21 pandemic shutdowns were omitted, the initial reopening phase generated two consecutive years of revenue growth as live performances resumed.

Severe FY2024 Retraction: FY24 experienced the steepest single-year drop in earned revenue across the entire data series, wiping out post-pandemic attendance gains.

Projected Partial Recovery (FY25): The January 2025 forecast modeled an upward rebound, but still left the institution with an ongoing structural operating deficit and depleted reserves to cover sudden capital or emergency breakdowns.

| Fiscal Year | Direction vs. Prior Year Shown |
|---|---|
| FY2017 Actual | – |
| FY2018 Actual | Increase |
| FY2019 Actual | Decrease |
| FY2022 Actual | Increase (FY2020–FY2021 omitted; pandemic closure) |
| FY2023 Actual | Increase |

| | |
|---|---|
| FY2024 Actual | Decrease – largest single-year decline in the series |
| FY2025 Projection (as of Jan. 2025) | Increase – partial rebound projected |

Sources: Finance Committee Presentation, January 21, 2025, pp. 4, 9, 32.

**Corroborating Trend: Growing Operating Deficit**
Over the same three most recent actual fiscal years, the Center's effective operating deficit (excluding one-time sustainability fund draws) widened every year, before a projected partial narrowing, while remaining a deficit, in the FY2025 projection:

| Fiscal Year | Effective Operating Deficit – Trend |
|---|---|
| FY2022 Actual | Deficit |
| FY2023 Actual | Deficit – widened vs. FY2022 |
| FY2024 Actual | Deficit – widened again vs. FY2023 |
| FY2025 Projection (as of Jan. 2025) | Deficit – projected to narrow vs. FY2024, but still a deficit |

Sources: Finance Committee Presentation, January 21, 2025, pp. 4, 9, 16, 32.

**Why This Matters**
This report's primary purpose is to summarize the building's physical condition. Financial context is included because the recent years of compounding structural decay – active shoring, code-noncompliant electrical vaults, a failed condenser water system, and corroding structural steel – coincided directly with the deterioration of the institution's own finances. Continued deferral of the physical repairs documented in this report carries a severe cost not only to public safety, but to the institution's long-term solvency. Although building maintenance is supported through federal capital appropriations, deferring this work creates direct liabilities for the Trust. Unplanned utility outages, deferred maintenance, and degraded public spaces depress ticket sales and rental revenues, actively undermining the Center's operational viability and mission.

# Appendix A – Source Documents Reviewed

This report was compiled from the following documents. Page references throughout this report correspond to the page numbering of these source files.

- **2020 Comprehensive Building Plan** – Facility-wide condition assessment covering electrical vaults and the River Pump Room.
- **2022-12-23 WPM Field Report on Kennedy Center Soffit Failure** – Original December 2022 emergency field investigation of the soffit panel failure.
- **2024 Leak Investigation Report** – Root-cause leak tracking (GG-H3 and related items) linking roof/scupper leaks to soffit corrosion.
- **Board Meeting Minutes, March 16, 2026** – Board discussion of the closure plan and Hall of States entrance work.
- **Delta Report Construction Program Assessment Report, August 20, 2026** – Independent assessment of construction scenarios and financials.
- **Executive Summary Project Outlines (as of 07/29/2026)** – Full itemized Renewal Project budget by subproject code.
- **Finance Committee Presentation, January 21, 2025** – Internal Finance Committee financial reporting, including FY24 actual results, FY25 projections, and multi-year earned revenue and operating deficit history (Financial Context).
- **Kennedy Center Renewal Project Comprehensive Project Delivery Plan (CPDP)** – Program-level closure rationale, schedule, and delivery strategy.
- **Kennedy Center Renewal Project Monthly Report, June 2026** – Program status as of June 2026, decisions pending, and safety notices.
- **Kennedy Center Renewal Project Monthly Report, July 2026 (Report No. 004, issued Aug. 7, 2026)** – Confirms construction start slipped past July 6, 2026 (re-baselined internally to September 21, 2026); confirms overall program budget status; details new soffit load-capacity and confined-space findings; details new River Plaza column borescope findings; notes contingency-reserve risks.
- **Master CIP Summary Sheets** – Capital improvement project line items, budgets, and status.
- **Plumbing System Condition Report** – Condition of River Pump Room valves and condenser water piping.
- **Sapsis Rigging, Inc., Safety Inspection Report, Eisenhower Theatre / Opera House / Terrace Theatre, inspected July 17–18, 2024** – Underlying primary-source rigging and

fall-protection safety inspection corroborating the Wenger Nov. 2025 summary, with additional technical detail (Section 6).

