# Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x

JOYCE BEATTY, :

Plaintiff, :

v. : Case No.

DONALD J. TRUMP, et al., : 25 Civ 4480 (CRC)

Defendants. :

- - - - - - - - - - - - - - - - -x

Friday, October 2, 2026
Washington, D.C.

Deposition of:

CARISSA FAROUGHI,

called for oral examination by counsel for the Plaintiff, pursuant to notice, at the law offices of Washington Litigation Group, 1717 K Street, Northwest, Suite 1120, Washington, D.C. 20006, before Christina S. Hotsko, RPR, CRR, CA CSR, of Lexitas, a Notary Public in and for the District of Columbia, beginning at 9:25 a.m., when were present on behalf of the respective parties:

then, annually, we go through and we say, okay, these are the things that have been updated, these are the things that are changed. It's often updated based on what funding we actually get, because our CBP is a wish list. So -- and we typically haven't gotten the funding we're -- requested.

Q. And then in 2025, there was a request made to Congress for a larger amount of money --

A. Yes.

Q. -- is that correct?

A. Correct.

Q. That was around $150 million? Am --

A. Yes.

Q. -- I getting that right?

What is the relationship between what was in the request and the comprehensive building plan?

A. In developing that request, we went back to the CBP. We looked at what we had had to zero out as projects. We went back to the initial giant laundry list of projects, which was around

$250 million of things that were recommended to be done.

And then I know Matt also went and consulted with other departments, specifically I think the production department, to capture their additional needs or things they think that had come up that weren't captured in that initial 2021 laundry list of projects, to come up with this master list of projects for the $257 million ask.

Q. And for clarity, Matt is Matt Floca?

A. Yes.

Q. Okay. In developing the comprehensive building plan, was there any assumption made about how those projects would be performed in terms of phasing or, you know, potentially the building being fully shut down to perform all the --

A. In the comprehensive building plan, there's what we call an implementation plan, which is -- we have it in two versions -- one is a graphic schedule; one is a dollar value

schedule -- that sort of forecasts what projects we plan to spend in what fiscal year. So that is part of that.

Nowhere during that discussion -- we -- sorry. Nowhere during that was there ever a discussion of, you know, just shutting the building down to do the work. It's always been a phased construction approach.

Q. Got it.

And in your request to Congress, which was, again, my understanding is, based in part on what was in the comprehensive --

A. Yes.

Q. -- building plan, did that state anything about the building being shut down to perform the project?

A. I would have to look into the document. We typically have comments in there that -- no, the goal is to keep the building operational. We've always had to do some strategic shutdowns, but that -- the -- I don't know, the mantra, the show must go on has been our philosophy at the

Kennedy Center.

Q. Okay. Can you tell me, during your tenure at the Kennedy Center -- can you list some of the major capital projects that occurred while you were there?

A. The largest project we did was the JFK Gallery, which was the renovation of the existing atrium on the roof terrace level to become a new modern exhibit on John F. Kennedy and his relationship to the Kennedy Center and the founding of the Kennedy Center.

That was about a $20 million project.

We've executed a -- about a $4 million project, to the best of my recollection, to upgrade the building fire alarm system.

We've completed a $2 million project to do a 4,000 square foot office addition.

I'm trying to think. We did about a $2 million project, $1.6 million project, to replace air handling units that service the commercial kitchen.

We did a lot of small projects. We had a

congressional appropriation.

Can you talk about how that cost estimate was developed?

A. It was mostly developed internally. It did rely on a lot of the costs in the CBP. It was updated based on additional information. Some things had progressed farther in design, so we had better information on it, and we tried to incorporate that.

Several things I'm not -- I don't have clarity on with -- related to the production side and their needs. That was coordinated with -- between Matt and the VP of production at the time on what dollar value should be used.

Q. And so what was your involvement in preparing the estimate?

A. I reviewed it with Matt to sort of validate that it looked right, the dollar value distribution looked right so that -- and sort of just helped him with the narrative portion of it. And -- yeah.

Q. And when that estimate was prepared, what

was the Center's plan for how the work would be carried out in terms of was the work going to be phased or was there a shutdown contemplated?

