# Exhibit C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

\- - - - -

| | |
|---|---|
| JOYCE BEATTY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 25 Civ. 4480 |
| vs. | ) (CRC) |
| | ) |
| DONALD J. TRUMP, et al., | ) |
| | ) |
| Defendant. | ) |

VIDEO RECORDED DEPOSITION OF DARIN BUCHALTER

Monday, October 5, 2026, 9:32 a.m.

Washington Litigation Group

1717 K Street, NW

Washington, DC

Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

Job Number: Lexitas 1039998

finance and operations matters related to real estate.

Q. When you say "advise," does that include consulting work?

A. Yes.

Q. Are there particular industries that you focus on? You said "the built environment," but is that particular industries?

A. No. The industry is real estate and construction. The asset types I have been involved in, I genuinely think every asset type that exists.

Q. What are the principal areas of -- I guess that you consider yourself to have professional expertise in?

A. Finance, operations, administration, both of real estate entities that would include real estate investment trusts, real estate operating companies, vertically integrated developers, debt capital sources that underwrite real estate investments, insurance companies, private equity funds, and then portfolios and single assets. So down to the property level and the property

operations level.

Again, on all asset types. I have been involved in everything from raw land to high-rise office buildings.

Q. Do you consider yourself an expert in performing arts management?

A. No.

Q. Do you consider anyone at Delta an expert at performing arts management?

A. No.

Q. Before this engagement, had you ever worked in performing arts management or with a performing arts organization?

A. Just I make allusion in my report to my time with the San Francisco public libraries. I don't confuse that with the performing arts like the opera and the ballet, but it is arts, literacy, and a civic organization.

But I only draw that for the sake of completeness in my answer.

Q. Understood.

So that's more like sort of a

nonprofit more broadly; is that fair to say?
A. Literacy, the arts. You know, I certainly think it's all in the same realm, but I draw no connection to the symphony and the opera and performing arts.
Q. This is the Friends of the San Francisco Public Library; is that right?
A. Yes.
Q. The Friends organization, they weren't responsible for, for example, managing programming at a performing arts venue?
A. I'll need you to be more specific about programming at a performing arts venue.
Q. Well, what do you understand those words to mean?
A. We definitely had programming responsibility, again, more around writing, literacy, publishing trends in media, things of that nature.
Q. Did you consider the San Francisco Public Library to be a performing arts venue?
A. No.

A. No. You're just testing my memory.

So I know that Mr. Floca and Ms. Robinson, Ms. Robinson as the contracting officer, were there, and I would say there were three or four other people.

Q. All right. I'm going to turn back to this, but if I could have you turn back to Exhibit 7 -- or sorry, Tab 7, Exhibit 1.

This is the Solicitation?

A. Yes.

Q. Should have done this before, but if I could have you turn to -- it's marked page 40, or also KC Bates Number 239.

Do you see at the top, under the section The Core Advisory Challenge, it talks about four distinct operational phasing scenarios?

A. Yes.

Q. Can you tell us what your understanding of those is.

A. The four. I actually -- I know what you're talking about, but I don't see what you are referring to.

Q. Do you see 1.3, and then the word "four" three lines down?

A. Got it. Thank you. Yes.

So the Center had originally conceived of there being four operational approaches to the repair and renovation of the building.

One was to maintain full operations, and have isolated projects occurring for presumably a very long period of time that were patchwork projects that would ultimately lead to the necessary repair.

The complete opposite was shut down everything, the REACH, the whole site, fence at the perimeter. You know, the whole facility dark.

In the middle were two scenarios. One was to -- what I would describe as shut down the main building, keep the REACH operational, use off-site activities and the REACH to support programming, and focus on the restoration of the main building.

Or, a variant of that, where the main building was open to the public, but phased

construction was occurring within it such that portions of the main building from time to time were not available to the public.

Q. Where did you -- where or how did you receive these four scenarios?

A. They were -- well, they were outlined to us. I don't recall the source document.

Q. Was it in a document?

A. Well, I have a pretty vivid recollection of what the four scenarios are. So they must have been in the document. There's a -- there was also a set of numbers, and I know that along with those numbers, there are -- in interviews with finance staff, I understood what those numbers were around.

Q. Yeah. When you say "the numbers," are you talking about something that was fiscal year '27 budget scenarios?

A. I'm talking about that.

Q. That, if you recall, had three scenarios; right?

A. Yes.

Q. I saw your counsel flipping through the

exhibit binder. I don't know if that means that you think that those scenarios are in the report.

MR. LYNCH: No. There is definitely a document that we produced that lists four scenarios.

MS. FREENY: Yeah. We would be, like -- just in the interest of time, it would be helpful to know what that is, if you are able to identify it.

BY MS. FREENY:

Q. Then like just in -- sort of orient me in time when you would have -- when you recall, kind of knowing, these are the four scenarios that I'm going to be asked to look at. Is that before or after you were engaged?

A. I think before, and in fact, my reaction to your question is early.

Q. Okay.

A. So if not before, right at the outset. But I think before, because it would have, obviously, affected our pricing proposal.

Q. Got it. And Kennedy Center management

is the one that actually defined the four scenarios that you were going to look at?

A. Yes.

Q. Did any of those scenarios contemplate, like, the possibility of full closure for less or more than two years?

A. Help me with full closure.

Q. Yes. Full closure of the main building.

A. For -- did any of them involve closure of the main building for less or more than two years?

Q. Yes.

A. Yes.

Q. Which one?

A. I don't remember the numbering sequence of 1 through 4.

Q. Okay. I guess I'm trying to understand because you talked about the full shutdown of everything including the REACH; was that for two years or how long?

A. Yeah. That would have been for two years.

Q. You talked about closure of the main building. That was for two years?

A. Yes.

Q. I'm just trying to understand what input you were given versus what input you -- what you actually were asked to validate.

So this two-year period, was that given to you, two-year closure of the main building, or is that something that you independently came to?

A. Right. So I want to be careful here, just in the interest of truth.

So the two years comes from Jones Lang LaSalle's IPS, integrated project schedule. It did not come as an instruction. You know, let's close it, and make sure that that happens in two years.

What came was, as you synthesized the documents -- so where I'm struggling with my answer, but it's only an intellectual struggle, is the reason that I know that is from my review of the project information.

Q. Okay. I guess what I wanted to make

sure I understand is that you took it as given that the proposal for closure of the main building would be closure for two years?

A. I took it based on the analysis performed. I didn't take it as a blind instruction.

Q. Understood, and I'm not suggesting that. I'm just trying to figure out what your -- what input you validated versus what input you relied on someone else for.

So you did not independently validate this is a two-year project. You relied upon JLL?

A. Correct.

Q. It sounds like at least one of the options you called "patchwork," and one of the other options involved phased construction. What are the difference between those two in your understanding?

A. Small, isolated projects that are more akin to maintenance projects is the first instance.

The second are actual: Let's shut down portions of the site; fence them off; barricade areas from the public; erect scaffolding; do

invasive work.

Q. That latter scenario, is that what would have contemplated, for example, closure of one of the three performance halls, such as the opera hall?

A. Correct.

Q. Does that mean that the first -- again, don't -- I don't mean to suggest that numbers matter, but the first --

A. I'm with you.

Q. -- the first scenario that we talked about, that that contemplated not performing some of the work that the other scenarios contemplated?

MR. LYNCH: Objection. Form.

You can answer.

A. I couldn't reconcile that approach with the body of technical evidence on the building; the systems-level work sort of defies that way of repair, that method of repair.

I simply, logically didn't understand how you could -- for example, how can you repair a portion of piping, and then a week later, the next segment of the piping, and so on.

A. And I'm saying you can't wait.

Q. So let me be clear. I'm not asking can you wait. I'm asking for an assessment between various options, some of which may cost less.

A. Mm-hmm.

Q. Some of which may have a greater impact on programming and the mission, and how you weigh those two together.

You agree that in this -- you know, what I'm asking here is not do you do the work, but how you do the work.

You understand that?

A. Good. Yes.

Q. So how would you weigh that then? In your analysis, if you're saying, you know, one option is going to have a worse effect and/or negative effect on programming; the other option has costs. How did you, as the outside consultant, weigh those two?

A. By presenting my report to the trustees who can deliberate on that very issue.

Q. But how did you reach the results in

your presentation?

I'm trying to understand how you were weighing these competing considerations.

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. I was evaluating the relative merits of different methods of conducting the capital repair.

I realize it has implications for the mission and programming. I address how it is I think that those can be mitigated, but I obviously make primary my study and the issue of the building.

Q. Is that because you understood that to be part of your engagement?

MR. LYNCH: Objection. Vague.

A. What?

Q. The focus on construction.

A. Yes.

Q. I want to talk about the timeline.

Tell me your original understanding of the timeline for the work that you were going to be hired to do, because I'd like to take you back

before you were actually engaged.

A. We were under the assumption that we had 60 days to do the work.

Q. You say "assumption," but that actually -- that was sort of part of the Statement of Work or the solicitation, wasn't it?

A. Yes. You could point me to it specifically.

Q. Yeah.

A. But I'm sure we agree.

Q. I will, because I do have some questions about that.

If you could, take a look at Tab 7, marked Exhibit 1, and pages 36 and 37, or Bates 235 and 236.

A. Oh, yes.

Q. On page 37, that has the anticipated schedule for your work; is that right?

A. Yes.

Q. So it looks like a kickoff meeting within two business days. That's pretty standard, right, that time frame?

A. Yes.

Q. All right. The next is Document Review. Complete by Day 15.

Did I read that right?

A. Yes.

Q. All right. Is that typical, or is that fairly aggressive for a project of this magnitude?

A. It's not uncommon for it to be concurrent with the assessment.

So I --

Q. What do you mean by that?

A. I look at that whole section as 45 days.

Q. I got it.

So the 15 days is really just advisory, in a way. What you're looking at as an important factor or timeline is the assessment analysis complete by Day 45; is that right?

A. That's correct.

Q. But 45 days for this type of analysis still is pretty quick in comparison to sort of your average engagement of this type; is that fair?

A. Well, this is akin to a due diligence

any client, and I'm going to listen to their views, but it's what I accept and adopt that's important.

So again, I work in a commercial context all the time. Everybody's got strong wills and personalities, and they express themselves, but what it is that I'm willing to adopt and support is what keeps me independent.

Q. Do you ever receive -- I just mean this generally: Do you ever receive input from management trying to get you to change parts of your recommendation?

MR. LYNCH: Objection. Vague.

You can answer.

A. Yes.

Q. Did you here?

A. Oh, no. So this was a notably hands-off period of time.

Q. All right. I'll return to that in a bit, but I want to ask a couple more questions.

So the final assessment, your final report, was anticipated to be submitted 60 days after engagement; is that right?

A. Yes.

Q. Now, the time frame changed at some point. Tell us about that.

A. Well, I don't recall the conversations or the, you know, sequence as much as it just came to pass that a finance -- I think it's called Audit and Finance or Finance and Audit Committee, Building and Grounds Committee. A meeting was scheduled for August 3rd. We had commenced work on -- you know, we had been awarded on the 24th, but we commenced on the 27th. That's a Friday and a Monday.

Yeah, I was informed there was an introduction to those committees to talk about our -- you know, that we had been retained, and what we had set out to do.

Then I was informed there was a Board of Trustees meeting scheduled for August 13th, and that that -- those sets of committees needed to prepare a recommendation to make to the Board.

We scheduled a next meeting with the committees on August 10th, the subsequent Monday.

So began a -- you know, a very --

that, I will use the word "aggressive" -- aggressive deployment on our part, and a lot of hard work to make it to that first committee meeting -- to that second committee meeting on August 10th.

Q. The first committee meeting was August 3rd?

A. Yes.

Q. The idea was that you were presenting to help them prepare their recommendation to the larger Board?

A. Yes.

Q. When do you recall receiving that information that the timeline had changed and that there were these two subcommittee meetings?

MR. LYNCH: Objection. Compound.

You can answer.

A. I didn't receive both meetings.

Q. Okay.

A. So it's a sequence of events, but obviously, Monday the 3rd, I must have been informed.

I toured on, I think it was Thursday

the 30th --
Q. Okay.
A. -- and so I must have either known, or been told then. You know, so it's something of that ilk. Yeah.
Q. "Been told then," meaning the 30th?
A. Yeah. The 30th or --
Q. Okay.
A. -- thereabouts, I had been told and knew. Then -- actually, you know, I think Khaled told me, so I think he probably heard that on the 28th. There was an earlier tour.
Q. Okay. So you think the 28th would have been the earliest you would have known that the timeline was changing from what we just talked about?
A. I think the "you" there is Delta, and I think the "me" is like by the 30th and --
Q. Okay.
A. But I did understand that. I did not have material for the 3rd, and I was talking about our approach, and you know, what we had set out to

do, and how we were going to do it.

Q. Okay.

A. So I was briefing -- and certainly in my mind, and consistent with the expectations of the group, was briefing on the process.

Q. The process. Okay.

In your report, though, I think you said that you presented initial findings to subcommittees on both the 3rd and the 10th.

Is that not the case?

A. It is because I had toured --

Q. Okay.

A. -- and I had very stark observations.

In other context, I have seen this before, and I was really taken aback. I actually didn't expect what I saw, in that my prior experience was in a building that was built in the 1920s of -- you know, with similar issues.

So I just -- I wasn't ready for a building built in my lifetime to look like that.

Q. Okay. And so --

A. Because what does that say about me.

Q. I'm happy to say that I postdate the building of the Kennedy Center.

A. Good for you.

Q. Don't even ask about some of the people at the end of the table.

Does that mean, though, that the recommendation that you made -- or sort of -- so I misspoke there.

Let's use the words "initial findings," because those were your words.

You made initial findings on the 3rd to the Audit Committee?

A. Yes. And Building and Grounds. It was a joint -- it was two committees.

Q. Is it your recollection that both committees were present at both meetings? So there were two meetings, and both of them had Audit Committee and Building and Grounds?

A. Yes.

Q. Okay. So the third, you gave initial findings based on your tour?

A. Yes, and I am certain I was into the

technical reports by then as well, so I'm sure I had something to say about that.

Q. Okay. "Technical reports" meaning the JLL report; is that one of them?

A. Yes, and the Moore engineering reports are particularly robust.

Q. What about the 2021 comprehensive building report, did you review that as well?

A. I had that in my possession. So I must have been --

Q. Okay.

A. -- and if not, I was starting in on that.

Q. Okay. How -- do you recall roughly when you would have received the JLL report?

A. I don't remember how we did a document exchange. Again, I can only tell you our typical practice is we would have opened a site, and the Center would have sent it over.

I don't remember how that was all initially organized. That would have happened on the 27th, 28th.

