# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - -

| | | |
|---|---|---|
| JOYCE BEATTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 25 Civ. 4480 |
| vs. | ) | (CRC) |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| Defendant. | ) | |

VIDEO RECORDED DEPOSITION OF MATTHEW FLOCA

Tuesday, October 6, 2026, 9:40 a.m.

Washington Litigation Group

1717 K Street, NW

Washington, DC

Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

Job Number: Lexitas 1039999

at your testimony in the related court proceeding?
A. No.
Q. Do you recall describing an outside entity that was helping to make sure that you had an achievable schedule?
A. Sounds like something I would say, yes.
Q. Let me ask it this way: Was JLL an outside entity that was helping the Center to make sure that they had an achievable schedule for renovations?
A. That is what JLL is doing, yes.
Q. And a schedule that includes things like how long the different aspects of the work are going to take?
A. Yes. They have a schedule that includes the different aspects of the work, yes.
Q. Okay. So was JLL preparing that schedule?
MR. JANKOWSKI: Objection. Vague on "preparing."
You can answer.
A. Yes.

Q. They prepared a report at the end; is that right?

A. Yes.

Q. That report was given to the Board in August?

A. Yes.

Q. At the time that JLL was retained, though, we established it was before the May decision, the Center was planning to close the main building for a period of two years; is that right?

A. Yes.

Q. That plan to close the Center for -- or sorry, that plan to close the main building for a period of two years, that was built in as an assumption in the Statement of Work that resulted in JLL's engagement, wasn't it?

A. Yes. That was an assumption.

Q. So JLL was not actually asked to build a schedule of what it would look like if there was phased renovation; correct?

MR. JANKOWSKI: Objection. Vague on "asked."

You can answer.

A. In terms of the conversation we were having about do a portion of work in the Eisenhower Theater while the Opera House theater is active, or however else you want to describe that, a lot of different forms, that was not the sole focus of JLL's engagement.

They were brought on board to augment our project management team with an understanding of projects, and an understanding of the operations.

Q. Okay. One of the project parameters on which they were conducting their work was a two-year closure of the main building for renovations; correct?

A. Two-year window. Yes.

Q. JLL, they weren't asked to independently evaluate the feasibility of phased construction, were they?

MR. JANKOWSKI: Objection. Vague on "feasibility."

You can answer.

A. It was discussed with them.
Q. Okay. But it was not part of their Statement of Work, was it?
A. No. Again, we gave them the window --
Q. Mm-hmm.
A. -- and we gave them the projects.
Q. So they never did evaluate the feasibility or the cost of phased construction?
MR. JANKOWSKI: Same objection on "feasibility." Vague.
A. They did evaluate it.
Q. You're saying that JLL evaluated the feasibility of phased construction as distinct from full closure of the main building?
MR. JANKOWSKI: Objection. Asked and answered.
You can answer.
A. They did, yes. They did.
Q. They did, even though you just said one of the project parameters was that there would be a two-year full closure of the main building for renovation?

MR. JANKOWSKI: Asked and answered.
You can answer.
A. You're -- I'm sorry. You're framing it as a "We told you to do this."
Q. Mm-hmm.
A. "So go do it."
Q. Okay.
A. That's not just really how construction works. There's always a conversation about what's the best way, what's the most efficient way, what's going on in the building.
JLL did give us input on the efficiencies around closing the building versus doing the construction in an occupied manner.
Q. Okay. Tell me about that.
How did they convey that information?
A. Discussed in meetings. It was in a letter.
Q. A letter to the Center from JLL?
A. Yes.
MS. FREENY: I'm going to state for

the record that I don't think I have a copy of that letter, and to the extent that that letter exists, I would request a copy.

(Request.)

Q. When was that letter sent to the Center?

A. I don't recall. June. June, I think.

Q. It was after the May court decision?

A. Yes.

Q. Why was that letter not presented to the Board if it, as you state, contained JLL's discussion of the feasibility of phased versus full main building closure?

MR. JANKOWSKI: Objection. Lacks foundation. And -- yeah. As to whether it was presented to the Board.

A. I don't think I would ever just give -- I would never just give the Board a letter.

Q. Okay, but --

A. But it supports the underlying fact here of the efficiency and effectiveness that we have been discussing.

Q. That discussion of the efficiency and

effectiveness, as you describe it, of full closure versus phased renovation from JLL, that doesn't appear in JLL's report, does it?

A. Not in the -- not in the CPDP, Comprehensive Project Development Plan. There is not a -- that is a plan focused on a specific set of projects.

Q. So your testimony is that where we would find that is in a letter -- a separate letter from JLL?

MR. JANKOWSKI: Objection to the extent that misstates.

But you can answer.

A. You will find that this letter I'm referring to does include information on efficiency and effectiveness of completing the work in an occupied versus unoccupied building, yes.

Q. What was your understanding -- well, is that a letter that they voluntarily provided or that the Center requested?

A. They voluntarily provided.

Q. What was your understanding of why they

provided that letter to you if it was outside of the scope of work?

A. I think it's relevant to their relationship with the Center as a partner, and not just a contractor doing a job blindly.

Q. What is your recollection of the substance of what they said in that letter?

A. Again, I'd just -- the effectiveness of the work. Sorry, not the work. The effectiveness of, you know, occupied versus unoccupied.

Q. Occupied, that refers to phased construction?

A. To a degree, yeah.

Q. Did they state the basis for that perspective? In that letter.

A. I don't recall if it said exactly what their basis was.

Q. Well, do you have an understanding of what JLL did to, as you say, reach that perspective about effectiveness?

MR. JANKOWSKI: Objection to the extent it calls for speculation.

MR. JANKOWSKI: But you can answer.

A. Yes. At the same time as they're writing this letter, they're developing their understanding of the needs of the building, the project, the operations, so that's how they reached the conclusion that's in the letter.

Q. But as they're developing the projects, they're planning for a two-year closure; right?

MR. JANKOWSKI: Objection. Vague on "planning." And to the extent it misstates.

A. They're using that window, yes. Yes.

Q. Did JLL prepare a schedule for phased renovation?

A. I think we already talked about this, but they did not provide a schedule where Eisenhower is operational and Concert Hall is closed, and then Concert Hall is operational and Eisenhower is closed.

Q. So that means they did not prepare a schedule for phased renovation; correct?

MR. JANKOWSKI: Objection to the extent that misstates.

A. I would consider their schedule phased, as it is right now, but we're saying the same thing.

Q. Okay.

A. They did not -- they did not create a schedule where work within -- with the expectation that public access is maintained within the main building.

Q. Okay. Is another way to say that: JLL did not prepare a schedule that contemplated construction occurring while the main building was open at all?

A. Yes, but draw a delineation between the parking garage and the building above.

Q. Understood.

So separating out the parking garage, when I use the word "main building," I'm not talking about the parking garage. It would be fair to say that JLL did not prepare a schedule for renovations to occur while the main building was open.

A. Or sections of the main building was open, yes.

Q. Okay. Or any part of the main building was open; correct?
A. Correct.
Q. I want to get you to -- we're going to look at some documents now, and I want to just ask you a question about Tab 2 in your binder, which we are going to mark as Exhibit 1.
(Floca Exhibit 1, memorandum, 3.4.26, KC-BEATTY0827-829, was marked for identification.)
Q. Mr. Floca, you see in front of you Exhibit 1 is a memorandum from a source selection official to you with a Subject: Recommendation for Award.
Do you see that?
A. From me.
Q. Oh, I'm sorry.
I'm glad you corrected me, from you to the source selection official. Thank you.
Do you see that there are little numbers at the bottom that start "KC-BEATTY"; do you see that?
A. Yes.

Q. I will represent to you that those are something called Bates numbers, and that those were added by Defendants when they produced documents.

A. Okay.

Q. I may use these from time to time.

Do these numbers look familiar to you at all?

A. These numbers at the bottom?

Q. Yeah.

A. No.

Q. This is a memo from you to some -- who is -- what is a source selection official? Like a contracting officer, sort of?

A. Can be, but doesn't have to be. Source selection official is the entity for this procurement effort, making the ultimate selection.

Q. Okay. So you were making a recommendation for who should get selected; is that right?

A. Yes.

Q. I want to draw your attention to the number 2 on page 1.

A. Mm-hmm.
Q. It talks about "The primary risk to the Center's Renewal Project..."
And let me just pause there. The Renewal Project, is that the same thing as what we have previously described as the $257 million renovations?
A. Yes.
Q. Then I'll read that again.
"The primary risk to the Center's Renewal Project is the compressed 26-month execution timeline."
Do you see that?
A. Yes.
Q. It's 26 instead of 24 months. Is that -- but does this match up roughly to the assumption that there would be a two-year period of renovation during closure of the main building?
A. Yes.
Q. Is it 26 instead of 24 -- why is that, is that to account for the additional work that the contractor would need to do between the date of the

award, and the, at that time, planned closure in July?

A. I don't remember why, explicitly, we used 26 months.

Q. Okay. Do you remember there ever being a discussion of the Renewal Project or the $257 million renovation needing to take 26 months instead of 24?

A. Sorry. Do I remember what?

Q. Do you remember there being a discussion ever -- and this is not -- I just want to make sure.

The 26 you don't remember, but do you remember there being a discussion that the project, the renovations, would take 26 instead of 24 months?

A. Not explicitly.

Q. Help me understand the reference to "compressed"; what did you mean by that?

A. There's a lot of work to be done in a definitive window.

Q. Mm-hmm.

A. So you have to compress that work.

Q. What do you mean by "a definitive window"?

A. The two years.

Q. Okay. Why was it -- I guess, why was it two years and not, for example, longer?

A. Balancing doing the work, the amount of work, with needing to open the building back up, and then...

Q. Okay. Who made that decision that it would be a two-year period?

A. That decision was part of the Truth Social message.

Q. What do you mean by that, "Truth Social message"?

A. That first announced -- the message that first announced the closure.

Q. Okay. Understood.

That was a Truth Social message by Chairman Trump?

A. Yes.

Q. So that was when the decision was made to adopt a two-year closure duration?

MR. JANKOWSKI: Objection to the extent that it misstates.

You can answer.

A. Yes.

Q. Did you understand that announcement to be sort of like a decision by the Chairman?

A. I took the announcement at face value.

Q. But did you think that you had the ability to override it?

MR. JANKOWSKI: Objection. Vague on "override."

A. I'm sorry. I'm just -- I don't know how I would over -- over-delete the post. I don't know.

Q. So no. Yeah, let me rephrase.

After you saw the Truth Social post by President Trump announcing this two-year closure, did you understand that you had to close the Center for two years, or that you had the option to disagree and not close the Center for two years, or close the Center for a different amount of time?

MR. JANKOWSKI: Objection. Compound.

You can answer.

A. When that message came out, I remember meeting as a team --

Q. Yep.

A. -- the leadership team that was in place at the time, to begin -- the direction then was to begin focusing on a structured implementation of this work.

Q. Okay. That was a structured implementation of the two-year period that Trump had announced; correct?

A. Yes.

Q. You said the leadership team that was in place at the time met. Who was that?

MR. JANKOWSKI: I'll just note that we'll -- we're probably going to start to raise a scope objection at a certain point. So --

MS. FREENY: Okay. I'm close to -- let me get this question.

MR. JANKOWSKI: Okay.

