# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -x

JOYCE BEATTY, :

Plaintiff, :

v. : Case No.

DONALD J. TRUMP, et al., : 25 Civ 4480 (CRC)

Defendants. :

- - - - - - - - - - - - - - - -x

Wednesday, October 7, 2026
Washington, D.C.

Deposition of:

MATT FLOCA 30(b)(6),

called for oral examination by counsel for the Plaintiff, pursuant to notice, at the law offices of Washington Litigation Group, 1717 K Street, Northwest, Suite 1120, Washington, D.C. 20006, before Christina S. Hotsko, RPR, CRR, CA CSR, of Lexitas, a Notary Public in and for the District of Columbia, beginning at 9:45 a.m., when were present on behalf of the respective parties:

general, and work around other shows that might not necessarily fit cleanly in those buckets but were part of the Center's programming, like Shear Madness, were being discussed how -- you know, how things might evolve as the Center moved forward.

Q. Did management give any instructions to not -- or, sorry, let me say this again.

Did management give any instructions to defer any bookings until the board could have another meeting on how to proceeding with renovations?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: There wasn't a blanket hold on programming. There was -- because of the uncertainty around the ability of the Center to long-term plan a slowdown in programming, but that was also somewhat informed by the -- what I would consider a lack of leadership, maybe, on the -- within the programming department.

BY MS. FREENY:

Q. Tell me about that lack of leadership.

A. Historically, there should be a -- you know, there should be a person that is looking at all of programming across the Center and its effectiveness, both short term -- happening now -- and long term.

Q. Why wasn't there?

MR. JANKOWSKI: Vague. Objection.

THE WITNESS: I can't point to a single definite reason. It's broader than that. I know that there was a -- there's always a desire to keep -- you know, to keep structured leadership, whether it's programming or administrative services, in place.

BY MS. FREENY:

Q. Now, the Center had terminated programming staff in connection with the prior March board vote, had they not?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: There were terminations and resignations that impacted programming.

BY MS. FREENY:

Q. How many terminations of programming

staff that affected programming, roughly?
A. Between 20 and 30.
Q. Okay. And how many programming staff remained at the time the court decision came out in May?
A. Ten or less.
Q. I want to have you turn to tab 33 in your binder.
MS. FREENY: And I'm going to ask that this be marked Exhibit 1.
We'll number this separately than the exhibits from yesterday, and so we'll have this marked Exhibit 30(b)(6) 1.
And to the extent that 30(b)(6) does not actually appear on the sticker, I'll just note for the record that unlike yesterday's stickers, which are white, today's stickers for the 30(b)(6) deposition are blue.
(Floca (30(b)(6) Deposition Exhibit 1 marked for identification and attached to the transcript.)

BY MS. FREENY:
Q. All right. Mr. Floca, take a look at Exhibit 1.
And can you confirm for thee that this is a declaration from you executed on June 13th, 2026, in the case that we are here talking about?
A. Yes.
Q. Okay. I want to direct you to paragraph 6, which says, "Given present uncertainty as to future programming, management has deferred affirmative long-term programming or staff adjustments until the board selects a final operational path."
Do you see that?
A. I do.
Q. Okay. Tell me what management act- -- like, specifically did to defer affirmative long-term programming.
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: A general example would be to defer building a touring Broadway season for some period in the future.

BY MS. FREENY:

Q. Okay. Any other examples that you can think of?

A. I mentioned the Shear Madness --

Q. Okay.

A. -- longtime, you know, running show at the Center. An example would be working with them to explain or get to an understanding that there may be disruptions to the theater lab.

Q. Were they told that -- were they told how long those disruptions would last?

A. I would assume that generalities were provided, but there was -- there's uncertainty --

Q. Okay.

A. -- as the process is unfolding at this time.

Q. Were they told that they should not expect to perform at the Kennedy Center in the '26-'27 season?

A. I don't think definitively that would have been messaged.

Q. What would have been messaged?

A. That there is a process unfolding across both the courts and, you know, the board leadership about where the Center is moving.

Q. Okay.

A. That process is going to impact the availability of the theaters to -- and the building at large -- to hold events or programs.

Q. For how long?

A. There's no -- there's no definitive one -- there's no definitive one message as things were, and still are, you know, uncertain, so availability of space reflects a concrete path forward that wasn't identified or could not have been identified.

Q. Okay. But you're saying they were not told that space or booking was not available for this season?

MR. JANKOWSKI: Objection to the extent that misstates.

THE WITNESS: The messaging would have centered on uncertainty rather than just a clear no.

BY MS. FREENY:
Q. Was the Center made aware that expression -- sorry, let me say that again.
Was the Center made aware that, after conveying that uncertainty to the Shear Madness folks, they decided they could not perform at the Kennedy Center for the upcoming season?
A. Sorry. Can you ask that one more time?
Q. Was the -- did the Center become aware that, as a result of having conveyed what you had discussed about the uncertainty about their ability to perform, that Shear Madness made the decision that they would not be able to perform at the Kennedy Center for this season?
A. The Shear Madness team specifically, they were very concerned about the uncertainty and how their -- you know, how their show could move offsite or be built around any closures, and they -- they did communicate skepticism around the ability to continue at all. Yes.
Q. And was that skepticism that they conveyed about the ability to continue at all

with respect only to the upcoming 26-'27 season or any season that follows, for example, '27-'28?

MR. JANKOWSKI: Objection to the extent that calls for speculation.

THE WITNESS: Skepticism both short term and long term, but again, some of that, the concrete facts, were -- or the lack of the ability to provide concrete facts impact or -- impacts their planning, what's going to happen with the set, what's going to happen in the theater lab specifically. Can the set remain onsite or, when they do start back up, are they going to have to rebuild the set and the theater lab completely?

And, you know, those conversations are still ongoing.

But even though there was skepticism, the Center did always communicate to Shear Madness the willingness, you know, for them to continue no matter what the construction or operational changes are.

their representatives about potential bookings for the upcoming '26-'27 season? Other than Shear Madness.

A. Yes. Those would have come in the way of Millennium Stage programming, Fortas programming, programming for the orchestra --

Q. Okay.

A. -- and any, you know, work that the rentals team was doing to continue third-party engagements as well as special events.

Q. What work during this interim period was the rentals team doing to continue third-party engagements?

A. Mainly tracking leads that -- you know, inquiries that did come in. But, you know, those are going to be not unimportant events, but events and less so more than -- you know, cultural events or specific events for an organization or entity, as opposed to, you know, orchestra programming or Millennium Stage programming.

Q. Let me ask you about some specific

performances that I didn't hear you mention. And I'm interested in whether the Center received inquiries or had discussions about possible performances during the interim period.

Did Alvin Ailey or their representatives have discussions with the Center during the interim period about possible performances?

A. I'll have to get that information.

Q. Okay. So you personally don't know that -- think that the Center has that information?

A. The Center has that information. I just don't have it --

Q. Okay.

A. -- to tell you right now.

Q. What about The Nutcracker? Do you agree that The Nutcracker is a culturally significant event for the Center every year?

A. I do. Yes.

Q. Okay. Did the Center have discussions with representatives from The Nutcracker about potential performances at the Center for

fiscal -- or for the season '26-'27?
A. It would depend -- that would depend on what the dance programming team looked like at the time, which I don't recall -- or I can't recall right now. Again, an answer that we can get for you.
Q. Okay. And would the Center know not just whether those discussions were had but also what the nature of those discussions were?
A. Yes.
Q. And the Center would know whether folks at The Nutcracker were told anything about the availability of the Center for performances in fiscal year -- or in season '26-'27?
A. The Center would know what those conversations entailed. Yes.
Q. Okay. After the May court decision but before August 13th, had management made any booking or programming decisions that were premised on the main building being closed for '26-'27 season?
A. Again, during this period we were faced

with uncertainty, so there wasn't a complete hold on programming, but there was an adjustment to how -- you know, how purposeful or focused that team was.

Q. Help me understand what that means.

A. Well, the -- you -- you are uncertain about what portions of the building or what the building is going to be able to support, so it's difficult to discuss with production companies or shows or agents exactly what you can offer them.

Q. Were staff told not to offer programming availability for the '26-'27 season during this interim period?

A. Again, there's no blanket hold on programming --

Q. Okay.

A. -- or offers.

Q. So staff were permitted to proceed with booking in the main building during the interim period for performances in the '26-'27 season?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: Again, there was no

affirmative "don't" or "do." There was a process unfolding with leadership in the courts that was going to enable the team, programming team, to do work around the results of that process.

BY MS. FREENY:

Q. And how were programming -- how was the programming team told what was expected of them with respect to bookings during this interim period, in light of the uncertainty that you mentioned?

A. The main message across the Center is that there's still a mission to meet, and we have to be purposeful in how we do that even when we face uncertainty.

Q. When you say "purposeful," I'm just trying to understand what that means.

Does that mean to defer bookings until the board has voted?

A. No. I think that means looking at, for example, how the Opera House orchestra might be able to support a dance program somehow so we're still meeting the dance, you know, section of our

mission; or how the orchestra might be able to support opera programming or how Millennium Stage supports public programming even though we can't, you know, at a time -- in this time of uncertainty build a season around any one of those different types of artistic programs.

Q. And those different types of artistic programs that you mentioned, was that contemplated to be done in the main building or in the Reach or offsite?

A. The programming was contemplated to reflect whatever pathway we were able to take, you know, adjacent to the construction and the operational impacts to the building, which are uncertain.

Q. Okay. But that doesn't really answer my question. Right?

The programming you mentioned that the programming team was working on during this interim period -- opera, orchestra -- was that programming contemplated to include programming in the main building for the next season or

programming offsite or in the Reach?

MR. JANKOWSKI: Objection. Argumentative. Asked and answered.

THE WITNESS: There's a purposeful need to meet the Kennedy Center's mission. That was -- that was understood and has always been understood.

But at a time where we can't say exactly what the Center can offer a show in the Opera House because we don't know exactly what is going to happen with production infrastructure in the Opera House, at what time work will start, when there will be electrical outages, when there will be restrictions across the building, it's difficult to -- you know, to holistically plan something. And we -- you know, we were working within that -- you know, within those restrictions.

So there's still efforts to -- you know, to move forward, but there weren't efforts to -- to get in the way of -- or to obligate the Center to something that we might not be able to achieve

because there was going to be an infrastructure improvement that would impact that obligation.

BY MS. FREENY:

Q. Is it fair to say that the focus of the programming team during this interim period was at the direction of management on programming that could be accomplished either in the Reach or offsite?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: The direction would be more along the lines of programming that is flexible enough to -- you know, to still meet mission but reflect the dynamic needs of the main building and the infrastructure changes that maybe would start, maybe would not.

BY MS. FREENY:

Q. And did that or did that not include programming in the main building for '26-'27 season?

It's a yes or no question.

A. There was not a holistic comprehensive effort to develop a '26-'27 season in -- you

know, in May, in late May, June, July of '26. That's just not how -- that's not how the Center works. That's work that would have been, you know, completed earlier.

So the -- again, we were facing uncertainty on what the building could offer, and programmers were working in and around that uncertainty in a way that still was intended to meet the Kennedy Center's mission.

Q. And that was by focusing on programming taking place outside of the main building, right?

MR. JANKOWSKI: Objection. Argumentative. Asked and answered.

THE WITNESS: There was not a blanket "don't program something in the Eisenhower Theater," but there was an understanding that improvements were going to be made in the Eisenhower Theater at some point. And once we know the schedule of those improvements, we'll be able to build programming in the Eisenhower Theater, whether that's Broadway, dance, or, you know, chamber music in the Terrace Theater,

around our physical or infrastructure improvements.

BY MS. FREENY:

Q. Was the programming team told that the court had enjoined the board's March closure decision?

A. Yes.

Q. And was the programming team told that they could schedule performances in the main building for '26-'27 season?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: There was no -- it wasn't a yes or no, you can or cannot program in the main building. It was a you can program and should continue to program and come up with options that meet the mission, programs that meet the mission, alongside the work that we are trying to plan for the building.

BY MS. FREENY:

Q. This programming team, though, had been told after the March 8th decision -- sorry, let

me start that one again.

The programming team had been told, after the decision to close the Center for two years, that they shouldn't book programming for the '26-'27 season, right?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: There was a -- internally to the Center, a clear path forward at that time, which became less clear when the injunction, preliminary injunction, happened.

BY MS. FREENY:

Q. Okay.

A. So that was a period of time where there was a path forward, and now there's not.

Q. Understood. Mr. Floca, I'm just -- we're going to be here all day if I can't get a simple answer to what I think is a simple question. Your counsel can object to this, but I really am just -- to me, this seems like a sort of uncontroversial proposition, that, after the Center decided to close in early 2025, in Q1 of 2025, for two years to accomplish construction,

the programming staff was told, were they not, that they should not book programming for the 2026-2027 season?

And I am just trying to confirm that that is the case.

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: You're framing the -- you're framing that in a way that just doesn't reflect how I think the messaging is more appropriately communicated, which is programming needs to meet -- programming needs to match what's happening with the infrastructure in the building. And it's not just -- those things don't exist separately. They exist together.

BY MS. FREENY:

Q. Are you saying that the programming team was not told at any point in time between the decision to close the building for two years and the May court decision you should not program or book for the 2026-2027 season in the main building because the main building is going to be

closed?

MR. JANKOWSKI: Objection. Argumentative. Asked and answered. Misstates.

THE WITNESS: I think it's important to acknowledge what was happening around the time --

BY MS. FREENY:

Q. That's not my question, though. I asked you a yes or no question.

MS. FREENY: Can I have the court reporter read back my last question, please?

(The reporter read the record as requested.)

BY MS. FREENY:

Q. That's a yes-or-no question.

MR. JANKOWSKI: Same objections. Argumentative. Asked and answered. Misstates.

THE WITNESS: To put it plainly, I am not aware of the Center sending a blanket direction to programming to stop or refrain from programming anything in the main building.

BY MS. FREENY:

Q. And so what you're saying is that, from

the Center management's perspective, after the decision had been made to close the main building for two years but before the court injunction, that Center management would have been -- was okay with programming -- staff booking programming in the main building for the '26-'27 season?

MR. JANKOWSKI: Objection. Argumentative. Misstates.

THE WITNESS: Management was building a plan to make improvements in the main building, and those improvements would not have allowed programming to happen in the main building. But a programmer can't definitively say what they can or can't do without that plan, which was being built at this same time.

So the -- why -- I'm communicating that programming still needed to continue and we knew that, and that programming needed to -- and the plan for that programming needed to develop around the plan for improvements in the building during the -- you know, during this same

May/June time frame.

MS. FREENY: All right. I'd like to take a break. Can we take a break?

MR. JANKOWSKI: Could I ask why?

MS. FREENY: Because I want to chat with you.

MR. JANKOWSKI: Okay. Sure. Let's go off the record.

(Discussion off the record.)

BY MS. FREENY:

Q. All right. We're back on the record, Mr. Floca.

Mr. Floca, I want to -- we had been talking about the interim period, and then we talked about the period after the court -- sorry, after the Center decided to close the main building for two years but before the May decision.

Are you with me?

A. I am with you. Yes.

Q. Okay. During that time period, after the decision is made to close the main building, I

take it that the programming staff was not permitted to make bookings in the main building for the upcoming '26-'27 season.

Do I have that right?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The messaging was to build programming that would work with construction. And it's not that you're not permitted to program in these spaces; it's that the construction is going to work with programming, and programming is going to work with construction, and there's a plan for both of those.

BY MS. FREENY:

Q. Okay. Help me understand this, though, because --

MS. FREENY: Can I have my question read back?

(The reporter read the record as requested.)

MR. JANKOWSKI: And could you read his answer too?

(The reporter read the record as requested.)

MR. JANKOWSKI: I'm so sorry. That was the sentence I was hoping to get out for counsel, the one you just read. Sorry about that. "It's not that they were not permitted" -- something along those lines.

(The reporter read the record as requested.)

MR. JANKOWSKI: Thank you.

BY MS. FREENY:

Q. And so Mr. Floca, you're saying that the programming staff, after the -- after the decision was made to close the building but before the injunction, the programming staff were permitted to program -- to program for the FY '26-'27 season in the main building?

MR. JANKOWSKI: Objection. Misstates. Argumentative. Asked and answered.

THE WITNESS: There's not a simple response I can -- I can't just say yes to that because it's not -- the answer is not as simple.

BY MS. FREENY:

Q. So if a programming staff had come to you or -- had come to someone in management during this time period after the decision had been made and announced to close the main building for a period of two years but before that decision is enjoined by the court, and said, hey, I have a -- I've got this great thing, Shear Madness, I want to program them for the '26-'27 season in the main building, what would management have said?

