# Exhibit G

# Email from W. Jankowski to Plaintiff's Counsel, October 23, 2026

**From:** Jankowski, William S (CIV)
**To:** Alexander Kristofcak; Kyle Freeny; Nathaniel Zelinsky
**Cc:** Rosa Baum; Erin Wenokur; Norman Eisen; David Ogden; Lynch, Christopher M. (CIV); Mayers, Brantley T (CIV)
**Subject:** RE: [External] Discovery Meet-and-Confer Letter
**Date:** Friday, October 23, 2026 11:10:50 AM
**Attachments:** image001.png

Counsel,

Below are our responses to your inquiries.

To start, Defendants do not consent to extend the discovery period by one week. The Center has provided comprehensive and complete discovery responses and document productions, and further extension is unwarranted and would impose additional burdens on Defendants that are not proportional to the needs of the case, particularly given the limited scope of Plaintiff's remaining claims and the governing legal standard. In addition, as Defendants have repeatedly explained, any additional delay will also further harm the Center. In a related vein, Defendants will not respond to the additional requests for admission you have served in your letter, as such requests are new and are not contemplated under the Court's discovery orders.

1. **The August 20 CPDP**

As Defendants explained their notice of errata, ECF No. 109, references to the August 20 CPDP were an error based on the incorrect belief that information included in the August version was also included in June version. The reason is simple: due to the substantial similarities between the two versions, counsel did not realize that there were any non-trivial differences between the June and August versions of the report. And, because Plaintiff's pertinent requests for production concerned the retention of JLL and documentation related to the scope of its engagement, Defendants earlier took the position that not all communications with JLL were in scope under Plaintiff's requests. It was only following Plaintiff's supplemental request for JLL communications—and following Defendants' expansion of its search—that it became clear to counsel that there were two separate versions of the report.

To be clear, Defendants do *not* concede that the August 20 JLL report differs in any material way from the analysis that Delta conducted independently, as JLL's analysis only further confirms the substantial additional costs that a four-year occupied phasing strategy would incur. As JLL indicates, it estimates that construction costs alone would require more than $41 million in additional funding beyond the original congressional authorization, and would result in 23% of the planned projects under the appropriation going uncompleted. Those figures—which postdate but align with Delta's estimates for phased construction—are confirmatory of already-existing information.

2. **Additional Documents**

- Although Defendants do not concede that these documents are responsive to any request Plaintiff made, to avoid any further dispute over the completeness of their responses, Defendants will produce the 10:35 a.m. August 20 draft 4-year plan (dated August 12) in their next production at KC-BEATTY7923. The final combined CPDP appears at KC-BEATTY7562.

- Defendants are not aware of any other draft CPDPs that have been shared with the Center, and, moreover, object that additional searches for individual versions—which may have been overwritten and might appear in multiple individuals' files—would be unduly burdensome and not proportional to the needs of the case. Appendices C and D appear in the final combined CPBP that was produced, at KC-BEATTY7740–43, though those appendices appear to be mislabeled in the final document that JLL provided to the Center.
- Defendants are not aware of any written request to JLL for the four-year occupied scenario. As Mr. Floca's deposition and the related email traffic, KC-BEATTY7560–61, make clear, JLL originally offered its perspective on phased construction options unsolicited. That perspective evolved over several in-person and telephonic conversations into the product that became the final August 20 JLL report.
- Requests for all communications discussing the August 20 JLL report constitute a new request for which Defendants will not conduct a new search, as the request is out of scope and unduly burdensome given the needs of the case. Notwithstanding those objections, under the searches already conducted in this litigation, Defendants are not aware of any additional such communications.
- Requests for "documents sufficient to show the decision not to provide the August 20 CPDP to the Board" constitute a new request for which Defendants will not conduct a new search, as the request is out of scope, unduly burdensome given the needs of the case, and untenably broad and vague. Notwithstanding those objections, under the searches already conducted in this litigation, Defendants are not aware of any such documents.

3. **Supplemental Interrogatory Answers**

**Interrogatory 10.** Defendants' existing answer is complete, as the four-year occupied scenario was presented to the Board under the Delta analysis. Additional information is not responsive.

**Interrogatory 17.** As construed in their original response, Defendants contend that their existing answer is complete, as Defendants have already described the primary steps Defendants took to determine whether the main building of the Center could remain open during the renewal project. To avoid further dispute as to the completeness of that response, however, Defendants intend to serve a supplemental interrogatory response that identifies the August 20 JLL report by Bates number, which itself-provides sufficient response to Plaintiff's request. Defendants will also provide Bates number citations to the June 16 JLL letter and August 12 (sent on August 20) draft JLL four-year plan in that supplemental response, without conceding that those documents are directly responsive to Plaintiff's interrogatory.

**Interrogatories 1 and 2**. Defendants' existing answers are complete. The August 20 JLL report was completed on the same day as Delta's report and was not provided as an input. As the Delta report explains, Delta's analysis relies extensively on JLL's work, both as reflected in the June CPDP and in extensive conversations with JLL employees. *See* ECF No. 89-4 ¶ 5.

**Interrogatory 4.** The August 20 JLL report was not provided to any number of trustees, so Defendants' existing answer is complete. Howard Lutnick is not a trustee of the Center, so information about his involvement is out of scope of Plaintiff's requests. Notwithstanding that fact, Defendants can confirm that the August 20 JLL report was not provided to Secretary Lutnick.

4. **Requests for Admission**

As indicated above, Defendants will not respond to Plaintiff's supplemental requests for admission. Discovery has been limited in scope and to the requests Plaintiff originally served; Plaintiff would not have had the "August 20 CPDP and the Floca–JLL correspondence" prior to her September 23 requests under any scenario, so the purportedly "new factual questions" you raise do not justify expanding discovery, especially as the Court has already rejected Plaintiff's request to do so.

5. **Supplemental Responses to Requests for Production**

Except as identified above, Defendants will not supplement their responses to Plaintiff's RFPs, as such supplementation is out of scope of the Court's orders, out of scope of Plaintiff's original requests, and unduly burdensome given the needs of the case.

6. **Extension of Discovery**

As indicated above, Defendants do not consent to the extension of discovery.

Will

**William S. Jankowski**
Federal Programs Branch
Phone: (202) 353-7578
Cell: (202) 598-5325

---

**From:** Alexander Kristofcak <akristofcak@washingtonlitigationgroup.org>
**Sent:** Thursday, October 22, 2026 12:14 PM
**To:** Jankowski, William S (CIV) <William.S.Jankowski@usdoj.gov>; Kyle Freeny <kfreeny@washingtonlitigationgroup.org>; Nathaniel Zelinsky <nzelinsky@washingtonlitigationgroup.org>
**Cc:** Rosa Baum <rbaum@washingtonlitigationgroup.org>; Erin Wenokur <ewenokur@washingtonlitigationgroup.org>; Norman Eisen <norman@democracydefenders.org>; David Ogden <david@democracydefenders.org>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Mayers, Brantley T (CIV) <Brantley.T.Mayers@usdoj.gov>
**Subject:** Re: [External] Discovery Meet-and-Confer Letter

Will,

Attached, please find a letter regarding discovery.

Best regards,

Alex

WLG
Washington Litigation Group

**Alex Kristofcak**
Counsel

202-521-8734
1717 K Street NW | Suite 1120 | Washington DC 20006

---

**From:** Jankowski, William S (CIV) <William.S.Jankowski@usdoj.gov>
**Sent:** Wednesday, October 21, 2026 10:38 AM
**To:** Kyle Freeny <kfreeny@washingtonlitigationgroup.org>; Nathaniel Zelinsky <nzelinsky@washingtonlitigationgroup.org>
**Cc:** Alexander Kristofcak <akristofcak@washingtonlitigationgroup.org>; Rosa Baum <rbaum@washingtonlitigationgroup.org>; Erin Wenokur <ewenokur@washingtonlitigationgroup.org>; Norman Eisen <norman@democracydefenders.org>; David Ogden <david@democracydefenders.org>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Mayers, Brantley T (CIV) <Brantley.T.Mayers@usdoj.gov>
**Subject:** RE: [External] Discovery Meet-and-Confer Letter

Counsel,

Forthcoming shortly is another supplemental production that contains additional email communications responsive to your requests.

You'll note that certain communications reflect discussions that occurred during the interim period between the Center and representatives of Shear Madness, as requested in your October 12 letter. *See* Oct. 12 Letter at 3. The Center uncovered no communications between the Center and representatives of Alvin Ailey or the Nutcracker during that period.

Further, the Center uncovered no Teams messages in the custody of the Center's data custodians that are responsive to your requests.

As it stands, Defendants are unaware of any additional communications, save for text messages, that are responsive to any of Plaintiff's discovery requests. Defendants intend to make one additional production of text messages this week.

Will

**William S. Jankowski**
Federal Programs Branch
Phone: (202) 353-7578
Cell: (202) 598-5325

---

# D.C. Corporate Filing for the Trump Kennedy Center for the Performing Arts Foundation, March 18, 2026

***Electronically Filed***
Initial File No.: N00007933596
Filing Number: N00007933596-01
Filing Date: Mar. 18, 2026
Effective Date: Mar. 18, 2026
No. of Pages: 5

# DISTRICT OF COLUMBIA GOVERNMENT

## Articles of Amendment of Domestic Nonprofit Corporation

Under the provisions of the Title 29 §408.06 of D.C. Code (Business Organizations Act), the domestic filing entity listed below hereby applies for a Certificate of Amendment and for that purpose submits the statement below.

### I. Entity Name

The Entity Name is Amended from
THE KENNEDY CENTER FOUNDATION

To
THE TRUMP KENNEDY CENTER FOR THE PERFORMING ARTS FOUNDATION
Initial File No.: N00007933596
Initial Effective Date: February 26, 2024

### II. Amendment Effective Date

March 18, 2026

### III. Entity Email

The Entity Email is Amended from
None

To
Contributions@Kennedy-Center.org

### IV. Entity Phone

The Entity Phone is Amended from
N/A

To
202-416-8310

### V. Date of Adoption for Manner of Adoption

March 18, 2026

### VI. Manner of Adoption

DLCP
DC Department of Licensing and Consumer Protection

***Electronically Filed***
Initial File No.: N00007933596
Filing Number: N00007933596-01
Filing Date: Mar. 18, 2026
Effective Date: Mar. 18, 2026
No. of Pages: 5

The Amendment was adopted by the incorporators, board of directors, or a designated body without member approval, a statement that the amendment was adopted by the incorporators or by the board of directors or designated body, as the case may be, and that member approval was not required.

**VII. Members Provisions**

**VIII. Tax Provisions**
Tax Provisions is Amended from
None

To
Said corporation is organized exclusively for charitable, religious, educational, and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

**IX. Purpose**
The Entity Purpose is Amended from
This corporation is organized, and shall be administered and operated, exclusively to receive, administer, and expend funds for charitable and educational purposes, within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or corresponding provisions of any subsequent federal tax laws), and within such limits:

1. Support the educational and charitable purposes of John F. Kennedy Center for the Performing Arts; and

2. In particular, to raise money and make distributions to:

(a) Provide funds for educational and charitable purposes;

(b) Develop and support educational training, programs, and conferences;

(c) To engage in other charitable, scientific, and educational activity as determined by the board of directors; and

(d) To engage in any and all lawful activities incidental to the foregoing purposes except as restricted herein.

