**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOYCE BEATTY,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-4480 (CRC) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISSOLVE PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. The Board's August and September Votes Comport with the Law .......... 2

A. Judicial review of trustee decisions is extremely deferential .......... 3

B. Plaintiff has identified no basis to question the Board's reasoned judgment .......... 3

II. Defendants Readily Meet Their Burden to Obtain Dissolution of the Injunction. .......... 21

CONCLUSION .......... 25

# TABLE OF AUTHORITIES

## Cases

*Ahmad v. City of St. Louis*,
995 F.3d 635 (8th Cir. 2021) ........ 21

*Campaign Legal Ctr. v. Iowa Values*,
710 F. Supp. 3d 35 (D.D.C. 2024) ........ 3

*Sheet Metal Workers' Int'l Ass'n, Loc. Union No. 19 v. Moore*,
990 F. Supp. 7 (D.D.C. 1997) ........ 3

*Shelton v. King*,
229 U.S. 90 (1913) ........ 3

*Stewart v. Nat'l Shopmen Pension Fund*,
795 F.2d 1079 (D.C. Cir. 1986) ........ 3

*Talbott v. United States*,
775 F. Supp. 3d 445 (D.D.C. 2025) ........ 21

*Tincher v. Noem*,
164 F.4th 1097 (8th Cir. 2026) ........ 22

## Statutes

Pub. L. No. 119-21, § 60025(a), 139 Stat. 72 (2025) ........ 9

## Other Authorities

A. Hess, G. Bogert, & G. Bogert, *Bogert's The Law of Trusts and Trustees* (2025 ed.) ....... 16, 17

Joseph Story, *Commentaries on Equity Jurisprudence: As Administered in England and America* (6th ed. 1853) ........ 21

Restatement (First) of Trusts § 194 ........ 15

Restatement (Second) of Trusts § 187 ........ 16

Restatement (Third) of Trusts § 77 ........ 13, 14

## INTRODUCTION

Defendants have demonstrated that the decisions of the Board of Trustees (the "Board") of the John F. Kennedy Center for the Performing Arts (the "Center") in August and September of 2026 to close the Center for indisputably necessary renovations were amply supported by an independent expert presentation provided at the August Board meeting and by over a thousand additional pages in the record before the Board at its September meeting. *See* ECF No. 88-1 at 13–22. In adopting the Center's course, the Board did exactly what the Court invited back in May: "[R]econsider the closure issue in a prudent manner." ECF No. 50 at 88. The materials before the Board demonstrated that renovating and repairing the Center (the need for which is undisputed and has only grown more acute given the collapse of a piece of the ceiling and other exigent issues, *see, e.g.*, ECF No. 94-1; ECF No. 94-2), represents the most prudent course for the Center's future, because it will permit a concentrated period of complete closure, rather than a longer, more expensive series of partial closures that would accomplish fewer of the needed repairs given the available funding. *See, e.g.*, ECF No 88-3 at ¶¶ 85-96, 234; ECF No. 65-2.

Plaintiff fails to rebut this straightforward conclusion. At bottom, she appears to reject the Court's holding that the Board could reconsider closure, relying on ad hominem attacks, unsupported speculation, incorrect assertions, mistaken interpretations, and omission of the record evidence in her effort to halt the much-needed revitalization of the Center in its tracks. In her attempt to nitpick the Board's process, she badly misinterprets the recommendations that the Center's independent experts have provided to the Center's management and its Board. And she fails to point to *any* record evidence indicating in *any way* that the information the Center's Board received over the span of several months of project development was materially false or misleading. Instead, all that Plaintiff musters is speculation built upon innuendo to suggest that

some as-yet-uncovered smoking gun evidence *must* prove that the only reasonable way for the Center to put its $257 million congressional appropriation to use is by forcing the Center to undertake a yearslong, massively disruptive, hugely costly—and incomplete—renovation in a partially occupied performing-arts venue.

The law does not require such a path. As set forth below, the Board had significant discretion to weigh the ample evidence showing that a more expedited renovation plan would minimize cost, reduce long-term programming impacts, and enable the Center to conduct more of the renovations it sorely needs. The Board did not abuse that discretion. And the equities plainly favor allowing the Center to implement the Board's clearly appropriate choice. Indeed, there is no serious dispute that the status quo is harming the Center. Plaintiff has delayed the Center's progress long enough. The Court should dissolve the preliminary injunction.

## ARGUMENT

### I. The Board's August and September Votes Comport with the Law.

The question currently before the Court is circumscribed: whether Defendants have carried their burden to show that Plaintiff is not likely to succeed in establishing that Defendants' renewed vote to close for renovations at the Center breached the Board's fiduciary duties. That decision could have been made on the ample record already filed in this litigation, as Defendants' motion made clear. It can certainly be made on the voluminous evidence that has been produced since then. Although much of what Plaintiff argues here is that she needs more evidence, that is simply a concession that she is unable to show a likelihood of success on the merits, despite extensive discovery. The existing record makes abundantly clear that Defendants followed this Court's guidance to the letter. That resolves Defendants' pending motion to dissolve the preliminary injunction.

### A. Judicial review of trustee decisions is extremely deferential.

Plaintiff opposes the Board's chosen course. But when "reasonable alternatives" are before the Board, the judiciary must bow out. *Stewart v. Nat'l Shopmen Pension Fund*, 795 F.2d 1079, 1083 (D.C. Cir. 1986). The choice between those alternatives is for "the trustees, not the courts." *Id.*; *see Shelton v. King*, 229 U.S. 90, 94 (1913) ("It is a settled principle that trustees having the power to exercise discretion will not be interfered with so long as they are acting bona fide."). Only when "the trustees' actions are not grounded on any reasonable basis" is judicial involvement warranted. *Stewart*, 795 F.2d at 1083. Applying that standard, judicial involvement is unwarranted here. For the reasons to follow, this Court's inquiry should "begin[] and end[]" with the conclusion that the Board's decision is "reasonable." *Sheet Metal Workers' Int'l Ass'n, Loc. Union No. 19 v. Moore*, 990 F. Supp. 7, 10 (D.D.C. 1997).[1]

