# C

**In the Matter Of:**

*BEATTY v*

*TRUMP*

---

*Matthew Floca*

*October 06, 2026*

---

LEXITAS™

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - -

| | |
|---|---|
| JOYCE BEATTY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 25 Civ. 4480 |
| vs. | ) (CRC) |
| | ) |
| DONALD J. TRUMP, et al., | ) |
| | ) |
| Defendant. | ) |

VIDEO RECORDED DEPOSITION OF MATTHEW FLOCA

Tuesday, October 6, 2026, 9:40 a.m.

Washington Litigation Group

1717 K Street, NW

Washington, DC

Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

Job Number: Lexitas 1039999

VIDEO RECORDED DEPOSITION OF MATTHEW FLOCA, a witness herein, called by the Plaintiff for examination, taken pursuant to the Federal Rule of Civil Procedure 45, and the Court's Scheduling Order of September 16, 2026 (ECF No. 82), by and before Marjorie Peters, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the District of Columbia, at Washington Litigation Group, 1717 K Street, NW, Washington, DC, on Tuesday, October 6, 2026, at 9:40 a.m.

A P P E A R A N C E S

For the Plaintiff:

Kyle Freeny
Alexander Kristofcak
Rosa Baum
Nathaniel Zelinsky
THE WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
202-521-8743
kfreeny@washingtonlitigationgroup.org
akristofcak@washingtonlitigationgroup.org

For the Defendant:

William S. Kankowski
Christopher M. Lynch
US DEPARTMENT OF JUSTICE
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Christopher.M.Lynch@usdoj.gov
William.S.Jankowski@usdoj.gov
202.353.4537

ALSO PRESENT:

Lydia T. Makande, The Kennedy Center

Erin Wenokur, Fellow, WLG

Elliot Berke, The Kennedy Center

Bridget Kennedy Bailey, WLG

I N D E X


| EXAMINATION | PAGE |
|---|---|
| MATTHEW FLOCA | |
| By Ms. Freeny | 7 |
| Acknowledgment of Deponent | 278 |
| Certificate of Court Reporter | 279 |
| Errata Sheet | 280 |


I N D E X O F E X H I B I T S


| FLOCA EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | memorandum, 3.4.26, KC-BEATTY0827-829 | 70 |
| Exhibit 2 | meeting agenda, 8.3.26, KC-BEATTY1089-1096 | 86 |
| Exhibit 3 | Solicitation, KC-BEATTY0200-262 | 109 |
| Exhibit 4 | Appendix X, [no Bates] | 123 |
| Exhibit 5 | Delta PowerPoint presentation, 8.13.25, Construction Program Assessment, [no Bates] | 176 |

# I N D E X O F E X H I B I T S


| FLOCA EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 6 | Defendants' Objections and Responses to Plaintiff's First Set of Expedited Discovery Requests, [no Bates] | 207 |
| Exhibit 7 | e-mails, 9.16.26, KC-BEATTY0307-349 | 230 |
| Exhibit 8 | spreadsheet, [no Bates] | 237 |
| Exhibit 9 | Board of Trustees Special Meeting Agenda, 9.15.26, [no Bates] | 260 |

| REQUESTS | PAGE | LINE |
|---|---|---|
| Request | 65 | 4 |

P R O C E E D I N G S

MATTHEW FLOCA,

having been called as a witness, was legally placed under oath, testified as follows:

THE WITNESS: Yes.

EXAMINATION

BY MS. FREENY:

Q. Good morning, Mr. Floca. My name is Kyle Freeny; I represent Congresswoman Beatty in the lawsuit Beatty versus Trump.

Do you understand that?

A. Yes.

Q. Have you been deposed before?

A. No.

Q. So I understand that the court reporter gave you some pointers on how to make sure that she can transcribe, but I wanted to also go over some ground rules before we start. Is that okay?

A. Yes.

Q. So you understand that we're here today to take your deposition in the lawsuit Beatty versus Trump; right?

A. Yes.
Q. You understand that you are under oath?
A. Yes.
Q. You understand that that oath has the same effect as if you were testifying at trial; right?
A. Yes.
Q. Meaning that you have the obligation to tell the truth to the best of your ability; right?
A. Yes.
Q. Now, I mentioned this deposition is transcribed, and the reason it's important to note that is that -- well, at least two reasons:
One, if I ask you a question that is a yes or no question, I need you to answer verbally rather than just nodding your head. Okay?
A. Yes.
Q. If you don't, and if it sounds like I'm making a statement, I will say, "right," or something like that, and that's not meant to be, you know, offense. That's to prompt a verbal answer so that the court reporter can actually take down your

answer.
Do you understand that?
A. Yes.
Q. I also am going to ask you to let me finish my question before you answer, even if you think you know the answer to my question.
Do you understand?
A. Yes.
Q. The benefit of that is that it lets the court reporter take down everything I say, and then take down everything you say so that it's readable.
Do you understand?
A. Yes.
Q. During this objection [as spoken], your attorney may raise objections. If he raises an objection, unless he instructs you not to answer the question, you are to still answer the question.
Do you understand that?
A. Say that again.
Q. Okay. So your attorney may raise objections to some of my questions.
Do you understand that?

A. Yes. Yes.

Q. If he raises an objection, but does not instruct you not to answer the question, you are to answer the question.

Do you understand?

A. Yes. Understood.

Q. The purpose of his objections in that case is just to preserve them for the record, not to stop you from answering, unless he actually tells you not to answer.

Do you understand that?

A. Yes.

(Clarification requested by the Realtime Stenographer.)

A. Yes.

Q. I know you're very --

(Clarification requested by the Realtime Stenographer.)

Q. If, at any point in time, Mr. Floca, you don't understand one of my questions, please let me know that you don't understand. Okay?

A. Okay.

Q. If you need a break at any time, you can take one because we're certainly going to go long enough where you may need a bathroom break or just to stretch your legs. Okay?

A. Great.

Q. But if there's a question pending, I may ask you to answer the question before we take a break; fair?

A. Fair.

Q. Is there any reason today that you cannot answer my questions truthfully and accurately to the best of your ability?

A. No reason.

Q. Are you ready to proceed?

A. Yes.

Q. Fantastic.

All right. So, Mr. Floca, the last time you and I talked was during your testimony in another case about the Kennedy Center in late April.

Do you recall that?

A. Yes.

Q. But you recall that my questions were

related to Representative Beatty's lawsuit?
A. I do.
Q. After that lawsuit, the District Court issued a decision that included a preliminary injunction related to the Center's closure decision.
Do you recall that?
A. Yes.
Q. Did you read that decision from the District Court?
A. Not in its entirety.
Q. Tell me what you did read.
A. I read a lot of it. There were a number of documents, but you know, I read the opinion, and a lot of the information I found on CourtListener.
Q. What was your understanding of that opinion as it related to the Board's March decision to close the Center for two years?
MR. JANKOWSKI: I'll just object to the extent that calls for attorney-client privilege.
Don't answer anything --
Q. I just want you -- so I'm asking your understanding, not what people told you.

I just want to know -- whether it came from your attorney or not, I don't care. I just want to know what your understanding of that decision was.

MR. JANKOWSKI: You can answer.

A. So this is the opinion -- you're asking about the opinion that Judge Cooper --

Q. Correct. Yes.

A. -- issued in the Beatty-Trump case; right?

Q. Correct.

A. Okay. I mean, what would you like -- he -- there's a lot.

Q. Yeah.

A. He put a lot in there. So --

Q. Okay. So I guess I want to know -- the opinion comes out. What is your understanding of what actions the Center had to take next? If it's multiple, we can go through them. I just want to start the discussion of, you get the opinion. You, as the executive director of the Kennedy Center, are -- understand -- okay, here's what I have to do

next, in response.
A. So -- and this is the -- this is the injunction; right? We're talking about the -- his opinion related to the injunction, not the preliminary injunction --
Q. I'm asking about the preliminary injunction.
A. Preliminary injunction. Okay.
Q. So my questions, unless I specify, are going to be about the closure decision. When I say "closure decision," do you understand what that means?
A. Yeah, I think so.
MR. JANKOWSKI: Objection. Vague. Because you said the "closure decision."
Q. But -- so my question is: When I say "the closure decision," do you understand what that means?
MR. JANKOWSKI: Same objection.
You can answer.
A. I think I understand what you're saying.
Q. Okay.

A. The closure decision is the decision to close for renovation. I believe that's what you're --
Q. Yes.
Right now, I'm asking about the decision as it relates to March 16th; right?
A. Okay. Yes. Got it.
Q. So I'd like you to tell me what your understanding was after the opinion comes out of what steps you had to take in response to that decision, as it relates to closure, rather than renaming?
A. The --
MR. JANKOWSKI: Objection. Vague on "closure" and "renaming."
But you can answer.
A. The main action is to inform the Board to a larger degree, to a larger extent.
Q. What did you understand -- when you say "to inform the Board to a larger degree," what did you understand that to entail?
A. Physical, programmatic, financial

impacts of the decision.

Q. You say "impacts of the decision."

Did you -- what was your understanding of, sort of, what options would be on the table? Just the -- like, the existing decision, or that the Board was to consider other possibilities?

A. It's not predetermined what the Board should consider.

Q. How did you go about making sure that it was not predetermined what the Board should consider?

A. Weighing all of the options.

Q. When you say "weighing," who is the subject in that; who is weighing all the options?

A. There is multiple phases. There is staff-level conversations, and there is Board-level conversations about weighing the options.

Q. Okay. So let's talk about the staff-level conversations. What kind of staff-level conversations did the Center have in response to the Court's closure-related decision?

MR. JANKOWSKI: Objection on "closure."

You can answer.

A. We discussed what the Court's -- the impact of the Court's Opinion.

Q. What was the upshot of those conversations; that is, what did you identify as the impact of the Court's decision on next steps?

A. The largest impact was that the Center could not holistically, or in total, close without more information being discussed at the Board level.

Q. Then how -- at the staff level, what discussions did you have about getting the Board more information?

A. We discussed the financial options. We discussed physical options within the campus. Pretty much it.

Q. That's it. Okay.

A. Yeah.

Q. Who's the "we" who were doing -- who are having these discussions?

A. There are -- there's a finance team, a

project management team. There's a programming team.

Q. Okay. Roughly, like, how many people in total on these teams are involved in these discussions about the additional material to present to the Board?

MR. JANKOWSKI: Objection. Vague on "material."

You can answer.

A. Well, it -- at my level, like, the people that I work with --

Q. Yeah.

A. -- because I don't know at large, because they have teams, and people talk to their teams. So, you know, I regularly deal with 15 to 20 people.

Q. Are those all Center employees?

A. Yes.

Q. Within that 15 to 20 people, do you have folks that you would consider sort of closer to you or more like, you know, to use a word like "your inner circle," people that, within that group, you

had sort of more conversations with about the aftermath of the May decision?

A. I don't think I have an inner circle, no.

Q. Okay.

A. No.

But when -- just to be clear.

Q. Yeah.

A. When I have meetings and when I analyze things, I do it in a pretty open fashion.

Q. Okay.

A. From implications on the parking operations to theater managers to the artwork to the programming team.

Q. Okay.

A. There's -- so...

Q. So you're saying you didn't make efforts to restrict the, I guess, circle of people who received information about the renovation or the plans?

MR. JANKOWSKI: Objection to the extent that it mischaracterizes.

But you can answer.

A. Well, I thought we were talking about the Court action.

Q. Right. The plans in light of the Court action.

A. No. We didn't -- I didn't restrict any information regarding the renovation plans or what the Court actions, you know, resulted in.

Q. Is that consistent with your general practice?

A. Yes.

Q. Other than folks at the Center, was there anyone else who participated -- and let me go back. I'm not asking about advice of counsel.

So was there anyone else, other than the folks at the Center, who participated in discussions with you about how to move forward after the Court's decision?

MR. JANKOWSKI: Objection. Vague on "participated."

But you can answer.

A. In what regard, I guess? Like, I mean,

moving forward, in general?

Q. Yeah.

A. Or...

Q. I guess -- so you had to make a decision about, you mentioned, what information to provide to the Board; right?

A. Yes.

Q. Was there anyone else other than the Center -- other than people at the Center who participated in that decision-making process; what to present to the Board the next time?

MR. JANKOWSKI: Same objection on "participation."

But you can answer.

A. Would you consider contractors consultants --

Q. So let's just run through this.

We'll talk about that a little bit. We understand that the Center engaged some consultants, JLL and Delta. Any others besides those?

A. From an implementation and consulting

standpoint, no. Those are the only --
Q. How about --
A. Those are the two main contractors.
Q. How about from a --
MR. JANKOWSKI: Can I ask that you just make sure he finishes his answers. Thank you.
Q. How about from the sort of the decision-making perspective of what information to gather and present to the Board?
Anyone else -- any outside consultants other than what we talked about?
A. No, they all were part of either Delta or the JLL team, but at the same time, we were considering work on the building, so there -- you know, was the project team, which is led by JLL.
Q. Did --
MR. JANKOWSKI: Sorry. Was that all you had to say?
THE WITNESS: Yeah. Yeah.
Q. Did Secretary Lutnick participate at all in the decision about what material to gather and present to the Board?

A. Secretary Lutnick provided opinions, but he didn't guide materials or, you know, the efforts.

Sorry. Within staff, right? With the consultants, with the contractors, yeah. He provided guidance.

Q. Okay. What kind of guidance?

A. High-level guidance.

Q. Okay.

A. For example, you need someone to back up the decisions you're making.

Q. Did he provide guidance on what types of consultants to hire?

A. I would define it in one word: Experts.

Q. Okay. But he didn't provide guidance on what type of experts to secure?

A. No.

Q. You mentioned he provided opinions. What opinions did he provide about what to present to the Board, other than what you mentioned about experts to back up?

A. That's really it. You need additional support in making this case that, you know, is not a

Center employee; that's someone independent from the process.

Q. You say "you need additional support in making this case." Am I correct in understanding "making this case" means supporting your recommendation to close the main building for two years for renovation?

A. No.

Q. Okay. What do you mean "making this case," then?

A. Communicating what the decisions are, and the pros and cons of the decisions.

Q. Did you at any time depart from your previously stated conviction that the Center should close the main building for renovation?

MR. JANKOWSKI: Objection. Vague on "depart."

You can answer.

A. My opinion has always been the most effective and efficient way to complete this work is in an unoccupied building, and that is still true today.

Q. Did you see it as your role following the decision to convince the Board of that opinion?

MR. JANKOWSKI: Objection. Vague on convincing.

You can answer.

A. No.

Q. What did you see as your role?

A. I am a conduit of information. My role is to provide the Board with the realities, not opinions, and I am the conduit for that information.

Q. So as the executive director, if you remained convinced that closing during renovation was the most effective and efficient method, that's not something that you felt you wanted to convince the Board of?

MR. JANKOWSKI: Objection. Speculation. Mischaracterizes.

But you can answer.

A. Ask the question again.

Q. As the executive director of the Center, having the opinion, as you just mentioned, that closing the Center for renovations would be the most

effective and efficient method, that's not something that you wanted to convince the Board of following the Court's decision?

MR. JANKOWSKI: Same objection.

You can answer.

A. I don't want to convince the Board that that's what they need to do. They have the ability to make that decision themselves. Again, my job is to present them with information.

Q. So you don't think that your own conviction that the two-year closure was the better option influenced what you presented to the Board?

MR. JANKOWSKI: Again, objection. Speculation. Mischaracterization.

But you can answer.

A. No.

Q. At any point in time, did you -- I guess -- well, let me ask this way:

Did you take any steps to either revisit or test that conclusion that you had made that closure was the most efficient and effective method after the Court's decision?

MR. JANKOWSKI: Objection. Vague on "steps."

You can answer.

A. Yes.

Q. Okay. Tell me about those.

A. Just last week, we met, and when I say "we," I'm talking about a large team of stakeholders from all different parts of the Center, just to discuss emergency egress routes.

And in that conversation, we're weighing risk. The risk to our mission in keeping the Center main building closed; the risk to patrons, and letting them walk underneath falling hazards; and the risk to the budget we have, both the programmatic budget and the construction budget.

And we had discussions about where do we want to accept risk. Because there's risk in all of these different locations. And a big part of that conversation comes down to are we trying to keep the building open to patrons, the public, or are you trying to not.

So those conversations on every

single project, every need, are routine conversations.

Q. Okay. I just want to make sure I understand, though, that conversation --

MR. JANKOWSKI: Sorry, Kyle. I just want to make sure that Matt knows, you can finish your answer if you have more to say. Don't -- make sure that, you know, if you have more, say "I'm not finished."

Q. Yes, you absolutely can. Although, I will say if it's super long, you may want to let me ask a follow-up question because otherwise, we'll be here forever, because I'm going to direct what I'm interested in.

So I just want to make sure I understand about this conversation because you said it was last week, and that would have been after the Board already voted to close the Center for renovations; right?

A. The Board's voted multiple times to close for renovations.

Q. Right, that's what I'm understanding.

It sounded like you were presenting this as a meeting where you were sort of reflecting on or, you know, examining your prior decision, or your prior recommendation to close the Center, which is what I asked about, but that's not really on the table anymore, whether the Center is going to close or not close; right?

MR. JANKOWSKI: Objection to the extent that misstates prior testimony.

You can answer.

A. Yes, that's still on the table.

Q. Okay. Help me understand that, and I'm not trying to be coy. My understanding is that the Board has voted now in August, and then again in September, to approve resolutions to close the main building at the Kennedy Center for the duration of a roughly two-year renovation.

Is that your understanding?

A. I think they also voted in March. There's been multiple votes, yes.

Q. Right, but that was enjoined, right, preliminarily?

A. Okay.
Q. Okay. So I'm asking: You agree that the Board voted in August and September to approve resolutions to close the main building of the Center for a two-year period of renovation; right?
A. Yes.
Q. Help me understand, then, when you said that you thought that closure of the main building was still on the table, if the Board has already voted to approve that decision both in August and in September.
A. Well, aren't we waiting for Judge Cooper to lift -- or isn't the injunction still in place?
Q. Yes. The injunction is still in place, and I don't want to sort of get into a legal discussion with you because I understand that you're not a lawyer. So all I'm really getting at is your understanding.
But your understanding is that -- is your understanding that the Center has decided or has not decided definitively, subject to whatever the Court does, to close the Center, the main

building, for two years of construction?

MR. JANKOWSKI: Objection. Vague on "definitively." And form.

A. The Board has voted on a resolution that -- yes, that includes that. Yes.

Q. Is it your expectation that if the Court lifts the injunction, that that decision would govern what next happens with respect to renovation?

A. Yes. Yes.

Q. Okay. I want to go back. You talked about -- I asked you about Secretary Lutnick. You said, I think, that he provided some high-level input on next steps.

What was Secretary Lutnick's role at this point in time, and "this point in time" meaning after the May decision, until today, with respect to the Kennedy Center?

MR. JANKOWSKI: Objection. Vague. Calls for speculation.

You can answer.

A. To help. That's all.

Q. To help what?

A. To help the Center in its decision-making processes. To help the Center from an executive level. Just to provide guidance. And he brings, you know, experience. So that was the intent, is to -- is just to bring more support to the process.

Q. What did you understand, sort of, your relationship to be with respect to Secretary Lutnick; that is to say, did you understand that you reported to him?

MR. JANKOWSKI: Objection. Vague on "reported."

You can answer.

A. I report to the Board of Trustees.

Q. Do you report to Secretary Lutnick?

A. No.

Q. Does Secretary Lutnick have any formal position with respect to the Kennedy Center?

MR. JANKOWSKI: Objection. Vague on "formal."

A. There's nothing in the bylaws about his position, or his involvement --

Q. Okay.
A. -- so as to that as formal or not.
Q. What would you call his -- like, how would you -- does he have a title? Does he have -- how would you describe what his role is? You said it's to provide, I guess, guidance, but does he have like a title or a description of that role?
MR. JANKOWSKI: Objection. Vague. Misstates as to the extent a role exists.
(Clarification requested by the Realtime Stenographer.)
A. I'm only aware of him being the Secretary of Commerce. So that's...
Q. So does he have a role with respect to the Kennedy Center?
MR. JANKOWSKI: Vague on "role."
But you can answer.
A. Yes.
Q. What is that role?
A. To help.
Q. Okay. So if you were called up on the Hill to testify, and you were asked what is the

Secretary's role, would you say, "To help"?

A. Yeah. There's nothing unique about that. I think he was brought in to help.

Q. Who brought him in?

A. He called me, and I answered.

Q. What did he say in that call?

MR. JANKOWSKI: Objection. Executive privilege on that. Don't answer that.

MS. FREENY: All right. So this is going to come up a couple times, so I'm going to make a record here.

What form of executive privilege are you asserting?

MR. JANKOWSKI: The presidential communications.

MS. FREENY: You are instructing the witness not to answer my question on the basis of presidential communications privilege?

MR. JANKOWSKI: Yes, without waiving any other objections that might apply, yes.

MS. FREENY: Are you invoking this privilege at the direction of the President?

MR. LYNCH: At this point, it's protective assertion --

MR. JANKOWSKI: Yeah.

MR. LYNCH: -- when there's a --

MR. JANKOWSKI: A formal indication, you know.

MS. FREENY: So, at this point, you are not asserting it at the direction of the President?

MR. JANKOWSKI: Correct. Protective restriction.

MS. FREENY: Since this is going to come up again, can I -- can we assume that you're not asserting privilege at the direction of the President anytime you assert the presidential communications privilege, or should I ask every time?

MR. JANKOWSKI: You know, we -- no. I think we should ask every time.

MS. FREENY: Okay.

BY MS. FREENY:

Q. Mr. Floca, are you going to decline to

answer my question at the instruction of your counsel?

A. Yes.

Q. Just to be -- just so -- that's not meant to be a trick question. That's so that we have a record, so that -- it's a lawyer thing.

So I just need a record that when you are instructed not to answer, that that is reason that I am not getting the answer is because of the instruction.

So you will hear me do that again. It's just a really lame lawyer thing. Okay?

A. Okay. Great. I think.

Q. How many conversations, roughly speaking, have you had with Secretary Lutnick about the, sort of, plans for presenting the closure issue to the Board?

A. I recall 10, 15.

Q. Next, I want you to walk me through how the Center decided what types of outside experts to retain.

Before I get you to answer, let me

say, orienting in time, by this point in time in May, May 29th, when the decision came out, JLL had already been retained by the Center; is that correct?

MR. JANKOWSKI: Objection. Compound.

But to the extent you understand, you can answer.

A. Yes. JLL was already under contract by that time, yes.

Q. So the other consultant you mentioned that the Center retained was Delta; is that right?

A. Yes.

Q. What kind of consultant or expert would you consider them to be?

MR. JANKOWSKI: Objection. Vague on "kind."

But you can answer.

A. They provide a range of services from financial auditing to -- to infrastructure and construction.

Q. That's fair.

In this case, what type of expertise were you looking for when you retained Delta?

A. Analyze -- looking to analyze the Kennedy Center's operations against the needs of the campus, physical needs of the campus.

Q. So that would include construction expertise; is that right?

A. Yes.

Q. What other types of expertise would that include, or require?

A. Financial.

Q. Okay.

A. I mean, scheduling as much as construction includes scheduling.

We -- the Center is unique, so we brought, you know, management and operational and programmatic experience.

Q. When you say "we brought... programmatic experience," what do you mean by that?

A. Historically, types of shows, quantity of shows.

Q. Okay, but programmatic expertise, who

are you talking about when you're saying "programmatic expertise," the Center or Delta?

A. The Center has -- knows the most about how things historically work.

Q. I got it.

So you're not suggesting that Delta was retained to provide, among other things, programmatic expertise?

MR. JANKOWSKI: Objection. Misstates.

You can answer.

A. Delta was retained to evaluate operations. When I say operations, I mean programming, because that's a part of what the Center does against the construction needs. The physical needs. Sorry.

Q. Sorry.

So you're saying, in your view, Delta was retained in part, at least, to provide programmatic expertise?

MR. JANKOWSKI: Objection to the extent that misstates.

You can answer.

A. We are -- they're -- Delta was not retained to program. Delta was not retained to say, you need to have this type of opera, you need to have this type of civic programming, this type of classical programming. They were not retained to program.

They were retained to evaluate all of those things I just said, operations, infrastructure, and that includes historical programming.

Q. Would that require performing arts expertise?

MR. JANKOWSKI: Objection. Vague as to from whom or to whom it would require.

A. Maybe you just ask that again for me. Like, what are you -- what would require what?

Q. So if I could have you read back his answer.

(The record was read back by the Realtime Stenographer.)

Q. So my question refers to your answer,

and you said Delta was retained to do a series of things, and that includes historical programming.

So my question to you was: Does that, in your view, require arts management expertise?

MR. JANKOWSKI: Objection. Misstates on historical programming -- to do historical programming.

A. Delta, from my perspective, and seeing what they were capable of, was analyzing the information that we presented to them and making a recommendation.

That information included programming, figures, quantities, performances, financials, from years past.

Q. Okay.

A. And -- sorry, just the last thing. And they were tasked to evaluate that. At that point, though, you know, they're just figures. They're numbers. They're not: Does this meet mission, is this something that checks the box for, you know, what our statutory requirement is.

They're just evaluating the metrics.
Q. Okay. Would that include the effect that closure versus phased renovation would have on programming?
MR. JANKOWSKI: Objection. Vague on "effect."
A. Their work would need to consider the impacts of construction on the mission, and part of the mission is programming. Part of the mission is education. So yes, those are factors.
Q. Did you ask them to consider those factors -- or how did they -- let me ask that again. I'll break that up.
Did you ask them to consider those factors that you just mentioned?
A. By way of understanding the Center's statutory mission, yes.
Q. Did you ask them to perform any quantitative analysis on the effect of closure versus phased renovation on the programmatic side?
MR. JANKOWSKI: Objection. Vague.
A. Quantitative from the perspective of

financials, yes.

Q. How about the effect of the different options on expected fundraising; did you ask them to perform an analysis on that?

MR. JANKOWSKI: Objection. Vague.

You can answer.

A. Fundraising is a product of the budget.

So we did not ask them to say -- or to analyze explicitly, you know, what this budget means for fundraising, but it's -- that's a formula that is pretty straightforward.

Q. Okay. I'm probably going to return to that later to ask you about that budget, but I want to make sure that I understand when you say "fundraising is a product of the budget," who prepares that budget?

MR. JANKOWSKI: Objection. Vague on "prepares."

You can answer.

A. Staff across the Center.

Q. Are you referring to a specific year budget, that is, like an existing year, or are you

referring to a projected budget?

A. It's both, honestly.

Staff, historically, have updated budgets, if you're in the year, on a quarterly basis, actuals versus projected. Then well in advance of a fiscal year, a budget for a fiscal year.

Q. Got it. All right. As I mentioned, I think, I will return to the topic of budget later, but I think next, I just want to have you help me understand how the various options or scenarios for addressing the renovation evolved.

Now, if I said "scenarios," in this context, what we're talking about, after the Court's May decision, and then you do go back to the Board, would you understand what that means?

A. Say that one more time.

Q. So if I use the word "scenarios," the various scenarios to consider, do you understand that -- what that means in the context that we're talking about right now, where we just talked about having to go back to the Board with more

information?

A. Yes.

Q. Okay. Give me your understanding of what that means.

A. Different approaches to implementing physical improvements across the campus, and the impact or coordination around those improvements.

Q. Would it be fair also to call them different options for the Board to consider?

A. I think that's fair, yes.

Q. Was one of the options that you understood to be on the table just not to do the renovation that was previously planned for the 257 million?

MR. JANKOWSKI: Objection. Lacks foundation. "Previously planned."

Q. All right. I'm going to -- so give me a second.

So I'm going to lay that foundation. I was just trying to -- honestly, just trying to get through this.

So I think in your testimony in

April, you talked about a $257 million congressional appropriation for renovations; is that right?

A. Yes. Yes.

Q. That was for -- whether it changed here or there, that was for a specific set of renovations and repairs that Congress had approved money for; is that right?

MR. JANKOWSKI: Objection to the extent that misstates.

But you can answer.

A. That money was appropriated by Congress, yes, for --

Q. These are not trick questions. I'm trying to get us to lay -- your attorney objected to foundation because I skipped over this part, so I just need to lay this foundation.

So within that -- when I say $250 million, will you understand that what I'm talking about is the plans for -- sorry, the appropriation by Congress?

A. Yes.

Q. If I talk about the $257 million

renovations, can we agree that that can be shorthand for the scope of the renovations that were anticipated in connection with the $257 million congressional appropriation?

MR. JANKOWSKI: Objection. I think misstates in that anything -- it's been established anything was anticipated.

MS. FREENY: Well, so was there --

MR. JANKOWSKI: You can answer.

Q. That $257 million was for something; right? The Center went to Congress and proposed a series of proposed renovations; correct?

A. Went to Congress. I don't know there -- so we --

Q. You tell me. Because, honestly, I'm just trying to -- I'm trying to --

A. I'll give you the --

Q. -- to talk to you about the plans for renovation that we talked about, and that you talked about in April.

MR. JANKOWSKI: Let's -- you can go ahead and answer now.

A. We have the Comprehensive Building Plan.
Q. Yep.
A. We took information from the Comprehensive Building Plan.
Q. Mm-hmm.
A. Outlined that information to OMB.
That went through a process to get into the One Big Beautiful Bill.
Q. Okay.
A. Then that money was appropriated with language tied to its purpose.
Q. When the Center went through that process, did it have in mind a set of renovations that would be accomplished with the $257 million?
A. Yes, driven by the Comprehensive Building Plan.
Q. Can we agree to call those, as a shorthand the $257 million renovations?
A. Yes.
Q. Okay. All right. I am going to -- sorry. Give me one second.
All right. So I want to turn back

to what we've been talking about, the scenarios. Was one of the scenarios or options on the table after -- from your perspective -- for the Board to consider not to undertake the $257 million renovations?

A. If you're asking holistically, no. That scenario was not on the table.

Q. What do you mean "holistically"?

A. To let that money just sit and not spend it.

Q. Okay. Was there an option other than holistically? Help me understand.

So was there an option not to do that scope of renovation underlying the $257 million appropriation, that is from the Comprehensive Building Plan?

A. Phasing the work, is that what --

Q. No. So I'm actually just trying to get an understanding of what the options following the Court's decision were.

So obviously one of them that's going to be on the table, because it's your

preferred option, is to close the main building for two years; correct?

MR. JANKOWSKI: Objection. Argumentative. Misstates.

You can answer.

A. Yes.

Q. So one, or more than one, of the options would be a phased approach to conducting the contemplated $257 million renovations; right?

MR. JANKOWSKI: Same objections.

You can answer.

A. Yes.

Q. I'm trying to understand, was one of the options that you understood to be on the table before the Board, to just not do the full scope of the $257 million renovations?

A. No. We never discussed or never had -- there was never an option to not spend all of the $257 million.

Q. So then do I understand -- there was never a concern -- let me rephrase that.

I just want to make sure I

understand. It was never a question of whether the Center was going to undertake the $257 million renovations following the Court's Order?

MR. JANKOWSKI: Objection to the extent that it misstates.

You can answer.

A. Ask it again.

Q. It was never an option, from your perspective, following the Court's decision, for the Center not to undertake the $257 million renovations?

MR. JANKOWSKI: Same objection.

A. From my perspective, no. That's not an option.

Q. So that was never -- that simply wasn't a scenario that was presented to the Board?

MR. JANKOWSKI: Is there a question?

Q. Correct?

A. The scenario to not spend the money --

Q. Mm-hmm.

A. -- was not ever presented to the Board, no.

Q. When we say "not spend the money," that also means to not do the renovations that were planned with the money; right?

A. Yes.

Q. I'm really not trying to be -- this is not a trick question. This is me trying to make sure I understand, that there are a bunch of options that might be on the table; correct?

A. Yes.

Q. But it was not ever on the table just not to do the renovations; correct?

MR. JANKOWSKI: Objection. Vague on "the renovations."

But you can answer.

A. That has not been presented to the Board, no.

Q. All right. Talk to me about how the Center came up with the various scenarios to present to the Board.

A. It's really three buildings. The main building is really three buildings.

Q. Okay.

A. Concert Hall, Opera House, Eisenhower.
A lot of the infrastructure is similarly broken up that way, but not all of the infrastructure.
So if you look at the campus, which are those three buildings in the REACH, you can draw pretty clear conclusions, or assumptions -- I shouldn't say conclusions, but assumptions on how you would phase the work.
So whole campus, parts of the campus, parts of the main building. Those are the -- you know, the basics of how we approached it.
Q. When you say "parts of the campus," what do you mean? How would that phase -- how would that, the renovation under sort of that scenario as you described it, look?
A. Opera House and Concert Hall and REACH active. Eisenhower inactive.
Q. Okay.
A. Or perimeter of the building under construction, the inside of the building not under construction.

Q. Okay. Understood.
Would it be fair to call that phased construction?
A. More than fair.
Q. So then it sounds like, though, you gave two different examples of phased construction. One where the whole building is open, and the perimeter is shut; is that right?
A. That is an option, sure.
Q. And another where certain of the halls are open, and one might be closed. That's another possibility?
A. Yes.
Q. Help me understand how you decided -- again, that -- I don't know if that's two scenarios or one scenario sequentially.
How did you decide, okay, if we're going to do phased renovation, what will that look like so that I know what to present to the Board as an option?
A. How did we do it?
Q. Yeah. Right. Yes. How did you decide,

okay, what is the scenario -- what does this scenario or scenarios look like for phased renovation so that the Board could figure out what it was and whether to vote on it?

A. So those things that I just mentioned, the ways we do the work, high-level, is understood and communicated. And the team, Delta, JLL, staff across the Center, discussed the implications or the nuances of doing each of the different phases, and came up with a recommendation.

Q. When you say "each of the different phases," what do you mean by "phases"?

A. Sorry. Scenarios.

Q. Scenarios. Okay.

A. Options.

Q. Okay. Thank you.

All right. But I think I want to step back and understand how you identified what those separate scenarios are. Okay?

So, obviously, we all agree that one of the scenarios that is clearly going to be on the table is a full closure of the main building for two

years; right?
A. Yes. That's one.
Q. Then at least one of the scenarios is going to be phased renovation; correct?
A. Yes.
Q. How did you decide -- how did the Center decide what that looked like? Was it, for example, one or two scenarios, or only one scenario, and here's the plan?
A. We talked about it in a really unrestricted way.
Q. Okay.
A. Internal to the building, phasing the different theaters, levels. There was not a -- you have to do -- you have to consider it this way.
Q. Yeah.
A. You have to consider the Eisenhower first, or you have to consider the Opera House first. That was a discussion amongst the team when it came to pros and cons of doing the work.
Q. I assume, though, the pros and cons would vary a little bit on exactly how the different

parts of the construction were phased, would it not?

MR. JANKOWSKI: Objection. Vague on "vary."

But you can answer.

A. Yes.

Q. So help me understand, then. You're trying to think of the pros and cons. I assume one of the factors there would be, like, you know, how long it takes; right?

A. Yes.

Q. I assume also that how long it takes depends on how you're actually doing the phasing; right?

A. And what you're doing, yes.

Q. So that's what I'm trying to understand, is how you -- you need to -- it sounds like you need to know what you're doing, and how you're phasing it in order to really assess the pros and cons associated with phased renovation; right?

A. Yes.

Q. How did you then do that? Like, how did you decide, okay, this -- we need to do the -- we

need to assess the pros and cons, here is the plan?
A. The Comprehensive Building Plan --
Q. Okay.
A. -- outlined the work that was necessary.
Q. Okay.
A. So then that work and the impact of that work, in a phased manner, or in a somewhat phased manner, or in a holistic manner, has pros and cons.
Q. I understand they have pros and cons, but what are you looking at when you are saying, like, phased renovation? What --
A. Do you want an example?
Q. If you had to explain to the Board, okay, how's -- like, what is the plan for phased renovation? And they said, okay, what's going to close, how are you going to do it, when is the perimeter going to close? Would you know the answer to that, or would you have to say, actually, it depends, we haven't decided that yet?
A. If the Board asked me what does phased renovation look like, we could tell them.
Q. Okay. If I wanted to see what phased

renovation would look like from your perspective, back in the summer, before the Board voted, where would I look?

A. Back in the summer, before this last vote?

Q. Mm-hmm.

A. To a degree, you could look at the work JLL was doing.

Q. Okay.

A. We were also considering internal work that our facilities team was doing, but depends on what you're looking for.

Q. So you mentioned JLL, and I think earlier, we agreed that JLL was hired prior to the Court's May decision; is that right?

MR. JANKOWSKI: Objection to the extent that misstates. I honestly can't actually remember.

But you can answer.

A. Yes. They were under contract before the May decision.

Q. Okay. Do you recall talking about JLL

at your testimony in the related court proceeding?
A. No.
Q. Do you recall describing an outside entity that was helping to make sure that you had an achievable schedule?
A. Sounds like something I would say, yes.
Q. Let me ask it this way: Was JLL an outside entity that was helping the Center to make sure that they had an achievable schedule for renovations?
A. That is what JLL is doing, yes.
Q. And a schedule that includes things like how long the different aspects of the work are going to take?
A. Yes. They have a schedule that includes the different aspects of the work, yes.
Q. Okay. So was JLL preparing that schedule?
MR. JANKOWSKI: Objection. Vague on "preparing."
You can answer.
A. Yes.

Q. They prepared a report at the end; is that right?

A. Yes.

Q. That report was given to the Board in August?

A. Yes.

Q. At the time that JLL was retained, though, we established it was before the May decision, the Center was planning to close the main building for a period of two years; is that right?

A. Yes.

Q. That plan to close the Center for -- or sorry, that plan to close the main building for a period of two years, that was built in as an assumption in the Statement of Work that resulted in JLL's engagement, wasn't it?

A. Yes. That was an assumption.

Q. So JLL was not actually asked to build a schedule of what it would look like if there was phased renovation; correct?

MR. JANKOWSKI: Objection. Vague on "asked."

