# E

# In the Matter Of:

*Joyce Beatty vs*

*Donald J. Trump, et al.*

---

*DARIN BUCHALTER*

*October 05, 2026*

---

LEXITAS™

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - -

JOYCE BEATTY, )
)
Plaintiff, )
) No. 25 Civ. 4480
vs. ) (CRC)
)
DONALD J. TRUMP, et al., )
)
Defendant. )

VIDEO RECORDED DEPOSITION OF DARIN BUCHALTER

Monday, October 5, 2026, 9:32 a.m.

Washington Litigation Group

1717 K Street, NW

Washington, DC

Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

Job Number: Lexitas 1039998

VIDEO RECORDED DEPOSITION OF DARIN BUCHALTER, a witness herein, called by the Plaintiff for examination, taken pursuant to the Federal Rule of Civil Procedure 45, and the Court's Scheduling Order of September 16, 2026 (ECF No. 82), by and before Marjorie Peters, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the District of Columbia, at Washington Litigation Group, 1717 K Street, NW, Washington, DC, on Monday, October 5, 2026, at 9:32 a.m.

A P P E A R A N C E S

For the Plaintiff:

Kyle Freeny
Alexander Kristofcak
Rosa Baum
Nathaniel Zelinsky
THE WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
202-521-8743
kfreeny@washingtonlitigationgroup.org
akristofcak@washingtonlitigationgroup.org

For the Defendant:

Christopher M. Lynch
William Jankowski
US DEPARTMENT OF JUSTICE
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Christopher.M.Lynch@usdoj.gov
William.Jankowski@usdoj.gov
202.353.4537

ALSO PRESENT:

Lydia T. Makande, The Kennedy Center

Erin Wenokur, Fellow, WLG

I N D E X


| EXAMINATION | | PAGE |
|---|---|---|
| DARIN BUCHALTER | | |
| By Ms. Freeny | | 6 |
| By Mr. Kristofcak | | 320 |
| By Ms. Freeny | | 345 |
| Acknowledgment of Deponent | | 365 |
| Certificate of Court Reporter | | 366 |
| Errata Sheet | | 367 |


I N D E X  O F  E X H I B I T S


| BUCHALTER EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Contract Order, KC-BEATTY0200-262 | 30 |
| Exhibit 2 | Delta Pitch Deck, KC-BEATTY0006-0048 | 42 |
| Exhibit 3 | e-mail chain, 8.8.26, KC-BEATTY0405-453 | 100 |
| Exhibit 4 | The Kennedy Center Audit and Finance Committee Meeting, 8.3.26, KC-BEATTY1089-1096 | 136 |

I N D E X O F E X H I B I T S


| BUCHALTER EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 5 | e-mail chain, 9.15.26, KC-BEATTY0468-520 | 172 |
| Exhibit 6 | Delta PowerPoint presentation, 8.13.25, Construction Program Assessment, [no Bates] | 190 |
| Exhibit 7 | Appendix W, [no Bates] | 202 |
| Exhibit 8 | Delta Construction Program Assessment Report, 8.20.26, [no Bates] | 259 |
| Exhibit 9 | Appendix Y, [no Bates] | 309 |
| Exhibit 10 | Appendix X, [no Bates] | 310 |
| Exhibit 11 | Appendix T, [no Bates] | 337 |
| Exhibit 12 | Addendum to Expert Report of Darin L. Buchalter, [no Bates] | 344 |

P R O C E E D I N G S

DARIN BUCHALTER,

having been called as a witness, was legally placed under oath, testified as follows:

EXAMINATION

BY MS. FREENY:

Q. Good morning, Mr. Buchalter.

A. Good morning.

Q. My name is Kyle Freeny. I'm a lawyer with Washington Litigation Group, and I, along with my colleagues here on my side, represent Representative Beatty in the lawsuit Beatty versus Trump.

You're familiar with that lawsuit?

A. Yes.

Q. Have you been deposed before, I assume?

A. Yes.

Q. So you understand that you are currently under oath?

A. Yes.

Q. You understand what that means is that you have an obligation to tell the truth to the best

of your ability?
A. Yes.
Q. You understand that this deposition is being transcribed by the court reporter?
A. Yes.
Q. I can tell that you understand that because you are answering verbally rather than nodding your head, but you understand that's what we need you to do so that the court reporter can take down your answer?
A. Yes.
Q. I'd also ask you that even if you think you know the answer to my question before I finish it, if you let me finish first before you answer, and that way the court reporter can take down both my question and your answer.
Do you understand?
A. Yes.
Q. On the topic of understanding, if you don't understand one of my questions, I'm going to ask you to please just tell me that you don't understand. Okay?

A. Yes.
Q. If you need to take a break at any point in time, just let us know, and we can take a break. Okay?
A. Yes.
Q. But if there's a pending question, I may ask you to answer the pending question before we take a break. Okay?
A. Yes.
Q. Now, Mr. Buchalter, in preparation for this deposition, did you review any documents?
A. I reviewed the entirety of my report.
Q. Did you review any other documents in preparation for this deposition?
A. There are several documents that are outside of the report that are related to some of the exhibits, some of the industry exhibits that support my analysis.
Q. To the best of your knowledge, did you review any documents that were not produced to the Plaintiff in this litigation?
A. Again, there were several prior years of

cost estimating data that I did review, not all of which were disclosed along with my report.

Q. Okay. You say several years of cost...

A. Estimating data.

Q. Estimating data. Okay.

Is there anything else like that that was not included in the report, but was part of your consideration when you produced the report?

A. No.

Q. Just sort of ground rules. Any other questions before we begin the deposition?

A. No.

Q. Mr. Buchalter, can you just tell me your present position and role.

A. Yes.

I'm the Chief Executive Officer of Delta Consulting Group. I'm responsible for our 180 professionals around the world who are focused on consulting work, expert work, investigations, forensics, largely focused on the built environment.

Q. What does "the built environment" mean?

A. Real estate, hospitality, construction,

physical assets.

We work on capital projects, and also financial matters that are asset-backed in some fashion.

Q. What is actually your title at present?

A. Chief Executive Officer.

Q. How long have you been Chief Executive Officer at Delta Consulting Group?

A. I assumed that role in January of 2025.

Q. What were you doing before that?

A. I was an independent consultant from 2022 to 2024.

Q. Okay. Just tell me really briefly your educational background, by which I mean the degrees that you hold.

A. Right. I have a bachelor's in psychology from the University of California, Santa Cruz. I graduated in 1990, and held a California real estate salesperson's license for 17 years, from 1992 to 2009 or so.

In 2009, I was named a Counselor of Real Estate, which is a professional designation for

those that advise in real estate matters.

In 2010, I was named a fellow of the Royal Institution of Chartered Surveyors, which is more recognized outside the United States, but is similar to the CRE designation as an adviser to real estate investors, owners, developers, debt capital sources.

Q. Are you an architect?

A. No.

Q. Are you an engineer?

A. No.

Q. Licensed contractor?

A. No.

Q. Are you an accountant?

A. No.

Q. So you don't have a CPA?

A. No.

Q. How would you describe, in layman's terms, to like a person on the street, what you do at Delta?

A. Besides my responsibilities for running Delta, in my professional practice, I advise on

finance and operations matters related to real estate.

Q. When you say "advise," does that include consulting work?

A. Yes.

Q. Are there particular industries that you focus on? You said "the built environment," but is that particular industries?

A. No. The industry is real estate and construction. The asset types I have been involved in, I genuinely think every asset type that exists.

Q. What are the principal areas of -- I guess that you consider yourself to have professional expertise in?

A. Finance, operations, administration, both of real estate entities that would include real estate investment trusts, real estate operating companies, vertically integrated developers, debt capital sources that underwrite real estate investments, insurance companies, private equity funds, and then portfolios and single assets. So down to the property level and the property

operations level.

Again, on all asset types. I have been involved in everything from raw land to high-rise office buildings.

Q. Do you consider yourself an expert in performing arts management?

A. No.

Q. Do you consider anyone at Delta an expert at performing arts management?

A. No.

Q. Before this engagement, had you ever worked in performing arts management or with a performing arts organization?

A. Just I make allusion in my report to my time with the San Francisco public libraries. I don't confuse that with the performing arts like the opera and the ballet, but it is arts, literacy, and a civic organization.

But I only draw that for the sake of completeness in my answer.

Q. Understood.

So that's more like sort of a

nonprofit more broadly; is that fair to say?
A. Literacy, the arts. You know, I certainly think it's all in the same realm, but I draw no connection to the symphony and the opera and performing arts.
Q. This is the Friends of the San Francisco Public Library; is that right?
A. Yes.
Q. The Friends organization, they weren't responsible for, for example, managing programming at a performing arts venue?
A. I'll need you to be more specific about programming at a performing arts venue.
Q. Well, what do you understand those words to mean?
A. We definitely had programming responsibility, again, more around writing, literacy, publishing trends in media, things of that nature.
Q. Did you consider the San Francisco Public Library to be a performing arts venue?
A. No.

Q. I did notice in your report you talked about, when you were at the Friends of the San Francisco Public Library, some work that the Board was responsible for. I'm going to ask you about that.

But just the time frame of that, when was that, when you were the Board of Director of the Friends?

A. So approximately 2000 or 2001 to approximately 2010.

Q. So that was when you were at Navigant?

A. It was when I was at Ernst & Young originally. It crosses over, yes.

Q. You were doing real estate consulting at the time?

A. Yes.

Q. The role of the Board, then, the Board of the Friends of the San Francisco Public Library, that was to lead the fundraising for the renovation?

A. Yeah. We were the Board of that not-for-profit. So it was to do all of the things that were appropriate and prudent as a board: Hire

an executive director, approve an annual budget, et cetera.

I make mention of the fundraising effort because of the hands-on knowledge I have about donors and fundraising and the dynamics of a major capital program.

Q. You also in your report, though, talked about responsibility for execution, or implementation of the renovation?

A. So I believe this was when I had moved to Navigant, but we actually reviewed, not unlike -- not unlike the question of today, what is the best approach to executing certain work, but I did have the Board retain Navigant to conduct an analysis on the ability of the budget, the projected fundraise to complete the capital project work.

The capital project in that instance was in multiple locations. So the issue was, candidly, are we going to run out of money before we finish.

Q. How long did that project that Navigant undertook take?

A. I'm guessing from my memory. Less than a year.
Q. But more than a month?
A. Yes.
Q. More than six months?
A. I doubt it.
Q. Okay. Several months?
A. Yes.
Q. What kind of things were involved in that fundraising assessment?
A. Schedule analysis, budget consideration, scope, alternative methods for accommodating operations.
Q. What was -- I guess, how would you describe the main objective? You said to make sure you weren't going to run out of money, but just sort of like the fundraising side, what are you looking at?
A. We had a fundraising goal, but -- so we think of that as I think of all of these things as "sources."
Then we had the "uses," the

projected uses, under the programming of those branches, and the capital projects associated with those branches, some of which were new-build, some of which were renovation, some of which just involved, you know, maintenance and repair.

Again, interesting that they were Carnegie historic branches, so there was that sort of element to it.

But candidly, as a sources and uses analysis, and considering the different execution approaches, would we have sufficient capital under our projected fundraising, or were we going to have to either reduce the number of projects, or raise more money.

You know, so if so, it was a strategic issue for the Board.

Q. Did Navigant at that point in time do anything to analyze projected fundraising in the future?

A. I don't recall if Navigant did that or we, as a Board, did that. I mean, remember, I was sitting on the Board, and so I'm certain that we

were constantly evaluating our pipeline, and trying to evaluate the capacity of our donor -- donors and outreach.

I couldn't say specifically that that was Navigant's -- within Navigant's scope.

Q. But it would have been important for you to have, as a Board member, some assessment of the expected fundraising?

MR. LYNCH: Object to form.

You can answer.

A. Yes.

Q. Just stepping back to talk about, you know, your role as a Board member, you agree that you had a responsibility to exercise independent judgment as a Board member?

A. Yes.

Q. You would have -- you, as a Board member, would want sufficient information in order to be able to make an informed judgment on issues that were presented to the Board; is that right?

MR. LYNCH: Object to the form. Vague. Insufficient.

You can answer.

A. Yes.

Q. Would you agree that the quality of the decision that a board can make depends in large part on the information presented to the board?

MR. LYNCH: Same objection.

You can answer.

A. Yes.

Q. Would you also agree that as a Board member, when you are evaluating recommendations presented to you, it's important to understand the material assumptions that went into the recommendation?

MR. LYNCH: Same objection.

You can answer.

A. Yes.

Q. Would you also agree that it's important to understand whether information came from management or came from -- or was independently verified by whoever was making the recommendation?

MR. LYNCH: Objection. Vague.

You can answer.

A. I'm not sure that that would be important. It would depend on the item.

Q. Well, let's drill down.

So if an outside consultant is presenting to a board, are you saying you do not -- you would not need to know, or want to know, whether the information relied on by that outside consultant was independently verified --

MR. LYNCH: Objection. Compound.

Q. -- by the consultant?

MR. LYNCH: You can answer.

Compound.

A. Again, it would depend on the item.

Q. As a Board member, what -- you know, and again, I'm getting you to think about your time at the Board of the Friends, what information would you want to know was independently verified, if you say it depends on the item?

MR. LYNCH: Same objection. Vague.

You can answer.

A. The technical information that would be, at least in my judgment as a Board member, outside

of the scope of the management member.

Q. I assume you would want to know any material limitations on the analysis that was undertaken by an outside consultant?

A. Yes.

MR. LYNCH: Objection. Vague.

You can answer.

Q. Tell me a little bit about the team. We'll talk about the engagement, but I want to talk a little bit about the team that worked on the engagement with the Kennedy Center.

Who else from Delta worked on the Kennedy Center assignment?

A. To be sure of my answer, I would look at my report, but Cory Milburn, Khaled Aziz -- Aziza, Sean Dooley, James Hanson, Mikaela Hutchison, and Ben Wisniewski, myself, and not listed in the report, but incredibly helpful, Carrie Sherreard, who took responsibility for a lot of the compilation and production.

Q. Could you just give me an overview of what each person's primary role was in this

assignment.

A. Cory Milburn is one of our senior-most construction professionals. His focus was very much on the cost, cost escalation and contingency factors that we would need to apply to those costs to reflect the different potential operating scenarios.

Khaled was, in many ways, my project manager. So he had a full scope of responsibility across the project, and was working very closely with me in the drafting and production of the report.

James Hanson, from our London office, we brought in because he had been involved with a theater -- a capital project involving a theater on a fast-tracked execution, and we wanted to be sure that we understood the theater operating environment, and just frankly, to catch any nuance in our work that might be associated with the particular asset.

Oh, I'm sorry, I should mention, Khaled is part of our group that works with the Architect of the Capitol and has direct experience

with Washington monuments, the Senate Visitor -- the White House Visitor Center, the Senate -- I think this was a lobby restoration. So he knows the, if you will, ins and outs of Washington, DC, monuments.

Ben Wisniewski is an often-used -- "subcontractor" makes it sound like I'm diminishing his responsibility, but from SGH, who we bring in for technical matters. There's obviously a technical environment here to understand in terms of the heating and cooling systems, the electrical, the mechanical, and the questions that we were going to need to understand about the ability to divide the building into usable and unusable areas.

Mikaela is one of our engineers. She was -- she and Sean Dooley were very focused on the schedule, and the ways that I was thinking about the schedule, in terms of a full closure scenario and a partially operating scenario.

Q. When you say "schedule," what do you mean?

A. The construction schedule itself, the works.

Q. Now, Mr. Hanson, you mentioned that he worked on one theater project in the past.

Did he have -- he did not, though, as we said before, he did not have a performing arts expertise?

A. No.

Q. Who would you say was principally responsible for the construction analysis?

A. I was principally responsible for the entirety of the report.

Q. Were there any conclusions that were presented to the Board that you did not personally adopt?

A. No.

Q. So you had ultimate responsibility for Delta's recommendation?

A. Yes.

Q. I want to turn next to how Delta and you first, kind of, came to be involved in this opportunity.

So tell me when you first heard about the opportunity to, I guess, pitch for the

work.

A. Sure.

Around July 15th, I can't remember if it was the 14th or the 15th, and I believe it was on the same day, Khaled and I independently received e-mails from a contracting officer regarding a solicitation for this particular contract, scope of work.

We -- because we obviously work in the same company, we started sort of immediately messaging around, you know, what is this, who received this, and got ourselves immediately organized, and replied back that we were interested in replying to this solicitation.

Q. You said you received the solicitation from a contract officer?

A. I believe it came from Georgia Robinson. It was definitely a ministerial outreach.

Q. That's somebody with the Kennedy Center, or elsewhere?

A. I believe she's with the Kennedy Center. She's -- I have met her in person, and I took her to

be a Kennedy Center employee.

Q. When you said you've met her, had you met her prior to receiving the solicitation, or only after?

A. After, during one of my tours.

Q. Do you have an understanding of why you received that solicitation; that is, you know, why they chose Delta as at least among those to reach out to?

A. I do understand that it was competitive --

Q. Okay.

A. -- to the sort of second part of your question.

I don't. I can only suspect that our work with the Architect of the Capitol and the fact that we do significant work with the US Navy --

Q. Okay.

A. -- has put us onto a GSA list of vendors, and we have a GSA rate schedule.

So, you know, as I've said to others, just conversationally, I think we're on a

list somewhere.

Q. Do you have any -- either work connection or relationship with anyone at the Kennedy Center prior to this?

A. No.

Q. Are you aware of Aziz or anyone else on your team having a relationship, prior to this, with anyone at the Kennedy Center?

A. I'm sorry, it's Aziza, and I was the one that misspoke.

No.

Q. How about with the Board of the Kennedy Center?

A. No.

Q. With the general counsel, Elliot Berke?

A. No.

Q. That goes for either you or anyone else at Delta?

A. No. And again, too, we, as you would expect, go through a research and conflict check process. And so no -- nothing came from that.

Q. The initial outreach you received, was

that simply an e-mail with the solicitation?

A. I'm terribly sorry. I don't recall whether the solicitation was attached where there was a brief description, but it said -- the gist of it was, are you interested in this.

I think we may have subsequently then received -- I think I asked Khaled to take the lead in communicating, so we wouldn't have multiple points of contact with the Center itself. And it may be that they subsequently sent a more detailed request for proposal or request for information, and we prepared a proposal.

Q. I'm going to show you a solicitation, and go through that, but before I do, I just want to get the chronology of --

A. Yes.

Q. -- sort of how you learned different pieces of information.

So did you learn anything from the Kennedy Center about what they were looking for before you reviewed the solicitation and the Statement of Work?

MR. LYNCH: Objection. Vague.

You can answer.

A. No.

Q. So I'm going to ask you to turn in your binder, in the white binder, to Tab 7.

A. Yep.

Q. I'm going to ask the court reporter to mark Tab 7 as Exhibit 1. I believe this will be Buchalter Exhibit 1.

(Buchalter Exhibit 1, Contract Order, KC-BEATTY0200-262, was marked for identification.)

Q. Do you see what's been marked as Exhibit 1, which is titled up at the top left starting Solicitation of Contract Order?

A. Yes.

Q. All right. It's dated in the upper right, 7/16/2026.

Do you see that?

A. Yes.

Q. Is this the solicitation that you received from the Kennedy Center?

A. I can only say I'll take it as your

representation that it is.
Q. Okay. Well, I will represent to you that we received this from your counsel. If you'd like, I have a signed version. That signed version, though, does not have the Statement of Work, so...
A. I'm comfortable proceeding.
Q. Okay.
A. I just can't tell you exactly what I received.
Q. Okay.
A. But this certainly looks familiar.
Q. All right. Let me know at any time, if we look through this, if it's something that no longer looks familiar. Okay?
A. Yes.
Q. All right. So given that the solicitation issue date is 7/16/2026, does that change at all your recollection of when you received this; that is to say, do you think it's possible that you received the solicitation prior to what would have been listed as the date for the solicitation?

MR. LYNCH: Objection. Compound.
You can answer.
A. No. I think my testimony was, and my recollection is, that I was contacted, and I can't remember if this was attached. I think it was an expression to respond of interest. I thought that was on the 14th or the 15th, and then this is dated the 16th. So it seems to be in sequence to me.
Q. Got it. Okay.
So this likely followed the original e-mail asking about interest?
A. Yes.
(Clarification requested by the Realtime Stenographer.)
Q. Then just so that it's abundantly clear, it says at the bottom, KC-BEATTY0200.
Mr. Buchalter, can you turn to page 33 of this exhibit.
MR. LYNCH: Do you have a Bates number on that?
A. Is it Bates 2033 --
Q. 232.

A. 23 -- thank you.
Q. It has a 33 at the bottom; correct?
Do you see that?
A. Yes.
Q. This is the Statement of Work?
A. Yes.
Q. So the Statement of Work was "... to provide independent construction program assessment and advisory services..."; is that right?
A. Yes.
Q. Tell me sort of your -- when you see this, and you talk to Mr. Aziza, how you guys decided, yes, this is something we want to participate in.
A. I thought we were exceptionally well positioned for this between our disciplinary expertise and our familiarity with Washington monuments and our true independence here in that we had, you know, no prior work, no association.
Q. Now, you mentioned that you fixed in time, roughly, the outreach as around July 15th.
Are you aware of whether Mr. Aziza

had any conversations with Matt Floca prior to that time?

A. I'm not.

Q. So you're not aware that Mr. Aziza had a call with Mr. Floca on July 10th?

MR. LYNCH: Objection. Calls for speculation.

You can answer.

A. I'm not.

Q. Did you talk to Mr. Aziza when you got the solicitation about whether he had had any other outreach from the Kennedy Center?

A. No.

Q. At any point in time did Mr. Aziza tell you that Mr. Floca had given him information about what he was looking for; that is, some information outside of times when you talked to Mr. Floca?

MR. LYNCH: Objection. Calls for speculation. Vague.

You can answer.

A. Khaled was the project lead, so it's possible that he had been contacted and had had some

initial discussion.

Q. When you say "the project lead," what is the difference between that and your role, which I understand was as ultimately responsible for the overall recommendation?

A. Well, I mean that in the project manager sense.

Q. Mm-hmm.

A. He had day-to-day operating responsibility. So, yeah, I mean, I would expect him to take that kind of initiative if he received a call or something of that nature.

Q. I assume, also, though, that you would expect him to tell you if he had a substantive conversation with Mr. Floca about the terms of the engagement?

A. I think what's important there is you said "substantive."

I mean, if they had a conversation where Mr. Floca indicated that they were going to make this solicitation, and there were things they were looking for in respondents. So, I mean, that's

gathering intelligence so we can make a compelling proposal.

Q. So which way does that cut? Would you --

A. I would not expect -- I would expect Khaled to do that in the course of his duties.

Q. Okay.

A. That wouldn't be material information for the conduct of the work.

Q. Would it be material if Mr. Floca expressed preferences for the outcome?

MR. LYNCH: Objection. Vague. Calls for speculation.

You can answer.

A. I -- since I don't know about the conversation, I don't know what was said.

Q. Right, but if he had -- if Mr. Floca, the person responsible for the engagement, had suggested that he had a preference for the outcome, I assume that's something that you would want to know?

MR. LYNCH: Objection. Foundation.

Calls for speculation.

A. I would want to know. I don't know that it would affect my ultimate opinion.

Q. Let me just ask, then, because this -- the purpose talks about like an independent review.

Tell me your understanding of what that means, "independent."

A. I think what's important about that is the way we did the work here. We approached this as, is any of this work necessary? Is -- are all of the options for affecting the work possible? You know, the amount of funding is sufficient or not sufficient. Let's have a cold-eye look at the state of affairs.

Q. Did you have an understanding of whether the Kennedy Center management had a preference in the outcome of your recommendation?

A. No.

Q. No.

So you didn't understand that Mr. Floca preferred the option of a two-year full closure of the main building?

MR. LYNCH: Object to form. Lacks foundation.

You can answer.

A. I don't know what "preference" means. I mean, did he have -- did he professionally state that, you know, in a trustee meeting or something in my presence, you know, no. So --

Q. Okay.

A. So I don't know what you're referring to.

Q. So I'm referring to -- I guess, did you have an understanding of whether Mr. Floca himself had a recommendation for whether the Center should close for two years or not?

MR. LYNCH: Same objection. Lack of foundation.

You can answer.

A. No. No, I honestly don't recall. No. I was -- and I was not instructed with a preference or something.

Q. Just to be clear, you said you don't recall Mr. Floca saying that it was his

recommendation to close the Center for two years?

MR. LYNCH: Asked and answered.

You can answer.

A. No. I don't have that recollection.

Q. Now, I assume that you were familiar with this lawsuit before you signed the engagement.

MR. LYNCH: Is there a question?

Q. Correct?

A. I'm not sure that I was. I think certainly -- certainly, I will say, early I read the opinion of the Court, and perhaps everyone in this room knows the date of that better than I do, but that would have been the first piece I would have read.

I absolutely did that to understand what the issues were between and among the Board and this project.

I don't think I did that before proposing.

Q. Okay. Did you do that before your presentation to the Board on August 13th?

A. Yes.

Q. In reading that opinion, you would have known that Kennedy Center management had previously recommended a full closure?

MR. LYNCH: Objection. Lacks foundation.

You can answer.

A. If the document says that, yes.

Just to be clear, your previous questions were, had Mr. Floca told me or instructed me. You're now saying, did I read it in papers.

Q. So --

A. And so if it's in the papers, I read it.

Q. Okay. But I actually just want to know what your understanding was.

Did you have an understanding before the August presentation at the Board that Mr. Floca had previously recommended a full closure for two years?

MR. LYNCH: Objection. Lacks foundation.

You can answer.

A. I don't recall. I don't recall that it

did. It wasn't -- it was something that I was not focusing on. I was focusing on my own analysis and opinions.

Q. So you're saying that you did not recall at the time that you made the presentation to the Board on August 13th whether Mr. Floca had previously recommended closure in this case?

A. I don't.

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. I don't recall that.

Q. Who did you understand that you were hired to work for; that is, who was the client?

A. The Kennedy Center.

Q. Were you retained by management or the legal department?

A. I guess management. I was retained by the organization.

Q. Did you have a separate consulting relationship with the general counsel, Elliot Berke?

MR. LYNCH: Asked and answered.

You can answer.
A. No.
Q. Were you ever told that you were being engaged to assist the general counsel in providing legal advice to the Center?
A. No.
Q. You mentioned previously that this was a competitive process, this solicitation; is that right?
A. Yes.
Q. All right. Were you told who else received the solicitation?
A. No.
Q. I'm going to direct you to Tab 8.
MR. LYNCH: Are we going to mark this as Exhibit 2?
MS. FREENY: Yes. I was waiting.
MR. LYNCH: Yeah.
Q. You can see on the front, it says Confidence. We're going to -- I'm going to ask to have this marked as Exhibit 2.
(Buchalter Exhibit 2, Delta Pitch Deck,

KC-BEATTY0006-0048, was marked for identification.)

Q. Mr. Buchalter, if you could take a look at this and let me know, is this a pitch deck that you submitted in connection with this engagement?

A. Yes.

Q. Do you recall when that was submitted?

A. I think we made this presentation on the 20th of July.

Q. Okay.

A. 20th or 21st.

Q. Okay.

A. I can't remember if we submitted the deck in advance or we presented it on the screen and subsequently followed up with it, but somewhere between -- you'd have to help me with the calendar on what day of the week the 20th is. I think the 21st is a Tuesday. So somewhere in that sort of Monday to Wednesday of that week.

Q. Who attended the presentation from the Kennedy Center?

A. Oh.

Q. Is it a lot of people?

A. No. You're just testing my memory.
So I know that Mr. Floca and Ms. Robinson, Ms. Robinson as the contracting officer, were there, and I would say there were three or four other people.
Q. All right. I'm going to turn back to this, but if I could have you turn back to Exhibit 7 -- or sorry, Tab 7, Exhibit 1.
This is the Solicitation?
A. Yes.
Q. Should have done this before, but if I could have you turn to -- it's marked page 40, or also KC Bates Number 239.
Do you see at the top, under the section The Core Advisory Challenge, it talks about four distinct operational phasing scenarios?
A. Yes.
Q. Can you tell us what your understanding of those is.
A. The four. I actually -- I know what you're talking about, but I don't see what you are referring to.

Q. Do you see 1.3, and then the word "four" three lines down?

A. Got it. Thank you. Yes.

So the Center had originally conceived of there being four operational approaches to the repair and renovation of the building.

One was to maintain full operations, and have isolated projects occurring for presumably a very long period of time that were patchwork projects that would ultimately lead to the necessary repair.

The complete opposite was shut down everything, the REACH, the whole site, fence at the perimeter. You know, the whole facility dark.

In the middle were two scenarios. One was to -- what I would describe as shut down the main building, keep the REACH operational, use off-site activities and the REACH to support programming, and focus on the restoration of the main building.

Or, a variant of that, where the main building was open to the public, but phased

construction was occurring within it such that portions of the main building from time to time were not available to the public.

Q. Where did you -- where or how did you receive these four scenarios?

A. They were -- well, they were outlined to us. I don't recall the source document.

Q. Was it in a document?

A. Well, I have a pretty vivid recollection of what the four scenarios are. So they must have been in the document. There's a -- there was also a set of numbers, and I know that along with those numbers, there are -- in interviews with finance staff, I understood what those numbers were around.

Q. Yeah. When you say "the numbers," are you talking about something that was fiscal year '27 budget scenarios?

A. I'm talking about that.

Q. That, if you recall, had three scenarios; right?

A. Yes.

Q. I saw your counsel flipping through the

exhibit binder. I don't know if that means that you think that those scenarios are in the report.

MR. LYNCH: No. There is definitely a document that we produced that lists four scenarios.

MS. FREENY: Yeah. We would be, like -- just in the interest of time, it would be helpful to know what that is, if you are able to identify it.

BY MS. FREENY:

Q. Then like just in -- sort of orient me in time when you would have -- when you recall, kind of knowing, these are the four scenarios that I'm going to be asked to look at. Is that before or after you were engaged?

A. I think before, and in fact, my reaction to your question is early.

Q. Okay.

A. So if not before, right at the outset. But I think before, because it would have, obviously, affected our pricing proposal.

Q. Got it. And Kennedy Center management

is the one that actually defined the four scenarios that you were going to look at?

A. Yes.

Q. Did any of those scenarios contemplate, like, the possibility of full closure for less or more than two years?

A. Help me with full closure.

Q. Yes. Full closure of the main building.

A. For -- did any of them involve closure of the main building for less or more than two years?

Q. Yes.

A. Yes.

Q. Which one?

A. I don't remember the numbering sequence of 1 through 4.

Q. Okay. I guess I'm trying to understand because you talked about the full shutdown of everything including the REACH; was that for two years or how long?

A. Yeah. That would have been for two years.

Q. You talked about closure of the main building. That was for two years?

A. Yes.

Q. I'm just trying to understand what input you were given versus what input you -- what you actually were asked to validate.

So this two-year period, was that given to you, two-year closure of the main building, or is that something that you independently came to?

A. Right. So I want to be careful here, just in the interest of truth.

So the two years comes from Jones Lang LaSalle's IPS, integrated project schedule. It did not come as an instruction. You know, let's close it, and make sure that that happens in two years.

What came was, as you synthesized the documents -- so where I'm struggling with my answer, but it's only an intellectual struggle, is the reason that I know that is from my review of the project information.

Q. Okay. I guess what I wanted to make

sure I understand is that you took it as given that the proposal for closure of the main building would be closure for two years?

A. I took it based on the analysis performed. I didn't take it as a blind instruction.

Q. Understood, and I'm not suggesting that. I'm just trying to figure out what your -- what input you validated versus what input you relied on someone else for.

So you did not independently validate this is a two-year project. You relied upon JLL?

A. Correct.

Q. It sounds like at least one of the options you called "patchwork," and one of the other options involved phased construction. What are the difference between those two in your understanding?

A. Small, isolated projects that are more akin to maintenance projects is the first instance.

The second are actual: Let's shut down portions of the site; fence them off; barricade areas from the public; erect scaffolding; do

invasive work.

Q. That latter scenario, is that what would have contemplated, for example, closure of one of the three performance halls, such as the opera hall?

A. Correct.

Q. Does that mean that the first -- again, don't -- I don't mean to suggest that numbers matter, but the first --

A. I'm with you.

Q. -- the first scenario that we talked about, that that contemplated not performing some of the work that the other scenarios contemplated?

MR. LYNCH: Objection. Form.

You can answer.

A. I couldn't reconcile that approach with the body of technical evidence on the building; the systems-level work sort of defies that way of repair, that method of repair.

I simply, logically didn't understand how you could -- for example, how can you repair a portion of piping, and then a week later, the next segment of the piping, and so on.

You have to tear down the wall and fix the piping.

Q. I'm probably going to return in more depth to how we got from four scenarios to two scenarios later. But I just want to sort of understand sort of the inputs to begin with.

What was your understanding of, then, why that scenario was presented?

MR. LYNCH: Objection. Calls for speculation.

You can answer.

A. I took it to be just, like, the necessity for full closure. The reason I think of one -- each of them as extremes is that I thought that it was a logical, sort of, the waterfront, right. What are all of the possible ways that you could do this.

Q. So we're talking about all of the possible ways. It seems to me that one possible way also might be to vary from the two-year full main building closure recommended by JLL.

Is that not among what would be

considered all of the possible scenarios?

MR. LYNCH: Objection.

If you understand the question, you can answer it.

A. And there is the alternative, which is to do phased construction throughout the building.

My qualification earlier was that it has to be of that magnitude.

Q. Yeah.

A. The physical asset is way past the point of maintenance projects, and it doesn't appear necessary to shut down the entire site, which at first, we evaluated whether it was possible to divide the fundamental systems of the site so that you could --

Q. Yeah.

A. -- maybe keep the REACH open.

Q. I guess what I'm asking about is the possibility, for example, closing the main building for one year, and then doing another -- however long it takes, that is phased. That's not something that you were asked to consider?

MR. LYNCH: Objection. Calls for speculation.

You can answer.

Foundation.

A. I tested the ability to disaggregate the JLL schedule and look at it without what we describe as concurrency. So remove the concurrency in the JLL schedule.

It's hard for me to imagine a project of this magnitude being compressed to less than two years.

So when I think about the scope of work, you can make it longer. I don't know how to make it shorter.

Q. What did you do to test that?

That is, I want to make sure I'm really clear.

Because it sounds like even though you're saying you were not asked to test a scenario of, for example, one-year, full closure of the main building, one-year remaining construction, phased or not. Even though you weren't asked to do that, are

you saying that you did perform analysis?

A. So yes. Because the project schedule has concurrency. It has overlap.

The easiest way to think about it is if you had two six-month phases, and they overlapped three months, you would have a nine-month duration for 12 months of work.

So I looked at it that way in evaluating the difference between closing everything for two years, which allows the efficiency of concurrency, versus if you disaggregate the scopes of work, you have to do it in more of a serial fashion; it extends out, as my analysis shows, 36 months, 45 months, et cetera.

Q. Where is that analysis specifically with respect to whether this could be done with less than a two-year full closure of the main building?

A. Well, the analysis -- there's no statement in my report because the extremity of doing it in two years, to me, looked like the shortest that it could be done. That if you take those scopes of work that I'm describing, and you

stack them all up so they're 100 percent concurrent.

First of all, it doesn't -- the world doesn't work that way. You need trades to move in a sequence through a building.

The other thing is that that would be a truly amazing amount of work to do, you know, $250 million worth of work in a year. It's just -- it's a kind of a time-in-motion problem.

Q. Okay. But I guess, does that conclusion appear anywhere in your report?

A. No. Do I state that doing it faster than two years seems unlikely? I do not.

Q. When you say "doing it faster," so this assumes that all of the projects that are the "it," "doing it faster," all of the projects require some form of shutdown?

MR. LYNCH: Objection.

You can answer, if you understand the question.

A. First of all, you're speaking in absolutes. So do almost all of the utilities and structural elements require shutdown? Yes.

If we're on the margins of venue renovations, cosmetic upgrades, no, I don't think anybody thinks that requires a building shutdown.

Q. Did you perform that analysis of, like, which things required full building shutdown, which did not, or were you relying on the JLL report?

MR. LYNCH: Vague as to perform an analysis.

You can answer.

A. I did classify work as Priority 1 or Priority 2 to identify its import.

In fact, I am the one that advances the notion that the utility work needs to be done first; whereas there's a lot of emphasis on the structural elements, the soffits, and these, you know, other structural items.

But to me, the most invasive work is the -- is the utility work. The mechanical, electrical, plumbing, fire, and life safety work.

Q. How long did you estimate that to take?

A. I'd have to look again at the JLL schedule.

Q. Okay.
MR. KRISTOFCAK: Can I just clarify one thing?
MR. LYNCH: No. You can't ask questions. You can ask questions to her.
Q. You mentioned that almost all of the work required shutdown; is that right?
A. The utilities and structural work.
Q. But not a full shutdown; correct?
MR. LYNCH: Objection. Vague as to "full shutdown."
You can answer.
Q. A full shutdown of the main building; correct?
A. No. No. It's physically possible to have periodic shutdowns of the whole building, to shut down portions of the building. That's all physically possible.
Q. What drove your conclusion that that shouldn't be done?
A. The cost.
Q. Anything else?

A. Schedule. The --

Q. Help me understand that because I'm not a technical expert.

MR. LYNCH: Just to make sure, did you finish your answer on the other issues, possible schedule --

MS. FREENY: Objection. Yeah. That's coaching.

MR. LYNCH: No. You interrupted him in the middle of an answer. So he can finish his answer before you do the follow-up.

MS. FREENY: Can I have you read back the question I asked.

(The record was read back by the Realtime Stenographer.)

THE WITNESS: How did schedule drive my --

BY MS. FREENY:

Q. Yeah. Or what that -- you told me what it is, but like, what that means in this context.

A. Well, cost and schedule are closely related. The first thing that happens when there is

a greater duration of construction schedule, schedule is prolonged; there's exposure to further cost escalation.

Then we always are concerned in this business, we're always concerned about productivity. So are you getting the greatest efficiency over the deployment of the trades.

We talked about work-front exposure. So it's as simple as every time that the workers have to arrive and leave, they have procedures they have to go through upon arriving and leaving, the deployment of their equipment, and the like, that if you can get them access to more work, you get more output versus having them do isolated areas and then leave.

That translates itself to productivity. So we always talk about cost, schedule, productivity.

Q. Okay.

A. There's, of course, safety, mission, all of those other things are at play as well.

Q. So you talk about mission. What

analysis did you do of the effect on the performing arts mission, if any?

A. Well, I view that simply as the availability of the concert space. You can't program the space if it's not available.

Q. Okay.

A. So you have to have the -- you know, the physical plan has to be there so that you can create the experience consistent with your mission.

The mission of the Center is only partially to maintain the building, and if you've got theaters out of service, you know, it seems like just logically, candidly, the shorter that period is, the better it is for the continuity of the mission-oriented operations at the site.

Q. Right.

How, then, though, are you able to weigh that against what you mentioned before, the costs and the schedule if they argue in competing directions?

A. Yeah. I find the condition of the facility so worthy of overstatement. This water

intrusion issue is incredibly invasive and accelerating, and will accelerate -- and that's the nature of it. That's not a Kennedy Center thing. That's water intrusion.

I think time is of the essence in addressing the physical plant. I think we've gotten to a point where that's just the physical state of affairs.

So weighing it is almost weighing, do you want to have programming at the Kennedy Center, you know, sort of, period, not how do you weigh doing it for -- you know, can we do it for another couple of years. Yeah, you can do it for another couple of years, and then you'll probably never be able to do it again without closure.

Q. Well, but you -- so I'm going to push back there because you said that phasing was feasible, right, phasing construction?

A. Yes.

Q. So it sounded like you were suggesting if we don't close the building, or the main -- you know, the main building, this problem won't be

solved.

But if the construction were phased, it would actually address those issues, right, just over a longer time period?

MR. LYNCH: Objection. Compound. Argumentative.

You can answer.

Vague.

A. Yes, and what's important, and I may have mistook, a little bit, your question is, but you have to do the work. That is my first opinion in my report. You have to do the work.

I can't entertain a world where, well, we could put off the work and have programming, and just live to see another day.

Q. Was someone suggesting that that was an option on the table, put off the work?

A. No, but I may have mistook your earlier question --

Q. Okay. I --

A. -- as can you -- could you wait?

Q. Yeah.

A. And I'm saying you can't wait.

Q. So let me be clear. I'm not asking can you wait. I'm asking for an assessment between various options, some of which may cost less.

A. Mm-hmm.

Q. Some of which may have a greater impact on programming and the mission, and how you weigh those two together.

You agree that in this -- you know, what I'm asking here is not do you do the work, but how you do the work.

You understand that?

A. Good. Yes.

Q. So how would you weigh that then? In your analysis, if you're saying, you know, one option is going to have a worse effect and/or negative effect on programming; the other option has costs. How did you, as the outside consultant, weigh those two?

A. By presenting my report to the trustees who can deliberate on that very issue.

Q. But how did you reach the results in

your presentation?

I'm trying to understand how you were weighing these competing considerations.

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. I was evaluating the relative merits of different methods of conducting the capital repair.

I realize it has implications for the mission and programming. I address how it is I think that those can be mitigated, but I obviously make primary my study and the issue of the building.

Q. Is that because you understood that to be part of your engagement?

MR. LYNCH: Objection. Vague.

A. What?

Q. The focus on construction.

A. Yes.

Q. I want to talk about the timeline.

Tell me your original understanding of the timeline for the work that you were going to be hired to do, because I'd like to take you back

before you were actually engaged.
A. We were under the assumption that we had 60 days to do the work.
Q. You say "assumption," but that actually -- that was sort of part of the Statement of Work or the solicitation, wasn't it?
A. Yes. You could point me to it specifically.
Q. Yeah.
A. But I'm sure we agree.
Q. I will, because I do have some questions about that.
If you could, take a look at Tab 7, marked Exhibit 1, and pages 36 and 37, or Bates 235 and 236.
A. Oh, yes.
Q. On page 37, that has the anticipated schedule for your work; is that right?
A. Yes.
Q. So it looks like a kickoff meeting within two business days. That's pretty standard, right, that time frame?

A. Yes.
Q. All right. The next is Document Review. Complete by Day 15.
Did I read that right?
A. Yes.
Q. All right. Is that typical, or is that fairly aggressive for a project of this magnitude?
A. It's not uncommon for it to be concurrent with the assessment.
So I --
Q. What do you mean by that?
A. I look at that whole section as 45 days.
Q. I got it.
So the 15 days is really just advisory, in a way. What you're looking at as an important factor or timeline is the assessment analysis complete by Day 45; is that right?
A. That's correct.
Q. But 45 days for this type of analysis still is pretty quick in comparison to sort of your average engagement of this type; is that fair?
A. Well, this is akin to a due diligence

assignment. You know, I perform this kind of work for institutional investors who are looking at, you know, a building that's -- or some sort of property that's in some state of repair, and they want an answer.

So, you know, I look at that as, that's kind of within a normal diligence period.

Q. Okay. But this project was to have you do an independent assessment and make a recommendation about something pretty significant for the Center's future; right?

MR. LYNCH: Objection. Calls for speculation. Vague.

A. Yeah. Yes, but again, akin to an institutional investor looking to invest significant sums of money, based on a risk assessment and my recommendation.

So I still think it -- you know, it falls within reasonable market bounds.

Q. Okay. I'm not asking if it was totally outside market bounds, but it's pretty aggressive in the sort of the grand scheme of things, in

comparison to average?
MR. LYNCH: Argumentative. Asked and answered. Calls for speculation. Vague.
You can answer.
A. No.
Q. No? It's not an aggressive schedule?
A. For a --
MR. LYNCH: Asked and answered.
A. For a diligence assignment, no.
Q. Then Draft Findings are submitted Day 50; is that right?
A. Yes.
Q. Help me understand your -- how things work in terms of when you're hired as an independent consultant, but you're providing draft recommendations.
What is the kind of input that you expect to receive that still maintains your independence?
MR. LYNCH: Objection. Vague.
You can answer.
A. Well, I believe in open dialogue with

any client, and I'm going to listen to their views, but it's what I accept and adopt that's important.

So again, I work in a commercial context all the time. Everybody's got strong wills and personalities, and they express themselves, but what it is that I'm willing to adopt and support is what keeps me independent.

Q. Do you ever receive -- I just mean this generally: Do you ever receive input from management trying to get you to change parts of your recommendation?

MR. LYNCH: Objection. Vague.

You can answer.

A. Yes.

Q. Did you here?

A. Oh, no. So this was a notably hands-off period of time.

Q. All right. I'll return to that in a bit, but I want to ask a couple more questions.

So the final assessment, your final report, was anticipated to be submitted 60 days after engagement; is that right?

A. Yes.
Q. Now, the time frame changed at some point. Tell us about that.
A. Well, I don't recall the conversations or the, you know, sequence as much as it just came to pass that a finance -- I think it's called Audit and Finance or Finance and Audit Committee, Building and Grounds Committee. A meeting was scheduled for August 3rd. We had commenced work on -- you know, we had been awarded on the 24th, but we commenced on the 27th. That's a Friday and a Monday.

Yeah, I was informed there was an introduction to those committees to talk about our -- you know, that we had been retained, and what we had set out to do.

Then I was informed there was a Board of Trustees meeting scheduled for August 13th, and that that -- those sets of committees needed to prepare a recommendation to make to the Board.

We scheduled a next meeting with the committees on August 10th, the subsequent Monday.

So began a -- you know, a very --

that, I will use the word "aggressive" -- aggressive deployment on our part, and a lot of hard work to make it to that first committee meeting -- to that second committee meeting on August 10th.

Q. The first committee meeting was August 3rd?

A. Yes.

Q. The idea was that you were presenting to help them prepare their recommendation to the larger Board?

A. Yes.

Q. When do you recall receiving that information that the timeline had changed and that there were these two subcommittee meetings?

MR. LYNCH: Objection. Compound.

You can answer.

A. I didn't receive both meetings.

Q. Okay.

A. So it's a sequence of events, but obviously, Monday the 3rd, I must have been informed.

I toured on, I think it was Thursday

the 30th --
Q. Okay.
A. -- and so I must have either known, or been told then. You know, so it's something of that ilk. Yeah.
Q. "Been told then," meaning the 30th?
A. Yeah. The 30th or --
Q. Okay.
A. -- thereabouts, I had been told and knew. Then -- actually, you know, I think Khaled told me, so I think he probably heard that on the 28th. There was an earlier tour.
Q. Okay. So you think the 28th would have been the earliest you would have known that the timeline was changing from what we just talked about?
A. I think the "you" there is Delta, and I think the "me" is like by the 30th and --
Q. Okay.
A. But I did understand that. I did not have material for the 3rd, and I was talking about our approach, and you know, what we had set out to

do, and how we were going to do it.

Q. Okay.

A. So I was briefing -- and certainly in my mind, and consistent with the expectations of the group, was briefing on the process.

Q. The process. Okay.

In your report, though, I think you said that you presented initial findings to subcommittees on both the 3rd and the 10th.

Is that not the case?

A. It is because I had toured --

Q. Okay.

A. -- and I had very stark observations.

In other context, I have seen this before, and I was really taken aback. I actually didn't expect what I saw, in that my prior experience was in a building that was built in the 1920s of -- you know, with similar issues.

So I just -- I wasn't ready for a building built in my lifetime to look like that.

Q. Okay. And so --

A. Because what does that say about me.

Q. I'm happy to say that I postdate the building of the Kennedy Center.

A. Good for you.

Q. Don't even ask about some of the people at the end of the table.

Does that mean, though, that the recommendation that you made -- or sort of -- so I misspoke there.

Let's use the words "initial findings," because those were your words.

You made initial findings on the 3rd to the Audit Committee?

A. Yes. And Building and Grounds. It was a joint -- it was two committees.

Q. Is it your recollection that both committees were present at both meetings? So there were two meetings, and both of them had Audit Committee and Building and Grounds?

A. Yes.

Q. Okay. So the third, you gave initial findings based on your tour?

A. Yes, and I am certain I was into the

technical reports by then as well, so I'm sure I had something to say about that.

Q. Okay. "Technical reports" meaning the JLL report; is that one of them?

A. Yes, and the Moore engineering reports are particularly robust.

Q. What about the 2021 comprehensive building report, did you review that as well?

A. I had that in my possession. So I must have been --

Q. Okay.

A. -- and if not, I was starting in on that.

Q. Okay. How -- do you recall roughly when you would have received the JLL report?

A. I don't remember how we did a document exchange. Again, I can only tell you our typical practice is we would have opened a site, and the Center would have sent it over.

I don't remember how that was all initially organized. That would have happened on the 27th, 28th.

Q. Okay. So you would have had a number of days to review the JLL report?

A. Yes.

Q. You would have needed that because it's a pretty complicated report; is that right?

A. Yes, and I also had toured on the 30th with John Cracraft, was -- he is the senior project manager from JLL.

So we had occasion not only to view the building, you know, together, but I was able to have something of an interview at the time with him, as well.

Q. I'm going to return to all of these things, and hopefully a little bit more chronologically, but I want to continue on to just the change in the timeline.

What did you -- when did you originally expect the Board meeting to be? Is that at the end of the 60 days with the final assessment report?

MR. LYNCH: Objection. Calls for speculation.

You can answer.

Vague as to "the Board meeting."

A. I don't recall if we had talked about some sort of interim report of findings or some sort of status meeting.

I -- you know, I certainly thought that the 45 days was going to stand as the period for the analysis, regardless of whether there had been interim requests for communication.

Q. Okay. But you didn't end up having 45 days to do that analysis; right?

A. Right.

Q. You would agree that having more time permits an adviser to test more assumptions?

MR. LYNCH: Objection. Vague.

A. No.

Q. No. Having more time does not permit an adviser to test more assumptions?

A. We had --

MR. LYNCH: Objection. Asked and answered.

A. We had less time, so we had more people

working longer hours than originally planned.

Q. Is that all? That was the only change?

A. Well, I would like to think that there's no change in the quality of the work, yes.

Q. So I'm not asking really about the quality. I'm asking about the scope of the work, the amount of work.

There were things -- certainly, there must have been things that you otherwise would have done in a 45-day period that this time frame just didn't allow you to perform?

MR. LYNCH: Objection. Lack of foundation.

You can answer.

A. No. I think we did what was necessary, and I felt very personally it was a commitment that we would meet an accelerated schedule, so eight of us worked very hard to get it done.

Q. The decision to accelerate, though, that was not Delta's decision; correct?

A. That's right. That, I understood to be a schedule necessity of the Board.

Q. What did Matt Floca tell you about the change in the schedule, that scheduling necessity, as you call it?

MR. LYNCH: Objection. Lacks foundation.

You can answer.

A. That this was the schedule.

Q. Did he tell you why, between the time that you were engaged on the 24th and then the time that you were told there is a change, like, what occurred to cause that change?

A. No, he didn't. And you know, given that it could have been any number of things, I didn't -- it's not like I'm going to say, well, why is this happening.

I'm a professional. You just deal with it.

Q. All right. I want to get you to turn back to Tab 8, which has been marked as Exhibit 2. This is your pitch deck. I'll try to go through this a little quickly.

But I just want to have you turn --

just to make sure I understand what you had pitched when you were trying to secure this work related to the schedule.

If you turn to the page that says Deliverables, Bates 14 at the bottom.

A. Takes me two pairs of glasses to get through the day. Okay.

Q. All right. Do you see that slide marked Deliverables?

A. Thank you.

Q. It has three phases of work.

A. Yes.

Q. These are the three phases of work that you proposed to correspond to the schedule that we looked at previously in the Statement of Work; is that right?

A. Yes.

Q. Phase 2 is "Preliminary Assessment Findings."

Do you see that?

A. Yes.

Q. And also "Draft Recommendations"?

A. Yes.
Q. It would be fair to say that's roughly what you talked about within the 45-day time period?
A. I think so. Can we tie it to this --
Q. Yes. I will.
A. Okay.
Q. Phase 3, that's the "Final Independent Construction Assessment Report" (as read) and "Executive Summary Presentation."
Do you see that?
A. Yes.
Q. Executive Summary Presentation, what did you understand that to be? That's the final recommendation to the Board of Trustees?
A. Yes.
Q. Turn to the -- two pages later -- I guess four pages later.
It says Execution With Speed. Bottom number is Bates 17.
A. Yes. I -- can we pause for a second.
I don't have Bates numbers on this.
MR. LYNCH: These are the Bates

numbers here, the red.

Q. Sorry. They're very small.

I will state for the record that they were applied by your counsel, not us.

All right. So you see Execution With Speed with that tiny Bates Number 17 at the bottom?

A. Yes.

Q. Now, this is -- this corresponds to both the last slide we talked about, and you would agree, the Statement of Work schedule, is that right, the three phases?

A. Yes.

Q. All right. This contemplates a 60-day schedule; correct?

A. Yes.

Q. All right. It was at least, as Delta characterized it, an aggressive schedule?

A. Yes.

Q. So as you contemplated the work based on the Statement of Work, you contemplated six weeks for draft recommendations; correct?

A. Yes.
Q. And then eight weeks for a final recommendation and presentation to the Board; correct?
A. Elapsed, yes.
Q. I'm sorry. Say that again.
A. Elapsed. I just don't like the way you're saying -- it's not eight weeks to do it. It's within eight weeks.
Q. But you contemplated it would be an aggressive schedule for you to complete the final recommendation and executive briefing within 60 days?
MR. LYNCH: Objection. Asked and answered.
You can answer.
A. Yes.
MS. FREENY: I'm going to actually ask if we can take a break.
THE WITNESS: Sure.
MR. LYNCH: Sure.
(RECESS, 10:58 a.m. - 11:05 a.m.)

BY MS. FREENY:

Q. Mr. Buchalter, the next sort of overarching topic that I'd like to talk to you about is really just the chronology in between your retention as a consultant and the presentation that you made to the Board, okay?

A. Yes.

Q. You said you were retained on the 24th; is that right?

A. Yes.

Q. We think that there was a kickoff meeting on July 7th.

Does that match your memory?

A. No.

Q. Sorry. It shouldn't. Good catch.

July 27th.

A. Yes.

Q. Who attended that?

A. Khaled Aziza, and I believe it was Sean Dooley from Delta.

Q. From Delta. And then who from the Center?

A. I'm not sure. Matt Floca would have been there.

Q. What was the first telephone call, oral discussion, that you ever had with Matt Floca; was it that meeting or before?

MR. LYNCH: Objection. Compound.

You can answer.

A. I don't recall. I may have spoken to him briefly before.

Q. What do you recall about the first substantive conversation that you had with Mr. Floca about this engagement?

A. Well, I -- my first substantive conversation with him would have been during my visit on the 30th of July.

Q. So the kickoff meeting was before that, July 27th.

Does that mean that was not -- did not involve substantive conversations with Mr. Floca?

A. With me. Not with me.

Q. What did the meeting involve; did

someone else take the lead?
A. Yes.
Q. Okay. Tell us about that?
A. Khaled took the lead. It was, you know, a conventional kickoff, who were the participants, where are the documents, how do we get access to the documents.
They arranged -- they, Khaled and I believe it was Sean Dooley, arranged to tour on the 28th of July.
Q. Did you ask for that, or did the Center offer that?
A. The tour?
Q. Yes.
A. I definitely asked for that.
How we decided to do it the 28th with some of the group, and then on the 30th with me. I mean, those were all just scheduling factors. I forgot what my conflict was, but I wasn't able to be there on the 28th.
Q. During that kickoff meeting, did anyone from the Center talk about their objectives for your

engagement?

MR. LYNCH: Objection. Vague.

You can answer.

A. I don't know. Having not been there, I don't know.

Q. Oh, I'm sorry.

I missed that, you were not actually on the call. I should have paid attention.

You were actually not on that kickoff meeting?

A. No.

Q. Okay. I misunderstood you. I thought you just did not take the lead, but you just did not attend at all?

A. I did not attend.

Q. What did Mr. Aziza, to your recollection, tell you after the call about how the call went?

MR. LYNCH: Objection. Vague.

You can answer.

A. Again, as a sort of standard kickoff call, it's who are the participants. You know, who

is going to be involved. What are their names and contact information. Where is the source documentation. How do we get that transferred over to Delta.

You know, who can we call if we have questions, if we need things. It's a very -- it's not a substantive meeting. It's an important meeting for the administration of the work.

Q. How did you -- how did Delta then come to an understanding of the material that it would receive as part of the engagement to analyze?

A. Well, twofold.

The Center told us there were a variety of technical reports and studies, and then we, you know, know what we're asking for.

So, for example, give us three years of audited financial statements. You know, things like that are very conventional for us to ask for.

So it would have been a somewhat simultaneous what we typically see, what they think might be helpful. Then as we get things, we review. We ask questions, and you know, where are things,

and is there more of this.

Q. Mm-hmm.

You said, "the Center told us." Just put some more meat on that bone. When did the Center tell you that -- here are the reports that you are going to get?

MR. LYNCH: Objection. Asked and answered. Lacks foundation.

You can answer.

A. On July 27th, the -- you know, the core reports, the DLR, CBP, the JLL report of '26, you know, William [as spoken] Moore reports, because, you know, we're a technical crowd, so we would have -- we would always say what types of inspections and reports, and what technical reports do you have, and what does that body of evidence look like.

Q. Was there a list of reports that the Center was going to provide to Delta?

MR. LYNCH: Objection. Vague.

You can answer.

A. I don't recall. That's actually part of

my answer is I'm trying to remember if we did a written information request list, we call them an IRL, or if, candidly, I told Khaled, get yourself on-site, and start making the equivalent of an electronic war room.

So just start getting things was what I had said to Khaled.

So if we went through the structure that we typically would, where we would issue an IRL, start collecting documents, you know, kind of chasing documents down, I think we may have truncated that and said, give us everything you've got.

Q. If there wasn't an IRL, how would the requests from Delta to the Center, for information, have been conveyed?

A. There may have been e-mail. Again, there was -- we were talking a lot that week.

Q. Yeah.

A. Oh, and -- you know, and I do have to say, the communication with the Center was very open. They were not -- this was not impeded by

formality or undue process.

Q. You mentioned financial records. Who decided which financial records you would receive?

Was that -- did -- was that what the Center chose to provide, what Delta requested, or a mix of both?

MR. LYNCH: Objection. Compound.

You can answer.

A. What we asked and what was represented as available.

So by way of example, '23 and '24 are audited; '25 is unaudited.

Q. Yep.

A. I never ask for -- you know, if you've got an audit, give it to me, right. So it's the combination of what we want and what there really is.

Q. Okay. I notice you did not look at FY26 financial records.

Why is that?

A. I understood that because of the September fiscal year, they didn't exist.

Q. Okay, but underlying financial records, financial statements from -- monthly reports would have existed for about nine months at the time of your engagement; right?

MR. LYNCH: Objection. Calls for speculation. Lack of foundation.

You can answer.

A. Yes. There would be management accounting through that period.

Q. But you didn't ask for that FY26 data?

A. I don't recall. I don't recall enough to say I -- you know, I may have said, do you have something in suitable form? You know, and I may have been told, no, it's too rough and unreviewed.

Q. Okay. It sounds like something you remember, though, that conversation; being told the material was too rough for you to review?

A. Well, I had definitely been told that '26 had not closed yet. Yeah.

Q. But you also recall being told, the data is too rough for you to review?

MR. LYNCH: Objection. Misstates

the testimony.

You can answer.

A. No, I don't know that I was told that. I clearly am under the impression, though, that edited and complete fiscal year that -- yeah, that it was not made available.

Q. It was not made available, but you asked about it; right?

A. I --

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. I ask for -- I conventionally ask for three years audited financial statements and current-year unaudited.

Q. Yeah. Current year would have been the nine months for FY26; right?

A. Yes.

Q. So you would have asked for that from the Center?

A. Yes.

Q. They declined to provide that?

A. Yes, or -- well, didn't make that available. I don't...

Q. Yeah. Is that common for a client to not make something available that you have requested as the independent adviser?

A. Is it common? It happens.

Q. Okay. Should it happen?

A. It should happen if management's got some material reason to not provide it, yeah.

Q. What was the material reason for --

A. No, I'm --

MR. LYNCH: Objection. Calls for speculation. Lack of foundation.

You can answer.

A. I'm answering your question generally.

Q. So specifically, what was the material reason provided here?

A. I don't know because I didn't get it.

Q. Did you push back?

A. I found -- I knew what I needed to know in terms of the magnitude of operating losses versus the sources of revenue, so I was able to continue.

Q. You were able to continue, but you would have liked to have had the fiscal year '26 data, wouldn't you?

A. I am a consultant. We would like to have everything, all the time.

Q. That includes the fiscal year '26 data that you requested from the Center; correct?

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. Yes.

Q. You mentioned the difference between audited and unaudited financial data. So the fiscal year '25 data from the Center that you were provided, that was unaudited; is that right?

A. Yes.

Q. Okay. Is there a difference when you're performing -- when you -- and here, I mean Delta.

When Delta is performing financial analysis, is there a difference if you're looking at audited financial data than unaudited financial data and how you approach the information you are

provided?
A. No. There is no difference in how you approach the information.
Q. What is the difference?
A. Your ability to rely on the information.
Q. And audited would be a greater ability to rely on the information, I assume?
A. Yes.
Q. Correct.
I assume you would prefer to have audited data wherever possible?
A. Yes.
Q. Do you know why the fiscal year '25 audit had not been completed by the time you did your analysis?
MR. LYNCH: Objection. Calls for speculation. Lack of foundation.
You can answer.
A. No; however, in the industry, I do know that the audit firms will manage their workload based on, you know, public versus not public, and so on.

So it may have just been a backlog. I know BDO does the work.

Q. Mm-hmm.

A. They may have agreed to schedule it at a certain time of the year for fee reasons.

Q. Do you know that, or is that just a process --

A. No. I'm just answering why it doesn't -- I'm a little bit blasé on why they weren't yet audited.

Q. Okay.

A. There are very conventional reasons why that may have occurred.

Q. There are also reasons, though, having to do with issues of the finance that could cause an audit not to have been completed; correct?

MR. LYNCH: Objection. Vague. Lack of foundation.

You can answer.

A. Yes.

Q. Fiscal year '24, you reviewed those -- that data. That was -- that audit was completed in

March; correct?

MR. LYNCH: Objection. Vague as to March of what year.

A. I don't know.

Q. Did you ask the Center about the status of their fiscal '25 audit?

A. I don't think so.

Q. Did anyone mention to you from the Center about the '25 audit and why it was still open?

A. No.

Q. All right. Is there anything that you -- other than the fiscal year -- let me -- sorry. Let me restart that question.

Is there anything other than fiscal year '26 financial information that you requested from the Center and did not receive?

A. No.

Q. We talked about the JLL report, and I think you said that you thought you had that pretty early on in the engagement; is that right?

A. Yes.

Q. I just want to understand a little bit more about interactions with or about JLL.

So I am going to direct you to Tab 2.

MR. LYNCH: Shall I?

MS. FREENY: Yes. What exhibit are we on, Chris?

MR. LYNCH: 3.

MS. FREENY: We'll have Tab 2 marked as Exhibit 3.

(Buchalter Exhibit 3, e-mail chain, 8.8.26, KC-BEATTY0405-453, was marked for identification.)

BY MS. FREENY:

Q. I will represent to you that this is a grouping or collection of different e-mails that we received in discovery.

Do these look familiar to you?

A. Yes.

Q. Was Delta involved in helping collect information to respond to Plaintiff's discovery request in this case?

A. Yes.

Q. Were you personally involved?
A. Yes.
Q. What did you do to collect your e-mails and other information for discovery?
A. Yes. I am fastidious about my filing in my e-mail. So I looked in my Kennedy Center e-mail box. I identified each person. I searched for all of the Sents and Received by that person, and then produced, probably in the most clumsy way, produced, by person, each block of e-mails.
Q. Do you recall roughly how many pages?
A. No, but I remember it being -- I don't know, it was like 50, 50 e-mails or something like that.
Q. Did Mr. Aziza also collect e-mails that he had with the Center?
A. No. But you see him copied on many of these.
Q. But that means that if the Center had communications only with Mr. Aziza, and not with you --
A. Yeah.

Q. -- that Delta would not have produced those e-mails; correct?

A. That's right. I suspect that there's very little there that qualifies in that regard. And even I noticed, and I'm sure everyone in the room noticed, that most of these e-mails are confirming meeting dates and things like that.

Q. But Mr. Aziza could have e-mail communications with, for example, talking about the document requests. The requests for documents that we just talked about, since he took the lead on that?

MR. LYNCH: Objection. Calls for speculation. Lack of foundation.

You can answer.

A. Could have, yes.

Q. So within Exhibit 3, I want to turn your attention to at the back -- whoops. Or, not in the back. There's a very small Beatty 437.

It also has a number 33 above it.

A. I'm sorry. Repeat that. Beatty 4 --

Q. So 0437.

A. Yes.
Q. All right. I want -- I'm going to turn your attention to the very bottom, the last e-mail that is dated August 3rd, 2026.
Do you see that date?
A. Yes.
Q. I just want to turn your attention to the fact that the From has been redacted.
Do you see that?
A. Yes.
Q. I think I probably know the answer, but sitting here today, do you know who that -- this e-mail is from?
A. It's an invitation to a meeting.
Q. Take a look, if you can, to the very -- two pages later, marked 0439, or also 35?
A. Mm-hmm.
Q. It looks to be just a signature on that page?
A. Mm-hmm.
Q. Do you see 0439?
A. Yes.

Q. It talks about -- it looks like kind of the standard e-mail disclaimer on an e-mail that talks about JLL.
Do you see that?
A. Yes.
Q. Does that suggest that this e-mail came from JLL?
MR. LYNCH: Calls for speculation. Lack of foundation.
You can answer.
A. Let's see. Yes.
Q. Do you recall receiving e-mails from JLL in connection with this engagement?
A. I mean, I can only say that I see that I'm a To here.
Q. Yeah.
A. I don't recall.
Q. Okay. Are any of the folks that are unblocked to your knowledge from JLL?
A. Jennifer Hood.
Q. Okay. What do you recall about your conversations -- well, let me ask: Did you have

conversations with JLL, for example, during a Teams meeting?

A. Oh.

Q. It looks like you perhaps recall what this is?

A. This is a meeting that I did not attend. This is -- somebody at JLL, I guess, John Cracraft, set up some sort of recurring project management meeting that was about -- I think it was really about their work, and someone, probably, you know, in the spirit of inclusiveness, because we had just toured, included Khaled and I, and then I -- because I now recognize this KC Project Daily touch base.

I never attended these meetings. I don't think Khaled did, either.

Q. So the KC Daily touch base, to your understanding, was a touch base with JLL and the Center?

A. Yes.

Q. Not with Delta?

A. Right.

Q. We talked earlier about something called

the fiscal year '27 budget scenarios.
Do you recall that?
MR. LYNCH: Objection to the extent it mischaracterizes.
But you can answer.
A. Yes.
Q. Okay. Well, if your counsel objects, what -- I thought I heard you talk about something, like a document with budget scenarios.
A. Yes.
Q. How would you refer to that document?
A. A 2027 forecast.
Q. You said forecast?
A. Forecast under various operating scenarios.
Q. What is your first recollection of receiving that document?
A. So let me think here. I'm terribly sorry.
So around the 30th -- I think that's right. I think the 30th was the day that I toured, but then I stayed in the outer -- it was in the sort

of outer office of Mr. Floca. It's a double-office kind of setup.

I had a discussion with Donna Arduin about -- thinking about this not just as, you know, the capital cost, but the operating expenses.

And I'm almost positive that it would have been that day that she said, you know, we've done work and forecasting in that regard.

I know in particular, and in fact, the e-mail record showed -- refreshed my memory of this when I was producing it in this case, that the weekend before the 10th, so like, August 8th, I was very closely scrutinizing the operating results.

So terribly long answer of recollection, so between mention on the 30th, delivery analysis, and questioning, we now get to the 8th. So sort of that one-week period.

Q. Okay. I want to take you back first to that conversation that you had on the 30th with Donna Arduin.

Who initiated that conversation, she or you?

A. I did.
Q. What was your objective in talking to her about finances?
A. Understanding that the impact on the operations, the -- literally, the cash flow operations to the Center under different scenarios.
My objective was to understand whether the cost of operations would differ under closure versus continuing operations, and whether the -- because I had my own views of what I thought would happen to the operating income.
Q. Okay. Tell us about those.
A. The operating income?
Q. Your own views about what would happen to the operating income.
A. Yes.
Again, I may have even been reflecting on my time with the library, but it is often misunderstood that the operating performance of a facility is impacted by the construction and the environments you create.
So I wanted to make sure that,

again, I was doing the -- if I'm sitting in the seat of the trustees, and they're hearing an analysis and recommendation, are they getting a view on what happens to the revenue function of their institution during construction.

Q. Okay.

A. And is it relevant that if you're closed, revenue's probably pretty low, but before you overstate revenue, if you are open, partially open, then, you know, let's understand that against an operating cost set, because that's another use of funds.

Remember, my whole orientation is sources and uses of capital.

Q. To offer that perspective to the Board, that meant that you need financial information from the Center?

A. Yes. I needed their projections, their expectations of income, pledges, and operating expenses.

Q. What was your understanding about the -- I guess the role that Delta was to play in terms of

financial analysis versus receiving projections from the Center and just simply relying on those?

A. Simply relying on those?

Q. Mm-hmm.

A. Or using our professional judgment and evaluating them?

Q. So you tell me.

A. When we receive information like that, we use our professional judgment, and we evaluate the reasonableness of the figures, their consistency with the financial statements, audited, that we have in our possession; and our understanding of the competency of the preparer, and how they have gone -- what process they have gone through, and how they stand up to their questioning.

Q. What was your assessment of the preparer, Donna Arduin?

MR. LYNCH: Objection. Vague.

You can answer.

A. She is the Chief Financial Officer of the institution. She is in a position to know and to understand those figures, and she has been

involved with the same historic results that we -- that are audited, and we are reviewing.

Q. Was she involved in the fiscal year '24, the last year that you have audited statements?

MR. LYNCH: Objection. Lack of foundation. Calls for speculation.

A. I don't know when she was appointed to the position.

Q. Okay.

A. But she certainly --

Q. You didn't ask?

A. No. But she certainly, you know, as a sitting chief financial officer, I would assume, has gained familiarity with the operating results of the institution.

Q. Now, tell me about the -- going back to the budget scenario, tell me what your understanding of that was. You said it's forecasts, but I could use some more detail of what it was forecasts of.

MR. LYNCH: Objection. Compound.

You can answer.

A. So that's where I really dug in. What

were your assumptions around these scenarios. What is happening here. How, for example, are you accommodating -- you know, what's your assumption around the NSO. How is it operating.

So okay, in the closure scenario, it's touring. So when it tours, you get the revenue. So you don't have to have the operating expense of the upkeep. You don't have the same, you know, logistics and preparation because you've laid that off on the external facility.

So going through that kind of dialogue. Help me understand. What is this education line. What's in it. What are those programs. Are they being supported in the REACH.

Just trying to think through whether those projections stand up in the operating scenario that's being defined.

Q. So you say, "In these discussions."

Was that a discussion that you had on the 30th in the office, or later?

A. Definitely -- no, no. On the 30th, I was outlining what I was looking for.

I know Khaled spoke with, what's his name, Anton or something. His last name begins with an A.

I'm almost certain that there was -- that Khaled had a face-to-face discussion with, unfortunately, Anton or whatever his name is -- there it is, Alex. Alex, excuse me.

Then I had a discussion with Donna, telephone discussion with Donna.

Q. Before or after you received the scenarios? Are we talking about discussions like about the actual document that you had in front of you?

A. After.

Q. Okay. When you have this in-person conversation with Donna on the 30th, did she express any views about the impact of construction or the various scenarios on finance?

MR. LYNCH: Objection. Compound. Vague.

You can answer.

A. No. Views, no. No.

Her work was -- the predicate was is the programming occurring inside the facility or not.

That seemed to be the defining predicate for her.

Q. But she didn't express a preference as between the two?

A. No.

Q. Looking again at Tab 2, Exhibit 3, I want you to turn to number 451 at the bottom. You will see an e-mail from Donna to you and Khaled.

A. Mm-hmm.

Q. Dated August 5th.

Do you see that?

A. Yes.

Q. The Subject is Confidential FY27 Budget Scenarios for the KC Board.

Do you see that?

A. Yes.

Q. It lists two attachments, FY27 Budget Scenarios (2), and FY27 Budget Scenarios.

Do you see that?

A. Yes.
Q. You also see that there's a little warning sign in the text of the e-mail that says, "... this is the first time you received an e-mail from this sender..."
Do you see that?
A. Yes.
Q. So that means this is the first e-mail that you received from Donna Arduin?
A. Yes, as it's presented literally, and I assume that's true, and I am not debating it.
It's possible that our system does that one or two times, but --
Q. Yeah.
A. -- it's good enough for me.
Q. Yeah. Right. No reason to think that this was wrong?
A. No.
Q. I'm just trying to get the chronology, because to me, it looks like this suggests that the first date in which you would have received the scenarios from Donna, at least, was August 5th.

Does that align with your recollection?

A. I mean, I take it as true.

Q. Okay. Are there two -- it appears as though there were two attachments here.

Do you recall there being two versions of the budget scenario that were sent to Delta?

A. I don't.

I have to tell you, though, that when I see that sort of (2), I'm not exactly sure what that means, either, because sometimes the -- if you open the same document twice, so --

Q. Yeah.

A. But I don't.

Q. Understood.

A. I don't recall versions, and I don't recall analyzing versions.

MS. FREENY: Okay. I think I would just make a request on the record to have those two attachments, they were actually attached to this e-mail, produced to us. I don't think we received

those in the production.

Q. To your recollection, though, were there multiple versions of the FY27 Budget Scenarios spreadsheet?

A. No.

Q. To your recollection, did the numbers in that spreadsheet ever change?

MR. LYNCH: Objection. Vague.

A. I mean, ever -- for the point of your implied question, within this horizon, no.

Q. Did you -- did the numbers ever vary in any of -- like, in any of the documents that Delta received?

A. Not --

MR. LYNCH: Yeah. Objection. Vague. Calls for speculation.

If you understand --

A. Not to my recollection, and not -- I was proceeding with my analysis.

Q. I mean, I would assume that if --

A. I have no recollection of stopping and revising my work.

Q. Okay. So just to be clear, you didn't receive the budget scenarios until after you had made a presentation, an initial presentation to the subcommittees on August 3rd; correct?

MR. LYNCH: Objection to the extent it characterizes the presentation.

You can answer.

A. Maybe.

Q. Do you have reason to think that you did receive the fiscal year '27 budget scenarios prior to your presentation to the subcommittees on the 3rd?

A. I may have through another means. I really don't know.

I will testify that I was not talking about the operating results on the August 3rd meeting. That was not the purpose of the August 3rd meeting.

Q. What about that 10th meeting? Do you talk about the operating costs at the 10th meeting?

A. Yes.

Q. Just turning your attention to the one

e-mail below that, it looks like, from here, that Delta also received the audited '24 and '25 financials on August 5th; is that right?

A. As this e-mail indicates.

Q. Sorry. If I misspoke, '24 and '23; is that right? I may have said '25.

A. Yes.

Q. Do you recall if you received the '25 roughly around the same time?

I don't think we have any documents memorializing that.

A. We -- I mean, certainly. Certainly around the same time. I don't know the means by which it was transmitted.

Q. When you did your tour on July 30th, who were you accompanied by on that tour?

A. Matt Floca, John Cracraft, Jennifer Hood.

Q. The last two, Cracraft and Hood, are from JLL; right?

A. Yes. There was a Kennedy Center sort of security-maintenance person, I believe, employed by

the Center.

Q. Who led the tour, so to speak?

A. John Cracraft.

Q. So he took you around to show you areas that required renovation or construction?

A. Yeah, and in my experience, of course, I always ask, show me everything. Don't just show me -- you know, don't show me the photographs. Show me the facility.

I mean, we were in the various venues. I remember being in the main theater. We were on the roof, you know, we were throughout the facility.

Q. During that tour, did Matt Floca express any sort of his own perspective about the state of the building?

A. Well, I'm sure you've met him. He's a soft-spoken person, so he was not, you know, effusive. But, I mean, it is hard to look at this building and not make comments and not point at something and grunt.

In fact, I even wrote in my report,

and I think it's worth saying on the record, that we were walking through the parking garage, and I stopped and said is that daylight.

And literally, daylight was shining through from the plaza above. So there was enough erosion that the sun was actually coming through.

That's -- you know, things like that are worth sort of --

Q. Yeah.

A. -- everyone commenting on.

Q. It sounds like you're, almost like, visceral reaction to the state of the building. It sounds like that impacted what you thought needed to happen from a larger perspective in terms of construction.

A. The severity was really apparent, yes.

Q. Okay.

A. And it -- I made a direct comment in the August 13th Board of Trustees meeting, before I began my more technical commentary, I said, I want everybody to understand that the conditions here are severe, and they are accelerating.

Because I still believed that there was something in the ether about we don't have to do the work.

Q. Okay. Where do you think you got that impression from?

A. I wanted to be absolutely sure that that was off the table.

Q. Okay.

A. Like, as an independent expert, you have to do the work, so it's a question of "how," and that's what I'm here to evaluate, but let's not revisit "whether."

Q. Right. Okay. So you felt compelled to sort of emphasize the need to get things done and to close because you didn't want people to think, hey, we can push this off?

MR. LYNCH: Objection to the extent that misstates the testimony.

You can answer.

A. Let's, for a lack of precision, say, yes, that's the gist.

Q. I mean, is that fair? That's the

impression I'm getting is that you felt strongly enough that this construction cannot be delayed. It has to start. That you, you know, you wanted to emphasize that to the Board, and that impacted the emphaticness of your recommendation?

A. Yes.

MR. LYNCH: Objection.

Q. Were you -- I guess, were you worried that the Board was -- what were you -- like, what was your concern about, if they didn't adopt your recommendation, to close the main building for two years, were you concerned that the construction would just not go forward?

MR. LYNCH: Objection. Lack of foundation.

You can answer.

A. No.

I was concerned that they would not recognize the severity of the situation, and would not move forward. Forget about whether it was two years, four years, open or closed.

Q. Okay.

A. I wanted the record of this situation to reflect that Delta Consulting had made clear you've got to do something here.

Q. When you say "move forward," you mean immediately, or very soon, implement the planned renovations?

A. Two years or four years, that's the next question.

Q. Okay.

A. But I don't want to relitigate the first question.

Q. Right. So the most important thing was, this has to be done whether phased or full building closure?

A. And we're far past maintenance.

Q. But just to be clear, did anyone tell you that it was an option, that it was -- let me try to rephrase this.

I'm trying to get at did anyone actually tell you there was -- it was on the table for the Board to simply defer the renovations that had been discussed in the JLL report?

MR. LYNCH: Asked and answered.
You can answer.
A. No.
Q. Do you know where you formed that impression?
A. Concerns about bureaucracy and process and that delay would lead to a bad result.
Q. So your primary objective was to make sure that the construction set forth in the JLL report commenced shortly, soon?
MR. LYNCH: Objection to the extent it mischaracterizes.
You can answer.
A. That suggests that I'm adopting their program, and their timeline, and everything, so no, because I was --
Q. Okay.
A. -- taking a cold-eye view, but that we could circle around this. I have a friend who talks about "admiring the problem." Let's not admire the problem. It's a problem. How do we now address it.
As a Board member, you've got that

duty. We acted prudently in light of the state of the building.

Q. Yeah.

A. Okay. So now we have to think about how to balance factors and decide how.

But I didn't want anybody to think, well, let's spend some time -- you know, let's spend some time rethinking the severity of the building.

Q. Right.

A. I mean, no.

Q. Did you tell them though, that the issues could also be addressed in a phased construction manner, even if that took longer?

A. Yes.

Q. Okay. The downside to that would be the cost, though?

A. Well, yes, the cost is not the cost. I mean, I know we're going to get to this, but the cost is the cost. The cost is the scope because you can't just assume that you're going to have all the money, magically. So you have to reduce the scope to fit the budget.

Q. Okay. But there was an existing budget of about $257 million; right?

A. There was an existing appropriation of 257.

Q. So there was a bucket of money that was planned for the construction; right?

A. Your words, not mine.

Q. Well, I guess, I feel like this is hitting at something that --

A. I'm reacting to the word "bucket."

Q. Is that a construction joke?

A. No. No.

Q. But you understood that Congress had appropriated $257 million for the planned renovation; correct?

A. Yes. Yes.

Q. You understood that at the time it was appropriated, the plan was, in fact, to phase the renovation?

A. Yes.

Q. So when we're saying concern about whether the money was there, you mean whether it

would -- whether costs would exceed that appropriation or something else?

A. Yes.

Q. We'll return to that.

A. Yes.

Q. Tell us about the -- I guess, when did you -- we talked about the conclusions -- sort of the -- maybe not conclusions. Whatever word you want. The impressions that you had from the state of the building from the tour.

A. Yes. Observations. Yes.

Q. When did you start to form an impression about the financial side of things? The costs, the expenses.

A. So there's capital, and there's operating costs.

Q. Okay. Yes.

A. Okay. Capital is, of course, that's where we start.

Q. Okay.

A. That's what it's all about for us in our fixed asset world is how much money is going to go

into the ground, and how much money is going to go into soft costs, which don't translate to improvements.

Q. Okay. So when did you start to form an impression about the -- now I'm blanking on the -- what's that category called? The capital costs, sort of the capital side of things, when did you start to form an impression about, you know, which of the scenarios were supported?

MR. LYNCH: Objection. Compound.

You can answer.

A. I had already toured, so I had read the reports, but I had not yet started to take in the work of my team and think it through until I had seen the facility.

So that weekend, I started thinking, and I know that this is how I approach it -- I approach it as sources, and uses, and I also approach it as a waterfall.

The way I think about it is, first, we have to make sure we have the scope, because we've got multiple sources of scope.

So do we have one exhaustive scope. Do we have costs against that scope. How do we level-set those costs to current dollars, if they're from different -- you know, if the estimates are from different years.

Then how do we effectively prioritize that scope, and see how much we can cover with the 257 of appropriation.

So I think of it as a waterfall of, can we get all of the work done, or not get all of the work done, and what does that mean.

Q. When did you start to form an impression about the answer to that question?

A. That weekend.

So the -- you know, whatever that, is the 1st of August.

Q. Okay. So the weekend after the 30th?

A. Yes, because touring was very important.

Because we made a lot -- we talked a lot -- I gave testimony about the severity that I saw, and you know, you suggested that that created certain impressions in me.

Remember, I went with a cold-eye view. If I got there and thought, oh, well, you could just paint that, I would have been obligated to say so, and 257 would have been plenty of money, and you could --

Q. Okay.

A. -- you could be open. You could be whatever.

I didn't -- I also was not in the media. I wasn't -- so I literally showed up and said, okay, so this is the Kennedy Center.

Q. So did you have an impression, based on your tour, whether the 257 was going to be adequate, or did you need to look at the numbers your team ran?

A. The latter.

Q. Okay.

A. For sure.

Q. That, you said, would have happened around the weekend after the 30th?

A. Because they'd be -- they're now in it four to five days. I'm reviewing the reports before

my tour to get a feel for kind of the extremity of these reports, right. I mean, there's 363 projects in the DLR report. These are, you know, extensive pieces of work.

I'm starting to get the feel. I see the site. All right. Now it's time to buckle down. It's -- frankly, this is the whiteboard moment of all of these jobs.

Q. Yeah.

Now, that's the capital side of the finances. What about the cost, revenue side?

A. Right.

Q. Did you --

A. So it was in a serial fashion for me.

Q. Say it again.

A. It was serial for me.

Q. Okay.

A. Okay. I did really need to understand the capital costs, because, you know, this thing sort of makes or breaks, in that regard.

Q. Mm-hmm.

A. The question on the operating cost side

is: Is that a further demand on funds?

Whether it's, you know, a dollar, $10, $10 million, is less important than, is it also a financial consideration. Because we have donor dollars, congressional dollars, operating income. Those are our sources.

If we're going to start using funds to fund operating deficits, we have to think about how those funds are now not available for other things we might need, like, the capital is more than we think, or, like, we're depleting our endowment and reducing the durability of the organization.

That's all in the financial calculus.

Q. It's true that the Kennedy Center, based on the prior financial years that you reviewed --

A. Mm-hmm.

Q. -- used fundraising, used donor --

A. Mm-hmm.

Q. -- donations to fund operating expenses; right?

A. Significantly.

Q. So when did you, though, start having -- forming an impression about the ways in which the cost expenses side might influence your conclusions on the scenarios?

A. Again, because I know that I presented the summary slides on the 10th.

Q. Mm-hmm.

A. I know exactly what those contained, and I lived through the process of preparing them. I know I was very, very at-it that weekend.

So I'm going to suggest to you that, not inconsistent with the e-mail you showed me, that somewhere in the middle of that first week of August.

Q. Okay.

A. I'm going to say this. You know, I switched gears and went from capital to operating expense so I could give those observations as well.

Q. Okay. What observations did you give at the August 10th meeting?

A. That remaining open appeared to also have demands on operating expenses of approximately

$80 million a year, which is pretty consistent with the operating history of the Center itself.

Q. So that 80 million, roughly, is the same amount that eventually ends up in the August 13th presentation; is that right?

A. Oh, my goodness.

Yes.

Sorry. I got myself confused, but I'm not confused. I'm right.

Q. Okay. Yeah. I just want to understand.

So it sounds like that the roughly $80 million deficit that you set forth in the slide deck presented to the Board, you had already reached that by the 10th; is that right?

A. Yes.

Q. Okay. So sometime between the 5th and the 10th is when the financial analysis was performed?

A. Yes.

Q. I want to go back, actually, just really quickly to the August 3 Audit Committee -- the August 3rd meeting. It sounds like you understand

that to be both the Audit Committee and the Grounds Committee; is that right?

A. Yeah. I think it's called Audit and Finance and Building and Grounds.

Q. Yes. Do you recall that Donna Arduin presented some operating scenarios during that meeting?

A. I don't.

Q. Could you turn to Tab 17 in your binder. We are going to mark that Exhibit --

MR. LYNCH: 4.

Q. -- 4.

(Buchalter Exhibit 4, The Kennedy Center Audit and Finance Committee Meeting, 8.3.26, KC-BEATTY1089-1096, was marked for identification.)

Q. You see the front, it says, Kennedy Center Audit and Finance Committee Meeting, August 3, 2026?

A. Correct. Yes.

Q. All right. If you flip a couple pages in -- one, two -- three physical pages in, you will see a slide that is titled Programming Scenarios.

A. Yes.

Q. All right.

MR. LYNCH: There are actually several, it looks like.

MS. FREENY: Oh. Sorry.

MR. LYNCH: So we have numbers. Give us one. Bottom center.

THE WITNESS: 94?

Q. Yes. 1094.

Does this look like the presentation that Donna Arduin gave, or is this something you gave?

A. It's not something I gave, and I don't recognize this document.

Q. You don't?

A. No.

Q. Okay. I'm still going to ask if you -- if any of this rings any bells.

So in this slide on 1049, on the left-hand side, it has columns with what looked like, to me, you don't have to adopt this, but they look like three scenarios. I'm just going to

actually take a look at those and see if that means anything to you.

One says Endowment & Grant-funded. One says NSO Off-Site plus REACH. And the other says NSO On-Site plus REACH.

Do those map onto anything that you have heard the Center talk about?

A. I've heard the Center talk about this. I do not recognize the entirety of this presentation.

Q. What do you recall about the Center talking about these three scenarios?

A. Well, my understanding is that the NSO and the Center had come to some sort of agreement that the NSO was highly supportive of, and that that -- and I don't know the agreement.

Q. Yeah.

A. But that that agreement has the NSO off-site touring.

Q. Okay. So you understood that the NSO had already -- the decision had already been made to have the NSO off-site?

A. That's what I think.
Q. Okay.
A. But I am answering what I think I have heard.
Q. Understood.
A. Not something I have considered in performing my work.
Q. Understood.
Do you recall who told you that the NSO was going to be off-site this coming season?
A. I honestly can't remember the context. I do remember saying to somebody, and the NSO supports that, they're comfortable with that, and the person said, oh, yes.
Q. What else do you -- so if you remember these, can you help me understand at least what your understanding of Endowment & Grant-funding is, as a scenario.
MR. LYNCH: Objection. Calls for speculation. Lack of foundation.
A. There are two pieces of language for donor funds, and I think the -- I'm going to use my

words, I don't think these are Kennedy Center words -- is there's restricted and unrestricted gifts.

Q. Mm-hmm.

A. The endowment, I think of as a large pool of -- probably not right in the detail of this, but that that's essentially unrestricted. Use that how you want, and that the grant-funded are named for specific purposes, like the education fund.

Q. Yeah.

A. And things like that.

So those are restricted. I'm using language you would use to classify them, not -- you know, in financial statements, not necessarily terminology of the Center.

Q. Did you hear the Center talk about a scenario in which construction was funded by endowment and grant?

A. No. No. This is about operating expenses, to me.

Q. Well, so again, I'm just -- your counsel can make whatever objections he undoubtedly will

make.

A. Yeah.

Q. I'd like your help just trying to understand this, given what you know. I understand that you have not -- do not recall seeing this particular document, but you can see it talks about construction impact, mission risk, cost.

To me, it looks like an analysis of three scenarios.

MR. LYNCH: So I just, yeah --

MS. FREENY: Yeah.

MR. LYNCH: Why not I just object on speculation and foundation for this line.

MS. FREENY: Okay. Yeah.

MR. LYNCH: If I have to object to a specific question, I will say.

MS. FREENY: Yeah.

THE WITNESS: I just want to say, it's not that I don't recall this. I really have never seen this before.

BY MS. FREENY:

Q. Okay.

A. It's possible that I am mis-recalling the agenda, and that I presented and left or something, because I mean --

Q. Fair.

A. -- I really don't recognize this.

Q. Understand, and I don't mean to suggest that --

A. So you're --

(Clarification requested by the Realtime Stenographer.)

Q. I understand that. I'm trying to understand what this means, knowing that you haven't seen it, but knowing that you were at the meeting and heard things, and also, I think, that you testified that these three categories on the left were things that you had heard during your time in this engagement.

A. I'm satisfied with that as an understanding between us, yes.

Q. Okay. Okay. So given that, what does this, if anything, mean to you, this document?

MR. LYNCH: Objection. Vague.

A. Here's what I see. I recognize the first option and the second option.

Q. Okay.

A. I don't recognize the third option as -- I think as decisions and time passed, I think it wasn't something that I was concerned about.

I was never concerned about the NSO on-site.

Q. Is that because it was not presented as something for you to consider?

A. It was already -- it had already been moved on, was my understanding on that.

Q. Okay.

A. You know, right or wrong, that was the state of play.

Q. Understood.

So you never considered whether, for example, the NSO could remain on-site during phased construction?

A. Right.

Q. But just the NSO?

A. Right.

Q. Okay. I assume that means you also didn't consider, for example, the possibility of a one-year full closure of the main building followed by a following year of the NSO being on-site with remaining construction?

MR. LYNCH: Objection. Asked and answered.

A. Right. I did not consider that scenario.

Q. Because you thought that that was sort of already off the table?

A. That there had been an amicable agreement was what I understood there to be.

Q. All right. But an agreement that included management?

MR. LYNCH: Objection. Calls for speculation.

You can answer.

A. Of the Center --

Q. Yes.

A. -- as one party to that agreement?

Q. Yes.

A. Yes.

Q. You say you recognize Endowment & Grant-funded. What do you understand that to mean as an option?

A. I don't know that I understand the distinction on this page, in that NSO off-site plus the REACH is the operating scenario that I understand as it relates to the NSO. So that's something that is, I believe, presenting the "all other."

So I think the way this page is working, or the way it would be consistent with my understanding, is that Endowment & Grant-funded are the programming. Specifically, the education, the Memorial. And that then what's being addressed is how do we then -- it's like add on, how do you -- what are the alternative ways to address the NSO.

Q. Okay. I'm going to stop asking you about this slide, and then just ask you:

What do you remember from August 3rd in terms of the, you know, discussion of the possible scenarios that were on the table?

A. Very little. I don't think that -- I mean, again, it was a process briefing of this is the -- I mean, literally, I started with who I was. I introduced myself and my background, and why Delta had been selected, and the team that we had put together.

It was that kind of overview. I said we're going to evaluate different ways of addressing the physical condition of the building.

Q. Did it come up at all the acceleration of the timeline for your -- the completion of Delta's work at either of the subcommittee meetings?

A. Well, by the 10th, the 13th was a fact.

Q. Yeah. Okay.

A. I don't remember the 3rd -- I don't remember knowing about the 13th on the 3rd.

Q. Okay.

A. I do remember that on the 3rd, there was a -- you know, we really have to move this along sentiment among the group, which at some point caused the 10th to be scheduled.

Q. Okay. Tell me more about that.

You said there was a sentiment that you perceived from the 3rd of we really have to move this along.

How did you get that impression, and from whom?

A. From the interplay between the committee members.

Q. So it was the various committee members they were saying, we got to get this done; is that fair?

A. Yeah. That this is important, and you know, frankly, I agree.

Q. What's the "this"? You said "this is important." Is it the decision? Is it -- what's -- what needs to happen?

A. The decision. So that we're not, as I said, admiring the problem.

Q. What else do you recall from the August 3rd meeting about, sort of, the discussions about the -- like, a forthcoming Board meeting, whenever it might be?

A. That the committees were going to need

to evaluate and come together, and make a proposal to the Board; that that was -- they were -- they, amongst themselves, were reminding each other that that was their duty as Board committees.

Q. They did that at the 10th meeting?

A. Yes, because they now had briefing material.

Q. Okay. What were they given before the 10th meeting?

A. The -- I'm going to call it the four slides, but it's really two slides --

Q. Okay.

A. -- of the two scenarios summarized.

Q. Was that in final form, or was it a draft?

A. It was -- you know, it was in draft, but I'm trying to anticipate your next question.

I'm thinking about whether anything really changed. I don't think anything really changed.

Q. Okay.

A. I mean, we hustled to get those findings

put together. What I had done to produce those findings was outlined the entire expert report, so that I knew that what I was going to say in terms of findings, I was ultimately going to compile into an expert report.

Q. Did you provide that outline to anyone at the Center?

A. No.

Q. Did you provide them anything else other than the slide deck?

A. The Center?

Q. Yes.

A. No.

Q. So no underlying supporting documents at that time?

A. No. No.

Q. Did they ask for anything more?

A. No. They understood that -- what I was doing and why I was doing it.

Q. Okay.

A. They understood the timeline.

Q. So they understood that it was not

feasible to produce the supporting documentation in that time frame?

A. That's right.

Q. They were satisfied with the summary slide?

A. Yes.

Q. Tell me about the discussions that you had about what the output would look like for the -- I guess, first, the August 10th meeting.

A. I had a discussion in the middle of that first week of August about, you know, what was reasonable to produce, and I felt very strongly, as you can imagine under the circumstances, that whatever I produced and said, I wasn't going to be able to walk back.

Q. Mm-hmm.

A. So I asked, is this a situation where you need, you know, a five-page memo. Do you just need slides. Like, how do you think this group is going to best consume the information.

Because my intention was to -- as I said, since I was outlining the expert report, my

intention was to either produce some sort of -- whatever you want to call it, short-form version of that, or to do what I did, which is to produce something that is a little bit more presentation-oriented.

Q. Who made the decision that it would be a slide deck?

A. I was talking to -- I'm sure I was talking to Matt about that, Mr. Floca.

Q. Mm-hmm.

A. I don't know who else was involved in that decision.

I left it to the Center as an option.

Q. Okay.

A. You know, which way do you want me to do it.

Q. What were the options that you presented again?

A. A written memorandum where I would essentially flesh out my outline, but still -- you know, still preserve the right to produce a full

report.

I actually, at one point, said, you know, think of it as like an affidavit. Like, what would I say are the opinions that I'm going to express. Or is the group more presentation-oriented, and you know, would like this.

When they said, you know, slides will work, I said, okay, well, there's -- I'm going to have very few slides with a lot on them.

Q. Yeah. We talked before about the -- sort of the timeline for the Statement of Work.

Do you recall that?

A. Yes.

Q. And the 60 -- the sort of up to 60 days as the final product for a Board-ready recommendation.

Do you recall that?

A. Yes.

Q. Did you view this slide presentation as sort of Delta's Board-ready recommendation?

A. I viewed it as the executive

presentation that was in the scope of work, and that what I had done has effectively reversed the work, and produced the executive presentation first, and then was going to follow it with the fully compiled report.

Q. So you understood that the Board was going to be deciding on closure, and what that looked like, based, at least in part, on Delta's slide presentation?

A. I'm not sure if I knew that the Board was going to be deciding something as much as I knew that I had the obligation to present the findings of our report. And like I said, to not put myself into a position where I was going to say, well, I've done some more work, and I guess, actually, I think the opposite now.

Q. Yeah.

A. But that would be embarrassing.

Q. I assume if that had occurred, you would be obligated professionally to say so?

A. Absolutely, and that's why I took care because I do feel that way that if the information

had been presented; otherwise, as you know in this business, I'll always say if you show me something that makes me reconsider, I will.

Q. You said you weren't sure that the Board was deciding.

I guess, what was your understanding of the -- like, why you were presenting a -- not just a -- like, a neutral report, but a recommendation?

MR. LYNCH: Objection to the characterization.

A. Yeah. Yeah. Why can't a neutral report have a recommendation?

But you're asking the questions.

Q. Well, yeah. So let me ask: I heard you just say you didn't know that the -- you weren't sure that you knew that the Board was actually making a decision, voting, on how to pursue renovations.

Did I get that right?

A. Yeah. Because you said "deciding." You knew "that the Board was deciding."

Q. Yeah.
A. I don't think I knew the Board was deciding.
I think what I knew is I had been engaged to do a project, and I was asked to present my findings, and -- and it's in my scope of work -- a recommendation, and I was doing that.
I don't think I knew whether they were going to then discuss it, take it under advisement, produce -- you know, send it to a committee --
Q. Okay.
A. -- what the actual process was going to be.
I -- you know, like whether there was a motion or not. I --
Q. Yeah.
A. -- I don't think that was -- I don't want to say, you know, you all may be thinking that was naive or something, but I was just like that's not where my head was. That wasn't my hunt.
Q. I'm not trying to imply anything. I'm

actually trying to understand.

Because you now know that the Board made a decision, voted, at that Board meeting to close the building for two years; right?

A. Yes.

Q. At the time that you were preparing that slide presentation, you didn't know that that was going to form at least one basis for the Board deciding on that vote?

A. No. I did.

What you are asking me is, did I know that they were going to vote on it that day.

Q. Okay.

A. I didn't know that.

Q. I got it.

So you knew that they were going to vote; right?

A. And I under -- I had read the judge's Opinion, and I understood that at issue here was the prudence of the Board. So I was providing -- I thought my duty was that I was providing this depth of information so they could discuss and deliberate.

Whether they decided then today, that's the function of the Board to decide that, that's not...

Q. Was there any substantive work that remained outstanding at the time that you made the presentation to, I guess, the subcommittee?

MR. LYNCH: Objection. Vague as to "substantive."

You can answer.

A. Yes. Because my scope of work included the completion of a detailed risk register and some risk mitigation elements, which actually, we are still working on. I make note of that in my report that our work is continuing in that regard.

The final X-pages of my report, I don't know, three pages, I discuss certain things like having a risk register, having certain oversight practices, because I'm trying to make a nod to that that is within the scope of my contract.

Q. Yeah.

A. So yeah, I think there is a sort of -- if you think of it this way, once you've recommended

the method, you then need to -- again, professional diligence, you need to then say, well, what are the controls that we need to put in place to feel more assured about that. And I think that's -- you know, that's important in a capital project. It's an important consideration for a Board.

Q. Right. But wouldn't the -- like sort of the risk register and all of those other steps that help you feel more assured, wouldn't that be relevant to the underlying recommendation itself?

A. If the recommendation, as it is, is about the means --

Q. Mm-hmm.

A. -- like, how do you do -- you know, how should we best do that, what is most efficient when you compare the two alternatives, no.

How you now execute that with care, that -- you've now moved on from that decision.

And I would also say to you, it's regardless. Regardless of -- you know, the risk mitigation applies regardless of the path chosen.

Q. Did you perform -- like, I may be

getting the word wrong -- "sensitivity analysis"?
Does that ring a bell?
A. The way that I -- I know what you mean.
The way that I did that is by testing the escalation factors on the capital, and whether I was putting them on hard costs, soft costs, Priority 1, Priority 2.
So it was within the set of definitions --
Q. Okay.
A. -- rather than a sensitivity table, which, you know, truly said so for every dollar of variance.
I don't think at a trustee level that's helpful.
Q. Did you do that, the analysis that you described, before the presentation or after?
A. Before. Yeah. That's the analytical process, yes.
Q. Did you perform any sensitivity analysis with respect to the cost-revenue analysis?
A. Yes, in the use of the programming, the

declination of programming revenue, and the availability or unavailability of programming space.

Q. Okay.

A. So I changed those variables to look at the effect. I did ultimately present one in each instance on capital and operating expense. I presented one set of assumptions.

Q. Where is that analysis set forth?

A. The changing it?

Q. Mm-hmm.

A. Through the evolution of the work that I was doing. I only set forth the one set of assumptions, but I can explain things like the range is between, you know, 25 and 50, and I picked a number.

Q. All right. We'll -- I think we'll get to that in a bit.

With apologies. One last question about the August 3rd meeting.

Do you recall any discussion at that subcommittee meeting about the Center's cash position?

A. I recall a discussion about the Center's cash position. I couldn't peg it to August 3rd.

I know that -- especially with the fiscal year coming to a close. There's only so much cash on hand. There's a run rate -- there's a deficit run rate.

Q. Do you have an understanding of how much cash they had, like, for how many weeks?

A. So I was present where the comment was made -- I really cannot remember where this was, but where the comment was made that there was sufficient cash to make it to the end of the year, referring to the fiscal year, and that by October, the Center would be illiquid.

Q. Right.

A. I remember asking did we expect the audit opinions to continue to be qualified.

Q. Mm-hmm.

A. You know, essentially a going concern qualification, and the answer was yes.

Q. Okay. You said continue to be qualified. Were they qualified before?

A. I think that they are qualified. I think. The '23-'24 audits.

Q. There was a going concern issue?

A. I think there is. I think there is.

I mean, they can't -- the Center cannot pay its debts when due without using its endowment. So it does not cash well.

Q. Help me understand that.

So your understanding is that it had -- it doesn't have cash, but it has access to the endowment?

A. Yes.

Q. So it's not -- if someone says -- the Center doesn't have -- is going to run out of cash in X weeks, that doesn't mean they're going to be able to pay their bills in X weeks?

A. I haven't studied the endowment. I don't know the level of restriction and approvals required to release those funds, but there is an asset called endowment that's sitting there.

Is that consistent with the donors' expectations, you know, probably not. So there's

that issue as well.

But you know, the mechanics -- setting aside the mechanics, there's an endowment.

Q. Okay. So available cash is only one aspect of the Center's ability to continue to operate?

A. Right.

Q. I assume that if it's the case that the Center just doesn't have money to pay bills, that would be an important factor in your analysis of, sort of, how to move forward with construction?

MR. LYNCH: Objection. Vague.

You can answer.

A. Well, I'm not sure how the two -- the entire calculus is important to a trustee, but I'm not sure how operating costs and capital interact in that direction.

I understand how if you're spending more capital, you may be consuming cash, but if your operating expenses are too high, what's happening is you're just losing money.

Q. Right.

My question is, though: If you don't have any cash on hand, for example, to make payroll, that would be something that you would need to consider in terms of what scenarios are even viable for the Center; right?

A. I think there are two separate problems.

Q. Okay.

A. You do, as a trustee, need to consider the totality.

Q. So I'm actually asking what you, as a consultant, if you were asked to consider these four, then two scenarios, would consider relevant.

My question is: If you knew that the Center was three weeks, six weeks, away from running out of cash, unable to make payroll, that's something that you would need to consider, as you're evaluating the feasibility of the different scenarios; right?

MR. LYNCH: Objection to certain characterization of the scenarios and who -- whether was instructed or not to give them.

But you can answer.

A. Yes.

Q. Did you have an understanding that the Center was within weeks of not being able to make payroll?

A. I've heard that representation. I haven't evaluated the -- I don't know --

Q. Yeah?

A. I didn't look at the bank accounts --

Q. Okay.

A. -- of the Center.

Q. Help me understand that, though.

If you heard it, why wouldn't you evaluate whether there was going to be cash, for example, to make payroll in a couple of weeks?

A. Well, because that finding is entirely consistent with my recommendation of let's close and reduce staff, and get operating expenses back in line and get the construction going.

So in the alternative, we have to do exactly what I'm saying is not recommended. We have to spend a lot of money to do half of the capital work, and meanwhile, we have to figure out how to

get donors to fund operating expense losses like we've been doing.
Q. Yeah?
A. So sort of an economically irrational situation.
Q. But aren't you faced with a situation in two years after closure where you need to have donations and revenue in order to get the Center back up and running?
MR. LYNCH: Objection. Calls for speculation.
A. Yeah. I mean, how you're going to ramp up and reopen that's like -- we're all speculating how we're going to do that. You could equally tell an entire scenario where that's an energizing event that causes a lot of excitement.
Q. Okay.
A. To all that, I would say, I don't know, but the -- I can sure tell you that capital is going to get executed more efficiently.
Q. So the feasibility of ramping up and getting, you know, back underway, was that outside

the scope of what you're looking at?
A. No. It's absolutely a consideration, but -- and I think I wrote in my report that the duration of the construction project is what you need to keep your eye on because, candidly, if the place is under construction for four-plus years, I think you've got a much more difficult time getting people reenergized about the site. They have sort of mentally written it off.
Q. During those four years, the Center would be at least partially open and have programming in the main building; right?
A. With people walking through a construction site.
Q. What is the basis for your, like, opinion about the -- sort of the reaction of the audience? What is the basis of that opinion that you are offering?
A. Because I have been involved in large capital projects where we've tried to operate a facility, and people really discount how invasive the physical constraints, and signage, and

equipment, and everything can be with the addition that in this case, the architecture does you no favors in that you've got this major internal hallway -- I mean, it's the very features of the building that make it beautiful that make it tough to construct within and have people inside.

So they ingress and egress through the same channel. They come in through one big foyer. All of those things are going to get constrained, and I think have an impact on people's experience.

Q. Did you offer that opinion to either the subcommittee or the Board?

A. I feel like I -- you know, I must have said that -- I must have said it on the 10th. My pause was I was trying to think about whether that was in my remarks on the 13th.

But I guess the minutes would say.

Q. All right. The prior experience that you were just reference, those were not performing arts venues; right?

A. Well, I worked on a stadium project for

a university where you've got sort of similar -- it's events-oriented, large crowds, and you're renovating, and in that instance, we decided to -- that it was so important for there to be a positive experience, including, by the way, donors. That's who we were really worried about, we actually demobilized the site to conduct the university's football games, and then would remobilize the entire project.

Now, the most significant difference there is that there was a lot of land surrounding the stadium. So we could figure out how to phase it. Because one of the first things I did when I got to the site is I was like, where are we going to put all of the equipment.

To the Kennedy Center site.

Q. The different -- the difference between a stadium, though, and the Kennedy Center, the Kennedy Center has three different performing arts venues, right, three different theaters?

A. Yes.

Q. A stadium has one; right?

A. Yes.

Q. Okay. So in the case that you -- I guess the exemplar you're mentioning, there's really no alternative but to shut the entire thing down; right?

A. There are 36 entrances to a stadium, and there is, like, two or four, depending on how you think about it, to this building, going down a main hallway. I mean, that's a wildly simplistic analysis that there's three theaters. Like, yeah. How do you get to them?

Q. Is it your view that it would take two years to do the construction of those hallways that you mentioned?

MR. LYNCH: Objection. Calls for speculation.

A. You're misunderstanding the impact of the flow of work and the flow of the equipment, and how the -- there is no doubt that the construction would be visible. This is not going to happen behind closed doors.

Q. But it would be feasible.

So if the Centered decided, yes, we prioritize having at least one venue open for as long as possible, it would be feasible to do that?

A. Yes.

MS. FREENY: Do we want to break for lunch?

THE WITNESS: What time is it?

MR. LYNCH: 12:30.

(Off the record.)

(RECESS, 12:34 p.m. - 1:15 p.m.)

BY MS. FREENY:

Q. Good afternoon, Mr. --

A. Buchalter.

Q. Buchalter. I'm so sorry.

A. That's okay.

Q. I actually thought about writing that on a Post-It note so I would recall the pronunciation.

So we are back from lunch. You understand you're still under oath?

A. Yes.

Q. Did you have, at any point, a meeting with Secretary Lutnick prior to your presentation to

either the subcommittee or the Board?
A. Yes.
Q. Tell us about that.
A. I was going to try to remember the date.
Q. If I said August 7th...
A. I thought it was July 30th.
Q. Or, sorry. July. Let me just -- just really quickly, to orient you --
A. Yes.
Q. -- Tab 5, which is going to be Exhibit 5.
MR. LYNCH: 5. Yeah, 5 of 5.
(Buchalter Exhibit 5, e-mail chain, 9.15.26, KC-BEATTY0468-520, was marked for identification.)
A. 5 is blank.
Q. Bates Number 484.
MR. JANKOWSKI: I think the witness does not have anything in his binder.
THE WITNESS: 5 is blank.
MR. LYNCH: So let's use this one, and we'll share.
MS. FREENY: Apologies for that.

Q. So we are looking for 484.
A. Thank you.
Q. You see that looks to be a calendar invite for a meeting with Secretary Lutnick sent by you as the organizer.
Do you see that?
A. Yes.
Q. The date there is August 7th, a Friday. Is that consistent with your recollection?
A. It isn't, but I --
Q. Okay.
A. But I believe it.
Q. Did you have one or more than one meeting with Secretary Lutnick before that August Board meeting?
A. Oh, just one.
Q. Just one. Okay.
What was the purpose of that meeting, as you understood it?
A. To review our findings. To review the findings and presentation for the -- I presume, for the Board meeting itself, but the -- but it was

obviously in advance of the August 10th meeting.
Q. Did you give Secretary Lutnick a sort of presentation in that meeting?
A. No. It was a verbal meeting.
Q. Did Delta provide him with any materials in advance of the meeting?
A. No.
Q. What was the nature of the verbal presentation that you gave to Secretary Lutnick?
A. I compared the two alternatives of two years and four years, I'll call that for ease, and the capital and time associated with that.
Donna Arduin was there, and she talked about the differences in operating expense.
Q. Why did Donna, rather than you, talk about the difference in operating expenses?
A. I just deferred to her for, you know -- she's an executive member of the agency, or of the Kennedy Center.
Q. At this point in time, had you independently prepared an analysis of the operating expenses and costs?

A. I had not finished, but we were fundamentally aligned. I mean, she didn't say anything that surprised me. I just figured, give her an opportunity to present those numbers.

Q. Were they numbers that she had prepared, or were they numbers that Delta had prepared?

A. That she had prepared.

Q. Did they differ from the numbers that Delta ultimately included in its presentation and subsequent report?

A. They did not differ to my -- you know, in listening, to my understanding of the source documents that we were using in our analysis.

Our numbers would differ because we had applied factors to the revenue numbers.

Q. Okay. Donna, though, also applied factors to the revenue numbers, didn't she?

A. She may have, and she may have done it in that presentation. Those concepts were mine.

Q. When did you first communicate the concept of applying discount factors, shall we call them?

A. Earlier that week.
Q. So we talked about Delta receiving the financials from '23 and '24 on August 5th. Shall we say that week -- sometime after August 5th, but before August 7th?
A. Yes. Unless, as concepts, I had already brought them up as well.
Q. Explain them to me as concepts.
A. Yes.
One is that revenue will decline from its current level of about 100 million, simply due to the fact that it's a -- the construction impacts will reduce the desire of people to purchase tickets and attend events and the like. That's one adjustment factor.
The second adjustment factor is a physical one, where you can't fill a seat in an area that's closed. So it's sort of a supply-demand. It's a series of two, one supply and one demand degradation of current income.
Q. So I think the non-availability of available seats, I think, is a little easier for me

to understand.
A. Right.
Q. So let me address that one first.
How did you arrive at the discount factor that you would apply based on the idea that in phased construction, there would be certain seats that were not available?
A. So I applied 37.5 percent, which is 25 percent increased by 50 percent.
Q. And --
A. So it's 25 plus 12-and-a-half is 37-and-a-half.
Q. Mm-hmm.
A. 25 is a four-year duration of just straight-lining a 100 percent execution over four years, 25 per year, and then applying a circulation factor, or -- you know, a circulation impact that is -- that you can't just discretely close 25 percent. You're going to have to have a, you know, a circulation. You're going to have other impacts.
Conventionally, that's estimated as

1.5. 50 percent.

Q. When you say "conventionally," where are you getting that from?

A. From -- it's one of those rules of thumb, that it could be more or less, but that that's the right way, in a initial estimate, to estimate circulation.

Q. What is "circulation"?

A. Ingress and egress, equipment movement. They sometimes call them lay-down yards. You know, the fact that you need areas to stage material.

Q. So I think I might be confused here. I thought we were talking about the discount that was applied for, like, the fact that there just aren't seats available?

A. Yes, but to the extent that programming space is -- so here's an example.

In the Kennedy Center, there is storage on stairwells. So event-oriented storage will be on a stairwell or on a landing of a stairwell. If you have to construct in that area, you're going to have to close that stairwell.

You're going to have the flow of materials in that stairwell. Now you don't have the storage area, either, to support that event space.

So it's not literally taking, you know, 8,000 seats and saying, okay, well, those seats won't be available. It's that the programming space will not be available.

So to the extent that that programming space supports revenue, it will be, in kind, compressed.

Q. I think I still need help figuring out how you came up with the exact numbers, rather than the concept.

A. Yep.

Q. Because I assume that it's going to vary, based on both the type of building --

A. Yep.

Q. -- and also the purpose of the building.

So, you know, an office is going to be -- or, you know, a vendor is going to be different than a performing arts venue; right?

A. Yes.

Q. How did you arrive at these specific discount rates versus some other one, including the discount rate that Donna was applying in her calculations?

MR. LYNCH: Objection. Compound. Calls for speculation.

A. I -- yeah. I mean, you'll have to tell me what Donna's -- you know, I mean, to the extent that that's relevant to the question.

Q. Yeah. Let me write that up, then.

How did you arrive at the specific discount numbers that you applied rather than higher or lower?

A. Right, and conferring with my group, and we all work with the same contracting estimate standards and various, you know, AACE rules, and the like around estimating. It's part of the capital project estimating process.

Q. Okay. But again, what's the -- what is the process or methodology by which you came up with the exact discount percentage that you applied?

A. By picking the most conventional, it's a

factor of 1.5 percent is the most conventionally used factor.

So you'd have to start to explain higher or lower, on average, and I also did 25 percent a year over four years.

It's really correct in the aggregate, because it probably wouldn't look like that, either.

There probably would be -- it would be 100 percent by the end of four years, so says the schedule, but it would probably be most acute somewhere in the middle or in two peaks.

Q. Yeah. You said you have to -- you'd have to explain higher or lower?

A. Yeah. I'd have to have these program specifics. I would have to know the actual areas that were going to be worked on, not as a inventory of projects, but somebody would have to go through and do all of the phasing and explain, okay, well, we're going to do the work to understand how the flow works when we're doing Eisenhower.

Where are we going to put the

equipment? Where is the lay-down yard? How is the population going to flow? That work is all JLL's work that's in process.

Q. Okay. So it's in process, meaning it has not been completed?

A. Right, until there's a commitment to a duration.

Q. So essentially, it would take more time to analyze whether to depart from the conventionally used number to apply a higher or lower number?

MR. LYNCH: Objection. Mischaracterizes.

You can answer.

A. It would take more time.

Q. Mm-hmm.

A. It would take more information, yes.

Q. More information than you were provided?

MR. LYNCH: Objection.

A. Than is available.

Q. It would also, though, take more time to develop that analysis; right?

You said the flow analysis, the

analysis of the buildings?

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. Sure.

Q. What -- like, I guess, what else do you recall from the meeting with Secretary Lutnick in terms of what you presented to him?

A. My goal in that meeting was to clearly have him understand the difference between the amount of -- I was describing it at the time as yield. Yield on the appropriated dollar was close to 90 percent under one scenario, and closer to, you know, 50 percent in another scenario. And should I be thinking differently about fundraising or other sources of funds, or should I be thinking about this as I was in the context of the congressional appropriation.

Q. What did he say?

A. We only have $257 million.

Q. Did you discuss or talk with him about the impact on programming?

A. There was discussion about that the NSO was off-site, and this, again, was reinforcement to me that that was an understanding between the Center and the NSO, that the REACH and -- very clear, the REACH will be in operation. That what we were talking about was -- you know, sometimes we call it the "main building." I don't love that term, but we call it the "main building." That my views were confined. Not by instruction, I was telling him, you know, I see this as an operating site, with the main building closed for this concentrated period.

Q. Did you discuss with him what impact that would have on, for example, donations?

A. You know, oh, donations, I've always thought that there may not be an impact. I've always thought that, properly handled, that there's probably good public relations work that could be done around how the Center is being revitalized, or something like that, to create some energy. That's at the donation side.

Q. Okay.

A. I did talk about -- and I think probably

that's when the handoff went to Donna, is the -- what I saw as some real friction on the revenue function.

I have always been a little bit surprised at the level of operating loss. You know, not something I knew as a person in the world until I was involved in this project.

You know, it's a significant number, and you have to think about what -- how are you going to fund that when you're simultaneously doing a major capital project.

Q. That issue, though, doesn't go away when the Center reopens; right?

A. It doesn't.

Q. You talked about your thought about the impact on fundraising. On what do you base that?

A. Probably, again, my experience with the library. It's just that, you know, people are dedicated to a cause, like the arts, and they feel good about it, and want to support it.

You know, I don't know that the -- I don't know that the donor function is as impacted.

I do know that the lack of programming, you know, tends to discourage donors. But you know, I can see also a commitment generally to the arts.

Q. Did you do -- or did Delta do any analysis of the impact on fundraising?

A. No.

Q. Were you asked to?

A. No.

Q. Not having done that, but having your own opinion about it, did that factor into the recommendation that you gave to the Board?

A. It did from the standpoint that, again, from a sources and uses perspective, if you are going to have to use endowment funds to support operations, and conceivably to support capital repair, then you're diminishing the capacity and durability of the organization, and that is a concern, and I think I drafted that into my briefing slides to the trustees.

Q. Did you have a discussion with Donna before she -- before this meeting where she

presented her perspective on the finances?

MR. LYNCH: Objection. Vague.

A. No. I had asked for -- I had asked, first, her view of scenarios, and was, you know, as you showed in that e-mail, was in receipt. We did not talk prior to this meeting, and in fact, we met at the Hoover building.

Q. Whose idea was it to have Donna present on the revenue and cost side of things to Secretary Lutnick?

A. Oh, why did she attend the meeting?

Q. No, not why did she attend the meeting, but why did she make the presentation on finances?

A. She is the CFO. It just felt appropriate in the room. There --

Q. Was that your -- but was that your idea, her idea, Floca's idea; whose idea?

A. I don't know. It wasn't my idea.

Q. You didn't think that was unusual if you were the outside consultant, and one of the things that were opining on was related to costs and revenue that she would be doing the presentation?

A. No.

Q. What if her -- like, what if what she presented was different than what Delta had uncovered?

MR. LYNCH: Objection. Calls for speculation. Vague. Lack of foundation.

A. It wasn't, and had it been, I would have said something.

Q. Okay. So what you're saying is, in this meeting, Secretary Lutnick, you were sort of assessing on the fly whether the information that she was presenting to the Secretary on costs and revenue was consistent with what Delta had analyzed in the two days prior?

MR. LYNCH: Objection. Mischaracterizes.

A. I wouldn't -- I'm going to decline to answer that question. I wouldn't characterize what I was doing as making decisions on the fly.

Q. Well, I'm trying to understand. If she's making a presentation, you're saying I would have disagreed. Did you have Delta's financial

analysis in front of you?

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. No. I had nothing in front of me.

Q. All right. Who, if anyone, at the Center provided input on drafts of your presentation, the slide deck?

A. Oh.

MR. LYNCH: Objection to the extent it calls for attorney-client privilege.

A. Good. I need that.

MR. LYNCH: But you can answer who, but not the substance of anything --

A. Yeah. I submitted it to Matt Floca, who I believed shared it with Elliot Berke.

Q. Okay. Then I'm not asking you the substance: Did you have direct discussions with Elliot Berke about your presentation?

A. No.

Q. Did Matt Floca tell you input, like relay input to you from Elliot Berke that he said,

this is Elliot's?

MR. LYNCH: Same instructions on the substance.

But you can answer yes or no.

A. No.

Q. What sort of input did Mr. Floca provide to you?

A. Nothing that affected the drafting. I think what he was doing was conferring, however he thought necessary, among his staff, and came back and, you know, confirmed that, yeah, he didn't think there was anything of issue in there; in other words, they didn't have any conflicting information.

Q. Did you make any edits in response to his comments?

A. No.

Q. All right. I'm now going to have you turn to Tab 1, which we are going to mark as --

MR. LYNCH: 6.

Q. -- Exhibit 6.

(Buchalter Exhibit 6, Delta PowerPoint presentation, 8.13.25, Construction Program Assessment, [no

Bates], was marked for identification.)
Q. On the front, it says Construction Program Assessment, and it's dated August 13, 2026.
Do you see that?
A. Yes, thank you.
Q. Is this what we had been talking about as the Delta presentation or slide deck?
A. Yes.
Q. You would agree if I call it the "slide deck," the "presentation," the "deck," we're still referring to the same thing, this Exhibit 6?
A. Yes.
Q. Okay. All right. This is the presentation that you made to the Board on August 13th?
A. Yes.
Q. Is this also the presentation that you made to the subcommittees on August 10th?
A. Yes.
Q. Did you make any edits to the document in between the 10th and the 13th?
A. I may have.

Q. If so, do you have drafts of the version that you delivered to the subcommittee on August 10th?

A. I would expect that they've been overwritten. I mean, our practice is to have the documents evolve.

Q. Did you send a copy of the version that you presented on August 10th to the Kennedy Center at any point in time?

A. Yes, but my memory is faulty on whether it was before the 10th or the 13th.

MS. FREENY: I think, counsel, we understand there is probably a version that went over to the Kennedy Center, and we would request a copy of that. It was not in the production as far as we know.

Q. So I want to turn your attention to page 3 and 4.

Earlier, you talked about two slides. These are the -- essentially, the two real substantive slides that we have been talking about containing your recommendations?

A. Yes.

Q. At the top of one, it says, Operate and Partially Renovate, and at the top of another, it says, Partially Close and Renovate.

Do you see both of those?

A. Yes.

Q. Who came up with those two titles for the two scenarios?

A. I did, personally.

Q. Why did you choose "Operate and Partially Renovate," and "Partially Close and Renovate," instead of other terms that perhaps the Kennedy Center had been using more commonly?

A. I understood -- and I don't remember how I came to this understanding, but I understood there was some confusion about whether "close" meant close-close, dark, nothing --

Q. Mm-hmm.

A. -- crickets.

And then there was "open," which meant open and maintenance projects.

So I was still -- remember, seems

like history, but I'm still back at we have to do the work.

Q. Okay.

A. And I'm back at this idea of slow-rolling and the idea of slamming all the doors shut, those are off the table.

So in --

Q. Right.

A. -- each instance, you are either partially closed, right, and then the reason that I say "partially" -- in the first instance, I say, "partially renovate," is I wanted to reinforce the point that you are not going to get all of the work done.

So you can --

Q. Okay.

A. -- be open, and not get all of the work done, or you can partially close; that is, maintain your mission, and renovate the main building.

Q. Okay.

A. I wanted to -- and I really wanted to set that stark distinction so that we were all

talking about the same thing, because I felt as though -- and it's a large group, as you know. I felt as though they were sort of garden-pathing around, well, do you mean -- when you say "closed," do you mean, and I wanted to just get all that off the table and be able to sort of crisply say, these are the two scenarios that we are considering.

Q. Were you concerned by using partially closed, that they would think that meant partially close the main building, but partially keep the main building open?

A. No. I didn't find that misleading. It was in contrast to close. And close is close the whole site.

Q. The Delta there being the public access parts of the REACH?

A. Yes.

Q. The external parts of the REACH?

A. Yes.

Q. So operate and partially renovate, as you're presenting it here, you're suggesting that all of the construction -- all of the renovation

would not be completed under this scenario here?

A. There's not enough money in the congressional appropriation.

Q. So core to your conclusion that you could only partly renovate, was the conclusion that the 257 that was appropriated would not cover the renovations?

A. Correct.

Q. We'll return to this later, but that also means that you -- when you say "Partially Close and Renovate," you're implying, I assume, that you could renovate to the full extent contemplated by that appropriation?

A. Yes. Analytically, I actually come up with 90 percent, but yes.

Q. So it was your conclusion that it would cost 257-plus, what, 30 million or so?

A. Yes.

Q. I think we're going to return to that later.

Right now, I just want to start just kind of asking the basis for some of these

conclusions that we set forth in these two slides.

Starting with Operate and Partially Renovate, which I am going to call phased renovation. Is that okay with you for these purposes?

A. Yes.

Q. Okay. So in the scenario that you present for phased renovation, you talk about four-year revolving closures through the main building.

Then remind me, where did the four-year conclusion come? Was that from JLL or did you independently reach that conclusion?

A. Independently.

Q. Who actually conducted that analysis to say this was going to take four years to complete these renovations?

A. That, again, is me, Khaled, Sean Dooley, and Mikaela Hutchison.

Q. You did that in between the date you started working on or about the 27th of July, and August 10th, when this was presented to the

subcommittees?

A. Yes. Likely faster than that, but yes.

Q. Then the conclusion, "One-third of the main structures will be inaccessible to the public at any given time..." (As read.)

Is that something you also independently verified or took from the JLL report?

A. Independently calculated.

That's the 37-and-a-half we referred to earlier. I realize that 37-and-a-half is not a third, but I was taking some liberties to just make it conversational.

Q. So, in your view, there's no point in time in the entire period of two-year construction that -- or sorry, four-year construction that you contemplated that 37.5 percent of the building would be shut?

A. There's no -- I'm sorry.

Q. Are you -- you are contemplating that for the entire duration of four years, roughly a third of the building will be shut?

MR. LYNCH: Objection. Asked and

answered.

A. Yes.

Q. So there's no point in time that accounts for where, you know, superficial renovations are done, or renovations that don't require shutting large portions of the building?

A. I think, again, earlier, I testified that there will be periods where it will be higher, and so there are certainly periods where it will be lower.

I would actually expect it to be somewhat episodic during the four-year period. I think this is the right average.

Q. Now, at the last bullet point, you estimate "... an annual operating deficit of $75 million for the term of the renovation" (as read); is that right?

A. Yes.

Q. That matches or corresponds to the charts on the bottom left?

A. Yeah.

I'll just correct, 78. You said

"75," but --
Q. Oh, excuse me, 78.
A. -- we're saying the same thing.
Q. Your answer is yes, the 78 corresponds to the chart on the bottom left?
A. Yes.
Q. Walk me through, where did you get these numbers from?
A. So these are numbers from the work of the Kennedy Center, as adjusted by me. The adjustments are the revenue and programming space adjustments that we had talked about.
Q. For the expenses, where did those come from?
A. The Kennedy Center.
Q. The uses. But are -- did they supply them as the projected -- help me understand.
A. I'm sorry. I understand.
The '27 forecast. 2027 forecast.
Q. Okay. So the expenses or the uses in this chart come from the fiscal year '27 scenarios chart supplied by the Kennedy Center?

A. Yes.

Q. I think I, for some reason, thought that the expenses were drawn from the fiscal year '25 financials; is that wrong?

Because the scenarios...

A. I know. The -- yes.

They come from the three-year trailing financial statements because the -- if you stay open, you are going to operate at your historical levels of cost.

Q. Who made the determination to use those numbers?

A. I did.

Q. When you say "three years trailing," did you -- you did an average, or did you just draw from FY27 -- or excuse me, '25.

A. No, my recollection is that I -- yeah, I -- yes. Yes. I drew from '25. I looked for aberrations in '23 and '24 to see that I could rely on '25.

Q. Did you vary any of them from fiscal year '25 up or down, do you recall?

A. I don't believe so.

Q. I want to draw your attention to -- hold on one second. Tab 14 for a second. We are going to turn back to this, but...

A. Mm-hmm. Yeah.

Q. Which will be --

MR. LYNCH: 7.

(Buchalter Exhibit 7, Appendix W, [no Bates], was marked for identification.)

Q. Correct.

So Exhibit 7, marked Appendix W, this is an appendix from Delta's report, is it not?

A. Yes.

Q. This is the unaudited fiscal year '25 financials that you received from the Kennedy Center?

A. Yes.

Q. These were the financials that we were just referring to?

A. Yes. Yes.

Q. All right. So I can give you some time to look at this. I know it's very small. I remind

you that this was your report.

The numbers under operating expenses, if you see, it looks like they do match the numbers that appear in your presentation, with one exception, which is Kennedy Center programming.

A. Mm-hmm.

Q. Do you see that?

A. Yes.

Q. Okay. So in FY25, the unaudited financials list expenses of approximately 65.5 million for Kennedy Center programming?

A. Mm-hmm. Mm-hmm.

Q. Whereas in your table --

A. Can you give me the tab reference again.

MR. LYNCH: It's 1.

Q. Oh, sorry. It's Tab 1, Exhibit 6.

We looked at 65.5 in the '25 financials, and this -- your presentation lists expenses for Center programming at 72.5?

A. Yeah.

Q. Why is that?

A. I don't know.

Q. Do you think that you had discussions with your team about why that is?
A. I'm sorry. Would I or could I?
Q. Do you think that you would?
A. Yes. I'm going to presume the 72-and-a-half is sourced from somewhere else.
Q. Okay, but you don't know where?
A. Right.
Q. Who actually on your team was responsible for preparing that chart?
A. We did that chart live. Khaled, James Hanson, Carrie Sherreard and I were literally dictating off of a spreadsheet.
Q. How many days in advance of the August 10th meeting, when you were putting this together?
A. Probably that weekend, the 8th. Probably those two days.
Q. All right. I want to turn next to the slide marked Partially Close and Renovate, which I'm going to call main building closure, if you don't mind. Okay?

A. Okay.
Q. Now, here, you have two different sections, one starts Essential Renovations, and the other starts Considerations. Both of them are in blue.
A. Yes.
Q. I just want to understand, these appear to be sort of observations and recommendations, both of them.
In your mind, was there a distinction between what you put in the top, sort of the top square versus what you called considerations?
A. My intention was to explain the scenario in the upper left, but then again, briefing the Board of Trustees, things that they should -- that the trustees should consider when discussing this alternative.
Q. Okay.
A. Items, not things.
Q. Now, the third bullet point talks about mission-based programming in the REACH. Where did

the information -- where did that information come from?

A. From the Center and interviews because the import of -- and it's actually interesting, right, because there's certain elements of the Kennedy memorial that you can't relocate, but there are considerable elements and educational programming around the memorial. The memorial is one of the key tenants, and so how was that going to be accommodated.

Q. So you said you got this information on the programming in the REACH from the Center?

A. Yes.

Q. And interviews, you've said. With whom?

A. There were a series of interviews. I think they were mostly that first week of August. And there were -- there was a -- forgive me, there was a consultant to the Center from California who was on the phone, and somebody else in the programming group was part of a series of interviews. We had, you know, half a dozen or eight interviews.

Q. Okay. Do you have a list of those interviews somewhere?

A. Yes. Somewhere.

Q. Okay.

A. I can't do it from memory.

Q. I don't know that we have that.

Do you recall, was it in your report?

A. I don't believe so. I think we make reference to the fact that we conducted interviews.

Q. Did Delta also keep notes of those interviews?

A. I didn't, and -- I don't know, and I doubt it, in that, again, we worked very hard to say, let's keep working into an expert report, and having our notes and those materials evolve through that report.

Q. What can you tell me about this consultant from California?

A. That, as I recall, he was a former employee of the Center for a number of years, and I think -- I think -- I think it's not uncommon in

that work to then kind of spin off and do your own thing independently, but obviously maintains all of the contacts within the arts, and the like.

Q. What was your understanding of his role in the process?

A. To understand the programming implications of being -- of main building closure versus otherwise.

Q. What input did he provide to you, or to Delta, on that issue?

A. We were talking through the -- the maintaining certain programming; we were particularly focused on the -- as I call it here, the mission-based programming. That's why I'm bringing this point up.

Q. Why were you focused on the mission-based programming, more so than, for example, arts programming?

MR. LYNCH: Objection. Mischaracterizes.

A. Well, it does somewhat mischaracterize what I said, but the -- knowing that the NSO was

going to be off-site, and knowing that there was sort of a remainder of programming, some of which had pledges, the question really is can you fulfill those pledges such that they are a source of capital.

Then the Kennedy Center -- the memorial is an entire separate of the three obligations of the Center.

So, you know, at a threshold issue, the arts, the memorial, the building.

Q. Right. I guess -- I think I still am a little bit confused.

Arts would be like the arts programming; right?

MR. LYNCH: Objection. Arts are arts, I don't understand the question.

If you can understand it, you can answer.

A. I'm not trying to be difficult here, I'm just --

Q. I'm trying to understand your --

A. Yeah. Go ahead.

Q. I'm trying to -- like, you expressed particular interest in assuring mission-based programming.

I guess I had understood that to mean what we had been talking about: The memorial. Are you saying that also includes art programming?

A. No.

Q. No. I guess, why was your focus on the mission-based memorial programming versus arts programming?

A. Because the trustees are going to come into the room, and they're going to have the obligation to fulfill all three.

Q. Mm-hmm.

A. They're going to need to hear the answer as to why the arts -- okay, the NSO is off-site, et cetera, et cetera. Where's the memorial? You have to be quite clear, the memorial is at the REACH. That's number two.

Q. Okay.

A. Number three, let's talk about the building and how to protect it.

You know, to me, again, putting myself in the shoes of the trustees --

Q. Yeah.

A. -- I've got to -- my obligation is I have to understand and deliberate the fulfillment of those three elements.

Q. So it sounds like you understood that NSO being off-site fulfilled the arts programming mission?

MR. LYNCH: Objection to the extent it mischaracterizes.

You can answer.

A. Not in its totality, if that's what you are implying.

Q. Okay.

A. But I didn't evaluate and didn't think whether it was on-site or off-site mattered, as long as the Center was continuing to support its existence and performances.

Q. Okay, but obviously, the Center, if it can, would like to have more than just NSO programming; right?

A. And I'm not saying otherwise. I'm not saying that NSO was -- I'm not saying you can check the box on --

Q. Mm-hmm.

A. -- your entire arts obligation with the NSO. That's not at all what I'm saying.

Q. Okay. Did the consultant provide any input on the impact of the various scenarios on arts programming?

A. What we actually -- we actually talked more about how you would continue to maintain the programming, and then be off-site, and then bring it back on and ramp up. This is where we better -- we, Delta, better understood the whole idea of, like, Broadway, that it takes several years to position a venue for Broadway.

Q. Okay.

A. And that you can't just close -- you know, book Broadway acts, open Broadway acts, show up. It's -- you know, it's not a --

Q. Right.

A. It's not that type of process, which we

know from our experience in the London theater, which was all about an opening.

Q. But that's just about the closure of the main building scenario?

A. Mm-hmm.

Q. What about the scenario that you were also asked to consider, which was the phased renovation?

MR. LYNCH: Objection.

Q. Did the consultant provide input on the effect of programming as between those two scenarios?

A. I don't believe so.

Q. Okay. So the focus was on the programming options under a main building closure scenario?

A. Yes, and the necessary continuity of those -- of that programming. Because that's what I was concerned about is, can we represent that -- to the trustees that their -- you know, two-thirds of their duties are still being fulfilled?

Q. Yeah.

If I wanted to see what your conclusion -- analysis or conclusions are about that, about continuity after the two full years of main building closure, where would I look?

A. At my report.

Q. Okay. We'll look at that in a minute.

Anywhere else? Okay.

A. Somewhere in the 1500 pages of my report, yes.

Q. What analysis, I guess, did you do, specifically focused on what is it going to look like after two years of main building closure, on the programming side?

A. Oh, I didn't do any analysis on that.

Q. Let's look at some additional bullet points. It talks about -- the last bullet point says that -- this is closure of the main building for two years. "Allows the time necessary to program for 2028-2029 in accordance with industry practice..."

How did you come to that conclusion?

A. Specifically, what I just referred to,

that I better understood the ramp required to position your -- reposition yourself for large, Broadway productions and the like, that that itself is a specific market that bids and operates in certain cycles, and that the idea that you could -- you can't book an act without necessary lead time.

Q. Right. But you are not a performing arts expert; right?

A. I -- didn't I testify to that?

Q. Yes. I'm just confirming.

A. You're confirming my prior testimony?

MR. LYNCH: Asked and answered.

Q. Yes. Yeah.

Yeah. I'm trying to -- like, so you have told us that you are not an expert in performing arts management, but you made a conclusion to the Board that full closure of the main building would be consistent with industry practice.

I'm trying to understand how you made that conclusion if you don't have expertise in arts management?

MR. LYNCH: Argumentative. Asked and answered.

Q. Do you consider that to be an expert opinion?

MR. LYNCH: "That," meaning that bullet point?

MS. FREENY: Correct.

Q. Do you consider it an expert opinion that fully closing the main building would allow the time necessary to program for 2028 to 2029 in accordance with industry practice?

Sir?

A. I don't think that it's necessary that that be an expert opinion.

Q. Okay.

A. Just.

Q. So that was not an expert opinion?

A. It's not an expert opinion. It's just a statement of fact.

Q. It's a fact that you based on what?

MR. LYNCH: Asked and answered.

A. My interviews and investigation.

Q. What is the scope of that investigation, into industry practice?

MR. LYNCH: Asked and answered.

A. Inquiring from the Center and personnel at its -- under its direction, or that were made available to me in answer to my questions in preparing this analysis.

Q. Who at the Center provided you with information about industry practice in that respect?

MR. LYNCH: Asked and answered.

A. The programming personnel and Mr. Floca.

Q. Which programming personnel in particular did you talk to, or did people at Delta talk to?

A. I'll have to get you those names.

Q. Did somebody at the Center tell you that industry -- that the closure for two years was in accordance with industry practice?

MR. LYNCH: Asked and answered.

A. The industry practice is that there's time necessary --

Q. Did someone at the --

A. -- to program.

Q. Did someone at the Center tell you that -- that first sentence, that there would be -- the closure would allow time necessary to program consistent with industry practice? Did that come from somebody at the Center?

A. From the consultant, the fact that it takes several years to position for those types of acts. Those large Broadway productions.

So this is just a statement of fact, that there's -- the time necessary. You can take advantage of that time necessary.

Q. In comparison, though, with the sort of the renovate, right, there would still be an ability to have that same programming; right? I'm trying to understand why this is consistent with industry practice.

Like, what is this intended to convey?

A. That the industry practice is the lead time. So if we've, you know, drafted this to cause confusion, let's remedy that. The industry practice

is that you need the time, the lead time.

Q. What about the next clause?

So the -- this scenario "... mitigates market and consumer confusion..."

What analysis did Delta do to reach that conclusion?

A. We didn't do specific analysis on it.

Q. Did that information come from the Kennedy Center, then?

A. No, it's just not expert -- it's not an expert opinion. Based on an independent analysis performed by Delta, it's an observation that I think describes this scenario.

Q. On what basis did you draw the conclusion that closure of the main building would mitigate market and consumer confusion?

MR. LYNCH: Objection. Mischaracterizes the testimony.

A. From my experience in similar capital projects.

Q. You say "similar," but none involving a performing arts venue?

MR. LYNCH: Objection. Mischaracterizes.
You can answer.
A. Well, I mean, we have experience in performing arts venues.
Q. Do you personally have experience in performing arts venues?
A. No. Personally, no.
Q. If you didn't think that this was an expert opinion, "mitigates market and consumer confusion," why did you include it in the presentation to the Board?
MR. LYNCH: Asked and answered.
You can answer.
A. You know, you're really focused on the concept of expert opinion.
I'm really focused on the fact that we were retained to do an independent analysis.
Q. Mm-hmm.
A. So I think we should take care with the expert opinion characterization because if I'm providing the information necessary to fulfill the

assignment, you're conflating that with expert opinion and holding it to a different standard.

Q. Okay.

A. At least in the way that I'm perceiving your questions.

Q. That's fair.

So we'll not talk about expert opinion. We'll talk about independent analysis because I thought you said this did not reflect independent analysis?

A. It does not.

Q. Okay. You knew that the Board would be relying on these statements to decide how to proceed with respect to closure?

A. They would consider this information as they deliberated. I mean --

Q. I assume you wouldn't include something like this will "mitigate market and consumer confusion" if you didn't think it would be something that the Board would want to consider.

MR. LYNCH: Objection. Argumentative.

A. Or something that I believed.

Q. Let's go with the next clause where Delta is representing that closing the main building "best preserves the brand."

What is the basis for that conclusion?

A. Reputation.

Q. Did you do any analysis to reach that conclusion?

A. No.

Q. What is it based on?

A. Logic. Experience.

Q. Okay. But I assume, though, in other engagements, Delta has been asked to actually do analysis of what will preserve, or not, a brand, when it comes to making construction decisions; is that fair?

MR. LYNCH: Argumentative.

You can answer.

A. In our 26-year history, I presume we have, yes.

Q. So when the real question is: Will this

preserve the brand or will it not, from a -- you know, let me rephrase that.

When the question is: Will one course of construction versus another preserve the brand, there are actually analytical methods that are available to try to reach that determination; correct?

MR. LYNCH: Vague as to the question.

You can answer.

A. Yes, I think some of them that -- some of them are employed in this analysis. The lack of -- I warned throughout the report about the conditions that the building will be in, that the damage is invasive, and will affect the customer experience.

Q. Okay, but that's a conclusion.

I'm talking about analysis?

MR. LYNCH: Objection.

A. I've conducted that analysis to lead to that conclusion. I've looked at the schedule. I have seen its concurrency. I have seen the scope of

work. I have read the technical reports. It's going to be an invasive project.

Q. Right.

A. It's going to affect the customer experience. When I answered earlier logic, it's that one stems from the other.

Q. One aspect of brand is willingness of donors to give money; right?

A. An important one here.

Q. But Delta, I assume, did not conduct an analysis of fundraising under these two different scenarios?

A. I think I testified to that.

Q. Under Considerations, were these also -- were these inputs that you received from the Center, or were these Delta's conclusions?

A. Delta's conclusions.

Q. The first one is "The Center maintains its statutory cultural mandate..."

What is the basis for saying that?

A. Reading the obligations of the Center under the law.

Q. I assume you do not have a legal background?

A. I do not.

Q. What about the conclusion that "The REACH will preserve the memorial experience..."

What's the basis for that?

A. Direct inquiry.

Q. With whom?

MR. LYNCH: Asked and answered, I think.

A. Every member of Kennedy Center management.

Q. Then where "The renovation process will serve as a means of engagement with patrons and donors."

What is the basis for that?

A. I ran a 10-year capital campaign. We used the capital campaign as a basis to draw more attraction and more visibility to the library system.

Q. So your conclusion to the Board that the renovation process of the Kennedy Center will serve

the means of engagement comes from your experience in 2003 to 2010 with the San Francisco Public Library.

A. If I present this information and the Board of Trustees says, gee, I don't agree with that, they can make any decision they want.

Q. Understood.

My question was: I wanted to confirm that your statement here that the renovation process, the renovation of the Kennedy Center, will serve as means of engagement with patrons and donors is based on your experience from 2003 to 2010 with the San Francisco Public Library -- Friends of the Public Library?

A. 2001 to 2010.

Q. Okay.

A. Yes.

Q. Anything else? Is it based on anything else?

A. No.

Q. Did Matt Floca ever talk to you about what -- like, what sorts of things you should put in

this presentation?
A. No.
Q. Did he ever encourage you to put in things about donor engagement?
A. No.
Q. I assume that you had an understanding of -- I'm not going to ask that one. Strike that one.
All right. I want to take a look at the financial figures in this main building closure scenario.
You estimate here revenue from the Kennedy Center programming of 38.3.
Do you see that?
A. Yes.
Q. Generally speaking, for this scenario, where did those numbers come from in terms of revenue sources?
A. Yes. This is the '27 forecast, and what the sources do is they combine pledges and income.
Q. Which combines pledges and income?
A. Sources.

Q. Okay. Right. For essentially available operating budget?

A. Sources, yeah.

Q. Okay. So but where did the numbers come from?

A. The '27 forecast prepared by the Center.

Q. Okay. So these were numbers that you received from Donna Arduin?

A. Yes.

Q. Did Delta independently verify them?

A. No.

Q. Why is that?

A. We considered that Donna's and her staff to be, you know, in a position to reduce credible information, and if we were going to rely on it, it is going to be the same information that the trustees would rely on.

Q. Why did you sort of apply your own calculations and methodology to the projections with respect to the other scenario, but you relied on the Kennedy Center's projections for this scenario?

A. Oh, no. I'm sorry.

It's a consistent methodology. The source of the information is what we were talking about.

Q. Okay. Help me understand that.

How do we know it's a consistent methodology?

A. I'm sure I outlined that in the report.

Q. Okay. We'll -- so I want to -- what is your understanding of the methodology underlying the FY27 projections that you received from the Kennedy Center?

MR. LYNCH: Objection.

I think that -- if you understand, you can answer.

Mischaracterizes.

A. Why do we adopt the '27 forecast?

Q. No, no, no. Like -- you know what, I will bracket this, and we'll get to it later.

A. Okay. Okay.

Q. I'm trying to understand --

A. No. No, I'm not --

Q. -- how you got -- how you got that.

But because to me, it sounds like -- we talked about the reductions that you applied to the prior scenario, and it sounds like for these, for the main building closure, you didn't do your own methodology, you took the numbers that were supplied by the Center in that FY27 chart; is that fair?

A. Yes.

Q. Okay.

A. It's not necessary to make those adjustments during a period of closure.

Q. Okay.

A. With the main building closure.

Q. Well, but -- so look with me under the revenue for the Kennedy Center programming.

A. Yes.

Q. This says full building closure, the revenue is 38.3 million.

Do you see that?

A. Yes, yes.

Q. In the prior slide --

A. Yes.

Q. -- the revenue for where the Kennedy Center remains mostly open, partially closed, the revenue is lower --

A. Yes.

Q. -- 32.7.

Why is that?

A. Because as you see how there's the 62 -- I don't have a Bates number here -- but on the prior slide, that adds up to 115.7 million.

Q. Uh-huh.

A. You see the $62 million of contributions.

Q. Yes.

A. So that's a separate item.

So what's happening is there's $32.7 million of Kennedy Center revenue, and then there's the addition of $62 million of contributions.

On the next page, the 38.3 million includes any of the contributions that are sort of general funds to the Kennedy Center in that figure.

The contributions are not broken out

in the second instance.
Q. Okay. But your understanding would be that the operating revenue -- the revenue from tickets and that kind of thing would be lower?
A. Correct. Yes.
Q. Why -- there's a zero --
A. Yeah.
Q. -- sorry. External services, or External programming, is zeroed out.
Why is that?
A. I don't remember why the -- I don't remember.
Q. Because that's -- when I read this, it seems to suggest that there is no external programming or events.
Was that your understanding?
A. I mean, I think it's a matter of geography, meaning, it probably is now rolled up into the symphony or something. I'd have to look at the source documentation on that -- on that item that is $3 million on a $116 million budget.
Q. All right.

On the expense side of things, you estimate $2.7 million in fundraising versus, it looks like, 16.2.

A. Yes.

Q. Why is that?

A. Because when the Center is operating, the presumption, and you know, candidly, we are talking about people and jobs here, is that the fundraising would continue at the same historical levels.

And that at -- the main building closure would allow you to, for a period of time, to significantly downscale the staff and fundraising.

Q. How is that consistent with the idea that the renovation process is a means of engagement with patrons and donors?

A. I certainly see your point.

I think that you can still have near-term reductions in operating revenue, and still create that kind of branding, or event excitement, 24 months out, but I understand your question.

Q. Did you account for a reduction in

development staff when you were calculating or assuming fundraising and contribution levels for this closure scenario?

A. Would you read that back, please.

Q. Yeah. Sorry. Go ahead.

(The record was read back by the Realtime Stenographer.)

A. Yes. That's the staff that I'm referring to where -- and I don't want to be quoted on this, on the record, but I thought the staff reductions were quite substantial.

Q. My question, though, is: Did you account that staff reduction level in your projections of fundraising for a closure scenario?

MR. LYNCH: Asked and answered.

You can answer.

A. I assume meaningful reductions in staff.

Q. But wouldn't that also mean meaningful reduction in donations?

A. I don't know.

Q. Was that part of your assumptions going in?

A. My assumption is anything we can do to reduce the operating deficit.
Q. But it's logical, isn't it, that a reduction in fundraising staff reduces contributions?
A. Oh. Logical.
Q. Mm-hmm.
A. Yes. A lot of things in this presentation are logical.
Q. In one of the two white boxes, on the right, you see, I think, four little bullet points?
MR. LYNCH: Which --
A. Which --
Q. I'm sorry. The main building closure.
A. Yes.
Q. It talks about how this scenario "delivers a faster return to full programming."
What do you mean by that?
A. Simply that the duration is shorter.
Q. The duration -- so full programming --
A. A renovated, revitalized building, now with all of the theaters operating. It happens in

two years, not four.

Q. All right. I want to now take you to your preparations for the meeting with the Board on August 13th.

It looks like from the e-mails that we got that you had a number of discussions with Matt Floca to prepare for the Board; is that right?

A. Yes. I think so. Yes.

Q. Did he emphasize anything in particular that he wanted you to address or not address?

A. No. I think that most of the traffic was around the work that I was doing on the operating numbers, if I remember correctly -- the -- I'm sorry --

Q. Operating...

A. Operating figures.

Q. Were you still doing that work as you were preparing to make a presentation to the Board?

A. Yes, because I'm particularly remembering and am focused on the -- oh, the Board, I'm sorry. I am sorry.

I'm talking about the 8th for the

10th.

Q. Now, I'm talking about preparation --

A. What happened between the 10th and the 13th is your question.

Q. Yes.

A. I don't think much happened in between Delta and the Center.

I think I was starting to pivot toward the expert report. I think with the 10th meeting having happened, I was -- as you can imagine, reluctant, would certainly be true, to make any modifications to the slides since the committee had already seen them.

And actually, my recollection is I showed up for the Board meeting on the 13th, and I did -- I was physically here with the Center staff.

Q. Okay. I'll get to that in a minute, but I'm going to ask if you were involved at all in the preparation of any of the materials that went to the Board, other than, obviously, preparing your presentation?

A. No.

Q. At some point in time, though, there was -- you were approached about a resolution that was going to be given to the Board.
Do you recall that?
A. Yes, and I made a comment.
Q. Mm-hmm.
A. Which you know, and I don't remember, and it's a word, and I said could we change that word.
Q. Yeah. So we can -- I don't need to be coy. We can just show it to you.
A. Yeah. I know, I know, but that was -- I did -- so I did obviously review that resolution, and I think there was something about the word that characterized my work that I reacted to.
Q. Right. This was an e-mail from general counsel, Elliot Berke.
Do you recall that?
A. Yes.
Q. He e-mailed part of a resolution that was going to be prepared -- or going to be delivered to the Board.

Was that your understanding?
A. Yes.
Q. It was a characterization of what output Delta was giving to the Board; is that right?
A. You know, now we'd have to look at it.
Q. Let's take a look.
A. But I know I had a one-word reaction.
Q. Let's turn to Tab 5, which is also Exhibit 5, I believe.
MR. LYNCH: Can we already -- yes. We already --
Q. Then it's 473.
This is the exchange that you were referring to?
A. Yes. I can give plenty of color on this.
Q. Oh. Please do.
A. So what's the background on this request on my part.
It's that as we talked about the timeline and the amount of work that I knew we were going to have to do to produce the report, we agreed

to do what we did do. We produced the executive briefing slides, and I had to be very demanding on myself that those slides matched the outline, which was going to match the report, so that I was going to get a complete and consistent record at the end of a process, without conflict -- conflict among the deliverables.

So -- where does he say it -- oh, in its report.

So I reacted to the "in its report," and asked for that to be presentation, because I regard it, as would you, I would think, those slides were a presentation.

That was not the report that I knew -- that I knew I was building, and I didn't want anybody -- any of the trustees -- anybody -- any of the trustees to say this is your report?

That's our presentation for the purposes of briefing the trustees to -- so that they could confer around this issue.

This is the report.

Q. But the report did not yet exist as a

report?

A. Well, as something that I was prepared to deliver, right.

Q. Going back -- so under the original Statement of Work and your expectation, you had been expecting that you would be able to deliver a final report to the Board, with --

MR. LYNCH: Objection. Did you finish your question? I'm sorry.

A. The sequence of work --

Q. Yes.

A. -- would have involved the analysis, the preparation of the report, the summary of findings, and the presentation.

Q. So one difference in sort of the timing is that the final report that was contemplated at the end of 60 days now comes two to three weeks after the initial.

A. The summary and presentation comes two to three weeks, and then I have, you know, essentially -- now elapsed time, I have a month to produce the report.

Q. Another difference was also that period of analysis, which I think we discussed before, was 45 days. That was in fact actually curtailed to about two weeks?
A. Yeah, with eight people working full time to adjust for that.
Q. Tell me about the actual meeting with the Board, and in particular, your presentation to the Board.
MR. LYNCH: Objection. Vague.
You can answer.
A. It was a formal Zoom meeting. I was here in Washington, DC, with the Kennedy Center staff. Quite a few participants. Maybe as much as a dozen participants here. 55 or something people on the Zoom link.
I'm challenged to remember the agenda because it did not include just this. There was, I think, something about, like, the election of Board members or -- there was some sort of administrative item.
There was then a -- this item of the

building was introduced, I presume, by the chairperson, in my memory. I then, solely, you know, frankly, without interruption, made a -- something between a 15- and 20-minute presentation of my presentation, the slides.

There was open dialogue. I had six or so Board members ask various questions, which I answered. I don't think -- I don't think there was any -- I don't think it went around the table in any way, if you know what I mean.

Q. Mm-hmm.

A. You know, other people didn't answer questions.

Then I would say that session was concluded after 30 minutes or something of that nature.

Q. Did you provide any opinions to the Board during that meeting that are not reflected in your slides?

A. No.

Q. Did you run through everything, or did you have highlights?

A. I did a voiceover. I don't read slides. You know, I didn't add anything, I guess, is the best answer.

Q. Did you provide any caveats or limitations that are not in your presentation?

A. No. The only voiceover that, again, I think I mentioned this already today, is that I made very clear that I had experience with water intrusion on these types of historic buildings, and on older buildings, and that nobody should be confused. This is an accelerated -- rapidly deteriorating, accelerating condition.

Q. That's because you were concerned that they would decide just not to move forward with the renovation?

A. Yes, and you put 55 people on a Zoom screen, and you think, you know, this could end up in a -- just a long conversation as opposed to, you know, a group taking action.

Q. I mean, is it fair to say that your primary objective going in was to convince the Board that they needed to begin the renovations

immediately, regardless of the scenario?

MR. LYNCH: Objection. Mischaracterizes the answer.

A. No, no, no.

My recommendation, which I haven't wavered from after doing the capital analysis, is that it's much more efficient use of capital, of the Congressional funds, to close than to continue to maintain operations.

I was clear that that was my recommendation.

Q. And that's close for two years; correct?

A. Yes. 25 to 28 months.

Q. Again, I'm trying to understand.

Did you consider the option -- and we talked about -- how full closure of the main building is going to have an impact on programming; right?

A. Oh, definitely is.

Q. So if it were possible to say, for example, fully close the main building for one year, and then partially open and continue renovation for

however -- I don't want to say it's exactly a year, but for some other period of time, is that something -- like, that was not one of the scenarios that you were asked to consider?

A. Is there an engineering analysis that says you can do that?

Q. Is there not an engineering analysis that says that you can do that?

A. Do you have an engineering analysis that says you can do that?

Q. I'm not the expert.

What I'm asking is, is it something that you considered to close for one year?

A. In contravention to the body of evidence in this case --

Q. What body of evidence is that?

A. JLL's got a 200-project program scheduled against that need.

Q. Ah. Okay. So this is based on the JLL recommendation?

A. It's based on scope that exists in a record that's been evolving for literally decades.

Q. Yeah.
Were you aware that JLL was given a two-year fixed period of construction as part of the input from the Kennedy Center?
A. No.
Q. Okay. Would that change your perspective on this, if you knew that JLL was told two years for construction rather than a different period of time?
A. Would it change my opinion.
No. It wouldn't change my opinion that closing the building is superior to operating -- having the public walk through the site.
Q. Would it change your opinion, though, on what we just discussed.
Because you asked -- your reaction to my positing of a scenario of close for one full year.
A. Mm-hmm.
Q. And then reopen for partial reconstruction, wouldn't that matter whether JLL's

report independently considered two years of construction, or was told two years is your input?

MR. LYNCH: Objection. Argumentative.

You can answer.

A. I think two years is as fast as you could possibly do a scope of this magnitude.

I can't -- I'm having trouble with your hypothetical, which is a hypothetical. You haven't --

Q. Yep.

A. -- you haven't shown me anything to suggest that what you're talking about is even possible.

Q. Understood.

A. You're asking me this imaginary world where one year, and then something else, and you have no analysis or information to support that --

I'll pause while counsel whispers.

Q. Yeah. Go ahead.

A. Are you done whispering, sir?

Q. We're conferring.

A. You all done?

MR. KRISTOFCAK: I'm done when I'm done.

MS. FREENY: Do we need to take a break?

MR. LYNCH: He's in the middle of an answer.

THE WITNESS: I thought I was answering a question.

MR. LYNCH: So let's finish the answer.

MS. FREENY: Okay. I'm not trying to be -- I'm trying to get answers to my questions. I'm sensing some frustration from your end. I'm not trying to cause it. If we need to take a break for you to collect yourself, I'm happy to do that.

Do you need to take a break?

THE WITNESS: No.

MS. FREENY: Okay.

THE WITNESS: So the basis of your question, which is entirely hypothetical, and you have no evidence or information that you can put in

front of me that that is even possible, I, in my industry experience, severely doubt because I don't know how you do the type of invasive, significant capital work that we're talking about here, in a year.

I can't conceive of it.

BY MS. FREENY:

Q. Did --

A. Yes.

Q. Okay. But what I heard is that you relied on the JLL report for the -- sort of the two years that it would take and the schedule that they produced to say this is going to take two years; correct?

MR. LYNCH: Objection. Mischaracterizes answer.

A. That two years has a year of concurrency in it.

So as soon as I disaggregate the JLL schedule, it immediately turns into a three-year schedule.

Q. But -- yes or no to my question that you

relied on the JLL report and the schedule that JLL prepared to say this is going to be two years of construction?

MR. LYNCH: Objection. Vague as to rely.

You can answer.

A. After review -- after detailed review of that schedule, yes.

Q. I guess that gets back to my question.

Then would it not be the case that whether or not JLL was told two years as an input from the Kennedy Center, would affect how you reviewed that report?

MR. LYNCH: Objection. Asked and answered.

A. No, it wouldn't change how I reviewed that report.

Concurrency is what I'm focused on, and there's only a certain amount of -- we sometimes call it crashing the schedule. There's only a certain amount of compression that you can possibly put into a schedule.

Q. Okay. Let me just make sure, before I move on, that I understand.

So you're saying that if JLL had been told, start with the premise of a two-year period of construction, that would not have affected your assessment in this case?

MR. LYNCH: Asked and answered.

You can answer.

A. It would not have affected my assessment of their material because had I looked at their material and said, well, where's the concurrency or why is this -- you know, why is this so long or so short, I would still be asking those questions.

It is in the -- and it's important to understand this. It is in the fact that I tested the concurrency of the schedule by splitting it into its sequential units to understand how long it was and how reliant it was on compression.

I was doing what I would do. I was looking at schedule durations and productivity, and I would do that anyhow.

If that revealed a defect in JLL,

that is, they were purposefully taking half the time or unnaturally, you know, doing the program with speed, I would have seen that.

Q. Where is that analysis reflected?

MR. LYNCH: Objection. Vague as to what that analysis would be.

A. The results are in my report, and the work is done -- you know, it's done by looking at the project schedule itself.

Q. Okay. You did that in a period of less than three weeks?

A. Yes. Sean Dooley and Mikaela Hutchison were assigned to that.

Q. Have you had any communications with individual trustees outside of Board or subcommittee meetings?

A. No.

Q. You talked about, at some point -- I heard you say that, by a certain period of time, you had pivoted to focus on the report.

Do you recall that?

A. Yes.

Q. That was before the August 13th meeting?
A. Yes, because the delivery of the briefing slides on the 10th, I really do recall that, you know, I had submitted the deliverable for the 13th, and we had work to do.
Q. Okay.
A. But I didn't have to address -- readdress the presentation.
Q. Do you recall a discussion of a full report coming up during the Board meeting?
A. Oh, yes.
Q. Okay. What do you recall?
A. That it was -- I think correctly represented by Secretary Lutnick, I believe, that we, Delta, were preparing, and -- a full, final report for consideration by the trustees.
Q. If the meeting minutes from that August 13th Board meeting reflected that Secretary Lutnick actually said, "Delta's full report of roughly 100 pages was not distributed because it was repetitive of the same analysis" (as read), would that surprise you?

A. I don't have a view on that. We weren't prepared to release it.
Q. Because it wasn't ready?
A. Yeah. In my judgment.
Q. Okay. But do you recall Secretary Lutnick saying that there was 100-page report in existence?
A. No. Not specifically, no.
Q. Just to be clear, there was not, at that point in time, on the August 13th meeting, there was no 100-page Delta report in existence?
A. I mean, he wouldn't know the -- he wouldn't know the page count or something of our report.
Q. Well, you say "of your report," but there was no report, as such, on August 13th; right?
A. Well, I mean, it was evolving at Delta, but I mean, I wasn't prepared to release it.
Q. Okay. I mean, you're saying it's evolving. Tell me what you're saying.
A. Well, we're drafting. We're building sections. We're, you know, looking through --

Q. Yeah.
A. -- thinking about how to compile exhibits. It's a process.
Q. Were you -- yeah. Were you -- like, were you aware at this time, during this meeting, did you notice that Secretary Lutnick represented that there was actually was, in existence, a roughly 100-page Delta report?
A. No.
MR. LYNCH: Asked and answered.
A. I don't remember that.
Q. Okay. Now, at some point in time, Secretary Lutnick actually asked for the report by a specific deadline.
Do you remember that?
A. Yes.
Q. So he said he wanted a copy of the report by the 20th; is that right?
A. He actually asked me what do I need.
Q. Okay.
A. And I said, I need a week.
Q. Okay.

A. And he said, okay. You got a week.

Q. When was that conversation? At the meeting?

A. It was not at the meeting. I think it was -- I think it was later that day.

Q. Okay.

A. I mean, I, literally -- that was a -- I was in the airport.

Q. Okay. You had a -- this was a phone call, then?

A. Yes.

Q. What was the nature of that conversation with Secretary Lutnick?

A. How long do you need to put the report together?

Q. Mm-hmm.

A. I said, I need a week. He said, okay. You got a week.

Q. Did he tell you, sort of, what, on his end, the timing considerations were?

A. No.

Q. Okay. Because a week is --

A. Sorry. Can we go off the record for a second. Just take a quick --

MS. FREENY: Yeah.

(Off the record.)

BY MS. FREENY:

Q. Why are you laughing?

A. No reason.

Q. It feels like there was a reason, though; right? What was that reason?

A. Those conversations were brief.

Q. There's something notable that caused you to laugh, and I'm -- I want to know what it is.

A. The brevity. You're asking me questions about that exchange. It was one minute long.

Q. So just -- what's happening between August 13th and August 20th when you actually produce the report?

A. Long days for eight people.

Q. Is the work mostly being done internal to Delta?

A. Yes.

Q. What kind of interactions did you have

with the Center substantively, if any, during this time period?

A. Nothing.

Q. Was there any information that you had not gathered from the Center that you gathered during that time period?

A. Not that I recall. So not in any meaningful way.

Q. All right. I am about to talk about the report, and --

MR. LYNCH: Should we take, like, five, just --

MS. FREENY: Yeah. I could use a bathroom break.

(RECESS, 2:50 p.m. - 3:00 p.m.)

BY MS. FREENY:

Q. Mr. Buchalter, I'm going to direct you now to Tab 12, which will be marked as --

MR. LYNCH: 8.

Q. -- Exhibit 8.

(Buchalter Exhibit 8, Delta Construction Program Assessment Report, 8.20.26, [no Bates], was marked

for identification.)

Q. And get you to confirm that this is a copy of Delta's full report that we have been talking about.

A. It is.

Q. So --

MR. LYNCH: With the caveat, not with the exhibits, as we just discussed off the record.

Q. Correct. This is your report part minus the appendices; correct?

A. Yes.

Q. All right. This was finalized on or about August 20th?

A. At 9:13 a.m.

Q. How did you convey this to the Center?

A. By e-mail. That might not be true. Because of its size, we may have done it through a ShareFile, but electronically.

Q. Is it fair to say that this report is the culmination of what had previously been described as Phase 3 in the Statement of Work in

your engagement? This is the final -- this is the final --

A. Yes.

Q. -- product?

A. Yes.

Q. I think you said before, this report -- sort of provides the support or backup for the presentation that you gave to the Board on the 13th, and the subcommittee on the 10th?

A. Yes, or it certainly should be consistent with it.

Q. Well, how would you describe this? Because it's not a normal sequence of events.

A. That I took care that the presentation that I gave on the 13th, that that represented a summary of what I expected the final report and its related opinions to include, and that there's a no-conflict between that presentation and this report.

Which I distinguish from support for those slides.

Q. Okay.

A. Is what I'm saying. It's a body of work that's all consistent.
Q. Why did you prepare a report if you had already given a presentation to the Board, and the Board had already voted in favor of your recommended approach of two years, main building closure?
A. To complete the trustee's diligence.
Q. Who -- is that something that you were told by someone at the Center?
A. Well, it was -- it was in my scope of work, and it's also what I would view as appropriate.
Q. Help me understand, though. The Board had already voted in favor of your recommended approach; correct?
A. There was certainly commentary about, "And we look forward to seeing the report."
So I saw it as the findings presented at the 13th were compelling enough to produce the vote, but that the file and the trustees' consideration should include the body of work, and I don't think that the briefing slides

reflected the full body of work.

So there was no reason to limit the process. Limit the materials that were made available.

Q. Okay. But necessarily, the materials that were made available to the Board when it first voted were limited just by the time frame; right?

A. Yes.

Q. So who made the determination, as between you, Delta, versus someone at the Center, that the trustees' consideration should include the full materials, including the report?

A. I didn't ask, and I wasn't told to stop. So I continued to complete what I considered to be my assignment. I'm under an SOW to do all of this.

Q. Okay.

A. And nobody said your work is unnecessary and stop.

Q. Well, even more than that, because Secretary Lutnick said, hey, I really need this report or something to that effect; right?

A. Yes.

Q. So what -- I guess --

A. Yeah.

Q. I'm hearing your understanding, but what was conveyed to you about what the Center needed your report for, since the vote had already occurred?

A. Well, I think the dialogue during the Board meeting on the 13th, I think it was necessary for the trustees to receive the report. I think it was an expectation of the trustees that they would receive the report.

I think the findings were compelling enough for them to make the vote. But I think, I mean, I think about it as a trustee, you know, if I were in their shoes, I would want to see the report.

Q. Did you have an opportunity to review the minute meetings from the August 13th meeting?

A. No. I don't receive them.

Q. I'm just going to represent to you that I'm reading from --

A. Sure.

Q. -- minute meets of the August 13th Board

meeting.

"Secretary Lutnick clarified that two separate documents were involved: The JLL report... and the Delta report prepared at a summary level, Delta's full report of roughly 100 pages, not having been distributed because it was repetitive of the same analysis." (As read.)

A. Hmm.

Q. So we talked about this earlier, and I asked you if it would be surprised to hear that the meeting minutes reflected that Secretary Lutnick told the Board that there was a 100-page Delta report on August 13th.

Do you recall that?

A. Yes.

Q. Taking my representation that I am reading from those minutes, what do you take from that, because we have been talking, and I had understood that you thought the Board knew that they had not seen a report.

How do you square that with the minutes which suggest that the Board was told that

there was a report, and it just wasn't presented?

MR. LYNCH: Objection. Lack of foundation. Calls for speculation.

A. I'm terribly sorry. I'm not following your question.

Q. Yeah.

A. I don't misunderstand the subject matter.

Q. Okay. You understood -- like --

Let me just take a step back.

So after the 13th, it sounds like pretty soon thereafter, Secretary Lutnick says -- I want the report; correct?

A. I think later that day.

Q. That was to provide it to the Board; right?

A. Well, he didn't say so, but I presume so.

Q. Did you have an understanding of why it was being provided for the -- to the Board or for what purpose?

MR. LYNCH: Asked and answered.

You can answer.

A. My understanding was it was just to conclude the process of --

Q. Did you understand that there would be an additional Board vote?

A. No.

Q. About closure?

A. No.

Q. When did you come to understand that there would be an additional Board vote in September ratifying their prior vote?

A. At the end of August, I want to say, August 30th, around there, I spoke on the telephone with Matt Floca.

He told me your report has been distributed, and we're going to have a second meeting. We're going to give the trustees two weeks to read your report, and we're going to have a second meeting. We want it to be an open dialogue, and anything that they want to ask you, they can ask you.

Q. Okay.

A. And I said, sure, because frankly, I submitted the report, so I had a report.

Q. Right.

A. I just had to show up for a meeting.

Q. All right. If we have time, I'll return to the September time period, but for now, let's talk about your report.

If I could have you turn to Paragraph 24 in Exhibit 8. 24 talks about your expertise in the areas that are the subject matter of this report?

A. Yes.

Q. I just want to ask, do you consider performing arts management to fall within the subject matter of your expert report?

MR. LYNCH: Asked and answered at least twice.

You can answer.

A. No.

Q. All right. In this report, you talk about a amendment to your scope of work to eliminate certain aspects, including a final risk register.

Do you remember that?

A. I'm sorry. Are you reading?

Q. No, I'm not.

A. But you're telling me, and I do remember.

Q. That was -- that amendment to the scope of work, was that done just based on the compressed time frame?

A. Yes. And just verbally. We didn't actually amend this, the SOW.

Q. Were there any other changes to your Statement of Work, other than -- I can just -- it's Paragraph 3?

A. Yeah.

Q. "... preparation of program improvement recommendations and a final risk register."

I just want to know if there were any other amendments to the scope of work.

A. It is Paragraph 2(vi). The elements of (vi) were deferred. We are doing the work. In Paragraph 3, I say my work in this regard may continue beyond the date of this expert report.

Q. Has it continued?

A. Yes. And that's what I'm referring to (vi), in Paragraph 2.

Q. Now I want to get you to turn to Paragraph 168. We're going to jump around a little bit.

Section F of your report is The Shorter Schedule Preserves Credible Time Before the Federal Appropriation Expires.

Do you see that?

A. Yes.

Q. What was your understanding of the expiration of the federal appropriation?

A. That it exists on September 30th, 2029.

That is the expiration date.

Q. Expiration date of what?

MR. LYNCH: Objection to the extent it calls for a legal conclusion.

A. Yes. The funding available through that date. I absolutely am making no interpretation of what you have to do to get access to that money --

Q. Okay.

A. -- or what -- what available means, and what gone means.

Q. Okay. I think I -- you know where I'm going. I just want to make sure I understand what you are saying and what you aren't saying, okay?

A. You completely understand that I understand what that says, and what I am definitely not saying.

I do not know the mechanical ins and outs. I know literally what the statute says.

Q. Do you know the difference between obligation and expenditure of funds?

A. Not in a legal context.

Q. Okay. Well, let me just talk about a practical -- like, your understanding in a practical context.

A. Yes.

Q. So in here, in the first sentence, you say, "... schedule duration is particularly important because the approximately $257 million federal appropriation is available through September 30, 2029."

A. Yes, and if we're sitting in the latter half of '26, and we're on a four-year program, we're going to go way past that date.

Q. Okay.

A. So what I'm saying as a practical matter is -- is -- my experience with these types of dates is you have to have the funds committed, or you have to have a contract in place, or something like that.

Q. Yep.

A. When the work starts to extend 12, 15 months past that date, the possibility that you're going to have that kind of preparatory material, and be able to earmark the funds, per se, diminishes.

Q. Okay.

A. I'm not making more of it than that, but it's a consideration.

Q. So you're not saying that the money has to be spent by September 30th?

A. I'm saying to please consider that the four-year period clearly goes past September 2029.

Q. But if the funds had been, for example, obligated, or basically contracted for, they would

still be available to fund ongoing construction after September 30, 2029?

MR. LYNCH: Objection. Calls for a legal conclusion.

A. I don't know.

Q. You don't know. Okay.

But wouldn't that -- I guess, wouldn't that --

A. But that would make sense.

Q. Wouldn't that matter to this sentence, because you're saying it's really significant that the money goes away on September 30th. Doesn't it matter what it means to go away?

MR. LYNCH: Objection. Mischaracterizes the report.

You can answer.

A. No. No, because you're colorizing it as it goes away. I'm not saying that.

What I am saying, though, is we're not talking about missing it by a month. We're talking about missing it by like a year. So it's a consideration you got to think about what that

means.

That might mean you have to accelerate certain portions of the work, or the planning process, or incur more costs on the soft cost side to get plans in order so that you can get the funds earmarked, so you can do the work later.

It could mean all of those kinds of sequencing things.

It's a consideration.

Q. Other than noting that it's a consideration, did you do any other analysis in terms of what impact that would have on the four-year scenario?

A. No.

Q. I want to talk now about financial information.

So we talked about some of the inputs that formed the basis of your -- both on the -- I guess, the capital side and on the revenue side.

I'm going to ask you about the revenue cost side. I'm going to call that the soft

side, because that's the only thing I can think of.
Is there a better term for me to use? You've got capital and --
A. Expenses.
Q. Okay. But I guess I'm thinking capital on the construction side.
A. Yes.
Q. Then revenue and expenses on the other?
A. Yes.
Q. Is there like a single word for that? You've got capital versus?
A. Operating.
Q. Operating. Okay. My colleague, Mr. Kristofcak, I will turn it over to him. He's going to ask questions about the capital side because I am less familiar with that.
But right now, I'm going to ask you some questions on the operating side.
A. Okay. Very good.
Q. So it sounds like from our prior discussion, you received financials from the Kennedy Center for fiscal year '23 and '24; right?

A. Audited financials, yes.
Q. Audited financials for '23 and '24, and then unaudited for '25; right?
A. Yes.
Q. We talked about the fact that you requested, but did not receive any financials for the months of FY26; right?
A. That's right.
Q. Then you received this FY27 scenarios document from the Kennedy Center; right?
A. Yes.
Q. Those were projections prepared by Donna Arduin and her team?
A. Yes.
Q. Based on your report, it looks like you also conducted interviews, and I think we talked in part about those interviews.
Interviews were also an input on the operating side?
A. Yes.
Q. Other than those documents and interviews, anything else that you considered when

deciding or assessing the operational and financial implications of the two scenarios?

A. As you know, a few e-mail exchanges.

Q. With the Center?

A. Yes.

Q. Which of the interviews were relevant to the operating side of the house, the calculations of the operating cost impact?

A. I guess some of the programming interviews, and certainly the finance interviews with Donna and Alex.

Q. How many interviews were conducted with the finance folks?

A. I mean, it's an odd word to use. You know, how many interviews were there. There's probably one or two interviews, but there were, you know -- especially with Donna, there were six to eight, easily, discussions.

Q. What kind of discussions? Like, what -- just give me an idea of something that you would go to Donna in the course of preparing this report to ask -- either preparing this report or, to be fair,

also preparing the original presentation.

A. Color and commentary around things like the educational programming line item, what does that include. How are pledges put against that. How do they generate -- you know, do they sell tickets. Do they generate revenue, or is it just, you know, a public interest kind of program.

Q. Do you have notes of those discussions?

MR. LYNCH: Asked and answered.

You can answer.

A. I do not. It's my practice to make sure that it ends up in a report. I don't know if my staff have, notes, though, I would expect them to be -- I would expect that they wouldn't.

Q. Don't take this the wrong way, but help me understand: How do you make sure that the information you learn through a discussion with finance ends up in the report if you don't take notes?

A. Because the notes are the report. Because we've got this live document up that we're building the whole time that the inquiry is going

on, or the analysis is going on. Everything's got to make its way in here.

In fact, you see some relics in here of that process, unfortunately, where there's repetition among paragraphs and the like. You're seeing that it's a live document.

Q. When you mention relics, are there any relics in here that aren't just repetition, but are -- you know, not accurate, or old information?

A. No. No. There's annoying repetition.

Q. Is it -- okay.

A. There's no contradiction between the paragraphs or anything.

Q. There's nothing in there that was superseded by some other conclusion or information?

A. No.

Q. All right. So we talked a little bit about -- when we talked about your presentation about the revenue and cost chart, but I want to kind of drill down on that in your report.

So for operating revenue, I think we talked about the fact that you started with fiscal

year '25?

A. Yes.

Q. Okay. You stated that in your report.

Then we talked about the multipliers or reductions that you applied. You mentioned there were two of those; is that right?

A. Yes.

Q. One of those was a 37.5 percent reduction?

A. Yes.

Q. In your report, you say that is to account for the main building being renovated over four years?

A. Yes.

Q. In your report, and I'm happy to give you the number, it's Paragraph 209, but I'm guessing you also remember a lot of this, you talk about that there's a -- you apply a factor of 50 percent to account for staging equipment and safety.

Do you see that?

A. Oh, yes. I'm sorry. Yeah. That's funny. That's not the way I think about it.

Yes.

Q. Did something throw you for a loop?

A. Well, I don't like the way that's written.

Q. Okay. Well, I was going to ask you to explain what it means.

A. And you should.

It's a 25 percent reduction, with a 50 percent factor thereon, which would create a 37-and-a-half percent reduction --

Q. Okay.

A. -- in revenue.

Q. All right.

A. It's not a 37 with -- you know, especially when it says, i.e., 25 percent, which really doesn't help you.

Q. So if you were to write this yourself right now, how would you --

A. You mean if I were to correct my own drafting.

Q. Yes.

A. I would say reflect two factors, a --

since it's renovating the main building over four years, it's 25 percent per annum with a factor of 50 percent applied thereon.

That is a 37-and-a-half percent reduction in total, which is 25 plus 12-and-a-half is 37-and-a-half.

Q. I get it. Okay.

A. So it's all there. It's just kind of backward.

Q. I got it.

Then help me understand what you mean when that factor is to account for staging equipment and safety.

I know you explained this before --

A. Oh, yeah.

I'm sorry. The word "staging" is kind of odd here, isn't it?

Q. Yeah.

A. So staging is a construction concept of staging construction activities. So I mean equipment.

Q. Okay.

A. Materials. It's kind of funny to say sitting here, but it's like you realize sitting here that staging could certainly mean something else.

Q. Yeah. So I guess I was a little confused because some of these seemed like they were costs, or expenses rather than reductions in revenue?

A. This is a physical space constraint that's going to take up floor space and reduce the amount of programming space.

So this is where earlier, when I was talking about supply and demand, I'm reducing supply. I have to reduce the whole building by supply. They have to do it at least logically in a straight line over four years, and then I have to apply some sort of additional factor for things like: I've got to move people, equipment, set things up.

Q. Yeah.

So I think -- I really don't want to mischaracterize what you said before, but I feel like I asked you where you came up with this because

it does look like it's just a number on this page, and I think you said it was something that is used in construction; is that right?

A. Yes. I mean, it can be 10 to 90 percent. I mean, it's one of those things where you're supposed to classify it by type, and the complexity of construction, and the footprint of the area.

You know, so for estimating purposes, again, conventionally, you pick 50 because you're saying, look, when we ultimately plan this work, we're going to say things like, let's put certain equipment, let's park it outside, some of it can go into the loading bay. You know, you're going to figure all of that out, and it's going to take up floor space.

The convention is to say that it's going to be -- the factor of 1.5 is conventionally used until you refine your plan.

Q. Okay.

A. So I'm saying 37-and-a-half over four years, recognizing that I'm probably talking about

this over four years, which is bad for the record.

Q. Is it --

A. I'm talking about changes between 20 percent of the building to 60 percent of the building, episodically over a four-year period.

Q. Is it typical to -- this process that you say where you kind of refine it. Where you refine the number.

Is it typical for that to occur after you've made a decision between -- you know, between two, sort of, different scenarios. Like, are we going to close entirely, or not?

MR. LYNCH: Vague as to "typical."

You can answer.

A. Yes, because even a project --

Yes. Because the difference here is that this is an existing building. An existing building already introduces the notion of existing conditions and discovered conditions.

So what's going to happen is even as you commence the work, you're going to learn more and more about what it is you're doing, and what it

entails, and it's going to change the schedule and budget, and means and methods.

Q. But so the -- like, at a later point in time, this 37.5 percent reduction could be much higher?

A. Yes, and then, as you correctly pointed out earlier today, and then there's a time where you're going to be doing cosmetic work in the main foyer, and you know, it's going to involve some scaffolding, and that's all.

Q. But also, I guess I mean -- it sounds to me like there's a process for refining this number to figure out what is it really -- not over time. I understand that it's going to be month-to-month. It may be up and down, so this may be an average.

A. Yes.

Q. But 37.5, it's obviously not the case that that's an expectation for every type of building and every type of construction?

MR. LYNCH: Objection. Asked and answered a couple of times, I think.

A. No. It's dependent -- I mean, when you

think about it from -- in this case, it's dependent on the four-year period.

Q. It's also, though, dependent on the building itself, the work that needs to be done as well; right?

A. Yes, but honestly, if we're going to err in any direction in this building, we're going to be erring low. Because what we're going to find when we start ripping up plaster and stuff, we're going to find more than has been discovered.

Q. That's on the construction side.

But, obviously, there's another part of the input that's on revenue, and revenue from a performing arts venue, you would agree, is different than revenue from, for example, a store or an office building.

A. Yes, but averagely works. Because the consideration for the trustees is not whether 37.5 is scientifically accurate and consistent over four years, it's that in the near term, we're going to be losing $80 million.

So what I'm saying is that's not

close. You have to -- you have a serious consideration that you have a continuing operating loss. So some of -- some of your observations, while good questions, when they translate into numbers, I mean, if it were 75 or 85, it's a lot.

Q. Okay. So then what in your mind would make the real difference? What's the big driver of what you call that $80 million operating loss?

What's something that's big enough to be like, if that were wrong -- if that assumption were wrong, that would make a difference?

A. Where are the slides again?

MR. LYNCH: I think it's Tab 1.

Q. It's 1.

A. How inconvenient.

Well -- if there was a way to execute the NSO program on-site during this construction that costs significantly less than $40 million.

Q. Okay.

A. It would have to cost like pretty much nothing to do.

Q. Where did that $40 million come from; is that from fiscal year '25?

A. Yes. So, you know, if there's an alternative means of producing that programming for no cost.

Q. Okay. It sounds like what you are saying is that the big number 80, 80 million, really is primarily -- it's driven by the NSO cost?

MR. LYNCH: Objection. Mischaracterizes.

You can answer.

A. Well, 40 million of it is.

Q. Yeah.

A. Then there's the Kennedy Center cost of 70. Those are the two big numbers. G&A. G&A. Head count. You know, if you don't maintain the same head count.

Those are the three.

Q. So on the operating expenses side, those came from the fiscal year '25 numbers?

A. Historical.

Q. In your report, and it's in

Paragraph 211 --

MR. LYNCH: Remind us what tab that is.

MR. KRISTOFCAK: 12.

Q. This is 12.

A. Thank you.

Q. Exhibit 8.

A. 120 --

Q. 211.

MR. LYNCH: It's page 65.

Q. You say operating expenses would not decline at the same rate.

I'll tell you, I think this is -- in relation to your prior projection about revenue.

A. Okay.

Q. Are you -- so I understand what that means, but it looks to me from the way that you calculated the expenses that you assumed that operating expenses in a phased construction would not decline at all; is that right?

A. Yeah.

Q. Why, then, did you say operating

expenses would not decline at the same rate, instead of just I assume operating expenses would not decline?

A. Sure. It's to make the point that we're not matching the decline in revenue with a decline in operating expenses to maintain the same margin.

Q. Okay.

A. So we're just creating greater and greater operating deficit, without adjustment.

Q. Wouldn't it be fair to assume that operating expenses would decline at least a little if a whole segment of the building was closed?

A. Yeah. That's not the projections of management, but I -- you know, you could decide that. It's an $80 million problem, so you have to come up with an $80 million solution.

Q. So when you say "the projections of management," what do you mean?

You said "that's not a projection of management..." (As read.)

A. Well, so this is the -- excuse me. This is the historical, and if you presume that the

historical information -- that there would be continued continuity of operations at the same level.

Q. Okay. Why did you assume that, though, if there was going to be a substantial closure of parts of the building?

A. Because in reply to that question to Kennedy Center management, they said, we would have to keep everything running.

Q. Okay. I got it.

So the reason that Delta used the FY25 expenses for projecting expenses during a partial closure, partial -- whatever you want to call it --

A. Mm-hmm.

Q. -- is because that was the assumption supplied by the Center?

A. The reason that we didn't reduce the expenses was an assumption provided by the Center.

Q. Okay.

A. The data was the -- were the facts.

Q. Well, the data was from FY25. The

reason that you used the FY25 data instead of, for example, reducing it --

A. Right.

Q. -- is because of an assumption supplied by the Center?

A. Right.

Q. Okay.

A. Recognizing again that it's an $80 million gap.

Q. How did you -- so I skipped around a little bit, and my apologies.

We talked about the 35 percent reduction in a little bit greater detail. You had mentioned a separate reduction of 18 percent before, but I just wanted to exhaust that a little bit.

A. Sure.

Q. Was that your idea to apply that reduction?

A. Yes.

Q. How did you arrive at that particular number, 18 percent?

A. The decline in revenue '23, '24, '25,

is, round numbers, 115, 125, 100.

So revenue is declining $25 million a year for the period '23, '24, '25.

That is an 18 percent decline in revenue. I wanted the trustees to understand that the environment under construction, in a construction scenario, would likely require further downward adjustment. I did not adjust that downward every year. I just did it once.

Q. Okay.

A. But just to sort of pressure-test, we're not going to continue to maintain $100 million of revenue and run a construction project that people are walking through.

So what figure should I use for that compression? I'll use the historical one we're experiencing.

Q. On the contribution side, in Paragraph 209, you note, "Approximately 61.5 million in-place contributions."

A. Yeah. That's that 62 number on the presentation briefing slides.

Q. Just for clarity, what do you mean by "in-place contributions"?

A. They are in-place pledges. They're -- earlier, I talked about restricted funds. Like, they are actually designated. They're in place. The Center has the money. They're -- I mean, I -- I think in all instances, but certainly in most instances, they are for a specific program.

So if someone has made a donation for the education program, it's there. Use it.

Q. Okay. Does that mean that the funds could not be used for another purpose?

A. So I don't know.

Q. Okay.

A. Categorically, I don't know.

But in my conversations, I got the restricted funds feeling from the dialogue.

Q. Did you ever hear that there were -- there were contributions that would need to be refunded or returned if President Trump's name was not on the building?

A. No. No, I haven't heard that.

Q. You laughed. Why did you laugh? Would that surprise you that such a thing would exist?

A. If his name wasn't on the building?

Q. Yeah. If his name was not returned to the building.

A. That that was a condition of the --

Q. Yes.

A. No.

Q. You never heard that?

A. No.

Q. As a Board member, in other contexts, I assume it would surprise you to know, if such a thing existed, right, that there were -- that an organization was accepting funds conditioned on recognizing its chairman?

MR. LYNCH: I'm going to object that this is outside the scope.

I'm going to instruct the witness not to answer.

THE WITNESS: And that's it, or...

MS. FREENY: I mean, I'm going to -- this is relevant to the August 13th -- August 16th

meetings. I don't see how this is not relevant.

MR. LYNCH: It's not part of his analysis or report. It's not in those meetings on the closure issue.

MS. FREENY: So I just want to make sure, like -- because I don't want to fight about this because it's silly, but like, you're not going to let me ask your witness, he, who has purported to testify about what a good Board does, what expectations are, and has seen the finances, you're not going to let me probe about the prospect -- which --

MR. LYNCH: You want to ask this one question and move on, we can do this one question and move on. I'm fine with that.

MS. FREENY: Okay.

MR. LYNCH: But it is striking me that it's -- I mean, the sort of naming issue is not even in the jurisdiction of the District Court. So...

MS. FREENY: We're not going to -- let's -- we'll move on. I'm not going to get into

this.

BY MS. FREENY:

Q. I assume that that would -- it would surprise you if there were -- if the Center had accepted donations on the condition that they would have to return them if President Trump's name was not on the building?

MR. LYNCH: Object to form.

A. I didn't look at that. You're asking me in my general experience.

I do know -- you know, I have experience with, you know, ways that funds are donated, and there's promotion around those things with the, you know --

Q. Yeah.

A. -- promise of recognition of some kind.

Q. Is it typical that it's for a Board chairman that has fiduciary duties?

A. Oh, I don't know.

Q. You don't know if that's typical?

A. If that's typical?

Q. Yeah.

A. I mean, I think you're asking the whole fiduciary duty thing here. I don't think I should...

MR. LYNCH: Calls for a legal conclusion. Calls for speculation.

Q. All right. So where do you get the $61.8 million in in-place contributions?

A. Directly reported from the Kennedy Center on precisely the question of what donations are in place, that is to say, not -- you do not have to raise dollars.

Q. Okay.

A. There's no speculative dollars in this forecast.

Q. Okay. So that was the amount of money that the Kennedy Center had, what, gotten in the last year? Help me understand what point it is.

A. No. No, they're -- some of them are multiyear gifts, and they're actually -- you know, may have been pledged years, years ago. I don't mean ancient history.

Q. Yep.

A. But years ago, and are running their course because they prescribed something like, you can use X per year on this educational program or something of that nature.

So it's the balance as of.

Q. Is that different or the same as the endowment?

A. Different.

Q. Different. Okay.

What is your understanding of the endowment as distinct from the pool of in-place contributions?

A. So I have only heard a balance number. I've never looked at the investment accounts of the Kennedy Center.

Q. Okay. Do you know if the $61.8 million figure that the Center provided includes or excludes an $18 million that President Trump claims to have donated to the Center?

A. Oh, I don't know that.

Q. You don't know that?

A. Yeah.

Q. Do you know if it includes or excludes any money that may have been earmarked for return if President Trump's name is not on the Kennedy Center?

A. No. I don't know that.

Q. That number, although, also assumes that there would not be additional donations during the period; right?

A. Oh, it does.

Q. Okay. Why is that?

A. It's just to set the basis that any additional funds during the period, in one scenario, would go back into the endowment building, you know, building for the future, building for programming, you know, available for use in the event that there was, you know, additional capital needs and the like.

And that in the other scenario, it needs to -- those funds need to first fund an operating shortfall.

So again, my posture is sources and uses. First dollar collected needs to pay operating expenses, in one scenario.

In the other scenario, first dollar collected goes to the beneficial use of the Center however they deem necessary.

Q. In that scenario, there's two years where there's no programming in the main building; right?

A. Yes.

Q. I guess, if there were additional donations during the course of a phased renovation, wouldn't that decrease the operating deficit?

A. Additional -- yes, but you're making my point, which is the first dollar would go to pay salaries.

Q. Okay.

A. Instead of the first dollar going to programming or increasing the endowment so that, you know, the future is more certain.

Q. Okay, but again in your scenario, when you say go to programming, there would be no programming at the main building?

A. But the construction will end, and then there will be programming, and you would rather have

the money in your bank account than being put into the operating account to go to people's salaries.

Q. Okay. Is that your conclusion, or was that supplied by the Kennedy Center?

A. That's my conclusion.

Q. It didn't -- that conclusion wasn't mitigated by the fact that if there were more contributions in the four-year period of phased construction, that that would actually be less of an operating deficit and/or, you know, significantly?

MR. LYNCH: Objection. Compound.

If you understand it, you can answer.

A. Yes, and you're inside the mind of a trustee right now, as you should be, thinking, gee, do I believe we can raise $100 million so we can spend 80 on operating expenses, and 20 on programming, or should we reduce our operating costs, raise $100 million, and spend it all on programming and investments in the future.

That's exactly the question that you want the trustees deliberating over.

Q. How did you help them deliberate over that second scenario? What happens after the conclusion of two years when a center that's been closed for two years has to come back up and running?

A. I helped them by offering a scenario where every dollar that they raise during the interim period is available to help them with that ramp-up.

I mean, I think that that -- I've offered the most important thing you can offer, which is financial durability and wherewithal in the future versus I'm going to spend the money on an operating deficit, and go through at construction process, and still have to ramp-up.

Your scenario, in that case, sounds riskier than mine, to me.

Q. To you. Okay.

A. Yeah.

Q. Wouldn't that, though, depend on how easy it was to get a performing arts venue back up and running after a year or two of closure?

A. Or four years of closure? Yes. I think it would be the same difficult task.

Q. You think it would be the same difficult task to get a performing arts center up and running after four years of closure of the main building as it would a phased opera closes one time?

A. One time?

Q. For -- sequentially. Phased.

A. Over four years?

Q. Yeah.

A. They sound equally challenging to me. I can't differentiate that challenge.

Q. But would you agree that someone who is an expert performing arts management actually could differentiate that challenge?

MR. LYNCH: Objection. Calls for speculation.

A. I wouldn't agree with that. They might identify it as the same challenge.

Q. They might, but they would -- they would be the person that would be able to say which one was -- you know, which one was harder?

MR. LYNCH: Objection. Calls for speculation.

A. And I would like to have all of the fundraising dollars in my pocket the day that I had to do that, and that's my point.

Q. Okay. I'm just trying to probe the limits here because what it sounds to me like you're giving your understanding of which is harder to get a performing arts venue up and running. And I'm trying to understand, isn't that something that a performing arts management expert might have an opinion on?

MR. LYNCH: Objection. Asked and answered to the extent there's a question.

A. Yeah, and I'm wondering what the question is.

Q. My --

A. Because you sound like you're testifying to me, so I'm not sure what the question is.

Q. So my question is: Is that -- is the -- I'm going to take one second.

So you have given your opinion about

the relative degree of difficulty of -- for lack of a better word, getting back up on your feet for the Kennedy Center if it closes for -- if it closes the main building for two full years versus it does phased construction.

You've just give that opinion; right?

A. Yes.

Q. Okay. My question is: Is that not something that you would want to know what a performing arts management expert thought about?

MR. LYNCH: Objection. Asked and answered.

You can answer.

A. A trustee may want to know that information. What I'm offering, in that question, is that under a closure scenario, donated dollars are going to go into investments and be available to help navigate whatever that process might be.

And that sounds like a less risky proposition for the durability of the organization than emerging from this construction project two

years, four years, or otherwise, $80 million a year deficit.

Q. Does that conclusion depend at all on the nature of the institution; that is, would you have the same conclusion for other types of institutions?

A. Yes. Because I'm talking about math.

Q. Okay. Did you do the math on the effect on fundraising as between the two scenarios you considered?

MR. LYNCH: Objection. Asked and answered.

A. I believe I have already testified that I have not reviewed the fundraising capacity under the alternative scenarios.

Q. I want to now turn your attention to -- I think what's -- we have been -- oh, no. Sorry. Let me --

Appendix Y of your report, which is at Tab 16, which we will marked --

MR. LYNCH: Exhibit 9.

MS. FREENY: -- as Exhibit 9.

(Buchalter Exhibit 9, Appendix Y, [no Bates], was marked for identification.)

Q. I just want to make sure I understand. This reflects what we have just been talking about, your calculations --

A. Yes.

Q. Okay. What is the difference between the FY25 contributions, and the 61.8 substantively? Like, what is the -- is the 94 from fiscal year '25?

A. That's right.

MR. LYNCH: The 91.4, just making sure I'm seeing the right thing?

Q. Yes. 91.4.

That just reflects that there were fewer donations in -- or did that reflect they spent?

I'm trying to understand how it moved from 91.4 to 61.8 under contributions?

A. It's the difference between that was actually collected -- fundraising and collected, and the amount of in-place.

So think of the 61.8 as the

remaining balance available for future use. So it implies -- although the number was probably higher than 61.8, it implies that they raised, you know, 20 or 30 million above, or some portion of the 61.8 was raised in '25 as well, and then still exists as a balance.

Q. Could it also imply that some of that money was spent, or was that a completely separate calculation?

A. No. It's a completely separate calculation.

Q. All right. Let's talk now about the methodology that you used for the full closure of the main building.

Here, I think we're going to turn to Tab 15.

MR. LYNCH: 10.

(Buchalter Exhibit 10, Appendix X, [no Bates], was marked for identification.)

Q. Appendix X. We'll mark Exhibit --

MR. LYNCH: 10.

MS. FREENY: X and 10. That's a

nice parallel.

All right. We've been talking all along about something called FY27 scenarios or something thereabouts.

Is that what Exhibit 10 is?

A. Yes.

Q. This is the information that was provided by Donna Arduin to you for use in your analysis?

A. Yes.

Q. What is your understanding of the three different scenarios?

Because we have been talking about three, four in the SOW. We talked about two that you considered.

What are these three?

A. I used Scenario 2. I don't know that I can tell you what 1 and 3 are.

Q. Okay. Was there a period in time where the Kennedy Center, or Ms. Arduin, were sort of bandying about, like, sort of three scenarios?

A. So you're more knowledgeable about this

than I am, because through your question, I'm vaguely recalling something, but I can just tell you that I used Scenario 2 in my work.

Q. So I actually don't know. I need your help with this.

I can tell that Scenario 2 is what you used, and I assume that that meant Scenario 2 mapped onto the proposed -- like, closure of the main building.

But what I don't know is whether -- I assumed that Scenario 1 and 3 were different scenarios, not just different methodologies or what have you?

A. Yes, they are.

Q. But you don't know which -- like, what they represent?

A. No, honestly, as I sit here, I cannot recall.

Q. Is it fair to say that you would -- I assume you would know that Scenario 2 mapped onto main building closure?

A. Yes. Oh, yes.

Q. What did Delta do to verify these numbers, if anything?

A. Just to go through them with Donna and Alex, and we went -- you know, we went through the line items, and discussed them so that I was sure that I understood their derivation, and what they had thought about when they put it together.

Q. Okay. Why didn't you verify independently their calculations?

A. I felt I could rely on these figures given that I understood that they were coming from internal -- you know, management was using internal reports to make projections.

Q. Couldn't the same be said about the other scenario where you did your own calculations?

A. I didn't have to -- under closure, the question is can you develop a way to operate at less of an operating deficit.

Under being open, I had the historical data, and I had the adjustments that were necessary to make because of the impacts of doing construction while you're open.

Q. I mean, I hear that those are two different things. I guess I don't understand why you sort of independently did the calculations for phased, and then just relied on the calculations from the Kennedy Center for closed?

MR. LYNCH: Objection to the extent it mischaracterizes. And asked and answered.

You can answer.

A. Because this is a different exercise. I mean, this exercise is how much can we downsize head count, really. And so a lot of what's going on here is wage expense allocated across different groups.

I mean, that's where you see, for example, the IT and the system infrastructure, I distinctly recall that. I mean, that's a significant reduction in personnel, because you don't have to have people on the site making sure that IT systems, and telecommunications, and things like that are running.

Q. Might you have independently verified these numbers if you had more time?

A. Yes. I would have gone through, you

know, underlying detail, and done historical trending, and things like that to determine, you know, that a greater level of comfort with these numbers. But here's the real issue for me, is if I had done all of that work, and been even close, the difference is extreme.

So I keep coming back to the -- the consideration for the trustees is that the operating cost difference is extreme. It's an $80 million swing.

Q. In calculating the overall revenue for the second scenario, the closure of the main building scenario, is it fair to say that you -- essentially, you added -- for Scenario 2, it looks like there are five categories of revenue?

A. Yes.

Q. So essentially, you added those together to get the total projected revenue for the closure scenario?

A. That's right.

Q. In your report, though, you say that you estimated --

A. Hmm.
Q. -- 76.1 million.
Why did you use that term?
A. I tend not to think about that.
Q. Okay. No?
A. No.
Q. You'd agree, though, that estimate -- it suggests that you did some calculations; right?
A. Yeah. No.
Q. Essentially, you just added the Center's numbers?
A. Not a good word.
Q. But right -- I just need a yes or no.
Essentially, you added the Center's numbers for revenue?
A. Yes.
Q. To reach that 76.1?
A. Yes.
Q. I assume that also in your report, the costs and expenses for the closure scenario is also based on Appendix X, Exhibit 10?
A. Yes.

Q. So those are numbers coming from the Center?

A. Yes.

Q. Is there any concern that they're not parallel between the two scenarios?

MR. LYNCH: Well, you mean the two scenarios of his overarching report; right?

Q. Correct. The two scenarios, meaning -- right, we talked about the way in which you -- you drew FY25 for the phased scenario, and this is just taking what the Center gave you.

I don't know, is there is kind of concern that it's a little bit -- is it possibly a little bit of apples and oranges?

A. I'm going to answer that question, but just what the Center gave me is a dilution of the diligence around asking questions, and making inquiries, and thinking about the work, and thinking about the presentation that I'm going to make to a Board of Trustees.

So --

Q. Okay.

A. -- that's what I did, not just.

However, no, because one is a forward-looking exercise to something we have never seen before, so what do we do if we're closing the Center. How do we take operations down to a level that, you know, we have not done before. We are going to have a RIF. We're going to disband certain activities for some period of time. You know, obviously, we have to think about how to ramp them back up.

Those are all of the challenges that are put into this type of business forecast.

Q. Yeah.

A. Whereas, operating similarly, it seems very good to rely on, well, how has it cost to operate. Like, why would I speculate as to what operating similarly would look like? I don't have to rely on a forecast in that place -- in that instance, and so I would rather use the historical information.

Q. Yeah, but that also seems to me, then, if you were hired to do this independent analysis,

that it would be most important for you to independently arrive at the forecast for the scenario that we just don't have data for from the past.

MR. LYNCH: Objection.

Is there a question?

Q. Correct?

A. No. I would -- I think that you do have to acknowledge the reliance on, you know, adequately informed and placed professionals within an organization like this.

You can't say -- you can't -- you know, it's unreasonable for me to say, well, management doesn't know what they're doing.

Q. I'm not saying that, but this was -- this was a sort of -- this was a projection of revenue and expenses in the future.

A. Mm-hmm.

Q. And it sounds like it was something that you decided didn't require independent performing and verification by the Center -- or sorry, by Delta, that you were going to rely on the

calculations and projections by the Center?

MR. LYNCH: Objection. Mischaracterizes the answer --

A. Subject to my inquiry, yes.

MS. FREENY: All right. I think at this point, do you want to -- I don't need a break, but if you guys want to take a break.

THE WITNESS: Just a quick, and sort of rearrange, and...

MR. LYNCH: Sure.

MS. FREENY: Go off the record.

(RECESS, 4:04 p.m. - 4:11 p.m.)

MS. FREENY: So at this point in time, as I mentioned, I'm going to turn it over to my colleague, Alex Kristofcak, who is going to ask some questions on the capital construction side.

MR. LYNCH: And we'll read and sign, for the record.

EXAMINATION

BY MR. KRISTOFCAK:

Q. So starting with the $250 million appropriation amount, what was your understanding of

how that amount was calculated?

A. You know, I don't know how the amount that appeared in the bill was actually developed.

I know that it's similar in magnitude to the DLR 2021 report. I suspect that that report provided some basis.

I also suspect that, you know, there was a bunch of law-making, and things get moved around, and so the final number was what it was.

Q. What is the 2021 DLR report?

A. It's a cost estimate that's part of the CBP, the Comprehensive Building Plan, that is -- was conducted from 1995 through 2020-2021 to do a capital assessment of the Kennedy Center.

Q. Did anyone at the Center tell you anything about what the $257 million estimate assumed in terms of how the projects were going to be implemented in terms of phasing versus closure?

A. No, but the DLR report, again, this 2021 CBP was done -- it was a five- or seven-year period of about $20 million of appropriation each year.

So it was a series of phased

projects. It's a 363-project program.

Q. If I can ask you to go back to your report, which is...

MR. LYNCH: 12. Tab 12, Exhibit 8.

Q. Paragraph 89. In the paragraph, you state, "... capital required to execute the sequential renovation would more than double to 560 million."

Do you see where it says that?

A. Yes.

Q. So here, you are comparing the closure scenario versus the sequential work scenario; correct?

A. Yes.

Q. The more than double is based on comparing the $560 million with the appropriation amount, or what -- what amount was that?

A. Yes.

Q. Now, if the $557 million estimate itself was built on the assumption of phased work, what would that mean for your conclusion -- or help me understand why you felt like you needed to make an

adjustment to that number to calculate how much it would cost to perform the same work with phased renovation.

MR. LYNCH: I'm sorry. I think you said the "557 million." Do you mean the 257 million?

MR. KRISTOFCAK: Yes.

A. I got it.

Why would I have to adjust the 257 scope under a phased scenario?

Q. Yes.

A. For three reasons.

For the design maturity, the -- what's called beneficial occupancy, doing work in an occupied building. And for the loss of productivity that comes from doing work in an occupied building, which includes everything from additional maintenance, cleaning, security, and all of these -- all of those various soft costs that are necessary because you have a construction site adjacent to a public area.

Q. So let me ask it a different way.

In making your adjustments to arrive at the $560 million estimate, you were assuming that the amount that you were starting from did not include phasing; is that correct?

A. That's right, because I was not starting with 257. I was starting with the DLR '21 numbers escalated to today's dollars.

Q. What were those numbers, if you remember?

A. It's 285. It's what I present on the Board briefing sheet.

So there is a gap between 257 and 285. I acknowledge that in my report, and I say, you know, you're going to have to do something about that. You're going to have to either reduce some of the projects, value-engineer, raise money. You know, costs will change over time anyhow.

Q. But the -- so my understanding of that 285 was that that was your estimate for how much it would cost to perform the construction under the closure scenario?

A. Yes.

Q. But again, as we were talking about initially, the amounts that we were starting with assumed phased construction. So I'm just trying to sort of tease out if you're applying all of these adjustments to those amounts, that implies that the amounts you were starting with, you were assuming assumed a closure?

MR. LYNCH: Objection.

I'm not quite sure I understand, but if you understand, you can answer.

A. I understand.

Q. So is that a yes?

So the baseline numbers you were working with, the 285 for your estimate of what the project would cost in the closed scenario --

A. Yes.

Q. -- assumed that the Center would close?

A. Okay.

So you understand that what you're saying to me is that if I take the DLR numbers and escalate them to today's dollars, and they're phased, and I don't have to phase them, it's going

to cost less?

Do you understand what you're saying to me? You're saying to me --

Q. I'm not saying anything to you.

A. You're saying --

Q. You're the witness. My question is --

A. -- you're --

Q. -- was your sort of starting assumption, that the numbers in the DLR report or the budget request, whichever one you want to start from, that those assumed a closed environment where all of the work is being performed without performances or anything else?

A. I earlier testified that I understood that the DLR basis was a multiyear phased set of projects where they actually specify two things: They say we're going to do what we can to keep as much of the Center open while we do this work.

They also say unless closure or those complications impact our costs... so they say, we'll try, but our costs could escalate, okay.

So I took their dollars, escalated

them for time, just to make them today's dollars.

What you're saying is the basis of those should contemplate being phased, and I'm saying, okay, what if it was closed.

I'm giving the benefit of the doubt, and not reducing that number. Just like I would have to take the other number and increase it. So it would be getting farther apart in the two scenarios.

Q. Explain to me what you mean by the "benefit of the doubt."

A. I am being conservative and using a phased construction cost in a scenario where I know I can gain efficiency, and I'm not reducing the number, versus taking that same number and saying let's do it over four years -- well, if I have to do it over four years, I have to increase it.

Q. But again, just -- I'm not sure I'm getting the answer to the question I'm trying to ask, and I think it's because I'm not asking it right.

Before you did any work, my simple

question is: Did you assume that the numbers that were, whether it's in the report or the budgets, were predicated on the Center being closed or operational?

MR. LYNCH: I think that's asked and answered.

THE WITNESS: Yeah.

A. I assumed that the basis of my work, the DLR numbers, were based on the Center being open.

Q. Okay. Now, in Paragraph 182, you say, "... I applied a 40 percent design-maturity adjustment to both hard and soft costs to recognize the uncertainty associated with incomplete design, developing quantities, continuing investigation, concealed conditions, and the absence of final contractor pricing."

Do you agree it says that?

A. Yes.

Q. Can you say more about why you applied this 40 percent adjustment.

A. It's -- design maturity is a concept in bidding, and I provide the AACE rules in this

regard -- guidance. I shouldn't call them rules -- in this respect.

The way you think about a bid, and the dollar -- the estimated dollars in a construction project has to do with how complete your design is.

If you've got a set of plans that are ready to be stamped by the building department, somebody can take very precise measurements of those plans and produce an estimate. Everything else exists before that, all the way back to what's considered conceptual drawings where literally an architect might just hand-designate something.

The guidance is it's about certainty and uncertainty. So in the middle of that continuum, they talk about, again, if 20 to 40 percent or so surety, and the rest is uncertainty, and so what I conventionally do is given where the maturity falls, I take the remainder, the uncertainty, and I usually cut it in half, because you don't know. You don't know whether it's all of the uncertainty, a little bit of the uncertainty.

So 40 is half of 80, which is the difference between -- it's the midpoint between 10 and 30, and the guidance shows that range. They describe it, just to be really confusing, they describe it as being 2 and 6 on a 20-point scale.

The world needs more engineers.

Q. Indeed, it does.

So by applying that adjustment, that's how you get to the $400 million estimate for the closed scenario; correct?

A. And the idea is that when closed, but if done in sort of a public solicitation, and let's just -- everybody's going to apply all of this design uncertainty to their bids, and they're going to come back at about $400 million. I wanted the trustees to understand that at 257, there's already a lot of pressure between 257 and 400 on -- we really need to execute this properly.

The 560 is to do it a different way, the 400 represents sort of a warning that there is an outside bound here that I think is what you would hear from the commercial contracting community

around this project.

Q. So is that $400 million number what you would describe as sort of the commercially relevant amount that the scope would take to execute in a closed scenario?

MR. LYNCH: Objection. Mischaracterizes.

You can answer.

A. Yes. If you, frankly, were purposefully -- you know, sort of intent around being relatively inefficient about your execution, and you were bidding out different pieces of work, and then trying to coordinate it all, yes. The compilation of that would result in 400.

So there's an execution -- there's execution pressure to delivering at 250. That 150 is that execution pressure. You have to do a good job to hit the 250.

Q. So when you made your comparison, as we said earlier, your characterization was that the costs under the operating scenario would be more than double the closure scenario, you were not

comparing -- you were not taking account -- into account this 40 percent adjustment for the closure scenario; correct?

A. That's right.

Q. But you were applying it to the operating scenario; correct?

MR. LYNCH: Objection. I think that mischaracterizes.

You can answer.

A. Correct.

Q. Why would it be applied to one and not the other?

A. The 285 million assumes coordinated execution by the Center. The Kennedy Center has to act as the manager of this project. That if you put it out into the marketplace, you've got the uncertainty that commercial ventures would apply to it.

So essentially, run by a not-for-profit for its own benefit, but you have to have a tremendous amount of execution discipline.

I can see taking that cost out.

Q. Mm-hmm.
A. But my warning to the trustees was, execute it under a different model, you're at 400. Execute it on a multiyear model where you're open, you're at 560. I was trying to put flags in the ground for them to consider.
Q. I see.
So you're not necessarily saying that you believe the 40 percent should apply under the operating scenario, or are you?
A. I am.
Q. I'm just trying to understand.
A. I am.
Q. Again, why would you only -- so it sounds like you're fairly certain that you will see the inefficiencies in the operating scenario, and fairly certain that you will not see them in the closed scenario?
A. Because of the duration. It does concern me to put a project over four years.
Q. Can you help me understand -- I just read you earlier what the design-maturity adjustment

is, and again, this is Paragraph 182. You described it as, it's an adjustment to recognize "... the uncertainty associated with incomplete design, developing quantities, continuing investigation, concealed conditions, and the absence of final contractor pricing."

Can you tell me which of those aspects differ for the two different approaches.

A. They don't. They don't.

But in the closure, the efficiency around the work is so much greater that it's more likely that you will be able to mitigate that exposure.

Remember, it's an estimate. The 40 percent is an estimate of that exposure.

So I'm saying you're more likely, because of the efficiency of the way that you're doing the work, to be able to reduce that number than in the 560 case.

Q. Earlier, you said that you were using, I think it was 285 --

A. Yes.

Q. -- as the sort of operative program amount.

If I'm remembering correctly, that only included two of the three tiers of work that you identified.

Can you talk about why you excluded the third tier.

A. The third tier are venue-related, cosmetic effects that could wait and/or be done afterwards.

Tier 1 and Tier 2, just to -- I think they call them Priority 1 and Priority 2. There's varying terminology throughout.

Those are what I describe as the utilities, system, major sort of ingress, egress, stairwell-type issues, fire-life safety. That's all of the stuff that -- if you're going to be in a construction mode, do all that.

If you want to, you know, change doors or change carpets or something, you can do that afterwards.

So why include it? Why put the

demand? Because to be honest, 285 is -- Priority 1 and Priority 2 escalated to today's dollars, I already am -- I already have a funding problem, right, and I haven't even gotten to the cosmetic part.

Q. Right.

So the 285 didn't actually include the entire scope that was included in the CBP report or the budget request?

MR. LYNCH: Objection. Calls for speculation. To the extent it mischaracterizes.

A. Yeah. I don't know -- the budget request, you mean under the public law?

Q. So forget about that.

Let's just focus on the --

A. Yes.

Q. -- the CBP report?

A. Yes.

Q. So to -- actually, let's just look at Exhibit -- sorry, Appendix T, which is Tab 13.

MR. LYNCH: That's going to be Exhibit 11, I believe.

(Buchalter Exhibit 11, Appendix T, [no Bates], was marked for identification.)

Q. So with -- just so I understand it, the line on here that you call Baseline Program - 2021 dollars.

Do you see where it says that?

A. Yes.

Q. In the column that says Totals, that's -- it says 248.9 million.

A. Yes.

Q. Is that sort of the full scope of everything included at 2021 dollars?

A. Yes.

Q. Okay. So then in the next line you include the 47 percent escalation to 2026. That's just simple inflation?

A. Well, it's cost-indexed. So it's hard cost growth over that period. It's not inflation. It's the change in the commodity hard cost.

Q. But it's pricing cost. It's not changing scope?

A. That's right. Value. It's value

escalation.

Q. So in other words, to get that same amount of work done in 2026 dollars would cost three -- let's see if I can do this math.

$356.7 million. Am I roughly getting that correct?

A. Yes.

Q. The total of the first two cells on -- all the way on the right side?

A. Yes.

Q. Okay. So even under the closure scenario, with the $250 million -- $257 million appropriation, the Center can really only fund whatever that is, two-thirds of the total scope?

A. Of the total DLR scope, but if you drop off -- the way I think about it is you drop off the Tier 3.

Q. Okay. But just off the DLR scope, it's roughly two-thirds, or somewhere around there?

A. Yes.

Q. Did anyone ask you to exclude Tier 3, or was that your own initiative?

A. No. It was my decision.

Q. Your estimate that, in the closure scenario, that the Center could execute on 90 percent of the total project with the existing appropriation, that's based on costs of Tier 1 and Tier 2; correct?

A. Yes.

Q. So then continuing further down, do you see the line where it says Total Partially Close and Renovate?

A. Yes.

Q. Then all the way on the right, the total for that is 502.8 million?

A. Yes.

Q. What's the difference between that and the amount that you presented to the Board?

A. That's the -- so speaking in round numbers, that's the 500 minus 100, if you drop off Tier 3, gets you to 400, which is the 400 we talked about.

That's the commercial --

Q. That's the -- that includes the 40

percent adjustment?
A. Yes.
Q. Okay. Then similarly for the other scenario, for the operating scenario, sort of apples-to-apples with the $503 million cost, for the operating scenario, the cost would be about $724 million?
A. That's right, with the same adjustment methodology, with the addition of the two adjustments in the final two rows before the total. Total Scenario B.
Q. That's the 25 percent occupancy risk and 25 percent additional construction allowance?
A. Yes.
Q. Now, help me understand, sort of -- is it fair to say that on an apples-to-apples basis, the comparison between the two scenarios is, you know, 503 million and 725 million?
A. If you include Tier 3.
Q. Okay. What about without Tier 3?
A. It's the 285, 400, and 560.
Q. So it's roughly 1.4x?

A. To get to the 724?
Q. Well, no. The 724 includes Phase 3.
So without Phase 3 --
A. Yes.
Q. -- I'm asking what would be the apples-to-apples comparison between the two?
A. Tier 1 and Tier 2, 2 -- 280 --
Q. Or closed versus open?
A. -- 285. That's where the 285 plus 5 -- order of 560 comes from, and the 400 is that piece in the middle, which you can see is 500 minus 100, in that green line that goes across.
Q. Right. I guess what I'm trying to ask is, on a -- calculated using the same methodology, if you include the 40 percent adjustment for both scenarios, the comparison is 400 versus 560; correct?
A. Yes.
Q. So that's a Delta of about 40 percent?
A. Yeah.
Q. All right. Changing gears to another topic.

Do you remember preparing an addendum to your report?

A. Yes.

Q. Do you remember when you prepared it?

A. September 15th.

Q. Who asked you to prepare it?

A. I made a comment at the conclusion of the September 15th Board of Trustees meeting.

I was in the Kennedy Center conference room with a number of people, but Elliot Berke was in the room, and when I made the comment, he said, is that something you'd be willing to write up? And I said, yes.

Q. What was the comment?

A. That this limiting condition in my report was construed as, oh, see, Delta said this, and that's not what Delta said, and I wrote it, and I know what I wrote, and why I wrote it. And it was a misunderstanding. It was important to me that that be put in as an addendum just so nobody misunderstood the report.

And then, you know, effectively, it

was kind of a rash effort to say that 1500 pages, and many, many hours of my people's time was suddenly superfluous.

So I wanted to make sure the record reflected what I meant in the famous Paragraph 49.

Q. Now, so on that...

MR. LYNCH: Are you looking for the addendum or the report?

MR. KRISTOFCAK: No. We're still on the report.

MR. LYNCH: The addendum is in your book at Tab 3.

MR. KRISTOFCAK: We have it in here.

BY MR. KRISTOFCAK:

Q. So looking at -- as you refer to it, the famous paragraph 49, it says, "... I do not offer" --

(Clarification requested by the Realtime Stenographer.)

Q. The full sentence says, "Accordingly, I do not offer a building-wide opinion that the Main Building, considered as a whole, is presently

unlawful or unsafe for occupancy."
You agree it says that; correct?
A. Yes.
Q. Then in your addendum, which is Tab 11, let's mark that --
MR. LYNCH: Exhibit 12.
Q. -- Exhibit 12.
(Buchalter Exhibit 12, Addendum to Expert Report of Darin L. Buchalter, [no Bates], was marked for identification.)
Q. In Paragraph 6, you state, "Paragraph 49 was intended to define the scope and limitations of my assessment, not to express an affirmative opinion that the Main Building was safe."
Do you agree it says that?
A. Yes.
Q. So you're not rescinding anything in Paragraph 49; correct?
A. Correct.
MR. KRISTOFCAK: I think that's all I have.
MS. FREENY: Okay. Can we take a

break. I think I will have a little bit more.

MR. LYNCH: Do you want the room?

MS. FREENY: We can -- go off the record.

(RECESS, 4:45 p.m. - 4:50 p.m.)

CONTINUED EXAMINATION

BY MS. FREENY:

Q. Mr. Buchalter, I think we're in the final stretch.

I want to take you forward to the period between, I guess -- let me just start again. It's a little bit late in the afternoon.

So I think previously you had talked about, I think, a call -- or a discussion that you had with Matt Floca on or about September 30th. Does that ring a bell? Or August 30th?

A. Correct.

Q. That was when he told you there was going to be -- they were circulating your full report to the Board; is that right?

A. Correct.

Q. Is that also when he notified you that

there would be a second Board meeting at which your presence would be requested?

A. Yes.

Q. What did he tell you about why you were going to be sort of present at the next Board meeting?

A. To make myself available for any questions or concerns that the trustees had after reviewing my report.

Q. Okay.

A. Yeah. As a resource, was my takeaway.

Q. Did you sort of prepare any remarks for that meeting?

A. No. No, I didn't. Honestly, because of the extensive work around the report, I felt like I could say whatever I needed to say.

Q. So your plan was to answer questions, but not to make a formal presentation?

A. Correct.

Q. All right. Did you -- I guess, why did you understand that the Board would be doing with the information that you provided to them; that is,

like, you're there to -- as a resource, but like, for what purpose?

A. I thought that it was, you know, a healthy, open discussion about the status of the Center, and still pending was the question of which option is the most effective path to follow.

And you know, how did the trustees want to talk and deliberate amongst themselves.

You know, I saw myself in my capacity as a resource to that effort. I'd already done my analysis. I had already made my recommendation.

So I was there to answer the questions that they would deem important in making that final determination.

Q. So I heard you say that it was your understanding that the decision about how to proceed with the renovations was still pending.

Did I get that right?

A. Yes. I'm going to sort of procedurally misstate this.

Q. Okay.

A. I know motions had been made, and votes had been passed, but you know, clearly, we were still back having a conversation around which way is the right way to go.

Q. Yeah. Yeah.

A. So I used very layman's parlance.

Q. That's helpful. Because I'm actually just trying to understand, you know, because I know as a matter of fact that there was a vote in -- at the August Board meeting to approve your recommended scenario; right?

A. Yes.

Q. So I'm trying to understand what -- at least what your understanding was of, like, why -- why are you back, and what is still before the Board, if the Board had already voted on one particular approach?

A. Yes, and again, procedurally, I'm not offering a view. I thought it was further deliberation on the topic.

Q. Did Mr. Floca tell you what the purpose of the September meeting was, at least as it related

to renovations and closure?

A. Well, he said for open dialogue on the issue. I mean, I actually distinctly remember him saying open dialogue on the issue.

Q. Did it surprise you that there would be another Board meeting after they had already voted?

A. Well, I attended that Board meeting.

Q. Yeah.

A. I wouldn't say that it was, you know, that there was unanimity.

Q. Okay.

A. So I think in the interest of sort of a public interest institution, to work further to try to create a collective view.

Q. Okay.

A. You know, just sounds like good practice, to me.

Q. Now, at some point, we understand that the, sort of, main purpose of the Board meeting changed. Was that also your understanding?

MR. LYNCH: Objection. Calls for speculation.

A. No. I mean, I had -- I had no understanding in either regard.

Q. Okay.

A. I was showing up to do my job.

Q. At what point did you understand that the Board would actually be asked to vote to ratify the decision it had made on August 13th with respect to the scenarios?

MR. LYNCH: Objection to the extent that it calls for a legal conclusion.

You can answer.

A. I don't think -- well, ratify.

I don't -- I don't know -- I don't know that I knew or understood that there would be additional voting.

I saw the constructive -- I saw the meeting as a constructive opportunity for the trustees to get more information, better alignment, better visibility to an issue that, you know, is of high importance to the institution.

I don't think I spent time thinking about, well, they're voting or not voting or...

Q. Were you given, either in advance of the meeting or at the meeting, a copy of the materials that were circulated to the Board?

A. No.

Q. Were you aware that the Board received materials that summarized, for example, the financial context surrounding the closure decision?

MR. LYNCH: Objection. Vague.

A. No, but in the August meeting, there was a request.

Q. Okay. Who made that request?

A. Senator Whitehouse, I believe.

Q. Were you involved at all in preparing that summary of financial context?

A. No.

Q. Do you have an understanding of why not, if you had been doing a lot of the work in connection with your report?

A. No.

Q. Was that topic ever discussed, the preparation of this financial context information for the Board?

A. Not in my presence.

Q. With you?

A. Yeah.

Q. Were you also aware that the Board was -- circulated a draft resolution that made certain representations about the financial position of the Center?

A. No.

Q. So you weren't aware that the Board received materials stating that the Board was within certain financial collapse within weeks?

A. No.

Q. Is that consistent with your understanding of the Board's -- of the Center's finance?

A. The cash available for servicing the salaries, wages, was diminishing as the fiscal year end approached.

Q. Is that the same thing as certain financial collapse within weeks?

MR. LYNCH: Objection. Calls for speculation.

A. I mean, it's not good, but you know, there are other sources of capital for --

Q. If you had been asked at that Board meeting, is the Center within certain financial collapse within weeks, based on the information that you've reviewed as part of your engagement, including information provided from the finance folks, would you have said, yes, they are within certain financial collapse within weeks?

MR. LYNCH: Same objection.

You can answer.

A. I mean, I would have said the operating deficit and cash available are such that you're going to have to make some decisions about how to raise alternative funds, whether it's debt or endowment or -- you're going to have to do something to address what is clearly a factual liquidity issue, but...

Q. But you would not have told them, yes, the Center is within certain financial collapse within weeks?

MR. LYNCH: Objection. Asked and

answered.

A. There would have been alternatives.

Q. Meaning you would not have told them, if asked, the Center is within certain financial collapse within weeks?

MR. LYNCH: Asked and answered multiple times.

You can answer.

A. Well, I mean, with also the proviso that I think you're asking me to draw conclusions from information that I've reviewed, which makes sense, but certainly, just to be clear, not in the scope of my report.

Q. Understand.

A. But there would have been alternatives, and there would have been, you know -- but difficult alternatives.

Q. But not certain financial collapse; correct?

MR. LYNCH: Asked and answered, third time.

A. No.

Q. Do you recall any discussion about sort of the cash position at the September 15th meeting?

A. I don't. I remember it at August 13th.

Q. I apologize if I have asked this; I genuinely do not remember: Were you ever asked to do analysis or financial modeling about the cash position of the Center or its liquidity position?

A. No.

Q. I guess you probably couldn't have done that because you didn't have access to any of the FY26 financial data; is that right?

A. That's right. It would have been a historical review.

Q. Did you have discussions with Donna Arduin about the cash position, kind of, after that August 13th meeting?

A. I didn't.

Q. How about with Mr. Floca?

A. Only in the context of saying it appears there's questions in that regard from the August 13th meeting itself.

Q. Okay.

A. You know, Senator Whitehouse made the request, and clearly, there was concern around what is the financial state of affairs of the Center.

Q. Do you recall what he said?

MR. LYNCH: Objection. Vague as to "he."

Q. Do you recall what Matt Floca said in response?

A. No. No, and perhaps he didn't respond.

Q. That's not something that you felt that -- let me just try that again.

That's not something that -- the concern about the Center's cash position was not something that you felt like you needed to incorporate into your report?

A. Well, no, but that sounds like it's because I'm not sensitive to it or I don't think it's material. It's that I think that the operating deficit of the Center is so stark that it's almost a constant to the future of that institution.

I mean, it has to be addressed. It's a -- I mean, it's a use of cash.

Q. Right. I guess my question is: If the Center was going to close the main building and have no performances in the main building for two years, and it's out of cash, wouldn't you want to know how they were going to get back up and running at the conclusion of those two years, or wouldn't you want to do some analysis of that?

MR. LYNCH: Objection.

A. Well, in a comparison of the two scenarios, they have to do that either way. It's not -- I'm not looking for an easy answer here. It's that that is a separate set of cash and resources that need to be deployed.

Whether they're deployed in, say, 18 months in preparation for reopening, or in 42 months in preparation for reopening, I mean, it's still the same -- it's still -- it's a consistent challenge. It is a challenge.

Q. That assumes, though, because you're saying "reopening," you're -- that assumes what you're talking about is a full reopening, and that it sort of doesn't count, so to speak, that there

are performances in, say, one or two of the venues of the main building.

A. I know, but we have vastly different views of this operating.

Q. That's what I'm trying to drill down on.

A. Yeah, we really do. And not to be silly, but I have noticed it over the course of the day, is that this idea that it's basically operating and it's okay, there's just some construction over in the corner, is just not the reality of this phased renovation. It's an extensive project. It's just like by my eyes -- and I'll give you an example.

To work on the garage the way that it needs to be worked on, you're going to need to take up the entire front -- you know, the garage is coming under that whole front portico, or whatever, circular driveway area in front. That whole thing is going to be excavated. It's the only way to get down there. You can't -- so how do you get into the building?

So it's just as simple as -- and

then where do you put the equipment? You have to take that entire plaza area in between the REACH and the building, and you have to cordon it off, and fill it with equipment. Or the other side, right.

As you're doing those things, you know, I'm thinking about it, and it's like the idea that, well, there's all these performances going on, and everything is fine, it just flies in the face of what I can visualize is going to have to happen.

Q. And then -- are you aware that the Center has done full renovations of at least individual halls while keeping the main building open?

A. Yes.

Q. You talk about the patron experience, and sort of your, sort of, view on what should happen. Are you familiar with what the performing arts, sort of, industry practice is with respect to keeping a building open during renovation, or -- sorry. Yeah. Let me just completely rephrase.

Because you have given me a hypothetical or a posit that you think I've not

considered. Here's what I would ask you: Would it surprise you to know that, in this case, we had experts testify that it is industry practice in the performing arts management space to try to phase renovations; that is, avoid a closure of the building wherever possible due to the deleterious effects of a full closure on goodwill donors and patrons?

A. Okay. That's a matter of opinion, but okay.

Q. Okay.

A. So because you could also tell one of those experts my opinion.

Q. Understood.

Does your opinion take into account that having the Center dark for two years, the main building dark for two years, can cause patrons, you know, just to give up on the Center, and not come back?

MR. LYNCH: Objection. I think it's asked and answered.

But you can answer again.

A. Yeah. I think that's a risk.
Q. Okay.
A. I think the building falling down is a greater risk.
Q. Well, I'll push back there because in the scenario of phased renovation, that is still completing the renovations that were planned; correct?
A. Yes, with a fairly negative experience being in the building.
Q. But not the building falling down?
A. Well, let's maybe go back to what I answered. Because I thought you had suggested, just let it go.
Q. No. So I'm not suggesting let it go. Right, we have been talking about the difference between phased renovation and full closure, not the difference between full closure of the main building and doing nothing.
The alternative I'm positing here is phased renovation, which, you know, as you acknowledged, the Center has done before; right?

A. Mm-hmm.
Q. Okay.
A. Okay.
Q. And the phased -- yeah.
A. Yeah.
Q. Yeah. I think we're all tired. I'm going to end this hypothetical debate.
Did Delta provide the Board with anything else relevant to its report in connection with the September 15th meeting, other than the report?
A. No.
Q. Now, you were slated to, I think, speak as a guest at the meeting. Did that end up happening?
A. No.
Q. Why?
A. Nobody asked me any questions.
Q. Okay. Was that a surprise?
A. Yes.
Q. So you went into the meeting expecting that you would have some role in speaking?

A. That, after this level of effort and voluminous report, that there would be discussion and questions.

Q. Okay. Did they -- did either Mr. Floca or Secretary Lutnick, or whoever's running the meeting, actually open the floor for questions?

A. Somebody, I guess, Mr. Floca, made clear that we were all here and available and -- you know, so he made the offer to the trustees.

Q. But did he actually say, does anyone have questions?

A. Not to my recollection.

Q. So is it possible that people didn't ask questions because there just -- it wasn't presented as a, now is the time to ask Mr. Buchalter?

MR. LYNCH: Objection. Calls for speculation.

A. No. No, I think it was clear that we were there -- John Cracraft from Jones Lang LaSalle was there. I think it was clear, and you know, it's Zoom, and we're all in a conference together. I think it was clear that we were there to field

questions, but there weren't any.

MS. FREENY: All right. I think those are all the questions I have. So with that, I will thank you very much, Mr. Buchalter.

THE WITNESS: Yeah.

MS. FREENY: We can go off the record.

(CONCLUDED, 5:10 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, DARIN BUCHALTER, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

________________________ ________________________

(DATE) (SIGNATURE)

CERTIFICATE OF COURT REPORTER

I, Marjorie Peters, Fellow of the Academy of Reporting, Registered Merit Reporter, Certified Realtime Reporter, Realtime Systems Administrator, and Notary Public in the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that the witness was placed under oath according to the law; that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction, and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

I further certify that signature was not waived by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand this day of , 2026.

Marjorie Peters

Marjorie Peters, FAPR, RMR, CRR, RSA

My commission expires October 31, 2029.

ERRATA SHEET

IN RE:

DEPONENT:

RETURN BY:

= = = = = = = = = = = = = = = = = = = = = = = = = = =

PAGE/LINE CORRECTION AND REASON

(DATE) (DEPONENT SIGNATURE)

NOTARY PUBLIC:

## $

**$10** 133:3

**$100** 294:12 303:16,19

**$116** 232:21

**$18** 300:18

**$2.7** 233:2

**$20** 321:21

**$25** 294:2

**$250** 56:7 320:21 338:12

**$257** 127:2,14 183:20 271:20 321:16 338:12

**$3** 232:21

**$32.7** 231:16

**$356.7** 338:5

**$40** 288:19 289:1

**$400** 330:9,15 331:2

**$503** 340:5

**$557** 322:19

**$560** 322:16 324:2

**$61.8** 299:7 300:16

**$62** 231:11,17

**$724** 340:7

**$75** 199:16

**$80** 135:1,12 287:21 288:8 291:15,16 293:9 308:1 315:9

## (

**(2)** 114:21 116:11

## 0

**0437** 102:22

**0439** 103:16,21

## 1

**1** 30:8,9,10,13 44:8 48:16 57:10 66:14 159:7 190:18 203:15,16 288:13,14 311:18 312:11 335:11,12 336:1 339:5 341:7

**1.3** 45:1

**1.4x** 340:22

**1.5** 178:1 181:1 284:18

**10** 284:4 310:17,18,21,22 311:5 316:21 330:2

**10-year** 225:17

**100** 56:1 176:11 177:15 181:10 254:20 265:5 294:1 339:18 341:11

**100-page** 255:6,11 256:8 265:12

**1049** 137:19

**1094** 137:9

**10:58** 84:22

**10th** 34:5 71:21 72:4 74:9 107:12 118:19,20 134:6,20 135:14,17 146:13,21 148:5,9 150:9 168:15 174:1 191:18,21 192:3,8,11 197:22 204:15 237:1,3,9 254:3 261:9

**11** 336:22 337:1 344:4

**115** 294:1

**115.7** 231:9

**11:05** 84:22

**12** 55:7 259:18 272:10 290:4,5 322:4 344:6,7,8

**12-and-a-half** 177:11 282:5

**120** 290:8

**125** 294:1

**12:30** 171:8

**12:34** 171:10

**13** 191:3 336:20

**13th** 39:21 41:6 71:17 121:19 135:4 146:13,16 168:17 191:15,21 192:11 236:4 237:4,15 254:1,5,18 255:10,16 258:16 261:8,15 262:19 264:8,17,22 265:13 266:11 296:22 350:7 355:3,16,21

**14** 81:5 202:3

**14th** 26:4 32:7

**15** 67:3,14 272:10 310:16

**15-** 243:4

**150** 331:16

**1500** 214:8 343:1

**15th** 26:3,4 32:7 33:21 342:5,8 355:2

**16** 308:20

**16.2** 233:3

**168** 270:5

**16th** 32:8 296:22

**17** 10:19 82:19 83:6 136:9

**18** 293:14,21 294:4 357:14

**180** 9:17

**182** 328:10 334:1

**1920s** 74:18

**1990** 10:18

**1992** 10:20

**1995** 321:13

**1:15** 171:10

**1st** 130:16

## 2

**2** 42:16,21,22 57:11 80:19 81:18 100:4,9 114:9 159:7 270:3 311:17 312:3,6,7,20 315:14 330:5 335:11,12 336:2 339:6 341:7

**2(vi)** 269:19

**20** 285:4 303:17 310:3 329:16

**20-minute** 243:4

**20-point** 330:5

**200-project** 246:17

**2000** 15:9

**2001** 15:9 226:15

**2003** 226:2,12

**2009** 10:20,21

**2010** 11:2 15:10 226:2,12,15

**2020-2021** 321:13

**2021** 76:7 321:5,10,19 337:4,12

**2022** 10:12

**2024** 10:12

**2025** 10:9

**2026** 103:4 136:18 191:3 337:15 338:3

**2027** 106:12 200:19

**2028** 216:10

**2028-2029** 214:19

**2029** 216:10 270:14 271:22 272:20 273:2

**2033** 32:21

**209** 280:16 294:19

**20th** 43:8,10,16 256:18 258:16 260:14

**21** 324:6

**211** 290:1,9

**21st** 43:10,17

**23** 33:1 92:11 119:5 176:3 201:19 275:22 276:2 293:22 294:3

**23-'24** 162:2

**232** 32:22

**235** 66:14

**236** 66:15

**239** 44:13

**24** 92:11 98:21 111:3 119:2,5 176:3 201:19 233:21 268:9 275:22 276:2 293:22 294:3

**248.9** 337:9

**24th** 71:10 80:9 85:8

**25** 92:12 96:14 97:13 99:6,9 119:2,6,8 160:14 177:9,11,14,16,19 181:4 201:3,16,18,20,22 202:14 203:17 245:13 276:3 280:1 281:8,15 282:2,5 289:2,20 293:22 294:3 309:9 310:5 340:12,13

**250** 331:16,18

**257** 127:4 130:8 131:4,13 196:6 323:6,9 324:6,12 330:16,17

**257-plus** 196:17

**26** 90:11 93:19 96:2,6 99:16 272:2

**26-year** 222:20

**27** 46:16 106:1 118:10 200:19,21 227:19 228:6 229:16

**27th** 71:11 76:22 85:16 86:17 90:10 197:21

**28** 245:13

**280** 341:7

**285** 324:10,13,19 325:14 332:13 334:21 336:1,7 340:21 341:9

**28th** 73:12,13 76:22 87:10,16,20

**2:50** 259:15

### 3

**3** 82:7 100:8,10,11 102:17 114:9 135:21 136:18 192:18 260:22 269:13,21 311:18 312:11 338:17,21 339:19 340:19,20 341:2,3 343:12

**30** 196:17 243:15 271:22 273:2 310:4 330:3

**30th** 73:1,6,7,18 77:6 86:15 87:17 106:20,21 107:15,19 112:20,21 113:16 119:15 130:17 131:20 172:6 267:13 270:14 272:18 273:12 345:15,16

**32.7** 231:5

**33** 32:18 33:2 102:20

**35** 103:16 293:12

**36** 55:13 66:14 170:6

**363** 132:2

**363-project** 322:1

**37** 66:14,17 281:14

**37-and-a-half** 177:12 198:9,10 281:10 282:4,6 284:21

**37.5** 177:8 198:16 280:8 286:4,17 287:18

**38.3** 227:13 230:18 231:19

**3:00** 259:15

**3rd** 71:9 72:6,20 73:21 74:9 75:11 103:4 118:4,12,17,18 135:22 145:20 146:15,16,18 147:2,19 160:19 161:2

### 4

**4** 48:16 102:21 136:11,12,13 192:18

**40** 44:12 289:12 328:11,20 329:16 330:1 332:2 333:9 334:15 339:22 341:15,19

**400** 330:17,20 331:14 333:3 339:19 340:21 341:10,16

**42** 357:15

**437** 102:19

**45** 55:14 67:12,17,19 78:7,10 242:3

**45-day** 79:10 82:3

**451** 114:10

**47** 337:15

**473** 239:12

**484** 172:16 173:1

**49** 343:5,16 344:11,18

**4:04** 320:12

**4:11** 320:12

**4:45** 345:5

**4:50** 345:5

### 5

**5** 172:10,11,12,13,15,19 239:8,9 341:9

**50** 69:11 101:13 160:14 177:9 178:1 183:14 280:18 281:9 282:3 284:10

**500** 339:18 341:11

**502.8** 339:13

**503** 340:18

**55** 242:15 244:16

**557** 323:5

**560** 322:8 330:19 333:5 334:19 340:21 341:10,16

**5th** 114:13 115:22 119:3 135:16 176:3,4

### 6

**6** 190:19,20,21 191:11 203:16 330:5 344:11

**60** 66:3 70:21 77:19 84:13 152:15 241:17 285:4

**60-day** 83:14

**61.5** 294:19

**61.8** 309:8,18,22 310:3,4

**62** 231:7 294:21

**65** 290:10

**65.5** 203:11,17

### 7

**7** 30:5,8 44:8 66:13 202:7,8,11

**7/16/2026** 30:17 31:17

**70** 289:15

**72-and-a-half** 204:6

**72.5** 203:19
**724** 341:1,2
**725** 340:18
**75** 200:1 288:5
**76.1** 316:2,17
**78** 199:22 200:2,4
**7th** 85:12 172:5 173:8 176:5

### 8

**8** 42:14 80:19 259:19,20,21 268:9 290:7 322:4
**8,000** 179:5
**8.13.25** 190:22
**8.20.26** 259:22
**8.3.26** 136:14
**8.8.26** 100:11
**80** 135:3 289:7 303:17 330:1
**85** 288:5
**89** 322:5
**8th** 107:12,17 204:17 236:22

### 9

**9** 308:21,22 309:1
**9.15.26** 172:13
**90** 183:13 196:15 284:4 339:4
**91.4** 309:11,13,18
**94** 137:8 309:9
**9:13** 260:15

### A

**a.m.** 84:22 260:15
**AACE** 180:16 328:22
**aback** 74:15
**aberrations** 201:19
**ability** 7:1 16:15 24:12 54:5 97:5,6 163:5 218:14
**absence** 328:15 334:5
**absolutely** 39:15 122:6 153:21 167:2 270:20
**absolutes** 56:21
**abundantly** 32:15
**accelerate** 62:2 79:19 274:3
**accelerated** 79:17 244:11
**accelerating** 62:2 121:22 244:12
**acceleration** 146:10
**accept** 70:2
**accepted** 298:5
**accepting** 296:14
**access** 60:13 87:6 162:10 195:15 270:21 355:10
**accommodated** 206:10
**accommodating** 17:12 112:3
**accompanied** 119:16
**accordance** 214:19 216:11 217:18
**account** 233:22 234:13 280:12,19 282:12 303:1,2 332:1,2
**accountant** 11:14
**accounting** 93:9
**accounts** 165:8 199:4 300:14
**accurate** 279:9 287:19
**acknowledge** 319:9 324:13
**act** 215:6 332:15
**acted** 126:1
**action** 244:19
**activities** 45:18 282:20 318:8
**acts** 212:19 218:9
**actual** 50:20 113:12 155:13 181:16 242:7
**acute** 181:11
**add** 145:16 244:2
**added** 315:14,17 316:10,14
**addendum** 342:2,20 343:8,11 344:4,8
**addition** 168:1 231:17 340:9
**additional** 214:15 267:5,10 283:16 301:6,11,15 302:8,11 323:17 340:13 350:15
**address** 63:3 65:10 125:21 145:17 177:3 236:10 254:7 353:17
**addressed** 126:12 145:15 356:21
**addressing** 62:6 146:9
**adds** 231:9
**adequate** 131:13
**adequately** 319:9
**adjacent** 323:20
**adjust** 242:6 294:8 323:9
**adjusted** 200:10
**adjustment** 176:15,16 291:9 294:8 323:1 328:12,20 330:8 332:2 333:22 334:2 340:1,8 341:15
**adjustments** 200:11,12 230:11 313:20 324:1 325:5 340:10
**administration** 12:15 89:8
**administrative** 242:21
**admire** 125:20
**admiring** 125:20 147:17
**adopt** 25:13 70:2,6 123:10 137:21 229:16
**adopting** 125:14
**advance** 43:13 174:1,6 204:14 351:1
**advances** 57:12
**advantage** 218:12
**advice** 42:5
**advise** 11:1,22 12:3
**advisement** 155:10
**adviser** 11:5 78:14,18 95:5
**advisory** 33:9 44:15 67:15
**affairs** 37:14 62:8 356:3
**affect** 37:3 223:15 224:4 251:12
**affected** 47:21 190:8 252:5,9
**affecting** 37:11
**affidavit** 152:3
**affirmative** 344:13
**afternoon** 171:12 345:12
**agency** 174:18
**agenda** 142:2 242:18
**aggregate** 181:7
**aggressive** 67:7 68:21 69:6 72:1 83:18 84:11
**agree** 19:13 20:3,9,17 64:9 66:10 78:13 83:10 147:12 191:9 226:5

287:14 305:13,18 316:7 328:17 344:2,15

**agreed** 98:4 239:22

**agreement** 138:14,16,18 144:13,14, 21

**ahead** 209:22 234:5 248:20

**airport** 257:8

**akin** 50:19 67:22 68:14

**Alex** 113:7 277:11 313:4 320:15

**align** 116:1

**aligned** 175:2

**alignment** 350:18

**allocated** 314:12

**allowance** 340:13

**allusion** 13:14

**alternative** 17:12 53:5 145:17 165:19 170:4 205:18 289:4 308:15 353:15

**alternatives** 158:16 174:10 354:2, 15,17

**amazing** 56:6

**amend** 269:10

**amendment** 268:21 269:6

**amendments** 269:18

**amicable** 144:12

**amount** 37:12 56:6 79:7 135:4 183:11 239:21 251:19,21 283:10 299:15 309:21 320:22 321:1,2 322:17 324:3 331:4 332:21 335:2 338:3 339:16

**amounts** 325:2,5,6

**analysis** 8:18 16:14 17:11 18:10 22:3 25:8 41:2 50:4 55:1,13,15,18 57:4,8 61:1 64:15 67:17,19 78:8,11 96:20 97:15 107:16 109:2 110:1 117:19 135:17 141:8 159:1,16,20,21 160:8 163:10 170:10 174:21 175:13 182:21,22 183:1 186:6 189:1 197:15 214:2,10,14 217:7 219:5,7,11 220:18 221:8,10 222:8,15 223:12,18,20 224:11 241:12 242:2 245:6 246:5,7,9 248:18 253:4,6 254:21 265:7 274:11 279:1 297:3 311:9 318:22 347:11 355:6 357:7

**analytical** 159:18 223:5

**Analytically** 196:14

**analyze** 18:18 89:11 182:9

**analyzed** 188:13

**analyzing** 116:18

**ancient** 299:21

**and/or** 64:16 303:10 335:9

**annoying** 279:10

**annual** 16:1 199:15

**annum** 282:2

**answering** 7:7 95:15 98:8 139:3 249:9

**answers** 249:13

**anticipate** 148:17

**anticipated** 66:17 70:21

**Anton** 113:2,6

**apologies** 160:18 172:22 293:11

**apologize** 355:4

**apparent** 121:16

**appeared** 134:21 321:3

**appears** 116:4 355:19

**appendices** 260:11

**appendix** 202:8,11,12 308:19 309:1 310:18,20 316:21 336:20 337:1

**apples** 317:14

**apples-to-apples** 340:5,16 341:6

**applied** 83:4 175:15,16 177:8 178:14 180:12,21 230:2 280:5 282:3 328:11, 19 332:11

**applies** 158:21

**apply** 23:5 177:5 182:10 228:18 280:18 283:16 293:17 330:13 332:17 333:9

**applying** 175:21 177:16 180:3 325:4 330:8 332:5

**appointed** 111:7

**approach** 16:13 51:15 73:22 96:22 97:3 129:17,18,19 262:6,15 348:17

**approached** 37:9 238:2 352:18

**approaches** 18:11 45:5 334:8

**appropriated** 127:14,18 183:12 196:6

**appropriation** 127:3 128:2 130:8 183:18 196:3,13 270:9,13 271:21 320:22 321:21 322:16 338:13 339:5

**approvals** 162:18

**approve** 16:1 348:10

**approximately** 15:9,10 134:22 203:10 271:20 294:19

**architect** 11:8 23:22 27:16 329:13

**architecture** 168:2

**Arduin** 107:3,20 110:17 115:9 136:5 137:11 174:13 228:8 276:13 311:8,20 355:15

**area** 176:17 178:21 179:2 284:8 323:21 358:18 359:2

**areas** 12:12 24:13 50:22 60:14 120:4 178:11 181:16 268:10

**argue** 61:19

**Argumentative** 63:6 69:2 216:1 221:22 222:18 248:4

**arranged** 87:8,9

**arrive** 60:10 177:4 180:1,11 293:20 319:2 324:1

**arriving** 60:11

**art** 210:6

**arts** 13:6,9,12,13,16,17 14:2,5,11,13, 21 25:4 61:2 168:21 169:19 179:21 185:19 186:4 208:3,18 209:10,13,15, 16 210:9,16 211:8 212:5,8 215:8,16, 22 219:22 220:5,7 268:14 287:14 304:21 305:4,14 306:9,11 307:11 359:18

**aspect** 163:5 224:7

**aspects** 268:22 334:8

**assessing** 188:11 277:1

**assessment** 17:10 19:7 33:8 64:3 67:9,16 68:9,16 70:20 77:19 81:18 82:8 110:16 190:22 191:3 252:6,9 259:22 321:14 344:13

**asset** 12:10,11 13:2 23:19 53:10 128:22 162:20

**asset-backed** 10:3

**assets** 10:1 12:21

**assigned** 253:13

**assignment** 22:13 23:1 68:1 69:9 221:1 263:15

**assist** 42:4

**association** 33:19

**assume** 6:16 22:2 35:13 36:20 39:5

97:7,10 111:13 115:11 117:20 126:20 144:1 153:19 163:8 179:15 196:11 221:17 222:13 224:10 225:1 227:6 234:17 291:2,10 292:4 296:12 298:3 312:7,20 316:19 328:1

**assumed** 10:9 290:18 312:11 321:17 325:3,7,17 326:11 328:8

**assumes** 56:14 301:5 332:13 357:19,20

**assuming** 234:2 324:2 325:6

**assumption** 66:2,4 112:3 235:1 288:10 292:16,19 293:4 322:20 326:8

**assumptions** 20:12 78:14,18 112:1 160:7,13 234:21

**assured** 158:4,9

**assuring** 210:2

**at-it** 134:10

**attached** 29:3 32:5 116:21

**attachments** 114:20 116:5,21

**attend** 88:14,15 105:6 176:14 187:11,12

**attended** 43:19 85:18 105:14 349:7

**attention** 88:8 102:18 103:3,7 118:22 192:17 202:2 308:16

**attorney-client** 189:11

**attraction** 225:19

**audience** 167:17

**audit** 71:6,7 75:12,17 92:15 97:14,20 98:16,22 99:6,9 135:21 136:1,3,13,17 161:17

**audited** 89:17 92:12 94:14 96:13,21 97:6,11 98:10 110:11 111:2,4 119:2 276:1,2

**audits** 162:2

**August** 39:21 40:16 41:6 71:9,17,21 72:4,6 103:4 107:12 114:13 115:22 118:4,16,17 119:3 121:19 130:16 134:14,20 135:4,21,22 136:18 145:20 147:19 150:9,11 160:19 161:2 172:5 173:8,14 174:1 176:3,4,5 191:3,15,18 192:3,8 197:22 204:15 206:16 236:4 254:1,18 255:10,16 258:16 260:14 264:17,22 265:13 267:12,13 296:22 345:16 348:10 350:7 351:9 355:3,16, 21

**availability** 61:4 160:2

**average** 67:21 69:1 181:4 199:13

201:15 286:15

**averagely** 287:17

**awarded** 71:10

**aware** 28:6 33:22 34:4 247:2 256:5 351:5 352:4,9 359:10

**Aziz** 22:15 28:6

**Aziza** 22:15 28:9 33:12,22 34:4,10,14 85:19 88:16 101:15,20 102:8

## B

**bachelor's** 10:16

**back** 19:12 26:13 44:6,7 59:13,14 62:17 65:22 80:19 95:19 102:18,19 107:18 111:16 135:20 150:15 165:17 166:9,22 171:18 190:10 194:1,4 202:4 212:13 234:4,6 241:4 251:9 266:10 301:12 304:4,21 307:2 315:7 318:10 322:2 329:11 330:15 348:3,15 357:5

**background** 10:14 146:4 225:2 239:18

**backlog** 98:1

**backup** 261:7

**backward** 282:9

**bad** 125:7 285:1

**balance** 126:5 300:5,13 310:1,6

**ballet** 13:17

**bandying** 311:21

**bank** 165:8 303:1

**barricade** 50:21

**base** 105:13,16,17 185:16

**based** 50:4 68:16 75:21 83:20 97:21 131:12 133:15 153:8 177:5 179:16 216:20 219:11 222:11 226:12,18 246:19,21 269:7 276:15 316:21 322:15 328:9 339:5 353:5

**baseline** 325:13 337:4

**basically** 272:22 358:8

**basis** 156:8 167:15,17 196:22 219:14 222:5 224:20 225:6,16,18 249:20 274:18 301:10 321:6 326:15 327:2 328:8 340:16

**Bates** 32:19,21 44:13 66:14 81:5 82:19,21,22 83:6 172:16 191:1 202:8 231:8 259:22 309:1 310:18 337:1 344:9

**bathroom** 259:14

**bay** 284:14

**BDO** 98:2

**Beatty** 6:12 102:19,21

**beautiful** 168:5

**began** 71:22 121:20

**begin** 9:11 52:6 244:22

**begins** 113:2

**believed** 122:1 189:16 222:1

**bell** 159:2 345:16

**bells** 137:18

**Ben** 22:17 24:5

**beneficial** 302:2 323:14

**benefit** 327:5,11 332:20

**Berke** 28:15 41:21 189:16,19,22 238:17 342:11

**bid** 329:3

**bidding** 328:22 331:12

**bids** 215:4 330:14

**big** 168:8 288:7,9 289:7,15

**bill** 321:3

**bills** 162:16 163:9

**binder** 30:5 47:1 136:9 172:18

**bit** 22:8,10 63:10 70:19 77:14 98:9 100:1 151:4 160:17 185:4 209:12 270:6 279:17 293:11,13,15 317:13,14 329:22 345:1,12

**blank** 172:15,19

**blanking** 129:5

**blasé** 98:9

**blind** 50:5

**block** 101:10

**blue** 205:5

**board** 15:3,7,17,20,22 16:14 18:16, 21,22 19:7,13,15,17,20 20:4,5,9 21:5, 14,16,22 25:12 28:12 39:16,21 40:16 41:6 71:17,19 72:10 77:18 78:2 79:22 82:14 84:3 85:6 109:15 114:17 121:19 123:4,9 124:21 125:22 135:13 147:20 148:2,4 153:6,10 154:4,17,22 155:2 156:2,3,8,20 157:2 158:6 168:13 172:1 173:15,22 186:12 191:14 205:16 215:17 220:12 221:12, 20 225:21 226:5 236:3,7,18,20

237:15,20 238:3,22 239:4 241:7 242:8,9,20 243:7,18 244:21 253:15 254:10,18 261:8 262:4,5,13 263:6 264:8,22 265:12,19,22 266:15,20 267:5,10 296:11 297:9 298:17 317:20 324:11 339:16 342:8 345:20 346:1,5, 21 348:10,16 349:6,7,19 350:6 351:3, 5,22 352:4,9,10 353:3

**Board's** 352:14

**Board-ready** 152:16,21

**body** 51:16 90:16 246:14,16 262:1, 21 263:1

**bone** 90:4

**book** 212:19 215:6 343:12

**bottom** 32:16 33:2 81:5 82:19 83:7 103:3 114:10 137:7 199:20 200:5

**bound** 330:21

**bounds** 68:19,21

**box** 101:7 212:3

**boxes** 235:10

**bracket** 229:18

**branches** 18:2,3,7

**brand** 222:4,15 223:1,5 224:7

**branding** 233:20

**break** 8:2,3,8 84:19 171:5 249:5,15, 17 259:14 320:6,7 345:1

**breaks** 132:20

**brevity** 258:13

**briefing** 74:3,5 84:12 146:2 148:6 186:19 205:15 240:2,19 254:3 262:22 294:22 324:11

**briefly** 10:13 86:9

**bring** 24:7 212:12

**bringing** 208:15

**broadly** 14:1

**Broadway** 212:15,16,19 215:3 218:9

**broken** 231:22

**brought** 23:13 176:7

**buchalter** 6:2,7 8:10 9:13 30:9,10 32:17 42:22 43:2 85:2 100:11 136:13 171:13,14 172:13 190:21 202:8 259:17,21 309:1 310:18 337:1 344:8, 9 345:8

**bucket** 127:5,10

**buckle** 132:6

**budget** 16:1,15 17:11 46:17 106:1,9 111:17 114:16,20,21 116:7 117:3 118:2,10 126:22 127:1 228:2 232:21 286:2 326:9 336:9,12

**budgets** 328:2

**building** 24:13 37:22 45:6,17,20,22 46:2 48:8,10 49:2,8 50:2 51:16 52:21 53:6,19 54:21 55:17 56:4 57:3,5 58:13,16,17 61:11 62:21,22 65:12 68:3 71:7 74:17,20 75:2,13,18 76:8 77:10 120:16,20 121:12 123:11 124:13 126:2,8 128:10 136:4 144:3 146:9 156:4 167:12 168:5 170:8 179:16,18 184:7,8,11 187:7 194:19 195:10,11 197:10 198:16,21 199:6 204:21 208:7 209:10 210:22 213:4,15 214:4,12,17 215:18 216:9 219:15 222:3 223:14 227:10 230:4,13,17 233:11 235:14,21 240:15 243:1 245:17,21 247:12 255:21 262:6 278:22 280:12 282:1 283:13 285:4,5, 17,18 286:19 287:4,7,16 291:12 292:6 295:21 296:3,5 298:7 301:12, 13 302:5,20 305:5 307:4 310:14 312:9,21 315:13 321:12 323:15,16 329:8 343:22 344:14 357:2,3 358:2, 21 359:3,12,19

**building-wide** 343:21

**buildings** 13:4 183:1 244:9,10

**built** 9:20,21 12:7 74:17,20 322:20

**bullet** 199:14 205:21 214:15,16 216:6 235:11

**bunch** 321:8

**bureaucracy** 125:6

**business** 60:5 66:21 154:2 318:12

## C

**calculate** 323:1

**calculated** 198:8 290:18 321:1 341:14

**calculating** 234:1 315:11

**calculation** 310:9,11

**calculations** 180:4 228:19 277:7 309:5 313:9,15 314:3,4 316:8 320:1

**calculus** 133:14 163:15

**calendar** 43:15 173:3

**California** 10:17,18 206:18 207:19

**call** 34:5 35:12 80:3 86:3 88:8,17,18, 22 89:5 91:2 148:10 151:2 174:11 175:21 178:10 184:6,8 191:9 197:3 204:21 208:13 251:20 257:10 274:22 288:8 292:14 329:1 335:12 337:4 345:14

**called** 6:3 50:15 71:6 105:22 129:6 136:3 162:20 205:12 311:3 323:14

**calls** 34:6,18 36:13 37:1 52:9 54:1 68:12 69:3 77:21 93:5 95:12 97:16 102:13 104:8 111:6 117:16 139:19 144:16 166:10 170:15 180:6 188:5 189:11 266:3 270:18 273:3 299:4,5 305:16 306:1 336:10 349:21 350:10 352:21

**campaign** 225:17,18

**candidly** 16:19 18:9 61:13 91:3 167:5 233:7

**capacity** 19:2 186:17 308:14 347:10

**capital** 10:2 11:6 12:19 16:6,16,17 18:2,11 23:14 65:8 107:5 109:14 128:15,18 129:6,7 132:10,19 133:10 134:17 158:5 159:5 160:6 163:16,19 165:21 166:19 167:20 174:12 180:17 185:11 186:16 209:5 219:19 225:17, 18 245:6,7 250:4 274:19 275:3,5,11, 15 301:15 320:16 321:14 322:6 353:2

**Capitol** 23:22 27:16

**care** 153:21 158:17 220:20 261:14

**careful** 49:10

**Carnegie** 18:7

**carpets** 335:20

**Carrie** 22:18 204:12

**case** 41:7 74:10 100:21 107:11 163:8 168:2 170:2 246:15 251:10 252:6 286:17 287:1 304:16 334:19

**cash** 108:5 160:21 161:2,5,8,12 162:7,10,14 163:4,19 164:2,15 165:13 352:16 353:13 355:2,6,15 356:13,22 357:4,12

**catch** 23:17 85:15

**Categorically** 295:15

**categories** 142:15 315:15

**category** 129:6

**caused** 146:21 258:11

**caveat** 260:7

**caveats** 244:4

**CBP** 90:11 321:12,20 336:8,17

**cells** 338:8

**center** 22:11,13 24:2 26:19,21 27:1 28:4,8,13 29:9,20 30:21 34:12 37:16 38:13 39:1 40:2 41:15 42:5 43:20 45:4 47:22 61:10 62:3,11 75:2 76:19 85:22 87:11,22 89:13 90:3,5,19 91:15,21 92:5 94:20 96:7,14 99:5,9, 17 101:6,16,19 105:18 108:6 109:17 110:2 119:21 120:1 131:11 133:15 135:2 136:13,17 137:7 138:7,8,11,14 140:1,15,16 144:19 149:7,11 151:13 161:13 162:5,14 163:9 164:5,14 165:3,10 166:8 167:10 169:16,18,19 174:19 178:18 184:3,18 185:13 189:7 192:8,14 193:13 200:10,15,22 202:16 203:5,11,19 206:3,12,18 207:21 209:6,8 211:18,20 217:4,8,16 218:2,6 219:9 224:15,18,21 225:11,22 226:10 227:13 228:6 229:11 230:6,15 231:2, 16,21 233:6 237:7,16 242:13 247:4 251:12 259:1,5 260:16 262:9 263:10 264:4 275:22 276:10 277:4 289:14 292:8,17,19 293:5 295:6 298:4 299:9, 16 300:15,17,19 301:3 302:2 303:4 304:3 305:4 307:3 311:20 314:5 317:2,11,16 318:5 319:21 320:1 321:14,15 325:17 326:18 328:3,9 332:14 338:13 339:3 342:9 347:5 352:7 353:4,20 354:4 355:7 356:3,19 357:2 359:11

**Center's** 68:11 160:21 161:1 163:5 228:21 316:10,14 352:14 356:13

**Centered** 171:1

**certainty** 329:14

**cetera** 16:2 55:14 210:17

**CFO** 187:14

**chain** 100:11 172:13

**chairman** 296:15 298:18

**chairperson** 243:2

**challenge** 44:15 305:12,15,19 357:17,18

**challenged** 242:17

**challenges** 318:11

**challenging** 305:11

**change** 31:18 70:10 77:16 79:2,4 80:2,10,11 117:7 238:8 247:6,10,11, 15 251:16 286:1 324:17 335:19,20 337:19

**changed** 71:2 72:13 148:19,20 160:4 349:20

**changing** 73:15 160:9 337:21 341:21

**channel** 168:8

**characterization** 154:11 164:20 220:21 239:3 331:20

**characterize** 188:18

**characterized** 83:18 238:15

**characterizes** 118:6

**chart** 200:5,21,22 204:10,11 230:6 279:19

**Chartered** 11:3

**charts** 199:20

**chasing** 91:11

**check** 28:20 212:2

**chief** 9:16 10:6,7 110:20 111:13

**choose** 193:10

**chose** 27:8 92:5

**chosen** 158:21

**Chris** 100:7

**chronologically** 77:15

**chronology** 29:15 85:4 115:19

**circle** 125:19

**circular** 358:18

**circulated** 351:3 352:5

**circulating** 345:19

**circulation** 177:16,17,20 178:7,8

**circumstances** 150:13

**civic** 13:18

**claims** 300:18

**clarification** 32:13 142:9 343:18

**clarified** 265:2

**clarify** 58:2

**clarity** 295:1

**classify** 57:10 140:13 284:6

**clause** 219:2 222:2

**cleaning** 323:18

**clear** 32:15 38:21 40:8 54:17 64:2 118:1 124:2,16 184:4 210:18 244:8 245:10 255:9 354:12

**client** 41:14 70:1 95:3

**close** 38:14 39:1 49:15 62:21 122:15 123:11 156:4 161:4 165:16 177:18 178:22 183:12 193:4,11,16 194:18 195:10,13 196:10 204:20 212:18 245:8,12,21 246:13 247:18 285:12 288:1 315:5 325:17 339:9 357:2

**close-close** 193:17

**closed** 93:19 109:8 123:21 170:21 176:18 184:11 194:10 195:4,9 231:2 291:12 304:4 314:5 325:15 326:11 327:4 328:3 330:10,11 331:5 333:18 341:8

**closely** 23:9 59:21 107:13

**closer** 183:13

**closes** 305:6 307:3

**closing** 53:19 55:9 216:9 222:3 247:12 318:4

**closure** 24:17 37:22 40:3,17 41:7 48:5,7,8,9 49:1,8 50:2,3 51:3 52:13, 21 54:20 55:17 62:15 108:9 112:5 124:14 144:3 153:7 166:7 204:21 208:7 213:3,15 214:4,12,17 215:17 217:17 218:4 219:15 221:14 227:10 230:4,11,13,17 233:12 234:3,14 235:14 245:16 262:6 267:7 292:5,13 297:4 304:22 305:1,5 307:17 310:13 312:8,21 313:16 315:12,18 316:20 321:18 322:11 324:21 325:7 326:19 331:22 332:2 334:10 338:11 339:2 349:1 351:7

**closures** 197:9

**clumsy** 101:9

**coaching** 59:8

**cold-eye** 37:13 125:18 131:1

**collapse** 352:11,20 353:5,9,20 354:5,18

**colleague** 275:13 320:15

**colleagues** 6:11

**collect** 100:19 101:3,15 249:16

**collected** 301:21 302:2 309:20

**collecting** 91:10

**collection** 100:15

**collective** 349:14

**color** 239:15 278:2

**colorizing** 273:17

**column** 337:8
**columns** 137:20
**combination** 92:16
**combine** 227:20
**combines** 227:21
**comfort** 315:3
**comfortable** 31:6 139:13
**commence** 285:21
**commenced** 71:9,10 125:10
**comment** 121:18 161:9,11 238:5 342:7,11,14
**commentary** 121:20 262:16 278:2
**commenting** 121:10
**comments** 120:20 190:15
**commercial** 70:3 330:22 332:17 339:21
**commercially** 331:3
**commitment** 79:16 182:6 186:3
**committed** 272:7
**committee** 71:7,8 72:3,4,5 75:12,18 135:21 136:1,2,14,17 147:6,8 155:11 237:12
**committees** 71:13,18,21 75:14,16 147:22 148:4
**commodity** 337:19
**common** 95:3,6
**commonly** 193:13
**communicate** 175:20
**communicating** 29:8
**communication** 78:9 91:21
**communications** 101:20 102:9 253:14
**community** 330:22
**companies** 12:18,20
**company** 26:10
**compare** 158:16
**compared** 174:10
**comparing** 322:11,16 332:1
**comparison** 67:20 69:1 218:13 331:19 340:17 341:6,16 357:9
**compelled** 122:13
**compelling** 36:1 262:19 264:12
**competency** 110:13
**competing** 61:19 65:3
**competitive** 27:11 42:8
**compilation** 22:19 331:14
**compile** 149:4 256:2
**compiled** 153:4
**complete** 16:16 45:12 67:3,17 84:11 94:5 197:16 240:5 262:7 263:14 329:5
**completed** 97:14 98:16,22 182:5 196:1
**completely** 271:6 310:8,10 359:20
**completeness** 13:20
**completion** 146:11 157:11
**complexity** 284:7
**complicated** 77:5
**complications** 326:20
**Compound** 21:9,12 32:1 63:5 72:15 86:6 92:7 111:20 113:19 129:10 180:5 303:11
**comprehensive** 76:7 321:12
**compressed** 54:10 179:10 269:7
**compression** 251:21 252:18 294:16
**concealed** 328:15 334:5
**conceivably** 186:16
**conceive** 250:6
**conceived** 45:5
**concentrated** 184:11
**concept** 175:21 179:13 220:16 282:19 328:21
**concepts** 175:19 176:6,8
**conceptual** 329:12
**concern** 123:10 127:21 161:19 162:3 186:19 317:4,13 333:20 356:2,13
**concerned** 60:4,5 123:12,18 143:6,7 195:8 213:19 244:13
**concerns** 125:6 346:8
**concert** 61:4
**conclude** 267:3
**concluded** 243:15
**conclusion** 56:9 58:19 196:4,5,16 197:12,13 198:3 214:2,21 215:17,21 219:6,15 222:6,9 223:17,21 225:4,21 270:18 273:4 279:15 299:5 303:3,5,6 304:3 308:3,5 322:21 342:7 350:10 357:6
**conclusions** 25:11 128:7,8 134:3 197:1 214:2 224:16,17 354:10
**concurrency** 54:7 55:3,11 223:22 250:17 251:18 252:11,16
**concurrent** 56:1 67:9
**condition** 61:21 146:9 244:12 296:6 298:5 342:15
**conditioned** 296:14
**conditions** 121:21 223:14 285:19 328:15 334:5
**conduct** 16:14 36:9 169:7 224:10
**conducted** 197:15 207:10 223:20 276:16 277:12 321:13
**conducting** 65:8
**confer** 240:20
**conference** 342:10
**conferring** 180:14 190:9 248:22
**Confidence** 42:20
**Confidential** 114:16
**confined** 184:9
**confirm** 226:9 260:2
**confirmed** 190:11
**confirming** 102:7 215:10,11
**conflating** 221:1
**conflict** 28:20 87:19 240:6
**conflicting** 190:13
**confuse** 13:16
**confused** 135:8,9 178:12 209:12 244:11 283:5
**confusing** 330:4
**confusion** 193:16 218:22 219:4,16 220:11 221:19
**Congress** 127:13
**congressional** 133:5 183:17 196:3 245:8
**connection** 14:4 28:3 43:4 104:13 351:18

**conservative** 327:12

**considerable** 206:7

**consideration** 9:8 17:11 133:4 158:6 167:2 254:16 262:21 263:11 272:16 273:22 274:9,11 287:18 288:2 315:8

**considerations** 65:3 205:4,13 224:14 257:20

**considered** 53:1 139:6 143:17 228:13 246:13 248:1 263:14 276:22 308:10 311:15 329:12 343:22

**consistency** 110:10

**consistent** 61:9 74:4 135:1 145:12 162:21 165:16 173:9 188:13 215:18 218:5,16 229:1,5 233:14 240:5 261:11 262:2 287:19 352:13 357:17

**constant** 356:20

**constantly** 19:1

**constrained** 168:10

**constraint** 283:8

**constraints** 167:22

**construct** 168:6 178:21

**construction** 9:22 12:10 23:3 24:21 25:8 33:8 46:1 50:16 53:6 54:21 60:1 62:18 63:2 65:17 82:8 108:20 109:5 113:17 120:5 121:15 123:2,12 125:9 126:13 127:6,11 140:17 141:7 143:19 144:5 163:11 165:18 167:4,6,14 170:13,19 176:12 177:6 190:22 191:2 195:22 198:14,15 222:16 223:4 247:3,8 248:2 251:3 252:5 259:21 273:1 275:6 282:19,20 284:3,7 286:19 287:11 288:18 290:19 294:6, 7,13 302:21 303:9 304:14 307:5,22 313:22 320:16 323:20 324:20 325:3 327:13 329:5 335:18 340:13 358:9

**constructive** 350:16,17

**construed** 342:16

**consultant** 10:11 21:4,7,10 22:4 64:18 69:15 85:5 96:4 164:11 187:20 206:18 207:19 212:7 213:10 218:7

**consulting** 9:17,19 10:8 12:4 15:14 41:20 124:2

**consume** 150:20

**consumer** 219:4,16 220:10 221:18

**consuming** 163:19

**contact** 29:9 89:2

**contacted** 32:4 34:22

**contacts** 208:3

**contained** 134:8

**contemplate** 48:4 327:3

**contemplated** 51:3,11,12 83:20,21 84:10 196:12 198:16 241:16

**contemplates** 83:14

**contemplating** 198:19

**context** 59:20 70:4 74:14 139:11 183:17 271:13,16 351:7,14,21 355:19

**contexts** 296:11

**contingency** 23:4

**continue** 77:15 95:22 96:1 161:17, 21 163:5 212:11 233:9 245:8,22 269:22 294:12

**continued** 263:14 270:1 292:2 345:6

**continuing** 108:9 157:14 211:18 288:2 328:14 334:4 339:8

**continuity** 61:14 213:17 214:3 292:2

**continuum** 329:16

**contract** 26:7,16 30:10,14 157:19 272:8

**contracted** 272:22

**contracting** 26:6 44:3 180:15 330:22

**contractor** 11:12 328:16 334:6

**contradiction** 279:12

**contrast** 195:13

**contravention** 246:14

**contribution** 234:2 294:18

**contributions** 231:12,18,20,22 235:5 294:20 295:2,19 299:7 300:12 303:8 309:8,18

**controls** 158:3

**convention** 284:17

**conventional** 87:5 89:18 98:12 180:22

**conventionally** 94:13 177:22 178:2 181:1 182:9 284:10,18 329:18

**conversation** 35:15,19 36:16 86:11, 14 93:16 107:19,21 113:16 244:18 257:2,12 348:3

**conversational** 198:12

**conversationally** 27:22

**conversations** 34:1 71:4 86:19 104:22 105:1 258:10 295:16

**convey** 218:19 260:16

**conveyed** 91:16 264:4

**convince** 244:21

**cooling** 24:10

**coordinate** 331:13

**coordinated** 332:13

**copied** 101:17

**copy** 192:7,15 256:17 260:3 351:2

**cordon** 359:3

**core** 44:15 90:10 196:4

**corner** 358:10

**correct** 33:2 39:8 50:13 51:5 58:9,14 67:18 79:20 83:15,22 84:4 96:7 97:9 98:16 99:1 102:2 118:4 127:15 136:19 181:6 196:8 199:22 202:10 216:7 223:7 232:5 245:12 250:14 260:10,11 262:15 266:13 281:19 317:8 319:7 322:13 324:4 330:10 332:3,6,10 338:6 339:6 341:17 344:2, 18,19 345:17,21 346:19 354:19

**correctly** 236:13 254:13 286:6 335:3

**correspond** 81:14

**corresponds** 83:9 199:19 200:4

**Cory** 22:15 23:2

**cosmetic** 57:2 286:8 335:9 336:4

**cost** 9:1,3 23:4 58:21 59:21 60:3,17 64:4 107:5 108:8 109:11 126:16,17, 19 132:11,22 134:3 141:7 187:9 196:17 201:10 274:5,22 277:8 279:19 288:21 289:5,8,14 315:9 318:15 321:11 323:2 324:20 325:15 326:1 327:13 332:22 337:18,19,20 338:3 340:5,6

**cost-indexed** 337:17

**cost-revenue** 159:21

**costs** 23:5 61:19 64:18 118:20 128:1, 13,16 129:2,6 130:2,3 132:19 159:6,7 163:16 174:22 187:21 188:12 274:4 283:6 288:18 303:19 316:20 323:19 324:17 326:20,21 328:12 331:21 339:5

**counsel** 28:15 31:3 41:21 42:4 46:22 83:4 106:7 140:21 192:12 238:17 248:19

**Counselor** 10:21

**count** 255:13 289:16,17 314:11 357:22

**couple** 62:13,14 70:19 136:20 165:14 286:21

**court** 7:4,9,15 30:7 39:11 297:19

**cover** 130:7 196:6

**coy** 238:11

**CPA** 11:16

**Cracraft** 77:7 105:7 119:17,19 120:3

**crashing** 251:20

**CRE** 11:5

**create** 61:8 108:21 184:19 233:20 281:9 349:14

**created** 130:21

**creating** 291:8

**credible** 228:14 270:8

**crickets** 193:19

**crisply** 195:6

**crosses** 15:13

**crowd** 90:13

**crowds** 169:2

**Cruz** 10:18

**culmination** 260:21

**cultural** 224:19

**current** 94:16 130:3 176:11,20

**current-year** 94:15

**curtailed** 242:3

**customer** 223:15 224:4

**cut** 36:3 329:20

**cycles** 215:5

D

**Daily** 105:13,16

**damage** 223:15

**Darin** 6:2 344:9

**dark** 45:14 193:17

**data** 9:1,4,5 93:10,20 96:2,6,13,14,21 97:11 98:22 292:21,22 293:1 313:20 319:3 355:11

**date** 31:17,21 39:12 103:5 115:21 172:4 173:8 197:20 269:22 270:15,16,20 272:3,11

**dated** 30:16 32:7 103:4 114:13 191:3

**dates** 102:7 272:6

**day** 26:5 43:16 63:15 67:3,17 69:11 81:7 106:21 107:7 156:12 257:5 266:14 306:4 358:8

**day-to-day** 35:9

**daylight** 121:3,4

**days** 66:3,21 67:12,14,19 70:21 77:2,19 78:7,11 84:13 131:22 152:15 188:14 204:14,18 241:17 242:3 258:18

**DC** 24:4 242:13

**deadline** 256:14

**deal** 80:16

**debating** 115:11

**debt** 11:6 12:18 353:15

**debts** 162:6

**decades** 246:22

**decide** 126:5 157:2 221:13 244:14 291:14

**decided** 33:13 87:16 92:3 157:1 169:3 171:1 319:20

**deciding** 153:7,11 154:5,21,22 155:3 156:9 277:1

**decision** 20:4 79:19,20 138:21 147:14,16 151:6,12 154:18 156:3 158:18 226:6 285:10 339:1 347:17 350:7 351:7

**decisions** 143:5 188:19 222:16 353:14

**deck** 42:22 43:3,13 80:20 135:13 149:10 151:7 189:8 191:7,10

**declination** 160:1

**decline** 176:10 188:17 290:12,20 291:1,3,5,11 293:22 294:4

**declined** 94:22

**declining** 294:2

**decrease** 302:10

**dedicated** 185:19

**deem** 302:3 347:14

**defect** 252:22

**defer** 124:21

**deferred** 174:17 269:20

**deficit** 135:12 161:6 199:15 235:2 291:9 302:10 303:10 304:14 308:2 313:18 353:13 356:19

**deficits** 133:8

**defies** 51:17

**define** 344:12

**defined** 48:1 112:17

**defining** 114:4

**definitions** 159:9

**degradation** 176:20

**degree** 307:1

**degrees** 10:14

**delay** 125:7

**delayed** 123:2

**deliberate** 64:21 156:22 211:5 304:1 347:8

**deliberated** 221:16

**deliberating** 303:22

**deliberation** 348:20

**deliver** 241:3,6

**deliverable** 254:4

**deliverables** 81:5,9 240:7

**delivered** 192:2 238:21

**delivering** 331:16

**delivers** 235:17

**delivery** 107:16 254:2

**Delta** 9:17 10:8 11:20,22 13:8 22:12 25:18 27:8 28:18 42:22 73:17 83:17 85:20,21 89:4,9 90:19 91:15 92:5 96:18,19 100:19 102:1 105:20 109:22 116:8 117:12 119:2 124:2 146:4 174:5 175:6,9 176:2 186:5 188:3,13 190:21 191:7 195:15 207:11 208:10 212:14 217:13 219:5,12 222:3,14 224:10 228:10 237:7 239:4 254:15 255:11,17 256:8 258:20 259:21 263:10 265:4,12 292:11 313:1 319:22 341:19 342:16,17

**Delta's** 25:16 79:20 146:12 152:21 153:8 188:22 202:12 224:16,17 254:19 260:3 265:5

**demand** 133:1 176:19 283:12 336:1

**demanding** 240:2
**demands** 134:22
**demobilized** 169:7
**depart** 182:9
**department** 41:17 329:8
**depend** 21:2,13 304:20 308:3
**dependent** 286:22 287:1,3
**depending** 170:7
**depends** 20:4 21:18
**depleting** 133:11
**deployed** 357:13,14
**deployment** 60:7,12 72:2
**deposed** 6:16
**deposition** 7:3 8:11,14 9:11
**depth** 52:4 156:21
**derivation** 313:6
**describe** 11:18 17:15 45:16 54:6 261:12 330:4,5 331:3 335:14
**describes** 219:13
**describing** 55:22 183:11
**description** 29:4
**design** 323:13 328:13,21 329:6 330:14 334:3
**design-maturity** 328:11 333:22
**designated** 295:5
**designation** 10:22 11:5
**desire** 176:13
**detail** 111:19 140:6 293:13 315:1
**detailed** 29:10 157:11 251:7
**deteriorating** 244:12
**determination** 201:11 223:6 263:9 347:15
**determine** 315:2
**develop** 182:21 313:17
**developed** 321:3
**developers** 11:6 12:18
**developing** 328:14 334:4
**development** 234:1
**dialogue** 69:22 112:12 243:6 264:7 267:19 295:17 349:2,4
**dictating** 204:13
**differ** 108:8 175:8,11,14 334:8
**difference** 35:3 50:17 55:9 96:12,17, 20 97:2,4 169:10,17 174:16 183:10 241:15 242:1 271:11 285:16 288:7,11 309:7,19 315:6,9 330:2 339:15
**differences** 174:14
**differentiate** 305:12,15
**differently** 183:15
**difficult** 167:7 209:19 305:2,3 354:16
**difficulty** 307:1
**diligence** 67:22 68:7 69:9 158:2 262:7 317:17
**dilution** 317:16
**diminishes** 272:13
**diminishing** 24:6 186:17 352:17
**direct** 23:22 42:14 100:3 121:18 189:18 225:7 259:17
**direction** 163:17 217:5 287:7
**directions** 61:20
**Directly** 299:8
**director** 15:7 16:1
**disaggregate** 54:5 55:11 250:19
**disagreed** 188:22
**disband** 318:7
**disciplinary** 33:16
**discipline** 332:21
**disclaimer** 104:2
**disclosed** 9:2
**discount** 167:21 175:21 177:4 178:13 180:2,3,12,21
**discourage** 186:2
**discovered** 285:19 287:10
**discovery** 100:16,20 101:4
**discretely** 177:18
**discuss** 155:9 156:22 157:16 183:21 184:12
**discussed** 124:22 242:2 247:16 260:8 313:5 351:20
**discussing** 205:17
**discussion** 35:1 86:4 107:3 112:19 113:5,8,9 145:21 150:10 160:20 161:1 184:1 186:21 254:9 275:21 278:17 345:14 347:4 355:1
**discussions** 112:18 113:11 147:19 150:7 189:18 204:1 236:6 277:18,19 278:8 355:14
**distinct** 44:16 300:11
**distinction** 145:6 194:22 205:11
**distinctly** 314:15 349:3
**distinguish** 261:20
**distributed** 254:20 265:6 267:16
**District** 297:19
**divide** 24:12 53:14
**DLR** 90:11 132:3 321:5,10,19 324:6 325:20 326:9,15 328:9 338:15,18
**document** 40:7 46:7,8,11 47:4 67:2 76:16 102:10 106:9,11,17 113:12 116:13 137:14 141:6 142:21 191:20 276:10 278:21 279:6
**documentation** 89:3 150:1 232:20
**documents** 8:11,13,15,20 49:18 87:6,7 91:10,11 102:10 117:12 119:10 149:14 175:13 192:6 265:3 276:21
**dollar** 133:2 159:12 183:12 301:21 302:1,12,15 304:7 329:4
**dollars** 130:3 133:5 299:11,13 306:4 307:17 324:7 325:21 326:22 327:1 329:4 336:2 337:5,12 338:3
**donated** 298:13 300:19 307:17
**donation** 184:20 295:9
**donations** 133:20 166:8 184:13,14 234:19 298:5 299:9 301:6 302:9 309:15
**Donna** 107:3,20 110:17 113:8,9,16 114:11 115:9,22 136:5 137:11 174:13,15 175:16 180:3 185:1 186:21 187:8 228:8 276:12 277:11,17,21 311:8 313:3 355:14
**Donna's** 180:8 228:13
**donor** 19:2 133:4,18 139:22 185:22 227:4
**donors** 16:5 19:2 166:1 169:5 186:2 224:8 225:15 226:11 233:16
**donors'** 162:21
**Dooley** 22:16 24:15 85:20 87:9 197:18 253:12

**doors** 170:21 194:5 335:20

**double** 322:7,15 331:22

**double-office** 107:1

**doubt** 17:6 170:19 207:14 250:2 327:5,11

**downscale** 233:13

**downside** 126:15

**downsize** 314:10

**downward** 294:8

**dozen** 206:21 242:15

**draft** 69:10,15 81:22 83:22 148:15,16 352:5

**drafted** 186:19 218:21

**drafting** 23:10 190:8 255:21 281:20

**drafts** 189:7 192:1

**draw** 13:19 14:4 201:15 202:2 219:14 225:18 354:10

**drawings** 329:12

**drawn** 201:3

**drew** 201:18 317:10

**drill** 21:3 279:20 358:5

**drive** 59:16

**driven** 289:8

**driver** 288:7

**driveway** 358:18

**drop** 338:15,16 339:18

**drove** 58:19

**due** 67:22 162:6 176:12

**dug** 111:22

**durability** 133:12 186:18 304:12 307:21

**duration** 55:6 60:1 167:4 177:14 182:7 198:20 235:19,20 271:19 333:19

**durations** 252:20

**duties** 36:6 213:21 298:18

**duty** 126:1 148:4 156:21 299:2

**dynamics** 16:5

**E**

**e-mail** 29:1 32:11 91:17 100:11 101:6 102:8 103:3,13 104:2,6 107:10 114:11 115:3,4,8 116:22 119:1,4 134:12 172:13 187:5 238:16 260:17 277:3

**e-mailed** 238:20

**e-mails** 26:6 100:15 101:3,10,13,15 102:2,6 104:12 236:5

**earlier** 53:7 63:18 73:12 105:22 176:1 192:19 198:10 199:7 224:5 265:9 283:11 286:7 295:4 326:14 331:20 333:22 334:20

**earliest** 73:14

**early** 39:10 47:17 99:21

**earmark** 272:13

**earmarked** 274:6 301:2

**ease** 174:11

**easier** 176:22

**easiest** 55:4

**easily** 277:18

**easy** 304:21 357:11

**economically** 166:4

**edited** 94:5

**edits** 190:14 191:20

**education** 112:13 140:9 145:14 295:10

**educational** 10:14 206:7 278:3 300:3

**effect** 61:1 64:16,17 160:5 213:11 263:21 308:8

**effective** 347:6

**effectively** 130:6 153:2 342:22

**effects** 335:9

**efficiency** 55:10 60:6 327:14 334:10,17

**efficient** 158:15 245:7

**efficiently** 166:20

**effort** 16:4 343:1 347:10

**effusive** 120:19

**egress** 168:7 178:9 335:15

**Eisenhower** 181:21

**elapsed** 84:5,7 241:21

**election** 242:19

**electrical** 24:10 57:19

**electronic** 91:5

**electronically** 260:19

**element** 18:8

**elements** 56:22 57:15 157:12 206:5,7 211:6 269:19

**eliminate** 268:21

**Elliot** 28:15 41:21 189:16,19,22 238:17 342:10

**Elliot's** 190:1

**embarrassing** 153:18

**emerging** 307:22

**emphasis** 57:14

**emphasize** 122:14 123:4 236:9

**emphaticness** 123:5

**employed** 119:22 223:12

**employee** 27:1 207:21

**encourage** 227:3

**end** 75:5 77:19 78:10 161:12 181:10 240:5 241:17 244:17 249:14 257:20 267:12 302:21 352:18

**endowment** 133:11 138:3 139:17 140:5,18 145:2,13 162:7,11,17,20 163:3 186:15 300:7,11 301:12 302:16 353:16

**ends** 135:4 278:12,18

**energizing** 166:15

**energy** 184:19

**engaged** 42:4 47:15 66:1 80:9 155:5

**engagement** 13:11 22:9,11 35:16 36:18 39:6 43:4 65:14 67:21 70:22 86:12 88:1 89:11 93:4 99:21 104:13 142:17 225:14 226:1,11 227:4 233:15 261:1 353:6

**engagements** 222:14

**engineer** 11:10

**engineering** 76:5 246:5,7,9

**engineers** 24:14 330:6

**entails** 286:1

**entertain** 63:13

**entire** 53:12 149:2 163:15 166:15 169:8 170:4 198:14,20 209:7 212:5 336:8 358:16 359:2

**entirety** 8:12 25:10 138:9

**entities** 12:16

**entrances** 170:6

**environment** 9:20,21 12:7 23:17 24:9 294:6 326:11

**environments** 108:21

**episodic** 199:12

**episodically** 285:5

**equally** 166:14 305:11

**equipment** 60:12 168:1 169:15 170:18 178:9 182:1 280:19 282:13,21 283:17 284:13 359:1,4

**equity** 12:20

**equivalent** 91:4

**erect** 50:22

**Ernst** 15:12

**erosion** 121:6

**err** 287:6

**erring** 287:8

**escalate** 325:21 326:21

**escalated** 324:7 326:22 336:2

**escalation** 23:4 60:3 159:5 337:15 338:1

**essence** 62:5

**Essential** 205:3

**essentially** 140:7 151:21 161:19 182:8 192:20 228:1 241:21 315:14,17 316:10,14 332:19

**estate** 9:22 10:19,22 11:1,6 12:2,9, 16,17,19 15:14

**estimate** 57:20 178:6,7 180:15 199:15 227:12 233:2 316:7 321:11,16 322:19 324:2,19 325:14 329:10 330:9 334:14,15 339:2

**estimated** 177:22 315:22 329:4

**estimates** 130:4

**estimating** 9:1,4,5 180:17,18 284:9

**ether** 122:2

**evaluate** 19:2 110:9 122:11 146:8 148:1 165:13 211:16

**evaluated** 53:13 165:6

**evaluating** 19:1 20:10 55:9 65:7 110:6 164:17

**event** 166:15 179:3 233:20 301:14

**event-oriented** 178:19

**events** 72:19 176:14 232:15 261:13

**events-oriented** 169:2

**eventually** 135:4

**everybody's** 70:4 330:13

**Everything's** 279:1

**evidence** 51:16 90:16 246:14,16 249:22

**evolution** 160:11

**evolve** 192:6 207:16

**evolving** 246:22 255:17,20

**exact** 179:12 180:21

**EXAMINATION** 6:5 320:19 345:6

**excavated** 358:19

**exceed** 128:1

**exception** 203:5

**exceptionally** 33:15

**exchange** 76:17 239:13 258:14

**exchanges** 277:3

**excitement** 166:16 233:20

**exclude** 338:21

**excluded** 335:6

**excludes** 300:17 301:1

**excuse** 113:7 200:2 201:16 291:21

**execute** 158:17 288:17 322:6 330:18 331:4 333:3,4 339:3

**executed** 166:20

**executing** 16:13

**execution** 16:8 18:10 23:15 82:18 83:5 177:15 331:11,15,16,17 332:14, 21

**executive** 9:16 10:6,7 16:1 82:9,12 84:12 152:22 153:3 174:18 240:1

**exemplar** 170:3

**exercise** 19:14 314:9,10 318:3

**exhaust** 293:15

**exhaustive** 130:1

**exhibit** 30:8,9,10,13 32:18 42:16,21, 22 44:8 47:1 66:14 80:19 100:6,10,11 102:17 114:9 136:10,13 172:11,13 190:20,21 191:11 202:8,11 203:16 239:9 259:20,21 268:9 290:7 308:21, 22 309:1 310:18,20 311:5 316:21 322:4 336:20,22 337:1 344:6,7,8

**exhibits** 8:17 256:3 260:8

**exist** 92:22 240:22 296:2

**existed** 93:3 296:13

**existence** 211:19 255:7,11 256:7

**existing** 127:1,3 285:17,18 339:4

**exists** 12:11 246:21 270:14 310:5 329:11

**expect** 28:20 35:10,14 36:5 69:18 74:16 77:18 161:16 192:4 199:11 278:13,14

**expectation** 241:5 264:10 286:18

**expectations** 74:4 109:19 162:22 297:10

**expected** 19:8 261:16

**expecting** 241:6

**expenditure** 271:12

**expense** 112:8 134:18 160:6 166:1 174:14 233:1 314:12

**expenses** 107:5 109:20 128:14 133:20 134:3,22 140:20 163:20 165:17 174:16,22 200:13,20 201:3 203:3,10,19 275:4,8 283:6 289:19 290:11,18,19 291:1,2,6,11 292:12,19 301:22 303:17 316:20 319:17

**experience** 23:22 61:9 74:17 120:6 168:11,19 169:5 185:17 213:1 219:19 220:4,6 222:12 223:16 224:5 225:5 226:1,12 244:8 250:2 272:6 298:10, 12 359:15

**experiencing** 294:17

**expert** 9:19 13:5,9 59:3 122:9 149:2, 5 150:22 207:15 215:8,15 216:3,8,14, 17,18 219:10,11 220:10,16,21 221:1, 7 237:9 246:11 268:15 269:22 305:14 306:11 307:11 344:8

**expertise** 12:14 25:5 33:17 215:21 268:10

**expiration** 270:13,15,16

**Expires** 270:9

**explain** 160:13 176:8 181:3,14,19 205:14 281:6 327:10

**explained** 282:14

**exposure** 60:2,8 334:13,15

**express** 70:5 113:16 114:6 120:14 152:5 344:13

**expressed** 36:11 210:1

**expression** 32:6

**extend** 272:10

**extends** 55:13

**extensive** 132:3 346:15 358:11

**extent** 106:3 118:5 122:17 125:11 178:16 179:8 180:8 189:10 196:12 211:10 270:17 306:14 314:6 336:11 350:9

**external** 112:10 195:18 232:8,9,14

**extreme** 315:6,9

**extremes** 52:14

**extremity** 55:19 132:1

**eye** 167:5

**eyes** 358:12

F

**face** 359:8

**face-to-face** 113:5

**faced** 166:6

**facility** 45:14 61:22 108:20 112:10 114:2 120:9,13 129:15 167:21

**fact** 27:17 47:16 57:12 103:8 107:9 120:22 127:18 146:13 176:12 178:11, 14 187:6 207:10 216:19,20 218:7,10 220:17 242:3 252:15 276:5 279:3,22 303:7 348:9

**factor** 67:16 163:10 176:15,16 177:5, 17 181:1,2 186:11 280:18 281:9 282:2,12 283:16 284:18

**factors** 23:4 87:18 126:5 159:5 175:15,17,21 281:22

**facts** 292:21

**factual** 353:17

**fair** 14:1 67:21 82:2 122:22 142:4 147:10 221:6 222:17 230:7 244:20 260:20 277:22 291:10 312:19 315:13 340:16

**fairly** 67:7 333:15,17

**fall** 268:14

**falls** 68:19 329:19

**familiar** 6:14 31:11,14 39:5 100:17 275:16 359:17

**familiarity** 33:17 111:14

**famous** 343:5,16

**farther** 327:8

**fashion** 10:4 55:13 132:14

**fast** 248:6

**fast-tracked** 23:15

**faster** 56:11,13,15 198:2 235:17

**fastidious** 101:5

**faulty** 192:10

**favor** 262:5,14

**favors** 168:3

**feasibility** 164:17 166:21

**feasible** 62:18 150:1 170:22 171:3

**features** 168:4

**federal** 270:9,13 271:21

**fee** 98:5

**feel** 127:8 132:1,5 153:22 158:3,9 168:14 185:19 283:21

**feeling** 295:17

**feels** 258:8

**feet** 307:2

**fellow** 11:2

**felt** 79:16 122:13 123:1 150:12 187:14 195:1,3 313:10 322:22 346:15 356:10,14

**fence** 45:13 50:21

**fewer** 309:15

**fiduciary** 298:18 299:2

**fight** 297:6

**figure** 50:7 165:22 169:12 231:21 284:15 286:13 294:15 300:17

**figured** 175:3

**figures** 110:10,22 227:10 236:16 313:10

**figuring** 179:11

**file** 262:20

**filing** 101:5

**fill** 176:17 359:4

**final** 70:20 77:19 82:7,13 84:2,11 148:14 152:16 157:15 241:6,16 254:15 261:1,2,16 268:22 269:16 321:9 328:15 334:5 340:10 345:9 347:15

**finalized** 260:13

**finance** 12:1,15 46:13 71:6,7 98:15 113:18 136:4,14,17 277:10,13 278:18 352:15 353:7

**finances** 108:3 132:11 187:1,13 297:10

**financial** 10:3 89:17 92:2,3,19 93:1,2 94:14 96:13,19,21 99:16 109:16 110:1,11,20 111:13 128:13 133:4,13, 16 135:17 140:14 188:22 201:8 227:10 274:15 277:1 304:12 351:7, 14,21 352:6,11,20 353:4,9,20 354:4, 18 355:6,11 356:3

**financials** 119:3 176:3 201:4 202:15, 18 203:10,18 275:21 276:1,2,6

**find** 61:21 195:12 287:8,10

**finding** 165:15

**findings** 69:10 74:8 75:10,11,21 78:4 81:19 148:22 149:2,4 153:12 155:6 173:20,21 241:13 262:18 264:12

**fine** 297:15 359:8

**finish** 7:13,14 16:20 59:5,10 241:9 249:10

**finished** 175:1

**fire** 57:19

**fire-life** 335:16

**firms** 97:20

**fiscal** 46:16 92:22 94:5 96:2,6,13 97:13 98:21 99:6,13,15 106:1 111:3 118:10 161:4,13 200:21 201:3,21 202:14 275:22 279:22 289:2,20 309:9 352:17

**fit** 126:22

**five-** 321:20

**five-page** 150:18

**fix** 52:2

**fixed** 33:20 128:22 247:3

**flags** 333:5

**flesh** 151:21

**flies** 359:8

**flip** 136:20

**flipping** 46:22

**Floca** 34:1,5,15,17 35:15,20 36:10,17 37:21 38:12,22 40:9,16 41:6 44:2 80:1 86:1,4,11,20 107:1 119:17 120:14 151:9 189:15,21 190:6 217:11 226:21 236:7 267:14 345:15 348:21 355:18 356:7

**Floca's** 187:17

**floor** 283:9 284:16

**flow** 108:5 170:18 179:1 181:21 182:2,22

**fly** 188:11,19

**focus** 12:7 23:3 45:19 65:17 210:8 213:14 253:20 336:15

**focused** 9:18,20 24:15 208:13,16 214:11 220:15,17 236:20 251:18

**focusing** 41:2

**folks** 104:18 277:13 353:8

**follow** 153:4 347:6

**follow-up** 59:11

**football** 169:8

**footprint** 284:7

**forecast** 106:12,13,14 200:19 227:19 228:6 229:16 299:14 318:12, 18 319:2

**forecasting** 107:8

**forecasts** 111:18,19

**forensics** 9:20

**forget** 123:20 336:14

**forgive** 206:17

**forgot** 87:19

**form** 19:9,21 38:1 51:13 56:16 93:13 128:12 129:4,8 130:12 148:14 156:8 298:8

**formal** 242:12 346:18

**formality** 92:1

**formed** 125:4 274:18

**forming** 134:2

**forthcoming** 147:20

**forward** 123:13,20 124:4 163:11 244:14 262:17 345:10

**forward-looking** 318:3

**found** 95:20

**foundation** 36:22 38:2,16 40:5,20 54:4 79:13 80:5 90:8 93:6 95:13 97:17 98:18 102:14 104:9 111:6 123:15 139:20 141:13 188:6 266:3

**four-plus** 167:6

**four-year** 177:14 197:9,12 198:15 199:12 272:2,20 274:13 285:5 287:2 303:8

**foyer** 168:9 286:9

**frame** 15:6 66:22 71:2 79:10 150:2 263:7 269:8

**Francisco** 13:15 14:6,20 15:3,18 226:2,13

**frankly** 23:17 132:7 147:12 243:3 268:1 331:9

**Freeny** 6:6,9 42:17 47:6,10 59:7,12, 18 84:18 85:1 100:6,9,13 116:19 137:5 141:11,14,17,21 171:5,11 172:22 192:12 216:7 249:4,12,19 250:7 258:3,5 259:13,16 296:21 297:5,16,21 298:2 308:22 310:22 320:5,11,13 344:22 345:3,7

**friction** 185:2

**Friday** 71:11 173:8

**friend** 125:19

**Friends** 14:6,9 15:2,8,18 21:16 226:13

**front** 42:19 113:12 136:16 189:1,5 191:2 250:1 358:16,17,18

**frustration** 249:14

**fulfill** 209:3 210:13 220:22

**fulfilled** 211:8 213:21

**fulfillment** 211:5

**full** 23:8 24:17 37:21 40:3,17 45:7 48:5,7,8,18 52:13,20 54:20 55:17 57:5 58:9,11,13 124:13 144:3 151:22 196:12 214:3 215:17 230:17 235:17, 20 242:5 245:16 247:18 254:9,15,19 260:3 263:1,12 265:5 307:4 310:13 337:11 343:20 345:19 357:21 359:11

**fully** 153:4 216:9 245:21

**function** 109:4 157:2 185:3,22

**fund** 133:8,20 140:9 166:1 185:10 273:1 301:18 338:13

**fundamental** 53:14

**fundamentally** 175:2

**funded** 140:17

**funding** 37:12 270:19 336:3

**fundraise** 16:15

**fundraising** 15:19 16:3,5 17:10,17, 19 18:12,18 19:8 133:18 183:15 185:16 186:6 224:11 233:2,9,13 234:2,14 235:4 306:4 308:9,14 309:20

**funds** 12:21 109:12 133:1,7,9 139:22 162:19 183:16 186:15 231:21 245:8 271:12 272:7,13,21 274:6 295:4,11, 17 296:14 298:12 301:11,18 353:15

**funny** 280:22 283:1

**future** 18:19 68:11 301:13 302:17 303:20 304:13 310:1 319:17 356:20

**FY25** 203:9 292:12,22 293:1 309:8 317:10

**FY26** 92:18 93:10 94:17 276:7 355:11

**FY27** 114:16,20,21 117:3 201:16 229:10 230:6 276:9 311:3

G

**G&a** 289:15

**gain** 327:14

**gained** 111:14

**games** 169:8

**gap** 293:9 324:12

**garage** 121:2 358:14,16

**garden-pathing** 195:3

**gathered** 259:5

**gathering** 36:1

**gave** 75:20 130:20 137:11,12,13 174:9 186:12 261:8,15 317:11,16

**gears** 134:17 341:21

**gee** 226:5 303:15

**general** 28:15 41:21 42:4 231:21 238:16 298:10

**generally** 70:9 95:15 186:3 227:16

**generate** 278:5,6

**genuinely** 12:11 355:5

**geography** 232:18

**Georgia** 26:17

**get all** 130:10 194:13,17 195:5

**gifts** 140:3 299:19

**gist** 29:4 122:21

**give** 22:21 89:16 91:12 92:15 134:18,19 137:7 164:21 174:2 175:3 202:21 203:14 224:8 239:15 267:17 277:20 280:15 307:6 358:12

**giving** 239:4 306:8 327:5

**glasses** 81:6

**goal** 17:19 183:9

**good** 6:7,8 64:13 75:3 85:15 115:15 171:12 184:17 185:20 189:12 275:19 288:4 297:9 316:12 318:15 331:17 349:16 353:1

**goodness** 135:6

**graduated** 10:18

**grand** 68:22

**grant** 140:18

**grant-funded** 138:3 140:8 145:3,13

**Grant-funding** 139:17

**greater** 60:1 64:6 97:6 291:8,9 293:13 315:3 334:11

**greatest** 60:6

**green** 341:12

**ground** 9:10 129:1 333:6

**Grounds** 71:8 75:13,18 136:1,4

**group** 6:10 9:17 10:8 23:21 74:5 87:17 146:20 150:19 152:5 180:14 195:2 206:20 244:19

**grouping** 100:15

**groups** 314:12

**growth** 337:18

**grunt** 120:21

**GSA** 27:19,20

**guess** 12:13 17:14 25:22 38:11 41:18 48:17 49:22 53:18 56:9 82:17 105:7 109:22 123:8 127:8 128:6 150:9 153:15 154:6 157:6 168:18 170:3 183:6 209:11 210:4,8 214:10 244:2 251:9 264:1 273:7 274:19 275:5 277:9 283:4 286:11 302:8 314:2 341:13 345:11 346:20 355:9 357:1

**guessing** 17:1 280:16

**guidance** 329:1,14 330:3

**guys** 33:12 320:7

### H

**half** 165:21 206:21 253:1 272:2 329:20 330:1

**hall** 51:4

**halls** 51:4 359:12

**hallway** 168:4 170:9

**hallways** 170:13

**hand** 161:5 164:2

**hand-designate** 329:13

**handled** 184:16

**handoff** 185:1

**hands-off** 70:16

**hands-on** 16:4

**Hanson** 22:16 23:12 25:1 204:12

**happen** 95:7,8 108:11,14 121:14 147:15 170:20 285:20 359:9,17

**happened** 76:21 131:19 237:3,6,10

**happening** 80:15 112:2 163:20 231:15 258:15

**happy** 75:1 249:16 280:15

**hard** 54:9 72:2 79:18 120:19 159:6 207:14 328:12 337:17,19

**harder** 305:22 306:8

**head** 7:8 155:21 289:16,17 314:10

**healthy** 347:4

**hear** 140:16 210:15 265:10 295:18 314:1 330:22

**heard** 25:21 73:11 106:8 138:7,8 139:4 142:14,16 154:15 165:5,12 250:10 253:19 295:22 296:9 300:13 347:16

**hearing** 109:2 264:3

**heating** 24:10

**held** 10:18

**helped** 304:6

**helpful** 22:18 47:8 89:21 159:15 348:7

**helping** 100:19

**hey** 122:15 263:20

**high** 163:20 350:20

**high-rise** 13:4

**higher** 180:12 181:4,14 182:10 199:8 286:5 310:2

**highlights** 243:22

**highly** 138:15

**Hire** 15:22

**hired** 41:14 65:22 69:14 318:22

**historic** 18:7 111:1 244:9

**historical** 201:10 233:9 289:21 291:22 292:1 294:16 313:20 315:1 318:19 355:13

**history** 135:2 194:1 222:20 299:21

**hit** 331:18

**hitting** 127:9

**Hmm** 265:8 316:1

**hold** 10:15 202:2

**holding** 221:2

**honest** 336:1

**honestly** 38:18 139:11 287:6 312:17 346:14

**Hood** 104:20 119:18,19

**Hoover** 187:7

**horizon** 117:10

**hospitality** 9:22

**hours** 79:1 343:2

**house** 24:2 277:7

**hunt** 155:21

**hustled** 148:22

**Hutchison** 22:16 197:19 253:12

**hypothetical** 248:9 249:21 359:22

### I

**i.e.** 281:15

**idea** 72:8 177:5 187:8,16,17,18 194:4,5 212:14 215:5 233:14 277:20 293:17 330:11 358:8 359:6

**identification** 30:11 43:1 100:12 136:15 172:14 191:1 202:9 260:1 309:2 310:19 337:2 344:10

**identified** 101:7 335:5

**identify** 47:9 57:11 305:19

**ilk** 73:5

**illiquid** 161:14

**imaginary** 248:16

**imagine** 54:9 150:13 237:11

**immediately** 26:10,12 124:5 245:1 250:20

**impact** 64:6 108:4 113:17 141:7 168:10 170:17 177:17 183:22 184:12, 15 185:16 186:6 212:8 245:17 274:12 277:8 326:20

**impacted** 108:20 121:13 123:4 185:22

**impacts** 176:13 177:21 313:21

**impeded** 91:22

**implement** 124:5

**implementation** 16:9

**implemented** 321:18

**implications** 65:9 208:7 277:2

**implied** 117:10

**implies** 310:2,3 325:5

**imply** 155:22 310:7

**implying** 196:11 211:14

**import** 57:11 206:4

**importance** 350:20

**important** 19:6 20:11,17 21:2 35:17 37:8 63:9 67:16 70:2 89:7 124:12 130:18 133:3 147:11,14 158:5,6 163:10,15 169:4 224:9 252:14 271:20 304:11 319:1 342:19 347:14

**impression** 94:4 122:5 123:1 125:5 128:12 129:5,8 130:12 131:12 134:2 147:4

**impressions** 128:9 130:22

**improvement** 269:15

**improvements** 129:3

**in-person** 113:15

**in-place** 294:20 295:2,3 299:7 300:11 309:21

**inaccessible** 198:4

**include** 12:3,16 220:11 221:17 242:18 261:17 262:21 263:11 278:4 324:4 335:22 336:7 337:15 340:19 341:15

**included** 9:7 105:12 144:15 157:10 175:9 335:4 336:8 337:12

**includes** 96:6 210:6 231:20 300:17 301:1 323:17 339:22 341:2

**including** 48:19 169:5 180:2 263:12 268:22 353:7

**inclusiveness** 105:11

**income** 108:11,13,15 109:19 133:5 176:20 227:20,21

**incomplete** 328:13 334:3

**inconsistent** 134:12

**inconvenient** 288:15

**incorporate** 356:15

**increase** 327:7,17

**increased** 177:9

**increasing** 302:16

**incredibly** 22:18 62:1

**incur** 274:4

**independence** 33:18 69:19

**independent** 10:11 19:14 33:8 37:5, 7 68:9 69:14 70:7 82:7 95:5 122:9 219:11 220:18 221:8,10 318:22 319:20

**independently** 20:19 21:8,17 26:5 49:9 50:10 174:21 197:13,14 198:7,8 208:2 228:10 248:1 313:9 314:3,20 319:2

**individual** 253:15 359:12

**industries** 12:6,8

**industry** 8:17 12:9 97:19 214:19 215:18 216:11 217:2,9,17,18,20 218:5,16,20,22 250:2 359:18

**inefficiencies** 333:16

**inefficient** 331:11

**inflation** 337:16,18

**influence** 134:3

**information** 19:18 20:5,18 21:7,16, 21 29:11,18 34:15,16 36:8 49:21 72:13 89:2 91:2,15 96:22 97:3,5,7 99:16 100:20 101:4 109:16 110:8 150:20 153:22 156:22 182:16,17 188:11 190:13 206:1,11 217:9 219:8 220:22 221:15 226:4 228:15,16 229:2 248:18 249:22 259:4 274:16 278:17 279:9,15 292:1 307:16 311:7 318:20 346:22 350:18 351:21 353:5,7 354:11

**informed** 19:19 71:12,16 72:21 319:10

**infrastructure** 314:14

**ingress** 168:7 178:9 335:15

**initial** 28:22 35:1 74:8 75:9,11,20 118:3 178:6 241:18

**initially** 76:21 325:2

**initiated** 107:21

**initiative** 35:11 338:22

**input** 49:4,5 50:8 69:17 70:9 189:7, 21,22 190:6 208:9 212:8 213:10 247:4 248:2 251:11 276:18 287:13

**inputs** 52:6 224:15 274:18

**inquiries** 317:18

**Inquiring** 217:4

**inquiry** 225:7 278:22 320:4

**ins** 24:4 271:9

**inside** 114:2 168:6 303:14

**inspections** 90:15

**instance** 16:17 50:19 160:6 169:3 194:9,11 232:1 318:19

**instances** 295:7,8

**institution** 11:3 109:4 110:21 111:15 308:4 349:13 350:20 356:20

**institutional** 68:2,15

**institutions** 308:6

**instruct** 296:18

**instructed** 38:19 40:9 164:21

**instruction** 49:14 50:5 184:9

**instructions** 190:2

**Insufficient** 19:22

**insurance** 12:20

**integrated** 12:18 49:13

**intellectual** 49:19

**intelligence** 36:1

**intended** 218:18 344:12

**intent** 331:10

**intention** 150:21 151:1 205:14

**interact** 163:16

**interactions** 100:2 258:22

**interest** 32:6,11 47:7 49:11 210:2 278:7 349:12,13

**interested** 26:13 29:5

**interesting** 18:6 206:4

**interim** 78:4,9 304:8

**internal** 168:3 258:19 313:12

**interplay** 147:6

**interpretation** 270:20

**interrupted** 59:9

**interruption** 243:3

**interview** 77:11

**interviews** 46:13 206:3,14,15,21,22 207:2,10,12 216:22 276:16,17,18,22 277:6,10,12,15,16

**introduced** 146:4 243:1

**introduces** 285:18

**introduction** 71:13

**intrusion** 62:1,4 244:9

**invasive** 51:1 57:17 62:1 167:21 223:15 224:2 250:3

**inventory** 181:17

**invest** 68:15

**investigation** 216:22 217:1 328:14 334:4

**investigations** 9:19

**investment** 12:17 300:14

**investments** 12:20 303:20 307:18

**investor** 68:15

**investors** 11:6 68:2

**invitation** 103:14

**invite** 173:4

**involve** 48:9 86:19,22 286:9

**involved** 12:10 13:3 17:9 18:5 23:13 25:19 50:16 89:1 100:19 101:1 111:1,3 151:11 167:19 185:7 237:18 241:12 265:3 351:13

**involving** 23:14 219:21

**IPS** 49:13

**IRL** 91:3,10,14

**irrational** 166:4

**isolated** 45:8 50:18 60:14

**issue** 16:18 18:16 31:17 62:1 64:21 65:12 91:9 156:19 162:3 163:1 185:12 190:12 208:10 209:9 240:20 297:4,18 315:4 349:3,4 350:19 353:18

**issues** 19:19 39:16 59:5 63:3 74:18 98:15 126:12 335:16

**item** 21:2,13,18 231:14 232:20 242:21,22 278:3

**items** 57:16 205:20 313:5

## J

**James** 22:16 23:12 204:11

**JANKOWSKI** 172:17

**January** 10:9

**Jennifer** 104:20 119:17

**JLL** 50:12 52:21 54:6,8 57:6,21 76:4,15 77:2,8 90:11 99:19 100:2 104:3,7,12,19 105:1,7,17 119:20 124:22 125:9 197:12 198:7 246:19 247:2,7 250:11,19 251:1,11 252:3,22 265:3

**JLL's** 182:2 246:17 247:22

**job** 331:18 350:4

**jobs** 132:8 233:8

**John** 77:7 105:7 119:17 120:3

**joint** 75:14

**joke** 127:11

**Jones** 49:12

**judge's** 156:18

**judgment** 19:15,19 21:22 110:5,9 255:4

**July** 26:3 33:21 34:5 43:8 85:12,16 86:15,17 87:10 90:10 119:15 172:6,7 197:21

**jump** 270:5

**jurisdiction** 297:19

## K

**KC** 44:13 105:13,16 114:17

**KC-BEATTY0006-0048** 43:1

**KC-BEATTY0200** 32:16

**KC-BEATTY0200-262** 30:11

**KC-BEATTY0405-453** 100:12

**KC-BEATTY0468-520** 172:14

**KC-BEATTY1089-1096** 136:15

**keeping** 359:12,19

**Kennedy** 22:11,13 26:19,21 27:1 28:4,8,12 29:20 30:21 34:12 37:16 40:2 41:15 43:20 47:22 62:3,10 75:2 101:6 119:21 131:11 133:15 136:13,16 140:1 169:16,18,19 174:19 178:18 192:8,14 193:13 200:10,15,22 202:15 203:5,11 206:6 209:6 219:9 225:11,22 226:10 227:13 228:21 229:10 230:15 231:1,16,21 242:13 247:4 251:12 275:21 276:10 289:14 292:8 299:8,16 300:15 301:3 303:4 307:3 311:20 314:5 321:14 332:14 342:9

**key** 206:9

**Khaled** 22:15 23:7,21 26:5 29:7 34:21 36:6 73:10 85:19 87:4,8 91:3,7 105:12,15 113:1,5 114:11 197:18 204:11

**kickoff** 66:20 85:11 86:16 87:5,21 88:10,21

**kind** 17:9 25:19 35:11 47:12 56:8 68:1,7 69:17 91:10 104:1 107:2 112:11 132:1 146:7 179:10 196:22 208:1 232:4 233:20 258:22 272:12 277:19 278:7 279:19 282:8,17 283:1 285:7 298:16 317:12 343:1 355:15

**kinds** 274:7

**knew** 73:10 95:20 149:3 153:10,11 154:17,22 155:2,4,8 156:16 164:13 185:6 221:12 239:21 240:15 247:7 265:19 350:14

**knowing** 47:13 142:12,13 146:16 208:22 209:1

**knowledge** 8:19 16:4 104:19

**knowledgeable** 311:22

**Kristofcak** 58:2 249:2 275:14 290:4 320:15,20 323:7 343:9,13,14 344:20

**Kyle** 6:9

## L

**lack** 38:15 79:12 93:6 95:13 97:17 98:17 102:14 104:9 111:5 122:20 123:14 139:20 186:1 188:6 223:12 266:2 307:1

**Lacks** 38:1 40:4,19 80:4 90:8

**laid** 112:9

**land** 13:3 169:11
**landing** 178:20
**Lang** 49:13
**language** 139:21 140:13
**large** 20:4 140:5 167:19 169:2 195:2 199:6 215:2 218:9
**largely** 9:20
**larger** 72:9 121:14
**Lasalle's** 49:13
**late** 345:12
**laugh** 258:12 296:1
**laughed** 296:1
**laughing** 258:6
**law** 224:22 336:13
**law-making** 321:8
**lawsuit** 6:12,14 39:6
**lawyer** 6:9
**lay-down** 178:10 182:1
**layman's** 11:18 348:6
**lead** 15:19 29:8 34:21 35:2 45:10 87:1,4 88:13 102:11 125:7 215:6 218:20 219:1 223:20
**learn** 29:19 278:17 285:21
**learned** 29:17
**leave** 60:10,15
**leaving** 60:11
**led** 120:2
**left** 30:13 142:2,15 151:13 199:20 200:5 205:15
**left-hand** 137:20
**legal** 41:17 42:5 225:1 270:18 271:13 273:4 299:4 350:10
**legally** 6:3
**level** 12:22 13:1 159:14 162:18 176:11 185:5 234:13 265:5 292:3 315:3 318:5
**level-set** 130:3
**levels** 201:10 233:10 234:2
**liberties** 198:11
**libraries** 13:15
**library** 14:7,21 15:3,18 108:18 185:18 225:19 226:3,13,14
**license** 10:19
**Licensed** 11:12
**life** 57:19
**lifetime** 74:20
**light** 126:1
**limit** 263:2,3
**limitations** 22:3 244:5 344:12
**limited** 263:7
**limiting** 342:15
**limits** 306:7
**lines** 45:2
**link** 242:16
**liquidity** 353:17 355:7
**list** 27:19 28:1 90:18 91:2 203:10 207:1
**listed** 22:17 31:21
**listen** 70:1
**listening** 175:12
**lists** 47:4 114:20 203:18
**literacy** 13:17 14:2,18
**literally** 108:5 115:10 121:4 131:10 146:3 179:4 204:12 246:22 257:7 271:10 329:12
**litigation** 6:10 8:21
**live** 63:15 204:11 278:21 279:6
**lived** 134:9
**loading** 284:14
**lobby** 24:3
**locations** 16:18
**logic** 222:12 224:5
**logical** 52:15 235:3,6,9
**logically** 51:19 61:13 283:14
**logistics** 112:9
**London** 23:12 213:1
**long** 10:7 16:21 45:9 48:20 53:20 57:20 107:14 171:3 211:17 244:18 252:12,17 257:14 258:14,18
**longer** 31:14 54:13 63:4 79:1 126:13
**looked** 55:8,20 81:15 101:6 137:20 153:8 201:18 203:17 223:21 252:10 300:14
**loop** 281:2
**losing** 163:21 287:21
**loss** 185:5 288:3,8 323:15
**losses** 95:21 166:1
**lot** 22:19 43:22 57:14 72:2 91:18 130:19,20 152:10 165:21 166:16 169:11 235:8 280:17 288:5 314:11 330:17 351:17
**love** 184:7
**low** 109:8 287:8
**lower** 180:13 181:4,14 182:10 199:10 231:3 232:4
**lunch** 171:6,18
**Lutnick** 171:22 173:4,14 174:2,9 183:7 187:10 188:10 254:14,19 255:6 256:6,13 257:13 263:20 265:2,11 266:12
**LYNCH** 19:9,21 20:6,14,21 21:9,11, 19 22:6 30:1 32:1,19 34:6,18 36:12, 22 38:1,15 39:2,7 40:4,19 41:9,22 42:15,18 47:3 51:13 52:9 53:2 54:1 56:17 57:7 58:4,10 59:4,9 63:5 65:4, 15 68:12 69:2,8,20 70:12 72:15 77:21 78:15,20 79:12 80:4 82:22 84:14,21 86:6 88:2,19 90:7,20 92:7 93:5,22 94:10 95:12 96:8 97:16 98:17 99:2 100:5,8 102:13 104:8 106:3 110:18 111:5,20 113:19 117:8,15 118:5 122:17 123:7,14 125:1,11 129:10 136:11 137:3,6 139:19 141:10,12,15 142:22 144:6,16 154:10 157:7 163:12 164:19 166:10 170:15 171:8 172:12, 20 180:5 182:11,18 183:2 187:2 188:5,15 189:2,10,13 190:2,19 198:22 202:7 203:15 208:19 209:15 211:10 213:9 215:12 216:1,5,21 217:3,10,19 219:17 220:1,13 221:21 222:18 223:8,19 225:9 229:12 234:15 235:12 239:10 241:8 242:10 245:2 248:3 249:6,10 250:15 251:4,14 252:7 253:5 256:10 259:11,19 260:7 266:2,22 268:16 270:17 273:3,14 278:9 285:13 286:20 288:13 289:9 290:2,10 296:16 297:2,13,17 298:8 299:4 303:11 305:16 306:1,13 307:12 308:11,21 309:11 310:17,21 314:6 317:6 319:5 320:2,10,17 322:4 323:4 325:8 328:5 331:6 332:7 336:10,21 343:7,11 344:6 345:2 349:21 350:9 351:8 352:21 353:10,22 354:6,20 356:5 357:8

M


**made** 41:5 43:7 75:7,11 85:6 94:6,7 118:3 121:18 124:2 130:19 138:21 151:6 156:3 157:5 161:10,11 191:14, 18 201:11 215:16,21 217:5 238:5 243:3 244:7 263:3,6,9 285:10 295:9 331:19 342:7,11 347:11 348:1 350:7 351:11 352:5 356:1

**magically** 126:21

**magnitude** 53:8 54:10 67:7 95:21 248:7 321:5

**main** 17:15 37:22 45:17,20,22 46:2 48:8,10 49:1,8 50:2 52:20 53:19 54:20 55:17 58:13 62:21,22 120:11 123:11 144:3 167:12 170:8 184:7,8, 11 194:19 195:10 197:9 198:4 204:21 208:7 213:4,15 214:4,12,17 215:18 216:9 219:15 222:3 227:10 230:4,13 233:11 235:14 245:16,21 262:6 280:12 282:1 286:8 302:5,20 305:5 307:4 310:14 312:9,21 315:12 343:21 344:14 349:19 357:2,3 358:2 359:12

**maintain** 45:7 61:11 194:18 212:11 245:9 289:16 291:6 294:12

**maintaining** 208:12

**maintains** 69:18 208:2 224:18

**maintenance** 18:5 50:19 53:11 124:15 193:21 323:18

**major** 16:6 168:3 185:11 335:15

**make** 13:14 16:3 17:15 19:19 20:4 35:21 36:1 49:15,22 54:13,14,16 59:4 65:12 68:9 71:19 72:3 81:1 95:1,4 108:22 116:20 120:20 125:8 129:21 140:22 141:1 148:1 157:13,18 161:12 164:2,15 165:3,14 168:5 187:13 190:14 191:20 198:11 207:9 226:6 230:10 236:18 237:11 252:1 264:13 271:4 273:9 278:11,16 279:2 288:7, 11 291:4 297:5 309:3 313:13,21 317:19 322:22 327:1 343:4 346:7,18 353:14

**makes** 24:6 132:20 154:3 354:11

**making** 20:20 91:4 154:18 188:19,21 222:16 270:20 272:15 302:11 309:11 314:17 317:17 324:1 347:14

**manage** 97:20

**management** 13:6,9,12 20:19 22:1 37:16 40:2 41:16,18 47:22 70:10 93:8 105:8 144:15 215:16,22 225:12 268:14 291:14,18,20 292:8 305:14 306:11 307:11 313:12 319:14

**management's** 95:8

**manager** 23:8 35:6 77:8 332:15

**managing** 14:10

**mandate** 224:19

**manner** 126:13

**map** 138:6

**mapped** 312:8,20

**March** 99:1,3

**margin** 291:6

**margins** 57:1

**mark** 30:8 42:15 136:10 190:18 310:20 344:5

**marked** 30:11,12 42:21 43:1 44:12 66:14 80:19 81:8 100:9,12 103:16 136:15 172:14 191:1 202:9,11 204:20 259:18,22 308:20 309:2 310:19 337:2 344:9

**market** 68:19,21 215:4 219:4,16 220:10 221:18

**marketplace** 332:16

**match** 85:13 203:3 240:4

**matched** 240:3

**matches** 199:19

**matching** 291:5

**material** 20:12 22:3 36:8,10 73:21 89:10 93:17 95:9,10,16 148:7 178:11 252:10,11 272:12 356:18

**materials** 174:5 179:1 207:16 237:19 263:3,5,12 283:1 351:2,6 352:10

**math** 308:7,8 338:4

**Matt** 34:1 80:1 86:1,4 119:17 120:14 151:9 189:15,21 226:21 236:7 267:14 345:15 356:7

**matter** 51:8 232:17 247:22 266:8 268:10,15 272:5 273:10,13 348:9

**mattered** 211:17

**matters** 10:3 11:1 12:1 24:8

**maturity** 323:13 328:21 329:19

**meaning** 73:6 76:3 182:4 216:5 232:18 317:8 354:3

**meaningful** 234:17,18 259:8

**means** 6:21 37:7 38:4 47:1 59:20 101:19 115:8 116:12 118:13 119:13 138:1 142:12 144:1 158:12 196:10 225:14 226:1,11 233:15 271:1,2 273:13 274:1 281:6 286:2 289:4 290:17

**meant** 109:16 193:16,21 195:9 312:7 343:5

**measurements** 329:9

**meat** 90:4

**mechanical** 24:11 57:18 271:9

**mechanics** 163:2,3

**media** 14:18 131:10

**meet** 79:17

**meeting** 38:6 66:20 71:8,17,20 72:3, 4,5 77:18 78:2,5 85:12 86:5,16,22 87:21 88:10 89:7,8 102:7 103:14 105:2,6,9 118:17,18,19,20 121:19 134:20 135:22 136:7,14,17 142:13 147:19,20 148:5,9 150:9 156:3 160:19,21 171:21 173:4,14,15,19,22 174:1,3,4,6 183:7,9 186:22 187:6,11, 12 188:10 204:15 236:3 237:10,15 242:7,12 243:18 254:1,10,17,18 255:10 256:5 257:3,4 264:8,17 265:1, 11 267:17,19 268:4 342:8 346:1,6,13 348:10,22 349:6,7,19 350:17 351:2,9 353:4 355:2,16,21

**meetings** 72:14,17 75:16,17 105:14 146:12 253:16 264:17 297:1,3

**meets** 264:22

**member** 19:7,13,15,18 20:10 21:14, 22 22:1 125:22 174:18 225:11 296:11

**members** 147:7,8 242:20 243:7

**memo** 150:18

**memorandum** 151:20

**memorial** 145:15 206:6,8 209:7,10 210:5,9,17,18 225:5

**memorializing** 119:11

**memory** 17:1 44:1 85:13 107:10 192:10 207:5 243:2

**mentally** 167:9

**mention** 16:3 23:20 99:8 107:15 279:7

**mentioned** 25:1 33:20 42:7 58:6 61:18 92:2 96:12 170:14 244:7 280:5 293:14 320:14

**mentioning** 170:3

**merits** 65:7

**messaging** 26:11

**met** 26:22 27:2,3 120:17 187:6

**method** 51:18 158:1

**methodologies** 312:12

**methodology** 180:20 228:19 229:1,6,9 230:5 310:13 340:9 341:14

**methods** 17:12 65:8 223:5 286:2

**middle** 45:15 59:10 134:13 150:10 181:12 249:6 329:15 341:11

**midpoint** 330:2

**Mikaela** 22:16 24:14 197:19 253:12

**Milburn** 22:15 23:2

**million** 56:7 127:2,14 133:3 135:1,3,12 176:11 183:20 196:17 199:16 203:11 230:18 231:9,11,16,17,19 232:21 233:2 271:20 287:21 288:8,19 289:1,7,12 291:15,16 293:9 294:2,12,19 299:7 300:16,18 303:16,19 308:1 310:4 315:9 316:2 320:21 321:16,21 322:8,16,19 323:5,6 324:2 330:9,15 331:2 332:13 337:9 338:5,12 339:13 340:5,7,18

**mind** 74:4 204:22 205:10 288:6 303:14

**mine** 127:7 175:19 304:17

**ministerial** 26:18

**minus** 260:10 339:18 341:11

**minute** 214:6 237:17 258:14 264:17,22

**minutes** 168:18 243:15 254:17 265:11,17,22

**mis-recalling** 142:1

**mischaracterize** 208:21 283:21

**mischaracterizes** 106:4 125:12 182:12 188:16 208:20 211:11 219:18 220:2 229:15 245:3 250:16 273:15 289:10 314:7 320:3 331:7 332:8 336:11

**misleading** 195:12

**missed** 88:7

**missing** 273:20,21

**mission** 60:20,22 61:2,9,10 64:7 65:10 141:7 194:19 211:9

**mission-based** 205:22 208:14,17 210:2,9

**mission-oriented** 61:15

**misspoke** 28:10 75:8 119:5

**misstate** 347:21

**misstates** 93:22 122:18

**mistook** 63:10,18

**misunderstand** 266:7

**misunderstanding** 170:17 342:19

**misunderstood** 88:12 108:19 342:21

**mitigate** 219:16 221:18 334:12

**mitigated** 65:11 303:7

**mitigates** 219:4 220:10

**mitigation** 157:12 158:21

**mix** 92:6

**Mm-hmm** 35:8 64:5 90:2 98:3 103:17,20 110:4 114:12 132:21 133:17,19 134:7 140:4 150:16 151:10 158:13 160:10 161:18 177:13 182:15 193:18 202:5 203:6,12 210:14 212:4 213:5 220:19 235:7 238:6 243:11 247:20 257:16 292:15 319:18 333:1

**mode** 335:18

**model** 333:3,4

**modeling** 355:6

**modifications** 237:12

**moment** 132:7

**Monday** 43:18 71:11,21 72:20

**money** 16:19 17:16 18:14 68:16 126:21 127:5,22 128:22 129:1 131:4 163:9,21 165:21 196:2 224:8 270:21 272:17 273:12 295:6 299:15 301:2 303:1 304:13 310:8 324:16

**month** 17:3 241:21 273:20

**month-to-month** 286:14

**monthly** 93:2

**months** 17:5,7 55:6,7,14 93:3 94:17 233:21 245:13 272:11 276:7 357:15

**monuments** 24:1,4 33:18

**Moore** 76:5 90:12

**morning** 6:7,8

**motion** 155:16

**motions** 348:1

**move** 56:4 123:20 124:4 146:19 147:2 163:11 244:14 252:2 283:17 297:14,15,22

**moved** 16:10 143:12 158:18 309:18 321:8

**movement** 178:9

**multiple** 16:18 29:8 117:3 129:22 354:7

**multipliers** 280:4

**multiyear** 299:19 326:15 333:4

N

**naive** 155:20

**named** 10:21 11:2 140:8

**names** 89:1 217:15

**naming** 297:18

**nature** 14:19 35:12 62:3 174:8 243:16 257:12 300:4 308:4

**Navigant** 15:11 16:11,14,21 18:17,20

**Navigant's** 19:5

**navigate** 307:19

**Navy** 27:17

**near-term** 233:19

**necessarily** 140:14 263:5 333:8

**necessity** 52:13 79:22 80:2

**needed** 71:18 77:4 95:20 109:18 121:13 244:22 264:4 322:22 346:16 356:14

**negative** 64:17

**neutral** 154:8,12

**new-build** 18:3

**nice** 311:1

**nine-month** 55:6

**no-conflict** 261:18

**nod** 157:19

**nodding** 7:8

**non-availability** 176:21

**nonprofit** 14:1

**normal** 68:7 261:13

**not-for-profit** 15:21 332:20

**notable** 258:11

**notably** 70:16

**note** 157:13 171:17 294:19

**notes** 207:11,16 278:8,13,19,20

**notice** 15:1 92:18 256:6

**noticed** 102:5,6 358:7

**notified** 345:22

**noting** 274:10

**notion** 57:13 285:18

**NSO** 112:4 138:4,5,13,15,18,20,22 139:10,12 143:7,18,21 144:4 145:6,8, 17 184:1,4 208:22 210:16 211:8,21 212:2,6 288:17 289:8

**nuance** 23:17

**number** 18:13 32:20 44:13 77:1 80:13 82:19 83:6 102:20 114:10 160:15 172:16 182:10 185:8 207:21 210:19,21 231:8 236:6 280:16 284:1 285:8 286:12 289:7 293:21 294:21 300:13 301:5 310:2 321:9 323:1 327:6,7,15 331:2 334:18 342:10

**numbering** 48:15

**numbers** 46:12,13,14,15 51:7 82:21 83:1 117:6,11 131:14 137:6 175:4,5, 6,8,14,15,17 179:12 180:12 200:8,9 201:12 203:2,4 227:17 228:4,7 230:5 236:13 288:5 289:15,20 294:1 313:2 314:21 315:4 316:11,15 317:1 324:6, 8 325:13,20 326:9 328:1,9 339:18

**O**

**oath** 6:4,19 171:19

**object** 19:9,21 38:1 141:12,15 296:16 298:8

**objection** 20:6,14,21 21:9,19 22:6 30:1 32:1 34:6,18 36:12,22 38:15 40:4,19 41:9 51:13 52:9 53:2 54:1 56:17 58:10 59:7 63:5 65:4,15 68:12 69:20 70:12 72:15 77:21 78:15,20 79:12 80:4 84:14 86:6 88:2,19 90:7, 20 92:7 93:5,22 94:10 95:12 96:8 97:16 98:17 99:2 102:13 106:3 110:18 111:5,20 113:19 117:8,15 118:5 122:17 123:7,14 125:11 129:10 139:19 142:22 144:6,16 154:10 157:7 163:12 164:19 166:10 170:15 180:5 182:11,18 183:2 187:2 188:5,15 189:2,10 198:22 208:19 209:15 211:10 213:9 219:17 220:1 221:21 223:19 229:12 241:8 242:10 245:2 248:3 250:15 251:4,14 253:5 266:2 270:17 273:3,14 286:20 289:9 303:11 305:16 306:1,13 307:12 308:11 314:6 319:5 320:2 325:8 331:6 332:7 336:10 349:21 350:9 351:8 352:21 353:10,22 356:5 357:8

**objections** 140:22

**objective** 17:15 108:2,7 125:8 244:21

**objectives** 87:22

**objects** 106:7

**obligated** 131:3 153:20 272:22

**obligation** 6:22 153:12 210:13 211:4 212:5 271:12

**obligations** 209:8 224:21

**observation** 219:12

**observations** 74:13 128:11 134:18, 19 205:8 288:3

**occasion** 77:9

**occupancy** 323:14 340:12 344:1

**occupied** 323:15,16

**occur** 285:9

**occurred** 80:11 98:13 153:19 264:6

**occurring** 45:8 46:1 114:2

**October** 161:13

**odd** 277:14 282:17

**off-site** 45:18 138:4,19,22 139:10 145:6 184:2 209:1 210:16 211:8,17 212:12

**offer** 87:12 109:15 168:12 304:11 343:17,21

**offered** 304:11

**offering** 167:18 304:6 307:16 348:19

**office** 13:4 23:13 107:1 112:20 179:19 287:15

**officer** 9:16 10:6,8 26:6,16 44:4 110:20 111:13

**often-used** 24:5

**older** 244:10

**on-site** 91:4 138:5 143:8,18 144:4 211:17 288:17

**One-third** 198:3

**one-week** 107:17

**one-word** 239:7

**one-year** 54:20,21 144:3

**ongoing** 273:1

**open** 45:22 53:17 69:22 91:22 99:10 109:9,10 116:13 123:21 131:7 134:21 167:11 171:2 193:20,21 194:17 195:11 201:9 212:19 231:2 243:6 245:22 267:19 313:19,22 326:18 328:9 333:4 341:8 347:4 349:2,4 359:13,19

**opened** 76:18

**opening** 213:2

**opera** 13:17 14:4 51:4 305:6

**operate** 163:6 167:20 193:2,10 195:20 197:2 201:9 313:17 318:16

**operates** 215:4

**operating** 12:17 23:6,16 24:18 35:9 95:21 106:14 107:5,13 108:11,13,15, 19 109:11,19 111:14 112:4,7,16 118:16,20 128:16 132:22 133:5,8,20 134:17,22 135:2 136:6 140:19 145:7 160:6 163:16,20 165:17 166:1 174:14,16,21 184:10 185:5 199:15 203:2 228:2 232:3 233:6,19 235:2,22 236:13,15,16 247:13 275:12,13,18 276:19 277:7,8 279:21 288:2,8 289:19 290:11,19,22 291:2,6,9,11 301:19,21 302:10 303:2,10,17,18 304:14 313:18 315:8 318:14,17 331:21 332:6 333:10,16 340:4,6 353:12 356:18 358:4,8

**operation** 184:5

**operational** 44:16 45:5,17 277:1 328:4

**operations** 12:1,15 13:1 17:13 45:7 61:15 108:5,6,8,9 186:16 245:9 292:2 318:5

**operative** 335:1

**opining** 187:21

**opinion** 37:3 39:11 40:1 63:11 156:19 167:16,17 168:12 186:11 216:4,8,14,17,18 219:11 220:10,16, 21 221:2,8 247:10,11,15 306:12,22 307:6 343:21 344:13

**opinions** 41:3 152:4 161:17 243:17 261:17

**opportunity** 25:20,22 175:4 264:16 350:17

**opposed** 244:18

**opposite** 45:12 153:16

**option** 37:21 63:17 64:16,17 124:17 143:2,4 145:4 151:14 245:15 347:6

**options** 37:11 50:15,16 64:4 151:18 213:15

**oral** 86:3

**oranges** 317:14

**order** 19:18 30:10,14 166:8 274:5 341:10

**organization** 13:13,18 14:9 41:19 133:12 186:18 296:14 307:21 319:11

**organized** 26:13 76:21

**organizer** 173:5

**orient** 47:11 172:8

**orientation** 109:13

**original** 32:10 65:20 241:4 278:1

**originally** 15:13 45:4 77:18 79:1

**outcome** 36:11,19 37:17

**outer** 106:22 107:1

**outline** 149:6 151:21 240:3

**outlined** 46:6 149:2 229:7

**outlining** 112:22 150:22

**output** 60:14 150:8 239:3

**outreach** 19:3 26:18 28:22 33:21 34:12

**outs** 24:4 271:10

**outset** 47:19

**outstanding** 157:5

**overarching** 85:3 317:7

**overlap** 55:3

**overlapped** 55:5

**oversight** 157:18

**overstate** 109:9

**overstatement** 61:22

**overview** 22:21 146:7

**overwritten** 192:5

**owners** 11:6

**P**

**p.m.** 171:10 259:15 320:12 345:5

**pages** 66:14 82:16,17 101:11 103:16 136:20,21 157:16 214:8 254:20 265:5 343:1

**paid** 88:8

**paint** 131:3

**pairs** 81:6

**papers** 40:10,12

**paragraph** 268:9 269:13,19,21 270:3,5 280:16 290:1 294:19 322:5 328:10 334:1 343:5,16 344:11,18

**paragraphs** 279:5,13

**parallel** 311:1 317:5

**park** 284:13

**parking** 121:2

**parlance** 348:6

**part** 9:7 20:4 23:21 27:13 65:14 66:5 72:2 89:11 90:22 153:8 180:17 206:20 234:21 238:20 239:19 247:3 260:10 276:17 287:12 297:2 321:11 336:5 353:6

**partial** 247:21 292:13

**partially** 24:18 61:11 109:9 167:11 193:3,4,11 194:10,11,12,18 195:8,9,10,20 196:10 197:2 204:20 231:2 245:22 339:9

**participants** 87:5 88:22 242:14,15

**participate** 33:14

**partly** 196:5

**parts** 70:10 195:16,18 292:6

**party** 144:21

**pass** 71:6

**passed** 143:5 348:2

**past** 25:2 53:10 124:15 272:3,11,20 319:4

**patchwork** 45:9 50:15

**path** 158:21 347:6

**patron** 359:15

**patrons** 225:14 226:11 233:16

**pause** 82:20 168:16 248:19

**pay** 162:6,16 163:9 301:21 302:12

**payroll** 164:3,15 165:4,14

**peaks** 181:12

**peg** 161:2

**pending** 8:6,7 347:5,18

**people** 43:22 44:5 75:4 78:22 122:15 167:8,13,21 168:6 176:13 185:18 217:13 233:8 242:5,15 243:12 244:16 258:18 283:17 294:13 314:17 342:10

**people's** 168:10 303:2 343:2

**perceived** 147:2

**perceiving** 221:4

**percent** 56:1 177:8,9,15,19 178:1 181:1,5,10 183:13,14 196:15 198:16 280:8,18 281:8,9,10,15 282:2,3,4 284:5 285:4 286:4 293:12,14,21 294:4 328:11,20 329:17 332:2 333:9 334:15 337:15 339:4 340:1,12,13 341:15,19

**percentage** 180:21

**perform** 55:1 57:4,7 68:1 79:11 158:22 159:20 323:2 324:20

**performance** 51:4 108:19

**performances** 211:19 326:12 357:3 358:1 359:7

**performed** 50:5 135:18 219:12 326:12

**performing** 13:6,9,12,13,16 14:5,11,13,21 25:4 51:11 61:1 96:18,19 139:7 168:20 169:19 179:21 215:7,16 219:22 220:5,7 268:14 287:14 304:21 305:4,14 306:9,11 307:11 319:20 359:17

**perimeter** 45:14

**period** 45:9 49:7 61:13 62:11 63:4 68:7 70:17 78:7 79:10 82:3 93:9 107:17 184:11 198:14 199:12 230:11 233:12 242:1 246:2 247:3,9 252:5 253:10,19 259:2,6 268:6 272:20 285:5 287:2 294:3 301:7,11 303:8 304:8 311:19 318:8 321:20 337:18 345:11

**periodic** 58:16

**periods** 199:8,9

**permit** 78:17

**permits** 78:14

**person** 11:19 26:22 36:18 101:7,8,10

119:22 120:18 139:14 185:6 305:21

**person's** 22:22

**personalities** 70:5

**personally** 25:12 79:16 101:1 193:9 220:6,8

**personnel** 217:4,11,12 314:16

**perspective** 109:15 120:15 121:14 186:14 187:1 247:7

**phase** 81:18 82:7 127:18 169:12 260:22 325:22 341:2,3

**phased** 45:22 50:16 53:6,21 54:21 63:2 124:13 126:12 143:18 177:6 197:3,8 213:7 290:19 302:9 303:8 305:6,8 307:5 314:4 317:10 321:22 322:20 323:2,10 325:3,22 326:15 327:3,13 358:11

**phases** 55:5 81:11,13 83:12

**phasing** 44:16 62:17,18 181:19 321:18 324:4

**phone** 206:19 257:9

**photographs** 120:8

**physical** 10:1 53:10 61:8 62:6,7 136:21 146:9 167:22 176:17 283:8

**physically** 58:15,18 237:16

**pick** 284:10

**picked** 160:14

**picking** 180:22

**piece** 39:13 341:10

**pieces** 29:18 132:4 139:21 331:12

**pipeline** 19:1

**piping** 51:21,22 52:2

**pitch** 25:22 42:22 43:3 80:20

**pitched** 81:1

**pivot** 237:8

**pivoted** 253:20

**place** 158:3 167:6 272:8 295:5 299:10 318:18

**Plaintiff** 8:21

**Plaintiff's** 100:20

**plan** 61:8 127:18 284:11,19 321:12 346:17

**planned** 79:1 124:5 127:6,14

**planning** 274:4

**plans** 274:5 329:7,10

**plant** 62:6

**plaster** 287:9

**play** 60:21 109:22 143:15

**plaza** 121:5 359:2

**pledged** 299:20

**pledges** 109:19 209:3,4 227:20,21 278:4 295:3

**plenty** 131:4 239:15

**plumbing** 57:19

**pocket** 306:4

**point** 8:2 18:17 34:14 53:10 62:7 66:7 71:3 117:9 120:20 146:20 152:2 171:21 174:20 192:9 194:13 198:13 199:3,14 205:21 208:15 214:16 216:6 233:17 238:1 253:18 255:10 256:12 286:3 291:4 299:17 302:12 306:5 320:6,13 349:18 350:5

**pointed** 286:6

**points** 29:9 214:16 235:11

**pool** 140:6 300:11

**population** 182:2

**portfolios** 12:21

**portico** 358:17

**portion** 51:21 310:4

**portions** 46:2 50:21 58:17 199:6 274:3

**posit** 359:22

**positing** 247:18

**position** 9:14 110:21 111:8 153:14 160:22 161:2 212:15 215:2 218:8 228:14 352:6 355:2,7,15 356:13

**positioned** 33:16

**positive** 107:6 169:4

**possession** 76:9 110:12

**possibility** 48:5 53:19 144:2 272:11

**possibly** 248:7 251:21 317:13

**Post-it** 171:17

**postdate** 75:1

**posture** 301:20

**potential** 23:6

**Powerpoint** 190:21

**practical** 271:15 272:5

**practice** 11:22 76:18 192:5 214:20 215:19 216:11 217:2,9,18,20 218:5, 17,20,22 278:11 349:17 359:18

**practices** 157:18

**precise** 329:9

**precisely** 299:9

**precision** 122:20

**predicate** 114:1,5

**predicated** 328:3

**prefer** 97:10

**preference** 36:19 37:16 38:4,19 114:6

**preferences** 36:11

**preferred** 37:21

**Preliminary** 81:18

**premise** 252:4

**preparation** 8:10,14 112:9 237:2,19 241:13 269:15 351:21 357:15,16

**preparations** 236:3

**preparatory** 272:12

**prepare** 71:19 72:9 236:7 262:3 342:6 346:12

**prepared** 29:12 174:21 175:5,6,7 228:6 238:21 241:2 251:2 255:2,18 265:4 276:12 342:4

**preparer** 110:13,17

**preparing** 134:9 156:6 204:10 217:7 236:18 237:20 254:15 277:21,22 278:1 342:1 351:13

**prescribed** 300:2

**presence** 38:7 346:2 352:1

**present** 9:14 10:5 75:16 153:12 155:5 160:5 161:9 175:4 187:8 197:8 226:4 324:10 346:5

**presentation** 39:21 40:16 41:5 43:7, 19 65:1 82:9,12 84:3 85:5 118:3,6,11 135:5 137:10 138:10 152:20 153:1,3, 9 156:7 157:6 159:17 171:22 173:21 174:3,9 175:9,19 187:13,22 188:21 189:8,19 190:21 191:7,10,14,17 203:4,18 220:12 227:1 235:9 236:18 237:21 240:11,13,18 241:14,19 242:8 243:4,5 244:5 254:8 261:8,14,18 262:4 278:1 279:18 294:22 317:19 346:18

**presentation-oriented** 151:5 152:6

**presented** 19:20 20:5,11 25:12 43:13 52:8 74:8 115:10 134:5 135:13 136:6 142:2 143:9 151:18 154:1 160:7 183:8 187:1 188:3 192:8 197:22 262:19 266:1 339:16

**presenting** 21:5 64:20 72:8 145:9 154:7 188:12 195:21

**presently** 343:22

**preserve** 151:22 222:15 223:1,4 225:5

**preserves** 222:4 270:8

**President** 295:20 298:6 300:18 301:3

**pressure** 330:17 331:16,17

**pressure-test** 294:11

**presume** 173:21 204:5 222:20 243:1 266:17 291:22

**presumption** 233:7

**pretty** 46:9 66:21 67:20 68:10,21 77:5 99:20 109:8 135:1 266:12 288:21

**previous** 40:8

**previously** 40:2,17 41:7 42:7 81:15 260:21 345:13

**pricing** 47:21 328:16 334:6 337:20

**primarily** 289:8

**primary** 22:22 65:12 125:8 244:21

**principal** 12:12

**principally** 25:7,9

**prior** 8:22 27:3 28:4,7 31:20 33:19 34:1 74:16 118:10 133:16 168:19 171:22 187:6 188:14 215:11 230:3,21 231:8 267:11 275:20 290:14

**prioritize** 130:7 171:2

**Priority** 57:10,11 159:7 335:12 336:1,2

**private** 12:20

**privilege** 189:11

**probe** 297:11 306:6

**problem** 56:8 62:22 125:20,21 147:17 291:15 336:3

**problems** 164:6

**procedurally** 347:20 348:18

**procedures** 60:10

**proceed** 221:13 347:17

**proceeding** 31:6 117:19

**process** 28:21 42:8 74:5,6 92:1 98:7 110:14 125:6 134:9 146:2 155:13 159:19 180:18,20 182:3,4 208:5 212:22 225:13,22 226:10 233:15 240:6 256:3 263:3 267:3 274:4 279:4 285:6 286:12 304:15 307:19

**produce** 149:1 150:1,12 151:1,3,22 155:10 239:22 241:22 258:17 262:20 329:10

**produced** 8:20 9:8 47:4 101:9 102:1 116:22 150:14 153:3 240:1 250:13

**producing** 107:11 289:4

**product** 152:16 261:4

**production** 22:20 23:10 117:1 192:15

**productions** 215:3 218:9

**productivity** 60:5,17,18 252:20 323:15

**professional** 10:22 11:22 12:14 80:16 110:5,9 158:1

**professionally** 38:5 153:20

**professionals** 9:18 23:3 319:10

**program** 16:6 33:8 61:5 125:15 181:15 190:22 191:3 214:19 216:10 218:1,4 246:17 253:2 259:21 269:15 272:2 278:7 288:17 295:8,10 300:3 322:1 335:1 337:4

**programming** 14:10,13,16 18:1 45:19 62:10 63:15 64:7,17 65:10 114:2 136:22 145:14 159:22 160:1,2 167:12 178:16 179:6,9 183:22 186:2 200:11 203:5,11,19 205:22 206:8,12, 20 208:6,12,14,17,18 209:2,14 210:3, 6,9,10 211:8,22 212:9,12 213:11,15, 18 214:13 217:11,12 218:15 227:13 230:15 232:9,15 235:17,20 245:17 277:9 278:3 283:10 289:4 301:13 302:5,16,19,20,22 303:18,20

**programs** 112:14

**project** 16:16,17,21 23:7,9,14 25:2 34:21 35:2,6 39:17 49:13,21 50:11 54:10 55:2 67:7 68:8 77:7 105:8,13 155:5 158:5 167:4 168:22 169:9 180:18 185:7,11 224:2 253:9 285:15 294:13 307:22 325:15 329:5 331:1 332:15 333:20 339:4 358:11

**projected** 16:15 18:1,12,18 200:17 315:18

**projecting** 292:12

**projection** 290:14 291:19 319:16

**projections** 109:18 110:1 112:16 228:19,21 229:10 234:14 276:12 291:13,17 313:13 320:1

**projects** 10:2 18:2,13 45:8,10 50:18, 19 53:11 56:14,15 132:2 167:20 181:18 193:21 219:20 321:17 322:1 324:16 326:16

**prolonged** 60:2

**promise** 298:16

**promotion** 298:13

**pronunciation** 171:17

**properly** 184:16 330:18

**property** 12:22 68:3

**proposal** 29:11,12 36:2 47:21 50:2 148:1

**proposed** 81:14 312:8

**proposing** 39:19

**proposition** 307:21

**prospect** 297:11

**protect** 210:22

**provide** 33:8 90:19 92:5 94:22 95:9 149:6,9 174:5 190:6 208:9 212:7 213:10 243:17 244:4 266:15 328:22

**provided** 95:17 96:15 97:1 182:17 189:7 217:8 266:20 292:19 300:17 311:8 321:6 346:22 353:7

**providing** 42:4 69:15 156:20,21 220:22

**proviso** 354:9

**prudence** 156:20

**prudent** 15:22

**prudently** 126:1

**psychology** 10:17

**public** 13:15 14:7,21 15:3,18 45:22 46:3 50:22 97:21 184:17 195:15 198:4 226:2,13,14 247:13 278:7 323:21 330:12 336:13 349:13

**publishing** 14:18

**purchase** 176:13

**purported** 297:8

**purpose** 37:5 118:17 173:18 179:18 266:21 295:12 347:2 348:21 349:19

**purposefully** 253:1 331:10

**purposes** 140:9 197:5 240:19 284:10

**pursue** 154:18

**push** 62:16 95:19 122:16

**put** 27:19 63:14,17 90:4 146:5 149:1 153:13 158:3 169:15 181:22 205:11 226:22 227:3 244:16 249:22 251:22 257:14 278:4 284:12 303:1 313:7 318:12 332:15 333:5,20 335:22 342:20 359:1

**putting** 159:6 204:15 211:1

**Q**

**qualification** 53:7 161:20

**qualified** 161:17,22 162:1

**qualifies** 102:4

**quality** 20:3 79:4,6

**quantities** 328:14 334:4

**question** 7:13,16 8:6,7 16:12 27:14 39:7 47:17 53:3 56:19 59:13 63:10,19 95:15 99:14 117:10 122:10 124:8,11 130:13 132:22 141:16 148:17 160:18 164:1,13 180:9 188:18 209:3,16 222:22 223:3,9 226:8 233:21 234:12 237:4 241:9 249:9,21 250:22 251:9 266:5 292:7 297:14 299:9 303:21 306:14,16,19,20 307:9,16 312:1 313:17 317:15 319:6 326:6 327:19 328:1 347:5 357:1

**questioning** 107:16 110:15

**questions** 7:20 9:11 24:11 40:9 58:5 66:11 70:19 89:6,22 154:14 217:6 221:5 243:7,13 249:13 252:13 258:13 275:15,18 288:4 317:17 320:16 346:8,17 347:14 355:20

**quick** 67:20 258:2 320:8

**quickly** 80:21 135:21 172:8

**quoted** 234:9

**R**

**raise** 18:13 299:11 303:16,19 304:7 324:16 353:15

**raised** 310:3,5

**ramp** 166:12 212:13 215:1 318:9

**ramp-up** 304:9,15

**ramping** 166:21

**ran** 131:15 225:17

**range** 160:13 330:3

**rapidly** 244:11

**rash** 343:1

**rate** 27:20 161:5,6 180:3 290:12 291:1

**rates** 180:2

**ratify** 350:6,12

**ratifying** 267:11

**raw** 13:3

**reach** 27:8 45:13,17,18 48:19 53:17 64:22 112:14 138:4,5 145:7 184:4,5 195:16,18 197:13 205:22 206:12 210:19 219:5 222:8 223:6 225:5 316:17 359:2

**reached** 135:13

**reacted** 238:15 240:10

**reacting** 127:10

**reaction** 47:16 121:12 167:16 239:7 247:17

**read** 39:10,14 40:10,12 59:12,14 67:4 82:8 129:12 156:18 198:5 199:17 224:1 232:13 234:4,6 244:1 254:21 265:7 267:18 291:20 320:17 333:22

**readdress** 254:8

**reading** 40:1 224:21 264:20 265:17 269:2

**ready** 74:19 255:3 329:8

**real** 9:22 10:19,22 11:1,5 12:1,9,16, 17,19 15:14 185:2 192:20 222:22 288:7 315:4

**reality** 358:10

**realize** 65:9 198:10 283:2

**realm** 14:3

**Realtime** 32:13 59:14 142:9 234:6 343:18

**rearrange** 320:9

**reason** 49:20 52:13 95:9,10,17 115:16 118:9 194:10 201:2 258:7,8,9 263:2 292:11,18 293:1

**reasonable** 68:19 150:12

**reasonableness** 110:10

**reasons** 98:5,12,14 323:12

**recall** 18:20 29:2 38:18,22 40:22 41:4,12 43:6 46:7,19 47:12 71:4 72:12 76:14 78:3 86:8,10 90:22 93:11,20 101:11 104:12,17,21 105:4 106:2 116:6,17,18 119:8 136:5 138:11 139:9 141:5,19 147:18 152:13,18 160:20 161:1 171:17 183:7 201:22 207:7,20 238:4,18 253:21 254:3,9,12 255:5 259:7 265:14 312:18 314:15 355:1 356:4,7

**recalling** 312:2

**receipt** 187:5

**receive** 46:5 69:18 70:8,9 72:17 89:11 92:3 99:17 110:8 118:2,10 264:9,11,18 276:6

**received** 26:5,12,15 27:7 28:22 29:7 30:21 31:3,9,18,20 35:11 42:12 76:15 100:16 101:8 113:10 115:4,9,21 116:22 117:13 119:2,8 202:15 224:15 228:8 229:10 275:21 276:9 351:5 352:10

**receiving** 27:3 72:12 104:12 106:17 110:1 176:2

**RECESS** 84:22 171:10 259:15 320:12 345:5

**recognition** 298:16

**recognize** 105:13 123:19 137:14 138:9 142:5 143:1,4 145:2 328:12 334:2

**recognized** 11:4

**recognizing** 284:22 293:8 296:15

**recollection** 31:18 32:4 39:4 46:9 75:15 88:17 106:16 107:15 116:2 117:2,6,18,21 173:9 201:17 237:14

**recommendation** 20:13,20 25:16 35:5 37:17 38:13 39:1 68:10,17 70:11 71:19 72:9 75:7 82:14 84:3,12 109:3 123:5,11 152:17,21 154:9,13 155:7 158:10,11 165:16 186:12 245:5,11 246:20 347:12

**recommendations** 20:10 69:16 81:22 83:22 192:22 205:8 269:16

**recommended** 40:3,17 41:7 52:21 157:22 165:20 262:5,14 348:10

**reconcile** 51:15

**reconsider** 154:3

**reconstruction** 247:22

**record** 59:14 83:3 107:10 116:20 121:1 124:1 171:9 234:6,10 240:5 246:22 258:1,4 260:9 285:1 320:11, 18 343:4 345:4

**records** 92:2,3,19 93:1

**recurring** 105:8

**red** 83:1

**redacted** 103:8

**reduce** 18:13 126:21 165:17 176:13 228:14 235:2 283:9,13 292:18 303:18 324:15 334:18

**reduces** 235:4

**reducing** 133:12 283:12 293:2 327:6,14

**reduction** 233:22 234:13,19 235:4 280:9 281:8,10 282:5 286:4 293:13, 14,18 314:16

**reductions** 230:2 233:19 234:11,17 280:5 283:6

**reenergized** 167:8

**refer** 106:11 343:15

**reference** 168:20 203:14 207:10

**referred** 198:9 214:22

**referring** 38:9,11 44:22 161:12 191:11 202:19 234:9 239:14 270:2

**refine** 284:19 285:7,8

**refining** 286:12

**reflect** 23:6 124:2 221:9 281:22 309:15

**reflected** 243:18 253:4 254:18 263:1 265:11 343:5

**reflecting** 108:18

**reflects** 309:4,14

**refreshed** 107:10

**refunded** 295:20

**regard** 102:4 107:8 132:20 157:14 240:12 269:21 329:1 350:2 355:20

**register** 157:11,17 158:8 268:22 269:16

**reinforce** 194:12

**reinforcement** 184:2

**related** 8:16 12:1 59:22 81:2 187:21 261:17 348:22

**relates** 145:8

**relation** 290:14

**relations** 184:17

**relationship** 28:3,7 41:21

**relative** 65:7 307:1

**relay** 189:22

**release** 162:19 255:2,18

**relevant** 109:7 158:10 164:12 180:9 277:6 296:22 297:1 331:3

**reliance** 319:9

**reliant** 252:18

**relics** 279:3,7,8

**relied** 21:7 50:8,11 228:20 250:11 251:1 314:4

**relitigate** 124:10

**relocate** 206:6

**reluctant** 237:11

**rely** 97:5,7 201:19 228:15,17 251:5 313:10 318:15,18 319:22

**relying** 57:6 110:2,3 221:13

**remain** 143:18

**remainder** 209:2 329:19

**remained** 157:5

**remaining** 54:21 134:21 144:5 310:1

**remains** 231:2

**remarks** 168:17 346:12

**remedy** 218:22

**remember** 18:21 26:3 32:5 43:12 48:15 76:16,20 91:1 93:16 101:12 109:13 120:11 131:1 139:11,12,15 145:20 146:15,16,18 161:10,16 172:4 193:14,22 232:11,12 236:13 238:7 242:17 256:11,15 269:1,5 280:17 324:9 334:14 342:1,4 349:3 355:3,5

**remembering** 236:20 335:3

**remind** 197:11 202:22 290:2

**reminding** 148:3

**remobilize** 169:8

**remove** 54:7

**renovate** 193:3,4,11,12 194:12,19 195:20 196:5,11,12 197:3 204:20 218:14 339:10

**renovated** 235:21 280:12

**renovating** 169:3 282:1

**renovation** 15:19 16:9 18:4 45:6 120:5 127:15,19 195:22 197:4,8 199:16 213:8 225:13,22 226:9,10 233:15 244:15 245:22 302:9 322:7 323:3 358:11 359:19

**renovations** 57:2 124:6,21 154:19 196:7 197:17 199:5 205:3 244:22 347:18 349:1 359:11

**reopen** 166:13 247:21

**reopening** 357:15,16,20,21

**reopens** 185:13

**repair** 18:5 45:6,11 51:18,21 65:8 68:4 186:17

**Repeat** 102:21

**repetition** 279:5,8,10

**repetitive** 254:21 265:6

**rephrase** 124:18 223:2 359:20

**replied** 26:13

**reply** 292:7

**replying** 26:14

**report** 8:12,16 9:2,7,8 13:14 15:1 16:7 22:15,18 23:11 25:10 47:2 55:19 56:10 57:6 63:12 64:20 70:21 74:7 76:4,8,15 77:2,5,20 78:4 82:8 90:11 99:19 120:22 124:22 125:10 132:3 149:2,5 150:22 152:1 153:5,13 154:8, 12 157:13,15 167:3 175:10 198:7 202:12 203:1 207:8,15,17 214:5,9 223:13 229:7 237:9 239:22 240:4,9, 10,14,17,21,22 241:1,7,13,16,22 248:1 250:11 251:1,13,17 253:7,20 254:10,16,19 255:6,11,14,15,16 256:8,13,18 257:14 258:17 259:10,22 260:3,10,20 261:6,16,19 262:3,17 263:12,21 264:5,9,11,15 265:4,5,13, 20 266:1,13 267:15,18 268:2,7,11,15, 20 269:22 270:7 273:15 276:15 277:21,22 278:12,18,20 279:20 280:3,11,15 289:22 297:3 308:19 315:21 316:19 317:7 321:5,6,10,19 322:3 324:13 326:9 328:2 336:8,17 342:2,16,21 343:8,10 344:8 345:20 346:9,15 351:18 354:13 356:15

**reported** 299:8

**reporter** 7:4,9,15 30:7

**reports** 76:1,3,5 89:14 90:5,11,12, 15,18 93:2 129:13 131:22 132:2

224:1 313:13

**reposition** 215:2

**represent** 6:11 31:2 100:14 213:19 264:19 312:16

**representation** 31:1 165:5 265:16

**representations** 352:6

**Representative** 6:12

**represented** 92:9 254:14 256:6 261:15

**representing** 222:3

**represents** 330:20

**Reputation** 222:7

**request** 29:11 91:2 100:21 116:20 192:14 239:18 326:10 336:9,13 351:10,11 356:2

**requested** 32:13 92:5 95:4 96:7 99:16 142:9 276:6 343:18 346:2

**requests** 78:9 91:15 102:10

**require** 56:15,22 199:6 294:7 319:20

**required** 57:5 58:7 120:5 162:19 215:1 322:6

**requires** 57:3

**rescinding** 344:17

**research** 28:20

**resolution** 238:2,13,20 352:5

**resource** 346:11 347:1,10

**resources** 357:13

**respect** 55:16 159:21 217:9 221:14 228:20 329:2 350:7 359:18

**respond** 32:6 100:20 356:9

**respondents** 35:22

**response** 190:14 356:8

**responsibilities** 11:21

**responsibility** 14:17 16:8 19:14 22:19 23:8 24:7 25:15 35:10

**responsible** 9:17 14:10 15:4 25:8,9 35:4 36:18 204:10

**rest** 329:17

**restart** 99:14

**restoration** 24:3 45:19

**restricted** 140:2,12 295:4,17

**restriction** 162:18

**result** 125:7 331:14

**results** 64:22 107:13 111:1,14 118:16 253:7

**retain** 16:14

**retained** 41:16,18 71:14 85:8 220:18

**retention** 85:5

**rethinking** 126:8

**return** 52:3 70:18 77:13 128:4 196:9, 19 235:17 268:5 298:6 301:2

**returned** 295:20 296:4

**revealed** 252:22

**revenue** 95:22 109:4,9 112:7 132:11 160:1 166:8 175:15,17 176:10 179:9 185:2 187:9,22 188:13 200:11 227:12,18 230:15,18 231:1,3,16 232:3 233:19 274:19,22 275:8 278:6 279:19,21 281:12 283:7 287:13,15 290:14 291:5 293:22 294:2,5,13 315:11,15,18 316:15 319:17

**revenue's** 109:8

**reversed** 153:2

**review** 8:11,13,20 9:1 37:5 49:20 67:2 76:8 77:2 89:21 93:17,21 173:20 238:13 251:7 264:16 355:13

**reviewed** 8:12 16:11 29:21 98:21 133:16 251:13,16 308:14 353:6 354:11

**reviewing** 111:2 131:22 346:9

**revising** 117:22

**revisit** 122:12

**revitalized** 184:18 235:21

**revolving** 197:9

**RIF** 318:7

**ring** 159:2 345:16

**rings** 137:18

**ripping** 287:9

**risk** 68:16 141:7 157:11,12,17 158:8, 20 268:22 269:16 340:12

**riskier** 304:17

**risky** 307:20

**Robinson** 26:17 44:3

**robust** 76:6

**role** 9:14 10:9 15:17 19:13 22:22 35:3 109:22 208:4

**rolled** 232:18

**roof** 120:12

**room** 39:12 91:5 102:6 187:15 210:12 342:10,11 345:2

**rough** 93:14,17,21

**roughly** 33:21 76:14 82:2 101:11 119:9 135:3,11 198:20 254:20 256:7 265:5 338:5,19 340:22

**round** 294:1 339:17

**rows** 340:10

**Royal** 11:3

**rules** 9:10 178:4 180:16 328:22 329:1

**run** 16:19 17:16 161:5,6 162:14 243:21 294:13 332:19

**running** 11:21 164:15 166:9 292:9 300:1 304:5,22 305:4 306:9 314:19 357:5

## S

**safe** 344:14

**safety** 57:19 60:20 280:19 282:13 335:16

**sake** 13:19

**salaries** 302:13 303:2 352:17

**salesperson's** 10:19

**San** 13:15 14:6,20 15:2,18 226:2,13

**Santa** 10:17

**satisfied** 142:18 150:4

**scaffolding** 50:22 286:10

**scale** 330:5

**scenario** 24:17,18 51:2,10 52:8 54:19 111:17 112:5,16 116:7 139:18 140:17 144:9 145:7 166:15 183:13,14 196:1 197:7 205:14 213:4,6,16 219:3, 13 227:11,16 228:20,21 230:3 234:3, 14 235:16 245:1 247:18 274:13 294:7 301:11,17,22 302:1,4,18 304:2,6,16 307:17 311:17 312:3,6,7,11,20 313:15 315:12,13,14,19 316:20 317:10 319:3 322:12 323:10 324:21 325:15 327:13 330:10 331:5,21,22 332:3,6 333:10,16,18 338:12 339:3 340:4,6,11 348:11

**scenarios** 23:6 44:16 45:15 46:5,10, 17,20 47:2,5,13 48:1,4 51:12 52:4,5

53:1 106:1,9,15 108:6 112:1 113:11, 18 114:17,21 115:22 117:3 118:2,10 129:9 134:4 136:6,22 137:22 138:12 141:9 145:22 148:13 164:4,12,18,20 187:4 193:8 195:7 200:21 201:5 212:8 213:12 224:12 246:3 276:9 277:2 285:11 308:9,15 311:3,12,21 312:12 317:5,7,8 327:9 340:17 341:16 350:8 357:10

**schedule** 17:11 24:16,17,19,21 27:20 49:13 54:6,8 55:2 57:22 59:1,6, 16,21 60:1,2,18 61:19 66:18 69:6 79:17,22 80:2,7 81:3,14 83:11,15,18 84:11 98:4 181:11 223:21 250:12,20, 21 251:1,8,20,22 252:16,20 253:9 270:8 271:19 286:1

**scheduled** 71:8,17,20 146:21 246:18

**scheduling** 80:2 87:18

**scheme** 68:22

**scientifically** 287:19

**scope** 17:12 19:5 22:1 23:8 26:7 54:12 79:6 126:19,21 129:21,22 130:1,2,7 153:1 155:6 157:10,19 167:1 217:1 223:22 246:21 248:7 262:10 268:21 269:6,18 296:17 323:10 331:4 336:8 337:11,21 338:14,15,18 344:12 354:12

**scopes** 55:11,22

**screen** 43:13 244:17

**scrutinizing** 107:13

**Sean** 22:16 24:15 85:19 87:9 197:18 253:12

**searched** 101:7

**season** 139:10

**seat** 109:1 176:17

**seats** 176:22 177:6 178:15 179:5,6

**Secretary** 171:22 173:4,14 174:2,9 183:7 187:9 188:10,12 254:14,18 255:5 256:6,13 257:13 263:20 265:2, 11 266:12

**section** 44:15 67:12 270:7

**sections** 205:3 255:22

**secure** 81:2

**security** 323:18

**security-maintenance** 119:22

**segment** 51:22 291:12

**selected** 146:5

**sell** 278:5

**Senate** 24:1,2

**Senator** 351:12 356:1

**send** 155:10 192:7

**sender** 115:5

**senior** 77:7

**senior-most** 23:2

**sense** 35:7 273:9 354:11

**sensing** 249:14

**sensitive** 356:17

**sensitivity** 159:1,11,20

**sentence** 218:3 271:18 273:10 343:20

**sentiment** 146:20 147:1

**Sents** 101:8

**separate** 41:20 164:6 209:7 231:14 265:3 293:14 310:8,10 357:12

**September** 92:22 267:10 268:6 270:14 271:22 272:18,20 273:2,12 342:5,8 345:15 348:22 355:2

**sequence** 32:8 48:15 56:4 71:5 72:19 241:10 261:13

**sequencing** 274:8

**sequential** 252:17 322:7,12

**sequentially** 305:8

**serial** 55:12 132:14,16

**series** 176:19 206:15,20 321:22

**serve** 225:14,22 226:11

**service** 61:12

**services** 33:9 232:8

**servicing** 352:16

**session** 243:14

**set** 46:12 71:15 73:22 105:8 109:11 125:9 135:12 159:8 160:7,8,12 194:22 197:1 283:17 301:10 326:15 329:7 357:12

**sets** 71:18

**setting** 163:3

**setup** 107:2

**seven-year** 321:20

**severe** 121:22

**severely** 250:2

**severity** 121:16 123:19 126:8 130:20

**SGH** 24:7

**share** 172:21

**shared** 189:16

**Sharefile** 260:19

**sheet** 324:11

**Sherreard** 22:18 204:12

**shining** 121:4

**shoes** 211:2 264:15

**short** 252:13

**short-form** 151:2

**shorter** 54:14 61:13 235:19 270:8

**shortest** 55:21

**shortfall** 301:19

**shortly** 125:10

**show** 29:13 120:4,7,8 154:2 212:19 238:11 268:4

**showed** 107:10 131:10 134:12 187:5 237:15

**showing** 350:4

**shown** 248:12

**shows** 55:13 330:3

**shut** 45:12,16 50:20 53:12 58:17 170:4 194:6 198:17,21

**shutdown** 48:18 56:16,22 57:3,5 58:7,9,11,13

**shutdowns** 58:16

**shutting** 199:6

**side** 6:11 17:17 128:13 129:7 132:10, 11,22 134:3 137:20 184:20 187:9 214:13 233:1 274:5,19,20,22 275:1,6, 15,18 276:19 277:7 287:11 289:19 294:18 320:16 338:9 359:4

**sign** 115:3 320:17

**signage** 167:22

**signature** 103:18

**signed** 31:4 39:6

**significant** 27:17 68:10,15 169:10 185:8 250:3 273:11 314:16

**significantly** 133:22 233:13 288:18

303:10

**silly** 297:7 358:7

**similar** 11:5 74:18 169:1 219:19,21 321:4

**similarly** 318:14,17 340:3

**simple** 60:9 327:22 337:16 358:22

**simplistic** 170:9

**simply** 29:1 51:19 61:3 110:2,3 124:21 176:11 235:19

**simultaneous** 89:20

**simultaneously** 185:10

**single** 12:21 275:10

**sir** 216:12 248:21

**sit** 312:17

**site** 45:13 50:21 53:12,14 61:15 76:18 132:6 167:8,14 169:7,14,16 184:10 195:14 247:14 314:17 323:20

**sitting** 18:22 103:12 109:1 111:13 162:20 272:1 283:2

**situation** 123:19 124:1 150:17 166:5,6

**six-month** 55:5

**size** 260:18

**skipped** 293:10

**slamming** 194:5

**slide** 81:8 83:10 135:12 136:22 137:19 145:19 149:10 150:5 151:7 152:20 153:9 156:7 189:8 191:7,9 204:20 230:21 231:9

**slides** 134:6 148:11 150:19 152:8,10 186:20 192:20,21 197:1 237:12 240:2,3,12 243:5,19 244:1 254:3 261:21 262:22 288:12 294:22

**slow-rolling** 194:5

**small** 50:18 83:2 102:19 202:22

**soffits** 57:15

**soft** 129:2 159:6 274:4,22 323:19 328:12

**soft-spoken** 120:18

**solely** 243:2

**solicitation** 26:7,14,15 27:3,7 29:1, 3,13,21 30:14,20 31:17,20,22 34:11 35:21 42:8,12 44:9 66:6 330:12

**solution** 291:16

**solved** 63:1

**sort** 9:10 13:22 17:16 18:7 26:10 27:13 29:17 33:11 43:17 47:11 51:17 52:5,6,15 62:11 66:5 67:20 68:3,22 75:7 78:4 85:2 88:21 105:8 106:22 107:17 116:11 119:21 120:15 121:8 122:14 128:7 129:7 132:20 138:14 144:10 147:19 151:1 152:12,15,21 157:21 158:7 163:11 166:4 167:8,16 169:1 174:2 176:18 188:10 190:6 195:3,6 205:8,11 209:2 218:13 228:18 231:20 241:15 242:20 250:11 257:19 261:7 283:16 285:11 294:11 297:18 311:20,21 314:3 319:16 320:8 325:4 326:8 330:12,20 331:3,10 335:1,15 337:11 340:4,15 346:5,12 347:20 349:12,19 355:1 357:22 359:16,18

**sorts** 226:22

**sound** 24:6 305:11 306:18

**sounded** 62:20

**sounds** 50:14 54:18 93:15 121:11,13 135:11,22 211:7 230:1,3 266:11 275:20 286:11 289:6 304:16 306:7 307:20 319:19 333:15 349:16 356:16

**source** 46:7 89:2 175:12 209:4 229:2 232:20

**sourced** 204:6

**sources** 11:7 12:19 17:21 18:9 95:22 109:14 129:18,22 133:6 183:16 186:14 227:18,20,22 228:3 301:20 353:2

**SOW** 263:15 269:10 311:14

**space** 61:4,5 160:2 178:17 179:3,7,9 200:11 283:8,9,10 284:16

**speak** 120:2 357:22

**speaking** 56:20 227:16 339:17

**specific** 14:12 140:9 141:16 180:1, 11 215:4 219:7 256:14 295:8

**specifically** 19:4 55:15 66:8 95:16 145:14 214:11,22 255:8

**specifics** 181:16

**speculate** 318:16

**speculating** 166:13

**speculation** 34:7,19 36:13 37:1 52:10 54:2 68:13 69:3 77:22 93:6 95:13 97:17 102:14 104:8 111:6 117:16 139:20 141:13 144:17 166:11 170:16 180:6 188:6 266:3 299:5 305:17 306:2 336:11 349:22 352:22

**speculative** 299:13

**speed** 82:18 83:6 253:3

**spend** 126:7 165:21 303:17,19 304:13

**spending** 163:18

**spent** 272:18 309:16 310:8 350:21

**spin** 208:1

**spirit** 105:11

**splitting** 252:16

**spoke** 113:1 267:13

**spoken** 86:8 90:12

**spreadsheet** 117:4,7 204:13

**square** 205:12 265:21

**stack** 56:1

**stadium** 168:22 169:12,18,22 170:6

**staff** 46:14 165:17 190:10 228:13 233:13 234:1,8,10,13,17 235:4 237:16 242:14 278:13

**stage** 178:11

**staging** 280:19 282:12,16,19,20 283:3

**stairwell** 178:20,21,22 179:2

**stairwell-type** 335:16

**stairwells** 178:19

**stamped** 329:8

**stand** 78:7 110:15 112:16

**standard** 66:21 88:21 104:2 221:2

**standards** 180:16

**standpoint** 186:13

**stark** 74:13 194:22 356:19

**start** 91:4,6,10 123:3 128:12,19 129:4,8 130:12 133:7 134:1 181:3 196:21 252:4 287:9 326:10 345:11

**started** 26:10 129:13,16 146:3 197:21 279:22

**starting** 30:14 76:12 132:5 197:2 237:8 320:21 324:3,5,6 325:2,6 326:8

**starts** 205:3,4 272:10

**state** 37:13 38:5 56:11 62:7 68:4 83:3 120:15 121:12 126:1 128:9 143:15 322:6 344:11 356:3

**stated** 280:3

**statement** 29:22 31:5 33:5,7 55:19 66:5 81:15 83:11,21 152:12 216:19 218:10 226:9 241:5 260:22 269:12

**statements** 89:17 93:2 94:14 110:11 111:4 140:14 201:8 221:13

**States** 11:4

**stating** 352:10

**status** 78:5 99:5 347:4

**statute** 271:10

**statutory** 224:19

**stay** 201:9

**stayed** 106:22

**stems** 224:6

**Stenographer** 32:14 59:15 142:10 234:7 343:19

**step** 266:10

**stepping** 19:12

**steps** 158:8

**stop** 145:18 263:13,18

**stopped** 121:3

**stopping** 117:21

**storage** 178:19 179:2

**store** 287:15

**straight** 283:15

**straight-lining** 177:15

**strategic** 18:16

**street** 11:19

**stretch** 345:9

**Strike** 227:7

**striking** 297:17

**strong** 70:4

**strongly** 123:1 150:12

**structural** 56:22 57:15,16 58:8

**structure** 91:8

**structures** 198:4

**struggle** 49:19

**struggling** 49:18

**studied** 162:17

**studies** 89:14

**study** 65:12

**stuff** 287:9 335:17

**subcommittee** 72:14 146:12 157:6 160:21 168:13 172:1 192:2 253:15 261:9

**subcommittees** 74:9 118:4,11 191:18 198:1

**subcontractor** 24:6

**subject** 114:16 266:7 268:10,15 320:4

**submitted** 43:4,6,12 69:10 70:21 189:15 254:4 268:2

**subsequent** 71:21 175:10

**subsequently** 29:6,10 43:14

**substance** 189:14,18 190:3

**substantial** 234:11 292:5

**substantive** 35:14,18 86:11,13,19 89:7 157:4,8 192:21

**substantively** 259:1 309:8

**suddenly** 343:3

**sufficient** 18:11 19:18 37:12,13 161:11

**suggest** 51:7 104:6 134:11 142:6 232:14 248:13 265:22

**suggested** 36:19 130:21

**suggesting** 50:6 62:20 63:16 195:21

**suggests** 115:20 125:14 316:8

**suitable** 93:13

**summarized** 148:13 351:6

**summary** 82:9,12 134:6 150:4 241:13,19 261:16 265:4 351:14

**sums** 68:16

**sun** 121:6

**superficial** 199:4

**superfluous** 343:3

**superior** 247:12

**superseded** 279:15

**supplied** 200:22 230:6 292:17 293:4 303:4

**supply** 176:19 200:16 283:12,13,14

**supply-demand** 176:18

**support** 8:18 45:18 70:6 179:3 185:20 186:15,16 211:18 248:18 261:7,20

**supported** 112:14 129:9

**supporting** 149:14 150:1

**supportive** 138:15

**supports** 139:13 179:9

**supposed** 284:6

**surety** 329:17

**surprise** 254:22 296:2,12 298:4 349:5

**surprised** 175:3 185:5 265:10

**surrounding** 169:11 351:7

**Surveyors** 11:3

**suspect** 27:15 102:3 321:5,7

**swing** 315:10

**switched** 134:17

**symphony** 14:4 232:19

**synthesized** 49:17

**system** 115:12 225:20 314:14 335:15

**systems** 24:10 53:14 314:18

**systems-level** 51:17

## T

**tab** 30:5,8 42:14 44:8 66:13 80:19 100:4,9 114:9 136:9 172:10 190:18 202:3 203:14,16 239:8 259:18 288:13 290:2 308:20 310:16 322:4 336:20 343:12 344:4

**table** 63:17 75:5 122:7 124:20 144:11 145:22 159:11 194:6 195:6 203:13 243:9

**takeaway** 346:11

**takes** 53:21 81:6 212:15 218:8

**taking** 125:18 179:4 198:11 244:19 253:1 265:16 317:11 327:15 332:1,22

**talk** 19:12 22:9 33:12 34:10 60:17,22 65:19 71:13 85:3 87:22 106:8 118:20 138:7,8 140:16 174:15 183:21 184:22 187:6 197:8 210:21 217:13,14 221:7, 8 226:21 259:9 268:7,20 271:14 274:15 280:17 310:12 329:16 335:6 347:8 359:15

**talked** 15:1 16:7 34:17 48:18 49:1 51:10 60:8 73:15 78:3 82:3 83:10 99:19 102:11 105:22 128:7 130:19

152:11 174:14 176:2 185:15 192:19 200:12 212:10 230:2 239:20 245:16 253:18 265:9 274:17 276:5,16 279:17,18,22 280:4 293:12 295:4 311:14 317:9 339:19 345:13

**talking** 44:21 46:16,18 52:18 73:21 91:18 102:9 108:2 113:11 118:16 138:12 151:8,9 178:13 184:6 191:6 192:21 195:1 208:11 210:5 223:18 229:2 233:8 236:22 237:2 248:13 250:4 260:4 265:18 273:20,21 283:12 284:22 285:3 308:7 309:4 311:2,13 325:1 357:21

**talks** 37:5 44:15 104:1,3 125:19 141:6 205:21 214:16 235:16 268:9

**task** 305:2,4

**team** 22:8,10 28:7 129:14 131:14 146:5 204:2,9 276:13

**Teams** 105:1

**tear** 52:1

**tease** 325:4

**technical** 21:21 24:8,9 51:16 59:3 76:1,3 89:14 90:13,15 121:20 224:1

**telecommunications** 314:18

**telephone** 86:3 113:9 267:13

**telling** 184:9 269:4

**tenants** 206:9

**tend** 316:4

**term** 184:7 199:16 275:2 287:20 316:3

**terminology** 140:15 335:13

**terms** 11:19 24:9,17 35:15 69:14 95:21 109:22 121:14 145:21 149:3 164:4 183:8 193:12 227:17 274:12 321:17,18

**terribly** 29:2 106:18 107:14 266:4

**test** 54:15,19 78:14,18

**tested** 54:5 252:15

**testified** 6:4 142:15 199:7 224:13 308:13 326:14

**testify** 118:15 215:9 297:9

**testifying** 306:18

**testimony** 32:3 94:1 122:18 130:20 215:11 219:18

**testing** 44:1 159:5

**text** 115:3

**theater** 23:14,15,16 25:2 120:11 213:1

**theaters** 61:12 169:20 170:10 235:22

**thereabouts** 73:9 311:4

**thereon** 281:9 282:3

**thing** 56:5 58:3 59:22 62:3 124:12 132:19 170:4 191:11 195:1 200:3 208:2 232:4 275:1 296:2,13 299:2 304:11 309:12 352:19 358:18

**things** 14:18 15:21 17:9,20 35:21 57:5 60:21 68:22 69:13 77:14 79:8,9 80:13 89:6,17,21,22 91:6 102:7 121:7 122:14 128:13 129:7 133:10 140:11 142:14,16 157:16 160:13 168:9 169:13 187:9,20 205:16,20 226:22 227:4 233:1 235:8 274:8 278:2 283:16,18 284:5,12 298:13 314:2,18 315:2 321:8 326:16 359:5

**thinking** 24:16 107:4 129:16 148:18 155:19 183:15,16 256:2 275:5 303:15 317:18 350:21 359:6

**thinks** 57:3

**thought** 32:6 33:15 52:14 78:6 88:12 99:20 106:8 108:10 121:13 131:2 144:10 156:21 171:16 172:6 178:13 184:15,16 185:15 190:10 201:2 221:9 234:10 249:8 265:19 307:11 313:7 347:3 348:19

**three-year** 201:7 250:20

**threshold** 209:9

**throw** 281:2

**thumb** 178:5

**Thursday** 72:22

**tickets** 176:14 232:4 278:6

**tie** 82:4

**tier** 335:7,8,11 338:17,21 339:5,6,19 340:19,20 341:7

**tiers** 335:4

**time** 8:3 13:15 15:6,15 18:17 21:15 31:12 33:21 34:2,14 41:5 45:9 46:2 47:7,12 60:9 62:5 63:4 66:22 70:4,17 71:2 77:11 78:13,17,22 79:10 80:8,9 82:3 93:3 96:5 97:14 98:5 108:18 115:4 119:9,13 126:7,8 127:17 132:6 142:16 143:5 149:15 150:2 156:6 157:5 167:7 171:7 174:12,20 182:8, 14,20 183:11 192:9 198:5,14 199:3 202:21 214:18 215:6 216:10 217:21 218:4,11,12,21 219:1 233:12 238:1 241:21 242:6 246:2 247:9 253:1,19 255:10 256:5,12 259:2,6 263:7 268:5, 6 269:8 270:8 278:22 286:4,7,13 305:6,7 311:19 314:21 318:8 320:14 324:17 327:1 343:2 350:21 354:21

**time-in-motion** 56:8

**timeline** 65:19,21 67:16 72:13 73:15 77:16 125:15 146:11 149:21 152:12 239:21

**times** 34:17 115:13 286:21 354:7

**timing** 241:15 257:20

**tiny** 83:6

**title** 10:5

**titled** 30:13 136:22

**titles** 193:7

**today** 16:12 103:12 157:1 244:7 286:7

**today's** 324:7 325:21 327:1 336:2

**told** 40:9 42:3,11 59:19 73:4,6,9,11 80:10 89:13 90:3 91:3 93:14,16,18,20 94:3 139:9 215:15 247:7 248:2 251:11 252:4 262:9 263:13 265:12,22 267:15 345:18 353:19 354:3

**top** 30:13 44:14 193:2,3 205:11,12

**topic** 7:19 85:3 341:22 348:20 351:20

**total** 282:5 315:18 338:8,14,15 339:4, 9,12 340:10,11

**totality** 164:9 211:13

**totally** 68:20

**Totals** 337:8

**touch** 105:13,16,17

**tough** 168:5

**tour** 73:12 75:21 87:9,13 119:15,16 120:2,14 128:10 131:13 132:1

**toured** 72:22 74:11 77:6 105:12 106:21 129:12

**touring** 112:6 130:18 138:19

**tours** 27:5 112:6

**trades** 56:3 60:7

**traffic** 236:11

**trailing** 201:8,14

**transcribed** 7:4

**transferred** 89:3

**translate** 129:2 288:4

**translates** 60:16

**transmitted** 119:14

**tremendous** 332:21

**trending** 315:2

**trends** 14:18

**trouble** 248:8

**true** 33:18 115:11 116:3 133:15 237:11 260:17

**Trump** 6:13 300:18

**Trump's** 295:20 298:6 301:3

**truncated** 91:12

**trustee** 38:6 159:14 163:15 164:8 264:14 303:15 307:15

**trustee's** 262:7

**trustees** 64:20 71:17 82:14 109:2 121:19 186:20 205:16,17 210:11 211:2 213:20 226:5 228:17 240:16, 17,19 253:15 254:16 264:9,10 267:17 287:18 294:5 303:22 315:8 317:20 330:16 333:2 342:8 346:8 347:7 350:18

**trustees'** 262:21 263:11

**trusts** 12:17

**truth** 6:22 49:11

**Tuesday** 43:17

**turn** 25:18 30:4 32:17 44:6,7,12 80:18,22 81:4 82:16 102:17 103:2,7 114:10 136:9 190:18 192:17 202:4 204:19 239:8 268:8 270:4 275:14 308:16 310:15 320:14

**turning** 118:22

**turns** 250:20

**two-thirds** 213:20 338:14,19

**two-year** 37:21 49:7,8 50:11 52:20 55:17 198:14 247:3 252:4

**twofold** 89:12

**type** 12:11 67:19,21 179:16 212:22 250:3 284:6 286:18,19 318:12

**types** 12:10 13:2 90:14 218:8 244:9 272:6 308:5

**typical** 67:6 76:17 285:6,9,13 298:17,20,21

**typically** 89:20 91:9

## U

**Uh-huh** 231:10

**ultimate** 25:15 37:3

**ultimately** 35:4 45:10 149:4 160:5 175:9 284:11

**unable** 164:15

**unanimity** 349:10

**unaudited** 92:12 94:15 96:13,15,21 202:14 203:9 276:3

**unavailability** 160:2

**unblocked** 104:19

**uncertainty** 328:13 329:15,17,20,22 330:14 332:17 334:3

**uncommon** 67:8 207:22

**uncovered** 188:4

**underlying** 93:1 149:14 158:10 229:9 315:1

**understand** 6:18,21 7:3,6,8,17,20, 22 14:14 20:11,18 24:9,12 27:10 35:4 37:20 39:15 41:13 48:17 49:4 50:1 51:20 52:6 53:3 56:18 59:2 64:12 65:2 69:13 73:20 81:1 82:13 100:1 108:7 109:10 110:22 112:12 117:17 121:21 132:18 135:10,22 139:16 141:4 142:6,11,12 145:3,5,8 156:1 162:8 163:18 165:11 171:19 177:1 181:20 183:10 188:20 192:13 200:17, 18 205:7 208:6 209:16,17,21 211:5 215:20 218:16 229:4,13,20 233:21 245:14 252:2,15,17 262:13 267:4,9 271:4,6,7 278:16 282:11 286:14 290:16 294:5 299:17 303:12 306:10 309:3,17 314:2 322:22 325:9,10,11, 19 326:2 330:16 333:12,21 337:3 340:15 346:21 348:8,13 349:18 350:5 354:14

**understanding** 7:19 27:6 37:6,15 38:12 40:14,15 44:18 50:17 52:7 65:20 89:10 105:17 108:4 109:21 110:12 111:17 138:13 139:17 142:19 143:12 145:13 154:6 161:7 162:9 165:2 175:12 184:3 193:15 208:4 227:6 229:9 232:2,16 239:1 264:3 266:19 267:2 270:12 271:15 300:10 306:8 311:11 320:22 324:18 347:17 348:14 349:20 350:2 351:16 352:14

**understood** 13:21 23:16 46:14 50:6 65:13 79:21 92:21 116:16 127:13,17 138:20 139:5,8 143:16 144:13 149:18,21,22 153:6 156:19 173:19 193:14,15 210:4 211:7 212:14 215:1 226:7 248:15 265:19 266:9 313:6,11 326:14 350:14

**undertaken** 22:4

**undertook** 16:22

**underway** 166:22

**underwrite** 12:19

**undoubtedly** 140:22

**undue** 92:1

**United** 11:4

**units** 252:17

**university** 10:17 169:1

**university's** 169:7

**unlawful** 344:1

**unlike** 16:11,12

**unnaturally** 253:2

**unnecessary** 263:17

**unreasonable** 319:13

**unrestricted** 140:2,7

**unreviewed** 93:14

**unsafe** 344:1

**unusable** 24:13

**unusual** 187:19

**upgrades** 57:2

**upkeep** 112:8

**upper** 30:16 205:15

**usable** 24:13

**utilities** 56:21 58:8 335:15

**utility** 57:13,18

## V

**Vague** 19:22 20:21 21:19 22:6 30:1 34:19 36:12 57:7 58:10 63:8 65:15 68:13 69:3,20 70:12 78:2,15 88:2,19 90:20 98:17 99:2 110:18 113:20 117:8,16 142:22 157:7 163:12 187:2 188:6 223:8 242:10 251:4 253:5 285:13 351:8 356:5

**vaguely** 312:2

**validate** 49:6 50:11

**validated** 50:8

**value-engineer** 324:16

**variables** 160:4

**variance** 159:13

**variant** 45:21

**variety** 89:14

**vary** 52:20 117:11 179:16 201:21

**varying** 335:13

**vastly** 358:3

**vendor** 179:20

**vendors** 27:20

**ventures** 332:17

**venue** 14:11,13,21 57:1 171:2 179:21 212:16 219:22 287:14 304:21 306:9

**venue-related** 335:8

**venues** 120:11 168:21 169:20 220:5,7 358:1

**verbal** 174:4,8

**verbally** 7:7 269:9

**verification** 319:21

**verified** 20:20 21:8,17 198:7 314:20

**verify** 228:10 313:1,8

**version** 31:4 151:2 192:1,7,13

**versions** 116:7,17,18 117:3

**versus** 6:12 49:5 50:8 55:11 60:14 95:21 97:21 108:9 110:1 180:2 205:12 208:8 210:9 223:4 233:2 263:10 275:11 304:13 307:4 321:18 322:12 327:15 341:8,16

**vertically** 12:18

**vi** 269:20 270:3

**viable** 164:5

**view** 61:3 77:9 109:3 125:18 131:2 152:20 170:12 187:4 198:13 255:1 262:11 348:19 349:14 359:16

**viewed** 152:22

**views** 70:1 108:10,14 113:17,22 184:8 358:4

**visceral** 121:12

**visibility** 225:19 350:19

**visible** 170:20

**visit** 86:15

**Visitor** 24:1,2

**visualize** 359:9

**vivid** 46:9

**voiceover** 244:1,6

**vote** 156:9,12,17 262:20 264:5,13 267:5,10,11 348:9 350:6

**voted** 156:3 262:5,14 263:7 348:16 349:6

**votes** 348:1

**voting** 154:18 350:15,22

W

**wage** 314:12

**wages** 352:17

**wait** 63:21 64:1,3 335:9

**waiting** 42:17

**walk** 150:15 200:7 247:13

**walking** 121:2 167:13 294:14

**wall** 52:1

**wanted** 23:15 49:22 108:22 122:6 123:3 124:1 194:12,21 195:5 214:1 226:8 236:10 256:17 293:15 294:5 330:15 343:4

**war** 91:5

**warned** 223:13

**warning** 115:3 330:20 333:2

**Washington** 6:10 24:1,4 33:17 242:13

**water** 61:22 62:4 244:8

**waterfall** 129:19 130:9

**waterfront** 52:15

**wavered** 245:6

**ways** 23:7 24:16 52:16,19 134:2 145:17 146:8 298:12

**Wednesday** 43:18

**week** 43:16,18 51:21 91:18 134:13 150:11 176:1,4 206:16 256:21 257:1,17,18,22

**weekend** 107:12 129:16 130:14,17 131:20 134:10 204:17

**weeks** 83:21 84:2,8,9 161:8 162:15,16 164:14 165:3,14 241:17,20 242:4 253:11 267:17 352:11,20 353:5,9,21 354:5

**weigh** 61:18 62:12 64:7,14,19

**weighing** 62:9 65:3

**wherewithal** 304:12

**whichever** 326:10

**whispering** 248:21

**whispers** 248:19

**white** 24:2 30:5 235:10

**whiteboard** 132:7

**Whitehouse** 351:12 356:1

**whoops** 102:18

**wildly** 170:9

**William** 90:12

**willingness** 224:7

**wills** 70:4

**Wisniewski** 22:17 24:5

**wondering** 306:15

**word** 45:1 72:1 127:10 128:8 159:1 238:8,9,14 275:10 277:14 282:16 307:2 316:12

**words** 14:14 75:9,10 127:7 140:1,2 190:13 338:2

**work** 9:19 10:2 12:4 15:3 16:13,16 23:18 26:1,8,9 27:16,17 28:2 29:22 31:5 33:5,7,19 36:9 37:9,10,11 41:14 51:1,12,17 54:13 55:7,12,22 56:3,6,7 57:10,13,17,18,19 58:7,8 60:13 63:11,12,14,17 64:10,11 65:21 66:3,6,18 68:1 69:14 70:3 71:9 72:2 79:4,6,7 81:2,11,13,15 83:11,20,21 89:8 98:2 105:10 107:8 114:1 117:22 122:3,10 129:14 130:10,11 132:4 139:7 146:12 152:9,12 153:1,2,15 155:6 157:4,10,14 160:11 165:22 170:18 180:15 181:20 182:2,3 184:17 194:2,13,17 200:9 208:1 224:1 236:12,17 238:15 239:21 241:5,10 250:4 253:8 254:5 258:19 260:22 262:1,11,22 263:1,17 268:21 269:7,12,18,20,21 272:10 274:3,6 284:12 285:21 286:8 287:4 312:3 315:5 317:18 322:12,20 323:2,14,16 326:12,18 327:22 328:8 331:12

334:11,18 335:4 338:3 346:15 349:13 351:17 358:14

**work-front** 60:8

**worked** 13:12 22:10,12 25:2 79:18 168:22 181:17 207:14 358:15

**workers** 60:9

**working** 23:9 79:1 145:12 157:13 197:21 207:15 242:5 325:14

**workload** 97:20

**works** 23:21 24:22 181:21 287:17

**world** 9:18 56:3 63:13 128:22 185:6 248:16 330:6

**worried** 123:8 169:6

**worse** 64:16

**worth** 56:7 121:1,8

**worthy** 61:22

**write** 180:10 281:17 342:12

**writing** 14:17 171:16

**written** 91:2 151:20 167:9 281:4

**wrong** 115:17 143:14 159:1 201:4 278:15 288:10,11

**wrote** 120:22 167:3 342:17,18

X

**X-PAGES** 157:15

Y

**yard** 182:1

**yards** 178:10

**year** 17:2 46:16 53:20 56:7 92:22 94:5,16 96:2,6,14 97:13 98:5,21 99:3,13,16 106:1 111:3,4 118:10 135:1 144:4 161:4,12,13 177:16 181:5 200:21 201:3,22 202:14 245:21 246:1,13 247:19 248:17 250:5,17 273:21 275:22 280:1 289:2,20 294:3,9 299:17 300:3 304:22 308:1 309:9 321:21 352:17

**years** 8:22 9:3 10:19 38:14 39:1 40:18 48:6,11,20,22 49:2,12,16 50:3 54:11 55:10,20 56:12 62:13,14 89:16 94:14 123:12,21 124:7 130:5 133:16 156:4 166:7 167:6,10 170:13 174:11 177:16 181:5,10 197:16 198:20 201:14 207:21 212:15 214:3,12,18 217:17 218:8 236:1 245:12 247:8 248:1,2,6 250:12,13,17 251:2,11 262:6 280:13 282:2 283:15 284:22 285:1 287:20 299:20 300:1 302:4 304:3,4 305:1,5,9 307:4 308:1 327:16,17 333:20 357:3,6

**yield** 183:12

**Young** 15:12

Z

**zeroed** 232:9

**Zoom** 242:12,16 244:16