# G

**In the Matter Of:**

*JOYCE BEATTY vs*

*DONALD J. TRUMP*

---

*MATT FLOCA*

*October 07, 2026*

---

LEXITAS™

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -x

JOYCE BEATTY, :

Plaintiff, :

v. : Case No.

DONALD J. TRUMP, et al., : 25 Civ 4480 (CRC)

Defendants. :

- - - - - - - - - - - - - - - -x

Wednesday, October 7, 2026
Washington, D.C.

Deposition of:

MATT FLOCA 30(b)(6),

called for oral examination by counsel for the Plaintiff, pursuant to notice, at the law offices of Washington Litigation Group, 1717 K Street, Northwest, Suite 1120, Washington, D.C. 20006, before Christina S. Hotsko, RPR, CRR, CA CSR, of Lexitas, a Notary Public in and for the District of Columbia, beginning at 9:45 a.m., when were present on behalf of the respective parties:

A P P E A R A N C E S

On behalf of Plaintiff:
KYLE R. FREENY ESQUIRE
ALEXANDER KRISTOFCAK, ESQUIRE
ROSA BAUM, ESQUIRE
Washington Litigation Group
1717 K Street, Northwest, Suite 1120
Washington, D.C. 20006
(202) 521-8750

On behalf of Defendants:
WILLIAM JANKOWSKI, EQUIRE
CHRISTOPHER M. LYNCH, ESQUIRE
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, Northwest
Washington, D.C. 20530-0001
(202) 514-2000

Also Present:
Elliot Berke, Kennedy Center General Counsel
Bridget Kennedy-Bailey, Washington Legal Group

C O N T E N T S


| EXAMINATION BY: | | PAGE |
|---|---|---|
| Counsel for the Plaintiff | | 05 |
| FLOCA 30(b)(60 DEPOSITION EXHIBITS: * | | PAGE |
| Exhibit 1 | Floca Declaration | 13 |
| Exhibit 2 | Audit and Finance Committee Meeting Minutes, 1 June 2026 | 48 |
| Exhibit 3 | FY 27 Budget Scenarios | 60 |
| Exhibit 4 | Audit and Finance Committee PowerPoint Presentation 1 June 2026 | 75 |
| Exhibit 5 | Cash Burn Spreadsheet | 77 |
| Exhibit 6 | May Board Report | 144 |
| Exhibit 7 | Appendix V, Consolidated Financial Statements, Fiscal Years Ended 29 September 2024 and 1 October 2023 | 163 |
| Exhibit 8 | Kennedy Center Board of Trustees Special Meeting Agenda 15 September 2026 | 177 |
| Exhibit 9 | Trump Truth Social Post 15 September 2026 | 211 |
| Exhibit 10 | Joint Status Report | 217 |
| Exhibit 11 | E-mail Chain | 229 |
| Exhibit 12 | E-mail Chain | 239 |

| FLOCA 30(b)(60 DEPOSITION EXHIBITS: * | | PAGE |
|---|---|---|
| Exhibit 13 | Demolition Tweet 16 September 2026 | 250 |
| Exhibit 14 | JLL Letter | 287 |

* (Exhibits attached to transcript.)

P R O C E E D I N G S

Whereupon,

MATTHEW FLOCA 30(b)(6),

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MS. FREENY:

Q. Good morning, Mr. Floca.

A. Good morning.

Q. As you know, I'm Kyle Freeny. I represent Congressman Beatty in the lawsuit Beatty versus Trump.

We -- you were here yesterday in your personal capacity, and you are here today as a representative of the Center.

Do you understand that?

A. Yes.

Q. Okay. Just for the sake of the record, I'm going to go over the same ground rules that I went over yesterday. Okay?

A. Okay.

Q. You understand that you are under oath during this deposition, right?

A. Yes.

Q. And you understand that that oath obligates you to tell the truth to the best of your ability in response to my questions.

A. I do.

Q. And because this deposition is transcribed by a court reporter, I'm going to ask you to respond verbally rather than, for example, nodding your head.

Do you understand that?

A. I do.

Q. And also -- and I will also try to help with this. If we can not talk over each other. And so even if you know the answer to my question, if you could let me finish before you answer, that will allow the court reporter to take everything down. And I will also try to wait until you answer before I ask my next question. Is that okay?

A. Okay.

Q. All right. As I mentioned yesterday, if you don't understand any of my questions, please tell me and I will try to explain or rephrase. Okay?

A. Okay.

Q. As with yesterday, if you need a break, you know, just to stretch, to go to the bathroom, please let me know, though I may, if there is a question pending, ask you to answer that question before we break. Okay?

A. Understood.

Q. Yesterday I asked you if you had been deposed before and you told me you had not. Now I know that the answer to that question is yes. But I want to go over and make sure that we have an understanding of the difference between what's happening today and your testimony yesterday.

You understand that you're here today as a designated representative of the Kennedy Center pursuant to Federal Rule of Civil Procedure 30(b)(6); is that right?

A. Yes.

Q. And you were designated by the Kennedy Center to testify on its behalf, right?

A. Yes.

Q. Do you understand that your testimony is not limited to matters within your personal knowledge?

A. I do.

Q. Okay. And so you understand that you are expected to -- you're expected to have prepared to testify about information known or reasonably available to the Center concerning the topics identified in the deposition notice, correct?

A. Yes.

Q. All right. Now, because you're testifying on behalf of the Kennedy Center, if you respond to one of my questions with "I don't know," I need you to specify whether that's because you, personally, Mr. Floca, don't know the answer or if what you mean is that the Kennedy Center does not know the answer; is that fair?

A. Yes.

Q. Okay. Any other questions before we start?

A. No.

Q. All right. So I want to ask you some information on behalf of the Kennedy Center about the -- what we have called in some of our discovery requests the interim period.

And when I say interim period, what I mean is the period between May 29th, the date of the preliminary injunction in this case, and the August 13 board meeting. Okay?

A. Okay.

Q. All right. So after the court decision and preliminary injunction, what instructions did management give to the Center regarding main building programming?

A. There would be three main buckets of programming.

Q. Okay.

A. Educational, civic or public programming, and the orchestra.

Q. Okay.

A. Those three buckets of programming continued with shows that were already booked or, you know, adjustments to things that were already on the calendar or new efforts, like the orchestra, negotiating, working on new shows.

So those -- those are the three main areas of programming that continued on. And specifically on education, that team has largely remained intact and doing business as they normally would within the education portfolio.

MR. JANKOWSKI: Just for my reference, Kyle, this is topic F you guys are going into?

MS. FREENY: Yes. Topic F, implementation...

BY MS. FREENY:

Q. What instructions did management give to the Center regarding programming following the May court decision with respect to other buckets, other types of performance besides the three buckets that you just mentioned?

A. Special programming also continued, planning for Mark Twain Prize and honors in

general, and work around other shows that might not necessarily fit cleanly in those buckets but were part of the Center's programming, like Shear Madness, were being discussed how -- you know, how things might evolve as the Center moved forward.

Q. Did management give any instructions to not -- or, sorry, let me say this again.

Did management give any instructions to defer any bookings until the board could have another meeting on how to proceeding with renovations?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: There wasn't a blanket hold on programming. There was -- because of the uncertainty around the ability of the Center to long-term plan a slowdown in programming, but that was also somewhat informed by the -- what I would consider a lack of leadership, maybe, on the -- within the programming department.

BY MS. FREENY:

Q. Tell me about that lack of leadership.

A. Historically, there should be a -- you know, there should be a person that is looking at all of programming across the Center and its effectiveness, both short term -- happening now -- and long term.

Q. Why wasn't there?

MR. JANKOWSKI: Vague. Objection.

THE WITNESS: I can't point to a single definite reason. It's broader than that. I know that there was a -- there's always a desire to keep -- you know, to keep structured leadership, whether it's programming or administrative services, in place.

BY MS. FREENY:

Q. Now, the Center had terminated programming staff in connection with the prior March board vote, had they not?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: There were terminations and resignations that impacted programming.

BY MS. FREENY:

Q. How many terminations of programming

staff that affected programming, roughly?
A. Between 20 and 30.
Q. Okay. And how many programming staff remained at the time the court decision came out in May?
A. Ten or less.
Q. I want to have you turn to tab 33 in your binder.
MS. FREENY: And I'm going to ask that this be marked Exhibit 1.
We'll number this separately than the exhibits from yesterday, and so we'll have this marked Exhibit 30(b)(6) 1.
And to the extent that 30(b)(6) does not actually appear on the sticker, I'll just note for the record that unlike yesterday's stickers, which are white, today's stickers for the 30(b)(6) deposition are blue.
(Floca (30(b)(6) Deposition Exhibit 1 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. All right. Mr. Floca, take a look at Exhibit 1.

And can you confirm for thee that this is a declaration from you executed on June 13th, 2026, in the case that we are here talking about?

A. Yes.

Q. Okay. I want to direct you to paragraph 6, which says, "Given present uncertainty as to future programming, management has deferred affirmative long-term programming or staff adjustments until the board selects a final operational path."

Do you see that?

A. I do.

Q. Okay. Tell me what management act- -- like, specifically did to defer affirmative long-term programming.

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: A general example would be to defer building a touring Broadway season for some period in the future.

BY MS. FREENY:
Q. Okay. Any other examples that you can think of?
A. I mentioned the Shear Madness --
Q. Okay.
A. -- longtime, you know, running show at the Center. An example would be working with them to explain or get to an understanding that there may be disruptions to the theater lab.
Q. Were they told that -- were they told how long those disruptions would last?
A. I would assume that generalities were provided, but there was -- there's uncertainty --
Q. Okay.
A. -- as the process is unfolding at this time.
Q. Were they told that they should not expect to perform at the Kennedy Center in the '26-'27 season?
A. I don't think definitively that would have been messaged.
Q. What would have been messaged?

A. That there is a process unfolding across both the courts and, you know, the board leadership about where the Center is moving.

Q. Okay.

A. That process is going to impact the availability of the theaters to -- and the building at large -- to hold events or programs.

Q. For how long?

A. There's no -- there's no definitive one -- there's no definitive one message as things were, and still are, you know, uncertain, so availability of space reflects a concrete path forward that wasn't identified or could not have been identified.

Q. Okay. But you're saying they were not told that space or booking was not available for this season?

MR. JANKOWSKI: Objection to the extent that misstates.

THE WITNESS: The messaging would have centered on uncertainty rather than just a clear no.

BY MS. FREENY:
Q. Was the Center made aware that expression -- sorry, let me say that again.
Was the Center made aware that, after conveying that uncertainty to the Shear Madness folks, they decided they could not perform at the Kennedy Center for the upcoming season?
A. Sorry. Can you ask that one more time?
Q. Was the -- did the Center become aware that, as a result of having conveyed what you had discussed about the uncertainty about their ability to perform, that Shear Madness made the decision that they would not be able to perform at the Kennedy Center for this season?
A. The Shear Madness team specifically, they were very concerned about the uncertainty and how their -- you know, how their show could move offsite or be built around any closures, and they -- they did communicate skepticism around the ability to continue at all. Yes.
Q. And was that skepticism that they conveyed about the ability to continue at all

with respect only to the upcoming 26-'27 season or any season that follows, for example, '27-'28?

MR. JANKOWSKI: Objection to the extent that calls for speculation.

THE WITNESS: Skepticism both short term and long term, but again, some of that, the concrete facts, were -- or the lack of the ability to provide concrete facts impact or -- impacts their planning, what's going to happen with the set, what's going to happen in the theater lab specifically. Can the set remain onsite or, when they do start back up, are they going to have to rebuild the set and the theater lab completely?

And, you know, those conversations are still ongoing.

But even though there was skepticism, the Center did always communicate to Shear Madness the willingness, you know, for them to continue no matter what the construction or operational changes are.

BY MS. FREENY:
Q. You said "to continue," but I want to understand that because I thought you had previously said that the Center also communicated that it couldn't commit during this interim period because of the uncertainty to at least have them continue in FY '26-'27.
Do I have that right?
A. To continue long term. So still call the Kennedy Center home long term.
Q. Okay. Does the Kennedy Center have an understanding of whether Shear Madness remains potentially willing to return to the Center after a two-year closure?
MR. JANKOWSKI: Objection. Foundation on "after a two-year closure."
But you can answer.
THE WITNESS: It's my understanding that Shear Madness does want to continue to call the Kennedy Center home long term.
BY MS. FREENY:
Q. Has the Center been made aware of whether

Shear Madness has found an alternative venue for the upcoming season?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I don't personally know that right now, but I think there is an answer to that. We could find out.

BY MS. FREENY:

Q. Okay. Understood.

So you think the Kennedy Center may know; you just don't personally know?

A. Yes.

Q. Okay. I appreciate that.

Do you -- let me ask, does the Center know whether Shear Madness has made plans for performing at another venue for the season '27-28?

A. Same --

Q. Okay.

A. -- answer.

MR. JANKOWSKI: Kyle, to the extent -- we can try to get information for you on a reasonable basis.

MS. FREENY: Yes. That's fine.
MR. JANKOWSKI: All right.
BY MS. FREENY:
Q. All right. I want to turn you back to the paragraph in your declaration that we've been discussing. And I had asked about what specifically management had done to defer affirmative long-term planning during this interim period. We talked about the discussions with Shear Madness.
What else did Center management do to defer affirmative long-term programming in the interim period following the May decision?
A. I think I've summarized everything.
Q. Okay. Nothing else? Okay.
Did the -- so after the May 29th court decision, did the Center -- let me just start that again.
During this interim period, after the May 29th court decision but before the August 13th board vote, did the Center receive inquiries from, you know, performing artists or

their representatives about potential bookings for the upcoming '26-'27 season? Other than Shear Madness.

A. Yes. Those would have come in the way of Millennium Stage programming, Fortas programming, programming for the orchestra --

Q. Okay.

A. -- and any, you know, work that the rentals team was doing to continue third-party engagements as well as special events.

Q. What work during this interim period was the rentals team doing to continue third-party engagements?

A. Mainly tracking leads that -- you know, inquiries that did come in. But, you know, those are going to be not unimportant events, but events and less so more than -- you know, cultural events or specific events for an organization or entity, as opposed to, you know, orchestra programming or Millennium Stage programming.

Q. Let me ask you about some specific

performances that I didn't hear you mention. And I'm interested in whether the Center received inquiries or had discussions about possible performances during the interim period.

Did Alvin Ailey or their representatives have discussions with the Center during the interim period about possible performances?

A. I'll have to get that information.

Q. Okay. So you personally don't know that -- think that the Center has that information?

A. The Center has that information. I just don't have it --

Q. Okay.

A. -- to tell you right now.

Q. What about The Nutcracker? Do you agree that The Nutcracker is a culturally significant event for the Center every year?

A. I do. Yes.

Q. Okay. Did the Center have discussions with representatives from The Nutcracker about potential performances at the Center for

fiscal -- or for the season '26-'27?
A. It would depend -- that would depend on what the dance programming team looked like at the time, which I don't recall -- or I can't recall right now. Again, an answer that we can get for you.
Q. Okay. And would the Center know not just whether those discussions were had but also what the nature of those discussions were?
A. Yes.
Q. And the Center would know whether folks at The Nutcracker were told anything about the availability of the Center for performances in fiscal year -- or in season '26-'27?
A. The Center would know what those conversations entailed. Yes.
Q. Okay. After the May court decision but before August 13th, had management made any booking or programming decisions that were premised on the main building being closed for '26-'27 season?
A. Again, during this period we were faced

with uncertainty, so there wasn't a complete hold on programming, but there was an adjustment to how -- you know, how purposeful or focused that team was.

Q. Help me understand what that means.

A. Well, the -- you -- you are uncertain about what portions of the building or what the building is going to be able to support, so it's difficult to discuss with production companies or shows or agents exactly what you can offer them.

Q. Were staff told not to offer programming availability for the '26-'27 season during this interim period?

A. Again, there's no blanket hold on programming --

Q. Okay.

A. -- or offers.

Q. So staff were permitted to proceed with booking in the main building during the interim period for performances in the '26-'27 season?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: Again, there was no

affirmative "don't" or "do." There was a process unfolding with leadership in the courts that was going to enable the team, programming team, to do work around the results of that process.

BY MS. FREENY:

Q. And how were programming -- how was the programming team told what was expected of them with respect to bookings during this interim period, in light of the uncertainty that you mentioned?

A. The main message across the Center is that there's still a mission to meet, and we have to be purposeful in how we do that even when we face uncertainty.

Q. When you say "purposeful," I'm just trying to understand what that means.

Does that mean to defer bookings until the board has voted?

A. No. I think that means looking at, for example, how the Opera House orchestra might be able to support a dance program somehow so we're still meeting the dance, you know, section of our

mission; or how the orchestra might be able to support opera programming or how Millennium Stage supports public programming even though we can't, you know, at a time -- in this time of uncertainty build a season around any one of those different types of artistic programs.

Q. And those different types of artistic programs that you mentioned, was that contemplated to be done in the main building or in the Reach or offsite?

A. The programming was contemplated to reflect whatever pathway we were able to take, you know, adjacent to the construction and the operational impacts to the building, which are uncertain.

Q. Okay. But that doesn't really answer my question. Right?

The programming you mentioned that the programming team was working on during this interim period -- opera, orchestra -- was that programming contemplated to include programming in the main building for the next season or

programming offsite or in the Reach?

MR. JANKOWSKI: Objection. Argumentative. Asked and answered.

THE WITNESS: There's a purposeful need to meet the Kennedy Center's mission. That was -- that was understood and has always been understood.

But at a time where we can't say exactly what the Center can offer a show in the Opera House because we don't know exactly what is going to happen with production infrastructure in the Opera House, at what time work will start, when there will be electrical outages, when there will be restrictions across the building, it's difficult to -- you know, to holistically plan something. And we -- you know, we were working within that -- you know, within those restrictions.

So there's still efforts to -- you know, to move forward, but there weren't efforts to -- to get in the way of -- or to obligate the Center to something that we might not be able to achieve

because there was going to be an infrastructure improvement that would impact that obligation.

BY MS. FREENY:

Q. Is it fair to say that the focus of the programming team during this interim period was at the direction of management on programming that could be accomplished either in the Reach or offsite?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: The direction would be more along the lines of programming that is flexible enough to -- you know, to still meet mission but reflect the dynamic needs of the main building and the infrastructure changes that maybe would start, maybe would not.

BY MS. FREENY:

Q. And did that or did that not include programming in the main building for '26-'27 season?

It's a yes or no question.

A. There was not a holistic comprehensive effort to develop a '26-'27 season in -- you

know, in May, in late May, June, July of '26. That's just not how -- that's not how the Center works. That's work that would have been, you know, completed earlier.

So the -- again, we were facing uncertainty on what the building could offer, and programmers were working in and around that uncertainty in a way that still was intended to meet the Kennedy Center's mission.

Q. And that was by focusing on programming taking place outside of the main building, right?

MR. JANKOWSKI: Objection. Argumentative. Asked and answered.

THE WITNESS: There was not a blanket "don't program something in the Eisenhower Theater," but there was an understanding that improvements were going to be made in the Eisenhower Theater at some point. And once we know the schedule of those improvements, we'll be able to build programming in the Eisenhower Theater, whether that's Broadway, dance, or, you know, chamber music in the Terrace Theater,

around our physical or infrastructure improvements.

BY MS. FREENY:

Q. Was the programming team told that the court had enjoined the board's March closure decision?

A. Yes.

Q. And was the programming team told that they could schedule performances in the main building for '26-'27 season?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: There was no -- it wasn't a yes or no, you can or cannot program in the main building. It was a you can program and should continue to program and come up with options that meet the mission, programs that meet the mission, alongside the work that we are trying to plan for the building.

BY MS. FREENY:

Q. This programming team, though, had been told after the March 8th decision -- sorry, let

me start that one again.

The programming team had been told, after the decision to close the Center for two years, that they shouldn't book programming for the '26-'27 season, right?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: There was a -- internally to the Center, a clear path forward at that time, which became less clear when the injunction, preliminary injunction, happened.

BY MS. FREENY:

Q. Okay.

A. So that was a period of time where there was a path forward, and now there's not.

Q. Understood. Mr. Floca, I'm just -- we're going to be here all day if I can't get a simple answer to what I think is a simple question. Your counsel can object to this, but I really am just -- to me, this seems like a sort of uncontroversial proposition, that, after the Center decided to close in early 2025, in Q1 of 2025, for two years to accomplish construction,

the programming staff was told, were they not, that they should not book programming for the 2026-2027 season?

And I am just trying to confirm that that is the case.

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: You're framing the -- you're framing that in a way that just doesn't reflect how I think the messaging is more appropriately communicated, which is programming needs to meet -- programming needs to match what's happening with the infrastructure in the building. And it's not just -- those things don't exist separately. They exist together.

BY MS. FREENY:

Q. Are you saying that the programming team was not told at any point in time between the decision to close the building for two years and the May court decision you should not program or book for the 2026-2027 season in the main building because the main building is going to be

closed?
MR. JANKOWSKI: Objection. Argumentative. Asked and answered. Misstates.
THE WITNESS: I think it's important to acknowledge what was happening around the time --
BY MS. FREENY:
Q. That's not my question, though. I asked you a yes or no question.
MS. FREENY: Can I have the court reporter read back my last question, please?
(The reporter read the record as requested.)
BY MS. FREENY:
Q. That's a yes-or-no question.
MR. JANKOWSKI: Same objections. Argumentative. Asked and answered. Misstates.
THE WITNESS: To put it plainly, I am not aware of the Center sending a blanket direction to programming to stop or refrain from programming anything in the main building.
BY MS. FREENY:
Q. And so what you're saying is that, from

the Center management's perspective, after the decision had been made to close the main building for two years but before the court injunction, that Center management would have been -- was okay with programming -- staff booking programming in the main building for the '26-'27 season?

MR. JANKOWSKI: Objection. Argumentative. Misstates.

THE WITNESS: Management was building a plan to make improvements in the main building, and those improvements would not have allowed programming to happen in the main building. But a programmer can't definitively say what they can or can't do without that plan, which was being built at this same time.

So the -- why -- I'm communicating that programming still needed to continue and we knew that, and that programming needed to -- and the plan for that programming needed to develop around the plan for improvements in the building during the -- you know, during this same

May/June time frame.

MS. FREENY: All right. I'd like to take a break. Can we take a break?

MR. JANKOWSKI: Could I ask why?

MS. FREENY: Because I want to chat with you.

MR. JANKOWSKI: Okay. Sure. Let's go off the record.

(Discussion off the record.)

BY MS. FREENY:

Q. All right. We're back on the record, Mr. Floca.

Mr. Floca, I want to -- we had been talking about the interim period, and then we talked about the period after the court -- sorry, after the Center decided to close the main building for two years but before the May decision.

Are you with me?

A. I am with you. Yes.

Q. Okay. During that time period, after the decision is made to close the main building, I

take it that the programming staff was not permitted to make bookings in the main building for the upcoming '26-'27 season.

Do I have that right?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The messaging was to build programming that would work with construction. And it's not that you're not permitted to program in these spaces; it's that the construction is going to work with programming, and programming is going to work with construction, and there's a plan for both of those.

BY MS. FREENY:

Q. Okay. Help me understand this, though, because --

MS. FREENY: Can I have my question read back?

(The reporter read the record as requested.)

MR. JANKOWSKI: And could you read his answer too?

(The reporter read the record as
requested.)
MR. JANKOWSKI: I'm so sorry. That was the sentence I was hoping to get out for counsel, the one you just read. Sorry about that. "It's not that they were not permitted" -- something along those lines.
(The reporter read the record as
requested.)
MR. JANKOWSKI: Thank you.
BY MS. FREENY:
Q. And so Mr. Floca, you're saying that the programming staff, after the -- after the decision was made to close the building but before the injunction, the programming staff were permitted to program -- to program for the FY '26-'27 season in the main building?
MR. JANKOWSKI: Objection. Misstates. Argumentative. Asked and answered.
THE WITNESS: There's not a simple response I can -- I can't just say yes to that because it's not -- the answer is not as simple.

BY MS. FREENY:

Q. So if a programming staff had come to you or -- had come to someone in management during this time period after the decision had been made and announced to close the main building for a period of two years but before that decision is enjoined by the court, and said, hey, I have a -- I've got this great thing, Shear Madness, I want to program them for the '26-'27 season in the main building, what would management have said?

A. Here's the plan -- here's where the plan for the main building currently is from a construction standpoint; here's the time frame that these things might be happening in the main building --

Q. Why do you say might? This is what I'm --

MR. JANKOWSKI: Could you let him finish his answer?

MS. FREENY: No, actually, this is -- I'm just trying to get to the -- actually, you know what, I do need to interject here because I'm

not -- I'm not certain if the witness is confused about the time frame or is just evading the question.

My -- because we're talking here about -- the decision has already been made to close the building.

BY MS. FREENY:

Q. And so how is there any leeway there for programming -- like, how is it a "might"?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: I feel like you're approaching this from the perspective that the Kennedy Center is just stopping and --

MS. FREENY: Okay. Again, I do want to tell the witness --

BY MS. FREENY:

Q. So I am the questioner. And so I need you to answer my questions. But what I don't need you to do is interpret, like, what I am getting at or what my perspective is.

Sp what my perspective is, you can have

whatever opinion you want on it, but what -- I just need answers to the questions, not what you think about my perspective.

MR. JANKOWSKI: And we'll push back against the characterization that these are not answering the questions. I want to be very clear about that.

Again, to the extent that this kind of continues in this vein, I think we'd start to object that this is harassing and --

MS. FREENY: Okay.

MR. JANKOWSKI: -- telling the witness what he's testifying.

So I'm going to ask that the witness is given an opportunity to finish the answers to your questions and to give what his and the Center's knowledge is as to the specific answers that -- to the questions you're providing.

THE WITNESS: We spoke yesterday about developing a plan for construction. And that plan has a schedule, and that schedule has the ability to allow things or stop things from

happening. And that plan is being developed at the same time -- the Center is developing this schedule for construction, and programming can definitely fit into that schedule. That's a normal process for the organization to -- to do.

BY MS. FREENY:

Q. And so during this time period -- so after the decision is made -- was it possible for the Center to book performances for -- in the main building for the '26-'27 season?

A. It would have been possible but irresponsible without knowing what was happening from the construction standpoint. And I don't think any programmer would -- a programmer might come with an idea and say, let's do Nutcracker in 2027, at which time we would say, well, what does the construction look like in the Opera House? Is that even going to allow Nutcracker in 2027 to happen?

Q. Why are you -- so it sounds like the answer to that question -- again, we are talking about after the decision is made to close in Q1

of 2026.

At that point in time, the Center is planning to close, correct? For two years. Close the main building.

A. The Center is planning to close and developing the way construction will happen, you know, during that time frame. Yes.

Q. Okay. And during that time frame -- so after the decision is made but before the order -- the Center is not planning on having any performances in the main building for the 2026-'27 season or '27-'28 season, correct?

A. The Center is planning to execute the construction projects that are contemplated in the Big Beautiful Bill and program.

Q. That's not my question. So this one I'm just going to insist on, and that -- because this is a yes-or-no question.

MS. FREENEY: Can I have this read back?

(The reporter read the record as requested.)

BY MS. FREENY:
Q. Is that correct or incorrect?
A. That is correct.
Q. Thank you.
I saw, Mr. Floca, that it was recently announced that the Kennedy Center Honors was going to -- is going to take place offsite in the upcoming season; is that right?
A. In December. Yes.
Q. Okay. Where is that going to be held? What venue?
A. Capital One Arena.
Q. When was that decision made, that the Kennedy Center Honors would be held at Capital One Arena?
A. I can get a specific date for you, but I don't have it right now.
Q. Okay. Was it before or after September 1st?
A. Before September 1st.
Q. Was it before or after August 13th?
A. Before August 13th.

Q. Who made that decision, that it would be at the Capital One Arena?

A. There was not one single person that made that decision. It was a decision by the Center.

Q. Okay. Who was involved in that decision?

A. People in the development and events team, myself, general counsel's office, and programming.

Q. And who first suggested the -- Capital One Arena as the venue for this year's Kennedy Center Honors?

A. Those same people looked at venues across the area at the same time, not just specifically or singularly Capital One.

Q. Okay. Did those same people also consider the prospect of holding the Kennedy Center Honors in the main building?

A. Yes.

Q. But the decision was made to hold it at Capital One offsite.

A. Yes.

Q. All right. The next topic I'm going to

turn to is regarding funding and finances --

A. Okay.

Q. -- which is topic A in the deposition notice.

All right. And this may also --

MS. FREENY: In case you object, this may also cross over with some of my questions with topic C, board decisions, because I will have questions about what was given to the board.

BY MS. FREENY:

Q. All right. Do you recall yesterday, Mr. Floca, in your individual deposition, that we talked about some -- the Audit and Finance Committee?

A. Yes.

Q. Okay. We talked about a meeting that was held with the Audit and Finance Committee, I believe, in early August of '26 in advance of the board's vote on August 13th.

Do you recall that?

A. Yes.

Q. Okay. I want to move backwards to the

Audit and Finance Committee meeting that was held in June and ask, knowing that the court decision came out on May 29th, would the June meeting of the Audit and Finance Committee have been the first meeting of that committee to take place after the court's preliminary injunction order and decision?

A. Yes.

Q. Okay. And then the Center's CFO, Donna Arduin, she attended that June meeting of the Audit and Finance Committee, did she not?

A. Yes. She would have.

Q. And she at that meeting discussed the effect of the Center's name change on finances; is that right?

MR. JANKOWSKI: Objection. Vague.

Go ahead.

THE WITNESS: If that was on the agenda. I'm not --

BY MS. FREENY:

Q. Okay. Well, why don't I have you refresh your recollection by having you turn to tab 9 in

your binder, which we are going to have marked as Exhibit 2.

(Floca (30(b)(6) Deposition Exhibit 2 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. All right. Mr. Floca, if you take a look at Exhibit 2, this is the Audit and Finance Committee meeting minutes from June 1st, 2026; is that right?

A. Yes.

Q. And you see the Bates number at the bottom indicating that this was produced by defendants in this case?

A. Yes.

Q. Okay.

MS. FREENY: Actually, I'm just going to ask counsel, just so that I understand. There's information that's blacked out throughout this.

Is there a privilege assertion?

MR. JANKOWSKI: Yes.

MS. FREENY: Okay. Which --

MR. JANKOWSKI: Well, and scope. So I think -- the scope -- I mean, I think it's scope and privilege with respect to the section entitled, "Background and Financial Position." It's attorney-client privilege under "Legal Analysis."

MS. FREENY: Clearly.

MR. JANKOWSKI: And it should be -- so there may be an intermingling of two, but it's largely attorney-client privilege for the rest.

MS. FREENY: Okay. And I will just state that at least my perspective, at a minimum, the financial position, not knowing what it says, I think, to us we think would be relevant given the court's statement about finances.

MR. JANKOWSKI: So I think this is a financial position with respect to the WNO disaffiliation update and financial exposure.

MS. FREENY: Okay.

MR. JANKOWSKI: So we would say that's out of scope.

MS. FREENY: All right.

MR. LYNCH: And privileged.

MR. JANKOWSKI: And likely attorney-client privileged.

MR. LYNCH: Litigation, right?

MR. JANKOWSKI: Yes, that's correct.

MS. FREENY: All right. I think our perspective is that it's not appropriate to redact for scope. But with that, I will turn my attention back to Mr. Floca.

BY MS. FREENY:

Q. Mr. Floca, in the committee minutes from the August 1st -- or excuse me -- start again.

In the meeting minutes from the June 1st, 2026, Audit and Finance Committee meeting, if you turn to page 2, it talks about committee discussion. That second bullet point, at least the second unredacted bullet point, that reads, "Arduin" -- that's the CFO, right?

A. Yes.

Q. "Arduin reported that following the December board meeting at which the name change was approved, ticket sales and fundraising came

to a halt."
Do you see that?
A. Yes.
Q. Does that refresh your recollection that CFO Donna Arduin told the Audit and Finance Committee on June 1st, 2026, that following the December board meeting at which the name change was approved ticket sales and fundraising came to a halt?
A. Yes.
Q. And the reference to name change, that was the decision to add the name Donald J. Trump to the Kennedy Center's name; is that right?
A. Yes.
Q. Was that information, the effect of the name change on financing, conveyed to the full board?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: The full board has not seen any information that is, you know, directly linked between this board meeting and ticket sales.

BY MS. FREENY:

Q. Meaning the full board had not been told that following the December board meeting at which the name change was approved, that ticket sales and fundraising came to a halt, correct?

A. No. That has not been communicated to the board, no.

Q. Okay. Why has the Center not communicated that to the board, the full board?

A. The structure around board meetings has not -- has not evolved in a way to have those conversations with the full board, but will, in FY '27, when we soon have the -- you know, the conversations, meetings, to look back at '26 financials and look forward at '27 financials.

Q. Did management have discussions about whether to tell the full board that ticket sales and fundraising came to a halt after the December board meeting?

MR. JANKOWSKI: Object to the extent that this calls for attorney-client privileged information.

But you can answer otherwise.

THE WITNESS: The Center has -- Center management has discussed multiple times the need to bring financial information to the full board.

BY MS. FREENY:

Q. Did they specifically discuss whether to bring to the full board information that ticket sales and fundraising had come to a halt after the December meeting?

MR. JANKOWSKI: Same objections.

THE WITNESS: No.

BY MS. FREENY:

Q. Okay.

A. No.

Q. Did the audit committee have any discussions about whether to raise to the full board the information that Donna Arduin had provided that ticket sales and fundraising had come to a halt after the December board meeting?

MR. JANKOWSKI: Same objections.

THE WITNESS: Yes. I think it's formalized in the -- in the conclusion here.

BY MS. FREENY:

Q. Oh, no, no. So my question was whether the audit committee had discussions about whether to raise this information that's memorialized here that we've just been talking about to the full board?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: The Audit and Finance Committee acknowledged that this information, including actuals from the course of FY '26, needs to go in front of the full board and -- or at the same time as an FY '27 proposed budget.

BY MS. FREENY:

Q. When is the FY '27 proposed budget slated to go before the full board?

A. It's not -- there's no schedule.

Q. Okay.

A. There's no scheduled meeting right now, but the path forward is another Audit and Finance Committee meeting, and then a development committee meeting and a programming committee

meeting, and then a full board meeting to discuss the things that those committees, including the events committee, discuss.

Q. Does there exist at this point in time a draft FY '27 proposed budget?

A. Yes.

Q. Okay. At what stage is that draft? Meaning, how far along is it?

A. It's almost final.

Q. Okay. What remains to be finalized?

A. We're working through a purposeful leadership establishment in the Center for departmental leaders who can then provide the appropriate input into a budget and be able to elevate that budget and the contents of that budget across those committees I mentioned.

So that's procedurally where things are. And it's -- you know, it's close to being finalized, within weeks.

Q. When did the Center start preparing that proposed FY '27 budget?

A. May, June.

Q. And was that budget prepared based on an assumption that the main building would close?

A. That was one of the assumptions of the budget. Yeah.

Q. Okay. Did the Center prepare a proposed budget for FY '27 to cover a scenario where the main building would stay open during the period of construction?

A. Those -- that financial information would have been part of the -- or is part of the Delta report and -- that report to the board.

Q. Okay. But did the Center itself prepare a proposed budget for FY '27 for the scenario of the building remaining open during construction?

A. Not for consideration by these committees.

Q. Okay. For any other purpose?

A. For -- yes. For the analysis of operating while renovating or renovating while operating.

Q. Okay. Where is that proposed budget?

A. It's largely a forecast based on

historicals, and that's part of the information that was discussed with Delta.

Q. Okay. Do you recall yesterday -- and we can look at it if you need to -- we talked about a chart that addressed FY '27 scenarios that was included as an appendix to the Delta report?

Do you recall that?

A. Yes.

Q. Is that what you are referring to when you are talking about this proposed budget for a scenario of phased renovation?

A. No.

Q. What are you talking about? I'm trying to understand -- you said that there is a proposed budget that contemplates phased renovation.

I'm trying to understand -- if I wanted to see that, where would I find that?

A. It's a forecast where you take --

Q. Okay.

A. -- the previous years -- and really, '25 would not be a -- not terribly appropriate. But

take numbers from '24 and forecast them forward without any change.

Q. Was that shared with the Delta consultants as part of their engagement?

A. The previous year financial information was. Yes.

Q. Okay. But --

A. And that's how Delta can extrapolate that information or move that information forward to see what -- you know, what normal year-over-year operating expenses are.

Q. Okay. So I guess I'm trying to drill down on whether there exists -- whether the Center prepared a proposed budget for FY '27 that contemplated phased renovation.

Did the Center, not Delta, prepare such a proposed budget?

A. Not in the -- not to the degree that I'm discussing now in presenting to committees and the full board.

Q. Meaning the Center didn't prepare the kind of proposed FY '27 budget for phased

renovation that, as we discussed, the Center is preparing and is almost finished preparing for the closure of main building scenario --

A. Yes.

Q. -- is that fair? Okay.

I do, though, then, want to know -- I want to close that gap, because you said it's not to the same extent.

To what extent did the Center, if at all, prepare an FY '27 budget that contemplated phased renovation?

A. Not past a forecast. Not in a detailed manner --

Q. Okay.

A. -- past a forecast of previous -- or an extension of previous years' operating costs.

Q. Okay. And are you saying, though, that the Center did prepare a forecast for -- a budget for phased renovation?

A. As part -- yes. As part of the Delta analysis.

Q. Okay. Is that the same thing or

different than the FY '27 scenarios chart that was an appendix to the Delta report?

A. The appendix? I'd have to look at what --

Q. Okay.

A. -- appendix you're -- what appendix you're...

Q. Give me just one second. We'll get the tab number for you.

MS. BAUM: Tab 3.

MS. FREENY: Okay.

(Floca (30(b)(6) Deposition Exhibit 3 marked for identification and attached to the transcript.)

MS. FREENY: So we're going to mark tab 3 Exhibit 3.

BY MS. FREENY:

Q. What is the appendix -- you see that on Exhibit 3, appendix X. That comes from --

A. Yes.

Q. That's an appendix to the Delta report.

And if you turn a page, this is what I

was referring to, and what we talked about yesterday, as a chart that the Center prepared to give to Delta for FY '27 scenarios; is that right?
A. Yes. This is (indicating).
Q. Okay. And this -- and when you were mentioning a forecast the other minute, is this what you were referring to or were you referring to something else?
A. Something else.
Q. Okay. What does that something else look like?
A. An analysis of multiple previous fiscal years' --
Q. Okay.
A. -- revenues and expenses that then can extrapolated forward --
Q. Okay.
A. -- to give an assumption on what an FY '27, you know, budget might look like if the construction was not -- you know, if renovations were not happening.

Q. Okay. Let me make sure I understand. Because I'm not asking about if renovations were not happening. What I'm asking about is planning -- budgetary planning for if the renovations happened but happened in a phased manner.

Do you understand that?

A. There was not a specific budget --

Q. Okay.

A. -- created to reflect or to mirror a more detailed phasing of construction within the main building.

Q. Okay. But was there a forecast, like the one you were mentioned [sic], that the Center prepared to extrapolate, as you said, for fiscal year '27 for a scenario not where the -- the construction was deferred, but where the construction was undertaken but in a phased manner?

A. There were -- there was work that Delta and finance did together to assume what some of the burdens would be to expenses and revenues and

to the construction if the -- if a more phased manner was undertaken. And that is what's reflected in their full report in some of the charts that they presented during the August board meeting.

Q. Okay. But not Exhibit 3?

A. No.

Q. Okay. I'm just going to represent --

A. Or, sorry, Exhibit X --

Q. Appendix X, Exhibit 3.

A. Yes.

MS. FREENY: Just for -- to move along, I'm going to represent that I'm not aware of any other, like, attachments to the report that have those -- you know, that forecast. To the extent that there is such an additional forecast, I think we would want to have a copy of that.

MR. JANKOWSKI: So -- yeah, we -- defendants produced -- again, defendants produced a workbook underlying these projections. I don't know if that's --

MS. FREENY: Ah. Okay.

BY MS. FREENY:
Q. So were you involved in helping to respond to the plaintiff's discovery request?
A. Yes.
Q. Okay. And were you involved in helping to identify underlying documents -- documents underlying Exhibit 3, the FY '27 outlook chart?
A. Yes.
Q. Okay. How did the Center -- I guess -- so you've heard your counsel say that the defendants produced a workbook in Excel format, which we understand to be supporting documentation for this FY '27 appendix X. Is that your understanding as well?
A. Okay. I would need to see the workbook.
Q. Okay.
A. But that sounds -- I know that this is a summary --
Q. Yeah.
A. -- and there's a lot more tabs and information that goes into this summary.
Q. Okay. How was that workbook prepared?

A. The financial planning and analysis team handles the majority of that work.

Q. Okay. When did that work start to prepare that analysis?

A. Which analysis? The Delta --

Q. No. The work that the Center did to provide to Delta to produce this -- to produce this chart to provide to Delta.

Let me ask you this: Did it -- did the Center begin preparing the underlying financial projections for the different scenarios before or after Delta was engaged?

A. At the same time. I think they would go hand in hand.

So the underlying workbook and structures has always been in place as part of what FP&A does, and that information would be -- would be adjusted to reflect the work that Delta is doing at the same time.

Q. Okay. So it would be fair to say that the -- that work was adjusted to be able to provide Delta with the Center's number -- the

Center's projections for a fiscal year '27 scenario with phased renovation.

A. Yes.

Q. You said financial and planning was involved in preparation of that analysis.

Anyone else?

A. Well, they work with all of the different programs, all of the different teams, so the --

Q. Who over- -- sorry.

A. Sorry. So they would have been involved in -- multiple people would be involved in --

Q. Who --

A. -- FP&A's process.

Q. Who from the Center oversaw the preparation of the financial analysis underlying the chart that appears in appendix X?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: A lady named Kasama is the leader -- vice president of the FP -- of financial planning and analysis. And she works for Donna who then works with me --

BY MS. FREENY:
Q. So are you saying that this lady, Kasama, would have taken the lead in preparing the financial analysis underlying the chart set forth in Exhibit 3?
A. Lead in preparation, maybe not lead in strategy or what's, you know, included in each one of the buckets. She's more of a -- the owner of the process.
Q. I got it.
Who took the lead in the strategy?
A. I was a big part of that.
Q. Okay.
A. The -- Donna was a big part of that.
Q. Anyone else that you would consider having been a big part of the strategy decisionmaking?
A. No, not necessarily.
Q. Okay. Did the financial analysis underlying the chart in Exhibit 3, did that encompass data from fiscal year '26?
A. Yes.

Q. Okay. It's your understanding that fiscal year '26 data was used to prepare this chart that was provided to Delta?
A. '26 financials were a factor in this --
Q. Okay.
A. -- in addition to other --
Q. Yeah.
A. -- '25 -- other previous years.
Q. I want to understand factor, though, because -- you know, I assume that when the financial people, including Kasama, are doing this, they're running numbers, I think you said based on historical data; is that right?
A. Uh-huh.
Q. I need you to answer out loud.
A. Yes. Yes. Sorry. Yes.
Q. I know this is not the most exciting part of our deposition.
Did -- was fiscal year '26 financial data part of the data that was used to calculate the numbers in this Exhibit 3?
A. Yes.

Q. Okay. Was fiscal year 2026 financial data provided to -- separately to Delta Consulting?

A. I don't think so, not explicitly --

Q. Okay.

A. -- not, here's '26 data, no.

Q. Okay. But it was -- it was used by the Center internally to provide -- to prepare this chart for Delta. Do I have that distinction correct?

A. Yes.

Q. Okay. And am I right in assuming that the reason that the Center incorporated fiscal year '26 data was to make sure that it had the most up-to-date figures and the most number of figures available for its calculations; is that right?

A. Yes.

Q. All right. Did -- Delta, though -- Delta was provided fiscal year, what, '23 and '24 financial statements, which were audited; is that right?

A. Yes.
Q. Okay.
A. Audited financial statements.
Q. And then they were provided fiscal year '25 unaudited statements, correct?
A. I believe so. Yes.
Q. Okay. But they were not provided financial statements or financial reports for fiscal year '26, were they?
A. No, not outside of what information might have been shared in meetings with them with finance.
Q. Was there information shared in meetings with them regarding fiscal year '26 finance -- finances?
A. I'm sure that they would have discussed that. They would have come up --
Q. Okay.
A. -- in conversations with Delta.
Q. Delta, though, actually requested to obtain from the Center fiscal year '26 financial data, didn't they?

A. I'm not -- I'm not certain if they did.
Q. Okay. And just to be clear, that means you, personally, are not certain; is that right?
A. Yes. Yes.
Q. All right. But the Center would know whether Delta requested fiscal year '26 financial data, correct?
A. Yes. There would be a record of that.
Q. Okay. And if I asked who made the decision about whether to provide fiscal year '26 financial data to Delta, do you know the answer on behalf of the Center?
A. I do not.
Q. Okay.
And this I'm just going to do to get on the record, because I'm going to represent that I -- we understand that they were not provided, and so one of my questions would be why were the fiscal year '26 -- why was the fiscal year '26 financial data not provided to Delta?
And I assume, based on your questions -- or your responses, that you, sitting here today,

are not in a position to know how to answer that question on behalf of the Center; is that right?

MR. JANKOWSKI: Objection. Speculation. Argumentative.

BY MS. FREENY:

Q. Do you know --

A. No, I can answer --

Q. Okay.

A. -- why.

Q. Okay.

A. The actual financial data of the year we're in is not relevant to Delta's work in extrapolating out an analysis of how the Center might operate while it's renovating or how the Center might renovate while it's operating, which is the main focus of Delta's work.

Q. Okay. And so, from the Center's perspective, what you're saying is that the fiscal year '26 financial data was not provided to Delta because it was not, in the Center's perspective, relevant to Delta's analysis.

Do I have that right?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The current year, fiscal year, in which we're operating is not as relevant to their work as year-over-year historicals, which they were provided with.

BY MS. FREENY:

Q. Understood. But does the Center regard it as relevant?

A. It's relevant.

Q. Okay.

A. Yes, it's relevant.

Q. Then why was it not provided if it was relevant to Delta?

A. Again, I'm certain it was discussed. I'm certain FY '26 financials were discussed, and the more relevant historicals were provided to them --

Q. Okay.

A. -- which gave them a true picture of what the Kennedy Center is, financially, over, you know, a number of years, not just a fraction of FY '26, which is a tumultuous year that doesn't

reflect what we should be planning for.

Q. Okay. Is that why the Center did not give FY '26 data to -- to Delta, because it was a tumultuous year?

A. Well, it's -- it's data, financials, and information that does not reflect, you know, a normal operating realm for the Center, which is what we wanted Delta to analyze.

Q. And did the Center regard that data as material to Delta's analysis?

MR. JANKOWSKI: Objection. Asked and answered. And also a legal conclusion.

THE WITNESS: It's not relevant to their understanding of the Center's financials.

BY MS. FREENY:

Q. Okay. All right. I took us on a little bit of a diversion because you had mentioned what I thought was exhibit -- the exhibit we just talked about, but I want to turn back and close one loop on the June meeting of the Audit and Finance Committee.

So do you recall that we were talking

about that meeting?
A. Yes.
Q. Okay. Can I get you to turn to page -- to tab 42 in your binder, which I think we are going to mark as Exhibit 4.
Mr. --
MR. JANKOWSKI: Still turning, sorry.
MS. FREENY: Oh, sorry.
(Floca (30(b)(6) Deposition Exhibit 4 marked for identification and attached to the transcript.)
BY MS. FREENY:
Q. Mr. Floca, do you see that Exhibit 4 is marked, "Audit and Finance Committee, June 1st, 2026"?
A. Yes.
Q. Okay. And do you agree that this is a PowerPoint presentation? Yes?
A. Yes.
Q. Was this a PowerPoint presentation that was made to the Audit and Finance Committee at that meeting on June 1st, 2026?

A. Yes.
Q. Okay. And if you flip ahead to what's marked in very small numbers at the bottom right-hand corner 17, or in the middle red 110, and you see a chart, and the slide says, "Where Are We Now..."
Do you see that?
A. Yes.
Q. Okay. And so do you agree that this is a -- this is a chart that was shown to the finance and audit [sic] committee on June 1st depicting trends in ticket sales; is that right?
A. Yes.
Q. Was this chart ever showed to the full board?
A. No.
Q. Was any of this Exhibit 4 slide deck shown to the full board?
A. No.
Q. Okay. Now I want to have you turn to tab 11, which is a document that we looked at during your deposition yesterday that you were

not able to answer at least one of my questions, and so I wanted to return to it and ask you in your capacity as the representative designee of the Kennedy Center.

MR. JANKOWSKI: We'll mark this as 5?

MS. FREENY: Okay. So we're marking tab 11 as Exhibit 5.

(Floca (30(b)(6) Deposition Exhibit 5 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. And do you recall, Mr. Floca, yesterday we talked about this -- I believe you called it a burn chart; is that the term that you would use?

A. Yes.

Q. And this chart was -- it's dated July 29th, 2026; is that right?

A. Yes.

Q. And this reflects an analysis of the Center's cash position at the time?

A. Yes.

Q. Okay. And remind me, who -- was this

prepared for a specific committee or was this prepared for a different purpose?

A. For -- this was not prepared for a specific committee. This --

Q. Okay.

A. -- was a tool for staff and management to use.

Q. Okay. Did the Center use this tool to track its cash position in other years? Or was this prepared on or around, you know, 2026?

A. Prepared on or around 2026.

Q. Okay. Was it prepared on or around the July date that is shown, or was it prepared sometime previously?

A. Previously. I don't know to what extent, but --

Q. Okay.

A. -- in, you know, June, July.

Q. Okay. That's helpful.

Yesterday when you were testifying in your individual capacity, I asked you about the -- one of the remaining sources that's

listed, the foundation.

Do you recall that?

A. Yes.

Q. And we agreed that that -- the term "foundation" referred to this Trump-Kennedy Center for the Performing Arts Foundation; is that right?

A. Yes.

Q. Okay. And on this chart it shows in terms of sources that the Center had $18 million remaining from the foundation; is that right?

A. Yes.

Q. And do you recall yesterday you had indicated that that 18 million was transferred from the foundation to the Center sometime in 2026; is that right?

A. Yes.

Q. All right. When you testified yesterday, I asked you the meaning of "pending board action," as listed under the header "Repayment Required," and you didn't know what that meant.

And so I'm going to ask you again, acting

as the Center's designee, what does this chart indicate when it says that the $18 million in sources from the Foundation, under "Payment [sic] Required?" is pending board action?

A. Transfers or agreements or any exchange of information between the foundation and the Center should be -- you know, should be represented in an action by both entities' boards' officers.

Q. Okay. And is that a requirement set forth in any document?

A. There are -- yes, there are stipulations in -- in the bylaws.

Q. And that's the bylaws of the Kennedy Center or the bylaws of the foundation?

A. The bylaws of the foundation.

Q. Okay. Did the Kennedy Center also agree -- make any agreement with respect to what you said, that these actions, including any exchange, should be approved by both boards?

A. I think it's less that the Center's board needs to approve an action and more than the

Center's development committee and finance committee need to understand how the foundation and the Center work together.

Q. Okay. How do the foundation and the Center work together?

A. The foundation is an external development, fundraising, and philanthropic tool meant to -- a similar mission to the Center of both supporting the Center but also furthering arts.

Q. And who controls the foundation?

A. There are officers and a board.

Q. Okay. Is there a director of that board?

MR. JANKOWSKI: Is some of this duplicative of what we talked about yesterday and also maybe outside the Center's...

MS. FREENY: I don't think he knows.

BY MS. FREENY:

Q. So to be clear, if -- if the Center does not know who the board of directors is, then, you know, with your counsel's consent here, I would ask you to just say the Center doesn't know.

If you don't know but you don't know if others at the Center know -- for example, board members who are also defendants in this case -- then I would ask you to say that you don't know personally.

A. The Center and its leadership and the foundation and its leadership have not had that exchange of information that needs to happen in the future.

Q. Okay.

A. So the -- here's the -- you know, here's what the foundation is and here's the leadership on the foundation and here's what the Center is going to rely on the foundation for.

Q. Okay. And so are you saying that the -- at least -- let me parse this out.

Center management has not been made aware of who the board of -- the -- the director of the board of the foundation is?

A. No, not Center management. No.

Q. Okay. Anyone else affiliated with the Center?

MR. JANKOWSKI: Objection. Vague.
THE WITNESS: Yes. There are specific people within the Center that know of, you know, the foundation's leadership or potential changes to the foundation's leadership.
BY MS. FREENY:
Q. And who are those people?
A. I know some of that information --
Q. Okay.
A. -- but I'm not going to assume who else knows --
MR. JANKOWSKI: And I think I'm going to object on scope in the 30(b)(6) as well, unless you can point me to where --
MS. FREENY: I mean, I think it's relevant, since this is the finances, and their cash position is dependent on understanding pending board action and --
MR. JANKOWSKI: Well, so actually I don't -- so, yeah, I don't know if we've established what it's dependent on. I don't --
THE WITNESS: I think it's important that

there's a foundation and there's the Center. And the foundation has -- is supporting the Center by transferring funding which the Center is now utilizing for its day-to-day operations.

So that funding is not -- there is no pending board action --

BY MS. FREENY:

Q. Okay.

A. -- that is going to dictate that funding or the Center's use of that funding. That funding is unrestricted, and it's being used by the Center at this time to support its operations --

Q. Was that --

A. So that's the -- I mean, that is -- I'm sorry. That's important. I just wanted to say.

Q. I appreciate that.

Was that funding at any point in time restricted?

A. No. The donations were not -- were not restricted.

Q. Okay. And when you say "the donations,"

do you mean the donations that were made from individuals to the foundation or the donations that were made from the foundation to the Center were never restricted?

MR. JANKOWSKI: I think object on scope grounds as to "the foundation" question.

Answer to you -- your or the Center's knowledge.

THE WITNESS: I don't think the Center is aware of a restriction and furthermore is using the funding in an unrestricted way.

BY MS. FREENY:

Q. Was the Center aware that the Department of Justice filed a brief with the D.C. circuit that represented that funding from the foundation to the Center could be clawed back if Donald Trump's name was not on the building?

MR. JANKOWSKI: Objection. Asked and answered. And misstates.

MS. FREENY: I'll just say I've never asked about the D.C. Circuit in this deposition.

MR. JANKOWSKI: Well, I think -- okay. I

think he already answered your question in the previous answer.

BY MS. FREENY:

Q. My question is, was the Center aware that the Department of Justice filed a brief in the D.C. Circuit that represented that the donations from the fund [sic] to the Center could be clawed back if Donald Trump's name was not on the building?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The Center is aware that there could be fundraising done by the foundation that has stipulations tied to it. Yes.

BY MS. FREENY:

Q. You said they -- okay.

A. It could be.

Q. Okay. It didn't answer my question, but let me pursue that.

There could be funding. Was there -- at the time that the Department of Justice filed a brief with the D.C. Circuit representing that donations made from the foundation to the Center

could be clawed back, was there actually those conditions, allowing the foundation to claw back donations given to the Center?

MR. JANKOWSKI: Objection. Vague and misstates.

THE WITNESS: There's no -- in order for that to actually happen, there would have to be some type of agreement on what the funding that is transferred is being used for.

BY MS. FREENY:

Q. Okay.

A. And this funding was transferred without any restrictions to it.

Q. Okay.

A. But that doesn't also mean that there could not be more fundraising that the foundation does on the Center's behalf that has restrictions tied to them.

Q. Has the Center had discussions with the foundation about the prospect of receiving donations that were restricted in some fashion?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Nothing explicitly that --
BY MS. FREENY:
Q. Anything not explicitly?
MR. JANKOWSKI: Same objections --
BY MS. FREENY:
Q. Any discussions?
MR. JANKOWSKI: Same objections. Still unclear on the time frame.
BY MS. FREENY:
Q. Well, let me ask this again, then, to make sure we get this clear.
At any point in time, has the Center had discussions with the foundation about accepting donations that are restricted?
A. Not about accepting them --
Q. Uh-huh.
A. -- but discussions that are -- discussions around how the foundation could raise money that is restricted.
Q. Okay. When did those discussions take place?
A. They're normal -- I can't point to a

single discussion. This is not a -- it's not a singular or -- it's an -- it's normal course of action between the two entities that are trying to achieve the same purpose.

Q. Okay. And so, from the Center's perspective, it's a normal course of action to have discussions with a donor about the prospect of accepting donations that are conditioned on the outcome of a pending legal action?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: It's normal for the Center to have discussions with entities or organizations who give on the expectation or condition of their gift.

BY MS. FREENY:

Q. Does that include where the condition is to place the president's name -- or to give recognition to President Trump?

The Center's perspective is that that is a normal condition?

MR. JANKOWSKI: Objection. Misstates and argumentative.

THE WITNESS: I think it is normal for someone to say they want to give a gift to the Center and expect recognition for that gift.

BY MS. FREENY:

Q. Including if that person is the chair of the board of directors -- or the board of trustees?

MR. JANKOWSKI: Objection. Asked and answered. Misstates.

THE WITNESS: Yes.

BY MS. FREENY:

Q. Okay. Did anyone in management at the Center express concern about the prospect of accepting funds from the foundation that were conditioned on providing recognition to President Trump?

MR. JANKOWSKI: Object to the extent that that calls for attorney-client privileged communications.

MS. FREENY: So I'm not asking about attorney-client privilege -- I'm asking about Center discussions, management discussions.

MR. JANKOWSKI: Which could include counsel, so...

MS. FREENY: Okay.

BY MS. FREENY:

Q. Bit again -- so just -- this one I do want to be just clear about, and what you're withholding.

I'm not asking about a discussion that someone in management had to obtain legal advice from counsel. What I'm asking about are discussions that management had, whether counsel was present or not -- which, from our perspective would not destroy privilege because I am asking about management discussions, not legal discussions.

A. And what are you asking about those discussions?

Q. I'm asking about whether anyone in management expressed concerns about the Center accepting donations from the foundation that were conditioned on certain recognition given to President Trump.

Did anyone at management express those concerns?

A. Are you asking if they expressed them to me or expressed them out loud to the Center or just generally had them?

Q. Generally expressed them.

So because -- understanding that you are here in a representative capacity, you can't know what's in people's heads. What you can know is if there was a discussion, if they were expressed -- whether they were expressed to management or in -- you know, I'm not talking about with counsel. But with management, with the board, with whoever.

A. There were discussions about -- about fundraising that was secured or pledged. Whether that's, you know, from the foundation that has a stipulation on it or from other people who had pledged money, and what we would need to do if that fundraising wasn't available or if those pledges weren't available.

So yes, there were discussions around --

Q. Okay.
A. -- that -- you know, those concerns.
Q. Okay. During those discussions, did anyone at the Center -- anyone either -- let me -- did anyone in management express concerns about the prospect of accepting donations that were conditioned -- specifically conditioned on recognition for President Trump?
MR. JANKOWSKI: Objection. Asked and answered.
THE WITNESS: Yes. I just -- yes.
BY MS. FREENY:
Q. Okay. Who expressed those concerns?
MR. JANKOWSKI: Same objection on attorney-client privilege, but...
THE WITNESS: Well, I have concerns.
BY MS. FREENY:
Q. Okay.
A. I mean, mechanically --
Q. Yeah.
A. -- there would have to be -- you -- if that were to happen, you have to weather the

outcome of -- of those decisions.
So I thought about that --
Q. Who did you --
A. -- and Donna --
Q. Sorry.
A. -- thought about some of those mechanics as well in making, you know, budgets and plans and these financial pictures that we've been discussing.
Q. Who did you express those concerns to other than counsel?
A. I think I'm in my personal capacity now, right? So --
Q. Well, so I think with this, if the Center had designated, you know, somebody else who knows about the -- you know, who knows about those discussions, I would be asking them the same question, what did Matt Floca -- who did Matt Floca express those concerns to?
And so I am asking you as the representative of the Kennedy Center, but I'm asking for information about its executive

director, which also happens to be you.

And so who did -- if you want me to phrase it this way: Who did executive director Matt Floca express concerns to about any conditions being placed on foundation donations.

A. It was mainly Donna and myself --

Q. Okay. But did you --

A. -- having those conversations.

Q. Okay. So those were conversations between the two of you?

A. Yes.

Q. Did you express concerns to Secretary Lutnick about -- about any conditions that would be placed on donations received by the Center from the foundation?

MR. JANKOWSKI: Object to the extent that that could be construed as advising the president or his advisors on the president's behalf. On executive privilege grounds, I'll instruct the witness not to answer.

But if you can answer beyond that, feel free.

THE WITNESS: I never expressed any concerns to Secretary Lutnick about the restricted giving or conditional giving from the foundation to the Center. These are mainly internal conversations about what needs to happen to -- to prolong our operations within the expect- -- or within the conditions that we find ourselves in. And if those conditions change and, you know, down the road we need to do something differently...

BY MS. FREENY:

Q. Okay. Did you discuss with Secretary Lutnick the prospect of the Center's receipt of donations from the foundation as a source of funds for Center operations?

MR. JANKOWSKI: Same objection on executive privilege. To the extent any concerns or advice were communicated with the understanding they'd be communicated to the president, we would invoke the executive privilege.

MS. FREENY: And here, just to make the

record -- like, just to make it clear, I don't understand what is being withheld from me. You obviously were challenging the invocation of executive privilege here, so I just need help understanding what information you're directing him not to answer because it's conditional.

MR. JANKOWSKI: Well, maybe Mr. Floca can explain further.

I'll be candid, I don't have specific details as to what was discussed and to say that we're withholding this --

MS. FREENY: Okay.

MR. JANKOWSKI: -- specific statement and we're not withholding --

MS. FREENY: Would it be easier if we put a pin in that question and returned to it after you had time to consult with him just so that we can -- you can figure out what he might say and whether it's going to be withheld?

MR. JANKOWSKI: Sure. Could we maybe ask on the record whether he believes there is any information that will be withheld on that basis?

MS. FREENY: Okay. I mean -
MR. LYNCH: Why don't we just --
MR. JANKOWSKI: Okay.
MR. LYNCH: Get the question, we'll talk it through in the next break, and we can go back to it.
MS. FREENY: Okay. All right.
MR. LYNCH: I think that's easiest.
BY MS. FREENY:
Q. Did the full -- was the full board ever informed that the Center was -- had discussed with the foundation the possibility of receiving funds that were restricted based on possible recognition for President Trump?
A. That never specifically came up at board -- you know, at board-level meetings.
Q. Okay. And so that means that management never raised that -- let me rephrase that. I'll try to be a little more neutral there.
That means that management never raised at the -- at a full board meeting the prospect that it might accept funds from the foundation

conditioned on certain recognition by Trump.
A. That's --
MR. JANKOWSKI: Objection. Misstates.
THE WITNESS: That --
MR. JANKOWSKI: Was there an answer?
THE WITNESS: Yeah, that's -- that's correct.
BY MS. FREENY:
Q. Okay. You agree, though, that if the Center does accept funds conditioned on recognition of President Trump, that may require board action in order for those funds to be usable by the Center, right?
A. There would need to be an agreement between the Center and the foundation. Yes.
Q. Might there also need to be a board resolution to approve the recognition that was the condition for the donation?
MR. JANKOWSKI: Objection. Asked and answered.
THE WITNESS: To the degree a resolution is an agreement, I mean, I think things could

happen separately that aren't identified in the resolution. You know --

BY MS. FREENY:

Q. Okay.

A. -- there have been gifts that come in to the Center that aren't discussed at the board level, so it really depends.

Q. Okay. What about that -- focusing on the donations or the gifts from the foundation, what were the conditions or the restrictions that were being discussed with the foundation?

MR. JANKOWSKI: Objection. Asked and answered, I think, although not positive.

THE WITNESS: There are -- there were discussions around, you know, involvement with -- within the Center, within the, you know, physical improvements of the Center, within, you know, what's going to happen from, you know, an acknowledgement perspective.

So there's a handful of conversations, but nothing -- nothing that's out of the ordinary.

BY MS. FREENY:

Q. Okay. Were those potential restrictions the memorialized anywhere in Center records?

A. No.

Q. Okay.

MR. JANKOWSKI: And could I just -- I won't raise it now, but scope as to I think both the discovery limitation, as well as the 30(b)(6) notice.

Could I just ask what the basis is for continuing to go down here?

MS. FREENY: Yeah. This is relevant to the finances to the extent that they are talking about -- their financial position is inextricably linked to conditioning the receipt of funds --

MR. JANKOWSKI: So -- I don't think we've established that. In fact, I think he testified the opposite.

MS. FREENY: He --

MR. JANKOWSKI: So, you know, to the extent that that relates to the Center's current financial position, we've already gone over that.

MS. FREENY: All right. But their financial position the equities that the court considered is inevitably going to depend on whether -- on the Center's discussion about the conditions that are being placed on donations.

MR. JANKOWSKI: And he's already testified there are none on the one --

MS. FREENY: But he's also testified that they are -- they are discussing conditions.

MR. JANKOWSKI: But the Center's current financial position --

MS. FREENY: Correct.

MR. JANKOWSKI: -- is not dependent on --

BY MS. FREENY:

Q. Mr. Floca, does the Center -- is the Center continuing to discuss with the foundation the prospect of receiving funds from the foundation that contain these conditions that you just mentioned?

A. There aren't active conversations today --

Q. Uh-huh.

A. -- in the near term, but the Center and with the foundation will continue to rely on one another. That's the -- you know, that's the intent, that's the purpose, and that is the path forward. But the Center is also working on, you know, development and fundraising avenues, whether that's events or targets or other -- other corporate gifts that will live alongside whatever the foundation is able to do for the Center.

Q. Is the Center open to the prospect of receiving donations from the foundation that are conditioned on acknowledgment, as you used the term, of Mr. Trump?

MR. JANKOWSKI: Objection. Vague. And asked and answered.

THE WITNESS: Yes, there's no issue with acknowledge- -- acknowledging the chairman of the board, and it's happened previously in the past --

BY MS. FREENY:

Q. Okay.

A. -- precedent there.
Q. And what is your understanding of acknowledgment in this context of conditions that the Center is open to having them placed on potential receipt of funds from the foundation?
What type of acknowledgement are we talking about?
A. It can range. It can, again, vary.
Q. Including renaming of -- or put -- let me ask this: Does it include putting President Trump's name somewhere on the building?
MR. JANKOWSKI: Object on the scope here. I'm going to instruct the witness not to answer. It's outside of the scope of the court's discovery order.
MS. FREENY: Okay. And I'll just state plaintiff's position that -- the witness has testified that the Center is open to accepting funds that are conditioned on placing President Trump's name on the building, which is something that is currently enjoined and an issue before the D.C. Circuit, and so we regard that as

inextricably linked to the Center's financial position as it goes forward, and the equities in particular of the funds that will be available for the renovation that is the subject of the court's current inquiry.

MR. JANKOWSKI: And I'll just note that, yes, there has already been final judgment entered on that issue, which is why it's out of scope of the current discovery, and the extent of the witness' testimony thus far has been to establish that the Center's financial position is not dependent or is inextricably linked --

MS. FREENY: All right.

MR. JANKOWSKI: -- on that issue.

MS. FREENY: So -- yeah. And just to be clear, the relevance here is to the financial position for a closure decision. But I would also just note for the record that the Department of Justice, in its briefing, has linked the financial position and the closure.

MR. JANKOWSKI: And one more response on that statement by counsel and a legal filing is

not the equivalent of fact testimony from a fact witness.

BY MS. FREENY:

Q. Were --

MS. FREENY: So are you going to let him answer this question?

BY MS. FREENY:

Q. Were any board members involved in discussions with the foundation? Again, this is -- I want to talk about sort of around this time period, the sort of July, pre-August 13 time period.

Were any board members involved in discussions with the foundation about the terms of receiving this $18 million from the foundation set forth in Exhibit 5?

A. Our vice-chair, Jennifer Fischer, was part of conversations and specifically -- or importantly, she's also part of the Audit and Finance Committee.

Q. Okay. Any other board members besides Jennifer Fischer who were involved in those

conversations?
A. I believe this was part of the conversations with the full Audit and Finance Committee as well. So they would all be part of the financial -- an understanding of the financial picture here.
Q. Okay. So the board members at the audit committee would understand the -- the interactions with the foundation with respect to the 18 million.
But were there any other board members other than Jennifer Fischer who were involved in conversations with the foundation about this $18 million?
A. I think it was mostly Jennifer.
Q. Okay. You say mostly. I just wanted -- are you aware -- are you aware of anyone else on the board who was involved in conversations with the foundation about this 18 million?
A. I'm not certain. There may have been conversations with the -- with the treasurer as well of the -- the Kennedy Center's treasurer.

Q. Who is that?
A. John Falconetti.
Q. Okay.
A. I don't remember exactly what the extent of those conversations were.
Q. Understood. That's helpful.
Anyone else besides those two who made have had conversations with the foundation about this 18 million?
A. No, I don't think so.
Q. Okay. And Mr. Floca, you're aware that Mr. Trump has claimed that he gave $18 million to the Kennedy Center?
A. I saw the Truth Social message --
Q. Okay.
A. -- that communicated that. Yes.
Q. Okay. And is this, like -- did President Trump separately give $18 million from his own account, or is that, to the Center's understanding, a reference to the $18 million from the foundation?
A. I don't think the President gave

$18 million from his own account, no.

Q. Okay. Did -- wait.

Yesterday, I asked you whether the -- well, do you recall that we talked about the -- sorry, one more question, going back to our discussion of the foundation.

Does the Center have a copy of the foundation's bylaws?

A. Yes.

Q. Okay. When did they receive a copy of those bylaws?

A. I don't know the specific date --

Q. Was it before or after the court's May decision?

A. I don't know. I'm going to have to get -- I can get you a firm --

Q. Okay.

A. -- time frame on when we got --

Q. All right.

A. -- bylaws or --

Q. That's helpful.

And when the Center received those

bylaws, who sent them?
A. I don't know.
Q. Okay.
A. I mean, I'm sure we -- that's -- we can find that.
Q. You have records of that, I'm sure.
A. Yes.
Q. Okay. Now we're going to jump to the fiscal year 2025 audit.
Yesterday we talked about the fact that that audit has not been completed.
Do you recall that?
A. Yes.
Q. Okay. And I believe that you testified yesterday in your personal capacity that BDO, which is the Center's auditor, had communicated to the Center that the reason that the audit was open was primarily due to outstanding issues with a request from Senator Whitehouse; is that right?
A. Sounds right. Yes.
Q. Okay. So acting as the Center's designee, are there other reasons that BDO has

communicated to the Center about why the audit has not yet been completed?

A. I mean, there are procedural steps, but that's the main reason --

Q. Okay.

A. -- having that -- the confidence -- BDO having the confidence that the Center is going to analyze what Senator Whitehouse is raising and respond to it where necessary, and then respond -- right?

Q. Okay.

A. So that's happening. Yes.

Q. Okay. When did BDO raise that concern about -- that they needed to have the confidence that the Center was going to respond appropriately to Senator Whitehouse?

A. I'll have to find out --

Q. Okay.

A. -- how that communication originally came from BDO --

Q. Okay.

A. -- and when that was.

Q. Are you able to answer when you first learned about it?
A. Yes. Week before last.
Q. Okay.
A. Within the last two weeks.
Q. Okay.
A. It's a recent conversation between myself and the main point of contact at BDO.
Q. Prior to that period of time, did the Center decline to provide information to BDO to assuage its concern about the response to Whitehouse?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: No. But this was another example of a complicated --
BY MS. FREENY:
Q. Okay.
A. -- a complicated set of things.
Q. Okay.
A. And I'll just paint one picture that I've been concerned about since I started --
Q. Yeah.

A. -- and something that Senator Whitehouse has also pointed at in a lot of his -- in a lot of his messaging, is that the contract -- not federal contracting, but the contracting procedures on the trust side are not as structured as I think they should be. And that's something that we've been discussing how to improve now for months.

Q. Okay.

A. And the way that we make those improvements and communicate them and also put them in place, effectuate them at the Center, will -- you know, will be a response to Senator Whitehouse. But especially at a time where, you know, we're having to do more with less, it's difficult to get to that better place.

Q. All right.

A. Just specifically on how we write contracts.

But there's also, you know, issues in his -- in his letters that are similarly as complicated that we have to just change or --

Q. Okay.
A. -- improve.
Q. What other issues raised by Senator Whitehouse is the Center -- I guess what are these other issues?
A. Tracking pledges --
Q. Okay.
A. -- and tracking donations. How that information, you know, is easier to analyze.
Q. Okay.
A. It's on the fundraising front as well as the -- as well as the financial front.
And, you know, he's raised issues on the -- on the federal contracting side as well but, you know, we have -- we have strong mechanisms in place on the federal side to track requisitions and obligations and commitments.
Q. Okay. Has the Center had issues during your tenure as executive director with the tracking of pledges or tracking of donations?
MR. JANKOWSKI: Objection. Vague. Argumentative.

THE WITNESS: Yes.

BY MS. FREENY:

Q. Okay. Tell me about those.

A. Who made the pledge --

Q. Okay.

A. -- when did the pledge come through, who's following up on the pledge. Was this pledge just a single person's point of contact or was it understood as a broader part of development's work?

You know, basic business things --

Q. Okay.

A. -- and visualization of -- of fundraising efforts across the --

Q. Okay. You'll have to excuse me because I don't -- I'm not a fundraising expert.

So can you help me understand what you mean where one of the tracking issues was tracking of whether someone was a single point of contact or not?

What's that mean?

A. If a single point of contact was working

with a specific donor and not updating the Kennedy Center's, you know, database, if you will, of what that -- you know what that donor was willing to do or what that donor was going to do or had actually done --

Q. Okay.

A. -- and what the impact of their donation --

Q. Okay.

A. -- was.

Q. And so -- meaning there were instances where that was not tracked because only a single person was the point of contact for a donor?

A. Not tracked, or the records are not as easily accessible as they should be --

Q. Okay.

A. -- for us to be able to say to someone like Senator Whitehouse, you know, here's concrete information.

Q. Okay. Were there -- have there been issues during your tenure as executive director at the Kennedy Center where donations -- pledges

were booked, so to speak, where they were unlikely to actually come through?

MR. JANKOWSKI: Objection. Vague. Speculation.

THE WITNESS: I can't think of anything specifically, just speaking in broader terms about our systems and less about specific people or pledges or individuals.

BY MS. FREENY:

Q. Okay. While we're talking about tracking, I want to talk about how the Center tracks its accounting, and specifically what accounting software the Center uses for its finances.

MR. JANKOWSKI: Can I just ask which --

MS. FREENY: Yeah. So this one is going to be related to documents and records. And that is -- I think it's the last one.

MR. JANKOWSKI: Preservation, collection, production?

MS. FREENY: Yeah. This relates to our -- well, your and my discussions about

financial records.
MR. JANKOWSKI: Okay.
THE WITNESS: We have a system in place now called Sage --
BY MS. FREENY:
Q. Okay.
A. -- which is the accounting system of record, the accounting platform.
Q. And when did you adopt that accounting platform? "You" being the Center.
A. Starting around the beginning of the year.
Q. Okay. What was your platform before that?
A. It was KC Master.
Q. Okay.
A. But it's really a -- like, an internal data warehouse, if you will, that was built specifically on a really old platform, but for the Center.
Q. And is that platform live anymore?
A. I believe it is to a degree --

Q. Okay.
A. -- but I don't know what functionality it currently --
Q. Okay.
A. Because we still -- it's infrastructure, essentially, that we still have, but I don't know how, like, we're using it exactly right now.
Q. I assume that the Center provided to BDO, its auditor, information from its financial system as part of the -- well, I guess, are they -- let me actually back up.
Has the Center provided to BDO any financial information for fiscal year '26?
A. Yes. That process is just now kicking off.
Q. Okay. Given the migration to a new software, how did the Center accomplish sending that financial data for fiscal year '26 to its auditor BDO?
MR. JANKOWSKI: Objection to the extent it misstates.
THE WITNESS: The process is just

starting. I don't -- it's not complete.

BY MS. FREENY:

Q. Okay. Is the Center capable of sending its financial data to BDO, its auditor, for fiscal year '26?

A. Yes.

Q. Okay. What, to your understanding, does that process entail to get them the data that they need for their financial purposes?

A. A chart of accounts and expenses and revenues for that chart of accounts.

Q. Okay. Where do those records reside?

A. For '26, it would be reflected in Sage.

Q. Okay. What about financial -- sort of periodic financial reporting?

During fiscal year '26, did the Center prepare periodic financial reporting?

A. Internally, we have something called an interim budget tool, which is --

Q. Okay.

A. -- which is periodic reporting from staff on expenses.

Q. And did the Center circulate any fiscal year '26 financial reporting to management?
A. Yes. As part of the interim budget tool, the functionality there, and Kasama, the financial planning and analysis team I spoke about earlier, there would be routine conversations there with management and leaders about needs of their department --
Q. Okay. What about documents?
A. Not outside of the, you know, workbooks and tools and spreadsheets and e-mails and --
Q. Okay. Well, tell me about those workbooks and tools and e-mails, specifically as they relate to fiscal year '26.
A. Which just ended. So, you know, the majority of those conversations on -- I have an expense or I -- you know, if there's a service that I need to secure or -- you know, those are routine conversations that would happen between staff and finance.
Q. For the workbooks that you mentioned, with respect to fiscal year '26, where would

those be housed?
A. I think you have -- there's three tools. You have the interim budget tool, which is a workbook, essentially. It's a spreadsheet.
You have spreadsheets that would just be on -- you know, that people use in their daily work.
And then you have Sage.
Q. Okay.
A. Those are the three points of reference.
Q. Okay. Does the Center have unaudited 2026 balance sheets?
A. Not yet.
Q. Okay. Not even unaudited?
A. Did you ask unaudited or audited?
Q. Yeah. Unaudited.
A. Yes.
Q. Okay. Does it have an unaudited monthly fiscal year 2026 balance sheets?
A. Yes. Our accounting team would have that.
Q. Okay. Would the accounting team have

statements of activities or something otherwise known as an income statement?

A. Yes.

Q. Okay. How difficult would it be to identify that and produce it?

A. I'd have to see what Sage was -- I've never asked for -- I've never seen one produced or generated --

Q. Okay.

A. -- so I'd have to ask what Sage -- you know, what we can do --

Q. Okay.

A. -- with Sage --

Q. Got it.

A. -- to answer that question.

Q. So you've never had a discussion about Sage's capabilities and limitations?

A. Not as they relate to producing monthly reports.

Q. Okay. Have you had conversations as they relate to producing any other type of report in discovery? Financial report in discovery.

A. I have been involved in conversations about what Sage is capable of --

Q. Okay.

A. -- and that's what the chart of accounts is. The idea is there should be a chart of accounts broken down by departments and divisions and that's where --

Q. I got it.

But I assume that conversation was in the context of just understanding what they can do -- what Sage can do generally as a tool.

My question is, did you have any conversations about the -- what Sage is capable -- its limitations and its capabilities in terms of producing financial records in discovery?

MR. JANKOWSKI: I'll just note, I think this is a yes-or-no question, but I'll object to the extent it calls for attorney-client privileged information.

But if you can answer --

BY MS. FREENY:

Q. Yeah, I'm just -- I'm asking, did you have those conversations?

A. As the Center or as myself? I'm sorry.

Q. I mean, I would think this is in both capacities since my understanding is that you produced on behalf of -- you know, you assisted on behalf of the Center.

MR. JANKOWSKI: Yeah, so I'll raise the same objection on privilege to the extent that the Center's, you know, many employees or officers or management have discussed with counsel the need to --

MS. FREENY: Yeah.

BY MS. FREENY:

Q. I just want to know your discussion, not with counsel, but your discussions with whoever you would have discussions with about Sage's capabilities and limitations in producing financial records in discovery.

A. Are you asking if conversations about producing financial records happened?

Q. If you had conversations -- again, not with your counsel, but if you had conversations within the Center to understand the capabilities and limitations of Sage for producing document -- financial documents in discovery.

A. It's very likely that those conversations occurred --

Q. Okay.

A. -- yes, internally.

Q. Okay. And is it -- I guess, what was the upshot of those conversations? What are the capabilities and limitations of Sage in producing financial records in discovery?

MR. JANKOWSKI: Again, object to the extent that this calls for attorney-client privileged information.

And I think -- I want to just be clear in terms of Matt's individual capacity and the Center's --

MS. FREENY: Okay. So let me --

BY MS. FREENY:

Q. On behalf of the Center, what --

MR. JANKOWSKI: Well, I was going to make the point I think the privilege is broader in the Center's context in that there could be multiple people who have spoken with counsel about the nature of any burden that might result.

MS. FREENY: Okay.

BY MS. FREENY:

Q. So on behalf of the Center, what are the -- what are the capabilities and limitations of the Center's accounting system as it relates to producing financial records in discovery?

MR. JANKOWSKI: Again, object on privilege grounds --

MS. FREENY: Again, I'm not asking about conversations. I'm asking about what those limitations are.

MR. JANKOWSKI: But to the extent those --

MS. FREENY: I'm not asking about conversations.

BY MS. FREENY:

Q. What are the limitations?

MR. JANKOWSKI: So -- sorry. To the extent that any limitations might relate to a legal conclusion and any advice that the Center was given with respect to discovery specifically, which I think you're framing your question in terms of financial discovery -- right?

MS. FREENY: Yeah.

MR. JANKOWSKI: That we would say is privileged and also calls for a legal conclusion.

MS. FREENY: And I just want to make sure I understand. So you are saying he can't test- -- I'm -- it almost sounds like you're suggesting that legal counsel advised the Center on limitations. I'm trying to understand --

MR. LYNCH: It goes two ways, the privilege.

MS. FREENY: But I don't want to know about the conversations. I want to know about the facts.

MR. JANKOWSKI: No, but the facts in this -- again, if I'm understanding your question correctly, I think the facts in this scenario are

contingent upon the nature of, like, legal litigation --

MR. LYNCH: The only -- yeah. The only context in which such discussions would be had were -- would be in the context of litigation discovery --

MR. JANKOWSKI: Yeah.

MR. LYNCH: -- which would necessarily be attorney-client privilege, and I think --

MR. KRISTOFCAK: I don't get it. I'm sorry.

MS. FREENY: Yeah -- we'll address this. I think we'll address this after.

MR. JANKOWSKI: Okay.

MS. FREENY: Because, again, this is a concern for us because we think we're entitled to those records. Counsel has represented that the reason they can't be produced is because of difficulties in producing, and I'm trying to probe that, and I'm not able to. So we'll --

MR. JANKOWSKI: But --

MS. FREENY: -- we'll return to this

after.

MR. JANKOWSKI: Again, you have statements from counsel, which again, I think is evidence, really, that this is an attorney-client matter, and so you have the representations --

MS. FREENY: But that's another -- that's an underlying fact. The fact of what -- what it would entail, that's a fact; that's not a legal conclusion. And I'm trying to get the facts.

And what I'm hearing is that I'm being prevented from probing what actually it would take as a matter of fact for the Center to collect and produce to us these financial records that we have requested and --

MR. LYNCH: I think you've already gotten what he has on that, on the fact, and now you're just asking about what discussions were had in the context of discovery, which is clearly --

MS. FREENY: All right. Again --

MR. KRISTOFCAK: No, she wasn't asking -- she specifically wasn't asking about --

MR. LYNCH: I'm not --

MS. FREENY: Okay. Guys --

MR. LYNCH: I'm not asking about attorney-client privileged conversations, what happened in your attorney-client privileged conversations --

MS. FREENY: Okay. Guys --

MR. KRISTOFCAK: No, that's not what she asked --

MS. FREENY: Guys, guys --

MR. JANKOWSKI: I think we've got a couple raised voices in the room.

MS. FREENY: All right. Let's --

MR. JANKOWSKI: Take a step back.

MS. FREENY: Because -- again, the fact that I'm interjecting is not that I disagree with what my counsel said, but I think let's -- we will caucus and we are going to -- we may reapproach this after lunch.

It is about 12:34. I have -- I probably have more questions related to topic A, funding and finance, but I don't know if -- actually, let me just -- I will just -- I'm just going to run

through, just to understand some of the categories of records that we've requested and understand what they have, and then does it make a sense for us to break after that for lunch?

MR. JANKOWSKI: Sure. So is this going to be kind of closing out the preservation, collection, production topic?

MS. FREENY: It's not going to. I'm going to return to that kind of more generally. Not as it relates -- I think -- well, again, I can't promise because I'm going to return to some of this anyway. This is just to close out the discussion that I'm having about production of finances.

MR. JANKOWSKI: Okay.

BY MS. FREENY:

Q. Mr. Floca, did finance produce any analyses or memorandums about fiscal year '26 financial position for the Center or Center management or the board?

A. I don't recall any memos or anything like that --

Q. Okay.

A. -- on '26, the --

Q. Are you able to testify on behalf of the Center that such analyses or memorandums were not prepared?

A. No. It's -- analysis of '26 is an ongoing responsibility of finance. That's --

Q. Yeah, so --

A. -- what they do.

Q. So I guess here -- and I should be -- when I say analyses, I mean written analyses. So written analyses or memorandums related to fiscal year '26.

I'm just trying to understand if those were produced by the finance staff at the Center at any point in fiscal year 2026.

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I have to assume that finance has produced an analysis of '26 at multiple points during fiscal year '26.

BY MS. FREENY:

Q. Okay. Does the Center have accounts

payable aging reports for fiscal year 2026?
A. I have not seen that report as a product of Sage.
Q. Okay.
A. I have seen those reports as a product of KC Master in the past.
Q. Meaning for fiscal year '25?
A. Yes. And likely a portion of FY '26. They may be available because there was a transition --
Q. Okay.
A. -- between the two platforms.
Q. If you needed to retrieve those right now for the data that you said may be available for FY '26, could you do that?
A. No, because I don't have -- there's not staff -- there's no access, like, staff level -- I can't log into KC Master --
Q. Could you have one of your staff do it who had that login?
A. I assume that may be possible, but I don't -- again, going back to KC Master -- we

discussed this a little bit before --
Q. Uh-huh.
A. -- I don't know exactly what those limitations are.
Q. Okay. And then you said that you had not seen accounts payable aging reports for fiscal year '26.
As the Center's representative or designee, do you know whether the Center has accounts payable aging reports for FY '26?
A. In some form or fashion that information exists. Yes.
Q. Okay. What about year-to-date annual payroll registers for FY '26?
Does the Center have those?
A. Again, that is information in Sage that I believe is a -- you know, that is in some form or fashion. Yes.
Q. Okay. What about accounts receivable aging reports for fiscal year '26?
We talked about accounts payable; now this is accounts receivable.

A. Yes. All of this is dependent on what Sage --

Q. Okay.

A. -- is -- you know, the transition between KC Master and Sage --

Q. Yeah.

A. -- and how that platform is now built.

Q. And if you needed to retrieve, for example, an accounts receivable aging report for fiscal year '26, what would you do?

A. I would have a meeting with finance.

Q. Okay. Is it your understanding that finance could retrieve that for you?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Sage is an IT platform --

BY MS. FREENY:

Q. Uh-huh.

A. -- and finance is the -- you know, is the user. So between IT and finance, information would likely be available.

Q. Okay. Does the Center have monthly and year-to-date budget-to-actual reports for fiscal

year 2025 and 2026?
A. And those historically are reports that are a familiar product of KC Master. I don't know what state they're in via Sage.
Q. Okay. Do you know if they exist in Sage for fiscal year '26?
A. I mean, in theory the data is the data and the inputs are the inputs if the inputs exist.
Q. Okay.
A. So I --
Q. And then help me understand, was the fiscal year '25 data migrated over to Sage or does Sage only have the fiscal year '26 data?
A. I'd have to get that answer. That's an answer that --
Q. Okay.
A. -- probably could get both.
Q. Did anyone at the Center prepare a schedule or any other written documents that showed donations that were discontinued or withdrawn or reduced at any point in fiscal

year '25 or '26?

MR. JANKOWSKI: Object to the extent that calls for attorney-client.

But answer otherwise.

THE WITNESS: I mean, this kind of goes back to what I mentioned earlier. Tessitura is a platform that is built to collect donor information and ticket sales and patron information.

That has not been -- has not been well managed.

BY MS. FREENY:

Q. Okay.

A. So to -- you know, to some degree, that information exists. How -- you know, how reliable a platform is versus someone's spreadsheet, I have a lack of confidence there --

Q. Okay.

A. -- but that is something that we are -- you know, we are trying to improve.

Q. Okay. And would it be the same thing for -- if I asked about a schedule or a document

that shows pledges that were canceled or written off for fiscal year '25, '26?

A. I mean, the system should all reflect, you know, if someone said, I'm no longer giving or --

Q. Okay.

A. -- or has gone silent, that information would -- should exist inside the development --

Q. Did --

A. Inside development's platform.

Q. Got it.

So we had talked before, for example, at the audit committee meeting in June, there was a discussion about the effect that the renaming in December had on the revenue of the Center.

Did anyone at the Center sort of prepare any sort of written analysis of pledges that were canceled or reduced or written off since the December 2025 renaming?

A. Not holistically or outside this process --

Q. Okay.

A. -- of developing a budget with finance, or developing, you know, the -- the development -- developing development targets and -- you know, so not an individual structured separate report --

Q. Okay.

A. -- but that -- the concept of what is still a reliable --

Q. Uh-huh.

A. -- known donation versus something that we would have to go out and get is a product of the financial FY '27 budget that we're working on --

Q. Okay.

A. -- right now.

Q. Would that information be in a workbook somewhere?

A. Not holistically, no.

Q. Okay. I guess I don't know --

A. Like --

Q. -- what you mean by holistically.

But, like, would that -- would there

be -- if someone asked you, hey, I need to see --

A. Yeah.

Q. -- pledges that were reduced or written off, could you direct them somewhere, for example, to a workbook?

A. No, that's, I guess, what I'm saying, is there's not a -- I don't have confidence that there's one place that holds the totality of everything that was being tracked. All of the development --

Q. Uh-huh.

A. -- targets across committees, corporates, individuals, you know, all of those entities, when they last gave and when they said, we're not giving any more, or someone that we just haven't followed up to say, hey, are you still interested in supporting the Kennedy Center?

So that holistic list does not -- does not exist like it should.

Q. Okay. Understood.

MS. FREENY: I think maybe now is a good time for a lunch break if you guys are amenable.

MR. JANKOWSKI: Sure. Do you want us to run down specifics? We can try to get you further clarity on certain things if you --

MS. FREENY: Yeah. I mean, I feel like you have been writing some of them down -- we have been tracking --

MR. JANKOWSKI: We can go off --

MS. FREENY: We can go off the record, sorry.

(Discussion off the record.)

(A recess was taken.)

BY MS. FREENY:

Q. Good afternoon, Mr. Floca.

Just a reminder, you understand that you are still under oath, right?

A. Yes.

Q. And you understand that this time, unlike when we were here yesterday, you are still, after lunch, speaking as the designee for the Kennedy Center.

A. Yes.

Q. All right. Did Center management ever

ask staff to prepare a report for the full board to show ticket sales over time?

A. Yes. There were -- yes. Yes.

Q. Okay. How many such reports? One or more than one?

A. More than -- there were more than one type of those reports.

Q. Okay. But they were not ever presented to the board?

A. No. They were prepared as part of Delta's investigation and assessment of the Center.

Q. Okay. I think I'm a little confused.

I'm not asking about things that Delta prepared or things that The Center prepared to give to Delta.

What I'm asking is whether Center management ever asked staff at the Center to prepare a report for the board showing trends in ticket sales or ticket revenue.

A. No, not for the board.

Q. Okay. Can I get you to turn in your

binder to what is tab 43 which, with help of your counsel, I'm going to ask to be marked as Exhibit --

MR. JANKOWSKI: 6, I believe.

BY MS. FREENY:

Q. -- 6.

MR. JANKOWSKI: 43 you said, right?

MS. FREENY: Correct.

(Floca (30(b)(6) Deposition Exhibit 6 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. Mr. Floca, I'm going to ask you to take a look at what has been marked as Exhibit 6 that is titled, "Board Report."

Do you see that?

A. I do.

Q. And I'm happy to let you flip through it, but before you do, can I just draw your attention to something on the top upper left-hand corner.

It says it small lettering, "Board report," and even smaller lettering, "May 5th,

2026."

Do you see that?

A. Yes.

Q. And it also says, in red, "Seats and tickets."

Did I read that right?

A. Yes. That's right.

Q. All right. This document titled, "Board Report," is this at least a draft of a report that was prepared for the board of the Kennedy Center? The board of trustees.

A. This is my first time ever seeing this report --

Q. Okay.

A. -- but it would appear to be a board report on revenues and ticket sales.

Q. Okay. So if this is the first time that you're seeing this, I take it that means that this report was not presented to the full board at any point.

A. No, this report was not presented to the full board.

Q. Okay. Did the Center have staff prepare a report to the board to depict this -- the financial information that you see in Exhibit 6?

Again, I'm not asking about this report, because I understand that you don't recognize it. What I'm asking is, did the Center have staff prepare a report containing the kind of sort of -- it looks like revenue analysis that is depicted in Exhibit 6?

A. I don't know the genesis of this report, but --

Q. Okay.

A. -- if -- if we prepared this, the Center prepared this, then we prepared it for the board. The format -- I've never seen this format before.

Q. Okay. Setting aside the format, do you know why, if this was prepared for the board, why it was not shown to the board?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: What was the question again?

BY MS. FREENY:
Q. Do you know why, if this -- if this report was prepared for the board, why it was not shown to the board?
MR. JANKOWSKI: Objection. Misstates.
THE WITNESS: This was not -- all I know is this was not prepared -- or this was not shown to the board.
BY MS. FREENY:
Q. Okay. Do you know why? No?
A. No, I do not.
Q. Okay. Do you know who was responsible for directing staff to prepare this report?
MR. JANKOWSKI: Objection. Foundation.
THE WITNESS: I do not.
BY MS. FREENY:
Q. Okay. Do you know whose idea it was to prepare this report titled, "Board Report"?
A. I do not.
Q. Okay. Were you aware that, in this litigation, the defendants submitted something to the court that represented that the Center was

losing tens of millions of dollars each year for decades?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: I am aware of the Center's year-over-year financials. Yes.

BY MS. FREENY:

Q. Okay. And so the Center's perspective is that the Center has been losing tens of millions of dollars each and every year for decades?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The Center offsets its expenses with tens of millions of dollars of fundraising every year in addition to, you know, things that aren't cleanly reconciled with fundraising that could be considered as further losses, or negatives.

BY MS. FREENY:

Q. Okay. And so from the Center's perspective, when it talks about deficits or losses, what it's talking about does not include the revenue from contributions?

MR. JANKOWSKI: Objection. Speculation.

Vague. And misstates.

THE WITNESS: At the end of a fiscal year there are losses, or can be losses, and there can be fundraising efforts, but those work along with the -- you know, the budget for that given year. And -- I mean, it is simply a formula of your expenses against your revenues that come in as earned revenues and your contributed revenues, which are not earned but, you know, philanthropic, or fundraising targets, which are to the tune of tens of millions of dollars.

BY MS. FREENY:

Q. And so when the Center talks about losses or deficit in a particular fiscal year, does that number incorporate or consider contributions or only earned revenue?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I would say that losses are more attune to a -- like a show-by-show conversation. What losses you have on a show --

BY MS. FREENY:

Q. Okay.

A. -- not necessarily what losses you have, you know, on an annual budgetary level. Losses would be what losses a show might experience versus -- you know, you don't have a loss at the end of the year; you could have a deficit at the end of the year.

Q. Okay. So shall we use the word "deficit" to describe sort of the budgetary accounting for the equivalent of what the defendants in this case described in a legal filing as losing money every year.

We should use the word "deficit," you think?

MR. JANKOWSKI: Objection. Misstates.

BY MS. FREENY:

Q. I'm just trying to get on the same page on, like -- so that I can drill down further.

A. Yes. We should use the term "deficit."

Q. Okay. And when the Center uses the term "deficit," is that considering contributed

revenue or only earned revenue?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I think you can look at it both ways --

BY MS. FREENY:

Q. Okay. But how --

A. I think you can -- I think it's appropriate to look at the -- your fundraising targets or how much money you need to -- how much money you need to secure in contributed revenue as a negative, because that's what it is. And you -- that's the deficit. And you fill that deficit with a fundraising plan, with a development plan.

Q. Okay. But that, it sounds like to me -- the way that you used the word "deficit" in that sentence, the deficit existed before considering the contributed revenue, correct?

A. Yes.

MR. JANKOWSKI: Objection.

THE WITNESS: Yes. Yeah.

BY MS. FREENY:
Q. Tell me about the phrase "earned income gap."
A. It's essentially the same thing that we're talking about here.
Q. Okay.
A. It's a gap in your budget that is not offset by your earned income or your earned revenue.
Q. Okay. And the earned income, the earned revenue, that's things like ticket sales; is that right?
A. Ticket sales, ancillary things like, you know, parking, proceeds, or the gift shop. Yes.
Q. Okay.
A. Or -- it's earned -- earned revenue.
Q. Okay. And so an earned income gap could exist even where the Center has more contributed revenue than the earned income gap.
A. I would say an earned income gap exists, period. And then that figure helps you understand what the -- you know, the fundraising

target should be, or the development plan should be, to -- which is the contributed revenue.

Q. Okay. Does the Center have a term that it uses for that final number? That is, whether it's plus -- you know, in the black or in the red for once you take an earned income gap and then you consider contributed revenue?

A. At year ending, that would be your ultimate -- or the -- at the close of a fiscal year, that would be your year-ending deficit.

Q. Okay. I thought, though, that you had described the term "deficit," as the Center uses it, to not account for contributed revenue, meaning that you could have -- the Center could declare that it has a deficit even if it had enough contributed revenue from that fiscal year to cover that -- that deficit in earned income.

A. No. I would say at the end of a year --

Q. Uh-huh.

A. -- if you have raised every single dollar that is -- raised every single dollar that's part

of your fundraising plan for that year and your contributed and earned revenue, combined, exactly matches your -- the value of your expenses, there would be no deficit.

Q. Okay. Is that true at any point other than at the end of the fiscal year? That is, if it's not the end of the fiscal year, but it's somewhere in the middle of the fiscal year, can there be a deficit -- can the Center say, we have a deficit if their expenses exceed earned income, regardless of how much in contributions have come in?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: You can look at expenses at any point of the year --

BY MS. FREENY:

Q. Uh-huh.

A. -- against the earned income that are related to those expenses and see whether or not that program area is running at a deficit.

Q. Okay. I understand that you could. But would the Center, during the middle of a fiscal

year, look at the expenses -- see that expenses exceeded earned income and conclude that there was a deficit, regardless of the amount of contributions?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: The Center would look at those figures routinely on a show-by-show basis at multiple points during the year --

BY MS. FREENY:

Q. Okay.

A. That's historically how -- you know, my experience, what I've seen and witnessed when -- you know, first year of being at the Kennedy Center, that was an ongoing conversation on a routine basis on a program-by-program level.

Q. And how about at a 10,000-foot level, not on a program basis? For example, on a quarterly basis.

A. Yes. Actually, on a quarterly basis would be -- would be correct when we're -- when the Center is updating either the -- call it now either the interim budget tool, or envelopes

previously.
Q. Sorry, what's the interim budget tool?
A. It's a -- it's a spreadsheet, essentially, but a shared spreadsheet.
Q. And who maintains that?
A. The finance team.
Q. Okay. What is it? Like how would you just describe that, kind of in layman's terms?
MR. JANKOWSKI: Objection. Asked and answered. We talked about this earlier.
THE WITNESS: Yeah, we did discuss this earlier.
BY MS. FREENY:
Q. All right. Just --
A. You go to --
Q. Yeah.
A. You go on the intranet, the Kennedy Center's intranet, and you -- depending on who you are and what your role is and what team, you know, you're responsible for, what program you're responsible for, information is made available to you to update or analyze or update.

Q. Okay. You said previously envelopes, and it sounded like that was maybe, in the past, something that was used in lieu of the interim budget tool; is that right?

A. Yes. Before the interim budget tool, before there was more online presence, if you will, this functionality, people would exchange information via shared folders and update KC Master one way or the other.

Q. Okay. When did that changeover occur?

A. In effect, late '25, early '26.

Q. Okay. Returning back to the -- sort of the quarterly budgetary assessment.

So when the Center is looking on a quarterly basis -- so not at the end of a fiscal year, but on a quarterly basis -- do I have it right that, at that point in time, if the Center sees that expenses exceed earned income, that the Center concludes that that is a deficit, regardless of the amount of contributions?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: A deficit in a -- a deficit

on a program-by-program basis in one viewpoint and then a holistic viewpoint with any information that's available for contributed revenue. Those would be two separate vantage points of looking at deficits.

BY MS. FREENY:

Q. Okay. And so does the Center have a single definitive definition of deficit in that context, or might it, when, you know, we see in writing something the Center considers deficit, might it refer either to -- to either of those two categories, meaning it might include contributions or it might not include contributions?

MR. JANKOWSKI: Objection. Compound. Vague.

THE WITNESS: It's not inappropriate to consider either of those scenarios with contributed revenue or without contributed revenue, program-by-program, holistic, as a deficit.

BY MS. FREENY:
Q. Yeah -- okay. I'm not even, you know, asking about, like, what's appropriate. I'm just trying to understand.
If there's a reference in a Kennedy Center document that says "deficit," is it possible that that means -- how does one --
A. The --
Q. -- decide? Does that include contributed revenue or does that not include contributed revenue?
A. The Center does not have a -- a published definition of what "deficit" means.
Q. Okay. Setting aside published, does it have one single understanding that it deploys in what "deficit" means?
A. No. I think it can be deployed in multiple ways.
Q. Got it. Okay.
Going back to the phrase "earned income gap."
Is that -- how -- is that something that

the Center is focused on?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: The Center is focused on the delta between projected expenses and the revenue those expenses can generate to develop development plans or fundraising plans.

So if that -- if the earned income gap equates to -- is a large factor in creating a development plan for a year, yes, the Center is focused on that.

BY MS. FREENY:

Q. And if the Center raised enough donations in a given fiscal year to cover its operating expenses, would it still -- would it -- you know, would it consider that to be a concern or would it consider that to be, you know, a good outcome?

MR. JANKOWSKI: Objection. Speculation. Vague.

THE WITNESS: I would consider raising funding to offset expenses either at level or in addition to a good outcome.

BY MS. FREENY:
Q. Okay. And at least within a range of $1 million, that actually occurred in fiscal year 2024, did it not?
A. No, it did not.
Q. Okay. Tell me -- what is your understanding of -- of how it did not?
A. The figure in my mind at the end of FY '24, that year-end deficit, is closer to $10 million than $1 million.
Q. And did -- the $10 million figure that you are stating here, did that include -- did that consider all of the sources of potential revenue available to the Center?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: That considered various sources of contributed revenue.
BY MS. FREENY:
Q. Okay. Were there any sources -- available sources of revenue to the Center that were not considered in calculating that $10 million figure that you just mentioned?

A. No, not at the end of '24.

MR. JANKOWSKI: And I'll just make a point of scope here too. Are we considering this part of the financial --

MS. FREENY: Yes.

MR. JANKOWSKI: -- discussion? Okay. So I think the financial discussion focuses on FY '25 results, '26 performance, and the FY '27 budget to the extent we're asking about FY '24.

MS. FREENY: Point taken.

Okay. This -- it is going to be about '24, but I'm actually really trying to get the meaning of something.

MR. JANKOWSKI: Okay.

BY MS. FREENY:

Q. Yesterday I asked you about funds with donor restrictions, and you didn't know what those were.

And even before I'm going to ask you, I'm just going to point you to a document. It is going to be fiscal year '24, but I am really interested -- just to show you what it looks like

in context in a document.

MS. FREENY: If you could turn to tab 18 for a minute. And this will be marked -- are we at Exhibit 11?

MR. JANKOWSKI: I think I have 7.

MS. FREENY: 7. Oh, goodness. So tab 18 will be marked Exhibit 7.

MR. JANKOWSKI: Sorry, it's going to take us a little while to...

(Discussion off the record.)

MR. JANKOWSKI: So tab 18 is Exhibit 7? Right? Tab 18 is Exhibit 7?

MS. FREENY: Tab 18, yes.

MR. JANKOWSKI: Okay.

(Floca (30(b)(6) Deposition Exhibit 7 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. Mr. Floca, you see that Exhibit 7 indicates that it is consolidated financial statements for fiscal years '24 and '23.

Do you see that?

A. Uh-huh.
Q. And this was an exhibit to the Delta report, was it not?
A. Yes.
MS. FREENY: I would just -- just in case I veer off, I will state my position, now that I'm reminded, that this -- I think because this was a consideration for Delta's inputs, I think it probably also falls within the scope, but we can address that when it comes to it.
MR. JANKOWSKI: Yeah, I don't think we have a discovery scope objection. Just...
BY MS. FREENY:
Q. Mr. Floca, can you please turn to page 34?
A. Okay.
Q. So it looks like the year is '23 to -- October 1st, 2023, to September 29th, 2024.
Does that mean this is fiscal year '23?
A. The right-hand column is fiscal year '23 and the --
Q. Ah.

A. -- left-hand column is fiscal year '24.

Q. Understood. That's helpful. Okay.

In the text above where you were just helpfully pointing to me, the second sentence, "Expenditures of donor-restricted funds are released out of the appreciation of those funds to the extent allowed by donors."

I'm just going to ask you what that means.

A. An easy -- very simple example is -- see a line item here of Japanese performing arts.

Q. Okay.

A. There are donor-restricted funds as part of the endowment for specifically Japanese performing arts. And that -- and funding related to Japanese performing arts in that endowment can be released to fund things that are Japanese performing arts.

Q. Okay. And if a Japanese performing arts-related programming was scheduled, when would the funds be actually released and booked?

And this might be compound, but I'm just

trying to get, like -- just the answer.

Would it be when the performance was scheduled or when the performance was held?

A. I think it could vary. There's not --

Q. Okay.

A. -- one answer. It could be either.

Q. And like -- I guess who decides? Who's responsible for kind of making the decision that, okay, yes, now these funds can be released?

A. The finance team would have an understanding of when funds might need to be released based on the overall position and financial situation of the Center, and that could be -- that could be strategic. It could just be general, but the finance team would be closest to knowing the accounting there.

Q. Okay. I am going to actually ask you -- and we'll see if your counsel lets me do this.

Turn to page 6.

MR. JANKOWSKI: You're allowed to turn to page 6, but we'll see.

MS. FREENY: And I'll just state so that

it's clear what I'm trying to do.

I'm trying to understand how the Center, you know, tracks and understands its financial records more so than trying to understand, like, specific finances.

MR. JANKOWSKI: Okay. Yeah. Maybe to the extent we're talking about general processes and --

MS. FREENY: Yeah. Because this is the only audited financials we have. I don't have '25 to look at.

BY MS. FREENY:

Q. Okay. Mr. Floca, do you see on page 6 there's a -- a consolidated statement of activities for the Center?

A. Yes.

Q. And it's got a lot of numbers and they're very small.

At the very end it talks about -- are these -- these are assets.

What is this reporting?

A. The -- this operating fund column has

revenues, expenses --
Q. Okay.
A. -- contributed revenues. And then, at the very end, a total --
Q. Okay.
A. -- which is a deficit or a positive.
Q. Okay.
A. Position of assets. So that's what's at the end.
Q. All right. And it looks to me -- so when you say at the end, are we talking about in the lower right-hand corner, a number that starts approximately 558,000?
A. No. Lower left-hand corner.
Q. Lower left-hand corner, okay.
A. Closest to net deficit assets --
Q. Okay.
A. -- at end of year.
Q. What is the difference between that figure -- that's the figure under operating fund.
Why are you focused on that figure and not total?

A. The total on the right-hand side includes things like the appropriation.

Q. Okay.

A. It also includes, you know, the endowment at large. So to get a true picture of the year end on an operating -- a trust operating perspective, you would just look at the operating fund column.

Q. Okay. Is that term, trust operating perspective, is that something that is, like, a term of art used by the Center?

A. "Trust" is the non-federal side --

Q. Okay.

A. -- of the Center.

Q. And again, just help me understand, because -- I'll just tell you, if I looked at this -- you know, these financials, I would say in 2024 there was not a deficit; the Center did not run a deficit because it ended up in the black with $558,000, considering all revenues being in excess of expenses.

Why is that not the way that the Center

reads this -- its financials?

MR. JANKOWSKI: Objection. Argumentative and misstates.

THE WITNESS: I think you need to look at the more granular line items here. And an example would be Kennedy Center programming in fiscal year '24 had $70 million worth of expenses, but $68 million worth of revenues.

So that line item --

BY MS. FREENY:

Q. Yeah.

A. -- Kennedy Center programming lost $2 million --

Q. Okay.

A. -- which was then offset by Kennedy Center contributing revenues --

Q. Right.

A. -- or contributions from --

Q. And that's sort of -- I mean, that's typical for a performing arts venue, right? So -- because -- or at least a non-profit performing arts venue, I assume, right?

A. Yes. I would consider that typical.

Q. Okay. All right. And also that -- even if, you know, certain programming is operating on the -- you know, even if the expenses of certain programming exceed -- and I think it was 2 million -- the revenue from that programming -- I assume the idea for the Center is that -- but that programming also helps generate contributions, right?

A. Firstly, the programming should meet mission. And then, because you're meeting mission and you're serving that -- you know, the public good, you can raise money around that effectiveness or that --

Q. Okay. I guess I'm just trying to understand.

From the Center's perspective, if programming has higher expenses than its operating revenue, is that, itself, a problem? Does that mean that shouldn't happen because it is not profitable?

MR. JANKOWSKI: Objection. Vague. And

compound.

THE WITNESS: It's only a problem if the -- you know, if the expenses are wasteful or uncontrolled.

BY MS. FREENY:

Q. Okay.

A. But because you're -- you have a program that is -- that has an expense and maybe the importance of that expense or that program outweighs what you can sell a ticket for --

Q. Uh-huh.

A. -- that's okay because you're meeting --

Q. Okay.

A. -- the Center's mission.

Q. Okay. Got it.

All right. Yesterday when you were here in your personal capacity, we talked about -- and I'm going to try to choose my words carefully -- I believe a dire fiscal situation is what we talked about yesterday.

But you tell me the words to describe the situation that the Center faced itself in

September of this year with respect to liquidity.

MR. JANKOWSKI: Object to the extent that misstates.

THE WITNESS: I'm fine to categorize the situation as dire.

BY MS. FREENY:

Q. Okay. Dire fiscal situation.

Would you also -- would the Center also consider it a liquidity crisis?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: What you're -- there isn't liquidity -- there can be and is a liquidity crisis because operating expenses are pretty -- you know, pretty set. They're firm. They're firmer than revenues.

So when you have an impact to revenues from patron uncertainty, patron friction, and your revenues drop, it's difficult to drop your expenses to -- you know, it's more difficult to drop your expenses, especially in an institution like the Center with so many employees and so many -- you know, a very large campus.

So if your revenues drop, yes, that is -- that's where you come to a liquidity issue or a cash issue, especially looking at this building the future and sustainability fund column, which is a -- you know, if you're not putting money into that sustainability fund, you are dealing with fixed revenues and declining -- I'm sorry, fixed expenses and declining revenues.

BY MS. FREENY:

Q. In the last six years -- sorry. In the last six months, has the Center at any point in time been at risk of fiscal collapse before the end of fiscal year '26?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Was a risk to the Center that we were actively trying to respond to and adjust.

BY MS. FREENY:

Q. Okay. And so you're saying the Center was at a risk of fiscal collapse before the end of fiscal year '26?

MR. JANKOWSKI: Objection. Vague. And

asked and answered.

THE WITNESS: The financial risk is something the Center was aware of. The overall financial picture was dire, and that is something we were aware of.

BY MS. FREENY:

Q. When did you become aware of that?

A. Largely May, June --

Q. Okay.

A. -- when the conversation started to -- that May, June was around the time that we started having these important conversations about business decisions and our financial position.

Q. Did management inform the full board that it perceived a risk of fiscal collapse before the year end -- before the end of the fiscal year at least prior to, meaning informed the board prior to September of this year?

A. That financial position was not presented -- or the Center's financial position was not -- was not presented during any of the

board meetings --

Q. Okay.

A. -- in that period of time.

Q. All right. And then I asked you about whether there was a risk of fiscal collapse. I want to ask you a little bit tighter.

At any point in the last six months has the Center faced certain fiscal collapse within weeks?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I'm not going to be able to give you an exact point in time where the Center said, next week we are facing certain fiscal collapse. And the main reason for that is you're constant- -- the Center is constantly looking at expenses, other revenues coming in, and, you know, orchestrating a -- you know, the best path forward for the Center.

There are, with that said, dire, really constraining situations that we're trying to exist in.

BY MS. FREENY:

Q. So I think I can give you a particular point in time when the Center indicated that it was facing certain fiscal collapse. And toward that end, I'm going to point -- ask you to turn in your binder to tab 30.

MS. FREENY: And this will be -- is this 8?

MR. JANKOWSKI: Yes.

MS. FREENY: Exhibit 8.

(Floca (30(b)(6) Deposition Exhibit 8 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. And Mr. Floca, if you could flip one page over.

I think you will recall, having looked at this yesterday during your individual deposition, this is an agenda and meeting material -- let me say that again.

This is an agenda and materials sent to the board in connection with the September 15th,

2026, board meeting; is that right?
A. Yes.
Q. All right. I want to get you to turn to page 56 of 58 in the upper right-hand corner in blue. We talked a little bit about this yesterday, but I want to get the Center's perspective.
So to set the stage, you agree that what we are looking at on page 56 of 58 of Exhibit 8, this is a proposed resolution that was circulated to the board in September, right?
A. Yes. That's correct.
Q. Okay. And this -- this resolution was circulated to the board, but it was never actually voted on, was it?
A. It was never brought to the full board --
Q. Okay.
A. -- during a meeting.
Q. At the -- so at the time that this proposed resolution was circulated, it was -- the -- you would agree that the Center was representing to the board that the Center was

within certain fiscal collapse within weeks.
Would you agree with that?
MR. JANKOWSKI: Objection.
Argumentative.
THE WITNESS: This is a draft resolution that was not discussed -- or brought to the full board.
BY MS. FREENY:
Q. Understood. But it was circulated to the board, correct?
A. This was circulated as a draft, but taken away or off of the table for consideration.
Q. Okay. Why was it taken off for consideration?
A. Because the other resolution on the renovation was being prioritized for discussion with the board.
Q. Did the Center, when it circulated this resolution, intend to represent to the board that the Center was within certain fiscal collapse within weeks?
MR. JANKOWSKI: Objection.

Argumentative. Vague.

THE WITNESS: When this was circulated, we intended to have a conversation on a financial position. That did not occur, and this resolution was not brought forward or discussed, and we focused on the renovation resolution, status of the building only.

BY MS. FREENY:

Q. If the Center did not intend to represent to the board at the time that this resolution was circulated that the Center was within certain financial -- fiscal collapse within weeks, why did the Center circulate a resolution to the board represent- -- like, that contained the phrase "certain fiscal collapse within weeks"?

MR. JANKOWSKI: Objection. Argumentative. And vague.

THE WITNESS: There was an intention to discuss the financials. That did not happen.

BY MS. FREENY:

Q. Okay.

A. And the financials still do need to be

discussed, and we're planning on doing that.

But the focus of this board meeting was on the renovation.

Q. Okay. But the focus of the board meeting being on renovation, that actually -- that changed after this resolution was circulated, right?

A. After these were circulated but prior to the meeting.

Q. At the time this resolution was circulated, the intent of management was to have the board consider this resolution at the upcoming board meeting, was it not?

A. Alongside a conversation on the financials of the Center, yes.

Q. And was management's intent at the time this was circulated to present to the board that the board was within certain fiscal collapse within weeks?

MR. JANKOWSKI: Objection. Argumentative. Asked and answered.

THE WITNESS: The intent was to review

this alongside a financial -- what do we call it? -- a financial position with the board.

BY MS. FREENY:

Q. Okay.

A. But that changed.

Q. Okay. At the time that this resolution was circulated, was it true that the Center was within certain fiscal collapse within weeks?

MR. JANKOWSKI: Objection. Asked and answered. And vague.

BY MS. FREENY:

Q. Was that true?

MR. JANKOWSKI: Same objection.

THE WITNESS: We discussed this a little yesterday --

BY MS. FREENY:

Q. Okay.

A. That position and that outlook, there are a multitude of factors that go into considering the longevity of the Center's financial or cash position.

And yes, the Center was in dire

financial -- in dire financial position. Yes, there were decisions that needed to be made in a very short period of time. But it was strategic to focus on the needs of the building above that, or instead of that, because the result of that conversation is a -- is an incredible lever that changes what the Center's financial position is going to be.

Q. Is it fair to say that the Center, at the time this resolution was circulated, was not going to face fiscal collapse within weeks if management took the steps that I think you just described as levers to access additional sources of funds to cover the cash needs?

A. I mean, simply put, if we can communicate with certainty what the Center's future is going to be, then we can start to build momentum, whether that's around programming or a development in fundraising plan, once we know how the Center can move forward. And that's why the renovation resolution was more important because that clears the hurdles with this process that

we're in right now with the court.

Q. That wasn't my question, though.

MS. FREENY: I'm going to ask if the court reporter could read back my question when she gets a chance.

(The reporter read the record as requested.)

THE WITNESS: The ability to move forward with the renovation impacts the expenses that the Center has and when the Center's cash is going to be expended or more cash is going to come in via other fundraising efforts.

So your -- there's -- these two things are connected, and the first needs to happen in order for the second to have a firm window.

BY MS. FREENY:

Q. I --

A. Fiscal collapse --

Q. Yeah.

A. -- is -- is a -- is not as simple as a one plus two equals three. There are -- and every day there are things that the Center can do

to, you know, elongate its operations or to move money around or to secure additional funds.

And this dire situation that is being communicated via this resolution does not change, but the priority that we established is with the building, and wanted to focus on that and then have a purposeful conversation -- purposeful and specific conversation on the Kennedy Center's finances.

That was the intent behind taking this resolution off the table.

Q. Okay. Was at least one intent behind using the phrase "certain fiscal collapse within weeks," which you just said could mean multiple things, was one of the intent behind that to convince the board to favor this renaming resolution set forth below?

MR. JANKOWSKI: Objection. Argumentative and vague.

And actually, I won't categorically object yet, but I think on scope, too. We're getting beyond finances.

MS. FREENY: All right. I'm very comfortable here.

BY MS. FREENY:

Q. So please answer.

A. These things -- the fiscal collapse and recognition are related to one another, but there's a reason why this was not -- this was not discussed.

And the discussion around the Center's finances still needs to happen. We're in a bit of a different position now than we were during or at the time of this board meeting.

So this doesn't -- this has no bearing on where we are going moving forward --

Q. And that's not my question.

MR. JANKOWSKI: I'm sorry, I don't think he was finished with his answer.

BY MS. FREENY:

Q. You can finish, but my question was not why this was not discussed.

So keep going and I'll...

A. The renovation resolution was prioritized

for this meeting with the expectation to have this conversation at a later time.

Q. Okay. And I want to be clear here. I'm not asking about why this resolution was not discussed. I'm focusing on why this resolution was circulated when it was circulated to the board. Okay?

And my question was, you had mentioned that fiscal collapse, that can mean multiple things.

Was one of the reasons that the phrase "certain fiscal collapse within weeks" used in this resolution to try to convince the board members, at the time this resolution, was sent out, to approve the recognition proposals?

MR. JANKOWSKI: Yeah, I'm going to object on scope grounds, on the discovery limitation there.

This isn't related to the process, justification, substance, mechanics of the board's closure decisions at the August or September meetings and the surrounding couple of

weeks.

MS. FREENY: And I -- are you going to instruct him not to answer?

MR. JANKOWSKI: Yeah -- yes, at this point.

MS. FREENY: Okay. I would state for the record that probing representations by the Center to the board that the Center was within certain fiscal collapse within weeks, which I still have not gotten, I don't think, an answer about whether the Center believes to be true, is certainly relevant to the equities, as we heard Judge Cooper say last Thursday.

MR. JANKOWSKI: So to that point I think we've gotten multiple answers as to what the Center's position was at the time as to whether certain fiscal collapse was imminent or likely or whether there was a risk of it -- I think we've had about ten different variations of that answer.

To the extent that this bears on the board's consideration of the resolution here qua

resolution, with respect to the naming options, you know, presented that were later withdrawn, that's out of scope. That's --

MS. FREENY: That's -- so --

MR. JANKOWSKI: -- not related to the financing.

MS. FREENY: I am probing whether the phrase "certain fiscal collapse," whether it's true, whether it was true at the time, or whether it was put in this resolution for other reasons. So I don't see how that's not relevant.

So if you're going to tell him not to answer, let's just make a record of that and we'll deal with that later.

You're telling him not to answer even though my question is to try to probe the accuracy and the good faith belief of the Center about whether, at the time that this resolution was circulated, the Center was within certain fiscal collapse within weeks.

MR. JANKOWSKI: So to the extent that that's the question, feel free to probe on that.

We've already established that that was absolutely one of the pieces -- one of the intents behind circulating this resolution.

MS. FREENY: So -- well, I actually have not --

MR. JANKOWSKI: I mean --

MS. FREENY: I have not -- I have not heard the witness state that one of the intents behind using the phrase "certain fiscal collapse within weeks" was to try to persuade the board --

MR. JANKOWSKI: No.

MS. FREENY: -- to vote for this resolution.

MR. JANKOWSKI: I'm sorry, the opposite. He's testified that it was to inform the board as to what the -- as to what the state of the financial position was --

MS. FREENY: And then he --

MR. JANKOWSKI: -- at the Center at the time.

MS. FREENY: Okay. So -- I don't want to get in a -- we don't need to argue on the record.

Are you not going to let me probe any more about the "phrase certain fiscal collapse within weeks" as represented to the board?

MR. JANKOWSKI: I think if we're -- I mean, so if you want to ask about what the Center's understanding was as to the Center's financial position at that time, we -- I mean, we can say asked and answered; it's been answered multiple times --

MS. FREENY: Yeah.

MR. JANKOWSKI: -- but -- that's within scope. Sure.

MS. FREENY: Okay.

MR. JANKOWSKI: That's...

MS. FREENY: But also within scope would be why they set out this representation.

MR. JANKOWSKI: Which I think has been asked and answered as well.

MS. FREENY: Okay. Well, but if that's been asked and answered, then he can tell me, no, that one of the intents behind -- one of the -- like, they did not specifically deploy the phrase

"certain fiscal collapse within weeks" for that purpose.

MR. JANKOWSKI: For which purpose?

MS. FREENY: To -- I'd say to persuade the board of the necessity of approving the naming resolution.

MR. JANKOWSKI: So to the extent that multiple things can be true, one set of those things is out of scope and one is in scope.

MS. FREENY: Okay. Well, I'm just going to state for the record that's a very cramped view of relevance.

Are you -- essentially, you're not -- what are you telling him to -- you're telling him not to answer the last question I asked?

MR. JANKOWSKI: Yes. And to the extent you'd like to continue asking questions about the Center's understanding of its financial position at the time, that's within scope.

MS. FREENY: And if I can get a yes or no answer, I am willing to move on.

BY MS. FREENY:
Q. Mr. Floca, at the time that Center management sent out this resolution to the board, did the Center believe -- or did management believe that the Center was within certain fiscal collapse within weeks?
MR. JANKOWSKI: Objection. Asked and answered.
BY MS. FREENY:
Q. I just -- I'm just looking for a yes or no answer.
MR. JANKOWSKI: Asked and answered. And vague.
THE WITNESS: I'm not going to be able to say yes or no because the situation is more dynamic and complex than that.
There was a complementary analysis of the Center's financials that needs to be presented alongside this type of resolution and this type of effort. And we're still going to have that conversation and we are still going to provide the board with more information of a financial

perspective. They're going to see, you know, what was supposed to live alongside this resolution that we did not need to discuss at the time that was taken off the table.

And I can't -- that's really all I can say.

BY MS. FREENY:

Q. The fact that, though, you as the Center's representative cannot answer yes or no whether management believed in a phrase that was represented to the board at the time that it was sent to the board suggests to me that you're not confident that it was true at the time.

MR. JANKOWSKI: Objection. Argumentative and harassing.

I'm going to ask counsel not to bring your personal opinion of his demeanor into the deposition.

MS. FREENY: I'm bringing a sense of logic.

MR. JANKOWSKI: Argumentative and harassing, again.

And I don't think there was a question there, unless I'm misunderstanding.

BY MS. FREENY:

Q. Is the reason you're not giving me a yes and no question [sic] because you're concerned about that it was not, in fact, true to the Center's understanding, that the Center was within certain fiscal collapse within weeks at the time it sent this resolution to the board?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: This is not a simple scenario or a simple answer to say that this needs to be discussed, was going to be discussed, but the analysis was not provided. So -- that was alongside this resolution. And we made a decision that we could wait and have another board meeting to focus on the financials --

BY MS. FREENY:

Q. Okay.

A. -- and we focused on the renovation. And there was going to be a board meeting, you know,

immediately --
Q. Uh-huh.
A. -- as soon as we could schedule after this meeting. That was the intent.
Q. Okay. And if at the time the Center was within certain fiscal collapse within weeks, how was the Center able to make a decision that you could wait to talk about that situation with the board?
MR. JANKOWSKI: Objection. Vague. Argumentative. Foundation. Scope. Speculation.
THE WITNESS: I mean, it was a leadership decision.
BY MS. FREENY:
Q. Who do you mean by leadership?
A. We, I, the Center, made a decision not to talk about this and to focus on the renovation.
Q. Was Secretary Lutnick involved in that decision?
A. Secretary Lutnick was supporting the process.
Q. Did you discuss whether to present this

to the board with Secretary Lutnick?

A. Putting it a different way, we discussed we needed to prioritize the renovation and focus on that and not try to mix these two things during one board meeting.

Q. Okay. Did you discuss with Secretary Lutnick whether it was responsible to wait on making a decision if there was -- if the Center faced certain fiscal collapse within weeks?

Did you have a discussion along those lines?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Yes. We discussed the ability to focus on the renovation in this board meeting and wait to have the board meeting immediately after this one to focus on the financials.

BY MS. FREENY:

Q. Okay. And what did Secretary Lutnick tell you about the financials and what would be going on at the next board meeting?

A. He didn't tell me --
Q. Okay.
A. -- anything. The need of the next board meeting is to look at FY '27 financials. And that's the -- that's the purpose of -- that's, you know, living alongside this type of work and presenting an annual budget to the board.
Q. Has that next board meeting been scheduled?
A. It has not.
Q. Okay. Did you discuss with Secretary Lutnick the Center's perspective on its proximity to fiscal collapse?
A. If there were any discussions with him about fiscal collapse, they were secondary to the work we were doing with the renovation and Delta and they were not the focus of those conversations or interactions at the time.
Q. Okay. But that's -- that's not my question.
You said if there were. My question is were there.

Did the -- did you have discussions with Secretary Lutnick about the prospect of the Center's fiscal collapse?

A. I would characterize them as the financial position and less the fiscal collapse.

Q. Okay. Did you -- did you have discussions, though, with him about the proximity, like, how close the Center was to a liquidity problem, running out of cash?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Not explicit direct conversations with him about we are going to run out of cash in this period of time. There were broader conversations about presenting a -- presenting the financial picture, the annual budget.

BY MS. FREENY:

Q. Was the Secretary made aware that the Center was purportedly within -- was purportedly facing certain fiscal collapse within weeks in early September?

MR. JANKOWSKI: Objection. Asked and

answered. Vague. Foundation.

THE WITNESS: He was aware of our financial preparation we were doing on the -- on this financial presentation. So yes, he was aware of our -- of the Center's finances. But this was not -- you know, this is a -- the detailed walk-through of a budget and the detailed walk-through of -- we never got to this.

BY MS. FREENY:

Q. Okay.

A. We didn't discuss this. And we focused on the renovation.

Q. Did Secretary Lutnick provide any input or guidance on the -- how the Center should address its financial position?

MR. JANKOWSKI: I'll just object to the extent that that calls for any communication purporting to be on the president's behalf, not to answer --

MS. FREENY: I guess --

MR. JANKOWSKI: -- but otherwise --

MS. FREENY: -- I don't know how to

address that. Because I don't -- like, if I
don't know if he had a conversation, like --
BY MS. FREENY:
Q. Did you have a conversation with --
MS. FREENY: Like, I don't know how to --
MR. JANKOWSKI: I think we established he
did have a conversation. Right? With
Secretary Lutnick --
MS. FREENY: But did he provide input?
And, like, if he's going to say no, but the real
answer is yes because he's not telling -- like, I
don't know -- if he -- if the Secretary had
provided input to the Center on its financial
position, like, I don't know how he's supposed to
answer that question. Like, are you asking him
to decide whether it was on behalf of Trump or
not? Because either --
MR. JANKOWSKI: I'm asking whether he's
aware of whether it was on behalf of the
president or not. I think if he's not aware,
then we can't -- we won't --
MS. FREENY: But how is he supposed to

even answer? Like, if he can't --

BY MS. FREENY:

Q. If you decide you can't answer that question, if you could just tell me you can't answer that question. But if the answer is you have -- like, the -- you know, if -- right? Either the Secretary has provided input on the financial position or how the Center should address the financial position or it has not.

And if you answer that question no, I'm going to assume no, period, not that there's information that was conveyed by Trump and you're withholding it because your counsel told you not to answer.

MR. JANKOWSKI: I think to the extent that distinction can be drawn, hopefully the witness can do so.

BY MS. FREENY:

Q. Do you need me to say it again?

A. I don't...

MR. JANKOWSKI: Yeah, sorry.

THE WITNESS: Secretary Lutnick was aware

of the Center's finances at a high level and did provide input --

BY MS. FREENY:

Q. Okay.

A. -- on the Center's finances.

Q. What input did he provide on the Center's finances?

A. You need to present them to the board.

Q. Okay. Did he say when they needed to be presented to the board?

A. As soon as possible. Immediately.

Q. Okay.

A. Immediately after this board meeting.

Q. Okay. If Secretary Lutnick had said -- if Secretary Lutnick said the finances should be presented as soon as possible, why did the Center not present them at the September 15th board meeting?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: This board meeting was -- the desire was to focus it on the renovation and

have a second board meeting about the finances.
BY MS. FREENY:
Q. Did you approve -- I guess let me ask this.
Like, did Center management approve of this resolution being sent to the board?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: The Center sent this in draft form.
BY MS. FREENY:
Q. Okay. And so who actually drafted -- whose idea was this resolution?
MR. JANKOWSKI: Objection. Compound. And also to the extent it calls for attorney-client privileged information, not to provide that.
BY MS. FREENY:
Q. Whose idea was this -- whose idea within the Center was this resolution?
A. I can't point to one specific person, myself or otherwise, that said we need to draft this resolution. But the intent of this

resolution was to be responsive to the board and give them options about different naming and recognition possibilities. And that's a -- that seems like a, you know, prudent, good decision to make and give the board.

Again, these things in fundraising and development and the Center's FY '27 financials will be discussed --

Q. Okay.

A. -- with the board soon.

Q. And so I take it, then, also, since the Center sent this, the Center also thought it was a good idea to let the board know that, without appropriate recognition for President Trump, it's unlikely that President Trump will provide the fundamental oversight of the renovation of the main building; is that right?

MR. JANKOWSKI: Objection. Vague and argumentative.

THE WITNESS: As it's written there, recognition -- appropriate recognition is -- it is unlikely.

BY MS. FREENY:
Q. Okay. And at the time that the Center circulated this resolution to the board, it believed that that was true, that it was unlikely the President would provide that support; is that right?
MR. JANKOWSKI: Objection. Vague. And misstates.
THE WITNESS: It is an unlikely and uncertain thing. Yes.
BY MS. FREENY:
Q. Okay. On what basis did the Center reach that conclusion?
A. I believe the president has said that publicly multiple times.
Q. Has the president said that to anyone at the Center?
MR. JANKOWSKI: Objection. Executive privilege. I'll instruct the witness not to answer.
MS. FREENY: And I would confirm, Counsel, you're invoking what I call the

presidential communications privilege. You can give it whatever appellation you think is more technical. I just want to confirm the nature of the privilege that you are either invoking, or at least asserting.

MR. JANKOWSKI: Yes. The executive privilege, the presidential communications component of the executive privilege.

MS. FREENY: And just to be clear, you are not going to let him tell me whether President Trump told anyone at the Center that he would not -- or it would not be likely that he would provide oversight for the renovation if he did not receive appropriate recognition.

MR. JANKOWSKI: I guess I should be clear. To the extent that any communications were private and confidential, yes.

MS. FREENY: Okay.

MR. JANKOWSKI: But other than public statements.

MS. FREENY: Okay. And so for example, if the president had called someone at the Center

and said, I am not going to support renovation unless I get recognition, you would not permit him to answer that question.

MR. JANKOWSKI: Correct. Again, assuming -- so, like, I think during a board meeting is different than an individual phone conversation or --

MS. FREENY: Okay.

MR. JANKOWSKI: -- something along those lines.

MS. FREENY: And are you asserting -- are you making that assertion at the direction of the president or his representatives?

MR. JANKOWSKI: That calls for attorney-client privileged information. We're doing so pursuant to the Justice Department's procedures.

MS. FREENY: Okay.

BY MS. FREENY:

Q. And then just for the record, Mr. Floca, are you not going to answer my question at the direction of your counsel?

A. Correct.

Q. Okay. If President Trump directed the board not to proceed with renovation until he got recognition that he was seeking -- let me just start that again because I might have made a mistake.

If the -- if Chairman Trump directed the Center or Center management not to proceed with renovation until he received certain recognition by the Center, would the Center follow that instruction?

MR. JANKOWSKI: Objection. Vague and speculative.

THE WITNESS: An instruction like that would need to come by way of resolution. That is counter to the resolution that was passed in the previous board meeting.

BY MS. FREENY:

Q. Which resolution? In -- the September resolution?

A. Yes.

Q. Okay. And so if Chairman Trump made that

instruction to Center management without having gotten board approval, you're saying that the Center would not follow that instruction?

MR. JANKOWSKI: Objection. Vague and speculative.

THE WITNESS: The Center responds to the board, and President Trump is the chair of the board and a trustee.

BY MS. FREENY:

Q. Yes.

A. So it would have to be a -- that's pretty one to one, that -- the board would have to say, here's what needs to happen, and the Center would respond to that.

Q. Does the Center expect a situation in which President Trump either directs or suggests that renovations should not proceed until he gets recognition?

MR. JANKOWSKI: Objection. Compound and speculative and vague.

THE WITNESS: I don't -- I don't know what to expect.

BY MS. FREENY:

Q. Okay. I'm going to draw your attention to tab -- or ask you to turn to tab 25 in your binder.

MS. FREENY: And that is going to be marked as Exhibit -- what are we up to?

MS. BAUM: 9.

MS. FREENY: Exhibit 9.

(Floca (30(b)(6) Deposition Exhibit 9 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. Mr. Floca, can you take a look at Exhibit 9 and confirm for me that this is a Truth Social post from Donald Trump from September 15th, 2026?

A. Where is the date?

Q. In the --

A. Oh, yes. September 15th. Sorry.

Q. And that's the same date of the board meeting?

A. Yes.

Q. Okay. Do you recall when you first saw this -- saw this post?
A. I don't.
Q. Do you recall learning that President Trump had made a social media post where he had indicated that if the ruling on the renaming issue, which is at the D.C. Circuit, is a negative one, that the reconstruction and renovation of the Kennedy Center will not take place?
A. There's a sep- -- you're saying there's a separate tweet that says that?
Q. Oh, no. So if you take a look --
A. Oh, sorry.
Q. You see where it says, "If the ruling is a negative one" -- let me back up just so you get the whole picture.
Do you see where it starts, "The closing"?
A. Yes.
Q. Or why don't we just -- just read the whole thing.

A. Yeah.
Q. "The board of the Kennedy Center today agreed, almost unanimously, to close the building for safety reasons and so that it can begin the process of reconstruction."
And so that, you would agree, indicates that this Truth Social post was issued after the board meeting was held, right?
A. Yes.
Q. Okay. And then Mr. Trump goes on to say, "The closing will take place immediately; however, the renovation and reconstruction, which is a very large and complex job, cannot begin until such time as the D.C. Circuit rules on the board's approved name."
Do you see that?
A. I do.
Q. And then he goes on to say, "If the ruling is a negative one, which it should not be, and is not overturned by the U.S. Supreme Court, the reconstruction and the renovation of the Kennedy Center will not take place."

Do you see that?
A. Yes.
Q. Do you recall -- even if you don't recall actually seeing this tweet specifically, do you recall knowing or learning that President Trump had made a Truth Social post in sum and substance like this?
A. Yes.
Q. Okay. What can you tell me about when you first learned that?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: I think it was that afternoon, or early the next day.
BY MS. FREENY:
Q. Okay. And what was the Center's response, if any, after learning that Chairman Trump had indicated that the renovation and reconstruction that had just been approved by the board would not, at least according to him, take place until rulings on the renaming issue?
A. Again, this is not a -- the form of direction that the Center can take.

Q. Uh-huh.

A. Resolutions or committee meeting guidance, that's the direction that the Center takes.

Q. Has anyone at the Center had any discussions with President Trump about his public statement that the reconstruction and renovation of the Kennedy Center will not take place unless certain things happen in the legal proceedings around renaming?

MR. JANKOWSKI: Object on executive privilege grounds and instruct the witness not to answer.

MS. FREENY: And I assume that's the same presidential communications aspect.

MR. JANKOWSKI: Yes.

MS. FREENY: And I assume that the answer will be the same when I ask whether you have -- whether you're making an assertion at the direction of the president or his designee.

MR. JANKOWSKI: Same answer.

BY MS. FREENY:

Q. Okay. And sir, you're not going to answer that question at the direction of your counsel?

A. Correct.

Q. All right. I'm going to ask the same question just for the record.

Did you have any discussions with Secretary Lutnick about President Trump's indication that -- whether in this tweet or otherwise -- that the reconstruction and renovation of the Center would or should not take place unless certain things happened in the renaming legal proceedings?

MR. JANKOWSKI: Same objection on executive privilege grounds. Instruct the witness not to answer.

MS. FREENY: Okay. And I assume all the same provisos apply.

MR. JANKOWSKI: Yes.

MS. FREENY: You're not going to fight me on that? Okay.

BY MS. FREENY:

Q. And I assume, sir, you're not going to answer the question at the instruction of your counsel.

A. Yes.

Q. All right. Next I would like to turn you to tab 21. This is going to be a new topic, and this is related to topic C in our notice, board decisions.

MR. JANKOWSKI: Exhibit 10, we said?

MS. BAUM: Yes. It's Exhibit 10.

MS. FREENY: So tab 21 will be marked as Exhibit 10.

(Floca (30(b)(6) Deposition Exhibit 10 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. If you take a look, you can see that this is a filing in the Beatty versus Trump litigation, and it's titled, "Joint Status Report."

Do you see that?

A. Yes.
Q. All right. I'd like to turn your attention to page 3 of 6, the bottom paragraph.
And I understand that you may or may not have seen this because it's a legal filing. What I really am trying to get is what the Center did that corresponds to some of these statements.
So I'm going to read sort of almost halfway through the second paragraph, a little bit more. It's -- and to orient ourselves, you can see that this is dated June 5th, 2026? You agree? It's at the top.
A. Oh, yes.
Q. All right. And so in this report, the defendants state, "The Center's management is currently compiling a comprehensive briefing for the Center's board of trustees related to the financial, programmatic and capital metrics associated with the Center's construction activities."
Do you see this?
A. Where -- it's on page 3?

Q. It's on page 3 --

MR. JANKOWSKI: You don't mind me pointing him?

MS. FREENY: No, go ahead.

THE WITNESS: Okay.

BY MS. FREENY:

Q. Yeah. And, again, I'm not -- I'm just trying to get through this more quickly.

I will represent to you that this is a joint filing, but that these are representations that the defendants made about the status following the court's May 29th preliminary injunction.

So that's the orientation. And these are just facts that the Center told the court, and I just want to get the basis and sort of some of the details of these.

A. Okay.

Q. And so what I had read, the defendants indicated that "Center's management is currently compiling a comprehensive briefing for the Center's board of trustees related to the

financial, programmatic and capital metrics associated with the Center's construction activities."

Do you see that?

A. Yes.

Q. Okay. And I just want to know what the -- at this time -- and so this would have been maybe six or seven days after the court's decision -- what the Center was -- what that included. Like, what the Center was doing to currently compile this comprehensive briefing at that time.

A. It was a combination of the work JLL was already doing --

Q. Okay.

A. -- on the comprehensive project development plan and the work that was being started through the -- for Delta's independent report --

Q. Okay.

A. -- and analysis.

Q. And I think we talked about yesterday

that the solicitation that ultimately resulted in Delta's engagement was not issued until July 16th; is that right?

A. It --

Q. Roughly?

A. It seems right. Yes.

Q. Okay. And so this was filed on June 5th. And so I guess I want to understand what the Center was doing -- I understand what you said with JLL. I just want to understand what else the Center was doing in -- in June to compile briefing for the board of trustees, knowing that the solicitation did not go out to Delta and others until mid-July.

A. The JLL report was the bulk of the work in understanding --

Q. Okay.

A. -- the sequencing of the construction.

Q. Was there anything that the Center was doing at this time that was not related to JLL in compiling this briefing for the -- for the board?

A. Some of the work, while not immediately

on June 5th --
Q. Uh-huh.
A. -- getting the RFP and scope and everything for Delta would have happened, you know, a couple --
Q. Okay.
A. -- a week or so or a couple of weeks after this. Starting. Not necessarily RFP --
Q. Okay.
A. -- but the work started.
Q. Okay. And help me understand the time frame. Because when we talked yesterday, as it -- as it materialized, Delta -- the time between when Delta was engaged and when Delta made a presentation to the board was a few weeks.
Recall that?
A. Uh-huh.
Q. Okay. And now I'm trying to figure out between June -- you know, between June 5th when the Center's management is compiling this briefing, and when the solicitation goes out, that's longer, significantly longer -- you don't

need to adopt that word, but it's longer than the amount of time that Delta even had to complete the work. And so I'm wondering what the Center was doing to prepare that solicitation. Was it doing other things?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: No, not -- the Center was determining the best way to be responsive to -- you know, to this -- to what had just happened.

BY MS. FREENY:

Q. Okay.

A. That's what was going on between the injunction and the Delta report.

Q. Okay. But I want to focus on the time period between the injunction and the date the solicitation goes out.

A. All right.

Q. Roughly, let's say, you know, middle of July.

What was the Center doing there -- setting aside the JLL materials, what was the Center doing there to compile briefing for the

board and decide how to move forward?

A. Mainly financial work --

Q. Okay.

A. -- and -- but not -- you know, the focus was identifying a third party, identifying someone independent. And that lagged after the injunction.

Q. Okay. Did the -- was the Center considering retaining other types of consultants besides the type called for in what ultimately became the Delta statement of work, or was it always a focus on that type of engagement?

MR. JANKOWSKI: Objection. Compound.

THE WITNESS: I think other things -- other things could have been considered, but no, the focus was an independent third party. That was the -- that was what we thought would be the most effective.

BY MS. FREENY:

Q. Okay. And prime- -- and the focus was also on the type of expertise that Delta had?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The intent was to bring someone on that had broad expertise.

BY MS. FREENY:

Q. Okay. Was there -- were there any other engagements, statements of work in draft form or that were being considered other than the Delta statement of work, and obviously the JLL statement of work that had already been signed?

A. I don't think so.

Q. Okay. Can you turn the page to page 4? And I would direct you to the top of the page. And I will read.

Defendants represented that "The board expects to schedule one or more meetings in the coming weeks to coalesce around a plan for the Center's construction activities."

Do you see that?

A. Yes.

Q. Okay. And I know we talked yesterday in your individual capacity a little bit about -- a little bit about the ultimate meeting, but I want to get the Center's perspective on how the

decision was made about when to schedule that meeting. Okay?

So when -- ultimately, just to orient ourselves, you agree the board had a meeting on August 13th to decide, as this said, a plan for the Center's construction activities, right?

A. Yes.

Q. Okay. When was the August 13th board meeting first scheduled?

A. In early August.

Q. Okay. What date?

A. I don't know exactly when the meeting invite went out, but I'm sure --

Q. Okay.

A. -- we could provide that.

Q. Was the meeting -- was the meeting scheduled, meaning did management plan to hold a meeting of the board on August 13th at any -- did they have that plan at any point before sending out the meeting invite? Or was the meeting invite sent out at the time that the decision was made, we are going to hold a board meeting on the

13th?

MR. JANKOWSKI: Objection. Vague and compound.

THE WITNESS: The Center was intending to meet with the board to -- to discuss these options before the meeting was scheduled.

BY MS. FREENY:

Q. Okay. But -- I guess I'm saying, if I want to know when the -- I'm asking, like, when the meeting was scheduled, when Center management knew that there would be a board meeting on August 13th.

And my question is, is that date -- when Center management knew there is going to be a board meeting on August 13th, is that the same date that the invites went out or is that a different date?

A. I -- when we knew there would be a board meeting and when it was scheduled are probably the same dates.

Q. Okay. Yeah. That was not meant to be a trick question. I'm just trying to understand if

I looked -- we can see when the invite was.

I'm just wanting to understand, is that -- did the invite go out right away? And it sounds like you're saying the date that the invite went to the board members is effectively the date that the Center -- the exact same day that the Center made the decision, this is when we're going to hold the meeting.

A. Yes. I think that makes sense.

Q. Okay. Even though that -- I actually recognize that was a complicated question.

Okay. At some point in time -- so -- well, let me -- take me back.

At one point in time, the -- management had tentatively scheduled a board meeting for August 6th; is that right?

A. I don't recall that.

Q. Okay. To see if I can help you, can you turn to tab 13, which --

MS. FREENY: Is this going to be Exhibit 11?

MS. BAUM: Yes.

(Floca (30(b)(6) Deposition Exhibit 11
marked for identification and attached to
the transcript.)
BY MS. FREENY:
Q. Mr. Floca, you see Exhibit 11 is an
e-mail from you dated July 14th at the top to
some folks.
Do you see that?
A. Yes.
Q. And at the top it looks like there's the
name Jackline Browder. And what that looks like
to me -- it probably suggests that this came from
her mailbox; is that right?
Is that at least consistent with the way
you would read this?
A. Yes.
Q. Okay. Who is Jackline Browder?
A. Jackline is a federal finance analyst.
Q. Okay. So does she work in the accounting
department?
A. Not in accounting. Within finance.
Underneath contracts and procurement.

Q. Okay.

A. Sorry, it's -- federal business operations is the name of her team.

Q. Okay. And just, again, to orient us, the time we're talking about, July 14th, 2026.

Do you see that?

I want to direct you close to the bottom of the e-mail where it starts, "As for meeting times."

Do you see that?

A. Uh-huh.

Q. It says, "As for meeting times, we need to have the presentations this week in order to give the firms time to compile documents and reports over the next two weeks."

So first, on that, what -- what presentations is this sentence referring to?

A. Oral presentations on their approach to the job, their proposal.

Q. Okay. And just to be clear, so these are -- this is oral pitch presentations from the bidders for the -- what became the Delta

contract?
A. Where they -- yes, where they talk about their team and their experience and capabilities.
Q. Okay. And then it says the reason they need the presentations this week is "in order to give the firms time to compile documents and report over the next two weeks."
Do you see that?
A. Uh-huh.
Q. And then it says, "The board meeting is tentatively scheduled for 8/6."
Do you see that?
A. Uh-huh.
Q. Does that refresh your recollection that, at one point in time, the board meeting to vote on the way forward after the court's order was tentatively scheduled for August 6th?
A. Yes. I see that.
Q. Okay. Who decided when to schedule the board meeting?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: The scheduling of board

meetings is, one, a product of the trustees' availability, and, two, a product of what we're going to be presenting and if that material is ready.

BY MS. FREENY:

Q. Okay. And so to have the board meeting go forward on 8/6, as is indicated in this e-mail on -- July 14th is the date of the e-mail.

In order for that board meeting to go forward with the materials from the outside advisor, those materials would have to have been compiled within, what, roughly three weeks?

A. Yes.

Q. Okay. And so was it the Center's intention from even before the statement of work was sent out to eventually ask the consultant to provide materials within approximately three weeks?

A. I don't -- I don't think the three-week time frame is -- is a hard and fast. I think it was as soon as possible --

Q. Okay.

A. -- when we need to have a board meeting. We need to get in front of the board. You can't just continue to be, you know, without a way forward.

Q. Once that board meeting was actually set and no longer tentative, though, you would agree that the timeline for when the Center needed those materials from Delta was dictated by the date of that board meeting, right?

A. I think it's a give and take. The preparation of materials needs to be completed in a way that both gives enough time for Delta or the consultant to prepare things, but also is not just open-ended. So it's a give and take. They're working together: The time frame of the board meeting and the work that is going to be presented at the board meeting.

Q. At the time of the August 13th vote, it -- Delta had not completed its final written report, correct?

A. Correct.

Q. What was the Center's understanding at

the time of the August 13th presentation about, I guess, the status of such a report?

A. It needed to be compiled, but it was mainly -- the content and the message and the research was already complete.

Q. Okay. Was the board made aware that Delta had been retained approximately three weeks earlier?

A. No.

Q. Okay. Was the board informed that the timeline for the completion of Delta's work that ultimately materialized was shorter than the original timeline contemplated by the statement of work?

A. No.

Q. Who at the Kennedy Center -- no.

Did Secretary Lutnick play a role in deciding the timeline for the board meeting?

A. Not outside of -- of providing an urgency to inform the board more.

Q. Okay. But not in terms of, for example, it needs to be August 6th or it needs to be

August 13th?
A. There's likely routine scheduling of, you know -- there's scheduling, it can be this date or this date, but his -- his guidance has always been you need to do this as soon as you're ready.
Q. And did you understand that that encouragement to do this as soon as you're ready was driven at all by President Trump's stated preference that the construction be completed during his term?
MR. JANKOWSKI: Objection on the basis of executive privilege. I instruct the witness not to answer.
MS. FREENY: And I assume all the same provisos apply.
BY MS. FREENY:
Q. And sir, I assume that you're also not going to answer that question at the direction of your counsel.
A. Yes.
Q. Did management have a prep session with Secretary Lutnick before the August 13th board

meeting?
A. There was a meeting with Secretary Lutnick.
Q. Okay. And at that meeting, did Secretary Lutnick provide any input or guidance on the forthcoming presentation by management to the board?
A. The presentation and deck in its form were not part of that, but the overall --
Q. Yeah.
A. -- this is what you're analyzing, this is what you're reviewing, this is, you know, the important things that need to be considered by the board were --
Q. Okay.
A. -- so high level but not a --
Q. Yeah.
A. -- here's the presentation, let's review it.
Q. What was Secretary Lutnick's input or guidance on the forthcoming presentation to the board?

A. It needs to be detailed, it needs to be thorough. Just general support on how to address this issue in a meaningful way.

Q. Did he provide input as well on how to persuade the board to agree to full closure of the main building?

MR. JANKOWSKI: Objection. Vague and argumentative.

THE WITNESS: No, there was no, here's how you should persuade the board one way or the other.

BY MS. FREENY:

Q. Okay. And during that meeting with Secretary Lutnick about preparations for the upcoming August 13th board meeting, did you understand him to be speaking on his own behalf or on behalf of Chairman Trump or both?

A. I understood him to be speaking from his own perspective and his own -- and giving his own guidance on how to -- you know, really, on how to support what we were -- what we were doing.

Q. Okay. So during that meeting, you did

not understand that he was speaking on behalf of Chairman Trump; is that right?

MR. JANKOWSKI: Objection. Asked and answered.

THE WITNESS: Yes. That -- yes. Asked and answered. He was --

BY MS. FREENY:

Q. I --

A. Sorry. Again -- like, I'm just going to say it again. He was speaking to us, to the Center, on -- from his perspective on how to address the things that we were dealing with.

I don't know if he was discussing what we were discussing with the president or how his conversations with the president were unfolding.

Q. Okay. Secretary Lutnick was also involved in the timeline for Delta's production of the final report, was he not?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: Again, involvement from a general, you know, guidance and support and leadership perspective, yes --

BY MS. FREENY:

Q. It was also, though, a little bit more than just general guidance. He was the -- he was the person who suggested a deadline for Delta's production of the report, was he not?

MR. JANKOWSKI: Objection. Argumentative and misstates.

THE WITNESS: I don't remember a deadline --

BY MS. FREENY:

Q. Okay.

A. -- but he could have. He could have said something. Sure.

Q. Okay. I'm going to ask you to turn to tab 4 in your binder, which we will mark as Exhibit 12.

(Floca (30(b)(6) Deposition Exhibit 12 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. And Mr. Floca, I believe we looked at this same exhibit yesterday during your personal

deposition and -- yesterday. You know, I represented this is -- these are a series of e-mails that were produced by defendants in this case.

And so what I'd like to have you do is turn to Bates number 0322.

And do you see at the top of -- the first e-mail at the top is an e-mail from Elliot Berke to Darin Buchalter. That's the Delta representative; is that right?

A. Yes.

Q. And then to you, correct?

And that's --

A. Yes.

Q. The e-mail is dated August 14th, 2026; is that right?

A. Yes.

Q. And that's the day after the August 13th board meeting, correct?

A. Yes.

Q. All right. And the e-mail -- in this e-mail, Mr. Berke tells Mr. Buchalter, "We just

got off with Howard. He wants a report, even if preliminary, ready to go by 8:00 a.m. on 8/20. We realize this is a heavy lift."

Do you see that?

A. I do.

Q. Okay. Does that refresh your recollection -- well, let me ask, did you understand that the reference to Howard is to Secretary Howard Lutnick?

A. Yes.

Q. And does this refresh your recollection that Secretary Lutnick was involved -- was actually responsible for a deadline that was given to Delta for the production of a report?

A. I see here he is pushing to get the report ready by 8:00 a.m., and that's what --

Q. Okay.

A. -- yes.

Q. What is the Center's understanding of why Secretary Lutnick was pushing for the report to be ready specifically on 8/20?

MR. JANKOWSKI: Objection. Speculative.

MS. FREENY: This is the Center's understanding.

BY MS. FREENY:

Q. So just to be clear, I just want to know what the Center knows, and so I don't think it's possible to be speculative.

MR. JANKOWSKI: Well, sorry, Secretary Lutnick is not an employee of or affiliated formally with the Center in any way so --

MS. FREENY: I'm not asking what the Secretary intended. I'm asking what the Center's understanding was of why Secretary Lutnick was requesting the report by 8/20.

MR. JANKOWSKI: To the extent that involves personal knowledge to Secretary Lutnick, yeah, objection. Speculative.

BY MS. FREENY:

Q. You can answer.

A. There's -- I don't think there's one reason that I can point to why he wants a date or another date or anything that he's communicated

to say this is why the report needs to be done.

Q. Okay.

A. In general --

Q. Uh-huh.

A. -- his -- his.

Guidance was, this needs to happen as quickly as you can get it done. I mean, every day that goes on without more work put in here is a day that you know, is hurting the Kennedy Center. So just urgency.

Q. Okay. Now I want to ask for you to explain the -- give me one second.

Let me try to orient my next question.

So at the meeting -- the board meeting on August 13th, the board voted to approve a resolution to close the main building for two years during the course of construction, correct?

A. Yes.

Q. Okay. That resolution having already been passed, why did the Center management schedule an additional meeting at which the closure for two years would be discussed again?

A. Mainly to allow the board members to have access for a longer period of time to the full written report --

Q. Okay.

A. -- and have questions be asked or have a discussion around this issue once more.

Q. Was that in response to any specific concerns or objections that were raised about the amount of time that the board had to consider the materials?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I believe there were concerns raised during the board meeting about not having full --

BY MS. FREENY:

Q. Okay.

A. -- information, yes. And we want to have board members -- we want to provide board members the opportunity to review things.

Q. Okay. When was the Delta presentation -- not the report, the Delta presentation -- first sent to the board?

A. As soon as it was completed. I mean, that was --
Q. Okay. And that's actually my question, because I don't care as much about the date, because we know that from when our client received it.
But -- so I guess my question really is, did the Center, you know, receive Delta's final presentation deck on the same day that it sent it to the board or prior to the day that it sent it to the board?
A. It was likely prior, but only by -- I mean, it was a day or two.
Q. Okay. Do you know whether it was a day or two?
A. I don't know, no --
Q. Okay. So that's a --
A. -- but, I mean, we have it.
MS. FREENY: So I think that's something we would at least want to know.
MR. JANKOWSKI: Okay. I mean, I think it's -- okay. I think we've gotten that from

multiple -- from Darin's testimony.

MS. FREENY: Yeah. We want it from the Center.

MR. JANKOWSKI: Okay.

MS. FREENY: Yeah.

BY MS. FREENY:

Q. Okay. The original plan at the September 15th meeting was to have Delta walk through their engagement scope methodology analysis and conclusions as well as answer any questions; is that right?

And let me know if you want to see something. But does that sound right?

A. That sounds -- that sounds accurate.

Q. Okay. We noticed that at least one of the agendas that was eventually circulated didn't actually indicate on its face any presentation or time set aside for Delta.

Do you recall that?

A. No.

Q. Okay. Could you turn to tab 30? Which -- yes. This has been marked as Exhibit 8.

This is something we talked about as the meeting packet sent to the board in connection with the September 15th meeting.

Do you see that?

A. I see Exhibit 8. Yes.

Q. All right. And on the first page of the actual substance of the exhibit, you see the agenda.

Do you see that there's no agenda item for Delta? That is, no specific, like, item to have Delta either present or answer questions.

A. Well, that's number 3.

Q. That's number 3? Okay.

Ultimately, though, at the September 15th meeting, Delta did not either make a presentation or answer any questions, did they?

A. No. I don't remember any trustee having a question directly for Delta.

Q. Okay. Was the floor opened for questions? That is, did management say, does anyone have any questions for Delta?

A. There's always opportunity for trustees

to talk during a board meeting, and there's opportunities for trustees to talk -- there's plenty of conversation and trustees engaging at this board meeting. Yes.

Q. I have no doubt. But I guess my question is, did Center management actually ask, does anyone have questions for Delta or something in sum and substance like that?

MR. JANKOWSKI: Objection. Asked and answered.

You can answer, Matt.

THE WITNESS: Sorry, what are we -- there are times for trustees to ask questions --

BY MS. FREENY:

Q. Yes. My --

A. -- yes. We welcomed questions -- I think, at the end of my speech, I said, we are here to answer questions. Yes. It's normal, there's time for trustees to ask questions, yes.

Q. Between the August 13th meeting and the September 15th meeting, did the Center obtain any new factual information relevant to the closure

decision other than the production of the Delta final report?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: If you're talking about the closure decision as part of a resolution, as in the decision is memorialized in the resolution --

BY MS. FREENY:

Q. Uh-huh.

A. -- the resolutions stand by themselves. The Center is still doing other things on site that are related to the building and that impacts operations. Work is ongoing.

Q. Okay.

MS. FREENY: Do you guys mind if we take a bathroom break?

MR. JANKOWSKI: Let's do it.

MS. FREENY: We're going to go off the record.

(A recess was taken.)

BY MS. FREENY:

Q. All right. Mr. Floca, can I have you turn to tab 32 in your binder?

A. Yes.

MS. FREENY: And we're going to mark this Exhibit 13.

(Floca (30(b)(6) Deposition Exhibit 13 marked for identification and attached to the transcript.)

BY MS. FREENY:

Q. Mr. Floca, do you see that Exhibit 13 appears to be maybe not the best production of, but it's a social media post with President Trump looking at a placard?

A. Yes.

Q. And I will just represent to you because it's cut off a little bit, but that the placard said something -- appeared to say something about the Kennedy Center and the word "demolish" or "demolished."

A. Yes.

Q. Okay. Do you recall seeing this photograph appearing to show that President Trump had a placard with Kennedy Center demolition or demolished?

A. I do recall seeing this, I believe, the morning after this was posted.
Q. Okay. Was anyone at the Kennedy Center, including board members, involved in preparing this placard for President Trump?
MR. JANKOWSKI: Sorry. Give me one second to think this through.
To the extent that's a yes-or-no question, I think I won't instruct him not to answer. But beyond that, we'll invoke -- we'll rely on the executive privilege.
THE WITNESS: I can't speak for the board members.
BY MS. FREENY:
Q. Okay.
A. I don't know what the board members are or were involved in, but I can say that no one at the Center had any knowledge of this --
Q. Okay.
A. -- this placard.
Q. Were there discussions among Center management after publication of this post about

the content or the writing on the placard?
A. No meaningful discussions, no.
Q. Okay. So Center management didn't have discussions of what is -- why does President Trump have a placard that appears to show Kennedy Center demolition or demolished?
MR. JANKOWSKI: Objection. Asked and answered.
THE WITNESS: We -- no, there were no -- there were no real discussions about this.
BY MS. FREENY:
Q. Okay. When you say real discussions, distinguish that from, like, what you're excluding just so I understand.
A. A circulation of -- like, a link to -- you know, to this type of social media page, but no -- no real discussions, as in, and now let's get prepared for responding or doing something on site.
Q. Does the Center have any plans to demolish the Kennedy Center?
A. No.

Q. Does the Kennedy Center understand that there is a reasonable prospect that it will need to demolish the Kennedy Center within the next two years?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: The Center is focused on implementing the projects that were funded in the Big Beautiful Bill and outlined in the CPDP.

BY MS. FREENY:

Q. Okay. But what does that mean for whether or not the Center anticipates a possible need within the next two years to demolish the Kennedy Center?

A. I am not anticipating that need.

Q. Okay. Has anyone at the Kennedy Center discussed with Chairman Trump whether the main building would need or should be demolished?

MR. JANKOWSKI: Objet on executive privilege grounds and I instruct the witness not to answer.

MS. FREENY: Okay. And I assume we can agree to all the same provisos, and that the

witness is not going to answer.

BY MS. FREENY:

Q. Sir?

A. Yes.

Q. Okay. At the instruction of your counsel, correct?

A. Yes.

Q. And the same question: Did you have any discussions with Secretary Lutnick about the need for a possibility that the Kennedy Center would be demolished?

A. No.

Q. If President Trump directed or expressed a preference for demolishing the main building of the Kennedy Center, would the Center comply?

MR. JANKOWSKI: Objection. Speculative and compound.

THE WITNESS: The Center would comply with a resolution by the board of trustees, of which the president is the chairman, but that information would have to come via a resolution.

BY MS. FREENY:
Q. Does the Center anticipate a resolution -- or -- I guess, does the Center anticipate, like, asking the board to vote on demolition of the main building of the Kennedy Center?
A. No.
Q. Okay. If Trump asked for it, would the management put forward a resolution to approve demolition of the Kennedy Center's main building?
MR. JANKOWSKI: Objection. Vague and speculative.
THE WITNESS: The Center would have to respond to a request like that --
BY MS. FREENY:
Q. Okay.
A. -- but it would not -- it would not, without good reason, provide information and a resolution to that regard. There would have to be a substantial reason.
Q. Okay. Would the Center consider as a substantial reason that Chairman Trump has said

he wants the Center demolished?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I think this is speculation on his public comments, and I -- if the chairman of the board of trustees, President Trump or otherwise, brought something forward to management, we would have to respond to that, and we would, and we would provide reason and justification, and that would be a dialogue, and not just a -- acting because someone said to do something.

BY MS. FREENY:

Q. And just to clarify, you say you would have to respond to such a request. Are you saying -- does respond, in the way that you are using it, mean that management would put forward that resolution to the board and see what the board thought?

A. No. More, we would need to respond to the request...

(Discussion off the record.)

(The reporter read the record as requested.)

THE WITNESS: I'll just restart, if that's okay.

BY MS. FREENY:

Q. That's okay.

A. Respond in the terms of understand why the chairman of the board is bringing forward the need and analyze the need so we can put a concrete or substantial justification together, which would then be part of resolution and discussion at the board level.

Q. And so just to confirm, management would understand that it was not -- at least one option would be at the end of the day not to put forward such a resolution to the board?

A. Yes. Management does not need to draft resolutions for the board. The board can bring forward whatever business it wants to. The Center and management does not need to draft resolution for it to be considered by the board.

Q. I do need to clean up -- or return to one

question on finance that I forgot to ask. Because yesterday we talked about the audit, the '25 audit, and I think I started to talk today about that audit.

A. Uh-huh.

Q. But one question I had asked yesterday was about going concern letter or going concern warning. And I just wanted to know, as the Center's representative, if you can answer whether BDO has expressed to the Center a perspective on whether -- or let me just start that over.

I want to know, on behalf of the Center, whether BDO, the Center's auditor, has discussed with the Center the possible need to issue a going concern warning for fiscal year '26.

A. Yes -- I'm sorry, '26 or '25?

Q. Sorry, '26. Yes.

A. Not for '26. We haven't gotten there in the process yet --

Q. Yeah.

A. -- but there is a pending need for -- to

finalize a going concern letter for '25.

Q. Okay. When did those discussions start, the possible need to issue a going concern warning for fiscal year '25?

A. I don't know the term "warning," but the letter, as I understand it, is drafted by finance and just needs to be finalized by myself --

Q. Okay.

A. -- and then it's issued.

Q. Okay. And --

A. Or it then becomes part of the audit.

Q. And yesterday you indicated that you thought but weren't sure that going concern letters might have been issued for fiscal years '23 and '24.

MS. FREENY: The reason, Counsel, I'm asking about '23 and '24 is just to contextualize what to make of the '25 letter, you know, whether that's a pattern or that's something different.

BY MS. FREENY:

Q. Can you tell me definitively on behalf of the Center whether going concern warnings were

issued in fiscal year '23 and '24? And --
A. Yes.
Q. Okay.
A. My team has told me that --
Q. Okay.
A. -- so yes.
Q. Okay. And I guess I'm -- where would I find that? And the reason that I'm pushing back on this is that I've looked at the fiscal year '24 and '25 consolidated financial statements. They indicate -- you know, they indicate a requirement of both management and its auditor to issue such a warning or talk about a going concern warning under certain circumstances. But I do not see in those audited financials something that actually says -- that represents there is a going concern issue.
And so where would I find -- if you say your staff has told you that going concern warnings or letters were issued in '23 and '24, where would I find those if not in the fiscal year -- or in the consolidated financial

statements?

MR. JANKOWSKI: Objection. Foundation. And to the extent it misstates.

THE WITNESS: I believe the letters are just communicate -- they're communications between the Center and BDO. They would be in regular communications with the auditors.

BY MS. FREENY:

Q. Okay. And so the going concern letters that your staff has told you were issued for fiscal year '23, '24, you understand that those are not included in the consolidated financial statements?

A. I think they're separate from -- they're not -- they don't end up in the product of the audit, but they're a part of what BDO and the Center does during the audit.

Q. All right. Next I'm going to turn to what's going to be -- promised to be a really fascinating topic, the discovery collection -- which is topic G in the deposition notice, preservation, collection, and production.

And so essentially what I'm going to ask you is a series of questions so that I can just understand, again, not what counsel said or what counsel did, but how the Center itself, in collecting information responsive to plaintiff's discovery requests, what it searched and how things were organized.

Does that generally make sense?

A. Yes.

Q. Okay. So which Center's personnel files were kind of collected or searched for purposes of responding to the plaintiff's discovery requests?

MR. JANKOWSKI: Objection. Vague on "personnel files."

BY MS. FREENY:

Q. And let me be clear. I don't mean personnel files. I mean which personnel's files?

MR. JANKOWSKI: Sorry.

BY MS. FREENY:

Q. Right? So their e-mails or their files.

Which personnel were the -- files were

the subject of search in response to the discovery request?

A. You're asking for just a list of names?

Q. Yes.

A. Okay. I'll give you the ones that I know.

Q. Okay.

A. Myself. Donna Arduin. Alex Antkowiak. Cecelia Royster. Joe Fauci.

That might be it.

Q. When we're talking about e-mails, were individuals asked to search and identify their own e-mails for possible production, or was the search conducted by, for example, IT or -- not by the individuals themselves?

A. Not by the individuals themselves.

Q. Okay. Are you aware of any Center personnel who may have information concerning the August and the September board decisions regarding closure whose files were not searched?

A. No.

Q. Does the Center still maintain Donna

Arduin's mailbox, even though she has left the Center?

A. Yes.

Q. Did the Center make any effort to collect text messages?

A. I don't -- I don't know --

Q. Okay.

A. -- that the Center did -- there were questions about text messages, but not -- I don't know the extent of the effort to collect text messages.

Q. Okay. Do -- do members of the Center management use text message to communicate about Center business?

A. It's likely, to some effect, yes.

Q. Okay. Would there be text messages among Center management employees, or involving Center management employees, regarding the events leading up to the August 13th or September 15th board meetings?

A. Maybe.

Q. Okay. Do members of Center management

use other messaging apps -- not text message, but other text messaging apps like Signal or WhatsApp -- for Center business?

A. Teams, but not -- no -- there are no official -- there are no Signal apps that the Center uses.

Q. Okay. Were you aware that the -- so one of the things that plaintiff requested were documents that were prepared for the board but not provided to the board related to either of the two board meetings or finances.

Were you aware of that?

A. Yes.

Q. How did the Center go about identifying whether such documents existed?

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: That's that same process I mentioned before of -- there were -- employees did not provide their own --

BY MS. FREENY:

Q. Okay.

A. -- information. Information was taken

out of employees', you know, systems.

Q. Okay. By whom?

A. Our general counsel's office. I don't know who --

Q. Okay. And so you, for example, didn't have any involvement in helping to identify if there exists material that was prepared for the board but not shared with the board?

A. I didn't prepare any material that was not shared with the board --

Q. Okay.

A. -- and then give -- like, there's no --

Q. Yeah. What about other -- I'm trying to understand --

A. That would have been found during the discovery process.

Q. Okay. Are you suggesting through searches or through discussions with employees? I'm trying to understand, like -- I'm essentially trying to figure out the process so I can understand why we got things, why we didn't get things.

A. General counsel's office had discussions with employees.

Q. Okay.

A. And then -- I don't know the name of the tool, but through a tool they were able to search records and provide information related to those discussions.

Q. Were -- did Center -- like, were Center -- were Center personnel instructed to collect any records themselves to respond to the discovery?

A. Personnel were directed to preserve records but not to, outside of whatever conversations general counsel had with personnel, were not given an order to provide anything.

Q. Okay. I think -- we talked earlier today about tab 42, Exhibit 4, which is a slide deck presented to the Audit and Finance Committee on June 1st, 2026.

A. Uh-huh. Yes.

Q. Okay. And one of plaintiff's requests for production were materials that were presented

to one or more, but fewer than all, of the trustees on either of the two meetings or on finance.

And so my question is, do you know why this Exhibit 4, this slide presentation, that was presented to some of the trustees at -- those trustees that were on the Audit and Finance Committee but not all trustees was not produced to plaintiff?

MR. JANKOWSKI: Objection. Foundation. Speculation.

THE WITNESS: Well, it was produced, but it wasn't produced as part of -- you're talking about this (indicating)?

BY MS. FREENY:

Q. Yes. I'll just represent to you we did not receive this from defendants.

A. Oh.

Q. You see it doesn't have those little Bates numbers?

A. And this specific presentation would not have, I guess, been discussed with -- you know,

with the general counsel's office and finance to flag it, maybe, but it likely should have been found when looking through records.

Q. Okay. Do you know why it wasn't found in looking through records?

A. I don't.

Q. Okay. Do you know where the Center looked in terms -- to identify materials responsive to the request for materials shown to one or more but fewer than all trustees?

A. E-mails.

Q. Okay. Other than e-mails, what about sort of, like, share drives, that kind of thing?

A. Well, e-mails would have been the way that the information is shared, in addition to OnBoard, but we weren't using OnBoard to that extent with committees, that is.

So e-mails would have been how a committee or members of a committee received information.

Q. Okay. You mentioned OnBoard, and I just want to ask sort of generally.

When materials are distributed to the board, are -- materials are put on OnBoard or are they e-mailed or both?

A. Both happen.

Q. Okay. And the reason I ask is that I recall from yesterday that you indicated that the material for the August 13th meeting was sent around two days before the meeting, but I thought you indicated that some other material was made available on OnBoard.

A. The -- mainly from a cursory review of how we were using it, agendas and, you know, minutes were made available on OnBoard, and then substance was e-mailed.

In the case of the Delta report, it was too large to e-mail. So that's why that, plus the other meeting [sic] for the September board meeting were uploaded.

Q. Okay. And so those were uploaded two days before, basically the same time that material was sent around via e-mail?

A. Information would have been uploaded to

OnBoard around the same time that it was distributed -- notices or agendas or information was distributed to trustees.

Q. Okay. Is the Center's document collection complete? Like, to your knowledge, is the Center currently -- Center employees currently identifying documents to respond to plaintiff's discovery requests?

A. It's complete.

Q. Okay.

MS. FREENY: I think at this point in time, I am going to turn the questioning over to my colleague, Mr. Kristofcak, who is going to ask you questions about the September 4th incident, if that means -- if you get what we're getting at.

And then I think we also received a copy of the JLL letter that we discussed yesterday, and he may have some questions about that.

Do you want to take a break or shall we just keep going?

MR. JANKOWSKI: Fine by me.

MR. KRISTOFCAK: Sorry, can we take just a couple of minutes?

MS. FREENY: Okay. Are you guys okay with that?

MR. JANKOWSKI: Sure.

(A recess was taken.)

BY MR. KRISTOFCAK:

Q. All right. So I'd like to ask you some questions about the September 4th incident.

Can you tell me what happened?

A. The ceiling incident, right?

Q. That's right.

MR. JANKOWSKI: I was going to object on vagueness grounds, sorry, but I thought maybe we should move forward.

THE WITNESS: A section of plaster in the grand foyer, 5 foot by 4 foot, roughly, delaminated -- is the right term -- from the structure above and fell to the floor that prompted the safety and security team to close off the area while further investigations were undertaken.

BY MR. KRISTOFCAK:
Q. And did the Center close immediately following the plaster incident?
MR. JANKOWSKI: Objection. Vagueness.
THE WITNESS: We closed the grand foyer, which is where the plaster fell.
BY MR. KRISTOFCAK:
Q. Is that to say that the remainder of the Center stayed open?
A. Correct.
Q. And then you closed the Center ultimately on September 16th, correct?
A. Correct.
MR. JANKOWSKI: Objection. Vagueness.
I know you already answered, but...
BY MR. KRISTOFCAK:
Q. What's your understanding of what caused the plaster to fall?
A. Water infiltration from the plaza level and air infiltration from the plaza level into interstitial space above the grand foyer, which then, you know, created moisture in the plaster

and made the plaster delaminate.

Q. What information did you receive between September 4th and September 16th about the causes of the incident? Or reports or studies?

A. The unfortunate issue with the grand foyer is that you need a specialized lift to get up to where the -- to where the issue is. So we weren't able to -- because the lift was broken, we weren't able to get up and closely investigate where the ceiling delaminated. But we did see six or seven other areas where there were similar signs of water infiltration, mold, paint delaminating.

So specifically in the grand foyer, we -- you know, we documented those issues in those locations.

And then adjacent to the grand foyer, Walter P. Moore was continuing their investigation work and assessment of the soffits that are linked to the space above the grand foyer, that interstitial space.

Q. The soffits are on the exterior of the

building?

A. The soffits are on the exterior of the building below the -- below the terrace overhanging walkway but above the plaza-level perimeter.

Q. Okay. And as far as on the interior of the building, the areas that you say you observed that had additional indications of leaks or potential issues, those were all in the grand foyer?

A. Mainly the grand foyer with the -- with the two exceptions of additional leaks and water intrusion that had been reported in the Hall of Nations and a report in the Hall of States of a section of the ceiling falling on top of a security station at the front of the Hall of States.

That was a while ago, a month and a half ago. But there are other issues that we were tracking and aware of that we knew we needed to look into in the Hall of States and Hall of Nations.

Q. And help me understand, what information did you receive before September 16th that indicated to you that the closing off that area was not sufficient, from a safety perspective, given the issues you were seeing?

A. The driving delineation between the grand foyer and the larger safety issues on the main building was driven by the work Walter P. Moore was doing assessing the soffits.

So at the time, they had done a LiDAR analysis of deflection in the soffits, negative and positive deflection in the soffits. They had done borescope tests into the space above the soffits to look at the structural systems, and they were just starting to actually cut larger portions of the soffit out so they could physically, you know, put eyes directly on the structural system above the space, because it is a confined space and it's largely hard to access.

They had previously flown drones through the interstitial space just to get an understanding of, you know, what they could see

with the roof drains that are leaking into the space and the structure.

So all of those reports were coalescing; in addition to them, Walter P. Moore actually putting eyes directly on the space, which they had not done previously.

Q. And when was that analysis done?

A. It was ongoing -- really ongoing between the 2nd, 3rd, and 15th and 16th. Even longer to, like, the 20th, 21st.

So it's the whole -- you know, the whole beginning part of September, Walter P. Moore was doing analysis on -- detailed analysis on the soffit panels.

Q. But wasn't there a September 3rd report from Walter P. Moore that you received?

A. They issued a draft report that summarized the findings from that LiDAR and borescope and drone investigation, but it did not include the information that -- that was later included in their final report when they took the sections of the soffit out to actually look at it

face to face.
Q. Okay.
A. And just to be clear, in that draft report, you know, we historically know and have known that the soffit panels were in bad shape, water leaking through them, the failure that happened a couple of years ago, and the -- you know, the draft report that Walter P. Moore issued highlighted a lot of that information with more specifics, and the final report really clearly outlined what the risks were.
Q. So -- I think you just alluded to prior reports from Walter P. Moore.
Is this the 2024 and 2022 reports from Walter P. Moore?
A. They have provided reports throughout the building -- in the parking garage, the loading dock --
Q. Sorry, just referring to the soffit-related issues.
A. Yes. There is a report when the -- that Walter P. Moore provided when the soffit panel on

the northwest side of the building failed.

Q. And the September 3rd report recommended that the soffit panel system be replaced, correct?

A. It did.

Q. Was there anything additional in the subsequent report that came out in late September that sort of increased your confidence in their analysis?

A. Between that draft report and the final report, they were able to -- to inspect things in person instead of on a drone, and that's where they, as mentioned in the report, witnessed missing ties on some of the panels, structural members that were completely degraded with, you know, no integrity left.

So that information wasn't -- it's more difficult to see that with a borescope and a drone than it is -- it's easier to see that in person.

So some of those, you know, real structural failures were identified when they

were able to see things, investigate things in person.

Q. And that final report came out on the 20- --

A. 21st? 2nd? It --

Q. But in any event, after you decided to close the Center, correct?

A. Yes.

Q. So your closure decision was based on the information in the report on September 3rd?

MR. JANKOWSKI: Objection. Misstates.

THE WITNESS: The decision was partially informed by the report, but there were ongoing conversations every day with Walter P. Moore and the team, the facilities and project management and security and safety team about, you know, what they were finding. So it wasn't that there was a report and then we waited, did something, and then got another report. There were ongoing, you know, coordination and project-level discussions regularly during that time period.

BY MR. KRISTOFCAK:
Q. And the -- was the September 3rd report the first time Walter P. Moore recommended that the soffits be replaced?
A. The first time they recommended that all of the soffits be replaced.
Q. Okay. So help me understand. It sounds like you were qualifying my statement.
Was there some other recommendation that they made about soffit replacement?
A. Well, at -- prior to that report and the work that they did leading up to that report, the -- the failure on the northwest side of the building had happened, so we knew that there were components above the soffits that were at risk and failing.
Then, additionally, if you -- there are visual inspections that were taking place when it would rain and water would just come through the soffits.
So both those visual inspections and the actual failure that happened and what we learned

during that failure in repairing the systems helped drive us to the fact that replacing the soffits was an important project. But it wasn't until we went through that preliminary, you know, scoping and investigation that we knew the full extent that -- how widespread the actual issues were.

Like, for example, you know, we know that there's water coming through the soffits, because you can see it when it rains, and it shouldn't be. So that means something wrong is happening. But we didn't know until Walter P. Moore did their investigation that every single roof drain on the low roof overhang had failed.

Q. Is it fair to say that the issues generally weren't new, but you just became more confident more recently that they were urgent?

A. With -- yes. With the information from, you know, and the conversations that we were having with Walter P. Moore. Yes.

Q. And the -- when the closure actually happened, that was on the 16th, you had your

board meeting the day before at which the board approved a different closure.

Did you talk to the board about the possibility of sort of administratively closing the Center?

A. No, I did not have a chance to -- no. During the board meeting, that did not come up. No.

Q. Why not?

A. The focus of the board meeting was the resolution. And part of the -- the inability to reach consensus and these mounting safety issues that I see in the building informed the need to act.

Q. I guess -- is it fair to say that, by the time of the board meeting, you knew that you wanted to close the Center regardless of what the board decided?

MR. JANKOWSKI: Objection to the extent that misstates.

THE WITNESS: I approached the board meeting as an opportunity to present and discuss

these issues with a lot more information than we previously had, and hoped there would be, you know, the time to reach that consensus which would result in the main building moving forward with renovations.

That consensus was not reached --

BY MR. KRISTOFCAK:

Q. That consensus was not what, sorry?

A. Was not reached during the board meeting.

Q. Can you help me understand that statement?

A. There's really two options coming out of that board meeting. There's all of the trustees understand that these are really critical important things that need to happen to the building that are actively failing, and here's the proof, you know, right in front of your face what's happening, so all of the trustees can have a discussion and reach consensus there or what continues to happen where there's not consensus.

And in the term of -- or in the case of not consensus, I have to make a decision about

what is best for patrons and staff and visitors and put safety before anything else, and that's what we did.

Q. I still don't understand. Didn't the board vote to close the building? What was the lack of consensus you're referring to?

A. The injunction is still in place. So even -- the board can vote every day to close it building, but that doesn't mean that the injunction is lifted.

Q. Okay. So your decision to close the Center was to get around the injunction?

MR. JANKOWSKI: Objection. Argumentative --

BY MR. KRISTOFCAK:

Q. I'm just trying to understand the statement.

MR. JANKOWSKI: -- misstates.

THE WITNESS: If I have a structural engineer telling me that I have failing soffits around the entire perimeter of the building that need to be replaced and I have evidence of other

failures happening in the building, and then I have pieces of the parking garage that are actively failing, I have pieces in the loading docks that are actively failing and I have electrical arc flash hazards in my electrical vaults, I have to take a step to quantify all of these risks. And I can't just ignore them because they are risks to people's lives.

And that's the priority I'm talking about. I'm not trying to get around the injunction. In fact, we're doing everything we can to understand what all of our risks are and mitigate them so we can move things forward.

This was not anything related to the injunction. This was mounting safety risks that I needed to act on and quantify so we know the liability that the Center has.

MR. KRISTOFCAK: If you could -- we're going to mark this as Exhibit 14.

MS. BAUM: I will send you an electronic copy.

MS. FREENY: And if you could just make

sure that, afterwards, you put that with the binder?

(Floca (30(b)(6) Deposition Exhibit 14 marked for identification and attached to the transcript.)

BY MR. KRISTOFCAK:

Q. So is this the JLL report or, I guess, letter that we talked about yesterday?

A. Yes.

Q. If I could turn your attention to the second page. On the bottom it's stamped with Bates number 6801.

Do you see the paragraph that has the heading, "Cost efficiency through elimination of premiums"?

A. Yes.

Q. And the last statement states, "These savings, potentially 60 to $80 million, are redirected to actual scope delivery"?

A. Yes.

Q. What did you understand these savings to be?

A. An example of these savings -- or the savings identified here is highlighted in the work we're doing now with the soffits. So in order to preserve access, safe access into the building for the public, we have to build a scaffolding or a tunnel so people can get into and out of the main building.

So things like that: pedestrian protection, phasing, working -- you know, working around rehearsals or performances or creating things to allow the flow of traffic and pedestrians has a cost to it.

And that's the $68 million that you have to spend on that, or you can spend that on improvements to the building.

Q. So is it fair to say that these are the savings that you achieve from pursuing the renovation with the Center being closed instead of phasing it in an occupied building?

MR. JANKOWSKI: Objection to the extent "Center" is vague.

BY MR. KRISTOFCAK:
Q. Or the main building of the Center.
A. Yes.
Q. Okay. And do you recall what Delta's sort of cost differential estimate was?
A. 50 to $60 million, I believe.
Q. Is there -- did you present these findings from JLL to the board?
A. No --
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: -- this letter was not presented to the board, but Delta and JLL met frequently and discussed what JLL knew, and this is part of what JLL knew in their -- in their work creating --
BY MR. KRISTOFCAK:
Q. So did you --
A. -- the plan.
Q. -- provide this letter to Delta?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: I don't know if they received this exact letter, but I -- I would

have -- it would have come up in their meetings with JLL, though, I'm sure.

BY MR. KRISTOFCAK:

Q. Okay. So you don't -- I genuinely can't recall what your answer was.

Did you present JLL's findings with respect to the potential cost savings to the board or --

A. No. This letter was not presented to the board.

Q. Okay. So just to clarify, when I asked earlier if you shared this with the board, I meant either the letter or the ultimate conclusion. And I just want to clar- -- make sure that you understand my question.

MR. JANKOWSKI: Are you asking the question again, whether the letter or the ultimate conclusions were --

MR. KRISTOFCAK: That's right.

MR. JANKOWSKI: Okay.

BY MR. KRISTOFCAK:

Q. Sort of separately from whatever Delta's

findings were, were JLL's findings presented to the board?

A. Not -- no, not explicitly, no.

Q. Okay. Another finding that JLL made, or observation, I guess, they -- on the first page, Bates number 6800, on the bottom two lines it says, "Our assessment suggest the building's true needs approach 400 to 500 million when all deferred maintenance, systems replacements, and necessary improvements are evaluated."

Do you see where it says that?

A. Yes.

Q. So is it fair to say that JLL believed that the entire scope of the work that the Center needed to do was significantly greater than the roughly $250 million appropriation received?

A. That is their assessment. Yes.

Q. Okay. And then on the fourth page stamped 6803, do you see where it says, "Significant schedule extension (36 to months)"?

A. Yes.

Q. This is significantly shorter than what

Delta estimated, correct?
MR. JANKOWSKI: Objection. Vague.
BY MR. KRISTOFCAK:
Q. Let me ask, do you remember what Delta estimated as the extension and schedule for the phased renovation?
A. At -- you know, double -- at least double the schedule. And, you know, this 40 months, it's around the same. But Delta's expectations were longer. Yes.
Q. And was this 36- to 40-month estimate from JLL shared with Delta?
A. I don't know exactly what they discussed, but I would assume that they discussed, again, the contents of this letter because they were meeting regularly with Delta.
Q. So would it surprise you if Delta said that they, in fact, did not receive any schedule estimates from JLL about the timeline for a phased renovation?
MR. JANKOWSKI: Objection. Argumentative. Misstates.

THE WITNESS: No, I'm not surprised by that. That doesn't mean that they weren't coordinated and meeting.

BY MR. KRISTOFCAK:

Q. And was this 36- to 40-month estimate from JLL shared with the board?

A. Again, this letter was not shared --

Q. I'm not asking about the letter; I'm asking about the conclusion.

MR. JANKOWSKI: Objection. Vague.

THE WITNESS: I did not share a conclusion with the board that JLL assumed that there could be more than 36- to 40-month schedule extension.

BY MR. KRISTOFCAK:

Q. Okay. And on the last page, stamped 6806, do you -- there's a paragraph towards the end that starts with "Second," and it says, "Both approaches are technically feasible. Should leadership determine that occupied renovation better serves the institution's overall interests, JLL stands ready to execute

successfully."
Do you see where it says that?
A. Yes.
Q. Was that conclusion shared with the board?
MR. JANKOWSKI: Objection. Vague.
THE WITNESS: That conclusion was not shared with the board, and neither was their professional recommendation to stay the course with closure execution recommended to the board.
BY MR. KRISTOFCAK:
Q. Okay. But you did not share JLL's view that the phased approach is technically feasible with the board, correct?
MR. JANKOWSKI: Objection. Asked and answered. Vague.
THE WITNESS: Anything is technically feasible. They have a professional recommendation in this letter that is -- that is the preface to the section you're highlighting.
BY MR. KRISTOFCAK:
Q. What do you mean by "anything is

technically feasible"?
Could you renovate the entire Center in six months? Is that technically feasible?
A. No, that's not technically not feasible.
Q. Okay. So anything is not technically feasible, correct?
I'm just trying --
A. Yes.
Q. -- to understand, when an engineering expert states that something is technically feasible, they're not lightly making that statement. That's a professional view, correct?
A. It is a statement --
MR. JANKOWSKI: Objection.
THE WITNESS: -- that something is technically feasible but is not their professional recommendation.
BY MR. KRISTOFCAK:
Q. That's not what I'm asking. I'm asking that their statement that the phased approach is technically feasible is a professional expert opinion that they made, correct?

MR. JANKOWSKI: Objection. Asked and answered. Argumentative.

THE WITNESS: I don't disagree that both approaches are technically feasible --

BY MR. KRISTOFCAK:

Q. Okay.

A. -- and it is stated in this letter.

And what is also stated in this letter, that they have a professional recommendation to stay the course with a closure execution based on stewardship principles, delivery success factors, and minimization of public interest -- investment value -- maximization of public investment value.

I think you're picking a piece of this letter which I don't disagree with, but that's not what their professional recommendation actually is in the letter.

Q. Thank you.

MR. KRISTOFCAK: Let me just...

MS. FREENY: Okay. And I think the turnover back to me -- and this is going to be a little bit similar to what we did yesterday, if

you're amenable, Will. I just need to make a record of questions that -- because in some cases I have skipped over questions I would otherwise ask just to move things along. These are questions where I anticipate that defendants' counsel is going to raise an executive privilege/presidential communications assertion. And rather than go through the whole process, if we can -- if I can read the first one, we can do it the way that I think -- with sort of a full explication of both sides' positions. And then, afterwards, if we agree, I will read the rest of the questions. And then I will assume, if you don't tell me otherwise, that you would raise the same objections; we would make the same statements unless you tell me otherwise.

Is that fair?

MR. JANKOWSKI: Agreed.

MS. FREENY: Okay.

BY MS. FREENY:

Q. And so one of the questions that I would want to ask is, did Chairman Trump provide any

input that was used in Delta Consulting Group's analysis for the board's August 13th meeting?

MR. JANKOWSKI: Object on executive privilege grounds and instruct the witness not to answer.

MS. FREENY: And that is the presidential communications privilege, or assertion; is that right?

MR. JANKOWSKI: That's correct. Presidential communications component of the executive privilege. Yes.

MS. FREENY: And are you making that assertion at the direction of the president or his representatives?

MR. JANKOWSKI: Decline to answer specifically on the basis of the attorney-client privilege, but represent that we're following the standard procedures of the Department of Justice.

BY MS. FREENY:

Q. And sir, I -- I think, for the record, I'm just going to ask, you would refuse to answer that question at the instruction of your

attorney?
A. Yes.
Q. And for the rest of these, I can also take that you will -- if your attorney instructs you not to answer, you would not answer, correct?
A. Correct.
Q. Okay. So then I'm going to proceed with the additional questions that we would want answers to if there was not an objection and an instruction not to answer.
Did anyone at the Kennedy Center speak with Chairman Trump regarding the Center's cash position?
MR. JANKOWSKI: Objection.
BY MS. FREENY:
Q. Did anyone at the Kennedy Center speak with Chairman Trump regarding the drop in revenue following renaming?
MR. JANKOWSKI: Objection. And -- objection.
BY MS. FREENY:
Q. Did anyone at the Kennedy Center receive

input from the chairman regarding how to proceed following the Court's preliminary injunction order?

MR. JANKOWSKI: Objection. And attorney-client privilege.

MS. FREENY: Help me understand that.

Did anyone at the Kennedy Center receive input from the chairman regarding --

MR. JANKOWSKI: To the extent that the communications were between the president and the general counsel's office or --

MS. FREENY: Ah. Okay. And so if I ask, did anyone other than the general counsel's office receive input from the chairman regarding how to proceed following the court's preliminary injunction, that would be -- you would not assert attorney-client; you would just assert executive privilege?

MR. JANKOWSKI: Correct.

MS. FREENY: Okay.

BY MS. FREENY:

Q. Did Chairman Trump instruct anyone at the

Center on steps to take following the May 29th preliminary injunction?

MR. JANKOWSKI: Objection. And same scoping issue on attorney-client privilege.

BY MS. FREENY:

Q. Did Chairman Trump provide information about -- information or input about whether he would support renovation if he was not recognized in some way by the Kennedy Center?

MR. JANKOWSKI: Objection.

BY MS. FREENY:

Q. Did Chairman Trump speak with anyone about the September 16th decision to shut down the Kennedy Center's main building?

MR. JANKOWSKI: Objection and scope.

MS. FREENY: All right. And I think, with that, I would just put on the record that, again, as with yesterday, I think -- our position is that you would be subject to recall pending the outcome of certain discovery disputes that we have about our access to information. And I understand that your counsel opposes that. And

that will be to be decided at a later date.

MR. JANKOWSKI: Yes. The government's position is that, to the extent the court decides no relief is afforded to the plaintiffs, then the deposition is over.

And I'll just ask on the record to read and sign the transcript.

MS. FREENY: All right. And with that, I will conclude and I will thank you for your time again today, Mr. Floca.

THE WITNESS: Thank you.

MS. FREENY: Off the record.

(Whereupon at 5:01 p.m., the 30(b)(6) deposition of MATTHEW FLOCA was concluded.)

CERTIFICATE OF NOTARY PUBLIC

I, CHRISTINA S. HOTSKO, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting under my direction; that said statement is a true record of the proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this statement was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Christina S. Hotsko

CHRISTINA S. HOTSKO

Notary Public in and for the

District of Columbia

My commission expires:

1 January 2027

JOYCE BEATTY vs. DONALD J. TRUMP, et al.

MATT FLOCA 30(b)(6)

INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully and make any necessary corrections.

You should state the reason in the appropriate space on the errata sheet for any corrections that are made. After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

2026-1040000

JOYCE BEATTY vs. DONALD J. TRUMP, et al.

MATT FLOCA 30(b)(6)

E R R A T A

\- - - - -

PAGE LINE CHANGE

___ ___ ________________

Reason:____________________________________

___ ___ ________________

Reason:____________________________________

___ ___ ________________

Reason:____________________________________

___ ___ ________________

Reason:____________________________________

___ ___ ________________

Reason:____________________________________

___ ___ ________________

Reason:____________________________________

___ ___ ________________

Reason:____________________________________

___ ___ ________________

2026-1040000

JOYCE BEATTY vs. DONALD J. TRUMP, et al.

MATT FLOCA 30(b)(6)

ACKNOWLEDGMENT OF DEPONENT

I, ________________________, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

___________ __________________________

DATE SIGNATURE

2026-1040000

$

**$1** 161:3,10
**$10** 161:10,11,22
**$18** 79:10 80:2 106:15 107:14 108:12,18,20 109:1
**$2** 170:13
**$250** 291:16
**$558,000** 169:20
**$60** 289:6
**$68** 170:8 288:13
**$70** 170:7
**$80** 287:18

0

**0322** 240:6

1

**1** 13:10,13,19 14:3
**10** 217:10,11,13,14
**10,000-foot** 155:16
**11** 76:21 77:7 163:4 228:21 229:1,5
**110** 76:4
**12** 239:16,17
**12:34** 131:19
**13** 9:11 106:11 228:19 250:3,4,8
**13th** 14:5 21:21 24:18 44:21,22 46:19 226:5,8,18 227:1,12,15 233:18 234:1 235:1,22 237:15 240:18 243:15 248:20 264:19 270:7 298:2
**14** 286:19 287:3
**14th** 229:6 230:5 232:8 240:15
**15th** 177:22 203:17 211:16,19 246:8 247:3,14 248:21 264:19 277:9
**16th** 221:3 273:12 274:3 276:2 277:9 282:22 301:13
**17** 76:4
**18** 79:14 107:10,19 108:9 163:2,6,11, 12,13
**1st** 44:19,20 48:9 50:12,13 51:6 75:14,22 76:11 164:18 267:19

2

**2** 48:2,3,8 50:15 171:6
**20** 13:2
**20-** 280:4
**2022** 278:14
**2023** 164:18
**2024** 161:4 164:18 169:18 278:14
**2025** 32:21,22 110:9 137:1 139:19
**2026** 14:6 43:1 48:9 50:14 51:6 69:1 75:15,22 77:17 78:10,11 79:16 122:12,19 133:16 134:1 137:1 145:1 178:1 211:16 218:11 230:5 240:15 267:19
**2026-'27** 43:12
**2026-2027** 33:3,21
**2027** 42:16,18
**20th** 277:10
**21** 217:7,12
**21st** 277:10 280:5
**23** 69:20 163:21 164:17,19,20 259:15, 17 260:1,20 261:11
**24** 58:1 69:20 161:9 162:1,9,12,21 163:21 165:1 170:7 259:15,17 260:1, 10,20 261:11
**25** 57:21 68:8 70:5 134:7 137:13 138:1 139:2 157:11 162:8 167:11 211:3 258:3,17 259:1,4,18 260:10
**26** 30:1 46:18 52:14 54:11 67:21 68:2, 4,19 69:6,14 70:9,14,21 71:6,10,19 72:19 73:15,22 74:3 119:13,18 120:5, 13,16 121:2,14,22 132:18 133:2,6,13, 19,20 134:8,15 135:7,10,14,20 136:10 137:6,14 138:1 139:2 157:11 162:8 174:13,21 258:16,17,18,19
**26-'27** 15:19 18:1 19:7 22:2 24:1,14, 21 25:12,20 29:19,22 31:10 32:5 35:7 37:3 38:17 39:9 42:10
**27** 52:13,15 54:13,15 55:5,21 56:6,13 57:5 58:14,22 59:10 60:1 61:3,20 62:16 64:7,13 66:1 140:12 162:8 198:4 205:7
**27-'28** 18:2 43:12
**27-28** 20:16
**29th** 9:9 21:16,20 47:3 77:17 164:18 219:12 301:1
**2nd** 277:9 280:5

3

**3** 60:10,12,15,16,19 63:6,10 64:7 67:5,20 68:21 218:3,22 219:1 247:12, 13
**30** 13:2 177:6 246:21
**30(b)(6)** 5:3 7:21 13:13,14,18 83:13 101:8 302:13
**32** 249:22
**33** 13:7
**34** 164:15
**36** 291:20
**36-** 292:11 293:5,13
**3rd** 277:9,15 279:2 280:10 281:2

4

**4** 75:5,9,13 76:17 225:10 239:15 267:17 268:5 272:17
**40** 292:8
**40-month** 292:11 293:5,13
**400** 291:8
**42** 75:4 267:17
**43** 144:1,7
**4th** 271:14 272:9 274:3

5

**5** 77:5,7,8 106:16 272:17
**50** 289:6
**500** 291:8
**558,000** 168:13
**56** 178:4,9
**58** 178:4,9
**5:01** 302:13
**5th** 144:22 218:11 221:7 222:1,19

## 6

**6** 14:9 144:4,6,9,14 146:3,9 166:19,21 167:13 218:3

**60** 287:18

**6800** 291:6

**6801** 287:12

**6803** 291:19

**6806** 293:17

**6th** 228:16 231:17 234:22

## 7

**7** 163:5,6,7,11,12,15,19

## 8

**8** 177:8,10,11 178:9 246:22 247:5

**8/20** 241:2,21 242:14

**8/6** 231:11 232:7

**8:00** 241:2,16

**8th** 31:22

## 9

**9** 47:22 211:7,8,9,14

## A

**a.m.** 241:2,16

**ability** 6:6 11:16 17:12,20,22 18:8 41:22 184:8 197:15

**absolutely** 190:2

**accept** 98:22 99:10

**accepting** 88:13,15 89:8 90:14 91:20 93:6 104:18

**access** 134:17 183:13 244:2 276:19 288:4 301:21

**accessible** 116:15

**accomplish** 32:22 119:17

**accomplished** 29:7

**account** 108:19 109:1 153:13

**accounting** 117:12,13 118:7,8,9 122:20,22 127:10 150:10 166:16 229:19,21

**accounts** 120:10,11 124:4,6 133:22 135:6,10,19,21,22 136:9

**accuracy** 189:17

**accurate** 246:14

**achieve** 28:22 89:4 288:17

**acknowledge** 34:5

**acknowledge-** 103:18

**acknowledged** 54:10

**acknowledgement** 100:19 104:6

**acknowledging** 103:18

**acknowledgment** 103:13 104:3

**act** 283:14 286:16

**act-** 14:16

**acting** 79:22 110:21 256:10

**action** 79:20 80:4,8,22 83:18 84:6 89:3,6,9 99:12

**actions** 80:19

**active** 102:20

**actively** 174:16 284:16 286:3,4

**activities** 123:1 167:15 218:20 220:3 225:16 226:6

**actual** 72:11 247:7 281:22 282:6 287:19

**actuals** 54:11

**add** 51:12

**addition** 68:6 148:13 160:21 269:15 277:4

**additional** 63:16 183:13 185:2 243:21 275:8,12 279:6 299:8

**additionally** 281:17

**address** 129:12,13 164:10 200:15 201:1 202:9 237:2 238:12

**addressed** 57:5

**adjacent** 27:13 274:17

**adjust** 174:17

**adjusted** 65:18,21

**adjustment** 25:2

**adjustments** 10:3 14:12

**administrative** 12:12

**administratively** 283:4

**adopt** 118:9 223:1

**advance** 46:18

**advice** 91:9 96:18 128:3

**advised** 128:13

**advising** 95:17

**advisor** 232:11

**advisors** 95:18

**affected** 13:1

**affiliated** 82:21 242:9

**affirmative** 14:11,17 21:8,12 26:1

**affirmed** 5:4

**afforded** 302:4

**afternoon** 142:13 214:13

**agenda** 47:18 177:19,21 247:8,9

**agendas** 246:16 270:12 271:2

**agents** 25:10

**aging** 134:1 135:6,10,20 136:9

**agree** 23:16 75:17 76:9 80:18 99:9 178:8,21 179:2 213:6 218:12 226:4 233:6 237:5 253:22 297:12

**agreed** 79:4 213:3 297:18

**agreement** 80:18 87:8 99:14,22

**agreements** 80:5

**ahead** 47:17 76:2 219:4

**Ailey** 23:5

**air** 273:20

**Alex** 263:8

**allowed** 35:12 165:7 166:20

**allowing** 87:2

**alluded** 278:12

**alongside** 31:18 103:8 181:14 182:1 193:19 194:2 195:16 198:6

**alternative** 20:1

**Alvin** 23:5

**amenable** 141:22 297:1

**amount** 155:3 157:20 223:2 244:9

**analyses** 132:18 133:4,11,12

**analysis** 49:6 56:18 59:21 61:13 65:1,4,5 66:5,15,20 67:4,19 72:13,21 74:10 77:19 121:5 133:6,19 139:17 146:8 193:17 195:15 220:21 246:10 276:11 277:7,13 279:9 298:2

**analyst** 229:18

**analyze** 74:8 111:8 114:9 156:22 257:9

**analyzing** 236:11

**ancillary** 152:13

**announced** 39:5 44:6

**annual** 135:13 150:4 198:7 199:15

**answering** 41:6

**answers** 41:2,15,17 188:15 299:9

**anticipate** 255:2,4 297:5

**anticipates** 253:11

**anticipating** 253:14

**Antkowiak** 263:8

**anymore** 118:21

**appeared** 250:15

**appearing** 250:20

**appears** 66:16 250:9 252:5

**appellation** 207:2

**appendix** 57:6 60:2,3,6,18,19,21 63:10 64:13 66:16

**apply** 216:19 235:15

**appreciation** 165:6

**approach** 230:18 291:8 294:13 295:20

**approached** 283:21

**approaches** 293:19 296:4

**approaching** 40:13

**appropriately** 33:11 111:16

**appropriation** 169:2 291:16

**approval** 210:2

**approve** 80:22 99:17 187:15 204:3,5 243:15 255:9

**approved** 50:22 51:8 52:4 80:20 213:15 214:18 283:2

**approving** 192:5

**approximately** 168:13 232:17 234:7

**apps** 265:1,2,5

**arc** 286:5

**Arduin** 47:10 50:18,20 51:5 53:17 263:8

**Arduin's** 264:1

**area** 45:13 154:20 272:21 276:3

**areas** 10:7 274:11 275:7

**Arena** 44:12,15 45:2,10

**argue** 190:22

**argumentative** 28:3 30:13 34:3,16 35:9 38:19 72:4 89:22 114:22 170:2 179:4 180:1,17 181:21 185:18 194:14,21 196:11 205:19 237:8 239:6 285:14 292:22 296:2

**art** 169:11

**artistic** 27:6,7

**artists** 21:22

**arts** 79:6 81:10 165:11,15,16,18 170:20,22

**arts-related** 165:20

**aspect** 215:15

**assert** 300:16,17

**asserting** 207:5 208:11

**assertion** 48:20 208:12 215:19 297:7 298:7,13

**assessing** 276:9

**assessment** 143:11 157:13 274:19 291:7,17

**assets** 167:20 168:8,16

**assisted** 125:7

**assuage** 112:11

**assume** 15:12 62:21 68:10 71:21 83:10 119:8 124:9 133:18 134:21 170:22 171:7 202:11 215:14,17 216:18 217:2 235:14,17 253:21 292:14 297:13

**assumed** 293:12

**assuming** 69:12 208:5

**assumption** 56:2 61:19

**assumptions** 56:3

**attached** 13:20 48:4 60:13 75:10 77:9 144:10 163:16 177:12 211:10 217:15 229:2 239:18 250:5 287:4

**attachments** 63:14

**attended** 47:10

**attention** 50:9 144:19 211:2 218:3 287:10

**attorney** 299:1,4

**attorney-client** 49:5,10 50:3 52:21 90:18,21 93:15 124:19 126:15 129:9 130:4 131:3,4 138:3 204:15 208:15 298:16 300:5,17 301:4

**attune** 149:20

**audit** 46:13,17 47:1,4,11 48:8 50:14 51:5 53:15 54:3,9,20 74:20 75:14,21 76:11 106:19 107:3,7 110:9,11,17 111:1 139:13 258:2,3,4 259:11 261:16,17 267:18 268:7

**audited** 69:21 70:3 122:15 167:10 260:15

**auditor** 110:16 119:9,19 120:4 258:14 260:13

**auditors** 261:7

**August** 9:11 21:21 24:18 44:21,22 46:18,19 50:12 63:5 187:21 226:5,8, 10,18 227:12,15 228:16 231:17 233:18 234:1,22 235:1,22 237:15 240:15,18 243:15 248:20 263:19 264:19 270:7 298:2

**availability** 16:6,12 24:13 25:12 232:2

**avenues** 103:6

**aware** 17:2,4,9 19:22 34:18 63:13 82:17 85:10,13 86:4,11 107:17 108:11 147:20 148:4 175:3,5,7 199:18 200:2,5 201:19,20 202:22 234:6 263:17 265:7,12 275:20

B

**back** 18:12 21:4 34:10 36:11 37:17 41:4 43:19 50:9 52:14 74:19 85:16 86:8 87:1,2 98:5 109:5 119:11 131:13 134:22 138:6 157:12 159:20 184:4 212:16 228:13 260:8 296:21

**Background** 49:4

**backwards** 46:22

**bad** 278:5

**balance** 122:12,19

**based** 56:1,22 68:13 71:21 98:13 166:12 280:9 296:10

**basic** 115:11

**basically** 270:20

**basis** 20:22 97:22 101:10 155:7,15, 17,18,19 157:15,16 158:1 206:12 219:16 235:11 298:16

**Bates** 48:12 240:6 268:20 287:12 291:6

**bathroom** 7:7 249:15

**BAUM** 60:10 211:7 217:11 228:22 286:20

**BDO** 110:15,22 111:6,13,20 112:8,10 119:8,12,19 120:4 258:10,14 261:6, 16

**bearing** 186:13

**bears** 188:21

**Beatty** 5:12,13 217:19

**Beautiful** 43:15 253:8

**begin** 65:10 213:4,13

**beginning** 118:11 277:12

**behalf** 8:2,15 9:5 71:12 72:2 87:17 95:18 125:7,8 126:22 127:8 133:3 200:18 201:16,19 237:16,17 238:1 258:13 259:21

**belief** 189:17

**believed** 194:10 206:4 291:13

**believes** 97:21 188:11

**Berke** 240:8,22

**bidders** 230:22

**big** 43:15 67:12,14,16 253:8

**Bill** 43:15 253:8

**binder** 13:8 48:1 75:4 144:1 177:6 211:4 239:15 249:22 287:2

**bit** 74:17 91:5 135:1 176:6 178:5 186:10 218:10 225:20,21 239:2 250:14 296:22

**black** 153:5 169:20

**blacked** 48:19

**blanket** 11:14 25:14 30:14 34:18

**blue** 13:18 178:5

**board** 9:11 11:10 12:17 14:12 16:2 21:21 26:18 46:8,9 50:21 51:7,17,19, 21 52:2,3,7,9,10,12,17,19 53:4,7,17, 19 54:6,12,16 55:1 56:11 58:20 63:5 76:15,18 79:19 80:4,21 81:12,13,20 82:2,18,19 83:18 84:6 90:6 92:14 98:10,16,21 99:12,16 100:6 103:19 106:8,13,21 107:7,11,18 132:20 143:1,9,19,21 144:15,21 145:8,10,11, 15,19,22 146:2,14,17,18 147:3,4,8,18 175:15,18 176:1 177:22 178:1,11,14, 16,22 179:7,10,17,19 180:10,14 181:2,4,12,13,17,18 182:2 185:16 186:12 187:7,13 188:8 190:10,15 191:3 192:5 193:3,22 194:11,12 195:9,18,22 196:9 197:1,5,15,16,22 198:3,7,8 203:8,10,13,17,21 204:1,6 205:1,5,10,13 206:3 208:5 209:3,17 210:2,7,8,12 211:20 213:2,8 214:19 217:8 218:17 219:22 221:12,21 222:15 224:1 225:13 226:4,8,18,22 227:5,11,15,18 228:5,15 231:10,15, 20,22 232:6,9 233:1,2,5,9,16,17 234:6,10,18,20 235:22 236:7,14,22 237:5,10,15 240:19 243:14,15 244:1, 9,13,18,22 245:10,11 247:2 248:1,4 251:4,12,16 254:19 255:4 256:5,17, 18 257:8,12,16,18,21 263:19 264:20 265:9,10,11 266:8,10 270:2,17 283:1, 3,7,10,16,18,21 284:9,13 285:5,8 289:8,12 290:8,10,12 291:2 293:6,12 294:5,8,10,14

**board's** 31:5 46:19 187:21 188:22 213:15 298:2

**board-level** 98:16

**boards** 80:20

**boards'** 80:9

**book** 32:4 33:2,21 42:9

**booked** 10:2 117:1 165:21

**booking** 16:16 24:19 25:19 35:5

**bookings** 11:10 22:1 26:8,17 37:2

**borescope** 276:13 277:19 279:18

**bottom** 48:13 76:3 218:3 230:7 287:11 291:6

**break** 7:6,10 36:3 98:5 132:4 141:22 249:15 271:20

**briefing** 105:19 218:16 219:21 220:11 221:12,21 222:21 223:22

**bring** 53:4,7 194:16 225:1 257:18

**bringing** 194:19 257:8

**broad** 225:2

**broader** 12:9 115:9 117:6 127:2 199:14

**Broadway** 14:21 30:21

**broken** 124:6 274:8

**brought** 178:16 179:6 180:5 256:6

**Browder** 229:11,17

**Buchalter** 240:9,22

**buckets** 9:17 10:1,18,20 11:2 67:8

**budget** 54:13,15 55:5,14,15,16,21 56:1,4,6,13,21 57:10,15 58:14,17,22 59:10,18 61:20 62:8 120:19 121:3 122:3 140:1,12 149:5 152:7 155:22 156:2 157:4,5 162:9 198:7 199:16 200:7

**budget-to-actual** 136:22

**budgetary** 62:4 150:4,10 157:13

**budgets** 94:7

**build** 27:5 30:20 37:6 183:17 288:5

**building** 9:16 14:21 16:7 24:20 25:7, 8,19 27:9,14,22 28:14 29:13,18 30:6, 11 31:10,15,19 33:14,19,22 34:20 35:2,6,10,11,13,21 36:17,22 37:2 38:14,17 39:5,10,12,15 40:6 42:10 43:4,11 45:17 56:2,7,14 59:3 62:12 85:17 86:9 104:11,20 174:3 180:7 183:4 185:6 205:17 213:3 237:6 243:16 249:11 253:17 254:14 255:5, 10 275:1,3,7 276:8 278:17 279:1 281:14 283:13 284:4,16 285:5,9,21 286:1 288:5,7,15,19 289:2 301:14

**building's** 291:7

**built** 17:18 35:16 118:18 136:7 138:7

**bulk** 221:15

**bullet** 50:16,17

**burden** 127:5

**burdens** 62:22

**burn** 77:14

**business** 10:9 115:11 175:13 230:2 257:19 264:14 265:3

**bylaws** 80:13,14,15,16 109:8,11,20 110:1

C

**calculate** 68:20

**calculating** 161:21

**calculations** 69:16

**calendar** 10:4

**call** 19:9,19 155:21 182:1 206:22

**called** 9:6 77:13 118:4 120:18 207:22 224:10

**calls** 18:4 52:21 90:18 124:19 126:15 128:9 138:3 200:17 204:14 208:14

**campus** 173:22

**canceled** 139:1,18

**candid** 97:9

**capabilities** 123:17 124:14 125:19 126:3,12 127:9 231:3

**capable** 120:3 124:2,14

**capacities** 125:6

**capacity** 5:15 77:3 78:21 92:8 94:12 110:15 126:18 172:17 225:20

**capital** 44:12,15 45:2,10,14,20 218:18 220:1

**care** 245:4

**carefully** 172:18

**case** 9:10 14:6 33:5 46:6 48:14 82:3 150:12 164:5 240:4 270:15 284:21

**cases** 297:2

**cash** 77:20 78:9 83:17 174:3 182:20 183:14 184:10,11 199:9,13 299:12

**categorically** 185:20

**categories** 132:2 158:12

**categorize** 173:4

**caucus** 131:17

**caused** 273:17

**Cecelia** 263:9

**ceiling** 272:11 274:10 275:15

**Center** 5:16 7:19 8:2,11,15,20 9:5,15 10:17 11:5,16 12:3,15 15:7,18 16:3 17:2,4,7,9,14 18:18 19:4,10,11,13,20, 22 20:9,13 21:11,17,21 23:2,6,10,12, 18,20,22 24:7,11,13,15 26:11 28:9,21 30:2 32:3,8,21 34:18 35:1,4 36:16 40:14 42:2,9 43:2,5,10,13 44:6,14 45:4,11,17 52:8 53:2 55:12,20 56:5, 12 58:14,16,21 59:1,9,18 61:2 62:14 64:9 65:6,10 66:14 69:8,13 70:21 71:5,12 72:2,13,15 73:7,20 74:2,7,9 77:4 78:8 79:6,10,15 80:7,15,17 81:3, 5,8,9,19,22 82:2,6,13,17,20,22 83:3 84:1,2,3,12 85:3,9,13,16 86:4,7,11,22 87:3,19 88:12 89:11 90:3,13,22 91:19 92:4 93:4 94:14,21 95:15 96:4,15 98:11 99:10,13,15 100:6,16,17 101:3 102:15,16 103:1,5,10,11 104:4,18 108:13 109:7,22 110:17 111:1,7,15 112:10 113:12 114:4,18 116:22 117:11,13 118:10,20 119:8,12,17 120:3,16 121:1 122:11 125:4,8 126:3, 22 127:8 128:3,13 130:12 132:19 133:4,15,22 135:9,15 136:21 137:19 139:15,16 141:17 142:20,22 143:12, 15,17,18 145:11 146:1,6,13 147:22 148:8,11 149:14 150:21 152:18 153:3,12,14 154:9,22 155:6,14,21 157:14,17,19 158:7,10 159:6,12 160:1,3,9,12 161:14,20 166:13 167:2, 15 169:11,14,18,22 170:6,12,16 171:7 172:22 173:8,21 174:11,15,19 175:3 176:8,12,15,18 177:3 178:21, 22 179:18,20 180:9,11,13 181:15 182:7,22 183:9,20 184:10,22 188:7,8, 11 189:17,19 190:19 193:2,4,5 195:7 196:5,7,16 197:9 199:8,19 200:14 201:13 202:8 203:16 204:5,8,19 205:12 206:2,12,17 207:11,22 209:8, 10 210:1,3,6,13,15 212:9 213:2,22 214:22 215:3,5,8 216:12 218:6 219:15 220:9,10 221:9,11,19 223:3,7, 20,22 224:8 227:4,10,14 228:6,7 233:7 234:16 238:11 242:5,9 243:10, 20 245:8 246:3 248:6,21 249:10 250:16,21 251:3,18,21 252:3,6,20,21 253:1,3,6,11,13,15 254:10,15,18 255:2,3,6,13,21 256:1 257:20 258:10, 13,15 259:22 261:6,17 262:4 263:17, 22 264:2,4,8,12,14,17,22 265:3,6,14 267:8,9 269:7 271:6 273:2,9,11 280:7 283:5,17 285:12 286:17 288:18,21 289:2 291:14 295:2 299:11,16,22 300:7 301:1,9

**Center's** 11:3 28:5 30:9 41:17 47:9, 14 51:13 65:22 66:1 72:17,20 74:14 77:20 80:1,21 81:1,16 84:10 85:7 87:17 89:5,19 96:13 101:21 102:4,10 105:1,11 107:22 108:19 110:16,21 116:2 125:11 126:19 127:3,10 135:8 148:4,7,18 156:18 171:17 172:14 175:21 178:6 182:20 183:7,16 184:10 185:8 186:9 188:16 191:6 192:18 193:18 194:9 195:7 198:12 199:3 200:5 203:1,5,6 205:7 214:15 218:15, 17,19 219:20,22 220:2 222:20 225:16,22 226:6 232:14 233:22 241:19 242:1,12 255:10 258:9,14 262:10 271:4 299:12 301:14

**centered** 16:21

**certainty** 183:16

**CFO** 47:9 50:18 51:5

**chair** 90:5 210:7

**chairman** 103:18 209:7,22 214:17 237:17 238:2 253:16 254:20 255:22 256:4 257:8 297:22 299:12,17 300:1, 8,14,22 301:6,12

**challenging** 97:3

**chamber** 30:22

**chance** 184:5 283:6

**change** 47:14 50:21 51:7,11,16 52:4 58:2 96:8 113:22 185:4

**changed** 181:6 182:5

**changeover** 157:10

**characterization** 41:5

**characterize** 199:4

**chart** 57:5 60:1 61:2 64:7 65:8 66:16 67:4,20 68:3 69:9 76:5,10,14 77:14, 16 79:9 80:1 120:10,11 124:4,5

**charts** 63:4

**chat** 36:5

**choose** 172:18

**circuit** 85:14,21 86:6,21 104:22 212:7 213:14

**circulate** 121:1 180:13

**circulated** 178:10,14,20 179:9,11,18 180:2,11 181:6,8,11,17 182:7 183:10 187:6 189:19 206:3 246:16

**circulating** 190:3

**circulation** 252:15

**circumstances** 260:15

**civic** 9:20

**Civil** 7:20

**claimed** 108:12

**clar-** 290:14
**clarify** 256:13 290:11
**clarity** 142:3
**claw** 87:2
**clawed** 85:16 86:7 87:1
**clean** 257:22
**cleanly** 11:2 148:14
**clear** 16:21 32:8,9 41:6 71:2 81:19 88:11 91:6 97:1 105:16 126:17 167:1 187:3 207:9,16 230:20 242:4 262:17 278:3
**clears** 183:22
**client** 245:5
**close** 32:3,21 33:19 35:2 36:16,22 38:14 39:5 40:5 42:22 43:3,4,5 55:18 56:2 59:7 74:19 132:12 153:9 199:8 213:3 230:7 243:16 272:20 273:2 280:7 283:17 285:5,8,11
**closed** 24:20 34:1 273:5,11 288:18
**closely** 274:9
**closer** 161:9
**closest** 166:15 168:16
**closing** 132:6 212:19 213:11 276:3 283:4
**closure** 19:14,16 31:5 59:3 105:17, 20 187:21 237:5 243:22 248:22 249:5 263:20 280:9 282:21 283:2 294:10 296:10
**closures** 17:18
**coalesce** 225:15
**coalescing** 277:3
**collapse** 174:12,20 175:16 176:5,8, 14 177:4 179:1,20 180:12,15 181:18 182:8 183:11 184:18 185:13 186:5 187:9,12 188:9,17 189:8,20 190:9 191:2 192:1 193:6 195:8 196:6 197:9 198:13,15 199:3,5,20
**colleague** 271:13
**collect** 130:13 138:7 264:4,10 267:10
**collected** 262:11
**collecting** 262:5
**collection** 117:19 132:7 261:20,22 271:5
**column** 164:20 165:1 167:22 169:8 174:4
**combination** 220:13
**combined** 154:2
**comfortable** 186:2
**comments** 256:4
**commit** 19:5
**commitments** 114:17
**committee** 46:14,17 47:1,4,5,11 48:9 50:11,14,15 51:6 53:15 54:3,10, 21,22 55:3 74:21 75:14,21 76:11 78:1,4 81:1,2 106:20 107:4,8 139:13 215:2 267:18 268:8 269:19
**committees** 55:2,16 56:16 58:19 141:12 269:17
**communicate** 17:19 18:18 113:11 183:15 261:5 264:13
**communicated** 19:4 33:11 52:6,9 96:18,19 108:16 110:16 111:1 185:4 242:22
**communicating** 35:17
**communication** 111:19 200:17
**communications** 90:19 207:1,7,16 215:15 261:5,7 297:7 298:7,10 300:10
**companies** 25:9
**compile** 220:11 221:11 223:22 230:14 231:6
**compiled** 232:12 234:3
**compiling** 218:16 219:21 221:21 222:20
**complementary** 193:17
**complete** 25:1 120:1 223:2 234:5 271:5,9
**completed** 30:4 110:11 111:2 233:11,19 235:9 245:1
**completely** 18:14 279:15
**completion** 234:11
**complex** 193:16 213:13
**complicated** 112:15,18 113:22 228:11
**comply** 254:15,18
**component** 207:8 298:10
**components** 281:15
**compound** 158:15 165:22 172:1 204:13 210:19 224:13 227:3 254:17
**comprehensive** 29:21 218:16 219:21 220:11,16
**concept** 140:7
**concern** 90:13 111:13 112:11 129:16 160:15 258:7,16 259:1,3,13, 22 260:14,17,19 261:9
**concerned** 17:16 112:21 195:5
**concerns** 91:19 92:2 93:2,5,13,16 94:10,19 95:4,12 96:2,17 244:8,13
**conclude** 155:2 302:9
**concluded** 302:15
**concludes** 157:19
**conclusion** 53:22 74:12 128:3,9 130:9 206:13 290:14 293:9,12 294:4, 7
**conclusions** 246:10 290:18
**concrete** 16:12 18:7,8 116:19 257:10
**condition** 89:14,16,20 99:18
**conditional** 96:3 97:6
**conditioned** 89:8 90:15 91:21 93:7 99:1,10 103:13 104:19
**conditioning** 101:15
**conditions** 87:2 95:5,13 96:7,8 100:10 102:5,9,18 104:3
**conducted** 263:14
**confidence** 111:6,7,14 138:17 141:7 279:8
**confident** 194:13 282:17
**confidential** 207:17
**confined** 276:19
**confirm** 14:4 33:4 206:21 207:3 211:14 257:13
**confused** 40:1 143:13
**Congressman** 5:12
**connected** 184:14
**connection** 12:16 177:22 247:2
**consensus** 283:12 284:3,6,8,19,20, 22 285:6

**consent** 81:21
**consideration** 56:15 164:8 179:12, 14 188:22
**considered** 102:3 148:15 161:16,21 224:15 225:6 236:13 257:21
**considers** 158:10
**consistent** 229:14
**consolidated** 163:20 167:14 260:10,22 261:12
**constant-** 176:15
**constantly** 176:15
**constraining** 176:20
**construction** 18:20 27:13 32:22 37:7,9,11 39:13 41:20 42:3,13,17 43:6,14 56:8,14 61:21 62:11,17,18 63:1 218:19 220:2 221:18 225:16 226:6 235:9 243:17
**construed** 95:17
**consult** 97:17
**consultant** 232:16 233:13
**consultants** 58:4 224:9
**Consulting** 69:3 298:1
**contact** 112:8 115:8,20,22 116:13
**contained** 180:14
**contemplated** 27:9,11,21 43:14 58:15 59:10 234:13
**contemplates** 57:15
**content** 234:4 252:1
**contents** 55:15 292:15
**context** 104:3 124:10 127:3 129:4,5 130:18 158:9 163:1
**contextualize** 259:17
**contingent** 129:1
**continue** 17:20,22 18:19 19:2,7,9,19 22:9,12 31:16 35:18 103:2 192:17 233:3
**continued** 10:2,7,21
**continues** 41:9 284:20
**continuing** 101:11 102:16 274:18
**contract** 113:3 231:1
**contracting** 113:4 114:14
**contracts** 113:19 229:22
**contributed** 149:9 150:22 151:10,18 152:18 153:2,7,13,16 154:2 158:3,19 159:9,10 161:17 168:3
**contributing** 170:16
**contributions** 148:21 149:16 154:11 155:4 157:20 158:13,14 170:18 171:9
**controls** 81:11
**conversation** 112:7 124:9 149:21 155:14 175:10 180:3 181:14 183:6 185:7,8 187:2 193:21 201:2,4,7 208:7 248:3
**conversations** 18:15 24:16 52:12, 14 70:19 95:8,9 96:5 100:20 102:20 106:18 107:1,3,13,18,21 108:5,8 121:7,16,19 123:20 124:1,13 125:3, 21 126:1,2,6,11 127:15,20 128:18 131:3,5 175:12 198:18 199:12,14 238:15 267:14 280:14 282:19
**conveyed** 17:10,22 51:16 202:12
**conveying** 17:5
**convince** 185:16 187:13
**Cooper** 188:13
**coordinated** 293:3
**coordination** 280:20
**copy** 63:17 109:7,10 271:17 286:21
**corner** 76:4 144:20 168:12,14,15 178:4
**corporate** 103:8
**corporates** 141:12
**correct** 8:12 43:3,12 44:2,3 50:5 52:5 69:10 70:5 71:7 99:7 102:12 144:8 151:18 155:20 178:12 179:10 208:4 209:1 216:5 233:20,21 240:12, 19 243:17 254:6 273:10,12,13 279:4 280:7 292:1 294:14 295:6,12,22 298:9 299:5,6 300:19
**correctly** 128:22
**corresponds** 218:7
**cost** 287:14 288:12 289:5 290:7
**costs** 59:16
**counsel** 5:7 32:18 38:4 48:18 64:10 91:2,10,11 92:13 94:11 105:22 125:13,17 126:2 127:4 128:13 129:17 130:3 131:16 144:2 166:18 194:16 202:13 206:22 208:22 216:4 217:4 235:19 254:6 259:16 262:3,4 267:14 297:6 301:22
**counsel's** 45:7 81:21 266:3 267:1 269:1 300:11,13
**counter** 209:16
**couple** 131:11 187:22 222:5,7 272:2 278:7
**court** 6:9,18 9:13 10:18 13:4 21:16, 20 24:17 31:5 33:20 34:9 35:3 36:15 39:7 47:2 102:2 147:22 184:1,4 213:20 219:15 302:3
**court's** 47:6 49:15 104:14 105:5 109:13 219:12 220:8 231:16 300:2,15
**courts** 16:2 26:2
**cover** 56:6 153:17 160:13 183:14
**CPDP** 253:8
**cramped** 192:11
**created** 62:10 273:22
**creating** 160:8 288:10 289:15
**crisis** 173:9,13
**critical** 284:14
**cross** 46:7
**cultural** 22:18
**culturally** 23:17
**current** 73:2 101:21 102:10 105:5,9
**cursory** 270:11
**cut** 250:14 276:15

## D

**D.C.** 85:14,21 86:6,21 104:22 212:7 213:14
**daily** 122:6
**dance** 24:3 26:21,22 30:21
**Darin** 240:9
**Darin's** 246:1
**data** 67:21 68:2,13,19,20 69:2,6,14 70:22 71:7,11,20 72:11,19 74:3,5,9 118:18 119:18 120:4,8 134:14 137:7, 13,14
**database** 116:2

**date** 9:9 44:16 78:13 109:12 211:17, 20 223:15 226:11 227:13,16,17 228:4,6 232:8 233:9 235:3,4 242:21, 22 245:4 302:1

**dated** 77:16 218:11 229:6 240:15

**dates** 227:20

**day** 32:16 184:22 214:13 228:6 240:18 243:8,9 245:9,10,13,14 257:15 280:14 283:1 285:8

**day-to-day** 84:4

**days** 220:8 270:8,20

**deadline** 239:4,9 241:13

**deal** 189:14

**dealing** 174:6 238:12

**decades** 148:2,9

**December** 44:9 50:21 51:7 52:3,19 53:9,19 139:15,19

**decide** 159:9 201:16 202:3 224:1 226:5

**decided** 17:6 32:21 36:16 231:19 280:6 283:18 302:1

**decides** 166:7 302:3

**deciding** 234:18

**decision** 9:13 10:18 13:4 17:13 21:13,17,20 24:17 31:6,22 32:3 33:19,20 35:2 36:18,22 38:14 39:4,6 40:5 42:8,22 43:9 44:13 45:1,4,5,19 47:2,7 51:12 71:10 105:17 109:14 166:8 195:17 196:7,13,16,19 197:8 205:4 220:9 226:1,21 228:7 249:1,5,6 280:9,12 284:22 285:11 301:13

**decisionmaking** 67:17

**decisions** 24:19 46:8 94:1 175:13 183:2 187:21 217:9 263:19

**deck** 76:17 236:8 245:9 267:17

**declaration** 14:5 21:5

**declare** 153:15

**decline** 112:10 298:15

**declining** 174:7,8

**defendants** 48:14 63:19 64:11 82:3 147:21 150:11 218:15 219:11,19 225:13 240:3 268:17

**defendants'** 297:5

**defer** 11:10 14:17,21 21:7,12 26:17

**deferred** 14:11 62:17 291:9

**deficit** 149:15 150:7,9,14,20,22 151:12,13,16,17 153:10,12,15,17 154:4,9,10,20 155:3 157:19,22 158:8, 10,21 159:6,13,16 161:9 168:6,16 169:18,19

**deficits** 148:19 158:5

**definite** 12:9

**definition** 158:8 159:13

**definitive** 16:9,10 158:8

**definitively** 15:20 35:14 259:21

**deflection** 276:11,12

**degraded** 279:15

**degree** 58:18 99:21 118:22 138:14

**delaminate** 274:1

**delaminated** 272:18 274:10

**delaminating** 274:13

**delineation** 276:6

**delivery** 287:19 296:11

**delta** 56:10 57:2,6 58:3,8,16 59:20 60:2,21 61:3 62:20 65:5,7,8,12,18,22 68:3 69:2,9,19 70:19,20 71:6,11,20 72:20 73:13 74:3,8 143:14,16 160:4 164:2 198:16 221:13 222:4,13,14 223:2,13 224:11,21 225:6 230:22 233:8,12,19 234:7 240:9 241:14 244:20,21 246:8,18 247:10,11,15,18, 21 248:7 249:1 270:15 289:12,19 292:1,4,12,16,17 298:1

**Delta's** 72:12,16,21 74:10 143:11 164:8 220:18 221:2 234:11 238:17 239:4 245:8 289:4 290:22 292:9

**demeanor** 194:17

**demolish** 250:16 252:21 253:3,12

**demolished** 250:17,22 252:6 253:17 254:11 256:1

**demolishing** 254:14

**demolition** 250:21 252:6 255:5,10

**department** 11:20 85:13 86:5,20 105:18 121:8 229:20 298:18

**Department's** 208:16

**departmental** 55:13

**departments** 124:6

**depend** 24:2 102:3

**dependent** 83:17,21 102:13 105:12 136:1

**depending** 156:18

**depends** 100:7

**depict** 146:2

**depicted** 146:9

**depicting** 76:12

**deploy** 191:22

**deployed** 159:17

**deploys** 159:15

**deposed** 7:13

**deposition** 6:2,8 8:12 13:18,19 46:3, 12 48:3 60:12 68:18 75:9 76:22 77:8 85:21 144:9 163:15 177:11,18 194:18 211:9 217:14 229:1 239:17 240:1 250:4 261:21 287:3 302:5,14

**describe** 150:10 156:8 172:21

**designated** 7:19 8:1 94:15

**designee** 77:3 80:1 110:22 135:9 142:19 215:20

**desire** 12:10 203:22

**destroy** 91:13

**detailed** 59:12 62:11 200:7,8 237:1 277:13

**details** 97:10 219:17

**determine** 293:20

**determining** 223:8

**develop** 29:22 35:20 160:5

**developed** 42:1

**developing** 41:20 42:2 43:6 140:1,2, 3

**development** 45:6 54:21 81:1,7 103:6 139:8 140:3 141:10 151:14 153:1 160:6,9 183:19 205:7 220:17

**development's** 115:10 139:10

**dialogue** 256:9

**dictate** 84:9

**dictated** 233:8

**difference** 7:16 168:19

**differential** 289:5

**differently** 96:10

**difficult** 25:9 28:15 113:16 123:4 173:18,19 279:18

**difficulties** 129:19

**dire** 172:19 173:5,7 175:4 176:19 182:22 183:1 185:3

**direct** 14:8 141:4 199:11 225:11 230:7

**directed** 209:2,7 254:13 267:12

**directing** 97:5 147:13

**direction** 29:6,10 34:18 208:12,22 214:22 215:3,20 216:3 235:18 298:13

**directly** 51:20 247:18 276:17 277:5

**director** 81:13 82:18 95:1,3 114:19 116:21

**directors** 81:20 90:6

**directs** 210:16

**disaffiliation** 49:18

**disagree** 131:15 296:3,15

**discontinued** 137:21

**discovery** 9:7 64:3 101:8 104:15 105:9 123:22 124:16 125:20 126:5,13 127:11 128:4,6 129:6 130:18 164:12 187:17 261:20 262:6,12 263:2 266:16 267:11 271:8 301:20

**discuss** 25:9 53:6 55:1,3 96:12 102:16 156:11 180:19 194:3 196:22 197:6 198:11 200:11 227:5 283:22

**discussed** 11:4 17:11 47:13 53:3 57:2 59:1 70:16 73:14,15 97:10 98:11 100:6,11 125:12 135:1 179:6 180:5 181:1 182:14 186:8,20 187:5 195:14 197:2,14 205:8 243:22 253:16 258:14 268:22 271:18 289:13 292:13,14

**discussing** 21:6 58:19 94:9 102:9 113:7 238:13,14

**discussion** 36:9 50:16 89:1 91:8 92:10 102:4 109:6 123:16 125:16 132:13 139:14 142:10 162:6,7 163:10 179:16 186:9 197:11 244:6 256:21 257:12 284:19

**discussions** 21:9 23:3,6,20 24:8,9 52:16 53:16 54:3 87:19 88:6,13,17, 18,20 89:7,12 90:22 91:11,14,15,17 92:15,22 93:3 94:17 100:15 106:9,14 117:22 125:17,18 129:4 130:17 198:14 199:1,7 215:6 216:8 251:21 252:2,4,10,12,17 254:9 259:2 266:18 267:1,7 280:21

**disputes** 301:20

**disruptions** 15:9,11

**distinction** 69:9 202:16

**distinguish** 252:13

**distributed** 270:1 271:2,3

**diversion** 74:17

**divisions** 124:6

**dock** 278:18

**docks** 286:4

**document** 76:21 80:11 126:4 138:22 145:8 159:6 162:20 163:1 271:4

**documentation** 64:13

**documented** 274:15

**documents** 64:6 117:17 121:9 126:5 137:20 230:14 231:6 265:9,15 271:7

**dollar** 153:21,22

**dollars** 148:1,9,12 149:12

**Donald** 51:12 85:16 86:8 211:15

**donation** 99:18 116:8 140:10

**donations** 84:20,22 85:1,2 86:6,22 87:3,21 88:14 89:8 91:20 93:6 95:5, 14 96:14 100:9 102:5 103:12 114:8, 20 116:22 137:21 160:12

**Donna** 47:9 51:5 53:17 66:21 67:14 94:4 95:6 263:8,22

**donor** 89:7 116:1,3,4,13 138:7 162:17

**donor-restricted** 165:5,13

**donors** 165:7

**double** 292:7

**doubt** 248:5

**draft** 55:5,7 145:9 179:5,11 204:9,21 225:5 257:17,20 277:17 278:3,8 279:10

**drafted** 204:11 259:6

**drain** 282:13

**drains** 277:1

**draw** 144:19 211:2

**drawn** 202:16

**drill** 58:12 150:19

**drive** 282:2

**driven** 235:8 276:8

**drives** 269:13

**driving** 276:6

**drone** 277:19 279:12,19

**drones** 276:20

**drop** 173:18,20 174:1 299:17

**due** 110:18

**duly** 5:4

**duplicative** 81:15

**dynamic** 29:13 193:16

E

**e-mail** 229:6 230:8 232:7,8 240:8,15, 21,22 270:16,21

**e-mailed** 270:3,14

**e-mails** 121:11,13 240:3 262:21 263:11,13 269:11,12,14,18

**earlier** 30:4 121:6 138:6 156:10,12 234:8 267:16 290:12

**early** 32:21 46:18 157:11 199:21 214:13 226:10

**earned** 149:8,9,17 151:1 152:2,8,10, 16,17,19,20 153:6,17 154:2,10,18 155:2 157:18 159:20 160:7

**easier** 97:15 114:9 279:19

**easiest** 98:8

**easily** 116:15

**easy** 165:10

**education** 10:8,10

**Educational** 9:20

**effect** 47:14 51:15 139:14 157:11 264:15

**effective** 224:18

**effectively** 228:5

**effectiveness** 12:4 171:14

**effectuate** 113:12
**efficiency** 287:14
**effort** 29:22 193:20 264:4,10
**efforts** 10:4 28:19,20 115:14 149:4 184:12
**Eisenhower** 30:15,18,20
**electrical** 28:13 286:5
**electronic** 286:20
**elevate** 55:15
**elimination** 287:14
**Elliot** 240:8
**elongate** 185:1
**employee** 242:8
**employees** 125:11 173:21 264:17, 18 265:18 266:18 267:2 271:6
**employees'** 266:1
**enable** 26:3
**encompass** 67:21
**encouragement** 235:7
**end** 149:2 150:7,8 153:19 154:6,7 157:15 161:8 162:1 167:19 168:4,9, 11,18 169:6 174:13,20 175:17 177:5 248:17 257:15 261:15 293:18
**ended** 121:15 169:19
**ending** 153:8
**endowment** 165:14,16 169:4
**engaged** 65:12 222:14
**engagement** 58:4 221:2 224:12 246:9
**engagements** 22:10,13 225:5
**engaging** 248:3
**engineer** 285:20
**engineering** 295:9
**enjoined** 31:5 39:7 104:21
**entail** 120:8 130:8
**entailed** 24:16
**entered** 105:8
**entire** 285:21 291:14 295:2
**entities** 89:3,12 141:13
**entities'** 80:8
**entitled** 49:4 129:16
**entity** 22:19
**envelopes** 155:22 157:1
**equals** 184:21
**equates** 160:8
**equities** 102:2 105:2 188:12
**equivalent** 106:1 150:11
**essentially** 119:6 122:4 152:4 156:4 192:13 262:1 266:19
**establish** 105:11
**established** 83:21 101:17 185:5 190:1 201:6
**establishment** 55:12
**estimate** 289:5 292:11 293:5
**estimated** 292:1,5
**estimates** 292:19
**evading** 40:2
**evaluated** 291:10
**event** 23:18 280:6
**events** 16:7 22:10,16,17,18 45:6 55:3 103:7 264:18
**eventually** 232:16 246:16
**evidence** 130:4 285:22
**evolve** 11:5
**evolved** 52:11
**exact** 176:12 228:6 289:22
**EXAMINATION** 5:7
**examined** 5:6
**examples** 15:2
**exceed** 154:10 157:18 171:5
**exceeded** 155:2
**Excel** 64:11
**exceptions** 275:12
**excess** 169:21
**exchange** 80:5,20 82:8 157:7
**exciting** 68:17
**excluding** 252:14
**excuse** 50:12 115:15
**execute** 43:13 293:22
**executed** 14:5
**execution** 294:10 296:10
**executive** 94:22 95:3,19 96:17,20 97:4 114:19 116:21 206:18 207:6,8 215:11 216:16 235:12 251:11 253:18 297:6 298:3,11 300:17
**exhibit** 13:10,13,19 14:3 48:2,3,8 60:12,16,19 63:6,9,10 64:7 67:5,20 68:21 74:18 75:5,9,13 76:17 77:7,8 106:16 144:3,9,14 146:3,9 163:4,7, 11,12,15,19 164:2 177:10,11 178:9 211:6,8,9,14 217:10,11,13,14 228:21 229:1,5 239:16,17,22 246:22 247:5,7 250:3,4,8 267:17 268:5 286:19 287:3
**exhibits** 13:12
**exist** 33:15 55:4 137:5,9 139:8 141:19 152:18 176:21
**existed** 151:17 265:15
**exists** 58:13 135:12 138:15 152:20 266:7
**expect** 15:18 90:3 210:15,22
**expect-** 96:7
**expectation** 89:13 187:1
**expectations** 292:9
**expected** 8:9 26:7
**expects** 225:14
**expended** 184:11
**Expenditures** 165:5
**expense** 121:17 172:8,9
**expenses** 58:11 61:16 62:22 120:10, 22 148:12 149:7 154:3,10,14,19 155:1 157:18 160:4,5,14,20 168:1 169:21 170:8 171:4,18 172:3 173:13, 19,20 174:8 176:16 184:9
**experience** 150:5 155:12 231:3
**expert** 115:16 295:10,21
**expertise** 224:21 225:2
**explain** 7:3 15:8 97:8 243:12
**explication** 297:11
**explicit** 199:11
**explicitly** 69:4 88:1,3 291:3

**exposure** 49:18
**express** 90:13 92:1 93:5 94:10,19 95:4,12
**expressed** 91:19 92:3,4,6,11 93:13 96:1 254:13 258:10
**expression** 17:3
**extension** 59:16 291:20 292:5 293:14
**extent** 13:14 16:18 18:3 20:20 41:8 52:20 59:8,9 63:15 78:15 90:17 95:16 96:17 101:13,21 105:9 108:4 119:20 124:19 125:10 126:15 127:17 128:2 138:2 162:9 165:7 167:7 173:2 188:21 189:21 192:7,16 200:17 202:15 204:14 207:16 242:15 251:8 261:3 264:10 269:17 282:6 283:19 288:21 300:9 302:3
**exterior** 274:22 275:2
**external** 81:6
**extrapolate** 58:8 62:15
**extrapolated** 61:17
**extrapolating** 72:13
**eyes** 276:17 277:5

F

**face** 26:14 183:11 246:17 278:1 284:17
**faced** 24:22 172:22 176:8 197:9
**facilities** 280:15
**facing** 30:5 176:13 177:4 199:20
**fact** 101:17 106:1 110:10 130:7,8,12,16 131:14 194:8 195:6 282:2 286:11 292:18
**factor** 68:4,9 160:8
**factors** 182:19 296:11
**facts** 18:7,8 128:19,20,22 130:9 219:15
**factual** 248:22
**failed** 279:1 282:14
**failing** 281:16 284:16 285:20 286:3,4
**failure** 278:6 281:13,22 282:1
**failures** 279:22 286:1
**fair** 8:21 29:4 59:5 65:20 183:9 282:15 283:15 288:16 291:13 297:17
**faith** 189:17
**Falconetti** 108:2
**fall** 273:18
**falling** 275:15
**falls** 164:9
**familiar** 137:3
**fascinating** 261:20
**fashion** 87:21 135:11,18
**fast** 232:20
**Fauci** 263:9
**favor** 185:16
**feasible** 293:19 294:13,18 295:1,3,4,6,11,16,21 296:4
**federal** 7:20 113:4 114:14,16 229:18 230:2
**feel** 40:12 95:21 142:4 189:22
**fell** 272:19 273:6
**fewer** 268:1 269:10
**fight** 216:21
**figure** 97:18 152:21 161:8,11,22 168:20,21 222:18 266:20
**figures** 69:15,16 155:7
**filed** 85:14 86:5,20 221:7
**files** 262:10,15,18,21,22 263:20
**filing** 105:22 150:12 217:19 218:5 219:10
**fill** 151:12
**final** 14:12 55:9 105:7 153:4 233:19 238:18 245:8 249:2 277:21 278:10 279:10 280:3
**finalize** 259:1
**finalized** 55:10,19 259:7
**finance** 46:13,17 47:1,4,11 48:8 50:14 51:5 54:9,20 62:21 70:12,14 74:21 75:14,21 76:11 81:1 106:20 107:3 121:20 131:21 132:17 133:7,15,19 136:11,13,18,19 140:1 156:6 166:10,15 229:18,21 258:1 259:6 267:18 268:3,7 269:1
**finances** 46:1 47:14 49:15 70:15 83:16 101:13 117:14 132:14 167:5 185:9,22 186:10 200:5 203:1,5,7,15 204:1 265:11
**financial** 49:4,13,17,18 53:4 56:9 58:5 65:1,10 66:4,15,20 67:4,19 68:11,19 69:1,21 70:3,8,21 71:6,11,20 72:11,19 94:8 101:14,22 102:2,11 105:1,11,16,20 107:5,6 114:12 118:1 119:9,13,18 120:4,9,14,15,17 121:2,5 123:22 124:15 125:20,22 126:5,13 127:11 128:6 130:13 132:19 140:12 146:3 162:4,7 163:20 166:13 167:3 175:2,4,13,20,21 180:3,12 182:1,2,20 183:1,7 190:17 191:7 192:18 193:22 199:5,15 200:3,4,15 201:13 202:8,9 218:18 220:1 224:2 260:10,22 261:12
**financially** 73:20
**financials** 52:15 68:4 73:15 74:5,14 148:5 167:10 169:17 170:1 180:19,22 181:15 193:18 195:18 197:18,21 198:4 205:7 260:16
**financing** 51:16 189:6
**find** 20:6 57:18 96:7 110:5 111:17 260:8,18,21
**finding** 280:17 291:4
**findings** 277:18 289:8 290:6 291:1
**fine** 21:1 173:4 271:22
**finish** 6:17 39:18 41:15 186:19
**finished** 59:2 186:17
**firm** 109:16 173:14 184:15
**firmer** 173:15
**firms** 230:14 231:6
**Firstly** 171:10
**fiscal** 24:1,14 61:13 62:15 66:1 67:21 68:2,19 69:1,13,20 70:4,9,14,21 71:6,10,19 72:19 73:2 110:9 119:13,18 120:5,16 121:1,14,22 122:19 132:18 133:12,16,20 134:1,7 135:6,20 136:10,22 137:6,13,14,22 139:2 149:2,15 153:9,16 154:6,7,8,22 157:15 160:13 161:3 162:21 163:21 164:19,20 165:1 170:7 172:19 173:7 174:12,13,20,21 175:16,17 176:5,8,13 177:4 179:1,20 180:12,15 181:18 182:8 183:11 184:18 185:13 186:5 187:9,12 188:9,17 189:8,20 190:9 191:2 192:1 193:5 195:8 196:6 197:9 198:13,15 199:3,5,20 258:16 259:4,14 260:1,9,21 261:11

**Fischer** 106:17,22 107:12

**fit** 11:2 42:4

**fixed** 174:7,8

**flag** 269:2

**flash** 286:5

**flexible** 29:11

**flip** 76:2 144:18 177:15

**floca** 5:3,9 8:18 13:19 14:2 32:15 36:12,13 38:12 44:5 46:12 48:3,7 50:9,11 60:12 75:9,13 77:8,12 94:18, 19 95:4 97:7 102:15 108:11 132:17 142:13 144:9,13 163:15,19 164:14 167:13 177:11,15 193:2 208:20 211:9,13 217:14 229:1,5 239:17,21 249:21 250:4,8 287:3 302:10,14

**floor** 247:19 272:19

**flow** 288:11

**flown** 276:20

**focus** 29:4 72:16 181:2,4 183:4 185:6 195:18 196:17 197:3,15,17 198:17 203:22 223:14 224:4,12,16,20 283:10

**focused** 25:3 160:1,3,10 168:21 180:6 195:21 200:11 253:6

**focuses** 162:7

**focusing** 30:10 100:8 187:5

**folders** 157:8

**folks** 17:6 24:11 229:7

**follow** 209:10 210:3

**foot** 272:17

**forecast** 56:22 57:19 58:1 59:12,15, 18 61:7 62:13 63:15,16

**forgot** 258:1

**form** 135:11,17 204:9 214:21 225:5 236:8

**formalized** 53:22

**formally** 242:9

**format** 64:11 146:15,16

**formula** 149:7

**Fortas** 22:5

**forthcoming** 236:6,21

**forward** 11:6 16:13 28:20 32:8,14 52:15 54:20 58:1,9 61:17 103:5 105:2 176:18 180:5 183:20 184:8 186:14 224:1 231:16 232:7,10 233:4 255:9 256:6,16 257:8,15,19 272:15 284:4 286:13

**found** 20:1 266:15 269:3,4

**foundation** 19:15 79:1,5,6,11,15 80:3,6,15,16 81:2,4,6,11 82:7,12,13, 14,19 84:1,2 85:2,3,6,15 86:12,22 87:2,16,20 88:13,18 90:14 91:20 92:17 95:5,15 96:4,14 98:12,22 99:15 100:9,11 102:16,18 103:2,9,12 104:5 106:9,14,15 107:9,13,19 108:8,21 109:6 147:14 196:11 200:1 261:2 268:10

**foundation's** 83:4,5 109:8

**fourth** 291:18

**foyer** 272:17 273:5,21 274:6,14,17, 21 275:10,11 276:7

**FP** 66:19

**FP&A** 65:16

**FP&A's** 66:13

**fraction** 73:21

**frame** 36:1 39:13 40:2 43:7,8 88:8 109:18 222:12 232:20 233:15

**framing** 33:8,9 128:5

**free** 95:22 189:22

**Freeny** 5:8,11 10:13,15 11:21 12:14, 21 13:9 14:1 15:1 17:1 19:1,21 20:7 21:1,3 26:5 29:3,16 31:3,20 32:11 33:16 34:6,9,13,21 36:2,5,10 37:13, 16 38:11 39:1,20 40:7,15,17 41:11 42:6 43:19 44:1 46:6,10 47:20 48:6, 17,22 49:7,11,19,22 50:6,10 52:1 53:5,12 54:1,14 60:11,15,17 63:12,22 64:1 67:1 72:5 73:6 74:15 75:8,12 77:6,11 81:17,18 83:6,15 84:7 85:12, 20 86:3,14 87:10 88:2,5,9 89:15 90:4, 11,20 91:3,4 93:12,17 96:11,22 97:12,15 98:1,7,9 99:8 100:3 101:1, 12,19 102:1,8,12,14 103:21 104:16 105:13,15 106:3,5,7 112:16 115:2 117:9,16,21 118:5 120:2 125:1,14,15 126:20,21 127:6,7,14,19,21 128:7,10, 17 129:12,15,22 130:6,19 131:1,6,9, 12,14 132:8,16 133:21 136:16 138:12 141:21 142:4,8,12 144:5,8,12 147:1, 9,16 148:6,17 149:13 150:1,17 151:5 152:1 154:16 155:9 156:13 158:6 159:1 160:11 161:1,18 162:5,10,15 163:2,6,13,18 164:5,13 166:22 167:9, 12 170:10 172:5 173:6 174:9,18 175:6 177:1,7,10,14 179:8 180:8,20 182:3,11,16 184:3,16 186:1,3,18 188:2,6 189:4,7 190:4,7,12,18,21 191:10,13,15,19 192:4,10,20 193:1,9 194:7,19 195:3,19 196:14 197:19 199:17 200:9,20,22 201:3,5,9,22 202:2,18 203:3 204:2,10,17 206:1,11, 21 207:9,18,21 208:8,11,18,19 209:18 210:9 211:1,5,8,12 214:14 215:14,17 216:1,18,21 217:1,12,17 219:4,6 223:10 224:19 225:3 227:7 228:20 229:4 232:5 235:14,16 237:12 238:7 239:1,10,20 242:1,3,11,18 244:15 245:19 246:2,5,6 248:14 249:7,14,17,20 250:2,7 251:14 252:11 253:9,21 254:2 255:1,15 256:12 257:5 259:16,20 261:8 262:16,20 265:20 268:15 271:11 272:3 286:22 296:20 297:19,20 298:6,12,19 299:15,21 300:6,12,20, 21 301:5,11,16 302:8,12

**frequently** 289:13

**friction** 173:17

**front** 54:12 114:11,12 233:2 275:16 284:17

**full** 51:16,19 52:2,9,12,17 53:4,7,16 54:6,12,16 55:1 58:20 63:3 76:14,18 98:10,21 107:3 143:1 145:19,22 175:15 178:16 179:6 237:5 244:2,14 282:5 297:10

**functionality** 119:2 121:4 157:7

**fund** 86:7 165:17 167:22 168:20 169:8 174:4,6

**fundamental** 205:16

**funded** 253:7

**funding** 46:1 84:3,5,9,10,11,18 85:11,15 86:19 87:8,12 131:20 160:20 165:15

**fundraising** 50:22 51:8 52:5,18 53:8,18 81:7 86:12 87:16 92:16,20 103:6 114:11 115:13,16 148:13,15 149:4,10 151:8,13 152:22 154:1 160:6 183:19 184:12 205:6

**funds** 90:14 96:15 98:13,22 99:10,12 101:15 102:17 104:5,19 105:3 162:16 165:5,6,13,21 166:9,11 183:14 185:2

**furthering** 81:9

**future** 14:10,22 82:9 174:4 183:16

**FY** 19:7 38:17 52:13 54:11,13,15 55:5,21 56:6,13 57:5 58:14,22 59:10 60:1 61:3,20 64:7,13 73:15,22 74:3 134:8,15 135:10,14 140:12 161:9 162:8,9 198:4 205:7

**G**

**gap** 59:7 152:3,7,17,19,20 153:6 159:21 160:7

**garage** 278:17 286:2

**gave** 73:19 108:12,22 141:14

**general** 11:1 14:20 45:7 166:15 167:7 237:2 238:21 239:3 243:3 266:3 267:1,14 269:1 300:11,13

**generalities** 15:12

**generally** 92:5,6 124:11 132:9 262:8 269:22 282:16

**generate** 160:5 171:8

**generated** 123:8

**genesis** 146:10

**genuinely** 290:4

**gift** 89:14 90:2,3 152:14

**gifts** 100:5,9 103:8

**give** 9:15 10:16 11:7,9 41:16 60:8 61:3,19 74:3 89:13,17 90:2 108:18 143:16 176:12 177:2 205:2,5 207:2 230:14 231:6 233:10,14 243:12 251:6 263:5 266:12

**giving** 96:3 139:4 141:15 195:4 237:19

**good** 5:9,10 141:21 142:13 160:16, 21 171:13 189:17 205:4,13 255:18

**goodness** 163:6

**government's** 302:2

**grand** 272:17 273:5,21 274:5,14,17, 20 275:9,11 276:6

**granular** 170:5

**great** 39:8

**greater** 291:15

**ground** 5:20

**grounds** 85:6 95:19 127:13 187:17 215:12 216:16 253:19 272:14 298:4

**Group's** 298:1

**guess** 58:12 64:9 114:4 119:10 126:10 133:10 140:19 141:6 166:7 171:15 200:20 204:3 207:15 221:8 227:8 234:2 245:7 248:5 255:3 260:7 268:22 283:15 287:7 291:5

**guidance** 200:14 215:3 235:4 236:5, 21 237:20 238:21 239:3 243:6

**guys** 10:12 131:1,6,9 141:22 249:14 272:3

**H**

**half** 275:18

**halfway** 218:9

**Hall** 275:13,14,16,21

**halt** 51:1,9 52:5,18 53:8,19

**hand** 65:14

**handful** 100:20

**handles** 65:2

**happen** 18:9,10 28:11 35:13 42:19 43:6 82:8 87:7 93:22 96:5 100:1,18 121:19 171:20 180:19 184:14 186:10 210:13 215:9 243:6 270:4 284:15,20

**happened** 32:10 62:5 103:19 125:22 131:4 216:13 222:4 223:9 272:10 278:7 281:14,22 282:22

**happening** 7:17 12:4 33:13 34:5 39:14 42:1,12 61:22 62:3 111:12 282:11 284:18 286:1

**happy** 144:18

**harassing** 41:10 194:15,22

**hard** 232:20 276:19

**hazards** 286:5

**head** 6:11

**header** 79:20

**heading** 287:14

**heads** 92:9

**hear** 23:1

**heard** 64:10 188:12 190:8

**hearing** 130:10

**heavy** 241:3

**held** 44:10,14 46:17 47:1 166:3 213:8

**helped** 282:2

**helpful** 78:19 108:6 109:21 165:2

**helpfully** 165:4

**helping** 64:2,5 266:6

**helps** 152:21 171:8

**hey** 39:7 141:1,16

**high** 203:1 236:16

**higher** 171:18

**highlighted** 278:9 288:2

**highlighting** 294:20

**historical** 68:13

**historically** 12:1 137:2 155:11 278:4

**historicals** 57:1 73:4,16

**hold** 11:14 16:7 25:1,14 45:19 226:17,22 228:8

**holding** 45:16

**holds** 141:8

**holistic** 29:21 141:18 158:2,20

**holistically** 28:15 139:20 140:18,21

**home** 19:10,20

**honors** 10:22 44:6,14 45:11,17

**hoped** 284:2

**hoping** 38:4

**House** 26:20 28:10,12 42:17

**housed** 122:1

**Howard** 241:1,8,9

**hurdles** 183:22

**hurting** 243:9

**I**

**idea** 42:15 124:5 147:17 171:7 204:12,18 205:13

**identification** 13:20 48:4 60:13 75:10 77:9 144:10 163:16 177:12 211:10 217:15 229:2 239:18 250:5 287:4

**identified** 8:12 16:13,14 100:1 279:22 288:2

**identify** 64:6 123:5 263:12 266:6 269:8

**identifying** 224:5 265:14 271:7
**ignore** 286:7
**immediately** 196:1 197:17 203:11, 13 213:11 221:22 273:2
**imminent** 188:17
**impact** 16:5 18:8 29:2 116:7 173:16
**impacted** 12:20
**impacts** 18:9 27:14 184:9 249:11
**implementation** 10:14
**implementing** 253:7
**importance** 172:9
**important** 34:4 83:22 84:16 175:12 183:21 236:13 282:3 284:15
**importantly** 106:19
**improve** 113:8 114:2 138:20
**improvement** 29:2
**improvements** 30:17,19 31:2 35:11, 12,21 100:17 113:11 288:15 291:10
**inability** 283:11
**inappropriate** 158:17
**incident** 271:14 272:9,11 273:3 274:4
**include** 27:21 29:17 89:16 91:1 104:10 148:20 158:12,13 159:9,10 161:12 277:20
**included** 57:6 67:7 220:10 261:12 277:21
**includes** 169:1,4
**including** 54:11 55:2 68:11 80:19 90:5 104:9 251:4
**income** 123:2 152:2,8,10,17,19,20 153:6,18 154:10,18 155:2 157:18 159:20 160:7
**incorporate** 149:16
**incorporated** 69:13
**incorrect** 44:2
**increased** 279:8
**incredible** 183:6
**independent** 220:18 224:6,16
**indicating** 48:13 61:5 268:14
**indication** 216:10
**indications** 275:8
**individual** 46:12 78:21 126:18 140:4 177:18 208:6 225:20
**individuals** 85:2 117:8 141:13 263:12,15,16
**inevitably** 102:3
**inextricably** 101:14 105:1,12
**infiltration** 273:19,20 274:12
**inform** 175:15 190:15 234:20
**information** 8:10 9:5 20:21 23:8,11, 12 48:19 51:15,20 52:22 53:4,7,17 54:4,10 56:9 57:1 58:5,9 64:21 65:17 70:10,13 74:6 80:6 82:8 83:8 94:22 97:5,22 112:10 114:9 116:19 119:9, 13 124:20 126:16 135:11,16 136:19 138:8,9,15 139:7 140:16 146:3 156:21 157:8 158:3 193:22 202:12 204:15 208:15 244:17 248:22 254:21 255:18 262:5 263:18 265:22 267:6 269:15,20 270:22 271:2 274:2 276:1 277:20 278:9 279:17 280:10 282:18 284:1 301:6,7,21
**informed** 11:18 98:11 175:18 234:10 280:13 283:13
**infrastructure** 28:11 29:1,14 31:1 33:13 119:5
**injunction** 9:10,14 32:9,10 35:3 38:15 47:6 219:13 223:13,15 224:7 285:7,10,12 286:11,15 300:2,16 301:2
**input** 55:14 200:13 201:9,13 202:7 203:2,6 236:5,20 237:4 298:1 300:1, 8,14 301:7
**inputs** 137:8 164:8
**inquiries** 21:22 22:15 23:3
**inquiry** 105:5
**inside** 139:8,10
**insist** 43:17
**inspect** 279:11
**inspections** 281:18,21
**instances** 116:11
**institution** 173:20
**institution's** 293:21
**instruct** 95:19 104:13 188:3 206:19 215:12 216:16 235:12 251:9 253:19 298:4 300:22
**instructed** 267:9
**instruction** 209:11,14 210:1,3 217:3 254:5 298:22 299:10
**instructions** 9:14 10:16 11:7,9
**instructs** 299:4
**intact** 10:9
**integrity** 279:16
**intend** 179:19 180:9
**intended** 30:8 180:3 242:12
**intending** 227:4
**intent** 103:4 181:11,16,22 185:10,12, 15 196:4 204:22 225:1
**intention** 180:18 232:15
**intents** 190:3,8 191:21
**interactions** 107:9 198:18
**interest** 296:12
**interested** 23:2 141:16 162:22
**interests** 293:22
**interim** 9:7,8 19:5 21:9,13,19 22:11 23:4,7 25:13,19 26:8 27:20 29:5 36:14 120:19 121:3 122:3 155:22 156:2 157:3,5
**interior** 275:6
**interject** 39:22
**interjecting** 131:15
**intermingling** 49:9
**internal** 96:5 118:17
**internally** 32:7 69:8 120:18 126:9
**interpret** 40:20
**interstitial** 273:21 274:21 276:21
**intranet** 156:17,18
**intrusion** 275:13
**investigate** 274:9 280:1
**investigation** 143:11 274:19 277:19 282:5,13
**investigations** 272:21
**investment** 296:12,13
**invite** 226:13,20,21 228:1,3,5

**invites** 227:16

**invocation** 97:3

**invoke** 96:20 251:10

**invoking** 206:22 207:4

**involved** 45:5 64:2,5 66:5,10,11 106:8,13,22 107:12,18 124:1 196:18 238:17 241:12 251:4,17

**involvement** 100:15 238:20 266:6

**involves** 242:16

**involving** 264:17

**irresponsible** 42:12

**issue** 103:17 104:21 105:8,14 174:2, 3 212:7 214:20 237:3 244:6 258:15 259:3 260:13,17 274:5,7 301:4

**issued** 213:7 221:2 259:9,14 260:1, 20 261:10 277:17 278:9

**issues** 110:18 113:20 114:3,5,13,18 115:18 116:21 274:15 275:9,19 276:5,7 278:20 282:6,15 283:12 284:1

**item** 165:11 170:9 247:9,10

**items** 170:5

J

**Jackline** 229:11,17,18

**JANKOWSKI** 10:11 11:13 12:7,18 14:19 16:18 18:3 19:15 20:3,20 21:2 25:21 28:2 29:9 30:12 31:11 32:6 33:6 34:2,15 35:8 36:4,7 37:5,20 38:3,10,18 39:18 40:10 41:4,12 47:16 48:21 49:1,8,16,20 50:2,5 51:18 52:20 53:10,20 54:7 63:18 66:17 72:3 73:1 74:11 75:7 77:5 81:14 83:1,12, 19 85:5,18,22 86:10 87:4,22 88:4,7 89:10,21 90:8,17 91:1 93:9,14 95:16 96:16 97:7,13,20 98:3 99:3,5,19 100:12 101:6,16,20 102:6,10,13 103:15 104:12 105:6,14,21 112:13 114:21 117:3,15,19 118:2 119:20 124:17 125:9 126:14 127:1,12,17 128:1,8,20 129:7,14,21 130:2 131:10, 13 132:5,15 133:17 136:14 138:2 142:1,7 144:4,7 146:19 147:5,14 148:3,10,22 149:18 150:16 151:2,20 154:13 155:5 156:9 157:21 158:15 160:2,17 161:15 162:2,6,14 163:5,8, 11,14 164:11 166:20 167:6 170:2 171:22 173:2,10 174:14,22 176:10 177:9 179:3,22 180:16 181:20 182:9, 13 185:18 186:16 187:16 188:4,14 189:5,21 190:6,11,14,19 191:4,11,14, 17 192:3,7,16 193:7,12 194:14,21 195:10 196:10 197:13 199:10,22 200:16,21 201:6,18 202:15,21 203:19 204:7,13 205:18 206:7,18 207:6,15, 19 208:4,9,14 209:12 210:4,19 214:11 215:11,16,21 216:15,20 217:10 219:2 223:6 224:13,22 227:2 231:21 235:11 237:7 238:3,19 239:6 241:22 242:7,15 244:11 245:21 246:4 248:9 249:3,16 251:6 252:7 253:5,18 254:16 255:11 256:2 261:2 262:14,19 265:16 268:10 271:22 272:5,13 273:4,14 280:11 283:19 285:13,18 288:20 289:10,20 290:16,20 292:2,21 293:10 294:6,15 295:14 296:1 297:18 298:3,9,15 299:14,19 300:4,9,19 301:3,10,15 302:2

**Japanese** 165:11,14,16,17,19

**Jennifer** 106:17,22 107:12,15

**JLL** 220:13 221:10,15,20 223:21 225:7 271:18 287:7 289:8,12,13,14 290:2 291:4,13 292:12,19 293:6,12, 22

**JLL's** 290:6 291:1 294:12

**job** 213:13 230:19

**Joe** 263:9

**John** 108:2

**joint** 217:20 219:10

**Judge** 188:13

**judgment** 105:7

**July** 30:1 77:17 78:13,18 106:11 221:2 223:19 229:6 230:5 232:8

**jump** 110:8

**June** 14:5 30:1 47:2,3,10 48:9 50:13 51:6 55:22 74:20 75:14,22 76:11 78:18 139:13 175:8,11 218:11 221:7, 11 222:1,19 267:19

**Justice** 85:14 86:5,20 105:19 208:16 298:18

**justification** 187:20 256:9 257:10

K

**Kasama** 66:18 67:2 68:11 121:4

**KC** 118:15 134:6,18,22 136:5 137:3 157:9

**Kennedy** 7:19 8:1,15,20 9:5 15:18 17:7,14 19:10,11,20 20:9 28:5 30:9 40:14 44:6,14 45:11,16 51:13 73:20 77:4 80:14,17 94:21 107:22 108:13 116:2,22 141:17 142:19 145:10 155:13 156:17 159:5 170:6,12,15 185:8 212:9 213:2,22 215:8 234:16 243:9 250:16,21 251:3 252:6,21 253:1,3,13,15 254:10,15 255:5,10 299:11,16,22 300:7 301:9,14

**kicking** 119:14

**kind** 41:8 58:22 132:6,9 138:5 146:7 156:8 166:8 262:11 269:13

**knew** 35:18 227:11,14,18 275:20 281:14 282:5 283:16 289:13,14

**knowing** 42:12 47:2 49:13 166:16 214:5 221:12

**knowledge** 8:6 41:17 85:8 242:16 251:18 271:5

**Kristofcak** 129:10 130:20 131:7 271:13 272:1,7 273:1,7,16 281:1 284:7 285:15 286:18 287:6 289:1,16 290:3,19,21 292:3 293:4,15 294:11, 21 295:18 296:5,19

**Kyle** 5:11 10:12 20:20

L

**lab** 15:9 18:11,14

**lack** 11:19,22 18:7 138:17 285:6

**lady** 66:18 67:2

**lagged** 224:6

**large** 16:7 160:8 169:5 173:22 213:13 270:16

**largely** 10:8 49:10 56:22 175:8 276:19

**larger** 276:7,15

**late** 30:1 157:11 279:7

**lawsuit** 5:12

**layman's** 156:8

**lead** 67:3,6,11

**leader** 66:19

**leaders** 55:13 121:7

**leadership** 11:19,22 12:11 16:3 26:2 55:12 82:6,7,12 83:4,5 196:12,15 238:22 293:20

**leading** 264:19 281:12

**leads** 22:14

**leaking** 277:1 278:6

**leaks** 275:8,12

**learned** 112:2 214:10 281:22

**learning** 212:4 214:5,16

**leeway** 40:8

**left** 264:1 279:16

**left-hand** 144:20 165:1 168:14,15

**legal** 49:5 74:12 89:9 91:9,14 105:22 128:3,9,13 129:1 130:8 150:12 215:9 216:14 218:5

**lets** 166:18

**letter** 258:7 259:1,6,18 271:18 287:8 289:11,19,22 290:9,13,17 292:15 293:7,8 294:19 296:7,8,15,17

**lettering** 144:21,22

**letters** 113:21 259:14 260:20 261:4,9

**level** 100:7 134:17 150:4 155:15,16 160:20 203:1 236:16 257:12 273:19, 20

**lever** 183:6

**levers** 183:13

**liability** 286:17

**Lidar** 276:10 277:18

**lieu** 157:3

**lift** 241:3 274:6,8

**lifted** 285:10

**light** 26:9

**lightly** 295:11

**limitation** 101:8 187:17

**limitations** 123:17 124:14 125:19 126:4,12 127:9,16,22 128:2,14 135:4

**limited** 8:5

**lines** 29:11 38:7 197:12 208:10 291:6

**link** 252:15

**linked** 51:21 101:15 105:1,12,19 274:20

**liquidity** 173:1,9,12 174:2 199:9

**list** 141:18 263:3

**listed** 79:1,20

**litigation** 50:4 129:2,5 147:21 217:20

**live** 103:8 118:21 194:2

**lives** 286:8

**living** 198:6

**loading** 278:17 286:3

**locations** 274:16

**log** 134:18

**logic** 194:20

**login** 134:20

**long** 12:5 15:11 16:8 18:6 19:9,10,20

**long-term** 11:17 14:11,18 21:8,12

**longer** 139:4 222:22 223:1 233:6 244:2 277:9 292:10

**longevity** 182:20

**longtime** 15:6

**looked** 24:3 45:12 76:21 169:16 177:17 228:1 239:21 260:9 269:8

**loop** 74:20

**losing** 148:1,8 150:12

**loss** 150:6

**losses** 148:16,20 149:3,14,19,21 150:3,4,5

**lost** 170:12

**lot** 64:20 113:2 167:17 278:9 284:1

**loud** 68:15 92:4

**low** 282:14

**lower** 168:12,14,15

**lunch** 131:18 132:4 141:22 142:19

**Lutnick** 95:13 96:2,13 196:18,20 197:1,7,20 198:12 199:2 200:13 201:8 202:22 203:14,15 216:9 234:17 235:22 236:3,5 237:14 238:16 241:9, 12,20 242:8,13,16 254:9

**Lutnick's** 236:20

**LYNCH** 50:1,4 98:2,4,8 128:15 129:3,8 130:15,22 131:2

## M

**made** 17:2,4,12 19:22 20:14 24:18 30:17 35:2 36:22 38:14 39:4 40:5 42:8,22 43:9 44:13 45:1,3,19 71:9 75:21 82:17 85:1,3 86:22 108:7 115:4 156:21 183:2 195:16 196:16 199:18 209:5,22 212:5 214:6 219:11 222:15 226:1,22 228:7 234:6 270:9,13 274:1 281:10 291:4 295:22

**Madness** 11:4 15:4 17:5,12,15 18:18 19:12,19 20:1,14 21:10 22:3 39:8

**mailbox** 229:13 264:1

**main** 9:15,17 10:6 24:20 25:19 26:11 27:9,22 29:13,18 30:11 31:9,14 33:21,22 34:20 35:2,6,11,13 36:16,22 37:2 38:17 39:5,10,12,14 42:10 43:4, 11 45:17 56:2,7 59:3 62:11 72:16 111:4 112:8 176:14 205:17 237:6 243:16 253:16 254:14 255:5,10 276:7 284:4 288:7 289:2 301:14

**maintain** 263:22

**maintains** 156:5

**maintenance** 291:9

**majority** 65:2 121:16

**make** 7:15 35:11 37:2 62:1 69:14 80:18 88:11 96:22 97:1 113:10 127:1 128:10 132:3 162:2 189:13 196:7 205:5 247:15 259:18 262:8 264:4 284:22 286:22 290:14 297:1,15

**makes** 228:9

**making** 94:7 166:8 197:8 208:12 215:19 295:11 298:12

**managed** 138:11

**management** 9:15 10:16 11:7,9 14:10,16 21:7,11 24:18 29:6 35:4,10 39:3,10 52:16 53:3 78:6 82:17,20 90:12,22 91:9,11,14,19 92:1,12,13 93:5 98:17,20 121:2,7 125:12 132:20 142:22 143:18 175:15 181:11 183:12 193:3,4 194:10 204:5 209:8 210:1 218:15 219:20 222:20 226:17 227:10, 14 228:14 235:21 236:6 243:20 247:20 248:6 251:22 252:3 255:9 256:7,16 257:13,17,20 260:12 264:13,17,18,22 280:15

**management's** 35:1 181:16

**manner** 59:13 62:6,19 63:2

**March** 12:17 31:5,22
**mark** 10:22 60:15 75:5 77:5 239:15 250:2 286:19
**marked** 13:10,13,20 48:1,4 60:13 75:10,14 76:3 77:9 144:2,10,14 163:3,7,16 177:12 211:6,10 217:12, 15 229:2 239:18 246:22 250:5 287:4
**marking** 77:6
**Master** 118:15 134:6,18,22 136:5 137:3 157:9
**match** 33:12
**matches** 154:3
**material** 74:10 177:19 232:3 266:7,9 270:7,9,21
**materialized** 222:13 234:12
**materials** 177:21 223:21 232:10,11, 17 233:8,11 244:10 267:22 269:8,9 270:1,2
**Matt** 94:18 95:4 248:11
**Matt's** 126:18
**matter** 18:20 130:5,12
**matters** 8:5
**MATTHEW** 5:3 302:14
**maximization** 296:13
**May/june** 36:1
**meaning** 52:2 55:8 58:21 79:19 116:11 134:7 153:14 158:12 162:13 175:18 226:17
**meaningful** 237:3 252:2
**means** 25:5 26:16,19 71:2 98:17,20 145:18 159:7,13,16 165:9 271:15 282:11
**meant** 79:21 81:8 227:21 290:13
**mechanically** 93:19
**mechanics** 94:6 187:20
**mechanisms** 114:16
**media** 212:5 250:10 252:16
**meet** 26:12 28:5 29:12 30:9 31:17 33:12 171:10 227:5
**meeting** 9:11 11:11 26:22 46:16 47:1,3,5,10,13 48:9 50:13,14,21 51:7, 21 52:3,19 53:9,19 54:19,21,22 55:1 63:5 74:20 75:1,22 98:21 136:11 139:13 171:11 172:12 177:19 178:1, 18 181:2,4,9,13 186:12 187:1 195:18, 22 196:4 197:5,16,22 198:4,8 203:13, 18,21 204:1 208:6 209:17 211:21 213:8 215:2 225:21 226:2,4,9,12,16, 18,20,22 227:6,10,11,15,19 228:8,15 230:8,12 231:10,15,20 232:6,9 233:1, 5,9,16,17 234:18 236:1,2,4 237:13, 15,22 240:19 243:14,21 244:13 246:8 247:1,3,15 248:1,4,20,21 270:7,8,17, 18 283:1,7,10,16,22 284:9,13 292:16 293:3 298:2
**meetings** 52:10,14 70:11,13 98:16 176:1 187:22 225:14 232:1 264:20 265:11 268:2 290:1
**members** 82:3 106:8,13,21 107:7,11 187:14 228:5 244:1,18 251:4,13,16 264:12,22 269:19 279:15
**memorandums** 132:18 133:4,12
**memorialized** 54:4 101:3 249:6
**memos** 132:21
**mention** 23:1
**mentioned** 7:1 10:20 15:4 26:10 27:8,18 55:16 62:14 74:17 102:19 121:21 138:6 161:22 187:8 265:18 269:21 279:13
**mentioning** 61:7
**message** 16:10 26:11 108:14 234:4 264:13 265:1
**messaged** 15:21,22
**messages** 264:5,9,11,16
**messaging** 16:20 33:10 37:6 113:3 265:1,2
**met** 289:12
**methodology** 246:9
**metrics** 218:18 220:1
**mid-july** 221:14
**middle** 76:4 154:8,22 223:18
**migrated** 137:13
**migration** 119:16
**Millennium** 22:5,20 27:2
**million** 79:10,14 80:2 106:15 107:10, 14,19 108:9,12,18,20 109:1 161:3,10, 11,22 170:7,8,13 171:6 287:18 288:13 289:6 291:8,16
**millions** 148:1,8,12 149:11
**mind** 161:8 219:2 249:14
**minimization** 296:12
**minimum** 49:12
**minute** 61:7 163:3
**minutes** 48:9 50:11,13 270:13 272:2
**mirror** 62:10
**missing** 279:14
**mission** 26:12 27:1 28:5 29:12 30:9 31:17 81:8 171:11,12 172:14
**misstates** 16:19 25:21 34:3,16 35:9 37:5 38:18 73:1 85:19 86:10 87:5 89:10,21 90:9 99:3 119:21 146:19 147:5 148:3,10 149:1 150:16 157:21 170:3 173:3 206:8 224:22 239:7 261:3 280:11 283:20 285:18 292:22
**mistake** 209:6
**misunderstanding** 195:2
**mitigate** 286:13
**mix** 197:4
**moisture** 273:22
**mold** 274:12
**momentum** 183:17
**money** 88:19 92:19 150:12 151:9,10 171:13 174:5 185:2
**month** 275:18
**monthly** 122:18 123:18 136:21
**months** 113:8 174:11 176:7 291:20 292:8 295:3
**Moore** 274:18 276:8 277:4,12,16 278:8,13,15,22 280:14 281:3 282:12, 20
**morning** 5:9,10 251:2
**mounting** 283:12 286:15
**move** 17:17 28:20 46:22 58:9 63:12 183:20 184:8 185:1 192:21 224:1 272:15 286:13 297:4
**moved** 11:5
**moving** 16:3 186:14 284:4
**multiple** 53:3 61:13 66:11 127:3 133:20 155:8 159:18 185:14 187:9 188:15 191:9 192:8 206:15 246:1

**multitude** 182:19

**music** 30:22

N

**named** 66:18

**names** 263:3

**naming** 189:1 192:6 205:2

**Nations** 275:14,22

**nature** 24:9 127:5 129:1 207:3

**necessarily** 11:2 67:18 129:8 150:3 222:8

**necessity** 192:5

**needed** 35:18,19,20 111:14 134:13 136:8 183:2 197:3 203:9 233:7 234:3 275:20 286:16 291:15

**negative** 151:11 212:8,16 213:19 276:11

**negatives** 148:16

**negotiating** 10:5

**net** 168:16

**neutral** 98:19

**nodding** 6:11

**non-federal** 169:12

**non-profit** 170:21

**normal** 42:5 58:10 74:7 88:22 89:2,6, 11,20 90:1 248:18

**northwest** 279:1 281:13

**note** 13:15 105:6,18 124:17

**notice** 8:12 46:4 101:9 217:8 261:21

**noticed** 246:15

**notices** 271:2

**number** 13:11 48:12 60:9 65:22 69:15 73:21 149:16 153:4 168:12 240:6 247:12,13 287:12 291:6

**numbers** 58:1 68:12,21 76:3 167:17 268:20

**Nutcracker** 23:16,17,21 24:12 42:15,18

O

**oath** 6:1,4 142:15

**object** 32:18 41:10 46:6 52:20 83:13 85:5 90:17 95:16 104:12 124:18 126:14 127:12 138:2 173:2 185:21 187:16 200:16 215:11 272:13 298:3

**objection** 11:13 12:7,18 14:19 16:18 18:3 19:15 20:3 25:21 28:2 29:9 30:12 31:11 32:6 33:6 34:2 35:8 37:5 38:18 40:10 47:16 51:18 54:7 66:17 72:3 73:1 74:11 83:1 85:18 86:10 87:4,22 89:10,21 90:8 93:9,14 96:16 99:3,19 100:12 103:15 112:13 114:21 117:3 119:20 125:10 133:17 136:14 146:19 147:5,14 148:3,10,22 149:18 150:16 151:2,20 154:13 155:5 156:9 157:21 158:15 160:2,17 161:15 164:12 170:2 171:22 173:10 174:14, 22 176:10 179:3,22 180:16 181:20 182:9,13 185:18 193:7 194:14 195:10 196:10 197:13 199:10,22 203:19 204:7,13 205:18 206:7,18 209:12 210:4,19 214:11 216:15 223:6 224:13,22 227:2 231:21 235:11 237:7 238:3,19 239:6 241:22 242:17 244:11 248:9 249:3 252:7 253:5 254:16 255:11 256:2 261:2 262:14 265:16 268:10 273:4,14 280:11 283:19 285:13 288:20 289:10,20 292:2,21 293:10 294:6,15 295:14 296:1 299:9, 14,19,20 300:4 301:3,10,15

**objections** 34:15 53:10,20 88:4,7 244:8 297:15

**Objet** 253:18

**obligate** 28:21

**obligates** 6:5

**obligation** 29:2

**obligations** 114:17

**observation** 291:5

**observed** 275:7

**obtain** 70:21 91:9 248:21

**occupied** 288:19 293:20

**occur** 157:10 180:4

**occurred** 126:7 161:3

**October** 164:18

**offer** 25:10,11 28:9 30:6

**offers** 25:17

**office** 45:7 266:3 267:1 269:1 300:11,14

**officers** 80:9 81:12 125:12

**official** 265:5

**offset** 152:8 160:20 170:15

**offsets** 148:11

**offsite** 17:18 27:10 28:1 29:8 44:7 45:20

**Onboard** 269:16,21 270:2,10,13 271:1

**ongoing** 18:16 133:7 155:14 249:12 277:8 280:13,19

**online** 157:6

**onsite** 18:12

**open** 56:7,14 103:11 104:4,18 110:18 273:9

**open-ended** 233:14

**opened** 247:19

**opera** 26:20 27:2,20 28:9,12 42:17

**operate** 72:14

**operating** 56:19,20 58:11 59:16 72:15 73:3 74:7 160:13 167:22 168:20 169:6,7,9 171:3,19 173:13

**operational** 14:13 18:20 27:14

**operations** 84:4,13 96:6,15 185:1 230:3 249:12

**opinion** 41:1 194:17 295:22

**opportunities** 248:2

**opportunity** 41:15 244:19 247:22 283:22

**opposed** 22:19

**opposes** 301:22

**opposite** 101:18 190:14

**option** 257:14

**options** 31:16 189:1 205:2 227:6 284:12

**oral** 230:18,21

**orchestra** 9:21 10:5 22:6,20 26:20 27:1,20

**orchestrating** 176:17

**order** 43:10 47:6 87:6 99:12 104:15 184:15 230:13 231:5,16 232:9 267:15 288:4 300:3
**ordinary** 100:22
**organization** 22:19 42:5
**organizations** 89:13
**organized** 262:7
**orient** 218:10 226:3 230:4 243:13
**orientation** 219:14
**original** 234:13 246:7
**originally** 111:19
**outages** 28:13
**outcome** 89:9 94:1 160:16,21 301:20
**outlined** 253:8 278:11
**outlook** 64:7 182:18
**outstanding** 110:18
**outweighs** 172:10
**over-** 66:9
**overhang** 282:14
**overhanging** 275:4
**oversaw** 66:14
**oversight** 205:16 207:13
**overturned** 213:20
**owner** 67:8

**P**

**p.m.** 302:13
**packet** 247:2
**paint** 112:20 274:12
**panel** 278:22 279:3
**panels** 277:14 278:5 279:14
**paragraph** 14:9 21:5 218:3,9 287:13 293:17
**parking** 152:14 278:17 286:2
**parse** 82:16
**part** 11:3 56:10 57:1 58:4 59:20 65:16 67:12,14,16 68:17,20 106:18, 19 107:2,4 115:9 119:10 121:3 143:10 153:22 162:4 165:13 236:9 249:5 257:11 259:11 261:16 268:13 277:12 283:11 289:14
**partially** 280:12
**party** 224:5,16
**passed** 209:16 243:20
**past** 59:12,15 103:20 134:6 157:2
**path** 14:13 16:12 32:8,14 54:20 103:4 176:17
**pathway** 27:12
**patron** 138:8 173:17
**patrons** 285:1
**pattern** 259:19
**payable** 134:1 135:6,10,21
**Payment** 80:3
**payroll** 135:14
**pedestrian** 288:8
**pedestrians** 288:12
**pending** 7:9 79:19 80:4 83:18 84:6 89:9 258:22 301:19
**people** 45:6,12,15 66:11 68:11 83:3, 7 92:18 117:7 122:6 127:4 157:7 288:6
**people's** 92:9 286:8
**perceived** 175:16
**perform** 15:18 17:6,12,13
**performance** 10:19 162:8 166:2,3
**performances** 23:1,4,7,22 24:13 25:20 31:9 42:9 43:11 288:10
**performing** 20:15 21:22 79:6 165:11,15,16,18,19 170:20,22
**perimeter** 275:5 285:21
**period** 9:7,8,9 14:22 19:6 21:9,13,19 22:11 23:4,7 24:22 25:13,20 26:9 27:20 29:5 32:13 36:14,15,21 39:4,6 42:7 56:7 106:11,12 112:9 152:21 176:3 183:3 199:13 202:11 223:15 244:2 280:21
**periodic** 120:15,17,21
**permit** 208:2
**permitted** 25:18 37:2,8 38:6,16
**person** 12:2 45:3 90:5 116:13 204:20 239:4 279:12,20 280:2
**person's** 115:8
**personal** 5:15 8:5 94:12 110:15 172:17 194:17 239:22 242:16
**personally** 8:18 20:4,10 23:9 71:3 82:5
**personnel** 262:10,15,18,22 263:18 267:9,12,14
**personnel's** 262:18
**perspective** 35:1 40:13,21,22 41:3 49:12 50:7 72:18,21 89:6,19 91:12 100:19 148:7,19 169:7,10 171:17 178:7 194:1 198:12 225:22 237:19 238:11,22 258:11 276:4
**persuade** 190:10 192:4 237:5,10
**phased** 57:11,15 58:15,22 59:10,19 62:5,18 63:1 66:2 292:6,20 294:13 295:20
**phasing** 62:11 288:9,19
**philanthropic** 81:7 149:10
**phone** 208:6
**photograph** 250:20
**phrase** 95:3 152:2 159:20 180:15 185:13 187:11 189:8 190:9 191:2,22 194:10
**physical** 31:1 100:16
**physically** 276:17
**picking** 296:14
**picture** 73:19 107:6 112:20 169:5 175:4 199:15 212:17
**pictures** 94:8
**piece** 296:14
**pieces** 190:2 286:2,3
**pin** 97:16
**pitch** 230:21
**placard** 250:11,14,21 251:5,20 252:1,5
**place** 12:13 30:11 44:7 47:5 65:16 88:21 89:17 113:12,16 114:16 118:3 141:8 212:10 213:11,22 214:20 215:8 216:13 281:18 285:7
**placing** 104:19
**plainly** 34:17
**plaintiff** 265:8 268:9

**plaintiff's** 64:3 104:17 262:5,12 267:21 271:8

**plaintiffs** 5:7 302:4

**plan** 11:17 28:15 31:18 35:11,15,20, 21 37:12 39:11 41:20,21 42:1 151:13, 14 153:1 154:1 160:9 183:19 220:17 225:15 226:5,17,19 246:7 289:18

**planning** 10:22 18:9 21:8 43:3,5,10, 13 62:4 65:1 66:4,20 74:1 121:5 181:1

**plans** 20:14 94:7 160:6 252:20

**plaster** 272:16 273:3,6,18,22 274:1

**platform** 118:8,10,13,19,21 136:7,15 138:7,16 139:10

**platforms** 134:12

**play** 234:17

**plaza** 273:19,20

**plaza-level** 275:4

**pledge** 115:4,6,7,8

**pledged** 92:16,19

**pledges** 92:21 114:6,20 116:22 117:8 139:1,17 141:3

**plenty** 248:3

**point** 12:8 30:18 33:18 43:2 50:16,17 55:4 83:14 84:18 88:12,22 112:8 115:8,19,22 116:13 127:2 133:16 137:22 145:20 154:5,15 157:17 162:3,10,20 174:11 176:7,12 177:3,5 188:5,14 204:20 226:19 228:12,14 231:15 242:21 271:11

**pointed** 113:2

**pointing** 165:4 219:3

**points** 122:10 133:20 155:8 158:5

**portfolio** 10:10

**portion** 134:8

**portions** 25:7 276:16

**position** 49:4,13,17 72:1 77:20 78:9 83:17 101:14,22 102:2,11 104:17 105:2,11,17,20 132:19 164:6 166:12 168:8 175:14,20,21 180:4 182:2,18, 21 183:1,7 186:11 188:16 190:17 191:7 192:18 199:5 200:15 201:14 202:8,9 299:13 301:18 302:3

**positions** 297:11

**positive** 100:13 168:6 276:12

**possibilities** 205:3

**possibility** 98:12 254:10 283:4

**post** 211:15 212:2,5 213:7 214:6 250:10 251:22

**posted** 251:2

**potential** 22:1 23:22 83:4 101:2 104:5 161:13 275:9 290:7

**potentially** 19:13 287:18

**Powerpoint** 75:18,20

**pre-august** 106:11

**precedent** 104:1

**preface** 294:20

**preference** 235:9 254:14

**preliminary** 9:10,14 32:10 47:6 219:12 241:2 282:4 300:2,15 301:2

**premised** 24:20

**premiums** 287:15

**prep** 235:21

**preparation** 66:5,15 67:6 200:3 233:11

**preparations** 237:14

**prepare** 56:5,12 58:16,21 59:10,18 65:4 68:2 69:8 120:17 137:19 139:16 143:1,19 146:1,7 147:13,18 223:4 233:13 266:9

**prepared** 8:9 56:1 58:14 61:2 62:15 64:22 78:1,2,3,10,11,12,13 133:5 143:10,15 145:10 146:13,14,17 147:3,7 252:18 265:9 266:7

**preparing** 55:20 59:2 65:10 67:3 251:4

**presence** 157:6

**present** 14:9 91:12 181:17 196:22 203:8,17 247:11 283:22 289:7 290:6

**presentation** 75:18,20 200:4 222:15 234:1 236:6,8,18,21 244:20,21 245:9 246:17 247:15 268:5,21

**presentations** 230:13,17,18,21 231:5

**presented** 63:4 143:8 145:19,21 175:21,22 189:2 193:18 203:10,16 233:17 267:18,22 268:6 289:12 290:9 291:1

**presenting** 58:19 198:7 199:14,15 232:3

**preservation** 117:19 132:6 261:22

**preserve** 267:12 288:4

**president** 66:19 89:18 90:16 91:22 93:8 95:17 96:20 98:14 99:11 104:11, 20 108:18,22 201:20 205:14,15 206:5,14,16 207:11,22 208:13 209:2 210:7,16 212:5 214:5 215:6,20 216:9 235:8 238:14,15 250:10,20 251:5 252:5 254:13,20 256:5 298:13 300:10

**president's** 89:17 95:18 200:18

**presidential** 207:1,7 215:15 298:6, 10

**pretty** 173:13,14 210:11

**prevented** 130:11

**previous** 57:21 58:5 59:15,16 61:13 68:8 86:2 209:17

**previously** 19:4 78:14,15 103:19 156:1 157:1 276:20 277:6 284:2

**primarily** 110:18

**prime-** 224:20

**principles** 296:11

**prior** 12:16 112:9 175:18 181:8 245:10,12 278:12 281:11

**prioritize** 197:3

**prioritized** 179:16 186:22

**priority** 185:5 286:9

**private** 207:17

**privilege** 48:20 49:3,5,10 90:21 91:13 93:15 95:19 96:17,21 97:4 125:10 127:2,13 128:16 129:9 206:19 207:1,4,7,8 215:12 216:16 235:12 251:11 253:19 298:4,7,11,17 300:5, 18 301:4

**privilege/presidential** 297:7

**privileged** 50:1,3 52:21 90:18 124:20 126:16 128:9 131:3,4 204:15 208:15

**Prize** 10:22

**probe** 129:20 189:16,22 191:1

**probing** 130:11 188:7 189:7

**problem** 171:19 172:2 199:9

**procedural** 111:3
**procedurally** 55:17
**Procedure** 7:20
**procedures** 113:5 208:17 298:18
**proceed** 25:18 209:3,8 210:17 299:7 300:1,15
**proceeding** 11:11
**proceedings** 215:9 216:14
**proceeds** 152:14
**process** 15:15 16:1,5 26:1,4 42:5 66:13 67:9 119:14,22 120:8 139:21 183:22 187:19 196:21 213:5 258:20 265:17 266:16,20 297:8
**processes** 167:7
**procurement** 229:22
**produce** 65:7 123:5 130:13 132:17
**produced** 48:13 63:19 64:11 123:7 125:7 129:18 133:15,19 240:3 268:8, 12,13
**producing** 123:18,21 124:15 125:19,22 126:4,12 127:11 129:19
**product** 134:2,5 137:3 140:11 232:1, 2 261:15
**production** 25:9 28:11 117:20 132:7,13 238:17 239:5 241:14 249:1 250:9 261:22 263:13 267:22
**professional** 294:9,18 295:12,17,21 296:9,16
**profitable** 171:21
**program** 26:21 30:15 31:14,15,16 33:20 37:8 38:16 39:9 43:15 154:20 155:17 156:20 172:7,9
**program-by-program** 155:15 158:1,20
**programmatic** 218:18 220:1
**programmer** 35:14 42:14
**programmers** 30:7
**programming** 9:16,18,20 10:1,7,17, 21 11:3,15,17,20 12:3,12,16,20,22 13:1,3 14:10,11,18 21:12 22:5,6,20, 21 24:3,19 25:2,11,15 26:3,6,7 27:2, 3,11,18,19,21 28:1 29:5,6,11,18 30:10,20 31:4,8,21 32:2,4 33:1,2,11, 12,17 34:19,20 35:5,6,13,18,19,20 37:1,7,10 38:13,15 39:2 40:9 42:3 45:8 54:22 165:20 170:6,12 171:3,5, 6,8,10,18 183:18
**programs** 16:7 27:6,8 31:17 66:8
**project** 220:16 280:15 282:3
**project-level** 280:20
**projected** 160:4
**projections** 63:20 65:11 66:1
**projects** 43:14 253:7
**prolong** 96:6
**promise** 132:11
**promised** 261:19
**prompted** 272:20
**proof** 284:17
**proposal** 230:19
**proposals** 187:15
**proposed** 54:13,15 55:5,21 56:5,13, 21 57:10,15 58:14,17,22 178:10,20
**proposition** 32:20
**prospect** 45:16 87:20 89:7 90:13 93:6 96:13 98:21 102:17 103:11 199:2 253:2
**protection** 288:9
**provide** 18:8 55:13 65:7,8,22 69:8 71:10 112:10 193:21 200:13 201:9 203:2,6 204:16 205:15 206:5 207:13 226:15 232:17 236:5 237:4 244:18 255:18 256:8 265:19 267:6,15 289:19 297:22 301:6
**provided** 15:13 53:18 68:3 69:2,20 70:4,7 71:17,20 72:19 73:5,12,16 119:8,12 195:15 201:13 202:7 265:10 278:16,22
**providing** 41:18 90:15 234:19
**provisos** 216:19 235:15 253:22
**proximity** 198:13 199:8
**prudent** 205:4
**public** 9:20 27:3 171:13 207:19 215:6 256:4 288:5 296:12,13
**publication** 251:22
**publicly** 206:15
**published** 159:12,14
**purportedly** 199:19
**purporting** 200:18
**purpose** 56:17 78:2 89:4 103:4 192:2,3 198:5
**purposeful** 25:3 26:13,15 28:4 55:11 185:7
**purposes** 120:9 262:11
**pursuant** 7:20 208:16
**pursue** 86:18
**pursuing** 288:17
**push** 41:4
**pushing** 241:15,20 260:8
**put** 34:17 97:15 104:9 113:11 183:15 189:10 243:8 255:9 256:16 257:9,15 270:2 276:17 285:2 287:1 301:17
**putting** 104:10 174:5 197:2 277:5

**Q**

**Q1** 32:21 42:22
**qua** 188:22
**qualifying** 281:8
**quantify** 286:6,16
**quarterly** 155:17,19 157:13,15,16
**question** 6:17,21 7:9,14 27:17 29:20 32:17 34:7,8,10,14 37:16 40:3 42:21 43:16,18 54:2 72:2 85:6 86:1,4,17 94:18 97:16 98:4 106:6 109:5 123:15 124:12,18 128:5,21 146:20 184:2,4 186:15,19 187:8 189:16,22 192:15 195:1,5 198:20,21 201:15 202:4,5,10 208:3,21 216:3,7 217:3 227:13,22 228:11 235:18 243:13 245:3,7 247:18 248:5 251:9 254:8 258:1,6 268:4 290:15,17 298:22
**questioner** 40:18
**questioning** 271:12
**questions** 6:6 7:2 8:16 9:1 40:19 41:2,6,16,18 46:7,9 71:18,21 77:1 131:20 192:17 244:5 246:11 247:11, 16,20,21 248:7,13,16,18,19 262:2 264:9 271:14,19 272:9 297:2,3,5,13, 21 299:8
**quickly** 219:8 243:7

R

**rain** 281:19

**rains** 282:10

**raise** 53:16 54:4 88:18 101:7 111:13 125:9 171:13 297:6,14

**raised** 98:18,20 114:3,13 131:11 153:21,22 160:12 244:8,13

**raising** 111:8 160:19

**range** 104:8 161:2

**reach** 27:10 28:1 29:7 206:12 283:12 284:3,19

**reached** 284:6,9

**read** 34:10,11 37:16,18,20 38:1,5,8 43:19,20 145:6 184:4,6 212:21 218:8 219:19 225:12 229:15 257:1 297:9,12 302:6

**reads** 50:17 170:1

**ready** 232:4 235:5,7 241:2,16,21 293:22

**real** 201:10 252:10,12,17 279:21

**realize** 241:3

**realm** 74:7

**reapproach** 131:18

**reason** 12:9 69:13 110:17 111:4 129:18 176:14 186:7 195:4 231:4 242:21 255:18,20,22 256:8 259:16 260:8 270:5

**reasonable** 20:22 253:2

**reasons** 110:22 187:11 189:10 213:4

**rebuild** 18:13

**recall** 24:4,5 46:11,20 57:3,7 74:22 77:12 79:2,13 109:4 110:12 132:21 177:17 212:1,4 214:3,5 222:16 228:17 246:19 250:19 251:1 270:6 289:4 290:5 301:19

**receipt** 96:14 101:15 104:5

**receivable** 135:19,22 136:9

**receive** 21:21 109:10 207:14 245:8 268:17 274:2 276:2 292:18 299:22 300:7,14

**received** 23:2 95:14 109:22 209:9 245:6 269:19 271:17 277:16 289:22 291:16

**receiving** 87:20 98:12 102:17 103:12 106:15

**recent** 112:7

**recently** 44:5 282:17

**recess** 142:11 249:19 272:6

**recognition** 89:18 90:3,15 91:21 93:8 98:14 99:1,11,17 186:6 187:15 205:3,14,21 207:14 208:2 209:4,9 210:18

**recognize** 146:5 228:11

**recognized** 301:8

**recollection** 47:22 51:4 231:14 241:7,11

**recommendation** 281:9 294:9,19 295:17 296:9,16

**recommended** 279:2 281:3,5 294:10

**reconciled** 148:14

**reconstruction** 212:8 213:5,12,21 214:18 215:7 216:11

**record** 5:19 13:16 34:11 36:8,9,11 37:18 38:1,8 43:20 71:8,16 97:1,21 105:18 118:8 142:8,10 163:10 184:6 188:7 189:13 190:22 192:11 208:20 216:7 249:18 256:21 257:1 297:2 298:20 301:17 302:6,12

**records** 101:3 110:6 116:14 117:17 118:1 120:12 124:15 125:20,22 126:13 127:11 129:17 130:13 132:2 167:4 267:6,10,13 269:3,5

**red** 76:4 145:4 153:5

**redact** 50:8

**redirected** 287:19

**reduced** 137:22 139:18 141:3

**refer** 158:11

**reference** 10:11 51:11 108:20 122:10 159:5 241:8

**referred** 79:5

**referring** 57:9 61:1,8 230:17 278:19 285:6

**reflect** 27:12 29:13 33:10 62:10 65:18 74:1,6 139:3

**reflected** 63:3 120:13

**reflects** 16:12 77:19

**refrain** 34:19

**refresh** 47:21 51:4 231:14 241:6,11

**refuse** 298:21

**regard** 73:7 74:9 104:22 255:19

**registers** 135:14

**regular** 261:7

**regularly** 280:21 292:16

**rehearsals** 288:10

**relate** 121:14 123:18,21 128:2

**related** 117:17 131:20 133:12 154:19 165:15 186:6 187:19 189:5 217:8 218:17 219:22 221:20 249:11 265:10 267:6 286:14

**relates** 101:21 117:21 127:10 132:10

**released** 165:6,17,21 166:9,12

**relevance** 105:16 192:12

**relevant** 49:14 72:12,21 73:3,8,9,11, 13,16 74:13 83:16 101:12 188:12 189:11 248:22

**reliable** 138:16 140:8

**relief** 302:4

**rely** 82:14 103:2 251:11

**remain** 18:11

**remainder** 273:8

**remained** 10:9 13:4

**remaining** 56:14 78:22 79:11

**remains** 19:12 55:10

**remember** 108:4 239:8 247:17 292:4

**remind** 77:22

**reminded** 164:7

**reminder** 142:14

**renaming** 104:9 139:14,19 185:16 212:7 214:20 215:10 216:14 299:18

**renovate** 72:15 295:2

**renovating** 56:19 72:14

**renovation** 57:11,16 58:15 59:1,11, 19 66:2 105:4 179:16 180:6 181:3,5 183:21 184:9 186:22 195:21 196:17 197:3,15 198:16 200:12 203:22 205:16 207:13 208:1 209:3,9 212:9 213:12,21 214:17 215:7 216:12 288:18 292:6,20 293:20 301:8

**renovations** 11:12 61:21 62:2,5 210:17 284:5

**rentals** 22:9,12

**repairing** 282:1

**Repayment** 79:20

**rephrase** 7:3 98:18

**replaced** 279:3 281:4,6 285:22

**replacement** 281:10

**replacements** 291:9

**replacing** 282:2

**report** 56:11 57:6 60:2,21 63:3,14 123:21,22 134:2 136:9 140:5 143:1, 19 144:15,22 145:9,13,16,19,21 146:2,4,7,10 147:3,13,18 164:3 217:21 218:14 220:19 221:15 223:13 231:7 233:20 234:2 238:18 239:5 241:1,14,16,20 242:14 243:1 244:3, 21 249:2 270:15 275:14 277:15,17,21 278:4,8,10,21 279:2,7,10,11,13 280:3,10,13,18,19 281:2,11,12 287:7

**reported** 50:20 275:13

**reporter** 6:9,18 34:10,11 37:18 38:1, 8 43:20 184:4,6 257:1

**reporting** 120:15,17,21 121:2 167:21

**reports** 70:8 123:19 134:1,5 135:6, 10,20 136:22 137:2 143:4,7 230:15 274:4 277:3 278:13,14,16

**represent** 5:12 63:8,13 71:16 179:19 180:9 219:9 250:13 268:16 298:17

**represent-** 180:14

**representation** 191:16

**representations** 130:5 188:7 219:10

**representative** 5:16 7:19 77:3 92:8 94:21 135:8 194:9 240:10 258:9

**representatives** 22:1 23:5,21 208:13 298:14

**represented** 80:8 85:15 86:6 129:17 147:22 191:3 194:11 225:13 240:2

**representing** 86:21 178:22

**represents** 260:17

**request** 64:3 110:19 255:14 256:14, 20 263:2 269:9

**requested** 34:12 37:19 38:2,9 43:21 70:20 71:6 130:14 132:2 184:7 257:2 265:8

**requesting** 242:14

**requests** 9:7 262:6,13 267:21 271:8

**require** 99:11

**Required** 79:21 80:4

**requirement** 80:10 260:12

**requisitions** 114:17

**research** 234:5

**reside** 120:12

**resignations** 12:20

**resolution** 99:17,21 100:2 178:10, 13,20 179:5,15,19 180:5,6,10,13 181:6,10,12 182:6 183:10,21 185:4, 11,17 186:22 187:4,5,13,14 188:22 189:1,10,18 190:3,13 192:6 193:3,19 194:3 195:9,16 204:6,12,19,22 205:1 206:3 209:15,16,19,20 243:16,19 249:5,6 254:19,21 255:3,9,19 256:17 257:11,16,21 283:11

**resolutions** 215:2 249:9 257:18

**respect** 10:18 18:1 26:8 49:3,17 80:18 107:9 121:22 128:4 173:1 189:1 290:7

**respond** 6:10 8:16 64:3 111:9,10,15 174:16 210:14 255:14 256:7,14,15,19 257:7 267:10 271:7

**responding** 252:18 262:12

**responds** 210:6

**response** 6:6 38:21 105:21 112:11 113:13 214:16 244:7 263:1

**responses** 71:22

**responsibility** 133:7

**responsible** 147:12 156:20,21 166:8 197:7 241:13

**responsive** 205:1 223:8 262:5 269:9

**rest** 49:10 297:12 299:3

**restart** 257:3

**restricted** 84:19,21 85:4 87:21 88:14,19 96:3 98:13

**restriction** 85:10

**restrictions** 28:14,18 87:13,17 100:10 101:2 162:17

**result** 17:10 127:5 183:5 284:4

**resulted** 221:1

**results** 26:4 162:8

**retained** 234:7

**retaining** 224:9

**retrieve** 134:13 136:8,13

**return** 19:13 77:2 129:22 132:9,11 257:22

**returned** 97:16

**Returning** 157:12

**revenue** 139:15 143:20 146:8 148:21 149:17 151:1,10,18 152:9,11,16,19 153:2,7,13,16 154:2 158:4,19,20 159:10,11 160:5 161:14,17,20 171:6, 19 299:17

**revenues** 61:16 62:22 120:11 145:16 149:7,8,9 168:1,3 169:20 170:8,16 173:15,16,18 174:1,7,8 176:16

**review** 181:22 236:18 244:19 270:11

**reviewing** 236:12

**RFP** 222:3,8

**right-hand** 76:4 164:20 168:12 169:1 178:4

**risk** 174:12,15,20 175:2,16 176:5 188:18 281:15

**risks** 278:11 286:7,8,12,15

**road** 96:9

**role** 156:19 234:17

**roof** 277:1 282:13,14

**room** 131:11

**roughly** 13:1 221:5 223:18 232:12 272:17 291:16

**routine** 121:6,19 155:15 235:2

**routinely** 155:7

**Royster** 263:9

**Rule** 7:20

**rules** 5:20 213:14

**ruling** 212:6,15 213:19

**rulings** 214:20

**run** 131:22 142:2 169:19 199:12

**running** 15:6 68:12 154:20 199:9

S

**safe** 288:4
**safety** 213:4 272:20 276:4,7 280:16 283:12 285:2 286:15
**Sage** 118:4 120:13 122:8 123:6,10,13 124:2,11,13 126:4,12 134:3 135:16 136:2,5,15 137:4,5,13,14
**Sage's** 123:17 125:18
**sake** 5:19
**sales** 50:22 51:8,22 52:5,17 53:8,18 76:12 138:8 143:2,20 145:16 152:11,13
**savings** 287:18,21 288:1,2,17 290:7
**scaffolding** 288:6
**scenario** 56:6,13 57:11 59:3 62:16 66:2 128:22 195:13
**scenarios** 57:5 60:1 61:3 65:11 158:18
**schedule** 30:19 31:9 41:21 42:3,4 54:17 137:20 138:22 196:3 225:14 226:1 231:19 243:21 291:20 292:5,8,18 293:13
**scheduled** 54:19 165:20 166:3 198:9 226:9,17 227:6,10,19 228:15 231:11,17
**scheduling** 231:22 235:2,3
**scope** 49:1,2,21 50:8 83:13 85:5 101:7 104:12,14 105:9 162:3 164:9,12 185:21 187:17 189:3 191:12,15 192:9,19 196:11 222:3 246:9 287:19 291:14 301:15
**scoping** 282:5 301:4
**search** 263:1,12,14 267:5
**searched** 262:6,11 263:20
**searches** 266:18
**season** 14:21 15:19 16:17 17:7,14 18:1,2 20:2,16 22:2 24:1,14,21 25:12,20 27:5,22 29:19,22 31:10 32:5 33:3,21 35:7 37:3 38:17 39:9 42:10 43:12 44:8
**Seats** 145:4
**secondary** 198:15
**Secretary** 95:13 96:2,13 196:18,20 197:1,7,20 198:12 199:2,18 200:13 201:8,12 202:7,22 203:14,15 216:9 234:17 235:22 236:3,5,20 237:14 238:16 241:9,12,20 242:8,12,13,16 254:9
**section** 26:22 49:3 272:16 275:15 294:20
**sections** 277:22
**secure** 121:18 151:10 185:2
**secured** 92:16
**security** 272:20 275:16 280:16
**seeking** 209:4
**sees** 157:18
**selects** 14:12
**sell** 172:10
**Senator** 110:19 111:8,16 113:1,14 114:4 116:18
**send** 286:20
**sending** 34:18 119:17 120:3 226:19
**sense** 132:4 194:19 228:9 262:8
**sentence** 38:4 151:17 165:4 230:17
**sep-** 212:11
**separate** 140:5 158:4 212:12 261:14
**separately** 13:11 33:15 69:2 100:1 108:18 290:22
**September** 44:19,20 164:18 173:1 175:19 177:22 178:11 187:22 199:21 203:17 209:19 211:16,19 246:8 247:3,14 248:21 263:19 264:19 270:17 271:14 272:9 273:12 274:3 276:2 277:12,15 279:2,8 280:10 281:2 301:13
**sequencing** 221:18
**series** 240:2 262:2
**serves** 293:21
**service** 121:17
**services** 12:13
**serving** 171:12
**session** 235:21
**set** 18:10,11,13 67:4 80:10 106:16 112:18 173:14 178:8 185:17 191:16 192:8 233:5 246:18
**setting** 146:16 159:14 223:21
**shape** 278:5
**share** 269:13 293:11 294:12
**shared** 58:3 70:11,13 156:4 157:8 266:8,10 269:15 290:12 292:12 293:6,7 294:4,8
**Shear** 11:3 15:4 17:5,12,15 18:18 19:12,19 20:1,14 21:10 22:3 39:8
**sheets** 122:12,19
**shop** 152:14
**short** 12:4 18:5 183:3
**shorter** 234:12 291:22
**show** 15:6 17:17 28:9 143:2 149:21 150:5 162:22 250:20 252:6
**show-by-show** 149:20 155:7
**showed** 76:14 137:21
**showing** 143:19
**shown** 76:10,18 78:13 146:18 147:4,7 269:9
**shows** 10:2,5 11:1 25:10 79:9 139:1
**shut** 301:13
**sic** 62:14 76:11 80:3 86:7 195:5 270:17
**side** 113:5 114:14,16 169:1,12 279:1 281:13
**sides'** 297:11
**sign** 302:7
**Signal** 265:2,5
**signed** 225:8
**significant** 23:17 291:20
**significantly** 222:22 291:15,22
**signs** 274:12
**silent** 139:7
**similar** 81:8 274:11 296:22
**similarly** 113:21
**simple** 32:16,17 38:20,22 165:10 184:20 195:12,13
**simply** 149:6 183:15
**single** 12:8 45:3 89:1 115:8,19,22 116:12 153:21,22 158:8 159:15 282:13

**singular** 89:2
**singularly** 45:14
**sir** 216:2 217:2 235:17 254:3 298:20
**site** 249:10 252:19
**sitting** 71:22
**situation** 166:13 172:19,22 173:5,7 185:3 193:15 196:8 210:15
**situations** 176:20
**skepticism** 17:19,21 18:5,17
**skipped** 297:3
**slated** 54:15
**slide** 76:5,17 267:17 268:5
**slowdown** 11:17
**small** 76:3 144:21 167:18
**smaller** 144:22
**social** 108:14 211:15 212:5 213:7 214:6 250:10 252:16
**soffit** 276:16 277:14,22 278:5,22 279:3 281:10
**soffit-related** 278:20
**soffits** 274:19,22 275:2 276:9,11,12, 14 281:4,6,15,20 282:3,9 285:20 288:3
**software** 117:13 119:17
**solicitation** 221:1,13 222:21 223:4, 16
**someone's** 138:16
**sort** 32:19 106:10,11 120:14 139:16, 17 146:7 150:10 157:12 170:19 218:8 219:16 269:13,22 279:8 283:4 289:5 290:22 297:10
**sound** 246:13
**sounded** 157:2
**sounds** 42:20 64:17 110:20 128:12 151:15 228:4 246:14 281:7
**source** 96:15
**sources** 78:22 79:10 80:3 161:13,17, 19,20 183:13
**Sp** 40:22
**space** 16:12,16 273:21 274:20,21 276:13,18,19,21 277:2,5
**spaces** 37:9
**speak** 117:1 251:12 299:11,16 301:12
**speaking** 117:6 142:19 237:16,18 238:1,10
**special** 10:21 22:10
**specialized** 274:6
**specific** 22:18,22 41:17 44:16 62:8 78:1,4 83:2 97:9,13 109:12 116:1 117:7 167:5 185:8 204:20 244:7 247:10 268:21
**specifically** 10:8 14:17 17:15 18:11 21:7 45:13 53:6 93:7 98:15 106:18 113:18 117:6,12 118:19 121:13 128:4 130:21 165:14 191:22 214:4 241:21 274:14 298:16
**specifics** 142:2 278:10
**speculation** 18:4 72:3 117:4 148:22 160:17 196:11 256:3 268:11
**speculative** 209:13 210:5,20 241:22 242:6,17 254:16 255:12
**speech** 248:17
**spend** 288:14
**spoke** 41:19 121:5
**spoken** 127:4
**spreadsheet** 122:4 138:17 156:3,4
**spreadsheets** 121:11 122:5
**staff** 12:16 13:1,3 14:12 25:11,18 33:1 35:5 37:1 38:13,15 39:2 78:6 120:21 121:20 133:15 134:17,19 143:1,18 146:1,6 147:13 260:19 261:10 285:1
**stage** 22:5,20 27:2 55:7 178:8
**stamped** 287:11 291:19 293:16
**stand** 249:9
**standard** 298:18
**standpoint** 39:13 42:13
**stands** 293:22
**start** 9:2 18:12 21:17 28:12 29:15 32:1 41:9 50:12 55:20 65:3 183:17 209:5 258:11 259:2
**started** 112:21 175:10,12 220:18 222:10 258:3
**starting** 118:11 120:1 222:8 276:15
**starts** 168:12 212:18 230:8 293:18
**state** 49:11 104:16 137:4 164:6 166:22 188:6 190:8,16 192:11 218:15
**stated** 235:8 296:7,8
**statement** 49:15 97:13 105:22 123:2 167:14 215:7 224:11 225:7,8 232:15 234:13 281:8 284:11 285:17 287:17 295:12,13,20
**statements** 69:21 70:3,5,8 123:1 130:3 163:21 207:20 218:7 225:5 260:11 261:1,13 297:16
**states** 275:14,17,21 287:17 295:10
**stating** 161:12
**station** 275:16
**status** 180:7 217:20 219:11 234:2
**stay** 56:7 294:9 296:10
**stayed** 273:9
**step** 131:13 286:6
**steps** 111:3 183:12 301:1
**stewardship** 296:11
**sticker** 13:15
**stickers** 13:16,17
**stipulation** 92:18
**stipulations** 80:12 86:13
**stop** 34:19 41:22
**stopping** 40:14
**strategic** 166:14 183:3
**strategy** 67:7,11,16
**stretch** 7:7
**strong** 114:15
**structural** 276:14,18 279:14,22 285:19
**structure** 52:10 272:19 277:2
**structured** 12:11 113:6 140:4
**structures** 65:15
**studies** 274:4
**subject** 105:4 263:1 301:19
**submitted** 147:21
**subsequent** 279:7

**substance** 187:20 214:6 247:7 248:8 270:14

**substantial** 255:20,22 257:10

**success** 296:11

**successfully** 294:1

**sufficient** 276:4

**suggest** 291:7

**suggested** 45:9 239:4

**suggesting** 128:13 266:17

**suggests** 194:12 210:16 229:12

**sum** 214:6 248:8

**summarized** 21:14 277:18

**summary** 64:18,21

**support** 25:8 26:21 27:2 84:12 206:5 208:1 237:2,21 238:21 301:8

**supporting** 64:12 81:9 84:2 141:17 196:20

**supports** 27:3

**supposed** 194:2 201:14,22

**Supreme** 213:20

**surprise** 292:17

**surprised** 293:1

**surrounding** 187:22

**sustainability** 174:4,6

**sworn** 5:4

**system** 118:3,7 119:10 127:10 139:3 276:18 279:3

**systems** 117:7 266:1 276:14 282:1 291:9

T

**tab** 13:7 47:22 60:9,10,15 75:4 76:21 77:7 144:1 163:2,6,11,12,13 177:6 211:3 217:7,12 228:19 239:15 246:21 249:22 267:17

**table** 179:12 185:11 194:4

**tabs** 64:20

**takes** 215:4

**taking** 30:11 185:10 281:18

**talk** 6:15 98:4 106:10 117:11 196:8, 17 231:2 248:1,2 258:3 260:13 283:3

**talked** 21:9 36:15 46:13,16 57:4 61:1 74:19 77:13 81:15 109:4 110:10 135:21 139:12 156:10 172:17,20 178:5 220:22 222:12 225:19 247:1 258:2 267:16 287:8

**talking** 14:6 36:14 40:4 42:21 54:5 57:10,13 74:22 92:12 101:13 104:7 117:10 148:20 152:5 167:7 168:11 230:5 249:4 263:11 268:13 286:9

**talks** 50:15 148:19 149:14 167:19

**target** 153:1

**targets** 103:7 140:3 141:12 149:10 151:9

**team** 10:8 17:15 22:9,12 24:3 25:4 26:3,7 27:19 29:5 31:4,8,21 32:2 33:17 45:7 65:1 121:5 122:20,22 156:6,19 166:10,15 230:3 231:3 260:4 272:20 280:15,16

**teams** 66:8 265:4

**technical** 207:3

**technically** 293:19 294:13,17 295:1, 3,4,5,10,16,21 296:4

**telling** 41:12 189:15 192:14 201:11 285:20

**tells** 240:22

**ten** 13:6 188:19

**tens** 148:1,8,12 149:11

**tentative** 233:6

**tentatively** 228:15 231:11,17

**tenure** 114:19 116:21

**term** 12:4,5 18:5,6 19:9,10,20 77:14 79:5 103:1,14 150:20,22 153:3,12 169:9,11 235:10 259:5 272:18 284:21

**terminated** 12:15

**terminations** 12:19,22

**terms** 79:10 106:14 117:6 124:15 126:18 128:6 156:8 234:21 257:7 269:8

**terrace** 30:22 275:3

**terribly** 57:22

**Tessitura** 138:6

**test-** 128:12

**testified** 5:6 79:18 101:17 102:7,8 104:18 110:14 190:15

**testify** 5:4 8:2,10 133:3

**testifying** 8:15 41:13 78:20

**testimony** 7:17 8:4 105:10 106:1 246:1

**tests** 276:13

**text** 165:3 264:5,9,10,13,16 265:1,2

**theater** 15:9 18:11,14 30:16,18,21,22

**theaters** 16:6

**thee** 14:4

**theory** 137:7

**thing** 39:8 59:22 138:21 152:4 206:10 212:22 269:13

**things** 10:3 11:5 16:11 33:14 39:14 41:22 55:2,17 99:22 112:18 115:11 142:3 143:14,15 148:14 152:11,13 165:17 169:2 184:13,22 185:15 186:5 187:10 192:8,9 197:4 205:6 215:9 216:13 223:5 224:14,15 233:13 236:13 238:12 244:19 249:10 262:7 265:8 266:21,22 279:11 280:1 284:15 286:13 288:8,11 297:4

**third-party** 22:9,12

**thought** 19:3 74:18 94:2,6 153:11 205:12 224:17 256:18 259:13 270:8 272:14

**three-week** 232:19

**Thursday** 188:13

**ticket** 50:22 51:8,21 52:4,17 53:7,18 76:12 138:8 143:2,20 145:16 152:11, 13 172:10

**tickets** 145:5

**tied** 86:13 87:18

**ties** 279:14

**tighter** 176:6

**time** 13:4 15:16 17:8 24:4 27:4 28:8, 12 32:8,13 33:18 34:5 35:16 36:1,21 39:4,13 40:2 42:2,7,16 43:2,7,8 45:13 54:13 55:4 65:13,19 77:20 84:12,18 86:20 88:8,12 97:17 106:11 109:18 112:9 113:14 141:22 142:17 143:2 145:12,17 157:17 174:12 175:11 176:3,12 177:3 178:19 180:10 181:10,16 182:6 183:3,10 186:12 187:2,14 188:16 189:9,18 190:20

191:7 192:19 193:2 194:4,11,13 195:9 196:5 198:18 199:13 206:2 213:14 220:7,12 221:20 222:11,13 223:2,14 226:21 228:12,14 230:5,14 231:6,15 232:20 233:12,15,18 234:1 244:2,9 246:18 248:19 270:20 271:1, 12 276:10 280:21 281:3,5 283:16 284:3 302:9

**timeline** 233:7 234:11,13,18 238:17 292:19

**times** 53:3 191:9 206:15 230:9,12 248:13

**titled** 144:15 145:8 147:18 217:20

**today** 5:15 7:17,18 71:22 102:21 213:2 258:4 267:16 302:10

**today's** 13:17

**told** 7:13 15:10,17 16:16 24:12 25:11 26:7 31:4,8,22 32:2 33:1,18 51:5 52:2 202:13 207:11 219:15 260:4,19 261:10

**tool** 78:6,8 81:7 120:19 121:3 122:3 124:11 155:22 156:2 157:4,5 267:5

**tools** 121:11,13 122:2

**top** 144:20 218:12 225:11 229:6,10 240:7,8 275:15

**topic** 10:12,13 45:22 46:3,8 131:20 132:7 217:7,8 261:20,21

**topics** 8:11

**total** 168:4,22 169:1

**totality** 141:8

**touring** 14:21

**track** 78:9 114:16

**tracked** 116:12,14 141:9

**tracking** 22:14 114:6,8,20 115:18,19 117:11 142:6 275:20

**tracks** 117:12 167:3

**traffic** 288:11

**transcribed** 6:9

**transcript** 13:21 48:5 60:14 75:11 77:10 144:11 163:17 177:13 211:11 217:16 229:3 239:19 250:6 287:5 302:7

**transferred** 79:14 87:9,12

**transferring** 84:3

**Transfers** 80:5

**transition** 134:10 136:4

**treasurer** 107:21,22

**trends** 76:12 143:19

**trick** 227:22

**true** 73:19 154:5 169:5 182:7,12 188:11 189:9 192:8 194:13 195:6 206:4 291:7

**Trump** 5:13 51:12 89:18 90:16 91:22 93:8 98:14 99:1,11 103:14 108:12,18 201:16 202:12 205:14,15 207:11 209:2,7,22 210:7,16 211:15 212:5 213:10 214:5,17 215:6 217:19 237:17 238:2 250:10,20 251:5 252:5 253:16 254:13 255:8,22 256:5 297:22 299:12,17 300:22 301:6,12

**Trump's** 85:17 86:8 104:11,20 216:9 235:8

**Trump-kennedy** 79:5

**trust** 113:5 169:6,9,12

**trustee** 210:8 247:17

**trustees** 90:7 145:11 218:17 219:22 221:12 247:22 248:2,3,13,19 254:19 256:5 268:2,6,7,8 269:10 271:3 284:13,18

**trustees'** 232:1

**truth** 5:5,6 6:5 108:14 211:14 213:7 214:6

**tumultuous** 73:22 74:4

**tune** 149:11

**tunnel** 288:6

**turn** 13:7 21:4 46:1 47:22 50:8,15 60:22 74:19 75:3 76:20 143:22 163:2 164:14 166:19,20 177:5 178:3 211:3 217:6 218:2 225:10 228:19 239:14 240:6 246:21 249:22 261:18 271:12 287:10

**turning** 75:7

**turnover** 296:21

**Twain** 10:22

**tweet** 212:12 214:4 216:10

**two-year** 19:14,16

**type** 87:8 104:6 123:21 143:7 193:19 198:6 224:10,12,21 252:16

**types** 10:19 27:6,7 224:9

**typical** 170:20 171:1

U

**U.S.** 213:20

**Uh-huh** 68:14 88:16 102:22 135:2 136:17 140:9 141:11 153:20 154:17 164:1 172:11 196:2 215:1 222:2,17 230:11 231:9,13 243:4 249:8 258:5 267:20

**ultimate** 153:9 225:21 290:13,18

**ultimately** 221:1 224:10 226:3 234:12 247:14 273:11

**unanimously** 213:3

**unaudited** 70:5 122:11,14,15,16,18

**uncertain** 16:11 25:6 27:15 206:10

**uncertainty** 11:16 14:10 15:13 16:21 17:5,11,16 19:6 25:1 26:9,14 27:5 30:6,8 173:17

**unclear** 88:8

**uncontrolled** 172:4

**uncontroversial** 32:20

**underlying** 63:20 64:6,7 65:10,15 66:15 67:4,20 130:7

**Underneath** 229:22

**understand** 5:17 6:1,4,12 7:2,18 8:4,8 19:3 25:5 26:16 37:14 48:18 57:14,17 62:1,7 64:12 68:9 71:17 81:2 97:2 107:8 115:17 126:3 128:11, 14 132:1,3 133:14 137:12 142:14,17 146:5 152:22 154:21 159:4 167:2,4 169:15 171:16 218:4 221:8,9,10 222:11 227:22 228:2 235:6 237:16 238:1 241:8 252:14 253:1 257:7,14 259:6 261:11 262:3 266:14,19,21 276:1 281:7 284:10,14 285:4,16 286:12 287:21 290:15 295:9 300:6 301:22

**understanding** 7:16 15:8 19:12,18 30:16 64:14 68:1 74:14 83:17 92:7 96:19 97:5 104:2 107:5 108:20 120:7 124:10 125:6 128:21 136:12 159:15 161:7 166:11 191:6 192:18 195:7 221:16 233:22 241:19 242:2,13 273:17 276:22

**understands** 167:3

**understood** 7:11 20:8 28:6,7 32:15 73:7 108:6 115:9 141:20 165:2 179:9 237:18

**undertaken** 62:18 63:2 272:22

**unfolding** 15:15 16:1 26:2 238:15

**unfortunate** 274:5

**unimportant** 22:16

**unlike** 13:16 142:17

**unredacted** 50:17

**unrestricted** 84:11 85:11

**up-to-date** 69:15

**upcoming** 17:7 18:1 20:2 22:2 37:3 44:8 181:13 237:15

**update** 49:18 156:22 157:8

**updating** 116:1 155:21

**uploaded** 270:18,19,22

**upper** 144:20 178:4

**upshot** 126:11

**urgency** 234:19 243:10

**urgent** 282:17

**usable** 99:13

**user** 136:19

**utilizing** 84:4

V

**vague** 11:13 12:7,18 14:19 20:3 29:9 32:6 47:16 51:18 66:17 83:1 87:4,22 103:15 112:13 114:21 117:3 133:17 136:14 149:1,18 151:2 154:13 155:5 158:16 160:2,18 161:15 171:22 173:10 174:14,22 176:10 180:1,17 182:10 185:19 193:13 196:10 197:13 199:10 200:1 204:7 205:18 206:7 209:12 210:4,20 214:11 223:6 227:2 231:21 237:7 238:19 244:11 249:3 253:5 255:11 256:2 262:14 265:16 288:21 289:10,20 292:2 293:10 294:6,16

**vagueness** 272:14 273:4,14

**vantage** 158:4

**variations** 188:19

**vary** 104:8 166:4

**vaults** 286:6

**veer** 164:6

**vein** 41:9

**venue** 20:1,15 44:11 45:10 170:20, 22

**venues** 45:12

**verbally** 6:10

**versus** 5:13 138:16 140:10 150:6 217:19

**vice** 66:19

**vice-chair** 106:17

**view** 192:12 294:12 295:12

**viewpoint** 158:1,2

**visitors** 285:1

**visual** 281:18,21

**visualization** 115:13

**voices** 131:11

**vote** 12:17 21:21 46:19 190:12 231:15 233:18 255:4 285:5,8

**voted** 26:18 178:15 243:15

W

**wait** 6:20 109:2 195:17 196:8 197:8, 16

**waited** 280:18

**walk** 246:8

**walk-through** 200:7,8

**walkway** 275:4

**Walter** 274:18 276:8 277:4,12,16 278:8,13,15,22 280:14 281:3 282:12, 20

**wanted** 57:17 74:8 77:2 84:16 107:16 185:6 258:8 283:17

**wanting** 228:2

**warehouse** 118:18

**warning** 258:8,16 259:4,5 260:13,14

**warnings** 259:22 260:20

**wasteful** 172:3

**water** 273:19 274:12 275:12 278:6 281:19 282:9

**ways** 128:15 151:4 159:18

**weather** 93:22

**week** 112:3 176:13 222:7 230:13 231:5

**weeks** 55:19 112:5 176:9 179:1,21 180:12,15 181:19 182:8 183:11 185:14 187:12 188:1,9 189:20 190:10 191:3 192:1 193:6 195:8 196:6 197:10 199:20 222:7,15 225:15 230:15 231:7 232:12,18 234:7

**welcomed** 248:16

**Whatsapp** 265:3

**white** 13:17

**Whitehouse** 110:19 111:8,16 112:12 113:1,14 114:4 116:18

**widespread** 282:6

**willingness** 18:19

**window** 184:15

**withdrawn** 137:22 189:2

**withheld** 97:2,19,22

**withholding** 91:7 97:11,14 202:13

**witness'** 105:10

**witnessed** 155:12 279:13

**WNO** 49:17

**wondering** 223:3

**word** 150:9,14 151:16 223:1 250:16

**words** 172:18,21

**work** 11:1 22:8,11 26:4 28:12 30:3 31:18 37:7,10,11 62:20 65:2,3,6,18, 21 66:7 72:12,16 73:4 81:3,5 115:10 122:7 149:4 198:6,16 220:13,17 221:15,22 222:10 223:3 224:2,11 225:5,7,8 229:19 232:15 233:16 234:11,14 243:8 249:12 274:19 276:8 281:12 288:3 289:15 291:14

**workbook** 63:20 64:11,15,22 65:15 122:4 140:16 141:5

**workbooks** 121:10,13,21

**working** 10:5 15:7 27:19 28:16 30:7 55:11 103:5 115:22 140:12 233:15 288:9

**works** 30:3 66:20,21

**worth** 170:7,8

**write** 113:18

**writing** 142:5 158:10 252:1

**written** 133:11,12 137:20 139:1,17, 18 141:3 205:20 233:19 244:3

**wrong** 282:11

**Y**

**year** 23:18 24:14 58:5 62:16 66:1 67:21 68:2,19 69:1,14,20 70:5,9,14, 21 71:6,10,19 72:11,19 73:2,3,22 74:4 110:9 118:12 119:13,18 120:5, 16 121:2,14,22 122:19 132:18 133:13,16,20 134:1,7 135:7,20 136:10 137:1,6,13,14 138:1 139:2 148:1,9,13 149:3,6,15 150:7,8,13 153:8,10,17,19 154:1,6,7,8,15 155:1, 8,13 157:16 160:9,13 161:4 162:21 164:17,19,20 165:1 168:18 169:5 170:7 173:1 174:13,21 175:17,19 258:16 259:4 260:1,10,22 261:11

**year's** 45:10

**year-end** 161:9

**year-ending** 153:10

**year-over-year** 58:10 73:4 148:5

**year-to-date** 135:13 136:22

**years** 32:3,22 33:19 35:3 36:17 39:6 43:3 57:21 68:8 73:21 78:9 163:21 174:10 243:17,22 253:4,12 259:14 278:7

**years'** 59:16 61:14

**yes-or-no** 34:14 43:18 124:18 251:8

**yesterday** 5:14,21 7:1,6,12,17 13:12 41:19 46:11 57:3 61:2 76:22 77:12 78:20 79:13,18 81:15 109:3 110:10, 15 142:18 162:16 172:16,20 177:18 178:6 182:15 220:22 222:12 225:19 239:22 240:1 258:2,6 259:12 270:6 271:18 287:8 296:22 301:18

**yesterday's** 13:16