- **The Kennedy Center MEP Feasibility Study, Revision 1, dated August 28, 2026 (WB Project No. 05ATR.260312)** – Full facility-wide MEP feasibility study by WB Engineers+Consultants, with JLL cost appendix; existing-conditions deficiencies, equipment-age data, and decided/open scope items (Section 5).
- **Walter P Moore Kennedy Center Parking Garage Structure Field Investigation Report, September 23, 2022** – Full three-level visual structural assessment, non-destructive steel testing, and concrete material testing of the parking garage, loading docks, and entry tunnel.
- **Walter P Moore Roof Terrace Canopy Field Investigation Work Plan** – Scope of the follow-up structural investigation of the terrace canopy and soffit system.
- **Walter P Moore Soffit Borescope Investigation Field Observation Report (2024/2026)** – Borescope inspection identifying corrosion at additional soffit panels.
- **Walter P Moore Soffit Panel Assessment (Draft, September 3, 2026; Project No. D01.26006.00)** – Comprehensive structural assessment of 278 perimeter soffit panels. Synthesizes drone inspections, lift-access borescope probing, 3'x3' panel cutouts, and ASTM D5957 drain flood testing (Section 1).
- **Walter P Moore Soffit Panel LiDAR Analysis (2026)** – LiDAR scan of the building perimeter identifying panel displacement zones.
- **WB Engineers+Consultants MEP Feasibility Presentation, August 27, 2026** – Facility-wide MEP feasibility study covering condenser water, central plant, electrical switchboard/generator, and plumbing systems, with budget-variance forecast (Section 5).
- **WB Engineers+Consultants MEP Feasibility Presentation** – Meeting Minutes, August 27, 2026 – Record of MEP decisions reached and open items as of the August 27, 2026 feasibility presentation (Section 5).
- **Wenger Corporation / J.R. Clancy Theatrical Equipment Rigging Assessment (September 4, 2026; Requisition No. 626011)** – Field engineering survey and structural replacement assessment for the Eisenhower Theatre, Opera House, and Terrace Theater.
- **Wenger Rigging Summary and Proposal, November 25, 2025** – Third-party rigging engineering review of the Terrace Theatre, Opera House, and Eisenhower Theatre fly and counterweight systems, with safety findings and ROM replacement pricing (Section 6).

# Appendix B – Referenced Photographic Documentation

- Figure 1 – High Voltage Switchgear in Concert Hall Electrical Vault
- Figure 2 – Failed Soffit Support Tie Wires
- Figure 3 – River Plaza Structural Steel Support, Level A Column Line D/C 16
- Figure 4 – Loading Dock 1 Below Hall of States Entrance
- Figure 5 – Loading Dock 2 Below Hall of Nations Entrance
- Figure 6 – Concert Hall Electrical Substation South Wall
- Figure 7 – Ruptured Sanitary Plumbing
- Figure 8 – Out of Service Potomac River Water Filtration System
- Figure 9 – Opera House Stage Rigging
- Figure 10 – Concert Hall Stage Rigging

## Attachment 4: Draft Resolutions - For Board Consideration

**RESOLUTION OF THE BOARD OF TRUSTEES**

**OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**

WHEREAS, the Board of Trustees has reviewed the full reports of both the Delta Consulting Group and JLL, as well as the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto;

WHEREAS, the Board was able to meet with the principal of the Delta Consulting Group on September 15, 2026, and fully explore the basis for its recommendation that the main building close for renovations;

WHEREAS, the Board has been advised of the Court's rulings in *Beatty v. Trump et al.* and has been guided by the Court's expressed thoughts about its statutory and fiduciary obligations;

WHEREAS, subsequent to the Board meeting on August 13 and the most recent hearing in *Beatty v. Trump et al.*, additional water intrusion and deterioration of the Center's physical plant caused a partial ceiling collapse in the Grand Foyer, releasing debris from a height of approximately 60 feet and endangering visitors and employees alike;