A. I --

MR. MAYERS: Objection. Speculation.

THE WITNESS: -- don't recall us having a specific discussion about whether we close down or phase. My assumption was always we're trying to -- we're continuing to operate. We want to operate.

Like I said, our standard had been that all of our projects get phased to avoid shutdowns to the extent feasible, or minimize shutdowns.

BY MR. KRISTOFCAK:

Q. So is it fair to say that the estimate, even if not expressly, sort of implicitly assumed that the project would be performed in line with your historical practice of --

A. Of phasing --

Q. -- trying to keep the building open as much as --

A. That would have been my assumption at the

time.

Q. And at the time the estimate was prepared, were projects already being actively developed --

A. Yes.

Q. -- and the various phases of being awarded?

A. Yes. We were always actively in design or construction. The CBP is sort of a living, breathing document, and it's constantly being -- it's in a constant state of flux, partially because costs changed so we have to reallocate funds or, you know, move things around.

So it's -- and that -- the 257 that we asked for was really a snapshot in time at that place because it -- we were also including what we already had in carryover funds from our normal appropriations, and we were rolling both together into a big project -- you know, into one big number. So we were -- and that -- and I think at that time we had estimated 57 million, but it was probably closer to 54 million because we were

five months.

BY MR. KRISTOFCAK:

Q. Got it.

So just to clarify, when you say you were down for five months, that -- you're referring to -- explain what --

A. Sorry.

Q. -- that means.

A. We were -- that area of the upper plaza was restricted from vehicular access during that period.

And then we had limited access to loading dock 1 for deliveries, though I think lots of people ignored it and still made deliveries there because -- they just did.

But the -- yeah, it was a vehicular restriction on the upper plaza.

Q. Now, as a general practice, how did the building respond when there was, you know, a condition that posed a potential threat to the public, like a piece of plaster falling off or something like that?

MR. MAYERS: Objection. Speculation.
THE WITNESS: The first thing we always did was restrict public access to the area where the incident was happening using, usually, immediately bike racks. We had lots of those on site. Security would set them up to create a no-access zone until we could implement a more thorough repair or restricted area, depending on what the repair required.
BY MR. KRISTOFCAK:
Q. Do you recall any incidents that required either a whole block of the building or the whole building to shut down?
A. Not to my recollection.
Q. Going back to the soffits, or the 2022 soffit incident you mentioned, can you tell me more about sort of what happened with the soffit?
A. There was a major rain event. There had been an active leak at that location for a while. And I think nobody understood the full extent of it. A lot of water ponded on top of the plaster up there, perhaps saturated. A significant

percentage -- I want to say 50 percent -- of the wire ties failed, causing a displacement in two of the panels. But I think most of it was in one panel.

We ended up replacing two panels as part of that process.

We were notified by operations staff, hey, this is an issue. They immediately blocked off the area. O&M staff went up into the interstitial space to try and see, you know, what they could see. They drilled a few pilot holes to try and get a better idea of what the problem was.

I worked with our office of contracting to get some shoring out immediately to support the soffit. While it appeared stable, it didn't -- it hadn't moved further, based on our initial examination, we got a shoring contractor out there and they put up shoring over the holidays. So it was right before Christmas.

And then we engaged with our architect/engineering firm that was in contract

to have them come out and inspect the area and evaluate and provide us with a design solution for it.

Q. And was that Walter P. Moore?

A. It -- our current contract was with Page Southerland Page. They're now Stantec. But the subcontractor that they hired for that was Walter P. Moore.

Q. Okay. And just so I get a better sense of what happened with the soffit, did it actually collapse or just slightly sort of dislocate?

A. There was a displacement in -- primarily the northeast corner of it was the largest level of displacement. The remaining structure up there was sufficient to keep it from complete structural failure.

Q. So it didn't actually collapse?

A. No. It was a partial failure.

Q. Okay. During the remediation of that particular issue, what was done in terms of limiting access to that area?

A. Once the shoring was up, there was

fencing involved in that too that permitted -- that stopped public access to that particular area.