Q. Okay. So you would have had a number of days to review the JLL report?

A. Yes.

Q. You would have needed that because it's a pretty complicated report; is that right?

A. Yes, and I also had toured on the 30th with John Cracraft, was -- he is the senior project manager from JLL.

So we had occasion not only to view the building, you know, together, but I was able to have something of an interview at the time with him, as well.

Q. I'm going to return to all of these things, and hopefully a little bit more chronologically, but I want to continue on to just the change in the timeline.

What did you -- when did you originally expect the Board meeting to be? Is that at the end of the 60 days with the final assessment report?

MR. LYNCH: Objection. Calls for speculation.

You can answer.
Vague as to "the Board meeting."
A. I don't recall if we had talked about some sort of interim report of findings or some sort of status meeting.
I -- you know, I certainly thought that the 45 days was going to stand as the period for the analysis, regardless of whether there had been interim requests for communication.
Q. Okay. But you didn't end up having 45 days to do that analysis; right?
A. Right.
Q. You would agree that having more time permits an adviser to test more assumptions?
MR. LYNCH: Objection. Vague.
A. No.
Q. No. Having more time does not permit an adviser to test more assumptions?
A. We had --
MR. LYNCH: Objection. Asked and answered.
A. We had less time, so we had more people

working longer hours than originally planned.

Q. Is that all? That was the only change?

A. Well, I would like to think that there's no change in the quality of the work, yes.

Q. So I'm not asking really about the quality. I'm asking about the scope of the work, the amount of work.

There were things -- certainly, there must have been things that you otherwise would have done in a 45-day period that this time frame just didn't allow you to perform?

MR. LYNCH: Objection. Lack of foundation.

You can answer.

A. No. I think we did what was necessary, and I felt very personally it was a commitment that we would meet an accelerated schedule, so eight of us worked very hard to get it done.

Q. The decision to accelerate, though, that was not Delta's decision; correct?

A. That's right. That, I understood to be a schedule necessity of the Board.

Q. What did Matt Floca tell you about the change in the schedule, that scheduling necessity, as you call it?

MR. LYNCH: Objection. Lacks foundation.

You can answer.

A. That this was the schedule.

Q. Did he tell you why, between the time that you were engaged on the 24th and then the time that you were told there is a change, like, what occurred to cause that change?

A. No, he didn't. And you know, given that it could have been any number of things, I didn't -- it's not like I'm going to say, well, why is this happening.

I'm a professional. You just deal with it.

Q. All right. I want to get you to turn back to Tab 8, which has been marked as Exhibit 2. This is your pitch deck. I'll try to go through this a little quickly.

But I just want to have you turn --

numbers here, the red.

Q. Sorry. They're very small.

I will state for the record that they were applied by your counsel, not us.

All right. So you see Execution With Speed with that tiny Bates Number 17 at the bottom?

A. Yes.

Q. Now, this is -- this corresponds to both the last slide we talked about, and you would agree, the Statement of Work schedule, is that right, the three phases?

A. Yes.

Q. All right. This contemplates a 60-day schedule; correct?

A. Yes.

Q. All right. It was at least, as Delta characterized it, an aggressive schedule?

A. Yes.

Q. So as you contemplated the work based on the Statement of Work, you contemplated six weeks for draft recommendations; correct?

A. Yes.

Q. And then eight weeks for a final recommendation and presentation to the Board; correct?

A. Elapsed, yes.

Q. I'm sorry. Say that again.

A. Elapsed. I just don't like the way you're saying -- it's not eight weeks to do it. It's within eight weeks.

Q. But you contemplated it would be an aggressive schedule for you to complete the final recommendation and executive briefing within 60 days?

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. Yes.

MS. FREENY: I'm going to actually ask if we can take a break.

THE WITNESS: Sure.

MR. LYNCH: Sure.

(RECESS, 10:58 a.m. - 11:05 a.m.)

BY MS. FREENY:

Q. Mr. Buchalter, the next sort of overarching topic that I'd like to talk to you about is really just the chronology in between your retention as a consultant and the presentation that you made to the Board, okay?

A. Yes.

Q. You said you were retained on the 24th; is that right?

A. Yes.

Q. We think that there was a kickoff meeting on July 7th.

Does that match your memory?

A. No.

Q. Sorry. It shouldn't. Good catch.

July 27th.

A. Yes.

Q. Who attended that?

A. Khaled Aziza, and I believe it was Sean Dooley from Delta.

Q. From Delta. And then who from the Center?

formality or undue process.

Q. You mentioned financial records. Who decided which financial records you would receive?

Was that -- did -- was that what the Center chose to provide, what Delta requested, or a mix of both?

MR. LYNCH: Objection. Compound.

You can answer.

A. What we asked and what was represented as available.

So by way of example, '23 and '24 are audited; '25 is unaudited.

Q. Yep.

A. I never ask for -- you know, if you've got an audit, give it to me, right. So it's the combination of what we want and what there really is.

Q. Okay. I notice you did not look at FY26 financial records.

Why is that?

A. I understood that because of the September fiscal year, they didn't exist.

Q. Okay, but underlying financial records, financial statements from -- monthly reports would have existed for about nine months at the time of your engagement; right?

MR. LYNCH: Objection. Calls for speculation. Lack of foundation.

You can answer.

A. Yes. There would be management accounting through that period.

Q. But you didn't ask for that FY26 data?

A. I don't recall. I don't recall enough to say I -- you know, I may have said, do you have something in suitable form? You know, and I may have been told, no, it's too rough and unreviewed.

Q. Okay. It sounds like something you remember, though, that conversation; being told the material was too rough for you to review?

A. Well, I had definitely been told that '26 had not closed yet. Yeah.

Q. But you also recall being told, the data is too rough for you to review?

MR. LYNCH: Objection. Misstates

the testimony.

You can answer.

A. No, I don't know that I was told that. I clearly am under the impression, though, that edited and complete fiscal year that -- yeah, that it was not made available.

Q. It was not made available, but you asked about it; right?

A. I --

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. I ask for -- I conventionally ask for three years audited financial statements and current-year unaudited.

Q. Yeah. Current year would have been the nine months for FY26; right?

A. Yes.

Q. So you would have asked for that from the Center?

A. Yes.

Q. They declined to provide that?

A. Yes, or -- well, didn't make that available. I don't...
Q. Yeah. Is that common for a client to not make something available that you have requested as the independent adviser?
A. Is it common? It happens.
Q. Okay. Should it happen?
A. It should happen if management's got some material reason to not provide it, yeah.
Q. What was the material reason for --
A. No, I'm --
MR. LYNCH: Objection. Calls for speculation. Lack of foundation.
You can answer.
A. I'm answering your question generally.
Q. So specifically, what was the material reason provided here?
A. I don't know because I didn't get it.
Q. Did you push back?
A. I found -- I knew what I needed to know in terms of the magnitude of operating losses versus the sources of revenue, so I was able to continue.

Q. You were able to continue, but you would have liked to have had the fiscal year '26 data, wouldn't you?

A. I am a consultant. We would like to have everything, all the time.

Q. That includes the fiscal year '26 data that you requested from the Center; correct?

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. Yes.

Q. You mentioned the difference between audited and unaudited financial data. So the fiscal year '25 data from the Center that you were provided, that was unaudited; is that right?

A. Yes.

Q. Okay. Is there a difference when you're performing -- when you -- and here, I mean Delta.

When Delta is performing financial analysis, is there a difference if you're looking at audited financial data than unaudited financial data and how you approach the information you are

provided?

A. No. There is no difference in how you approach the information.

Q. What is the difference?

A. Your ability to rely on the information.

Q. And audited would be a greater ability to rely on the information, I assume?

A. Yes.

Q. Correct.

I assume you would prefer to have audited data wherever possible?

A. Yes.

Q. Do you know why the fiscal year '25 audit had not been completed by the time you did your analysis?

MR. LYNCH: Objection. Calls for speculation. Lack of foundation.

You can answer.

A. No; however, in the industry, I do know that the audit firms will manage their workload based on, you know, public versus not public, and so on.

So it may have just been a backlog. I know BDO does the work.

Q. Mm-hmm.

A. They may have agreed to schedule it at a certain time of the year for fee reasons.

Q. Do you know that, or is that just a process --

A. No. I'm just answering why it doesn't -- I'm a little bit blasé on why they weren't yet audited.

Q. Okay.

A. There are very conventional reasons why that may have occurred.

Q. There are also reasons, though, having to do with issues of the finance that could cause an audit not to have been completed; correct?

MR. LYNCH: Objection. Vague. Lack of foundation.

You can answer.

A. Yes.

Q. Fiscal year '24, you reviewed those -- that data. That was -- that audit was completed in

March; correct?

MR. LYNCH: Objection. Vague as to March of what year.

A. I don't know.

Q. Did you ask the Center about the status of their fiscal '25 audit?

A. I don't think so.

Q. Did anyone mention to you from the Center about the '25 audit and why it was still open?

A. No.

Q. All right. Is there anything that you -- other than the fiscal year -- let me -- sorry. Let me restart that question.

Is there anything other than fiscal year '26 financial information that you requested from the Center and did not receive?

A. No.

Q. We talked about the JLL report, and I think you said that you thought you had that pretty early on in the engagement; is that right?

A. Yes.

those in the production.

Q. To your recollection, though, were there multiple versions of the FY27 Budget Scenarios spreadsheet?

A. No.

Q. To your recollection, did the numbers in that spreadsheet ever change?

MR. LYNCH: Objection. Vague.

A. I mean, ever -- for the point of your implied question, within this horizon, no.

Q. Did you -- did the numbers ever vary in any of -- like, in any of the documents that Delta received?

A. Not --

MR. LYNCH: Yeah. Objection. Vague. Calls for speculation.

If you understand --

A. Not to my recollection, and not -- I was proceeding with my analysis.

Q. I mean, I would assume that if --

A. I have no recollection of stopping and revising my work.

Q. Okay. So just to be clear, you didn't receive the budget scenarios until after you had made a presentation, an initial presentation to the subcommittees on August 3rd; correct?

MR. LYNCH: Objection to the extent it characterizes the presentation.

You can answer.

A. Maybe.

Q. Do you have reason to think that you did receive the fiscal year '27 budget scenarios prior to your presentation to the subcommittees on the 3rd?

A. I may have through another means. I really don't know.

I will testify that I was not talking about the operating results on the August 3rd meeting. That was not the purpose of the August 3rd meeting.

Q. What about that 10th meeting? Do you talk about the operating costs at the 10th meeting?

A. Yes.

Q. Just turning your attention to the one

e-mail below that, it looks like, from here, that Delta also received the audited '24 and '25 financials on August 5th; is that right?

A. As this e-mail indicates.

Q. Sorry. If I misspoke, '24 and '23; is that right? I may have said '25.

A. Yes.

Q. Do you recall if you received the '25 roughly around the same time?

I don't think we have any documents memorializing that.

A. We -- I mean, certainly. Certainly around the same time. I don't know the means by which it was transmitted.

Q. When you did your tour on July 30th, who were you accompanied by on that tour?

A. Matt Floca, John Cracraft, Jennifer Hood.

Q. The last two, Cracraft and Hood, are from JLL; right?

A. Yes. There was a Kennedy Center sort of security-maintenance person, I believe, employed by

the Center.

Q. Who led the tour, so to speak?

A. John Cracraft.

Q. So he took you around to show you areas that required renovation or construction?

A. Yeah, and in my experience, of course, I always ask, show me everything. Don't just show me -- you know, don't show me the photographs. Show me the facility.

I mean, we were in the various venues. I remember being in the main theater. We were on the roof, you know, we were throughout the facility.

Q. During that tour, did Matt Floca express any sort of his own perspective about the state of the building?

A. Well, I'm sure you've met him. He's a soft-spoken person, so he was not, you know, effusive. But, I mean, it is hard to look at this building and not make comments and not point at something and grunt.

In fact, I even wrote in my report,

A. Yes.

Q. All right.

MR. LYNCH: There are actually several, it looks like.

MS. FREENY: Oh. Sorry.

MR. LYNCH: So we have numbers. Give us one. Bottom center.

THE WITNESS: 94?

Q. Yes. 1094.

Does this look like the presentation that Donna Arduin gave, or is this something you gave?

A. It's not something I gave, and I don't recognize this document.

Q. You don't?

A. No.

Q. Okay. I'm still going to ask if you -- if any of this rings any bells.

So in this slide on 1049, on the left-hand side, it has columns with what looked like, to me, you don't have to adopt this, but they look like three scenarios. I'm just going to

actually take a look at those and see if that means anything to you.

One says Endowment & Grant-funded. One says NSO Off-Site plus REACH. And the other says NSO On-Site plus REACH.

Do those map onto anything that you have heard the Center talk about?

A. I've heard the Center talk about this. I do not recognize the entirety of this presentation.

Q. What do you recall about the Center talking about these three scenarios?

A. Well, my understanding is that the NSO and the Center had come to some sort of agreement that the NSO was highly supportive of, and that that -- and I don't know the agreement.

Q. Yeah.

A. But that that agreement has the NSO off-site touring.

Q. Okay. So you understood that the NSO had already -- the decision had already been made to have the NSO off-site?

A. That's what I think.
Q. Okay.
A. But I am answering what I think I have heard.
Q. Understood.
A. Not something I have considered in performing my work.
Q. Understood.
Do you recall who told you that the NSO was going to be off-site this coming season?
A. I honestly can't remember the context. I do remember saying to somebody, and the NSO supports that, they're comfortable with that, and the person said, oh, yes.
Q. What else do you -- so if you remember these, can you help me understand at least what your understanding of Endowment & Grant-funding is, as a scenario.
MR. LYNCH: Objection. Calls for speculation. Lack of foundation.
A. There are two pieces of language for donor funds, and I think the -- I'm going to use my

words, I don't think these are Kennedy Center words -- is there's restricted and unrestricted gifts.

Q. Mm-hmm.

A. The endowment, I think of as a large pool of -- probably not right in the detail of this, but that that's essentially unrestricted. Use that how you want, and that the grant-funded are named for specific purposes, like the education fund.

Q. Yeah.

A. And things like that.

So those are restricted. I'm using language you would use to classify them, not -- you know, in financial statements, not necessarily terminology of the Center.

Q. Did you hear the Center talk about a scenario in which construction was funded by endowment and grant?

A. No. No. This is about operating expenses, to me.

Q. Well, so again, I'm just -- your counsel can make whatever objections he undoubtedly will

actually trying to understand.

Because you now know that the Board made a decision, voted, at that Board meeting to close the building for two years; right?

A. Yes.

Q. At the time that you were preparing that slide presentation, you didn't know that that was going to form at least one basis for the Board deciding on that vote?

A. No. I did.

What you are asking me is, did I know that they were going to vote on it that day.