MS. FREENY: And then I will take a break.

Can I just get my question back.
(The record was read back by the Realtime Stenographer.)
THE WITNESS: Richard Grenell was the president of the Kennedy Center. I mean, there's a whole -- I could go through -- but the -- that leader -- that's the -- under ambassador, that's the leadership team.
BY MS. FREENY:
Q. Who do you remember being in that meeting specifically that talked about President Trump's announcement on February 1st, besides Mr. Grenell?
A. That wasn't one definitive meeting. There were multiple meetings about getting the work started.
Q. Okay.
A. You know, it wasn't one meeting where it was -- so...
Q. Then let me direct you, because I heard you say, I remember being -- after that Truth Social post, I remember being in a meeting with a

you identified the different scenarios that you might even consider putting before the Board.

A. The main building is broken up in three sections.

Q. Okay.

A. Concert Hall, Opera House, Eisenhower. Then you have the REACH.

Q. Okay.

A. So the consideration is one at a time; multiple at a time; and "multiple" that means Concert Hall and Opera House, Ike and Opera House, Ike and Concert Hall.

Q. Okay.

A. Public spaces only versus back of house.

Q. Okay.

A. Then interior versus exterior, main building, REACH, whole campus.

All of those --

Q. Mm-hmm. Okay.

A. -- items, all of those scenarios were discussed.

Q. Discussed within the Center, or with

consultants?
A. Both.
Q. I think maybe at this point in time, it just -- it maybe makes more sense to get more concrete.
So I'm going to ask you to turn to Tab 41 in your binder.
MR. JANKOWSKI: Exhibit 2, I think.
Q. This will get marked as Exhibit 2.
(Floca Exhibit 2, meeting agenda, 8.3.26, KC-BEATTY1089-1096, was marked for identification.)
Q. Mr. Floca, if you take a look at Exhibit 2, it is titled Kennedy Center Audit and Finance Committee meeting dated August 3, 2026.
Do you see this?
A. Yes.
Q. Do you see the little Bates numbers at the bottom that indicate that it was produced by the Defendants in this case?
A. Yes.
Q. This is a slide deck that was used for a presentation at the August 3rd Audit and Finance

Committee meeting; is that right?
A. Yes.
Q. Okay. Who prepared this slide deck?
A. Finance team.
Q. Okay.
A. Programming team, education team. I worked on this. PR team.
Q. What was your role in working on this presentation?
A. I brought all of the different stakeholders together. I came up with the format.
Q. Format. Okay.
Did you review it before it was presented to the committee?
A. Multiple times, yes.
Q. If I can -- oh, I guess, what is -- just so that I understand, what is the purpose of this presentation? Or, what was the purpose?
A. To review the statutory mandates, programming scenarios, programming requirements and solutions, and a financial crosswalk.
(Clarification requested by the Realtime

Stenographer.)

A. We also have a litigation update on here, but I don't remember discussing litigation at the meeting.

Q. Okay. This -- let's see.

How did this -- did this meeting have any relation to the August 13th full Board meeting at which there was a vote on full closure of the main building?

A. This was a committee meeting.

Q. Okay. Was it a monthly meeting that was held every month, or was this meeting called in anticipation of the August 13th Board meeting?

A. It's both. These are regular -- should be regular meetings.

Q. Okay.

A. And the meeting prior to the Board meeting.

Q. What role, if any, does the Audit and Finance Committee play, or did they play, with respect to planning for the August 13th Board meeting?

A. Are you asking what role they played in -- during the meeting, or what role do they play in general?

Q. Yeah. What role -- I'm just trying to understand, like, you know, this is -- this occurs before the meeting.

What role did this particular committee play, not in the August meeting, the August 13th meeting, but with respect to planning for the August 13th meeting?

A. In general, the Audit and Finance Committee meeting makes budget-related recommendations to the Board, and as a part of that, in the committee process, becomes -- they should be more informed than, you know, the general Board.

Q. Does the committee -- does the Audit Committee decide what financial information gets presented to the Board or does management decide, or both?

A. Both.

Q. I'd like to have you turn to -- a couple of pages in to what is numbered at the bottom,

number 1094, and the top of the slide says Programming Scenarios.

A. Mm-hmm.

Q. Do you see that?

A. Yes.

Q. So are these the -- are these the type of scenarios like we had been talking about, scenarios as possible options for accomplishing the renovation?

A. Focused on programming implementation.

Q. But -- well, let me drill down.

On the left-hand column, there are three different boxes --

A. Mm-hmm.

Q. -- starting with Endowment & Grant-funded, NSO Off-site plus REACH, and NSO On-site plus REACH.

Are those three possible scenarios for implementing the $257 million renovation?

A. These scenarios are adjacent to how you would implement work on-site.

Q. Well --

A. So you can implement work multiple ways under the top-line item, Endowment & Grant-funded, or the middle line item, or the bottom line item.

Q. Yeah. I don't think I yet understand, so why don't we go through one by one, and I'll have you explain what that means.

So in this context of this slide on 1094, what is your understanding of the box Endowment & Grant-Funded?

A. That line item, not just the box, that line item --

Q. Mm-hmm.

A. -- looks at programs that -- the best example, or a good example, is Millennium Stage. Millennium Stage is a grant-funded -- sorry, an endowment-funded program.

Q. Okay.

A. Education is a grant-funded program.

Q. Okay.

A. What that line item does not include is the National Symphony Orchestra. So this is programming on-site without the NSO, and a risk, a

cost, a memorial presence. What you see there.

Q. In that line item 1, the other boxes associated with the cost and the mission risk, I don't think -- I still don't understand, is that associated with what, closure?

A. Associated with only operating --

Q. Okay.

A. -- via endowment and grant-funded programmatic things.

Q. I got it.

So this programming scenario would be during the period of renovation, I take it; is that what we're talking about?

A. Yes.

Q. It would be during the period of renovation; the scenario is running Millennial Stage, running the Educational program, and perhaps anything else that is funded out of the endowment or grants; is that right?

A. Yes.

Q. So that doesn't include NSO you mentioned; correct?

A. Correct.
Q. Does that include things like Broadway shows or Alvin Ailey?
A. No.
Q. That's because those are not funded out of the endowment or grants?
A. Correct.
Q. Who was primarily responsible for preparing this slide?
A. I prepared this slide.
Q. Then did you come up with these three scenarios, or were they supplied to you by one of your staff? One or more of your staff.
A. These were informed by one or more of my staff, yes.
Q. But you ultimately came up with which three scenarios -- programming scenarios to present to the Audit Committee?
A. I am presenting this via the slide, yes.
Q. Help me understand your thinking behind the first one, that the possibility would be to present -- to keep programming only if it's covered

by endowment or grant-funded.

What was your thinking behind that option?

A. The lowest expense, what is moderately acceptable for the mission, and because it has the lowest expense, it has the smallest footprint on the campus, so from a construction perspective, there's more ability. There's more efficiency.

Q. Is the idea that the grant-funded work like the education would take place in the REACH?

A. Or off-site.

Q. Or off-site. Okay.

But Millennium Stage, where is that? Is that in the main building?

A. It's a program.

Q. Okay.

A. There are Millennium Stages in the Grand Foyer, but they don't have to host Millennium Stage.

Q. So when you were saying this first scenario, Endowment & Grant-funded, contemplated Millennial Stage because it is funded by the endowment, were you referring to -- what were you

A. The orchestra playing in venues around the DMV, and utilizing the REACH to the greatest extent that they can for rehearsals, offices, music library. Those things.

Q. The NSO can't perform in the REACH due to its size. Do I have that right?

A. The NSO -- the musicians can fit within Studio K.

Q. Mm-hmm.

A. But there's not much space for an audience.

Q. Okay. So it was never -- it was never, sort of, reasonably contemplated to have the NSO perform in the REACH?

A. No.

Q. Does the NSO practice in the REACH?

A. No. They can, but they don't. They haven't.

Q. Is that for space reasons?

A. Acoustical reasons.

Q. Ah. Okay.

Does that mean that's because the

Concert Hall has better acoustics?

A. Yes, the Concert Hall has better acoustics, and there are additional acoustical treatments that I would want to see in Studio K before the musicians start using the space.

Q. Ah. Got it.

Where is the NSO currently practicing?

A. In the Concert Hall.

Q. All right. Let's go to the third scenario. NSO on-site at REACH, and tell me what that scenario entails?

A. This -- the main difference is that the NSO is performing in the Concert Hall, which means we're welcoming patrons -- 1,200, 2,000 patrons into the building for their performances.

Q. But in that scenario, would there be any other performances besides the NSO in the Concert Hall?

A. Theoretically, there could be, but that --

Q. Okay.

A. -- wasn't -- this is an analysis, to a degree, of what's the lowest risk to the mission.
Q. Okay.
A. Not, you know -- not the full programming, historical programming depth that there would be in the Concert Hall.
Q. All right. Why was this option selected; that is, why was there a separate scenario that focused on the NSO performing in the main building, while renovation was going on?
A. The orchestra would prefer to perform in the Concert Hall.
Q. Is it fair to say that the NSO has a special relationship with the Kennedy Center?
A. Yes. That's fair.
Q. While we're on it, so you say the orchestra -- the NSO would prefer to perform in the Concert Hall.
At what point in time was the decision made that they would be off-site?
A. I don't remember exactly when that decision was made.

Q. Would it have been before or after this presentation on August 3rd?

A. I think they were planning their season being off-site before this presentation.

Q. Did you have an understanding of why they were planning their season being off-site before this presentation?

A. The uncertainty around this process.

Q. Did you have discussions with the NSO about that?

A. About what?

Q. About the planning for whether they were going to be off-site for the next season?

A. Yes. I was part of the discussions with them in the off-site season planning.

Q. During those discussions with the NSO about planning for the next season, did you or anyone else at the Center encourage the NSO to plan to be off-site for the upcoming season?

MR. JANKOWSKI: Objection. Vague as to encourage.

You can answer.

A. I wouldn't characterize it as encouraging, no. My --

Q. How would you --

A. -- my appreciation for the NSO is that they have music that they need to produce, and the risk of inaction is very high to their program and to the musicians.

I think it's a balance of making sure that they can continue to be viable and have stability while all of this is unfolding.

Q. Is that something that you conveyed to the NSO?

MR. JANKOWSKI: Objection. Vague as to "that."

But you can answer.

A. I regularly convey to the NSO my appreciation for what they do, yes.

Q. Did you also convey to them anything about your view on where they should be planning to perform for the upcoming season?

A. I never directed them where to plan or where to consider planning. They began the process

themselves based on the needs, the work, the appropriation, and then the announcement.

Q. So you said "they began the process themselves."

Did you provide any input to them on that process before they finalized the decision to be off-site for the upcoming season?

A. We had meetings to discuss where things were in the court process, and where things were in the project management process -- construction process.

Q. I've heard you say you didn't -- you wouldn't characterize it as encouraging them to be off-site, but did you express approval for their preliminary -- the process for -- let me just restart that one.

So did you express any views on whether they should finalize the decision to perform off-site for the upcoming season?