A. Here's the plan -- here's where the plan for the main building currently is from a construction standpoint; here's the time frame that these things might be happening in the main building --

Q. Why do you say might? This is what I'm --

MR. JANKOWSKI: Could you let him finish his answer?

MS. FREENY: No, actually, this is -- I'm just trying to get to the -- actually, you know what, I do need to interject here because I'm

not -- I'm not certain if the witness is confused about the time frame or is just evading the question.

My -- because we're talking here about -- the decision has already been made to close the building.

BY MS. FREENY:

Q. And so how is there any leeway there for programming -- like, how is it a "might"?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: I feel like you're approaching this from the perspective that the Kennedy Center is just stopping and --

MS. FREENY: Okay. Again, I do want to tell the witness --

BY MS. FREENY:

Q. So I am the questioner. And so I need you to answer my questions. But what I don't need you to do is interpret, like, what I am getting at or what my perspective is.

Sp what my perspective is, you can have

whatever opinion you want on it, but what -- I just need answers to the questions, not what you think about my perspective.

MR. JANKOWSKI: And we'll push back against the characterization that these are not answering the questions. I want to be very clear about that.

Again, to the extent that this kind of continues in this vein, I think we'd start to object that this is harassing and --

MS. FREENY: Okay.

MR. JANKOWSKI: -- telling the witness what he's testifying.

So I'm going to ask that the witness is given an opportunity to finish the answers to your questions and to give what his and the Center's knowledge is as to the specific answers that -- to the questions you're providing.

THE WITNESS: We spoke yesterday about developing a plan for construction. And that plan has a schedule, and that schedule has the ability to allow things or stop things from

happening. And that plan is being developed at the same time -- the Center is developing this schedule for construction, and programming can definitely fit into that schedule. That's a normal process for the organization to -- to do.

BY MS. FREENY:

Q. And so during this time period -- so after the decision is made -- was it possible for the Center to book performances for -- in the main building for the '26-'27 season?

A. It would have been possible but irresponsible without knowing what was happening from the construction standpoint. And I don't think any programmer would -- a programmer might come with an idea and say, let's do Nutcracker in 2027, at which time we would say, well, what does the construction look like in the Opera House? Is that even going to allow Nutcracker in 2027 to happen?

Q. Why are you -- so it sounds like the answer to that question -- again, we are talking about after the decision is made to close in Q1

of 2026.

At that point in time, the Center is planning to close, correct? For two years. Close the main building.

A. The Center is planning to close and developing the way construction will happen, you know, during that time frame. Yes.

Q. Okay. And during that time frame -- so after the decision is made but before the order -- the Center is not planning on having any performances in the main building for the 2026-'27 season or '27-'28 season, correct?

A. The Center is planning to execute the construction projects that are contemplated in the Big Beautiful Bill and program.

Q. That's not my question. So this one I'm just going to insist on, and that -- because this is a yes-or-no question.

MS. FREENY: Can I have this read back?

(The reporter read the record as requested.)

BY MS. FREENY:
Q. Is that correct or incorrect?
A. That is correct.
Q. Thank you.
I saw, Mr. Floca, that it was recently announced that the Kennedy Center Honors was going to -- is going to take place offsite in the upcoming season; is that right?
A. In December. Yes.
Q. Okay. Where is that going to be held? What venue?
A. Capital One Arena.
Q. When was that decision made, that the Kennedy Center Honors would be held at Capital One Arena?
A. I can get a specific date for you, but I don't have it right now.
Q. Okay. Was it before or after September 1st?
A. Before September 1st.
Q. Was it before or after August 13th?
A. Before August 13th.

MR. JANKOWSKI: Well, and scope. So I think -- the scope -- I mean, I think it's scope and privilege with respect to the section entitled, "Background and Financial Position." It's attorney-client privilege under "Legal Analysis."

MS. FREENY: Clearly.

MR. JANKOWSKI: And it should be -- so there may be an intermingling of two, but it's largely attorney-client privilege for the rest.

MS. FREENY: Okay. And I will just state that at least my perspective, at a minimum, the financial position, not knowing what it says, I think, to us we think would be relevant given the court's statement about finances.

MR. JANKOWSKI: So I think this is a financial position with respect to the WNO disaffiliation update and financial exposure.

MS. FREENY: Okay.

MR. JANKOWSKI: So we would say that's out of scope.

MS. FREENY: All right.

MR. LYNCH: And privileged.
MR. JANKOWSKI: And likely attorney-client privileged.
MR. LYNCH: Litigation, right?
MR. JANKOWSKI: Yes, that's correct.
MS. FREENY: All right. I think our perspective is that it's not appropriate to redact for scope. But with that, I will turn my attention back to Mr. Floca.
BY MS. FREENY:
Q. Mr. Floca, in the committee minutes from the August 1st -- or excuse me -- start again.
In the meeting minutes from the June 1st, 2026, Audit and Finance Committee meeting, if you turn to page 2, it talks about committee discussion. That second bullet point, at least the second unredacted bullet point, that reads, "Arduin" -- that's the CFO, right?
A. Yes.
Q. "Arduin reported that following the December board meeting at which the name change was approved, ticket sales and fundraising came

to a halt."
Do you see that?
A. Yes.
Q. Does that refresh your recollection that CFO Donna Arduin told the Audit and Finance Committee on June 1st, 2026, that following the December board meeting at which the name change was approved ticket sales and fundraising came to a halt?
A. Yes.
Q. And the reference to name change, that was the decision to add the name Donald J. Trump to the Kennedy Center's name; is that right?
A. Yes.
Q. Was that information, the effect of the name change on financing, conveyed to the full board?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: The full board has not seen any information that is, you know, directly linked between this board meeting and ticket sales.

BY MS. FREENY:
Q. Meaning the full board had not been told that following the December board meeting at which the name change was approved, that ticket sales and fundraising came to a halt, correct?
A. No. That has not been communicated to the board, no.
Q. Okay. Why has the Center not communicated that to the board, the full board?
A. The structure around board meetings has not -- has not evolved in a way to have those conversations with the full board, but will, in FY '27, when we soon have the -- you know, the conversations, meetings, to look back at '26 financials and look forward at '27 financials.
Q. Did management have discussions about whether to tell the full board that ticket sales and fundraising came to a halt after the December board meeting?
MR. JANKOWSKI: Object to the extent that this calls for attorney-client privileged information.

Q. Okay. It's your understanding that fiscal year '26 data was used to prepare this chart that was provided to Delta?
A. '26 financials were a factor in this --
Q. Okay.
A. -- in addition to other --
Q. Yeah.
A. -- '25 -- other previous years.
Q. I want to understand factor, though, because -- you know, I assume that when the financial people, including Kasama, are doing this, they're running numbers, I think you said based on historical data; is that right?
A. Uh-huh.
Q. I need you to answer out loud.
A. Yes. Yes. Sorry. Yes.
Q. I know this is not the most exciting part of our deposition.
Did -- was fiscal year '26 financial data part of the data that was used to calculate the numbers in this Exhibit 3?
A. Yes.

Q. Okay. Was fiscal year 2026 financial data provided to -- separately to Delta Consulting?

A. I don't think so, not explicitly --

Q. Okay.

A. -- not, here's '26 data, no.

Q. Okay. But it was -- it was used by the Center internally to provide -- to prepare this chart for Delta. Do I have that distinction correct?

A. Yes.

Q. Okay. And am I right in assuming that the reason that the Center incorporated fiscal year '26 data was to make sure that it had the most up-to-date figures and the most number of figures available for its calculations; is that right?

A. Yes.

Q. All right. Did -- Delta, though -- Delta was provided fiscal year, what, '23 and '24 financial statements, which were audited; is that right?

A. Yes.
Q. Okay.
A. Audited financial statements.
Q. And then they were provided fiscal year '25 unaudited statements, correct?
A. I believe so. Yes.
Q. Okay. But they were not provided financial statements or financial reports for fiscal year '26, were they?
A. No, not outside of what information might have been shared in meetings with them with finance.
Q. Was there information shared in meetings with them regarding fiscal year '26 finance -- finances?
A. I'm sure that they would have discussed that. They would have come up --
Q. Okay.
A. -- in conversations with Delta.
Q. Delta, though, actually requested to obtain from the Center fiscal year '26 financial data, didn't they?

A. I'm not -- I'm not certain if they did.
Q. Okay. And just to be clear, that means you, personally, are not certain; is that right?
A. Yes. Yes.
Q. All right. But the Center would know whether Delta requested fiscal year '26 financial data, correct?
A. Yes. There would be a record of that.
Q. Okay. And if I asked who made the decision about whether to provide fiscal year '26 financial data to Delta, do you know the answer on behalf of the Center?
A. I do not.
Q. Okay.
And this I'm just going to do to get on the record, because I'm going to represent that I -- we understand that they were not provided, and so one of my questions would be why were the fiscal year '26 -- why was the fiscal year '26 financial data not provided to Delta?
And I assume, based on your questions -- or your responses, that you, sitting here today,

think he already answered your question in the previous answer.

BY MS. FREENY:

Q. My question is, was the Center aware that the Department of Justice filed a brief in the D.C. Circuit that represented that the donations from the fund [sic] to the Center could be clawed back if Donald Trump's name was not on the building?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The Center is aware that there could be fundraising done by the foundation that has stipulations tied to it. Yes.

BY MS. FREENY:

Q. You said they -- okay.

A. It could be.

Q. Okay. It didn't answer my question, but let me pursue that.

There could be funding. Was there -- at the time that the Department of Justice filed a brief with the D.C. Circuit representing that donations made from the foundation to the Center

could be clawed back, was there actually those conditions, allowing the foundation to claw back donations given to the Center?

MR. JANKOWSKI: Objection. Vague and misstates.

THE WITNESS: There's no -- in order for that to actually happen, there would have to be some type of agreement on what the funding that is transferred is being used for.

BY MS. FREENY:

Q. Okay.

A. And this funding was transferred without any restrictions to it.

Q. Okay.

A. But that doesn't also mean that there could not be more fundraising that the foundation does on the Center's behalf that has restrictions tied to them.

Q. Has the Center had discussions with the foundation about the prospect of receiving donations that were restricted in some fashion?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Nothing explicitly that --
BY MS. FREENY:
Q. Anything not explicitly?
MR. JANKOWSKI: Same objections --
BY MS. FREENY:
Q. Any discussions?
MR. JANKOWSKI: Same objections. Still unclear on the time frame.
BY MS. FREENY:
Q. Well, let me ask this again, then, to make sure we get this clear.
At any point in time, has the Center had discussions with the foundation about accepting donations that are restricted?
A. Not about accepting them --
Q. Uh-huh.
A. -- but discussions that are -- discussions around how the foundation could raise money that is restricted.
Q. Okay. When did those discussions take place?
A. They're normal -- I can't point to a

asked and answered.

THE WITNESS: The financial risk is something the Center was aware of. The overall financial picture was dire, and that is something we were aware of.

BY MS. FREENY:

Q. When did you become aware of that?

A. Largely May, June --

Q. Okay.

A. -- when the conversation started to -- that May, June was around the time that we started having these important conversations about business decisions and our financial position.

Q. Did management inform the full board that it perceived a risk of fiscal collapse before the year end -- before the end of the fiscal year at least prior to, meaning informed the board prior to September of this year?

A. That financial position was not presented -- or the Center's financial position was not -- was not presented during any of the

board meetings --
Q. Okay.
A. -- in that period of time.
Q. All right. And then I asked you about whether there was a risk of fiscal collapse. I want to ask you a little bit tighter.
At any point in the last six months has the Center faced certain fiscal collapse within weeks?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: I'm not going to be able to give you an exact point in time where the Center said, next week we are facing certain fiscal collapse. And the main reason for that is you're constant- -- the Center is constantly looking at expenses, other revenues coming in, and, you know, orchestrating a -- you know, the best path forward for the Center.
There are, with that said, dire, really constraining situations that we're trying to exist in.

BY MS. FREENY:

Q. So I think I can give you a particular point in time when the Center indicated that it was facing certain fiscal collapse. And toward that end, I'm going to point -- ask you to turn in your binder to tab 30.

MS. FREENY: And this will be -- is this 8?

MR. JANKOWSKI: Yes.

MS. FREENY: Exhibit 8.

(Floca (30(b)(6) Deposition Exhibit 8 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. And Mr. Floca, if you could flip one page over.

I think you will recall, having looked at this yesterday during your individual deposition, this is an agenda and meeting material -- let me say that again.

This is an agenda and materials sent to the board in connection with the September 15th,

2026, board meeting; is that right?
A. Yes.
Q. All right. I want to get you to turn to page 56 of 58 in the upper right-hand corner in blue. We talked a little bit about this yesterday, but I want to get the Center's perspective.
So to set the stage, you agree that what we are looking at on page 56 of 58 of Exhibit 8, this is a proposed resolution that was circulated to the board in September, right?
A. Yes. That's correct.
Q. Okay. And this -- this resolution was circulated to the board, but it was never actually voted on, was it?
A. It was never brought to the full board --
Q. Okay.
A. -- during a meeting.
Q. At the -- so at the time that this proposed resolution was circulated, it was -- the -- you would agree that the Center was representing to the board that the Center was

within certain fiscal collapse within weeks.

Would you agree with that?

MR. JANKOWSKI: Objection.
Argumentative.

THE WITNESS: This is a draft resolution that was not discussed -- or brought to the full board.

BY MS. FREENY:

Q. Understood. But it was circulated to the board, correct?

A. This was circulated as a draft, but taken away or off of the table for consideration.

Q. Okay. Why was it taken off for consideration?

A. Because the other resolution on the renovation was being prioritized for discussion with the board.

Q. Did the Center, when it circulated this resolution, intend to represent to the board that the Center was within certain fiscal collapse within weeks?

MR. JANKOWSKI: Objection.

Argumentative. Vague.

THE WITNESS: When this was circulated, we intended to have a conversation on a financial position. That did not occur, and this resolution was not brought forward or discussed, and we focused on the renovation resolution, status of the building only.

BY MS. FREENY:

Q. If the Center did not intend to represent to the board at the time that this resolution was circulated that the Center was within certain financial -- fiscal collapse within weeks, why did the Center circulate a resolution to the board represent- -- like, that contained the phrase "certain fiscal collapse within weeks"?

MR. JANKOWSKI: Objection. Argumentative. And vague.

THE WITNESS: There was an intention to discuss the financials. That did not happen.

BY MS. FREENY:

Q. Okay.

A. And the financials still do need to be

discussed, and we're planning on doing that.

But the focus of this board meeting was on the renovation.

Q. Okay. But the focus of the board meeting being on renovation, that actually -- that changed after this resolution was circulated, right?

A. After these were circulated but prior to the meeting.

Q. At the time this resolution was circulated, the intent of management was to have the board consider this resolution at the upcoming board meeting, was it not?

A. Alongside a conversation on the financials of the Center, yes.

Q. And was management's intent at the time this was circulated to present to the board that the board was within certain fiscal collapse within weeks?

MR. JANKOWSKI: Objection. Argumentative. Asked and answered.

THE WITNESS: The intent was to review

this alongside a financial -- what do we call it? -- a financial position with the board.

BY MS. FREENY:

Q. Okay.

A. But that changed.

Q. Okay. At the time that this resolution was circulated, was it true that the Center was within certain fiscal collapse within weeks?

MR. JANKOWSKI: Objection. Asked and answered. And vague.

BY MS. FREENY:

Q. Was that true?

MR. JANKOWSKI: Same objection.

THE WITNESS: We discussed this a little yesterday --

BY MS. FREENY:

Q. Okay.

A. That position and that outlook, there are a multitude of factors that go into considering the longevity of the Center's financial or cash position.

And yes, the Center was in dire

financial -- in dire financial position. Yes, there were decisions that needed to be made in a very short period of time. But it was strategic to focus on the needs of the building above that, or instead of that, because the result of that conversation is a -- is an incredible lever that changes what the Center's financial position is going to be.

Q. Is it fair to say that the Center, at the time this resolution was circulated, was not going to face fiscal collapse within weeks if management took the steps that I think you just described as levers to access additional sources of funds to cover the cash needs?

A. I mean, simply put, if we can communicate with certainty what the Center's future is going to be, then we can start to build momentum, whether that's around programming or a development in fundraising plan, once we know how the Center can move forward. And that's why the renovation resolution was more important because that clears the hurdles with this process that

we're in right now with the court.

Q. That wasn't my question, though.

MS. FREENY: I'm going to ask if the court reporter could read back my question when she gets a chance.

(The reporter read the record as requested.)

THE WITNESS: The ability to move forward with the renovation impacts the expenses that the Center has and when the Center's cash is going to be expended or more cash is going to come in via other fundraising efforts.