This corporation may do all other acts necessary or expedient for the administration of the affairs and attainment of the purposes of this corporation; provided, however, that this corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the primary

DLCP
DC Department of Licensing and Consumer Protection

***Electronically Filed***
Initial File No.: N00007933596
Filing Number: N00007933596-01
Filing Date: Mar. 18, 2026
Effective Date: Mar. 18, 2026
No. of Pages: 5

purposes of this corporation.

To
This corporation is organized, and shall be administered and operated, exclusively to receive, administer, and expend funds for charitable and educational purposes, within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or corresponding provisions of any subsequent federal tax laws), and within such limits:

1. Support the educational and charitable purposes of The Donald J. Trump and the John F. Kennedy Center for the Performing Arts; and

2. In particular, to raise money and make distributions to:

(a) Provide funds for educational and charitable purposes;

(b) Develop and support educational training, programs, and conferences;

(c) To engage in other charitable, scientific, and educational activity as determined by the board of directors; and

(d) To engage in any and all lawful activities incidental to the foregoing purposes except as restricted herein.

This corporation may do all other acts necessary or expedient for the administration of the affairs and attainment of the purposes of this corporation; provided, however, that this corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the primary purposes of this corporation.

**X. Principal Office Address**
The Principal Office (street address) is Amended from
2700 F Street NW, Washington, DC, 20566, USA

To
2700 F Street NW, Washington, DC, 20566, USA

The Principal Office (mailing address) is Amended from
None

To
P.O. Box 58100, Washington, DC, 20037, USA

DLCP
DC Department of Licensing and Consumer Protection

***Electronically Filed***
Initial File No.: N00007933596
Filing Number: N00007933596-01
Filing Date: Mar. 18, 2026
Effective Date: Mar. 18, 2026
No. of Pages: 5

**XI. Director Information**
The Director(s) is Amended from
None

To

**XII. Beneficial Owner Information**
The Entity Beneficial Owner is Amended from

| Name | Business Address |
|---|---|
| Elliot Berke | 2700 F Street NW, Washington, DC, 20566, USA |

To

| Name | Business Address |
|---|---|
| Elliot Berke | 2700 F Street NW, Washington, DC, 20566, USA |

**XIII. Miscellaneous Provisions**
Miscellaneous Provisions is Amended from
Directors:

Fred Eychaner
2700 F. Street, N.W.
Washington, DC  20566

Karel Komarek
2700 F. Street, N.W.
Washington, DC  20566

Christine Schwarzman
2700 F. Street, N.W.
Washington, DC  20566

To
None

**XIV. Attestations**

***Electronically Filed***
Initial File No.: N00007933596
Filing Number: N00007933596-01
Filing Date: Mar. 18, 2026
Effective Date: Mar. 18, 2026
No. of Pages: 5

DLCP
DC Department of Licensing and Consumer Protection

By typing my name below, I am attesting to the truth and accuracy of the information provided. I further understand that by signing this form, that I understand anyone making a false statement can be punished by criminal penalties of a fine up to $1000, imprisonment up to 180 days, or both, under DCOC § 22-2405.

| **XV. Signature(s)** | **Date Signed** |
|---|---|
| Elliot S. Berke, Authorized Person | March 18, 2026 |

# Defendants' Emergency Motion for a Stay Pending Appeal, Beatty v. Trump, No. 26-5224 (D.C. Cir. filed June 12, 2026)

**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5224**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

JOYCE BEATTY,
Plaintiff-Appellee,

v.

DONALD J. TRUMP, *et al.*,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

**EMERGENCY MOTION FOR A STAY PENDING APPEAL AND AN IMMEDIATE ADMINISTRATIVE STAY**

---

BRETT A. SHUMATE
*Assistant Attorney General*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3304*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiff-appellee is Joyce Beatty. Defendants-appellants are the following individuals in their official capacity as trustees of the John F. Kennedy Center for the Performing Arts—Donald J. Trump, Jennifer Fischer, Sergio Gor, John Falconetti, Brian D. Ballard, Maria Bartiromo, Pamela Bondi, Mary Helen Bowers, Hannah F. Buchan, Robert Castellani, Elaine Chao, Pamella Roland Devos, Patricia Duggan, Emilia May Fanjul, Lynette Friess, Pamela Gross, Lee Greenwood, Kate Adamson Haselwood, Laura Ingraham, Michele Kessler, Dana Kraft, Mindy Levine, Lynda Lomangino, Barbara Long, Allison Lutnick, Douglas Manchester, Catherine B. Reynolds, Denise Saul, Dan Scavino, Cheri Summerall, Usha Vance, Susie Wiles, Andrea Wynn, Paolo Zampolli, Robert F. Kennedy, Jr., Marco Rubio, Linda McMahon, Mike Johnson, Sam Graves, Julia Letlow, Mike McCaul, John Thune, Shelley Moore Capito, and Susan Collins—as well as Matthew Floca (substituted for Richard Grenell) in his official capacity as the Executive Director and Chief Operating Officer of the John F. Kennedy Center for the Performing Arts, the Trustees of the John F. Kennedy Center for the Performing Arts, and the John F. Kennedy Center for the Performing Arts.

The Committee for the First Amendment and a group of alumni of the President's Advisory Committee on the Arts, the Kennedy Center Board of Trustees, and the President's Committee on the Arts and Humanities participated as amici in the district court. Those individual alumni are: Mary Boyle, Guy Cecil, Gilbert R. Cisneros Jr., Bruce Cohen, Sylvia Davis White, Catherine Gledhill, Sonya Halpern, Sharon Hoffman, Barry Karas, Shahid Khan, Robin Leeds, Amalia Perea Mahoney, Noah Mamet, Ronnie Planalp, Deborah Dozier Potter, Diane Robertson, Rusty Rueff, Alexandra C. Stanton, Gary Sugarman, and Reginald Van Lee.

**B. Rulings Under Review**

The ruling under review is the opinion and order entered May 29, 2026 (ECF Nos. 49, 50), granting partial summary judgment to plaintiff. *See Beatty v. Trump*, No. 25-cv-4480, --- F. Supp. 3d ----, 2026 WL 1505646 (D.D.C. May 29, 2026) (Cooper, J.).

**C. Related Cases**

This case has not previously been before this Court or any other court. A case pending in district court—*DC Preservation League v. Board of Trustees of the John F. Kennedy Center for the Performing Arts*, No. 26-cv-981 (D.D.C.) (Cooper, J.)—involves some of the same parties and similar issues.

*/s/ Brett A. Shumate*
Brett A. Shumate

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

TABLE OF CONTENTS

INTRODUCTION ........ 1

STATEMENT ........ 6

ARGUMENT ........ 13

A. The balance of the harms and the public interest both lie in favor of a stay. ........ 14

B. Defendants are likely to succeed on the merits. ........ 17

CONCLUSION ........ 22

CERTIFICATE OF COMPLIANCE

ADDENDUM

## INTRODUCTION

Defendants respectfully seek a stay pending appeal of the district court's permanent injunction requiring the removal, from the campus of the John F. Kennedy Center for the Performing Arts (the Center), of all physical signage reflecting the name of President Donald J. Trump. This appeal raises serious questions about Article III standing and about the powers of the Center's Board. Major physical changes to the Center should await this Court's resolution of those issues; as an equitable matter, it does not make sense to alter the Center's name and signage now, only to potentially revert the name again after what should be a successful appeal. The District Court is not allowing us to close in order to properly fix up and repair the Building, including potentially life threatening structural damage like beams and parking garage ceilings that are rusted, and in serious danger of falling onto people below — Indeed, total collapse! Moreover, stripping President Trump's name from the Center threatens to substantially undermine fundraising and financial viability at the most sensitive point in its history, a time when other such performing arts structures throughout the Country are in serious financial difficulty, many of them, like The Kennedy Center, losing hundreds of millions of dollars per year. Because the district court's order otherwise requires compliance by the end of the day today, Defendants respectfully request an administrative stay pending

resolution of this motion, and ask the Court to rule on that request no later than 7 PM. Without the name, “Trump” on the Building, our fundraising will not only come to a halt, but any and all monies raised or committed would be obligated to be returned, refunded, or terminated. The Bylaws of The Trump Kennedy Center for the Performing Arts Foundation state, unequivocally: “The Corporation may make donations to the Center in support of its educational, artistic, cultural, and performing arts functions; provided, however, that in so doing, the Board of Directors shall condition such donations to the Center upon the name of the Center remaining unchanged as the ‘Donald J. Trump and John F. Kennedy Memorial Center for the Performing Arts.’ In the event the Center should at any time remove the name of President Donald J. Trump from its filings, marketing, branding, façade, or any other affiliated location, the Corporation shall recover from the Center the total of all gifts, donations, and contributions made to the Center by or on behalf of the Corporation.” The reason for this clause is that people and companies, who have given, or will be giving, millions of dollars to the Center were only willing to do so with the name “Trump” on the Building. Many did it because they loved the concept of two Great Presidents, one Republican, one Democrat, working together as one — In many ways, a bipartisan relationship! All of this money, hundreds of millions of dollars, will have to be immediately returned, or not received by the Center.

No one else other than President Trump would be in the position of both rebuilding the Building, and raising the money for its operation. As an example, President Trump has already raised, from Congress, $258 Million Dollars for construction of the new and highly improved Trump Kennedy Center, but the district court is not even allowing us to properly do that. We ask for the court's reversal on both name and construction or, at least, a stay. The district court doesn't want it to close so that complex, high level construction can be completed (which cannot be done without the Building being closed). Therefore, we would also like approval to immediately start spending the money, not only from an aesthetic point of view, but also from a structural and safety standpoint. People entering the Building under present conditions will be in serious danger, and risk of injury, or beyond. Certain areas are already roped off for this reason. The Building is also in bad shape, and unsightly to look at, a constant source of conversation within the Washington, D.C., area. It is unable to compete with other such venues throughout the United States, but when completed, as planned, will be the envy of the World, something that everyone, including this court, will be proud of. Contractors have already been selected for the work, and will have to be immediately informed that we are not able to utilize their services. Some have already been paid, so this becomes an expensive and unnecessary proposition in and of itself.

In December 2025, the Center's Board voted overwhelmingly to add President Trump's name to the Center in recognition of his personal commitment to rebuild and revitalize the Center—which had fallen into a sad state of dangerous disrepair—so it can once again serve as a world-class performing arts center. In this action, however, one of the Board's *ex officio* trustees, Rep. Joyce Beatty (D-OH, a troublemaking appointment, from the beginning of her tenure!), sued her fellow trustees of the Board alleging, among other things, that this resolution and its implementation constituted a breach of fiduciary duty under the Center's organic legislation. In actuality, it represented a saving of The Kennedy Center which, if this doesn't happen, would go into financial and structural collapse, something the Board recognized in approving the name change. Despite all of this, the district court, however, ruled against the Board, and granted a permanent injunction, requiring the Center to revert to its prior name—and make all necessary adjustments to its physical signage, website, and more—by today, June 12, 2026. Again, millions of dollars is necessary to be raised, and this movement would come to a halt.