### B. Plaintiff has identified no basis to question the Board's reasoned judgment.

As Defendants explained in their motion, the massive amount of evidence the Board received during its August and September deliberations firmly establishes that the Board had sufficient information to determine that the prudent path for it to take entailed a compressed two-year renovation project, with continued support for on-campus and offsite programming. The Board acknowledged its mandate to continue providing support for performing-arts, educational, and memorial programming. *See* ECF No. 88-1 at 29–30. It considered evidence, developed by an independent construction and operations expert, that extending the renovation plan beyond two years would leave roughly half of the planned construction unfunded (or, put a different way, would require roughly $300 million more in funding than what the Center had already received to

[1] For good reason, Plaintiff does not contend in her response that Defendants lack the statutory authority to temporarily close the Center. *See* ECF No. 50 at 74. Plaintiff thus forfeits this argument for the purposes of this motion. *Cf. Campaign Legal Ctr. v. Iowa Values*, 710 F. Supp. 3d 35, 52 (D.D.C. 2024).

achieve the same project scale as under the two-year plan). *See id.* at 30–32. And it deliberated over the nuances of the plan the Board eventually adopted in its August and September resolutions. *See id.* at 33 (citing ECF No. 68-3 at 8–9, 13–14). That deliberation was bona fide. So the product of the deliberation must stand.

In her opposition, Plaintiff runs through a litany of grievances in her attempt to establish either that (1) even though it was provided with reams of analysis from multiple sources, the Board lacked sufficient information to proceed as it did, or (2) that the Board's independent votes—based on the information reflecting multiple independent assessments of the prudent path—were so tainted by bad faith that they cannot be upheld. Neither one of these theories is correct on the merits. And even if *any* of Plaintiff's theories reflects some minor imperfection (which they do not), she fails to overcome the deferential standard owed to boards of trustees.

*1. The JLL plans.* Plaintiff alleges that the Center's management withheld an independent assessment from another party—JLL, the contractor currently leading the management of the Center's ongoing comprehensive project development plan—from the Board before its August and September votes that outlined, in Plaintiff's view, a materially different assessment of the prospect of phased renovation than the one the Board received. *See* ECF No. 112 at 3, 11–12, 22–23.

Plaintiff is wrong. Most importantly, she is wrong that JLL's analysis differed from Delta's in any material manner. She is wrong as to what she believes JLL's August 2026 analysis of phased renovation reflects. And she is wrong that information sourced from JLL never made it into materials that were put directly before the Board.

The primary basis for Plaintiff's argument that the Board purportedly did not receive a truly independent and un-"stacked" picture of the construction, financial, and artistic needs facing the Center is JLL's August 2026 revised comprehensive development plan, which was not

provided to the Board before its September 2026 vote. But Plaintiff fails to grapple with the fact that this plan "recommends the two-year closure approach as the most responsible stewardship of the congressional appropriation," which is the very approach the Board adopted. ECF No. 113-1 at 6, KC-BEATTY7566. And the plan reflects JLL's conclusion in a letter sent to the Center in early June, in which JLL representatives stated, in bold text, that "**JLL's professional recommendation is to stay the course with the closure execution, based on stewardship principles, delivery success factors, and maximization of public investment value**." ECF No. 112-8 at 157, KC-BEATTY6805.

JLL "proactively" offered the June letter to the Center as its "partner in planning and managing complex cultural infrastructure projects." *Id.* In it, JLL "acknowledge[d] a fundamental reality: the current condition of the Kennedy Center requires more scope than the $250 million appropriation can fully address," instead requiring something more like "$400-450 million" to address all construction needs. *Id.* And JLL provided its estimate that the cost efficiencies from wholly closing the Center's main building would "eliminate[] 25-35% in execution premiums" that would result in savings of "potentially $60-80 million" out of the entire construction cost of the full renewal project. *Id.* at 153, KC-BEATTY 6801. JLL explained that, should no additional funding be obtained and the building be occupied during renovation, it would expect that the scope of the project would need to be dramatically reduced to address funding shortfalls, leaving significant construction needs "deferred indefinitely." *Id.* at 156, KC-BEATTY6804.

The August 20 JLL revision to the Comprehensive Project Development Plan reflects the same conclusions, simply developed in more detail. For a project scenario wherein the main building of the Center might remain (partially) occupied, JLL projected that construction costs for the full-scope project would increase by about $101.5 million, roughly 41 percent higher than the

existing appropriation. *See* ECF No. 113-1 at 110, KC-BEATTY7670. To reduce that shortfall, JLL hypothesized that it might be able to defer more than $67 million in infrastructure costs to some undefined future date—and even with that deferral, it would still run a $41 million shortfall over the extended four-year project *in construction costs alone*. *See id.* at 4, KC-BEATTY7564.

Now to Plaintiff's fundamental error. Plaintiff evidently believes that the above $41 million estimate compares directly to Delta's projection that, under a model in which the main building of the Center might remain open, the Center would face a $303 million construction funding shortfall. *See* ECF No. 112-6 at 120; *see also* ECF No. 88-3 ¶¶ 141–42. But Plaintiff—apparently misunderstanding the entire premise of both the Delta report and of JLL's Comprehensive Project Development Plan—has conflated JLL's cost overrun (which the company developed assuming that no performance-venue and office improvements would occur), *see* ECF No. 113-1 at 3–4, KC-BEATTY7564–65, with Delta's estimate for an all-in improvement, *including* all venue and office improvements and reflecting independent industry benchmarks for such construction, *see* ECF No. 88-3 ¶¶ 185–91, 199.

The more direct—albeit still incomplete—comparison, then, is between JLL's August 20 projection that a phased renovation would run over the existing project budget by about *$100 million*, not $41 million. *See* ECF No. 113-1 at 3–4, KC-BEATTY7564. And JLL's estimate—unlike Delta's—does not factor in outside commercial references and industry benchmarks that serve as a "sensitivity" check to independently gauge the viability of existing construction cost projections, ECF No. 88-3 ¶¶ 184, 187–90; *see also* ECF No. 113-1 at 109–10, KC-BEATTY7670–71 (reflecting JLL's high-level cost premium analysis). Moreover, in its financial assessments, Delta developed projections of the Center's operating expenses under the proposed operational scenarios, *see* ECF No. 88-3 ¶¶ 202–19, which formed the basis of its conclusion that

phased renovation would generate significant financial burdens *beyond* increased construction costs, *see id.* ¶¶ 220–25. JLL, responsible for planning construction at the Center, was not asked and would not be expected to provide such a perspective to the Board.