You can answer.

A. In terms of the conversation we were having about do a portion of work in the Eisenhower Theater while the Opera House theater is active, or however else you want to describe that, a lot of different forms, that was not the sole focus of JLL's engagement.

They were brought on board to augment our project management team with an understanding of projects, and an understanding of the operations.

Q. Okay. One of the project parameters on which they were conducting their work was a two-year closure of the main building for renovations; correct?

A. Two-year window. Yes.

Q. JLL, they weren't asked to independently evaluate the feasibility of phased construction, were they?

MR. JANKOWSKI: Objection. Vague on "feasibility."

You can answer.

A. It was discussed with them.

Q. Okay. But it was not part of their Statement of Work, was it?

A. No. Again, we gave them the window --

Q. Mm-hmm.

A. -- and we gave them the projects.

Q. So they never did evaluate the feasibility or the cost of phased construction?

MR. JANKOWSKI: Same objection on "feasibility." Vague.

A. They did evaluate it.

Q. You're saying that JLL evaluated the feasibility of phased construction as distinct from full closure of the main building?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer.

A. They did, yes. They did.

Q. They did, even though you just said one of the project parameters was that there would be a two-year full closure of the main building for renovation?

MR. JANKOWSKI: Asked and answered.
You can answer.
A. You're -- I'm sorry. You're framing it as a "We told you to do this."
Q. Mm-hmm.
A. "So go do it."
Q. Okay.
A. That's not just really how construction works. There's always a conversation about what's the best way, what's the most efficient way, what's going on in the building.
JLL did give us input on the efficiencies around closing the building versus doing the construction in an occupied manner.
Q. Okay. Tell me about that.
How did they convey that information?
A. Discussed in meetings. It was in a letter.
Q. A letter to the Center from JLL?
A. Yes.
MS. FREENY: I'm going to state for

the record that I don't think I have a copy of that letter, and to the extent that that letter exists, I would request a copy.

(Request.)

Q. When was that letter sent to the Center?
A. I don't recall. June. June, I think.
Q. It was after the May court decision?
A. Yes.
Q. Why was that letter not presented to the Board if it, as you state, contained JLL's discussion of the feasibility of phased versus full main building closure?

MR. JANKOWSKI: Objection. Lacks foundation. And -- yeah. As to whether it was presented to the Board.

A. I don't think I would ever just give -- I would never just give the Board a letter.
Q. Okay, but --
A. But it supports the underlying fact here of the efficiency and effectiveness that we have been discussing.
Q. That discussion of the efficiency and

effectiveness, as you describe it, of full closure versus phased renovation from JLL, that doesn't appear in JLL's report, does it?

A. Not in the -- not in the CPDP, Comprehensive Project Development Plan. There is not a -- that is a plan focused on a specific set of projects.

Q. So your testimony is that where we would find that is in a letter -- a separate letter from JLL?

MR. JANKOWSKI: Objection to the extent that misstates.

But you can answer.

A. You will find that this letter I'm referring to does include information on efficiency and effectiveness of completing the work in an occupied versus unoccupied building, yes.

Q. What was your understanding -- well, is that a letter that they voluntarily provided or that the Center requested?

A. They voluntarily provided.

Q. What was your understanding of why they

provided that letter to you if it was outside of the scope of work?

A. I think it's relevant to their relationship with the Center as a partner, and not just a contractor doing a job blindly.

Q. What is your recollection of the substance of what they said in that letter?

A. Again, I'd just -- the effectiveness of the work. Sorry, not the work. The effectiveness of, you know, occupied versus unoccupied.

Q. Occupied, that refers to phased construction?

A. To a degree, yeah.

Q. Did they state the basis for that perspective? In that letter.

A. I don't recall if it said exactly what their basis was.

Q. Well, do you have an understanding of what JLL did to, as you say, reach that perspective about effectiveness?

MR. JANKOWSKI: Objection to the extent it calls for speculation.

MR. JANKOWSKI: But you can answer.
A. Yes. At the same time as they're writing this letter, they're developing their understanding of the needs of the building, the project, the operations, so that's how they reached the conclusion that's in the letter.
Q. But as they're developing the projects, they're planning for a two-year closure; right?
MR. JANKOWSKI: Objection. Vague on "planning." And to the extent it misstates.
A. They're using that window, yes. Yes.
Q. Did JLL prepare a schedule for phased renovation?
A. I think we already talked about this, but they did not provide a schedule where Eisenhower is operational and Concert Hall is closed, and then Concert Hall is operational and Eisenhower is closed.
Q. So that means they did not prepare a schedule for phased renovation; correct?
MR. JANKOWSKI: Objection to the extent that misstates.

A. I would consider their schedule phased, as it is right now, but we're saying the same thing.

Q. Okay.

A. They did not -- they did not create a schedule where work within -- with the expectation that public access is maintained within the main building.

Q. Okay. Is another way to say that: JLL did not prepare a schedule that contemplated construction occurring while the main building was open at all?

A. Yes, but draw a delineation between the parking garage and the building above.

Q. Understood.

So separating out the parking garage, when I use the word "main building," I'm not talking about the parking garage. It would be fair to say that JLL did not prepare a schedule for renovations to occur while the main building was open.

A. Or sections of the main building was open, yes.

Q. Okay. Or any part of the main building was open; correct?

A. Correct.

Q. I want to get you to -- we're going to look at some documents now, and I want to just ask you a question about Tab 2 in your binder, which we are going to mark as Exhibit 1.

(Floca Exhibit 1, memorandum, 3.4.26, KC-BEATTY0827-829, was marked for identification.)

Q. Mr. Floca, you see in front of you Exhibit 1 is a memorandum from a source selection official to you with a Subject: Recommendation for Award.

Do you see that?

A. From me.

Q. Oh, I'm sorry.

I'm glad you corrected me, from you to the source selection official. Thank you.

Do you see that there are little numbers at the bottom that start "KC-BEATTY"; do you see that?

A. Yes.

Q. I will represent to you that those are something called Bates numbers, and that those were added by Defendants when they produced documents.
A. Okay.
Q. I may use these from time to time.
Do these numbers look familiar to you at all?
A. These numbers at the bottom?
Q. Yeah.
A. No.
Q. This is a memo from you to some -- who is -- what is a source selection official? Like a contracting officer, sort of?
A. Can be, but doesn't have to be. Source selection official is the entity for this procurement effort, making the ultimate selection.
Q. Okay. So you were making a recommendation for who should get selected; is that right?
A. Yes.
Q. I want to draw your attention to the number 2 on page 1.

A. Mm-hmm.
Q. It talks about "The primary risk to the Center's Renewal Project..."
And let me just pause there. The Renewal Project, is that the same thing as what we have previously described as the $257 million renovations?
A. Yes.
Q. Then I'll read that again.
"The primary risk to the Center's Renewal Project is the compressed 26-month execution timeline."
Do you see that?
A. Yes.
Q. It's 26 instead of 24 months. Is that -- but does this match up roughly to the assumption that there would be a two-year period of renovation during closure of the main building?
A. Yes.
Q. Is it 26 instead of 24 -- why is that, is that to account for the additional work that the contractor would need to do between the date of the

award, and the, at that time, planned closure in July?

A. I don't remember why, explicitly, we used 26 months.

Q. Okay. Do you remember there ever being a discussion of the Renewal Project or the $257 million renovation needing to take 26 months instead of 24?

A. Sorry. Do I remember what?

Q. Do you remember there being a discussion ever -- and this is not -- I just want to make sure.

The 26 you don't remember, but do you remember there being a discussion that the project, the renovations, would take 26 instead of 24 months?

A. Not explicitly.

Q. Help me understand the reference to "compressed"; what did you mean by that?

A. There's a lot of work to be done in a definitive window.

Q. Mm-hmm.

A. So you have to compress that work.

Q. What do you mean by "a definitive window"?
A. The two years.
Q. Okay. Why was it -- I guess, why was it two years and not, for example, longer?
A. Balancing doing the work, the amount of work, with needing to open the building back up, and then...
Q. Okay. Who made that decision that it would be a two-year period?
A. That decision was part of the Truth Social message.
Q. What do you mean by that, "Truth Social message"?
A. That first announced -- the message that first announced the closure.
Q. Okay. Understood.
That was a Truth Social message by Chairman Trump?
A. Yes.
Q. So that was when the decision was made to adopt a two-year closure duration?

MR. JANKOWSKI: Objection to the extent that it misstates.

You can answer.

A. Yes.

Q. Did you understand that announcement to be sort of like a decision by the Chairman?

A. I took the announcement at face value.

Q. But did you think that you had the ability to override it?

MR. JANKOWSKI: Objection. Vague on "override."

A. I'm sorry. I'm just -- I don't know how I would over -- over-delete the post. I don't know.

Q. So no. Yeah, let me rephrase.

After you saw the Truth Social post by President Trump announcing this two-year closure, did you understand that you had to close the Center for two years, or that you had the option to disagree and not close the Center for two years, or close the Center for a different amount of time?

MR. JANKOWSKI: Objection. Compound.

MS. FREENY: You can answer.

A. When that message came out, I remember meeting as a team --

Q. Yep.

A. -- the leadership team that was in place at the time, to begin -- the direction then was to begin focusing on a structured implementation of this work.

Q. Okay. That was a structured implementation of the two-year period that Trump had announced; correct?

A. Yes.

Q. You said the leadership team that was in place at the time met. Who was that?

MR. JANKOWSKI: I'll just note that we'll -- we're probably going to start to raise a scope objection at a certain point. So --

MS. FREENY: Okay. I'm close to -- let me get this question.

MR. JANKOWSKI: Okay.

MS. FREENY: And then I will take a break.

Can I just get my question back.

(The record was read back by the Realtime Stenographer.)

THE WITNESS: Richard Grenell was the president of the Kennedy Center. I mean, there's a whole -- I could go through -- but the -- that leader -- that's the -- under ambassador, that's the leadership team.

BY MS. FREENY:

Q. Who do you remember being in that meeting specifically that talked about President Trump's announcement on February 1st, besides Mr. Grenell?

A. That wasn't one definitive meeting. There were multiple meetings about getting the work started.

Q. Okay.

A. You know, it wasn't one meeting where it was -- so...

Q. Then let me direct you, because I heard you say, I remember being -- after that Truth Social post, I remember being in a meeting with a

leadership team.

So just focus on that first meeting that you said you remembered. Who was there besides Mr. Grenell?

A. Nick Meade.

Q. Okay.

A. And Rick Loughery were the --

Q. I didn't hear the second.

A. Rick Loughery.

Q. Loughery.

You said the direction was to begin on -- begin focusing on implementation of the President's announcement. Direction by whom?

MR. JANKOWSKI: I think we'll make a scope objection here.

If you can explain to me how this relates to the process of --

(Clarification requested by the Realtime Stenographer.)

MR. JANKOWSKI: Substance, justification, mechanics of the later Board meetings, we can discuss maybe further going down

this road, but we'll -- for now, I'll instruct you not to answer as it's outside the scope.

MS. FREENY: Okay. So I'm going to say on the record, the witness already testified that the JLL report, which was put before the Board in support of the full closure, what I'm calling the full closure, was predicated on a projected duration, that was one of the assumptions of the JLL report of two years. Not more, not less.

I think he's also said that that was -- you know, that was arrived at after President Trump's Tweet.

I think we are entitled to understand if that was an input into what was put before the Board, we are entitled to that.

MR. JANKOWSKI: So I think that testimony has been given, though. So going beyond that is outside the scope.

MS. FREENY: I don't see how, if the direction is coming from President Trump, we are going to close for two years, and we are trying to probe whether the reason the Center is closing for

two years, as opposed to any other amount of time, whether that is because President Trump gave the direction, I want you to close for two years.

I think we are entitled to probe that because that was the only option that was put before the Board in terms of full closure.

MR. JANKOWSKI: Before the August and September meetings?

MS. FREENY: Yes.

MR. JANKOWSKI: So I think you can ask that. We can get into that with respect to the August and September meetings, as to the Center's understanding of whether that direction exists.

MS. FREENY: I want -- so I think that we are entitled to know whether there was direction from the President to -- who is also, in our view, acting as the chairman of the Center's Board, to close the Center for a period of two years.

I think we are entitled to know if that direction came from the President. I do not think it matters when it was, because regardless,

whether it was given in February, or whether it was given after the May decision, we regard that direction from the chairman as relevant to the decision before the Board, which included only one closure option, a period of two years.

MR. JANKOWSKI: The issue is that precedes the March meeting, which the Court -- at which the closure decision was taken, and the Board has already preliminarily enjoined. So, you know, I'll --

MS. FREENY: All right. So we will -- you know, we won't debate this.

I think this is something that we will end up litigating in front of the Court.

MR. JANKOWSKI: So I'll enforce the Court's Order discovery limitation there and say not to -- that's outside the scope, and instruct the witness not to answer.

MS. FREENY: We will just say, we do not think that is enforcing the scope.

BY MS. FREENY:

Q. But I will ask you, sir, are you going

to not answer that question at the direction of your counsel?

A. Yes.

MS. FREENY: I think this is now probably time for a break. Everyone good for a bathroom break?

MR. JANKOWSKI: Sure.

(RECESS, 11:15 a.m. - 11:23 a.m.)

MR. JANKOWSKI: I'm sorry. I'll just make a request to read and sign the transcript.

MS. FREENY: All right.

BY MS. FREENY:

Q. Mr. Floca, we're back from break. You understand you're still under oath?

A. Yes. Yes. Yes.

Q. All right. So we were talking about different scenarios, and I guess I just want to continue on talking about those scenarios.

We've talked about, I think, what I have been calling a phased construction scenario; right? It's one option?

A. Okay.

Q. And we just talked about a two-year closure scenario; right?

A. Yes.

Q. Were there any other scenarios that the Center considered presenting to the Board as options for the -- accomplishing the renovations?

A. We considered all of the scenarios. I mean...

Q. So I guess "all of the scenarios" sort of, to me, sounds like an infinite possibility, right.

So here's what I would assume is that, okay, you need to move forward after the decision. So you've got to figure out what are the options, right, what are the options that are worth considering; is that fair to say?

A. Yes. That is fair.

Q. Because there might be some options, we talked about one, just not doing the renovation, that just isn't worth considering; right?

MR. JANKOWSKI: Objection. Vague on "worth considering."

But you can answer.

A. That is a consideration. That is an option, a bad one, but yes.

Q. But you couldn't -- there are certain scenarios that just aren't -- weren't worth doing additional analysis.

You had to pick and choose which scenarios were worth analyzing more deeply; right?

MR. JANKOWSKI: Objection. Compound.

You can answer.

A. We had to pick what scenarios were worth presenting to the Board.

Q. And what scenarios did you consider as you're deciding what to present to the Board; right? I'm not trying to be coy here. Again, this is --

A. We --

Q. Because I can -- I'll just tell you, you know, we have documents that talk about four scenarios; we have documents that talk about three scenarios.

I'm just trying to understand how

you identified the different scenarios that you might even consider putting before the Board.

A. The main building is broken up in three sections.

Q. Okay.

A. Concert Hall, Opera House, Eisenhower. Then you have the REACH.

Q. Okay.

A. So the consideration is one at a time; multiple at a time; and "multiple" that means Concert Hall and Opera House, Ike and Opera House, Ike and Concert Hall.

Q. Okay.

A. Public spaces only versus back of house.

Q. Okay.

A. Then interior versus exterior, main building, REACH, whole campus.

All of those --

Q. Mm-hmm. Okay.

A. -- items, all of those scenarios were discussed.

Q. Discussed within the Center, or with

consultants?

A. Both.

Q. I think maybe at this point in time, it just -- it maybe makes more sense to get more concrete.

So I'm going to ask you to turn to Tab 41 in your binder.

MR. JANKOWSKI: Exhibit 2, I think.

Q. This will get marked as Exhibit 2.

(Floca Exhibit 2, meeting agenda, 8.3.26, KC-BEATTY1089-1096, was marked for identification.)

Q. Mr. Floca, if you take a look at Exhibit 2, it is titled Kennedy Center Audit and Finance Committee meeting dated August 3, 2026.

Do you see this?

A. Yes.

Q. Do you see the little Bates numbers at the bottom that indicate that it was produced by the Defendants in this case?

A. Yes.

Q. This is a slide deck that was used for a presentation at the August 3rd Audit and Finance

Committee meeting; is that right?
A. Yes.
Q. Okay. Who prepared this slide deck?
A. Finance team.
Q. Okay.
A. Programming team, education team. I worked on this. PR team.
Q. What was your role in working on this presentation?
A. I brought all of the different stakeholders together. I came up with the format.
Q. Format. Okay.
Did you review it before it was presented to the committee?
A. Multiple times, yes.
Q. If I can -- oh, I guess, what is -- just so that I understand, what is the purpose of this presentation? Or, what was the purpose?
A. To review the statutory mandates, programming scenarios, programming requirements and solutions, and a financial crosswalk.
(Clarification requested by the Realtime

Stenographer.)
A. We also have a litigation update on here, but I don't remember discussing litigation at the meeting.
Q. Okay. This -- let's see.
How did this -- did this meeting have any relation to the August 13th full Board meeting at which there was a vote on full closure of the main building?
A. This was a committee meeting.
Q. Okay. Was it a monthly meeting that was held every month, or was this meeting called in anticipation of the August 13th Board meeting?
A. It's both. These are regular -- should be regular meetings.
Q. Okay.
A. And the meeting prior to the Board meeting.
Q. What role, if any, does the Audit and Finance Committee play, or did they play, with respect to planning for the August 13th Board meeting?

A. Are you asking what role they played in -- during the meeting, or what role do they play in general?

Q. Yeah. What role -- I'm just trying to understand, like, you know, this is -- this occurs before the meeting.

What role did this particular committee play, not in the August meeting, the August 13th meeting, but with respect to planning for the August 13th meeting?

A. In general, the Audit and Finance Committee meeting makes budget-related recommendations to the Board, and as a part of that, in the committee process, becomes -- they should be more informed than, you know, the general Board.

Q. Does the committee -- does the Audit Committee decide what financial information gets presented to the Board or does management decide, or both?

A. Both.

Q. I'd like to have you turn to -- a couple of pages in to what is numbered at the bottom,

number 1094, and the top of the slide says Programming Scenarios.

A. Mm-hmm.

Q. Do you see that?

A. Yes.

Q. So are these the -- are these the type of scenarios like we had been talking about, scenarios as possible options for accomplishing the renovation?

A. Focused on programming implementation.

Q. But -- well, let me drill down.

On the left-hand column, there are three different boxes --

A. Mm-hmm.

Q. -- starting with Endowment & Grant-funded, NSO Off-site plus REACH, and NSO On-site plus REACH.

Are those three possible scenarios for implementing the $257 million renovation?

A. These scenarios are adjacent to how you would implement work on-site.

Q. Well --

A. So you can implement work multiple ways under the top-line item, Endowment & Grant-funded, or the middle line item, or the bottom line item.
Q. Yeah. I don't think I yet understand, so why don't we go through one by one, and I'll have you explain what that means.
So in this context of this slide on 1094, what is your understanding of the box Endowment & Grant-Funded?
A. That line item, not just the box, that line item --
Q. Mm-hmm.
A. -- looks at programs that -- the best example, or a good example, is Millennium Stage. Millennium Stage is a grant-funded -- sorry, an endowment-funded program.
Q. Okay.
A. Education is a grant-funded program.
Q. Okay.
A. What that line item does not include is the National Symphony Orchestra. So this is programming on-site without the NSO, and a risk, a

cost, a memorial presence. What you see there.

Q. In that line item 1, the other boxes associated with the cost and the mission risk, I don't think -- I still don't understand, is that associated with what, closure?

A. Associated with only operating --

Q. Okay.

A. -- via endowment and grant-funded programmatic things.

Q. I got it.

So this programming scenario would be during the period of renovation, I take it; is that what we're talking about?

A. Yes.

Q. It would be during the period of renovation; the scenario is running Millennial Stage, running the Educational program, and perhaps anything else that is funded out of the endowment or grants; is that right?

A. Yes.

Q. So that doesn't include NSO you mentioned; correct?

A. Correct.
Q. Does that include things like Broadway shows or Alvin Ailey?
A. No.
Q. That's because those are not funded out of the endowment or grants?
A. Correct.
Q. Who was primarily responsible for preparing this slide?
A. I prepared this slide.
Q. Then did you come up with these three scenarios, or were they supplied to you by one of your staff? One or more of your staff.
A. These were informed by one or more of my staff, yes.
Q. But you ultimately came up with which three scenarios -- programming scenarios to present to the Audit Committee?
A. I am presenting this via the slide, yes.
Q. Help me understand your thinking behind the first one, that the possibility would be to present -- to keep programming only if it's covered

by endowment or grant-funded.

What was your thinking behind that option?

A. The lowest expense, what is moderately acceptable for the mission, and because it has the lowest expense, it has the smallest footprint on the campus, so from a construction perspective, there's more ability. There's more efficiency.

Q. Is the idea that the grant-funded work like the education would take place in the REACH?

A. Or off-site.

Q. Or off-site. Okay.

But Millennium Stage, where is that? Is that in the main building?

A. It's a program.

Q. Okay.

A. There are Millennium Stages in the Grand Foyer, but they don't have to host Millennium Stage.

Q. So when you were saying this first scenario, Endowment & Grant-funded, contemplated Millennial Stage because it is funded by the endowment, were you referring to -- what were you

referring to, a location or something else?

A. The program.

Q. The programming.

A. So which could -- sorry. It could be the -- it could be the location. It could be in the Grand Foyer on Millennium Stage, or it could be in the REACH, or it could be at a partner venue.

As long as it's -- as long as the plan is included within the funding that the endowment.

Q. I got it.

So under this scenario, Endowment & Grant-funded, there could have been programming in the main building, but only Millennium Stage?

A. No, there were conversations about having Fortas in the main -- Fortas --

Q. Oh. Okay.

A. -- in the main building, which is another endowment-funded --

Q. Okay.

A. -- endowment-funded program.

Q. I got it.

So the distinction with respect to the first scenario is programming could take place in the main building if it was endowment-funded, but the scenario did not contemplate programming if it was not endowment-funded like a Broadway show; is that right?

A. That's correct.

Q. It sounds to me like this analysis of scenarios is primarily budget-driven; is that right?

MR. JANKOWSKI: Objection to the extent that misstates.

But you can answer.

A. I don't think it's primarily budget-driven. It is an analysis of mission, and construction impact, and then the budget.

The budget is important. You can't understate that, but anyway -- sorry, I said, or understate.

Q. Yeah, I could see the wheels turning. Okay. Walk me through, the next scenario was NSO off-site plus REACH.

What did that contemplate?

A. The orchestra playing in venues around the DMV, and utilizing the REACH to the greatest extent that they can for rehearsals, offices, music library. Those things.

Q. The NSO can't perform in the REACH due to its size. Do I have that right?

A. The NSO -- the musicians can fit within Studio K.

Q. Mm-hmm.

A. But there's not much space for an audience.

Q. Okay. So it was never -- it was never, sort of, reasonably contemplated to have the NSO perform in the REACH?

A. No.

Q. Does the NSO practice in the REACH?

A. No. They can, but they don't. They haven't.

Q. Is that for space reasons?

A. Acoustical reasons.

Q. Ah. Okay.

Does that mean that's because the

Concert Hall has better acoustics?
A. Yes, the Concert Hall has better acoustics, and there are additional acoustical treatments that I would want to see in Studio K before the musicians start using the space.
Q. Ah. Got it.
Where is the NSO currently practicing?
A. In the Concert Hall.
Q. All right. Let's go to the third scenario. NSO on-site at REACH, and tell me what that scenario entails?
A. This -- the main difference is that the NSO is performing in the Concert Hall, which means we're welcoming patrons -- 1,200, 2,000 patrons into the building for their performances.
Q. But in that scenario, would there be any other performances besides the NSO in the Concert Hall?
A. Theoretically, there could be, but that --
Q. Okay.

A. -- wasn't -- this is an analysis, to a degree, of what's the lowest risk to the mission.

Q. Okay.

A. Not, you know -- not the full programming, historical programming depth that there would be in the Concert Hall.

Q. All right. Why was this option selected; that is, why was there a separate scenario that focused on the NSO performing in the main building, while renovation was going on?

A. The orchestra would prefer to perform in the Concert Hall.

Q. Is it fair to say that the NSO has a special relationship with the Kennedy Center?

A. Yes. That's fair.

Q. While we're on it, so you say the orchestra -- the NSO would prefer to perform in the Concert Hall.

At what point in time was the decision made that they would be off-site?

A. I don't remember exactly when that decision was made.

Q. Would it have been before or after this presentation on August 3rd?

A. I think they were planning their season being off-site before this presentation.

Q. Did you have an understanding of why they were planning their season being off-site before this presentation?

A. The uncertainty around this process.

Q. Did you have discussions with the NSO about that?

A. About what?

Q. About the planning for whether they were going to be off-site for the next season?

A. Yes. I was part of the discussions with them in the off-site season planning.

Q. During those discussions with the NSO about planning for the next season, did you or anyone else at the Center encourage the NSO to plan to be off-site for the upcoming season?

MR. JANKOWSKI: Objection. Vague as to encourage.

You can answer.

A. I wouldn't characterize it as encouraging, no. My --

Q. How would you --

A. -- my appreciation for the NSO is that they have music that they need to produce, and the risk of inaction is very high to their program and to the musicians.

I think it's a balance of making sure that they can continue to be viable and have stability while all of this is unfolding.

Q. Is that something that you conveyed to the NSO?

MR. JANKOWSKI: Objection. Vague as to "that."

But you can answer.

A. I regularly convey to the NSO my appreciation for what they do, yes.

Q. Did you also convey to them anything about your view on where they should be planning to perform for the upcoming season?

A. I never directed them where to plan or where to consider planning. They began the process

themselves based on the needs, the work, the appropriation, and then the announcement.

Q. So you said "they began the process themselves."

Did you provide any input to them on that process before they finalized the decision to be off-site for the upcoming season?

A. We had meetings to discuss where things were in the court process, and where things were in the project management process -- construction process.

Q. I've heard you say you didn't -- you wouldn't characterize it as encouraging them to be off-site, but did you express approval for their preliminary -- the process for -- let me just restart that one.

So did you express any views on whether they should finalize the decision to perform off-site for the upcoming season?

A. Yes. I'm sure I did.

Q. Okay.

A. Yeah.

Q. What views did you convey to them?

A. It's pretty broad. I'm sorry. It's a broad statement. I mean...

Q. Okay.

A. If we are talking about the -- should you move forward --

Q. Mm-hmm.

A. -- with a plan off-site --

Q. Mm-hmm. Yes.

A. -- versus should you bank on performing in the Concert Hall, the prudent thing is to move forward with plans off-site. And that's driven by the uncertainty in this process.

Q. Let me ask: At that point in time -- so this is before the Board meeting. Did you have any expectation -- and by expectation, I mean anticipation -- any expectation of how the Board would vote on closure?

A. You're asking if I anticipated before the August Board meeting how the Board would vote?

Q. Yes.

A. I could assume, yes, how they would

vote.

Q. Why do you say that? Why could you assume?

A. Because the information, the reality, hadn't changed, and the information, to a degree, was already presented to them.

So the underlying needs or analysis of the needs really had not changed.

Q. Okay. Well, one thing that the judge in this case noted that wasn't presented to them was, sort of, the programming perspective; right?

A. Yes.

MR. JANKOWSKI: Objection to the extent that --

MS. FREENY: He's already answered.

MR. JANKOWSKI: -- it misstates the Judge's Opinion.

MS. FREENY: He's already answered.

MR. JANKOWSKI: But you can answer.

MS. FREENY: He already answered.

Yeah, if you can just -- once he's already answered, he's already answered.

MR. LYNCH: He can put his objection on the record.

MR. JANKOWSKI: Yes.

MS. FREENY: It's invalid after he already answers.

MR. LYNCH: We don't have to argue about that.

MS. FREENY: Also, he can -- Will can speak for himself, Chris.

MR. JANKOWSKI: Yes.

We don't have to argue about that.

BY MS. FREENY:

Q. Is this -- this slide that we've been talking about, programming scenarios, is that one of the sort of inputs to making sort of -- to providing programming information to the Board?

A. This was an input to the Audit and Finance Committee, which the members are Board members.

Q. Why was something like this not presented to the Board? Like, these are three different scenarios. As I understand it, three

different scenarios were not presented to the full Board.

Is that your understanding as well?

A. Delta's oral presentation did not include three different scenarios.

Q. What is your understanding of why it did not include three different scenarios?

A. When you look at the infrastructure of the building --

Q. Mm-hmm.

A. -- a reality, and one driving fact, is that many of the core building systems are interconnected. So it's extremely difficult to phase work.

That's juxtaposed to the risk to mission, and the benefits you have to mission, there's programming and education, and the memorial, at the REACH versus in the building, the main building.

Q. Was that risk assessment, at least in part, underlying your decision about which scenarios to present to the Board?

A. Analyzing programming, education, the memorial, and the needs of the building were all factors in making recommendations to the Board.

Q. Who ultimately decided not to present these three scenarios to the Board?

A. The strategy with the Board meeting, the August Board meeting, was to have an independent presentation to the Board, and that's what happened.

Q. Okay. My question was: Who decided not to present these three scenarios to the Board?

A. The information included in these three scenarios is also included in the presentation that Delta made in their oral report and the full report.

Q. Was Delta asked to analyze these three scenarios?

MR. JANKOWSKI: Objection. Vague as to "analyze."

A. Delta was asked to provide an assessment of the Center's operations and construction needs, physical needs.

Q. But they were presented with certain scenarios; right?

A. We discussed with them multiple scenarios, yes.

Q. Actually, the Center defined which scenarios Delta would consider as part of its engagement; right?

MR. JANKOWSKI: Objection. Vague as to "defined."

You can answer.

A. It was more of a discussion.

Q. Okay.

A. Than defining exactly what Delta needed to analyze.

Q. But you understand, though, that the solicitation made reference to four scenarios to be analyzed by the consultant; right?

A. I think the solicitation was more general than just -- or more -- it was broader than just analyzing scenarios.

Q. Okay. But you also recognize that it talked about four scenarios; right?

A. I'd have to see exactly what the solicitation says.

Q. All right. Let's turn to Exhibit 7.

MR. JANKOWSKI: Tab 7.

MS. FREENY: Or -- sorry. I'm sorry. Tab 7. Thank you.

This will be Exhibit 3; is that correct?

Tab 7 will be Exhibit 3.

(Floca Exhibit 3, Solicitation, KC-BEATTY0200-262, was marked for identification.)

BY MS. FREENY:

Q. Mr. Floca, take a look at Exhibit 3, which is marked at the top Solicitation/Contract/Order for Commercial Products, et cetera.

Do you see that?

A. Yes.

Q. You see the date in the upper right-hand corner, 7/16/26.

Do you see that?

A. Yes.

Q. You see the Bates number at the bottom indicating that this document was produced by

Defendants in this litigation?

A. Yes.

Q. All right. Is this a copy of the solicitation for the work that ultimately Delta was hired to perform?

A. Yes.

Q. In this solicitation, I'd like to have you turn to page 40 on the bottom right, or Bates Number 0239. Actually, first, 0238, just for orientation, page 39.

And you see, this is the request for proposal, or RFP.

Do you see that?

A. Mm-hmm. Yes.

Q. It says, "The Center is soliciting proposals from qualified, independent construction advisory, forensic engineering, and capital program management consulting firms..." (As read.)

Do you see that?

A. Sorry. Where does it say that?

Q. Under Overview & Purpose. "The Kennedy Center is soliciting..." (As read.)

A. Yes. Yes.

Q. Turn the page to page 40, Bates 0239. At the top, do you see where it says, 1.3, The Core Advisory Challenge.

Do you see that?

A. Yes.

Q. Then do you see, as an explanation of the Core Advisory Challenge, a reference to four distinct operational phasing scenarios?

A. Yes.

Q. So with this being the solicitation, this means that four scenarios were presented to Delta within -- as defining the scope of their work; correct?

A. Yes. We discussed multiple scenarios with Delta.

Q. Okay. But it's not just discussing, Mr. Floca; right? It is actually tasking them with analyzing four distinct scenarios; right?

A. This is requesting a proposal from them for that.

Q. Okay. This is the -- this is the work

that they were ultimately engaged to perform; correct?

A. This is the RFP. This is the --

Q. Right.

A. -- RFP for the work, yes.

Q. So Delta was engaged, originally, to perform work related to four distinct operational phasing scenarios.

A. To submit a proposal for that, yes.

Q. But that's what they were also ultimately engaged to do, as the scope of their work; correct?

A. To review multiple scenarios, yes.

Q. Four scenarios to be precise; correct?

MR. JANKOWSKI: Objection. I think asked and answered at this point.

Q. You can answer.

A. Multiple scenarios, yes.

Q. Four scenarios; correct?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer.

A. The RFP document is requesting, and we do have in the RFP the four scenarios.
Q. Okay.
A. I'm not -- I'm not ignoring or saying that four scenarios are not possible, but there could be five. There could be six.
Q. I know, and I want to understand --
A. There could be three.
MR. JANKOWSKI: I'm sorry. Kyle, please let him turn his answer.
Q. I want to understand, Mr. Floca --
MR. JANKOWSKI: Well, hang on. Matt, were you done with your answer?
A. Just -- the -- my point is that there are multiple scenarios. Four scenarios were contemplated in the RFP.
Q. Mm-hmm.
A. And multiple scenarios were discussed with Delta when they came on board.
Q. How many scenarios did you understand that Delta actually analyzed in their scope of work when they performed the work?

A. We did not dictate how many scenarios they needed to analyze. It was open to them, in their conversations with staff and their conversations with JLL, to come up with that review themselves.

Now, we -- it's easy, again, based on the building, to come up with scenarios, like what was presented to the Audit and Finance Committee, and what I talked about earlier, three different buildings, plus the REACH. These are easy things to draw a line to.

But it was never told to Delta, you need to analyze this exactly. It was a conversation with Delta about holistic needs of the Center, not just these are the four scenarios. Weigh in on them.

Q. Why, then, were four distinct scenarios identified in the solicitation?

A. Mainly to draw the point that they are -- they are weighing options. They're helping the Center analyze the different options that are before us. The paths that we might take.

Q. Did you understand that Delta was defining the possible options, or that the Center was defining the possible options for Delta to evaluate and make recommendations on?

A. It was a back-and-forth. A give-and-take.

We understand more about the Center than Delta does. Delta has an independent lens that is not informed by anything going on. So we gave Delta information, and they requested information and analyzed information.

So it was a give and take, not just a one-way direction.

Q. Help me identify what is meant just by the four scenarios referenced in this document in this solicitation.

What four scenarios were referenced?

A. I am going to assume they are whole building offline --

Q. Okay.

A. I'm sorry. Or whole campus offline.

Q. Mm-hmm.

A. Main building offline.

Q. Okay.

A. Large portion -- well, main building offline, with the REACH online.

Large portions of the main building offline, with the REACH online.

Q. Mm-hmm.

A. Or small components of the main building offline.

So instead of the whole Opera House theater, you know, components of the building.

Q. Okay. That's helpful.

A. Very detailed.

Q. You said you assume that those are the scenarios.

Why do you say assume rather than know?

A. Well, that's what I -- that's what's in my mind, right.

Q. Okay.

A. When I'm thinking of the different ways that you can cut the building up.

Q. Okay. Did you play a role in preparing the content for the RFP?
A. I drafted the original and gave it to the team.
Q. Okay. When you drafted the original, did it have reference to four scenarios?
A. Yeah. I drafted this.
Q. You drafted this. Okay.
So the reference to four scenarios would have come from you originally?
A. Yes.
Q. Okay. So the four that you defined, I can pretty well rely on those as the four scenarios referenced in this document?
A. Yes.
Q. How did you come up with those in comparison to the three that we talked about earlier, which we called programmatic scenarios?
A. I think that is the cleanest way to compartmentalize this ask to someone who has little to no understanding of the Center.
Q. When you say "that is the way," are you

referring to the four scenarios that you described?

A. Yes.

Q. Okay. Why weren't -- were any of the three programmatic scenarios, those were not presented other than the scenario of NSO and NSO off-site?

Does that make sense? I know that's a little --

A. Presented to who?

Q. Included within the scope of these four scenarios.

A. The programming --

Q. Mm-hmm.

A. -- lives adjacent to, and is a part of these scenarios.

Q. Okay.

A. But not explicit, like in the Audit and Finance Committee meeting.

Q. Okay. Why is there that distinction, from your perspective?

MR. JANKOWSKI: Objection. Vague on "distinction." I'm not sure he testified it was a

distinction. And/or misstates.

But you can answer.

A. Well, you're asking me if that was a part of this, the concept of who's doing what within the building.

Q. Yep.

A. And that is a part of these scenarios.

Q. Okay. But one of the scenarios we talked about in connection with the programmatic scenarios presented to the August 3rd Finance Committee meeting, that, if you recall, was an option to have at least some performances in the main building, funded by endowment and grants, but nothing else.

Is that among one of the four scenarios that you describe as -- in connection with this reference, "four distinct operational scenarios"?

A. The programming lives adjacent to these scenarios. So if you have a scenario where you're phasing improvements, or systems within a building, it is correct to say that the programming is working

alongside that plan for phasing.

So if you're renovating -- if you're replacing electrical systems in this section of the building, then your programming doesn't happen in that section of the building. It happens somewhere else.

So that is a conversational -- that is again, adjacent to this idea of where construction is happening, or improvements are happening in the building.

Q. Okay. Understood.

But where construction is happening in the building, and in what sequence, is going to have an impact on the cost and the timeline of that renovation; is that right?

MR. JANKOWSKI: Objection. Vague as to "that renovation."

But you can answer.

A. Construction -- the cost of doing something does depend on how it's being done, yes.

Q. Okay. So that's what -- what I'm trying to understand, Mr. Floca, is when Delta is

analyzing, okay, what is this phased construction going to look like, don't they need to know whether it's going to be the Opera House and the Eisenhower are open while the Concert Hall is closed, for example, or it's going to be, it is only -- the only thing that's going to be open is the Concert Hall for the NSO?