WHEREAS, both Delta Consulting Group and the Center's own Executive Director consider the main building to be unsafe for continued occupancy, and anticipate further risk to the public and employees if the building is not immediately closed and renovations begun;

WHEREAS, the Board, being duly advised, believes that the risk associated with exposing patrons and employees to a hazardous building greatly outweighs any reputational risk associated with closing the main building; and

WHEREAS, the Board, being duly advised, believes that maintaining continued programming in the REACH and offsite, maintaining educational outreach to the community, continuing the Center's support for the National Symphony Orchestra, and continuing the Center's long-standing tradition of presenting the Kennedy Center Honors and Mark Twain Prize, even though offsite, will ensure sufficient continuing engagement with the artistic community, the donor base, and patrons, that a two-year closure of the main building will not unduly affect its ability to ramp up programming in a revitalized main building in 2028;

IT IS HEREBY RESOLVED, in addition to the resolution passed by the Board on August 13, 2026, that the main building of the John F. Kennedy Center for the Performing Arts shall be closed to patrons forthwith; that the Center shall continue to present educational and artistic programming at the REACH; that the Center shall continue its partnership with and support of the National Symphony Orchestra in performances at off-site venues; that the Center shall continue signature artistic productions offsite including but not limited to the Kennedy Center Honors and the Mark Twain Prize for American Humor; that the Memorial to President John F. Kennedy be temporarily relocated to the REACH where it will remain open to the public; and that immediate repair and restoration work be commenced in accordance with the Comprehensive Project Development Plan dated June 8, 2026, and subsequent updates thereto.

**RESOLUTION OF THE BOARD OF TRUSTEES**

**OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**

WHEREAS, the Kennedy Center is in a dire financial position having exhausted its fiscal resources. The Kennedy Center is in such a precarious fiscal position that it will not be able to support its payroll obligations, nor routine maintenance contracts within a matter of weeks. While actively considering alternative means of fiscal survival, President Trump has offered to step in and raise the necessary funds to keep the Center from bankruptcy during its much needed renovation. With certain fiscal collapse within weeks, the board seeks to determine what recognition and acknowledgement will comply with the Court's decisions in *Beatty v. Trump et al.* and with its statutory obligations, and wishes to explore additional options to present that recognition in a concrete and public fashion.

WHEREAS, the Center is seeking to appropriately recognize and acknowledge President Trump for his well timed proffer of fiscal rescue. The Board understands that without such appropriate recognition it is unlikely that President Trump will provide the fundamental oversight of the renovation of the main building and lead the fiscal rescue of the Center. The Board seeks to provide multiple options so that President Trump can be legally and appropriately recognized and acknowledged on the facade of the Kennedy Center so that he agrees to carry the burden of managing the renovation and provides the Center with a much required financial rescue.

IT IS HEREBY RESOLVED that the Center will undertake all legal means to effectuate one or more of the following public recognitions or acknowledgements to the President:

TO BE PLACED ON THE EXTERIOR MARBLE BENEATH THE NAME OF THE CENTER, ONE OF THE FOLLOWING as voted upon by the Board:

- **Option 1:**

  Renovation and endowment overseen by

  President Donald J. Trump

  and the

  Trump Kennedy Center Fund

- **Option 2:**

  Renovation Restoration and Endowment overseen by President Donald J. Trump

  and the

  Trump Kennedy Center Fund

- **Option 3:**

With Gratitude for Support from

President Donald J. Trump

and the

Trump Kennedy Center Fund

- **Option 4:**

Renovation and Restoration directed by

President Donald J. Trump

and endowment provided by the

Trump Kennedy Center Fund

- **Option 5:**

Restoration and endowment overseen by

President Donald J. Trump

and endowment provided by the

Trump Kennedy Center Fund

- **Option 6:**

A Legacy protected through the Generosity of President Donald J. Trump

- **Option 7:**

Renovated, restored, and sustained through the generosity of

President Donald J. Trump

- **Option 8:**

Renovation, oversight, and support provided by

President Donald J. Trump

- **Option 9:**

Acknowledging the unwavering support of

President Donald J. Trump

and the

Trump Kennedy Center Fund

- **Option 10:**

Renovation, Restoration, and support by

President Donald J. Trump