And then same thing during construction, there was construction fencing up and sawhorses used to prevent public access to the area.

Q. And how long did it take sort of from when the condition was first discovered until it was fully remediated?

A. About two years. It took us a while to get the design done and to get a contract awarded, and then we hit winter, so we didn't want to do work in winter.

This -- and then, at one point, we -- once we completed the demolition work of removing the panel, we were able to take down the scaffolding and we completed the rest of the work off of lifts.

Q. And how much of that two-year period was the actual construction?

A. Maybe eight months of it. Most of it was shoring in place while we were getting resources

aligned.

Q. You mentioned that, after that particular soffit was fixed, the engineering firm did a bigger study about the condition of the soffits.

A. When the soffit first collapsed and they came out, we asked -- they did do sort of a visual inspection around the building, looking for other -- you know, to see if they could visually inspect and see if there were any other areas that there appeared to be displacement or leaks.

We had identified several other roofing leaks and, as part of the mitigation of that, we went and we did do a contract to have a construction company come in and do roofing repairs to tie this over until we could do a full roofing replacement.

And then, part of that, we had hired Page Southerland Page and Walter P. Moore to do a comprehensive leak investigation of the Kennedy Center, which included both subgrade and roof areas, to determine what improvements needed to

be done.

Q. And so as part of that inspection, do you remember what the recommendations were coming out of that?

A. There were numerous recommendations. Related to the soffit specifically, their recommendation was to replace the soffit. The -- their recommendation was to replace the soffit, its supporting structure, the metal deck that supported the roof overhang, and all new roofing system.

So essentially, we would have been stripping it down to steel at the perimeter of the building.

Q. And roughly what time period was this?

A. That would have been 2024. I think the final recommendation report was May of '24.

Q. If I can ask you to take a look at tab 3.

MR. KRISTOFCAK: If we can mark this as Exhibit 11.

(Faroughi Deposition Exhibit 11 marked for identification and attached to the transcript.)

BY MR. KRISTOFCAK:

Q. Turning to the second page, it says, Field Observation Report.

A. Uh-huh.

Q. This is a report from Walter P. Moore about the 2022 soffit failure that --

A. Yes.

Q. -- we just talked about? Great.

MR. KRISTOFCAK: And then if we could mark tab 4 as Exhibit 12.

(Faroughi Deposition Exhibit 12 marked for identification and attached to the transcript.)

BY MR. KRISTOFCAK:

Q. If you'll look at the second page of this exhibit, it states, The Kennedy Center Waterproofing and Leak Investigation and Repairs, and the date is May 6th, 2024.

This is the sort of more comprehensive --

discussion about any of that work requiring the Center to be fully shut down?

A. No.

Q. Can you talk about the history of water intrusion in the electrical vaults that serve the three different spaces?

A. Uh-huh. It has been an ongoing issue. I can't remember which vault is the worst. I want to say it was the Concert Hall vault had the worst amount of efflorescence.

It's been a -- my understanding, it's been a chronic issue in the building as long as people have known.

The primary source of water into the service tunnels are those building expansion joints that had failed and were continuing to fail.

The issue with the vaults had to do more with vertical waterproofing on the exterior of the walls. When they did some destructive investigation, they opened up, and there's membranes on the horizontal surfaces, but then it

never really turns down and goes down on the vertical surfaces of the vault.

The primary waterproofing under that, based on what destructive investigation they'd done, was in good condition with localized areas of failure.

Q. And was there any plan in place to address these waterproofing issues?

A. Yes. That would have been part of the statement of work and requisition we wrote to address the waterproofing, subgrade waterproofing issues. That was going to be a sole-source award to Walter P. Moore.

Q. Got it.

So that was, like -- along with the waterproofing for the roof, that was --

A. They were two separate requisitions.

Q. I see.

A. The requisition we wrote in August for the sole-source award, that included -- if I recall, it included a comprehensive life building safety assessment. It included replacement of

domestic hot water heaters, motor lobby restroom renovation. There was five in total. And roofing and soffit replacement was one of those line items.