Q. Okay.

A. I didn't know that.

Q. I got it.

So you knew that they were going to vote; right?

A. And I under -- I had read the judge's Opinion, and I understood that at issue here was the prudence of the Board. So I was providing -- I thought my duty was that I was providing this depth of information so they could discuss and deliberate.

Whether they decided then today, that's the function of the Board to decide that, that's not...

Q. Was there any substantive work that remained outstanding at the time that you made the presentation to, I guess, the subcommittee?

MR. LYNCH: Objection. Vague as to "substantive."

You can answer.

A. Yes. Because my scope of work included the completion of a detailed risk register and some risk mitigation elements, which actually, we are still working on. I make note of that in my report that our work is continuing in that regard.

The final X-pages of my report, I don't know, three pages, I discuss certain things like having a risk register, having certain oversight practices, because I'm trying to make a nod to that that is within the scope of my contract.

Q. Yeah.

A. So yeah, I think there is a sort of -- if you think of it this way, once you've recommended

the method, you then need to -- again, professional diligence, you need to then say, well, what are the controls that we need to put in place to feel more assured about that. And I think that's -- you know, that's important in a capital project. It's an important consideration for a Board.

Q. Right. But wouldn't the -- like sort of the risk register and all of those other steps that help you feel more assured, wouldn't that be relevant to the underlying recommendation itself?

A. If the recommendation, as it is, is about the means --

Q. Mm-hmm.

A. -- like, how do you do -- you know, how should we best do that, what is most efficient when you compare the two alternatives, no.

How you now execute that with care, that -- you've now moved on from that decision.

And I would also say to you, it's regardless. Regardless of -- you know, the risk mitigation applies regardless of the path chosen.

Q. Did you perform -- like, I may be

A. Earlier that week.

Q. So we talked about Delta receiving the financials from '23 and '24 on August 5th. Shall we say that week -- sometime after August 5th, but before August 7th?

A. Yes. Unless, as concepts, I had already brought them up as well.

Q. Explain them to me as concepts.

A. Yes.

One is that revenue will decline from its current level of about 100 million, simply due to the fact that it's a -- the construction impacts will reduce the desire of people to purchase tickets and attend events and the like. That's one adjustment factor.

The second adjustment factor is a physical one, where you can't fill a seat in an area that's closed. So it's sort of a supply-demand. It's a series of two, one supply and one demand degradation of current income.

Q. So I think the non-availability of available seats, I think, is a little easier for me

to understand.

A. Right.

Q. So let me address that one first.

How did you arrive at the discount factor that you would apply based on the idea that in phased construction, there would be certain seats that were not available?

A. So I applied 37.5 percent, which is 25 percent increased by 50 percent.

Q. And --

A. So it's 25 plus 12-and-a-half is 37-and-a-half.

Q. Mm-hmm.

A. 25 is a four-year duration of just straight-lining a 100 percent execution over four years, 25 per year, and then applying a circulation factor, or -- you know, a circulation impact that is -- that you can't just discretely close 25 percent. You're going to have to have a, you know, a circulation. You're going to have other impacts.

Conventionally, that's estimated as

1.5. 50 percent.

Q. When you say "conventionally," where are you getting that from?

A. From -- it's one of those rules of thumb, that it could be more or less, but that that's the right way, in a initial estimate, to estimate circulation.

Q. What is "circulation"?

A. Ingress and egress, equipment movement. They sometimes call them lay-down yards. You know, the fact that you need areas to stage material.

Q. So I think I might be confused here. I thought we were talking about the discount that was applied for, like, the fact that there just aren't seats available?

A. Yes, but to the extent that programming space is -- so here's an example.

In the Kennedy Center, there is storage on stairwells. So event-oriented storage will be on a stairwell or on a landing of a stairwell. If you have to construct in that area, you're going to have to close that stairwell.

You're going to have the flow of materials in that stairwell. Now you don't have the storage area, either, to support that event space.

So it's not literally taking, you know, 8,000 seats and saying, okay, well, those seats won't be available. It's that the programming space will not be available.

So to the extent that that programming space supports revenue, it will be, in kind, compressed.

Q. I think I still need help figuring out how you came up with the exact numbers, rather than the concept.

A. Yep.

Q. Because I assume that it's going to vary, based on both the type of building --

A. Yep.

Q. -- and also the purpose of the building.

So, you know, an office is going to be -- or, you know, a vendor is going to be different than a performing arts venue; right?

A. Yes.

Q. How did you arrive at these specific discount rates versus some other one, including the discount rate that Donna was applying in her calculations?

MR. LYNCH: Objection. Compound. Calls for speculation.

A. I -- yeah. I mean, you'll have to tell me what Donna's -- you know, I mean, to the extent that that's relevant to the question.

Q. Yeah. Let me write that up, then.

How did you arrive at the specific discount numbers that you applied rather than higher or lower?

A. Right, and conferring with my group, and we all work with the same contracting estimate standards and various, you know, AACE rules, and the like around estimating. It's part of the capital project estimating process.

Q. Okay. But again, what's the -- what is the process or methodology by which you came up with the exact discount percentage that you applied?

A. By picking the most conventional, it's a

factor of 1.5 percent is the most conventionally used factor.

So you'd have to start to explain higher or lower, on average, and I also did 25 percent a year over four years.

It's really correct in the aggregate, because it probably wouldn't look like that, either.

There probably would be -- it would be 100 percent by the end of four years, so says the schedule, but it would probably be most acute somewhere in the middle or in two peaks.

Q. Yeah. You said you have to -- you'd have to explain higher or lower?

A. Yeah. I'd have to have these program specifics. I would have to know the actual areas that were going to be worked on, not as a inventory of projects, but somebody would have to go through and do all of the phasing and explain, okay, well, we're going to do the work to understand how the flow works when we're doing Eisenhower.

Where are we going to put the

equipment? Where is the lay-down yard? How is the population going to flow? That work is all JLL's work that's in process.

Q. Okay. So it's in process, meaning it has not been completed?

A. Right, until there's a commitment to a duration.

Q. So essentially, it would take more time to analyze whether to depart from the conventionally used number to apply a higher or lower number?

MR. LYNCH: Objection. Mischaracterizes.

You can answer.

A. It would take more time.

Q. Mm-hmm.

A. It would take more information, yes.

Q. More information than you were provided?

MR. LYNCH: Objection.

A. Than is available.

Q. It would also, though, take more time to develop that analysis; right?

You said the flow analysis, the

that's when the handoff went to Donna, is the -- what I saw as some real friction on the revenue function.

I have always been a little bit surprised at the level of operating loss. You know, not something I knew as a person in the world until I was involved in this project.

You know, it's a significant number, and you have to think about what -- how are you going to fund that when you're simultaneously doing a major capital project.

Q. That issue, though, doesn't go away when the Center reopens; right?

A. It doesn't.

Q. You talked about your thought about the impact on fundraising. On what do you base that?

A. Probably, again, my experience with the library. It's just that, you know, people are dedicated to a cause, like the arts, and they feel good about it, and want to support it.

You know, I don't know that the -- I don't know that the donor function is as impacted.

I do know that the lack of programming, you know, tends to discourage donors. But you know, I can see also a commitment generally to the arts.

Q. Did you do -- or did Delta do any analysis of the impact on fundraising?

A. No.

Q. Were you asked to?

A. No.

Q. Not having done that, but having your own opinion about it, did that factor into the recommendation that you gave to the Board?

A. It did from the standpoint that, again, from a sources and uses perspective, if you are going to have to use endowment funds to support operations, and conceivably to support capital repair, then you're diminishing the capacity and durability of the organization, and that is a concern, and I think I drafted that into my briefing slides to the trustees.

Q. Did you have a discussion with Donna before she -- before this meeting where she

presented her perspective on the finances?

MR. LYNCH: Objection. Vague.

A. No. I had asked for -- I had asked, first, her view of scenarios, and was, you know, as you showed in that e-mail, was in receipt. We did not talk prior to this meeting, and in fact, we met at the Hoover building.

Q. Whose idea was it to have Donna present on the revenue and cost side of things to Secretary Lutnick?

A. Oh, why did she attend the meeting?

Q. No, not why did she attend the meeting, but why did she make the presentation on finances?

A. She is the CFO. It just felt appropriate in the room. There --

Q. Was that your -- but was that your idea, her idea, Floca's idea; whose idea?

A. I don't know. It wasn't my idea.

Q. You didn't think that was unusual if you were the outside consultant, and one of the things that were opining on was related to costs and revenue that she would be doing the presentation?

A. No.

Q. What if her -- like, what if what she presented was different than what Delta had uncovered?

MR. LYNCH: Objection. Calls for speculation. Vague. Lack of foundation.

A. It wasn't, and had it been, I would have said something.

Q. Okay. So what you're saying is, in this meeting, Secretary Lutnick, you were sort of assessing on the fly whether the information that she was presenting to the Secretary on costs and revenue was consistent with what Delta had analyzed in the two days prior?

MR. LYNCH: Objection. Mischaracterizes.

A. I wouldn't -- I'm going to decline to answer that question. I wouldn't characterize what I was doing as making decisions on the fly.

Q. Well, I'm trying to understand. If she's making a presentation, you're saying I would have disagreed. Did you have Delta's financial

analysis in front of you?

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. No. I had nothing in front of me.

Q. All right. Who, if anyone, at the Center provided input on drafts of your presentation, the slide deck?

A. Oh.

MR. LYNCH: Objection to the extent it calls for attorney-client privilege.

A. Good. I need that.

MR. LYNCH: But you can answer who, but not the substance of anything --

A. Yeah. I submitted it to Matt Floca, who I believed shared it with Elliot Berke.

Q. Okay. Then I'm not asking you the substance: Did you have direct discussions with Elliot Berke about your presentation?

A. No.

Q. Did Matt Floca tell you input, like relay input to you from Elliot Berke that he said,

this is Elliot's?

MR. LYNCH: Same instructions on the substance.

But you can answer yes or no.

A. No.

Q. What sort of input did Mr. Floca provide to you?

A. Nothing that affected the drafting. I think what he was doing was conferring, however he thought necessary, among his staff, and came back and, you know, confirmed that, yeah, he didn't think there was anything of issue in there; in other words, they didn't have any conflicting information.

Q. Did you make any edits in response to his comments?

A. No.

Q. All right. I'm now going to have you turn to Tab 1, which we are going to mark as --

MR. LYNCH: 6.

Q. -- Exhibit 6.

(Buchalter Exhibit 6, Delta PowerPoint presentation, 8.13.25, Construction Program Assessment, [no

Bates], was marked for identification.)

Q. On the front, it says Construction Program Assessment, and it's dated August 13, 2026.

Do you see that?

A. Yes, thank you.

Q. Is this what we had been talking about as the Delta presentation or slide deck?

A. Yes.

Q. You would agree if I call it the "slide deck," the "presentation," the "deck," we're still referring to the same thing, this Exhibit 6?

A. Yes.

Q. Okay. All right. This is the presentation that you made to the Board on August 13th?

A. Yes.

Q. Is this also the presentation that you made to the subcommittees on August 10th?

A. Yes.

Q. Did you make any edits to the document in between the 10th and the 13th?

A. I may have.

Q. If so, do you have drafts of the version that you delivered to the subcommittee on August 10th?

A. I would expect that they've been overwritten. I mean, our practice is to have the documents evolve.

Q. Did you send a copy of the version that you presented on August 10th to the Kennedy Center at any point in time?

A. Yes, but my memory is faulty on whether it was before the 10th or the 13th.

MS. FREENY: I think, counsel, we understand there is probably a version that went over to the Kennedy Center, and we would request a copy of that. It was not in the production as far as we know.

Q. So I want to turn your attention to page 3 and 4.

Earlier, you talked about two slides. These are the -- essentially, the two real substantive slides that we have been talking about containing your recommendations?

answered.

A. Yes.

Q. So there's no point in time that accounts for where, you know, superficial renovations are done, or renovations that don't require shutting large portions of the building?

A. I think, again, earlier, I testified that there will be periods where it will be higher, and so there are certainly periods where it will be lower.

I would actually expect it to be somewhat episodic during the four-year period. I think this is the right average.

Q. Now, at the last bullet point, you estimate "... an annual operating deficit of $75 million for the term of the renovation" (as read); is that right?

A. Yes.

Q. That matches or corresponds to the charts on the bottom left?

A. Yeah.

I'll just correct, 78. You said

"75," but --

Q. Oh, excuse me, 78.

A. -- we're saying the same thing.

Q. Your answer is yes, the 78 corresponds to the chart on the bottom left?

A. Yes.

Q. Walk me through, where did you get these numbers from?

A. So these are numbers from the work of the Kennedy Center, as adjusted by me. The adjustments are the revenue and programming space adjustments that we had talked about.

Q. For the expenses, where did those come from?

A. The Kennedy Center.

Q. The uses. But are -- did they supply them as the projected -- help me understand.

A. I'm sorry. I understand.

The '27 forecast. 2027 forecast.

Q. Okay. So the expenses or the uses in this chart come from the fiscal year '27 scenarios chart supplied by the Kennedy Center?

A. Yes.

Q. I think I, for some reason, thought that the expenses were drawn from the fiscal year '25 financials; is that wrong?

Because the scenarios...

A. I know. The -- yes.

They come from the three-year trailing financial statements because the -- if you stay open, you are going to operate at your historical levels of cost.

Q. Who made the determination to use those numbers?

A. I did.

Q. When you say "three years trailing," did you -- you did an average, or did you just draw from FY27 -- or excuse me, '25.

A. No, my recollection is that I -- yeah, I -- yes. Yes. I drew from '25. I looked for aberrations in '23 and '24 to see that I could rely on '25.

Q. Did you vary any of them from fiscal year '25 up or down, do you recall?

A. I don't believe so.

Q. I want to draw your attention to -- hold on one second. Tab 14 for a second. We are going to turn back to this, but...

A. Mm-hmm. Yeah.

Q. Which will be --

MR. LYNCH: 7.

(Buchalter Exhibit 7, Appendix W, [no Bates], was marked for identification.)

Q. Correct.

So Exhibit 7, marked Appendix W, this is an appendix from Delta's report, is it not?

A. Yes.

Q. This is the unaudited fiscal year '25 financials that you received from the Kennedy Center?

A. Yes.

Q. These were the financials that we were just referring to?

A. Yes. Yes.

Q. All right. So I can give you some time to look at this. I know it's very small. I remind

you that this was your report.

The numbers under operating expenses, if you see, it looks like they do match the numbers that appear in your presentation, with one exception, which is Kennedy Center programming.

A. Mm-hmm.

Q. Do you see that?

A. Yes.

Q. Okay. So in FY25, the unaudited financials list expenses of approximately 65.5 million for Kennedy Center programming?