A. Yes. I'm sure I did.

Q. Okay.

A. Yeah.

Q. What views did you convey to them?
A. It's pretty broad. I'm sorry. It's a broad statement. I mean...
Q. Okay.
A. If we are talking about the -- should you move forward --
Q. Mm-hmm.
A. -- with a plan off-site --
Q. Mm-hmm. Yes.
A. -- versus should you bank on performing in the Concert Hall, the prudent thing is to move forward with plans off-site. And that's driven by the uncertainty in this process.
Q. Let me ask: At that point in time -- so this is before the Board meeting. Did you have any expectation -- and by expectation, I mean anticipation -- any expectation of how the Board would vote on closure?
A. You're asking if I anticipated before the August Board meeting how the Board would vote?
Q. Yes.
A. I could assume, yes, how they would

vote.

Q. Why do you say that? Why could you assume?

A. Because the information, the reality, hadn't changed, and the information, to a degree, was already presented to them.

So the underlying needs or analysis of the needs really had not changed.

Q. Okay. Well, one thing that the judge in this case noted that wasn't presented to them was, sort of, the programming perspective; right?

A. Yes.

MR. JANKOWSKI: Objection to the extent that --

MS. FREENY: He's already answered.

MR. JANKOWSKI: -- it misstates the Judge's Opinion.

MS. FREENY: He's already answered.

MR. JANKOWSKI: But you can answer.

MS. FREENY: He already answered.

Yeah, if you can just -- once he's already answered, he's already answered.

MR. LYNCH: He can put his objection on the record.

MR. JANKOWSKI: Yes.

MS. FREENY: It's invalid after he already answers.

MR. LYNCH: We don't have to argue about that.

MS. FREENY: Also, he can -- Will can speak for himself, Chris.

MR. JANKOWSKI: Yes.

We don't have to argue about that.

BY MS. FREENY:

Q. Is this -- this slide that we've been talking about, programming scenarios, is that one of the sort of inputs to making sort of -- to providing programming information to the Board?

A. This was an input to the Audit and Finance Committee, which the members are Board members.

Q. Why was something like this not presented to the Board? Like, these are three different scenarios. As I understand it, three

MR. JANKOWSKI: Objection. Misstates.

A. I put them on the presentation.

Q. Mm-hmm.

A. I did not single-handedly craft them, because what is included in those scenarios is -- it's baked into what the Kennedy Center has done for years.

Q. Understood.

So you didn't single-handedly craft them, but you made the decision, these are the three scenarios that makes sense to present to the Audit Committee?

A. That make the most sense.

Q. Did you have any role in, sort of, the preparation of the numbers on this sheet?

MR. JANKOWSKI: Objection. Vague as to "any role in the preparation of numbers."

A. These numbers are mainly driven by historical revenues and expenses.

Q. Okay.

A. But yes, there are tweaks that you make

along the way that reflect, you know, what's happening, right.

Q. All right.

A. Auxiliary programs might change because -- or the forecast of auxiliary revenue and expenses might change with how the parking garage is being used.

Q. Who was responsible for deciding whether and when to make those tweaks to the historical financial data when presenting them in this exhibit?

A. That's a process with the financial planning and the owners of these different programs.

Q. Okay. Did you play a role in suggesting tweaks to be made to historical financial data for presentation in this chart?

MR. JANKOWSKI: Objection. Vague as to "role" and "suggesting" and "tweaks."

A. I helped lead the process.

Q. Okay. I assume that means you were comfortable with the process that the Center undertook to prepare this analysis of the scenarios?

A. At the time, I was.

Q. Okay.
A. Now, I would be less comfortable, having been intimately involved in, you know, conversations over the last couple of months.
But, yeah, the process was normal.
Q. Let me break that down.
So at the time you said you were fine with this.
Roughly, what time frame are we talking, right around the August 3rd Finance Committee meeting?
A. Yeah.
Q. Okay.
A. Throughout the month of August.
Q. You said you would be less comfortable now. Why is that?
A. There are projections built into some of these numbers that --
Q. Okay.
A. -- that correspond to ticket sales and expenses, and how much, for example, it might cost for the NSO to do a show at this venue versus

another venue.
Q. Mm-hmm.
A. That is a normal process under unique times. I would have -- I am more intimately involved in that process now.
Q. Okay.
A. So I understand more about this process than I did in -- than I did in August.
Q. By "this process," is it fair to say, broadly speaking, the Center's financials?
A. Yes.
Q. Is there a reason that you became more intimately involved in the process of understanding the Center's financials in recent weeks or months?
A. Because I want to see the Center succeed, and to a large degree, that means I have to be able to answer a wide range of questions.
Q. Okay.
A. So...
Q. It sounds, though, that -- and this is not meant to be a criticism. This is meant for my understanding.

It sounds like, you know, at the time of the Board meeting, you were relying on your staff a little bit more for their knowledge about the Center's finances; is that fair to say?

A. That is fair.

Q. Is there anything else that prompted you to become more involved, other than just a general interest in being knowledgeable and able to answer questions?

A. No.

Q. So it didn't having anything to do with the Center's cash position?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer.

A. No.

Q. Did it have anything to do with representations that the Center made that it was within weeks of financial collapse?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer.

A. No.
Q. Do you recall the Center making representations that it was within weeks of financial collapse?
A. I do recall those representations.
Q. What can you tell me about those representations?
MR. JANKOWSKI: I'll just add -- not making a categorical objection, but just object to the extent that calls for attorney-client privilege, or executive privilege, as coming from, on behalf, or from the President, just instruct him not to answer.
But otherwise, you can answer.
A. Those comments are driven by the lack of following this process for FY26.
Q. What is "this process"?
A. The financial planning and analysis process.
Q. Okay. The Center's financial position, though, also was seriously affected by the decrease in revenue following the renaming of the Center;

right?

MR. JANKOWSKI: Objection. Lack of foundation.

Answer, if you can.

A. Financials were impacted, yes.

Q. Pretty significantly impacted, weren't they?

A. By asking the question that way, you're trying to draw a link between two specific things, and I think the impacts were driven by a much broader series of events than just the renaming, or the naming aspect.

Q. Are you saying that, from your perspective, the renaming did not have a significant impact on the Center's revenue?

MR. JANKOWSKI: Objection. Misstates.

A. I'm saying that the renaming did have an impact, and any significant impact, as you would describe it, is driven by broader factors, and not just the renaming.

Q. Broader factors specific to fiscal year

A. We are prioritizing the abnormal, not the normal governance. So why was it not discussed? I'm assuming because these are priorities instead of normal governance.

Q. Do you have a say in what gets discussed at the Board meetings?

A. Yes.

Q. Why did you not bring up -- well, let me first -- I will lay a foundation.

Were you aware in -- at the time of the August 13th Board meeting, that, as you describe it, the Center was at a risk of fiscal collapse by the end of fiscal year '26?

A. I don't think I described it that way.

Q. Did you understand that to be the Center's financial position at the time of the August 13th Board meeting?

A. The financial position, whether it's the end of September, or the end of January, or the end of March of '27, is existing alongside the uncertainty with the path forward in construction.

So it's not a -- it's not -- there's

not a clear line in the sand. There are multiple different factors that drive the Center's financial position.

Q. Were you aware on August 13th that the Center -- well, was the -- was the Center within -- let me start that again.

Was the Center at risk of running out of cash to make payroll by the end of fiscal year '26 at the time of the August 13th meeting?

MR. JANKOWSKI: Objection. Vague as to "risk."

A. With the information I knew at the time, I could not have said that.

Q. Okay. With the information that you now know, what is the cash position of the Center and its ability to make payroll?

A. Good.

Q. Okay. If the Center has a good financial position now, what caused the Center to make representations in September that it was within weeks of financial collapse?

MR. JANKOWSKI: Objection as to

foundation, again.

I think the witness testified he didn't recall that that foundation occurred.

A. Ask the question again.

Q. Let me -- I will try to address your counsel's concern.

At a certain point in September -- we talked about this -- the Center made some representations about dire fiscal position.

Do you recall that?

A. I recall dire fiscal position comments, yes.

Q. That included representations about being imminently at risk of not being able to make payroll within three weeks.

Do you recall that?

A. I don't recall the three-week period, but yes, there were representations about issues and payroll.

Q. Okay. Those issues were -- whether it was three weeks or not, the issue was a concern that the Center was at risk of not being able to make

A. We are prioritizing the abnormal, not the normal governance. So why was it not discussed? I'm assuming because these are priorities instead of normal governance.

Q. Do you have a say in what gets discussed at the Board meetings?

A. Yes.

Q. Why did you not bring up -- well, let me first -- I will lay a foundation.

Were you aware in -- at the time of the August 13th Board meeting, that, as you describe it, the Center was at a risk of fiscal collapse by the end of fiscal year '26?

A. I don't think I described it that way.

Q. Did you understand that to be the Center's financial position at the time of the August 13th Board meeting?

A. The financial position, whether it's the end of September, or the end of January, or the end of March of '27, is existing alongside the uncertainty with the path forward in construction.

So it's not a -- it's not -- there's

not a clear line in the sand. There are multiple different factors that drive the Center's financial position.

Q. Were you aware on August 13th that the Center -- well, was the -- was the Center within -- let me start that again.

Was the Center at risk of running out of cash to make payroll by the end of fiscal year '26 at the time of the August 13th meeting?

MR. JANKOWSKI: Objection. Vague as to "risk."

A. With the information I knew at the time, I could not have said that.

Q. Okay. With the information that you now know, what is the cash position of the Center and its ability to make payroll?

A. Good.

Q. Okay. If the Center has a good financial position now, what caused the Center to make representations in September that it was within weeks of financial collapse?

MR. JANKOWSKI: Objection as to

foundation, again.

I think the witness testified he didn't recall that that foundation occurred.

A. Ask the question again.

Q. Let me -- I will try to address your counsel's concern.

At a certain point in September -- we talked about this -- the Center made some representations about dire fiscal position.

Do you recall that?

A. I recall dire fiscal position comments, yes.

Q. That included representations about being imminently at risk of not being able to make payroll within three weeks.

Do you recall that?

A. I don't recall the three-week period, but yes, there were representations about issues and payroll.

Q. Okay. Those issues were -- whether it was three weeks or not, the issue was a concern that the Center was at risk of not being able to make

payroll by the end of the fiscal year '26; correct?
A. I don't remember the fiscal year.
Q. Okay.
A. Outlook.
Q. Do you remember that it was --
A. In --
Q. -- it was a representation that the Center was imminently, meaning very, very soon, at risk of running out of money to make payroll?
A. I did hear that, yes.
Q. Who did you hear that from?
A. It was discussed at the Board meeting.
Q. The Board meeting in September?
A. Yes, at the Board meeting in September.
Q. Is that the first time that you heard that about the risk of running out of money to make payroll imminently?
A. Again, the time frame of cash on hand and when that is an issue lived alongside what we're able to do with the -- you know, the larger, broader operation.
Q. I think we're close to lunch, so I

may -- I'm probably going to return to this topic. But -- or, I at least reserve the right to.

But before we break for lunch, did you -- did you discuss the subject of the Center's -- I believe you called -- we agreed that it was dire fiscal position with Secretary Lutnick in September of this year?

MR. JANKOWSKI: Objection on executive privilege grounds.

Don't answer that.

MS. FREENY: Okay. So I just want to confirm that you are directing the witness not to answer on the grounds of what -- which form of privilege?

MR. JANKOWSKI: Executive privilege.

MS. FREENY: Is that the presidential communications privilege or another privilege?

MR. JANKOWSKI: It's the executive privilege, Kyle, but the presidential communications element of it, yes.