So your -- there's -- these two things are connected, and the first needs to happen in order for the second to have a firm window.

BY MS. FREENY:

Q. I --

A. Fiscal collapse --

Q. Yeah.

A. -- is -- is a -- is not as simple as a one plus two equals three. There are -- and every day there are things that the Center can do

to, you know, elongate its operations or to move money around or to secure additional funds.

And this dire situation that is being communicated via this resolution does not change, but the priority that we established is with the building, and wanted to focus on that and then have a purposeful conversation -- purposeful and specific conversation on the Kennedy Center's finances.

That was the intent behind taking this resolution off the table.

Q. Okay. Was at least one intent behind using the phrase "certain fiscal collapse within weeks," which you just said could mean multiple things, was one of the intent behind that to convince the board to favor this renaming resolution set forth below?

MR. JANKOWSKI: Objection. Argumentative and vague.

And actually, I won't categorically object yet, but I think on scope, too. We're getting beyond finances.

MS. FREENY: All right. I'm very comfortable here.

BY MS. FREENY:

Q. So please answer.

A. These things -- the fiscal collapse and recognition are related to one another, but there's a reason why this was not -- this was not discussed.

And the discussion around the Center's finances still needs to happen. We're in a bit of a different position now than we were during or at the time of this board meeting.

So this doesn't -- this has no bearing on where we are going moving forward --

Q. And that's not my question.

MR. JANKOWSKI: I'm sorry, I don't think he was finished with his answer.

BY MS. FREENY:

Q. You can finish, but my question was not why this was not discussed.

So keep going and I'll...

A. The renovation resolution was prioritized

for this meeting with the expectation to have this conversation at a later time.

Q. Okay. And I want to be clear here. I'm not asking about why this resolution was not discussed. I'm focusing on why this resolution was circulated when it was circulated to the board. Okay?

And my question was, you had mentioned that fiscal collapse, that can mean multiple things.

Was one of the reasons that the phrase "certain fiscal collapse within weeks" used in this resolution to try to convince the board members, at the time this resolution, was sent out, to approve the recognition proposals?

MR. JANKOWSKI: Yeah, I'm going to object on scope grounds, on the discovery limitation there.

This isn't related to the process, justification, substance, mechanics of the board's closure decisions at the August or September meetings and the surrounding couple of

weeks.

MS. FREENY: And I -- are you going to instruct him not to answer?

MR. JANKOWSKI: Yeah -- yes, at this point.

MS. FREENY: Okay. I would state for the record that probing representations by the Center to the board that the Center was within certain fiscal collapse within weeks, which I still have not gotten, I don't think, an answer about whether the Center believes to be true, is certainly relevant to the equities, as we heard Judge Cooper say last Thursday.

MR. JANKOWSKI: So to that point I think we've gotten multiple answers as to what the Center's position was at the time as to whether certain fiscal collapse was imminent or likely or whether there was a risk of it -- I think we've had about ten different variations of that answer.

To the extent that this bears on the board's consideration of the resolution here qua

resolution, with respect to the naming options, you know, presented that were later withdrawn, that's out of scope. That's --

MS. FREENY: That's -- so --

MR. JANKOWSKI: -- not related to the financing.

MS. FREENY: I am probing whether the phrase "certain fiscal collapse," whether it's true, whether it was true at the time, or whether it was put in this resolution for other reasons. So I don't see how that's not relevant.

So if you're going to tell him not to answer, let's just make a record of that and we'll deal with that later.

You're telling him not to answer even though my question is to try to probe the accuracy and the good faith belief of the Center about whether, at the time that this resolution was circulated, the Center was within certain fiscal collapse within weeks.

MR. JANKOWSKI: So to the extent that that's the question, feel free to probe on that.

We've already established that that was absolutely one of the pieces -- one of the intents behind circulating this resolution.

MS. FREENY: So -- well, I actually have not --

MR. JANKOWSKI: I mean --

MS. FREENY: I have not -- I have not heard the witness state that one of the intents behind using the phrase "certain fiscal collapse within weeks" was to try to persuade the board --

MR. JANKOWSKI: No.

MS. FREENY: -- to vote for this resolution.

MR. JANKOWSKI: I'm sorry, the opposite. He's testified that it was to inform the board as to what the -- as to what the state of the financial position was --

MS. FREENY: And then he --

MR. JANKOWSKI: -- at the Center at the time.

MS. FREENY: Okay. So -- I don't want to get in a -- we don't need to argue on the record.

Are you not going to let me probe any more about the "phrase certain fiscal collapse within weeks" as represented to the board?

MR. JANKOWSKI: I think if we're -- I mean, so if you want to ask about what the Center's understanding was as to the Center's financial position at that time, we -- I mean, we can say asked and answered; it's been answered multiple times --

MS. FREENY: Yeah.

MR. JANKOWSKI: -- but -- that's within scope. Sure.

MS. FREENY: Okay.

MR. JANKOWSKI: That's...

MS. FREENY: But also within scope would be why they set out this representation.

MR. JANKOWSKI: Which I think has been asked and answered as well.

MS. FREENY: Okay. Well, but if that's been asked and answered, then he can tell me, no, that one of the intents behind -- one of the -- like, they did not specifically deploy the phrase

"certain fiscal collapse within weeks" for that purpose.

MR. JANKOWSKI: For which purpose?

MS. FREENY: To -- I'd say to persuade the board of the necessity of approving the naming resolution.

MR. JANKOWSKI: So to the extent that multiple things can be true, one set of those things is out of scope and one is in scope.

MS. FREENY: Okay. Well, I'm just going to state for the record that's a very cramped view of relevance.

Are you -- essentially, you're not -- what are you telling him to -- you're telling him not to answer the last question I asked?

MR. JANKOWSKI: Yes. And to the extent you'd like to continue asking questions about the Center's understanding of its financial position at the time, that's within scope.

MS. FREENY: And if I can get a yes or no answer, I am willing to move on.

BY MS. FREENY:

Q. Mr. Floca, at the time that Center management sent out this resolution to the board, did the Center believe -- or did management believe that the Center was within certain fiscal collapse within weeks?

MR. JANKOWSKI: Objection. Asked and answered.

BY MS. FREENY:

Q. I just -- I'm just looking for a yes or no answer.

MR. JANKOWSKI: Asked and answered. And vague.

THE WITNESS: I'm not going to be able to say yes or no because the situation is more dynamic and complex than that.

There was a complementary analysis of the Center's financials that needs to be presented alongside this type of resolution and this type of effort. And we're still going to have that conversation and we are still going to provide the board with more information of a financial

perspective. They're going to see, you know, what was supposed to live alongside this resolution that we did not need to discuss at the time that was taken off the table.

And I can't -- that's really all I can say.

BY MS. FREENY:

Q. The fact that, though, you as the Center's representative cannot answer yes or no whether management believed in a phrase that was represented to the board at the time that it was sent to the board suggests to me that you're not confident that it was true at the time.

MR. JANKOWSKI: Objection. Argumentative and harassing.

I'm going to ask counsel not to bring your personal opinion of his demeanor into the deposition.

MS. FREENY: I'm bringing a sense of logic.

MR. JANKOWSKI: Argumentative and harassing, again.

MS. FREENY: And I don't think there was a question there, unless I'm misunderstanding.

BY MS. FREENY:

Q. Is the reason you're not giving me a yes and no question [sic] because you're concerned about that it was not, in fact, true to the Center's understanding, that the Center was within certain fiscal collapse within weeks at the time it sent this resolution to the board?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: This is not a simple scenario or a simple answer to say that this needs to be discussed, was going to be discussed, but the analysis was not provided. So -- that was alongside this resolution. And we made a decision that we could wait and have another board meeting to focus on the financials --

BY MS. FREENY:

Q. Okay.

A. -- and we focused on the renovation. And there was going to be a board meeting, you know,

immediately --
Q. Uh-huh.
A. -- as soon as we could schedule after this meeting. That was the intent.
Q. Okay. And if at the time the Center was within certain fiscal collapse within weeks, how was the Center able to make a decision that you could wait to talk about that situation with the board?
MR. JANKOWSKI: Objection. Vague. Argumentative. Foundation. Scope. Speculation.
THE WITNESS: I mean, it was a leadership decision.
BY MS. FREENY:
Q. Who do you mean by leadership?
A. We, I, the Center, made a decision not to talk about this and to focus on the renovation.
Q. Was Secretary Lutnick involved in that decision?
A. Secretary Lutnick was supporting the process.
Q. Did you discuss whether to present this

to the board with Secretary Lutnick?

A. Putting it a different way, we discussed we needed to prioritize the renovation and focus on that and not try to mix these two things during one board meeting.

Q. Okay. Did you discuss with Secretary Lutnick whether it was responsible to wait on making a decision if there was -- if the Center faced certain fiscal collapse within weeks?

Did you have a discussion along those lines?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Yes. We discussed the ability to focus on the renovation in this board meeting and wait to have the board meeting immediately after this one to focus on the financials.

BY MS. FREENY:

Q. Okay. And what did Secretary Lutnick tell you about the financials and what would be going on at the next board meeting?

A. He didn't tell me --

Q. Okay.

A. -- anything. The need of the next board meeting is to look at FY '27 financials. And that's the -- that's the purpose of -- that's, you know, living alongside this type of work and presenting an annual budget to the board.

Q. Has that next board meeting been scheduled?

A. It has not.

Q. Okay. Did you discuss with Secretary Lutnick the Center's perspective on its proximity to fiscal collapse?

A. If there were any discussions with him about fiscal collapse, they were secondary to the work we were doing with the renovation and Delta and they were not the focus of those conversations or interactions at the time.

Q. Okay. But that's -- that's not my question.

You said if there were. My question is were there.

Did the -- did you have discussions with Secretary Lutnick about the prospect of the Center's fiscal collapse?

A. I would characterize them as the financial position and less the fiscal collapse.

Q. Okay. Did you -- did you have discussions, though, with him about the proximity, like, how close the Center was to a liquidity problem, running out of cash?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Not explicit direct conversations with him about we are going to run out of cash in this period of time. There were broader conversations about presenting a -- presenting the financial picture, the annual budget.

BY MS. FREENY:

Q. Was the Secretary made aware that the Center was purportedly within -- was purportedly facing certain fiscal collapse within weeks in early September?

MR. JANKOWSKI: Objection. Asked and

answered. Vague. Foundation.

THE WITNESS: He was aware of our financial preparation we were doing on the -- on this financial presentation. So yes, he was aware of our -- of the Center's finances. But this was not -- you know, this is a -- the detailed walk-through of a budget and the detailed walk-through of -- we never got to this.

BY MS. FREENY:

Q. Okay.

A. We didn't discuss this. And we focused on the renovation.

Q. Did Secretary Lutnick provide any input or guidance on the -- how the Center should address its financial position?

MR. JANKOWSKI: I'll just object to the extent that that calls for any communication purporting to be on the president's behalf, not to answer --

MS. FREENY: I guess --

MR. JANKOWSKI: -- but otherwise --

MS. FREENY: -- I don't know how to

address that. Because I don't -- like, if I don't know if he had a conversation, like --

BY MS. FREENY:

Q. Did you have a conversation with --

MS. FREENY: Like, I don't know how to --

MR. JANKOWSKI: I think we established he did have a conversation. Right? With Secretary Lutnick --

MS. FREENY: But did he provide input? And, like, if he's going to say no, but the real answer is yes because he's not telling -- like, I don't know -- if he -- if the Secretary had provided input to the Center on its financial position, like, I don't know how he's supposed to answer that question. Like, are you asking him to decide whether it was on behalf of Trump or not? Because either --

MR. JANKOWSKI: I'm asking whether he's aware of whether it was on behalf of the president or not. I think if he's not aware, then we can't -- we won't --

MS. FREENY: But how is he supposed to

even answer? Like, if he can't --

BY MS. FREENY:

Q. If you decide you can't answer that question, if you could just tell me you can't answer that question. But if the answer is you have -- like, the -- you know, if -- right? Either the Secretary has provided input on the financial position or how the Center should address the financial position or it has not.

And if you answer that question no, I'm going to assume no, period, not that there's information that was conveyed by Trump and you're withholding it because your counsel told you not to answer.

MR. JANKOWSKI: I think to the extent that distinction can be drawn, hopefully the witness can do so.

BY MS. FREENY:

Q. Do you need me to say it again?

A. I don't...

MR. JANKOWSKI: Yeah, sorry.

THE WITNESS: Secretary Lutnick was aware

of the Center's finances at a high level and did provide input --

BY MS. FREENY:

Q. Okay.

A. -- on the Center's finances.

Q. What input did he provide on the Center's finances?

A. You need to present them to the board.

Q. Okay. Did he say when they needed to be presented to the board?

A. As soon as possible. Immediately.

Q. Okay.

A. Immediately after this board meeting.

Q. Okay. If Secretary Lutnick had said -- if Secretary Lutnick said the finances should be presented as soon as possible, why did the Center not present them at the September 15th board meeting?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: This board meeting was -- the desire was to focus it on the renovation and

have a second board meeting about the finances.

BY MS. FREENY:

Q. Did you approve -- I guess let me ask this.

Like, did Center management approve of this resolution being sent to the board?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: The Center sent this in draft form.

BY MS. FREENY:

Q. Okay. And so who actually drafted -- whose idea was this resolution?

MR. JANKOWSKI: Objection. Compound. And also to the extent it calls for attorney-client privileged information, not to provide that.

BY MS. FREENY:

Q. Whose idea was this -- whose idea within the Center was this resolution?

A. I can't point to one specific person, myself or otherwise, that said we need to draft this resolution. But the intent of this

resolution was to be responsive to the board and give them options about different naming and recognition possibilities. And that's a -- that seems like a, you know, prudent, good decision to make and give the board.

Again, these things in fundraising and development and the Center's FY '27 financials will be discussed --

Q. Okay.

A. -- with the board soon.

Q. And so I take it, then, also, since the Center sent this, the Center also thought it was a good idea to let the board know that, without appropriate recognition for President Trump, it's unlikely that President Trump will provide the fundamental oversight of the renovation of the main building; is that right?

MR. JANKOWSKI: Objection. Vague and argumentative.

THE WITNESS: As it's written there, recognition -- appropriate recognition is -- it is unlikely.

BY MS. FREENY:
Q. Okay. I'm going to draw your attention to tab -- or ask you to turn to tab 25 in your binder.
MS. FREENY: And that is going to be marked as Exhibit -- what are we up to?
MS. BAUM: 9.
MS. FREENY: Exhibit 9.
(Floca (30(b)(6) Deposition Exhibit 9 marked for identification and attached to the transcript.)
BY MS. FREENY:
Q. Mr. Floca, can you take a look at Exhibit 9 and confirm for me that this is a Truth Social post from Donald Trump from September 15th, 2026?
A. Where is the date?
Q. In the --
A. Oh, yes. September 15th. Sorry.
Q. And that's the same date of the board meeting?
A. Yes.

Q. Okay. Do you recall when you first saw this -- saw this post?
A. I don't.
Q. Do you recall learning that President Trump had made a social media post where he had indicated that if the ruling on the renaming issue, which is at the D.C. Circuit, is a negative one, that the reconstruction and renovation of the Kennedy Center will not take place?
A. There's a sep- -- you're saying there's a separate tweet that says that?
Q. Oh, no. So if you take a look --
A. Oh, sorry.
Q. You see where it says, "If the ruling is a negative one" -- let me back up just so you get the whole picture.
Do you see where it starts, "The closing"?
A. Yes.
Q. Or why don't we just -- just read the whole thing.

A. Yeah.
Q. "The board of the Kennedy Center today agreed, almost unanimously, to close the building for safety reasons and so that it can begin the process of reconstruction."
And so that, you would agree, indicates that this Truth Social post was issued after the board meeting was held, right?
A. Yes.
Q. Okay. And then Mr. Trump goes on to say, "The closing will take place immediately; however, the renovation and reconstruction, which is a very large and complex job, cannot begin until such time as the D.C. Circuit rules on the board's approved name."
Do you see that?
A. I do.
Q. And then he goes on to say, "If the ruling is a negative one, which it should not be, and is not overturned by the U.S. Supreme Court, the reconstruction and the renovation of the Kennedy Center will not take place."

Do you see that?
A. Yes.
Q. Do you recall -- even if you don't recall actually seeing this tweet specifically, do you recall knowing or learning that President Trump had made a Truth Social post in sum and substance like this?
A. Yes.
Q. Okay. What can you tell me about when you first learned that?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: I think it was that afternoon, or early the next day.
BY MS. FREENY:
Q. Okay. And what was the Center's response, if any, after learning that Chairman Trump had indicated that the renovation and reconstruction that had just been approved by the board would not, at least according to him, take place until rulings on the renaming issue?
A. Again, this is not a -- the form of direction that the Center can take.