Yesterday afternoon, the Center's Board voted to appeal that order, and to seek a stay. This Court should grant that relief. The equitable factors weigh strongly in favor of a stay. On the one hand, it will cause no harm to politically motivated Representative Beatty. Her theory of Article III injury is that she faced

potential fiduciary liability if she did not sue. Even assuming that constitutes cognizable injury, it does not pose any threat of irreparable harm if a stay is granted; she has more than discharged any fiduciary duty by this point. On the other hand, the district court's injunction requires physical alterations to the Center's campus, and the costs of compliance will not be recoverable after appeal. Nor will be the lost fundraising potential, for donors who support the President Trump, and will not want to contribute if his name is no longer publicly associated with the Center. For the public, too, the confusion caused by potentially *three* name changes (in December 2025, today, and then again after appeal) cuts in favor of allowing this Court to resolve the appeal before any such steps are taken.

As for the merits, the district court's ruling is vulnerable on both Article III standing and the merits. There is simply no historical precedent for trustees of charitable quasi-public trusts like the Center to sue over intangible harms like a renaming. Even if the courts could reach the merits, nothing in the Center's organic legislation prohibits adopting a secondary name, and doing so is hardly unusual. The name "Kennedy" is still on the Building, but in a much stronger form. The structure will now function as a financially sound and physically beautiful enterprise, as opposed to a bankrupt eyesore that, for years, will look like nothing more than an abandoned hulk. Countless federal buildings,

highways, airports, and other structures are known by colloquial or secondary names rather than their "official" ones. And the statute governing the Center prohibits only "memorials" or plaques "in the nature of memorials," which is narrow language that does not sweep in the name here—meant to recognize the ongoing and future contributions of a living President, not to commemorate or remember a deceased one. Congress used the broader term "acknowledgment" in the same statute; that difference in language should be respected.

Because Defendants are likely to succeed on appeal on at least one of these two grounds, and because this is the type of case where compliance should await definitive resolution on appeal of the novel legal issues presented, this Court should stay the injunction pending appeal and enter an administrative stay, by 7 PM today, to preserve the status quo until it can resolve this motion.[1]

## STATEMENT

**1.** Congress first established the National Cultural Center in 1958. National Cultural Center Act, Pub. L. No. 85-874, 72 Stat. 1698 (1958). Shortly after President Kennedy's assassination, Congress and President Johnson renamed the new entity as the "John F. Kennedy Center for the Performing Arts." Act of Jan. 23, 1964, Pub. L. No. 88-260, 78 Stat. 4.

[1] Defendants sought a stay from the district court last night, following the Board's vote. The district court denied that motion today.

Congress provided that an array of individuals would, by virtue of their outside offices, sit as *ex officio* trustees on the Board, including the Secretary of State, the Mayor of the District of Columbia, the Speaker and Minority Leader of the House of Representatives, the Majority and Minority Leader of the Senate, and several other members of Congress. 20 U.S.C. § 76h(a)(2). Congress further provided that the Board would contain thirty-six "general" trustees, who "shall be appointed by the President" for six-year terms. *Id.* § 76h(a)(2)(L), (b).

Congress bestowed the Board with "all the usual powers and obligations of a trustee in respect of all trust funds administered by it." 20 U.S.C. § 76*l*(b). The Board is empowered to enter into contracts; prepare a budget; employ personnel; negotiate contracts; and manage the grounds of the Center. *See id.* § 76j(a)(2). The Board also has a number of duties. *See* 20 U.S.C. § 76j. As relevant here, the Board must provide "all necessary maintenance, repair, and alteration of . . . the building and site, in a manner consistent with requirements for high quality operations." *Id.* § 76j(a)(1)(H)(ii). And it must "plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." *Id.* § 76j(a)(1)(G). It must also, *inter alia*, "present classical and contemporary music, opera, drama, dance, and other performing arts," *id.* § 76j(a)(1)(A), and

provide "facilities for other civic activities" and "a suitable memorial in honor of the late President," *id.* § 76j(a)(1)(D)-(E).

In July 2025, Congress appropriated $256,657,000 to the Center "for necessary expenses for capital repair, restoration, maintenance backlog, and security structures of the building and site of the John F. Kennedy Center for the Performing Arts." An Act to Provide for Reconciliation, Pub. L. No. 119-21, § 60025(a), 139 Stat. 72, 157 (2025). The funding is available until September 30, 2029. *See id.* That amount represents "roughly six times the amount" the Center "usually receives from the government" in a given year. Javier C. Hernández, *Trump's Kennedy Center Would Get $257 Million in House Republican Plan*, N.Y. Times (May 6, 2025), https://www.nytimes.com/2025/05/06/arts/music/kennedy-center-budget-congress-trump.html.

**2.** Plaintiff Joyce Beatty, a member of the House of Representatives from Ohio, is an *ex officio* trustee on the Center's Board by virtue of her position in Congress. ECF No. 12, ¶ 13. In 2025, President Trump made several changes to the Board. After the President replaced the Board's general trustees, the Board elected President Trump as Chair and replaced the Center's president with Defendant Richard Grenell. ECF No. 12, ¶¶ 25-27. (Mr. Grenell has since left his position as President, and Matthew Floca was voted in as the Executive Director and Chief Operating Officer of the Center.)

In December, the Board voted to add Donald J. Trump's name to the Center, in recognition of the President's personal investment of time and effort to rebuild the Center as a premier, world-class performing arts facility. *See* ECF No. 12, ¶ 32. Following the Board's vote, workers installed letters on the Center's front portico, so that it now reads: "The Donald J. Trump and the John F. Kennedy Memorial Center for the Performing Arts." *Id.* ¶ 33. The Center updated its website to read "The Trump Kennedy Center" and began to send emails using that phrase. *Id.*

In February 2026, President Trump announced that the Center would close for two years for construction, revitalization, and "[r]ebuilding," subject to Board approval. ECF No. 12, ¶ 44. The Board planned to discuss and vote on the closure at its March 16 meeting. Id. ¶ 53. Plaintiff, believing that she had not been invited to the meeting, sought a temporary restraining order (TRO) as to her perceived exclusion from the meeting, her inability to vote at the meeting, and her lack of access to information about the Center's closure. ECF No. 13. (Plaintiff later discovered that invitation in her email's spam folder.) Plaintiff also sought a preliminary injunction preventing defendants "from taking any steps to implement the plan to close the Kennedy Center and 'rebuild' it, while this litigation is pending." ECF No. 13, at 3.

On March 14, the Court granted the TRO motion in part and ordered the Board to distribute certain materials about the upcoming vote to plaintiff and afford her a "meaningful opportunity" to "voice her dissent." ECF No. 24, at 25, 36. It did not order the Board to permit plaintiff to vote at the upcoming meeting. The Board distributed the materials to plaintiffs as required by the TRO and also distributed a declaration from Matthew Floca describing the development of Mr. Floca's recommendation to close the Center for a 24-month period to permit renovation. *See* ECF No. 29-2. Mr. Floca elaborated on the basis for his conclusions in a supplemental declaration. ECF No. 29-3.

Mr. Floca explained that he has been conducting a review of the Center's infrastructure needs for more than two years. *See* ECF No. 29-3, ¶ 6. In undertaking that review, he relied on external reports obtained from architectural and engineering firms in the years prior to and during his tenure at the Center; a 2024 report documenting severe water intrusion from the Potomac River; a 2022 Comprehensive Building Plan for the Center that found that the building's central plant had reached the end of its engineered service life; a 2022 report showing that the Center's soffits—which overhang outdoor public spaces of the Center—had failed; and a 2021 Comprehensive Building Plan, which showed that the Center's vertical plumbing risers had "reached a state of systemic failure" and its steel channels had corroded. *Id.* ¶ 9. Considering those

needs, Mr. Floca recommended to President Trump and the Board that the Center be closed for a concentrated two-year closure to address significant infrastructure needs. *See id.* ¶ 7; ECF No. 29-9, at 11-16.

Mr. Floca gave a presentation to the Board about the proposed construction plans at the March Board meeting. ECF 34-5, at 8-9. Plaintiff noted her objection to closing the Center and to voting on the closure, but indicated that she did not generally oppose the need for repairs. ECF 34-5, at 9. After further discussion, including about safety and liability issues that might result from extending the timeline for renovations and repairs, the Board voted to close the Center for two years for renovation. *See id.* at 9-11. The vote, conducted among the general trustees of the Board, was unanimous. *See id.* at 11.

**3.** Plaintiff moved for partial summary judgment on the naming issue and a preliminary injunction preventing the closure of the Center.

The district court granted those motions in part. First, it granted summary judgment to plaintiff on the naming issue, concluding that only Congress could modify the Center's name and that adding the President's name to the portico violated the statutory prohibition on additional "memorials." Add.7. Second, the court sua sponte granted summary judgment to plaintiff on the voting rights issue. Add.7-8. And third, the court granted plaintiff a preliminary injunction on the closure issue, concluding that while it would be lawful for the Board to close

the Center temporarily, plaintiff was likely to succeed in her claim that the Board had not adequately considered its closure decision. Add.8.

The district court permanently enjoined the Center from "displaying, installing, or maintaining any physical or digital signage on the Kennedy Center building or grounds that designates, suggests, or implies that the institution is named for any person other than President John F. Kennedy, including but not limited to the signage that currently reads 'The Donald J. Trump And' on the front of the Center's main building . . . unless and until an Act of Congress so permits" Add.2. It further enjoined the Center from "publishing, issuing, or distributing any official materials—including website content, email communications, promotional materials, press releases and statements, contracts, and government filings—that refer to the institution as named for anyone other than John F. Kennedy, including but not limited to the 'Trump Kennedy Center,' or the 'Donald J. Trump and John F. Kennedy Memorial Center for the Performing Arts' unless and until an Act of Congress so permits." Add.2.

The court ordered defendants to, within 14 days of the order—*i.e.*, by June 12, 2026—"remove all physical signage on the Kennedy Center building and grounds, including the front portico, that purports to rename the Kennedy Center after President Trump or any other individual besides President

Kennedy"; "update the Kennedy Center's official website to remove all references to the institution as the 'Trump Kennedy Center,' the 'Donald J. Trump and John F. Kennedy Memorial Center for the Performing Arts,' or any similar formulation"; "withdraw any trademark application officially referring to the Kennedy Center as the 'Trump Kennedy Center,' the 'Donald J. Trump and John F. Kennedy Memorial Center for the Performing Arts,' or any similar formulation"; and "file with the Court a sworn declaration from a responsible official of the Kennedy Center certifying compliance with this order." Add.3.

The district court also preliminarily enjoined defendants from "effectuating the closure decision made at the March 16 Board meeting," but permitted the Center to "mov[e] forward with the capital repair work it has planned" and did not "prohibit the Board from closing the Center should it come to this decision anew after independently balancing its multiple obligations to the Center in a prudent fashion." Add.8-9.

Yesterday afternoon, the Board of Trustees voted to appeal and seek a stay of the district court's injunction as it relates to the naming issue.

## ARGUMENT

The factors governing whether to issue a stay include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3)

whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Here, these factors weigh in favor of staying pending appeal the district court's permanent injunction as it relates to naming.

**A. The balance of the harms and the public interest both lie in favor of a stay.**

The balance of harms and the public interest powerfully favor a stay pending appeal. Absent a stay, Defendants will be forced to squander time and money—by both removing the signage and then potentially returning it after appeal—that cannot be recovered when Defendants prevail on the merits. That is the very definition of irreparable harm. *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("financial injury can be irreparable where no adequate compensatory or other corrective relief will be available"). The district court erred in rejecting this argument based on its unexplained conclusion that such costs would be "de minimis." Add.62. Regardless of the exact amount of time and money spent, Defendants will never be able to recover it.