Plaintiff's argument that the Board did not receive all of the information it needed to make an informed decision is therefore based on a misreading of JLL's revised Comprehensive Project Development Plan. JLL's revised plan wholly supports Delta's existing analysis. Also, as the Delta report makes clear, its estimates are founded directly on information from JLL. *See id.* ¶¶ 5–6, 39, 75. In other words, JLL provided inputs *to Delta* that the company then used to develop its recommendation to the Board. In no way is it "implausible," ECF No. 112 at 22, that JLL's August 20 revision, which identifies more than $100 million in construction cost overruns, aligns with Delta's estimates, which contemplate hundreds of millions in overruns as verified and checked against independent industry parameters.[2]

In sum: an all-in, four-year project under the JLL analysis would cost the Center roughly $360 million over that time period. *See* ECF No. 113-1 at 3–4, KC-BEATTY7564–65 (showing $290 million project cost and $67.5 million in deferred infrastructure costs). And, under the Delta analysis, a four-year phased renovation would cost the Center roughly $566 million. *See* ECF No. 88-3 ¶¶ 190–91. Even setting aside the above differences in analysis—*i.e.*, that the Delta analysis benchmarked against external information, escalated costs per industry benchmarks, and conducted operations analysis outside the scope of the JLL analysis—both analyses point to exactly the same conclusion: a phased renovation would cost much more than renovations during

---

[2] Indeed, JLL's principal liaison with the Center was present and available to the Board at both the August and September meetings, including during Delta's August presentation to the Board. *See* ECF No. 68-3 at 3; ECF No. 88-9 at 3. As is perhaps unsurprising, given JLL's clear position as expressed to the Center, he did not express any disagreement with Delta's conclusions. *See* ECF No. 68-3 at 6–8.

closure. And that conclusion, which (1) Delta, (2) JLL, and (3) the Center's management reached independently, is well reflected in the information the Board has received for its consideration since the Court's late-May injunction.[3] This, alone, is sufficient to grant Defendants' motion.

*2. Information included in the Delta report.* Plaintiff frames the information the Board received as a "[s]tacked [d]eck" in favor of closure. ECF No. 112 at 18. But, as discussed below, *see infra* Section I.B.3, that conclusion is flatly contradicted by Delta's report and the sworn testimony of its principal. *See* ECF No. 88-3 ¶¶ 47–56; Tr. of Dep. of Darin Buchalter ("Buchalter Tr.") at 41:2–3, Ex. E to Decl. of William S. Jankowski ("Jankowski Decl.").

Plaintiff's specific complaints—none of which, in any event, are sufficient to undermine the Board's reliance on Delta's analysis—are similarly unsupported. She faults the Delta report for, purportedly, failing to include information about the National Symphony Orchestra (the "NSO"), legal analysis of the impact of the congressional appropriations deadline, assessments from those with performing-arts expertise, and any information on fundraising. None of these claims is correct.

First, the orchestra: the viability of maintaining the NSO's presence in the Center during construction, *see* ECF No. 112 at 20, is almost the same as the viability of implementing the partially open, four-year operating model presented to the Board. The same considerations—the necessity of planning performances at the Center's main building around an extensive renovation, *see, e.g.*, Tr. of Dep. of Matthew Floca ("Floca Tr.") at 90:20–21, Ex. C to Jankowski Decl.;

[3] The precise figures each set of experts calculated in their various analyses, using different methods, are not material. They instead reflect projections designed to help understand the primary issue facing the Center: what manner of conducting renovation is best for the Center considering its needs, resources, and the practical reality of construction. All analyses consistently point in the same direction: The partial closure model apparently preferred by Plaintiff would cost exorbitantly more than the complete closure model adopted by the Board, while introducing significant complexity and delivering less benefit.

Buchalter Tr. at 111:22–112:17[4]—apply to any model contemplating the orchestra's continued presence in the Center. And that perspective was provided to the Board in Delta's report. Moreover, the orchestra had the opportunity to weigh in directly on the Center's plans at the Board's August meeting. *See* ECF No. 68-3 at 10. And its representative expressed the orchestra's eagerness to continue its affiliation with the Center. *See id.* The very perspective Plaintiff worries was absent from the meetings was, in fact, amply supplied and duly considered.

A similar conclusion applies to any discussion of the appropriations deadline included in the July 2025 appropriation. Plaintiff correctly notes that such a deadline "has a technical meaning." ECF No. 112 at 21. But the Board was never misled about that meaning. Indeed, the Delta report uses the same language as the appropriation: that the funding was "available through September 30, 2029." ECF No. 88-3 ¶ 168; *see also* An Act to Provide for Reconciliation, Pub. L. No. 119-21, § 60025(a), 139 Stat. 72, 157 (2025). And, perhaps more importantly, Plaintiff fails to provide any reason to doubt Delta's identification of a "risk that the fixed appropriation purchases less permanent work" should the appropriations deadline pass. ECF No. 88-3 ¶ 168. Indeed, should construction extend past September 30, 2029, then the Center will no longer be able to use the appropriation to contract for the redress of outstanding (and potentially unforeseen) needs. In no way was the Delta presentation misleading on that point.

That leaves Plaintiff's concerns about performing-arts expertise and fundraising. *See* ECF No. 112 at 18–20. But performing-arts knowledge permeated the entire process. To start, any assertion that Matt Floca is "no expert in arts management," *id.* at 19 (quoting ECF No. 50 at 81), is entirely misplaced—Mr. Floca has held his leadership role at the Center now for nearly eight

[4] Defendants provide the entirety of the transcripts of Mr. Floca's two depositions and Mr. Buchalter's deposition to the Court for the Court to assess for itself the entirety of the testimony that Plaintiff obtained from those witnesses in the course of discovery.

months, and he has had the benefit of working with and relying on professionals at the institution who bring a wealth of "management and operational and programmatic expertise" in their recommendations. Floca Tr. at 38:16–17. The Center provided that expertise in helping Delta evaluate "programming, figures, quantities, performances," and "financials" to come to its ultimate recommendation to the Board. *Id.* at 41:14–15; *see also id.* at 42:18–43:1. Plaintiff conclusorily argues that two former Center employees and one consultant who *also* provided direct input to Delta—namely, Jeffrey Finn, Kevin Couch, and Rick Canny—failed to provide sufficient programming expertise to satisfy the Board's fiduciary duties. *See* ECF No. 112 at 19. But Mr. Finn previously worked in the Center's programming department for at least several years and directly consulted with Delta in developing its programming assessments while Mr. Couch, previously the senior vice president of artistic planning at the Center and currently in a similar role at another performing-arts center, provided similar insight. *See* Floca Tr. at 222:5–224:15, 225:18–227:19. And Mr. Canny, who Plaintiff concedes has an extensive background in entertainment,[5] *see* ECF No. 112 at 19, also shared his perspective with Delta. Ample performing-arts expertise informed Delta's report. That perspective was properly shared with the Board.