A. They -- yes. They do need to know that.

Q. Okay. How do they know that without -- I mean -- how would they know that?

So how would they know what the various options, programmatically, that make sense for the Center, according to your analysis, what those would look like?

A. They would understand from the physical side.

Q. Mm-hmm.

A. This is what it means to replace electrical infrastructure, and this is what would be offline during that work.

Then they would understand from the programming side, here's what needs to happen to

meet the Kennedy Center's mission in the unimpacted areas.

Q. How would they know from the programming side?

A. Conversations with the NSO, conversations with education, conversations with programming staff, Millennium Stage staff, production staff.

Q. Did you have an understanding that Delta was making an assessment on the programmatic side?

MR. JANKOWSKI: Objection. Vague as to "assessment on the programmatic side."

You can answer.

A. Delta has to understand the historical finances related to programming, alongside the needs of the building. Delta is not the programmer.

Q. Mm-hmm.

A. But Delta has to understand the historics.

Q. Did you ask Delta to consider the three programmatic scenarios that you presented to the Audit Committee when they were doing their analysis?

MR. JANKOWSKI: Objection. I think this has been asked and answered.

You can answer.

A. They did consider those scenarios.

Q. At your direction?

A. Yes.

Q. I want to then turn to Tab 3 and talk about another, sort of, characterization of the scenarios, so I make sure that I understand what they are.

MR. JANKOWSKI: Exhibit 4.

(Floca Exhibit 4, Appendix X, [no Bates], was marked for identification.)

Q. So Tab 3 we're going to mark as Exhibit 4.

Mr. Floca, take a look at the front of Exhibit 4. It's marked Appendix X, and it says FY27 Budget Scenarios.

Do you see that?

A. Yes.

Q. Do you recognize this as an exhibit to the Delta report?

A. Yes. Exhibit X, yes.

Q. Turn the page, and I want to take a look at this chart. Just tell me what this chart shows.

A. Financials across expenses and revenues in three different scenarios.

Q. These are scenarios in the sense that we have been talking about before; that is, options for how to accomplish the $257 million renovations?

MR. JANKOWSKI: Objection to the extent that misstates prior testimony.

But you can answer.

A. Ask your question again because there's -- sorry. Ask it again.

Q. Okay. So you said -- you described this as having scenarios. I can see that it says scenarios, and I want to make sure that I understand.

Does this exhibit show financials for scenarios in the way that we have been using that term to mean options for how to accomplish the $257 million renovation?

MR. JANKOWSKI: Same objection.

You can answer.

A. Yes.

Q. But these are three scenarios. We talked previously about the four that's mentioned in the solicitation of work.

Are these the same three scenarios that we talked about in connection with the Finance Committee presentation on August 3rd?

A. These correspond to the programming scenarios.

Q. Okay. These are the programming scenarios.

So Scenario 1, that would be the Endowment & Grant scenario?

A. Correct.

Q. Ah. Okay.

Program 2 -- is -- sorry.

Scenario 2, that's with the closure of the main building, but not the REACH?

A. Yes.

Q. Then Scenario 3 is -- remind me, what is Scenario 3?

A. Scenario 3 is the NSO performing on-site in the Concert Hall.

Q. I got it. Okay.

Tell me how -- like, how did this chart or -- is it a chart? Is that what I call it?

A. Definitely.

Q. How did this chart come to be prepared?

A. Finance, mainly, has a -- has two sections -- three sections, but --

Q. Okay.

A. -- two main sections, accounting and financial planning.

Q. Okay.

A. Financial planning develops this outlook or budget with input from the different programs across the Center.

Q. Is this something that you directed them to produce?

MR. JANKOWSKI: Objection. Vague. "Directed."

You can answer.

A. This is a normal function of annual

planning.

Q. I'm going to push back on that because -- I thought we talked about this is -- this is planning for a pretty significant upcoming renovation; right?

MR. JANKOWSKI: Objection. Argumentative, and misstates.

You can answer.

A. This budget and exercise reflects the direction of this Board of Trustees preference.

The process is normal, as normal as it can be in this time. So this direction that the Board is taking does not reflect the last Board's priorities. It reflects their priorities. So that might be different, but it's not abnormal for a board to do different things.

This financial document is part of the team's normal process.

Q. I guess I would have thought that this was being prepared in response to the Court's May 29th Order, which as we discussed, the Court said additional information has to be presented to

the Board.

Is that not your understanding of why this was prepared?

MR. JANKOWSKI: Objection. Argumentative, and misstates.

You can answer.

A. It's normal to provide this. I don't know why it was not provided in March.

Q. Okay.

A. Because that wasn't my job at the time. But this is normal to provide the Board, and it's being done so in -- under unique circumstances with the Court, but this is a normal process.

Q. I'm not trying to get into a debate about the word "normal." I'm just trying to make sure I understand.

This was prepared in connection with trying to present the Board with sufficient information, so that it could make a decision about how to proceed with respect to renovation; correct?

MR. JANKOWSKI: Objection. Asked and answered. Misstates.

You can answer.

A. This was developed to present different scenarios to the Audit and Finance Committee and to the Board.

Q. Okay. Again, different scenarios for renovation; right?

MR. JANKOWSKI: Objection to the extent it misstates.

But you can answer.

A. For operations. Trust operations.

Q. Trust operations, with the understanding that there would be $257 million of renovations; correct?

A. Yes.

Q. Did you -- you said this was prepared by, I'm sorry, the financial planning staff?

A. They -- at financial planning and analysis is a --

Q. Okay.

A. -- is the division of finance, and they would have taken a lead in preparing this.

Q. Okay. Who else would have taken a lead

in preparing it?
MR. JANKOWSKI: Objection. I think this was asked and answered.
But, answer to your...
A. All of the entities under the expense category, like the NSO, like education, inform the process.
Q. Okay. If I wanted to see the original draft copy of this, like, whose would that be, who had the pen?
A. I don't -- I don't know who originally created this document.
Q. Okay.
A. But the format, with programs and all of these line items, these categories, is a long-standing breakdown of finances.
Q. Just so -- to make sure I understand, you didn't correct anyone to create this report for purposes of the consideration of the different scenarios?
MR. JANKOWSKI: Objection. Asked and answered, and to the extent it misstates prior

testimony.
A. This is part of the process, not a direction.
Q. Okay. How did they know then which scenarios to analyze? I assume that was from the presentation to the Audit Committee on August 3rd?
A. Finance is a part of the team that was discussing scenarios and working with JLL and working with Delta. So they were aware of all of those conversations.
Q. Okay. But I'm talking specifically about the three scenarios presented to the Audit Committee on August 3rd; right?
You agree that these scenarios, in Exhibit 4 were prepared because of the scenarios identified in the Audit Committee report; correct?
MR. JANKOWSKI: Objection to the extent that misstates prior testimony.
A. They correspond to those three scenarios.
Q. Okay. Again, you originated those three scenarios?

MR. JANKOWSKI: Objection. Misstates.

A. I put them on the presentation.

Q. Mm-hmm.

A. I did not single-handedly craft them, because what is included in those scenarios is -- it's baked into what the Kennedy Center has done for years.

Q. Understood.

So you didn't single-handedly craft them, but you made the decision, these are the three scenarios that makes sense to present to the Audit Committee?

A. That make the most sense.

Q. Did you have any role in, sort of, the preparation of the numbers on this sheet?

MR. JANKOWSKI: Objection. Vague as to "any role in the preparation of numbers."

A. These numbers are mainly driven by historical revenues and expenses.

Q. Okay.

A. But yes, there are tweaks that you make

along the way that reflect, you know, what's happening, right.

Q. All right.

A. Auxiliary programs might change because -- or the forecast of auxiliary revenue and expenses might change with how the parking garage is being used.

Q. Who was responsible for deciding whether and when to make those tweaks to the historical financial data when presenting them in this exhibit?

A. That's a process with the financial planning and the owners of these different programs.

Q. Okay. Did you play a role in suggesting tweaks to be made to historical financial data for presentation in this chart?

MR. JANKOWSKI: Objection. Vague as to "role" and "suggesting" and "tweaks."

A. I helped lead the process.

Q. Okay. I assume that means you were comfortable with the process that the Center undertook to prepare this analysis of the scenarios?

A. At the time, I was.

Q. Okay.
A. Now, I would be less comfortable, having been intimately involved in, you know, conversations over the last couple of months.
But, yeah, the process was normal.
Q. Let me break that down.
So at the time you said you were fine with this.
Roughly, what time frame are we talking, right around the August 3rd Finance Committee meeting?
A. Yeah.
Q. Okay.
A. Throughout the month of August.
Q. You said you would be less comfortable now. Why is that?
A. There are projections built into some of these numbers that --
Q. Okay.
A. -- that correspond to ticket sales and expenses, and how much, for example, it might cost for the NSO to do a show at this venue versus

another venue.

Q. Mm-hmm.

A. That is a normal process under unique times. I would have -- I am more intimately involved in that process now.

Q. Okay.

A. So I understand more about this process than I did in -- than I did in August.

Q. By "this process," is it fair to say, broadly speaking, the Center's financials?

A. Yes.

Q. Is there a reason that you became more intimately involved in the process of understanding the Center's financials in recent weeks or months?

A. Because I want to see the Center succeed, and to a large degree, that means I have to be able to answer a wide range of questions.

Q. Okay.

A. So...

Q. It sounds, though, that -- and this is not meant to be a criticism. This is meant for my understanding.

It sounds like, you know, at the time of the Board meeting, you were relying on your staff a little bit more for their knowledge about the Center's finances; is that fair to say?

A. That is fair.

Q. Is there anything else that prompted you to become more involved, other than just a general interest in being knowledgeable and able to answer questions?

A. No.

Q. So it didn't having anything to do with the Center's cash position?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer.

A. No.

Q. Did it have anything to do with representations that the Center made that it was within weeks of financial collapse?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer.

A. No.

Q. Do you recall the Center making representations that it was within weeks of financial collapse?

A. I do recall those representations.

Q. What can you tell me about those representations?

MR. JANKOWSKI: I'll just add -- not making a categorical objection, but just object to the extent that calls for attorney-client privilege, or executive privilege, as coming from, on behalf, or from the President, just instruct him not to answer.

But otherwise, you can answer.

A. Those comments are driven by the lack of following this process for FY26.

Q. What is "this process"?

A. The financial planning and analysis process.

Q. Okay. The Center's financial position, though, also was seriously affected by the decrease in revenue following the renaming of the Center;

right?

MR. JANKOWSKI: Objection. Lack of foundation.

Answer, if you can.

A. Financials were impacted, yes.

Q. Pretty significantly impacted, weren't they?

A. By asking the question that way, you're trying to draw a link between two specific things, and I think the impacts were driven by a much broader series of events than just the renaming, or the naming aspect.

Q. Are you saying that, from your perspective, the renaming did not have a significant impact on the Center's revenue?

MR. JANKOWSKI: Objection. Misstates.

A. I'm saying that the renaming did have an impact, and any significant impact, as you would describe it, is driven by broader factors, and not just the renaming.

Q. Broader factors specific to fiscal year

'26? Or are you referring to something historical?
A. I'm referring to things like patron friction, uncertainty, people not knowing what's happening with the building, not being able to make plans, not being able to say, here's what the Center means at this time, because of a lack of consensus or direction from the Board and the public at large.
All of that -- all of that impacts the Center's financial position.
Q. Is that related to President Trump's takeover as chairman of the Board?
MR. JANKOWSKI: Objection. Misstates. Argumentative. Speculation. Form.
You can answer.
Q. You can answer.
MR. JANKOWSKI: If you can.
A. We should be six to seven months into construction right now, and if we were, we would be telling a different story, painting a different picture of the Center, and instead, we're not.
Q. Understood, but that wasn't my question.
So my question was about the -- you

talked about patron friction, and confusion over the mission.

I wanted to confirm whether that was related to the change in Center administration from the former chairman to Chairman Trump; is that right?

MR. JANKOWSKI: Objection. Form. Speculation.

Answer, if you can.

A. I'd point more to a lack of consensus on the Board than any one person's actions.

Q. Patron friction. So you're -- you would point to -- I want to make sure I understand.

You're saying that there has been patron friction that has impacted the Center.

Do I have that right?

A. Yes.

Q. A major cause of that patron friction, is it not, was when Trump took over as chairman of the Board; correct?

MR. JANKOWSKI: Same objections. Form. Speculation. Misstates prior testimony.

Asked and answered.

A. I would consider the inability to see this renewal process through holistically, and everything that it means to meet mission during that time, the time of renovation, I would point to that as driving the more negative patron friction than just by a name on the building.

Q. Going back to the Center's representation about its proximity to fiscal collapse.

Do you recall that?

A. Yes.

MR. JANKOWSKI: Object to the extent that it misstates prior testimony.

You can answer.

Q. When was the Board first informed that the Center was imminently at risk of fiscal collapse before the end of fiscal year '26?

MR. JANKOWSKI: Objection to the extent it misstates prior testimony and lacks foundation.

You can answer, if you can.

A. I was informed during, you know, during the August and September Board meetings.

Q. So your testimony is that the Board was informed that it was at imminent risk of running out of cash to pay payroll, for example, at the August 13th meeting?

MR. JANKOWSKI: Objection. Misstates prior testimony.

A. No. Those -- the specifics on running out of cash --

Q. Mm-hmm.

A. -- was not discussed during the August Board meeting.

Q. Was the prospect of imminent fiscal collapse discussed at the August 13th Board meeting?

A. Do not recall that being discussed.

Q. Why was that not discussed at the August 13th Board meeting?

MR. JANKOWSKI: Object to the extent it calls for speculation.

But answer, if you know.

Q. Sir?

A. We are prioritizing the abnormal, not the normal governance. So why was it not discussed? I'm assuming because these are priorities instead of normal governance.

Q. Do you have a say in what gets discussed at the Board meetings?

A. Yes.

Q. Why did you not bring up -- well, let me first -- I will lay a foundation.

Were you aware in -- at the time of the August 13th Board meeting, that, as you describe it, the Center was at a risk of fiscal collapse by the end of fiscal year '26?

A. I don't think I described it that way.

Q. Did you understand that to be the Center's financial position at the time of the August 13th Board meeting?

A. The financial position, whether it's the end of September, or the end of January, or the end of March of '27, is existing alongside the uncertainty with the path forward in construction.

So it's not a -- it's not -- there's

not a clear line in the sand. There are multiple different factors that drive the Center's financial position.

Q. Were you aware on August 13th that the Center -- well, was the -- was the Center within -- let me start that again.

Was the Center at risk of running out of cash to make payroll by the end of fiscal year '26 at the time of the August 13th meeting?

MR. JANKOWSKI: Objection. Vague as to "risk."

A. With the information I knew at the time, I could not have said that.

Q. Okay. With the information that you now know, what is the cash position of the Center and its ability to make payroll?

A. Good.

Q. Okay. If the Center has a good financial position now, what caused the Center to make representations in September that it was within weeks of financial collapse?

MR. JANKOWSKI: Objection as to

foundation, again.

I think the witness testified he didn't recall that that foundation occurred.

A. Ask the question again.

Q. Let me -- I will try to address your counsel's concern.

At a certain point in September -- we talked about this -- the Center made some representations about dire fiscal position.

Do you recall that?

A. I recall dire fiscal position comments, yes.

Q. That included representations about being imminently at risk of not being able to make payroll within three weeks.

Do you recall that?

A. I don't recall the three-week period, but yes, there were representations about issues and payroll.

Q. Okay. Those issues were -- whether it was three weeks or not, the issue was a concern that the Center was at risk of not being able to make

payroll by the end of the fiscal year '26; correct?
A. I don't remember the fiscal year.
Q. Okay.
A. Outlook.
Q. Do you remember that it was --
A. In --
Q. -- it was a representation that the Center was imminently, meaning very, very soon, at risk of running out of money to make payroll?
A. I did hear that, yes.
Q. Who did you hear that from?
A. It was discussed at the Board meeting.
Q. The Board meeting in September?
A. Yes, at the Board meeting in September.
Q. Is that the first time that you heard that about the risk of running out of money to make payroll imminently?
A. Again, the time frame of cash on hand and when that is an issue lived alongside what we're able to do with the -- you know, the larger, broader operation.
Q. I think we're close to lunch, so I

may -- I'm probably going to return to this topic. But -- or, I at least reserve the right to.

But before we break for lunch, did you -- did you discuss the subject of the Center's -- I believe you called -- we agreed that it was dire fiscal position with Secretary Lutnick in September of this year?

MR. JANKOWSKI: Objection on executive privilege grounds.

Don't answer that.

MS. FREENY: Okay. So I just want to confirm that you are directing the witness not to answer on the grounds of what -- which form of privilege?

MR. JANKOWSKI: Executive privilege.

MS. FREENY: Is that the presidential communications privilege or another privilege?

MR. JANKOWSKI: It's the executive privilege, Kyle, but the presidential communications element of it, yes.

MS. FREENY: Are you invoking that

privilege at the direction of the President?

MR. JANKOWSKI: It's a protective assertion.

MS. FREENY: So you're not invoking it --

MR. JANKOWSKI: No. It's a protective assertion.

MS. FREENY: Sorry. Just -- let me make sure I finish.

You are not invoking that privilege at the direction of the President?

MR. JANKOWSKI: No. It's a protective assertion.

BY MS. FREENY:

Q. Sir, I'm just going to ask you to confirm that you are not going to answer my question about whether you had conversations with Secretary Lutnick about the Center's dire fiscal position in September of this year at the direction of your counsel; is that right?

A. Yes.

MS. FREENY: All right. With that,

I think we can go off the record and take a lunch break.

MR. JANKOWSKI: Fine by us.

(RECESS, 12:51 p.m. - 1:36 p.m.)

BY MS. FREENY:

Q. Good afternoon, Mr. Floca.

Just a reminder, you understand that you are still under oath in this deposition?

A. Yes.

Q. I want to -- we had been talking about the various scenarios that the Center considered in response to the Court's preliminary injunction in the Beatty versus Trump matter.

Do you recall that?

A. I recall the scenarios, yes.

Q. I have just I think one more subtopic on that that I want to close out before I move on.

The -- did management consider the scenario or the prospect of full closure of the main building for less than a year followed by partial reopening and phased construction?

A. Yes, we considered -- we considered a

shorter closure.

Q. Okay. Tell me about what that scenario, as you are describing it, looked like.

A. That would really fall into the more structured phasing, instead of a different -- you know, that would be more along the lines of you close the Eisenhower Theater for a shorter period of time and then you open and close the Concert Hall for a shorter period of time.

Q. Okay. What about just closing the entire building for a year to handle things like utilities throughout the building, and then reopening partially after that, for whatever period of time, it took to complete the remaining renovations?

A. One issue -- that was discussed, but what drives the schedule to a large degree is the structural and electrical repairs, which have longer than a 12-month duration.

An example of that, which we're learning more about now, the soffit panels, for example, is a -- that -- just replacing the soffit

panels is a five to six-month-long effort. Just that one component.

Q. Are you saying that from your perspective, replacing the soffits requires full closure of the building for five to six months?

A. No.

Q. How long does it require closure of the building for?

A. It depends -- that depends on how you phase the work, and what egress routes you establish during the construction.

Q. JLL has not done the work to figure out how you would phase that work, have they?

A. Preliminarily, from a project management perspective, they have, and they presented information recently on that.

The only thing is a general contractor will always have means and methods that need to be taken into account.

Q. Was that based on their understanding that the Center was going to proceed with two-year full closure of the main building?

A. No. The soffits are related to the Big Beautiful Bill appropriation, but being independently analyzed right now, separately from the two-year closure.

Q. Is that by the company with the last name, or with the name Moore in it?

A. Walter P. Moore is a structural engineer who has a long history with the Center.

Q. This -- you said that it was discussed, this scenario that I posited of closing entirely for one year, and then reopening on a phased basis thereafter.

When you say "was discussed," who was it discussed among?

A. At the project team level with the facilities office and JLL, mainly around the length of the infrastructure and exterior versus interior improvements.

Q. Was that prospect, that possibility, specifically discussed with JLL; that is, the possibility of a one-year full closure of the main building followed by a phased renovation?

A. Yes. At a high level, yes.
Q. What do you mean "at a high level"?
A. We never got past the concept of that type of closure, given the durations, the anticipated durations for, you know, the -- what we think needs to happen first, which is the infrastructure and structural improvements.
Q. So orient me in time. When would these discussion have been taking place? It sounds like it was -- you know, you never got past the concept.
When were you discussing the concept?
A. Early. You know, April, May.
Q. Okay. Before the Court's decision?
A. Yes.
Q. How long, in your view, would it take to accomplish the utilities renovations?
A. You need to comprehensively address the mechanical, electrical, and plumbing.
That is a 12 to 16-month effort.
Q. Does it in your view require the full closure of the building for the duration of those --

of that time period?

A. To do the work efficiently and effectively, yes.

Q. But that means it would be feasible to do it phased, I assume, just not preferably, in your opinion?

MR. JANKOWSKI: Objection to the extent that misstates.

A. I think anything is possible, if that's the right way to answer your question. You can theoretically do anything, yes.

Q. One way that you would decide whether something is feasible, though, would be to have a company like JLL actually do a schedule for you; right?

A. Yes. You could ask a project management company to create any type of schedule you want.

Q. That was not done here?

A. We asked JLL to look at the projects that were -- that backed up the Big Beautiful Bill appropriation and the time frame that was established and come up with a delivery plan and

schedule.

Q. When you say "time frame... established," you're referring back to that two-year period as announced by President Trump?

A. I'm referring, yes, to 24 to 26 months.

Q. Let me ask it on the flip side.

Did the Center consider the possibility that it would take longer than two years, assuming a full closure of the building to complete the renovations, the $257 million renovations?

A. Yes. Early on, we looked at schedules, anticipated, you know, high-level schedules that went into calendar year '29.

Q. Okay. Is that still -- I guess what was that -- sort of the upshot of your inquiry into that?

A. A lot of that was driven by the length of time it has historically taken us to -- and I say "us," the Center, the project management teams -- historically taken us to design, procure, bid work.

Q. How confident are you that the

construction that is currently contemplated can be completed after two years of closure at the main building?

A. I think two years is the right duration for the type of work that is being anticipated.

Q. Does that mean that -- I guess my -- I don't know what you mean when you say "right duration."

Are you confident -- how confident are you that the construction that is contemplated during the two-year closure will be completed during that two-year period?

A. Well, we have less than two years now, if we're trying to hold the -- you know, the end date of calendar year '28, so I'm not extremely confident that all of the work can be done between now, if we were to start tomorrow.

Q. Mm-hmm.

A. And the end of Q3 or 4 of '28.

Q. Sorry. I don't think I caught what you called the end date, but I didn't hear what you said after that.

What is the end date of?

A. If we are holding Q3 or Q4 of '28 --

Q. Okay.

A. -- as the reopening time frame --

Q. Okay.

A. -- we have the same amount of work to do in a much shorter period.

Q. Okay.

A. JLL's schedule that they -- the framework that they gave in schedule format on -- in June, early June, laid out how we could complete the work that's all of the different projects within that time frame.

Q. So has the end date or the completion date for the contemplated renovation changed since you testified in April?

A. Depends on which way you're looking at the issue.

If you are looking at it from a feasibility, here's the needs of the building, how long is it going to take, I think that's a two-year effort.

Q. Okay.
A. Are we trying to fit that two years in a year-and-a-half, that's a -- you know, that is a -- that's an ongoing conversation.
Q. Why are you trying to fit what you see as two years of renovation in that one-and-a-half-year period?
A. Well, at this point the '28-'29 season is the earliest we can actually program something -- "meaningful" is not the right word -- something large scale, like touring Broadway.
Q. Okay.
A. So that is the earliest reasonable amount of time where we can have, you know, touring Broadway and Ike and Opera House.
Q. I thought I heard you -- when I asked about the end date, you had said, I thought, Q3 or Q4, and that would take us into the -- like, past the start of the Center's season, wouldn't it?
A. Depends, because it's not a -- an exact time frame -- or point in time.
But September-October is the

beginning of seasons. Whether that's classical season or a touring Broadway season.

Q. You also said there were ongoing conversations about trying to fit the construction into this one-year period.

Conversations with whom were you referring?

A. We meet regularly to talk about projects. There's internal conversations within the Center about how to complete the work that needs to be done.

Q. Is one of the factors driving the time frame for completion of the construction the President's preference that the construction be completed before the end of his term?

A. I don't know the President's preferences regarding that, but I do think that we can't forever be in construction, so it makes sense to establish an end date.

From a -- I mean, I'm -- I don't want to make it sound less than it is, but if you look at the work that is anticipated, the work

that's identified, you know, it's about a year's worth of infrastructure and about a year's worth of interior work. Mechanical overlaps.

I think that's appropriate.

Q. You said you were not aware of the President's preferences.

Were you aware that Secretary Lutnick appeared at a -- gave -- I guess an interview or made some remarks in front of cameras outside of a hearing in this case over the summer?

A. I am aware of that. I did not watch the whole -- not an interview.

I did not watch the whole -- thing.

Q. Got it. I understand that you did not watch the whole thing, but were you aware that during those remarks Secretary Lutnick said the following: "Then why would the President agree to work on the restoration where he's going to be the President for the next 2.5 -- two-and-a-half years, and then he's leaving." (As read.)

Then he later said, "I mean, it's ridiculous. So he wouldn't be involved."

Were you aware that Secretary Lutnick said that about the President?
A. I did hear him say that, yes.
Q. You heard that part of his interview?
A. Yes, yes.
Q. So when you said you didn't -- you weren't aware of the President's preferences, I take it you mean that's because you didn't speak directly with the President, but you are aware of what Secretary Lutnick represented about the President?
A. Yes. I saw that part of the -- of Secretary Lutnick's interview -- press release.
Q. Did you understand -- I guess, what do you understand Secretary Lutnick to be saying in terms of what the Center should be doing?
A. I take his comments there to say if the President is going to invest in this project, he will want to see it completed, and there's an end date, you know, to that.
Q. Then did that influence the way that you approached the timeline for construction?
A. I've always taken the end of -- you

know, September-October, Q3-Q4, of '28 to be our target for reopening, mainly based on that it makes sense for the Center.

Q. But at least in part also because it aligned with the President's preferences?

MR. JANKOWSKI: Objection. Form, and misstates.

A. I think it's that time frame aligns with the Center's operations.

Q. Mm-hmm.

A. Whether or not that aligns with the President's desires, I can't tell you.

Q. Does that mean that you have not had conversations with the President about the timeline for construction?

MR. JANKOWSKI: Objection on executive privilege grounds. I'll instruct you not to answer.

MS. FREENY: I'm again going to ask, which executive privilege?

MR. JANKOWSKI: The executive privilege, and the presidential communications

portion of it.

MS. FREENY: You are instructing the witness not to answer?

MR. JANKOWSKI: Yes.

MS. FREENY: Has the President or his representative directed you to assert that privilege?

MR. JANKOWSKI: No. It's protected because the White House will need to review the transcript of this deposition before it can make a specific invocation of the privilege.

BY MS. FREENY:

Q. Sir, are you going to decline to answer my question at the instruction of counsel?

A. Yes.

MS. FREENY: Also, let me just ask for the record: Has the White House instructed you to make that the -- I forget what you called it, but the prophylactic assertion so that they can have the opportunity to review the deposition?

MR. JANKOWSKI: I think there's -- I think even that could call for privileged

information. So it's a protective assertion.

MS. FREENY: So you're not going to tell me whether the approach of the Department of Justice, in invocation of the Presidential communications privilege, is at the direction of the White House?

MR. JANKOWSKI: I think the Department of Justice is following its standard procedure for asserting and invoking the executive privilege.

MS. FREENY: So you will not answer that question?

THE WITNESS: I will not.

BY MS. FREENY:

Q. I think maybe a little bit of a drier topic. I'm going to move on to talking about the Center's engagement with Delta Consulting. Okay?

A. Great.

Q. All right. I believe that you mentioned that it was a competitive bidding process; is that right?

A. Yes.

Q. How did you identify -- how did the Center identify firms to invite to participate in the bidding process?

A. I did the first round of market research -- or I did the market research. I identified three companies. I only remember two of the names right now, which is Aegis and Delta. We sent them the package, scheduled presentations with them, and set the procurement time frame.

Q. When you were researching and trying to identify potential candidates for this engagement, what qualifications were you looking for?

A. A range of what I would consider controls. So financial controls, construction controls, accounting, experience with, you know, large institutions or organizations. Obviously, schedule analysis. Mainly it.

Q. What about experience in performing arts management?

A. That was a consideration, but not one that overlaid any of the others, mainly because every performing arts institute or venue is

different and unique.

Q. I just want to confirm. You had said you sent a packet to the bidders. I assume that includes the -- does that include the solicitation?

A. Our contracting office sent an RFP to the bidders.

Q. I thought I heard you say that you sent a packet to the bidders.

Did I get that wrong?

A. I think I was referring to the RFP.

Q. Okay. Was anything else sent to the bidders other than the RFP?

A. No, just the RFP.

Q. We understand that -- well, let me ask you this: Because we talked about -- you mentioned that you identified Delta and you identified Aegis. Did you also identify the other one you can't remember?

A. Yes. Mm-hmm.

Q. How did you go about identifying Delta; was it from online research or did you have prior experience with them?

A. All of it was online research.
Q. At some point, you had a call with someone from Delta named Khaled Aziza; is that right?
A. Yes, I did have a call with Khaled.
Q. Did you know Khaled at the time?
A. No.
Q. Do you know if he had any connections to anyone else at the Center?
A. No.
Q. Do you know if he had any connections to anyone in the general counsel's office?
A. No.
Q. Aegis, we understand that they declined to submit a proposal; is that correct?
A. They did, yes.
Q. How was that decision conveyed to you?
A. They sent an e-mail.
Q. What did that e-mail say?
A. I don't remember exactly what the e-mail said.
Q. What did it say in sum and substance?

A. That they declined to submit a proposal.

Q. Did it explain why?

A. They didn't give any -- that I recall, any specific, other than they read the RFP, and respectfully said that they were not going to submit a proposal.

Q. Did you have any telephone or video conference communications with anyone at Aegis like you did with Mr. Aziza?

A. Yes.

Q. Tell me about that.

A. I had an introductory call with Aegis explaining, you know, what we were considering, and what we wanted them to potentially look at.

Q. Was this before or after you sent them a solicitation?

A. Before.

Q. Did they express at least tentative interest at that point in time?

A. Yes.

Q. Did you have any conversations with them between that first initial phone call and the e-mail

that you received where they declined to submit a bid?

A. I don't remember.

Q. Well, let me ask you this way: Do you have an understanding of why, even if they didn't put it in the e-mail, they declined to submit a bid?

A. I don't.

Q. Did they express any concerns about the nature of the engagement or the scope of work?

MR. JANKOWSKI: Objection. Asked and answered.

A. I will respond this way: I had the same conversation with both Delta and Aegis, and explained to them what we were looking at, and if it's something they would be interested in submitting proposals for.

We formalized that in an RFP, and sent it to them. I was surprised when Aegis sent the e-mail and said, you know, they did not want to submit an -- or submit a proposal.

Q. I want to talk about the timeline for the engagement with Delta. So in order to sort of

orient ourselves, I would like to have you turn again to Tab 7 in your binder, which has already been marked Exhibit 3.

Do you see that? This is the solicitation that we've been talking about; correct?

A. Yes.

Q. If I can have you turn to page 37 at the bottom right, or Bates Number 236.

A. Okay.

Q. Do you see in the middle, it says, Period of Performance Milestones?

A. Yes.

Q. Then it's got some milestones, and then the associated completion dates.

Do you see that?

A. Yes.

Q. Am I understanding correctly that this was a timeline of sorts for the engagement that eventually Delta was hired under?

A. That's correct.

Q. Who prepared the timeline; that is, who decided how -- you know, what the milestones were,

and how long the contractor would have for completion?

A. It was a conversation between myself and the project manager, or core, and the contracting office.

Q. Did you have ultimate say, or no?

A. No, I do not -- did not have ultimate say.

Q. What was driving, sort of, these timelines, when you and your team were preparing and asking for a final assessment report within 60 days?

MR. JANKOWSKI: Objection. Vague.

A. We know -- we knew at the time we needed to present information to an independent person, organization, or body that could then present that information, independently, and you don't want that to just have, you know, a yearlong time frame to it. It needs to be something that's manageable, so we can actually move everything forward.

Q. So you wanted something expeditious enough that you could present something to the Board to move things along?

A. (Nods head up and down.)

MR. JANKOWSKI: Objection to the extent that it misstates.

A. I would agree with that.

Q. But you also said "manageable," so I assume you're also thinking it can't be so quick that you're not getting the kind of independent input that you're looking for?

A. I think -- yes, and it was important for me to go through this process collaboratively, and not as a single point of authority.

I gave draft documents that then turned into what's here.

Q. Okay.

A. And that was -- you know, that was important for me not to just say, this is how this has to happen, no questions asked.

Q. I got it. That's helpful.

So this timeline reflected not just your views, but sort of the consensus of your team?

A. Yes.

Q. So it shows here that the work

contemplated ultimately by Delta -- you see that it says Assessment Analysis.

Do you see that?

A. Yes.

Q. That was to be done within 45 days of engagement?

A. Yes, or as agreed upon.

Q. The assessment analysis, that was the kind of, the core of the -- sort of the capital revenue, financial analysis, and the construction analysis?

A. And programming.

Q. And then this contemplated a final assessment report within 60 days?

A. Yes.

Q. Is that final assessment report, is that what was contemplated to be the present -- like the ultimate independent presentation to the Board?

MR. JANKOWSKI: Objection. Vague.

A. This is -- what's in Phase III is what -- that deliverable.

Q. I got it.

So under Deliverables, you can see -- actually, that's helpful, you can see it right above, the deliverable includes Executive Summary presentation.

Do you see that?

A. Yes.

Q. So that would mean within 60 days the contemplation was, I assume that Executive Summary presentation was a presentation to the Board?

A. To the Board and leadership.

Q. At the same time?

A. Not necessarily.

Q. Okay. Understood.

Now, at some point in time, this timeline obviously changed; correct?

A. We did not strictly adhere to these -- the days that were listed here.

Q. I'm going to drill down on that.

But more than just not strictly adhering to the days, Delta ultimately was asked to provide at least a preliminary assessment much sooner than within 45 days; correct?

MR. JANKOWSKI: Objection. Vague.
A. They were asked to deliver an oral assessment sooner, or faster, than the time frame between their completion of the document review and this 45-day mark.
Q. That was what, roughly, like two weeks, less than two weeks?
A. It was about two weeks.
Q. What would you consider -- let me back up.
So Delta prepares a slide deck.
Do you recall that?
MR. JANKOWSKI: Objection. Vague.
A. Are you referring to what was in the August Board meeting?
Q. Would you consider that a Delta slide deck?
A. Sure. Yes.
Q. So that provided a -- well, number one, that included their analysis of the -- sort of, the things we have been talking about in this solicitation of work; right?

A. It did.
Q. It included their recommendations as between potential options for renovation; correct?
A. Included their analysis of the potential options.
Q. But it also included their recommendation of which one, at least Delta, was recommending choosing; right?
A. Can you pull it up.
Q. Sure. If you could turn to...
All right, if you turn to Tab 40. You may want to just keep that marked because we're going to turn back to...
MR. JANKOWSKI: Okay. Back to the decision. Okay. Thanks.
Exhibit 5, I take it.
Q. We'll have Tab 40 marked Exhibit 5.
This is the Delta PowerPoint that we were just discussing; correct?
(Floca Exhibit 5, Delta PowerPoint presentation, 8.13.25, Construction Program Assessment, [no Bates], was marked for identification.)

A. This is what Delta provided for the August Board meeting.

Q. You see that they included recommendations, did they not?

A. I see considerations.

Q. Let me ask it this way: Do you recall that Delta actually made -- a Delta representative, Darin Buchalter, actually made a recommendation during his presentation to the Board on August 13th, that the Board approve a two-year full closure of the main building?

MR. JANKOWSKI: Objection. Vague as to "recommendation."

Q. Do you recall that?

A. I remember the conversation around, and in the presentation of the pros and cons.

Q. You don't recall that Mr. Buchalter actually recommended one approach over another?

A. I don't remember exactly what he said, no.

Q. But do you -- I'm not asking exactly what he said. I'm asking if you remember that he

recommended one approach over another?

MR. JANKOWSKI: Asked and answered.

A. I don't remember exactly what he said.

Q. I'm not asking whether you --

Do you recall whether he made a recommendation of one approach over the other?

MR. JANKOWSKI: Asked and answered.

A. I don't remember exactly what he said.

Q. Let's turn back to Exhibit 7; this is back to the timeline, page 37, Bates 236, that you were talking about.

This is the Statement of Work.

MR. JANKOWSKI: A lot of pages to flip.

Q. So would that Delta slide deck presentation, would that correspond on this Statement of Work to the final assessment report?

A. The final independent construction program assessment report, yes.

Q. So I just want to ask --

A. Well. Sorry.

Q. Yep.

A. Their full report was provided later.
Q. Understood, and we'll talk about that.
But the slide deck presentation was a presentation to the Board on the options that they had been asked to analyze; is that right?
A. What we just looked at was his -- was Delta's assessment, and his presentation --
Q. Yep.
A. -- of these scenarios to the Board.
Q. Okay. I guess I'm just asking you, from your perspective, did that Delta presentation, made on August 13th, correspond to the assessment analysis in the Statement of Work or the final assessment report?
MR. JANKOWSKI: Counsel, could I just ask you to point where on the page you are referring to?
Q. Do you see on page 37? Yep. We talked about those two things: The assessment analysis at Day 45, and the final assessment report at Day 60.
Did you consider the Delta presentation, the slide deck that we just talked

about, did you consider that to be -- to correspond to the assessment analysis or to the final assessment report?