That RFP went out to Page Southerland Page. They provided us pricing and proposals for that work. It came in over our initial estimate. We wrote a second requisition in December to fully fund that work and move forward with the award. And then the award never happened.

Q. And this would be December of 2025?

A. December of 2025.

MR. KRISTOFCAK: Can we take a break?

MS. FREENY: Is now an okay time?

MR. KRISTOFCAK: Yes.

THE WITNESS: Okay.

MR. KRISTOFCAK: Let's go off the record.

(A recess was taken.)

BY MR. KRISTOFCAK:

Q. So going back to the requisition we just talked about, that -- remind me what happened with it in December of 2025.

A. After we had negotiated the fee and we accepted their fee with their adjustments, I directed our -- the project manager who was -- who initiated the requisition to write a second requisition to provide additional funding to cover the full scope of design services.

That was submitted in mid-December, and it went through the approval process. It was approved by Matt in January. And then from there, it was never awarded and was eventually canceled.

That's the one that included the roofing and soffit repair.

Q. Got it.

Now, moving on to parking garage structural issues, was there a design effort underway for structural repairs to the garage spaces?

A. Yes.

Q. Can you tell me more about that process?

A. We had -- actually, shortly after we had the loading dock 1 soffit -- the award for

investigation of all of our structural issues in the parking garage happened that summer. And it was, again, to Page Southerland Page, with Walter P. Moore as their subcontractor.

They completed an investigation of all the issues. Based on their investigation, they developed a concept report of recommended solutions of how to proceed.

We reviewed and approved those solutions. We wrote another -- I can't remember if we did a contract mod or if we did a separate requisition to fund design services, to design a comprehensive structural repair of the parking garages.

Along that process, we ended up doing a couple of modifications. One was to add the building expansion joints based on the recommendation of the waterproofing leak investigation and the remediation of rust at our exterior plaza-level columns.

So those were two modifications that were issued during the design process.

now looking at what is marked -- what has already been marked in a prior deposition as Exhibit 8.

MR. TAGERT: Thank you.

MR. KRISTOFCAK: Actually, let's go off the record.

(Discussion off the record.)

MS. FREENY: Just so the record is clear, I had indicated one way of numbering the exhibits. We went off the record and we agreed that the easiest way to make this the least confusing going forward is that we are numbering exhibits in the Faroughi deposition starting with Exhibit 9. There are no Exhibits 1 through 8. And then we are numbering sequentially thereafter, regardless of whether an exhibit was introduced in a prior deposition.

MR. KRISTOFCAK: All right. Thank you.

(Faroughi Deposition Exhibit 13 marked for identification and attached to the transcript.)

BY MR. KRISTOFCAK:

Q. So if you go -- so we're now looking at

Exhibit 13, which, less there be any confusion, is ECF 88-8.

But if you go to page 21 on the top right.

So this is a report that Matt Floca wrote, and it says, "One-third of the facility's 278 outer roof panels suffer from severe corrosion and require immediate replacement, driven by roof scupper drains that completely failed water testing. Replacing these 2,500-pound ceiling assemblies, fixing cracked concrete decks, and replacing the roof cannot safely occur while visits and staff walk 60 feet below."

Do you agree with that assessment?

A. Which part of it?

Q. That one-third of the panels cannot be replaced with people walking underneath.

A. The replacement would have to happen sequentially. So you would block off the area underneath where you were doing the repairs, similarly to what we did when the previous soffit

was damaged.

Q. And when you say it would have to be done sequentially, can you elaborate on that?

A. You're not -- you're going to -- what's the best way to put this? You're going to caterpillar your way around the building to do that. So anything related to the roof work, you're not going to rip everything out and then go back and put all thing new. You're going to do a sequence of construction, where you're going to take out X amount of roof and panel based on however you want to do, do the replacement work, make it whole again, move on to the next one, move on to the next one, move on to the next one.

Most roofing and replacement projects happen in a sequence because you don't want to leave the building exposed.

Q. Got it.

The assessment here that one-third of the roof panels suffer from severe corrosion, from your recollection of your work at the Center, is that a new fact or something that you previously

knew?