A. Mm-hmm. Mm-hmm.

Q. Whereas in your table --

A. Can you give me the tab reference again.

MR. LYNCH: It's 1.

Q. Oh, sorry. It's Tab 1, Exhibit 6.

We looked at 65.5 in the '25 financials, and this -- your presentation lists expenses for Center programming at 72.5?

A. Yeah.

Q. Why is that?

A. I don't know.

Q. Do you think that you had discussions with your team about why that is?

A. I'm sorry. Would I or could I?

Q. Do you think that you would?

A. Yes. I'm going to presume the 72-and-a-half is sourced from somewhere else.

Q. Okay, but you don't know where?

A. Right.

Q. Who actually on your team was responsible for preparing that chart?

A. We did that chart live. Khaled, James Hanson, Carrie Sherreard and I were literally dictating off of a spreadsheet.

Q. How many days in advance of the August 10th meeting, when you were putting this together?

A. Probably that weekend, the 8th. Probably those two days.

Q. All right. I want to turn next to the slide marked Partially Close and Renovate, which I'm going to call main building closure, if you don't mind. Okay?

A. Okay.

Q. Now, here, you have two different sections, one starts Essential Renovations, and the other starts Considerations. Both of them are in blue.

A. Yes.

Q. I just want to understand, these appear to be sort of observations and recommendations, both of them.

In your mind, was there a distinction between what you put in the top, sort of the top square versus what you called considerations?

A. My intention was to explain the scenario in the upper left, but then again, briefing the Board of Trustees, things that they should -- that the trustees should consider when discussing this alternative.

Q. Okay.

A. Items, not things.

Q. Now, the third bullet point talks about mission-based programming in the REACH. Where did

the information -- where did that information come from?

A. From the Center and interviews because the import of -- and it's actually interesting, right, because there's certain elements of the Kennedy memorial that you can't relocate, but there are considerable elements and educational programming around the memorial. The memorial is one of the key tenants, and so how was that going to be accommodated.

Q. So you said you got this information on the programming in the REACH from the Center?

A. Yes.

Q. And interviews, you've said. With whom?

A. There were a series of interviews. I think they were mostly that first week of August. And there were -- there was a -- forgive me, there was a consultant to the Center from California who was on the phone, and somebody else in the programming group was part of a series of interviews. We had, you know, half a dozen or eight interviews.

know from our experience in the London theater, which was all about an opening.

Q. But that's just about the closure of the main building scenario?

A. Mm-hmm.

Q. What about the scenario that you were also asked to consider, which was the phased renovation?

MR. LYNCH: Objection.

Q. Did the consultant provide input on the effect of programming as between those two scenarios?

A. I don't believe so.

Q. Okay. So the focus was on the programming options under a main building closure scenario?

A. Yes, and the necessary continuity of those -- of that programming. Because that's what I was concerned about is, can we represent that -- to the trustees that their -- you know, two-thirds of their duties are still being fulfilled?

Q. Yeah.

If I wanted to see what your conclusion -- analysis or conclusions are about that, about continuity after the two full years of main building closure, where would I look?

A. At my report.

Q. Okay. We'll look at that in a minute.

Anywhere else? Okay.

A. Somewhere in the 1500 pages of my report, yes.

Q. What analysis, I guess, did you do, specifically focused on what is it going to look like after two years of main building closure, on the programming side?

A. Oh, I didn't do any analysis on that.

Q. Let's look at some additional bullet points. It talks about -- the last bullet point says that -- this is closure of the main building for two years. "Allows the time necessary to program for 2028-2029 in accordance with industry practice..."

How did you come to that conclusion?

A. Specifically, what I just referred to,

that I better understood the ramp required to position your -- reposition yourself for large, Broadway productions and the like, that that itself is a specific market that bids and operates in certain cycles, and that the idea that you could -- you can't book an act without necessary lead time.

Q. Right. But you are not a performing arts expert; right?

A. I -- didn't I testify to that?

Q. Yes. I'm just confirming.

A. You're confirming my prior testimony?

MR. LYNCH: Asked and answered.

Q. Yes. Yeah.

Yeah. I'm trying to -- like, so you have told us that you are not an expert in performing arts management, but you made a conclusion to the Board that full closure of the main building would be consistent with industry practice.

I'm trying to understand how you made that conclusion if you don't have expertise in arts management?

MR. LYNCH: Argumentative. Asked and answered.

Q. Do you consider that to be an expert opinion?

MR. LYNCH: "That," meaning that bullet point?

MS. FREENY: Correct.

Q. Do you consider it an expert opinion that fully closing the main building would allow the time necessary to program for 2028 to 2029 in accordance with industry practice?

Sir?

A. I don't think that it's necessary that that be an expert opinion.

Q. Okay.

A. Just.

Q. So that was not an expert opinion?

A. It's not an expert opinion. It's just a statement of fact.

Q. It's a fact that you based on what?

MR. LYNCH: Asked and answered.

A. My interviews and investigation.

Q. What is the scope of that investigation, into industry practice?

MR. LYNCH: Asked and answered.

A. Inquiring from the Center and personnel at its -- under its direction, or that were made available to me in answer to my questions in preparing this analysis.

Q. Who at the Center provided you with information about industry practice in that respect?

MR. LYNCH: Asked and answered.

A. The programming personnel and Mr. Floca.

Q. Which programming personnel in particular did you talk to, or did people at Delta talk to?

A. I'll have to get you those names.

Q. Did somebody at the Center tell you that industry -- that the closure for two years was in accordance with industry practice?

MR. LYNCH: Asked and answered.

A. The industry practice is that there's time necessary --

Q. Did someone at the --

A. -- to program.

Q. Did someone at the Center tell you that -- that first sentence, that there would be -- the closure would allow time necessary to program consistent with industry practice? Did that come from somebody at the Center?

A. From the consultant, the fact that it takes several years to position for those types of acts. Those large Broadway productions.

So this is just a statement of fact, that there's -- the time necessary. You can take advantage of that time necessary.

Q. In comparison, though, with the sort of the renovate, right, there would still be an ability to have that same programming; right? I'm trying to understand why this is consistent with industry practice.

Like, what is this intended to convey?

A. That the industry practice is the lead time. So if we've, you know, drafted this to cause confusion, let's remedy that. The industry practice

is that you need the time, the lead time.

Q. What about the next clause?

So the -- this scenario "... mitigates market and consumer confusion..."

What analysis did Delta do to reach that conclusion?

A. We didn't do specific analysis on it.

Q. Did that information come from the Kennedy Center, then?

A. No, it's just not expert -- it's not an expert opinion. Based on an independent analysis performed by Delta, it's an observation that I think describes this scenario.

Q. On what basis did you draw the conclusion that closure of the main building would mitigate market and consumer confusion?

MR. LYNCH: Objection. Mischaracterizes the testimony.

A. From my experience in similar capital projects.

Q. You say "similar," but none involving a performing arts venue?

MR. LYNCH: Objection.
Mischaracterizes.

You can answer.

A. Well, I mean, we have experience in performing arts venues.

Q. Do you personally have experience in performing arts venues?

A. No. Personally, no.

Q. If you didn't think that this was an expert opinion, "mitigates market and consumer confusion," why did you include it in the presentation to the Board?

MR. LYNCH: Asked and answered.

You can answer.

A. You know, you're really focused on the concept of expert opinion.

I'm really focused on the fact that we were retained to do an independent analysis.

Q. Mm-hmm.

A. So I think we should take care with the expert opinion characterization because if I'm providing the information necessary to fulfill the

assignment, you're conflating that with expert opinion and holding it to a different standard.

Q. Okay.

A. At least in the way that I'm perceiving your questions.

Q. That's fair.

So we'll not talk about expert opinion. We'll talk about independent analysis because I thought you said this did not reflect independent analysis?

A. It does not.

Q. Okay. You knew that the Board would be relying on these statements to decide how to proceed with respect to closure?

A. They would consider this information as they deliberated. I mean --

Q. I assume you wouldn't include something like this will "mitigate market and consumer confusion" if you didn't think it would be something that the Board would want to consider.

MR. LYNCH: Objection. Argumentative.

this presentation?
A. No.
Q. Did he ever encourage you to put in things about donor engagement?
A. No.
Q. I assume that you had an understanding of -- I'm not going to ask that one. Strike that one.
All right. I want to take a look at the financial figures in this main building closure scenario.
You estimate here revenue from the Kennedy Center programming of 38.3.
Do you see that?
A. Yes.
Q. Generally speaking, for this scenario, where did those numbers come from in terms of revenue sources?
A. Yes. This is the '27 forecast, and what the sources do is they combine pledges and income.
Q. Which combines pledges and income?
A. Sources.

Q. Okay. Right. For essentially available operating budget?

A. Sources, yeah.

Q. Okay. So but where did the numbers come from?

A. The '27 forecast prepared by the Center.

Q. Okay. So these were numbers that you received from Donna Arduin?

A. Yes.

Q. Did Delta independently verify them?

A. No.

Q. Why is that?

A. We considered that Donna's and her staff to be, you know, in a position to reduce credible information, and if we were going to rely on it, it is going to be the same information that the trustees would rely on.

Q. Why did you sort of apply your own calculations and methodology to the projections with respect to the other scenario, but you relied on the Kennedy Center's projections for this scenario?

A. Oh, no. I'm sorry.

You can answer.

A. My understanding was it was just to conclude the process of --

Q. Did you understand that there would be an additional Board vote?

A. No.

Q. About closure?

A. No.

Q. When did you come to understand that there would be an additional Board vote in September ratifying their prior vote?

A. At the end of August, I want to say, August 30th, around there, I spoke on the telephone with Matt Floca.

He told me your report has been distributed, and we're going to have a second meeting. We're going to give the trustees two weeks to read your report, and we're going to have a second meeting. We want it to be an open dialogue, and anything that they want to ask you, they can ask you.

Q. Okay.

A. And I said, sure, because frankly, I submitted the report, so I had a report.

Q. Right.

A. I just had to show up for a meeting.

Q. All right. If we have time, I'll return to the September time period, but for now, let's talk about your report.

If I could have you turn to Paragraph 24 in Exhibit 8. 24 talks about your expertise in the areas that are the subject matter of this report?

A. Yes.

Q. I just want to ask, do you consider performing arts management to fall within the subject matter of your expert report?

MR. LYNCH: Asked and answered at least twice.

You can answer.

A. No.

Q. All right. In this report, you talk about a amendment to your scope of work to eliminate certain aspects, including a final risk register.

Do you remember that?

A. I'm sorry. Are you reading?

Q. No, I'm not.

A. But you're telling me, and I do remember.

Q. That was -- that amendment to the scope of work, was that done just based on the compressed time frame?

A. Yes. And just verbally. We didn't actually amend this, the SOW.

Q. Were there any other changes to your Statement of Work, other than -- I can just -- it's Paragraph 3?

A. Yeah.

Q. "... preparation of program improvement recommendations and a final risk register."

I just want to know if there were any other amendments to the scope of work.

A. It is Paragraph 2(vi). The elements of (vi) were deferred. We are doing the work. In Paragraph 3, I say my work in this regard may continue beyond the date of this expert report.

side, because that's the only thing I can think of.

Is there a better term for me to use? You've got capital and --

A. Expenses.

Q. Okay. But I guess I'm thinking capital on the construction side.

A. Yes.

Q. Then revenue and expenses on the other?

A. Yes.

Q. Is there like a single word for that? You've got capital versus?

A. Operating.

Q. Operating. Okay. My colleague, Mr. Kristofcak, I will turn it over to him. He's going to ask questions about the capital side because I am less familiar with that.

But right now, I'm going to ask you some questions on the operating side.

A. Okay. Very good.

Q. So it sounds like from our prior discussion, you received financials from the Kennedy Center for fiscal year '23 and '24; right?

A. Audited financials, yes.
Q. Audited financials for '23 and '24, and then unaudited for '25; right?
A. Yes.
Q. We talked about the fact that you requested, but did not receive any financials for the months of FY26; right?
A. That's right.
Q. Then you received this FY27 scenarios document from the Kennedy Center; right?
A. Yes.
Q. Those were projections prepared by Donna Arduin and her team?
A. Yes.
Q. Based on your report, it looks like you also conducted interviews, and I think we talked in part about those interviews.
Interviews were also an input on the operating side?
A. Yes.
Q. Other than those documents and interviews, anything else that you considered when

deciding or assessing the operational and financial implications of the two scenarios?

A. As you know, a few e-mail exchanges.

Q. With the Center?

A. Yes.

Q. Which of the interviews were relevant to the operating side of the house, the calculations of the operating cost impact?

A. I guess some of the programming interviews, and certainly the finance interviews with Donna and Alex.

Q. How many interviews were conducted with the finance folks?

A. I mean, it's an odd word to use. You know, how many interviews were there. There's probably one or two interviews, but there were, you know -- especially with Donna, there were six to eight, easily, discussions.

Q. What kind of discussions? Like, what -- just give me an idea of something that you would go to Donna in the course of preparing this report to ask -- either preparing this report or, to be fair,

also preparing the original presentation.

A. Color and commentary around things like the educational programming line item, what does that include. How are pledges put against that. How do they generate -- you know, do they sell tickets. Do they generate revenue, or is it just, you know, a public interest kind of program.

Q. Do you have notes of those discussions?

MR. LYNCH: Asked and answered.

You can answer.

A. I do not. It's my practice to make sure that it ends up in a report. I don't know if my staff have, notes, though, I would expect them to be -- I would expect that they wouldn't.

Q. Don't take this the wrong way, but help me understand: How do you make sure that the information you learn through a discussion with finance ends up in the report if you don't take notes?

A. Because the notes are the report. Because we've got this live document up that we're building the whole time that the inquiry is going

on, or the analysis is going on. Everything's got to make its way in here.

In fact, you see some relics in here of that process, unfortunately, where there's repetition among paragraphs and the like. You're seeing that it's a live document.

Q. When you mention relics, are there any relics in here that aren't just repetition, but are -- you know, not accurate, or old information?

A. No. No. There's annoying repetition.

Q. Is it -- okay.

A. There's no contradiction between the paragraphs or anything.

Q. There's nothing in there that was superseded by some other conclusion or information?

A. No.

Q. All right. So we talked a little bit about -- when we talked about your presentation about the revenue and cost chart, but I want to kind of drill down on that in your report.

So for operating revenue, I think we talked about the fact that you started with fiscal

escalation.

Q. So in other words, to get that same amount of work done in 2026 dollars would cost three -- let's see if I can do this math. $356.7 million. Am I roughly getting that correct?

A. Yes.

Q. The total of the first two cells on -- all the way on the right side?

A. Yes.

Q. Okay. So even under the closure scenario, with the $250 million -- $257 million appropriation, the Center can really only fund whatever that is, two-thirds of the total scope?