MS. FREENY: Are you invoking that

privilege at the direction of the President?

MR. JANKOWSKI: It's a protective assertion.

MS. FREENY: So you're not invoking it --

MR. JANKOWSKI: No. It's a protective assertion.

MS. FREENY: Sorry. Just -- let me make sure I finish.

You are not invoking that privilege at the direction of the President?

MR. JANKOWSKI: No. It's a protective assertion.

BY MS. FREENY:

Q. Sir, I'm just going to ask you to confirm that you are not going to answer my question about whether you had conversations with Secretary Lutnick about the Center's dire fiscal position in September of this year at the direction of your counsel; is that right?

A. Yes.

MS. FREENY: All right. With that,

I think we can go off the record and take a lunch break.

MR. JANKOWSKI: Fine by us.

(RECESS, 12:51 p.m. - 1:36 p.m.)

BY MS. FREENY:

Q. Good afternoon, Mr. Floca.

Just a reminder, you understand that you are still under oath in this deposition?

A. Yes.

Q. I want to -- we had been talking about the various scenarios that the Center considered in response to the Court's preliminary injunction in the Beatty versus Trump matter.

Do you recall that?

A. I recall the scenarios, yes.

Q. I have just I think one more subtopic on that that I want to close out before I move on.

The -- did management consider the scenario or the prospect of full closure of the main building for less than a year followed by partial reopening and phased construction?

A. Yes, we considered -- we considered a

shorter closure.

Q. Okay. Tell me about what that scenario, as you are describing it, looked like.

A. That would really fall into the more structured phasing, instead of a different -- you know, that would be more along the lines of you close the Eisenhower Theater for a shorter period of time and then you open and close the Concert Hall for a shorter period of time.

Q. Okay. What about just closing the entire building for a year to handle things like utilities throughout the building, and then reopening partially after that, for whatever period of time, it took to complete the remaining renovations?

A. One issue -- that was discussed, but what drives the schedule to a large degree is the structural and electrical repairs, which have longer than a 12-month duration.

An example of that, which we're learning more about now, the soffit panels, for example, is a -- that -- just replacing the soffit

panels is a five to six-month-long effort. Just that one component.

Q. Are you saying that from your perspective, replacing the soffits requires full closure of the building for five to six months?

A. No.

Q. How long does it require closure of the building for?

A. It depends -- that depends on how you phase the work, and what egress routes you establish during the construction.

Q. JLL has not done the work to figure out how you would phase that work, have they?

A. Preliminarily, from a project management perspective, they have, and they presented information recently on that.

The only thing is a general contractor will always have means and methods that need to be taken into account.

Q. Was that based on their understanding that the Center was going to proceed with two-year full closure of the main building?

A. No. The soffits are related to the Big Beautiful Bill appropriation, but being independently analyzed right now, separately from the two-year closure.

Q. Is that by the company with the last name, or with the name Moore in it?

A. Walter P. Moore is a structural engineer who has a long history with the Center.

Q. This -- you said that it was discussed, this scenario that I posited of closing entirely for one year, and then reopening on a phased basis thereafter.

When you say "was discussed," who was it discussed among?

A. At the project team level with the facilities office and JLL, mainly around the length of the infrastructure and exterior versus interior improvements.

Q. Was that prospect, that possibility, specifically discussed with JLL; that is, the possibility of a one-year full closure of the main building followed by a phased renovation?

A. Yes. At a high level, yes.
Q. What do you mean "at a high level"?
A. We never got past the concept of that type of closure, given the durations, the anticipated durations for, you know, the -- what we think needs to happen first, which is the infrastructure and structural improvements.
Q. So orient me in time. When would these discussion have been taking place? It sounds like it was -- you know, you never got past the concept.
When were you discussing the concept?
A. Early. You know, April, May.
Q. Okay. Before the Court's decision?
A. Yes.
Q. How long, in your view, would it take to accomplish the utilities renovations?
A. You need to comprehensively address the mechanical, electrical, and plumbing.
That is a 12 to 16-month effort.
Q. Does it in your view require the full closure of the building for the duration of those --

of that time period?

A. To do the work efficiently and effectively, yes.

Q. But that means it would be feasible to do it phased, I assume, just not preferably, in your opinion?

MR. JANKOWSKI: Objection to the extent that misstates.

A. I think anything is possible, if that's the right way to answer your question. You can theoretically do anything, yes.

Q. One way that you would decide whether something is feasible, though, would be to have a company like JLL actually do a schedule for you; right?

A. Yes. You could ask a project management company to create any type of schedule you want.

Q. That was not done here?

A. We asked JLL to look at the projects that were -- that backed up the Big Beautiful Bill appropriation and the time frame that was established and come up with a delivery plan and

schedule.

Q. When you say "time frame... established," you're referring back to that two-year period as announced by President Trump?

A. I'm referring, yes, to 24 to 26 months.

Q. Let me ask it on the flip side.

Did the Center consider the possibility that it would take longer than two years, assuming a full closure of the building to complete the renovations, the $257 million renovations?

A. Yes. Early on, we looked at schedules, anticipated, you know, high-level schedules that went into calendar year '29.

Q. Okay. Is that still -- I guess what was that -- sort of the upshot of your inquiry into that?

A. A lot of that was driven by the length of time it has historically taken us to -- and I say "us," the Center, the project management teams -- historically taken us to design, procure, bid work.

Q. How confident are you that the

construction that is currently contemplated can be completed after two years of closure at the main building?

A. I think two years is the right duration for the type of work that is being anticipated.

Q. Does that mean that -- I guess my -- I don't know what you mean when you say "right duration."

Are you confident -- how confident are you that the construction that is contemplated during the two-year closure will be completed during that two-year period?

A. Well, we have less than two years now, if we're trying to hold the -- you know, the end date of calendar year '28, so I'm not extremely confident that all of the work can be done between now, if we were to start tomorrow.

Q. Mm-hmm.

A. And the end of Q3 or 4 of '28.

Q. Sorry. I don't think I caught what you called the end date, but I didn't hear what you said after that.

What is the end date of?
A. If we are holding Q3 or Q4 of '28 --
Q. Okay.
A. -- as the reopening time frame --
Q. Okay.
A. -- we have the same amount of work to do in a much shorter period.
Q. Okay.
A. JLL's schedule that they -- the framework that they gave in schedule format on -- in June, early June, laid out how we could complete the work that's all of the different projects within that time frame.
Q. So has the end date or the completion date for the contemplated renovation changed since you testified in April?
A. Depends on which way you're looking at the issue.
If you are looking at it from a feasibility, here's the needs of the building, how long is it going to take, I think that's a two-year effort.

Q. Okay.
A. Are we trying to fit that two years in a year-and-a-half, that's a -- you know, that is a -- that's an ongoing conversation.
Q. Why are you trying to fit what you see as two years of renovation in that one-and-a-half-year period?
A. Well, at this point the '28-'29 season is the earliest we can actually program something -- "meaningful" is not the right word -- something large scale, like touring Broadway.
Q. Okay.
A. So that is the earliest reasonable amount of time where we can have, you know, touring Broadway and Ike and Opera House.
Q. I thought I heard you -- when I asked about the end date, you had said, I thought, Q3 or Q4, and that would take us into the -- like, past the start of the Center's season, wouldn't it?
A. Depends, because it's not a -- an exact time frame -- or point in time.
But September-October is the

beginning of seasons. Whether that's classical season or a touring Broadway season.

Q. You also said there were ongoing conversations about trying to fit the construction into this one-year period.

Conversations with whom were you referring?

A. We meet regularly to talk about projects. There's internal conversations within the Center about how to complete the work that needs to be done.

Q. Is one of the factors driving the time frame for completion of the construction the President's preference that the construction be completed before the end of his term?

A. I don't know the President's preferences regarding that, but I do think that we can't forever be in construction, so it makes sense to establish an end date.

From a -- I mean, I'm -- I don't want to make it sound less than it is, but if you look at the work that is anticipated, the work

that's identified, you know, it's about a year's worth of infrastructure and about a year's worth of interior work. Mechanical overlaps.

I think that's appropriate.

Q. You said you were not aware of the President's preferences.

Were you aware that Secretary Lutnick appeared at a -- gave -- I guess an interview or made some remarks in front of cameras outside of a hearing in this case over the summer?

A. I am aware of that. I did not watch the whole -- not an interview.

I did not watch the whole -- thing.

Q. Got it. I understand that you did not watch the whole thing, but were you aware that during those remarks Secretary Lutnick said the following: "Then why would the President agree to work on the restoration where he's going to be the President for the next 2.5 -- two-and-a-half years, and then he's leaving." (As read.)

Then he later said, "I mean, it's ridiculous. So he wouldn't be involved."

Were you aware that Secretary Lutnick said that about the President?

A. I did hear him say that, yes.

Q. You heard that part of his interview?

A. Yes, yes.

Q. So when you said you didn't -- you weren't aware of the President's preferences, I take it you mean that's because you didn't speak directly with the President, but you are aware of what Secretary Lutnick represented about the President?

A. Yes. I saw that part of the -- of Secretary Lutnick's interview -- press release.

Q. Did you understand -- I guess, what do you understand Secretary Lutnick to be saying in terms of what the Center should be doing?

A. I take his comments there to say if the President is going to invest in this project, he will want to see it completed, and there's an end date, you know, to that.

Q. Then did that influence the way that you approached the timeline for construction?

A. I've always taken the end of -- you

know, September-October, Q3-Q4, of '28 to be our target for reopening, mainly based on that it makes sense for the Center.

Q. But at least in part also because it aligned with the President's preferences?

MR. JANKOWSKI: Objection. Form, and misstates.

A. I think it's that time frame aligns with the Center's operations.

Q. Mm-hmm.

A. Whether or not that aligns with the President's desires, I can't tell you.

Q. Does that mean that you have not had conversations with the President about the timeline for construction?

MR. JANKOWSKI: Objection on executive privilege grounds. I'll instruct you not to answer.

MS. FREENY: I'm again going to ask, which executive privilege?

MR. JANKOWSKI: The executive privilege, and the presidential communications

portion of it.

MS. FREENY: You are instructing the witness not to answer?

MR. JANKOWSKI: Yes.

MS. FREENY: Has the President or his representative directed you to assert that privilege?

MR. JANKOWSKI: No. It's protected because the White House will need to review the transcript of this deposition before it can make a specific invocation of the privilege.

BY MS. FREENY:

Q. Sir, are you going to decline to answer my question at the instruction of counsel?

A. Yes.

MS. FREENY: Also, let me just ask for the record: Has the White House instructed you to make that the -- I forget what you called it, but the prophylactic assertion so that they can have the opportunity to review the deposition?

MR. JANKOWSKI: I think there's -- I think even that could call for privileged

information. So it's a protective assertion.

MS. FREENY: So you're not going to tell me whether the approach of the Department of Justice, in invocation of the Presidential communications privilege, is at the direction of the White House?

MR. JANKOWSKI: I think the Department of Justice is following its standard procedure for asserting and invoking the executive privilege.

MS. FREENY: So you will not answer that question?

THE WITNESS: I will not.

BY MS. FREENY:

Q. I think maybe a little bit of a drier topic. I'm going to move on to talking about the Center's engagement with Delta Consulting. Okay?