Q. Uh-huh.
A. Resolutions or committee meeting guidance, that's the direction that the Center takes.
Q. Has anyone at the Center had any discussions with President Trump about his public statement that the reconstruction and renovation of the Kennedy Center will not take place unless certain things happen in the legal proceedings around renaming?
MR. JANKOWSKI: Object on executive privilege grounds and instruct the witness not to answer.
MS. FREENY: And I assume that's the same presidential communications aspect.
MR. JANKOWSKI: Yes.
MS. FREENY: And I assume that the answer will be the same when I ask whether you have -- whether you're making an assertion at the direction of the president or his designee.
MR. JANKOWSKI: Same answer.

I looked -- we can see when the invite was.

I'm just wanting to understand, is that -- did the invite go out right away? And it sounds like you're saying the date that the invite went to the board members is effectively the date that the Center -- the exact same day that the Center made the decision, this is when we're going to hold the meeting.

A. Yes. I think that makes sense.

Q. Okay. Even though that -- I actually recognize that was a complicated question.

Okay. At some point in time -- so -- well, let me -- take me back.

At one point in time, the -- management had tentatively scheduled a board meeting for August 6th; is that right?

A. I don't recall that.

Q. Okay. To see if I can help you, can you turn to tab 13, which --

MS. FREENY: Is this going to be Exhibit 11?

MS. BAUM: Yes.

(Floca (30(b)(6) Deposition Exhibit 11 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. Mr. Floca, you see Exhibit 11 is an e-mail from you dated July 14th at the top to some folks.

Do you see that?

A. Yes.

Q. And at the top it looks like there's the name Jackline Browder. And what that looks like to me -- it probably suggests that this came from her mailbox; is that right?

Is that at least consistent with the way you would read this?

A. Yes.

Q. Okay. Who is Jackline Browder?

A. Jackline is a federal finance analyst.

Q. Okay. So does she work in the accounting department?

A. Not in accounting. Within finance. Underneath contracts and procurement.

Q. Okay.
A. Sorry, it's -- federal business operations is the name of her team.
Q. Okay. And just, again, to orient us, the time we're talking about, July 14th, 2026.
Do you see that?
I want to direct you close to the bottom of the e-mail where it starts, "As for meeting times."
Do you see that?
A. Uh-huh.
Q. It says, "As for meeting times, we need to have the presentations this week in order to give the firms time to compile documents and reports over the next two weeks."
So first, on that, what -- what presentations is this sentence referring to?
A. Oral presentations on their approach to the job, their proposal.
Q. Okay. And just to be clear, so these are -- this is oral pitch presentations from the bidders for the -- what became the Delta

contract?

A. Where they -- yes, where they talk about their team and their experience and capabilities.

Q. Okay. And then it says the reason they need the presentations this week is "in order to give the firms time to compile documents and report over the next two weeks."

Do you see that?

A. Uh-huh.

Q. And then it says, "The board meeting is tentatively scheduled for 8/6."

Do you see that?

A. Uh-huh.

Q. Does that refresh your recollection that, at one point in time, the board meeting to vote on the way forward after the court's order was tentatively scheduled for August 6th?

A. Yes. I see that.

Q. Okay. Who decided when to schedule the board meeting?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: The scheduling of board

meetings is, one, a product of the trustees' availability, and, two, a product of what we're going to be presenting and if that material is ready.

BY MS. FREENY:

Q. Okay. And so to have the board meeting go forward on 8/6, as is indicated in this e-mail on -- July 14th is the date of the e-mail.

In order for that board meeting to go forward with the materials from the outside advisor, those materials would have to have been compiled within, what, roughly three weeks?

A. Yes.

Q. Okay. And so was it the Center's intention from even before the statement of work was sent out to eventually ask the consultant to provide materials within approximately three weeks?

A. I don't -- I don't think the three-week time frame is -- is a hard and fast. I think it was as soon as possible --

Q. Okay.

A. -- when we need to have a board meeting. We need to get in front of the board. You can't just continue to be, you know, without a way forward.

Q. Once that board meeting was actually set and no longer tentative, though, you would agree that the timeline for when the Center needed those materials from Delta was dictated by the date of that board meeting, right?

A. I think it's a give and take. The preparation of materials needs to be completed in a way that both gives enough time for Delta or the consultant to prepare things, but also is not just open-ended. So it's a give and take. They're working together: The time frame of the board meeting and the work that is going to be presented at the board meeting.

Q. At the time of the August 13th vote, it -- Delta had not completed its final written report, correct?

A. Correct.

Q. What was the Center's understanding at

August 13th?

A. There's likely routine scheduling of, you know -- there's scheduling, it can be this date or this date, but his -- his guidance has always been you need to do this as soon as you're ready.

Q. And did you understand that that encouragement to do this as soon as you're ready was driven at all by President Trump's stated preference that the construction be completed during his term?

MR. JANKOWSKI: Objection on the basis of executive privilege. I instruct the witness not to answer.

MS. FREENY: And I assume all the same provisos apply.

BY MS. FREENY:

Q. And sir, I assume that you're also not going to answer that question at the direction of your counsel.

A. Yes.

Q. Did management have a prep session with Secretary Lutnick before the August 13th board

meeting?
A. There was a meeting with Secretary Lutnick.
Q. Okay. And at that meeting, did Secretary Lutnick provide any input or guidance on the forthcoming presentation by management to the board?
A. The presentation and deck in its form were not part of that, but the overall --
Q. Yeah.
A. -- this is what you're analyzing, this is what you're reviewing, this is, you know, the important things that need to be considered by the board were --
Q. Okay.
A. -- so high level but not a --
Q. Yeah.
A. -- here's the presentation, let's review it.
Q. What was Secretary Lutnick's input or guidance on the forthcoming presentation to the board?

A. It needs to be detailed, it needs to be thorough. Just general support on how to address this issue in a meaningful way.

Q. Did he provide input as well on how to persuade the board to agree to full closure of the main building?

MR. JANKOWSKI: Objection. Vague and argumentative.

THE WITNESS: No, there was no, here's how you should persuade the board one way or the other.

BY MS. FREENY:

Q. Okay. And during that meeting with Secretary Lutnick about preparations for the upcoming August 13th board meeting, did you understand him to be speaking on his own behalf or on behalf of Chairman Trump or both?

A. I understood him to be speaking from his own perspective and his own -- and giving his own guidance on how to -- you know, really, on how to support what we were -- what we were doing.

Q. Okay. So during that meeting, you did

not understand that he was speaking on behalf of Chairman Trump; is that right?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: Yes. That -- yes. Asked and answered. He was --

BY MS. FREENY:

Q. I --

A. Sorry. Again -- like, I'm just going to say it again. He was speaking to us, to the Center, on -- from his perspective on how to address the things that we were dealing with.

I don't know if he was discussing what we were discussing with the president or how his conversations with the president were unfolding.

Q. Okay. Secretary Lutnick was also involved in the timeline for Delta's production of the final report, was he not?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Again, involvement from a general, you know, guidance and support and leadership perspective, yes --

MR. KRISTOFCAK: Sorry, can we take just a couple of minutes?

MS. FREENY: Okay. Are you guys okay with that?

MR. JANKOWSKI: Sure.

(A recess was taken.)

BY MR. KRISTOFCAK:

Q. All right. So I'd like to ask you some questions about the September 4th incident.

Can you tell me what happened?

A. The ceiling incident, right?

Q. That's right.

MR. JANKOWSKI: I was going to object on vagueness grounds, sorry, but I thought maybe we should move forward.

THE WITNESS: A section of plaster in the grand foyer, 5 foot by 4 foot, roughly, delaminated -- is the right term -- from the structure above and fell to the floor that prompted the safety and security team to close off the area while further investigations were undertaken.

BY MR. KRISTOFCAK:
Q. And did the Center close immediately following the plaster incident?
MR. JANKOWSKI: Objection. Vagueness.
THE WITNESS: We closed the grand foyer, which is where the plaster fell.
BY MR. KRISTOFCAK:
Q. Is that to say that the remainder of the Center stayed open?
A. Correct.
Q. And then you closed the Center ultimately on September 16th, correct?
A. Correct.
MR. JANKOWSKI: Objection. Vagueness.
I know you already answered, but...
BY MR. KRISTOFCAK:
Q. What's your understanding of what caused the plaster to fall?
A. Water infiltration from the plaza level and air infiltration from the plaza level into interstitial space above the grand foyer, which then, you know, created moisture in the plaster

and made the plaster delaminate.

Q. What information did you receive between September 4th and September 16th about the causes of the incident? Or reports or studies?

A. The unfortunate issue with the grand foyer is that you need a specialized lift to get up to where the -- to where the issue is. So we weren't able to -- because the lift was broken, we weren't able to get up and closely investigate where the ceiling delaminated. But we did see six or seven other areas where there were similar signs of water infiltration, mold, paint delaminating.

So specifically in the grand foyer, we -- you know, we documented those issues in those locations.

And then adjacent to the grand foyer, Walter P. Moore was continuing their investigation work and assessment of the soffits that are linked to the space above the grand foyer, that interstitial space.

Q. The soffits are on the exterior of the

face to face.
Q. Okay.
A. And just to be clear, in that draft report, you know, we historically know and have known that the soffit panels were in bad shape, water leaking through them, the failure that happened a couple of years ago, and the -- you know, the draft report that Walter P. Moore issued highlighted a lot of that information with more specifics, and the final report really clearly outlined what the risks were.
Q. So -- I think you just alluded to prior reports from Walter P. Moore.
Is this the 2024 and 2022 reports from Walter P. Moore?
A. They have provided reports throughout the building -- in the parking garage, the loading dock --
Q. Sorry, just referring to the soffit-related issues.
A. Yes. There is a report when the -- that Walter P. Moore provided when the soffit panel on

the northwest side of the building failed.

Q. And the September 3rd report recommended that the soffit panel system be replaced, correct?

A. It did.

Q. Was there anything additional in the subsequent report that came out in late September that sort of increased your confidence in their analysis?

A. Between that draft report and the final report, they were able to -- to inspect things in person instead of on a drone, and that's where they, as mentioned in the report, witnessed missing ties on some of the panels, structural members that were completely degraded with, you know, no integrity left.

So that information wasn't -- it's more difficult to see that with a borescope and a drone than it is -- it's easier to see that in person.

So some of those, you know, real structural failures were identified when they

were able to see things, investigate things in person.

Q. And that final report came out on the 20- --

A. 21st? 2nd? It --

Q. But in any event, after you decided to close the Center, correct?

A. Yes.

Q. So your closure decision was based on the information in the report on September 3rd?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The decision was partially informed by the report, but there were ongoing conversations every day with Walter P. Moore and the team, the facilities and project management and security and safety team about, you know, what they were finding. So it wasn't that there was a report and then we waited, did something, and then got another report. There were ongoing, you know, coordination and project-level discussions regularly during that time period.

during that failure in repairing the systems helped drive us to the fact that replacing the soffits was an important project. But it wasn't until we went through that preliminary, you know, scoping and investigation that we knew the full extent that -- how widespread the actual issues were.

Like, for example, you know, we know that there's water coming through the soffits, because you can see it when it rains, and it shouldn't be. So that means something wrong is happening. But we didn't know until Walter P. Moore did their investigation that every single roof drain on the low roof overhang had failed.

Q. Is it fair to say that the issues generally weren't new, but you just became more confident more recently that they were urgent?

A. With -- yes. With the information from, you know, and the conversations that we were having with Walter P. Moore. Yes.

Q. And the -- when the closure actually happened, that was on the 16th, you had your

board meeting the day before at which the board approved a different closure.

Did you talk to the board about the possibility of sort of administratively closing the Center?

A. No, I did not have a chance to -- no. During the board meeting, that did not come up. No.

Q. Why not?

A. The focus of the board meeting was the resolution. And part of the -- the inability to reach consensus and these mounting safety issues that I see in the building informed the need to act.

Q. I guess -- is it fair to say that, by the time of the board meeting, you knew that you wanted to close the Center regardless of what the board decided?

MR. JANKOWSKI: Objection to the extent that misstates.

THE WITNESS: I approached the board meeting as an opportunity to present and discuss

these issues with a lot more information than we previously had, and hoped there would be, you know, the time to reach that consensus which would result in the main building moving forward with renovations.

That consensus was not reached --

BY MR. KRISTOFCAK:

Q. That consensus was not what, sorry?

A. Was not reached during the board meeting.

Q. Can you help me understand that statement?

A. There's really two options coming out of that board meeting. There's all of the trustees understand that these are really critical important things that need to happen to the building that are actively failing, and here's the proof, you know, right in front of your face what's happening, so all of the trustees can have a discussion and reach consensus there or what continues to happen where there's not consensus.

And in the term of -- or in the case of not consensus, I have to make a decision about

what is best for patrons and staff and visitors and put safety before anything else, and that's what we did.

Q. I still don't understand. Didn't the board vote to close the building? What was the lack of consensus you're referring to?

A. The injunction is still in place. So even -- the board can vote every day to close it building, but that doesn't mean that the injunction is lifted.

Q. Okay. So your decision to close the Center was to get around the injunction?

MR. JANKOWSKI: Objection. Argumentative --

BY MR. KRISTOFCAK:

Q. I'm just trying to understand the statement.

MR. JANKOWSKI: -- misstates.

THE WITNESS: If I have a structural engineer telling me that I have failing soffits around the entire perimeter of the building that need to be replaced and I have evidence of other

failures happening in the building, and then I have pieces of the parking garage that are actively failing, I have pieces in the loading docks that are actively failing and I have electrical arc flash hazards in my electrical vaults, I have to take a step to quantify all of these risks. And I can't just ignore them because they are risks to people's lives.

And that's the priority I'm talking about. I'm not trying to get around the injunction. In fact, we're doing everything we can to understand what all of our risks are and mitigate them so we can move things forward.

This was not anything related to the injunction. This was mounting safety risks that I needed to act on and quantify so we know the liability that the Center has.

MR. KRISTOFCAK: If you could -- we're going to mark this as Exhibit 14.

MS. BAUM: I will send you an electronic copy.

MS. FREENY: And if you could just make

A. An example of these savings -- or the savings identified here is highlighted in the work we're doing now with the soffits. So in order to preserve access, safe access into the building for the public, we have to build a scaffolding or a tunnel so people can get into and out of the main building.

So things like that: pedestrian protection, phasing, working -- you know, working around rehearsals or performances or creating things to allow the flow of traffic and pedestrians has a cost to it.

And that's the $68 million that you have to spend on that, or you can spend that on improvements to the building.

Q. So is it fair to say that these are the savings that you achieve from pursuing the renovation with the Center being closed instead of phasing it in an occupied building?

MR. JANKOWSKI: Objection to the extent "Center" is vague.

BY MR. KRISTOFCAK:
Q. Or the main building of the Center.
A. Yes.
Q. Okay. And do you recall what Delta's sort of cost differential estimate was?
A. 50 to $60 million, I believe.
Q. Is there -- did you present these findings from JLL to the board?
A. No --
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: -- this letter was not presented to the board, but Delta and JLL met frequently and discussed what JLL knew, and this is part of what JLL knew in their -- in their work creating --
BY MR. KRISTOFCAK:
Q. So did you --
A. -- the plan.
Q. -- provide this letter to Delta?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: I don't know if they received this exact letter, but I -- I would

have -- it would have come up in their meetings with JLL, though, I'm sure.

BY MR. KRISTOFCAK:

Q. Okay. So you don't -- I genuinely can't recall what your answer was.

Did you present JLL's findings with respect to the potential cost savings to the board or --

A. No. This letter was not presented to the board.

Q. Okay. So just to clarify, when I asked earlier if you shared this with the board, I meant either the letter or the ultimate conclusion. And I just want to clar- -- make sure that you understand my question.

MR. JANKOWSKI: Are you asking the question again, whether the letter or the ultimate conclusions were --

MR. KRISTOFCAK: That's right.

MR. JANKOWSKI: Okay.

BY MR. KRISTOFCAK:

Q. Sort of separately from whatever Delta's

findings were, were JLL's findings presented to the board?

A. Not -- no, not explicitly, no.

Q. Okay. Another finding that JLL made, or observation, I guess, they -- on the first page, Bates number 6800, on the bottom two lines it says, "Our assessment suggest the building's true needs approach 400 to 500 million when all deferred maintenance, systems replacements, and necessary improvements are evaluated."

Do you see where it says that?

A. Yes.

Q. So is it fair to say that JLL believed that the entire scope of the work that the Center needed to do was significantly greater than the roughly $250 million appropriation received?