Additionally, removal of President Trump's name threatens to impede the Center's fundraising efforts and contribute to the financial decline of the Center. As the Center's Executive Director explained, the President has been a central force in the Center's current fundraising efforts, but his supporters will be deterred from contributing to the Center if his name is removed and the Center's

bipartisan credentials are disrupted. *See* Dkt. 47-1 at 2. This loss of fundraising time and potential is also definitionally irreparable, and the public interest weighs in favor of an economically viable Center. Again, the district court erred in concluding otherwise, Add.62, and in rejecting the financial projections of the Center's Executive Director on this issue.

Finally, requiring a name change now, only to potentially revert back to the current name after appeal, would be incredibly confusing for the public. Rather than potentially force the Center to undertake three name changes in the span of a year, the far more sensible course is for this Court to adjudicate this appeal before requiring these sorts of irreparable compliance measures.

That is especially true because of the virtually non-existent interests on the other side of the ledger. Any harm to Plaintiff from a stay pending appeal is abstract at best. Even though this Court concluded that a permanent injunction was necessary to place Plaintiff "in good stead as to her statutory and fiduciary duties," Add.61, it is clear that Rep. Beatty has long since discharged any fiduciary responsibility she may hold. Any further harm Plaintiff will suffer in her capacity as a trustee is merely a "harm" to the Center's ability to fulfill its mission.[2] That "harm," as the Board's statutes make clear, is not to Plaintiff—

---

[2] Even if this Court agrees with the district court's theory of harm, there is no reason to conclude that, pending an appeal, a stay would inflict any harm on

it is to the public, as beneficiaries of the trust. Plaintiff's asserted harm is, at best, the harm any trustee—or, for that matter, any corporate director, legislator, or voter—faces when the democratic body in which she participates takes an action with which she disagrees. That harm is not cognizable in federal court. *Cf. L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1199, 1201–02 (9th Cir. 1980) (finding no irreparable injury where three-fourths quorum of owners needed to approve team transfers and plaintiff alleged it would lose such a vote); *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) ("[I]njuries to third parties are not a basis to find irreparable harm.").

Indeed, *Dellinger v. Bessent*, a case plaintiff relied on below, confirms that any harm resulting from being unable to fulfill a "statutory mission" belongs to the person—or entity—directly charged with fulfilling that mission. 766 F. Supp. 3d 57, 70 (D.D.C. 2025) (citing 5 U.S.C. § 1212, establishing the Special Counsel role). Here, the Board is the "trustee in respect of all trust funds administered by it," 20 U.S.C. § 76l(b), responsible for fulfilling the duties established under the Center's governing statutes, *id.* § 76j(a)(1). Rep. Beatty is a member of the Board, but she is not the Board. Any harm from an inability to fulfill the statutory mission in the Center's charter belongs not to plaintiff as an

---

Plaintiff that is "certain and great." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

individual. It belongs to the Board itself. A trustee might well believe that any action taken against her wishes means that statutory obligations are being impeded. But only the body charged with undertaking those obligations has the right to assert that harm. *See Dellinger*, 766 F. Supp. 3d at 70.

Finally, even if plaintiff could rely on harms to the Center, she cannot show that removal of the signage today, rather than keeping it in place pending this appeal, would save the Center from "certain and great" harm. *Wisconsin Gas Co.*, 758 F.2d at 674 (D.C. Cir. 1985); *see* ECF No. 34-1, at 42-43. Indeed, as explained above, there is every reason to think that the opposite is true.

**B. Defendants are likely to succeed on the merits.**

As to the merits, the strength of the Center's arguments is sufficient to warrant a stay, especially in light of the heavy equitable considerations at play on Defendants' side and the minimal (if any) harms to Rep. Beatty of allowing the signage to remain for now. Defendants have raised substantial questions as to both standing and the Board's ability to adopt a secondary name for the Center and reflect that name on the Center's façade.

**1.** Regarding the former, the Center is likely to succeed on appeal in showing that Rep. Beatty does not have Article III standing to pursue her claim. To have standing, plaintiff must point to something more than "a general legal, moral, ideological, or policy objection to a particular government action." *FDA*

*v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Rep. Beatty claims that she clears this hurdle because she is a trustee. But this role gives her no more a concrete stake in the renaming claims than that enjoyed by any other member of the public. Her claimed intangible harm in her role as a trustee is not an individualized harm traditionally recognized as providing a basis for lawsuits in American courts. *See Pileggi v. Washington Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1226 (D.C. Cir. 2025) ("Article III looks for a close relationship between the harm remedied by courts in the past and the harm that the plaintiff wants remedied by a court today." (quotation omitted)). Rep. Beatty cannot credibly claim that any individualized harm in the form of liability that the Board's actions might create for its trustees is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). Without any harm from potential future legal liability, plaintiff's only interest in her renaming challenge is her general objection to the Board's actions. *See Hippocratic Med.*, 602 U.S. at 381.

Further, even if this Court thought that private trustees in similar situations could have standing, *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 304 n.2 (2008) (Roberts, C.J., dissenting), that rule should not extend to this circumstance because the Center is a *sui generis* charitable federal trust entity that operates to benefit members of the public rather than to provide any financial benefit to specified, individual beneficiaries. Indeed, Rep. Beatty's

lawsuit here implicates significant separation-of-powers issues by infringing on the executive's sovereign prerogative to prioritize among and pursue different legal actions, *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021), especially where the sovereign is—at common law—the sole entity responsible for enforcing the terms of charitable trusts, *see, e.g.*, *Jackson v. Phillip*, 96 Mass. (14 Allen) 539, 579 (1867).

**2.** Defendants are also likely to succeed in showing that the Board's vote to adopt a secondary name was lawful. The Center's governing statute requires that the Board construct "a building to be designated as the John F. Kennedy Center for the Performing Arts." 20 U.S.C. § 76i(a). The Board did so, and it maintains compliance with that directive today. Nowhere in that directive, or anywhere else in the governing statutes, is there any limitation on the Board's ability to add a secondary name.

Other governmental entities are commonly known by secondary names. The Department of Defense is also known as the Department of War in "official correspondence, public communications, ceremonial contexts, and non-statutory documents within the executive branch." Exec. Order No. 14347, 90 Fed. Reg. 43893, § 2(a) (Sep. 5, 2025). The Federal National Mortgage Association, *see* 12 U.S.C. § 1716b, is commonly known—including on its website and in communications—as "Fannie Mae," a play on the pronunciation

of its acronym. *See* Fannie Mae, Fannie Mae Announces Results of Tender Offer for Any and All of Certain CAS Notes (Mar. 2, 2026), https://perma.cc/9A8GLSG5. And, even though it is officially named the "Robert F. Kennedy Department of Justice Building," Memorandum for the Adm'r of Gen. Servs. (Nov. 20, 2001), https://perma.cc/26XS-FWWE, passerby and attorneys alike refer to it as "Main Justice." *See, e.g.*, *Does 1-9 v. Dep't of Just.*, No. 25-CV-325, 2025 WL 894120, at *7 (D.D.C. Mar. 22, 2025) (describing "the offices at Main Justice"); *Smith v. Env't & Nat. Res. Div.*, 521 F. Supp. 2d 87, 90 (D.D.C. 2007) (referencing "three drawers of a file cabinet at the main Justice Department building in Washington, D.C.").

Although the district court recognized these many examples, its opinion sought to distinguish them on the basis that none of them "implicate a presidential memorial that was legislatively intended to honor a specific public figure." Add.56. While true, that distinction is not legally meaningful. Defendants' use of these examples serves to demonstrate that, before now, naming statutes were not read to be exclusive, nor were those using secondary names understood to be violating the law. That point holds regardless of the legislative intent behind a specific naming decision.

To be sure, there does exist a statutory directive forbidding, with some exceptions, the Board from designating or installing "in the public areas" of the

Center any "additional memorials or plaques in the nature of memorials." 20 U.S.C. § 76j(b)(1). But the lettering on the building's façade is not a "memorial" or a plaque "in the nature of" a memorial. Start with the text of the lettering itself. The word "memorial" appears only once on the facade: immediately after *President Kennedy's* name. The text including *President Trump's* name does not indicate that the text is intended to memorialize him.

The text of the statute cuts in the same direction. A "memorial" is "anything meant to help people remember some person or event, as a statue" or a "holiday." Noah Webster, *Webster's New Universal Unabridged Dictionary* 1123 (2d ed. 1983). A "memory" typically "denotes the power by which we reproduce past impressions," akin to a "distinct effort to collect again or call back what we know has been formerly in the mind," often as a "posthumous" "remembrance." *Id.* Congress's use of the term "memorial" confirms that it intended to sweep in only those adornments meant to "help remember" some "past impression." An addition that acknowledges the involvement and leadership of the sitting President of the United States simply does not qualify.

The district court disagreed, reading the addition as contrary to "the terms of Congress's clear proscription." Add.57. But, if Congress truly meant for a proscription so broad, then it would have used different language. Instead of banning memorials or plaques in the nature of a memorial, Congress could have

banned, for example, all "acknowledgements"—a term used elsewhere in the statutory scheme. *See* 20 U.S.C. § 76i(c)(3). Or Congress could have banned all additions of plaques or text in the public areas of the Center. But it did not. And that choice in text matters. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022).

## CONCLUSION

The Court should grant a stay pending appeal, and issue an immediate administrative stay by no later than 7 PM today due to the impending deadline for compliance with the district court's injunction.[3]

Respectfully submitted,

*<u>/s/ Brett A. Shumate</u>*
BRETT A. SHUMATE
*Assistant Attorney General*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3301*
*brett.a.shumate@usdoj.gov*

JUNE 2026

[3] Plaintiff opposes this motion and intends to respond today to the request for an administrative stay.

# Letter from W. Jankowski to Plaintiff's Counsel, October 19, 2026

**U.S. Department of Justice**
Civil Division
Federal Programs Branch

**Mailing Address**
P.O. Box 883
Washington, D.C. 20044

**Overnight Delivery Address**
1100 L Street, N.W.
Washington, D.C. 20005

William Jankowski
Title: Trial Attorney

Tel: (202) 353-7578
Fax: (202) 616-8460
william.s.jankowski@usdoj.gov

**October 19, 2026**

<u>Via Electronic Mail</u>

Kyle Freeny
Nathaniel Zelinsky
Washington Litigation Group
1717 K Street NW
Suite 1120
Washington, DC 20006

By email: kfreeny@washingtonlitigationgroup.org
nzelinsky@washingtonlitigationgroup.org

Counsel:

We write in response to your letter dated October 12, 2026 ("Oct. 12 Letter") to provide Defendants' responses to the asserted discovery deficiencies that you raise in that letter. We start by noting that—contrary to your assertion that the extension of discovery by two weeks means that Defendants' prior assertions of undue burden are "foreclose[d]" and "no longer hold[]," Oct. 12 Letter at 4–5—the expedited nature of the limited discovery ordered in this litigation provides ample basis for Defendants to invoke their right to limit their discovery responses where Plaintiff's requests impose undue burdens on Defendants and call for the production of documents or information that is not proportional to the needs of the case. Even absent an expedited timeline, moreover, Rule 26 expressly limits discovery to that which is "proportional to the needs of the case," including, *inter alia*, "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). That position informs several of our more detailed responses below.