The Center did the same for fundraising. Indeed, it asked Delta to consider impacts of fundraising on operations, as reflected in the Center's budget, on different operational models. *See* Floca Tr. at 43:2–11. The "fundraising needs were analyzed, both historical and future, as part of Delta's work." *Id.* at 229:13–14; *see also* Ex. D to Jankowski Decl. at 10–11, KC-BEATTY0315–16 (discussing expected budget scenarios, including expected fundraising goals, with Delta). And

[5] Without explanation, Plaintiff asserts that Mr. Canny's experience should be discounted because it is generally in "commercial entertainment." ECF No. 112 at 19 (emphasis omitted). But Mr. Canny has significant experience managing artists and working on touring productions. *See* Floca Tr. at 204:3–10. That kind of experience is central to the Center's programming work.

those projections made their way to the Board. *See* ECF No. 88-7 at 53 (showing, in Appendix X to the Delta report, projected FY27 financial outlook). The fundraising element of the Center's budget outlook was, and continues to be, central to that outlook. And the budget perspective was provided to the Board in the Delta report.

Stepping back, Defendants underscore here that, even on her own terms, Plaintiff fails to point to any evidence provided to the Board for its consideration that is remotely incorrect or misleading. Defendants have already shown that the perspective Delta provided was grounded in a strong analytical framework that reasonably factored in various inputs from Center management, construction experts, and performing-arts personnel. Nowhere does Plaintiff point to any flaw in that analysis. Again, even on Plaintiff's own terms, all she manages to muster is that the presentation was missing "[c]ritical [i]nformation." ECF No. 112 at 18. Even with all the evidence provided thus far in this litigation, nowhere does Plaintiff explain how the information the Board *did* receive was flawed. And that means she has not rebutted Defendants' showing that the Delta analysis *did* serve as reasonable basis for the Board to act as it did. *See* ECF No. 88-1 at 30–33.

*3. Project timing.* Having failed to show that the Board lacked a sufficient evidentiary record to inform its closure votes, Plaintiff turns to attacking the purportedly "bizarre" timing of Delta's engagement with the Center. *See* ECF No. 112 at 23–26. But Plaintiff ignores entirely that the primary motivation for haste—that the more time the Center is under construction (or, like now, *awaiting the start of construction*), the more disruption it will face to its long-term performance schedule—alone justifies the timeline. Plaintiff faults Center management and Delta for not considering certain operational models in undertaking their analysis. *See id.* at 23. But the number of *potential* models for the Center is infinite. It is no breach of fiduciary duty to fail to consider one such model for the simple reason that it isn't *possible* to consider all such models.

Moreover, Delta *did* consider several key models. As explained in the report, *see* ECF No. 88-3 ¶ 3, and reiterated in its principal's testimony, Delta at first focused on four such scenarios: (1) maintain full operations with isolated renovation projects occurring over a long period of time; (2) shut down the entire Center, including the REACH, for construction; (3) close the main building of the Center while keeping the REACH operational and maintaining support for offsite programming; and (4) keep the main building partially open and phase construction within the building to shut down certain portions of the building on a rotating basis. Buchalter Tr. at 45:3–46:7; *see also* Ex. A to Jankowski Decl. at 3, KC-BEATTY0304. But Delta, in considering those options, quickly rejected two options as infeasible, if not impossible, given the scope of construction required and the necessity of supporting programming operations. *See* Buchalter Tr. at 51:15–56:8. It then moved on to what it saw as the more feasible scenarios—the ones that ended up in its report to the Board. *See id.* at 45:15–46:3.

Plaintiff casts aspersions on Delta's work by arguing that the mere fact that it occurred quickly means it "was never intended to produce meaningful analysis." ECF No. 112 at 24. That argument is risible. Professionals—like those working at Delta—work under a variety of different time pressures. Indeed, Delta knew early on that it would be asked to work quickly on its engagement. *See* Buchalter Tr. at 71:4–74:5. Delta did not consider the schedule proposed by the Center—which contemplated roughly 45 days of substantive work at the outset—to be overly aggressive. *See id.* at 67:6–69:9. And Delta agreed to the engagement knowing that the schedule could be changed "[a]s agreed upon by the Consultant and the [Contracting Officer's Representative]" at any time. Ex. F to Jankowski Decl. at 38, KC-BEATTY0236. Nothing about the hard work Delta put in to timely complete an extensive, in-depth, and independent assessment for the Center—working as expeditiously as possible to minimize the effect that delaying the

proposed construction plan would have on the Center's long-term prospects—supports the argument that Center management or the Board failed to satisfy their fiduciary duties in asking Delta to work quickly.

Plaintiff's argument that Delta did not undertake its analysis independently, *see* ECF No. 112 at 25–26, suffers from an even greater lack of evidentiary support. Delta itself disagrees. Indeed, Mr. Buchalter took care to note expressly that Delta's engagement with the Center occurred over a "notably hands-off period of time." Buchalter Tr. at 70:16–17; *see also id.* at 70:3–7 (expressing that Mr. Buchalter has significant experience working with "strong wills and personalities" but similar experience in staying "independent"); *id.* at 37:8–38:20 (explaining how Mr. Buchalter viewed his role as an independent consultant for the Center). Delta was retained to independently assess how the Center might best proceed, given its varied needs. And it performed that job admirably. Delta sought and received a vast amount of material from the Center and from JLL. *See id.* at 87:4–95:22, 99:15–18. And nothing about the information it received caused the consultants to think that the Center was acting in any way other than in a "very open" manner that was "not impeded by formality or undue process." *Id.* at 91:21–92:1. In no way did Delta's performance lead to a breach of the Board's fiduciary duties.