A. The assessment analysis.

Q. Walk me through -- well, let me first establish this.

I think we already did, but the timeline that's in the Statement of Work ultimately was compressed, meaning it became shorter -- the amount of time that Delta was given to prepare the various pieces of its work was less time than what was contemplated in the original Statement of Work.

Do you agree with that?

A. Not that it was given. This was not a, Delta, we're giving you less time, or you must provide within X time.

There were conversations that occurred with Delta and the whole team about the urgency, both behind what Delta saw in the building, but also the urgency to support the process moving forward for the greater good of the Center.

So they weren't given less time, but

they were -- they acted because of the urgency.

Q. Okay. Well, let me ask it this way: Are you saying that the Center did not direct Delta to complete a presentation that could be made to the Board sooner than originally contemplated?

MR. JANKOWSKI: Objection to the extent that it misstates testimony.

A. Delta moved forward with supporting the urgency of the Board's, you know, consideration. They responded to that urgency.

Q. But they responded to that urgency because the Center directed them to move more quickly; right?

MR. JANKOWSKI: Objection. Asked and answered.

A. They responded to the urgency because every day without progress was a day wasted, both at the expense of the Kennedy Center, its staff and people, and the physical building itself.

Q. Did something change between when you and your team put together this Statement of Work that outlined a timeline contemplating up to 60

days, and after you retained Delta and you're describing an urgency?

A. This is a conservative, without context, schedule. When we got into the interactions with Delta, and they walked, and they understood what was happening in the Courts, and they understood what was happening from the governance perspective at the Board, that is what created the urgency, the urgency to move.

Q. Are you -- is it your testimony that it was Delta's idea to move more quickly through this Statement of Work than is contemplated in the document?

MR. JANKOWSKI: Objection. Misstates his testimony.

A. I did not say that Delta said we need to move faster than what's in the contract.

Q. Okay.

A. There is a desire to do what's right and provide a clear analysis as quickly as possible.

Q. Who had that desire?

A. We all do. We all did.

Q. Okay. I just want to understand, because within a span of about two weeks, the Center moved from a process that contemplated 60 days for Delta to complete its work and present it to the Board, to a timeline where Delta completed at least an initial presentation on August 13th, about three weeks after it started work.

Is that roughly the right outline of time?

A. That sounds correct, yes.

Q. Okay. I am trying to -- I just want to make sure I understand, because that follows shortly after Delta signs this solicitation agreeing to perform the work in 60 days; correct?

MR. JANKOWSKI: Objection that it misstates what's on the page.

A. I don't know when they signed this versus when direction -- you're saying direction was given to change, but the urgency to move, this is -- this was created from a draft that I put together to help the project team begin, and a project manager, who is looking at this from a different lens,

created this, along with the contracting team.

When Delta was onboarded and started to meet with JLL and the rest of the Kennedy Center team, that's where the understanding of the urgency would come into play.

Because the project manager that's creating this doesn't necessarily understand what needs to happen at the REACH, or what needs to happen with the mission.

So there's an urgency as you get into the work to deliver, which is what I'm pointing to.

Q. At the time that the Center sent this out, did it understand that it would need the work to be completed faster than this schedule?

A. This is the schedule.

Q. I understand that. You talked about an urgency. Did that urgency, in your mind, exist at the time that this solicitation was sent out?

A. Yes.

Q. Then why didn't you solicit in the Statement of Work for a schedule that was consistent

with what you actually wanted?
A. Again, it was important for me to have this product come from a team rather than just unilaterally fit what I would consider urgent.
Q. But wouldn't --
A. So --
Q. Go ahead.
A. Sorry.
That's the -- you know, that's the concept of involving more people across the Center in this work.
Q. Okay. But wouldn't it also be important for the consultant that you are engaging to know from the outset how quickly they're being asked to perform the analysis, and make the presentation?
A. This is what they received, and this is what they submitted, a proposal.
Q. Okay. But then ultimately, they were asked to make a presentation to the Board on August 13th; right?
A. That is what we agreed upon.
Q. Because that's what the Center asked;

right?
A. That's what we felt was necessary.
Q. Okay.
A. All of us. It was agreed upon. This was a conversation between Delta and the Center.
Q. They agreed to do it because they had a contract with you, though; right? This was not their idea to accelerate the work?
A. They agreed on it because they could, not because they had a contract that said they -- that they had to work with the Center. They could have walked away, or they could have said, no, we can't provide what you need on this time frame.
Q. Whose idea was it to accelerate the timeline?
MR. JANKOWSKI: Objection. Asked and answered.
A. We agreed on the time frame.
Q. Who proposed it first?
MR. JANKOWSKI: Objection. Asked and answered.
MS. FREENY: I have not gotten an

answer, actually.

Q. So who proposed, first, accelerating the timeline?

MR. JANKOWSKI: Objection. Asked and answered. I think he's now testified three separate times.

A. We agreed.

Q. I'm going to ask my question again because I'm entitled to an answer, and I want an individual.

Who first proposed accelerating the timeline?

MR. JANKOWSKI: Objection. Asked and answered.

A. I'm not going to be able to say that this person said at this period of time, you need to accelerate your work because of this reason. This was a -- this was an effort that was created to do the right thing, and bring someone in, and look at the needs, and help the Kennedy Center move forward.

So it was not anything other than doing something that was in the best interest of the

Kennedy Center.

Q. I'm not arguing about that. I'm not trying to debate that.

I am trying to get an answer to who -- the very first time, proposed the option of accelerating the time frame. It sounds like you're not going to answer that --

MR. JANKOWSKI: I'm sorry. Objection.

MS. FREENY: Wait, wait, wait. Sorry. You got to let me finish, Will.

MR. JANKOWSKI: Yeah --

MS. FREENY: You got to let me finish.

MR. JANKOWSKI: Kyle.

MS. FREENY: I'm just going to make an objection. I'm not going to ask the question.

I am just going to state for the record that I think that -- I think that we are entitled to know the individual who first proposed the idea of accelerating the time frame because I think that's pretty relevant, and I think we're

going to ask the witness to come back -- we're going to ask that whoever you designate under 30(b)(6) be prepared to answer that question tomorrow.

MR. JANKOWSKI: I'm sorry. Objection. Asked and answered.

Marjorie, could I ask you to read back the witness's last answer in response to counsel's question.

(The record was read back by the Realtime Stenographer.)

MR. JANKOWSKI: Thank you very much. I think that was a pretty clear answer that he's going to be able to say at this time, and to provide a specific example, whether one exists or not.

MS. FREENY: Fair. That's noted.

MR. JANKOWSKI: I think that's the answer.

MS. FREENY: I think it is our position that there is an answer to the question, and we're entitled to it, but we can discuss the rest of it off the record.

BY MS. FREENY:

Q. Okay. At some point, you and Mr. Buchalter from Delta met with Secretary Lutnick in connection with this engagement; is that right?

A. Yes.

Q. That was to -- was that to brief Secretary Lutnick on Delta's preliminary analysis?

MR. JANKOWSKI: I'll just raise a preliminary objection here. Not a categorical one necessarily, but to the extent that this implicates advice given for the purpose of advising the President or his advisers or from receiving communications purporting to come from the President or his advisers -- you know, or his advisers on the President's behalf, I'll instruct the witness not to answer.

But otherwise, to the extent --

MS. FREENY: Are you taking the position -- just for clarity, are you taking the position that Mr. Buchalter falls within the scope of an adviser to the President?

MR. JANKOWSKI: I think the adviser to the President is Secretary Lutnick. Did I

mishear your question?

MS. FREENY: So Mr. Buchalter is present at this meeting; correct?

BY MS. FREENY:

Q. Let me just orient. We are talking about a meeting with Secretary Lutnick, yourself, perhaps others, and Mr. Buchalter. Mr. Buchalter is not a government employee; is that right?

A. That's correct.

MS. FREENY: I just want to understand the scope of what your objection is.

MR. JANKOWSKI: To the extent -- so I'm happy to get into it a little more.

MS. FREENY: Yeah.

MR. JANKOWSKI: To the extent that Secretary Lutnick is receiving advice on the President's behalf from anyone, regardless of whether they're a government or nongovernment employee, that information may be protected under the presidential privilege.

So that's -- I'm -- again, it's not a categorical objection. I'm just -- to the extent

that Mr. Floca is aware of any information kind of presented as if it's being given to the President or taken from on the President's behalf. That's the reason I'm raising the objection.

MS. FREENY: Okay.

BY MS. FREENY:

Q. Let me try to probe around that.

Did you understand, Mr. Floca, that when you were having conversations with Mr. Lutnick, he was communicating on Trump's behalf?

MR. JANKOWSKI: Objection. Vague.

You can answer, if you can.

A. You have -- would have to define what you mean by "on his behalf."

Q. How did you understand Mr. -- or sorry, Secretary Lutnick, when he was communicating something, did you understand that he had spoken, for example, to the President about the thing he was communicating?

A. Not regularly.

Q. Sometimes?

A. Initially, to help the Center move

forward. That was my understanding.
Q. When was that? What time frame?
A. Mid-May.
Q. Okay. Is this before the Court decision, or after the Court decision?
A. After the Court decision.
Q. Okay. So it would have been maybe more like June, if I told you that the Court decision was on May 29th?
A. Which Court decision was on May 29th?
Q. The preliminary injunction decision.
You know, I'm going to withdraw that question because it doesn't really matter.
(Clarification requested by the Realtime Stenographer.)
Q. I'm very sorry. I think some of the problem is that I jump too quickly, but I think some of the problem also is that I did not hear anything.
So if you could speak up a little bit, and I will try to slow down.
A. It would have been after the Court decision, yes.

Q. When Secretary Lutnick offered guidance, you know, to you about the Center's -- about the -- you know, just about the Center and its operations, did you understand that he was offering guidance on behalf of himself, on behalf of the President, or both?

A. Both.

Q. Then in the meeting with Secretary Lutnick at which Mr. Buchalter was present, did Secretary Lutnick provide any input or guidance about the presentation to the Board?

MR. JANKOWSKI: I'll just raise the same objection to the extent anything is coming from the President or purporting to come from the President, executive privilege.

But other than that, feel free to answer.

A. We did not review the presentation with Darin and Secretary Lutnick. There wasn't a -- you know, a review of those slide decks.

Q. Understood.

Was there, like, more of just a more

informal oral discussion?

A. About the Center's operations in general, yes.

Q. I guess I would assume it would also be about Delta's analysis, since Delta had been invited as the outside consultant to meet with Secretary Lutnick; is that not the case?

A. Delta's -- it was a -- or a conversation around the work that the Center and Delta was doing together, yes.

Q. During that meeting, did Secretary Lutnick communicate any input from Chairman Trump?

MR. JANKOWSKI: Objection on executive privilege grounds. I'll instruct the witness not to answer.

MS. FREENY: I will confirm that when you say that, the privilege you are invoking is the presidential communications privilege?

MR. JANKOWSKI: The privilege we're invoking is the executive privilege, and specifically, the presidential communications component of it.

(Clarification requested by the Realtime Stenographer.)

MR. JANKOWSKI: Sorry.

The privilege we're invoking is the executive privilege, and specifically, the presidential communications component of it.

MS. FREENY: You are -- is that at the direction of the President or his representative?

MR. JANKOWSKI: I'll say it's pursuant to the government standard process for invoking the executive privilege at a deposition.

MS. FREENY: I just want to make sure I understand and the record reflects, you are asserting this privilege, and instructing the witness not to answer, notwithstanding the presence of an outside independent consultant in the room?

MR. JANKOWSKI: That's correct.

MS. FREENY: Okay.

BY MS. FREENY:

Q. Then, Mr. Floca, I'm just going to confirm that you are not going to answer my question

about what Secretary Lutnick may have told you in this meeting with Delta Consulting, at the instruction of your attorney?

A. Correct.

Q. When we talked to Delta Consulting, I will tell you that they mentioned having a conversation with someone that they represented to be a California consultant.

Does that ring a bell to you?

A. Not a California consultant.

Q. Okay. If I said that Mr. Buchalter mentioned talking about something like programming with a California consultant by phone, does that maybe jog a memory or suggest who he may have been talking about?

A. Yes.

Q. Who do you think that was?

A. Rick Canny.

Q. Who is Rick Canny?

A. Rick Canny.

Rick Canny is a California consultant.

Q. Okay. What is his relationship to the Kennedy Center?

A. He is assisting with all things programming, arts, entertainment, the business related to.

Q. Is he an employee, or is he a consultant?

A. He is a consultant.

Q. Okay.

A. Contractor.

Q. When did he come to be contracting with the Center?

A. I don't know exactly when.

Q. Was it before or after the May Court decision?

A. Before.

Q. Was it before or after you became the executive director of the Center?

A. I don't know.

Q. Did you have any role in deciding to retain Mr. Canny?

A. I didn't -- I did not know who

Mr. Canny -- or who Rick was.
Q. Okay.
A. I did not bring him into the Center.
Q. Who brought him into the Center?
A. I don't know.
Q. Does Mr. Canny have any connections with anyone at the Center?
MR. JANKOWSKI: Objection. Vague.
A. I don't know the extent of Rick's connections.
Q. Okay. Let me just make sure I understand, though.
I'm not asking for the full extent, but do you know if he has any connections to anyone at the Center?
MR. JANKOWSKI: Same objection.
A. I don't know the full extent of the connections or the context under why Rick was originally brought to the Center --
Q. Okay.
A. -- other than I know the value that he is providing and has provided.

Q. Who told you that Mr. Canny was being brought on as a consultant to the Center?

MR. JANKOWSKI: Objection. I think it misstates prior testimony.

A. I met him.

Q. Okay. Well, let me ask you this: How did you find out that Rick Canny was being brought on as a consultant to the Center?

MR. JANKOWSKI: Objection. Again, I think it misstates prior testimony.

A. He was already working --

Q. Okay.

A. -- within the Center.

Q. Okay.

A. And I was introduced to him.

Q. All right. Where -- "already working within the Center" meaning as a consultant or...

A. As a contractor.

Q. As a contractor. Okay.

But you don't know when he was first brought on?

A. I don't.

Q. You don't know the circumstances?

A. I recall him being brought on to help identify a senior vice president of artistic planning, but outside of that, I don't know the extent other than it was general programming and, you know, arts-related business support.

Q. Are you aware of whether Mr. Canny has any connection with the Kennedy Center's general counsel, Elliot Berke?

MR. JANKOWSKI: Objection. Vague. And to the extent it calls for attorney-client privilege information, instruct you not to answer that, but...

Q. I'm just asking for if you know if there's a connection there, a preexisting connection.

A. I can speculate there is one, but I don't -- I mean...

Q. I'm going to ask you to speculate, and just tell me why you think there is one.

MR. JANKOWSKI: Objection. Speculation.

A. I will assume that there is business related to this industry that has occurred in the past.

Q. Ah.

So you're referring to Mr. Berke's role as -- other work in the entertainment industry; is that what you are referring to?

MR. JANKOWSKI: Objection to the extent that it misstates.

But you can answer.

A. I can speak to the work that Rick is doing now.

Q. Okay.

A. I cannot speak to the work that Rick has done prior to me knowing him, or his relationships with people prior to me knowing him.

Q. Okay. You have some familiarity, though, with his background, from having worked with him the last couple of months?

A. I have some familiarity, yes.

Q. It looks from online like he has experience with commercial entertainment; is that

fair to say?

MR. JANKOWSKI: Objection. Vague. Speculation.

A. It's -- is that an opinion? I don't know what's the -- sure. Fair to say, yes.

Q. He does not, however, have prior experience with any major performing arts venues; correct?

MR. JANKOWSKI: Objection. Vague. Speculation. Lacks foundation.

A. I completely understand the thread that you're pulling on.

Q. Mm-hmm.

A. But what you're missing is that people come to the Kennedy Center to be entertained. That is the whole purpose. One of the major purposes.

To be entertained, and to be happy. What it sounds like you're implying is that Rick Canny's entertainment experience is not arts, and arts is not entertainment.

But the reality is, it's the same thing because the purpose of one of the -- one of

the major purposes is to make people happy when they come to the Center.

And I think that -- and now -- Rick's experience managing artists, or working on touring productions, those are relevant to the Center. It's just as relevant as the Center's education mission, because combined, it's all about making people happy and entertaining people.

That's the same -- that's the same thing.

Q. All right. I understand that. I'm not implying anything. I'm actually just asking a question.

I'm asking you to confirm that he does not have prior experience with major performing arts venues?

MR. JANKOWSKI: Objection. Vague. Speculation.

Q. You can answer.

MR. JANKOWSKI: Lacks foundation.

Yes, you can answer, if you can.

MS. FREENY: Okay, let's --

A. We -- in order to answer that question, we would have to ask him for every single venue he has ever worked with, or for in the past.

Q. Okay. So you're not aware, sitting here today, of any prior experience he has with any major performing arts venue; right?

MR. JANKOWSKI: Objection. Misstates prior testimony. And vague.

Q. So this is -- that's a yes or no question that I am entitled to the answer to. And it's not a judgment. It's just a factual question.

Are you aware -- it sounds like you are not aware, sitting here today, of any prior experience that Mr. Canny has with a major performing arts venue; are you?

MR. JANKOWSKI: Same objections.

A. Would you consider the Hollywood Bowl a major performing arts venue?

Q. Would you?

A. Yes.

Q. So I guess you -- do you understand Mr. Canny to have experience with nonprofit

performing arts centers?
A. I think it's irrelevant.
Q. Okay. You think it's irrelevant because you don't think that there are different considerations for a nonprofit performing arts center, and a for-profit performing arts center?
A. There are definitely different considerations.
Q. Okay. That includes different missions; right?
A. Yes.
Q. So sort of a different approach to -- for example, fundraising, I would assume; right?
A. Yes, but Rick is not involved in fundraising, nor -- he does not direct fundraising or need to have anything other than an understanding and appreciation of the Center's mechanics.
So again, they're adjacent things, but -- sorry. They're adjacent.
Q. Are you aware of whether Mr. Canny has any experience booking children's theater?
MR. JANKOWSKI: Objection. Vague.

A. Yes, I am.
Q. What is that experience?
A. How far do I go into Rick's personal life? I don't understand if that's okay, or should we talk about his daughter? Should we talk about what he does at his daughter's high school and the work that he's done there?
Q. Okay. So the experience -- well, I guess -- let me sort of put a framework on why I'm asking these questions. I'm trying to -- again, I'm just asking the facts.
If you don't think it's significant, I guess, I would think that you would have no problem answering no, if he doesn't have that experience.
The framework I'm trying to understand, I'm going to turn you to Tab 37. This we will have marked as Exhibit 6.
MR. JANKOWSKI: 6, I think. That's what I have.
(Floca Exhibit 6, Defendants' Objections and Responses to Plaintiff's First Set of Expedited

Discovery Requests, [no Bates], was marked for identification.)

Q. Mr. Floca, Exhibit 6 is, as you can see on the page, Defendants' Objections and Responses to Plaintiff's First Set of Expedited Discovery Requests.

Do you see that?

Turn to the very back, the very last page. Do you see a verification?

A. Yes.

Q. You signed that verifying the interrogatory responses under penalty of perjury; is that right?

A. Yes.

Q. So I'm going to direct you to the middle of the document, page 50 at the bottom?

These are among the interrogatory responses that you verified, and I just want to ask you about that.

At the top, you see it says Paragraph 7, and the question that was asked was: "Identify each person with professional expertise

and performing arts management who was consulted by the Kennedy Center, the Board, or Delta on a matter related to either of the Board decisions, and for each state the subject of the consultation and the nature of that person's performing arts management professional experience."

All right. So the first person listed here is Matt Floca. That's you; correct?

A. Yes.

Q. So you have identified yourself as a person with professional expertise in performing arts management; is that right?

A. Yes.

Q. Is that experience come from anything other than your role as the executive director of the Kennedy Center since the beginning -- sort of toward the beginning of fiscal -- calendar year 2026?

A. It also includes my experience working under Deborah Rutter, and working under Ric Grenell.

Q. Okay. I got it. Before you assumed the position of executive director, did you have a role

in programming?

MR. JANKOWSKI: Objection. Vague.

A. I oversaw production, which is a role in programming.

Q. But in scheduling -- in bringing performances to the Center, for example?

MR. JANKOWSKI: Objection. Vague.

A. My -- no, my job was not to bring performances to the Kennedy Center.

Q. Do you consider yourself to be an expert in performing arts management?

MR. JANKOWSKI: Objection. Legal conclusion. Calls for one.

But you can answer.

A. I understand all of the pertinent aspects, so I would consider myself an expert.

Q. Would you have said that at the start of -- or I guess, would you have said that at the time of the Board meeting that was held in March of 2026?

A. I would not have considered myself an expert in performing arts management at the time.

Q. So really, the experience that you have gained in those intervening months overseeing the operations of the Kennedy Center is a big factor in your, sort of, in -- the answer to that question, I take it?

A. Yes.

Q. Let's move on next, because this is obviously why I have asked. You've identified Rick Canny as a person with professional expertise in performing arts management.

Now I know you mentioned that he -- you talked about his daughter. Was that professional experience, expertise, sounds like, at a school?

MR. JANKOWSKI: Objection to the extent it misstates the witness's testimony in response to counsel's question.

A. I don't know the business dealings of Rick Canny, between, you know, himself and what he has done for, you know, his daughter's high school.

Q. Okay. So you don't know whether that was professional -- in a professional capacity or a

personal capacity?

A. Or a nonprofit capacity, nope. I don't.

Q. Then do you consider that that experience is what gives him the -- like, sort of the expertise in performing arts management, or is it that plus something else?

A. It's his understanding of the industry, the arts and entertainment industry, and his ability to leverage other people, who still work at the Center, like our vice president of education.

Q. Did Rick Canny ever work at the Kennedy Center?

MR. JANKOWSKI: Objection.

Q. As an employee?

A. I don't know.

Q. Where is Rick Canny's office?

A. In Los Angeles.

Q. Okay. Does he maintain an office in the general counsel's office?

A. No.

Q. Did you ever -- were you ever involved in turning down internal candidates for the role

that Mr. Canny now fills?
A. No.
Q. Does Mr. Canny have a connection with Live Nation?
MR. JANKOWSKI: Yeah. Objection to speculation. I mean, I won't make the categorical objection now, but I'm wondering what the scope of relevance is here within the Court's discovery limitation.
MS. FREENY: I mean, so I think Live Nation was one of its -- was brought in, for example -- we understand it to bring in as a ticketer. After they --
MR. JANKOWSKI: How is that related to the Board's decisions?
MS. FREENY: It's related to the equities.
MR. JANKOWSKI: Can you give me a little more detail than that? I mean, again, I think --
MS. FREENY: Sure, if one of --
MR. JANKOWSKI: I think the Court's

pretty clear indication is that --

MS. FREENY: Yeah.

MR. JANKOWSKI: -- matters of finances and any sort of process matters that may go -- speak to meetings before the August and September meetings might be within the equities of the Board's decisions.

MS. FREENY: Okay. Are you able to recommend on the part of Defendants that Live -- that potential contracts with Live Nation had no bearing on the Center's consideration of renovations and closure?

MR. JANKOWSKI: Not -- I mean, you know, I don't know if I have -- I don't think I have an answer to that.

MS. FREENY: Okay. So I guess that's the concern is that we want to explore that topic because we think it's at least possible.

THE WITNESS: Ask your question. Sorry.

MR. JANKOWSKI: Well --

THE WITNESS: Ask the question.

BY MS. FREENY:

Q. Does Rick Canny have a connection with Live Nation?

MR. JANKOWSKI: Objection. Vague.

A. I don't know.

Q. What is Live Nation's connection with the Kennedy Center, if any?

MR. LYNCH: Objection. Vague.

A. I don't know if there's a -- an actual arrangement between the Kennedy Center and Live Nation.

Q. If there's not an actual arrangement, is there something -- is there any connection?

A. If I heard you correctly, what you said earlier, you're wondering if there is a -- a reason -- a connection between Rick Canny and Live Nation, which I think you mean Ticketmaster, to -- that would then influence how we're approaching the programming, the construction, and doing the work that we need do.

There's no -- two completely irrelevant things.

Q. Are you -- well, let me break that down.
Are you aware that at a certain point over the summer, the Defendants in this case filed a -- some kind of legal brief that argued that, if certain things didn't happen, the Center would have to be demolished.
Are you aware of that?
MR. JANKOWSKI: Objection. Misstates.
A. What are you asking me if I'm aware of?
Q. Were you aware that the Department of Justice filed on behalf of the Center and others a brief that said if certain conditions weren't met, that it -- the Center would be required to be taken down -- that the Center would be required to be taken down with a determination to follow up on what to build on the site.
Were you aware of that representation to the Court?
MR. JANKOWSKI: Same objection.
A. I'm somewhat aware of that. Yes.
Q. Okay. Does it -- were you aware that in

that same filing the Department of Justice posited as one of the possible things to build on the site, after the Kennedy Center was torn down, a large outdoor amphitheater?

Were you aware of that?

MR. JANKOWSKI: Objection. Misstates.

A. Somewhat aware of the conversations around that, yes.

Q. What were the conversations surrounding the possibility of building a large outdoor amphitheater on the site of the Kennedy Center?

MR. JANKOWSKI: To the extent that calls for attorney-client privileged information, I direct the witness not to answer.

Answer to the extent you can, but...

A. I know as much as you do. What was put in there, and what was -- that is the extent of what I know.

Q. Okay, but you just referenced conversations surrounding this concept of a possible large outdoor amphitheater, and I'm wondering where

you -- again, I'm not asking about the legal filing.

Did you hear people -- was there ever a discussion with anyone, whether -- other than your -- other than counsel, with -- at the Center or elsewhere, about the possibility of building an amphitheater on the site?

A. Not with me.

Q. Were you aware of conversations with other people?

A. The conversations I was talking about, or I just referenced, were --

Q. Mm-hmm.

A. -- staff-level conversations about what is -- you know, what is swirling, what is being discussed. Not conversations trying to effectuate some plan for building an amphitheater on the site.

Q. Knowing that the Department of Justice represented to the Court that it was a prospect to build a large outdoor amphitheater on the site of the Kennedy Center, had you heard anything about that other than in connection with the literal filing?

MR. JANKOWSKI: Objection.
Misstates, and again, to the extent there's attorney-client privileged information.

Do not answer.

A. Sorry. I'm just not clear what you're asking me to answer.

Q. Have you heard -- have you heard people -- other than rumors, staff, and other than discussions with counsel about that legal filing, have you heard, in your operational capacity, discussions about the possibility that the Kennedy Center would be demolished, and in its place might be a large outdoor amphitheater.

Is that something that you heard?

A. No.

Q. Do you have any reason to believe that the Kennedy Center might be torn down and replaced with a large outdoor amphitheater?

A. No.

Q. Are you aware of any connection between a structure like a large outdoor amphitheater and the company Live Nation?

MR. JANKOWSKI: Objection. Vague.

A. Yes.

Q. That's because Live Nation, they build amphitheaters; right?

A. They operate them more than build them, but a little bit of both.

Q. So I guess that begs the question: If the Department of Justice is saying if certain conditions aren't met, the building may be torn down and a large amphitheater brought in.

When you saw that, did you have an understanding that that was a suggestion that an amphitheater would be built that Live Nation would run?

MR. JANKOWSKI: Objection. Misstates. Asked and answered. I'll throw form in there.

Q. Did you?

A. I don't know what you're asking me to answer here.

Q. Well --

A. Because I already told you that there's

no connection between --
Q. Yeah.
A. -- the work that we're trying to do --
Q. Yep.
A. -- and the improvements that we're trying to make to the existing Kennedy Center, the building as it is today, and Rick Canny and Live Nation.
Q. Okay. What was your reaction when you saw the filing that the Department of Justice was going to represent that the Kennedy Center, if certain conditions wouldn't be met, could be torn down and replaced with an amphitheater?
MR. JANKOWSKI: Objection. Misstates.
A. I have no reaction.
Q. You had no reaction?
A. No.
Q. I want to turn back to the Exhibit 37 in the interrogatories, and go with the next name that the Defendants have listed, and I think you verified as a person with professional experience in the

performing arts?

MR. JANKOWSKI: Can I speak on the record, it's Tab 37, Exhibit 6; right?

Q. Sorry. Thank you.

Do you see that, Jeffrey Finn? Tell me about Jeffrey Finn.

A. Jeffrey Finn was in the programming department when I started at the Kennedy Center in early '24.

Q. Okay.

A. He took on more responsibility during the change in leadership between Deborah Rutter and Ric Grenell, and shortly after that change in leadership.

Q. What is his current role?

A. He's not an employee of the Kennedy Center right now.

Q. Okay. Where is he now?

A. He is doing his own business.

Q. Okay. So he is a consultant?

A. He has his own -- he has his own company. He is not -- I don't think he is actively

under contract, but --
Q. Okay.
A. -- with the Kennedy Center --
Q. I got it.
A. -- but he has historical, you know, knowledge in programming, and Broadway, traveling Broadway, and the Kennedy Center's business.
Q. When did he leave the Kennedy Center, roughly?
A. I don't know.
Q. Before you became executive director or after?
A. Yeah. Before. I think.
Q. In what capacity did he -- did the Center consult with him related to the Board decisions?
A. Programming.
Q. Can you be more specific. Like, what about programming? What did you ask him to consult about?
A. How shows are historically booked at the Center, types of shows, the cost of shows, the

general industry approach to working with the Kennedy Center.

Q. Okay. I guess, what use did you make of the information that he provided?

A. This was information taken during meetings with Delta --

Q. Ah.

A. -- as part of Delta's -- as part of Delta's work.

Q. Okay. Did Delta bring him on, or did the Center bring him on to those conversations?

A. We -- the Center brought him to educate on historical --

Q. Okay.

A. -- business.

Q. I'm curious, why did you have him provide information to Delta rather than providing a perspective directly to the Board?

A. He was not an employee, or he is not an employee.

Q. Well, Delta wasn't an employee, either; right?

A. Well, he wasn't under -- he wasn't under contract.

Q. But do you see what I'm asking? Like, what --

A. I don't.

Q. Okay. Then I'm -- why -- he could have been under contract, right, to provide a perspective. I'm just wondering why you didn't have him just provide his perspective on programming directly to the Board.

MR. JANKOWSKI: Objection. Asked and answered.

A. We brought Delta on to synthesize these different perspectives and make a presentation. That was their job, and this is a perspective in their work.

Q. Okay. Last name that is listed in response to Question 7 in the interrogatories is Kevin Couch.

Is he an employee or not?

A. He is not an employee.

Q. Where is he?

MR. JANKOWSKI: Objection. Vague.
A. Tennessee, I think.
Q. What is his connection with the Kennedy Center?
A. He was briefly the senior vice president of artistic planning.
Q. Oh. What time period?
A. Before I was executive director.
Q. Okay. When you say "briefly," roughly how long of a tenure?
A. I don't recall.
Q. Okay. Why was he consulted by the Kennedy Center on these matters?
A. He's another industry point of contact that's familiar with arts and entertainment that has Kennedy Center experience.
Q. All right. Sorry, remind me again, what was his role when he was at the Kennedy Center, vice president of...
A. Senior vice president of artistic planning.
Q. What is his current position, like, or

his current job?
A. A similar position within another performing arts presenter.
Q. Okay. What presenter is that?
A. I don't remember off the top of my head.
Q. Is it a nonprofit, or is it a commercial venture?
A. I don't know.
Q. Okay. Do you know if he has a background in nonprofit performing arts?
A. I do not know.
Q. And then just estimating how long he was at the Kennedy Center, I assume that was -- it was less than a year; correct?
A. It was less than a year, definitely.
Q. Sounds like maybe about a month; is that fair to say?
A. Or two.
Q. One or two months. Okay.
All right. Then kind of going through, just finishing off this interrogatory, it identifies the subjects of consultation regarding

performing arts management -- or it -- sorry. Let me restate that.

The question asks for the subjects on which these individuals were consulted, and then the response that you provide lists a couple. "... the feasibility of presenting programming in the main building during construction; durability of continuing to present certain programming that was financially burdensome; feasibility of presenting programming in the REACH; and feasibility of presenting special events and programming off-site." (As read.)

Were there any other subject matters that these -- the Kennedy Center consulted folks with respect to performing arts management, and these issues?

I'm going to -- if you want to --

A. Yeah. I mean, there are other people still at the Kennedy Center who are working on programming.

Q. Let me ask a better question, because this is actually what I'm trying to get at:

What I don't see listed here as a topic of consultation is, for example, how closure would affect fundraising, and willingness of donors to give money to the Center.

Is that something that the Center analyzed in connection with -- or prior to the Board meeting?

A. You said is it something we analyzed?

Q. Yeah.

MR. JANKOWSKI: Objection. Vague.

A. Which Board meeting are you asking?

Q. The August 13th Board meeting.

A. The fundraising needs were analyzed, both historical and future, as part of Delta's work.

Q. Okay. Other than Delta, did the Center do its own analysis of fundraising needs, comparing the closure versus phased renovation scenarios, or did it rely on Delta's work?

A. The Center analyzed fundraising and development --

Q. Okay.

A. -- internally or separately alongside

Delta as well, yes.

Q. Do you recall discussion with -- well, let me say: Donna Arduin is the CFO, is that right, or was the CFO during the relevant time period we're talking about; correct?

A. Yes.

Q. Do you recall conversations and e-mail with Ms. Arduin about how much in fundraising Delta should -- like, what the calculations -- what numbers Delta should use in terms of projected fundraising for the two different scenarios they were analyzing?

A. I don't recall e-mails.

Q. Why don't we turn to it just so that you can see something.

I'm going to have you turn to Exhibit -- sorry, Tab 4, which will be marked as Exhibit --

MR. JANKOWSKI: 7, I think.

Q. -- 7.

(Floca Exhibit 7, e-mails, 9.16.26, KC-BEATTY0307-349, was marked for identification.)

Q. Mr. Floca, this is a collection of e-mails. You can see from the bottom containing the Bates number, which indicates that they were produced by Defendants in this matter. And I will represent to you that although it's just a -- it's a collection, this is -- this happens to be the way it was produced to us.

Do you understand that?

A. Yes.

Q. I want to have you turn to -- at the bottom, the number will be 315, or page number 17. I'm going to ask you to look at the very bottom of the e-mail where it's an e-mail from Donna Arduin to you, and some others, dated August 8, 2026.

Do you see that?

A. Yes.

Q. Okay. Then just so that you're oriented, can you turn the page. I'll have you turn back, but just so you can see.

What's beneath that looks like that's a -- the e-mail we just looked at, it's a response to an e-mail from Mr. Buchalter to Donna

and others, including you, also on the 8th of August.

Do you see that?

Where it says, "And just to confirm, contributed revenue of 62 is actual for fiscal year '25?" (As read.)

Do you see that?

A. All right. I'm getting there.

MR. JANKOWSKI: Can you say the page number one more time.

Q. 316. The top of 316, the first full e-mail. Do you see that's from Mr. Buchalter to you and Donna and others; do you see that?

A. "And just to confirm, contributed revenue of 62 is actual for FY25?"

Q. Yes. You see that, okay.

Again, if we don't have to, I'm not going to ask you about all the various details, but if I can get you to agree that this is a discussion amongst some Center staff, including you, and Delta about the financial inputs that Delta was going to use for their projections; is that fair?

A. These are fundraising figures, targets, it looks like.

Q. Okay. The reason that this e-mail exchange is occurring is because the Center is trying to provide to Delta information for it to use in its analysis; is that fair?

A. Yes.

Q. Okay. So can you turn to 315, and I'm just going to ask you about that bottom e-mail, from Ms. Arduin to you, and others, including Mr. Buchalter.

It says, "I should have added a note there, Darin. Matt and I are using our FY27 contributed revenue number because we have no reasonable belief we could raise more if we stay open."

Do you see that?

A. I see that, yes.

Q. Do you recall that the Center, like, gave a contributed -- a projected fiscal year '27 contributed revenue number to Delta for it to rely on in its calculations?

A. This is the -- I mean, we gave them -- just based on what Donna's saying here.

Q. Yes.

A. A contributed revenue number.

Q. Okay. I guess my question is -- because it states here, "... we have no reasonable belief we could raise more money if we stay open."

Why is that?

Why did the Center assume that it would not be able to fundraise more if it stayed open than if it closed?

A. I don't know exactly what Donna is pointing to with this e-mail, but what I can tell you is that development needs a plan, and that plan has to be backed up by programming and a vision for the Center, which then gets people to support your mission.

So this is -- just in the context of these numbers that Darin and everyone is discussing in this -- Darin and everyone is discussing in this e-mail chain, but I have confidence in our path forward on the development front.

Q. Do you agree that it's reasonable to believe that the Center could not -- or do you -- let me rephrase that.

Do you agree that there is no reason to believe that the Center could raise more if it stayed open than if it closed?

A. Say it one more time.

Q. Do you agree with what Donna says -- sorry -- with what Ms. Arduin says here, that there is no reason to believe that the Center could raise more money if it stayed open than if it closed?

A. I think that's reasonable, especially in the time frame that's being considered here because even if we had a full programming team tomorrow, ready to get to work, you're not raising money via sponsorships or otherwise.

We have no traveling Broadway this -- right now. We have no traveling Broadway next year. So I think it is reasonable to say that -- you know, there's marginal differences between what you can traditionally do to raise money.

Q. Did the Center do any, sort of, financial projections to test that?

A. Financial projections is not the right -- I don't think the right descriptor for what we're talking about.

The question would really be did we -- you know, did we develop a fundraising plan that failed.

Q. It failed in part because the Center decided to close on July 6th, though; right? That's why the Center doesn't have programming.

MR. JANKOWSKI: Objection. Foundation. And also misstates.

A. This information that Delta is analyzing is based on historical processes, and figures, and expectations. And what the trade-offs are for implementing the work in different scenarios.

Whether or not the Center has a fundraising plan to work alongside an outlined budget that includes all of the things that are on that FY27 3 scenario, that's a separate -- that's not this, that's a separate conversation, and a

separate process. I think we're talking about two different things here.