A. No. We assumed that there was corrosion throughout the soffit space, and per the recommendation from the study that we were going to plan to replace at least 50 percent of them at that point in time -- it might have grown to 100 percent based on further design and evaluation.

Q. And you knew this based on the report that Walter P. Moore prepared for you in 2024?

A. Yes.

Q. Going to the next page.

And -- sorry. Going back to the soffit replacement, when you are saying that the work has to be done sequentially, does that mean that you don't have to close the entire building to replace the soffits?

A. No.

Q. Sorry. You don't have to close --

A. You don't --

Q. Do you mind just stating?

A. Yes, you do not have to close the entire

building to do this type of work.

Q. Thank you.

So moving to page 22. It states, "Key steel girders in the garage have lost over a third of their strength to rust, while overhead concrete is crumbling onto driving aisles due to water intrusion. Crews cannot repair failing structural steel and concrete, reapply fireproofing, or install and remove temporary shoring braces while patrons and vehicles are actively using the garage."

Starting with the statement about steel girders. Is that a correct assessment in your opinion?

A. Based on the structural investigation that Walter P. Moore completed, they did, I believe, testing in eight locations to check for section loss of steel. There was one location that was the seat for a girder that had up to -- it was over 30 percent section loss in that one particular location. Most of the other locations did not show any significant section loss.

Q. So does that mean that the statement that key steel girders have lost over a third of their strength to rust is not accurate?

MR. MAYERS: Objection. Speculation.

THE WITNESS: Not based on the information I have from previous reports.

BY MR. KRISTOFCAK:

Q. And what do you think about the statement that the repair cannot be done while patrons and vehicles are actively using the garage?

A. We came up design during with a detailed phasing plan that would shut down limited areas of the parking garage at a time to do the structural repairs. That would keep the building open.

So that -- there's multiple drive aisles and ways to navigate the parking garage. Prior to me, Kennedy Center has done similar repairs before in the parking garage where they've, again, gone through and repaired minor cracks and, to my knowledge, kept the building open at the same time.

When we did our investigation -- or when Walter P. Moore did their investigation on it, we did destructive investigation where we chipped concrete and poured concrete, and we did that with the building in operation.

Q. Then on page 23, this discusses the service tunnel water intrusion.

A. Uh-huh.

Q. And it says, "Stopping major water intrusion into the underground service tunnel will require lengthy closures to the main entrances directly above."

And then continues, "Because most of the building's 44 emergency stairwells lead directly into these areas, closing them eliminates primary evacuation routes."

Is that last statement about eliminating primary evacuation routes correct?

MR. MAYERS: Objection. Speculation.

THE WITNESS: No. The -- you could say that maybe 25 percent of the evacuation routes exit to the east plaza, which is the area that we

have the service tunnel over. Building has four sides. The exits dump out on all four sites of the building simultaneously.

The service tunnel repair work, except for the replacement of the building expansion joints, could be done almost entirely from underneath. So we might run into situations where we would limit vehicular access for the safety of the contractors as we were doing selective demolition, but it would be virtually invisible from the plaza platform.

BY MR. KRISTOFCAK:

Q. And moving on to the following page, page 24.

This discusses high-voltage electrical substations, and it states, "Because workers cannot safely patch leaks or replace equipment around live high-voltage cables, fixing these rooms requires shutting down the power to more than half of the campus for extended periods of time."

Is that consistent with your

understanding of how these systems work?

A. Yes. I mean, we cannot do the structural repairs with -- around high-voltage live wires. Some other alternative plans would have to be made to keep the building powered while we made those repairs.

Q. So does that mean that it requires a full-scale shutdown of the Center for this work to be performed?

A. Well, you don't want to shut power down to the building for extended periods of time. You just don't. You need to maintain your life safety systems. You want the water to keep circulating. You want the chilled water, hot water -- you want all these systems to keep circulating at some level. It's deleterious to the equipment just to shut it down and drain it down.

So in general, you wouldn't want to -- you need to maintain cooling in the building. You need to maintain heating in the building.