A. Of the total DLR scope, but if you drop off -- the way I think about it is you drop off the Tier 3.

Q. Okay. But just off the DLR scope, it's roughly two-thirds, or somewhere around there?

A. Yes.

Q. Did anyone ask you to exclude Tier 3, or was that your own initiative?

A. No. It was my decision.

Q. Your estimate that, in the closure scenario, that the Center could execute on 90 percent of the total project with the existing appropriation, that's based on costs of Tier 1 and Tier 2; correct?

A. Yes.

Q. So then continuing further down, do you see the line where it says Total Partially Close and Renovate?

A. Yes.

Q. Then all the way on the right, the total for that is 502.8 million?

A. Yes.

Q. What's the difference between that and the amount that you presented to the Board?

A. That's the -- so speaking in round numbers, that's the 500 minus 100, if you drop off Tier 3, gets you to 400, which is the 400 we talked about.

That's the commercial --

Q. That's the -- that includes the 40

percent adjustment?

A. Yes.

Q. Okay. Then similarly for the other scenario, for the operating scenario, sort of apples-to-apples with the $503 million cost, for the operating scenario, the cost would be about $724 million?

A. That's right, with the same adjustment methodology, with the addition of the two adjustments in the final two rows before the total. Total Scenario B.

Q. That's the 25 percent occupancy risk and 25 percent additional construction allowance?

A. Yes.

Q. Now, help me understand, sort of -- is it fair to say that on an apples-to-apples basis, the comparison between the two scenarios is, you know, 503 million and 725 million?

A. If you include Tier 3.

Q. Okay. What about without Tier 3?

A. It's the 285, 400, and 560.

Q. So it's roughly 1.4x?

A. To get to the 724?

Q. Well, no. The 724 includes Phase 3.

So without Phase 3 --

A. Yes.

Q. -- I'm asking what would be the apples-to-apples comparison between the two?

A. Tier 1 and Tier 2, 2 -- 280 --

Q. Or closed versus open?

A. -- 285. That's where the 285 plus 5 -- order of 560 comes from, and the 400 is that piece in the middle, which you can see is 500 minus 100, in that green line that goes across.

Q. Right. I guess what I'm trying to ask is, on a -- calculated using the same methodology, if you include the 40 percent adjustment for both scenarios, the comparison is 400 versus 560; correct?

A. Yes.

Q. So that's a Delta of about 40 percent?

A. Yeah.

Q. All right. Changing gears to another topic.

answered.

A. There would have been alternatives.

Q. Meaning you would not have told them, if asked, the Center is within certain financial collapse within weeks?

MR. LYNCH: Asked and answered multiple times.

You can answer.

A. Well, I mean, with also the proviso that I think you're asking me to draw conclusions from information that I've reviewed, which makes sense, but certainly, just to be clear, not in the scope of my report.

Q. Understand.

A. But there would have been alternatives, and there would have been, you know -- but difficult alternatives.

Q. But not certain financial collapse; correct?

MR. LYNCH: Asked and answered, third time.

A. No.

Q. Do you recall any discussion about sort of the cash position at the September 15th meeting?
A. I don't. I remember it at August 13th.
Q. I apologize if I have asked this; I genuinely do not remember: Were you ever asked to do analysis or financial modeling about the cash position of the Center or its liquidity position?
A. No.
Q. I guess you probably couldn't have done that because you didn't have access to any of the FY26 financial data; is that right?
A. That's right. It would have been a historical review.
Q. Did you have discussions with Donna Arduin about the cash position, kind of, after that August 13th meeting?
A. I didn't.
Q. How about with Mr. Floca?
A. Only in the context of saying it appears there's questions in that regard from the August 13th meeting itself.
Q. Okay.

A. You know, Senator Whitehouse made the request, and clearly, there was concern around what is the financial state of affairs of the Center.

Q. Do you recall what he said?

MR. LYNCH: Objection. Vague as to "he."

Q. Do you recall what Matt Floca said in response?

A. No. No, and perhaps he didn't respond.

Q. That's not something that you felt that -- let me just try that again.

That's not something that -- the concern about the Center's cash position was not something that you felt like you needed to incorporate into your report?

A. Well, no, but that sounds like it's because I'm not sensitive to it or I don't think it's material. It's that I think that the operating deficit of the Center is so stark that it's almost a constant to the future of that institution.

I mean, it has to be addressed. It's a -- I mean, it's a use of cash.

A. Yeah. I think that's a risk.
Q. Okay.
A. I think the building falling down is a greater risk.
Q. Well, I'll push back there because in the scenario of phased renovation, that is still completing the renovations that were planned; correct?
A. Yes, with a fairly negative experience being in the building.
Q. But not the building falling down?
A. Well, let's maybe go back to what I answered. Because I thought you had suggested, just let it go.
Q. No. So I'm not suggesting let it go. Right, we have been talking about the difference between phased renovation and full closure, not the difference between full closure of the main building and doing nothing.
The alternative I'm positing here is phased renovation, which, you know, as you acknowledged, the Center has done before; right?

A. Mm-hmm.
Q. Okay.
A. Okay.
Q. And the phased -- yeah.
A. Yeah.
Q. Yeah. I think we're all tired. I'm going to end this hypothetical debate.
Did Delta provide the Board with anything else relevant to its report in connection with the September 15th meeting, other than the report?
A. No.
Q. Now, you were slated to, I think, speak as a guest at the meeting. Did that end up happening?
A. No.
Q. Why?
A. Nobody asked me any questions.
Q. Okay. Was that a surprise?
A. Yes.
Q. So you went into the meeting expecting that you would have some role in speaking?

A. That, after this level of effort and voluminous report, that there would be discussion and questions.

Q. Okay. Did they -- did either Mr. Floca or Secretary Lutnick, or whoever's running the meeting, actually open the floor for questions?

A. Somebody, I guess, Mr. Floca, made clear that we were all here and available and -- you know, so he made the offer to the trustees.

Q. But did he actually say, does anyone have questions?

A. Not to my recollection.

Q. So is it possible that people didn't ask questions because there just -- it wasn't presented as a, now is the time to ask Mr. Buchalter?

MR. LYNCH: Objection. Calls for speculation.

A. No. No, I think it was clear that we were there -- John Cracraft from Jones Lang LaSalle was there. I think it was clear, and you know, it's Zoom, and we're all in a conference together. I think it was clear that we were there to field

questions, but there weren't any.

MS. FREENY: All right. I think those are all the questions I have. So with that, I will thank you very much, Mr. Buchalter.

THE WITNESS: Yeah.

MS. FREENY: We can go off the record.

(CONCLUDED, 5:10 p.m.)

CERTIFICATE OF COURT REPORTER

I, Marjorie Peters, Fellow of the Academy of Reporting, Registered Merit Reporter, Certified Realtime Reporter, Realtime Systems Administrator, and Notary Public in the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that the witness was placed under oath according to the law; that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction, and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

I further certify that signature was not waived by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand this day of , 2026.

Marjorie Peters, FAPR, RMR, CRR, RSA

My commission expires October 31, 2029.

# Excerpts from Buchalter Dep. Ex. 1

**SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL PRODUCTS AND COMMERCIAL SERVICES**
**OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30**

1. REQUISITION NO. BBBCRR_000195
PAGE 1 OF 63

2. CONTRACT NO.
3. AWARD/EFFECTIVE DATE
4. ORDER NO.
5. SOLICITATION NUMBER 33310526R0009
6. SOLICITATION ISSUE DATE 7-16-2026

7. FOR SOLICITATION INFORMATION CALL:
a. NAME Georgia Robinson
b. TELEPHONE NO. (No Collect Calls) [redacted]
8. OFFER DUE DATE/LOCAL TIME 07-21-2026 10:00AM EDT

9. ISSUED BY CODE

The John F Kennedy Center
Attn: Contracting
2700 F Street, N.W.
Washington DC 20566-0001

10. THIS ACQUISITION IS [X] UNRESTRICTED OR [ ] SET ASIDE: ____ % FOR:
[ ] SMALL BUSINESS
[ ] HUBZONE SMALL BUSINESS
[ ] SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS
[ ] WOMEN-OWNED SMALL BUSINESS (WOSB) ELIGIBLE UNDER THE WOMEN-OWNED SMALL BUSINESS PROGRAM
[ ] EDWOSB
[ ] 8(A)
NAICS: 541611
SIZE STANDARD: $24.5 Million

11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED
[ ] SEE SCHEDULE

12. DISCOUNT TERMS

[ ] 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)

13b. RATING N/A

14. METHOD OF SOLICITATION [ ] RFQ [ ] IFB [X] RFP

15. DELIVER TO CODE

JFKC Center for the Performing Arts
Loading Dock #1
2700 F Street, N.W.
Washington DC 20566-001

16. ADMINISTERED BY CODE

The John F Kennedy Center
Attn: Contracting
2700 F Street, N.W.
Washington DC 20566-0001

17a. CONTRACTOR/OFFEROR CODE FACILITY CODE

TELEPHONE NO. UEI: EFT:

[ ] 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18a. PAYMENT WILL BE MADE BY CODE

Upload Invoices to Kolan Campbell:
https://forms.office.com/r/0VKLxz2ppt

PHONE: FAX:

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED [ ] SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES — See CONTINUATION Page | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | Unique Entity Identifier (UEI): ________________<br>Tax Identification Number (TIN): ________________<br><br>This is a Request for Proposal (RFP) for Independent Construction Program Assessment and Advisory Services in accordance with The Statement of Work (SOW).<br><br>The Center reserves the right to cancel this RFP at anytime. | | | | |

(Use Reverse and/or Attach Additional Sheets as Necessary)

EXHIBIT
Buchalter 1
mp 10.5.26
PENGAD 800-631-6989

25. ACCOUNTING AND APPROPRIATION DATA See CONTINUATION Page

26. TOTAL AWARD AMOUNT (For Govt. Use Only)

[X] 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA [X] ARE [ ] ARE NOT ATTACHED.

[ ] 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA [ ] ARE [ ] ARE NOT ATTACHED

[ ] 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ____________ COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED

[ ] 29. AWARD OF CONTRACT: REF. ____________ OFFER DATED ____________. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN IS ACCEPTED AS TO ITEMS:

30a. SIGNATURE OF OFFEROR/CONTRACTOR

31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER)

30b. NAME AND TITLE OF SIGNER (TYPE OR PRINT) | 30c. DATE SIGNED

31b. NAME OF CONTRACTING OFFICER (TYPE OR PRINT) | 31c. DATE SIGNED

The Kennedy Center

Project: Independent Construction Program Assessment & Advisory Services

1. **Purpose**

The purpose of this Statement of Work (SOW) is to provide independent construction program assessment and advisory services through objective information review, analysis, documentation, and reporting. The services are intended to provide stakeholders with an independent understanding of program status, performance conditions, and available program information.

The Consultant shall perform an independent assessment of construction program information, including program documentation, cost and schedule data, risk information, reporting processes, and other relevant program records. Advisory services under this scope are limited to independent analysis, clarification, and informational support based on reviewed materials.

2. **Scope of Services**

**General Requirements**

The Consultant shall perform the assessment, analysis, and reporting activities required to evaluate program management practices, project controls, cost and schedule performance, risk management, contract administration, and construction delivery processes.

**Specific Requirements**

The Consultant shall provide independent construction program assessment and advisory services, including:

**Task 1 – Program Information Assessment**

Review and assess available program documentation, including project records, plans, schedules, budgets, reports, and performance data. Document program organization, governance, processes, reporting methods, and the completeness and reliability of available information.

**Task 2 – Cost and Schedule Assessment**

Review program cost data, forecasts, schedules, milestones, and progress information. Analyze available data to summarize cost and schedule status, trends, and documented variances.

**Task 3 – Risk, Issue, and Performance Review**
Review risk registers, issue logs, change documentation, and performance information. Summarize identified risks, issues, trends, and documented program conditions.

**Task 4 – Program Controls and Reporting Assessment**
Review program controls, reporting processes, performance metrics, and information management practices. Document methods used to monitor, track, and communicate program status.

**Task 5 – Independent Advisory Support**
Provide independent analysis, clarification, and informational support through document reviews, stakeholder discussions, interviews, and assessment briefings.

**Task 6 – Assessment Reporting** Prepare assessment reports documenting:

- Information reviewed and assessment methodology
- Program status observations
- Cost and schedule summaries
- Risk and issue review results
- Data limitations and information gaps
- Independent assessment findings

**3. Deliverables**
The Consultant shall provide the following deliverables, as applicable:

- Document Review Summary
- Independent Construction Program Assessment Report
- Cost and Schedule Assessment Summary
- Risk and Issue Review Summary
- Stakeholder Briefing Materials
- Final Assessment Report

Deliverables shall present factual observations, analysis, and documented findings based on available programmatic and other information.

**4. Independence and Objectivity**
The Consultant shall perform all services independently and objectively. The assessment shall be based on but not limited to documentation provided, stakeholder input, interviews, and program data. The Consultant shall not assume responsibility for program management, construction management, project execution, decision-making, or implementation of program changes.

**5. Advisory Services Limitation**

Advisory services provided under this Statement of Work are limited to independent review, analysis, interpretation, and communication of program information. The Consultant shall not provide construction management services, direct project activities, implement corrective actions, or assume responsibility for program outcomes.

**6. Reporting and Coordination**
The Consultant shall coordinate with designated stakeholders to obtain relevant program information, conduct reviews, and communicate assessment results. Reports and briefings shall be prepared in a format suitable for stakeholder and executive-level review.

**7. Period of Performance**
The period of performance for the Independent Construction Program Assessment & Advisory Services shall commence upon issuance of the Owner's Notice to Proceed (NTP) and continue for approximately sixty (60) calendar days.

The Center may authorize a thirty (30) calendar day extension. The maximum period of performance, including the optional extension, shall not exceed ninety (90) calendar days from the effective date of the NTP.

**Phase 1 – Project Initiation and Data Collection**
**Duration:** As agreed upon by the Consultant and Contracting Officer's Representative

The Consultant shall initiate services, establish communication protocols, and collect the information necessary to perform the independent program assessment.
Activities shall include:

- Conduct project kickoff meeting with Owner representatives.
- Confirm scope, objectives, and expectations.
- Review available project documentation, including:
  - Program management plans
  - Project schedules
  - Cost reports and budgets
  - Contracts and procurement documents
  - Risk registers
  - Status reports
  - Change management records
  - Quality and safety documentation
- Identify key stakeholders and establish interview schedule.
- Any other relevant information and documentation

**Deliverables:**

- Project Management Plan
- Document Request Log
- Assessment Work Plan
- Stakeholder Interview Schedule

**Phase 2 – Program Assessment and Analysis**
**Duration:** As agreed upon by the Consultant and Contracting Officer's Representative

The Consultant shall perform an independent assessment of the Owner's construction program management practices, controls, and project delivery performance.