A. Great.

Q. All right. I believe that you mentioned that it was a competitive bidding process; is that right?

A. Yes.

about what Secretary Lutnick may have told you in this meeting with Delta Consulting, at the instruction of your attorney?

A. Correct.

Q. When we talked to Delta Consulting, I will tell you that they mentioned having a conversation with someone that they represented to be a California consultant.

Does that ring a bell to you?

A. Not a California consultant.

Q. Okay. If I said that Mr. Buchalter mentioned talking about something like programming with a California consultant by phone, does that maybe jog a memory or suggest who he may have been talking about?

A. Yes.

Q. Who do you think that was?

A. Rick Canny.

Q. Who is Rick Canny?

A. Rick Canny.

Rick Canny is a California consultant.

Q. Okay. What is his relationship to the Kennedy Center?

A. He is assisting with all things programming, arts, entertainment, the business related to.

Q. Is he an employee, or is he a consultant?

A. He is a consultant.

Q. Okay.

A. Contractor.

Q. When did he come to be contracting with the Center?

A. I don't know exactly when.

Q. Was it before or after the May Court decision?

A. Before.

Q. Was it before or after you became the executive director of the Center?

A. I don't know.

Q. Did you have any role in deciding to retain Mr. Canny?

A. I didn't -- I did not know who

Mr. Canny -- or who Rick was.
Q. Okay.
A. I did not bring him into the Center.
Q. Who brought him into the Center?
A. I don't know.
Q. Does Mr. Canny have any connections with anyone at the Center?
MR. JANKOWSKI: Objection. Vague.
A. I don't know the extent of Rick's connections.
Q. Okay. Let me just make sure I understand, though.
I'm not asking for the full extent, but do you know if he has any connections to anyone at the Center?
MR. JANKOWSKI: Same objection.
A. I don't know the full extent of the connections or the context under why Rick was originally brought to the Center --
Q. Okay.
A. -- other than I know the value that he is providing and has provided.

Q. Who told you that Mr. Canny was being brought on as a consultant to the Center?

MR. JANKOWSKI: Objection. I think it misstates prior testimony.

A. I met him.

Q. Okay. Well, let me ask you this: How did you find out that Rick Canny was being brought on as a consultant to the Center?

MR. JANKOWSKI: Objection. Again, I think it misstates prior testimony.

A. He was already working --

Q. Okay.

A. -- within the Center.

Q. Okay.

A. And I was introduced to him.

Q. All right. Where -- "already working within the Center" meaning as a consultant or...

A. As a contractor.

Q. As a contractor. Okay.

But you don't know when he was first brought on?

A. I don't.

Q. You don't know the circumstances?
A. I recall him being brought on to help identify a senior vice president of artistic planning, but outside of that, I don't know the extent other than it was general programming and, you know, arts-related business support.
Q. Are you aware of whether Mr. Canny has any connection with the Kennedy Center's general counsel, Elliot Berke?
MR. JANKOWSKI: Objection. Vague. And to the extent it calls for attorney-client privilege information, instruct you not to answer that, but...
Q. I'm just asking for if you know if there's a connection there, a preexisting connection.
A. I can speculate there is one, but I don't -- I mean...
Q. I'm going to ask you to speculate, and just tell me why you think there is one.
MR. JANKOWSKI: Objection. Speculation.

A. I will assume that there is business related to this industry that has occurred in the past.
Q. Ah.
So you're referring to Mr. Berke's role as -- other work in the entertainment industry; is that what you are referring to?
MR. JANKOWSKI: Objection to the extent that it misstates.
But you can answer.
A. I can speak to the work that Rick is doing now.
Q. Okay.
A. I cannot speak to the work that Rick has done prior to me knowing him, or his relationships with people prior to me knowing him.
Q. Okay. You have some familiarity, though, with his background, from having worked with him the last couple of months?
A. I have some familiarity, yes.
Q. It looks from online like he has experience with commercial entertainment; is that

fair to say?
MR. JANKOWSKI: Objection. Vague. Speculation.
A. It's -- is that an opinion? I don't know what's the -- sure. Fair to say, yes.
Q. He does not, however, have prior experience with any major performing arts venues; correct?
MR. JANKOWSKI: Objection. Vague. Speculation. Lacks foundation.
A. I completely understand the thread that you're pulling on.
Q. Mm-hmm.
A. But what you're missing is that people come to the Kennedy Center to be entertained. That is the whole purpose. One of the major purposes.
To be entertained, and to be happy. What it sounds like you're implying is that Rick Canny's entertainment experience is not arts, and arts is not entertainment.
But the reality is, it's the same thing because the purpose of one of the -- one of

the major purposes is to make people happy when they come to the Center.

And I think that -- and now -- Rick's experience managing artists, or working on touring productions, those are relevant to the Center. It's just as relevant as the Center's education mission, because combined, it's all about making people happy and entertaining people.

That's the same -- that's the same thing.

Q. All right. I understand that. I'm not implying anything. I'm actually just asking a question.

I'm asking you to confirm that he does not have prior experience with major performing arts venues?

MR. JANKOWSKI: Objection. Vague. Speculation.

Q. You can answer.

MR. JANKOWSKI: Lacks foundation.

Yes, you can answer, if you can.

MS. FREENY: Okay, let's --

A. We -- in order to answer that question, we would have to ask him for every single venue he has ever worked with, or for in the past.

Q. Okay. So you're not aware, sitting here today, of any prior experience he has with any major performing arts venue; right?

MR. JANKOWSKI: Objection. Misstates prior testimony. And vague.

Q. So this is -- that's a yes or no question that I am entitled to the answer to. And it's not a judgment. It's just a factual question.

Are you aware -- it sounds like you are not aware, sitting here today, of any prior experience that Mr. Canny has with a major performing arts venue; are you?

MR. JANKOWSKI: Same objections.

A. Would you consider the Hollywood Bowl a major performing arts venue?

Q. Would you?

A. Yes.

Q. So I guess you -- do you understand Mr. Canny to have experience with nonprofit

performing arts centers?

A. I think it's irrelevant.

Q. Okay. You think it's irrelevant because you don't think that there are different considerations for a nonprofit performing arts center, and a for-profit performing arts center?

A. There are definitely different considerations.

Q. Okay. That includes different missions; right?

A. Yes.

Q. So sort of a different approach to -- for example, fundraising, I would assume; right?

A. Yes, but Rick is not involved in fundraising, nor -- he does not direct fundraising or need to have anything other than an understanding and appreciation of the Center's mechanics.

So again, they're adjacent things, but -- sorry. They're adjacent.

Q. Are you aware of whether Mr. Canny has any experience booking children's theater?

MR. JANKOWSKI: Objection. Vague.

A. Yes, I am.
Q. What is that experience?
A. How far do I go into Rick's personal life? I don't understand if that's okay, or should we talk about his daughter? Should we talk about what he does at his daughter's high school and the work that he's done there?
Q. Okay. So the experience -- well, I guess -- let me sort of put a framework on why I'm asking these questions. I'm trying to -- again, I'm just asking the facts.
If you don't think it's significant, I guess, I would think that you would have no problem answering no, if he doesn't have that experience.
The framework I'm trying to understand, I'm going to turn you to Tab 37. This we will have marked as Exhibit 6.
MR. JANKOWSKI: 6, I think. That's what I have.
(Floca Exhibit 6, Defendants' Objections and Responses to Plaintiff's First Set of Expedited

Discovery Requests, [no Bates], was marked for identification.)

Q. Mr. Floca, Exhibit 6 is, as you can see on the page, Defendants' Objections and Responses to Plaintiff's First Set of Expedited Discovery Requests.

Do you see that?

Turn to the very back, the very last page. Do you see a verification?

A. Yes.

Q. You signed that verifying the interrogatory responses under penalty of perjury; is that right?

A. Yes.

Q. So I'm going to direct you to the middle of the document, page 50 at the bottom?

These are among the interrogatory responses that you verified, and I just want to ask you about that.

At the top, you see it says Paragraph 7, and the question that was asked was: "Identify each person with professional expertise

and performing arts management who was consulted by the Kennedy Center, the Board, or Delta on a matter related to either of the Board decisions, and for each state the subject of the consultation and the nature of that person's performing arts management professional experience."

All right. So the first person listed here is Matt Floca. That's you; correct?

A. Yes.

Q. So you have identified yourself as a person with professional expertise in performing arts management; is that right?

A. Yes.

Q. Is that experience come from anything other than your role as the executive director of the Kennedy Center since the beginning -- sort of toward the beginning of fiscal -- calendar year 2026?

A. It also includes my experience working under Deborah Rutter, and working under Ric Grenell.

Q. Okay. I got it. Before you assumed the position of executive director, did you have a role

in programming?

MR. JANKOWSKI: Objection. Vague.

A. I oversaw production, which is a role in programming.

Q. But in scheduling -- in bringing performances to the Center, for example?

MR. JANKOWSKI: Objection. Vague.

A. My -- no, my job was not to bring performances to the Kennedy Center.

Q. Do you consider yourself to be an expert in performing arts management?

MR. JANKOWSKI: Objection. Legal conclusion. Calls for one.

But you can answer.

A. I understand all of the pertinent aspects, so I would consider myself an expert.

Q. Would you have said that at the start of -- or I guess, would you have said that at the time of the Board meeting that was held in March of 2026?

A. I would not have considered myself an expert in performing arts management at the time.

Q. So really, the experience that you have gained in those intervening months overseeing the operations of the Kennedy Center is a big factor in your, sort of, in -- the answer to that question, I take it?

A. Yes.

Q. Let's move on next, because this is obviously why I have asked. You've identified Rick Canny as a person with professional expertise in performing arts management.

Now I know you mentioned that he -- you talked about his daughter. Was that professional experience, expertise, sounds like, at a school?

MR. JANKOWSKI: Objection to the extent it misstates the witness's testimony in response to counsel's question.

A. I don't know the business dealings of Rick Canny, between, you know, himself and what he has done for, you know, his daughter's high school.

Q. Okay. So you don't know whether that was professional -- in a professional capacity or a

personal capacity?

A. Or a nonprofit capacity, nope. I don't.

Q. Then do you consider that that experience is what gives him the -- like, sort of the expertise in performing arts management, or is it that plus something else?

A. It's his understanding of the industry, the arts and entertainment industry, and his ability to leverage other people, who still work at the Center, like our vice president of education.

Q. Did Rick Canny ever work at the Kennedy Center?

MR. JANKOWSKI: Objection.

Q. As an employee?

A. I don't know.

Q. Where is Rick Canny's office?

A. In Los Angeles.

Q. Okay. Does he maintain an office in the general counsel's office?

A. No.

Q. Did you ever -- were you ever involved in turning down internal candidates for the role

that Mr. Canny now fills?
A. No.
Q. Does Mr. Canny have a connection with Live Nation?
MR. JANKOWSKI: Yeah. Objection to speculation. I mean, I won't make the categorical objection now, but I'm wondering what the scope of relevance is here within the Court's discovery limitation.
MS. FREENY: I mean, so I think Live Nation was one of its -- was brought in, for example -- we understand it to bring in as a ticketer. After they --
MR. JANKOWSKI: How is that related to the Board's decisions?
MS. FREENY: It's related to the equities.
MR. JANKOWSKI: Can you give me a little more detail than that? I mean, again, I think --
MS. FREENY: Sure, if one of --
MR. JANKOWSKI: I think the Court's

no connection between --

Q. Yeah.

A. -- the work that we're trying to do --

Q. Yep.

A. -- and the improvements that we're trying to make to the existing Kennedy Center, the building as it is today, and Rick Canny and Live Nation.