A. That is their assessment. Yes.

Q. Okay. And then on the fourth page stamped 6803, do you see where it says, "Significant schedule extension (36 to months)"?

A. Yes.

Q. This is significantly shorter than what

Delta estimated, correct?
MR. JANKOWSKI: Objection. Vague.
BY MR. KRISTOFCAK:
Q. Let me ask, do you remember what Delta estimated as the extension and schedule for the phased renovation?
A. At -- you know, double -- at least double the schedule. And, you know, this 40 months, it's around the same. But Delta's expectations were longer. Yes.
Q. And was this 36- to 40-month estimate from JLL shared with Delta?
A. I don't know exactly what they discussed, but I would assume that they discussed, again, the contents of this letter because they were meeting regularly with Delta.
Q. So would it surprise you if Delta said that they, in fact, did not receive any schedule estimates from JLL about the timeline for a phased renovation?
MR. JANKOWSKI: Objection. Argumentative. Misstates.

THE WITNESS: No, I'm not surprised by that. That doesn't mean that they weren't coordinated and meeting.

BY MR. KRISTOFCAK:

Q. And was this 36- to 40-month estimate from JLL shared with the board?

A. Again, this letter was not shared --

Q. I'm not asking about the letter; I'm asking about the conclusion.

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I did not share a conclusion with the board that JLL assumed that there could be more than 36- to 40-month schedule extension.

BY MR. KRISTOFCAK:

Q. Okay. And on the last page, stamped 6806, do you -- there's a paragraph towards the end that starts with "Second," and it says, "Both approaches are technically feasible. Should leadership determine that occupied renovation better serves the institution's overall interests, JLL stands ready to execute

successfully."

Do you see where it says that?

A. Yes.

Q. Was that conclusion shared with the board?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: That conclusion was not shared with the board, and neither was their professional recommendation to stay the course with closure execution recommended to the board.

BY MR. KRISTOFCAK:

Q. Okay. But you did not share JLL's view that the phased approach is technically feasible with the board, correct?

MR. JANKOWSKI: Objection. Asked and answered. Vague.

THE WITNESS: Anything is technically feasible. They have a professional recommendation in this letter that is -- that is the preface to the section you're highlighting.

BY MR. KRISTOFCAK:

Q. What do you mean by "anything is

technically feasible"?
Could you renovate the entire Center in six months? Is that technically feasible?
A. No, that's not technically not feasible.
Q. Okay. So anything is not technically feasible, correct?
I'm just trying --
A. Yes.
Q. -- to understand, when an engineering expert states that something is technically feasible, they're not lightly making that statement. That's a professional view, correct?
A. It is a statement --
MR. JANKOWSKI: Objection.
THE WITNESS: -- that something is technically feasible but is not their professional recommendation.
BY MR. KRISTOFCAK:
Q. That's not what I'm asking. I'm asking that their statement that the phased approach is technically feasible is a professional expert opinion that they made, correct?

CERTIFICATE OF NOTARY PUBLIC

I, CHRISTINA S. HOTSKO, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting under my direction; that said statement is a true record of the proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this statement was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

CHRISTINA S. HOTSKO

Notary Public in and for the

District of Columbia

My commission expires:

1 January 2027

# Floca 30(b)(6) Deposition Ex. 1

EXHIBIT
FLOCA 30(b)(6)
1
PENGAD 800-631-6989

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOYCE BEATTY,

*Plaintiff,*

v.

DONALD J. TRUMP, *et al.*,

*Defendants.*

Civil Action No. 25-4480 (CRC)

**DECLARATION OF CHARLES MATTHEW ("MATT") FLOCA**

In accordance with the provisions of 28 U.S.C. § 1746, I, Charles Matthew Floca, state as follows, under penalty of perjury, pertinent to the above-styled and numbered case:

1. I currently serve as the Executive Director and Chief Operating Officer of the John F. Kennedy Center for the Performing Arts ("the Center"). In this capacity, I exercise operational authority over all institutional departments, managing a complex integration of both trust and federal functions, including all elements of the Center's physical footprint.

2. The matters set forth in this Declaration are true and correct from my own personal knowledge and from information made available to me in the course of my official duties.

3. To the best of my knowledge, pursuant to the Court's prior orders permanently enjoining the Center and its Board of Trustees ("the Board") from displaying, installing, or maintaining any unauthorized signage, the Center has achieved full compliance. Should I or other executive officials become aware of any remaining instances of the use of the President's name on the Center's building or grounds, the Center will take expeditious remedial action to remove each instance.

4. The Center has halted all steps to effectuate the March 16 decision to wind down programming and fully close the facility by July 5, 2026.

5. The Center will maintain an operational model past July 5, allowing for continued public access. Educational and community-outreach programming will also be maintained.

6. Given present uncertainty as to future programming, management has deferred affirmative long-term programming or staffing adjustments until the Board selects a final operational path.

7. Management is currently compiling materials for a Board meeting in mid-July regarding operational and construction options. These options will include variation of:

    a. A full closure of the Center to accelerate construction activities with no ongoing public programming.

    b. A partial closure of specific building spaces, enabling some continued public access and limited programming in unaffected spaces.

    c. A coordinated series of phased closures designed to address the most critical infrastructure needs while maintaining more onsite programming

8. Additional capital repair and construction activities have begun; those initial activities are scheduled to take place between July and December 2026. The exact timelines and scope are subject to adjustment pending the Board's determinations.

Executed in Washington, DC, on Friday, June 19, 2026.

Charles Matthew Floca

# Floca 30(b)(6) Deposition Ex. 2

EXHIBIT
PENGAD 800-631-6989
FLOCA 30(b)(6)
2
cn 10/7/26

# THE JOHN F. KENNEDY MEMORIAL CENTER FOR THE PERFORMING ARTS
## AUDIT AND FINANCE COMMITTEE
## ZOOM MEETING MINUTES – JUNE 1, 2026

**Time:** 2:31 PM EST
**Format:** Zoom Meeting
**Presiding:** Jennifer Fischer

**Committee Members Present:** Jennifer Fischer, John Falconetti, Maria Bartiromo, Bob Castellani, Laura Ingraham, Lee Greenwood
**Committee Members Absent:** Catherine Reynolds

**Kennedy Center Management and Staff:** Matt Floca, Donna Arduin, Elliot Berke, Joe LaFauci

**Minutes:**

**1. Call to Order and Quorum**

Jennifer Fischer called the meeting to order at 2:31 PM. A quorum was present.

**2. Approval of Prior Meeting Minutes**

Motion: Approve the minutes of the last meeting.

Vote: Approved unanimously.

**3. Governance Item: Committee Approval Requirement**

Fischer confirmed that all committee members had received and acknowledged the item requiring that matters coming before the committee be approved by the General Counsel, President, and CFO.

**4. WNO Disaffiliation Update and Financial Exposure**

**Background and Financial Position:**

- [redacted]
- [redacted]
- [redacted]
- [redacted]

**Legal Analysis (Elliot Berke):**

- [redacted]
- [redacted]

- [redacted]
- [redacted]

**Committee Discussion:**

- [redacted]
- [redacted]
- [redacted]
- Arduin provided a bankruptcy framework for context: TKC's liabilities include approximately $72 million owed to Eastern Bank and approximately $20 million on its line of credit. The endowment is the primary asset, though its use may be restricted. The reach is part of the federal building and may not be considered a saleable asset.
- Arduin reported that following the December board meeting at which the name change was approved, ticket sales and fundraising came to a halt. The Center is back to prior deficit levels, reversing progress made in the months leading up to that decision.
- [redacted].
- Falconetti raised a procedural question: whether the A&F Committee is the appropriate venue for the WNO negotiation strategy, or whether it should be escalated to the Executive Committee or full Board. Members acknowledged the complexity and agreed more information is needed before any formal recommendations can be made.
- [redacted]
- Berke confirmed that the matter must go to both the Executive Committee and the full Board. [redacted] Members concurred that no formal action should be taken until the full Board is engaged.
- Regarding governance, members raised the question of Board leadership given the current uncertainty around the Chair position. Berke reported that based on his team's conversations, the Chair intends to step aside from this matter entirely. Members noted the Executive Committee cannot be convened without the Chair calling the meeting, per the Bylaws.

- Berke noted he has received inquiries from the Speaker's office and Senator Capito's office regarding the Center's situation. [redacted]

**Conclusion:**

No formal vote was taken. The committee agreed that the matter requires full Board engagement and that no negotiation commitments or legal actions should be taken without Board authorization. [redacted]

All members concurred.

**5. Adjournment**

Jennifer Fischer adjourned the meeting at 3:18 PM.

# Floca 30(b)(6) Deposition Ex. 4



June 1, 2026

# Audit and Finance Committee

The Trump Kennedy Center

94

EXHIBIT
PENGAD 800-631-6989
Floca 30(b)(6)
4
10/7/26

# Where We Were...

Where we were when this board convened, as reported in the May 8, 2025 committee meeting:

- Out of cash
- Owe Eastern Bank $72 million for the Reach
- Borrowing for operations
- Debt reserve. Once $54M, $10M remaining September 2025
- FY 25 budget out of balance by $26M due to fictitious funds

The Trump Kennedy Center

# Where We Are Now...

In-person attendance has declined across the performing arts industry

- Ticket sales decline since the pandemic
- This decline accelerates in 2025 when the new board is announced
- By 2Q 2026, ticket sales further drop to pandemic levels – around $4m since Jan
- FY2026 total projected ticket sales: $17.8m




Jan – Apr fundraising starkly contrasts Oct – Dec

- Gifts drop 42%
- Pledges drop >100% due to adjustments and write-offs

110

# FY26 Budget vs. Reprojection (Consolidated)

| Category | FY26 Approved Budget | FY26 Projection | Variance (Fav/Unfav) |
|---|---|---|---|
| **Revenues** | | | |
| Earned Revenues | $93.8 | $28.3 | ($65.4) |
| Auxiliary Programs | $21.1 | $7.5 | ($13.6) |
| Contributed Revenues | $84.9 | $63.5 | ($21.5) |
| Grant Revenues | $12.7 | $8.6 | ($4.1) |
| Endowment Releases | $7.6 | $16.0 | $8.4 |
| **Total Revenues** | **$220.1** | **$123.9** | **($96.1)** |
| **Expenses** | | | |
| Programs | $171.1 | $112.5 | $58.7 |
| Auxiliary Services | $6.8 | $2.9 | $3.9 |
| Development | $12.3 | $8.8 | $3.6 |
| G&A | $24.9 | $16.9 | $8.0 |
| Debt Repayments and Interest Expenses | $5.4 | $5.9 | ($0.5) |
| Miscelleneous Expenses | ($0.5) | $0.1 | ($0.5) |
| **Total Expenses** | **$220.1** | **$146.9** | **$73.1** |
| **Net Surplus / (Deficit)** | **($0.0)** | **($23.0)** | **($23.0)** |

# Trump Kennedy Center Foundation

- Created as a 501(c)(3) July 2024
- Serves as a fundraising platform during shutdown
- Fundraising team provided by our Chairman
- Operating in close coordination with TKC staff
- Funds received to date $17.5M



# Post Shutdown Plan

- Education programs will continue through offsite delivery, touring, and broadcast
- Funding is supported primarily by the Department of Education and other grants
- NSO programs will continue at offsite venues
- Significantly reduced staffing levels across the organization
- Essential operations will remain in place, including future program planning, Board relations, system upgrades, and institutional readiness for reopening
- Matt will share a shutdown budget with this committee as soon as possible

# Floca 30(b)(6) Deposition Ex. 7

EXHIBIT
PENGAD 800-631-6989
FLOCA 30(b)(6)
7
ecu 10/7/26

**APPENDIX V**

John F. Kennedy Center for the Performing Arts

Consolidated Financial Statements,

Supplemental Schedules of Operations, and Independent Auditor's Report

Fiscal Years Ended September 29, 2024 and October 1, 2023

# John F. Kennedy Center for the Performing Arts

## Consolidated Statements of Financial Position

| | September 29, 2024 | October 1, 2023 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 21,085,208 | $ 28,697,766 |
| Accounts receivable, net | 5,679,261 | 3,976,109 |
| Contributions receivable, net | 118,264,660 | 83,477,418 |
| Marketable securities and other investments | 180,585,839 | 149,226,815 |
| Restricted cash and investments (Note 6B) | 9,000,000 | 9,000,000 |
| Federal government appropriation held by the U.S. Treasury – | | |
| Operations and maintenance | 11,649,653 | 8,733,028 |
| Capital repair and restoration | 56,310,192 | 54,849,405 |
| Property, net of accumulated depreciation | 272,639,988 | 282,687,194 |
| Other assets | 8,930,378 | 4,309,239 |
| Right-of-use assets- operating leases | 7,251,603 | 7,637,139 |
| Right-of-use assets- finance leases | 15,001 | 25,074 |
| **Total assets** | $ 691,411,783 | $ 632,619,187 |
| **Liabilities and net assets** | | |
| **Liabilities:** | | |
| Accounts payable and accrued liabilities | $ 13,574,332 | $ 17,290,515 |
| Future performance receipts | 29,756,627 | 29,336,937 |
| Loan payable, net | 71,612,163 | 75,063,515 |
| Accrued pension cost | 4,760,448 | 6,101,105 |
| Charitable gift annuity liability | 383,958 | 400,775 |
| Other liabilities | 4,819,344 | 5,490,204 |
| Lease liabilities- operating leases | 8,214,394 | 8,830,426 |
| Lease liabilities- finance leases | 12,960 | 22,805 |
| **Total liabilities** | 133,134,226 | 142,536,282 |
| **Contingencies and commitments** (Note 8) | | |
| **Net assets (deficit):** | | |
| Without donor restrictions: | | |
| Operating fund | (25,704,674) | (24,543,212) |
| Building the Future and Sustainability funds | 10,769,859 | 19,437,883 |
| Board Designated fund | 26,943,384 | 18,608,966 |
| WNO Fund for Innovation & Excellence | 3,993,325 | 3,820,985 |
| Appropriation fund | 62,691,919 | 66,841,360 |
| Plant and Bond fund | 141,724,962 | 146,791,630 |
| Total without donor restrictions | 220,418,775 | 230,957,612 |
| With donor restrictions | 337,858,782 | 259,125,293 |
| **Total net assets** | 558,277,557 | 490,082,905 |
| **Total liabilities and net assets** | $ 691,411,783 | $ 632,619,187 |