We also note the Court's continued limitation, in its most recent discovery order, that the "targeted" and "expedited" discovery in this litigation, ECF No. 103 at 2, has been extended by a short period only "to allow for responses to discovery requests already made," *id.* at 8. Several of the asserted deficiencies you identify in your letter call for information that is out of scope of the Court's discovery orders, out of scope of any request Plaintiff has already made, or both. That position also informs several of our more detailed responses below.

### 1. Materials the Court Ordered Produced

**FY 2026 financial statements.** As you note, the Court ordered Defendants to produce what FY 2026 financial information might reasonably be available to Defendants under the circumstances of this case. The Court noted that "Defendants need not produce the Center's full general ledger, payroll reports, or all internal financial management reports," but that "existing sources" should provide sufficient documentation of "actual financial performance over FY 2026" to permit Defendants to provide documentation of that performance. With the October 15, 2026 production of certain core financial information reflecting FY 2026 financial performance, Defendants have now satisfied their obligations under this request.

Counsel's recent October 18, 2026 email expresses dissatisfaction with the nature of the data Defendants provided and claims that Defendants failed to produce documents "expressly contemplated by the Court's order." Defendants have provided what FY 2026 data is available, given the expedited discovery timeline, the recent migration to the Sage financial-management system, and staff turnover within the Center's finance department. Indeed, the Court acknowledged that "bespoke" reports need not be produced and that "standardized reports will do." ECF No. 103 at 4. And the Court affirmed that "Plaintiff's exhaustive requests are unduly broad given the expedited timetable." *Id.* The information that *is* available on this expedited timeline is the general ledger of FY 2026 financial data, which is broken down by quarter (and is directly responsive to Plaintiff's request for "quarterly" data) and provides as detailed a perspective as is possible of the Center's account balances throughout FY 2026. The general ledger dataset contains sufficient information to enable "rollup[s]" of the Center's financial position throughout FY 2026, as it contains classification tags and indicates whether each transaction represents a credit or a debit to the relevant account. The preliminary trial balance includes account balances through FY 2026—the relevance of that information to the Center's financial statements should be self-evident. And the report containing FY 2026 budget information (KC-BEATTY7534), as we explained in our email accompanying last week's production, represents current estimates of actual FY 2026 results, including "periodic reporting from staff on expenses" pulled from the Center's "interim budget tool. Floca 30(b)(6) Tr. at 120:18–22. As we have explained numerous times throughout this process, the Center does not yet consider these results to be "actual" in the sense that they have been validated and can be considered an accurate representation of the Center's financial condition. But they do reflect the actual sources of data relied upon by the Center's management for assessing in real time the Center's current financial condition. For the reasons explained above (*e.g.*, staff constraints and data migration), the Center does not currently possess 2026 balance sheets, statements of activities, and income statements. The FY 2026 general ledger data provide the most complete picture possible—given the existing constraints on the Center's financial data—of the institution's current financial condition. No other responsive documents exist.

**Text messages.** Defendants continue to search for responsive text and Teams messages. At this juncture, counsel understand that the universe of responsive, non-privileged text and Teams messages maintained by data custodians previously identified in this litigation is very small, if not nonexistent. Should that search uncover responsive, non-privileged messages, Defendants will produce them prior to the close of discovery.

**Supplemental Authority.** You indicate in your letter that Defendants declined to provide any responses or documents to certain requests related to Plaintiff's Notice of Supplemental Authority, ECF No. 85, solely on the basis of their objection that the information sought was out of scope. That is inaccurate. In addition to their scope objections, Defendants raised objections on executive-privilege grounds, and withheld information on that basis. Each response to the RFAs you identify in your letter (RFAs 48–53) implicates the Presidential Communications Privilege; Defendants continue to withhold responses to those requests on that basis. Further, the responses Defendants provided to RFPs 38 and 39 indicated that Defendants would withhold documents under the executive privilege but that, under the burden constraints negotiated by the parties and asserted by Defendants generally, "Defendants are not aware of any such responsive documents." Defs.' Objs. & Resps. to Pl.'s First Set of Expedited Discovery Requests at 39 ("Defs.' Discovery Responses"); *see also id.* at 40. For clarity, Defendants now reiterate that, considering the burden constraints already asserted by Defendants in this litigation, Defendants are not aware of the existence of any non-privileged documents responsive to RFPs 38 and 39.

Indeed, the Court noted in its recent order that "the circumstances surrounding the photograph, and what it may say about any intention to deviate from the renovation plans that have been presented to the Court, are within the scope of the Court's discovery order." ECF No. 103 at 5. And Plaintiff has received ample information from Defendants on those circumstances. *See, e.g.*, Defs.' Discovery Responses at 73–75 (providing responses to questions asking about directions from the President and the current state of renovation plans at the Center, including whether there is "any intention to deviate from the [existing] renovation plans," ECF No. 103 at 5); Floca 30(b)(6) Tr. at 209:2–215:4 (discussing the "form[s] of direction" that the Center takes and the fact that no demolition plans are in place); *id.* at 250:8–257:21 (discussing the Center's knowledge of the circumstances surrounding the placard identified in ECF No. 85, the lack of involvement of any Center employee in the circumstances surrounding the placard, and the lack of any plans to demolish the Center).

**February 1 announcement.** The Court rightfully affirmed that "information bearing on the reasoning behind the Court's now-enjoined initial decision to close the enter, including President Trump's pre-announcement of the decision, is outside the scope of the Court's discovery order." ECF No. 103 at 6. The sole exception would be "if non-privileged documents exist showing that the President's February 1 announcement affected Board members' August or September votes," then "those documents would be relevant to the Court's inquiry and should be produced." *Id.* The sole example you point to as falling within that category, a March 31, 2026 draft "Renewal Project Charter," *see* KC-BEATTY6956–63, was produced only because it related to the scope of the Center's engagement with JLL. It predates the Court's May 29, 2026 preliminary injunction, and is not within scope as a document responsive to RFP 23. For clarity: under the constraints already identified and asserted by Defendants under this expedited discovery timeline, Defendants are not aware of the existence of any non-privileged documents "showing that the President's February 1 announcement affected Board members' August or September votes," ECF No. 103 at 6, in the manner in which you describe—or in any manner.

Defendants will not produce a list of individual trustees who communicated with the President about the Center's plan for renovation and construction at any point after May 29, 2026. *See* Oct. 12

Letter at 2. That request constitutes a new request, untethered from any existing discovery request that Plaintiff has made. The Court was clear that any additional responses should be to "discovery requests already made." ECF No. 103 at 8. Moreover, it constitutes an interrogatory beyond the 25 authorized by the Court, subject to the parties' agreement regarding how interrogatories would be counted for that purpose. And the burden of surveying each individual trustee to the Center under the expedited timeline in this litigation—especially considering that this is a new request—provides an additional basis to decline this request. Center management has no knowledge of how or whether individual trustees communicate with the President outside of Board meetings. Defendants will not respond to this new request.

**2. Documents Identified During Depositions That Have Not Been Produced**

Responses to your specific requests are below:

- Defendants are not aware of the existence of any other discoverable versions of the June 1, 2026 Audit and Finance Committee presentation. Defendants further clarify that, although certain portions of the June 1 minutes produced are outside the scope of the Court's discovery order (including certain redacted portions), all redactions made to those minutes, including redactions made to the "Background and Financial Position" section related to the ongoing WNO litigation, were made pursuant to the attorney-client privilege. That extends as well to the bullet points redacted under the "Committee Discussion" section, which includes committee discussion and legal advice related to both the ongoing WNO litigation and to this litigation.

- In their October 15 production, Defendants produced all versions of the May 5, 2026 "Board Report" of which they are aware. *See* KC-BEATTY7513–28.

- In their October 15 production, Defendants included the "draft FY 2027 proposed budget" at KC-BEATTY7534. Defendants included their latest "FY 2027 forecast for the operate-while-renovating scenario" in the ongoing scenario budget modeling document at KC-BEATTY 7533.

- The "FY 2027 budget scenarios" attached to the August 5 email from Donna Arduin to Khaled Aziza and Darin Buchalter were produced on October 8 at KC-BEATTY6977 ("FY27 Budget Scenarios (2)]") and KC-BEATTY6976 ("FY27 Budget Scenarios").

- The Center received the "presentation" used for Board matters on August 9 at 11:10 PM. *See* KC-BEATTY7508. The Center used the same presentation for the August 10 subcommittee meeting that it later used for the August 13 Board meeting. *See* Darin Buchalter Tr. at 192:7–11 (indicating that only one version of the presentation was sent to the Center and that the witness's "memory [was] faulty on whether it was before the 10th or the 13th").

- The Center is not aware of the existence of any documents reflecting any "request for FY

2026 financial data and the Center's response." All written communications between Center management and Delta have been produced, subject to Defendants' burden limitations.

- The Center has conducted a supplemental search for all written communications (email and text) between Center management and Delta representatives prior to July 16. That search uncovered several emails that Defendants will produce. The Center has already produced extensive documentation "concerning the selection of Delta." *See, e.g.*, KC-BEATTY0001–0306. The "four scenarios" document is located at KC-BEATTY0304.

- Defendants will not produce the "Trump-Kennedy Center Foundation bylaws." Discovery of those bylaws is out of scope of the Court's limited discovery order, which concerns only the substance, justification, mechanics, and process of the Board's decisions at its August and September meetings, which concern the operations of a legal entity wholly independent of the Foundation referenced. Discovery of those bylaws is also out of scope of Plaintiff's cited requests for production, which concern "Documents sufficient to show . . . fund[s] maintained by or available to the Kennedy Center, all restrictions on the use of each such account or fund, and all transfers into or out of such accounts or funds" (RFP 26); all "cash-flow, liquidity, or treasury forecasts" (RFP 29); and "[a]ll Documents and Communications relating to the Naming Condition" (RFP 39). The foundation's bylaws reflect the operative rules governing an independent institution and do not themselves constitute restrictions on accounts managed by or available to the Center. As Mr. Floca testified, Defendants are not aware of the existence of "documents reflecting any restriction, condition, or 'pending board action' associated with the $18 million transfer." *See* Floca 30(b)(6) Tr. at 83:22–85:11 (indicating that the Center is not "aware of a restriction and furthermore is using the funding in an unrestricted way").

- Although they do not concede that going-concern letters are in scope of the Court's discovery order or Plaintiff's discovery requests, Defendants recently provided the going-concern letters for FY 2023 and FY 2024, as well as a draft FY 2025 going-concern letter that has not yet been finalized and approved. *See* KC-BEATTY 7542–59. Further communications with the Center's auditor are out of scope of the Court's limited discovery order, which concerns the substance, justification, mechanics, and process of the Board's decision at its August and September meetings, and of Plaintiff's requests for production (RFPs 25, 31), because they neither show revenues, expenses, cash and other available fiscal resources nor "substantiate" the draft resolution provided to the Board, but withdrawn from Board consideration prior to its September 15, 2026 meeting, which the Court has concluded is out of scope of the limited discovery in this litigation. *See* ECF No. 103 at 5. Moreover, to the extent such communications might broadly concern the Center's FY 2026 financial condition—which postdates the FY 2025 audit—they are duplicative of information already provided at multiple junctures in this litigation and would thus be unduly burdensome for Defendants to produce.

- In their October 15 production, Defendants produced what internal FY 2026 "reports,"

Floca 30(b)(6) Tr. at 134:5–6, are available to be produced under the expedited discovery timeline in effect in this litigation. Defendants are not aware of the existence of any other "FY 2026 financial analyses" within the scope of the Court's recent order or available for production in this litigation, considering the burdens of expedited discovery.