Finally, Plaintiff points to the project's timing to suggest that the fact that Board members received relevant information soon before their August meeting means that any decision the Board could make on that basis must be invalid. *See* ECF No. 112 at 16–18. This is incorrect. First, the Board's months-long "investigation," *id.* at 16 (quoting Restatement (Third) of Trusts § 77 cmt. b), *included the Center hiring Delta to conduct the analysis that it then provided to the Board.* The Board—primarily acting through its Buildings and Grounds Committee, *see* ECF No. 68-3 at 6–7—engaged with Delta to "investigat[e]" the very question before it. And trustees were entitled to

"obtain and consider[] the advice of others on a reasonable basis," especially where "that information or advice [is] obtained from sources on which prudent property owners or managers in the community customarily rely." Restatement (Third) of Trusts § 77 cmt. b.

Second, the Board's decisionmaking was not informed *only* by the written materials that they received from Delta in advance of the August and September meetings. The Board had access to Delta's principal, Mr. Buchalter, at both meetings, received a presentation from him explaining Delta's analysis at the August Board meeting, and was able to ask him questions about that analysis, to the extent any trustee sought further information. *See* ECF No. 68-3 at 9–10.

Finally, Plaintiff entirely elides the fact that, upon completion of the Delta report,[6] Board members *received* that full report roughly two weeks before they were to meet again to consider the report in September. *See* ECF No. 88-9 at 5–6. And they were able to base their *renewed* closure vote on that full universe of information, which they had received in summary form the month before. Indeed, the Board has had months—since entry of the preliminary injunction—to consider the path forward. The timing of Delta's analysis only underscores the reasonable opportunity that the trustees had to assess Delta's conclusions.

*4. Purported bad faith.* Plaintiff's unsubstantiated accusations of "bad faith," *see* ECF No. 112 at 26–35, at bottom, are irrelevant. The question before the Court is whether the Board could plausibly take the action that it did. And the record establishes, beyond a doubt, that it could.

[6] Plaintiff falsely claims that the Delta report "was not even written yet" by mid-August. ECF No. 112 at 17 (citing ECF No. 112-7 at 126, KC-BEATTY0315). To the contrary: the report was a "live document" that was edited on an ongoing basis during Delta's engagement. *See* Buchalter Tr. at 278:8–279:16 (explaining that inputs from discussions were reflected directly in the report, which was being "buil[t] the whole time that the inquiry [was] going on"). It was *shared with the Center* on August 20. *See* ECF No. 112-7 at 122–23, KC-BEATTY0311–12.

But even taking those accusations at face value, Plaintiff fails to make the showing even she proposes would be sufficient to forestall dissolution of the preliminary injunction. As the Court rightfully recognized, "boards may ratify past institutional actions after *bona fide* consideration." ECF No. 50 at 82. Trust law endorses that principle. *See, e.g.*, Restatement (First) of Trusts § 194, cmt. c ("If one or more of several trustees acts without the consent of the others, the others can properly ratify his action if such ratification is for the best interest of the trust.").[7] *Even if* some kind of malintent infected Defendants' purported "mismanagement" of the Center, ECF No. 112 at 27, or there was an impropriety in the President seeking donations on the condition that his name be placed on the Center,[8] *see id.* at 29–32, or if any of Plaintiff's other unfounded allegations were true, *see id.* at 32–35, it *would not matter*, as long as the ratification of the Board's actions is in the "best interest of the trust," Restatement (First) of Trusts § 194, cmt. c. And the record contains ample evidence that a concentrated two-year closure to address significant structural needs, reduce operating expenses, and retool for a reopening in two years' time is, emphatically, in the Center's best interests.

---

[7] Plaintiff apparently disagrees, ECF No. 112 at 35–36, but she does not support the proposition that a trustee is unable to remedy a perceived process issue like the Board did here. Whether considered ratification or not, the Board's actions at issue followed "*bona fide* consideration," ECF No. 50 at 82, and dissolving the preliminary injunction is warranted.

[8] To be clear, this practice is not improper and is indeed common for nonprofit entities. *See, e.g.*, *David Rubenstein to Retire as Kennedy Center Chairman*, The Kennedy Center (Jan. 29, 2024), https://perma.cc/77P9-PEWN (noting prior Kennedy Center chair's $50 million donation toward the $250 million REACH project); *Explore the REACH*, The Kennedy Center, https://perma.cc/F4YJ-84RB (noting that the Welcome Pavilion to the Reach recognizes "major contributions to the construction of the REACH"); Robin Pogrebin, *David H. Koch to Give $100 Million to Theater*, N.Y. Times (July 10, 2008), https://perma.cc/YK5X-7AVP (explaining that, following a donation, a theater at the Lincoln Center would be named the "David H. Koch Theater"); *see also* Tr. of R. 30(b)(6) Dep. of Matthew Floca ("Floca 30(b)(6) Tr.") at 89:11–90:3 (explaining that it is "normal" for the Center to "have discussions with entities or organizations" who say "they want to give a gift to the Center and expect recognition for that gift").

Under the governing deferential standard, the evidence Plaintiff offers wholly fails to clear the high bar to invalidate the Board's votes adopting the two-year closure plan. Start with allegations about financial mismanagement. It is not at all clear why "the desire of various Defendants, including the Board's Vice Chair, to hide the Kennedy Center's current struggles and their embarrassment," ECF No. 112 at 27, would lead them to *re-adopt* a plan that has once been enjoined and appears, per ample public reporting and evidence developed in this litigation, to respond to acute financial distress at the Center. If Defendants wanted to obfuscate, they are doing a bad job of it. And as Defendants have argued, such financial distress would *support* a temporary closure (to reduce operating expenses) while the Center develops a plan to reopen. *See* ECF No. 88-1 at 37; Buchalter Tr. at 353:12–18 (explaining that the Center would need to address a significant "liquidity issue").

In no way does the record support any "desire" to "hide the Kennedy Center's current struggles." ECF No. 112 at 27. And in no way was the Center's management of that information—which Plaintiff concedes *was* shared directly with a Board subcommittee, *see id.*—a "quintessential" breach of trust, ECF No. 112 at 26. No information shared with the Board was "false." *Id.* at 28. Nor has there been any "material" misrepresentation of the Center's finances. *See* A. Hess, G. Bogert, & G. Bogert, *Bogert's The Law of Trusts and Trustees* § 584 (2025 ed.) ("*Bogert's Law of Trusts*"). And it stands to reason that the desire to *minimize* financial harm to the Center is not an "improper" motive sufficient to invalidate the subsequent act. Restatement (Second) of Trusts § 187 cmt. e.