MS. FREENY: I think this might be a good time to take a break if everyone's okay with that.

MR. LYNCH: Sure. Let's go off the record for a second.

MR. JANKOWSKI: Yeah. We're good. Thank you.

(RECESS, 3:27 p.m. - 3:37 p.m.)

BY MS. FREENY:

Q. Mr. Floca, just a reminder, you understand that you are still under oath; correct?

A. Yes.

Q. All right. I want to turn to some details about the Center's finances. Okay?

A. Okay.

Q. All right. Can I get you to turn to Tab 11, which we are going to mark as Exhibit --

MR. JANKOWSKI: 8, I think.

Q. -- 8.

(Floca Exhibit 8, spreadsheet, [no Bates], was

marked for identification.)

Q. Do you see that Exhibit 8 has a date in the upper left corner, 7/29/26, and it's a chart with dates and information; do you see that?

A. Yes.

Q. Do you recognize Exhibit 8?

A. Yes.

Q. What is it?

A. Donna referred to this as the "burn chart."

Q. I think I saw a reference to cash burn; does that sound also similar?

A. Yes.

Q. So what is your understanding of what the burn chart is?

A. It takes these expenses, turns it into a rate of daily burn.

Q. Okay. What do you mean by "daily burn"?

A. A forecast of how much outflow there is each day.

Q. Outflow of revenue?

A. Cash.

Q. Cash. Okay. Who prepared the burn table; was it Ms. Arduin?
A. Not just her. I would -- I believe the finance team worked on this. More than just Donna.
Q. When do you first recall seeing this chart?
A. Early July.
Q. What's your understanding of the purpose for which this chart was prepared?
A. To get to this cash burn figure.
Q. To help the Center understand how much cash it had on hand; is that...
A. I would categorize it as outflows and inflows.
Q. Was this created because of a specific concern about cash inflows or outflows?
A. Less a concern, and more a tool.
Q. Whose idea was it to create this tool?
A. I don't know.
Q. But it wasn't you?
A. I don't think so, no.
Q. Okay. Did you show this to the -- this

to the Audit Committee; do you recall?
A. I didn't show this to the Audit Committee.
Q. Did somebody at the Center?
A. I don't know.
Q. Okay.
A. I don't know if -- and if they would have, I doubt it would have been in this format.
Q. Okay. If you -- like, I will just represent for the record that it's -- one reason it may look a little bit unexpected to you is that the way that it was produced to us, unless you did it as a screenshot, the date would self-populate with the current date.
So this is just a screenshot. That's why it looks sort of larger than an Excel spreadsheet would.
This chart indicates that the out-of-cash date for the Center was December 24, 2026.
Do you see that?
A. Yes.

Q. So is it your understanding that -- you know, at the time you saw this chart, was it your understanding that this chart was representing that the Center would run out of cash at the end of the year -- at the end of the calendar year?

A. Based on whatever scenario this is involved in, yes.

Q. What do you recall about the discussions about the date when the Center was projected to run out of cash?

A. That date depends on expenses and revenues.

Q. It also depends on, I guess, these remaining sources that are listed in the bottom set of rows; is that fair?

A. That is -- those sources are a factor, yes.

Q. Okay.

A. They don't take into consideration, you know, other ongoing factors.

Q. Okay. It shows the endowment, and it's listed as $2 million with pending WNO litigation.

What does that mean? Do you know?
A. Those are -- those are unrestricted -- that's pointing to unrestricted endowment funds that are available.
Q. What are the restrictions -- I guess, like, how can the endowment of the Center be spent?
A. There are a number of restricted and unrestricted partitions across the endowment.
Q. Mm-hmm.
A. That -- where you can point funding to different programs, or it's just planted for the -- like, an annual draw.
Q. So right now, within the endowment, are there -- there are unrestricted funds available to cover cash needs?
A. To cover some -- yes. To cover some things. Not just general, some -- yes.
Q. One of the sources here lists Foundation. What is your understanding of what that means?
A. This is -- this is pointing to a separate pot of Foundation money.

Q. If I said the name Trump Kennedy Center for the Performing Arts Foundation, is that the Foundation this is referring to?
A. It likely is, yes.
Q. Okay. How is that the Trump Kennedy Center for the Performing Arts Foundation connected to the Kennedy Center?
A. It supports similar missions.
Q. Is it a nonprofit organization?
A. I believe it is, yes.
Q. The general counsel of the Kennedy Center, Elliot Berke, he is affiliated with the Foundation, is he not?
A. He is affiliated, yes.
Q. Who controls the Foundation?
A. The Foundation has members and officers.
Q. Who has ultimate control?
A. Those members and officers.
Q. Who are those members and officers?
A. I don't remember them all right now.
Q. Okay.
A. The mission of the Foundation and the

mission of the Center are similar missions.

Q. Do you know when that Foundation was created?

A. Early 2025.

Q. Okay. Do you know the circumstances in which it was created?

MR. JANKOWSKI: Objection. Vague.

A. I don't know the circumstances, but again, the Foundation and the Center were created to work alongside each other and support each other.

Q. Does the Center have any control over the Foundation?

A. Both organizations have the same -- or similar missions.

Q. Okay, but that's not my question.

My question is: Does the Kennedy Center have any control over the Foundation?

A. I think they influence one another. Yes.

Q. Okay.

A. Again, they're -- the Foundation and the Center are meant to support one another.

Q. Okay. The Foundation donated funds to the Center; is that right?

A. I don't know if "donated" is the right word, but there was a transfer of funds, yes.

Q. What word would you use to describe that transfer of funds?

A. Transfer.

Q. Okay. What was the purpose of the transfer?

MR. JANKOWSKI: Objection. Vague.

A. The funds were raised --

Q. Okay.

A. -- to help the Kennedy Center meet its mission and needs, and the funds were transferred, and the Kennedy Center is using those funds to help meet mission and need.

Q. Do you know who raised those funds on behalf of the Foundation?

A. I don't know all of the details about how the money was exactly raised.

Q. If you wanted to have a conversation with the Foundation, as you described towards sort

of the mutual, shared goals, who would you talk to?
A. I don't know right now. I mean, I would not -- I have no need to talk to the Foundation right now.
I have a need to create my own, with my teams, need and concept of the development plan. The Foundation has no bearing on that from my perspective.
Q. Okay. Well, let me drill down on that.
The number here that is next to the Foundation, it says, "Remaining 18."
You agree that's 18 million based on the top of the chart?
A. Yep. I would agree.
Q. Am I reading this right that that represents $18 million in available funds that were, as you said, transferred from the Foundation to the Center?
A. Yes.
Q. When did that transfer take place? Was it a single transfer or over multiple periods -- multiple transfers?

A. I don't know the specifics of the transfers.

Q. Who would know the specifics of the transfers?

A. Our finance teams.

Q. Do you know, sort of, roughly, what time period the transfers were made; for example, this year?

A. It was definitely this year, yes, but I don't know -- I don't know the exact time frame or amounts.

Q. Do you know if it was before or after the Court's preliminary injunction decision?

A. Which was May; right?

Q. Mm-hmm. May 29th.

A. It was likely after that.

Q. Okay. I want to ask about these -- the transfer of funds.

You've resisted calling them donations, but do you recall that there were funds donated from a foundation to -- let me just rephrase that.

Were there -- was there money that was transferred from the Foundation to the Center that was conditioned on Trump's name remaining on the building?

A. I'm not aware of an explicit condition, but I am aware of the -- you know, the strategy, right. Not necessarily explicit condition, though.

Q. Tell me what your understanding is of the strategy?

A. There are supporters, and entities, and organizations that would want to support the Kennedy Center, and support the chairman and Board's vision for the Kennedy Center.

Q. Is that support in any way connected to, or conditioned on, Trump's name being on the building?

MR. JANKOWSKI: Objection. Asked and answered.

A. I would be willing to assume that there are some donors who would want to condition their gifts on that, and I'm sure there are some donors that would not, just like there are some patrons

that love to see his name on the building, and there's some that do not.

Q. But some of them actually -- you're aware, though, that some -- some patrons -- well, let me just rephrase this.

Let me just ask this question: On this chart, there's a column on the right that asks, "Repayment Required?"

Do you see that? In orange.

A. Yes.

Q. I assume that column is indicating whether the available funds require repayment; is that fair?

A. Yes.

Q. Okay. For the Foundation, in answer to the question, "Repayment required," it says, "Pending Board action."

Do you see that?

A. Yes.

Q. What does that mean?

A. I don't know.

Q. You don't know what that means?

A. No.
Q. Just to confirm, I'm not trying to be a jerk here -- you don't know what Board action is pending?
A. I know that the Foundation gave the Center this -- it might be a rounding -- I think it was $17-and-a-half or...
Q. Mm-hmm.
A. Less than 18. But that money was transferred, given, donated. I'm not aware of a pending Board action that would impact repayment or otherwise.
Q. Okay. Are you aware that the Department of Justice told the DC circuit, which is the Court that's hearing the appeal from the renaming that -- about this Foundation and conditions on gifts -- let me -- on donations made to the Center by the Foundation?
MR. JANKOWSKI: Objection to foundation, and to the extent that misstates anything.
THE WITNESS: Can we go off the

record just for a second.

MS. FREENY: Why don't we stay on the record. If you need to consult with your counsel.

THE WITNESS: This is personal. Sorry. It's just about my kids.

MS. FREENY: Oh, okay. We can go off the record.

MR. JANKOWSKI: Go off the record. Okay. Yes.

(RECESS, 3:58 p.m. - 3:58 p.m.)

BY MS. FREENY:

Q. Mr. Floca, were you aware that the Department of Justice told the DC Circuit in the appeal from the District Court's decision on the renaming that the Center received funds that were -- that needed to be repaid if Trump's name did not remain on the building?

MR. JANKOWSKI: Objection. Foundation, and to the extent that misstates.

But you can answer.

A. I am aware of, I guess, that statement.

I don't know the exact --

Q. Okay.

A. -- the specifics around it, sorry.

Q. I can point you to it. I can read it to you, in the interest of time.

The Department wrote, "The Bylaws of The Trump Kennedy Center of the Performing Arts Foundation state, unequivocally" (as read), and then this is a quote, "The Corporation may make donations to the Center in support of its educational, artistic, cultural, and performing arts functions; provided, however, that in so doing, the Board of Directors shall condition such donations to the Center upon the name of the Center remaining unchanged as the 'Donald J. Trump and John F. Kennedy Memorial Center for the Performing Arts.'"

Is that consistent with your understanding of the funds that the Center received from the Foundation?

A. I am not aware of any pending action that is on anyone's docket or list of Board

actions --
Q. Yep.
A. -- to repay money that has been transferred to the Kennedy Center from the Foundation.
Q. Okay. Is it possible that the pending action is actually a -- is a reference to one of the resolutions put before the Board over the summer and in September to further recognize President Trump?
MR. JANKOWSKI: Objection. Speculation.
A. I was referring to this, where it says, "Pending Board action."
Q. Right. My question is: "Pending Board action," is it possible that that is a reference to a resolution pending before the Board, such as the one that was approved on August 13th to add Mr. Trump's name back up onto the Center and to the grounds?
MR. JANKOWSKI: Objection. Speculation.
A. I think I see the line you're drawing

between this comment of "pending Board action" meaning that this 18 million is only going to be transferred if there is a recognition of the President.

Q. I'm not trying to draw a line. I'm actually just trying to understand.

And if you don't know, then I would ask you this: Who would know what that reference means?

MR. JANKOWSKI: Could we let him finish that. I don't know if that was intended to be a substantive response.

Did you have anything else to say on that, Matt?

A. I think what I'm -- I don't know if this refers to a pending -- to any pending Board action. Like, I don't know if any Board is considering money being conditioned or being repaid.

What I know is that money has been transferred, and that money is available for our use, the Kennedy Center's use.

Q. Who would know why that chart reads in

that line "Pending Board action"?
A. Could be any member of the finance team.
Q. Anyone else?
A. No. It's only the finance team.
Q. So Donna Arduin was separated from the Kennedy Center in September; is that right?
A. She resigned.
Q. What reason did she give for her resignation?
MR. JANKOWSKI: I won't raise a categorical objection, but I think scope, we are starting to creep outside the scope of the Court's discovery limitation.
Q. You can answer.
MR. JANKOWSKI: But you can answer, Matt. Although we may get to a point where I might instruct him not to answer.
A. You asked me what reason she gave?
Q. Yes.
A. I don't remember exactly what she put in her e-mail.
Q. But she memorialized her resignation in

an e-mail?
A. She did. She sent an e-mail.
Q. Had the Center been contemplating terminating her before she resigned?
MR. JANKOWSKI: Objection to the extent this calls for any attorney-client privilege. And I'll reiterate scope, although...
Q. Yeah. I just want to be clear: I'm not asking what your attorneys told you. I'm asking whether the Center, of which you are the manager, contemplated terminating Ms. Arduin before she resigned?
A. I've contemplated multiple reorganization efforts that fit the future of the Center, and some of those reorganizations have a CFO, and some of those reorganizations do not.
Q. Okay. Well, so are you saying that you contemplated terminating Ms. Arduin because you contemplated eliminating the position of CFO; is that what you're saying?
MR. JANKOWSKI: Objection to the extent that misstates the testimony.

A. Yeah. Just to -- there are a number of ways to manage administrative services, like finance, like HR, within an organization, and some of those have a CFO, and some of those don't.

Q. Did the departure of Ms. Arduin have anything to do with the -- I believe what you previously agreed was the dire fiscal condition of the Kennedy Center in September of this year?

MR. JANKOWSKI: Objection. Vague.

A. Donna is not -- is not and was not and has not been solely responsible for the Kennedy Center's fiscal situation.

Q. Okay, but that wasn't my question.

My question was whether the departure of Ms. Arduin had anything to do with the dire fiscal condition of the Kennedy Center --

MR. JANKOWSKI: Objection.

Q. -- in September of this year?

MR. JANKOWSKI: Objection. Vague.

A. I'm willing to assume that it weighed on her mind.

Q. Okay. Did she tell you that?

A. No. I'm just assuming that would be on her mind, given these conversations.

Q. When we talked about the Center's dire fiscal condition earlier, and I think it was a couple hours earlier now, I think we were talking about roughly in September of this year; is that right?

A. That's what you were saying, yes.

Q. That's also what you understand to be the case, because it was what was discussed with the Board on September 15th; is that right?

MR. JANKOWSKI: Objection. Misstates prior testimony.

A. If it were so easy. It's not a clear -- there's not a clear here's where we are, and here's where, you know, we will run out of cash. There are a lot of different assumptions and changes and expectations between those two points.

Q. All right. Well, let's drill down on that.

I want to turn your attention to -- let me ask you this: The Board held a meeting on

September 15th; is that right?

A. Yes.

Q. There were two resolutions that were proposed in connection with that meeting; is that correct?

A. Yes.

Q. One of those resolutions related to ratifying the prior closure decisions; is that right?

A. I mean, it outlined the -- it outlined what -- it outlined closure, but it also outlined special events and programming in the REACH, and other things.

Q. Then the other resolution related to recognition of President Trump; is that right?

MR. JANKOWSKI: I will object on scope grounds here, and instruct the witness not to answer, except to the extent it bears on the substance, process, justification, and mechanics of the Board's August and September meetings, as well as the surrounding equities of those decisions.

Q. I'm going to turn your attention to

Tab 30 in your binder, which we're going to have marked as --

MR. JANKOWSKI: Exhibit 9, I think.

MR. ZELINSKY: I believe we're on Exhibit 9.

MS. FREENY: Exhibit 9. Okay.

MR. JANKOWSKI: Tab 30. Exhibit 9.

Q. Turn to the second page, and you --

MR. JANKOWSKI: Sorry. Let me just mark it.

(Floca Exhibit 9, Board of Trustees Special Meeting Agenda, 9.15.26, [no Bates], was marked for identification.)

Q. You will see, Mr. Floca, this is listed as the Special Meeting Agenda for September 15, 2026.

Do you see that?

A. Yes.

Q. I will represent to you that this was filed in this litigation as a packet of materials sent to Board members prior to that meeting.

Is that your understanding as well?

A. At a cursory glance, yes.
Q. Can you turn to page 2. Actually, let me just -- so more than a cursory glance, I'm going to have you first look at a -- look at the top, the blue numbers, 56 of 58.
A. Mm-hmm. Okay.
Q. You will see that's one resolution. That was a resolution that was circulated to the Board; correct?
A. Yes.
Q. That resolution talks about the dire financial position of the Center; is that right?
In that first sentence.
Do you see that?
A. Yes. Yes. Sorry.
Q. Who prepared this resolution?
A. It was work between our Board relations, general counsel, and myself.
Q. I assume you would not have permitted this to be circulated to the Board if you did not believe it to be factually accurate; correct?
A. To be clear, this was ultimately not

addressed during the meeting.

Q. Understood.

I guess my question is: Would you have circulated this as a proposed resolution, regardless of whether it was voted on, if you hadn't thought it was factually accurate?

MR. JANKOWSKI: Objection. Foundation on you circulating it.

Q. Let me rephrase that.

Would you have permitted this resolution to be circulated, whether it was voted on or not, if you had not -- if you had thought it was not accurate?

A. The resolutions are in draft form, and it was not ultimately considered.

Q. It was circulated to the Board, though; right?

A. But it was circulated to the Board, yes.

Q. Well, let me just ask: At the time that this was circulated to the Board, did you believe that the Center was in dire financial position having exhausted its fiscal resources?

MR. JANKOWSKI: Objection. Vague.

Q. That's a yes or no question.

MR. JANKOWSKI: I'll ask counsel to give him some time to think about his response.

A. I think it's accurate to say that the Center was in a dire financial -- is, was at the time, in a dire financial position.

The intent of this resolution was to get -- the main intent of this resolution was to get input from the Board on different options.

From a management perspective, there are still levers that can be pulled to adjust the true, dire situation of the Kennedy Center.

So, no, it's not inaccurate to say that the Kennedy Center was in dire financial position, and it's also important to acknowledge that this resolution was meant to capture information or thoughts, including ways to recognize the President's efforts for the organization.

Q. So if management adjusted some of those levers that you mentioned, that could avoid the Center actually running out of funds, running out of

cash, to pay expenses?

A. Yes, and there are -- an example would be we're supposed to put money away to pay the debt on the REACH. And instead of paying the debt on the REACH, we can use the money that we're putting away for that to pay for operating expenses. But that's not a great option because we do have debt on the REACH, so...

Q. One of the other available sources of funds that is not considered part of operating revenue, that's restricted donations; is that right?

A. Restricted donations?

Q. Mm-hmm.

A. You mean a restricted endowment?

Q. I mean restricted donations. So if the answer to that question is no, then I'll take that answer.

A. Someone can donate to the Center for a specific purpose, and then, you know, that specific purpose has to be honored.

Q. Okay. Was it accurate at the time that this resolution was sent out that the Center would

not be able to support its payroll obligations within a matter of weeks?

MR. JANKOWSKI: Objection. Vague.

A. Without rebalancing the projection and moving funding to cover, there are, again, things that you can do to elongate, just like we saw in that other -- in that cash burn table, to elongate, but it depends on what you do.

Q. Yeah.

A. Depends on what you move.

Q. Well, why weren't those alternatives noted here as ways in which, oh, okay, it may not be, as I'm reading, "certain financial collapse within weeks" (as read)?

A. I understand why you're asking that question, but I think it's -- it does not reflect what actually happened. And what actually happened is we focused on one issue, and the financials are a separate issue.

Q. I'm focused here -- I want to actually focus on this phrase, "certain financial collapse within weeks." (As read.)

You agree that this resolution, in draft form, granted, is sent to the Board members representing that the Center was within certain financial collapse within weeks; right?

A. It does say that, yes.

Q. Okay. Did you believe that to be accurate at the time this resolution was sent?

A. Without prioritizing, yes, it could have been. Without prioritizing those things like debt repayments.

Q. This is, though, "certain financial collapse within weeks" (as read), not "potential financial collapse within weeks."

I just want to make sure I understand: Did you or did you not believe that it was accurate at the time that this resolution was circulated to the Board that the Center was within certain financial collapse within weeks?

MR. JANKOWSKI: Objection. Asked and answered.

Q. It's a yes or no question.

A. Financial issues were imminent.

Q. Okay.

A. And they're not. There's a -- we do not need to talk -- we are going to talk about financials, and we are going to talk to the Board about FY27, and development, but that's -- that did not -- we did not get to this.

Q. Okay. That, to me, suggests that you did not believe at the time that the Center was within certain financial collapse within weeks; is that fair to say?

MR. JANKOWSKI: Objection. Argumentative and bordering on harassing. Please don't tell him what he's testifying.

Answer, if you can.

A. You're -- these are questions about something that is irrelevant, and I just don't --

Q. Okay. So your perspective -- sorry.

A. I don't see the connection. Sorry.

Q. So your perspective is that a representation to the Board about the potential financial -- right, this is about the Center's financial future.

I guess, is it your perspective that the Center's imminent financial future is irrelevant to the decision about how to proceed with respect to renovation?

A. This --

MR. JANKOWSKI: Objection to the extent it misstates prior testimony.

A. If we would have had a financial position conversation, if we would have gotten into finances and discussed those things during this Board meeting, and we would -- and the Center, as a result, would be in a different place than where we are now, this questioning would be different.

But we didn't get to that. We talked about the renovation and the closure. These other items weren't discussed.

Q. Why -- sorry.

A. So there's no -- so I acknowledge that this is in here, but it was not discussed.

Q. Okay. I get that it was not discussed. I guess from your perspective, was it relevant to the question of closure, or was that a separate

issue?
A. Financials are relevant to the closure, yes.
Q. Can you tell me why the -- why BDO has not yet completed the Center's audit for fiscal year '25?
MR. JANKOWSKI: Objection to the extent it calls for speculation.
Q. Well, let me ask you: Do you know why BDO has not completed the financials for fiscal year '25?
A. I think there are other reasons, but one of the driving reasons is our -- the work that we need to do and gathering responses to Senator Whitehouse.
Q. Did they express concerns about your finances, or the unaudited statements that they were reviewing?
A. BDO did not express any concerns to me.
Q. Okay. Did you hear them express concerns to anyone else -- hear about them express concerns to anyone else, including Donna?

A. The only -- no. The only concerns they have expressed to me is around the process for gathering information so we're responsive to Senator Whitehouse.

Q. Just so I'm clear, Senator Whitehouse, did he -- he expressed concerns about the finances for fiscal year, what, it was '25?

A. His concerns are long and lengthy. It probably -- it spans '25, '26.

Q. Has there been -- so has -- does the -- has BDO issued a going concern letter in previous years for the Center?

A. Yes. That's part -- I don't think BDO issues that. I think the Center issues --

Q. The Center issues it?

A. -- the Center issues that, and then that's part of the audit.

Q. I want to ask you about the August 13th meeting. Do you recall that the Board meeting -- excuse me.

The materials that were sent to the Board, you recall they were only sent out two days

before the Board meeting?

A. This package was sent out, that you have here, but additional materials were made available via OnBoard.

Q. Sorry. I might have been a little -- I caused some confusion because what we have in front of us is the September meeting packet.

I want to draw your attention back to the August 13th meeting packet that included the JLL report and the Delta presentation.

Do you recall that?

A. Yes.

Q. Why was that -- what dictated the timing in which the Board materials were sent?

A. We sent those materials out as soon as we could, and they were sent, I believe, directly and via OnBoard.

Q. When you say, as soon as you could, does that mean you sent them out as soon as you had them?

A. As soon as they were ready to be sent out.

Q. Well, for the Delta report, that's --

Delta was actually preparing it, so I'm trying to understand. Did you receive the material from Delta and hold it, and so the thing that's waiting is on your end, or did you send it out once -- as soon as you received the report, or the presentation from Delta?

A. I think it was pretty close to, and we are talking days, from when we received it to when it was made available, it was sent out.

Q. Once you received the presentation from Delta, why didn't you send it out the same day? What did you need to do to be ready to send that out?

A. It was just process. There was nothing driving it except for process.

Q. Okay. Who is in charge of that process?

A. Again, shared between whoever is planning to support the Board meeting, so staff like finance and Board relations, and general counsel's office.

MS. FREENY: Okay. Actually, can we go off the record, and I just want to -- I think it

might help to confer with you about how we're going to try to get some stuff on the record.

MR. JANKOWSKI: Okay. Sure.

(RECESS, 4:27 p.m. - 4:30 p.m.)

BY MS. FREENY:

Q. Mr. Floca, my next question for you: Did you talk to Chairman Trump about the Center's cash position at any point this year?

MR. JANKOWSKI: I'll object to that question on executive privilege grounds, and instruct the witness not to answer.

MS. FREENY: To confirm, that is the presidential communications privilege or aspect of executive privilege; right?

MR. JANKOWSKI: That's correct. The presidential communications component of the executive privilege, yes.

MS. FREENY: Was that at the direction of the White House?

MR. JANKOWSKI: It was pursuant to the standard procedures the Department of Justice uses to invoke and assert the executive privilege.

BY MS. FREENY:

Q. Mr. Floca, you're going to refuse to answer that question at your counsel's instruction?

A. Yes.

MS. FREENY: In the interest of time and just so that we make our record, I'm going to ask a series of other questions, and if you can agree that that same -- those same objections, and his -- you know, his -- that he will follow your instructions, is the case, unless you say otherwise.

Is that agreed?

MR. JANKOWSKI: Agreed. Blanket objection unless the Government notes otherwise.

MS. FREENY: Okay.

BY MS. FREENY:

Q. Mr. Floca, did you talk to Trump about a shutdown to avoid addressing the Center's financial -- nope. Let me just strike that one.

Did you talk to Trump about the fiscal harms caused by renaming?

MR. JANKOWSKI: Objection.

Q. Okay. Sorry. I forgot, I will just

keep reading with that understanding in mind.

Mr. Floca, did you talk to Chairman Trump about the decline in patrons, donations, and artists this year?

MR. JANKOWSKI: Objection.

Q. Did you talk to Chairman Trump about how to proceed following the Court's May 29th Order and preliminary injunction?

MR. JANKOWSKI: Objection.

Q. Did Chairman Trump instruct you or provide input to you on steps to take following the Court's May 29th Order and preliminary injunction?

MR. JANKOWSKI: Objection.

Q. Did Trump instruct you at all regarding the limitations on the funds from the Foundation?

MR. JANKOWSKI: Objection.

Q. Did anyone on Trump's behalf instruct you regarding the limitations on the funds from the Foundation?

MR. JANKOWSKI: Objection.

Q. Did Chairman Trump -- did you talk to Chairman Trump about his -- about whether he would

support renovation if he was not recognized in some way by the Kennedy Center?

MR. JANKOWSKI: Objection.

Q. Did you talk to President Trump about whether the Kennedy Center would potentially be demolished?

MR. JANKOWSKI: Objection.

Q. Did you talk to President Trump about the September 16th, rather than September 15th, decision to shut down the Kennedy Center main building on an emergency basis?

MR. JANKOWSKI: Apologies. I'm thinking on the fly.

Same objection, and also scope.

MS. FREENY: Okay. I think with that, I will just state for the record that the Plaintiff's position, I think as the Government knows, and as we discussed off the record, is that we would want to keep this deposition open for the possibility of recalling Mr. Floca to testify about matters that are the subject of pending discovery disputes.

MR. JANKOWSKI: To the extent that that outcome is dependent on the Court's ruling on the pending motion to compel, you know, I don't think the Government has an objection, but would otherwise not waive our right to declare the deposition closed assuming that the Court does not grant the Plaintiff's relief.

MS. FREENY: With that, I think we can go off the record, and thank you very much, Mr. Floca.

(RECESSED for the day at 4:34 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, MATTHEW FLOCA, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

________________________ ________________________

(DATE) (SIGNATURE)

CERTIFICATE OF COURT REPORTER

I, Marjorie Peters, Fellow of the Academy of Reporting, Registered Merit Reporter, Certified Realtime Reporter, Realtime Systems Administrator, and Notary Public in the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that the witness was placed under oath according to the law; that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction, and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

I further certify that signature was not waived by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand this day of , 2026.

Marjorie Peters

Marjorie Peters, FAPR, RMR, CRR, RSA
My commission expires October 31, 2029.

ERRATA SHEET

IN RE:

DEPONENT:

RETURN BY:

= = = = = = = = = = = = = = = = = = = = = = = = = = =

PAGE/LINE CORRECTION AND REASON

(DATE) (DEPONENT SIGNATURE)

NOTARY PUBLIC:

### $

**$17-and-a-half** 250:7
**$18** 246:16
**$2** 241:22
**$250** 46:18
**$257** 46:1,22 47:3,10 48:14,18 49:4, 14 50:9,16,19 51:2,10 72:6 73:7 90:19 124:8,21 129:12 155:10

### 0

**0238** 110:9
**0239** 110:9 111:2

### 1

**1** 70:7,8,11 71:22 92:2 125:13
**1,200** 98:15
**1.3** 111:3
**10** 36:18
**1094** 90:1 91:8
**11** 237:19
**11:15** 82:8
**11:23** 82:8
**12** 153:20
**12-month** 150:19
**12:51** 149:4
**13th** 88:7,13,21 89:9,10 142:6,15,18 143:11,17 144:4,9 177:9 179:12 183:6 185:20 229:12 253:17 270:18 271:9
**15** 18:15,19 36:18 260:15
**15th** 258:11 259:1
**16-month** 153:20
**16th** 15:6
**17** 231:11
**18** 246:11,12 250:9 254:2
**1:36** 149:4
**1st** 77:12

### 2

**2** 70:6 71:22 86:8,9,10,13 125:17,18 261:2
**2,000** 98:15
**2.5** 160:19
**20** 18:15,19
**2025** 244:4
**2026** 86:14 209:18 210:20 231:14 240:20 260:16
**236** 170:8 178:10
**24** 72:15,20 73:8,15 155:5 222:9 240:19
**25** 232:6 269:6,11 270:7,9
**257** 45:14
**26** 72:15,20 73:4,7,12,14 139:1 141:18 143:13 144:9 146:1 155:5 270:9
**26-month** 72:11
**27** 143:20 233:20
**28** 156:15,19 157:2 162:1
**28-'29** 158:8
**29** 155:14
**29th** 37:2 127:21 193:9,10 247:15

### 3

**3** 86:14 109:5,7,8,11 123:7,14 125:21, 22 126:1 170:3 236:21
**3.4.26** 70:8
**30** 260:1,7
**30(b)(6)** 189:2
**315** 231:11 233:8
**316** 232:11
**37** 170:7 178:10 179:18 207:17 221:19 222:3
**39** 110:10
**3:27** 237:10
**3:37** 237:10
**3:58** 251:11
**3rd** 86:22 100:2 119:10 125:8 131:6, 13 134:10

### 4

**4** 123:11,12,15,17 131:15 156:19 230:17
**40** 110:8 111:2 176:11,17
**41** 86:7
**45** 173:5 174:22 179:20
**45-day** 175:5
**4:27** 273:4
**4:30** 273:4

### 5

**5** 176:16,17,20
**50** 208:16
**56** 261:5
**58** 261:5

### 6

**6** 207:18,19,21 208:3 222:3
**60** 171:11 173:14 174:7 179:20 181:22 183:3,14
**62** 232:5,15
**6th** 236:10

### 7

**7** 109:1,2,4,7 170:2 178:9 208:21 225:18 230:19,20,21
**7/16/26** 109:18
**7/29/26** 238:3

### 8

**8** 231:14 237:20,21,22 238:2,6
**8.13.25** 176:21
**8.3.26** 86:10
**8th** 232:1

### 9

**9** 260:3,5,6,7,11
**9.15.26** 260:12

**9.16.26** 230:21

## A

**a.m.** 82:8
**ability** 8:9 11:12 26:7 75:9 94:8 144:16 212:8
**abnormal** 127:15 143:1
**absolutely** 28:10
**accelerate** 186:8,14 187:17
**accelerating** 187:2,11 188:6,21
**accept** 27:17
**acceptable** 94:5
**access** 69:6
**accomplish** 124:8,20 153:17
**accomplished** 48:14
**accomplishing** 83:6 90:8
**account** 72:21 151:19
**accounting** 126:11 165:15
**accurate** 261:21 262:6,13 263:5 264:21 266:7,16
**accurately** 11:11
**achievable** 60:5,9
**acknowledge** 263:16 268:18
**acoustical** 97:20 98:3
**acoustics** 98:1,3
**acted** 181:1
**acting** 80:17
**action** 15:17 20:3,5 249:17 250:3,11 252:21 253:7,13,15 254:1,16 255:1
**actions** 13:18 20:8 140:11 253:1
**active** 53:18 62:4
**actively** 222:22
**actual** 215:9,12 232:5,15
**actuals** 44:5
**add** 137:8 253:17
**added** 71:3 233:12
**additional** 18:5 23:21 24:3 72:21 84:6 98:3 127:22 271:3
**address** 145:5 153:18
**addressed** 262:1
**addressing** 44:12
**adhere** 174:16
**adhering** 174:20
**adjacent** 90:20 118:14 119:19 120:8 206:18,19
**adjust** 263:12
**adjusted** 263:20
**administration** 140:4
**administrative** 257:2
**adopt** 74:22
**advance** 44:6
**advice** 20:14 190:10 191:16
**adviser** 190:20,21
**advisers** 190:11,13
**advising** 190:10
**advisory** 110:17 111:4,8
**Aegis** 165:7 166:16 167:14 168:8,12 169:13,18
**affect** 229:3
**affected** 137:21
**affiliated** 243:12,14
**aftermath** 19:2
**afternoon** 149:6
**agenda** 86:10 260:12,15
**agree** 30:2 47:1 48:17 55:20 131:14 160:17 172:4 180:13 232:19 235:1,4,8 246:12,14 266:1
**agreed** 59:14 147:5 173:7 185:21 186:4,6,9,18 187:7 257:7
**agreeing** 183:13
**ahead** 47:22 185:7
**Ailey** 93:3
**aligned** 162:5
**aligns** 162:8,11
**alongside** 120:1 122:15 143:20 146:19 229:22 236:19 244:10
**alternatives** 265:11
**Alvin** 93:3
**ambassador** 77:7
**amount** 74:6 75:20 80:1 157:6 158:14 180:10
**amounts** 247:11
**amphitheater** 217:4,12,22 218:6,16,19 219:13,18,21 220:10,13 221:13
**amphitheaters** 220:4
**analysis** 42:19 43:4 84:6 96:8,14 99:1 104:7 121:13 122:22 129:18 133:21 137:18 165:17 173:2,8,10,11 175:20 176:4 179:13,19 180:2,4 182:20 185:15 190:6 195:5 229:16 233:6
**analyze** 19:9 38:3 43:9 107:14,17 108:12 114:2,13,21 131:5 179:5
**analyzed** 108:15 113:21 115:11 152:3 229:6,8,13,19
**analyzing** 41:10 84:8 107:1 108:18 111:19 121:1 230:12 236:14
**And/or** 119:1
**Angeles** 212:17
**announced** 74:15,16 76:11 155:4
**announcement** 75:5,7 77:12 78:13 102:2
**announcing** 75:16
**annual** 126:22 242:12
**answering** 10:9 207:14
**answers** 22:6 105:5
**anticipated** 47:3,7 103:19 153:5 155:13 156:5 159:22
**anticipation** 88:13 103:17
**anymore** 29:6
**anyone's** 252:22
**anytime** 35:15
**appeal** 250:15 251:15
**appeared** 160:8
**Appendix** 123:12,17
**apply** 34:20
**appreciation** 101:4,17 206:17
**approach** 50:8 164:3 177:18 178:1,6 206:12 224:1
**approached** 53:12 161:21
**approaches** 45:5
**approaching** 215:18
**appropriated** 46:11 48:10
**appropriation** 46:2,20 47:4 49:15

102:2 152:2 154:21
**approval** 102:14
**approve** 29:15 30:3,10 177:10
**approved** 46:6 253:17
**April** 11:19 46:1 47:20 153:13 157:16
**Arduin** 230:3,8 231:13 233:10 235:9 239:2 255:5 256:11,18 257:5,15
**areas** 122:2
**argue** 105:6,11
**argued** 216:4
**arguing** 188:2
**Argumentative** 50:4 127:7 128:5 139:13 267:12
**arrangement** 215:10,12
**arrived** 79:11
**artistic** 201:3 226:6,20 252:11
**artists** 204:4
**arts** 40:12 41:4 165:18,22 198:4 203:7,19,20 204:16 205:6,15,18 206:1,5,6 209:1,5,12 210:11,22 211:10 212:5,8 222:1 226:15 227:3, 10 228:1,15 243:2,6 252:7,11
**arts-related** 201:6
**Arts.'** 252:17
**artwork** 19:13
**asks** 228:3 249:7
**aspect** 138:12 273:13
**aspects** 60:13,16 210:16
**assert** 35:15 163:6 273:22
**asserting** 34:13 35:8,14 164:9 196:15
**assertion** 35:2 148:3,7,13 163:19 164:1
**assess** 57:18 58:1
**assessment** 106:20 107:18 122:10, 12 171:11 173:2,8,14,16 174:21 175:3 176:21 178:17,19 179:7,12,14, 19,20 180:2,3,4
**assisting** 198:3
**assume** 35:13 56:21 57:7,11 83:12 103:22 104:3 115:18 116:14,16 131:5 133:19 154:5 166:3 172:6 174:8 195:4 202:1 206:13 227:13 234:9 248:19 249:11 257:20 261:19
**assumed** 209:21
**assuming** 143:3 155:9 258:1
**assumption** 61:15,17 72:17
**assumptions** 53:7,8 79:8 258:17
**attention** 71:21 258:21 259:22 271:8
**attorney** 9:15,20 13:2 46:14 197:3
**attorney-client** 12:19 137:10 201:11 217:14 219:3 256:6
**attorneys** 256:9
**audience** 97:11
**audit** 86:13,22 88:19 89:11,16 93:18 105:17 114:8 118:17 122:22 129:3 131:6,12,16 132:12 240:1,2 269:5 270:17
**auditing** 37:20
**augment** 62:9
**August** 29:14 30:3,10 61:5 80:7,12 86:14,22 88:7,13,21 89:8,9,10 100:2 103:20 107:7 119:10 125:8 131:6,13 134:10,14 135:8 142:2,6,12,15,18 143:11,17 144:4,9 175:15 177:2,9 179:12 183:6 185:20 214:5 229:12 231:14 232:2 253:17 259:20 270:18 271:9
**authority** 172:11
**auxiliary** 133:4,5
**avoid** 263:21
**award** 70:13 73:1
**aware** 33:12 131:9 143:10 144:4 160:5,7,11,15 161:1,7,9 192:1 201:7 205:4,12,13 206:20 216:2,7,10,11,18, 21,22 217:5,8 218:8 219:20 248:5,6 249:4 250:10,13 251:13,22 252:21
**Aziza** 167:3 168:9