The discussions we had related to

completing the work in here, it had been part of our discussions for the structural repairs, because part of the structural repairs happen in these vaults, was having to work with a contractor to bring in a temporary power bank or generator system that would help power the building systems so that they could stay operational while we did the repair work.

Q. Then on the following page -- it's page 25 -- this discusses mechanical, electrical, and plumbing systems.

It states that they lack local isolation capabilities. Is that consistent with your understanding?

A. Our water lines -- our domestic water lines and our sprinkler lines don't have the best isolation capabilities from block to block.

The building chilled water/hot water systems all have isolation valves throughout the building so that you can isolate individual air handling units from the primary system.

So it's -- and sanitary piping doesn't

have anything related to isolation valves. They wouldn't.

Q. So it continues, "Because these systems lack local isolation capabilities, replacing end-of-life infrastructure forces rolling and whole-building blackouts that make public occupancy unreasonable."

Is that consistent with your understanding?

A. No.

Q. Can you elaborate on that?

A. We have, in my tenure there, replaced -- installed five new air handling units and main electrical distribution panels in different parts of the building, and we've maintained the building operational.

We've done temporary overnight shutdowns. We've brought in temporary air handling units to cover the gap between when we demoed the old and installed the new so that the building can remain operational.

Q. Now moving on to the following page,

page 26, this discusses theatrical and production infrastructure. And it states, "Overhead stage rigging relies on unrated hardware, damaged batten trusses, and outdated safety gear that violate ANSI and OSHA standards. Replacing line sets and stage fire curtains require prolonged blackouts and heavy overhead work zones that cannot occur while theaters remain active."

Were you aware of these issues in the theaters?

A. Not as well as I was informed on other building systems. Like I said, production staff were in charge of those systems, and they operated mostly independently from the PMO office on repairs that needed to be done.

They do sound familiar. I know our production staff wanted more automation in the controls work because it is still a very conventional manual rigging system.

Q. What was your understanding of how these issues were being addressed?

A. Again, our production staff had what we

requisition?

A. Basically to approve it, to move forward with processing.

Q. And then if you look at tab 7.

MR. KRISTOFCAK: Let's mark that as Exhibit 15.

(Faroughi Deposition Exhibit 15 marked for identification and attached to the transcript.)

BY MR. KRISTOFCAK:

Q. Sorry, just going back to tab 5. That's Exhibit 14.

It's fair to say you're familiar with this document. You've seen it before.

A. Yes.

Q. And it's an accurate and correct copy of the document as you remember it?

A. Yes.

Q. And is this part of the business records of the Kennedy Center?

A. Yes.

Q. And it's maintained by people who are

familiar with the information that's in the document?

A. Yes.

Q. Great. So moving forward to tab 7 that's Exhibit 15, have you seen this document before?

A. Yes.

Q. What is it?

A. This an image from our requisition processing portal. This is the portal where we uploaded requisitions for approval and processing and tracking.

Q. And is this a correct and accurate representation of the document as you remember it?

A. Yes.

Q. And is this part of the business records of the Kennedy Center?

A. Yes.

Q. And is it maintained by people with knowledge of the contents of the document?

A. Yes.

Q. And on the right side it says, "This

request has been canceled on 4/10/2026 per COO Matt Floca and direction from contracting staff."

Do you see where it says that?

A. Yes.

Q. What do you take that to mean?

A. That they were canceling the requisition and the subsequent award of the contract.

Q. Do you know why the requisition was canceled?

A. No.

Q. Do you know if there was a new requisition issued that covered the same scope?

A. Not to my knowledge.

Q. Now, in the fall of 2025, was there a project to paint the exterior and interior of the building?

A. Yes.

Q. Who initiated it?

A. Matt Floca.

Q. What was your role in that project?

A. In the first week of December, we had a meeting with Matt and our contracting officer --

I don't recall who else was in the room -- where he informed us that they had gotten verbal authorization to proceed with a painting project for the exterior columns.

Q. Sorry, who said that?

A. Matt.

Q. Matt Floca.

A. Oh, sorry, did I say -- sorry, it was in September. First week of September.

Q. You said December.

A. Okay. Sorry. September. First week of September.

And that they had provided a notice to proceed, for the painting work to start. Cypress Painting was already onsite painting.