**Activities at a minimum shall include:**

- Evaluate program governance and organizational structure.
- Assess project management processes and procedures.
- Review cost and schedule controls.
- Evaluate risk management practices.
- Assess change management processes.
- Review contract administration procedures.
- Evaluate reporting processes and performance metrics.
- Identify opportunities for improvement and risk mitigation.

**Deliverables:**

- Preliminary Assessment Findings
- Program Risk Assessment
- Cost and Schedule Review Memoranda
- Draft Recommendations

**Phase 3 – Final Assessment and Advisory Report**
**Duration:** As agreed upon by the Consultant and Contracting Officer's Representative (COR)

The Consultant shall finalize findings and provide actionable recommendations to support Owner decision-making.

**Activities shall include:**

- Validate assessment findings with Owner stakeholders.
- Incorporate Owner comments and additional information.
- Develop final recommendations and implementation strategies.
- Conduct executive briefing.

**Deliverables:**

- Final Independent Construction Program Assessment Report
- Executive Summary Presentation
- Program Improvement Recommendations
- Final Risk Register
- Closeout Meeting

**Optional Extension Period**

The Owner may authorize a **thirty (30) calendar day extension**

The optional extension may be used for tasks such as:

- Additional briefings suitable for stakeholder and executive-level review
- Additional review of Owner-provided documentation.
- Development of supplemental recommendations.
- Additional stakeholder interviews or workshops.
- Owner-requested advisory support related to the assessment findings.

•

**Period of Performance Milestones**

| **Milestone** | **Completion Date** |
|---|---|
| Notice to Proceed Issued | Date of Award |
| Kickoff Meeting | Within 2 Business Days of Award |
| Document Review | Complete by Day 15 or As agreed upon by the Consultant and COR |
| Assessment Analysis | Complete by Day 45 or As agreed upon by the Consultant and COR |
| Draft Findings | Submit Day 50 or As agreed upon by the Consultant and COR |
| Final Assessment Report | Submit Day 60 or As agreed upon by the Consultant and COR |
| Optional Extension Period | Days 61–90 |

**8. PLACE OF PERFORMANCE**
The primary place of performance shall be:

John F. Kennedy Center for the Performing Arts
2700 F Street, NW
Washington, DC 20566

**9. CONTRACTOR RESPONSIBILITIES**
The Contractor shall provide qualified personnel, supervision, equipment, and management necessary to perform all services required.

a. Disclosure of Information
Information made available to the Contractor by the Center shall be used only for purposes directly related to performance of this contract. The Contractor shall not disclose, publish, release, or reproduce the Center's information without written approval.

b. Project Security Requirements
Any Contractor personnel requiring recurring access to Kennedy Center facilities shall obtain and maintain Kennedy Center-issued badges. The Contractor shall complete and submit all required badging documentation, including Form RFID-Rev B and Kennedy Center Pass Applications.

Contractor personnel shall comply with all security procedures and access requirements. The Center reserves the right to deny or revoke access to any Contractor employee who fails to comply with security requirements.

**10. PAYMENT**

-

The Contractor shall submit invoices monthly unless otherwise directed by the Government. Invoices shall be reviewed and signed by the Contractor's authorized representative prior to submission. Invoices shall be submitted through the Kennedy Center Invoice Submission Portal: https://forms.office.com/r/0VKLxz2ppt

Failure to provide complete and accurate documentation may result in delayed payment processing.

---

**END OF STATEMENT OF WORK**

# Excerpts from Buchalter Dep. Ex. 3

**Darin L. Buchalter**

| | |
|---|---|
| **From:** | Arduin, Donna <[redacted]> |
| **Sent:** | Saturday, August 8, 2026 11:39 AM |
| **To:** | Darin L. Buchalter; Khaled Aziza; Floca, Matt; Berke, Elliot; Antkowiak, Alex |
| **Subject:** | Fw: |
| **Attachments:** | FY27 Budget Scenarios (2)].pdf |

---

**From:** Arduin, Donna <[redacted]>
**Sent:** Saturday, 08 August 2026 11:38:03
**To:** Arduin, Donna <[redacted]>
**Subject:**

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.



EXHIBIT
PENGAD 800-631-6989
Buchalter 3
mp 10.5.26

**Darin L. Buchalter**

**From:** Arduin, Donna <[redacted]>
**Sent:** Saturday, August 8, 2026 11:26 AM
**To:** Floca, Matt; Berke, Elliot; Antkowiak, Alex; Khaled Aziza; Darin L. Buchalter
**Subject:** Re: [EXTERNAL]: Delta + KC GC

I should have added a note there, Darin. Matt and I are using our FY 27 contributed revenue number because we have no reasonable belief we could raise more if we stay open. $62 m is the amount we have in solid pledges for the KC with no new fundraising, and for the NSO, a reasonable FY 27 fundraising goal.

---

**From:** Darin L. Buchalter <dbuchalter@delta-cgi.com>
**Sent:** Saturday, 08 August 2026 11:18:35
**To:** Arduin, Donna <[redacted]>; Floca, Matt <[redacted]>; Berke, Elliot <[redacted]>; Antkowiak, Alex <[redacted]>; Khaled Aziza <kaziza@delta-cgi.com>
**Subject:** RE: [EXTERNAL]: Delta + KC GC

And, just to confirm, contributed revenue of 62 is actual for FY 25?

**Darin L. Buchalter**
**Chief Executive Officer**
CRE, FRICS
**D:** +1 (646) 814 9421 | **M:** +1 [redacted]
**E:** dbuchalter@delta-cgi.com
Based in the New York metro area | Serving clients globally
delta-cgi.com

*This email contains information from Delta Consulting Group which may be privileged or confidential. The information contained herein, or attached, is for the exclusive use of the addressee above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this information is prohibited. If you have received this electronic mail transmission in error, please notify us and delete the message without reading, copying, saving or disclosing it.*

**From:** Darin L. Buchalter
**Sent:** Saturday, August 8, 2026 11:17 AM
**To:** 'Arduin, Donna' <[redacted]>; Floca, Matt <[redacted]>; Berke, Elliot <[redacted]>; Antkowiak, Alex <[redacted]>; Khaled Aziza <kaziza@delta-cgi.com>
**Subject:** RE: [EXTERNAL]: Delta + KC GC

Donna:

On the KC programming of 59 is the 75% a floor space reduction and 80% a sales reduction stemming from construction impacts? Is that how you think about it?

Best regards,

Darin

---

**From:** Arduin, Donna <[redacted]>
**Sent:** Saturday, August 8, 2026 8:59 AM
**To:** Floca, Matt <[redacted]>; Darin L. Buchalter <dbuchalter@delta-cgi.com>; Berke, Elliot <[redacted]>; Antkowiak, Alex <AAntkowiak@kennedy-center.org>; Khaled Aziza <kaziza@delta-cgi.com>
**Subject:** Re: [EXTERNAL]: Delta + KC GC

I get this line using FY 25 financial statements and discounting ticket sales:

Revenue
KC programming: 59m*.75*.8=35.4 m
Opera programming: make this zero
NSO programming: 13
Education: 6
Tkt handling and Aux: 20m*.75*.8=12 m
Total: 66

Contributed revenue: 62

Expenses: 218
Ex-WNO: 211

Deficit: 83 m

---

**From:** Floca, Matt <[redacted]>
**Sent:** Friday, August 7, 2026 7:10 PM
**To:** dbuchalter <dbuchalter@delta-cgi.com>; Berke, Elliot <[redacted]>; Arduin, Donna <[redacted]>; Antkowiak, Alex <[redacted]>; Khaled Aziza <kaziza@delta-cgi.com>
**Subject:** Re: [EXTERNAL]: Delta + KC GC

Donna,

I took a stab at this. Can you please review?

Matt Floca
Executive Director & Chief Operating Officer
The John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566
[redacted] | Kennedy-Center.org

# Buchalter Dep. Ex. 6



DELTA
CONSULTING GROUP

# Construction
## Program Assessment

INDEPENDENT CONSTRUCTION PROGRAM ASSESSMENT AND ADVISORY SERVICES
August 13, 2026
Contract No. 33310526C0011

*Prepared for*

**The Kennedy Center**

*Privileged & Confidential*

EXHIBIT
PENGAD 800-631-6989
Buchalter 6
mp 10-5-26

# Darin L. **Buchalter**

## Chief Executive Officer

**Darin L. Buchalter** is a senior operating executive with 36 years of experience driving turnaround, transformation and strategic growth across the professional services, real estate and construction industries.

- Proven track record delivering year-over-year revenue growth, EBITDA improvement and increased enterprise and shareholder value
- Extensive executive leadership experience across businesses ranging from startup operations to companies exceeding $550 million in revenue
- Deep expertise leading global transformations that enhance operational performance, market position and company valuation
- Experienced in leading human capital-intensive, asset-light businesses with a focus on strategic growth and financial performance
- Independent board member of several private equity-backed companies and former Chair of the Friends of the San Francisco Public Library

## Education

- **Harvard Business School Executive Education**
  Leading Professional Service Firms, January 2020
- **University of California, Santa Cruz**
  BA (Honors, Phi Beta Kappa), 1990

## Certifications & Licenses

- Fellow of the Royal Institution of Chartered Surveyors (FRICS)
- Counselor of Real Estate (CRE)

DELTA
CONSULTING GROUP

**T:** (646) 814-9421
**E:** dbuchalter@delta-cgi.com



# Operate

## AND PARTIALLY RENOVATE

*(all figures in millions USD; except percentages)*

| Scope | Funding | Need | Shortfall |
|---|---|---|---|
| Utilities | 225 | 225 | – |
| Structure | 32 | 156 | (124) |
| Venues | – | 179 | (179) |
| Total | 257 | 560 | (303) |

| SOURCES | OPERATING FUND |
|---|---|
| Programming | |
| Kennedy Center | 32.7 |
| Education & Visual Arts Disability | 1.1 |
| National Symphony Orchestra | 6.6 |
| External programming and events | 3.2 |
| Auxiliary services | 5.0 |
| Ticket handling fees and other revenues | 5.1 |
| Contributions | 62.0 |
| **Total** | **115.7** |

| USES | OPERATING FUND |
|---|---|
| Programming | |
| Kennedy Center | 72.5 |
| Education & Visual Arts Disability | 15.3 |
| National Symphony Orchestra | 41.9 |
| External programming and events | 2.2 |
| Auxiliary services | 3.6 |
| General & Administrative, Marketing & Sales | 39.1 |
| Development, Institutional Affairs | 16.2 |
| Production, Operation and Maintenance | 2.6 |
| **Total** | **193.5** |
| **Difference** | **(77.8)** |

## Partial Access. Higher Cost. Prolonged Impact.

- 4-year revolving closures throughout main building.
- One-third of the main structure will be inaccessible to the public at any given time; accordingly, programming, ticket sales and patron experience will be constrained.
- Invested capital will deliver 46% of the program, with an annual operating deficit of ~$78M for the term of the renovation.

## CAPITAL INVESTMENT

- The logistics and duration of simultaneously operating and renovating reduces the amount of capital spent on the building.
- The $257M appropriation does not deliver the full program.
- Instead, the renovation of the structure is under-funded and venue improvement is unfunded.

## OPERATING DEFICIT

- Phased construction will impact the usable programming space by one-third each year.
- Revenue will reduce given the disruption caused by significant construction.
- At the same time, operating costs will be constant given the extent of necessary operations.
- Endowment releases and new contributions will become critical while disruption at the Center is high.

## Considerations

- The state of disrepair is significant and escalating; the remedy is invasive.
- Patron safety will be an ever-present challenge.
- Time introduces increased uncertainty and complexity.
- Fundraising efforts will go to operating costs and infrastructure remediation, rather than building a durable, profitable national arts program through a sustainable endowment.

# Partially Close
## AND RENOVATE

## Essential Renovations. Protect the Institution.

- 2-year concentrated renovation duration; close the main building; erect fencing and commence large scale renovations.
- This program renovates an historic structure and is not a wholesale rebuilding of the site; character-defining historic elements will be restored and preserved.
- Mission-based programming continues in the REACH, the primary onsite hub.
- NSO events are held offsite through regional partner venues, touring and digital broadcasts. Signature events like the Kennedy Center Honors and the Mark Twain Prize are also held offsite.
- Allows the time necessary to program for 2028-2029 in accordance with industry practice, mitigates market and consumer confusion, and best preserves the brand by delivering the highest caliber performances in the highest quality venues.

## CAPITAL INVESTMENT

- The $257M appropriation advances 90% of the program.
- Value engineering or targeted fundraising of $30M would close the gap and enable 100% completion.
- Commercial execution costs 40% more for the same scope.

## OPERATING DEFICIT

- Curtails annual operating deficit of ~$78M.
- Partially closing enables staff reduction and a reset of expenses.
- Pro forma operating deficit (before debt service) is minimal during a shorter renovation period.
- Partially closing preserves current funds, limits long-term reputational harm and delivers a faster return to full programming.

## Considerations

- The Center maintains its statutory cultural mandate during a facility shutdown.
- The REACH will preserve the memorial experience with public displays and interactive content.
- The renovation process will serve as a means of engagement with patrons and donors.
- Key staff will be redeployed in alignment with the needs of the Center during renovations.
- Focused execution over shortest possible duration further reduces cost uncertainty.
- Vertically integrated delivery model avoids standard commercial premiums.
- Fundraising efforts build endowment funds and durability of the national arts program.