Q. Okay. What was your reaction when you saw the filing that the Department of Justice was going to represent that the Kennedy Center, if certain conditions wouldn't be met, could be torn down and replaced with an amphitheater?

MR. JANKOWSKI: Objection. Misstates.

A. I have no reaction.

Q. You had no reaction?

A. No.

Q. I want to turn back to the Exhibit 37 in the interrogatories, and go with the next name that the Defendants have listed, and I think you verified as a person with professional experience in the

performing arts?

MR. JANKOWSKI: Can I speak on the record, it's Tab 37, Exhibit 6; right?

Q. Sorry. Thank you.

Do you see that, Jeffrey Finn? Tell me about Jeffrey Finn.

A. Jeffrey Finn was in the programming department when I started at the Kennedy Center in early '24.

Q. Okay.

A. He took on more responsibility during the change in leadership between Deborah Rutter and Ric Grenell, and shortly after that change in leadership.

Q. What is his current role?

A. He's not an employee of the Kennedy Center right now.

Q. Okay. Where is he now?

A. He is doing his own business.

Q. Okay. So he is a consultant?

A. He has his own -- he has his own company. He is not -- I don't think he is actively

under contract, but --
Q. Okay.
A. -- with the Kennedy Center --
Q. I got it.
A. -- but he has historical, you know, knowledge in programming, and Broadway, traveling Broadway, and the Kennedy Center's business.
Q. When did he leave the Kennedy Center, roughly?
A. I don't know.
Q. Before you became executive director or after?
A. Yeah. Before. I think.
Q. In what capacity did he -- did the Center consult with him related to the Board decisions?
A. Programming.
Q. Can you be more specific. Like, what about programming? What did you ask him to consult about?
A. How shows are historically booked at the Center, types of shows, the cost of shows, the

MR. JANKOWSKI: Objection. Vague.
A. Tennessee, I think.
Q. What is his connection with the Kennedy Center?
A. He was briefly the senior vice president of artistic planning.
Q. Oh. What time period?
A. Before I was executive director.
Q. Okay. When you say "briefly," roughly how long of a tenure?
A. I don't recall.
Q. Okay. Why was he consulted by the Kennedy Center on these matters?
A. He's another industry point of contact that's familiar with arts and entertainment that has Kennedy Center experience.
Q. All right. Sorry, remind me again, what was his role when he was at the Kennedy Center, vice president of...
A. Senior vice president of artistic planning.
Q. What is his current position, like, or

his current job?
A. A similar position within another performing arts presenter.
Q. Okay. What presenter is that?
A. I don't remember off the top of my head.
Q. Is it a nonprofit, or is it a commercial venture?
A. I don't know.
Q. Okay. Do you know if he has a background in nonprofit performing arts?
A. I do not know.
Q. And then just estimating how long he was at the Kennedy Center, I assume that was -- it was less than a year; correct?
A. It was less than a year, definitely.
Q. Sounds like maybe about a month; is that fair to say?
A. Or two.
Q. One or two months. Okay.
All right. Then kind of going through, just finishing off this interrogatory, it identifies the subjects of consultation regarding

performing arts management -- or it -- sorry. Let me restate that.

The question asks for the subjects on which these individuals were consulted, and then the response that you provide lists a couple. "... the feasibility of presenting programming in the main building during construction; durability of continuing to present certain programming that was financially burdensome; feasibility of presenting programming in the REACH; and feasibility of presenting special events and programming off-site." (As read.)

Were there any other subject matters that these -- the Kennedy Center consulted folks with respect to performing arts management, and these issues?

I'm going to -- if you want to --

A. Yeah. I mean, there are other people still at the Kennedy Center who are working on programming.

Q. Let me ask a better question, because this is actually what I'm trying to get at:

What I don't see listed here as a topic of consultation is, for example, how closure would affect fundraising, and willingness of donors to give money to the Center.

Is that something that the Center analyzed in connection with -- or prior to the Board meeting?

A. You said is it something we analyzed?

Q. Yeah.

MR. JANKOWSKI: Objection. Vague.

A. Which Board meeting are you asking?

Q. The August 13th Board meeting.

A. The fundraising needs were analyzed, both historical and future, as part of Delta's work.

Q. Okay. Other than Delta, did the Center do its own analysis of fundraising needs, comparing the closure versus phased renovation scenarios, or did it rely on Delta's work?

A. The Center analyzed fundraising and development --

Q. Okay.

A. -- internally or separately alongside

Delta as well, yes.

Q. Do you recall discussion with -- well, let me say: Donna Arduin is the CFO, is that right, or was the CFO during the relevant time period we're talking about; correct?

A. Yes.

Q. Do you recall conversations and e-mail with Ms. Arduin about how much in fundraising Delta should -- like, what the calculations -- what numbers Delta should use in terms of projected fundraising for the two different scenarios they were analyzing?

A. I don't recall e-mails.

Q. Why don't we turn to it just so that you can see something.

I'm going to have you turn to Exhibit -- sorry, Tab 4, which will be marked as Exhibit --

MR. JANKOWSKI: 7, I think.

Q. -- 7.

(Floca Exhibit 7, e-mails, 9.16.26, KC-BEATTY0307-349, was marked for identification.)

Q. Mr. Floca, this is a collection of e-mails. You can see from the bottom containing the Bates number, which indicates that they were produced by Defendants in this matter. And I will represent to you that although it's just a -- it's a collection, this is -- this happens to be the way it was produced to us.

Do you understand that?

A. Yes.

Q. I want to have you turn to -- at the bottom, the number will be 315, or page number 17. I'm going to ask you to look at the very bottom of the e-mail where it's an e-mail from Donna Arduin to you, and some others, dated August 8, 2026.

Do you see that?

A. Yes.

Q. Okay. Then just so that you're oriented, can you turn the page. I'll have you turn back, but just so you can see.

What's beneath that looks like that's a -- the e-mail we just looked at, it's a response to an e-mail from Mr. Buchalter to Donna

marked for identification.)

Q. Do you see that Exhibit 8 has a date in the upper left corner, 7/29/26, and it's a chart with dates and information; do you see that?

A. Yes.

Q. Do you recognize Exhibit 8?

A. Yes.

Q. What is it?

A. Donna referred to this as the "burn chart."

Q. I think I saw a reference to cash burn; does that sound also similar?

A. Yes.

Q. So what is your understanding of what the burn chart is?

A. It takes these expenses, turns it into a rate of daily burn.

Q. Okay. What do you mean by "daily burn"?

A. A forecast of how much outflow there is each day.

Q. Outflow of revenue?

A. Cash.

Q. Cash. Okay. Who prepared the burn table; was it Ms. Arduin?
A. Not just her. I would -- I believe the finance team worked on this. More than just Donna.
Q. When do you first recall seeing this chart?
A. Early July.
Q. What's your understanding of the purpose for which this chart was prepared?
A. To get to this cash burn figure.
Q. To help the Center understand how much cash it had on hand; is that...
A. I would categorize it as outflows and inflows.
Q. Was this created because of a specific concern about cash inflows or outflows?
A. Less a concern, and more a tool.
Q. Whose idea was it to create this tool?
A. I don't know.
Q. But it wasn't you?
A. I don't think so, no.
Q. Okay. Did you show this to the -- this

to the Audit Committee; do you recall?

A. I didn't show this to the Audit Committee.

Q. Did somebody at the Center?

A. I don't know.

Q. Okay.

A. I don't know if -- and if they would have, I doubt it would have been in this format.

Q. Okay. If you -- like, I will just represent for the record that it's -- one reason it may look a little bit unexpected to you is that the way that it was produced to us, unless you did it as a screenshot, the date would self-populate with the current date.

So this is just a screenshot. That's why it looks sort of larger than an Excel spreadsheet would.

This chart indicates that the out-of-cash date for the Center was December 24, 2026.

Do you see that?

A. Yes.

Q. Okay. The Foundation donated funds to the Center; is that right?

A. I don't know if "donated" is the right word, but there was a transfer of funds, yes.

Q. What word would you use to describe that transfer of funds?

A. Transfer.

Q. Okay. What was the purpose of the transfer?

MR. JANKOWSKI: Objection. Vague.

A. The funds were raised --

Q. Okay.

A. -- to help the Kennedy Center meet its mission and needs, and the funds were transferred, and the Kennedy Center is using those funds to help meet mission and need.

Q. Do you know who raised those funds on behalf of the Foundation?

A. I don't know all of the details about how the money was exactly raised.

Q. If you wanted to have a conversation with the Foundation, as you described towards sort

of the mutual, shared goals, who would you talk to?

A. I don't know right now. I mean, I would not -- I have no need to talk to the Foundation right now.

I have a need to create my own, with my teams, need and concept of the development plan. The Foundation has no bearing on that from my perspective.

Q. Okay. Well, let me drill down on that.

The number here that is next to the Foundation, it says, "Remaining 18."

You agree that's 18 million based on the top of the chart?

A. Yep. I would agree.

Q. Am I reading this right that that represents $18 million in available funds that were, as you said, transferred from the Foundation to the Center?

A. Yes.

Q. When did that transfer take place? Was it a single transfer or over multiple periods -- multiple transfers?

A. I don't know the specifics of the transfers.

Q. Who would know the specifics of the transfers?

A. Our finance teams.

Q. Do you know, sort of, roughly, what time period the transfers were made; for example, this year?

A. It was definitely this year, yes, but I don't know -- I don't know the exact time frame or amounts.

Q. Do you know if it was before or after the Court's preliminary injunction decision?

A. Which was May; right?

Q. Mm-hmm. May 29th.

A. It was likely after that.

Q. Okay. I want to ask about these -- the transfer of funds.

You've resisted calling them donations, but do you recall that there were funds donated from a foundation to -- let me just rephrase that.

Were there -- was there money that was transferred from the Foundation to the Center that was conditioned on Trump's name remaining on the building?

A. I'm not aware of an explicit condition, but I am aware of the -- you know, the strategy, right. Not necessarily explicit condition, though.

Q. Tell me what your understanding is of the strategy?

A. There are supporters, and entities, and organizations that would want to support the Kennedy Center, and support the chairman and Board's vision for the Kennedy Center.

Q. Is that support in any way connected to, or conditioned on, Trump's name being on the building?

MR. JANKOWSKI: Objection. Asked and answered.

A. I would be willing to assume that there are some donors who would want to condition their gifts on that, and I'm sure there are some donors that would not, just like there are some patrons

that love to see his name on the building, and there's some that do not.

Q. But some of them actually -- you're aware, though, that some -- some patrons -- well, let me just rephrase this.

Let me just ask this question: On this chart, there's a column on the right that asks, "Repayment Required?"

Do you see that? In orange.

A. Yes.

Q. I assume that column is indicating whether the available funds require repayment; is that fair?

A. Yes.

Q. Okay. For the Foundation, in answer to the question, "Repayment required," it says, "Pending Board action."

Do you see that?