*See accompanying notes to the consolidated financial statements.*

# John F. Kennedy Center for the Performing Arts

## Consolidated Statements of Activities

| | Without Donor Restrictions | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *For the fiscal year ended September 29, 2024* | Operating Fund | Building the Future and Sustainability Funds | Board Designated Fund | WNO Fund for Innovation & Excellence | Appropriation Fund | Plant and Bond Fund | Total | With Donor Restrictions | Total |
| **Operating revenues** | | | | | | | | | |
| Kennedy Center programming | $ 68,654,902 | $ - | $ - | $ - | $ - | $ - | $ 68,654,902 | $ - | $ 68,654,902 |
| Education and VSA | 1,298,224 | - | - | - | - | - | 1,298,224 | - | 1,298,224 |
| National Symphony Orchestra programming | 15,863,011 | - | - | - | - | - | 15,863,011 | - | 15,863,011 |
| Washington National Opera programming | 4,906,851 | - | - | - | - | - | 4,906,851 | - | 4,906,851 |
| External programming and events | 9,162,307 | - | - | - | - | - | 9,162,307 | - | 9,162,307 |
| Auxiliary services | 13,023,991 | - | - | - | - | 544,576 | 13,568,567 | - | 13,568,567 |
| Ticket handling fees and other revenues | 12,424,139 | - | - | - | - | 2,402 | 12,426,541 | - | 12,426,541 |
| Federal government appropriation – Operations and maintenance | - | - | - | - | 27,930,074 | - | 27,930,074 | 4,362,926 | 32,293,000 |
| Federal government appropriation – Capital repair and restoration | - | - | - | - | - | - | - | 12,633,000 | 12,633,000 |
| Federal government appropriations released from restrictions – Operations and maintenance | - | - | - | - | 128,863 | - | 128,863 | (128,863) | - |
| Federal government appropriations released from restrictions – Capital repair and restoration | - | - | - | - | 10,534,445 | - | 10,534,445 | (10,534,445) | - |
| Total operating revenues | 125,333,425 | - | - | - | 38,593,382 | 546,978 | 164,473,785 | 6,332,618 | 170,806,403 |
| **Operating expenses** | | | | | | | | | |
| Kennedy Center programming | 70,295,823 | - | - | - | - | - | 70,295,823 | - | 70,295,823 |
| Education and VSA | 14,110,906 | - | - | - | - | - | 14,110,906 | - | 14,110,906 |
| National Symphony Orchestra programming | 43,108,348 | - | - | - | - | - | 43,108,348 | - | 43,108,348 |
| Washington National Opera programming | 24,445,364 | - | - | - | - | - | 24,445,364 | - | 24,445,364 |
| External programming and events | 4,055,545 | - | - | - | - | - | 4,055,545 | - | 4,055,545 |
| Auxiliary services | 5,378,567 | - | - | - | - | - | 5,378,567 | - | 5,378,567 |
| General and administrative | 22,397,569 | - | - | - | - | - | 22,397,569 | - | 22,397,569 |
| Marketing and sales | 17,614,866 | - | - | - | - | - | 17,614,866 | - | 17,614,866 |
| Development | 18,205,362 | - | - | - | - | - | 18,205,362 | - | 18,205,362 |
| Institutional affairs | 2,161,347 | - | - | - | - | - | 2,161,347 | - | 2,161,347 |
| Production | 1,387,263 | - | - | - | - | - | 1,387,263 | - | 1,387,263 |
| Operation and maintenance | 89,844 | - | - | - | 28,058,937 | - | 28,148,781 | - | 28,148,781 |
| Depreciation | - | - | - | - | 14,683,886 | 7,175,407 | 21,859,293 | - | 21,859,293 |
| Interest and other expenses | 1,190,237 | 434,537 | - | - | - | 1,566,683 | 3,191,457 | - | 3,191,457 |
| Total operating expenses | 224,441,041 | 434,537 | - | - | 42,742,823 | 8,742,090 | 276,360,491 | - | 276,360,491 |
| Operating (deficit) income before contributions, grants, and other support | (99,107,616) | (434,537) | - | - | (4,149,441) | (8,195,112) | (111,886,706) | 6,332,618 | (105,554,088) |
| **Contributions, grants, and other support** | | | | | | | | | |
| Kennedy Center | 40,232,538 | 345 | 1,611,438 | - | - | - | 41,844,321 | 62,741,433 | 104,585,754 |
| National Symphony Orchestra | 8,489,931 | - | 725,607 | - | - | - | 9,215,538 | 17,012,817 | 26,228,355 |
| Washington National Opera | 2,505,917 | - | 311,850 | 4,300,000 | - | - | 7,117,767 | 1,426,528 | 8,544,295 |
| Change in value of charitable gift annuity liability | - | - | - | - | - | - | - | 1,126,520 | 1,126,520 |
| Fund transfers | 12,377,660 | (8,250,000) | - | (4,127,660) | - | - | - | - | - |
| Contributions and other support released from restrictions | 28,453,348 | - | - | - | - | - | 28,453,348 | (28,453,348) | - |
| Endowment assets appropriated for expenditure by Board of Trustees – Spending rate | 3,954,624 | - | (758,208) | - | - | - | 3,196,416 | (3,196,416) | - |
| Contributed non-financial assets | 2,572,158 | - | - | - | - | 501,255 | 3,073,413 | - | 3,073,413 |
| Total contributions, grants, and other support | 98,586,176 | (8,249,655) | 1,890,687 | 172,340 | - | 501,255 | 92,900,803 | 50,657,534 | 143,558,337 |
| **Change in net assets before change in net present value of contributions, grants, and other support, nonoperating activity and other transfers and activities listed below** | (521,440) | (8,684,192) | 1,890,687 | 172,340 | (4,149,441) | (7,693,857) | (18,985,903) | 56,990,152 | 38,004,249 |
| Change in net present value of contributions, grants and other support | - | 16,168 | - | - | - | 91,256 | 107,424 | (2,849,317) | (2,741,893) |
| **Change in net assets before nonoperating activity, transfers and pension-related changes excluding net periodic pension cost** | (521,440) | (8,668,024) | 1,890,687 | 172,340 | (4,149,441) | (7,602,601) | (18,878,479) | 54,140,835 | 35,262,356 |
| **Nonoperating activity** | | | | | | | | | |
| Investment return, net | - | - | 4,503,731 | - | - | 1,285,933 | 5,789,664 | 25,051,637 | 30,841,301 |
| Other nonoperating income | 1,940,000 | - | - | - | - | - | 1,940,000 | - | 1,940,000 |
| Other components of net periodic pension cost | (883,769) | - | - | - | - | - | (883,769) | - | (883,769) |
| Other nonoperating costs | (97,679) | - | - | - | - | - | (97,679) | (458,983) | (556,662) |
| **Change in net assets before other transfers and pension-related changes excluding net periodic pension cost** | 437,112 | (8,668,024) | 6,394,418 | 172,340 | (4,149,441) | (6,316,668) | (12,130,263) | 78,733,489 | 66,603,226 |
| Fund transfers | (3,190,000) | - | 1,940,000 | - | - | 1,250,000 | - | - | - |
| Pension-related changes excluding net periodic pension cost | 1,591,426 | - | - | - | - | - | 1,591,426 | - | 1,591,426 |
| **Total change in net assets** | (1,161,462) | (8,668,024) | 8,334,418 | 172,340 | (4,149,441) | (5,066,668) | (10,538,837) | 78,733,489 | 68,194,652 |
| Net (deficit) assets at beginning of year | (24,543,212) | 19,437,883 | 18,608,966 | 3,820,985 | 66,841,360 | 146,791,630 | 230,957,612 | 259,125,293 | 490,082,905 |
| Net (deficit) assets at end of year | $ (25,704,674) | $ 10,769,859 | $ 26,943,384 | $ 3,993,325 | $ 62,691,919 | $ 141,724,962 | $ 220,418,775 | $ 337,858,782 | $ 558,277,557 |

*See accompanying notes to the consolidated financial statements.*

# John F. Kennedy Center for the Performing Arts

## Consolidated Statements of Activities

| *For the fiscal year ended October 1, 2023* | Without Donor Restrictions: Operating Fund | Without Donor Restrictions: Building the Future and Sustainability Funds | Without Donor Restrictions: Board Designated Fund | Without Donor Restrictions: WNO Fund for Innovation & Excellence | Without Donor Restrictions: Appropriation Fund | Without Donor Restrictions: Plant and Bond Fund | Without Donor Restrictions: Total | With Donor Restrictions | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Operating revenues** | | | | | | | | | |
| Kennedy Center programming | $ 94,725,051 | $ - | $ - | $ - | $ - | $ - | $ 94,725,051 | $ - | $ 94,725,051 |
| Education and VSA | 1,405,766 | - | - | - | - | - | 1,405,766 | - | 1,405,766 |
| National Symphony Orchestra programming | 13,324,826 | - | - | - | - | - | 13,324,826 | - | 13,324,826 |
| Washington National Opera programming | 4,563,794 | - | - | - | - | - | 4,563,794 | - | 4,563,794 |
| External programming and events | 7,266,769 | - | - | - | - | - | 7,266,769 | - | 7,266,769 |
| Auxiliary services | 15,094,286 | - | - | - | - | - | 15,094,286 | - | 15,094,286 |
| Ticket handling fees and other revenues | 15,585,055 | - | - | - | - | 2,435 | 15,587,490 | - | 15,587,490 |
| Federal government appropriation – Operations and maintenance | - | - | - | - | 26,833,306 | - | 26,833,306 | 806,694 | 27,640,000 |
| Federal government appropriation – Capital repair and restoration | - | - | - | - | - | - | - | 17,740,000 | 17,740,000 |
| Federal government appropriations released from restrictions – Operations and maintenance | - | - | - | - | 760,961 | - | 760,961 | (760,961) | - |
| Federal government appropriations released from restrictions – Capital repair and restoration | - | - | - | - | 3,737,291 | - | 3,737,291 | (3,737,291) | - |
| **Total operating revenues** | 151,965,547 | - | - | - | 31,331,558 | 2,435 | 183,299,540 | 14,048,442 | 197,347,982 |
| **Operating expenses** | | | | | | | | | |
| Kennedy Center programming | 94,412,986 | - | - | - | - | - | 94,412,986 | - | 94,412,986 |
| Education and VSA | 13,720,148 | - | - | - | - | - | 13,720,148 | - | 13,720,148 |
| National Symphony Orchestra programming | 38,564,700 | - | - | - | - | - | 38,564,700 | - | 38,564,700 |
| Washington National Opera programming | 20,366,676 | - | - | - | - | - | 20,366,676 | - | 20,366,676 |
| External programming and events | 2,905,828 | - | - | - | - | - | 2,905,828 | - | 2,905,828 |
| Auxiliary services | 5,443,144 | - | - | - | - | - | 5,443,144 | - | 5,443,144 |
| General and administrative | 21,464,234 | - | - | - | - | - | 21,464,234 | - | 21,464,234 |
| Marketing and sales | 19,226,698 | - | - | - | - | - | 19,226,698 | - | 19,226,698 |
| Development | 17,024,945 | - | - | - | - | - | 17,024,945 | - | 17,024,945 |
| Institutional affairs | 2,147,151 | - | - | - | - | - | 2,147,151 | - | 2,147,151 |
| Production | 1,996,805 | - | - | - | - | - | 1,996,805 | - | 1,996,805 |
| Operation and maintenance | 922,796 | - | - | - | 27,594,267 | - | 28,517,063 | - | 28,517,063 |
| Depreciation | - | - | - | - | 15,562,038 | 7,554,605 | 23,116,643 | - | 23,116,643 |
| Interest and other expenses | 1,209,203 | - | - | - | - | 84,050 | 1,293,253 | - | 1,293,253 |
| **Total operating expenses** | 239,405,314 | - | - | - | 43,156,305 | 7,638,655 | 290,200,274 | - | 290,200,274 |
| **Operating (deficit) income before contributions, grants, and other support** | (87,439,767) | - | - | - | (11,824,747) | (7,636,220) | (106,900,734) | 14,048,442 | (92,852,292) |
| **Contributions, grants, and other support** | | | | | | | | | |
| Kennedy Center | 37,905,602 | (26,070) | 1,205,745 | - | - | - | 39,085,277 | 9,641,122 | 48,726,399 |
| National Symphony Orchestra | 7,398,077 | - | 474,420 | - | - | - | 7,872,497 | 1,352,137 | 9,224,634 |
| Washington National Opera | 7,237,410 | - | 1,602,941 | 2,502,331 | - | - | 11,342,682 | 27,221,500 | 38,564,182 |
| Change in value of charitable gift annuity liability | - | - | - | - | - | - | - | 440,775 | 440,775 |
| Fund transfers | 6,913,042 | (5,000,000) | - | (1,913,042) | - | - | - | - | - |
| Contributions and other support released from restrictions | 23,321,941 | - | - | - | - | - | 23,321,941 | (23,321,941) | - |
| Endowment assets appropriated for expenditure by Board of Trustees – Spending rate | 3,454,000 | - | (564,000) | - | - | - | 2,890,000 | (2,890,000) | - |
| Contributed non-financial assets | 1,927,266 | - | 11,594 | - | - | 269,411 | 2,208,271 | - | 2,208,271 |
| **Total contributions, grants, and other support** | 88,157,338 | (5,026,070) | 2,730,700 | 589,289 | - | 269,411 | 86,720,668 | 12,443,593 | 99,164,261 |
| **Change in net assets before change in net present value of contributions, grants, and other support, nonoperating activity and other transfers and activities listed below** | 717,571 | (5,026,070) | 2,730,700 | 589,289 | (11,824,747) | (7,366,809) | (20,180,066) | 26,492,035 | 6,311,969 |
| Change in net present value of contributions, grants and other support | - | 26,300 | - | - | - | 131,759 | 158,059 | (1,659,607) | (1,501,548) |
| **Change in net assets before nonoperating activity, transfers and pension-related changes excluding net periodic pension cost** | 717,571 | (4,999,770) | 2,730,700 | 589,289 | (11,824,747) | (7,235,050) | (20,022,007) | 24,832,428 | 4,810,421 |
| **Nonoperating activity** | | | | | | | | | |
| Investment return, net | - | - | 1,475,827 | - | - | 135,260 | 1,611,087 | 10,467,764 | 12,078,851 |
| Other components of net periodic pension cost | (891,732) | - | - | - | - | - | (891,732) | - | (891,732) |
| Other nonoperating costs | - | - | - | - | - | - | - | (386,024) | (386,024) |
| **Change in net assets before other transfers and pension-related changes excluding net periodic pension cost** | (174,161) | (4,999,770) | 4,206,527 | 589,289 | (11,824,747) | (7,099,790) | (19,302,652) | 34,914,168 | 15,611,516 |
| Fund Transfer | (1,250,000) | - | - | - | - | 1,250,000 | - | - | - |
| Pension-related changes excluding net periodic pension cost | 103,956 | - | - | - | - | - | 103,956 | - | 103,956 |
| **Total change in net assets** | (1,320,205) | (4,999,770) | 4,206,527 | 589,289 | (11,824,747) | (5,849,790) | (19,198,696) | 34,914,168 | 15,715,472 |
| Net (deficit) assets at beginning of year | (23,223,007) | 24,437,653 | 14,402,439 | 3,231,696 | 78,666,107 | 152,641,420 | 250,156,308 | 224,211,125 | 474,367,433 |
| **Net (deficit) assets at end of year** | $ (24,543,212) | $ 19,437,883 | $ 18,608,966 | $ 3,820,985 | $ 66,841,360 | $ 146,791,630 | $ 230,957,612 | $ 259,125,293 | $ 490,082,905 |

*See accompanying notes to the consolidated financial statements.*

# John F. Kennedy Center for the Performing Arts

## Notes to Consolidated Financial Statements

### 9. Leases (Continued)

Operating lease cost is recognized on a straight-line basis over the lease term. Finance lease cost is recognized as a combination of the amortization expense for the ROU assets and interest expense for the outstanding lease liabilities. The components of lease expense are included in "Rentals, insurance and utilities" within the functional expenses as follows:

| *For the fiscal years ended* | **September 29, 2024** | October 1, 2023 |
|---|---|---|
| Operating lease costs | **$ 1,648,371** | $ 1,543,206 |
| Amortization of right-of-use assets- finance lease | **10,073** | 5,145 |
| Interest on lease liabilities- finance lease | **845** | 603 |
| Total lease cost | **$ 1,659,289** | $ 1,548,954 |

Rent expense was $1,659,289 and $1,584,954 for the years ended September 29, 2024 and October 1, 2023 respectively.