- Although Defendants do not concede that "[d]ocuments reflecting the decision to hold the Kennedy Center Honors at Capital One Arena" are within scope of the Court's discovery limitations, in part because such discussions predate the Court's preliminary-injunction order and because they do not concern the Board's decisionmaking process, Defendants will provide information below about the timing of the finalization of that decision.

**3. Questions the Center's Designee Could Not Answer**

Responses to your specific requests are below:

- The Center is currently undertaking a search for communications regarding Shear Madness, Alvin Ailey, and The Nutcracker.

- Subject to the above objection noted as to whether information about the Kennedy Center Honors is within the scope of the Court's discovery limitation, Defendants can confirm that the "Honors venue decision" was consummated in a contract dated June 26, 2026 and executed on July 16, 2026.

- Defendants are not aware of any one individual who "decided not to provide FY 2026 data to Delta." The Center understands that Delta's requests for financial information evolved over the course of multiple in-person and telephonic meetings and that the financial analysis Delta conducted was the result of a collaborative process. The decision not to rely on FY 2026 data for the Delta analysis was informed by the lack of ready availability of such data, given the recent shift in financial-management systems; staff unavailability; and the fact that FY 2026 was not yet complete at the time Delta conducted its analysis.

- As outlined above, Defendants decline to respond to questions about the Foundation's bylaws as out of scope of the Court's discovery orders.

- Defendants maintain that communications with their auditor are out of scope of the Court's limited discovery order, as outlined above. Notwithstanding that fact, Defendants understand that BDO first engaged with the Center in addressing certain concerns about the FY 2025 audit on March 17, 2026.

- FY 2025 data was migrated to Sage within roughly the past month. However, the Lawson system's FY 2025 data is still considered the financial results of record for FY 2025, as the Sage database does not necessarily reflect a complete dataset reflective of

the actual standing of the Center's finances. Sage does have the capacity to generate monthly statements, but the Center has not been running those reports because it is still in the process of inputting FY 2026 data. Any report that would currently be run would be incomplete and would not reflect the Center's current financial standing.

- Because Plaintiff has provided no detail about the provenance of the May 5 Board Report identified at Exhibit 6 to the Floca 30(b)(6) deposition, Defendants have been unable to verify details about that specific document. But Defendants understand that Donna Arduin directed the preparation of materials containing information also contained in Exhibit 6. *See* KC-BEATTY7513–28. As indicated in the related communications, information was synthesized from those materials into a slide that was presented at the June 1 Audit and Finance Subcommittee meeting. *See* KC-BEATTY7513; *see also* Ex. 4 to Floca 30(b)(6) Depo. at 17. Although Ms. Arduin is not available to provide her reasoning behind distilling information into one slide for the Audit and Finance Subcommittee and into an oral financial overview for the full Board, the Center understands that such distillation likely occurred to make the relevant information more easily digestible for subcommittee members and other trustees.

## 4. Requests Defendants Declined to Answer or Unilaterally Narrowed

As noted above, Defendants maintain their burden-related objections to Plaintiff's requests and do not withdraw that objection, especially considering that the expedited discovery period in this litigation was extended by only two weeks. Where possible, Defendants have provided additional information responsive to the requests you outline in your letter, and they continue to work to identify any additional information that might be responsive to your requests under the timelines in effect in this case. Beyond the responses outlined elsewhere in this letter, Defendants rest on their burden- and scope-related objections and are otherwise not aware of any non-privileged documents responsive to the requests Plaintiff references. *See* Oct. 12 Letter at 4.

## 5. The JLL Letter and Defendants' Search Methodology

We previously set forth Defendants' position regarding the JLL Letter you identify in our email of October 16, 2026, at 1:02pm, and incorporate our response here.

As relevant to Defendants' searches for responsive communications in this litigation, Mr. Floca's testimony indicated that, of the names he "kn[e]w," Floca 30(b)(6) Tr. at 263:5–6, he, Donna Arduin, Alex Antkowiak, Cecelia Royster, and Joe LaFauci were considered data custodians for the purposes of discovery for all of Plaintiff's requests, *see id.* at 263:8–9. As to the information responsive to Plaintiff's requests about the retention of JLL and the scope of its engagement, the Center maintained all contracting information and communications in a central filesharing database, which was maintained in the regular course of business, and provided that information in full (save for non-responsive documents and communications related to contractors that were not selected) to Plaintiff. To be clear, the Center, of course, also performed its search depending on the likely location of the materials in question on a request-by-request basis, and, as previously discussed, obtained some of the materials produced from

Delta Consulting Group; not every request involved a search of the same individuals or locations. As outlined above, "day-to-day" communications between the Center's contracting representatives and JLL were not searched, as they fall outside the scope of Plaintiff's discovery requests and the Court's discovery orders. Pursuant to the agreement of the parties, as previously indicated, communications entirely internal to the Office of General Counsel were not searched; no employee of the Office of General Counsel was searched as a data custodian.

The June 16 JLL letter was not provided to Plaintiff because the Center did not understand it to be responsive to Plaintiff's requests for production of documents related to JLL's retention and the scope of its engagement, which, by that date, had already begun. Moreover, the letter—as it states—represented JLL's "offer[ed] . . . strategic perspective," KC-BEATTY6800, and it did so unsolicited. JLL incorporated that perspective into a version of the Comprehensive Project Development Plan that was finalized on August 20, 2026. The Center has now committed to conducting a supplemental search for communications with JLL that might be responsive to Plaintiff's request for "all communications with JLL relating to the duration, sequencing, phasing, or cost of the Renewal Project," even though Center management does not understand there to have been further analysis conducted by JLL beyond what the firm has included in its latest revised Comprehensive Project Development Plan. Center management are the relevant custodians—and Defendants will search those files using the search string "@jll.com." In addition to the custodians identified above, Defendants will search the communications records of Kolan Campbell, who is the main point of contact for contracting communications with JLL. As previously communicated to Plaintiffs, given that Defendants are not aware of substantive communications with JLL relating to the duration, sequencing, phasing, or cost of the Renewal Project following the completion of the development of JLL's Comprehensive Project Development Plan, Defendants expect there to be a small number of responsive documents, if any.

## 6. Privilege Log and Executive-Privilege Materials

Although Defendants do not agree that the "rationale" of a "compressed schedule" "no longer holds," Oct. 12 Letter at 5, as a basis to obviate the need to create a privilege log, Defendants confirm here that they have not withheld any responsive documents in full on the basis that they are privileged under the attorney-client privilege. Any redactions included in documents produced thus far should provide sufficient information to determine the basis of the privilege assertion. Should Plaintiff identify specific redacted documents by Bates number as to which counsel seeks additional information as to the basis of the privilege, Defendants will consider such requests and determine whether further information can be provided. Defendants maintain all their prior objections and understandings about the scope of discovery (*e.g.*, because Defendants did not search for documents or communications created or maintained entirely within the Center's Office of General Counsel, they will not be able to provide a privilege log indicating whether any such materials were retrieved and withheld).

Defendants further maintain their *Cheney*-based objections to conducting a full search for executive-privilege materials and to requiring Defendants (and the White House, which bears the burden of asserting the executive privilege) to identify each individual responsive document retrieved and withheld on the basis of the executive privilege. That said, Defendants intend to create a privilege log indicating what documents with the Center's possession have been found under the current search

parameters and withheld under the executive privilege.

Sincerely,

*/s/ William S. Jankowski*

Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
william.s.jankowski@usdoj.gov
202-353-7578

cc: Christopher M. Lynch
Brantley T. Mayers
Alexander Kristofcak
Rosa Baum
Erin Wenokur
Norman Eisen
David Ogden

# New York Times Article, “If the Kennedy Center Is ‘Dangerous’, Why Is the Symphony Rehearsing There?”, October 7, 2026

# If the Kennedy Center Is 'Dangerous,' Why Is the Symphony Rehearsing There?

The National Symphony Orchestra is practicing inside a building that President Trump and his allies say could fall on their heads.

Listen · 8:30 min



**By Elizabeth Williamson**

Elizabeth Williamson reported from a designated safe area in the underground garage of the Kennedy Center.

Oct. 7, 2026

The shuttered John F. Kennedy Center for the Performing Arts is a deadly place. Just ask President Trump.

This week he said it was "a great danger to anyone who walks inside." Last month he said that a security guard had narrowly avoided "certain death" after a storm brought down a five-foot piece of ceiling plaster, injuring no one. The center, he said, is in a "virtual state of collapse."

And yet on most weekday mornings, 100-odd members of the National Symphony Orchestra arrive for rehearsals in the shell of their former home. This week they are rehearsing in the center's main concert hall for upcoming performances in the Maryland and Virginia suburbs of Prokofiev's Symphony No. 5, Haydn's Symphony No. 85 ("La Reine") and Stravinsky's Scènes de Ballet.

The theme, as advertised on their website, is "music that finds hope and vitality in the face of adversity."

So far, none of the musicians have encountered collapsing concrete garage decks, falling 2,500-pound roof sections or "electrical explosions"— risks the center's management says lurk everywhere.

“We’re just happy to work,” a violinist said last week, while hustling into the building through a parking lot entrance. The violinist, and all other musicians interviewed as they entered the building, asked not be named for fear of retaliation against the orchestra, which still has financial ties to the Kennedy Center.

One musician expressed the hope that her colleagues would “shut up” and focus on music, not politics.

Another said that the orchestra’s presence in the building reinforced the view by some former employees that the administration’s portrayal of the building’s problems have been exaggerated.









The shuttered Kennedy Center is ringed by security fencing and signage preventing access to the public. The underground lot remains open for daily and monthly parking. Photographs by Elizabeth Frantz for The New York Times

A Kennedy Center spokesman, P.J. Elliott, said this week that the concert hall was perfectly safe for the musicians but not for the public. The hall "is not a restricted area to essential staff and N.S.O. musicians," he said in a statement. "Musicians can rehearse in it safely during the closure." He did not explain why.

The development is the latest in the saga of Mr. Trump's takeover of the center. Briefly: Less than a month into his second term, the president purged the Kennedy Center board of Biden-era appointees, installed allies who made him chairman, then announced that the place would close for two years of renovations. Democratic lawmakers on the board said it was an excuse to avoid the humiliation of plummeting ticket sales and fleeing artists.

In December, Mr. Trump put his name on the center, a living memorial to a slain president, but a judge ordered it off. When he was again denied last month, the president decreed that the renovation would not begin until courts allowed his name on the building front. He followed with a threat to tear the entire place down.

While the drama plays out, one of the nation's premier orchestras still needs a place to practice for its 2026-27 season, with concerts now in six different places across the region. They and the center's Opera House Orchestra, which now performs in an annex called The Reach, are the only paid performances that have survived Mr. Trump's takeover. Local music lovers call it a tribute to the orchestras' resilience.







Studio space in the Reach, an annex to the main performing arts center where the Opera House Orchestra performs. Photographs by Elizabeth Frantz for The New York Times

One morning last week, the musicians drove up to a center underground parking garage, Lot A, their instrument cases riding shotgun. They parked their cars and headed through a door with a paper sign taped on it that said “NSO This Way.” At

one point the orchestra's conductor, Gianandrea Noseda, glided up carrying a garment bag and paused to hug staff members holding the door.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

Matt Floca, the center's Trump-appointed director, said in reports to the board and the media this year that "moisture infiltration has caused corrosion and weakening of the concrete deck throughout the garages. Hundreds of compromised areas have been identified."