The same is true of the President's purported self-"aggrandize[ment]." ECF No. 112 at 29. For one, none of Plaintiff's meritless accusations on this score supply a basis for setting aside the independent *closure decision*. Besides that, Plaintiff's arguments suffer from two fatal flaws: (1)

the President is not, and has never, sought to "aggrandize" himself in a way that constitutes a breach of fiduciary duty under the law; and (2) none of the President's actions have come at the Center's "expense," *id.* at 29.

To show a breach of the duty of loyalty requires showing that the trustee failed to act "*solely* in the interests of the trust beneficiaries." *Bogert's Law of Trusts* § 543. Plaintiff has entirely failed to meet that burden. There is no indication that any of the President's actions—which, as Plaintiff frames them, focus (1) on ensuring that construction at the Center can be completed in a timely manner, *see* ECF No. 112 at 29, and (2) on the President's (and other trustees', including Plaintiff's) expressed desire to recognize the President for contributions to the Center, *see id.*—qualify under trust law as a breach of that duty of loyalty. There is no evidence, for example, of the President (or any other trustee) securing any improper "personal financial advantage." *Bogert's Law of Trusts* § 543.[9]

Moreover, Plaintiff has entirely failed to establish that anything the President alone has done (or "threatened" to do, ECF No. 112 at 29) has in any way *actually* impacted the Center. Plaintiff has concocted a conspiracy in which the President is wholly in control—*i.e.*, by "decid[ing] to close," "select[ing] the two-year timeframe," "threaten[ing] to demolish the building," and attempting to clawback a donation. ECF No. 112 at 29–31. But—as Plaintiff seems to acknowledge implicitly, *see id.* at 30 (arguing that the Board is "abet[ting]" the President's breach of fiduciary duty)—the President *cannot* act alone to dictate the Center's actions. Only the

[9] Indeed, as noted above, *see supra* n.8, if a desire for recognition for charitable work constituted an unlawful conflict of interest, then the fundraising efforts of many—if not most—nonprofit entities around the world would be invalid. Plaintiff's argument that "[t]hese are textbook examples of a trustee elevating 'personal interests' over the trust's interests," ECF No. 112 at 29–30, falls flat when those examples appear nowhere in the textbook she cites, *see Bogert's Law of Trusts* § 543.

*Board* can approve actions like the ones Plaintiff invokes here. *See* Tr. of R. 30(b)(6) Dep. of Matthew Floca ("Floca 30(b)(6) Tr.") at 209:2–210:14, Ex. G to Jankowski Decl. (explaining that an instruction "not to proceed with renovation" would "need to come by way of resolution"). And the Board—reasonably, and as supported by the input of multiple experts—determined that the President's proposals to close and to conduct renovation over a shorter period of time than a phased model would necessitate were prudent.

Further, the funding Plaintiff references—a $17.5 million infusion, *see* ECF No. 112 at 31—was "transferred without any restrictions on it," Floca 30(b)(6) Tr. at 87:12–13, and thus there was never any "manipulation of the finances," ECF No. 112 at 30. Plaintiff entirely fails to show either that any Defendant has acted with an improper motive, under the law, or that the President's purportedly improper acts have themselves alone affected the Center in such a way as to come at the Center's "expense."

Plaintiff's remaining examples of purported bad faith are likewise meritless. Defendants "did not resume booking performances and other normal operations," ECF No. 112 at 32, because such an act would have irreparably committed the Center to a course of action that the Board had not endorsed. And, more to the point, Defendants did not resume such operations because this Court expressly contemplated that the Board might vote again to adopt a closure plan. *See* ECF No. 50 at 88. Setting up performances—when the Board might again vote, under this Court's guidance, to close for two years—might itself constitute a breach of trust. Plaintiff next points to information from JLL that the Center purportedly "withheld" from the Board as evidence of bad faith. ECF No. 112 at 33. That argument entirely overlooks the vast amount of evidence that the Center *did* share with the Board that provided exactly the perspective that Plaintiff alleges was withheld: that phased renovation would cost far more, take far longer, and result in far greater

disruption than the total closure of the Center's main building. And it wrongly assumes that the source of the withheld information—JLL—never provided any input into Delta's deliverable. As already explained, JLL engaged directly with Delta to help the consultant develop its report and was available to discuss ongoing construction with the Board at its meetings.[10]

Plaintiff's final bad-faith invocation, that the "safety rationale" for the Center's temporary closure is "obviously pretextual," ECF No. 112 at 34, is both manifestly contrary to the record and typifies the irresponsibility of Plaintiff's position. Mr. Floca first received a draft report from the firm Walter P Moore on September 3 indicating that significant deterioration to the Center's soffit panels represented a substantial life-safety risk. *See* Floca 30(b)(6) Tr. at 277:7–278:11; *see also* ECF No. 91-1 ¶¶ 8–9. As demonstrated in multiple declarations and supported by a certified engineer's report, many of the Center's soffit panels, which hang 60 feet in the air and weigh approximately 2,500 pounds each, "need to be immediately replaced" in light of corrosion to their supports that was "significantly more advanced than expected." ECF No. 94-2 at 4. At the same

[10] Plaintiff asserts that Delta was not independent because management provided "input" to Delta on its presentation. ECF No. 112 at 33. That argument is baseless. Plaintiff cites the fact that the Center provided minor feedback in finalizing Delta's presentation. *See id.* at 34 n.17. This is of no consequence, as is apparent from the minor changes to the drafts of Delta's presentation, which Plaintiff has filed. *See* ECF No. 112-9 at 58–88. Plaintiff further points to a small number of references to Secretary Lutnick, claiming the Secretary was "heavily involved" in drafting Delta's presentation. *Id.* But Plaintiff's evidence establishes only that the Secretary took notes, which Mr. Floca conveyed to Mr. Buchalter, and that he thought the presentation was "[c]lear." ECF No. 112-9 at 26–27, 34, KC-BEATTY7837-38, KC-BEATTY7845. That is hardly heavy involvement in the drafting process. And the record refutes any such purportedly undue involvement in Delta's work. *See, e.g.*, Buchalter Tr. at 173:16 (noting one meeting with Secretary Lutnick); *id.* at 258:13–14 (noting a one-minute phone call with Secretary Lutnick). Notably, notwithstanding Plaintiff's representation at the November 3, 2026, status conference that documents withheld under executive privilege are core to her theory of the case, her only argument involving those communications relates to the Secretary's purported influence on Delta. ECF No. 112 at 33. That theory is (1) immaterial, given the lack of any legal theory undermining the Board's reasonable reliance on that advice, and (2) factually incorrect. This Court can, and should, resolve Defendants' pending motion to dissolve without reliance on privileged evidence.

time, a portion of the Grand Foyer ceiling weighing approximately 150 pounds fell onto a public passageway below. *See* Floca 30(b)(6) Tr. at 273:11–280:21. There can be no legitimate doubt as to the safety risks poses by heavy materials falling dozens of feet into occupied spaces.