## B

**back** 20:14 23:9,20 31:10 40:18,20 44:15,22 48:22 55:18 59:2,4 74:7 77:1,2 82:13 85:14 127:2 141:8 155:3 175:9 176:13,14 178:9,10 189:1,7,9 208:8 221:19 231:19 253:18 271:8
**back-and-forth** 115:5
**backed** 154:20 234:15
**background** 202:18 227:10
**bad** 84:3
**baked** 132:7
**balance** 101:8
**Balancing** 74:6
**bank** 103:10
**based** 102:1 114:6 151:20 162:2 234:2 236:15 241:6 246:12
**basics** 53:12
**basis** 34:17 44:5 67:14,17 152:11
**Bates** 71:2 86:17 109:21 110:8 111:2 123:12 170:8 176:22 178:10 208:1 231:3 237:22 260:12
**bathroom** 11:3 82:6
**BDO** 269:4,10,19 270:11,13
**bearing** 214:11 246:7
**bears** 259:18
**Beatty** 7:9,10,21 149:13
**Beatty's** 12:1
**Beatty-trump** 13:9
**Beautiful** 48:8 152:2 154:20
**began** 101:22 102:3
**begin** 76:6,7 78:11,12 183:21
**beginning** 159:1 209:16,17
**begs** 220:7
**behalf** 137:11 190:14 191:17 192:3, 10,14 194:5 216:12 245:18
**belief** 233:15 234:6
**bell** 197:9
**beneath** 231:20
**benefit** 9:9
**benefits** 106:16
**Berke** 201:9 243:12
**Berke's** 202:5
**bid** 155:21 169:2,6
**bidders** 166:3,6,8,12
**bidding** 164:20 165:3
**big** 27:18 48:8 152:1 154:20 211:3
**Bill** 48:8 152:2 154:20
**binder** 70:6 86:7 170:2 260:1
**bit** 21:18 56:22 136:3 164:15 193:20 220:6 240:11

**blindly** 67:5

**blue** 261:5

**board** 15:17,20 16:6,8,11 17:11,13 18:6 21:6,11 22:9,22 23:19 25:2,9,15 26:2,6,12 28:18 29:14 30:3,9 31:4 32:14 36:17 44:15,22 45:9 49:3 50:15 51:16,21 52:16,19 54:19 55:3 58:13, 20 59:2 61:4 62:8 65:10,15,17 78:21 79:5,15 80:6,18 81:4,8 83:5 84:13,15 85:2 88:7,13,17,21 89:13,15,18 103:15,17,20 105:16,18,21 106:2,22 107:3,5,6,7,8,10 113:19 127:10,13,16 128:1,11,18 129:4 136:2 139:7,11 140:11,20 141:16 142:2,3,13,15,18 143:6,11,17 146:12,13,14 171:21 173:18 174:9,10 175:15 177:2,9,10 179:4,9 181:5 182:8 183:5 185:19 194:11 209:2,3 210:19 223:15 224:18 225:10 229:6,11,12 249:17 250:3,11 252:12,22 253:8,13,14,16 254:1,16, 17 255:1 258:11,22 260:11,21 261:9, 17,20 262:16,18,20 263:10 266:2,17 267:4,20 268:11 270:19,22 271:1,14 272:18,19

**Board's** 12:16 28:20 127:13 181:9 213:15 214:7 248:12 259:20

**Board-level** 16:17

**body** 171:15

**booked** 223:21

**booking** 206:21

**bordering** 267:12

**bottom** 70:20 71:8 86:18 89:22 91:3 109:21 110:8 170:8 208:16 231:2,11, 12 233:9 241:14

**Bowl** 205:17

**box** 41:21 91:8,10

**boxes** 90:13 92:2

**break** 11:1,3,8 42:13 76:22 82:5,6,13 134:6 147:3 149:2 216:1 237:4

**breakdown** 130:16

**briefly** 226:5,9

**bring** 32:5 143:8 187:19 199:3 210:8 213:12 224:10,11

**bringing** 210:5

**brings** 32:4

**broad** 103:2,3

**broader** 108:17 138:11,20,22 146:20

**broadly** 135:10

**Broadway** 93:2 96:5 158:11,15 159:2 223:6,7 235:17,18

**broken** 53:3 85:3

**brought** 34:3,4 38:16,18 62:8 87:10 199:4,19 200:2,7,21 201:2 213:11 220:10 224:12 225:13

**Buchalter** 177:8,17 190:2,19 191:2,7 194:9 197:11 231:22 232:12 233:11

**budget** 27:14,15 43:7,9,13,15,16,22 44:1,6,9 96:15,16 123:18 126:15 127:9 236:20

**budget-driven** 96:9,14

**budget-related** 89:12

**budgets** 44:4

**build** 61:18 216:17 217:2 218:19 220:3,5

**building** 22:14 24:6,15,21 27:12,20 29:16 30:4,8 31:1 48:1,4,16 49:16 50:1 52:21 53:11,20,21 54:7 55:22 56:13 58:2 61:10,13 62:14 63:14,21 64:11,13 65:12 66:17 68:4 69:7,10, 13,16,19,21 70:1 72:18 74:7 85:3,17 88:9 94:14 95:14,18 96:3 98:16 99:10 106:9,12,18,19 107:2 114:7 115:19 116:1,3,5,8,11,22 119:5,13,21 120:4, 5,10,13 122:16 125:19 139:4 141:7 149:20 150:11,12 151:5,8,22 152:22 153:22 155:9 156:3 157:20 177:11 180:19 181:19 217:11 218:5,16 220:9 221:7 228:7 248:4,16 249:1 251:18

**buildings** 52:20,21 53:6 114:10

**built** 61:14 134:17 220:13

**bunch** 52:7

**burdensome** 228:9

**burn** 238:9,11,15,17,18 239:1,10 265:7

**business** 198:4 201:6 202:1 211:18 222:19 223:7 224:15

**bylaws** 32:21 252:6

## C

**calculations** 230:9 233:22

**calendar** 155:14 156:15 209:17 241:5

**California** 197:8,10,13,21

**call** 33:3 34:6 45:8 48:17 54:2 126:5 163:22 167:2,5 168:12,22

**called** 7:3 33:21 34:5 71:2 88:12 117:18 147:5 156:21 163:18

**calling** 79:6 82:20 247:19

**calls** 12:19 31:19 67:22 137:10 142:20 201:11 210:13 217:14 256:6 269:8

**cameras** 160:9

**campus** 17:16 38:5 45:6 53:5,10,11, 13 85:17 94:7 115:21

**candidates** 165:11 212:22

**Canny** 197:18,19,20,21 198:21 199:1,6 200:1,7 201:7 205:14,22 206:20 211:9,19 212:11 213:1,3 215:2,16 221:7

**Canny's** 203:19 212:16

**capable** 41:10

**capacity** 211:22 212:1,2 219:10 223:14

**capital** 110:17 173:9

**capture** 263:17

**care** 13:2

**case** 10:8 11:19 13:9 23:22 24:4,5,10 38:1 86:19 104:10 160:10 195:7 216:3 258:10

**cash** 136:12 142:5,10 144:8,15 146:18 238:11,22 239:1,10,12,16 241:4,10 242:15 258:16 264:1 265:7 273:8

**categorical** 137:9 190:8 191:22 213:6 255:11

**categories** 130:15

**categorize** 239:13

**category** 130:6

**caught** 156:20

**caused** 144:19 271:6

**center** 11:19 12:17 13:18,21 16:21 17:9 18:17 20:12,16 21:9,19 24:1,14 25:20,22 27:8,12 28:18 29:4,6,16 30:4,20,22 31:17 32:1,2,18 33:15 36:20 37:3,12 38:15 39:2,3,15 43:20 47:11 48:12 51:2,10 52:18 55:8 56:6 60:8 61:9,12 64:20 65:5 66:20 67:4 75:17,19,20 77:5 79:22 80:18 83:5 85:22 86:13 99:14 100:18 108:3 110:15,22 114:14,21 115:2,7 117:21

121:13 126:16 132:7 133:20 135:15 136:18 137:2,22 139:5,20 140:4,15 141:17 143:12 144:5,7,15,18,19 145:8,22 146:8 149:11 151:21 152:8 155:7,20 159:10 161:15 162:3 165:2 167:9 180:21 181:3,12,18 183:2 184:3,13 185:10,22 186:5,11 187:20 188:1 192:22 194:3 195:9 198:2,12, 18 199:3,4,7,15,19 200:2,8,13,17 203:15 204:2,6 206:6 209:2,16 210:6, 9 211:3 212:10,12 215:7,10 216:5,12, 14,15 217:3,12 218:4,20 219:12,17 221:6,11 222:8,17 223:3,8,15,22 224:2,11,12 226:4,13,16,18 227:13 228:14,19 229:4,5,15,19 232:20 233:4,19 234:9,16 235:2,5,10 236:1, 9,11,18 239:11 240:4,19 241:4,9 242:6 243:1,6,7,12 244:1,9,11,17,22 245:2,13,15 246:18 248:2,12,13 250:6,17 251:16 252:7,10,14,16,19 253:4,18 255:6 256:3,10,15 257:8,16 261:12 262:21 263:6,13,15,22 264:18,22 266:3,17 267:8 268:11 270:12,14,15,16

**Center's** 12:5 38:4 42:16 72:3,10 80:12,17 107:19 122:1 135:10,14 136:4,12 137:20 138:15 139:9 141:8 143:16 144:2 147:5 148:18 158:19 162:9 164:17 194:2 195:2 201:8 204:6 206:17 214:11 223:7 237:16 254:21 257:12 258:3 267:21 268:2 269:5 273:7

**centers** 206:1

**cetera** 109:14

**CFO** 230:3,4 256:16,19 257:4

**chain** 234:21

**chairman** 74:19 75:6 80:17 81:3 139:11 140:5,19 195:12 248:12 273:7

**Challenge** 111:4,8

**change** 133:4,6 140:4 181:20 183:19 222:12,13

**changed** 46:4 104:5,8 157:15 174:15

**characterization** 123:8

**characterize** 101:1 102:13

**charge** 272:16

**chart** 124:3 126:5,7 133:15 238:3,10, 15 239:6,9 240:18 241:2,3 246:13 249:7 254:22

**checks** 41:21

**children's** 206:21

**choose** 84:7

**choosing** 176:8

**Chris** 105:9

**circle** 18:22 19:3,18

**circuit** 250:14 251:14

**circulated** 261:8,20 262:4,11,16,18, 20 266:17

**circulating** 262:8

**circumstances** 128:12 201:1 244:5, 8

**civic** 40:5

**clarification** 10:13,17 33:10 78:18 87:22 193:14 196:1

**clarity** 190:18

**classical** 40:6 159:1

**cleanest** 117:19

**clear** 19:7 53:7 144:1 182:20 189:12 214:1 219:5 256:8 258:14,15 261:22 270:5

**close** 12:17 15:2 17:10 24:6,15 28:18,21 29:4,6,7,15 30:4,22 50:1 58:16,17 61:9,12,13 75:17,19,20 76:18 79:21 80:3,18 146:22 149:17 150:7,8 236:10 272:7

**closed** 27:12 54:11 68:16,18 121:4 234:11 235:6,11

**closer** 18:20

**closing** 25:12,22 64:13 79:22 150:10 152:10

**closure** 12:5 14:10,11,15,17 15:1,11, 15 17:2 26:11,21 30:8 36:16 42:3,19 55:22 62:14 63:14,21 65:12 66:1 68:8 72:18 73:1 74:16,22 75:16 79:6,7 80:6 81:5,8 83:2 88:8 92:5 103:18 125:18 149:19 150:1 151:5,7,22 152:4,21 153:4,22 155:9 156:2,11 177:10 214:12 229:2,17 259:8,11 268:15,22 269:2

**closure-related** 16:22

**collaboratively** 172:10

**collapse** 136:19 137:4 141:10,17 142:15 143:12 144:21 265:13,21 266:4,12,13,18 267:9

**collection** 231:1,6

**column** 90:12 249:7,11

**combined** 204:7

**comfortable** 133:20 134:2,15

**comment** 254:1

**comments** 137:15 145:11 161:16

**Commerce** 33:13

**commercial** 109:13 202:22 227:6

**committee** 86:14 87:1,14 88:10,20 89:8,12,14,16,17 93:18 105:18 114:9 118:18 119:11 122:22 125:8 129:3 131:6,13,16 132:13 134:11 240:1,3

**communicate** 195:12

**communicated** 55:7

**communicating** 24:11 192:10,16, 19

**communications** 34:15,18 35:16 147:17,20 162:22 164:5 168:8 190:12 195:18,21 196:6 273:13,16

**companies** 165:6

**company** 152:5 154:14,17 219:22 222:22

**comparing** 229:16

**comparison** 117:17

**compartmentalize** 117:20

**competitive** 164:20

**complete** 24:20 150:14 155:10 157:11 159:10 181:4 183:4

**completed** 156:2,11 159:15 161:18 183:5 184:15 269:5,10

**completely** 203:11 215:21

**completing** 66:16

**completion** 157:14 159:13 170:14 171:2 175:4

**component** 151:2 195:22 196:6 273:16

**components** 116:8,11

**Compound** 37:6 75:22 84:10

**Comprehensive** 48:1,4,15 49:15 58:2 66:5

**comprehensively** 153:18

**compress** 73:22

**compressed** 72:11 73:18 180:9

**concept** 119:4 153:3,10,12 185:10 217:21 246:6

**concern** 50:21 145:6,21 214:17 239:16,17 270:11

**concerns** 169:8 269:16,19,21,22 270:1,6,8

**Concert** 53:1,17 68:16,17 85:6,11,12 98:1,2,9,14,18 99:6,12,18 103:11 121:4,6 126:2 150:8

**conclusion** 26:20 68:6 210:13

**conclusions** 53:7,8

**concrete** 86:5

**condition** 248:5,7,20 252:13 257:7, 16 258:4

**conditioned** 248:3,15 254:18

**conditions** 216:13 220:9 221:12 250:16

**conducting** 50:8 62:13

**conduit** 25:8,10

**confer** 273:1

**conference** 168:8

**confidence** 234:21

**confident** 155:22 156:9,16

**confirm** 140:3 147:12 148:16 166:2 195:16 196:22 204:14 232:4,14 250:2 273:12

**confusion** 140:1 271:6

**Congress** 46:6,11,20 47:11,13

**congressional** 46:1 47:4

**Congresswoman** 7:9

**connected** 243:6 248:14

**connection** 47:3 119:9,16 125:7 128:17 190:3 201:8,15,16 213:3 215:2,6,13,16 218:21 219:20 221:1 226:3 229:6 259:4 267:18

**connections** 167:8,11 199:6,10,14, 18

**cons** 24:12 56:20,21 57:7,18 58:1,8,9 177:16

**consensus** 139:6 140:10 172:20

**conservative** 182:3

**consideration** 84:2 85:9 130:19 165:20 181:9 214:11 241:19

**considerations** 177:5 206:5,8

**considered** 83:5,7 149:11,22 210:21 235:13 262:15 264:10

**consistent** 20:9 184:22 252:18

**construction** 27:15 31:1 37:21 38:6, 14 39:15 42:8 53:21,22 54:3,6 57:1 62:18 63:8,13 64:8,14 67:12 69:10 82:20 94:7 96:15 102:10 107:19 110:16 120:9,12,19 121:1 139:18 143:21 149:21 151:11 156:1,10 159:4,13,14,18 161:21 162:15 165:14 173:10 176:21 178:18 215:19 228:7

**consult** 223:15,19 251:3

**consultant** 37:11,14 108:15 185:13 195:6 196:17 197:8,10,13,22 198:7,8 200:2,8,17 222:20

**consultants** 21:16,20 22:11 23:4,12 86:1

**consultation** 209:4 227:22 229:2

**consulted** 209:1 226:12 228:4,14

**consulting** 21:22 110:18 164:17 197:2,5

**contact** 226:14

**contained** 65:10

**contemplate** 96:4,22

**contemplated** 50:9 69:9 94:20 97:13 113:16 156:1,10 157:15 173:1, 13,17 180:12 181:5 182:12 183:3 256:11,13,18,19

**contemplating** 181:22 256:3

**contemplation** 174:8

**content** 117:2

**context** 44:14,20 91:7 182:3 199:18 234:18

**continue** 82:18 101:9

**continuing** 228:8

**contract** 37:9 59:20 182:17 186:7,10 223:1 225:2,7

**contracting** 71:13 166:5 171:4 184:1 198:11

**contractor** 67:5 72:22 151:18 171:1 198:10 200:18,19

**contractors** 21:15 22:3 23:4

**contracts** 214:10

**contributed** 232:5,14 233:14,20,21 234:4

**control** 243:17 244:11,17

**controls** 165:14,15 243:15

**conversation** 27:10,19 28:4,16 62:2 64:9 114:13 158:4 169:13 171:3 177:15 186:5 195:8 197:7 236:22 245:21 268:9

**conversational** 120:7

**conversations** 16:17,18,20,21 17:7 19:1 27:22 28:2 36:14 95:15 114:3,4 122:5,6 131:10 134:3 148:17 159:4,6, 9 162:14 168:21 180:17 192:9 217:8, 10,21 218:8,10,13,15 224:11 230:7 258:2

**convey** 64:16 101:16,18 103:1

**conveyed** 101:11 167:17

**conviction** 24:14 26:11

**convince** 25:2,14 26:2,6

**convinced** 25:12

**convincing** 25:4

**Cooper** 13:7 30:12

**coordination** 45:7

**copy** 65:1,3 110:3 130:9

**core** 106:12 111:3,8 171:4 173:9

**corner** 109:18 238:3

**Corporation** 252:9

**correct** 13:8,11 24:4 35:10 37:4 47:12 50:2 51:18 52:8,11 56:4 61:20 62:15 68:20 70:2,3 76:11 92:22 93:1, 7 96:7 109:6 111:14 112:2,12,14,19 119:22 125:15 128:20 129:13 130:18 131:16 140:20 146:1 167:15 170:5,20 174:15,22 176:3,19 183:10,14 191:3, 9 196:18 197:4 203:8 209:8 227:14 230:5 237:13 259:5 261:9,21 273:15

**corrected** 70:17

**correctly** 170:17 215:14

**correspond** 125:9 131:19 134:20 178:16 179:12 180:1

**cost** 63:8 92:1,3 120:14,19 134:21 223:22

**Couch** 225:19

**counsel** 20:14 36:2 82:2 148:20 163:14 179:15 201:9 218:4 219:9 243:11 251:4 261:18 263:3

**counsel's** 145:6 167:12 189:8 211:17 212:19 272:19

**couple** 34:10 89:21 134:4 202:19 228:5 258:5

**court** 7:15 8:22 9:10 12:3,9 20:3,4,8 30:22 31:6 60:1 65:7 81:7,14 102:9

127:21 128:13 193:4,5,6,8,10,21 198:14 216:19 218:18 250:14

**Court's** 16:22 17:4,5,8 20:18 26:3,22 44:14 49:20 51:3,9 59:15 81:16 127:20 149:12 153:14 213:8,22 247:13 251:15 255:12

**Courtlistener** 12:14

**Courts** 182:6

**cover** 242:15,16 265:5

**covered** 93:22

**coy** 29:13 84:16

**CPDP** 66:4

**craft** 132:5,10

**create** 69:4 130:18 154:17 239:18 246:5

**created** 130:12 182:8 183:20 184:1 187:18 239:15 244:3,6,9

**creating** 184:7

**creep** 255:12

**criticism** 135:21

**crosswalk** 87:21

**cultural** 252:11

**curious** 224:16

**current** 222:15 226:22 227:1 240:14

**cursory** 261:1,3

**cut** 116:22

## D

**daily** 238:17,18

**Darin** 177:8 194:19 233:13 234:19,20

**data** 133:10,14

**date** 72:22 109:17 156:15,21 157:1,14,15 158:17 159:19 161:19 238:2 240:13,14,19 241:9,11

**dated** 86:14 231:14

**dates** 170:14 238:4

**daughter** 207:5 211:12

**daughter's** 207:6 211:20

**day** 179:20 181:17 238:20 272:11

**days** 171:11 173:5,14 174:7,17,20,22 182:1 183:3,14 270:22 272:8

**DC** 250:14 251:14

**deal** 18:15

**dealings** 211:18

**debate** 81:12 128:14 188:3

**Deborah** 209:20 222:12

**debt** 264:3,4,7 266:9

**December** 240:19

**decide** 54:17,22 56:6,7 57:22 89:17,18 154:12

**decided** 30:20,21 36:20 54:14 58:19 107:4,9 170:22 236:10

**deciding** 84:15 133:8 198:20

**decision** 12:4,5,8,16 13:4 14:10,11,15,17 15:1,6,11 16:1,2,5,22 17:8 19:2 20:18 21:4 22:21 25:2 26:3,8,22 29:3 30:10 31:7,16 37:2 44:15 49:20 51:9 59:15,21 61:9 65:7 74:9,11,21 75:6 81:2,4,8 83:14 99:20,22 102:6,18 106:21 128:19 132:11 153:14 167:17 176:15 193:5,6,8,10,11,22 198:15 247:13 251:15 268:3

**decision-making** 21:10 22:8 32:2

**decisions** 23:10 24:11,12 209:3 213:15 214:7 223:16 259:8,21

**deck** 86:21 87:3 175:11,17 178:15 179:3,22

**decks** 194:20

**decline** 35:22 163:13

**declined** 167:14 168:1 169:1,6

**decrease** 137:21

**deeply** 84:8

**Defendants** 71:3 86:19 110:1 214:9 216:3 221:21 231:4

**Defendants'** 207:21 208:4

**define** 23:13 192:13

**defined** 108:3,7 117:12

**defining** 108:11 111:13 115:2,3

**definitive** 73:20 74:1 77:14

**definitively** 30:21 31:3

**degree** 15:18,20 59:7 67:13 99:2 104:5 135:16 150:17

**delineation** 69:12

**deliver** 175:2 184:11

**deliverable** 173:21 174:3

**Deliverables** 174:1

**delivery** 154:22

**Delta** 21:20 22:12 37:12 38:2 39:2,6,12,19 40:2,3 41:1,9 55:7 107:13,14,18 108:4,11 110:4 111:13,16 112:6 113:19,21 114:12,14 115:1,3,8,10 120:22 122:9,14,16,18,20 123:22 131:9 164:17 165:7 166:16,20 167:3 169:13,22 170:19 173:1 174:20 175:11,16 176:7,18,20 177:1,7 178:15 179:11,21 180:10,15,18,19 181:3,8 182:1,5,16 183:4,5,13 184:2 186:5 190:2 195:5,9 197:2,5 209:2 224:6,10,17,21 225:13 229:15 230:1,8,10 232:20,21 233:5,21 236:14 271:10,22 272:1,2,6,11

**Delta's** 106:4 179:7 182:11 190:6 195:5,8 224:8,9 229:14,18

**demolished** 216:6 219:12

**depart** 24:13,17

**department** 164:3,8 216:11 217:1 218:17 220:8 221:10 222:8 250:13 251:14 252:6 273:21

**departure** 257:5,15

**depend** 120:20

**depends** 57:12 58:19 59:11 151:9 157:17 158:20 241:11,13 265:8,10

**deposed** 7:13

**deposition** 7:21 8:11 149:8 163:10,20 196:12

**depth** 99:5

**describe** 33:5 62:5 66:1 119:16 138:20 143:11 245:5

**describing** 60:3 150:3 182:2

**description** 33:7

**descriptor** 236:4

**design** 155:21

**designate** 189:2

**desire** 182:19,21

**desires** 162:12

**detail** 213:19

**detailed** 116:13

**details** 232:18 237:16 245:19

**determination** 216:16

**develop** 236:7

**developed** 129:2

**developing** 68:3,7

**development** 66:5 229:20 234:14, 22 246:6 267:5

**develops** 126:14

**dictate** 114:1

**dictated** 271:13

**difference** 98:13

**differences** 235:20

**difficult** 106:13

**dire** 145:9,11 147:6 148:18 257:7,16 258:3 261:11 262:21 263:6,7,13,15

**direct** 28:13 77:20 181:3 206:15 208:15 217:15

**directed** 101:21 126:17,20 163:6 181:12

**directing** 147:12

**direction** 34:22 35:8,14 76:6 78:11, 13 79:20 80:3,13,16,21 81:3 82:1 115:13 123:5 127:10,12 131:3 139:7 148:1,11,19 164:5 183:18 196:8 273:19

**directly** 161:8 224:18 225:10 271:16

**director** 13:21 25:11,20 198:18 209:15,22 223:11 226:8

**Directors** 252:13

**disagree** 75:19

**discovery** 81:16 208:1,5 213:8 255:13

**discuss** 27:9 78:22 102:8 147:4 189:20

**discussed** 17:4,11,15,16 50:17 55:8 63:1 64:18 85:21,22 108:1 111:15 113:18 127:21 142:12,15,16,17 143:2,5 146:12 150:16 152:9,13,14, 20 218:15 258:10 268:10,16,19,20

**discussing** 65:21 88:3 111:17 131:8 153:11 176:19 234:19,20

**discussion** 13:20 30:16 56:19 65:11,22 73:6,10,13 108:9 153:9 195:1 218:3 230:2 232:19

**discussions** 17:13,21 18:5 20:17 27:16 100:9,14,16 219:9,11 241:8

**distinct** 63:13 111:9,19 112:7 114:17 119:17

**distinction** 96:1 118:19,22 119:1

**District** 12:3,9 251:15

**division** 129:20

**DMV** 97:2

**docket** 252:22

**document** 109:22 113:1 115:15 117:14 127:17 130:12 175:4 182:13 208:16

**documents** 12:13 70:5 71:3 84:19, 20 172:12

**Donald** 252:15

**donate** 264:18

**donated** 245:1,3 247:21 250:10

**donations** 247:20 250:17 252:9,13 264:11,12,15

**Donna** 230:3 231:13,22 232:13 234:12 235:8 238:9 239:4 255:5 257:10 269:22

**Donna's** 234:2

**donors** 229:3 248:20,21

**doubt** 240:8

**draft** 130:9 172:12 183:20 262:14 266:2

**drafted** 117:3,5,7,8

**draw** 53:6 69:12 71:21 114:11,19 138:9 242:12 254:5 271:8

**drawing** 253:22

**drier** 164:15

**drill** 90:11 174:18 246:9 258:19

**drive** 144:2

**driven** 48:15 103:12 132:19 137:15 138:10,20 155:18

**drives** 150:17

**driving** 106:11 141:6 159:12 171:9 269:13 272:15

**due** 97:5

**durability** 228:7

**duration** 29:16 74:22 79:8 150:19 153:22 156:4,8

**durations** 153:4,5

### E

**e-mail** 167:18,19,20 168:22 169:6,19 230:7 231:13,21,22 232:12 233:3,9 234:13,21 255:21 256:1,2

**e-mails** 230:13,21 231:2

**earlier** 59:14 114:9 117:18 215:15 258:4,5

**earliest** 158:9,13

**early** 153:13 155:12 157:11 222:9 239:7 244:4

**easy** 114:6,10 258:14

**educate** 224:12

**education** 42:10 87:6 91:18 94:10 106:17 107:1 122:6 130:6 204:7 212:10

**educational** 92:17 252:10

**effect** 8:5 42:2,6,19 43:2

**effective** 24:20 25:13 26:1,21

**effectively** 154:3

**effectiveness** 65:20 66:1,16 67:8,9, 20

**effectuate** 218:15

**efficiencies** 64:13

**efficiency** 65:20,22 66:15 94:8

**efficient** 24:20 25:13 26:1,21 64:10

**efficiently** 154:2

**effort** 71:16 151:1 153:20 157:22 187:18

**efforts** 19:17 23:2 256:14 263:19

**egress** 27:9 151:10

**Eisenhower** 53:1,18 56:17 62:3 68:15,17 85:6 121:3 150:7

**electrical** 120:3 121:19 150:18 153:19

**element** 147:21

**eliminating** 256:19

**Elliot** 201:9 243:12

**elongate** 265:6,7

**emergency** 27:9

**employee** 24:1 191:8,19 198:6 212:14 222:16 224:19,20,21 225:20, 21

**employees** 18:17
**encourage** 100:18,21
**encouraging** 101:2 102:13
**end** 61:1 81:14 141:18 143:13,19 144:8 146:1 156:14,19,21 157:1,14 158:17 159:15,19 161:18,22 241:4,5 272:4
**endowment** 90:15 91:2,9 92:8,18 93:6 94:1,20,22 95:10,12 119:13 125:14 241:21 242:3,6,8,13 264:14
**endowment-funded** 91:16 95:19, 21 96:3,5
**enforce** 81:15
**enforcing** 81:20
**engaged** 21:19 112:1,6,11
**engagement** 61:16 62:7 108:5 164:17 165:11 169:9,22 170:18 173:6 190:3
**engaging** 185:13
**engineer** 152:7
**engineering** 110:17
**enjoined** 29:21 81:9
**entail** 15:21
**entails** 98:12
**entertained** 203:15,17
**entertaining** 204:8
**entertainment** 198:4 202:6,22 203:19,20 212:8 226:15
**entire** 150:11
**entirety** 12:10
**entities** 130:5 248:10
**entitled** 79:13,15 80:4,15,20 187:9 188:20 189:20 205:10
**entity** 60:4,8 71:15
**equities** 213:17 214:6 259:21
**establish** 151:10 159:18 180:6
**established** 47:6 61:8 154:22 155:3
**estimating** 227:12
**evaluate** 39:12 40:8 41:18 62:18 63:7,11 115:4
**evaluated** 63:12
**evaluating** 42:1
**events** 138:11 228:11 259:12
**eventually** 170:19
**everyone's** 237:4
**evolved** 44:12
**exact** 158:20 247:10 252:1
**EXAMINATION** 7:6
**examining** 29:3
**examples** 54:6
**Excel** 240:16
**exchange** 233:4
**excuse** 270:20
**execution** 72:11
**executive** 13:21 25:11,20 32:3 34:8, 12 137:11 147:9,15,19 162:17,20,21 164:9 174:3,8 194:15 195:14,20 196:5,12 198:18 209:15,22 223:11 226:8 273:10,14,17,22
**exercise** 127:9
**exhausted** 262:22
**exhibit** 70:7,8,11 86:8,9,10,13 109:1, 5,7,8,11 123:11,12,15,17,21 124:1,18 131:15 133:10 170:3 176:16,17,20 178:9 207:18,21 208:3 221:19 222:3 230:17,18,21 237:19,22 238:2,6 260:3,5,6,7,11
**exist** 184:18
**existing** 16:5 43:22 143:20 221:6
**exists** 33:9 65:2 80:13 189:14
**expectation** 31:6 69:5 103:16,17
**expectations** 236:16 258:18
**expected** 43:3
**Expedited** 207:22 208:5
**expeditious** 171:20
**expense** 94:4,6 130:5 181:18
**expenses** 124:4 132:20 133:6 134:21 238:16 241:11 264:1,6
**experience** 32:4 38:17,19 165:15,18 166:22 202:22 203:7,19 204:4,15 205:5,14,22 206:21 207:2,8,15 209:6, 14,19 211:1,13 212:4 221:22 226:16
**expert** 37:14 210:10,16,22
**expertise** 38:1,7,9,22 39:2,8,20 40:13 41:5 208:22 209:11 211:9,13 212:5
**experts** 23:13,15,20 36:20
**explain** 58:13 78:16 91:6 168:2
**explained** 169:14
**explaining** 168:13
**explanation** 111:7
**explicit** 118:17 248:5,7
**explicitly** 43:9 73:3,16
**explore** 214:17
**express** 102:14,17 168:18 169:8 269:16,19,20,21
**expressed** 270:2,6
**extent** 12:19 15:18 19:22 29:9 33:9 37:7 39:22 46:9 51:5 59:17 65:2 66:12 67:22 68:10,22 75:2 96:11 97:3 104:14 124:10 129:8 130:22 131:18 137:10 141:13,20 142:19 154:8 172:3 181:7 190:9,16 191:12,15,22 194:13 199:9,13,17 201:5,11 202:9 211:16 217:13,16,18 219:2 250:20 251:20 256:6,22 259:18 268:7 269:8
**exterior** 85:16 152:17
**extremely** 106:13 156:15

F

**face** 75:7
**facilities** 59:11 152:16
**fact** 65:19 106:11
**factor** 211:3 241:16
**factors** 42:10,12,15 57:8 107:3 138:20,22 144:2 159:12 241:20
**facts** 207:11
**factual** 205:11
**factually** 261:21 262:6
**failed** 236:8,9
**fair** 11:8,9 37:22 45:8,10 54:2,4 69:17 83:16,17 99:13,15 135:9 136:4,5 189:15 203:1,5 227:17 232:22 233:6 241:15 249:13 267:10
**fall** 150:4
**falling** 27:13
**falls** 190:19
**familiar** 71:6 226:15
**familiarity** 202:17,20

**Fantastic** 11:16

**fashion** 19:10

**faster** 175:3 182:17 184:15

**feasibility** 62:18,21 63:8,10,13 65:11 157:20 228:6,9,10

**feasible** 154:4,13

**February** 77:12 81:1

**feel** 194:16

**felt** 25:14 186:2

**figure** 55:3 83:14 151:12 239:10

**figures** 41:14,19 233:1 236:15

**filed** 216:4,12 260:20

**filing** 217:1 218:1,22 219:9 221:10

**fills** 213:1

**final** 171:11 173:13,16 178:17,18 179:13,20 180:2

**finalize** 102:18

**finalized** 102:6

**finance** 17:22 86:14,22 87:4 88:20 89:11 105:18 114:8 118:18 119:10 125:7 126:8 129:3,20 131:7 134:10 239:4 247:5 255:2,4 257:3 272:19

**finances** 122:15 130:16 136:4 214:4 237:16 268:10 269:17 270:6

**financial** 15:22 17:15 37:20 38:11 87:21 89:17 126:12,14 127:17 129:16,17 133:10,11,14 136:19 137:4,18,20 139:9 143:16,18 144:2, 19,21 165:14 173:10 232:21 236:2,3 261:12 262:21 263:6,7,15 265:13,21 266:4,11,13,18,22 267:9,21,22 268:2, 8

**financially** 228:9

**financials** 41:15 43:1 124:4,18 135:10,14 138:5 265:18 267:4 269:2, 10

**find** 66:9,14 200:7

**fine** 134:8 149:3

**finish** 9:5 28:6 148:9 188:11,14 254:11

**finished** 28:9

**finishes** 22:6

**finishing** 227:21

**Finn** 222:5,6,7

**firms** 110:18 165:2

**fiscal** 44:6 138:22 141:9,17,18 142:14 143:12,13 144:8 145:9,11 146:1,2 147:6 148:18 209:17 232:5 233:20 257:7,12,16 258:4 262:22 269:5,10 270:7

**fit** 97:7 158:2,5 159:4 185:4 256:14

**flip** 155:6 178:14

**floca** 7:2,8 10:19 11:17 35:22 70:8,10 82:13 86:10,12 109:8,11 111:18 113:11 120:22 123:12,16 149:6 176:20 192:1,8 196:21 207:21 208:3 209:8 230:21 231:1 237:12,22 251:13 260:11,14 273:6

**focus** 62:6 78:2 265:21

**focused** 66:6 90:10 99:9 265:18,20

**focusing** 76:7 78:12

**folks** 18:20 20:12,16 228:14

**follow** 216:16

**follow-up** 28:12

**footprint** 94:6

**for-profit** 206:6

**forecast** 133:5 238:19

**forensic** 110:17

**forever** 28:13 159:17

**forget** 163:18

**form** 31:3 34:12 139:13 140:7,22 147:13 162:6 220:16 262:14 266:2

**formal** 32:17,20 33:2 35:5

**formalized** 169:17

**format** 87:11,12 130:14 157:10 240:8

**forms** 62:6

**formula** 43:10

**Fortas** 95:16

**forward** 20:17 21:1 83:13 103:6,12 143:21 171:19 180:21 181:8 187:20 193:1 234:22

**found** 12:14

**foundation** 45:16,19 46:15,16 65:14 138:3 141:21 143:9 145:1,3 203:10 204:20 236:13 242:19,22 243:2,3,6, 13,15,16,22 244:2,9,12,17,21 245:1, 18,22 246:3,7,11,17 247:21 248:2 249:15 250:5,16,18,20 251:20 252:8, 20 253:5 262:8

**Foyer** 94:18 95:6

**frame** 134:9 146:18 154:21 155:3 157:4,13 158:21 159:13 162:8 165:9 171:17 175:3 186:13,18 188:6,21 193:2 235:13 247:10

**framework** 157:10 207:9,16

**framing** 64:3

**free** 194:16

**Freeny** 7:7,9 34:9,16,21 35:7,12,20, 21 47:8 64:22 76:18,21 77:9 79:3,19 80:9,14 81:11,19,21 82:4,11,12 104:15,18,20 105:4,8,12 109:3,10 147:11,16,22 148:4,8,14,22 149:5 162:19 163:2,5,12,16 164:2,11,14 186:22 188:10,13,16 189:15,18,22 190:17 191:2,4,10,14 192:5,6 195:16 196:7,13,19,20 204:22 213:10,16,21 214:2,8,16 215:1 237:3,11 251:2,7,12 260:6 272:21 273:5,12,18