We were directed to develop a requisition to award a contract to Washington Office Interiors, an 8(a) contractor, for a sole-source award for painting exterior columns, interior columns, some of our reflecting pools, and at that time some interior backstage spaces.

MR. MAYERS: Just note for the record

that the deponent discussed her answer with counsel.

MR. SEIDE: Counsel, for the record, asked the witness to clarify the date, as the witness did on the record. And if counsel has other questions for... we prefer they ask during the deposition or afterwards, off the record or on. Thank you.

BY MR. KRISTOFCAK:

Q. And how did that process compare with the standard contracting process?

A. It was fast-tracked. We -- Matt provided us with a version of the statement of work that outlined the technical requirements of it.

I had one of our project managers take that document and put it in our standard format for statements of work. And we put a requisition together. I believe we submitted it on September 10th for award and processing, and it was awarded, I think, the second week in October.

Q. When you say it was fast track, is that a standard term that you used or --

A. The -- 8(a) contract -- we found -- one of the methods we used, 8(a) contractors, we can do a sole source up to $4-1/2 million without having to competitively bid a project. So the project would sort of fit under that cap so that a direct award could be made.

There are several typical procedural steps that we would have for capital projects that were bypassed, to the best of my knowledge.

Q. What would those be?

A. Anything over a million dollars, before it goes out for pricing, is supposed to go through the contract review board, which was our standard policy. And before the RFP goes out, anything over a million is supposed to be reviewed by legal counsel. And then, before the award, it's supposed to go through -- be reviewed by legal counsel.

Typically during that process, our staff and the PMO would review the award document before it's issued to the contractor to make sure that it aligns technically with our understanding

of it. That did not happen in the process either.

Q. And how was this painting work funded?

A. It was funded with our standard annual appropriations money.

Q. Was the money reallocated from other projects?

MR. MAYERS: Objection. Speculation.

THE WITNESS: Yes. It wasn't a project that we had budgeted for. It was supposed to be part of the structural repairs project.

So we created a new budget line item and new project tracking number and reallocated funds from other budget line items to fund it.

BY MR. KRISTOFCAK:

Q. What were those other budget line items?

A. I know we reallocated some from -- I think it was -- I can't remember if it was waterproofing or roofing design. We had -- our budget categories follow seven categories. So the first stop I do is within the category of funding. So if I'm doing -- it's exterior

envelope -- this is primarily an exterior envelope project -- I'll see what funding is available under that category and move that over. And then, if that isn't sufficient funds, we look at other ones.

But I do know we took some either waterproofing or roofing design funds to fund that project, and then we found funding under other categories that we hadn't obligated yet.

Q. If I could ask you to turn to tab 8.

MR. KRISTOFCAK: If we could mark this as Exhibit 16.

(Faroughi Deposition Exhibit 16 marked for identification and attached to the transcript.)

BY MR. KRISTOFCAK:

Q. Are you familiar with this document?

A. Yes.

Q. What is it?

A. This is the requisition to fund the sole award -- sole-source award to Washington Office Interiors for the painting of the columns,

exterior and interior.

Q. And your name appears on the bottom left of the document; is that correct?

A. Yes.

Q. And it was also signed by Mr. Floca on the right; is that correct?

A. Yes.

Q. And is this a correct and accurate representation of the document as you remember it?

A. Yes.

Q. And is it part of the Kennedy Center's business records?

A. Yes.

Q. And was it created by people who have knowledge of the contents of the document?

A. Yes.

MR. MAYERS: Objection. Speculation.

MR. KRISTOFCAK: Then if you could turn to tab 9.

Let's mark this as Exhibit 17.

CERTIFICATE OF NOTARY PUBLIC

I, CHRISTINA S. HOTSKO, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting under my direction; that said statement is a true record of the proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this statement was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Christina S. Hotsko

CHRISTINA S. HOTSKO

Notary Public in and for the

District of Columbia

My commission expires:

1 January 2027