*(all figures in millions USD, except percentages)*

| Scope | Vertically Integrated | Commercial Bid | Premium |
|---|---|---|---|
| Utilities | 115 | 160 | +45 |
| Structure | 80 | 110 | +30 |
| Venues | 90 | 130 | +40 |
| Total | 285 | 400 | +115 / +40% |

| SOURCES | OPERATING FUND |
|---|---|
| Programming | |
| Kennedy Center | 38.3 |
| Education & Visual Arts Disability | 8.3 |
| National Symphony Orchestra | 28.3 |
| External programming and events | - |
| Auxiliary services | - |
| Ticket handling fees and other revenues | 1.2 |
| **Total** | **76.1** |

| USES | OPERATING FUND |
|---|---|
| Programming | |
| Kennedy Center | 8.1 |
| Education & Visual Arts Disability | 7.7 |
| National Symphony Orchestra | 44.0 |
| External programming and events | - |
| Auxiliary services | - |
| General & Administrative | 4.6 |
| Fundraising | 2.7 |
| IT & System Infrastructure | 5.6 |
| **Total** | **72.7** |
| **Difference** | **3.4** |

DELTA
CONSULTING GROUP




delta-cgi.com

# Buchalter Dep. Ex. 11

## APPENDIX T

Comparative Cost Assessment Workbook

EXHIBIT
Buchalter 11
mp 10-5-26
PENGAD 800-631-6989

## Scenario Summary

| Category | Close & Renovate – VI | Close & Renovate – Commercial | Operate & Renovate | Notes |
|---|---|---|---|---|
| Utilities | $113.5 | $158.9 | $227.2 | Tier 1 reporting allocation |
| Structure | $78.9 | $110.5 | $158.0 | Tier 1 reporting allocation |
| Venues | $90.6 | $126.8 | $180.7 | Tier 2 reporting pool |
| **TOTAL** | **$283.0** | **$396.3** | **$565.9** | **Tier 1 + Tier 2 only** |

| Scenario | Total | Federal Appropriation | Gap | Funding Coverage |
|---|---|---|---|---|
| Close & Renovate - Vertically Integrated | $283.0 | $257.0 | $26.0 | 90.8% |
| Close & Renovate - Commercial | $396.3 | $257.0 | $139.3 | 64.9% |
| Operate & Renovate | $565.9 | $257.0 | $308.9 | 45.4% |

*Operate and Partially Renovate: 40% design-maturity adjustment applies to hard and soft costs; the 25% occupancy risk and 25% additional construction allowance apply to hard/construction costs only.*

## Two-Scenario Capital Cost Build-Up

*Totals exclude contingency and management reserve. Values in $ millions. Scenario B occupancy and additional construction allowances are applied to hard costs only.*

| Cost Component | Tier 1 - Hard | Tier 1 - Soft | Tier 2 - Hard | Tier 2 - Soft | Tier 3 - Hard | Tier 3 - Soft | Totals |
|---|---|---|---|---|---|---|---|
| **Baseline Program- 2021$** | $122.7 | $12.6 | $56.9 | $7.2 | $44.7 | $4.8 | **$248.9** |
| **Escalation to 2026 @ 47%** | $57.2 | | $26.5 | | $20.9 | $2.3 | **$106.8** |
| **Escalation to Partially Close and Renovate + @ 4.7% to 2028 $** | | | | | $3.1 | $0.3 | **$3.4** |
| **Subtotal Partially Close and Renovate After Escalation** | $179.9 | $12.6 | $83.4 | $7.2 | $68.7 | $7.4 | **$359.1** |
| **Partially Close and Renovate - Design Maturity Risk @ 40%** | $71.9 | $5.0 | $33.4 | $2.9 | $27.5 | $3.0 | **$143.7** |
| **Total Partially Close and Renovate** | **$251.8** | **$17.6** | **$116.7** | **$10.1** | **$96.1** | **$10.4** | **$502.8** |
| **Escalation to Operate and Partially Renovate + @ 7.2% 2030$** | $13.0 | $0.9 | $6.0 | $0.5 | $4.7 | $0.5 | **$25.6** |
| **Subtotal Total Operate and Partially Renovate After Escalation** | $192.8 | $13.5 | $89.4 | $7.7 | $70.3 | $7.6 | **$381.3** |
| **Operate and Partially Renovate - Design Maturity Risk @ 40%** | $77.1 | $5.4 | $35.8 | $3.1 | $28.1 | $3.0 | **$152.5** |
| **Operate and Partially Renovate - Occupancy Risk @ 25% (Hard Cost Only)** | $48.2 | $3.4 | $22.3 | $1.9 | $17.6 | $1.9 | $95.3 |
| **Operate and Partially Renovate - Addl' Construction Allowance @ 25% (Hard Cost Only)** | $48.2 | $3.4 | $22.3 | $1.9 | $17.6 | $1.9 | $95.3 |
| **Total Scenario B** | **$366.3** | **$25.6** | **$169.8** | **$14.7** | **$133.6** | **$14.5** | **$724.6** |

## Tiered Baseline Hard / Soft Cost Summary

*Program-enabling hard and soft costs are allocated pro rata to included tier hard and soft costs, respectively. Values in $ millions.*

| Tier | Direct Hard | Direct Soft | Direct Total |
|---|---|---|---|
| Tier 1 | $119.9 | $11.1 | $131.0 |
| Tier 2 | $55.6 | $6.4 | $62.0 |
| Tier 3 | $43.7 | $4.3 | $48.0 |
| Program Enabling | $5.0 | $3.0 | $8.0 |
| **TOTAL** | **$224.3** | **$24.6** | **$248.9** |

| Tier | Direct Hard | Direct Soft | Direct Total | Allocated Enabling Hard / Share per Tier | Allocated Enabling Soft / Share per Tier | Total Hard | Total Soft | Total incl. Enabling | % of Program |
|---|---|---|---|---|---|---|---|---|---|
| Tier 1 | $119.9 | $11.1 | $131.0 | $2.7 | $1.5 | $122.7 | $12.6 | $135.2 | 54.3% |
| Tier 2 | $55.6 | $6.4 | $62.0 | $1.3 | $0.9 | $56.9 | $7.2 | $64.1 | 25.7% |
| Tier 3 | $43.7 | $4.3 | $48.0 | $1.0 | $0.6 | $44.7 | $4.8 | $49.6 | 19.9% |
| **TOTAL** | **$219.3** | **$21.7** | **$241.0** | **$5.0** | **$3.0** | **$224.3** | **$24.6** | **$248.9** | **$1.000** |

*Notes:*
*Asbestos $0.4M moved to Tier 1*
Source: Master CIP Roll Up

## Baseline Program Projects - Hard / Soft Cost and Tier Classification

Hard: Construction + Equipment; Soft: Design + Project Management + Other. Values in $ millions.

| # | Master Row | Category | Activity | Description | Phase | Category2 | Source Budget | Design | Project Mgmt | Construction | Equipment | Other | Hard Cost | Soft Cost | Preliminary Tier | Source Ref |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 6 | Building Envelope & Structural Rehabilitation | S01-00-001 | Plaza Level Waterproofing, Hardscapes and Garage Repairs | A | Utilities | $24.000 | $1.370 | $0.538 | $21.492 | - | - | $21.492 | $2.508 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G6:H6 |
| 2 | 7 | Building Envelope & Structural Rehabilitation | S01-00-002 | Garage Repairs & Subgrade Waterproofing | A | Utilities | - | - | - | - | - | - | - | - | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G7:H7 |
| 3 | 8 | Building Envelope & Structural Rehabilitation | S01-00-003 | Terrace Level Overhang & Roof | A | Utilities | $14.000 | $0.280 | $0.314 | $12.806 | $0.601 | - | $13.406 | $0.594 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G8:H8 |
| 4 | 11 | Site Restoration | S02-00-001 | Site & Landscaping Upgrades | B | Structure | $3.500 | $0.245 | $0.078 | $3.177 | - | - | $3.177 | $0.323 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G11:H11 |
| 5 | 12 | Site Restoration | S02-00-002 | Fountain Restoration | B | | $1.000 | $0.090 | $0.011 | $0.899 | - | - | $0.899 | $0.101 | Tier 3 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G12:H12 |
| 6 | 13 | Site Restoration | S02-00-003 | Rock Creek Parkway Stabilization | A | Utilities | $0.350 | $0.047 | $0.011 | $0.292 | - | - | $0.292 | $0.058 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G13:H13 |
| 7 | 16 | Perimeter & Physical Security Improvements | S03-00-001 | Vehicle Force Protection | A | Structure | $2.500 | $0.225 | $0.056 | $2.000 | $0.219 | - | $2.219 | $0.281 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G16:H16 |
| 8 | Project List row 11 | Perimeter & Physical Security Improvements | S03-00-002 | River Plaza Perimeter | B | | - | - | - | - | - | - | - | - | Tier 2 | Data Program Assessment Summary.xlsx, Project List row 11 |
| 9 | 17 | Perimeter & Physical Security Improvements | S03-00-003 | Exterior Glass & Door Replacement | A | Structure | $2.000 | $0.180 | $0.045 | $1.775 | - | - | $1.775 | $0.225 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G17:H17 |
| 10 | 21 | Public Space Improvements | SB01-00-001 | Front of House Renewal | B | | $20.000 | $0.700 | $0.448 | $18.852 | - | - | $18.852 | $1.148 | Tier 3 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G21:H21 |
| 11 | 22 | Public Space Improvements | SB01-00-002 | Restroom Renovations | B | Structure | $7.000 | $0.630 | $0.157 | $6.213 | - | - | $6.213 | $0.787 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G22:H22 |
| 12 | 23 | Public Space Improvements | SB01-00-003 | Wayfinding | B | Structure | $2.000 | $0.080 | $0.045 | $1.875 | - | - | $1.875 | $0.125 | Tier 3 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G23:H23 |
| 13 | 24 | Public Space Improvements | SB01-00-004 | Box Office Relocation | B | | $8.000 | $0.760 | $0.179 | $6.411 | $0.650 | - | $7.061 | $0.939 | Tier 3 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G24:H24 |
| 14 | 27 | Employee Office Renovations | SB02-00-001 | OPH Back Office Renovation | B | | $4.000 | $0.380 | $0.090 | $3.230 | $0.300 | - | $3.530 | $0.470 | Tier 3 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G27:H27 |
| 15 | 28 | Employee Office Renovations | SB02-00-002 | Level A Office Renovation | B | | $10.000 | $0.850 | $0.224 | $8.166 | $0.760 | - | $8.926 | $1.074 | Tier 3 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G28:H28 |
| 16 | 29 | Employee Office Renovations | SB02-00-003 | CCH Back Office Renovation | B | | $2.000 | $0.170 | $0.045 | $1.700 | $0.085 | - | $1.785 | $0.215 | Tier 3 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G29:H29 |
| 17 | 30 | Employee Office Renovations | SB02-00-004 | Terrace Office Renovation | B | | $3.000 | $0.255 | $0.067 | $2.488 | $0.190 | - | $2.678 | $0.322 | Tier 3 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G30:H30 |
| 18 | 33 | Vertical Transportation Improvements | SB03-00-001 | Elevator Modernization | AB | Structure | $10.000 | $0.250 | $0.041 | $5.709 | $4.000 | - | $9.709 | $0.291 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G33:H33 |
| 19 | 34 | Vertical Transportation Improvements | SB03-00-002 | Escalator Capital Repair | B | Structure | $1.000 | $0.025 | $0.015 | $0.860 | $0.100 | - | $0.960 | $0.040 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G34:H34 |
| 20 | 38 | Fire Alarm & Fire Protection | S801-00-001 | Extend Fire Protection A Level | A | Utilities | $0.250 | $0.013 | $0.009 | $0.229 | - | - | $0.229 | $0.021 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G38:H38 |
| 21 | 39 | Fire Alarm & Fire Protection | S801-00-002 | Fire Alarm Phase 2 | | | - | - | - | - | - | - | - | - | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G39:H39 |
| 22 | 42 | Hazardous Material Abatement | S802-00-001 | Asbestos Abatement | AB | Utilities | $0.400 | $0.250 | $0.024 | $0.126 | - | - | $0.126 | $0.274 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G42:H42 |
| 23 | 45 | MEP Improvements | S803-00-001 | Sanitary & Domestic Piping | AB | Utilities | $30.000 | $1.950 | $0.672 | $26.128 | $1.250 | - | $27.378 | $2.622 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G45:H45 |
| 24 | 46 | MEP Improvements | S803-00-002 | Central Plant Upgrades | AB | Utilities | $10.000 | $0.650 | $0.224 | $3.526 | $5.600 | - | $9.126 | $0.874 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G46:H46 |
| 25 | 47 | MEP Improvements | S803-00-003 | Condenser Loop | AB | Utilities | $16.000 | $1.040 | $0.358 | $13.202 | $1.400 | - | $14.602 | $1.398 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G47:H47 |
| 26 | 48 | MEP Improvements | S803-00-004 | Electrical System Upgrades | AB | Utilities | $20.000 | $1.300 | $0.448 | $9.752 | $8.500 | - | $18.252 | $1.748 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G48:H48 |
| 27 | 49 | MEP Improvements | S803-00-005 | River Pump Room | B | Structure | $1.500 | $0.143 | $0.034 | $1.324 | - | - | $1.324 | $0.176 | Tier 1 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G49:H49 |
| 28 | 53 | Mobilization Costs | SA01-00-001 | Mobilization Costs | A | | $5.000 | - | - | $5.000 | - | - | $5.000 | - | Program Enabling | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G53:H53 |
| 29 | 56 | Support Services | SA02-00-001 | Staffing, Architectural Services, misc. | AB | | $2.000 | - | - | - | - | $2.000 | - | $2.000 | Program Enabling | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G56:H56 |
| 30 | 57 | Support Services | SA02-00-002 | Document Mgmt. & Life Safety | AB | | $0.350 | - | - | - | - | $0.350 | - | $0.350 | Program Enabling | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G57:H57 |
| 31 | 61 | Concert Hall Restoration | PV01-00-001 | Front of House | B | Structure | $10.000 | $0.900 | $0.224 | $8.426 | $0.450 | - | $8.876 | $1.124 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G61:H61 |
| 32 | 62 | Concert Hall Restoration | PV01-00-002 | Back of House | B | Structure | $1.500 | $0.135 | $0.034 | $1.331 | - | - | $1.331 | $0.169 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G62:H62 |
| 33 | 63 | Concert Hall Restoration | PV01-00-003 | Production Infrastructure | AB | Structure | $1.200 | $0.096 | $0.027 | $1.077 | - | - | $1.077 | $0.123 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G63:H63 |
| 34 | 64 | Concert Hall Restoration | PV01-00-004 | Acoustics | AB | Structure | $12.000 | $0.960 | $0.090 | $10.200 | $0.750 | - | $10.950 | $1.050 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G64:H64 |
| 35 | 67 | Opera House Restoration | PV02-00-001 | Front of House | B | Structure | $6.000 | $0.480 | $0.134 | $4.786 | $0.600 | - | $5.386 | $0.614 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G67:H67 |
| 36 | 68 | Opera House Restoration | PV02-00-002 | Back of House | B | Structure | $2.000 | $0.220 | $0.045 | $1.735 | - | - | $1.735 | $0.265 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll-Up!G68:H68 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | 69 | Opera House Restoration | PV22-99-003 | Production Infrastructure | 8 | Structure | $2.000 | $0.220 | $0.045 | $0.130 | $1.600 | - | $1.730 | $0.265 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G69:H69 |
| 38 | 72 | Eisenhower Theater Restoration | PV23-99-001 | Front of House | 8 | Structure | $4.000 | $0.320 | $0.090 | $3.470 | $0.120 | - | $3.590 | $0.410 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G72:H72 |
| 39 | 73 | Eisenhower Theater Restoration | PV23-99-002 | Back of House | 8 | Structure | $2.000 | $0.160 | $0.045 | $1.775 | - | - | $1.775 | $0.225 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G73:H73 |
| 40 | 74 | Eisenhower Theater Restoration | PV23-99-003 | Production Infrastructure | 8 | Structure | $1.000 | $0.080 | $0.022 | $0.088 | $0.800 | - | $0.888 | $0.112 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G74:H74 |
| 41 | 77 | Family Theater Restoration | PV24-99-001 | Front of House | 8 | Structure | $2.000 | $0.160 | $0.045 | $1.795 | - | - | $1.795 | $0.205 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G77:H77 |
| 42 | 78 | Family Theater Restoration | PV24-99-002 | Back of House | 8 | Structure | $0.500 | $0.045 | $0.011 | $0.444 | - | - | $0.444 | $0.056 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G78:H78 |
| 43 | 79 | Family Theater Restoration | PV24-99-003 | Production Infrastructure | 8 | Structure | $0.500 | $0.045 | $0.011 | $0.143 | $0.301 | - | $0.444 | $0.056 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G79:H79 |
| 44 | 82 | Terrace Theater Restoration | PV25-99-001 | Front of House | 8 | Structure | $0.500 | $0.040 | $0.011 | $0.449 | - | - | $0.449 | $0.051 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G82:H82 |
| 45 | 83 | Terrace Theater Restoration | PV25-99-002 | Back of House | 8 | Structure | $1.000 | $0.080 | $0.022 | $0.888 | - | - | $0.888 | $0.112 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G83:H83 |
| 46 | 84 | Terrace Theater Restoration | PV25-99-003 | Production Infrastructure | 8 | Structure | $0.500 | $0.040 | $0.011 | $0.112 | $0.337 | - | $0.449 | $0.051 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G84:H84 |
| 47 | 87 | Theater Lab Restoration | PV26-99-001 | Front of House | 8 | Structure | $0.250 | $0.023 | $0.011 | $0.217 | - | - | $0.217 | $0.034 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G87:H87 |
| 48 | 88 | Theater Lab Restoration | PV26-99-002 | Back of House | 8 | Structure | $1.000 | $0.085 | $0.022 | $0.893 | - | - | $0.893 | $0.107 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G88:H88 |
| 49 | 89 | Theater Lab Restoration | PV26-99-003 | Production Infrastructure | 8 | Structure | $0.500 | $0.040 | $0.011 | $0.449 | - | - | $0.449 | $0.051 | Tier 2 | Master CIP Summary Sheets 6.22.2026.xlsx, Roll- Up!G89:H89 |
| TOTAL | | | | | | | $248.900 | $16.881 | $5.043 | $196.444 | $28.013 | $2.960 | $224.287 | $24.643 | | |