A. Yes.

Q. What does that mean?

A. I don't know.

Q. You don't know what that means?

CERTIFICATE OF COURT REPORTER

I, Marjorie Peters, Fellow of the Academy of Reporting, Registered Merit Reporter, Certified Realtime Reporter, Realtime Systems Administrator, and Notary Public in the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that the witness was placed under oath according to the law; that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction, and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

I further certify that signature was not waived by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand this ____ day of __________, 2026.

Marjorie Peters, FAPR, RMR, CRR, RSA
My commission expires October 31, 2029.

# Floca Dep.
# Ex. 1

EXHIBIT
PENGAD 800-631-6989
Floca 1

# The Trump Kennedy Center

MEMORANDUM

**TO:** Cecelia Royster, Source Selection Official (SSO)
**FROM:** Matthew Floca, Technical Evaluation Panel (TEP) Chairperson
**DATE:** March 4, 2026
**RE:** Recommendation for Award – Project Management Contractor (PMC) Services

**1. Recommendation for Award**

After a comprehensive and discriminating technical evaluation of all five proposals, the Technical Evaluation Panel (TEP) recommends that the contract for Project Management Contractor (PMC) services be awarded to Jones Lang LaSalle (JLL). The TEP conducted a formal consensus meeting on March 2, 2026, at 9:30 AM, to rank the offerors based on technical proficiency, depth of experience, and management viability. JLL emerged as the top-ranked firm (Consensus Score: 4+ / Very Good), demonstrating the highest quality of understanding of the Kennedy Center's "speed-to-market" requirements and presenting the most effective strategy to protect the non-negotiable July 6, 2026, mobilization date.

**2. Technical Justification and Trade-Off Summary**

The primary risk to the Center's Renewal Project is the compressed 26-month execution timeline. JLL's proposal was the only submission that successfully translated these aggressive goals into a proactive, day-by-day operational strategy.

- Proactive Methodology: JLL's "8-Sprint" front-loaded planning framework enables parallel workstreams, such as long-lead procurement and site decommissioning, months before construction begins. This contrasts with the more traditional, sequential "Base Building First" approach proposed by VVA (Rank 2) and Jacobs (Rank 3), which the panel felt introduced higher schedule risk.
- Technological Integration: JLL was the only offeror to commit to day-one deployment of OpenSpace AI and Ingenious.Build. This provides the Center with 360-degree job site documentation and automated budget "burn rate" visibility, essential for executive-level transparency and board reporting.
- Operational Sensitivity: JLL demonstrated elite experience in coordinating complex infrastructure within active performance venues (e.g., MGM Music Hall, Capital One Hall). Their understanding of the occupied campus environment ensures that the Renewal Project can proceed without compromising the Center's mission or patron experience.

**3. Comparative Ranking of Offerors**

| Rank | Offeror | Confidence Level | Performance Risk |
|---|---|---|---|
| 1 | JLL | Very Good | Low–Moderate Risk |
| 2 | VVA | Very Good | Low–Moderate Risk |
| 3 | Jacobs | Very Good | Low–Moderate Risk |
| 4 | AECOM | Satisfactory | Moderate Risk |
| 5 | K2 | Poor | Moderate–High Risk |

- VVA & Jacobs: While both firms demonstrated relevant experience (Lircoln Center and EEOB respectively), their technical scores were lower than JLL's due to VVA's reliance on a limited senior staff tier and Jacobs' attempt to limit liability through contract refinements.
- AECOM & K2: These firms presented higher performance risks due to a lack of project specific deliverables and reporting samples (AECOM) and significant leadership/logistical ambiguity regarding prime-subcontractor roles (K2).

**4. Cost Reasonableness and Price Evaluation**

In accordance with the "Best Value" selection process, the TEP Chairperson and the Contracting Office performed a comprehensive review of the Total Evaluated Prices (TEP) and individual labor rates for the top three ranked vendors. JLL's proposed pricing is determined to be fair, reasonable, and representative of the best value to the Center based on the following:

- Total Price Comparison:
    1. Jacobs: $9,725,872
    2. JLL: $10,553,898
    3. VVA: $13,473,512
- Price-to-Technical Trade-Off: JLL is significantly more cost-effective than VVA, providing a superior technical solution at a $2.9 million (21.6%) savings. While JLL is approximately $828,000 (8.5%) more expensive than Jacobs, it is determined that this premium is justified by JLL's higher technical ranking (4+ vs 4-) and their superior risk mitigation tools.

- Labor Rate Benchmarking: JLL's Project Manager rate ($185/hr) is nearly identical to Jacobs' ($180/hr) and 26% lower than VVA's ($252/hr). JLL's Principal rate ($296/hr) is 30% lower than VVA's ($425/hr), demonstrating that JLL has optimized its executive costs while focusing resources on the specialized project management staff required for the project.
- Efficiency Gains: JLL's "8-Sprint" methodology and deployment of the Ingenious.Build platform are expected to automate reporting and budget tracking. This automation directly reduces the total hours required for manual administration, yielding a higher return on investment than the traditional, labor-heavy PMO structures proposed by competitors.
- Risk Mitigation Value: The technical superiority of JLL's plan offers the highest protection against schedule-driven cost overruns. The $828k delta over the low bidder is a prudent investment to mitigate the risks associated with missing the July 2026 construction launch.

- Comparison to Independent Government Estimate (IGE): JLL's total price is $1.33M (11.2%) below the IGE, providing a high level of confidence that their pricing is realistic and reflects current market conditions for specialized cultural renovation services. Furthermore, their rates for core personnel are highly competitive compared to the IGE. JLL's Project Manager rate ($185/hr) is 18% lower than the IGE's $225/hr. Their Principal rate ($296/hr) is also below the IGE estimate of $325/hr. This demonstrates a disciplined approach to labor costs while still attracting top-tier talent.

**5. Conclusion**

JLL provides the most advantageous solution to the Kennedy Center. Their technical proposal offers the necessary momentum and specialized integration to meet our deadlines while maintaining the high standards of stewardship required for a national cultural monument. I recommend proceeding with the award to JLL.

**Matt Floca, VP of Operations (TEP Chairperson)**

# Floca Dep.
# Ex. 2

# The Kennedy Center
## Audit and Finance Committee Meeting

August 3, 2026



KC-BEATTY1089

EXHIBIT
PENGAD 800-631-6989
Floca 2

# STATUTORY MANDATES

**Education:** To lead national performing arts education and provide innovative programs for all ages to foster arts appreciation.

**Presentation:** To present classical and contemporary music, opera, drama, dance, and other performing arts from both the United States and other countries.

**Preservation:** To maintain and operate the facility as a high-quality, living memorial to President John F. Kennedy.



# PROGRAMMING SCENARIOS

| | Construction Impact | Artistic/Memorial Presence | Mission Risk | Annual Cost |
|---|---|---|---|---|
| Endowment & Grant-funded | Highest efficiency; 2-year timeline; lowest cost. | Minimal REACH activity & home to temporary Memorial. | Moderate | $10M |
| NSO Offsite + REACH | Highest efficiency; 2-year timeline; lowest cost. | Offsite alternate venues; REACH remains active & home to temporary Memorial. | Low | $25M |
| NSO Onsite + REACH | Complex logistics; higher operating & construction costs; +2-year timeline. | Phased onsite / online; REACH remains active; Memorial remains open on Terrace Level. | Low | $25M |

# PROGRAMMING REQUIREMENTS & SOLUTIONS

| | Endowment & Grant | NSO Offsite + REACH | NSO Onsite + REACH |
|---|---|---|---|
| Classical Music | Fortas, Millennium Stage, Opera House Orchestra | National Symphony Orchestra Fortas | ☑ |
| Contemporary Music | Fortas, Millennium Stage, Opera House Orchestra | National Symphony Orchestra | ☑ |
| Opera | Fortas, Millennium Stage, Opera House Orchestra | National Symphony Orchestra | ☑ |
| Drama | Millennium Stage, Theater for Young Audiences | Theater for Young Audiences | ☑ |
| Dance | Millennium Stage, Theater for Young Audiences | Opera House Orchestra Performances for Young Audiences | ☑ |
| Other | Events, Rentals, Special Programming, Comedy, Broadcasting | ☑ | ☑ |

# Floca Dep.
# Ex. 6

EXHIBIT
PENGAD 800-631-6989
Tloca 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOYCE BEATTY,<br>*Plaintiff,*<br>v.<br>DONALD J. TRUMP, *et al.*,<br>*Defendants.* | Civil Action No. 25-4480 (CRC) |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF EXPEDITED DISCOVERY REQUESTS**

Pursuant to Federal Rules of Civil Procedure 26, 30, 33, and 34; Local Civil Rule 26.2; the Court's Scheduling Order of September 16, 2026 (ECF No. 82); and the Court's September 17, 2026 minute order, Defendants Donald J. Trump, *et al.*, provide the following responses and objections to Plaintiff's discovery requests.

**OBJECTIONS TO INSTRUCTIONS**

1. Defendants object to all of Plaintiff's instructions to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure. Defendants will respond consistent with their obligations imposed by the Federal Rules of Civil Procedure, and not beyond those obligations.

2. Defendants object to Instruction No. 8 to the extent it purports to impose an obligation to produce electronically stored information "a single-page TIFF images or searchable PDFs, in either case with document-level extracted text and standard load files, together with associated metadata (including custodian, author, recipients, date sent/received/created/modified, file name, and file path), except that spreadsheets . . . and other documents that cannot reasonably

7. Identify each person with professional expertise in performing-arts management who was consulted by the Kennedy Center, the Board, or Delta on a matter related to either of the Board Decisions, and for each state the subject of the consultation and the nature of that person's performing-arts management professional experience.

**Objections:** Defendants hereby incorporate by reference the foregoing general objections and objections to definitions and instructions set forth above, including, but not limited to those related to burden, proportionality, and feasibility in the context of the Court's Scheduling Order, ECF No. 82. Defendants will construe this request to include only that information within Defendants' possession, custody, or control under the expedited discovery timeline in this litigation, to wit: those persons known to Center Management as having participated in any consultation under the above conditions. Defendants object that the phrase "professional expertise in performing-arts management" is vague and undefined. Defendants will construe the phrase according to the primary dictionary definitions of each constituent term, to wit: of, or relating to, a "principal calling, vocation, or employment" of one with "special skill or knowledge" regarding the "conducting or supervising" of "types of art (such as music, dance, or drama) that are performed for an audience." *See Profession*, Merriam-Webster, https://www.merriam-webster.com/dictionary/profession; *Expert*, Merriam-Webster, https://www.merriam-webster.com/dictionary/expert; *Management*, Merriam-Webster, https://www.merriam-webster.com/dictionary/management; *Performing Arts*, Merriam-Webster, https://www.merriam-webster.com/dictionary/performing%20arts. Subject to and without waiving the foregoing objections, Defendants respond as follows:

**Response:** Matt Floca; Rick Canny; Jeffrey Finn; Kevin Couch. In general, the subject of these consultations was the feasibility of presenting programming in the main building during

construction; the desirability of continuing to present certain programming that was financially burdensome; the feasibility of presenting programming in the Reach; and the feasibility of presenting special events and programming off-site.

8. Describe each instruction given during the Interim Period, by any officer or employee of the Kennedy Center, to any other Kennedy Center officer or employee, concerning whether to book, schedule, or contract for performances or events occurring after July 6, 2026, and identify the person who gave it.