Supplemental information related to the Center's operating and finance leases for the years ended September 29, 2024 and October 1, 2023 is as follows:

| | **September 29, 2024** | October 1, 2023 |
|---|---|---|
| **Cash paid for amounts included in measurement of lease liabilities** | | |
| Operating cash outflows – payments on operating leases | **$ 1,878,867** | $ 1,731,730 |
| Financing cash outflows – payments on finance leases | **9,845** | 7,414 |
| **Weighted-average remaining lease term:** | | |
| Operating leases | **9.42 years** | 10.34 years |
| Finance leases | **1.49 years** | 2.19 years |
| **Weighted-average discount rate:** | | |
| Operating leases | **3.86%** | 3.80% |
| Financing leases | **4.61%** | 4.61% |

Aggregate remaining maturities of operating lease and finance lease liabilities as of September 29, 2024, are as follows:

| | Operating Leases | Financing Leases |
|---|---|---|
| 2025 | $ 1,503,003 | $ 10,690 |
| 2026 | 1,162,898 | 2,672 |
| 2027 | 753,655 | - |
| 2028 | 771,596 | - |
| 2029 | 789,986 | - |
| Thereafter | 4,840,985 | - |
| Total lease payments | 9,822,123 | 13,362 |
| Less imputed interest | (1,607,729) | (402) |
| | $ 8,214,394 | $ 12,960 |

## 10. Net Assets

A. Net assets with donor restrictions

Net assets with donor restrictions are restricted for the following purposes or periods at September 29, 2024 and October 1, 2023:

| As of | September 29, 2024 | October 1, 2023 |
|---|---|---|
| **Subject to expenditures for specified purpose:** | | |
| Kennedy Center | $ 9,748,017 | $ 7,586,162 |
| National Symphony Orchestra programs | 6,436,204 | 5,753,809 |
| Washington National Opera | 15,367,017 | 18,148,786 |
| **Subject to expenditures for time restrictions:** | | |
| For periods after fiscal year end- Kennedy Center | 68,605,559 | 23,053,628 |
| For periods after fiscal year end- Washington National Opera | 3,995,162 | 7,969,621 |
| **Subject to expenditures for purpose and time as required by the underlying Federal appropriation requirements:** | | |
| Operations and maintenance | 7,095,239 | 2,861,175 |
| Capital repair and restoration | 88,459,824 | 86,372,425 |
| Total subject to expenditures for specified purposes and time | 199,707,022 | 151,745,606 |
| **Endowments:** | | |
| **Subject to the Center's endowment spending policy:** | | |
| Education programs | 18,983,733 | 9,981,344 |
| Chamber music | 8,835,210 | 7,403,705 |
| Japanese performing arts | 4,964,246 | 4,094,403 |
| Millennium Stage | 2,346,699 | 1,986,479 |
| Ballet programming | 4,217,213 | 3,569,119 |
| International performing arts | 2,355,663 | 1,916,780 |
| Texas performing arts | 945,395 | 820,933 |
| Arts access programs | 1,702,656 | 1,188,789 |
| Musical Theater | 532,876 | 444,278 |
| Other designated programs | 2,666,914 | 1,352,615 |
| NSO music director | 8,464,248 | 7,185,402 |
| NSO Commissioning | 1,223,151 | 1,448,564 |
| NSO Debut Artists | 1,178,311 | 1,001,049 |
| NSO Family concerts | 670,566 | 567,119 |
| NSO other programs | 5,573,330 | 2,268,882 |
| Operating activities of the Center | 73,491,549 | 62,150,226 |
| Total endowments | 138,151,760 | 107,379,687 |
| Total net assets with donor restrictions | $ 337,858,782 | $ 259,125,293 |

## 10. Net Assets (Continued)

### A. Net assets with donor restrictions (Continued)

Net assets are released from donor restrictions when expenses were incurred to satisfy the restricted purposes as specified by donors or for the passage of time. Expenditures of donor-restricted funds are released out of the appreciation related to those funds to the extent allowed by the donors. Such net assets were released as follows:

| *For the fiscal years ended* | September 29, 2024 | October 1, 2023 |
|---|---|---|
| **Satisfaction of purpose restrictions:** | | |
| Kennedy Center | $ 4,321,901 | $ 5,857,023 |
| National Symphony Orchestra | 3,191,940 | 4,056,135 |
| Washington National Opera | 8,775,038 | 2,878,133 |
| **Satisfaction of time restrictions:** | | |
| Time restrictions expired | 9,313,076 | 8,653,430 |
| **Satisfaction of purpose and time restrictions as required by the underlying Federal appropriation requirements:** | | |
| Operations and maintenance—released for difference in amount of accruals for unfunded liabilities and amounts expended in current year under prior-year obligated appropriations | 128,863 | 760,961 |
| Capital repair and restoration—released for property placed into service | 10,534,445 | 3,737,291 |
| Total satisfaction of purpose and time restrictions | 36,265,263 | 25,942,973 |
| **Restricted-purpose spending rate distributions and appropriations:** | | |
| Education programs | 895,228 | 227,928 |
| Chamber music | 286,903 | 356,750 |
| Japanese performing arts | 88,821 | 200,993 |
| Millennium Stage | 105,973 | 98,080 |
| Ballet Programming | 172,387 | 146,186 |
| International performing arts | 11,941 | 260,673 |
| Texas performing arts | 65,051 | 16,548 |
| Arts Access Program | 52,984 | 29,854 |
| Musical Theater | 14,423 | 6,317 |
| Other designated programs | 66,999 | 55,875 |
| NSO music director | 375,121 | 345,739 |
| NSO Commissioning | 553,734 | 4,276 |
| NSO Debut Artists | 52,356 | 48,299 |
| NSO Family concerts | 29,661 | 27,366 |
| NSO other programs | 79,811 | 52,336 |
| Operating activities of the Center | 3,196,416 | 2,890,000 |
| Total restricted-purpose spending rate distributions and appropriations | 6,047,809 | 4,767,220 |
| Total net assets released from donor restrictions | $ 42,313,072 | $ 30,710,193 |

# Floca 30(b)(6) Deposition Ex. 8

EXHIBIT
PENGAD 800-631-6989
Floca 9

EXHIBIT
PENGAD 800-631-6989
FLOCA 30(b)(6)
8
CR 10/7/24

# B

# The Kennedy Center

## BOARD OF TRUSTEES | SPECIAL MEETING AGENDA

Tuesday, September 15, 2026 | 12:30 P.M. Eastern Time

*Virtual Convening via Zoom (Access Link Provided to Members)*

1. **Call to Order**
2. **Approval of Minutes**
3. **Facility Conditions & Capital Renovations**
4. **Financial Position**
5. **Consideration of Formal Recognition Protocols**
6. **Adjournment**

# Financial Context

The physical conditions documented in Sections 1–6 did not develop in isolation. Over the same period, the Center's own Finance Committee materials show its earned revenue, ticketing, rentals, concessions, and other self-generated income, as distinct from government and donor support, and its operating deficit both moving in an unfavorable direction. This section presents that financial context in qualitative terms, sourced entirely from the Center's internal Finance Committee reporting.

**Earned Revenue Trend**

FY2024 shows a steep, single-year decline in earned revenue compared to FY2023. This decline appears in the Finance Committee presentation dated January 21, 2025.

However earned revenue appears to be volatile rather than a clean, uninterrupted multi-year decline; FY2020–FY2021 are omitted from the Center's own reporting, consistent with pandemic-related closure. The FY2023-to-FY2024 decline is the most recent, and largest single-year, drop in the series, with a partial rebound projected for FY2025:

Baseline Pre-Pandemic Volatility (FY17–FY19): Performance revenue fluctuated normally before the pandemic, rising in FY18 and dipping slightly in FY19.

Post-Pandemic Rebound (FY22–FY23): After the FY20–FY21 pandemic shutdowns were omitted, the initial reopening phase generated two consecutive years of revenue growth as live performances resumed.

Severe FY2024 Retraction: FY24 experienced the steepest single-year drop in earned revenue across the entire data series, wiping out post-pandemic attendance gains.

Projected Partial Recovery (FY25): The January 2025 forecast modeled an upward rebound, but still left the institution with an ongoing structural operating deficit and depleted reserves to cover sudden capital or emergency breakdowns.

| Fiscal Year | Direction vs. Prior Year Shown |
|---|---|
| FY2017 Actual | – |
| FY2018 Actual | Increase |
| FY2019 Actual | Decrease |
| FY2022 Actual | Increase (FY2020–FY2021 omitted; pandemic closure) |
| FY2023 Actual | Increase |

| | |
|---|---|
| FY2024 Actual | Decrease – largest single-year decline in the series |
| FY2025 Projection (as of Jan. 2025) | Increase – partial rebound projected |

Sources: Finance Committee Presentation, January 21, 2025, pp. 4, 9, 32.

**Corroborating Trend: Growing Operating Deficit**
Over the same three most recent actual fiscal years, the Center's effective operating deficit (excluding one-time sustainability fund draws) widened every year, before a projected partial narrowing, while remaining a deficit, in the FY2025 projection:

| Fiscal Year | Effective Operating Deficit – Trend |
|---|---|
| FY2022 Actual | Deficit |
| FY2023 Actual | Deficit – widened vs. FY2022 |
| FY2024 Actual | Deficit – widened again vs. FY2023 |
| FY2025 Projection (as of Jan. 2025) | Deficit – projected to narrow vs. FY2024, but still a deficit |

Sources: Finance Committee Presentation, January 21, 2025, pp. 4, 9, 16, 32.

**Why This Matters**
This report's primary purpose is to summarize the building's physical condition. Financial context is included because the recent years of compounding structural decay – active shoring, code-noncompliant electrical vaults, a failed condenser water system, and corroding structural steel – coincided directly with the deterioration of the institution's own finances. Continued deferral of the physical repairs documented in this report carries a severe cost not only to public safety, but to the institution's long-term solvency. Although building maintenance is supported through federal capital appropriations, deferring this work creates direct liabilities for the Trust. Unplanned utility outages, deferred maintenance, and degraded public spaces depress ticket sales and rental revenues, actively undermining the Center's operational viability and mission.

## RESOLUTION OF THE BOARD OF TRUSTEES

## OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS

WHEREAS, the Kennedy Center is in a dire financial position having exhausted its fiscal resources. The Kennedy Center is in such a precarious fiscal position that it will not be able to support its payroll obligations, nor routine maintenance contracts within a matter of weeks. While actively considering alternative means of fiscal survival, President Trump has offered to step in and raise the necessary funds to keep the Center from bankruptcy during its much needed renovation. With certain fiscal collapse within weeks, the board seeks to determine what recognition and acknowledgement will comply with the Court's decisions in *Beatty v. Trump et al.* and with its statutory obligations, and wishes to explore additional options to present that recognition in a concrete and public fashion.

WHEREAS, the Center is seeking to appropriately recognize and acknowledge President Trump for his well timed proffer of fiscal rescue. The Board understands that without such appropriate recognition it is unlikely that President Trump will provide the fundamental oversight of the renovation of the main building and lead the fiscal rescue of the Center. The Board seeks to provide multiple options so that President Trump can be legally and appropriately recognized and acknowledged on the facade of the Kennedy Center so that he agrees to carry the burden of managing the renovation and provides the Center with a much required financial rescue.

IT IS HEREBY RESOLVED that the Center will undertake all legal means to effectuate one or more of the following public recognitions or acknowledgements to the President:

TO BE PLACED ON THE EXTERIOR MARBLE BENEATH THE NAME OF THE CENTER, ONE OF THE FOLLOWING as voted upon by the Board:

- **Option 1:**

  Renovation and endowment overseen by

  President Donald J. Trump

  and the

  Trump Kennedy Center Fund

- **Option 2:**

  Renovation Restoration and Endowment overseen by President Donald J. Trump

  and the

  Trump Kennedy Center Fund

- **Option 3:**

With Gratitude for Support from

President Donald J. Trump

and the

Trump Kennedy Center Fund

- **Option 4:**

Renovation and Restoration directed by

President Donald J. Trump

and endowment provided by the

Trump Kennedy Center Fund

- **Option 5:**

Restoration and endowment overseen by

President Donald J. Trump

and endowment provided by the

Trump Kennedy Center Fund

- **Option 6:**

A Legacy protected through the Generosity of President Donald J. Trump

- **Option 7:**

Renovated, restored, and sustained through the generosity of

President Donald J. Trump

- **Option 8:**

Renovation, oversight, and support provided by

President Donald J. Trump

- **Option 9:**

  Acknowledging the unwavering support of

  President Donald J. Trump

  and the

  Trump Kennedy Center Fund

- **Option 10:**

  Renovation, Restoration, and support by

  President Donald J. Trump

# Floca 30(b)(6) Deposition Ex. 9

EXHIBIT
PENGAD 800-631-6989
FLAA 30(b)(6)
9
cu 10/7/26

**Donald J. Trump**
@realDonaldTrump

The Board of The Kennedy Center today agreed, almost unanimously, to close the Building for Safety reasons, and so that it can begin the process of Reconstruction. The closing will take place immediately, however, the Renovation and Reconstruction, which is a very large and complex job, cannot begin until such time as the D.C. Circuit rules on the Board's approved name. If the ruling is a negative one, which it should not be, and is not overturned by the U.S. Supreme Court, the Reconstruction and the Renovation of The Kennedy Center will not take place. The attorneys from the DOJ will ask for an expedited appeal. In the meantime, 17 Million Dollars, raised by President Trump, has been put into The Kennedy Center account to keep it afloat. Thank you for your attention to this matter! President DONALD J. TRUMP

**4.56k** ReTruths **18.5k** Likes 9/15/26, 2:54 PM

# Floca 30(b)(6) Deposition Ex. 11

EXHIBIT
PENGAD 800-631-6989
FLOCA 30(b)(6)
11
cu 10/7/26

**Browder, Jackline**

**From:** Floca, Matt
**Sent:** Tuesday, July 14, 2026 10:39 AM
**To:** Campbell, Kolan A.; Cracraft, John; Browder, Jackline
**Cc:** Arduin, Donna; Makande, Lydia; Royster, Cecelia V; Robinson, Georgia; Davis, Jo-Lynn; Berke, Elliot
**Subject:** Re: Independent Construction Program Assessment and Advisory Services

Kolan/John/Jackline,

Requesting your assistance with compiling and submitting a requisition package today for the subject services. Please see the link below to a folder with all of the files. You can ignore the RFP and the Sole Source package at this time. Only include the SoW, attachments, and Estimate.

These are the two firms that should be noted on the req cover sheet.

1. Aegis Project Controls
   a. 1010 Wayne Avenue, Suite 770, Silver Spring, MD 20910
   b. [redacted]
   c. Nick Giambra
2. Delta Consulting Group
   a. 330 Prince William Parkway, Suite 301, Woodbridge, VA 22192
   b. [redacted]
   c. Khaled Aziza

Link: Independent Construction Program Assessment & Advisory Services

Jo-Lynn,

The other two "evaluators" that will attend the presentations should be Donna and Elliot.

Regarding the additional language, I agree but would like to incorporate after the initial req package makes its way to contracting.

As for meeting times, we need to have the presentations this week in order to give the firms time to compile documents and reports over the next two weeks. The Board Meeting is tentatively scheduled for 8/6.

I'll schedule a quick meeting for us to check in on this later today.

Matt Floca
Executive Director & Chief Operating Officer
The John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566
[redacted] | Kennedy-Center.org

**From:** Davis, Jo-Lynn <[redacted]>
**Sent:** Monday, July 13, 2026 10:10 AM

**To:** Floca, Matt [redacted]>
**Cc:** Arduin, Donna <[redacted]>; Makande, Lydia <[redacted]>; Robinson, Georgia <[redacted]>; Royster, Cecelia V <[redacted]>
**Subject:** Independent Construction Program Assessment and Advisory Services

Matt,

Georgia and I will be working on the subject requirement. In order for the Office of Contracting to finalize the package we would ask you to finalize and submit your documents along with a requisition to fund the contract. (See attached, notated documents). If you would like to discuss any of the notes we would be happy to have a meeting with you via Teams.

Per Cecelia's direction, we will take the opportunity to use the Oral Presentation process (FAR 15.102) for the contractors to present their proposals. The Office of Contracting realizes the urgency and importance of this requirement. Using oral presentations can streamline the process while preserving the integrity of the process. Oral presentations provide for dialogue among the participants. We want to take advantage of this opportunity to interview the potential contractors in real time.

Unfortunately, we can't develop the necessary documents to send to potential contractors until we have your finalized documents and a funding document (requisition).

The Office of Contracting will need a day or so to prepare all of the documents and instructions to the contractors. We will also have to coordinate the review/issuance of all documents with the Office of General Counsel.
In order to develop and send a request and schedule presentations by the 2 suggested vendors we will need the following from you:

- final documents - market research, statement of work/objectives, justification, IGCE, and the requisition;
- your availability for the oral presentations (early next week, if you think this will be an appropriate amount of time for companies to prepare proposals). Please provide a few days/times that you are available (2 hours per presentation) as we need time to prepare, see the presentation, and conduct evaluation/discussion. (Both can be conducted on one day, or we can do one per day on separate days.);
- the names and availability of 2 other evaluators; and a
- plan to video tape the presentations, as each will have to be videotaped (let us know if the Office of Contracting should coordinate with IT) .

We need to ensure that the potential contractors have ample time to prepare their presentations and schedule their subject matter experts (if you would like to require that the actual key personnel are the ones to present to you, which we would recommend). We would recommend that you include language to:

- require proposed key personnel team to present.
- ensure the slide deck outline is what you want to see as the proposal – including what would be traditional evaluation criteria: technical approach; key personnel; price. Provide an outline and let them create their own slide deck.

# Floca 30(b)(6) Deposition Ex. 12

EXHIBIT
PENGAD 800-631-6989
Floca 7

EXHIBIT
PENGAD 800-631-6989
FLOCA 30(b)(6)
12
cm 10/7/2?

**Darin L. Buchalter**

**From:** Berke, Elliot <[redacted]>
**Sent:** Wednesday, September 16, 2026 7:13 AM
**To:** Darin L. Buchalter
**Cc:** Floca, Matt
**Subject:** Re: [EXTERNAL]: Delta Consulting

Thanks Darin. Much appreciated.