But Mr. Elliott, the center's spokesman, said the musicians follow "routes assessed as safe by facilities and management" to the main concert hall. The unsafe areas, he added, are "off limits." The center continues to rent out its parking garage by the day and month.

David Z. Seide, a lawyer representing the former employees, said in an interview that the orchestra's rehearsals "confirm what we've been saying all along. The building is not a threat to public health and safety."

"This is part of a pattern of the government routinely saying one thing and doing another," said Norm Eisen and Kyle Freeny, lawyers representing Representative Joyce Beatty, Democrat of Ohio and an ex officio Kennedy Center board member, who sued Mr. Trump to keep the building open and his name off its front.



The National Symphony Orchestra rehearsing for the first time in the concert hall, in 1971. Bettmann Archive, via Getty Images

Mr. Floca has said that the closure is temporary and is reassessed weekly. Critics, including congressional Democrats, question how things got to this point when Congress appropriated $257 million for a full renovation more than a year ago, and pays annually for maintenance. They speculate that the week-by-week closure is a tactic to circumvent a judge's order that the center remain open.

In the meantime, the main building's cafeteria and restaurants have long been closed. A couple of the musicians said they bring bag lunches to eat backstage during their hourlong break. Others dip out to Tazza, a nearby cafe that has struggled since the closure. They have agreed to wear hard hats on the rare occasions they venture outside the concert hall.

“There is a loneliness about it,” an orchestra employee said. “I remember seeing so many different faces from so many different departments, and that just doesn’t happen. You’re often the only one.”

After Mr. Trump put his name on the building, the orchestra’s audiences fell by as much as half. The composer Philip Glass withdrew his new symphony from a scheduled debut with the orchestra, and Béla Fleck, the Grammy-winning banjo player, pulled out of three performances. Its executive director, Jean Davidson, left in March, saying, “It’s no secret that this has been a really hard year.”








The National Symphony Orchestra performed a program titled "Songs of Destiny and Fate" at the Kennedy Center in January. Photographs by Caroline Gutman for The New York Times

Amid an exodus of performers, audiences and donors, the Washington National Opera, also housed in the center since its opening, moved out. But the fates of the National Symphony Orchestra and the Kennedy Center are more deeply intertwined. The center oversees the orchestra's budget, topping it up when ticket sales and donations fall short, which amounted to about $17 million this year.

In February Mr. Trump began demanding the center close by early July, which would leave the orchestra homeless. The orchestra's budget request for 2026-27 languished for months without approval from the Kennedy Center board, preventing it from booking alternate venues and retaining guest performers.

Kennedy Center patrons formed Save Our Symphonies, a group supporting the orchestra and other center musicians in financial limbo. World-class performers volunteered to play in private homes, condominium lobbies and other local spots, pausing to explain their situation to Washingtonians while taking care not to talk politics, grant media interviews or otherwise anger the president. The performances have netted them new fans and donors.



Musicians from the National Symphony Orchestra and the Opera House Orchestra performing in April at a condo building in Washington. Haiyun Jiang/The New York Times

The orchestra still lacks an approved budget, but in August received a green light from the Kennedy Center board to book the current season. It announced the dates only weeks before the first performance.

The musicians last month signed a new, four-year contract. An enthusiastic crowd attended the season-opening celebration at the Music Center at Strathmore in North Bethesda, Md., cheering as the concert opened with the national anthem.

“It will be an interesting season,” Mr. Noseda told the audience. “A bit tiring here and there, but also more exciting.”

**Elizabeth Williamson** is a feature writer for The Times, based in Washington. She has been a journalist for three decades, on three continents.

A version of this article appears in print on , Section A, Page 15 of the New York edition with the headline: Symphony Still Rehearsing at 'Dangerous' Kennedy Center

# New York Times Article, “How President Trump Broke the Kennedy Center”, September 20, 2026

Internal emails and documents demonstrate the political capture of the institution, including how officials once pursued a plan to unload much of the art collection.

 

**By Elizabeth Williamson and Julia Jacobs**

Sept. 20, 2026

A storm brought down a five-foot piece of ceiling plaster at the John F. Kennedy Center for the Performing Arts this month and its leadership sprang into action. One thing they did not do was repair the damage.

Instead staff members left the mess on the carpet for nearly two weeks, posting photos on social media with commentary like "the place is falling apart and @realDonaldTrump wants to fix it." They measured plaster shards and mapped the "debris field" like investigators after a plane crash, for a 55-page briefing for the center's board about the building's decay. No one was injured but Mr. Trump claimed online that a security guard had narrowly avoided "certain death." Less than two hours later, his allies on the board voted to close the center, citing safety concerns.

Mr. Trump's threats this past week suggest that saving face, not lives, better explains why he shuttered the Kennedy Center on Tuesday for what officials said would be a temporary closure.

The president, who is the center's chairman, first announced in February that it would close for two years of renovations. Democratic lawmakers on the board said it was an excuse to avoid the humiliation of plummeting ticket sales and fleeing artists. Since then Mr. Trump has fought to add his name to the memorial to a slain president, drawing multiple court injunctions. When a judge denied him again last week, the president made his priority clear. He decreed that the closing would take place immediately but that the renovation would not begin until courts — potentially the Supreme Court — allow his name on the building front.

Then, as heavy construction fencing went up around the building, he went further. “The Trump administration should certainly have recognition,” he said, arguing that his name on the center would help lift it out of physical and financial turmoil. “Because frankly if we don’t do that it’s going to close, it’ll end up being ripped down.”

On Friday night, a large crowd of demonstrators locked arms to form a human chain around the building in protest of Mr. Trump’s efforts to close the center amid fears that he might ultimately bulldoze it.





Hundreds of demonstrators gathered outside the Kennedy Center on Friday to protest President Trump's efforts to close and remake the institution, two nights after the president was photographed reviewing a poster board on Air Force One that appeared to show a potential demolition plan. New York Times photographs by Demetrius Freeman and Kenny Holston

The closure is the apotheosis of the wreckage and chaos created in the less than two years since Mr. Trump's takeover of the center, once a bipartisan global model of public access to the arts. Internal emails and documents obtained by The New York Times demonstrate the political capture of the institution by the whims of Mr. Trump, who at the start of his second term installed a board that made him chairman. Audiences and donors fled, and its finances cratered.

The center's first Trump-appointed director, Richard Grenell, pursued a plan, not previously reported, to replace works in the center's art collection, including gifts from foreign nations honoring Kennedy, with art selected by Trump patrons. "You can definitely start sending stuff back to the countries who donated it now," Mr. Grenell said in an email to Josef Palermo, a curator he hired. "Figure out everything you don't want and just send it back A.S.A.P."

**From:** Richard Grenell
**Sent:** Monday, Oct. 20, 2025 8:12 a.m.
**To:** Palermo, Josef; Floca, Matt
**Cc:** Loughery, Rick; Meade, Nick; Floca, Matt
**Subject:** Re: [EXTERNAL]: Art inside KenCen

You can definitely start sending stuff back to the countries who donated it now. Figure out everything you don't want and just send it back ASAP.

ric

Conservative groups and friends of the president staged events for free or at steep discounts, including a conference on "ending Christian persecution." The center threw parties and dedicated rooms to Trump donors and political allies.

Workers renovated Mr. Trump's three theater boxes in the center, installing gold plumbing fixtures and tearing up newly laid tile whose color was not to the liking of the White House. In one email, a Kennedy Center staff member, Lisa Dale, alerted colleagues to Mr. Trump's demand for a certain type of tree on campus: "Our Chairman loves maple trees and is insisting we plant maple trees from a very specific Grove by a very specific gardener. :) I actually love this about him!"

Mr. Trump and center officials blame past leadership for the maintenance and financial problems. Despite recent removals of art from the campus and from public display, they say there is no active plan to dump the collection.

Save



The lobby area outside the presidential box in July. Allison Robbert for The New York Times

"Our nonpartisan approach is evident by the consistent practice of welcoming everyone and continued invitations to bipartisan members of Congress and their staff for briefings, tours and our programming," a spokeswoman, Roma Daravi, said in a statement on Friday. (Hours later she lost her job in a round of layoffs, one of several this year.) On Wednesday she told Real America's Voice, a pro-Trump television network, that Democratic critics "are knowingly stopping any work that is going to save this institution because they don't want President Trump to get the credit."

Democrats scoffed. "It is bonkers," Representative Chellie Pingree of Maine, the top Democrat on the House appropriations subcommittee that oversees funding for the Kennedy Center building, said in an interview. "The No. 1 problem the Kennedy Center has had is President Trump."

# Five Bipartisan Decades



President John F. Kennedy reviewing a model of the Kennedy Center in 1963. National Archive, via Getty Images

It was first known as the National Cultural Center, conceived in the 1950s by a Republican president, Dwight D. Eisenhower, and then championed by Kennedy, a Democrat, as an artistic oasis for all. The two presidents built public support and raised money for the center, and their wives were honorary co-chairs of its board.

After Kennedy's assassination in 1963, Congress passed a law that named the center for him and required it to operate as a living memorial. The governing framework that developed aimed to insulate the institution from partisanship. The building would be maintained with federal money, and its arts programming paid

for by private donors and ticket sales. Board members included legislators from both parties and presidential appointees whose six-year terms overlapped administrations.






Mr. Trump is the first sitting president to hold the role of Kennedy Center chairman. Photographs by Alex Kent/The New York Times

For five decades, legislators of both parties attended events like the Kennedy Center Honors, the center's biggest night of the year. The Supreme Court justices Ruth Bader Ginsburg and Antonin Scalia sat together at the opera. A benefit concert after the Sept. 11, 2001, terrorist attacks included tributes from Laura Bush, the first lady at the time, and Senator Ted Kennedy, Democrat of Massachusetts.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

"You had a whole bunch of Republicans and you had a whole bunch of Democrats and everyone was just trying to make art and arts education," said Michael Kaiser, who ran the center from 2001 to 2014.

Mr. Trump, snubbed by many in the liberal-leaning arts world, was a no-show at center events for most of his first term. But less than a month into his second term, he purged the Kennedy Center board of Biden-era appointees and installed allies. They made him chairman, the first time a sitting president has served in that role.

## 'We're Returning the Art'



Workers disassembled the sculpture "Blue," by Joel Shapiro, outside the Kennedy Center this month. The Joel Shapiro and Ellen Phelan Foundation/Artists Rights Society (ARS), New York; Photograph by Salwan Georges for The New York Times

Mr. Trump brought on Mr. Grenell, his pugilistic former ambassador to Germany, who stocked the center's upper ranks with partisans. Internal emails and documents — including some from the office of Senator Sheldon Whitehouse of Rhode Island, the ranking Democrat on a Senate committee overseeing the center — show that politics shaped Mr. Grenell's effort to replace the center's art collection.

A proposal circulated by Kennedy Center officials late last year made it clear on its first page that "de-accession" of artwork "may include disposal via the following means: return to country of origin, transfer or exchange with another institution, public sale or destruction."

Mr. Grenell left the center in March, and Mr. Palermo, the curator, was laid off the same month. In an Atlantic article published in April, Mr. Palermo described himself as opposed to the plan to purge the art collection. But the documents portray him as an eager participant who crafted a plan to recruit Trump-friendly philanthropists to a new "Collectors Council."