Indeed, documentary evidence reflects that Mr. Floca memorialized his safety concerns almost immediately following the September 4 event, and these concerns only deepened in the two weeks during which Mr. Floca learned more from engineers about the severity of the state of the soffit panels. *See id.* at 279:6–280:21. On September 9, mere days after the September incident, Mr. Floca drafted a letter to the Board in which he sought to "elevate an urgent, unavoidable threshold regarding safety and collective governance at the Kennedy Center." Ex. B to Jankowski Decl. at 2, KC-BEATTY7860.[11] Mr. Floca noted that "members of the public and outside commentators have dismissed compounding facility issues like these as 'red herrings,' " but that "the physical reality of this campus is not so convenient." *Id.* He noted that this litigation could not "engineer away falling concrete" or "failing electrical vaults," concluding that he "cannot in good conscience continue to lead" the Center "and manage our daily operations under conditions that put lives at risk." *Id.* at 4, KC-BEATTY7863. The draft letter speaks for itself. In no way does it reflect anything but the frank concern of the individual charged with maintaining the safety and integrity of the Center. And further undermining any pretext is the fact that, just last week, Mr. Floca announced to staff that the Center had finalized its review of the safety emergency and would plan "a phased approach to occupancy" that would enable public access to "the Hall of States, Hall of Nations, and the Roof Terrace Level." Ex. A to Nov. 6 Decl. of Matthew Floca at 2; *see also*

[11] Mr. Floca never sent version of his letter. He instead shared it with Mr. Buchalter, *see* ECF No. 112-9 at 40, KC-BEATTY7851, then distributed a revised version to the Board on September 12, *see* ECF No. 88-8. But this draft letter corrects any misconception that may exist as to the urgency with which the Center approached these safety issues.

Nov. 6 Decl. of Matthew Floca. In no way are the Center's actions reflective of anything but deep and sincere worry for the structural integrity of the main building and the safety of the workers and members of the public who traverse its spaces.[12]

## II. Defendants Readily Meet Their Burden to Obtain Dissolution of the Injunction.

As the above makes clear, circumstances have changed since this Court entered its preliminary injunction in May. And that change warrants dissolution of the preliminary injunction. *See Talbott v. United States*, 775 F. Supp. 3d 445, 448–49 (D.D.C. 2025).[13] This Court has already recognized that continued application would be unwarranted upon the Board's prudent reconsideration of the closure issue. *See* ECF No. 50 at 88. And because the Board's prudence is apparent from the record, the time has come for the Court to vacate its order. Indeed, given the physical and financial condition of the Center, Plaintiff's pursuit of continued application of the preliminary injunction is nothing more than a request for this Court to wield its equitable authority as a "means of extensive . . . [and] irreparable injustice." 2 Joseph Story, *Commentaries on Equity Jurisprudence: As Administered in England and America* § 959(b), at 303 (6th ed. 1853); *see* ECF No. 88-1 at 40–44. The Court should refuse to do so.

Grasping for straws in her attempt to convince the Court of the contrary, Plaintiff first renews her unfounded merits arguments. ECF No. 112 at 41. Plaintiff is wrong; the trustees did possess "sufficient information to make a well-considered decision to close the Center." *Id.*

---

[12] Any implication that the National Symphony Orchestra's presence in the building belies Mr. Floca's analysis, *see* ECF No. 112 at 35, is specious. As the very sources Plaintiff cites indicate, members of the orchestra follow "routes assessed as safe by facilities and management." ECF No. 112-10 at 55. They do not walk under the soffits or through the Grand Foyer.

[13] "Though Rule 60(b)(5) on its face is limited to relief from final orders," courts apply the same standard to "motions to modify or dissolve preliminary injunctions." *Ahmad v. City of St. Louis*, 995 F.3d 635, 640–41 (8th Cir. 2021). And regardless of whether this Court looks to Rule 54 or Rule 60 for guidance, *see* ECF No. 112 at 15–16, the standard for dissolution is met here given the significant change in facts.

(quotation omitted). This change in circumstances is the very change that the Court previously concluded would warrant dissolution of the injunction. ECF No. 50 at 88. Plaintiff also cites the Center's staffing and programming decisions. *Id.* But, as explained, it would be imprudent for the Board to direct the Center to expend funds on programming and staff when this Court made clear that temporary closure could follow a new vote on closure. That is why this Court did not so order. *See* ECF No. 60 at 2–4; *id.* at 4 ("[A]ny immediate affirmative programming action is neither required by this Court's order nor prudent.").

Next, Plaintiff argues that "Defendants are not harmed by an injunction halting unlawful conduct." ECF No. 112 at 41. Besides conflating the preliminary-injunction factors, Plaintiff is simply wrong. There is no unlawful conduct, "bad faith," or "defiance" of any court order. Instead, Defendants have proceeded exactly as this Court's May order contemplated. *See* ECF No. 60 at 2–4. The hardships at present are thus not of the Center's creation, but instead the product of Plaintiff's insistence on continued litigation despite manifestly legitimate and reasonable Board actions. This lawsuit, not Defendants' actions, is to blame for "hobbling" the Kennedy Center and harming the public interest. ECF No. 112 at 41.

Plaintiff next labels Defendants' safety concerns as "pretext," and claims that the injunction does not prevent the Center from undertaking necessary remedial work. *Id.* at 42. That is a change of tune. *See, e.g.*, ECF No. 84 at 1 (Plaintiff moving for an "emergency hearing" regarding temporary closure of the Center for safety reasons). In any case, the fact that the preliminary injunction allows for temporary closure in exigent circumstances does not mean that safety concerns do not militate in favor of vacating the injunction. For one, the injunctive specter that hangs over the Center's efforts to address these issues is harmful enough. *Cf. Tincher v. Noem*, 164 F.4th 1097, 1100 (8th Cir. 2026). Also, as multiple sources can attest, the phased closure that

Plaintiff favors brings its own safety concerns. ECF No. 29-3 ¶ 7 (discussing the "safety risks inherent in a multi-year, phased renovation"); ECF No. 65-1 at 2 (phased construction would "compromise both patron experience and contractor safety"); ECF No. 88-3 ¶ 86 (opining that keeping the building open presents "meaningful concerns for public safety"). And finally, given that phased renovation would lead to an increase in cost and duration, the injunction forbidding closure of the main building threatens to prevent Center leadership from maximizing the use of the available funds to resolve the building's issues. *See, e.g.*, ECF No. 88-1 at 14. These are real harms, not pretext.