**friction** 139:3 140:1,12,15,18 141:6

**front** 70:10 81:14 123:16 160:9 234:22 271:6

**full** 50:15 55:22 63:14,21 65:11 66:1 79:6,7 80:6 88:7,8 99:4 106:1 107:13 149:19 151:4,22 152:21 153:21 155:9 177:10 179:1 199:13,17 232:11 235:14

**function** 126:22

**functions** 252:11

**funded** 92:18 93:5 94:21 119:13

**funding** 95:9 242:10 265:5

**fundraise** 234:10

**fundraising** 43:3,7,10,15 206:13,15 229:3,13,16,19 230:8,11 233:1 236:7, 19

**funds** 242:3,14 245:1,4,6,11,14,15, 17 246:16 247:18,20 249:12 251:16 252:19 263:22 264:10

**future** 229:14 256:14 267:22 268:2

**FY25** 232:15

**FY26** 137:16

**FY27** 123:18 233:13 236:21 267:5

G

**gained** 211:2

**garage** 69:13,16,17 133:6

**gather** 22:9,21

**gathering** 269:14 270:3

**gave** 7:16 54:5 63:4,6 80:2 115:9 117:3 157:10 160:8 172:12 233:20 234:1 250:5 255:18

**general** 20:9 21:1 89:3,11,15 108:17 136:7 151:17 167:12 195:3 201:5,8 212:19 224:1 242:17 243:11 261:18 272:19

**gifts** 248:21 250:16

**give** 45:3,17 47:17 48:21 64:12 65:16,17 115:12 168:3 213:18 229:4 255:8 263:4

**give-and-take** 115:6

**giving** 180:15

**glad** 70:17

**glance** 261:1,3

**goals** 246:1

**good** 7:8 82:5 91:14 144:17,18 149:6 180:21 237:4,8

**govern** 31:8

**governance** 143:2,4 182:7

**government** 191:8,18 196:11

**Grand** 94:17 95:6

**Grant** 125:14

**grant-funded** 90:16 91:2,9,15,18 92:8 94:1,9,20 95:13

**granted** 266:2

**grants** 92:19 93:6 119:13

**great** 11:5 36:13 164:18 264:7

**greater** 180:21

**greatest** 97:2

**Grenell** 77:4,13 78:4 209:20 222:13

**ground** 7:18

**grounds** 147:9,13 162:17 195:14 253:19 259:17 273:10

**group** 18:22

**guess** 13:16 19:18 20:22 21:4 26:18 33:6 74:4 82:17 83:9 87:16 127:19 155:15 156:6 160:8 161:13 179:10 195:4 205:21 207:9,13 210:18 214:16 220:7 224:3 234:5 241:13 242:5 251:22 262:3 268:1,21

**guidance** 23:5,6,7,11,14 32:3 33:6 194:1,4,10

**guide** 23:2

## H

**Hall** 53:1,17 68:16,17 85:6,11,12 98:1,2,9,14,19 99:6,12,18 103:11 121:4,6 126:2 150:8

**halls** 54:10

**hand** 146:18 239:12

**handle** 150:11

**hang** 113:12

**happen** 120:4 121:22 153:6 172:17 184:8,9 216:5

**happened** 107:8 265:17

**happening** 120:9,10,12 133:2 139:4 182:6,7

**happy** 191:13 203:17 204:1,8

**harassing** 267:12

**hazards** 27:14

**head** 8:16 172:1 227:5

**hear** 36:11 78:8 146:10,11 156:21 161:3 193:18 218:2 269:20,21

**heard** 77:20 102:12 146:15 158:16 161:4 166:7 215:14 218:20 219:7,10,14

**hearing** 160:10 250:15

**held** 88:12 210:19 258:22

**helped** 133:18

**helpful** 116:12 172:18 174:2

**helping** 60:4,8 114:20

**high** 101:6 153:1,2 207:6 211:20

**high-level** 23:7 31:12 55:6 155:13

**Hill** 33:22

**hire** 23:12

**hired** 59:14 110:5 170:19

**historical** 40:10 41:2,7,8 99:5 122:14 132:20 133:9,14 139:1 223:5 224:13 229:14 236:15

**historically** 38:20 39:4 44:3 155:19,21 223:21

**historics** 122:19

**history** 152:8

**hold** 156:14 272:3

**holding** 157:2

**holistic** 58:8 114:14

**holistically** 17:10 49:6,8,12 141:3

**Hollywood** 205:17

**honestly** 44:2 45:20 47:15 59:17

**honored** 264:20

**host** 94:18

**hours** 258:5

**house** 53:1,17 56:18 62:4 85:6,11,14 116:10 121:3 158:15 163:9,17 164:6 273:19

**how's** 58:14

**HR** 257:3

## I

**idea** 94:9 120:8 182:11 186:8,14 188:21 239:18

**identification** 70:9 86:11 109:9 123:13 176:22 208:2 230:22 238:1 260:13

**identified** 55:18 85:1 114:18 131:16 160:1 165:6 166:16 209:10 211:8

**identifies** 227:22

**identify** 17:7 115:14 165:1,2,11 166:17 201:3 208:22

**identifying** 166:20

**ignoring** 113:4

**Ill** 173:20

**Ike** 85:11,12 158:15

**imminent** 142:4,14 266:22 268:2

**imminently** 141:17 145:14 146:8,17

**impact** 17:5,8,9 45:7 58:6 96:15 120:14 138:15,19 250:11

**impacted** 138:5,6 140:15

**impacts** 16:1,2 42:8 138:10 139:8

**implement** 90:21 91:1

**implementation** 21:22 76:7,10 78:12 90:10

**implementing** 45:5 90:19 236:17

**implicates** 190:9

**implications** 19:12 55:8

**implying** 203:18 204:12

**important** 8:12 96:16 172:9,16 185:2,12 263:16

**improvements** 45:6,7 119:21 120:9 152:18 153:7 221:5

**inability** 141:2

**inaccurate** 263:14

**inaction** 101:6

**inactive** 53:18

**include** 38:6,10 42:2 66:15 91:20 92:21 93:2 106:5,7 166:4

**included** 12:4 41:13 81:4 95:9 107:11,12 118:10 132:6 145:13 175:20 176:2,4,6 177:3 271:9

**includes** 31:5 38:14 40:10 41:2 60:12,15 166:4 174:3 206:9 209:19 236:20

**including** 232:1,20 233:10 263:18 269:22

**independent** 24:1 107:7 110:16 115:8 171:14 172:7 173:18 178:18 196:17

**independently** 62:17 152:3 171:16

**indicating** 109:22 249:11

**indication** 35:5 214:1

**individual** 187:10 188:20

**individuals** 228:4

**industry** 202:2,6 212:7,8 224:1 226:14

**infinite** 83:10

**inflows** 239:14,16

**influence** 161:20 215:18 244:18

**influenced** 26:12

**inform** 15:17,20 130:6

**informal** 195:1

**information** 12:14 17:11,14 19:19 20:7 21:5 22:8 25:8,10 26:9 41:11,13 45:1 48:3,6 64:17 66:15 89:17 104:4,5 105:16 107:11 115:10,11 127:22 128:19 144:12,14 151:16 164:1 171:14,16 191:19 192:1 201:12 217:14 219:3 224:4,5,17 233:5 236:14 238:4 263:18 270:3

**informed** 89:15 93:14 115:9 141:16 142:1,4

**infrastructure** 37:20 40:10 53:2,4 106:8 121:19 152:17 153:7 160:2

**initial** 168:22 183:6

**Initially** 192:22

**injunction** 12:5 14:3,4,5,7,8 30:13,14 31:7 149:12 193:11 247:13

**input** 31:13 64:12 79:14 102:5 105:17 126:15 172:8 194:10 195:12 263:10

**inputs** 105:15 232:21

**inquiry** 155:16

**inside** 53:21

**institute** 165:22

**institutions** 165:16

**instruct** 10:3 79:1 81:17 137:12 162:17 190:14 195:14 201:12 255:17 259:17 273:11

**instructed** 36:8 163:17

**instructing** 34:16 163:2 196:15

**instruction** 36:1,10 163:14 197:3

**instructs** 9:16

**intended** 254:11

**intent** 32:5 263:8,9

**interactions** 182:4

**interconnected** 106:13

**interest** 136:8 168:19 187:22 252:5

**interested** 28:14 169:15

**interior** 85:16 152:17 160:3

**internal** 56:13 59:10 159:9 212:22

**internally** 229:22

**interrogatories** 221:20 225:18

**interrogatory** 208:12,17 227:21

**intervening** 211:2

**interview** 160:9,12 161:4,12

**intimately** 134:3 135:4,13

**introduced** 200:15

**introductory** 168:12

**invalid** 105:4

**invest** 161:17

**invite** 165:2

**invited** 195:5

**invocation** 163:11 164:4

**invoke** 273:22

**invoking** 34:21 147:22 148:4,10 164:9 195:17,20 196:4,12

**involved** 18:4 134:3 135:5,13 136:7 160:22 206:14 212:21 241:7

**involvement** 32:22

**involving** 185:10

**irrelevant** 206:2,3 215:22 267:16 268:2

**issue** 36:16 81:6 145:21 146:19 150:16 157:18 265:18,19 269:1

**issued** 12:4 13:9 270:11

**issues** 145:18,20 228:16 266:22 270:14,15,16

**item** 91:2,3,10,11,20 92:2

**items** 85:20 130:15 268:16

### J

**JANKOWSKI** 12:18 13:5 14:14,19 15:14 17:1 18:7 19:21 20:19 21:12 22:5,17 24:16 25:3,16 26:4,13 27:1 28:5 29:8 31:2,18 32:11,19 33:8,16 34:7,14,19 35:3,5,10,18 37:5,16 39:9,21 40:14 41:6 42:5,21 43:5,17 45:15 46:8 47:5,9,21 50:3,10 51:4,12,17 52:12 57:2 59:16 60:19 61:21 62:20 63:9,15 64:1 65:13 66:11 67:21 68:9,21 75:1,10,21 76:15,20 78:14,20 79:16 80:7,10 81:6,15 82:7,9 83:21 84:9 86:8 96:10 100:20 101:13 104:13,16,19 105:3,10 107:16 108:6 109:2 112:15,20 113:9,12 118:21 120:16 122:11 123:1,11 124:9,22 126:19 127:6 128:4,21 129:7 130:2,21 131:17 132:1,17 133:16 136:13,20 137:8 138:2,16 139:12,16 140:7,21 141:13,19 142:7,19 144:10,22 147:8,15,19 148:2,6,12 149:3 154:7 162:6,16,21 163:4,8,21 164:7 169:10 171:12 172:2 173:19 175:1,13 176:14 177:12 178:2,7,13 179:15 181:6,14 182:14 183:15 186:16,20 187:4,13 188:8,12,15 189:4,11,16 190:7,21 191:12,15 192:11 194:12 195:13,19 196:3,10,18 199:8,16 200:3,9 201:10,21 202:8 203:2,9 204:17,20 205:7,16 206:22 207:19 210:2,7,12 211:15 212:13 213:5,14,18,22 214:3,13,21 215:4 216:8,20 217:6,13 219:1 220:1,

15 221:14 222:2 225:11 226:1 229:10 230:19 232:9 236:12 237:8,20 244:7 245:10 248:17 250:19 251:9,19 253:10,20 254:10 255:10,15 256:5,21 257:9,17,19 258:12 259:16 260:3,7,9 262:7 263:1,3 265:3 266:19 267:11 268:6 269:7 273:3,9,15,20

**January** 143:19

**Jeffrey** 222:5,6,7

**jerk** 250:3

**JLL** 21:20 22:13,15 37:2,9 55:7 59:8, 13,14,22 60:7,11,17 61:7,18 62:17 63:12 64:12,20 66:2,10 67:19 68:12 69:8,18 79:5,8 114:4 131:8 151:12 152:16,20 154:14,19 184:3 271:10

**JLL's** 61:16 62:7 65:10 66:3 157:9

**job** 26:8 67:5 128:10 210:8 225:15 227:1

**jog** 197:14

**John** 252:15

**judge** 13:7 30:12 104:9

**Judge's** 104:17

**judgment** 205:11

**July** 73:2 236:10 239:7

**jump** 193:17

**June** 65:6 157:11 193:8

**Justice** 164:4,8 216:12 217:1 218:17 220:8 221:10 250:14 251:14 273:21

**justification** 78:21 259:19

**juxtaposed** 106:15

## K

**KC-BEATTY** 70:20

**KC-BEATTY0200-262** 109:8

**KC-BEATTY0307-349** 230:22

**KC-BEATTY0827-829** 70:9

**KC-BEATTY1089-1096** 86:11

**keeping** 27:11

**Kennedy** 11:19 13:21 29:16 31:17 32:18 33:15 38:4 77:5 86:13 99:14 110:21 122:1 132:7 181:18 184:3 187:20 188:1 198:2 201:8 203:15 209:2,16 210:9 211:3 212:11 215:7, 10 217:3,12 218:20 219:11,17 221:6, 11 222:8,16 223:3,7,8 224:2 226:3, 13,16,18 227:13 228:14,19 243:1,5,7, 11 244:16 245:13,15 248:11,13 252:7,16 253:4 254:21 255:6 257:8, 11,16 263:13,15

**Kevin** 225:19

**Khaled** 167:3,5,6

**kids** 251:6

**kind** 16:20 23:6 37:14,17 172:7 173:9 192:1 216:4 227:20

**knew** 144:12 171:13

**knowing** 139:3 202:15,16 218:17

**knowledge** 136:3 223:6

**knowledgeable** 136:8

**Kyle** 7:9 28:5 113:9 147:20 188:15

## L

**lack** 137:15 138:2 139:6 140:10

**lacks** 45:15 65:13 141:20 203:10 204:20

**laid** 157:11

**lame** 36:12

**language** 48:11

**large** 18:13 27:7 116:3,5 135:16 139:7 150:17 158:11 165:16 217:3, 11,22 218:19 219:13,18,21 220:10

**larger** 15:18,20 146:20 240:16

**largest** 17:9

**late** 11:19

**lawsuit** 7:10,21 12:1,3

**lawyer** 30:17 36:6,12

**lay** 45:19 46:14,16 143:9

**lead** 129:21,22 133:18

**leader** 77:7

**leadership** 76:5,13 77:8 78:1 174:10 222:12,14

**learning** 150:21

**leave** 223:8

**leaving** 160:20

**led** 22:15

**left** 238:3

**left-hand** 90:12

**legal** 30:15 210:12 216:4 218:1 219:9

**legally** 7:3

**legs** 11:4

**length** 152:16 155:18

**lengthy** 270:8

**lens** 115:8 183:22

**lets** 9:9

**letter** 64:19,20 65:2,5,9,17 66:9,14, 19 67:1,7,15 68:3,6 270:11

**letting** 27:13

**level** 17:11,12 18:10 32:3 152:15 153:1,2

**levels** 56:14

**leverage** 212:9

**levers** 263:12,21

**library** 97:4

**life** 207:4

**lift** 30:13

**lifts** 31:7

**light** 20:4

**limitation** 81:16 213:9 255:13

**lines** 150:6

**link** 138:9

**list** 252:22

**listed** 174:17 209:8 221:21 225:17 229:1 241:14,22 260:14

**lists** 228:5 242:18

**literal** 218:21

**litigating** 81:14

**litigation** 88:2,3 110:1 241:22 260:20

**Live** 213:4,10 214:9,10 215:3,6,10,16 219:22 220:3,13 221:7

**lived** 146:19

**lives** 118:14 119:19

**location** 95:1,5

**locations** 27:18

**long** 11:2 28:11 57:9,11 60:13 95:8 151:7 152:8 153:16 157:21 171:1 226:10 227:12 270:8

**long-standing** 130:16

**longer** 74:5 150:18 155:8

**looked** 56:7 150:3 155:12 179:6 231:21

**Los** 212:17

**lot** 12:12,14 13:13,15 53:2 62:5 73:19 155:18 178:13 258:17

**Loughery** 78:7,9,10

**love** 249:1

**lowest** 94:4,6 99:2

**lunch** 146:22 147:3 149:1

**Lutnick** 22:20 23:1 31:11 32:9,15,17 36:15 147:6 148:18 160:8,16 161:2,10,14 190:2,6,22 191:6,16 192:9,16 194:1,9,10,19 195:7,12 197:1

**Lutnick's** 31:14 161:12

**LYNCH** 35:1,4 105:1,6 215:8 237:6

**M**

**made** 26:20 74:9,21 99:20,22 107:13 108:14 132:11 133:14 136:18 145:8 160:9 177:7,8 178:5 179:11 181:4 247:7 250:17 271:3 272:9

**main** 15:17 22:3 24:6,15 27:12 29:15 30:4,8,22 50:1 52:20 53:11 55:22 61:9,13 62:14 63:14,21 65:12 69:6,10,16,19,21 70:1 72:18 85:3,16 88:9 94:14 95:14,16,18 96:3 98:13 99:9 106:18 116:1,3,5,8 119:13 125:19 126:11 149:19 151:22 152:21 156:2 177:11 228:7 263:9

**maintain** 212:18

**maintained** 69:6

**major** 140:18 203:7,16 204:1,15 205:5,14,18

**make** 7:16 19:17 21:4 22:6 26:8 28:3,6,7,15 34:11 43:14 50:22 52:6 60:4,8 73:11 78:14 82:10 115:4 118:7 121:12 123:9 124:16 128:15,19 130:17 132:14,22 133:9 139:4 140:13 144:8,16,20 145:14,22 146:9,16 148:9 159:21 163:10,18 183:12 185:15,19 188:16 196:13 199:11 204:1 213:6 221:6 224:3 225:14 252:9 266:14

**makes** 86:4 89:12 132:12 159:18 162:2

**making** 8:19 16:10 23:10,22 24:4,5,9 41:11 71:16,17 101:8 105:15 107:3 122:10 137:2,9 204:8

**manage** 257:2

**manageable** 171:18 172:5

**management** 18:1 38:16 41:4 62:9 89:18 102:10 110:18 149:18 151:14 154:16 155:20 165:19 209:1,5,12 210:11,22 211:10 212:5 228:1,15 263:11,20

**manager** 171:4 183:21 184:6 256:10

**managers** 19:13

**managing** 204:4

**mandates** 87:19

**manner** 58:7,8 64:14

**March** 12:16 15:6 29:19 81:7 128:8 143:20 210:19

**marginal** 235:20

**Marjorie** 189:6

**mark** 70:7 123:14 175:5 237:19 260:10

**marked** 70:9 86:9,11 109:9,12 123:12,17 170:3 176:12,17,22 207:18 208:1 230:17,22 238:1 260:2,12

**market** 165:4,5

**match** 72:16

**material** 18:5,8 22:21 272:2

**materials** 23:2 260:20 270:21 271:3,14,15

**Matt** 28:6 113:13 209:8 233:13 254:14 255:16

**matter** 149:13 193:13 209:2 231:4 265:2

**matters** 80:22 214:3,4 226:13 228:13

**MATTHEW** 7:2

**Meade** 78:5

**meaning** 8:8 31:15 146:8 180:9 200:17 254:2

**meaningful** 158:10

**means** 14:12,18 24:5 43:10 44:16,20 45:4 52:2 68:19 85:10 91:6 98:14 111:12 121:18 133:19 135:16 139:6 141:4 151:18 154:4 242:20 249:22 254:9

**meant** 8:20 36:5 115:14 135:21 244:22 263:17

**mechanical** 153:19 160:3

**mechanics** 78:21 206:17 259:19

**meet** 41:20 122:1 141:4 159:8 184:3 195:6 245:13,16

**meeting** 29:2 76:3 77:11,14,18,22 78:2 81:7 86:10,14 87:1 88:4,6,8,10,11,12,13,17,18,22 89:2,6,8,9,10,12 103:15,20 107:6,7 118:18 119:11 134:11 136:2 142:6,13,15,18 143:11,17 144:9 146:12,13,14 175:15 177:2 191:3,6 194:8 195:11 197:2 210:19 229:7,11,12 258:22 259:4 260:11,15,21 262:1 268:11 270:19 271:1,7,9 272:18

**meetings** 19:9 64:18 77:15 78:22 80:8,12 88:15 102:8 142:2 143:6 214:5,6 224:6 259:20

**member** 255:2

**members** 105:18,19 243:16,18,19 260:21 266:2

**memo** 71:11

**memorandum** 70:8,11

**memorial** 92:1 106:17 107:2 252:16

**memorialized** 255:22

**memory** 197:14

**mentioned** 8:11 21:5 23:17,19 25:21 37:11 42:15 44:8 55:5 59:13 92:22 125:4 164:19 166:15 197:6,12 211:11 263:21

**message** 74:12,14,15,18 76:2

**met** 27:6 76:14 190:2 200:5 216:13 220:9 221:12

**method** 25:13 26:1,22

**methods** 151:18

**metrics** 42:1

**Mid-may** 193:3

**middle** 91:3 170:10 208:15

**milestones** 170:11,13,22

**Millennial** 92:16 94:21

**Millennium** 91:14,15 94:13,17,18 95:6,14 122:7

**million** 45:14 46:1,18,22 47:3,10 48:14,18 49:4,14 50:9,16,19 51:2,10 72:6 73:7 90:19 124:8,21 129:12 155:10 241:22 246:12,16 254:2

**mind** 48:13 116:19 184:18 257:21

258:2
**Mischaracterization** 26:14
**mischaracterizes** 19:22 25:17
**mishear** 191:1
**missing** 203:14
**mission** 27:11 41:20 42:8,9,17 92:3 94:5 96:14 99:2 106:16 122:1 140:2 141:4 184:9 204:7 234:17 243:22 244:1 245:14,16
**missions** 206:9 243:8 244:1,14
**misstates** 29:9 33:9 39:10,22 41:7 46:9 47:6 50:4 51:5 59:17 66:12 68:10,22 75:2 96:11 104:16 119:1 124:10 127:7 128:5,22 129:8 130:22 131:18 132:2 138:17 139:13 140:22 141:14,20 142:8 154:8 162:7 172:3 181:7 182:15 183:16 200:4,10 202:9 205:8 211:16 216:9 217:7 219:2 220:16 221:15 236:13 250:20 251:20 256:22 258:13 268:7
**Mm-hmm** 48:5 51:20 59:6 63:5 64:5 72:1 73:21 85:19 90:3,14 91:12 97:9 103:7,9 106:10 110:14 113:17 115:22 116:7 118:13 121:17 122:17 132:4 135:2 142:11 156:18 162:10 166:19 203:13 218:12 242:9 247:15 250:8 261:6 264:13
**moderately** 94:4
**money** 46:6,11 48:10 49:9 51:19 52:1,3 146:9,16 229:4 234:7 235:11, 15,22 242:22 245:20 248:1 250:9 253:3 254:17,19,20 264:3,5
**month** 88:12 134:14 227:16
**monthly** 88:11
**months** 72:15 73:4,7,15 134:4 135:14 139:17 151:5 155:5 202:19 211:2 227:19
**Moore** 152:6,7
**morning** 7:8
**move** 20:17 83:13 103:6,11 149:17 164:16 171:19,22 181:12 182:9,11,17 183:19 187:20 192:22 211:7 265:10
**moved** 181:8 183:3
**moving** 21:1 180:20 265:5
**multiple** 13:19 16:16 28:20 29:20 77:15 85:10 87:15 91:1 108:1 111:15 112:13,18 113:15,18 144:1 246:21,22 256:13
**music** 97:3 101:5
**musicians** 97:7 98:5 101:7
**mutual** 246:1

## N

**named** 167:3
**names** 165:7
**naming** 138:12
**Nation** 213:4,11 214:10 215:3,11,17 219:22 220:3,13 221:8
**Nation's** 215:6
**National** 91:21
**nature** 169:9 209:5
**necessarily** 174:12 184:7 190:9 248:7
**needed** 108:11 114:2 171:13 251:17
**needing** 73:7 74:7
**negative** 141:6
**Nick** 78:5
**nodding** 8:16
**nods** 172:1
**nongovernment** 191:18
**nonprofit** 205:22 206:5 212:2 227:6, 10 243:9
**normal** 126:22 127:11,18 128:7,11, 13,15 134:5 135:3 143:2,4
**note** 8:12 76:15 233:12
**noted** 104:10 189:15 265:12
**notwithstanding** 196:16
**NSO** 90:16 91:22 92:21 96:20 97:5,7, 13,16 98:7,11,14,18 99:9,13,17 100:9,16,18 101:4,12,16 118:5 121:7 122:5 126:1 130:6 134:22
**nuances** 55:9
**number** 12:12 71:22 90:1 109:21 110:9 170:8 175:19 231:3,11 232:10 233:14,21 234:4 242:7 246:10 257:1
**numbered** 89:22
**numbers** 41:20 70:20 71:2,6,8 86:17 132:16,18,19 134:18 230:10 234:19 261:5

## O

**oath** 7:4 8:2,4 82:14 149:8 237:13
**object** 12:18 137:9 141:13 142:19 259:16 273:9
**objected** 46:14
**objection** 9:14,16 10:2 14:14,19 15:14 17:1 18:7 19:21 20:19 21:12 24:16 25:3,16 26:4,13 27:1 29:8 31:2, 18 32:11,19 33:8 34:7 37:5,16 39:9, 21 40:14 41:6 42:5,21 43:5,17 45:15 46:8 47:5 50:3 51:4,12 52:12 57:2 59:16 60:19 61:21 62:20 63:9,15 65:13 66:11 67:21 68:9,21 75:1,10,21 76:17 78:15 83:21 84:9 96:10 100:20 101:13 104:13 105:1 107:16 108:6 112:15,20 118:21 120:16 122:11 123:1 124:9,22 126:19 127:6 128:4, 21 129:7 130:2,21 131:17 132:1,17 133:16 136:13,20 137:9 138:2,16 139:12 140:7 141:19 142:7 144:10,22 147:8 154:7 162:6,16 169:10 171:12 172:2 173:19 175:1,13 177:12 181:6, 14 182:14 183:15 186:16,20 187:4,13 188:9,17 189:5 190:8 191:11,22 192:4,11 194:13 195:13 199:8,16 200:3,9 201:10,21 202:8 203:2,9 204:17 205:7 206:22 210:2,7,12 211:15 212:13 213:5,7 215:4,8 216:8, 20 217:6 219:1 220:1,15 221:14 225:11 226:1 229:10 236:12 244:7 245:10 248:17 250:19 251:19 253:10, 20 255:11 256:5,21 257:9,17,19 258:12 262:7 263:1 265:3 266:19 267:11 268:6 269:7
**objections** 9:15,21 10:7 34:20 50:10 140:21 205:16 207:21 208:4
**obligation** 8:8
**obligations** 265:1
**occupied** 64:14 66:17 67:10,11
**occur** 69:19
**occurred** 145:3 180:18 202:2
**occurring** 69:10 233:4
**occurs** 89:5
**off-site** 90:16 94:11,12 96:21 99:20 100:4,6,13,15,19 102:7,14,19 103:8, 12 118:6 228:11
**offense** 8:21
**offered** 194:1

**offering** 194:4

**office** 152:16 166:5 167:12 171:5 212:16,18,19 272:20

**officer** 71:13

**officers** 243:16,18,19

**offices** 97:3

**official** 70:12,18 71:12,15

**offline** 115:19,21 116:1,4,6,9 121:20

**OMB** 48:6

**on-site** 90:17,21 91:22 98:11 126:1

**Onboard** 271:4,17

**onboarded** 184:2

**one-and-a-half-year** 158:7

**one-way** 115:13

**one-year** 152:21 159:5

**ongoing** 158:4 159:3 241:20

**online** 116:4,6 166:21 167:1 202:21

**open** 19:10 27:20 54:7,11 69:11,20, 22 70:2 74:7 114:2 121:4,6 150:8 233:16 234:7,11 235:6,11

**opera** 40:4 53:1,17 56:18 62:4 85:6, 11 116:10 121:3 158:15

**operate** 220:5

**operating** 92:6 264:6,10

**operation** 146:21

**operational** 38:16 68:16,17 111:9 112:7 119:17 219:10

**operations** 19:13 38:4 39:13 40:9 62:11 68:5 107:19 129:10,11 162:9 194:3 195:2 211:3

**opinion** 12:13,16 13:6,7,17,20 14:4 15:9 17:5 24:19 25:2,21 104:17 154:6 203:4

**opinions** 23:1,17,18 25:10

**opportunity** 163:20

**opposed** 80:1

**option** 26:12 49:11,13 50:1,18 51:8, 14 54:9,20 75:18 80:5 81:5 82:21 84:3 94:3 99:7 119:12 188:5 264:7

**options** 16:4,13,15,18 17:15,16 43:3 44:11 45:9,11 49:2,19 50:7,14 52:7 55:15 83:5,15,18 90:8 114:20,21 115:2,3 121:12 124:7,20 176:3,5 179:4 263:10

**oral** 106:4 107:13 175:2 195:1

**orange** 249:9

**orchestra** 91:21 97:1 99:11,17

**order** 51:3 57:18 81:16 127:21 169:22 205:1

**organization** 171:15 243:9 257:3 263:19

**organizations** 165:16 244:13 248:11

**orient** 153:8 170:1 191:5

**orientation** 110:10

**oriented** 231:18

**orienting** 37:1

**original** 117:3,5 130:8 180:12

**originally** 112:6 117:10 130:11 181:5 199:19

**originated** 131:21

**out-of-cash** 240:19

**outdoor** 217:4,11,22 218:19 219:13, 18,21

**outflow** 238:19,21

**outflows** 239:13,16

**outline** 183:8

**outlined** 48:6 58:4 181:22 236:19 259:10,11

**outlook** 126:14 146:4

**outset** 185:14

**over-delete** 75:13

**overlaid** 165:21

**overlaps** 160:3

**override** 75:9,11

**oversaw** 210:3

**overseeing** 211:2

**Overview** 110:21

**owners** 133:12

P

**p.m.** 149:4 237:10 251:11 273:4

**package** 165:8 271:2

**packet** 166:3,8 260:20 271:7,9

**pages** 89:22 178:13

**painting** 139:19

**panels** 150:21 151:1

**Paragraph** 208:21

**parameters** 62:12 63:20

**parking** 19:12 69:13,15,17 133:6

**part** 22:12 27:18 39:14,19 42:8,9 46:15 63:2 70:1 74:11 89:13 100:14 106:21 108:4 118:14 119:4,7 127:17 131:2,7 161:4,11 162:4 214:9 224:8 229:14 236:9 264:10 270:13,17

**partial** 149:20

**partially** 150:13

**participate** 22:20 165:2

**participated** 20:13,16,20 21:10

**participation** 21:13

**partitions** 242:8

**partner** 67:4 95:7

**parts** 27:8 53:10,11,13 57:1

**past** 41:15 153:3,10 158:18 202:3 205:3

**path** 143:21 234:21

**paths** 114:22

**patron** 139:2 140:1,12,15,18 141:6

**patrons** 27:13,20 98:15 248:22 249:4

**pause** 72:4

**pay** 142:5 264:1,3,6

**paying** 264:4

**payroll** 142:5 144:8,16 145:15,19 146:1,9,17 265:1

**pen** 130:10

**penalty** 208:12

**pending** 11:6 241:22 249:17 250:4, 11 252:21 253:6,13,14,16 254:1,16 255:1

**people** 12:22 18:3,11,14,16,19,22 19:18 21:9 139:3 181:19 185:10 202:16 203:14 204:1,8 212:9 218:2,9 219:8 228:18 234:16

**perform** 42:18 43:4 97:5,14 99:11,17 101:20 102:18 110:5 112:1,7 183:14 185:15

**Performance** 170:11

**performances** 41:14 98:16,18 119:12 210:6,9

**performed** 113:22

**performing** 40:12 98:14 99:9 103:10 126:1 165:18,22 203:7 204:15 205:6, 15,18 206:1,5,6 209:1,5,11 210:11,22 211:10 212:5 222:1 227:3,10 228:1, 15 243:2,6 252:7,11,16

**perimeter** 53:20 54:7 58:17

**period** 30:5 61:10,14 72:17 74:10 76:10 80:18 81:5 92:12,15 145:17 150:7,9,13 154:1 155:4 156:12 157:7 158:7 159:5 170:11 187:16 226:7 230:4 247:7

**periods** 246:21

**perjury** 208:12

**permitted** 261:19 262:10

**person** 171:14 187:16 208:22 209:7, 11 211:9 221:22

**person's** 140:11 209:5

**personal** 207:3 212:1 251:5

**perspective** 22:8 41:9 42:22 49:3 51:9,13 59:1 67:15,19 94:7 104:11 118:20 138:14 151:4,15 179:11 182:7 224:18 225:8,9,15 246:8 263:11 267:17,19 268:1,21

**perspectives** 225:14

**pertinent** 210:15

**phase** 53:9,14 106:14 151:10,13 173:20

**phased** 42:3,20 50:8 54:2,6,18 55:2 56:4 57:1,19 58:7,11,14,20,22 61:20 62:18 63:8,13 65:11 66:2 67:11 68:12,20 69:1 82:20 121:1 149:21 152:11,22 154:5 229:17

**phases** 16:16 55:9,12

**phasing** 49:17 56:13 57:12,17 111:9 112:8 119:21 120:1 150:5

**phone** 168:22 197:13

**phrase** 265:21

**physical** 15:22 17:16 38:5 39:16 45:6 107:20 121:15 181:19

**pick** 84:7,12

**picture** 139:20

**pieces** 180:11

**place** 30:13,14 76:5,14 94:10 96:2 153:9 219:12 246:20 268:12

**Plaintiff's** 207:22 208:5

**plan** 48:1,4,16 49:16 56:9 58:1,2,14 61:12,13 66:5,6 95:9 100:18 101:21 103:8 120:1 154:22 218:16 234:14 236:7,19 246:6

**planned** 45:13,16 52:3 73:1

**planning** 61:9 68:8,10 88:21 89:9 100:3,6,12,15,17 101:19,22 126:12, 14 127:1,4 129:16,17 133:12 137:18 201:4 226:6,21 272:18

**plans** 19:20 20:4,7 36:16 46:19 47:18 103:12 139:5

**planted** 242:11

**play** 88:20 89:2,8 117:1 133:13 184:5

**played** 89:1

**playing** 97:1

**plumbing** 153:19

**point** 10:19 26:17 31:15 35:1,7 37:1 41:18 76:17 86:3 99:19 103:14 112:16 113:14 114:19 140:10,13 141:5 145:7 158:8,21 167:2 168:19 172:11 174:14 179:16 190:1 216:3 226:14 242:10 252:4 255:16 273:8

**pointers** 7:16

**pointing** 184:12 234:13 242:3,21

**points** 258:18

**portion** 62:3 116:3 163:1

**portions** 116:5

**posited** 152:10 217:1

**position** 32:18,22 136:12 137:20 139:9 143:16,18 144:3,15,19 145:9, 11 147:6 148:18 189:19 190:18,19 209:22 226:22 227:2 256:19 261:12 262:21 263:7,16 268:9 273:8

**possibilities** 16:7

**possibility** 54:12 83:10 93:21 152:19,21 155:8 217:11 218:5 219:11

**post** 75:13,15 77:22

**pot** 242:22

**potential** 165:11 176:3,4 214:10 266:12 267:20

**potentially** 168:14

**Powerpoint** 176:18,20

**PR** 87:7

**practice** 20:10 97:16

**practicing** 98:8

**precedes** 81:7

**precise** 112:14

**predetermined** 16:8,11

**predicated** 79:7

**preexisting** 201:15

**prefer** 99:11,17

**preferably** 154:5

**preference** 127:10 159:14

**preferences** 159:16 160:6 161:7 162:5

**preferred** 50:1

**preliminarily** 29:22 81:9 151:14

**preliminary** 12:4 14:5,6,8 102:15 149:12 174:21 190:6,8 193:11 247:13

**preparation** 132:16,18

**prepare** 68:12,19 69:9,18 133:21 180:10

**prepared** 61:1 87:3 93:10 126:7 127:20 128:3,17 129:15 131:15 170:21 189:3 239:1,9 261:16

**prepares** 43:16,18 175:11

**preparing** 60:17,20 93:9 117:1 129:21 130:1 171:10 272:1

**presence** 92:1 196:16

**present** 18:5 21:11 22:9,22 23:18 26:9 52:18 54:19 84:15 93:17,22 106:22 107:4,10 128:18 129:2 132:12 171:14,15,21 173:17 183:4 191:3 194:9 228:8

**presentation** 86:22 87:9,18 100:2,4, 7 106:4 107:8,12 125:8 131:6 132:3 133:15 173:18 174:4,9 176:20 177:9, 16 178:16 179:3,4,7,11,22 181:4 183:6 185:15,19 194:11,18 225:14 271:10 272:5,10

**presentations** 165:8

**presented** 26:12 41:11 51:16,21 52:15 65:9,15 87:14 89:18 104:6,10 105:21 106:1 107:21 111:12 114:8 118:5,9 119:10 122:21 127:22 131:12 151:15 192:2

**presenter** 227:3,4

**presenting** 29:1 36:16 83:5 84:13 93:19 133:10 228:6,9,11

**preserve** 10:8

**president** 34:22 35:9,15 75:16 77:5, 12 79:12,20 80:2,16,21 137:12 139:10 148:1,11 155:4 160:17,19 161:2,9,10,17 162:14 163:5 190:11, 12,20,22 192:2,18 194:5,14,15 196:8 201:3 212:10 226:5,19,20 253:9 254:4 259:15