| DLR Group - 2021 Comprehensive Building Plan (CBP) | | | | | | | | Delta - Escalation Costs | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Exterior Building Envelope | FY22 | FY23 | FY24 | FY25 | FY26 | FY27 | Total | Total Normalized to 2026 | Total Normalized to 2027 | Escalation Amount - 2026 | Escalation Amount - 2027 |
| 1.1 | Plaza Trench Drain Replacement | | 150,000 | | | | | 150,000 | 194,327 | 225,138 | | |
| 1.2 | Exterior Envelope Studies - Marble Panels | | 200,000 | | | | | 200,000 | 259,103 | 300,184 | | |
| 1.3 | Exterior Walls at Level A, B, C - Near Term Repair - Repairs | | | 2,500,000 | | | | 2,500,000 | 2,792,993 | 3,079,981 | | |
| 1.4 | Exterior Door Investigations | | | | 100,000 | | | 100,000 | 104,010 | 110,669 | | |
| 1.5 | Plaza Level Columns | | | | | 900,000 | | 900,000 | 900,000 | 920,700 | | |
| 1.6 | Waterproofing And Leak Investigations | 325,000 | | | | | | 325,000 | 507,116 | 615,486 | | |
| 1.7 | Waterproofing Repairs | | 1,300,000 | 1,275,000 | | | | 2,575,000 | 3,108,595 | 3,521,987 | | |
| 1.8 | White Single Ply roofing replacement | 100,000 | 2,900,000 | | | | | 3,000,000 | 3,913,026 | 4,542,049 | | |
| 1.9 | Roof Surveys, Investigation, and Repair | 250,000 | 250,000 | | | | | 500,000 | 713,968 | 848,681 | | |
| 1.10 | Exterior Art Work Assessment and Repair | | 260,000 | | | | | 260,000 | 336,834 | 390,239 | | |
| 2 | **Life Safety & Security** | | | | | | | | | | | |
| 2.1 | Hazardous Material Abatement | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 250,000 | 271,491 | 293,130 | | |
| 2.2 | Fire Alarm System Upgrade | 5,000,000 | 3,500,000 | 3,750,000 | | | | 12,250,000 | 16,525,575 | 19,342,214 | | |
| 2.3 | Fire, Life Safety, and Environmental Deficiencies | 650,000 | | | | | | 650,000 | 1,014,232 | 1,230,973 | | |
| 2.4 | Life Safety Upgrades-Rated Fire Door Testing&Penetrations | 10,000 | 425,000 | | | | | 435,000 | 566,197 | 656,829 | | |
| 2.5 | Life safety: Interior Steel fire proofing review & repairs | 400,000 | 410,000 | | | | | 810,000 | 1,155,304 | 1,372,899 | | |
| 2.6 | Sprinkler System Repair - Dry pipe investigation parking garages | | 100,000 | | | | | 100,000 | 129,551 | 150,092 | | |
| 2.7 | Extend Sprinkler System: Areas not appropriately sprinklered | | 175,000 | | | | | 175,000 | 226,715 | 262,661 | | |
| 2.8 | Vehicle Force Protection - Vehicle wedge barriers | | | | | 900,000 | | 900,000 | 900,000 | 920,700 | | |
| 3 | **Interior Repair & Accessibility** | | | | | | | | | | | |
| 3.1 | Concert Hall Seating & Carpet Replacement & Painting | | 5,500,000 | | | | | 5,500,000 | 7,125,327 | 8,255,062 | | |
| 3.2 | Opera House and Ike Theater Rigging Replacement Study | | 150,000 | | | | | 150,000 | 194,327 | 225,138 | | |
| 3.3 | Opera House Seating and Finishes Upgrades | | | | | | 4,200,000 | 4,200,000 | 4,103,400 | 4,200,000 | | |
| 3.4 | Office Space and Backstage Improvements Study | 310,000 | | | | | | 310,000 | 483,711 | 587,079 | | |
| 3.5 | Office Space Improvements - Phased Renovation | | 4,100,000 | 4,200,000 | 4,300,000 | 4,500,000 | 4,600,000 | 21,700,000 | 23,470,466 | 25,290,407 | | |
| 3.6 | Eisenhower Theater Green Room Renovation | 400,000 | | | | | | 400,000 | 624,143 | 757,522 | | |
| 3.7 | Improvements to Parking Level Lobbies - Restroom Upgrades | | | 1,300,000 | | | | 1,300,000 | 1,452,357 | 1,601,590 | | |
| 3.8 | Bathroom Upgrades - Office Space Full Renovation | | | | 2,100,000 | 2,100,000 | 2,200,000 | 6,400,000 | 6,433,610 | 6,672,348 | | |
| 3.9 | Assistive Listening Systems Upgrades | | | 650,000 | | | | 650,000 | 726,178 | 800,795 | | |
| 3.10 | Interior Art Assessment & Conservation | | | 100,000 | | | | 100,000 | 111,720 | 123,199 | | |
| 3.11 | Art and Decorative Finishes Maintenance Plan | | | 190,000 | | | | 190,000 | 212,268 | 234,079 | | |
| 3.12 | Level A Connection to the REACH | | 3,100,000 | | | | | 3,100,000 | 4,016,093 | 4,652,853 | | |
| 3.13 | Interior and Exterior Wayfinding | | 1,000,000 | | | | | 1,000,000 | 1,295,514 | 1,500,920 | | |
| 4 | **Building Systems** | | | | | | | | | | | |
| 4.1 | HVAC in Switchgear rooms | | 175,000 | | | | | 175,000 | 226,715 | 262,661 | | |
| 4.2A | MEP Modernization Ph 3 - Fan replacement (garage, general exhaust, | | 500,000 | 500,000 | 525,000 | 550,000 | 560,000 | 2,635,000 | 2,849,528 | 3,070,118 | | |
| 4.2B | MEP Modernization Ph 3 - Garage fan controls upgrade (23 fans) | | 560,000 | | | | | 560,000 | 725,488 | 840,515 | | |
| 4.3 | Family Theater Temperature | 100,000 | | | | | | 100,000 | 156,036 | 189,380 | | |
| 4.4 | Hydronic System Optimizations (EPA) | 2,100,000 | 2,100,000 | 2,200,000 | | | | 6,400,000 | 8,455,164 | 9,839,305 | | |
| 4.5 | Sanitary System an Domestic Water System Study | 265,000 | | | | | | 265,000 | 413,495 | 501,858 | | |
| 4.6 | Sanitary System Upgrades - Phase 1 | | 900,000 | 920,000 | 950,000 | | | 2,770,000 | 3,181,879 | 3,535,616 | | |
| 4.7 | Domestic Water System Upgrades - Phase 1 | | | 850,000 | 875,000 | 900,000 | | 2,625,000 | 2,759,705 | 2,936,247 | | |
| 4.8 | Electrical Power Dist. Study | 100,000 | | | | | | 100,000 | 156,036 | 189,380 | | |
| 4.9 | Study to locate all unused electrical equip | 30,000 | | | | | | 30,000 | 46,811 | 56,814 | | |
| 4.10 | Electrical Distribution Upgrades - Grounding System | | 125,000 | 125,000 | | | | 250,000 | 301,589 | 341,614 | | |
| 4.11 | Electrical Distribution Upgrade - Replace feeders | | 950,000 | 980,000 | 1,000,000 | 1,000,000 | 1,100,000 | 5,030,000 | 5,440,392 | 5,862,916 | | |
| 4.12 | Distribution Equipment Replacement | | 590,000 | 600,000 | 625,000 | 645,000 | 665,000 | 3,125,000 | 3,379,439 | 3,641,254 | | |
| 4.13 | Lighting System Upgrade - Exterior Lighting Controls | 150,000 | | | | | | 150,000 | 234,054 | 284,071 | | |
| 4.14 | Lighting system upgrade - Disconnect PEPCO feeds | 65,000 | | | | | | 65,000 | 101,423 | 123,097 | | |
| 4.15 | Generator System Upgrade - Study | | | | | 220,000 | | 220,000 | 220,000 | 225,060 | | |
| 4.16 | Generator System Upgrade - Replacement | | | | | | 1,500,000 | 1,500,000 | 1,465,500 | 1,500,000 | | |
| 4.17 | Technical Stage Systems | 1,000,000 | 1,320,000 | 1,325,000 | 1,330,000 | 1,335,000 | 1,400,000 | 7,710,000 | 8,836,855 | 9,745,011 | | |
| 4.18 | Opera House Pit Lift Replacement | 750,000 | | | 2,000,000 | | | 2,750,000 | 3,250,468 | 3,633,732 | | |
| 4.19 | Cyclical Elevator Refurbishment | 1,000,000 | 175,000 | 1,000,000 | 1,000,000 | 1,200,000 | 2,600,000 | 6,975,000 | 7,684,570 | 8,322,747 | | |
| 5 | **Memorial Interpretation** | | | | | | | | | | | |
| 5.1A | 5.1 Atrium Renovation & Exhibit | 15,000,000 | | | | | | 15,000,000 | 23,405,359 | 28,407,063 | | |
| 5.1B | 5.2 Upgrade Grand Foyer | 7,000,000 | 500,000 | 500,000 | 1,000,000 | 1,000,000 | 1,000,000 | 11,000,000 | 15,145,957 | 17,752,775 | | |
| 5.1C | 5.3 JFK Memorial Interp | | 500,000 | 3,000,000 | 3,500,000 | 3,500,000 | 3,500,000 | 14,000,000 | 14,559,199 | 15,400,351 | | |
| 6 | **Parking & Site Circulation** | | | | | | | | | | | |
| 6.1 | Loading Dock Concrete Repairs | | 2,500,000 | | | | | 2,500,000 | 3,238,785 | 3,752,301 | | |
| 6.2 | Exterior Dock Lift Study | 75,000 | | | | | | 75,000 | 117,027 | 142,035 | | |
| 6.3 | Exterior Dock Lift @ OH and IKE loading doors | | | 625,000 | | | | 625,000 | 698,248 | 769,995 | | |
| 7 | **Comprehensive Planning & PMO** | | | | | | | | | | | |
| 7.0 | Project Management Office | 650,000 | 1,000,000 | 1,200,000 | 1,200,000 | 1,000,000 | 1,000,000 | 6,050,000 | 6,875,503 | 7,561,311 | | |
| 7.1 | Comprehensive Plan Development (2027) | | | | | | 900,000 | 900,000 | 879,300 | 900,000 | | |
| 7.2 | Document Management & Comprehensive Life Safety Analysis | 391,000 | | | | | | 391,000 | 610,100 | 740,477 | | |
| 7.3 | Minor Repair | 500,000 | 500,000 | 500,000 | 500,000 | 550,000 | 550,000 | 3,100,000 | 3,593,934 | 3,979,353 | | |
| | | | | | | | | - | | | | |
| | Total Costs | 36,621,000 | 35,915,000 | 28,290,000 | 21,005,000 | 20,300,000 | 25,775,000 | 167,906,000 | | | | |
| | Total Costs (Corrected)[1] | 36,621,000 | 35,965,000 | 28,340,000 | 21,055,000 | 20,350,000 | 25,825,000 | 168,156,000 | 202,876,707 | 228,192,666 | 34,720,707.47 | 60,036,666.09 |
| | **Annual Appropriations** | **13,400,000** | **20,000,000** | **21,000,000** | **22,000,000** | **22,000,000** | **23,000,000** | 121,400,000 | | | | |
| | Carryover | 47,131,554 | 23,910,554 | 7,995,554 | 705,554 | 1,700,554 | 3,400,554 | 84,844,324 | 119,364,299 | 140,878,169 | 34,519,975.39 | 56,033,845.29 |
| | **Balance** | **23,910,554** | **7,995,554** | **705,554** | **1,700,554** | **3,400,554** | **625,554** | 38,338,324 | | | | |
| | | | | | | | | **Totals (Total Costs & Carryover)** | 322,241,007 | 369,070,835 | | |
| | | | | | | | | **Escalation Amount** | | | 69,240,682.85 | 116,070,511.38 |

[1]"Total Costs" omits the amounts in Item 2.1 "Hazardous Material Abatement"

Source: 2021 Comprehensive Building Plan, 2021 CBP.pdf, pg. 125 of 214