**Objections:** Defendants hereby incorporate by reference the foregoing general objections and objections to definitions and instructions set forth above, including, but not limited to those related to burden, proportionality, and feasibility in the context of the Court's Scheduling Order, ECF No. 82. Defendants will construe this request to include only that information within Defendants' possession, custody, or control under the expedited discovery timeline in this litigation, to wit: whether any such instruction is known by Center Management to have been given beginning May 29, 2026. Due to the expedited nature of this discovery, it is unduly burdensome to produce each instance where such a communication occurred; Defendants construe the request to seek information as to whether any such instructions were given in the normal course of business. Defendants further object to this Interrogatory for the reasons set forth in their objections to RFP No. 18, which are incorporated here by reference. Subject to and without waiving the foregoing objections, Defendants respond as follows:

**Response:** Center Management communicated in the course of normal business to Center staff and personnel that performances should continue to be booked for the National Symphony Orchestra, for the series of Fortas Chamber Music Concerts, and for the Millennium Stage.

# Floca Dep.
# Ex. 7

EXHIBIT
PENGAD 800-631-6989
Floca 7

**Darin L. Buchalter**

EXHIBIT
PENGAD 800-631-6989
FLOCA 30(b)(6)
12
cn 10/7/26

**From:** Berke, Elliot <[redacted]>
**Sent:** Wednesday, September 16, 2026 7:13 AM
**To:** Darin L. Buchalter
**Cc:** Floca, Matt
**Subject:** Re: [EXTERNAL]: Delta Consulting

Thanks Darin. Much appreciated.

**Elliot S. Berke**
General Counsel
John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566

[redacted] (o) | [redacted] (c)
Email: [redacted]
www.kennedy-center.org

On Sep 16, 2026, at 7:10 AM, Darin L. Buchalter <dbuchalter@delta-cgi.com> wrote:

See attached

**Darin L. Buchalter**
**Chief Executive Officer**
CRE, FRICS

**D:** +1 (646) 814 9421 | **M:** +1 [redacted]
**E:** dbuchalter@delta-cgi.com
Based in the New York metro area | Serving clients globally

<delta_linkedin_icon_6aff6e4c-0baf-4d5a-b893-d0dd0ea47337.png> <delta_facebook_icon_86990161-e2c3-4082-9dde-319e0955036e.png> <delta_x_icon_60e82a31-e72e-477c-a722-2f373db41305.png> <delta_instagram_icc a9c7-41bb-af85-3a29b975eddc.png>

*This email contains information from Delta Consulting Group which may be privileged or confidential. The information contained herein, or attached, is fo the addressee above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this information is prohibited. If yo electronic mail transmission in error, please notify us and delete the message without reading, copying, saving or disclosing it.*

**From:** Berke, Elliot <[redacted]>
**Sent:** Tuesday, September 15, 2026 10:09 PM
**To:** Darin L. Buchalter <dbuchalter@delta-cgi.com>
**Cc:** Floca, Matt <[redacted]>
**Subject:** Re: [EXTERNAL]: Delta Consulting

Thanks. Can you remove the "Protected Under Seal"? We would need to file as part of the public court record.

**Darin L. Buchalter**

---

**From:** Berke, Elliot <E[redacted]>
**Sent:** Thursday, August 20, 2026 11:01 AM
**To:** Floca, Matt; Khaled Aziza; Darin L. Buchalter
**Subject:** RE: [EXTERNAL]: Darin L. Buchalter shared "Kennedy Center Expert Report - Delta Consulting Group FINAL" with you

No – looks like it needs to come to me directly to access.

**Elliot S. Berke**
General Counsel
John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566

[redacted] (o) | [redacted] (c)
Email: [redacted]
www.kennedy-center.org

---

**From:** Floca, Matt <[redacted]>
**Sent:** Thursday, August 20, 2026 10:53 AM
**To:** Khaled Aziza <kaziza@delta-cgi.com>; Berke, Elliot <[redacted]>; dbuchalter <dbuchalter@delta-cgi.com>
**Subject:** Fw: [EXTERNAL]: Darin L. Buchalter shared "Kennedy Center Expert Report - Delta Consulting Group FINAL" with you

Elliot can you access?

Matt Floca
Executive Director & Chief Operating Officer
The John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566
[redacted] | Kennedy-Center.org

---

**From:** Darin L. Buchalter <dbuchalter@delta-cgi.com>
**Sent:** Thursday, 20 August 2026 08:03:34
**To:** Floca, Matt <[redacted]>
**Subject:** [EXTERNAL]: Darin L. Buchalter shared "Kennedy Center Expert Report - Delta Consulting Group FINAL" with you

## Darin L. Buchalter shared a file with you

Here's the document that Darin L. Buchalter shared with you.

Kennedy Center Expert Report - Delta Consulting Group FINAL

This link only works for the direct recipients of this message.

Open

This email is generated through Delta Consulting Group's use of Microsoft 365 and may contain content that is controlled by Delta Consulting Group.

**Darin L. Buchalter**
**Chief Executive Officer**
CRE, FRICS

**D:** +1 (646) 814 9421 | **M:** +1 [redacted]
**E:** dbuchalter@delta-cgi.com
Based in the New York metro area | Serving clients globally

delta-cgi.com

*This email contains information from Delta Consulting Group which may be privileged or confidential. The information contained herein, or attached, is for the exclusive use of the addressee above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this information is prohibited. If you have received this electronic mail transmission in error, please notify us and delete the message without reading, copying, saving or disclosing it.*

CAUTION: This email originated from outside of The Kennedy Center. DO NOT click any links or open attachments unless you recognize the sender and know the content is safe.

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

**Darin L. Buchalter**

---

**From:** Berke, Elliot <[redacted]>
**Sent:** Saturday, August 15, 2026 3:44 PM
**To:** Darin L. Buchalter
**Cc:** Floca, Matt
**Subject:** Re: [EXTERNAL]: Delta + KC GC

[redacted] it's the 18th not the 20th. My guess is you won't be ready by the 18th. If that's the case, then [redacted].

**Elliot S. Berke**
General Counsel
John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566

[redacted] (o) | [redacted] (c)
Email: [redacted]
www.kennedy-center.org

On Aug 14, 2026, at 5:04 PM, Darin L. Buchalter <dbuchalter@delta-cgi.com> wrote:

Got it

**Darin L. Buchalter**
**Chief Executive Officer**
CRE, FRICS
**D:** +1 (646) 814 9421 | **M:** +1 [redacted]
**E:** dbuchalter@delta-cgi.com
Based in the New York metro area | Serving clients globally

<delta_linkedin_icon_6aff6e4c-0baf-4d5a-b893-d0dd0ea47337.png> <delta_facebook_icon_86990161-e2c3-4082-9dde-319e0955036e.png> <delta_x_icon_60e82a31-e72e-477c-a722-2f373db41305.png> <delta_instagram_icc a9c7-41bb-af85-3a29b975eddc.png>

*This email contains information from Delta Consulting Group which may be privileged or confidential. The information contained herein, or attached, is foi the addressee above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this information is prohibited. If yc electronic mail transmission in error, please notify us and delete the message without reading, copying, saving or disclosing it.*

---

**From:** Berke, Elliot <[redacted]>
**Sent:** Friday, 14 August 2026 16:56:20
**To:** Darin L. Buchalter <dbuchalter@delta-cgi.com>; Floca, Matt <[redacted]>
**Subject:** Re: [EXTERNAL]: Delta + KC GC

Darin:

We just got off with Howard. He wants a report even if preliminary ready to go by 8am on 8/20. We realize this is a heavy lift.

**Elliot S. Berke**
General Counsel
John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566

[redacted] (o) | [redacted] (c)
Email: [redacted]
www.kennedy-center.org

---

**From:** Darin L. Buchalter <dbuchalter@delta-cgi.com>
**Sent:** Saturday, August 8, 2026 11:33 AM
**To:** Arduin, Donna <[redacted]>; Floca, Matt <[redacted]>; Berke, Elliot [redacted]>; Antkowiak, Alex <[redacted]>; Khaled Aziza <kaziza@delta-cgi.com>
**Subject:** RE: [EXTERNAL]: Delta + KC GC

See highlight. This amount is included in the 62? If yes, what is the 62 net of this figure? That would be your in place pledges?

**Darin L. Buchalter**
**Chief Executive Officer**
CRE, FRICS

**D:** +1 (646) 814 9421 | **M:** +1 [redacted]
**E:** dbuchalter@delta-cgi.com
Based in the New York metro area | Serving clients globally

<delta_linkedin_icon_6aff6e4c-0baf-4d5a-b893-d0dd0ea47337.png> <delta_facebook_icon_86990161-e2c3-4082-9dde-319e0955036e.png> <delta_x_icon_60e82a31-e72e-477c-a722-2f373db41305.png> <delta_instagram_icc a9c7-41bb-af85-3a29b975eddc.png>

*This email contains information from Delta Consulting Group which may be privileged or confidential. The information contained herein, or attached, is foi the addressee above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this information is prohibited. If yc electronic mail transmission in error, please notify us and delete the message without reading, copying, saving or disclosing it.*

**From:** Arduin, Donna <[redacted]>
**Sent:** Saturday, August 8, 2026 11:26 AM
**To:** Floca, Matt <[redacted]>; Berke, Elliot [redacted]>; Antkowiak, Alex <[redacted]>; Khaled Aziza <kaziza@delta-cgi.com>; Darin L. Buchalter <dbuchalter@delta-cgi.com>
**Subject:** Re: [EXTERNAL]: Delta + KC GC

I should have added a note there, Darin. Matt and I are using our FY 27 contributed revenue number because we have no reasonable belief we could raise more if we stay open. $62 m

# Floca Dep.
# Ex. 8

**Date**

7/29/26

**$ Millions**

| Sources | Date | Draw | Spent | Repayment Required? |
|---|---|---|---|---|
| LOC | 1/1/26 | $5 | $5 | Owed, date indeterminate |
| LOC | 3/26/26 | $5 | $5 | Owed, date indeterminate |
| LOC | 3/30/26 | $5 | $5 | Owed, date indeterminate |
| LOC | 4/26/26 | $6 | $6 | Owed, date indeterminate |
| Debt Reserve | 5/4/26 | $4 | $4 | 2030 balloon |
| Endowment | 5/11/26 | $10 | $8 | Pending WNO litigation |
| Months/$Total | 6.966666667 | $35 | $33 | |

| | | | | |
|---|---|---|---|---|
| Monthly Burn | | | $4.74 | |

| Remaining Sources | Date | Remaining | Spent | Repayment Required? |
|---|---|---|---|---|
| LOC | | $0 | | Owed, date indeterminate |
| LOC | | $0 | | Owed, date indeterminate |
| LOC | | $0 | | Owed, date indeterminate |
| LOC | | $0 | | Owed, date indeterminate |
| Debt Reserve | | $4 | | 2030 balloon |
| Endowment | | $2 | | Pending WNO litigation |
| Foundation | | $18 | | Pending Board action |
| Total | | $24 | | |

| | | | | |
|---|---|---|---|---|
| | | | | Out of Cash Date |
| 7/29/26 | Months Cash Remaining | | 4.96 | 12/24/26 |
| | Daily Burn | | $0.16 | Cash needed for each additional day in business |

PENGAD 800-631-6989
EXHIBIT
5

PENGAD 800-631-6989
EXHIBIT
Flocca 8