**Elliot S. Berke**
General Counsel
John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566

[redacted] (o) | [redacted] (c)
Email: [redacted]
www.kennedy-center.org

On Sep 16, 2026, at 7:10 AM, Darin L. Buchalter <dbuchalter@delta-cgi.com> wrote:

See attached

**Darin L. Buchalter**
**Chief Executive Officer**
CRE, FRICS

**D:** +1 (646) 814 9421 | **M**: +1 [redacted]
**E:** dbuchalter@delta-cgi.com
Based in the New York metro area | Serving clients globally

<delta_linkedin_icon_6aff6e4c-0baf-4d5a-b893-d0dd0ea47337.png> <delta_facebook_icon_86990161-e2c3-4082-9dde-319e0955036e.png> <delta_x_icon_60e82a31-e72e-477c-a722-2f373db41305.png> <delta_instagram_icc a9c7-41bb-af85-3a29b975eddc.png>

*This email contains information from Delta Consulting Group which may be privileged or confidential. The information contained herein, or attached, is fo the addressee above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this information is prohibited. If yo electronic mail transmission in error, please notify us and delete the message without reading, copying, saving or disclosing it.*

**From:** Berke, Elliot <[redacted]>
**Sent:** Tuesday, September 15, 2026 10:09 PM
**To:** Darin L. Buchalter <dbuchalter@delta-cgi.com>
**Cc:** Floca, Matt <[redacted]>
**Subject:** Re: [EXTERNAL]: Delta Consulting

Thanks. Can you remove the “Protected Under Seal”? We would need to file as part of the public court record.

**From:** Floca, Matt
**Sent:** Monday, 03 August 2026 13:11:43
**To:** Floca, Matt <[redacted]>; Berke, Elliot <[redacted]>; Makande, Lydia <[redacted]>; Hagan, Laura <[redacted]>; Darin L. Buchalter <dbuchalter@delta-cgi.com>; Khaled Aziza <kaziza@delta-cgi.com>; Campbell, Kolan A. <[redacted]>
**Subject:** Delta + KC GC
**When:** Wednesday, August 5, 2026 12:30 PM-1:00 PM.
**Where:** Microsoft Teams Meeting

Please let me know if this time does not work.

---

_

## Microsoft Teams meeting

### Join:

https://teams.microsoft.com/meet/288953902552619?p=N10ejYlxbNNsvToKxC

Meeting ID: 288 953 902 552 619

Passcode: So3jT9tE

---

Need help? | System reference

**Dial in by phone**

+1 332-249-0718,,673553094# United States, New York City

Find a local number

Phone conference ID: 673 553 094#

For organizers: Meeting options | Reset dial-in PIN

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information.

---

_

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or

entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

CAUTION: This email originated from outside of The Kennedy Center. DO NOT click any links or open attachments unless you recognize the sender and know the content is safe.

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

---

This e-mail message is intended only for the recipient(s) named above. This message may contain trade secrets, attorney-client communication, or other privileged and confidential information. Any review, re-transmission, dissemination, reproduction or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the Sender and delete the material from any computer.

**Darin L. Buchalter**

**From:** Berke, Elliot <[redacted]>
**Sent:** Friday, August 14, 2026 4:56 PM
**To:** Darin L. Buchalter; Floca, Matt
**Subject:** Re: [EXTERNAL]: Delta + KC GC

Darin:

We just got off with Howard. He wants a report even if preliminary ready to go by 8am on 8/20. We realize this is a heavy lift.

**Elliot S. Berke**
General Counsel
John F. Kennedy Center for the Performing Arts
2700 F Street NW | Washington, DC 20566

[redacted] (o) | [redacted] (c)
Email: [redacted]
www.kennedy-center.org

---

**From:** Darin L. Buchalter <dbuchalter@delta-cgi.com>
**Sent:** Saturday, August 8, 2026 11:33 AM
**To:** Arduin, Donna <[redacted]>; Floca, Matt <[redacted]>; Berke, Elliot <[redacted]>; Antkowiak, Alex <[redacted]>; Khaled Aziza <kaziza@delta-cgi.com>
**Subject:** RE: [EXTERNAL]: Delta + KC GC

See highlight. This amount is included in the 62? If yes, what is the 62 net of this figure? That would be your in place pledges?

**Darin L. Buchalter**
**Chief Executive Officer**
CRE, FRICS

**D:** +1 (646) 814 9421 | **M:** +1 [redacted]
**E:** dbuchalter@delta-cgi.com
Based in the New York metro area | Serving clients globally
delta-cgi.com

*This email contains information from Delta Consulting Group which may be privileged or confidential. The information contained herein, or attached, is for the exclusive use of the addressee above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this information is prohibited. If you have received this electronic mail transmission in error, please notify us and delete the message without reading, copying, saving or disclosing it.*

# Floca 30(b)(6) Deposition Ex. 14

EXHIBIT
PENGAD 800-631-6989
Floca 30(b)(6)
14
On 10/7/26

JLL

June 16, 2026

Mr. Kolan Campbell
Contracting Officer's Representative
The John F. Kennedy Center for the Performing Arts
2700 F Street, NW
Washington, DC

**RE: Strategic Perspective on Execution Approaches for the Kennedy Center Renewal Project**

Dear Mr. Campbell,

The Kennedy Center stands at a critical juncture. Following the recent judicial stay of the planned facility closure, the institution must determine the most appropriate path forward for executing the Renewal project that addresses decades of deferred maintenance and positions this national landmark to serve future generations.

JLL offers this strategic perspective proactively, based on our experience as your partner in planning and managing complex cultural infrastructure projects. While we recognize the Kennedy Center's deliberations encompass considerations beyond project execution—and this letter addresses only the project delivery, we believe our professional insights may inform the decision-making process. The choice between closure and occupied renovation represents fundamentally different approaches to project delivery, each with distinct implications for stewardship of public resources, schedule certainty, quality outcomes, and long-term institutional benefit.

This assessment draws from the JLL Comprehensive Project Development Plan, our collective experience delivering comparable projects, and preliminary analysis of execution trade-offs. We emphasize that both approaches are technically feasible; the question is which approach best serves the Kennedy Center's mission and maximizes the value of the public investment.

**The Strategic Challenge: Stewardship and Scope**

Before addressing execution approaches, we must acknowledge a fundamental reality: the current condition of the Kennedy Center requires more scope than the $250 million appropriation can fully address. Our assessment suggests the building's true needs approach $400-450 million when all deferred maintenance, systems replacements, and necessary improvements are evaluated.

This reality frames the central strategic question: **How do we maximize limited public resources to achieve maximum lasting benefit for this national institution?**

Every dollar allocated to managing the complexity of working in an occupied building—premium labor costs, temporary systems, extended project management, coordination overhead—is a dollar unavailable for actual infrastructure renewal. The execution approach directly determines how much of the $250 million investment delivers tangible building improvements versus compensating for construction complexity.

The Kennedy Center deserves an approach that stretches public funds as far as possible toward scope delivery rather than execution premiums. Given that difficult scope prioritization decisions are inevitable within the budget constraint, it is our opinion the execution strategy should maximize what can be accomplished rather than consume resources managing avoidable complexity.

**Closure Execution: Strategic Assessment**

Closure execution represents the most efficient use of limited resources. By eliminating the inherent inefficiencies of occupied building construction, this approach maximizes the percentage of appropriated funds that directly improve building infrastructure, systems, and spaces. Closure enables comprehensive, concurrent work across all building systems and spaces—compressing the timeline to 25 months and optimizing contractor productivity, systems integration, and quality outcomes.

**Schedule Certainty and Momentum**

The 25-month timeline represents the minimum feasible duration for the planned scope. Closure enables all three Projects—infrastructure, major systems, and interiors/venues—to proceed in parallel with natural sequencing. Work flows continuously without interruption, maintaining project momentum and contractor engagement. Critical path activities proceed without coordination delays, access restrictions, or work-hour limitations.

**Cost Efficiency Through Elimination of Premiums**

Closure eliminates 25-35% in execution premiums inherent to occupied renovation: after-hours labor surcharges (15-25% wage premiums plus reduced productivity), extended general conditions (11-15 additional months of fixed project costs), temporary protection systems, phased mobilization inefficiencies, and temporary building systems to maintain operations during infrastructure replacement. These savings—potentially $60-80 million—are redirected to actual scope delivery.

**Risk Management**

Closure provides schedule float to address inevitable unforeseen conditions in a 55-year-old building. When hidden deterioration, unexpected structural conditions, or additional hazardous materials are discovered, work can immediately adapt—extending hours, resequencing activities, or accelerating following trades. In occupied renovation, the same discoveries often require waiting for next available access windows, cascading delays through subsequent phases with limited recovery options.

**The REACH as Continuity**

We commit to plan, under either scenario, to effectively and ensure The REACH remains fully operational throughout the main building renovation under either scenario. We believe The REACH is the Kennedy Center not just a temporary facility. It can accommodate performances, rehearsals, public programs, and will serve as the JFK presidential memorial's interim location. The REACH will continue public engagement and mission delivery while the main building undergoes comprehensive renewal. The Kennedy Center is not truly "closed"—The REACH will be strategically used to fulfill the Kennedy Center's mission while comprehensively renewing its historic core.

**Building Long-Term Institutional Capacity**

Closure enables the most thorough building renewal within budget constraints. Rather than compromising scope or execution quality to accommodate operational constraints, the approach prioritizes building systems that will serve reliably for 30-50 years. This represents responsible long-term institutional stewardship—investing once, comprehensively, to create lasting infrastructure rather than making incremental improvements that may require revisiting sooner due to execution compromises.

**Occupied Renovation: Strategic Assessment**

**Core Value Proposition**

Occupied renovation maintains main building accessibility and programming continuity throughout the renewal project. Work proceeds in phases, with portions of the facility remaining operational while others undergo renovation. This approach demonstrates institutional adaptability and preserves operational continuity.

**Project Delivery Success Factors**

**Continuous Building Presence**

The main building remains accessible throughout the project, with some venues and spaces available for use. Programming continues, though at reduced scale and with rotating venue availability as work progresses through sequential phases.

**Progressive Commissioning**

As building zones complete renovation, they can be commissioned and returned to service while work continues elsewhere. This allows operational validation of improvements incrementally rather than waiting for comprehensive project completion.

**Demonstrated Institutional Resilience**

Maintaining operations during comprehensive infrastructure renewal demonstrates the institution's capacity to adapt and continue serving its mission despite major undertaking. It models institutional continuity and resilience.

## Occupied Building Strategic Challenges

### Significant Schedule Extension (36-40 Months)

Occupied renovation inherently requires sequential phasing of work that closure enables concurrently. The seven performance venues must be renovated in phases rather than simultaneously. Building systems serving occupied spaces cannot be comprehensively shut down, requiring zone-by-zone replacement with temporary bypass systems. Work schedules must accommodate programming calendars, and disruptive activities must shift to after-hours periods.

This sequential approach extends the timeline 44-60% beyond closure execution. The extended duration has strategic implications: prolonged disruption to the institution (though distributed differently), extended exposure to construction risks, and greater vulnerability to market fluctuations in labor and material costs over the longer horizon.

### Substantial Cost Premium Consuming Scope Capacity (25-35%)

Occupied renovation premiums derive from fundamental execution inefficiencies: after-hours work commanding wage premiums with reduced productivity, 11-15 additional months of project management and supervision costs, extensive temporary protection systems maintained throughout occupied areas, repeated contractor mobilization/demobilization cycles, and temporary building systems to maintain operations during infrastructure work.

The strategic implication is direct and significant: $62-87 million of the $250 million appropriation compensates for execution complexity rather than delivering building improvements. Given that the building's true needs exceed available funding, consuming 25-35% of the budget on execution premiums necessitates proportional scope reductions. Projects carefully prioritized in the CPDP would require re-evaluation and deferral.

### Complex Phasing Impacting Systems Integration

Building systems replaced incrementally over 36-40 months creates challenges to comprehensively integrate and test and commission systems. Mechanical systems serving some zones while others undergo replacement require complex temporary connections. Electrical distribution upgraded in phases requires elaborate temporary power routing. Fire alarm and life safety systems must maintain functionality in occupied zones while adjacent areas undergo modification.

The technical challenge is manageable but introduces complexity that impacts both cost and long-term system performance. Commissioning becomes more challenging when systems cannot be tested as integrated wholes under full building load.

### Reduced Schedule Flexibility for Unforeseen Conditions

The fragmented work windows in occupied renovation leave minimal schedule float. When unexpected conditions arise—hidden structural deterioration, undiscovered hazardous materials, concealed infrastructure conflicts—resolution must fit within available access windows. Discovery mid-phase may require waiting weeks or months for the next access opportunity, cascading delays through subsequent work with limited recovery capacity.

### Coordination Complexity and Risk

Managing construction activities in proximity to building occupants and ongoing operations introduces coordination complexity: daily access control and segregation protocols, continuous dust and noise management, protection of circulation paths and egress routes, fire watch and life safety coordination during system modifications, emergency response planning in a building fragmented by construction zones.

JLL has experience managing these complexities and will execute safely and professionally under either scenario. However, the coordination overhead requires additional management staffing, monitoring resources, and continuous attention that closure execution does not demand.

### Scope Reduction Imperative

If the $250 million budget remains fixed and occupied renovation is pursued, the 25-35% execution premium directly reduces scope. We request we revisit the project charter and governance to re-evaluate the approach, re-prioritize the subprojects to determine essential infrastructure work and deferring lower-priority improvements to potential future phases.

This represents a strategic choice: comprehensive renewal within the closure timeline, or partial renewal over an extended period with remaining needs deferred indefinitely. Neither approach is inherently wrong, but the implications for the Kennedy Center differ significantly.

### Time Sensitivity and Decision Urgency

**The decision timeline is strategically important.** The current CPDP assumes a July 6, 2026, closure and construction start. Many preparatory activities—investigation & design, preservation cooperation, long-lead equipment procurement, and contractor prequalification—can continue regardless of execution approach. However, several critical path decisions require clarity on the execution framework:

- Design assumptions built around closure execution may require substantial revision for occupied phasing.
- Contractor procurement documents assume closure coordination and must be rewritten for occupied scenarios, and more consideration to phasing requirements.
- Each month of decision delay compounds schedule pressure and reduces flexibility for managing unforeseen conditions.

**JLL recommends establishing a closure determination deadline by July 31, 2026,** to preserve schedule viability for the Q3 2028 target. Beyond that date, the project faces a binary choice: extend the completion deadline or reduce scope to fit a compressed timeline.

We understand your deliberations may extend beyond this timeline due to circumstances beyond anyone's control. Should that occur, JLL will adapt our approach and work collaboratively within whatever decisions emerge. However, transparency about timeline implications serves effective decision-making.

**Governance and Path Forward**

Regardless of which execution approach is selected, JLL recommends convening an additional governance workshop with Kennedy Center project leadership to:

- Align on execution approach implications for the Project Charter and success criteria.
- Update the risk register.
- Establish scope prioritization protocols if budget constraints require trade-off decisions.
- Ensure all parties share understanding of what success looks like under the selected approach.

If occupied renovation is pursued, this workshop should specifically address CPDP revision requirements, phasing strategy, scope prioritization criteria, and the revised timeline. The current CPDP was developed assuming closure; a fundamentally different execution approach requires correspondingly comprehensive plan revision.

**Recommendation and Conclusion**

The Kennedy Center Renewal Project represents a once-in-a-generation opportunity to comprehensively renew infrastructure serving this presidential memorial and national cultural institution. The execution approach directly determines how effectively limited resources translate into lasting building improvements.

Closure execution maximizes the value extracted from every public dollar—directing resources to actual infrastructure renewal rather than managing avoidable complexity. It delivers the most comprehensive systems integration, highest quality outcomes, and strongest long-term performance within the appropriated budget and timeline.

JLL remains committed as your partner to successful execution under either approach. We will adapt our methodology, revise our planning, and marshal our resources to deliver the best possible outcome within whatever framework the Board establishes. Our goal is unchanged: stewarding this project to maximize lasting benefit for the Kennedy Center's mission and the nation it serves.

**JLL's professional recommendation is to stay the course with the closure execution, based on stewardship principles, delivery success factors, and maximization of public investment value.**

This recommendation reflects our assessment that closure offers:

- The most efficient use of the $250 million appropriation, maximizing scope delivery.
- The highest confidence in meeting the Q3 2028 completion target.
- The most comprehensive building systems renewal and integration
- Optimal quality outcomes for preservation work and long-term infrastructure performance
- The strongest risk management position given inevitable unforeseen conditions in a 55-year-old building.

However, we emphasize these important qualifications:

First, we recognize this recommendation addresses only project execution considerations. Leadership's deliberations appropriately encompass broader institutional, stakeholder, and contextual factors outside our role. Our perspective represents one input to a complex decision.

Second, both approaches are technically feasible. Should leadership determine that occupied renovation better serves the institution's overall interests, JLL stands ready to execute successfully. We have the expertise, experience, systems, and commitment to deliver excellent results under either framework. Our role as your partner is to adapt to the path chosen and optimize outcomes within that reality.

We appreciate the opportunity to provide this perspective and remain available to discuss these considerations in whatever format would be most helpful to your deliberations.

Respectfully submitted,



John Cracraft
Managing Director
Project & Development Services
JLL
2020 K Street NW, Suite 1100
Washington, DC 20006