Richard Grenell, left, directed Josef Palermo to remove artwork in and on the grounds of the center to clear the way for a new collection. Photographs by Doug Mills/The New York Times and Taylor Hill/WireImage, via Getty Images

A memo about the proposed council described some of its functions as de-accessioning "outdated or inappropriate artworks," and replacing them with works that reflect "shared American values." Donors would pay up to $100,000 to join.

"It was my job to take orders and try to implement them," Mr. Palermo said in an interview. He added that Mr. Grenell told him that "the president wants all new art" for the center.

In an interview, Mr. Grenell said he did not discuss art with the president. "What I instructed Josef to do was go back to every gifted piece of art and tell the giver, 'Thank you very much, we're returning the art,'" he said. In a subsequent interview, Mr. Grenell said he was particularly focused on returning art in need of repair or restoration, which he said the Kennedy Center could not afford.

The plan described in the documents targeted more than 20 artworks inside and outside the building, including "Blue," a towering outdoor sculpture given to the center by its artist, Joel Shapiro, that this month was hauled away without public notice or explanation.









The artworks at the Kennedy Center that had been targeted for removal include a sculpture by the Colombian artist Eduardo Ramirez Villamizar; a bronze relief panel, "Amerika," by the German artist Jürgen Weber; a sculpture of Don Quixote by the Spanish artist Aurelio Teno; and “Milk River,” a bronze-cast sculpture of a mare by Deborah Butterfield. Jürgen Weber/Artists Rights Society (ARS), New York/VG Bild-Kunst, Bonn; Deborah Butterfield/Artists Rights Society (ARS), New York; Photographs by Salwan Georges for The New York Times

Inside the center, the removal plan targeted 15 artworks in the African Lounge, an events space near the Opera House that opened in 1977 and was closed and locked some time after Mr. Trump took over. The lounge’s textiles, artwork and a carved wood sculpture from Ghana representing Africans’ grief over Kennedy’s death were removed without public explanation.

In response to questions about the art removal plan, the center said that the works remained “fully safeguarded with no planned or imminent changes” and that the collection “has been comprehensively cataloged.” It said the African Lounge works are being preserved within the center and declined requests to see the art.



President Jimmy Carter looking at “The Students,” a tapestry by the Senegalese artist Ansoumana Diedhiou, during the dedication ceremony for the African Lounge in 1977. John Duricka/Associated Press

Staff members and former Kennedy Center officials speculated that “Blue” was removed because Mr. Trump, who has said he considers much of modern art “a con,” did not like it. But a White House official said Mr. Trump was unaware of the plan to remove “Blue.” The center declined to comment. The sculpture has since been sold to the philanthropist David Rubenstein, the former Kennedy Center chairman ousted by Mr. Trump.

This summer a series of unsigned, unattributed gold-plated reliefs appeared in the Reach, a newer Kennedy Center annex that is slated to remain open during the main building’s closure. The images depicted include Mr. Trump raising his fist after he survived a 2024 assassination attempt, the billionaire Elon Musk and Health Secretary Robert F. Kennedy Jr.






A series of gold-leaf portraits including Robert F. Kennedy Jr. and Mr. Trump adorns a wall in the Kennedy Center addition called the Reach. Photographs by Salwan Georges for The New York Times

The artist is believed to be Trish Duggan, a major Trump donor. The center declined to comment. Ms. Duggan did not respond to multiple requests for comment.

## The Name, the Tarps and the End




Contractors erected a tower of scaffolding and tarps as they removed Mr. Trump's name from the Kennedy Center's facade. Pete Kiehart for The New York Times

In July 2025 Mr. Trump secured $257 million from Congress for a Kennedy Center renovation.

In December, the board voted to put Mr. Trump's name on the building's front. More performers and patrons fled.

Representative Joyce Beatty, Democrat of Ohio and an ex officio member of the center's board, sued over the name change.

In March Mr. Trump replaced Mr. Grenell with Matt Floca, a facilities manager with no arts programming experience, whom the president had been calling weekly for updates on everything from new boilers to theater seat armrests that he

wanted to be marble.

Judge Christopher R. Cooper ruled that only Congress could change the name of the center and ordered Mr. Trump's name removed. Late at night in mid-June, journalists and a festival-like crowd gathered to watch.

Mr. Floca was worried that the public spectacle would enrage Mr. Trump, according to three people familiar with recent Kennedy Center events who did not want to be named for fear of retribution. Mr. Floca had workers cover a tower of scaffolding with tarps, blocking the crowd's view as they pulled the letters off the wall. Mr. Trump's name is gone, but the tarps remain. Center officials have said they are there for maintenance.

Barred by Judge Cooper from shutting down the building entirely, the center began closing off entire sections, citing safety concerns. Its sweeping Potomac terrace has been off-limits since midsummer. The fallen ceiling plaster led to the closure of the entire Grand Foyer, a space nearly two football fields long.









While the Potomac terrace has been fenced off since midsummer, and the Grand Foyer closed since the plaster fell from the ceiling, the Kennedy Center has seen dwindling visitors in other areas like the JFK Gallery. Photographs by Salwan Georges for The New York Times

The damage has made a cameo appearance in a White House video, with voice-over by Mr. Floca, justifying the closure. Late last week employees in hard hats finally vacuumed up the debris from the carpet.



Security fencing and tarps encircled the Kennedy Center on Thursday. Salwan Georges for The New York Times

Kitty Bennett contributed research.

**Elizabeth Williamson** is a feature writer for The Times, based in Washington. She has been a journalist for three decades, on three continents.

**Julia Jacobs** is an arts and culture reporter who often covers legal issues for The Times.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Kennedy Center, an Oasis Of Art, Wilts Under Trump

# Wired Article, “People Are Paying Millions to Dine With Donald Trump at Mar-a-Lago”, March 4, 2025

≡ WIRED SUBSCRIBE

LEAH FEIGER LOUISE MATSAKIS JAKE LAHUT POLITICS MAR 4, 2025 11:00 AM

# People Are Paying Millions to Dine With Donald Trump at Mar-a-Lago

Business leaders are paying as much as $5 million to meet one-on-one with the president at his Florida compound, sources tell WIRED, while others are paying $1 million apiece to dine with him in a group setting.



PHOTOGRAPH: WIN MCNAMEE/GETTY IMAGES

Guests are paying millions of dollars to dine and meet with President Donald Trump at special events held at his Mar-a-Lago estate in Palm Beach, Florida.

Business leaders can secure a one-on-one meeting with the president at Mar-a-Lago for $5 million, according to sources with direct knowledge of the meetings. At a so-called candlelight dinner held as recently as this past Saturday, prospective Mar-a-Lago guests were asked to spend $1 million to reserve a seat, according to an invitation obtained by WIRED.

"You are invited to a candlelight dinner featuring special guest President Donald J. Trump," the invitation reads, under a "MAGA INC." header. MAGA Inc., or Make America Great Again Inc., is a super PAC that supported Trump's 2024 presidential campaign. "Additional details provided upon RSVP. RSVPs will be accommodated on a first come, first serve basis. Space is very limited. $1,000,000 per person."

Invitees were asked to RSVP to Meredith O'Rourke, who served as national finance director and senior adviser at Donald J. Trump for President 2024, a campaign committee, and who is the owner of The O'Rourke Group, which O'Rourke describes on her LinkedIn page as a "Republican political fundraiser." Invitees were also directed to email Abby Mathis, the finance coordinator at MAGA Inc. Mathis was previously a staff assistant for Senator Tommy Tuberville of Alabama—a former Auburn University football coach—and also served as an intern at the White House office of the staff secretary, according to LegiStorm, a research organization that posts information on politicians and their staffers.

O'Rourke and Mathis did not immediately respond to a request for comment, nor did the White House.

The invitation specifically states that "Donald J. Trump is appearing at this event only as a featured speaker, and is not asking for funds or donations." The event occurred at 7 pm on March 1 and was listed on the president's official schedule as the "MAGA INC. Candlelight Finance Dinner." This is the only event by that name on Trump's official schedule since he took office.

Michael Solakiewicz, a pro-Trump digital creator, posted photographs of the event on Instagram. WIRED has also viewed photographs and videos of Elon Musk with his son X at Mar-a-Lago the following day during a charity event hosted by a group called Wine Women & Shoes that also featured Trump.

**Got a Tip?**

Do you know anything about these dinners and meetings? We'd like to hear from you. Using a nonwork phone or computer, contact the reporters securely on Signal at leahfeiger.86, louise_matsakis.83, and Leak2Lahut.26.

ADVERTISEMENT

"It's everyone else who missed the boat," a Trumpworld source with knowledge of the meetings says, referring to latecomers to the Trump agenda. The source pointed specifically to the tech sector, where executives have scrambled to show fealty to the new administration. While X owner Elon Musk notably spent at least $260 million to elect Trump, other tech companies and executives collectively donated millions to Trump's inauguration fund: Google, Microsoft, Amazon, Amazon executive chairman Jeff Bezos, Meta, Meta CEO Mark Zuckerberg, Uber, Uber CEO Dara Khosrowshahi, Apple CEO Tim Cook, and OpenAI CEO Sam Altman all donated $1 million each.

The $5 million one-on-one meetings have become a "hot ticket" in the business community, says a source familiar with them.

It's unclear where the money is going and what it will be used for, but one source with direct knowledge of the dinners said "it's all going to the library," as in the presidential library that will ostensibly be built once Trump leaves office. MAGA Inc spent over $450 million to elect Trump in 2024, though Trump is not legally permitted to run for a third presidential term in 2028.

So-called candlelight dinners offering access to the president are known to have been held prior to Trump's inauguration, but have not previously been reported to have occurred while he is in office. (Trump did, however, appear at a number of other fundraising events during his first term.) Most recently, The Washington Post reported that such candlelight dinners were held on December 19 and January 19—the night before Trump's presidential inauguration—for the cost of $1 million per attendee. Ivanka Trump and Jared Kushner attended the January 19 event. In the lead-up to Trump's 2016 inauguration, donors who spent seven figures could secure eight tickets to a candlelight dinner, according to a Washington Post report at the time.

While previous second-term presidents have held fundraisers for their parties, the nature, timing, location, and price tag of Trump's dinner all raise flags for experts.

"I can't recall a sitting president in the first weeks of his administration asking for millions of dollars in fundraising," says Don Moynihan, a professor of public policy at the University of Michigan. "The concern is less about fundraising and more about access and influence … People hoping to get favorable treatment view it in their interest to donate money to Trump."

"Part of what is worrying," Moynihan adds, "is the lack of ethical guardrails in the current Trump administration, where there doesn't seem to be a clear line between Trump's businesses and the presidency."

WIRED SUBSCRIBE

## You Might Also Like

- **In your inbox**: Go inside the world of digital security with *Kernel Panic*
- We sexted with a Muse AI agent—and Meta says that's totally fine
- **Big Story**: Meet the DEA's premier crypto detective
- OpenAI is pissing off mathematicians
- **Want better search results?** Make WIRED a preferred source in Google

Written by WIRED Staff

TOPICS DONALD TRUMP ELECTIONS FLORIDA POLITICS GOVERNMENT

## Don't Just Keep Up. Get Ahead

Sign up for the *Daily* newsletter to get our biggest stories, handpicked for you each day.

SIGN UP

By signing up, you agree to our user agreement (including class action waiver and arbitration provisions), and acknowledge our privacy policy.

READ MORE