Plaintiff's argument about the soffits and the September 4 incident demonstrate the ongoing harm caused by the injunction. *See* ECF No. 112 at 42. Mr. Floca, who is responsible for the safety of patrons, staff, and artists, has explained why the temporary closure was warranted. *See generally* ECF No. 86-1; ECF No. 91-1. But because of the injunction, Mr. Floca's eminently reasonable conclusion has been subject to judicial superintendence and second-guessing by a dissenting *ex officio* trustee. Such interference is both harmful and unwarranted, regardless of whether past Center leadership would have pursued a different path.[14]

Plaintiff also disputes Defendants' argument that it would be "at a minimum highly impractical" for the Center to conduct the necessary repairs "without a sustained, two-year closure of the main building." ECF No. 112 at 42. But none of the sources Plaintiff cites "belie[]"

---

[14] Plaintiff claims that, in April 2026, Mr. Floca "inexplicably" cancelled a "contract to address the soffits." ECF No. 112 at 42. In making this claim, Plaintiff relies on unsupported testimony from a former Kennedy Center employee who met with Plaintiff's counsel only a few days before her deposition. *See* Tr. of Dep. of Carissa Faroughi at 98:16–103:17, Ex. H to Jankowski Decl. But the "earlier roof repair plans were delayed because the contractor's bid was more than $500,000 higher than the anticipated cost for this project." Sarah Davis, *Former Kennedy Center Employees Claim Officials Halted Repairs Months Prior to Closure*, The Hill (Sept. 26, 2026), https://perma.cc/PKT5-6SFM. And that work is "now being addressed within the center's broader development plan." *Id.*

Defendants' position. *Id.* The Delta Report makes clear that a phased plan would have a "substantial" impact on "cost and schedule." ECF No. 88-3 ¶ 135. JLL, in its June 16 letter, opined that closure of the main building would maximize "scope delivery." ECF No. 112-8 at 158. The Center's history does not include a restoration and renovation of this scale and is thus uninformative as to how such a project can be accomplished. *See, e.g.*, ECF No. 112-5 at 6–7. And the fact that previous leadership contemplated a phased plan, *see id.* at 4–5, does nothing to disprove the proposition that a temporary closure of the Center would allow the Center to accomplish more with the money available, *see, e.g.*, ECF No. 88-1 at 14. This well-supported proposition stands—and because the injunction prevents the Center from proceeding with closure, it threatens the Center's ability to accomplish necessary repairs. That is harmful.

Further, continued maintenance of the injunction will work financial harm to Defendants. *See* ECF No. 88-1 at 42 (detailing "distinct risks to the Center's finances"). Plaintiff previously recognized that the Center's finances are "deteriorating." ECF No. 63 at 3. But now, Plaintiff claims that the Center's finances are "unclear." ECF No. 112 at 43. Plaintiff's evaluation of the Center's finances was right the first time. Indeed, the Board has been informed for months about the precarious nature of the Center's finances. *See* ECF No. 68-3 at 10 (the Board receiving a "report on the Center's financials").

In any case, the focus of the Delta Report—which includes information "based on" which the Board decided to temporarily close, ECF No. 112 at 44—was not on the present state of the Center's finances but rather concerned the finances moving forward. The Report explains "that Partially Close and Renovate is financially superior to Operate and Partially Renovate" because, among other things, "it avoids the approximately $78 million annual operating deficit associated

with prolonged partial operation." ECF No. 88-3 ¶ 223; *see* ECF No. 68-3 at 10 (discussing this project deficit at the August Board meeting).

Plaintiff's expert does not contest this calculation or provide any reason to find it unreasonable. Instead, Plaintiff tucks her attack in a footnote. *See* ECF No. 112 at 45 n.21. And for good reason. Plaintiff fails to show that the operating deficit Delta associates with "Operate and Partially Renovate" is wrong. Notably, although Plaintiff cites Mr. Floca's testimony, *id.*, the cited portion provides no reason to question the assertion that Plaintiff's preferred path forward would result in an operating deficit like the one Delta projected. That deficit—associated with the path forward absent vacatur of this Court's injunction—would harm the Center.[15]

Finally, Plaintiff is widely off the mark in suggesting that the public interest weighs in favor of the injunction. *See* ECF No. 112 at 43. Once the Court gets past the ad hominem attacks and groundless accusations of misconduct, Plaintiff has nothing left. The public interest weighs in favor of a safe and secure Kennedy Center. And that is what the Kennedy Center the Board has voted to provide to the American people.

**CONCLUSION**

For the reasons stated above, the Court should grant Defendants' motion to dissolve the preliminary injunction.

[15] Plaintiff asserts that "Defendants have withheld necessary documentation." ECF No. 112 at 43. "That is flatly incorrect." ECF No. 97 at 3. Defendants have provided the "financial information underlying the Center's and Delta's analysis," *id.* at 3 n.2, including "the raw financial transaction data (in addition to unaudited FY25 financial statements) for every single transaction on the Center's financial ledger in FY25," along with the data "underlying the FY27 budget projections that the Center communicated to Delta." *Id.* at 3–4. Defendants also produced, in accord with this Court's order, the same granular transaction-level FY2026 data. *See* ECF No. 112-3 at 196–97. As with the rest of Plaintiff's unsupported complaints about discovery, her inability to find any support in the data for her argument does not imply any defect in what Defendants provided to her. It simply demonstrates the lack of support for Plaintiff's contentions.

Dated: November 6, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

/s/ Brantley T. Mayers
BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 890-9874
brantley.t.mayers@usdoj.gov

STEPHEN M. ELLIOTT
Assistant Branch Director

CHRISTOPHER M. LYNCH
Chief Litigation Counsel

WILLIAM S. JANKOWSKI
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch

*Counsel for Defendants*