**President's** 78:13 159:14,16 160:6 161:7 162:5,12 190:14 191:17 192:3 263:19

**presidential** 34:14,18 35:15 147:17, 20 162:22 164:4 191:20 195:18,21 196:6 273:13,16

**press** 161:12

**pretty** 17:17 19:10 43:11 53:7 103:2 117:13 127:4 138:6 188:22 189:12 214:1 272:7

**previous** 270:11

**previously** 24:14 45:13,16 72:6 125:4 257:7

**primarily** 93:8 96:9,13

**primary** 72:2,10

**prior** 29:3,9 59:14 88:17 124:10 130:22 131:18 140:22 141:14,20 142:8 166:21 200:4,10 202:15,16 203:6 204:15 205:5,8,13 229:6 258:13 259:8 260:21 268:7

**priorities** 127:14 143:3

**prioritizing** 143:1 266:8,9

**privilege** 12:19 34:8,12,18,22 35:14, 16 137:10,11 147:9,14,15,17,18,20 148:1,10 162:17,20,22 163:7,11 164:5,10 191:20 194:15 195:14,17, 18,19,20 196:4,5,12,15 201:12 256:6 273:10,13,14,17,22

**privileged** 163:22 217:14 219:3

**probe** 79:22 80:4 192:7

**problem** 193:17,18 207:14

**procedure** 164:9

**procedures** 273:21

**proceed** 11:14 128:20 151:21 268:3

**proceeding** 60:1

**process** 21:10 24:2 32:6 48:7,13 78:17 89:14 100:8 101:22 102:3,6,9, 10,11,15 103:13 127:11,18 128:13 130:7 131:2 133:11,18,20 134:5 135:3,5,7,9,13 137:16,17,19 141:3 164:20 165:3 172:10 180:20 183:3 196:11 214:4 237:1 259:19 270:2 272:14,15,16

**processes** 32:2 236:15

**procure** 155:21

**procurement** 71:16 165:9

**produce** 101:5 126:18

**produced** 71:3 86:18 109:22 231:4,7 240:12

**product** 43:7,15 185:3

**production** 122:8 210:3

**productions** 204:5

**Products** 109:13

**professional** 208:22 209:6,11 211:9,13,22 221:22

**program** 40:3,7 91:16,18 92:17 94:15 95:2,21 101:6 110:17 125:17 158:9 176:21 178:19

**programmatic** 15:22 27:15 38:17, 18,22 39:2,8,20 42:20 92:9 117:18 118:4 119:9 122:10,12,21

**programmatically** 121:12

**programmer** 122:16

**programming** 18:1 19:14 39:14 40:5,6,11 41:2,7,8,14 42:4,9 87:6,20 90:2,10 91:22 92:11 93:17,22 95:3,13 96:2,4 99:5 104:11 105:14,16 106:17 107:1 118:12 119:19,22 120:4 121:22 122:3,7,15 125:9,11 173:12 197:12 198:4 201:5 210:1,4 215:19 222:7 223:6,17,19 225:9 228:6,8,10,11,20 234:15 235:14 236:11 259:12

**programs** 91:13 126:15 130:14 133:4,12 242:11

**progress** 181:17

**project** 18:1 22:15 28:1 62:9,12 63:20 66:5 68:5 72:3,5,11 73:6,14 102:10 151:14 152:15 154:16 155:20 161:17 171:4 183:21 184:6

**projected** 44:1,5 79:7 230:10 233:20 241:9

**projection** 265:4

**projections** 134:17 232:22 236:2,3

**projects** 62:10 63:6 66:7 68:7 154:19 157:12 159:9

**prompt** 8:21

**prompted** 136:6

**prophylactic** 163:19

**proposal** 110:12 111:20 112:9 167:15 168:1,6 169:20 185:17

**proposals** 110:16 169:16

**proposed** 47:11,12 186:19 187:2,11 188:5,20 259:4 262:4

**pros** 24:12 56:20,21 57:7,18 58:1,8,9 177:16

**prospect** 142:14 149:19 152:19 218:18

**protected** 163:8 191:19

**protective** 35:2,10 148:2,7,13 164:1

**provide** 21:5 23:11,14,18 25:9 32:3 33:6 37:19 39:7,19 68:15 102:5 107:18 128:7,11 174:21 180:16 182:20 186:13 189:13 194:10 224:17 225:7,9 228:5 233:5

**provided** 23:1,5,17 31:12 66:19,21 67:1 128:8 175:19 177:1 179:1 199:22 224:4 252:12

**providing** 105:15 199:22 224:17

**proximity** 141:9

**prudent** 103:11

**public** 27:20 69:6 85:14 139:7

**pull** 176:9

**pulled** 263:12

**pulling** 203:12

**purporting** 190:12 194:14

**purpose** 10:7 48:11 87:17,18 110:21 190:10 203:16,22 239:8 245:8 264:19,20

**purposes** 130:19 203:16 204:1

**pursuant** 196:11 273:20

**push** 127:2

**put** 13:15 79:5,14 80:5 105:1 132:3 169:6 181:21 183:20 207:9 217:17 253:8 255:20 264:3

**putting** 85:2 264:5

Q

**Q3** 156:19 157:2 158:17
**Q3-q4** 162:1
**Q4** 157:2 158:18
**qualifications** 165:12
**qualified** 110:16
**quantitative** 42:19,22
**quantities** 41:14
**quantity** 38:20
**quarterly** 44:4
**question** 8:14,15 9:5,6,17 10:3,4 11:6,7 14:16 25:19 28:12 34:17 36:1, 5 40:22 41:3 51:1,17 52:6 70:6 76:19 77:1 82:1 107:9 124:12 138:8 139:21, 22 145:4 148:16 154:10 163:14 164:12 187:8 188:17 189:3,8,19 191:1 193:13 196:22 204:13 205:1, 10,11 208:21 211:4,17 214:19,22 220:7 225:18 228:3,21 234:5 236:6 244:15,16 249:6,16 253:14 257:13,14 262:3 263:2 264:16 265:16 266:21 268:22 273:6,10
**questioning** 268:13
**questions** 9:21 10:20 11:11,22 14:9 46:13 135:17 136:9 172:17 207:10 267:15
**quick** 172:6
**quickly** 181:13 182:11,20 185:14 193:17
**quote** 252:9

R

**raise** 9:15,20 76:16 190:7 194:12 233:15 234:7 235:5,10,21 255:10
**raised** 245:11,17,20
**raises** 9:15 10:2
**raising** 192:4 235:15
**range** 37:19 135:17 165:13
**rate** 238:17
**ratifying** 259:8
**reach** 53:6,17 67:19 85:7,17 90:16, 17 94:10 95:7 96:21 97:2,5,14,16 98:11 106:18 114:10 116:4,6 125:19 184:8 228:10 259:12 264:4,5,8
**reached** 68:5
**reaction** 221:9,16,17
**read** 12:8,11,12,13 40:18,20 72:9 77:2 82:10 110:18,22 160:20 168:4 189:6,9 228:12 232:6 252:4,8 265:14, 22 266:12
**readable** 9:11
**reading** 246:15 265:13
**reads** 254:22
**ready** 11:14 235:15 271:20 272:12
**realities** 25:9
**reality** 104:4 106:11 203:21
**Realtime** 10:13,17 33:10 40:20 77:2 78:18 87:22 189:9 193:14 196:1
**reason** 8:12 11:10,13 36:9 79:22 135:12 187:17 192:4 215:16 219:16 233:3 235:4,10 240:10 255:8,18
**reasonable** 158:13 233:15 234:6 235:1,12,19
**reasons** 8:13 97:19,20 269:12,13
**rebalancing** 265:4
**recall** 11:20,22 12:6 36:18 59:22 60:3 65:6 67:16 119:11 137:2,5 141:11 142:16 145:3,10,11,16,17 149:14,15 168:3 175:12 177:6,14,17 178:5 201:2 226:11 230:2,7,13 233:19 239:5 240:1 241:8 247:20 270:19,22 271:11
**receive** 272:2
**received** 19:19 169:1 185:16 251:16 252:19 272:5,8,10
**receiving** 190:11 191:16
**recent** 135:14
**recently** 151:16
**RECESS** 82:8 149:4 237:10 251:11 273:4
**recognition** 254:3 259:15
**recognize** 108:19 123:21 238:6 253:9 263:18
**recollection** 67:6
**recommend** 214:9
**recommendation** 24:6 29:4 41:12 55:10 70:12 71:18 176:7 177:8,13 178:6
**recommendations** 89:13 107:3 115:4 176:2 177:4
**recommended** 177:18 178:1
**recommending** 176:8
**record** 10:8 34:11 36:6,7 40:20 65:1 77:2 79:4 105:2 149:1 163:17 188:19 189:9,21 196:14 222:3 237:7 240:10 251:1,3,8,9 272:22 273:2
**reference** 73:17 108:14 111:8 117:6, 9 119:17 238:11 253:7,15 254:8
**referenced** 115:15,17 117:14 217:20 218:11
**referred** 238:9
**referring** 43:21 44:1 66:15 94:22 95:1 118:1 139:1,2 155:3,5 159:7 166:10 175:14 179:17 202:5,7 243:3 253:12
**refers** 40:22 67:11 254:16
**reflect** 127:13 133:1 265:16
**reflected** 172:19
**reflecting** 29:2
**reflects** 127:9,14 196:14
**regard** 20:22 81:2
**regular** 88:14,15
**regularly** 18:15 101:16 159:8 192:20
**rehearsals** 97:3
**reiterate** 256:7
**related** 12:1,5,16 14:4 60:1 112:7 122:15 139:10 140:4 152:1 198:5 202:2 209:3 213:14,16 223:15 259:7, 14
**relates** 15:6,11 78:17
**relation** 88:7
**relations** 261:17 272:19
**relationship** 32:8 67:4 99:14 198:1
**relationships** 202:15
**release** 161:12
**relevance** 213:8
**relevant** 67:3 81:3 188:22 204:5,6 230:4 268:21 269:2
**rely** 117:13 229:18 233:21
**relying** 136:2
**remain** 251:18
**remained** 25:12

**remaining** 150:14 241:14 246:11 248:3 252:14

**remarks** 160:9,16

**remember** 59:18 73:3,5,9,10,12,13 76:2 77:10,21,22 88:3 99:21 146:2,5 165:6 166:18 167:20 169:3 177:15, 19,22 178:3,8 227:5 243:20 255:20

**remembered** 78:3

**remind** 125:21 226:17

**reminder** 149:7 237:12

**renaming** 15:12,15 137:22 138:11, 14,18,21 250:15 251:16

**renewal** 72:3,5,11 73:6 141:3

**renovating** 120:2

**renovation** 15:2 19:19 20:7 24:7,15 25:12 29:17 30:5 31:8 42:3,20 44:12 45:13 47:19 49:14 53:15 54:18 55:3 56:4 57:19 58:11,15,21 59:1 61:20 63:22 66:2 68:13,20 72:18 73:7 83:19 90:9,19 92:12,16 99:10 120:15,17 124:21 127:5 128:20 129:6 141:5 152:22 157:15 158:6 176:3 229:17 268:4,15

**renovations** 25:22 28:19,21 46:2,5 47:1,2,12 48:13,18 49:5 50:9,16 51:3, 11 52:2,11,13 60:10 62:14 69:19 72:7 73:14 83:6 124:8 129:12 150:15 153:17 155:10,11 214:11

**reopening** 149:21 150:13 152:11 157:4 162:2

**reorganization** 256:14

**reorganizations** 256:15,16

**repaid** 251:17 254:18

**repairs** 46:6 150:18

**repay** 253:3

**repayment** 249:8,12,16 250:11

**repayments** 266:10

**rephrase** 50:21 75:14 235:3 247:21 249:5 262:9

**replace** 121:18

**replaced** 219:17 221:13

**replacing** 120:3 150:22 151:4

**report** 32:14,15 61:1,4 66:3 79:5,9 107:13 123:22 130:18 131:16 171:11 173:14,16 178:17,19 179:1,14,20 180:3 271:10,22 272:5

**reported** 32:10,12

**reporter** 7:15 8:22 9:10

**represent** 7:9 71:1 221:11 231:5 240:10 260:19

**representation** 141:9 146:7 216:19 267:20

**representations** 136:18 137:3,5,7 144:20 145:9,13,18

**representative** 12:1 163:6 177:7 196:9

**represented** 161:10 197:7 218:18

**representing** 241:3 266:3

**represents** 246:16

**request** 65:3,4 82:10 110:11

**requested** 10:13,17 33:10 66:20 78:18 87:22 115:10 193:14 196:1

**requesting** 111:20 113:1

**Requests** 208:1,6

**require** 38:10 40:12,15,17 41:4 151:7 153:21 249:12

**required** 216:14,15 249:8,16

**requirement** 41:22

**requirements** 87:20

**requires** 151:4

**research** 165:5 166:21 167:1

**researching** 165:10

**reserve** 147:2

**resignation** 255:9,22

**resigned** 255:7 256:4,12

**resisted** 247:19

**resolution** 31:4 253:16 259:14 261:7,8,11,16 262:4,11 263:8,9,17 264:22 266:1,7,16

**resolutions** 29:15 30:4 253:8 259:3, 7 262:14

**resources** 262:22

**respect** 31:8,16 32:8,18 33:14 80:11 88:21 89:9 96:1 128:20 228:15 268:3

**respectfully** 168:5

**respond** 169:12

**responded** 181:10,11,16

**response** 14:1 15:10 16:21 127:20 149:12 189:7 211:17 225:18 228:5 231:22 254:12 263:4

**responses** 207:22 208:4,12,18 269:14

**responsibility** 222:11

**responsible** 93:8 133:8 257:11

**responsive** 270:3

**rest** 184:3 189:21

**restart** 102:16

**restate** 228:2

**restoration** 160:18

**restrict** 19:18 20:6

**restricted** 242:7 264:11,12,14,15

**restriction** 35:11

**restrictions** 242:5

**result** 268:12

**resulted** 20:8 61:15

**retain** 36:21 198:21

**retained** 37:3,12 38:2 39:7,12,19 40:3,6,8 41:1 61:7 182:1

**return** 43:12 44:9 147:1

**revenue** 133:5 137:22 138:15 173:10 232:5,15 233:14,21 234:4 238:21 264:11

**revenues** 124:4 132:20 241:12

**review** 87:13,19 112:13 114:4 163:9, 20 175:4 194:18,20

**reviewing** 269:18

**revisit** 26:20

**RFP** 110:12 112:3,5 113:1,2,16 117:2 166:5,10,12,13 168:4 169:17

**Ric** 209:20 222:13

**Richard** 77:4

**Rick** 78:7,9 197:18,19,20,21 199:1,18 200:7 202:11,14 203:18 206:14 211:8,19 212:11,16 215:2,16 221:7

**Rick's** 199:9 204:4 207:3

**ridiculous** 160:22

**right-hand** 109:17

**ring** 197:9

**risk** 27:11,12,14,17 72:2,10 91:22 92:3 99:2 101:6 106:15,20 141:17 142:4 143:12 144:7,11 145:14,22 146:9,16

**road** 79:1

**role** 25:1,7,8 31:14 33:5,7,9,14,16,19 34:1 87:8 88:19 89:1,2,4,7 117:1 132:15,18 133:13,17 198:20 202:6 209:15,22 210:3 212:22 222:15 226:18

**room** 196:17

**roughly** 18:3 29:17 36:14 72:16 134:9 175:6 183:8 223:9 226:9 247:6 258:6

**round** 165:4

**rounding** 250:6

**routes** 27:9 151:10

**routine** 28:1

**rows** 241:15

**rules** 7:18

**rumors** 219:8

**run** 21:17 220:14 241:4,9 258:16

**running** 92:16,17 142:4,9 144:7 146:9,16 263:22

**Rutter** 209:20 222:12

S

**sales** 134:20

**sand** 144:1

**scale** 158:11

**scenario** 49:7 51:16,19 53:15 54:16 55:1,2 56:8 82:20 83:2 92:11,16 94:20 95:12 96:2,4,20 98:11,12,17 99:8 118:5 119:20 125:13,14,18,21, 22 126:1 149:19 150:2 152:10 236:21 241:6

**scenarios** 44:11,13,18,19 49:1,2 52:18 54:15 55:2,13,14,19,21 56:3,8 82:17,18 83:4,7,9 84:5,8,12,14,20,21 85:1,20 87:20 90:2,7,8,18,20 93:12, 17 96:9 105:14,22 106:1,5,7,21 107:5,10,12,15,22 108:2,4,14,18,20 111:9,12,15,19 112:8,13,14,18,19 113:2,5,15,18,20 114:1,7,15,17 115:15,17 116:15 117:6,9,13,18 118:1,4,11,15 119:7,8,10,16,18,20 122:21 123:4,9,18 124:5,6,15,16,19 125:3,6,10,12 129:3,5 130:20 131:5, 8,12,14,15,20,22 132:6,12 133:21 149:11,15 179:9 229:17 230:11 236:17

**schedule** 60:5,9,12,15,18 61:19 68:12,15,20 69:1,5,9,18 150:17 154:14,17 155:1 157:9,10 165:17 182:4 184:15,16,22

**scheduled** 165:8

**schedules** 155:12,13

**scheduling** 38:13,14 210:5

**school** 207:6 211:14,20

**scope** 47:2 49:14 50:15 67:2 76:17 78:15 79:2,18 81:17,20 111:13 112:11 113:21 118:10 169:9 190:19 191:11 213:7 255:11,12 256:7 259:17

**screenshot** 240:13,15

**season** 100:3,6,13,15,17,19 101:20 102:7,19 158:8,19 159:2

**seasons** 159:1

**Secretary** 22:20 23:1 31:11,14 32:8, 15,17 33:13 36:15 147:6 148:17 160:7,16 161:1,10,12,14 190:2,6,22 191:6,16 192:16 194:1,8,10,19 195:6, 11 197:1

**Secretary's** 34:1

**section** 120:3,5

**sections** 69:21 85:4 126:9,11

**secure** 23:15

**selected** 71:18 99:8

**selection** 70:11,18 71:12,15,16

**self-populate** 240:13

**Senator** 269:14 270:3,5

**send** 272:4,11,12

**senior** 201:3 226:5,20

**sense** 86:4 118:7 121:12 124:6 132:12,14 159:18 162:3

**sentence** 261:13

**separate** 55:19 66:9 99:8 187:6 236:21,22 237:1 242:22 265:19 268:22

**separated** 255:5

**separately** 152:3 229:22

**separating** 69:15

**September** 29:15 30:3,11 80:8,12 142:2 143:19 144:20 145:7 146:13,14 147:7 148:19 214:6 253:9 255:6 257:8,18 258:6,11 259:1,20 260:15 271:7

**September-october** 158:22 162:1

**sequence** 120:13

**sequentially** 54:16

**series** 41:1 47:12 138:11

**services** 37:19 257:2

**set** 46:5 48:13 66:6 165:9 207:22 208:5 241:14

**shared** 246:1 272:17

**sheet** 132:16

**shorter** 150:1,7,9 157:7 180:9

**shorthand** 47:1 48:18

**shortly** 183:12 222:13

**show** 96:5 124:18 134:22 239:22 240:2

**shows** 38:20,21 93:3 124:3 172:22 223:21,22 241:21

**shut** 54:8

**side** 42:20 121:16,22 122:4,10,12 155:6

**sign** 82:10

**signed** 183:17 208:11

**significant** 127:4 138:14,19 207:12

**significantly** 138:6

**signs** 183:13

**similar** 227:2 238:12 243:8 244:1,14

**similarly** 53:3

**simply** 51:15

**single** 28:1 172:11 205:2 246:21

**single-handedly** 132:5,10

**sir** 81:22 142:22 148:15 163:13

**sit** 49:9

**site** 216:17 217:2,12 218:6,16,19

**sitting** 205:4,13

**situation** 257:12 263:13

**six-month-long** 151:1

**size** 97:6

**skipped** 46:15

**slide** 86:21 87:3 90:1 91:7 93:9,10,19 105:13 175:11,16 178:15 179:3,22 194:20

**slow** 193:20

**small** 116:8

**smallest** 94:6

**Social** 74:12,13,18 75:15 77:21

**soffit** 150:21,22

**soffits** 151:4 152:1

**sole** 62:6

**solely** 257:11

**solicit** 184:21

**solicitation** 108:14,16,22 109:8 110:4,7 111:11 114:18 115:16 125:5 166:4 168:16 170:5 175:22 183:13 184:19

**Solicitation/contract/order** 109:13

**soliciting** 110:15,22

**solutions** 87:21

**sooner** 174:22 175:3 181:5

**sort** 16:4 18:20 19:1 22:7 29:2 30:15 32:7 36:16 53:15 71:13 75:6 83:9 97:13 104:11 105:15 123:8 132:15 155:16 169:22 171:9 172:20 173:9 175:20 206:12 207:9 209:16 211:4 212:4 214:4 236:1 240:16 245:22 247:6

**sorts** 170:18

**sound** 159:21 238:12

**sounded** 29:1

**sounds** 8:18 54:5 57:16 60:6 83:10 96:8 135:20 136:1 153:9 183:10 188:6 203:18 205:12 211:13 227:16

**source** 70:11,18 71:12,14

**sources** 241:14,16 242:18 264:9

**space** 97:10,19 98:5

**spaces** 85:14

**span** 183:2

**spans** 270:9

**speak** 105:9 161:8 193:19 202:11,14 214:5 222:2

**speaking** 36:15 135:10

**special** 99:14 228:11 259:12 260:11, 15

**specific** 43:21 46:5 66:6 138:9,22 163:11 168:4 189:14 223:18 239:15 264:19

**specifically** 77:11 131:11 152:20 195:21 196:5

**specifics** 142:9 247:1,3 252:3

**speculate** 201:17,19

**speculation** 25:17 26:14 31:19 67:22 139:13 140:8,22 142:20 201:22 203:3,10 204:18 213:6 253:11,21 269:8

**spend** 49:9 50:18 51:19 52:1

**spent** 242:6

**spoken** 9:14 192:17

**sponsorships** 235:16

**spreadsheet** 237:22 240:17

**stability** 101:10

**staff** 17:12 23:3 43:20 44:3 55:7 93:13,15 114:3 122:7,8 129:16 136:3 181:18 219:8 232:20 272:18

**staff-level** 16:17,20 218:13

**Stage** 91:14,15 92:17 94:13,18,21 95:6,14 122:7

**Stages** 94:17

**stakeholders** 27:7 87:11

**standard** 164:8 196:11 273:21

**standpoint** 22:1

**start** 7:18 13:20 70:20 76:16 98:5 144:6 156:17 158:19 210:17

**started** 77:16 183:7 184:2 222:8

**starting** 90:15 255:12

**state** 64:22 65:10 67:14 188:18 209:4 252:8

**stated** 24:14

**statement** 8:19 61:15 63:3 103:3 178:12,17 179:13 180:8,12 181:21 182:12 184:22 251:22

**statements** 269:17

**states** 234:6

**statutory** 41:22 42:17 87:19

**stay** 233:15 234:7 251:2

**stayed** 234:10 235:6,11

**Stenographer** 10:14,18 33:11 40:21 77:3 78:19 88:1 189:10 193:15 196:2

**step** 55:18

**steps** 15:10 17:8 26:19 27:2 31:13

**stop** 10:9

**story** 139:19

**straightforward** 43:11

**strategy** 107:6 248:6,9

**stretch** 11:4

**strictly** 174:16,19

**structural** 150:18 152:7 153:7

**structure** 219:21

**structured** 76:7,9 150:5

**Studio** 97:8 98:4

**stuff** 273:2

**subject** 16:15 30:21 70:12 147:4 209:4 228:13

**subjects** 227:22 228:3

**submit** 112:9 167:15 168:1,5 169:1, 6,20

**submitted** 185:17

**submitting** 169:16

**substance** 67:7 78:20 167:22 259:19

**substantive** 254:12

**subtopic** 149:16

**succeed** 135:16

**sufficient** 128:18

**suggest** 197:14

**suggesting** 39:6 133:13,17

**suggestion** 220:12

**suggests** 267:7

**sum** 167:22

**Summary** 174:4,8

**summer** 59:2,4 160:10 216:3 253:8

**super** 28:11

**supplied** 93:12

**support** 23:22 24:3 32:5 79:6 180:20 201:6 234:16 244:10,22 248:11,12,14 252:10 265:1 272:18

**supporters** 248:10

**supporting** 24:5 181:8

**supports** 65:19 243:8

**supposed** 264:3

**surprised** 169:18

**surrounding** 217:10,21 259:21

**swirling** 218:14

**Symphony** 91:21

**synthesize** 225:13

**systems** 106:12 119:21 120:3

### T

**Tab** 70:6 86:7 109:2,4,7 123:7,14 170:2 176:11,17 207:17 222:3 230:17 237:19 260:1,7

**table** 16:5 29:5,11 30:9 45:12 49:2,7, 22 50:14 52:8,10 55:22 239:2 265:7

**takeover** 139:11

**takes** 57:9,11 238:16

**taking** 127:13 153:9 190:17,18

**talk** 16:19 18:14 21:18 46:22 47:18 52:17 84:19,20 123:7 159:8 169:21 179:2 207:5 246:1,3 267:3,4 273:7

**talked** 11:18 22:11 31:10 44:21 46:1 47:19 56:10 68:14 77:11 82:19 83:1, 19 108:20 114:9 117:17 119:9 125:4, 7 127:3 140:1 145:8 166:15 179:18, 22 184:17 197:5 211:12 258:3 268:15

**talking** 14:3 20:2 27:7 39:1 44:14,21 46:19 49:1 59:22 69:17 82:16,18 90:7 92:13 103:5 105:14 124:7 131:11 134:10 149:10 164:16 170:5 175:21 178:11 191:5 197:12,15 218:10 230:5 236:5 237:1 258:5 272:8

**talks** 72:2 261:11

**target** 162:2

**targets** 233:1

**tasked** 41:18

**tasking** 111:18

**team** 17:22 18:1,2 19:14 22:13,15 27:7 55:7 56:19 59:11 62:9 76:3,5,13 77:8 78:1 87:4,6,7 117:4 131:7 152:15 171:10 172:20 180:18 181:21 183:21 184:1,4 185:3 235:14 239:4 255:2,4

**team's** 127:18

**teams** 18:4,14,15 155:20 246:6 247:5

**telephone** 168:7

**telling** 139:19

**tells** 10:9

**Tennessee** 226:2

**tentative** 168:18

**tenure** 226:10

**term** 124:20 159:15

**terminating** 256:4,11,18

**terms** 62:2 80:6 161:15 230:10

**test** 26:20 236:2

**testified** 7:4 79:4 118:22 145:2 157:16 187:5

**testify** 33:22

**testifying** 8:5 267:13

**testimony** 11:18 29:9 45:22 60:1 66:8 79:17 124:10 131:1,18 140:22 141:14,20 142:3,8 181:7 182:10,15 200:4,10 205:8 211:16 256:22 258:13 268:7

**theater** 19:13 62:4 116:11 150:7 206:21

**theaters** 56:14

**theoretically** 98:20 154:11

**thing** 36:6,12 41:17 69:2 72:5 103:11 104:9 121:6 151:17 160:13,15 187:19 192:18 203:22 204:10 272:3

**things** 19:10 39:4,7 40:9 41:2 55:5 60:12 92:9 93:2 97:4 102:8,9 114:11 127:16 138:9 139:2 150:11 171:22 175:21 179:19 198:3 206:18 215:22 216:5 217:2 236:20 237:2 242:17 259:13 265:5 266:9 268:10

**thinking** 93:20 94:2 116:21 172:6

**thought** 20:2 30:8 127:3,19 158:16, 17 166:7 262:6,12

**thoughts** 263:18

**thread** 203:11

**three-week** 145:17

**throw** 220:16

**ticket** 134:20

**ticketer** 213:13

**Ticketmaster** 215:17

**tied** 48:11

**time** 10:19 11:1,18 21:11 22:13 24:13 26:17 31:15 35:17,19 37:1,10 44:17 61:7 68:2 71:5 73:1 75:20 76:6,14 80:1 82:5 85:9,10 86:3 99:19 103:14 127:12 128:10 133:22 134:7,9 136:2 139:6 141:5 143:10,16 144:9,12 146:15,18 150:8,9,14 153:8 154:1,21 155:2,19 157:4,13 158:14,21 159:12 162:8 165:9 167:6 168:19 171:13,17 174:11,14 175:3 180:10,11,15,16,22 183:9 184:13,19 186:13,18 187:16 188:5,6,21 189:13 193:2 210:19,22 226:7 230:4 232:10 235:7,13 237:4 241:2 247:6,10 252:5 262:19 263:4,7 264:21 266:7,16 267:8

**timeline** 72:12 120:14 161:21 162:14 169:21 170:18,21 172:19 174:15 178:10 180:8 181:22 183:5 186:15 187:3,12

**timelines** 171:10

**times** 28:20 34:10 87:15 135:4 187:6

**timing** 271:13

**title** 33:4,7

**titled** 86:13

**today** 7:20 11:10 24:22 31:16 205:5, 13 221:7

**told** 12:22 64:4 114:12 193:8 197:1 200:1 220:22 250:14 251:14 256:9

**tomorrow** 156:17 189:3 235:14

**tool** 239:17,18

**top** 90:1 109:12 111:3 208:20 227:5 232:11 246:13 261:4

**top-line** 91:2

**topic** 44:9 147:1 164:16 214:18 229:2

**torn** 217:3 219:17 220:9 221:12

**total** 17:10 18:4

**touring** 158:11,14 159:2 204:5

**trade-offs** 236:16

**traditionally** 235:21

**transcribe** 7:17

**transcribed** 8:12

**transcript** 82:10 163:10

**transfer** 245:4,6,7,9 246:20,21 247:18

**transferred** 245:14 246:17 248:2 250:10 253:4 254:3,20

**transfers** 246:22 247:2,4,7

**traveling** 223:6 235:17,18

**treatments** 98:4

**trial** 8:5

**trick** 36:5 46:13 52:6

**true** 24:21 263:13

**Trump** 7:10,22 74:19 75:16 76:10 79:20 80:2 140:5,19 149:13 155:4 195:12 243:1,5 252:7,15 253:9 259:15 273:7

**Trump's** 77:12 79:12 139:10 192:10 248:3,15 251:17 253:18

**Trust** 129:10,11

**Trustees** 32:14 127:10 260:11

**truth** 8:9 74:11,13,18 75:15 77:21

**truthfully** 11:11

**turn** 48:22 86:6 89:21 109:1 110:8 111:2 113:10 123:7 124:2 170:1,7 176:10,11,13 178:9 207:17 208:8 221:19 230:14,16 231:10,18 233:8 237:15,18 258:21 259:22 260:8 261:2

**turned** 172:13

**turning** 96:19 212:22

**turns** 238:16

**tweaks** 132:22 133:9,14,17

**Tweet** 79:12

**two-and-a-half** 160:19

**two-year** 26:11 29:17 30:5 62:13,16 63:21 68:8 72:17 74:10,22 75:16 76:10 83:1 151:21 152:4 155:4 156:11,12 157:21 177:10

**type** 23:15 38:1 40:4,5 90:6 153:4 154:17 156:5

**types** 23:11 36:20 38:9,20 223:22

## U

**ultimate** 71:16 171:6,7 173:18 243:17

**ultimately** 93:16 107:4 110:4 112:1,11 173:1 174:20 180:8 185:18 261:22 262:15

**unaudited** 269:17

**uncertainty** 100:8 103:13 139:3 143:21

**unchanged** 252:15

**underlying** 49:14 65:19 104:7 106:21

**underneath** 27:13

**understand** 7:11,15,20 8:2,4 9:2,7,12,18,22 10:5,11,20,21 13:22 14:11,17,21 15:19,21 21:19 28:4,16 29:12 30:7,16 32:7,9 37:7 43:14 44:11,16,19 46:18 49:12 50:13,20 51:1 52:7 54:14 55:18 57:6,15 58:9 73:17 75:5,17 79:14 82:14 84:22 87:17 89:5 91:4 92:4 93:20 105:22 108:13 113:7,11,20 115:1,7 120:22 121:15,21 122:14,18 123:9 124:17 128:16 130:17 135:7 140:13 143:15 149:7 160:14 161:13,14 166:14 167:14 183:1,12 184:7,14,17 191:11 192:8,15,17 194:4 196:14 199:12 203:11 204:11 205:21 207:4,17 210:15 213:12 231:8 237:13 239:11 254:6 258:9 265:15 266:15 272:2

**understanding** 12:15,22 13:3,17 15:9 16:4 24:4 28:22 29:13,18 30:18,19,20 42:16 45:3 49:19 62:10 66:18,22 67:18 68:4 80:13 91:8 100:5 106:3,6 117:21 122:9 128:2 129:11 135:13,22 151:20 169:5 170:17 184:4 193:1 206:16 212:7 220:12 238:14 239:8 241:1,3 242:19 248:8 252:19 260:22

**understate** 96:17,18

**understood** 10:6 45:12 50:14 54:1 55:6 69:14 74:17 120:11 132:9 139:21 174:13 179:2 182:5,6 194:21 262:2

**undertake** 49:4 51:2,10

**undertook** 133:21

**unequivocally** 252:8

**unexpected** 240:11

**unfolding** 101:10

**unilaterally** 185:4

**unimpacted** 122:1

**unique** 34:2 38:15 128:12 135:3 166:1

**unoccupied** 24:21 66:17 67:10

**unrestricted** 56:11 242:2,3,8,14

**upcoming** 100:19 101:20 102:7,19 127:4

**update** 88:2

**updated** 44:3

**upper** 109:17 238:3

**upshot** 17:6 155:16

**urgency** 180:19,20 181:1,9,10,11,16 182:2,8 183:19 184:4,10,18

**urgent** 185:4

**utilities** 150:12 153:17

**utilizing** 97:2

## V

**vague** 14:14 15:14 18:7 20:19 24:16 25:3 27:1 31:2,18 32:11,19 33:8,16 37:16 40:14 42:5,21 43:5,17 52:12 57:2 60:19 61:21 62:20 63:10 68:9 75:10 83:21 100:20 101:13 107:16 108:6 118:21 120:16 122:11 126:19 132:17 133:16 144:10 171:12 173:19 175:1,13 177:12 192:11 199:8 201:10 203:2,9 204:17 205:8 206:22 210:2,7 215:4,8 220:1 226:1 229:10 244:7 245:10 257:9,19 263:1 265:3

**vary** 56:22 57:3

**venture** 227:7

**venue** 95:7 134:22 135:1 165:22 205:2,6,15,18

**venues** 97:1 203:7 204:16

**verbal** 8:21

**verbally** 8:15

**verification** 208:9

**verified** 208:18 221:21

**verifying** 208:11

**versus** 7:10,21 42:3,20 44:5 64:13 65:11 66:2,17 67:10 85:14,16 103:10 106:18 134:22 149:13 152:17 183:18 229:17

**viable** 101:9

**vice** 201:3 212:10 226:5,18,20

**video** 168:7

**view** 39:18 41:4 80:17 101:19 153:16,21

**views** 102:17 103:1 172:20

**vision** 234:15 248:12

**voluntarily** 66:19,21

**vote** 55:4 59:5 88:8 103:18,20 104:1

**voted** 28:18,20 29:14,19 30:3,10 31:4 59:2 262:5,11

**votes** 29:20

W

**wait** 188:10

**waiting** 30:12 272:3

**waiving** 34:19

**walk** 27:13 36:19 96:20 180:5

**walked** 182:5 186:12

**Walter** 152:7

**wanted** 7:17 25:14 26:2 58:22 130:8 140:3 168:14 171:20 185:1 245:21

**wasted** 181:17

**watch** 160:11,13,15

**ways** 55:6 91:1 116:21 257:2 263:18 265:12

**week** 27:6 28:17

**weeks** 135:14 136:19 137:3 144:21 145:15,21 175:6,7,8 183:2,7 265:2, 14,22 266:4,12,13,18 267:9

**Weigh** 114:15

**weighed** 257:20

**weighing** 16:13,14,15,18 27:11 114:20

**welcoming** 98:15

**wheels** 96:19

**White** 163:9,17 164:6 273:19

**Whitehouse** 269:15 270:4,5

**wide** 135:17

**willingness** 229:3

**window** 62:16 63:4 68:11 73:20 74:2

**withdraw** 193:12

**witness's** 189:7 211:16

**WNO** 241:22

**wondering** 213:7 215:15 217:22 225:8

**word** 18:21 23:13 44:18 69:16 128:15 158:10 245:4,5

**work** 18:11 22:14 24:20 39:4 42:7 49:17 53:9 55:6 56:20 58:4,6,7 59:7, 10 60:13,16 61:15 62:3,13 63:3 66:16 67:2,9 69:5 72:21 73:19,22 74:6,7 76:8 77:15 90:21 91:1 94:9 102:1 106:14 110:4 111:13,22 112:5,7,12 113:21,22 121:20 125:5 151:10,12,13 154:2 155:21 156:5,16 157:6,12 159:10,22 160:3,18 169:9 172:22 175:22 178:12,17 179:13 180:8,11,12 181:21 182:12 183:4,7,14 184:11,14, 22 185:11 186:8,11 187:17 195:9 202:6,11,14 207:7 212:9,11 215:19 221:3 224:9 225:16 229:14,18 235:15 236:17,19 244:10 261:17 269:13

**worked** 87:7 202:18 205:3 239:4

**working** 87:8 119:22 131:8,9 200:11, 16 204:4 209:19,20 224:1 228:19

**works** 64:9

**worth** 83:15,20,22 84:5,8,12 160:2

**writing** 68:3

**wrong** 166:9

**wrote** 252:6

Y

**year** 43:21,22 44:4,6,7 138:22 141:18 143:13 144:9 146:1,2 147:7 148:19 149:20 150:11 152:11 155:14 156:15 209:17 227:14,15 232:6 233:20 235:19 241:5 247:8,9 257:8,18 258:6 269:6,11 270:7 273:8

**year's** 160:1,2

**year-and-a-half** 158:3

**yearlong** 171:17

**years** 12:17 24:7 31:1 41:15 50:2 56:1 61:10,14 74:3,5 75:18,19 79:9, 21 80:1,3,19 81:5 132:8 155:9 156:2, 4,13 158:2,6 160:19 270:12

Z

**ZELINSKY** 260:4